# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530,

*Plaintiff*,

v.

BERTELSMANN SE & CO. KGaA
Carl-Bertelsmann-Strasse 270
33311 Gütersloh, Germany,

PENGUIN RANDOM HOUSE, LLC
1745 Broadway
New York, NY 10019,

VIACOMCBS, INC.
1515 Broadway
New York, NY 10036,

and

SIMON & SCHUSTER, INC.
1230 Avenue of the Americas
New York, NY 10020

*Defendants*.

# COMPLAINT

The United States of America brings this civil action to stop Penguin Random House,

LLC—the world's largest book publisher—from buying its publishing rival, Simon &

Schuster, Inc.  If Defendants' proposed merger is allowed to proceed, Penguin Random

1

House would be, by far, the largest book publisher in the United States, towering over its rivals. The merger would give Penguin Random House outsized influence over who and what is published, and how much authors are paid for their work. The deal, which was arranged by the two publishers' parent companies, Bertelsmann SE & Co. KGaA, ("Bertelsmann") and ViacomCBS, Inc. ("ViacomCBS"), would likely harm competition in the publishing industry and should be blocked. The United States alleges as follows:

## INTRODUCTION

1.      Authors are the lifeblood of book publishing. Without authors, there would be no stories; no poetry; no biographies; no written discourse on history, arts, culture, society, or politics. In the words of Penguin Random House's U.S. CEO, "[B]ooks have the power to sustain us, particularly in challenging times . . ." Penguin Random House's Global CEO put it more simply, "Books matter . . ."

2.      Penguin Random House's proposed acquisition of Simon & Schuster would result in substantial harm to authors, particularly authors of anticipated top-selling books. Today, Penguin Random House and Simon & Schuster compete vigorously to acquire publishing rights from authors and provide publishing services to those authors. This competition has resulted in authors earning more for their publishing rights in the form of advances (*i.e.*, upfront payments made to authors for the rights to publish their works), and receiving better editorial, marketing, and other services that are critical to the success of their books. In 2020 alone, publishers paid authors over $1 billion in advances. Authors rely on these advances to fund their writing and pay their bills.

3.      Penguin Random House is the world's largest book publisher, and Simon & Schuster is the fourth-largest U.S. book publisher. Together their U.S. revenues would be

twice that of their next closest competitor.  Indeed, one of Penguin Random House's strategic goals for the merger is to "cement Penguin Random House as #1 in the U.S."

4.       Penguin Random House and Simon & Schuster are two of what the industry calls the "Big Five" U.S. publishers.[1]  The Big Five and their predecessors have long dominated the U.S. publishing market.  In evaluating a potential acquisition of Simon & Schuster, a Bertelsmann board presentation characterized the U.S. publishing industry as an "oligopoly" of Penguin Random House and "only 4 further large publishers."

5.       Publishing is a risky business.  Only a fraction of books published become commercially successful.  Publishers pay significant advances to authors whose books they expect will have commercial success.  In most cases, the advance represents an author's total compensation.  One reason the Big Five are able to offer authors higher advances than smaller publishers is because they can spread the costs—and risks—of their investment over a larger number of books and authors.  They also are able to offer authors the extensive editorial, production, marketing, and publicity support generally needed to produce a top-selling book, and the sales and distribution networks necessary to place books into readers' hands.

6.       Publishers other than the Big Five cannot regularly pay the high advances and provide the unique bundle of services needed to secure the publishing rights to anticipated top-selling books and maximize their chances of becoming commercially successful.  Simon & Schuster's late CEO likened non-Big Five publishers to "farm teams for authors" from

---

[1] The other three Big Five publishers are HarperCollins Publishers (which recently acquired Houghton Mifflin Harcourt's trade publishing business for $349 million), Hachette Book Group (which recently acquired Workman Publishing, one of the largest independently-owned publishers in the U.S.), and Macmillan Publishing Group, LLC.

which the Big Five could cherry pick talent.  In contrast, she described the other Big Five publishers as "our biggest competitors, especially for books by already bestselling authors and celebrities, since they are the most likely to come up with the high advance payments required and are known for their strong editorial and publishing skills."

