**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA
    *Plaintiff,*

  v.

BERTELSMANN SE & CO. KGaA,
PENGUIN RANDOM HOUSE, LLC,
VIACOMCBS, INC., and
SIMON & SCHUSTER, INC.
    *Defendants*.

Civil Action No. 1:21-cv-02886-FYP

**DEFENDANTS' OPPOSITION TO
UNITED STATES' MOTION *IN LIMINE* TO PRECLUDE
EVIDENCE OF PENGUIN RANDOM HOUSE'S ANNOUNCED BIDDING POLICY**

The government has moved *in limine* for an order that would prohibit this Court from considering the policy adopted by defendant Penguin Random House ("PRH") to permit imprints of Simon & Schuster ("S&S") to bid against PRH imprints in auctions for the acquisition of book rights. According to the government, evidence of that policy is irrelevant and thus inadmissible under Federal Rule of Evidence 403 because the policy is not legally enforceable. But the government cites no case—not one—holding that a merging party's post-merger policy commitment is not relevant to the court's analysis of post-merger competitive conditions. To the contrary, many decisions have considered and given weight to such commitments. Perhaps most significant for present purposes, even the government's own cases squarely contradict its theory that such evidence is inadmissible at trial: in every case the government cites, the court *did consider* evidence of the commitment while determining whether that evidence was probative as to the merger's effect in those particular cases.

Here, evidence concerning PRH's commitment is highly probative of post-merger

competitive conditions.  The government compares it to fantastical scenarios like a couple

bidding against each other to purchase a house or a merging company unilaterally promising not

to harm competition.  The government resorts to silly hypotheticals because its motion cannot

survive a candid recitation of the actual facts.  For example:

- Defendants' economic expert will testify that intra-firm competition can be profit-maximizing.

- That testimony is buttressed by a wealth of academic literature reaching the same conclusion.

- PRH has for decades encouraged bidding competition between imprints, until advised by the agent running the auction that only PRH imprints remain.

- PRH editors consider other PRH imprints to be among their most significant competitors.

- Other large publishers with multiple imprints also allow imprints to bid against each other under various conditions.

- PRH publicly announced its policy to agents to assure them that S&S will remain an independent bidder; betraying that assurance would have serious adverse market consequences for PRH.

- PRH announced the policy publicly *before* it knew whether the government would challenge the merger.

The correct question is not whether those uncontested facts—most of which are omitted from the

government's motion—are relevant to this Court's analysis of post-merger competitive

conditions, but whether this Court ultimately finds them persuasive on that point.

To be clear, Defendants do not believe that the independent S&S bidding policy is

necessary to avoid any anticompetitive effects, as confirmed by the fact that PRH announced the

policy to its agent-partners without even knowing whether the merger would be challenged.

After all, the evidence will show that the vast majority of books are acquired in one-to-one

negotiations or single-round auctions where the policy never comes into play.  And even for those acquired through multiple-round auctions, PRH and S&S are *rarely* the final two bidders, contrary to the government's theory that by eliminating such "head to head" competition, the merger will cause substantial harm to the market.  But to the extent the Court finds from the evidence above that PRH's commitment is credible and thus such direct PRH-S&S competition will continue after the merger, the government's whole case collapses on itself.  Which is, of course, why the government does not want the Court to even consider the evidence—not because it is *ir*relevant, but because it may be *too* relevant.

The government's motion should be denied.  The Court should consider all evidence from both sides concerning the credibility and effect of PRH's post-merger commitment to permit independent bidding by S&S.  Having heard that evidence, the Court then can give PRH's commitment whatever weight the Court deems appropriate in evaluating the merger's likely effect on competitive bargaining in the book-acquisition market.

## BACKGROUND

For decades, Bertelsmann has allowed individual imprints[1] within its publishing company to compete against each other to acquire books from authors, until those imprints are the only remaining bidders in the contest (a rule that does not come into play if the agent calls for "best bids" before that occurs).  This is the policy that PRH and its predecessor have applied for decades, and it is the policy PRH promised to continue after the merger of PRH and S&S was announced.  Consistent with that longstanding company policy, in September 2021—before PRH

---

[1] If multiple imprints in a PRH division want to compete for a book, they often submit a "house bid" on their collective behalf.  If there is a multi-round auction, the imprints individually decide at each stage whether to increase their bid.  If more than one imprint continues to participate such that the author chooses the house bid, the author then chooses which imprint she wants to publisher her book.

knew whether the government would file a complaint challenging the merger of PRH and S&S—

PRH issued a public statement to its publishing industry partners assuring them that S&S

imprints, like PRH imprints, would be allowed to continue bidding independently for book

acquisitions.[2]  PRH then took the policy a step further, announcing that S&S imprints will be

allowed to continue bidding against PRH imprints even when they are the only bidders

remaining in a multi-round auction.[3]  As the evidence will show, PRH will not renege on that

public commitment because, among other things, rescinding the policy after the merger would

severely damage its crucial partnership with the literary agents who decide whether to even

invite PRH imprints to consider the opportunity to publish their clients' books.

