# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*Plaintiff*,<br><br>v.<br><br>BERTELSMANN SE & CO. KGaA,<br>PENGUIN RANDOM HOUSE, LLC,<br>VIACOMCBS, INC., and<br>SIMON & SCHUSTER, INC.<br>*Defendants*. | Civil Action No. 1:21-cv-02886-FYP |

**DEFENDANTS' OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY FROM JENNIFER RUDOLPH WALSH**

# TABLE OF CONTENTS

**Page**

BACKGROUND ........................................................................................................................ 2

LEGAL STANDARDS ............................................................................................................ 4

ARGUMENT............................................................................................................................ 5

CONCLUSION........................................................................................................................ 10

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*,
  315 F. Supp. 3d 101 (D.D.C. 2018) ................................................................. 5

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
  214 F. Supp. 2d 530 (D. Md. 2002) ............................................................... 10

*Burkhart v. Washington Metro. Area Transit Auth.*,
  112 F.3d 1207 (D.C. Cir. 1997) ...................................................................... 5

*Dial Corp. v. News Corp.*,
  165 F. Supp. 3d 25 (S.D.N.Y. 2016) ............................................................... 5

*FTC v. Arch Coal, Inc.*,
  329 F. Supp. 2d 109 (D.D.C. 2004) ................................................................ 6

*FTC v. Whole Foods Mkt., Inc.*,
  2007 WL 7632283 (D.D.C. July 27, 2007) ...................................................... 1

*FTC v. Whole Foods Mkt., Inc.*,
  502 F. Supp. 2d 1, 13 (D.D.C. 2007),
  *rev'd on other grounds*, 533 F.3d 869 (D.C. Cir. 2008) ................................. 6

*Groobert v. President & Directors of Georgetown Coll.*,
  219 F. Supp. 2d 1 (D.D.C. 2002) .................................................................... 5

*Khairkhwa v. Obama*,
  793 F. Supp. 2d 1 (D.D.C. 2011), *aff'd*, 703 F.3d 547 (D.C. Cir. 2012) ................... 5

*Ralston v. Mortg. Invs. Grp., Inc.*,
  2011 WL 6002640 (N.D. Cal. Nov. 30, 2011) ................................................. 9

*Robinson v. District of Columbia*,
  75 F. Supp. 3d 190 (D.D.C. 2014) ................................................................. 4

*Rothe Dev., Inc. v. Dep't of Def.*,
  107 F. Supp. 3d 183 (D.D.C. 2015), *aff'd*, 836 F.3d 57 (D.C. Cir. 2016) ................ 5, 9

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*,
  467 F.3d 107 (2d Cir. 2006) ........................................................................... 5

*United States ex rel. Morsell v. NortonLifeLock*, Inc.,
  567 F. Supp. 3d 248 (D.D.C. 2021) ................................................................ 1

*United States v. Christie*,
  2009 WL 10706981 (D.N.M. Oct. 19, 2009) ................................................... 8

*United States v. H & R Block, Inc.*,
  831 F. Supp. 2d 27 (D.D.C. 2011) .................................................................. 1

*United States v. Marshall*,
  946 F.3d 591 (D.C. Cir. 2020) ....................................................................... 4

*United States v. Sungard Data Sys., Inc.*,
   172 F. Supp. 2d 172 (D.D.C. 2001) ........................................................ 6

*Va. Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*,
   98 F. Supp. 2d 729 (W.D. Va. 2000) ...................................................... 10

*Veleron Holding B.V. v. Stanley*,
   117 F. Supp. 3d 404 (S.D.N.Y. 2015) ..................................................... 6

*West v. Bayer HealthCare Pharms. Inc.*,
   293 F. Supp. 3d 82 (D.D.C. 2018) .......................................................... 1

Jennifer Rudolph Walsh is a thirty-year veteran of the book publishing industry.  As a literary agent, she represented numerous authors and personally sold or supervised sales of books of all advance levels (including thousands of books for advances of $250,000 or more).  For years, she co-led the literary department of the longest-running talent agency in the world.  Ms. Walsh is undoubtedly qualified to offer opinions about the real-world competitive forces that affect bargaining for the acquisition of such books and about the real-world effects of this merger on those bargaining processes.  She is equally qualified to address the many ways in which the opinions of the government's expert, Dr. Nicholas Hill, rest on critical assumptions at odds with the facts of how books are acquired in this industry.

