<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

| |
|---|
| UNITED STATES OF AMERICA,<br><div align="center">*Plaintiff,*</div><div align="center">v.</div>BERTELSMANN SE & CO. KGaA,<br>PENGUIN RANDOM HOUSE, LLC,<br>VIACOMCBS, INC., and<br>SIMON & SCHUSTER, INC,<br><div align="right">*Defendants*.</div> |

Civil Action No. 1:21-cv-02886-FYP

<div align="center">

**UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE BELATED**
**EXPERT OPINION APPLYING "GUPPI" ANALYSIS**

</div>

In his initial report, the United States' economic expert, Dr. Nicholas Hill, employed a widely used economic model to show that the proposed merger of Penguin Random House ("PRH") and Simon & Schuster ("S&S") is likely to harm authors substantially. In his rebuttal report, Defendants' economic expert, Dr. Edward Snyder, criticized Dr. Hill's merger effect estimates on the grounds that Dr. Hill's model is a poor fit for the publishing industry, but chose not to put forth his own economic model. In the ordinary rhythm of expert discovery, Dr. Hill responded to these criticisms in his reply report by showing that alternative economic models produced the same results as his original model: the proposed merger is likely to harm authors substantially. In fact, these alternative models were originally developed by *Defendants' economists* to fit the publishing industry and presented to the United States in the pre-complaint investigation of this merger.

Defendants waited nearly two weeks to object to Dr. Hill's analysis, an approach at odds with this case's "highly time-compressed" schedule. Dkt. 98 at 6. And instead of rebutting Dr. Hill's analysis on the merits, Defendants filed the instant motion, which asks this Court to

<div align="center">1</div>

jettison the Federal Rules of Civil Procedure and the Case Management Order ("CMO") to protect Defendants from an imagined prejudice. The models at issue were properly disclosed, known to Defendants, and a subject of Dr. Hill's deposition. Thus, this motion should be denied.

## BACKGROUND

The United States served Dr. Hill's initial expert report on May 4. In that report, Dr. Hill modeled the likely effects of the merger with a second-score auction ("SSA") model. SSA models are well-established in economics and similar models have been used in litigations to measure the effect of mergers. *See, e.g.*, *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 212, 217–19 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017); Ex. A. at 4–5 (Trial Tr. 958:17–959:22).

The SSA model uses market shares and profit margins to estimate the effect of the merger on advances received by authors of anticipated top selling books ("ATS books"), *i.e.* books acquired for advances of at least $250,000. Dr. Hill's model predicts that the merger is likely to substantially harm authors of ATS books. While acknowledging that many authors sell their books to publishers using methods other than an SSA, Dr. Hill explained in his report that the SSA model is a reliable and economically sound way to model the effect of eliminating competition between PRH and S&S across the variety of methods by which books are sold.

Defendants served a rebuttal expert report by Dr. Snyder on June 3. In this report, Dr. Snyder criticized Dr. Hill's use of the SSA model, repeatedly claiming that the SSA model was a poor fit to the industry, in large part because authors sell books to publishers in ways other than an SSA. *See, e.g.*, Snyder Rebuttal Report ¶ 16. Even though he had the opportunity to do so, Dr. Snyder did not present an alternative model.

The United States served Dr. Hill's reply report on June 23. In that report, Dr. Hill not only defended his use of the SSA model conceptually, but also rebutted Dr. Snyder's criticisms of the SSA model by analyzing the merger's likely effect using Gross Upward Pricing Pressure Index ("GUPPI") models adapted for various auction formats. *See* Hill Reply Report § 6. GUPPI models are widely used because they simplify merger analysis by focusing only on the change in incentives of the merging parties caused by the merger, rather than trying to fully simulate the post-merger equilibrium. The GUPPI models used by Dr. Hill were developed by Defendants' economists by modifying the traditional GUPPI formula to fit different book acquisition formats. *See* Hill Reply Report ¶¶ 81–82. These models were presented by Defendants in a September 2021 white paper to the United States in response to the United States' interest in analyzing the effects of the merger using GUPPI analysis. In addition, the inputs to these models were either disclosed in Dr. Hill's initial report or taken from Dr. Snyder's rebuttal report. Dr. Hill presented the results of these GUPPI models to show that they predict similar price effects to the SSA model. In presenting these models, Dr. Hill explained that the consistency of the GUPPI model results with the SSA model results refutes Dr. Snyder's claim that the SSA model results cannot be interpreted as a general measure of the merger's likely effect on competition.

