# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
            *Plaintiff*,

            v.

BERTELSMANN SE & CO. KGaA,
PENGUIN RANDOM HOUSE, LLC,
VIACOMCBS, INC., and
SIMON & SCHUSTER, INC.
            *Defendants*.

Civil Action No. 1:21-cv-02886-FYP

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO
## STRIKE BELATED EXPERT OPINION APPLYING "GUPPI" ANALYSIS

Defendants have moved to exclude the new "GUPPI" analysis presented in the Reply Report of the government's economic expert, Dr. Nicholas Hill. The government's response shows why the analysis should be excluded.

*First*, the government contends that exclusion of Dr. Hill's new GUPPI opinion should be governed by the standard set forth in *Allstate Ins. Co. v. Shah*, 2021 WL 4555177 (D. Nev. Oct. 5, 2021). Defendants agree. The *Allstate* standard recognizes that an expert "may not advance new arguments for the first time in a reply expert report," and that a reply report (or part thereof) should be excluded "when the disclosing party engaged in sandbagging." *Id*. at *3, *5 (quotation marks omitted). *Allstate* makes clear that a reply report—much like a reply brief—may include new material only to the extent it is "offered to directly contradict or rebut the opposing party's expert." *Id*. at *4 (quotation marks omitted).

Under that standard, Dr. Hill was free to show why Professor Snyder used flawed analyses, calculations, or data to criticize Dr. Hill's application of the "second-score auction" ("SSA") or other of Dr. Hill's opinions. Most of his Reply Report pursues that objective. But

Dr. Hill far exceeds merely responding to Professor Snyder's own analysis when he introduces an entirely *new* analysis with a *new* model—which neither his Initial Report nor Professor Snyder's Rebuttal Report had even mentioned—leaving Professor Snyder no fair opportunity to respond.

The distinction between permissible *responsive* analyses and impermissible *new* analyses is explained in *Allstate*.  On the one hand, the court held, an expert may, for example, re-run calculations from an initial report using data mentioned in the initial report but not included in the calculations, to respond to criticisms about omission of the data.  *Id.* (citing *Sloan Valve Co. v. Zurn Indus.*,2013 WL 3147349, *2-4 (N.D. Ill. June 19, 2013)).  On the other hand, the court emphasized, a reply report may *not* use new data "to conduct an *alternative calculation* for [the expert's] analysis."  *Id.* at *5 (emphasis added).

Under the same standard, Dr. Hill's new GUPPI analysis should be struck a fortiori.  Dr. Hill's GUPPI analysis is not just an "alternative calculation," it is an entirely new model.  According to the government itself, whereas the SSA model tries to "fully simulate the post-merger equilibrium," the GUPPI model examines merger effects "by focusing only on the change in incentives of the merging parties caused by the merger."  Dkt. 108, at 3.  If introducing an "alternative calculation" in a reply is improper, then certainly an "alternative analytical device" is improper as well.  It would be a different situation if Professor Snyder had conducted his own GUPPI analysis to rebut Dr. Hill's SSA  analysis—Dr. Hill would then be fully entitled to critique Professor Snyder's GUPPI model and run his own counter-GUPPI in response.[1]  But

---

[1] The government repeatedly suggests that Professor Snyder *did* have an obligation to produce his own model, Dkt. 108, at 1, 2, even going so far as to say his lack of a model was a "critical omission," *id.* at 6.  Dr. Snyder had no obligation to prepare his own counter-model, either GUPPI or any other abstract device.  The government bears "the ultimate burden of persuasion" on "every element of [a] Section 7 challenge, and a failure of proof in any respect

because neither expert had never even mentioned a GUPPI analysis, let alone expressed any opinions about its application to this case, it was clearly an improper "new opinion" under the *Allstate* standard—or any common-sense standard—to introduce and opine about this model's validity and outcomes for the first time in the Reply.

