## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                    *Plaintiff,*

          v.

BERTELSMANN SE & CO. KGaA,          Civil Action No. 1:21-cv-02886-FYP
PENGUIN RANDOM HOUSE, LLC,
VIACOMCBS, INC., and
SIMON & SCHUSTER, INC,

                    *Defendants*.

## UNITED STATES' REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY FROM JENNIFER RUDOLPH WALSH

The United States moved *in limine* to exclude the expert testimony of Defendants' proffered industry expert Jennifer Rudolph Walsh because, as a former literary agent in the industry, she is not qualified to provide expert economic testimony about the impact of the merger and because her testimony on such matters is without foundation and therefore completely unreliable. *See* Dkt. 96. In their opposition, Defendants assert that Ms. Walsh is entitled to testify as an expert and that she should have "broader leeway than other industry-veteran fact witnesses to express opinions about, for example, whether Dr. Hill's analysis applies in the real world she has actually experienced." Dkt. 105 at 8. That question is, in fact, the key one: whether someone who has personal experience in one aspect of the industry but has no economic background or knowledge should be able to rebut as an expert the data-driven, market-wide conclusions of an economic expert, which are also the subject of testimony by Defendants' economic expert.

Giving Ms. Walsh the imprimatur of an expert to offer personal experience-based opinions about what will happen to the industry as a whole if an unprecedented merger is consummated discounts the experience and belief of every other industry player the parties intend to call—and there are many of them.  Ms. Walsh's testimony should be limited to her personal experiences and knowledge of the business of a literary agent, as the testimony of all other fact witnesses will be, along with whatever fact-based opinions the Court finds helpful under Fed. R. Evid. 701.  Ms. Walsh's purported "expert" opinions under Fed. R. Evid. 702 about the legal and economic matters at issue are neither based in any expertise nor industry data and should be excluded.

## ARGUMENT

**I.    Ms. Walsh's Deposition Testimony Establishes that She Has Insufficient Foundation To Testify as an Expert on the Effects of the Merger.**

In their introduction, Defendants make clear that they intend to offer Ms. Walsh's testimony for two points: (1) her "opinions about the real-world competitive forces that affect bargaining for the acquisition of such books and about the real-world effects of this merger on those bargaining processes"; and (2) "the many ways in which the opinions of the government's expert, Dr. Nicholas Hill, rest on critical assumptions at odds with the facts of how books are acquired in this industry."  Dkt. 105 at 5.  Ms. Walsh does not simply seek to offer information about the real world as it existed when she was still an agent or which assumptions she believes Dr. Hill got wrong; she wants to offer opinions about the beliefs of other players in the market and about the effect of the merger on competition among publishers in the entire industry, areas in which she has no practical experience, data, or methodology.

An example from Ms. Walsh's deposition illustrates the way in which Ms. Walsh seeks to conjecture about the state of the industry based on no industry-wide knowledge.  Asked in her

deposition for the basis for the opinion in her report that the Big Five publishers could all

disappear and that there would be no adverse impact on the industry, Ms. Walsh testified as

follows:

> Q.    Let's turn to the last paragraph of your report, and specifically the last sentence. "If all of the Big Five publishers closed their doors tomorrow, writers will still write, readers will still read and the absence of a competitor or competition will have no adverse impact on the industry." What percentage of titles in the U.S. are published by the Big Five?
>
> A.    I don't know.
>
> Q.    And -- but it's your opinion that the Big Five could disappear, and the industry would be the same?
>
> MS. RUDZIN:        Object to the form of the question.
>
> THE WITNESS:        It would evolve. But I think the net result would be that writers still write, readers still read. And that while there might need to be new business models in -- you know, that would have to arise so that the money could exchange hands without the big distributors, the culture would find a way. And I believe that, ultimately, the money would be the same and certainly the amount of books that publish will be the same.
>
> BY MS. CROSS: Q.  On what time frame?
>
> A.    You know, hard to say.  Quick.
>
> Q.    What do you mean by "quick"?
>
> A.    I think people figure things out very quickly.  And I think, you know, places like, for example, Patreon where people pay, you know, a monthly amount for people's writings, I think that there would be things that would fill the void.  And people that -- publishers that are in one business, one category would expand to be in other categories to fill the void. And I think that there's all sorts of opportunities that would arise.
>
> Q.    And what's the basis for that belief?
>
> A.    My experience.
>
> Q.    Have you seen any large publisher disappear?
>
> A.    I just -- I feel like I -- I saw a large bookstore chain disappear, and that's something that you never -- you never could imagine, you know, would happen.· But it happens, and something else fills its place. And I believe that in the unlikely event that all five of the major publishers disappeared, something would fill the space.  I don't believe that writers would stop writing, readers would stop reading, and I don't believe people would go uncompensated for their work.

