# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*Plaintiff,*<br><br>v.<br><br>BERTELSMANN SE & CO. KGaA,<br>PENGUIN RANDOM HOUSE, LLC,<br>VIACOMCBS, INC., and<br>SIMON & SCHUSTER, INC.<br><br>*Defendants.* | **[FILED UNDER SEAL]**<br><br>Civil Action No. 1:21-cv-02886-FYP |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO UNITED STATES' MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF PROFESSOR EDWARD SNYDER REGARDING EFFICIENCIES**

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................. 1

II.  EFFICIENCIES ARE AN IMPORTANT ISSUE FOR THE COURT TO DECIDE AT TRIAL, NOT BY *IN LIMINE* MOTION..................................... 3

III.  *DAUBERT* MOTIONS TO PRECLUDE EXPERT TESTIMONY ARE DISFAVORED IN BENCH TRIALS. ........................................................ 6

IV.  PROFESSOR SNYDER'S RELIANCE ON THE PRH EFFICIENCIES MODEL IS NOT GROUNDS TO EXCLUDE HIS TESTIMONY ON MERGER-SPECIFICITY, PASS-THROUGH, OR OTHER EFFICIENCY-RELATED SUBJECTS. ...................................................................................... 8

V.  THE DOJ'S VARIOUS ATTACKS ON THE PRH EFFICIENCIES MODEL AND PROFESSOR SNYDER'S OPINIONS AT BEST GO TO THE WEIGHT, NOT THE ADMISSIBILITY, OF THE EVIDENCE. .................................... 13

    A.  PRH Has Provided Ample Substantiation to Support the Projections in the PRH Efficiencies Model. ........................................................ 14

    B.  No Court Has Held That Efficiencies Must Be Analyzed and Projected Using a "Bottoms-Up" Approach. ...................................... 15

    C.  PRH's Efficiency Projections Are Not Outdated.................................. 17

    D.  PRH Can Rely On Its Vast Experience Achieving Efficiencies in Prior Transactions to Support Its Efficiency Projections Here. ................... 18

    E.  Professor Snyder Analyzed and Confirmed That Each Category of Efficiencies Projected In PRH's Model Can Offset the Minimal Harm Alleged. .......................................................................... 19

VI.  THERE IS NO BASIS TO EXCLUDE PROFESSOR SNYDER'S TESTIMONY CONCERNING BENEFITS TO AUTHORS. ............................. 21

VII.  CONCLUSION .................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ambrosini v. Labarraque*,
  101 F.3d 129 (D.C. Cir. 1996) ................................................................. 3, 13, 16, 22

*Barnett v. PA Consulting Grp., Inc.*,
  35 F. Supp. 3d 11 (D.D.C. 2014) .......................................................................... 23

*Bazarian International Financial Associates, LLC v. Desarrollos Aerohotelco, C.A.*,
  315 F. Supp. 3d 101 (D.D.C. 2018) ........................................................................ 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ....................................................................................... 6, 7

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) .......................................................................................... 24

*F.T.C. v. Staples, Inc.*,
  970 F. Supp. 1066 (D.D.C. 1997) ....................................................... 6, 9, 10, 15

*F.T.C. v. University Health, Inc.*,
  938 F.2d 1206 (11th Cir. 1991) ............................................................................. 4

*Frye v United States*,
  293 F. 1013 (1923) ............................................................................................... 6

*FTC v. Arch Coal*,
  329 F. Supp. 2d 109 (D.D.C. 2004) ....................................................................... 4

*FTC v. Procter & Gamble Co.*,
  386 U.S. 568 (1967) ............................................................................................. 4

*FTC v. Qualcomm, Inc.*,
  411 F. Supp. 3d 658 (N.D. Cal. 2019) ................................................................ 24

*FTC v. Qualcomm, Inc.*,
  Case No. 17-cv-00220-LHK, 2018 WL 6615050 (N.D. Cal. 2018) ..................... 24

*FTC v. Sysco Corp.*,
  113 F. Supp 3d 1 (D.D.C. 2015) .......................................................................... 13

*FTC v. Tronox Ltd.*,
  332 F. Supp. 3d 187 (D.D.C. 2018) ..................................................................... 24

*FTC v. Wilh. Wilhelmsen Holding ASA*,
  341 F. Supp. 3d 27 (D.D.C. 2018) ....................................................................... 19

*Kumho Tire Company v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................................. 6

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984) ............................................................................................. 24

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020) ................................................................... 5

# TABLE OF AUTHORITIES

**Page(s)**

*Paige International, Inc. v. XL Specialty Insurance Co.*,
  2016 WL 3024008 (D.D.C. 2016) .......................................................................... 2, 7

*Salomon Construction and Roofing Corp. v. James McHugh Construction Co.*,
  2019 WL5256980 (S.D. Fl. Mar. 22, 2019) ............................................................. 7

*SD3, LLC v. Rea*,
  71 F. Supp. 3d 189 (D.D.C. 2014) .......................................................................... 7

*Sitts v. Dairy Farmers of Am., Inc.*,
  Case No. 2:16-cv-00287, 2020 WL 3467993 (D. Vt. June 24, 2020) ..................... 24

*U.S. v. H&R Block*,
  831 F. Supp. 2d 27 (D.D.C. 2011) ............................................................... 3, 7, 13

*U.S. v. H&R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) ............................................................... 3, 4, 9

*U.S. v. Philadelphia National Bank*,
  374 U.S. 321 (1963) ................................................................................................ 4

*United States ex rel Morsell v. NortonLifeLock, Inc.*,
  567 F. Supp. 3d 248 (D.D.C. 2021) ................................................................. 7, 12

*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017) ..................................................................... 9, 19

*United States v. Anthem*,
  236 F. Supp. 3d 171 (D.D.C. 2017) ............................................................... 4, 5, 6

*United States v. Anthem*,
  855 F.3d 345 (D.C. Cir. 2017) ................................................................................ 4

*United States v. Henry*,
  472 F.3d 910 (D.C. Cir. 2007 ............................................................................... 12

## Other Authorities

2006 Commentary on the Horizontal Merger Guidelines .................................... 9, 18, 20

Horizontal Merger Guidelines ................................................................................ passim

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 970c2 ...................... 4

## I.    INTRODUCTION

The Department of Justice ("DOJ")'s 18-page motion to exclude the testimony of Professor Edward A. Snyder ("Motion" or "Mot."), Dkt. 97.1, is a transparent and inappropriate attempt to side-step the fact finding process and do an end-run around Defendants' claimed efficiencies before a single witness has taken the stand or the Court has received a single document into evidence, and must be denied.  And no wonder: Given the low level of harm ($29 million per year) the DOJ's expert, Dr. Nicholas Hill, alleges, based on a model which does not reflect the real world, even a small amount of efficiencies will easily demonstrate there is no harm.  And here, PRH has projected ███████████████ in annual cognizable merger efficiencies.  This, coupled with the admission by the DOJ's other expert, certified public accountant Christine Hammer, that she "assume[s] there will be" efficiencies from the merger, makes determination of the efficiencies a potentially vital component of the upcoming trial if, contrary to the evidence, the government demonstrates that there might be harm from the transaction.

