# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

BERTELSMANN SE & CO. KGaA,
PENGUIN RANDOM HOUSE, LLC,
VIACOMCBS, INC., and
SIMON & SCHUSTER, INC,

*Defendants.*

**FILED UNDER SEAL**

Civil Action No. 1:21-cv-02886-FYP

## UNITED STATES' PRE-TRIAL BRIEF

# TABLE OF CONTENTS

Introduction ........................................................................................................................ 1

**Factual Background** ......................................................................................................... 4

    A.    The Parties ................................................................................................... 4

    B.    How a Manuscript is Acquired and Published ............................................ 6

    C.    Anticipated Top-Selling Books .................................................................. 7

    D.    The Big Five Dominate the Publishing Industry and are the Main Competitors for Anticipated Top-Selling Books ................................................................. 9

    E.    Penguin Random House and Simon & Schuster Compete Fiercely to Acquire the Rights to Publish Anticipated Top-Selling Books .................................... 11

    F.    The Proposed Transaction ......................................................................... 11

    G.    The Proposed Transaction Will Cede Nearly Fifty Percent of the Market for Anticipated Top-Selling Books to the Combined Firm, Which Will Harm Competition by Lowering Author Advances and Diminishing Output, Creativity, and Diversity ..................................................................................................... 12

**Argument** ....................................................................................................................... 13

I.    Legal Standard ..................................................................................................... 13

    A.    Legal Standard: Section 7 ......................................................................... 13

    B.    Legal Standard: Defining Relevant Product Markets ............................... 15

    C.    Legal Standard: Defining Submarkets Around Targeted Groups ............. 17

II.    There is a Relevant Product Market for the Acquisition of U.S. Publishing Rights to Anticipated Top-Selling Books ............................................................................. 19

    A.    Practical Indicia Establish that Authors of Anticipated Top-Selling Books are Unique Customers with Unique Needs ....................................................... 20

    B.    Authors of Anticipated Top-Selling Books can be Targeted by Publishers ............. 22

    C.    An Advance Level of $250,000 is an Appropriate Way to Identify Targeted . Authors of Anticipated Top-Selling Books .............................................................. 23

    D.    Economic Analysis Establishes that the Acquisition of U.S. Publishing Rights to Anticipated Top-Selling Books is a Relevant Product Market ................. 27

III.    The Relevant Geographic Market is Global ......................................................... 28

IV.    Bertelsmann's Acquisition of Simon & Schuster Is Presumptively Unlawful ................. 299

    A.    The Proposed Transaction is Presumptively Illegal Because It Would Create Extraordinarily High Market Shares and Concentration in the Relevant Market .... 299

    B.    The Record Evidence Corroborates the Presumption of Illegality .......................... 31

            i.    Industry Participants Recognize That the Big Five Are Especially Close Competitors and Smaller Publishers Struggle to Compete ....................... 31

      ii.    Examples of Head-to-Head Competition..................................................33

      iii.   Industry Participants Recognize That the Proposed Transaction Is Likely to Lead to Lower Advances for Authors of Anticipated Top-Selling Books ...................................................355

      iv.   Industry Participants Recognize That the Proposed Merger Is Likely to Reduce the Overall Output and Diversity of Books ..............................35

      v.    There is Evidence That the 2013 Merger Between Penguin and Random House May Have Harmed Competition and Authors ...............................36

  C.   Economic Analysis Corroborates the Presumption of Illegality ..............................37

  D.   Coordinated Effects: The Proposed Transaction Will Increase the Likelihood of Tacit Coordination Among Publishers Regarding Content Acquisition...........................40

V.   Defendants Cannot Rebut the Strong Presumption of Illegality .........................................42

  A.   Entry and Expansion Would Not be Timely, Likely, Or Sufficient .........................42

  B.   Literary Agents Cannot Counteract the Anticompetitive Effects of the ....... Proposed Merger.........................................................................................................................46

  C.   Defendants' Efficiencies Defense Fails .................................................................48

  D.   Defendants' Unenforceable Promise to Allow Simon & Schuster to Bid Independently for Books Does Not Resolve the Proposed Transaction's Anticompetitive Harm........................................................................................49

**Conclusion**..................................................................................................................................50

# TABLE OF AUTHORITIES

## Cases

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016) ................................................14

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ......................................................passim

*California v. Am. Stores Co.*, 495 U.S. 271 (1990). ...................................................................13

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008)....................................46

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) ...............................................43

*FTC v. CCC Holdings*, 605 F. Supp. 2d 26 (D.D.C. 2009).....................................38, 41, 42, 45

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) ............................................. 13, 41, 42

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ......................................................passim

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) .................................................................48

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ............................................................17

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ...................................................passim

*FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000) ......................................... 29, 38, 42

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) .......................................................passim

*FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018) ....................................................16, 24

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ......................................passim

*FTC v. Wilh. Wilhelmsen Holding ASA,* 341 F. Supp. 3d 27 (D.D.C. 2018).......................passim

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986).......................................13, 29, 41, 42

*Int'l Boxing Club of New York v. United States*, 358 U.S. 242 (1959) .................................18, 26

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219 (1948) .........................14

*O'Bannon v. NCAA*, 7 F. Supp. 3d 955 (N.D. Cal. 2014),
    *aff'd in relevant part*, 802 F.3d 1049 (9th Cir. 2015).....................................................26

*Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440 (9th Cir. 1988) ............................................... 16

*Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990 (9th Cir. 1986). ................ 17, 26

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124 (10th Cir. 2002) ........................... 12

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) .................................... 16, 25

*Todd v. Exxon Corp,* 275 F.3d 191, 202 (2d Cir. 2001) ............................................... 16, 20, 27

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) ........................................... passim

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) ......................................................... 41

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990) ..................................... 3, 15

*United States v. Cont'l Can Co.,* 378 U.S. 441 (1964) ......................................................... 14, 16

*United States v. Gen. Dynamics Corp.,* 415 U.S. 486 (1974) ................................................... 31

*United States v. Gillette Co.*, 828 F. Supp. 78 (D.D.C. 1993) ................................................... 25

*United.States. v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ............................... passim

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) ....................................................... 14

*United States v. Pennzoil Co.*, 252 F. Supp. 962 (W.D. Pa. 1965) ........................................... 14

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ...................................................... passim

*United States v. Rice Growers Ass'n of Cal.*, No. S–84–1066 EJG, 1986 WL 12562 (E.D. Cal. Jan. 31, 1986) ............................................................................................................. 14

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) .................... 14

## Statutes and Guidelines

15 U.S.C. § 18 ............................................................................................................ 2, 13, 50

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) .......... passim

## Other Authorities

Areeda & Hovenkamp, Antitrust Law: *An Analysis of Antitrust Principles and Their Application* (2021) ..................................................................................................................... 40, 41

## Introduction

Penguin Random House's proposed acquisition of Simon & Schuster would further entrench the largest publishing giant in the United States (and the world) and give the merged company control of nearly half of the market to acquire anticipated top-selling books from authors. Penguin Random House admits that the merger would "[c]ement PRH as #1 in the US" and strengthen the "oligopoly" of large publishing houses.[1] Indeed, the post-merger combined Penguin Random House/Simon & Schuster would share control of 90% of the relevant market with just three other companies. The evidence will show that the proposed merger would likely result in authors of anticipated top-selling books receiving smaller advances, meaning authors who labor for years over their manuscripts will be paid less for their efforts and fewer authors will be able to earn a living from writing. The proposed merger creates such an obvious risk of harm to competition that Simon & Schuster's CEO, Jonathan Karp, admitted in an email: "I'm pretty sure the Department of Justice wouldn't allow Penguin Random House to buy us, but that's assuming we still have a Department of Justice."[2] This concern was prescient.

If allowed to proceed, the proposed transaction would eliminate competition between two of the last remaining major publishers. Penguin Random House and Simon & Schuster are legendary businesses responsible for publishing some of the most esteemed works of fiction and non-fiction in this country's history. Today, they compete fiercely to win the rights to publish anticipated top-selling books. The evidence will show that many authors have benefitted from this competition, which would disappear if the proposed merger were allowed to proceed, likely leading to lower advances and worse contract terms for authors.

---

[1] PX-139 at 1, PX-881 at 12.
[2] PX-655 at 1.

1

The proposed merger also is the latest and most aggressive march towards concentration in an industry with a history of consolidation and coordination and would solidify the dominant position and power of the leading player, Penguin Random House. Today, the publishing industry is an "oligopoly" dominated by the "Big Five" publishers. The late Simon & Schuster CEO Carolyn Reidy described the Big Five as one another's "biggest competitors," in contrast to smaller publishers, which she characterized as "farm teams for authors who then want to move to a larger, more financially stable major publisher."[3] The Big Five make up 90% of the relevant market because they are the only firms with the capital, reputations, editorial capacity, marketing, publicity, sales, and distribution resources to regularly acquire anticipated top-selling books. The proposed merger would further increase consolidation in this concentrated industry, make the biggest player even bigger, and likely increase coordination in an industry with a history of coordination among the major publishers.

The Clayton Act prohibits mergers if the effect of the transaction "may be" substantially to lessen competition. 15 U.S.C. § 18. The Supreme Court has explained that the words "may be" are intentional to show that the statute is concerned with "probabilities, not certainties," *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962), because Congress "intended to arrest anticompetitive tendencies in their 'incipiency.'" *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963) (quoting *Brown Shoe*, 370 U.S. at 317). The Supreme Court has made clear that courts need not wait until the harms of consolidation have already been cemented; rather, the Clayton Act can be used as a proactive tool to thwart consolidation before it worsens. Where, as here, the relevant market is already highly concentrated and the merging parties' market shares are substantial, both the Supreme Court and DC Circuit have recognized that the

---

[3] PX-530 at 2.

proposed acquisition is presumptively anticompetitive. *Phila. Nat'l Bank*, 374 U.S. at 364 (holding that significant change in concentration that resulted in a combined market share of 30% was sufficient to establish that transaction was presumptively illegal); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 711, 716-17 (D.C. Cir. 2001) (finding FTC established prima facie showing of anticompetitive effects where defendants would have a combined share of 32.8% in a concentrated industry).

The presumption of illegality empowers the Court to reject a proposed merger unless and until the Court finds that the Defendants present significant countervailing evidence to disturb that presumption. Here, Defendants have not and cannot meet that weighty burden. First, Defendants themselves recognize that barriers to entry into the relevant market are high, undercutting their arguments that new or smaller publishers could enter or expand in a manner timely, likely, and sufficient to restore competition lost by the merger.[4] Second, Defendants grossly overstate the ability of literary agents to maximize value for their author clients in the absence of a competitive environment. Literary agents cannot create competitive conditions where there are none. Third, Defendants' purported efficiencies defense fails for several reasons (if it is even legally permissible) because their purported efficiencies are neither cognizable nor sufficient to overcome the likely anticompetitive harm that will arise should the Court permit the proposed merger to be completed. Finally, Penguin Random House's last-ditch, made-for-

---

[4] *See U.S. v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 73 (D.D.C. 2011) (citing U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 9 (2010) ("*Merger Guidelines*")). The D.C. Circuit considers the *Merger Guidelines*, while not binding, "a helpful tool, in view of the many years of thoughtful analysis they represent, for analyzing proposed mergers." *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (citing *United States v. Baker Hughes Inc.*, 908 F.2d 981, 985–86 (D.C. Cir. 1990)).

litigation effort to save its proposed merger with an unenforceable, unilateral promise to compete against itself post-merger is irrelevant, illogical, and should be ignored.

