~~HIGHLY CONFIDENTIAL~~
~~FILED UNDER SEAL~~

PUBLIC VERSION
NOT FILED UNDER SEAL

# Exhibit A

## In the Matter Of:

*USA vs*

*Bertelsmann SE*

*JENNIFER WALSH*

*June 29, 2022*



```
 1   you relied on in forming your opinions set
 2   forth in Walsh Exhibit 1 in Appendix A?
 3        A.   Yes.
 4        Q.   And you identified your report as
 5   a rebuttal to the expert report of U.S.
 6   economist Nicholas Hill; is that right?
 7        A.   Correct.
 8        Q.   Let's turn to the materials that
 9   you relied upon.  Please turn to Appendix A
10   of your report.
11        A.   Okay.  Yes.
12        Q.   In Appendix A, you identified
13   three documents:  The complaint filed by
14   the United States, the corrected expert
15   report of Nicholas Hill and the responses
16   of Spiegel & Grau LLC to PRH subpoena; is
17   that right?
18        A.   Correct.
19        Q.   Why did you choose to review
20   those three documents?
21        A.   I chose to review the documents
22   that I felt supported my -- my position,
23   and that could potentially give me examples
24   for the points that I was making.
25        Q.   Have you reviewed any documents
```

```
 1   in this case other than the complaint,
 2   Mr. Hill's -- Dr. Hill's expert report and
 3   the Spiegel & Grau subpoena response?
 4        A.   Yes.  I reviewed some of the --
 5        Q.   Go ahead.  What other documents
 6   have you reviewed?
 7        A.   I apologize.
 8             I reviewed some of the
 9   testimonies.
10        Q.   Okay.  And by testimony, you mean
11   deposition testimony?
12        A.   Correct.
13        Q.   Do you know whose deposition
14   testimony you reviewed?
15        A.   I can't remember all of them, but
16   Chris Parris-Lamb, Joy Harris, Andrew
17   Wylie.  I would need to see a list if you
18   wanted me to tell you comprehensively.  I
19   think I read four or five of them.
20        Q.   Okay.  Did you review solely
21   agent depositions?
22        A.   Yes.
23        Q.   And do you know if you reviewed
24   all of the agent depositions that were
25   taken in the case?
```

1        A.   I did not.  Ayesha Pande.
2        Q.   How did you decide which agent
3   depositions to read?
4        A.   I planned to read them all, but
5   they took so much longer than I expected,
6   that I just didn't get around to it.
7        Q.   And at what point did you read
8   those deposition transcripts?
9        A.   It was like two months ago.
10       Q.   So it was prior to writing your
11  report?
12       A.   Oh, yeah.
13       Q.   Other than agent deposition
14  transcripts, are there other materials you
15  reviewed in forming your opinions?
16       A.   No.  And actually, just to be
17  clear, I think I was beginning to formulate
18  my reports, you know, simultaneously as I
19  was reading the testimonies.  It wasn't
20  that -- then that.  It was -- they were.
21  It was concurrent.
22       Q.   Do you know how many depositions
23  were taken in the case as a whole?
24       A.   I don't.
25       Q.   Okay.  But beyond agent

```
 1  depositions, you didn't look to read any
 2  others; is that fair?
 3       A.   That's correct.
 4       Q.   And did you ask for access to any
 5  other documents produced during discovery
 6  in this case?
 7       A.   I did not.
 8       Q.   Why not?
 9       A.   I felt like I had the experience
10  I needed in order to create an opinion that
11  I felt was supported.  I didn't need any
12  additional information.
13       Q.   You have not worked at a
14  publisher in your career; is that right?
15       A.   I have not.
16       Q.   Okay.  And do you know whether
17  there are documents about the inner
18  workings of publishers that were produced
19  in this case?
20       A.   I'm not aware of that.
21       Q.   Are you aware that Defendants
22  have hired an economist by the name of
23  Edward Snyder or Ted Snyder?
24       A.   I'm aware of that.
25       Q.   Have you reviewed any of his
```

```
 1         Q.   Did you reach out to any clients
 2    or former clients to prepare the report?
 3         A.   I did not.
 4         Q.   Did you rely on any client files
 5    to write the report?
 6         A.   I did not.
 7         Q.   Did you have any conversations
 8    with other market participants to write the
 9    report?
10         A.   I -- I spoke with my attorney,
11    whose name is Eric Zohn, Z-o-h-n.  He
12    worked for me at WME for many years, and
13    then he left before I left and went on --
14    went on to be in private practice.  And I
15    spoke with him two times.
16         Q.   Okay.  And did you speak with him
17    in his capacity as an attorney for you?
18         A.   I mean, he is my attorney.  He
19    helped me with my letter of agreement, but
20    I spoke to him more in his capacity as
21    somebody who keeps a lot of my memories,
22    having worked together for, you know, 25
23    years.
24              I just wanted to check, for
25    example, whether I was deposed in -- I just
```

