**FILED UNDER SEAL**

PUBLIC REDACTED VERSION
NOT FILED UNDER SEAL

# Exhibit B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil Action No. 21-2886-FYP |
| Plaintiff, | |
| v. | |
| BERTELSMANN SE & CO., KGaA, PENGUIN RANDOM HOUSE, LLC, VIACOMCBS, INC., and SIMON & SCHUSTER, INC. | |
| Defendants. | |

# EXPERT REPORT OF JENNIFER RUDOLPH WALSH
## JUNE 3, 2022

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     QUALIFICATIONS AND PROFESSIONAL EXPERIENCE ............................... 4

III.    PUBLISHING IS A UNIQUE INDUSTRY ........................................................... 8

IV.     AGENTS CONTROL THE ACQUISITION PROCESS ...................................... 10

        A.      The Agent-Author Relationship ............................................................... 11

        B.      The Role of Agents in the Publishing Industry ....................................... 12

                1.      Pre-submission ............................................................................. 12

                2.      Preparing to Sell the Book to Publishers .................................... 12

V.      THERE ARE MANY TOOLS IN THE AGENT'S TOOLBOX ...................... 15

        A.      Selling a Book .......................................................................................... 15

                1.      Exclusive Submissions ................................................................. 16

                2.      Auctions ....................................................................................... 16

        a.      Best Bids Auctions ................................................................................... 18

        b.      Rounds Auctions ...................................................................................... 18

        c.      Better/Best Auctions ................................................................................ 19

        B.      The Sales Process for a Repeat Author Might Be Different ..................... 19

        C.      Terms and Rights Negotiated During the Book Selling Process ............. 21

                1.      Financial Terms ........................................................................... 21

                2.      Payouts/Accounting ..................................................................... 24

                3.      International and Ancillary Rights ............................................... 24

                4.      The Number of Books .................................................................. 25

                5.      Other Terms ................................................................................. 25

        D.      Determining When to Leave a Publisher ................................................. 26

        E.      Post-Sale Activities .................................................................................. 26

VI.     THE MERGER WILL HAVE NO ADVERSE IMPACT ON THE INDUSTRY ............ 27

        A.      The Structure of the Publishing Industry Means that the Transaction Will
                Not Harm Authors ..................................................................................... 28

        B.      An Independent Simon & Schuster Is Not Necessary to Preserve
                Competition, and It Will Benefit from Becoming Part of Penguin Random
                House ......................................................................................................... 33

        C.      The Merger Will Not Reduce the Number and Type of Books ................ 36

Appendix A.         Materials Relied Upon ........................................................................ A-1

## I.  PRELIMINARY STATEMENT

1.      Defendants retained me to offer an opinion in response to the May 10, 2022 Corrected Expert Report of Nicholas Hill.  I was a literary agent for more than 30 years and ran the largest literary agency in the world.  Accordingly, I have supervised scores of literary agents during the course of my career.  Dr. Hill contends that the merger between Penguin Random House and Simon & Schuster would harm competition for "anticipated top sellers," which he defines as books that receive advances against royalties of $250,000 or more.  In my opinion, Dr. Hill's report is fundamentally flawed in several key respects.

2.      First, Dr. Hill does not understand publishing—he is trying to explain a highly personal, relationship-driven industry in cold and abstract academic terms.  He describes many of the technical details of book acquisitions correctly, but misses much of the big picture and nuances that make the publishing industry unique.  It is as if he is describing trees in a forest by describing the leaves, the branches, and the bark of each without discussing the roots that support them all and intertwine among each other below the forest floor, much less the ecosystem of the forest as a whole.

3.      Book publishing is not like typical businesses; its goals and principles are not interchangeable with those of a widget manufacturer.  Publishing is a calling; the people who write books and become editors and literary agents do it primarily for the love of books, rather than the fortune or the glory.  In ignoring this aspect of publishing, Dr. Hill's report overemphasizes the role that money, particularly the advance against royalties, plays in the industry.  Authors write books because writing is a form of creative expression.  And book rights are not commodities bought and sold only on the basis of price; most books are works of art that agents and editors fall in love with and shepherd into the world.  Every book is different, and it is

impossible to reliably predict how many copies of a book will sell.  The eternal hope that every

book has the potential to be a bestseller is the lifeblood of book publishing.  It keeps us going.

4.    Second, Dr. Hill downplays—and essentially ignores—the role agents play in

publishing.  Publishing depends on the literary agent; agents control every aspect of the process

of selling books to publishers.  They control which publishers even have an opportunity to make

an offer to publish a client's book and control the process of how it will be sold.  Nothing about

the merger will change this dynamic.

5.    Agents have various tools they can use to get the best deal possible for their

clients.  The best deal does not necessarily mean the highest advance against royalties.  Every

author is as different as every book, and each will have her own priorities and goals.  The agent

uses her different tools to obtain the deal that best suits that author for that book, which usually

means a deal with the publisher that best connects with the author or the book, not necessarily

the highest bidder.  The advance is one of many factors authors consider when accepting an

offer; authors also take into account their connection with an editor and that editor's vision for

the book.

6.    Third, Dr. Hill's view of the different players in the publishing industry is

inconsistent with my experience.  While he believes that only the so-called Big Five can compete

effectively for books that receive advances above $250,000, that has not been my experience in

my decades selling—or supervising scores of agents selling—thousands of books for an advance

higher than $250,000.  Many different publishers pay advances against royalties of $250,000 or

more.  Some also offer net profits deals, which have lower advances but a greater upside in

success.  Precisely which publisher would offer a high figure for any particular book depends on

the nature of the book and the author and each editor's unique outlook.  But a skilled agent

knows how to get a good offer out of an editor and have that editor thank the agent profusely for giving her the book. This is not eBay: Editors often do not even know if there are other bidders, much less who they are.

7.      Fourth, Dr. Hill's conclusion that advances might go down after the transaction is inconsistent with my experience. In my experience, the industry trend has been increasing author advances. This long-term trend has continued alongside multiple industry combinations, including the 2013 merger between Penguin and Random House. Agents have always been able to adapt to change to get favorable deals for their clients. Adaptation does not suggest harm to authors; it is part of life. And there are factors other than competition that can drive up advances: prestige of a particular author being on the roster, the help a certain book or author can offer the sales department in getting retail support for other books, a cultural or political trend that strikes at the right moment, or the need or desire to have a book in an underrepresented genre of the publisher's upcoming publications. Even if S&S went out of business tomorrow, I would not expect any impact on the advances paid by other publishers, the overall health of the industry, or the number of unique books that get published each year. There have been concerns raised about other publishing mergers over the years, but in my experience, those concerns have not borne out and the industry remains as healthy and competitive as it has ever been.

8.      It is my opinion, informed by my 30 years of experience as a top literary agent, that the merger will not adversely impact competition in the acquisition of books by publishers.

9.      To begin, there are the particular and unique characteristics of publishing. Books are not commodities; they are works of art, born of passion. As someone who is deeply familiar with the industry, I will explain how the different players in the industry—agents, authors, and publishers—work together to bring this art into the world.

