**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               *Plaintiff,*<br><br>     v.<br><br>BERTELSMANN SE & CO. KGaA,<br>PENGUIN RANDOM HOUSE, LLC,<br>VIACOMCBS, INC., and<br>SIMON & SCHUSTER, INC,<br><br>               *Defendants.* | ▮▮▮▮▮▮▮▮▮▮<br><br>Civil Action No. 1:21-cv-02886-FYP |

**UNITED STATES' MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF**
**DR. EDWARD SNYDER REGARDING EFFICIENCIES**

# TABLE OF CONTENTS

Preliminary Statement ................................................................................................ 1

Legal Standard ........................................................................................................... 4

Expert Admissibility .................................................................................................. 4

Cognizable Efficiencies ............................................................................................. 5

Argument ................................................................................................................... 7

I.     Dr. Snyder's "Review" of the November 2020 Investment Model is Not a Proper
Methodology to Verify Cognizable Efficiencies ........................................... 7

     A.  Dr. Snyder Did Not Verify the Synergy Amounts or Test the Reasonableness of
the November 2020 Investment Model's Assumptions, Which Are
Unsubstantiated and Contrary to Record Evidence ................................ 9

     B.  Dr. Snyder Did Not Reconcile the November 2020 Investment Model With
Actual S&S Data for 2020 and 2021 and Later Iterations of the Penguin Random
House Model ....................................................................................... 10

     C.  Dr. Snyder Did Not Analyze Whether the Efficiencies Are the Type That Can
Offset Harm………………………………………………………...…14

II.    Dr. Snyder's Ratio to Calculate Alleged Benefits to Authors is Methodologically
Unsound and Without Support ................................................................... 15

Conclusion .............................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*Barnett v. PA Consulting Grp., Inc.*, 35 F. Supp. 3d 11 (D.D.C. 2014). .................................. 5, 16

*Brown Shoe Co. v. United States,* 370 U.S. 294 (1962) ..................................................... 5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).......................................... 4

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) .......................................................... 6, 17

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ......................................................... 5

*FTC vs. Qualcomm Inc.*, 411 F. Supp. 3d 658 (N.D. Cal. 2019) *rev'd and vacated on other grounds*, 969 F.3d 974 (9th Cir. 2020) ........................................................... 3

*FTC v. Sysco,* 113 F. Supp. 3d 1 (D.D.C. 2015)...................................................... 6, 7, 9, 13, 14

*FTC v. Tronox Ltd.*, 332 F.Supp.3d 187 (D.D.C. 2018)........................................................... 8

*FTC v. Univ. Health, Inc*, 938 F.2d 1206 (11th Cir. 1991)......................................................... 6

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018)........................... 7, 13

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ...................................................................... 5

*Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1 (D.D.C. 2002) ............... 5

*Kumho Tire Company v. Carmichael*, 526 U.S. 137 (1999)........................................................ 4

*Meister v. Med. Eng'g Corp.*, 267 F.3d 1123 (D.C. Cir. 2001);................................................... 5

*Raynor v. Merrell Pharm. Inc*., 104 F.3d 1371 (D.C. Cir. 1997). ................................................ 5

*Sitts v. Dairy Farmers of America, Inc.*, No. 2:16-CV-00287, 2020 WL 3467993 (D. Vt. June 24, 2020) .................................................................................................................................... 3

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ......................................... 13, 14, 18

*United States v. Alcoa, Inc.*, 377 U.S. 271 (1964) ........................................................... 6

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) ......................................... 1, 5, 7

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871 (D.C. Cir. 2010) ..... 4

*United States. v. H&R Block, Inc.,* 833 F. Supp. 2d 36 (D.D.C. 2011) ............................. 2, 3, 7, 8

*United States v. Philadelphia National Bank,* 374 U.S. 321 (1963)....................................... 1, 5, 6

**Regulations**

15 U.S.C. § 18 ................................................................................................................ 5

**Other Authorities**

Hearings before a Subcommittee of the Committee on the Judiciary of the House of
    Representatives on H.R. 2734, 81st Cong., 1st Sess. (1949) .................................... 6

Note, Section 7 of the Clayton Act A Legislative History, 52 Colum. L. Rev. 766 ....................... 6

S. Rep. No. 1775, 81st Cong., 2d Sess. (1950) ........................................................... 6

United States Department of Justice and Federal Trade Commission Horizontal Merger
    Guidelines (2010) .............................................................................. 2, 7, 12, 14, 18

## PRELIMINARY STATEMENT

Penguin Random House ("PRH"), the largest book publisher in the United States,
proposes to acquire one of its chief rivals, Simon & Schuster ("S&S"). The resulting behemoth
would control approximately ▮ of the market for anticipated top-selling books in the United
States and be ▮▮▮▮ the size of its next-largest competitor. To justify this transaction,
Defendants claim that the merger would create a more efficient publisher and the resulting higher
profits would be passed on not only to PRH's owner, Bertelsmann, and its shareholders, but to
authors as well.[1] These claims are factually and legally unfounded and based on improper and
unreliable expert opinion. The Court should not allow them to be presented as admissible expert
testimony.

