# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    *Plaintiff,*<br><br>  v.<br><br>BERTELSMANN SE & CO. KGaA,<br>PENGUIN RANDOM HOUSE, LLC,<br>VIACOMCBS, INC., and<br>SIMON & SCHUSTER, INC.<br><br>    *Defendants*. | **DEFENDANTS' PRE-TRIAL BRIEF**<br><br>███████████████<br><br>Civil Action No. 1:21-cv-02886-FYP |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND .............................................................................. 6

ARGUMENT ...................................................................................................... 11

I.    THE GOVERNMENT CANNOT SHOW THAT THE $250,000+ PRICE SEGMENT IS A COGNIZABLE PRODUCT MARKET ............................ 13

    A.    **The *Brown Shoe* Factors Do Not Support Treating The Price Segment Of Books Acquired For $250,000+ Advances As A Distinct Market** ........... 16

        1.    *The Publishing Industry Does Not Recognize A Separate Market For The Acquisition Of Books For $250,000+ Advances* ................................................................................. 17

        2.    *Books In This Price Segment Lack "Peculiar Characteristics And Uses"* ........................................................ 18

        3.    *Acquiring Books In This Price Segment Requires No Unique Facilities* ................................................................... 18

        4.    *There Is No Distinct Set Of Authors Selling Only $250,000+ Books* .............................................................. 19

        5.    Brown Shoe*'s "Distinct Prices" Factor Is Meaningless Here* ...................................................................................... 21

        6.    *Publishers Cannot Set General Price Levels Against Competitors* ................................................................... 22

        7.    *There Are No "Specialized Vendors" In The $250,000+ Advance Segment* ........................................................ 22

    B.    **The "Hypothetical Monopsonist Test" Does Not Justify Recognition Of A Discrete Market For Books Acquired For $250,000+ Advances** ........ 23

II.    THE GOVERNMENT WILL NOT ESTABLISH A LIKELIHOOD OF SUBSTANTIAL HARM TO COMPETITION IN THE ERSATZ MARKET FOR THE ACQUISITION OF BOOKS FOR ADVANCES OF $250,000 OR MORE ........ 25

    A.    **The Government Cannot Rely On A Statistical Presumption Of Likely Substantial Harm** ................................................................. 28

        1.    *The HHI Has Limited Probative Value In General* .................... 28

        2.    *The HHI Is Not Relevant To A "Unilateral Effects" Analysis* ................................................................................. 30

        3.    *The Government's Reliance On Static, Backward-Looking Market Shares Does Not Account For The Ease Of Expansion And Entry* ................................................................ 30

**TABLE OF CONTENTS**
(continued)

**Page**

4.   *Market Shares Alone Do Not Account For Multiple Other Factors That Drive Competition In Real-World Acquisitions* ............................................................. 31

B.   **Anecdotes Of Individual Head-To-Head Competition Do Not Show Substantial Harm To The Market** ........................................ 33

C.   **The Government's Model Does Not Prove The Merger Will Cause Harm** ........................................................................... 34

III.   THE GOVERNMENT WILL NOT PROVE AN INCREASED LIKELIHOOD OF COORDINATION AFTER THE MERGER ............................................. 45

A.   **Multiple Features Of The Publishing Industry Preclude Coordination** ....... 46

1.   *Differentiated Products And Non-Transparent Pricing* ............. 46

2.   *Non-Price Competition* ................................................. 47

3.   *Ease Of Entry And Expansion* ........................................ 48

B.   **Given Strong Downstream Competition To Sell Books, Publishers Would Have Little Incentive To Coordinate Upstream** ................................ 48

C.   **The Merger Will Not Increase The Incentive Or Opportunity To Coordinate In Author Recruitment** ................................................. 48

D.   **The Ebooks Case Does Not Show That The Merger Will Increase The Likelihood Of Coordination** ........................................................ 49

CONCLUSION ............................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993).................................................................................. 31, 51

*Brown Shoe Co. v. U.S*,
370 U.S. 294 (1962).................................................................................. 15, 17

*Crestron Elecs. Inc. v. Cyber Sound & Sec. Inc.*,
2012 WL 426282 (D.N.J. Feb. 9, 2012) ................................................ 18

*FTC v. Arch Coal*,
329 F. Supp. 2d 109 (D.D.C. 2004) ................................................... passim

*FTC v. Atl. Richfield Co.*,
549 F.2d 289 (4th Cir. 1977) ............................................................... 49

*FTC v. Butterworth Health Corp.*,
946 F. Supp. 1285 (W.D. Mich. 1996), *aff'd,* 121 F.3d 708 (6th Cir. 1997).......................... 48

*FTC v. H.J. Heinz*,
246 F.3d 708 (D.C. Cir. 2001) ....................................................... 12, 13, 34

*FTC v. RAG-Stiftung*,
436 F. Supp. 3d 278 (D.D.C. 2020) ...................................................... 14, 15

*FTC v. Staples, Inc.*,
970 F. Supp. 1066 (D.D.C. 1997) ...................................................... passim

*FTC v. Sysco Corp.*,
113 F. Supp. 3d 1 (D.D.C. 2015) ....................................................... passim

*FTC v. Tenet Health Care Corp.*,
186 F.3d 1045 (8th Cir.1999) ............................................................ 11, 44

*FTC v. Tronox, Ltd.*,
332 F. Supp. 3d 187 (D.D.C. 2018)..................................................... 12

*FTC v. Whole Foods Mkt., Inc.*,
548 F.3d 1028 (D.C. Cir. 2008)........................................................... 22

*FTC v. Wilh. Wilhelmsen Holding ASA*,
341 F. Supp. 3d 27 (D.D.C. 2018)....................................................... 16, 22

*General Foods Corp. v. FTC*,
386 F.2d 943 (3d Cir. 1967) ............................................................... 21

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*,
   895 F.2d 1417 (9th Cir. 1990) ................................................. 17

*HDC Med., Inc. v. Minntech Corp.*,
   474 F.3d 543 (8th Cir. 2007) ................................................... 17

*Hosp. Corp. of Am. v. FTC*,
   807 F.2d 1381 (7th Cir. 1986) ................................................. 51

*Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*,
   935 F.2d 1469 (7th Cir. 1991) ................................................. 49

*In re AMR Corp.*,
   625 B.R. 215 (Bankr. S.D.N.Y. 2021) ...................................... 33

*In re B.F. Goodrich Co.*,
   110 F.T.C. 207 (1988), *as modified by* 112 F.T.C. 83 (July 18, 1989) ................................... 51

*In re Caremark Rx, Inc./Advance PCS*,
   FTC File No. 031 0239 (Feb. 11, 2004) ................................... 31

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,
   691 F. Supp. 1262 (N.D. Cal. 1988) ......................................... 17

*Kirtsaeng v. John Wiley & Sons, Inc.*,
   568 U.S. 519 (2013) ................................................................. 29

*New York v. Deutsche Telekom AG*,
   439 F. Supp. 3d 179 (S.D.N.Y. 2020) ............................... passim

*NRDC v. Jackson*,
   650 F.3d 662 (7th Cir. 2011) ................................................... 50

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986) ......................................... 20, 21

*U.S. v. Anthem, Inc.*,
   855 F.3d 345 (D.C. 2017) .............................. 13, 34, 44, 45

*U.S. v. AT&T, Inc.*,
   916 F.3d 1029 (D.C. Cir. 2019) .............................................. 12

*U.S. v. Baker Hughes, Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) ......................................... passim

*U.S. v. H & R Block*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ................................... 19, 24

iv

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*U.S. v. Joseph Schlitz Brewing Co.*,
253 F. Supp. 129 (N.D. Cal. 1966) ......................................................... 18

*U.S. v. Aetna Inc.*,
240 F. Supp. 3d 1 (D.D.C. 2017) ............................................................ 49

*U.S. v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) ............................................................ 55, 56

*U.S. v. Atl. Richfield Co.*,
297 F. Supp. 3d 1061 (S.D.N.Y. 1969), *aff'd*, 401 U.S. 986 (1971) ....................... 49

*U.S. v. General Dynamics*,
415 U.S. 486 (1974) ..................................................................... 34

*U.S. v. Gillette Co.*,
828 F. Supp. 78 (D.D.C. 1993) ............................................................ 14

*U.S. v. Marine Bancorp.*,
418 U.S. 602 (1974) ..................................................................... 11

*U.S. v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ............................................................. 15

*U.S. v. Oracle Corp.*,
331 F. Supp. 2d 1098 (N.D. Cal. 2004) ............................................ 11, 35, 53

*U.S. v. SunGard Data Sys., Inc.*,
172 F. Supp. 2d 172 (D.D.C. 2001) ................................................ 14, 19, 20

**Statutes**

15 U.S.C. § 18 ........................................................................... 11

**Other Authorities**

Dep't of Justice & Fed. Trade Comm'n, *Commentary on the Horizontal Merger Guidelines*, at
52 (Mar. 2006) .......................................................................... 45

George J. Stigler, *A Theory of Oligopoly*, 72 J. Pol. Econ. (1964) ....................... 51

Herbert Hovenkamp & Carl Shapiro, *Horizontal Mergers, Market Structure, and Burdens of
Proof*, 127 Yale L.J. 1996 (2018) ........................................................ 35

Herbert Hovenkamp,
*Federal Antitrust Policy* (6th ed. 2020) ................................................ 30

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Julian O. von Kalinowski,
  2 *Antitrust Laws and Trade Regulation* § 24.02 (2d ed. 2022) ............................................... 25

Phillip E. Areeda & Herbert Hovenkamp,
  *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th and 5th eds.
  2021) ...................................................................................................................... 16, 29, 30

Statement of FTC Concerning the *Proposed Acquisition of Medco Health Solutions by Express
  Scripts, Inc.*,
  FTC File No. 111-0210, at 7 (Apr. 2, 2012) ["FTC *Express Scripts* Closing Statement"] ...... 29

U.S. Dep't of Justice and Fed. Trade Comm'n,
  *Horizontal Merger Guidelines* (2010) ............................................................................. passim

## INTRODUCTION

The U.S. publishing industry is robust and highly competitive.  More readers are reading books than ever before, and the number grows every year.  Publishers compete vigorously to reach those readers, and the only way they can compete effectively is to find, acquire, and publish the books readers most want to read—books that might be written by established best-selling authors, public figures with a "story to tell," or previously unknown authors whose debut novel captures the public's imagination.  Publishers compete to acquire these books across a variety of objective and subjective dimensions, including royalty advances, editorial relationships, niche-genre experience, marketing visions, and other factors.  Publishers of all sizes compete to acquire and sell books of all kinds at all advance levels.  To be sure, the largest publishers predictably acquire more books at all advance levels, including the highest, but smaller publishers acquire books at all levels as well.  Collectively, in fact, smaller publishers— which include elite publishers like Norton and Scholastic, and global giants like Amazon and Disney—outpace one or more of the largest publishers in acquisitions every year.  Slice and dice the market any way you want, and you will find vigorous competition to acquire books, especially books that one or more publishers believe are most likely to succeed with consumers.

The merger at issue in this case will encourage even more competition and growth in the U.S. publishing industry.  The transaction originated when the owner of Simon & Schuster ("S&S"), ViacomCBS (n/k/a Paramount Global), stated publicly that it would be divesting S&S as part of a broader strategy to shed non-core assets and focus on film, television, and streaming. ViacomCBS's sale of S&S created an opportunity for Penguin Random House ("PRH") to compete better in hotly competitive consumer markets, where large rivals are expanding and—to an even greater extent—smaller competitors and entirely new publishers are rapidly gaining share.  S&S is a storied publishing house with an attractive list of authors, skilled and

experienced editors, and a strong backlist of popular titles, but it lacks access to PRH's larger, industry-leading distribution structure and administrative systems.  PRH recognized that if it combined S&S's high-quality assets with PRH's premier logistics, PRH could expand distribution of S&S titles to the benefit of authors and consumers alike, while also improving PRH's ability to compete against its many bookselling rivals.

