# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| United States of America, | ) Civil Action |
| | ) No. 1:21-cv-02886-FYP |
| Plaintiff, | ) |
| | ) |
| vs. | ) **Pretrial Conference** |
| | ) |
| Bertelsmann SE & Co. KGaA, | ) |
| et al. | ) Washington, D.C. |
| | ) **July 25, 2022** |
| Defendants. | ) Time:  10:00 a.m. |

_____

**Transcript of <u>Pretrial Conference</u>**
**Held Before**
**The Honorable Florence Y. Pan**
**United States District Judge**

<u>A P P E A R A N C E S</u>

For the United States:    **John R. Read**
                          **Ihan Kim**
                          **Melvin A. Schwarz, I**
                          **Amanda Strick**
                          **Robert P. Vance, Jr.**
                          U.S. DEPARTMENT OF JUSTICE
                          Antitrust Division
                          450 Fifth Street, Northwest
                          Washington, D.C. 20530

For the Defendants Bertelsmann SE & Co. KGaA and Penguin Random
House, LLC:               **Daniel M. Petrocelli**
                          **Drew Breuder**
                          **M. Randall Oppenheimer**
                          **Megan Smith**
                          O'MELVENY & MYERS LLP
                          1999 Avenue of the Stars, 8th Floor
                          Los Angeles, California 90067

                          **Daniel L. Cantor**
                          **Andrew J. Frackman**
                          **Abby Rudzin**
                          O'MELVENY & MYERS LLP
                          7 Times Square, Times Square Tower
                          New York, New York 10036

(appearances continued on the next page)

```
 1              A P P E A R A N C E S, continued

 2    For the Defendants Bertelsmann SE & Co. KGaA and Penguin Random
      House, LLC (continued):
 3                              Jefferson J. Harwell
                                O'MELVENY & MYERS LLP
 4                              1625 Eye Street, Northwest
                                Washington, D.C. 20006
 5
      For the Defendants ViacomCBS, Inc. and Simon & Schuster, Inc.:
 6                              Stephen Fishbein
                                Noni Nelson
 7                              SHEARMAN & STERLING LLP
                                599 Lexington Avenue
 8                              New York, New York 10022

 9                              Rachel E. Mossman
                                SHEARMAN & STERLING LLP
10                              2828 North Harwood Street, 18th Floor
                                Dallas, Texas 75201
11
                                Daniel Chozick
12                              Michael Mitchell
                                Ryan A. Shores
13                              SHEARMAN & STERLING LLP
                                401 9th Street, Northwest
14                              Washington, D.C. 20004
      _____
15
      Stenographic Official Court Reporter:
16                              Nancy J. Meyer
                                Registered Diplomate Reporter
17                              Certified Realtime Reporter
                                333 Constitution Avenue, Northwest
18                              Washington, D.C. 20001
                                202-354-3118
19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2        THE COURTROOM DEPUTY:  Your Honor, this is Civil Case

3  No. 21-2886, United States of America v. Bertelsmann SE & Co.,

4  et al.

5        Starting with plaintiff's counsel, please approach the

6  podium and introduce yourselves for the record.

7        MR. READ:  Good morning, Your Honor.  It's good to

8  see you in person.

9        John Read for the United States.  If I can introduce my

10  colleagues.  Bobby Vance and Amanda Strick.  They will be here

11  today with confidentiality expertise to help you analyze those

12  issues.

13        Ihan Kim is with me at the table.  He'll help me with

14  logistics regarding trial.

15        And then behind me is Mel Schwarz, who will handle the

16  Snyder motion *in limine* argument.

17        THE COURT:  Good morning.  Thank you.

18        MR. PETROCELLI:  Good morning, Your Honor.

19        Daniel Petrocelli for Penguin Random House and

20  Bertelsmann.  And with me from O'Melveny are Megan Smith,

21  Abby Rudzin, Dan Cantor, Randy Oppenheimer, Andy Frackman,

22  Drew Breuder, and Jefferson Harwell.  I may have missed

23  somebody.  Hopefully, I won't the next time.

24        Also, I'd like to introduce some of my clients,

25  Your Honor.

1           THE COURT:  Yes.

2           MR. PETROCELLI:  We have Markus Dohle, who is the

3   global chief executive of Penguin Random House.  We have

4   Anke Steinecke, who's general counsel of Penguin Random House,

5   and we have Matthew Martin, who is deputy general counsel of

6   Penguin Random House.

7           THE COURT:  Okay.  Good morning.

8           MR. PETROCELLI:  Thank you.

9           MR. FISHBEIN:  Good morning, Your Honor.  Steven

10  Fishbein, Shearman & Sterling.  I represent ViacomCBS and Simon

11  & Schuster.  And with me from Shearman & Sterling are

12  Ryan Shores, Rachel Mossman, Mike Mitchell, and in the back

13  Daniel Chozick and Noni Nelson.

14          THE COURT:  Okay.

15          MR. FISHBEIN:  Thank you, Your Honor.

16          THE COURT:  Good morning.

17      All right.  This is my first in-person hearing since the

18  pandemic.  So I'm pleased to be back in the courtroom and ready

19  to get started on this case.  I know the parties all have been

20  working extremely hard on this, and I appreciate all your

21  efforts.

22      So today, just some preliminary matters about COVID

23  restrictions.  I'm mindful that we're, sort of, undergoing a

24  new COVID surge, and I do want to note that I'm going to

25  require everyone in the courtroom to be wearing an N94 or N95

1    mask going forward.  You can -- I want people to keep their

2    masks on at all times.  You can take it off when you're

3    speaking, or you can leave it on if you're speaking.  It's

4    going to be up to you.  But I want to make sure that we're

5    being safe.

6         Also, during the trial, I want to require everyone

7    coming to the courtroom to take a rapid test in the morning

8    before you come.  This will be on the honor system, and if

9    you're positive, don't come.

10        I think that we will be having the technology to tune in

11   by Zoom, which we are trying out today with some third party --

12   third-party representatives, who I'm just noticing there are a

13   lot of them here.  Good morning to you-all too.

14        And so I want to make sure that we're using best

15   practices to all stay safe during this trial.  And I am looking

16   into having an overflow courtroom where there will be a feed,

17   and I want the parties to think about how many lawyers you need

18   to have in the courtroom at any given time.  You don't need to

19   answer me today, but I think that we should try to limit that

20   number.  And maybe you can meet and confer and tell me how many

21   people we need to have in the courtroom at any given time,

22   assuming that we can have an overflow courtroom so other

23   people, who want to participate, can be there to watch the

24   proceedings.

25        Yes, Mr. Read.

1    MR. READ:  If I may on that, Your Honor.  With regard

2    to that, Your Honor, I do believe -- I apologize.  With regard

3    to that, Your Honor, I do believe that at least for the first

4    couple of days of trial, there will be a lot of media interest

5    and third-party interest, and so an overflow room will probably

6    be necessary to accommodate them as -- at least until the trial

7    gets underway, I think there will be a lot of attendance

8    outside of just counsel.

9    THE COURT:  Thank you for telling me that.  I think I

10   talked to John Cramer, who's the guy in charge of these things

11   for the courthouse, this morning, and he's working on it.

12   Apparently, there's some other trials going on, which are

13   taking up more than one courtroom, and he's going to get back

14   to me later today.  And so, hopefully, we'll have that ability

15   to have an overflow courtroom.

16   Okay.  So for today's hearing, I thought that we would

17   start with third-party confidentiality issues, since we have a

18   number of third parties who are interested in that issue and

19   present via Zoom, and then we can move on to motions *in limine*,

20   and then trial procedures and logistics.

21   Is there anything else I should add to that agenda, or

22   does that pretty much cover everything for today?

23   Okay.  Hearing no objection -- okay.  Wait.

24   Mr. Petrocelli.  Yes.

25   MR. PETROCELLI:  It's not an objection, Your Honor,

1    but I thought it may be helpful to the Court if I could briefly

2    update you on the status of the confidentiality issues.

3         We -- both sides have been diligently working to

4    de-designate as much as possible.  As you can imagine, during

5    the discovery process, pretty much everything was designated

6    confidential and highly confidential by -- by us, by the

7    parties, by third parties; and we made a lot of progress over

8    the last several days in de-designating much of our -- the

9    parties' -- the defendants' information down to the bare

10   minimum.  And we've made progress working with the third

11   parties in the order in which the witnesses will be called.

12        So for the first week of witnesses, by way of example,

13   we're -- we're almost in complete agreement with the third

14   parties and their counsel on how to handle the confidential

15   information, essentially limiting it to very specific pieces of

16   information which would not be disclosed publicly; and there

17   are different ways in which we can handle the elicitation of

18   that evidence.  By way of example, we could not mention an

19   author's name or an amount of an advance.  We can anonymize a

20   lot of the information, and Your Honor will have the benefit of

21   seeing documents unredacted.  So you'll have the actual record,

22   but certain things don't need to be spoken out loud.

23        So we received -- the Court received 26 letters.

24             THE COURT:  Twenty-eight.

25             MR. PETROCELLI:  Yes.  And we haven't even been able

1    to digest most of them.  So we figured we're just proceeding in

2    sequence, working with the government, working with the third

3    parties, and I think we're making good progress.

4              THE COURT:  Okay.  I appreciate that.  Thank you,

5    Mr. Petrocelli.

6        I had some thoughts about how -- maybe we could adopt

7    some general procedures that would address some of the concerns

8    in the letters.

9        Is there something you wanted to say?  I'm sorry.  Can

10   you identify yourself again.

11             MR. VANCE:  Yes, Your Honor.  Bobby Vance for the

12   United States.

13             THE COURT:  Okay.  Mr. Vance, go ahead.

14             MR. VANCE:  We agree that we've made a lot of

15   progress on de-designating the transcripts.  On Friday the

16   government had proposed a modification to the process in the

17   pretrial order to try to deal with some of the objections that

18   we've received to the third -- from the third parties.  We

19   don't have agreement on that process, but we think it's a good

20   idea.

21        The process would be to provide third parties 72 hours'

22   notice of when their materials would be used with a

23   meet-and-confer requirement, and then the ability of the third

24   parties to appear before the Court the morning their materials

25   would be used.  The reason we think this is a good idea is,

1    first, it's not a substitution for all the hard work that's

2    happening now.  We agree that we should be working diligently

3    to try to get these issues resolved now.

4         But as you saw, there's a lot of different issues.  We

5    think, as we've discussed previously, every confidentiality

6    ruling by the Court is going to resolve ten behind it.  So we

7    think a 72-hour process would just force the parties back to

8    the bargaining table to refine their confidentiality positions

9    and, hopefully, reach resolution.

10        We think this is a particularly good idea because, you

11   may have noticed, a lot of the third parties are here simply

12   because of exhibits on defendants' witness list, which are

13   charts created by their expert, Dr. Snyder.  It's very possible

14   those exhibits won't be used at trial, but to the extent they

15   are, I'm assuming that most of them will be used with

16   Dr. Snyder on -- during his exam, which will be at the end of

17   trial.

18        So we think by then, we'll have lots of guidance from

19   the Court as to your views on confidentiality, and that will

20   help us resolve a lot of these Snyder charts closer to when

21   they might be used; and we'll, hopefully, appease a lot of the

22   third parties here today.

23             THE COURT:  Okay.

24             MR. VANCE:  And then, finally, we think this process

25   is responsive to some of the objections to the -- by the third

1    parties, such as Hachette and Bloomsbury, about not being

2    involved in the meet-and-confer process in the pretrial order

3    or having notice as to when their materials will be used.  And

4    we think this will create more efficient examinations because

5    it will allow the parties -- the third parties to raise their

6    issues in the morning rather than raise a bunch of

7    confidentiality objections during the examinations.

8         So that -- that's our recommended process to the Court

9    in these third-party issues.

10        THE COURT:  Thank you.  I think that's a good idea,

11   and it has the benefit of addressing issues, sort of, in real

12   time, like, as they arise.

13        Do you have any objection to that approach,

14   Mr. Petrocelli?

15        MR. PETROCELLI:  Not in principle.

16        There is one aspect to which we would object, and that

17   is, we are not going to disclose in advance passages of

18   deposition testimony that we might use to cross-examine or

19   impeach a witness.  I don't know that that's being suggested.

20   I doubt it, but certainly documents and things of that --

21        THE COURT:  Of course.

22        MR. PETROCELLI:  And really what we're trying to do

23   is go through the entire deposition transcripts with the third

24   parties and identify what parts they really think are truly

25   confidential, and then we can work around that.  But we

1    certainly are not going to affirmatively disclose pieces of

2    testimony that we might use.  So that's the process we've been

3    working through.

4         THE COURT:  Okay.  Of course.  And I would not expect

5    you to disclose what you want to use for impeachment on

6    cross-examination.

7         MR. PETROCELLI:  Okay.  Thank you.

8         THE COURT:  But let me ask the parties this:  Because

9    as I -- you don't have to stand here, Mr. Petrocelli.

10        As I was looking through the 28 letters that were sent

11   to the Court, it seemed like a lot of the concerns that were

12   being expressed could be dealt with by just implementing some

13   general procedures such as:  I understand that there's an

14   Exhibit H to the joint pretrial statement.  It's entitled -- I

15   think it was -- Stipulation Regarding Disclosure at Trial of

16   Confidential Information of Non-Parties.

17        And Exhibit H takes pains to protect the identities of

18   authors.  It specifically talks about authors.  "The Parties

19   will not disclose the identity of an author in public filings

20   or in open court . . . that connects that author's identity

21   to . . . financial details."

22        "Parties [will] use pseudonyms or otherwise mask the

23   identity of the author" when disclosing financial details.  And

24   parties will redact trial exhibits shown in court or filed

25   publicly "so that the author's identity cannot be connected to

1    . . . . Financial Details."

2        My question to the parties is:  Is there any reason why

3    the protections in Exhibit H should not be extended to

4    third-party publishers and to agents?  Because that seems to be

5    a lot of what I see in these 28 letters.  They just want to be

6    anonymized, and I think that this would go a long way towards

7    addressing their concerns.

8        MR. VANCE:  At least to agents, we've made progress

9    on that front and have an agreement with defendants that we

10    will anonymize agent names, unless they're a witness at trial

11    or necessary to a witness examination.  But we're in agreement

12    that we can do that for agent names.

13        With respect to publishers, there's, frankly, just a lot

14    of Snyder exhibits, and we're not -- we don't have a firm

15    position yet on how much of it -- it is appropriate to redact

16    yet.  It's certainly a procedure that we're open to, but it's

17    hard to commit at this point because there's a lot of --

18        THE COURT:  Right.

19        MR. VANCE:  -- potential exhibits from the smaller

20    publishers that could go up during the examination.

21        THE COURT:  So while I have you here -- and I'll give

22    Mr. Petrocelli a chance too -- my second thought was that it

23    seemed that a lot of the objections from the third parties

24    related to the raw data files of Dr. Snyder.  And I'm

25    wondering, does it make sense to seal the raw data files of

1     Dr. Snyder, and would that go a long way towards addressing

2     these issues?

3              MR. VANCE:  I don't think that we would have

4     objection to sealing the raw data files.  I think that -- and I

5     don't want to speak for Dr. Snyder, but I think certain of the

6     exhibits are aggregate data from the raw data files, so it

7     really doesn't -- the exhibits themselves don't necessarily

8     require keeping them under seal.

9          Part of the issue here is we can't show the third

10    parties, necessarily, the exhibits because they're

11    confidential.  So some of them don't -- might not have this

12    objection if they could actually see what the exhibits looked

13    like.  But we're not opposed to sealing the raw data files and

14    then taking the individual exhibits on sort of a case-by-case

15    basis to see if we can anonymize them in a way that would

16    satisfy the third parties.

17             THE COURT:  Okay.  Let me hear from Mr. Petrocelli on

18    that.

19             MR. PETROCELLI:  Your Honor, we agree that the raw

20    data files should be sealed.

21             THE COURT:  Okay.  Thank you.

22         So if we extend Exhibit H to publishers and agents and

23    we seal the raw data files, and then we incorporate the process

24    that the government has suggested to deal with things as they

25    come up on a case-by-case basis, with an understanding that

1    nobody has to reveal information they intend to use for

2    impeachment or on cross-examination -- because that would ruin

3    your impeachment or cross-examination.  I wouldn't expect you

4    to do that -- I think that that would go a long way towards

5    addressing these issues.

6           Let me just confirm with the parties.  Do we agree on

7    that approach?  And then I can ask the third parties.

8                MR. PETROCELLI:  If I understand, Your Honor, with

9    respect to the extending of Exhibit H, I think you said it

10   was --

11               THE COURT:  Yes.

12               MR. PETROCELLI:  -- to publishers; right?

13               THE COURT:  Yes.

14               MR. PETROCELLI:  That would be in connection with

15   particular acquisitions, so --

16               THE COURT:  Yes.

17               MR. PETROCELLI:  Okay.  Because publisher names are

18   going to be freely discussed.

19               THE COURT:  Yes.  I mean, I think Exhibit H talks

20   about disclosing identities in connection with financial

21   details, and so it would be in connection with financial

22   details.

23               MR. PETROCELLI:  Yes.  Okay.  That's fine.

24               THE COURT:  Okay.

25               MR. VANCE:  I do want to clarify the same issue.  I

1    mean, the -- the stipulation was designed towards, you know,

2    the book -- individual book acquisition process.  So, you know,

3    we're in agreement there.

4         But to the extent there are charts by the experts that

5    has more generalized financial data of these publishers that's

6    not tied to a specific book acquisition -- for example, there

7    might be a chart that says the 70 publishers that produced data

8    spent X amount on anticipated top sellers -- we wouldn't think

9    that that type of information should be under seal.

10              THE COURT:  Okay.

11              MR. VANCE:  So it's not all --

12              THE COURT:  Well, wouldn't that be subject to your

13   process where you --

14              MR. VANCE:  Yes.

15              THE COURT:  -- would reveal that to the third parties

16   and then they could object, if they want to, about that?

17              MR. VANCE:  Yes.  Absolutely.

18              THE COURT:  Because I would think that aggregated

19   information would not bother them.  I could be wrong.  But they

20   would have an opportunity to address that.

21              MR. VANCE:  Right.  So I just want to make clear that

22   the revision to the stipulation -- extending the stipulation

23   would be more in this specific book acquisition process, that

24   it was meant for -- for the authors and agents, and not a

25   general discussion of financial details.  Not that we're

1    getting into that granular level with these publishers, but

2    that is the extent of the stipulation.

3         THE COURT:  Okay.  So I wonder if -- so that

4    everybody is on the same page -- the parties should meet and

5    confer and do a version of Exhibit H that includes publishers

6    and agents, to the extent that everybody agrees, and also

7    outlines the process that you're going to follow to give them

8    notice of each day's exhibits, and notes the caveat that that

9    won't include impeachment information.

10        And maybe you can meet and confer about what to do about

11   impeachment information that includes identifying information.

12   Maybe we can use a Rosetta stone for that.  I don't know.  But

13   I want the parties to maybe meet and confer and provide this

14   all in writing so that the third parties can all see it.

15        MR. VANCE:  We can do that.

16        THE COURT:  Okay.  Okay.  So having said all of that,

17   I just want to suggest to the third-party representatives --

18   and I'll just note, for the record, I see -- let's see -- 21

19   people on the Zoom who I believe are -- are representatives of

20   third parties who have confidentiality interests in this case.

21   I would suggest that you-all wait and see the new written

22   stipulation about how these are going to be handled, and I'm

23   happy to so order that once everybody agrees on what that is.

24        I think that the process that we've discussed today

25   should protect your interests, especially given that you should

1    be given specific notice about confidential information that is

2    proposed to be used on any given day, and have an opportunity

3    to discuss that with the parties and bring it to my attention,

4    if it is not appropriately dealt with from your perspective.

5         And so I would suggest that you look at what they come

6    up with in writing, first, and then you would have an

7    opportunity to raise additional issues with me, but if there's

8    anybody among the third-party representatives who wish to be

9    heard at this time, I'm happy to hear you.  You can just raise

10   your hand.

11        Okay.  And I see no response.  Thank you.  So I'll --

12   I'll leave it to you to take a look at what the parties come up

13   with in writing, and you'll have an opportunity to raise

14   additional issues with me.  You can always email the chambers,

15   or you can do it through the parties through the process that

16   they've discussed today.

17        Looks like Mr. Mitnick would like to be heard.  Go

18   ahead, Mr. Mitnick.

19        MR. MITNICK:  Thank you, Your Honor.  Joel Mitnick.

20   I represent --

21        THE COURT:  I'm sorry.  Who do you represent?  You

22   cut out.

23        MR. MITNICK:  Sorry.  I represent Macmillan

24   Publishers, and I am affiliated with Cadwalader, Wickersham &

25   Taft.

1        Just a logistical question, Your Honor.  If the Court

2    endorses the 72-hour proposal of the government with counsel

3    making objections to the Court in the morning of the day of

4    testimony, will the Court permit that argument to be made by

5    Zoom, or must counsel attend in Court, which could require

6    multiple trips from wherever counsel happens to be?

7        THE COURT:  Okay.  I would allow you to do that by

8    Zoom or by telephone.

9        MR. MITNICK:  Thank you.

10        THE COURT:  Okay.  Thank you.

11    Anything else from the third-party representatives on

12    Zoom?

13    Okay.  Thank you.  I appreciate you being here today,

14    and I will look forward to hearing from you if you have any

15    other concerns.  You're all excused.  Thank you.

16        MR. MITNICK:  Thank you, Your Honor.

17        THE COURT:  Okay.  So let's move on -- oh, I should,

18    I think, for the record, do a *Hubbard* analysis, because I think

19    what I'm contemplating doing will involve sealing the raw data

20    files, as well as potentially redacting or sealing identifying

21    information in the record.  So I think, for the record, I do

22    need to perform a *Hubbard* analysis and do an on-the-record

23    weighing of the different considerations at issue.

24        So the relevant factors do weigh in favor of sealing

25    evidence that reveals confidential business information of

1    third parties to these proceedings.  I'm referring to

2    information that relates to amounts offered, committed, or paid

3    in connection with the book contract or any specific financial

4    details of an actual book contract or actual auction for a book

5    contract.  I think it's appropriate to seal evidence that

6    reveals the identities of the parties involving -- involved in

7    any such transaction.

8        So the relevant legal standard is as follows:  The

9    starting point in considering whether to seal court records is

10   a strong presumption in favor of public access to judicial

11   proceedings.  The presumption recognizes that the right of

12   public access is a fundamental element of the rule of law,

13   important to maintaining the integrity and legitimacy of an

14   independent judicial branch.

