# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA,       )
                             )

*Plaintiff,*                )
                             )

v.                        )   Civil Action No. 1:21-cv-02886-FYP
                             )

BERTELSMANN SE & CO. KGaA, PENGUIN  )
RANDOM HOUSE, LLC, VIACOMCBS, INC.,  )
and SIMON & SCHUSTER, INC.,      )
                             )

*Defendants.*            )
                             )
_____ )

## DEFENDANT PENGUIN RANDOM HOUSE LLC'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to the Scheduling and Case Management Order (Dkt. No. 53, the "CMO"), Rule 33 of the Federal Rules of Civil Procedure, and Rule 26.2(d) of the Local Rules of the United States District Court for the District of Columbia (the "Local Rules"), Defendant Penguin Random House LLC ("PRH") hereby responds and objects as follows to Plaintiff United States of America's First Set of Interrogatories ("Interrogatories"), dated February 17, 2022:

## GENERAL OBJECTIONS

The following General Objections apply to each and every Interrogatory Plaintiff propounded on PRH, and are incorporated into each of the following responses by reference as if set forth fully therein.

1.     PRH objects to each Interrogatory and Plaintiff's Instructions to the extent that they purport to impose upon PRH obligations that exceed, or are inconsistent with, the CMO, the

**US v. Bertelsmann**
1:21-cv-0866-FYP
**PX 0862**

Federal Rules of Civil Procedure, or the Local Rules.  he CMO, Federal Rules of Civil

Procedure, and the Local Rules.

2.      PRH objects to Plaintiff's Interrogatories to the extent that they seek information

protected from discovery and disclosure by the attorney-client privilege, the attorney work

product doctrine, or any other applicable privilege or protections.

3.      PRH objects to Plaintiff's Interrogatories to the extent that they prematurely seek

production of information relating to the anticipated testimony of any expert witness.  PRH will

produce such information in accordance with the CMO.

4.      PRH objects to each of Plaintiff's Interrogatories as premature, overly broad,

unduly burdensome and not proportional to the needs of the case to the extent they require PRH

to provide, describe, or identify "each" or "any" facts or evidence that support particular

contentions that PRH may make at trial.  Any response to an Interrogatory incorporates this

objection and is made without waiver of additional evidence PRH may introduce at trial.  PRH

reserves the right to supplement, clarify, revise, or correct any or all of its objections and

responses.

5.      PRH objects to Instruction 2 as unduly burdensome and attempting to impose

obligations beyond those provided under Rules 26 and 33 of the Federal Rules of Civil

Procedure, the Local Rules, or the CMO.

## SPECIFIC OBJECTIONS AND RESPONSES

### INTERROGATORY 1:

For each investment since the merger of Penguin and Random House that you claim has

improved your supply chain for distributing books to retailers or wholesalers, including those

that resulted in expedited shipping times or lower return rates, provide a detailed description of

2

DOJ-LIT-000000038

the specific investment, the amount in dollars of the investment, the date and location of the investment, and the effects of the investment.

**OBJECTIONS AND RESPONSE TO INTERROGATORY 1**:

PRH objects to this Interrogatory to the extent it is duplicative of information supplied to Plaintiff during its investigation of the proposed transaction. PRH objects to this Interrogatory as seeking information not relevant to the parties' claims or defenses. PRH objects to this Interrogatory as vague and ambiguous, including in its use of the phrase "effects of the investment." PRH objects to this Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case because it calls for PRH to provide information about "each" investment it has made since 2013 and the effects of those investments. PRH objects to this Interrogatory as containing non-discrete subparts. PRH objects to this Interrogatory's request for a detailed and exhaustive list of every possible piece of evidence that may support PRH's contentions. PRH, nevertheless, has endeavored to estimate the investments it has made that have improved its supply chain. Subject to and without waiving the foregoing objections, PRH states as follows:

For over a decade, PRH has undertaken significant investments to increase the quality of its supply chain to the benefits of readers, retailers, and authors alike. Since 2009, PRH has spent nearly $257 million on supply chain improvements, including estimated up-front and annual spend. The majority of PRH's supply chain investments—approximately $159 million in cumulative expenditures—took place after the 2013 merger of Penguin and Random House and do not include other expenditures that might have indirectly improved PRH's supply chain, such as its investments in data science and metadata.

DOJ-LIT-000000039

These substantial investments have resulted in expedited shipping times and lower return rates, allowing booksellers to keep authors' titles in stock so readers can buy them and reducing (or eliminating) retailers' tendency to order too many copies (and then return those copies for a refund) when they know that a publisher might be slow in shipping books. Lower return rates result in significant savings to PRH that drop to the bottom line of an acquisition P&L, increasing the advance amount PRH can offer its authors. These improved return rates also directly benefit retailers by allowing them to keep books in stock and avoid the need to spend resources on returns.

