# Demonstrative Exhibits for the Rebuttal Testimony of Dr. Nicholas Hill

*U.S. v. Bertelsmann SE & CO. KGaA, et al.*

United States District Court for the District of Columbia

**August 17, 2022**

US v. Bertelsmann
1:21-cv-02866-FYP
US DEMONSTRATIVE
8

# Anticipated Top Sellers receive more marketing



Average title marketing expenditures by advance amount

# The advantages of the Big 5 are magnified for Anticipated Top Sellers

## Publicity and reach

**Q.** Why is it harder for non-Big Five publishers to be successful with a best-selling book than it would be for Big Five publishers?

**A.** Well, they don't have the same resources. And they don't have the same – they don't have the same resources and by and large, they don't have the same contacts. You know, your book comes out and what do you want; you want to be on NPR, you want to be on Good Morning America or the Today show, you want to be to -- do a radio interview with Terry Gross. You want to do all of these different things.

And any publisher can sort of try.  The publishers at the Big Five houses have more ready access to all of that.

**Andrew Solomon**, Author

## Marketing

…I don't find that marketing money can create a success. I think it can amplify it.

**Brian Tart**, President and Publisher of Viking Penguin

## Editorial, production, and distribution

**Q.** Now, you mentioned the Big 5. . . almost all of your, you know, higher amounts of -- of advances are with Big 5 firms. Why is that?

**A.** I think they have the broadest talent editorially. They are generally well financed, and their production and distribution is expert.

**Andrew Wylie**, Literary Agent

# Anticipated Top Sellers can be identified and targeted

**A.** I think there are recognizable qualities in -- in books that people who have been in the business for a long time would easily recognize.

**Q.** And so would you say for some books there's a consensus that this is going to be a successful book?

**A.** Yes.

**Andrew Wylie**, Literary Agent

**Q.** Why is it . . . there are so many deals 250 and above that are done with the Big 5 as opposed to the non-Big 5?

**A.** I think the non-Big 5, you know, are just not going to play in that sandbox too many times. They don't have the same scale.

**Elyse Cheney**, Literary Agent

Trial Tr. 2108:19–24 (Wiley); Trial Tr. 2047:13–18 (Cheney).

4

# Dr. Snyder figure on his advance data is misleading



# Authors of Anticipated Top Sellers are published differently



# Market shares for Anticipated Top Sellers have been stable over time



# Market shares over time



The Agencies give more weight to market concentration when market shares have been stable over time, especially in the face of historical changes in relative prices or costs.

# Dr. Snyder's 7% statistic is calculated incorrectly

Dr. Snyder calculates the share of books in his agency data where the winner and runner-up are the merging parties as:

$$7\% = \frac{21}{149 + 150}$$

The correct calculation should be (excluding, to be conservative, one contract where two publishers are marked as the runner-up):

$$13\% = \frac{20}{150}$$



# Diversion ratios



**Horizontal Merger Guidelines**

U.S. Department of Justice
and the
Federal Trade Commission

Issued: August 19, 2010

The extent of direct competition between the products sold by the merging parties is central to the evaluation of unilateral price effects. Unilateral price effects are greater, the more the buyers of products sold by one merging firm consider products sold by the other merging firm to be their next choice.

Diversion ratios between products sold by one merging firm and products sold by the other merging firm can be very informative for assessing unilateral price effects, with higher diversion ratios indicating a greater likelihood of such effects. Diversion ratios between products sold by merging firms and those sold by non-merging firms have at most secondary predictive value.

# Dr. Snyder's "natural first step"

281.    Notably, Penguin and Random House merged in 2013 (the "2013 P-RH merger"),[492] and the impact of that merger can provide insights into the potential impact of the Proposed Transaction and the validity of Dr. Hill's analysis.[493] A natural first step is to examine whether PRH advance amounts changed, if at all, after the 2013 merger. For example, if average advances were increasing prior to 2013, but then flatten out or decrease thereafter, that could be an indication that the 2013 P-RH merger had the effect of reducing author advances.

