*United States of America v. Bertelsmann SE & Co., KGaA, Penguin Random House LLC, ViacomCBS Inc., and Simon & Schuster Inc.*

# Expert Testimony of Prof. Edward A. Snyder

# August X, 2022

Case No: 1:21-CV-02886

1

# Summary of Opinions

**Overall: Transaction is likely to benefit consumers and competition**

1. No allegation of harm to consumers in the sale of books

2. No harm to authors in broad market

3. Books with advances of $250,000 or more are not a valid market

4. No harm to authors who receive advances $250,000 and above
   - Highly competitive with many publishers
   - PRH and S&S are rarely winner and runner-up to each other (12%)
   - SSA model and GUPPI calculations cannot be used to show harm

5. No coordinated effects

6. Authors will benefit from efficiencies

7. 2013 P-RH merger shows no likelihood of harm

# Approach to My Assignment

# Important Industry Features for Economic Analysis

## Authors/Agents  Publishers  Consumers

- Unique product
- Uncertain demand for each product
- Critical role of agents
- Mix of acquisition processes
- Long-term editor-author relationship
- Mix of author and agent profiles

- Co-development of products by authors and editors
- Entrepreneurial skills at the imprint level
- Distribution
- Diverse range of publishers

- Acquisitions from authors are the essential input for sales to consumers
- Competition to sell books to consumers drives competition to acquire books for authors

4

# Agent Decisions Influence Economic Outcomes

1. Choose editors and publishers to invite to compete for book
   - May choose from hundreds of editors at dozens of publishers
   - May invite bids during process from additional publishers
2. Decide what type of acquisition process to use and its rules and timing
   - May change process at any time
3. Control the information disclosed to publishers

# Important Industry Features for Economic Analysis

## Authors/Agents  Publishers  Consumers

- Unique product
- Uncertain demand for each product
- Critical role of agents
- Mix of acquisition processes
- Long-term editor-author relationship
- Mix of author and agent profiles

- Co-development of products by authors and editors
- Entrepreneurial skills at the imprint level
- Distribution
- Diverse range of publishers

- Acquisitions from authors are the essential input for sales to consumers
- Competition to sell books to consumers drives competition to acquire books for authors

# Industry Participants Face Day to Day Challenges

1. Matching authors to editors

2. Editors and publishers: how much to bid?

3. Distribution of physical books

# The Match Between Authors and Publishers Is Important

"Two Americans, Alvin E. Roth and Lloyd S. Shapley, were awarded the Nobel Memorial Prize in Economic Science … for their work on market design and matching theory, which relate to how people and companies find and select one another in everything from marriage to school choice to jobs to organ donations."

*"2 From U.S. Win Nobel in Economics," New York Times, October 15, 2012*

8

# Industry Participants Face Day to Day Challenges

1. Matching authors to editors

2. Editors and publishers: how much to bid?

3. Distribution of physical books

# Common and Private Valuation Factors

■ Books with advances in the $1M+ range usually have a more predictable audience for sales; books below that level carry more uncertainty



**Jennifer Bergstrom**

*Gallery Books Group*



Q. And **in that million dollar plus range**, when you pay an advance at that level, **do you anticipate the book will sell well?**
**A. I certainly hope so.**
Q. Does it always happen?
A. No. We have had our duds for sure. But **I expect, when I am acquiring someone like Amy Schumer, that her fans are going to come to the book**. And we actually published her when she was really at the height of her career.

Q. Okay. And **do you think about the risk differently at lower advance levels than the million dollar advance level?**
**A. I actually do.** I find the lower advance levels, even the three that we just spoke of, to be I am uncertain, I don't have a track record, or my group is very good at identifying talents before the rest of the world knows how big they are. So **there's a lot of uncertainty there, more so than actually the million plus**.

Jennifer Bergstrom Trial Testimony, 1841:11-19, 1843:1-8

# Industry Participants Face Day to Day Challenges

1. Matching authors to editors

2. Editors and publishers: how much to bid?

3. Distribution of physical books

# Demand Side Substitution and Competitor Responses in the HMGs



**Horizontal Merger Guidelines**

U.S. Department of Justice
and the
Federal Trade Commission

Issued: August 19, 2010

==A price increase for targeted customers== may be profitable even if a price increase for all customers would not be profitable because too many other customers would substitute away.

==The responsive actions of suppliers== are also important in competitive analysis. They are considered in these Guidelines in the sections addressing the identification of market participants, the measurement of market shares, the analysis of competitive effects, and entry.

