# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

               *Plaintiff,*

     v.

BERTELSMANN SE & CO. KGaA,
PENGUIN RANDOM HOUSE, LLC,
VIACOMCBS, INC., and SIMON &
SCHUSTER, INC.

               *Defendants.*

Civil Action No. 1:21-cv-02886-FYP

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................... 1

PROPOSED FINDINGS OF FACT ......................................................................... 4

I.      BACKGROUND OF THE PARTIES AND THE DEAL ................................. 4

II.     THE GOVERNMENT'S PROPOSED RELEVANT SUBMARKET ........................... 11

      A.      The Alleged Submarket Is Both Underinclusive And Overinclusive ................ 12

      B.      The "Hypothetical Monopsonist" Test Does Not Establish Any Well-Defined Submarket Based Solely On Price ........................................................ 17

      C.      The Alleged Submarket Does Not Reflect Industry Realities ............................ 18

              1.      Books Acquired For Advances Of At Least $250,000 Receive No Unique Services Or Treatment.................................................................. 18

              2.      Non-Big Five Publishers Provide Equivalent Publishing Services ......... 25

              3.      The $250,000+ Advance Threshold Does Not Correspond To Any Distinct Set Of Authors Or Particular Book Characteristics ................... 29

              4.      Industry Participants Do Not Recognize A Separate Submarket For The Acquisition Of "Anticipated Top Sellers" Defined By A $250,000 Advance Threshold ......................................................... 34

              5.      Publishers Cannot Adjust General Bidding Conduct In Response To Competitors' Pricing .......................................................... 39

III.    ABSENCE OF LIKELY SUBSTANTIAL AND IMMINENT HARM ........................ 42

      A.      Industry Participants Recognize That The Merger Will Not Reduce Competition For The Most Sought-After Books .................................................. 45

      B.      Large Existing Rivals Plan To Expand And Can Easily Do So ........................ 49

              1.      Printing................................................................................................ 52

              2.      Backlist ............................................................................................... 54

               3.      Reputation ........................................................................................... 55

               4.      Distribution ......................................................................................... 56

      C.      Downstream Competition Drives Competition For The Acquisition Of Books ...................................................................................................... 56

      D.      Agents Control The Competitive Conditions Of Specific Acquisition Processes .......................................................................................... 57

      E.      Non-Big Five Publishers Collectively Impose A Significant Competitive Threat ............................................................................................. 61

## TABLE OF CONTENTS
(continued)

Page

F.   Self-Publishing Is Also A Competitive Threat, Especially For Celebrity And Romance Authors ........................................................................... 67

G.   PRH And S&S Do Not Frequently Compete Head To Head As The Top Two Bidders In Acquisitions .......................................................... 68

H.   Internal Imprint Competition Significantly Broadens The Competitive Landscape ............................................................................................... 72

I.   The Evidence Does Not Show That Advances Will Be Substantially Reduced Through A "Softening" Of Competition ................................... 78

J.   The 2013 Merger Of Random House With Penguin Did Not Cause A Reduction In Author Advances .............................................................. 84

K.   The Government's Economic Models Did Not Prove A Likelihood Of Substantial Harm To Competition ....................................................... 89

    1.   The SSA Does Not Reflect Most Real-World Acquisitions ................... 90

    2.   Dr. Hill Used Flawed Inputs In The SSA ............................................. 96

    3.   The SSA Model Does Not Account For Imprint Competition ............. 101

    4.   Dr. Hill's GUPPI Calculations Are Marred By The Same Errors As The SSA ............................................................................................. 102

IV.   COORDINATED EFFECTS ........................................................................ 104

A.   Books Are Non-Homogeneous And Subjectively-Valued ................................ 105

B.   Publishers Compete Over Non-Price Terms ..................................................... 106

C.   New Publishers Can Easily Enter The Market ................................................. 107

D.   The Merger Will Not Facilitate No-Poaching Agreements ............................... 107

E.   Downstream Competition Reduces Any Incentive To Coordinate Upstream ........................................................................................................... 107

PROPOSED CONCLUSIONS OF LAW ............................................................................ 108

I.   THE GOVERNMENT DID NOT CARRY ITS BURDEN OF ESTABLISHING A WELL-DEFINED SUBMARKET ............................................. 110

A.   The Government's Alleged Submarket Does Not Reflect Industry Reality ...... 114

B.   The Unsurprising Correlation Between Advances And Expected Sales Does Not Establish A Distinct Submarket ........................................................ 117

C.   The Government's Alleged "Targeted Sellers" Market Is Not Well Defined ............................................................................................................. 118

## TABLE OF CONTENTS
(continued)

Page

 1. The $250,000 Advance Level Does Not Reflect Changed Competitive Conditions ........................... 119

 2. The $250,000 Advance Level Is Not Narrowly Defined Around Franchise, Celebrity, And Prize-Winning Authors ............................. 122

D. The Government's Caselaw Does Not Support Its Inadequate Market Definition .................................... 125

II. THE GOVERNMENT HAS NOT PROVED THAT THE MERGER WILL SUBSTANTIALLY LESSEN THE VIGOROUS COMPETITION TO ACQUIRE BOOKS BY FRANCHISE, CELEBRITY, AND PRIZE-WINNING AUTHORS ...... 127

A. The Statistical Presumption Has Minimal Force ................................................. 128

B. The Presumption Is Rebutted Because Evidence Shows That Concentration Statistics Alone Do Not Accurately Predict The Competitive Effects Of The Merger ................................ 131

 1. Market Shares Alone Are Misleading Because PRH And S&S Are Not Close Competitors—They Are Rarely First And Second Place In Bidding ................................. 131

 2. Market Share Statistics Do Not Account For Ordinary Course Business Documents Demonstrating That Industry Participants Do Not Expect The Merger To Reduce Author Compensation ................. 134

 3. Competitive Incentives Arising From Downstream Sales Competition Will Constrain Publishers From Reducing Advances For The Most Sought-After Books ...................... 135

 4. Market Share Statistics Do Not Account For Agents' Ability To Influence Competition By Controlling The Bargaining Processes ........ 136

 5. Most Acquisitions Are Subject To The Collective Competitive Pressure Of The Entire Market, Not Individual Competitive Threats Measured By The Participant's Market Share ......................... 137

 6. Market Concentration Statistics Ignore The Much Broader Competitive Field Created by Imprint Competition ............................. 138

 7. Planned Expansion By Rivals Makes Static Market Shares An Unreliable Basis For Evaluating The Likely Future Effects Of The Merger ................................ 139

 8. Market Concentration Statistics Do Not Reflect The Natural Experiment Of The 2013 Penguin And Random House Merger, Which Did Not Cause A Reduction In Advances ................................. 141

## TABLE OF CONTENTS
(continued)

Page

C. The Government's Theory Of General "Softening" Of Competition Is Inconsistent With Its Unilateral Effects Claim, Unsupported By The Evidence, And Inadequate To Prove A Likely Substantial Lessening Of Competition ...................................................................................... 143

D. The Government's Unilateral Effects Models Do Not Establish That The Merger Is Likely To Cause A Substantial Reduction In Advances ................... 147

   1. The SSA Model At Best Applies Only To Round-Robin Auctions And Its Predictions Cannot By Extended To Other Acquisition Formats ................................................................................. 149

   2. Dr. Hill Used Inappropriate Inputs In Applying The SSA Model ......... 153

   3. Dr. Hill's GUPPI Calculations Do Not Bolster His Inapplicable And Flawed SSA Analysis .................................................................. 155

III. THE GOVERNMENT DID NOT PROVE THAT THE MERGER WILL LIKELY CAUSE A SUBSTANTIAL DECREASE IN ADVANCES THROUGH COORDINATED EFFECTS .................................................................................. 156

A. A Coordinated Effects Claim Requires Proof That A Merger Increases The Ability Of Industry Participants Both To Reach An Express Or Implied Agreement And To Punish Deviations From The Agreement ........................... 156

B. The Merger Will Not Increase The Likelihood Of Coordinated Compensation Terms ........................................................................... 157

C. The Merger Will Not Increase The Likelihood That Hachette, Macmillan, And Other Publishers Will Enter Illegal Anti-Poaching Agreements .............. 159

D. The Ebooks Case Does Not Show That The Merger Will Increase The Likelihood Of Coordination ................................................................. 160

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brooke Grp. Ltd. V. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ................................................................................ 155

*Brown Shoe Co. v. U.S.*,
    370 U.S. 294 (1962) ............................................................ 108, 110, 111

*Coburn v. Evercore Trust Co., N.A.*,
    844 F.3d 965 (D.C. Cir. 2016) ............................................................ 151

*Crestron Elecs. Inc. v. Cyber Sound & Sec. Inc.*,
    2012 WL 426282 (D.N.J. Feb. 9, 2012) ............................................ 111

*FTC v. Arch Coal*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ................................................ passim

*FTC v. Cardinal Health, Inc.*,
    12 F. Supp. 2d 34 (D.D.C. 1998) ........................................................ 114

*FTC v. CCC Holdings, Inc.*,
    605 F. Supp. 2d 26 (D.D.C. 2009) ...................................................... 133

*FTC v. Freeman Hosp.*,
    69 F.3d 260 (3d Cir. 1995) .................................................................. 110

*FTC v. H.J. Heinz*,
    246 F.3d 708 (D.C. Cir. 2001) ........................................................ passim

*FTC v. Peabody Energy Co.*,
    492 F. Supp. 3d 865 (E.D. Mo. 2000) ................................................ 133

*FTC v. RAG-Stiftung*,
    436 F. Supp. 3d 278 (D.D.C. 2020) ................................................ passim

*FTC v. Staples*,
    190 F. Supp. 3d 100 (D.D.C. 2016) .................................................... 125

*FTC v. Sysco Corp.*,
    113 F. Supp. 3d 1 (D.D.C. 2015) .................................................... passim

*FTC v. Tenet Health Care Corp.*,
    186 F.3d 1045 (8th Cir. 1999) ............................................................ 110

*FTC v. Thomas Jefferson Univ.*,
    505 F. Supp. 3d 522 (E.D. Pa. 2020) ................................................ 110

*FTC v. Tronox Ltd.*,
    332 F. Supp. 3d 187 (D.D.C. 2018) ............................................ 109, 134

*FTC v. Whole Foods Market, Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008) .......................................................... 117

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*FTC v. Wilh. Wilhelmsen Holding ASA*,
341 F. Supp. 3d 27 (D.D.C. 2018) ....................................................................... 125

*HDC Med., Inc. v. Minntech Corp.*,
474 F.3d 543 (8th Cir. 2007) ............................................................................... 111

*Hosp. Corp. of Am. v. FTC*,
807 F.2d 1381 (7th Cir. 1986) ............................................................................ 156

*In re B.F. Goodrich Co.*,
110 F.T.C. 207 (1988), *as modified by* 112 F.T.C. 83 (July 18, 1989) .......................... 155, 156

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,
691 F. Supp. 1262 (N.D. Cal. 1988), *aff'd*, 895 F.2d 1417 (9th Cir. 1990) .......................... 111

*New York v. Deutsche Telekom AG*,
439 F. Supp. 3d 179 (S.D.N.Y. 2020) ............................................................ 129, 130, 157, 158

*NRDC v. Jackson*,
650 F.3d 662 (7th Cir. 2011) ............................................................................... 140

*O'Bannon v. NCAA*,
7 F. Supp. 3d 955 (N.D. Cal. 2014), *rev'd in part*, 802 F.3d 1049 (9th Cir. 2015) ................................................................................................................ 125

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
792 F.2d 210 (D.C. Cir. 1986) ............................................................................ 114

*Standard Oil Co. of Cal. v. U.S.*,
337 U.S. 293 (1949) ............................................................................................ 109

*United States v. Anthem, Inc.*,
855 F.3d 345 (D.C. Cir. 2017) ................................................................ 109, 125, 129

*United States v. AT&T, Inc.*,
916 F.3d 1029 (D.C. Cir. 2019) .......................................................................... 107

*United States v. Baker Hughes*,
908 F.2d 981 (D.C. Cir. 1990) ........................................................................ passim

*United States v. E. I. du Pont de Nemours & Co.*,
353 U.S. 586 (1957) ............................................................................................ 109

*United States v. H & R Block*,
833 F. Supp. 2d 36 (D.D.C. 2011) ........................................................ 114, 122, 156

*United States v. Joseph Schlitz Brewing Co.*,
253 F. Supp. 129 (N.D. Cal. 1966) ..................................................................... 111

*United States v. Long Island Jewish Med. Ctr.*,
983 F. Supp. 121 (E.D.N.Y. 1997) ..................................................................... 110

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Marine Bancorp*,
    418 U.S. 602 (1974) ................................................................................................... 107, 108

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ........................................................................ passim

*United States. v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ................................................................................................ 159

*United States. v. Syufy Enterprises, Inc.*,
    793 F.2d 990 (9th Cir. 1986) ............................................................................................... 124

**Statutes**

15 U.S.C. § 18 .......................................................................................................................... 4

**Other Authorities**

Carl Shapiro, *The 2020 Horizontal Merger Guidelines: From Hedgehog to Fox in
    Forty Years*, 77 Antitrust L.J. 49 (2010) ............................................................................ 26

George J. Stigler, *A Theory of Oligopoly*, 72 J. Pol. Econ. 44 (1964) ......................................... 52

Herbert Hovenkamp & Carl Shapiro, *Horizontal Mergers, Market Structure, and
    Burdens of Proof*, 127 Yale L.J. 1996, 2014 (2018) ............................................................ 28

Jan M. Rybnicek & Laura C. Onken, *A Hedgehog in Fox's Clothing? The
    Misapplication of GUPPI Analysis*, 23 Geo. Mason L. Rev. 1187, 1193 (2016) ................... 51

**INTRODUCTION**

1.      Under Clayton Act § 7, a merger can be blocked only if the government proves that it will likely cause substantial and imminent harm to competition in a relevant, well-defined market.  The government has not made that showing.

2.      Antitrust law operates on the basic premise that competition is the best means for ensuring low prices, which generally benefits consumers, and maximizing output, which generally benefits workers.

3.      The government did not bring this case to address concerns that the proposed merger of storied publishing houses Penguin Random House ("PRH") and Simon & Schuster ("S&S") might increase consumer book prices or reduce the number of books published every year.  The case has never been about competitive harm to readers or booksellers.

4.      Instead, the government has always focused on alleged harm to authors. Specifically, the government claims that the merger will reduce the component of compensation paid to them in the form of advances on royalties from eventual book sales.  But the government ultimately abandoned any claim that the merger would reduce advances paid to *all* authors.  By the time of trial, the government was focused only books that yielded advances of $250,000 or more—the top two percent of all books, representing only about 1000 authors.  The government paid no heed to whether the merger would improve the sales, distribution, and visibility of books written by the many thousands of other authors who receive less than $250,000 for their hard work and creative efforts.

5.      Trial brought even more clarity to the government's claim.  It turns out that the government is not even concerned with all authors who receive advances of $250,000 or more. According to the government, its suit focuses on only a subset of that high-end category:  authors easily identifiable by their proven track records and existing fan bases, i.e., "franchise" authors

who write multiple successful books, popular or notorious celebrities, and authors with prior books that won the acclaim of literary awards.

6.      These are not the authors being paid advances of $250,000, or $500,000, or even $1,000,000.  These authors sign multi-million dollar deals.  They are the elite of the elite.  As such, they are the least in need of protection by the antitrust laws, because their well-deserved compensation reflects a simple market reality:  they write the books publishers will always compete hardest to acquire.

7.      Yet protecting these authors is what this case has come to.  The government at trial could not identify any other way to plausibly define or describe the market its case addresses.  The trial confirmed that industry participants draw no categorical distinctions between books acquired for advances lower than $250,000 and books acquired for higher amounts.  The government then tried to assert that its targeted market could be identified by the advance threshold where the Big Five publishers acquire the overwhelming majority of books.  But the evidence showed that threshold to be just $50,000—a threshold that would likely preclude the government from trying to make its case based on statistical concentration alone.

8.      All of which leaves the government with only one real argument:  the market it wants to protect is characterized by the franchise, celebrity, and prize-wining authors who write books everyone recognizes as likely best-sellers.  But the government has provided the court no workable quantitative metric that captures the advances paid to those select authors while excluding advances paid to other authors without similar track records or platforms.  The law requires the government to draw the narrowest market that can be drawn to distinguish the products that require antitrust protection from those that do not.  The $250,000 advance threshold

cannot be reconciled with that rule.  It is an arbitrary price line with no practical, competitive, or legal significance.

9.      The government's effort to prove competitive harm to the most successful authors suffers from similarly arbitrary and unsupported claims.  Among other things, the government's economic expert, Dr. Nicholas Hill, sought to prove that the merger would lower advances through a statistical model that admittedly examined the merger's effects only on one type of book acquisition:  a "round-robin" or "rounds" style auction, where multiple editors each submit offers through multiple bidding rounds.  Yet the agents who control the bidding rules rarely choose such formats, because such formats are usually not in authors' best interests, financial and otherwise.  Dr. Hill nevertheless extrapolated the results of his rounds-only model across all bargaining formats to reach a broad conclusion about the merger's effects industrywide.  To justify the extrapolation, Dr. Hill speculated that bidding in all formats is subject to roughly similar competitive considerations, even though he is not an expert on bargaining in the publishing industry—as this Court emphasized—and even though agents overwhelmingly choose other formats precisely because they do *not* generate the same bargaining results as the round-robin auctions examined in his model.

10.     The extrapolation of a model focused on round-robins to other formats is insupportable.  And it cannot be rehabilitated by Dr. Hill's further speculation about how the merger might affect competition in acquisitions he never studied—the vast majority of acquisitions in the industry.

11.     For these and the many other reasons set forth below, the government did not prove that the merger is likely to cause a substantial and imminent adverse effect on competition in any well-defined market.

## PROPOSED FINDINGS OF FACT

### I.   BACKGROUND OF THE PARTIES AND THE DEAL

1.      On November 25, 2020, Penguin Random House ("PRH") and Bertelsmann SE &

Co. KGaA ("Bertelsmann") announced plans to acquire Simon & Schuster, Inc. ("S&S").

2.      The Department of Justice conducted a lengthy investigation of the merger, and

on November 2, 2021, filed a complaint seeking to enjoin the merger under Section 7 of the

Clayton Act.  *See* Compl. (Dkt. 1).  The case was tried and included 12 days of testimony,

concluding on August 19, 2022.

3.      *Story of Penguin Random House.*  PRH's mission is "to create the future of books

and reading . . . for generations to come."  Tr. 806:11-14 (Dohle (PRH)).  PRH believes that

"books matter," that "reading matters."  Tr. 806:21-22 (Dohle (PRH)).

4.      PRH is made up of about 100 imprints, both "small- and medium-sized publishing

houses" that it operates in the United States.  Tr. 812:5-11 (Dohle (PRH)).

5.      PRH is owned by Bertelsmann, which itself is majority-owned by the nonprofit

Bertelsmann Foundation, and minority-owned by the sixth generation of the Mohn family, who

founded the company.  Tr. 808:20-23 (Dohle (PRH)).  The Bertelsmann Foundation—the largest

operating nonprofit in Europe, with an office in Washington, D.C.—was founded 45 years ago

and aims to help governments and institutes make data-driven decisions tackling major issues

like the environment, healthcare, and education.  Tr. 808:24-809:22 (Dohle (PRH)).

6.      Bertelsmann's commitment to its publishing business means that the company

reinvests its profits into its business divisions, including by making significant investments into

PRH.  Those investments include—first and foremost—PRH's investment in content.  In 2021

alone, PRH paid over one billion dollars in author advances and royalties.  Tr. 810:18-25 (Dohle

(PRH)).  As Mr. Dohle testified, Bertelsmann gives PRH "unlimited access to cash flow to invest

into our business.  I've never seen them limit us in any way . . . in terms of investments."  Tr. 809:23-811:3, Tr. 815:18-21 (Bertelsmann imposes no budget on what PRH can spend to acquire books; "As much as we want.").

7.      _Story of Simon & Schuster._  S&S was founded in 1924 by Richard Simon and Max Schuster.  Tr. 473:11-12 (Karp (S&S)).  The company publishes adult, children, and audio books.  Tr. 473:16-19 (Karp (S&S)).  About 75 percent of S&S's business takes place in the United States.  Tr. 474:2-6 (Karp (S&S)).

8.      S&S is made up of nearly 50 imprints and publishes around a thousand new books each year.  Tr. 473:20-474:1 (Karp (S&S)).

9.      S&S built its "origins in going out and getting the books."  Tr. 475:25-476:1 (Karp (S&S)).  The company tries to maintain the same spirit it held in 1939 of seeking out its "own books" as "exclusive opportunities," Tr. 475:25-476:6 (Karp (S&S)), often through approaching authors directly or receiving exclusive submissions from agents.  Tr. 475:22-24, Tr. 476:7-10 (Karp (S&S)).

10.     CBS owned S&S for many years.  CBS merged with Viacom in 2019 and changed its name to ViacomCBS.  Tr. 2177:16-22 (Berkett (Paramount f/k/a ViacomCBS)).  ViacomCBS continued to own S&S.  Tr. 2177:23-25 (Berkett (Paramount)).  ViacomCBS then changed its name to Paramount Global, the current name of the owner of S&S.  Tr. 2177:23-2178:3 (Berkett (Paramount)).

11.     Following the merger between Viacom and CBS, the management team decided that S&S was no longer a strategic priority, and the company would "now center on building a streaming video business and producing the world's best video content."  Tr. 2180:23-2181:19

(Berkett (Paramount)).  The management team discussed with the company's board of directors pursuing the sale of S&S.  Tr. 2181:10-19 (Berkett (Paramount)).

12.     Three strategic buyers made it to the end of the two-round bidding process to purchase S&S.  Tr. 2185:8-2187:9 (Berkett (Paramount)).  Bertelsmann/PRH bid the highest price.  Tr. 2189:1-4 (Berkett (Paramount)).  Certain that Bertelsmann could "finance the business and live up to their obligations"—including being a great home for S&S's business, legacy, and employees—Paramount decided to sell S&S to Bertelsmann.  Tr. 2189:5-19 (Berkett (Paramount)).

13.     _The Publishing Industry._  The publishing industry has changed in recent years. Tr. 1067:17-1068:3 (Weisberg (Macmillan)); DX-299 at 9 (News Corp. 10-K stating that the book publishing business "is quickly changing and continues to see technological innovations"). The shift to online retail has "made publishers more profitable and leveled the playing field," changing the risk assessment for smaller publishers in particular.  Tr. 837:2-838:6 (Dohle (PRH)).  With the advent of "social media and TikTok, all of the different ways you can market a book virally," publishers are trying to find an audience for a book using "every device possible to find that audience."  Tr. 1067:19-25, 1108:22-1109:24, 1113:1-17 (Weisberg (Macmillan)).

14.     The market for the acquisition of books is highly competitive.  Tr. 1298:21-1299:10 (Murray (HarperCollins)) (HarperCollins will compete aggressively for books); PX-2002 (Stehlik (HarperCollins) Dep.) 71:17-72:16; DX-299 at 9 (News Corp. 10-K describing the "book publishing business" as "operat[ing] in a highly competitive market"); Tr. 552:10-20 (Karp (S&S)) (publishing is "a dynamic landscape"); Tr. 1805:15-22 (Walsh) ("It's an exciting time for new entrants in the publishing industry"); PX-2005 (Jacobs (Abrams) Dep.) at 51:23-52:3 (Abrams' "strategic plan" is to "grow our business and to be very strong in categories in

which we publish and to try new things, keep growing our children's publishing aggressively and, you know, be a—a profitable independent midsized publisher.")

15.    Amidst all of this, advances publishers pay to authors are rising.  PX-2002 (Stehlik (HarperCollins) Dep.) at 51:11-16, 51:18-52:1; DX-422 (Glusman (Norton) Dep.) at 130:14-131:3, 131:9-19.; Tr. 991:5-19 (Tart (PRH)); Tr. 1990:4-9 (Kim (PRH)).

16.    Publishers plan to spend more on author advances in the future, not less, including in plans developed after the PRH/S&S merger was announced.  PX-2002 (Stehlik (HarperCollins) Dep.) at 49:11-51:5; DX-188 at 1 (June 16, 2021 email noting HarperCollins CEO publicly stated that HarperCollins "was going to be more aggressive in its offers" for books "because the market is growing"); ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████  Tr. 1092:6-10, 1098:5-18 (Weisberg (Macmillan)) (Macmillan plans to spend more on author advances in coming years in efforts to grow its retail market share).

17.    Between 2020 and 2021, PRH and S&S lost retail market share, while other "Big Five" publishers gained.  PX-829 at 2; Tr. 1094:1-6 (Weisberg (Macmillan)); DX-217.0006 (noting that "year to date," Macmillan has "taken approximately 2 points of market share from the other Big Five publishers").

18.    Macmillan is a strong publishing company, with multiple well-known imprints, led by CEO Don Weisberg.  Tr. 1057:14-19, 1089:4-17 (Weisberg (Macmillan)).  Macmillan opened its Flatiron imprint within the last eight years.  Tr. 1089:23-1090:7 (Weisberg (Macmillan)).  That imprint is affiliated with Oprah Winfrey, who has a book club that both attracts authors and helps sales.  Tr. 1090:8-25 (Weisberg (Macmillan).  In the past two years, Macmillan has had record-breaking, unprecedented growth and profit.  Tr. 1091:4-12 (Weisberg

(Macmillan)); PX-829 at 2 ████████████████████████████████████

████████████████████████████ DX-217.0004 (Macmillan internal presentation

showing that Macmillan grew its market share within the "Big Five," based on Bookscan data,

from about 10.4 percent to 12.2 percent year over year).

19.     Hachette Book Group is another large and successful publisher.  Hachette has

multiple imprints that compete against each other in book auctions.  Tr. 227:2-8 (Pietsch

(Hachette)); Tr. 1796:21-23, Tr. 1797:10-15 (Walsh).  Hachette is led by CEO Michael Pietsch.

Tr. 95:22-96:4 (Pietsch (Hachette)).

20.     HarperCollins, led by CEO Brian Murray, is owned by News Corporation and is

the second largest publisher in the industry.  Tr. 1362:10-1365:9, 1401:21-24 (Murray

(HarperCollins)).  HarperCollins competes with other Big Five publishers as well as non-Big

Five publishers for content.  DX-299 at 9.

21.     _Plans to Sell S&S._  The decision to sell S&S is a firm one.  Paramount's

leadership has made repeated public statements to investors that S&S will be sold and divested

from the company because it is no longer a strategic priority.  Tr. 2182:14-2183:15 (Berkett

(Paramount)) (describing public comments made by CEO Bob Bakish and others).  If S&S

cannot be sold to PRH, Paramount will sell it to another buyer "as soon as possible."  Tr.

2183:16-2184:2 (Berkett (Paramount)).

22.     Paramount believes that a sale to PRH would be the best outcome for the

company.  ViacomCBS used four criteria for evaluating the offers it received for S&S:  price,

deal certainty, stewardship, and whether the buyer is a "good home for the employees and

executives at Simon & Schuster."  Tr. 2188:1-12 (Berkett (Paramount)).  Alexander Berkett—

EVP, Chief Corporate Development and Strategy Officer at Paramount—testified that, "[b]ased

on conversations we had with the company, based on Bertelsmann/Penguin Random House's reputation in the marketplace," he "thought they'd be an excellent home for the business, for the legacy of the business, and for the employees and executives."  Tr. 2189:9-19; Tr. 584:15-585:4 (Karp); DX-154 (Karp "delighted" with transaction outcome).

23.     Literary agents believe PRH's acquisition of S&S is a superior outcome to the alternative of an acquisition by a private equity company.  Tr. 2094:20-2095:2 (Wylie (Wylie Agency)) ("Because what is important, in my view, for Simon & Schuster is to have its enterprise supported by an understanding parent company.  So if it were, for instance, to go to private equity, as happened originally with Houghton Mifflin, the private equity company wouldn't understand the business it was in; would, say, load it with debt as Blackstone did to Houghton Mifflin, basically destroying the publishing house so that it was sold at a discount later to one of the Big 5.").  Agent Elyse Cheney explained that the merger will be "neutral to positive" for her clients because "Penguin Random House has really—has made a commitment to books over a very, very long period of time, and because they're a private company, they can invest long-term in things like infrastructure, printing, whatever, you know.  Whereas, a company like Simon & Schuster, which is shareholder driven and quarterly-report driven, it cannot make those kinds of investments."  Tr. 2069:12-24.

24.     Best-selling author Charles Duhigg also testified that an acquisition of Simon & Schuster by a private equity firm would be "disastrous for Simon & Schuster writers."  Tr. 1938:18-23 ("And I covered private equity for a decade at *The New York Times*, and I saw what happened with newspapers.  And they will gut that company.").

25.     *Story of the Deal.*  Bertelsmann and PRH decided to pursue the acquisition of S&S because they were convinced PRH was the best home for S&S.  They believed that—as

with the merger of Random House and Penguin—Bertelsmann could bring PRH's industry-leading supply chain to bear on S&S's books, enabling S&S to obtain more retail shelf space, enjoy higher sales, and reach more readers.  Tr. 878:1-22 (Dohle (PRH)).  And they believed that savings from the merger would allow the combined company to spend more money to acquire books and thereby compete better for retail sales.  *Id.*; Tr. 2258:3-13 (McIntosh (PRH)) (if merger reduces overhead costs for combined company, formula for calculating advances will generate higher advance offers to authors).[1]

26.     Other publishers who considered or attempted to acquire S&S also believed an acquisition would create significant benefits.  Tr. 208:12-14 (Pietsch (Hachette)).  HarperCollins, the second biggest publisher in the industry, sought to acquire S&S for that reason, DX-288.0017; Tr. 1421:23-25 (Murray (HarperCollins)); DX-143.0002, and it is now concerned that

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████

27.     Other industry participants anticipate other author benefits apart from increased advances.  In particular, they expect that S&S authors will benefit from PRH's superior distribution system, retail relationships, and marketing and promotional departments.  PX-2007 (Fletcher (Fletcher & Company) Dep.) at 140:22-142:3; ████████████████████████

██████████████  Tr. 2134:11-20 (Ross (Ross Yoon Agency)) (Q. "What impact, if any, do you

---

[1] While the Court excluded defendants' evidence quantifying its projected benefits, Tr. 2751:11-2752:5, it is not disputed that PRH is acquiring S&S because it *expects* the merger to be beneficial for the combined company and for authors, Tr. 2544:22-2545:22 (Sansigre (PRH)).  In light of the Court's ruling, these Proposed Findings and Conclusions do not restate defendants' evidence quantifying the projected efficiencies.  Defendants instead reserve objections to the Court's ruling for appeal.

believe this merger would have on your clients?" A. "Well, I'm focusing primarily on my Simon & Schuster clients.  I have a lot of Simon & Schuster clients whose books will be published in the next several years.  And I think—I think it will be terrific for them . . . ."); Tr. 2135:9-20 (Ross (Ross Yoon Agency)) ("[A] lot of my clients do very well in independent bookstores.  And I go around the country and I ask bookstore people about their various publishers.  And, you know, everyone thinks that PRH has the best relations with the independent bookstores in the business.  And I'm just looking forward to that for my Simon & Schuster authors.").

28.     As literary agent Elyse Cheney testified, "Penguin Random House has really— has made a commitment to books over a very, very long period of time, and because they're a private company, they can invest long-term in things like infrastructure, printing, whatever, you know.  Whereas, a company like Simon & Schuster, which is shareholder driven and quarterly-report driven, it cannot make those kinds of investments.  So I do think that Simon & Schuster could benefit from some of the tools that Penguin Random House has developed over time."  Tr. 2069:18-2070:1.

## II.     THE GOVERNMENT'S PROPOSED RELEVANT SUBMARKET

29.     The government has sought to block the merger under Clayton Act § 7, but it has not attempted to prove that the merger will increase consumer prices or reduce output in the sale of books to readers downstream. Tr. 1539:11-25 (Hill).

30.     The government also did not show—or even attempt to show—that the merger would likely harm competition in the upstream market for all trade books.  The government originally alleged such a claim, *see* Compl. ¶¶ 32-35, but it abandoned the claim at trial.  Tr. 1536:16-1537:2 (Hill).  Defendants' expert Professor Edward Snyder agreed that the market for all U.S. trade books is a relevant market but, testified that there is "no harm to authors in the broad market of all trade books.  The main basis for that is that there is a lot of competition in

that industry to acquire books and the merger is not going to reduce that competition."  Tr. 2629:7-22, Tr. 2837:1-4 (Snyder) (Q. "What is your view on the acquisition – on the market for the acquisition of all books of this merger?" A. "It's competitive, highly competitive, and it will remain that way."); DX-382 (market shares for the broader market for all trade books, 2019-2021).  The government's expert, Dr. Nicholas Hill, agreed.  Tr. 1535:16-1536:22 (Hill).

31.    Unable to show harm from the transaction in the market for the acquisition of all trade books, the government instead sought to prove harm only in an arbitrarily-defined submarket, which it described as the market to acquire rights to "anticipated top selling books," defined as U.S. trade books acquired for advances of $250,000 or more.  Compl. ¶¶ 36-39.

32.    The alleged price-segmented submarket is not well defined, as explained in the following findings.  While a price can help "corroborate" a proposed product market, "it should not be . . . used as the sole means of identifying a product market."  Tr. 2815:20-25 (Snyder).

### A.    The Alleged Submarket Is Both Underinclusive And Overinclusive

33.    Dr. Hill testified that, in defining his market for anticipated top selling books, "an anticipated top seller is a book that is expected to sell a significant number of copies."  Tr. 1226:5-7 (Hill).  But Dr. Hill never analyzed what it means to be an "anticipated top seller" in terms of sales—he defined the term simply "using the advance amount."  Tr. 3176:20-3177:10 (Hill) (Q.  "You have never—in your work, you have never actually, other than with respect to the price cutoff, you haven't defined with specificity what it means for a book to be a top seller in your reports, correct?"  A.  "Correct.  I defined it using the advance amount or identify it using the advance amount, I would say."  Q.  "When you were asked in your deposition, well, what is an anticipated top seller expected to do in retail sales, you said it would generate what you called significant sales, correct?" . . . . A.  "Yeah.  And I identified that this is about 20 percent of all books in the sample qualify for this."  Q.  "But that you did not have a definition of what

significant copies was, correct?"  A.  "That's correct."). And, in defining his alleged submarket, Dr. Hill did not study whether the amount of sales that would support an advance of $250,000 or more in a P&L varies across publishers.  Tr. 3177:10-22 (Hill) (Q.  "And you did not know what quantity of downstream sales, for example, at Penguin Random House supports an advance of $250,000 or more?"  A.  "That's correct."  Q.  "And you haven't studied whether the number of estimated book sales needed to justify a $250,000 advance varies across publishers?"  A. "Correct."  Q.  "And there's no specific level of estimated sales that you can identify that's associated with your price segment threshold of $250,000?"  A.  "Correct.").

34.      Instead of using a threshold for the alleged submarket that is based on sales, Dr. Hill used an advance of $250,000 as the boundary of the market.  Tr. 3176:24-25 (Hill) ("I defined it using the advance amount or identify it using the advance amount.").  This price-defined submarket is both over- and underinclusive for the category of books it claims to cover.  Tr. 1238:15-1239:8 (Hill) (admitting that "[s]ome anticipated top sellers are in our market, but they're not—or some books are in our market, but they're probably not anticipated top sellers, and vice versa").

35.      Dr. Hill asserted that the $250,000 advance threshold demarcates a line above which the Big Five publishing houses have a dominant aggregate market share of book acquisitions.  Tr. 3169:24-3170:17 (Hill).  According to Dr. Hill, that larger market share proves that authors "are making different choices" above and below that threshold.  Tr. 1233:3-13, 1235:12-21 (Hill).  The government relied on PX-963 to argue that the $250,000 threshold reflects a change in competitive conditions because authors of books acquired for more than $250,000 have fewer publisher options:



Source: Snyder Advance Data.

