**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

*Plaintiff*,

v.

BERTELSMANN SE & CO. KGaA,
PENGUIN RANDOM HOUSE, LLC,
VIACOMCBS, INC., and
SIMON & SCHUSTER, INC.

*Defendants*.

[redacted]

Civil Action No. 1:21-cv-02886-FYP

**DEFENDANTS' OBJECTIONS TO PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

Page


I. THE GOVERNMENT MUST PROVE THAT SUBSTANTIAL HARM IS LIKELY TO OCCUR ..... 5

II. THE GOVERNMENT'S $250,000 ADVANCE THRESHOLD DOES NOT ESTABLISH A WELL-DEFINED MARKET FOR ANTICIPATED TOP-SELLING BOOKS ..... 7

A. The $250,000 Advance Level Does Not Reflect A Change In Market Shares ..... 8

B. The $250,000 Advance Level Is Not Narrowly Defined To Capture Only Anticipated Top Selling Books ..... 9

C. Practical Indicia Do Not Provide Any Basis For Distinguishing Books Acquired For $250,000 Or More From Other Books ..... 12

D. The HMT Does Not Identify A Substantively Distinct Submarket ..... 14

III. THE PURELY STATISTICAL HHI PRESUMPTION IS REBUTTED HERE ..... 15

A. The Presumption Does Not Shift The Burden To Defendants To Prove The Absence Of Competitive Harms ..... 15

B. The Evidence Casts Serious Doubt On The Reliability Of Market Shares As Conclusive Proof Of Competitive Harm ..... 17

1. The Government Wrongly Focuses On The Big Five's Collective Market Share ..... 17

2. PRH And S&S Are Not Close Head-To-Head Competitors ..... 21

3. Static Market Shares Fail To Account For Rivals' Planned Expansion ..... 23

4. Market Shares Fail To Account For Agents' Role In Driving Competition ..... 24

5. Market Shares Do Not Capture The Competitive Significance of Imprint Competition ..... 25

6. The 2013 Merger Did Not Cause A Decrease In Author Advances ..... 26

7. Ordinary Course Documents Show No Expectation Of Decreased Advances ..... 27

IV. THE GOVERNMENT'S UNILATERAL EFFECTS ANALYSIS DID NOT PROVE THE MERGER IS LIKELY TO CAUSE SUBSTANTIAL HARM ..... 28

A. The Government's Attempt To Extrapolate The Results Of The SSA Model To Formats Not Modeled By The SSA Is Insupportable ..... 29

B. Dr. Hill's SSA Model Fails On Its Own Terms ..... 37

C. The GUPPI Calculations Do Not Cure The SSA's Defects ..... 39

**TABLE OF CONTENTS**
(continued)

**Page**


D. No Evidence Supports The Government's Speculative Theory Of Harm Through A "Second Order Effect" Of Softening Competition ........ 40

V. THE MERGER WILL NOT INCREASE THE LIKELIHOOD OF COORDINATION ........ 42

A. Contractual Terms Are Not A Plausible Avenue For Coordination ........ 42

B. The Merger Will Not Make Anti-Poaching Coordination More Likely ........ 44

C. The Ebooks Case Is Irrelevant ........ 44

CONCLUSION ........ 45

# TABLE OF CONTENTS

**Page**

**Cases**

*United States v. Baker Hughes, Inc.*,
908 F.2d 981 (D.C. Cir. 1990) .......... 15, 23

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .......... 6

*Catalano, Inc. v. Target Sales, Inc.*,
446 U.S. 643 (1980) .......... 42

*FTC v. Foster*,
2007 WL 1793441 (D.N.M. May 29, 2007) .......... 26

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) .......... passim

*FTC v. Libbey, Inc.,*
211 F. Supp. 2d 34 (D.D.C. 2002) .......... 17

*FTC v. RAG-Stiftung*,
436 F. Supp. 3d 278 (D.D.C. 2020) .......... 7

*FTC v. Staples Inc.*,
190 F. Supp. 3d 100 (D.D.C. 2016) .......... 17

*FTC v. Swedish Match*,
131 F. Supp. 2d 151 (D.D.C. 2000) .......... 17

*FTC v. Sysco Corp.*,
113 F. Supp. 3d 1 (D.D.C. 2015) .......... 11, 19, 25, 27

*FTC v. Tenet Health Care Corp.*,
186 F.3d 1045 (8th Cir. 1999) .......... 7

*FTC v. Tronox Ltd.*,
332 F. Supp. 3d 187 (D.D.C. 2018) .......... 27

*FTC v. University Health, Inc.*,
938 F.2d 1206 (11th Cir. 1991) .......... 16

*FTC v. Wilh. Wilhelmsen Holding ASA*,
341 F. Supp. 3d 27 (D.D.C. 2018) .......... 16, 27

*Hospital Corp. of Am. v. FTC*,
807 F.2d 1381 (7th Cir. 1986) .......... 6

*In re Super Premium Ice Cream Distribution Antitrust Litig.*,
691 F. Supp. 1262 (N.D. Cal. 1988) .......... 13

*Syufy Enterprises v. American Multicinema, Inc.*,
793 F.2d 990 (9th Cir. 1986) .......... 11

*United States v. Aetna*,
240 F. Supp. 3d 1 (D.D.C. 2017) .......... 17

**TABLE OF CONTENTS**

**Page**

*United States v. Anthem*,
236 F. Supp. 3d 171 (D.D.C. 2017) ........ 23

*United States v. AT & T Inc.*,
310 F. Supp. 3d 161 (D.D.C. 2018) *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) ........ 28

*United States v. AT&T, Inc.*,
916 F.3d 1029 (D.C. Cir. 2019) ........ 6

*United States v. Bazaarvoice, Inc.*,
2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ........ 27

*United States v. E.I. du Pont de Nemours & Co.*,
353 U.S. 586 (1957) ........ 27

*United States v. Gen. Dynamics Corp.*,
415 U.S. 486 (1974) ........ 15

*United States v. H & R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011) ........ 12, 17

*United States v. Oracle Corp.*,
331 F. Supp. 2d 1098 (N.D. Cal. 2004) ........ 9

*United States. v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) ........ 44, 45

**Other Authorities**

Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*,
77 Antitrust L.J. 701 (2010) ........ 1, 20

Christopher Conlon & Julie Holland Mortimer, *Empirical Properties of Diversion Ratios* (2021)
........ 20

David Wirth, *To Bid or Not to Bid, That Is the Question: The Assessment of Bidding Markets in Merger Control*, Int'l Compar. Legal Guide to: Merger Control 2016 ........ 19

Herbert Hovenkamp & Carl Shapiro, *Horizontal Mergers, Market Structure, and Burdens of Proof*, 127 Yale L.J. 1996, 2014 (2018) ........ 20

Nathan Miller, *Modeling the effects of mergers in procurement*, 37 Int'l J. Indus. Org 201 (2014)
........ 38, 39

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) ........ passim

The government's Proposed Findings of Fact and Conclusions of Law (Dkt. 177) confirms the government's failure to prove that the merger between Penguin Random House ("PRH") and Simon & Schuster ("S&S") would likely cause a substantial lessening in competition in any well-defined market.

The government's brief is an anachronism. Before its first thorough modernization in 1992, the Horizontal Merger Guidelines focused principally on concerns about concentration in markets for homogenous products. A central premise of the 1992 Guidelines is that markets for differentiated products require a different analysis, focused less on market concentration and more on the effects of eliminating head-to-head competition between the merging parties. That premise was fortified and elaborated in the current 2010 version. *See generally* Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 Antitrust L.J. 701 (2010) (co-author of 2010 Guidelines).

The government's brief seeks to escape the current Guidelines and resurrect a bygone era. It focuses overwhelmingly on market concentration, insisting that market shares alone conclusively prove the anticompetitive effects of the merger and obviate any need even to *consider* whether head-to-head competition between PRH and S&S tells a different story about competitive effects. The government even embellishes the facts, repeatedly describing the merger as if it were fusing five separate rival publishers into a single dominant collective with a 90 percent share. Contrary to the government's depiction, this merger is a not a "merger to monopoly," or anything like it. The industry will remain rife with competition—there will be four large, aggressive rivals, and numerous other elite publishers that are collectively equivalent to a fifth threat competitor in bargaining for the most sought-after books.

This merger will not substantially lessen competition, but will enhance it. Among other things, the merger will incentivize PRH and S&S's many rivals to compete even harder to win the books readers most want to read. The contemporaneous, ordinary-course business documents of industry participants uniformly recognize that advances will continue to increase, either despite the merger or because of it. When pressed on the stand, witnesses from rival publishers were forced to admit that they either planned no advance reductions, or affirmatively recognized that the merged entity would be able to increase advances, forcing a competitive response that rivals plainly would rather avoid.

The government eventually acquiesces to the Guidelines' focus on head-to-head competition between the merging parties, but its case founders there as well. First, despite what market shares might facially indicate, PRH and S&S hardly ever compete with each other head-to-head as the top two choices for authors. Second, when they do so, it is hardly ever in the form of round-robin-style auctions. Even though such auctions are the rarest form of bargaining in the industry, the government's expert, Dr. Hill, used a model designed specifically to examine only round-robin auctions—its entire point is to examine how a merger affects bargaining outcomes when all bidders know and respond to the amounts they are bidding against, and the merger eliminates one of the bidders. Despite that essential condition of his own model, Dr. Hill extrapolated its projections to the "blind" bargaining formats—bilateral negotiations and best bids—that comprise some 80 to 90 percent of acquisitions, *none* of which involves bidding against known amounts. According to Dr. Hill, the model's projections apply equally to these blind-bidding formats, based entirely on his own speculation that editors and agents would perceive and consciously respond to post-merger changes in competitive conditions as if they *did* know exactly what amount they were bidding against. Dr. Hill cited no authority justifying this

extrapolation, conducted no study to support it, and lacked any publishing-industry expertise on which to ground it. And the evidence directly refuted his assumption that a model about known-bid bargaining could apply to blind-bid bargaining: in fact, editors in the latter formats have none of the information they would need to adjust their offers, as he assumes they would. And if they started bidding less aggressively absent accurate information about whom they are bidding against for a book and how much their rivals are valuing it, they would immediately start losing bestselling books and authors. And not just for that acquisition, but likely forever. For these reasons, editors in blind-bargain book acquisitions cannot make the kind of experimental, market-guessing price adjustments that, according Dr. Hill, are the norm in everyday consumer product markets, where goods are commonly priced and sellers *do* have accurate, detailed, timely information on what consumers purchased, how much, and the prices they paid.

Competition matters in both markets, to be sure, but the competitive conditions in the markets are fundamentally different. That difference is precisely why the Guidelines long ago recognized that mergers in markets with individually bargained prices require a different analysis. Dr. Hill's assumption that the dynamics of pricing consumer goods are similar to the dynamics of individualized bargaining for unique, unpublished manuscripts cannot be reconciled with that principle.

