**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

BERTELSMANN SE & CO. KGaA,
PENGUIN RANDOM HOUSE, LLC,
VIACOMCBS, INC., and
SIMON & SCHUSTER, INC,

*Defendants.*

Civil Action No. 1:21-cv-02886-FYP

# UNITED STATES' CORRECTED PROPOSED
# <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

I.    FACTUAL BACKGROUND ...................................................................................... 7

   A.   The Merging Parties, Jurisdiction, and Venue ................................................... 7

   B.   Overview of the Proposed Transaction ............................................................. 8

   C.   How a Book Is Acquired and Published .......................................................... 11

      1.   Methods of Selling a Book ........................................................................ 12

      2.   Expected Sales and Competition Drive How Much Publishers Offer for a Book ......... 14

      3.   Advances Are the Most Important Contract Term ........................................ 16

II.   SECTION 7 LEGAL FRAMEWORK ....................................................................... 18

   A.   Section 7 of the Clayton Act Proscribes Mergers That *May* Substantially Lessen Competition; Doubts Are to Be Resolved Against the Transaction................................... 18

   B.   Courts Analyze Section 7 Claims Through a Burden-Shifting Framework..................... 21

III.  THERE IS A RELEVANT MARKET FOR THE ACQUISITION OF U.S. PUBLISHING RIGHTS TO ANTICIPATED TOP-SELLING BOOKS ........................... 22

   A.   Applicable Legal Standards............................................................................. 22

      1.   General Principles of Market Definition .................................................... 22

      2.   Courts May Define Relevant Sub-Markets Around Groups of Targeted Sellers........... 24

      3.   A Price Level Is an Appropriate Way to Identify Targeted Sellers ................ 25

      4.   Courts May Rely on Economic Analysis and Practical Indicia to Determine the Relevant Product Market ........................................................................... 27

      5.   Defendants Rely on Inapposite Product Market Caselaw............................. 28

   B.   The Anticipated Top Seller Market................................................................. 29

   C.   Authors of Anticipated Top-Selling Books Can Be Targeted for a Reduction in Advances ............................................................................................. 31

   D.   The Hypothetical Monopsonist Test Establishes That the Acquisition of U.S. Publishing Rights to Anticipated Top-Selling Books Is a Relevant Product Market ......... 34

      1.   Qualitative Evidence Shows That Self-Publishing Is a Poor Substitute to Traditional Publishing............................................................................ 35

      2.   The Market for Anticipated Top Sellers Formally Passes the Hypothetical Monopsonist Test..................................................................................... 36

   E.   Practical Indicia Establish That Authors of Anticipated Top-Selling Books Are Unique Customers with Unique Needs ...................................................... 37

i

1.    The Publishing Industry Recognizes Anticipated Top Sellers ...................................... 38

2.    Anticipated Top-Selling Writers Have Unique Needs ................................................... 43

3.    Anticipated Top Sellers Have Specialized Vendors ..................................................... 48

4.    Anticipated Top Sellers Have Distinct Prices ............................................................. 50

5.    Anticipated Top-Selling Authors Are Not Sensitive to Price Changes ........................ 51

6.    Anticipated Top-Selling Books Have Special Characteristics ..................................... 51

F.    Defendants' Argument About the Phrase "Anticipated Top Sellers" Is Misguided ......... 53

G.    The Acquisition of Publishing Rights to All Books Is Also a Relevant Product Market .. 54

H.    The Relevant Geographic Market Is Worldwide ............................................................. 54

IV.    THE PROPOSED ACQUISITION OF SIMON & SCHUSTER IS
       PRESUMPTIVELY UNLAWFUL ..................................................................................... 54

A.    Applicable Legal Standards ............................................................................................. 54

B.    The Merger Presumptively Violates Section 7 in the Relevant Market ............................ 55

C.    The Presumption Is Almost Always Sufficient to Block a Merger .................................... 58

D.    Aggregating the Fringe Competitors Strengthens, Rather than Weakens, the
       Presumption .................................................................................................................... 60

V.    THE DEFENDANTS CANNOT REBUT THE PRESUMPTION ..................................... 61

A.    Market Shares Accurately Reflect Competitive Conditions ............................................. 61

B.    The Big Five Publishers Are the Main Competitors in the Anticipated
       Top-Seller Market ........................................................................................................... 64

1.    Big Five Publishers Have the Size and Resources Necessary to Absorb
      Losses and Manage Risk ................................................................................................ 66

2.    Big Five Publishers Have Robust Backlists .................................................................. 67

3.    Big Five Publishers Have Sophisticated Publicity and Marketing Resources ............... 67

4.    Big Five Publishers Have Extensive Sales Forces ......................................................... 68

5.    Big Five Publishers Have Variable Cost Advantages .................................................... 69

6.    Big Five Publishers Benefit from Their History of Success ........................................... 70

7.    Non-Big Five Publishers Are at a Competitive Disadvantage Against
      the Big Five .................................................................................................................... 70

8.    Dr. Snyder Presented Misleading Data Regarding the Competitive
      Significance of Small Publishers ................................................................................... 74

C.    Entry and Expansion by Non-Big Five Publishers Would Not Be Timely,
       Likely, or Sufficient ........................................................................................................ 74

1. Legal Standard for Entry and Expansion ........................................................ 74

2. Entry Barriers Are High ............................................................................... 77

3. Expansion by Existing Publishers Will Not Be Sufficient, Timely, or Likely ............. 79

4. Printing Is an Additional Barrier to Entry and Expansion ................................... 86

5. Amazon's Limited Success Shows How Difficult Entry Is ...................................... 88

6. Other Recent Entrants Have Made Little Headway ............................................ 90

7. Dr. Snyder's Analysis of Entry and Expansion Is Unpersuasive ............................ 91

D. Defendants' Purported Efficiencies Are Not Verifiable and Cannot
Rebut the Presumption of Harm .................................................................... 94

E. Literary Agents Cannot Counteract the Likely Anticompetitive Effects
of the Proposed Merger ............................................................................... 95

1. "Sophisticated Seller" Is No Defense .............................................................. 95

2. The Agency Landscape Is Fragmented ............................................................ 96

3. Margin and Bargaining Evidence Shows That Agents' Leverage Is Limited ............. 97

4. Agents Do Not Have the Leverage to Hold Back Audio Rights .............................. 99

5. Agents Could Not Prevent Disadvantageous Shifts in Author Payout Structures ...... 100

6. Agents Could Not Improve Digital Rights – Odyssey Editions ............................. 101

F. Intra-Publisher Competition Does Not Rebut the Presumption of the Harm
from the Merger ...................................................................................... 102

1. Intra-Firm Competition Is Legally Irrelevant ................................................. 102

2. Even if Intra-Firm Competition Was Legally Relevant, Defendants
Cannot Show That It Will Eliminate the Harm Caused by the Merger .................... 103

G. Mr. Dohle's Unenforceable Letter Does Not Rebut the Presumption ..................... 107

1. Promises to Not Use Acquired Market Power Are Legally Insufficient ................... 107

2. Mr. Dohle's Unenforceable Letter Fails to Rebut or Offset the Harm
from Defendants' Merger ........................................................................... 108

H. Defendants' Intent Is Irrelevant ................................................................. 110

I. Defendants' Attempt to Gain Market Share Through the Merger Does Not
Rebut—and Actually Reinforces—the Presumption Against the Merger ................. 111

J. The Effects of the 2013 Merger Do Not Rebut the Presumption ........................... 112

1. Lack of Provable Effects from an Earlier Merger Does Not Rebut a
Presumption of Harm for This Merger ........................................................... 112

2. The Penguin/Random House Merger May Have Harmed Authors ......................... 112

VI.   THE EVIDENCE OF ANTICOMPETITIVE EFFECTS IS SUFFICIENT TO BLOCK THE PROPOSED TRANSACTION ................................................................. 114

A.   Applicable Legal Standards for Unilateral Effects ........................................... 115

B.   The Merger Would Eliminate Head-to-Head Competition Between PRH and S&S ....... 117

1.   Authors Benefit from Direct Competition between PRH and S&S ........................... 117

2.   Authors Benefit from Competition Between S&S and PRH When Defendants Are Not the Highest Two Bidders in an Auction ......................................... 121

3.   Authors Benefit from Competition Between PRH and S&S in Single-Round Best-Bid Auctions .......................................................................... 122

4.   Authors Benefit from Competition Between PRH and S&S for Books Acquired Outside of Auctions ............................................................... 123

5.   Eliminating the Competition Between PRH and S&S Will Harm Authors ................. 125

C.   Economic Analysis Shows That Eliminating Competition Between S&S and PRH Will Lower Advances and Harm Authors ................................................. 126

1.   Diversion Ratios Indicate That There Is Significant Competition to Be Lost Between the Merging Parties ................................................................ 126

2.   Dr. Hill's Economic Modeling Provides Results That Are Consistent with the Prediction That the Merger Is Likely to Lead to a Significant Reduction in Competition ............................................................................. 131

3.   Dr. Hill's Harm Estimates Are Consistent with Other Times Courts Have Blocked Anticompetitive Mergers ........................................................ 138

4.   The Merger Will Likely Lower Output and Harm Readers ............................... 139

D.   The Proposed Transaction Will Increase the Likelihood of Coordinated Effects ........... 141

1.   Applicable Legal Standard ................................................................. 141

2.   This Merger Is Likely to Increase the Risk of Coordination Among Publishers ........ 143

3.   Defendants' Arguments Regarding Structural Barriers are Unsubstantiated and Ignore Likely Forms of Coordination ................................................. 147

VII.  CONCLUSION ........................................................................... 151

# TABLE OF AUTHORITIES

## Cases

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016) .................................................... 20

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........................................................... passim

*California v. Am. Stores Co*., 495 U.S. 271 (1990) ........................................................................ 18

*Catalano v. Target Stores*, 446 U.S. 643 (1980) ........................................................................ 148

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008) ............................ 22, 75, 76

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) .................................... 102, 104

*Crestron Elecs. Inc. v. Cyber Sound & Sec. Inc.*,
    2012 WL 426282 (D.N.J. Feb. 9, 2012) .................................................................................... 28

*FTC v. Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016) ........................................ 19

*FTC v. Arch Coal, Inc.,* 329 F. Supp. 2d 109 (D.D.C. 2004) ....................................................... 28

*FTC v. Cardinal Health*, 12 F. Supp. 2d 34 (D.D.C. 1998)................................... 75, 76, 95, 97, 108

*FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26 (D.D.C.) ................................................................ 76

*FTC v. Elders Grain, Inc*., 868 F.2d 901 (7th Cir. 1989) ..................... 19, 60, 75, 93, 141, 142, 143

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ........................ 19, 21, 55, 58, 107, 114, 139

*FTC v. Hackensack Meridian Health, Inc.*,
    2021 WL 4145062 (D.N.J. Aug. 4, 2021) ............................................................................... 138

*FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160 (3d Cir. 2022) ........................ 60, 93, 138

*FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34 (D.D.C. 2002)....................................................... 59, 108

*FTC v. PPG Indus.*, 798 F.2d 1500 (D.C. Cir. 1986) ................................................................. 141

*FTC v. Sanford Health*, 926 F.3d 959 (8th Cir. 2019).............................................................. 133

*FTC v. Sanford Health*, No. 1:17-cv-133,
    2017 WL 10810016 (D.N.D. Dec. 15, 2017).......................................................................... 133

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ....................................................... passim

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ....................................................... 37, 115

*FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000)................................... 37, 51, 55, 59, 93

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015)........................................................... passim

*FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018)............................. 23, 58, 85, 94, 143, 147

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ............................... 24, 26, 27, 59

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018)........................... passim

*Haagen-Dazs Co., Inc. v. Double Rainbow Gourmet Ice Creams, Inc.*,
  895 F.2d 1417 (9th Cir. 1990)............................................................................28

*HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543 (8th Cir. 2007)................................................28

*Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968 (8th Cir. 1968)................................................111

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986) ......................................................passim

*In re Super Premium Ice Cream Distribution Antitrust Litig.*,
  691 F. Supp. 1262 (N.D. Cal. 1988) ...............................................................26, 28

*Int'l Boxing Club of New York, Inc. v. United States*, 358 U.S. 242 (1959)....................................26

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913 (9th Cir. 1975) ........................38

*Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154 (D. Nev. 2016)................................................................53

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219 (1948) ....................21, 139

*O'Bannon v. NCAA*, 7 F. Supp. 3d 9557 (N.D. Cal. 2014) ......................................................23, 26

*O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015)........................................................................26

*Promedica Health Sys., Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014) ......................................102, 108

*St. Alphonsus Med. Ctr. v. St. Luke's Health Sys.*, 778 F.3d 775 (9th Cir. 2015) ................102, 107

*Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990 (9th Cir. 1986)...............26, 52, 53

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124 (10th Cir. 2002) ............................139

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) .............................................23

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) .............................................................23, 139

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) .......................................59, 115, 116

*United States v. Aluminum Co. of Am.*, 377 U.S. 271 (1964)..............................................24, 25

*United States v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) ........................................passim

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) .................................................22

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015)........................................................144, 146

*United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019)...................................................19

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990)............................................61

*United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014).........................110

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964)......................................................19, 22, 24

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ........................................28

*United States v. Gillette Co.*, 828 F. Supp. 78 (D.D.C. 1993) ....................................................28

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ................................passim

vi

*United States v. Joseph Schlitz Brewing Co.*, 253 F. Supp. 129 (N.D. Cal. 1966) .......................... 28

*United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004) .......................................... 28

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) ............................................................. 19

*United States v. Pennzoil Co.*, 252 F. Supp. 962 (W.D. Pa. 1965) .......................................... 20, 108

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1962) ........................................................ passim

*United States v. Rice Growers Ass'n of Cal.*, No. S–84–1066 EJG,
    1986 WL 12562 (E.D. Cal. Jan. 31, 1986) ........................................................................ 20, 139

*United States v. Rockford Mem'l Corp.*, 898 F.2d 1278 (7th Cir. 1990) ........................................ 60

*United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150 (1940) .................................................... 148

*United States v. Sungard Data Systems, Inc.*, 172 F. Supp. 2d 172 (D.D.C. 2001) ....................... 28

*United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001) ..................................... 75

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d. Cir. 2003) ................................................... 75

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) ...................... 20

## Statutes

15 U.S.C. § 18 ............................................................................................................ 18, 20, 111

15 U.S.C. § 22 ........................................................................................................................ 8

28 U.S.C. § 1391 .................................................................................................................... 8

## Other Authorities

Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to
    Fox in Forty Years*, 77 Antitrust L.J. 49 (2010) .................................................. 32, 82, 128, 132

Herbert Hovenkamp & Carl Shapiro, *Horizontal Mergers, Market Structure,
    and Burdens of Proof*, 127 Yale L.J. 1996, 2014 (2018) ........................................................ 59

Joseph Farrell & Carl Shapiro, *Antitrust Evaluation of Horizontal Mergers: An Economic
    Alternative to Market Definition*, 10 B.E. J. Theoretical Econ. 1 (2010) .............................. 136

Nathan Miller, *Modeling the effects of mergers in procurement*,
    37 Int'l J. Indus. Org. 201 (2014) ....................................................................................... 136

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) ............. passim

## Treatises

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law:
    An Analysis of Antitrust Principles and Their Application* (5th ed. 2022) ............................ 102

**TABLE OF FIGURES**

Figure 1.  Average Marketing Expenditures by Advance Amount, PRH and S&S (PX-972) ......................................................................................... 41

Figure 2.  Market Shares by Contract for Anticipated Top Sellers and Non-Anticipated Top Sellers (2019–2021) (PX-963) .................................................. 44

Figure 3.  Anticipated Top Sellers as a Percentage of Dr. Snyder Advance Data Titles by Publisher (2019–2021) (PX-995) ........................................... 50

Figure 4.  Share of Purchases of Anticipated Top Sellers (January 2019–June 2021) (PX-959) ............................................................ 57

Figure 5.  Share of Purchases of Anticipated Top Sellers Using Different Advance Cutoffs (January 2019–June 2021) (PX-960) ...................................... 58

Figure 6.  Shares by Count of Anticipated Top Seller Contracts (2019–2021) (PX-994) ......................................................................................... 63

Figure 7.  Summary of Dr. Hill's Diversion Estimates (PX-970) ............................................. 129

Figure 8.  Dr. Hill's Estimates From Second-Score Auction and GUPPI Models (PX-964) ..... 134

**INTRODUCTION**

As its CEO admitted, Penguin Random House's ("PRH") proposed acquisition of Simon & Schuster ("S&S") would "cement Penguin Random House as number one in the United States." The acquisition would establish a single firm with nearly 50% of the market in a concentrated industry that has a history of coordination. PRH, along with the remaining "Big Five" publishers, would control approximately 90% of the relevant market. The proposed acquisition is precisely the march toward concentration and monopsony power that Congress enacted the Clayton Act to prevent.

One entity's control of almost half of the nation's anticipated top-selling books threatens competition in multiple ways. Authors' advances would fall—advances that they use to pay their bills and that reflect compensation for their work. The contractual terms publishers offer authors would worsen. Authors would have one fewer independent outlet for their work, and, as PRH's CEO acknowledged, as advances fall the diversity of stories being told would narrow. These are not abstract concerns. They are shared by many agents, authors, and even Defendants' executives. PRH and S&S themselves recognized the serious antitrust concerns inherent in their proposed merger. Contemporaneous documents predicted regulatory hurdles, and it is therefore no surprise that PRH agreed to pay a significant premium to acquire S&S.

The United States has satisfied its burden under prevailing Supreme Court precedent. Due to the high level of concentration, the proposed merger triggers a presumption of illegality. There is no real dispute that if the relevant market is the market for the acquisition of publishing rights to anticipated top-selling books, then the proposed merger is presumptively illegal. That is the case here, and Defendants have not and cannot rebut that presumption. The proposed merger

may substantially lessen competition.  Therefore, the acquisition violates Section 7 of the

Clayton Act and should be enjoined permanently.

Merger analysis begins with the framework-setting exercise of market definition.  This

exercise is not a rigid formulaic one requiring measurement by "metes and bounds," but is

instead an analytical tool to evaluate competition.  Market definition is a relatively narrow issue

here, as Defendants concede that: (1) there is a market for the acquisition of all trade books in the

United States as self-publishing is not an adequate substitute to defeat a significant reduction in

advances by publishers in that market; and (2) self-publishing is not an adequate alternative to

defeat a reduction in advances among anticipated top sellers—defined as books obtaining

advances of $250,000 and above.  Defendants' argument against the United States' product

market is simply that the $250,000 threshold for that submarket is "arbitrary" and unrecognized

by publishers.

The United States proved that the relevant market here is anticipated top sellers, *i.e.*

books that receive an advance of $250,000 or more.  This market was established by Defendants'

own documents, witness testimony describing whom the Defendants compete against,

Defendants' internal approval processes, and how authors of anticipated top-selling books

choose their publishers, the "practical indicia" described in *Brown Shoe Co. v. United States*, 370

U.S. 294 (1962), and the economic analysis presented by the United States' economic expert, Dr.

Nicholas Hill.  The incontrovertible reality is that authors of anticipated top sellers—because

they have more substantial financial, marketing, reputational and distribution needs—face a far

more limited market of purchasers of their manuscripts than other authors.  Market definition is

one of many tools to assess whether the merger in question will cause competitive harm to an

identifiable segment of market participants. Precedent in this Circuit is clear that whether the segment exists is more important than precisely where the line is drawn.

Once the relevant market is defined, this is a straightforward case: the merger would eliminate a key competitor to the top player in the market and lead to a nearly 50% market share for the combined entity. This easily clears the thresholds used in this Circuit to identify mergers presumed to be illegal. These metrics account for the relative competitive significance of smaller publishers, acknowledging that they can occasionally compete for a handful of titles. But those smaller publishers do not win often enough—nor have any realistic prospect of doing so in the near future—to create any doubt about the enduring market power of a combined PRH and S&S. This is borne out by the evidence; in the last thirty years, no new publisher has cracked the ranks of the Big Five.

The record evidence shows that competition among the Big Five publishers is what drives advance levels for anticipated top-selling books. The idea that "everything is random" in the publishing industry and therefore there can be no value attributed to how and where publishers set advance levels is contradicted by the everyday dealings of the publishing industry. PRH, S&S, and other publishers are large companies run by sophisticated executives who are accountable to corporate owners, shareholders, and investors. These publishers invest substantial time, capital, and energy to identify books that are likely to sell well, win awards, and contribute to the marketplace of ideas. Identifying these anticipated top sellers is what their editors do— quite successfully—for a living, and they compete vigorously to acquire these books. Indeed, it is an economic and business rationale that motivated this merger. PRH's CEO was clear that PRH had lost market share and one way to regain market share was through merger, here with one of its most significant competitors.

The evidence is clear that head-to-head competition between the parties significantly increases advances for anticipated top-selling books. Defendants' own expert admitted that PRH is the principal competitor of S&S and that S&S is the runner up to PRH at least 20% of the time. Non-Big Five publishers play a minimal role, winning less than 10% of anticipated top sellers, whereas they win a much larger percentage of books outside of the anticipated top-seller market.

Defendants had an opportunity to rebut the presumption by showing how it might not reflect commercial realities. But they did not come close to meeting their burden. First, they failed to show how new firms could timely enter or other firms could expand to replace the competition from S&S and defeat any effort by the merged parties to exercise their market power. Defendants themselves recognize that barriers to entry into the relevant market are high, undercutting their own argument. New and smaller publishers face many hurdles to entry or expansion, including a lack of a reputation for success, the absence of a backlist, difficulty publicizing books, and weaker relationships with retailers. The fact that on some occasions, small publishers win big books does not change this fact. Indeed, those occasions are all the more notable because they are not common. That even Amazon is no longer considered a competitive threat by Big Five publishers when it comes to acquiring anticipated top sellers underscores the high barriers to successful entry into the market.

Second, Defendants attempted to argue that literary agents can control and manufacture competition as well as extract higher offers from unwilling publishers. The record shows that, even now, agents' leverage is limited. Agents cannot force editors to bid on a book, let alone to bid above the editors' authorized limit. And the record contains numerous examples of publishers' ability to insist on terms that are beneficial to them and detrimental to authors:

standardized royalty terms, mandatory transfer of audio rights, lengthened payout timetables, and reduced digital royalty rates.

Third, Defendants argued that internal competition among Defendants' imprints could eliminate the harm from the merger.  This runs contrary to common business sense and legal precedent and is similarly unsupported factually.  Publishers monitor how their imprints bid for books and limit competition between them, even in situations where the imprints nominally have some autonomy.  Indeed, the CEO of PRH's U.S. operations specifically sought to reduce "internal up-bidding" by PRH imprints in recent years.

Defendants' attempt to save the merger with a unilateral, unenforceable, and revocable promise to compete against itself post-merger does not stand up to scrutiny.  Real-world business realities and PRH's current internal bidding policies show that it is in PRH's interest to limit internal competition, and the record shows that internal competition among imprints is no substitute for robust competition among independent publishers.  And, of course, there are numerous challenges in the details of implementation for such a promise when the Defendants control the existence of imprints, those imprints' budgets and editorial focus, and so forth.

Defendants' failure to rebut the presumption ends the analysis and requires a judgment in the United States' favor.  But even if Defendants were able to rebut the presumption—which they are not—the United States still carries its burden on the strength of the evidence showing that the merger may cause anticompetitive effects.  The record shows numerous examples where authors have benefited from the competition between PRH and S&S that the merger will extinguish.  In addition to that evidence, Dr. Hill performed a number of analyses utilizing multiple data sets and various sensitivities.  The trend was consistent: the proposed merger will harm authors by reducing advances for anticipated top sellers.  Specifically, Dr. Hill's

quantitative analysis predicts that if the merger is allowed to proceed, advances for anticipated top sellers will decline by about 4% for PRH authors, and about 11.5% for S&S authors. In real terms, this means that authors stand to lose on average tens of thousands of dollars, if not more, per book.

Even when using quantitative economic models proposed by Defendants' own economists during the investigative phase (the GUPPI models), Dr. Hill predicted similar reductions in author compensation. Defendants' expert, Dr. Snyder, offered no model of his own to counter these harm estimates.

The loss of S&S as an independent bidder will not just be felt in head-to-head bidding scenarios. S&S will no longer be a stalking horse that agents can point to as an alternative when negotiating one-on-one with an editor or soliciting bids in a single-round auction.

This merger will also enhance the ability of major publishers to tacitly coordinate their actions towards authors. For example, they may refrain from poaching each other's authors, thereby reducing author income. Or they may further change standard contract terms to the detriment of authors. Such coordination need not be particularly elaborate or involved; simply by cementing PRH as the "leader" that other publishers follow, the merger will affect other firms' behavior and endangers competition and authors' livelihoods.

For the reasons detailed below, the Court should find that PRH's proposed acquisition of S&S may substantially lessen competition and thus violates Section 7 of the Clayton Act. The evidence and law support a permanent injunction. The Court should block the merger.

## I.    FACTUAL BACKGROUND

### A.  The Merging Parties, Jurisdiction, and Venue

1.       PRH is the largest trade book publisher worldwide and in the United States.  Trial Tr. 741:14–16 (Dohle); Trial Tr. 595:20–22 (Karp).  Headquartered in New York, New York, PRH is owned by Bertelsmann SE & Co. KGaA ("Bertelsmann"), an international media and services company headquartered in Gütersloh, Germany.  Dkt. 119-7 at 2 (Joint Pre-Trial Statement, Exhibit G, Statement of Uncontested Facts ¶¶ 1–3).  PRH has close to 100 U.S. publishing imprints (a trade or brand name for a specific editorial group such as Viking, Riverhead, and Crown) across six publishing divisions.  Trial Tr. 812:5–11 (Dohle).  PRH publishes over 2,000 new titles annually in the United States, more than any other publisher. Dkt. 56 at 9 (Am. Answer ¶ 18); Dkt. 56 at 11 (Am. Answer ¶ 28).  Its 2020 U.S. publishing revenues surpassed $2.4 billion.  Dkt. 56 at 9 (Am. Answer ¶ 18).

2.       S&S, also headquartered in New York, New York, is the third-largest trade book publisher in the United States.[1]  Dkt. 119-7 at 3 (Joint Pre-Trial Statement, Exhibit G, Statement of Uncontested Facts ¶ 5); PX-530 at 2 (describing S&S as the third largest publisher of general interest books for adults and children); Trial Tr. 106:14–19 (Pietsch) (same); DX-105 at 64 (same); PX-663 at 92 (showing 2019 US trade publishing market share); PX-829 at 2 (showing revenue shares of the Big Five for December 2021 year-to-date).  Paramount Global, the global media and entertainment company (formerly known as ViacomCBS), owns S&S.  Dkt. 119-7 at

---

[1] The United States' Complaint and Pre-Trial Brief conservatively estimated that S&S was the fourth-largest book publisher in the United States by total sales, *see* Dkt. 2 at 2 (Compl. ¶ 3); Dkt. 132 at 9 (United States' Pre-Trial Brief); however, the evidence presented at trial indicates that S&S is actually the third-largest publisher.  Regardless of S&S's ranking in the downstream market for all trade books, it is the third-largest acquirer of anticipated top sellers. S*ee infra* IV.B.

3 (Joint Pre-Trial Statement, Exhibit G, Statement of Uncontested Facts ¶¶ 7–8).  S&S operates

around 50 U.S. imprints across three publishing groups and publishes over 1,000 new titles

annually in the United States.  PX-663 at 89; Trial Tr. 473:20–474:1 (Karp); Dkt. 56 at 9 (Am.

Answer ¶ 20).  Its 2020 U.S. publishing revenues exceeded $760 million.  Dkt. 56 at 9 (Am.

Answer ¶ 20).

3.       This Court has personal jurisdiction over each Defendant under Section 12 of the

Clayton Act, 15 U.S.C. § 22.  Dkt. 56 at 9 (Am. Answer ¶ 15).  PRH and S&S both transact

business within this District.  Dkt. 56 at 9 (Am. Answer ¶ 15).

4.       Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §

22, and 28 U.S.C. § 1391.  Dkt. 56 at 9 (Am. Answer ¶ 16).

5.       PRH and S&S are engaged in interstate commerce, Dkt. 56 at 9 (Am. Answer ¶

14), and as shown throughout this trial, their activities substantially affect interstate commerce.

### B. Overview of the Proposed Transaction

6.       PRH and S&S are two of what the industry refers to as the "Big Five" publishers,

a group of the largest trade book publishers in the United States that also includes HarperCollins

Publishers, Hachette Book Group, and Macmillan Publishing Group, LLC.  Trial Tr. 106:14–19

(Pietsch); Trial Tr. 344:12–24 (Eulau).

7.       The Big Five have been consolidating the publishing industry for decades.  Trial

Tr. 334:5–9 (King).  Bertelsmann entered the U.S. publishing market in 1977 by acquiring

Bantam Books, and continued to grow by merging with other large U.S. publishers including

Doubleday Dell in 1986, Random House in 1998, and most recently Penguin in 2013, creating

the current entity Penguin Random House.  Dkt. 119-7 at 2 (Joint Pre-Trial Statement, Exhibit G,

Statement of Uncontested Facts ¶ 4); Trial Tr. 818:8–16 (Dohle).  Since the 2013 merger, PRH

has continued to acquire new imprints, including Rodale and Little Tiger.  Trial Tr. 2522:19–

2523:1 (Sansigre); *see also* PX-163 at 46–47 (U.S. publishers partially or fully acquired by PRH

since 2013 include Sasquatch Books, Rodale, Little Tiger, F&W Media, and Sourcebooks).

8.      Other members of the Big Five have followed PRH's example, acquiring mid-

sized publishers in the United States in recent years.  Trial Tr. 169:10–17 (Pietsch) ("Each time

the smaller publishers of scale, you know, in recent years, you know, are continually being

acquired by other Big Five publishers….").  Hachette acquired a number of independent

publishers over the last decade, including most recently Workman Publishing in September

2021, along with Worthy, Perseus, and Black Dog & Leventhal.  Trial Tr. 102:13–103:4

(Pietsch); Trial Tr. 204:3–19 (Pietsch).  Similarly, HarperCollins acquired Houghton Mifflin

Harcourt (HMH), one of the largest remaining independent publishers, in 2021.  Trial Tr.

1386:12–17 (Murray).  Rodale, Workman and HMH previously competed on occasion with the

Big Five for anticipated top-selling books in the United States.  *See, e.g.*, Trial Tr. 2075:14–20

(Cheney) (Workman); Trial Tr. 2095:10–2096:6 (Wylie); Trial Tr. 2098:11–12 (Wylie)

(Rodale); Trial Tr. 2129:24–2130:17 (Ross); Trial Tr. 2144:7–18 (Ross) (HMH); Trial Tr.

309:7–20 (Pande) (HMH); Trial Tr. 192:6–193:15 (Pietsch) (explaining that approximately half

of Hachette's losses to non-Big Five publishers for books with advances above $500,000 were to

HMH).  Macmillan, the smallest of the Big Five, has seen its market position decline relative to

the rest of the Big Five as it has pursued organic growth rather than mergers and acquisitions.

Trial Tr. 1079:23–1080:18 (Weisberg).

9.      The proposed acquisition of S&S by PRH continues this trend of consolidation.

In March 2020, ViacomCBS (now Paramount Global) CEO Bob Bakish announced that S&S

would be put up for sale.  Trial Tr. 2182:14–2183:2 (Berkett).  While a "fantastic business" as a

9

trade book publisher, ViacomCBS determined S&S was not core to its strategic interests.  Trial Tr. 2181:20–24 (Berkett).

10.     After ViacomCBS announced its plans to sell S&S, PRH management described S&S as "one of the last high-quality, scaled assets remaining in the [U.S. publishing] market." PX-163 at 52.  PRH CEO Markus Dohle advocated that Bertelsmann be willing to pay a substantial premium over the next largest bidder for S&S.  Trial Tr. 740:23–741:5 (Dohle).

11.     In the fall of 2020, ViacomCBS solicited bids during a two-round bidding process in which the final second-round bidders were Bertelsmann/PRH, News Corp/HarperCollins, and Vivendi.  Trial Tr. 2185:2–15 (Berkett).  ViacomCBS had four criteria when evaluating the final bids: value maximization, deal certainty (*i.e.*, ability to satisfy the transaction terms), finding a good home for the business, and finding a good home for the employees and executives, with price and deal certainty being the more important considerations.  Trial Tr. 2187:22–2188:25 (Berkett).  Bertelsmann/PRH submitted the highest bid.  Trial Tr. 2189:1–14 (Berkett).  ███████

████████████████████████████████████████████████████████████████

█████████████ the deal team recommended Bertelsmann/PRH.  Trial Tr. 2224:15–2225:1 (Berkett).

12.     On November 24, 2020, ViacomCBS entered into a Share Purchase Agreement with Bertelsmann and Penguin Random House.  *See* PX-885.  Under this agreement, Bertelsmann and PRH would acquire S&S for $2.175 billion in cash.  PX-885 at 23.  Bertelsmann agreed to certain contractual terms related to deal certainty, particularly the apportionment of the antitrust risk, ████████████████████████████████████

███████████████████████████ Trial Tr. 2219:16–22 (Berkett).  ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████    The deal was announced to the public

in late November 2020.  Trial Tr. 2187:17–21 (Berkett).

13.    The acquisition would cement Penguin Random House as the number one trade

publisher in the United States—one of PRH's strategic goals for the merger.  Trial Tr. 742:2–4

(Dohle); PX-162 at 1 ("Strategic rationale . . . Cement PRH as #1 in the US").  The combined

firm would benefit from outsized influence over the U.S. publishing industry with a market share

at least twice that of its next closest competitor in the Big Five, ████████████  *See* ████████

████████████████████████████████████████████████████    *see*

*also* PX-959 at 1 (combined firm's upstream market share (49%) nearly twice that of

████████████████

### C.  How a Book Is Acquired and Published

14.    Publishers compete to acquire the rights from authors to publish books in the

United States.  In exchange for the right to publish the work, publishers pay authors an advance,

which is frequently the author's entire compensation for the book.  Trial Tr. 254:18–21 (Pande).