7.     If consummated, this merger would likely result in substantial harm to authors of anticipated top-selling books and ultimately, consumers.  Penguin Random House would control close to half of the market for the acquisition of publishing rights to anticipated top-selling books.  Penguin Random House's next largest competitor would be less than half its size.  Post-merger, the two largest publishers would collectively control more than two-thirds of this market, leaving hundreds of authors with fewer alternatives and less leverage.  As illustrated by the chart below, when measured by total advances paid to authors for rights to anticipated top-selling books, the combined Penguin Random House-Simon & Schuster (shown in dark blue and orange) would far outstrip the remaining Big Five publishers and the largest independent publishers (shown in lighter blue), and enjoy substantial market power in its negotiations with authors:



8.      Penguin Random House and Simon & Schuster compete head-to-head to acquire publishing rights to hundreds of books every year, and this competition has resulted in substantial benefits for authors of anticipated top-selling books.  Penguin Random House and Simon & Schuster are frequently invited by agents to bid in auctions for the rights to these books, and they are often the final two bidders.  Competition between Penguin Random House and Simon & Schuster has resulted in higher advances, better services, and more favorable contract terms for authors.

9.      The proposed merger would eliminate this head-to-head competition, enabling the merged firm to pay less and extract more from authors who often work for years at their craft before producing a book.  As a senior Penguin Random House executive remarked to a colleague: "I would not want to be a big author at Simon & Schuster now . . ."  The colleague

responded, "I agree. Especially when the price tag [for acquiring Simon & Schuster] is going to be so high." By harming authors, the merger is also likely to harm consumers. Penguin Random House's Global CEO has recognized the principle that reducing author pay means "[f]ewer authors will be able to make a living from writing" which, in turn, "will have an impact on the output." By reducing author pay, this merger would make it harder for authors to earn a living by writing books, which would, in turn, lead to a reduction in the quantity and variety of books published.

10.    There is no reason to accept the harm to competition threatened by this merger. Although Defendants have publicly suggested that the merger is necessary to create a stronger counterweight to Amazon, Penguin Random House's Global CEO privately admitted that he "never, never bought into that argument" and that one "[g]oal" after the merger is to become an "[e]xceptional partner" to Amazon.

11.    Penguin Random House and Simon & Schuster both recognized that a merger of their companies would give rise to substantial antitrust risk. When Simon & Schuster announced that it was up for sale in March 2020, its current CEO wrote to one of its best-selling authors: "I'm pretty sure that the Department of Justice wouldn't allow Penguin Random House to buy us, but that's assuming we still have a Department of Justice." That same month, the Chairman of Bertelsmann, Penguin Random House's parent, acknowledged that Penguin Random House posed greater "antitrust risks" than any other potential buyer of Simon & Schuster. As a consequence of that risk, Bertelsmann understood that it would have to pay a significant premium over other bidders to acquire Simon & Schuster.

12.    Authors and consumers should not be asked to bear the risk and suffer the harm from this anticompetitive merger. For the reasons set forth in this Complaint, Penguin

Random House's proposed acquisition of Simon & Schuster is likely to substantially lessen competition in violation of Section 7 of the Clayton Act and should be enjoined.

## JURISDICTION AND VENUE

13.     The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.  This Court has subject matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

14.     Defendants Penguin Random House and Simon & Schuster are engaged in interstate commerce and in activities substantially affecting interstate commerce.  Penguin Random House and Simon & Schuster acquire publishing rights from authors and provide publishing services, including editing, marketing, sales, and distribution of general trade books, to authors throughout the United States.

15.     This Court has personal jurisdiction over each Defendant.  Bertelsmann and ViacomCBS have consented to personal jurisdiction in this District.  Penguin Random House and Simon & Schuster also are corporations that transact business within this District through, among other things, their acquisition of content from and provision of publishing services to authors.

16.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391.

7

## DEFENDANTS AND THE PROPOSED TRANSACTION

17.     Bertelsmann is an international media and services company, headquartered in Gütersloh, Germany.  Bertelsmann has numerous subsidiaries, including Penguin Random House and the Bertelsmann Printing Group, a major supplier of book printing services in the United States.

18.     Penguin Random House is headquartered in New York, New York.  Penguin Random House was formed from the 2013 merger of Penguin and Random House, which were founded in 1935 and 1927, respectively.  Penguin Random House has more than 90 U.S. imprints (a trade or brand name for a specific group of editors, such as Doubleday), across seven publishing groups.  Penguin Random House is the largest U.S. trade book publisher.  It publishes over 2,000 new titles every year in the U.S.  In addition to publishing, Penguin Random House sells distribution services to third-party publishers.  In 2020, Penguin Random House earned over $2.4 billion in U.S. publishing revenues.

19.     ViacomCBS is an international media and entertainment company, headquartered in New York, New York.  ViacomCBS's assets include the Paramount film and television studios, the CBS television network, cable networks, streaming services, and Simon & Schuster.