The government asserts that intrafirm competition is "nonsensical, akin to spouses

bidding against each other and driving up the price for a house that they will share," something

no "profit-maximizing firm" would ever tolerate.  Dkt. 95 at 3.  But intrafirm competition is not

uncommon in the publishing industry:  The evidence will show that other large publishers also

encourage their imprints to compete separately for acquisitions.  Defendants' economics expert,

Edward Snyder, the William S. Beinecke Professor of Economics and Management at the Yale

School of Management, also will testify that a "robust economics literature" shows how firms

can maximize profits "by combining entrepreneurial incentives at the operation level with firm-

wide capabilities."  Snyder Rebuttal Rep. ¶ 96; *see also* Vijay Mahajan *et al.*, *The Adoption of*

*the M-Form Organizational Structure: A Test of Imitation Hypothesis*, 34 Mgmt. Sci. 1188

---

[2] *See* Jim Milliot, *Dohle Promises Competitive Bidding Between PRH, S&S*, Publisher's
Weekly (Sept. 21, 2021), https://www.publishersweekly.com/pw/by-topic/industry-
news/publisher-news/article/87412-dohle-promises-competitive-bidding.html.

[3] Markus Dohle, *Penguin Random House's Open Letter to Our Book Publishing Industry
Partners*, https://www.penguinrandomhouse.com/penguin-random-houses-open-letter-to-our-
book-publishing-industry-partners/.

(1988); Patrick J. Kaufman & Francine Lafontaine, *Costs of Control: The Source of Economic Rents for McDonalds Franchisees*, 37 J.L. & Econ 417 (1994).  PRH's experience confirms the theory:  PRH will show at trial that allowing agents to pursue multiple imprints for a given book increases the likelihood that the author will find the best home for the book, thereby also increasing the likelihood that a PRH imprint will acquire the book.

## ARGUMENT

To evaluate the government's claim under Clayton Act § 7 in this case, the Court must evaluate all aspects of "the particular market—its structure, history, and probable future." *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974); *see also United States v. Baker Hughes Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990) (court applies "a totality-of-the-circumstances approach" to market analysis under § 7).  It follows that any evidence concerning the "probable future" of the post-merger market is relevant to the case under Rule 403.  Applying that logic, courts analyzing merger challenges routinely admit and consider evidence about commitments the merging parties have made about their business practices that could affect competitive conditions in the post-merger market.

For example, in *FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1304 (W.D. Mich. 1996), *aff'd* 121 F.3d 708 (6th Cir. 1997), merging hospitals made "formal assurances . . . to assuage any purchaser concerns" regarding the merger's effect on prices.  Like the government does here, the FTC complained that the hospitals' commitment was temporary and illusory, but the court found from the evidence that the merged entity was likely to adhere to the assurances, which bespoke "a serious commitment by defendants . . . to refrain from exercising market power in ways injurious to the consuming public." *Butterworth*, 946 F. Supp. at 1298.  The court concluded that the merger was unlikely to harm competition based in part on consideration of those assurances.  *Id.*; *see also FTC v. Atl. Richfield Co.*, 549 F.2d 289, 299 (4th Cir. 1977)

(considering merging party's post-merger agreement to divest assets; concluding FTC claim was "moot"); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 189, 230 (S.D.N.Y. 2020) (crediting DISH's "good faith" commitments to enter market; granting judgment to defendants).

The government's own cases actually prove the same point:  in every case, the court admitted and considered evidence regarding the post-merger commitment in question.  *See United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 82 (D.D.C. 2011) (considering defendants' pledge to maintain current prices); *FTC v. Arch Coal, Inc.*, No. 1:04-cv-00534-JDB, Slip. Op. at 5, 6 (D.D.C. July 7, 2004) (considering merging parties' agreement to divest assets as "good faith response" to FTC investigation); *United States v. Pennzoil Co.*, 252 F. Supp. 962, 984 (W.D. Pa. 1965) (considering merging party's statement that it intended to "maintain [the acquired company] as a separate entity" and holding under the "factual circumstances" that statement was not credible).[4]  It is remarkable that the government wants this Court to blind itself to all evidence of PRH's commitment, yet it cannot muster even one other example of a court similarly refusing to consider evidence of a merging party's commitment about its post-merger business practices.  This Court should not be the first.

The remainder of the government's motion largely constitutes arguments on the merits about the competitive effect of PRH's independent S&S bidding policy.  If anything, those arguments show both why that commitment matters and why adversarial presentation of

---

[4] Even in *Hospital Corp. of America v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986), in which the court declined to consider a post-acquisition transaction because the evidence showed it was "subject to manipulation" by the merging party seeking to use it for litigation advantage, the Seventh Circuit still affirmed in part because the transaction would not have altered the ultimate conclusions of the case, demonstrating that the impact of the post-merger transaction was considered.  In any case, as demonstrated *supra* at 3-4, PRH's post-merger bidding policy was announced before the government commenced this litigation, and is not subject to such manipulation.