The government has moved to exclude or limit Ms. Walsh's testimony, complaining that she is unqualified to critique Dr. Hill's abstract, model-driven analysis and that even if she is qualified, she does not follow sound methods in doing so.  Those arguments are meritless.  So long as an expert opinion has "an adequate factual basis" and is "sufficiently reliable," attacks on the opinion go only to its *weight*, not its admissibility, and are properly pursued through cross-examination at trial.  *See West v. Bayer HealthCare Pharms. Inc.*, 293 F. Supp. 3d 82, 86, 93 (D.D.C. 2018).  That is especially true in a bench trial:  Because the Court serves as both gatekeeper and factfinder, a *Daubert* motion only "asks the court to gate-keep expert testimony from itself."  *United States ex rel. Morsell v. NortonLifeLock, Inc.*, 567 F. Supp. 3d 248, 260 (D.D.C. 2021) (cleaned up); *accord United States v. H & R Block, Inc.*, 831 F. Supp. 2d 27, 30 (D.D.C. 2011); *FTC v. Whole Foods Mkt., Inc.*, 2007 WL 7632283, at *2 (D.D.C. July 27, 2007).

Rather than deny itself the benefits of Ms. Walsh's extensive experience and valuable industry perspectives, the Court should hear and evaluate her experienced input based on her complete testimony—including whatever weaknesses the government might expose through

1

cross-examination—not the isolated and truncated snippets the government scatters throughout its brief. The government's motion should be denied.

## BACKGROUND

Ms. Walsh has thirty years of experience bargaining on behalf of authors to sell book rights, including in the specific segment of the market the government claims is the "relevant market" affected by this merger. She started as intern for a literary agency, reviewing manuscripts for the agency from her college dorm room. Dkt. 96-3 (Ex. B, Walsh Report ¶ 13). After graduating, she spent the next decade working for that agency, eventually purchasing it and running it as both co-owner and co-president. *Id.* ¶ 16. From 2006 to 2014, *The Hollywood Reporter* named Ms. Walsh to the "Women in Entertainment Power 100" list as a top female leader in entertainment. *Id.* ¶ 24.

For a significant portion her career, Ms. Walsh served as co-head of the literary department of the world's longest-running talent agency, William Morris Endeavor. *Id.* ¶ 18. There, she sold or supervised the sale of thousands of books to dozens of publishers across the industry. *Id.* ¶¶ 6, 19. Ms. Walsh personally oversaw the placement and sale of more than 200 books each year to all types of publishers, large and small. *Id.* ¶ 19. Fully *one third* of those books landed on the *New York Times* bestseller list, *id.*, making her experience especially relevant to the tiny segment of the book-publishing market the government claims will be affected by this merger.

Defendants are proffering Ms. Walsh as an industry expert to rebut Dr. Hill's opinions about the likely effects of the merger on bargaining conditions in the publishing industry. Her opinions draw on her decades-long personal involvement in the very book-acquisition transactions Dr. Hill attempts to model mathematically. As Ms. Walsh's report shows, she expresses four main opinions about Dr. Hill's abstract analysis:

"First, Dr. Hill does not understand publishing." *Id.* ¶ 2. Among other things, he ignores or understates the importance of non-monetary factors in acquisitions and the inherently subjective and individualized nature of book rights, which are not valued and priced like commodities in other markets. *Id.* ¶¶ 28-32.

"Second, Dr. Hill downplays—and essentially ignores—the role agents play in publishing." *Id.* ¶ 4. Ms. Walsh explains that the book acquisition process is composed of authors, publishers, and—at the heart of the process—the agents. She provides a detailed recitation of the critical role agents play—how they choose which editors to submit content to, how they structure the sale process, how different processes serve different objectives and create different incentives, the scope of rights that are negotiated, how authors decide which imprint to proceed with, and so on. *Id.* ¶¶ 33-98. All of that information is critical to any analysis of the competitive forces that affect real-world acquisitions, yet almost none of it appears in Dr. Hill's report.

"Third, Dr. Hill's view of the different players in the industry is inconsistent with my experience." *Id.* ¶ 6. In particular, Ms. Walsh rejects Dr. Hill's opinion that "only the so-called Big Five can compete effectively for books that receive advances above $250,000." *Id.* In her extensive experience with competition for such books, Ms. Walsh has seen many other publishers pay such advances, and she explains how they structure deals differently to provide more upside payoff. *Id.* She also explains how an agent will target a publisher not based on its size or market share, but on whether the publisher or editor is a good fit for the particular book being pitched. *Id.* ¶¶ 108-09.