On July 1, Defendants deposed Dr. Hill and asked several questions about the GUPPI models. When Defendants asked why Dr. Hill did not include the GUPPI models in his initial report, Dr. Hill explained that he views the SSA model as a reasonable approach to modeling the merger's effect on competition and that he used the GUPPI models in response to Dr. Snyder's criticisms. *See* Ex. B. at 4 (Hill Dep. 353:8–21).

Defendants did not object to Dr. Hill's GUPPI analysis until they informed the United States that they intended to file the instant motion, on July 6, after the formal close of expert

discovery. The United States deposed Dr. Snyder on that same day. Dr. Snyder testified that he hadn't reviewed Dr. Hill's GUPPI analysis, but was aware that Defendants had "presented" a GUPPI analysis to the United States during the pre-complaint investigation. *See* Ex. C at 3–5 (Snyder Dep. 154:17–156:4).

## LEGAL STANDARD

Federal Rule of Civil Procedure 26 does not explicitly contemplate reply expert reports. Therefore, when a court's scheduling order allows for such reports, as this case's CMO does, the appropriate scope of a reply expert report is determined by Rule 26's standard for rebuttal expert reports. *See, e.g.*, *Allstate Ins. Co. v. Shah*, No. 2:15–cv-01786-APJ-DJA, 2021 WL 4555177, at *4 (D. Nev. Oct. 5, 2021) (noting that courts have applied "the logic of Rule 26's restrictions governing rebuttal and supplemental reports to replies") (citing cases).

Under that standard, new analysis in a rebuttal report is proper if it "is intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). *See also United States v. Philip Morris USA Inc.*, Civ. A. No. 99-2496 (PLF), 2022 WL 1101730, at *5 (D.D.C. Apr. 13, 2022) ("Rebuttal testimony is proper if it explains, repels, counteracts, or disproves evidence of the adverse party.") (cleaned up). "[I]n evaluating the admissibility of rebuttal expert testimony, [courts] look[] to whether the rebuttal testimony goes 'directly to refuting' a claim asserted by the opposing party's witness." *Id.* at *5 (quoting *United States v. Gatling*, 96 F.3d 1511, 1523 (D.C. Cir. 1996).

Moreover, "[a] rebuttal expert is permitted to use new methodologies for the purpose of rebutting or critiquing the opinions of the opposing party's expert witness." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (cleaned up). *See also Little v. Washington Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 416 (D.D.C. 2017) ("District courts

routinely permit new experts for rebuttal purposes and permit rebuttal experts to use new methodologies to rebut the opinions of the opposing expert."). Similarly, a rebuttal report may contain analysis that the expert *could* have included in an initial report, as long as it is intended to rebut an opposing party's expert. *See Philip Morris*, 2022 WL 1101730, at *7.

If a court finds that analysis in a reply report strays beyond refutation of an opposing party's rebuttal report, it must evaluate an appropriate sanction. *See* Fed. R. Civ. P. 37(c)(1). Preclusion of evidence is an "extreme sanction," and courts "must consider less drastic responses." *Richardson v. Korson*, 905 F. Supp. 2d 193, 200 (D.D.C. 2012) (cleaned up).

## ARGUMENT

Because the sole purpose of Dr. Hill's presentation of GUPPI models in his reply report was to directly refute Dr. Snyder's criticisms about his use of the SSA model, and this analysis was on the same subject matter as Dr. Snyder's criticisms, Dr. Hill's analysis is proper reply evidence and should not be excluded. That Dr. Hill could have included it in his initial report is not a basis to strike it. In any event, Dr. Hill's testimony about the GUPPI models would not prejudice Defendants for several reasons. The models were developed by Defendants' own economists almost a year ago, Defendants had the opportunity to depose Dr. Hill about the models, and Defendants failed to raise this issue during the expert discovery period (even though they had an opportunity to do so).

**1. Dr. Hill's GUPPI analysis is proper reply evidence.**

The results of the GUPPI models presented by Dr. Hill directly refute Dr. Snyder's criticisms of the SSA model. *See Gatling*, 96 F.3d at 1523. For dozens of pages in his rebuttal report, Dr. Snyder criticized Dr. Hill's use of the SSA model because of its purported lack of fit with the industry. In particular, Dr. Snyder claimed more than ten times that Dr. Hill's SSA

model cannot be used to measure the likely effect of the merger because books are sold via processes other than an SSA. *See, e.g.*, Snyder Rebuttal Report ¶¶ 16, 219. But Dr. Snyder's analysis stopped there. Aside from one academic article, Dr. Snyder did not provide any basis for why the results of Dr. Hill's SSA model would be incorrect, let alone an alternative model to prove his claim. His failure to do so is a critical omission. Dr. Snyder is unable to produce an alternative model that gives different results because there is no reason to believe Dr. Hill's SSA model "overstates or understates the likely effect of the merger." Hill Reply Report ¶ 58.