*Second*, in an effort to show that Dr. Hill's GUPPI opinion is not new to this case, the government rests heavily on an indefensible mischaracterization of the parties' pre-litigation communications that are not in the record of this case. According to the government, Dr. Hill's GUPPI analysis was "developed by Defendants' own economists almost a year ago," Dkt. 108, at 5, in a paper Defendants submitted in response to a government query about GUPPI, *id.* at 3. The government asserts that Defendants' submission itself validates Dr. Hill's analysis, in that that Dr. Hill merely "present[ed] results from GUPPI models that were designed by Defendants' economists" and that the "GUPPI models derived by the defendants—which cover a range of auction types—predict advance decreases that are similar to those predicted by the second-score auction model." *Id.* at 6 (quotation marks omitted).

The government's reliance on these pre-litigation, extra-record communications only underscores the unfairness in Dr. Hill's untimely GUPPI analysis. Had he conducted and disclosed that analysis in his Initial Report and thereby afforded Defendants and Professor Snyder an opportunity to respond, they could have developed a full record about the validity and limitations of the GUPPI analysis in this context. Instead the government blithely invokes Defendants' pre-litigation submission, as if that submission alone obviates any need for an actual

---

will mean the transaction should not be enjoined." *FTC v. Arch Coal*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004). It was accordingly more than sufficient for Professor Snyder to debunk Dr. Hill's model on its own terms and show why the model does not prove the competitive harm the government alleges.

record addressing Dr. Snyder's GUPPI analysis. But among other things, the government's self-serving characterizations of the submission omit its many caveats, including:

- its observation that Defendants were unaware of any precedent where the government had publicly applied the GUPPI to a "buy side" market to screen for merger effects;

- its warning that because the basic GUPPI analysis *necessarily* shows an adverse price effect from any merger, the analysis must also incorporate projected synergies that would have the opposite price effect; and

- its criticism that the government was incorrectly focusing on Big Five market shares alone, when many other publishers actually create competitive pressure in real-world acquisitions.

Despite such caveats, Defendants proffered a GUPPI analysis, based on the data then available, showing that a preliminary GUPPI analysis did *not* project adverse price effects in any market the government was then considering, contrary to Dr. Hill's analysis.

Discussion of that submission during the pre-litigation investigation was the last Defendants heard from the government about any GUPPI analysis, until Dr. Hill's Reply. The omission of any GUPPI analysis from Dr. Hill's Initial Report was a silence seemingly pregnant with meaning: Dr. Hill evidently agreed that the initial GUPPI screening device would not generate meaningful predictions about price effects in this context. After all, Dr. Hill had recently testified that any GUPPI analysis only "measures the upward pricing pressure created by a merger" and "cannot predict how a merger is likely to affect prices." Defs.' Proposed Findings of Fact & Conclusions of Law at 104 (¶ 260 & nn.602-04), *FTC v. RAG-Stiftung*, Case No. 1:19-cv-02337-TJK (D.D.C.) (Dkt. 138-1). It was thus hardly surprising that, to conduct a deeper analysis here, Dr. Hill chose to invoke a *different* model that seeks not only to consider "incentives" in isolation, but to "fully simulate the post-merger equilibrium." Dkt. 108, at 3.

The fact that Defendants had months earlier responded to a government request and submitted a paper addressing GUPPI, filled with caveats and warnings about its proper application, does not remotely justify Dr. Hill's failure to disclose his own GUPPI analysis in his Initial Report. Just the opposite: Defendants' submission gave Dr. Hill clear notice of their concerns about applying GUPPI in this context. His only response was to *forgo* GUPPI in favor of different model. He cannot now fairly resurrect GUPPI in his Reply for the first time, leaving Defendants' expert no reasonable opportunity to develop and submit a written critique, as the Case Management Order contemplates.