Walsh Dep. at 309:17–312:6.  This colloquy establishes the fundamental problem with Ms.

Walsh's testimony: one person's belief that some publisher or publishers will emerge to maintain

the marketplace and that competition will continue at the same level is not appropriate expert

testimony.  Moreover, Ms. Walsh has no foundation for her conclusion that the number of books and the amount of advances would remain the same in the new competitive landscape she imagines would emerge.  Ms. Walsh is simply providing a personal opinion unsupported by any particularized facts or analysis, and, contrary to Defendants' argument, it should not get past this Court's gate-keeping responsibility under Fed. R. Evid. 702.

Similarly, Ms. Walsh seeks to testify about what motivates publishers in acquiring books—including how publishers decide what books to bid on, how much to bid, and what resources they have—without ever having worked for a publisher or having reviewed the internal processes that guide those decisions (such as a profit/loss statement, authorization of advances, publisher-specific guidance on payout terms, and win/loss reports).  Indeed, Ms. Walsh has not even looked at the documents on these subjects produced in this litigation.  As such, her testimony on this subject would be entirely ungrounded and merely an *ipse dixit*.

## II.    The Case Law Is Clear That Expert Opinions Must Have a Traceable, Analytical Basis in Objective Fact, and Ms. Walsh's Opinions Do Not Meet That Standard.

Defendants assert that "Courts thus routinely admit testimony from industry experts to help explain industries and market transactions, including in antitrust cases."  Dkt. 105 at 9.  The four cases they cite illustrate the weakness of their argument.  In *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 40 (S.D.N.Y. 2016), the Southern District of New York denied a motion to exclude an industry expert.  That expert, a Professor at University of Virginia's Darden School of Business Administration, identified "five criteria to assess the substitutability of third-party [in-store promotions] for other advertising methods, such as traditional out-of-store consumer promotions." The court noted that that the expert in his report "presents a table identifying sufficient support for his methodology in academic literature and practitioner studies." *Id.*  Ms. Walsh cites no literature and no practitioner studies; rather, as described in the United States'

motion, she relies on three materials, two of which are the Complaint and the Dr. Hill's expert report; the third is a small publisher's subpoena response.

In the next case Defendants rely on, *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132–134 (2d Cir. 2006), the expert testimony sought to be excluded concerned customs and practices in the insurance industry. The proffered expert—who had been a broker specializing in property insurance and an underwriter for a property insurance company—was admitted to testify about those customs and practices. Unlike *SR Int'l Bus.*, this case does not have a custom-and-practice legal standard for which customs and practice opinion testimony is helpful.

In *FTC v. Whole Foods Mkt., Inc.,* 502 F. Supp. 2d 1, 13 (D.D.C. 2007), the court declined to exclude testimony about the state of the industry from a "recognized expert" in the food retailing industry; that expert was a Professor of Food Marketing, whose research and consulting had been in both the retail and supplier sides of food marketing; he testified regarding his knowledge of the store formats and operations of certain stores. So *Whole Foods* stands for the concept that an expert in an area—food retailing—can testify about operations in that industry, not the antitrust consequences of a merger in that industry. In *United States v. SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172 (D.D.C. 2001), the court heard testimony from an industry expert in disaster recovery about the types of solutions available in the industry for disaster recovery, their availability, and costs. The court noted that that expert, Mr. Keating, presented a hypothesis about the number of companies with disaster recovery systems that managed them internally—"but his support for that estimate was also the statistically-significant CIO survey." *Id.* at 187. Ms. Walsh has done no survey work to support her opinions.

Defendants' attempts to distinguish the United States' cases that excluded experts point out the very issue they're fighting: Defendants characterize *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530 (D. Md. 2002) as "excluding non-antitrust expert's opinion defining the relevant product market" and *Va. Vermiculite Ltd. v. W.R. Grace & Co-Conn.*, 98 F. Supp. 2d 729 (W.D. Va. 2000) as "declining to qualify witness as an 'expert in antitrust economics' given his lack of antitrust experience and training[.]"  Dkt. 105 at 13.  Those holdings should guide the outcome here: a non-antitrust expert is trying to opine on antitrust concepts like market definition and harm from a merger.  In her deposition, Ms. Walsh asserted a rebuttal opinion to Dr. Hill's market definition methodology as follows:

> Q.    Let me ask you a specific question. So Section 5.5 is, "The market for anticipated top sellers passes the hypothetical monopsonist test."  That's the title of that section.
> A.    Okay.
> Q.    You don't disagree with the way he applied the hypothetical monopsonist test?
> A.    I don't know what the hypothetical monopsonist test is, so I couldn't possibly agree.
> Q.    Or disagree?
> A.    Or disagree.  Either way, yes.