Defendants' expert, Professor Snyder, is an economist and the William S. Beinecke Professor of Economics and Management at the Yale School of Management.  At trial, Professor Snyder will present expert testimony on various topics, including (i) the significant efficiencies that Penguin Random House ("PRH") estimates it will achieve from its merger with Simon & Schuster ("S&S"), the reasonableness of PRH's process of estimating efficiencies and that the categories of efficiencies are consistent with economic principles; (ii) how the company can only

1

achieve efficiencies as a result of the proposed merger; and (iii) how those efficiencies will fully mitigate the anticompetitive effects the DOJ alleges.[1]

As explained herein, there is no basis to exclude Professor Snyder's testimony on efficiencies. The DOJ's Motion, which reads more like a request for summary judgment than an *in limine* motion, turns on a host of disputed factual and legal issues. For example, the DOJ complains that Professor Snyder "did not create his own efficiencies model," that the PRH Efficiencies Model "was not created as part of a bottoms-up integration exercise," and that Professor Snyder "projected marketing campaign, freight rate, and book manufacturing synergies based on PRH's estimates" instead of "the companies' actual contracts." Dkt. 97.1 at 11-13. These arguments go to the weight and credibility of the evidence, not its admissibility. *See*, *e.g*., *Paige Int'l, Inc. v. XL Specialty Insurance Co.,* 2016 WL 3024008, at *5 (D.D.C. 2016) ("Resolving factual disputes or weigh[ing] evidence is the function of a motion for summary judgment, or, in the alternative, the task of the factfinder at trial. [Plaintiff] may reasonably believe that [the expert's] analysis fails to consider important or contrary evidence, or inappropriately jumps to conclusions, but the solution is to provide competing evidence of its own or to cross-examine [the expert] at trial, rather than seek to strike Defendant's Report.").[2] Likewise, the DOJ's assertion that "Defendants have failed to demonstrate the factual or technical rigor required to make a cognizable efficiencies claim," Dkt. 97.1 at 7, is based on and parrots Ms. Hammer's expert opinions and ultimately reduces to a complaint about the sufficiency of the proof, not a reason to exclude Professor Snyder's testimony. These are classic "battle of the expert" issues which require the trier of fact—here, the Court—to receive and

---

[1] Corrected Initial Expert Report of Edward A. Snyder, May 20, 2022 ("Initial Snyder Report") ¶ 14.

[2] Unless otherwise indicated, all internal citations and quotations are omitted.

review the evidence, weigh it, and make credibility determinations. That can only happen at trial.

This motion to exclude is particularly inappropriate in the context of this upcoming bench trial. The normal considerations courts typically cite when *Daubert* motions are granted—fear of confusing the jury or "tainting the trial by exposing the jury to unreliable evidence"—simply do not apply where, as here, the Court will serve as both the "gatekeeper" and factfinder. *United States v. H&R Block*, 831 F. Supp. 2d 27, 30 (D.D.C. 2011) (noting the "importance of the trial court's gatekeeper role is significantly diminished" in a bench trial); *see also Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996) (*Daubert* "does not establish a heightened threshold for the admission of expert evidence, but rather focuses on a court's gatekeeper role as a check on subjective belief and unsupported speculation"). Professor Snyder's opinions clearly meet the low "relevance" and "reliability" bars for expert testimony in a bench trial. If the DOJ wishes to challenge and contest Professor Snyder's efficiencies opinions, it can do so through the traditional methods of cross-examination or presentation of rebuttal expert testimony. What the DOJ cannot do is try to prevent full and fair adjudication of these issues by pretending this evidence is so irrelevant and unreliable that the Court cannot entertain it in the first instance.

## II.    EFFICIENCIES ARE AN IMPORTANT ISSUE FOR THE COURT TO DECIDE AT TRIAL, NOT BY *IN LIMINE* MOTION.

"One of the key benefits of a merger to the economy is its potential to generate efficiencies." *H&R Block, Inc.*, 833 F. Supp. 2d at 89. Indeed, the DOJ's and FTC's Horizontal Merger Guidelines (the "Merger Guidelines")—which set forth those agencies' practices and policies when evaluating mergers and acquisitions involving actual or potential competitors under the federal antitrust laws—expressly recognize the importance of efficiencies:

Competition usually spurs firms to achieve efficiencies internally. Nevertheless, *a primary benefit of mergers to the economy is their potential to generate significant efficiencies and thus enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products*. For example, merger-generated efficiencies may enhance competition by permitting two ineffective competitors to form a more effective competitor, e.g., by combining complementary assets. In a unilateral effects context, incremental cost reductions may reduce or reverse any increases in the merged firm's incentive to elevate price. Efficiencies also may lead to new or improved products, even if they do not immediately and directly affect price.

Merger Guidelines ¶ 10 (emphasis added).

Contrary to the DOJ's suggestion, efficiencies are relevant to the question of whether a merger violates Section 7 of the Clayton Act.[3] *See* Merger Guidelines ¶ 10 ("The Agencies will not challenge a merger if cognizable efficiencies are of a character and magnitude such that the merger is not likely to be anticompetitive in any relevant market.").  For example, "evidence [of efficiencies] is relevant to the competitive effects analysis of the market required to determine whether the proposed transaction will substantially lessen competition."  *FTC v. Arch Coal*, 329 F. Supp. 2d 109, 151 (D.D.C. 2004); *see also H&R Block, Inc.*, 833 F. Supp. 2d at 89 ("Courts have recognized that a showing of sufficient efficiencies may rebut the government's showing of likely anticompetitive effects."); *United States v. Anthem*, 855 F.3d 345, 373 (D.C. Cir. 2017) ("The case law of the Supreme Court and this Court, as well as the Government's own Merger Guidelines, establish that we must consider the efficiencies and consumer benefits of a merger together with its anti-competitive effects.") (Kavanaugh, J., dissenting).