Accordingly, the United States respectfully requests that the Court permanently enjoin Penguin Random House's proposed acquisition of Simon & Schuster.

## Factual Background

### A. The Parties

Penguin Random House ("PRH") is the largest trade book publisher worldwide and in the United States.[5] Headquartered in New York, New York, PRH is owned by Bertelsmann SE & Co. KgaA ("Bertelsmann"), an international media and services company headquartered in Germany. PRH has more than ninety U.S. publishing imprints (a trade or brand name for a specific editorial group such as Viking, Riverhead, and Crown) across six publishing divisions. PRH publishes over 2,000 new titles every year in the U.S. Its 2020 U.S. net sales surpassed $2.6 billion.[6]

Simon & Schuster ("S&S"), also headquartered in New York, New York, is the fourth-largest book publisher in the United States as measured by total sales. S&S is owned by international media and entertainment company Paramount Global (formerly known as ViacomCBS). S&S has over thirty U.S. imprints across three publishing groups and publishes over 1,000 new titles annually in the U.S.[7] Its 2020 U.S. net sales were ███████.[8] Bertelsmann executives described S&S as "one of the last high-quality scaled assets in the US

---

[5] Trade books are books that are broadly available and intended for general readership.
[6] Corrected Expert Report of Nicholas Hill, May 10, 2022 ("Hill Initial Rep."), ¶ 48. With respect to this and all forthcoming references to expert reports and summaries, the United States refers to the expert materials submitted to the Court by all parties on July 8, 2022.
[7] PX-865 at 7.
[8] Hill Initial Rep., ¶ 52.

[publishing] market" in advocating for its acquisition by Bertelsmann, which "would solidify PRH's position in the US, our key market."[9]

PRH and S&S are two of what the industry refers to as the "Big Five" U.S. publishers, a group which includes HarperCollins Publishers, Hachette Book Group, and Macmillan Publishing Group, LLC. Together, the Big Five publishers are one another's "biggest competitors … since they are the most likely to come up with high advance payments required and are known for their strong editorial and publishing skills."[10]  The Big Five dominate U.S. book publishing and account for over 90% of the market for the acquisition of publishing rights to anticipated top-selling books.  The Big Five have existed for decades, some dating back to the early 1900s, and have grown mostly through acquisitions of smaller competitors.  Defendants' internal documents acknowledge there have been "no successful startups in the last decade," in part due to "[h]igh barriers to entry."[11]

The publishing industry has undergone significant consolidation in incremental measures over recent years.  The impact of that consolidation has further cemented the dominant position of the Big Five.  PRH itself is a result of the 2013 merger between Penguin and Random House.  Other recent examples of consolidation include the 2021 acquisition of Houghton Mifflin Harcourt's trade book division by HarperCollins, Inc. for $349 million, and Hachette Book Group's 2021 acquisition of Workman Publishing for $240 million. [12]

---

[9] PX-865 at 8.
[10] PX-530 at 2.
[11] PX-177 at 8.
[12] Hill Initial Rep., ¶ 62.

**B. How a Manuscript is Acquired and Published**

Authors typically partner with a literary agent to sell the publishing rights to their book (or books) when they are in the form of a proposal or manuscript.[13] This process usually relies on competition to secure the best outcome for the author, and ranges from exclusive negotiations, to submissions to multiple publishers, to fast-moving auctions.[14] Auctions may take various forms, including best bid auctions, a one-round process in which each interested publisher submits its best bid; rounds auctions, in which the literary agent holds several rounds of bidding as publishers with the lowest bids are eliminated from contention; or other hybrid auction formats.[15] Authors whose books are anticipated to attract especially high bids and generate significant sales typically will submit their proposal through an agent to a variety of editors at multiple publishing houses and conduct a competitive auction to maximize the value of their work.[16] In an effort to secure the best outcome for their clients, literary agents frequently submit proposals to imprints at some or all of the Big Five publishers, especially for books that are expected to sell well.[17]

Authors are primarily compensated through an advance against royalties. An advance is a guaranteed payment typically paid out in installments over several years and represents prepaid royalties that accrue from the sale of a book to a publisher.[18] Over time, if a book "earns out" by

---

[13] PX-164 at 91.

[14] PX-164 at 91. Submissions are the process of sending a book proposal to editors.

[15] Hill Initial Rep., ¶ 31.

[16] *Id.;* PX-886 at 79. Generally speaking, fiction works are submitted as full manuscripts and non-fiction works are submitted as proposals before the book has been completed.

[17] ███████████████████████████████ Ex. B [Watterson Dep.] at 3–4 (53:9–54:24).

[18] For example, an author receiving an advance of $400,000—after paying the 15% agent's commission—could receive four payments of $85,000 each over several years. Hill Initial Rep., ¶ 40 nn.85–86.

earning royalties equal to the amount of the initial advance, the author receives additional payments from further sales as periodic royalty accountings.[19]  Royalties are determined by media type, format, territory, and language.[20]  In addition to the amount of the advance, authors and their agents also look for a strong editorial relationship, robust marketing and publicity plans, and an extensive distribution network.[21]

Publishers determine how much to offer for an author's work—namely, the size of the advance—by putting together projected profit-and-loss statements known as "P&Ls" for the work.[22]  These P&Ls include the expected list price for the book in various formats, production and marketing costs, and—the key factor—anticipated sales based on previous sales of comparative titles (referred to as "comp titles" or "comps").[23]  Comp titles are those with similar characteristics to the proposed book, such as subject matter, literary merit, and author background.  Publishers consider these the best estimates of a new book's projected sales[24] and use the commercial success of comp titles to help determine how much to offer for an author's work.[25]

## C.  Anticipated Top-Selling Books

An anticipated top-selling book is expected to generate significant sales, which typically requires strong editing, marketing, and distribution support.[26]  An author of an anticipated top-

---

[19] PX-164 at 116; PX-886 at 79.
[20] PX-164 at 116.
[21] ███████████████████████████ Ex. B [Watterson Dep.] at 2 (46:24–47:12).
[22] *See, e.g.*, PX-719 at 1.
[23] PX-886 at 77; Hill Initial Rep., ¶ 37; Ex. C [Tart Dep.] at 2–3, 8 (52:16–54:7;  138:21–139:19).
[24] Ex. C [Tart Dep.] at 2–3, 8 (52:16–54:7;  56:17–57:10).
[25] *Id*.
[26] Hill Initial Rep., ¶ 117 nn.295 & 296.

selling book typically receives a generous advance.[27] More than 85% of author contracts for anticipated top-selling books never earn out their advance, even several years after publication. Thus, the amount of the advance is all the more important because the vast majority of authors never receive royalties beyond the amount of the initial advance.[28] Indeed, because authors of anticipated top-selling books seldom earn out their advance, literary agents and authors focus on the amount of the advance in negotiations with publishers and rarely negotiate royalties beyond the advance ███████████████████████████████████████████

████████████████████████████████████████████ ██

Authors of anticipated top-selling books are overwhelmingly published by Big Five publishers, including PRH and S&S. The Big Five have the financial wherewithal, editorial, marketing, sales, and distribution support that these authors strongly prefer to put them in the best financial position possible.[30] This phenomenon is borne out by the numbers: the Big Five control over 90% of the market for anticipated top-selling books. In 2020, that meant the Big Five controlled 90% of a $1 billion market for advances contracted to be paid to authors.[31] Authors of anticipated top-selling books typically look to the Big Five publishers when selling the rights to publish their books, rather than smaller publishers. Authors of anticipated top-selling books also do not typically consider self-publishing a feasible alternative because it requires authors to leave a sizable guaranteed advance on the table while also taking on all the

---

[27] Hill Initial Rep., ¶ 117.
[28] Hill Initial Rep., ¶ 39 n.81.
[29] ████████████████████████████████
[30] Hill Initial Rep., ¶ 117 n.300 (collecting deposition testimony).
[31] Hill Initial Rep., ¶ 159 & Figure 8 & n.364 & ¶ 160.

publishing responsibilities themselves, including potentially significant costs.[32] Indeed, many self-published books sell very few or no copies at all.[33]

### D. The Big Five Dominate the Publishing Industry and are the Main Competitors for Anticipated Top-Selling Books

The Big Five publishers are best able to acquire and publish anticipated top-selling books because their size and resources allow them to better manage risk and facilitate a book's commercial success.[34] First, publishing anticipated top-selling books usually requires the ability to pay large advances and assume the risk that the book will not sell well. The dynamics of publishing anticipated top-selling books leverage the Big Five's dominance because they have the capital, market position, and other assets that enable them to spread the costs—and risks—of their investment over a larger number of books and authors.[35] The Court will hear testimony from Penguin Random House Global CEO Markus Dohle describing the publishing business as a "portfolio business" and confirming that PRH can better manage its risk relative to a smaller publisher because it publishes many books and is not dependent on a few.[36]

Second, the Big Five are best able to offer authors the extensive and sophisticated infrastructure of editorial, production, marketing, and publicity support needed to produce a top-selling book, and the sales and distribution networks necessary to place a book into the hands of readers.[37] For example, a marketing presentation titled "The Penguin Random House Advantage" touts the company's "industry-leading supply chain and specialized sales team for

---

[32] Hill Initial Rep., ¶¶ 118, 126–130.
[33] Hill Initial Rep., ¶ 128 Figure 1.
[34] PX-139 at 1.
[35] Ex. E [Dohle CID Dep. (Day 2)] at 2 (286:7–9; 286:19–21).
[36] *Id*.
[37] Hill Initial Rep., ¶ 219; PX-68 at 7-14.

every kind of retail channel" as a competitive advantage and proclaims, "we get our books into consumers' hands faster and more reliably than our competition."[38]

Third, because the Big Five publishers have superior marketing, distribution, and sales strengths compared to smaller publishing competitors, they are more likely to help a book succeed commercially.[39]  Because Big Five publishers are more likely to sell a large number of books than their rivals, they can afford to pay authors of anticipated top-selling books larger advances than smaller publishers can.[40] For that reason, internal S&S documents ███████ ███████████████████████████████████████ confirm that Big Five publishers—and not smaller firms—are one another's "biggest competitors, especially for books by already bestselling authors and celebrities, since they are the most likely to come up with high advance payments required and are known for their strong editorial and publishing skills."[41]  The same document confirms that publishers outside the Big Five are "farm teams for authors who then want to move to a larger, more financially stable major publisher" because the smaller publishers cannot regularly offer high advances or the unique bundle of services that the authors of anticipated top-selling books expect.[42] PRH executives agree that "for higher advance levels … the smaller publishers tend not to compete."[43]

---

[38] PX-218 at 3.
[39] *See* ███████████████████████████████ Ex. F [Solomon Dep.] at 2–5 (32:18–33:6;  97:14–98:4;  101:21–103:18);  *see also* Ex. G [Karp CID Dep. (Day 1)] at 2–3 (248:14–21; 250:2–8).
[40] ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
[41] PX-530 at 2.
[42] *Id.* at 2.
[43] PX-190 at 1.