1      Q.    Let's go ahead it your
2  qualifications, which are on page 4 of your
3  report.
4      A.    Sure.  Okay.
5      Q.    So in Section 2, qualifications
6  and professional experience, you describe
7  different positions you've held; is that
8  right?
9      A.    I do.
10     Q.    And did you include in this
11 section all of the positions you've held
12 since graduating from college?
13     A.    Yes.
14     Q.    You graduated from Kenyon College
15 in 1989; is that right?
16     A.    I did.
17     Q.    What degree did you obtain?
18     A.    A bachelor of art.
19     Q.    And what was your major?
20     A.    Literature.
21     Q.    Do you have any other degrees
22 other than that bachelor's degree?
23     A.    Well, they gave me an honorary
24 doctorate, if that counts.
25     Q.    So that honorary doctorate is

1  WME was salaried; is that right?
2       A.   Correct.
3       Q.   Do you know whether that's how
4  most agents in the industry get
5  compensated?
6       A.   I couldn't speak comprehensively,
7  but anecdotally, it's my understanding.
8       Q.   So it's your understanding that a
9  salary is standard for agents?
10      A.   Just my understanding.
11      Q.   Okay.  And do you know whether
12 most agents get bonuses?
13      A.   I don't.
14      Q.   Have you done any research on
15 agent compensation in the industry?
16      A.   I haven't done any formal
17 research.
18      Q.   Have you done any informal
19 research?
20      A.   Running an agency for that long
21 and hiring people from different -- from
22 different agencies to come work with us was
23 sort of a research project in and of
24 itself, because you get a sense of how
25 people are being paid.  So I feel like I