10. I will then focus on the role of agents, who are key players in the book publishing process. Agents control every aspect of the submission and sale process, including determining how rights to the book will be offered and to whom. I describe in detail the role that agents play in the sale and publication of books. In this section, I also explain the relationship between authors and agents, describing the genesis and nature of the agent-client relationship.

11. I will also explain the different tools in the agent's toolbox that she can use to sell her clients' books to publishers. Agents have many different levers they can pull to get good deals for their clients. There is no formula for how to sell a book; every book is different, so every sales process must be different too. But I would note that many, many books are sold through exclusive negotiations, and skilled agents get maximum value for their client in those negotiations. Agents can achieve good results without auctions.

12. I conclude my report by describing the different publishers in the industry that will continue after the merger to compete for books. Post-merger, agents will still have plenty of publisher options for books and still have all of the sales tools they use now. Additionally, although I think it is wrong to suggest that the merger might cause advances to go down, it is not plausible to claim, as Dr. Hill does, that such a reduction would have any effect on whether books are written. Writers are artists and will still write books. Thus, it is my opinion that the merger will have no harmful impact on the industry: Agents will still be able to sell books effectively, writers will still write and get published, and readers will still have access to diverse types of books.

## II.    QUALIFICATIONS AND PROFESSIONAL EXPERIENCE

13. I have loved books my entire life and pursued a career in publishing to follow that passion professionally. I began my career as an intern at the Virginia Barber Literary Agency during my junior year at Kenyon College. This was my first introduction to my dream job of

being a literary agent. I was Virginia's first intern, and I took the job seriously and soon proved my value to the firm. When I returned to Kenyon for my senior year, I kept working for Virginia, reviewing manuscripts in my dorm room.

14.     This was an exciting time in publishing: new categories of fiction and nonfiction were being developed, as the previously rigid lines demarcating genres started to blur and authors started to experiment with new forms. The "literary Brat Pack," a group of young successful East Coast writers, emerged in the 1980s as I was coming up, and there was an air of opportunity and excitement in the industry.

15.     When I graduated from Kenyon in 1989, I returned to work for Virginia and was promoted to a full literary agent in 1990. I relished the opportunity to learn everything I possibly could from Virginia, who imparted upon me the knowledge she gained from her decades in publishing. While Virginia was my boss, she was also my friend and mentor. Publishing is, at its heart, a relationship business, and with Virginia I was able to experience for the first time the pivotal role that relationships play in this business.

16.     By the time I turned 30, I had bought the Virginia Barber Literary Agency and renamed it The Writers Shop. I was the co-owner and co-president of The Writers Shop, and we grew it from three employees when I bought it to nine employees just a few years later.

17.     In 2001, The William Morris Agency ("WMA"), one of the world's premier talent agencies, acquired The Writers Shop, and I became the head of WMA's worldwide literary department. Just two years later, I became the first woman and the youngest person in the history of WMA to sit on WMA's Board of Directors. While at WMA, I supervised a team of agents who represented internationally bestselling authors, critically acclaimed literary writers, award-winning journalists, renowned celebrities, and promising debut authors.

18.    In 2009, WMA merged with Endeavor to form William Morris Endeavor ("WME").  WME is the world's longest-running talent agency, with roots dating back to 1898. WME represents an unparalleled list of artists and content creators and employs some of the most talented agents in the world.  After the merger of WMA and Endeavor, I took on additional responsibilities and oversaw a larger team of literary agents and WME employees.  Not only was I a co-head of WME's literary department, but I also served as the only literary department representative, and only woman, on WME's nine-person governing board.  I also added lectures, theater, and the running of the New York office to my responsibilities.  As head of WME's New York office, I supervised hundreds of employees who represented clients in every aspect of the arts, including literature, music, lectures, theater, film, television, and commercials.

19.    At the time, WME's book division was the number one content provider in the publishing industry.  As head of that division at WME, I oversaw the placement and sale of more than 200 books each year in the United States with dozens of publishers, and a third of those books were featured on "The New York Times" Best Seller list.  I was also responsible for WME's extensive international rights team, which was devoted to selling global translation rights for our clients' books.  All told, my department closed nearly 1,000 publishing deals around the world each year.

20.    In 2014, I led the launch of a conference department at WME.  With the creation of this new department, I became the head of the agency's worldwide literary, speakers, and conference division.  That same year, this new department ran three national arena tours that drew hundreds of thousands of attendees: Oprah's eight-city *The Life You Want* tour, Arianna Huffington's three-city *Thrive* tour, and Cosmopolitan magazine's *Fun Fearless Life* tour.

21.    In 2016, I created Together Live, a touring event that brings together authors, thought leaders, social activists, athletes, and celebrities for talks, interviews, and interactive conversations across the country.  I have served as the master of ceremonies for Together Live's events, which allows me to be the link between fans and content creators.  As a fan myself, amplifying important stories is a deeply fulfilling part of my work.

22.    At the end of 2019, I stepped down from my position at WME to focus on Together Live, which COVID subsequently caused me to close.  Since that time, I have also worked as an independent consultant for authors and assisted them in having their works published.  This role has allowed me to continue to be involved in bringing books into the world, which has been my lifelong passion.

23.    During the course of my career as an agent, I have worked with Nobel, Pulitzer, and National Book Award-winning authors, including such luminaries as Arianna Huffington, Sheryl Sandberg, Sue Monk Kidd, Jeannette Walls, Ken Burns, Howard Schultz, Oprah Winfrey, Tyler Perry, James Patterson, and Brené Brown.  Some of the books that I have sold and seen published include *The Glass Castle, Lean In*, *The Secret Life of Bees,* and *The Sisterhood of the Traveling Pants*.

24.    From 2006 to 2014, I was featured in *The Hollywood Reporter's* "Women in Entertainment Power 100" list, which ranks entertainment's top female leaders.  I also serve on the Board of Trustees of Kenyon College, where I received both an undergraduate degree and an honorary doctorate of letters.  I have also served as a member of the board of the National Book Foundation.

25.    I have never provided any expert testimony.  In terms of publications, in 2021, Penguin Random House imprint The Dial Press published a book of essays that I edited called

*Hungry Hearts: Essays on Courage, Desire, and Belonging.* I also wrote an essay about my life and career for Lean In, the women's empowerment organization started by Sheryl Sandberg, available at https://lean in.org/stories/jennifer-rudolph-walsh. In 2007, I wrote an article for *The Huffington Post* about raising kids, available at https://www.huffpost.com/entry/raising-kids-from-bed_b_46302.

26.     Publishing is a relationship business, and I have been in the business for more than 30 years. I also have the benefit of Virginia Barber's wealth of knowledge, which she shared with me as my mentor. I have seen and experienced the industry develop over the course of my career, and I am deeply familiar with its intricacies and nuances. Publishing is not like other industries: while books are a business, they are also art and steeped in love—a fact industry outsiders often fail to understand.

27.     I am being compensated with a guaranteed minimum fee of $250,000 against a rate of $2,000 per hour and an additional $10,000 per day spent at trial.