Efficiencies cannot be an end run around the basic principles prohibiting mergers that
substantially lessen competition. The Supreme Court has consistently held this view since
*United States v. Philadelphia National Bank*, when it said that "a merger the effect of which
'may be substantially to lessen competition' is not saved because, on some ultimate reckoning of
social or economic debits and credits, it may be deemed beneficial." 374 U.S. 321, 371 (1963).
This Circuit has followed the Supreme Court's guidance and taken a highly skeptical view of
efficiencies as a potential defense to a merger. *See United States v. Anthem, Inc*., 855 F.3d 345,
353 (D.C. Cir. 2017) ("[I]t is not at all clear that [efficiencies] offer a viable legal defense to
illegality under Section 7."). The skepticism is particularly warranted here where PRH, the
market leader, seeks to acquire one of its largest competitors, which would only enhance PRH's
dominance.

---

[1] Amended Answer (Dkt. No. 56), 16.

In support of their efficiencies defense, Defendants seek to introduce expert testimony from Dr. Edward Snyder who opines on the alleged efficiencies that would result from the proposed merger and the alleged economic benefit to authors.  Dr. Snyder, however, has served more as an advocate than an expert reliably applying generally accepted economic principles to fact.  First, the caselaw and the United States Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines* (2010) ("*Merger Guidelines*") recognize that only certain types of efficiencies have the potential to enhance a merged firm's ability and incentive to compete, and thus potentially offset the anticompetitive effects of a merger.  These efficiencies, referred to as "cognizable efficiencies," must be substantiated by the merging parties, reasonably verifiable by an independent party, achievable solely via the merger, and not arise from anticompetitive reductions in output or service.  *See U.S. v. H&R Block, Inc.,* 833 F. Supp. 2d 36, 89 (D.D.C. 2011); *Merger Guidelines* § 10.  But PRH did not substantiate its claimed efficiencies with anything but an outdated financial model prepared in November 2020 to justify its bid for S&S (the "November 2020 Investment Model").  Nor did Defendants' expert witness, Dr. Snyder, even attempt to verify the basis for or size of the alleged synergies, as he candidly admits in his initial report.[2]  Moreover, even with respect to the other requirements for cognizability of efficiencies, he gave only a cursory blessing to the November 2020 Investment Model and ignored a mountain of contradictory evidence and updated financials.  Finally, Dr. Snyder attempted to demonstrate the benefits of these savings for authors by creating out of whole cloth a ratio of author advances to net income, which has no factual, economic, scientific, or technical basis and so is inadmissible.

---

[2] Corrected Initial Expert Report of Edward A. Snyder, May 20, 2022 ("Snyder Initial Report") ¶ 61 ("I do not independently derive estimates of the projected efficiency gains); *id*. ¶ 17 ("I do not independently verify specific dollar amounts….").

As Judge Howell stated explicitly in *U.S. v. H&R Block*, "claimed efficiencies [need] to be independently verifiable in order to constitute evidence that can rebut the government's presumption of anticompetitive effects." 833 F. Supp. 2d at 91-92. Defendants have failed to demonstrate the factual or technical rigor required to make a cognizable efficiencies claim. Certainly Dr. Snyder's cursory effort to rubber stamp an outdated financial model and claim it as transformed into an efficiencies defense will not suffice.

What Dr. Snyder has done here is strikingly similar to his opinions in *Sitts v. Dairy Farmers of America, Inc.*, and *FTC v. Qualcomm Inc.*, where portions of his opinions were excluded under *Daubert*. No. 2:16-CV-00287, 2020 WL 3467993, at *11-12 (D. Vt. June 24, 2020); 411 F. Supp. 3d 658, 805 (N.D. Cal. 2019), *rev'd and vacated on other grounds*, 969 F.3d 974 (9th Cir. 2020). In *Sitts*, the court excluded portions of Dr. Snyder's opinions because he failed to "investigate or analyze" facts underlying his opinions and his analysis "did not fit the facts of the case." 2020 WL 3467993, at *11-12. In addition, much like Dr. Snyder's ratio here, the court determined that Dr. Snyder's analysis "more closely approximates a mathematical and mapping exercise that employs no specialized knowledge or expertise unavailable to the average juror," than a detailed empirical analysis. *Id*. Similarly, in *Qualcomm*, the court held that Dr. Snyder's approach "makes little sense" and excluded his opinion because he ignored relevant evidence. 411 F. Supp. 3d at 805.