Unsurprisingly, after investigating the merger, the government found no evidence that combining PRH and S&S would diminish competition in any consumer market.  If anything, by making the combined entity a stronger bookselling competitor, the merger will incentivize other publishers to compete even harder for consumer attention.  The government will not even attempt to prove otherwise at trial.

But it still wants to block the merger.  Unable to prove any downstream harm to consumers, the government instead seeks to focus solely on the merger's alleged effects in the *upstream* market to *acquire* the books that publishers compete to sell downstream.  Yet the government does not actually allege harm to that upstream market either.  While its complaint initially alleged that the merger would harm competition in the market to acquire U.S. book rights, its expert has abandoned that claim—he admits that the market will remain unconcentrated, and he conducted no analysis purporting to establish harm to that market.

The government instead has narrowed its focus down to one very small *segment* of the market to acquire U.S. book rights:  the set of about 1200 books acquired annually for advances of at least $250,000, or about 2% of all books published by commercial publishers.  The government treats this tiny price segment as a "sub-market" and gives it a label—the market for the rights to "anticipated top-selling books"—that is entirely unknown to industry participants.

But even then, the government does not allege the merger will adversely affect *all* advances within that small price segment.  Its focus tightens even further, narrowing down to advances paid when either PRH or S&S acquires the book.  And yet according to the mathematical model the government invokes to prove harm, not even advances for all of *those* books will decline.  By its terms, the model applies only to a specific kind of transaction—one very uncommon in the publishing industry.  Based on the best available data, the type of transaction modeled by the government accounts for only approximately *85* books acquired annually, out of more than 55,000 total books published annually, and out of approximately 1200 books acquired annually for advances of $250,000 or more.

To block a merger under Clayton Act § 7, the government must prove that it is likely to cause a "substantial lessening of competition" in a "line of commerce."  Alleged harm to 85 books does not constitute a substantial lessening of competition by any definition.  To find a § 7 violation in such a tiny corner of the market, the government makes three claims.  None will survive scrutiny at trial.

*First*, the government tries to erase 98% of the market, shriveling it down to the small segment of books that are acquired for advances of at least $250,000.  But that price segment is just that—a price segment, not a cognizable "market."  Courts have consistently rejected price-defined product markets in antitrust cases when the alleged price boundary does not reflect any real-world *substantive* difference in how industry actors treat the products.  And the evidence will show that publishing industry actors do not treat the acquisition of books differently based on the amount of the advance that might ultimately be negotiated.  Publishers across the entire industry compete to acquire books of all kinds, and neither editors nor agents nor authors treat books that yield advances in one price segment differently from books that yield lower (or

higher) advances.  The advance for each unique book is driven primarily by how particular editors perceive that book's potential success, and different editors have different expectations for any given book.  The wide variation in advances that inevitably results is, if anything, the *opposite* of a clear, market-defining product categorization.  The government's failure to define a cognizable market is fatal to its claim.

*Second*, after shifting focus to a corner of the book-acquisition market, the government then tries to show that the merger will reduce some of the advances within that artificially shrunken market.  But the government will not prove even that constricted theory of harm.  The government starts with a purely statistical *presumption* of harm, based on post-merger shares of its small market segment.  The D.C. Circuit has repeatedly held, however, that the statistical presumption is weak at best, and easily overcome by evidence showing that market shares do not adequately reflect real-world competitive forces.  Such evidence here will be overwhelming.  Among other competitive factors that market shares cannot account for, acquisitions in this industry are controlled by agents, who use their skill and experience to decide which publisher(s) to invite to consider a given book and which acquisition format will best serve their clients' interests.  Book-acquisition market shares—a statistic unknown to anyone in the industry—do not figure into either decision, nor do they affect how publishers compete if and when they are selected to participate in a given acquisition.

Where market shares alone do not prove a § 7 case, the government must conduct an actual analysis of real-world competitive conditions to identify likely harm.  When it turns to that task here, however, the government either ignores or mischaracterizes the real world it is supposed to examine.  The government's theory is that the merger will reduce advances in acquisitions where PRH and S&S would have been the final two bidders for a book, on the basic

premise that removing one of them via merger will make the final advance lower.  To make that case, the government will rely on two categories of evidence.

The government first will invoke a handful of anecdotes about acquisitions where PRH and S&S were the highest bidders, suggesting that eliminating one of them would have reduced the final advance amount.  Nobody disputes, of course, that PRH and S&S *occasionally* have the two highest bids.  But the evidence will show that they are *rarely* the top two bidders—only in about 7% of acquisitions involving advances of $250,000 or more.  Anecdotes about *some* of those acquisitions out of thousands of books published each year cannot establish substantial harm to competition.

Recognizing as much, the government will also try to make a more comprehensive, quantitative prediction of marketwide harm based on a mathematical model that purports to show how eliminating either S&S or PRH through the merger will systematically affect real-world bargaining.  But the model rests on assumptions that do not remotely reflect the reality of book acquisitions.  For example, the model assumes that in all acquisitions, the winning bid amount was constrained by the runner-up bid, which in turns leads to the critical inference that if the runner-up bid were removed, the winning bidder would make a lower bid and still prevail.  In the real world, however, agents structure the vast majority of book acquisitions as either a one-on-one negotiation or a single-round "best bid" auction, neither of which involves a constraining runner-up bid.  A model need not "fit" the real world perfectly, but it must at least *represent* the real world in a meaningful way.  The government's auction model here comes nowhere close.  It accordingly does not reliably represent the effects of the merger on real-world acquisitions.  And that foundational defect, while dispositive in itself, is only the first of many other flawed assumptions, omissions, and data errors that underlie the model.

*Third*, at the outset of this case, the government contended that even if the merger will not enable the combined entity to make significant unilateral reductions in advance levels, the merger at least will enable publishers as a group to coordinate various aspects of the book-acquisition process.  The government's expert, however, has effectively abandoned this claim—he will not testify that the merger will more likely than not facilitate coordination.  Rightly so: none of the conditions required for coordinated effects is present here.

The merger between PRH and S&S will not substantially lessen competition, either in the market to acquire U.S. book rights, or in the small segment of that market involving books that ultimately yield advances of $250,000 or more.  The merger instead will enhance competition by creating efficiencies that will enable the combined entity to make better offers to more authors, especially for those books most likely to succeed with consumers.  And by making the combined entity a stronger competitor downstream, it will incentivize other publishers to compete harder to acquire the books they, too, need to win sales among consumers.  Blocking this merger would harm authors and consumers alike.  The government's effort to enjoin the merger should be denied.

## FACTUAL BACKGROUND

Some 57,000 to 64,000 books are published in the United States each year by one of more than 500 different publishing houses (another 10,000 to 20,000 are self-published). Publishers compete vigorously to sell these books to consumers.  The government does not contend otherwise, nor does it contend that the merger will reduce competition in the consumer bookselling market.  That competition among publishers to sell books to consumers gives every publisher a strong incentive to compete aggressively in acquiring the rights to publish books, especially the rights to books they believe readers most want to read.

The trial evidence will show that, given the significant competition to *sell* books, the market to *acquire* books is also extremely competitive, at all advance levels.  As in any competitive industry, of course, some firms publish more books than others.  In the publishing industry, the five largest individual publishing houses based on consumer book sales are PRH, HarperCollins, Macmillan, S&S, and Hachette—which some colloquially refer to as the "Big Five."  The next five largest include global behemoths Amazon and Disney, as well as renowned publisher Scholastic, and the next ten include such prominent firms as Norton, Abrams, and Chronicle.  While the five largest publishers by definition acquire and sell the most titles, other publishers compete and win books of all kinds at all advance levels, including bestselling books from prominent authors like JK Rowling, Michael Lewis, Dolly Parton, and Paul Krugman.  In the aggregate, smaller publishers acquire more books than one or more of the Big Five every year, and they have been gaining share among consumers for years.

As that growth shows, there are no meaningful barriers to expansion by existing rivals or entry by new competitors.  The evidence will show that other Big Five publishers are actively planning to grow their shares across advance levels.  They already have the tools—skill, experience, and reputation—and they do not need to add facilities (publishers generally obtain printing services from third parties).  Entirely new publishers can easily enter as well: established editors have left incumbent publishers to begin their own imprints, and investors have proven more than willing to finance new ventures from well-known editors.  In just the past three years, at least three new publishers—Astra, Spiegel & Grau, and Zando—have entered the market and have acquired books at all advance levels.  Zando and Spiegel & Grau have already published major best-sellers and have plans to expand.

Competition in the publishing industry differs from most other industries. One critical difference is that books, unlike most other consumer products, are highly differentiated, with entirely subjective and individualized assessments of "value." Except for a few books published each year by well-established or celebrity authors, it is impossible to predict with any certainty whether a given book will perform well. There is thus no intrinsic value for the rights to any book, nor is there an identifiable "market" price—there is only the actual compensation paid in each specific acquisition. That compensation usually includes (but often is not limited to) a percentage royalty on sales of the book, with a royalty "advance" individually negotiated and paid up front. An author will "earn out" her advance if the book sells well enough to pay royalties exceeding the advance, in which case the author continues earning royalties.

But acquisitions are about more than just the advance. Authors (through agents) negotiate other terms, such as the scope of the rights (allowing the author to profit elsewhere from excluded rights), higher royalty rates, accelerated payments, and other financial perks. Authors also may bet on themselves and forgo an advance in favor of a profit-sharing arrangement that might provide higher upside payments. And monetary terms are only one part of the story. Authors also care about the relationship with the editor: they seek an editor who shares the author's vision for the book and often an editor who will be a good partner for a long-term writing career. Because authors highly value the editor herself and their connection, it is not uncommon for an author to choose a publisher that has not offered the highest advance.

Another critical feature of the industry is that acquisitions are controlled by literary agents acting on authors' behalf. The agent determines the "rules" for each acquisition, decides which publishers may compete for each acquisition, and controls what information about bidding to share. When an author brings her agent a book, the agent uses her skill and experience to

determine how and to whom to pitch the book.  Given each book's subjective nature, a good agent uses different tools for different books to serve her clients' interests.

One critical agent tool is the acquisition format.  The agent can choose to make an "exclusive submission" to a single publisher, either because the author prefers to stay with his current editor, or because the agent uses her experience and relationships to identify a particular editor she thinks is likely to value the book most highly.  In either case, the agent simply negotiates with that editor (and her publisher) to see if they can agree on terms.  If they cannot, the agent can always look elsewhere.  And even when an agent chooses to submit a book more widely—i.e., to multiple editors at different publishers (or different imprints within the same publisher)—the book still may be acquired without any competitive bidding.  An interested publisher can respond with a generous offer to "preempt" an auction.  Or, if the author is enthusiastic about working with a particular editor—usually based on a meeting between them to assess the potential relationship—the agent can solicit a preempt offer.  Either way, the agent and publisher negotiate deal terms one-on-one.

In the minority of acquisitions involving multiple bidders, agents usually do not choose the kind of format common in other industries that use auction-type bidding.  Agents typically use "best bid" auctions—either one-round only, or with a chance to improve the bid—where each interested publisher simply makes its maximum bid (or almost maximum, if there will be a chance to improve), not knowing how many other bidders there are, who they might be, or how much their "best" is.  And auctions that start as more traditional round-robin auctions—perhaps because the agent wants to generate "buzz" for a book—usually conclude with a call for each finalist's best bid.  Few auctions involve round-robin bidding through to the end.