15       Although the presumption is a strong one, it is not

16   absolute, and it may be outweighed in certain cases by

17   competing interests.  And this is especially true where court

18   files might become a vehicle for improper purposes, such as

19   where court files serve as sources of business information that

20   might harm a litigant's competitive standing.  That's *Nixon v.*

21   *Warner Commc'ns, Inc.*, 435 U.S. 589 at 597-98 (1978).

22       So the decision to access is left to the discretion of

23   the trial court, but the D.C. Circuit established a six-factor

24   test in *United States v. Hubbard*, which is at 650 F.2d, 293

25   (D.C. Cir. 1980).

1    And that test requires the Court to weigh the following

2    factors:  First, the need for public access to the documents at

3    issue; second, the extent of previous public access to the

4    documents; third, the fact that someone has objected to

5    disclosure and the identity of that person; fourth, the

6    strength of any property and privacy interests asserted; fifth,

7    the possibility of prejudice to those opposing disclosure; and

8    sixth, the purposes for which the documents were introduced

9    during the judicial proceedings.

10    As for the first *Hubbard* factor, the Court can discern

11    no need for the public to access the specific details of any

12    particular book contract or at least the identities of the

13    parties involved in any given transaction.  As a result, the

14    requests to anonymize or otherwise protect the confidential

15    information of third parties to this case do not gravely impact

16    the public's access to the overall lawsuit, nor does the

17    decision to seal certain evidence that reveals confidential

18    information adversely affect the public's right to public

19    access.

20    The second *Hubbard* factor looks to whether, when, and

21    under what conditions the public has already had access to the

22    records.  The information at issue here has never been made

23    publicly available.  To the contrary, the information at issue

24    is routinely kept secret to avoid competitive injury.

25    The third *Hubbard* factor concerns whether anyone objects

1    and the identity of the objectors, and that weighs strongly in

2    favor of sealing the information because there are numerous

3    third parties who have expressed their concerns and objections

4    to the Court.  This is not their case, and they have provided

5    the information to the parties with the understanding that it

6    would remain confidential.

7         The fourth and fifth *Hubbard* factor is concerning the

8    strength of the interests and possibility of prejudice are

9    often considered together, and they also weigh in favor of

10    limiting access under these circumstances.  The third parties

11    assert a strong interest in maintaining the confidentiality of

12    competitively sensitive and granular information about their

13    bids, offers, and contracts, and they note they will be

14    prejudiced by the disclosure of such information.

15         And, notably, whereas here, a third-party's interest in

16    the confidentiality of its proprietary information is at stake,

17    "Courts commonly permit redaction of that kind of information."

18    That's *MetLife*, 865 F.3d at 671.

19         And, finally, the sixth *Hubbard* factor considers the

20    purpose for which the document is to be introduced.  Here the

21    evidence at issue will be introduced to assess the relevant

22    market at issue and the alleged anticompetitive effects of the

23    proposed merger.  The details of each book contract, however,

24    including the identity of the parties to each transaction, will

25    not be significant in the Court's decision-making.  That's in

1    the Court's view.  All the relevant factors weigh in favor of

2    sealing the confidential business information of third parties

3    to this action, to the extent that it reveals the identities of

4    authors, publishers, and agents involved in individual

5    contracts, negotiations, or auctions.

6         Does anybody want anything in addition on my *Hubbard*

7    factor analysis?  The parties are shaking their heads.

8         Okay.  So thank you.

9         Let's move on, then, to motions *in limine*.  So I issued

10   a minute order on Friday to let the parties know that I was

11   planning to rule on these without oral argument, except for

12   one, and so I would propose just to roll through the five that

13   I'm going to rule on now, and then we'll address the one that I

14   do want to hear some argument on.

15        The first is ECF No. 95.  This is the government's

16   motion *in limine* to preclude evidence of Penguin Random House's

17   announced bidding policy.

18        I may be referring to Penguin Random House as PRH and

19   Simon & Schuster as S&S as I make these rulings.

20        In September of 2021, amid competitive concerns

21   regarding Penguin Random House's acquisition of Simon &

22   Schuster, PRH CEO Markus Dohle announced that PRH imprints and

23   legacy Simon & Schuster imprints will be allowed to bid against

24   one another for the purchase of books if the merger is

25   consummated.  That's the announced bidding policy.  PRH

1    currently lets its imprints bid against one another until the

2    PRH imprints are the only remaining bidders, at which point

3    they stop bidding against each other.  But the new announced

4    policy would let them continue bidding, even after they're the

5    only remaining bidders.

6         The government argues that evidence of PRH's announced

7    bidding policy should be excluded as irrelevant and

8    inadmissible because it's a unilateral, unenforceable promise

9    that does not align with profit-maximizing incentives.  The

10   government argues that the cases cited by defendants to admit

11   evidence of its bidding policy involve enforceable or bilateral

12   agreements.  But the Court has reviewed the cases, and some of

13   them do involve courts, including the District Court for the

14   District of Columbia, considering unenforceable or unilateral

15   agreements on their merits.  So the Court does not think that

16   there's a blanket rule against admitting this type of evidence.

17        And so it comes down to relevance.  The Court concludes

18   that the unenforceability of the bidding policy goes to weight

19   and not admissibility.  It, potentially, has some relevance,

20   and it will, therefore, deny the government's motion to exclude

21   evidence on the announced bidding policy.

22        Number 2, ECF No. 96.  That's government's motion *in*

23   *limine* to exclude the expert testimony from Jennifer Rudolph

24   Walsh.

25        Jennifer Rudolph Walsh is an experienced literary agent

1    who's an expert witness for defendants.  In her report, she

2    criticizes the assumptions made by Dr. Hill in his expert

3    report for the government, claiming that they do not reflect

4    real conditions in the industry.  In addition, she makes

5    various predictions about the effects of the merger, such as

6    that it will have no impact on author advances, the overall

7    health of the industry, or the number of unique books published

8    each year.

9         The government argues in its motion to exclude

10   Ms. Walsh's expert testimony that she is not qualified to

11   criticize Dr. Hill's economic analysis and should not be

12   allowed to provide conclusions about the merger's impact

13   because she's not an economist, has only worked as an agent,

14   and provides no methodologies or references to the record to

15   support her ultimate conclusions.

16        In their opposition, the defendants argue that Ms. Walsh

17   is qualified as an expert because agents oversee and direct the

18   book acquisition process.  She personally has sold or

19   supervised book sales at all advance levels -- including

20   thousands for 250,000 or more -- and she's not providing her

21   own economic analysis but, rather, showing that the premise

22   underlying Dr. Hill's economic analysis do not align with

23   actual industry practices.

24        In its reply the government argues that Ms. Walsh's

25   testimony should be limited to her experience and knowledge of

1    the industry as a fact witness rather than as an expert about

2    legal or economic matters that she's not qualified to discuss.

3          The following are some portions of Ms. Walsh's report

4    that the government argues she is not qualified to testify

5    about.  First, "It is my opinion informed by my 30 years of

6    experience as a top literary agent, that the merger will not

7    adversely impact competition in the acquisition of books by

8    publishers."  That's Exhibit B, the Walsh report at page 3,

9    paragraph 8.

10          Second, she says, "It is my opinion that the merger will

11    not result in fewer books being published.  In my experience,

12    writers write books even if they receive a lower advance than

13    they had hoped or even if there is no publisher for that book.

14    Writing is a creative outlet for authors, and a decrease in the

15    number of publishers in the market will not impact their

16    output."  That's the Walsh report at 36, paragraph 124.

17          And the third example is, "If all of the five -- Big 5

18    publishers closed their doors tomorrow, writers will still

19    write, readers will still read, and the absence of a competitor

20    or competition will have no adverse impact on the industry."

21    That's the Walsh report at page 37, paragraph 125.

22          Federal Rule of Evidence 702 regarding the testimony of

23    expert witnesses provides, quote, a witness who is qualified as

24    an expert by knowledge, skill, experience, training, or

25    education may testify in the form of an opinion or otherwise

1    if:  (a) the expert's scientific, technical, or other

2    specialized knowledge will help the trier of fact to understand

3    the evidence or to determine a fact in issue; (b) the testimony

4    is based on sufficient facts or data; (c) the testimony is the

5    product of reliable principles and methods; and (d) the expert

6    has reliably applied the principles and methods to the facts of

7    the case.

8         The inquiry under 702 is flexible, ultimately concerning

9    the evidentiary relevance and reliability of the principles

10   that underlie a proposed submission.  That's from *Daubert v.*

11   *Merrell Dow Pharmaceuticals*, 509 U.S. 579 at 595 (1993).  The

12   relevant factors in the Court's gatekeeping function under

13   *Daubert*, "depend on the nature of the issue, the expert's

14   particular expertise, and the subject of her testimony."  And

15   that's *Daubert* at 151.

16        If the witness is, "relying solely or primarily on

17   experience, then the witness must explain how that experience

18   leads to the conclusions reached, why that experience is a

19   sufficient basis for the opinion, and how that experience is

20   reliably applied to the facts."

21        That's *Rothe Dev., Inc., v. Dep't of Def.*, 107 F. Supp.

22   3d 183 (D.D.C. 2015).  And that's quoting the Federal Rule of

23   Evidence 702's advisory committee note from 2000.

24        "The trial court's gatekeeping function requires more

25   than simply taking the expert's word for it.  The more

1    subjective and controversial the expert's inquiry, the more

2    likely the testimony should be excluded as unreliable."  That's

3    *Twin Cities Bakery Workers Health & Welfare Fund v. Biovail*

4    *Corp.*, 2005 WL 3675999 at 4.  That's D.C. District Court,

5    March 31st of 2005.

6         So the Court finds that Ms. Walsh is qualified to

7    testify as an expert about industry practices.  Through such

8    testimony, she may challenge the factual premises underlying

9    Dr. Hill's model and its resulting conclusions.  The following

10   cases support this proposition:  In *SR Int'l Bus. Ins. Co. v.*

11   *World Trade Ctr. Props., LLC*.  That's 467 F.3d 107 at 132 to

12   134 (2d Circuit 2006).  An expert was qualified based on

13   31 years of experience in the insurance industry to testify

14   about customs and practices in the insurance industry.

15        In *FTC v. Whole Foods Mkt., Inc.* -- that's 502 F. Supp.

16   2d 1 at 13 (D.D.C. 2007), expert testimony was upheld about the

17   industry, more generally, that did not discuss the facts of the

18   particular case because the state of the industry itself was an

19   important factor in that case.  That case was reversed on other

20   grounds at 533 F.3d 869 (D.C. Cir. 2008).

21        In *Bazarian Int'l Fin. Assocs., LLC v. Desarrollos*

22   *Aerohotelco, C.A.*, 315 F.3d 101 at D.D.C. (2018), an expert's

23   reliance on his extensive experience in the industry was

24   sufficient to support opinions about industry, customs, and

25   standards.

 1          So I think all of these cases support the idea that

 2     Ms. Walsh can testify about industry, customs, and standards

 3     and, thereby, indirectly challenge the conclusions of Dr. Hill

 4     based -- because his assumptions do not match industry reality.

 5          None of the cases cited by defendants, however, supports

 6     allowing Ms. Walsh to testify about more technical areas such

 7     as relevant markets, the competitive effects of the merger, or

 8     predicting what will happen because of this merger.

 9          So the Court finds that Ms. Walsh is not qualified to

10     testify about relevant markets or to opine about the

11     competitive effects of the merger.  That conclusion is

12     supported by two cases that were cited by the government,

13     *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530

14     at 538.  That's from the District of Maryland in 2002.  In that

15     case the District of Maryland held that a proffered expert

16     witness was not qualified to opine on the relevant market

17     because he lacked training or experience in antitrust or

18     economic analysis.  The Court reasoned that general business

19     experience unrelated to antitrust economics does not render a

20     witness qualified to offer an opinion on complicated antitrust

21     issues such as defining relevant markets.

22          And also a second case, *Va. Vermiculite Ltd. v. W.R.*

23     *Grace & Co.-Conn.*  That's 98 F. Supp. 2d 729 at 740, Western

24     District of Virginia from 2000.  In this case, the court

25     declined to qualify a witness as expert in antitrust economics

1    given his lack of antitrust experience and training.  In this

2    case, the Court found that a proffered expert witness was not

3    qualified to conduct antitrust analysis because "He lacked a

4    clear understanding of basic economic principles."

5         So in sum, the Court will grant in part and deny in part

6    the government's motion to preclude Ms. Walsh from testifying

7    as an expert.  Ms. Walsh may testify as an expert about

8    industry practices, but she may not offer opinions about

9    relevant markets or the likely competitive effects of the

10   merger.

11        Third motion, ECF No. 98.  This is defendants' motion

12   *in limine* to strike belated expert opinion applying GUPPI

13   analysis.  The initial expert report by the government's

14   expert, Dr. Hill, offered an opinion on the impact of the

15   merger using a second score auction model.  We'll call that

16   SSA.  The rebuttal by the defendants' expert, Dr. Snyder,

17   criticized the applicability of the SSA model to the publishing

18   industry, and the reply by Dr. Hill reaffirmed the validity of

19   the SSA model by, in part, offering an alternative GUPPI model

20   that arrived at results similar to those reached by the SSA

21   model.

22        The defendants argue that Dr. Hill's use of the GUPPI

23   model and the reply should be excluded as new evidence provided

24   for the first time in a reply.  They argue that it is

25   unreasonably delayed and prejudicial because it should have

1    been included in the initial expert report.  Defendants contend

2    that the reply should be limited to the SSA model, as it was

3    the only methodology employed in the initial expert report and

4    the only methodology criticized in the defendants' rebuttal.

5    The defendants also claim that the GUPPI model's late inclusion

6    in the June 23rd reply did not give them enough time to produce

7    a written report countering it given the August 1st trial date.

8         The government disagrees with defendants on the

9    allowable scope of analysis in a reply.  They argue that a

10   reply can include any material, including new methodologies of

11   analysis that is on the same subject matter raised by the other

12   party and that is used to contradict the other parties'

13   assertions.  Because the GUPPI model is used to confirm the

14   validity of the SSA model that Snyder targets in the rebuttal,

15   the government argues that it concerns the same subject matter

16   and is, thus, properly included in the reply.

17        The government further argues that defendants were able

18   to depose Hill a week before he submitted his reply; that

19   defendants were aware of the existence and workings of the

20   GUPPI model because it was developed by their own economists

21   during the precomplaint investigation; and that the defendants

22   could have used all the time they've spent arguing to exclude

23   the GUPPI model on having Dr. Snyder prepare a written

24   rebuttal.  Defendants received the reply on June 23rd for an

25   August 1st trial date, and defendants note in their motion to

1   strike on page 5, that, "GUPPI is the easiest factor to measure

2   simply and quickly."

3          The case law reviewed by the Court supports the

4   government's position that Dr. Hill's reliance on a new

5   methodology in his reply was permissible under the

6   circumstances.  Those cases include:  *Little v. Washington*

7   *Metro. Area Transit Auth.*, 249 F. Supp. 3d 394 at 416.  That's

8   D.D.C. (2017).  In a discrimination suit, the plaintiffs in

9   that case had an expert, Dr. Farber, who submitted an initial

10  expert report with statistical modeling to show discrimination.

11  This was attacked by defendant's expert in her rebuttal report,

12  but the defense expert did not propose her own model.

13         In reply, the plaintiffs not only had a new methodology,

14  but a whole new expert to employ that new methodology,

15  Dr. Siskin, in order to support the initial report.  The Court

16  allowed this over objection stating, "District courts routinely

17  permit new experts for rebuttal purposes and permit rebuttal

18  experts to use new methodologies to rebut the opinions of the

19  opposing expert."  And that case cited *South Carolina v.*

20  *United States*, No. 12-203, 2012 WL 11922224 at page 2, which is

21  D.D.C., August 15th, 2012.  And also *Scott v. Chipotle Mexican*

22  *Grill, Inc.*, 315 F.R.D. 33.  That's Southern District of

23  New York (2016).  And that case also permitted the use of a new

24  expert and new methodology in rebuttal.

25         The following additional cases stand for the same

1    proposition of allowing new methodologies, analyses, and

2    evidence to be used in an expert's reply: *United States v.*

3    *Philip Morris, USA Inc.*, 2022 Westlaw 1101730, D.D.C.,

4    April 13th, 2022.  And *Allstate Ins. Co. v. Shah*, 2021 WL

5    4555177.  That's District of Nevada, October 5th of 2021.

6         So moving on to the next motion, ECF No. 99.  This is

7    government's motion *in limine* to exclude use of

8    printing-related evidence.  I'm sorry.  Defendants' motion

9    *in limine* to exclude use of printing-related evidence.

10   Defendants move to preclude evidence of the printing

11   capabilities of Bertelsmann and printing market conditions

12   generally because the government did not disclose certain

13   information in its possession regarding a prior transaction in

14   that industry; the proposed merger of Quad/Graphics, Inc. and

15   LSC Communications, Inc., in 2019.  The government says that

16   printing capabilities are undeniably relevant in this case and

17   that it produced all evidence about printing that it gathered

18   to the defendants.

19        The government contends that the alleged dispute is

20   about information in an unrelated antitrust case which the

21   government could not produce due to statutory constraints and a

22   protective order in the other case.

23        The government asserts that it met and conferred with

24   defendants about this evidence and told defendants to seek the

25   information from others who are not so constrained, and the

1  government further notes that defendants never made a motion to

2  compel production of the evidence in question; so the evidence

3  should not be excluded for an alleged discovery violation.

4         The defendants erroneously rely on Rule 37(c) of the

5  Federal Rules of Civil Procedures which provides that if a

6  party fails to provide information or identify a witness as

7  required by Rule 26(a) or (e), the party is not allowed to use

8  that information or witness, unless the failure was

9  substantially justified or is harmless.  That rule, in this

10 Court's view, is not applicable because the government is not

11 trying to admit the information it failed to disclose, and this

12 is not information that was provided or not provided under

13 Rule 26(a) or (e).  Rather, the defendants are complaining of

14 an alleged failure to provide information that they requested

15 during discovery.  That's under Rule 34.  And so the defendants

16 should have made a motion to compel discovery under Rule

17 37(a)(3) when they did not receive the information that they

18 now deem to be important.

19        Rule 37(a)(3) provides that a party seeking discovery

20 may move for an order compelling an answer, designation,

21 production, or inspection.  This motion may be made if a party

22 fails to produce documents as requested under Rule 34.

23        Here, the defendants have not demonstrated how the

24 information about the Quad/Graphics and LSC merger is relevant

25 or why the proposed sanction is proportional or appropriate.

1    In any event, the Court concludes that the defendants may not

2    seek the severe sanction they propose based on an alleged

3    discovery violation that they do not properly litigate.

4    Because defendants never moved to compel the production of the

5    evidence at issue, they're not entitled to ask for sanctions.

6    And so the defendants' motion to exclude evidence of

7    printing-related evidence is denied.

8        Okay.  ECF No. 102 is a sealed motion.  The sealed

9    motion is granted.  The ruling -- this ruling follows from the

10   reasoning and ruling from my previous sealed order, which is

11   ECF No. 84.  Also, the government's theory of relevance is

12   weak, and the evidence at issue is, thus, substantially more

13   prejudicial than probative under Rule 403.  So that motion is

14   granted.

15       Okay.  So that covers all the motions *in limine*, other

16   than the one regarding Dr. Snyder's testimony.  Does anyone

17   want to state anything, for the record, regarding my rulings on

18   the first five motions *in limine*?  Okay.  Both parties are

19   saying no.  Thank you.

20       So let's move on to Dr. Snyder's testimony about

21   efficiencies.  I'm not sure what's the best way to proceed

22   here.  I have some specific questions, but I guess we have time

23   to entertain a little bit of general argument before I get

24   there.  So would you like to present your argument?

25           MR. SCHWARZ:  Good morning, Your Honor.  Mel Schwarz

1    for the United States.  May it please the Court.

2         Defendants' economic expert, Dr. Snyder, has two parts

3    to his testimony, one of the economic parts, which we're not

4    addressing today, and the other are the efficiencies portions,

5    which we are.

6         THE COURT:  Yes.

7         MR. SCHWARZ:  We put aside today the government's

8    view that there is a serious question about whether or not an

9    efficiencies defense exists at all in this case and that --

10   Your Honor is probably familiar with the *United States v.*

11   *Anthem*, in the D.C. Circuit -- and that's a question for

12   another day that we hope we don't have to come to, but we may.

13        THE COURT:  Okay.

14        MR. SCHWARZ:  And this is particularly an issue with

15   respect to the fact that this is a dominant number one position

16   in the publishing industry seeking to buy another major

17   competitor, where there's an even more serious question whether

18   efficiencies are relevant at all.  But let's move on from that.

19   I didn't want to forego that issue.

20        There are three problems with Dr. Snyder's testimony.

21   The one -- and the most important part, I think, in terms of

22   getting your -- easiest to get our arms around, is Dr. Snyder

23   admits in -- twice in his report -- there's no question about

24   it.  We're just going to put up the *H&R Block* decision.  So

25   it's nothing terribly controversial, but I wanted to refer to

1    it, make it easier to see, and easier for me to read, frankly.

2    But without -- without getting -- before I get to that, for one

3    second, Your Honor, the -- I wanted to note that he admits that

4    he does not verify any -- any -- of the quantification of any

5    of these things.  And that, Your Honor, is fatal -- fatality,

6    if you will, number one, as judge chief -- now Chief Judge --

7    then Judge Howell -- said in *H&R Block*.  After quoting --

8         THE REPORTER:  Hold on.  Hold on, Mr. Schwarz.  Do

9    you mind using -- do you mind using the mic?

10        MR. SCHWARZ:  In other words, a cognizable efficiency

11   claim must represent a type of cost saving that could not be

12   achieved without the merger, and the estimate of the predicted

13   saving must be reasonably verified by an independent party.

14        THE COURT:  Yes.

15        MR. SCHWARZ:  That, in particular, has been followed

16   by three other judges in three other antitrust cases in this

17   court, Your Honor:  Judge Bates, Judge Mehta, and Judge

18   Chutkan.  And the cases that we've cited -- I won't go through

19   them all.  But that is -- that is totally established law,

20   quite familiar to defendants before this case arose.