In response to this interrogatory, and without waiving the foregoing objections, PRH has provided a list of the investments it has made to improve its supply chain since 2009, including a detailed description of the investment, an explanation of how the investment resulted in expedited shipping times or lower return rates, the date of the investment, the estimated amount of the investment (in estimated one-time costs, annual spend, and cumulative spend through 2021), the location of the investment, and the effects of the investment. *See* Exhibit 1.

Absent the transaction, it would be impractical for S&S to attempt to match PRH's $257 million supply chain improvements that have been more than 14 years in the making. With the transaction, S&S will have instant access to PRH's fulfillment capabilities and lower return rates, improving the advances S&S can offer its authors and allowing those authors to earn more royalties when their books are more available on retailers' shelves.

**INTERROGATORY 2:**

Describe any policies, practices, rules, or requirements regarding your acquisition of audio rights (including, but not limited to, those referenced in BPRH-005126181, BPRH-000633795, BPRH-005266893) for the period January 1, 2010, to the present and the basis for

DOJ-LIT-000000040

enacting or making any changes to such policies, practices, rules, or requirements over that time. For each policy, practice, rule, or requirement, please include in your description the substance of the policy, practice, rule, or requirement, as well as the date the policy, practice, rule, or requirement went into effect.

**OBJECTIONS TO INTERROGATORY 2**:

PRH objects to this Interrogatory to the extent Plaintiff has equal access to the information it seeks through PRH's document production because the burden of obtaining the requested information from those records will be substantially the same for either party. PRH objects to this Interrogatory as overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case because it calls for PRH to describe information about "any" policies, practices, rules, or requirements regarding its acquisition of audio rights since 2010 and the basis for any changes. PRH objects to this Interrogatory as containing non-discrete subparts. PRH also objects to this request as vague and ambiguous, including in its use of the term "basis."

Subject to and without waiving the foregoing objections, PRH states as follows: When PRH acquires the rights to publish a book, PRH prefers to acquire the right to publish the book in all formats, including physical, ebook, and audio. Each of those formats provides the narrative experience of the author's text (whether in print or spoken word), and PRH believes that the sale of audio rights separate from print and ebook rights allows the third-party audio publisher to free-ride on the substantial investments PRH makes after it acquires a title. PRH does not fully realize the benefits of its investments in an author's title—including substantial editorial and marketing investments—when a third party has the right to sell the same narrative experience in audio format. Accordingly, it has been the general practice of both Penguin and Random House since January 1, 2010 (prior to the merger in 2013, and then after that as a merged entity) to

5

acquire audiobook rights at the same time and under the same agreement as it acquires print and ebook rights. *See* BPRH-LIT-000475578 (Penguin and Random House pre-merger guidelines). Throughout that period, PRH has made exceptions on a case-by-case basis, usually for authors who have pre-existing audio publishing relationships (i.e. their previous books have been published in audio by another publisher) in which case PRH would agree to acquire print rights without audio. In April 2020, PRH issued global audio policy guidelines to PRH affiliates throughout the world describing the longstanding practice that has been followed by the U.S. business. *See* BPRH-005041515-517.

**INTERROGATORY 3:**

Describe any policies, practices, rules, or requirements regarding your payout structure for author advances (including, but not limited to, those referenced in BPRH-000459558, BPRH-005135053, BPRH-LIT-006235478) for the period January 1, 2010, to the present and the basis for enacting or making any changes to such policies, practices, rules, or requirements over that time. For each policy, practice, rule, or requirement, please include in your description the substance of the policy, practice, rule, or requirement, as well as the date the policy, practice, rule, or requirement went into effect.

**OBJECTIONS TO INTERROGATORY 3**:

PRH objects to this Interrogatory to the extent Plaintiff has equal access to the information it seeks through PRH's document production because the burden of obtaining the requested information from those records will be substantially the same for either party. PRH objects to this Interrogatory as overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case because it calls for PRH to provide information about "any" policies, practices, rules, or requirements regarding its payout structure for author advances since 2010

6

and the basis for any changes.  PRH objects to this Interrogatory as containing non-discrete

subparts.  PRH also objects to this request as vague and ambiguous, including in its use of the

term "basis" and phrase "payout structure."