# Average advances before and after the Penguin-Random House merger



| | $0 and Above | | $100,000 and Above |
|---|---|---|---|
| | $250,000 and Above | | $500,000 and Above |

# Average advance amounts based on Dr. Snyder's Exhibit X.11

| Titles | Before (2010–2012) | After (2014–2016) |
|---|---|---|
| Anticipated Top Sellers | | |
| Other books | | |

# Advances for Anticipated Top Sellers and other books before and after the Penguin-Random House merger



# Advances for Anticipated Top Sellers decreased after the Penguin-Random House merger

| Competitive situation | Estimated change in advance over time | Difference-in-differences estimate |
|---|---|---|
| Anticipated top sellers | -5.6% | -15.3% |
| Other books | 9.6% | |

# Penguin Random House imprints coordinate bids

## 2018 auction for non-fiction book

"I'm sorry to say I didn't catch [another editor] in time to stop a first bid . . . but maybe there's still time for coordination once the money gets higher?"

"I'm starting to wonder how real the 4th bidder is. This is the perfect situation where we risk driving up price. Wondering if we shouldn't tell Crown to match the 885 and Penguin the same if they go to them next. . . . Would avoid us bidding each other up."

**Three Penguin Random House imprints and Simon & Schuster competing in last rounds**

"[Penguin Random House] is now the main driver of value here. So we're agreeing [to] move up slowly. Crown intends to bid $890k (up only $5k). When it comes back to [Penguin Publishing Group]… we also go up a mere $5k…."

"So it seems best for everyone to go with $1050 to have the best shot. No bonus. North America [rights]… Quarterly payouts."

**Penguin Random House imprints coordinate identical offers of $1,050,000 in last round**

# Advance offers submitted for novel in auction

| Publisher | Imprint | Round 1 | Round 2 | Round 3 | Round 4 | Round 5 | Round 6 | Winner |
|-----------|---------|---------|---------|---------|---------|---------|---------|--------|
| PRH | Viking | $75,000 | $100,000* | $115,000 | $125,000 | $160,000 | $300,000 | **$300,000** |
| Macmillan | Henry Holt | $75,000 | $105,000 | $120,000 | $150,000 | $165,000 | $250,000 | |
| PRH | Hogarth | $25,000 | $85,000 | $110,000 | | | | |
| Norton | N/A | $40,000 | $86,000 | $100,000 | | | | |

Hill Reply Report, Figure 26.

# Advance offers submitted for novel in auction if Penguin Random House only bid

| Publisher | Imprint | Round 1 | Round 2 | Round 3 | Round 4 | Round 5 | Round 6 | Winner |
|-----------|---------|---------|---------|---------|---------|---------|---------|--------|
| PRH | Viking | $75,000 | | | | | | **$75,000** |
| | | | | | | | | |
| PRH | Hogarth | $25,000 | | | | | | |
| | | | | | | | | |

Value of competition from independent publishers: **$225,000**

# The Big 5 most frequently sign large contracts

| Publisher | Share of $1 million+ contracts | Months with $1 million+ contracts |
|---|---|---|
| Penguin Random House | 38.3% | 36 |
| HarperCollins | ■■■ | ■ |
| Simon & Schuster | 14.1% | 33 |
| Macmillan | | |
| Hachette | | |
| Non-Big 5 | | |
| *Scholastic* | | |
| *Amazon* | | |
| *Blackstone* | | |
| *Disney* | | |
| *Hay House* | | |
| *Baker* | | |
| *Kensington* | | |
| *WW Norton* | | |
| *Wiley* | | |
| *Abrams* | | |
| *Bloomsbury* | | |
| *Chronicle* | | |
| *National Geographic* | | |
| *Regnery* | | |
| *Sterling* | | |

Hill Reply Report, Figure 41.

# Few "potential entrants" have won a book with an advance over $175,000



# The non-Big 5 publishers largely focus on winning other books



# Astra, Penzler, Spiegel & Grau, and Zando remain small in the market for Anticipated Top Sellers



# The combined share of identified entrants in the market for Anticipated Top Sellers remains very small



# Simon & Schuster's Ratio of author compensation to net income is not stable



Hill Rebuttal Report, Figure 1.

# Penguin Random House's Ratio of author compensation to net income is not stable



Author compensation ratio

# Penguin Random House's Ratio is not stable using other financial metrics

Author compensation ratio index (2012 = 100)

# Dr. Snyder's calculation diverges from the Sansigre Model



# The second-score auction model predicts harm even with Dr. Snyder's efficiencies



# Observations used in each calculation of diversion between Penguin Random House and Simon & Schuster

| Data source | Years included | Number of observations | |
| --- | --- | --- | --- |
| | | PRH | S&S |
| Proportional to Share | January 2019–June 2021 | 2,008 | 2,777 |
| Win-Loss | 2018–2022 | 74 | 27 |
| Runner Up | 2020 | 57 | 23 |
| Editorial Minutes | 2020 | 90 | 78 |
| Agency Data | 2018–2021 | 74 | 22 |

Hill Reply Report, Figure 48.