HMGs, §§ 3 and 4

12

# Six Data Sets

| | Dr. Hill | | | | Prof. Snyder | |
|---|---|---|---|---|---|---|
| | **(1)** **Advance Data** | **(2)** **Win-Loss Data** | **(3)** **Editorial Minutes** | **(4)** **Runner Up Data** | **(5)** **Advance Data** | **(6)** **Agency Data** |
| **Time Period** | 2019-6/2021 | 2018-2021 | 2020-2021 | 2020 | 2019-2021 | 2018-2021 |
| **Number of Obs. – Broad Market** | 23,940 | 924 | 784 | 287 | 29,344 | 973 |
| **Number of Obs. – $250,000+ Advances** | 3,163 | 206 | 284 | 287 | 3,540 | 360 |

Dr. Hill Advance Data; Dr. Hill Win-Loss Data; Dr. Hill Editorial Minutes; Dr. Hill Runner Up Data (Dr. Hill Corrected Initial Report, ¶ 185);
Prof. Snyder Advance Data; Prof. Snyder Agency Data (DX-377)

13

# Agency Data Adds Important Insights into Competition

| | Dr. Hill | | | | Prof. Snyder | |
|---|---|---|---|---|---|---|
| | **(1)** Advance Data | **(2)** Win-Loss Data | **(3)** Editorial Minutes | **(4)** Runner Up Data | **(5)** Advance Data | **(6)** Agency Data |
| **Winner** | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ |
| **Runner-up** | ✘ | ✘ | ✘ | ✔ | ✘ | ✔ |
| **Other bidders and bids** | ✘ | ✘ | ✘ | ✘ | ✘ | ✔ |
| **Multi- or Single-bidder process** | ✘ | ✘ | ✘ | ✔ | ✘ | ✔ |
| **Imprint Competition** | ✘ | ✘ | ✘ | ✘ | ✘ | ✔ |

Dr. Hill Advance Data; Dr. Hill Win-Loss Data; Dr. Hill Editorial Minutes; Dr. Hill Runner Up Data; Prof. Snyder Advance Data; Prof. Snyder Agency Data

# Agency Data: Overview



Total Contracts from 2018-2021: 973

2018: 182
2019: 253
2020: 306
2021: 232

Advance Per Title < $250,000: 613

Advance Per Title ≥ $250,000: 360

Prof. Snyder Agency Data (DX-377)

15

# Agency Data: Overview



Prof. Snyder Agency Data (DX-377)

# Round Robins Are Infrequent



**Jennifer
Rudolph Walsh**
*William Morris Agency*

WME

Q. **Mr. Pietsch testified that round-robin auctions are the most common form of auction**. Do you recall that testimony?

A. Yeah. **I was surprised by that**.

Q. Why?

A. **Because it's -- it's been so many years since, really, that was the common way of doing things**. And **most of my colleagues and most of my associates seem to do best bids or better best**.



**Elyse Cheney**
*Cheney Agency*

THE *Cheney* Agency

Q. So **how many of your eight auctions for 250 and above were round-robin auctions** that went the whole distance as a round-robin instead of ending with a best-bid or a better best bid?

A. **I believe none.**

Jennifer Rudolph Walsh Trial Testimony, 1767:2-9; Elise Cheney Trial Testimony, 2049:20-24

17

# Summary of Conclusions

**1** No Allegation of Harm to Consumers in the Sale of Books

**2** No Harm to Authors in Broad Market

**3** Books with Advances of $250,000 Or More Are Not a Valid Market

**4** No Harm to Authors Who Receive $250,000 and Above

**5** No Coordinated Effects

**6** Authors Will Benefit from Efficiencies

**7** 2013 P-RH Merger Shows No Likelihood of Harm

# Summary of Conclusions

**1**   **No Allegation of Harm to Consumers in the Sale of Books**

**2**   No Harm to Authors in Broad Market

**3**   Books with Advances of $250,000 Or More Are Not a Valid Market

**4**   No Harm to Authors Who Receive $250,000 and Above

**5**   No Coordinated Effects

**6**   Authors Will Benefit from Efficiencies

**7**   2013 P-RH Merger Shows No Likelihood of Harm

# No Analysis of Downstream Harm

"Q. By the way, it's also your view, is it not, that the downstream market is not highly concentrated?
A. I believe that to be true, yes.
Q. And so just we're talking about the same things, I think we are, by downstream, I simply mean the retail sale books, right?
A. Correct."