US v. Bertelsmann
1:21-cv-0866-FYP
**PX 0963**

t.Shares                                                   1 of 1                                                   DOJ-LIT-000000927

36.      The data actually show that if there is a relevant price cutoff above which the Big

Five make up a large majority of book acquisitions, it is much lower than $250,000, closer to

$50,000:



37.      This chart shows that "if you are looking for changes in the number of

competitors or the shares of competitors, there is nothing special about [$]250,000." Tr.

14

2825:23-2826:2 (Snyder); 1816:21-1817:17 (Walsh).  To the contrary, the data establish that *if* competitive conditions differ based on market shares and author preferences, the difference begins with books acquired for advances of $50,000 or more.  Tr. 2822:14-2823:18 (Snyder); DX-438.  In other words, under Dr. Hill's theory that the market share difference defines the proper boundary of a submarket for "anticipated top selling books," the boundary must be drawn at the $50,000 advance level.

38.     If a market were properly defined—according the government's own criteria—at the $50,000 advance level, the government could not establish likely substantial harm in that market.  The HHI for this broader market would show a "substantially less concentrated market." Tr. 2828:11-2829:6 (Snyder).  Dr. Hill did not attempt to measure concentration in the market for books acquired for $50,000 or more.  Tr. 1536:10-15 (Hill).

39.     The government's $250,000 advance-level market boundary fails to properly capture "anticipated top selling books" in another respect.  The government contended in closing arguments that "anticipated top sellers" share certain easily identifiable "special characteristics": they are books written by repeat authors with a successful "track record" (often "franchise" authors), celebrity authors with "notoriety," and authors "recognized with past awards."  Tr. 3241:10-14 (closing).  Jennifer Bergstrom, Publisher of Gallery Books at S&S, explained that when she acquires a book by a celebrity author like Amy Schumer, she expects the author's platform to result in high sales.  Tr. 1841:8-19 (Bergstrom (S&S)).  Jennifer Walsh also acknowledged that with "giant celebrities," like Michelle Obama, and franchise authors like James Patterson, "you know it's going to be a top seller."  Tr. 1813:20-1814:3 (Walsh).  Agent Andrew Wylie testified that he would understand "anticipated top selling books" as referring to

well-known, repeat, "top selling authors," like "John Grisham or Danielle Steel."  Tr. 2096:16-23; *see* Tr. 2281:8-17 (McIntosh (PRH)) (franchise authors are "top sellers").

40.     These books by established, franchise, celebrity, and prize-winning authors tend to be acquired for millions of dollars, not for anything close to $250,000.  Tr. 2281:18-2282:7 (McIntosh (PRH)); *see also* Tr. 984:14-23 (Tart (PRH)) (Q. "[T]his case is about books that go for $250,000 advance or more.  Is that a high level advance to you?" A. "[N]o.  I don't consider 250—a high level advance.  You know, I consider seven figures mid—multiple seven figures being a high level advance."); Tr. 1842:10-16 (Bergstrom (S&S)) (Q. "Is there any way to anticipate, other than the million dollar plus that you mentioned, is there any way to accurately anticipate what a top selling book would be?" A. "No.").  If there is any difference in negotiating conditions, it exists only in the high million-dollar advance arena.  Tr. 985:3-8 (Tart (PRH)).  The government's market-defining advance threshold of $250,000 thus encompasses a vast collection of books that would not be broadly recognized in the industry as any type of "anticipated top seller."

41.     The government asserted that 90 percent of  books acquired for under $250,000 sell fewer than 2000 copies—they are essentially bottom-tier books.  Tr. 2905:9-2906:9 (Snyder); Tr. 3242:22-24 (closing).  The majority of *mid-list* books, then, must be found above the government's $250,000 threshold.  As the witnesses testified, the only industry-consensus top-sellers, with the distinct, easily-identifiable characteristics the government emphasizes, generally receive advances well exceeding $1 million.

42.     If the government had attempted to allege a well-defined submarket of books written by established, franchise, celebrity, and prize-winning authors, that submarket would have been subject to analysis of competitive harms very different from the submarket the

government did allege.  These authors have the most leverage in negotiations with publishers and

are therefore the least likely to be targeted.  Tr. 2685:16-2686:5, 2830:18-23 (Snyder) ("[A]n

author with a very strong track record, he or she's going to have—may have a relationship with

one publisher, but other publishers would look very fondly on the prospect of getting that author

because they can see the track record.").  As successful author Andrew Solomon observed:  "I

have a proven sales history and a proven history of winning prizes. And I think the publishers are

always going to be interested in that and drawn to it."  PX-2004 (Solomon Dep.) at 108:5-15; *see*

Tr. 2830:13-15, 2646:21-2647:12 (Snyder) ("[T]here are going to be some authors who can be

anticipated to be bestsellers, but . . . . those are the ones with respect to targeting who have the

leverage.").  The leverage these authors have is evident in the fact that the books sold for the

highest advances are generally less profitable than "mid-list" books acquired for lower advances.

Tr. 2287:10-2288:2 (McIntosh (PRH)); Tr. 589:24-591:9 (Karp (S&S)) ("I think there's a fairly

common truth that publishers hold which is that you make money on the midlist books.").

43.    Dr. Hill admitted that he did not consider whether authors who sell books for tens

of millions of dollars would have more bargaining leverage than authors who sell books for

$250,000.  Tr. 1544:3-10 (Hill).

**B.    The "Hypothetical Monopsonist" Test Does Not Establish Any Well-Defined Submarket Based Solely On Price**

44.    The hypothetical monopsonist test ("HMT") does not justify using the $250,000

advance-level threshold to define a submarket because the test would pass at any submarket at

any price level.  Tr. 2821:14-25 (Snyder).  Dr. Hill agreed that the HMT "tests whether the

market you've chosen passes the [m]onopsonist test, but it doesn't necessarily validate your

demarcation point at 250,000 or more."  Tr. 1243:12-1244:15, 1548:3-7 (Hill) (Q.  "[Y]ou're not

claiming that your hypothetical monopsonist test required you to choose 250- or any other specific advance level as a cut-off, correct; that we agree on?"  A.  "Correct.").

       **C.**    **The Alleged Submarket Does Not Reflect Industry Realities**

    45.    The $250,000 price boundary does not reflect the commercial realities of the publishing industry.  While advance payments may loosely correlate with expected sales, advances simply increase along a continuum—there is no categorical divide at the $250,000 level, or anywhere close, where industry participants negotiate or otherwise treat books differently based on sales expectations.  Above and below the $250,000 threshold, all basic industry functions are the same—publishers, agents, editors, and authors do not operate differently above and below that threshold.  Tr. 1816:25-1817:4 (Walsh) (books above and below $250,000 are provided "the identical service" from agencies and publishers); Tr. 2816:1-18, 2889:5-2890:2 (Snyder) ($250,000 threshold is "arbitrary").  Indeed, publishers and agents do not track publishers' market shares for the acquisition of books for advances over $250,000, or at any advance level.  Tr. 823:18-824:4 (Dohle (PRH)) (PRH does not track market shares for the acquisition of books and he is not aware of any industry publications that provide such information); Tr. 2128:1-7 (Ross (Ross Yoon Agency)) (does not know what publishers' market shares are in acquisition market).

    46.    Every factor relevant to commercial reality shows only a price continuum, not a distinct submarket of books defined anywhere around the $250,000 advance level.

        1.    *Books Acquired For Advances Of At Least $250,000 Receive No Unique Services Or Treatment*

    47.    Industry participants do not treat books differently depending on whether they were acquired for an advance above $250,000 or below that amount.  Tr. 1989:11-1990:3 (Kim (PRH)) (no difference in negotiations over book that will cost more or less than $250,000; no

difference in sales support based on that acquisition amount; no difference in printing or distribution based on that acquisition amount).  There is no distinct set of agents who only sell books for over $250,000, and no distinct set of editors who only acquire books for over $250,000.  Tr. 1817:18-1818:7 (Walsh); Tr. 2133:17-22 (Ross (Ross Yoon Agency)) (Q. "[I]n your business, is there some kind of demarcation by the reference to an advance level—let's say $250,000—where the industry treats books above that amount in a certain way in contrast with how they would treat books below that amount?" A. "No."); PX-2002 (Stehlik (HarperCollins) Dep.) at 134:24-135:10 (no special evaluation processes for books in different potential advance categories).

48.     Nor do publishers have distinct editorial, publishing, sales, or marketing departments that service books receiving advances of $250,000 or more.  Hachette CEO Michael Pietsch opposes the merger and testified for the government.  He nonetheless admitted, with respect to marketing books with $250,000+ advances:  "We do not divide our company that way."  Tr. 232:16-20 (Pietsch (Hachette)); DX-422 (Glusman (Norton) Dep.) 137:22-138:5; Tr. 985:19-21, 989:18-25 (Tart (PRH)); Tr. 2278:23-2279:1 (McIntosh (PRH)) (Q. "[A]nd just to be clear, do you have any—any kind of separate marketing, publicity, or sales teams associated for books that were acquired for more than $250,000?" A. "No, I do not."); Tr. 1868:5-17 (Bergstrom (S&S)) (THE COURT: "So putting aside advance levels, are there just some books that you think are going to sell well . . . and do those books get treated differently from other books?" A. "When we acquire books at Gallery, we assign a marketer, a publicist, and obviously an editor to it.  Each one of our books has—I call them the SWAT team. . . .  Again, some will take off.  Some won't.  But our attitude really is that that's what each book deserves, and we are able to do it.").

49.     _Marketing Spend and Marketing Plans._  Marketing spend is not a feature that distinguishes "anticipated top sellers" from other books publishers acquire.  Marketing spend is not determined by the advance, and marketing spend does not separate books into any distinct identifiable categories.

50.     The estimated marketing spend figure identified in the acquisition "profit and loss" ("P&L") statements is a "placeholder number."  Tr. 2253:14-24 (McIntosh (PRH)); Tr. 918:18-21 (Tart (PRH)); Tr. 1850:1-1850:9 (Bergstrom (S&S)) (Q.  "And do you include an estimate of marketing and publicity spend in the profit and loss statement that you discussed?" A.  "When I am—when we are acquiring books, yes, we do. We put a, it's a guesstimate, into each P&L. And it's a guesstimate because oftentimes we aren't publishing that book for many years.  So it's not until—we are usually about ten months from publication, from actual pub date, that we start our planning for how we are going to market and publicize that book.").

51.     Publishers do not often create marketing plans to submit with their acquisition offers.  Tr. 1855:6-13 (Bergstrom (S&S)) (Gallery at S&S "rarely" submits marketing plans with offers).  Whether they do or not has nothing to do with the advance level.  After all, when a marketing plan is created to present with an offer, the publisher does not yet know how much the book will ultimately be acquired for, or who will acquire it.  Tr. 576:17-578:3 (Karp (S&S)); Tr. 1854:23-1855:5 (Bergstrom (S&S)) ("I really tend not to give any marketing promises in the acquisition.  I never promise any financial. I really don't.  If we are in what I call a beauty contest where we are competing with someone else, yes, I will tip—I will talk about what I have done for other authors.  But it's too early in the process when we are acquiring a book to know what we are going to market and spend on it.").

52.    The actual marketing plan for a book is not derived from or developed with reference to the advance paid for the book.  Tr. 2271:24-2272:3 (McIntosh (PRH)) ("advance level does not play a role in the development of the marketing plan"); Tr. 2278:7-10 (McIntosh (PRH)) (Q. "So is there any kind of system in place now or that has been in place in the last ten years or so where marketing is directly tied to advance levels?" A. "No.").  In fact, the individuals at S&S in charge of marketing and publicity "often don't know" and "our sales force rarely knows" how much was paid to acquire a book.  Tr. 493:13-19 (Karp (S&S)).  Likewise, the salespeople at PRH rarely know the advance levels of the books they are tasked with selling because the advance levels are considered confidential.  Tr. 2268:22-2269:24 (McIntosh (PRH)); *see* Tr. 1921:13-19, 1922:3-14 (Duhigg) (explaining absence of special marketing attention for book that received $750,000 advance).

53.    Publishers instead determine their marketing plan near the *publication* date, "as late as possible, often six weeks before [they're] about to publish a book."  Tr. 976:21-22 (Tart (PRH)).  That is because the marketing spend depends on the finished book and its reception in the marketplace, not the advance.  Tr. 976:23-977:24 (Tart (PRH)) (explaining three key factors that determine book marketing spend).  Publishers do not typically even decide how much they are going to spend to market a book until *after* reader reactions have come in.  Tr. 574:4-11 (Karp (S&S)); Tr. 1850:15-25 (Bergstrom (S&S)) (publisher "can't determine our marketing and publicity plans until we have all had a chance to read that finished book").  PRH's Putnam imprint follows substantially the same approach.  Tr. 1981:1-7 (Kim (PRH)) (discussing decision about the level of marketing support to provide for a book) (Q.  "When does Putnam make that decision?"  A.  "Pretty close to publication.  By that time, the book has been written; it's been edited; it's been revised; we've shared it around internally; our sales department starts

to buzz about it.  And we have a sense of kind of what the traction or reaction the book will get

out there in the world.").  As Viking Editor Brian Tart explained, any marketing plans a publisher

might submit with a bid become "pretty obsolete by the time we publish."  Tr. 984:1-13.

54.     Government witness Ayesha Pande agreed that the key time marketing decisions

are made is "the month immediately leading up to publication, when the publisher starts pitching

the book to news outlets and other media, and then in the six to eight weeks right after

publication."  Tr. 258:11-259:2.

55.     Marketing spend is also not a distinguishing feature of a distinct anticipated top-

seller category because books sold for drastically different advance levels can and do receive

identical marketing and promotion downstream.  Tr. 990:1-991:4 (Tart (PRH)) (providing

example of $1,000,000 and $100,000 book with same marketing and sales).  Although publishers

hope marketing spend will be correlated "with books that we feel are going to sell well,"

publishers nonetheless "look at each book individually," and so marketing spend ultimately "has

no bearing on how much we paid for the book."  Tr. 1988:6-15 (Kim (PRH)); *see* Tr. 491:13-22

(Karp (S&S)); Tr. 1114:1-24 (Weisberg (Macmillan)).

56.     Books acquired for particularly high advances actually can require *less* marketing

spend because such authors are often public figures who generate publicity and therefore do not

need marketing.  Tr. 1986:7-18 (Kim (PRH)) (describing $35,000 spend on million-dollar

advance book, Book E); DX-413 (book title decoder for Kim testimony).  Agent Elyse Cheney

explained:  "People get that advance, in part, because the author has their own marketing—they

already have an audience that is, sort of, built in.  They're coming, in a way, with their own

marketing machine."  Tr. 2069:2-5.  For example, S&S's current best-selling author, Colleen

Hoover, does not have a high marketing budget at S&S because she is "the queen of TikTok, and

so she has a huge following on TikTok." Tr. 572:19-20 (Karp (S&S)). The highest advances certainly do not always reflect the highest marketing spend. Tr. 1858:25-1859:2 (Bergstrom (S&S)) (marketing and publicity spends for best-selling authors ranged from five percent to thirty percent of advance level).

57. As literary agent Elyse Cheney testified, while one might think that a publisher would spend "more marketing money" for books acquired for higher advances, "in fact, that's not the case." Tr. 2067:17-22. Cheney explained the story of two books she sold recently, "one over a million, one over 700; one of them extremely timely." Tr. 2067:23-25. In both situations, she asked the editor for special treatment in the form of "fancier" advanced copies for reviewers, and was "told no twice" before complaining to the head of the publishing company who said "Okay. Fine." Tr. 2068:1-10, 2068:18-21 (Cheney (Cheney Agency)) ("Half the time they're not even—it just happened to me. Same book. No, we don't even have the list together. So I'm the one who's doing that. I'm the one who's driving it half the time."); Tr. 2068:22-2069:1 (Cheney (Cheney Agency)) ("I mean, I did a deal with, actually, the same publisher, $1.1 million, and I said to her afterwards—because it's always—it's actually a point of frustration, I think, for a lot of agents. Why didn't you spend more money on marketing? And she said: Well, we just spent it all on the advance.").

58. Marketing spend will vary for all of these reasons, regardless of the advance paid upfront. Sally Kim, SVP and Publisher of PRH's Putnam imprint, testified to several examples of books with marketing spend that did not directly correlate with the advance spend. Tr. 1985:9-22 (describing advances versus marketing spend for Book F and Book B), *see also* DX-413 (book title decoder for Kim testimony).

59.     As Professor Snyder testified, to the extent high advances correlate with higher marketing spends at all, that correlation reflects the publishers' efforts to recoup the money spent at the outset.  But there are many "variants around that relationship.  A very well-known author might be able to basically sell the book herself or himself."  Tr. 2818:11-13 (Snyder); *see also* Tr. 1818:8-15 (Walsh).  Ultimately, regardless of the actual marketing spend, the marketing *functions* are the same for all books regardless of advance.  Tr. 2817:8-2818:17 (Snyder).

60.     <u>*Negotiation Processes and Contract Terms.*</u>  Publishers do not employ a different negotiation process for books that sell for advances above $250,000.  Tr. 984:24-985:2 (Tart (PRH)).

61.     The top 2 percent of the advance market is not more "competitive" than the other 98 percent.  Government witness Don Weisberg (Macmillan) characterized the 98 percent as "just as competitive."  Tr. 1131:18-25 ("I don't think there's anybody, any editor that you'd meet that doesn't want to find that future story that they worked on.").

62.     The same boilerplate contracts are used for authors of books that sell for above and below $250,000, and there are no contract terms that are negotiable only for authors of books that sell for above $250,000.  Tr. 1818:16-1819:8 (Walsh).

63.     The so-called "glam budget" occasionally included in a contract is not a feature that defines anticipated top-selling books as a market, either.  Viking Publisher Brian Tart explained that a "glam budget" is discussed only for certain "kinds of books, like celebrity books . . . you don't ever talk about glam with fiction really or certain other kinds of books that you're doing, it's really a specific kind of book that you would be negotiating that.  So I don't really consider it so much advance based as I do kind of type of book."  Tr. 987:6-12; Tr. 1859:3-1859:12 (Bergstrom (S&S)) (testifying that it is "very rare" for authors to get "glam budgets and

"willingness to offer a glam budget" does not depend on advance level); Tr. 575:20-23 (Karp

(S&S)) (THE COURT: "It's not a standard term in a book contract?" THE WITNESS:

"Thankfully, no.  John Irving isn't asking for a glam budget."); Tr. 1819:9-1820:2 (Walsh)

(negotiated "glam" for a celebrity book sold for under $250,000 because "that was specific to the

author's needs").

64.     Negotiations over royalty rates and bonuses do not vary according to advance

level either.  These benefits depend on the competitive dynamics in each particular acquisition

process; they can be wrested by agents with particular leverage in negotiations.  As Brian Tart

testified, things like bonuses and royalties can come up "[w]hen there's leverage" and the agent

says "if you give me this or that, then it's yours . . . that's usually when I'll negotiate to get the

book.  And so, you know, bonuses come up, even at the five-figure level."  Tr. 1045:7-14.

Agents often try to reach a six-figure payout by simply negotiating a bonus on top of a five-

figure advance—as a result, publishers "do talk bonuses" at lower advance levels.  Tr. 1045:15-

18 (Tart (PRH)).

2.     *Non-Big Five Publishers Provide Equivalent Publishing Services*

65.     Big Five publishers do not provide unique publishing services that cannot be

provided by numerous other elite publishers among the top 30 publishers.  These other

publishers can and do provide the same quality editorial, publicity, marketing, and sales services

necessary to successfully publish authors of books at all advance levels, including above

$250,000.  PX-2007 (Fletcher (Fletcher & Company) Dep.) at 171:25-172:19 (services offered

by smaller companies can be "superior" to services offered by larger publishers; "just because a

big publisher has the capabilities to perform at a certain level doesn't mean they will . . . . And a

smaller publisher may value a particular book more and be willing to throw a disproportionate

amount of resources behind that book."); Tr. 2096:9-15 (Wylie (Wylie Agency)) ("[T]he services

provided by non-Big 5 publishers . . . are professional and . . . really quite—quite strong."); DX-422 (Glusman (Norton) Dep.) at 66:2-8, 66:10; Tr. 2047:7-12 (Cheney (Cheney Agency)) (Q. "In your experience, have you observed any qualitative difference in the publishing services rendered by the Big 5 versus the non-Big 5?"  A.  "Broadly, no.  It's pretty similar.  I mean, it's a process of bringing a book to market, to—everybody's travel to the bookstores is pretty similar."); Tr. 1551:9-13 (Hill) (Q.  "So you don't dispute . . . that publishers outside of the so-called Big 5 are perfectly capable of rendering those services, they just don't do it as often?"  A. "Yeah, in some circumstances, they can do it, yes."); Tr. 1563:16-23 (Hill) (Q.  "But you're not saying that the services that those publishers actually render are inferior to the services provided by the Big 5?"  A.  "For a particular book that is acquired by the non-Big 5, the author has decided that—assuming that the Big 5 competed, that that—for that book, that non-Big 5 publisher is the best choice.  And given the respective advance amounts offered."); Tr. 2834:23-2835:3 (Snyder) ("there are other publishers that are really credible with anticipated top sellers"); Tr. 1798:12-16 (Walsh) (non-Big Five publishers "are best in class too.  So just because they are smaller doesn't mean that they are not as impeccable in every way.").

66.     It is not disputed that non-Big-Five companies, collectively, compete as a sixth bidder for books above the government's $250,000 advance threshold.  Tr. 3081:12-23 (Hill) (A: "In the model, I believe I combine the non-Big 5 into one group and give them a 9 percent market share."  Q.  "So they're bidding as a sixth bidder.  Am I understanding that right?"  A. "Correct."); Tr. 1574:8-18 (Hill) (THE COURT:  "[F]rom the perspective of a Big 5 publishing house in an auction, are they thinking, we're just as likely to have one non-Big 5 firm, whichever one it is, as likely as Hachette, which has, like, a similar share?"  THE WITNESS:  "That's right. If you take them all collectively, that's roughly correct.").

67.     Although Dr. Hill asserted that non-Big-Five publishers have less ability to bear risk than Big Five publishers, he did not study the issue and had no basis for opining on publisher financing.  Tr. 1565:15-25 (Hill) (he has not studied the capital constraints of publishers in the industry, and is "not aware of the funding of all the non-Big 5 publishers").

68.     The fact that Big Five publishers enter *more* deals than individual non-Big-Five publishers above $250,000 advances simply reflects their greater appetite and resources, not qualitative difference in the services they provide to authors.  Tr. 2047:7-18 (Cheney (The Cheney Agency)) (Q.  "Why is it, then, that as we've seen in this trial, there are so many deals 250 and above that are done with the Big 5 as opposed to the non-Big 5?  Do you have a view about that?"  A.  "I think the non-Big 5, you know, are just not going to play in that sandbox too many times.  They don't have the scale."); Tr. 2047:25-2048:3 (Cheney (The Cheney Agency)) (Q.  "So other than scale, have you, in your experience, observed any qualitative differences in the work performed by these publishers?"  A.  "No, not at all.").  The weight of the evidence does not support the theory that the non-Big Five publishers' lower frequency of participation in the alleged submarket demonstrates that they provide a lower quality of service to authors in that market.

69.     Depending on an author's goals, non-Big Five publishers may be preferable.  Tr. 1798:12-1799:4 (Walsh).  Larger publishers do not necessarily have competitive advantages when it comes to reputation, marketing, distribution, or printing.  First, many editors at smaller publishers—just like editors at larger publishers—have stellar reputations.  Second, any advantages larger publishers might have once had in marketing and publicity have eroded as dynamics have shifted to favor new technologies like Instagram and TikTok over traditional print media.  Third, smaller publishers use the same distribution channels as larger publishers.

Fourth, to the extent Big Five publishers have any greater access to printing services (which they do not, *see infra* FF ¶¶ 134-43), printing is simply not a factor for authors in choosing a publisher. Tr. 1799:19-1800:22, 1801:12-20, 1802:19-1803:1 (Walsh); Tr. 1977:18-21 (Kim (PRH)) (Q.  "Does Penguin Random House's access to printing facilities ever come up in conversations with authors or agents?  A.  "No, they don't.")

70.    The evidence showed that non-Big Five publishers publish many top-selling authors.  *See* DX-376 (list of noteworthy authors who signed contracts for at least $250,000 with non-Big Five publishers).  For example, ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

71.    ███████████████████████████████████████████████████████

███████████    And Abrams now publishes "the most successful middle grade series in the world," Jeff Kinney's *Diary of a Wimpy Kid*.  That publication "helped [the] company grow significantly" over the last 15 years, and the series remains under contract at Abrams for additional books.  PX-2005 (Jacobs (Abrams) Dep.) at 61:21-63:2.

72.    Norton also publishes many well-known authors, including several books by Michael Lewis, all of which became bestsellers.  DX-422 (Glusman (Norton) Dep.) at 58:2-10, 59:1-2, 59:4-6.  Indeed, Norton is "one of the best publishers in the business," with "one of the most serious nonfiction lists in the business on a consistent basis, award winners ranging from the Pulitzer Prize to the Nobel Prize to the National Book Award to the National Book Critics Circle Award."  Norton's long, stable history is "enormously attractive to agents and authors

alike." DX-422 (Glusman (Norton) Dep.) at 63:14-64:1, 65:2-4, 65:6-18; *see also* Tr. 1415:12-1416:3 (Murray (HarperCollins)) (discussing Norton).

73.     Major authors like Michael Lewis, Mary Roach, and Richard Powers have chosen to continue to publish with Norton despite opportunities to move to a Big Five publisher.  These authors choose to stay with Norton out of loyalty, and because of their excellent marketing capabilities, among other reasons.  Tr. 541:8-544:24, 550:19-551:13 (Karp (S&S)); DX-054 (July 2019 email demonstrating author chose Norton over S&S "because of their marketing team, who . . . conveyed a compelling plan"); Tr. 1799:9-1800:8 (Walsh) (identifying authors who have chosen to remain with smaller publishers or to switch to smaller publishers from Big Five publishers); ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████

74.     Authors, too, acknowledge that non-Big Five publishers, such as Graywolf, can "do extremely well" by their authors, and that their books can win "extraordinary number[s] of Pulitzer prizes and national book awards."  PX-2004 (Solomon Dep.) at 99:11-20.

3.     *The $250,000+ Advance Threshold Does Not Correspond To Any Distinct Set Of Authors Or Particular Book Characteristics*

75.     "Every book is unique, every book is individual."  Tr. 1068:12-13 (Weisberg (Macmillan)).  And "every author is atypical."  Tr. 1952:20-25 (Duhigg (best-selling author)).

76.     There is no specific category of authors who write books that sell for $250,000 or more.  Some authors sell books for under $250,000 early in their career, and for above $250,000 once they have established themselves.  Tr. 1817:13-19 (Walsh).

77.     Books acquired for over $250,000 come from all genres.  As of 2021, 27 percent of PRH's trade book publishing program consisted of children's books, representing over a

quarter of PRH's trade book publishing program.  Tr. 2297:12-15 (McIntosh (PRH)).  PRH

acquires some of those children's books for over $250,000, and even over $1 million.  Tr.

2297:16-20 (McIntosh (PRH)).  Christian books, which are a much smaller segment of the trade

books market than children's books are, constitute about two percent of PRH's trade book

publishing program, and are likewise sometimes acquired for advances exceeding $250,000.  Tr.

2299:14-19, 2299:25-2300:2 (McIntosh (PRH)).  The acquisition processes for children's and

Christian books are exactly the same as for other trade books.  Tr. 2299:22-24 (McIntosh

(PRH)).

78.     Apart from certain easily identifiable established, franchise, celebrity, and prize-

winning authors, agents and publishers generally have no objective criteria for reaching in

advance an consensus on whether a book is likely to be a top selling book.  One editor or agent

may have a sense the book will do well, or hope that it will, but normally there is no consensus.

Tr. 2133:15-16 (Ross (Ross Yoon Agency)) ("[W]e don't have a crystal ball.").  And they use the

same tools to negotiate the sale of any book, regardless of one individual's subjective

expectations.  Tr. 1811:3-10, 1817:18-20 (Walsh).

79.     Nor, apart from the few exceptions already discussed, can publishers cannot

easily predict top sellers, and there is no "magic advance number" that corresponds to books that

sell well.  PX-2002 (Stehlik (HarperCollins) Dep.) at 134:18-21.  Books acquired for below

$250,000 sometimes unexpectedly evolve into "breakout" books after winning major awards.

DX-422 (Glusman (Norton) Dep.) at 136:21-23, 136:25, 137:1-2, 137:5-20; Tr. 573:2-574:3

(Karp (S&S)) (testifying about unexpected bestseller acquired for low advance); Tr. 1843:9-16

(Bergstrom (S&S)) (Q.  "Are there examples of authors below—that you paid below a hundred

thousand dollar advance that have gone on to sell a lot of books?"  A.  "Yeah. One of my biggest

authors, author D███████ on this list, we bought her first book for $95,000. It has sold over 1.3 million copies.").  The government's own witness, Macmillan CEO Don Weisberg, rejected the premise—essential to the government's submarket theory—that there are identifiable "criteria" that determine when a book will become a "big book":  "Sometimes it's determined by the advance you pay, sometimes it's determined by the passion you have for the books.  So we may buy a book for less money but because everybody in house reads it and loves it, it becomes a big book.  So it's not always defined by the same criteria."  Tr. 1070:18-24; *see also* Tr. 316:15-18, 317:4-6, 318:22-319:4 (King) (testifying that his book *Carrie* received $2,500 advance and became a bestseller).

80.     In fact, editors do not always agree on which books are likely to be bestsellers. *Where the Crawdads Sing* exemplifies this phenomenon.  The book was submitted widely but Viking editor Brian Tart's team "didn't think it was going to be a big book" and "didn't even make a bid on it."  Tr. 970:15-22.  An editor at PRH's Putnam imprint, though, "read it, loved it, shared it with all of us, ran up and down the halls.  And through our conversations with the agent, we started to get the sense, as I mentioned before, that there weren't a lot of editors banging down his door to make an offer."  Tr. 1967:17-22 (Kim (PRH)).  Putnam made a preempt offer in the mid six-figures.  Tr. 1967:25-1968:1 (Kim (PRH)).  Although Putnam "always hoped" *Crawdads* would be successful, it still initially printed only 25,000 copies—not even enough for the author to earn back her advance.  Tr. 1969:12-19 (Kim (PRH)).  But "then Reese Witherspoon picked it for her book club and the skies opened up."  Tr. 1969:23-24 (Kim (PRH)).  As of today, the book has sold "about 10 million" copies in the U.S.  Tr. 1970:12-13 (Kim (PRH)).

81.     Mr. Tart told a similar story about the highly successful book *The Life-Changing Magic of Tidying Up* by Marie Kondo:  "I didn't know what to make of it.  And I didn't even make a bid on that book.  And ultimately that's kind of changed the world in some way and sold millions of copies in the process."  Tr. 971:2-7; Tr. 971:7-8 (Tart (PRH)) (Q.  "Were those books anticipated top sellers?"  A.  "Not to me.").

82.     Madeline McIntosh, CEO of PRH U.S., testified that those breakout titles—those "unanticipated best sellers"—are in fact the titles that "account for the lion's share of [PRH's] profit because they had advances that were relatively low compared to the very high sales achievement."  Tr. 2287:10-2288:5.  For books like *Where the Crawdads Sing, Fifty Shades of Gray*, and *Gone Girl*, the "sales performance so outstrips [PRH's] expectation, that they deliver most of the profit to the company."  Tr. 2289:2-10 (McIntosh (PRH)); Tr. 748:11-23 (Dohle (PRH)).

83.     For all the foregoing reasons, individual editors may value a book at vastly different levels.  *See* Tr. 1815:5-16 (Walsh).  When editors create P&Ls to determine what advance they should offer, they include projected sales based on comparable books, known as "comp titles."  Tr. 1844:7-12 (Bergstrom (S&S)).  But determining the comp titles is an "art," "not a science."  Tr. 1844:12 (Walsh).  There is frequently disagreement among editors at the same publishing company about the potential sales for an individual book because "it's so subjective," it's a "guesstimate."  Tr. 1844:13-18 (Bergstrom (S&S)); Tr. 2240:1-8 (McIntosh (PRH)) (Q. "And why do they vary?" A. "Because . . . these aren't widgets that we're producing. . . . . [T]he valuation is a highly subjective process, and so it's a reflection of the—that particular editor's vision and belief in the book project."); *see also* Tr. 1555:6-21 (Hill) (discussing book

███████████████████ where one non-Big Five publisher bid above $250,000 but remaining publishers, including PRH and S&S, bid below $250,000).

84.     Because editors strive to develop lasting relationships with authors they want to publish, advances are not always correlated with editors' expectations of how a particular book will sell.  Don Weisberg testified that sometimes Macmillan is "paying more for a book that we might not think might benefit us at the time of publication but we think the author is somebody we want to publish forever and we think down the road will be special so we'll spend extra.  I mean, it's hard for me to make statements about this that are accurate in every case because every auction is different."  Tr. 1135:6-20.

85.     And even if a book obtains a high advance, that advance does not necessarily correspond to a book's ultimate sales.  Books that everyone expects to sell well, and that obtain high advances, frequently flop.  Tr. 1814:7-1815:4 (Walsh); Tr. 2134:2-10 (Ross (Ross Yoon Agency) ("It happens more than any of us would like"); Tr. 2281:8-17 (McIntosh (PRH)) ("[W]e certainly have made many very painfully expensive bets on celebrities who turned out not to be able to sell the books.").

86.     When pressed, competing publishers could not identify any meaningful characteristics that correspond to the $250,000 advance threshold.  The government's own witness, Don Weisberg (CEO of Macmillan), testified that the difference between the top 2 percent of advances and the other 98 percent is dollars:  "The difference is primarily in the financial level."  Tr. 1129:2-12.  Auctions take place "every day," even for lower-advance books.  *See* Tr. 1129:13 (Weisberg (Macmillan)).  The only thing that distinguishes the other 98 percent are that they are "not the big mega price books."  *See* Tr. 1129:24-25, 1130:12-23 (Weisberg (Macmillan)) (THE COURT:  "I see.  And so you're saying these are sort of a different set of

authors, more ones that you're developing and investing in?"  THE WITNESS:  "Well—or we can develop and invest in an author from a higher level too, but, yes."  THE COURT:  "But are you discovering them, is that the difference?"  THE WITNESS:  "Discovering is a strong word. I mean, we're investing in them.  At the end of the day, as a publisher, all we're about is our authors.").

4.  <u>*Industry Participants Do Not Recognize A Separate Submarket For The Acquisition Of "Anticipated Top Sellers" Defined By A $250,000 Advance Threshold*</u>

87.  The publishing industry does not recognize a market for "anticipated top selling books" defined by an advance threshold anywhere in the $250,000 range.  As John Glusman, editor-in-chief at Norton testified, if there were a common industry understanding of anticipated top-selling books, "we'd all be rich by now."  DX-422 (Glusman (Norton) Dep.) at 134:24-135:1.