The government's brief resists long-settled antitrust principles in another important way. Courts have held for decades that to block a merger, the government cannot just claim harm to competition in general—it must prove that the merger is likely to cause substantial harm to competition *in a well-defined market.* Unless a market is properly identified, the parties cannot know what the relevant market shares are or what specific competitive forces will be affected by the merger.

After incorrectly asserting that market definition is merely one among many "tools" used to assess competitive harm—in fact, it is an essential predicate to any merger challenge—the government searches *within* the market for the acquisition of all U.S. trade books for a "submarket" where it can find an adverse effect on advances. The government claims to have found such a submarket—its own separate economic unit—in the acquisition of books for advances of $250,000 or more. But the proposed $250,000 market-defining threshold does not survive even the government's own justifications for it.

On the one hand, the government contends that the submarket must be defined by the advance level where the Big Five collectively possess the strong majority of market shares, because that difference in market shares ostensibly shows a difference in competitive conditions and a difference in author preferences. The evidence showed, however, that the advance level at which the Big Five possess a strong majority of market share occurs at the *$50,000* threshold. The market-share difference justification thus fails to provide a sound basis for defining a submarket at the $250,000 level.

On the other hand, the government describes its submarket in substance as capturing books by franchise, celebrity, and prize-winning authors, because such books are easily identifiable *ex ante* and there is an industry consensus that they will likely be top sellers. The evidence showed, however, that such books typically receive advances well exceeding $1,000,000. The industry-consensus justification thus also fails to provide a sound basis for defining a submarket at the $250,000 level.

In short, the government's submarket is far too small if it is meant to capture a market-share difference, and far too big if it is meant to capture an industry consensus about certain books easily identifiable as likely bestsellers. Indeed, among the potential market-defining

thresholds discussed at trial, the boundary that makes the *least* sense is the $250,000 threshold the government elected to build its case upon. No industry participant recognizes $250,000 as an amount that divides competition for books into separate economic units. No industry participant structures its personnel, imprints, divisions, or services around unpublished manuscripts or proposals acquired at or around that level. No special contract template is triggered. Some manuscripts of course garner advances higher than others—the inevitable result of competition and individualized bargaining over entirely unique products. And higher advances generally reflect higher sales expectations, which sometimes translate into a higher marketing spend, *if* the book still looks like a winner as it nears publication. But a broader market characterized by a predictable *continuum* of different prices for different books is, if anything, the opposite of a market that segregates books into distinct *categories* that operate as separate submarkets.

Because the government did not prove that the $250,000 threshold it used to analyze competitive effects constitutes a well-defined submarket, its challenge fails as a matter of law.

## I. THE GOVERNMENT MUST PROVE THAT SUBSTANTIAL HARM IS LIKELY TO OCCUR

The government persists in contending that it must prove only that harm "may" occur, not that the merger is "likely" to cause substantial competitive harm. Dkt. 177 at 28-29 (¶ 40); Tr. 31:23-32:4. That contention ignores three decades of precedent, Dkt. 178 at 116 (Defendants' Proposed Conclusions of Law ("CL") ¶ 2), as well the Guidelines, which require "an assessment of what will likely happen if a merger proceeds," U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 1 (2010).[1]

[1] The "likely" standard pervades the Guidelines. *See*, *e.g.*, Guidelines § 1 ("A merger enhances market power if it is likely to encourage one or more firms to raise price, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives."); Guidelines § 2 (summarizing evidence government considers "most

Contrary to the government's assertion, the D.C. Circuit in *FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001), did not adopt an "appreciable danger" standard that is lower than "likely" harm. The *Heinz* court in fact expressly applied the settled "likely" standard. *Id.* at 717 n.13, 719 n.17. The court made only a passing reference to "appreciable danger" embedded within a parenthetical quotation from *Hospital Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986) ("*HCA*"), which the government also misreads. The *HCA* court referred to an "appreciable danger" standard only to emphasize that the government need not show *already-existing* harm from a *consummated* merger. *Id.* at 1389. The government need only show future harm, but to make that showing, the court emphasized, it must prove that "the challenged acquisition is *likely* to hurt consumers." *Id.* at 1386 (emphasis added). The "appreciable danger" of harm standard is thus functionally equivalent to the "likely" harm standard.

Finally, the government cites the D.C. Circuit's statement in *United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019), that blocking a merger requires proof that it "is likely to substantially lessen competition, which encompasses a concept of 'reasonable probability.'" *Id.* at 1032 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 n.39 (1962)). Contrary to the government's suggestion, that passage does not announce a *lower* standard—it *equates* "reasonable probability" with the "likely" standard, as the court makes clear in the very next paragraph, which repeatedly invokes the "likely" harm standard. *Id.* The Court's meaning is also clear from its citation to *Brown Shoe* footnote 39, which distinguishes "reasonable probability" from an incorrect "mere possibility" standard—a standard akin to the low "may occur" standard the government urges this Court to apply. 370 U.S. at 323 n.39.

---

informative in predicting the likely competitive effects of mergers"); Guidelines § 5 ("Market concentration is often one useful indicator of likely competitive effects of a merger.").

## II. THE GOVERNMENT'S $250,000 ADVANCE THRESHOLD DOES NOT ESTABLISH A WELL-DEFINED MARKET FOR ANTICIPATED TOP-SELLING BOOKS

In a § 7 case, the government must begin at the threshold by proving the existence of a "well-defined" market where the merger will allegedly harm competition. Dkt. 178 at 118-19 (CL ¶ 8). The government again seeks to evade a long-settled burden, asserting that market definition is merely "one of many tools" used to assess competitive harm. Dkt. 177 at 11. It is more than a "tool"—it is a "necessary predicate" that the government must prove in every case, *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 291 (D.D.C. 2020), because "[w]ithout a well-defined relevant market, a merger's effect on competition cannot be evaluated," *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999). The failure to prove a well-defined market dooms a § 7 challenge. Dkt 178 at 118-19 (CL ¶ 8).

The government here sought to prove harm only in one submarket within the broader market for all U.S. trade books: an alleged submarket for "anticipated top-selling books." Because that phrase concededly has no industry meaning (Dkt. 177 at 62-63 (¶¶ 122-23)), it provides no basis, in itself, for identifying market shares or assessing the merger's competitive effects. The government accordingly invoked a quantitative metric—an advance level of $250,000—to distinguish books within the submarket from other books.

The government concedes that to establish a well-defined market, a price-defined boundary like its $250,000 threshold must have substantive content., i.e., it must either identify a "submarket of core customers" whose needs make certain products subject to differential pricing, Dkt. 177 at 34-35 (¶ 56) (quotation omitted), or it must identify categorical distinctions among products within "a broader range of products," *id.* at 35 (¶ 57). In this case, the government contends that the $250,000 advance level is "an appropriate way to identify targeted sellers." *Id.* at 34 (emphasis and capitalization altered). According to the government, the $250,000 advance

level segregates "a group of books whose authors have different preferences and face different competitive conditions." Dkt. 177 at 38 (¶ 64); *see id.* at 39 (¶ 66). The "different competitive conditions" the government refers to are the "significantly different market shares" that supposedly exist below and above the $250,000 advance level. *Id.* at 39 (¶ 66). The same is true for authors' "different preferences": the supposed difference in market share data above and below the $250,000 advance threshold "show that authors of anticipated top-selling books make different choices from authors of other books." *Id.* at 52 (¶ 100); *see* Tr. 1235:17-21 (Hill) (market share difference at $250,000 level shows that "authors of anticipated top sellers are making different choices than other authors"); Tr. 1549:15-18 (Hill) (market shares reflect authors' "revealed choices that they have a stronger preference for the Big 5 vis-à-vis the non-Big 5 than do . . . authors of other books").

The $250,000 advance level does not establish a well-defined market based on different "competitive conditions" and different "preferences" for multiple reasons.

**A. The $250,000 Advance Level Does Not Reflect A Change In Market Shares**

As just shown, the fundamental premise of the government's $250,000 market-defining advance level is that above that level, the Big Five have a strong majority of market shares, and below that level, they do not. That premise is unambiguously false. As defendants have already shown, the market-share dynamic changes at *$50,000*. Dkt. 178 at 128 (CL ¶¶ 31-32). It is accordingly at that level—and only that level—where it is possible even in theory to claim that authors have different "revealed preferences" and that their books are subject to different competitive conditions. In other words, the government's own defense of its quantitative metric proves why that metric does *not* establish a well-defined submarket. And because the government never defined a submarket according to the $50,000 threshold dictated by its own "targeted seller" criteria, the government did not and could not identify any HHI presumption at

that level, nor did it conduct any analysis of the merger's competitive effects in a market defined by a $50,000 advance threshold. The government's own flawed litigation choices about what submarket to analyze, and how to define it, compel judgment for defendants.

### B. The $250,000 Advance Level Is Not Narrowly Defined To Capture Only Anticipated Top Selling Books

As defendants have shown, the government was obligated to identify an advance level that defined a submarket narrowly enough to exclude books that are not "anticipated top selling books." Dkt. 178 at 131 (CL ¶¶ 37-38); *see United States v. Oracle Corp*., 331 F. Supp. 2d 1098, 1158 (N.D. Cal. 2004) (rejecting market defined by $500,000 price that included many products that the market is supposed to exclude). The government's brief only confirms its failure to do so.

The government's brief reiterates that the $250,000 advance level is supposed to exclude "'midlist' books," Dkt. 177 at 48 (¶ 92); *see* Dkt. 178 at 120-21 (CL ¶ 13), which are assertedly in a "different business" than the "big mega price books" in the government's submarket. Dkt. 177 at 48 (¶ 92) (quotations omitted). Yet the government itself insists that almost all books below $250,000 sell fewer than 2,000 copies, and the vast majority sell only a few dozen. Dkt. 178 at 24 (Defendants' Proposed Findings of Fact ("FF") ¶ 41). In other words, the segment below $250,000 almost entirely comprises *low* selling books. It necessarily follows that most of the anticipated *midlist* books supposedly excluded from the government's submarket are in fact found above the $250,000 threshold. *Id.* That inference is supported by testimony that only "seven figure[]" advances are considered "high level advance[s]," Dkt. 178 at 24 (FF ¶ 40), confirming that six-figure advances tend to reflect midlist expectations.

Further confirming the overbreadth problem, the government's brief doubles down on its trial theory that books in the alleged submarket can be distinguished from others by the status of

their authors as franchise authors, celebrities, or prize winners. Dkt. 177 at 61 (¶ 121). In describing the "special characteristics" that make these books and authors easily identifiable and hence subject to targeting, the government emphasizes that the market comprises authors who "are more likely to have track records of success, reach bestseller lists, and receive awards." *Id.* at 60 (¶ 118); *see id.* at 61 (¶ 121) (books in submarket "tend to be associated with 'franchise' authors, celebrities, or authors with potential to win major literary awards"); *id.* at 62-63 (¶ 123) (citing testimony referring to "franchise authors" and "giant celebrities"). The government also adds emphasis to Carolyn Reidy's assertion that "*books by already bestselling authors and celebrities*" require especially skilled publishing services. *Id.* at 53 (¶ 102) (quoting PX-530 at 2 (emphasis by government)). And the government cites agent Andrew Wylie's statement that "for some books, there is a consensus in advance that a particular book is likely to be successful," *id.* at 47-48 (¶ 91), which Wylie illustrated with the example of a book by widely-acclaimed, award-winning author Sally Rooney.