An advance is a guarantee of payment typically paid out in installments and represents prepaid

royalties that accrue from the sale of a book to a publisher.  Trial Tr. 106:20–107:25 (Pietsch).

Over time, if a book "earns out" by earning royalties equal to the amount of the initial advance,

the author receives additional payments from further sales as periodic royalty payments.  Trial

Tr. 106:20–107:25 (Pietsch); Trial Tr. 1945:7–17 (Duhigg); *see* Trial Tr. 321:15–17 (King).  As

discussed *infra*, more than 85% of author contracts for anticipated top-selling books never earn

out their advance.  Trial Tr. 1239:25–1240:8 (Hill).

15.     An anticipated top-selling book is simply that: a book expected to generate significant sales. Trial Tr. 1226:5–7 (Hill). The authors of those books want, need, and can often obtain, significant marketing and distribution support, as well as an editor with a reputation for quality and success. Trial Tr. 1231:13–19 (Hill); *see also* DX-21 at 5. An author of an anticipated top-selling book can also demand and obtain a sizeable advance given that their book is expected to have sizable sales. The market of anticipated top-selling books is roughly a $1 billion market and accounts for 70% of all advance spending on general trade books. *See* Trial Tr. 1239:10–24 (Hill); Trial Tr. 2819:19–2820:2 (Snyder); Trial Tr. 2904:17–2905:3 (Snyder).

16.     Authors are typically represented by literary agents to sell the publishing rights to their book (or books) in the form of a proposal or a completed manuscript. PX-151 at 5. Literary agents are typically compensated with a 15% commission of the author's earnings. Trial Tr. 245:18–25 (Pande); *see* PX-151 at 5.

### 1.    Methods of Selling a Book

17.     It can take an author several years of refining a manuscript to get it ready for submission to publishers. Trial Tr. 245:1–17 (Pande); Trial Tr. 246:23–257:6 (Pande).

18.     Once the manuscript is ready to be sent to prospective publishers, the author and agent choose editors to whom they will send the manuscript. Trial Tr. 246:1–8 (Pande). Agents consider "which might be the most qualified editors and publishing houses to submit" the manuscript. Trial Tr. 246:1–8 (Pande). Factors include the reputation and track record of the editor and publisher for publishing similar books and the "ability of a publishing company to pay an appropriate compensation for the work." Trial Tr. 246:9–16 (Pande); Trial Tr. 1379:10–21 (Murray). It is common for agents to submit manuscripts to a variety of editors at different publishing imprints. PX-151 at 5. For some repeat authors, the project is subject to an option

clause from their previous publishing contract.  Trial Tr. 113:5–18 (Pietsch).  An option clause gives a publisher a 30- or 60-day window to bid on the author's next book before the agent submits the proposal to other publishers.  Trial Tr. 113:5–18 (Pietsch); PX-2002 at 57–58 (Stehlik Dep. 145:24–146:8).

19.      Depending on the level of interest from editors, the literary agent will determine how to solicit offers.  Trial Tr. 251:8–11 (Pande).  The method of sale can range from exclusive negotiations to submissions to multiple publishers culminating in single or multi-round auctions.  PX-151 at 5; *see also* Trial Tr. 2087:2–23 (Wylie); Trial Tr. 2088:9–16 (Wylie); Trial Tr. 2088: 24–2089:22 (Wylie); Trial Tr. 2048:9–13 (Cheney) (identifying the formats of selling a book as auction, preempt, option, and exclusive).

20.      In exclusive negotiations, the agent negotiates with one publisher for acquisition rights.  That can happen because the publisher has an option in a prior contract, because the agent chooses to submit the project to a single publisher, or because a single publisher is interested after a manuscript has been widely submitted.  Trial Tr. 954:18–955:4 (Tart).

21.      If there are enough interested bidders, an agent can choose to set up an auction.  Trial Tr. 252:13–15 (Pande); Trial Tr. 253:12–19 (Pande).  Auctions take various forms.  Some common methodologies in the publishing industry include 1) rounds or round-robin auctions, where publishers bid against one another in rounds; 2) best-bid auctions, where there may be a single round; and 3) hybrid auctions, which may be some combination of the two.  Trial Tr. 1265:2–13 (Hill); Trial Tr. 112:4–113:4 (Pietsch); Trial Tr. 2116:10–2117:9 (Ross); Trial Tr. 2048:21–2049:19 (Cheney).  The auction structure an agent uses for any given project differs based on the competitive variables at play, agency practices, agent preference, and the author's priorities.  *See* PX-2007 at 11 (Fletcher Dep. 36:2–3, 36:5–13); Trial Tr. 253:12–24

(Pande) (the auction structure selected "really depends on how many editors at different publishing houses have expressed interest").

22.     Sometimes, after submitting a manuscript widely, the author may accept a preempt.  Trial Tr. 252:18–253:1 (Pande).  A preempt is an offer to preemptively acquire the book before it goes to auction.  Trial Tr. 252:18–253:1 (Pande); Trial Tr. 303:5–15 (Pande).  An author may accept a preempt where there is a good editorial fit and "the money [is] so high that they fe[el] like they [are] getting a premium above what the bidding would be. . . ."  PX-2007 at 69 (Fletcher Dep. 156:18–157:8); *see also* Trial Tr. 303:5–15 (Pande) ("[P]reemptive offers tend to be quite high because it has to incentivize us to be willing to take the book off the table and not offer it in a competitive situation.").  Other times, after an agent has submitted a book widely and only received one offer, the author will decide to take the bid in hand instead of face the uncertainty associated with an auction.  PX-2007 at 69 (Fletcher Dep. 156:18–157:8).

### 2.     Expected Sales and Competition Drive How Much Publishers Offer for a Book

23.     Publishers determine how much to offer for an author's work—namely, the size of the advance—by putting together projected profit-and-loss statements known as "P&Ls" for the proposed book(s).  Trial Tr. 1973:12–22 (Kim); Trial Tr. 200:1–18 (Pietsch); Trial Tr. 569:1–13 (Karp); *see also* DX-414 at 1.  These P&Ls include the expected list price for the book in various formats, production and marketing costs, and—the key factor—anticipated sales based on previous sales of comparable titles (referred to as "comp titles" or "comps").  *See* Trial Tr. 1971:4–14 (Kim); Trial Tr. 200:1–18 (Pietsch); Trial Tr. 916:3–8 (Tart) (anticipated sales based on comp titles are input and calculated to get a "suggested advance"); Trial Tr. 2393:21–2394:14 (McIntosh) (PRH "spend[s] a lot of time trying to guess the expected sales of books").  Comp titles are those with similar characteristics to the proposed book, such as subject matter, literary

merit, and author background.  Trial Tr. 1971:4–14 (Kim); Trial Tr. 2066:1–2067:1 (Cheney) (explaining the use of comps when deciding how much she thinks she can sell a project for). Publishers consider these indicative of a new book's projected sales and use the commercial success of comp titles to help determine how large an advance to offer for an author's work. Trial Tr. 1971:15–1972:10 (Kim).  P&Ls represent the publisher's best estimate at the time of acquisition.  Trial Tr. 1041:11–19 (Tart).

24.    The relationship between the level of advance and projected sales is "extremely close" because publishers are "willing to pay a higher advance when [they] think [they] can sell more copies."  Trial Tr. 110:19–111:1 (Pietsch); *see also* Trial Tr. 749:15–17 (Dohle); Trial Tr. 458:9–14 (Karp); Trial Tr. 1039:25–1040:8 (Tart).

25.    In addition to the anticipated sales, competition among publishers is the key driver of the price paid by the publisher in the form of an advance.  *See, e.g.*, Trial Tr. 114:25–115:6 (Pietsch) (in negotiations "we end up bidding against what we imagine the market would be if the book were taken out [to other publishers].  So it can lead to us increasing our offers quite significantly."); Trial Tr. 596:5–597:4 (Karp) (the threat that the agent could shop a book to other publishers affects the advance that S&S pays in exclusive negotiations and preempts); Trial Tr. 253:2–6 (Pande) (if an agent or author views the preempt as insufficient, they can decline and seek offers from other publishers).

26.    Even when a book is sold via an option or exclusive negotiation, publishers know that their offers need to be attractive enough to keep the manuscript "off the marketplace."  Trial Tr. 1122:24–1123:6 (Weisberg); *see* Trial Tr. 113:5–115:6 (Pietsch) (most option clauses do not include binding terms or set the price for future advances so if the agent and the publisher cannot reach a mutual agreement under the option, the agent can take the project elsewhere).

### 3.    Advances Are the Most Important Contract Term

27.    Authors' agreements with publishers include many contract terms, some of which are the subject of negotiations with publishers.  The most important contract term is the advance; however, the contract also includes the royalty rates for different formats, the scope of rights the publisher is seeking to acquire (including territories, translation rights, and formats such as audio), and the payout structure for advances (*e.g.*, quarters or thirds).  Trial Tr. 254:9–17 (Pande); Trial Tr. 254:25–255:14 (Pande).  As publishers have consolidated, many contract terms have become less advantageous to authors and more difficult for agents to negotiate.  *See infra* V.E.

28.    The advance is the "single most important contract term" because, "in a large number of cases, it may be the only compensation that the author will receive for their work." Trial Tr. 254:11–21 (Pande).  Very few authors earn out their advances.  Trial Tr. 254:18–24 (Pande) (estimating on the "generous side" 20% of her agency's authors have earned out their advance); Trial Tr. 2101:3–5 (Wylie) (estimating 5% of his clients' books earn out); *see also* PX-989 at 2–3, 8–9 (columns E and F of the summary tabs identify authors that have un-earned royalties).  Dr. Hill calculated that more than 85% of author contracts for anticipated top-selling books never earn out their advance, even several years after publication, making the advance all the more important for these authors.  Trial Tr. 1239:25–1240:8 (Hill).

29.    The amount of the advance is often critical for authors.  Trial Tr. 2101:6–8 (Wylie) (agreeing that for most authors he represents the advance level matters for their daily existence).  Authors use advances to take time off from their jobs to research and write their book(s), as well as support their children, buy houses, and for general living expenses.  *See, e.g.,* PX-656 at 1; Trial Tr. 1916:7–21 (Duhigg); Trial Tr. 1942:22–1943:1 (Duhigg); Trial Tr.

1925:12–22 (Duhigg) ("I was relieved because it meant that I would get a check that was about equal to one year of salary at *The New York Times*, and that meant that I could take another year off to write the second book. It meant that we could actually buy a house . . ."); *see also* Trial Tr. 334:10–14 (King) (noting that in 2018, the average full-time writer earned below the poverty line); PX-2002 at 69–70 (Stehlik Dep. 163:14–164:10). As a HarperCollins publishing executive testified, "typically the most important thing for an agent representing authors is to get the most amount of money up front." PX-2002 at 66–67 (Stehlik Dep. 157:20–158:12).

30.    Because authors of anticipated top sellers seldom earn out their advance, literary agents and authors focus on the amount of the advance in negotiations with publishers and rarely negotiate royalty rates that would apply beyond the advance. Trial Tr. 109:12–110:10 (Pietsch); PX 2002 at 66–67 (Stehlik Dep. 157:20–158:23); *see also* Trial Tr. 1941:16–20 (Duhigg) (testifying that seeking a higher royalty rate was "not an option given to [him]")

31.    Authors usually receive their advances in a four-payment structure, under which the publisher makes the fourth payment a year after the book is published. Trial Tr. 1829:2–18 (Walsh); *see also* Trial Tr. 254:25–255:3 (Pande); Trial Tr. 256:22–25 (Pande); PX-862 at 7 (describing PRH's adult books payout guidelines).

32.    Standard royalty rates are determined by media type, format, territory, and language. Trial Tr. 2249:1–13 (McIntosh) (PRH's royalty rates differ by book format). Generally, hardcover books receive a 10% royalty rate for the first 5,000 copies sold, 12.5% for copies 5,000 to 10,000, and 15% thereafter, while paperback books earn a straight 7.5% royalty. Trial Tr. 255:24–256:20 (Pande). Standardization of royalty rates has extended even to e-books, which at one point received royalty rates around 50% of net sales but were lowered to 25% across the industry. Trial Tr. 775:14–776:10 (Dohle); Trial Tr. 2101:15–17 (Wylie); Trial Tr.

255:24–256:20 (Pande).  Audio and digital downloads also earn 25% of net sales.  Trial Tr.

256:3–20 (Pande).

33.    Some higher profile authors are able to negotiate profit share deals, either in

addition to or instead of an advance; however, profit share deals are not common.  ████████

████████████████████  Trial Tr. 324:19–325:8 (King).

34.    Under the advance on royalty compensation structure, an author does not earn

additional compensation until the book earns out the advance paid.  *See, e.g.*, Trial Tr. 107:14–21

(Pietsch).  Publishers, on the other hand, enter "profitable territory at around 70 percent of

earnout for most books."  Trial Tr. 2258:21–25 (McIntosh); *see also* Trial Tr. 1240:9–12 (Hill).

## II.    SECTION 7 LEGAL FRAMEWORK

### A.    Section 7 of the Clayton Act Proscribes Mergers That *May* Substantially Lessen Competition; Doubts Are to Be Resolved Against the Transaction

35.    Section 7 of the Clayton Act "creates a relatively expansive definition of antitrust

liability," and "subjects mergers to searching scrutiny."  *California v. Am. Stores Co.*, 495 U.S.

271, 284–85 (1990).

36.    Section 7 bars mergers or acquisitions "the effect of [which] may be substantially

to lessen competition, or to tend to create a monopoly" in "any line of commerce or … activity

affecting commerce in any section of the country."  15 U.S.C. § 18.  As Section 7 makes plain,

Section 7 bars mergers or acquisition that may substantially *lessen* competition.  15 U.S.C. § 18.

The court does not need to find that the proposed transaction may *eliminate* competition to

enjoin it.

37.    Further, as the Supreme Court has explained, Congress used the word "may" in

Section 7 "to indicate that its concern was with probabilities, not certainties," *Brown Shoe*, 370

U.S. at 323 (1962), because Congress "intended to arrest anticompetitive tendencies in their

18

'incipiency.'" *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1962) (quoting *Brown Shoe*, 370 U.S. at 317).

38.     Accordingly, it is not necessary to prove that the proposed acquisition *will* cause competitive harm.  Rather, a showing "that the merger create[s] an appreciable danger of [anticompetitive consequences] in the future" is legally sufficient to block a merger.  *FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) (quoting *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986)).  "A certainty, even a high probability, need not be shown," and "doubts are to be resolved against the transaction.  *FTC v. Elders Grain, Inc*., 868 F.2d 901, 906 (7th Cir. 1989); *see also FTC v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016).

39.     This standard makes sense because the "fundamental purpose" of Section 7 is "to arrest the trend toward concentration, the tendency to monopoly, before the consumer's alternatives disappear[] through merger."  *Phila. Nat'l Bank*, 374 U.S. at 363.  The Supreme Court has held that "a trend toward concentration in an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anti-competitive effect of a merger may be."  *United States v. Pabst Brewing Co.*, 384 U.S. 546, 552–53 (1966); *see also United States v. Cont'l Can Co.,* 378 U.S. 441, 461–62 (1964).

40.     Defendants argued in their closing that *United States v. AT&T, Inc.,* 916 F.3d 1029, 1032 (D.C. Cir. 2019) overruled the plain text of the statute and controlling Supreme Court precedent and requires a Plaintiff to prove that the proposed merger will substantially reduce competition with some degree of certainty.  *See* Trial Tr. 3261:9–21 (Defendants' Closing); Bertelsmann & PRH Closing Slides at 2.  They are wrong.  Defendants quoted the language in *AT&T* stating that the government must show that the proposed merger is "likely to substantially lessen competition" (Defendants' Closing Slides at 2), but selectively omitted the language

immediately following that quote, which confirms that this standard "encompasses a concept of 'reasonable probability.'" 916 F.3d at 1032. Defendants also ignore that, in that same paragraph, the *AT&T* court explicitly stated that Section 7 prohibits mergers where "the effect of such acquisition may be substantially to lessen competition," 916 F.3d at 1032 (quoting 15 U.S.C. § 18), and that "Congress acted out of concern with 'probabilities, not certainties.'" 916 F.3d at 1032 (quoting *Brown Shoe*, 370 U.S. at 323).

41.    Section 7 prohibits anticompetitive mergers between buyers, and courts have enjoined such mergers when they may harm competition. *United States v. Rice Growers Ass'n of Cal.*, No. S–84–1066 EJG, 1986 WL 12562 (E.D. Cal. Jan. 31, 1986) (blocking merger of purchasers of paddy rice); *United States v. Pennzoil Co.*, 252 F. Supp. 962 (W.D. Pa. 1965) (enjoining merger of purchasers of crude oil); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1021–22 n.8 (9th Cir. 2016) (affirming injunction against merger harming competition in "seafood processors' purchase of fish from fishermen").[2] The evaluation of mergers of buyers, or "buy-side" mergers, involves "essentially the [same] framework" as mergers involving the selling side of a market. U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 12 (2010), https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf ("Merger Guidelines"); *see also Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 321–22 (2007) (due to the "close theoretical connection" between monopoly power and monopsony power, "similar legal standards should apply").

42.    In a buy-side case, the United States needs to show only that the merger may lessen competition at the buyer level. That is, there is no requirement that the United States

---

[2] Antitrust cases involving competition among buyers are often referred to as "buy-side" or "monopsony power" cases. *See Merger Guidelines* § 12.

prove downstream effects on consumers to block a proposed merger. *See Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) (finding a buy-side price-fixing scheme illegal "even though the price-fixing was by purchasers, and the persons specifically injured under the treble damage claim are sellers, not customers or consumers.").[3]

### B. Courts Analyze Section 7 Claims Through a Burden-Shifting Framework

43.     To effectuate the "searching scrutiny" of mergers prescribed by Congress, courts have developed a burden-shifting approach.  "First[,] the government must show that the merger would produce 'a firm controlling an undue percentage share of [a] relevant market, and [would] result[] in a significant increase in the concentration of firms in that market.'"  *Heinz*, 246 F.3d at 715 (quoting *Phila. Nat'l Bank*, 374 U.S. at 363).  "Such a showing establishes a presumption that the merger will substantially lessen competition."  *Id.* (quotation marks omitted).

44.     Next, "[t]he burden then shifts to the defendant to rebut the presumption by offering proof that 'the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition in the relevant market.'"  *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 23 (D.D.C. 2015) (quoting *Heinz*, 246 F.3d at 715).  Defendants' burden is dependent on the strength of the prima facie evidence: "the more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully."  *Heinz*, 246 F.3d at 725 (internal quotation marks omitted).  Further, "if a Government's prima facie case anticipates and addresses the respondent's rebuttal evidence," then the government's case is "significantly

---

[3] The absence of a downstream harm requirement is consistent with the principle that buy-side cases should be analyzed similarly to sell-side cases, in which the law is clear that it is not necessary to show downstream harm. *Heinz*, 246 F.3d at 719 ("[N]o court has ever held that a reduction in competition for wholesale purchasers is not relevant unless the plaintiff can prove impact at the consumer level.").

strengthened" and "the respondent's burden of production on rebuttal is also heightened."

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 425–26 (5th Cir. 2008).

45.     If Defendants rebut the plaintiff's prima facie case, "the burden of producing

additional evidence of anticompetitive effect shifts to the [plaintiff], and merges with the

ultimate burden of persuasion, which remains with the [plaintiff] at all times." *United States v.*

*Anthem, Inc.*, 855 F.3d 345, 350 (D.C. Cir. 2017) (internal quotations omitted).

## III.    THERE IS A RELEVANT MARKET FOR THE ACQUISITION OF U.S. PUBLISHING RIGHTS TO ANTICIPATED TOP-SELLING BOOKS

### A.  Applicable Legal Standards

#### 1.   General Principles of Market Definition

46.     As a general matter, "[m]erger analysis starts with defining the relevant market."

*Sysco*, 113 F. Supp. 3d at 24.  Defining a relevant market is not an end unto itself, but an analytic

tool or framework used to ascertain the "locus of competition," *Brown Shoe*, 370 U.S. at 320–21,

and "'recognize competition where, in fact, competition exists,'" *Cont'l Can Co.*, 378 U.S. at

453 (quoting *Brown Shoe*, 370 U.S. at 326) (internal quotations omitted); *see also* Merger

Guidelines § 4.1.1 ("[T]he purpose of defining the market and measuring market shares is to

illuminate the evaluation of competitive effects.").  This is why the Supreme Court held that the

Clayton Act market definition exercise was intended by Congress to be "a pragmatic, factual"

analysis and "not a formal, legalistic one." *Brown Shoe*, 370 U.S. at 336.

47.     A relevant antitrust market has two components: (1) the relevant product market;

and (2) the relevant geographic market.  *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 193

(D.D.C. 2017).  The Supreme Court instructs that "[t]he outer boundaries of a product market are

determined by the reasonable interchangeability of use or the cross-elasticity of demand between

the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325.  The focus of this analysis

is "on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service."  Merger Guidelines § 4; *see also Sysco*, 113 F. Supp. 3d at 25–26.

48.    In a buy-side case, the market definition analysis is a "mirror image" of that in a sell-side case, so "the market is not the market of competing sellers but of competing buyers." *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (Sotomayor, J.) (quotation marks omitted).  Thus, the proper inquiry is "the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers."  *Id.* (quotation marks omitted)*.*  Here, the focus is the "commonality and interchangeability" of publishers and the ability and willingness of authors to switch from a publisher to a substitute in the face of a decrease in advances.

49.    Courts find labor markets to be relevant markets for antitrust purposes.  For example, in *O'Bannon*, the court found a relevant market of "FBS football and Division I basketball schools" that compete for "elite football and basketball recruits."  *O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 965–67 (N.D. Cal. 2014).

50.    Contrary to Defendants' protestations about the precise boundaries of the relevant market, binding Supreme Court precedent acknowledges that "[t]he market, as most concepts in law or economics, cannot be measured by metes and bounds."  *Anthem*, 236 F. Supp. 3d at 193 (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953)).  It is expected that there may be some imprecision about the precise location of the outer boundaries of a market.  *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) ("The Supreme Court has wisely recognized there is 'some artificiality' in any boundaries, but that 'such fuzziness' is inherent in bounding any market.") (quotation marks omitted).  Such expected and normal imprecision does not doom a market definition as suggested by Defendants.

### 2. Courts May Define Relevant Sub-Markets Around Groups of Targeted Sellers

51.  "A broad market may also include relevant submarkets which themselves may 'constitute product markets for antitrust purposes.'"  *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037–38 (D.C. Cir. 2008) (quoting *Brown Shoe*, 370 U.S. at 325).

52.  Such sub-markets can be based on a set of "targeted customers."  *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 46 (D.D.C. 2018); *accord Anthem*, 236 F. Supp. 3d at 195 ("Case law provides for the distinction of product markets by customer."); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 117–118 (D.D.C. 2016) ("*Staples II*"); *Sysco*, 113 F. Supp. 3d at 48.  In a sell-side case, a "submarket exists when sellers can profitably raise prices 'to certain targeted customers but not to others,' in which case regulators 'may evaluate competitive effects separately by type of customer.'"  *Anthem*, 236 F. Supp. 3d at 195 (quoting Merger Guidelines § 3); *see also* Merger Guidelines § 4.1.4.  Conversely, in a buy-side market, a submarket exists where the merging parties can profitably lower prices to a certain group of targeted suppliers.

53.  In a buy-side case, there are two economic conditions necessary to define a targeted seller market: (1) buyers must be able to pay different prices to the members of the targeted group of sellers than to other sellers; and (2) sellers must not be able to engage in arbitrage, or opportunistic re-selling.  *See* Merger Guidelines § 3; *Staples II*, 190 F. Supp. 3d at 117–18.

54.  Multiple sub-markets may exist within a broader market.  *See Cont'l Can Co.*, 378 U.S. at 457–58; *United States v. Aluminum Co. of Am.*, 377 U.S. 271, 275 (1964).  The fact that one sub-market can be established by the evidence does not exclude the possibility that the record may also support the existence of other markets.  *Cont'l Can Co.*, 378 U.S. at 457–58.  Likewise, the existence of a sub-market is not disproven by evidence that a broader market could

also be properly defined.  *Aluminum Co. of Am.,* 377 U.S. at 275; *see also Brown Shoe*, 370 U.S. at 325; *Anthem*, 236 F. Supp. 3d at 254.

### 3.    A Price Level Is an Appropriate Way to Identify Targeted Sellers

55.    Courts have consistently used numerical cutoffs to define submarkets.  *See Wilhelmsen*, 341 F. Supp. 3d at 51 (market consisting of customers owning fleets of 10 or more vessels of a particular type); *Anthem*, 236 F. Supp. 3d at 195 (market of companies with 5,000 or more employees); *Staples II*, 190 F. Supp. 3d at 118 (market of customers who spend $500,000 or more annually on office supplies).  Numerical cutoffs are not designed to be rigid bright lines, but rather are used "[f]or analytical purposes."  *Staples II*, 190 F. Supp. 3d at 118 & n.10.  In *Wilhelmsen*, the court found a submarket of "Global Fleets"—defined as a fleet with "10 or more globally trading vessels"—even though the numerical value of 10 "was not intended as an exact statement of the threshold" and was chosen "for its roundness and simplicity."  *Wilhelmsen*, 341 F. Supp. 3d at 54–55.  The FTC's economist used this number "as a starting point for developing a series of statistical estimates."  *Id.* at 55.  The consistent results of these analyses confirmed that owners of Global Fleets are a "distinct customer group."  *Id.*; *see also Staples II*, 190 F. Supp. 3d at 118 & n.10 (noting that government's expert chose $500,000 in annual office supply purchases as a cutoff "[f]or analytical purposes" and citing testimony "that there is no 'magic place that's the right place' to draw the line"); *Anthem*, 236 F. Supp. 3d at 197–98 (acknowledging that some industry participants used different employee cutoffs to define "national accounts" than the 5,000 employee cutoff proposed by plaintiff).

56.    Likewise, courts have held that it is appropriate to use price levels to help identify a relevant submarket.  In *Brown Shoe*, the Supreme Court identified "distinct prices" as one of the "practical indicia" courts may use to identify the existence of a submarket.  370 U.S. at 325.

25

Judge Brown in *Whole Foods* applied this principle to a targeted customer market, stating that "distinct prices" for the targeted group (referred to as "core" customers) "indicates the existence of a submarket of core customers."  548 F.3d at 1038–39.

57.    Courts have also found relevant product markets consisting of premium product segments based on "distinctions in degree" across a broader range of products.  *Int'l Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 249–52 (1959) (affirming market of championship boxing contests as distinct from non-championship contests, based on factors such as their higher revenues/rights fees and greater popularity among viewers); *see also Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990, 994-95 (9th Cir. 1986) (affirming market of "industry-anticipated top-grossing films"); *Whole Foods,* 548 F.3d at 1041 (market of "premium" natural and organic supermarkets); *O'Bannon*, 7 F. Supp. 3d at 986 (finding relevant market in which colleges compete for "elite football and basketball recruits"), *aff'd in relevant part*, 802 F.3d 1049 (9th Cir. 2015).

58.    Defendants argue that markets cannot be identified by price, citing *In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F. Supp. 1262 (N.D. Cal. 1988), which rejected a proposed market for "super premium" ice creams.  But *Super Premium Ice Cream* is simply an example of a situation where a proposed market defined by price and quality characteristics failed the hypothetical monopolist test; the record there indicated that consumers of super premium ice creams could substitute to ice cream brands "lower in the spectrum of price or quality" in the event of a price increase, and thus those lower-cost options would discipline any price increase.  *See id.* at 1268.  Here, by contrast, the market for anticipated top-selling books satisfies the hypothetical monopsonist test, because authors of anticipated top sellers have no reasonable substitutes to turn to in response to a decrease in advances by a monopsonist

publisher. From the perspective of an author, selling her book for a low advance is not a reasonable substitute for selling her book for a high advance, unlike customers who did view low-price ice cream as a reasonable substitute for high-price ice cream.

### 4. Courts May Rely on Economic Analysis and Practical Indicia to Determine the Relevant Product Market

59. Courts look to two main types of evidence in defining the product market: "the hypothetical monopolist test, the application of which is frequently the subject of testimony from experts in the field of economics, and the practical indicia described by the Supreme Court in *Brown Shoe*." *Wilhelmsen*, 341 F. Supp. 3d at 47 (internal quotations and citation omitted).[4] Both economic analysis and the *Brown Shoe* indicia are tools to answer the same question: whether a product outside the proposed relevant market is "reasonably interchangeable" with the products within the proposed market. Reasonable interchangeability turns on whether a price increase in the proposed market likely would "drive consumers to an alternative product" such that "that product must be reasonably substitutable for those in the proposed market and must therefore be part of the market, properly defined." *Whole Foods*, 548 F.3d at 1038; *see also United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 55 (D.D.C. 2011) ("key question" for court is whether products outside the proposed market "are sufficiently close substitutes to constrain any anticompetitive . . . pricing" on products within the proposed market).

60. Both types of evidence show that authors of anticipated top sellers can be targeted and constitute a sub-market.

---

[4] The practical indicia (*Brown Shoe* factors) "may be viewed as evidentiary proxies for proof of substitutability and cross-elasticity of supply and demand." *United States v. H & R Block*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011); *see also Sysco*, 113 F. Supp. 3d at 27. Thus, as "evidentiary proxies," they are not required where there exists direct proof to establish the market.

### 5. Defendants Rely on Inapposite Product Market Caselaw

61.     In every case cited in Defendants' Pre-Trial Brief or closing arguments where a court rejected a proposed product market, the court found that reasonably interchangeable substitutes existed *outside* the proposed market. *See United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404 (1956) (holding that cellophane faces "competition and interchangeability with other wrappings"); *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007) (undisputed that multiple-use dialyzers and single-use dialyzers have "identical uses," such that there is "reasonable interchangeability" between the products); *Crestron Elecs.* Inc*. v. Cyber Sound & Sec. Inc.*, 2012 WL 426282, at *5 (D.N.J. Feb. 9, 2012) (plaintiff failed to define the market "with [any] reference to the rule of reasonable interchangeability"); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1131 (N.D. Cal. 2004) ("evidence at trial established that … customers have choices outside" the proposed market); *FTC v. Arch Coal, Inc.,* 329 F. Supp. 2d 109, 121–23 (D.D.C. 2004) ("evidence of significant interchangeability between 8800 Btu and 8400 Btu coal"); *United States v. Sungard Data Systems, Inc.*, 172 F. Supp. 2d 172, 183 (D.D.C. 2001) (users may switch to alternative forms of disaster recovery); *United States v. Gillette Co.*, 828 F. Supp. 78, 83–84 (D.D.C. 1993) (pen consumers would substitute to other modes of writing for fountain pens); *Super Premium Ice Cream*, 691 F. Supp. at 1268, *aff'd sub nom. Haagen-Dazs Co., Inc. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990) (concluding that "all grades of ice creams compete with one another"); *United States v. Joseph Schlitz Brewing Co.*, 253 F. Supp. 129, 146 (N.D. Cal. 1966) (finding a "'competitive overlap' between premium and non-premium beers").

62.    That is not the case here. Because the United States alleged a market that includes all publishers as buyers of anticipated top-selling books, there exist no reasonable substitutes outside the defined market, and Defendants have not attempted to propose any alternative product or service that authors of anticipated top sellers would turn to as a reasonable substitute when faced with a significant price increase.  Self-publishing, as discussed below, is not a credible alternative and Defendants concede as much.  Trial Tr. 3272:17–25 (Defendants' Closing).  Therefore, the cases cited by Defendants are not applicable here.

### B.  The Anticipated Top Seller Market

63.    The acquisition of U.S. rights to anticipated top sellers is a relevant product market.  Both the economic analysis and practical indicia support this conclusion.

64.    The government's economic expert, Dr. Nicholas Hill, concluded that the market for anticipated top sellers is a relevant market.  *See* Trial Tr. 1225:1–2 (Hill); Trial Tr. 1250:20–1251:1 (Hill).  Dr. Hill defined an anticipated top seller as a book that receives an advance of $250,000 or more.  Trial Tr. 1232:13–21 (Hill).  Dr. Hill used an advance threshold to identify anticipated top sellers because the advance a publisher pays is correlated with that publisher's expected sales for the book.  Trial Tr. 1232:22–1233:2 (Hill).  This threshold was intended to serve as a practical way to identify a group of books whose authors have different preferences and face different competitive conditions as indicated by the available data.  Trial Tr. 1237:21–1239:7 (Hill); Trial Tr. 3202:4–23 (Hill).  None of Dr. Hill's opinions are sensitive to the exact threshold used to define an anticipated top seller.  Trial Tr. 1233:14–20 (Hill); Trial Tr. 1238:7–14 (Hill); Trial Tr. 3202:4–23 (Hill).  And, as discussed in more detail below, Dr. Hill performed numerous sensitivity tests to confirm that his analysis holds at different thresholds.

65.     The choice of the $250,000 threshold is supported by the industry's recognition of $250,000 as a meaningful number.  For example, *Publishers Marketplace*, an industry publication, classifies deals over $250,000 as significant or major deals.  And $250,000 is an internal threshold used by some publishers to trigger additional managerial review.  Trial Tr. 1233:3–13 (Hill).  Further, PRH imprints analyze key performance indicators by advance level, including a $250,000 to $499,999 advance level.  *See, e.g.*, PX-989.

66.     Dr. Hill chose to define a market around this subset of sellers because authors of anticipated top sellers (1) have different preferences for publishers and self-publishing than other authors, and (2) face different competitive conditions than other authors.  Trial Tr. 1231:5–10 (Hill).  Authors of anticipated top sellers have stronger preferences than other authors for publishers with strong distribution, marketing, and reputation that allow their books to reach a broad consumer market.  Trial Tr. 1231:11–1232:11 (Hill); Trial Tr. 1236:6–10 (Hill); Trial Tr. 1549:11–21 (Hill).  Authors of anticipated top sellers also face different competitive conditions as demonstrated by the significantly different market shares that the non-Big Five have for anticipated top sellers (10%) compared to non-anticipated top sellers (45%).  Trial Tr. 1233:21–1234:6 (Hill); PX-963 at 1.