20.     Simon & Schuster, headquartered in New York, New York, is a wholly-owned subsidiary of ViacomCBS.  Founded in 1924, Simon & Schuster is the fourth-largest U.S. trade book publisher.  It has over 30 U.S. imprints across three publishing groups and publishes over 1,000 new titles annually in the U.S.  In 2020, Simon & Schuster earned over $760 million in U.S. publishing revenues.

21.     On November 25, 2020, Bertelsmann and ViacomCBS announced that Penguin Random House would acquire Simon & Schuster from ViacomCBS in an all-cash deal valued at approximately $2.175 billion.

## BACKGROUND

### A.     U.S. General Trade Book Publishing

22.     The term "general trade books" (hereinafter "books") is widely used in the publishing industry and refers to books that are published for wide public consumption, including both fiction and a variety of non-fiction such as biographies, cookbooks, travel guides, and self-help books.  It does not include, for example, academic texts or professional manuals.  Bringing a book to market in the United States requires the participation of many different entities, including authors and their agents, publishers, printers, distributors, wholesalers, retailers, and ultimately, readers.

23.     Book publishing is a collaborative effort between authors and publishers.  An author writes a manuscript or proposal for a book and generally hires an agent to solicit competing bids from publishers and negotiate a license for the book's publishing rights with the winning bidder.  The licenses obtained by publishers generally include the right to publish a book in various formats (print, e-book, audiobook) within a particular geographic area.  Publishers compete for these rights on a number of different dimensions.  In addition to paying authors advances and royalties, publishers provide editorial, design, marketing, publicity and other services to authors.  Publishers also arrange for printing and distribution of books to wholesalers and retailers.

24.     Authors are compensated in the form of an advance and royalties.  An advance is essentially an up-front payment of royalties expected to accrue from future sales of the book.

The royalty rate is a fixed percentage of sales that is set by the publisher and is rarely negotiated.  If a book "earns out" by earning royalties that exceed the amount of the advance, the author receives additional payments from further sales at the agreed upon royalty rate. Most authors do not earn out their advance and thus their advance generally constitutes their entire earnings from their book.  Consequently, the key financial determinant in most negotiations is the size of the advance and its payout structure (*e.g.,* the number of installments the advance is divided into, and the timing of each such payment).

25.     Authors' agents seek to maximize the amount paid to authors for licensing the rights to publish their clients' books.  In order to secure the most favorable terms for their clients, agents typically submit a book proposal, which can be a complete manuscript, an outline for a book, or just an idea for a book, to several publishers seeking offers.  If there are enough interested publishers, agents can set up a competitive bidding situation such as an auction where multiple publishers bid to acquire the rights to the book.

26.     In the United States, books are sold through several retail sales channels, including online retailers such as Amazon, national bookstore chains such as Barnes & Noble and Books-A-Million, independent bookstores such as The Strand and Politics & Prose, big-box stores such as Target, Walmart and Costco, and specialty retailers such as Anthropologie and Bass Pro Shops.  In the United States, books also are sold to retailers and institutional buyers (including schools and libraries) through wholesalers such as Ingram and Readerlink. Publishers set the cover or "list price" of a book and sell the books to retailers at a standard discount from the list price (a little less than half-off for most types of print books). Publishers also may offer retailers marketing and other promotional discounts in addition to the standard discount off of list.

**B.** **Penguin Random House and Simon & Schuster are Two of the Big Five Book Publishers in the United States**

27.     The book publishing market in the United States is dominated by the Big Five publishers.  In the words of Simon & Schuster's former CEO, the Big Five are one another's "biggest competitors."  In addition to strong editorial and publishing capabilities, the Big Five generally offer larger marketing and promotional budgets, and employ dedicated teams of sales representatives who service retailers and promote an author's books.

28.     In order to solicit the most attractive bids for their clients, authors' agents typically submit manuscripts to some or all of the Big Five publishers—especially Penguin Random House, which has, by far, the largest number of imprints and publishes the most new books in the United States.  Authors generally choose to work with a publisher they believe will bring them the best chance of success, usually based on a combination of advance and other financial terms and, as Simon & Schuster's former CEO put it, "editorial match, a feel the editor and [publishing] house understands what they are writing, and publishing vision as to how to bring the book to market and create an audience for it."