*evidence* about the commitment—rather than one party's snide denunciations—is relevant to understanding it.  For example, the government tries to dismiss the commitment as merely a "promise … to forgo profits and benevolently pretend for some of its imprints to compete against some of its other imprints."  Dkt. 95 at 3.  But Defendants will introduce ample evidence showing that competition between imprints is not "pretend" but taken very seriously, and that such competition is profitable because it enables PRH to win more books and build better editor-author relationships.  The government is free to introduce contrary evidence—if it has any—but the correct forum for resolving the factual dispute is trial, not an exchange of *in limine* papers.

The government similarly complains that unless the Court prohibits PRH from introducing evidence of its commitment, "firms in any industry could just merge to monopoly and then go scot-free with a promise to act like competitors."  Dkt. 95 at 5.  The government again misses the point:  in any merger case, the party making the commitment must adduce evidence supporting the credibility of the commitment.  Like all factual claims, especially concerning the future, some claims are more credible than others.  Defendants do not share the government's evident lack of confidence in the ability of this Court to evaluate evidence and distinguish "pretend" policies from genuine commitments that will actually affect the competitive landscape.  As discussed above, the commitment here is supported by longstanding practice at PRH and other publishers, by economic theory confirming the benefits of intrafirm competition, and by the need to avoid disrupting PRH's important agent relationships.  This Court can evaluate that evidence, and whatever evidence the government adduces in opposition, and decide for itself how much weight to give the commitment in its analysis.  *See United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017) ("[E]vidence about the likelihood of the [post-merger] divestiture goes to the weight of the evidence regarding the divestiture's effects.").

For the same reasons, the government errs in complaining that it would suffer "prejudice" if Defendants were allowed to introduce evidence establishing the credibility of PRH's commitment to maintaining S&S as an independent bidding entity, because the government would have to spend trial time and resources showing why the commitment is *not* credible.  Its "prejudice" argument again is merely a pretextual merits argument—the government simply wants the Court to rule that the commitment is not credible *without considering Defendants' evidence*.  "In a bench trial," however, "the portion of the rule concerning unfair prejudice has a highly limited application, if any at all."  *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 2015 WL 13680822, at *1 (D.D.C. June 12, 2015); *see Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*, 2019 WL 6910168, at *4 (D.D.C. Oct. 22, 2019) ("This case will be resolved through a bench trial, making the Court far less inclined to sustain an objection under Fed. R. Evid. 403.").  Where evidence regarding post-merger market conditions is available, "it should not be ignored," but of course the "weight to be attached to it depends upon all the facts and circumstances of the case."  *Proctor & Gamble Co. v. FTC*, 358 F.2d 74, 83 (6th Cir. 1966), *rev'd and remanded on other grounds*, 386 US. 568 (1967).

As its own citations confirm, the correct approach is for the government to address PRH's commitment on the merits at trial, rather than burdening the Court and Defendants with a "evidentiary" motion transparently intended to present disguised merits arguments.  The only "made-for-litigation performative gesture," Dkt. 95 at 7, at issue here is the government's own motion.

## CONCLUSION

For the foregoing reasons, the motion should be denied.

Dated: July 13, 2022

Respectfully submitted,

By:      */s/ Daniel M. Petrocelli*

Daniel M. Petrocelli (appearing *pro hac vice*)
M. Randall Oppenheimer (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Andrew J. Frackman (appearing *pro hac vice*)
Abby F. Rudzin (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10026
Telephone: (212) 326-2000
afrackman@omm.com
arudzin@omm.com

Jonathan D. Hacker (D.C. Bar No. 456553)
Julia Schiller (D.C. Bar No. 986369)
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
jhacker@omm.com
jschiller@omm.com

Deborah L. Feinstein (D.C. Bar No. 412109)
Jason Ewart (D.C. Bar No. 484126)
**ARNOLD & PORTER**
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
debbie.feinstein@arnoldporter.com
jason.ewart@arnoldporter.com

*Attorneys for Defendants Bertelsmann SE & Co.*
*KGaA and Penguin Random House LLC*

9

By: ___*/s/ Stephen R. Fishbein*___

Stephen R. Fishbein (appearing *pro hac vice*)
Jessica K. Delbaum (appearing *pro hac vice*)
**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
sfishbein@shearman.com
jessica.delbaum@shearman.com

Ryan Shores (D.C. Bar No. 500031)
Michael Mitchell (D.C. Bar No. 1531689)
**SHEARMAN & STERLING LLP**
401 9th Street, N.W., Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
ryan.shores@shearman.com
michael.mitchell@shearman.com

Rachel E. Mossman (D.C. Bar No. 1016255)
**SHEARMAN & STERLING LLP**
2828 North Harwood Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 271-5777
rachel.mossman@shearman.com

*Attorneys for Defendants Paramount Global (f/k/a ViacomCBS Inc.) and Simon & Schuster, Inc.*