"Fourth, Dr. Hill's conclusion that advances might go down after the transaction is inconsistent with my experience." *Id.* ¶ 7. She bases this view on various factors, all drawn

3

from her extensive experience actually negotiating book sales in the real world.  In her

experience, while the Big Five all compete aggressively at all advance levels, many publishers

outside the Big Five are viable competitors for any given book, and there have been recent

successful new entrants to the marketplace.  *Id.* ¶¶ 101-02, 111, 117.  She also explains why the

agent control that Dr. Hill ignores would enable agents to continue targeting submissions to the

right editors and structuring the sales process to ensure the best outcome for clients.  *Id.* ¶¶ 116,

118-19, 125.  She emphasizes that agents can use the mere *threat* of submission to another

publisher as a bargaining tool—a tool that would not be affected by the merger given the

numerous other publishers who acquire books in the DOJ's alleged market.  *Id.* ¶ 116.  In Ms.

Walsh's view, these particular features of the industry mean that *even if* S&S were no longer an

independent bidder in book acquisitions, agents would continue to obtain "favorable deals from

publishers big and small, new and established" by using the different negotiation tools at their

disposal.  *Id.* ¶ 100.

## LEGAL STANDARDS

As the government grudgingly admits, under Rule 702, "an expert may be qualified based

on practical experience or training rather than a formal education in an area."  Dkt. 96-1 at 3; *see*

*also United States v. Marshall*, 946 F.3d 591, 596 (D.C. Cir. 2020) (expert witnesses can be

qualified based on "knowledge, skill, experience, training, or education, any one of which is

sufficient"); *Robinson v. District of Columbia*, 75 F. Supp. 3d 190, 197 (D.D.C. 2014) ("[I]n the

absence of such formal education, an expert may still be qualified on the basis of his or her

practical experience or training.").  What the government ignores, however, is that practical

experience relates not only to the witness's qualifications, but also to Rule 702's requirement

that expert testimony be based on a reliable methodology:   Because "work experience is

obviously one method by which an individual may acquire an expertise in a particular field,"

*Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1211 (D.C. Cir. 1997), "experience alone can constitute a basis of reliable principles and methods," *Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.,* 315 F. Supp. 3d 101, 110 (D.D.C. 2018).

To prove both qualification and reliable experience-based methods, an expert witness must simply "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 196 (D.D.C. 2015), *aff'd*, 836 F.3d 57 (D.C. Cir. 2016).  Rule 702 ultimately is a "liberal and flexible" standard, *Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 7 (D.D.C. 2002), "requiring only that the witness possess the 'knowledge, skill, experience, training, or education' necessary to 'assist' the trier of fact, *Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 10 (D.D.C. 2011), *aff'd*, 703 F.3d 547 (D.C. Cir. 2012).

Courts thus routinely admit testimony from industry experts to help explain industries and market transactions, including in antitrust cases.  *See*, *e.g.*, *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 40 (S.D.N.Y. 2016) (denying motion in limine to exclude industry expert in monopolization case); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132–34 (2d Cir. 2006) (expert was qualified given "31 years of experience in the insurance industry"); *FTC v. Whole Foods Mkt., Inc.*, 502 F. Supp. 2d 1, 13 (D.D.C. 2007) ("[T]he state of the industry itself is an important factor in a case like this."), *rev'd on other grounds*, 533 F.3d 869 (D.C. Cir. 2008); *United States v. SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172, 174, 179 (D.D.C. 2001) (defendants "offered testimony from . . . an industry expert in disaster recovery").

## ARGUMENT

The government seeks to exclude or limit Ms. Walsh's testimony on the ground that she is not qualified and her methodology is not reliable.  But as the government argues them, the two

points are the same:  According to the government, Ms. Walsh lacks "formal training in economics or merger analysis," and because she does not conduct the kind of formal analysis Dr. Hill performs, she cannot provide opinions commenting on Dr. Hill's conclusions.  Dkt. 96-1 at 3-4.  As one court observed in an insider-trading case, however, the "word of an experienced trader about what traders are and are not allowed to do with information obtained during negotiations . . . is potentially worth far more than the opinion of any ivory tower academic." *Veleron Holding B.V. v. Stanley*, 117 F. Supp. 3d 404, 443 (S.D.N.Y. 2015).  That observation is equally salient in this merger challenge, where "antitrust theory and speculation cannot trump facts."  *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004).