In his reply report, Dr. Hill exposed this omission in Dr. Snyder's analysis by presenting results from GUPPI models that were designed by Defendants' economists to model various auction mechanisms.[1] Because the GUPPI models derived by Defendants' economists predict price effects similar to the SSA model, results from the GUPPI models rebut Dr. Snyder's claims about the SSA model. In his reply report, Dr. Hill repeatedly framed this analysis as a retort to Dr. Snyder's criticisms of the SSA model. *See* Hill Reply Report ¶¶ 6, 80, 90. For example, after presenting his GUPPI analysis, Dr. Hill wrote, "In summary, the GUPPI models derived by the defendants—which cover a range of auction types— predict advance decreases that are similar to those predicted by the second-score auction model. The consistency of these findings supports the validity of the second-score auction model and rebuts Dr. Snyder's criticism of the second-score auction model." Hill Reply Report ¶ 90. Dr. Hill said the same in his deposition, as

---

[1] Defendants make several false or misleading assertions about Dr. Hill's GUPPI analysis, detailed responses to which are unnecessary to reject the instant motion. Suffice it to say that GUPPI analysis (or a variant thereof, Upward Pricing Pressure ("UPP")) is a common method to assess the unilateral effects of a merger. It has been relied on by courts to conclude that mergers are likely to lessen competition. *See, e.g.*, *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 64–65 (D.D.C. 2018). And it is explicitly described in the Horizontal Merger Guidelines as a method to diagnose likely anticompetitive effects. U.S. DOJ & FTC, *Horizontal Merger Guidelines* § 6.1 (2010).

Defendants apparently recognize. Ex. B at 3 (Hill Dep. 237:8–15); Dkt. 98 at 5. Because Dr. Hill's GUPPI analysis "contradict[s] or rebut[s]" Dr. Snyder's report, it should not be struck. *See* Fed R. Civ. P. 26(a)(2)(D)(ii).

Indeed, Defendants' boast that their "expert thoroughly debunked" Dr. Hill's SSA model confirms that Dr. Hill's GUPPI models were proper reply evidence. Dkt. 98 at 1. Disproving a purported debunking, as Dr. Hill's GUPPI analysis did, is "archetypal rebuttal testimony." *Cf. Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03 CV 1851(NGG)(RML), 2008 WL 4911440, at *3 (E.D.N.Y. Nov. 13, 2008).

Defendants argue that the CMO barred "*new* analysis" from Dr. Hill's reply report. Dkt. 98 at 7 (emphasis in original). They are wrong. As noted above, experts are "permitted to use new methodologies," such as Dr. Hill's GUPPI analysis, in a response to an opposing party's expert report. *See Scott*, 315 F.R.D. at 44. *See also Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585, 591–92 (N.D. Ill. 2015), *aff'd*, 831 F.3d 919 (7th Cir. 2016) (declining to exclude "additional analyses" performed by expert in reply report because they were offered "to refute Defendants' arguments and to show that his original conclusions and opinions [were] sound and a reliable method"); *In re Genetically Modified Rice Litig.*, No. 4:06MD1811 CDP, 2010 WL 4483993, at *3 (E.D. Mo. Nov. 1, 2010) (declining to strike plaintiff's rebuttal expert report that included "new methods of analysis, such as [a] price model," because they were "offered to rebut a defendant's experts' criticisms"). Because Dr. Hill used the GUPPI models "for the purpose of rebutting or critiquing the opinions of" Dr. Snyder, his analysis is proper. *See Park W. Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009).

Defendants are similarly wrong to suggest that because Dr. Hill could have included a GUPPI analysis in his initial report, he should be barred from including it in his reply report.

Courts have repeatedly rejected such arguments because to require that experts include all potentially relevant analysis in their initial reports "would lead to the inclusion of vast amounts of arguably irrelevant material in an expert report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing the relevant material." *See, e.g.*, *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004). Instead, "[a]ll that is required is for the information to repel other expert testimony . . . ." *Id.* Dr. Hill's GUPPI analysis does exactly that.

**2. Defendants will not be prejudiced by Dr. Hill's testimony about the GUPPI models.**

As argued above, Dr. Hill's GUPPI analysis was timely disclosed. Had it not been, however, admitting it would not prejudice Defendants and should not be subject to the "extreme sanction" of preclusion. *See Richardson*, 905 F. Supp. 2d at 200. *See also* Fed. R. Civ. P. 37(c)(1) (allowing for untimely disclosures if they are "harmless").