According to the government, introducing a new analysis to answer criticism of an expert's original analysis "'is archetypal rebuttal testimony,' *Cf. Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03 CV 1851(NGG)(RML), 2008 WL 4911440, at *3 (E.D.N.Y. Nov. 13, 2008)." Dkt. 108, at 7. As foreshadowed by the "*Cf.*" signal, the cited case says no such thing. To the contrary, the rebuttal testimony there showed that the adverse expert's report made a single data error that led to a series of unjustified conclusions. *See Sci. Components Corp.*, 2008 WL 4911440, at *2 (testimony "identifie[d] a flawed premise in an expert report," which "cast[] doubt on both that report's conclusions and its author's expertise"). Such testimony is indeed "archetypal rebuttal testimony," but it is nothing like Dr. Hill's new GUPPI analysis. As noted above, the *rest* of his report properly sought to respond to Professor's Snyder's analysis on its own terms, but his GUPPI analysis simply introduced a new model and new analysis, without giving Professor Snyder any opportunity to respond. If the government had approach this issue fairly, Defendants' expert could have provided this Court with his own considered response to Dr. Snyder in his Rebuttal Report. And the parties at trial could properly

debate GUPPI on its merits with a full expert record, rather than now trading unsworn recollections about pre-litigation communications not before the Court.

*Third*, the government complains that Defendants did not move to strike Dr. Hill's GUPPI analysis earlier, as if filing a timely motion to strike by the agreed-upon deadline for filing such motions—the same day the government filed all of its own motions in limine— somehow unfairly prejudiced the government. It did not. The government cannot seriously claim prejudice from being confined to the opinions its expert considered sufficient to support the government's case when he submitted his Initial Report. If those opinions turn out to be insufficient, that result does not show prejudice, but a flawed case. To the extent the government thinks Dr. Hill's new GUPPI analysis is *important* to its case, it is all the more reason his Initial Report should have disclosed that analysis. Its failure to do so is a problem entirely of the government's own making: the government does not dispute that Dr. Hill had all the information he needed to conduct that analysis and disclose his opinions for Defendants' expert to scrutinize. He simply chose not to.

While the government will suffer no prejudice if Dr. Hill's GUPPI opinion is excluded, Defendants would be seriously prejudiced by the opposite result. When it disclosed its new GUPPI analysis, the government was fully aware that Defendants would have no opportunity to respond under the CMO, and no realistic opportunity to develop an ad hoc response outside the CMO structure, especially given the many burdens Defendants already must bear to prepare for trial just over two weeks from today. Defendants should not suffer the consequences of the government's gamesmanship.

**CONCLUSION**

For the foregoing reasons, the motion to strike Dr. Hill's belated GUPPI analysis should be granted.

Dated: July 15, 2022

Respectfully submitted,

By:  */s/ Daniel M. Petrocelli*

Daniel M. Petrocelli (appearing *pro hac vice*)
M. Randall Oppenheimer (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Andrew J. Frackman (appearing *pro hac vice*)
Abby F. Rudzin (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10026
Telephone: (212) 326-2000
afrackman@omm.com
arudzin@omm.com

Jonathan D. Hacker (D.C. Bar No. 456553)
Julia Schiller (D.C. Bar No. 986369)
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
jhacker@omm.com
jschiller@omm.com

Deborah L. Feinstein (D.C. Bar No. 412109)
Jason Ewart (D.C. Bar No. 484126)
**ARNOLD & PORTER**
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
debbie.feinstein@arnoldporter.com
jason.ewart@arnoldporter.com

*Attorneys for Defendants Bertelsmann SE & Co.
KGaA and Penguin Random House LLC*

8

By:    */s/ Stephen R. Fishbein*

Stephen R. Fishbein (appearing *pro hac vice*)
Jessica K. Delbaum (appearing *pro hac vice*)
**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
sfishbein@shearman.com
jessica.delbaum@shearman.com

Ryan Shores (D.C. Bar No. 500031)
Michael Mitchell (D.C. Bar No. 1531689)
**SHEARMAN & STERLING LLP**
401 9th Street, N.W., Suite 800
Washington, D.C. 20004
Telephone: (202) 508-8000
ryan.shores@shearman.com
michael.mitchell@shearman.com

Rachel E. Mossman (D.C. Bar No. 1016255)
**SHEARMAN & STERLING LLP**
2828 North Harwood Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 271-5777
rachel.mossman@shearman.com

*Attorneys for Defendants Paramount Global (f/k/a ViacomCBS Inc.) and Simon & Schuster, Inc.*