Walsh Dep. at 77:22–79:6.[1]  Ms. Walsh's lack of familiarity with the hypothetical monopsonist test means her comment on Dr. Hill's market definition lacks any foundation.

Defendants attempt to cast the antitrust analysis that both sides' experts will offer opinions on as an "abstract mathematical model" that relies on "assumptions and speculation about how the real-world market operates."  Dkt. 105 at 14; *see also* Dkt. 105 at 11 (claiming that Dr. Hill's use of head-to-head competition data between the merging parties "are relevant to

---

[1] The hypothetical monopsonist test is the buyer-side counterpart to the "hypothetical monopolist test," which courts routinely apply in sell-side cases to define a product market.  *See*, *e.g.*, *Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 47, 57–58 (D.D.C. 2018); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 121–122 (D.D.C. 2016) ("*Staples II*").

Dr. Hill's analysis only because he chose to use them as inputs to his mathematical model" and that "[t]he point of Ms. Walsh's testimony is that such data are not useful, because in her vast experience, a myopic focus on instances of 'head to head competition' between two particular publishers fails to capture all the competitive forces that actually affect outcomes in book acquisitions."). Dr. Hill reviewed voluminous records from competitive events, including emails from employees of the parties, agents, and authors, and deposition testimony from party witnesses, agents, and authors, and incorporated this information in his analysis. Ms. Walsh did not even review the data Dr. Hill compiled, much less the documents that underlie his analysis. The role of head-to-head competition data in antitrust analyses is well-established; Ms. Walsh's belief that such data is myopic is no excuse for her not having reviewed the data Dr. Hill compiled that she wants to comment on (even assuming she had the training to render a useful opinion on the data). If Defendants want to attack Dr. Hill on the inputs or outputs to his model, they will have ample opportunity to do so through their own economic expert and through cross-examination.

## CONCLUSION

Defendants' argument that the Court would "deny itself the benefits of Ms. Walsh's extensive experience and valuable industry perspectives" if it insisted that Ms. Walsh testify solely based on her actual experience is misplaced. If the Court appropriately limited Ms. Walsh's testimony, the Court would be focusing Ms. Walsh's testimony in the area in which she in fact has knowledge. If knowledge of agents' techniques is what Ms. Walsh brings to the table, that knowledge—not predictions of the competitive future implications of a merger—should be what she offers. For these reasons, the United States requests that the Court grant its Motion.

Respectfully submitted,

Dated: July 15, 2022

_____/s John R. Read_____

John R. Read (DC Bar #419373)
United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 725-0165
Fax: (202) 514-7308
Email: john.read@usdoj.gov

*Counsel for Plaintiff United States of America*

## CERTIFICATE OF SERVICE

I certify that on July 15, 2022, I served the foregoing and all accompanying documents on the below individuals by electronic mail:

For Defendants Bertelsmann SE & Co. KGaA and Penguin Random House LLC:

Daniel M. Petrocelli (dpetrocelli@omm.com)
M. Randall Oppenheimer (roppenheimer@omm.com)
O'Melveny & Myers LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067

Andrew J. Frackman (afrackman@omm.com)
Abby F. Rudzin (arudzin@omm.com)
Eamonn W. Campbell (ecampbell@omm.com)
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

Julia Schiller (jschiller@omm.com)
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006

Debbie Feinstein (Debbie.Feinstein@arnoldporter.com)
Arnold & Porter
601 Massachusetts Ave., NW
Washington, DC 20001

For Defendants ViacomCBS Inc. and Simon & Schuster, Inc.:

Stephen Fishbein (sfishbein@shearman.com)
Jessica Delbaum (jdelbaum@shearman.com)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022

Ryan Shores (ryan.shores@shearman.com)
Michael Mitchell (michael.mitchell@shearman.com)
Shearman & Sterling LLP
401 9th Street NW, Suite 800
Washington, DC 20004

Rachel Mossman (rachel.mossman@shearman.com)
Shearman & Sterling LLP
2828 North Harwood Street, Suite 1800
Dallas, TX 75201

Dated: July 15, 2022

*/s/ Ihan Kim*
Ihan Kim
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Phone: 202-532-4283
E-mail: ihan.kim@usdoj.gov

*Counsel for Plaintiff United States of America*