---

[3] The DOJ cites *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963), and *FTC v. Procter & Gamble Co*., 386 U.S. 568, 580 (1967), but neither of those opinions held that efficiencies is irrelevant to a Clayton Act challenge.  *See also United States v. Anthem*, 236 F. Supp. 3d 171, 252 (D.D.C. 2017) (describing *Philadelphia National Bank* as only saying that a "potential general benefit to consumers" unrelated to enhancement of competition may not be credited); *FTC v. University Health, Inc.*, 938 F.2d 1206, 1222 (11th Cir. 1991) (examining both cases and concluding consideration of efficiencies in a Section 7 Clayton Act challenge remains "appropriate in certain circumstances"); PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 970c2 ("The Court's brief and unelaborated language [in *Procter & Gamble Co.*] cannot reasonably be taken as a definitive disposition of so important and complex an issue as the proper role of economies in analyzing the legality of a merger.").

Moreover, Professor Snyder will show at trial that Dr. Hill's harm calculations are flawed because they fail to account for the significant and cognizable efficiencies that the merger will create and that will provide strong incentives for the merging parties to *increase* author compensation.[4]  Such efficiencies are clearly relevant to whether DOJ can prove the merger will substantially lessen competition.  For example, in *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020), a group of plaintiff states sued to enjoin the proposed acquisition of Sprint by T-Mobile and, as here, alleged the merger would violate Section 7 of the Clayton Act.  Following a bench trial, the court rejected plaintiffs' claims and held "the record evidence confirm[s] that there is substantial merit to Defendants' claims that the efficiencies arising from the Proposed Merger will lead T-Mobile to compete more aggressively to the ultimate benefit of all consumers, and in particular the subscribers of each of the four major competitors."  *Id*. at 210.

When examining efficiencies, courts typically focus on whether they are "merger-specific" and verifiable by reasonable means.  *Anthem*, 236 F. Supp. 3d at 236.  Merger-specific means "those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable

---

[4] Dr. Hill admitted his alleged harm calculations do not account, and must be adjusted, for any cognizable efficiencies.  7/1/2022 N. Hill Dep. at 78:23-80:14 ("Q. Apart from Ms. Hammer's opinions, do you have any independent opinions about whether cognizable efficiencies will occur in this case? A. I do not. Q. And if Ms. Hammer was incorrect in her assessment, your inclusion -- your failure to include efficiencies would overstate the harm in this case? . . . A. If they were significant. So setting aside the possibility that my estimates are underestimates, then -- or let's just talk relative to the estimates I made rather than whether they're relative to any true harm.  If there are significant variable cost efficiencies and they would be realized, then they may reduce harm.  Q. And you haven't analyzed that?  A. Well, I believe Dr. Snider (sic) analyzed it, and if I'm recalling correctly from his report, he found that the harm in the second score auction model ▮▮▮▮▮▮▮.  Q. And you have no reason to disagree with that assessment apart from Ms. Hammer's opinion that these are not cognizable efficiencies?  A. Well, so I have two things.  There's the question of whether they're cognizable or not, the original efficiencies.  But then I also disagree with Dr. Snider's (sic) methodology for projecting how much authors will benefit from those.  Setting that aside, but yeah, that's my answer.").

anticompetitive effects."  *Id.*; *see also* Merger Guidelines ¶ 10.  Courts may also examine the extent to which efficiencies are likely to be passed through to consumers (or, in this case, to authors).  *See*, *e.g.*, *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1090 (D.D.C. 1997) (analyzing projected pass-through rate for claimed efficiencies).  PRH will provide evidence at trial supporting and documenting the cognizability of its efficiencies.  The DOJ is free to contest these points at trial, but has no basis to exclude Professor Snyder from testifying to these and other matters altogether.

## III.    *DAUBERT* MOTIONS TO PRECLUDE EXPERT TESTIMONY ARE DISFAVORED IN BENCH TRIALS.

Federal Rule of Evidence 702 ("Rule 702") governs the admissibility of expert testimony. Expert testimony must be relevant and reliable.  *Daubert v. Merrell Dow Pharma., Inc.,* 509 U.S. 579, 588-89 (1993) (rejecting the more stringent "general acceptance" test from *Frye v United States,* 293 F. 1013 (1923), because it is "at odds with the liberal thrust of the Federal Rules and their general approach of relacing the traditional barriers to opinion testimony").  Expert testimony is relevant if it is "sufficiently tied to the facts of the case" and will aid the Court in understanding the evidence or resolving a factual dispute.  *Daubert,* 509 U.S. at 591-93.  "The relevance of proposed expert testimony does not depend on whether the testimony satisfies [a party's] burden on the ultimate issue at trial, but whether the testimony could aid the jury's resolution of the parties' claims."  *Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*, 315 F. Supp. 3d 101, 117 (D.D.C. 2018).

The Court has significant discretion in deciding whether expert testimony is reliable. *Kumho Tire Company v. Carmichael,* 526 U.S. 137, 152 (1999) ("the trial judge must have considerable leeway in deciding…whether particular expert testimony is reliable").  "In considering Rule 702 motions, the court assumes only a limited gate-keep[ing] role directed at

excluding expert testimony that is based upon subjective belief or unsupported speculation," *H&R Block*, 831 F. Supp. 2d at 30, and challenges to an expert's methodology are typically best left to cross-examination at trial or through rebuttal expert testimony. *Paige Int'l, Inc.,* 2016 WL 3024008, at *4; *see also Daubert*, 509 U.S. at 596 ("Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Moreover, in a bench trial the "importance of the trial court's gatekeeper role is significantly diminished . . . because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence." *H&R Block*, 831 F. Supp. 2d at 30. This is because "[w]here the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make such decisions [regarding reliability] prior to hearing the testimony is lessened." *SD3, LLC v. Rea*, 71 F. Supp. 3d 189, 196 (D.D.C. 2014); *see also Salomon Constr. and Roofing Corp. v. James McHugh Constr. Co*., 2019 WL5256980, *4 (S.D. Fla. Mar. 22, 2019) ("McHugh is correct that Daubert motions and motions in limine are generally disfavored, particularly in a bench trial where the gatekeeping rationale is not fully operative."); *United States ex rel Morsell v. NortonLifeLock, Inc.*, 567 F. Supp. 3d 248, 260 (D.D.C. 2021) (in a bench trial "resolving *Daubert* questions at the pretrial stage is generally less efficient than simply hearing the evidence").