### E. Penguin Random House and Simon & Schuster Compete Fiercely to Acquire the Rights to Publish Anticipated Top-Selling Books

Given the dynamics among the Big Five generally, it is no surprise that PRH and S&S fiercely compete head-to-head. This competition has inured to the benefit of authors, resulting in higher advances, better services, and more favorable contract terms for authors of anticipated top-selling books. The Court will hear from the parties and see Defendants' documents about this fierce competition, including several instances of head-to-head competition, discussed further *infra* at 33. For example, PRH imprint Viking celebrated winning over a house bid from S&S by declaring it had won over "stiff competition."[44] Further, the Court will hear testimony from the government's expert witness, Dr. Nicholas Hill, explaining how the extensive record of head-to-head competition between PRH and S&S confirms that the merger is likely to substantially lessen competition. Even Defendants' economic expert Dr. Edward Snyder concedes the existence of this head-to-head competition at comparable levels to Dr. Hill's analysis.[45]

### F. The Proposed Transaction

On November 25, 2020, ViacomCBS announced that it had agreed to sell S&S to Bertelsmann for $2.175 billion in cash. The combined firm would dominate the U.S. publishing industry with revenues twice that of its next closest competitor in the Big Five, HarperCollins.[46] The acquisition would "[c]ement Penguin Random House as #1 in the US"—one of PRH's strategic goals for the merger.[47]

---

[44] PX-39 at 1.
[45] Reply Expert Report of Nicholas Hill, June 23, 2022 ("Hill Reply Rep."), ¶ 45–46.
[46] Plaintiff's Summary of the Expert Reports of Dr. Nicholas Hill and Christine Hammer, CPA, July 8, 2022 ("Pls. Expert Sum."), ¶ 18.
[47] PX-139 at 1.

Top executives on both sides of the proposed transaction recognized that a deal between two otherwise fierce competitors in the Big Five may have anticompetitive consequences. For example, before the deal was announced, Simon & Schuster CEO Jonathan Karp assured one of his authors, "I'm pretty sure the Department of Justice wouldn't allow Penguin Random House to buy us…."[48] Bertelsmann's Chief Executive Officer likewise expressed that Bertelsmann faced ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[49] In an effort to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Bertelsmann paid ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ over the next-highest bidder.[50]

### G. The Proposed Transaction Will Cede Nearly Fifty Percent of the Market for Anticipated Top-Selling Books to the Combined Firm, Which Will Harm Competition by Lowering Author Advances and Diminishing Output, Creativity, and Diversity

The proposed merger would eliminate significant head-to-head competition between two firms who are already members of the Big Five. Should the Court allow the proposed merger to proceed, the combined firm would be a giant in the market for the acquisition of publishing rights to anticipated top-selling books, with a market share of 49%. Post-merger, PRH's even more dominant position in the market would provide it additional leverage in negotiations with authors, resulting in the combined firm's extracting lower advances and greater concessions from authors.[51] And although the United States need not show harm to consumers, *see Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1133–34 (10th Cir. 2002), readers inevitably would be harmed: by reducing author compensation, the quantity and variety of books published

---

[48] PX-655 at 1.
[49] PX-70 at 1 & PX-70A at 1.
[50] PX-70 at 1 & PX-70A at 1.
[51] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. B [Watterson Dep.] at 5–6 (133:10–20; 142:5–16; 142:25–143:23).

will fall as well. This harm is neither conjectural nor hypothetical. As the Court will hear from witnesses, including the Penguin Random House Global CEO himself, reducing author compensation will likely reduce the output of books published and limit consumer choice by limiting what stories readers hear.

## Argument

### I.   Legal Standard

#### A.   Legal Standard: Section 7

Section 7 of the Clayton Act "creates a relatively expansive definition of antitrust liability," and "subjects mergers to searching scrutiny." *California v. Am. Stores Co.*, 495 U.S. 271, 284–85 (1990). Section 7 specifically bars mergers or acquisitions "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly" in "any line of commerce or … activity affecting commerce in any section of the country." 15 U.S.C. § 18. As the Supreme Court has explained, Congress used the word "may" in Section 7 "to indicate that its concern was with probabilities, not certainties," *Brown Shoe*, 370 U.S. at 323, because Congress "intended to arrest anticompetitive tendencies in their 'incipiency.'" *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1962) (quoting *Brown Shoe*, 370 U.S. at 317).

Accordingly, it is not necessary to prove that the proposed acquisition *will* cause competitive harm. Rather, a showing "that the merger create[s] an appreciable danger of [anticompetitive] consequences in the future" is legally sufficient to block a merger. *Heinz*, 246 F.3d at 719 (quoting *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986)). "A certainty, even a high probability, need not be shown," and "doubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989). This standard makes sense because the "fundamental purpose" of Section 7 is "to arrest the trend toward concentration, the tendency to monopoly, before the consumer's alternatives disappear[] through

merger." *Phila. Nat'l Bank*, 374 U.S. at 363. Indeed, the Supreme Court has held that "[a] trend toward concentration in an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anti-competitive effect of a merger may be." *United States v. Pabst Brewing Co.*, 384 U.S. 546, 552–53 (1966); *see also United States v. Cont'l Can Co.*, 378 U.S. 441, 461 (1964).

The application of Section 7 is not limited to mergers between sellers; the statute also prohibits anticompetitive mergers between buyers, and courts have enjoined such mergers when likely to harm competition. *United States v. Rice Growers Ass'n of Cal.*, No. S–84–1066 EJG, 1986 WL 12562 (E.D. Cal. Jan. 31, 1986) (blocking merger of purchasers of paddy rice); *United States v. Pennzoil Co.*, 252 F. Supp. 962 (W.D. Pa. 1965) (enjoining merger of purchasers of Penn Grade crude oil); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1021–22 (9th Cir. 2016) (affirming injunction against merger harming competition in "seafood processors' purchase of fish from fishermen").[52] The evaluation of mergers of buyers, or "buy-side" mergers, involves "essentially the [same] framework" as mergers involving the selling side of a market. *Merger Guidelines* § 12; *see also Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 321–22 (2007) (due to the "close theoretical connection" between monopoly power and monopsony power, "similar legal standards should apply").

In a buy-side case, the United States needs to show only that the merger may lessen competition at the buyer level. That is, there is no requirement that the United States prove downstream effects on consumers to block a proposed merger. *See Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) (finding a buy-side price fixing scheme

---

[52] Antitrust cases involving competition among buyers are often referred to as "buy-side" or "monopsony power" cases. *See Merger Guidelines* § 12.

illegal "even though the price-fixing was by purchasers, and the persons specifically injured under the treble damage claim are sellers, not customers or consumers.").[53]

To effectuate the "searching scrutiny" of mergers prescribed by Congress, courts have developed a burden-shifting approach. If a transaction (1) "produces a firm controlling an undue percentage share of the relevant market," and (2) "results in a significant increase in the concentration of firms in that market," that creates a presumption that the merger will substantially lessen competition. *Phila. Nat'l Bank,* 374 U.S. at 363; *Heinz,* 246 F. 3d at 715. Once the government shows that the merger is presumptively unlawful, "[t]he burden then shifts to the defendant to rebut the presumption by offering proof that 'the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition in the relevant market.'" *FTC v. Sysco Corp.,* 113 F. Supp. 3d 1, 23 (D.D.C. 2015) (quoting *Heinz,* 246 F.3d at 715). The defendants' burden is dependent on the strength of the prima facie evidence: "The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully." *United States v. Baker Hughes Inc.,* 908 F.2d 981, 991 (D.C. Cir. 1990).

### B. Legal Standard: Defining Relevant Product Markets

As a general matter, "[m]erger analysis starts with defining the relevant market." *Sysco,* 113 F. Supp. 3d at 24. A relevant antitrust market has two components: (1) the relevant product market and (2) the relevant geographic market. *United States v. Anthem, Inc.,* 236 F. Supp. 3d 171, 193 (D.D.C. 2017). The Supreme Court has recognized that the definition of the relevant market in a Clayton Act case was intended by Congress to be "a pragmatic, factual" analysis and

---

[53] The absence of a downstream harm requirement is consistent with the principle that buy-side cases should be analyzed similarly to sell-side cases, in which the law is clear that it is not necessary to show downstream harm. *Heinz,* 246 F.3d at 719 ("[N]o court has ever held that a reduction in competition for wholesale purchasers is not relevant unless the plaintiff can prove impact at the consumer level.").

"not a formal, legalistic one." *Brown Shoe,* 370 U.S. at 336. This reflects the fact that "the market, as most concepts in law or economics, cannot be measured by metes and bounds." *Anthem*, 236 F. Supp. 3d at 193 (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953)); *see also FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) (recognizing that some "fuzziness is inherent in bounding any market"). Market definition is not an end in itself: "Defining the market is not the aim of antitrust law; it merely aids the search for competitive injury." *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988). It can help a court ascertain the "locus of competition" in which anticompetitive effects are to be assessed. *Brown Shoe*, 370 U.S. at 320–21. Thus, the tools of market definition analysis "are not to be used to obscure competition but to 'recognize competition where, in fact, competition exists.'" *Cont'l Can Co.*, 378 U.S. at 453 (quoting *Brown Shoe*, 370 U.S. at 326).

The Supreme Court instructs that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and the substitutes for it." *See Brown Shoe,* 370 U.S. at 325. The focus of this analysis is "on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service." *Merger Guidelines* § 4; *see also Sysco,* 113 F. Supp. 3d at 25–26.

In a buy-side merger such as this one, the market is not composed of competing sellers but of competing *buyers* (here, book publishers). *Todd v. Exxon Corp,* 275 F.3d 191, 202 (2d Cir. 2001) (Sotomayor, J.) (holding that the proper focus in a buy-side market is "the

commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers.").[54]

Creative industries can pose different challenges given that the industry is not about fungible items like widgets, but about art or ideas. As a result, in creative industries, courts have defined relevant markets around *anticipated* success. In *Syufy Enterprises v. American Multicinema, Inc.*, the court concluded that the exhibition of "industry anticipated top-grossing films" was an appropriately defined relevant market based on criteria such as national advertising support, longer play times, bookings in first class theaters, and lucrative terms offered for the films by exhibitors. 793 F.2d 990 (9th Cir. 1986). Using technical and formal parameters in lieu of common-sense industry realities to define a relevant market in a creative industry is not only unmoored from the law, but also detrimental to analyzing harm to participants in those industries.

### C. Legal Standard: Defining Submarkets Around Targeted Groups

Under longstanding precedent, "[a] broad market may also include relevant submarkets which themselves may 'constitute product markets for antitrust purposes.'" *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037–38 (D.C. Cir. 2008) (quoting *Brown Shoe*, 370 U.S. at 325). Thus, "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997) (holding that, while all sellers of office supplies "must, at some level, compete with one another," there is a relevant product

---

[54] *See also* Hill Initial Rep., ¶¶ 102–04 & n.285 (noting that in a buy-side merger, market definition is concerned with "the preferences of sellers" and "the options available to sellers").

market limited to office supply superstores); *see also Anthem*, 236 F. Supp. 3d at 193 ("plaintiffs' relevant market need not include all potential customers or participants.").

Such narrower markets can be based on a set of "targeted customers." *FTC v. Wilh. Wilhelmsen Holding ASA,* 341 F. Supp. 3d 27, 46 (D.D.C. 2018); *accord Anthem,* 236 F. Supp. 3d at 195 ("Case law provides for the distinction of product markets by customer."); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 117–118 (D.D.C. 2016) ("*Staples II*"); *Sysco*, 113 F. Supp. 3d at 48. As explained by the *Anthem* court, "[a] submarket exists when sellers can profitably raise prices to certain targeted customers but not to others, in which case regulators 'may evaluate competitive effects separately by type of customer.'" *Anthem,* 236 F. Supp. 3d at 195 (quoting *Merger Guidelines* § 3); *see also Merger Guidelines* § 4.1.4. In a buy-side market, this test is reversed: the question is whether buyers can profitably decrease payments to certain targeted sellers. The submarket can be based on numerical distinctions, such as company size or annual spending. *Wilhelmsen,* 341 F. Supp. 3d at 51 (market consisting of customers owning fleets of 10 or more vessels of a particular type); *Anthem,* 236 F. Supp. 3d at 195 (market of companies with 5,000 or more employees); *Staples II*, 190 F. Supp. 3d at 118 (market of customers who spend $500,000 or more annually on office supplies).[55]

---

[55] As discussed more fully below at pages 25–26, it can also be appropriate to divide higher-end or lower-end products into separate markets where there is distinct demand and customers do not view other options as reasonable substitutes. *See, e.g., Whole Foods*, 548 F.3d at 1032 (defining market of "premium natural and organic supermarkets," characterized by high levels of quality and customer service); *Int'l Boxing Club of New York v. United States*, 358 U.S. 242, 250–52 (1959) (upholding separate market of "championship boxing," which is "the 'cream' of the boxing business").