1     A.   My partner Suzanne Gluck at WME,
2 my partner Eric Simonoff at WME and my
3 former partner Jay Mandel at WME.
4     Q.   And what makes those folks
5 experts in the publishing industry?
6     A.   Time, vision, wisdom and success.
7     Q.   It's fair to say that there are
8 agents at other agencies who have all four
9 of those characteristics, right, time in
10 the field, vision, wisdom and success?
11     A.   I would imagine so.
12     Q.   Do you think the CEO of a
13 publishing company qualifies as an expert
14 in the publishing industry?
15        MS. RUDZIN:  Object to the form
16    of the question.
17        THE WITNESS:  It would depend
18    what publishing company.
19 BY MS. CROSS:
20     Q.   Do you think the CEO of one of
21 the Big Five publishers qualifies as an
22 expert in the publishing industry?
23     A.   Yes, I would.
24     Q.   Do you have any experience
25 evaluating the cost publishers incur?

```
 1  they do a projection of what they would
 2  hope to sell.
 3       Q.   And so that's a projection of
 4  sales of that title; is that right?
 5       A.   A projection of what they hope to
 6  sell for that title.
 7       Q.   Are you drawing a distinction
 8  between a projection and hopeful sales?
 9       A.   Yeah.  I am.
10       Q.   Okay.  What is that distinction?
11       A.   Well, I think that the sales
12  number that they put in there is
13  aspirational, because they're comparing
14  this book, which is unique in all the
15  world, to two other books that are also
16  unique in all the world, or three other
17  books, or whatever it is, and trying to
18  draw a prediction on how this totally
19  unique book is going to sell in comparison
20  to these two totally other unique books.
21  And so that's why I'm adding the hopeful
22  thing.
23       Q.   Do you consider yourself an
24  expert in antitrust economics?
25       A.   Definitely not.
```

```
 1        Q.   Did you take any courses in
 2   economics?
 3        A.   I didn't.
 4        Q.   And you've never conducted an
 5   economic analysis in the context of a
 6   merger before; is that fair?
 7        A.   Correct.
 8        Q.   Have you reviewed the Horizontal
 9   Merger Guidelines?
10        A.   No.
11        Q.   Have you ever done a market share
12   analysis?
13        A.   No.
14        Q.   Do you have any experience in
15   defining product markets for antitrust
16   purposes?
17        A.   I don't.
18        Q.   Do you have any experience in
19   analyzing competitive effects?
20        A.   Sorry.  No.
21        Q.   Do you have any experience in
22   analyzing unilateral effects?
23        A.   No.
24        Q.   And do you have any experience in
25   analyzing coordinated effects?
```

```
 1        A.   No.
 2        Q.   Do you have any experience
 3   analyzing entry into an industry?
 4        A.   No.
 5        Q.   Do you know what entry barriers
 6   are in antitrust economics?
 7        A.   I don't.
 8        Q.   And you didn't review any
 9   documents from Penguin Random House or
10   Simon & Schuster discussing entry barriers;
11   is that fair?
12        A.   Correct.
13        Q.   In paragraph 112 --
14        A.   112.
15        Q.   -- in the final sentence you
16   wrote, "As the recent entrants to the
17   industry demonstrate, the barriers to entry
18   for new publishers are low, and innovative
19   publishers are emerging to disrupt the
20   norms."
21             What is the basis for that
22   statement?
23        A.   In the last probably 18 months
24   alone, we've seen several new entrants
25   into -- into the publishing industry, and I
```

```
 1        Q.   So specifically with regard to
 2   Section 6, the impact of the merger, what
 3   did -- what did you do to reach opinions
 4   about the impact of the merger?
 5        A.   I just based it on my 30-plus
 6   years of experience.
 7        Q.   Okay.  Was there any methodology
 8   behind your analysis of the impact of the
 9   merger?
10        A.   The methodology is based on my
11   firsthand lived experience.
12        Q.   Okay.  And you've never analyzed
13   the price effect of the merger; is that
14   right?
15        A.   Correct.
16        Q.   And you didn't do any
17   quantitative analysis to inform your
18   opinion about the impact of the merger on
19   prices in the industry; is that fair?
20        A.   Correct.
21        Q.   So you're relying solely on your
22   experience?
23        A.   On my vast and deep experience.
24        Q.   In paragraph 7, you wrote, "In my
25   experience" --
```

```
 1        of the question.
 2              THE WITNESS:  I have no idea
 3        about most agents.
 4   BY MS. CROSS:
 5        Q.   Are you familiar with the
 6   methodology an antitrust economist uses to
 7   analyze mergers of differentiated products?
 8        A.   I'm not.
 9        Q.   Okay.  Have you heard of the
10   hypothetical monopolist test?
11        A.   I have not.
12        Q.   Same question for the
13   hypothetical monopsonist test?
14        A.   I just learned that word
15   yesterday.
16              No, I have not.
17              MS. CROSS:  I'd say let's go
18        ahead and take a break.
19              MS. RUDZIN:  Okay.
20              THE WITNESS:  Okay.
21              THE VIDEOGRAPHER:  The time right
22        now is 10:35 a.m.  We are off the
23        record.
24              (Whereupon, a recess was taken at
25              10:35 a.m.)
```

Case 1:21-cv-02886-FYP   Document 134-2   Filed 07/22/22   Page 16 of 16
USA vs
Bertelsmann SE
Jennifer Walsh
June 29, 2022

110

1     A.   Okay.  Then I would tell the
2  person what I -- what I felt was fair.
3     Q.   So at that point, you gave a
4  number?
5     A.   Yeah.  I mean, the way I look at
6  it is, like, when they say something first,
7  they're creating the floor.  I'm going to
8  create the ceiling.
9          I don't want to -- I want to make
10 that distance as travelable as possible.
11 So if I was the first person to speak, then
12 I've already lowered that distance.
13         So once I hear their offer, then
14 I can share my thoughts, and then we -- we
15 can figure out how to get to a place where
16 everybody is happy.
17    Q.   Do you know whether other agents
18 approached -- approach, current, exclusive
19 submissions in the same way?
20    A.   I can't speak to other agents,
21 but from the agents that I worked with, we
22 all -- we all tended to approach them in a
23 very similar fashion.
24    Q.   You wrote in your report that --
25 I need to find the paragraph -- that