### III.     PUBLISHING IS A UNIQUE INDUSTRY

28.     Publishing is a unique industry that has nuances not immediately apparent to outsiders. The core "products" in the industry—books—are works of passion and labors of love that are produced by artists and thought leaders who want their voices heard. Industry participants, including agents, editors, and publishers, usually join the industry because they love books and desire to bring books into the world. Book rights are not commodities that are bandied back and forth by dispassionate traders. To the contrary, agents, editors, and publishers fall in love with the books they sell, buy, and publish and then work in collaboration to bring them into the world.

29.     Dr. Hill's report fails to account for this fundamental truth of publishing—that it is an industry fueled by purpose. Editors do not decide how much to pay to acquire a book based

on a formula that considers only how many copies the book might sell; instead, editors make decisions on which books to pursue based on their personal love for the book and how they feel about the project. This can mean that an editor, supported by the publishing house, might pay a high advance to acquire a book that she really loves, even if she or her publishing house has doubts about its commercial prospects.

30.    This love is not limited to editors. Agents also choose to represent authors whom they really love and then work as hard as possible to make sure that those authors' books are brought into the world. This can lead to some business decisions that might seem irrational to outsiders. I have had rival agents refer authors to me because the agent could not represent the author but still wanted her book published. Actions like this are motivated by the agents' love for books and the authors they represent.

31.    Authors also do not write just to earn money. Authors write because they have something to say and want to share their views and their stories with the world. In my experience, authors are compelled to write and will make all efforts to share their writings. While it is true that some authors are able to make a lot of money through writing, this is not usually their primary motivation. In fact, most authors have careers outside of writing. This other income stream helps allow them to consider more than the size of the advance in evaluating offers from publishers.

32.    Booksellers are also motivated by a love of books. Selling books can be a tough business, but booksellers are motivated by their desire to discover new books and stories that they love and by sharing those books and stories with their customers. Industry players are passionate about books and work hard to bring new books to readers. In my experience, this is true not only in the United States, but around the world. This has been true for as long as I have

been in publishing, and I understand from Virginia Barber that it was true even before I was born. Nothing will be able to change this beating heart of the industry. Dr. Hill has failed to account for this alchemy in forming his opinions, and I believe that this blind spot makes many of his opinions flawed.

## IV.    AGENTS CONTROL THE ACQUISITION PROCESS

33.    Apart from the authors who actually create the content, agents are the most important players in the publishing industry. Agents control key steps in the book acquisition process: Agents sign authors as clients and then guide those authors to the right publishers to meet the authors' goals and have their books published. While it is important for agents to collaborate with their authors to find the right publisher, the author will rely on the agent's expertise and skill throughout the process. Publishers, in turn, rely on agents to bring them manuscripts and proposals to publish. Even after the book has been sold, authors and publishers will turn to agents for advice and guidance. The agent is the common thread throughout the process that links everything together.

34.    Agents are important in the industry, and their crucial role in the publishing process leads to publishers often requiring that an author be represented by an agent,. There is a wide variety of literary agents, ranging from those who work for themselves in their own shops to those who are employees of large international talent agencies.

35.    In this section of my report, I explain the role of agents in the industry. First, I explain how agents get clients and how the customary agreements between authors and agents work. Second, I detail the role of agents in the publishing industry, focusing specifically on the agent's central role in selling books to publishers.

36.    It is important to note at the outset that an agent acts as a fiduciary for her author clients. An agent is therefore duty-bound to act exclusively in her author's best interest. Part of

this responsibility involves remaining flexible and adapting as necessary to changes in the industry to make sure that the agent is getting the best deals possible for her client.  The agent's role as fiduciary is the central component of the author-agent relationship, and it forms a foundation for everything else that I discuss in this section.

### A.    The Agent-Author Relationship

37.    The majority of an agent's clients are retained through the agent's outreach.  That is, an agent contacts an author to ask if the author is interested in being represented by the agent. Agents can discover potential author-clients in several ways:

- Agents receive referrals from existing satisfied clients or from editors pleased with an agent's work.

- Agents can reach out to authors discovered in literary magazines, newspapers, or other publications.

- Agents can discover up-and-coming authors through literary festivals and similar events, which are often created to connect authors with agents.

- Agents can contact public figures, such as celebrities and politicians, and suggest writing a book.

38.    Some clients are obtained through author outreach.  That is, an author seeks an agent to represent her.  Authors write cover letters, also known as query letters, accompanied by an excerpt of the author's manuscript.  The best cover letters include a concise description of the book, comparisons to other similar books, and a pitch as to why the book and author would be a good fit for that particular agent.  These submissions are then put into the "slush pile" at the agency, for agents to review if they choose.  Prominent agencies, like WME, do not accept such unsolicited submissions.  Smaller agencies, however, might rely on slush pile submissions to sign new clients.

39.    Literary agents typically receive a 15% commission on domestic deals they achieve for their clients.  For international deals, literary agents typically receive a 20%

11

commission because the commission is usually split with an international rights agent.  The publisher pays the agent all monies owed to the author, from which the agent will deduct her commission and then forward the remainder to the author.

**B.      The Role of Agents in the Publishing Industry**

### 1.      *Pre-submission*

40.     The agent's role begins with reviewing manuscripts.  If the agent sees potential in the project, she will work with the author to sell it.  The agent might review drafts to provide feedback to the author.  In this respect, the agent serves as an early editor for the author to help shape the book.

41.     The agent then educates her author on publishing.  Authors are artists, and even seasoned authors often do not understand the commercial side of publishing.  Authors therefore depend on agents to provide advice about the marketability and monetary value of their work and how to evaluate competing offers.

42.     The agent also works with the author to determine the author's personal goals.  Every author is different, and every author has her own goals for each book.  Some authors want to win prestigious awards, for example, while others want to further their careers or boost their public profile.  Some authors just want to tell their stories and hope to see them published so readers can benefit from their stories.  And of course some authors hope to benefit economically.  Knowing the author's priorities allows the agent to find the right editor for the book.

### 2.      *Preparing to Sell the Book to Publishers*

43.     Publishing is a relationship business, and agents will leverage their personal relationships throughout the process.  While an agent cannot control whether an editor makes a bid, she can take steps to make that more likely.  She can, for example, write a compelling letter explaining the book, or come up with apt favorable comparisons.

44.     There is no recipe for selling a book.  Every book is unique, and thus every selling process is unique.  Selling a book often begins with "pre-seeding," the informal process by which the agent "hypes up" a book to potential purchasers.  An agent will talk about her books with editors at lunch or industry events, for example.  In book publishing it is custom for editors to arrange meetings so that the editors can hear about the agent's different books.

45.     After pre-seeding the marketplace, the agent decides the appropriate form of submission to publishers.  This submission could be a proposal, a manuscript, a chapter, an annotated table of contents, a letter, or even just a video of the author talking about her book.  The submission the agent makes to the publisher is often different from what the author submitted to the agent.  For example, while the author might share a complete manuscript with her agent, the agent might submit just a few chapters to an editor.  The agent submits whatever she thinks is best to further her author's goals; it is entirely within the agent's control what she submits.

46.     The agent will also prepare a personalized cover note for each editor to whom she submits the proposal.  The purpose of the cover letter is to provide an "elevator pitch" of the book that the editor could use to describe the book to her colleagues.  The cover letter will often include comparable titles to the proposed book, as well as a description of the agent's view of the book's place in the broader marketplace.