In short, his analysis (1) does not use methods recognized by economists as appropriate for analyzing merger-related efficiencies or for predicting effects on author compensation; (2) suffers from numerous factual inconsistencies; and (3) rests on unverified projections.

**LEGAL STANDARD**

**Expert Admissibility**

Federal Rule of Evidence 702 permits qualified experts to testify in the form of an opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 incorporates the Supreme Court's guidance in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which called upon trial judges to serve as "gatekeepers" in "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," and *Kumho Tire Company v. Carmichael*, 526 U.S. 137 (1999), which clarified that this "gatekeeper" role extends to all expert testimony.

In assessing evidentiary reliability, a court first must consider the expert's methodology and reasoning in light of the factors set forth in Rule 702, *Daubert*, and *Kumho*. *See Daubert*, 509 U.S. at 595 (the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate"). For the relevance requirement, a court must determine whether the proposed expert testimony is "sufficiently tied to the facts of the case," and whether it will aid the trier of fact in understanding the evidence or resolving a factual dispute. *Daubert*, 509 U.S. at 592–93 (internal quotation marks omitted); *see United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 894-95 (D.C. Cir. 2010).

Courts in this District have rejected expert testimony as unreliable where an expert opts to use his or her "own unique methodology rather than the proper analysis which is well-known

4

and respected." *Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 9

(D.D.C. 2002); *see also Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1131 (D.C. Cir. 2001);

*Raynor v. Merrell Pharm. Inc.*, 104 F.3d 1371, 1376 (D.C. Cir. 1997). Likewise, courts will not

admit expert opinion if it "is connected to existing data only by the *ipse dixit* of the expert," *Gen.*

*Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), if "there is simply too great an analytical gap

between the data and the opinion proffered," *id*. at 146, or if the opinion is "based on

assumptions that are contradicted by his or her party's own evidence," *Barnett v. PA Consulting*

*Grp., Inc.*, 35 F. Supp. 3d 11, 19 (D.D.C. 2014).

## Cognizable Efficiencies

The Clayton Act's prohibition on mergers where "the effect of such acquisition may be

substantially to lessen competition, or to tend to create a monopoly," 15 U.S.C. § 18, does not

include a balancing test. From the first case decided after the amendment of the Clayton Act to

apply to mergers, *Brown Shoe Co. v. United States*, the Supreme Court has focused on

preserving competition, not optimizing economic efficiency. 370 U.S. 294, 344 (1962); *see also*

*Philadelphia Nat'l Bank*, 374 U.S. at 371. This is because "a merger which produces a firm

controlling an undue percentage share of the relevant market, and results in a significant increase

in the concentration of firms in that market is so inherently likely to lessen competition

substantially that it must be enjoined in the absence of evidence clearly showing that the merger

is not likely to have such anticompetitive effects." *Philadelphia Nat'l Bank*, 374 U.S. at 363; s*ee*

*also FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967) ("Possible economies cannot be

used as a defense to illegality. Congress was aware that some mergers which lessen competition

may also result in economies but it struck the balance in favor of protecting competition."). This

Circuit has followed the Supreme Court's guidance and taken a highly skeptical view of

efficiencies as a potential defense to a merger. *See Anthem,* 855 F.3d at 353-54; *FTC v. H.J.*

*Heinz Co.*, 246 F.3d 708, 721 (D.C. Cir. 2001) (expressing concerns about efficiencies claims that are "mere speculation and promises about post-merger behavior").

This skepticism is heightened where a market leader acquires another competitor. Section 7 focuses on preserving the competitive process and the ability of market participants to discipline one another. While mergers between small firms might allow the combined company to more effectively compete against market-leading firms, a market leader's acquisition of a smaller firm could harm competition by entrenching or enhancing the market leader's market power, even if the result is that the smaller firm's products are more efficiently produced once part of the combined company. If the latter type of transactions were condoned, Section 7 of the Clayton Act becomes a dead letter; already-large market participants could expand with impunity by acquiring smaller rivals one after another, stopping only when challenged as an actual monopolist under the Sherman Act. *See United States v. Alcoa, Inc.*, 377 U.S. 271, 280-81 (1964); *see also* Note, Section 7 of the Clayton Act: A Legislative History, 52 Colum. L. Rev. 766, 775–76 (1952) (citing S. Rep. No. 1775, 81st Cong., 2d Sess. 5 (1950); Hearings before a Subcommittee of the Committee on the Judiciary of the House of Representatives on H.R. 2734, 81st Cong., 1st Sess., 41 (1949)).