Still another important industry feature is the prevalence of intra-firm competition. Economists recognize the benefits of allowing business sub-units to compete with each other, though it is not common in other industries.  It is in the publishing industry:  several publishers with multiple imprints allow them to bid independently for books.  One of them is PRH, which for decades has allowed imprints in separate divisions to bid independently, unless and until the agent advises that only PRH imprints are left bidding (the limitation has little significance in a best bid auction or in a round-robin auction that progresses to a call for best bids—i.e., most auctions—and thus is rarely triggered).  PRH has publicly assured agents that after the merger, it will not only apply its independent bidding policy to S&S imprints, but will go further and allow S&S imprints to bid against PRH imprints even absent an outside bidder.

Agents and others have recognized the value PRH will bring to S&S authors, editors, and readers.  The evidence will show that S&S is not going to remain a subsidiary of ViacomCBS—it will be divested one way or the other.  Agents and editors will testify that among potential acquirors, PRH will be the best steward of S&S's legacy and assets.  Other options would be another Big Five parent company (such as News Corp. or Vivendi), a similarly well-resourced company already in the publishing industry (such as Disney or Amazon), or a finance firm with no publishing tradition at all.  None of these other entities can claim Bertelsmann's centuries-long history in the publishing industry and the profound commitment it shares with PRH to improving public readership.  Other potential acquirors may be more likely to squeeze short-term profits from S&S, rather than make long-term investments that will help develop new, diverse authors and strengthen valued author relationships.  PRH and Bertelsmann intend to make exactly those investments, just as they always have.

**ARGUMENT**

Section 7 of the Clayton Act prohibits a merger only "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition … may be substantially to lessen competition, or tend to create a monopoly."  15 U.S.C. § 18. Section 7 requires a predictive exercise, but it "deals in probabilities not ephemeral possibilities."  *FTC v. Arch Coal*, 329 F. Supp. 2d 109, 115 (D.D.C. 2004) (quoting *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir.1999)); *see U.S. v. Baker Hughes, Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990) (Section 7 "involves probabilities, not . . . possibilities").  The government must therefore prove that "the challenged acquisition [is] *likely* substantially to lessen competition."  *Arch Coal*, 329 F. Supp. 2d at 115 (emphasis added); *see U.S. v. Marine Bancorp.*, 418 U.S. 602, 623 n.22 (1974) (alleged harm to competition must be "sufficiently probable and imminent" to warrant relief); *U.S. v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1109 (N.D. Cal. 2004) (rejecting merger challenge because government failed to prove "merger will *likely* lead to a substantial lessening of competition").  In any merger challenge, "the ultimate burden of persuasion … remains with the government at all times."  *FTC v. H.J. Heinz*, 246 F.3d 708, 715 (D.C. Cir. 2001) (quoting *Baker Hughes*, 908 F.2d at 983).

Courts generally apply a multi-stage proof structure to determine whether the government can establish that a merger will likely cause an imminent and substantial lessening of competition.  The first stage involves identifying concentration in a "relevant market":  the government must prove that the "transaction will lead to undue concentration in the market for a particular product in a particular geographic area."  *Baker Hughes*, 908 F.2d at 982.  This stage itself includes multiple subsidiary steps.  To show undue concentration in a relevant market, the government "bears the initial burden of (1) defining the appropriate product market, (2) defining the appropriate geographic market, and (3) showing that the merger will lead to undue

concentration in the relevant product and geographic market." *FTC v. Tronox, Ltd.*, 332 F. Supp. 3d 187, 197 (D.D.C. 2018).

If the government satisfies those elements, it gives rise to "a presumption that the transactions will substantially lessen competition." *Arch Coal*, 329 F. Supp. 2d at 129; *see also Baker Hughes*, 908 F.2d at 982. But where the government relies on the "short cut" of market concentration statistics, *U.S. v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019), the resulting presumption of harm is weak at best, *see infra* at 28-29. "[B]ecause the burden of persuasion ultimately lies with the plaintiff, the burden to rebut must not be 'unduly onerous.'" *U.S. v. Anthem, Inc.*, 855 F.3d 345, 349-50 (D.C. Cir. 2017) (quoting *Baker Hughes*, 908 F.2d at 991). The presumption imposes on defendants only a burden to produce evidence showing that market shares alone do not adequately capture the market's competitive conditions. *Baker Hughes*, 908 F.2d at 991. And when the government presents "a less-than-compelling prima facie case," even "less of a showing is required from defendants." *Arch Coal*, 329 F. Supp. 2d at 129; *see Baker Hughes*, 908 F.2d at 981, 989-92 (describing evolution of law away from presumptions and structural analysis toward focus on real-world facts and economic analysis).

If defendants surmount the low bar of showing that market-share statistics alone do not prove likely harm to competition, the presumption drops out, and the government must produce "additional evidence of anticompetitive effect" sufficient to carry its burden of persuasion, which again "'remains with the government at all times.'" *Heinz*, 246 F.3d at 715 (quoting *Baker Hughes*, 908 F.2d at 983). The government always bears "the ultimate burden of persuasion" on "every element of [a] Section 7 challenge, and a failure of proof in any respect will mean the transaction should not be enjoined." *Arch Coal*, 329 F. Supp. 2d at 116.

The government will not carry its burden of persuasion on any element of its § 7 challenge.  Part I below demonstrates that the small price segment of books that yield advances of $250,000 or more is not a cognizable "market" for antitrust purposes.  Even if it were, Part II shows that the government will not establish a substantial lessening of competition within that small price segment.  Finally, Part III explains why the government cannot show likely substantial harm through its separate "coordinated effects" claim.

## I.   THE GOVERNMENT CANNOT SHOW THAT THE $250,000+ PRICE SEGMENT IS A COGNIZABLE PRODUCT MARKET

Defining a product market is "a necessary predicate to finding a Clayton Act violation," because the government must show that "it is likely the proposed merger will substantially lessen competition *in a relevant market*."  *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 287, 291 (D.D.C. 2020) (internal quotation marks omitted; emphasis added).  Market definition is the "first step" in any merger case, and it is "key to the ultimate resolution of this type of case, since the scope of the market will necessarily impact any analysis of the anticompetitive effects of the transaction."  *U.S. v. SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172, 181 (D.D.C. 2001); *see U.S. v. Gillette Co.*, 828 F. Supp. 78, 81 (D.D.C. 1993).  An improperly-defined product market prevents an accurate assessment of a merger's competitive effects.  The government has the burden of proving the existence of a distinct, legally-cognizable market.  *See SunGard*, 172 F. Supp. 2d at 181.

"Because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, the relevant market must include all products reasonably interchangeable by consumers for the same purposes."  *U.S. v. Microsoft Corp.*, 253 F.3d 34, 51–52 (D.C. Cir. 2001) (internal quotation marks and citation omitted).  A "market" for antitrust purposes is thus defined by "all goods that are reasonable substitutes, even though the products

themselves are not entirely the same." *FTC v. Sysco Corp.,* 113 F. Supp. 3d 1, 25 (D.D.C. 2015).

The "general rule" in defining a product market is that the "outer boundaries" of the market "are

determined by the reasonable interchangeability of use" between defendants' products and

competing products, also known as "the cross-elasticity of demand." *Brown Shoe Co. v. U.S.*,

370 U.S. 294, 325 (1962); *see also FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1077 (D.D.C. 1997).

In other words, courts consider "whether two products can be used for the same purpose, and if

so, whether and to what extent purchasers are willing to substitute one for the other." *Arch Coal*,

329 F. Supp. 2d at 119.  If customers are willing to switch "from one product to another" in the

event of a price or quality change, then the market must encompass both products. *RAG-

Stiftung*, 436 F. Supp. 3d at 292.

Courts have applied "two main analytical approaches" when defining a product market:

the "practical indicia described by the Supreme Court in *Brown Shoe*," and a "hypothetical

monopolist" test. *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 47 (D.D.C. 2018)

(internal quotation marks omitted); *see Sysco*, 113 F. Supp. 3d at 27.  *Brown Shoe*'s "practical

indicia" are a set of factors that function as "proxies for proof of substitutability" between

products. *Wilhelmsen*, 341 F. Supp. 3d at 47; *see Sysco*, 113 F. Supp. 3d at 27.  The

"hypothetical monopolist" test examines, through statistical modeling, whether a single company

controlling an entire product market "could profitably raise prices" in that market.  *Sysco*, 113 F.

Supp. 3d at 33; *see* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of

Antitrust Principles and Their Application* ¶ 536 (4th and 5th eds. 2021).  These same market-

definition standards apply in cases where, as here, the government asserts that a merger will

reduce competition to *buy* inputs from upstream sellers.  *See* U.S. Dep't of Justice and Fed.

Trade Comm'n, *Horizontal Merger Guidelines* § 12 (2010) ("Guidelines").  The question is

"whether and to what extent" the sellers of an input (here, authors) will switch to other buyers (here, publishers) if input prices decline. *Arch Coal*, 329 F. Supp. 2d at 119.

Unable to identify any harm to competition in the market for the acquisition of all book rights, the government shifts its focus to one tiny corner of that market—the segment of books acquired for advances of $250,000 or more, which the government treats as a "sub-market" for the "acquisition of U.S. publishing rights to anticipated top-selling books." Dkt. 1 at 14 (Compl. ¶ 36).

Courts have generally rejected efforts to define markets solely by price differences among otherwise comparable products. *See Brown Shoe*, 370 U.S. at 326 ("It would be unrealistic to accept Brown's contention that, for example, men's shoes selling below $8.99 are in a different product market from those selling above $9.00."); *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007) ("Price is only one factor in a user's choice between one product or the other. That there are price differentials between the two products … are relevant matters but not determinative of the product market issue.") (cleaned up); *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) (price and quality distinctions "are economically meaningless where the differences are actually a *spectrum* of price and quality differences"), *aff'd sub nom*, *Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990); *accord Crestron Elecs. Inc. v. Cyber Sound & Sec. Inc.*, 2012 WL 426282, at *5-*6 (D.N.J. Feb. 9, 2012); *U.S. v. Joseph Schlitz Brewing Co.*, 253 F. Supp. 129, 145 (N.D. Cal. 1966). As these precedents recognize, price alone cannot define a market's boundaries—price matters only to the extent it reflects *substantive differences among products* that cause consumers to treat otherwise similar products differently within their different price categories. In other words, to establish a market defined

by a price divide, the government must prove that "products across that divide do not compete with each other," *Crestron*, 2012 WL 426282, at *6, in accordance with all the usual factors applied to identify product interchangeability.

The court's analysis in *Staples* exemplifies the correct approach.  In that case, the government challenged a merger as likely to harm competition in a sub-category of large "business-to-business" ("B-to-B") transactions directed at large enterprise customers.  The government, however, did not define the market merely by citing a particular price boundary, but instead made a persuasive factual showing, based on standard market-definition criteria, that real-world market participants substantively treated large B-to-B services as categorically separate from smaller-scale services provided at lower price-points.  190 F. Supp. 3d at 111-21. In particular, the court found that "the sale and distribution of consumable office supplies to large B-to-B customers is a proper antitrust market because the evidence supports the conclusion that: (1) there is industry or public recognition of the market as a separate economic entity; (2) B-to-B customers demand distinct prices and demonstrate a high sensitivity to price changes; and (3) B-to-B customers require specialized vendors that offer value-added services."  *Id.* at 127.

None of those factors is true here.  To the contrary, as discussed in Parts I.A. and I.B. below, the evidence will show that nobody in the industry—not authors, not publishers, not agents—approaches competition differently for books that yield advances of $250,000 or more. The analysis applied in *Staples* thus compels the opposite conclusion here:  there is no distinct market for the acquisition of books that yield advances in this small price segment.