21        There's a reason for this.  First of all, because of --

22   the efficiencies defense is so questionable to begin with, we

23   need to be sure what we're doing.  And you -- as Judge Howell

24   says -- Chief Judge Howell -- we need to -- we can't rely

25   merely on management; because at the end of the day, if we did,

1    Your Honor would be having a boatload of cases here in which

2    they will come up with the numbers they need to justify their

3    merger.  So we need an independent expert who doesn't have a

4    stake in the venture to discuss that.

5          Even in those cases, Your Honor, there is -- there's

6    no -- nothing in this district that I know of, and literally

7    anywhere, where anybody approves an otherwise anticompetitive

8    merger because of even verifiable efficiencies.

9          All right.  Secondly -- the second problem is that

10   there -- he -- the model that he -- Dr. Snyder relies on, which

11   he cleverly calls an efficiencies model, which no one else ever

12   before his -- that has ever called that the efficiencies model.

13   The parties -- the people who wrote it called it an investment

14   model.  But it was dated November 2020; presented to the

15   Bertelsmann board as the justification for the price being

16   paid.  That has been updated many times by PRH -- if I may call

17   them PRH -- itself; and even by the lawyers in this case, in

18   submissions before this case started, to the DOJ.  None of

19   that -- none of that is included in his report.  It is

20   completely outdated and unreliable.

21         The third problem, Your Honor, is that Dr. Snyder comes

22   up with a ratio, which I won't get into the specifics of,

23   because I think there's some confidentiality issue, but it's a

24   ratio of advances to net revenues.  It's a ratio that, to our

25   knowledge, has no basis in economics.  And Dr. Snyder certainly

1    couldn't come up with any citations of anything like that.  And

2    it makes no sense, just as a matter of simple economics.  The

3    price of an input has its own competitive issues, has nothing

4    to do with the net revenues of a company, which has all sorts

5    of other factors related to it.

6        So -- but he -- he says for three years, there's a

7    stable ratio there and that explains why -- and, again, I won't

8    repeat the number, but a substantial portion of the cost

9    savings calculated by an internal person would thereby get you

10   to a significant efficiencies number that would be passed on.

11           THE COURT:  To others.

12           MR. SCHWARZ:  To others.  Well, let's -- we'll come

13   back to others, because that's another problem, Your Honor.

14           THE COURT:  Okay.

15           MR. SCHWARZ:  And -- so that ratio is not stable

16   after the merger of Penguin Random House in 2013.  It starts to

17   go down.  It's flat for the three years Dr. Snyder

18   cherry-picks.  And then it goes down again.  So, in fact, it's

19   a lot lower than it was.  The point being, it's not stable.

20       So I think we've largely covered going back, then, to

21   each of these three problems.  We've covered number one.  I

22   think it's fairly simple and straightforward.  The merger

23   guidelines call for verification.  The defendants' response

24   seems to be something like, well, as long as somebody can

25   verify them.  It's not the government.  I think they're saying

1    Your Honor has to do it.  That's exactly what every judge in

2    this district has rejected.  No, I need somebody independent to

3    verify, explain it.  And even then, it's a very difficult and

4    onerous thing to do.

5            THE COURT:  Well, the word is verifiable.

6            MR. SCHWARZ:  The verified [sic] is verifiable.

7    Although, as Your Honor can see, the -- there is an interesting

8    semantic question, but I view it as it's able to be verified,

9    and the question is by whom.

10            THE COURT:  Yes.

11            MR. SCHWARZ:  And every judge who's faced that issue

12    in this district has said it has to be an independent party.

13    It's the defendants' burden to prove.  Obviously, the

14    government did not accept those efficiencies.  We wouldn't be

15    here if we did, and that leaves it between Your Honor and some

16    witnesses.

17            THE COURT:  Yes.

18            MR. SCHWARZ:  And I -- I point you to Chief Judge

19    Howell's view of this, again, adopted by everyone else who's

20    looked at it.

21            THE COURT:  I understand.

22            MR. SCHWARZ:  That's not enough.

23            THE COURT:  So I do think that the government's

24    arguments have some force here, which is why this is the motion

25    that I wanted to hear some oral argument on.

1      But there is the issue of whether I should rule on this

2   now or wait to actually hear the testimony from the experts;

3   and it seems that perhaps it would be more prudent given that

4   this is kind of a big ruling to hear the testimony of the

5   experts before deciding this.  And what is your response to

6   that?

7      MR. SCHWARZ:  Indeed, that was going to be my last

8   point.  So I'll get to it right now.

9      The answer is, Your Honor, defendants have caused the

10  government and this Court to operate on what we consider to be

11  a quite expedited time schedule.  We also have a chess clock

12  now where we have 38 hours to present our case and bear the

13  burden of proof.

14     We know where this is going to end up.  I mean, perhaps

15  I'm overstating it, but I think the path is clear.  There is

16  no -- I'm not dealing in disputed facts here.  Everything I've

17  told Your Honor is based on an undisputed fact.  There --

18  Dr. Snyder testified in his deposition, as well as in his

19  report, that he didn't verify any of the numbers here.  That is

20  the end of the story, as far as we're concerned, as to his

21  testimony.

22     So is Your Honor going to hear what probably is -- I'm

23  just guesstimating, you're going to have to hear Dr. Snyder's

24  testimony about this, the cross-examination of that; I believe

25  two of the PRH's witnesses; then our rebuttal expert.  We're

 1   going to spend a significant chunk of time on this case.  And

 2   then Your Honor is going to have to spend a significant number

 3   of -- amount of time, unless you just want to deal with it this

 4   way, dealing with efficiencies, which are not going to make

 5   this case, Your Honor.

 6        I don't think there's any question about that.  It's not

 7   going to make this case happen.  There is just not enough

 8   evidence.  So it's time to -- to cut it off now so that we can

 9   focus on what is really going to matter in this case, which

10   Your Honor has limited time to deal with after we're done.

11        THE COURT:  Thank you.

12        So my thought in response to what you just said is that

13   we could, when we get to this part of the trial, require the

14   defendants to focus, first, on the issue of verification, and

15   we could make a ruling based on that before we get into the

16   rest of it.

17        MR. SCHWARZ:  Well, that would -- that would

18   certainly be preferred to anything more broad than that.

19   I -- I would say it doesn't save us from having to prepare for

20   the entire cross-examination.

21        By the way, it may also deal -- help -- not help us deal

22   with -- unless it comes -- they come later.  There are --

23   there's Mr. Sansigre, the author of the model on which

24   Dr. Snyder is basing his testimony.  I believe he may come

25   first, if I remember right.  And then there's a Mr. Malaviya,

1    who is the COO of PRH, and I -- I suspect he's going to talk

2    about this issue as well.

3         If they come first, we will have to cross-examine them

4    on that issue as well.  I don't know if Your Honor wants to

5    hear all that; that -- that will come first.

6         THE COURT:  To be honest, like, I don't think the

7    record is very clear about how Mr. Sansigre did this.  I know

8    your theory is that he kind of pulled it out of his head, but

9    there is a -- and notably, I think, that the response from

10   Dr. Snyder is kind of vague.  It was, you know, about exactly

11   where these numbers came from, and I'm kind of interested in

12   that.  And the record doesn't reflect it in the reports.  Your

13   position is probably if it's not in the reports, they should

14   lose this motion.

15        MR. SCHWARZ:  Yes.

16        THE COURT:  But I hesitate to make such a

17   consequential ruling without hearing some evidence.

18        MR. SCHWARZ:  Could -- Your Honor, could we deal at

19   least with the verification issue before Mr. Sansigre

20   testifies, or -- or do you -- I don't know if you want to hear

21   him first.  I mean, that will be the other question, in my

22   mind.

23        THE COURT:  I'm sorry.  So what are you proposing;

24   that Dr. Snyder should testify about verification before

25   Sansigre testifies about what the numbers are?

1          MR. SCHWARZ:  Yes, Your Honor.  Maybe we can do it --

2     I don't know.  I don't know which way -- if Your Honor is

3     interested in Mr. Sansigre, let's do him first.

4          THE COURT:  Okay.  Let me hear from defendants.

5          MR. SCHWARZ:  Okay.

6          THE COURT:  Thank you.

7          MR. FRACKMAN:  Good morning, Your Honor.  Andrew

8     Frackman for defendants.

9          THE COURT:  Good morning, Mr. Frackman.

10          MR. FRACKMAN:  Pleasure to be here.  Pleasure to be

11     in person.

12          THE COURT:  Yes.

13          MR. FRACKMAN:  I don't agree with anything that

14     Mr. Schwarz said, as the Court might expect.  He cites and the

15     government cites no case where a court on a *Daubert* motion

16     excluded the defendants' proffer of efficiencies evidence.  All

17     of these cases -- *H&R Block* -- was -- were on the merits --

18     *Cisco* -- on the merits after a full trial, after all the

19     evidence was heard, Point 1.

20          Point 2, the Court correctly corrected Mr. Schwarz.  The

21     test is not that it -- the efficiencies claimed have to be

22     verified.  They have to be verifiable.  That is what the

23     Department of Justice itself says.  That is what all of the

24     cases say.

25          And why is that?  It's because when you're in court, as

1    we are now, we're not before the department -- we have to

2    prove -- we have to present evidence of the reliability of the

3    efficiencies we claim.  They have -- we have to present

4    evidence that they're merger specific; that they're not

5    fantasy.  Those are evidentiary issues that the Court has to

6    make findings on.  The department is no longer making findings

7    on this.  The Court has to make a finding with respect to the

8    substantiation of any efficiencies claimed.

9          THE COURT:  But do you agree that it's your burden to

10   substantiate?

11         MR. FRACKMAN:  It's our burden to present evidence.

12   I should say that efficiencies -- we can dispute the cases are,

13   I would say, not totally clear with respect to whether

14   efficiencies can be a separate defense.  But they all -- in

15   this district, they all say the same thing; that they are

16   relevant to the evaluation of the government's claim of

17   competitive effects, which the government always has the burden

18   of proof on.

19         We, of course -- if we're claiming that -- that

20   offsetting efficiencies exist, that we have to present the

21   evidence, that that evidence has to be persuasive.  We have to

22   meet -- we have to show that those efficiencies are more likely

23   than not or reasonably likely to occur.

24         THE COURT:  Thank you.  But if it's your burden to

25   substantiate and to show that it's verifiable, doesn't that

1    imply that you have to show that it's verifiable, which --

2              MR. FRACKMAN:  Yes.

3              THE COURT:  What Mr. Schwarz said was verified by

4    who.

5              MR. FRACKMAN:  Yes.  So that --

6              THE COURT:  What's your view of that?  You think I

7    have to verify this --

8              MR. FRACKMAN:  That is a --

9              THE COURT:  -- or who has to do this?

10             MR. FRACKMAN:  Sorry.  I didn't mean to interrupt,

11   Your Honor.

12            That is a very fair question, and I think it's

13   worthwhile.  If I could take a couple of minutes to provide a

14   little bit of context as to how this evidence is, in fact,

15   going to come in at trial because -- and we take our share of

16   the blame on this.  The briefing was not crystal clear on what

17   is actually going to happen next week or the week after when

18   we're in court.  So if I could take a couple of minutes, I

19   think it will be helpful to the Court.

20            At the outset, of course, we will show there's no harm,

21   there's no competitive harm, resulting from the transaction.

22   That's long before we get to efficiencies.  We're going to

23   contest the relevant market.  We're going to contest Dr. Hill's

24   estimate of harm.

25            But in addition, we are going to present evidence of

1    efficiencies flowing from the transaction.  And as the Court

2    can assume, reasonably assume, from a $2.2 billion acquisition,

3    there are some efficiencies.  We certainly believe the evidence

4    will show there are substantial efficiencies.  The starting

5    place for efficiencies evidence is not Professor Snyder.  It's

6    the testimony of the Penguin Random House executives who spent

7    hundreds of hours analyzing the proposed acquisition and

8    developing a rigorous and robust model that projects the

9    efficiencies flowing from the acquisition.

10          Mr. Sansigre is the principal author of that model.

11   This is not some fly-by-night effort.  Mr. Sansigre has

12   analyzed over 200 M&A transactions, over a hundred in the

13   publishing industry, and has brought to this model, this

14   projection of the efficiencies, the learning of two-dozen

15   publishing acquisitions that he led the analysis of and that

16   Penguin Random House has closed in the last few years.

17          In every one of those cases, he used a model similar to

18   this one.  In every one of those cases, Penguin -- well, with

19   the exception of perhaps one -- Penguin Random House ultimately

20   outperformed the projections in the model.  This is a proven,

21   established, real-world model.  And, actually, the guidelines

22   say that the actual work, business work, is more reliable, more

23   persuasive than something done just for litigation.

24          THE COURT:  Let me ask --

25          MR. FRACKMAN:  That goes to weight.  That goes to

1    credibility.

2         THE COURT:  Let me ask you about this, Mr. Frackman,

3    because what it appears happened is that Mr. Sansigre, who does

4    have experience in mergers and looked at prior mergers to see

5    what kind of efficiencies happened in the past, just based on

6    his experience in looking at this, came up with numbers.  And

7    on the one hand, he's somebody with expertise and did look at

8    some prior transactions.  So these numbers are not completely

9    random.

10         MR. FRACKMAN:  They're certainly not.

11         THE COURT:  But at the same time, they are his

12    subjective thoughts as to what the efficiencies might be, and

13    you kind of try to dress it up and say, well, he ran it by

14    Mr. Dohle and other people, you know.  But at the end of the

15    day, they're hard-coded percentages that he just assigned to

16    different categories.

17         That seems to be what the government is saying.  And in

18    my review of your expert's report and your briefing, I don't

19    see you denying that.  I see you, instead, trying to say, but

20    it's okay because he was experienced.  And I don't know how

21    that's verifiable -- verified or verifiable, if it's just --

22    came out of his head.

23         MR. FRACKMAN:  So the Court will hear from

24    Mr. Sansigre.  The Court will see his model in action.  The

25    Court will also hear from Mr. Malaviya who provides

1    confirmation and input for some of the numbers that are used in

2    the model.  The Court will hear how the experience of the prior

3    transactions, including the 2013 acquisition of Penguin by

4    Random House -- or merger with Random House, informs the

5    accuracy of the assumptions underlying the model.

6        That is, we submit, the best evidence of the likely

7    efficiencies flowing from the transaction, and sufficient for

8    the Court to make findings as to whether they are reliable and

9    reasonable and that the claimed output of that model, the

10    efficiencies, are reasonably -- are -- are -- that we've

11    satisfied whatever burden we might have to show that those

12    results are more likely than not.  They are not all hard-coded

13    numbers that Mr. Sansigre made up.  But, more importantly, the

14    Court needs to hear from Mr. Sansigre to make that evaluation.

15        So that's --

16        THE COURT:  One other question for you, Mr. Frackman.

17    And I'm sorry to interrupt you.

18        MR. FRACKMAN:  Yes.

19        THE COURT:  Ms. Hammer includes a chart in her expert

20    report.  It was at page 33 of her expert report, which shows

21    the November 2020 projected efficiencies, and then, like, two

22    other iterations of the same model, and the numbers are

23    sometimes wildly different.  Doesn't that render this

24    unreliable under Rule 702?

25        MR. FRACKMAN:  So, of course, that also goes to

1    weight and reliability.  It's not -- it's not something that

2    the Court can evaluate today, but I will make a little proffer

3    of what the evidence is going to show on this score.

4         The 2020 -- November 2020 model, which was a result of

5    hundreds of hours of work by Mr. Sansigre and his team, after

6    consultation with Simon & Schuster, the input of the due

7    diligence process, was the -- was vetted by Bertelsmann before

8    Bertelsmann approved the merger.  So it isn't just

9    Mr. Sansigre.  It's Mr. Sansigre, plus review and vetting by a

10   separate -- actually, two separate teams at Bertelsmann; the

11   Bertelsmann M&A team --

12             THE COURT:  That doesn't make it verifiable, though.

13             MR. FRACKMAN:  Well, I'm getting to that.

14             THE COURT:  Okay.

15             MR. FRACKMAN:  I'm going to go the back way.  Okay?

16             THE COURT:  Okay.

17             MR. FRACKMAN:  So it is a live model; that is, if

18   information changes over time, you can put that -- some of that

19   information into this massive Excel spreadsheet that the Court

20   will see, and it changes some of the output of that Excel

21   spreadsheet.

22        That was done from time to time.  It was done in

23   June 2021.  It was done again in January 2022.  Which are the

24   two subsequent -- I won't -- iterations.  They were not

25   official versions of the model.  They were just iterations that

1    were done at that particular point in time.  If we did it

2    today, it could be a little bit different than Mr. Sansigre

3    did.

4            There's a question as to which one is the best to use,

5    maybe.  That's something we can argue about.  We believe that

6    the November 2021, which was vetted by Bertelsmann and which

7    was the basis of the approval and the purchase -- the

8    transaction price, is the most reliable, and that's why

9    Professor Snyder also looked to that one.

10           THE COURT:  Why is it more reliable than things that

11   happened with more information later?

12           MR. FRACKMAN:  Yeah.  That's a perfectly -- that's a

13   perfectly fair question.  The bottom-line is the differences

14   between the total efficiencies in the official model -- the

15   official efficiency model in 2020 and the subsequent iterations

16   are immaterial to the total claimed efficiencies.  And even

17   if --

18           THE COURT:  I understand that.  I know this is a

19   point of contention between the parties because the horizontal

20   merger guidelines say you have to look at each efficiency, if

21   you can't just compare the bottom-line and say they're similar,

22   whether significant differences --

23           MR. FRACKMAN:  I don't think the Court, after hearing

24   Mr. Sansigre explain the differences, will conclude that they

25   are significant with respect to the ultimate finding that the

1    Court has to make.

2         THE COURT:  The question is whether it's the ultimate

3    finding that's relevant for each individual efficiency, and I

4    read the horizontal merger guidelines to seem to require

5    looking at each efficiency separately.

6         MR. FRACKMAN:  It -- it may be, Your Honor, that the

7    government, when it does its internal review at the Department

8    of Justice, approaches it that way.  I don't think that is

9    necessarily the way a court will review it, but even if the

10   Court were to approach it on an item-by-item basis, there will

11   be more than sufficient efficiencies in this case to make --

12   reliable efficiencies for the Court to make the finding that --

13   that we have the burden of.

14        I should point out, why is the -- why is the Department

15   of Justice so fixated on what is really almost a summary

16   judgment motion, a legal motion at this point in time?  It's

17   because their claim -- once you get past their contrived

18   limited market, once you get past Mr. -- Dr. Hill's model, only

19   shows $29 million of harm to authors.  Our efficiencies dwarfs

20   that, severalfold, both in an absolute sense and in the part

21   that Professor Snyder will testify flows through to the authors

22   themselves.

23        So they recognize -- in most cases, although

24   efficiencies is often referred to in mergers, it's a sideshow

25   because the claimed competitive harm is enormous.  The

1    efficiencies are small.  It doesn't offset.

2         But here, this is -- this is a very unusual case.  The

3    claimed harm is minuscule, $29 million a year.  The claimed

4    efficiencies are very huge.  Even if the Court were to make

5    findings that not all of those claimed efficiencies -- that we

6    haven't met our burden with respect to all of those claimed

7    efficiencies, there are more than sufficient efficiencies --

8    sufficient efficiencies for the Court to find that will

9    outweigh the $29 million a year of alleged harm.

10         This is just so inappropriate for a *Daubert* motion

11    without hearing from the witnesses.  And their big gripe is

12    that, I think -- Mr. Schwarz said it again this morning -- that

13    Professor Snyder did not verify the numbers.  That is not --

14    the law does not require that.  They have to be verifiable.  He

15    did review the model.  He will opine that the approach taken by

16    Mr. Sansigre is a reasonable one that is consistent with

17    normative M&A analysis, normative economic principles.  It's

18    not something made up by some junior analyst.

19         THE COURT:  So who's supposed to do the verifying, in

20    your view?

21         MR. FRACKMAN:  Who's supposed to?

22         THE COURT:  Do the verifying.

23         MR. FRACKMAN:  The Court has to find that the

24    alleged -- we've met our burden on the alleged efficiencies;

25    that they're reasonable; that they're reasonably likely to

1    occur -- or more likely to occur than not; that they're merger

2    specific and they don't --

3            THE COURT:  Then who does the verifying?  Because I'm

4    focused on that element of the overall analysis.

5            MR. FRACKMAN:  It's like a damages claim, Your Honor.

6            THE COURT:  I'm supposed to be verifying?

7            MR. FRACKMAN:  The Court --

8            THE COURT:  With no expert having done the verifying,

9    I'm supposed to do it?

10            MR. FRACKMAN:  Well, so what are we actually talking

11    about?  You will hear -- the Court will hear from the witness

12    who did the analytical work.  They will cross-examine

13    Mr. Sansigre.  Ms. Hammer will criticize Mr. Sansigre.  The

14    Court will be able to make a reasoned judgment as to whether

15    taking all of that evidence into account, it is more likely

16    than not that the efficiencies that Mr. Sansigre has projected

17    will occur.  It sounds --

18            THE COURT:  That's a different issue than --

19            MR. FRACKMAN:  -- daunting -- it -- excuse me?

20            THE COURT:  What you're describing is different from

21    verifying the actual numbers, which seems to be what the

22    horizontal merger guidelines and the case law contemplates,

23    verifying, verifiable.  You're saying that it has to be

24    verifiable.  But if you have the burden, why is it that I have

25    to figure -- verify this?  Why isn't it that you didn't have an

1    expert do so?  Why didn't Dr. Snyder verify this?  I guess

2    that's the question.  Why didn't he?

3            MR. FRACKMAN:  One approach could be to have had an

4    expert come in and try to redo Mr. Sansigre's efficiencies

5    model.  That is --

6            THE COURT:  Just verify it, which is what the law

7    requires.

8            MR. FRACKMAN:  He does verify it in the sense that he

9    approves the methodology.  He approves the approach.  He says

10   it's reasonable.  He says it's consistent with economic

11   normative analyses.

12           THE COURT:  He does it on a very general broad-brush

13   basis, but not looking closely at the numbers.

14           MR. FRACKMAN:  He does not do it on a line-by-line

15   basis.  There's no dispute about that.  There's no case that

16   says that's required.

17           THE COURT:  Well, the horizontal merger guidelines,

18   you have to look at each efficiency and determine whether it's

19   verifiable.  And I guess I'm open to that, but I'm a little put

20   off by the idea that I'm the one who's supposed to be verifying

21   here when I don't have expertise in this.