Subject to and without waiving the foregoing objections, PRH states as follows:  Since

January 1, 2010, Penguin Random House (prior to the merger in 2013, Penguin) has had payout

guidelines for adult books and a mix of practices and guidelines for children's books, all of

which allow publishers and their business managers the discretion to change advance payout

schedules to win titles.

*Adult Contract Guidelines*:  PRH's adult payout guidelines state that publishers should

pay advances in four equal installments upon each of the following events:  execution of the

acquisition contract, delivery and acceptance of the manuscript, initial publication, and twelve

months after initial publication (six months may apply to titles published in a single format).[1]

*Children's Contract Practices and Guidelines*:  Penguin Young Readers Group had no

written guidelines for advance payouts between 2010 and 2020, but generally followed the

practice of paying advances in three or four installments, with the last payment usually due on

publication.  Random House Children's Books (RHCB) had no written payout guidelines until

approximately 2011, when it issued new guidelines.  *See* BPRH-00513505.  RHCB's guidelines

followed its prior practice of paying advances in three installments with the last payment due

DOJ-LIT-000000043

upon publication, with exceptions in the guidelines for advances in excess of $150,000 and illustrated books, when advances were usually paid in four installments.  *See id.*

Temporary COVID Changes:  At the outset of the global COVID pandemic in 2020, PRH's physical bookstore customers closed their doors and the specter of a cash crunch ensued. In March 2020, PRH issued temporary adult and children's advance payout guidelines to ensure it maintained sufficient operating capital during the unprecedented crisis.  *See* BPRH-LIT-006235478 (COVID Adult Payout Guidelines); BPRH-LIT-006235479 (COVID Children's Payout Guidelines).[2]  Once bookstores started to reopen and sales began to recover, PRH issued "Interim COVID Payout Guidelines" in June 2020 for adult books, which provided the circumstances under which publishers and business managers could use their discretion as to offer "regular" pre-COVID payout terms.  *See* BPRH-004397968 (June 2020 Adult Payout Guidelines).

Post-COVID Changes:  On September 1, 2020 PRH's cash flow improved and it reinstituted its pre-COVID payout guidelines for adult books and issued new guidelines for children's books that applied to both of its children's divisions.  *See* BPRH-000459558 (Sep. 2020 Adult Payout Guidelines); BPRH-LIT-006487924 (September 2020 Children's Payout Guidelines).[3]

In December 2020, PRH specified the circumstances that would most often warrant a higher on-signing payment share of the advance for a second of subsequent book in multi-work contracts.  *See* BPRH-004389538 (Dec. 2020 Adult Payout Guidelines); BPRH-LIT-006487852

---

[2]  PRH's "Regular Payout Guidelines" for children's books listed in this document had not been in effect prior to the pandemic.

[3] PRH decided to issue uniform corporate-level payout guidelines for children's books in September 2020 to loosen the former March 2020 Covid temporary guidelines for children's books and provide clear and consistent guiding principles.

DOJ-LIT-000000044

(Dec. 2020 Children's Payout Guidelines).  The December revisions were intended as a reminder to publishers and business managers of what types of exceptions were most often justified.

In April 2021, PRH revised its adult guidelines and allowed for higher payouts for second and subsequent titles under multi-work contracts with per-title advances less than $1 million. *See* BPRH-LIT-006488036 (April 2021 Adult and Children's Payout Guidelines).  PRH also issued revised children's payout guidelines that increased the advance thresholds at which children's authors could receive more favorable payout structures and removed the distinction in payout terms between book formats. *See Id.*  All of those changes were made in response to requests from authors' agents and as a result of the economic recovery.

**INTERROGATORY 4:**

Describe each instance that any publisher, including you, offered an advance greater than or equal to $50,000 to acquire the rights to publish a proposed book, and the author elected to self-publish that proposed book.  Please include in your description the name of the author, the name of the proposed book, the date of your offer for an advance, and the financial details of your offer.

**OBJECTIONS TO INTERROGATORY 4**:

PRH objects to this Interrogatory as seeking information not in PRH's possession, custody, or control, or which Plaintiff has equal access to from document productions (including productions by the parties and third-parties) and publicly available sources, and states that the burden of obtaining the requested information from those records will be substantially the same for either party.  PRH objects to this Interrogatory as overly broad, unduly burdensome, irrelevant, and not proportional to the needs of the case because it calls for PRH to describe "each instance" of an offer from "any publisher" regardless of date.  PRH also objects that this

DOJ-LIT-000000045

Interrogatory is unduly burdensome because PRH does not keep a record of the advances it offers.  PRH objects to this Interrogatory as containing non-discrete subparts.  PRH also objects to this request as vague, ambiguous, and overbroad, including in its use of the phrase "financial details of your offer."