# Big 5 publishers compete in proportion to market shares

**Michael Pietsch**
CEO, Hachette
Book Group

**Q.** And do you have an understanding of which publishers Hachette competes with most frequently when Hachette is competing to acquire books?

**A.** The publishers we're competing with most frequently align with market share. We compete most frequently with Penguin Random House, then Harper Collins, Simon & Schuster, Macmillan in that order. And we lose to them kind of in that frequency, in that order.

**Liate Stehlik**
President &
Publisher of
Morrow Group,
HarperCollins
Publishers

**Q.** [W]ho do you view as your main competitors in the acquisition of books from authors?

**A.** I would say PRH, No. 1. S&S would be No. 2. Sometimes Hachette and Macmillan.

**Jonathan Karp**
CEO,
Simon & Schuster

**Q.** So you would expect Penguin Random House to be the publisher you bid against the most, correct?

**A.** I think so, yes.

# Private factors drive publisher valuations

**Q.** And to what do you attribute that? We're talking about the same book but you're saying there's a range of offers. Why is that?

**A.** Well, in a word, subjectivity. I think that people read differently, and they have different enthusiasms, they have different interests and they have different metabolic reactions to the book. But I also think that certain editors and publishers have a kind of inner confidence about certain kinds of books. And so sometimes they'll bid more because they've had success with a certain kind of book.

**Jonathan Karp**, CEO, Simon & Schuster

**Q.** In your experience, is it common for different imprints to value the same book differently?

**A.** Yes.

**Q.** And why is that?

**A.** Again, editor enthusiasm, imprint profile. I'm a believer that certain books wouldn't do as well in one imprint as in another. I think we are distinct. I think we offer different things, and so certain books can do really well at one imprint but maybe not do as well in another.

**Brian Tart**, President and Publisher of Viking Penguin

# Strategic similarities between negotiations and auctions

"I always think about the idea of the best alternative -- the BATNA . . . . And the best way to get the best deal from [the publisher you are negotiating with] is to improve your BATNA, your best alternative to what's in front of you. And so I spent a lot of time in my head and in information gathering and the like figuring out what that BATNA is and trying to get it this way."

"So – if the better your BATNA is, if you can walk away from something, then it's easier to push to the terms that you think are fair and right, and so I try to use that. Sometimes you can -- I mean, it's always easier to walk if you know what you're walking to. And in this business, there's always the other competitor. Whether it's -- whether they're bidding or not, they're always there."

**Gail Ross**, Literary Agent

"This 'second-score' approach is strategically equivalent to a specific form of bargaining in which buyers play suppliers off against each other, up to the point at which the utility offered by the highest-surplus supplier cannot be matched profitably by the next best supplier. At that point, buyers have no more leverage and negotiations end. This conveys tractability to the analysis and is reasonable for many markets with either (i) merging suppliers that are much larger than most buyers, or (ii) buyers that have sizable negotiating costs. If buyers exercise leverage above-and-beyond the competitive alternative, then the fit of the model is less good."

**Nathan Miller**, "Modeling the Effects of Mergers in Procurement," *International Journal of Industrial Organization*, Vol. 37, November, 201-208 (2014).



**Horizontal Merger Guidelines**

U.S. Department of Justice
and the
Federal Trade Commission

Issued: August 19, 2010

The Agencies do not treat merger simulation evidence as conclusive in itself, and they place more weight on whether their merger simulations consistently predict substantial price increases than on the precise prediction of any single simulation.

# Baseline second-score auction model results



# Second-score auction model results treating direct operating expenses as fixed



# Second-score auction model results using Dr. Snyder's margins



# Second-score auction model results using Dr. Snyder's Agency Data market shares



# Second-score auction model results incorporating Dr. Snyder's efficiencies



Case 1:21-cv-02886-FYP    Document 181-145    Filed 09/08/22    Page 39 of 40



Hill Reply Report, Figure 16.



Average margin per anticipated top sellers