*Dr. Hill Trial Testimony, 1539:1-7*

# Summary of Conclusions

**1** No Allegation of Harm to Consumers in the Sale of Books

**2** No Harm to Authors in Broad Market

**3** Books with Advances of $250,000 Or More Are Not a Valid Market

**4** No Harm to Authors Who Receive $250,000 and Above

**5** No Coordinated Effects

**6** Authors Will Benefit from Efficiencies

**7** 2013 P-RH Merger Shows No Likelihood of Harm

# Market Shares for Acquisitions of U.S. Publishing Rights (2019-2021)



Penguin Random House 19%

Simon & Schuster 9%

All Other Publishers 72%

Combined Parties 28%

Prof. Snyder Advance Data (DX-382)

22

# Post-Transaction HHI (2019-2021): Market Is Unconcentrated



Structural presumption of anticompetitive harm

| Pre: | 828 |
| Post: | 1,182 |
| Change: | 353 |

Prof. Snyder Advance Data (Prof. Snyder Rebuttal Report, Exhibit VII.3)

23

# Summary of Conclusions

1. No Allegation of Harm to Consumers in the Sale of Books

2. No Harm to Authors in Broad Market

3. **Books with Advances of $250,000 Or More Are Not a Valid Market**

4. No Harm to Authors Who Receive $250,000 and Above

5. No Coordinated Effects

6. Authors Will Benefit from Efficiencies

7. 2013 P-RH Merger Shows No Likelihood of Harm

# Basic Functions of Publishers Do Not Vary by Advance Level

1. **Acquisition** of publishing rights

2. **Editorial work**

3. **Art direction** and **design**

4. **Production**

5. **Sales** and **distribution**

6. **Marketing** and **promotion**

# Publisher Operations Not Organized By Advance Level



**Michael Pietsch**

*Hachette*



**Donald Weisberg**

*Macmillan Publishing*

**Q. You don't have any separate marketing channels or distribution** -- marketing services or distribution channels for **just books that happen to have an advance of 250 or above**. Correct?

**A. No. We do not divide our company that way.**

Q. **Does Macmillan have different editors that it assigns to books with advances over a certain dollar threshold**?

**A. No.**

Q. Does the amount of the **advance dictate how much effort the editor will devote to the work?**

**A. No. The answer is no.**

Michael Pietsch Trial Testimony 232:16-20; Donald Weisberg Deposition, 147:13-21

26

# $250,000 Is an Arbitrary Threshold



**Elyse Cheney**
*Cheney Agency*



Q. In your experience, is $250,000 or any number thereabouts some kind of dividing line above which books are treated differently than below that line?

**A. $250,000 is not -- certainly doesn't fit into the top seller category. It's just not a relevant number.**



**Gail Ross**
*Ross Yoon Agency*



Q. Is -- in your -- in your world, in your business, **is there some kind of demarcation by the reference to an advance level** -- let's say $250,000 -- where the industry treats books above that amount in a certain way in contrast with how they would treat books below that amount?

**A. No.**



**Jennifer Rudolph Walsh**
*William Morris Agency*

Q. **Is there anything different about books that receive an advance of $250,000** as compared to books that receive an advance below that amount?

A. **You know, I recognize that that is an arbitrary number, and it's certainly arbitrary to me.**

Elyse Cheney Trial Testimony, 2067:2-6; Gail Ross Trial Testimony, 2133:17-22; Jennifer Walsh Trial Testimony, 1816:21-25

27

# Dr. Hill's Reply Report Figure 1



**Dr. Hill's Reply Report Figure 1 (2019-2021)**
**($0 - $249,999, $250,000+)**

| | Number of Contracts | | | |
|---|---|---|---|---|
| Total Advance Dollars | | | | |

Prof. Snyder Advance Data (PX-963)

CONFIDENTIAL

28

# $250,000 Is Arbitrary



**Dr. Hill's Revised Reply Report Figure 1 (2019-2021)**
**($0 - $49,999, $50,000 - $999,999, $1,000,000+)**

Legend: Non-Big 5, Penguin Random House, [redacted], Simon & Schuster, [redacted], [redacted]

| | $0 - $49,999 | $50,000 - $999,999 | $1,000,000+ |
|---|---|---|---|
| Number of Contracts | ▮ | ▮ | ▮ |
| Total Advance Dollars | ▮ | ▮ | ▮ |

Prof. Snyder Advance Data

CONFIDENTIAL

# HMGs on Targeting



**Horizontal Merger Guidelines**

U.S. Department of Justice
and the
Federal Trade Commission

Issued: August 19, 2010

The mechanisms of these anticompetitive unilateral effects, and the indicia of their likelihood, differ somewhat according to the bargaining practices used, the auction format, and the sellers' information about one another's costs and about buyers' preferences. For example, when the merging sellers are likely to know which buyers they are best and second best placed to serve, any anticompetitive unilateral effects are apt to be targeted at those buyers; when sellers are less well informed, such effects are more apt to be spread over a broader class of buyers.

When price discrimination is feasible, adverse competitive effects on targeted customers can arise, even if such effects will not arise for other customers.