88.  Among publishers, there is no industry-wide agreement on what the term even means.  PX-2002 (Stehlik (HarperCollins) Dep.) at 134:2-7 (testifying that she has never heard and does not use the term "anticipated top-selling book"); PX-2005 (Jacobs (Abrams) Dep.) at Tr. 89:11-90:1 (Q. "Does Abrams use the term 'expected top seller'"?  A.  "No."  Q.  "Do you know what the term 'expected top seller' means?"  A.  "I would imagine or guess that it means what we might call a lead title."  Q.  "[Y]ou're speculating on what that may mean, because it's not a term that you use or are familiar with, correct?"  A.  "No.  I don't think I've ever used the term 'expected top seller.'"); Tr. 975:19-24 (Tart (PRH)) (advance level of $250,000 for book has no significance, and does not indicate how well book will sell); Tr. 1845:10-19 (Bergstrom (S&S)) (Q. "And do you think about $250,000 advance is any type of demarcation point for your expectations relative to book sales?"  A. "No."); Tr. 1133:7-14 (Weisberg (Macmillan)) (testifying that anticipated top-seller is not a category used at Macmillan).

89.     Agents do not recognize any distinct market for "anticipated top-selling books" defined by a $250,000 advance threshold either.  They are not familiar with any common industry understanding of the term or what it might mean, and do not know of any "formula" for determining whether a book is an "anticipated top-seller."  PX-2007 (Fletcher (Fletcher & Company) Dep.) at 179:14-16, 179:18, 179:20-180:6; Tr. 1810:17-19 (Walsh) (this case is first time she has heard term "anticipated top seller"); Tr.2132:14-22 (Ross (Ross Yoon Agency)) (first time encountered term anticipated top sellers "is when I read the complaint."); Tr. 2065:21-25 (Cheney (Cheney Agency)) (not familiar with term prior to this case).

90.     The market-defining $250,000 advance boundary also is not a line used in the industry to separate books into separate categories for different treatment.  For example, Hachette keeps track of books that it lost for *$500,000* or more—not $250,000.  PX-790 (showing that between 2017 and mid-2021, Hachette lost at least 30 books for $500,000 or more to *non*-Big Five publishers, while only losing 23 to Macmillan).  HarperCollins has no guidance—formal or informal—suggesting that a book acquired for an advance of $250,000 or more is bigger or riskier than any other book.  Tr. 1397:15-20 (Murray (HarperCollins)).

91.     To the extent that authors anticipate *themselves* to be best-sellers, the advance against royalties is far less relevant than the long-term royalties those authors expect to earn.  "For someone who is an expected bestseller, you anticipate that you will earn royalties in excess of your advance.  Like that's the whole point of being a bestseller."  Tr. 1953:14-18 (Duhigg); *see also* Tr. 1927:13-21 (explaining that his second top-selling book was less successful in sales, but still earned him royalties in excess of the advance) (Q.  "And was *Smarter Faster Better* published by Random House?"  A.  "It was."  Q.  "And was it successful?"  A.  "Yes.  It was not as successful as *The Power of Habit*, but it sold in excess of a million copies."  Q.  "And did

*Smarter Faster Better* earn out its advance?  A.  "It did.  The royalties from that have been in excess of the advance.  They've been over a million dollars.  Just from—again, this is North American royalties.").

92.     A key example of this was government witness Stephen King, who testified that he has earned royalties in excess of advances for his bestselling books such as *Carrie*, *The Shining*, and *Night Shift*.  Tr. 319:2-14 (A.  "*Carrie* was a best seller in paperback.  *The Shining* was the first hard cover best seller.  And *Night Shift* was also a best seller."  Q.  "And I take it you earned out your advance on those books?"  A.  "Yes."  Q.  "And received royalties hopefully?"  A.  "Yes."  Q.  "Okay.  Good.  Are any of those books still in backlist with Doubleday?"  A.  "Yes, they are still in the backlist."  Q.  "And they continue to earn money for Doubleday and for you, I hope?"  A.  "Yes.");  *see also* Tr. 321:13-17 (King) (Q.  "Okay.  And you recall whether those ten were best sellers?"  A.  "They were all best sellers, yes."  Q.  "And did all of them earn out, that is, you received royalties beyond the advance in those cases?"  A.  "Yes, sir.").

93.     *Internal Approval Thresholds.*  Some publishers do have internal thresholds at which editors must obtain clearance before they can make advance offers.  Those thresholds do not correlate with the view that any particular advance level indicates a book is an anticipated top seller.  Tr. 2260:14-17 (McIntosh (PRH)).

94.     These approval levels are not tied to the advance for any book; they are based on the full *contract* size for a book deal.  In other words, if the publisher offers $300,000 for a two-book deal, and each book receives an advance of $150,000, S&S's CEO must still approve that deal because the total deal is over $250,000.  Tr. 488:13-489:4 (Karp (S&S));  The same is true for the PRH divisions that require approval of certain advance levels.  DX-169.0002 (PRH

document showing "Title acquisition process descriptions" and noting for Penguin:  "Imprint publisher can approve *deals* up to $250k," while "*Deals* over $250k advance value get submitted to division head for review/discussion (no set format for that, can be formal or informal, depending on *deal size and complexity*" (emphases added)).

95.    The amounts at which approval is required vary among and even within different publishers.  At PRH, the approval levels vary among imprints and divisions from $100,000 to $75 million.  Tr. 2260:14-2263:18 (McIntosh (PRH)); DX-169.0002.  ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

96.    Even when Mr. Dohle encouraged Ms. McIntosh to get more involved in PRH's acquisitions at the $250,000 or $500,000 level, it was not because those particular advance levels had any correlation to "anticipated top selling books."  Mr. Dohle chose those thresholds randomly to signal to Ms. McIntosh that it was important that she encourage more content acquisition to stem PRH's market share loss.  Tr. 799:8-800:12, 803:12-15 (Dohle (PRH)).

97.    *Lead Titles.*  Some industry participants recognize "lead titles."  PX-2005 (Jacobs (Abrams) Dep.) at 90:4-7, 90:21-91:5.  These are books that a publisher expects to sell well.  PX-2005 (Jacobs (Abrams) Dep.) at 91:1-5; Tr. 1071:23-24 (Weisberg (Macmillan)) ("THE COURT: How would you define lead title?  THE WITNESS:  "Top of the list.").  Indeed, when

asked whether there was a "shorthand for identifying the books that you really want to put a

priority on," Don Weisberg (Macmillan) testified, "[T]here are lead titles versus—we don't have

any—there's not really a term that comes to my mind because each one of the publishers are

different.  And so, believe it or not, the semantics change even within house.  So nothing comes

to mind."  Tr. 1071:4-12.

98.     Although the phrase "lead title" is recognized, nobody testified that the phrase has

any connection to books that receive advances of $250,000 or more.  *See, e.g.*, Tr. 1113:18-

1114:24 (Weisberg (Macmillan)) (testifying that he is "not aware of" any dollar cutoff or

advance level where Macmillan begins to offer marketing, advertising, and publicity tours).

Lead titles are *not* associated with a particular dollar amount of advance.  No publisher was

familiar with the idea of assigning lead titles according to advances paid.

99.     Rather, the term "lead title" is associated with marketing, printing, and other

retail-market aspects of how a book is treated within a publishing company.  PX-2005 (Jacobs

(Abrams) Dep.) 91:22-92:7; Tr. 1989:1-7 (Kim (PRH)).  "Lead titles" are books that publishers

market "more aggressively."  Tr. 1072:7-8 (Weisberg (Macmillan)).  To be sure, some lead titles

are books that received advances of $250,000 or more.  But not every book that receives an

advance in that price segment becomes a lead title.  As government witness Don Weisberg

(Macmillan) testified, a lead title is "not defined by the fact that we might spend a lot of money

on it.  It might be a title that we bought for not a lot of money but because person after person

that has read it has raved about it and it becomes a lead title."  Tr. 1072:2-6.

100.    And like the marketing spend, the "lead title" moniker is not determined at

acquisition.  The "lead title" status attaches only after the book is ready to be sold and marketed

downstream.  Books "take on a life of their own as they go through the process" toward

downstream sales.  Tr. 1071:19-20 (Weisberg (Macmillan)).  And as Michael Jacobs, CEO of Abrams Books, explained, a lead title is a "title in which the company was—was taking an aggressive stand in terms of its marketing, its projected first printing distribution of the book into the marketplace and—and the resources in terms of marketing and publicity that—that the company would put against the—against the property."  PX-2005 (Jacobs (Abrams) Dep.) at 91:7-13.

101.    Ms. Bergstrom testified that Gallery Books chooses "focus titles" each season that represent great opportunities to find major success.  The Spring 2022 focus titles were acquired for advances ranging from $50,000 to $1 million, with more acquired for below $100,000 than above $250,000.  Tr. 1859:23-1860:8, 1860:20-25 (Bergstrom (S&S)).  Sally Kim testified that Putnam recently had lead titles that were acquired for only $100,000 and $175,000.  Tr. 1989:1-7.

102.    And Ms. McIntosh testified that different PRH publishing groups might select "priority" and "opportunity" books to focus sales efforts on.  Those selections have nothing to do with advance level, and everything to do with sales goals for the books.  In fact, the salespeople at PRH do not even know the advance levels of the books they are tasked with selling because the advance levels are considered confidential.  Tr. 2268:22-2269:24 (McIntosh (PRH)).  Priority and opportunity books are selected at strategy meetings held well after the book is acquired.  Tr. 2266:14-2268:21 (McIntosh (PRH)).

5.    *Publishers Cannot Adjust General Bidding Conduct In Response To Competitors' Pricing*

103.    Books acquired for advances of $250,000 or more also are not subject to collective targeting based on other publishers' pricing decisions.  It is effectively impossible to respond to the other publishers' pricing conduct from one acquisition to another because book

valuation is so individualized and because publishers rarely know who they are bidding against, if anyone, or what amounts they are bidding.

104.     Each book is unique and subject to highly individualized, subjective valuations that may range by hundreds of thousands of dollars for each book.  *See supra* FF ¶¶ 75-86.  As PRH Viking Publisher Brian Tart testified, valuing books is "as much an art as a science."  Tr. 967:5.  Multiple witnesses explained that different publishers, imprints, and editors place significantly different values on books when they are bidding.  Tr. 217:12-20 (Pietsch (Hachette)) (Q. "It's also the case when you are bidding for books against other publishers, it's quite common that with respect to the same book, different publishers and different editors could value it very differently. True?"  A. "Absolutely. Absolutely."  Q. "And that happens often. Right?"  A. "That is—that is—"  Q. "And that's because every book is unique. Correct?"  A. "Absolutely correct."); Tr. 479:9-480:5, 601:13-16 (Karp (S&S)) ("Well, in a word, subjectivity. I think that people read differently, and they have different enthusiasms, they have different interests and they have different metabolic reactions to the book.  But I also think that certain editors and publishers have a kind of inner confidence about certain kinds of books.  And so sometimes they'll bid more because they've had success with a certain kind of book. Conversely, they may bid more because they really want to carve a niche that they haven't yet succeeded at.  So sometimes people pay more because they have a lot of books like that, and other times they pay more because there are a lot of books that they don't have any books like that."); Tr. 1844:13-18 (Bergstrom (S&S)) (Q. "Is there ever disagreement among your staff about the potential sales for an individual book?"  A. "All the time, and with my boss."  Q. "And why is that?"  A. "Because it's so subjective. And some of us have been doing it longer than others, but it's a guesstimate."); Tr. 1974:7-13 (Kim (PRH)) (Q.  "In your experience, how

common is it for different imprints to value the same book differently?"  A.  "Very common.  I mean, I think I mentioned comps earlier.  It's such—even pulling comps is such a subjective thing.  You talk to three different editors; they'll pull three different comps for a book.").

105.    Because book valuations are so subjective and individualized, publishers can learn little if anything from the bidding decisions of other publishers from one acquisition to the next.  Winning or losing a negotiation for one unique book tells an editor nothing about how much to bid to win the next completely different book.  Tr. 489:20-21 (Karp (S&S)) ("I wouldn't be able to assess what the other people thought the books were worth, because they'd have the same subjective frame.").  Because each book and each negotiation differs, "you can't learn from what the outcomes are."  Tr. 2675:5-15 (Snyder).

106.    The problem is compounded by the fact that editors rarely know who they are bidding against when making a bid.  Tr. 216:12-17 (Pietsch (Hachette)); Tr. 1965:11-17 (Kim (PRH)) (Putnam does "not usually" know who they are bidding against in an auction, or how many bidders there are); PX-2007 (Fletcher (Fletcher & Company) Dep.) at 162:20-23 (Q. "[D]o you ever release the identities of auction participants to each during an auction?"  A. "No."); Tr. 495:18-24 (Karp (S&S)) (Q. "While a book auction is in progress and before it's concluded, what kind of information do you typically have about who the competitors are?"  A. "We rarely know anything.  Sometimes we know the number of people we're bidding against, but sometimes the agents don't even disclose that."); Tr. 2119:1-4 (Ross (Ross Yoon Agency)) (Q. "[D]o you tell the publishers how many are participating and who they are?"  A. "No.").  As a result, a publisher cannot learn from one acquisition how much value any other bidder placed on the book (except the winner's value, if the amount is even known).

107.    Given the individualized valuation of books and the absence of information in almost all acquisitions about who else was bidding and what amounts they bid, acquisitions do not normally provide publishers meaningful information about other publishers' pricing decisions or competitive conditions more generally.  Brian Murray, CEO of HarperCollins, testified that because acquisitions are "fast and furious," HarperCollins does not even assess whether its advance spending has increased or decreased until the end of each year.  Tr. 1435:10-1436:21.  Publishers thus have no way, in subsequent blind acquisitions for different unique books, to respond accurately to pricing conduct from prior acquisitions, whether at the $250,000 level or any other.  Tr. 2786:2-12 (Snyder) (THE COURT:  "It seems like you are saying, because when you enter an auction, you don't know who else is in it, you are not going to alter your behavior because maybe the other merger party wouldn't have been the second runner-up, so it shouldn't affect your behavior because you don't know who else is in the auction. Is that right?"  THE WITNESS: "Correct."); Tr. 1764:11-15 (Walsh) (regarding passing information on to publishers, "the agent decides this, but unless it's in the author's best interest to pass on the information, they don't").

## III.    ABSENCE OF LIKELY SUBSTANTIAL AND IMMINENT HARM

108.    The evidence does not show a likelihood of substantial and imminent harm in the alleged submarket for the acquisition of "anticipated top-selling books."

109.    The government's theory of harm relies heavily on the respective market shares of the many publishers that acquire books for advances of $250,000 or more.  But as discussed in greater detail below, market shares alone do not capture the competitive conditions that will continue to prevail in every acquisition for every one of the books in the government's alleged submarket—which, after all, constitutes the books that the government claims everyone is most certain will be bestselling titles (and would, therefore, be the most sought after books).

Following the merger, the combined entity will face stiff competition—either explicit or implicit—for every one of those books it is invited and chooses to consider.  Its rivals will include HarperCollins, the large and aggressive number two publisher with immediate plans to expand, Hachette and Macmillan, and elite houses like Norton, Disney, Abrams, Scholastic, and many others.  *See infra* FF ¶¶ 164-80.  And agents would be choosing not just from among those many elite publishers, but from a much larger field of *imprints*—Hachette and PRH between them have more than a hundred separate imprints that could make independent offers in any best bid auction or bilateral negotiation.  *See infra* ¶¶ 198-202.  In these and many other ways, the combined entity's market share by itself says nothing about how much competition there will be to win the books most likely to succeed.  As Professor Snyder testified, you "have to go beyond share . . . and look at the number and . . . capacity to compete over time."  Tr. 2885:7-21 (Snyder).

110.    The parties disagree about the significance of market share statistics, but the parties and their experts have never disagreed about how to calculate market shares in the alleged submarket for "anticipated top selling" books.

111.    In contrast to the considered market-share analysis of both experts, at trial, HarperCollins CEO Brian Murray proffered for the first time an unsupported hearsay claim that PRH's market share is actually three and a half times larger than HarperCollins' market share because HarperCollins' market should exclude its romance series and Christian books.  Tr. 1374:15-1375:23.  That claim is not more credible than the experts' shared understanding for multiple reasons.

112.    First, Murray's vague market share claim is based entirely on unreliable hearsay statements from ▆▆▆▆▆  Tr. 1324:24-1325:23, Tr. 1440:16-21 (Murray (HarperCollins)).

Second, Murray's testimony referred to *downstream* market shares for the sale of books, not the relevant upstream shares (which no one in the industry had collected or measured before Dr. Hill or Professor Snyder).  Tr. 1700:24-1701:13 (Hill); Tr. 826.15-19 (Dohle (PRH)) (HarperCollins' estimate of PRH's downstream share differs from those PRH tracks as part of its business operations).  Regardless, Murray testified that BookScan does not account for a very large part of HarperCollins' Christian sales, *see* Tr. 1390:24-1391:14, which means that HarperCollins' downstream market share is actually *understated*.  ███████████████████████

███████████████████████████████████████

████████████████████    ████████████████████

████████████████████████████████

███████████████████        *Id.* Fourth, any market share assessment based on eliminating Christian books and romance series books would need to remove those books from all competitors' sales before recalculating their market shares, a process that no expert or anyone else did in this case.  Fifth, there is no evidence that the types of books that Murray claimed should be excluded from general trade books—e.g. Bibles and mass market romance series, which Murray said were not sold in traditional bookstores—garner advances above $250,000 and are therefore relevant to the market at issue in this case.

113.    Most importantly, both parties' economists include Christian and romance books in the upstream market share measurements.  Tr. 2796:20-2797:7 (Snyder).  Although Dr. Hill studied market share data for months and had every incentive to reduce HarperCollins' market shares if it could be credibly done and helped the government's case, Dr. Hill's market-share assessment was the same as Professor Snyder's.  Tr. 2655:6-10 (Snyder).  Dr. Hill at no time opined that Christian books and romance books should be excluded from market share

calculations, and admitted that he included those books in his market share calculations. Tr. 1473:3-1474:6 (Hill). The analyses of the expert economists—who found rare common ground on this issue—carries greater weight than the hearsay-based assertion of a rival publishing company's CEO.

114.     Although the parties agree on how to calculate market shares, they do not agree on whether market shares by themselves prove that the merger is likely to substantially reduce competition. They do not. Market shares do not fully reflect many conditions in the industry that will affect competition after the merger.

### A.     Industry Participants Recognize That The Merger Will Not Reduce Competition For The Most Sought-After Books

115.     The direct evidence from industry witnesses shows that the merger will not lead to lower author advances or reduced title counts. Tr. 583:13-19 (Karp (S&S)) (testifying that S&S has no plans to decrease author advances or reduce title count post-merger because they "have a growth mindset"); Tr. 1407:24-1408:12 (Murray (HarperCollins)) (HarperCollins has had no discussions about author advances decreasing as a result of the merger). PRH itself has no plans to save money on author advances post-merger. *See infra* FF ¶ 120.

116.     Rival publishers consistently testified that the merger will have no effect on their bidding strategies or the amounts of their bids. Tr. 1385:9-15 (Murray (HarperCollins)) (HarperCollins does not "intend to hold back" in competing post-merger or to bid less for books); ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████  Tr. 211:9-13 (Pietsch (Hachette)) (Q. "To be clear, what you're saying is that, merger or not, your bidding would be the same as before. Right? You're going to bid as much as you think it's worth and not more. Right?" A. "That is correct."). Agents likewise testified

that the merger would not change their bidding strategies or the outcomes of their deals.  Tr. 308:13-16 (Pande (Ayesha Pande Literary)) (THE COURT: "Ms. Pande, is it correct that if Simon & Schuster and PRH were merged, it wouldn't have affected any of the deals on this list?"  THE WITNESS: "Correct."); Tr. 2135:25-2136:3 (Ross (Ross Yoon Agency)) (Q. "[D]o you have a concern that this merged company being—being much bigger than either one today would be in a position to lower author compensation?"  A.  "No, I don't . . . ."); 1823:21-1824:2 (Walsh) (Q.  "If the merger closes, do you expect agents to be unable to create good submission lists and find an author's perfect match?"  A.  "I don't understand why they would be unable to . . . .").

117.    In fact, ordinary-course business documents and trial testimony show that industry participants expect advances to increase.

118.    In a 2022 document presented to its parent company News Corp. after the merger of PRH and S&S was announced, HarperCollins forecasted that its title count and advance spending would ▇▇▇▇▇▇▇▇▇▇▇▇ over a five-year period.  DX-279.0025.



119.    Don Weisberg, CEO of Macmillan, effectively admitted his concern that advances and other benefits to authors would *improve* because of the merger.  According to Weisberg, the merged PRH and S&S would "try to benefit from its scale with customers, with vendors" (Tr. 1116:22-24), thereby gaining an advantage in distribution and discoverability (Tr. 1117:15-18, Tr. 1117:23-1118-13).  That advantage in distribution and discoverability would benefit authors. Tr. 1117:15-22 (Weisberg (Macmillan)) (if PRH were favored in distribution and discoverability by Amazon, it would be a benefit to PRH and S&S authors); Tr. 1937:2-1938:23 (Duhigg) (merger will increase "[d]iscoverability," which is crucial for authors' success and "the hardest thing" for authors to achieve in an online world).  As a result, rival publishers are concerned that the merged entity could "get any book" it wanted "in almost every situation if they want to pay enough."  Tr. 1088:6-7 (Weisberg (Macmillan)).  In response to the question whether he was "concerned . . . that the combined entity would have resources such that they could outbid you in auctions," Weisberg answered,  "Yes."  Tr. 1118:14-17.

120.    PRH's own ordinary-course documents show that it does not expect the merger to cause a reduction in author advances.  It is telling that, when modeling likely cost-savings from the merger, PRH did not account for any such reduction.  Manuel Sansigre, Senior Vice President & Head of Global Mergers & Acquisitions, led PRH's efforts to model the efficiencies from the acquisition of S&S.  Tr. 2400:4-6; 2402:5-9 (Sansigre (PRH)).  Over the course of eight months, Mr. Sansigre created over 100 drafts of the model used to project the benefits from the transaction, which Bertelsmann relied on to approve the $2.2 billion investment.  Tr. 2411:19-2412:14, 2421:9-16 (Sansigre (PRH)).  Notably, author compensation is a major cost center for publishers, consistently accounting for over half of S&S's and PRH's variable costs.  *See* PX-168 at Tabs Silk US IS Output cells C26:H27, PRH US cells B40:J41.  But in the model he

47

prepared in the ordinary course of business, Tr. 2411:13-2412:14 (Sansigre (PRH)), Mr. Sansigre

identified no potential cost-savings from reduced author compensation.

121.   To the extent Weisberg and other rivals claimed otherwise, they admitted it was

only speculation.  Tr. 1119:1-6 (Weisberg (Macmillan)) (admitting speculation); Tr. 1085:25-

1086:5 (Q.  "And what's your—what's the reasoning behind your thought that advances will go

down?"  A.  "Less competition.  It's simple as that."  Q.  "Is that based on any of your

experiences in the industry?"  A.  "No, it's just gut."); PX-2000 (Zacharius (Kensington) Dep.) at

71:15-18, 71:20-22 (view that advances may go down after the merger is "just a feeling" he has).

122.   The government also attempted to elicit evidence of "harm" from self-interested

Big Five publisher witnesses who admitted that their own companies will attempt to purchase

Simon & Schuster if PRH's acquisition falls through.  Tr. 1387:4-12 (Murray (HarperCollins))

(testifying that "if this deal gets blocked, HarperCollins would still be interested in acquiring"

S&S); Tr. 205:13-16 (Pietsch (Hachette)) ("I would be very happy for my parent company to

acquire it.  Yes.").  Despite their admitted interest in acquiring S&S, neither HarperCollins' CEO

nor Hachette's CEO believe that—if they were to acquire it—their companies would reduce

advances paid to authors.  Tr. 206:17-21 (Pietsch (Hachette)); Tr. 1387:19-21 (Murray

(HarperCollins)).  Hachette's CEO did not even perform any analysis informing his parent

company that Hachette *could* reduce title count or author advances should it acquire S&S.  Tr.

207:25-208:11 (Pietsch).  Rather, these companies calculated synergies—just as PRH did—to

justify their bids for S&S.  Tr. 1421:1-1422:6 (Murray (HarperCollins); *see* DX-288.0017

(Hachette presentation regarding synergies of potential acquisition of S&S).

123.   Author Andrew Solomon testified that he is "not concerned that the merger . . .

will negatively affect" him.  PX-2004 (Solomon Dep.) at 107:2-11.  The authors whose books

sell for high advances are precisely the authors whose books are the most desirable, whose

"proven sales history and proven history of winning prizes" means that they will always have

publisher options.  PX-2004 (Solomon Dep.) at 108:9-109:4 (testifying that the merger will not

affect him as an author).

### B.    Large Existing Rivals Plan To Expand And Can Easily Do So

124.    The publishing industry is dynamic and thriving.  Tr. 758:3-5 (Dohle (PRH))

("the book market has been growing 20 percent"); Tr. 552:10-20 (Karp) (publishing is "a

dynamic landscape"); Tr. 1805:15-22 (Walsh) ("It's an exciting time for new entrants in the

publishing industry"); Tr. 2684:10-19 (Snyder) ("[F]rom those data I identified the number of

publishers acquiring contracts with advances of at least $250,000 over this three-year time

period. And that number is 29 for 2019 and then it grows to 33 in 2021. Again, this is not just

bidding; this is winning.").

125.    Existing publishing companies are taking advantage of the dynamic environment

with plans to expand.  Macmillan's CEO testified that his company plans to spend more on

author advances in coming years in efforts to grow its retail market share.  Tr. 1092:6-10,

1098:5-18 (Weisberg (Macmillan)).  HarperCollins' CEO has publicly stated that his company is

"going to be more aggressive in its offers" for books "because the market is growing."  DX-188;

PX-2002 (Stehlik (HarperCollins) Dep.) at 49:11-14, 49:16-22, 50:4-51:5.  Mr. Jacobs testified

that Abrams intends to grow.  PX-2005 (Jacobs (Abrams) Dep 51:23-52:3 (Q. "What is Abrams'

strategic plan?"  A. "To, you know, grow our business and to be very strong in categories in

which we publish and to try new things, keep growing our children's publishing aggressively

and, you know, be a – a profitable independent midsized publisher.").

126.    As Dr. Hill was forced to concede, ███████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

127.    The industry also perceives Amazon to be growing as a publisher and becoming a more effective competitor. It has 50 editors working in multiple imprints to acquire and publish award-winning books in a variety of genres.  Tr. 558:16-559:6 (Karp (S&S)); Tr. 1419:15-21 (Murray (HarperCollins)) (testifying that Amazon was expanding its publishing operations," including by launching new imprints).  Amazon "getting more aggressive" in the acquisition of books, and competes for books at high advance levels.  Tr. 457:3-10, 559:21-560:2, (Karp (S&S)) (testifying that in July 2022, S&S competed with Amazon in a seven-figure auction for a book).

128.    Any competitive advantages the traditional publishers may have once had over Amazon are eroding.  Amazon has superior access to consumer data to inform its publishing program, and independent booksellers—once reluctant to carry Amazon-published books—now have Amazon titles on their best seller lists.  Amazon's penetration into the independent retail space demonstrates that "a rubicon has been crossed"—Amazon is "more of a threat" than traditional publishers may have previously thought.  Tr. 559:7-20, 560:18-561:11 (Karp (S&S)); Tr. 1808:24-1809:6 (Walsh); Tr. 1107:13-19 (Weisberg (Macmillan)) (Q.  "And, in fact, you fear that Amazon can again become a formidable competitor at any given moment; isn't that fair?"  A. "Yes."  Q.  "And that's because they could expand, right, they could change what they're doing now?"  A. "Right.  Yes.").

129.     New publishing houses are also entering the market to take advantage of opportunities to acquire and publish books.  Tr. 552:10-20 (Karp (S&S)) (testifying that publishing is "a dynamic landscape" with "new publishing companies" that have entered in the last few years); Tr. 1805:15-22 ("It's an exciting time for new entrants in the publishing industry."); DX-299.0011 (News Corp. 10-K indicating that HarperCollins' competition "could also come from new entrants as barriers to entry in book publishing are low"); Tr. 2296:24-2297:1 (McIntosh (PRH)) (testifying that "start-up publishers . . . also have been spending big to acquire books").

130.     Recent entrants have already been winning high-advance books over Big Five publishers.  For example, Michael Pietsch, CEO of Hachette, testified that Spiegel & Grau is a new publisher that recently bid more than $500,000 to win Alison Smith's *Echoes Within*.  Tr. 231:5-22; *see also* Tr. 757:2-22 (Dohle (PRH)) (testifying that Spiegel & Grau is founded by two ex-PRH editors and is "buying big books"); Tr. 552:21-24 (Karp (S&S)) (Spiegel & Grau is an "upstart company").  Spiegel & Grau only just launched in 2019, but the very first book they published, *Fox and I*, was a *New York Times* bestseller.  Tr. 554:22-555:2 (Karp (S&S)); Tr. 1805:23-1806:9 (Walsh).

131.     Zando is another new publishing company, founded by former PRH publisher, Molly Stern.  Zando pursues an innovative business strategy by creating imprints centered around public figures with large followings.  Tr. 555:7-556:14 (Karp (S&S)).  Zando is brand new, but it is already competing in auctions for books above the $250,000 advance-level and publishing successful books that achieve high sales.  *Id.*; Tr. 1807:5-18 (Walsh).  ██████████
████████████████████████████████████████████████████████████████  Tr.

2297:2-8 (McIntosh (PRH)).  Zando has also been "very aggressive" in acquiring books in the children's space.  Tr. 2299:5-8 (McIntosh (PRH)).

132.    Astra House, financially backed by a large parent company, is another new publishing company that has rapidly expanded to have multiple imprints.  Tr. 556:15-20 (Karp (S&S)).  Like Zando and Spiegel & Grau, Astra is also helmed by a publishing industry veteran. Tr. 1807:19-23 (Walsh).

133.    The government tried to show barriers to *entry* are high, but none of the cited barriers would impede *expansion* by existing publishers, which are already equipped with the skilled editors, good reputations, and logistical resources needed to fulfill their growth plans.

       1.    *Printing*

134.    The government asserts that access to printing is a barrier to entry, but Dr. Hill did not analyze or render any opinion on the effects of access to printing capacity on competitive forces.  Tr. 1734:1-7 (Hill).  The government did not show that access to printing would impede expansion plans by existing publishers or pose an obstacle to growth even for smaller publishers.

135.    All publishers—including PRH—have faced shortages of printing capacity in the United States.  Tr. 817:25:818:4 (Dohle (PRH)); ██████████████████████████████ ███████████████████████████████████  Publishers acknowledge that their concerns about printing capacity pre-exist any potential merger of PRH and S&S and will persist even if the merger does not go through.  *See, e.g.,* ████████████████████████████████

136.    ████████████████████████████████████████ █████████████████████████████

137.    ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████

138. ████████████████████████████████████████████

████████████████████████████████████████████

████████

139. █████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

140.   Although the government has tried to elicit evidence that Bertelsmann will use its ownership of printing facilities to raise rival publishers' costs or to favor PRH, no such allegations were made in the complaint, much less proved at trial.  The evidence showed Bertelsmann Printing Group does not give PRH preferential treatment compared to other publisher clients.  Tr. 817:25-818:4 (Dohle (PRH)); █████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

141. 

142.

143.    None of these concerns demonstrates favoritism toward PRH by Bertelsmann.  In

fact, the evidence showed that ████████████████████████████████████████

████████████████████████████████████████████ Tr. 817:12-818:4

(Dohle (PRH)).

       2.     *Backlist*

144.    The government attempted to show that backlists are crucial to publishers'

business models and therefore represent a barrier to new entrants.  But, again, the barrier has no

bearing on expansion by existing publishers, which have large backlists.  And, the evidence

shows that a backlist is merely one source of revenue among others—including the front list—

that allow publishers to invest in new books.  Tr. 2358:11-14 (McIntosh (PRH)) (Q. "Having a

backlist allows PRH to take risks on new acquisitions, right?" A. "Having all of our revenue,

which is inclusive of backlist and frontlist, is what allows us to invest in new books, yes."); Tr. 1803:2-10 (Walsh) ("a backlist is just money").  And, of course, existing publishers with big names such as Disney and Amazon, do not face funding constraints.  *See, e.g.*, Tr. 2956:10-14 (Snyder) (noting that Amazon does not consider funding to be a concern); Tr. 1808:24-1809:6 (Walsh) (Amazon has "all the money and all the resources and all the marketing power.  If they wanted to course correct, they absolutely could.").  New entrants can obtain the financial security that comes from backlists in other ways.  Spiegel & Grau, for example, is a brand new entrant and already oversubscribed for funding.  Tr. 1805:23-1806:6 (Walsh).  Zando is also well-funded.  1806:10-22 (Walsh).

145.    In any case, publishers can acquire entire backlists through mergers and acquisitions if they deem it important, and even *one* particularly successful backlist title can be as effective as one hundred other backlists titles.  *See* PX-2002 (Stehlik (HarperCollins) Dep.) at 230:19-22, 230:24-231:2, 232:4-14.

            3.    *Reputation*

146.    The government also attempted to show that publishing houses need to build reputations before they can compete to acquire books.  That concern again has no application to existing publishers that compete in the $250,000+ price segment—all have strong reputations.  Further, authors care more about the reputations of the individual editors and publishers they work with than the publishing houses in general.  Tr. 739:21-740:8 (Dohle (PRH)).

147.    And those individual editors can—and do—start their new publishing companies.  "Upstart" company Spiegel & Grau was founded by two former PRH publishers with track records of major successes.  Tr. 552:21-553:20 (Karp (S&S)); Tr. 2835:5-7 (Snyder) ("[Y]ou have interestingly entrants who don't have any track record, but they are proceeding to launch their businesses with reputable editors."); Tr. 2958:1-4 (Snyder) (Q. "And what do you know

about Spiegel & Grau?" A. "A recent entrant, they have the benefit of having well-known editors. And they're competing in the proposed segment."); Tr. 1805:23-1806:6 (Walsh) ("Spiegel & Grau was founded by two veterans of the publishing industry."); Tr. 1806:10-13 (Walsh) ("Zando is also founded by a veteran of the Big 5, Molly Stern.").

#### 4.   *Distribution*

148.    Access to distribution channels is irrelevant to expansion for existing publishers—they already have access to distribution infrastructure.  Many publishing companies—including HarperCollins, the second-largest publisher—engage third-party distribution companies to distribute their books to retail stores.  Tr. 1392:25-1393:18 (Murray (HarperCollins)).  New entrants can also contract for distribution services.  S&S and PRH both handle distribution for many smaller publishers.  Tr. 553:25-554:6 (Karp (S&S); Tr. 828:12-828:22 (Dohle (PRH)).  In fact, S&S offered to distribute books for Spiegel & Grau, but Spiegel & Grau instead chose to affiliate with Ingram for distribution.  Tr. 553:21-554:19 (Karp (S&S)); Tr. 1802:14-15 (Walsh) ("The larger publishers actually distribute some of the smaller publishers.").

### C.   Downstream Competition Drives Competition For The Acquisition Of Books

149.    It is uncontested that the downstream—or retail—market for the sale of books to readers is unconcentrated and fiercely competitive, and that it will remain so post-merger.  Tr. 1539:1-25 (Hill).  The government accordingly could not—and did not—bring a claim focused on downstream harm to consumers.

150.    This competitive dynamic is illustrated by the trends in publishers' retail market share. ███████████████████████████████████ Meanwhile, smaller and mid-size publishers' retail market shares have been increasing over the same period of time.  Tr. 832:6-833:9 (Dohle (PRH)); DX-76.0004 (December 2019 PRH presentation showing PRH's

loss of market share from 2013 to 2019).  In fact, in 2021, 50 percent of books sold in the United States were sold by non-Big Five publishers.  Tr. 833:12-24 (Dohle (PRH)).