Books by such franchise, celebrity, and prize-winning authors may fit within the government's substantive market-definition criteria. But the evidence shows that such books are acquired for advances well exceeding $1,000,000, often in the multimillion dollar range. Dkt. 178 at 130 (CL ¶ 36). The government established no connection between such easily-identifiable, industry-consensus top-sellers and advances in the $250,000-$1,000,000 range. To the contrary, its own witness testified that the $100,000-$500,000 advance range includes "first time" authors, authors who are not "celebrities," and authors who do not write "blockbusters." Tr. 1133:15-1134:7 (Weisberg). The $250,000 advance level again fails to establish a well-defined market under the government's own criteria.

The government suggests, however, that determining which books constitute "anticipated top-selling books" depends not on any industry-consensus criteria, but on each individual publisher's decision to pay an advance of $250,000 or more. Dkt. 177 at 21, 41-42 (¶¶ 15, 72, 75). The argument is perfectly circular: its market is well defined, the government says, because any book acquired for an advance of $250,000 is automatically a book within its submarket, and any book acquired for less is automatically outside its market. If the government's approach were right, its 32-page discussion of market definition would be largely meaningless: the fact that publishers choose to pay advances of $250,000 or more for certain books would be enough, by itself, to put those books in the submarket the government seeks to define.

More to the point, the government's approach is contrary to law, including the precedent the government presses most heavily, *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990 (9th Cir. 1986). In *Syufy*, the court upheld a submarket of "*industry* anticipated top-grossing films," which were all completed films defined by characteristics that made them identifiable and distinct "ex ante." *Id.* at 994-95 (emphasis added). The court thus required exactly the kind of industry-consensus criteria the government says are not required here. Similarly, the court in *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015), upheld a market definition defined by a quantitative metric because the evidence "demonstrate[d] a consensus among the industry's players regarding the boundaries of the product market." *Id.* at 33. As Judge Mehta warned, unless a court applies substantive "limitations" on an alleged price-discrimination market, the government could define a market around a single customer (here, seller). *Id.* at 39 n.20. The government's circular theory that the submarket is properly defined by whatever any one publisher decides to pay for a book implicates precisely that concern.

As Judge Mehta recognized, the correct way to determine whether the government has established a well-defined "targeted sellers" market is to apply the same objective criteria courts always apply in market definition analysis. *Id.* at 40. Those criteria do not support the government's effort to draw a price-defined submarket at the advance threshold of $250,000.

### C. Practical Indicia Do Not Provide Any Basis For Distinguishing Books Acquired For $250,000 Or More From Other Books

As already shown, if there is any industry consensus around objective criteria for identifying, *ex ante*, books likely to be top sellers, those criteria point only to books acquired for advances well exceeding $1,000,000. The government made no effort to identify a price level reasonably tailored to capture those books and exclude midlist and other books. Nor did the government attempt to establish that advance levels in that untested market would be adversely affected by the merger.

The only market the government did try to identify and analyze was defined by the $250,000 advance threshold, but as the trial made clear, nobody in the industry recognizes that threshold—or anything close to it—as distinguishing one category of books from another for separate competition. Dkt. 178 at 124 (CL ¶ 21). Just as "[e]vidence of industry or public recognition of the submarket as a separate economic unit matters because we assume that economic actors usually have accurate perceptions of economic realities," *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 53 (D.D.C. 2011), the converse must be true as well: the complete absence of *any* industry recognition that books acquired for advances of $250,000 or more constitute "a separate economic unit" constitutes strong evidence that no such separate unit exists.

The government's contrary argument relies chiefly on the premise that the industry does recognize a correlation between advances and anticipated retail sales. Dkt. 177 at 47 (¶ 89). The

government then spends many pages trying to show that advances correlate with increases in marketing and other services publishers provide to top-selling books. But as defendants have already shown, a certain degree of correlation between expected sale, advances, and publishing services is not evidence that the industry separate books into *different categories* at any particular advance level. Dkt. 178 at 125-26 (CL ¶¶ 24-25).

If anything, the correlations cited by the government *refute* its premise that the publishing industry treats manuscripts acquired for advances of $250,000 or more as a "separate economic unit" from other manuscripts. According to the government, this case differs from *In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F. Supp. 1262 (N.D. Cal. 1988), because in that case, the lower priced ice cream competed with the premium ice cream and thus could be substituted for it if premium prices were increased. *Id.* at 1268. The government says that here, if a "hypothetical monopsonist" reduced high advances, no author would turn to an even lower advance as a substitute. Dkt. 177 at 35-36 (¶ 58). The government is right about that much, which establishes only the circularity and uselessness of the "hypothetical monopsonist test" ("HMT") in this context. *See infra* at 14-15. During closing, however, the government distinguished *Super Premium* in a different way, asserting that the ice cream types there competed with each other, whereas here "authors at high end and low end" are "not competing against each other." Tr. 3324:20-21.

The argument is instructive. Authors do, of course, compete with each other to sell their books to publishers. And as the government's closing argument suggests, a central aspect of the market definition analysis is whether the $250,000 line separates authors and books into *distinct spheres of competition*, where books above the line largely do not compete with books below the line. Not one industry witness testified that the $250,000 threshold distinguishes books in that

way. Neither that advance threshold nor any other is used to divide books into different bargaining processes or distinct categories of editorial, marketing, printing, or other services. Some books of course are acquired for advances higher than others, and some books that show a promise of success as they near publication obtain more sales, marketing, and publicity support. Dkt. 178 at 29-31 (FF ¶¶ 52-58). But the evidence is undisputed that publishers generally do not commit to marketing spends when they acquire a manuscript—marketing is determined months or years later, when the book is completed and nearing publication, and sales agents are receiving early reactions. *Id.* at 29-30 (FF ¶ 53). In all events, no evidence shows that industry participants divide books by advance amounts and place those that garner advances for, say, $150,000 into a different economic unit than books that garner advances for $400,000 or $600,000 or $800,000. The evidence is uniformly to the contrary. *Id.* at 26-27 (FF ¶¶ 47-48).

The only real-world evidence cited by the government that even *mentions* the figure $250,000 is the various deal-approval thresholds used by some publishers for corporate governance purposes and the multiple categories of concluded deals reported in Publishers Marketplace. Dkt. 177 at 30 (¶ 65). But the government admits that these thresholds are only for "deals," not for individual books. *Id.* They thus do not reflect *any* assessment that $250,000 per book is a meaningful *advance* threshold. And the thresholds at which different publishers require approvals vary widely. Dkt. 178 at 44-45 (FF ¶¶ 94-95). The $250,000 threshold sometimes used for approving and reporting deals has no more significance than any of the many other thresholds used for the same purpose.

**D. The HMT Does Not Identify A Substantively Distinct Submarket**

The government asserts that because a price-segmented submarket defined at the $250,000 advance level "formally passes" the HMT—which nobody disputes—the market is properly defined. Dkt. 177 at 46 (¶ 86). As noted above, the government asserts that the HMT

properly defines a market because if a hypothetical monopsonist reduced advances within any given price segment, no author would reject the reduced advances for *even lower* advances. *Id.* at 35-36 (¶ 58). To state the argument is to refute it. As Dr. Hill admitted at trial, the HMT's operation would justify a submarket within *any* price segment along the advance continuum. Tr. 3173:7-13 (Hill) (THE COURT: "Well, the hypothetical monopsonist test would work on any of these levels except maybe the very lowest ones because self-publishing isn't really an alternative for most books, right?" THE WITNESS: "I would say it does."); Tr. 1548:3-7 (Hill) (Q. "[Y]ou're not claiming that your hypothetical monopsonist test required you to choose 250- or any other specific advance level as a cut-off, correct; that we agree on?" A. "Correct.").

Under the government's view, the HMT would properly define a market of books acquired for advances from $500,000 to $1,000,000, or from $500,000 to $600,000, or even from $500,000 to $505,000. Each segment would "formally" satisfy the HMT for the same reasons the $250,000 does: if a hypothetical monopsonist reduced advances within the segment, no rational author would respond by substituting lower advances or self-publishing. As Professor Snyder observed far too generously, a test that validates any price-defined market at any advance threshold is "not much of a test." Tr. 2831:19-20. Indeed, it is not a "test" at all.

## III. THE PURELY STATISTICAL HHI PRESUMPTION IS REBUTTED HERE

### A. The Presumption Does Not Shift The Burden To Defendants To Prove The Absence Of Competitive Harms

The government contends that under the *Baker Hughes* three-step proof structure, the purely statistical presumption is by itself "usually outcome-determinative." Dkt. 177 at 67-68 (¶ 130). That contention is refuted by *Baker Hughes* itself, which strongly condemned reliance on market concentration statistics, without more, as the basis for blocking a merger. *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 992 & n.13 (D.C. Cir. 1990); *see United States v.*

*Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974) (although "market share and concentration" can be "of great significance," they are "not conclusive indicators of anticompetitive effects").

It is likewise inconsistent with *Baker Hughes* to say that the government may buttress its purely statistical case by sprinkling in additional evidence of alleged harm and then force defendants to rebut the presumption by affirmatively *disproving* the government's additional evidence. That approach would effectively shift the burden of persuasion to defendants, contrary to *Baker Hughes*. *Heinz*, 246 F.3d at 715. Defendants' sole burden instead is to produce evidence showing that market-share statistics *alone* "give an inaccurate account of the merger's probable effects on competition." *Id.* at 715 (cleaned up). And defendants need only identify facts adequate to "*cast doubt[]* on the persuasive quality of the statistics to predict future anticompetitive consequences." *Id.* at 715 n.7 (emphasis added).[2]

The government cites several district court cases holding that the presumption was not rebutted. But in those cases, the concentration statistics alone gave rise to a much stronger inference than exists here—in many, the post-merger HHI would have been more than *double* the post-merger HHI of 3111 here. Several cases are addressed at Dkt. 178 at 142 (CL ¶ 64), others include:

- *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018): merging parties occupied the "number one and number two market positions," represented each other's "primary competition," and together would control almost 90 percent of the market, with the next closest competitor at 4 percent, resulting in post-merger HHI of 7214. *Id.* at 60, 62, 63.

[2] In practice, "the government usually introduces all of its evidence at one time, and the defendant responds in kind," as occurred here. *FTC v. University Health, Inc.*, 938 F.2d 1206, 1219 n.25 (11th Cir. 1991). The proof structure is an *analytical* framework—if the HHI triggers the purely statistical presumption, the court first determines whether defendants' evidence suffices to cast doubt on whether the HHI *alone* conclusively proves competitive harm; if defendants clear that low hurdle, the court then evaluates *all* the evidence to determine whether the government proved that the merger is likely to cause substantial harm.