67.     Though Dr. Snyder disagreed about whether defining a market around a subset of sellers applies to this case, he acknowledged the relevance of such considerations for market definition.  Trial Tr. 2824:14–2825:10 (Snyder).  He testified that he would "get the logic" of defining a market based on the primary competitors to serve a group of customers in a different context: "if you had a merger in the accounting world and you said . . . there is going to be a merger for a group of customers who . . . have different characteristics, the top accounting firms would be the ones most likely to compete."  Trial Tr. 2824:14–2825:10 (Snyder).

68.    The market for anticipated top sellers is significant, with advances committed by publishers for these books representing approximately 70% of all commitments for advances, or roughly $1 billion in commerce annually.  Trial Tr. 1239:13–24 (Hill); Trial Tr. 2904:17–2905:8 (Snyder).

## C.  Authors of Anticipated Top-Selling Books Can Be Targeted for a Reduction in Advances

69.    A properly defined market around a group of targeted sellers, *i.e.* a "price discrimination" market, must satisfy two conditions: differential pricing and limited arbitrage.  Merger Guidelines § 3; Trial Tr. 1229:11–15 (Hill); *see also Wilhelmsen*, 341 F. Supp. 3d at 46–47.  Differential pricing is the ability "to price differently to targeted [sellers] than to other [sellers]."  Merger Guidelines § 3.  In this context, it requires that publishers have the ability to (1) identify different sellers, and (2) charge them different prices.  Trial Tr. 1229:16–19 (Hill).  Arbitrage would be an attempt by authors to avoid targeting by selling to a third person who is then in turn able to sell to the publishers.  Trial Tr. 1230:7–12 (Hill).

70.    The market for anticipated top sellers satisfies the criteria for differential pricing and limited arbitrage.  Trial Tr. 1230:24–1231:4 (Hill).  Publishers are able to price to authors of anticipated top sellers differently than other authors because book deals are individually negotiated.  When deciding what to offer for a book, publishers form an expectation of a book's anticipated sales, thus identifying the book as an anticipated top seller (or not).  Trial Tr. 1541:21–24 (Hill); Trial Tr. 3046:7–16 (Hill).  Also, arbitrage is not feasible.[5]  *See* Trial Tr. 1230:13–23 (Hill).

---

[5] An author of an anticipated top seller would not benefit from reselling a contract to an author of a book that is not an anticipated top seller because this would yield a lower advance. *See* Trial Tr. 1230:13–23 (Hill).

71.    Defendants effectively agree.  First, though Dr. Snyder disputes whether individual publishers could identify anticipated top sellers, he agrees that the hypothetical monopsonist would be able to do so.  Trial Tr. 2909:17–2910:11 (Snyder).  That admission suffices for market definition purposes, where the question is "whether the hypothetical [monopsonist] can engage in price discrimination."  *See* Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 Antitrust L.J. 49, 93 (2010); *see also Sysco*, 113 F. Supp. 3d at 46 ("As the Merger Guidelines state, markets for targeted customers may exist 'when prices are individually negotiated and suppliers have information about customers that would allow a hypothetical monopolist to identify customers that are likely to pay a higher price for the relevant product.'") (quoting Merger Guidelines § 4.1.4).  Second, Defendants do not dispute that arbitrage is not occurring in this market.  *See* Trial Tr. 1545:23–1546:6 (Hill).

72.    Dr. Snyder is nevertheless incorrect that individual publishers could not identify anticipated top sellers.  *See* Trial Tr. 2630:19–2631:13 (Snyder).  For purposes of analyzing whether the market for anticipated top-selling books is a valid product market, it does not matter whether a publisher's prediction of success proves to be true or whether all publishers share the same view of every book.  As Dr. Hill explained, when an editor reviews a book, he or she forms "an expectation of the sales" for that book.  Trial Tr. 3046:12–16 (Hill).  In doing so, the publisher determines whether the book is likely an anticipated top seller.  Trial Tr. 3046:12–16 (Hill); *cf.* Trial Tr. 2393:21–2394:14 (McIntosh); *infra* III.E.1.  That identification suffices under the government's definition of an anticipated top seller.

73.    To illustrate: when a publisher submits a bid of $250,000 or more for a book, the publisher has determined the book is an anticipated top seller and therefore knows that few other

publishers are likely to be able to effectively compete with that bid.  *Cf.* Trial Tr. 2908:22–2909:8 (Snyder).

74.     Similarly, Defendants' greater marketing spend on anticipated top sellers, *see infra* III.E.1a., indicates that anticipated top sellers are identifiable by publishers.  Defendants' executives testified that advance amounts are irrelevant when making marketing decisions.  *See*, *e.g.*, Trial Tr. 2271:24–2272:3 (McIntosh).  Yet higher advance books receive more marketing than lower advance books.  *See, e.g.*, PX-972 at 1.  Taken together, as Dr. Hill explained, "if we take it as a given fact that the marketing folks do not know the advance amount when they're deciding on marketing for a book, they're nevertheless identifying the anticipated top sellers and treating them differently."  Trial Tr. 3045:7–20 (Hill).

75.     It is not necessary for all industry participants to agree on what an anticipated top seller is for price discrimination to be feasible.  A publisher just needs to know whether *it* believes the book is an anticipated top seller.  Nevertheless, the record demonstrates that there is often agreement, *ex-ante*, about the likelihood that a book will sell well.  For example, Mr. Wylie testified that publishing industry veterans are able to determine in advance which books are likely to be successful, and that there are books for which there is a consensus that the book is likely to be successful.  Trial Tr. 2108:10–24 (Wylie) ("there are recognizable qualities in . . . books that people who have been in the business for a long time would easily recognize."); *see also infra* III.E.1.

76.     Finally, Defendants argue that book sales are "random," *see* Trial Tr. 803:3–6 (Dohle), and that publishers cannot anticipate sales, but this argument addresses whether publishers can identify *actual* top sellers, a market not alleged, not *anticipated* top sellers.  Defendants also overstate the point.  While there certainly is some unpredictability in book

publishing, there is also a correlation between advances and sales. *See* PX-151 at 11 ("In general, **higher advance levels are correlated with more book sales** – however, there are always exceptions") (bolded in original); PX-2002 at 50 (Stehlik Dep. 134:8–15) (testifying it is uncommon for top-selling books to come from authors who are paid low advances). Moreover, Defendants' consistently high market shares, *see* PX-994 at 1, healthy profit margins, *see* Trial Tr. 781:3–5 (Dohle); Trial Tr. 1492:2–3 (Hill), and decades of success indicate that they must have at least some aptitude for anticipating what is likely to sell well.

### D. The Hypothetical Monopsonist Test Establishes That the Acquisition of U.S. Publishing Rights to Anticipated Top-Selling Books Is a Relevant Product Market

77.     The hypothetical monopsonist test is the buy-side counterpart to the "hypothetical monopolist test," which evaluates whether a market is too narrowly defined by examining whether a candidate market excludes important substitutes. Trial Tr. 1241:4–7 (Hill); Merger Guidelines §§ 4.1.1, 12; *see also, e.g.*, *H & R Block*, 833 F. Supp. 2d at 51 ("An analytical method often used by courts to define a relevant market is to ask hypothetically whether it would be profitable to have a monopoly over a given set of substitutable products. If so, those products may constitute a relevant market."); *Wilhelmsen*, 341 F. Supp. 3d at 47. In targeted-seller markets, the hypothetical monopsonist test also addresses whether the targeting of certain sellers is feasible. Trial Tr. 1546:10–23 (Hill); *see supra* III.C. The test asks whether a hypothetical monopsonist—the only buyer of the products in the alleged market—would find it profit-maximizing to impose a small but significant and non-transitory reduction in price ("SSNRP") for at least one product in the market. *See* Merger Guidelines § 4.1.1. If the hypothetical monopsonist test passes, the candidate market constitutes a relevant product market. *See id*.

78.     As the Merger Guidelines explain, "The hypothetical [monopsonist] test ensures that markets are not defined too narrowly, but it does not lead to a single relevant market." *Id.*; *see also* Trial Tr. 3048:20–3049:9 (Hill). *Any* relevant market that satisfies the test may be evaluated for competitive effects, "guided by the overarching principle that the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects." *See* Merger Guidelines § 4.1.1.

79.     In this context, the hypothetical monopsonist test answers the following question: if all competition among market participants were eliminated—*i.e.*, all publishers were combined into a single monopsonist publisher—would advances decrease by a significant amount? Trial Tr. 1241:14–1242:9 (Hill). The key inquiry is whether enough authors of anticipated top sellers would switch to self-publishing if faced with a SSNRP such that it would not be profitable for the hypothetical monopsonist to impose a SSNRP. *See* Trial Tr. 1242:10–1243:9 (Hill).

80.     Both the government and Defendants' experts agree that the market for anticipated top sellers passes the hypothetical monopsonist test, including that the hypothetical monopsonist could target authors of anticipated top sellers. *See* Trial Tr. 1230:24–1231:4 (Hill); Trial Tr. 1248:21–22 (Hill); Trial Tr. 2897:14–2898:2 (Snyder); Trial Tr. 2898:8–18 (Snyder); Trial Tr. 2909:17–2910:11 (Snyder). Therefore, the market is properly defined.

### 1.    Qualitative Evidence Shows That Self-Publishing Is a Poor Substitute to Traditional Publishing

81.     For authors of anticipated top-selling books, self-publishing is the only theoretical alternative that is outside of the proposed market. But, as Defendants conceded, competition from self-publishing will not suffice to prevent a small but significant price decrease. *See* Trial Tr. 3272:17–25 (Defendants' Closing) ("nobody was arguing in this case" that self-publishing is an "outside option" for authors).

35

82.     The qualitative evidence at trial demonstrated that self-publishing is not a meaningful alternative to the services provided by traditional publishers, particularly for authors who would otherwise receive an advance above $100,000 or $250,000.  For example, Mr. Pietsch testified that self-publishing was not a threat "at all" for books with an advance above $100,000 and that it is "not competitive with what we do."  Trial Tr. 173:7–174:2 (Pietsch); *see also* Trial Tr. 355:13–15 (Eulau) (self-publishing not a threat to a publisher's core business); Trial Tr. 356:7–9 (Eulau); PX-2004 at 51–52 (Solomon Dep. 83:20–22, 84:8–85:18); PX-445 at 3.

## 2.     The Market for Anticipated Top Sellers Formally Passes the Hypothetical Monopsonist Test

83.     Dr. Hill concluded that the market for anticipated top-selling books passes the hypothetical monopsonist test.  *See* Trial Tr. 1248:21–22 (Hill).  To reach his conclusions, Dr. Hill implemented the hypothetical monopsonist test using the aggregate diversion ratio methodology.  Trial Tr. 1244:23–25 (Hill); Trial Tr. 1245:14–1246:9 (Hill).

84.     If diversion to self-publishing is sufficiently high—and reaches what economists call the "critical diversion" ratio—it would not be profitable for the hypothetical monopsonist to impose a substantial reduction in advances.  Trial Tr. 1245:14–1246:9 (Hill).

85.     Dr. Hill therefore estimated what "actual diversion" would be for this market—*i.e.*, the percentage of authors who actually would switch to self-publishing.  If actual diversion is lower than the critical diversion ratio, then a price decrease would be profitable and the relevant market passes the hypothetical monopsonist test.  Trial Tr. 1245:14–1246:9 (Hill).  The actual diversion ratios calculated by Dr. Hill were both far below the critical diversion ratio.  Trial Tr. 1247:24–1249:6 (Hill); PX-969 at 1.  Therefore, the hypothetical monopsonist test passes.

86.    As noted above, Defendants and their economic expert do not dispute these results.  *See* Trial Tr. 2898:8–18 (Snyder); Trial Tr. 3272:17–25 (Defendants' Closing).  The economic and factual evidence supports a finding that the government's market passes the hypothetical monopsonist test.  As a result, the market for anticipated top sellers constitutes a relevant antitrust market.

### E.    Practical Indicia Establish That Authors of Anticipated Top-Selling Books Are Unique Customers with Unique Needs

87.    Along with economic analysis, "practical indicia" articulated by the Supreme Court in *Brown Shoe* may be used to determine the boundaries of a submarket.  Those indicia include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  *Brown Shoe*, 370 U.S. at 325.  In targeted customer cases, courts also consider whether the targeted group is "a distinct group with distinct needs," as compared to the broader universe of customers.  *Wilhelmsen*, 341 F. Supp. 3d at 52; *accord Anthem*, 236 F. Supp. 3d at 195 (finding that national accounts are "a unique set of customers with unique needs").

88.    The *Brown Shoe* factors "are not necessarily criteria to be rigidly applied[,]" and courts can find that submarkets exist when "only some"—but not all—of the "practical indicia" are present.  *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 159 (D.D.C. 2000); *see also FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997) ("*Staples I*") (same).  As this Court has recognized, "*Brown Shoe*'s practical indicia were meant as 'practical aids rather than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue.'"  *Staples I*, 970 F. Supp. at 1075 (quoting *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs.*

*Corp.*, 518 F.2d 913, 932 (9th Cir. 1975)).  The record includes practical indicia that support the conclusion that anticipated top-selling books are a distinct market:

### 1.  The Publishing Industry Recognizes Anticipated Top Sellers

89.     The industry recognizes that advances are based on the sales that a publisher anticipates for a particular book.  For example, Mr. Pietsch testified that the relationship between projected sales and advances is an "extremely close one."  Trial Tr. 110:19–111:1 (Pietsch). Similarly, Mr. Karp testified that predicted sales are the "main factor" on which advances are based.  Trial Tr. 458:9–14 (Karp).  Several other witnesses testified similarly.  *See* Trial Tr. 916:19–21 (Tart) (higher projected sales correspond to higher advances); PX-2002 at 64 (Stehlik Dep. 154:13–16) (larger potential audience results in willingness to pay higher advances); Trial Tr. 1371:22–1372:7 (Murray); ███████████████████████████ Trial Tr. 2239:16–22 (McIntosh); PX-151 at 11 ("In general, higher advance levels are correlated with more book sales – however, there are always exceptions.").

90.     It is clear that the concept of expected sales is very important to the publishing industry.  As Ms. McIntosh testified, PRH "spend[s] a lot of time trying to guess the expected sales of books"; expected sales is something PRH "absolutely" focuses on; and PRH works diligently to project expected sales throughout the publishing process.  Trial Tr. 2393:21–2394:14 (McIntosh); *see also* Trial Tr. 2148:16–2149:15 (Ross) (explaining agent's process for forecasting expected sales); Trial Tr. 749:7–22 (Dohle); Trial Tr. 1039:25–1040:8 (Tart).

91.     Agents, authors, and publishers have testified that anticipated top sellers are identifiable and recognized as competitively different.  Mr. Wylie testified that publishing industry veterans are able to determine in advance which books are likely to be successful, because there are "recognizable qualities in . . . books that people who have been in the business

for a long time would easily recognize." Trial Tr. 2108:10–24 (Wylie). For that reason, as Mr. Wylie admitted, for some books, there is a consensus in advance that a particular book is likely to be successful. Trial Tr. 2108:22–24 (Wylie); *see also* Trial Tr. 310:12–24 (Pande) (testifying that she treats books that she thinks will get a lot of attention differently than other books).

92.    Conversely, the industry also recognizes categories of books that are not anticipated top sellers. For example, Mr. Karp testified about "midlist" books, which are anticipated to have a lower level of sales and thereby receive lower advances. Trial Tr. 593:3–594:8 (Karp). Similarly, bestselling author, Stephen King, testified that occasionally some of his books are not "crafted best seller[s]" and do not "fit the mold," so he publishes those books with smaller publishers for smaller advances. Trial Tr. 327:17–331:15 (King). Generally, the industry acknowledges that the competitive conditions are different for anticipated top sellers. For example, the CEO of Macmillan, Mr. Weisberg, testified that "big mega price books" are a "different business" than the other 98% of books. Trial Tr. 1129:24–1130:11 (Weisberg).

93.    Anticipated top-selling books differ from other books in other ways:

### a. Greater Marketing Support

94.    Anticipated top-selling books generally receive more marketing support. *See, e.g.*, Trial Tr. 490:15–492:15 (Karp); Trial Tr. 1069:18–1070:10 (Weisberg); Trial Tr. 1373:1–11 (Murray); Trial Tr. 2001:12–2002:4 (Kim) (there is a general correlation between average advance level and marketing spend); PX-989 at 10–11; Trial Tr. 258:11–21 (Pande) ("[T]here's a pretty clear relationship between the level of the advance and the amount of resources that the publisher invests in the marketing and publicity of the book."). Publishers designate high advance books as "lead titles," which are books that receive the most marketing support. *See* PX-986 at 2 ("Category 1: Lead Titles[:] Sales goal of 75,000 units or higher and/or Advance

over $500,000"); Trial Tr. 1071:13–1072:15 (Weisberg) (testifying that lead titles can be picked because they were acquired for a large sum and/or because the book has received good reviews). Similarly, the CEO of Abrams defined "expected top seller[s]" as "lead titles, as titles that were the biggest potential books in terms of selling." PX-2005 at 24–25 (Jacobs Dep. 89:14–90:7). In addition, in some cases, agents negotiate for marketing commitments for particular books; and for those books, agents negotiate for larger commitments for higher-advance books. *See* Trial Tr. 1827:10–1828:18 (Walsh) (expects higher marketing commitments for higher advance books).

95.    Finally, the merging parties' data shows a strong correlation between advances and marketing spending. Dr. Hill analyzed the merging parties' actual marketing spend for individual books in title-level P&L data (as opposed to predicted spending reflected in acquisition P&Ls). Trial Tr. 1236:18–1237:8 (Hill). His analysis showed that for books that received advances less than $250,000, the merging parties spent an average of $10,000 per title on marketing. *See* PX-972 at 1 (Figure 1). By contrast, average marketing spend was nearly five times higher for books that received an advance between $250,000 and $500,000. *See* PX-972 at 1. And marketing spend was nearly ten times higher for titles with advances between $750,000 and $1 million (compared to spending for books with advances of less than $250,000). *See* PX-972 at 1; *see also* Trial Tr. 1236:11–1237:8 (Hill); Trial Tr. 2818:4–7 (Snyder); Trial Tr. 2835:18–25 (Snyder); Trial Tr. 2836:9–12 (Snyder).

**Figure 1. Average Marketing Expenditures by Advance Amount, PRH and S&S (PX-972)**



### b. Executive Approval

96.     Both Defendants require higher-level executive approval for high-advance books. In particular, both S&S and two of the three PRH adult divisions require high-level approval for offers that include an advance of $250,000 or more. *See* Trial Tr. 459:5–8 (Karp); Trial Tr. 2261:12–2262:5 (McIntosh); Trial Tr. 914:22–915:2 (Tart); Trial Tr. 1993:1–3 (Kim); *cf.* PX-87 at 3 (request for more senior management involvement in acquisitions "greater than 250/500k$"). Other publishers have similar executive approval levels. *See* ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Trial Tr. 232:21–233:2 (Pietsch) (Hachette publishers have varying executive approval level, but they are all around $250,000).

### c.  Higher Risk

97.     Higher-advance books are riskier than other books.  *See* Trial Tr. 1369:14–1370:4 (Murray) ("The more that you commit in an advance on a particular project, the greater the risk of failure."); *see also* Trial Tr. 1371:1–3 (Murray) ("[T]he bigger the book is, the bigger the risk is on the inventory and the printing and the logistics of getting those books out to the various customers."); Trial Tr. 1373:5–7 (Murray) (" [I]f [editors] ask me for a large advance, you know, there's a lot of risk riding on those big books.  There's less risk riding on the small books."); *cf.* Trial Tr. 155:4–17 (Pietsch) (Workman sought to acquire books with low advances because it did not want to "take on unearned advance risk").

### d.  Print Orders

98.     Publishers make larger print orders for books that they expect to sell at higher volumes.  Trial Tr. 1373:21–1374:3 (Murray); PX-2005 at 26 (Jacobs Dep. 91:6–13).  Publishers also print more advance copies, *i.e.*, books given to reviewers, booksellers, or social media influencers, of books they expect to sell well.  Trial Tr. 1373:12–20 (Murray).

### e.  Tracking

99.     Publishers also track high-advance books separately from other books—or, similarly, track their performance in various advance buckets or tiers.  *See* PX-790 at 1–36 (Hachette tracker of losses above $500K); PX-989 at 2 (tracking sales, profitability, and margin for books in various advance buckets); *cf.* PX-174 at 100, 103 (tracking market shares separately for top-selling authors and non-top-selling authors).  Publishers also measure their success based on bestseller lists.  *See* PX-218 at 3 ("500+ NYT bestsellers per year[;] 60+ Nobel Prize laureates"); PX-68 at 32; Trial Tr. 887:23–888:5 (Dohle); Trial Tr. 1090:2–7 (Weisberg); Trial Tr. 1378:7–14 (Murray); DX-217 at 8; Trial Tr. 1961:14–22 (Kim) (boasting that Putnam has

42

more hardcover *New York Times* bestsellers than any other imprint); Trial Tr. 2370:7–16

(McIntosh) (testifying that she reviews bestseller lists and that PRH performs better at the top of

list than they do at the bottom of the list).

### 2.   Anticipated Top-Selling Writers Have Unique Needs

100.    Authors of anticipated top-selling books have unique needs.  *See* Trial Tr.

1548:10–1549:6 (Hill).  Market share data show that authors of anticipated top-selling books

make different choices from authors of other books.  Trial Tr. 1233:21–1235:21 (Hill).  For

anticipated top-selling books, authors choose non-Big Five publishers approximately 10% of the

time of the time.  PX-963 at 1 (Figure 2).  For other books, authors choose non-Big Five

publishers roughly five times as often (*i.e.*, nearly 50% of the time).  PX-963 at 1. These market

shares suggest that authors of anticipated top-selling books most often choose a Big Five

publisher because they possess the strong reputation, distribution, and marketing needed to

maximize the sales of an anticipated top seller.  Trial Tr. 1231:11–1232:11 (Hill); Trial Tr.

1235:10–24 (Hill); Trial Tr. 1236:6–10 (Hill); Trial Tr. 1549:11–21 (Hill).

**Figure 2. Market Shares by Contract for Anticipated Top Sellers and Non-Anticipated Top Sellers (2019–2021) (PX-963)**



101.    As put by Dr. Snyder, "There is something about books that are anticipated to be best sellers, and authors and the agents who represent them are going to be looking for a set of services. One of the advantages that individual firms in the Big Five have is that they have reputations because they have been in business a long time and fundamentally economists talk about reputations being a function of repetition. So I get that and I accept that." Trial Tr. 2834:9–16 (Snyder).

102.    Late S&S CEO Carolyn Reidy wrote that the Big Five are S&S's "biggest competitors, *especially for books by already bestselling authors and celebrities*, since they are the most likely to come up with high advance payments required and are known for their strong editorial and publishing skills." PX-530 at 2 (emphasis added); *see also* Trial Tr. 353:1–4

(Eulau) (understanding that "publishing skills refers to everything you do to publish a book and get it out there such as marketing and sales").

103.    Defendants do not dispute that market shares look very different within the government's market than outside of it.  When asked about this difference at trial, Defendant's agent expert, Jennifer Walsh, agreed with the basic premise, stating that non-Big Five publishers "don't bid [above $250,000] often" and adding that the government's market share calculations "sound[] right to me."  Trial Tr. 1833:7–14 (Walsh).  Dr. Snyder also agreed that the market shares for "the group of Big 5 grows substantially" above the $250,000 advance level while the shares of the non-Big Five publishers drops "very dramatically" at this level, from 45% to 9%.  Trial Tr. 2820:9–13 (Snyder).

104.    Market shares reflect that authors of anticipated top sellers demand "publisher[s] [that are] ready to commit incredible energy and resources."  DX-21 at 5.  Witnesses testified that the Big Five publishers have stronger publicity and marketing capabilities—stronger capabilities that give them an edge in turning books into bestsellers.  *See*, *e.g.*, Trial Tr. 153:20– 154:14; (Pietsch); Trial Tr. 158:11–159:6 (Pietsch) ("[T]he publicists for our publishing imprints get noticed.  Their calls get returned . . . .  [T]hey have a presence; they have reputation; they have valuable connections.  The smaller publishers simply don't have the same scale.  They can't count on getting the attention of these influencers in the same way.");  Trial Tr. 335:13–336:8 (King).  For example, Mr. Karp admitted that, for new print books, the Big Five publishers' publicity and marketing assets give them an advantage in creating bestsellers.  Trial Tr. 451:22– 454:9 (Karp).  Similarly, best-selling author Andrew Solomon testified that Big Five publishers are more successful with best-selling books because, when "your book comes out . . . you want to be on NPR, you want to be on Good Morning America or the Today Show, . . . .  And any

publisher can sort of try.  The publishers at the Big Five houses have more ready access to all of

that. . . .  There's just a whole industry that responds better to Big Five publishers."  PX-2004 at

63–64 (Solomon Dep. 102:5–103:18); *see also* PX-2004 at 18–19 (Solomon Dep. 41:1–42:2).

105.    Similarly, Ms. Pande testified that when one of her authors has been successful

publishing with a small publisher, the author often prefers to publish his or her next book with a

Big Five publisher, because "the next book would have a better chance of success with more

substantial resources being brought to promoting and publishing the book from one of the Big

5."  Trial Tr. 291:10–292:1 (Pande). ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

106.    Big Five publishers' larger sales forces also make them better suited towards

maximizing sales of anticipated top-selling books.  Mr. Solomon testified that he picked S&S's

Scribner in part because of its larger sales force; this mattered to him because "[a] larger sales

force reaches a larger number of sales outlets and is more persuasive with their interaction with

them."  PX-2004 at 19 (Solomon Dep. 42:3–21); *see also* PX-2004 at 54 (Solomon Dep. 93:5–

20); Trial Tr. 326:20–327:6 (King) (King picked Scribner because "[t]hey had salespeople

everywhere . . . I realized that I was going to reach book stores from coast to coast and that was

great . . . .  They are a muscular firm.  They were not going to just be in specialty book stores.

They were going to be everywhere."). ██████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

107.    PRH knows that its strong marketing, publicity, and sales capabilities are important to authors and agents, as evidenced by its presentation to the literary agency, Writers House, in December of 2019.  *See generally* PX-68 at 1–42.  In that presentation, PRH highlighted its consumer insights and marketing for celebrity authors, its partner platforms (*e.g.*, *The New York Times*, Goodreads, and Amazon), and its retail relationships.  *See* PX-68 at 6–12. Publishers also highlight their marketing, publicity, and sales capabilities to prospective anticipated top-selling authors by submitting marketing plans during the acquisition process.  Mr. Karp agreed that anticipated top-selling authors expect a certain level of marketing, publicity, and sales attention.  Trial Tr. 491:11–13 (Karp).

108.    Additionally, publishers' larger marketing spend for anticipated top sellers, *see supra* III.E1.a., indicates that strong marketing can better maximize sales for anticipated top sellers than other books.  Publishers spend marketing resources on the books they believe will benefit most from those resources.  As put by Mr. Tart, "I don't find that marketing money can create a success.  I think it can amplify it."  Trial Tr. 981:21–23 (Tart).  Therefore, the large marketing spend on anticipated top sellers reflects publishers' judgment that anticipated top sellers will benefit more from marketing support than other books.

109.    Books with higher advances also involve a significant amount of risk because many high-advance books do not sell well, resulting in publisher losses.  *See, e.g.*, Trial Tr. 1369:14–1370:4 (Murray).  Larger publishers are better positioned to take on this risk because they can spread it out over a larger set of books and imprints and because they have amassed large backlists that serve as a financial cushion.  *See, e.g.*, Trial Tr. 156:5–20 (Pietsch); Trial Tr.

157:25–158:10 (Pietsch); PX-2002 at 83-84 (Stehlik Dep. 177:16–20, 177:23–178:6, 178:8–15,178:17–25); Trial Tr. 912:13–913:2 (Tart). Thus, according to Mr. Pietsch, large publishers like Hachette have "more range for taking these risks on books that could become significant bestsellers." Trial Tr. 156:5–20 (Pietsch).

### 3. Anticipated Top Sellers Have Specialized Vendors

110.    A distinct group of publishers serves anticipated top sellers. Of the "hundreds" of publishers who operate in the broader market for all trade books, *see* Dkt. 56 at 4 (Am. Answer ¶ 7), only 33 acquired an anticipated top seller in 2021, Trial Tr. 2684:10–19 (Snyder). And compared to their presence in the broader market, the Big Five dominate the market for anticipated top sellers. As discussed above, the Big Five acquire more than 90% of anticipated top sellers while acquiring only 55% of other books. *See* PX-963.

111.    Executives of both merging parties recognize that there are fewer strong competitors for anticipated top sellers than for other books. *See* PX-530 (Reidy: "[The Big Five] are our biggest competitors, *especially for books by already bestselling authors and celebrities*.") (emphasis added); Trial Tr. 602:18–23 (Karp); PX-438 at 1 (McIntosh: "If at a lower level I'd think of Norton, but it's hard to picture them playing at this level."); *see also supra* III.E.2.

112.    Third-party publishers also recognize this dynamic.



*see also* PX-2002 at 91–92 (Stehlik Dep. 185:20–186:19) (small publishers such as Norton, Chronicle, and Bloomsbury don't usually bid above $250,000, but Norton and Chronicle more commonly bid below $100,000).

113.     Similarly, Scholastic is, according to Mr. Dohle, "as large as Macmillan and Hachette."  Trial Tr. 737:19–738:1 (Dohle).  But in the market for anticipated top sellers, Scholastic is several times smaller than both Macmillan and Hachette, and ███████████ ████████████████████████  *See* PX-959.  And Workman Publishing, before it was acquired by Hachette, was one of the largest non-Big Five publishers.  Trial Tr. 169:18–23 (Pietsch).  But it rarely competed to acquire books with an advance of $200,000 or higher, because it sought to avoid the risks associated with publishing high-advance books.  Trial Tr. 155:4–17 (Pietsch).  The fact that all three of these firms—Kensington, Scholastic, and Workman—are successful in the broader book publishing industry but much less so for anticipated top-selling books shows that competitive conditions are different inside the market, compared to the rest of the business.

114.     Additionally, a much greater proportion of all books published by Big Five publishers are anticipated top sellers compared to non-Big Five publishers.  For example, 27% of PRH's books and 19% of S&S's books are anticipated top sellers, whereas only 4% of non-Big Five publishers' books are anticipated top sellers.  PX-995 (Figure 3); Trial Tr. 3077:9–3078:1 (Hill).

**Figure 3.  Anticipated Top Sellers as a Percentage of Dr. Snyder Advance Data Titles by Publisher (2019–2021) (PX-995)**



#### 4.   Anticipated Top Sellers Have Distinct Prices

115.     Anticipated top-selling books have distinct prices.  As discussed above, in this market, the "price" for the book is essentially the advance.  Anticipated top sellers receive higher advances because they are expected to sell more.

116.     Anticipated top-selling authors demand specialized terms that are not often available to other authors.  For example, an anticipated top-selling author secured a "50K budget for glam, travel expenses, and outside PR."  DX-21 at 2.  For that same author, S&S offered to provide business class airfare, four-star hotel accommodations, and a $5,000 reading fee for the audiobook.  DX-21 at 5.  Ms. Walsh testified that these specialized contract terms—such as guaranteed marketing, airfare and donations to charitable causes—are correlated with advances. Trial Tr. 1819:9–1820:2 (Walsh); Trial Tr. 1827:19–22 (Walsh).  Mr. Karp testified that "glam

budgets" and "as-is" clauses are not standard terms and that only authors of anticipated top sellers can demand them. Trial Tr. 575:7–576:5 (Karp). Mr. Weisberg, confirmed that special terms, such as bonuses and front-loading of payments, are usually only secured by "top end" authors. Trial Tr. 1132:17–23 (Weisberg). Mr. Tart testified he will only negotiate hardcover royalty rates for the more desirable books and he will only negotiate royalty rates for other formats "at the very, very top tier advance level." Trial Tr. 988:2–989:8 (Tart). Furthermore, anticipated top-selling authors sometimes receive bonuses when their books make bestseller lists. *See* ▮▮▮▮ at 2 (showing bestseller bonus for books by ▮▮▮▮▮▮▮▮▮ at 13.

### 5. Anticipated Top-Selling Authors Are Not Sensitive to Price Changes

117.    *Brown Shoe*'s price sensitivity factor is akin to the inquiry undertaken in the hypothetical monopsonist test. *See Swedish Match*, 131 F. Supp. 2d at 159–60. As has been addressed above, a small but significant change in advances will not cause authors of anticipated top-selling books to shift in a significant way to self-publishing. *See supra* III.D.

### 6. Anticipated Top-Selling Books Have Special Characteristics

118.    Anticipated top-selling authors are more likely to have track records of success, reach bestseller lists, and receive awards. Ms. McIntosh confirmed that agents of franchise authors "use [] track record[s] to ensure that [Penguin Random House is] paying [] a high advance." Trial Tr. 2285:23–2286:14 (McIntosh). Publishers identify anticipated top sellers as books that "could sell and hit the bestseller lists." PX-2002 at 66 (Stehlik Dep. 157:2–16) (uses the phrase "big book" instead of anticipated top seller).

119.    Publishers anticipate which books might win an award or receive critical acclaim, which causes them to offer higher advances because awards generate sales. Trial Tr. 1972:11–1973:11 (Kim); *see also* Trial Tr. 921:3–5 (Tart); Trial Tr. 969:13–21 (Tart) (publishers consider

whether a book might win an award when constructing a P&L). Also, an author is more likely to receive a higher advance if her previous book won an award. *See* Trial Tr. 313:19–314:11 (Pande).

120.     In *Syufy*, 793 F.2d 990, the Ninth Circuit delineated a product market around those approximately 30 films per year "anticipated" to be "top grossing." The Ninth Circuit focused on criteria similar to *Brown Shoe*'s practical indicia, but specifically geared for the creative industry of movies. *Id.* at 994.