**C.** **Smaller Publishers are Limited in their Ability to Compete Effectively with the Big Five**

29.     Smaller publishers lack the resources and capabilities of the Big Five publishers, and thus they are limited in their ability to compete for the publishing rights to anticipated top-selling books.  Smaller publishers typically have smaller "backlists" (*i.e.*, inventories of older titles that continue to generate sales) than the Big Five, which are a critical source of revenue that allow the Big Five to pay more and higher advances to authors.  Smaller publishers also lack scale in book sales.  With fewer titles to rely on for sales, smaller publishers lack the financial resources to (1) regularly pay the advances required to secure

11

publishing rights to anticipated top-selling books, and (2) absorb the financial losses from books that do not meet their sales expectations.  While smaller publishers occasionally win auctions for anticipated top-selling books, it is the exception rather than the norm.  Smaller publishers typically have lower marketing and promotional budgets, fewer experienced sales representatives, and less robust in-house distribution capabilities compared to the Big Five.  Authors of anticipated top-selling books generally seek publishers who have the prestige, reputation, experience, and ability to maximize the book's chances of becoming commercially successful.  Therefore, authors of anticipated top-selling books generally do not view smaller publishers as competitively significant options compared to the Big Five.

30.     The Defendants recognize that smaller publishers are limited in their ability to compete with the Big Five for the rights to publish anticipated top-selling books.  In the words of the late CEO of Simon & Schuster, the "myriad smaller publishers" in the United States "rarely compete with us in auctions for new properties.  Often these publishers become farm teams for authors who then want to move to a larger, more financially stable major publisher."

**RELEVANT MARKETS**

31.     A typical starting point for merger analysis is defining a relevant market, which has both a product and a geographic dimension.  Courts define relevant product markets to help determine the areas of competition most likely to be affected by the merger.

32.     The proposed acquisition would result in the lessening of competition in each of the two product markets described below.  Each of these products constitutes a line of commerce as that term is used in Section 7 of the Clayton Act, 15 U.S.C. §18, and each is a relevant product market in which competitive effects can be assessed.  As recognized by the

Supreme Court and the U.S. Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines*, the focus in defining product markets is the extent of substitution in response to changes in price.  One tool used to assess substitution in markets composed of buyers of goods is known as the "hypothetical monopsonist" test.  This test, as described in the *Horizontal Merger Guidelines*, asks whether a firm that was the only buyer of a product (a hypothetical monopsonist) would profitably impose a price reduction— specifically, a small but significant and non-transitory reduction in price (a "SSNRP")—on at least one product purchased by the merging firms in the relevant market.  As described below, each relevant product market satisfies this hypothetical monopsonist test.

### A.      Product Markets

### 1.      *The Acquisition of U.S. Publishing Rights to Books from Authors is a Relevant Product Market*

33.     The acquisition of U.S. publishing rights to books from authors (hereinafter referred to as "content acquisition") is a relevant market and line of commerce within the meaning of Section 7 of the Clayton Act.  In this market, authors sell the rights to publish their works in the United States, and publishers agree to provide editorial, design, printing, sales and distribution, marketing, publicity, or other services to authors.  The market is differentiated, meaning that publishers have differing capabilities and resources they can offer to authors.  In addition, advances are individually negotiated, which allows each publisher to bid higher or lower depending on its perception of the competition it faces in seeking to acquire the rights for any given book.  A hypothetical monopsonist of the U.S. publishing rights to books would profitably decrease the advances paid to authors by a small but significant, non-transitory amount.

13

34.    Self-publishing is not a reasonable alternative for most authors seeking to sell the publishing rights to their books in exchange for an advance.  By definition, self-publishing does not pay authors advances, which authors often use to fund their writing.  Self-publishing also does not include the breadth of editorial, distribution, and marketing services that are important factors in whether a book will become commercially successful.  Indeed, an internal Simon & Schuster document acknowledged that "[s]elf-publishing is not viewed as a threat to [our] core business."  Authors of books would not substitute to self-publishing in sufficient numbers to deter a hypothetical monopsonist from imposing a small, but significant, and non-transitory decrease in advances.

35.    Some publishers hire authors on a "work-for-hire" basis to draft books conceived of by the publisher, not the author.  The publisher, and not the author, owns the publishing rights in a work-for-hire arrangement.  Moreover, such authors generally are compensated differently than authors who sell the rights to publish their books in exchange for an advance and royalties.  Authors of books would not substitute to work-for-hire arrangements in sufficient numbers to deter a hypothetical monopsonist from imposing a small, but significant, and non-transitory decrease in advances.