The government's motion turns that premise on its head, seeking to elevate theory and speculation about competitive forces in the book acquisition market over testimony explaining how those forces actually work.  The government thus principally contends that Ms. Walsh could properly comment on Dr. Hill's analysis only if she herself applied the same formal methods he did, i.e., review a selected subset of data, analyze Merger Guideline standards, calculate market shares, or conduct her own abstract mathematical analysis.  *See* Dkt. 96-1 at 7-8.  That contention misconstrues Ms. Walsh's expertise and opinions.  She is not testifying to provide the Court with *additional* abstract economic analyses.  Precisely the opposite:  her opinions are being offered to show the Court how Dr. Hill's abstract economic analysis ignores or misstates fundamental *real-world* characteristics of the market Dr. Hill opines about.  Her experience eminently qualifies her to do so, and as shown above, an expert's reliance on experience *is* a reliable method for reaching conclusions, so long as the experience provides a sound basis for the conclusions and is reasonably applied to the facts of the case.  *See supra* at 2-3.  Ms. Walsh's opinions here easily satisfy that standard.

The government complains, for example, that Ms. Walsh did not review "data about head-to-head competition between the merging parties." Dkt.96-1 at 5. But such selective data are relevant to Dr. Hill's analysis only because he chose to use them as inputs to his mathematical model. The point of Ms. Walsh's testimony is that such data are not useful, because in her vast experience, a myopic focus on instances of "head to head competition" between two particular publishers fails to capture all the competitive forces that actually affect outcomes in book acquisitions. She draws on her experience to explain why, for instance, the *sales process* makes a major difference, why the general threat of competition from unnamed publishers can be as important as "head to head" competition with one known rival, and why agents could easily respond to the loss of one publisher from occasional "head to head" competitions by submitting books to a different publisher. The government and Dr. Hill might dispute whether those dynamics matter, but that dispute is a matter for trial, not a basis for excluding her opinions altogether.

The next of the government's various scattershot objections to Ms. Walsh's testimony appears to be that although she worked for an agency for 30 years, she never worked for a publisher, and her work as an agent ceased in 2019. Both points are baffling. The government's position seems to be that while Ms. Walsh knows much about bargaining as an *agent*, she cannot understand and testify about the incentives and motivations that drive *publishers* in bargaining. Consistent with the misunderstanding of publishing dynamics that underlies its entire case, the government plainly does not appreciate what agents *do* in bargaining. To state it clearly: an agent's job is to represent and advance the interests of her clients and to perform that task effectively—indeed, with the barest minimum competence—the agent *must* understand

everything possible about what publishers want, expect, and need during bargaining.  And few agents succeed in their jobs as well as Ms. Walsh did.

The contention that she cannot testify because her work as an agent ended in 2019—though she has consulted on book sales since then—is equally inscrutable.  As the government admits, the parties in this case have focused on the period 2018-2021, so by the government's own account, Ms. Walsh's work at the pinnacle of her career *did* overlap with a substantial amount of the period being analyzed.  Even more significant, the government makes no effort to show that after Ms. Walsh retired in 2019, all the incentives, objectives, and dynamics that existed in the industry for decades suddenly *changed* in some way relevant to her opinions. They obviously did not.

The government also asserts that if Ms. Walsh were qualified as an industry expert witness, then other witnesses with even more years in the industry *also* could be qualified as industry experts.  Dkt. 96-1 at 6.  Maybe so, but nobody else is being proffered as an expert witness.  And Rule 702, of course, "says nothing about having to show that one witness is more qualified than another to give an opinion."  *United States v. Christie*, 2009 WL 10706981, at *5 (D.N.M. Oct. 19, 2009).  All that matters is whether Ms. Walsh herself is qualified, and she certainly is.  Accordingly, she would have broader leeway than other industry-veteran fact witnesses to express opinions about, for example, whether Dr. Hill's analysis applies in the real world she has actually experienced.

For that reason, the government errs in asserting that Ms. Walsh's opinions must be limited to the kind of opinions any fact witness might make based on personal experience under Rule 701.  To be clear, contrary to the government's submission (Dkt. 96-1 at 9), Ms. Walsh does have personal knowledge both of what editors pursue in negotiations, *see supra* at 2-3, and

of the ease with which new publishers have been able to enter the market successfully.  Her

opinions on such matters easily satisfy Rule 701.  But as an industry expert, she can rely on her

specialized industry knowledge to provide more technical opinions about why the government's

harm theories do not fit the real-world facts.  It is thus wrong to say that "predictions about how

the market will respond to a merger" would "implicate[] specialized knowledge she does not

have."  Dkt. 96-1 at 9-10.  To the contrary, her opinions about the merger's likely effects on the

market are drawn directly from her specialized knowledge about that very market, based on her

extensive experience participating in the transactions the government says will be adversely

affected by the merger.  That experience gives her ample qualification and a sound

methodological basis for explaining why eliminating one potential bidder out of many would

have no material effect on acquisitions, given the way they are structured and controlled by

agents, among other real-world factors Dr. Hill's model ignores.