The GUPPI models Defendants seek to exclude were developed by their own economists almost a year ago. And, the GUPPI models' inputs were disclosed in Dr. Hill's initial report or taken from Dr. Snyder's rebuttal report. Dr. Hill's analysis is hardly a prejudicial surprise.

Moreover, Defendants' ability to depose Dr. Hill and their failure to timely object to Dr. Hill's analysis ameliorate any purported prejudice. Over a week after receiving Dr. Hill's reply report, Defendants deposed Dr. Hill, during which they had an unfettered opportunity to inquire about the GUPPI models. *See Little*, 249 F. Supp. 3d at 416–17 (finding that admission of impermissibly broad expert disclosure would not prejudice opposing party in part because it had the opportunity to depose the expert).

Next, given that this is a "necessarily fast-moving case," Dkt. 98 at 2, if Defendants feared prejudice from Dr. Hill's testimony, Defendants could and should have raised this issue

immediately upon receipt of Dr. Hill's reply report. Instead, they stayed silent for nearly two weeks. By the time Defendants submit their reply to this opposition, more time will have elapsed since Defendants received Dr. Hill's reply report than Dr. Hill was afforded to respond to the entirety of Dr. Snyder's 219-page (excluding appendices) rebuttal report. As such, Defendants' claim that "[a]t this late hour, [they] cannot reasonably prepare a written rebuttal to Dr. Hill's GUPPI analysis," Dkt. 98 at 8, is either false or self-inflicted.

**3. Defendants' cited authority fails to justify exclusion of Dr. Hill's GUPPI analysis.**

Defendants cite a total of three cases in their brief, none of which struck expert disclosures for impermissibly broad rebuttal analyses as the Defendants request the Court do here. *See Artis v. Yellen*, 307 F.R.D. 13, 21–22 (D.D.C. 2014); *Guerra v. Dematic Corp.*, No. 3:18-CV-00376-LRH-CLB, 2022 WL 1062336, at *2–4 (D. Nev. Apr. 8, 2022); *Keener v. United States*, 181 F.R.D. 639, 641–42 (D. Mont. 1998). In all three cases, the struck expert report was filed *after* the court's deadline for expert disclosures, and in the first case Defendants cite, *Artis*, seven months after the expert was deposed. *Artis*, 307 F.R.D. at 21–22. Dr. Hill's analysis was disclosed within the expert deadlines set by the CMO and Defendants deposed Dr. Hill regarding his GUPPI analysis. Therefore, these cases cannot justify striking Dr. Hill's GUPPI analysis.

**CONCLUSION**

For the foregoing reasons, Defendants' motion should be denied.

Respectfully submitted,

Dated: July 13, 2022

/s/ John R. Read
John R. Read (DC Bar #419373)
Ethan D. Stevenson
United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 725-0165
Fax: (202) 514-7308
Email: john.read@usdoj.gov

*Counsel for Plaintiff United States of America*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 13, 2022, I served the foregoing and all accompanying documents on the below individuals by electronic mail:

For Defendants Bertelsmann SE & Co. KGaA and Penguin Random House LLC:

Daniel M. Petrocelli (dpetrocelli@omm.com)
M. Randall Oppenheimer (roppenheimer@omm.com)
O'Melveny & Myers LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067

Andrew J. Frackman (afrackman@omm.com)
Abby F. Rudzin (arudzin@omm.com)
Eamonn W. Campbell (ecampbell@omm.com)
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

Julia Schiller (jschiller@omm.com)
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006

Debbie Feinstein
(Debbie.Feinstein@arnoldporter.com)
Arnold & Porter
601 Massachusetts Ave., NW
Washington, DC 20001

For Defendants ViacomCBS Inc. and Simon & Schuster, Inc.:

Stephen Fishbein (sfishbein@shearman.com)
Jessica Delbaum (jdelbaum@shearman.com)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022

Ryan Shores (ryan.shores@shearman.com)
Michael Mitchell
(michael.mitchell@shearman.com)
Shearman & Sterling LLP
401 9th Street NW, Suite 800
Washington, DC 20004

Rachel Mossman
(rachel.mossman@shearman.com)
Shearman & Sterling LLP
2828 North Harwood Street, Suite 1800
Dallas, TX 75201

Dated: July 13, 2022

*/s/ Ihan Kim*
Ihan Kim
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Phone: 202-532-4283
E-mail: ihan.kim@usdoj.gov

*Counsel for Plaintiff United States of America*