IV.     **PROFESSOR SNYDER'S RELIANCE ON THE PRH EFFICIENCIES MODEL IS NOT GROUNDS TO EXCLUDE HIS TESTIMONY ON MERGER-SPECIFICITY, PASS-THROUGH, OR OTHER EFFICIENCY-RELATED SUBJECTS.**

The DOJ claims that because Professor Snyder did not independently replicate the figures the PRH Efficiencies Model projects, the Court should preclude him from testifying about *anything* relating to efficiencies. *See*, *e.g.*, Dkt. 97.1 at 13 ("Dr. Snyder's failure to verify…renders his opinions regarding efficiencies unreliable.").  The Court should deny the Motion for several reasons.

First, the DOJ's insistence that Professor Snyder had to independently recreate and verify the projections in the PRH Efficiencies Model is contrary to agency policy.  DOJ's own guidelines expressly state that "[d]ocuments created in the normal course are more probative than documents created as advocacy materials in merger review."  Merger Guidelines ¶ 2.2.1.[5] DOJ can hardly complain that Professor Snyder rendered opinions based on these "more probative" ordinary course business documents.  *See also* Merger Guidelines ¶ 10 (stating DOJ's policy that "[p]rojections of efficiencies may be viewed with skepticism, particularly when generated outside of the usual business planning process").

Further, the Merger Guidelines state that "it is incumbent upon the merging firms to substantiate efficiency claims *so that the Agencies can verify* by reasonable means the likelihood and magnitude of each asserted efficiency…"  Merger Guidelines ¶ 10 (emphasis added).

---

[5] *See also* 6/29/22 C. Hammer Dep. at 129:7-13 ("Q: By the way, the November 2020 model was prepared in the ordinary course of business, correct? A. The November 2020 model was prepared to—for an investment proposal, so it was an ordinary investment proposal based on Bertelsmann's procedure for doing that."); *id*. at 134:13-21 ("Q. If PRH's expert had conducted a bottoms-up analysis accessing data in the clean room sort of how you explained it, do you think that would be an ordinary course document? A. No, I don't think that would be. I think that would be a specific expert approach that was done for litigation and hopefully would have been refined enough that one could find cognizable efficiencies in it.").

Likewise, the DOJ's 2006 Commentary on the Horizontal Merger Guidelines (the "2006 Commentary") says that "[a]fter the parties have presented substantiation for their claimed merger-specific efficiencies, *the Agencies attempt to verify* those claims." 2006 Commentary at 56 (emphasis added). Nothing in either the Merger Guidelines or the 2006 Commentary suggests that a party's expert is required to perform the verification task.

Nor is there any legal requirement that in a litigation (even where the agency claims it cannot verify the efficiencies) an expert must verify efficiencies. As the DOJ admits, the parties must only substantiate their estimates of efficiencies so they are "reasonably verifiable by an independent party," not "verified." *See* Dkt. 97.1 at 6, 11-12 (citing *H&R Block*, 833 F. Supp. 2d at 89); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 94 (D.D.C. 2017) (Consistent with the Merger Guidelines, "Aetna and Humana must 'substantiate' their efficiency claims."). Indeed, the DOJ's expert, Ms. Hammer, also did not independently verify PRH's efficiencies. [6] Courts have allowed defendants to rely on percipient testimony to help support and establish efficiencies without objection. *See*, *e.g.*, *Staples*, 970 F. Supp. at 1089 (noting the defendants relied upon the testimony and efficiencies study of Shira Goodman, Senior Vice President of Integration at Staples"). Here, Manuel Sansigre, PRH's Senior Vice-President and Head of Global Mergers & Acquisitions, will explain at trial the significant substantiation efforts the company undertook and why that allows the Court to verify those efficiencies.

---

[6] Ms. Hammer claimed that she could not verify the PRH Efficiencies Model because PRH purportedly failed to provide sufficient documentation to support its projections, an assertion which PRH disputes and will refute at trial. 6/29/22 C. Hammer Dep. at 86:6-23. Although Ms. Hammer initially claimed it was Professor Snyder's duty to verify PRH's efficiencies, she later conceded that she did not know "if you need to have an expert or not" to evaluate cognizable efficiencies in litigation and that whether an expert is required is "really a legal question." *Id*. at 84:9-16, 111:9-16. Ms. Hammer also admits that she did not analyze or ask for the data S&S provided to PRH. *Id*. at 110:18-21 ("Q. Did you ever ask anybody at the DOJ if you could see all the information that S&S has in the clean room? A. No.").

As this Court noted in *FTC v. Staples*, projected efficiencies must be "credible" and backed by "sound business judgment," not speculative:

> The Court agrees with the defendants that where, as here, the merger has not yet been consummated, it is impossible to quantify precisely the efficiencies that it will generate. *In addition, the Court recognizes a difference between efficiencies which are merely speculative and those which are based on a prediction backed by sound business judgment*....[L]ike all rebuttal evidence in Section 7 cases, the defendants must simply rebut the presumption that the merger will substantially lessen competition by showing that the Commission's evidence gives an inaccurate prediction of the proposed acquisition's probable effect. *See id*. at 991. *Defendants, however, must do this with credible evidence*....

*Id.* (emphasis added); *see also* Merger Guidelines ¶ 10 ("Efficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means."). Here Professor Snyder conducted analyses which directly bear on and relate to the verifiability, credibility, and reasonableness of the PRH Efficiencies Model. For instance,

- Professor Snyder confirmed that the PRH Efficiencies Model was prepared as part of the usual business planning process, which entitles it to more weight and credibility than the "made for litigation" model the DOJ claims Professor Snyder should have created specifically for this case. Initial Snyder Report ¶ 17; *see also* Merger Guidelines ¶ 2.2.1 ("Documents created in the normal course are more probative than documents created as advocacy materials in merger review."); *id*. ¶ 10 ("Projections of efficiencies may be viewed with skepticism, particularly when generated outside of the usual business planning process.").

- Professor Snyder determined that the PRH Efficiencies Model focused on the difference between how S&S would perform on a standalone basis compared to if it merged with PRH, and confirmed that many of the projected efficiencies ███

██████████████████████████████████████████████████████

█████████████████████████████████████████. Initial Snyder
Report ¶ 17, 24.