## II.    There is a Relevant Product Market for the Acquisition of U.S. Publishing Rights to Anticipated Top-Selling Books

The evidence at trial will show that the proposed merger is likely to lessen competition substantially in at least one relevant product market: the market for the acquisition of publishing rights to anticipated top-selling books. This relevant market is a "targeted customer" market (here, a "targeted seller" market) in which authors, as sellers, are the targeted group. Anticipated top-selling books can be identified by the advances publishers pay to authors because those advances are based on the publishers' assessment of the volume of future book sales. The United States will show that a $250,000 advance payment is an appropriate cutoff to identify anticipated top-selling books, although, as discussed below, other reasonable advance level cutoffs above and below this level also show that authors will likely be harmed. This product market is a significant one: advances contracted to be paid to authors of anticipated top-sellers totaled over $1 billion in 2020.[56] This is roughly ███ of all advance spending by the publishers who produced data in this case.[57]

At trial, the United States will present two categories of evidence supporting this product market. First, "practical indicia," rooted in the facts of the industry, and second, expert economic analysis from Dr. Hill. *See Sysco,* 113 F. Supp. 3d at 27 (noting that "practical indicia" and expert economic testimony are the "two main types of evidence in defining the relevant product market"). Both types of evidence establish that the relevant product market here is the sale of publishing rights to anticipated top-selling books.

---

[56] Hill Initial Rep., ¶ 159 n.364.
[57] *Id*. ¶ 148.

A.  Practical Indicia Establish that Authors of Anticipated Top-Selling Books are Unique Customers with Unique Needs

Practical indicia show that authors of anticipated top-selling books are a unique set of sellers with unique needs. *See Anthem*, 236 F. Supp. 3d at 195–197 (finding that national employers are a "unique set of customers with unique needs" that constitute "a distinct subset of the health insurance market"). To attract authors of anticipated top-selling books and successfully publish them, a publisher must have a high level of editorial, marketing and publicity expertise, and the sophisticated sales and distribution capabilities required to make the book a success.[58] Publishers also need the financial wherewithal—including the ability to spread financial risk across a portfolio of books and a steady revenue base fed by substantial sales of previously published books—to take on the very significant risks of paying such high advances to authors.[59] Successfully promoting and marketing top-selling books to consumers is also expensive and risky.[60] In addition, publishers that can demonstrate to authors a sustained track record of success with top-selling books have a competitive advantage over publishers who cannot.[61]

Publishers who lack these attributes are not "seen by sellers [*i.e.,* authors] as being reasonably good substitutes," and thus are limited in their ability to compete. *Todd*, 275 F.3d at 202. As Defendants and other industry participants recognize, there are few publishers who possess these attributes *and* who are regularly competing for (and winning) these top books—overwhelmingly, the Big Five. The former CEO of S&S wrote, "[t]he publishing market is made up of what is known as the 'Big Five' ... These are our biggest competitors." This is because

---

[58] Hill Initial Rep., ¶¶ 117, 231–33.
[59] *Id*. ¶¶ 224–228.
[60] *Id*. ¶¶ 229–230; Ex. C [Tart Dep.] at 4–5 (60:19–61:5, 62:24–63:16).
[61] Hill Initial Rep., ¶¶ 234.

"they are the most likely to come up with high advance payments required and are known for their strong editorial and publishing skills," whereas non-Big Five publishers "rarely compete with us in auctions for new properties" and often serve as "farm teams for authors who then want to move to a larger, more financially stable major publisher."[62]   PRH executives likewise recognize that "[l]arge publishers are our (main) competitors"[63] and "[f]or higher level advances ... smaller publishers tend not to compete."[64]   These statements reflect the reality that no small publisher has successfully entered or expanded to threaten the dominance of the Big Five.

The Court will hear testimony from other industry witnesses, including literary agents and executives from other publishing houses, that the Big Five have the editorial, marketing, publicity and sales skills, the long track record, the financial capacity, and the other key attributes that give them a powerful advantage in winning anticipated top-sellers from authors. The strong preference of authors of anticipated top-selling books for publishers who possess this particular set of attributes is highlighted by the fact that the Big Five publishers have consistently maintained a 90% share of this market.[65]   While Defendants may try to confuse the record by pointing to isolated instances of a non-Big Five publisher winning a particular book, the market share data tell the story: smaller publishers are not sufficient competitive constraints on the Big Five, and they cannot replace the competition that would be lost by allowing the Defendants to merge to a 50% share of the market.   Indeed, the dominance of the Big Five over the rest of the publishing market is so stark that Bertelsmann, in materials presented to its Board, called the U.S. market an "oligopoly" made up of PRH and "only 4 further large publishers."[66]

---

[62] PX-530 at 2.
[63] PX-157 at 1.
[64] PX-190 at 1.
[65] Hill Initial Rep., ¶¶ 159–160.
[66] PX-881 at 12.

### B. Authors of Anticipated Top-Selling Books can be Targeted by Publishers

There are two conditions necessary to define a targeted seller market: (1) buyers must be able to identify members of the targeted group of sellers; and (2) sellers must not be able to engage in arbitrage, or opportunistic re-selling.[67]  *See Merger Guidelines* § 3; *Staples II*, 190 F. Supp. 3d at 117–118.  Both conditions are satisfied here.  First, publishers identify the members of the targeted group of sellers when they project future sales and create P&L analyses for each book to determine what advance to offer.  Because book deals are individually negotiated, prices are not uniform and publishers can individually target sellers.  *See Merger Guidelines* §§ 3, 4.1.4.  Publishers can profitably lower advances to this group of authors because their competitive options are far more limited than for authors of books that are not anticipated top-sellers.  Second, authors of anticipated top-sellers have little ability to avoid targeting by publishers through arbitrage.[68]

Nor would authors be able to avoid targeting by switching to self-publishing.  As the Court will hear at trial, there is ample evidence that self-publishing is not a meaningful competitor to traditional publishing, especially for authors who have earned higher advances.  This is also reflected in Defendants' ordinary course documents—for example, the former S&S CEO stated that "self-publishing is not viewed as a threat to [Simon & Schuster's] core business."[69]

---

[67] Hill Initial Rep., ¶ 119 n.305.

[68] Hill Initial Rep., ¶ 119.  Arbitrage involves "purchasing indirectly from or through other customers." *Merger Guidelines* § 3.  In this case, arbitrage would theoretically involve selling a book to another seller (author) who would resell it on behalf of the original author—a scenario that is unknown in this industry, if not "inherently impossible." *Id.*

[69] PX-601 at 4.  Defendants' expert does not claim that self-publishing should be included in the market.  His report acknowledges that he has not determined "whether the relevant product market also includes self-publishing…." Rebuttal Expert Report of Edward A. Snyder, June 3, 2022 ("Snyder Rebuttal Rep."), ¶ 119 n.192.

C. <u>An Advance Level of $250,000 is an Appropriate Way to Identify Targeted Authors of Anticipated Top-Selling Books</u>

As discussed above, there is ample precedent in the caselaw for using a numerical cutoff to identify a group of targeted customers (or here, sellers). In this case, it is appropriate to use the amount of an advance because of the close connection between advances and anticipated sales. As Dr. Hill explains, "there is consistent evidence that publishers offer large advances for books that are expected to sell more copies. This means that a book that is awarded a large advance is very likely to have large anticipated sales."[70] The forward-looking sales expectations of the market participants are the key determinant of price competition at the time of acquisition.

Data shows that the competitive landscape is very different for advances over $250,000 than it is for advances below that threshold. Dr. Hill finds that the Big Five have a 90% share of advances over $250,000 and non-Big Five publishers only begin to have meaningful shares at levels below $250,000.[71] In fact, Defendants' expert's own agency data reveal that the Big Five dominate the market for anticipated top-sellers with a collective 94% market share.[72] This conclusion is reinforced by testimony the Court will hear from other publishing industry professionals. For example, ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████

---

[70] Hill Initial Rep., ¶ 121. Defendants' expert appears to agree on this point, citing Dr. Hill's report for the proposition that there is a relationship between anticipated sales and the advance level. Snyder Rebuttal Rep. ¶ 57 & n.45.

[71] Hill Initial Rep., ¶ 121 & Figure 9; Reply Expert Report of Nicholas Hill, June 23, 2022 ("Hill Reply Rep."), ¶¶ 18–22.

[72] Hill Reply Rep., ¶ 36.

[73] ███████████████████████████████████

Other practical indicia also support the use of a $250,000 advance level to identify authors of anticipated top-selling books. As the Court will hear at trial, both PRH and S&S recognize $250,000 as a significant threshold in their ordinary business operations: they require higher-level approvals and additional documentation to make an offer of $250,000 or more for a book. This type of internal business practice is recognized in the caselaw as a basis for defining a market. *See Anthem*, 236 F. Supp. 3d at 197–98 (using 5,000-employee cutoff to define "national accounts," where defendants used the 5,000 threshold in the "ordinary course of business operations."). Other publishers use the same threshold for additional approval. For example, industry journal *Publisher's Weekly* uses thresholds to categorize book deals, and uses $250,000 to define a "significant deal" when agents and publishers submit announcements of their deals.

Importantly, although the evidence supports that $250,000 is an appropriate threshold, changing the threshold for observing the likely effects of this merger does not change the results: Dr. Hill's analysis shows that his conclusions hold across a wide range of average advances. His report analyzes cutoffs of $150,000, $350,000, $500,000, and $1 million and finds that "market shares do not change meaningfully even when the precise definition of an anticipated top-seller is significantly changed."[74] Thus, using $250,000 is appropriate here given that the outcome is not sensitive to reasonable variations in the boundary. *See Wilhelmsen,* 341 F. Supp. 3d at 54–56; *see also Tronox*, 332 F. Supp. 3d at 202 ("The Supreme Court has wisely recognized there is 'some artificiality' in any boundaries, but that 'such fuzziness' is inherent in bounding any

---

[74] Hill Initial Rep., ¶¶ 148, 161–62, 165 & Appendix E. Dr. Hill also concludes, using the data set of Defendants' own expert, that the proposed merger is presumptively unlawful at a $100,000 advance level cutoff. Hill Reply Rep., ¶ 38 & Figure 9.

market.") (citations omitted); *Times-Picayune Publ'g Co.*, 345 U.S. at 611 (no requirement to define market "by metes and bounds").

Courts have recognized that, because there is not always a clear break point between submarkets, it is appropriate to select a reasonable cutoff as a starting point for further analysis to confirm the robustness of the results. For example, in *Wilhelmsen*, the FTC's economist used 10 vessels "as a starting point for developing a series of statistical estimates, the non-statistical implications of which support the appropriateness of regarding Global Fleets as a distinct customer group." *Wilhelmsen*, 341 F. Supp. 3d at 55; *see also Staples II*, 190 F. Supp. 3d at 118 & n.10 (noting that government's expert chose $500,000 in annual office supply purchases as a cutoff "[f]or analytical purposes" and citing testimony "that there is no 'magic place that's the right place' to draw the line").