47.     Because publishing is a relationship-driven business, agents are deeply familiar with different editors' individual book tastes.  Agents rely on this knowledge to create their submission list, i.e., the list of editors to whom they send the book.

48.     The relationship between agents and editors is symbiotic.  Editors need book submissions to acquire content to publish, and agents need editors to buy their clients' books.

Editors work to court agents, and agents work to meet new editors.  It is important for agents to keep expanding their potential submission pool so that they can continue to service their clients as editors retire or leave the industry.  Editors and agents often have lunches and other meetings to develop these relationships.

49.    If the agent determines that she will submit the project to multiple editors, she compiles an appropriate list.  She also relies on her colleagues to help develop the submission list.  In my experience, it is common for agents to discuss proposed submission lists at department meetings or informally consult with other agents.  In this way, the agent is able to take advantage of not only the personal relationships she has developed, but also the personal relationships that her colleagues have developed.  The publishing industry is an extended network of relationships grounded in a shared passion for books.

50.    Successful agents have many connections in the publishing industry and might submit manuscripts to more than a dozen editors, sometimes submitting to multiple editors at the same publisher.  But agents also often submit books exclusively to a single editor or to a highly targeted list.  The agent might make an exclusive submission if the author is focused on working with a particular editor, or if the agent thinks that an exclusive submission will be the best way to achieve the author's individual goals.  And, of course, the author might have a contractual obligation to present a new project to her existing publisher on a limited exclusive basis.

51.    After preparing the submission list, agents customarily call every editor on the list to gauge his or her interest in the project.  These editors are often already familiar with the project from the agent's pre-seeding efforts.  If an editor is not enthusiastic about the project in an initial phone call, the agent might remove the editor from the submission list.  The agent maintains full control over her submission list throughout the process and will tweak it as she

sees fit. After these calls are complete, the agent will send the project to the editors on the submission list.

52.    If appropriate, the agent then arranges meetings between the author and the editors who are interested after reading the submission. While the meetings are important, they are time consuming. Therefore sometimes the agent grants meetings to only a limited number of editors who have already made a promising bid.

53.    The goal of these meetings is for the agent to find a personal match between editor and author; the agent uses the meetings to test their chemistry. The parties often exchange editorial thoughts and ideas for the book to see if there is alignment between their respective visions for the book. Agents will also often require editors to bring other representatives from the imprint—such as publicity, marketing, or sales personnel—to give a sense of how the imprint as a whole sees the book. Agents will often also schedule meetings with multiple imprints within the same publishing house in order to give the agent and author a sense as to how imprints within the same corporate umbrella might differ in terms of personnel and vision for the project.

54.    After the meetings, the agent is ready to discuss offers. The next section of my report describes how agents work to get the best deal for their clients.

## V.    THERE ARE MANY TOOLS IN THE AGENT'S TOOLBOX

55.    Agents have many tools at their disposal to help sell their clients' books and have full control over which tools to use when.

### A.    Selling a Book

56.    Agents dictate the method to sell a book. The different methods include exclusive submissions and various types of auctions (including preempts, which occur before auction). Agents bring the value of their expertise and knowledge to this process, which allows the authors to trust that they are getting the right value for their books based on the threat of competition.

And because the relationship between the author and the agent is commission-based, the author knows that the agent's interests will be aligned with the author's interests.  I discuss each process in turn.

### 1.    Exclusive Submissions

57.    An exclusive submission is when the agent submits the project to a single editor with a deadline for making an offer before the agent sends the submission to others.  The agent might make the exclusive submission to honor an option clause, or because the agent or author believes the editor is the right editor for the book.

58.    Exclusive submissions have the added benefit of secrecy.  The agent might want to submit a book exclusively if, for example, the author is switching publishers or the subject matter is sensitive and she wants to keep the details of the book from leaking out.  Exclusive submissions can also help make sure that the editor approaches the author's material with his or her own vision and excitement about the project, rather than what she might hear or infer about what other editors are saying.

### 2.    Auctions

59.    Agents can also use auctions to sell a book.  It is up to the agent to decide which of the many auction structures she wants to use.

60.    If an editor wants to prevent a book from going to auction, she might make a "preemptive offer" or a "preempt."  These are offers made only after the project has been widely submitted and an agent has set a date for the auction, but before the auction has commenced. The offer is made to preempt the auction.  Sometimes publishers will put time limits or other restrictions on preempt offers to try to prevent the agent from shopping the preempt to other publishers.  I therefore disagree with Dr. Hill's use of the word "preempt," which he defines as any sale process that is not an auction and includes "bilateral negotiations between a publisher

16

and a recurring author." That is not what the term means to anyone in the industry, and it improperly lumps together different acquisition processes.

61.    It is possible that an editor who is not the best fit for the book might try to preempt an auction. The author might therefore reject the preempt offer, even if its financial terms were very attractive. Agents often use rejected preempt offers to set the floor for bidding in an auction or to set up preemptive duels between different publishers who want to preempt a book.

62.    If an editor whom the author favors makes a preempt offer, the agent might accept the preempt offer and call off the auction. The agent might also call an editor whom she sees as a good fit for the project to encourage her to make a preempt offer. Because auctions are fluid and subject to the agent's control, the agent can cancel the auction whenever she sees fit or pull different levers during the auction to get a better deal.

63.    If the agent does not accept a preempt, then the auction will proceed. Agents can use different types of auctions to try to get the best deal for their authors. In any type of auction, however, the agent will maintain the ability to structure the auction as she sees fit. I have known agents to change the auction format in the middle of an auction (or to stop it before its previously announced endpoint) in response to feedback from the marketplace to maximize their clients' interests (and agents often expressly reserve the right to do so when setting up the auction rules). The agent will also maintain control of information during the auction.

64.    As the one running the auction, only the agent knows which publishers are involved and what they are bidding, unless she chooses to tell an editor that information. The agent will be able to use this information to her advantage during the auction—sharing or withholding it from the bidding publishers to suit the agent's purpose. In all types of auctions,

17

agents customarily reserve the right not to accept the highest bid and to decide what constitutes the best overall offer, including both monetary and non-monetary terms.

### a.    Best Bids Auctions

65.    In a "best bids" single-round auction, the agent will set a date and time by when any interested editors need to submit their offers.  An interested editor would then submit her best offer for the book by the set date and time.  Best bids auctions are a good way for an agent to assess how different editors value a project.  It is for this reason, among others, that when I chose to hold auctions (rather than pursue an exclusive submission) my typical practice was to hold single-round, best bids auctions.  I would request an advance amount and a marketing plan. While that was my preference, other agents at WME whom I supervised often did it differently.

66.    Agents sometimes ask that marketing plans be included in a publisher's bid so that the agent has another metric for evaluating an offer.  The marketing plan is the publisher's initial strategy for positioning and selling the book; it might also contain a financial commitment to spend a specific amount on marketing. Marketing plans are a valuable tool in allowing the agent to evaluate offers on a holistic basis—not exclusively on the dollars and cents of an advance.