To the extent courts undertake the inherently speculative task of analyzing efficiencies, the analysis is complex and time-consuming. *See Philadelphia Nat'l Bank*, 374 U.S. at 371 (describing efficiencies analysis as "beyond the ordinary limits of judicial competence"); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1223 (11th Cir. 1991) ("it is difficult to calculate the anticompetitive costs of an acquisition against which to compare the gains realized through greater efficiency"). And that analysis has never justified an otherwise anticompetitive acquisition by a dominant company. *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 81 (D.D.C. 2015)

("The court is not aware of any case . . . where the merging parties have successfully rebutted the government's *prima facie* case on the strength of the efficiencies.").

This Circuit has found the *Merger Guidelines* framework useful in articulating the appropriate framework for analyzing efficiencies. *Anthem,* 855 F.3d at 356-57. The *Merger Guidelines* describe the analytical framework and specific standards that the Department of Justice and the Federal Trade Commission normally use in analyzing horizontal acquisitions and mergers. *Merger Guidelines* § 1. For the Department of Justice to even consider efficiencies, the efficiencies must be "cognizable," which the *Merger Guidelines* define as "merger-specific efficiencies that have been verified and do not arise from anticompetitive reductions in output or service." *Merger Guidelines* § 10; *see H&R Block*, 833 F. Supp. 2d at 89 (A cognizable efficiency is "a type of cost saving that could not be achieved without the merger and the estimate of the predicted saving must be reasonably verifiable **by an independent party**") (emphasis added). Because efficiencies are inherently "difficult to verify and quantify," merging parties must substantiate any efficiency claims. *Merger Guidelines* § 10; *see H&R Block*, 833 F. Supp. 2d at 91; *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 73 (D.D.C. 2018) ("Nor can reference to the merging parties' past practices, managerial expertise and incentives, or internal verification processes serve to substantiate any efficiencies."). In addition to being cognizable, companies must also "demonstrate that their claimed efficiencies would benefit customers" in the relevant market. *Sysco*, 113 F. Supp. 3d at 82 (citation omitted).

## ARGUMENT

### I. Dr. Snyder's "Review" of the November 2020 Investment Model is Not a Proper Methodology to Verify Cognizable Efficiencies

Dr. Snyder did not create his own efficiencies model to identify cognizable efficiencies. Rather, Dr. Snyder relied on a tool that PRH created before Bertelsmann agreed to purchase S&S

for the purpose of valuing the acquisition of its rival and determining how much to offer. This model did not, and was not designed to, project cognizable efficiencies. Throughout his reports, Dr. Snyder employs a sleight of hand and suggests that the November 2020 Investment Model projected efficiencies, but this is not accurate.[3] The November 2020 Investment Model predicted *synergies* that PRH expected to realize as a result of the merger.[4] This is a meaningful distinction. These projected *synergies* are purported cost savings opportunities and "revenue enhancements"[5] that are not necessarily cognizable efficiencies under caselaw or the *Merger Guidelines*. *See H&R Block*, 833 F. Supp. 2d at 89 & n.41 ("[A] cognizable efficiency claim must represent a type of cost saving that could not be achieved without the merger and the estimate of the predicted saving must be reasonably verifiable by an independent party . . . . Cognizable efficiencies are a subset of synergies. Synergies refer more generally to any business performance benefits that result from the merger of two companies.") (internal quotation marks omitted); *see also FTC v. Tronox Ltd.*, 332 F.Supp.3d 187, 216 (D.D.C. 2018). In fact, the *Merger Guidelines* do not even mention "revenue enhancements."

The November 2020 Investment Model was *not* created as part of a bottoms-up integration exercise using available information on employees, salaries, contracts, real estate plans and other details from S&S.[6] Rather, for virtually every alleged synergy, the model's author, Manuel Sansigre, PRH's Global Head of M&A, simply estimated the percentage by which he thought the proposed merger would improve the performance of S&S as part of the

---

[3] Dr. Snyder even tried to label the November 2020 Investment Model as an "Efficiencies Model." *See, e.g.*, Snyder Initial Report ¶ 17. But no one but Dr. Snyder ever called it an "Efficiencies Model." *See, e.g.*, Expert Report of Christine M. Hammer, June 3, 2022 ("Hammer Report") § VII (detailing the development of the November 2020 Investment Model).