A.     **The *Brown Shoe* Factors Do Not Support Treating The Price Segment Of Books Acquired For $250,000+ Advances As A Distinct Market**

Courts treat the "practical indicia" under *Brown Shoe* as important guidelines for market definition.  *SunGard*, 172 F. Supp. 2d at 182.  The factors include "industry or public recognition

of the relevant market as a separate economic entity," the "peculiar characteristics and uses" of a product, "unique production facilities," "distinct customers," "distinct prices," "sensitivity to price changes," and "specialized vendors." *U.S. v. H & R Block*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011). None of these factors supports the government's contention that a distinct market exists for the acquisition of books that yield advances of $250,000 or more.

1.  *The Publishing Industry Does Not Recognize A Separate Market For The Acquisition Of Books For $250,000+ Advances*

Evidence that the industry or general public recognizes a given market "matters because we assume that economic actors usually have accurate perceptions of economic realities." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 n.4 (D.C. Cir. 1986). Defining the relevant market is "in the end … a matter of business reality—how the market is perceived by those who strive for profit in it." *SunGard*, 172 F. Supp. 2d at 182 (cleaned up).

The evidence will show that there is no industry-wide understanding that the market for U.S. book rights is divided either into "anticipated top-sellers" and "other books," or into price-defined segments of books acquired for advances of at least $250,000 and those acquired for less. Industry actors do not employ objective criteria to identify the books that will receive advances of $250,000 or more and then treat them differently from others.[1] Testimony from numerous witnesses—including agents, editors, and representatives of multiple publishing

---

[1] The government relies heavily on *Publishers Marketplace* reports of book deals, which use cute designations to describe different deal-size thresholds, i.e., deals up to $50,000 are "nice"; those up to $100,000 are "very nice"; those up to $250,000 are "good"; those up to $500,000 are "significant"; and larger deals are "major." Those designations do not purport to identify different markets or bargaining conditions. On the government's contrary view, the designations would implausibly define *five* distinct book-acquisition "markets."

The government will also cite some publishers' internal requirements for additional approval of advances exceeding certain amounts (sometimes $250,000), the evidence will show that these approval thresholds are also arbitrary—i.e., they have never been fixed to collect a set of books with unique shared characteristics—and have varied over time.

houses—will demonstrate that members of the industry have very different expectations about which books will perform well.  Even when one editor is willing to pay an advance of $250,000 or more, other editors likely assign the book much lower value, if any at all.

The government focuses on a price segment defined entirely by the *outcome* of individualized and subjective acquisition processes for differentiated books.  But the government can cite no precedent defining a market in which participants share no common understanding as to which products are inside the market, even as those participants supposedly act differently when they compete over those products.

      2.     *Books In This Price Segment Lack "Peculiar Characteristics And Uses"*

The government will not prove that books in the $250,000-plus price segment share any "strong physical and functional relationship" that justifies treating them separately from other books.  *Rothery*, 792 F.2d at 219 n.4.  Books in this segment do not share common narrative, thematic, or other literary features that distinguish them from books that ultimately yield lower advances.  They come from everywhere and every genre—cookbooks, religious books, literary fiction, children's books, and more.  They are written by celebrities, professors, franchise authors, and debut writers.  The only shared feature of books in this price segment is that at least one editor somewhere ultimately decided it was worth paying an advance of $250,000 or more for the book—a decision that includes not only that editor's subjective assessment of the book's likely success, but many other individualized factors affecting her valuation of the book.

      3.     *Acquiring Books In This Price Segment Requires No Unique Facilities*

A market can be defined around a product that "requires unique production facilities," because if the producer raised prices, "the ability of other producers to shift resources to make the product would be limited."  *Rothery*, 792 F.2d at 219 n.4; *see General Foods Corp. v. FTC*, 386 F.2d 943 (3d Cir. 1967).  The evidence will show that publishers do not devote special

production facilities to books acquired for advances of $250,000 or more.  They are edited, printed, and distributed using the same people and instruments as all other books.

    4.    <u>There Is No Distinct Set Of Authors Selling Only $250,000+ Books</u>

Under certain circumstances, a "core group of particularly dedicated, 'distinct customers,' paying 'distinct prices,' may constitute a recognizable submarket." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1039 (D.C. Cir. 2008) (quoting *Brown Shoe*, 370 U.S. at 325). A market thus can be defined by a set of "distinct customers with distinct needs." *Wilhelmsen*, 341 F. Supp. 3d at 57.  Consistent with the focus on actual market realities, this factor considers whether companies cater to distinct customers by, for example, providing "higher levels of customer service," a "unique environment," or appealing to the "core values" of those customers through services provided. *Whole Foods*, 548 F.3d at 1039.  In *Whole Foods*, for example, the FTC argued for a distinct market of "premium, natural, and organic supermarkets" ("PNOS") by "describ[ing] the core PNOS customers, explain[ing] how PNOS cater to these customers, and show[ing] these customers provided the bulk of PNOS's business." *Id.* at 1032, 1041.

The government cannot make a comparable showing here.  As noted above, industry participants do not apply common objective criteria to identify which authors to target as likely to receive advances of $250,000 or more.  There are no separate publishers who target such authors, and no separate imprints or departments within publishers that cater separately to such authors.[2]  To be sure, some well-established or celebrity authors may predictably command large advances, but those advances vastly exceed $250,000.  And apart from the most successful

---

[2] The government's argument that larger publishers generally provide better marketing, distribution, and similar services, is a non sequitur:  what matters for market definition purposes is that they do not treat *authors* and *books* differently.  Further, the evidence will show that many smaller publishers provide comparable services, which is why authors that command large advances choose them as well.

authors, repeat authors in general do not command predictable advances.  Offers vary widely to debut and repeat authors alike:  even within the same publishing house, editors may submit drastically different bids on a book that eventually sells for $250,000 or more.

The most one can say about this price segment is that larger publishers *more often* acquire books than do smaller publishers.  But that fact—which is true at all price levels—does not demonstrate either that the largest publishers distinctly target books in this segment, or that authors treat such publishers as a distinct market.  It means only that the companies with the most capital tend to spend more money more often, which is a truism applicable in almost any market.  In any given acquisition in this price segment, however, many publishers—the top twenty at least—pose a credible competitive threat to win the title.  *See infra* at 32-33.

For similar reasons, the government cannot define a distinct "targeted customers" sub-market.  Such markets can exist where sellers can profitably "target for price increases" a distinct subgroup of customers who cannot substitute away to other products.  *Staples*, 190 F. Supp. 3d at 127.  Because sellers can discriminate in their pricing between distinct consumer segments—i.e., they can profitably raise prices in a distinct price category—these markets are also known as "price discrimination" markets.  *Sysco*, 113 F. Supp. 3d at 38 (quoting Guidelines § 4.1.4).

The analogous market here would be a targeted *sellers* market.  To establish such a market, the government must prove that publishers can (a) identify and segregate authors selling books for advances of at least $250,000, and (b) decrease advances for those books without losing the authors to other publishers.  Guidelines § 3; *see also Staples*, 190 F. Supp. 3d at 118.  The government will not make either showing.

As already explained, the trial evidence will show that no objective criteria exist for identifying in advance and separately "targeting" those authors whose books will be acquired for

advances of at least $250,000.  The inherent subjectivity of all books is partly why agents must intermediate—the agent best knows how to match a book with the potential acquirors who will value it most highly and structure an acquisition format for that will achieve maximum value for the author.  But neither the agent nor the author typically knows how the negotiation will turn out, or whether any publisher will ultimately agree to pay an advance of $250,000 or more.  As to the few authors whose books easily *can* be identified as likely to garner high advances—e.g., a brand-name author like John Grisham or a starpower public figure like Michelle Obama—they are among the most sought-after sellers in the industry, and their advances vastly exceed $250,000.  If a publisher tried to segregate these authors and impose an across-the-board price reduction on their advances, there would be many publishers to whom they could turn for better offers.  Indeed, these authors have the *most* leverage against publishers, making them *least* likely to be targeted for a price decrease.  Forcing price reductions on the most popular authors would be a losing strategy for any rational publisher.

5.      <u>Brown Shoe*'s "Distinct Prices" Factor Is Meaningless Here*</u>

Distinct product pricing is one feature suggesting that products belong in their own separate market.  *See H & R Block*, 833 F. Supp. 2d at 52-53; *see also* Julian O. von Kalinowski, 2 *Antitrust Laws and Trade Regulation* § 24.02 (2d ed. 2022) ("distinct prices may place products in separate submarkets").  But in this case, *price itself* is the defining boundary of the market.  Because any book sold for $250,000 or more is, by definition, a book sold in a "distinct price" category, this factor does no work to define this market.  Put differently, this factor would allow the government to define a market at *any* price segment:  a boundary of $1,000 would encompass "distinct prices," as would a boundary of $1,000,000 or $10,000,000.

6.      _Publishers Cannot Set General Price Levels Against Competitors_

Under _Brown Shoe_, a market definition can be supported by evidence that market participants set their prices in response to prices of other products within the alleged market, and contrariwise "do _not_ respond to changes in the prices of other alleged substitutes" _outside_ the market.  Kalinowski, _Antitrust Laws and Trade Regulation_ at § 24.02; _see also Staples_, 970 F. Supp. at 1075–76 (discussing "compelling evidence" that Staples priced certain products in comparison to comparable products at other office superstores).  This factor, too, confirms the absence of any cognizable market defined by books that yield advances of $250,000 or more.

The evidence will show that publishers cannot impose across-the-board price adjustments in response to rival pricing behavior.  Given the highly subjective, uncertain nature of predicting a book's success, what Publisher A pays for Book Y cannot affect what Publisher B pays for Book Z.  And even if a publisher somehow did try reducing all advances within one price segment by, say, 5%, rivals could not know whether that target was achieved in any given acquisition and thereby could not adjust their own acquisitions in response.

7.      _There Are No "Specialized Vendors" In The $250,000+ Advance Segment_

The government cannot demonstrate that publishers who acquire books for advances of $250,000 or more have "special characteristics."  _Staples_, 970 F. Supp. at 1078.  This factor requires more than the circular observation that larger entities are larger—it requires evidence of "uniqueness" among market participants; differences in the "type of customers targeted and served"; or visible differences in "appearance, physical size, [or] format" of vendors in the market.  _Id._  As Judge Mehta observed in describing the asserted market in _Sysco_, "[n]o one entering a systems, specialty, or cash-and-carry outlet would mistake it for a broadline distribution facility."  113 F. Supp. 3d at 28.

The opposite is true here.  Among the several dozen largest publishing houses, no one entering a given office would know whether it has paid advances of at least $250,000, or how often.  Many large and established companies outside the Big Five acquire books within this price range—including Disney, Amazon, Norton, and Scholastic.  New entrants do as well.  Even among the Big Five alone, there are no specialized editors or unique imprints that serve *only* books acquired for advances of $250,000 or more—every editor acquires and shepherds books at a wide range of advance levels.

**B.      The "Hypothetical Monopsonist Test" Does Not Justify Recognition Of A Discrete Market For Books Acquired For $250,000+ Advances**

In addition to the qualitative *Brown Shoe* factors, courts also often consider a quantitative measure of product substitution known as the "hypothetical monopolist test" or "HMT."  *See Sysco*, 113 F. Supp. 3d at 33.  That test hypothesizes that there is only a single seller of all products in the alleged market, and asks whether that seller "could profitably raise prices on those products" by imposing a "small but significant and non-transitory" increase in price (or "SSNIP") on products in the market, "typically assumed to be five percent."  *Id.* at 34 (citing Guidelines § 4.1.2).  If the hypothetical seller could impose a SSNIP without losing many consumers to substitute goods, then the products may define a relevant market.  *See id.*  By contrast, if the price increase would cause the hypothetical monopolist to *lose* so many buyers to substitute goods that the price increase became unprofitable, "then the relevant market cannot include only the monopolist's product and must also include the substitute goods."  *Id.* at 33.  In this case, the test involves a hypothetical *monopsonist*—i.e., a single *buyer* of all book rights in the alleged market—and the price conduct at issue is a "small but significant non-transitory *reduction* in price," or "SSNRP."