22           MR. FRACKMAN:  Your Honor, I think the Court, when it

23   hears the evidence, will see the common sense of many of the

24   alleged efficiencies.  Let me just give a few examples.

25           THE COURT:  You know what?  Let's not do that.  Let's

1    talk about -- so I'm inclined not to rule as I'm sitting here

2    right now on this because I think it's a consequential issue,

3    and I don't have the time, I think, to give it the sort of

4    consideration that it deserves.

5         However, I am interested in how we can shape the

6    presentation of this evidence to, first, address verifiability,

7    verification, and potentially not need to get into additional

8    testimony about efficiencies, if you can't meet that threshold.

9    And maybe that's something that the parties can meet and confer

10   on.

11        But like I -- I'm sensitive to the positions of each

12   side.  The government is saying, well, we don't want to waste a

13   lot of our time on our chess clock dealing with something that

14   we are obviously going to win.  We can use our time to present

15   our case in other ways; and you saying, well, you need to hear

16   the testimony of the witnesses before you rule on this, like

17   don't do it on a cold record.

18        I will say that my review of the expert reports and the

19   evidence on this leaves me a little skeptical about what you're

20   telling me.  But I am willing to hear the testimony from

21   Dr. Snyder and Mr. Sansigre to figure out if this is

22   verifiable.  And I'm still interested in, like, who's supposed

23   to do the verifying.  I'm not convinced that it should be me,

24   but I'm willing to hear more on that.

25        I think you should have more time to present this, but I

1    do want to do it in a way that's efficient and cognizant of the

2    idea that if you can't get past this one hurdle, I don't think

3    we need to get into the rest of this because I think it will

4    burn a lot of trial time if we go through the entire

5    efficiencies analysis and the ratio and all of that stuff.

6             MR. FRACKMAN:  Well, the pass-through analysis is

7    something completely different.

8             THE COURT:  I know.  And we don't even need to get

9    there, if you're not verified; right?

10            MR. FRACKMAN:  Well, Your Honor --

11            THE COURT:  If your data is not verifiable.

12            MR. FRACKMAN:  Yeah.  I would like to say a couple of

13   things on that point.  First of all, they can cite no case

14   where the Court has refused to let the parties, the defendants,

15   present efficiencies evidence, regardless of the ultimate

16   finding as to whether it was --

17            THE COURT:  Mr. Frackman, I just said I'm going to

18   let you present efficiencies evidence.  So why are you arguing

19   that?

20            MR. FRACKMAN:  So I'm just saying, the second point

21   is, this is -- this question of what the standard is, whether

22   it's verifiable or who has to verify it, it's basically a legal

23   argument that they are making in a case where the parties

24   stipulated and the pretrial order says there are going to be no

25   dispositive motions.  This is something that --

1          THE COURT:  This is not a dispositive motion.

2          MR. FRACKMAN:  Well...

3          THE COURT:  You're losing me here, Mr. Frackman.

4     This is not a dispositive motion.

5          MR. FRACKMAN:  Whether or not the --

6          THE COURT:  Here's what I see.  This is how I look at

7     this.  Put very simply, they're saying that the inputs in this

8     analysis are junky.

9          MR. FRACKMAN:  Are?

10         THE COURT:  They're junky.  They're not verifiable.

11    There's somebody sitting at his desk pulling numbers out of his

12    head.  He's very experienced, but he's pulling numbers out of

13    his head.  That's not verifiable, it's not verified, and it's

14    not reliable under Rule 702.

15         And you're saying, listen to the evidence first before

16    you decide that.  But the reason this particular motion gave me

17    pause is when I look at your briefing and I look at

18    Dr. Snyder's report, nobody is saying, oh, no, that's not what

19    happened.  I think that is what happened; that Mr. Sansigre

20    pulled these numbers out of his head based on a lot of

21    experience and taking into account prior merger transactions

22    and efficiencies from those transactions, but not applying that

23    information in a systematic or data-driven way.  Okay?

24         And so the reason this gave me pause is because just

25    looking at the Rule 702 standards and seeing that the

1    horizontal merger guidelines require verifiable -- whether you

2    called it verified or verifiable -- I don't know that this

3    meets the test.

4            MR. FRACKMAN:  Well, I think --

5            THE COURT:  So I'm entertaining the motion because I

6    think it -- it's potentially meritorious; but given that this

7    is a bench trial and we have more, I guess, leeway in terms of

8    *Daubert* motions and things of this nature, I think I should

9    hear some of this testimony.  So now I'm just at, is there a

10   way to efficiently present this so that we don't have to hear

11   evidence if I don't need to get there, because we can't even

12   get past verifiable.  And you don't need to answer me now.  I'm

13   thinking maybe the parties should meet and confer on that.

14           MR. FRACKMAN:  We're happy to consider it.  I think

15   the Court will hear Mr. Sansigre, and the observations of the

16   Court, based on the papers, will be changed by Mr. Sansigre's

17   testimony.  These are not casual numbers pulled out of a hat.

18   They're not made up.  They're grounded in fact, experience,

19   analysis, the due diligence documents.  Mr. Sansigre needs to

20   testify in order for the Court to be able to evaluate that.

21           THE COURT:  Okay.

22           MR. FRACKMAN:  I don't see any way around that.

23           THE COURT:  That's fine.  Let's make sure that we

24   present the evidence in a way that I can address this issue

25   first without having to get into other things that we might not

1    need to get into if this is dispositive of this particular

2    analysis.

3              MR. FRACKMAN:  Mr. Sansigre will go before

4    Professor Snyder, for whatever that's worth.

5              THE COURT:  Okay.  That's fine.  Thank you.

6              MR. SCHWARZ:  Your Honor, if you give me one minute

7    to correct a couple items that have been said here.  I will not

8    take long.

9              THE COURT:  Okay.

10             MR. SCHWARZ:  You clearly understand the issue.

11         In the merger guidelines, we talk about verifiable all

12   the time.  It says -- and I think it's the -- one, two,

13   three -- fifth paragraph of -- of Section 10.  Cognitive

14   efficiencies are merger-specific efficiencies that have been

15   verified and do not arise from anticompetitive reduction in

16   output, et cetera.

17         So it's not just -- that's not the only word here.

18   Somebody needs to verify these items, and I would also note,

19   Your Honor, some of these cases, not -- McKinsey was involved

20   in assisting -- I believe it was one of the health -- the

21   insur- -- I can't remember if it's *Aetna* or *Anthem*, but one of

22   the two district court trials.  The court rejected, even with

23   McKinsey adding things to the analysis, and required a further

24   independent analysis.

25             THE COURT:  No, I understand that.

1          MR. SCHWARZ:  And, likewise, it's -- the reason why

2     we're here is because we know that -- based on -- I'm not

3     making this up.  It's four decisions by four courts in this

4     district that an independent analysis is required.

5     Mr. Sansigre is not independent, can't supply.  And no one else

6     is doing it here.  Dr. Snyder, I will give him credit for this,

7     he twice says it in the first report, sections -- paragraph 17

8     and 61 -- that he did not verify any of these numbers.

9          THE COURT:  Okay.

10         MR. SCHWARZ:  It should be the end of this

11    efficiencies defense, as far as we're concerned.

12         THE COURT:  No, I understand that, but I want to

13    hear --

14         MR. SCHWARZ:  And beyond that, I just want to --

15    don't want it left it unsaid that this $29 million number is --

16    gets into Your Honor's head as our number.  That is not an

17    accurate statement of all the damage that will be done to this

18    market.

19         THE COURT:  Okay.

20         MR. SCHWARZ:  With that, I'll sit down.  Thank you

21    very much.

22         THE COURT:  So I'm going to deny the motion to

23    preclude the efficiencies evidence with the understanding that

24    the parties are going to meet and confer on whether there's a

25    way to efficiently present evidence of the efficiencies

 1    analysis that allows me to, first, resolve the issue of whether

 2    it's verified or verifiable.  And with the understanding if I

 3    find it's not, we don't need to get into all the rest of the

 4    testimony on this issue because that will save us some time.

 5         All right.  So I think that takes care of the motions *in*

 6    *limine*.  Anything else in the motions *in limine* before we move

 7    on?

 8         Okay.  Now let's talk about trial logistics and

 9    procedures.  I had a look at the parties' joint pretrial

10    statement, and I just had some questions and thoughts to share.

11         So I take the bench promptly, and we're going to start

12    promptly at 9:30 during the trial.  We'll try to take a break

13    after about an hour and a half.  There will be a midmorning

14    break and midafternoon break.  After about an hour and a half,

15    hour and 45 minutes, we'll take a break.  We'll take a lunch

16    break around 12:45 or 1:00 for an hour.  In the afternoon

17    we'll, again, sit for an hour and a half, 45 minutes, take a

18    break.  And we'll end by 5:00 each day.

19         When you prepare your opening statements, you can assume

20    that I've read your pretrial statements.  So you don't need to

21    get into all the detail.

22         And I want to ask the parties about closing arguments,

23    because I notice in your pretrial statement you don't want that

24    on the chess clock.  So what are the parties considering with

25    respect to closing arguments, how long that's going to take,

1    and why is it not on the chess clock?

2         MR. READ:  Your Honor, we did not put it on the chess

3    clock because we need the 38 hours to get our case in.  But we

4    think we can do the closing -- I haven't talked with Dan

5    Petrocelli about this -- with an hour each side or an hour and

6    a half each side.  So I don't think it'll be a long amount of

7    time.

8         THE COURT:  Okay.

9         MR. READ:  Our thought had been the closing argument

10   would be the 19th, that Friday, but I just wanted to clarify

11   that with you, what your expectation was.

12        THE COURT:  I'd have to take a look at the calendar,

13   but you want to do it on the Friday, the 19th?

14        MR. READ:  Yeah.  That had been our thought.

15        THE COURT:  Okay.  There's the issue of the timing

16   post-trial briefing that was proposed, and I'm going to adopt

17   that.  I thank the parties for cutting down the time.  So I'll

18   adopt the post-trial briefing schedule.  That was in the joint

19   pretrial statement.  So proposed findings filed 12 days after

20   the end of trial, no later than August 31st.  Objections, seven

21   days after that, and no later than September 7th.

22        Okay.  All right.  Any other trial logistics or

23   procedural issues that the parties want to discuss?

24        MR. PETROCELLI:  Not from us, Your Honor.

25        THE COURT:  Thank you.

1          MR. READ:  I will just note, both sides have agreed

2     to drop a few witnesses that are in the pretrial statement.  I

3     don't know if Your Honor wants to keep track of that, but it

4     will be a slightly shorter list than what Your Honor has.

5          THE COURT:  Are you going to file an amended list, or

6     do you want to just tell me on the record?

7          MR. READ:  Let me grab it and tell you.

8          THE COURT:  Okay.

9          MR. READ:  I apologize, Your Honor.  I should have

10    had this handy.

11         THE COURT:  That's okay.

12         MR. READ:  On the defendants' side, they will drop

13    Joy Harris, who's currently a will-call.  That's No. 7 on their

14    side.  They will drop Chris Parris-Lamb, No. 9 on their side.

15    The 14th witness on their side, Jon Anderson, they've agreed to

16    drop.  And the 15th witness on their list, William Thomas, they

17    have agreed to drop.

18         We have agreed to drop No. 7, William Thomas; No. 13 on

19    our list, Wendy Wolf; No. 16 on our list, Kent Wolf; No. 17 on

20    our list, Katherine McKean Landon.  We have also agreed not to

21    play the deposition of Alex Berkett, No. 3 on our list.  They

22    plan to call him live.

23         I think those are what we've agreed to as we are trying

24    to streamline.  As we get closer to trial, we may further

25    streamline.

1          THE COURT:  I appreciate any streamlining.

2          All right.  Anything else we need to address before we

3     adjourn?

4          MR. PETROCELLI:  Your Honor, I'm told we may need an

5     order from the Court to permit us to have internet access in

6     here.  Does the Court permit that?

7          THE COURT:  Of course.  Yes.

8          MR. PETROCELLI:  So we --

9          THE COURT:  Is that really required?

10         MS. SMITH:  Yes.  Your Honor, Megan Smith.

11         To use laptops in your courtroom, right now the

12    district's rule says laptops cannot be used inside the

13    courtroom.  So if Your Honor could rule we can use our laptops

14    so we can connect.

15         THE COURT:  Yes.  Absolutely.  You may.  And if I

16    need to sign a proposed order, just send it to me.

17         MR. PETROCELLI:  Thank you, Your Honor.  And thank

18    you very much for all the time you've put in today.

19         THE COURT:  No.  Absolutely.

20         All right.  So if there's nothing further, I thank the

21    parties for their presentations this morning, and parties are

22    excused.

23         (Proceedings were concluded at 11:33 a.m.)

24

25

1                   <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3            I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                        Dated this 25th day of July, 2022.

10

11                       /s/ Nancy J. Meyer
                         Nancy J. Meyer
12                       Official Court Reporter
                         Registered Diplomate Reporter
13                       Certified Realtime Reporter
                         333 Constitution Avenue Northwest
14                       Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