Subject to and without waiving the foregoing objections, PRH states as follows:  Self-publishing is a lucrative and common alternative to traditional publishing for many authors, including those who receive advances in excess of $50,000.  Under the self-publishing model, authors can receive a significantly higher percentage of their earnings than if they sold their book to a traditional publisher.  The calculus of whether self-publishing might be more lucrative than traditional publishing, however, is more often undertaken by the author before an auction than after it has closed.  An author wishing to self-publish rarely first offers his or her work to publishers.  And an author who ultimately self-publishes after receiving offers from traditional publishers would not necessarily tell PRH (or any other publisher) of that decision.  Accordingly, plaintiff's interrogatory is misdirected at PRH.  Moreover, plaintiff has equal access to the types of documents that contain the information it seeks: public reporting and listings of self-published works (e.g., Amazon.com), third-party productions, the production of Simon & Schuster, and the production from PRH.  PRH, nevertheless, has endeavored to conduct a reasonable and non-exhaustive search within these sources for instances in which self-publishing played a role in the competitive process and found the following examples:

- PRH author Hal Elrod self-published *The Miracle Morning* in 2012 and since then has sold 350,000 copies across print, ebook and audio formats.  After acquiring a subsequent title from Mr. Elrod, PRH offered to acquire the *The Miracle Morning* in 2018 for ████████[4]  Mr. Elrod refused, telling PRH he's making ██████████ self-publishing.  PRH increased its offer to ██████████ and his agent turned the offer down again, stating "he is making too much money a year [] to sell the rights for ██████████[5]

---

[4] *See* BPRH-LIT-000489231.
[5] *See* BPRH-LIT-000489572.

DOJ-LIT-000000046

- Brandon Sanderson, a top-selling Macmillan and PRH sci-fi and fantasy author of the *Wheel of Time* series (among others), started an online fund-raising campaign this week to self-publish four of the novels. According to CNN, his goal was to raise $1 million in 30 days; instead, he raised more than $15 million in one day and nearly $29 million as of March 17, 2022.[6]

- S&S and Hachette author Collen Hoover, who has three books on NYT's fiction best seller list this week alone (including *Verity*, a book she originally self-published) likes to switch between traditional publishers and self-publishing. Ms. Hoover told a reporter recently that "I feel like when I published with a publisher, the successes are theirs, but the failures are mine. That's just something I feel, or make myself feel. But with self-publishing, all the successes are mine, and all of the failures are mine."[7]

- Donald Trump, Jr., former Hachette author of *Triggered*, turned down an offer from Hachette imprint Front Street Books to publish his second book in favor of self-publishing, according to the *New York Times*.[8]

- PRH bestselling author Molly Baz turned down ▆▆▆▆▆▆▆ in advances -- "couched around a small threat of self-publishing" -- forcing PRH to increase its offer.[9]

- S&S author Abbi Glines, an author of various romance series who styles herself as a "#1 New York Times, USA Today, and Wall Street Journal bestselling author" published two books with S&S and subsequently self-published several romance novels.[10]

- Rebecca Fett, author of *It Starts with the Egg*, turned down an offer from PRH for a companion cookbook to self-publish -- seemingly due to the higher royalty rates she would realize.[11]

- PRH author James Clear, author of a #1 *New York Times* bestselling book, "rejected a ▆▆▆▆▆▆▆ with over $▆▆▆▆▆▆ at 44% earnings" for a new book. PRH took the rejection to mean Clear was considering "Amazon or self pub[lishing]" as alternatives.[12]

---

[6] https://www.cnn.com/2022/03/04/media/kickstarter-brandon-sanderson-books/index.html; https://www.kickstarter.com/projects/dragonsteel/surprise-four-secret-novels-by-brandon-sanderson
[7] https://preview.houstonchronicle.com/books/author-colleen-hoover-s-self-publishing-success-16484757
[8] https://www.nytimes.com/2020/08/06/books/donald-trump-jr-liberal-privilege.html?timespastHighlight=self-publish
[9] *See* BPRH-LIT-000025453.
[10] *See* BPRH-001512297; https://www.simonandschuster.com/authors/Abbi-Glines/409014588; https://www.amazon.com/Abbi-Glines/e/B0057RWP90
[11] *See* BPRH-000275039 ("I just heard from Donna that after thinking about the offer the author of *It Starts with the Egg* has decided that she is going to self-publish the companion cookbook rather than going with a traditional publisher.); *see also* *https://www.amazon.com/Starts-Egg-Fertility-Cookbook-Mediterranean-Inspired/dp/0999676164/ref=tmm_pap_swatch_0?_encoding=UTF8&qid=1647383010&sr=1-5*
[12] *See* BPRH-003086868.