First, the suppliers engaging in price discrimination must be able to price differently to targeted customers than to other customers. This may involve identification of individual customers to which different prices are offered or offering different prices to different types of customers based on observable characteristics.

HMGs, §§ 3 and 6.2

30

# Dr. Hill's Testimony on "Anticipated Top Sellers"

"So I think you could say: Is it absolutely 100 percent certain this is the threshold? The answer is no. Some anticipated top sellers are in our market, but they're not -- or some books are in our market, but they're probably not anticipated top sellers, and vice versa."

*Dr. Hill Trial Testimony, 1238:25-1239:4*

# Dr. Hill's HMT Does Not Justify Selection of $250,000 Threshold

Q. I see. So this tests whether the market you've chosen passes the Monopsonist test, but it doesn't necessarily validate your demarcation point at $250,000 or more?

A. That's fair, your Honor. What we're really testing here is, does this market -- you know, remember, I said there are these two parts. Where do the parties compete significantly? And who should be in there competing with them when we analyze it? The hypothetical Monopsonist test is addressing the second issue. It's saying: How many -- should we include self-publishing in addition to all other publishers as significant competitors?

*Dr. Hill Trial Testimony, 1244:2-14*

# Summary of Conclusions

**1** No Allegation of Harm to Consumers in the Sale of Books

**2** No Harm to Authors in Broad Market

**3** Books with Advances of $250,000 Or More Are Not a Valid Market

**4** No Harm to Authors Who Receive $250,000 and Above

**5** No Coordinated Effects

**6** Authors Will Benefit from Efficiencies

**7** 2013 P-RH Merger Shows No Likelihood of Harm

# Ample Competitive Options for Authors at Advance Levels $250,000 and Above

1. Four major publishers and a large number of mid-sized and smaller publishers will continue to compete

2. Publishers are entering and expanding

3. Internal imprint competition will continue

# HarperCollins Will Continue To Compete Aggressively



**Brian Murray**



Q. **Do you plan to hold back in competing with Penguin Random House, Simon & Schuster** if the merger goes through?

A. **No, I don't intend to hold back. No.**

Q. So when you say, going forward **you are going to compete with Penguin Random House and others**, **you have the tools to do that**, right?

A. **We do**.

Brian Murray Trial Testimony, 1385:13-15, 1392:21-24

35

# Macmillan Will Continue To Compete Aggressively



**Donald Weisberg**



Q. **[T]he Big 5 compete against each other**, right?

A. **Yes.**

Q. And **you compete strongly against the other Big 5**; is that fair?

A. **Yes.**

Q. And **you're going to continue to try to claw every percentage of market share that you can at their expense**, right?

A. **Yes**.

Donald Weisberg Trial Testimony, 1097:21-1098:4

36

# HarperCollins, Macmillan, and Hachette Are Active Bidders

When PRH or S&S bid, at least one of **HarperCollins**, **Hachette**, or **Macmillan** also bid <u>**90 percent**</u> **of the time**.







Prof. Snyder Agency Data, $250,000+ Multi-Bidder Acquisitions, 2019-2021

37

# Increasing Number of Publishers at $250,000+



**Number of Publishers Acquiring Contracts with Advances of at Least $250,000 (2019-2021)**

Prof. Snyder Advance Data (DX-370), $250,000+ Advances (2019-2021)

38

# Buyer Power in the HMGs



**Horizontal Merger Guidelines**

U.S.

Federal Trade Commission

Issued: August 19, 2010

Market power on the buying side of the market is not a significant concern if suppliers have numerous attractive outlets for their goods or services. However, when that is not the case, the Agencies may conclude that the merger of competing buyers is likely to lessen competition in a manner harmful to sellers.

HMGs, §12

# 20 Publishers Acquired $1 Million+ Contracts (2019-2021)



| | Publisher | Largest Contract by Advance Dollars |
|---|---|---|

Prof. Snyder Advance Data (DX-375)

CONFIDENTIAL

# Number of $250,000+ Titles Acquired (January 2019-June 2021)



Dr. Hill Advance Data, $250,000+ Advances

CONFIDENTIAL

# Mid-Sized and Smaller Publishers Are Significant Competitors



**Share of Contracts with Mid-Sized and Smaller Publishers as Winners or Runners-Up $250,000+ Advances per Title (2019-2021)**

23%

Acquisitions as Winner or Runner-Up

Prof. Snyder Agency Data (Prof. Snyder Rebuttal Report, ¶ 191), $250,000+ Advances

# Mid-Sized and Smaller Publishers Are Significant Competitors



**Share of Contracts With Mid-Sized and Smaller Publishers Bidding On $250,000+ Advances per Title (2019-2021)**

Prof. Snyder Agency Data (Prof. Snyder Rebuttal Report, ¶ 191), $250,000+ Advances