151.    The reason the retail market has been trending towards fragmentation, towards smaller publishers, and away from the Big Five publishers, is that consumers began shifting to online book purchases instead of in-store book purchases.  At least 50 percent of book sales are now made online.  This trend has leveled the playing field between smaller publishers and larger publishers for several reasons.  First, online retailers like Amazon can carry 1000 times more titles than a standard independent bookstore.  Second, online retailers use algorithms rather than human salespeople to determine what books are presented to consumers, which has removed some of the Big Five's advantages in terms of visibility to consumers.  Third, online retailers are much more efficient, helping smaller publishers save money on printing, binding, and other costs of producing excess stock.  Tr. 834:2-19, 835:18-836:22, Tr. 837:2-838:6 (Dohle (PRH)).

152.    This downstream competition drives publishing houses to compete "aggressively" to acquire the books that will make them more competitive downstream.  Tr. 799:14-800:5 (Dohle (PRH)) (Dohle "encouraged" McIntosh to get more involved in editors' acquisitions of books "given the importance of getting the books that are in demand with end consumers, to [s]top the market share loss").

153.    To that end, in 2021, PRH committed an all-time high of $650 million in author advances, representing a major push to acquire books that consumers want to buy.  Tr. 811:11-16 (Dohle (PRH)).

### D.    Agents Control The Competitive Conditions Of Specific Acquisition Processes

154.    There are no set rules for book acquisitions.  Agents devise the rules for each acquisition process, depending on what the agent thinks will achieve the best result for her

client's particular book.  PX-2007 (Fletcher (Fletcher & Company) Dep.) at 36:2-3, 36:5-13 ("It

really depends on the variables in play in that particular project.  How many people you

anticipate offering, who those people are, how much financials play into the author's decision

making."); Tr. 112:25-113:4 (Pietsch (Hachette)) ("Agents are all independent operators who . . .

set up . . . the sale of the books they represent and the way that they think is going to be most

effective for them and their client."); Tr. 1613:6-1614:15 (Hill) (acknowledging agent's role in

deciding the type of acquisition process).

155.    Agents choose how many editors to submit a book or book proposal to, based on

various factors, such as the editor's track record with comparable books, editorial sensibilities,

and their expectations of how much the editor might bid.  PX-2007 (Fletcher (Fletcher &

Company) Dep.) at 160:10-161:14.  Agents do *not* choose which publishing companies to submit

a book to based on those companies' respective shares in the market for the acquisition of books.

Tr. 2128:1-7 (Ross (Ross Yoon Agency)).

156.    They choose what information—if any—to share with publishers, including the

number and identities of other bidders, and even the rules for the acquisition process.  PX-2007

(Fletcher (Fletcher & Company) Dep.) at  161:17-20, 161:25-162:5, 162:18-23; Tr. 495:4-24

(Karp(S&S)); Tr. 1764:21-1765:14, 1765:19-1766:10 (Walsh).  As agent Gail Ross testified, she

only tells editors how many other editors are participating in an acquisition process "if it serves

my client's interests. . . . I get to control that kind of information."  Tr. 2119:5-10.

157.    When agents hold auctions—which they do in less than half of acquisitions, *see*

*infra* FF ¶ 163—they control the entire auction process.  PX-2000 (Zacharius (Kensington) Dep.)

at 119:2-3, 119:5; Tr. 183:23-184:14 (Pietsch (Hachette)).

158.    The entire acquisition process is fluid.  Agents change the rules and determine how to close the process in real time, depending on the feedback they receive on the book.  PX-2007 (Fletcher (Fletcher & Company) Dep.) at 155:2-20.  For example, agents might start an acquisition process as a round-robin auction, but reserve the right to end the auction and ask for best bids at any time.  Tr. 2120:3-19 (Ross (Ross Yoon Agency)); Tr. 1615:7-12 (Hill) (Q.  "But you would agree with me, though, that the acquisition process, whether it's an auction or some other form, can be changed mid-stream by the author and agent?"  A.  "Yeah, I've seen settings where they'll say, we're doing a two rounds auction, and then they will call for best bids at the end, having not previously announced that.").

159.    Having more bidders in an auction does not guarantee higher advances—an auction can be competitive with even just two bidders.  PX-2007 (Fletcher (Fletcher & Company) Dep.) at 256:6-10, 12-18.

160.    Even in auctions, agents reserve the right to accept an underbidder, because the best offer for an author might not be the highest offer.  Tr. 1756:13-1757:8, Tr. 1836:5-1837:2 (Walsh); ███████████████████████████  DX-422 (Glusman (Norton) Dep.) at 256:6-18.  Agent Andrew Wylie testified that he is looking for an offer "that we feel presents the strongest combination of financial terms plus editorial engagement and context for the author." Tr. 2090:11-23.  Likewise, "best bids" does not necessarily mean the "highest bid," but the best all-around bid for the book.  Tr. 2120:9-2121:25 (Ross (Ross Yoon Agency)).  Even the government's own witness, Ayesha Pande, testified that she has sold books to underbidders.  Tr. 304:16-24.

161.    In fact, an agent's goal is not always to extract every possible dollar from an editor in the advance.  The publication of a book requires a healthy relationship between editor

and author, so an agent wants to strike a deal that allows everyone to feel they are on the same team. Tr. 1756:2-12 (Walsh). As Ms. Walsh explained, "a majority of the authors want to have long-term careers and they want to be in successful relationships with the publisher where their books are lucrative." Tr. 1835:14-1837:2.

162. Multiple agents testified that the merger will have no effect on their ability to create submission strategies that achieve the best results for their clients. The S&S editors and imprints would not disappear and would still be available for submissions and bids, and if agents did lose one potential bidder, they could easily submit to any of the numerous other editors at dozens of other publishing houses that compete in the government's alleged market. Tr. 1823:21-1824:2 (Walsh); Tr. 2094:14-18 (Wylie (Wylie Agency)) (Q. "Do you have—what impact, if any, do you believe this merger would have on—on your business, on your representation of your clients, and your ability to get them the best possible deal?" A. "Generally speaking, I think it would be a positive result."); Tr. 2129:12-23 (Ross (Ross Yoon Agency)) (testifying that "if this merger were to occur, "[t]here's plenty of competitors out there" and "it only takes . . . the idea of one competitor to make my negotiations strong. And if we're going out more widely, then there are plenty of competitors"); Tr. 2136:21-25 (Ross (Ross Yoon Agency)) (if PRH and S&S tried to lower advances, "I'd be spending more time across town with the other publishers"); Tr. 2070:22-2071:16 (Cheney (Cheney Agency)) ("[I]t would mean I would need to take my 200 authors and, you know, call up Hachette, call up HarperCollins, call up, you know, Norton."). As Ms. Ross testified, "[I]n this business, there's always the other competitor. Whether it's—whether they're bidding or not, they're always there." Tr. 2127:11-13.

163. Despite agents' choice not to include every publisher in an auction and their ability to replace lost bidders, Dr. Hill's economic model does not account for that commercial

reality.  Tr. 1630:20-1631:18 (Hill).  As Professor Snyder explained, the model assumes that "all [publishers] bid" in all acquisitions, then assumes "the merger reduces the number of bidders by one in every case," and then uses market shares to determine the effect eliminating that one bidder.  Tr. 3036:11-12.  But in "the real world," agents do not invite all publishers; they instead "pick and engage a smaller number."  Tr. 3036:13-18 (Snyder); *see also* Tr. 1750:24-1751:4 (Walsh) ("we're not looking for the largest amount of submissions.  We're looking for the perfect match.").  The elimination of one publisher via merger thus does not necessarily affect all or even most acquisitions—whether the number of bidders is reduced "depends on the circumstances," and even if S&S would have been a bidder, "the agent can go to others to replace that bidder."  Tr. 3036:11-12 (Snyder).  Dr. Hill's market-share based model does not account for that dynamic.  This is particularly important given that the majority of acquisitions involve only one publisher in a bilateral negotiation with an agent and author.  Tr. 1608:20-1609:3 (Hill) (agreeing that about 60 percent of acquisitions for advances over $250,000 are bilateral negotiations).

E.     **Non-Big Five Publishers Collectively Impose A Significant Competitive Threat**

164.     Publishers outside the Big Five also pose a serious threat in any given acquisition, especially when viewed collectively.

165.     The data demonstrate that—as a group—the non-Big Five publishers are comparable in size as a competitive constraint to Macmillan or Hachette.  Tr. 2686:23-2687:9 (Snyder).  During the time period analyzed by Dr. Hill, non-Big-Five publishers collectively acquired as many titles for advances of $250,000 or more as Hachette did.  Tr. 1583:18-23 (Hill).  In 2021, non-Big-Five publishers collectively acquired roughly as many titles as S&S in the $250,000 and above price range—and they acquired more than Hachette or Macmillan.  Tr.

1584:5-17 (Hill).  When aggregated, the non-Big-Five publishers are as likely to win as Hachette or Macmillan and have the same market share as S&S.  Tr. 1572:10-16 (Hill) (Q.  "And if we look over to 2021, the non-Big 5 collectively have a larger market share than Hachette and Macmillan; is that correct?"  A.  "If you aggregate them into one firm, yes."  Q.  "And they have—collectively, they have the same market share as Simon & Schuster, correct?"  A. "Correct.").

166.     In fact, the data show that 54 percent of multi-bidder auctions for deals over $250,000 included at least one bid from a non-Big Five publisher, and non-Big Five publishers were either the winners or the runners-up in 23 percent of those multi-bidder auctions.  Tr. 2689:22-2690:5, 2827:13-23 (Snyder).  In other words, the non-Big Five compete well above their weight—while they collectively have a not-insubstantial 10 percent market share, they are an even more significant *competitor*, making the winning or second-place offer in almost one-quarter of all multi-bidder auctions.  Dr. Hill observes that the 23 percent figure does not reflect the *relative* size of non-Big Five publishers compared to the Big Five, Tr. 3204:9-17, which is true but irrelevant:  the 23 percent figure simply shows *how often* non-Big Five publishers are one of the top two bidders, and it shows that they impose a competitive constraint *more than twice as often* as the market shares might indicate, as Dr. Hill finally conceded.  Tr. 3147:17-3148:3 ("If you are using it to say in literally what proportion of auctions were they first or second, then the 23 is a percent.").

167.     The data confirm the real-world evidence that "high-profile, savvy authors are willing to go with" non-Big Five publishers.  They are "viable alternatives," which means they represent "a competitive constraint in this market," regardless of their market share.  Tr. 2693:2-19 (Snyder); Tr. 1798:12-1799:4 (Walsh) (authors sometimes pick smaller publishers over PRH).

168.    Literary agents regularly submit books to non-Big Five publishers.  Tr. 247:22-248:7 (Pande (Ayesha Pande Literary)) (she "frequently" submits books to publishers like Bloomsbury, Grove, and Norton to achieve a higher advance for her clients); Tr. 1797:16-23 (Walsh) (she has worked with Norton, Grove Atlantic, Kensington, Chronicle, Abrams, Hay House, Graywolf, and others); Tr. 2095:10-20 (Wylie (Wylie Agency)) (he "absolutely" makes deals with non-Big 5 publishers); Tr. 2130:9-17 (Ross (Ross Yoon Agency)) (she often submits books to Grove Atlantic, Norton, and Bloomsbury).  Accordingly, non-Big Five publishers regularly compete with Big Five publishers to acquire books at all advance levels.  PX-2000 (Zacharius (Kensington) Dep.) at 53:3-6, 56:18-24, 57:2 (acknowledging that Kensington regularly competes with Big Five publishers); Tr. 546:3-5 (Karp (S&S)) (S&S "regularly" competes with Scholastic for books with advances of $250,000 or more); DX-299.0010-11 (News Corp. 10-K stating that HarperCollins competes with "numerous smaller publishers for the right to works by well-known authors and public personalities"); Tr. 1797:24-1798:2 (Walsh) (midsized and small publishers compete "fiercely" for the same books as larger publishers); DX-422 (Glusman (Norton) Dep.) at 103:17-20 (Q.  "So Norton's biggest competitors are the Big 5 publishers and imprints of those Big 5 publishers, is that fair?"  A. "Yes."); Tr. 2296:20-2297:1 (McIntosh (PRH)) (testifying that "in most competitive situations where we're bidding on books, that we do encounter all the other Big 5 in those—in those situations, we also come across non-Big 5 publishers, whether that is Norton or Disney or Scholastic").

169.    Ms. Bergstrom testified that Gallery competes against mid-sized and smaller publishers for "all kinds" of books—"political, celebrity, novels, sci fi, all genres and types."  Tr. 1864:2-1864:6.

170.    Non-Big Five publishers do not just compete for books for advances of $250,000 and above—they frequently win them.  *See, e.g.,* ███████████████████████████

████████████████████████████████████████████████████

Tr. 547:3-548:3 (Karp (S&S)) (S&S has lost books for over $250,000 to Hay House); DX-038 (demonstrating S&S loss to Hay House for $700,000 book); Tr. 548:4-549:20 (Karp (S&S)) (S&S has lost books for over $250,000 to academic presses); DX-131 (demonstrating S&S loss to Princeton University Press for high advance book); Tr. 1799:5-8 (Walsh) (smaller publishers outbid larger publishers); Tr. 973:3-974:10 (Tart (PRH)) (describing PRH Viking losses to Norton and Hay House); Tr. 1555:6-21 (Hill) (demonstrating win by Astra House over Big Five publishers).  As of 2021, 33 publishers entered deals for $250,000 or more—up from 29 publishers in 2019.  Tr. 2684:10-19 (Snyder).

171.    Between 2017 and mid-2021, Hachette lost at least 30 books for $500,000 or more to *non*-Big Five publishers, while losing only 23 to Macmillan and 38 to S&S.  PX-790; Tr. 229:4-231:14 (Pietsch) (explaining Hachette's losses to Chronicle, Abrams, Grove Atlantic, Disney, and Spiegel & Grau).  This demonstrates that, collectively, the non-Big Five publishers represent as much of a competitive threat to Hachette as any one of the other Big Five publishers.

172.    Smaller publishers can also win books as the underbidder in auctions, because the size of the advance is not always the determinative factor in what leads an author to publish a book.  As Mr. Jacobs, explained, Abrams can "lend[] a certain amount of panache . . . to the publication," and authors sometimes "have a relationship with the—the editor that they feel is—is one in which they—their creative vision to be executed [sic] in a way."  PX-2005 (Jacobs (Abrams) Dep.) at 75:4-76:3.

173.    John Glusman testified that Norton sometimes wins auctions as the underbidder due to a "combination of factors," including "the editorial, the sales, the publicity, the promotional and marketing talent and our ability to sell books as effectively—and in some cases, more effectively depending on the book of any publisher in the industry."  DX-422 (Glusman (Norton) Dep.) at 255:2-14, 16-25.  This further shows that there isn't a qualitative difference in terms of the services that non-Big-Five publishers can offer.  *See supra* FF ¶¶ 65-74.

174.    Non-Big Five publishers that compete against the Big Five include smaller and mid-sized publishers like Abrams, Kensington, and Grove, but they also include large players like Amazon and Scholastic.  PX-2005 (Jacobs (Abrams) Dep.) at 33:25-34:1, 34:3-9, 34:11-17; Tr. 1105:18-1106:1 (Weisberg (Macmillan)).

175.    Scholastic is a "giant" of children's publishing and a competitor of the Big Five, with annual revenue in the billions.  Tr. 545:10-14 (Karp (S&S)).  Scholastic is "in some cases larger than the Big 5," with respect to children's books.  Tr. 1105:5-23 (Weisberg (Macmillan)).  S&S "regularly" competes with Scholastic for books that ultimately sell for over $250,000.  S&S has lost books by best-selling authors Cassandra Clare and Scott Westerfeld to Scholastic when Scholastic offered higher advances.  Tr. 546:3-13 (Karp (S&S)).

176.    Disney, too, is a major competitor for children's books.  Tr. 2297:21-2298:1 (McIntosh (PRH)).  In fact, in the children's space, the industry recognizes the "Big Seven" publishers, because Scholastic and Disney are such significant competitors.  Tr. 2298:4-8 (McIntosh (PRH)).

177.    Amazon is also a significant non-Big Five competitor and is only becoming more competitive.  *See supra* FF ¶¶ 127, 128; PX-2000 (Zacharius (Kensington) Dep.) at 106:17-20 (Amazon "absolutely" is "a direct competitor to book publishers"); Tr. 1107:13-19 (Weisberg

(Macmillan)) (Q. "And, in fact, you fear that Amazon can again become a formidable competitor at any given moment; isn't that fair?" A. "Yes." Q. "And that's because they could expand, right, they could change what they're doing now?" A. "Right. Yes."); PX-2002 (Stehlik (HarperCollins) Dep.) at 82:24-83:2, 83:12-84:15, 199:18-199:22 (HarperCollins competed with Amazon to publish Patricia Cornwell and Dean Koontz); Tr. 561:12-562:3 (Karp (S&S)) (S&S competed against Amazon for seven-figure books by Colleen Hoover, Dean Koontz, and others); Tr. 1419:25-1420:16 (Murray (HarperCollins)) (Amazon is a "major competitor" for HarperCollins, particularly in the romance genre).

178.    PRH has lost major authors to Amazon's publishing program in recent years. Tr. 2295:24-2296:5 (McIntosh (PRH)) (PRH lost Dean Koontz, Mindy Kaling, and Rhys Bowen to Amazon).

179.    For these reasons, the government's reliance on a draft presentation written by the late Carolyn Reidy of S&S—referring to non-Big Five publishers as "farm teams" for authors—is misplaced. As an initial matter, the trial evidence showed that the presentation was drafted in an effort to make S&S's outlook seem "positive enough" for senior management. Tr. 375:17-376:2 (Eulau); DX-405. The only testimony the government could elicit about this document came from Dennis Eulau, S&S CFO and COO, who—*first*—had no memory of receiving, discussing, or even reading the document (Tr. 371:15-372:4), and—*second*—admitted to having no personal knowledge of what it is like to compete on the book acquisition side of the business, having never held an editorial position during his career at S&S. Tr. 369:25-370:10, 370:19-371:5 (recounting no conversations with agents about acquisitions and no participation in any book acquisitions throughout his career), 372:5-15 (Q. "Mr. Eulau, do you know which publishers compete in auctions with Simon & Schuster?" A. "Which compete, I do not." Q.

"Because you don't follow auctions or who's bidding and that sort of thing, correct?"  A.  "I do not."  Q.  "And you don't know how often various publishers compete in auctions with Simon & Schuster?"  A.  "Or in the mix, I do not. I do not know.").

180.    In any case, S&S's *current* CEO, Jonathan Karp, disagreed with Ms. Reidy's characterization of non-Big Five publishers "because usually when you are on a farm team, you want to get off the farm team and you want to get to the majors," but non-Big Five publishers "publish a lot of authors [S&S] would love to publish and a lot of authors who actually have come to [S&S] and then gone back to" their previous non-Big Five publishers.  Tr. 550:6-18.

**F.    Self-Publishing Is Also A Competitive Threat, Especially For Celebrity And Romance Authors**

181.    Self-publishing is a viable option for authors.  Tr. 1809:7-9 (Walsh); Tr. 1108:2-9 (Weisberg (Macmillan)) (Q.  "Don't a lot of people self-publish through Amazon?  A.  "Yes." Q.  "And Amazon has a platform where you basically load up what you wrote and then they distribute it for you electronically right?"  A.  "Yes."  Q.  "As an e-book, right?"  A.  "Yes.").

182.    Self-publishing is a particularly viable option for celebrity or well-known authors who already have a built-in following on social media or elsewhere.  Tr. 1109:2-24 (Weisberg (Macmillan)) (Q.  "Would you agree that self-publishing is especially attractive for authors who have a built-in following?"  A.  "I think so.  Yes."  Q.  "When I say a built-in following or built-in audience, you mentioned social media, right?"  A.  "Yeah."  Q.  "And that's changed a lot in the industry recently, hasn't it?"  A.  "Yeah."  Q.  "In other words, there are personalities who are Internet influencers or have a big TikTok following, right?"  A.  "Sure."  Q.  "That can be very helpful in selling books?"  A.  "Absolutely."  Q.  "That's one of the things you look at, right, when you're looking at acquiring an author, right?"  A.  "Yes.").

183.    Authors have access to online platforms to sell books in ways that would not have been predicted years ago.  Tr. 1113:1-11 (Weisberg (Macmillan)).  Recently, Brandon Sanderson—who also publishes books with Macmillan—raised around $40 million in a self-publishing campaign on Kickstarter.  Tr. 1112:4-25 (Weisberg (Macmillan).  This phenomenon could well be the "wave of the future" in publishing.  Tr. 1807:10-15 (Walsh).

184.    Self-publishing is also a particularly attractive option to romance authors, as Jennifer Bergstrom testified.  Tr. 1872:21-1873:4 (Q.  "Does self-publishing play a role with authors at Gallery?"  A.  "Yes, particularly in romance. We have a—one of our top selling authors Anna Todd is now self-publishing.  I had author H, just recently on our last contract, the agent told me the author wanted to use a pseudonym and write a new series and wanted to self-publish it. So I essentially had to compete and buy the book. I didn't want her to self-publish, so we offered on that. It's actually coming out next week.").

185.    Even best-selling authors published by the Big Five are turning to self-publishing.  Tr. 1810:9-16 (Walsh).

**G.    PRH And S&S Do Not Frequently Compete Head To Head As The Top Two Bidders In Acquisitions**

186.    PRH is certainly viewed as the "major competition" for most publishers,   Tr. 3184:20-3185:3 (Hill), but PRH and S&S do not frequently compete head to head as the top two bidders in acquisitions.  HarperCollins is a powerful and aggressive second-place competitor. PX-163 at BPRH-004177288 (showing HarperCollins market share); ██████████████████ ████████████████████████████████████████████████   *see also* DX-299 (News Corp. 10-K).  S&S, on the other hand, is "part of another group" (Tr. 3185:1 (Hill)), in which each member represents about 10 percent of the market (Hachette, Macmillan, S&S, and other publishers collectively).  Tr. 2687:3-9 (Snyder) ("So what this slide identifies—and this is using

Dr. Hill's advance data—is the number of titles acquired by the individual members of the so-called Big 5 along with non-Big 5 publishers as a group. And what it shows is the non-Big 5 publishers as a group in red, that group is roughly comparable to Simon & Schuster, to Macmillan and to Hachette.").

187.    The data show that PRH and S&S are rarely the winner and runner-up.  As Dr. Hill concedes, his own market shares for books above $250,000 imply that PRH and S&S are the top two choices for authors in only about 12 percent of all acquisitions. Tr. 1588:7-19 (Hill). According to Professor Snyder's real-world agency data, the two are the top two bidders in only 6-7% of acquisitions where a winner and runner-up actually exist and can be identified.  Tr. 2797:20-2798:6 (Snyder).  At a minimum, then, some publisher *other* than PRH or S&S either wins or makes the constraining second-place bid in 88 percent of all acquisitions.  Tr. 1588:7-19 (Hill).

188.    As Professor Snyder summarized, "PRH and S&S are rarely the winner and runner-up . . . . [I]f you take Dr. Hill's market share data or my market share data, the prediction is that the two parties will be winner and runner up in only 12 percent of the time.  That means that in 88 percent of the time, that condition for harm doesn't exist." Tr. 2632:1-12 (Snyder).  As further proof that the merging parties are not particularly close competitors, 47 percent of the time, when one of PRH or S&S wins a book in a multi-bidder auction for over $250,000, the other company does not bid at all.  Tr. 2665:20-2666:4 (Snyder); Tr. 1579:11-17; 1692:5-10 (Hill). In fact, Dr. Hill's own analysis of Professor' Snyder's agency data, DX-436, entitled "Share of runner-up status for competitors to Penguin Random House and Simon & Schuster in anticipated top seller wins (2019–2021)" demonstrated that, when PRH won an anticipated top seller during this period, ███████████████████ were the runner-up in multi-bidder

auctions more frequently than S&S.  Conversely, when S&S won, ███████████████ ████████████ were more frequently the runner up than PRH.

189.    The Horizontal Merger Guidelines define diversion ratios as "the fraction of unit sales lost by the first product due to an increase in its price that would be diverted to the second product."  Guidelines § 6.1. Market shares are not always a useful assumption when calculating diversion ratios—particularly where the evidence suggest that diversion rates are "not proportional to share."  Tr. 1277:17-1278:19 (Hill).  Market shares only indicate the amount of wins a publisher has—they do not reflect how often a publisher serves as the competitive, runner-up constraint in actual acquisitions, and the idea that diversion is proportional to share is just an assumption.  Tr. 1687:18-1688:3, 1691:7-10, 1692:11-1693:20, 1694:8-18 (Hill).  Indeed, as Dr. Hill admitted, PRH and S&S could have the same market shares they do now, and yet *never* compete against each other.  Tr. 1689:23-1690:12 (Hill).  While, of course, real-world data shows that the merging parties do compete against each other in a limited set of auctions each year, this shows the limitations of the inferences that can be made based on market shares alone.

190.    The testimonial evidence from industry participants confirms that PRH and S&S are rarely the top two bidders for a book.  As S&S CEO Jon Karp testified, PRH and S&S are the final competitors for a book only a "small fraction" of the time.  Tr. 497:21-25.

191.    Even more compelling is the experience of literary agents, the only industry players with a view into all the bidders for a particular book.  Tr. 1707:8-16 (Hill).  And not one agent witness testified that PRH and S&S appeared as first-and-second bidder regularly in their business.  Even the government's own witness, Ayesha Pande, admitted that PRH and S&S were the final two bidders for *none* of the eight books she has sold for over $250,000 since 2018.  Tr. 301:6-8, 301:20-23 (Pande (Ayesha Pande Literary)); DX-263 (Pande deals sheet).  As a result,

if PRH and S&S had been merged, nothing about those eight deals would have been different—including the advance levels.  Tr. 308:13-16 (Pande (Ayesha Pande Literary)).

192.    Agent Elyse Cheney of The Cheney Agency testified that between 2018 and 2019, 28 out of her 44 books sold for $250,000 or more.  Tr. 2045:6-13; PX-749 (Elyse Cheney deals sheet).  Of those 28 deals, only eight were sold through auction.  Tr. 2045:11-13, 2052:5-10; PX-749 (Cheney deals sheet).  Out of those eight, five were won by either PRH or S&S.  Tr. 2050:14-22.  But out of those five, none—with the possible exception of one that Ms. Cheney could not fully remember—involved PRH and S&S as the final two bidders in the auction.  Tr. 2050:23-2051:12 (Cheney).

193.    Similarly, literary agent Andrew Wylie of The Wylie Agency testified that he does not think PRH and S&S have ever finished first and second in an acquisition process for a book his agency was selling.  Tr. 2088:17-22.  In fact, since 2018, Wylie has not sold any book in which both PRH and S&S submitted a bid for the book.  Tr. 2088:5-8; PX-856 (Wylie deals sheet).

194.    Literary agent Gail Ross of Ross Yoon Agency has sold just one book since 2018 for which PRH and S&S were the top two bidders.  Tr. 2124:11-17;  PX-838 at 5 (Ross deals sheet).

195.    Other evidence showed that PRH and S&S frequently lose books for over $250,000 to other Big Five publishers.  Tr. 533:09-534:23, 536:8-18 (Karp (S&S)) (S&S lost books that sold for over $250,000 to Macmillan and Hachette, including books by Jamie Foxx and Ben Carson); Tr. 506:11-25 (Karp (S&S) (S&S has lost "plenty of books" to HarperCollins, including seven-figure deals).  Other large publishers have many imprints to which agents can submit books.  Tr. 1797:7-15 (Walsh).  Competition is fierce among all the imprints, and S&S

and PRH imprints are not more fiercely competitive against each other than they are against imprints at other publishing companies, like Hachette or HarperCollins.  Tr. 1820:4-15 (Walsh). Further, when PRH or S&S bid, 90 percent of the time, one of the other three Big Five members also bids.  Tr. 2665:2-5 (Snyder).

196.    For example, Ms. McIntosh, CEO of PRH U.S., testified that PRH's children's book divisions see much more competition from HarperCollins and Scholastic than they do from S&S.  Tr. 2298:9-13.  Ms. McIntosh also testified that S&S is not a competitor against PRH in the Christian book market.  Instead, PRH's main competitors for Christian books are HarperCollins, Hachette, and non-Big Five publishers like Tyndale, Baker, and B&H.  Tr. 2301:2-12.

197.    The government introduced summaries and anecdotal evidence showing approximately 33 instances in which PRH and S&S finished first and runner up.  Tr. 416:24-448:11 (Karp (S&S)), PX-932-B through PX-958-B (Rule 1006 summaries created by Porro). But of course there will be times when S&S is runner up to PRH, which, after all, acquires the most books—that is what it means to be the largest publisher.  But those few anecdotal instances do not trump the overwhelming data showing that PRH and S&S in fact rarely are the first and second place bidders in book acquisitions.  Additionally, several of the summary exhibits include best bid auctions, *see* PX-0933-B, PX-0942-B, PX-0949-B, where the specific publisher finishing as the runner up does not actually serve as the competitive constraint, Tr. 2702:6-2703:5 (Snyder).

### H.    Internal Imprint Competition Significantly Broadens The Competitive Landscape

198.    Competition among imprints within the same publishing company is common in the industry.  Hachette allows its imprints to compete so long as there is one outside bidder

remaining in an auction.  Tr. 225:6-9 (Pietsch (Hachette)).  There is evidence that Macmillan

also allows its imprints to compete against each other in auctions.  PX-938-B (showing bids from

multiple Macmillan imprints).

199.    For decades, Random House and then PRH, too, have allowed their imprints

across divisions to bid separately for books, so long as one bidder from another publishing

company remains in the auction.  Tr. 839:1-10 (Dohle (PRH)); Tr. 297:18-23 (Pande (Ayesha

Pande Literary)); Tr. 2331:21-25,  2338:4-13 (McIntos(PRH)) (Q. "[H]ow long has this internal

bidding being going on?"  A. "At Random House, which is the part of the company that I came

from, it's gone on for as long as I have been aware of bidding.  It's a long, longstanding practice

within Random House."  Q. "And then when the Penguin company merged with Random House,

was Penguin then allowed as a publishing group to compete against the other divisions?"  A.

"Yeah, they adopted what had been the Random House approach.").

200.    For example, when Penguin and Random House merged in 2013, both companies

had their own children's division.  After the merger, the two children's divisions continued to

operate separately and to bid against each other in auctions.  Tr. 2331:7-20 (McIntosh (PRH)).

201.    Agents repeatedly testified that when they decide to whom they will submit a

book for sale, they think in terms of individual editors and their imprints, not in terms of

publishing houses.  Accordingly, when agents opt to submit a book widely to multiple potential

acquirers, they often submit to multiple editors and imprints within the same publishing house.

Tr. 1750:13-17 (Walsh); Tr. 2130:1-3 (Ross (Ross Yoon Agency)) ("I think of everything in

terms of editors and imprints and not—not Big 4 or Big 5"); Tr. 2051:17-2052:4 (Cheney (The

Cheney Agency)) (Q.  "In your experience, do you include PRH and Simon & Schuster in every

acquisition format?"  A.  "No."  Q.  "Why not?"  A.  "Really, first, again, just—I don't think of it

as PRH and Simon & Schuster.  I think per imprint, and for particular books, you know, I'm

going to try to find the imprint that's going to be best suited for—and the editors best suited for

the material."); Tr. 3-4:5-8 (Pande (Ayesha Pande Literary)) (testifying about book proposal

submitted to five different PRH imprints).

202.    There are hundreds of editors and imprints for an agent to choose from.  Tr.

1750:18-23 (Walsh).

203.    Although each PRH division has its own approach to how its imprints manage

communication with agents, it is still common for different imprints within a single division to

bid for the same book.  Tr. 2332:1-19 (McIntosh (PRH)).  There is no system in place within

PRH by which an editor alerts other editors at the company that she has received a particular

submission or intends to make a bid.  Tr. 2337:11-2338:3 (McIntosh (PRH)).  As a result, PRH

editors view some of their colleagues at other PRH imprints as their fiercest competitors for the

acquisition of books.  Tr. 771:3-10 (Dohle (PRH)).

204.    PRH and other publishers encourage internal competition because they believe

that it is good for business.  Mr. Dohle explained that the policy facilitates the "perfect match"

between author and editor, which hopefully translates to more sales of the book.  Tr. 839:11-

840:4 (the "essence of publishing . . . is that every book idea finds the most passionate editor

with the largest vision for the book.  And the largest vision for the book, the biggest passion for

the book, has a high correlation to the advance . . . the editor wants to pay for the book.  And

with that, hopefully, also in more sales.").

205.    When asked why PRH maintains this policy even though it might result in

different editors within the company bidding each other up, causing the company to pay more,

Ms. McIntosh explained that while "that could happen, the value in having these very diversified

opinions expressed about the value of a book is—I think it increases our chance of getting it right."  Tr. 2338:14-19.

206.    The policy also helps publishing companies win more books.  Tr. 2339:3-4 (McIntosh (PRH)) (Q. "Do you think it helps the company win more books?" A. "I think so."). As Mr. Pietsch, Hachette's CEO, explained:  "We want our publishers to be competitive, and in some cases that includes being competitive with each other.  That causes them to move faster and work harder and have better chances of winning the book."  Tr. 227:6-15.

207.    These policies align with Nobel-prize winning economists' matching theory, which posits that price alone is not outcome-determinative.  As Professor Snyder testified, matching theory is consistent with how publishing companies are organized:  "That's what the idea of the hybrid organization, combining firm-wide capabilities with entrepreneurial efforts at the imprint level, is all about.  It's a way to empower editors to be creative, to be entrepreneurial; and that is in the interest of the publisher because it increases the likelihood that they will—that there will be a match and they'll eventually win the contract"  Tr. 2643:22-2645:1, 2696:18-2697:4 (Snyder) ("It's in the interest of publishers, many publishers, to use imprints, to delegate to them, encourage them to compete to find authors and match with authors and win contracts . . . . they're not constrained in most acquisition processes.  That—specifically, they're not constrained at all in one-on-one negotiations, in preempts, in best bids or hybrids.").  Dr. Hill admits that imprint competition can be profit-maximizing.  Tr. 1719:4-16 (Hill) (Q. "But in its simplest forms, you would agree with me that the current structure at Penguin Random House of allowing its imprints to compete with each other may be profit maximizing; correct?"  A. "Yes, could be.").

208.    Consistent with those goals, Ms. McIntosh, CEO of PRH U.S., testified that if multiple editors come to her for approval to bid on a book, all seeking approval for a different bid amount, she will approve all three levels without telling each editor that she approved a different—and maybe higher—amount for another editor.  She does this because "if one of them is seeing it much more aggressively . . . that more aggressive number is likely to be reflected onto the market too.  So I'm not going to do anything to pull that number down because I want us to win the book."  Tr. 2240:9-24.

209.    Although both Hachette and PRH allow imprint competition only when there is an outside bidder, that restriction is rarely relevant, for various reasons.  For one, it does not apply at all to best bids, a very common acquisition format.  Tr. 1765:5-18 (Walsh).  In addition, agents have plenty of outside options, and even in rounds auctions they can always avoid the rule by calling for best bids before the last outside bidder drops out.  Agent Gail Ross testified that she has only *once*, in 36 years, had to notify a PRH imprint that no external bidder remained in the contest, in part because she can always call for best bids.  Tr. 2131:12-2132:13; *see* Tr. 1765:10-12 (Walsh) ("if the agent feels like they might be losing their external bidder, they might just go to best bids as a way of ending the auction").  An agent can avoid the rule even when the last outside bidder is lower than competing internal imprints, simply by keeping the outside bidder in a final best bids round.  One agent's written rules for a particular auction made this approach explicit:  "If in any round all of the top bidders are in the same corporation, then I will include the next highest bidder."  DX-440.

210.    PRH's post-merger policy will go even further, allowing PRH and S&S to compete regardless of whether an outside bidder remains in an auction.  Tr. 768:23-769:6 (Dohle (PRH)).  The aim is to keep PRH and S&S "as external and independent as possible."  Tr.