- *United States v. Aetna*, 240 F. Supp. 3d 1 (D.D.C. 2017): merging parties were "close competitors," and in vast majority of counties, merger would create HHI exceeding 5000, with outright monopoly in some counties. *Id.* at 42-43.

- *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016): merging parties were the first- and second-largest suppliers, with the third company having less than one percent of the market, resulting in a post-merger market with HHI of 6265, reflecting just "one dominant firm with a competitive fringe." *Id.* at 128, 136.

- *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011): merging parties were two of three largest providers, which collectively accounted for 90 percent of market, resulting in a post-merger HHI of 4691. *Id.* at 44, 72.

- *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34 (D.D.C. 2002): merging parties were first- and third-largest providers in a market of four, resulting in a post-merger HHI of 6241. *Id.* at 39, 50-51.

- *FTC v. Swedish Match N. Am., Inc.*, 131 F. Supp. 2d 151 (D.D.C. 2000): merging parties were first- and third-largest sellers, resulting in post-merger HHI of 4733. *Id.* at 153-54, 166-67.

The market-share statistics here are nothing like the statistics in those cases. But of course every case ultimately must be examined on its own facts and merits. And whatever was true in those cases, the record here—as shown below—includes vastly more than enough evidence to "cast doubt[] on the persuasive quality of the statistics to predict future anticompetitive consequences." *Heinz*, 246 F.3d at 715 n.7.

### B. The Evidence Casts Serious Doubt On The Reliability Of Market Shares As Conclusive Proof Of Competitive Harm

#### 1. *The Government Wrongly Focuses On The Big Five's Collective Market Share*

In attempting to show that concentration statistics alone conclusively prove the merger's anticompetitive effects, the government principally focuses on the market shares of the Big Five publishers as a collective. According to the government, the Big Five publishers are "the main competitors" in the government's alleged submarket, because they collectively have approximately 90 percent of the market, and elite publishers like Norton, Abrams, Scholastic,

Disney, and others collectively share about 10 percent of the market. Dkt. 177 at 73 (¶ 140); *see* Dkt. 178 at 70 (FF ¶ 166). The government then spends many pages reciting evidence that the Big Five publishers have certain advantages over most small publishers.[3]

The entire discussion misses the point. This merger is not a "merger to monopoly," leaving only a *single* entity—"BIG FIVE PUBLISHING, INC."—with a 90 percent share and a smattering of scattered, feeble fringe competitors. The merger instead will leave four large and aggressive rivals with 90 percent of the market competing for the most sought-after books—in addition to the merged entity, there will be HarperCollins with [redacted], Macmillan with [redacted], and Hachette with [redacted]. PX-963. And they would all face additional powerful competition from rivals in the remaining 10 percent, many with storied legacies, strong reputations, and skilled editors, with author and title lists to match. Dkt. 178 at 33, 36-37 (FF ¶¶

[3] While irrelevant for the reasons explained in the text, it is neither surprising nor disputed that the Big Five publishers acquire more books for advances of at least $250,000 than do non-Big Five publishers. The Big Five acquire more books, period. DX-382 (listing market shares for the broader market for all trade books). They acquire more books because they have more resources, not because of any significant qualitive difference in the publishing services they provide. Indeed, overwhelming evidence demonstrated that non-Big Five publishers like Norton, Abrams, and Scholastic provide excellent—and sometimes "superior"—publishing services to authors. Dkt. 178 at 33-37 (FF ¶¶ 65-74).

Each of the advantages the government cites to distinguish the Big Five are rooted in the simple fact that the Big Five are, to state the obvious, the five biggest publishers. Their backlists are "just money," *id.* at 62-63 (FF ¶ 144) (quoting Walsh), as DOJ essentially admits, Dkt. 177 at 76 (¶ 147). Money and scale might allow the Big Five to hire extensive sales forces and marketing teams and to negotiate advantageous agreements with retailers, but they say nothing about the quality of the non-Big Five's publishing services. The government's expert admitted that he has not studied publishers' capital constraints or non-Big Five publishers' funding. Dkt. 178 at 35 (FF ¶ 67) (quoting Dr. Hill). And the government itself acknowledges that scale is a main reason the Big Five win more high-end books. Dkt. 177 at 73-74 (¶ 142) (quoting Cheney: "I think the non-Big 5, you know, are just not going to play in that sandbox too many times. They don't have the same scale."); *id.* at 79-80 (¶ 152) (citing Big Five's "resources" and "scale"). DOJ also cites reputation as a Big Five advantage, *id.* at 79 (¶ 151), but there can be no doubt that many elite smaller publishers and new entrants have stellar reputations, as evidenced by their impressive title and author lists. Dkt. 178 at 27, 55 (FF ¶¶ 69, 146-47).

65, 70-74). Those facts alone may not fully determine the competitive effects of the merger, but neither does the government's misplaced focus on the Big Five's collective market share.

The Guidelines make clear that the merger's competitive effects depend not on market concentration alone, but on whether elimination of *head-to-head competition* between the merging parties will result in harm to authors. Guidelines § 6.2 ("Anticompetitive unilateral effects" are "in proportion to the frequency or probability with which, prior to the merger, one of the merging sellers had been the runner-up when the other won the business."); *id.* § 6.1 ("Unilateral price effects are greater, the more the buyers of products sold by one merging firm consider products sold by the other merging firm to be their next choice."); *see also Sysco*, 113 F. Supp. 3d at 61 ("Courts have recognized that a merger that eliminates head-to-head competition between close competitors can result in a substantial lessening of competition."). The government itself ultimately recognizes that analysis of head-to-competition—not a simple recitation of market share statistics—is central to evaluating the merger's competitive effects. Dkt. 177 at 124, 125 (¶¶ 246, 248).[4]

Market shares are not an adequate measure of that head-to-head competition. *See Sysco*, 113 F. Supp. 3d at 62 ("[E]ven if the merging parties had large market shares, if they were not particularly close competitors, then the market shares might overstate the extent to which the merger would harm competition."); Dkt. 178 at 78 (FF ¶ 189). That is why the HHI presumption has little force in unilateral effects cases: the presumption arises solely from concentration statistics and does not reflect in any way the extent of pre-merger or post-merger head-to-head

[4] *See also* David Wirth, *To Bid or Not to Bid, That is the Question: The Assessment of Bidding Markets in Merger Control*, Int'l Compar. Legal Guide to: Merger Control 2016, at 1 ("Accordingly, as explained by the US horizontal merger guidelines . . . it tends to be in situations in which the merging parties are ranked first and second in tenders in which unilateral effects arise (as the price is ultimately determined by the prices of the runner-up).").

competition. *See* Christopher Conlon & Julie Holland Mortimer, *Empirical Properties of Diversion Ratios*, 52 RAND J. Econ. 693, 694 n.1 (2021) ("Researchers have pointed out concerns with using concentration measures or functions of market share to capture the strength of competition. For example, such measures . . . do not capture the closeness of competition when products are differentiated."). For this reason, Professors Hovenkamp and Shapiro—the latter of whom co-authored the Guidelines and frequently appears as an expert for the government—warn that a unilateral effects claim "pose[s] a challenge for the structural presumption." Herbert Hovenkamp & Carl Shapiro, *Horizontal Mergers, Market Structure, and Burdens of Proof*, 127 Yale L.J. 1996, 2014 (2018). The government accuses defendants of misciting Professors Hovenkamp and Shapiro for the proposition that the statistical presumption does not apply *at all* in unilateral effects cases, Dkt. 177 at 68-69 (¶ 132 n.6), but neither defendants nor the professors said any such thing. The point, rather, is that because unilateral effects focuses on a factor—head-to-head competition—that market shares do not always capture accurately, the presumption should be especially *easy to rebut* in unilateral effects cases. As the professors observe, the presumption persists only insofar as its "basic contours . . . have been adapted to unilateral effects analysis, where the primary inquiry is not based on overall market concentration but rather on the relative degree of substitution." Hovenkamp & Shapiro, *supra*, at 2014; *see generally* Shapiro, *supra* at 707-08 & n.25 (2010 Guidelines approach "does not necessarily . . . base predictions of competitive effects primarily on market concentration," reflecting "the gradual decline of the structural presumption"). The government makes no effort to "adapt" the presumption here—it simply cites the Big Five's collective market shares and tries to declare victory.

The government's emphasis on the Big Five's collective shares not only ignores head-to-competition, but also misstates the competitive effect of the smaller publishers. As defendants have shown, the non-Big Five publishers actually pose a competitive constraint on the final advance amount in 23 percent of auctions, which is how often non-Big Five publishers win *or come in second* in auctions with multiple bidders in the alleged submarket. Dkt. 178 at 80 (FF ¶ 166). The government continues to assert that the 23 percent figure does not accurately represent the *relative* size of non-Big Five publishers, Dkt. 177 at 83 (¶ 156), but the argument misses the point: the 23 percent figure does not address the relative size of non-Big Five publishers, but how often they serve as a competitive constraint on other publishers by either winning or providing the runner-up "price to beat." The government's misunderstanding of the figure shows just how misleading market shares can be. It also starkly illustrates the challenges editors face in interpreting competitive threats in blind-bidding formats, as discussed below, *infra* at 31-34. If the government and its expert, after studying the market as extensively as they have in this case, can err so obviously in relying on market shares to infer that non-Big Five publishers pose a meaningful threat in only one out of ten cases, it is impossible to see how editors—who do not even possess that market share information, misleading as it is—can be expected to make accurate assessments of the competitive threats they face .

2. *PRH And S&S Are Not Close Head-To-Head Competitors*

The government ultimately recognizes that the question of competitive harm principally focuses on the frequency with which PRH and S&S compete head to head as the top two bidders for books in the alleged submarket. To prove the extent of that competition, however, the government begins not with the readily available data addressing that question, but with the very few anecdotes it could find illustrating specific instances of head-to-head competition between PRH and S&S. Dkt. 177 at 126-30 (¶¶ 252-55). These examples—which amount to just over

30, Dkt. 178 at 141 (CL ¶ 63)—are a tiny fraction of the 1200 or so acquisitions that Dr. Hill admitted occur each year in the alleged submarket. Tr. 1588:20-25. Defendants have never denied that some amount of such head-to-head competition occurs. Of course it does—in any merger, the merging parties will have engaged in *some* amount of direct competition. The relevant issue is how much, and what is its effect on market-wide competition. Here, as Dr. Hill admitted at trial, market shares indicate that PRH and S&S should be the top two bidders in, at most, only *12 percent* of acquisitions. Dkt. 178 at 77 (FF ¶ 187).