121.     The "anticipated top sellers" market proposed for books aligns closely with the approved "industry anticipated top grossing" market for films:

- There the movie studies invested more in the production of "anticipated top-grossing" films; here the publishers invest more in "anticipated top-selling" books including by paying larger advances;

- There "anticipated top-grossing" films tended to have big name stars, or directors, or producers; here "anticipated top selling" books tend to be associated with "franchise" authors, celebrities, or authors with potential to win major literary awards;

- There "anticipated top grossing" films were associated with larger advertising budgets; here "anticipated top selling" books with larger marketing spend (*see supra* III.E.1.a);

- There longer play times; here larger print runs (*see supra* III.E.1.d); and

- There more lucrative contract terms; here better contractual terms (*see supra* III.E.4).

Similarities between this case and *Syufy* confirm that the market for anticipated top sellers is a properly defined market.

### F. Defendants' Argument About the Phrase "Anticipated Top Sellers" Is Misguided

122.    Defendants argue that "anticipated top sellers" cannot form the basis for a product market because it is not a term used by publishers. They are wrong. There is no requirement that a relevant market be drawn around existing terminology in a particular industry. Such a requirement would immunize mergers that harms groups of customers or sellers as long as industry participants did not have a specific name for that group. In *Wilhelmsen*, for example, the court upheld a product market around "Global Fleets" despite the defendants' protests that "neither [defendant] use[s] the FTC's definition of that term." 341 F. Supp. 3d at 51–52. As the court explained, it was sufficient that "Global Fleets" constituted a "construct" providing a "useful way to discuss and predict economic conditions;" as long as it "capture[d] key aspects of the economic reality facing fleets" and allowed the court to "measure how the result of a merger would affect customers within [a relevant] subset" of the market. *Id*. at 52. Likewise, in upholding the plaintiff's proposed market of "industry anticipated top-grossing films," the court in *Syufy* never considered whether the term was commonly used by the movie industry. 783 F.2d at 882–883; *see also Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1165–66 (D. Nev. 2016) (allowing plaintiffs to proceed with a market based on "elite professional MMA [mixed martial arts] fighters" over defendants' objection that it is "a term not used in the industry and apparently created solely for the purpose of this [antitrust] litigation").

123.    As in *Wilhelmsen*, the government has shown that anticipated top sellers provides a useful construct here. Multiple publishers have testified that there are books that publishers and agents expect to generate high sales and that, for those books, publishers will put in extra

effort to boost sales. *See* Trial Tr. 1813:20–1814:3 (Walsh) ("there are franchise authors . . . yes, you know it's going to be a top seller . . . [a]nd then there are giant celebrities . . . where you know it's going to be a top seller"); Trial Tr. 575:10–576:5 (Karp) (agreeing with the Court that "you can't demand [a budget for glam and wardrobe] unless you are a top selling books author" and it is "a fair assumption to make" that an "as-is" term is "something you would only offer to an anticipated top selling books, not just to anybody").

### G. The Acquisition of Publishing Rights to All Books Is Also a Relevant Product Market

124.    Alternatively, the market can be defined more broadly to include all trade books, but not self-published books. Defendants appear to agree that this constitutes a relevant market. *See* Trial Tr. 2629:1–-22 (Snyder); Trial Tr. 2897:5–13 (Snyder).

### H. The Relevant Geographic Market Is Worldwide

125.    The relevant geographic market is worldwide—meaning that the government has included all acquisitions of U.S. publishing rights in the market, regardless of the location of the author or publisher. *See* Dkt. 2 at 16 (Compl. ¶ 40); Dkt. 56 at 13 (Am. Answer ¶ 40). Defendants have not contested this definition.

## IV.    THE PROPOSED ACQUISITION OF SIMON & SCHUSTER IS PRESUMPTIVELY UNLAWFUL

### A. Applicable Legal Standards

126.    "A merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase" in market concentration is presumptively illegal. *Phila. Nat'l Bank*, 374 U.S. at 363–65 & n.42; *Sysco*, 113 F. Supp. 3d at 52. Courts use two different measures of market concentration to trigger the presumption. One is based on the percentage of the relevant market that would be controlled by the merged firm, and the other is a

statistical measure of market concentration known as the Herfindahl-Hirschman Index ("HHI").

Starting with the combined firm's market share, in *Philadelphia National Bank*, the Supreme

Court held that a significant change in concentration that results in a combined market share of at

least 30% is sufficient to establish the legal presumption that a merger violates Section 7.  374

U.S. at 331, 364 (merger to a 36% market share with the top four banks controlling a combined

78%); *see also Heinz*, 246 F.3d at 711, 715–717 (holding FTC established presumption where

defendants would have a combined share of 32.8% in a concentrated market); *Hosp. Corp.*, 807

F.2d at 1383 (finding transaction unlawful that raised defendant's market share from 14% to

26% and the market share of the four largest firms from 79% to 91%).

127.    Courts also routinely assess a proposed merger's presumptive illegality using the

Merger Guidelines and employing HHIs.  *See, e.g.*, *Sysco*, 113 F. Supp. 3d at 52–53; *Swedish*

*Match*, 131 F. Supp. 2d at 166–67.  HHIs are calculated by summing the squares of each market

participant's individual market share both pre- and post-acquisition.  *Sysco*, 113 F. Supp. 3d at

52; *United States v. H & R Block*, 833 F. Supp. 2d at 71–72; Merger Guidelines § 5.3.  Under the

Merger Guidelines, if an acquisition (1) increases the HHI of a relevant market by more than 200

points and (2) results in a post-acquisition HHI exceeding 2500, it is presumptively

anticompetitive.  *H & R Block*, 833 F. Supp. 2d at 71–72 (enjoining transaction that would have

given the combined firm only a 28.4% market share because the transaction would have resulted

in a highly concentrated market as demonstrated by an increase in the HHI of more than 200 and

a post-acquisition HHI that would have exceeded 2500); Merger Guidelines § 5.3.

### B.  The Merger Presumptively Violates Section 7 in the Relevant Market

128.    The merger easily clears the applicable thresholds here.  The government's

expert, Dr. Hill, calculated market shares based on a comprehensive set of data from more than

sixty publishers.  Trial Tr. 1251:12–1252:3 (Hill).  According to these calculations, the merging firms account for nearly half (49%) of the market for anticipated top-selling books, and the Big Four combined will control approximately 90%.  Trial Tr. 1254:3–6 (Hill); PX-959 at 1 (Figure 4).  Dr. Hill also calculated market shares at different advance thresholds and found similar results.  *See* PX-960 at 1 (Figure 5).  The post-merger HHIs would be 3,111, with an increase of 891, well in excess of the thresholds required to establish the presumption under the Guidelines.  Trial Tr. 1256:24–1258:11 (Hill); Trail Tr. 1259:4–12 (Hill).  Moreover, post-merger HHIs (and the post-merger increase) are above the presumption thresholds at a variety of other advance cut-offs (*e.g.*, $150,000, $350,000, $500,000, or $1 million).  Trial Tr. 1254:7–25 (Hill); *see also* PX-960 at 1.

**Figure 4.  Share of Purchases of Anticipated Top Sellers (January 2019–June 2021) (PX-959)**



**Figure 5. Share of Purchases of Anticipated Top Sellers Using Different Advance Cutoffs (January 2019–June 2021) (PX-960)**



129.    While Defendants dispute the market definition of anticipated top-selling books, Defendants do not dispute those market shares or HHI calculations.

### C. The Presumption Is Almost Always Sufficient to Block a Merger

130.    Defendants' characterize the legal presumption as "weak." Dkt. 131 at 35–36 (Defendants' Pre-Trial Brief). But the caselaw demonstrates that triggering the presumption is usually outcome-determinative because defendants, as here, are unable to rebut it. *See, e.g., FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001); *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018); *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018);

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015); *FTC v. Staples Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011); *FTC v. Libbey, Inc.,* 211 F. Supp. 2d 34 (D.D.C. 2002); *FTC v. Swedish Match,* 131 F. Supp. 2d 151 (D.D.C. 2000).

131.    The presumption applies to mergers that raise concerns about unilateral effects—the loss of direct competition between the merging parties.  Merger Guidelines § 6 (unilateral effects)*.*  And the presumption applies to mergers that raise concerns about increased coordination among remaining firms in the market, *i.e.* coordinated effects.  Merger Guidelines § 7 (defining coordinated effects)*.*  Because Defendants appear to concede that HHIs can support a presumption of harm in coordinated effects merger cases, *see* Dkt. 131 at 37 (Defendants' Pre-Trial Brief) (arguing only that the HHI cannot support the presumption for unilateral effects), this brief will focus only on its application to unilateral effects.

132.    The caselaw is clear that the presumption of illegality applies when mergers raise concerns about unilateral effects.[6]  *See Whole Foods*, 548 F.3d at 1035 ("The district court should bear in mind the FTC will be entitled to a presumption against the merger on the merits" in a unilateral-effects case); *Heinz*, 246 F.3d at 716 (applying presumption in unilateral-effects case); *Wilhelmsen*, 341 F. Supp. 3d at 62 (same); *Aetna*, 240 F. Supp. 3d at 43 (evidence of unilateral effects supports application of the presumption); *Anthem*, 236 F. Supp. 3d 192, 231

---

[6] Defendants selectively quote an article by Professors Hovenkamp and Shapiro to imply that the structural presumptions should not apply to unilateral effects cases.  The authors explained, however, that "[d]espite the shift in merger enforcement toward unilateral effects, the *Philadelphia National Bank* presumption based on structural evidence and the opportunity to rebut remains alive and well in horizontal merger analysis."  Herbert Hovenkamp & Carl Shapiro, *Horizontal Mergers, Market Structure, and Burdens of Proof*, 127 Yale L.J. 1996, 2014 (2018) (citing a long list of cases applying the presumption to unilateral effects cases).

n.28 (applying presumption in unilateral-effects case); *Staples II*, 190 F. Supp. 3d at 131 (same);

*Sysco*, 113 F. Supp. 3d at 55 (same); *H & R Block*, 833 F. Supp. 2d at 81 (same).

### D. Aggregating the Fringe Competitors Strengthens, Rather than Weakens, the Presumption

133.    Defendants claim that practically the proposed merger reduces the number of

competitors from "*six* (the five largest plus all others in aggregate) to *five*," rather than five to

four, due to the presence of smaller non-Big-Five competitors.  Dkt. 131 at 40 (Defendants' Pre-

Trial Brief); *see also* Trial Tr. 3304:6–7 (Defendants' Closing) ("And then you've got all these

smaller and medium [publishers] as another Big 5").  Defendants cannot cite any authority for

this unconventional proposition.  Rather than "aggregate" fringe competitors, courts instead

observe the reality of their unique competitive force and assign them appropriate weight.  *See,*

*e.g.*, *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 172 (3d Cir. 2022) (assessing HHI

based on a post-merger combined share of 47%, with the next two closest competitors having

21% and 9% shares; court did not treat remaining competitors—comprising 23% of the market—

as a single firm); *Staples II,* 190 F. Supp. 3d at 128 (concluding merger was presumptively

illegal because it would result in "one dominant firm with a competitive fringe"; court did not

treat "competitive fringe" as an aggregate competitor in the market); *H & R Block*, 833 F. Supp.

2d at 71–72 (assessing HHI to be 4,291, with top three firms comprising 90% of the market;

court did not treat the "numerous smaller firms" that comprised the remaining 10% of the market

as a single firm).  In any event, characterizing the merger as one from six-to-five does not

magically remove its presumption of illegality.  *See, e.g., Elders Grain, Inc.*, 868 F.2d at 905

(enjoining merger from six to five firms after noting the relevant market "was already highly

concentrated before the acquisition, with only six firms of any significance") (Posner, J.); *United*

*States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284–85 (7th Cir. 1990) (Posner, J.) (same,

where record showed six hospitals in a service area—and an additional one nearby—accounted for 83% of hospitalizations).

134.    In fact, aggregating the fringe into one imagined unified competitive force leads to higher concentration measures that paint an even *worse* picture for defendants.  The reason is the HHI squares *each firm's* market share.  Squaring the share of one larger, combined firm (of about 9%) yields a larger post-merger HHI than squaring the shares of a number of smaller firms and then later adding them together.  *See* Trial Tr. 1572:10–25 (Hill); PX-959 at 1; PX-963 at 1.  This would entitle the government to an even stronger presumption of anticompetitive harm.

## V.    THE DEFENDANTS CANNOT REBUT THE PRESUMPTION

### A.    Market Shares Accurately Reflect Competitive Conditions

135.    Defendants bear the burden of showing that the market shares and the associated presumption of illegality inaccurately reflect competitive reality.  *United States v. Baker Hughes Inc.,* 908 F.2d 981, 991 (D.C. Cir. 1990).  Here, Defendants do not question the accuracy of Dr. Hill's market shares, either in the data he used or the methodology used to calculate them.  Instead, they try to argue that there are reasons to think that the market shares of firms, whether members of the Big Five, smaller publishers, or even firms that have yet to publish their first book, have greater competitive significance vis-à-vis PRH and S&S than their market shares would indicate.  However, when the record evidence is examined, it is clear that Defendants' arguments fall flat, and that the market shares are, in fact, an accurate representation of the publishing industry's market structure when it comes to anticipated top sellers and the likely effect of the merger on competition.

136.    Both Dr. Hill and Dr. Snyder gathered data from a variety of data sources for their analysis, and market shares calculated using both experts' data are consistent with competitive

conditions in the market for anticipated top sellers that justify finding the merger presumptively illegal. For example, as discussed more fully below, Dr. Hill compiled several different sets of data showing how frequently the merging parties compete with each other and with other publishers, including "win/loss" data from PRH and S&S tracking when they win or lose opportunities, Trial Tr. 1247:13:19 (Hill), and "runner-up" data that identifies, when PRH or S&S won a book, the runner-up publisher. *See infra* VI.C.1. These data sets describe a competitive dynamic consistent with publishers' market shares. For example, as market shares would predict, when S&S loses a book to a competitor, it most often loses to PRH. *See* Trial Tr. 1280:17–1281:17 (Hill).

137.    Similarly, data collected by Dr. Snyder from literary agents subpoenaed during the course of this lawsuit ("agency data") show that non-Big Five publishers are winners or runners up at a frequency consistent with their relative market share. *See infra* VI.C.1. And a win/loss tracker maintained by Hachette also depicts results consistent with what market shares would predict—that roughly 90 to 95% of Hachette's losses above $500,000 are to the other Big Five publishers. PX-790 (Hachette loss tracking document showing that Big Five publishers account for approximately ███ of Hachette's losses above $500,000); Trial Tr. 191:16–194:24 (Pietsch) (describing loss tracking document).

138.    As described at trial, the government's shares are based on hundreds of contracts—approximately 1,200 per year. Trial Tr. 1588:20–25 (Hill); Trial Tr. 2818:18–2819:18 (Snyder). As reflected in that broad set of contracts, market shares have not changed year-over-year. Trial Tr. 1482:15–1483:17 (Hill); Trial Tr. 3049:16–3050:21 (Hill); PX-967 at 1; PX-994 at 1 (Figure 6). This stability suggests that more weight should be placed on market

shares.  Trial Tr. 3051:5–15 (Hill); Merger Guidelines § 5.3 (agencies give more weight to market concentration when shares have been stable over time).

**Figure 6.  Shares by Count of Anticipated Top Seller Contracts (2019–2021) (PX-994)**



139.    Defendants argue that market shares are not good indicators because they understate the competitive significance of smaller publishers and the market is dynamic and changing over time.  While the evidence does show that the market has changed in some aspects—for example, audiobooks have become more popular recent years, change has been far slower for the essential features of competition.  As discussed more fully regarding entry, below, over at least the last three decades, no firm has entered the market and become a strong competitor for the Big Five.  And there is no evidence that the non-Big Five publishers are likely to change that reality in the near future.  For these reasons, while change occurs in this market

like any other, the evidence does not show that the government's market shares are an unreliable

guide as to what might happen after the merger.

**B. The Big Five Publishers Are the Main Competitors in the Anticipated Top-Seller Market**

140. The Big Five publishers are the main competitors in the market for the acquisition

of anticipated top-selling books. *See* Trial Tr. 153:5–13 (Pietsch); PX-157 at 1 ("Large

publishers are our (main) competitors . . . ."); PX-2002 at 71–72 (Stehlik Dep. 165:15–166:13)

(HarperCollins imprint Morrow Group's main competitors are first PRH, then S&S, and

sometimes Hachette and Macmillan). This is consistent with their relative market shares.

141. The industry itself recognizes that the Big Five dominate this market. At trial, top

executives from several Big Five publishers testified that the other Big Five publishers are the

publishers that they compete with—and lose to—most frequently. *See, e.g.*, Trial Tr. 152:11–

153:4 (Pietsch); Trial Tr. 449:19–25 (Karp); Trial Tr. 451:13–16 (Karp); Trial Tr. 794:16–795:7

(Dohle); Trial Tr. 2360:20–23 (McIntosh); Trial Tr. 1374:4–23 (Murray); PX-2002 at 98 (Stehlik

Dep. 197:1–11) (Harper Collins' Morrow Group loses most frequently first to PRH and second

to S&S); Trial Tr. 351:21–352:14 (Eulau).

142. The evidence shows that smaller publishers rarely compete for anticipated top

sellers. *See, e.g.*, Trial Tr. 153:14–22 (Pietsch) (Hachette loses to non-Big Five publishers "quite

rarely" above $250,000); PX-790 at 1–36 (Hachette loss tracking document showing that Big

Five publishers account for approximately ███ of Hachette's losses above $500,000); PX-

530 at 2 (smaller publishers "rarely compete with [S&S] in auctions for new properties," but

instead are "farm teams for authors who then want to move to a larger, more financially stable

major publisher"). For example, Kensington is one of the largest mid-sized publishers and is

quite successful in the genres it focuses on (*e.g.*, romance books), but it has a very small market

64

share in the market for anticipated top-selling books.  PX-2000 at 8 (Zacharius Dep. 52:5–24);

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████  Similarly,

Scholastic is a very large publisher for children's books, and mentioned often by Defendants at

trial, but it too has a very small market share in the market for anticipated top-selling books.  *See*

PX-959 at 1 (market shares; ████████████████ ); *see also* Trial Tr. 196:15–22 (Pietsch)

(explaining that Perseus and Workman rarely offer advances above $250,000).  Indeed, literary

agent, Elyse Cheney acknowledged that the Big-Five are best-positioned to win anticipated top-

selling books: "I think the non-Big 5, you know, are just not going to play in that sandbox too

many times.  They don't have the same scale."  Trial Tr. 2047:16–18 (Cheney).

143.    Publishers acknowledged at trial that while smaller publisher compete in the

broader market for the acquisition of publishing rights, their presence in the market for

anticipated top selling books differs markedly.  S&S CEO Jonathan Karp admitted that (at least

for auctions), there are fewer competitors at higher advance levels.  Trial Tr. 602:18–23 (Karp);

*see also* PX-2002 at 91–93 (Stehlik Dep 185:9–187:7) (non-Big Five publishers compete "very

rarely" at advance levels of $250,000 or higher, but do compete more frequently at lower levels);

Trial Tr. 169:24–170:20 (Pietsch) ("[S]ignificant independent publishers" generally do not "try[]

to compete in this high-risk area"); *cf.* PX-2005 at 42 (Jacobs Dep. at 157:11–17 ) (explaining

Abrams is "outbid all the time by publishers who are [] willing to pay . . . more for books than we are.  You know, it's just the reality of things.").

144.    Defendants' internal documents are consistent with this fact.  In her description of S&S's business, then-CEO Carolyn Reidy wrote that Big Five publishers are S&S's "biggest competitors, especially for books by already bestselling authors and celebrities"—or, in other words, anticipated top-selling books—"since they are the most likely to come up with high advance payments required and are known for their strong editorial and publishing skills."  PX-530 at 2.  Similarly, PRH executives recognize that "[f]or higher level advances . . . . [t]he smaller publishers tend not to compete . . . ."  PX-190 at 1; *see also* PX-438 at 1 ("If at a lower level I'd think of Norton, but it's hard to picture them playing at this level.").

145.    For anticipated top-selling books, Big Five publishers have several important competitive advantages over other publishers.  These advantages include:

### 1. Big Five Publishers Have the Size and Resources Necessary to Absorb Losses and Manage Risk

146.    Paying a significant advance carries the risk that a publisher will lose money if the book does not sell well.  *See, e.g.*, Trial Tr. 156:5–20 (Pietsch); Trial Tr. 456:1–456:5 (Karp); Trial Tr. 917:13–25 (Tart); PX-2002 at 90–91 (Stehlik Dep.184:21–185:8); Trial Tr. 1375:24–1376:5 (Murray).  The Big Five publishers, due to their larger size, are better positioned to absorb the losses from underperforming high-advance books.  *See, e.g.*, Trial Tr. 156:21–157:14 (Pietsch); PX-2002 at 91 (Stehlik Dep. 185:9–23); Trial Tr. 456:6–9 (Karp) (broader range of books/imprints helps S&S manage risk of advances).  If a book with a large advance financially underperforms, that loss can have a bigger negative financial impact on smaller publishers.  *See, e.g.*, Trial Tr. 156:21–157:14 (Pietsch).  This makes it harder for small publishers to compete for anticipated top-selling books.  *See, e.g.*, Trial Tr. 153:20–154:14 (Pietsch); PX-2002 at 81–82

(Stehlik Dep. 175:3–176:3) (Big Five publishers can "place more bets" than non-Big Five publishers); PX-2005 at 42–43 (Jacobs Dep. 157:11–158:8) (testifying the Abrams can only compete at higher advance levels for a very small number of books because of a resource issue).

## 2. Big Five Publishers Have Robust Backlists

147.    The Big Five publishers have, over decades, amassed a steady stream of revenue from "backlist" sales—meaning sales of books published in previous years.  Trial Tr. 117:19–118:14 (Pietsch).  These sales are particularly profitable, as backlist sales involve fewer costs (*e.g.*, their marketing costs are lower) and they have lower return rates than frontlist books.  Trial Tr. 157:15–158:10 (Pietsch); Trial Tr. 361:16–362:2 (Eulau).  Big Five publishers use the revenue they receive from backlist sales as a financial cushion that helps them afford to pay higher advances and manage the risk associated with high-advance books.  Trial Tr. 156:5–20 (Pietsch), Trial Tr. 157:25–158:10 (Pietsch); PX-2002 at 83–85 (Stehlik Dep. 177:16–178:25); Trial Tr. 2357:23–2358:19 (McIntosh); Trial Tr. 360:8–14 (Eulau); Trial Tr. 1377:14–1378:3 (Murray) ("The size of a publisher's backlist is critical to their financial stability and your ability to take these big risks with new projects, with new authors. . . . So without a backlist, you know, I think it's very hard compete [for] these big books."); Trial Tr. 1384:11–13 (Murray).  For this reason, the Big Five publishers' large backlist gives them an important competitive advantage over other publishers.

## 3. Big Five Publishers Have Sophisticated Publicity and Marketing Resources

148.    Big Five publishers have larger and more sophisticated publicity and marketing teams, as well as better relationships with media executives and other professionals who help publicize books.  *See, e.g.*, Trial Tr. 153:20–154:14 (Pietsch); Trial Tr. 158:11–159:6 (Pietsch);

███████████████████████████████████████████████████

These teams and relationships give Big Five publishers an important competitive advantage over other publishers, because they are better able to promote a book through their connections with media executives and others. *See, e.g.*, Trial Tr. 158:11–159:6 (Pietsch); Trial Tr. 451:21–454:9 (Karp) (marketing and publicity teams give Big Five publishers a competitive advantage for new print bestselling books); PX-2004 at 19–20 (Solomon Dep. 42:8–43:16); PX-2002 at 82–83 (Stehlik Dep. 176:21–177:15) (Big Five publishers have more data to create more effective marketing campaigns); Trial Tr. 335:13–336:1 (King); Trial Tr. 259:13–260:4 (Pande). As Mr. Solomon testified, "your book comes out and . . . you want to be on NPR; you want to be on Good Morning America or the Today Show . . . . And any publisher can sort of try. The publishers at the Big Five have more ready access to all of that. . . . There's just a whole industry that responds better to Big Five publishers." PX-2004 at 62–64 (Solomon Dep. 101:22–103:18).

### 4. Big Five Publishers Have Extensive Sales Forces

149.    The Big Five publishers have larger retail facing sales teams, and they supply retailers with many bestselling books. *See* Trial Tr. 159:7–160:1 (Pietsch). These assets allow Big Five publishers to do a better job of getting their books displayed (*e.g.*, "on an end cap or a visible display"), promoted, and sold through retailers. Trial Tr. 153:23–154:14 (Pietsch); Trial Tr. 159:7–160:1 (Pietsch) ("smaller publishers without that volume of successful publishing simply don't have that leverage; don't have that kind of relationship with retailers and don't have those kinds of [display and display space] commitments"); PX-2004 at 17–19 (Solomon Dep. 40:15–42:21) ("A larger sales force reaches a larger number of sales outlets and is more persuasive with their interaction with them. And you know, in that arena, I think bigger is better."); PX-2002 at 82 (Stehlik Dep. 176:5–13) (Big Five publishers have an advantage in

"get[ting] placement into different stores"); PX-2002 at 94 (Stehlik Dep. 188:17–22) (Big Five "more reach"); *see also* PX-2002 at 121 (Stehlik Dep. 246:6–16); Trial Tr. 334:20–335:7 (King) ("There are a number of independent publishers, but . . . the indies who look at works like my son's work who are new writers who don't have a reputation . . . , there are fewer and fewer of them because they are being squeezed. And the reason they are being squeezed is because they don't get the shelf space that they used to in the book stores because the majors take a lot of that shelf space up. And that's like the minor leagues for writers."); Trial Tr. 2355:15–22 (McIntosh) (having the largest sales force is a competitive advantage for PRH); PX-218 at 1; PX-218 at 3 (similar); Trial Tr. 1378:4–1379:9 (Murray) (strong sales force is necessary to compete successfully for higher-advance books).

### 5. Big Five Publishers Have Variable Cost Advantages

150. The Big Five have better terms with retailers and printers that put them in a better position to compete for anticipated top sellers. *See* Trial Tr. 154:7–14 (Pietsch); Trial Tr. 159:7–160:1 (Pietsch); Trial Tr. 163:7–18 (Pietsch) ("We negotiate the financial terms with each of the retailers and wholesalers that we work with. And, given our scale, we have terms of a certain favorableness. When we acquire smaller companies, we see that their terms are not nearly as favorable."); *see also* PX-2002 at 80–81, 82 (Stehlik Dep. 175:3–9, 176:14–20). Smaller publishers may struggle to distribute their books to some retailers. *See* ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ █

---

[7] Defendants argue that the rise of Amazon as a retailer reduces the competitive advantage that the Big Five previously enjoyed. Defendants' position is contradicted by the evidence. Ms. Stehlik testified that the Big Five have "more visibility on Amazon than other smaller publishers." PX-2002 at 11–112 (Stehlik Dep. 225:25–226:5). And Defendants'

### 6.  Big Five Publishers Benefit from Their History of Success

151.    Big Five publishers have a long track record of success, as they have published many, many successful authors for a long period of time.  *See, e.g.*, Trial Tr. 454:15–18 (Karp). This track record can give them an important competitive advantage in acquiring new books, particularly at higher advance levels.  *See, e.g.*, Trial Tr. 454:11–22 (Karp); Trial Tr. 920:7–21 (Tart); Trial Tr. 2005:15–2006:18 (Kim); Trial Tr. 353:20–25 (Eulau); Trial Tr. 1375:24–1376:23 (Murray); Trial Tr. 1379:10–21 (Murray); PX-2002 at 86–90 (Stehlik Dep. 180:25–184:19); *see also* Trial Tr. 2834:12–16 (Snyder) ("One of the advantages that individual firms in the Big 5 have is that they have reputations because they have been in business a long time and fundamentally economists talk about reputations being a function of repetition."); Trial Tr. 535:7–20 (Karp) (noting that Macmillan's division Farrar, Straus & Giroux has "a long reputation" which can help in acquiring authors); PX-411 at 11 (explaining that imprints with historical credibility in literary fiction can more easily influence independent booksellers, reviewers, and prize committees, which allows them to acquire books at "more reasonable advance levels.").

### 7.  Non-Big Five Publishers Are at a Competitive Disadvantage Against the Big Five

152.    All of these advantages collectively make it materially harder for non-Big Five publishers to compete with Big Five publishers to acquire anticipated top-selling books.  For

---

argument is inconsistent with the testimony by both Big Five and non-Big Five publishers, summarized above, which generally describes the non-Big Five publishers as being at a significant disadvantage, when compared with Big Five publishers.  In addition, Defendants ignore the fact that large publishers, like PRH, are better positioned to hire large teams of data scientists and other employees who work to optimize large publishers' ability to sell books on Amazon.com.  *See* Trial Tr. 892:15–894:7 (Dohle) (describing PRH's efforts to optimize sales on Amazon.com).

example, ██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ Similarly, Mr. Solomon testified that

"the Big Five publishers . . . have a capacity that smaller companies don't have.  I mean, in the

same way that Apple is better at selling computers than someone who makes them in his garage

in Vermont."  PX-2004 at 54 (Solomon Dep. 93:5–20); *see also* PX-2004 at 43–45 (Solomon

Dep. 74:10–20, 76:14–77:1) ("I believe the scale of [S&S] means that they have the resources to

really throw themselves behind the books that they put out. . . . [S]cale had been enormously

helpful."); PX-2004 at 60–61 (Solomon Dep. 99:11–100:9) ("It is possible for a non-Big Five

publisher to do extremely well, but it's a lot harder and it happens less frequently.  And even

when it does happen, I think the scope and spread is not comparable."); PX-2005 at 42 (Abrams

Dep. at 157:11–17) (Abrams "get[s] outbid all the time").  Mr. King also testified that the Big

Five publishers are more appealing to authors because of "[t]he distribution for one . . . They can

pay, if they choose, huge advances.  They have a publicity network. They have publicity

departments.  And they are able to tap into the social media now.  They are able to tap into --

they are able to get advanced copies out to reviewers and they are able to put up a platform."
Trial Tr. 335:13–22 (King).

153.    In contrast to the large number of losses the Big Five publishers have to each other each year, the losses of anticipated top-selling books to non-Big Five publishers are infrequent. *See, e.g.*, Trial Tr. 153:14–22 (Pietsch) (Hachette loses to other publishers "quite rarely" above $250,000); PX-790 at 1–36 (Hachette loss tracking document showing that Big Five publishers account for approximately ███████ of Hachette's losses above $500,000); Trial Tr. 191:16–194:24 (Pietsch) (describing loss tracking document); PX-530 at 2 (former S&S CEO Reidy saying that smaller publishers "rarely compete with [S&S] in auctions for new properties," but instead are "farm teams for authors who then want to move to a larger, more financially stable major publisher"); *see also* Trial Tr. 795:11–796:9 (Dohle) (cannot name specific instances in which PRH lost to non-Big Five publishers); PX-2002 at 26–30 (Stehlik Dep. 73:10–74:6, 75:18–77:4); PX-2002 at 74–75 (Stehlik Dep. 168:6–169:11); PX-2002 at 92–93 (Stehlik Dep. 186:2–187:7); PX-2002 at 122, (Stehlik Dep. 247:18–24); Trial Tr. 1029:19–1030:12 (Tart); Trial Tr. 253:25–254:8 (Pande); Trial Tr. 2047:16–18 (Cheney) ("I think the non-Big 5, you know, are just not going to play in that sandbox too many times.  They don't have the same scale.").

154.    Defendants point to examples where non-Big Five publishers beat one of the merging parties to acquire books, including anticipated top sellers.  These examples prove less than Defendants assert.  The government does not dispute that the merging parties sometimes lose to non-Big Five publishers; that follows from the fact that the non-Big Five publishers do have some market share.  Trial Tr. 1551:4–8 (Hill) ("So, again, there's 10 percent of the market is accounted for the non-Big 5.  So I'm not saying they can never do it.  I'm just saying there are

barriers to them doing it as regularly and competing as effectively as the Big 5 do.")  But none of Defendants' examples show that non-Big Five publishers frequently win anticipated top-selling books or are more competitive than their share would indicate.  To the contrary, for some of Defendants' examples, S&S's publishing executives expressed surprise that those non-Big Five publishers competed at high advance levels, further reinforcing that this type of competition is relatively rare and unlikely to affect the strategy of Big Five publishers like S&S when acquiring books.  *See* DX-38 at 1 (Pelz: "We lost this one to Hay House (!) . . . ."; McGuire: "Wow I didn't know they pay big advances"); DX-131 (Cheiffetz commenting on loss to Princeton: "They . . . buy one big book a year"; McGuire: "Wow I had no idea they pay that much").  These anecdotes do not constitute a trend—the evidence is clear-that non-Big Five publishers do not frequently acquire anticipated top-selling books.[8]

155.    In addition, some of the non-Big Five publishers' market share can be attributed to the fact that some authors started with particular non-Big Five publishers, developed close personal relationships with those publishers, and do not intend to switch to another publisher. █

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████    The fact that non-Big Five publishers are able to retain some authors with whom

---

[8] Defendants also argue that non-Big Five publishers can acquire anticipated top-selling books as an "under-bidder"—meaning, in other words, that they can win a book even when they have not offered the highest advance.  This too proves less than Defendants claim.  To the extent that non-Big Five publishers win as an under-bidder, those wins (like all wins) would be reflected in their market share.  And their share is, as discussed more fully above, less than 10%.  Moreover, there is evidence that under-bidders rarely win.  *See* Trial Tr. 2395:2–10 (McIntosh); *see also* Trial Tr. 2106:5–7 (Wylie) (Wylie sells to an underbidder about 7.5% of the time).

they have long-standing close personal relationships does not mean that their share understates their competitive impact

### 8. Dr. Snyder Presented Misleading Data Regarding the Competitive Significance of Small Publishers

156.    Despite a low market share, Dr. Snyder argues that non-Big Five publishers still serve as significant competitive constraints because they are the winner or runner-up 23% of the time for the acquisition of anticipated top-selling books.  Trial Tr. 2688:24–2689:6 (Snyder); Trial Tr.); Trial Tr. 2693:20–2694:2 (Snyder).  Dr. Snyder's figure is misleading, however, because it is not an actual percentage that measures the relative significance of the non-Big Five. To do so using this statistic, it must be halved.  Trial Tr. 3051:16–3053:17 (Hill).  This is because the 23% figure is actually the combined numerator from two percentages: the shares of all publishers' (a) wins and (b) runner up bids.  Adding the numerators, each with a denominator of 100%, means that the "23%" is relative to a denominator of 200%.  Trial Tr. 3051:16–3053:8 (Hill).  After halving the 23% to 11.5%, Dr. Snyder's statistic is similar to the non-Big Five's 9% market share.  Trial Tr. 3051:16–3053:17 (Hill).  Therefore, Dr. Snyder's statistic, when corrected, is consistent with the market shares calculated by Dr. Hill that support the presumption that the merger is illegal.