**2.    *The Acquisition of U.S. Publishing Rights to Anticipated Top-Selling Books is also a Relevant Product Market***

36.    The acquisition of the U.S. publishing rights to anticipated top-selling books is a relevant product market and line of commerce under Section 7 of the Clayton Act.  The market for the acquisition of U.S. publishing rights to anticipated top-selling books is narrower than, and included within, the market for the acquisition of U.S. publishing rights to books.

37.    The authors of anticipated top-selling books generally command higher advances than other authors.  Penguin Random House and Simon & Schuster typically require senior executives to review and approve such purchases based on projected profit-and-loss statements ("P&Ls") prepared by editors.  These P&Ls include the sales expected to be derived from the book based upon the sales history of comparable books or other works by the same author, production and marketing costs, and the book's expected list price.  The higher the anticipated sales, the higher a publisher is generally willing to bid on the advance.

38.    It is appropriate to define relevant product markets around purchases made from certain types of sellers, such as authors of anticipated top-selling books.  The publishing industry displays the characteristics identified in § 3 of the *Horizontal Merger Guidelines* for when markets may be defined in this way: prices (*i.e.,* advances) are individually negotiated and publishers have information that allows them to identify authors that have fewer competitive options.  Publishers know based on experience that if the bidding for a particular book exceeds a certain advance level, they are likely bidding against a limited set of competitors that have the financial wherewithal to pay for the advance, the publishing expertise to attract and serve authors of anticipated top-selling books, and the capability to generate sufficient sales to justify the advance.  Publishers take this into account when deciding how much to bid on advances for a particular book.  Given the individualized nature of the negotiations, publishers can target authors of anticipated top-selling books by offering lower advances and authors cannot arbitrage to avoid lower advances.  As a result, a hypothetical monopsonist of anticipated top-selling books would profitably reduce advances paid to authors of anticipated top-selling by a small but significant, non-transitory amount.

39.     Self-publishing and work-for hire arrangements are not reasonable alternatives for authors seeking to sell the rights to publish their books in exchange for an advance.  As noted above, self-published and work-for-hire authors typically do not receive advances for their work.  Moreover, authors who publish their own books retain the publishing rights, while work-for-hire authors do not possess publishing rights to begin with.  In other words, neither self-publishing nor work-for-hire arrangements involve the *acquisition* of publishing rights from authors.  Not enough authors of anticipated top-selling books would switch to self-publishing or work-for-hire arrangements to deter a hypothetical monopolist from imposing a small but significant, non-transitory decrease in advances.

### B.     Geographic Markets

40.     Penguin Random House and Simon & Schuster compete to acquire the rights to publish books in the United States.  Authors who sell U.S. publishing rights are predominantly located in the United States but can reside anywhere in the world.  The market includes publishers who acquire U.S. publishing rights even when those publishers are located outside the U.S.  Accordingly, the relevant geographic markets for content acquisition are global.

### ANTICOMPETITIVE EFFECTS

41.     The proposed merger would eliminate a major competitor to Penguin Random House, already the market leader, and create a firm that controls a substantial share of the relevant markets.  The merger would also result in significantly increased concentration in the relevant markets, which have experienced significant consolidation in recent years.  Post-

merger, the market for the acquisition of U.S. publishing rights to anticipated top-selling books would be highly concentrated.[2]  The merger is presumptively unlawful.

A. **The Proposed Merger Would Eliminate Head-to-Head Competition Between Penguin Random House and Simon & Schuster, Depressing Author Pay and Reducing the Quantity and Variety of Titles Published**

42.     If Defendants' proposed merger is allowed to proceed, Penguin Random House would account for close to half of the market for the acquisition of U.S. publishing rights to anticipated top-selling books.  Penguin Random House's next largest competitor would be less than half its size.  Post-merger, the merged firm and its next largest competitor would account for more than two-thirds of that market.

43.     Penguin Random House and Simon & Schuster compete closely to acquire the rights to anticipated top-selling books.  They almost always are invited to bid in auctions for anticipated top-selling books, are often the top two bidders, and frequently lose to each other. For example, in September 2019, after learning that Simon & Schuster lost an auction to Penguin Random House, Simon & Schuster's then-President and current CEO wrote to his boss: "This was the third [book] we lost this week to PRH [and] . . . [t]here may have been a fourth."