Finally, the cases the government cites (Dkt. 96-1 at 5) do not support exclusion of Ms.

Walsh's opinions.  In each case, the purported expert lacked training or experience relevant to

the highly technical matter at issue.  *See Rothe Dev., Inc.*, 107 F. Supp. 3d at 203 (excluding

mathematical response to expert reports based on witness's lack of "any formal education or

training in statistical or econometric analysis"); *Ralston v. Mortg. Invs. Grp., Inc.*, 2011 WL

6002640, at *6 (N.D. Cal. Nov. 30, 2011) (excluding witness testimony "specific to a sub-

practice within the industry"); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 538

(D. Md. 2002) (excluding non-antitrust expert's opinion defining the relevant product market);

*Va. Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*, 98 F. Supp. 2d 729, 740 (W.D. Va. 2000)

(declining to qualify witness as "expert in antitrust economics" given his lack of antitrust

experience and training).  Those cases have no application here.  Ms. Walsh is not offering

9

general expertise in the academic field of "antitrust economics," she is not offering her own abstract mathematical model to counter Dr. Hill's model, and she is not addressing a sub-practice with which she has no experience.  She is, instead, speaking from extensive experience that relates directly to the opinions Dr. Hill will proffer—opinions based on not his own experience, but on assumptions and speculation about how the real-world market operates.[1]  Defendants respectfully submit that the Court's own analysis would benefit substantially from hearing Ms. Walsh's opinions about why that real-world market does not reflect the artificial world Dr. Hill has modeled.

## CONCLUSION

For the foregoing reasons, the government's Motion *in Limine* to Exclude Expert Testimony from Jennifer Rudolph Walsh should be denied.

---

[1] Dr. Hill has already confessed to various gaps in his understanding of the industry.  For example, he claimed that agents and authors form "expectations" for the advance level of a book when deciding what type of acquisition format to use, Hill Depo Tr. 155:19-156:4, but when asked *how* agents and authors form those expectations for a book's advance level, Dr. Hill responded that he "would guess they draw on their past experience," and he was "not perfectly sure how they do that," *id.* at 156:7-14.  When asked whether he knew the "prevalence of" various book acquisition formats used by agents, Dr. Hill testified that he had "not analyzed that," and that he knew from "agency data" only that "agencies will often have multiple types of acquisitions."  *Id.* at 159:2-8.  In fact, the specific type of acquisition format is critical to the competitive forces in play for a given acquisition, as Ms. Walsh can and will explain.

Dated: July 13, 2022

Respectfully submitted,

By: ___*/s/ Daniel M. Petrocelli*___

Daniel M. Petrocelli (appearing *pro hac vice*)
M. Randall Oppenheimer (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Andrew J. Frackman (appearing *pro hac vice*)
Abby F. Rudzin (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10026
Telephone: (212) 326-2000
afrackman@omm.com
arudzin@omm.com

Jonathan D. Hacker (D.C. Bar No. 456553)
Julia Schiller (D.C. Bar No. 986369)
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
jhacker@omm.com
jschiller@omm.com

Deborah L. Feinstein (D.C. Bar No. 412109)
Jason Ewart (D.C. Bar No. 484126)
**ARNOLD & PORTER**
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
debbie.feinstein@arnoldporter.com
jason.ewart@arnoldporter.com

*Attorneys for Defendants Bertelsmann SE & Co.*
*KGaA and Penguin Random House LLC*

11

By:    */s/ Stephen R. Fishbein*

Stephen R. Fishbein (appearing *pro hac vice*)
Jessica K. Delbaum (appearing *pro hac vice*)
**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
sfishbein@shearman.com
jessica.delbaum@shearman.com

Ryan Shores (D.C. Bar No. 500031)
Michael Mitchell (D.C. Bar No. 1531689)
**SHEARMAN & STERLING LLP**
401 9th Street, N.W., Suite 800
Washington, D.C. 20004
Telephone: (202) 508-8000
ryan.shores@shearman.com
michael.mitchell@shearman.com

Rachel E. Mossman (D.C. Bar No. 1016255)
**SHEARMAN & STERLING LLP**
2828 North Harwood Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 271-5777
rachel.mossman@shearman.com

*Attorneys for Defendants Paramount Global (f/k/a ViacomCBS Inc.) and Simon & Schuster, Inc.*