- ███████████████████████████████████████████

  ███████████████████████████████████████████

  ██████████████████████. Initial Snyder Report ¶ 17, 54.

- Professor Snyder analyzed each category of ████████████████████

  █████████████████████████████████████—to identify

  whether they were consistent with Industrial Organization Economic principles,

  taking into account and considering the features of the publishing industry.

  - For example, Professor Snyder identified ██████████████████

    ███████████████████████████████████████████

    ██████████████████████████████████████

    ███████████████████████████████████████████

    ███████████████████████████████████████████

    ███████████████████████████████████████████

    ███████████████████████████████████████

    ███████████████████████████████████████████

    █████████████████████████████████ Initial Snyder Report ¶¶ 15, 22, 45-
    47, 58, 62, 87-88, 92.

  - In the course of his analysis of efficiencies in the PRH model, Professor

    Snyder identified that certain efficiencies related to ████████████████

    ████████████████████. Initial Snyder Report ¶ 81.

Professor Snyder will also testify at trial about other aspects of PRH's anticipated efficiencies, including "[w]hether the projected efficiencies are merger-specific—*i.e.*, whether the efficiencies are unlikely to be accomplished in the absence of the proposed merger" and "[w]hether the projected efficiencies are likely to benefit authors and consumers of books, including by impacting the merged firm's ability and incentive to compete, offer higher compensation to authors, acquire more books, invest in author discovery and author development, and further invest in capabilities to distribute books cost-efficiently through all relevant channels on a global basis."  Initial Snyder Report ¶ 14; *see also* 6/23/22 Reply Expert Report of Edward A. Snyder ("Snyder Reply Report") ¶¶ 67, 80 (explaining how the efficiencies do not arise from anticompetitive reductions in service or output).  The DOJ's complaints about whether and how Professor Snyder verified the PRH Efficiencies Model—fact issues which are hotly disputed and the Court must decide following a full and fair presentation of the evidence at trial—provide no basis to exclude Professor Snyder's testimony on merger-specificity, author pass-through, and the lack of reduction in output or services.[7]

Put differently, experts have wide latitude when testifying at trial.  They can rely on assumptions and hearsay.  *See NortonLifeLock, Inc.*, 567 F.Supp.3d at 275-76 (denying motion *in limine* to exclude expert testimony which relied on assumptions and involved questions concerning disputed issues of fact); *United States v. Henry*, 472 F.3d 910, 914 (D.C. Cir. 2007) (noting experts may rely on otherwise inadmissible evidence, including hearsay, in formulating their opinions under Federal Rule of Evidence 703).  And their testimony need only be relevant and reliable.  There is simply no requirement that an expert testify as to every element of a legal

---

[7] Notably, the Motion is devoid of any substantive criticism of Professor Snyder's opinions on merger-specificity and reduction in output or services, and does not challenge his qualifications, which only further underscores why wholesale exclusion of Professor Snyder's testimony on efficiencies is not warranted here.

claim or defense, much less that the testimony independently establish that claim or defense.  *See Ambrosini*, 101 F.3d at 136 ("That Professor Strom's testimony alone may be insufficient for the Ambrosinis to survive summary judgement does not necessarily defeat its admissibility . . . "). The sole question here is whether Professor Snyder's testimony could aid the Court in resolving and trying disputed issues of fact, which it plainly does.  *See*, *e.g.*, *H&R Block*, 831 F. Supp. 2d at 30 (court's gatekeeping role is "significantly diminished" in bench a trial).

The legal authorities DOJ relies on support denial, not grant, of the Motion.  For instance, the DOJ notes that in *FTC v. Sysco Corp.*, 113 F. Supp 3d 1, 83-86 (D.D.C. 2015), this Court critiqued an expert for "re[lying] exclusively on documents created by either McKinsey or Defendants" and "perform[ing] no independent analysis to verify these numbers."  Dkt. 97.1 at 13.  But *Sysco* involved an evidentiary hearing on a preliminary injunction, not an *in limine* motion, and the quoted statements came only *after* the Court conducted an eight-day mini-trial during which it heard testimony from 20 witnesses, received into evidence 185 declarations, 3,500 exhibits, and excerpts from over 70 depositions, and entertained closing arguments.  *Sysco Corp.*, 113 F. Supp. 3d at 21-22.

## V.    THE DOJ'S VARIOUS ATTACKS ON THE PRH EFFICIENCIES MODEL AND PROFESSOR SNYDER'S OPINIONS AT BEST GO TO THE WEIGHT, NOT THE ADMISSIBILITY, OF THE EVIDENCE.

To attempt to confuse the Court, the DOJ advances a host of arguments about why Professor Snyder's testimony and the PRH Efficiencies Model are purportedly deficient and do not establish cognizable efficiencies.  As explained below, each of these arguments involves disputed factual and/or legal issues which can only be decided at trial.

**A.    PRH Has Provided Ample Substantiation to Support the Projections in the PRH Efficiencies Model.**

The DOJ claims that Professor Snyder should not be allowed to testify on efficiencies because, in the DOJ's view, the estimates in the PRH Efficiencies Model are "almost entirely unsubstantiated." Dkt. 97.1 at 13; *see also id.* at 6. Not so. Defendants have produced voluminous evidence substantiating and supporting the reasonableness of the projections in the PRH Efficiencies Model. For example,

- PRH produced over 50 drafts of the PRH Efficiencies Model, including drafts prepared prior to submission of the official model to the Bertelsmann board in November 2020, and drafts prepared in 2021 and 2022 which included updated financial data from PRH and S&S. PRH also produced internal email correspondence discussing, explaining, and attaching the various drafts of the PRH Efficiencies Model.

- PRH produced mapping spreadsheets which the company created to compare and normalize the profit and loss statements ("P&Ls") of PRH and S&S, and which PRH used to better understand the different structure and finances of the two entities.

- PRH and S&S both produced historical financial records, the data from which PRH used as inputs to the PRH Efficiencies Model. S&S also produced documents showing its internal financial projections and forecasts for the company for 2020 and beyond.

- PRH produced documents relating to efficiencies achieved in prior mergers and acquisitions, including the 2013 merger of Penguin and Random House, which PRH relied on in modeling the acquisition of S&S and projecting efficiencies for this merger.

- PRH provided written discovery responses and a spreadsheet detailing the more than ██████████████████████████████████████████████, and which are the basis for and support many of the projected efficiencies.