Defendants' argument that it is inappropriate to use price to help identify a relevant submarket has been rejected by the caselaw. In *Brown Shoe*, the Supreme Court identified "distinct prices" as one of the "practical indicia" courts may use to identify the existence of a submarket. 370 U.S. at 325. The D.C. Circuit in *Whole Foods* applied this principle to a targeted customer market, holding that "distinct prices" for the targeted group (which the *Whole Foods* court referred to as "core" customers) "indicates the existence of a submarket of core customers…." *Whole Foods*, 548 F.3d at 1038–39. In *United States v. Gillette Co.*, 828 F. Supp. 78, 81 (D.D.C. 1993), the court found a separate market for premium writing implements priced between $50 and $400, expressly rejecting the defendants' argument that "a relevant product market cannot be defined by reference to a narrow price range along a broader continuum of prices."

Defendants' claim that it is arbitrary to impose a cutoff where there is a "continuum of advance payment amounts" is also contrary to precedent.[75] The caselaw supports using numerical cutoffs to identify a group of customers in a relevant submarket, and courts routinely determine where to draw a line based on the commercial realities of competition in the industry. *See, e.g., Anthem*, 236 F. Supp. 3d at 197–202; *Wilhelmsen*, 341 F. Supp. 3d at 54–56; *Staples II*, 190 F. Supp. 3d at 118–127. Courts have also found relevant product markets consisting of premium product segments based on "distinctions in degree" across a broader range of products. *Int'l Boxing Club*, 358 U.S. at 249–252 (holding that championship boxing contests are a distinct market from non-championship contests, based on factors such as their higher revenues/rights fees and greater popularity among viewers); *see also Syufy*, 783 F.2d at 882–883 (affirming market of "industry-anticipated top-grossing films"); *Whole Foods,* 548 F.3d at 1041 (market of "premium" natural and organic supermarkets; *O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 986 (N.D. Cal. 2014) (finding relevant market in which colleges compete for "elite football and basketball recruits"), *aff'd in relevant part*, 802 F.3d 1049 (9th Cir. 2015).

The key question in assessing whether the proposed group of targeted customers is a properly defined submarket is whether the "construct is a useful way to discuss and predict economic conditions" because "its key aspects correspond to elements of the existing marketplace that would make it possible to profitably target a subset of customers for price increases." *Wilhelmsen,* 341 F. Supp. 3d at 52 (citation omitted). For the reasons discussed above, the definition of anticipated top-selling books corresponds to the marketplace realities here.

---

[75] *See* Snyder Rebuttal Rep., ¶ 156.

D. <u>Economic Analysis Establishes that the Acquisition of U.S. Publishing Rights to Anticipated Top-Selling Books is a Relevant Product Market</u>

The hypothetical monopsonist test is the buyer-side counterpart to the "hypothetical monopolist test," which courts routinely apply in sell-side cases to define a product market. *See Merger Guidelines* § 12; *Wilhelmsen*, 341 F. Supp. 3d at 47, 57–58 (applying hypothetical monopolist test); *Staples II*, 190 F. Supp. 3d at 121–122 (same); *Sysco*, 113. F. Supp. 3d at 33–34 (same); *H&R Block*, 833 F. Supp. 2d at 51–52 (same); *see also Todd*, 275 F.3d at 201–02 (analyzing "whether a 'hypothetical cartel' would be 'substantially constrain[ed]' from increasing prices by the ability of customers to switch to other producers.").

The test asks whether a hypothetical monopsonist—the only present and future buyer of the products in the alleged market—would find it profit-maximizing to impose a small but significant and non-transitory reduction in price ("SSNRP") for at least one product in the market. *See Merger Guidelines* § 4.1.1.[76] A hypothetical monopsonist would likely impose a SSNRP if sellers could not reasonably substitute to buyers outside the proposed market in response to the price reduction. That means that buyers outside the proposed market do not serve as a competitive constraint on the hypothetical monopsonist. In such circumstances, the proposed market is properly defined for antitrust purposes. *Id*. If, on the other hand, the hypothetical monopsonist likely would *not* impose a SSNRP, because sellers are able to substitute to other buyers that have been excluded from the proposed market, the proposed market is too narrow to constitute a properly defined antitrust market.

At trial, Dr. Hill will testify that the relevant market for the acquisition of U.S. publishing rights to anticipated top-sellers satisfies the hypothetical monopsonist test.[77] Dr. Hill defined the

---

[76] *See also* Hill Initial Rep. ¶ 133.
[77] Pls. Expert Sum., 5–6; Hill Initial Rep. § 5.5; Hill Reply Rep. §§ 3.2–3.3.

hypothetical monopsonist as all publishers, with self-publishing as the buying option outside the market.[78] Dr. Hill's analysis demonstrates that a hypothetical monopsonist publisher would likely reduce advances to authors of anticipated top-sellers because an insufficient number of those authors would switch to self-publishing in response to such a reduction, so as to make it unprofitable for the hypothetical monopsonist to impose a SSNRP.[79]

## III.   The Relevant Geographic Market is Global

The relevant market is composed of both the relevant product market, described *supra* at Section II, and the relevant geographic market. "The 'relevant geographic market' identifies the geographic area in which the defendants compete in marketing their products or services." *H&R Block*, 833 F. Supp. 2d at 50 n.7; *Merger Guidelines* § 4.2. The relevant geographic market must "correspond to the commercial realities of the industry" as determined by a "pragmatic, factual approach" to assessing the industry. *Brown Shoe*, 370 U.S. at 336 (internal citation omitted). Here, the parties do not dispute that the relevant geographic market for the acquisition of U.S. publishing rights to anticipated top-sellers is global.[80]

---

[78] Dr. Snyder initially critiqued Dr. Hill for including all publishers as part of the hypothetical monopsonist. Dr. Hill explained in response that he included all publishers—both those that acquire and would acquire anticipated top-sellers—because the test is whether a merger of all publishers would result in a lower advance amount. Whether a publisher that currently has no share would likely enter or expand to defeat any price decrease is examined as part of a competitive effective analysis. Hill Reply Rep., § 3.2. Dr. Snyder testified that he is now satisfied that Dr. Hill's analytical approach was proper, and in essence, agreed that the potential competition from smaller publishers or new entrants should be analyzed separately, and not as part of the hypothetical monopsonist test. Ex. Q [Snyder Dep.] at 2 (23:8–24:24).

[79] Pls. Expert Sum., 5–6; Hill Initial Rep. § 5.5; Hill Reply Rep. §§ 3.2–3.3.

[80] *See generally* Snyder Rebuttal Rep., § III.

IV.     **Bertelsmann's Acquisition of Simon & Schuster Is Presumptively Unlawful**

A.    <u>The Proposed Transaction is Presumptively Illegal Because It Would Create Extraordinarily High Market Shares and Concentration in the Relevant Market</u>

A merger that significantly increases concentration in an already concentrated market is presumptively illegal. *Phila. Nat'l Bank*, 374 U.S. at 363–65 & n.42; *Sysco*, 113 F. Supp. 3d at 52. In *Philadelphia National Bank*, the Supreme Court found that a significant change in concentration that resulted in a combined market share of 30% was sufficient to establish that presumption. 374 U.S. at 364; *see also Heinz*, 246 F.3d at 715–717 (finding FTC established prima facie showing of anticompetitive effects where defendants would have a combined share of 32.8% in a concentrated market); *Hosp. Corp.*, 807 F.2d at 1383 (finding transaction unlawful that raised defendant's market share from 14% to 26% and the market share of the four largest firms from 79% to 91%).

Courts also assess a proposed merger's presumptive illegality using the *Merger Guidelines* and employ a statistical measure of market concentration called the Herfindahl-Hirschman Index ("HHI"). *See, e.g., Sysco*, 113 F. Supp. 3d at 52–53; *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 166–67 (D.D.C. 2000). HHIs are calculated by summing the squares of each market participant's individual market share both pre- and post-acquisition. *Sysco*, 113 F. Supp. 3d at 52–53; *Merger Guidelines* § 5.3. Under the *Merger Guidelines*, if an acquisition (1) increases the HHI of a relevant market by more than 200 points and (2) results in a post-acquisition HHI exceeding 2500, it is presumptively anticompetitive. *H&R Block*, 833 F. Supp. 2d at 71–72 (enjoining transaction that would have given the combined firm only a 28.4% market share because the transaction would have resulted in a highly concentrated market as demonstrated by the fact that it would have increased the HHI by more than 200 and the post-acquisition HHI would have exceeded 2500); *Merger Guidelines* § 5.3.

Starting with market share, Dr. Hill will testify that PRH currently controls ███ of the market for anticipated top-sellers and S&S controls approximately ███. If this merger is permitted to proceed, the combination of PRH and S&S would result in a dominant publisher that controls roughly half the market with a combined **49%** share[81]—significantly higher than the 30% the Supreme Court found concerning in *Philadelphia National Bank*. That newly-minted combined firm would also enjoy twice the market share of its next largest competitor, HarperCollins, which has a 24% market share.[82] The merged firm would also have more than *five times* the market share of *all* publishers outside the Big Five combined, whose collective market share is only 9% with no single publisher outside the Big Five having more than 2% market share.[83]

With respect to HHI, Dr. Hill will testify that the proposed merger would result in an 891 increase in the HHI and a post-merger HHI of 3113.[84] These results are well above the threshold (increase of more than 200 points in HHI and a post-merger HHI of 2500) to trigger a presumption of illegality under the *Merger Guidelines*. *See United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (citing *Merger Guidelines* § 5.3). These troubling outcomes are the same if the $250,000 advance threshold is raised or lowered. In fact, Dr. Hill calculated the HHI at multiple advance levels and across different time periods. The result did not change: each of those scenarios resulted in HHI figures that trigger the *Merger Guideline*'s presumption that the proposed transaction will substantially reduce competition.[85]

---

[81] Pls. Expert Sum., 6–7; Hill Initial Rep., ¶ 159.
[82] Hill Initial Rep., ¶ 160.
[83] *Id.*
[84] Pls. Expert Sum., 7.
[85] Hill Initial Rep., ¶ 165 & Figure 10.

Dr. Snyder does not (and cannot) dispute Dr. Hill's market share or HHI calculations. Instead, although market shares are routinely used in antitrust analysis (including in the *Merger Guidelines* § 5.2) to evaluate a firm's competitive significance, Dr. Snyder argues it is more informative to measure how frequently firms compete or firms' capacity to compete than their share of wins. Aside from speculating on potential better measures of analysis, Dr. Snyder does not offer competing calculations. Further, his own agency data show that a non-Big Five publisher is the runner-up in roughly ▆▆▆ of the competitions for anticipated top seller contracts, which is similar to the frequency that market shares predict, thus disproving Dr. Snyder's claims about market shares.[86]

### B.   The Record Evidence Corroborates the Presumption of Illegality

The parties' own ordinary-course documents and testimony from their executives, as well as documents and testimony from other industry participants, corroborate the presumption that the merger will substantially lessen competition.

### i.   *Industry Participants Recognize That the Big Five Are Especially Close Competitors and Smaller Publishers Struggle to Compete*

The Court will hear from numerous industry participants who will testify that should this merger be allowed to proceed, it is likely to reduce competition, largely because publishers outside the Big Five are not viable alternatives for most authors of anticipated top-selling books. These smaller competitors—who together make up only 9% of the market, representing their minimal competitive significance going forward—simply will not be able to constrain a post-merger combined firm that controls 49% of the relevant market.[87] Defendants' own documents

---

[86] *See* Pls. Expert Sum., 7–8; Hill Reply Rep., ¶ 32.