### b.    Rounds Auctions

67.    In a "rounds" or "round robin" auction, the agent sets a deadline for editors to make initial offers.  Once all of the initial offers are received, the lowest bidder is given the opportunity to outbid the highest bidder or drop out.  The next lowest bidder is given the same opportunity, and so on, until each bidder goes and the round concludes.  The rounds could continue for the set number of rounds the agent established at the outset or could end before or after that point depending on when the agent and author decide to accept an offer.  Sometimes the agent will limit the number of bidders that are permitted to proceed to the next round, and the

agent can always choose to end the auction at any point. If the highest bid does not come from the editor or imprint the author favors, the agent might ask the underbidder (but not others) to improve its offer. The agent retains discretion to conduct the auction as she sees best.

### c.    *Better/Best Auctions*

68.    In a hybrid version of the best bids and rounds auctions, the agent might also hold a "better/best" bids auction. Here the agent will call for the editors' "best" bids to be submitted at a set date and time, but with the understanding that there may be a second round in which the highest bidders will have an opportunity to submit their "better" bids. And once again, the agent can go back to the underbidder even after "best" bids, because she controls the process.

69.    Determining which auction type to use depends on the particular author and book, and different agents take different approaches. There are many different ways to sell books, and in my experience every agent I supervised had a different approach for different projects.

### B.    The Sales Process for a Repeat Author Might Be Different

70.    Selling an author's second or later book is usually different than selling an author's first book. Repeat authors often have option clauses with their prior publishers and have track records that guide editors in making their bids.

71.    Option clauses provide an author's current publisher a first look on the author's next book. Negotiations for books under an option clause are exclusive time-bound negotiations between the option holder and the author's agent. These submissions are often straightforward because the editor holding the option and the author already have a relationship, and the editor will have an idea of what to expect for the next book.

72.    The previous book's sales will be a key factor in the negotiations. Publishers are transparent about sales data during these negotiations, and an agent will make sure that she has access to the most current information available. If the prior book did not sell well, the agent

will argue to the publisher why the compensation for the new book should not be reduced, notwithstanding those poor sales. The agent might explain, for example, how the next book is different, that a publisher error caused the poor sales, or how the market has changed.

73.    Agents maintain the right to reject the option holder's offer. If the option holder and the author cannot reach agreement, the agent is free to shop the book, including by conducting an auction or by negotiating exclusively with a different publisher. The agent might then use the option holder's offer as a floor for negotiations with other publishers. The agent could then choose to return to the option holder after securing more attractive offers from other publishers to give the option holder an opportunity to beat the competing offers.

74.    Option clauses might include what is called a "topping" provision, which allows the option holder to top any offer received on the open market for the book. Option clauses might also include provisions that restrict the author from accepting an offer from a publisher for a lower advance than the option holder offered. In my experience, skilled agents are able to negotiate option clauses so that they are not overly restrictive and are often limited to the "first look" option described above.

75.    Agents are also able to negotiate for additional advances for repeat authors. For example, an agent could negotiate an additional advance for an author's prior book that has earned out its advance as a contract term for the author's subsequent book. This would allow the publisher to reward the author for a book that is selling well while also avoiding putting too much pressure or risk on the author's subsequent book. The agent could also negotiate for royalty improvements, increased bonuses, or other financial terms to make the offer on the next book more attractive.

76.     A publisher might also pay more for a subsequent book if it has rights to the author's previous books.  In that case, the publisher can assign a higher value to a subsequent book because it gives the publisher the opportunity to promote the author's older titles.  Agents can use this fact to get more favorable deals for their clients.

77.     In choosing a publisher, agents and authors will evaluate the full package of compensation and terms, the editor / author fit, and the editor's enthusiasm for the book.  Every editor and every imprint is different, which means that even offers that appear to have identical compensation and contractual terms are different.  The agent plays a pivotal role in guiding the author toward the deal that makes the most sense for the author.

### C.     Terms and Rights Negotiated During the Book Selling Process

78.     There are many deal terms that are negotiated between the agent and the publisher.  The agent gives the publisher terms that the publisher cares about in exchange for receiving terms that the author cares about.  These terms include financial compensation terms, payout terms, rights to publish the book internationally (and in what territories and languages), book formats and other rights (which include film, television, merchandise, and first serial rights, i.e., the rights to publish excerpts of a book in a periodical before publication), the number of works covered by the deal, and other terms like paying for book tours and travel costs.  Dr. Hill's analysis does not seem to account for these variables and nuances.

#### 1.     *Financial Terms*

79.     There are many ways for authors to be compensated for their work.  A primary form of compensation is an advance on royalties.  The advance is a payment of money made in advance of any sales generating royalties, which means that the royalties are applied against the advance before the author receives royalty payments.  After sales have generated sufficient

royalties to match the advance, the publisher will begin paying the author on subsequent sales based on the royalty percentages the publisher and the agent have agreed.

80.    Agents seek the right advance level for a book—i.e., a level that allows the author to receive upfront compensation for her work while also fostering her long-term career. The agent also needs to keep in mind the relationship between the author and the editor when negotiating an advance level. If an agent seeks an advance level that is too high it could damage the relationship—particularly if the book does not meet expectations—and dissuade the editor or publisher from wanting to publish the author's future books. An agent's job, in the case of authors who seek to ultimately publish multiple books, is to find the advance level that will strike the right balance for a long, successful publishing career.[1] By the same token I know that editors are not always looking to pay the lowest advance because they want the author to feel good about the deal and appreciate that the editor believes in them. The right level of advance helps to ensure there is a positive working relationship between the editor and author in the months that follow the signing of a contract—a period when the two must closely collaborate with each other to finish the book.

81.    Agents customarily reserve the right to decide what offer is the "best" offer, which they do in consultation with the author. It is not uncommon for an author to accept the offer of an "underbidder," i.e., a publisher offering a lower advance than another publisher. Authors do this for many reasons. The editorial match with the underbidder might be better, the underbidder might feel like the better long-term fit, the underbidder might be more prestigious and able to help the author win awards, or the underbidder's author list might be more attractive. Every author has different factors that matter to her.

---

[1] The incentives can be different for "one-off" books from celebrities or political figures, who might have more of an interest in maximizing the compensation from the first (and presumably only) book.

82.     Agents can also negotiate with publishers about royalty rates.  Royalty rates vary depending on the book's format.  A publisher's offer might provide a 15% royalty rate on hardcover sales, a 7.5% royalty rate on paperback sales, a 25% royalty rate on eBook sales, and a 25% royalty rate on audiobook sales.  Some offers might also include graduated royalties, which increase the royalty rate as the number of copies sold increases.  For example, the author might earn 10% on the first 10,000 hardcover books sold, 12.5% on the next 5,000, and 15% thereafter.  While there are long-standing industry norms of default royalty rates, they are—like so much else—always negotiable.

83.     Agents will also negotiate for other forms of financial compensation for their authors.  For example, agents can negotiate for bonuses to be paid to their authors upon certain milestones, particularly those that increase the value of the book like a movie deal.  Bonuses can be based on selling a certain number of books, earning out the book's advance, negotiating a movie or film deal, making it onto a best seller list, winning an award, or any other metric on which the agent and publisher agree.