[4] Hammer Report ¶ 33.

[5] *See id.* § VII.B.

[6] *Id.* ¶ 60.

merged entity and used that percentage to calculate synergies.[7]  Because the November 2020 Investment Model is based on Mr. Sansigre's estimates, there is no supporting data or documentation other than his hard-coded Excel spreadsheets—making the estimates impossible to verify.

### A. Dr. Snyder Did Not Verify the Synergy Amounts or Test the Reasonableness of the November 2020 Investment Model's Assumptions, Which Are Unsubstantiated and Contrary to Record Evidence

First, Dr. Snyder admitted that he did *not* verify any of the synergy amounts that the November 2020 Investment Model allegedly projected.[8]  Simply put, he should not be allowed to opine on the proposed merger's projected efficiencies if he did not even analyze whether the November 2020 Investment Model accurately projected those synergies.

Second, Dr. Snyder's "review" involved no technical analysis.  For each synergy, Dr. Snyder simply accepted PRH's estimates based on PRH's "expertise and experience", without any effort to verify whether the estimates are reasonable.[9]  This is particularly problematic because PRH's estimates themselves are almost entirely unsubstantiated and frequently contrary to the actual evidence.  *See Sysco*, 113 F. Supp. 3d at 83 (critiquing expert for "re[lying] exclusively on documents created by either McKinsey or Defendants" and "perform[ing] no independent analysis to verify these numbers").  For example:

- ██████████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████████

---

[7] *See, e.g.*, *id.* ¶¶ 57, 143, 153, 171, 184, 194, 203, 210, 216, 221, 238, 246, 254, 264.
[8] Snyder Initial Report ¶ 61 ("I do not independently derive estimates of the projected efficiency gains); *id.* ¶ 17 ("I do not independently verify specific dollar amounts….").
[9] *Id.* ¶ 61.



### B. Dr. Snyder Did Not Reconcile the November 2020 Investment Model With Actual S&S Data for 2020 and 2021 and Later Iterations of the Penguin Random House Model

Dr. Snyder did not address material inconsistencies between Mr. Sansigre's projections

for S&S for the years 2020 and 2021 in the November 2020 Investment Model and actual S&S

data for those same years. Nor did he address material inconsistencies between the synergies

---

[10] Hammer Report ¶¶ 139-156.
[11] *See, e.g.*, Exhibit A (Excerpts of Deposition Transcript of Manuel Sansigre, Feb. 2, 2022) at 3 (210:23-211:2, 212:6–213:3); Hammer Report ¶¶ 194, 210, 216, 221, 246, 254, 264.
[12] Exhibit B (Excerpts of June 25, 2021 Response of Bertelsmann to Request for Additional Information and Documentary Material Issued on March 12, 2021) at 5.
[13] *Id.*
[14] Hammer Report ¶ 213.

projected by the November 2020 Investment Model and synergies projected by later versions of
the November 2020 Investment Model that PRH created.

Although Dr. Snyder had access to actual data for S&S for the years 2020 and 2021, he
inexplicably relied on the stale PRH projections for these years, which are included in the
November 2020 Investment Model.[15]  His disregard of the actual data has no economic basis and
renders his synergies estimates unreliable.  For example, ███████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████.[16] ███████████████████████████████████████████████
███████████████████████████████████.

Further, PRH itself had created later versions of the November 2020 Investment Model
that incorporated new data from S&S.[17]  There are material differences in the synergy amounts
that Dr. Snyder disregarded.[18]  For example:

- ███████████████████████████████████████████████████████████████.

- ███████████████████████████████████████████████████████████████

- ███████████████████████████████████████████████████████████████

- ███████████████████████████████████████████████████████████████[19]

---

[15] *Id* ¶ 91.
[16] *Id*. ¶¶ 104, 107.
[17] Snyder Initial Report ¶ 66.
[18] Reply Expert Report of Edward A. Snyder, June 23, 2022 ("Snyder Reply Report"),
¶ 65.
[19] Hammer Report ¶ 97.