The HMT does not support the government's price-defined market here for two reasons. First, the test is tautological in a market defined only by price. Because the government here defines its proposed market to encompass only publishers who will pay advances of $250,000 or more, any publisher *outside* the market *by definition* will not pay an advance of that amount. Applied to that alleged market, the HMT asks whether, if a hypothetical single publisher paying advances of at least $250,000 imposed a SSNRP, authors would turn to substitute publishers who will *not* pay that amount. But no author would rationally turn to a source that pays *less than* $250,000 as an alternative to a source that pays *more than* $250,000, even if the latter imposes a SSNRP (so long as the price remains above $250,000). The same dynamic would hold for *any* price-defined market: if the market boundary is defined at $500,000 or $1,000,000, no rational author in that market would respond to a SSNRP by turning to a publisher who only pays less than the market-defining boundary. The HMT thus would confirm a market at *any* price definition, making it a meaningless test in this context.

Second, the hypothetical monopsonist test does not account for the real-world ease of expansion and entry by competing publishers. The evidence will show that other publishers can easily expand their acquisitions in the $250,000-plus price segment—they already have the needed skill, experience, and reputation, and they are already planning to grow. *See infra* at 31. New publishers have also recently entered and are growing. *See infra* at 31. Existing and new rivals would have an especially strong incentive to expand or enter if a hypothetical monopsonist tried to impose a SSNRP on the books considered most likely to succeed, thereby creating an opportunity for rivals to capture those books. The HMT thus provides no basis for inferring the real-world existence of a discrete market for books in the $250,000-plus price segment.

\*   \*   \*   \*

24

The foregoing analysis shows why the government will not be able to prove the existence of a cognizable market for the acquisition of books that yield advances of $250,000 or more. But even if this price boundary satisfied the technical requirements for defining a market, it ends up with a market "defined so narrowly that it encompasses an insubstantial amount of commerce." *Oracle*, 331 F. Supp. 3d at 1120. It is important not to define a market "so narrowly it fails to capture the potential effects of the merger"—for example, by "focus[ing] on a single city in analyzing the effects of a merger between sellers who compete on a much larger scale." *Id.* The government does exactly that here. It focuses narrowly on a price segment that is only about *2%* of the overall book-acquisition market, while ignoring the merger's effects on the remaining 98% of the market, and completely ignoring its effects on 100% of consumers. This merger instead should be evaluated on the much larger scale in which PRH and S&S actually compete, i.e., the market for the acquisition of all U.S. book rights. And the government will not even attempt to show harm to competition in that market.

## II. THE GOVERNMENT WILL NOT ESTABLISH A LIKELIHOOD OF SUBSTANTIAL HARM TO COMPETITION IN THE ERSATZ MARKET FOR THE ACQUISITION OF BOOKS FOR ADVANCES OF $250,000 OR MORE

The government's theory of competitive harm here is not quite entirely unprecedented, but it is unusual. Because the "principal objective of antitrust policy is to maximize *consumer* welfare by encouraging firms to behave competitively," *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 539 (2013) (emphasis added), merger challenges—like antitrust law more generally—almost always address likely harms to competition in *downstream* markets, in the form of higher prices or reduced output, *see* Areeda & Hovenkamp ¶ 910h (interest "antitrust policy cares about most" is "consumer welfare as measured by price and output"). In this case, however, after extensive investigation, the government could identify no likely harm to the consumers, because the sale of books will remain highly diffuse and competitive.

But rather than close the investigation, the government turned its attention *upstream*, to the "supply" or "input" market in which publishers acquire book rights.  Merger challenges based on alleged upstream harms are rare—and hence there is very little caselaw addressing them—because as the FTC has explained, "[o]nly in special circumstances does an increase in power in negotiating input prices adversely impact consumers."  Statement of FTC Concerning the *Proposed Acquisition of Medco Health Solutions by Express Scripts, Inc.*, FTC File No. 111-0210, at 7 (Apr. 2, 2012) ["*Express Scripts* Closing Statement"].  Normally the ability to obtain lower input prices is good for consumers, because "aggressive but competitive buying" tends to "yield[] higher output."  Areeda & Hovenkamp ¶ 983; *see also* Herbert Hovenkamp, *Federal Antitrust Policy*, 1.2b (6th ed. 2020); Areeda & Hovenkamp ¶ 983 ("If a large buyer is able to obtain lower prices by reducing transaction costs, the buyer will generally buy *more* rather than less."); Areeda & Hovenkamp ¶ 575 ("hard bargaining that reduces costs or drives prices down toward the competitive level results in *increased* output on the buying side").  But the kind of "special circumstances" referenced by the FTC may arise when a merger gives the combined entity enough power in the input market that it can reduce the *overall supply* of inputs, because reducing supply will tend to reduce output in the downstream consumer market, thereby raising consumer prices.  Areeda & Hovenkamp ¶ 575 ("The monopsonist, like the monopolist, 'exercises' its power by reducing output, in this case in the market in which it purchases."); *see also id.* ("Unlike the competitive buyer, the monopsony buyer can reduce the purchase price by scaling back its purchases.  The important and often overlooked consequence of monopsony power is *reduced output* …." (emphasis altered)).  But absent reduced supply in the input market, consumers suffer no harm:  neither "competition [nor] consumers suffer when the increased bargaining power of large buyers allows them to obtain lower input prices without decreasing

overall input purchases."  Statement of FTC, *In re Caremark Rx, Inc./Advance PCS*, FTC File No. 031 0239, at 2 (Feb. 11, 2004); *see also Express Scripts* Closing Statement, at 8 (closing merger investigation after concluding that "even if the transaction enables the merged firm to reduce" payments to upstream suppliers, there was "no evidence that this would result in reduced output or curtailment" of downstream consumer services).

The government challenges the merger here without seeking to prove that it will reduce the overall supply of books.[3]  That failure in itself justifies rejection of the merger challenge.

But even looking past that foundational legal defect, the trial evidence will show that the government's narrow theory that the merger will reduce some advances in a tiny price segment of the market fails on its own terms, purely as a matter of fact.  The government will seek to establish harm to advances on three bases.  First, the government will rely heavily on market share statistics to argue, based on market concentration alone, that the merger will give the combined entity enough market power to reduce advances in this price segment.  But as Part II.A. shows, market shares provide at best only a weak initial "presumption" of likely harm, and it is easily rebutted here.  Next, the government will recite anecdotes showing that PRH and S&S sometimes are the two highest bidders, which of course is true, but obscures the relevant point that PRH and S&S are *rarely* the two highest bidders, as Part II.B. shows.  Finally, the government will invoke an abstract mathematical model that purports to show how eliminating either PRH or S&S through the merger will affect real-world acquisitions.  But as shown in Part

---

[3] At most the government seeks only to show that some *participants* in the market (i.e., a small subset of authors) will obtain lower advances from the merged entity when they negotiate acquisitions.  The government is wrong even about that, as shown below, but its basic premise is flawed from the start:  just as "the antitrust laws were passed for the protection of *competition*, not *competitors*," *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (emphasis added), so too were they enacted to protect *markets*, not individual market *participants*.

II.C, the model's projections bear no connection to real-world book acquisitions, which are nothing like the auctions examined in the government's model. Part II.C. further shows that the model is rife with other errors and omissions in its assumptions and inputs. Given the government's failure to model real-world acquisitions or otherwise reliably show how those acquisitions would be harmed, the government's § 7 challenge must be rejected.

### A.   The Government Cannot Rely On A Statistical Presumption Of Likely Substantial Harm

The Complaint and discovery make clear that the government intends to rely heavily on estimates of post-merger market concentration to show harm to the price segment of books acquired for advances of at least $250,000. According to the government, one measure of such concentration—the Herfindahl-Hirschman Index "(HHI)"[4]—will by itself justify a presumption that the merger will substantially lessen competition in that price segment. That contention is incorrect. The HHI statistical presumption is a weak presumption, which courts recognize as easily rebuttable by the merging parties. It certainly is easily rebutted here.

### 1.   *The HHI Has Limited Probative Value In General*

The HHI and other concentration indices "may have some utility, but only if their significant limitations are kept in mind," and they are used "very tentatively." Areeda & Hovenkamp ¶ 930; *id.* ¶ 930d (if "used too rigidly," concentration indices "may in fact hinder rather than promote competitive analysis of mergers"). Such statistics are, after all, "artificial creations with no intrinsic claim to correctness." *Id.* ¶ 931a3. Because the HHI can be "overly responsive" to mergers, Areeda & Hovenkamp ¶ 931a3, overreliance on it risks doing

---

[4] The HHI "estimates market concentration by summing the squares of the market shares of every firm in the market." Areeda & Hovenkamp ¶ 930a. When evaluating a merger's effect on concentration, "the important numbers are (1) the post-merger HHI and (2) the amount by which the merger increases the HHI." *Id.*

"considerably more harm than good by preventing firms from developing to their most efficient size" through acquisitions, *id.* ¶ 930c. The Guidelines themselves specify that HHI thresholds are not "rigid screens," but are merely tools for identifying circumstances that warrant full analysis of all factors relevant to assessing potential anticompetitive effects. Guidelines ¶ 5.3.

Given the HHI's limited utility, the D.C. Circuit has emphasized that rejecting a merger based solely on market concentration figures would grossly inflate the role of statistics in § 7 actions, and would upend settled principles governing the burden of persuasion in civil litigation. *Baker Hughes*, 908 F.2d at 992. Put simply, the HHI "cannot guarantee litigation victories." *Id.*; *see also New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 206 (S.D.N.Y. 2020) ("[M]arket shares and HHIs establish only a presumption, rather than conclusive proof of a transaction's likely competitive impact."); *In re AMR Corp.*, 625 B.R. 215, 256 (Bankr. S.D.N.Y. 2021) ("HHI calculations alone are only a starting point in an antitrust inquiry.").

When the weak statistical presumption of harm arises in a merger case, defendants must produce evidence showing why market shares alone do not capture competitive conditions, but the burden is not "unduly onerous." *Anthem*, 855 F.3d at 349-50 (quoting *Baker Hughes*, 908 F.2d at 991). Courts impose no artificial constraints on the kind of evidence defendants may identify. Because "only examination of the particular market—its structure, history, and probable future—can provide the appropriate setting for judging the probable anticompetitive effects of the merger," *U.S. v. General Dynamics*, 415 U.S. 486, 498 (1974), § 7 "requires evaluation of a merger's competitive effects under the totality of the circumstances," *Deutsche Telekom*, 439 F. Supp. 3d at 208. Defendants can therefore identify many different ways in which concentration statistics "produce an inaccurate account of the merger's probable effects on competition in the relevant market." *Arch Coal*, 329 F. Supp. 2d at 116 (citing *FTC v. H.J.*

*Heinz*, 246 F.3d 708, 715 (D.C. Cir. 2001)).  Such evidence may include "the absence of

significant entry barriers in the relevant market," *Baker Hughes*, 908 F.2d at 984, and factors like

changing market conditions, special features of the product or negotiating process, and the

conduct of other firms in the market, *id.* at 986; *see Deutsche Telekom*, 439 F. Supp. 3d at 207.

As the following sections show, there are many reasons market shares do not themselves

prove an anticompetitive effect here.