## $

**$29** [4] - 51:19, 52:3, 52:9, 60:15

## 1

**1** [2] - 27:16, 43:19
**10** [1] - 59:13
**101** [1] - 27:22
**102** [1] - 34:8
**107** [1] - 26:21, 27:11
**1101730** [1] - 32:3
**11922224** [1] - 31:20
**11:33** [1] - 64:23
**12** [1] - 62:19
**12-203** [1] - 31:20
**124** [1] - 25:16
**125** [1] - 25:21
**12:45** [1] - 61:16
**13** [2] - 27:16, 63:18
**132** [1] - 27:11
**134** [1] - 27:12
**13th** [1] - 32:4
**14th** [1] - 63:15
**151** [1] - 26:15
**15th** [2] - 31:21, 63:16
**16** [1] - 63:19
**17** [2] - 60:7, 63:19
**183** [1] - 26:22
**1978)** [1] - 19:21
**1980)** [1] - 19:25
**1993)** [1] - 26:11
**19th** [2] - 62:10, 62:13
**1:00** [1] - 61:16
**1st** [2] - 30:7, 30:25

## 2

**2** [3] - 23:22, 31:20, 43:20
**2.2** [1] - 46:2
**200** [1] - 46:12
**2000** [2] - 26:23, 28:24
**2002** [1] - 28:14
**2005** [2] - 27:4, 27:5
**2006)** [1] - 27:12
**2007** [1] - 27:16
**2008)** [1] - 27:20
**2012** [2] - 31:20, 31:21
**2013** [2] - 38:16, 48:3
**2015)** [1] - 26:22
**2016)** [1] - 31:23
**2017)** [1] - 31:8
**2018** [1] - 27:22
**2019** [1] - 32:15
**2020** [5] - 37:14, 48:21, 49:4, 50:15
**2021** [5] - 22:20, 32:4, 32:5, 49:23, 50:6

**2022** [3] - 32:3, 32:4, 49:23
**21** [1] - 16:18
**21-2886** [1] - 3:3
**214** [1] - 28:13
**23rd** [2] - 30:6, 30:24
**249** [1] - 31:7
**250,000** [1] - 24:20
**26** [1] - 7:23
**26(a** [2] - 33:7, 33:13
**28** [2] - 11:10, 12:5
**293** [1] - 19:24
**2d** [4] - 27:12, 27:16, 28:13, 28:23

## 3

**3** [2] - 25:8, 63:21
**30** [1] - 25:5
**31** [1] - 27:13
**315** [2] - 27:22, 31:22
**31st** [2] - 27:5, 62:20
**33** [2] - 31:22, 48:20
**34** [2] - 33:15, 33:22
**36** [1] - 25:16
**3675999** [1] - 27:4
**37** [1] - 25:21
**37(a)(3** [2] - 33:17, 33:19
**37(c** [1] - 33:4
**38** [2] - 40:12, 62:3
**394** [1] - 31:7
**3d** [2] - 26:22, 31:7

## 4

**4** [1] - 27:4
**403** [1] - 34:13
**416** [1] - 31:7
**435** [1] - 19:21
**45** [2] - 61:15, 61:17
**4555177** [1] - 32:5
**467** [1] - 27:11

## 5

**5** [2] - 25:17, 31:1
**502** [1] - 27:15
**509** [1] - 26:11
**530** [1] - 28:13
**533** [1] - 27:20
**538** [1] - 28:14
**579** [1] - 26:11
**589** [1] - 19:21
**595** [1] - 26:11
**597-98** [1] - 19:21
**5:00** [1] - 61:18
**5th** [1] - 32:5

## 6

**61** [1] - 60:8
**650** [1] - 19:24
**671** [1] - 21:18

## 7

**7** [2] - 63:13, 63:18
**70** [1] - 15:7
**702** [5] - 25:22, 26:8, 48:24, 57:14, 57:25
**702's** [1] - 26:23
**72** [1] - 8:21
**72-hour** [2] - 9:7, 18:2
**729** [1] - 28:23
**740** [1] - 28:23
**7th** [1] - 62:21

## 8

**8** [1] - 25:9
**84** [1] - 34:11
**865** [1] - 21:18
**869** [1] - 27:20

## 9

**9** [1] - 63:14
**95** [1] - 22:15
**96** [1] - 23:22
**98** [2] - 28:23, 29:11
**99** [1] - 32:6
**9:30** [1] - 61:12

## A

**a.m** [1] - 64:23
**Abby** [1] - 3:21
**ability** [2] - 6:14, 8:23
**able** [5] - 7:25, 30:17, 39:8, 53:14, 58:20
**absence** [1] - 25:19
**absolute** [2] - 19:16, 51:20
**absolutely** [3] - 15:17, 64:15, 64:19
**accept** [1] - 39:14
**access** [11] - 19:10, 19:12, 19:22, 20:2, 20:3, 20:11, 20:16, 20:19, 20:21, 21:10, 64:5
**accommodate** [1] - 6:6
**account** [2] - 53:15, 57:21
**accuracy** [1] - 48:5
**accurate** [1] - 48:18
**achieved** [1] - 36:12
**acquisition** [10] -

15:2, 15:6, 15:23, 22:21, 24:18, 25:7, 46:2, 46:7, 46:9, 48:3
**acquisitions** [2] - 14:15, 46:15
**action** [2] - 22:3, 47:24
**actual** [6] - 7:21, 19:4, 24:23, 46:22, 53:21
**add** [1] - 6:21
**adding** [1] - 59:23
**addition** [2] - 22:6, 24:4, 45:25
**additional** [4] - 17:7, 17:14, 31:25, 55:7
**address** [6] - 8:7, 15:20, 22:13, 55:6, 58:24, 64:2
**addressing** [5] - 10:11, 12:7, 13:1, 14:5, 35:4
**adjourn** [1] - 64:3
**admissibility** [1] - 23:19
**admit** [2] - 23:10, 33:11
**admits** [2] - 35:23, 36:3
**admitting** [1] - 23:16
**adopt** [2] - 8:6, 62:16, 62:18
**adopted** [1] - 39:19
**advance** [4] - 7:19, 10:17, 24:19, 25:12
**advances** [2] - 24:6, 37:24
**adverse** [1] - 25:20
**adversely** [2] - 20:18, 25:7
**advisory** [1] - 26:23
**Aerohotelco** [1] - 27:22
**Aetna** [1] - 59:21
**affect** [1] - 20:18
**affiliated** [1] - 17:24
**affirmatively** [1] - 11:1
**afternoon** [1] - 61:16
**agenda** [1] - 6:21
**agent** [5] - 12:10, 12:12, 23:25, 24:13, 25:6
**agents** [7] - 12:4, 12:8, 13:22, 15:24, 16:6, 22:4, 24:17
**aggregate** [1] - 13:6
**aggregated** [1] - 15:18
**agree** [6] - 8:14, 9:2, 13:19, 14:6, 43:13, 44:9

**agreed** [6] - 63:1, 63:15, 63:17, 63:18, 63:20, 63:23
**agreement** [5] - 7:13, 8:19, 12:9, 12:11, 15:3
**agreements** [2] - 23:12, 23:15
**agrees** [2] - 16:6, 16:23
**ahead** [2] - 8:13, 17:18
**al** [1] - 3:4
**Alex** [1] - 63:21
**align** [2] - 23:9, 24:22
**alleged** [9] - 21:22, 32:19, 33:3, 33:14, 34:2, 52:9, 52:24, 54:24
**allow** [2] - 10:5, 18:7
**allowable** [1] - 30:9
**allowed** [4] - 22:23, 24:12, 31:16, 33:7
**allowing** [2] - 28:6, 32:1
**allows** [1] - 61:1
**Allstate** [1] - 32:4
**almost** [2] - 7:13, 51:15
**alternative** [1] - 29:19
**Amanda** [1] - 3:10
**amended** [1] - 63:5
**America** [1] - 3:3
**amid** [1] - 22:20
**amount** [4] - 7:19, 15:8, 41:3, 62:6
**amounts** [1] - 19:2
**analyses** [2] - 32:1, 54:11
**analysis** [23] - 18:18, 18:22, 22:7, 24:11, 24:21, 24:22, 28:18, 29:3, 29:13, 30:9, 30:11, 46:15, 52:17, 53:4, 56:5, 56:6, 57:8, 58:19, 59:2, 59:23, 59:24, 60:4, 61:1
**analyst** [1] - 52:18
**analytical** [1] - 53:12
**analyze** [1] - 3:11
**analyzed** [1] - 46:12
**analyzing** [1] - 46:7
**Anderson** [1] - 63:15
**Andrew** [1] - 43:7
**Andy** [1] - 3:21
**Anke** [1] - 4:4
**announced** [6] - 22:17, 22:22, 22:25, 23:3, 23:6, 23:21
**anonymize** [4] - 7:19,

12:10, 13:15, 20:14
**anonymized** [1] - 12:6
**answer** [4] - 5:19, 33:20, 40:9, 58:12
**Anthem** [1] - 59:21
**anthem** [1] - 35:11
**anticipated** [1] - 15:8
**anticompetitive** [3] - 21:22, 37:7, 59:15
**antitrust** [8] - 28:17, 28:19, 28:20, 28:25, 29:1, 29:3, 32:20, 36:16
**apologize** [2] - 6:2, 63:9
**appear** [1] - 8:24
**appease** [1] - 9:21
**applicability** [1] - 29:17
**applicable** [1] - 33:10
**applied** [2] - 26:6, 26:20
**applying** [2] - 29:12, 57:22
**appreciate** [4] - 4:20, 8:4, 18:13, 64:1
**approach** [7] - 3:5, 10:13, 14:7, 51:10, 52:15, 54:3, 54:9
**approaches** [1] - 51:8
**appropriate** [3] - 12:15, 19:5, 33:25
**appropriately** [1] - 17:4
**approval** [1] - 50:7
**approved** [1] - 49:8
**approves** [3] - 37:7, 54:9
**April** [1] - 32:4
**Area** [1] - 31:7
**areas** [1] - 28:6
**argue** [5] - 24:16, 29:22, 29:24, 30:9, 50:5
**argues** [7] - 23:6, 23:10, 24:9, 24:24, 25:4, 30:15, 30:17
**arguing** [2] - 30:22, 56:18
**argument** [9] - 3:16, 18:4, 22:11, 22:14, 34:23, 34:24, 39:25, 56:23, 62:9
**arguments** [3] - 39:24, 61:22, 61:25
**arise** [2] - 10:12, 59:15
**arms** [1] - 35:22
**arose** [1] - 36:20
**arrived** [1] - 29:20
**aside** [1] - 35:7

**aspect** [1] - 10:16
**assert** [1] - 21:11
**asserted** [1] - 20:6
**assertions** [1] - 30:13
**asserts** [1] - 32:23
**assess** [1] - 21:21
**assigned** [1] - 47:15
**assisting** [1] - 59:20
**Assocs** [1] - 27:21
**assume** [3] - 46:2, 61:19
**assuming** [2] - 5:22, 9:15
**assumptions** [3] - 24:2, 28:4, 48:5
**attacked** [1] - 31:11
**attend** [1] - 18:5
**attendance** [1] - 6:7
**attention** [1] - 17:3
**auction** [2] - 19:4, 29:15
**auctions** [1] - 22:5
**August** [4] - 30:7, 30:25, 31:21, 62:20
**Auth** [1] - 31:7
**author** [5] - 11:19, 11:23, 24:6, 41:23, 46:10
**author's** [3] - 7:19, 11:20, 11:25
**authors** [7] - 11:18, 15:24, 22:4, 25:14, 51:19, 51:21
**available** [1] - 20:23
**avoid** [1] - 20:24
**aware** [1] - 30:19

### B

**Bakery** [1] - 27:3
**bare** [1] - 7:9
**bargaining** [1] - 9:8
**based** [10] - 26:4, 27:12, 28:4, 34:2, 40:17, 41:15, 47:5, 57:20, 58:16, 60:2
**basic** [1] - 29:4
**basing** [1] - 41:24
**basis** [8] - 13:15, 13:25, 26:19, 37:25, 50:7, 51:10, 54:13, 54:15
**Bates** [1] - 36:17
**Bazarian** [1] - 27:21
**bear** [1] - 40:12
**become** [1] - 19:18
**begin** [1] - 36:22
**behind** [2] - 3:15, 9:6
**belated** [1] - 29:12
**bench** [1] - 58:7,

61:11
**benefit** [2] - 7:20, 10:11
**Berkett** [1] - 63:21
**Berlyn** [1] - 28:13
**Bertelsmann** [9] - 3:3, 3:20, 32:11, 37:15, 49:7, 49:8, 49:10, 49:11, 50:6
**best** [4] - 5:14, 34:21, 48:6, 50:4
**between** [3] - 39:15, 50:14, 50:19
**beyond** [1] - 60:14
**bid** [2] - 22:23, 23:1
**bidders** [2] - 23:2, 23:5
**bidding** [8] - 22:17, 22:25, 23:3, 23:4, 23:7, 23:11, 23:18, 23:21
**bids** [1] - 21:13
**Big** [1] - 25:17
**big** [2] - 40:4, 52:11
**bilateral** [1] - 23:11
**billion** [1] - 46:2
**Biovail** [1] - 27:3
**bit** [3] - 34:23, 45:14, 50:2
**blame** [1] - 45:16
**blanket** [1] - 23:16
**Block** [3] - 35:24, 36:7, 43:17
**Bloomsbury** [1] - 10:1
**board** [1] - 37:15
**boatload** [1] - 37:1
**Bobby** [2] - 3:10, 8:11
**book** [12] - 15:2, 15:6, 15:23, 19:3, 19:4, 20:12, 21:23, 24:18, 24:19, 25:13
**bother** [1] - 15:19
**bottom** [2] - 50:13, 50:21
**bottom-line** [2] - 50:13, 50:21
**branch** [1] - 19:14
**break** [6] - 61:12, 61:14, 61:15, 61:16, 61:18
**Breuder** [1] - 3:22
**briefing** [5] - 45:16, 47:18, 57:17, 62:16, 62:18
**briefly** [1] - 7:1
**bring** [1] - 17:3
**broad** [2] - 41:18,

54:12
**broad-brush** [1] - 54:12
**brought** [1] - 46:13
**brush** [1] - 54:12
**bunch** [1] - 10:6
**burden** [11] - 39:13, 40:13, 44:9, 44:11, 44:17, 44:24, 48:11, 51:13, 52:6, 52:24, 53:24
**burn** [1] - 56:4
**Bus** [1] - 27:10
**business** [5] - 18:25, 19:19, 22:2, 28:18, 46:22
**buy** [1] - 35:16

### C

**C.A** [1] - 27:22
**Cadwalader** [1] - 17:24
**calculated** [1] - 38:9
**calendar** [1] - 62:12
**cannot** [2] - 11:25, 64:12
**Cantor** [1] - 3:21
**capabilities** [2] - 32:11, 32:16
**care** [1] - 61:5
**Carolina** [1] - 31:19
**Case** [1] - 3:2
**case** [41] - 4:19, 13:14, 13:25, 16:20, 20:15, 21:4, 26:7, 27:18, 27:19, 28:15, 28:22, 28:24, 29:2, 31:3, 31:9, 31:19, 31:23, 32:16, 32:20, 32:22, 35:9, 36:20, 37:17, 37:18, 40:12, 41:1, 41:5, 41:7, 41:9, 43:15, 51:11, 52:2, 53:22, 54:15, 55:15, 56:13, 56:23, 62:3
**case-by-case** [2] - 13:14, 13:25
**cases** [20] - 19:16, 23:10, 23:12, 27:10, 28:1, 28:5, 28:12, 31:6, 31:25, 36:16, 36:18, 37:1, 37:5, 43:17, 43:24, 44:12, 46:17, 46:18, 51:23, 59:19
**casual** [1] - 58:17
**categories** [1] - 47:16
**caused** [1] - 40:9
**caveat** [1] - 16:8

**CEO** [1] - 22:22
**certain** [5] - 7:22, 13:5, 19:16, 20:17, 32:12
**certainly** [7] - 10:20, 11:1, 12:16, 37:25, 41:18, 46:3, 47:10
**cetera** [1] - 59:16
**challenge** [2] - 27:8, 28:3
**chambers** [1] - 17:14
**chance** [1] - 12:22
**changed** [1] - 58:16
**changes** [2] - 49:18, 49:20
**charge** [1] - 6:10
**chart** [2] - 15:7, 48:19
**charts** [3] - 9:13, 9:20, 15:4
**cherry** [1] - 38:18
**cherry-picks** [1] - 38:18
**chess** [5] - 40:11, 55:13, 61:24, 62:1, 62:2
**chief** [2] - 4:3, 36:6
**Chief** [3] - 36:6, 36:24, 39:18
**Chipotle** [1] - 31:21
**Chozick** [1] - 4:13
**Chris** [1] - 63:14
**chunk** [1] - 41:1
**Chutkan** [1] - 36:18
**Cir** [2] - 19:25, 27:20
**Circuit** [3] - 19:23, 27:12, 35:11
**circumstances** [2] - 21:10, 31:6
**Cisco** [1] - 43:18
**citations** [1] - 38:1
**cite** [1] - 56:13
**cited** [5] - 23:10, 28:5, 28:12, 31:19, 36:18
**cites** [2] - 43:14, 43:15
**Cities** [1] - 27:3
**Civil** [2] - 3:2, 33:5
**claim** [6] - 30:5, 36:11, 44:3, 44:16, 51:17, 53:5
**claimed** [9] - 43:21, 44:8, 48:9, 50:16, 51:25, 52:3, 52:5, 52:6
**claiming** [2] - 24:3, 44:19
**clarify** [2] - 14:25, 62:10
**clear** [6] - 15:21, 29:4, 40:15, 42:7, 44:13, 45:16

**clearly** [1] - 59:10
**cleverly** [1] - 37:11
**clients** [1] - 3:24
**clock** [5] - 40:11, 55:13, 61:24, 62:1, 62:3
**closed** [2] - 25:18, 46:16
**closely** [1] - 54:13
**closer** [2] - 9:20, 63:24
**closing** [4] - 61:22, 61:25, 62:4, 62:9
**Co** [3] - 3:3, 27:10, 32:4
**Co.-Conn** [1] - 28:23
**coded** [2] - 47:15, 48:12
**cognitive** [1] - 59:13
**cognizable** [1] - 36:10
**cognizant** [1] - 56:1
**cold** [1] - 55:17
**colleagues** [1] - 3:10
**Columbia** [1] - 23:14
**coming** [1] - 5:7
**Commc'ns** [1] - 19:21
**commit** [1] - 12:17
**committed** [1] - 19:2
**committee** [1] - 26:23
**common** [1] - 54:23
**commonly** [1] - 21:17
**Communications** [1] - 32:15
**company** [1] - 38:4
**compare** [1] - 50:21
**compel** [3] - 33:2, 33:16, 34:4
**compelling** [1] - 33:20
**competing** [1] - 19:17
**competition** [2] - 25:7, 25:20
**competitive** [10] - 19:20, 20:24, 22:20, 28:7, 28:11, 29:9, 38:3, 44:17, 45:21, 51:25
**competitively** [1] - 21:12
**competitor** [2] - 25:19, 35:17
**complaining** [1] - 33:13
**complete** [1] - 7:13
**completely** [3] - 37:20, 47:8, 56:7
**complicated** [1] - 28:20
**concerned** [2] - 40:20, 60:11
**concerning** [2] - 21:7,

26:8
**concerns** [8] - 8:7, 11:11, 12:7, 18:15, 20:25, 21:3, 22:20, 30:15
**conclude** [1] - 50:24
**concluded** [1] - 64:23
**concludes** [2] - 23:17, 34:1
**conclusion** [1] - 28:11
**conclusions** [5] - 24:12, 24:15, 26:18, 27:9, 28:3
**conditions** [3] - 20:21, 24:4, 32:11
**conduct** [1] - 29:3
**confer** [9] - 5:20, 8:23, 10:2, 16:5, 16:10, 16:13, 55:9, 58:13, 60:24
**conferred** [1] - 32:23
**confidential** [11] - 7:6, 7:14, 10:25, 13:11, 17:1, 18:25, 20:14, 20:17, 21:6, 22:2
**Confidential** [1] - 11:16
**confidentiality** [11] - 3:11, 6:17, 7:2, 9:5, 9:8, 9:19, 10:7, 16:20, 21:11, 21:16, 37:23
**confirm** [2] - 14:6, 30:13
**confirmation** [1] - 48:1
**connect** [1] - 64:14
**connected** [1] - 11:25
**connection** [4] - 14:14, 14:20, 14:21, 19:3
**connects** [1] - 11:20
**consequential** [2] - 42:17, 55:2
**consider** [2] - 40:10, 58:14
**consideration** [1] - 55:4
**considerations** [1] - 18:23
**considered** [1] - 21:9
**considering** [3] - 19:9, 23:14, 61:24
**considers** [1] - 21:19
**consistent** [2] - 52:16, 54:10
**constrained** [1] - 32:25
**constraints** [1] - 32:21
**consultation** [1] - 49:6

**consummated** [1] - 22:25
**contemplates** [1] - 53:22
**contemplating** [1] - 18:19
**contend** [1] - 30:1
**contends** [1] - 32:19
**contention** [1] - 50:19
**contest** [2] - 45:23
**context** [1] - 45:14
**continue** [1] - 23:4
**contract** [5] - 19:3, 19:4, 19:5, 20:12, 21:23
**contracts** [2] - 21:13, 22:5
**contradict** [1] - 30:12
**contrary** [1] - 20:23
**contrived** [1] - 51:17
**controversial** [2] - 27:1, 35:25
**convinced** [1] - 55:23
**COO** [1] - 42:1
**Corp** [1] - 27:4
**correct** [1] - 59:7
**corrected** [1] - 43:20
**correctly** [1] - 43:20
**cost** [2] - 36:11, 38:8
**counsel** [8] - 3:5, 4:4, 4:5, 6:8, 7:14, 18:2, 18:5, 18:6
**countering** [1] - 30:7
**couple** [5] - 6:4, 45:13, 45:18, 56:12, 59:7
**course** [6] - 10:21, 11:4, 44:19, 45:20, 48:25, 64:7
**court** [14] - 11:20, 11:24, 19:9, 19:17, 19:19, 19:23, 28:24, 36:17, 43:15, 43:25, 45:18, 51:9, 59:22
**court's** [1] - 26:24
**Court's** [4] - 21:25, 22:1, 26:12, 33:10
**courthouse** [1] - 6:11
**courtroom** [11] - 4:18, 4:25, 5:7, 5:16, 5:18, 5:21, 5:22, 6:13, 6:15, 64:11, 64:13
**COURTROOM** [1] - 3:2
**courts** [3] - 23:13, 31:16, 60:3
**Courts** [1] - 21:17
**cover** [1] - 6:22
**covered** [2] - 38:20, 38:21
**covers** [1] - 34:15
**COVID** [2] - 4:22, 4:24
**Cramer** [1] - 6:10
**create** [1] - 10:4

43:6, 43:9, 43:12, 44:9, 44:24, 45:3, 45:6, 45:9, 46:24, 47:2, 47:11, 48:16, 48:19, 49:12, 49:14, 49:16, 50:10, 50:18, 51:2, 52:19, 52:22, 53:3, 53:6, 53:8, 53:18, 53:20, 54:6, 54:12, 54:17, 54:25, 56:8, 56:11, 56:17, 57:1, 57:3, 57:6, 57:10, 58:5, 58:21, 58:23, 59:5, 59:9, 59:25, 60:9, 60:12, 60:19, 60:22, 62:8, 62:12, 62:15, 62:25, 63:5, 63:8, 63:11, 64:1, 64:7, 64:9, 64:15, 64:19
**Court** [60] - 7:1, 7:23, 8:24, 9:6, 9:19, 10:8, 11:11, 18:1, 18:3, 18:4, 18:5, 20:1, 20:10, 21:4, 23:12, 23:13, 23:15, 23:17, 27:4, 27:6, 28:9, 28:18, 29:2, 29:5, 31:3, 31:15, 34:1, 35:1, 40:10, 43:14, 43:20, 44:5, 44:7, 47:24, 47:25, 48:2, 48:8, 48:14, 49:2, 49:19, 50:23, 51:1, 51:10, 51:12, 52:4, 52:8, 52:23, 53:7, 53:11, 53:14, 54:22, 56:14, 58:15, 58:16, 58:20, 64:5, 64:6
**court's** [1] - 26:24
**court's** [1] - 26:24

**created** [1] - 9:13
**creative** [1] - 25:14
**credibility** [1] - 47:1
**credit** [1] - 60:6
**criticize** [2] - 24:11, 53:13
**criticized** [2] - 29:17, 30:4
**criticizes** [1] - 24:2
**cross** [8] - 10:18, 11:6, 14:2, 14:3, 40:24, 41:20, 42:3, 53:12
**cross-examination** [5] - 11:6, 14:2, 14:3, 40:24, 41:20
**cross-examine** [3] - 10:18, 42:3, 53:12
**crystal** [1] - 45:16
**Ctr** [1] - 27:11
**customs** [3] - 27:14, 27:24, 28:2
**cut** [2] - 17:22, 41:8
**cutting** [1] - 62:17

## D

**D.C** [5] - 19:23, 19:25, 27:4, 27:20, 35:11
**D.D.C** [6] - 26:22, 27:16, 27:22, 31:8, 31:21, 32:3
**damage** [1] - 60:17
**damages** [1] - 53:5
**Dan** [2] - 3:21, 62:4
**Daniel** [2] - 3:19, 4:13
**data** [14] - 12:24, 12:25, 13:4, 13:6, 13:13, 13:20, 13:23, 15:5, 15:7, 18:19, 26:4, 56:11, 57:23
**data-driven** [1] - 57:23
**date** [2] - 30:7, 30:25
**dated** [1] - 37:14
**Daubert** [6] - 26:10, 26:13, 26:15, 43:15, 52:10, 58:8
**daunting** [1] - 53:19
**day's** [1] - 16:8
**days** [4] - 6:4, 7:8, 62:19, 62:21
**de** [3] - 7:4, 7:8, 8:15
**de-designate** [1] - 7:4
**de-designating** [2] - 7:8, 8:15
**deal** [7] - 8:17, 13:24, 41:3, 41:10, 41:21, 42:18
**dealing** [3] - 40:16, 41:4, 55:13

dealt [2] - 11:12, 17:4
decide [1] - 57:16
deciding [1] - 40:5
decision [4] - 19:22,
20:17, 21:25, 35:24