11

DOJ-LIT-000000047

- PRH author Seth Godin, who had subsequently self-published, indicated to PRH that he was "interested in coming back to us for a big ideas book."[13]  PRH sought clearance to make a ▌▌▌▌▌offer for that book, foreseeing a "scenario where [his agent] comes back with a ▌▌▌▌ or he'll self-publish."[14]

- PRH author Jennifer Ashley "successfully self-publishes and will self-publish book #6 [in her mystery series] if we don't publish it—and she could probably easily make the ▌▌▌▌ [that PRH was considering for an advance]."[15]

## INTERROGATORY 5:

By title, date, and author, identify each auction or competition to acquire an author's content that you contend shows that Penguin Random House's proposed acquisition of Simon & Schuster would not result in substantial harm to authors. *See* Amended Answer paragraph 2 of Response to Specific Allegations (Dkt. No. 56 at pg. 6 of 18).

## OBJECTIONS TO INTERROGATORY 5:

PRH objects to this Interrogatory as prematurely seeking expert discovery, work product, and privileged information.  PRH objects to this Interrogatory given Plaintiff has equal access to the information it seeks from document productions (including productions by the parties and third-parties) and publicly available information because the burden of identifying the auctions and competitions from those records will be substantially the same for either party.  PRH objects to this Interrogatory as ambiguous, irrelevant, overly broad, unduly burdensome, and not proportional to the needs of the case because it asks PRH to identify "each" auction or competition that substantiates PRH's contentions regardless of date.  PRH further objects to this Interrogatory to the extent it lacks foundation, including to the extent it mischaracterizes the Amended Answer and/or attempts to reassign Plaintiff's burden to prove its case.  PRH objects to this Interrogatory as vague and ambiguous, including in its use of the phrase "substantial harm

---

[13] *See* BPRH-LIT-000082061.
[14] *See* BPRH-LIT-001365750.
[15] *See* BPRH-LIT-001600446.

DOJ-LIT-000000048

to authors." PRH objects to this Interrogatory's request for a detailed and exhaustive list of every possible piece of evidence that supports PRH's contentions. PRH also objects to this Interrogatory on the grounds that it is Plaintiff's burden, and not PRH's, to prove its allegations of harm to authors as a result of the Proposed Transaction. For the avoidance of doubt, PRH does not have any burden to show that the Proposed Transaction would not result in harm to authors.

Subject to and without waiving the foregoing objections, PRH states as follows: Under prevailing case law, the U.S. bears the burden to prove whether the transaction will substantially lessen competition. In an unconsummated merger, such as the proposed transaction at issue here, any inferences drawn about the transaction's probable effect on competition must rely on the totality of the evidence; mere anecdotes are not sufficient. There is no auction or competition (or set of auctions or competitions) to acquire an author's content that shows that PRH's proposed acquisition of S&S would result in substantial harm to authors. To the contrary, the totality of the auctions and competitions to acquire an author's content demonstrates, inter alia, that the parties face numerous competitors; those competitors could readily replace any hypothesized lost competition from S&S; and agents can control the sales process to ensure competition.

13

DOJ-LIT-000000049

Date:  March 24, 2022

*/s/ Daniel M. Petrocelli*
Daniel M. Petrocelli (appearing *pro hac vice*)
M. Randall Oppenheimer (appearing *pro hac vice*)
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Andrew J. Frackman (appearing *pro hac vice*)
Abby F. Rudzin (appearing *pro hac vice*)
O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10026
Telephone: (212) 326-2000
afrackman@omm.com
arudzin@omm.com

Courtney Dyer (D.C. Bar No. 490805)
Julia Schiller (D.C. Bar No. 986369)
O'MELVENY & MYERS LLP
1625 Eye Street Washington, D.C. 20006
Telephone: (202) 383-5300
cdyer@omm.com
jschiller@omm.com

Deborah L. Feinstein (D.C. Bar No. 412109)
Jason C. Ewart (D.C. Bar No. 484126)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001
Telephone:  202-942-6594
debbie.feinstein@arnoldporter.com
jason.ewart@arnoldporter.com

*Attorneys for Defendants Bertelsmann SE & Co. KGaA and Penguin Random House LLC*

DOJ-LIT-000000050

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2022, a true and correct copy of the foregoing was

served via email on counsel of record.

*/s/ Eamonn W. Campbell*
Eamonn W. Campbell

15

DOJ-LIT-000000051