# Authors and Agents Choose a Wide Range of Publishers for $250,000+ Contracts (2019-2021)



$250,000+ Advances

CONFIDENTIAL

# Authors and Agents Choose a Wide Range of Publishers for $250,000+ Contracts (2019-2021)



DX-376), $250,000+ Advances

CONFIDENTIAL

# Ample Competitive Options for Authors at Advance Levels $250,000 and Above

1. Four major publishers and a large number of mid-sized and smaller publishers will continue to compete

2. Publishers are entering and expanding

3. Internal imprint competition will continue

# Entry and Expansion

| New Entrants | Recently Expanded | Potential to Expand |
|:---:|:---:|:---:|

















Prof. Snyder Advance Data (Prof. Snyder Rebuttal Report, ¶¶ 175, 179, 181)

47

# Publishers Already Paying $250,000+ Advances Plan to Expand



CONFIDENTIAL

# Ample Competitive Options for Authors at Advance Levels $250,000 and Above

1. Four major publishers and a large number of mid-sized and smaller publishers will continue to compete

2. Publishers are entering and expanding

3. Internal imprint competition will continue

# Imprint Competition Is Central

- Imprints encouraged to be entrepreneurial

- Not constrained in most acquisition processes

  - 1-on-1 negotiations, pre-empts, best bids, hybrid

- Constrained only in round robin acquisitions when there are no external bidders

# Imprint Competition Can Be Profit Maximizing

**Michael Pietsch**



Q. Now, **your company allows your imprints to bid against each other. Correct?**
A. **As long as there is another party outside Hachette bidding. Yes.**
Q. Okay. So do you know any other company that allows imprints to bid against one another within the same corporation?
A. As I testified earlier, **I believe all the other Big 5 publishers allow the imprints within the company to bid against each other as long as there are outside bidders.** So yes, I do.

**Markus Dohle**



Q. Okay. Why do you allow these imprints to compete against one another?
A. The essence of publishing, the foundation of this business, is that every book idea finds the most passionate editor with the largest vision for the book [ . . . .] **And with that, hopefully, also in more sales.** [ . . . .]  It's one book at a time. So the perfect match is between book idea and editor and author and imprint. And **internal bidding makes that possible and supports that idea.**

**Dr. Nicholas Hill**

Q. But in its simplest forms, you would agree with me that **the current structure at Penguin Random House of allowing its imprints to compete with each other may be profit maximizing**; correct?
A. **Yes**, could be.

Michael Pietsch Trial Testimony, 225:6-16; Markus Dohle Trial Testimony, 839:11-840:4; Dr. Hill Trial Testimony, 1719:12-16

# Imprint Competition Is Important: █████████

**BEST BIDS AUCTION**



| | |
|---|---|
| Ballantine (PRH) | $1,250,000 |
| Dutton (PRH) | $250,000 |
| Scribner (S&S) | $225,000 |
| Graydon House (HC) | $200,000 |
| Doubleday (PRH) | $150,000 |

Prof. Snyder Agency Data

CONFIDENTIAL

# Agents Can Set Auction Rules to Extend Imprint Competition



If in any round all of the top bidders are in the same corporation, then I will include the next highest bidder. ███ reserves the right to accept or reject and bid at any time.

CONFIDENTIAL

# Imprint Competition Rules Don't Stop Competitive Auction Bidding



**Gail Ross**

*Ross Yoon Agency*



Q. How often, if at all, does it happen in your auctions that you have to make that notification to Penguin Random House?

A. I've had it happen **once** in 36 years.

Gail Ross Trial Testimony, 2131:23-25

54

# Dr. Hill's SSA Model

1. Bidders
   - Pre-merger: all publishers bid
   - Post-merger: one fewer bidder
   - Agents cannot replace lost bidder

2. Single auction format that most closely resembles round robin auctions

3. Each publisher always bids its maximum valuation
   - Post-merger no changes in amount bid

4. Authors get paid less. Merging parties do not lose any market share.

# Dr. Hill's SSA Model Does Not Fit the Industry

| Industry Characteristics | Dr. Hill's SSA Model |
|---|---|
| Variety of acquisition processes | ❌ |
| Agent plays important role | ❌ |
| Imprints compete | ❌ |
| Rival publishers relevant | ❌ |

# Conditions for Potential Harm Are Rarely Met

|  | **Scenario 1** | **Scenario 2** | **Scenario 3** | **Scenario 4** |
|---|---|---|---|---|
| **Situation** | Non-merging publisher wins | One of the merging parties wins and other does not participate | PRH wins and S&S is not the competitive constraint | S&S wins and PRH is not the competitive constraint |
| **Incentive to lower bid?** | No ✗ | No ✗ | No ✗ | No ✗ |