771:24-25 (Dohle (PRH)).  The commitment to preserve S&S as an independent bidder may not be legally binding, but PRH also cannot simply renege on the promise.  Dohle testified that, based on his decades of experience, once a publisher commits something to authors and agents, it is "practically" impossible to take it away without "damag[ing]" the publisher's important relationship with authors and agents, and therefore, damaging its business.  Tr. 873:18-874:10.  Ms. Walsh, with decades of experience as an agent, agreed.  Tr. 1822:9-19.

211.    But even if PRH were to go back on its promise to treat S&S as an external bidder—which the evidence shows is highly unlikely—there is no evidence that PRH would abandon its decades-long business practice of allowing the combined company's imprints to compete against each other as they do now, in best bids and in rounds auctions, until there is no external bidder, and the agents would still have the same tools at their disposal to achieve the best results for their clients.  Tr. 1822:20-1823:6 (Walsh).

212.    Because of the internal competition policies at PRH, it is very rare that PRH imprints communicate with one another about an auction, which, as noted (*supra* FF ¶ 163), make up less than half of the total acquisitions.  Tr. 1608:23-1609:3; 1609:19-1610:3 (Hill).  When it does happen, it is usually because a highly motivated imprint is looking for information to help it win the book.  Tr. 2339:23-2340:20 (McIntosh (PRH)).  It might also come up if an agent approaches one of PRH's publishers about a PRH author moving to another imprint within PRH.  While PRH has no policy against such a move, the current publisher should be aware of the situation to ensure that any option clauses in the author's contract have been exercised, and to share any extenuating circumstances.  Tr. 2342:9-24 (McIntosh (PRH)).  Ms. McIntosh testified that these instances of internal communications generally result in the bids going to the *highest* common denominator, not the lowest.  Tr. 2342:25-2343:12.

213.    Ms. McIntosh further testified that while she encourages competition among the imprints at the different divisions, since she became CEO, she has sought to reduce the use of especially "sharp elbows" within the company.  In particular, she has sought to encourage the different division heads to work towards what is best for their division, but also to share expertise and acknowledge that PRH is one company working together to achieve the best results.  She also testified that, in response to some acquisitions in which agents improperly manipulated PRH imprints into bidding against each other with no external bidder participating, she has occasionally encouraged division heads to communicate to avoid such embarrassing scenarios.  Tr. 2343:13-2345:1.  In her role as President of Strategic Development, Nina Von Moltke serves as Ms. McIntosh's "right hand" in all sorts of situations—including occasionally facilitating communication among imprints in the rare circumstances where such communication is warranted.  Tr. 2340:21-2341:23.  Contrary to the government's suggestion, Ms. Von Moltke was not hired to coordinate all internal bidding, which would defeat any benefits the company gains from internal competition.  *See supra* FF ¶¶ 204-07.  And again, Ms. McIntosh testified that "in practice, my experience has been that even with the top level of the company working together more collaboratively and even with those occasional consultations, I think it has not translated to any kind of lowering impact on the advances that we have paid.  In fact, the opposite."  Tr. 2345:2-7.

I.    **The Evidence Does Not Show That Advances Will Be Substantially Reduced Through A "Softening" Of Competition**

214.    The government at trial argued, for the first time, that eliminating S&S from the market would cause a general "softening" of competition market-wide.  The government alleged that this softening would cause all publishers—not just the merging parties—to reduce their bids over time in all acquisitions.  As between the merging parties, Dr. Hill speculated that PRH and

S&S editors will be able to "bid less aggressively" without losing books, even in bilateral negotiations and best bids, because the number of potential, unknown competitors will be reduced by one.  Tr. 1270:6-12 (Hill).  He further speculated that there could be a "second order" softening in which other publishers in the alleged market also may lower their bids for the same reason.  Tr. 1723:15-19, 3182:23-3183:12 (Hill)

215.    But Dr. Hill admits that his models only measure harm where PRH and S&S are the first and second-place bidders in multi-round auctions.  Tr. 1584:24-1585:2, 1585:10-20 (Hill).  His second-score auction ("SSA") model does not actually measure any first-order "softening" where PRH and S&S are not the first and second-place bidders, and neither his SSA model nor his GUPPI calculation examines one-on-one bilateral negotiations.  Tr. 1620:16-1621:4, 1626:22-1627:20 (Hill) (admitting he did not analyze whether the SSA could be applied to processes other than second-score auctions); Tr. 1736:16-23 (Q. "But you do not have a GUPPI for the bilateral negotiation context; correct? A. Correct.").  He also admits he did not model or quantify any second-order softening effect to predict what other publishers might do post-merger.  Tr. 1723:20-1724:4, 3183:13-21 (Hill).  Nor is Dr. Hill an expert on publishing industry bargaining processes.  Tr. 1554:12-21 (Court).  He accordingly was not qualified to opine on whether and how the elimination of one potential competitor would affect editor responses in blind bidding formats, including bilateral negotiations and best bids.  The government thus adduced no competent evidence establishing even the existence of a competitive response to the elimination of one relatively small competitor, much less establishing that the speculative softening effect would likely create a substantial lessening of competition.

216.    Dr. Hill recognized that the elimination of one competitor could reduce advances in blind acquisition formats only to the extent editors consciously recognize and account for absence of the former competitor in calculating their offers.  Editors would need to "take account of the fact that competition has been lessened" and then decide to "to be less aggressive" in bidding  Tr. 1728:18-1729:1 (Hill).  Each editor's response in a given acquisition thus depends on her subjective "perception of current competition" with the merged company pre-merger.  Tr. 3192:12-24 (Hill) ("Post merger they are going to perceive that there's less competition facing them, so they will bid less aggressively."); Tr. 3183:25-3184:5 (Hill) ("It's in the best bids [and] the negotiations, you have that weakening in anticipation. I frequently compete with this person, I don't think they are competing with me anymore, so I'm going to bid less aggressively.").

217.    Although Dr. Hill thus recognized that any "softening" effect from a merger of depends on how rivals both perceive and respond to the effect of eliminating of one competitor with a ten percent market share, he did not proffer a model to analyze that reaction, though he acknowledged that models are available to do so.  Tr. 3182:22-3183:3-6 (Hill).  Dr. Hill also proffered no real-world mechanism by which editors could learn from prior acquisitions how much they could safely reduce bids without losing books to the remaining competitors with 90 percent market shares.  Tr. 2680:9-22 (Snyder) (Dr. Hill offers "no explanation of how this would actually work").  The closest he came was speculating that firms would hire a "management consultant" to help them decide if, when, and how much to lower their bids—an idea that no one in the industry ever discussed existing or being contemplated.  Tr. 1594:20-1595:4 (Hill).

218.    Dr. Hill's "management consultant" suggestion illustrates the importance of industry expertise in establishing the existence and effect of any market response to the

elimination of a single competitor.  Dr. Hill lacks such expertise.  He nevertheless drew a halting comparison to the beer industry to explain how softening would occur.  Tr. 3195:21-3196:16, 3197:2-23 (Hill).  But bargaining to acquire books in the publishing industry differs in material ways that make comparisons to such commodity industries inapt.  As Professor Snyder observed, this "is a very different market from the electronic vehicle market, where you're setting prices and you're getting a variable response in terms of quantity demanded."  Tr. 2677:15-21.

219.    Unlike beer and electronic vehicles, every book that publishers acquire is wholly unique and subject to widely varying, individualized valuations.  *See supra* FF ¶ 104.  And unlike commodity transactions, bargaining for books is largely conducted without knowing who else is bidding or the amounts of their bids.  *See supra* FF ¶ 106.  These twin factors mean that acquisition processes give editors little information about their competition that they can use to inform their offers in the next blind bidding process for a completely different book—whether in a bilateral negotiation or a best bid format, which collectively constitute the overwhelming majority of book acquisition processes.  *See supra* FF ¶ 107; Tr. 1608:23-1609:3, 1609:19-1610:3 (Hill).

220.    To the extent Dr. Hill focused only on the possibility that PRH or S&S *themselves* would reduce offers in blind bidding formats because their editors perceive a reduced competitive threat, he acknowledged that this more limited form of softening requires each editor to revise her offers based on an understanding of how often she has encountered and lost to the other party.  Tr. 1268:9-21 (Hill) ("If Penguin Random House never lost to Simon & Schuster, then in these best bid settings it may say post-merger: We never lost to these guys anyway, so we're not going to change our behavior.  If Penguin and Random House always lost to Simon & Schuster, they could say post-merger:  This is great.  The competition has softened significantly.

And then somewhere in between is the middle ground where they competed sometimes, but not always.  And so you may soften—feel competition softened.  How much it softened depends on how often you compete with the other party.").  The data show that PRH lost to S&S and vice versa in only about 12 percent of all acquisitions, according to Dr. Hill (if it is assumed that all acquisitions are auctions with an identifiable runner up), and about 6-7% of acquisitions, according to Professor Snyder when taking into account the actual variety of acquisition formats, including bilateral negotiations.  *See supra* FF ¶ 187.  In all other acquisitions, another publisher won the book or was runner up ahead of the other merging party.  *See supra* FF ¶ 187.  There is no evidence that any editor at either publisher is aware of that figure, but the testimony of industry participants uniformly recognized that PRH and S&S are rarely first and second place bidders.  *See supra* FF ¶¶ 190-94.  And the diversion ratios that Dr. Hill referenced, which are unknown to editors in the ordinary course of business, also don't tell editors the extent of competition between the parties in the overall market because they do not show the frequency with which books are acquired in situations where PRH and S&S are actually the first and second place bidders.

221.    Dr. Hill did not and could not show how, given that data, editors would know how to safely reduce their offers without losing books to other rivals. As Professor Snyder testified, "the problem is, they have so many rivals there, it would not make sense as an across-the-board pricing strategy.  It would result in mistakes where you do [have] loss of business."  Tr. 2671:22-2672:25.  Dr. Hill speculated, for example, S&S editors, knowing they would no longer be outbid by PRH, would on average reduce their offers by about 11.5 percent in all acquisition processes, including bilateral negotiations and best bids.  Tr. 1312:7-15 (Hill).  But he has no analysis demonstrating that if S&S editors imposed such a reduction, the lower bid would still

exceed offers made by (best bids) or potentially available from (negotiations) HarperCollins, Hachette, Macmillan, Norton, or any of the other publishers that acquire books in the government's alleged submarket.  And "from an editor's point of view within PRH or S&S, post-merger, they're running into Macmillan and Hachette and HarperCollins with very high frequency."  Tr. 2682:21-24 (Snyder); DX-436.  Dr. Hill has only a "general intuition about the tradeoff" between reducing offers and losing books, as Professor Snyder testified, and it is "really hard to implement . . . . Well, there's less competition out there, and therefore I will reduce my bid when the competitive conditions vary so much across situations. And you really don't know when you should. You're going to be wrong most of the time, and you can't learn from what the outcomes are."  Tr. 2674:15-2675:15 (Snyder); Tr. 2672:11-18 (Snyder) ("But the most important thing for me is, how—it's completely unclear how Dr. Hill imagines this cascading starts when, from the point of view of PRH and S&S, they're only hitting each other 12 percent of the time. And the same analysis applies to anybody else. If you cut your advances and the competitive conditions for harm aren't met, meaning you're not—you don't actually have a lessening of competition, then you can be making a mistake.").

222.    Further, the costs of miscalculating how much advances can be shaved without losing the books are not like the consequences a brewery faces when it raises beer prices briefly to test consumer reactions.  Every time an editor miscalculates and loses a book by even the smallest margin, the book is gone forever, and the author may be as well.  "It would result in mistakes where you do [have] loss of business."  Tr. 2671:22-2672:25 (Snyder);  Tr. 2673:23-2674:3 (Snyder) ("It doesn't make sense to cut your advances if you're going to lose business.").  The stakes for editors in losing such business by miscalculating their offers would be especially high because, by the government's own account, these books and authors are the most attractive

in the entire industry.  And, softening advances would create opportunity for new entrants and smaller publishers—who already compete for high-advance books, *see supra* FF ¶¶ 164-80—to step in and win books.

223.    Publishers recognize these risks and uniformly testified that they did not expect to be lowering their offers after the merger.  Tr. 1873:5-16 (Bergstrom (S&S)) (Q. " Do you understand that there's an allegation in this case that if this merger of Penguin Random House and Simon & Schuster goes through, publishers like yourself will be able to identify a group of authors called anticipated top sellers and target them to reduce their advances? Do you understand that?" A. "Yes, I do." Q. "What is your view of that?" A. "My view is I struggle to identify what those top sellers are. And even if I could, I can't—no agent or author would want to work with me if they knew that I couldn't compete, so it would hurt my business."); Tr. 1088:3-7 (Weisberg (Macmillan)); ██████████████████████ DX-422 (Glusman (Norton) Dep.) 134:18-23.

224.    Dr. Hill's speculation that S&S, PRH, and other editors in the industry would perceive and respond to reduced competition in blind bidding by substantially reducing their offers for the most sought-after books, secure in the knowledge they would not be lost to aggressive rivals, is unsupported by data, trial testimony, or common sense.

**J.      The 2013 Merger Of Random House With Penguin Did Not Cause A Reduction In Author Advances**

225.    In 2013, Random House merged with Penguin.  The rationale for that merger was the same as the rationale for the merger of PRH and S&S:  Random House believed that it could deliver synergies by bringing its superior supply chain and distribution capabilities to the sale of Penguin books.  Tr. 818:23-819:6 (Dohle (PRH)).

226.    To economists, the 2013 merger of Random House and Penguin is highly relevant to the evaluation of the merger of PRH and S&S because it represents a "natural experiment." The effects the 2013 merger had on output and advances is highly predictive of what effects the instant merger will have on output and advances.  Tr. 2638:25-2639:14 (Snyder).

227.    The 2013 merger of Penguin and Random House did not result in reduced advances.  Tr. 218:6-8; 237:6-8; 237:9-12 (Pietsch (Hachette)); 2841:4-8 (Snyder).

228.    In fact, in the period coinciding with the merger of Random House and Penguin, publishers competed even more fiercely, setting off a "frenzy" to acquire books.  DX-188.0001; Tr. 503:8-504:5 (Karp (S&S)) (testifying that "around 2013," HarperCollins "made a strategic decision to increase their market share by bidding aggressively"); DX-422 (Glusman (Norton) Dep.) at 131:9-19.

229.    Advances industry-wide actually *increased*, despite an anxiety in the industry that advances would decrease, because other publishers had to bid *more* to compete with the combined Penguin and Random House, which was itself paying more in advances.  Tr. 2347:24-2348:1 (McIntosh (PRH)) (Q. "And after the Penguin Random House merger, did you observe any impact on advances paid by your company?"  A. "Yes.  They went up."); DX-435.0007 (showing annual advance commitments increasing since 2015, driven by higher advance levels); Tr. 1824:13-20 (Walsh); DX-422 (Glusman (Norton) Dep.) 133:7-9, 133:11-23; Tr. 2137:10-15 (Ross (Ross Yoon Agency)).  Professor Snyder's analysis of the 2013 merger also demonstrated that the average advances above $250,000 increased or stayed consistent after the merger.  Tr. 2839:13-25; DX-385 (PRH average advances committed per title 2010-2021).

230.    Professor Snyder's analysis confirmed that, when examining buckets of advance size, from $250,000 to $500,000, $500,000 to $1,000,000, and $1,000,000 to $2,000,000,

average advances *increased* or stayed flat from the pre-2013 period (2010-2012) to the post-2013 period (2014-2016).  Tr. 2838:16-2841:8 (Snyder).

231.    Nor did the 2013 merger result in a reduction in titles published by the newly combined company.  Tr. 820:15-19 (Dohle (PRH)); Tr. 2345:8-14 (McIntosh (PRH)) (title reduction "was not because of the merger").

232.    Rather, after the merger, PRH reduced the number of lower-advance titles it published due to market forces unrelated to the merger.  Readers of genre fiction—especially romance and science fiction—switched to purchasing e-books and self-published titles, which were available at lower price points than traditionally published mass-market paperbacks.  As a result, in 2014 and 2015, retailers began stocking fewer mass-market books.  Some of PRH's imprints were over-indexed in the declining mass-market format, and they had to adjust to the shift in market demand.  Tr. 820:20-822:2 (Dohle (PRH)).  As Ms. McIntosh testified, she decreased Penguin's publication of mass-market paperback format books in the genre fiction space after assessing that Penguin had been trying to "muscle their way through the fact that there were market changes," by continuing to acquire and publish these types of books without any marketing investments and with old-fashioned covers, and even though retailers were returning most of the books.  She determined that, "while I would be happy to keep publishing those books, I couldn't keep publishing them if there was no one who wanted to buy them."  So-called "mass market" fiction books typically receive very low advances.  Tr. 2345:17-2346:18.

233.    In the years following the 2013 merger, PRH also lost some very significant authors who commanded very large advances—like Nora Roberts and Harlan Coben—to rival publishers.  Tr. 2295:10-19, 2348:2-16, 2351:3-5 (McIntosh (PRH)).  These authors continued to be highly successful with other publishers.  Tr. 1099:9-1100:18 (Weisberg (Macmillan)) (Nora

Roberts moved from PRH to Macmillan; ███████████████████████████

███████████████████████████████████████).

234.    The decline in demand for mass-market paperback books, and the resulting reduction in publication of those books, was an industry-wide phenomenon not limited to PRH or connected to the 2013 merger.  Tr. 218:18-219:8 (Pietsch (Hachette)) (testifying that he observed a reduction in PRH's title count after the 2013 merger, and agreeing that at the same time a trend in the industry caused some publishers to "cut[] back on their mass-market publishing").

235.    Ms. McIntosh testified that her strategy with respect to genre fiction after the previous merger worked:  Within a couple of years, the repositioning of Penguin's imprints has resulted in "much more contemporary-feeling" romance books and a steady increase in title counts.  Tr. 2346:19-2347:6; 2347:14-23 (testifying that Berkeley (PRH imprint) "has become very successful . . . they invest more per book.  They pay higher advances.  They actually work to support authors in the market.  And these covers . . . are more aligned with kind of what might appeal to current consumers.  And the sales and profit results have been fantastic.").  Professor Snyder's analysis of the 2013 merger likewise demonstrates that output of titles acquired for $250,000 or more increased by 13 percent in the three years following that merger.  Tr. 2838:25-2839:12 (Snyder).

236.    When Dr. Hill analyzed the 2013 merger's effect on advances, he compared average advances for books above and below the $250,000 threshold before and after the 2013 merger and estimated a drop in average advances above $250,000, both in absolute terms and compared to advances below $250,000, but he did not analyze whether the mass market decline, and reduction in output of books at the lowest advance levels, affected the validity of his

calculations, nor did he examine the impact of the unevenness in high advance contracts during these time periods on the average advances.  Tr. 3187:16-3189:19 (Hill); Tr. 2839:15-25 (Snyder); *see also* DX-385 (showing higher variability of average advances in higher advance contracts).

237.    In fact, Professor Snyder demonstrated that Dr. Hill's approaches to analyzing the 2013 merger omitted two key facts.  First, that if one were to exclude the so-called "mass market" fiction books with advances below $50,000, Dr. Hill's "difference in difference" analysis comparing books with advances below $250,000 with books with advances above $250,000 and below $4,000,000 in the three years before and after the merger the results were statistically insignificant.  Tr. 2876:9-2879:13 (Snyder).

238.    Second, Professor Snyder found that Dr. Hill's average advance calculations pre- and post-2013 were heavily affected by the presence or absence of a few extremely high advance contracts in both time periods.  Professor Snyder's analysis confirmed that average advances rose post-merger for advances in the $250,000 to $500,000, $500,000 to $1,000,000, and $1,000,000 to $2,000,000 ranges.  Tr. 2838:16-2841:8 (Snyder).  It was only when looking at advances above $2 million, and in particular above $4 million, that the average advance data become noisy due to small numbers and the timing of large contracts with repeat authors.  *Id.*; *see* Tr. 2348:2-16 (McIntosh (PRH)) ("[V]ariability can be caused by the highest level advances that we pay. There are some of our highest paid authors.  We don't negotiate a new contract every year.  We could have a contract that has many years['] worth of books on a single contract. And so depending on the year in which that contract is established, that could impact our average. Our averages can also, of course, be impacted . . . if we lose a franchise author.  I have already described a couple who we lost to our competitors or in a happier circumstance when we woo

away from a competitor a new franchise author and make an investment in them."); DX-439 (table showing significant variability in annual author contracts from 2019 to 2021).

239.    Dr. Hill did not analyze whether the mass market decline affected the validity of his calculations.  Tr. 3188:6-14 (Hill).  He did not even calculate whether the number of book contracts increased or decreased after the merger.  Tr. 3185:16-18 (Hill).  He admitted, though, that such trends might have affected his conclusions.  Tr. 3188:24-3189:19 (Hill).  He further admitted that his analysis did not show that the effects he calculated were caused by the merger—just that they occurred after the merger.  Tr. 3188:1-2 (Hill).

**K.    The Government's Economic Models Did Not Prove A Likelihood Of Substantial Harm To Competition**

240.    Consistent with the unilateral effects claim asserted by the government, Dr. Hill analyzed the potential for harm through an economic model focused only on auctions in which the merging parties are the first and runner-up bidders.  Tr. 1299:20-23, 1301:15-23, 1302:21-1303:6, 1584:24-1585:2, 1585:10-23, 3163:17-23 (Hill).

241.    To model such harm, Dr. Hill principally used the SSA model.  The SSA model, by design, will *always* show some harm when any two competitors merge.  Tr. 1629:1-5 (Hill); Tr. 2810:25-2811:19 (Snyder).  Consistent with its function, Dr. Hill admits that the harm estimated by his SSA model is "more directional than . . . entirely precise."  Tr. 1654:5-9 (Hill). He estimated authors would see their advances reduced by 4 percent for authors contracting with PRH and 11.5 percent for S&S authors, for an overall average of about 6.1 percent, but admitted that the overall harm could be as low as 3 percent.  Tr. 1654:14-1655:13 (Hill); Tr. 2802:24-2803:15 (Snyder).  Although the model was designed specifically to examine round-robin style auctions, Hill applied his projections to all acquisitions won by either PRH or S&S.  Tr. 1298:16-19, 1586:10-14, 1597:11-13.  The overall reduction projected by applying the model's results

across all formats is approximately $29.3 million in annual reduced advances for PRH and S&S authors.  Tr. 2802:24-2803:15 (Snyder).

242.    The evidence revealed a variety of problems with the SSA model.

       1.    *The SSA Does Not Reflect Most Real-World Acquisitions*

243.    Dr. Hill selected the SSA model not because it was a sound fit for the publishing industry or is typically used to model the bilateral negotiations and best bid formats that dominate bargaining in the industry.  To the contrary, Dr. Hill testified that a bilateral negotiation model would have been his first choice, but he could not build one that generated meaningful results.  Tr. 1618:5-21.  He also tried a best bid model, but lacked the information necessary for that model.  Tr. 1322:19-1324:1 (Hill); Tr. 1633:5-14 (Hill) (Q. "You did look at the first score auction model and rejected it, correct?" A. "I tried a number of first price auctions and rejected them."  Q "So were you just looking at auction models?" A. "No, I also looked at negotiations. As I said, I tried to build a model that included all of the mechanisms in one grand model and it—sadly, for my chances of winning the Nobel prize, I failed in that endeavor.").

244.    Dr. Hill instead used the SSA model because, unlike models more appropriate to real-world bargaining conditions, the SSA model was "easy to solve."  Tr. 1322:19-1324:1 (Hill) (explaining he used SSA because "it's very easy to solve" and though it is "not guaranteed" to give the "same predictions as best bid auctions or other formats," Hill lacked information needed to run other models for this industry); Tr. 1611:20-1612:15 (Hill) (THE COURT:  "So your choice of model depended in part on what the results were and if they just looked right to you?" THE WITNESS:  "It depended on whether I could get a model I could solve.").

245.    Dr. Hill admitted that the SSA model was designed to examine round-robin style auctions, not bilateral negotiations or best bids.  Tr. 1616:17-19, 1605:21-24, 1627:13-20 (Hill). He also admitted that as far as he is aware, no other economist has ever applied an SSA model to

make predictions about the effect of a merger on bargaining outcomes in best bids and bilateral negotiations.  Tr. 1620:16-1621:4 (Hill).

246.    As Professor Snyder explained, the SSA "is in this setting a wrong fit for the industry," because it fails to account for agents' roles in acquisitions, publishers' responses to competition, and the diversity of acquisition formats.  Tr. 2632:21-2633:19 (Snyder); Tr. 2634:12-22 (Snyder) ("I don't find that the SSA model in this context offers any value in terms of the fundamental economic analysis.").  In particular, Professor Snyder emphasized, "the model presumes an acquisition format, rounds to completion, that so-called round-robin format, that agents rarely choose."  Tr. 2632:21-2633:19 (Snyder).

247.    Indeed, the vast majority of books are not sold to publishers through the round-robin auctions that Dr. Hill modeled.  Dr. Hill himself estimates that only about 20 percent of all acquisitions use rounds auction formats, much less round-robins—the rest are bilateral negotiations or best bids.  Tr. 1608:23-1609:3, 1609:19-1610:3 (Hill).  Professor Snyder estimated that multi-bidder acquisitions that finish as a round robin comprise "probably less than 10 percent" of all acquisitions.  Tr. 2658:19-2659:9 (Snyder).  Other witnesses testified similarly from practical experience.  Tr. 475:10-476:10 (Karp (S&S)) (testifying that the majority of S&S acquisitions are not acquired via auction); Tr. 2088:13-16 (Wylie (The Wylie Agency)) (Q. "The Wylie Agency, some 20 agents or so, including yourself, your testimony is that the firm does not conduct auctions in transacting book sales to publishers?"  A. "Correct."); Tr. 2292:10-13 (McIntosh (PRH)) (Q. "In your experience, do agents have a preference for round-robin auctions?"  A. "I know that round-robin auctions have been declining in—in popularity, and that's driven by the agents."); Tr. 1767:2-9 (Walsh) (testifying that most of her colleagues use best bids or better-best, not round robins).

248.     The rarity of rounds or round-robin auctions shows authors generally do not perceive that such formats generate results that are in their best interest.  If such processes typically maximized author interests, they would be a widespread form of acquisition, not the least common.  Although a process where multiple publishers "bid up" the advance might at first seem favorable to authors, the evidence made clear why authors and agents generally do not favor this format.  Tr. 2056:8-25 (Cheney (The Cheney Agency)) (idea that auctions will compel higher end prices is "kind of a myth" when it comes to publishing); Tr. 1758:14-1759:6 (Walsh).

249.     In a multi-round auction, the auction may end before the bidding reaches the amount the winning publisher would have paid.  Tr. 2291:12-2292:9 (McIntosh (PRH)) (round robin auctions do not necessarily result in publishers paying more because "in a round robin auction, you can start low and feel your way up"); Tr. 1759:1-6 (Walsh) ("If they come to the auction and I have a lot of people that are bidding low and slow, they might feel they don't have to go anywhere near what the original preemptive number was.").  By contrast, in the increasingly common best bid format, the publisher does not know any other bid amounts and likely will have only one chance to win the book.  Tr. 477:25-479:08 (Karp (S&S)); Tr. 1757:18-25, 1762:10-1763:1 (Walsh); Tr. 2702:3-2703:5 (Snyder).  The publisher accordingly must bid an amount at or near its maximum bid (hence the term "best bid").  Tr. 1763:2-6 (Walsh) (Q. "Is it true that the more bidders the agent has participating in a best-bids process, the higher the advance will be?" A. "It's actually not true."); Tr. 2292:3-21 (McIntosh (PRH)) ("I think that in best-bid situations, those are the situations where we often end up overpaying . . . .").  Similarly, in a bilateral negotiation, the publisher does not know what other publishers are willing to pay, so it must again ultimately offer at or near its maximum amount to "keep it off the marketplace," as Weisberg put it.  Tr. 1122:23-1123:11 (Weisberg (Macmillan)); Tr. 1758:14-1759:6 (Walsh).

250.    For these reasons, as agent Elyse Cheney explained, "there's a misapprehension that the primary determinant of the value of the project is competitive auctions or competitive bidding."  Tr. 2053:20-23 (Cheney (Cheney Agency)).  In Cheney's experience, publishers tend to "prefer auctions because it's a much safer route for them," but other negotiation formats are better for authors.  Tr. 2056:8-11 (Cheney (Cheney Agency)).  Among the 28 books that agent Elyse Cheney sold for $250,000 between 2018-2021, 20 of those books were sold through a manner other than a multi-bidder auction.  Tr. 2052:5-10 (Cheney (Cheney Agency)).

251.    The majority of books are sold through one-on-one bilateral negotiations with just one editor.  Tr. 2124:24-2125:5 (Ross (Ross Yoon Agency)) (more than 60 percent direct negotiations, not auctions); Tr. 2088:13-16 (Wylie (The Wylie Agency)); Tr. 1963:20-23 (Kim (PRH)) (80 percent of PRH's Putnam imprint acquisitions via bilateral negotiation); Tr. 1609:8-13 (Hill) (Q. "I think we're in agreement in essence, which is that the majority of the acquisitions are not auctions, they're bilateral negotiations?" THE COURT: "The majority are. They're 60 percent." THE WITNESS: "Yeah, I would say somewhere around 50 to 60 percent will be negotiation.").

252.    There are various reasons agents usually choose to submit to and negotiate exclusively with one editor rather than solicit bids from multiple editors.  PX-2007 (Fletcher (Fletcher & Company) Dep.) at 155:21-156:17.  Among other reasons, agents pursue bilateral negotiations because authors have long-term objectives—including financial objectives—beyond the immediate maximization of a one-off advance.  For example, literary agent Gail Ross explained that there is a "huge, huge advantage" to authors publishing their first and second books with the same publisher, because when the second book is published, the first book gets a new round of promotion.  Tr. 2126:3-9.  Established authors likewise tend to stay with same

editors or imprints that enabled their career success, Tr. 1748:24-1749:9 (Walsh), as illustrated

by the Putnam imprint's experience, Tr. 1963:20-23 (Kim (PRH)).

253.    Similarly, agents often pursue bilateral negotiations with a single editor because

the editor and author have made a particular connection that will produce the best possible book,

facilitate a long-term lucrative partnership, or both.  As author Charles Duhigg explained: "The

biggest issue is:  Do I like this editor?  Do I think this editor is going to elevate my work and

help me write a great book?  Because if I write a great book, it doesn't matter how big the

advance is.  I'm going to sell a lot of books.  And that's where the money is going to come

from."  Tr. 1917:22-1918:10; Tr. 1956:7-10 (Duhigg) ("And so I'm not going to ask for a huge

amount of money because it means the next time I come, they're going to say:  Look, it's just too

big a risk.  We can't do this again.  We've lost too much money on you."); *see* Tr. 2293:17-

2294:1 (McIntosh (PRH)) ("[I]t's a very close working relationship between an author or –

publisher and the editor.  So there's a personal connection but even more than that, there is a

desire to continue to work and reap the benefits of the investments we've already made in that

career.")

254.    Agent Elyse Cheney similarly testified "I could give you example after example"

of where the wrong editor ruined a book project.  Tr. 2063:18-25.  In one case, she chose the

highest-bidding publisher and "then, literally, I had to work every single day for the next three

years in order to help make that project right.  And we took—and it just never was right, and it

was incredibly frustrating because they just didn't understand how to do this particular kind of

book."  Tr. 2063:25-2064:4.  As a result, "the book ended up selling a pittance compared to the

advance, like—and that's not good for the authors."  Tr. 2064:6-8; *see* Tr. 2063:5-14 (Cheney

(The Cheney Agency)) (her authors "want to work with the best people" because "they have a

story to tell, and they're trying to make meaning of something.  And the editor who can help

them bring—make the richest, most robust project, that means the world to them.  It's huge.  It's

like—and then how that editor then communicates—and that editor is sort of like the orchestra

leader.").

255.    "Top-selling" authors might not even bother to shop their books around to

multiple publishers, preferring instead to accept preempts or continue publishing with their

current publisher.  Tr. 322:12-20, 324:11-18, 326:8-11 (King) (testifying that he accepted an

offer from Scribner without talking to other publishers, and has not tested the market for his

books with other publishers).  Duhigg sold his first book through a preempt to Andy Ward at

Random House based on the recommendation of his agent, Tr. 1913:21-1914:17 (Duhigg), and

sold his second book to the same editor at Random House without soliciting any offers from

other publishers.  Tr. 1924:4-23 (Duhigg).

256.    Agents ultimately are looking not just for the maximum one-off advance amount,

but to get the "best deal" for their clients, which includes maximizing their *long*-term financial

benefit.  In Elyse Cheney's words:  "I think we should define what the best deal for my client

means.  In my mind, the promise that we make to authors is we're going to try to help you find

the widest audience possible for your books.  So in order to do that, that may mean going with

the publisher who has the highest bid, but it might also mean going with the publisher who has

the most experience in that kind of project, and that—the imprint, and—and the editor who has

the most experience and success rate for that kind of project."  Tr. 2053:7-15.  Andrew Wylie

agreed:  "The strongest financial terms offered do not compose, necessarily, the best offer, in my

view, because you also have to consider the editor who would be working with the author and

the context from which the book would—would come; what else the publisher is publishing, and

the strengths or weaknesses of the—of the publishing house." Tr. 2089:15-22.  So did Charles
Duhigg: "When I wrote this book, it was not to get the advance.  It was to write a great book that
would hopefully sell millions of copies, because that's where the real money comes from: It
comes from selling a lot of books.  And then there's all these other things that appear.  Right?
You can give speeches.  You sell foreign rights. You sell your—the IP to companies that take it
and do things with it. So no. I had hoped to earn much more than the advance."  Tr. 1916:22-
1917:15; Tr. 1772:24-1773:7 (Walsh) ("[T]here is a pie that is the book.  The advance is one—
the North American advance is one—is one wedge of that pie.  If we picked an editor that the
collaboration is very successful, the book will be better as a result.  It will sell more; so royalties.
But also internationally, it will sell more in more territories . . . as well as potentially more likely
to get a . . . film or TV deal.  So that's the full pie.").

2.    _Dr. Hill Used Flawed Inputs In The SSA_

257.    Not only do Dr. Hill's analyses fail to reflect the real competitive conditions in
the publishing industry, they incorporate significant input flaws that further underscore their lack
of connection to the real world, and the inapplicability of the SSA model, and which results in an
overstatement of the alleged harm.

258.    _Margin Inputs._  In Dr. Hill's first report, he used inconsistent inputs to calculate
the parties' profit margins:  he included ongoing operating expenses for PRH, which reduced
PRH's profit margin, but excluded them for S&S.  Professor Snyder pointed out the inconsistent
treatment and he recalibrated the SSA model by using profit margins that included ongoing
operating expenses for both PRH and S&S, Tr. 2801:1-18 (Snyder), resulting in a 30 percent
reduction in alleged harm.  Tr. 2802:16-2804:23 (Snyder).

259.    In response, Dr. Hill chose to use profit margins that _excluded_ operating expenses
for both merging parties in his reply report, Tr. 2801:19-22 (Snyder), although he admitted that

this approach to calculating margins was likewise inaccurate, Tr. 1645:8-18 (Hill) ("The truth here is somewhere in between . . . the figure in my initial report, which is conservative, and the figure in my reply report is aggressive . . . so somewhere in between there is what I think is the truth.").