Because such head-to-head competition between PRH and S&S is so rare, the government now seeks to retreat from Dr. Hill's admission, asserting instead that the various *diversion* ratios that Dr. Hill calculated are the proper measure. Dkt. 177 at 136 (¶ 267). But diversion ratios do not, alone, identify the frequency with which the merging parties actually meet head-to-head as the top two bidders—the fact most essential to evaluating the unilateral effects of a merger. For example, market shares—the principal basis on which Dr. Hill calculated diversions—necessarily identify only who won an acquisition, not who was runner-up. And Dr. Hill admitted that two of his other methods likewise did not identify who the runner-up bidder was, while the third provided no information for acquisitions between $250,000 and $500,000. Tr. 1283:6-21, 1284:11-14, 1712:20-23, 1696:13-1697:3, 1698:18-1699:7. None of his diversion analyses, in short, provides adequate information about runner-up bidders, a fact essential to determining how often PRH and S&S were winner *and runner-up* to each other. It is irrelevant that his diversion analyses "all point in the same direction," Dkt. 177 at 138 (¶ 275), because they all fail to establish the most important fact: the identity of runner-up bidders. The government cannot escape Dr. Hill's own acknowledgment, based on more than diversions alone, that PRH and S&S are the top two bidders in, at most, just 12 percent of acquisitions.

Finally, the government's assertion that "diversion from S&S to PRH indicates that PRH is S&S's closest competitor," Dkt. 177 at 136 (¶ 267), is belied by Dr. Hill's own analysis of the agency data. Defendants' trial exhibit DX-436, which is an exhibit from Dr. Hill's own expert report, shows that when S&S won a book in the government's alleged submarket, [redacted] Dkt. 178 at 141 (CL ¶ 63); DX-436. Dr. Hill's own analysis shows a stark divergence between what happens in the real world and what a market-share approach suggests.

3. *Static Market Shares Fail To Account For Rivals' Planned Expansion*

Because the government's analysis relies on static market shares, it cannot adequately account for future expansion or entry in the market—very little of which is needed to actually replace any potential lost competition. The government agrees that future expansion or entry of other firms into the relevant market can mitigate anticompetitive effects. Dkt. 177 at 83-84 (¶ 157). But the government wrongly asserts that expansion or entry matters only if defendants prove that it will be *induced* by the merger. *Id.* at 93 (¶ 178). The D.C. Circuit recognizes that even "a firm that *never* enters a given market can nevertheless exert competitive pressure on that market," such that even "the *threat* of entry" (or expansion) can rebut the statistical presumption. *Baker Hughes*, 908 F.2d at 988; *see Heinz*, 246 F.3d at 717 n.13 ("threat of outside entry can significantly alter the anticompetitive effects of the merger"). There is ample evidence in the record that existing, well-resourced rivals are already planning to exploit this moment of growth in the industry to expand their own market shares. Dkt. 178 at 57-58 (FF ¶¶ 124-28). There is also indisputable evidence of recent, significant entry by aggressive new firms that are spending heavily to acquire books in the government's proposed market. *Id.* at 59-60 (FF ¶¶ 129-32).

This entry and expansion are more than sufficient to fill any "competitive void" resulting from the merger. Dkt. 177 at 83 (¶ 157) (quoting *United States v. Anthem*, 236 F. Supp. 3d 171,

222 (D.D.C. 2017)). PRH and S&S are the top two bidders in only 12 percent of acquisitions, *supra* at 22, which means that only 120 to 145 acquisitions per year might be affected by the merger. *See* Tr. 1588:20-1589:11 (Hill). Even assuming that those few transactions will be affected adversely by the merger (which defendants dispute), very little expansion by existing rivals or entry by new rivals would be needed to offset that small effect. The data show that other publishers have the capacity to counteract any advance decreases because they do not always acquire the maximum number of book deals they could for $250,000 or more. *See* DX-369 (showing other publishers do not always acquire up to their capacity); *see also* Tr. 2826:20-2827:12 (Snyder). In other words, they are able to expand, and the record shows they are ready to as well. [redacted] Dkt. 178 at 57 (FF ¶ 126). Macmillan's CEO testified that his company plans to spend more on author advances in coming years, and HarperCollins' CEO has publicly stated that his company intends to bid more aggressively. Abrams also intends to grow its business. *Id.* at 57 (FF ¶ 125).

4. <u>*Market Shares Fail To Account For Agents' Role In Driving Competition*</u>

Because static market shares reflect only prior wins, they could have meaning in themselves only to the extent all publishers participated in all past acquisitions and will all participate again in all future acquisitions post-merger. In that scenario, market shares alone might be instructive as to how eliminating one participant will affect future acquisitions. The assumption does not hold, however, because literary agents indisputably control the basic structure of bargaining—they decide who will receive a manuscript, who may bid, and what bargaining format applies. Dkt. 177 at 21-22 (¶¶ 18-19); Dkt. 178 at 65-67 (FF ¶¶ 154-58). The evidence shows that agents rarely select multi-bidder, multi-round auction formats. Dkt. 178 at 101 (FF ¶ 251). The evidence also shows that agents never invite all potential market

participants to engage in an acquisition, and that agents do not select invited participants based on their market shares. *Id.* at 66, 68 (FF ¶¶ 155, 163). Agents' control over bargaining participation shows why market shares alone do not conclusively determine the merger's competitive effects. *Id.* at 144-45 (CL ¶¶ 71-73).

Contrary to the government's caricature, defendants do not argue that agents hold "all of the bargaining leverage," Dkt. 177 at 106 (¶ 205), or that agents could use their leverage to unilaterally eliminate any harm the merger might cause. *Id.* at 104 (¶ 199). Defendants' point is simply that agents' control over the bargaining process gives them great influence over the competitive conditions that govern any given acquisition—including who is actually competing—and that market shares alone do not account for that influence.

5. *Market Shares Do Not Capture The Competitive Significance of Imprint Competition*

Market share statistics also fail to capture intra-publisher competition, which dramatically broadens the competitive landscape. Hachette permits active competition among its imprints. Dkt. 178 at 80-81 (FF ¶ 198). PRH has done so for decades. *Id.* at 81 (FF ¶ 199). The evidence suggests that Macmillan does, too. *Id.* at 80-81 (FF ¶ 198). Any analysis that fails to take this competition into account fails to comport with "business realities." *Sysco*, 113 F. Supp. 3d at 37.

The government does not deny that intrafirm imprint competition is a reality in the publishing industry, but contends that the Court must disregard it because the government could not find another merger decision relying on a similar industry reality. Dkt. 177 at 111 (¶¶ 213-14). But the absence of such decisions suggests only that intrafirm competition is not a commercial reality in most other industries—not that it must be ignored where it *is* a standard practice. The reality in the publishing industry is there are more than one hundred imprints to

which agents can submit books to drive competition. Market shares alone falsely suggest a much more limited field of potential bidders for a book. Dkt. 178 at 147 (CL ¶ 79).

6. *The 2013 Merger Did Not Cause A Decrease In Author Advances*

The government very much wants this Court to ignore the 2013 merger of Penguin and Random House. Dkt. 177 at 121 (¶ 238). But the Guidelines and the caselaw make clear that such "natural experiments" are directly relevant in merger analysis. Dkt. 178 at 149 (CL ¶ 84); *see FTC v. Foster*, 2007 WL 1793441, at *38 (D.N.M. May 29, 2007) ("'Natural experiments,' *i.e.*, evidence that the posited harm has occurred under circumstances similar to the proposed transaction, are relevant to merger analysis."). The government downplays the 2013 merger because under its own theory, that merger—which involved similar downstream market shares—should have caused the kind of advance reduction the government projects here. Dkt. 178 at 149 (CL ¶ 85).

It did not. Following the 2013 merger, output of books acquired for $250,000 or more *increased*, and PRH did not reduce advances. Rather, average advances increased for all advance segments under $2 million. *Id.* at 92-97 (FF ¶¶ 225-39). Dr. Hill's contrary results are explained entirely by broader market dynamics he did not consider and by normal variations in a few of the very highest-end, multimillion dollar advances. *Id.* at 97 (FF ¶ 239).

The outcome of the 2013 merger "natural experiment" is strong evidence that this merger, too, will have no adverse competitive effect. And it is conclusive evidence that market share statistics should not be the sole basis on which to assess the competitive effect of this merger.

7. *Ordinary Course Documents Show No Expectation Of Decreased Advances*

The government contends that defendants' "intent" with respect to author compensation is irrelevant. Dkt. 177 at 119 (¶ 234). As an initial matter, the cases the government cites hold only that the government need not *prove* an intent to lessen competition—not that the merging parties' intent is categorically irrelevant. *See United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 607 (1957) ("It is not requisite to the proof of a violation of [§] 7 to show that restraint or monopoly was intended."); *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *11 (N.D. Cal. Jan. 8, 2014) ("Intent is not an element of a Section 7 violation.").

In fact, § 7 cases consistently rely on contemporaneous, ordinary course documents showing the merging parties' and other industry participants' understanding of the market conditions and their expectations of the effects of the merger. *See, e.g.*, *Heinz,* 246 F.3d at 717 (noting that "Heinz's own documents recognize the wholesale competition and anticipate that the merger will end it"); *Wilhelmsen Holding ASA*, 341 F. Supp. 3d at 63 (considering strategic planning email, among other ordinary course documents, stating that if defendant were to "[a]cquire WSS chemical business, take away [its] main competitor and win back this space fully for [Drew Marine], this could increase our ability to charge far better prices and win across all segments"); *Sysco*, 113 F. Supp. 3d at 64-65 ("The FTC presented ordinary course documents, from both Defendants and third parties," demonstrating that the merging parties were "particularly close competitors"); *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 208-10 (D.D.C. 2018) (considering ordinary course documents showing parties' recognition that reducing output would be an effective strategy).

The same types of ordinary course documents in this case demonstrate that neither the merging parties nor their rivals are expecting reduced advances as they make their most

important business decisions. Dkt. 178 at 54, 55 (FF ¶¶ 118, 120). These documents hold far more weight than the government witnesses' made-for-litigation statements, which are plainly motivated by rival publishers' fear that the merger will result in *increased competition*, which in turn will compel them to *increase* their bids to compete against the combined company. *Id.* at 55 (FF ¶ 119); *see United States v. AT & T Inc.*, 310 F. Supp. 3d 161, 211 (D.D.C. 2018) ("Caution is . . . necessary in evaluating the probative value of the proffered third-party competitor testimony."), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). In fact, the government cites no contemporaneous statements from rival publishers indicating any expectation of decreased advances. Rival publishers who wanted to acquire S&S themselves actually admitted that they did not consider the potential for decreased advances in constructing their proposals for the acquisition of S&S. *See* Dkt. 178 at 56 (FF ¶ 122) (describing Murray and Pietsch testimony).