### C. Entry and Expansion by Non-Big Five Publishers Would Not Be Timely, Likely, or Sufficient

#### 1. Legal Standard for Entry and Expansion

157.    To successfully rebut a presumption of harm, Defendants must demonstrate that entry into the relevant product market would be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern."  *H & R Block*, 833 F. Supp. 2d at 73 (quoting Merger Guidelines § 9); *see also Anthem*, 236 F. Supp. 3d at 222

(entry must "fill the competitive void" resulting from the merger) (quoting *Sysco*, 113 F. Supp. 3d at 80); *Staples II*, 190 F. Supp. 3d at 133.  Merely pointing to the existence of potential entrants or publishers that might expand is insufficient to rebut the presumption of illegality.  *See Chi. Bridge*, 534 F.3d at 436; *H & R Block*, 833 F. Supp. 2d at 73–77.

158.    To be timely, Defendants must show that entry and expansion would be "rapid enough to make unprofitable overall the actions causing those effects."  *Merger Guidelines* § 9.1. When expansion would take a period of years, it will not deter anticompetitive activity by the merged entity.  *See Elders Grain*, 868 F.2d at 905; *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d. Cir. 2003); *see also Staples II*, 190 F. Supp. 3d at 133 ("The relevant time frame for consideration in this forward looking exercise is two to three years.").

159.    "The history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future."  *Anthem*, 236 F. Supp. 3d at 222 (quoting *FTC v. Cardinal Health*, 12 F. Supp. 2d 34, 56 (D.D.C. 1998)).  The absence of significant entry in the market can indicate that there are high barriers to entry.  *See Heinz*, 246 F.3d at 717 (rejecting ease of entry defense where district court found that "there had been no significant entries in the baby food market in decades"); *Cardinal Health,* 12 F. Supp. 2d at 56 (noting that history of entry and expansion in wholesale drug distribution market "does not suggest that any form of entry in the future is very likely").

160.    Entry must be at sufficient scale to prevent anticompetitive effects from the merger.  *See H & R Block*, 833 F. Supp. 2d at 73.  Similarly, where Defendants allege there will be an expansion of existing competitors, they must be able to demonstrate that such expansion can act as a constraint on the merged company.  *See id.* at 73–77 (finding the eighteen companies

75

offered by defendants as expansion candidates post-merger insufficient because they were unlikely to replace the competition that would be eliminated by the acquisition); *Sysco*, 113 F. Supp. 3d at 81 (rejecting defendants' argument that existing regional firms could expand to serve national customers because "like new entry, successful expansion is extraordinarily capital intensive and demands a long time horizon").

161.    "Entrants must be significant enough to compete effectively, *i.e.,* affect pricing." *Anthem*, 236 F. Supp. 3d at 222 (quotation omitted).  That is, they must be "of a sufficient scale to compete on the same playing field" as the merged firm.  *Id*. (quoting *Chi. Bridge*, 534 F.3d at 430); *see also Sysco*, 113 F. Supp. 3d at 81 (rejecting defendant's argument about expansion by regional players); *Cardinal Health,* 12 F. Supp. 2d at 58 (finding that the lack of another national wholesaler after the merger was "too great a competitive loss—which the regional wholesalers cannot sufficiently replace").

162.    Courts have recognized numerous barriers to entry that are present here, including reputation and the need for significant upfront investments.  "Reputation can be a considerable barrier to entry where customers and suppliers emphasize the importance of reputation and expertise."  *Anthem,* 236 F. Supp. 3d at 222 *(*quoting *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 54–55 (D.D.C.)); *see also id.* at 223 ("To sell to national accounts, the insurer must develop a strong enough reputation to be recommended by the consultants guiding the employers through the contracting process. . . ."); *Sysco*, 113 F. Supp. 3d at 80 (finding incumbency "a powerful force in the foodservice distribution industry"); *H & R Block*, 833 F. Supp. 2d at 75 ("Building a reputation that a significant number of consumers will trust requires time and money."); *Cardinal Health*, 12 F. Supp. 2d at 57 ("The sheer economies of scale and strength of reputation

that the Defendants already have over these wholesalers serve as barriers to competitors as they

attempt to grow significantly in size.").

### 2. Entry Barriers Are High

163.    In this market, barriers to entry are high.  In the past thirty years, no publisher has

entered the market and become a strong competitor for the Big Five.  *See* Trial Tr. 163:2–6

(Pietsch).  And for good reason.  New entrants face a variety of disadvantages—they lack a

backlist, have a harder time publicizing books, have weaker relationships with retailers, and

cannot point authors and agents to a sustained history of success.  *See* Trial Tr. 163:7–165:6

(Pietsch).

164.    Moreover, the competitive advantages of the Big Five are difficult to duplicate,

particularly in the immediate term.  Building a large backlist is a years-long endeavor because

only a small number of new titles each year turn into reliable backlist titles.  Trial Tr. 165:20–

167:5 (Pietsch); PX-2002 at 85 (Stehlik Dep. 179:18–20, 179:23–25).  Building relationships

with the media executives and other professionals that help publicize a book also takes a long

time; the Big Five have spent many years developing these relationships and building their

credibility.  Trial Tr. 163:21–164:17 (Pietsch); Trial Tr. 167:6–168:8 (Pietsch).  And building a

strong track record of success can also take many years.  *See* PX-2002 at 90 (Stehlik Dep.

184:10–13, 184:16–19).  Finally, no entrant has come close to building the scale necessary to

manage the risk of high-advance books as effectively as the Big Five publishers do today.  *See*

Trial Tr. 168:17–169:17 (Pietsch).

165.    For these reasons, industry participants recognize that entry is not easy.  For

example, Hachette CEO Michael Pietsch testified that entry in this market is "very difficult."

Trial Tr. 168:0–169:1 (Pietsch).  Similarly, HarperCollins CEO Brian Murray stated that it would

be "very, very difficult" for a startup to compete for high-advance books, for a variety of reasons, including the "risk profile of placing big bets" and lack of access to a backlist. Trial Tr. 1380:12–1381:8 (Murray); *see also* Trial Tr. 249:20–250:9 (Pande) ("[I]t takes a long time for a publisher to establish itself in the industry . . . all of these [new entrant] publishers are still too new to have really proven themselves."); Trial Tr. 339:6–10 (King) ("If you are saying could a new publisher suddenly show up in the marketplace, they show up all the time and they don't have a great deal of success because they don't have the traction that the Big 5 do. The Big 5 are pretty entrenched.").

166.    Bertelsmann itself recognizes the difficulty of entry. A Bertelsmann board presentation states that "[b]arriers to entry" in the U.S. publishing market are "[h]igh" due to reputation and distribution requirements. PX-80-E at 13. And in 2019, PRH advised ████████ ██████████████████████████████████████ that starting their own publishing company was "[n]ot a viable option," noting that there is "[n]o history of companies starting from scratch achieving profitability in 3–5 year time period." PX-79 at 8; *see* Trial Tr. 755:4–15 (Dohle). PRH further explained that creating a profitable publisher would take many years because there is a years-long lag between when books are acquired and when they are published—and because it would take many additional years after that before the publisher would accrue a backlist large enough to insulate the publisher against the risk associated with high-advance frontlist books. PX-151 at 33 (showing an initial three-year phase with "losses driven by investment in books that are not yet published," and an additional four-year period where "[l]osses [are] driven by book(s) with high advances not performing," with the publisher not reaching the "steadier-state phase" until years seven through ten); Trial Tr. 750:6–751:12 (Dohle) (similar); *see also* Trial Tr.

1380:12–1381:8 (Murray) ("It can take more than five years for an imprint to become profitable.").

167.    As writer Andrew Solomon explained, the publishing business is a "long game" because "you have to invest a lot of money at an early stage in order to get a book to do well" and even successful books can take 10 years to earn a publisher more than a negligible profit. PX-2004 at 57–58 (Solomon Dep. 96:12–17, 96:20–97:12, 97:14–18, 97:22).  The Big Five publishers are best positioned to play that long game.  PX-2004 at 57–58 (Solomon Dep. 96:12–17, 96:20–97:12, 97:14–18, 97:22).

### 3.    Expansion by Existing Publishers Will Not Be Sufficient, Timely, or Likely

#### a.    Expansion or Repositioning by Non-Big Five Publishers is Unlikely

168.    Non-Big Five publishers have small market shares that have not changed over time.  They face barriers to expansion—including reputation, lack of a strong backlist, ability to manage risk, breadth of marketing and distribution, strong relationships with retailers—and are unlikely to expand.  Trial Tr. 1481:15–1482:12 (Hill); *see generally* Trial Tr. 1475:21–1483:17 (Hill) (discussing barriers to expansion non-Big Five publishers face).

169.    Mr. Pietsch testified that it would be "very, very hard" for non-Big Five publishers to grow to the point where they could compete on an even playing field with the Big Five in this market, noting that this type of expansion has not happened in his 45 years in the publishing business.  Trial Tr. 169:2–170:20 (Pietsch). ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████  And, in

fact, some small or mid-sized publishers that tried to compete with the Big Five eventually

decided to abandon those efforts and sell themselves to Big Five publishers instead—or simply

exited the business.  Trial Tr. 169:2–170:8 (Pietsch); Trial Tr. 334:20–335:3 (King) (there are

"fewer and fewer" independent publishers "because they are being squeezed"); ████████

████████████████████████████████

    170.    Relatedly, at trial, multiple non-Big Five publishers testified either that they do

not plan to expand or that they plan to expand only in a very limited way.  ████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████  *see also*  █████████████████████████

████████████████████████████████████████████████████

███████████████████████

**b.  Expansion by The Remaining Big Five Is Also Unlikely**

    171.    The remaining Big Five publishers lack the incentive to expand in response to a

post-merger price decrease.  Trial Tr. 1486:25–1487:6 (Hill).  In multi-round auctions, these

publishers will have an incentive to maintain their current bidding behavior, and in other

---

[9] Notable examples of Big Five publishers acquiring smaller publishers include
Hachette's acquisition of Workman and HarperCollins's acquisition of HMH.

acquisition types, they will have an incentive to bid similarly or *less* aggressively, not more. Trial Tr. 1486:25–1489:9 (Hill).

172.    To start with, the Big Five publishers do not all bid in every auction.  *See* PX-933B at 1 (PRH and S&S only bidders); PX-937B at 1 (PRH and S&S only bidders).  There are many instances in which the other three Big Five publishers dropped out of multi-round auctions and competition between PRH and S&S, as the only remaining bidders, forced advances to go up.  *See, e.g.*, PX-935B at 1 ███████████████████████████ PX-943B at 1 ███████████████████████ PX-557 at 6 ██████████████████████████████ ████████████ *see also* Trial Tr. 427:5–430:17 (Karp) (describing auction discussed in PX-557; competition between PRH and S&S pushed the advance up from $650K to $825K after the last non-party bidder dropped out); Trial Tr. 176:2–17 (Pietsch).  Nothing about the merger will cause the remaining large publishers to bid more aggressively, or offer higher advances.  At most, they will continue to drop out of auctions at the same level that they have in the past.  Trial Tr. 177:1–15 (Pietsch); Trial Tr. 1088:8–14 (Weisberg) (Macmillan does not have plans to change how it bids or the number of books it acquires because of the merger); Trial Tr.1486:25–1487:18 (Hill); *cf.* ███████████████████████████████████████ ████████████████████████ PX-2005 at 30 (Jacobs Dep. 118:2–6 (similar).  For that reason, expansion by the Big Five publishers is unlikely to prevent the harm from the merger in many multi-round auctions.

173.    An example illustrates this point.  As described more fully above, today, there are some auctions where a third bidder, like Hachette, drops out at a particular level, like $500,000, and competition between the merging parties continues until the advance increases to, say, $700,000.  *See, e.g.*, PX-588 at 1 (describing auction where last third-party bidder dropped out

around $650K and competition between PRH and S&S pushed advance up to $825K); PX-941-B

at 1; *see also* PX-938-B at 1 (summary of auction for ███████████████████ in which

two ██████ imprints dropped out after bidding $500,000 and competition between PRH and

S&S pushed the advance up to $750,000); PX-943-B at 1 (summary of auction for ███

███████████████ in which ███████ bid $150,000 in Round 1 and competition between

PRH and S&S pushed the advance to $390,000).  In those sorts of auctions, if $500,000 is the

limit Hachette set for itself at the start of the auction, it is likely that Hachette would still drop

out once the auction hit that level after the merger.  Trial Tr. 177:1–15 (Pietsch).  Once Hachette

drops out, there would be no other competition to force S&S or PRH to increase to $700,000.

174.    In other acquisition types, such as best-bid auctions, negotiations, and some

hybrid auctions, the remaining Big Four will have an incentive to compete *less* aggressively after

the merger.  Trial Tr. 1487:19–1489:9 (Hill).  Publishers will recognize over time that the

combined PRH-S&S is bidding less aggressively, and, as put by Dr. Hill, "[i]f you recognize that

competition has been softened but you are less likely to lose an auction for a book on average,

then your incentive is to take some of that as a high probability of winning and take of it as a

higher margin if you win.  So you take a little bit of both, and that means you bid a little bit less

aggressively than you did prior to the merger."  Trial Tr. 1488:8–18 (Hill); *see also* Trial Tr.

1268:22–1269:24 (Hill); Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog

to Fox in Forty Years*, 77 Antitrust L.J. 49, 71 n.81 (2010) (stating, with regard to rival responses

in sell-side mergers: "[r]ivals usually have an incentive to raise the prices of their products in

response to the higher demand they face when the merged firm raises the prices for its

products").  *Cf. H & R Block*, 833 F. Supp. 2d at 77–78, 88 (holding that expansion or

repositioning by the largest competitor, Intuit, was unlikely because it did not have incentive to

defeat an anticompetitive elimination of free products after the merger).

> ### c. The Merger Will Not Affect the Future Plans of HarperCollins, Hachette or Macmillan, and Their Shares Have Been Declining

175.    In addition to their economic incentives, other evidence confirms that the

remaining Big Five publishers are unlikely to expand sufficiently.  First, the combined market

share of HarperCollins, Hachette, and Macmillan declined from 2019 to 2021, indicating that

they have not grown more competitively significant in recent years.  PX-994 at 1.

176.    Second, these publishers testified that the merger will *not* affect their future plans,

or that they do not plan to expand faster than they have been (which would be captured by

existing market shares).  *See* Trial Tr. 177:1–15 (Pietsch); Trial Tr. 1088:8–14 (Weisberg).

Hachette's CEO, Michael Pietsch explained that Hachette will not change how it evaluates and

bids on books after the merger.  Trial Tr. 177:1–15 (Pietsch); Trial Tr. 217:7–11 (Pietsch).

Macmillan's CEO, Weisberg testified similarly.  Macmillan has no plans to change how it bids

for books or the number of titles it seeks to acquire if PRH were to acquire S&S.  Trial Tr.

1088:8–14 (Weisberg).  Because Hachette and Macmillan will continue to operate as they do

today, they are unlikely to expand or in any way replace the loss of competition the market will

suffer.

177.    Nor will HarperCollins expand sufficiently.  HarperCollins CEO Brian Murray

testified that it plans to grow more slowly than it has in recent years.  Trial Tr. 1429:15–1430:10

(Murray); DX-279 at 25.  And the existing plans project annual growth rates in advance spending

from fiscal years 2022–2024 of ██████████████████, which do not necessarily mean

that it would grow faster than the market, given the trade book business's significant growth in

recent years. *See, e.g.*, DX-279 at 3 (showing ████ annual growth).[10] ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

### d. Defendants' Unsupported Arguments About Expansion at Closing Arguments Cannot Justify Rebutting the Presumption

178.    At closing, counsel for ViacomCBS claimed that a number of firms are "poised" to expand to fill in the gap created by the merger. *See* Trial Tr. 3300:15–3304:19 (Defendants' Closing). In addition, he argued that the merger will change the incentives of the remaining publishers, causing them to compete more aggressively than they did prior to the merger. *See* Trial Tr. 3292:20–3293:8 (Defendants' Closing). To rebut the presumption of harm, Defendants must offer proof that the merger will induce expansion by these publishers. *See* Merger Guidelines § 9. Such proof does not exist in the record.

179.    First, the unstated premise of these arguments is that it would be easy for another Big Five publisher to expand to such a degree that it would replace the competitive significance of S&S. This is simply not the case. Publishers are not commodities and S&S's competitive significance is the result of decades of effort to establish a reputation, brand, and relationships with authors and editors. *See, e.g.*, 454:11–18 (Karp) (S&S has "decades of credibility and success for nonfiction books"). If it were so easy to replace (or replicate) that competitive

---

[10] In closing, Defendant ViacomCBS implied that DX-279 shows that HarperCollins plans to increase its advance spending by ████████████ *See* Trial Tr. 3293:23–3294:12 (Defendants' Closing); ViacomCBS and Simon & Schuster Closing Slides at 6. But DX-279 reflects some growth that has *already happened* and hence captured in the government's market shares. As noted above, the *future* growth plans reflected in DX-279 are modest. Counsel also failed to address how these plans compare to other publishers, a critical omission given that several witnesses testified that other publishers, not just HarperCollins, have grown substantially in recent years. *See, e.g.*, Trial Tr. 466:16–467:7 (Karp) (agreeing that S&S "has had several very strong years recently" and that he gave a press interview that S&S was "defying gravity" in 2022). The statistic, therefore, has little meaning.

significance, then there would be no reason for PRH to pay $2 billion to buy it. Nor would it make sense for PRH to conclude that the merger would "cement" its position as the number one publisher. Trial Tr. 742:2–4 (Dohle); PX-162 at 1 ("Cement PRH as #1 in the US").

180.    Second, the United States called six witnesses from five different non-party competitors—including the three CEOs of the remaining Big Five publishers and the CEOs of two relatively large non-Big Five publishers. None of them said that the merger will cause them to change their bidding strategies or induce them to expand. *See supra* V.C.3.a–b. And it is clear that those publishers will have no greater incentives—and perhaps diminished ones—to compete vigorously for advances.

181.    Finally, because they cannot rely on testimony from the non-party publisher witnesses who did appear at trial about what they would do, Defendants instead point to speculation about potential expansion by non-testifying publishers, like Disney, Amazon and Scholastic. Trial Tr. 3302:11–3303:13 (Defendants' Closing). The Court should not credit unsupported, speculative claims about future plans by other publishers. If such evidence existed, Defendants could have presented it.

182.    Indeed, much of the evidence cited by counsel does not relate to expansion at all—instead, it relates to the existing competition between publishers, which is also captured by current market shares. For example, as evidence of a "Competitive Response to [the] Merger," counsel cited testimony from Mr. Pietsch that the merger would *not* change Hachette's bidding strategy. *See* Trial Tr. 3300:15–3301:2 (Defendants' Closing); ViacomCBS & S&S Closing Slides at 8. But the existence of other competitors does not rebut the *Philadelphia National Bank* presumption. *See, e.g.*, *Tronox,* 332 F. Supp. 3d at 194–195, 207–210 (enjoining five-to-four merger).

#### 4.    Printing Is an Additional Barrier to Entry and Expansion

183.    Lack of access to printing capacity also serves as a barrier to entry and expansion. In recent years, the industry has faced a printing capacity crunch, as the number of books printed and sold has continued to increase while book printing capacity has remained flat.  Trial Tr. 758:3–5 (Dohle); Trial Tr. 121:8–19 (Pietsch); Trial Tr. 364:1–9 (Eulau); ███████████   Lack of access to printing capacity creates several problems for publishers.  Without timely access to printing capacity, publishers' books may go out of stock at retailers, which can lead to lost sales. Trial Tr. 759:6–9 (Dohle); Trial Tr. 362:16–23 (Eulau); Trial Tr. 1379:22–1380:11 (Murray). This is especially true if a book becomes an unexpected success and the publisher cannot meet the demand for a book because it is unable to get copies printed on short notice. ███████ ██████████████████████  In addition, publishers may be forced to push back the release date of a book, which can also lead to wasted marketing and publicity efforts, lost sales, and frustrated authors and agents.  Trial Tr. 758:18–759:9 (Dohle); Trial Tr. 362:9–15 (Eulau); Trial Tr. 363:13–25 (Eulau).  Access to printing capacity is important when competing for authors, and losing access would adversely impact the publisher's ability to attract authors.  Trial Tr. 363:8–12 (Eulau); Trial Tr. 363:19–22 (Eulau).

184.    PRH's parent company, Bertelsmann, owns a book printing company.  No other major or mid-sized publisher does.  *See* PX-983 at 1 ("[w]e are the only publisher with a printer in the family…."); Trial Tr. 760:18–21 (Dohle); Trial Tr. 762:11–17 (Dohle).  And alternatives to Bertelsmann are limited.  For one-color trade book printing—*i.e.,* the printing of standard-size black and white books—the only other large printer in the United States is LSC, which may not have capacity available and which may give preferential treatment to Big Five publishers.  *See*

███████████████████████████████████████████████████



And smaller printers do not have the scale required to efficiently serve the needs of large and mid-sized publishers.

*cf.*

Trial Tr. 364:19–365:14 (Eulau).[11] For mass market books, publishers' options are even more limited—Bertelsmann owns the only major U.S. mass market book printing company.

185.    Without access to sufficient printing capacity, new and existing publishers alike may find expansion more challenging—in fact, they may even be forced to retrench.

*see also* PX-682 at 2 (S&S "would not want

---

[11] Overseas options exist but are hampered by the higher costs, longer lead times, and other logistical issues presented when shipping a book from another country to the United States. Trial Tr. 365:18–23 (Eulau).

to be 100% beholden to a competitor for printing."); PX-983 (PRH's relationship with a printing group gives it a "huge competitive advantage in attracting authors . . ."); Trial Tr. 764:22–765:6 (Dohle) (acknowledging that other publishers have "a genuine concern" that they will be at a competitive disadvantage in acquiring authors); Trial Tr. 363:5–22 (Eulau); Trial Tr. 368:7–369:12 (Eulau).

186.    In fact, several publishers have testified that the problems caused by their dependence on Bertelsmann for printing may worsen after the merger with S&S.



### 5.   Amazon's Limited Success Shows How Difficult Entry Is

187.    Notably, even Amazon has tried to marshal its considerable resources to enter the market and made very little headway in acquiring authors.  *See* Trial Tr. 356:10–18 (Eulau). Amazon launched a publishing business called "Amazon Publishing" over a decade ago.  Trial Tr. 171:24–173:6 (Pietsch).  It made a few headline-grabbing acquisitions but met with limited success and then retrenched.  Trial Tr. 171:24–173:6 (Pietsch); PX-2002 at 101–102 (Stehlik

Dep. 201:17–202:1) (Amazon has become less aggressive in recent years). As Mr. Pietsch described it, Amazon "started an Amazon publishing program that was intended to be competitive . . . . And they closed it down . . . very quickly after some very visible failures." Trial Tr. 172:17–25 (Pietsch).

188. As a potential competitor, Amazon faces all of the disadvantages (*e.g.,* lack of backlist, limited publicity resources, etc.) of other new or small competitors. Trial Tr. 171:4–23 (Pietsch). In addition, it faces a unique competitive disadvantage that does not affect other potential entrants: its ability to sell Amazon-published books at book retailers Amazon does not own is very limited. Trial Tr. 171:17–23 (Pietsch) (Amazon's ability to sell books via other retail channels, such as chain stores, independent books stores, Target, and Walmart is "extremely limited"); PX-2000 at 36–37 (Zacharius Dep. 142:22–143:24); PX-2002 at 99–101 (Stehlik Dep. 199:10–201:19).

189. Today, Amazon's competitive significance remains limited. As several industry participants testified, it is not a significant competitor, particularly for anticipated top-selling books. Trial Tr. 170:23–173:6 (Pietsch); PX-2005 at 43–44 (Jacobs Dep. 158:14–159:4); PX-2002 at 33–34 (Stehlik Dep. 80:25–81:3) (Amazon is not a competitor for HarperCollins for the acquisition of books); Trial Tr. 1433:4–17 (Murray) (HarperCollins has not competed against Amazon for "big books"); Trial Tr. 1107:4–8 (Weisberg); DX-422 at 28 (Glusman Dep. 102:14–20); DX-422 at 70 (Glusman Dep. 219:6–11, 219:16–18) (Norton does not view Amazon or Audible as a competitor; cannot recall Amazon being part of any of Norton's auctions; that would be "highly unusual"). Agents also testified that they rarely sell books to Amazon. PX-2007 at 23–24 (Fletcher Dep. 55:20–56:10) (Ms. Fletcher has only sold one book to Amazon publishing and does not regularly submit to Amazon); Trial Tr. 2144:22–24 (Ross) (Ms. Ross did

not sell the publishing rights to any book to Amazon between 2018 and 2021); Trial Tr.

2079:17–22 (Cheney) (Ms. Cheney has never sold a print deal to Amazon).  In fact, Amazon's

share in the relevant market was ███████ in 2021. ███████ Trial Tr. 1486:3–11 (Hill).

And Amazon's share ███████████████████████

### 6. Other Recent Entrants Have Made Little Headway

190.    Defendants mostly point to three companies as examples of new entrants who

have had success in publishing anticipated top-selling books: Spiegel & Grau, Zando, and Astra.

Spiegel & Grau and Zando are small publishers started recently by former PRH editors and do

not have a backlist.[13]  Trial Tr. 756:7–757:1 (Dohle); Trial Tr. 2388:9–17 (McIntosh).  Astra is a

small publisher owned by Thinkingdom Media Group.  Trial Tr. 556:15–20 (Karp).  Despite

these individual editors' impressive professional successes in prior roles, these potential entrants

have made little headway.  Their share in the market is, collectively, ████████████

and there is no evidence that they compete with the merging parties with any degree of

frequency.  *See* PX-2002 at 29–30 (Stehlik Dep. 76:12–77:4) (unaware of any instances in which

Morrow competed with Zando or S&G); Trial Tr. 249:20–250:9 (Pande) (Pande typically does

not include S&G, Zando, or Astra in her submissions because "these publishers are still too new

to have really proven themselves"); Trial Tr. 552:21–557:3 (Karp) (unable to identify any

blockbuster books published by Zando or Astra; when asked about Astra: "I don't know about

their track record"; identified only one instance in which S&S competed with S&G and none for

Zando or Astra); PX-790 ███████████████████████

████████████ DX-422 at 60 (Glusman Dep. 182:16–18) (Astra is not a significant

---

[13] PRH maintained possession of Spiegel & Grau's backlist when it discontinued the imprint.  Trial Tr. 2388:6–8 (McIntosh).

competitor); DX-422 at 66 (Glusman Dep. 188:1–4, 188:20–22) (S&G and Zando are not significant competitors); Trial Tr. 1380:17–1381:8 (Murray) (startup publishers can "buy a book or two, but in the main, I don't think they are a competitor"). In fact, even Dr. Snyder acknowledged that Astra is not a "major competitive constraint." Trial Tr. 2953:4–9 (Snyder).

### 7. Dr. Snyder's Analysis of Entry and Expansion Is Unpersuasive

191.    Defendants' expert attempted to create several analyses suggesting that entry and expansion are likely here. None are persuasive.

192.    Dr. Snyder testified that a group of publishers are "operating just below the 250,000 threshold" and "have the potential to move into the 250-plus category." Trial Tr. 2694:24–2695:2 (Snyder). But placing this evidence in context shows that this group is unlikely to meaningfully constrain the merged firm. Of the 21 publishers identified in Dr. Snyder's report who had won a book for an advance between $100,000 and $250,000, 75% have never won a book for more than $175,000, and only one has ever won a book for more than $225,000. Trial Tr. 3076:9–3077:8 (Hill).

193.    Second, Dr. Snyder collected data showing that a select group of non-Big Five publishers grew, to some extent, in the proposed market between 2019 and 2021. *See* Trial Tr. 1482:15–22 (Hill). But, as Dr. Hill explained, this growth was almost entirely offset by a decline by other non-Big Five publishers, leaving the collective market share of non-Big Five publishers essentially unchanged. Trial Tr. 1482:15–1483:17 (Hill); Trial Tr. 3082:5–3083:6 (Hill); PX-977 at 1; PX-967 at 1; PX-994 at 1. And, of course, none grew to the point where their share even approaches that of any of the Big Five. *See* PX-959 at 1. The fact that a few non-Big Five publishers grew a small amount, while others shrunk by a similar amount, evidences churn amongst the non-Big Five publishers but fails to show that significant expansion by the non-Big

Five is possible.  *See Anthem*, 236 F. Supp. 3d at 224 (rejecting Defendants' argument that growth by 32 small entrants showed entry was timely, likely, and sufficient, noting that only one had attained a double-digit market share, while others lost share).

194.    Similarly, Dr. Snyder testified that the number of publishers who have acquired anticipated top sellers has increased from 2019 to 2021.  Trial Tr. 2684:10–19 (Snyder).  But merely counting the number of firms in the market is rarely relevant to antitrust analysis without considering other measures of their competitive significance.  *Cf. H & R Block*, 833 F. Supp. 2d at 50 (stating that 10% of the market was "divided amongst a plethora of smaller companies").  Instead, as Dr. Hill explained, the market shares of non-Big Five publishers is more informative than their number.  Trial Tr. 3083:7–20 (Hill).  And those market shares, when aggregated, remained flat from 2019 to 2021.  PX-994 at 1.  Indeed, the competitive significance (here, average market share) of any given publisher within that group may actually have decreased if, in fact, the number of firms acquiring anticipated top sellers increased as Dr. Snyder alleged.  Trial Tr. 3083:7–20 (Hill).

195.    Finally, some of Dr. Snyder's testimony about expansion appears to reflect a misunderstanding of the record.  Dr. Snyder at first highlighted Chronicle as his most notable example of a small publisher that has expanded significantly; he testified that he thought that Chronicle has tripled its spending on advances in recent years.  Trial Tr. 2695:9–23 (Snyder) (referring to Chronicle); Trial Tr. 2945:10–18 (Snyder) (Chronicle is "moving forward . . . I think the evidence was that they were tripling advances."); Trial Tr. 2953:22–25 (Snyder) (similar); *see also* Trial Tr. at 2943:24–2955:9 (Snyder).  But Dr. Snyder later acknowledged that his testimony was based on a misunderstanding of the record.  In fact, his opinion was based on

deposition testimony from an executive from a different (and much smaller) publisher, Blackstone.  Trial Tr. 2953:18–2954:13 (Snyder).

196.    In addition, the argument that post-merger competition from the remaining Big Four will suffice to prevent the harm is inconsistent with the law.  Courts have enjoined mergers even where the merging parties are not the two only—or even the main two—competitors.  For example, in *Anthem*, the court enjoined a merger of a firm with a 40% share and a competitor with an 8% share based on the reasoning that the merger would eliminate a significant amount of head-to-head competition between the two firms.  *See Anthem*, 236 F. Supp. 3d at 208 (market shares); *see also id.* at 216–221 (unilateral effects analysis).  The fact that other strong competitors existed—including another competitor that was the "closest" competitor for at least one of the firms—was beside the point, because competition between the merging parties was significant.  *See id.* at 216–221.  In addition, as the court found, "reducing the number of national [competitors] from four to three is significant."  *Id.* at 220.

197.    Similarly, in *Swedish Match*, the court found that the existence of two remaining large competitors was not enough to prevent the harm from the merger because "a unilateral price increase . . . is likely after the acquisition because it will eliminate one of Swedish Match's primary direct competitors."  131 F. Supp. 2d at 169.  And several other cases have similarly enjoined mergers, despite the existence of continued competition from two or three large competitors, based on the conclusion that unilateral and/or coordinated effects are likely when a merger unites a firm with one of its most important rivals.  *See, e.g., Hackensack Meridian Health*, 30 F.4th at 172–174 (enjoining merger based on unilateral effects theory where merging parties had post-merger market share of 47% and at least two other non-party hospitals remained in the market); *Elders Grain,* 868 F.2d at 902–903, 905 (reducing number of competitors from

six to five "will make it easier for leading members of the industry to collude on price and output" ); *Hosp. Corp.*, 807 F.2d at 1384 (enjoining merger where, after the merger, the four largest firms would have held a combined market share of ~90%); *Tronox,* 332 F. Supp. 3d at 194–195, 207–210 (enjoining five-to-four merger).

### D.  Defendants' Purported Efficiencies Are Not Verifiable and Cannot Rebut the Presumption of Harm

198.    On July 8, 2022, the United States filed a Motion *in Limine* pursuant to Federal Rule of Evidence 702 to exclude testimony by Dr. Snyder regarding efficiencies.  Dkt. 97. During the July 25, 2022 argument on the motion, Defendants argued that the Court needed to hear evidence about the projection of synergies in a financial model on which Dr. Snyder based his testimony before making an evaluation of Defendants' efficiencies claim.  Final Pretrial Conference Tr. 47:23–48:14.  The Court instructed the parties to arrange the presentation of evidence during trial so that the projected synergies' verifiability could be considered and argued before hearing the totality of Dr. Snyder's expert testimony on efficiencies.  Final Pretrial Conference Tr. 60:22–61:4; Trial Tr. 2751:4–10.  The Court determined that it would be more efficient to proceed in this fashion because if Defendants were unable to meet their burden to show that the efficiencies were substantiated, verifiable, and verified under the Merger Guidelines, then it would be unnecessary to consider any of the other aspects of the efficiencies evidence.  Trial Tr. 2751:11–16.  After hearing the testimony of the financial model's author, PRH's Senior Vice President of M&A Manuel Sansigre, the Court found that Defendants failed to establish that the projected efficiencies relied upon by Dr. Snyder are substantiated, and failed to show that those projected efficiencies are reasonably verifiable by an independent party or that the projected efficiencies are, in fact, verified.  Trial Tr. 2749:13–2772:19.  The Court granted

the United States' Motion *in Limine* and excluded Defendants' efficiencies evidence.  Trial Tr. 2770:20–2771:4; Trial Tr. 2772:17–19.