44.     The head-to-head competition between Defendants has allowed authors of anticipated top-selling books to secure higher advances and other favorable terms.  For

_____

[2] To measure market concentration, courts often use the Herfindahl-Hirschman Index ("HHI") as described in § 5.3 of the *Horizontal Merger Guidelines*.  HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share.  Under the *Horizontal Merger Guidelines*, when a merger increases the HHI in any market by more than 200 and results in an HHI above 2,500, the market is "highly concentrated" and the transaction is presumed to be anticompetitive.  Here, the proposed merger would create a highly concentrated market for the acquisition of U.S. publishing rights to anticipated top-selling books and is presumptively anticompetitive.

example, in January 2019, Simon & Schuster tried to acquire the memoir of a Grammy-Award winning singer and avoid competing in an auction by making a pre-emptive offer for $5 million.  After this initial offer was rejected, Simon & Schuster increased its bid to $6 million, and Penguin Random House countered with $7 million plus $2.5 million in potential bonuses.  Upon hearing of Penguin Random House's bid, Simon & Schuster's then-President emailed his boss: "I'm concerned that if we offer less than $8 million, [the author's agent] will go back to PRH.  She said they were willing to offer more."  Simon & Schuster eventually won with a bid of $8 million.

45.     In mid-2019, Penguin Random House, Simon & Schuster, and Hachette were invited to bid on a book proposal based on a Broadway play.  Penguin Random House and Simon & Schuster submitted equivalent bids; Hachette's was lower.  The author's agent then asked for "best bids" from Penguin Random House and Simon & Schuster, both of which knew they were competing against the other.  Simon & Schuster submitted a bid of $1.4 million, whereas Penguin Random House's bid was closer to $1.25 million.  Upon learning this, Penguin Random House's U.S. CEO agreed to match Simon & Schuster at $1.4 million.  At that point the auction was a dead-heat, with each publisher trying to win the "beauty contest" between them by pointing to the superior services each could provide to the author, including marketing, publicity, and editorial support.  As Simon & Schuster's current CEO summed it up: "The choice is between Simon & Schuster and RH and we'll find out today."  The author eventually chose Penguin Random House.

46.     That same month, an agent sent a proposal to four of the Big Five publishers for a book on the Mueller investigation.  Only Simon & Schuster and Penguin Random House submitted offers.  After hearing that its bid of $625,000 was lower, Simon & Schuster

18

increased its bid to $1.5 million.  A senior Simon & Schuster executive told the agent that Simon & Schuster had not offered her agency "an advance of this magnitude to a new author in the nine years I've been here."  Penguin Random House increased its offer to $1.5 million plus up to $500,000 in sales bonuses.  After hearing that the author chose Penguin Random House, the Simon & Schuster executive wrote the CEO: "I did everything I could and we lost to Random House … Frustrating."

47.     In 2020 Penguin Random House and Simon & Schuster competed in an auction for a book on gender inequality.  After the first round, three bidders remained, including Penguin Random House and Simon & Schuster, with Simon & Schuster submitting the highest bid at $475,000.  After the third bidder dropped out, Simon & Schuster and Penguin Random House drove the bidding up to $625,000 and $650,000 respectively.  Subsequently, the agent asked for best and final bids, and Simon & Schuster bid $750,000.  Suspecting that it was bidding against Simon & Schuster, Penguin Random House stretched its bid to $775,000.  After winning the contract, the acquiring editor emailed her colleague: "we prevailed over . . . S&S."  Her colleague replied: "[W]e got this one, and over stiff competition."

48.     Penguin Random House and Simon & Schuster again went down to the wire in another fierce contest for an author's debut novel.  After multiple rounds of bidding, the author's agent announced that only the two top bidders would be allowed to continue. Penguin Random House and Simon & Schuster were the two highest at $510,000 and $525,000, respectively.  They continued bidding against one another for several additional rounds.  Upon hearing that the other bidder had put in a final offer just shy of $700,000, Simon & Schuster increased its offer from $525,000 to $700,000 and won the auction.

49.    Penguin Random House and Simon & Schuster also competed for a book on the opioid epidemic in an auction in early 2020.  When the bidding reached $645,000 after several rounds, the other bidders dropped out leaving Penguin Random House and Simon & Schuster as the only remaining bidders.  Penguin Random House and Simon & Schuster then went back and forth with competing bids for multiple rounds, with Penguin Random House eventually prevailing with a winning bid of $825,000.