- Defendants provided dozens of hours of testimony on efficiencies-related topics, including nearly 14 hours of testimony from Manuel Sansigre, PRH's Senior Vice-President and Head of Global Mergers & Acquisitions.  Mr. Sansigre is the chief architect of the PRH Efficiencies Model, and the DOJ questioned him at length about nearly every facet of the model and the basis for the projections contained therein.

- Defendants also provided (i) multiple depositions of PRH's President and COO, Nihar Malaviya, who has personal knowledge of the company's significant investments in the its supply chain; (ii) a 30(b)(6) deposition of Bertelsmann concerning the efficiencies achieved by PRH following the 2013 merger of Penguin and Random House; and (iii) depositions of PRH's CEO Markus Dohle, ViacomCBS's Executive Vice President and Chief Corporate Development Strategy officer Alex Berkett, and other S&S witnesses.

At trial, Defendants will introduce this and other evidence to establish that, contrary to the DOJ's claim, they have adequately substantiated the PRH Efficiencies Model and that the projected efficiencies are "credible" and backed by "sound business judgment."  *Staples*, 970 F. Supp. at 1089.

### B.    No Court Has Held That Efficiencies Must Be Analyzed and Projected Using a "Bottoms-Up" Approach.

The DOJ finds fault with the PRH Efficiencies Model because it "was not created as part of a bottoms-up integration exercise using available information on ██████████████,

██████████████, and other details from S&S."[8]  Dkt. 97.1 at 12.  Even if that were

true, Ms. Hammer admitted that a bottoms-up approach is her suggested "best practice," not a

legal requirement.[9]  In fact, neither the Guidelines nor the 2006 Commentary mentions, let alone

insists on, a bottoms-up approach to modeling efficiencies—to the contrary, the Guidelines

support the use of top-down efficiencies projections that were created to inform the merging

parties' business decisions in the ordinary course.  Nor are Defendants aware of any court

requiring use of a bottoms-up efficiencies model.  At best, the parties' dispute about the proper

method for calculating efficiencies is a question of weight, not admissibility, of the evidence.

*See*, *e.g.*, *Ambrosini*, 101 F.3d at 141 ("By attempting to evaluate the credibility of opposing

experts and the persuasiveness of competing scientific studies, the district court conflated the

questions of the admissibility of expert testimony and the weight appropriately to be accorded

such testimony by a fact finder.").  This is particularly so given that Ms. Hammer did not

conduct a bottoms-up efficiencies model either and has "no idea" whether her suggested

---

[8] According to Ms. Hammer, a "top-down" approach is typically used prior to closing of a merger where access to confidential information is limited.  *See* 6/3/22 C. Hammer Report, Appendix F ("Potential business synergy savings are often identified using a 'top-down' approach, where an evaluation is performed using certain industry metrics as assumptions to assess, if the entities were to combine, what level of savings could typically be achieved.").  A bottoms-up approach typically occurs in connection with post-closing integration planning exercises, when the merging companies finalize "specific plans . . . as to how the two companies will be organized and managed following the completion of the merger" and access to confidential information of the acquired company is less restricted.  *Id.*; *see also* 6/29/22 C. Hammer Dep. at 111:20-112:14 (testifying that an integration plan is "one of the distinctions" between a top-down and bottoms-up).

[9] 6/3/22 C. Hammer Report, Appendix F; 6/29/22 C. Hammer Dep. at 122:25-123:10 ("Q. So would you -- is it fair to characterize the bottoms-up analysis as more of a best practice as opposed to a legal requirement? A. I don't want to step into legal requirements. It's definitely a best practice within the accounting and financial modeling world. Q. You've referred to it as a best practice in the past; correct? A. I believe it is the best practice. I may well have referred to it, but I'm just saying that's my belief.").  Notably, Ms. Hammer was not aware of any literature discussing the distinction between top-down and bottoms-up, other than her website blog which she wrote shortly after being retained in this case.  6/29/22 C. Hammer Dep. at 123:22-124:16, 128:11-17.

approach would materially change the efficiencies PRH projected.  6/29/22 C. Hammer Dep. at 133:23-134:9.

### C.    PRH's Efficiency Projections Are Not Outdated.

The DOJ claims the Court should preclude Professor Snyder from opining on efficiencies because the PRH Efficiencies Model was created in November 2020 and the projected efficiencies differ from those estimated in later versions from 2021 and 2022.  Dkt. 97.1 at 6-7, 15-16.  But the DOJ ignores that while individual line item subcategories of efficiencies may have changed in later drafts when the model was updated to, among other things, include more recent PRH and S&S financial data, the overall amount of projected efficiencies remained nearly identical.  Specifically, in November 2020 the PRH Efficiencies Model projected efficiencies of approximately ███████ per year in the United States (base case), while the June 2021 and January 2022 drafts each predicted approximately ██████ per year in efficiencies, a difference of only ████  *See* 6/3/22 C. Hammer Report at 36, Table 1; *id.* ¶ 96, n.149 (Hammer admits the "total dollar amount of synergies in each model" only differ by 4.4%).  Moreover, as Professor Snyder explained at his deposition, ████████████████████ ███████████████████████████████████████████ ████████████████████.  Snyder Dep. at 212:7-213:22.

In any event, these are classic weight, not admissibility, arguments.  Moreover, they have nothing to do with and are no basis to preclude Professor Snyder's opinions on merger-specificity, whether the efficiencies will arise from anticompetitive means, or whether authors will benefit from the transaction.  At trial, PRH will present further evidence on these issues, including explanation of how PRH updated its model and why the change in individual subcategories of efficiencies do not render the original projections from November 2020 speculative or unreliable.

**D.    PRH Can Rely On Its Vast Experience Achieving Efficiencies in Prior Transactions to Support Its Efficiency Projections Here.**

The DOJ's assertion that PRH cannot rely on its extensive experience modeling, projecting, and achieving efficiencies—including in the 2013 Penguin-Random House merger and more recent acquisitions—also lacks merit and is directly contrary to agency policy.  The Merger Guidelines expressly state that "efficiencies claims substantiated by analogous past practice are those *most likely to be credited*."  Merger Guidelines ¶ 10 (emphasis added). Similarly, the 2006 Commentary says the "*best way* to substantiate an efficiency claim is to demonstrate that similar efficiencies were achieved in the recent past from similar actions." 2006 Commentary at 57 (emphasis added).