[87] *See United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 501 (1974) ("In most situations, of course, the unstated assumption is that a company that has maintained a certain share of a market in the recent past will be in a position to do so in the immediate future. Thus,

and testimony from executives recognize that publishers outside the Big Five are "farm teams for authors."[88] Simon & Schuster's current CEO Jonathan Karp is expected to testify that S&S bids most frequently against and loses most to other Big Five publishers (and to PRH most of all).[89] Simon & Schuster's Chief Financial Officer Dennis Eulau is expected to testify that other Big Five publishers are the "most able to afford to" compete at high advance levels.[90] PRH executives confirmed that for "higher level advances … smaller publishers tend not to compete."[91] ███████████████████████████████████████

███████████████████████████████████ ██

Literary agents and authors will likewise testify that publishers outside the Big Five cannot consistently compete on an equal playing field for anticipated top-selling books.[93] For example, when asked by an author if she had ever ███████████████████████████

████████████████████████████████████████████████████

---

companies that have controlled sufficiently large shares of a concentrated market are barred from merging by S[ection] 7, not because of their past acts, but because their past performances imply an ability to continue to dominate with at least equal vigor.").

[88] PX-530 at 2.

[89] Ex. I [Karp CID Dep. (Day 2)] at 2 (458:11–458:16) ("Q. It sounds like in your experience as an executive in the publishing industry that Simon & Schuster loses to the Big Five publishers more than it does to other publishers, is that correct? A. Seems to be the case."); Id. at 2 (459:6–459:11) ("Q. I'll try to be more precise. Are the other Big Five publishers in your experience the competitors against which Simon & Schuster bids most frequently for author acquisitions? A. Yes.").

[90] Ex. P [Eulau CID Dep.] at 2 (225:24–226:12) ("Q. [I]s it accurate today that the Big Five publishers are the most likely to come up with high advance payments? A. Most likely, yes. Q. In your opinion, why are the Big Five publishers the most likely to come up with high advance payments? A. My opinion, because they're the most able to afford to. Q. Any other reason? A. They have history of success by doing so.").

[91] PX-190 at 1.

[92] ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████
█ ██████████████████████████████

here, no?", literary agent Christy Fletcher responded, ██████████████████ ■ Author

Andrew Solomon will testify that Big Five publishers are more likely to be successful publishers

of a top-selling book than smaller publishers due to the superior resources and contacts of the

Big Five.[95]

Executives at publishers outside the Big Five themselves recognize that they struggle to

compete for anticipated top-selling books. For example, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ ■ Abrams CEO Michael Jacobs will testify that Abrams gets

"outbid all the time by publishers who are willing to pay... more for books than we are" because

Abrams has limited resources and there is a "limited number" of things Abrams can "really lean

into" and "make investments that make sense for us."[97] The evidence demonstrating that the Big

Five are close competitors who leave small publishers far behind in competing for anticipated

top-selling books matters because it illustrates that those smaller publishers will not be a

meaningful competitive constraint on the combined firm such that they could overcome the

presumption of illegality.

*ii. Examples of Head-to-Head Competition*

"[M]ergers that eliminate head-to-head competition between close competitors often

result in a lessening of competition.... And this is true even where the merging parties are not

---

[94] PX-758 at 1.
[95] Ex. F [Solomon Dep.] at 5 (101:21–103:18).
[96] ████████████████████████████████████████
[97] Ex. K [Jacobs Dep.] at 2-3 (157:11–158:8).

the only two, or even the two largest, competitors in the market." *See Anthem,* 236 F. Supp. 3d at 216 (internal quotation and quotation marks omitted); *see also Sysco*, 113 F. Supp. 3d at 61 ("Courts have recognized that a merger that eliminates head-to-head competition between close competitors can result in a substantial lessening of competition."); *Merger Guidelines* § 6.[98] The evidence at trial will depict numerous instances of head-to-head competition between PRH and S&S.  For example:

In 2020, PRH and S&S competed in a multi-round auction for a book focused on gender inequality.[99]   After the first round, three bidders remained with S&S submitting the highest bid at $475,000.   After the third bidder dropped out, PRH and S&S competed against each other to drive the bidding up to $650,000 and $625,000, respectively.  At that point, the literary agent asked for each publisher's best and final bid, and S&S bid $750,000.   Suspecting that it was bidding against S&S, PRH stretched its final bid to $775,000 and won the book.  After learning they had indeed beaten S&S, PRH editors celebrated their win "over stiff competition."[100]

Also in 2020, PRH and S&S competed in an auction for a book regarding the opioid epidemic.[101]   All other bidders dropped out when the bidding reached $645,000 after several rounds, leaving the two merging parties as the only remaining competitors.   PRH and S&S went back and forth with competing bids over multiple rounds, with PRH ultimately prevailing with a winning bid of $825,000.

These instances of head-to-head competition inform the likelihood of anticompetitive effects if the proposed transaction is permitted to move forward.

---

[98] Hill Reply Rep., ¶ 45–46.
[99] PX-944B at 1.
[100] PX-39 at 1.
[101] PX-941B at 1.

### iii. Industry Participants Recognize That the Proposed Transaction Is Likely to Lead to Lower Advances for Authors of Anticipated Top-Selling Books

Industry participants anticipate that the merger is likely to lead to lower advances for authors. For example, Hachette CEO Michael Pietsch is expected to testify that ███████ █████████████████████████████ and Kensington CEO Steven Zacharius has testified that he "would expect that [advances] go down since there will be less competition for those authors."[102]   The Court will hear testimony from several literary agents that they expect the merger will lead to lower advances for authors.[103]   For example, literary agent Christy Fletcher testified that ████████████████████████████████ ██   Executives from the remaining Big Five publishers will testify that the combined firm will be so dominant that it will be able to employ exclusionary tactics such as restricting printing capacity or access to distribution networks to make it more difficult for the remaining Big Five publishers to compete against the combined firm.

### iv. Industry Participants Recognize That the Proposed Merger Is Likely to Reduce the Overall Output and Diversity of Books

To be clear, the United States need not prove any harm to consumers to prevail in this matter (*see* Legal Standard, *supra* at 14). Nevertheless, it bears noting that industry participants also recognize that by lowering author advances, the proposed merger is likely to diminish overall output, creativity, and diversity among books published. Penguin Random House Global CEO Markus Dohle is expected to testify that compensating authors less would mean that fewer authors will be able to make a living from writing, which would negatively impact the output of

---

[102] ████████████████████████████ Ex. J [Zacharius Dep.] at 2 (20:6–13).

[103] ████████████████████████████████ Ex. B [Watterson Dep.] at 5–6 (133:10–20; 142:5–16; 142:25–143:23).

[104] ████████████████████████

overall books written.[105]  Moreover, Mr. Dohle is expected to testify about the correlation between author income and the diversity of stories that are published, such that if author income is significantly diminished, the diversity of stories published would also be diminished.[106]

Author ███████████████████████████████████████████████████

██████████████████████████████████████[107]  Author Andrew

Solomon will testify that even authors who are paid large advances receive those payments in "dribs and drabs" over several years, which can make it challenging if not impossible for an author to make a living solely by writing.[108] ████████████████████████████████████

that ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████  ███

     *v.   There is Evidence That the 2013 Merger Between Penguin and Random House May Have Harmed Competition and Authors*

Some evidence suggests that the 2013 merger of Penguin and Random House, *see supra* at 5, harmed authors of anticipated top-selling books by reducing advances and the overall output of books published.[110]  Literary agents have testified that the ██████████████████████

█████████████████████████████████████████████████████████

---

[105] Ex. M [Dohle CID Dep. (Day 1)] at 2 (231:14–232:10).
[106] Ex. M [Dohle CID Dep. (Day 1)] at 2 (231:14–232:10).
[107] ████████████████████████████████████████████████████
[108] Ex. F [Solomon Dep.] at 6–7 (160:8–161:3); ███████████████████████████████████████████;
Hill Initial Rep., ¶ 40 n.86.
[109] ████████████████████████████  *see also* PX-915 at 2 (██████████████████████████
██████████████████████████████████████████████████████.
[110] *See generally* Pls. Expert Sum., 12; PX-149A at 1.

███████████████████████████████████████████ [111]  Internal

PRH documents confirm the anticompetitive harm from the 2013 merger.[112]

Dr. Hill will testify that the merger between Penguin and Random House led to lower

compensation for authors of anticipated top-selling books.[113]  The relevant data shows that

authors of anticipated top-selling books earned on average just under ███████  *less* per advance

in the two years following the 2013 merger than they did in the two years leading up to the

merger.[114]  Furthermore, average advances for authors of anticipated top-selling books decreased

by about ████ compared to advances for authors of all books.[115]  Such anticompetitive

consequences will only be more significant with the proposed acquisition of S&S by PRH, which

will result in a 49% combined share in the relevant market.

### C.  Economic Analysis Corroborates the Presumption of Illegality

Dr. Hill will testify at trial that he quantified the extent of head-to-head competition

between PRH and S&S for anticipated top-selling books by estimating diversion ratios between

the parties that show S&S is a significant competitor to PRH.[116]  Here, diversion ratios measure

the proportion of anticipated top-sellers that a merging party would acquire of those that the

other merging party would lose if it offered lower advances.  Because the merged firm will now

earn profits on books that are diverted from one merging partner to the other, the higher the

---

[111] ███████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████

[112] *See, e.g.*, PX-149A at 1.
[113] Hill Reply Rep., § 7.
[114] Hill Reply Rep., ¶ 94 & Figure 23.
[115] Hill Reply Rep., ¶ 99 & Figure 25 & ¶ 100.
[116] Pls. Expert Sum., 8–9; Hill Initial Rep. § 7.2; Hill Reply Rep. § 4.2.

diversion ratio between the merging parties, the more likely the merged firm is to lower advances.[117] *See H&R Block*, 833 F. Supp. 2d at 86 ("[T]he diversion rate from TaxACT to HRB measures the proportion of customers that would leave TaxACT in response to a price increase and switch to HRB."); *FTC v. CCC Holdings*, 605 F. Supp. 2d 26, 70 (D.D.C. 2009) ("[T]he diversion ratios are the best indicators of whether a significant share of the market views CCC and Mitchell as their first and second choices, and Audatex a more distant third."); *Swedish Match*, 131 F. Supp. 2d at 169 ("[T]he diversion ratio is important because it calculates the percentage of lost sales that go to National.  High margins and high diversion ratios support large price increases, a tenet endorsed by most economists."); *Merger Guidelines* § 6.1.