84.     "Joint ventures," "profit shares," or "net profit" arrangements can be options for authors who are looking to take a risk on themselves in exchange for a greater reward.  In these arrangements, authors share with the publisher the net profit from each book sold, but likely earn a lower, or no, upfront advance.

85.     Skilled agents will be able to pull all of these levers to negotiate more favorable deals (in both monetary and non-monetary terms) for their clients.  Which levers the agent ends up pulling will depend on the particular goals of the individual author.  Agents can even trade things of unequal value.  As an example, if the author cares a lot about first-class flights but has no feelings about the first serial rights, the agent might give up first serial rights in exchange for

the publisher covering the cost of author's first-class flights.  Even reimbursement for hair and makeup can be included in a deal.  Agents are dealmakers and control all the pieces of the ultimate deal.

### 2.    *Payouts/Accounting*

86.    Agents will also negotiate with publishers over the payout schedule for the advance.  A common model is that a portion of the advance is paid upon signing the contract, a portion upon delivery and acceptance of the final manuscript, a portion upon publication, and a portion one year after publication.  But the schedule and allocation are all negotiable.

87.    Another tool in the agent's box is joint accounting.  The agent might, for example, offer joint accounting (counting the advance as a single lump sum for multiple books) on an author's next book in exchange for a higher advance, and the publisher might accept this because it would then have to pay for only a single royalty stream for the author.  If the author's next book ends up being successful, then the agent could negotiate to "un-joint" the accounts so that the author would have two separate royalty streams.

### 3.    *International and Ancillary Rights*

88.    Depending on the book and the author, the agent might also split up the right to sell the book in different geographic areas or different languages for sale to different publishers. In my experience, publishers push for world rights (and pay more for them than rights for a limited territory).  While this might make sense for some authors, agents resist these efforts if it does not.  I have been involved in many deals throughout my career in which the geographic rights to sell a book have been divided between different publishers, and I often received offers from publishers with different geographic rights included, which requires the agent to compare and estimate the value of the rights in different regions.  The agent might offer world rights if she wants a higher immediate advance for her author.  The agent could also decide, however, to sell

rights directly into each market, giving her greater flexibility.  The agent uses her expertise, judgment, and experience to help decide which rights to offer to get a good deal for her author.

89.    The agent maintains control over all rights to the book and will sell those to the author's benefit.  These rights include large print, audio, book club, first serial, and second serial rights.  The agent might also explore podcast, film, and television deals if applicable.  The agent will leverage the various rights to her client's benefit.

### 4.    *The Number of Books*

90.    Agents might also negotiate with publishers over the number of books included in a contract.  While some authors prefer the security of having a multi-book deal with a publisher, others might want to preserve their freedom to negotiate contracts for subsequent books with different editors or publishers.  I have often also seen auctions or other acquisition processes in which the agent offers North American rights for a particular number of books and the responsive bid from a particular publisher comes back for North American rights for more or fewer books.  Even within the same acquisition process, therefore, publishers might be bidding on different sets of rights.

### 5.    *Other Terms*

91.    There are still other terms that agents can negotiate with publishers.  Agents might negotiate to provide for a reversion of rights to the author after a certain period of years, which would allow the author to re-sell the book rights after that period expires.  Agents might also negotiate for publishers to cover book tour expenses, first class airfare, hotel costs, and guaranteed marketing or publicity budgets.

92.    The key is that a skilled agent has the flexibility to negotiate over any terms she thinks are important to her author.

### D.    Determining When to Leave a Publisher

93.    In my experience it is rare for authors to leave their publisher because they establish a strong relationship with their editor.  But there are times when it makes sense.

94.    In my experience, an agent can move a successful author to a different publisher, if that is the author's choice.

95.    One reason an author might want to leave for a new publisher is to follow her editor.  Publishing is a relationship-driven business, and the relationship between the editor and the author is fundamental.  If the author's editor leaves, the author might feel she will not be as supported at that publisher.  This could also happen if there is a breakdown in the relationship between the editor and the author, in which case it might make sense for the agent to consider moving the author to a new publisher.

96.    Another reason the agent might move the author to a new publisher is because the author's goals change.  An author might, for example, start her career as a journalist writing investigative nonfiction but evolve into writing fiction as her career develops.  In that example, the agent might want to take the author's fiction book to a different editor who has a good reputation for publishing novels rather than a focus on nonfiction.

### E.    Post-Sale Activities

97.    After selling a book, the agent negotiates the formal contractual terms with the publisher.  While a publisher has a form contract, most agencies negotiate a different form contract for the agency's deals.  That agency-specific contract is then negotiated.  In my long career, I have negotiated many different contractual terms and provisions.  Even after a contract is signed, some specific terms might be renegotiated if circumstances have changed.  For example, if the author has had a lot of press appearances scheduled since the contract was signed, the agent might get the publisher to pay for the author's air travel to those appearances.

98.     Agents continue to add value in numerous ways.  Agents will typically be copied on all correspondence between the author and the editor throughout the editorial process.  This enables the agents to make sure that the author and editor maintain a good relationship.  Agents can also review drafts of the book.  In my experience, some agents are more hands-on in this process than others.  Agents can also have a say in when the book is published.  For example, the agent might suggest a particular season for the book depending on the genre and topic.  Agents can also use their experience to propose marketing strategies or be involved in publicity campaigns via social media and events.  Again, the agent's income is derivative of the author's, so the agent has every interest in helping the book sell.

## VI.    THE MERGER WILL HAVE NO ADVERSE IMPACT ON THE INDUSTRY

99.     In my opinion, informed by my more than 30 years of experience in the industry, the proposed merger between Penguin Random House and Simon & Schuster will not harm authors and will have no adverse impact on the industry.

100.    If the merger goes through, agents will still be able to use the many tools I described above to get favorable deals from publishers big and small, new and established. During the course of my career, the industry has experienced what many in the industry thought would be fundamental shifts.  For example, some in the industry thought the 2013 merger between Penguin and Random House would harm competition for content acquisition.  In my experience, that merger had no impact on author advances.  As another example, some in the industry thought that the advent of the e-book was the end of print books.  That has not happened.  Agents, authors, editors, and publishers have been able to adapt to changes in the world and industry, and the fundamental dynamics of the industry remain the same as when I started working as an agent over 30 years ago.  In this section, I describe the structure of publishers in the industry, which informs my opinion that the merger will not harm authors.

27

After that, I explain why the merger will not have an impact on the output of writers, who will continue to write regardless of what happens between publishers in the industry.

### A.    The Structure of the Publishing Industry Means that the Transaction Will Not Harm Authors

101.    There are many different publishers in the industry, which vary in terms of size and history.  Some in the industry refer to the "Big Five."  This term refers to the five largest publishers, which are Hachette, HarperCollins, Macmillan, Penguin Random House, and Simon & Schuster.  I have done deals with all of these publishers (and many others) over the course of my career, and in my experience they are all aggressive competitors for books at all advance levels, ranging from less than $100,000 up to well above $1,000,000.  It is also not unusual to have offers from multiple imprints within the same major publisher.  Imprints under the same roof often compete with each other, another facet of publishing's uniqueness.