In every instance, Dr. Snyder used the outdated November 2020 Investment Model's projections, while ignoring the updated record evidence. This is true even though the June 2022 Model is the basis for synergy estimates that Bertelsmann submitted to the Department of Justice.[20] Dr. Snyder's only explanations for relying on the November 2020 Investment Model instead of later versions of the Model are that (1) this is the Model submitted to the Bertelsmann board of directors to support the deal, and (2) as a matter of coincidence – the *total* amount of synergies is approximately the same across the different versions of the Model, even if the underlying numbers are very different.[21] But this does not justify Dr. Snyder's reliance on a host of inaccurate data when his responsibility is to verify the accuracy of the projected synergies. His failure to consider all these various changes and amendments demonstrates the utter unreliability of the cost savings projections. Comparing total amounts is not a methodology, particularly when each efficiency claim must be verified. *See Merger Guidelines* § 10 ("[I]t is incumbent upon the merging firms to substantiate efficiency claims so that the Agencies can verify by reasonable means the likelihood and magnitude of each asserted efficiency, how and when each would be achieved (and any costs of doing so), how each would enhance the merged firm's ability and incentive to compete, and why each would be merger-specific.").

    Dr. Snyder attempted to excuse his blind acceptance of the November 2020 Investment Model by arguing that because Mr. Sansigre looked to previous transactions, and particularly the 2013 merger of Penguin and Random House, the estimates in the November 2020 Investment

---

[20] *See id.* ¶¶ 93-95.
[21] *See* Snyder Initial Report ¶ 66; Snyder Reply Report ¶ 65.

Model are reasonable.[22][23]  This would not be sufficient even if the data for that merger were supportive or comparable.  He did not independently assess: (i) whether the realized past cost savings were cognizable efficiencies under the *Merger Guidelines*; and (ii) if so, whether the past realized efficiencies are analogous to the claimed savings at issue.  Dr. Snyder simply pointed to the expertise and experience of PRH in conducting valuation analyses to justify prior transactions.  But valuation exercises are not the same as projecting cognizable efficiencies.  *See Sysco*, 113 F. Supp. 3d at 83 (explaining that defendants' consultant was hired "to determine whether a merged company could achieve enough cost savings to make the combination worthwhile," *not* "to identify merger-specific savings for antitrust purposes.") And in any event, simply pointing to past transactions is not enough to verify the amounts or validity of cognizable efficiencies claims.  This is particularly so where the prior transaction differed in numerous ways, occurred nine years ago, ███████████████████████████████████████████████

█████████████████████████████.[24]  *See, e.g.*, *Wilhelmsen*, 341 F. Supp. 3d at 73 ("Nor can reference to the merging parties' past practices, managerial expertise and incentives, or internal verification processes serve to substantiate any efficiencies.  The court cannot substitute Defendants' assessments and projections for independent verification."); *United States v. Aetna*

---

[22] *See e.g.*, Snyder Initial Report ¶¶ 57, 61, 77, 88, 97; Snyder Reply Report ¶ 50.

[23] The only other "analogous" transaction that Dr. Snyder specifically identified is PRH's acquisition of Little Tiger in 2019.  Little Tiger, however, was a U.K.-based publisher with a particular focus on picture books, board books, and color and activity books.  And that transaction was *54 times smaller* than the transaction here.  Hammer Report ¶¶ 67-69.  Dr. Snyder admitted that the transaction is "not comparable in size" to the proposed merger here.  Exhibit C (Excerpts of Deposition Transcript of Edward A. Snyder, July 7, 2022 ("Snyder Dep.")) at 1 (243:4-11).

[24] Exhibit D (Markus Dohle, "Penguin Random House Update," *Penguin Random House*, December 17, 2020) at 10 ██████████████████████████████████████████

████████████████  *See also* Hammer Report ¶¶ 78-79.

*Inc.*, 240 F. Supp. 3d 1, 98 (D.D.C. 2017) ("Nor can the companies shore up their efficiency claims by comparisons to the Aetna-Coventry merger. [Defendants' efficiencies expert] did not analyze whether the $1.1 billion in claimed efficiencies resulting from the Coventry merger were actually cognizable.").