2.   *The HHI Is Not Relevant To A "Unilateral Effects" Analysis*

The HHI is an unhelpful predictor of the competitive impact of this merger because the

government's theory of competitive harm relies on "unilateral effects" analysis.  Dkt. 1 at 4-5

(Compl. ¶¶ 7-9).  In a merger between buyers, a unilateral effects analysis focuses on the

merger's effects on transactions where sellers strongly prefer to sell only to one of the two

merging parties (enabling the buyer to lower prices without losing sellers).  Market concentration

has nothing to do with that analysis.  *See* Guidelines ¶ 6.1; *Oracle*, 331 F. Supp. 2d at 1122 ("a

strong presumption of anticompetitive effects based on market concentration is especially

problematic in a differentiated products unilateral effects context"); Herbert Hovenkamp & Carl

Shapiro, *Horizontal Mergers, Market Structure, and Burdens of Proof*, 127 Yale L.J. 1996, 2014

(2018) (cases alleging unilateral effects "pose[] a challenge for the structural presumption").  The

HHI-based presumption of harm accordingly should play no role in determining whether the

government carried its burden of proving likely harm through "unilateral effects."

3.   *The Government's Reliance On Static, Backward-Looking Market Shares Does*
     *Not Account For The Ease Of Expansion And Entry*

The government's case assumes that the current market shares define the competitive

landscape that will exist after the merger—the same participants and shares, except that PRH and

S&S shares will be combined.  But when there are low barriers to expansion by existing rivals or

entry by new rivals, it is error to rely on past market shares to draw inferences about post-merger competition.  As the Guidelines recognize, market-share analysis must account for firms outside the market that can provide "rapid" response to a price reduction, Guidelines § 5.1, because even "the *threat* of entry can stimulate competition in a concentrated market, regardless of whether entry ever occurs," *Baker Hughes*, 908 F.2d at 987; *see Deutsche Telekom*, 439 F. Supp. 3d at 226 (realistic threat of entry "constitute[s] a substantial incentive to competition" post-merger).

The evidence will show that existing Big Five rivals can easily expand and actively plan to do so.  Other rivals among the top twenty also can easily increase their acquisitions—they already possess the needed talent, experience, and reputation.  Numerous top twenty rivals plan to meaningfully expand, including Disney, Chronicle, Candlewick, and others.  And entirely new publishers started by well-known editors have recently gained share and become increasingly effective competitors. Given this ease of expansion and entry, market shares are a highly unreliable predictor of post-merger competitive conditions.

4.    *Market Shares Alone Do Not Account For Multiple Other Factors That Drive Competition In Real-World Acquisitions*

The government's reliance on current market shares also ignores numerous other factors that will continue to profoundly affect competition after the merger.

*First*, the evidence will show that publishers compete ferociously downstream to sell their books to readers.  They compete for shelf space in independent bookstores and in superstores like Barnes & Noble, Walmart, and Target.  They compete for visibility in online marketplaces like Amazon.  Ultimately, the publishing companies make money from the sale of books to consumers—if they do not compete aggressively to acquire the books from authors, they will lose out in the competition to sell them to readers.  The government itself does not contest the highly competitive nature of the downstream sale of books.  Upstream market share

statistics alone do not reflect the effect the concededly competitive downstream marketplace has on incentives to compete upstream.

*Second*, market concentration also ignores the competitive effect of agents' control over the acquisition process. Publishers do not participate in acquisitions proportionally to their market shares—the agent decides which publishers to invite, and how many. Those invitations are not based on market shares, which are not even known to the agent. They are instead based on a host of individualized factors, including the agent's judgment about which editors are most likely to connect with the book and author. And even where an agent perceives that a bidder has been "lost," the agent often can invite a new bidder to replace the lost bidder. Increased market concentration thus has little to no bearing on participation in specific acquisitions.

*Third*, the vast majority of acquisitions are structured either as exclusive submissions, where there is no bidding competition at all, or "best bid" and "better/best bid" formats, where a publisher does not know the amount of other bids. In both formats, each publisher must bid as if it is competing against the *entire collection* of unknown rivals that *could* submit bids. Increased concentration would not affect that bargaining dynamic.

What matters instead is the collective threat posed by the many potential rivals that might acquire the book if the publisher does not. For any given book—especially one a publisher thinks is likely to succeed—that threat comprises potential bids from many quarters. *See Arch Coal*, 329 F. Supp. 2d at 150 (continued presence of "significant number of competitors" weighs against finding merger anticompetitive). The other three members of the Big Five— HarperCollins, Hachette, and Macmillan—by themselves pose a major competitive threat in any given acquisition. In multi-bidder acquisitions where the advance was at least $250,000 and PRH and/or S&S bid, at least one of the other Big Five also bid 90% of the time. And those

three publishers collectively won only slightly fewer titles than PRH and S&S combined.  The next fifteen largest publishers are a major threat as well.  They include numerous name brands— like Amazon, Disney, Scholastic, and Norton—that regularly bid in multi-round auctions, pay large advances, and win prominent authors.  For contracts in this segment, these publishers as a group acquired more titles in 2019-2021 than each of the other three Big Five publishers.

In short, the merger at most reduces the number of publishers that pose a meaningful competitive threat in any given acquisition from "very many" to "still very many, but one fewer."[5]  Even viewed strictly through the government's structural lens, the merger changes the effective number of potential acquirors for any given book from *six* (the five largest plus all others in aggregate) to *five*.  And the government has not cited any case rejecting a merger on the basis of market concentration alone, where five market participants remained in active competition.  But again, market shares here are especially unreliable indicators of competitive forces:  given how agents structure acquisitions and control publisher participation, competition is generally driven by the collective threat of competition from all possible acquirors, rather than by any specific threat posed by individual rivals in accordance with their market shares.

**B.**   **Anecdotes Of Individual Head-To-Head Competition Do Not Show Substantial Harm To The Market**

Based on its complaint and discovery strategy, it is clear the government at trial will rely heavily on anecdotes about individual multi-bidder acquisitions where PRH and S&S were the two highest bidders.  Such anecdotes do exist, of course, just as they would in any competitive market.  But individual anecdotes are not the equivalent of marketwide data.  Defendants will provide the Court with much more complete acquisition data, reflecting *thousands* of

---

[5] Even this characterization assumes the merger will eliminate competition from S&S, but it will not.  *See infra* at 43.

acquisitions beyond the few anecdotes the government will recite.  The data show that, beyond the government's anecdotes, S&S and PRH are rarely the top two bidders—only about 7% of all acquisitions with advances of $250,000 or more.  In all other acquisitions in that segment, either there was no bidding competition at all (i.e., the book was acquired through one-on-one negotiations) or other publishers provided the direct competition.  The government's anecdotal stories about some acquisitions where PRH and S&S were the top two bidders reflect only a minuscule percentage of actual acquisitions.  *See infra* at 37.

The government's anecdotes are also flawed even on their own terms.  Some are simply incorrect and do not represent acquisitions where PRH and S&S were runners up to each other.  Many appear to involve best-bid or better-best formats, where the runner up bid is unknown and thus poses no competitive constraint.  And even in the few instances where they were knowingly the two final bidders, there is no basis for assuming that in that acquisition, the winner's bid necessarily would have been different if the runner up had not been present—especially considering that the agent could well have replaced the lost bidder with publisher.  Finally, and in any event, the merger will *not* eliminate S&S as an independent bidder, *see infra* at 43, so the anecdotal examples of pre-merger competition actually reflect the post-merger world as well.

### C.    The Government's Model Does Not Prove The Merger Will Cause Harm

The government's unilateral effects theory of harm relies on a mathematical device known as a "second score auction" model ("SSA").  The SSA model attempts to predict how a merger will affect the prices of products sold in one very specific auction scenario, i.e., multi-round, multi-bidder auctions when the merging parties were the two highest bidders.  The model seeks to determine whether and how eliminating one of the bidders through merger would affect the outcome of those auctions.  Although the SSA by its terms applies only to a specific acquisition format, the government's expert, Dr. Nicholas Hill, assumes that its results can be

34

applied to *all* acquisitions won by either S&S or PRH.  Dr. Hill projects that in such acquisitions, the merger would reduce advances by about 6% on average.  Dr. Hill admits this projected percentage translates to a reduction of just $29.3 million in total annual author compensation, out of PRH and S&S combined total average annual author compensation of $473 million in this price segment, and total author compensation marketwide of many hundreds of millions more.

The trial evidence—including the opinions of Defendants' expert, Edward Snyder, the William S. Beinecke Professor of Economics and Management at the Yale School of Management—will show that for multiple reasons, even the relatively small effect Dr. Hill projects from the SSA model is entirely unreliable.[6]

1.     *Dr. Hill's Model Does Not Reflect Real-World Acquisitions*

As noted, the SSA model expressly applies only to acquisitions involving multi-bid, multi-round formats—the only formats that have two "final" bidders and thus can be subject to the model, which depends on the existence (and elimination) of a runner-up bidder that constrains the winner's price.  In the real world, however, the vast majority of acquisitions are structured as either a one-on-one negotiation or a best-bid auction, neither of which involves a final round where the top bidder is constrained by the runner-up.  Dr. Hill nevertheless assumes that the SSA model's output applies to all acquisitions where PRH or S&S prevailed, as if every one of those acquisitions involves a competitive dynamic identical to a multiple-bidder, multiple-round auction.  That assumption is facially nonsensical, and indeed is specifically rejected by the academic literature Dr. Hill cites, which demonstrates that different acquisition formats lead to

---

[6] After reviewing Professor Snyder's critique, Dr. Hill tried to buttress his SSA model analysis with an entirely new analysis based on a different model, called the GUPPI.  Not only was that analysis untimely, but it added nothing of substance to the SSA analysis.  *See* Dkt. 98. It also relied on much of the same incomplete and incorrect data Dr. Hill used in his SSA model.

different competitive effects.  The Guidelines agree:  "The mechanisms of these anticompetitive unilateral effects, and the indicia of their likelihood, differ somewhat according to the bargaining practices used, the auction format, and the sellers' information about one another's costs and about buyers' preferences."  Guidelines § 6.2.  Dr. Hill does not and cannot justify applying his model to acquisitions that lack the one feature most important to the auctions his model examines:  the presence of a constraining runner-up bidder.

2.     _Dr. Hill Makes Significant Errors In All Three Inputs Used In His Model_

As Dr. Hill presents it, the SSA model requires three key data inputs.  Dr. Hill makes profound errors as to all three.

_Diversion Ratio/Market Shares_.  One key input of the SSA model is market share, which the SSA uses to determine "diversion ratios" between S&S and PRH.  This ratio is essentially the estimated proportion of sales that would have been won by one of the merging buyers, but would be diverted to non-merging buyers if one of the merging buyers were eliminated.  The larger the diversion ratio, the more likely it is sellers would turn to non-merging buyers, giving the combined entity less power to impose a profitable price reduction.

To determine the diversion ratio, the SSA uses market shares to estimate how often PRH and S&S were the top two bidders in acquisitions, which ostensibly identifies the frequency of post-merger diversion.  But market shares significantly overpredict how often PRH and S&S are the top two bidders in book acquisitions, causing the model to overstate projected harm here.  Using market shares, Dr. Hill estimates that S&S and PRH would be the top two bidders in about 12% of acquisitions involving advances of at least $250,000 in the last several years.  That percentage itself is low, but actual data from agents show that from 2018 to 2021, PRH and S&S were the top two bidders in only 21 acquisitions out of 299 in this price segment, or just _7%_ of

acquisitions.  That low percentage reflects both the strength of other competitors and the fact that, for the multi-bidder contracts in this segment where either PRH or S&S won, the other company did not even bid for almost half of them (47%).  In other words, PRH and S&S very often do not pursue the same book, even when it draws multiple bidders.