decision-making [1] -
21:25
decisions [1] - 60:3
declined [1] - 28:25
decrease [1] - 25:14
deem [1] - 33:18
Def [1] - 26:21
defendant's [1] -
31:11
defendants [31] -
12:9, 23:10, 24:1,
24:16, 28:5, 29:22,
30:1, 30:5, 30:8,
30:17, 30:19, 30:21,
30:24, 30:25, 32:10,
32:18, 32:24, 33:1,
33:4, 33:13, 33:15,
33:23, 34:1, 34:4,
36:20, 40:9, 41:14,
43:4, 43:8, 56:14
defendants' [12] - 7:9,
9:12, 29:11, 29:16,
30:4, 32:8, 34:6,
35:2, 38:23, 39:13,
43:16, 63:12
defense [5] - 31:12,
35:9, 36:22, 44:14,
60:11
defining [1] - 28:21
delayed [1] - 29:25
demonstrated [1] -
33:23
denied [1] - 34:7
deny [3] - 23:20, 29:5,
60:22
denying [1] - 47:19
Dep't [1] - 26:21
Department [3] -
43:23, 51:7, 51:14
department [2] - 44:1,
44:6
depose [1] - 30:18
deposition [4] - 10:18,
10:23, 40:18, 63:21
deputy [1] - 4:5
DEPUTY [1] - 3:2
Desarrollos [1] -
27:21
describing [1] - 53:20
deserves [1] - 55:4
designate [1] - 7:4
designated [1] - 7:5
designating [2] - 7:8,
8:15
designation [1] -

33:20
designed [1] - 15:1
desk [1] - 57:11
detail [1] - 61:21
details [8] - 11:21,
11:23, 14:21, 14:22,
15:25, 19:4, 20:11,
21:23
Details [1] - 12:1
determine [2] - 26:3,
54:18
Dev [1] - 26:21
developed [1] - 30:20
developing [1] - 46:8
differences [3] -
50:13, 50:22, 50:24
different [9] - 7:17,
9:4, 18:23, 47:16,
48:23, 50:2, 53:18,
53:20, 56:7
difficult [1] - 39:3
digest [1] - 8:1
diligence [2] - 49:7,
58:19
diligently [2] - 7:3, 9:2
direct [1] - 24:17
disagrees [1] - 30:8
discern [1] - 20:10
disclose [6] - 10:17,
11:1, 11:5, 11:19,
32:12, 33:11
disclosed [1] - 7:16
disclosing [2] - 11:23,
14:20
disclosure [3] - 20:5,
20:7, 21:14
Disclosure [1] - 11:15
discovery [6] - 7:5,
33:3, 33:15, 33:16,
33:19, 34:3
discretion [1] - 19:22
discrimination [2] -
31:8, 31:10
discuss [1] - 17:3,
25:2, 27:17, 37:4,
62:23
discussed [4] - 9:5,
14:18, 16:24, 17:16
discussion [1] - 15:25
dispositive [4] -
56:25, 57:1, 57:4,
59:1
dispute [3] - 32:19,
44:12, 54:15
disputed [1] - 40:16
District [3] - 23:13,
23:14, 27:4, 28:14,
28:15, 28:24, 31:16,
31:22, 32:5
district [6] - 37:6,

39:2, 39:12, 44:15,
59:22, 60:4
district's [1] - 64:12
document [1] - 21:20
documents [7] - 7:21,
10:20, 20:2, 20:4,
20:8, 33:22, 58:19
Dohle [3] - 4:2, 22:22,
47:14
DOJ [1] - 37:18
dominant [1] - 35:15
done [8] - 41:10,
46:23, 49:22, 49:23,
50:1, 53:8, 60:17
doors [1] - 25:18
doubt [1] - 10:20
Dow [1] - 26:11
down [6] - 7:9, 23:17,
38:17, 38:18, 60:20,
62:17
dozen [1] - 46:14
Dr [38] - 9:13, 9:16,
12:24, 13:1, 13:5,
24:2, 24:11, 24:22,
27:9, 28:3, 29:14,
29:16, 29:18, 29:22,
30:23, 31:4, 31:9,
31:15, 34:16, 34:20,
35:2, 35:20, 35:22,
37:10, 37:21, 37:25,
38:17, 40:18, 40:23,
41:24, 42:10, 42:24,
45:23, 51:18, 54:1,
55:21, 57:18, 60:6
dress [1] - 47:13
Drew [1] - 3:22
driven [1] - 57:23
drop [6] - 63:2, 63:12,
63:14, 63:16, 63:17,
63:18
due [3] - 32:21, 49:6,
58:19
during [10] - 5:6, 5:15,
7:4, 9:16, 10:7,
12:20, 20:9, 30:21,
33:15, 61:12
dwarfs [1] - 51:19

**E**

e) [1] - 33:13
easier [1] - 36:1
easiest [2] - 31:1,
35:22
ECF [6] - 22:15, 23:22,
29:11, 32:6, 34:8,
34:11
economic [10] - 24:11,
24:21, 24:22, 25:2,
28:18, 29:4, 35:2,

35:3, 52:17, 54:10
economics [4] -
28:19, 28:25, 37:25,
38:2
economist [1] - 24:13
economists [1] -
30:20
education [1] - 25:25
effects [6] - 21:22,
24:5, 28:7, 28:11,
29:9, 44:17
efficiencies [57] -
34:21, 35:4, 35:9,
35:18, 36:22, 37:8,
37:11, 37:12, 38:10,
39:14, 41:4, 43:16,
43:21, 44:3, 44:8,
44:12, 44:14, 44:20,
44:22, 45:22, 46:1,
46:3, 46:4, 46:5,
46:9, 46:14, 47:5,
47:12, 48:7, 48:10,
48:21, 50:14, 50:16,
51:11, 51:12, 51:19,
51:24, 52:1, 52:4,
52:5, 52:7, 52:8,
52:24, 53:16, 54:4,
54:24, 55:8, 56:5,
56:15, 56:18, 57:22,
59:14, 60:11, 60:23,
60:25
efficiency [6] - 36:10,
50:15, 50:20, 51:3,
51:5, 54:18
efficient [2] - 10:4,
56:1
efficiently [2] - 58:10,
60:25
effort [1] - 46:11
efforts [1] - 4:21
eight [1] - 7:24
element [2] - 19:12,
53:4
elicitation [1] - 7:17
email [1] - 17:14
employ [1] - 31:14
employed [1] - 30:3
end [8] - 9:16, 36:25,
40:14, 40:20, 47:14,
60:10, 61:18, 62:20
endorses [1] - 18:2
enforceable [1] -
23:11
enormous [1] - 51:25
entertain [1] - 34:23
entertaining [1] - 58:5
entire [3] - 10:23,
41:20, 56:4
entitled [2] - 11:14,
34:5

erroneously [1] - 33:4
especially [2] - 16:25,
19:17
essentially [1] - 7:15
established [3] -
19:23, 36:19, 46:21
estimate [2] - 36:12,
45:24
et [2] - 3:4, 59:16
evaluate [2] - 49:2,
58:20
evaluation [2] - 44:16,
48:14
event [1] - 34:1
Evidence [2] - 25:22,
26:23
evidence [50] - 7:18,
18:25, 19:5, 20:17,
21:21, 22:16, 23:6,
23:11, 23:16, 23:21,
26:3, 29:23, 32:2,
32:8, 32:9, 32:10,
32:17, 32:24, 33:2,
34:5, 34:6, 34:7,
34:12, 41:8, 42:17,
43:16, 43:19, 44:2,
44:4, 44:11, 44:21,
45:14, 45:25, 46:3,
46:5, 48:6, 49:3,
53:15, 54:23, 55:6,
55:19, 56:15, 56:18,
57:15, 58:11, 58:24,
60:23, 60:25
evidentiary [2] - 26:9,
44:5
exactly [2] - 39:1,
42:10
exam [1] - 9:16
examination [7] -
11:6, 12:11, 12:20,
14:2, 14:3, 40:24,
41:20
examinations [2] -
10:4, 10:7
examine [3] - 10:18,
42:3, 53:12
example [4] - 7:12,
7:18, 15:6, 25:17
examples [1] - 54:24
Excel [2] - 49:19,
49:20
except [1] - 22:11
exception [1] - 46:19
exclude [7] - 23:20,
23:23, 24:9, 30:22,
32:7, 32:9, 34:6
excluded [5] - 23:7,
27:2, 29:23, 33:3,
43:16
excuse [1] - 53:19

**excused** [2] - 18:15, 64:22
**executive** [1] - 4:3
**executives** [1] - 46:6
**Exhibit** [8] - 11:14, 11:17, 12:3, 13:22, 14:9, 14:19, 16:5, 25:8
**exhibits** [11] - 9:12, 9:14, 11:24, 12:14, 12:19, 13:6, 13:7, 13:10, 13:12, 13:14, 16:8
**exist** [1] - 44:20
**existence** [1] - 30:19
**exists** [1] - 35:9
**expect** [1] - 11:4, 14:3, 43:14
**expectation** [1] - 62:11
**expedited** [1] - 40:11
**experience** [18] - 24:25, 25:6, 25:11, 25:24, 26:17, 26:18, 26:19, 27:13, 27:23, 28:17, 28:19, 29:1, 47:4, 47:6, 48:2, 57:21, 58:18
**experienced** [3] - 23:25, 47:20, 57:12
**expert** [40] - 9:13, 23:23, 24:1, 24:2, 24:10, 24:17, 25:1, 25:23, 25:24, 26:5, 27:7, 27:12, 27:16, 28:15, 28:25, 29:2, 29:7, 29:12, 29:13, 29:14, 29:16, 30:1, 30:3, 31:9, 31:10, 31:11, 31:12, 31:14, 31:19, 31:24, 35:2, 37:3, 40:25, 48:19, 48:20, 53:8, 54:1, 54:4, 55:18
**expert's** [7] - 26:1, 26:13, 26:25, 27:1, 27:22, 32:2, 47:18
**expertise** [4] - 3:11, 26:14, 47:7, 54:21
**experts** [5] - 15:4, 31:17, 31:18, 40:2, 40:5
**explain** [3] - 26:17, 39:3, 50:24
**explains** [1] - 38:7
**expressed** [2] - 11:12, 21:3
**extend** [1] - 13:22
**extended** [1] - 12:3
**extending** [2] - 14:9,

15:22
**extensive** [1] - 27:23
**extent** [6] - 9:14, 15:4, 16:2, 16:6, 20:3, 22:3
**extremely** [1] - 4:20

**F**

**F.2d** [1] - 19:24
**F.3d** [4] - 21:18, 27:11, 27:20, 27:22
**F.R.D** [1] - 31:22
**faced** [1] - 39:11
**fact** [9] - 20:4, 25:1, 26:2, 26:3, 35:15, 38:18, 40:17, 45:14, 58:18
**factor** [9] - 19:23, 20:10, 20:20, 20:25, 21:7, 21:19, 22:7, 27:19, 31:1
**factors** [5] - 18:24, 20:2, 22:1, 26:12, 38:5
**facts** [5] - 26:4, 26:6, 26:20, 27:17, 40:16
**factual** [1] - 27:8
**failed** [1] - 33:11
**fails** [2] - 33:6, 33:22
**failure** [2] - 33:8, 33:14
**fair** [2] - 45:12, 50:13
**fairly** [1] - 38:22
**familiar** [2] - 35:10, 36:20
**fantasy** [1] - 44:5
**far** [2] - 40:20, 60:11
**Farber** [1] - 31:9
**fatal** [1] - 36:5
**fatality** [1] - 36:5
**favor** [5] - 18:24, 19:10, 21:2, 21:9, 22:1
**Federal** [3] - 25:22, 26:22, 33:5
**feed** [1] - 5:16
**few** [3] - 46:16, 54:24, 63:2
**fewer** [1] - 25:11
**fifth** [3] - 20:6, 21:7, 59:13
**figure** [2] - 53:25, 55:21
**figured** [1] - 8:1
**file** [1] - 63:5
**filed** [2] - 11:24, 62:19
**files** [10] - 12:24, 12:25, 13:4, 13:6, 13:13, 13:20, 13:23,

18:20, 19:18, 19:19
**filings** [1] - 11:19
**Fin** [1] - 27:21
**finally** [2] - 9:24, 21:19
**financial** [8] - 11:21, 11:23, 12:1, 14:20, 14:21, 15:5, 15:25, 19:3
**findings** [5] - 44:6, 48:8, 52:5, 62:19
**fine** [3] - 14:23, 58:23, 59:5
**firm** [1] - 12:14
**first** [24] - 4:17, 6:3, 7:12, 9:1, 17:6, 20:2, 20:10, 22:15, 25:5, 29:24, 34:18, 36:21, 41:14, 41:25, 42:3, 42:5, 42:21, 43:3, 55:6, 56:13, 57:15, 58:25, 60:7, 61:1
**FISHBEIN** [2] - 4:9, 4:15
**Fishbein** [1] - 4:10
**five** [3] - 22:12, 25:17, 34:18
**fixated** [1] - 51:15
**flat** [1] - 38:17
**flexible** [1] - 26:8
**flowing** [3] - 46:1, 46:9, 48:7
**flows** [1] - 51:21
**fly** [1] - 46:11
**fly-by-night** [1] - 46:11
**focus** [2] - 41:9, 41:14
**focused** [1] - 53:4
**follow** [1] - 16:7
**followed** [1] - 36:15
**following** [4] - 20:1, 25:3, 27:9, 31:25
**follows** [2] - 19:8, 34:9
**Foods** [1] - 27:15
**force** [2] - 9:7, 39:24
**forego** [1] - 35:19
**form** [1] - 25:25
**forward** [2] - 5:1, 18:14
**four** [1] - 60:3
**fourth** [2] - 20:5, 21:7
**Frackman** [7] - 3:21, 43:8, 43:9, 47:2, 48:16, 56:17, 57:3
**FRACKMAN** [40] - 43:7, 43:10, 43:13, 44:11, 45:2, 45:5, 45:8, 45:10, 46:25, 47:10, 47:23, 48:18, 48:25, 49:13, 49:15, 49:17, 50:12, 50:23, 51:6, 52:21, 52:23,

53:5, 53:7, 53:10, 53:19, 54:3, 54:8, 54:14, 54:22, 56:6, 56:10, 56:12, 56:20, 57:2, 57:5, 57:9, 58:4, 58:14, 58:22, 59:3
**frankly** [2] - 12:13, 36:1
**freely** [1] - 14:18
**Friday** [4] - 8:15, 22:10, 62:10, 62:13
**front** [1] - 12:9
**FTC** [1] - 27:15
**full** [1] - 43:18
**function** [2] - 26:12, 26:24
**Fund** [1] - 27:3
**fundamental** [1] - 19:12

**G**

**gatekeeping** [2] - 26:12, 26:24
**gathered** [1] - 32:17
**Gazette** [1] - 28:13
**general** [8] - 4:4, 4:5, 8:7, 11:13, 15:25, 28:18, 34:23, 54:12
**generalized** [1] - 15:5
**generally** [2] - 27:17, 32:12
**given** [10] - 5:18, 5:21, 16:25, 17:1, 17:2, 20:13, 29:1, 30:7, 40:3, 58:6
**global** [1] - 4:3
**government** [29] - 8:2, 8:16, 13:24, 18:2, 23:6, 23:10, 24:3, 24:9, 24:24, 25:4, 28:12, 30:8, 30:15, 30:17, 32:12, 32:15, 32:19, 32:21, 32:23, 33:1, 33:10, 38:25, 39:14, 40:10, 43:15, 44:17, 47:17, 51:7, 55:12
**government's** [11] - 22:15, 23:20, 23:22, 29:6, 29:13, 31:4, 32:7, 34:11, 35:7, 39:23, 44:16
**grab** [1] - 63:7
**Grace** [1] - 28:23
**grant** [1] - 29:5
**granted** [2] - 34:9, 34:14
**granular** [2] - 16:1,

21:12
**gravely** [1] - 20:15
**Grill** [1] - 31:22
**gripe** [1] - 52:11
**grounded** [1] - 58:18
**grounds** [1] - 27:20
**guess** [4] - 34:22, 54:1, 54:19, 58:7
**guesstimating** [1] - 40:23
**guidance** [1] - 9:18
**guidelines** [8] - 38:23, 46:21, 50:20, 51:4, 53:22, 54:17, 58:1, 59:11
**GUPPI** [8] - 29:12, 29:19, 29:22, 30:5, 30:13, 30:20, 30:23, 31:1
**guy** [1] - 6:10

**H**

**H&R** [3] - 35:24, 36:7, 43:17
**Hachette** [1] - 10:1
**half** [4] - 61:13, 61:14, 61:17, 62:6
**hammer** [2] - 48:19, 53:13
**hand** [2] - 17:10, 47:7
**handle** [3] - 3:15, 7:14, 7:17
**handled** [1] - 16:22
**handy** [1] - 63:10
**happy** [3] - 16:23, 17:9, 58:14
**hard** [5] - 4:20, 9:1, 12:17, 47:15, 48:12
**hard-coded** [2] - 47:15, 48:12
**harm** [8] - 19:20, 45:20, 45:21, 45:24, 51:19, 51:25, 52:3, 52:9
**harmless** [1] - 33:9
**Harris** [1] - 63:13
**Harwell** [1] - 3:22
**hat** [1] - 58:17
**head** [6] - 42:8, 47:22, 57:12, 57:13, 57:20, 60:16
**heads** [1] - 22:7
**Health** [1] - 27:3
**health** [2] - 24:7, 59:20
**hear** [24] - 13:17, 17:9, 22:14, 39:25, 40:2, 40:4, 40:22, 40:23, 42:5, 42:20, 43:4,

47:23, 47:25, 48:2,
48:14, 53:11, 55:15,
55:20, 55:24, 58:9,
58:10, 58:15, 60:13
**heard** [3] - 17:9,
17:17, 43:19
**hearing** [7] - 4:17,
6:16, 6:23, 18:14,
42:17, 50:23, 52:11
**hears** [1] - 54:23
**held** [1] - 28:15
**help** [6] - 3:11, 3:13,
9:20, 26:2, 41:21
**helpful** [2] - 7:1, 45:19
**hesitate** [1] - 42:16
**highly** [1] - 7:6
**Hill** [1] - 30:18
**hill** [4] - 24:2, 28:3,
29:14, 29:18
**hill's** [7] - 24:11,
24:22, 27:9, 29:22,
31:4, 45:23, 51:18
**hold** [1] - 36:8
**Hold** [1] - 36:8
**honest** [1] - 42:6
**Honor** [56] - 3:2, 3:7,
3:18, 3:25, 4:9, 4:15,
6:1, 6:2, 6:3, 6:25,
7:20, 8:11, 13:19,
14:8, 17:19, 18:1,
18:16, 34:25, 35:10,
36:3, 36:5, 36:17,
37:1, 37:5, 37:21,
38:13, 39:1, 39:7,
39:15, 40:9, 40:17,
40:22, 41:2, 41:5,
41:10, 42:4, 42:18,
43:1, 43:2, 43:7,
45:11, 51:6, 53:5,
54:22, 56:10, 59:6,
59:19, 62:2, 62:24,
63:3, 63:4, 63:9,
64:4, 64:10, 64:13,
64:17
**honor** [1] - 5:8
**Honor's** [1] - 60:16
**hope** [1] - 35:12
**hoped** [1] - 25:13
**hopefully** [4] - 3:23,
6:14, 9:9, 9:21
**horizontal** [5] - 50:19,
51:4, 53:22, 54:17,
58:1
**hour** [7] - 61:13,
61:14, 61:15, 61:16,
61:17, 62:5
**hours** [4] - 40:12,
46:7, 49:5, 62:3
**hours'** [1] - 8:21
**House** [11] - 3:19, 4:3,

4:4, 4:6, 22:18,
38:16, 46:6, 46:16,
46:19, 48:4
**House's** [2] - 22:16,
22:21
**Howell** [3] - 36:7,
36:23, 36:24
**Howell's** [1] - 39:19
**hubbard** [1] - 19:24
**Hubbard** [8] - 18:18,
18:22, 20:10, 20:20,
20:25, 21:7, 21:19,
22:6
**huge** [1] - 52:4
**hundred** [1] - 46:12
**hundreds** [2] - 46:7,
49:5
**hurdle** [1] - 56:2

## I

**idea** [7] - 8:20, 8:25,
9:10, 10:10, 28:1,
54:20, 56:2
**identify** [3] - 8:10,
10:24, 33:6
**identifying** [2] - 16:11,
18:20
**identities** [5] - 11:17,
14:20, 19:6, 20:12,
22:3
**identity** [7] - 11:19,
11:20, 11:23, 11:25,
20:5, 21:1, 21:24
**Ihan** [1] - 3:13
**imagine** [1] - 7:4
**immaterial** [1] - 50:16
**impact** [7] - 20:15,
24:6, 24:12, 25:7,
25:15, 25:20, 29:14
**impeach** [1] - 10:19
**impeachment** [5] -
11:5, 14:2, 14:3,
16:9, 16:11
**implementing** [1] -
11:12
**imply** [1] - 45:1
**important** [4] - 19:13,
27:19, 33:18, 35:21
**importantly** [1] - 48:13
**imprints** [4] - 22:22,
22:23, 23:1, 23:2
**improper** [1] - 19:18
**in-person** [1] - 4:17
**inadmissible** [1] -
23:8
**inappropriate** [1] -
52:10
**Inc** [9] - 19:21, 26:21,
27:15, 28:13, 31:22,

32:3, 32:14, 32:15
**incentives** [1] - 23:9
**inclined** [1] - 55:1
**include** [4] - 16:9,
30:10, 31:6
**included** [3] - 30:1,
30:16, 37:19
**includes** [3] - 16:5,
16:11, 48:19
**including** [5] - 21:24,
23:13, 24:19, 30:10,
48:3
**inclusion** [1] - 30:5
**incorporate** [1] -
13:23
**indeed** [1] - 40:7
**independent** [8] -
19:14, 36:13, 37:3,
39:2, 39:12, 59:24,
60:4, 60:5
**indirectly** [1] - 28:3
**individual** [4] - 13:14,
15:2, 22:4, 51:3
**industry** [19] - 24:4,
24:7, 24:23, 25:1,
25:20, 27:7, 27:13,
27:14, 27:17, 27:18,
27:23, 27:24, 28:2,
28:4, 29:8, 29:18,
32:14, 35:16, 46:13
**information** [40] - 7:9,
7:15, 7:16, 7:20,
14:1, 15:9, 15:19,
16:9, 16:11, 17:1,
18:21, 18:25, 19:2,
19:19, 20:15, 20:18,
20:22, 20:23, 21:2,
21:5, 21:12, 21:14,
21:16, 21:17, 22:2,
32:13, 32:20, 32:25,
33:6, 33:8, 33:11,
33:12, 33:14, 33:17,
33:24, 49:18, 49:19,
50:11, 57:23
**Information** [1] -
11:16
**informed** [1] - 25:5
**informs** [1] - 48:4
**initial** [5] - 29:13, 30:1,
30:3, 31:9, 31:15
**injury** [1] - 20:24
**input** [3] - 38:3, 48:1,
49:6
**inputs** [1] - 57:7
**inquiry** [2] - 26:8, 27:1
**inside** [1] - 64:12
**inspection** [1] - 33:21
**instead** [1] - 47:19
**insur** [1] - 59:21
**insurance** [2] - 27:13,

27:14
**Int'l** [2] - 27:10, 27:21
**integrity** [1] - 19:13
**intend** [1] - 14:1
**interest** [4] - 6:4, 6:5,
21:11, 21:15
**interested** [5] - 6:18,
42:11, 43:3, 55:5,
55:22
**interesting** [1] - 39:7
**interests** [5] - 16:20,
16:25, 19:17, 20:6,
21:8
**internal** [2] - 38:9,
51:7
**internet** [1] - 64:5
**interrupt** [2] - 45:10,
48:17
**introduce** [3] - 3:6,
3:9, 3:24
**introduced** [3] - 20:8,
21:20, 21:21
**investigation** [1] -
30:21
**investment** [1] - 37:13
**involve** [3] - 18:19,
23:11, 23:13
**involved** [5] - 10:2,
19:6, 20:13, 22:4,
59:19
**involving** [1] - 19:6
**irrelevant** [1] - 23:7
**issue** [29] - 6:18, 13:9,
14:25, 18:23, 20:3,
20:22, 20:23, 21:21,
21:22, 26:3, 26:13,
34:5, 34:12, 35:14,
35:19, 37:23, 39:11,
40:1, 41:14, 42:2,
42:4, 42:19, 53:18,
55:2, 58:24, 59:10,
61:1, 61:4, 62:15
**issued** [1] - 22:9
**issues** [16] - 3:12,
6:17, 7:2, 9:3, 9:4,
10:6, 10:9, 10:11,
13:2, 14:5, 17:7,
17:14, 28:21, 38:3,
44:5, 62:23
**it'll** [1] - 62:6
**item** [2] - 51:10
**item-by-item** [1] -
51:10
**items** [2] - 59:7, 59:18
**iterations** [4] - 48:22,
49:24, 49:25, 50:15
**itself** [3] - 27:18,
37:17, 43:23

## J

**January** [1] - 49:23
**Jefferson** [1] - 3:22
**Jennifer** [2] - 23:23,
23:25
**Joel** [1] - 17:19
**John** [2] - 3:9, 6:10
**joint** [3] - 11:14, 61:9,
62:18
**Jon** [1] - 63:15
**Joy** [1] - 63:13
**judge** [3] - 36:6, 39:1,
39:11
**Judge** [8] - 36:6, 36:7,
36:17, 36:23, 36:24,
39:18
**judges** [1] - 36:16
**judgment** [2] - 51:16,
53:14
**judicial** [3] - 19:10,
19:14, 20:9
**June** [3] - 30:6, 30:24,
49:23
**junior** [1] - 52:18
**junky** [2] - 57:8, 57:10
**Justice** [3] - 43:23,
51:8, 51:15
**justification** [1] -
37:15