# Correcting Some of the Flaws in Dr. Hill Model Predicts Small Harm



**Estimated Percent Decrease in Combined Entity's Average Author Compensation (2015-2020)**

Percentage Decrease in Author Compensation

- With Dr. Hill's Margins: 6.1% ($29.3 Million)
- With Corrected Margins: 4.3% ($20.3 Million)
- With Base Case Efficiencies and Dr. Hill's Margins: 3.8% ($18.2 Million)
- With Base Case Efficiencies and Corrected Margins: 2.0% ($9.3 Million)

Prof. Snyder Initial Report; Dr. Hill Corrected Initial Report Backup Materials; Simon & Schuster Company-Level P&L, 2020 (Prof. Snyder Rebuttal Report, Exhibits X.2 and X.5), $250,000+ Advances

# SSA and GUPPI Do Not Fit the Industry

| Industry Characteristics | Dr. Hill's SSA | Dr. Hill's GUPPI |
|---|:---:|:---:|
| Variety of acquisition processes | ❌ | ❌ |
| Agent plays important role | ❌ | ❌ |
| Imprints compete | ❌ | ❌ |
| Rival publishers relevant | ❌ | ❌ |

# GUPPI Is an Index

- It is calculated based on a single formula that would be applied to any industry:

$$\text{GUPPI}_A = -\frac{\text{Diversion}_{A \text{ to } B} \times \text{Margin}_B}{\text{Pre-merger Author Comp}_A} \times \text{Pass Through}$$

- For best bids and hybrid format, pass through is assumed to be 50%
- For multi-round format, pass through is 100%
- Is a screening device
- Not an equilibrium model

60

# GUPPI Is a Screening Device That Cannot Validate the SSA Model

"Our test has the enormous practical virtue that it **relies only on pre-merger data on prices and costs, along with the key feature of demand that is inherently central to unilateral effects: the diversion ratio, $D_{12}$.** This simplicity depends on asking only about the presence or absence of net upward pricing pressure. As discussed below, the magnitude of the price change will depend in a more complex and less transparent way on the overall demand system and on oligopoly conduct. Thus **we propose that any such calculations, perhaps including merger simulation, should normally await the fuller analysis** that follows the raising of a flag based on UPP."

*Farrell and Shapiro, "Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition," 2010*

"For all of these reasons, **DOJ investigations mainly use the GUPPI and merger simulation models to provide an indication—not a precise prediction—of whether a merger is likely to cause significant unilateral price effects. Both methods are used in conjunction with other evidence.**"

*Carl Shapiro, "The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years", 2010*

# Correcting Some of the Flaws in Dr. Hill's GUPPI Yields Small Harm

|  | [1]<br>Original Hill Margins<br>(Dr. Hill Reply Report) | [2]<br>Corrected Margins with<br>Corrected Diversion<br>(Prof. Snyder Rebuttal Report) | [3]<br>Corrected Margins with<br>Corrected Diversion and<br>Efficiencies (Base Case) |
|---|---|---|---|
| Multi-Round | 10.3% | 4.7% | N/A* |
| Single-Round/Hybrid | 5.2% | 2.3% | 0.7% |

*Dr. Hill's GUPPI does not allow quantification of benefits to PRH and S&S authors resulting from efficiencies.

Prof. Snyder Initial Report; Dr. Hill Corrected Initial Report Backup Materials; Simon & Schuster Company-Level P&L, 2020 (Prof. Snyder Rebuttal Report, Exhibits X.2, X.5, DX-431), $250,000+ Advances

# Dr. Miller's Reliability Test of the SSA Model

A. Yes. **So Dr. Miller's paper says, a first way to test the reliability of the model is to compare the actual margins to the predicted margins.**

Q. Because if the predicted margins that result from the inputs don't accurately predict the actual margins, then there could be something wrong with the model, correct?

A. Yeah. **If you see very big differences between predicted and actual margins, it's a warning sign that the model is not working well.**

[...]

Q. And that test, that the accuracy of that prediction is a -- pretty much a requirement to determine the reliability of the model, would you say?