260.     Exclusion of operating expenses is not consistent with how publishers operate. Operating expenses are a key component of the book-level P&Ls that publishers build to inform their bids for books.  Tr. 2801:23-2802:7 (Snyder).  Professor Snyder explained that in this context, including operating expenses to determine profit margins is appropriate because PRH operates through about 100 different imprints, and when "you have a hundred different entrepreneurial creative . . . operations, you better make sure that they are bidding in a way that allows PRH as a whole to recover operating expenses."  Tr. 2936:10-2937:5 (Snyder).  If no advances were calibrated to recover some operating expenses, the company could not cover its costs.  That is why the book-level P&Ls incorporate operating expenses into the advance recommendation.  Tr. 3025:7-3026:23 (Snyder); Tr. 2253:25-2254:17 (McIntosh (PRH)) (describing line item for fixed costs in book-level P&L); Tr. 570:12-571:14 (Karp (S&S)) (describing line item for operating income margin after fixed expenses, and testifying that S&S always wants the operating income margin to be positive and in the double digits); Tr. 3029:20-3030:14 (Snyder) ("I believe the practice here for both companies leads you to when you're selecting margins to include margins that reflect the importance of capturing these ongoing operating expenses.").  Professor Snyder recalculated Dr. Hill's results for the SSA by including operating expenses for both PRH and S&S.  Tr. 2801:15-17 (Snyder).

261.     Dr. Hill admitted that by excluding operating costs to calculate higher profit margins, his calculations suggested more harm from the merger.  Tr. 1305:24-1306:3 (Hill) ("So

a higher variable profit margin leads to greater variation in bids or is associated with greater variation in bids and leads to more harm. And smaller margins means more tightly clustered bids and it means less harm"); Tr. 1309:10-16 (Hill) ("But the general point I was just trying to make here is just that when there's higher profit margins, there's generally going to be more harm."). Merely by correcting that input to include ongoing operating costs in the determination of the profit margins for both firms, the estimated harm under Dr. Hill's SSA would decrease from 6.1 percent to 4.3 percent for the combined firm, with a commensurate reduction in the $29.3 million dollars in estimated annual harm.  Tr. 2802:16-2804:23 (Snyder).

262.     Equally important, Dr. Hill's initial approach to calculating profit margins (including ongoing operating costs for PRH, but excluding them for S&S) is the only way in which he could get the actual and predicted margins to acceptably match in the SSA model— which he and Professor Snyder agree is a key test of the reliability of the model according to its creator. Tr. 1646:12-14, 1647:3-8 (Hill); Tr. 2633:20-2634:8; 2802:1-7 (Snyder).  It was only by taking this inconsistent approach to ongoing operating expenses that Dr. Hill could get the actual and predicted margins to come within five percent of each other for both companies.  Tr. 2805:15-2806:9 (Snyder).  As Professor Snyder explained, when Dr. Hill treated margins consistently by excluding operating expenses from PRH and S&S's margins, "the predictions versus actuals diverge greatly."  Tr. 2805:24-2806:5 (Snyder).  "[T]he model is predicting an S&S margin that is 50 percent higher than its actual margin, and the lower, the second row, is predicting a 33 percent lower margin for PRH compared to actual."  Tr. 2806:2-5 (Snyder).  And "what this failure of the reliability test means is that the results [of the model] are not reliable."  Tr. 2806:7-9 (Snyder).

263.     Dr. Hill's variable approach to ongoing operating expenses in his initial and reply reports highlights an aspect of the SSA model obscured by his testimony.  The SSA model (and the GUPPI calculations) do not demand a particular type of margin to function.  The article proposing the SSA model discusses marginal costs, but only because "it is a dominant strategy for the suppliers to submit offers at marginal cost."  Nathan H. Miller, *Modeling the Effects of Mergers in Procurement*, 37 INT'L J. OF INDUS. ORG. 201, 203 (2014).  It does not require the use of marginal costs when they are not actually the relevant costs.  On the basis of what margins are identified, the SSA model then infers differences in bids from the profit margins, because that margin is the difference between the maximum a firm is willing to bid, and the value it actually pays.  Thus, as Professor Snyder stated, for the profit margin to be a meaningful input into the analysis, it *must* represent the actual way firms determine their maximum bid, which is why it is proper to look at whether and how ongoing operating costs are treated in the acquisition P&Ls that help guide the bidding process.  Tr. 2936:10-18 (Snyder).

264.     Notably, the SSA model *did not* "reject" Dr. Hill's PRH margins when he chose to include ongoing operating expenses in the PRH margin in his initial report.  The model simply accepts the margins given as a measure of the maximum willingness to pay.  The crucial issue for the reliability of the model is that the actual margins input into the model must match the margins the model predicts for each entity.  And whether operating expenses are included (as Dr. Snyder testified should be included, given how advances are estimated in acquisition P&Ls by including fixed cost contributions) or excluded (as Dr. Hill chose to do after his inconsistent approach was criticized), the actual and predicted margins are not sufficiently close to be reliable here.

265.     Ultimately, both of Dr. Hill's SSA model attempts fail.  His first attempt fails because of the inconsistent treatment of the margin inputs, and the second attempt fails because even after adjusting the margin inputs, the model failed the reliability test established by the model's developer.  Tr. 2633:20-2634:11 (Snyder).

266.     _Market Shares and Runner-Up, Win-Loss, and Editorial Minutes Data as a Check._  The next input error involves the data used to identify how often PRH and S&S were the top two bidders in the modeled auctions—an essential factor in the SSA analysis.  Dr. Hill relied on the parties' market shares for all acquisition formats combined (rather than seeking to derive market shares related to auctions, much less round robin auctions) for this input, notwithstanding the fact that the record evidence demonstrates that these overall market shares overstate the degree of winner and runner-up competition between PRH and S&S.  _See supra_ FF ¶ 187.  Dr. Hill did so based in part on his belief that market shares are a conservative measure based on "diversions" from two other data sources that failed to even show who the winner and runners up were in various acquisition processes, and thus shed no light on the actual amount of head to head competition between the parties.  Tr. 1283:6-21 (Hill) (admitting that win loss data does not show who was runner up or "second closest bidder"); Tr. 1712:20-23 (Hill) (same); Tr. 1696:13-1697:3 (Hill) (admitting that editorial minutes do not show who was runner up); Tr. 1698:18-1699:7 (Hill) (same).  Two of Dr. Hill's key data sources were notes from publishing company editorial meetings, and win-loss data from publishing companies.  Yet he admitted that both sources identify only which publisher won a given auction and provide no information about the runner-up; he merely assumed that either PRH or S&S was the runner up if the other firm won.  As for editorial minutes:  "Q.  And could you actually tell from looking at the editorial minutes who was number one and number two?"  A. "No."  Tr. 1696:19-1697:3 (Hill); _see_ Tr. 1699:1-7

(Hill) ("Q.  "But in each of these specific cases, you couldn't tell for the book that was the subject of the minutes you reviewed who was actually one and two?"  A.  "That's correct.").  And for win-loss data:  "In the win-loss data, we know that Penguin Random House records that it lost and Simon & Schuster won.  But we don't necessarily know that Penguin Random House was the second closest bidder; we just know they competed."  Tr. 1283:6-21 (Hill).  While Dr. Hill also relied on runner-up data, those data were limited to just the acquisitions that the merging parties won for more than $500,000, thereby providing an inaccurate picture of real-world competition in the government's alleged $250,000+ market.  Tr. 1284:11-14 (Hill).  The runner-up data also do not compare how frequently the two encounter each other in the marketplace overall.  Tr. 1283:23-1284:3 (Hill) (explaining that runner up data focused on books won by the parties).

267.    The data on which Professor Snyder relies—collected from literary agencies—are superior because they provide insight into not only the winning bids for transactions across the marketplace, but also the runner-up bids and the full set of acquisition formats used to sell books to publishing companies.  Tr. 2654:6-15, 2656:15-20 (Snyder).  When diversion ratios are measured using Professor Snyder's superior agency data, it becomes clear just how much Dr. Hill's diversion ratios—which rely on his flawed data inputs—overestimate diversion.  *See* DX-436 (using agency data to show most frequent runners-up when PRH or S&S win contracts for over $250,000).

3.      *The SSA Model Does Not Account For Imprint Competition*

268.    Because Dr. Hill's SSA analysis relies on market shares, it incorrectly assumes that every pre-merger acquisition involves every publisher—the Big Five plus the other non-Big Five publishers.  And it likewise incorrectly assumes that every post-merger acquisition will involve one fewer competitors.  That's not the competitive reality.  As Professor Snyder

explained, in the SSA model, "the merger reduces the number of bidders by one in every case." Tr. 3036:11-12 (Snyder). That's [i]n contrast to the real world—call that big number N. In the real world, agents pick and engage a smaller number. Call it P. And whether there's a reduction depends on the circumstances following the merger. And even if there is, the agent can go to others to replace that bidder. Tr. 3036:13-18 (Snyder).

269.    Furthermore, as everyone agrees, the majority of book acquisitions involve bilateral negotiations—which Dr. Hill failed to model at all. Tr: 1611:2-12  (Hill); 1736:16-23 (Hill); *see also supra* FF ¶ 163.  And, even among the subset of books acquired in some auction format, as already shown, Dr. Hill is extremely over-inclusive in assuming that every auction involves every publisher with a represented market share.  But he is also grossly under-inclusive in assuming that *only* five (then four) publishers are available as competitive options for any given acquisition.  In fact, because agents can separately invite publishers' internal imprints to compete independently for acquisitions, there are more than one hundred competitive options available to agents for any given acquisition. *See supra* FF ¶¶ 198-202.  And the merger will not eliminate any of the that imprint-level competition at all.  Dr. Hill's model thus errs fundamentally in analyzing competition only at the market share level.

4.    *Dr. Hill's GUPPI Calculations Are Marred By The Same Errors As The SSA*

270.    In response to Professor Snyder's criticisms of the fit of Dr. Hill's second score auction model, Dr. Hill employed a GUPPI calculation in an attempt to confirm the results of the SSA model.  As an initial matter, the GUPPI is not a confirmation device; it is a "screening device" that is "used at the outset" to determine whether a merger should be further scrutinized. Tr. 2636:6 (Snyder).  More significantly, though, "[i]t's got the same problems with lack of fit to the industry.  It's got the same problems with respect to inputs.  It also cannot account for agent

behavior.  There's no competitor response."  Tr. 2635:23-2636:18 (Snyder).  As Dr. Hill admitted, GUPPIs are not equilibrium models, which take into account the actions of rivals post-merger.  Tr. 3164:23-25 (Hill) (Q.  "And the GUPPI models don't assume any competitive response, correct?"  A.  "That's correct.").  Nor did Dr. Hill create a GUPPI calculation for books acquired through bilateral negotiations.  Tr. 1736:16-23 (Hill) (Q. "But you do not have a GUPPI for the bilateral negotiation context; correct?" A. "Correct.").  And because Dr. Hill did not determine the prevalence of particular acquisition formats in the industry, he was unable to use his format-specific GUPPI results to actually calculate industry-wide price effects akin to what he attempted to do with the SSA model.  Tr. 3165:16-3166:20 (Hill) (Q.  "And you have not performed any calculation that amalgamates the results of the individual GUPPIs, right?"  A. "Correct. . . ."  Q.  "And you didn't provide any framework for combining those three results?"  A.  "That's fair.").

271.    Both the SSA model and the GUPPI calculation, by design, will *always* show some harm when any two rival publishers merge.  Tr. 1629:1-5 (Hill); Tr. 2810:25-2811:19 (Snyder).  Consistent with that design, Dr. Hill admits that the harm estimated by his SSA model is "more directional than . . . entirely precise."  Tr. 1654:5-9 (Hill).  He estimated the downward pricing pressure to be approximately 4 percent for PRH and 11.5 percent for S&S, but admitted that the overall harm could be as low as 3 percent.  Tr. 1654:14-1655:13 (Hill); Tr. 2802:24-2803:15 (Snyder) (Hill's average reduction in author compensation is 6.1 percent, which corresponds to $29.3 million in annual harm).

272.    As Dr. Hill testified, he relied on the same flawed inputs for his GUPPI calculation as his SSA model.  Tr. 1318:2-13 (Q.  "How do these inputs compare to the second score auction models?"  A. "So they're the same.  In the second score auction model, we used

market shares to estimate diversion.  In GUPPI, we can—we also have a diversion estimate. And then both models take the variable profit margin.").  For example, the margins he inserted in his GUPPI calculations used the same inconsistent approach to operating expenses that he used in his initial report—including ongoing operating expenses for PRH and excluding them for S&S.  Tr. 1643:5-23 (Hill).  Likewise, he used diversions according to overall market share for all acquisition formats for each of his specific GUPPI calculations.  Tr. 1318:8-24 (Hill). However, when the GUPPI calculations are corrected using Professor Snyder's inputs, *see supra* FF ¶¶ 260, 267, they suggest harm of less than five percent for both multi-round and single round/hybrid formats, as Dr. Hill admitted.  Tr. 3107:7-12 (Hill).  The figures fall within the GUPPI "safe harbor," which is designed to acknowledge that even though the GUPPI always predicts harm, mitigating market conditions—like ease of entry and expansion—may make that harm prediction inaccurate.  Tr. 1629:6-25, 3109:14-23 (Hill); Tr. 2813:24-2814:10 (Snyder).

## IV.   COORDINATED EFFECTS

273.   Although the government alleges the merger will facilitate coordination among the remaining Big Five publishers, Compl. ¶¶ 52-53, the evidence demonstrated that the market is not conducive to coordination.

274.   Dr. Hill admitted that he did not study the likelihood of increased coordination post-merger, is not aware of any current coordination in the industry, and did not quantify any price impact from purported coordination.  Tr. 1733:4-15 (Hill).  Instead, Dr. Hill speculates that coordination may be more likely because some publishing companies were previously found liable for participating in a conspiracy orchestrated by Apple to raise downstream retail prices of e-books.  But Dr. Hill acknowledges that case found collusion in "a different market."  Tr. 1329:4-1330:20 (Hill).  Moreover, Random House was not alleged to have been involved in the conspiracy orchestrated by Apple.  Tr. 774:14-775:3 (Dohle (PRH)).

275.   In particular, this market is characterized by "one-off acquisition processes with many dimensions that are not observable by other rivals," which means there is no ability to "detect and monitor" rivals' adherence to the agreed-upon behavior.  Tr. 2638:2-21 (Snyder).  It is not enough that the identity of the winner is eventually known, based on public announcements or publication of the book, because the deals are so complex.  As Professor Snyder testified, even an agreement to pay advances on a different schedule is not a workable "coordination mechanism," because "that just tells you the intervals over which time advances will be paid out.  It doesn't tell you how much."  Tr. 2880:14-2881:11 (Snyder).

276.   Michael Pietsch (CEO of Hachette), who opposes the merger, admitted that the merger will not change Hachette's bidding strategy for books going forward—Hachette editors will bid as much as they think a book is worth and do not intend to coordinate pricing.  Tr. 211:9-13; 217:7-11; 217:21-24; 237:23-238:5 (Pietsch); *see also* PX-2002 (Stehlik (HarperCollins) Dep.) at 135:24-136:2, 136:4-7, 136:9 (Q. "And if the Simon & Schuster/Penguin Random House merger goes through, do you believe it will be any more likely that Morrow Group will coordinate or discuss author advances with other publishers?" A. "No.");

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

### A.    Books Are Non-Homogeneous And Subjectively-Valued

277.   Because books are non-homogenous, publishers cannot send or receive price signals based purely on the advance level paid for a book.  Dr. Hill agreed that "greater transparency typically makes coordination[] easier because it aids in the monitoring and punishment."  Tr. 1329:22-25 (Hill).  But the publishing industry is "one of the most opaque

industries in terms of acquisition processes to understand why did somebody win, why did somebody lose." Tr. 2881:5-7 (Snyder).  Given the complexity of book deal terms and the "multiplicity of dimensions" in deals, signaling to and coordinating on terms with rival publishers would be ineffective and unlikely.  Tr. 2881:2-25 (Snyder).  Given the subjective and individualized valuation of books and the lack of information available about bidders' identities and offer amounts, it is impossible to send and receive pricing signals from one acquisition to the next.  *See supra* FF ¶¶ 104-07.

278.    Estimates of potential sales in the P&L are just that: estimates.  Editors are "very rarely spot on with those estimations," and tend to skew in a "really wide range."  Tr. 918:1-6, 967:22-24 (Tart (PRH)) ("Q.  And as you discussed with the Judge, you don't usually get it right, right?  A.  Correct, it's really a guess.").  Although the expected sales are informed by "comp" titles used in the P&L, that number is an "educated guess."  Tr. 1971:15-25 (Kim (PRH)).

### B.    Publishers Compete Over Non-Price Terms

279.    Agents negotiate with publishers over terms beyond the advance amount, including payout structure, territorial rights, royalty rates, division of revenue for second serial rights, and other non-price terms.  Tr. 2091:10-13 (Wylie (Wylie Agency)); ██████████ ██████████ 66:1-2; PX-2007 (Fletcher (Fletcher & Company) Dep.) at 66:4-5, 66:8.

280.    Authors also often choose publishers based on non-price factors like their connection with the editor.  *See supra* FF ¶ 253.

281.    Professor Snyder testified that the "potential for coordination on these [non-price] dimensions seems to me to be zero, because there are too many dimensions on which to compete. . . . And it's all about is there an effective mechanism that actually results in a bottom line reduction in competition."  Tr. 2881:12-25.

### C. New Publishers Can Easily Enter The Market

282.    As set forth in Part III.B., *supra*, barriers to entry are low, meaning new entry and expansion into the market is easy.

### D. The Merger Will Not Facilitate No-Poaching Agreements

283.    Nor will the merger facilitate agreements among publishers not to poach authors from each other.  Dr. Hill did not even offer an opinion that the merger will facilitate no-poach agreements.  Tr. 1733:23-25 (Hill).

284.    And as Professor Snyder testified, it is simply unrealistic to expect publishing companies to act against their own interests by refusing to explore opportunities to publish authors published by other companies.  Tr. 3016:5-3018:1 (Snyder).  In any case, a no-poach agreement among the remaining Big Five publishers would be ineffective in the face of non-Big Five publishers' track record of winning authors from Big Five publishers.  *See supra* FF ¶¶ 170, 171, 178.

### E. Downstream Competition Reduces Any Incentive To Coordinate Upstream

285.    As set forth above in Part III.C., *supra*, it is uncontested that publishers compete fiercely downstream to sell books to consumers.  This downstream competition drives publishers' revenue, and reduces incentives to coordinate upstream, which would constrain their abilities to compete in that downstream market.

## PROPOSED CONCLUSIONS OF LAW

1.      Section 7 of the Clayton Act prohibits a merger only "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.  This standard requires the government to "show that the proposed merger is *likely* to *substantially* lessen competition."  *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019)  (first emphasis added).  The government also must prove that substantial harm is "imminent."  *United States v. Marine Bancorp*, 418 U.S. 602, 623 n.22 (1974); *see FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 290 (D.D.C. 2020).

2.      The government asserts that § 7 does not require it to prove that a merger is "likely" to cause substantial harm to competition, only that harm "may" occur.  Tr. 31:23-32:4 ("The standard here is what may occur, not what is likely to happen.").  The law in the D.C. Circuit and elsewhere has been to the contrary for more than 30 years.  *See AT&T*, 916 F.3d at 1032; *FTC v. H.J. Heinz*, 246 F.3d 708, 719 n.17 (D.C. Cir. 2001); *United States v. Baker Hughes*, 908 F.2d  981, 985, 991 (D.C. Cir. 1990); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 65 (D.D.C. 2015); *FTC v. Arch Coal*, 329 F. Supp. 2d 109, 115 (D.D.C. 2004); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1109 (N.D. Cal. 2004).  Congress used the term "may" in the statute not to establish a standard lower than "likely" harm, but simply "to indicate that its concern was with probabilities, not certainties," *Heinz*, 246 F.3d at 713 (quoting *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 323 (1962)).  The government's effort to apply a lower standard to this merger is baseless.

3.      The difference between the D.C. Circuit standard and the government's standard is not just semantics—it is the difference between a concrete, fact-based projection of substantial harm and speculation about the possibility of some harm.  By eliminating one market competitor,

almost any merger in theory *could* diminish competition in some way.  And it is easy enough for the government to speculate that a change in the number of competitors might lead to some "softening" of overall competition that might reduce prices by some unknown amount.  But "§ 7 deals in 'probabilities,' not 'ephemeral possibilities.'" *Marine Bancorp*, 418 U.S. at 622-23 (quoting *Brown Shoe*, 370 U.S. at 323).  For this reason, "antitrust theory and speculation cannot trump facts" and merger challenges "must be resolved on the basis of the record evidence relating to the market and its probable future," *Arch Coal*, 329 F. Supp. 2d at 116-17, not on the basis of what *might* or *could* occur.

4.      In a merger challenge, "the ultimate burden of persuasion . . . remains with the government at all times." *Heinz*, 246 F.3d at 715 (quoting *Baker Hughes*, 908 F.2d at 983).  The government must prove "every element" of a § 7 claim, and "a failure of proof in any respect will mean the transaction should not be enjoined." *Arch Coal*, 329 F. Supp. 2d at 116.

5.      A three-step proof structure applies.  First, the government must prove that the "transaction will lead to undue concentration in the market for a particular product in a particular geographic area." *Baker Hughes*, 908 F.2d at 982.  This stage itself includes multiple subsidiary steps.  To show undue concentration in a relevant market, the government "bears the initial burden of (1) defining the appropriate product market, (2) defining the appropriate geographic market, and (3) showing that the merger will lead to undue concentration in the relevant product and geographic market." *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 197 (D.D.C. 2018).

6.      If the government satisfies those elements, it gives rise to "a presumption that the transaction will substantially lessen competition." *Arch Coal*, 329 F. Supp. 2d at 129; *see also Baker Hughes*, 908 F.2d at 982.  The statistical presumption imposes on defendants only a burden to produce evidence showing that market shares alone do not adequately capture the

market's competitive conditions. *Baker Hughes*, 908 F.2d at 991. "[B]ecause the burden of persuasion ultimately lies with the plaintiff, the burden to rebut must not be 'unduly onerous.'" *United States v. Anthem, Inc.*, 855 F.3d 345, 349-50 (D.C. Cir. 2017) (quoting *Baker Hughes*, 908 F.2d at 991); *see Baker Hughes*, 908 F.2d at 981, 989-92 (describing evolution of law away from presumptions and structural analysis toward focus on real-world facts and economic analysis).

7.      If defendants surmount the low bar of showing that market-share statistics alone do not prove likely harm to competition, the presumption drops out, and the government must produce "additional evidence of anticompetitive effect" sufficient to carry its burden of persuasion, which again "'remains with the government at all times.'" *Heinz*, 246 F.3d at 715 (quoting *Baker Hughes*, 908 F.2d at 983).

## I.    THE GOVERNMENT DID NOT CARRY ITS BURDEN OF ESTABLISHING A WELL-DEFINED SUBMARKET

8.      The government "bears the burden of proof and persuasion in defining the relevant market." *RAG-Stiftung*, 436 F. Supp. 3d at 291 (quoting *Arch Coal*, 329 F. Supp. 2d at 119). The relevant market is the "area of effective competition" where the defendants operate. *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957) (quoting *Standard Oil Co. of Cal. v. U.S.*, 337 U.S. 293, 299 n.5 (1949)). "Defining the relevant market is a necessary predicate to finding a Clayton Act violation because the proposed merger must be one which will substantially lessen competition within the area of effective competition.'" *RAG-Stiftung*, 436 F. Supp. 3d at 291 (quotation omitted). "Without a well-defined relevant market, a merger's effect on competition cannot be evaluated," *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054 (8th Cir. 1999), because the market definition "dictates the analysis of market power and the merger's anticompetitive effects," *RAG-Stiftung*, 436 F. Supp. 3d at 291; *see FTC v.*

*Freeman Hosp.*, 69 F.3d 260, 268 (3d Cir. 1995).  The government's failure to properly define a market by itself compels rejection of a merger challenge.  *See*, *e.g.*, *RAG-Stiftung*, 436 F. Supp. 3d at 292; *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 557 (E.D. Pa. 2020); *Oracle*, 331 F. Supp. 2d at 1109; *United States v. SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172, 182-83 (D.D.C. 2001); *United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 137-140 (E.D.N.Y. 1997).

9.      The principal "area of effective competition" between PRH and S&S (at least upstream) is the market for the acquisition of *all* U.S. trade books, which indisputably is a "well-defined market" for antitrust purposes.  FF ¶ 30.  But while the government initially claimed that a merger between PRH and S&S would substantially harm competition in that market, it abandoned that claim by the time of trial.  FF ¶ 30.

10.      The government instead focused on a "submarket" within the broader market.  The law recognizes that within a broader market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."  *Brown Shoe*, 370 U.S. at 325.

11.      The government intended its submarket to capture only "anticipated top selling books," and it picked an advance threshold of $250,000 to define that submarket for purposes of identifying market shares and proving competitive harm.  FF ¶ 31.  The government does not claim mathematical precision in that amount, but neither does it disclaim the need for line-drawing altogether:  Dr. Hill opined only that "a *small* change away from [$]250,000" does not make a "significant" difference in his market definition analysis.  Tr. (Hill) 1233:17-20 (emphasis added).

12.      To the extent the government means to define its submarket by price alone, the proposed market fails—a submarket cannot be defined solely on the basis of price differences

among otherwise comparable products.  *See Brown Shoe*, 370 U.S. at 326 ("It would be unrealistic to accept Brown's contention that, for example, men's shoes selling below $8.99 are in a different product market from those selling above $9.00."); *Oracle*, 331 F. Supp. 2d at 1158 (rejecting government effort to define market as "any sale in excess of $500,000"); *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) (price and quality distinctions "are economically meaningless where the differences are actually a *spectrum* of price and quality differences"), *aff'd*, 895 F.2d 1417 (9th Cir. 1990); *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007); *Crestron Elecs. Inc. v. Cyber Sound & Sec. Inc.*, 2012 WL 426282, at *5-*6 (D.N.J. Feb. 9, 2012); *United States v. Joseph Schlitz Brewing Co.*, 253 F. Supp. 129, 145 (N.D. Cal. 1966).  As these precedents indicate, price matters only to the extent it reflects *substantive differences among products* that cause consumers to treat otherwise similar products differently within their different price categories. In other words, to establish a submarket defined by a price divide, the government must prove that "products across that divide do not compete with each other," *Crestron*, 2012 WL 426282, at *6, in accordance with all the usual factors applied to identify product interchangeability.

13.     The government now seems to agree that a submarket cannot be defined by price alone.  Its theory now is that books that yield advances of at least $250,000 generally comprise a *qualitatively different* category of books than books acquired for lower advances.  As the government argued during closing, industry participants describe the "high end" books encompassed by its market as those by "franchise authors, key authors, giant celebrities."  Tr. 3233:17-19 (closing).  According to the government, these "[a]nticipated top selling authors are often authors of successful books in the past.  They've appeared on best seller lists often.  They have a successful track record.  They may be recognized with past awards or have notoriety from

their social media endeavors." Tr. 3241:10-14 (closing).[2]  The government contrasts the high

end of "anticipated top selling books" with "midlist authors and midlist titles," which differ from

"those at the high end that have a different set of competitive conditions."  Tr. 3233:20-24; *see*

Tr. 3173:2-3  (Hill) (describing "market for 50 to 250" as "mid-tier market"; Tr. 3172:17-22

(Court) (referring to "another relevant market of mid-selling books between 50 and 250").

14.     The government's market definition theory is similar to the theory rejected by

Judge Vaughn Walker in *Oracle*.  In that case, the government tried to define a market "limited

to so-called high function [software]" sold by certain vendors, which was supposed to exclude

"mid-market software" and other potentially competitive software solutions.  331 F. Supp. 2d at

1158.  According to the government's expert economist, "high function" software included "any

sale in excess of $500,000."  *Id.*  That price threshold, however, swept in many products the

market was supposed to exclude.  *Id.*  The court thus held that the expert's sales data was

"unreliable in establishing a distinct and articulable product market."  *Id.* at 1159.  In addition,

the court emphasized, the government's expert admitted that the proposed market had "no

'quantitative metric' that could be used to determine the distinction between a high function

product and a mid-market product"; instead, the expert simply "kept telling the court that there is

'something different' about the products sold" by certain vendors.  *Id.*  That vague assurance was

insufficient:  "[T]he court cannot delineate product boundaries in multi-billion dollar merger

---

[2] The government added during closing that such authors also can be identified "based on
the literary quality in their submissions."  Tr. 3241:15-17.  To the extent the government means
to suggest that new authors who are *not* franchise, celebrity, or prize-winning authors can be
readily identified based on their submission, the government cites no testimony supporting that
proposition.  The government elsewhere in closing mentioned testimony from Andrew Wylie,
Tr. 3240:7-11, but Wylie specifically distinguished between an already-accomplished author like
Sally Rooney and an unknown author with an appealing debut submission, where there is
typically *not* consensus as to expected success or advance level, Tr. 2109:3-21.

suits based upon the mere notion that there is 'something different' about the merging products and all others, especially when that 'something different' cannot be expressed in terms to make a judgment of the court have meaning.  More is required."  *Id.*

15.     Much the same analysis applies here, as shown below.  First, the government's economist essentially asserts that there is "something different" about books acquired for advances of $250,000 or more, but industry participants in fact recognize no distinctions among books acquired for advances above and below that level.  *See infra* CL ¶ 21.  There are certainly differences among books, but the differences do not separate books into distinct price-defined market *categories*—they at most merely reflect the unexceptionable spectrum of price and quality that exists in any market of differentiated products.  Second, the $250,000 quantitative metric fails to distinguish between high-end books and mid-market books even by its own terms.  If, as the government contends, such books are distinguished from each other by how often the Big Five acquire, then the proper market boundary would be a $50,000 advance threshold, which is the threshold where the Big Five begin acquiring the clear majority of books.  *See infra* CL ¶ 31.  Third, as in *Oracle*, the government's quantitative metric sweeps in a vast number of "mid-tier" books that its market is supposed to exclude, thereby violating the "narrowest market" rule that governs the market definition analysis, *see infra* CL ¶ 34.

16.     In sum, just as the "sale in excess of $500,000" quantitative metric failed to establish a well-defined market in *Oracle*, the $250,000 advance threshold fails here as well, as the following sections demonstrate.

**A.     The Government's Alleged Submarket Does Not Reflect Industry Reality**

17.     The central issue in defining a product market is drawing a boundary where products outside the market cannot be reasonably substituted for products inside the market.  *See*

*Sysco*, 113 F. Supp. 3d at 25.  Courts generally use two tests to determine whether the government has established a well-defined market boundary.

18.     One test is the multifactor analysis of "practical indicia" identified in *Brown Shoe*, which seek to account for the "economic and commercial realities" of the industry.  *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998).  These factors reflect the core premise that "determination of the relevant market in the end is a matter of business reality . . . of how the market is perceived by those who strive for profit in it."  *Id.* (quotation omitted); *see Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 n.4 (D.C. Cir. 1986) ("we assume that economic actors usually have accurate perceptions of economic realities").  The factors include "industry or public recognition of the relevant market as a separate economic entity," the "peculiar characteristics and uses" of a product, "unique production facilities," "distinct customers," "distinct prices," "sensitivity to price changes," and "specialized vendors."  *United States v. H & R Block*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011).

19.     In addition to the qualitative *Brown Shoe* factors, courts also often consider a quantitative measure of product substitution known as the "hypothetical monopolist test" or "HMT."  *See Sysco*, 113 F. Supp. 3d at 33.  That test hypothesizes that there is only a single seller of all products in the alleged market, and asks whether that seller "could profitably raise prices on those products" without losing customers to substitute goods.  *Id.* at 33-34 (citing Guidelines § 4.1.2).

20.     Dr. Hill conceded that the HMT does not operate to draw any meaningful market-defining boundary in this case.  According to Dr. Hill, the HMT did not address whether books at different advance levels could be substitutes for each other.  FF ¶ 44.  He also admitted that the HMT could be used to define *any* price segment as its own submarket.  FF ¶ 44.  If the

HMT sufficed to define a submarket based solely on price, the government could wield the HMT to cherry-pick a submarket among otherwise identical products merely by identifying some price segment where there was enough concentration to claim a presumption of harm.  The HMT is supposed to distinguish *different* products, not facilitate an infinite set of price-segmented submarkets among the *same* products.  The HMT thus does not provide a sound legal basis for distinguishing books in the $250,000+ segment—or in any other segment—from books acquired in any other range of advances.

21.     The factors relevant here are the industry-reality *Brown Shoe* factors.  The evidence underlying those factors is largely undisputed.  Nobody in the industry uses the term "anticipated top sellers."  FF ¶¶ 87-92.  Not only is the phrase meaningless, there is no such substantive category either, certainly not as defined by a boundary anywhere around the $250,000 advance level.  *Id.*  No publishing company organizes itself, its imprints, or its personnel around the advance level paid to acquire books.  FF ¶ 47.  Nobody categorically distinguishes between books that receive advances of $250,000 or more and those that receive lower advances, whether in terms of editorial personnel, editing processes, negotiating tactics, printing services, distribution mechanisms, marketing support, or retailer placement.  FF ¶¶ 47-48.  No special imprints or divisions cater specially to books that yield advances of $250,000 or more.  FF ¶ 48.  The $250,000 advance level itself does not separate books or authors according to any special characteristics.  FF ¶¶ 75-86.  Internal management approval requirement and deal thresholds vary widely, and they are triggered by total *deal* amounts, not individual title amounts.  FF ¶¶ 93-102.  In all these respects, the record evidence "failed to demonstrate a consensus among the industry's players regarding the boundaries of the product market."  *Sysco*, 113 F. Supp. 3d at 33.

22.     The government asserts two main arguments in response.  Neither has merit.

**B.      The Unsurprising Correlation Between Advances And Expected Sales Does Not Establish A Distinct Submarket**

23.     The government's first argument is that a distinct submarket for anticipated top-sellers exists because author advances are generally correlated with sales expectations and, therefore, with expenditures on certain publishing services:



24.     Defendants do not deny the existence of a general, positive correlation for each of these metrics.  To be sure, it is not a perfect correlation along any of them, and correlation alone does not establish causation.  For example, with respect to marketing, the evidence showed that marketing commitments are not fixed in the contract in conjunction with the advance—marketing expenditures are always determined long after the acquisition (when the advance is determined), and the marketing and sales teams typically do not even know the amount of the advance.  FF ¶¶ 49-59.  And "glam" promises in the contract have no connection at all to advance levels or expected sales.  FF ¶ 63.

25.      But, much more important, the general correlation between advances and expected sales and certain publishing expenditures does not prove the existence of a *separate,*

*distinct submarket* for books at any point along the advance-level spectrum.  The correlation merely shows that books—like all differentiated products—are valued along a *continuum*.  As shown, however, market-defining criteria must do more than reflect a spectrum of price or value among otherwise comparable products in a market—they must establish a lack of substitutability between the products or otherwise identify a substantive distinction among the products recognized by real-world market participants.  *See supra* CL ¶ 12.

       **C.**      **The Government's Alleged "Targeted Sellers" Market Is Not Well Defined**

     26.    The government also asserts a "targeted sellers" or "price discrimination" submarket.  Some courts have recognized such markets where, for example, there is a distinctly identifiable group of "core consumers" whose "particular circumstances dictate that a product is the only realistic choice," or who "find a particular product uniquely attractive."  *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1039 (D.C. Cir. 2008) (opinion of Brown, J.).  As the *Sysco* court emphasized, this principle is "not without controversy," because taken to its logical extreme,  "price discrimination against a single customer might be used to justify blocking a merger."  113 F. Supp. 3d at 39 & n.20.  For that reason, it is essential to identify "limiting principles or factors" that allow the court "to distinguish a 'targeted' group of customers from customers in general."  *Id.* at 39 n.20.