## IV. THE GOVERNMENT'S UNILATERAL EFFECTS ANALYSIS DID NOT PROVE THE MERGER IS LIKELY TO CAUSE SUBSTANTIAL HARM

To prove that the merger is likely to cause "substantial" harms, the government touts Dr. Hill's opinion that, post-merger, "advances for anticipated top sellers will decline by about 4% for PRH authors, and about 11.5% for S&S authors." Dkt. 177 at 15. According to the government, this percentage reduction translates to a per capita $44,000 average reduction for PRH authors in the alleged market, and $105,000 for S&S authors, Dkt. 177 at 140 (¶ 279), for an aggregate average reduction of $29.3 million annually, Dkt. 178 at 97 (FF ¶ 241).

The government reached its overall quantitative harm projection through a two-step analysis. First, its expert Dr. Hill ran his "second-score auction" model to predict the percentage price reduction for PRH and S&S authors in acquisitions subject to the model—i.e., "rounds" or round-robin auctions—where he predicted PRH and S&S would be the top two bidders. That model generated predicted 11.5 and 4 percent reductions for S&S and PRH authors, respectively.

Second, Dr. Hill then applied those specific percentage reductions across *all* acquisitions won by either PRH or S&S. According to Dr. Hill, after the merger, S&S and PRH editors would all perceive a reduced threat of competition. *Id.* at 88 (FF ¶ 216). Assuming—with no evidence—that editors would perceive reduced competition roughly consistent with the market-share-based assumptions he used in the SSA model, Dr. Hill then opined that S&S editors would respond to the elimination of competition from PRH by reducing their average offers in all formats by about 11.5 percent, without losing books, and that PRH editors would similarly respond to the merger by reducing their average offers by about 4 percent, again without losing books. Tr. 1312:18-25, 3198:9-13, 3199:7-11 (Hill); Dkt. 178 at 90-91 (FF ¶ 221).

Both steps in the government's method for estimating harm to PRH and S&S authors are fundamentally flawed. First, even *accepting* the SSA model's predicted average advance reductions for round-robin auctions, such auctions are a rare acquisition format, and there is no basis for extrapolating the projection harm in those formats to the other, non-round-robin formats that comprise 80 to 90 percent of all acquisitions. In fact, Dr. Hill admitted that he is unaware of any other economist who has used a second-score auction model to examine other bargaining formats. Dkt. 178 at 90 (FF ¶ 245). Second, the model itself is flawed; correcting its errors further diminishes the projected harm into statistical insignificance—certainly not enough to show a "substantial" competitive harm.

### A. The Government's Attempt To Extrapolate The Results Of The SSA Model To Formats Not Modeled By The SSA Is Insupportable

The government admits that the SSA model, by its terms, applies only to "a specific form of negotiation," i.e., one "where the price obtained through the negotiation is set by the next best alternative." Dkt. 177 at 140 (¶ 279) (citing Tr. 3098:10-3100:3 (Hill)). As Dr. Hill put it in the cited testimony, the SSA analysis "is strategically equivalent to a specific form of bargaining in

which buyers play suppliers off against each other," until the second-best bidder cannot match the highest bid. Tr. 3099:14-20; *see* Tr. 1297:8-18 (Hill) (equating SSA to "open outcry auction," where "there's an object and I say, I'll pay $10 and you say, I'll pay $15, and we keep bidding" and "eventually, at some point, everybody drops out but the winner"). All agree that the "specific form of bargaining" modeled by the SSA is rounds or round-robin bargaining, and that such formats comprise only about 10 to 20 percent of all acquisitions. Dkt. 178 at 98-99 (FF ¶¶ 243-47). The remaining 80 to 90 percent are either bilateral negotiations (the majority) or "best bid" formats, neither of which involves agents "playing off" editors against each other through known bidding levels until the second-to-last bidder drops out. *Id.* at 99 (FF ¶ 247). Dr. Hill nevertheless extrapolates the SSA's "known bid" results to all "blind bid" formats and projects that advances for all acquisitions will be reduced, on average, by 11.5 percent (S&S authors) and 4 percent (PRH authors), for an overall average of 6 percent.

Dr. Hill's overall harm projection thus depends entirely on his ability to justify extrapolating the SSA's percentage harm projection to the 80 to 90 percent of formats that, unlike round-robin formats, do not involve bidding against a known bid amount. It is not enough to say that the SSA reveals a "directional" effect of decreased advances—the SSA will *always* show a negative price effect. *Id.* at 97 (FF ¶ 241). What matters is how much effect it shows and how far it applies. If Dr. Hill's extrapolation cannot be justified, his harm projection is reduced by at least the 80 to 90 percent attributable to projected effects in blind-bidding formats.

Dr. Hill's extrapolation is indefensible. In round-robin auctions, the SSA predicts a price reduction automatically, as a mathematical matter: whenever the merging parties are the final two bidders, eliminating one of them will necessarily cause a price reduction in certain cases (depending on the amount of the third-place bid). The SSA calculates the mathematical effect of

eliminating one of those final two bidders. In that situation, the effect occurs without conscious response by either party, as Dr. Hill observes: "In rounds auctions you don't really need to take any action. You continue to bid the way you did before, and some auctions will just end before they otherwise would have, and you will pay less." Tr. 1729:2-5.

In blind formats, by contrast, Dr. Hill concedes that the effect, if any, of eliminating one competitor occurs through an entirely different mechanism: editors must *perceive* diminished competition and react to that perception by *consciously* reducing the amount of their offers. In "the best-bid setting or negotiations," Dr. Hill speculates, "you're thinking about how often is this other party competing with . . . me," and you "us[e] your knowledge of the past to make a prediction about how likely it is they will compete with you" for a given book. Tr. 1728:3-20. In Dr. Hill's view, if an editor thinks she was "competing frequently with an opponent in . . . negotiations and they are removed from the competition," it would be "profit-maximizing" for her "to take account of the fact that competition has been lessened and to lower [her] bids, in general, in best bids, and negotiations to be less aggressive." Tr. 1728:21-1729:1. As a result, Dr. Hill imagines, "when there's a change in competition . . . because of a merger," editors "will modify their behavior accordingly." Tr. 1730:2-4; *see* Tr. 3183:1-3184:4 (Hill) ("It's in best bids and negotiations, you have that weakening in anticipation. I frequently compete with this person, I don't think they are competing with me anymore, so I'm going to bid less aggressively."); Tr. 3201:25-3202:1 (Hill) ("information is learned, people react, and they adjust their behavior").

There is no basis for Dr. Hill's speculation that S&S and PRH editors will have either the incentive or the ability post-merger to reduce their offers in blind bargaining formats at all, let alone by an average of 6 percent. First, Dr. Hill is not an expert on bargaining in the publishing industry, Dkt. 178 at 87 (FF ¶ 215), and thus is not qualified to proffer opinions on how agents

and editors determine their offers in blind bargaining, i.e., what information they have, what factors they consider, what weight they give various factors, how much they "learn," and so on.

Second, the evidence Dr. Hill cites to prove that editors would reduce their offers in best bids and bilateral negotiations because they perceive diminished competition shows nothing of the kind. Dr. Hill relies on a single agent, Gail Ross, who testified about how *she* approaches bargaining in non-rounds formats. Tr. 3099:2-11 (Hill). According to Ms. Ross, she tries to consider her best available alternative, a technique she was taught when she took a "Harvard negotiating project training" course after law school. Tr. 2125:17-24 (Ross). Dr. Hill says that technique is similar to round-robin auctions, where the parties are bidding against a specific known amount—i.e., the best available alternative—which to him justifies extrapolating the SSA's harm projections to all other formats.

Ms. Ross's testimony does not remotely justify that extrapolation. Dr. Hill cited no evidence that editors are, like agent Ross, lawyers specifically trained in the Harvard negotiation project approach. What is more, Ms. Ross did not testify *how* she analyzes her next best option in bilateral negotiations, where she does not know whom the other option might be or how they would value the unique book at issue. Even more important, she did not explain how *editors* evaluate the next best option in both negotiations and best bids, given that they have no information about whom they are bidding against or how their unknown rivals value the book.

In that key respect, the formats fundamentally differ on the one point most critical to the SSA and round-robins: in blind best bids and negotiations, the editor does *not* know the agent's best available alternative, and thus cannot bargain against that specific amount. Ms. Ross's testimony is entirely consistent with the testimony of other witnesses that in blind formats, editors can only bid against the *general threat* of competition from the *entire* market, which can

"lead to [publishers] increasing [their] offers quite significantly." Tr. 115:6 (Pietsch). Because an editor in blind bargaining does not know whom she is bidding against, or what subjective valuation any other editor would place on the book, the publisher is incentivized to go "all in" to win the book. Dkt. 178 at 100 (FF ¶ 249). By contrast, in a round-robin auction, everyone knows exactly what they must beat, and the bidding may end before the amount reaches the winner's maximum willingness to bid. *Id.*

In short, even if all editors use the Harvard bargaining strategy of basing bids on the next best option—and there is no evidence they do—the next best option in a blind format is indisputably *not* the same as the next best option in a round-robin format: rather than being a specific known amount, it is the maximum amount that *could* be offered by *anyone* that *could* be interested in the particular book. And given that books are subject to widely varying valuations, it is impossible to treat the highly individualized, unknown next best option in non-rounds formats as equivalent to the very specific, known next best bid in a round robin. *Id.* at 48-50 (FF ¶¶ 104-07). It is easy to see why Dr. Hill was unaware of any other economist who considered the SSA model applicable to bargaining formats that lack a known next best bid.

Third, the record refutes Dr. Hill's speculation that even if PRH and S&S editors do not know the specific amounts they are bidding against, they nevertheless will know enough to reduce their offers in blind bidding by an average of 6 percent, without losing bestselling books and authors to unknown and aggressive rivals. Indeed, Dr. Hill's own speculation proves the opposite. According to Dr. Hill, an S&S editor "today . . . knows that Penguin Random House wins four out of ten books," and after the merger the editors would take account of that fact and reduce offers, on average, by 6 percent. Tr. 1731:9-16. But any editor of the merged entity who followed Dr. Hill's approach would be guaranteed to lose books—bestselling books, by authors

the company likely will never see again. The information an editor needs is not how often PRH or S&S previously won in general, but how often and when PRH and S&S were the top two bidders—in every other case, another publisher *necessarily* won or came in second. *See* Dkt. 178 at 55-56 (FF ¶¶ 220-21). In the latter situation, reducing bids by an average of 6 percent would mean either still losing (if another publisher would have won), or creating a huge risk of losing a book it previously would have won (if the runner-up bid would have exceeded the reduced bid). And of course an editor has no way of knowing exactly who would have been the winner or runner up, or how much their bids would have been. If there is any reasonable prospect HarperCollins or Macmillan or any other rival would have been the second-place bidder, reducing bids by 6 percent will in many cases simply gift these rivals new victories for the most sought-after books in the industry.

The government cites no basis on which editors could confidently reduce bidding given their lack of information about winners and runners-up. Dr. Hill's own estimations are based on market share data unknown to anyone in the industry. *Id.* at 25, 89 (FF ¶¶ 44, 220). Certainly nobody knows the 12 percent head-to-head competition figure his analysis generates. Given that figure, any former S&S editor who reduces her bids based on her observation that PRH previously won about 40 percent of the time overall (based simply on its market share) will make it *more likely another publisher will win* 88 percent of the acquisitions.