### E. Literary Agents Cannot Counteract the Likely Anticompetitive Effects of the Proposed Merger

199.    The record does not support Defendants' assertion that the skill and power of agents will rebut the potential for harm from the merger.  Instead, the record is replete with evidence showing that agents will not have sufficient bargaining leverage to eliminate the harm that this merger likely will cause.  *See generally* Trial Tr. 1491:3–19 (Hill); *cf.* Trial Tr. 338:13–25 (King) (agents cannot maintain competition after the merger because "there are only so many shops").

### 1.  "Sophisticated Seller" Is No Defense

200.    It is no defense that some authors may be represented by sophisticated agents in negotiations.  As a legal matter, courts "have not considered the 'sophisticated [seller]' defense as itself independently adequate to rebut a prima facie case" and view "the economic argument for even partially rebutting a presumptive case, because a market is dominated by large [sellers]," as "weak."  *Chicago Bridge*, 534 F.3d at 440; *see also Anthem*, 236 F. Supp. 3d at 221; *cf. Phila. Nat'l Bank*, 374 U.S. at 370 (rejecting "the concept of 'countervailing power'" where defendants claimed that a merger would enable competition with other banks).

201.    The mere "presence of some large sophisticated [sellers]" is not sufficient to defend against anticompetitive harm.  *Cardinal Health*, 12 F. Supp. 2d at 58 ("courts have not yet found that power buyers alone enable a defendant to overcome the government's presumption of anti-competitiveness" in Section 7 cases).  Defendants must show not only the existence of powerful authors or agents, but also that these authors or agents can "counteract" anticompetitive harms to the market.  *See Anthem*, 236 F. Supp. 3d at 221.

202.    In *Anthem*, the court rejected the defendants' argument that some customers could push back against anticompetitive harm, even though those customers were "typically sophisticated companies with substantial resources," which "benefit[ed] from the assistance and advice of brokers and consultants" (similar to the roles agents play for authors) during the negotiation process. *Anthem*, 236 F. Supp. 3d at 221. The evidence in this case likewise indicates that the "loss of one competitor" would "alter[]" the "negotiating dynamic, even with strong advocates on the other side." *Id.*

203.    As in *Anthem*, the "loss of leverage" authors and agents will suffer as a result of the merger "undermines the defense contention that [these authors and agents] will be able to . . . counteract the anticompetitive effects of the merger." *Id.* There is limited evidence that individual authors and agents possess sufficient market power to counter harm resulting from the combined entity at all—much less that these authors and agents can offset harms to competition as a whole. An example demonstrates the real power dynamic at play: as discussed more fully below *infra* V.E.6, even a high-profile agent such as Mr. Wylie was unable to withstand Random House's market power. After attempting to publish e-books with Amazon through an endeavor called "Odyssey Editions," Random House announced in *The New York Times* it would not do business with Mr. Wylie. Trial Tr. 2103:6–9 (Wylie). As a result, Mr. Wylie met with Mr. Dohle. Trial Tr. 2103:14–18 (Wylie). After this meeting, Mr. Wylie pulled his Odyssey Editions books from Amazon, and Random House received the digital rights for the books for which it already had the print rights. Trial Tr. 2104:5–2104:12 (Wylie).

## 2.    The Agency Landscape Is Fragmented

204.    The fragmentation of the agency landscape also undercuts Defendants' optimistic prediction of agent power. The cases involving a "power buyer" defense usually involve an

industry where a small number of buyers have a large market share. *See Cardinal Health*, 12 F. Supp. 2d at 59 (discussing cases). That is not the case here. To the contrary, the literary agency segment is unconcentrated. *See* PX-151 at 5 ("Agent landscape fragmented with a few big agencies, but large number of small players. . . ."). This fact undercuts Defendants' claim that agents' bargaining leverage will suffice to prevent the harm from the merger. The experience of the agents Defendants called to the stand represent examples of the fragmented agent landscape. They accounted for a very small proportion of the approximately 4,800 book contracts that would occur over a 4-year period given that there are approximately 1,200 anticipated top selling books acquired per year. *See* PX-838 at 2–4 (Ross listed approximately ▮ deals during 2018–2021); PX-749 at 1–4 (Cheney listed ▮ deals during 2018–2021); PX-857 at 16–18 (Wylie listed ▮ deals during 2018–2021).

### 3. Margin and Bargaining Evidence Shows That Agents' Leverage Is Limited

205.    The record also shows that, even in the pre-merger world, agents' leverage is limited. As Dr. Hill explained, publishers' margins are fairly significant. Trial Tr. 1491:20–1492:8 (Hill). If agents held all of the bargaining leverage, one would expect that agents would capture almost all of the publishers' margins. Trial Tr. 1491:20–1492:8 (Hill). The fact that this does not happen undermines Defendants' prediction that, post-merger, agents will suddenly be empowered to exercise more influence and power than they have historically. Indeed, even Dr. Snyder agreed that literary agents are not omnipotent, explaining that agents would not be able to overcome harm to authors from a hypothetical monopsonist publisher. Trial Tr. 2933:24–2934:7 (Snyder).

206.    Relatedly, publishers often acquire books for less than they were willing to pay. *See* Trial Tr. 2006:19–2007:3 (Kim); Trial Tr. 1491:20–1492:8 (Hill); Trial Tr. 1844:19–22

(Bergstrom); Trial Tr. 2678:13–15 (Snyder) ("There are situations, yes, where an imprint gets a book for less than the maximum willingness to pay."); *see also* Trial Tr. 1758:1–13 (Walsh) (agents do not know if obtained what publisher was willing to pay).  For example, in one auction, PRH (Putnam) employees asked for clearance to bid up to $350,000 but ultimately won the book for $275,000.  Trial Tr. 2009:3–2010:3 (Kim); PX-42 at 1, 3; *see also* Trial Tr. 1492:9–1493:3 (Hill) (summarizing example where publisher was approved to offer $500,000 but acquired the title for $350,000).  This, too, suggests that there are limits to agents' power.  If agents held all of the cards, they would always or almost always push publishers to spend the maximum amount of money that they are willing to spend.  *See* Trial Tr. 1492:5-8 (Hill).

207.    Agent witnesses and Dr. Snyder also concede that agents cannot force editors to bid or increase their maximum bid.  *See* Trial Tr. 2934:6–2935:10 (Snyder); Trial Tr. 1875:17–19 (Bergstrom). And Ayesha Pande testified that there is nothing she can do to control the number of editors who express interest in a book, how many editors make an offer to acquire a book, or how much an editor offers to acquire a book.  Trial Tr. 251:12–20 (Pande); *see also* Trial Tr. 1826:21–24 (Walsh) (agreeing that agents can't control what a publisher chooses to bid on a book).

208.    For PRH in particular, its outsized presence requires literary agents to deal with its editors.  Ayesha Pande testified that she "always" submits books to more than one editor at PRH because they have so many imprints.  Trial Tr. 251:12–20 (Pande).  Ms. Pande testified that she would not be able to discipline PRH by refusing to submit projects to any of their editors because "I don't believe I would be doing my clients any favors by not submitting to Penguin Random House when on average they make up approximately 30 or so percent of my

submissions.  So leaving them out would really shrink the possibilities."  Trial Tr. 250:10–251:3 (Pande).

### 4.   Agents Do Not Have the Leverage to Hold Back Audio Rights

209.    Publisher treatment of audio rights over time provides an instructive example of relative bargaining power between large publishers and literary agents.  Agents would often prefer to sell print rights (*i.e.*, the rights to publish a print book) to one publisher and audio rights to another publisher.  Ayesha Pande explained that she would always prefer to sell audio rights separately from print rights because if she sells both to the same publisher, "any revenues from those [audio] rights will only come to my client after the entire advance earns out."  Trial Tr. 257:21–258:2 (Pande).  But if an agent can separately sell audio rights to an audio publisher, the agent can "provide a separate income stream directly to" the client.  Trial Tr. 258:3–6 (Pande); *see also* Trial Tr. 622:20–22 (Karp) (agents sometimes ask S&S to buy a book without also acquiring audio rights).  PRH and S&S both have a policy of always, or almost always, refusing to acquire a book without also acquiring audio rights.  Trial Tr. 622:17–19 (Karp); PX-328 at 1 ("For at least the last five years, but more likely the last ten years, we have bought everything with Audio."); Trial Tr. 1876:5–6 (Bergstrom).  Agents do not have the leverage to force the merging parties to abandon this position in favor of authors.  To the contrary, as Mr. Tart explained in an internal email, PRH "turned down big book after big book until agents realized we would not play in an auction without Audio.  And now they always sell us audio."  PX-328 at 1–2.  PRH's unwillingness to bid for titles unless audio rights are included in the sale shows that PRH, not agents, have leverage over these valuable rights.

210.    In a recent auction over a highly-sought after book, ███████████ █████████████████████████████,[14] an agent's attempt to hold back audio rights from the bundle of rights offered to publishers quickly failed.  An S&S editor described the project as "a book we would all love to publish, but I hope we will walk away if audio rights are not part of the deal."  PX-652 at 2.  Without audio rights, S&S declined to bid, with one S&S executive commenting: "It will be very interesting to see whether PRH, Hachette, Harper or Macmillan participate.  MY understanding is that they too have the 'no audio, no deal' rule."  PX-652 at 2.  The strategy to hold to the industry line succeeded.  After initially excluding the audio rights from the auction, the agent for this title restarted the auction with audio rights included.  *See* PX-568 at 1–2; Trial Tr. 625:21–626:6 (Karp); *see also* PX-320 at 1 (PRH editor suggesting that the agent probably restructured the auction because everyone bid on audio).  Both S&S and PRH bid on the project, with PRH making the winning bid of ██████  PX-944-B at 1.

## 5.    Agents Could Not Prevent Disadvantageous Shifts in Author Payout Structures

211.    Just as with audio rights, agents have not had the leverage to prevent publishers from paying authors in smaller increments over longer periods of time.  Authors used to receive advances in two installments—half on signing of the contract and half on the delivery and acceptance of the book (*i.e.*, before it is published).  Trial Tr. 1828:19–1829:1 (Walsh).  Over time, publishers worsened the deal they offered their authors.  First, they changed to a three-payment structure, and now to a four-payment (quarters) structure, under which the publisher makes the fourth payment a year after the book is published.  Trial Tr. 1829:2–18 (Walsh); *see*

---

[14] Book 44.  U.S. Demonstrative 9 at 1.

*also* Trial Tr. 254:25–255:3 (Pande); Trial Tr. 256:22–25 (Pande); PX-862 at 7 (describing

PRH's adult books payout guidelines). Ayesha Pande explained that now it can take three to

four years for an author to receive her entire advance. Trial Tr. 255:15–18 (Pande). ███

█████████████████████████████████████████████████████████████

███████████████████████████ Despite that, she could not recall a

specific example where she was able to negotiate a payout with PRH that was not in quarters.

PX-2007 at 32 (Fletcher Dep. 74:9–12, 14).

### 6.    Agents Could Not Improve Digital Rights – Odyssey Editions

212.    Finally, the history of Mr. Wylie's failed "Odyssey Editions" project further

confirms the limitations on agents' leverage. In 2010, Mr. Wylie tried to convince Random

House to raise the e-book royalty rate from 25%. Trial Tr. 2101:21–2102:9 (Wylie). He failed.

Trial Tr. 2102:10–12 (Wylie). Mr. Wylie then turned to Amazon with his Odyssey Editions

project, in which Amazon would be the exclusive e-book distributor of twenty books; Random

House held the print rights for many of these titles. Trial Tr. 2101:18–2103:5 (Wylie). Under

this proposed plan, authors would have received 100% of the digital royalties for Odyssey

Edition e-books (less a commission paid to the Wylie Agency). Trial Tr. 2103:2–5 (Wylie). In

response to the launch of Odyssey Editions, Random House announced in *The New York Times*

that it would not do business with Mr. Wylie, blackballing him. Trial Tr. 2103:6–9 (Wylie). As

a result, Mr. Wylie met with Mr. Dohle. Trial Tr. 2103:14–18 (Wylie). After this meeting, Mr.

Wylie pulled his Odyssey Editions books from Amazon, and Random House obtained the digital

rights for the books for which it already had the print rights. Trial Tr. 2104:5–12 (Wylie).

Today, Penguin Random House continues to offer a digital royalty rate of only 25%—a rate that

Mr. Wylie described as unfair. Trial Tr. 2104:16–2105:5 (Wylie).

**F.   Intra-Publisher Competition Does Not Rebut the Presumption of the Harm from the Merger**

**1.   Intra-Firm Competition Is Legally Irrelevant**

213.    The law assumes that a corporation's wholly-owned subsidiaries and divisions pursue "the common interests of the whole" and categorically rejects arguments that individual units of a corporation are "separate economic actors, pursuing separate economic interests." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769–70 (1984).  Rather, a corporation and its division or wholly-owned subsidiary "have a complete unity of interest.  Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one."  *Id.* at 771; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 964b (5th ed. 2022) ("Antitrust generally presumes that a firm maximizes its profits in the environment in which it finds itself . . . .").  "They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests."  *Copperweld*, 467 U.S. at 771–772.

214.    Defendants cite no case where a Court has approved a merger based on a claim that defendants permit its subsidiaries to compete with each other.  Indeed, courts have rejected such commitments as potential remedies in merger cases.  *See, e.g., St. Alphonsus Med. Ctr. v. St. Luke's Health Sys.*, 778 F.3d 775, 793 (9th Cir. 2015) (holding that district court did not abuse discretion when choosing a divestiture remedy instead of defendants' proposal to establish "separate bargaining units to negotiate with insurers"); *Promedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 572–73 (6th Cir. 2014) (discussing the FTC's disfavor towards behavioral or conduct remedies; affirming FTC's divestitures; rejecting the merging parties' proposal to form separate negotiating teams for each merging hospital to negotiate with insurers).  Even if intra-publisher

competitive bidding were relevant, it is insufficient to counteract the presumption because it is: (1) revocable or alterable at any time for any reason; and (2) predicated upon a number of operational and logistical choices, discussed below, that only PRH controls. There would be no legal or factual impediment to changing, sidestepping, ignoring, or revoking the promise and so the Court cannot assume that any such bidding, even if relevant, would continue or be genuine.

### 2. Even if Intra-Firm Competition Was Legally Relevant, Defendants Cannot Show That It Will Eliminate the Harm Caused by the Merger

215. In addition, as a factual matter, Defendants cannot show that intra-publisher competition will eliminate the harm caused by the merger. While some imprints are allowed to bid separately in some situations, this competition will not suffice to prevent the harm the merger may likely cause, for a variety of reasons.

216. A publisher has an economic incentive to limit competition among its imprints that would drive up the publisher's costs. Trial Tr. 1494:24–1495:14 (Hill) (discussing the deposition testimony of PRH's President of Crown Publishing Group; "because ultimately we are the same company so, frankly, we would just be driving up the price of an auction amongst ourselves. So this is summarizing the incentive to try to limit competition when the competition is just down to Penguin Random House imprints."); *see generally* Trial Tr. 1494:24–1495:14 (Hill) (discussing publisher incentives to avoid competitive intra-publisher competition).

217. If a PRH imprint loses a book to another PRH imprint, PRH still retains any profit the book earns. Trial Tr. 3069:21–3070:7 (Hill). But if a PRH imprint loses a book to an external publisher, PRH loses the entire profit for that book. Trial Tr. 3069:21–3070:7 (Hill). That gives PRH imprints an incentive to compete less aggressively with each other than with external publishers. *See* Trial Tr. 3068:21–3070:7 (Hill).

218.    Consistent with these incentives, publishers limit competition among imprints in several ways:

### a. Publishers Place Formal Limits on Intra-Publisher Bidding

219.    First, publishers place formal limits on the extent to which imprints can bid independently.  S&S and HarperCollins do not allow imprints to bid separately for the same book; they all bid together.  *See* Trial Tr. 463:11–13 (Karp); PX-2002 at 75–76 (Stehlik Dep. 169:24–170:2, 170:4–6, 170:8–20).  By contrast, Hachette allows its imprints to bid independently, but only when a non-Hachette publisher is also bidding; when the only remaining imprints in an auction are from Hachette, they do not bid independently.  Trial Tr. 239:11–23 (Pietsch).

220.    PRH follows a similar policy to Hachette: it allows imprints from different divisions—the Penguin, Random House, and Knopf Doubleday divisions—to bid independently when other publishers are also competing, but not when they are the only remaining bidders.  *See* PX-332 at 1–2; Trial Tr. 943:3–18 (Tart); Trial Tr. 2331:21–25 (McIntosh).[15]  Once they are the only remaining bidders, the bidding stops and does not replicate the bidding that takes place between independently competing publishers.

### b. PRH's Imprints Coordinate Their Bids to Avoid Real Competition

221.    Second, internal coordination among imprints—which is expressly contemplated and permitted pursuant to *Copperweld*—can limit competition between them even in situations where PRH's claimed internal competition policy permits them to continue bidding.  A board

---

[15] In addition, PRH has a "rule" where, during option negotiations, if an existing PRH author rejects an offer on an option for a new book from one PRH division, no other PRH division may make a higher offer than the first one unless the book goes to a competitive auction that includes non-PRH bidders.  *See* PX-54 at 1; *see also* Trial Tr. 948:11–18 (Tart).

presentation prepared by Ms. McIntosh makes this point explicitly, noting that PRH had

"increased background coordination in auctions to . . . avoid internal up-bidding."  PX-411 at 4;

Trial Tr. 2372:17–2373:8 (McIntosh).

222.    Consistent with Ms. McIntosh's presentation, the record includes several

examples of intra-PRH coordination.  For example, when PRH author ███████ sought bids

from multiple PRH divisions—including Knopf Doubleday and Random House (which under

PRH's claimed internal policies are supposed to bid separately)—Ms. McIntosh asked them to

"coordinate," adding that PRH "shouldn't be forced into bidding against each other for existing

authors."  PX-107 at 1.  One of her direct reports reached out to both divisions and ensured that

they followed Ms. McIntosh's instructions, noting: "We are coordinated.  Bill [Random House]

and Kara [Knopf Doubleday] will agree to a number and both offer same."  PX-107 at 1; *see also*

Trial Tr. 2373:25–2376:6 (McIntosh).  Similarly, in another situation, when PRH thought it was

the "main driver of value" in an auction, Knopf Doubleday and Crown (which at that time was

an independent PRH division) "agree[d] to move up slowly."  PX-336 at 2; *see also* Trial Tr.

1051:12–1054:21 (Tart) (describing bidding for the book discussed in PX-336 and agreeing that

PRH divisions can coordinate on bids).[16]  This would constitute price-fixing if done by separate

firms.  Because PRH divisions are all owned by one company, however, such conduct is legal.

But it undercuts the argument that imprints amount to independent competitors.[17]

_____

[16]  For additional evidence of intra-PRH coordination, *see* PX-116 at 1 ("Wondering if
we should advise KDD to go a bit lower in round 1?  I worry that if they go in at $600k each, it'll
go for more than $750k per book."); PX-121 at 1 ("[B]oth RH and KDD want to go up to $1.6m
+ bonuses in round 2 (coordinated in this case)"); PX-421 at 1 (top three offers were from PRH;
"Glad we didn't go higher (this one definitely benefited from the coordination!"); Trial Tr.
3068:13–3069:20 (Hill).

[17]  Dr. Snyder's apparent unfamiliarity with this evidence, *see* Trial Tr. 3002:10–3004:12
(Snyder), undermines his suggestion that imprint competition would mitigate the merger's

### c. Publishers Take Additional Steps to Avoid Intra-Publisher Competition

223.    Third, publishers can also take other steps to reduce internal publisher competition, even when they allow their imprints to bid separately.  They can, for example, instruct imprints to focus on acquiring different types of books, reduce the title count or restrict acquisition budgets of particular imprints, fire editors, or just informally instruct the leaders of imprints not to bid too aggressively against each other.  *See* DX-71 at 2 (Karp tells S&S publishers "Collegiality matters more than internal competition.  We will thank and honor editors who defer to more enthusiastic colleagues . . . .  Try to bail out on submissions in which there are more than two imprints in the building pursuing the project . . . .");

224.    The most notable example of this relates to PRH's internal merger of the Random House and Crown divisions.  Prior to that internal reorganization, Crown and Ballantine Bantam Dell (which is part of the Random House division) had both published fiction and non-fiction books.  After the merger, however, PRH instructed Ballantine Bantam Dell to focus on fiction and told Crown to focus on non-fiction.  PX-241 at 2–3.  According to an internal PRH analysis, this would result in "less internal competition" even though (at the time) Ballantine Bantam Dell and Crown were allowed to continue to bid separately.  PX-241 at 3.

---

anticompetitive effects.  At first, Dr. Snyder suggested that Ms. McIntosh's efforts to limit imprint competition wouldn't "materially affect the extent of imprint competition."  Trial Tr. 3001:25–3002:6 (Snyder).  He then stated that coordination across imprints in best-bid auctions "would be a very sharp departure" from current practice, Trial Tr. 3003:25–3004:1 (Snyder), despite evidence that such coordination occurs in best-bid auctions today, Trial Tr. 3069:6–20 (Hill).  Ultimately, Dr. Snyder conceded that PRH's current efforts to coordinate bids "could have an effect in some situations, based on what I'm hearing this morning."  Trial Tr. 3004:11–12 (Snyder).

**d. Imprint "Competition" Does Not Likely Lead to Increased Author Compensation**

225.    Whatever imprint competition that exists after publishers' limitations likely does not generate higher author compensation.  Dr. Hill testified that "[i]f there is a tremendous amount of competition because of the large number of imprints, we'd expect to see very low margins."  Trial Tr. 3100:25–3101:2 (Hill).  Yet PRH earns a healthy margin, Trial Tr. 781:3–5 (Dohle); Trial Tr. 1492:2–3 (Hill), which suggests that competition among the dozens of PRH imprints is not equivalent to competition among independent bidders and does not materially increase author compensation.

226.    Similarly, Mr. Karp, who has worked at S&S, Hachette, and Random House, *see* Trial Tr. 415:2–11 (Karp), testified that intra-firm competition rarely drives up the advance for a book.  Trial Tr. 463:22–464:6 (Karp).  He further testified, "I don't believe that internal competition has any effect on what we ultimately offer."  Trial Tr. 600:5–7 (Karp).  For all these reasons, Defendants cannot show that intra-firm competition will meaningfully mitigate the harm caused by the merger.

**G. Mr. Dohle's Unenforceable Letter Does Not Rebut the Presumption**

**1. Promises to Not Use Acquired Market Power Are Legally Insufficient**

227.    A revocable behavioral promise cannot rebut a prima facie case.  The Clayton Act prohibits attaining market power by acquisition without requiring a specific showing that the dominant merged firm intends to exercise that market power.  *See Phila. Nat'l Bank*, 374 U.S. at 362–63; *Hosp. Corp.*, 807 F.2d at 1389 (proof of higher prices is not required); *see also Heinz*, 246 F.3d at 719.

228.    Courts have consistently rejected promises by merging parties not to exercise their acquired market power in merger cases such as this.  *See St. Luke's Health Sys.,* 788 F.3d at

793; *ProMedica Health Sys.,* 749 F.3d at 573; *H & R Block*, 833 F. Supp. 2d at 82 ("While the Court has no reason to doubt that defendants would honor their promise [to maintain the acquired firm's current prices for three years post-merger], this type of guarantee cannot rebut a likelihood of anticompetitive effects in this case."); *Cardinal Health*, 12 F. Supp. 2d at 64. When a corporation states an intention to maintain an acquired entity as separate and permit them to continue to function in the future as they had been doing, "[t]here can be little, if any, reliance upon the statement in the face of well-known tendencies of human conduct." *Pennzoil Co.*, 252 F. Supp. at 984. Further, an action that a defendant takes during the pendency of an investigation into their acquisition should be viewed with skepticism, especially when it may have been made to improve their litigating position. *Cf. Hosp. Corp.*, 807 F.2d at 1384 ("Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight."). The fact that Defendants are willing to make such a promise "strongly supports the fears" of anticompetitive effects. *Cardinal Health*, 12 F. Supp. 2d at 67.

229.     Even if viewed as a self-help remedy for the anticompetitive effects of the merger, the announced bidding policy is not the type of unilateral remedy that courts might consider, as it does not change or affect the acquisition at issue. *See, e.g., FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 45–46 (D.D.C. 2002) (finding that an amended acquisition agreement that "supercede[d] and nullifie[d]" the original merger agreement "becomes the new agreement that the Court must evaluate in deciding whether an injunction should be issued.").

### 2.    Mr. Dohle's Unenforceable Letter Fails to Rebut or Offset the Harm from Defendants' Merger

230.     The factual record in this case supports the conclusion that Mr. Dohle's unilateral, revocable promise should be given no weight. Mr. Dohle's letter is neither binding nor legally enforceable. *See, e.g.*, Trial Tr. 770:5–8 (Dohle). If PRH violates the terms of the letter, agents

and authors would have no formal recourse or enforcement mechanism.  In addition, Mr. Dohle, his successor, or his superiors could rescind or modify the promise at any time for any reason, including self-serving ones or rationales based on demands of corporate leadership and PRH's owners.  Trial Tr. 770:13–21 (Dohle).

231.    The letter also has limited application.  By its terms, it applies only to auctions, DX-236 at 1; Trial Tr. 771:11–25 (Dohle)—a puzzling omission given that Defendants frequently argue in other aspects of this litigation that many or most books are acquired outside of auctions.

232.    In addition, the letter's promise can be sidestepped.  PRH can take a variety of measures to reduce intra-firm competition without violating the promise even when permitting S&S legacy imprints to bid independently.  *See supra* V.F.2.b.  For example, Mr. Dohle's letter does not stop PRH from simply instructing PRH and/or S&S imprints to refocus on categories of books that would reduce potential competition with their sister imprints (as it did after the Crown/Random House merger).  *See* Trial Tr. 767:24–768:19 (Dohle); *supra* V.F.2.c.  Nor does it stop PRH from reducing competition through a variety of other means, like closing imprints, reducing title count, or just informally discouraging intense intra-firm competition.  *See* Trial Tr. 765:24–766:2 (Dohle); Trial Tr. 767:24–768:19 (Dohle).  And PRH's history of allowing coordination among PRH imprints—even when those imprints are supposed to bid independently—also casts doubt on the effectiveness of Mr. Dohle's promise.[18]  *See supra* V.F.2.b.

---

[18] Perhaps for these reasons, when asked whether the bidding letter would eliminate the harm from the merger, Mr. King responded: "[Y]ou might as well say that you're going to have a husband and wife bidding against each other for the same house."  Trial Tr. 339:11–340:2 (King); *see also* PX-2000 at 15 (Zacharius Dep. 66:1–23).

233.     Defendants' promise is further suspect because it initially arose at the end of the government's pre-Complaint investigation and is related to the current litigation.  While Defendants initially tried to suggest otherwise, *see* Dkt. 104 at 2 (Defendants' Opposition to United States' Motion *In Limine* To Preclude Evidence of Penguin Random House's Announced Bidding Policy) ("PRH announced the policy . . . without even knowing whether the merger would be challenged."), Defendants' explanation is not credible.  An earlier version of the promise was announced less than a month before the United States filed this lawsuit, during a period of time when PRH and S&S were working to convince the government not to file its lawsuit.  *See* Dkt. 104 at 3–4 (Defendants' Opposition to United States' Motion *In Limine* To Preclude Evidence of Penguin Random House's Announced Bidding Policy).  Mr. Dohle's letter itself was released during the pending litigation.  DX-236 at 1.  Moreover, Mr. Dohle conceded that he made the promise because agents were concerned about the proposed merger.  Trial Tr. 770:1–4 (Dohle).  Accordingly, skepticism of the promise is appropriate.  *Cf. Hosp. Corp.*, 807 F.2d at 1384 ("Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight.").

## H.  Defendants' Intent Is Irrelevant

234.     Defendants' assertion that they do not intend to lower author compensation if this merger is consummated is legally irrelevant.  The United States is not required to prove bad intent, so a counterargument suggesting salutary intent does not advance analysis of this proposed merger.

235.     "It is not requisite to the proof of a violation of § 7 to show that restraint or monopoly was intended."  *E. I. du Pont de Nemours*, 353 U.S. at 607 *accord United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *11 (N.D. Cal. Jan. 8, 2014) ("[I]ntent is not an element

of a Section 7 violation"). Rather, Section 7 prohibits any acquisition whose "*effect* . . . may be substantially to lessen competition." 15 U.S.C. § 18 (emphasis added). Thus, a proposed acquisition that, as here, "is reasonably likely to cause anticompetitive effects" is unlawful, *H & R Block*, 833 F. Supp. 2d at 49 (quotation marks omitted), irrespective of the parties' intent.

## I. Defendants' Attempt to Gain Market Share Through the Merger Does Not Rebut—and Actually Reinforces—the Presumption Against the Merger

236. Defendants seek to justify their merger by proffering that they are merely seeking to gain market share. Trial Tr. 741:17–23 (Dohle); Trial Tr. 876:25–877:2 (Dohle) ("We are basically paying $2.2 billion to actually replace our lost market share in this case."). But the structural presumption exists because acquiring market share of the size of PRH's proposed acquisition of S&S is likely to reduce competition. *See Phila. Nat'l Bank*, 374 U.S. at 363 (describing mergers "which produce[] a firm controlling an undue percentage share of the relevant market" as "inherently suspect" under Section 7).

237. The law contemplates that companies grow by competing in the market and winning additional business through the provision of superior goods and services. As the Supreme Court explained, "one premise of an antimerger statute such as § 7 is that corporate growth by internal expansion is socially preferable to growth by acquisition." *Phila. Nat'l Bank*, 374 U.S. at 370. This preference protects consumers from anticompetitive harm because "expansion through merger," as compared to expansion via internal growth, "is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output." *Brown Shoe,* 370 U.S. at 345 n.72; s*ee also Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 975–76 (8th Cir. 1968) ("As a general proposition internal expansion is preferable to growth by merger or purchase"). Bertelsmann's strategy to "refill [its] market share" after losing market share to its competitors therefore underscores the dangers of the proposed merger. Rather than

competing with its rivals to gain market share, PRH has chosen to buy its close competitor and eliminate competition that benefits authors. *See* Trial Tr. 741:17–742:4 (Dohle); Trial Tr. 802:12–18 (Dohle). That rationale is not a valid defense.

### J. The Effects of the 2013 Merger Do Not Rebut the Presumption

#### 1. Lack of Provable Effects from an Earlier Merger Does Not Rebut a Presumption of Harm for This Merger

238. Defendants have suggested that the 2013 Penguin/Random House merger did not have an effect on competition for books and therefore rebuts the allegations of anticompetitive effects for this merger. But that argument is unavailing. First, that merger did not result in the concentration increase the present merger will cause. At the time, the Penguin/Random House merger reduced the Big Six down to the Big Five. Additionally, to adopt a policy that a failure to find harm from a prior merger would rebut the presumption of harm would simply mean that a merger in a consolidating industry could not be stopped until *after* at least one merger in the industry unambiguously showed harm—which is too late. Such a policy would fly directly in the face of the intent of Congress "to arrest anticompetitive tendencies in their 'incipiency.'" *Phila. Nat'l Bank*, 374 U.S. at 362 (quoting *Brown Shoe*, 370 U.S. at 317).

#### 2. The Penguin/Random House Merger May Have Harmed Authors

239. Contrary to Defendants' arguments about the 2013 merger, there is ample evidence suggesting that it may have harmed authors. First, there is testimony from those in the industry that experienced harm from the Penguin/Random House merger. Agent Christy Fletcher testified that the merger harmed her authors because Penguin and Random House no longer bid against each other. ██████████████████████████████ PX-2007 at 33–34 (Fletcher Dep. 76:18–77:10); PX-2007 at 40–42 (Fletcher Dep. 87:12–89:19); PX-2007 at 43–44 (Fletcher Dep. 90:13–91:20); PX-2007 at 57–58 (Fletcher Dep. 119:24–120:5). Similarly,

agent Ayesha Pande testified that the merger led to editorial layoffs and made it "more challenging to sell [her] clients' books because there was less choice." Trial Tr. 293:1–294:3 (Pande).

240.    Second, it should be undisputed that PRH paid lower average advances for anticipated top sellers after the 2013 merger. Dr. Hill, Dr. Snyder, and PRH management all came to that same conclusion. *See* Trial Tr. 3060:4–16 (Hill); Trial Tr. 3009:25–3010:14 (Snyder) (acknowledging PRH document showing PRH's advance payments decreased even though its net retail sales increased);

241.    Third, Dr. Hill studied the data and found that the 2013 merger led to a statistically significant reduction in advances for anticipated top-selling books. Trial Tr. 3066:2–10 (Hill). Dr. Hill's difference-in-difference analysis compares the change in advances for anticipated top sellers to the change in advances for other books before and after the 2013 merger of Penguin and Random House. *See* PX-966 at 1. By statistically comparing these two groups, Dr. Hill estimates that advances for authors of anticipated top sellers fell by approximately 15% relative to advances for others books after the merger. Trial Tr. 3065:16–25 (Hill). Dr. Hill testified this analysis is indicative of a negative effect from the 2013 merger, but not dispositive, due to the quality of data available for this historical time period. Trial Tr. 3066:11–3067:1 (Hill).

242.    Finally, even though Dr. Snyder stated that "[t]he number one thing as an economist that I would be interested in seeing is what effect [the 2013 merger] had on output," Trial Tr. 2638:25–2639:14 (Snyder), he never analyzed the Penguin/Random House merger's effect on output in his expert reports. Trial Tr. 3059:21–3060:3 (Hill). And Dr. Snyder ignored

evidence that PRH's output had actually decreased after the merger. *See* Trial Tr. 218:13–17 (Pietsch) (observing a 1,000-title reduction in a PRH division's title count following the 2013 merger). To the extent that Dr. Snyder's late argument that PRH's output increased was correct, he failed to compare PRH's putative change in output to the rest of the market. Because Defendants claim that PRH's retail market share declined after the 2013 merger, one can infer that the putative increase in output suggested by Dr. Snyder happened as the rest of the retail book market (including the sale of coloring and other books) was growing even faster, underscoring that PRH behaved differently than the rest of the market after the 2013 merger. Consequently, the disputed results of the 2013 merger cannot rebut the presumption.