50.    In the broader product market for content acquisition, the merger would harm a wide spectrum of authors who benefit from competition between Penguin Random House and Simon & Schuster today.  While smaller publishers can be competitive alternatives for some authors whose works are not anticipated to be top sellers, the merger is likely to harm any author who views Penguin Random House and Simon & Schuster as close substitutes and would benefit from head-to-head bidding by these competitors.  For example, Penguin Random House and Simon & Schuster were the final two bidders for a book by a freelance science journalist, and their direct competition drove the final advance up substantially above Penguin Random House's initial offer.  Penguin Random House's successful final bid was $15,000 higher than Simon & Schuster's best bid, a difference the author indicated would help pay for her son's college tuition.  The fact that smaller publishers may be an acceptable alternative for certain authors will not protect other authors who have benefitted from competition between Penguin Random House and Simon & Schuster, and would continue to benefit in the future if the merger is enjoined.

51.    By eliminating the head-to-head competition between Penguin Random House and Simon & Schuster, the proposed merger would likely result in authors earning less for their books.  Because many authors do not earn out their advances, the advance often

represents the sum total of an author's compensation.  A reduction in author compensation is likely to lead to fewer authors being able to make a living from writing and fewer and less diverse books being published.

**B.  Penguin Random House's Proposed Acquisition of Simon & Schuster Would Facilitate Coordination Among the Remaining Big Five Publishers**

52.     In addition to eliminating head-to-head competition, the proposed merger is also likely to reduce competition by facilitating coordination between the remaining major publishers.  The market structure of the publishing industry already is conducive to coordinated behavior.  A few large players dominate the industry and the terms of author contracts, other than advances, have become fairly standardized over time.  For example, royalty rates are typically identical among the Big Five publishers and are rarely negotiable.  Similarly, audio rights used to be negotiated separately but the Big Five publishers now generally demand that authors bundle audio rights with print and electronic rights.  If this merger is allowed to proceed, the Big Five would be reduced to the Big Four, with the merged firm nearly twice as large as its next largest competitor.  Penguin Random House would thereby cement its position as the key leader for other publishers to follow.  With fewer players and an obvious leader, the Big Four would likely find it easier to reach and sustain a consensus that harms authors through coordination.  For example, the new Big Four could tacitly agree to extract a broader scope of rights by requiring authors to sell worldwide publishing rights (instead of U.S. or North American-only publishing rights), or they could pay out advances in smaller increments or over longer periods of time.  Information about rival publishers' actions is widely available in this industry, and communications between employees of rival publishers is common, making deviations from any industry understanding or agreement more easily detectable.

21

53.     The risks of post-merger coordination are substantial.  The Big Five have a history of collusion.  In 2012 the United States filed a complaint in the District Court for the Southern District of New York alleging that five publishers—including Penguin and Simon & Schuster—conspired with Apple to increase the prices of e-books.  After a trial, the District Judge found that Apple and the publishers had indeed engaged in a price-fixing conspiracy in violation of Section 1 of the Sherman Act, a judgment that was affirmed by the Second Circuit.

## LACK OF COUNTERVAILING FACTORS

### A.     Entry Barriers are High and Will Increase With this Merger

54.     There are high barriers to economically meaningful entry or repositioning in the markets for content acquisition, and thus new entry or repositioning by existing competitors is unlikely to prevent or counteract the proposed acquisition's likely anticompetitive effects. It can take many years and significant financial investment for a publisher to accumulate a stable of backlist titles, which are a crucial source of revenue used to fund author advances for new books.  In addition to sufficient financial resources, infrastructure and scale, a publisher needs name recognition and a demonstrated track record to convince authors of anticipated top-selling books to consider switching publishers.  Because authors must entrust their work to a publisher for the entire lifecycle of a book (often spanning years), it is important to authors of anticipated top-selling books that a publisher has a proven track record of producing commercially successful books.  One internal Bertelsmann analysis of the potential merger succinctly described the barriers to entry as "high (mainly reputation, distribution)."

55.     In addition, many smaller publishers lack distribution capabilities and depend upon Penguin Random House and Simon & Schuster for distribution services.  These services include: selling books to retailers and other customers; warehousing; order fulfillment and shipping (often referred to as "pick, pack, and ship"); invoicing and collections; and returns processing.  The merged firm would have even greater control over distribution services, giving it more power over competitors and allowing Defendants to raise competitors' costs or enhance barriers to entry or re-positioning.

**B.     There Are No Merger-Specific Efficiencies that Outweigh the Likely Harm to Competition from this Merger**

56.     Defendants have claimed that the proposed acquisition would generate synergies by combining the operations of Penguin Random House and Simon & Schuster.  But Penguin Random House's own executives have raised doubts about these synergy claims.  For example, Penguin Random House's COO, who is charged with integrating Simon & Schuster into Penguin Random House, has characterized the "synergies task" as "extremely aggressive."  Similarly, Penguin Random House's Global CEO testified that he is "not convinced" that Penguin Random House's U.S. management will take the steps necessary to achieve the planned synergies.  To the extent the proposed transaction would result in any verifiable, transaction-specific efficiencies in the alleged relevant markets, such efficiencies are unlikely to outweigh the transaction's likely anticompetitive effects.