Nor do the Merger Guidelines say that merging parties must demonstrate that efficiencies achieved in prior transactions are independently "cognizable," which would effectively force PRH to prove a case-within-a-case and run counter to the Merger Guidelines' preference for ordinary course business records.  Dkt. 97.1 at 17 (arguing Professor Snyder did not assess "whether the realized past cost savings" from previous transactions "were cognizable efficiencies under the Merger Guidelines").  Even if that were the standard, PRH's witnesses testified in deposition, and will explain again at trial, how the company assiduously tracked the efficiencies from the 2013 Penguin-Random House merger and benefitted from those efficiencies for years after the merger.  They will also describe how many of those efficiencies are the same type and category of efficiencies projected here, how the efficiencies achieved were a direct result of the merger (*i.e.*, they were merger-specific), how the company overachieved its targets, and ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  These are all issues that can only be adjudicated and resolved at trial.

The DOJ's legal authorities are inapposite. *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 72-73 (D.D.C. 2018), and *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 98 (D.D.C. 2017), do not support exclusion of Professor Snyder's testimony on efficiencies the company achieved in prior transactions. Both *Wilhelmsen* and *Aetna* involved bench trials where the experts were *permitted* to testify, not *Daubert* motions excluding their testimony.

### E.    Professor Snyder Analyzed and Confirmed That Each Category of Efficiencies Projected In PRH's Model Can Offset the Minimal Harm Alleged.

The DOJ argues the Court should preclude Professor Snyder from testifying because he "did not break out synergies that are reductions in fixed costs…versus marginal or variable costs." Dkt. 97.1 at 18. But Professor Snyder did separately break out each distinct category of efficiencies, including by identifying the operational (*i.e.*, fixed) and variable costs in his report:



Initial Snyder Report ¶ 23.

The DOJ's assertion that fixed costs "are less likely to be considered cognizable efficiencies" is also not accurate. Dkt. 97.1 at 18. The Merger Guidelines say that efficiencies relating to "costs that are fixed in the short term are unlikely to benefit customers in the short

term, *but can benefit customers in the longer run*, e.g., if they make new product introduction less expensive."  Merger Guidelines ¶ 10, n.15 (emphasis added).  Likewise, the 2006 Commentary says that fixed cost savings "may result in lower prices in the short term" and that consumers "may benefit from them over the longer term even if not immediately."  2006 Commentary at 62.  Even Ms. Hammer agrees that operational expense efficiencies are potentially cognizable, and that PRH is likely to achieve savings in operational expenses from the merger.[10]

This is a merits argument, and Professor Snyder will explain at trial why the Court should credit each category of PRH's projected efficiencies.  For example, Professor Snyder will testify about the direct relationship between book sales and royalties paid to authors.  If, as PRH projects, the company is able to sell more S&S books because of PRH's superior distribution system, then the Court should recognize revenue efficiencies because the increased sales will result in increased author compensation.  Likewise, Professor Snyder will testify at trial about how publishers often use book-level P&Ls to help determine how much of an advance to offer an author; ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████.[11]

There is no basis to preclude Defendants from presenting this and other evidence at trial.

---

[10] 6/29/22 C. Hammer Dep. at 224:12-15 ("Q Operational expenses, you don't dispute that that's a category of savings that could potentially be cognizable; right? A I do not dispute that.); *id.* at 227:23-228:6 (Q You don't dispute that PRH will achieve some savings in operational expenses if there is a merger, do you? A I don't dispute that. Q You're just saying again PRH hasn't proven it from a cognizability standpoint? A They haven't shown an amount that can be verifiable. And, therefore, it's impossible to tell which portion of that expense is merger-specific.").

[11] Initial Snyder Report ¶¶ 107-123; *see also id.* ¶¶ 123-129 (Professor Snyder calculates the magnitude of benefit PRH's projected increases in revenue and decreases in costs could bring to authors).

## VI.    THERE IS NO BASIS TO EXCLUDE PROFESSOR SNYDER'S TESTIMONY CONCERNING BENEFITS TO AUTHORS.

The DOJ's argument concerning pass-through of efficiencies—that the Court should preclude Professor Snyder from testifying about expected benefits to authors—simply regurgitates the opinions in Dr. Hill's Rebuttal Report, and further demonstrates why the only vehicle to resolve these expert disputes is through the presentation of testimony at trial and appropriate cross-examination.[12]

To recap, in his expert reports Professor Snyder quantified the financial impact of PRH's projected efficiencies on "authors whose work is published by the combined entity" by examining the "historical relationship between author compensation and Net Income."[13] Specifically, Professor Snyder noted that ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Snyder Reply Report ¶ 24.  Professor Snyder examined historical data demonstrating that from 2017 through 2019 total author compensation for PRH and S&S was ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Initial Snyder Report ¶¶ 124-129.  In response to Dr. Hill's claim that the historical ratio of author compensation to Net Income for

---

[12] *Compare* Dkt. 97.1 at 20 (arguing "the Snyder Ratio is not, in fact, stable" and "there is no underlying economic theory to support the Snyder Ratio"), *with* 6/3/22 Rebuttal Expert Report of Nicholas Hill ("Hill Rebuttal Report") at ¶¶ 8-10 (same).

[13] Initial Snyder Report ¶¶ 124-129.  The DOJ refers to this historical relationship as the "Snyder Ratio," even though the measurements are based on objective data and commonly-accepted financial metrics like Net Income.

PRH varied when examined over a longer time period (2012 to 2021), Professor Snyder analyzed

additional data, explained that Dr. Hill's use of data from the longer time period was problematic

because of changes in accounting practices and other issues, and refined his opinion to conclude

that regardless of the precise value used PRH's efficiencies still supported a conservative

increase in author compensation between ███████████████████.[14]

      The DOJ's assertion that there is "no underlying economic theory" for Professor Snyder's

opinion misses the forest for the trees. Dkt. 97.1 at 20. It is undisputed that author compensation

is ███████████████████, which demonstrates the significant leverage

and bargaining power authors and agents have when negotiating with publishers.[15] The ratio,

which is based on objective financial data, thus provides a useful guide to assess how authors

will benefit from the merger.