Dr. Hill estimated diversion between the merging parties in four different ways.  The methods are based on different datasets, including market share data and extensive party data that provide different angles from which Dr. Hill examined how frequently the merging parties lose to each other for anticipated top-sellers.[118]  All four methods reveal that the proposed transaction will likely lead to substantial anticompetitive unilateral effects.  For example, in analyzing anticipated top-sellers that S&S would lose if it lowered advances, Dr. Hill estimates that approximately ▮ to ▮ would be lost to PRH.[119]  Today, the threat that S&S could lose these authors to PRH keeps S&S from reducing advances.  Post-merger, however, these authors would be recaptured by the merged firm.  As Dr. Hill will explain, "[t]his greatly reduces the competitive pressure on Simon & Schuster to keep advances at their current level and will create a strong incentive for it to lower advances."[120]

---

[117] Pls. Expert Sum., 9; Hill Initial Rep. § 7.2.
[118] Pls. Expert Sum., 9–10; Hill Initial Rep. § 7.2.
[119] Hill Initial Rep., ¶¶ 174–77 & Figure 11.
[120] Hill Initial Rep., ¶ 175.  Dr. Snyder offers competing diversion ratios that he calculated using his own dataset based on book acquisition information collected from a set of 18

Dr. Hill also calibrated a second-score auction model to evaluate how the proposed merger may affect competition for anticipated top-sellers.[121] The model formalizes a competitive dynamic that is generally present when a book is sold, regardless of the method of acquisition: the publisher that acquires the book seeks to pay only as much as is necessary to beat out its strongest rival. The model uses high-level information about competition in the entire market for anticipated top-selling books to quantify the extent to which the elimination of competition between the merging parties will lead to lower advances. The model is calibrated using two inputs to estimate the effect of the merger on advances for anticipated top-selling books: market shares and profit margins. Using a PRH margin that is likely a significant underestimate, the model conservatively predicts a decrease in advances paid by PRH of 4.3% and by S&S of 11.6%.[122] The model predicts a decrease in advances paid of 5.8% for PRH and 15.3% for S&S if one uses a PRH margin that is likely closer to PRH's true margin.[123]

In addition, Dr. Hill estimated the effect of the proposed merger using alternative models, and found that (1) they produce results consistent with the results of his second-score auction

---

literary agencies. This dataset is smaller than any of the datasets Dr. Hill employed to calculate diversions. At trial, Dr. Hill will testify that the dataset is not representative. But even if it were representative, Dr. Snyder's estimates are largely consistent with Dr. Hill's. Hill Reply Rep., §§ 4.4 & 4.6.

[121] Pls. Expert Sum., 10–11; Hill Initial Rep. § 7.3; Hill Reply Rep. § 5.

[122] Pls. Expert Sum., 10; Hill Initial Rep. § 7.3.2; Hill Reply Rep. § 5.3. Dr. Hill performed a robustness check by increasing and decreasing the advance threshold to define an anticipated top-seller by $100,000. His results did not materially change, which shows that the predicted percentage harm is not sensitive to the particular advance threshold that Dr. Hill selected to identify anticipated top-sellers. Hill Initial Rep., ¶¶ 195–97.

[123] Dr. Snyder criticizes Dr. Hill's second-score auction model as a poor fit for the industry because many books are sold in processes other than second-score auctions and because agents can change sales processes. Dr. Snyder's criticism misses the point of using an economic model (which is meant to simplify market realities without losing competitive dynamics) and offers no reason why different processes would lead to different outcomes. Nor does he provide an alternative model leading to different outcomes. Hill Reply Rep. § 5; Pls. Expert Sum., 11.

model and (2) all predicted that the proposed merger would lead to substantial anticompetitive effects. Dr. Hill used Gross Upward Pricing Pressure Index ("GUPPI") models developed by Defendants' economists in the pre-complaint investigation to modify the traditional GUPPI formula to fit different book acquisition formats.[124] The models predicted advance decreases of 3.7–7.3% for PRH and 9.6–19.2% for S&S. Even incorporating Dr. Snyder's own diversion ratios, these models still predicted substantial harm to authors of anticipated top-sellers.[125] Moreover, those results were consistent with the results of the second-score auction model.

### D. Coordinated Effects: The Proposed Transaction Will Increase the Likelihood of Tacit Coordination Among Publishers Regarding Content Acquisition

"Merger law rests upon the theory that, where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels." *Heinz*, 246 F.3d at 715 (internal quotation marks omitted). Mergers can "diminish competition by enabling or encouraging post-merger coordinated interaction among firms in the relevant market that harms customers." *Merger Guidelines* § 7. A century of antitrust law recognizes that "oligopolistic market structures" dominated by only a few firms are likely to result in "tacit coordination," *Heinz*, 246 F. 3d at 725 (quoting Areeda & Hovenkamp, Antitrust Law: *An Analysis of Antitrust Principles and Their Application* (2021), ¶ 901b2), where a few major firms can engage in "interdependent pricing … by recognizing their shared economic interests with respect to price and output decisions." *Id*. at 724 n.23.

Tacit collusion, more so even than express collusion, is "feared by antitrust policy" because "even when observed, [tacit collusion] cannot easily be controlled directly by the

---

[124] Pls. Expert Sum., 11–12; Hill Reply Rep., § 6.
[125] Pls. Expert Sum., 11–12; Hill Reply Rep., ¶¶ 87–90, Figures 21 & 22.

antitrust laws." *Id.* at 725 (quoting Areeda ¶ 901b2); *see also Hosp. Corp.* 807 F.2d at 1389 ("The fewer competitors there are in a market, the easier it is for them to coordinate their pricing without committing detectable violations of [S]ection 1 of the Sherman Act, which forbids price fixing."). For this reason, "[i]t is a central object of merger policy to obstruct the creation or reinforcement by merger of such oligopolistic market structures in which tacit coordination can occur." *Id.* (quoting Areeda ¶ 901b2). In evaluating the possible acquisition of S&S, Bertelsmann itself recognized the U.S. publishing industry as an "oligopoly" with "only four other major trade publishers" beyond PRH.[126] The proposed transaction would reinforce that oligopolistic market structure, rendering it even more susceptible to tacit coordination.

Once the government has established its prima facie case, the burden is on Defendants to produce evidence of "structural barriers" specific to the publishing industry that would defeat the "ordinary presumption of collusion" that "attaches to a merger in a highly concentrated market." *CCC Holdings*, 605 F. Supp. 2d at 60 (quoting *Heinz*, 246 F.3d at 725). Defendants have not and cannot identify any such structural barriers here, especially in light of the recent history of express collusion over e-book prices among Defendants and their competitors. *See United States v. Apple, Inc.*, 791 F.3d 290, 320 (2d Cir. 2015) (upholding finding that the current members of the Big Five, with the exception of then-independent Random House, conspired with Apple, Inc. to "eliminate retail price competition and to raise e-book prices.").

Courts have found that a history of collusion—like that affirmed by the Second Circuit in *United States v. Apple*—is relevant to an evaluation of a merger's likely coordinated effects; a market that is "prone to collusion" is "even more prone to collusion" after the proposed merger of two large competitors. *See, e.g., Elders Grain*, 868 F.2d at 905–906. A history of collusion

---

[126] PX-80E at 13.

also "establishes a precondition to effective collusion—mutual trust and forbearance." *Hosp.*

*Corp.,* 807 F. 2d at 1388; *Elders Grain,* 868 F.2d at 906 (mergers "which reduce[] the number of

significant sellers" in markets "already highly concentrated and prone to collusion by reason of

its history and circumstances is unlawful in the absence of special circumstances.").

The history of collusion in the publishing industry would therefore further render the

market susceptible to tacit coordination following the proposed transaction. *See Heinz,* 246 F.3d

at 725. Moreover, the presence of entry barriers in this concentrated market as discussed *infra* at

page 42 add to the likelihood of coordinated effects that would occur if the proposed merger is

permitted to proceed. As noted in *Heinz,* "[t]he combination of a concentrated market and

barriers to entry is a recipe for price coordination." *Id.* at 724.

## V.    Defendants Cannot Rebut the Strong Presumption of Illegality

"If plaintiffs establish the prima facie case, defendants must present evidence to rebut the

presumption by affirmatively showing why a given transaction is unlikely to substantially lessen

competition, or by discrediting the data underlying the initial presumption in the government's

favor." *Anthem,* 236 F. Supp. 3d 192 (internal quotation marks omitted); *see also H&R Block,*

833 F. Supp. 2d at 72; *CCC Holdings,* 605 F. Supp. 2d at 46.

### A.    Entry and Expansion Would Not be Timely, Likely, Or Sufficient

Ease of entry into the relevant product market "can be sufficient to offset the

government's prima facie case of anti-competitiveness," *Sysco,* 113 F. Supp. 3d at 80, but only if

it is "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract

the competitive effects of concern," *H&R Block,* 833 F. Supp. 2d at 73 (quoting *Merger*

*Guidelines* § 9). "Defendants bear the burden of demonstrating the ability of other distributors to

'fill the competitive void' that will result from the proposed merger." *Sysco,* 113 F. Supp. 3d at

80 (quoting *Swedish Match,* 131 F. Supp. 2d at 169).

Here, there are high barriers to economically meaningful entry or repositioning in the anticipated top-seller market.[127] As described *supra* at page 5, entry at the scale of the Big Five has been limited, which is evidence that entry or expansion by a non-Big Five publisher is unlikely. *See FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 56 (D.D.C. 1998) ("The history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future."). This is exemplified by the failure of even Amazon—which has a wealth of resources—to expand materially in the market. Today, more than a decade after launching its publishing business, Amazon rarely succeeds in acquiring anticipated top-sellers. Although it has the second largest market share of any non-Big Five publisher, its share is still only ▮.[128]

Publishers outside the Big Five are limited competitors for anticipated top-sellers. Non-Big Five publishers collectively account for only about 9% of anticipated top-seller acquisitions, with no single small publisher having more than 2% market share.[129] Further, from 2019 to 2021, the non-Big Five's market share of anticipated top-sellers has increased by only ▮,[130] and Amazon's market share has declined over this period.[131] *See Anthem*, 236 F. Supp. 3d at 244 (finding entry unlikely where only one of 32 entrants had grown to attain a double-digit market share, and the company with the second highest share stood at 6%). In addition, Dr. Hill will testify that based on the parties' win-loss-data, neither Defendant loses more than ▮ of anticipated top-sellers to non-Big Five publishers.[132] Moreover, at trial, the other Big Five publishers and smaller publishers will testify about the non-Big Five's relative inability to

---

[127] *See* Pls. Expert Sum. § 7; Hill Initial Rep., § 9; Hill Reply Rep., § 9.
[128] Hill Initial Rep., § 9.3.3, Appendix E.
[129] Hill Initial Rep., ¶ 160.
[130] Hill Reply Rep., ¶ 124 & Figure 30.
[131] Hill Reply Rep., ¶ 136 & Figure 36.
[132] Hill Initial Rep., ¶ 217 & Figure 21.

compete for anticipated top-sellers.[133]  Defendants can point to no record evidence that any publisher outside the Big Five intends to expand to the extent necessary to counteract the anticompetitive effects of the proposed merger.[134]

One reason that non-Big Five publishers struggle to gain market share is that they are financially constrained from competing with the Big Five, especially for anticipated top-selling books.[135]  As detailed *supra* at pages 8–10 and 19–21, anticipated top-selling books are risky because they are based on sales numbers that can be difficult to achieve.  The risks involved in acquiring anticipated top-sellers makes timely or sufficient expansion by smaller publishers unlikely, as diversifying risk by publishing many anticipated top-sellers is not a realistic option for many non-Big Five publishers.  *See supra* at pages 8–10, 19–21.  Further, Big Five publishers, unlike smaller publishing companies, can also mitigate risk through backlist sales.  Backlist books are those no longer considered new releases, generally published at least one year earlier.  Backlist sales are a significant portion of Big Five publishers' revenues and are typically higher margin than front list sales.  In 2020, PRH earned ▮ of its revenue from backlist books and S&S earned ▮ of its revenue from backlist books.  An entrant, however, would have no backlist, and small publishers have substantially smaller backlists than Big Five publishers.[136]

Anticipated top-selling books are also expensive to market and distribute.[137]  The Big Five have large and experienced marketing departments, which give them a competitive edge over smaller publishers in competing for anticipated top-sellers.  In addition, all of the Big Five handle their own sales and marketing, and all but one of the Big Five handle their own

---

[133] *See* Hill Initial Rep., ¶ 218 (collecting deposition testimony).
[134] *See, e.g.*, Hill Initial Rep., § 9.2.
[135] Hill Initial Rep., § 9.3.2.a.
[136] Hill Initial Rep., ¶¶ 227–28.
[137] Hill Initial Rep., §§ 9.3.2.b–c.

distribution.   All of the Big Five publishers also have robust sales teams and well-established sales relationships.   In contrast, smaller publishers typically do not have the scale to handle all aspects of distribution in-house and must outsource distribution functions.   These publishers must rely on third parties—in many cases, the Big Five publishers with which they compete—to distribute their books.[138]   For a smaller publisher, third-party distribution services can be the highest cost of publishing a book outside the cost of acquiring the book.[139]

Moreover, the Big Five publishers have been in business for decades and have strong reputations across a broad range of genres and subgenres.   It takes many years, numerous literary prizes, critical acclaim, and commercial success to build up the kind of prestige that PRH and S&S have built.   Smaller publishers do not have the same track of record of success with anticipated top-sellers.[140]   Indeed, when asked why the Big Five had such a high percentage of anticipated top-selling books, Dr. Snyder admitted that reputation was a major reason.[141]  *See CCC Holdings*, 605 F. Supp. 2d at 54–55 ("Reputation can be a considerable barrier to entry where customers and suppliers emphasize the importance of reputation and expertise").