102.    There are many mid-sized publishers in the industry outside of the Big Five. Some examples are Abrams, Amazon, Chronicle, Disney, Graywolf Press, Grove Atlantic, Hay House, W.W. Norton, and Scholastic.  There are also university presses and countless smaller publishers all around the country that are publishing new books every day.

103.    In my experience, publishers that are not thought of as part of the Big Five are viable competitors for books at all advance levels, including for books that receive advances above $250,000.  There is nothing unique in the acquisition process for a book that receives an advance above $250,000—these books are viewed the same as other books by publishers, and all publishers can compete to acquire these books.  Indeed, some of these publishing houses are favored by an author because they are particularly well-known or prestigious in certain areas— e.g., Abrams and Chronicle are known for illustrated books, Scholastic and Disney are known for children's books, and Hay House can be a first choice for the author of a self-help or wellness

book.  And even smaller publishers like Baker Publishing and Tyndale House Publishers are known for Christian books and thus preferred by those authors.

104.    Additionally, focusing on the advance level ignores that agents are able to negotiate creative deals with publishers that work to their authors' benefit outside of increasing advances; advances are only a single lever that sophisticated agents can and do pull in deal negotiations.  For example, agents can negotiate for profit sharing arrangements, bonuses, increased royalties, or other favorable terms that their authors want to secure in their contracts.  And, as described above, it is customary for agents who run best bid auctions to pair advance offers with marketing commitments.  Dr. Hill's focus on the advance amount misses the point of how the industry actually works.

105.    I am unfamiliar with the term "anticipated top-selling books."  This is not a term that is used in the industry, and it does not have any meaning in the industry.  As we see repeatedly in films, television, music, and books, big budget projects often fail to find an audience and sleepers  break through regularly.  There is no formula to predict what will and will not sell.  To us in the industry, there is a collective belief that every single book has the potential to sell well—hope springs eternal.  Moreover, no matter what any publisher pays, all advances are just that; advances against royalties on actual sales.  If an author sells millions of copies of her book, she is going to earn out her advance and be paid royalties, no matter how large the advance or which publisher paid it.

106.    There are few guaranteed successes, and it is impossible to predict accurately how well a book will sell.  This is especially true for debut authors, who do not have a track record of prior sales that could be used as a basis for predicting future sales.  Even with repeat authors, however, prior sales form only a basis to venture a guess as to how well future books will sell—

there is no way to forecast accurately how well any given book will sell.  And if there are books that really are shoo-ins like the next John Grisham or another book from Michelle Obama—those books receive seven- or eight-figure advances, far above $250,000, and will have publishers clamoring for them (although even for those there is no guarantee of success).  Assuming that only the Big Five could afford a book like that—even though non-Big Five publishers do pay seven-figure advances—there would still be intense competition for those books after Penguin Random House's acquisition of Simon & Schuster.

107.    Placement on a bestseller list like *The New York Times* is not an accurate reflection of a book's lifetime sales.  This is because bestseller lists offer only a snapshot look at a book's sales during one particular week, relative to other books' sales during that same week. It is thus possible for a book to sell well for years and never make a bestseller list.  A book like that could easily sell more copies than a book that made it to number one on a bestseller list for a week or two.  And a short-lived bestseller might not even earn out its advance.  Dr. Hill's assumption that a high advance yields a bestseller or vice versa is simply not justified.

108.    Given that publishers outside the Big Five compete for books at all advance levels, agents do not focus exclusively on the Big Five publishers.  To the contrary, agents customarily include a wide array of editors on their submission list—a list that depends principally on the type of book that is being pitched.  As explained above, non-Big Five publishers are often favored by authors for books in their specialty.  Publishers outside the Big Five offer high advances for books that they believe in and can sometimes give more support and attention to an author or a particular book than a big publisher can.  Such offers are often uniquely appealing to authors who feel a close relationship with editors at those publishers.  And

then there are the smaller publishers who out-spend the Big Five on a given book.  One fewer

buyer, even one of the Big Five, will only make more room for new publishers.

109.    While not every publisher (whether one of the Big Five or not) will participate in

every acquisition, in my experience agents routinely submit books to publishers outside the Big

Five, and at least one non-Big Five publisher will often compete for any given book, with the

actual publishers participating depending on the book that is up for auction.  There are agents

who almost exclusively sell books outside of the Big Five.  For example, if the agent is selling a

children's book, Scholastic or Disney are often first on the submission list.  If the agent is selling

an illustrated book, Chronicle or Abrams might be the best publisher for the book and win the

rights.  If the agent is selling a Christian-oriented book, Baker Books or Tyndale might

participate and win.  If the agent is selling a self-help or wellness book, Hay House might win

the book.  If the agent is selling a fiction book with the goal of winning literary awards,

Graywolf or Grove Atlantic might be the best house.  If the agent is selling a journalistic

nonfiction book, W.W. Norton or a university press might be the only houses the agent submits

to.  And of course agents can always use these other publishers to create competition and

negotiate a better deal from a Big Five publisher.

110.    Authors often accept an offer from a publisher not part of the Big Five because

the offer is financially commensurate with an offer from the Big Five or because those smaller

publishers have unique characteristics that make them appealing to certain authors, or both.

W.W. Norton and Grove Atlantic, for example, bring a level of depth, expertise, and caring to

book publications that is attractive to authors.  Authors might also want to be associated with

similarly minded authors who are also signed with smaller publishers.  Smaller houses create a

family and authors want to be part of a family.  Authors might also feel there is a better editorial

31

fit with an editor who works at a smaller publisher.  These are just some of the reasons why authors might want to sign with a publisher outside the Big Five.  I am aware of many highly successful authors who publish with a non-Big Five publisher, including J.K. Rowling (Scholastic), Michael Lewis (W.W. Norton), Jeff Kinney (Abrams), Mary Roach (W.W. Norton), and Suzanne Collins (Scholastic).

111.    There are also many new entrants to the publishing industry that are attractive options for authors.  Talented editors have left the Big Five to start publishing companies that are successful and that I would have considered as options for my author clients.  Some examples are Zando, Spiegel & Grau, and Astra, all of which were founded by Big Five veterans.  While these are new publishers, they are capable of successfully publishing books and can and do compete with the Big Five to acquire books.  These new publishers often employ other skilled editors who have left Big Five publishers for new opportunities.  The first book that Spiegel & Grau published as an independent company, *Fox & I,* in July 2021, was an instant bestseller, which demonstrates that new entrants to the industry are capable of acquiring books and publishing them well.  It is worth noting that this book ████████████ Spiegel & Grau ██████████████████████████████████████ became a bestseller.

112.    In my opinion, there are too many publishers with differing goals for them to coordinate on acquisition terms generally or in a specific auction.  Every deal is different, and every term is negotiable.  If every publisher were to suddenly start insisting on a contractual term that agents found to be unacceptable, one publisher would surely seize the competitive opportunity to win more books by breaking from the group.  Agents would then submit books to the publishers with the most favorable terms.  As the recent entrants to the industry demonstrate,

the barriers to entry for new publishers are low and innovative publishers are emerging to disrupt the norms.