### C. Dr. Snyder Did Not Analyze Whether the Efficiencies Are the Type That Can Offset Harm

Dr. Snyder made no effort to identify whether the November 2020 Investment Model's projected synergies are of the "character and magnitude such that the merger is not likely to be anticompetitive in any relevant market." *Merger Guidelines* § 10. *See Sysco*, 113 F. Supp. 3d at 83 (critiquing expert for not explaining how expert identified "the amount of variable cost savings to include in his merger-specific estimate"). His report did not break out synergies that are reductions in fixed costs (which are less likely to be considered cognizable efficiencies under the *Merger Guidelines*) versus marginal or variable costs (which are reductions in costs associated with producing each new unit to be sold).[25] *See Aetna,* 240 F. Supp. 3d at 96 n.50 ("Reductions in fixed costs are even less likely to be passed on to consumers. According to the Guidelines, '[e]fficiencies relating to costs that are fixed in the short term are unlikely to benefit customers in the short term.'") (quoting *Merger Guidelines* § 10 n.15). For example, many of the ███████ cost savings that PRH and Dr. Snyder addressed are likely fixed costs, including costs savings ████████████████████.[26] But Dr. Snyder did not break out these costs in his synergy estimates,[27] making it impossible to assess what portion of the synergies may be relevant to the Court's merger analysis.

---

[25] *See* Hammer Report § 10.
[26] *Id*. ¶¶ 230, 238-242.
[27] Snyder Initial Report ¶ 101.

In sum, Dr. Snyder's failure to verify any of the November 2020 Investment Model's estimates or reconcile those estimates with contradictory evidence in Defendants' records renders his opinions regarding efficiencies unreliable.  That Dr. Snyder does not make any attempt to identify what synergies could be considered cognizable under applicable caselaw and the *Merger Guidelines* makes his opinions about them irrelevant as well.

## II. Dr. Snyder's Ratio to Calculate Alleged Benefits to Authors is Methodologically Unsound and Without Support

Dr. Snyder opined that PRH's acquisition of S&S will not only improve sales and reduce costs, but also that the merger could increase author advances because the merged publisher's editors will have an increased willingness to pay for books.  To calculate the increased author compensation expenditures, Dr. Snyder "appl[ied] the weighted average ratio of author compensation to Net Income for PRH and S&S for the period 2017-2019, which corresponds to

████ [28]  He then applied the "Snyder Ratio" to the purported efficiency gains to calculate a change in the amount of author compensation.[29]  As Dr. Snyder admitted, however, the increase that he calculated is "*total* author compensation expenditures," which "could reflect (i) an increase in compensation per author; or (ii) an increase in titles that the merged firm acquires, or some combination of these."[30]  Dr. Snyder did not allocate the increased author compensation to either category.  The Snyder Ratio is without theoretical foundation, contrary to record evidence, based on cherry-picked data, and the projection of total author compensation expenditures is ultimately irrelevant.

---

[28] *Id*. ¶ 27.

[29] *Id*.

[30] Snyder Initial Report ¶ 128 (emphasis added).

First, the only support Dr. Snyder provided for the Snyder Ratio is his observation that, over the time period he chose to review, ███████████████████████████████ ████████████████████████████████████.[31] ███████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████.[32] ████████████████████████████████████ ███████████████████.[33] ███████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████ ██████████████████████████████████ ███████████████████████████████████████ ██████████████████████. By not reconciling these discrepancies between his analysis and the Defendants' own historical data, Dr. Snyder renders his own analysis unreliable. *See Barnett*, 35 F. Supp. 3d at 19 (collecting cases standing for the "unremarkable proposition that an expert witness's testimony should be excluded as unreliable if it is based on assumptions that are contradicted by his or her party's own evidence.").

Second, there is no underlying economic theory to support the Snyder Ratio. Economists have developed a host of tools to analyze financial performance and estimate how changes in a firm's expenses can affect how much it has available to pay suppliers (here, authors). The

---

[31] *Id.* ¶ 124.
[32] Hill Rebuttal Report ¶ 8.
[33] Exhibit C (Snyder Dep.) at 4 (261:12–263:1).
[34] Reply Expert Report of Nicholas Hill, June 23, 2022, ¶¶ 100–101.

Snyder Ratio is not one of those tools.  Dr. Snyder provides no factual or theoretical basis for why the Snyder Ratio will continue to be stable, or why, other than its purported stability, it should be used to predict author compensation.  Dr. Snyder does not cite any economic literature in support of his ratio.  Nor is the Division aware of any cases in which this type of ratio has been used to substantiate a claim that cost reductions will be passed on to customers (in a traditional merger case) or suppliers (in a monopsony case like this one).