Market shares do not accurately estimate how often PRH and S&S were the top two bidders because shares do not capture the competitive makeup of individual acquisitions, which causes another error in Dr. Hill's analysis.  In relying on market shares, he assumes that all publishers participate in all acquisitions in proportion to their market shares, and would continue to do so after the merger, except that one bidder in every auction would be eliminated.  That assumption is categorically false—it ignores the real-world role of agents, who *choose* how many and which publishers to invite to auction (when the agent holds one).  Market shares thus do not reflect how often the "lost" bidder actually participated in auctions.  Market shares also cannot account for the agent's ability to replace a lost bidder by simply inviting another publisher to participate.  Because Dr. Hill overlooks the likelihood of bidder replacement in real-world acquisitions, his conclusions say little about the real-world effects of the merger.

*Profit Margins*.  A second necessary input to the SSA model is at least one of the merging parties' profit margin on book acquisitions.  The margin combines with the diversion ratio to determine the extent to which the merged entity could profitably reduce advances.  To simplify slightly, the higher the margin, the easier it would be for the combined entity to profitably reduce advances, even though doing so would cause some authors to divert elsewhere. If the margin is inflated, the model will necessarily exaggerate the harm by overstating the profit incentive to reduce advances.

To predict PRH and S&S margins, Dr. Hill uses data that do not reflect the actual margins they use to determine their bids in acquisition processes. He initially excluded certain marketing costs from PRH's margin, and he excluded operating expenses altogether from S&S's margin (while conversely including those same costs in the PRH margin). He later tried to cure the problem by removing operating expenses from both margins, but the resulting predicted margins still do not align with actual margins. As a result, Dr. Hill's projected harm is overstated and unreliable.

*Third-Best Bid Data*. Dr. Hill also uses the SSA model to quantify the projected price effect. The model assumes that the price for an asset sold at auction is determined by the *second* highest offer, because the winning bid need be only nominally higher to prevail. The second-best bid thus effectively determines how high the winning bid must be. To test the effect of a merger on the second-highest bid, the model assumes if the second-highest bidder drops out, the price would have been effectively determined by the *third*-best bid. If that bid is close to the second-highest bid, the quantifiable harm is negligible or nonexistent, as Dr. Hill himself admits. To quantify the price effect, the model assumes that shares and profitability data can be used to infer the level of the third-highest bid.

Dr. Hill's initial analysis relied on that assumption and thus offered no evidence identifying real-world differences between the second-best bid and the third-best bid, when PRH and S&S were the two highest. He again subsequently tried to cure that omission using the agent-generated data on actual acquisitions Defendants relied on, but his analysis of that data was selective and unreliable. Dr. Hill accordingly has failed to corroborate his model's assumption-based harm quantification.

3.  *Dr. Hill Does Not Account For Author Benefits From Merger Efficiencies*

As Dr. Hill applies it, the SSA model will *always* project some price reduction, because the diversion ratio is necessarily positive—there are *some* sellers who would divert to the other merging buyer when their preferred buyer is eliminated, and the model predicts that *at least* for those sellers, eliminating the constraining runner-up bid will reduce the prices they pay.  Of course, it is entirely implausible that all mergers cause adverse price effects purely by mathematical fiat.  To the contrary, as the Guidelines recognize, "a primary benefit of mergers to the economy is their potential to generate significant efficiencies and thus enhance the merged firm's ability and incentive to compete," leading to better "prices, improved quality, enhanced service, or new products."  Guidelines § 10.  For this reason, a static market-share based model like Dr. Hill's cannot reliably assess a merger's full competitive effects.  It is instead essential to evaluate the extent to which the combined entity will attain the efficiency benefits any merger seeks.  Such benefits are "relevant to the competitive effects analysis of the market," and form part of the "comprehensive and holistic assessment of whether the proposed merger is likely to create or enhance market power or facilitate its exercise."  *Arch Coal*, 329 F. Supp. 2d at 124, 151; *see Tenet Health Care*, 186 F.3d at 1054 (efficiencies must be considered "in the context of the competitive effects of the merger").

Courts take into account efficiency benefits that are merger-specific, verifiable, and do not arise from anticompetitive effects of an acquisition.  *Anthem*, 855 F.3d at 354-56.  To be merger-specific, a claimed efficiency benefit must not be "achiev[able] by either company alone" through "practical alternatives" to the merger.  *Id.* at 356.  But even if merger-specific, efficiency benefits "will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means."  Guidelines § 10; *see also Sysco*, 113 F. Supp. 3d at 86.  Merging parties thus must "present[] substantiation" showing that claimed efficiency benefits are concrete

39

and non-speculative, but the merging parties need not secure independent verification of them. Dep't of Justice & Fed. Trade Comm'n, *Commentary on the Horizontal Merger Guidelines*, at 52 (Mar. 2006).[7]  Efficiencies "substantiated by analogous past experience" are the "most likely to be credited." *Deutsche Telekom*, 439 F. Supp. 3d at 213, 216–17 (quoting Guidelines § 10). Efficiencies resulting from consolidating operations among separate facilities are also especially "susceptible to verification." *Id.* at 213 (quoting Guidelines § 10).

To evaluate the merits of acquiring S&S, senior PRH executives with experience in analyzing business combinations thoroughly analyzed the merger's costs and benefits.  The resulting "PRH Efficiencies Model" identifies four distinct ways in which the merger will improve the combined entity's net income over what each entity could achieve separately.  First, the merger will increase the number of books sold at retail by providing S&S authors access to PRH's premier supply chain.  Absent a merger, the investments required by S&S to create such a system would be costly, time-consuming, and impractical.  Second, the merger will reduce variable costs, including especially the significant costs incurred when unsold books are returned to the publisher.  PRH has consistently reduced the "return rates" of previously acquired companies by incorporating their books into PRH's distribution system, and it expects to do the same for S&S's return rate.  Third, the combined company will decrease operating expenses by reducing duplicative sales, marketing, and administrative positions.  PRH does not eliminate editorial roles after acquisitions—it considers editorial expertise additive, not redundant—but "de-duplicating" other positions will reduce costs significantly.  Finally, the combined company

---

[7] The current version of the Guidelines was issued four years after the Commentary, but the Commentary "remains a valuable supplement" to the Guidelines.  Guidelines § 1 n.1.

will save real estate costs by reducing redundant properties and consolidating employees into existing PRH offices.

As the trial evidence will show, none of these efficiencies could reasonably be achieved by either entity absent the merger, and none of them stems from anticompetitive reductions in output or quality.  They are not speculative, but instead are verified by past experience:  in prior mergers, PRH achieved efficiency benefits even *greater* than expected, creating access to more money it has deployed to win the most attractive books and thereby better compete downstream.

Professor Snyder will show how the foregoing gains from cost savings and revenue enhancement will directly benefit authors.  Given the intensity of downstream competition, publishers always have strong incentives to use their gains to win more titles, especially those considered most likely to succeed.  With greater net income, the combined company will not only offer higher advances, it will also bid on more books from more authors—an author benefit the government ignores entirely.  The historical pattern at both PRH and S&S shows the effect of this incentive:  as Professor Snyder will demonstrate, based on the observed correlation between each entity's net income and total author compensation, authors have consistently received 60% or more of each firm's resources gained.  That relationship between publisher income and author compensation reflects basic industry economics.  A publisher's willingness to pay for any given book is largely a function of its expected revenues from sales of the book, minus the variable and operating costs associated with the book.  For each potential acquisition, these revenue and cost factors are reflected in a "profit and loss" ("P&L") projection prepared before the editor she makes an offer for a book.  When publisher income rises because revenues are enhanced and costs are reduced, the projected profit margin on each book increases automatically, giving the editor room to offer a higher advance for a given book without diminishing the profit the

publisher would have received pre-merger.  And publishers will seize that opportunity, because acquiring successful books is the best way to compete effectively in selling books to consumers.

Based on the cognizable efficiencies quantified in the PRH Efficiencies Model (with reductions conservatively made by Professor Snyder for efficiencies he did not consider adequately merger-specific), Professor Snyder will opine that the merger will produce gains for the merged entity that will translate to an increase in total annual author compensation for all U.S. book rights of $75 million to $107 million in 2025.  Dr. Hill's model simply ignores those gains.  On its own terms—leaving aside the flaws described above—the model implies that the merger will reduce total author compensation in the segment of books acquired for advances of at least $250,000 by only $29.3 million.  Accordingly, depending on exactly how the merger's gains to authors are distributed across all price segments, the merger could well *increase* author compensation in this price segment.  And the merger need achieve only a fraction of the gains PRH anticipates to wipe out Dr. Hill's projected harms.  At a minimum, any fair accounting for the merger's gains to authors would drive his projected harms down toward zero, eliminating any confidence that his model projects enough marketwide harm to justify blocking the merger.

4. <u>No Bidder Will Be Eliminated By The Merger</u>

A § 7 merger challenge involves a predictive judgment, and here the government's predictions rest on the crucial assumption that after the merger, S&S will no longer exist as an independent bidding force.  The government will not be able to substantiate that assumption.  In fact, S&S will remain an independent bidding entity, consistent with longstanding PRH practice, the practice of other publishers, and recognized business organization theory.

A key value for PRH is internal competition, which PRH views as good for business:  it increases the likelihood that PRH—via one of its imprints—will acquire the book, and it ensures

that the book and its author are matched with the best editor for the project. Consistent with its longstanding internal competition policy, PRH has publicly announced to its agent-partners that it will allow PRH imprints to bid against S&S imprints (and vice versa), even when they are the only bidders in an auction. *See supra* at 10.

When evaluating the competitive effects of a merger, courts take such commitments into consideration. *See, e.g.*, *FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1298 (W.D. Mich. 1996) (concluding that hospital merger was unlikely to harm competition in part because of "formal assurances" hospitals made regarding prices, which bespoke "a serious commitment by defendants … to refrain from exercising market power in ways injurious to the consuming public"), *aff'd,* 121 F.3d 708 (6th Cir. 1997) (per curiam).[8] To be sure, a commitment to certain post-merger conduct does not factor *automatically* into predictions about post-merger effects. The commitment must be credible, concrete, and supported by evidence—just like any other prediction or assumption about the post-merger world. *See U.S. v. Aetna Inc.*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017) ("[E]vidence about the likelihood of the [post-merger] divestiture goes to the weight of the evidence regarding the divestiture's effects.").

Here, the evidence shows that S&S will in fact remain an independent bidding force after the merger. As noted, internal bidding competition is a longstanding PRH policy—a strategy that helped lead to its industry-leading position. Other publishers pursue similar internal competition strategies. Well-recognized business organization theory validates reliance on internal competition to maximize enterprise performance. And PRH made a public commitment

---

[8]*See, e.g.*, *Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1485 (7th Cir. 1991); *FTC v. Atl. Richfield Co.*, 549 F.2d 289, 299 (4th Cir. 1977); *Deutsche Telekom*, 439 F. Supp. 3d at 230; *U.S. v. Atl. Richfield Co.*, 297 F. Supp. 3d 1061, 1069 (S.D.N.Y. 1969), *aff'd*, 401 U.S. 986 (1971).

to agents that S&S would be treated as an independent bidder after the merger (even absent an outside bidder).  Reneging on that assurance would violate the trust between PRH and its author-agent partners that is essential to PRH's ability to compete successfully for book rights.

These facts demonstrate conclusively that PRH's commitment to treating S&S as an independent bidder is not illusory or a policy manufactured merely to obtain merger approval.  It is a serious business commitment that will govern its post-merger conduct.

5.    _Dr. Hill's Model Does Not Reflect Experience From PRH's Prior Merger_

The 2013 merger of Random House and Penguin confirms that this merger will not reduce author advances.  The Guidelines recognize that a "recent merger[] … in the relevant market" can represent a "'natural experiment[]'" that is "informative regarding the competitive effects of the merger" under review.  Guidelines § 2.1.2.  Put more sharply, the surest "way to test a model is to compare its projection against real outcomes."  _NRDC v. Jackson_, 650 F.3d 662, 665 (7th Cir. 2011).