**justified** [1] - 33:9
**justify** [1] - 37:2

## K

**Katherine** [1] - 63:20
**keep** [2] - 5:1, 63:3
**keeping** [1] - 13:8
**Kent** [1] - 63:19
**kept** [1] - 20:24
**Kim** [1] - 3:13
**kind** [7] - 21:17, 40:4,
42:8, 42:10, 42:11,
47:5, 47:13
**knowledge** [4] -
24:25, 25:24, 26:2,
37:25

## L

**lack** [1] - 29:1
**lacked** [2] - 28:17,
29:3
**Lamb** [1] - 63:14
**Landon** [1] - 63:20
**laptops** [3] - 64:11,
64:12, 64:13
**largely** [1] - 38:20
**last** [3] - 7:8, 40:7,
46:16

**late** [1] - 30:5
**law** [6] - 19:12, 31:3, 36:19, 52:14, 53:22, 54:6
**lawsuit** [1] - 20:16
**lawyers** [2] - 5:17, 37:17
**leads** [1] - 26:18
**learning** [1] - 46:14
**least** [5] - 6:3, 6:6, 12:8, 20:12, 42:19
**leave** [2] - 5:3, 17:12
**leaves** [2] - 39:15, 55:19
**led** [1] - 46:15
**leeway** [1] - 58:7
**left** [2] - 19:22, 60:15
**legacy** [1] - 22:23
**legal** [4] - 19:8, 25:2, 51:16, 56:22
**legitimacy** [1] - 19:13
**letters** [4] - 7:23, 8:8, 11:10, 12:5
**level** [1] - 16:1
**levels** [1] - 24:19
**likely** [9] - 27:2, 29:9, 44:22, 44:23, 48:6, 48:12, 52:25, 53:1, 53:15
**likewise** [1] - 60:1
**limine** [12] - 3:16, 6:19, 22:9, 22:16, 23:23, 29:12, 32:7, 32:9, 34:15, 34:18, 61:6
**limit** [1] - 5:19
**limited** [4] - 24:25, 30:2, 41:10, 51:18
**limiting** [2] - 7:15, 21:10
**line** [4] - 50:13, 50:21, 54:14
**line-by-line** [1] - 54:14
**list** [8] - 9:12, 63:4, 63:5, 63:16, 63:19, 63:20, 63:21
**listen** [1] - 57:15
**literally** [1] - 37:6
**literary** [2] - 23:25, 25:6
**litigant's** [1] - 19:20
**litigate** [1] - 34:3
**litigation** [1] - 46:23
**live** [2] - 49:17, 63:22
**LLC** [2] - 27:11, 27:21
**logistical** [1] - 18:1
**logistics** [4] - 3:14, 6:20, 61:8, 62:22
**look** [11] - 17:5, 17:12, 18:14, 47:7, 50:20,

54:18, 57:6, 57:17, 61:9, 62:12
**looked** [4] - 13:12, 39:20, 47:4, 50:9
**looking** [6] - 5:15, 11:10, 47:6, 51:5, 54:13, 57:25
**looks** [2] - 17:17, 20:20
**lose** [1] - 42:14
**losing** [1] - 57:3
**loud** [1] - 7:22
**lower** [2] - 25:12, 38:19
**LSC** [2] - 32:15, 33:24
**Ltd** [1] - 28:22
**lunch** [1] - 61:15

**M**

**M&A** [2] - 46:12, 49:11, 52:17
**Macmillan** [1] - 17:23
**maintaining** [2] - 19:13, 21:11
**major** [1] - 35:16
**Malaviya** [2] - 41:25, 47:25
**management** [1] - 36:25
**March** [1] - 27:5
**market** [7] - 21:22, 25:15, 28:16, 32:11, 45:23, 51:18, 60:18
**markets** [4] - 28:7, 28:10, 28:21, 29:9
**Markus** [2] - 4:2, 22:22
**Martin** [1] - 4:5
**Maryland** [2] - 28:14, 28:15
**mask** [2] - 5:1, 11:22
**masks** [1] - 5:2
**massive** [1] - 49:19
**match** [1] - 28:4
**material** [1] - 30:10
**materials** [3] - 8:22, 8:24, 10:3
**matter** [4] - 30:11, 30:15, 38:2, 41:9
**matters** [2] - 4:22, 25:2
**Matthew** [1] - 4:5
**maximizing** [1] - 23:9
**McKean** [1] - 63:20
**McKinsey** [2] - 59:19, 59:23
**mean** [5] - 14:19, 15:1, 40:14, 42:21, 45:10
**meant** [1] - 15:24
**measure** [1] - 31:1

**media** [1] - 6:4
**meet** [11] - 5:20, 8:23, 10:2, 16:4, 16:10, 16:13, 44:22, 55:8, 55:9, 58:13, 60:24
**meet-and-confer** [2] - 8:23, 10:2
**meets** [1] - 58:3
**Megan** [2] - 3:20, 64:10
**Mehta** [1] - 36:17
**Mel** [2] - 3:15, 34:25
**mention** [1] - 7:18
**merely** [1] - 36:25
**merger** [29] - 21:23, 22:24, 24:5, 25:6, 25:10, 28:7, 28:8, 28:11, 29:10, 29:15, 32:14, 33:24, 36:12, 37:3, 37:8, 38:16, 38:22, 44:4, 48:4, 49:8, 50:20, 51:4, 53:1, 53:22, 54:17, 57:21, 58:1, 59:11, 59:14
**merger's** [1] - 24:12
**merger-specific** [1] - 59:14
**mergers** [3] - 47:4, 51:24
**meritorious** [1] - 58:6
**merits** [3] - 23:15, 43:17, 43:18
**Merrell** [1] - 26:11
**met** [3] - 32:23, 52:6, 52:24
**methodologies** [4] - 24:14, 30:10, 31:18, 32:1
**methodology** [7] - 30:3, 30:4, 31:5, 31:13, 31:14, 31:24, 54:9
**methods** [2] - 26:5, 26:6
**MetLife** [1] - 21:18
**Metro** [1] - 31:7
**Mexican** [1] - 31:21
**mic** [1] - 36:9
**midafternoon** [1] - 61:14
**midmorning** [1] - 61:13
**might** [11] - 9:21, 10:18, 11:2, 13:11, 15:7, 19:18, 19:20, 43:14, 47:12, 48:11, 48:25
**Mike** [1] - 4:12
**million** [4] - 51:19,

52:3, 52:9, 60:15
**mind** [3] - 36:9, 42:22
**mindful** [1] - 4:23
**minimum** [1] - 7:10
**minuscule** [1] - 52:3
**minute** [2] - 22:10, 59:6
**minutes** [4] - 45:13, 45:18, 61:15, 61:17
**missed** [1] - 3:22
**Mitchell** [1] - 4:12
**Mitnick** [3] - 17:17, 17:18, 17:19
**MITNICK** [4] - 17:19, 17:23, 18:9, 18:16
**Mkt** [1] - 27:15
**model** [37] - 27:9, 29:15, 29:17, 29:19, 29:21, 29:23, 30:2, 30:13, 30:14, 30:20, 30:23, 31:12, 37:10, 37:11, 37:12, 37:14, 41:23, 46:8, 46:10, 46:13, 46:17, 46:20, 46:21, 47:24, 48:2, 48:5, 48:9, 48:22, 49:4, 49:17, 49:25, 50:14, 50:15, 51:18, 52:15, 54:5
**model's** [1] - 30:5
**modeling** [1] - 31:10
**modification** [1] - 8:16
**morning** [17] - 3:7, 3:17, 3:18, 4:7, 4:9, 4:16, 5:7, 5:13, 6:11, 8:24, 10:6, 18:3, 34:25, 43:7, 43:9, 52:12, 64:21
**Morris** [1] - 32:3
**Mossman** [1] - 4:12
**most** [5] - 8:1, 9:15, 35:21, 50:8, 51:23
**motion** [30] - 3:16, 22:16, 23:20, 23:22, 24:9, 29:6, 29:11, 30:25, 32:6, 32:7, 32:8, 33:1, 33:16, 33:21, 34:6, 34:8, 34:9, 34:13, 39:24, 42:14, 43:15, 51:16, 52:10, 57:1, 57:4, 57:16, 58:5, 60:22
**motions** [6] - 6:19, 22:9, 34:15, 34:18, 56:25, 58:8, 61:5, 61:6
**move** [8] - 6:19, 18:17, 22:9, 32:10, 33:20, 34:20, 35:18, 61:6
**moved** [1] - 34:4

**moving** [1] - 32:6
**multiple** [1] - 18:6
**must** [4] - 18:5, 26:17, 36:11, 36:13

**N**

**N94** [1] - 4:25
**N95** [1] - 4:25
**name** [1] - 7:19
**names** [3] - 12:10, 12:12, 14:17
**nature** [2] - 26:13, 58:8
**necessarily** [3] - 13:7, 13:10, 51:9
**necessary** [2] - 6:6, 12:11
**need** [25] - 5:17, 5:18, 5:21, 7:22, 18:22, 20:2, 20:11, 36:23, 36:24, 37:2, 37:3, 39:2, 55:7, 55:15, 56:3, 56:8, 58:11, 58:12, 59:1, 61:3, 61:20, 62:3, 64:2, 64:4, 64:16
**needs** [3] - 48:14, 58:19, 59:18
**negotiations** [1] - 22:5
**Nelson** [1] - 4:13
**net** [2] - 37:24, 38:4
**Nevada** [1] - 32:5
**never** [3] - 20:22, 33:1, 34:4
**new** [14] - 4:24, 16:21, 23:3, 29:23, 30:10, 31:4, 31:13, 31:14, 31:17, 31:18, 31:23, 31:24, 32:1
**New** [1] - 31:23
**Newspapers** [1] - 28:13
**next** [3] - 3:23, 32:6, 45:17
**night** [1] - 46:11
**Nixon** [1] - 19:20
**nobody** [2] - 14:1, 57:18
**Non** [1] - 11:16
**Non-Parties** [1] - 11:16
**none** [3] - 28:5, 37:18, 37:19
**Noni** [1] - 4:13
**normative** [3] - 52:17, 54:11
**notably** [2] - 21:15, 42:9
**note** [8] - 4:24, 16:18,

21:13, 26:23, 30:25, 36:3, 59:18, 63:1
**notes** [2] - 16:8, 33:1
**nothing** [4] - 35:25, 37:6, 38:3, 64:20
**notice** [5] - 8:22, 10:3, 16:8, 17:1, 61:23
**noticed** [1] - 9:11
**noticing** [1] - 5:12
**November** [4] - 37:14, 48:21, 49:4, 50:6
**number** [13] - 5:20, 6:18, 23:22, 24:7, 25:15, 35:15, 36:6, 38:8, 38:10, 38:21, 41:2, 60:15, 60:16
**numbers** [17] - 37:2, 40:19, 42:11, 42:25, 47:6, 47:8, 48:1, 48:13, 48:22, 52:13, 53:21, 54:13, 57:11, 57:12, 57:20, 58:17, 60:8
**numerous** [1] - 21:13

**O**

**O'Melveny** [1] - 3:20
**object** [2] - 10:16, 15:16
**objected** [1] - 20:4
**objection** [6] - 6:23, 6:25, 10:13, 13:4, 13:12, 31:16
**objections** [7] - 8:17, 9:25, 10:7, 12:23, 18:3, 21:3, 62:20
**objectors** [1] - 21:1
**objects** [1] - 20:25
**observations** [1] - 58:15
**obviously** [2] - 39:13, 55:14
**occur** [4] - 44:23, 53:1, 53:17
**October** [1] - 32:5
**offer** [2] - 28:20, 29:8
**offered** [1] - 19:2, 29:14
**offering** [1] - 29:19
**offers** [1] - 21:13
**official** [3] - 49:25, 50:14, 50:15
**offset** [1] - 52:1
**offsetting** [1] - 44:20
**often** [2] - 21:9, 51:24
**on-the-record** [1] - 18:22
**once** [3] - 16:23, 51:17, 51:18

**one** [32] - 6:13, 10:16, 19:15, 22:12, 22:13, 22:24, 23:1, 34:16, 35:3, 35:15, 35:21, 36:2, 36:6, 37:11, 38:21, 46:17, 46:18, 46:19, 47:7, 48:16, 50:4, 50:9, 52:16, 54:3, 54:20, 56:2, 59:6, 59:12, 59:20, 59:21, 60:5
**onerous** [1] - 39:4
**open** [3] - 11:20, 12:16, 54:19
**opening** [1] - 61:19
**operate** [1] - 40:10
**opine** [3] - 28:10, 28:16, 52:15
**opinion** [7] - 25:5, 25:10, 25:25, 26:19, 28:20, 29:12, 29:14
**opinions** [3] - 27:24, 29:8, 31:18
**Oppenheimer** [1] - 3:21
**opportunity** [4] - 15:20, 17:2, 17:7, 17:13
**opposed** [1] - 13:13
**opposing** [2] - 20:7, 31:19
**opposition** [1] - 24:16
**oral** [2] - 22:11, 39:25
**order** [13] - 7:11, 8:17, 10:2, 16:23, 22:10, 31:15, 32:22, 33:20, 34:10, 56:24, 58:20, 64:5, 64:16
**otherwise** [4] - 11:22, 20:14, 25:25, 37:7
**outdated** [1] - 37:20
**outlet** [1] - 25:14
**outlines** [1] - 16:7
**outperformed** [1] - 46:20
**output** [4] - 25:16, 48:9, 49:20, 59:16
**outset** [1] - 45:20
**outside** [1] - 6:8
**outweigh** [1] - 52:9
**outweighed** [1] - 19:16
**overall** [3] - 20:16, 24:6, 53:4
**overflow** [4] - 5:16, 5:22, 6:5, 6:15
**oversee** [1] - 24:17
**overstating** [1] - 40:15
**own** [4] - 24:21, 30:20, 31:12, 38:3

**P**

**page** [6] - 16:4, 25:8, 25:21, 31:1, 31:20, 48:20
**paid** [2] - 19:2, 37:16
**pains** [1] - 11:17
**pandemic** [1] - 4:18
**papers** [1] - 58:16
**paragraph** [5] - 25:9, 25:16, 25:21, 59:13, 60:7
**Parris** [1] - 63:14
**Parris-Lamb** [1] - 63:14
**part** [7] - 13:9, 29:5, 29:19, 35:21, 41:13, 51:20
**participate** [1] - 5:23
**particular** [8] - 14:15, 20:12, 26:14, 27:18, 36:15, 50:1, 57:16, 59:1
**particularly** [2] - 9:10, 35:14
**Parties** [2] - 11:16, 11:18
**parties** [60] - 4:19, 5:17, 6:18, 7:7, 7:11, 7:14, 8:3, 8:18, 8:21, 8:24, 9:7, 9:11, 9:22, 10:1, 10:5, 10:24, 11:8, 11:22, 11:24, 12:2, 12:23, 13:10, 13:16, 14:6, 14:7, 15:15, 16:4, 16:13, 16:14, 16:20, 17:3, 17:12, 17:15, 19:1, 19:6, 20:13, 20:15, 21:3, 21:5, 21:10, 21:24, 22:2, 22:7, 22:10, 34:18, 37:13, 50:19, 55:9, 56:14, 56:23, 58:13, 60:24, 61:22, 61:24, 62:17, 62:23, 64:21
**parties'** [3] - 7:9, 30:12, 61:9
**parts** [3] - 10:24, 35:2, 35:3
**party** [16] - 5:11, 5:12, 6:5, 6:17, 10:9, 12:4, 16:17, 17:8, 18:11, 30:12, 33:6, 33:7, 33:19, 33:21, 36:13, 39:12
**party's** [1] - 21:15
**pass** [1] - 56:6
**pass-through** [1] - 56:6

**passages** [1] - 10:17
**passed** [1] - 38:10
**past** [5] - 47:5, 51:17, 51:18, 56:2, 58:12
**path** [1] - 40:15
**pause** [2] - 57:17, 57:24
**Penguin** [13] - 3:19, 4:3, 4:4, 4:6, 22:16, 22:18, 22:21, 38:16, 46:6, 46:16, 46:18, 46:19, 48:3
**people** [6] - 5:1, 5:21, 5:23, 16:19, 37:13, 47:14
**percentages** [1] - 47:15
**perfectly** [2] - 50:12, 50:13
**perform** [1] - 18:22
**perhaps** [4] - 40:3, 40:14, 46:19
**permissible** [1] - 31:5
**permit** [6] - 18:4, 21:17, 31:17, 64:5, 64:6
**permitted** [1] - 31:23
**person** [5] - 3:8, 4:17, 20:5, 38:9, 43:11
**personally** [1] - 24:18
**perspective** [1] - 17:4
**persuasive** [2] - 44:21, 46:23
**PETROCELLI** [18] - 3:18, 4:2, 4:8, 6:25, 7:25, 10:15, 10:22, 11:7, 13:19, 14:8, 14:12, 14:14, 14:17, 14:23, 62:24, 64:4, 64:8, 64:17
**Petrocelli** [8] - 3:19, 6:24, 8:5, 10:14, 11:9, 12:22, 13:17, 62:5
**Pharmaceuticals** [1] - 26:11
**Philip** [1] - 32:3
**picks** [1] - 38:18
**pieces** [2] - 7:15, 11:1
**place** [1] - 46:5
**plaintiff's** [1] - 3:5
**plaintiffs** [2] - 31:8, 31:13
**plan** [1] - 63:22
**planning** [1] - 22:11
**play** [1] - 63:21
**pleased** [1] - 4:18
**pleasure** [2] - 43:10
**plus** [1] - 49:9
**podium** [1] - 3:6

**point** [12] - 12:17, 19:9, 23:2, 38:19, 39:18, 40:8, 50:1, 50:19, 51:14, 51:16, 56:13, 56:20
**Point** [2] - 43:19, 43:20
**policy** [7] - 22:17, 22:25, 23:4, 23:7, 23:11, 23:18, 23:21
**portion** [1] - 38:8
**portions** [2] - 25:3, 35:4
**position** [4] - 12:15, 31:4, 35:15, 42:13
**positions** [2] - 9:8, 55:11
**positive** [1] - 5:9
**possession** [1] - 32:13
**possibility** [2] - 20:7, 21:8
**possible** [2] - 7:4, 9:13
**post** [2] - 62:16, 62:18
**post-trial** [2] - 62:16, 62:18
**potential** [1] - 12:19
**potentially** [4] - 18:20, 23:19, 55:7, 58:6
**practices** [5] - 5:15, 24:23, 27:7, 27:14, 29:8
**preclude** [4] - 22:16, 29:6, 32:10, 60:23
**precomplaint** [1] - 30:21
**predicted** [1] - 36:12
**predicting** [1] - 28:8
**predictions** [1] - 24:5
**preferred** [1] - 41:18
**prejudice** [2] - 20:7, 21:8
**prejudiced** [1] - 21:14
**prejudicial** [2] - 29:25, 34:13
**preliminary** [1] - 4:22
**premise** [1] - 24:21
**premises** [1] - 27:8
**prepare** [3] - 30:23, 41:19, 61:19
**present** [15] - 6:19, 34:24, 40:12, 44:2, 44:3, 44:11, 44:20, 45:25, 55:14, 55:25, 56:15, 56:18, 58:10, 58:24, 60:25
**presentation** [1] - 55:6
**presentations** [1] -

64:21
**presented** [1] - 37:14
**presumption** [3] -
19:10, 19:11, 19:15
**pretrial** [9] - 8:17,
10:2, 11:14, 56:24,
61:9, 61:20, 61:23,
62:19, 63:2
**pretty** [2] - 6:22, 7:5
**previous** [2] - 20:3,
34:10
**previously** [1] - 9:5
**PRH** [8] - 22:18,
22:22, 22:25, 23:2,
37:16, 37:17, 42:1
**PRH's** [2] - 23:6, 40:25
**price** [3] - 37:15, 38:3,
50:8
**primarily** [1] - 26:16
**principal** [1] - 46:10
**principle** [1] - 10:15
**principles** [5] - 26:5,
26:6, 26:9, 29:4,
52:17
**printing** [7] - 32:8,
32:9, 32:10, 32:11,
32:16, 32:17, 34:7
**printing-related** [3] -
32:8, 32:9, 34:7
**privacy** [1] - 20:6
**probative** [1] - 34:13
**problem** [3] - 37:9,
37:21, 38:13
**problems** [2] - 35:20,
38:21
**procedural** [1] - 62:23
**procedure** [1] - 12:16
**procedures** [4] - 6:20,
8:7, 11:13, 61:9
**Procedures** [1] - 33:5
**proceed** [1] - 34:21
**proceeding** [1] - 8:1
**proceedings** [4] -
5:24, 19:1, 19:11,
20:9
**Proceedings** [1] -
64:23
**process** [18] - 7:5,
8:16, 8:19, 8:21, 9:7,
9:24, 10:2, 10:8,
11:2, 11:23, 15:2,
15:13, 15:23, 16:7,
16:24, 17:15, 24:18,
49:7
**produce** [3] - 30:6,
32:21, 33:22
**produced** [2] - 15:7,
32:17
**product** [1] - 26:5
**production** [3] - 33:2,

33:21, 34:4
**Professor** [5] - 46:5,
50:9, 51:21, 52:13,
59:4
**proffer** [2] - 43:16,
49:2
**proffered** [2] - 28:15,
29:2
**profit** [1] - 23:9
**profit-maximizing** [1]
- 23:9
**progress** [5] - 7:7,
7:10, 8:3, 8:15, 12:8
**projected** [2] - 48:21,
53:16
**projection** [1] - 46:14
**projections** [1] - 46:20
**projects** [1] - 46:8
**promise** [1] - 23:8
**promptly** [2] - 61:11,
61:12
**proof** [2] - 40:13,
44:18
**properly** [2] - 30:16,
34:3
**property** [1] - 20:6
**proportional** [1] -
33:25
**proposal** [1] - 18:2
**propose** [3] - 22:12,
31:12, 34:2
**proposed** [10] - 8:16,
17:2, 21:23, 26:10,
32:14, 33:25, 46:7,
62:16, 62:19, 64:16
**proposing** [1] - 42:23
**proposition** [2] -
27:10, 32:1
**proprietary** [1] - 21:16
**Props** [1] - 27:11
**protect** [3] - 11:17,
16:25, 20:14
**protections** [1] - 12:3
**protective** [1] - 32:22
**prove** [2] - 39:13, 44:2
**proven** [1] - 46:20
**provide** [6] - 8:21,
16:13, 24:12, 33:6,
33:14, 45:13
**provided** [4] - 21:4,
29:23, 33:12
**provides** [5] - 24:14,
25:23, 33:5, 33:19,
47:25
**providing** [1] - 24:20
**prudent** [1] - 40:3
**pseudonyms** [1] -
11:22
**public** [8] - 11:19,
19:10, 19:12, 20:2,

20:3, 20:11, 20:18,
20:21
**public's** [2] - 20:16,
20:18
**publicly** [3] - 7:16,
11:25, 20:23
**published** [2] - 24:7,
25:11
**publisher** [2] - 14:17,
25:13
**Publishers** [1] - 17:24
**publishers** [13] - 12:4,
12:13, 12:20, 13:22,
14:12, 15:5, 15:7,
16:1, 16:5, 22:4,
25:8, 25:15, 25:18
**publishing** [4] - 29:17,
35:16, 46:13, 46:15
**pulled** [3] - 42:8,
57:20, 58:17
**pulling** [1] - 57:11,
57:12
**purchase** [2] - 22:24,
50:7
**purpose** [1] - 21:20
**purposes** [3] - 19:18,
20:8, 31:17

## Q

**Quad/Graphics** [2] -
32:14, 33:24
**qualified** [11] - 24:10,
24:17, 25:2, 25:4,
25:23, 27:6, 27:12,
28:9, 28:16, 28:20,
29:3
**qualify** [1] - 28:25
**quantification** [1] -
36:4
**questionable** [1] -
36:22
**questions** [3] - 34:22,
61:10
**quickly** [1] - 31:2
**quite** [2] - 36:20,
40:11
**quote** [1] - 25:23
**quoting** [2] - 26:22,
36:7

## R

**Rachel** [1] - 4:12
**raise** [5] - 10:5, 10:6,
17:7, 17:9, 17:13
**raised** [1] - 30:11
**ran** [1] - 47:13
**Random** [13] - 3:19,
4:3, 4:4, 4:6, 22:16,
22:18, 22:21, 38:16,

46:6, 46:16, 46:19,
48:4
**random** [1] - 47:9
**Randy** [1] - 3:21
**rapid** [1] - 5:7
**rather** [4] - 10:6,
24:21, 25:1, 33:13
**ratio** [6] - 37:22,
37:24, 38:7, 38:15,
56:5
**raw** [8] - 12:24, 12:25,
13:4, 13:6, 13:13,
13:19, 13:23, 18:19
**reach** [1] - 9:9
**reached** [2] - 26:18,
29:20
**READ** [9] - 3:7, 6:1,
62:2, 62:9, 62:14,
63:1, 63:7, 63:9,
63:12
**read** [4] - 25:19, 36:1,
51:4, 61:20
**Read** [2] - 3:9, 5:25
**readers** [1] - 25:19
**ready** [1] - 4:18
**reaffirmed** [1] - 29:18
**real** [3] - 10:11, 24:4,
46:21
**real-world** [1] - 46:21
**reality** [1] - 28:4
**really** [6] - 10:22,
10:24, 13:7, 41:9,
51:15, 64:9