**A. I mean, I think Dr. Miller says it's a first check you can make. I think it's an important check to make.**

Dr. Hill Trial Testimony, 1646:5-14, 1647:3-8

# Dr. Hill's SSA Model Fails Reliability Test

| | Dr. Hill's SSA Model Prediction Error | | |
| --- | --- | --- | --- |
| | [1]<br>Original Hill Margins<br>(Dr. Hill Initial Report) | [2]<br>Corrected Margins<br>(Prof. Snyder Rebuttal Report) | [3]<br>Hill's Revised Margins<br>(Dr. Hill Reply Report) |
| S&S Margin Prediction Error (Using PRH Actual Margin) | -5% | 190% | 50% |
| PRH Margin Prediction Error (Using S&S Actual Margin) | 5% | -66% | -33% |

Dr. Hill Advance Data; PRH P&L Data; S&S P&L Data (Dr. Hill Reply Report, Figure 18); Simon & Schuster Company-Level P&L, 2020 (Prof. Snyder Rebuttal Report, Exhibit X.3), $250,000+ Advances

# Summary of Conclusions

**1** No Allegation of Harm to Consumers in the Sale of Books

**2** No Harm to Authors in Broad Market

**3** Books with Advances of $250,000 Or More Are Not a Valid Market

**4** No Harm to Authors Who Receive $250,000 and Above

**5** No Coordinated Effects

**6** Authors Will Benefit from Efficiencies

**7** 2013 P-RH Merger Shows No Likelihood of Harm

# Coordinated Interaction in the HMGs



**Horizontal Merger Guidelines**

U.S. Department of Justice
and the
Federal Trade Commission

Issued: August 19, 2010

Coordinated interaction can involve the explicit negotiation of a common understanding of how firms will compete or refrain from competing. Such conduct typically would itself violate the antitrust laws. Coordinated interaction also can involve a similar common understanding that is not explicitly negotiated but would be enforced by the detection and punishment of deviations that would undermine the coordinated interaction.

HMGs, §7

# Book Deals Differ on Many Dimensions

1. Advances and potential royalties

2. Rights covered

3. Schedule of payments and conditions

4. Bonuses and other mechanisms to increase value to author

5. Number of titles included in contract

# The Likelihood of Coordination in Book Publishing Is Low

"The context for the e-book pricing—activity in a downstream market where pricing is observable [to consumers]—is completely different from the focus here on upstream acquisition of publishing rights."

*Prof. Snyder Rebuttal Report, ¶ 305*

| E-Books | This Case |
|---|---|
| A hub (Apple) coordinated the alleged conspiracy | No possible hub |
| Prices were observable | Prices not observable |
| Random House not part of the alleged conspiracy | Random House would have to be part of the conspiracy |

# Summary of Conclusions

**1** No Allegation of Harm to Consumers in the Sale of Books

**2** No Harm to Authors in Broad Market

**3** Books with Advances of $250,000 Or More Are Not a Valid Market

**4** No Harm to Authors Who Receive $250,000 and Above

**5** No Coordinated Effects

**6** Authors Will Benefit from Efficiencies

**7** 2013 P-RH Merger Shows No Likelihood of Harm

# Efficiencies Assignment

"[F]ocus[ed] on the efficiencies that PRH estimates it will achieve from the merger and their likely impact on the anticompetitive effects the DOJ alleges."

*Prof. Snyder Corrected Initial Report, ¶14*

# More Specific Questions

Are the efficiencies:

1. The types that economists recognize given the industry context?

2. Merger-specific?

3. Likely to benefit authors and readers?

# Process To Execute Overall Assignment

1. Evaluated 2020 model and whether it has been used in prior acquisitions

2. Studied the industry to identify what efficiencies could be expected from the merger

3. Studied prior investments by PRH and whether they lead to efficiencies

4. Evaluated whether the four categories of efficiencies and important P&L line items were sensible

5. Interviewed Mr. Sansigre and Mr. Malaviya

# Process To Execute Overall Assignment

6. Inquired whether subsequent experience altered the overall estimated efficiencies in a material way

7. Inquired whether subsequent experience negated particular efficiencies

8. Reviewed testimony regarding sources of efficiency gains and merger specificity

9. Reviewed Ms. Hammer's rebuttal

10. Reviewed Dr. Hill's rebuttal

# Factors

The 2020 Model:

1. Uses a standard P&L format with five-year horizons

2. Distinguishes among:

   - Revenue enhancements (e.g., physical gross sale, eBook, audio)

   - Ongoing cost reductions (e.g., cost of PPB, return cost, marketing cost)

   - Asset rationalization (e.g., reduction of IT department)

3. Is based on efficiencies from the use of existing assets and capabilities

# The Horizontal Merger Guidelines on Efficiencies



**Horizontal Merger Guidelines**

U.S. Department of Justice
and the
Federal Trade Commission

Issued: August 19, 2010

Efficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means. ==Projections of efficiencies may be viewed with skepticism, particularly when generated outside of the usual business planning process.==

==By contrast, efficiency claims substantiated by analogous past experience are those most likely to be credited.==