     27.    The government invokes a version of the core customer principle here, asserting that the category of franchise, celebrity, and prize winning authors is both easily identifiable and vulnerable to targeted advance decreases because they have unique needs and preferences that only certain publishers can satisfy.  According to Dr. Hill, their books "are aimed at a broad market" and they "have more of a taste for strong distribution, strong marketing and a strong reputation."  Tr. 1231:13-15.  "And similarly, on the supply side . . . the number of publishers that regularly compete to purchase these books is different for authors of anticipated top sellers

than for other authors." Tr. 1231:16-19; Tr. 1232:5-8 (Hill) ("[I]f you're a major political figure and you're having your 15 minutes of fame, you want your book everywhere and get it sold. And you may have different preferences than authors who are doing different things.").

28.     In the government's view, the $250,000 advance level captures the distinction between books that require unique services, on the one hand, and books acquired under different competitive conditions where authors have more publishing options, on the other. Tr. 3233:6-3235:25. The government is wrong in two respects.

> 1.     *The $250,000 Advance Level Does Not Reflect Changed Competitive Conditions*

29.     To prove that the $250,000 advance level reflects the point at which author preferences differ and competitive conditions change, the government relies heavily on the following chart:



Source: Snyder Advance Data.

US v. Bertelsmann
1:21-cv-0866-FYP
PX 0963

30.     The two bars show market shares above and below the $250,000 threshold, and they appear to suggest that the Big Five have significantly larger aggregate market shares above

that threshold.  According to Dr. Hill, the market-share difference is important to his market definition because it shows that "the authors of anticipated top sellers are making different choices than other authors," Tr. 1235:20-21, which in his view proves that they have a distinct need for "marketing, distribution and reputation" that he thinks only the Big Five can provide, Tr. 1236:9-10.  In addition, the government contends that authors selling books that yield advances below $250,000 have more publishing options and thus cannot be as easily targeted by publishers for advance decreases.  According to the government, the chart reflects "data" that shows "a difference in how the firms competed" for books at the "high end" compared to other books.  Tr. 3233:17-3234:2 (closing).

31.     The data collected in the chart actually prove the opposite.  Defendants' expert Professor Snyder analyzed the same data and demonstrated that the Big Five publishers' aggregate market share actually changes materially at about the *$50,000* level, which is therefore where the market-defining boundary exists under the government's own market-share-based theory.  The following chart illustrates that dynamic:



32.     By Dr. Hill's and the government's own account, their submarket is properly defined by the advance level at which competing publishers' market shares reveal that "the authors of anticipated top sellers are making different choices than other authors."  Tr. 1235:20-21 (Hill).  Those different choices are what allegedly facilitate "targeting" and price discrimination.  But on that theory, the chart above shows that the market-defining line exists at $50,000—all authors above that price level are subject to essentially the same alleged threat of targeting, because they all supposedly depend equally on the Big Five to serve their "taste" for certain publishing services.  Put differently, any line at an advance level above $50,000 fails to identify the substantive difference in competitive conditions and author "choices" and "preferences" that supposedly justify a distinct submarket.

33.     Drawing the line at $50,000, however, results in a submarket that would be substantially less concentrated.  FF ¶ 38.  Indeed, it is telling that the government declined to measure HHIs using any threshold below $100,000.  Tr. 1536:10-15 (Hill).  The absence of a clear record shows why courts insist the government prove a well-defined market at the outset: the market definition is essential to correctly analyzing "the merger's anticompetitive effects." *RAG-Stiftung*, 436 F. Supp. 3d at 291.

34.     Dr. Hill suggested that even if the $50,000 line accurately captures anticipated top-selling book authors' supposed "preferences" for Big Five publishing services, the $250,000 line still works because there may simply be *another* "submarket" for "mid-tier" books between $50,000 and $250,000.  Tr. 3173:1-3174:8; *see* Tr. 3324:12-15 (closing) ("you can have multiple sub markets, and as long as there's one that's a problem and it's material and substantial, a merger should not be allowed").  The separate submarket suggestion is a non sequitur.  The problem is not that the government ignored a distinct submarket—it is that the $250,000+

submarket the government *did* allege fails to distinguish books subject to one set of competitive conditions from books subject to different competitive conditions.  Rather, on the government's own market-share-based theory, books are subject to the *same* competitive conditions all the way down to the $50,000 threshold.  Under the government's own market-definition criteria, then, that threshold should determine its submarket.

2.      *The $250,000 Advance Level Is Not Narrowly Defined Around Franchise, Celebrity, And Prize-Winning Authors*

35.      The government's alleged market fails in another, independent respect.  As noted above, the alleged market principally seeks to encompass books being sold by "franchise authors, key authors, giant celebrities."  Tr. 3233:17-19.  If the evidence showed anything approaching "a consensus among the industry's players" (*Sysco*, 113 F. Supp. 3d at 33) as to books likely to perform well, that consensus would center only on books by such franchise, celebrity, and prize-winning authors—authors easily identifiable by their track records or platforms.  FF ¶¶ 39-40, 78.  According to the government, because such books are easy to identify, they are uniquely subject to "targeting" for a price decrease.

36.      The evidence uniformly showed, however, that advances paid for such books generally well exceed $1,000,000, and tend to range in the *millions* of dollars.  FF ¶ 40.  The government adduced no evidence establishing any kind of industry consensus that books sold for *under* $1,000,000 are normally expected to be "top selling" books, rather than the kind of "mid-selling" or "mid-tier" books that fall outside the government's alleged market.  *See supra* CL ¶ 34.  In fact, the government's position is that advances below $250,000 almost entirely represent very *low* selling books.  FF ¶ 41.  The $250,000 threshold thus necessarily captures most *mid*-tier books, with any true industry-consensus bestsellers typically in a range well exceeding

$1,000,000.  The $250,000 price boundary, in other words, captures vastly *more* books than just easily-identifiable, consensus top-sellers by franchise, celebrity, and prize-winning authors.

37.    The government's submarket accordingly violates the Guidelines' "narrowest market" rule.  Guidelines § 4.1.1 ("market shares and concentration" should be examined "in the smallest relevant market satisfying the hypothetical monopolist test"); *see RAG-Stiftung*, 436 F. Supp. 3d at 292; *Sysco*, 113 F. Supp. 3d at 26-27; *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 58-60 (D.D.C. 2011).  Under the narrowest market rule, market definition analysis "begins by examining the most narrowly-defined product or group of products sold by the merging firms to ascertain if the evidence and data support the conclusion that this product or group of products constitutes a relevant market."  *Arch Coal*, 329 F. Supp. 2d at 120.  If the "most narrowly defined" product group does not qualify as a relevant market, then "the analysis shifts to the next broadest product grouping to test whether that is a relevant market," and the "process continues until a relevant market is identified."  *Id.*; *see Oracle*, 331 F. Supp. 2d at 1158-59 (government's price threshold failed to define "distinct and articulable market" where threshold encompassed products market was supposed to exclude).

38.    The government here made no effort to satisfy the narrowest market rule.  Its price boundary is not tailored at all to the books and authors it seeks to encompass, i.e., books by franchise and celebrity authors and others with a similar consensus of expected success.  The boundary instead indisputably extends the market far more broadly, embracing mid-tier and other books that do not share the easily-identifiable characteristics of books likely to become bestsellers.

39.    As explained above, the government cannot justify its failure to prove a proper submarket at the $250,000 boundary by arguing that it could have tried to prove a *different*

submarket for the acquisition of books for advances exceeding $1,000,000 or $2,000,000 or $5,000,000.  Even if a valid submarket could be tailored to encompass only multimillion-dollar acquisitions of books by franchise, celebrity, and prize-winning authors, the charts above indicate it likely would capture an insignificant number of acquisitions each year—"an insubstantial amount of commerce."  *Oracle*, 331 F. Supp. 2d at 1120.

40.     The anticompetitive effects analysis in such a hypothetical submarket would also be qualitatively different.  The government would have to prove, for example, that S&S competes frequently enough with PRH in such rarefied space for the merger to have materially adverse unilateral effects among the relatively few transactions that exist in that space.  Further, authors winning multi-million dollar contracts have much more leverage in bargaining, as shown by the fact that such books are less profitable for publishers.  FF ¶ 42.  Given that leverage, while such authors can be more easily identified, they likely cannot be easily targeted for price decreases.  The government, in any event, did not conduct this analysis, and the government bears the burden of proof.  The defendants cannot be required to disprove the likelihood of harm in a market the government did not proffer in the first place.

41.     In short, if the government had actually sought to define a submarket by an advance level that reflected its asserted substantive distinctions among books and authors—i.e., either at $50,000 and above to reflect allegedly changed competitive conditions, or at $1,000,000 and above to reflect the easily-identifiable top-selling books—it would have had serious difficulty proving the likely competitive harm needed to block the merger.  The Court need not reach such issues, of course, and it lacks the evidentiary record to do so, given the government's litigation choices.  The simple, dispositive point is that the government sought to prove harm

only in a price-segment submarket that is not properly defined.  Its case accordingly fails at the threshold.

### D.    The Government's Caselaw Does Not Support Its Inadequate Market Definition

42.    The cases cited by the government do not justify defining a submarket by a boundary untethered to any of the substantive distinctions that allegedly warrant a submarket.

43.    The best example is the government's lead case, *United States. v. Syufy Enterprises, Inc.*, 793 F.2d 990 (9th Cir. 1986).  That case involved alleged monopolization of a local market for the exhibition of "industry anticipated top-grossing films" in theaters in San Jose, California.  *Id.* at 994.  The Ninth Circuit in that case upheld a jury's market definition finding, because the evidence showed that the already-completed films in the alleged market shared such characteristics, all easily identifiable "ex ante," as "longer playtimes, guaranteed rentals, famous stars, directors and producers, booking in first class theatres, and lucrative terms offered for the pictures by exhibitors."  *Id.* at 995.  None of those ex ante factors exists here— notably, the *Syufy* court did not define a market based on the price of the movie *script*, which would be analogous to the book manuscripts (sometime uncompleted) at issue here.  At the time a manuscript is acquired, no distribution or marketing plan is known, no shelf space is reserved, no copies are pre-ordered, and the author may or may not be famous.  The last factor is the only potential basis for an analogy to *Syufy*, because one might compare an expected movie blockbuster with marquee actors to a manuscript by a franchise or celebrity author—even an incomplete manuscript by such an author could generate industry consensus about its expected success.  But the government's market is not narrowly tailored to such books.

44.    The analysis in cases like *Staples*, *Wilhelmsen*, and *Anthem* is similar.  The courts in those cases used "numerical thresholds to define markets," Tr. 3241:23-24 (closing), but the

threshold was never a negotiated price paid for a product or service; it was instead a threshold reflecting a substantive distinction among products and customers the courts were trying to capture. *See FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 55 (D.D.C. 2018) (using number of vessels to distinguish global shipping fleet from smaller regional fleets, based on statistics showing that numeric definition closely aligned with substantive customer needs); *Anthem*, 855 F.3d at 351 (defining "national account" as health insurance for 5,000 employees in more than one state, to distinguish from small intrastate markets); *FTC v. Staples*, 190 F. Supp. 3d 100, 110-21 (D.D.C. 2016) (using $500,000 annual office-supply spend to distinguish large "business to business" customers from individual customers with small retail needs).

45.     Another case cited by the government, *O'Bannon v. NCAA*, 7 F. Supp. 3d 955 (N.D. Cal. 2014), *rev'd in part*, 802 F.3d 1049 (9th Cir. 2015), illustrates the same point in a different way.  As the government observes, the court there approved a market "in which NCAA Division I schools compete to sell unique bundles of goods and services to elite football and basketball recruits."  7 F. Supp. 3d at 986.  The government contends that "elite" athletic recruits are comparable to the elite authors in its submarket—the status may be hard to define, but in both cases "you know when you see it—at least the people in the industry do."  Tr. 3242:12-15.  But the elite athletic recruits in *O'Bannon* were easily identified by their prior track records of success.  Importantly, the *O'Bannon* court did not try to draw a similarly arbitrary numerical boundary to distinguish "elite" recruits from other recruits; rather, the court simply labeled as "elite" *all* the Division I football and men's basketball recruits who received the unique bundle of goods and services.  Here, there is no comparable distinction in the publishing services provided to different authors—no category of authors at any price level receives "unique" services.  FF ¶¶ 47-59, 63.  At best, the government could have tried to define its market by an

advance-level boundary that genuinely segregates easily-identifiable "elite" authors, i.e., franchise, celebrity, and prize-winning authors with proven track records and/or existing fan bases. But instead the government drew a $250,000 price boundary that sweeps in many authors who do not share the same characteristics as authors whose books are expected to be best sellers.

46.     Neither *O'Bannon* nor any other case cited by the government holds that a submarket can be defined by a quantitative boundary that comes nowhere close to capturing the qualitative distinctions between product or consumer characteristics that allegedly justify a separate submarket.

## II.    THE GOVERNMENT HAS NOT PROVED THAT THE MERGER WILL SUBSTANTIALLY LESSEN THE VIGOROUS COMPETITION TO ACQUIRE BOOKS BY FRANCHISE, CELEBRITY, AND PRIZE-WINNING AUTHORS

47.     Nobody disputes that publishers today compete vigorously to acquire books written by franchise, celebrity, and prize-winning authors. If anything, competition is especially intense for such books, as shown by the lower profits publishers realize on the books with the highest advances. FF ¶ 42. When defined (inaccurately and overbroadly) by the $250,000 price boundary, five large publishers routinely compete to acquire books in this price segment, and another thirty or so compete as an aggregate as often as three of the Big Five. FF ¶¶ 164-178. These authors have no difficulty triggering interest among one or more of the hundreds of editors working at the publishing imprints that compete for such books. FF ¶ 42.

48.     The government did not prove that the merger is likely to substantially lessen that competition by diminishing the incentives or ability of publishers to continue vying aggressively for these most sought-after books.

49.     Apart from its distinct "coordinated effects" theory, *see infra* Part III, the government asserts only one theory of likely harm from the merger—the "unilateral effects" analysis prescribed by the Guidelines for analyzing mergers in markets involving differentiated

products and individualized bargaining.  Guidelines §§ 6.1, 6.2.  A unilateral effects analysis

does not ask whether or how eliminating one competitor from a market affects the general

competitive incentives and conduct of all other competitors.  There is no general competitive

"softening" or "weakening" analysis.  Rather, a unilateral effects claim focuses much more

specifically on the elimination of competition *between the merging parties*:

> The extent of direct competition between the products sold by the merging parties
> is central to the evaluation of unilateral price effects.  Unilateral price effects are
> greater, the more the buyers of products sold by one merging firm consider
> products sold by the other merging firm to be their next choice.

Guidelines § 6.1.  And where prices are determined by individual bargaining processes,

"[a]nticompetitive unilateral effects in these settings are likely in proportion to the frequency or

probability with which, prior to the merger, one of the merging sellers had been the runner-up

when the other won the business."  Guidelines § 6.2.

50.     Applying those long-settled Guidelines principles, the government's complaint

focused on the effect of the merger in eliminating "head-to-head" competition.  Compl. ¶¶ 9, 42-

51.  And every example the complaint listed of such head-to-competition alleged that PRH and

S&S were the top two bidders in an auction.  Compl. ¶¶ 44-49.  The evidence ultimately showed,

however, that PRH and S&S are the top two choices for authors in only, at most, about 12

percent of all acquisitions.  FF ¶¶ 187-188.  As a result, the merger would have no effect on 88

percent of all acquisitions in the government's alleged market.  FF ¶ 187.

51.     For that reason and others set forth below, the government failed to prove that

merging PRH and S&S would cause substantial harm to competition.

## A.     The Statistical Presumption Has Minimal Force

52.     Assuming that a $250,000 price boundary establishes a well-defined submarket of

books widely recognized in the industry as likely top sellers, it is not disputed that the merger

triggers the purely statistical presumption of harm based on the Herfindahl-Hirschman Index

("HHI") of increased market concentration.  But rebutting that presumption is never unduly

onerous and it is not dispositive here.

53.     The Guidelines expressly warn against overreliance on HHI and other purely

statistical thresholds as proof of harm, because the "purpose of these thresholds is not to provide

a rigid screen to separate competitively benign mergers from anticompetitive ones."  Guidelines

§ 5.3; *see* Areeda & Hovenkamp ¶ 930 (HHI indices "may have some utility, but only if their

significant limitations are kept in mind" and they are used "very tentatively").  The HHI simply

identifies concentration levels that "raise concerns," providing "one way" to distinguish between

those "mergers unlikely to raise competitive concerns," and those "for which it is particularly

important to examine whether other competitive factors confirm, reinforce, or counteract the

potentially harmful effects of increased concentration."  Guidelines § 5.3.  It would contradict

the Guidelines' plain terms to give conclusive force to an HHI presumption without closely

examining the "other competitive forces" affecting the market.  *See* Carl Shapiro, *The 2020*

*Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 Antitrust L.J. 49, 55-

56 & n.25 (2010) (co-author of 2010 Guidelines explaining that Guidelines adopt "integrated

approach" to antitrust analysis that "does not necessarily . . . base predictions of competitive

effects primarily on market concentration," reflecting "the gradual decline of the structural

presumption").

54.     The government suggests that defendants bear the burden of persuasion both to

rebut the statistical presumption and to disprove other aspects of the government's prima facie

case.  That suggestion misconstrues the *Baker Hughes* proof structure.  *Baker Hughes* and its

progeny make clear that courts ordinarily should not block mergers solely on the basis of market

concentration statistics.  "The government does not maximize its scarce resources when it allows statistics alone to trigger its ponderous enforcement machinery."  *Baker Hughes*, 908 F.2d at 992 n.13.  Put simply, the HHI "cannot guarantee litigation victories."  *Id.* at 992; *see New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 206 (S.D.N.Y. 2020) ("[M]arket shares and HHIs establish only a presumption, rather than conclusive proof of a transaction's likely competitive impact.").  For that reason, the HHI presumption imposes on defendants only a "burden of producing evidence," not a burden of persuasion.  *Baker Hughes*, 908 F.2d at 991.

55.     The defendants' evidentiary burden is not "unduly onerous," *Anthem*, 855 F.3d at 349-50 (quoting *Baker Hughes*, 908 F.2d at 991), and it does not require defendants to affirmatively disprove the government's prima facie case.  Rather, "the ultimate burden of persuasion . . . remains with the government at all times."  *Heinz*, 246 F.3d at 715 (quoting *Baker Hughes*, 908 F.2d at 983).  The defendants' burden instead is limited to rebutting the *statistical* presumption:  defendants need only produce evidence indicating that market shares, *without more*, "produce an inaccurate account of the merger's probable effects on competition in the relevant market."  *Arch Coal*, 329 F. Supp. 2d at 116 (citing *Heinz*, 246 F.3d at 715).  After defendants make that minimal evidentiary showing, the statistical presumption itself drops from the case, and the government must rely on "additional evidence of anticompetitive effect" to carry its burden of persuasion, which again "'remains with the government at all times.'"  *Heinz*, 246 F.3d at 715 (quoting *Baker Hughes*, 908 F.2d at 983).

56.     Defendants may rely on a wide range of evidence to show that market shares alone do not provide all the information required to fully assess the likely competitive effects of a merger.  Such evidence may include "the absence of significant entry barriers in the relevant market," *Baker Hughes*, 908 F.2d at 984, and factors like changing market conditions, special

130

features of the product or negotiating process, and the conduct of other firms in the market, *see id.* at 985-86; *Deutsche Telekom*, 439 F. Supp. 3d at 207.

**B.      The Presumption Is Rebutted Because Evidence Shows That Concentration Statistics Alone Do Not Accurately Predict The Competitive Effects Of The Merger**

57.      As shown in this section, overwhelming evidence of real-world dynamics shows that market shares alone do not capture the full competitive conditions in the publishing industry and do not accurately predict the merger's likely effects on author advance levels.  The statistical presumption thus is rebutted, and the government must carry the burden of proof and persuasion to establish likely substantial harm through "a broader inquiry into future competitiveness" that requires "weighing a variety of factors to determine the effects" of the merger on competition. *Baker Hughes*, 908 F.2d at 984; *see Brown Shoe*, 370 U.S. at 322 n.8 ("only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger").

1.      *Market Shares Alone Are Misleading Because PRH And S&S Are Not Close Competitors—They Are Rarely First And Second Place In Bidding*

58.      HHI concentration levels are an especially unhelpful indicator of competitive effects where, as here, the government asserts a unilateral effects claim focused on competition between the merging parties.  Market shares are neither a necessary nor sufficient component of such a claim (at least absent a merger creating one entity with monopoly power).  For example, a unilateral effects claim requires analysis of the merging parties' margins, *see infra* CL ¶¶ 119-21, so market shares alone cannot accurately predict competitive outcomes.

59.      Even more importantly, as explained above, a unilateral effects challenge to a merger under Guidelines §§ 6.1 and 6.2 addresses the effects of eliminating consumers' options *between the merging parties' products or services.  See supra* CL ¶ 49.  The premise of

Guidelines §§ 6.1 and 6.2 is that regardless of market shares, when prices are individually negotiated, a merger can adversely affect only those transactions in which the merging parties were consumers' top two choices:  "Anticompetitive unilateral effects . . . are likely in proportion to the frequency or probability with which, prior to the merger, one of the merging sellers had been the runner-up when the other won the business."  Guidelines § 6.2.  In all other transactions, only two outcomes are possible:  either one of the merging parties wins and another publisher was runner-up, in which case the merger has no effect; or another publisher wins, in which case the merger has no effect.  Tr. 2662:9-20 (Snyder) (if PRH and S&S are not "winner or runner-up" in acquisitions, "then the loss of head-to-head competition does not generate harm").  It follows that "even if the merging parties had large market shares, if they were not particularly close competitors, then the market shares might overstate the extent to which the merger would harm competition."  *Sysco*, 113 F. Supp. 3d at 62; *see Oracle*, 331 F. Supp. 2d at 1122 ("a strong presumption of anticompetitive effects based on market concentration is especially problematic in a differentiated products unilateral effects context"); Herbert Hovenkamp & Carl Shapiro, *Horizontal Mergers, Market Structure, and Burdens of Proof*, 127 Yale L.J. 1996, 2014 (2018) (unilateral effects claims "pose[] a challenge for the structural presumption").

60.     In this case, overall market shares are a highly misleading indicator of competitive effects because PRH  and S&S are not particularly close competitors.  While many publishers view PRH as their "major competition," Tr. 3184:24-25 (Hill), ███████ is and will remain a powerful and aggressive second-place competitor.  FF ¶ 186.  S&S, on the other hand, is "part of another group," Tr. 3184:24-3185:1 (Hill), each of which represents about 10

percent of the market ███████████████████████████████████████ FF ¶¶ 165,

186.  It is not an especially strong competitor to PRH.

  61. The data confirm that PRH and S&S are rarely the final two competitors for

books.  According to Dr. Hill's own estimates, PRH and S&S are the top two choices in only

about 12 percent of all acquisitions in the $250,000+ price segment.  FF ¶¶ 177-178.  According

to Professor Snyder's more robust set of granular, real-world agency data, the two are the top

two bidders in only 6-7 percent of such acquisitions, specifically those where an actual winner

and runner-up exist and can be identified.  FF ¶ 187.  Even taking a rough average of the two,

some *other* publisher wins or makes the constraining second-place bid in about 90 percent of all

acquisitions.

  62. The data are confirmed by industry participants who testified that in their many

years of experience, very few acquisitions involved a final choice between PRH and S&S.  FF

¶¶ 190-196.

  63. The government has identified approximately 33 individual transactions where

PRH and S&S were the top two bidders, out of thousands over the same time period.  FF ¶ 197.

Those anecdotes do not show that both parties are *each other's* main competitor, as in *Sysco* and

*Heinz*, which is the key to a unilateral effects claim.  In fact, the agency data show that when

either PRH or S&S wins, the most common runner-up is ███████████ DX-436.  And when

S&S wins, PRH is the third most common runner-up.  *Id*.  It is of course inevitable that S&S will

sometimes lose books to PRH, and vice versa.  But those few instances do not trump the full data

showing that, proportional to all acquisitions in the government's alleged market, PRH and S&S

are rarely the top two bidders.

64.     As Dr. Hill acknowledged, this case is unlike *Sysco* and *Peabody*, where the merging parties were not just each other's biggest rivals, but were the top two competitors in the industry.  Tr. 3184:20-3185:12.[3]  Nor is it like *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, (D.D.C. 2009), which involved a 3-2 "merger to duopoly," where the only two remaining firms would control 99 percent of the market, *id.* at 33, rather than the effective 6-5 merger (based on market shares) at issue here.  It is also unlike *Heinz*, where the parties were not the top two competitors in the whole market, but they were the *only* competitors in the wholesale market for "second position on the supermarket shelves."  246 F.3d at 717.  The merger thus was likely to cause price increases by removing the constant, direct competition between them for that important second-place position.  *Id.*

65.     The competitive dynamic between PRH and S&S is nothing like the competition at issue in those cases or in any other where a merger has been blocked.  And that dynamic certainly is not captured accurately by overall market share statistics.

2.     *Market Share Statistics Do Not Account For Ordinary Course Business Documents Demonstrating That Industry Participants Do Not Expect The Merger To Reduce Author Compensation*

66.      Courts routinely rely on ordinary-course business documents from the merging parties and other industry participants to draw inferences about the likely competitive effects of a merger.  In *Heinz*, the D.C. Circuit emphasized that "Heinz's own documents recognize the wholesale competition and anticipate that the merger will end it."  246 F.3d at 717.  In *Sysco*, Judge Mehta relied heavily on numerous documents from both merging parties and industry analysts expressly recognizing that the two merging parties were each other's strongest

---

[3] *See Sysco*, 113 F. Supp. 3d at 16-17 (two largest broadline food-service distributors, and "only two broadliners with true nationwide capability"); *FTC v. Peabody Energy Co.*, 492 F. Supp. 3d 865, 874 (E.D. Mo. 2000) (two largest SPRB coal producers).

competitors, making adverse unilateral effects almost inevitable.  113 F. Supp. 3d at 64-65.  And in *Tronox*, the court discussed a plethora of ordinary-course documents showing the parties' recognition that reducing output would be an effective strategy.  332 F. Supp. 3d at 208-10.

67.     In this case, there are no comparable documents demonstrating an industry expectation that the merger will reduce author advances.  The documents show the opposite.  For example, a board-level business-planning document prepared by ██████████████████ ████████████████████████ demonstrates its expectation that advances will *increase*.  FF ¶ ██.  This document is especially credible—it reflects an understanding of market conditions formulated by a highly sophisticated industry actor to guide its fundamental business decisions.

68.     PRH's own documents are equally significant.  The record includes extensive evidence of PRH's own merger planning documents and analysis, which includes detailed assessments and quantification of every conceivably relevant savings from the merger.  Author compensation is a major cost center for any book publisher, and it is thus an enormous opportunity for savings.  FF ¶ 120.  Yet nowhere does any merger-planning spreadsheet include any entry identifying how much PRH is likely to save in reduced author advances.  FF ¶ 120.  If increased market concentration were likely by itself to cause a substantial reduction in advances, it is impossible that the company would have overlooked such a significant source of likely savings in its detailed accounting of the merger's expected benefits.

3.     *Competitive Incentives Arising From Downstream Sales Competition Will Constrain Publishers From Reducing Advances For The Most Sought-After Books*

69.     The government does not deny that publishers compete fiercely to sell their books to readers downstream.  Nor does the government contend that the merger will diminish that strong downstream competition.  That continued competition matters upstream because publishing companies only make money by selling books to consumers—if they do not compete

aggressively to acquire books from authors, they will lose out in the aggressive competition to sell them to readers.  FF ¶¶ 149-153.

70.     In short, competitive incentives upstream are driven almost entirely by competitive pressures downstream.  And because downstream competition will concededly be unaffected by the merger, increased concentration in the upstream market is much less likely to reduce competition than in other markets lacking such exogenous competitive pressures.

4.     _Market Share Statistics Do Not Account For Agents' Ability To Influence Competition By Controlling The Bargaining Processes_

71.     Market concentration statistics also ignore the competitive effect of agents' control over the bargaining process.  In markets where all or most participants actively bid in all or most product transactions, the elimination of one competitor might have some quantifiable effect on prices corresponding in some way to market shares.  _See infra_ CL ¶ 104 (discussing auction model).  But in this price segment of the publishing market, very few acquisitions involve multibidder, multiround auctions, and none involves active participation by all market participants.  FF ¶¶ 163, 247.  Rather, the agent decides which editors to invite, and how many, based on a host of individualized factors.  FF ¶ 155.  They certainly do not decide whom to invite based on market shares.  FF ¶ 155.  In fact, it is undisputed that in this price segment, the agent usually chooses to negotiate with only _one_ publisher, because bilateral negotiations maximize authors' competitive outcomes.  FF ¶¶ 252-253.

72.     As a result, even if a merger eliminated one competitor from the overall market, the effect would not be consistent across all acquisitions in accordance with market shares.  Eliminating one publisher would have _no_ competitive effect on acquisitions to which that publisher would not have been invited or would not have made the winning or runner-up bid.  _See supra_ CL ¶ 59 (discussing "softening" theory).  And even where the publisher might have

competed, the agent often can replace the lost bidder.  FF ¶ 163.  Given agents' control over the

competitive conditions applicable in each acquisition, it is essential to analyze the merger's

effects at the acquisition level, rather than at the more abstract level of overall market

concentration.

73.     In emphasizing the significance of agent control over bargaining, defendants do

not contend that agents "create competition where none exists," as the government asserts.

Indeed, according to the government's own theory, agents do not *need* to create competition—if

there are books that the everyone in the industry knows will be top-selling books downstream,

they are necessarily books publishers will compete aggressively for, especially given the highly

competitive arena downstream.  The point is that in deciding which publishers may vie for these

most sought-after books, and the rules under which they will compete, agents profoundly affect

acquisition-level competitive forces in ways not captured by high-level market concentration

statistics alone.

5.      *Most Acquisitions Are Subject To The Collective Competitive Pressure Of The Entire Market, Not Individual Competitive Threats Measured By The Participant's Market Share*

74.     The vast majority of acquisitions are either one-on-one negotiations or "best bid"

and "better/best bid" formats.  FF ¶ 251.  In neither situation is the publisher bidding directly

against known bidders or bids.  The publisher accordingly must bid as if it is competing against

the *entire collection* of unknown rivals that *could* submit bids.  Market shares have little to do

with that competitive threat—because the publisher does not know which or how many rivals it

is bidding against, it cannot measure their competitive threat by their identity or market share.

And nobody tracks market shares in the acquisition market, let alone share segments by advance

amounts.  FF ¶ 45.  The publisher instead knows only that it faces the collective threat of the

entire market, including any rival that might acquire the book if the publisher does not bid high

enough to win it.  *See infra* CL ¶ 109 (discussing competitive differences between auction-style bidding against known bids and non-auction bargaining against entire market).

75.     Even after the merger, for any given book—especially one that enjoys an industry consensus of likely success—that threat comprises potential bids from many quarters.  *See Arch Coal*, 329 F. Supp. 2d at 150 (continued presence of "significant number of competitors" weighs against finding merger anticompetitive).  HarperCollins, Hachette, and Macmillan by themselves will pose a major competitive threat in any given acquisition for these most-valued books.  In multi-bidder acquisitions where the advance was at least $250,000 and PRH and/or S&S bid, at least one of the other Big Five also bid 90 percent of the time.  FF ¶ 195.

76.     The next fifteen largest publishers will also continue to be a major threat.  They include name brands—like Amazon, Disney, Scholastic, and Norton—that regularly bid in multi-round auctions, pay large advances, and win prominent authors.  FF ¶¶ 164-178.  In this price segment, these publishers as a group acquired as many or more titles in 2021 than each of Hachette, Macmillan, and S&S.  FF ¶ 165.  Even without considering continued imprint competition, the merger changes the effective number of potential acquirors for any given book from at least six (the five largest plus all others in aggregate) to at least five.  The government cites no case rejecting a merger on the basis of market shares alone where five market participants remained in active competition.

6.     *Market Concentration Statistics Ignore The Much Broader Competitive Field Created by Imprint Competition*

77.     Market shares also do not accurately capture market conditions because they do not reflect the full competitive landscape created by internal imprint competition in the industry. FF ¶¶ 198-213.  Hachette's imprints compete actively against each other.  FF ¶ 198.  PRH's imprints have done so for decades.  FF ¶ 199.  There is also evidence that Macmillan permits

Case 1:21-cv-02886-FYP   Document 182   Filed 09/09/22   Page 147 of 171

imprint competition.  FF ¶ 198.  Market share analysis must comport with "business realities," *Sysco*, 113 F. Supp. 3d at 37, and imprint competition is unquestionably a reality in the publishing industry.

78.     Like Hachette's rule, PRH's imprint competition rule requires the presence of an outside bidder for a multi-round auction, but that rule does not apply to the very common single-round best bid format.  FF ¶ 209.  And even in multi-round auctions, agents easily avoid the rule by calling for best bids as participants narrow down to just PRH imprints.  FF ¶ 209.

79.     Even though each publisher's total market share is partly the product of its internal imprint competition, market shares do not capture the effect of imprint competition on overall market dynamics.  Relying on market-share statistics would compel the assumption that for each acquisition in this price segment, there are at most six potential bidders for any given book.  *See supra* CL ¶ 76.  The business reality is completely different.  Because of imprint competition, each author with an industry-consensus top-seller in fact has *more than a hundred* potential options for publishing her book.  FF ¶ 202.  And the merger of PRH and S&S would not reduce the number of bidding imprints at all.  FF ¶ 162.  The correct question in this case, then, must be whether and how a merger between PRH and S&S would materially affect author advances in *that* competitive landscape—a much broader and more diverse landscape than market shares alone suggest.

    7.     *Planned Expansion By Rivals Makes Static Market Shares An Unreliable Basis For Evaluating The Likely Future Effects Of The Merger*

80. Static, backward-looking market shares are an unreliable measure of the future effects of this merger because existing large, successful, aggressive, well-resourced rivals are already planning to spend more money purchasing more books, and there are no objective barriers that will hinder their plans.  "Barriers to entry are important in evaluating whether market

concentration statistics accurately reflect the pre- and likely post-merger competitive picture."
*Heinz*, 246 F.3d at 717 n.13; *see* Guidelines § 5.2.

81. The publishing industry is dynamic and thriving.  FF ¶¶ 14-16, 124.  Existing large
and aggressive rivals are actively planning to exploit the moment by expanding their own retail
market shares.  ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████            FF ¶¶ 125-126.  Industry participants also recognize expansion by
Amazon as a growing threat.  FF ¶¶ 127-128.  As Macmillan's CEO testified, Amazon is poised
to be a "formidable" competitor "at any given moment."  FF ¶ 128.

82. None of the barriers to entry cited by the government would deter these existing well-
resourced, successful, and aggressive publishers from executing on their plans to acquire more of
the most sought-after books.  They can all handle printing and distribution as they always do,
they all have strong reputations and skilled editors, and they all have backlists or other sources of
financial support.  FF ¶¶ 133-148.  The government did not show how any of those factors could
hinder the existing growth plans of HarperCollins, Macmillan, and Disney, or how they could
impede a juggernaut like Amazon if it decided to expand its acquisitions.

83. The planned growth by these significant rivals makes purely backward-looking
market shares an unsound basis for predicting how future book acquisitions will be affected by
the merger.  By their own design, publishers like HarperCollins, Macmillan, Disney, and Abrams
will be making themselves available as options to agents in more acquisitions and they will be
willing to pay higher amounts to acquire books.  Static market share figures ignore that dynamic.

8.     *Market Concentration Statistics Do Not Reflect The Natural Experiment Of The 2013 Penguin And Random House Merger, Which Did Not Cause A Reduction In Advances*

84. The Guidelines state that a "recent merger[] … in the relevant market" can represent a "'natural experiment[]'" that is "informative regarding the competitive effects of the merger" under review.  Guidelines § 2.1.2; *see NRDC v. Jackson*, 650 F.3d 662, 665 (7th Cir. 2011) (surest "way to test a model is to compare its projection against real outcomes").