Nor is there any way to accurately identify the true scope of PRH and S&S head-to-head competition anecdotally from repeat bargaining—i.e., there is no way to "learn" the necessary information, as Dr. Hill speculates. *See supra* at 30-32. Bilateral negotiations are the most common form of acquisition, and editors ordinarily glean no information about any potential rival bidding in that process. In best bids, agents rarely if ever tell editors who they were bidding

against and how much they bid, so editors learn little information there, as well. Dkt. 178 at 66 (FF ¶ 156). Even in round robins, editors usually do not learn who the non-prevailing bidders were or how much they bid. *Id.* And even when an editor does learn in a given acquisition how much another publisher bid, Dr. Hill cannot explain how the editor can use that information in the next acquisition to determine how much rivals are subjectively valuing a different, unique book. *Id.* at 88 (FF ¶ 217); *id.* at 154 (CL ¶ 100). Without all this information—all of which is known in a round-robin format—there is no way editors post-merger could confidently make the kind of decisions about bidding "less aggressively" that would reduce advances to the level Dr. Hill projects.

Finally, Dr. Hill does not account for the stakes involved. Unlike the "consumer products" markets Dr. Hill analogized to, Tr. 3089:13 (Hill), publishers cannot "test" the market with price reductions and quickly recover lost market share if too many authors flee. When a publisher loses an anticipated bestselling book, the book is gone forever, and the author probably is too, taking with her all her future downstream sales. *Id.* at 91 (FF ¶ 222); *id.* at 154 (CL ¶ 101). Editors of the combined entity post-merger thus will have strong incentives *not* to reduce advances, because doing so risks losing books and authors to publishers that previously would have come in second, especially given that editors have almost no information about whom the potential second-place publisher might have been or how much it would have bid.

For these reasons and others defendants have already identified, *id.* at 157-61 (CL ¶¶ 107-15), there is no sound basis for extrapolating the projected harm from the SSA model to acquisitions that lack the known-competing-bid feature essential to the SSA. Dr. Hill's speculation that the combined entity's editors will know enough from their perceptions of

diminished competition to reduce their bids by an equivalent amount is unsupported and insupportable.

Industry participants recognize that round-robin auctions differ fundamentally from blind-bidding formats like bilateral negotiations and best bids. Agents and authors overwhelmingly choose the latter formats precisely because they are *not* like round-robins—they serve other interests and objectives and ultimately generate better results for authors. *Id.* at 100-01 (FF ¶¶ 248-50). If round robins were similarly effective, they would not be the rarest of all bargaining formats.

Economists likewise recognize the differences, which is why when they study the effects of mergers on blind-bidding formats, they use models different from the SSA, as Dr. Hill admitted. *Id.* at 98-99 (FF ¶¶ 243, 245). Economists also may use a device—known as the "revenue equivalence theorem" ("RET")—to determine whether an SSA's projections can be legitimately extrapolated to at least best bid auctions, if not to bilateral negotiations. Tr. 1626:22-1627:21 (Hill). As Dr. Hill explained, if the RET's conditions were satisfied here, "it would mean you could apply the second score auction to best bid auctions." Tr. 1627:15-16. Although this recognized method was readily available to test the validity of his extrapolation (at least in part), Dr. Hill admittedly did not even attempt to determine whether the RET justified the extrapolation. Tr. 1627:13-14.

In short, nothing in Dr. Hill's analysis or in the trial evidence justifies extrapolating his SSA's results to blind-bargaining formats that lack the one feature most essential to the auctions modeled by the SSA—actual knowledge of rival bid amounts. And without that extrapolation, almost all of the harm Dr. Hill projects—some 80 to 90 percent or more—reduces to zero.

**B. Dr. Hill's SSA Model Fails On Its Own Terms**

Not only did Dr. Hill err in applying the SSA model's results to blind-bargaining formats, but the SSA fails on its own terms even as to the round-robins it is supposed to examine.

Two inputs go into the SSA model: market shares and margins. Tr. 1305:5-18 (Hill). Both inputs are flawed, resulting in a faulty calculation of harm.

*First*, the backbone of the SSA model is the assumption that the winner pays the price of the second-place bid. Tr. 1299:25-1300:2 (Hill). Dr. Hill admits that, according to the model, "an author can be harmed" only "when the parties are the first and second closest bidders." Tr. 1300:6-7 (Hill). It is thus essential to determine, as accurately as possible, not only who won the bidding, but also who was runner up. Dr. Hill employed market shares in the model, but market shares reflect only who won, not who was the runner up, and they do not accurately predict runners-up here. Dkt. 178 at 77, 108-09 (FF ¶¶ 187, 266-67). The model's results accordingly are unreliable.

*Second*, Dr. Hill also used faulty margin information. Dr. Hill's first report initially included ongoing operating expenses in PRH's margins, but excluded them for S&S's margins. *Id.* at 104 (FF ¶ 258). After Professor Snyder objected to the inconsistent treatment, Dr. Hill elected to estimate profit margins by excluding operating expenses altogether for both merging parties. *Id.* at 104-05 (FF ¶¶ 258-59). But by excluding ongoing operating costs from margin estimates, Dr. Hill estimates margins that are much higher than the *actual* margins publishers use to calculate their advance offers. Using the correct margin figures that account for operating costs—just as publishers do when determining their offer amounts—results in much lower predicted advance-reduction harm, as Dr. Hill acknowledges. *Id.* at 105-06 (FF ¶¶ 260-61).

The government now asserts that the SSA model is "explicit" that "one should use firms' variable, not fixed, costs to implement the model[]." Dkt. 177 at 144-45 (¶ 293). That assertion is refuted by Dr. Hill himself, who included fixed operating expenses in PRH's margins when he first ran the model and reported its results in his initial report. Dkt. 178 at 104 (FF ¶ 258). It is also refuted by the academic article on the SSA cited by the government, Nathan Miller, *Modeling the effects of mergers in procurement*, 37 Int'l J. Indus. Org. 201, 203, 206 n.9 (2014). That article does not say the model allows only for the use of marginal costs—in fact, the very footnote cited by the government is applying the model using a margin that includes *more than marginal costs*. *See id.* As even the government concedes, the SSA model employs marginal costs only because economists "assume" that businesses make purchase decisions on the basis of marginal cost. Dkt. 177 at 144-45 (¶ 293). The government thus contends that Dr. Hill properly excluded fixed costs because when publishers decide how much they are willing to pay, they "*should* consider variable costs and not fixed costs." *Id.* at 145 (¶ 294) (emphasis added). But when seeking an accurate estimate of a merger's effect on real-world pricing decisions, what matters is not what an economist thinks publishers *should* do in the abstract, but what publishers *actually* do. Dkt. 178 at 162 (CL ¶ 120). And ongoing operating expenses—which include some but not all "fixed" costs—are a key component of the P&L statements publishers use to generate their advance decisions. *Id.* at 105 (FF ¶ 260).

The government asserts that PRH executive Madeline McIntosh "explicitly rejected" the premise that ongoing operating costs are part of the P&L analysis. Dkt. 177 at 144-45 (¶ 295). Not so. The government omits the rest of her testimony explaining that when she urged her editors to focus on the "contribution number," she was encouraging PRH publishers to be "more liberal" in their approach "for the bigger bets," where she thinks it suffices for PRH to be in

"positive contribution territory," because if PRH does not bid aggressively and win the book, then there is no incremental benefit at all. Tr. 2260:5-6, 2259:16 (McIntosh). Under a "[m]ore conservative approach," she observed, PRH is "aiming to be in positive net profit or EBITDA on every single book because we do need to cover our overhead costs." Tr. 2260:2-5. That approach is consistent with S&S's practice—its P&L objective is for operating income margins, after fixed expenses, to be positive. Tr. 571:4-14 (Karp). The fact that Ms. McIntosh adopts a more nuanced approach to costs in certain situations does not justify a categorical rejection of the *general* practice that publishers follow in calculating their advance offers.

By using costs that differ from actual costs publishers use, the model's predicted margins fail the reliability "check" prescribed by the model's author. *See* Miller, *supra,* at 203. The government contends otherwise, but only by confusingly criticizing Professor Snyder's critique of Dr. Hill's method. Dkt. 177 at 146 (¶ 297). The problem is simple. The SSA article urges the modeler to conduct a "first check" on the reliability of a firm's margin estimates by comparing it to data on real-world margins "for other firms." Miller, *supra*, at 203. Dr. Hill did not do so. He instead used the average margin of *both firms*. Tr. 3095:21-3097:14 (Hill). His margins thus improperly validated themselves. Analyzed correctly, the margins fail the SSA reliability check, as Professor Snyder showed. Dkt. 178 at 106 (FF ¶ 262).

### C. The GUPPI Calculations Do Not Cure The SSA's Defects

The government contends that Dr. Hill's GUPPI calculations "corroborated" the SSA's results. Dkt. 177 at 142 (¶ 286). To be sure, the GUPPIs generated similar results, but the results suffer from the same inadequacies and defects as the SSA. For one thing, Dr. Hill did not create a GUPPI calculation for books acquired through bilateral negotiations, which compromise the majority of book acquisitions. Dkt. 178 at 110 (FF ¶¶ 269); Tr. 1736:16-23, 3164:14-16 (Hill). And the GUPPIs—like the SSA—are not "equilibrium models" that actually account for

the kind of post-merger competitive responses Dr. Hill could only speculate about. Dkt. 178 at 110-11 (¶ 270); Tr. 3164:23-25 (Hill). The GUPPI calculations thus do no more work than the woefully inadequate SSA.

Dr. Hill's GUPPI calculations also use the same flawed margin inputs he used in the SSA. Dkt. 178 at 111-12 (FF ¶ 272). Using Professor Snyder's diversion calculations and margins, which properly account for ongoing operating expenses as the merging firms do, the results "suggest harm of less than five percent for both multi-round and single round/hybrid forms, as Dr. Hill admitted," which "fall within the GUPPI 'safe harbor.'" *Id.*; Tr. 1629:6-25, 3107:7-12, 3109:14-23 (Hill); Tr. 2813:24-2814:10 (Snyder).

More generally, the government substantially overstates the capabilities of a GUPPI calculation. Dkt. 177 at 142 (¶ 286). It is merely a "screening device that is used at the outset to determine whether a merger should be further scrutinized." Dkt. 178 at 110-11 (FF ¶ 270). In other words, GUPPI is not a model but is merely a calculation used at the early stages of a merger investigation to determine if further investigation is warranted. If GUPPI calculations had probative force, Dr. Hill surely would have employed them in his initial report.