## VI.    THE EVIDENCE OF ANTICOMPETITIVE EFFECTS IS SUFFICIENT TO BLOCK THE PROPOSED TRANSACTION

243.    Even if Defendants are able to rebut the presumption that the proposed merger is unlawful, Plaintiff has introduced sufficient additional evidence of both unilateral and coordinated anticompetitive effects to meet the ultimate burden of persuasion.

244.    If Defendants rebut the presumption, the Court next examines the evidence to determine whether harm is reasonably probable. *Heinz*, 246 F.3d at 715. Defendants' own statements and documents and the economic evidence show that the parties compete fiercely for the rights to anticipated top selling books, and that eliminating direct competition between them is likely to harm authors. *See id.* at 717 ("[T]he FTC's market concentration statistics are bolstered by the indisputable fact that the merger will eliminate competition between the two merging parties."); *Sysco*, 113 F. Supp. 3d at 65 ("Evidence of probable unilateral effects strengthens the FTC's *prima facie* case that the merger will lessen competition in the national customer market.").

245.    Moreover, PRH's own CEO has admitted that its incentives to grow (*i.e.,* compete more vigorously for market share) will change if is allowed to acquire S&S. Today, Mr. Dohle is focused on the importance of growing PRH's market share.  Trial Tr. 797:19–25 (Dohle).  To do so, he encourages PRH editors to be more aggressive in acquiring books by increasing their appetite for risk.  Trial Tr. 799:22–800:5 (Dohle); Trial Tr. 801:8–20 (Dohle) (desiring PRH now pay "much more" to win books).  But Mr. Dohle also recognized that an alternative way to grow is to acquire a company with sizable share—a company like S&S, Trial Tr. 801:21–23 (Dohle)— and conceded that once PRH buys S&S *it will not have as strong a need to grow its share.*  Trial Tr. 802:11–18 (Dohle).  That is, based on the PRH CEO's own description of what it would take to acquire more books and how acquiring market share would generate the same effect, it is clear that after the merger PRH will no longer need to be as aggressive or increase its appetite for risk as it competes with remaining publishers for books.  This predictably harms authors.

### A. Applicable Legal Standards for Unilateral Effects

246.    Mergers necessarily eliminate the competition between the merging companies. *See Heinz*, 246 F.3d at 717.  The inevitable loss of that competition supports the finding that the merger may result in a substantial lessening of competition.  *See Sysco*, 113 F. Supp. 3d at 61–62 ("Courts have recognized that a merger that eliminates head-to-head competition between close competitors can result in a substantial lessening of competition.") (citing cases and Merger Guidelines § 6); *Aetna*, 240 F. Supp. 3d at 9 ("direct evidence of head-to-head competition" supported presumptive unlawfulness of the merger).

247.    This is particularly true in a "highly concentrated market," where the loss of "significant head-to-head competition" is "an important consideration when analyzing possible anti-competitive effects." *Staples I*, 970 F. Supp. at 1083.

115

248.    In particular, a merger between direct competitors that eliminates head-to-head competition may lead to "unilateral anticompetitive effects," meaning "the acquiring firm will have the incentive to raise prices or reduce quality after the acquisition, independent of competitive responses from other firms." *Aetna*, 240 F. Supp. 3d at 43 (quoting *H & R Block*, 833 F. Supp. 2d at 81).

249.    Unilateral effects commonly arise in markets where "buyers and sellers negotiate to determine prices and other terms of trade" via auctions or other negotiation processes. Merger Guidelines § 6.2. "In such a market, '[sellers] commonly negotiate with more than one [buyer], and may play [buyers] off against one another.'" *Sysco*, 113 F. Supp. 3d at 62 (quoting Merger Guidelines § 6.2). "If two competitors merge, [sellers] will be prevented from playing the [buyers] off one another in negotiations." *Id.* "This alone can significantly enhance the ability and incentive of the merged entity to obtain a result more favorable to it, and less favorable to the [seller], than the merging firms would have offered separately absent the merger." Merger Guidelines § 6.2.

250.    A merger may cause harmful unilateral effects even if the merging firms are not the two largest in the market or each other's closest competitors. *Sysco*, 113 F. Supp. 3d at 62 ("[T]he merging parties need not be the top two firms to cause unilateral effects."); *see also Aetna*, 240 F. Supp. 3d at 43; *Anthem*, 236 F. Supp. 3d at 216. In *H & R Block*, for example, a nonparty to the proposed merger had a market share of over 60% and was the closest competitor to both merging companies, but the court nonetheless enjoined the merger. 833 F. Supp. 2d at 44, 83–84. Similarly, in *Heinz*, the D.C. Circuit enjoined the merger of two baby food manufacturers even though a third company was the largest and closest competitor of both defendants. 246 F.3d at 718–19, 727.

### B. The Merger Would Eliminate Head-to-Head Competition Between PRH and S&S

#### 1. Authors Benefit from Direct Competition between PRH and S&S

251. There can be no dispute that the merging parties compete intensely with each other to acquire books. PRH is S&S's closest competitor and the publisher against whom S&S's editors compete most frequently.[19] *See* Trial Tr. 595:23–25 (Karp) ("Q. So you would expect Penguin Random House to be the publisher you bid against the most, correct? A. I think so, yes."); Trial Tr. 1280:17–1281:17 (Hill) (S&S win/loss data shows that S&S loses to PRH ~60% of the time). Similarly, S&S is one of PRH's most important competitors, *see* Trial Tr. 2360:20–23 (McIntosh); Trial Tr. 1275:25–1276:6 (Hill), and is a particularly strong competitor for certain categories of books, including, most notably, biographies, memoirs, political non-fiction and books about current events. *See* Trial Tr. 454:23–455:3 (Karp); Trial Tr. 455:8–11 (Karp); PX-326 at 2 ("S&S has political bestseller chops like no other right now.").

252. Authors benefit from Defendants' fierce and frequent head-to-head competition for the rights to anticipated top-selling books. The record includes numerous examples showing the extent to which competition between the two firms can benefit authors, including:

a.     ██████████████████████.[20] In January 2019, S&S offered $5 million for a memoir by ██████████ a few days later, it increased its offer to $6 million. Trial Tr. 418:13–18 (Karp); PX-643 at 2. PRH's Crown imprint then offered $7.5 million. Trial Tr. 419:24–420:8 (Karp); PX-958-B at 1; PX-643 at 2; PX-863 at 2. ██████████████████ told S&S that ██ would not go back to Crown if S&S increased its offer to $8 million. Trial Tr. 420:9–13 (Karp);

---

[19] PRH is also the most frequent runner up to S&S in Dr. Snyder's data set. Trial Tr. 2927:17–2928:4 (Snyder).

[20] Book 58. U.S. Demonstrative 9 at 2.

PX-643 at 2. To prevent the agent from going back to PRH, S&S bid $8 million to secure the book. PX-613 at 1; Trial Tr. 425:2–8 (Karp); PX-958-B at 1. Competition from PRH was directly relevant to S&S's decision to increase its offer from $6 million to $8 million. *See* Trial Tr. 423:22–424:4 (Karp); *see also* Trial Tr. 425:2–5 (Karp) (PRH was the "stalking horse" that the agent used to increase the offer to $8 million).

      b.    ██████████████████████ [21] The auction for ████████ initially included up to six bidders, but narrowed to two bidders—PRH and S&S—once the bidding reached approximately $650,000. Trial Tr. 427:5–428:2 (Karp); PX-557 at 6; PX-941-B at 1. Even after the other bidders dropped out, S&S and PRH continued to bid against each other for several rounds. Trial Tr. 428:3–428:20 (Karp); PX-557 at 1–6; PX-588 at 1. In the final rounds of the auction, PRH bid $805,000, S&S matched that offer, and PRH increased its bid by $20,000 to win. Trial Tr. 430:8–18 (Karp); PX-588 at 1. For ████████████████████████ direct competition between PRH and S&S drove up the final advance by $175,000, from $650,000 to $825,000. Trial Tr. 430:19–23 (Karp); *see also* PX-941-B at 1.

      c.    ████████████████████████████████████ [22] The auction for ████████████████ book started with multiple bidders but narrowed to just two—PRH and S&S—after S&S bid $475,000. PX-324 at 1; PX-944-B at 1 (summary of auction for ██████████████████████). [23] Even after the other bidders dropped out, Defendants continued to increase their bids through several auction rounds until S&S bid $650,000. At that time, the agent called for the parties to submit their final best bid. *See* PX-326

---

[21] Book 41. U.S. Demonstrative 9 at 1.

[22] Book 44. U.S. Demonstrative 9 at 1.

[23] ████████████████████████████████

at 2; PX-569 at 1.  Viking (PRH) Associate Publisher Wendy Wolf assumed that Viking was

bidding against S&S, adding that "S&S has political bestseller chops like no other right now."

PX-326 at 2.  When Mr. Tart suggested PRH increase its bid to $775,000 to have a "shot," Ms.

Wolf agreed, writing "there just is literally no telling what the opponents hold in their hands,

esp[ecially] if it's S&S and they're looking at their winning streak in politics."  PX-326 at 1.

Viking then bid $775,000 and won the book.  Trial Tr. 929:11–13 (Tart); PX-39 at 1.  After

winning, Ms. Wolf described PRH as having "prevailed over a house bid from . . . S&S."  PX-39

at 1.  Mr. Tart replied: "we got this one, and over stiff competition."  PX-39 at 1.

    d.    ████████████████████.[24]  S&S offered $750,000 for ████████████

████████    Trial Tr. 446:2–4 (Karp).  After receiving S&S's bid, the agent decided to conduct

an auction and gave S&S "topping rights," meaning S&S could acquire the book if it made an

offer that was 10% higher than the highest bid in the auction.  Trial Tr. 446:6–11 (Karp); PX-729

at 1.  PRH's Portfolio imprint submitted the highest bid in the auction, at $1 million.  Trial Tr.

446:14–22 (Karp); PX-729 at 1; PX-863 at 2–3.  S&S then exercised its "topping rights" with a

bid for $1.1 million and won the book.  Trial Tr. 447:1–5 (Karp).  The author had previously

published books with S&S.  When justifying his recommendation to increase to $1.1 million, Mr.

Karp wrote that he didn't "want to let PRH steal an author we've invested in and developed."

PX-729 at 1.

    253.    These examples are illustrative; the record includes many other instances of head-

to-head competition between the merging parties.  *See, e.g.*, PX-559 at 1 (S&S lost three "beauty

contest[s]" in one week to PRH); PX-624 at 1 ("I did everything I could and we lost to Random

House. . . .  Frustrating."); PX-716 at 1–3 (PRH and S&S only bidders in last two rounds for

---

[24] Book 30.  U.S. Demonstrative 9 at 1.

book by ████████ ); PX-590 at 1 ("The author is deciding between Hillary Redmon at

Random House and Karyn Marcus at Gallery [S&S]"); PX-700 at 1 ("It was down to PRH and

Atria [S&S] in the final best bid part of the auction . . . ."); PX-697 at 1 (S&S and two PRH

imprints were the three highest bidders); PX-574 at 1 (similar); PX-2007 at 38–39 (Fletcher Dep.

84:24–85:15; 85:18) (testifying her authors benefited from having S&S bid against PRH).

254.    The government's summary witness, Adriana Porro, prepared exhibits

summarizing 27 competitive episodes, including some of those discussed above, in which PRH

and S&S were the final two bidders (or, sometimes, the only two bidders) for a particular book.

*See* Trial Tr. 660:16–17 (Porro); Trial Tr. 663:9–15 (Porro); Trial Tr. 664:8–10 (Porro)

(describing Ms. Porro's review); PX-932-B at 1 (summary of bidding for ████████ ); PX-934-B

at 1 (same, for ████████ ); PX-935-B at 1 (same, for ████████ ); PX-936-B at 1–2

(same, for ████████ ); PX-937-B at 1 (same, for ████████ ); PX-938-B at 1–2

(same, for ████████ ); PX-939-B at 1–3 (same, for ████████ ); PX-940-B at 1–2

(same, for ████████ ); PX-943-B at 1 (same, for ████████ ); PX-945-B at 1 (same, for

████████ ); PX-946-B at 1–2 (same, for ████████ ); PX-947-B at 1 (same, for ████████ );

PX-948-B at 1–2 (same, for ████████ ); PX-950-B at 1–2 (same, for ████████ ); PX-951-B

at 1 (same, for ████████ ); PX-952-B at 1 (same, for ████████ ); PX-954-B at 1–2 (same,

for ████████ ); PX-955-B at 1 (same, for ████████ ); PX-956-B at 1 (same, for

████████ ); PX-957-B at 1 (same, for ████████ ).

255.    As these examples illustrate, there is a substantial history of direct head-to-head

competition between PRH and S&S that has resulted in increased payments to authors.  The

post-merger loss of this competition significantly increases the likelihood of anticompetitive

effects.  *See, e.g.*, *Staples II*, 190 F. Supp. 3d at 131–132 (examining instances of past head-to-

head competition over customers between defendants); *H & R Block*, 833 F. Supp. 2d at 81–82 (historical instances where one defendant considered offerings and prices of the other in setting its own offerings and prices); *Heinz*, 246 F.3d at 718 (concluding defendants compete with each other because of "evidence that the two do in fact price against each other").

### 2. Authors Benefit from Competition Between S&S and PRH When Defendants Are Not the Highest Two Bidders in an Auction

256.    The benefits of competition between PRH and S&S for author advances are not limited to auctions where Defendants are the two highest bidders.  This is because having a larger number of bidders participating in auctions can lead to higher advances more generally. For example, Hachette CEO Michael Pietsch testified that a larger number of bidders leads to "more upward pressure in auctions . . . in general, . . . the price paid at auction can increase because of the number of participants."  Trial Tr. 180:20–181:11 (Pietsch); *see also* Trial Tr. 499:6–500:12 (Karp); PX-2002 at 78–79 (Stehlik Dep. 172:1–17, 172:20–25, 173:1–2, 173:4–7); Trial Tr. 338:23–25 (King) ("You know, the baseball players have a saying, you can't hit them if you can't see them.  And you can't sell books competitively if there are only so many people in competition"); PX-2007 at 12–14 (Fletcher Dep. 40:21–23, 41:1–10, 41:13–19, 41:23–25, 42:2–3) (for auctions, "we prefer to have an array of editors from different houses participating"; want a minimum of three for a rounds auction); Trial Tr. 1268:2–5 (Hill); *Anthem*, 236 F. Supp. 3d at 220–221 (enjoining merger in part because "reducing the number of national carriers from four to three is significant"; relying on testimony that having more bidders leads to better prices during negotiations even before negotiations narrow to the two best options).

257.    The potential positive effect of having an increased number of bidders is particularly important in an auction for book rights because the bids that a publisher makes for a particular book are subjective—meaning that one publisher or editor can sometimes value a book

higher or even significantly higher than other publishers or editors.  Trial Tr. 479:9–480:5
(Karp); Trial Tr. 601:9–16 (Karp).  Having more bidders thus increases the chance that one of
the bidders has a higher valuation for a work.  Trial Tr. 601:17–25 (Karp); *see also* Trial Tr.
1305:24–1306:3 (Hill) (greater variation in bids leads to more harm in second-score auction
model); Trial Tr. 2109:22–2111:5 (Wylie) (in situations where there are likely to be significant
differences in how publishers value a work, it helps to have more choice in terms of publishers to
whom the book can be submitted); PX-2007 at 12–13 (Fletcher Dep. 40:21–23, 41:1–10, 41:13–
19); PX-2007 at 36 (Fletcher Dep. 82:7–10, 82:12–13); Trial Tr. 2931:16–2933:23 (Snyder)
(discussing the best-bid auction for ███████████████████ in Defendants'
Demonstrative 18 at 25 in which the highest bidder bid █████████ in a field of five bidders).

### 3. Authors Benefit from Competition Between PRH and S&S in Single-Round Best-Bid Auctions

258.    Competition between the merging parties is also important in single-round best-
bid auctions, where agents require each publisher to submit their best and final bid in the first
round and publishers are not given a chance to later improve their bids.  Trial Tr. 2008:25–
2009:2 (Kim) (describing best-bid auction format).  As with other auction types, in best-bid
auctions having more bidders often leads to higher advances.  As Mr. Karp agreed, "anytime
there is a competitive situation," including best-bid auctions, "competition raises advance levels,
less competition lowers them."  Trial Tr. 499:6–500:12 (Karp); *see also* Trial Tr. 1267:13–
1268:21 (Hill) (discussing two examples in U.S. Demonstrative 4 at 37 that illustrate the
correlation between bid levels and the number of bidders in best-bid auctions).  This is because
publishers bidding in a single-round best-bid auction are more likely to submit a higher bid when
there are more competitors, as the presence of more competitors reduces the publisher's odds of
winning any given bid.  Trial Tr. 1268:22–1270:12 (Hill); Trial Tr. 1487:21–1488:1 (Hill); PX-

2002 at 77–79 (Stehlik Dep. 171:11–24, 172:1–17, 172:20–173:2, 173:4–8) (larger number of bidders in two-round best-bid auction leads to higher bids because bidders have a lower chance of winning). For that reason, if the merger eliminates an important bidder, one would expect advances to go down for books acquired in a one-round best-bid auction. *See* Trial Tr. 3088:20–3089:25 (Hill).

259.    Defendants' claim that one-round best-bid auctions give agents more leverage than other types of auctions is unsupported by the record. In at least one instance, PRH pushed an agent to end a multiple-round auction by moving to best bids. Trial Tr. 928:5–23 (Tart) (discussing PX-326 at 3). If best-bid auctions were inherently better for agents and worse for publishers, PRH presumably would not press agents to move to that format.

### 4. Authors Benefit from Competition Between PRH and S&S for Books Acquired Outside of Auctions

260.    Competition among publishers, including PRH and S&S, affects the advances offered for books acquired outside of auctions. This includes situations where only one publisher has submitted a bid for a particular work, such as exclusive negotiations, options contracts, and preempts. In these bidding situations, publishers know that the agent can always shop the book to other publishers if the publisher's offer is not high enough. *See, e.g.,* Trial Tr. 113:19–115:6 (Pietsch); Trial Tr. 596:10–597:4 (Karp); Trial Tr. 1847:1–6 (Bergstrom) (even in exclusive negotiations she always has her "competition in [the] review mirror . . . . [S]ometimes [they] don't come to terms, and sometimes they will go to someone else."). Accordingly, the threat that the agent could take a book to auction or other publishers—*i.e.* the threat of competition from other publishers—directly influences the advances publishers offer even in exclusive or other one-on-one negotiations. *See, e.g.*, Trial Tr. 113:19–115:6 (Pietsch); Trial Tr. 596:10–597:4 (Karp); Trial Tr. 1966:13–24 (Kim) ("[E]ven if it's a one-on-one negotiation, we know the agent

can decide to send it to five more editors . . . .  So we're constantly aware that there's competition."); Trial Tr. 2127:7–13 (Ross) ("[I]f you can walk away from something, then it's easier to push to the terms that you think are fair and right, and so I try to use that . . . .  [I]t's always easier to walk away if you know what you're walking to.  And in this business, there's always the other competitor.  Whether it's -- whether they're bidding or not, they're always there."); Trial Tr. 1271:19–1272:12 (Hill) (discussing U.S. Demonstrative 4 at 38).

261.    Similarly, when a publisher seeks to acquires a book through a "preempt," the publisher must submit a bid that is high enough to entice the agent and author to forego further bidding.  *See, e.g.*, Trial Tr. 115:7–116:15 (Pietsch); Trial Tr. 596:5–9 (Karp); ██████████ ████████████████████████████████ PX-2002 at 59–61 (Stehlik Dep. 147:19–21, 147:23–149:4); Trial Tr. 303:5–11 (Pande); *see also* Trial Tr. 921:6–11 (Tart) (preempts are a "competitive situation").  Also, agents can invite several publishers to make competing preempt offers.  PX-2002 at 60 (Stehlik Dep. 148:4–10); DX-188 at 2 ("[Agent] has an aggressive editor trying to preempt the book now and is subtly inviting us to counter preempt."); Trial Tr. 1271:19–12 (Hill) (discussing U.S. Demonstrative 4 at 39).

262.    Publisher competition to recruit or poach authors away from their current publishers also affects author advances and represents another type of competitive acquisition format.  PRH tracks "key authors," which include authors the company wants to recruit.  When asked about PRH's recruitment of other publishers' authors, Mr. Dohle explained that "[i]f we have an opening and a chance to get attractive authors on board, we immediately go in and try to get them to Penguin Random House, sure."  Trial Tr. 884:1–18 (Dohle).  Poaching of authors between the merging parties "[r]esults in better terms for authors.  It gives established authors a chance to realize benefits of competition."  Trial Tr. 1272:13–1273:3 (Hill).  After highlighting

examples of poaching between the merging parties, Dr. Hill explained that poaching demonstrates "there's substantial head-to-head competition between the parties" and that such head-to-head competition can "be important for different acquisition formats." Trial Tr. 1272:21–1273:11 (Hill).

### 5. Eliminating the Competition Between PRH and S&S Will Harm Authors

263.    Because authors benefit from competition between PRH and S&S, the elimination of that competition will likely harm authors. Though the effect of eliminating this competition will be most acute for PRH and S&S authors, it is not necessarily limited to authors of those publishers. As Dr. Hill explained, for certain acquisition types, "[t]hird parties may also have a second-order effect, where they observe that the merged firm is less aggressive and so they can also bid as they were before or even bid a little less aggressively because their probability of winning has also gone up." Trial Tr. 1269:20–24 (Hill); *see also* Trial Tr. 1487:19–1489:9 (Hill).

264.    At trial, several industry participants testified that they expected that the proposed merger would lead to a reduction in competition. For example, the CEO of Kensington stated that he "personally expect[s] that advances will go down since there will be less competition . . . ." PX-2000 at 3 (Zacharius Dep. 20:6–13); *see also* Trial Tr. 1085:3–1086:2 (Weisberg) (advances will go down because of "[l]ess competition. It's as simple as that."). Similarly, Ms. Pande testified that the proposed merger would limit the choices her authors have to publish their books and that "overall advances" for her clients "would be suppressed." Trial Tr. 294:4–295:16 (Pande). And Ms. Fletcher testified about the concern that if PRH and S&S merged in the same way that Penguin and Random House integrated, it would make it harder for agents to withhold certain rights, such as territories or formats, as they customarily do now. PX-2007 at 37–38

(Fletcher Dep. 83:7–25, 84:3–10). These conclusions should come as no surprise even to

Defendants' senior executives. For example, the CEO of S&S predicted that the Department of

Justice would not allow PRH to acquire S&S—and also stated that a merger with a competitor

would arguably be harmful for the book publishing ecosystem. PX-655 at 1; PX-634 at 1.

### C. Economic Analysis Shows That Eliminating Competition Between S&S and PRH Will Lower Advances and Harm Authors

265.    Economic analysis presented by the government's expert, Dr. Hill, confirms that

the merger is likely to lead to significant unilateral effects. Dr. Hill conducted several different

types of economic analyses. Each analysis, when taken alone, is subject to various limitations

and caveats, which Dr. Hill acknowledged. Viewed collectively, however, these analyses

reinforce the conclusions set forth by the qualitative evidence discussed above—*i.e.*, that the

merger is likely to lead to a significant reduction in competition in the market for anticipated top

sellers.

### 1. Diversion Ratios Indicate That There Is Significant Competition to Be Lost Between the Merging Parties

266.    Economists often use "diversion ratios" to estimate how closely merging parties

compete with each other. Trial Tr. 1263:1–3 (Hill); *see also* Merger Guidelines § 6.1. A

"diversion ratio" is an attempt to quantify the following question: if one of the merging parties

tries to raise prices (or, here, lower advances), how often would an author switch to the other

merging party relative to other firms? Trial Tr. 1274:13–1275:4 (Hill). The higher the diversion

ratio, the more often customers in that scenario are predicted to switch to the other merging

party. A higher diversion ratio indicates that the merging parties are close competitors and,

therefore, that a merger is more likely to lead to harm. Trial Tr. 1274:2–12 (Hill); *see also*

Merger Guidelines § 6.1. More broadly, diversion ratios can be thought of as one way to

estimate the significance of the competition between the merging parties. *See* Merger Guidelines § 6.1.

267. Dr. Hill estimated diversion ratios by undertaking four studies, each based on a different set of data: (i) market shares; (ii) win/loss data; (iii) "runner-up" data; and (iv) minutes from the parties' editorial meetings. Trial Tr. 1275:5–24 (Hill). All four studies lead to the same conclusions: first, that diversion between the merging parties is significant, and second, that diversion from S&S to PRH indicates that PRH is S&S's closest competitor. *See* Trial Tr. 1275:25–1276:6 (Hill); PX-970 at 1.

268. First, Dr. Hill analyzed diversion according to market shares—meaning that he estimated what diversion would be if one assumes that diversion is proportional to market shares. Trial Tr. 1276:18–1277:4 (Hill). Based on that approach, Dr. Hill estimated that if PRH were to lower advances, about 20% of its lost authors would divert to S&S and about 40% of S&S's lost authors would divert to PRH. Trial Tr. 1276:7–17 (Hill); PX-970 at 1.

269. Dr. Hill also explained that diversion according to share is a widely used approach in antitrust economics. Trial Tr. 1276:18–1277:16 (Hill); *see also H & R Block*, 833 F. Supp. 2d at 86. Using market shares to calculate diversion is particularly appropriate here because the documentary and testimonial evidence shows that the merging parties compete just as intensely as their market shares would suggest and that publishers generally compete in accordance with their market shares. Trial Tr. 1277:20–1279:22 (Hill); *compare* Trial Tr. 3085:15–3086:3 (Hill); Trial Tr. 150:20–151:2 (Pietsch); PX-2002 at 71 (Stehlik Dep. 165:15–20); Trial Tr. 595:23–25 (Karp) *with* PX-959 at 1. Diversion according to share is also based on the largest data set. Trial Tr. 1293:20–1294:11 (Hill). Accordingly, Dr. Hill viewed diversion ratios proportional to market shares as his baseline diversion estimate. Trial Tr. 3084:1–3085:2 (Hill).

270.     Second, Dr. Hill analyzed sets of win/loss data maintained by the merging parties. These data show which publishers the merging parties lose to most often.  *See* Trial Tr. 1281:5– 18 (Hill).  According to these data, when PRH bids on a book and loses, it loses to S&S approximately 20% of the time.  Trial Tr. 1280:17–1281:17 (Hill); PX-970 at 1.  And when S&S bids on a book and loses, it loses to PRH approximately 60% of the time.  Trial Tr. 1280:17– 1281:17 (Hill); PX-970 at 1.

271.     Win/loss data are commonly used to estimate diversion ratios.  Trial Tr. 1281:19– 1282:1 (Hill); *see also* Merger Guidelines § 6.1; *Wilhelmsen*, 341 F. Supp. 3d at 65; Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 Antitrust L.J. 49, 83 (2010).

272.     Third, Dr. Hill conducted a "runner-up" study.  For this study, Dr. Hill compiled as much evidence as he could regarding the bidding for all of the books that PRH and S&S acquired for $500,000 or more in 2020.  Trial Tr. 1284:11–1285:12 (Hill).  The "runner-up" study showed that for books acquired by PRH, S&S was the runner-up approximately 25% of the time.  Trial Tr. 1282:15–24 (Hill); PX-970 at 1.  And for books acquired by S&S, PRH was the runner-up approximately 60% of the time.  Trial Tr. 1282:15–24 (Hill); PX-970 at 1.

273.     Finally, Dr. Hill conducted a study based on the merging parties' editorial minutes.  Editorial minutes are business records kept of each party's editorial staff meetings where the parties discuss books they are interested in, books they bid on, and books they won or lost.  *See* Trial Tr. 1286:13–22 (Hill).  Dr. Hill used these minutes to identify a set of books that each of the merging parties bid on and then used acquisition data from all publishers (including non-parties) to determine how frequently one merging party bid on a book and lost to the other merging party.  Trial Tr. 1286:13–1287:11 (Hill).  According to this study, when PRH bid on a

book and lost, it lost to S&S about 20% of the time.  *See* Trial Tr. 1286:6–12 (Hill); PX-970 at 1.

And when S&S bid on a book and lost, it lost to PRH about 55% of the time.  *See* Trial Tr.

1286:6–12 (Hill); PX-970 at 1.

274.    The following chart, based on PX-970, summarizes the results of these four

studies.

**Figure 7.  Summary of Dr. Hill's Diversion Estimates (PX-970)**

| Type of Analysis | Diversion from PRH to S&S | Diversion from S&S to PRH |
|---|---|---|
| Diversion according to share | 19% | 42% |
| Win/loss data | 19% | 59% |
| Runner-up study | 27% | 59% |
| Editorial minutes | 21% | 54% |

275.    As suggested by the above chart, though these four studies differ

methodologically, they all point in the same direction.  *See* Trial Tr. 1287:14–16 (Hill).  They all

show that there is a significant amount of competition between the merging parties—and, in

particular, that PRH is S&S's most frequent competitor.  *See* Trial Tr. 1275:25–1276:6 (Hill);

PX-970 at 1.  In addition, this evidence is also consistent with the qualitative evidence, described

more fully above, *see supra* VI.B., which also shows that the parties compete frequently with

each other.  Trial Tr. 1263:15–1265:1 (Hill).

276.    Diversion estimates calculated by Defendants' economic expert, Dr. Snyder, are

broadly consistent with those calculated by Dr. Hill in the four studies described above.  Trial Tr.

1289:16–20 (Hill); Trial Tr. 1292:25–1293:19 (Hill) (discussing U.S. Demonstrative 4 at 48–49).

Dr. Snyder found that the diversion ratio from PRH to S&S is 20% and the diversion ratio from

S&S to PRH is 27%.  Trial Tr. 2927:4–25 (Snyder).  Based on those calculations, Dr. Snyder

also found that PRH is S&S's closest competitor. *See* Trial Tr. 2928:1–10 (Snyder). However, the diversion ratio from S&S to PRH that Dr. Snyder estimated is smaller than the diversion ratios from S&S to PRH that Dr. Hill estimated from his four data sources. *See* Trial Tr. 1293:9–19 (Hill).

277.    Dr. Snyder used data collected from agents, the agency data, as his sole method for estimating diversion. But Dr. Snyder's agency data is flawed because it is not representative, *i.e.*, books in his data set differ in important ways from the population of all anticipated top-selling books, Trial Tr. 1289:22–1291:14 (Hill) (discussing U.S. Demonstrative 4 at 47); Trial Tr. 2997:17–22 (Snyder), and is based on a small sample size. In particular, Dr. Snyder's estimate of diversion from S&S to PRH is based on a sample of 22 books over four years, the smallest sample of all the data sets used to estimate diversion. Trial Tr. 1291:15–1292:12 (Hill); Trial Tr. 1707:20–1708:1 (Hill); PX-996 at 1.

278.    In contrast, Dr. Hill's analysis was based on several sources of data that painted a consistent picture. *See* PX-970 at 1. Though each data set had its limitations, Dr. Hill explained that taken in the aggregate the studies tried "to get a holistic understanding of what diversion might look like." Trial Tr. 1294:20–1295:4. Similarly, while Dr. Snyder's agency data diversion ratios are not worthless, they should be considered as just one of five estimates, not the only estimate as Dr. Snyder suggests. *See* Trial Tr. 1289:7–15 (Hill). Treating Dr. Snyder's ratios as such supports Dr. Hill's baseline diversion estimate, diversion according to share. Trial Tr. 1293:20–1294:11 (Hill) (discussing U.S. Demonstrative 4 at 50).

### 2. Dr. Hill's Economic Modeling Provides Results That Are Consistent with the Prediction That the Merger Is Likely to Lead to a Significant Reduction in Competition

279.    Dr. Hill used various economic models to quantify the expected harm from the merger.  Although no one model perfectly fits the publishing industry, these models are still useful to assess the likelihood of substantial anticompetitive harm in this setting.  Taken together, Dr. Hill's models confirm that the merger is likely to lead to a significant reduction in competition.  *See* Trial Tr. 3106:5–15 (Hill); Merger Guidelines § 6.1 (discussing how the DOJ and FTC use merger simulations).  Following the merger, Dr. Hill's model predicts that advances for anticipated top sellers would be reduced by about 4% (or $44,000) for PRH authors and about 11.5% (or $105,000) for S&S authors.  Trial Tr. 1311:7–1312:20 (Hill); PX-964 at 1–2.

280.    First, Dr. Hill used a "second-score" auction model to simulate the effect of the proposed merger.  Trial Tr. 1295:21–22 (Hill).  This model is designed to analyze the competitive effects of mergers in industries where auctions are common and where the full history of bidding is often not available.  Trial Tr. 1295:23–1296:4 (Hill).  The model predicts harm in situations where the merging parties are the first- and second-place bidders, since the effect of the merger is to eliminate the second-highest bid, making the third-place bid the one that sets the amount of advance.  *See* Trial Tr. 1299:17–1302:19 (Hill); Trial Tr. 1303:7–22 (Hill).

281.    Similar or identical models have been used by the government's economic experts in successful merger challenges in this district, including in industries that feature negotiations.  *See Wilhelmsen*, 341 F. Supp. 3d at 64–65; *Anthem*, 236 F. Supp. 3d at 217–20; *Sysco*, 113 F. Supp. 3d at 24, 66–67 (noting that customers were awarded contracts through requests for proposal or "bilateral negotiations").