**C.     This Merger Will Not Provide a Counterweight to Amazon's Alleged Buying Power**

57.     Although Penguin Random House has publicly stated that the merger with Simon & Schuster will provide a counterweight to Amazon's alleged buying power, its internal documents tell a different story: Penguin Random House plans to embrace Amazon even

more closely after the merger.  For example, in seeking approval from Bertelsmann's

Supervisory Board to pursue Simon & Schuster, Penguin Random House executives stated

that the acquisition would advance their "[g]oal" to be an "[e]xceptional partner for

Amazon."  Penguin Random House's Global CEO has also refuted this claim.  When asked

whether he viewed the proposed merger as a counterweight to Amazon, he replied: "No, I've

never, never bought into that argument… I am convinced it is not the case in the coming

together of Penguin Random House and Simon & Schuster."

### D. Penguin Random House's Proposed "Fix" Would Not Preserve Competition Between Defendants

58.     Aware of the competitive concerns raised by agents and authors, as well as the

ongoing antitrust scrutiny of this merger by the United States, Defendants have tried to

salvage their deal by making an unenforceable promise to continue competing after the

merger is consummated.  On September 20, 2021 Penguin Random House announced that,

after the merger, it would allow Penguin Random House imprints and legacy Simon &

Schuster imprints to continue bidding against one another up to an unspecified amount.  In

short, after securing nearly half the market for publishing rights to anticipated top-selling

books, Penguin Random House asks this Court to trust that Penguin Random House will not

use its market power to maximize profits for the benefit of its shareholders but rather, it will

essentially compete with itself to reduce those profits.  This proposal defies economic sense,

can be evaded or violated without detection, and is unenforceable.

### VIOLATIONS ALLEGED

59.     If allowed to proceed, Penguin Random House's proposed acquisition of Simon &

Schuster would eliminate competition between Penguin Random House and Simon &

Schuster and would likely lessen competition substantially in the markets for content acquisition in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

60. Among other things, the transaction would:

    a. eliminate competition between Penguin Random House and Simon & Schuster;

    b. facilitate coordination between the combined firm and the remaining Big Five publishers;

    c. likely cause author income to be less than it would be otherwise;

    d. likely cause a reduction in the quantity and variety of books published by the merged firm; and

    e. likely reduce quality, service, choice, and innovation.

## REQUEST FOR RELIEF

61. The United States requests:

    a. that Penguin Random House's proposed acquisition of Simon & Schuster be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

    b. that the Defendants be permanently enjoined and restrained from carrying out the proposed acquisition of Penguin Random House by Simon & Schuster or any other transaction that would combine the two companies;

    c. that the United States be awarded costs of this action; and

    d. that the United States be awarded such other relief as the Court may deem just and proper.

Dated: November 2, 2021

Respectfully Submitted,

_____/s/ Richard A. Powers_____
RICHARD A. POWERS
Acting Assistant Attorney General
Antitrust Division


_____/s/ Kathleen S. O'Neill_____
KATHLEEN S. O'NEILL
Senior Director of Investigations
and Litigation


_____/s/ Craig W. Conrath_____
CRAIG W. CONRATH
Director of Civil Litigation


_____/s/ Owen M. Kendler_____
OWEN M. KENDLER
Chief
Financial Services, Fintech, and Banking
Section


_____/s/ Yvette F. Tarlov_____
YVETTE F. TARLOV (DC Bar #442452)
Assistant Chief
Financial Services, Fintech, and Banking
Section

_____/s/ John R. Read_____
JOHN R. READ (DC Bar #419373)*
Brittney Dimond
Jonathan S. Goldsmith (DC Bar #1044315)
Collier Kelley
Ihan Kim
January Kim (DC Bar #1035032)
Kevin Krautscheid
Jessica N. Leal
Sarah H. Licht (DC Bar #1021541)
Bennett J. Matelson (DC Bar #454551)
Lisa A. Scanlon
Ethan Stevenson
Jeffrey G. Vernon (DC Bar #1009690)


Attorneys for the United States


United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 725--0165
Fax: (202) 514-7308
Email: john.read@usdoj.gov


*LEAD ATTORNEY TO BE NOTICED