      Nor does the existence of some variation in the ratio over time warrant exclusion of

Professor Snyder's testimony. As Professor Snyder has explained, Dr. Hill's analysis fails to

account for changes in company accounting policies and the disruption of COVID-19, each of

which impact Dr. Hill's opinion that the ratio is "not stable."[16] These are weight and credibility

issues that can only be decided at trial. *See Ambrosini* 101 F.3d at 141.[17]

---

[14] Snyder Reply Report ¶¶ 28-32 ("Irrespective of the precise value used, the bottom-line conclusion remains that authors receive a substantial share of the resources gained from the Proposed Transaction. PRH's historical ratio using EBITA demonstrates that authors receive ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

[15] Snyder Reply Report ¶ 24.

[16] Snyder Reply Report ¶¶ 27-32.

[17] While Professor Snyder did testify ████████████████████████████████ ████ (Dkt. 97.1 at 20), the DOJ omitted his explanation that "it doesn't change the bottom line that there's going to be a substantial pass-through of these efficiencies in a way that will

Professor Snyder's opinions on pass-through are also not "inconsistent with" certain line items in the PRH Efficiencies Model, and the DOJ is conflating apples with oranges. Dkt. 97.1 at 21. Specifically, the DOJ claims that Professor Snyder's pass-through calculations are unreliable because they are "███████" the "pass-through estimate" in the PRH Efficiencies Model. *Id.* But the PRH Efficiencies Model was not designed to calculate how PRH will reinvest the efficiencies it will achieve from the merger and how that may impact author compensation. Rather, and as Mr. Sansigre will explain at trial, the ███████████████

███████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████. Quantification of "how author compensation will increase as a result of business decisions by the combined entity to allocate the efficiency gains," ███████████████████████████████

███████ is the subject of Professor Snyder's testimony. Snyder Reply Report ¶¶ 35-36. Again, even if the DOJ were correct (and it is not), its arguments go to weight and credibility, not admissibility.

Finally, the DOJ claims Professor Snyder's "analysis should be excluded as irrelevant" because it does not identify whether the efficiencies will lead to increased author compensation versus increased output. Dkt. 97.1 at 22. But the impact of allegedly anticompetitive conduct on output is not irrelevant—it is a hallmark concern of antitrust law and no basis to exclude

---

benefit authors. And this doesn't take into account the benefits and the nonpecuniary benefits." 7/6/22 E. Snyder Dep. at 262:1-8. Nor does *Barnett v. PA Consulting Grp., Inc.*, 35 F. Supp. 3d 11, 19 (D.D.C. 2014), support exclusion of Professor Snyder's testimony. Professor Snyder did not rely on assumptions or facts "contradicted by" his evidence, and the Court could easily conclude here that Professor Snyder's reliance on ratio data from 2017 through 2019 is entitled to more weight and credibility than Dr. Hill's use of data from 2012 through 2021. Moreover, in *Barnett* the court permitted the expert to testify to the jury, notwithstanding plaintiff's argument that the testimony was based on improper assumptions.

Professor Snyder's testimony either.  *See Eastman Kodak Co. v. Image Technical Services, Inc*., 504 U.S. 451, 464 (1992) ("[Market power] has been defined as the ability of a single seller to raise price and restrict output"); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107-08 (1984) ("Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit."); *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 208-09 (D.D.C. 2018) ("But a core purpose of antitrust law is to scrutinize mergers that may make it easier for firms to collectively reduce output, and indeed, to prevent mergers that are likely to do so.").[18]

## VII.   CONCLUSION

For all the foregoing reasons, the Court should deny the DOJ's Motion to exclude Professor Snyder's testimony on efficiencies.

---

[18] Neither *FTC v. Qualcomm, Inc*., 411 F. Supp. 3d 658 (N.D. Cal. 2019), nor *Sitts v. Dairy Farmers of Am., Inc*., Case No. 2:16-cv-00287, 2020 WL 3467993 (D. Vt. June 24, 2020), support exclusion of Professor Snyder's testimony. Dkt. 97.1 at 7.  In *Qualcomm*, the court permitted Professor Snyder to testify and, following a 10-day bench trial, discounted a portion of his testimony—but only *after* denying the FTC's earlier motion to exclude his testimony.  *See id.*, 411 F. Supp. 3d at 669, 805; *FTC v. Qualcomm, Inc.*, Case No. 17-cv-00220-LHK, 2018 WL 6615050, at *1 (N.D. Cal. 2018).  In *Sitts*, the court excluded a narrow portion of Professor Snyder's opinion involving calculation of combined plant capacities.  The court did not hold that Professor Snyder's testimony was unreliable, but simply that it was not helpful to the jury because the information was publicly available and did not require any specialized knowledge or expertise unavailable to the average juror. *Id.*, at *11-12.  By contrast, Professor Snyder's opinions here are based on his extensive knowledge of Industrial Organization economics, and will help the Court resolve the parties' dispute over whether PRH's projected efficiencies are cognizable and how much of those efficiencies will pass-through to authors.

Dated: July 13, 2022

Respectfully submitted,

By:   */s/ Daniel M. Petrocelli*

Daniel M. Petrocelli (appearing *pro hac vice*)
M. Randall Oppenheimer (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Andrew J. Frackman (appearing *pro hac vice*)
Abby F. Rudzin (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10026
Telephone: (212) 326-2000
afrackman@omm.com
arudzin@omm.com

Jonathan D. Hacker (D.C. Bar No. 456553)
Julia Schiller (D.C. Bar No. 986369)
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
jhacker@omm.com
jschiller@omm.com

Deborah L. Feinstein (D.C. Bar No. 412109)
Jason Ewart (D.C. Bar No. 484126)
**ARNOLD & PORTER**
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
debbie.feinstein@arnoldporter.com
jason.ewart@arnoldporter.com

*Attorneys for Defendants Bertelsmann SE & Co.*
*KGaA and Penguin Random House LLC*

By: ___/s/ Stephen R. Fishbein___

Stephen R. Fishbein (appearing *pro hac vice*)
Jessica K. Delbaum (appearing *pro hac vice*)
**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
sfishbein@shearman.com
jessica.delbaum@shearman.com

Ryan Shores (D.C. Bar No. 500031)
Michael Mitchell (D.C. Bar No. 1531689)
**SHEARMAN & STERLING LLP**
401 9th Street, N.W., Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
ryan.shores@shearman.com
michael.mitchell@shearman.com

Rachel E. Mossman (D.C. Bar No. 1016255)
**SHEARMAN & STERLING LLP**
2828 North Harwood Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 271-5777
rachel.mossman@shearman.com

*Attorneys for Defendants Paramount Global (f/k/a ViacomCBS Inc.) and Simon & Schuster, Inc.*