Significant expansion or repositioning by other members of the Big Five is also unlikely. Dr. Hill will testify that the merged firm will bid less aggressively than the companies would bid pre-merger because its probability of winning has increased due to the elimination of S&S as an independent rival.   This, in turn, incentivizes rival publishers to bid less aggressively for books to

---

[138] Hill Initial Rep., ¶¶ 232–33.  Dr. Hill will testify that Defendants and the other Big Five are likely able to distribute their books more cost-effectively than publishers that pay for third-party distribution services. Hill Initial Rep. ¶ 233.

[139] Hill Initial Rep., § 233; Reply Expert Report of Edward A. Snyder, June 23, 2022 ("Snyder Reply Rep."), ¶ 69 n.135 ("Contracting distribution and warehousing with another publisher is likely to be more costly than using one own's distribution and warehousing.").

[140] Hill Initial Rep., § 9.3.2.d.

[141] Ex. Q [Snyder Dep.] at 3–5 (129:12–140:21).

increase their likelihood of winning the same books at lower cost, enabling higher margins.[142] Further, as described *supra* at page 35, the Court will hear evidence that the combined firm will be so dominant that it will be able to employ exclusionary tactics, such as restricting printing capacity or access to distribution networks, that will make it more difficult for other publishers to compete against the combined firm.

### B. Literary Agents Cannot Counteract the Anticompetitive Effects of the Proposed Merger

Defendants assert that because agents can choose the process by which they sell the rights to a book and which publishers to invite to compete for a book, the proposed merger will not harm authors. But courts "have not considered the 'sophisticated [seller]' defense as itself independently adequate to rebut a *prima facie* case" and view "the economic argument for even partially rebutting a presumptive case, because a market is dominated by large [sellers]" as "weak". *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 440 (5th Cir. 2008); *see also Anthem,* 236 F. Supp. 3d at 221.

Moreover, testimony at trial will show that Defendants' argument is not grounded in reality. Agents are not powerful sellers that can counteract the anticompetitive harms from the merger. As Defendants' purported expert Jennifer Walsh admitted at deposition, literary agents are part of a fragmented industry.[143] They are numerous and diffuse, with agents belonging to many different agencies, including many small or even solo agencies. Most literary agents have more limited resources compared to PRH and S&S, which are part of multibillion-dollar companies that have access to business development and strategy teams and vast amounts of data.

---

[142] Hill Initial Rep., § 9.4.
[143] Ex. O [Walsh Dep.] at 2 (39:21–40:8).

Further, agents are not omnipotent.[144]   Agents cannot control whether publishers are interested in a book.  Agents cannot control a publishing house's internal bidding rules, including whether it prohibits its imprints from bidding against each other for a book.  Nor can an agent control how a publisher values a book.  Agents cannot control how much a publisher bids for a book.  Agents cannot even always control the scope of rights that they can sell; a recent example is that the Big Five publishers have all but refused to acquire books unless audio rights are included.[145]   Moreover, contrary to Defendants' assertion, agents do not always have control over the process of selling the book rights.  For example, a lack of interest in a book may leave an agent without the ability to conduct an auction, and require the agent to accept an offer without the benefit of a competitive process (or no offer at all).  Agents cannot manufacture competition.  In addition, an agent cannot conduct an auction if the only imprints that are interested in a book are all in the same publishing house.  Similarly, an agent may be required to conduct a best bids auction, instead of a rounds auction, if there are an insufficient number of independent bidders for a book.

Defendants also frequently acquire books for less than their P&Ls project the books are worth.[146]  If agents currently exercised outsized real competitive leverage that substituted for publishers' market power, as Defendants suggest, this would not happen; rather, a publisher would consistently pay the maximum value that its individual book P&L supported.  Accordingly, agents cannot extract the maximum value for books even pre-merger.  Defendants do not suggest agents' power will increase post-merger, and there is no reason to believe that it

---

[144] *See* Pls. Expert Sum. § 6; Hill Reply Rep. § 10.
[145] *See, e.g.,* PX-328 at 1.
[146] *See* Hill Initial Rep., ¶ 38 (collecting examples).

would.  Thus, the evidence belies Defendants' assertion that agents will be able to extract the maximum value for books from Defendants simply by adjusting auction rules.

### C.  Defendants' Efficiencies Defense Fails

Defendants claim that the proposed merger would create a more efficient publisher and the resulting higher profits would be passed on not only to PRH's owner, Bertelsmann, and its shareholders, but also to authors.  From the earliest cases decided after the amendment of the Clayton Act to apply it to mergers, the Supreme Court has focused on preserving competition rather than optimizing economic efficiency.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962); *see also Phila. Nat'l Bank*, 374 U.S. at 371.  This is because "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects."  *Phila. Nat'l Bank*, 374 U.S. at 363, *see also FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967) ("Possible economies cannot be used as a defense to illegality.   Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition.").  This Circuit has followed the Supreme Court's guidance and taken a highly skeptical view of efficiencies as a potential merger defense.  *See Anthem,* 855 F.3d at 353 ("[I]t is not at all clear that [efficiencies] offer a viable legal defense to illegality under Section 7."); *Heinz,* 246 F.3d at 721 (expressing concerns about efficiencies claims that are "mere speculation and promises about post-merger behavior").  This skepticism is heightened where a market leader acquires another competitor.  Efficiencies analysis has never on its own justified an otherwise anticompetitive acquisition by a dominant company.  *Sysco*, 113 F. Supp. 3d at 81 ("The court is not aware of any case ... where the merging parties have successfully rebutted the

government's *prima facie* case on the strength of the efficiencies."). The skepticism is particularly warranted here where PRH, the market leader, seeks to acquire one of its largest competitors, thereby cementing PRH's dominance.

The caselaw and *Merger Guidelines* recognize that only certain types of efficiencies have the potential to enhance a merged firm's ability and incentive to compete, and thus potentially offset the anticompetitive effects of a merger. These efficiencies, referred to as "cognizable efficiencies," must be substantiated by the merging parties, reasonably verifiable by an independent party, achievable solely via the merger, and not arise from anticompetitive reductions in output or service. *See H&R Block*, 833 F. Supp. 2d at 89; *Merger Guidelines* § 10. As detailed in the United States' Motion *in Limine* to Exclude Testimony of Dr. Edward Snyder Regarding Efficiencies (Dkt. No. 97) and Plaintiff's Expert Summary § 8, which the United States incorporates here by reference, the analysis by Defendants' efficiency expert Dr. Snyder fails each of these criteria.

### D. Defendants' Unenforceable Promise to Allow Simon & Schuster to Bid Independently for Books Does Not Resolve the Proposed Transaction's Anticompetitive Harm

PRH attempts to shift the focus from the plain anticompetitive effects of the proposed merger by offering the Court what amounts to little more than a hope and a promise. Contrary to economically rational decision-making, PRH now promises to change its current bidding practice to allow S&S to compete against PRH for a book, even if there is no third-party publisher competing for the book. In other words, PRH promises to bid against itself to drive up the price of acquiring books. PRH's nonsensical proposal is a self-serving, transparent litigation strategy, and the United States addresses its failure to resolve the anticompetitive effects of the proposed

merger in the Unites States' Motion *in Limine* to Preclude Evidence of Penguin Random House's Announced Bidding Policy (Dkt. No. 95), which it incorporates by reference here.

## Conclusion

Defendants' presumptively illegal proposed transaction would unite two powerhouses among the Big Five publishers and eliminate longstanding competition that has benefited authors of anticipated top-selling books. Accordingly, the United States respectfully requests that this Court find that the proposed acquisition of Simon & Schuster by Penguin Random House violates Section 7 of the Clayton Act, 15 U.S.C. § 18, issue a permanent injunction restraining Penguin Random House and Bertelsmann from carrying out the proposed acquisition of Simon & Schuster or any other transaction that would combine the companies, award the United States costs of this action, and award any such other relief as the Court may deem just and proper. Respectfully submitted,


Dated: July 15, 2022
                                                            */s/ John Read*
                                              John R. Read (DC Bar #419373)
                                              Sarah Licht (DC Bar #1021541)
                                              Bennett J. Matelson (DC Bar #454551)
                                              Robert P. Vance, Jr.
                                              United States Department of Justice
                                              Antitrust Division
                                              450 Fifth Street, NW, Suite 4000
                                              Washington, DC 20530
                                              Telephone: (202) 725-0165
                                              Fax: (202) 514-7308
                                              Email: john.read@usdoj.gov

                                              *Counsel for Plaintiff United States of America*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 15, 2022, I served the foregoing and all accompanying documents on the below individuals by electronic mail:

<u>For Defendants Bertelsmann SE & Co. KGaA and Penguin Random House LLC</u>:

Daniel M. Petrocelli (dpetrocelli@omm.com)
M. Randall Oppenheimer
(roppenheimer@omm.com)
O'Melveny & Myers LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067

Andrew J. Frackman (afrackman@omm.com)
Abby F. Rudzin (arudzin@omm.com)
Eamonn W. Campbell (ecampbell@omm.com)
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

Julia Schiller (jschiller@omm.com)
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006

Debbie Feinstein
(Debbie.Feinstein@arnoldporter.com)
Arnold & Porter
601 Massachusetts Ave., NW
Washington, DC 20001

<u>For Defendants ViacomCBS Inc. and Simon & Schuster, Inc.</u>:

Stephen Fishbein (sfishbein@shearman.com)
Jessica Delbaum (jdelbaum@shearman.com)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022

Ryan Shores (ryan.shores@shearman.com)
Michael Mitchell
(michael.mitchell@shearman.com)
Shearman & Sterling LLP
401 9th Street NW, Suite 800
Washington, DC 20004

Rachel Mossman
(rachel.mossman@shearman.com)
Shearman & Sterling LLP
2828 North Harwood Street, Suite 1800
Dallas, TX 75201

Dated: July 15, 2022

*/s/ Sarah Licht*
Sarah Licht
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Phone: 202-390-3599
E-mail: sarah.licht@usdoj.gov

*Counsel for Plaintiff United States of America*