113.    In my experience, prior industry combinations have had no impact on the book selling process.  I saw no reduction in competition as a result of the Penguin and Random House merger in 2013, for example.  While many in the industry were nervous that the merger could negatively impact the industry, it is now widely seen as a success.  In my experience, including after the Penguin and Random House merger, advances for authors have increased over time, with the exception of a slight dip that occurred in 2009 due to the broader financial crisis.

**B.    An Independent Simon & Schuster Is Not Necessary to Preserve Competition, and It Will Benefit from Becoming Part of Penguin Random House**

114.    I do not believe that the merger will adversely affect competition in the sale of book rights or reduce advances paid to authors.  Even if Simon & Schuster were fully removed as an independent competitor, which I understand will not be the case, I believe based on my experience that there are still plenty of publishers to compete for books.

115.    In my experience, Penguin Random House and Simon & Schuster are not commonly the top two bidders for a book given the number of competitors out there.  Nor are there are any types of books that are uniquely suited to just Penguin Random House and Simon & Schuster.  Any book that I would have submitted to editors at both Penguin Random House and Simon & Schuster I would also submit to editors at other publishing houses.  To the extent they decide to conduct an auction, agents will not limit themselves to a situation where there are only two publishers competing for a book and they will submit widely enough to ensure that this does not happen.

116.    The remaining members of the Big Five—Hachette, HarperCollins, and Macmillan—alone would provide competition with Penguin Random House for book

acquisitions.  If Penguin Random House had made an offer for a book that I felt was too low, I would have been able to go to any of these three other publishers to try to negotiate a more favorable deal.  That was my job as an agent.  Agents could also use the threat of taking the author to these publishers in negotiations with Penguin Random House to drive up the offer.  As described above, it is not difficult to move a successful author between publishers, and nothing about the merger will change that.

117.    Beyond the Big Five, smaller publishers will also continue to compete aggressively to acquire books.  These publishers can compete to acquire any book, with some more likely to compete than others depending on the particular book that the agent is trying to sell.  This will include books that obtain advances above $250,000.  And based on trends in the industry, new entrants to the industry—such as those I mentioned above—are likely to be increasingly competitive.

118.    An important consideration in my opinion that the merger will not impact competition in the industry is that agents will maintain full control over their submission lists.  Agents are able to decide to whom they send their book projects.  Agents will maintain this control after the merger and will be able to submit their projects as widely as they choose to increase the chance of an attractive offer.

119.    Another important consideration in my opinion that the merger will not adversely impact competition in the industry is that agents will also maintain full control over the sales processes they use to sell their clients' books.  Agents will be able to structure the process in the manner that best suits the particular book they are trying to sell.  This might be an exclusive submission, accepting a preempt offer, or a blind best bids or rounds auction.  The agent will be able to use her judgment to control the process and determine what will work best for her client.

120.    Penguin Random House's bidding rules will maintain internal competition at Penguin Random House.  These rules allow Penguin Random House imprints to bid each other up as long as there is an external imprint also bidding on the book.  I understand that Penguin Random House has publicly committed to allow Simon & Schuster's imprints to bid independently against the Penguin Random House imprints—i.e., constitute an external bidder—after the merger.  This means in practice that Simon & Schuster will be able to play the same role it does today in aggressively competing for books.  As an agent, I have been able to extract favorable terms for my authors through internal competition at Penguin Random House, and I expect that agents will be able to continue to do this after the merger.  Penguin Random House and its predecessors have allowed their divisions to bid independently of each other for decades, and I believe it will continue to do so after the merger.  This practice makes sense because it allows multiple passionate editors to compete for a book and helps match the author with the editor best suited for her project.

121.    It is my opinion that Penguin Random House would not be able to roll back its commitment to allow Simon & Schuster's imprints to bid independently after the merger, even if it wanted to do so, without seriously damaging its ability to acquire books.  Publishing is a relationship business, and those who go back on their word in the industry are held accountable by others in the industry.  If agents feel that Penguin Random House is not fulfilling its commitments, then agents will lose trust in Penguin Random House and will take their book projects to one of the many competing publishers.  In the past, I have stopped sending books to editors who have lost my trust or who have attempted to act unfairly in negotiations.  For example, one editor tried to insist that I sell him only full world rights for all of the books that I sent him; as a result, I stopped sending that editor any books at all until he changed this position.

I had the ability to do that because there are—and will remain after the acquisition—so many alternative editors and publishers.  Agents maintain control to do deals with only the editors and publishers with whom they want to do deals.

122.    Even if Penguin Random House had not made this commitment, for the reasons just described above, I still do not believe that author advances would decrease.  There is plenty of competition in the industry, and skilled agents know how to use it to get good deals for their authors.

123.    It is my view that Penguin Random House is in all respects an excellent publisher and has the best distribution capabilities in the industry.  I understand that Penguin Random House has made large investments to improve its distribution and works to support independent booksellers.  Moving the Simon & Schuster authors into that system will only benefit them.

### C.    The Merger Will Not Reduce the Number and Type of Books

124.    It is my opinion that the merger will not result in fewer books being published.  In my experience, writers write books even if they receive a lower advance than they had hoped or even if there is no publisher for that book.  Writing is a creative outlet for authors, and a decrease in the number of publishers in the market will not impact their output.

125.    Even if the author receives a lower advance offer than she had imagined, or otherwise receives pushback on her manuscript or book proposal from the publisher, she will generally either work with her agent to submit the book to additional publishers or otherwise revise or restructure her book to align with the feedback she is receiving from publishers.  Advances are more the result of the publisher's best hope for how well a book will sell, not how much another publisher is willing to offer.  Most book deals are not competitive auctions.  It has always been the case in the industry that some book ideas are not worth publishing; publishers are not able to offer money for every book idea that agents submit and not every publisher is

willing to pay top dollar for a book idea just because another publisher is willing to.  If there is not enough money for the book in the industry at all, then the author will pursue a different book idea and work to publish something else.  It is my opinion that the merger will not change this dynamic, and authors will continue to write and publish books at the same rate they are today.  And they will earn royalties commensurate with their sales irrespective of their advance.  If an author's advance is earned out by her royalties, then the amount of the advance was irrelevant, and Dr. Hill's entire premise fails.  Publishing is not about advances; it is about the love of writing and reading books.  If all of the Big Five publishers closed their doors tomorrow, writers will still write, readers will still read, and the absence of a competitor or competition will have no adverse impact on the industry.

June 3, 2022

DocuSigned by:

B249131BC93C476...

Jennifer Rudolph Walsh

## Appendix A.  Materials Relied Upon

**Legal Documents**

Complaint, *United States of America v. Bertelsmann SE & Co. KGaA, Penguin Random House, LLC, ViacomCBS Inc., and Simon & Schuster, Inc.*, Case No. 1:21-cv-02886, November 2, 2021

Corrected Expert Report of Nicholas Hill, *United States of America v. Bertelsmann SE & Co. KGaA, Penguin Random House, LLC, ViacomCBS Inc., and Simon & Schuster, Inc.*, Case No. 1:21-cv-02886, May 10, 2022

Responses of Spiegel & Grau, LLC to PRH Subpoena, *United States of America v. Bertelsmann SE & Co. KGaA, Penguin Random House, LLC, ViacomCBS Inc., and Simon & Schuster, Inc.*, January 28, 2022