Third, the ratio is inconsistent with the November 2020 Investment Model, which includes a pass-through estimate that is ███████ of Dr. Snyder's estimate.[35]  Dr. Snyder dismissed the discrepancy by asserting that the estimate in the November 2020 Investment Model was "conservative."[36]  But Dr. Snyder fails to reconcile his opinion that the November 2020 Investment Model was constructed following "standard practices" based on experience from previous transactions,[37] with the inference that PRH management materially overestimated the additional profits accruing to Bertelsmann's shareholders.[38]  Indeed, Dr. Snyder asks the Government and the Court to accept his view that authors will reap the benefits of these purported efficiencies because Messrs. Dohle and Rabe promise that this is how they will spend their added profits.[39]  But the Court of Appeals for this Circuit specifically rejected such management promises about alleged efficiencies as a basis for such a defense.  *FTC v. H.J. Heinz Co.*, 246 F. 3d 708, 721-22 (D.C. Cir. 2001) ("[T]he court must undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies'

---

[35] Hill Rebuttal Report ¶¶ 18–19.
[36] Snyder Initial Report, n.278.
[37] *Id.* ¶ 57.
[38] *See* Hill Rebuttal Report ¶ 20.
[39] Snyder Reply Report ¶ 34.

represent more than mere speculation and promises about post-merger behavior.").  Further, that Dr. Snyder otherwise wholesale adopts the November 2020 Investment Model, but purports to find it unreliable only for calculating pass-through where he finds the Model "conservative", underscores that his "analysis" is nothing more than advocacy.

Finally, even if the Snyder Ratio could accurately predict increases to author compensation expenditures (it cannot), Dr. Snyder admitted that his analysis is "agnostic about whether the gains in efficiency will be used to acquire more books or pay authors for specific books greater amounts."[40]  As a result, his analysis should be excluded as irrelevant because it does not tell the Court whether the proposed transaction would actually lead to improved author advances, and if so, by how much.  *Aetna*, 240 F. Supp 3d at 94 ("[T]he companies must demonstrate that their claimed efficiencies would benefit customers . . . in the challenged markets.") (internal quotation marks omitted); *Merger Guidelines* § 10.

Dr. Snyder's use of a ratio between net income and author compensation is not grounded in any recognized economic theory or practices, and is contradicted by Defendants' own estimates and historical data – defects that render his analysis both unreliable and irrelevant. Testimony relating to the Snyder Ratio should be excluded from trial.

## CONCLUSION

For the above reasons, Dr. Snyder's proffered expert opinions regarding efficiencies he expects to be achieved from PRH's acquisition of S&S are unreliable and irrelevant, and should be excluded from presentation at trial.  Pursuant to the Court's Standing Order and Local Rule 7(m), the parties have met and conferred, and Defendants have stated that they will oppose this Motion.  Per Local Rule 7(c), a proposed order is attached.

---

[40] Exhibit C (Snyder Dep.) at 264:1–8; *see also* Snyder Initial Report ¶ 128.

Respectfully submitted,

Dated: July 8, 2022                    /s/ John R. Read
                                           John R. Read (DC Bar #419373)
                                           Melvin A. Schwarz

United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 725-0165
Fax: (202) 514-7308
Email: john.read@usdoj.gov

*Counsel for Plaintiff United States of America*

## CERTIFICATE OF SERVICE

I certify that on July 8, 2022, I served the foregoing and all accompanying documents on the below individuals by electronic mail:

For Defendants Bertelsmann SE & Co. KGaA and Penguin Random House LLC:

Daniel M. Petrocelli (dpetrocelli@omm.com)
M. Randall Oppenheimer
(roppenheimer@omm.com)
O'Melveny & Myers LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067

Andrew J. Frackman (afrackman@omm.com)
Abby F. Rudzin (arudzin@omm.com)
Eamonn W. Campbell (ecampbell@omm.com)
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

Julia Schiller (jschiller@omm.com)
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006

Debbie Feinstein
(Debbie.Feinstein@arnoldporter.com)
Arnold & Porter
601 Massachusetts Ave., NW
Washington, DC 20001

For Defendants ViacomCBS Inc. and Simon & Schuster, Inc.:

Stephen Fishbein (sfishbein@shearman.com)
Jessica Delbaum (jdelbaum@shearman.com)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022

Ryan Shores (ryan.shores@shearman.com)
Michael Mitchell
(michael.mitchell@shearman.com)
Shearman & Sterling LLP
401 9th Street NW, Suite 800
Washington, DC 20004

Rachel Mossman
(rachel.mossman@shearman.com)
Shearman & Sterling LLP
2828 North Harwood Street, Suite 1800
Dallas, TX 75201

Dated: July 8, 2022

/s/ Ihan Kim
Ihan Kim
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Phone: 202-532-4283
E-mail: ihan.kim@usdoj.gov

*Counsel for Plaintiff United States of America*