The government's model of harm fails that test.  When Random House and Penguin merged, they were the first and second largest publishers respectively, with a combined market share in trade-book sales similar to that of PRH and S&S today.  Based on those market shares and assuming comparable margins, the government's model would have projected a reduction in advances comparable to, or even greater than, the model predicts here.  The evidence will show, however, that the 2013 merger had no negative effect on author advances.  In fact, advances trended _upwards_ in subsequent years.[9]  The 2013 merger did not cause the harm the

---

[9] Dr. Hill uses a regression analysis to attempt to show that advances did decline after the 2013 merger, but his analysis (a) relies on a comparison group (books outside the $250,000-plus price segment) that he admits is different, and (b) fails to account for the industry-wide turn away from mass market paperbacks, which was entirely unrelated to the merger.

government's model would project because that model does not accurately capture the real-world conditions of this industry.  *See supra* at 35-36.

## III.   THE GOVERNMENT WILL NOT PROVE AN INCREASED LIKELIHOOD OF COORDINATION AFTER THE MERGER

The government's final theory of harm is that the merger will lead to "coordinated conduct" among the remaining publishers in the market for anticipated top-selling books. Coordination—sometimes referred to as "tacit collusion" or "conscious parallelism"—is the process "by which firms in a concentrated market might in effect share monopoly power … by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Grp.*, 509 U.S. at 227.  Coordination between rivals can occur only if the firms can solve what economists call "cartel problems," *i.e.*, the difficulties of maintaining a consensus to take actions that would *not* be in each company's individual interest absent coordination.  *See* George J. Stigler, *A Theory of Oligopoly*, 72 J. Pol. Econ. 44, 44-46 (1964). These problems make the "anticompetitive minuet" of tacit coordination "most difficult to compose and to perform."  *Brooke Grp.*, 509 U.S. at 227-28.

The first step—establishing a tacit consensus—"requires harmonizing the incentives of participating firms and mitigating firm uncertainty concerning rival firms, so that they can effectively coordinate their behavior."  *In re B.F. Goodrich Co.*, 110 F.T.C. 207, 295 (1988), *as modified by* 112 F.T.C. 83 (July 18, 1989).  The second step—enforcing the consensus—is equally critical, because without "mutual trust and forbearance … an informal collusive arrangement is unlikely to overcome the temptation to steal a march on a fellow colluder by undercutting him slightly."  *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1388-89 (7th Cir. 1986). Consequently, firms will not coordinate unless they can "retaliate effectively if and when cheating occurs."  *Goodrich*, 110 F.T.C. at 295.  To block a merger based on a likelihood of

coordinated effects, then, the government must prove that "market conditions, on the whole, are conducive to [1] reaching terms of coordination and [2] detecting and punishing deviations from those terms." *H & R Block*, 833 F. Supp. 2d at 77 (cleaned up).[10]

The government will not make that showing. The government's own expert concedes as much: Dr. Hill will testify at trial that he cannot say the merger is more likely than not to cause increased coordination. And indeed it will not, as the evidence will show.

### A.    Multiple Features Of The Publishing Industry Preclude Coordination

#### 1.    *Differentiated Products And Non-Transparent Pricing*

It is well recognized that a merger is unlikely to increase coordinated conduct where the product is non-homogenous and pricing is non-transparent. As the Guidelines put it, coordination is likely to succeed only when "each competitively important firm's significant competitive initiatives can be promptly and confidently observed by that firm's rivals," which is "more likely" when price terms "are relatively transparent" and products are "relatively homogeneous." Guidelines § 7.2; *see Arch Coal*, 329 F. Supp. 2d at 144-45 (non-transparent pricing leads to "limited, imperfect, and largely unreliable and untimely" information about rivals' conduct, making coordination "unlikely to succeed," and heterogeneity likewise "limit or impede the ability of firms to reach terms of coordination"); *Deutsche Telekom*, 439 F. Supp. 3d at 239 (coordination more likely in markets where pricing is "more transparent"); *Oracle*, 331 F. Supp. 2d at 1113 ("Factors that increase the likelihood of coordination include product homogeneity, pricing standardization and pricing transparency.").

---

[10] To be clear, the government must show that the merger "*change[s]* firms' incentives to coordinate their behavior." Areeda & Hovenkamp ¶ 919 (emphasis added); *see* Guidelines § 7.1 (merger must "enhance" market's "vulnerability" to coordination among rivals).

As discussed, books are the most non-homogenous, subjectively-valued products one can imagine.  Because the monetary terms for every unique book depend on individualized judgments about its "value," knowing how much a rival paid for a given book reveals nothing about whether that publisher departed from an implicit agreement or conveyed a signal about future acquisitions of other unique books.  To be sure, agents and editors often try to identify loosely comparable books as baselines for their valuation, but such "comps" are hardly precision devices, and even identifying useful "comps" is itself a highly subjective endeavor—different editors within the same publisher often choose different "comps" for the same book.

Non-transparent pricing also precludes coordination.  Given agents' control over bidding information, there is little opportunity to coordinate or signal in real time.  *See Arch Coal*, 329 F. Supp. 2d at 144 ("The emphasis on sealed bids and confidentiality [during bidding] is an important aspect of the market structure and dynamics that would frustrate coordination among producers.").  Final advance amounts are sometimes reported after the fact, but usually only in general ranges, and even that information is sporadic and unreliable, precluding timely responses.  *See id.* at 145 (coordination unlikely where "cheating" and "punishment" would not occur "until well after the fact").  Terms like advance payout timing and royalty rates are also independently negotiated and non-public, precluding tacit agreement on such terms.

2.    *Non-Price Competition*

Another factor precluding coordination is competition over non-price terms, which makes coordination less likely when such terms are subjective, variable, and undisclosed.  *See Deutsche Telekom*, 439 F. Supp. 3d at 235, 240.  Because authors often pursue subjective non-price preferences in acquisitions, *see supra* at 8, it is impossible to determine from the advance alone exactly what pricing strategy the publisher applied, how that strategy would apply to other books, and whether the advance deviated from a tacit understanding about acquisition terms.

3.      *Ease Of Entry And Expansion*

Coordination by incumbents is difficult when new firms can easily enter and take up slack created by non-competitive coordination.  *See Deutsche Telekom*, 439 F. Supp. 3d at 237; *cf. Arch Coal*, 329 F. Supp. 2d at 138 ("Barriers to entry … increase the likelihood of coordinated interaction.").  The same dynamic applies when smaller firms can easily expand. Guidelines § 7.2 (coordination less likely when market includes "participants with small market shares and little stake in the outcome resulting from the coordinated conduct, if these firms can rapidly expand their sales in the relevant market").  The easy of expansion and entry here, *see supra* at 31, further precludes any likelihood of coordination.

**B.      Given Strong Downstream Competition To Sell Books, Publishers Would Have Little Incentive To Coordinate Upstream**

To establish that a merger is likely to result in coordinated conduct, the government must prove that the merger would increase incumbent rivals' incentives to coordinate their pricing. *See supra* at 46.  The government cannot make that showing here, especially given the strong incentive to succeed in the vigorous competition to sell books to consumers.  That downstream competition—which the merger will not diminish in any way—gives every publisher an incentive to compete aggressively against rivals to acquire books upstream, especially those books predicted to perform well among readers.  Even if it were possible to reach some tacit understanding on advances, every publisher would have a strong incentive to undercut that agreement wherever possible, in order to outcompete rivals and grow market share downstream.

**C.      The Merger Will Not Increase The Incentive Or Opportunity To Coordinate In Author Recruitment**

The government also asserts that the merger will increase the likelihood publishers will tacitly agree not to "poach" successful authors from existing relationships.  But the same strong interest in competing downstream that disincentivizes coordination on pricing would also

strongly incentivize publishers to deviate from any agreement not to poach the most successful authors.  And the same ease of entry and expansion that makes any pricing agreement effectively unenforceable would mean the same for an anti-poaching agreement.

> **D.    The Ebooks Case Does Not Show That The Merger Will Increase The Likelihood Of Coordination**

The government's tacit coordination theory relies heavily on *U.S. v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015), which affirmed a judgment that Apple had orchestrated a conspiracy with certain major publishers to increase *downstream* retail prices of digital books ("ebooks").  The case involved a "hub-and-spoke" conspiracy, organized by Apple at the "hub" and imposed through the "spokes" of its separate contracts with publishers, each of which agreed that Apple's ebook outlet would charge specified retail prices.  Although each price agreement individually was contrary to the publisher's financial interest, the court held that Apple induced them all to agree by organizing communications and engineering a collusive understanding that each would accept the same term, thereby promoting their collective long-term interest in avoiding low-price ebooks competition from Amazon.  *Id.* at 318 ("Apple consciously played a key role in organizing their express collusion.").

The finding that Apple orchestrated a conspiracy concerning downstream price competition for ebooks is not relevant here.  For one thing, neither Random House nor Bertelsmann was even accused of participating in the conspiracy.  For another, as the Guidelines state, prior coordination in a different product market matters only if "the salient characteristics of that other market at the time of the collusion are *closely comparable* to those in the relevant market."  Guidelines § 7.2 (emphasis added).  The dynamics of retail bookselling are not at all comparable—much less *closely* comparable—to the acquisition of book rights.  Retail book prices are wholly transparent and easily monitored for any deviation from express or implied

agreement.  By contrast, book-acquisition pricing is completely non-transparent, subjective, and individualized, precluding monitoring and enforcement of any tacit agreement.  *See supra* at 46-48.  Finally, there is no third-party entity here with the incentive and ability to organize collusive behavior to serve its own independent business objectives.

## CONCLUSION

For all the foregoing reasons, and based on the evidence to be adduced at trial, this Court should grant judgment for Defendants and permit this merger to proceed.

Dated: July 15, 2022  Respectfully submitted,

By:  */s/ Daniel M. Petrocelli*

Daniel M. Petrocelli (appearing *pro hac vice*)
M. Randall Oppenheimer (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Andrew J. Frackman (appearing *pro hac vice*)
Abby F. Rudzin (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
Seven Times Square
New York, NY 10026
Telephone: (212) 326-2000
afrackman@omm.com
arudzin@omm.com

Courtney Dyer (D.C. Bar No. 490805)
Julia Schiller (D.C. Bar No. 986369)
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
cdyer@omm.com
jschiller@omm.com

Deborah L. Feinstein (D.C. Bar No. 412109)
Jason Ewart (D.C. Bar No. 484126)
**ARNOLD & PORTER**
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
debbie.feinstein@arnoldporter.com
jason.ewart@arnoldporter.com

*Attorneys for Defendants Bertelsmann SE & Co.*
*KGaA and Penguin Random House LLC*

By:    */s/ Stephen R. Fishbein*

Stephen R. Fishbein (appearing *pro hac vice*)
Jessica K. Delbaum (appearing *pro hac vice*)
**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
sfishbein@shearman.com
jessica.delbaum@shearman.com

Ryan Shores (D.C. Bar No. 500031)
Michael Mitchell (D.C. Bar No. 1531689)
**SHEARMAN & STERLING LLP**
401 9th Street, N.W., Suite 800
Washington, D.C. 20004
Telephone: (202) 508-8000
ryan.shores@shearman.com
michael.mitchell@shearman.com

Rachel E. Mossman (D.C. Bar No. 1016255)
**SHEARMAN & STERLING LLP**
2828 North Harwood Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 271-5777
rachel.mossman@shearman.com

*Attorneys for Defendants Paramount Global (f/k/a ViacomCBS Inc.) and Simon & Schuster, Inc.*