**reason** [6] - 8:25,
12:2, 36:21, 57:16,
57:24, 60:1
**reasonable** [4] - 48:9,
52:16, 52:25, 54:10
**reasonably** [5] -
36:13, 44:23, 46:2,
48:10, 52:25
**reasoned** [2] - 28:18,
53:14
**reasoning** [1] - 34:10
**rebut** [1] - 31:18
**rebuttal** [9] - 29:16,
30:4, 30:14, 30:24,
31:11, 31:17, 31:24,
40:25
**receive** [2] - 25:12,
33:17
**received** [4] - 7:23,
8:18, 30:24
**recognize** [1] - 51:23
**recognizes** [1] - 19:11
**recommended** [1] -
10:8
**record** [13] - 3:6, 7:21,
16:18, 18:18, 18:21,
18:22, 24:14, 34:17,

46:6, 46:16, 46:19,
48:4
**records** [2] - 19:9,
20:22
**redact** [2] - 11:24,
12:15
**redacting** [1] - 18:20
**redaction** [1] - 21:17
**redo** [1] - 54:4
**reduction** [1] - 59:15
**refer** [1] - 35:25
**references** [1] - 24:14
**referred** [1] - 51:24
**referring** [2] - 19:1,
22:18
**refine** [1] - 9:8
**reflect** [2] - 24:3,
42:12
**refused** [1] - 56:14
**regard** [2] - 6:1, 6:2
**regarding** [6] - 3:14,
22:21, 25:22, 32:13,
34:16, 34:17
**Regarding** [1] - 11:15
**regardless** [1] - 56:15
**rejected** [2] - 39:2,
59:22
**related** [5] - 12:24,
32:8, 32:9, 34:7,
38:5
**relates** [1] - 19:2
**relevance** [4] - 23:17,
23:19, 26:9, 34:11
**relevant** [16] - 18:24,
19:8, 21:21, 22:1,
26:12, 28:7, 28:10,
28:16, 28:21, 29:9,
32:16, 33:24, 35:18,
44:16, 45:23, 51:3
**reliability** [3] - 26:9,
44:2, 49:1
**reliable** [7] - 26:5,
46:22, 48:8, 50:8,
50:10, 51:12, 57:14
**reliably** [2] - 26:6,
26:20
**reliance** [2] - 27:23,
31:4
**relies** [1] - 37:10
**rely** [2] - 33:4, 36:24
**relying** [1] - 26:16
**remain** [1] - 21:6
**remaining** [2] - 23:2,
23:5
**remember** [2] - 41:25,
59:21
**render** [2] - 28:19,
48:23
**repeat** [1] - 38:8
**reply** [14] - 24:24,

29:18, 29:23, 29:24, 30:2, 30:6, 30:9, 30:10, 30:16, 30:18, 30:24, 31:5, 31:13, 32:2

**report** [21] - 24:1, 24:3, 25:3, 25:8, 25:16, 25:21, 29:13, 30:1, 30:3, 30:7, 31:10, 31:11, 31:15, 35:23, 37:19, 40:19, 47:18, 48:20, 57:18, 60:7

**REPORTER** [1] - 36:8

**reports** [3] - 42:12, 42:13, 55:18

**represent** [5] - 4:10, 17:20, 17:21, 17:23, 36:11

**representatives** [5] - 5:12, 16:17, 16:19, 17:8, 18:11

**requested** [2] - 33:14, 33:22

**requests** [1] - 20:14

**require** [8] - 4:25, 5:6, 13:8, 18:5, 41:13, 51:4, 52:14, 58:1

**required** [5] - 33:7, 54:16, 59:23, 60:4, 64:9

**requirement** [1] - 8:23

**requires** [3] - 20:1, 26:24, 54:7

**resolution** [1] - 9:9

**resolve** [3] - 9:6, 9:20, 61:1

**resolved** [1] - 9:3

**respect** [8] - 12:13, 14:9, 35:15, 44:7, 44:13, 50:25, 52:6, 61:25

**response** [5] - 17:11, 38:23, 40:5, 41:12, 42:9

**responsive** [1] - 9:25

**rest** [3] - 41:16, 56:3, 61:3

**restrictions** [1] - 4:23

**result** [3] - 20:13, 25:11, 49:4

**resulting** [2] - 27:9, 45:21

**results** [2] - 29:20, 48:12

**reveal** [2] - 14:1, 15:15

**reveals** [4] - 18:25, 19:6, 20:17, 22:3

**revenues** [2] - 37:24, 38:4

reversed [1] - 27:19

**review** [6] - 47:18, 49:9, 51:7, 51:9, 52:15, 55:18

**reviewed** [2] - 23:12, 31:3

**revision** [1] - 15:22

**rigorous** [1] - 46:8

**robust** [1] - 46:8

**roll** [1] - 22:12

**room** [1] - 6:5

**Rosetta** [1] - 16:12

**Rothe** [1] - 26:21

**routinely** [2] - 20:24, 31:16

**Rudolph** [2] - 23:23, 23:25

**Rudzin** [1] - 3:21

**ruin** [1] - 14:2

**rule** [11] - 19:12, 22:11, 22:13, 23:16, 33:9, 33:19, 40:1, 55:1, 55:16, 64:12, 64:13

**Rule** [12] - 25:22, 26:22, 33:4, 33:7, 33:13, 33:15, 33:16, 33:22, 34:13, 48:24, 57:14, 57:25

**Rules** [1] - 33:5

**ruling** [7] - 9:6, 34:9, 34:10, 40:4, 41:15, 42:17

**rulings** [2] - 22:19, 34:17

**Ryan** [1] - 4:12

---

**S**

**S&S** [1] - 22:19

**safe** [2] - 5:5, 5:15

**sales** [1] - 24:19

**sanction** [2] - 33:25, 34:2

**sanctions** [1] - 34:5

**Sansigre** [26] - 41:23, 42:7, 42:19, 42:25, 44:3, 46:10, 46:11, 47:3, 47:24, 48:13, 48:14, 49:5, 49:9, 50:2, 50:24, 52:16, 53:13, 53:16, 55:21, 57:19, 58:15, 58:19, 59:3, 60:5

**Sansigre's** [2] - 54:4, 58:16

**satisfied** [1] - 48:11

**satisfy** [1] - 13:16

**save** [2] - 41:19, 61:4

**saving** [2] - 36:11,

36:13

**savings** [1] - 38:9

**saw** [1] - 9:4

**schedule** [2] - 40:11, 62:18

**Schuster** [5] - 4:11, 22:19, 22:22, 22:23, 49:6

**SCHWARZ** [23] - 34:25, 35:7, 35:14, 36:10, 36:15, 38:12, 38:15, 39:6, 39:11, 39:18, 39:22, 40:7, 41:17, 42:15, 42:18, 43:1, 43:5, 59:6, 59:10, 60:1, 60:10, 60:14, 60:20

**Schwarz** [7] - 3:15, 34:25, 36:8, 43:14, 43:20, 45:3, 52:12

**scientific** [1] - 26:1

**scope** [2] - 30:9

**score** [2] - 29:15, 49:3

**Scott** [1] - 31:21

**SE** [1] - 3:3

**seal** [7] - 12:25, 13:8, 13:23, 15:9, 19:5, 19:9, 20:17

**sealed** [4] - 13:20, 34:8, 34:10

**sealing** [7] - 13:4, 13:13, 18:19, 18:20, 18:24, 21:2, 22:2

**second** [9] - 12:22, 20:3, 20:20, 25:10, 28:22, 29:15, 36:3, 37:9, 56:20

**secondly** [1] - 37:9

**secret** [1] - 20:24

**Section** [1] - 59:13

**sections** [1] - 60:7

**see** [19] - 3:8, 12:5, 13:12, 13:15, 16:14, 16:18, 16:21, 17:11, 36:1, 39:7, 47:4, 47:19, 47:24, 49:20, 54:23, 57:6, 58:22

**seeing** [2] - 7:21, 57:25

**seek** [2] - 32:24, 34:2

**seeking** [2] - 33:19, 35:16

**seem** [1] - 51:4

**sellers** [1] - 15:8

**semantic** [1] - 39:8

**send** [1] - 64:16

**sense** [5] - 12:25, 38:2, 51:20, 54:8, 54:23

**sensitive** [2] - 21:12,

55:11

**sent** [1] - 11:10

**separate** [3] - 44:14, 49:10

**separately** [1] - 51:5

**September** [2] - 22:20, 62:21

**sequence** [1] - 8:2

**serious** [2] - 35:8, 35:17

**serve** [1] - 19:19

**seven** [1] - 62:20

**several** [1] - 7:8

**severalfold** [1] - 51:20

**severe** [1] - 34:2

**Shah** [1] - 32:4

**shaking** [1] - 22:7

**shape** [1] - 55:5

**share** [2] - 45:15, 61:10

**Shearman** [2] - 4:10, 4:11

**Shores** [1] - 4:12

**shorter** [1] - 63:4

**show** [9] - 13:9, 31:10, 44:22, 44:25, 45:1, 45:20, 46:4, 48:11, 49:3

**showing** [1] - 24:21

**shown** [1] - 11:24

**shows** [2] - 48:20, 51:19

**sic** [1] - 39:6

**side** [7] - 55:12, 62:5, 62:6, 63:12, 63:14, 63:15

**sides** [2] - 7:3, 63:1

**sideshow** [1] - 51:24

**sign** [1] - 64:16

**significant** [6] - 21:25, 38:10, 41:1, 41:2, 50:22, 50:25

**similar** [3] - 29:20, 46:17, 50:21

**Simon** [5] - 4:10, 22:19, 22:21, 22:23, 49:6

**simple** [2] - 38:2, 38:22

**simply** [4] - 9:11, 26:25, 31:2, 57:7

**Siskin** [1] - 31:15

**sit** [2] - 60:20, 61:17

**sitting** [2] - 55:1, 57:11

**six** [1] - 19:23

**six-factor** [1] - 19:23

**sixth** [2] - 20:8, 21:19

**skeptical** [1] - 55:19

**skill** [1] - 25:24

**slightly** [1] - 63:4

**small** [1] - 52:1

**smaller** [1] - 12:19

**Smith** [2] - 3:20, 64:10

**SMITH** [1] - 64:10

**Snyder** [29] - 3:16, 9:13, 9:16, 9:20, 12:14, 12:24, 13:1, 13:5, 29:16, 30:14, 30:23, 35:2, 35:22, 37:10, 37:21, 37:25, 38:17, 40:18, 41:24, 42:10, 42:24, 46:5, 50:9, 51:21, 52:13, 54:1, 55:21, 59:4, 60:6

**Snyder's** [5] - 34:16, 34:20, 35:20, 40:23, 57:18

**sold** [1] - 24:18

**solely** [1] - 26:16

**someone** [1] - 20:4

**sometimes** [1] - 48:23

**sorry** [7] - 8:9, 17:21, 17:23, 32:8, 42:23, 45:10, 48:17

**sort** [4] - 4:23, 10:11, 13:14, 55:3

**sorts** [1] - 38:4

**sounds** [1] - 53:17

**sources** [1] - 19:19

**South** [1] - 31:19

**Southern** [1] - 31:22

**speaking** [1] - 5:3

**specialized** [1] - 26:2

**specific** [10] - 7:15, 15:6, 15:23, 17:1, 19:3, 20:11, 34:22, 44:4, 53:2, 59:14

**specifically** [1] - 11:18

**specifics** [1] - 37:22

**spend** [2] - 41:1, 41:2

**spent** [3] - 15:8, 30:22, 46:6

**spoken** [1] - 7:22

**spreadsheet** [2] - 49:19, 49:21

**SR** [1] - 27:10

**SSA** [6] - 29:16, 29:17, 29:19, 29:20, 30:2, 30:14

**stable** [3] - 38:7, 38:15, 38:19

**stake** [2] - 21:16, 37:4

**stand** [2] - 11:9, 31:25

**standard** [2] - 19:8, 56:21

**standards** [3] - 27:25, 28:2, 57:25

**standing** [1] - 19:20

**start** [2] - 6:17, 61:11
**started** [2] - 4:19, 37:18
**starting** [3] - 3:5, 19:9, 46:4
**starts** [1] - 38:16
**state** [2] - 27:18, 34:17
**statement** [6] - 11:14, 60:17, 61:10, 61:23, 62:19, 63:2
**statements** [2] - 61:19, 61:20
**States** [8] - 3:3, 3:9, 8:12, 19:24, 31:20, 32:2, 35:1, 35:10
**stating** [1] - 31:16
**statistical** [1] - 31:10
**status** [1] - 7:2
**statutory** [1] - 32:21
**stay** [1] - 5:15
**Steinecke** [1] - 4:4
**Sterling** [2] - 4:10, 4:11
**Steven** [1] - 4:9
**still** [3] - 25:18, 25:19, 55:22
**stipulated** [1] - 56:24
**stipulation** [5] - 15:1, 15:22, 16:2, 16:22
**Stipulation** [1] - 11:15
**stone** [1] - 16:12
**stop** [1] - 23:3
**story** [1] - 40:20
**straightforward** [1] - 38:22
**streamline** [2] - 63:24, 63:25
**streamlining** [1] - 64:1
**strength** [2] - 20:6, 21:8
**Strick** [1] - 3:10
**strike** [2] - 29:12, 31:1
**strong** [3] - 19:10, 19:15, 21:11
**strongly** [1] - 21:1
**stuff** [1] - 56:5
**subject** [4] - 15:12, 26:14, 30:11, 30:15
**subjective** [2] - 27:1, 47:12
**submission** [1] - 26:10
**submissions** [1] - 37:18
**submit** [1] - 48:6
**submitted** [2] - 30:18, 31:9
**subsequent** [2] - 49:24, 50:15
**substantial** [2] - 38:8,

46:4
**substantially** [2] - 33:9, 34:12
**substantiate** [2] - 44:10, 44:25
**substantiation** [1] - 44:8
**substitution** [1] - 9:1
**sufficient** [7] - 26:4, 26:19, 27:24, 48:7, 51:11, 52:7, 52:8
**suggest** [3] - 16:17, 16:21, 17:5
**suggested** [2] - 10:19, 13:24
**suit** [1] - 31:8
**sum** [1] - 29:5
**summary** [1] - 51:15
**supervised** [1] - 24:19
**Supp** [5] - 26:21, 27:15, 28:13, 28:23, 31:7
**supply** [1] - 60:5
**support** [5] - 24:15, 27:10, 27:24, 28:1, 31:15
**supported** [1] - 28:12
**supports** [2] - 28:5, 31:3
**supposed** [6] - 52:19, 52:21, 53:6, 53:9, 54:20, 55:22
**surge** [1] - 4:24
**suspect** [1] - 42:1
**system** [1] - 5:8
**systematic** [1] - 57:23

---

**T**

**table** [2] - 3:13, 9:8
**Taft** [1] - 17:25
**talks** [2] - 11:18, 14:19
**targets** [1] - 30:14
**team** [2] - 49:5, 49:11
**teams** [1] - 49:10
**technical** [2] - 26:1, 28:6
**technology** [1] - 5:10
**telephone** [1] - 18:8
**ten** [1] - 9:6
**terms** [2] - 35:21, 58:7
**terribly** [1] - 35:25
**test** [5] - 5:7, 19:24, 20:1, 43:21, 58:3
**testified** [1] - 40:18
**testifies** [2] - 42:20, 42:25
**testify** [11] - 25:4, 25:25, 27:7, 27:13, 28:2, 28:6, 28:10,

9:7, 42:24, 51:21, 58:20
**testifying** [1] - 29:6
**testimony** [29] - 10:18, 11:2, 18:4, 23:23, 24:10, 24:25, 25:22, 26:3, 26:4, 26:14, 27:2, 27:8, 27:16, 34:16, 34:20, 35:3, 35:20, 40:2, 40:4, 40:21, 40:24, 41:24, 46:6, 55:8, 55:16, 55:20, 58:9, 58:17, 61:4
**themselves** [2] - 13:7, 51:22
**theory** [2] - 34:11, 42:8
**thereby** [2] - 28:3, 38:9
**therefore** [1] - 23:20
**they've** [3] - 17:16, 30:22, 63:15
**thinking** [1] - 58:13
**third** [41] - 5:11, 5:12, 6:5, 6:17, 6:18, 7:7, 7:10, 7:13, 8:2, 8:18, 8:21, 8:23, 9:11, 9:22, 9:25, 10:5, 10:9, 10:23, 12:4, 12:23, 13:9, 13:16, 14:7, 15:15, 16:14, 16:17, 16:20, 17:8, 18:11, 19:1, 20:4, 20:15, 20:25, 21:3, 21:10, 21:15, 22:2, 25:17, 29:11, 37:21
**third-party** [8] - 5:12, 6:5, 6:17, 10:9, 12:4, 16:17, 17:8, 18:11
**third-party's** [1] - 21:15
**Thomas** [2] - 63:16, 63:18
**thoughts** [2] - 8:6, 47:12, 61:10
**thousands** [1] - 24:20
**three** [7] - 35:20, 36:16, 38:6, 38:17, 38:21, 59:13
**threshold** [1] - 55:8
**tied** [1] - 15:6
**timing** [1] - 62:15
**today** [15] - 3:11, 4:22, 5:11, 5:19, 6:14, 6:22, 9:22, 16:24, 17:16, 18:13, 35:4, 35:7, 49:2, 50:2, 64:18
**today's** [1] - 6:16

**together** [1] - 21:9
**tomorrow** [1] - 25:18
**top** [2] - 15:8, 25:6
**total** [2] - 50:14, 50:16
**totally** [2] - 36:19, 44:13
**towards** [4] - 12:6, 13:1, 14:4, 15:1
**track** [1] - 63:3
**Trade** [1] - 27:11
**training** [3] - 25:24, 28:17, 29:1
**transaction** [9] - 19:7, 20:13, 21:24, 32:13, 45:21, 46:1, 48:7, 50:8
**transactions** [5] - 46:12, 47:8, 48:3, 57:21, 57:22
**transcripts** [2] - 8:15, 10:23
**Transit** [1] - 31:7
**trial** [26] - 3:14, 5:6, 5:15, 6:4, 6:6, 6:20, 9:14, 9:17, 11:24, 12:10, 19:23, 26:24, 30:7, 30:25, 41:13, 43:18, 45:15, 56:4, 58:7, 61:8, 61:12, 62:16, 62:18, 62:20, 62:22, 63:24
**Trial** [1] - 11:15
**trials** [2] - 6:12, 59:22
**trier** [1] - 26:2
**trips** [1] - 18:6
**true** [1] - 19:17
**truly** [1] - 10:24
**try** [6] - 5:19, 8:17, 9:3, 47:13, 54:4, 61:12
**trying** [5] - 5:11, 10:22, 33:11, 47:19, 63:23
**tune** [1] - 5:10
**twenty** [1] - 7:24
**twenty-eight** [1] - 7:24
**twice** [2] - 35:23, 60:7
**Twin** [1] - 27:3
**two** [9] - 28:12, 35:2, 40:25, 46:14, 48:21, 49:10, 49:24, 59:12, 59:22
**two-dozen** [1] - 46:14
**type** [3] - 15:9, 23:16, 36:11

---

**U**

**U.S** [2] - 19:21, 26:11
**ultimate** [4] - 24:15, 50:25, 51:2, 56:15

**ultimately** [2] - 26:8, 46:19
**undeniably** [1] - 32:16
**under** [14] - 13:8, 15:9, 20:21, 21:10, 26:8, 26:12, 31:5, 33:12, 33:15, 33:16, 33:22, 34:13, 48:24, 57:14
**undergoing** [1] - 4:23
**underlie** [1] - 26:10
**underlying** [3] - 24:22, 27:8, 48:5
**underway** [1] - 6:7
**undisputed** [1] - 40:17
**unenforceability** [1] - 23:18
**unenforceable** [2] - 23:8, 23:14
**unilateral** [2] - 23:8, 23:14
**unique** [1] - 24:7
**United** [8] - 3:3, 3:9, 8:12, 19:24, 31:20, 32:2, 35:1, 35:10
**unless** [4] - 12:10, 33:8, 41:3, 41:22
**unreasonably** [1] - 29:25
**unredacted** [1] - 7:21
**unrelated** [2] - 28:19, 32:20
**unreliable** [3] - 27:2, 37:20, 48:24
**unsaid** [1] - 60:15
**unusual** [1] - 52:2
**up** [17] - 5:4, 6:13, 12:20, 13:25, 17:6, 17:12, 35:24, 37:2, 37:22, 38:1, 40:14, 47:6, 47:13, 48:13, 52:18, 58:18, 60:3
**update** [1] - 7:2
**updated** [1] - 37:16
**upheld** [1] - 27:16
**USA** [1] - 32:3

---

**V**

**Va** [1] - 28:22
**vague** [1] - 42:10
**validity** [2] - 29:18, 30:14
**VANCE** [12] - 8:11, 8:14, 9:24, 12:8, 12:19, 13:3, 14:25, 15:11, 15:14, 15:17, 15:21, 16:15
**Vance** [2] - 3:10, 8:11, 8:13
**various** [1] - 24:5

**vehicle** [1] - 19:18
**venture** [1] - 37:4
**verifiability** [1] - 55:6
**verifiable** [23] - 37:8, 39:5, 39:6, 43:22, 44:25, 45:1, 47:21, 49:12, 52:14, 53:23, 53:24, 54:19, 55:22, 56:11, 56:22, 57:10, 57:13, 58:1, 58:2, 58:12, 59:11, 61:2
**verification** [5] - 38:23, 41:14, 42:19, 42:24, 55:7
**verified** [11] - 36:13, 39:6, 39:8, 43:22, 45:3, 47:21, 56:9, 57:13, 58:2, 59:15, 61:2
**verify** [13] - 36:4, 38:25, 39:3, 40:19, 45:7, 52:13, 53:25, 54:1, 54:6, 54:8, 56:22, 59:18, 60:8
**verifying** [9] - 52:19, 52:22, 53:3, 53:6, 53:8, 53:21, 53:23, 54:20, 55:23
**Vermiculite** [1] - 28:22
**version** [1] - 16:5
**versions** [1] - 49:25
**vetted** [2] - 49:7, 50:6
**vetting** [1] - 49:9
**via** [1] - 6:19
**ViacomCBS** [1] - 4:10
**view** [7] - 22:1, 33:10, 35:8, 39:8, 39:19, 45:6, 52:20
**views** [1] - 9:19
**violation** [2] - 33:3, 34:3
**Virginia** [1] - 28:24

# W

**W.R** [1] - 28:22
**wait** [3] - 6:23, 16:21, 40:2
**Walsh** [12] - 23:24, 23:25, 24:16, 25:8, 25:16, 25:21, 27:6, 28:2, 28:6, 28:9, 29:6, 29:7
**Walsh's** [3] - 24:10, 24:24, 25:3
**wants** [2] - 42:4, 63:3
**Warner** [1] - 19:21
**Washington** [1] - 31:6
**waste** [1] - 55:12
**watch** [1] - 5:23

**ways** [2] - 7:17, 55:15
**weak** [1] - 34:12
**wearing** [1] - 4:25
**week** [4] - 7:12, 30:18, 45:17
**weigh** [4] - 18:24, 20:1, 21:9, 22:1
**weighing** [1] - 18:23
**weighs** [1] - 21:1
**weight** [3] - 23:18, 46:25, 49:1
**Welfare** [1] - 27:3
**well..** [1] - 57:2
**Wendy** [1] - 63:19
**Western** [1] - 28:23
**Westlaw** [1] - 32:3
**whereas** [1] - 21:15
**Whole** [1] - 27:15
**whole** [1] - 31:14
**Wickersham** [1] - 17:24
**wildly** [1] - 48:23
**will-call** [1] - 63:13
**William** [2] - 63:16, 63:18
**willing** [2] - 55:20, 55:24
**win** [1] - 55:14
**wish** [1] - 17:8
**witness** [18] - 9:12, 10:19, 12:10, 12:11, 24:1, 25:1, 25:23, 26:16, 26:17, 28:16, 28:20, 28:25, 29:2, 33:6, 33:8, 53:11, 63:15, 63:16
**witnesses** [8] - 7:11, 7:12, 25:23, 39:16, 40:25, 52:11, 55:16, 63:2
**WL** [3] - 27:4, 31:20, 32:4
**Wolf** [2] - 63:19
**wonder** [1] - 16:3
**wondering** [1] - 12:25
**word** [3] - 26:25, 39:5, 59:17
**words** [1] - 36:10
**Workers** [1] - 27:3
**workings** [1] - 30:19
**world** [1] - 46:21
**World** [1] - 27:11
**worth** [1] - 59:4
**worthwhile** [1] - 45:13
**write** [2] - 25:12, 25:19
**writers** [2] - 25:12, 25:18
**writing** [4] - 16:14, 17:6, 17:13, 25:14

**written** [3] - 16:21, 30:7, 30:23
**wrote** [1] - 37:13

# Y

**year** [3] - 24:8, 52:3, 52:9
**years** [5] - 25:5, 27:13, 38:6, 38:17, 46:16
**York** [1] - 31:23
**you-all** [2] - 5:13, 16:21
**yourself** [1] - 8:10
**yourselves** [1] - 3:6