HMGs, §10

# Findings on Efficiencies

1. Efficiencies are the type that economists recognize given the industry context

2. Efficiencies would be merger-specific, i.e., could only be achieved with a merger, with minor exceptions (audio and ebooks)

3. Projected efficiencies will benefit authors

# Categories of Efficiencies in 2020 Model

1. **Revenue Enhancements:** increased sales of S&S books in all formats and increased distribution income, net of the costs (royalties, write-offs, commissions) of the additional unit sales

2. **Variable Cost Efficiencies:** reduced variable costs from lower PPB, freight, and marketing costs and reduced return costs

3. **Operating Expense Efficiencies:** savings in overhead costs

4. **Real Estate Efficiencies:** reduced real estate costs from consolidation of offices

# Annual Efficiencies from the PRH 2020 Model

|  | P&L Categories | Base Case Efficiencies by 2025 ($ Million) |
|---|---|---|
| a) | Revenue Enhancement | ███████ |
| b) | Variable Costs and Returns | |
| c) | Operating Expenses | |
| d) | Real Estate | |
| | Total Efficiencies | |

Prof. Snyder Corrected Initial Report, ¶ 23

CONFIDENTIAL

# Author Benefits from Revenue Enhancement in 2020 Model

|  | Base Case in 2025 |
|---|---|
| Author Compensation | ███████ |

Prof. Snyder Reply Report, ¶ 35

CONFIDENTIAL

# Efficiencies Will Benefit Authors

1. How do the efficiencies affect book-level P&Ls?

2. Historically, what is the relationship between author compensation and PRH firm-wide Net Income?

# Efficiencies Will Benefit Authors



# Historical Relationship between Author Compensation and Income

|            | 2017 | 2018 | 2019 | 2017-2019 |
|------------|------|------|------|-----------|
| PRH and S&S | ██ | ██ | ██ | ██ |

Prof. Snyder Corrected Initial Report, Exhibit IX.1; Penguin Random House, "Project Silk Financial Model" (DX-397)

CONFIDENTIAL

# Authors Will Benefit from Efficiencies

| | Increase in Total Author Compensation Annually by 2025 | |
|---|---|---|
| **All Trade Books** | | ████████████ | |

Prof. Snyder Corrected Initial Report, Exhibit IX.2; Penguin Random House, "Project Silk Financial Model" (DX-398)

CONFIDENTIAL

# Summary of Conclusions

**1** No Allegation of Harm to Consumers in the Sale of Books

**2** No Harm to Authors in Broad Market

**3** Books with Advances of $250,000 Or More Are Not a Valid Market

**4** No Harm to Authors Who Receive $250,000 and Above

**5** No Coordinated Effects

**6** Authors Will Benefit from Efficiencies

**7** **2013 P-RH Merger Shows No Likelihood of Harm**

# PRH's Output Increased Post-Merger

| Contracts | Before (2010-2012) | After (2014-2016) |
|:---:|:---:|:---:|
| **$250,000 and above** | **941** | **1,067** |

Prof. Snyder Advance Data, $250,000+ Advances

CONFIDENTIAL

# PRH's Output Increased Post-Merger



Prof. Snyder Advance Data, $250,000+ Advances

CONFIDENTIAL

# Average Advance Trends Differ by Advance Range

**Average Advance Per Title**

| Total Contract Advance | Before (2010-2012) | After (2014-2016) |
|---|---|---|
| **$250,000 - $499,999** | ███████ | ███████ |
| **$500,000 - $999,999** | ███████ | ███████ |
| **$1,000,000 - $1,999,999** | ███████ | ███████ |
| $2,000,000 - $3,999,999 | ███████ | ███████ |
| $4,000,000+ | $██████ | ███████ |

Prof. Snyder Advance Data, $250,000+ Advances

CONFIDENTIAL

# High Variability in Contracts of $4 Million+



Prof. Snyder Advance Data

CONFIDENTIAL

# Problems with Dr. Hill's Difference-in-Differences Approach

1. $0-$249,999 books not a valid control group for $250,000+ books
   - No evidence that trends in advances per title for $0-$249,999 books would have evolved similarly
   - Average advances per title for $250,000+ books were quite variable pre-2013
2. Does not control for important composition effects
   - Industry-wide decline in "mass market" books that typically earn advances below $50,000
3. Removing books with advances of $0-$50,000 results in a small and statistically insignificant result

89

# Advances Will Not Decline

# Advances Will Not Decline

1. Competition for new titles will remain strong
2. Publishers cannot identify and target authors of $250,000+ books
3. S&S and PRH editors cannot operationalize a strategy of cutting advances
4. Softening of competition from other publishers will not take place
   - Publishers have testified they will not cut advances