85. In 2013, Random House merged with Penguin.  At the time, they were the first and second largest publishers respectively, with a combined market share in downstream trade-book sales similar to that of PRH and S&S today.  To the extent those shares correlate with upstream shares, that merger should have caused a reduction in author advances similar to—if not greater than—the reduction the government predicts from the merger of PRH and S&S.

86. The 2013 merger had no such advance-reducing effect.  FF ¶¶ 225-239.  PRH did not reduce advances paid to authors after the 2013 merger of Penguin and Random House.  FF ¶¶ 229-230.  Industry participants observed no decrease in advances after the merger, and some recognized an increase.  FF ¶¶ 227-229.

87. Professor Snyder confirmed that average advances increased after the merger for all advances below $2 million.  FF ¶ 230.  Professor Snyder also showed that output of titles acquired for $250,000 or more increased significantly in the years following the merger.  FF ¶ 235.

88. Dr. Hill contended that advances in the $250,000+ price segment decreased after the merger compared to books with lower advances.  FF ¶ 236.  But his data showed only a difference in advances between the segments—he did not attempt to show that the difference was *caused by the merger*.  FF ¶ 239.

89.  The merger did not cause the difference.  Market forces did.  Starting around the time of the merger, the entire industry began experiencing a precipitous decline in consumer demand for mass-market paperback books.  FF ¶¶ 232, 234.  PRH was compelled by these market forces to pull back significantly from the acquisition of such books.  FF ¶¶ 232, 234-235.  But because such books overwhelmingly are acquired for very low advance amounts—well under $250,000—the reduced acquisitions of these books had the effect of *increasing* the average advances for all books under $250,000.  FF ¶¶ 232, 237.  By contrast, because books produced exclusively as mass-market paperbacks rarely if ever appear among books acquired for $250,000 or more, the decline in acquisition of such books had no effect on advance levels in that price segment, which continued to steadily increase after the merger.  Dr. Hill admitted that he was unaware of the industrywide decline in demand for mass-market paperback books and thus did not consider its effect on advances for books above and below $250,000.  FF ¶ 239.

90. Further, the average advance reduction Dr. Hill cites for all books with advances of $250,000 did not occur for books in the $250,000 to $2,000,000 range.  FF ¶¶ 238.  The average reduction for all books includes major changes for a very few books over $2,000,000, which resulted from the timing of these large contracts and the loss of one very high-advance author to competition.  FF ¶¶ 233, 238.

91.  The natural experiment of the 2013 merger, in short, reveals no evidence that it caused a reduction in author advances at any level, and substantial evidence that it caused or contributed to an increase in advances.  At a minimum, the 2013 merger shows why concentration statistics alone do not conclusively prove that a comparable merger is likely to substantially reduce author advances.

C.   **The Government's Theory Of General "Softening" Of Competition Is Inconsistent With Its Unilateral Effects Claim, Unsupported By The Evidence, And Inadequate To Prove A Likely Substantial Lessening Of Competition**

92.     Consistent with the Guidelines §§ 6.1 & 6.2, the government's complaint challenges the merger on the ground that merging two allegedly close competitors will have the "unilateral effect" of allowing the combined entity to reduce prices in transactions with authors for whom the merging parties were the two top choices.  To establish that claim, Dr. Hill invoked an auction model that, in his view, proves that the merger would likely reduce advances for those authors.  Dr. Hill admits that his auction model analyzes the merger's effects on prices only in auctions where the merging parties are the first and runner-up bidders.  Tr. 1299:20-23, 1301:15-23, 1302:21-1303:6, 1584:24-1585:2, 1585:10-23 (Hill).  His auction model predicts an average 6 percent advance reduction for authors contracting with PRH and S&S, which he admitted could be as low as 3 percent.  FF ¶ 241.  His model did not predict reductions for any other author advances.  FF ¶¶ 215, 240.

93.      At trial, however, the government developed a different theory of harm, one that predicts the merger will likely reduce *all* author advances through a general "softening" of competition resulting merely from the elimination of S&S as a potential bidder in all acquisitions.  Tr. 1489:6-9, 3182:9-3184:19 (Hill).  As the Court described the government's softening theory, if the merger eliminates S&S as a potential bidder, advances will be lowered in all auctions—by an unspecified amount over an unspecified period of time—because "there's less competition, so people aren't bidding up the prices."  Tr. 2673:9-20 (Court).  In other words, "they're just going to win at an earlier point in time because there's less competition."  *Id.*; *see* Tr. 2674:15-18 (Court) ("it turns out you can win at lower levels because there are fewer people bidding now").  The government's theory further posits that "systemically, over time, this results

in a general lower level of advances because there are fewer people competing.  You don't have

to compete as high or as long to get to the end result.  The end result is generally lower."  Tr.

2676:8-12 (Court).

94.     The general softening theory on its face does not apply to best bids or one-on-one

negotiations—by far the most common acquisition formats—because neither format involves

publishers actively "bidding up prices" and there is no opportunity for bidding to end "at an

earlier point in time."  But as the Court described it, the government's theory applies "in a one-

on-one negotiation, too, because you might come in lower and realize you don't have to go as

high because there's less competition out there."  Tr. 2676:21-25 (Court); *see* Tr. 3183:3-

3184:19 (Hill) (best bids)).  There are multiple problems with this theory.

95.     First, while mathematical precision is not required, a merger cannot be blocked

unless the government proves that it is likely to cause a *substantial* reduction in competition.  *See*

*supra* at Introduction ¶ 1.  And the government admittedly never tried to quantify, by any

measure, the amount that advances would be reduced by "softening," even though Dr. Hill

acknowledged that economic models were available to do so.  Tr. 3183:13-21 (Hill).  Because

Dr. Hill did not use any model to quantify an alleged softening effect, even roughly, it is

impossible to predict a "substantial" reduction.  In fact, Dr. Hill suggested that any softening

effect would *not* be substantial—he testified that other publishers' bidding behavior "may be

unchanged or they may have a small diminution in their aggressiveness."  Tr. 1489:5-9; *see* Tr.

3183:13-17 ("I have not calculated it, but generally [the second order effect is] significantly

lower in most models" (Hill).

96.     Second, the merger cannot be enjoined under §7 unless the government proves

that likely substantial harm is *imminent*.  *See supra* at Introduction ¶ 1.  Yet the government

made no effort to prove how long it will take—even in broad-brush terms—for overall prices to be substantially reduced as a result of general "softening."  The imminent-harm requirement demands more than a speculative possibility that advances may be reduced by an unspecified amount over some unspecified period of time.  The requirement recognizes that dynamic market forces can easily change over time for various reasons, especially when the premise of harm is that market prices will become "substantially" supra- or infracompetitive, inviting expansion, entry, and repositioning.

97.     Third, the government's "softening" theory is internally inconsistent.  As the Court described the theory, such harm is not caused by publishers consciously choosing to pay lower advances:  "You don't say, I'm going to cut advances.  You just keep bidding and it turns out you can win at lower levels because there are fewer people bidding now.  I think that's the theory."  Tr. 2674:15-18.  But elsewhere Dr. Hill asserted that "softening" harm would occur *only* because publishers in best bids and one-on-one negotiations would make a *conscious* decision to respond to an *observed* "weakening" of competition by submitting lower bids.  Tr. 1269:20-24 ("Third parties may also have a second-order effect, where they observe that the merged firm is less aggressive and so they can also bid as they were before or even bid a little less aggressively because their probability of winning has also gone up."): Tr. 3183:4-6 ("other players seeing that competition has been weakened will, themselves, weaken their competitive response"); Tr. 3183:25-3184:4 ("It's in the best bids [and] the negotiations, you have that weakening in anticipation. I frequently compete with this person, I don't think they are competing with me anymore, so I'm going to bid less aggressively.").

98.     Fourth, assuming the government asserts only the latter position based on Dr. Hill's admissions that conscious competitive responses are required, the softening claim is

unsupported by the record.  Dr. Hill is not an expert on bargaining in the publishing industry, FF ¶ 215, and thus he is not qualified to opine on how editors determine the amount of their bids in blind formats and bilateral negotiations.  He did not and could not explain how often publishers would decide they could safely reduce their offers, or by how much, or under what circumstances.  FF ¶ 214-222.  His expertise *does* include economic modeling, but he did not invoke that expertise to use readily available models to analyze how the market, as a whole, would respond the elimination of S&S as a separate potential bidder.

99.     Nor did industry participants testify that they planned to make lower bids after the merger.  To the contrary, publisher witnesses consistently testified that they did *not* plan to bid lower than they otherwise would have, and some made clear that they expected advances to increase.  FF ¶¶ 16, 118, 223, 276.

100.     Finally, as Professor Snyder explained, eliminating S&S would not give publishers in best bids and bilateral negotiations the incentive or ability to reduce their offers without losing books.  FF ¶¶ 220-222.  S&S has only about a 10 percent market share.  The remaining five bidding sources (and many more counting imprints) that win 90 percent of all acquisitions will remain a collective threat to every publisher in every acquisition—especially for the most sought-after books in the industry.  No publisher can be confident that because one 10 percent player is no longer competing, it can safely reduce bids substantially for the highest-demand books without risking loss to one of the many players among the other 90 percent: given S&S's relatively small market share, "you're going to be wrong far more than you're going to be right."  Tr. 2677:15-17 (Snyder).  And because every book is unique and subjectively valued, and publishers have little to no information about the identity of other bidders (if any) in bargaining, they cannot "learn" from one blind bargaining experience how much value other

editors will place on the next entirely unique book.  FF ¶¶ 103-107, 221.  Whether "you're wrong or right, you're not going to learn and figure out how to do it.  This is a very different market from the electronic vehicle market, where you're setting prices and you're getting a variable response in terms of quantity demanded."  Tr. 2677:15-17 (Snyder).  Indeed, HarperCollins CEO Brian Murray testified he cannot even evaluate bargaining outcomes until year end, when they can be viewed in the aggregate—an aggregate outcome that is "[o]ften" driven by just "two or three books."  Tr. 1436:9-21.  Such untimely, broad-brush, erratic information plainly does not give allow editors to make sound judgments in real time about how much they can safely reduce specific bids in particular bargaining over unique books against unknown rivals.

101.    Further, as Dr. Hill acknowledged, the consequences of any miscalculation are significant:  if an editor reduces her offer for one high-demand book and loses it to a rival, the book is lost forever, and the publisher may lose that author—by definition a top-selling author—forever as well.  Tr. 1731:17-21 (Hill) (Q. "[Publishers are] also thinking about the fact that if they lose an author at those very high echelons, they also potentially lose their incumbency and the benefit of the future work of those authors; correct?"  A. "That's correct."); *see* FF ¶ 222. Dr. Hill did not explain why or how often editors would take such risks, especially given their lack of concrete information about their bidding rivals.

### D.    The Government's Unilateral Effects Models Do Not Establish That The Merger Is Likely To Cause A Substantial Reduction In Advances

102.    Rather than attempting to analyze whether and how eliminating one competitor would influence all acquisitions in the market, Dr. Hill invoked a statistical model that analyzes price effects only in acquisitions where he assumed that PRH and S&S were the two top bidders. FF ¶ 240.

103.    To predict those price effects, Dr. Hill's initial expert judgment was that the publishing industry is best modeled using a "second score auction" ("SSA") model.  He used the SSA because it was "easy to solve," whereas he could not make other available models work.  Tr. 1322:19-1324:1; Tr. 1611:20-1612:15 (Hill) (THE COURT:  "So your choice of model depended in part on what the results were and if they just looked right to you?"  THE WITNESS:  "It depended on whether I could get a model I could solve.").

104.    The SSA model attempts to predict how a merger will affect the prices of products sold in one very specific auction scenario, i.e., completed multi-round, round-robin auctions when the merging parties were the two final bidders.  FF ¶ 240.  The model seeks to determine whether and how eliminating one of the bidders would affect the outcome of those auctions, and only those auctions.  FF ¶ 240-241, 245.  Because eliminating one of those two bidders will necessarily affect prices in some of those auctions, the SSA model, by design, will *always* show some harm when any two competitors merge.  FF ¶ 241.

105.    Although the model itself analyzes only multi-round, multi-bidder formats, Dr. Hill assumed that its projections apply equally to any and all bargaining formats in which PRH or S&S acquires a book.  FF ¶ 241.  Applying the SSA's results to all such acquisitions, he calculated that advances for all authors who contract with PRH in the $250,000+ price segment would decline approximately 4 percent on average, and advances for S&S authors would decline about 11.5 percent.  FF ¶ 241.  Those percentages work out to a total predicted reduction of just $29.3 million in total annual author compensation, out of PRH and S&S combined total average annual author compensation of ███ million in this price segment, and billions of dollars in total author compensation market wide.  FF ¶ 241.  Dr. Hill conducted no formal analysis of potential

effects on acquisitions won by other publishers.  FF ¶ 215.  He asserted only that the effect

would be nonexistent or small.  *See supra* CL ¶ 95.

106.    For the reasons that follow, the SSA's projections cannot be applied to acquisition

formats other than round-robins and the results are unreliable on their own terms.

1.    <u>The SSA Model At Best Applies Only To Round-Robin Auctions And Its
      Predictions Cannot By Extended To Other Acquisition Formats</u>

107.    Dr. Hill admits that the SSA is designed to model only multi-round, multi-bidder

auctions like round-robins.  FF ¶¶ 215, 241.  He further acknowledges that the SSA was not

designed to apply to bilateral negotiations or best bids.  FF ¶¶ 243, 245.  According to Dr. Hill,

other models exist to examine the effects of a merger on such bargaining formats, and he would

have preferred to use one of those models.  FF ¶ 243.  In fact, Dr. Hill tried using several of the

models developed to examine bilateral negotiations and best bids, but he was to make them

work.  FF ¶ 243.

108.    Dr. Hill thus returned to the SSA model and simply applied its results to all

acquisition formats.  FF ¶ 215, 241.  The Guidelines specifically warn that different bargaining

formats can lead to different competitive effects.  Guidelines § 6.2  ("The mechanisms of these

anticompetitive unilateral effects, and the indicia of their likelihood, differ somewhat according

to the bargaining practices used, the auction format, and the sellers' information about one

another's costs and about buyers' preferences.").  Dr. Hill nevertheless applied the SSA model's

predictions equally across all formats because he assumed that bargaining dynamics and

outcomes are functionally similar enough to justify treating them all the same.  Tr. 1598:8-11,

1599:18-1600:6 (Hill).

109.    Dr. Hill's assumption that bargaining dynamics are ultimately the same regardless

of format is contrary to commercial reality.  Industry participants do not consider bargaining

dynamics in all formats to be equivalent—if agents and authors believed that round-robins maximized their outcome, round-robins would be the norm in the industry, rather than the rarest of all acquisition formats.  In fact, agents and authors overwhelmingly use bilateral negotiations and best bid formats because they believe that such formats better serve author interests, including their long-term financial interests.  FF ¶¶ 247-256.  It makes no sense to assume that the outcome of a round-robin bargaining model can fairly predict the outcome of other bargaining formats that are employed specifically because their outcomes are *not* equivalent to round-robin bargaining.

110.    No economic model is a perfect fit for the market it examines.  But it must be a close enough fit to generate reliable predictions about real-world outcomes.  In this case, the SSA model might reasonably fit the round-robin auctions it is designed to examine, but Dr. Hill seeks to extend the SSA's predictions to acquisition formats utilized precisely because they are *not* round-robins.  And the key difference centers on the one point *most important* to the SSA model:  the existence of a constraining runner-up bid.  The whole point of the SSA model is to examine the effect of eliminating one competitor among multiple buyers that are "bidding up" prices by bidding against known offers.  FF ¶ 241.  But a central reason agents and authors overwhelmingly eschew round-robin formats is that the dynamic of bidding against known bids often works against author interests, in part because bidding can end too early, before the winner makes its best bid.  FF ¶ 249.  Agents and authors accordingly use formats that leverage the omnipresent competitive threat of the *entire market*—rather than just a single known bid amount—which generally forces a buyer to make close to its maximum bid up front.  FF ¶ 249.

111.    The effect of eliminating one competitor from a collective market threat depends on dynamics different from those in play when specific bidders are competing through multiple

rounds of known bid amounts.  In the latter scenario, eliminating one competitor will cause certain price outcomes to be lower automatically (when the eliminated competitor was one of the two top bidders)—the point of the SSA and other models is to assess the extent of that effect.  By contrast, eliminating one competitor from the market has a completely different effect on best bids and bilateral negotiations.

112.     As Dr. Hill himself admits, the questions of whether, and how much, eliminating one competitor affects a given negotiation depend entirely on whether a bidder decides to respond by making a *conscious decision* to "bid less aggressively."  Tr. 1270:6-12; Tr. 1302:2-7 ("[I]n a best bids auction, the question is:  Has the competition with the field decreased?  Do I think there's less competition?  And if I know that someone I compete with a lot has been eliminated, I may say:  Okay.  Now there's less competition.  And I can bid less aggressively than I used to."); Tr. 1728:23:1729:1 (Hill) ("it is profit maximizing to take account of the fact that competition has been lessened and to lower your bids, in general, in best bids, and negotiations to be less aggressive").  And Dr. Hill further admits that whether and to what extent a given bidder consciously decides she can safely lower a bid without losing the book can depend on specific context.  Tr. 3191:17-22 (Q.  "So does that mean that they would bid less aggressively in every blind bid that they entered?" A. "It would depend on the particular subject matter of the book potentially and the editor's perception of how often they compete with Penguin Random House, but, yes, it could affect all blind bid competition."); Tr. 3194:3-8 (Q. "I want to make sure I understand.  Are you saying that in every form of acquisition, any type of auction, any type of bilateral negotiation, that it would be economically rational for the S&S editors to lower their bid?"  A. "Again, I said, I think, from the beginning, it's going to depend on the specific S&S editor and their perception.").  Indeed, Dr. Hill testified that a firm deciding

whether and how much to lower bids may even need to "hire a management consultant," who can assess the market conditions and "say, now that this competition is being removed, you can do these different things." Tr. 1595:21-1596:4. Economists likewise understand that bargaining dynamics in non-auction scenarios differ materially, which is why they use models *different* from the SSA to examine outcomes in non-auction bargaining. FF ¶ 243, 245.

113.     Dr. Hill nevertheless applied the model's results to justify his opinion that even in bilateral negotiations he "would expect [S&S editors] on average to reduce [bids] by the 11.5 percent" predicted by the SSA model. Tr. 3199:7-11. But he proffered no mechanism by which editors in bilateral negotiations and best bids could safely reduce bids so dramatically without losing acquisitions—acquisitions for the most sought-after books in the industry. Models do exist for predicting how mergers are likely to affect such transactions, but Dr. Hill did not apply any of them here. He instead could only speculate that editors would accurately assess competitive conditions in these transactions and successfully make lower bids without losing any books. But he is admittedly not an expert on bargaining in the industry, FF ¶ 215, and thus is not qualified to opine on how editors make decisions about how much to bid, what kind of competitive knowledge they normally act on, how much they can learn from prior acquisitions, and so on.

114.     Dr. Hill's theory might apply intuitively to a high-information, high-liquidity "efficient market," where it is appropriate to presume that market participants can fully and accurately incorporate all publicly available information into pricing decisions. *See*, *e.g.*, *Coburn v. Evercore Trust Co., N.A.*, 844 F.3d 965, 969 (D.C. Cir. 2016). The publishing industry is, if anything, the polar opposite of an "efficient market": the real-world facts show that because every book is unique and bidding is almost always blind, it is essentially impossible

for editors to learn from the acquisition of each unique book how much value other unknown editors place on different books in other acquisition processes.  FF ¶ 104-107.  Lacking either expertise in the industry or an economic model of bargaining conduct in such conditions, Dr. Hill could only speculate that the results of his SSA model apply equally to all transactions, despite their fundamentally different bargaining dynamics.  But "antitrust theory and speculation cannot trump facts."  *Arch Coal*, 329 F. Supp. 2d at 116-17.

115.    The fact that Dr. Hill could not obtain results from properly applicable models does not justify the use of an inapplicable model.  Nor does it justify retreat to unanalyzed and unsupported speculation about how individual negotiators and bidders make decisions about how much to offer when they are competing against the collective threat of the entire industry.

2.    *Dr. Hill Used Inappropriate Inputs In Applying The SSA Model*

116.    Dr. Hill also used inappropriate inputs in applying the SSA model.

117.    First, Dr. Hill used inadequate market-share data to estimate how often PRH and S&S were the top two bidders in the auctions modeled by the SSA.  Market shares necessarily reflect only which publisher won a given acquisition, not who was runner up.  And they are a product of all acquisition processes, not just auction formats.  Professor Snyder's agency data make clear that market shares significantly overstate how often PRH and S&S are actually winner and runner-up.  FF ¶ 187.

118.    Dr. Hill invoked other data sources to try to confirm the market shares, but those sources did not shed additional light.  He compiled and relied on editorial minutes and win-loss data, but neither source identified runners-up, as he admitted.  FF ¶ 266.  So Dr. Hill simply assumed that when one entity won and the other also bid, the other was runner-up—an unsupported assumption contradicted by the real-world agency data.  FF ¶ 266, 267.  Dr. Hill also collected runner-up data, but it too was incomplete:  it omitted a large portion of the alleged

market, and it did not compare how frequently the two encounter each other in the marketplace overall.  FF ¶ 266.

119.    Second, Dr. Hill used incorrect data to estimate the parties' book-acquisition margins, another essential factor in a unilateral effects claim.  Dr. Hill's first report initially included operating expenses in PRH's margins, but excluded them for S&S.  After Professor Snyder identified the inconsistent treatment, Dr. Hill chose to estimate profit margins by excluding operating expenses altogether for both merging parties.  FF ¶¶ 258-259 .

120.    The exclusion of operating expenses results in margins that are significantly inflated and wholly inconsistent with commercial realities.  Dr. Hill incorrectly asserted that the model requires the use of only variable costs, but the assertion contradicts his own analysis, which initially *included* operating costs for PRH.  FF ¶ 258.  If Dr. Hill actually understood that the model prohibits the inclusion of operating expenses in estimated margins, he would not have included them in his model at the outset.  In fact, as Professor Snyder explained, what the model "requires" is the use of predicted margins that reflect *the actual margins used by the parties* in their pricing decisions.  Tr. 2805:15-2806:9 (Snyder); FF ¶ 263.  One might speculate that companies in other industries focus only on variable costs when they calculate expected margins to make offers, but the undisputed evidence here shows that in the publishing industry, operating expenses are considered an essential component of the book-level P&Ls that publishers build to inform their advance offers.  FF ¶ 263.

121.    By excluding operating costs from margin estimates, Dr. Hill estimates margins that are much higher than the actual margins publishers use to calculate their advance offer.  Using the correct margin figures results in much lower predicted advance-reduction harm.  FF ¶ 261.

3.      _Dr. Hill's GUPPI Calculations Do Not Bolster His Inapplicable And Flawed SSA Analysis_

122.    In response to Professor Snyder's showing that the SSA does not generate reliable predictions of the merger's effects for the vast majority of acquisitions, Dr. Hill employed GUPPI calculations to try to model the effects in bargaining formats other than round-robins.  FF ¶ 270.  But the GUPPI calculations do not show reliable predictions either.

123.    As an initial matter, the GUPPI is not a confirmation device; it is a "screening device" that is "used at the outset" for evaluating whether a merger should undergo more in-depth analysis.  FF ¶ 270; _see_ Jan M. Rybnicek & Laura C. Onken, _A Hedgehog in Fox's Clothing? The Misapplication of GUPPI Analysis_, 23 Geo. Mason L. Rev. 1187, 1193 (2016) (GUPPI does not provide "a direct indication of the likely effects of a merger").  In addition, "[i]t's got the same problems lack of fit to the industry.  It's got the same problems with respect to inputs.  It also cannot account for agent behavior.  There's no competitor response."  Tr. 2635:23-2636:18 (Snyder).

124.    Dr. Hill also failed to create a GUPPI calculation—or any model at all—for bilateral negotiations, FF ¶ 270, which his own runner-up data show account for more than 60 percent of all acquisitions for PRH and S&S.  FF ¶ 163.

125.    Dr. Hill also used the same flawed inputs in his GUPPI calculations that he used in the SSA model.  FF ¶ 272.  Using Professor Snyder's inputs, the GUPPI calculations in fact suggest harm of less than 5 percent for both multi-round and single-round and hybrid acquisition processes, as Dr. Hill admitted.  FF ¶ 272.  Predicted pricing pressure below 5 percent falls within the recognized "safe harbor" for the inherently imprecise GUPPI calculation.  The Department of Justice typically employs a safe harbor because a GUPPI calculation always shows harm.  FF ¶ 272.  Where, as here, a GUPPI calculation predicts an effect below 5 percent,

it signals that harm is unlikely to result from the transaction and further investigation is not

warranted.  FF ¶ 272.

## III.   THE GOVERNMENT DID NOT PROVE THAT THE MERGER WILL LIKELY CAUSE A SUBSTANTIAL DECREASE IN ADVANCES THROUGH COORDINATED EFFECTS

126.    The government's final theory of harm is that the merger will lead to "coordinated

conduct" among the remaining publishers in the market for anticipated top-selling books.

### A.    A Coordinated Effects Claim Requires Proof That A Merger Increases The Ability Of Industry Participants Both To Reach An Express Or Implied Agreement And To Punish Deviations From The Agreement

127.    Coordination—sometimes referred to as "tacit collusion" or "conscious

parallelism"—is the process "by which firms in a concentrated market might in effect share

monopoly power . . . by recognizing their shared economic interests and their interdependence

with respect to price and output decisions."  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco

Corp.*, 509 U.S. 209, 227 (1993)*.*  Coordination between rivals can occur only if the firms can

solve what economists call "cartel problems," i.e., the difficulties of maintaining a consensus to

take actions that would *not* be in each company's individual interest absent coordination.  *See*

George J. Stigler, *A Theory of Oligopoly*, 72 J. Pol. Econ. 44, 44-46 (1964).  These problems

make the "anticompetitive minuet" of tacit coordination "most difficult to compose and to

perform."  *Brooke Grp.*, 509 U.S. at 227-28.

128.    The first step—establishing a tacit consensus—"requires harmonizing the

incentives of participating firms and mitigating firm uncertainty concerning rival firms, so that

they can effectively coordinate their behavior."  *In re B.F. Goodrich Co.*, 110 F.T.C. 207, 295

(1988), *as modified by* 112 F.T.C. 83 (July 18, 1989).  The second step—enforcing the

consensus—is equally critical, because without "mutual trust and forbearance . . . an informal

collusive arrangement is unlikely to overcome the temptation to steal a march on a fellow

colluder by undercutting him slightly." *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1388-89 (7th Cir. 1986). Consequently, firms will not coordinate unless they can "retaliate effectively if and when cheating occurs." *Goodrich*, 110 F.T.C. at 295. To block a merger based on a likelihood of coordinated effects, then, the government must prove that "market conditions, on the whole, are conducive to [1] reaching terms of coordination and [2] detecting and punishing deviations from those terms." *H&R Block*, 833 F. Supp. 2d at 77.

129.     The government also must show that the merger is "*likely to change* the manner in which market participants interact, inducing *substantially more* coordinated interaction." Guidelines § 7.1 (emphasis added); *see* Areeda & Hovenkamp ¶ 919 (merger must "change firms' incentives to coordinate their behavior").

**B.     The Merger Will Not Increase The Likelihood Of Coordinated Compensation Terms**

130.     During opening argument, the government's sole coordinated effects theory was that the merger would enable other industry participants to "play follow the leader in their choices about how to compensate authors or the terms in which they set for authors." Tr. 49:12-14. To establish that theory, the government acknowledged, it would have to prove that the combined entity would be able to "punish any other publisher it believes is acting as a maverick and not following the industry lead." Tr. 50:13-14.

131.     The government at trial did not adduce any evidence showing that the merger will make it easier at all—much less substantially easier—for aggressive market rivals to reach and enforce any implied "follow the leader" agreement on any author compensation terms. Nor did the government fulfill its promise to prove that the combined entity could "punish" any individual "maverick" who deviated from such an agreement. In fact, Dr. Hill admitted that he did not study the likelihood of increased coordination post-merger. FF ¶ 274. Dr. Hill testified

only that the existing market is "vulnerable" to coordination, but his key bases for that conclusion were the Ebooks precedent, Tr. 1329:11-13 (Hill), which is irrelevant, *see infra* CL ¶ 136, and transparency of pricing, Tr. 1330:14-122 (Hill), which is demonstrably incorrect, *see infra* CL ¶.  He also did not explain how the merger would likely facilitate substantially *more* coordination, which is the relevant inquiry.

132.    The merger does not increase the likelihood of coordination over advances and other compensation terms because books are non-homogenous, pricing is non-transparent, and deals are too complex.  Tr. 2880:14-2883:12 (Snyder).  As the Guidelines state, coordination is likely to succeed only when "each competitively important firm's significant competitive initiatives can be promptly and confidently observed by that firm's rivals," which is "more likely" when price terms "are relatively transparent" and products are "relatively homogeneous." Guidelines § 7.2; *see Arch Coal*, 329 F. Supp. 2d at 141-42, 144-45 (non-transparent pricing leads to "limited, imperfect, and largely unreliable and untimely" information about rivals' conduct, making coordination "unlikely to succeed," and heterogeneity likewise "limit or impede the ability of firms to reach terms of coordination"); *Deutsche Telekom*, 439 F. Supp. 3d at 239; *Oracle*, 331 F. Supp. 2d at 1113.  Because advance information is at best sparse and untimely, publishers cannot reliably send or respond to "follow the leader" signals.  FF ¶ 277.  Likewise, because books are so differentiated and their value is so subjective, even when a publisher does discover compensation terms, it cannot use that information to make a judgment about what terms to offer a different author for an entirely different book.  FF ¶ 277.  Relatedly, non-price competition undermines the ability to send and follow signals (since non-price subjects are even more subjective and non-transparent), *see Deutsche Telekom*, 439 F. Supp. 3d at 235, 240, and authors often pursue subjective non-price preferences in acquisitions, FF ¶¶ 279-281.  Further,

the ease of expansion by smaller firms, FF ¶ 282, precludes larger rivals from enforcing a tacit agreement. *See* Guidelines § 7.2 (coordination less likely when market includes "participants with small market shares and little stake in the outcome resulting from the coordinated conduct, if these firms can rapidly expand their sales in the relevant market").

133.    The government speculates that access to printing could be used to punish deviations, but Dr. Hill did not provide any support for that speculation:  he did not opine that the merged firm could identify deviations, nor did he opine that it would be profitable for the merged firm to withhold printing as punishment, given the availability of printing services elsewhere.

### C.    The Merger Will Not Increase The Likelihood That Hachette, Macmillan, And Other Publishers Will Enter Illegal Anti-Poaching Agreements

134.    In examining Professor Snyder, the government challenged him to explain why the merger would not make it more likely that rival publishers would enter into illegal and possibly criminal anti-poaching agreements, i.e., CEOs getting "together at dinner on a quarterly basis and agree[ing] that they weren't going to poach each other's top selling authors."  Tr. 3017:14-17.

135.    As an initial matter, the government adduced no evidence demonstrating that its own witnesses like Hachette's Michael Pietsch or Macmillan's Don Weisberg would be more likely after the merger to risk their personal freedom by entering into such illegal horizontal agreements.  Nor did the government show how changing the number of lunch partners from five to four (with, perhaps, a fifth rotating seat for Norton or Disney or Abrams and so on) would make it substantially more likely publisher CEOs would expressly collude over poaching.  Even leaving aside the specter of criminal liability, the government adduced no expert or real-world evidence establishing either that publishers would have an economic incentive to avoid poaching the most-sought after authors, or that they would have a mechanism for punishing deviations

from such an agreement.  As Professor Snyder explained, publishing CEOs would have no economic incentive to avoid poaching because there are too many competitive options for authors and CEOs would "just be hurting themselves" if they did not take the opportunity to contract with a top-selling author.  Tr. 3021:6-13.

D.     **The Ebooks Case Does Not Show That The Merger Will Increase The Likelihood Of Coordination**

136.    The government's coordination claim relies heavily on *United States. v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015), which affirmed a judgment that Apple had orchestrated a conspiracy with certain major publishers to increase *downstream* retail prices of digital books ("ebooks").  The case involved a "hub-and-spoke" conspiracy, organized by Apple at the "hub" and imposed through the "spokes" of its separate contracts with publishers, each of which agreed that Apple's ebook outlet would charge specified retail prices.  Although each price agreement individually was contrary to the publisher's financial interest, the court held that Apple induced them all to agree by organizing communications and engineering a collusive understanding that each would accept the same term, thereby promoting their collective long-term interest in avoiding low-price ebooks competition from Amazon.  *Id.* at 318 ("Apple consciously played a key role in organizing their express collusion.").

137.    The finding that Apple orchestrated a conspiracy concerning downstream price competition for ebooks is not relevant.  For one thing, neither Random House nor Bertelsmann was even accused of participating in the conspiracy.  The government at trial even congratulated PRH's CEO for having kept Random House out of the conspiracy.  Tr. 774:24-775:3.  For another, the Guidelines state that prior coordination in a different product market matters only if "the salient characteristics of that other market at the time of the collusion are *closely comparable* to those in the relevant market."  Guidelines § 7.2 (emphasis added).  The dynamics

of retail bookselling are not at all comparable—much less *closely* comparable—to the acquisition of book rights.  Unlike retail book prices, book-acquisition pricing is completely non-transparent, subjective, and individualized, precluding monitoring and enforcement of any tacit agreement. FF ¶¶ 77-85; *see supra* CL ¶ 132.  Finally, there is no third-party entity here with the incentive and ability to organize collusive behavior to serve its own independent business objectives.

138.    In sum, the government has failed to carry its burden of proving that the merger of PRH and S&S is likely to "substantially lessen competition" in any market.

Dated: August 31, 2022

Respectfully submitted,

By: _____*/s/ Daniel M. Petrocelli*_____

Daniel M. Petrocelli (appearing *pro hac vice*)
M. Randall Oppenheimer (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Andrew J. Frackman (appearing *pro hac vice*)
Abby F. Rudzin (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
Seven Times Square
New York, NY 10026
Telephone: (212) 326-2000
afrackman@omm.com
arudzin@omm.com

Jonathan D. Hacker (D.C. Bar No. 456553)
Julia Schiller (D.C. Bar No. 986369)
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
jhacker@omm.com
jschiller@omm.com

Deborah L. Feinstein (D.C. Bar No. 412109)
Jason Ewart (D.C. Bar No. 484126)
**ARNOLD & PORTER**
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
debbie.feinstein@arnoldporter.com
jason.ewart@arnoldporter.com

*Attorneys for Defendants Bertelsmann SE & Co.*
*KGaA and Penguin Random House LLC*

By:   */s/ Stephen R. Fishbein*

Stephen R. Fishbein (appearing *pro hac vice*)
Jessica K. Delbaum (appearing *pro hac vice*)
**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
sfishbein@shearman.com
jessica.delbaum@shearman.com

Ryan Shores (D.C. Bar No. 500031)
Michael Mitchell (D.C. Bar No. 1531689)
**SHEARMAN & STERLING LLP**
401 9th Street, N.W., Suite 800
Washington, D.C. 20004
Telephone: (202) 508-8000
ryan.shores@shearman.com
michael.mitchell@shearman.com

Rachel E. Mossman (D.C. Bar No. 1016255)
**SHEARMAN & STERLING LLP**
2828 North Harwood Street, Suite 1800
Dallas, TX  75201
Telephone: (214) 271-5777
rachel.mossman@shearman.com

*Attorneys for Defendants Paramount Global (f/k/a
ViacomCBS Inc.) and Simon & Schuster, Inc.*