### D. No Evidence Supports The Government's Speculative Theory Of Harm Through A "Second Order Effect" Of Softening Competition

In addition to addressing harm to authors who contract with either PRH or S&S, the government passingly asserts that potential harm is "not necessarily limited to authors of those publishers," because there could be a "second-order effect" based on the competitive responses of *other* firms. Dkt. 177 at 134 (¶ 263); *see id.* at 91-92 (¶ 174). According to Dr. Hill, just as PRH and S&S editors might respond to a perceived reduction in competition by bidding less aggressively, other publishers might also observe reduced competition and choose to bid less aggressively. *Id.* But to block the merger on that basis, the government must prove that this

second-order effect is both likely and substantial—it is not enough to speculate that harm might be "not necessarily limited" to authors who contract with PRH and S&S. And even the testimony from Dr. Hill the government cites observes only that, *if* rivals observe reduced competition, they could "bid *as they were before* or even bid a little aggressively." *Id.* at 134 (¶ 263) (quoting Tr. 1269:20-24 (Hill)); *see* Tr. 1489:6-9 (Hill) (rivals' bidding behavior "may be unchanged or they may have a small diminution in their aggressiveness"); *see* Dkt. 178 at 152 (CL ¶ 95). In other words, rivals might lower bids a little, or they might not lower them at all—hardly a basis for blocking a $2 billion merger.

Another witness cited by the government, agent Ayesha Pande, similarly conceded the failure of the "second-order softening" theory. After speculating that her clients would be harmed by reduced competition, Dkt. 177 at 134-35 (¶ 264), she was forced to admit that the merger would not have affected a single one of the acquisitions she cited, Dkt. 178 at 53-54 (FF ¶ 116).

On top of the admissions by its key witnesses, the government makes no effort to show how editors in specific acquisitions can accurately predict and respond to their rivals' valuations, especially given its *own admission* that "the bids a publisher makes for a particular book are subjective—meaning that one publisher or editor can sometimes value a book higher or even significantly higher than other publishers or editors." Dkt. 177 at 130-31 (¶ 257); *see id.* at 155 (¶ 154) (citing evidence showing that executives "expressed surprise" at how high rival bids were). The problem of individualized and unpredictable valuations is compounded by the fact that editors rarely even know who is vying for a given book and or who else might be interested. Dkt. 178 at 48-49 (FF ¶ 104). Especially given the exceedingly high stakes of losing an expected bestselling book and author, *id.* at 90-92 (FF ¶¶ 221-22); *id.* at 155 (CL ¶ 101), the idea that other

editors will have the incentive and ability to lower bids substantially in response to blind, subjective bidding over individualized books is not just speculative, but contrary to the commercial realities of the industry. *Id.* at 153-55 (CL ¶¶ 98-101).

## V. THE MERGER WILL NOT INCREASE THE LIKELIHOOD OF COORDINATION

The relevant question in coordinated effects analysis is whether the merger is "likely to *change* the manner in which market participants interact, inducing *substantially more* coordinated interaction." Guidelines § 7.1 (emphasis added); *see* Areeda & Hovenkamp, *Antitrust Law* ¶ 919 (merger must "change firms' incentives to coordinate their behavior"). According to the government, the "two most likely" avenues for post-merger coordination are coordination on "contractual terms or not to poach authors." Dkt. 177 at 156-67 (¶ 323). The government has not shown that coordination on contractual terms or poaching is likely in this market—let alone that the merger will lead to "substantially more" of such conduct.

### A. Contractual Terms Are Not A Plausible Avenue For Coordination

At trial, Professor Snyder opined that an agreement not to compete on audio rights would make little sense in the publishing industry, because competition exists on "many other dimensions" in book negotiations. Tr. 2882:18-19. The government argues that Professor Snyder was wrong because of *Catalano, Inc. v. Target Sales, Inc*., 446 U.S. 643 (1980). There, the Supreme Court held that an agreement by beer distributors to stop extending credit to retailers was a form of *per se* unlawful price-fixing. *Id.* at 649. The Court explained that because credit terms were "inseparable" from price terms, defendants' agreement to stop extending "interest-free credit" amounted to price-fixing. *Id.* at 648.

*Catalano* is irrelevant here. Professor Snyder's point was that *coordination*—which concededly requires firms to monitor and detect cheating, Dkt. 177 at 151 (¶ 307)—is unlikely to

occur along one element of a multifaceted set of contract terms. Coordination on audio rights would be nonsensical, because it would be rational and easy for any industry member to cheat on the agreement by competing on other negotiable contract terms. In other words, there is a structural barrier to coordinating on contract terms in the publishing industry: contract terms are developed through "opaque" negotiation processes, making it difficult to determine who cheated, on what, and how. Tr. 2881:5-7 (Snyder) ("This is one of the most opaque industries in terms of acquisition processes to understand why did somebody win, why did somebody lose."); *see also id.* at 2881:2-5 (Snyder) ("So the complexity of the deal, the multiplicity of dimensions makes both picking a coordination mechanism, but also finding ways—finding out whether a party is deviating from the mechanism."). No one is arguing, as defendants did in *Catalano*, that an explicit agreement to coordinate on a contractual term would be lawful. The point is that it would be implausible, given the structure of this industry.

The government also misses the mark by arguing that the standardization of various contract terms (i.e., audio rights, royalty rates, and payout installments) means that the Big Five "already engage, at least, in parallel behavior." Dkt. 177 at 154 (¶ 315). There are obvious alternative explanations for why contract terms would become standardized in book publishing. Audio rights are the clearest example: the negotiation of these rights presents a classic free-rider problem that each publisher has an individual incentive to solve. Witness Brian Tart explained this point at trial without contradiction. Tr. 932:6-7. He testified that because "[t]he audio book benefits entirely from the book's publicity, marketing, packaging, positioning, editing, et cetera," giving up audio rights as a publisher means that the "outside audio players do almost zero marketing, certainly nothing approaching our marketing and publicity, [and] they get a free ride." Tr. 952:10-12, 952:15-17 (Tart) (quoting PX-328). It is no surprise that publishers would

independently reach the same decision to request audio rights when acquiring a book. Nor is it any surprise that other subsidiary terms have become largely standardized, given that the "single most important contract term" is the *advance*, as the government itself insists. Dkt. 177 at 25 (¶ 28). Indeed, "in a large number of cases," the advance "may be the only compensation that the author will receive for their work." *Id.* (quoting Tr. 254:11–21 (Pande)). The standardization of other terms merely reflects their relative insignificance to authors during bargaining.

**B. The Merger Will Not Make Anti-Poaching Coordination More Likely**

The government separately asserts that there are "no structural barriers" that could prevent the Big Four from "tacitly agreeing not to poach each other's major authors." *Id.* at 158-59 (¶ 329). Yes, there are: the same structural barriers that hinder coordination on contract terms would hinder no-poach coordination as well. In particular, publishers would have little to no information about why authors *stay* with their respective publishers over time. The decision of an author to stay with her publisher could mean that other publishers have refrained from poaching, but it could also mean that other publishers have regularly attempted to poach and failed, leading the author to negotiate better terms with her own publisher through the same "opaque" and complex negotiations that characterize this industry. *See supra* at 43. Given the lack of information about deal terms, publishers have no effective means of monitoring compliance with a no-poach agreement, and nothing about the merger will change that fact.

**C. The Ebooks Case Is Irrelevant**

As defendants have explained in previous filings—*see* Dkt. 178 at 168 (CL ¶ 136); Dkt. 131 at 56-57 (Defs. Pre-Trial Brief 49-50)—*United States. v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015), has no bearing on the coordination question in this case.

Under the Guidelines, previous coordination in a different market matters only if the "salient characteristics of that other market at the time of the collusion are closely comparable to

those in the relevant market." Guidelines § 7.2. *Apple* involved a conspiracy to increase retail prices in a different market: the downstream market for the retail sale of ebooks. 791 F.3d at 318. Downstream retail prices are transparent and readily capable of being monitored for deviation from any tacit or explicit agreement. Upstream acquisition prices are the opposite. Tr. 2881:5-7 (Snyder) (acquisition processes are "opaque"). And Random House and Bertelsmann were not even defendants in the *Apple* case—a point that the government congratulated Mr. Dohle on during trial. Dkt. 178 at 168-69 (CL ¶ 137) (citing Tr. 774:24-775:3). If the *Apple* case suggests anything, then, it is that Mr. Dohle, Bertelsmann, and PRH would likely steer the company *away* from collusive conduct, just as they did in *Apple*. And if the government is right that PRH will be a "leading firm whose decisions the other players would likely follow" in the industry, Dkt. 177 at 156 (¶ 322), then collusion by others is less likely too.

In any event, PRH's size in itself cannot make coordination more likely when the requirements for coordination—transparency, the ability to monitor and punish, and a relevant history of coordination—are absent from the market the government has alleged. Size alone would not give PRH or others the ability to send or respond to the necessary signals, nor would PRH's size enable PRH or others to ensure they would not lose huge amounts of money passing up bestselling books and authors while they wait to see whether their rivals somehow understand the signal and do the same in their own contracting decisions—decisions others will know little about.

## CONCLUSION

For the foregoing reasons, and the reasons previously stated, the government's § 7 challenge should be rejected and the merger should be allowed to proceed.

Dated: September 7, 2022

Respectfully submitted,

By: /s/ Daniel M. Petrocelli

Daniel M. Petrocelli (appearing *pro hac vice*)
M. Randall Oppenheimer (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 553-6700
dpetrocelli@omm.com
roppenheimer@omm.com

Andrew J. Frackman (appearing *pro hac vice*)
Abby F. Rudzin (appearing *pro hac vice*)
**O'MELVENY & MYERS LLP**
Seven Times Square
New York, NY 10026
Telephone: (212) 326-2000
afrackman@omm.com
arudzin@omm.com

Jonathan D. Hacker (D.C. Bar No. 456553)
Julia Schiller (D.C. Bar No. 986369)
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
jhacker@omm.com
jschiller@omm.com

Deborah L. Feinstein (D.C. Bar No. 412109)
Jason Ewart (D.C. Bar No. 484126)
**ARNOLD & PORTER**
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
debbie.feinstein@arnoldporter.com
jason.ewart@arnoldporter.com

*Attorneys for Defendants Bertelsmann SE & Co. KGaA and Penguin Random House LLC*

By: *__/s/ Stephen R. Fishbein___________*

Stephen R. Fishbein (appearing *pro hac vice*)
Jessica K. Delbaum (appearing *pro hac vice*)
**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
sfishbein@shearman.com
jessica.delbaum@shearman.com

Ryan Shores (D.C. Bar No. 500031)
Michael Mitchell (D.C. Bar No. 1531689)
**SHEARMAN & STERLING LLP**
401 9th Street, N.W., Suite 800
Washington, D.C. 20004
Telephone: (202) 508-8000
ryan.shores@shearman.com
michael.mitchell@shearman.com

Rachel E. Mossman (D.C. Bar No. 1016255)
**SHEARMAN & STERLING LLP**
2828 North Harwood Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 271-5777
rachel.mossman@shearman.com

*Attorneys for Defendants Paramount Global (f/k/a ViacomCBS Inc.) and Simon & Schuster, Inc.*