282.    Dr. Hill calibrated the model using two inputs: market shares and variable profit margins. 1305:5–1306:3 (Hill). The model uses market shares to infer the frequency with which the merging parties are runner up when the other wins an auction. Trial Tr. 1305:5–17 (Hill). The model uses variable profit margins to infer the distance between the second- and third-place bidders. *See* Trial Tr. 1305:5–1306:3 (Hill); Trial Tr. 1471:1–11 (Hill). Generally speaking, higher margins suggest that there is greater variation among bids and hence greater harm. *See* Trial Tr. 1305:18–1306:3 (Hill); *see also* Merger Guidelines § 6.2 ("[Anticompetitive unilateral effects] tend to be greater, the more profitable were the pre-merger winning bids."); Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 Antitrust L.J. 49, 83 (2010). Dr. Hill corroborated the model's inference about the variation among bids using Dr. Snyder's agency data. Trial Tr. 1303:23–1304:12 (Hill).

283.    Dr. Hill used the merging parties' title-level P&L data (based on realized sales of anticipated top sellers) to calculate variable profit margins. Trial Tr. 1311:7–13 (Hill). To be conservative, he treated a cost category in PRH's P&Ls—"direct operating expenses"—as costs that were completely variable even though some of those costs were likely fixed. Trial Tr. 1311:18–1312:6 (Hill). By treating these costs as variable, it reduced PRH's margin and hence the model's prediction of harm. Trial Tr. 1311:25–1312:6 (Hill).

284.    Dr. Hill also ran the model treating direct operating expenses as fixed costs for PRH. Under that iteration, the model predicts greater harm—a 6% reduction in advances per book, or about a $60,000 reduction per book for PRH, and a 15% reduction per book, or about a $140,000 per book reduction for S&S. Trial Tr. 1314:10–20 (Hill).

285.    The second-score model leads to broadly similar results even if the market is defined with different advance thresholds of $150,000 or $350,000 to identify anticipated top sellers.  Trial Tr. 1315:7–15 (Hill).

286.    After criticism from Dr. Snyder about the second-score auction model's fit with the industry, Dr. Hill corroborated the results of the model using a series of models based on the "gross upward pricing pressure index" ("GUPPI").  Trial Tr. 1315:16–1316:10 (Hill).  The GUPPI models used by Dr. Hill were originally created by the Defendants' economists in the pre-complaint investigation of this merger by modifying the traditional GUPPI formula to fit three book acquisition types: a best-bid auction, a multi-round auction, and a hybrid approach, which was a multi-round auction followed by negotiations.  *See* Trial Tr. 1316:2–1317:13 (Hill); Trial Tr. 1633:15–1634:11 (Hill).

287.    GUPPI, or a variant thereof, "Upward Pricing Pressure" (UPP), has been used by the government's economic experts in several successful merger challenges.  *See Wilhelmsen*, 341 F. Supp. 3d at 64; *Anthem*, 236 F. Supp. 3d at 212; *FTC v. Sanford Health*, No. 1:17-cv-133, 2017 WL 10810016, at *12–13 (D.N.D. Dec. 15, 2017), *aff'd.*, 926 F.3d 959 (8th Cir. 2019).

288.    Like the second-score model, the GUPPI models use diversion ratios and margins as inputs.  Trial Tr. 1318:2–13 (Hill).  In the models, higher diversion ratios and higher margins will lead to a higher prediction of harm.  Trial Tr. 1318:14–19 (Hill).  For diversion ratios, Dr. Hill ran the GUPPI models using both diversion proportional to share and Dr. Snyder's diversion ratios based on his agency data.  Trial Tr. 1318:20–24 (Hill).  For margins, Dr. Hill used his original, conservative, margin calculation.  Trial Tr. 1318:25–1319:6 (Hill).  As described in the chart below, Dr. Hill found that the GUPPI models predicted similar effects to the second-score

auction model and that the merger likely will lead to a significant reduction in author

compensation. *See* PX-964 at 1–2; Trial Tr. 1637:21–1638:4 (Hill); Trial Tr. 1639:7–24 (Hill).

**Figure 8. Dr. Hill's Estimates From Second-Score Auction and GUPPI Models (PX-964)**

| Model | Diversion Assumption | % Reduction in Author Compensation | |
|---|---|---|---|
| | | **PRH** | **S&S** |
| Second-score auction model | Diversion according to share | 4.3% | 11.6% |
| Multi-round auction GUPPI | Diversion according to share | 7.3% | 19.2% |
| Multi-round auction GUPPI | Snyder diversion ratios | 7.4% | 12.8% |
| Single-round and hybrid GUPPI | Diversion according to share | 3.7% | 9.6% |
| Single-round and hybrid GUPPI | Snyder diversion ratios | 3.7% | 6.4% |

### a. Dr. Snyder's Criticisms of the Second-Score Auction Model Do Not Undermine the Model's Prediction that The Merger Is Likely to Substantially Harm Authors.

289.    Defendants' expert, Dr. Snyder, did not create or implement any alternative

models to estimate harm. Nor did he try to do so. Trial Tr. 2929:8–12 (Snyder). Dr. Snyder did,

however, offer several criticisms of Dr. Hill's models. As discussed below, these criticisms are

immaterial or incorrect.

290.    *First*, as mentioned previously, Dr. Snyder criticized Dr. Hill's use of the second-

score auction model on the grounds that the model most directly applies to a specific type of

auction (with a format similar to that of round robin auctions) and is not applicable to other types

of acquisitions. Trial Tr. 2632:21–2633:19 (Snyder). But Dr. Hill's application of the second-

score auction model was not meant to suggest that all anticipated top sellers are sold via second-

price auctions. Trial Tr. 1296:13–21 (Hill); Trial Tr. 1597:16–1598:23 (Hill). Instead, the

model generates a prediction for the market for anticipated top sellers based on aggregate

information about how often the parties compete. Modeling every type of acquisition would, for a variety of reasons, be infeasible. Trial Tr. 1597:16–1600:6 (Hill).

291. In addition, the intuition behind the second-score auction model—*i.e.*, that harm is more likely where the merging parties are close competitors and margins are higher—applies to other types of acquisitions, too. Trial Tr. 1599:16–1600:6 (Hill); Trial Tr. 1610:21–1611:1 (Hill). The second-score auction model does apply to a specific form of negotiation, the dynamics of which are similar to those in the publishing industry, where the price obtained through the negotiation is set by the next best alternative. Trial Tr. 3098:10–3100:3 (Hill). Dr. Hill also explained in his testimony the similarities to how best-bid auctions would likely be affected by the merger. Trial Tr. 1726:19–1730:4 (Hill). For these reasons, Dr. Hill found the second-score auction model to be useful as one method for estimating harm from the transaction. Trial Tr. 1726:19–1730:4 (Hill).

292. Moreover, as described above, in response to Dr. Snyder's criticism regarding the applicability of Dr. Hill's second-score auction model, Dr. Hill ran multiple iterations of a GUPPI analysis to corroborate his initial analysis. *See* Trial Tr. 1316:2–1317:13 (Hill). As set forth above, Dr. Hill found that the GUPPI models were similar to his earlier findings by predicting similar effects to the second-score auction model. *See* PX-964 at 1–2; Trial Tr. 1637:21–1638:4 (Hill); Trial Tr. 1639:7–24 (Hill). Both the second-score auction model and the GUPPI models confirm that the merger likely will lead to a significant reduction in author compensation.

293. *Second,* in addition to his high-level criticisms about fit, Dr. Snyder also criticized Dr. Hill's implementation of the second-score auction and GUPPI models. Dr. Snyder mistakenly argues that Dr. Hill should have accounted for fixed costs when calculating the

merging parties' variable profit margins.  As Dr. Hill explained, both the second-score auction model and the GUPPI models are "explicit" that one should use firms' variable, not fixed, costs to implement the models.  Trial Tr. 3092:23–3093:15 (Hill); *see also* Nathan Miller, *Modeling the effects of mergers in procurement*, 37 Int'l J. Indus. Org. 201, 203, 206 n.9 (2014) (specifying the model inputs are marginal costs, which depend on variable costs, not fixed costs); Joseph Farrell & Carl Shapiro, *Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition*, 10 B.E. J. Theoretical Econ. 1, 7 (2010) (same).  This is because these models (like most in economics) assume that publishers make decisions on whether to acquire one more book on the margin.  In other words, economists assume publishers ask whether the marginal profits of acquiring one more book exceed the marginal costs.  Trial Tr. 3092:23–3093:9 (Hill).

294.    Dr. Snyder notes, however, that the merging parties must cover fixed costs in the long run and that their acquisition P&Ls include fixed costs.  Trial Tr. 2935:17–2940:7 (Snyder).  Yet because all firms have fixed costs, it is hardly surprising that publishers are interested in covering them.  When making decisions about what a publisher's maximum willingness is to pay for a particular book, publishers should consider variable costs and not fixed costs.  Trial Tr. 3092:23–3094:16 (Hill).

295.    This intuition is corroborated by testimony from Defendants' executives.  For example, under questioning by Defendants' counsel, Ms. McIntosh testified that she tells her editors to "focus their attention on the contribution number . . . because I want them to think about what is the incremental impact of making this bet on our company."  Trial Tr. 2259:5–20

(McIntosh).[25]  In fact, she explicitly rejected Dr. Snyder's suggested approach of looking at how a book contributes to a publisher's fixed costs.  Trial Tr. at 2259:24–2260:7 (McIntosh).

296.    Nevertheless, even adopting Dr. Snyder's incorrect margins, the second-score auction model predicts meaningful harm to authors: a 3% reduction in compensation for PRH authors and an 8% reduction for S&S authors.  *See* Trial Tr. 3105:17–25 (Hill).

297.    Dr. Snyder's other criticisms of Dr. Hill's margin calculations are similarly incorrect.  As discussed above, in his initial report, Dr. Hill identified that a group of PRH's costs had a mix of fixed and variable costs.  Trial Tr. 1311:18–24 (Hill).  To be conservative, he treated all those costs as variable.  Trial Tr. 1311:25–1312:6 (Hill).  In response to Dr. Snyder's criticism that those costs should appropriately be treated as fixed, Dr. Hill reran his models in his reply report doing just that—and found an even greater prediction of harm.  Trial Tr. 1314:10–20 (Hill).  For this second iteration, Dr. Snyder claimed that the actual margins of the publishers did not match the margins predicted by Dr. Hill's second-score auction model and therefore the results of Dr. Hill's model were unreliable.  Trial Tr. 2804:24–2806:9 (Snyder).  But the actual and predicted margins presented by Dr. Snyder were based on a methodology Dr. Hill did not actually use.  Trial Tr. 3095:21–309724 (Hill).  When comparing the actual and predicted margins using the methodology Dr. Hill *did* perform, the model presented an acceptable match.  Trial Tr. 3094:19–3097:25 (Hill).

---

[25] For example, under questioning by Defendants' counsel, Ms. McIntosh testified that she tells her editors to "focus their attention on the contribution number . . . because I want them to think about what is the incremental impact of making this bet on our company."  Trial Tr. 2259:5–20 (McIntosh).

### 3. Dr. Hill's Harm Estimates Are Consistent with Other Times Courts Have Blocked Anticompetitive Mergers

298.    Dr. Hill's harm estimates are consistent with those other courts have found sufficient to enjoin a merger.  Courts have found estimates of quantifiable harm in the single digit percentage range, including estimates lower than Dr. Hill's here, to be substantial enough to enjoin a merger.  *See, e.g., FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062, at *22 n.26 (D.N.J. Aug. 4, 2021), *aff'd*, 30 F.4th 160 (3d Cir. 2022) (5.7% price effect for the merging parties' patients); *Sysco*, 131 F. Supp. 3d at 53–54, 66 (reflecting 4.6% to 5% market-wide price effect without efficiencies or the planned divestitures, or 3% to 3.2% market-wide price effect after accounting for those mitigating factors);[26] *H & R Block*, 833 F. Supp. 2d at 87 (2.2–2.5% price effect for the acquiring firm's customers and a 10.5–12.2% price effect for the acquired firm's customers).

299.    Further, Defendants' claim that the number of authors and books potentially harmed by this merger represents a "tiny corner" of the market not worthy of concern, Trial Tr. 60:21–61:3 (Defendants' Opening Statement), is contradicted by *Staples II*, which noted that "[a]ntitrust laws exist to protect competition, even for a targeted group that represents a relatively small part of an overall market."  190 F. Supp. 3d at 126.  There, the targeted group consisted of just 1,200 large customers, or 1% of all business-to-business customers, within a business segment that represented "approximately thirty-five percent of Defendants' sales."  *Id.* at 112, 126, 132, 138.  The court rejected the defendants' argument that blocking the merger to

---

[26] For *Sysco*, the percentage price effects were calculated using the harm estimates discussed on page 66 divided by the low and high end of the estimated total national broadline sales estimates discussed on page 53–54.

protect this segment of large customers was misplaced because 99% of all business-to-business customers would allegedly benefit from the merger.  *Id*. at 126, 137.

### 4.  The Merger Will Likely Lower Output and Harm Readers

300.    The Sherman Act does "not confine its protection to consumers, or to purchasers, or to competitors, or to sellers" and is meant to be "comprehensive" in "protecting all who are made victims of the forbidden practices."  *Mandeville Island Farms*, 334 U.S. at 235–36. Accordingly, the proposed merger between PRH and S&S must be enjoined because it will substantially lessen competition among purchasers in the relevant market (*i.e.*, publishing companies) in their effort to acquire anticipated top selling manuscripts.

301.    There is no requirement that the government also prove effects from the merger on consumers.  *See Mandeville Island Farms*, 334 U.S. at 235 (finding a buy-side price fixing scheme illegal "even though the price-fixing was by purchasers, and the persons specifically injured under the treble damage claim are sellers, not customers or consumers."); *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1133–34 (10th Cir. 2002) (rejecting the defendants' argument that the government needed to show harm to end consumers because "[t]he Supreme Court's treatment of monopsony cases strongly suggests that suppliers . . . are protected by antitrust laws even when the anti-competitive activity does not harm end-users."); *Todd*, 275 F.3d at 213–14 ("In an oligopsony, the risk is that buyers will collude to depress prices [or salaries to laborers], causing harm to sellers [laborers]."); *Rice Growers Ass'n*, 1986 WL 12562 at *11–12 (holding merger unlawful due to harms on buy-side without analyzing downstream harm); *Heinz*, 246 F.3d at 719 ("[N]o court has ever held that a reduction in competition for wholesale purchasers is not relevant unless the plaintiff can prove impact at the consumer level.").

302.     Plaintiff has nonetheless demonstrated harm to readers from the proposed

transaction.  As Mr. Dohle admitted, if advances go down it will lead to lower output, have a

negative impact on the diversity of stories that are being published, and ensure that fewer authors

will be able to make a living from writing.  Trial Tr. 772:1–25 (Dohle); *see also* Trial Tr.

295:23–296:5 (Pande) (the proposed merger may make it more difficult for certain authors to

publish their books because they "may get advances that will not allow them to move forward

with the publication of their book"); Glusman Dep. 247:21–249:14 (the merger will lead to less

diversity of books).

303.     Reduced advances will lead to lower output or reduced quality of books because

being paid less for their work will cause some authors to decide not to write a book at all, or

possibly to write a lower quality book by, for example, deciding not to hire a researcher or

photographer.  Trial Tr. 460:11–462:12 (Karp); *cf.* Trial Tr. 1941:6–15 (Duhigg) (the advance is

"the money that allows [authors] to write a book"); PX-2002 at 69–70 (Stehlik Dep. 163:14–15,

Stehlik Dep. 163:17–20, Stehlik Dep. 163:33, Stehlik Dep. 163:25–164:10) (authors sometimes

use advances to pay for living expenses or hire a researcher, photographer, or co-writer).  For

example, a journalist with a proposal to write a non-fiction book who receives an offer for a

lower advance might decide it does not make financial sense to take time off from work to write

the book.  PX-656 at 1; Trial Tr. 462:9–22 (Karp); *cf.* Trial Tr. 1912:13–1913:1 (Duhigg); Trial

Tr. 1916:4–21 (Duhigg) (explaining that the advance of $750,000 he was offered for his first

book, split into four payments, allowed him to take a year off from *The New York Times* to write

the book because the $115,00 he received as an initial payment, after taxes and paying the agent

commission, could replace the salary he was earning as a journalist).

### D. The Proposed Transaction Will Increase the Likelihood of Coordinated Effects

#### 1. Applicable Legal Standard

304.    "Merger law 'rests upon the theory that where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding….'" *Heinz*, 246 F.3d at 715 (quoting *FTC v. PPG Indus.*, 798 F.2d 1500, 1503 (D.C. Cir. 1986)).  Mergers that result in a sufficiently high level of concentration therefore establish a presumption of anticompetitive coordination.  *Id.* at 715–717; *see also H & R Block,* 833 F. Supp.2d at 77. Accordingly, once the "government has established its prima facie case, the burden is on the defendants to produce evidence of 'structural market barriers to collusion'" specific to the book publishing industry that would "defeat the 'ordinary presumption of collusion' that attaches to a merger in a highly concentrated market." *H & R Block,* 833 F. Supp.2d at 77 (quoting *Heinz*, 246 F.3d at 725).  Defendants cannot meet that burden here.

305.    Coordinated effects are not limited to explicit collusion; rather, there are "numerous forms of coordination."  Merger Guidelines § 7.1.  Indeed, the presumption is motivated, in part, by the concern that a merger may result in tacit agreements and other parallel accommodating conduct that softens competition but does not amount to an explicit agreement not to compete.  Such tacit coordination is difficult to detect and is often not actionable under the Sherman Act.  *See* Merger Guidelines § 7; *see also Heinz,* 246 F.3d at 725; *Elders Grain,* 868 F.2d at 905; *Hosp. Corp.,* 807 F.2d at 1387 ("The fewer competitors there are in a market, the easier it is for them to coordinate their pricing without committing detectable violations of [S]ection 1 of the Sherman Act, which forbids price fixing.").

306.    Accordingly, tacit collusion, more so even than express collusion, is "feared by antitrust policy" because "even when observed, [tacit collusion] cannot easily be controlled

141

directly by the antitrust laws." *Heinz*, 246 F.3d at 725 (citation omitted); *see also Elders Grain*, 868 F.2d at 905 (six to five merger increased likelihood "leading members of the industry [would] collude on price and output without committing a detectable violation of section 1 of the Sherman Act" . . . since competitors "may not have to communicate or otherwise collude overtly in order to coordinate their price and output decisions"); *Hosp. Corp.,* 807 F.2d at 1387 (similar).

307.    Competitors often find it easier to coordinate when it can "be enforced by detection and punishment of deviations that would undermine the coordinated interaction." Merger Guidelines § 7.  For some types of coordination to occur, there needs to be "some form of common understanding" that firms will "pull [their] punches," the "ability to monitor and detect" whether other firms are adhering to the coordination, and some kind of punishment mechanism.  Trial Tr. 1327:6–1328:5 (Hill); *see also* Trial Tr. 2638:2–21 (Snyder) ("what's important for coordinated effects are a mechanism of harm, the ability to detect and monitor.").

308.    Coordinated effects are more likely where there is enough transparency for firms to successfully monitor an anticompetitive agreement or implicit understanding.  *See, e.g.*, *H & R Block*, 833 F. Supp. 2d at 78.  Similarly, markets with high barriers to entry are more likely to result in coordinated effects.  *Heinz*, 246 F.3d at 724 (courts view the "combination of a concentrated market and barriers to entry [as] a recipe for price coordination.").

309.    Not all forms of coordination, however, require both detection and punishment. Parallel accommodating conduct requires neither.  Instead, parallel accommodating conduct covers situations where "each rival's response to competitive moves made by others is individually rational, . . ., but nevertheless . . . weakens competitive incentives to reduce prices or offer customers better terms."  Merger Guidelines § 7.  And, in fact, several cases have enjoined mergers based on a coordinated effects theory without explicitly analyzing whether a specific

punishment mechanism exists.  *See, e.g., H & R Block*, 833 F. Supp. 2d 36, 77– 81; *Elders Grain*, 868 F.2d at 905–906.

310.    Courts have found a history of collusion or attempted collusion highly probative of likely harm from a merger; a history of collusion "establishes a precondition to effective collusion—mutual trust and forbearance. . . ."  *Hosp. Corp.,* 807 F.2d at 1388; *see also Elders Grain*, 868 F.2d at 906 ("The theory of competition and monopoly that has been used to give concrete meaning to section 7 teaches that an acquisition which reduces the number of significant sellers in a market already highly concentrated and prone to collusion by reason of its history and circumstances is unlawful in the absence of special circumstances."); *H & R Block*, 833 F. Supp. 2d at 78; *Tronox*, 332 F. Supp. 3d at 208– 212; Merger Guidelines § 7.2.  Past coordination indicates that firms within the market have been able to overcome the obstacles that might otherwise make coordination difficult.  *See, e.g., Heinz*, 246 F.3d at 724 (defendants' argument that structural barriers would prevent coordination "undermined by the record evidence of past price leadership in the baby food industry").  And a market already "prone to collusion" is "even more prone to collusion" after the proposed merger of two large competitors—leading to significant competitive harm.  *Elders Grain*, 868 F.2d at 906; *see also Hosp. Corp.*, 807 F.2d at 1389 ("Considering . . . , the history of collusion in the industry [among other factors]," the FTC properly determined the hospital merger would "create an appreciable danger" of anticompetitive effects).

### 2. This Merger Is Likely to Increase the Risk of Coordination Among Publishers

311.    Evidence demonstrates that the increasing levels of market concentration, especially with only four remaining meaningful significant competitors, as well as the publishing industry's history of coordination pose a severe risk of tacit or even direct post-merger

coordination of competition among the remaining Big Four. The industry's structure and the elimination of S&S as an independent competitor will, as Dr. Hill concluded, "likely [] increase the risk of coordination." Trial Tr. at 1328:10–11 (Hill); *see generally* Trial Tr. 1260:7–11 (Hill); Trial Tr. 1326:3–1331:4 (Hill).

312.    First, as Bertelsmann itself recognized, the U.S. publishing industry is already an "oligopoly" with "only 4 further large publishers" beyond PRH. PX-80E at 13; *see also* Trial Tr. 2943:2–16 (Snyder). The proposed transaction would reinforce that oligopolistic market structure and render it even more susceptible to coordination by reducing the number of major competitors from five to four. Trial Tr. 1328:24–1329:1 (Hill). The elimination of an independent S&S will make it easier to reach a common understanding, monitor adherence to the understanding and detect deviations, and punish those who do not play along.

313.    And as discussed more fully above, barriers to entry and expansion are significant, making it less likely that a new, disruptive entrant would be able to limit coordination by the remaining Big Four. *See supra* V.C.2.

314.    Second, the trade book publishing industry has an established history of collusion. Between 2009 and 2010, five of the then Big Six publishers, including Penguin (but not Random House), coordinated with each other to raise e-book prices.[27] This coordination involved "numerous exchanges *between* executives at different Big Six publishers," including "frequent telephone calls among the Publisher Defendants." *United States v. Apple, Inc.*, 791 F.3d 290, 302 (2d Cir. 2015) (emphasis in original); *see also id.* at 319 ("That the Publisher Defendants

---

[27] Apple aided the conspiracy. Random House did not explicitly join the collusive agreement, but it did later follow the other Big Six publishers in switching to an agency model. *See Apple*, 791 F.3d at 309 n.12.

were in constant communication regarding their negotiations with both Apple and Amazon can hardly be disputed.").  The Second Circuit held this conduct to be *per se* unlawful, describing it as "express collusion."  *Id.* at 316, 321–29.[28]

315.    Third, industry-wide changes to the number of installments for author compensation payouts, the forced bundling of audio rights with publishing rights, and the uniform movement to 25% royalties on e-book sales all suggest that the Big Five publishers already engage, at least, in parallel behavior that allows them to obtain concessions that result in less favorable contractual terms and lower compensation for authors.  *See supra* V.E.4. (describing how publishers insist on obtaining audio rights at the same time they obtain publishing rights even though that deprives authors of direct payments from audio publishers); *supra* V.E.5. (describing how publishing industry has shifted to structure advances so that they are paid in smaller average amounts over longer periods of time); Trial Tr. 775:5–15 (Dohle) (e-book royalty rates shifted from 50% to 25%); *see also* Trial Tr. 776:22–25 (Dohle) (agreeing that he took credit for leading an industry shift in e-book royalty rates).

316.    The industry's history of coordination shows that competitors have the ability to reach some form of common understanding and the market is already susceptible to coordination.  Trial Tr. 1329:8–17 (Hill).

317.    Beyond its enduring oligopoly and history of collusion, several other structural features of the book publishing business make it susceptible to coordination.  First, it is a "close-knit" industry where key executives often have professional relationships with executives from

---

[28] In addition, according to the Second Circuit, the Big Six publishers had also previously communicated with each other about their plans to create a "windowing" system for e-books— *i.e.*, a system under which e-books would have been released later that the hardcover copy of a print book.  *See id.* at 300.

other publishers.  *See Apple*, 791 F.3d at 300 ("[T]he Big Six operated in a close-knit industry and had no qualms communicating about the need to act together.").

318.    Second, the evidence shows that competitive outcomes are transparent.  *See infra* ¶ 329 (collecting evidence on transparency).  The Big Five can easily monitor and detect adherence to common understandings.  Publishers acknowledge that they can observe which publisher poached an author or won a book in an auction or other competitive event.  That is, they have "an ability to know to whom [they a]re losing."  Trial Tr. 1330:11–22 (Hill).

319.    After detection, the industry has punishment mechanisms.  Many publishers depend on the Big Five for distribution, and some depend on Bertelsmann for printing.  *See* ████

████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

████████████████████  Trial Tr. 119:12–25 (Pietsch) (describing services that Hachette performs on behalf of its distribution clients); PX-682 at 2 ("We would not want to be 100% beholden to a competitor for printing.").  These contractual arrangements create deeper relationships among competitors, which can facilitate coordination and enable punishment.  *Cf. Hosp. Corp.*, 707 F.2d at 1389 ("The management contracts between" hospitals "illustrate the unusual degree of cooperation in this industry . . . .").

320.    Moreover, if the one of the publishers recruits or poaches an author, it can be punished by having its own authors targeted for poaching.  Targeting a particular publisher for poaching or more aggressive competitive actions could be a punishment for deviating from a

146

common understanding to make the standard contract terms more beneficial to publishers or to refrain from poaching.

321.    The market is also vulnerable to coordination because it involves frequent purchases for relatively small amounts.  Dr. Hill noted that there are over 1,000 contracts per year within the anticipated top-seller market.  Small, frequent purchases "make coordination easier," whereas larger purchases make coordination harder to sustain because of the temptation to deviate from the common understanding to secure particularly lucrative sales.  Trial Tr. 1330:1–3 (Hill); *see also* Merger Guidelines § 7.2 (explaining that a firm can be deterred from defecting from the agreement "if sales are small and frequent").

322.    Finally, the post-merger dominance of PRH is not something than can readily be ignored.  As discussed above, PRH is a powerful industry player today.  After the merger, with nearly 50% of the market and important stakes in the distribution and printing businesses, PRH would be in a pole position to act as a leading firm whose decisions the other players would likely follow.  In addition, after the merger, PRH and HarperCollins alone would control almost 75% of the relevant market.  As courts have recognized, such a market structure makes coordinated effects particularly likely.  *See Tronox*, 332 F. Supp. 3d at 209 (merger makes coordinated effects more likely through "sheer market power" in part because the "post-merger market would feature two firms that control roughly three quarters" of the market); *see also Heinz*, 246 F.3d at 724 n.23 (recognizing that "price leadership" is "a danger" in a "duopoly" market).

### 3.    Defendants' Arguments Regarding Structural Barriers are Unsubstantiated and Ignore Likely Forms of Coordination

323.    Defendants cannot meet their burden to rebut the presumption of coordinated effects here.  Defendants' arguments and Dr. Snyder's assumptions regarding the two most likely

forms of post-merger coordination—on contractual terms or not to poach authors—are unsubstantiated and belied by case law, the evidence, and common sense.

324.    First, Dr. Snyder opined that coordination on contractual terms such as audio rights and payout structure is immaterial because possible coordination on such terms "doesn't limit competition on many other dimensions, most important of which is advances." Trial Tr. 2882:5–19 (Snyder).

325.    The Supreme Court disagrees with Dr. Snyder.  In *Catalano v. Target Stores*, 446 U.S. 643, 647 (1980), competing beer distributors agreed to change the terms under which they sold beer to retailers by no longer extending credit to retailers and instead requiring upfront payments.  The beer distributors defended their agreement on credit terms by claiming there was no agreement on the price of the beer itself, even though those contractual changes made the overall bundle of terms and price less favorable to retailers.  The Court held the agreement *per se* illegal because "[i]t is more realistic to view an agreement to eliminate credit sales as extinguishing one form of competition among the sellers."  *Id.* at 649.  That the price of the beer remained outside the agreement to fix credit terms did not save the agreement from legal condemnation.  *Cf. United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 222 (1940) (agreements regarding price formulas are illegal because "they are related to the market prices" even when the ultimate price is not fixed).

326.    Here, the reasonable danger that the remaining competitors could more easily coordinate—or act in parallel by accommodating each other's updated standard contract terms— presents a harm to authors even if the advance amount itself is not subject to coordination.

327.    Defendants also argue that "there[ is] no way for publishers to coordinate or follow prices [or] other deal terms," in part because certain information about the acquisition

148

process is not fully transparent.  Trial Tr. 85:7–10 (Defendants' Opening Statement).  This assertion is not supported by the record.

328.    The evidence presented at trial shows that, in recent years, several deal terms have become standardized across the industry (or, at least, the Big Five), including audio and royalty rates, often to the detriment of authors.  *See, e.g.* PX-652 at 1–3 (audio); Trial Tr. 255:24–256:10 (Pande); Trial Tr. 257:14–18 (Pande) (audio and royalty rates); Trial Tr. 1941:16–20 (Duhigg) (testifying that he did not know he could negotiate over royalty rates); Trial Tr. 1828:21–1829:18 (Walsh) (payouts shifted from halves to fourths); Trial Tr. 256:22–25 (Pande) (similar), Trial Tr. 775:5–15 (Dohle); *see also* Trial Tr. 776:22–25 (Dohle).  These changes have been transparent to industry participants.  *See e.g.,* PX-652 at 1 ("It will be very interesting to see whether PRH, Hachette, Harper or Macmillan participate.  MY understanding is that they too have the 'no audio, no deal' rule.").  Taken together, further consolidation increases the likelihood of future consensus regarding contract terms such as royalty rates, payouts, and the types of rights authors can reserve—all of which already reflect a high degree of standardization within the relevant market.

329.    Second, there are no structural barriers that would prevent the future Big Four from tacitly agreeing not to poach each other's major authors.  Poaching is a competitive action that increases author compensation.  In the publishing industry, poaching is transparent and easily detected: when one publisher steals an author away from another publisher, the losing publisher learns the identity of the winner either through early reporting by industry trade press, Trial Tr. 1233:3–13 (Hill), or when the new publisher publishes the author's book.  *See* Trial Tr. 1330:11–22 (Hill); *see also* Trial Tr. 2295:10–19 (McIntosh) (describing major authors who moved from PRH to Hachette and Macmillan); DX-423 at 15–16 (Glusman Dep. 210:22–

211:25) (describing authors Norton lost to PRH).  When asked to explain why coordination

would be unlikely after the merger, Dr. Snyder differentiated coordination regarding author

poaching from other types of coordination, stating "I'm going to put aside the idea concerning

poaching authors, if I may.  All of the other ideas around coordination fall victim to the basic

economic principles here."  Trial Tr. 2880:14–2881:18 (Snyder).

      330.    Dr. Snyder's later testimony that any no-poach agreement would cause the Big

Five to lose authors to smaller publishers, Trial Tr. 3018:22–3021:13 (Snyder), ignores the

evidence, detailed above, establishing that non-Big Five publishers face a number of important

competitive disadvantages in the relevant market.  *Supra* V.C.3.a.  Dr. Snyder's argument that

editors would ignore a directive from their CEOs to refrain from poaching is similarly

unsubstantiated.  *See* Trial Tr. 3017:14–3018:1 (Snyder).  The record provides no basis to

conclude that employees in this business are particularly unlikely to ignore the instructions of

their corporate leaders.  In fact, to the contrary, the evidence suggests that the merging parties'

editors do, for example, follow corporate-wide rules against acquiring books without audio

rights.  PX-652 at 1–3.  And they also follow corporate guidance limiting intra-firm competition.

*See, e.g.*, PX-54 at 2 ("We would like to invoke the PRH policy/rule where other imprints can

bid on this but not more than our $150k."); PX-107 at 1 (PRH CEO asks divisions to coordinate;

they later report that they will "agree to a number and both offer same").

      331.    Similar to Defendants' arguments regarding transparency, any suggestion that

future coordination is unlikely because there is no plausible punishment mechanism misses the

mark.  Trial Tr. 2880:9–13 (Snyder).  Given its large size, a combined PRH/S&S could be

especially well situated to punish violations of any tacit or explicit agreement by, for example,

punishing deviations from a no-poach agreement by retaliating in a tit-for-tat manner whenever a

rival tries to poach authors from it.  In addition, because its parent company Bertelsmann

controls access to scarce printing capacity in the United States, PRH (through Bertelsmann)

could discipline publishers who violate an agreement by withholding or restricting access to

printing capacity.  *See* PX-983 at 1; Trial Tr. 760:18–21 (Dohle); Trial Tr. 762:11–17 (Dohle);

████████████████████████████████████████████████████████████████

████████████████████████████  Regardless, coordinated effects do not require a showing that

punishment is likely.  To the contrary, coordinated effects can occur where the major competitors

mutually recognize that it is not in each other's interest to aggressively compete in a particular

way, even in the absence of an obvious punishment mechanism.  *See* Merger Guidelines § 7.

    332.    For the foregoing reasons, Defendants cannot overcome the presumption of

coordinated effects here.

## VII.    CONCLUSION

    The evidence shows that the proposed merger between PRH and S&S likely would

substantially lessen competition in the market for the acquisition of U.S. publishing rights to

anticipated top-selling books in violation of Section 7 of the Clayton Act.  The Court should

therefore permanently enjoin PRH from merging with S&S.

Respectfully submitted,

Dated: September 1, 2022      /s/ John R. Read

John R. Read (DC Bar #419373)
United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 725-0165
Fax: (202) 514-7308
Email: john.read@usdoj.gov

*Counsel for Plaintiff United States of America*

152