## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                *Plaintiff*,

     v.

BERTELSMANN SE & CO. KGaA,
PENGUIN RANDOM HOUSE, LLC,
VIACOMCBS, INC., and
SIMON & SCHUSTER, INC,

                *Defendants*.

Civil Action No. 1:21-cv-02886-FYP

## UNITED STATES' OPPOSITION TO DEFENDANTS'
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

I.    DEFENDANTS MAKE SIGNIFICANT CONCESSIONS IN THEIR PROPOSED
      FINDINGS ........................................................................................................... 2

   A.   Defendants Concede That Dr. Hill's Market Share and HHI Calculations
        Are Correct ..................................................................................................... 2

   B.   Defendants Do Not Contest That They Are Close Competitors and That
        Significant Evidence Supports the Relevant Market ...................................... 3

   C.   Defendants Admit That Mr. Dohle's Letter "Is Not Legally Binding"................. 4

   D.   Defendants Do Not Contest That S&S Understood the Transaction
        Carried Antitrust Risk .................................................................................... 5

II.   DEFENDANTS CONTINUE TO MISSTATE THE APPROPRIATE LEGAL
      STANDARDS ....................................................................................................... 5

III.  DEFENDANTS' PRODUCT MARKET CLAIMS ARE WRONG .......................... 10

   A.   The Cases Defendants Cite Are Inapposite .................................................. 10

   B.   The Relevant Product Market Encompasses All Authors of Anticipated Top
        Sellers, Not Only Franchise Authors and Celebrities.................................... 12

   C.   Authors of Anticipated Top Sellers Can Be Targeted for a Decrease in Advances........... 14

   D.   Targeted Customers Can Be Harmed When They Lie On a "Continuum".......... 15

   E.   $250,000 Is an Appropriate Threshold to Identify Anticipated Top Sellers ...... 17

   F.   The Government Correctly Applied the "Narrowest Market" Principle ............ 20

   G.   The Relevant Market Properly Excludes Self-Publishing................................ 21

IV.   DEFENDANTS OFFER NO REAL REBUTTAL................................................... 21

   A.   The Government's Market Share Calculations Meaningfully Explain How
        Competition Works in the Relevant Market.................................................... 22

   B.   Defendants Failed to Show That Entry of New Publishers and Expansion of
        Current Publishers Will Constrain PRH Post-Merger .................................... 26

      1.   There Is No Evidence That Expansion by the Remaining Big Five Publishers
           Is Likely to Constrain PRH Post-Merger.................................................... 26

      2.   There Is No Evidence That Expansion by Non-Big Five Publishers Is Likely to
           Constrain PRH Post-Merger ...................................................................... 27

      3.   There Is No Evidence That New Publishers Are Likely to Enter at Sufficient
           Scale to Constrain PRH Post-Merger ........................................................ 28

i

4. Intra-Firm Competition Among a Publisher's Subsidiary Imprints Does Not Replace Competition Among Independent Publishers ..................... 29

C. Agents Cannot Protect Authors from the Merger's Anticompetitive Effects ................... 30

D. Defendants Failed to Demonstrate the Merger Would Increase Advances PRH Will Pay Authors ......................................................... 31

E. There Is No No Evidence that Changes in Retail Bookselling Affect the Market for Anticipated Top Sellers ......................................................... 31

F. Bertelsmann Controls Printing Assets Needed by Competitors ........................................ 32

V. DEFENDANTS' UNILATERAL EFFECTS ARGUMENTS ARE WRONG ..................... 32

A. Defendants Misconstrue Fundamental Principles of Unilateral Effects........................... 32

B. PRH and S&S Are Close Competitors to Each Other ........................................ 36

C. Defendants' Criticisms of Dr. Hill's Models Are Unavailing............................................ 38

D. Defendants Overstate the Competitiveness of Non-Big Five Publishers. ......................... 40

1. Big Five Publishers Do Have Competitive Advantages Over Other Publishers............ 40

2. Defendants' Aggregation of Non-Big Five Publishers Is Incorrect............................... 41

VI. DEFENDANTS MISSTATE THE FACTS AND THE LAW ON COORDINATED EFFECTS.................................................................................................... 42

VII. CONCLUSION......................................................................................................... 45

## TABLE OF AUTHORITIES

### Cases

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .......... 5, 42

*Catalano v. Target Stores*, 446 U.S. 643 (1980) .......... 43

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 753 (1984) .......... 30

*FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) .......... 6

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) .......... 9

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) .......... 2, 7, 44

*FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160 (3d Cir. 2022) .......... 10

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) .......... 16, 27

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) .......... 11, 14

*FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018) .......... 9

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) .......... 6, 8, 9, 16, 19

*Hospital Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986) .......... 3, 9, 44

*In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F. Supp. 1262 (N.D. Cal. 1988) .......... 11

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) .......... 8, 9

*United States v. Anthem*, *Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) .......... 16, 19, 20, 23, 28

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) .......... 8, 21, 22

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) .......... 44, 45

*United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990) .......... 7, 8, 10, 22

*United States v. Continental Can Co.*, 378 U.S. 441 (1964) .......... 6

*United States v. El Paso Natural Gas Co.*, 376 U.S. 651 (1964) .......... 6

*United States v. H & R Block Inc.,* 833 F. Supp. 2d 36 (D.D.C. 2011) .......... passim

*United States v. Marine Bancorp*., 418 U.S. 602 (1974) .......... 6

*United States v. Oracle Corp*., 331 F. Supp. 2d 1098 (N.D. Cal. 2004) .......... 10, 11

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1962) .......... 2, 8

### Statutes

15 U.S.C. § 18 .......... 2

**Other Authorities**

Carl Shapiro, Deputy Asst. Att'y Gen. for Economics, Antitrust Div., *Update from the Antitrust Divisio*n (2010) ......................................................................................... 39

Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 Antitrust L.J. 49 (2010) ........................................................ 33

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010)................ passim

**INTRODUCTION**

Penguin Random House's ("PRH") proposed merger with Simon & Schuster ("S&S") should be enjoined. This is a straightforward case: the merger would eliminate the significant head-to-head competition between the two companies that benefits authors today and result in a highly concentrated market for the acquisition of anticipated top-selling books. Pursuant to this Circuit's precedents, the merger is presumed to be unlawful.

Rather than persuasively counter the substantial factual record and Dr. Nicholas Hill's quantitative analysis, Defendants obfuscate. They misstate the law and fail to provide relevant and credible evidence to rebut the presumption. They seek to focus the Court's attention on outlier examples that are simply exceptions that prove the government correctly defined the market, demonstrated the merger is presumptively illegal, and proved the merger will likely harm authors.

The legal standards put forth by Defendants are inaccurate, and would hold the government to an impossibly high burden while requiring Defendants to provide the thinnest veneer of a defense to rebut the presumption of illegality. Such a framework inaccurately represents the law in this Circuit, as exemplified by *Anthem* and *Baker Hughes*, and would defeat the purpose of a burden-shifting exercise altogether. The government has met its burden to identify a relevant product market—the market for rights to publish anticipated top-selling books—and shown high levels of concentration sufficient to establish a presumption that the merger will substantially lessen competition.

Defendants have failed to satisfy their burden to rebut this presumption. Instead, in arguing the government's product market and evidence that the merger will lessen competition are incorrect, Defendants use statistical sleight-of-hand to suggest that Dr. Hill's analysis is

1

incorrect and rely on exceptions and outliers that do not represent the way that competition

typically works in the market for anticipated top sellers.  As demonstrated at trial and described

in the United States' Proposed Findings of Fact and Conclusions of Law ("United States'

Proposed Findings"), testimony, documents, and the economic analysis of Dr. Hill all provide

ample evidence that the merger's effects "may be substantially to lessen competition," in the

words of the Clayton Act, 15 U.S.C. § 18.  Accordingly, the merger should be enjoined.

## I.    DEFENDANTS MAKE SIGNIFICANT CONCESSIONS IN THEIR PROPOSED FINDINGS

1.       Defendants make several significant concessions that support finding that the

merger is presumptively illegal and that the United States alleged a proper relevant market.

### A.  Defendants Concede That Dr. Hill's Market Share and HHI Calculations Are Correct

2.       Defendants do not dispute that the government's shares for the market for

anticipated top-selling books are correctly calculated.  In their Proposed Findings ("Defs.

PFOF"), Defendants acknowledge that both Dr. Hill and their expert Dr. Snyder agree on the

market shares for the market for anticipated top-selling books.  *See* Dkt. 178 at 52 (Defs. PFOF ¶

113); Trial Tr. 2655:6–10 (Snyder); *see also* Dkt. 178 at 51 (Defs. PFOF ¶ 110).  Defendants do

not contest that the combined PRH and S&S will control approximately 49% of the market for

anticipated top-selling books.  *See* PX-959; Trial Tr. 1254:3–6 (Hill).  Thus, Defendants concede

the merger would result in a combined market share that far surpasses the 30% share the

Supreme Court found sufficient to establish a presumptive violation of Section 7.  *United States

v. Phila. Nat'l Bank*, 374 U.S. 321, 364 (1963); *see FTC v. H.J. Heinz Co.*, 246 F.3d 708, 711,

715–717 (D.C. Cir. 2001) (holding FTC established presumption where defendants would have a

combined share of 32.8% in a concentrated market); *Hospital Corp. of Am. v. FTC*, 807 F.2d

1381, 1384 (7th Cir. 1986) (finding transaction unlawful that raised defendant's market share from 14% to 26% and the market share of the four largest firms from 79% to 91%).

3.     Additionally, Defendants do not contest that Dr. Hill correctly calculated the HHIs in the market for anticipated top-selling books.  Dr. Hill found the HHIs in the relevant market were above the level necessary to create a presumption against the merger, as established by courts and the U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* (2010) ("Merger Guidelines").  Trial Tr. 1256:24–1258:11 (Hill); Trial Tr. 1259:4–12 (Hill) (establishing that the pre-merger HHI is 2,220 and the post-merger HHI is 3,111); Merger Guidelines § 5.3; *United States v. H & R Block, Inc.,* 833 F. Supp. 2d 36, 71–72 (D.D.C. 2011). While Defendants contest the government's definition of anticipated top sellers—*see infra* III for an explanation of why Defendants' criticisms are baseless—Defendants do not contest that if the government's market definition for anticipated top sellers is correct, the HHIs are correctly calculated and sufficient to establish that the merger is presumptively anticompetitive.

### B. Defendants Do Not Contest That They Are Close Competitors and That Significant Evidence Supports the Relevant Market

4.     While Defendants argue that market shares are not reliable indicators of competitive effects by stating that S&S is not PRH's closest competitor (which is itself a misleading statement, as S&S is one of PRH's closest competitors, *see infra* V.B), even they do not contest that PRH is S&S's closest competitor.  Mr. Karp conceded that PRH is the publisher that S&S's editors most frequently compete against.  *See* Trial Tr. 595:23–25 (Karp) ("Q. So you would expect Penguin Random House to be the publisher you bid against the most, correct? A. I think so, yes.").  And both Dr. Hill's and Dr. Snyder's data sets confirm that PRH is S&S's closest competitor—Dr. Hill's data sets show that S&S loses to PRH approximately 60% of the

time, and Dr. Snyder's data set indicates that PRH is the most frequent runner-up to S&S.  *See* Trial Tr. 1280:17–1281:17 (Hill); Trial Tr. 2927:17–2928:4 (Snyder).

5.      Defendants acknowledge commercially relevant factors distinguish books at different advance levels, Dkt. 178 at 26 (Defs. PFOF ¶ 46) ("*Every factor relevant* to commercial reality shows only a price continuum, not a distinct submarket of books defined anywhere around the $250,000 advance level.") (emphasis added), and concede that there are meaningful differences among books based on advance level.  For example, Defendants admit that there is a "general positive correlation" between higher advances and higher expected sales, more marketing support, higher initial print runs, and customized contract terms.  Dkt. 178 at 125 (Defs. PCOL ¶¶ 23–24); Trial Tr. 3265:12–15 (Defs.' Closing Statement) ("And to be clear, we have never disputed that there is a general correlation between advance levels and predicted sales.  After all, the profit and loss statements, Your Honor, are based on estimated sales."); Dkt. 178 at 26 (Defs. PFOF ¶ 45).

**C.  Defendants Admit That Mr. Dohle's Letter "Is Not Legally Binding"**

6.      Defendants concede that Mr. Dohle's promise made concerning PRH and S&S's competition post-merger "may not be legally binding."  *See* Dkt. 178 at 76–77 (Defs. PFOF ¶ 210).  This is in contrast to their Pre-Trial Brief, in which Defendants suggested that Mr. Dohle's promise could rebut the presumption if it was "credible, concrete, and supported by evidence." *See* Dkt. 159 at 50 (Defs. Pre-Trial Brief).  Defendants all but abandoned this argument in their proposed findings—spending a single paragraph on the promise, which cites no law—and effectively concede, as made clear in the United States' Proposed Findings, a mere promise not to abuse acquired market power is legally insufficient to rebut the government's prima facie case.  *See* Dkt. 177 at 84–85 (U.S. PFOF ¶¶ 227–229).

4

### D. Defendants Do Not Contest That S&S Understood the Transaction Carried Antitrust Risk

7.      The fact that the parties are before the Court today is not surprising.  It is undisputed that Defendants understood their merger—a merger that would transform the Big Five to the Big Four—risked violating the antitrust laws.  As a result, ███████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████

## II. DEFENDANTS CONTINUE TO MISSTATE THE APPROPRIATE LEGAL STANDARDS

8.      Defendants' Proposed Conclusions of Law misstate several applicable legal standards and attempt to add additional elements of proof to a Section 7 case.  The Court should reject Defendants' invitation to alter the standards established by the Supreme Court and the D.C. Circuit, and their attempts to avoid the presumption of illegality that applies to this merger.

9.      First, the Court should reject Defendants' suggestion that the language in Section 7 prohibiting mergers where the effect "may be substantially to lessen competition" requires the United States to prove harm with a heightened degree of certainty.  Defendants assert that a plaintiff must prove "a concrete, fact-based projection of substantial harm," and that here the United States is advocating for a standard of "speculation about the possibility of some harm."  Dkt. 178 at 116 (Defs.' PCOL ¶ 3).  Defendants are wrong on both counts: the United States' Proposed Findings sets forth the correct standard—the reasonable probability standard courts have applied for decades (*see Brown Shoe Co. v. United States*, 370 U.S. 294, 323 & n.39 (1962)

5

(the Clayton Act is "concern[ed] with probability, not certainties" and proscribes "mergers with probable anticompetitive effects"))—and explains why Defendants' effort to change the required level of proof is at odds with the settled caselaw.  Dkt. 177 at 27–29 (U.S. PFOF ¶¶ 35–40).  The United States is not arguing for a change of the Section 7 standard, and the evidence presented in this case clearly satisfies the existing standard.

10.    Second, the Court should reject Defendants' attempt to add a new element of proof in a Section 7 case by claiming that "the merger cannot be enjoined under § 7 unless the government proves that likely substantial harm is imminent."  Dkt. 178 at 152–3 (Defs. PCOL ¶ 96).  Defendants' new "requirement" purportedly "demands more than a speculative possibility that advances may be reduced by an unspecified amount over some unspecified period of time"—without citing a source.  Dkt. 178 at 152–3 (Defs. PCOL ¶ 96).[1]  When courts in this district have used the phrase "sufficiently probable and imminent," it has been in the context of discussing the general burden of proof in a Section 7 case, in order to clarify that it is something more than "ephemeral possibilities" and something less than a "certainty."  *See, e.g.*, *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 43 (D.D.C. 2018); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 115 (D.D.C. 2004).  The cases Defendants cite do not support the claim that courts require separate proof of "imminent harm" before enjoining a merger, and Defendants

---

[1] Elsewhere in their submission, Defendants cite a footnote in *United States v. Marine Bancorp.*, 418 U.S. 602, 623 n.22 (1974), as the source of this evidentiary "requirement."  The language, however, originally comes from *United States v. Continental Can Co.*, 378 U.S. 441, 458 (1964).  The full quote from *Continental Can* shows that this language was about something entirely different: "Moreover, the competition with which § 7 deals includes not only existing competition but that which is sufficiently probable and imminent."  Read in proper context, *Continental Can* was simply reaffirming the principle that cognizable competition can come not only from firms that currently operate in the market, but also from firms on the verge of entering the market that are already affecting competition within the market.  *Id.* (citing *United States v. El Paso Natural Gas Co.*, 376 U.S. 651 (1964)).

6

point to no cases holding that a plaintiff failed to make out a Section 7 claim solely because of a lack of "imminent harm."  In any event, there is no doubt on this record that authors face imminent harm from this merger—publishers are competing for new books every day, and the loss of S&S as an independent competitor would affect such competition immediately upon consummation of the merger.

11.    Third, the Court should reject Defendants' claim that the presumption of harm established by the government's prima facie case "[h]as [m]inimal [f]orce" and that it is a "low bar" that can be rebutted with a "minimal evidentiary showing."  Dkt. 178 at 118 (Defs. PCOL ¶ 7); Dkt. 178 at 138 (Defs. PCOL ¶ 55).  Defendants provide no legal support for this "minimal" standard.[2]  They also ignore that the quantum of proof required in rebuttal is not fixed.  As the D.C. Circuit explained in *Baker Hughes*, "[t]he more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully."  *United States v. Baker Hughes Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990).  Courts in this district subject rebuttal evidence to rigorous analysis and frequently reject it as insufficient.  For example, in *Heinz*, the D.C. Circuit rejected all of the defendants' proffered rebuttal arguments.  With respect to the defendants' efficiencies rebuttal, the *Heinz* court required "proof of extraordinary efficiencies" given the high concentration levels resulting from the merger—a standard the defendants failed to meet.  *Heinz*, 246 F.3d at 720.  Likewise, the court rejected the defendants' "innovation" rebuttal argument because of "the absence of *reliable and significant evidence*" to justify it.  *Id*. at 723 (emphasis

---

[2] Defendants also claim that "[t]he government suggests that defendants bear the burden of persuasion both to rebut the statistical presumption and to disprove other aspects of the government's prima facie case."  Dkt. 178 at 137–138 (Defs. PCOL ¶ 54).  Defendants fail to cite any instance in which the United States allegedly suggested that defendants "bear the burden of persuasion" in the rebuttal phase.  To the contrary, the United States' Proposed Findings accurately states the law that the burden of persuasion remains with the United States at all times.  Dkt. 177 at 31 (U.S. PFOF ¶ 45).

added); *see also Wilhelmsen*, 341 F. Supp. 3d at 68 (finding defendants failed to carry burden on ease of entry where claim was "at odds with" record evidence and "defies basic economic principles"); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 52–59 (D.D.C. 2017) (rejecting ease of entry rebuttal claim after conducting in-depth "assessment of the expert and non-expert evidence for each specific element of the entry analysis").  This is far from the "low bar" that Defendants claim.

12.    Defendants also misstate the standard for making this rebuttal showing, suggesting they need only provide evidence "indicating" that the market shares the United States presents are not representative.  Dkt. 178 at 138 (Defs. PCOL ¶ 55).  This is incorrect.  As the D.C. Circuit has stated, rebutting a presumption of illegality requires more: a defendant "must provide sufficient evidence that the prima facie case 'inaccurately predicts the relevant transaction's probable effect on future competition,' or it must sufficiently discredit the evidence underlying the original presumption."  *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (quoting *Baker Hughes*, 908 F.2d at 991).

13.    Fourth, this Court should reject Defendants' attempt to argue that the presumption of illegality should be ignored here because "[t]he government cites no case rejecting a merger on the basis of market shares alone where five market participants remained in active competition."  Dkt. 178 at 146 (Defs. PCOL ¶ 76).  While it is unclear what Defendants mean by "on the basis of market shares alone," there can be no doubt that there are numerous cases blocking a merger despite the fact that there would have been five remaining "market participants" (or many more) post-merger.  Indeed, the case that established the Section 7 presumption, *Philadelphia National Bank,* held a merger to be presumptively illegal based on market shares of 30% despite the fact that there existed "40 other banks in the Philadelphia

market." 374 U.S. at 363–64, 367; *see also H & R Block*, 833 F. Supp. 2d at 73 ("defendants note there are eighteen companies" in the relevant market); *Wilhelmsen*, 341 F. Supp. 3d at 60 (pie chart showing numerous other suppliers with total share of 9%); *Hosp. Corp.*, 807 F.2d at 1387 (seven competing hospitals remained after the acquisition); *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 905 (7th Cir. 1989) (five firms remaining post-merger). However, as explained in the United States' Proposed Findings, "merely counting the number of firms in the market is rarely relevant to antitrust analysis without considering other measures of their competitive significance." Dkt. 177 at 101 (U.S. PFOF ¶ 194). It is not the number of firms that drives the relevant inquiry. As precedent shows, the critical question is the extent to which each market participant is capable of constraining the merged firm.

14.     Defendants continue to attempt to distinguish this case from "any other where a merger has been blocked" by citing a handful of cases where the merging parties were "the top two competitors in the industry" or it was a "merger to duopoly." Dkt. 178 at 142 (Defs. PCOL ¶¶ 64–65). But Defendants argument is unavailing. First, it is not necessary in a unilateral effects case that the merging parties be either the top two competitors in a market or each other's closest competitor. Dkt. 177 at 102–103 (U.S. PFOF ¶¶ 196–97); Dkt. 177 at 125 (U.S. PFOF ¶ 250) (discussing cases). Nor is it necessary that the merger result in a duopoly or monopoly market structure. In fact, courts have found that a merger violates Section 7 even where, as here, there would be four or more significant competitors after the merger. *Elders Grain*, 868 F.2d at 902–903, 905 (merger reducing number of competitors "of any significance" from six to five); *Hosp. Corp.*, 807 F.2d at 1387 (the "four largest firms came to control virtually the whole market" as a result of acquisitions at issue); *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 207 (D.D.C. 2018) (enjoining merger resulting in four competitors); *Aetna*, 240 F. Supp. 3d at 9–10

(blocking merger).  Courts have also found Section 7 violations where the merged firm would have market shares similar to those here.  *FTC v. Hackensack Meridian Health, Inc.*, 30 F. 4th 160, 172 (3d Cir. 2022) (merged firm would have 47% share, with "next two closest competitors" at 21% and 9%, respectively); *Anthem*, 236 F. Supp. 3d at 207–09 (merged firm market share of approximately 50% in four-competitor market).  There is nothing to suggest that the facts of the cases cited by Defendants are necessary, rather than sufficient, conditions to block a merger.

## III.    DEFENDANTS' PRODUCT MARKET CLAIMS ARE WRONG

### A.  The Cases Defendants Cite Are Inapposite

15.     Defendants heavily rely on *Oracle*, a case from a different circuit that they claim is "similar" to the proposed market definition here.  Dkt. 178 at 121 (Defs. PCOL ¶ 14).  But *Oracle* is not similar to this case at all.  First, *Oracle* did not involve a submarket of targeted customers.  Rather, the issue was whether particular types of software products were reasonably interchangeable for buyers.  *Oracle* therefore provides no guidance on how to properly identify the members of a targeted customer submarket, the issue on which the Defendants seek to apply the case here.  *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1154 (N.D. Cal. 2004) (noting the government argued the case based on unique "product characteristics;" not characteristics of the customers).  Second, *Oracle* does not stand for the proposition that "a submarket cannot be defined solely on the basis of price differences among otherwise comparable products," as Defendants claim.  Dkt. 178 at 119–20 (Defs. PCOL ¶ 12).  There, the court found that "there were no generally available data" that would allow an expert to reliably calculate market shares in the proposed market—not that markets can never be defined by reference to prices.  331 F. Supp. 2d at 1148, 1158–59.  The *Oracle* court's concerns about the

availability of data to identify market participants and calculate shares do not apply here, where both experts agree that the data are accurate and complete.  Moreover, courts in this circuit do not follow *Oracle* when defining targeted customer markets.  For example, courts do not require the targeted group to have "objectively observable characteristics" (*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 45–46 (D.D.C. 2015)), and the fact that a proposed customer group may be somewhat "over-inclusive" does not render the submarket invalid.  *Id*. at 45 (finding defendants' "national customer" lists to be a "useful proxy" despite claim they were "over-inclusive").

16.    At bottom, *Oracle* is simply another in the line of cases Defendants cite where a proposed product market failed because there were reasonably interchangeable substitutes outside the candidate market.  *See id.* 331 F. Supp. 2d at 1158 (finding multiple substitutes for "high function" software); Dkt. 177 at 37–38 (U.S. PFOF ¶¶ 61–62).  In that way, *Oracle* is similar to *In re Super Premium Ice Cream Distribution Antitrust Litig.*, 691 F. Supp. 1262 (N.D. Cal. 1988), where the court held that ice cream options that were lower on the price/quality spectrum constrained the price of high-quality ice cream.  That is not the case here, where authors would not switch to writing books with only a niche readership as a substitute for writing and selling anticipated top sellers in order to defeat lowered advances.  *See* Dkt. 177 at 35–36 (U.S. PFOF ¶ 58).  Ultimately, both *Oracle* and *Super Premium Ice Cream* dealt with a different issue than the one the Court is deciding here.  Those cases addressed whether certain products were reasonably interchangeable with each other and therefore must be grouped in the same relevant product market.  They were not about how to identify a group of customers (or sellers) *within* a broader product market who could be targeted after the merger, which is the question the Court is addressing here.

17.     Defendants have not identified a single case that contradicts the United States'
statement at closing that "in this district, as far as I know, in the last decade . . . I cannot think of
a case where the plaintiff has failed on product market without there being an adequate
substitute."  Trial Tr. 3324:25–3325:4 (U.S. Closing).

### B. The Relevant Product Market Encompasses All Authors of Anticipated Top Sellers, Not Only Franchise Authors and Celebrities

18.     Defendants have attempted to twist the market at issue in this case by suggesting
that the United States is only interested in protecting the interests of the "elite of the elite"
authors.  Dkt. 178 at 9–10 (Defs. PFOF ¶¶ 5–6) (falsely claiming the United States narrowed its
case to "'franchise' authors who write multiple successful books, popular or notorious
celebrities, and authors with prior books that won the acclaim of literary awards").[3]  Contrary to
Defendants' claim, the United States' product market includes all books whose expected sales
would justify an advance of at least $250,000, Dkt. 177 at 38 (U.S. PFOF ¶ 64); not solely books
from franchise and celebrity authors.  A $250,000 advance paid out over three to four years after
the deduction of the typical 15% agent commission will earn an author between $53,000 and
$71,000 per year.  *See also* PX-656 at 1 ("I believe [the agent] is telling you the truth when she
says they can't [write the book] for less than $350,000.  Assume they're each making $150,000 a
year and they want to take a full year off.  They're just trying to break even after paying the
[agent's] commission.").

---

[3] Setting aside Defendants' strawman market definition, it bears noting that authors of
anticipated top-selling books have earned the advance they receive by working hard, often over
many decades, to generate the reputation and sales that justify an advance in the range of
millions of dollars.  Defendants' characterization of such authors as "elite" in order to support a
multi-billion-dollar merger among two publishing giants simply underscores one of the
animating principles at play in this case: a merger that would reduce compensation for authors'
work presents exactly the sort of harm that the Clayton Act was designed to address.

19.     It does not matter whether "everyone recognizes" the books in the United States'

market as likely best sellers.  *See* Dkt. 178 at 10–11 (Defs. PFOF ¶ 8).  It only matters that

publishing professionals—editors and agents—can recognize books that are expected to sell a lot

of copies and appeal to a large audience—a fact for which there is ample proof.  Trial Tr.

1541:21–25 (Hill); Dkt. 177 at 40 (U.S. PFOF ¶ 70); Dkt. 177 at 47–48 (U.S. PFOF ¶¶ 89–91);

Trial Tr. 1134:14–1135:3 (Weisberg); Trial Tr. 1229:20–1230:6 (Hill).  As Dr. Hill articulated,

"the threshold is identifying a group of books and authors that are different than other authors."

Trial Tr. 1239:4–6 (Hill).

20.     The summaries Ms. Porro created illustrate some examples in which PRH and

S&S agreed—based on their final bids—that a book was an anticipated top seller.  *See, e.g.*, PX-

932-B at 1 (both bidding $300,000); PX-955-B (both bidding $1.5 million); PX-954-B at 1 (three

PRH divisions and S&S all bidding $1.05 million); PX-938-B at 1 (both bidding $750,000); PX-

950-B at 1 (bidding $675,000 (PRH) and $700,000 (S&S)); PX-943-B at 1 (bidding $390,000

(PRH) and $350,000 (S&S)); PX-935-B at 1 (bidding $350,000 (PRH) and $368,000 (S&S)).

Only one of the competitive episodes summarized by Ms. Porro involved an author who is

inarguably famous selling a work for millions of dollars—███████████—and none involved

franchise writers.  Moreover, the United States presented evidence showing how many authors in

this market would be harmed by a merger of PRH and S&S, including non-franchise authors,

debut authors, non-fiction authors, and even a few celebrities of various levels of fame and

advance level.  Dkt. 177 at 126–129 (U.S. PFOF ¶¶ 252–254); Dkt. 177 at 140–141 (U.S. PFOF

¶¶ 279, 284).

21.     Defendants describe Where the Crawdads Sing as an example of an

"unanticipated best seller."  Dkt. 178 at 32 (Defs. PFOF ¶ 82).  Where the Crawdads Sing,

however, sold to PRH for ███████, DX-413 at 1, placing it squarely within the market for "anticipated top sellers." The other three books cited—Gone Girl, Fifty Shades of Gray, and The Life-Changing Magic of Tidying Up—were sold to PRH nearly a decade or more ago with no record evidence of their advance level.

### C. Authors of Anticipated Top Sellers Can Be Targeted for a Decrease in Advances

22.     Defendants suggest that authors of anticipated top sellers cannot be targeted because they do not share "objective," or "easily identifiable" characteristics. *See, e.g.*, Dkt. 178 at 38–39 (Defs. PFOF ¶¶ 78–79); Dkt. 178 at 131 (Defs. PCOL ¶ 38).  But as the court explained when rejecting a similar argument in *Sysco*, "price discrimination can occur even when customers do not have common observable characteristics."  *Sysco*, 113 F. Supp. 3d at 45–46; *see also id.* at 46 ("Price discrimination can occur in such a marketplace, even if the customers do not share specific identifiable traits").  Instead, price discrimination was feasible because the *Sysco* defendants "engage[d] in individual negotiations with their national customers and possess[ed] substantial information about them."  *Id.* at 46.

23.     The same is true here.  Book deals are individually negotiated.  *See* Dkt. 56 at 12 (Defs. Am. Answer ¶ 33).  And publishers have "substantial information about" books before they bid on them.  *See Sysco* 133 F. Supp. 3d at 46.  When deciding what to bid, publishers typically have a finished manuscript, partial manuscript, or book proposal.  *See* Trial Tr. 245:5–17 (Pande); Trial Tr. 246:23–247:6 (Pande); Trial Tr. 1750:4–7 (Walsh); 1912:13–1913:1 (Duhigg); Trial Tr. 2105:19–21 (Ross).  Publishers often know the sales history of the author's previous books, *see*, *e.g.*, ████████████████████████████████ and the

author's social media following or platform, *see* Trial Tr. 1111:18–25 (Weisberg); DX-21 at 5.[4]
Publishers also often meet with the author or agent before bidding. *See* Trial Tr. 1754:3–24
(Walsh). Publishers have the sales history of comparable titles to project a book's sales,
including some provided by the author's agent. *See, e.g.*, Trial Tr. 1753:12–1754:2 (Walsh); PX-
2002 at 62–63 (Stehlik Dep. 151:18–152:11); PX-42 at 5.

24.    Publishers already use this information to project the book's sales and hence
determine what they will pay for the book. Thus, publishers are already identifying whether a
book is an anticipated top seller, and publishers can target authors of anticipated top sellers. *See*
Dkt. 177 at 40–43 (U.S. PFOF ¶¶ 69–76). This is the case regardless of the degree of precision
with which publishers can anticipate the sales of a book at the time of acquisition. The moment
that a publisher submits a bid of $250,000 or more for a book, the publisher knows that this book
is an anticipated top seller, and that few other independent publishers are likely to be bidding
competitively—and one fewer after the merger of PRH and S&S.

### D. Targeted Customers Can Be Harmed When They Lie On a "Continuum"

25.    Defendants concede that for "every factor relevant to commercial reality," books
differ based on the advances they receive. *See* Dkt. 178 at 26 (Defs. PFOF ¶ 46); Dkt. 178 at
125–26 (Defs. PCOL ¶¶ 24–25). Nevertheless, Defendants argue that because such differences
occur along a "continuum" and do not sharply differ above and below the $250,000 threshold,

---

[4] Defendants repeatedly suggest that the only authors with track records or platforms are
celebrities who receive multi-million-dollar advances. *See, e.g.*, Dkt. 178 at 23 (Defs.' PFOF ¶
39). This is false. For example, S&S CEO Jonathan Karp testified that S&S has "so many
repeat authors" and "a lot of the people who we publish year after year constitute a good part of
our list." Trial Tr. 478:21–23 (Karp); *see also* █████████████████████████████
████████████████████; PX-577 (discussing track record for book that later received $600,000);
PX-945 B (showing advance for book discussed in PX-577).

the government's market is not properly defined.  *See* Dkt. 178 at 26 (Defs. PFOF ¶ 46); Dkt.

178 at 125–26 (PCOL ¶¶ 24–25).  Such a difference is not required by this Court's targeted

customer cases or the Merger Guidelines.

      26.      Similar to the "continuum" at issue in this case, the Court described a continuum

of insurance customers in *Anthem*: "the larger a customer becomes, it requires greater,

customization, sophistication and network coverage, as its range of choices narrows."  *See*

*United States v. Anthem*, *Inc.*, 236 F. Supp. 3d 171, 199 (D.D.C. 2017).  The *Anthem* Court found

that the existence of such a continuum *supported* the government's market definition of "national

customers," *i.e.*, employers with 5,000 or more employees, not the opposite, as Defendants argue

here.  *See Anthem*, 236 F. Supp. 3d at 199–200; Dkt. 178 at 26 (Defs.' PFOF ¶ 46).

      27.      In *Wilhelmsen* and *Staples II*, this Court defined markets around targeted

customers using a numerical threshold without finding that the government's threshold

represented a sharp break point.  *See Wilhelmsen*, 341 F. Supp. 3d at 52–56; *FTC v. Staples, Inc.*,

190 F. Supp. 3d 100, 118 & n.10 (D.D.C. 2016) ("*Staples II*").  And the government's expert in

*Wilhelmsen* performed an analysis to show that his 10-ship threshold was *not* drawn at a sharp

boundary between "global fleets" and other fleets.  *See Wilhelmsen*, 341 F. Supp. 3d at 54–56.

      28.      The Merger Guidelines explicitly contemplate that mergers can harm a group of

targeted customers situated along a continuum.  In a discussion of "Targeted Customers and

Price Discrimination," the Guidelines describe a hypothetical merger harming small buyers but

not large buyers, while noting that price discrimination targeted at small buyers "can occur *even*

*if* there is no discrete gap in size between the classes of large and small buyers."  Merger

Guidelines § 3 (emphasis added).  Requiring—as Defendants suggest—proof of sharp

differences above and below the government's threshold in a targeted customer case is

inconsistent with this Circuit's precedents and the Merger Guidelines, and would immunize mergers that unquestionably harm some sellers but not others so long as the group of affected sellers don't have sharp distinctions from the unaffected group.

### E.  $250,000 Is an Appropriate Threshold to Identify Anticipated Top Sellers

29.     Anticipated top sellers are defined as books that receive an advance of $250,000 or more.  Dkt. 177 at 38 (U.S. PFOF ¶ 64).  Authors of anticipated top sellers face different competitive conditions as demonstrated by the significantly different market shares that the non-Big Five have for anticipated top sellers (10%) compared to non-anticipated top sellers (45%).  Dkt. 177 at 39 (U.S. PFOF ¶ 64).

30.     Defendants argue that the government should have used a $50,000 threshold, claiming market shares for non-Big Five publishers materially change at that level.  Supporting this argument, Dr. Snyder presented market shares in three advance ranges: below $50,000, from $50,000 to $999,999, and $1,000,000+.  Dkt. 178 at 22– 23 (Defs. PFOF ¶¶ 36–37).

31.     Defendants are wrong for several reasons.  As an initial matter, defining a market for anticipated top sellers using an advance threshold of $250,000 does not preclude the existence of other markets, such as a $50,000 to $249,999 market.  *See* Trial Tr. 3172:17–3173:6 (Hill); Merger Guidelines § 4.1.1; Dkt. 177 at 33–34 (U.S. PFOF ¶ 54).[5]

32.     Next, a closer look at Dr. Snyder's exhibit shows that the $250,000 threshold captures the distinct preferences and competitive conditions of anticipated top sellers.  Dr. Hill demonstrated this by splitting Dr. Snyder's $50,000 to $999,999 range—which mixed anticipated top sellers with other books—into two ranges: $50,000 to $249,999 and $250,000 to

---

[5] Defendants never explained how authors receiving advances of $250,000 or more could be protected from the likely harms of the merger by the level of competition for books in the $50,000 to $249,999 range.

$999,999.  This created a total of four ranges: $0 to $49,999, $50,000 to $249,999, $250,000 to

$999,999, and $1,000,000+.  The market shares in the two ranges that concern anticipated top

sellers ($250,000 to $999,999 and $1,000,000+) look very similar to one another, yet different

from both the $0 to $49,999 and $50,000 to $250,000 ranges.  Trial Tr. 3047:6–3048:12 (Hill)

(discussing slide 6 of U.S. Demonstrative 8).  This is not to say that market shares in the $0 to

$50,000 range are identical to market shares in the $50,000 to $250,000 range.  As Dr. Hill

acknowledged, for books that receive advances between $50,000 and $250,000, there is a

"transition period" in which the non-Big Five's share is less than their share for books below

$50,000.  *See* Trial Tr. 3048:6–12 (Hill).

      33.     More fundamentally, Defendants misconstrue the purpose of the advance

threshold in Dr. Hill's analysis.  It was not meant to identify the precise point at which

competitive conditions and author preferences change from a zero dollars per book to something

else; as Defendants admit, these changes likely happen along a "continuum."  *See* Dkt. 178 at 26

(Defs. PFOF ¶ 46).  Instead, the threshold was meant as a practical way to identify a group of

authors who are more likely to be harmed by the merger than others because of that group's

preferences and the competitive conditions they face.  *See* Trial Tr. 1228:18–1229:10 (Hill);

Trial Tr. 1231:5–19 (Hill); Trial Tr. 3202:4–22 (Hill); *see also* Merger Guidelines § 3.  The

$250,000 threshold successfully does that.  Dkt. 177 at 31–63 (U.S. PFOF ¶¶ 46–125).  To check

that his results were not sensitive to the exact threshold used, Dr. Hill calculated market shares at

various other thresholds ($150,000, $350,000, $500,000, and $1 million) and found that these

alternatives generate similar results.  Dkt. 177 at 38 (U.S. PFOF ¶ 64); Dkt. 177 at 64–65 (U.S.

PFOF ¶ 128).  This stability around Dr. Hill's $250,000 threshold supports his choice, rather than

undermines it as Defendants suggest. *See Wilhelmsen*, 341 F. Supp. 3d at 55–56; *see also supra* III.E.

34.     Finally, the Court's rejection of an analogous argument in *Anthem* further supports the government's threshold.  In *Anthem*, the defendants argued that instead of the 5,000-employee threshold used by the government to define a "national customer," a better definition would be 1,000 or 3,000.  *Anthem*, 236 F. Supp. 3d at 199.  The Court acknowledged that some employers with fewer than 5,000 employees may have "needs and characteristics similar to" those with 5,000 or more.  *Id.*  But the suite of reasonable options available to Anthem's largest customers (some with more than 200,000 employees) were more limited than customers at defendants' proposed threshold, who had more insurance products to choose from.  *Id.* at 200.  The Court found the government's threshold superior because it "focuses the competitive analysis on the products that industry participants appear to agree are preferred by customers with more than 5000 employees."  *Id.*

35.     The same is true here.  The options for an author who receives a $50,000 advance are quite different than an author receiving a multi-million-dollar advance.  For example, many publishers have paid advances of at least $50,000 but never $250,000 or more.  The vast majority of publishers have never even paid more than $175,000 for a book, *see* Trial Tr. 3076:21–3077:8 (Hill) (discussing U.S. Demonstrative 8 at slide 20), suggesting that they are not viable options for authors who receive the largest advances.  Lowering the market threshold to $50,000 would assign market shares to publishers who cannot serve many authors in the market for anticipated top sellers.  Therefore, assigning these publishers market share would paint a misleading picture about the likely competitive effects of the merger for many authors of anticipated top sellers.  By drawing the line at $250,000, a threshold where market shares are stable, *see* PX-960, the

government's threshold "focuses the competitive analysis on the [publishers] that industry

participants appear to agree are preferred by" authors who receive advances of $250,000 and

more. *Anthem*, 236 F. Supp. 3d at 200; *see also* Merger Guidelines § 4.1.1 (the "overarching

principle" of "measuring market shares is to illuminate the evaluation of competitive effects").

### F.  The Government Correctly Applied the "Narrowest Market" Principle

36.     In addition to arguing that the government's proposed market is too narrow,

Defendants now argue that it is too broad.  Defendants now claim that because a market for

books with advances of at least $1,000,000 passes the hypothetical monopsonist test, the

government's market violates the "narrowest market rule."  Dkt. 178 at 130–31 (Defs. PCOL ¶¶

36–37).  This argument misconstrues the "narrowest market" principle.

37.     The "narrowest market" principle is used by the Department of Justice and the

Federal Trade Commission to determine the substitutes that should be included in the product

market (specifically those substitutes that can defeat the hypothetical monopolist test and

therefore need to be included in the market versus those substitutes that are too weak and

therefore are generally excluded).  *See* Merger Guidelines § 4.1.1 (explaining the logic that

otherwise "the relative competitive significance of more distant substitutes is apt to be overstated

by" their market shares).  That is what the government did here when it excluded self-publishing.

38.     The issue is different, however, when identifying the targeted customers that

should be included in the market and determining whether the government should focus on the

fewest customers who could be targeted, as Defendants implicitly suggest.  Here, the Merger

Guidelines embrace analyzing targeted-seller markets using a broader group of sellers than the

narrowest possible one, and state, "[i]f prices are negotiated individually with" sellers—as they

are here—"the hypothetical [monopsonist] test may suggest relevant markets that are as narrow

as *individual* [sellers] . . . . Nonetheless, the Agencies often define markets for *groups* of targeted [sellers], *i.e.*, by type of [seller], rather than by individual [seller].  By so doing, the Agencies are able to rely on aggregated market shares that can be more helpful in predicting the competitive effects of the merger."  Merger Guidelines § 4.1.4 (emphasis added).  The government followed this approach here: instead of analyzing individually each author (or small slice of authors) who could be harmed (as would be the narrowest market along the dimension Defendants contest), the government properly grouped a manageable set of similarly-situated authors together from whom market shares could meaningfully be drawn and analyzed—authors of anticipated top sellers.

### G.  The Relevant Market Properly Excludes Self-Publishing

39.    Despite conceding in their closing arguments that "nobody was arguing in this case" that self-publishing is an "outside option" for authors, Trial Tr. 3272:17–25 (Defs. Closing Argument), Defendants now try to do just that.  Dkt. 178 at 75–76 (Defs. PFOF ¶ 181–185).  The record is clear that they were right the first time: self-publishing is not a reasonable alternative for the vast majority of authors, and instances such as Brandon Sanderson's Kickstarter campaign are outliers rather than a competitive trend.  *See* Dkt. 177 at 35–36 (U.S. PFOF ¶¶ 81–82; *see also* Trial Tr. 2898:15–18 (Snyder); Trial Tr. 1076:4–10 (Weisberg).

## IV.    DEFENDANTS OFFER NO REAL REBUTTAL

40.    Defendants' attempts to rebut the presumption of illegality fail.  They do not contest, let alone discredit, the market shares or HHIs used to measure market concentration that were calculated by Dr. Hill, nor do they show that the presumption inaccurately predicts the merger's probable effect on future competition.  *Anthem*, 855 F.3d at 349; *Baker Hughes*, 908

F.2d at 991.  Though Defendants quibble at the margins, their focus on outliers does not change the facts that underly the core of the government's case and the presumption of illegality.

41.     As discussed above (*supra* ¶ 11), Defendants misstate the legal standard by asserting that they need only make a "minimal evidentiary showing" to rebut the government's prima facie case.  Dkt. 178 at 138 (Defs. PCOL ¶ 55).  Defendants make this claim in spite of *Anthem*'s and *Baker Hughes*'s plain language that "[t]he more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully."  *Anthem*, 855 F.3d at 349–350 (quoting *Baker Hughes*, 908 F.2d at 991).  When assessed under the proper standard, Defendants' arguments lack substantial, if any, actual evidentiary support and are insufficient to rebut the presumption that their merger is illegal.

### A.  The Government's Market Share Calculations Meaningfully Explain How Competition Works in the Relevant Market

42.     Instead of offering evidence that market shares overstate the extent of competition between PRH and S&S—such as evidence that the two publishers specialize in different genres—Defendants focus on misleading statistics to support their assertions.

43.     First, they assert that PRH and S&S are winner and runner-up in "only" 6–7% (or, alternatively, 12%) of acquisitions.  *See* Dkt. 178 at 141 (Defs. PCOL ¶ 61).  This statistic is both incorrectly calculated and lacks context.  As Dr. Hill testified, and as Defendants appear to acknowledge, Dr. Snyder inflated his denominator by including in it instances in which there was no known runner-up, which halved the correct calculation from 13% to 7%.  *See* Trial Tr. 2918:12–2919:24 (Snyder); Trial Tr. 3055:11–3056:18 (Hill).

44.     Even the corrected statistic, *i.e.*, 12 or 13%, fails to offer insight for unilateral effects analysis unless it is placed in context.  To the government's knowledge, no court has ever performed this calculation to evaluate the likely unilateral effects of a merger.  If they had,

however, many would have found calculations similar to Defendants' 12%, showing that, if

anything, Defendants' calculation *supports* the government's contentions regarding unilateral

effects.  One can perform this calculation using diversion ratios and market shares as shown in

the footnote.[6]  In *H & R Block*, fewer than 5% of customers viewed the merging parties as their

top two choices.[7]  In *Hackensack*, it was 12%.[8]  And in *Anthem*, it was about 15%.[9]  In each case,

the court found that the proposed mergers were likely to cause unilateral effects despite "only"

5–15% of customers viewing the merging parties as their top two options.

---

[6] The calculation is performed by summing the products of each merging party's market share and the diversion ratio from that merging party to the other.  To illustrate, Firm A's market share describes how often the firm is expected to win.  And the diversion ratio from Firm A to Firm B describes how often Firm B will be the runner up if Firm A wins.  The product of the two calculates the probability that Firm A was the winner and Firm B the runner up.  The equation is: [Firm A share] * [Diversion ratio A $\rightarrow$ B] + [Firm B Share] * [Diversion Ratio B -> A].

To calculate the diversion ratios when they are proportional to market shares, the formula is Diversion Ratio A $\rightarrow$ B = [Firm B share] / (1 – [Firm A share]).  Therefore, the full calculation when using diversion according to share can be written as: [Firm A share] * [Firm B share] / (1 – [Firm A share]) + [Firm B share] * [Firm A share] / (1 – [Firm B share]).  Here, PRH has a 37% share and S&S has a 12% share and the calculation (using shares to determine diversion) is 0.37 * 0.12 / (1 - 0.37) + 0.12 * 0.37 / (1 - 0.12) = 12.1%.

[7] H & R Block had a 15.6% market share and TaxACT had a 12.8% market share. *H & R Block*, 833 F. Supp. 2d at 72.  The diversion ratio from H & R Block to TaxACT was 14% and the diversion ratio from TaxACT to H & R Block was 12%.  *See id.* at 86.  The calculation is therefore: 0.156 * 0.14 + 0.128 * 0.12 = 3.7%.

[8] HMH (Hackensack) had 36% market share and Englewood had a 12% market share.  *See* Pl.'s Proposed Findings of Fact and Conclusions of Law at 23, *FTC v. Hackensack Meridian Health, Inc.*, No. 20-cv-18140 (D.N.J. June 4, 2021).  The diversion ratio from HMH to Englewood was 17% and the diversion ratio from Englewood to HMH was 45%.  *See id.* at 32.  The calculation is therefore: 0.36 * 0.17 + 0.12 * 0.45 = 11.5%.

[9] The government's economic expert calculated market shares in two ways.  Under the first measure, Anthem had a 41% market share and Cigna had 6%.  Under the second, Anthem had 41% and Cigna had 8%.  *Anthem*, 236 F. Supp. 3d at 208.  Similarly, the government's economic expert estimated diversion ratios in two ways.  For Anthem to Cigna, the results were 17% and 35%.  *Id.* at 217–18.  For Cigna to Anthem, the results were 60% and 54%.  *Id.*  Using the average of the market share and diversion estimates, Defendants' calculation is therefore: (0.40 + 0.41) / 2 * (0.17+0.35) / 2 + (0.06 + 0.08) / 2 * (0.60+0.54) / 2 = 14.5%.

45.     Specifically, Defendants point to their 12% calculation as proof that the merging parties' market shares are "highly misleading."  *See* Dkt. 178 at 140–41 (Defs. PCOL ¶¶ 60–61). This claim is wrong.  By Defendants' own admission, the 12% calculation is derived using only the merging parties' market shares.  *See* Dkt. 178 at 77 (Defs. PFOF ¶¶ 187–188).  Defendants' calculation comes from an equation that, as a matter of arithmetic, will transform Defendants' 49% share into a small-seeming number.  *See supra* note 6.  They therefore cannot prove that market shares are "highly misleading."  *See* Dkt. 178 at 140–141 (Defs. PCOL ¶¶ 60–61).

46.     Second, Defendants state that that the non-Big Five are winners or runners-up in 23% of auctions, which they claim shows that the non-Big Five are a competitive constraint more than twice as often as market shares indicate.  *See* Trial Tr. 2689:22–2690:5 (Snyder); Dkt. 178 at 70 (Def's PFOF ¶ 166).  Once again, this is misleading.

47.     Contrary to Defendants' assertions, their 23% statistic is not directly comparable to market shares.  *See* Trial Tr. 3052:24–3053:8 (Hill).  Since the total of market shares and the runner up shares each sum to 100%, to directly compare the 23% to non-Big Five publishers' market shares it should be divided by 2.  Trial Tr. 3051:16–3052:13 (Hill); *see* Dkt. 177 at 83 (U.S. PFOF ¶ 156).  With the proper adjustment, the 23% corresponds to 11.5%, which is similar to the market share of the non-Big Five publishers.  *See* Trial Tr. 3053:11–17 (Hill).  Rather than prove that the non-Big Five compete more than their shares suggest, as Defendants allege, Defendants' statistic does the opposite.  *See* Dkt. 177 at 83 (U.S. PFOF ¶ 156).

48.     Third, Defendants assert that the non-Big Five submit bids in 54% of multi-bidder auctions, which implies they are more significant competitors than their market shares suggest. *See* Dkt. 178 at 70 (Defs. PFOF ¶ 166).  They are wrong.  Defendants' 54% number includes instances in which non-Big Five publishers bid in an auction's early rounds but dropped out far

before its conclusion. *See, e.g.,* PX-935-B (book sold for $350,000; Norton bid $105,000); PX-941-B (book sold for $825,000; Norton and Bloomsbury bid $100,000 and $75,000 respectively). For example, even if a non-Big Five publisher bid a dollar, this would be counted in Defendants' 54% statistic. *See* Trial Tr. 3148:12–3149:14 (Hill). Such bids don't measure competitive significance.

49.    Fourth, instead of reporting the diversion ratios calculated by their expert, Defendants repeatedly cite DX-436, a figure taken out of context from Dr. Hill's reply report that Dr. Hill used to rebut a specific point from Dr. Snyder's rebuttal report. *See, e.g.*, Dkt. 178 at 76–77 (Defs. PFOF ¶ 186); Dkt. 178 at 77 (Defs. PFOF ¶ 188); Dkt. 178 at 91 (Defs. PFOF ¶ 221); Dkt. 178 at 109 (Defs. PFOF ¶ 267). DX-436 presents runners-up from Dr. Snyder's agency data for only a subset of the time period Dr. Snyder analyzed. *See* DX-436 (2019–2021); Trial Tr. 2657:7–25 (Snyder) (2018–2021). The diversion ratio from S&S to PRH is smaller than Dr. Snyder's complete results, and the diversion ratio from PRH to S&S is about the same. *Compare* DX-436 *with* Trial Tr. 2927:4–25 (Snyder) (discussing Snyder Rebuttal Report Exhibits VI.4 and VI.5). Thus, Defendants' claims based on DX-436 are derived from diversion ratios from a subset of an undisputedly unrepresentative sample of 22 contracts. *See* Dkt. 177 at 139 (U.S. PFOF ¶ 277); Trial Tr. 2997:17–22 (Snyder). Had Defendants presented the diversion ratios their expert actually calculated, they would have shown a diversion ratio for S&S to PRH that is consistent with Dr. Hill's estimates—which show substantial head-to-head competition between the merging parties—and that suggests that PRH is S&S's closest competitor. *See* Dkt. 177 at 138–39 (U.S. PFOF ¶ 276); Trial Tr. 2927:4–2928:10 (Snyder).

**B. Defendants Failed to Show That Entry of New Publishers and Expansion of Current Publishers Will Constrain PRH Post-Merger**

50.     The Merger Guidelines and this district's precedents require that a defendant show that entry by new competitors or expansion by incumbent competitors be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern" posed by a merger. *H & R Block*, 833 F. Supp. 2d at 73 (quoting Merger Guidelines § 9). Defendants must provide evidence that satisfies their burden with each of these hurdles. Defendants have provided insufficient evidence to clear any of them.

**1. There Is No Evidence That Expansion by the Remaining Big Five Publishers Is Likely to Constrain PRH Post-Merger**

51.     Defendants try to point to HarperCollins', Hachette's, and Macmillan's plans to continue to compete just as they did pre-merger as evidence those companies are likely to increase their presence post-merger. The CEOs of HarperCollins, Hachette, and Macmillan, however, all testified that the merger itself will *not* cause them to be more aggressive in acquiring books. *See* Dkt. 177 at 92–93 (U.S. PFOF ¶¶ 175–177). Citing to plans written before the merger was announced or referring to statements about what a company would *like* to do ignores concerns expressed by those same publishers that the merger will affect their ability to compete against the combined company. *See, e.g.*, Trial Tr. 1086:6–1087:5 (Weisberg) (ability to acquire books generally);

52.     If it were easy for HarperCollins, Hachette, or Macmillan to win books over PRH and S&S, they would have done so already. Instead, they have lost share since 2019, *see* Dkt.

26

177 at 62–63 (U.S. PFOF ¶ 138 & Fig. 6 (PX-994)).  Defendants did not, and cannot, point to

any evidence showing that HarperCollins, Hachette, or Macmillan are likely to expand their

market shares against a combined PRH and S&S sufficiently to replace S&S's competitive

significance.  Growing with, or slower than, the market's organic growth is not sufficient to

replace the lost competition.  *See* Dkt. 177 at 92–93 (U.S. PFOF ¶¶ 176–177).

### 2. There Is No Evidence That Expansion by Non-Big Five Publishers Is Likely to Constrain PRH Post-Merger

53.     Defendants also posit that certain smaller publishers *might* be able to expand and

become a new, major publisher.  However, the evidence Defendants cite does not show that

expansion by these publishers will be timely, likely, or sufficient.  For example, defense counsel

questioned Dr. Hill by using a news report about Disney that was not admitted into evidence,

suggesting that Disney would re-enter the adult trade book category and "within five years, []

aims to release 50 to 60 titles through" its Hyperion imprint.  *See* Dkt. 178 at 57– 58 (Defs.

PFOF ¶ 126); Trial Tr. 1569:2–6 (Hill).  Dr. Hill's acknowledgement of the news article is not

evidence that proves Disney will replace S&S's competitive significance.  Even if Disney's

intentions as represented by Defendants are taken at face value, there is no evidence regarding its

plans to acquire books with advances above $250,000 per year, and the five-year time horizon is

well outside the two-to-three years used to evaluate entry.  *See Staples II*, 190 F. Supp. 3d at 133.

54.     Defendants also assert Amazon is "a significant non-Big Five competitor [that] is

only becoming more competitive."  Dkt. 178 at 73 (Defs. PFOF ¶ 177).  This description is

contrary to the trial testimony, including from publishers cited by Defendants in their Proposed

Findings, *compare* Dkt. 177 at 97–98 (U.S. PFOF ¶¶ 187–189) *with* Dkt. 178 at 58 (Defs. PFOF

¶ 127), and Defendants' own executives.  Trial Tr. 356:10–18 (Eulau).  These assessments of

Amazon's competitive significance in the market for anticipated top sellers are based on

observations of Amazon's retrenchment after several of their high-profile author signings failed. *See, e.g.*, Trial Tr. 171:24–173:6 (Pietsch); PX-2002 at 101–102 (Stehlik Dep. 201:17–202:1). Defendants do not meet their burden by claiming Amazon could theoretically compete more. Rather, they must show that Amazon is likely to expand its presence in acquiring anticipated top sellers in a timely and sufficient way to counter the merger's likely anticompetitive effects. Defendants have not done so.

### 3.    There Is No Evidence That New Publishers Are Likely to Enter at Sufficient Scale to Constrain PRH Post-Merger

55.    With no evidence in the record sufficient to show that current publishers will replace S&S's competitive significance, it is not surprising that Defendants similarly cannot point to any evidence that a new publisher could do so either.  Though they provide a handful of examples of new publishers acquiring anticipated top sellers, these examples are notable because they are exceptions that prove the rule—that entry is difficult.  By focusing on these outliers, Defendants once again fail to provide any grounds for the Court to find that a new publisher will replace S&S's competitive significance.

56.    Defendants' use of Spiegel & Grau, Zando, and Astra as examples, *see* Dkt. 178 at 59–60 (Defs. PFOF ¶¶ 130–132), illustrates the problems new publishers face.  These publishers have yet to take any significant share, and there is no evidence in the record that they, or any other new publisher, could grow at such a rate that they could replace S&S's competitive significance, and thereby rebut a presumption of illegality.[10]  *See Anthem*, 236 F. Supp. 3d at 222; *H & R Block*, 833 F. Supp. 2d at 73.  That Spiegel & Grau, Zando, Astra, or any other

---

[10] The record is clear that Spiegel & Grau was not sufficiently profitable when it was an imprint of PRH and that PRH retained its backlist when it discontinued the Spiegel & Grau imprint.  Trial Tr. 756:7–15 (Dohle); Trial Tr. 2388:6–8 (McIntosh).

publisher can publish one or two successful books does not show that their market shares understate their competitive significance, or that any one of these firms will turn into an S&S-sized publishing house in the time frame required.  To assume that any of these new firms will be able to replace S&S is idle, optimistic speculation, especially since no publisher has joined the ranks of the Big Five in the past thirty years.  *See* Dkt. 177 at 86 (U.S. PFOF ¶ 163); Trial Tr. 163:7–165:6 (Pietsch).[11]

57.    Defendants rely on the unfounded assertions of former literary agent Jennifer Walsh for their claims related to the expansion plans of various smaller publishers.  *See* Dkt. 178 at 54–55 (Defs. PFOF ¶ 144).  Ms. Walsh, however, has no basis to testify as to any publisher's financial position or ability to invest in new acquisitions.  *See* Dkt. 178 at 54 (Defs. PFOF ¶ 144).  The United States' agent witness, Ayesha Pande was more credible on this topic when she explained why she typically excluded publishers like Spiegel & Grau, Zando, and Astra from her first wave of submissions: "[A]ll of these publishers are still too new to have really proven themselves."  Trial Tr. 250:2–9 (Pande); *see* Dkt. 177 at 90 (U.S. PFOF ¶ 190).  There is no direct evidence about any expansion plans, if they exist, for any small publishers.

### 4.    Intra-Firm Competition Among a Publisher's Subsidiary Imprints Does Not Replace Competition Among Independent Publishers

58.    PRH claims that post-merger "S&S editors and imprints would not disappear and would still be available for submissions and bids."  Dkt. 178 at 68 (Defs. PFOF ¶ 162).  However, this is directly contradicted by PRH's history of reorganizing imprints following the Penguin-Random House merger and its plans for headcount reductions following this merger.

---

[11] As Defendants' own economic expert admitted at trial, he "wouldn't identify [Astra] as a major competitive constraint" to the Big Five, Trial Tr. 2953:4–9 (Snyder), and could not describe how many books Spiegel & Grau plans on publishing in general, let alone in the relevant product market.  Trial Tr. 2958:5–7 (Snyder).

*See* Trial Tr. 767:24–768:11 (Dohle); Trial Tr. 2562:1–2563:20 (Sansigre) (testifying about

PRH's plans for headcount reductions of executives in the combined firm's editorial and art

functions).

59.     An imprint is nothing more than a publisher's subsidiary.  Imprints may

ostensibly be allowed to bid against each other, drawing off the same corporate parent resources,

but that is not a substitute for "separate economic actors, pursuing separate economic interests"

vying against one another for a book, *i.e.*, *actual* competition.  *See Copperweld Corp. v. Indep.*

*Tube Corp.*, 467 U.S. 753, 769–770 (1984).  As a result, Defendants cited to no example of a

PRH imprint bidding more aggressively than they otherwise would have to beat another PRH

imprint.  And Defendants can cite no case that supports their view that the Court should treat

competition among subsidiaries as equivalent to competition among independent companies.  *Cf.*

Dkt. 177 at 111–112 (U.S. PFOF ¶¶ 213–214).

### C.  Agents Cannot Protect Authors from the Merger's Anticompetitive Effects

60.     As discussed in the United States' Proposed Findings, the presence of certain

sophisticated sellers is insufficient as a matter of law to rebut the presumption.  Dkt. 177 at 104–

105 (U.S. PFOF ¶¶ 200–203).  Even before this proposed merger, agents have had limited

leverage and have been unable to hold back publisher demands to acquire audio rights, shift the

payout structure for advances, or lower e-book royalties.  Dkt. 177 at 106–110 (U.S. PFOF ¶¶

205–212).  Agents' role in the book acquisition process and the tools they have to encourage

publishers to acquire a book will not change if the merger is allowed to proceed.  To the extent

that agents have any power over the current bidding process to protect their authors, Defendants

provide no evidence describing how agents' power will increase or somehow prevent publishers

from altering how they bid for books post-merger.

**D.  Defendants Failed to Demonstrate the Merger Would Increase Advances PRH Will Pay Authors**

61.    Defendants cite testimony from Madeline McIntosh to claim that efficiencies will allow the company to increase the advances it pays authors.  Dkt. 178 at 17–18 (Defs. PFOF ¶ 25).  However, the Court has already found that Defendants' efficiency claims are "unreliable," Trial Tr. at 2767:3 (Court) and "unverified." Trial Tr. at 2769:4 (Court).  Defendants, therefore, cannot claim that that these purported efficiencies would benefit authors, and Ms. McIntosh's testimony regarding those efficiencies cannot be used to rebut the presumption.

**E.  There Is No Evidence that Changes in Retail Bookselling Affect the Market for Anticipated Top Sellers**

62.    The advent of social media as a tool used to publicize, market, and sell books to readers has not removed barriers to entry in publishing anticipated top sellers.  To the extent Defendants argue otherwise, they provide no support for this proposition.  Dkt. 178 at 35–36 (Defs. PFOF ¶ 69).  New ways to market books on social media networks like Instagram or Tik-Tok do not change the need for publishers to have sufficient resources, reputations, and printing capabilities to effectively publish books that can take advantage of such author-driven marketing. Marketing via endorsements by celebrities or "influencers" is not new.  As Mr. Weisberg testified, "this is a business of one to one word of mouth.  It's never been anything else and it's still not, just the devices have changed."  Trial Tr. 1068:24–1069:4 (Weisberg).  The effects of social media on the market for anticipated top sellers and the ability of smaller publishers to compete for such attention has already been reflected in the (uncontested) market shares in this case, the documents and testimony describing the competitive dynamic for anticipated top sellers, and Dr. Hill's quantitative analysis.  Dkt. 177 at 76–78 (U.S. PFOF ¶¶ 148–149).

31

63. Moreover, Defendants' assertions about the effect of online retail on the small publishers, Dkt. 178 at 57 (Defs. PFOF ¶ 151), is almost entirely unsupported by the factual record and, even if true, irrelevant to the claims in this case. Any trend toward online sales has not occurred recently, but over the past two decades. And yet, in the past thirty years no publisher has become a strong competitor for the Big Five. *See* Trial Tr. 163:2–6 (Pietsch).

**F. Bertelsmann Controls Printing Assets Needed by Competitors**

64. Defendants assert that Bertelsmann has not yet exercised its control over printing assets to disadvantage rival publishers. PRH's rivals, however, fear that control as they compete against PRH. ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████ Bertelsmann's ability to cut off other publishers from printing their books, making it harder for them to expand or compete in the future, is not strongly contested.

**V. DEFENDANTS' UNILATERAL EFFECTS ARGUMENTS ARE WRONG**

**A. Defendants Misconstrue Fundamental Principles of Unilateral Effects**

65. Defendants claim that a merger can adversely affect competition only when the merging parties were consumers' top two choices. Dkt. 178 at 135–136 (Defs. PCOL ¶ 49); Dkt. 178 at 139–140 (Defs. PCOL ¶ 59). This is incorrect. In best-bid auctions, for example, S&S is likely to reduce its bid in any auction where S&S perceives that PRH would have been a competitor for that book, regardless of whether PRH would have been the actual runner-up bidder (and vice-versa). *See* Trial Tr. 3086:4–3087:2 (Hill). This is because the competitive

constraint in a best-bids auction is the winner's expectation of competition, not the actual runner-up bid. *See* Trial Tr. 3155:7–3156:18 (Hill).

66.     In these types of auctions, losing an important competitor generates lower bids overall, not just when the merging parties are winner and runner-up. The more important the competitor being acquired, the greater the effect on bids made by the other party. The same is true for many books acquired outside of auctions. *See* Dkt. 177 at 132 (U.S. PFOF ¶ 260).

67.     Defendants misleadingly quote the following passage of the Merger Guidelines to support their claim that a merger can adversely affect only those authors for whom the merging parties were the winner and runner up: "Anticompetitive unilateral effects in [bargaining and auction] settings are likely *in proportion* to the frequency or probability with which, prior to the merger, one of the merging sellers had been the runner-up when the other won the business." Merger Guidelines § 6.2 (emphasis added); *see* Dkt. 178 at 139 (Defs. PCOL ¶ 59). Rather than limiting unilateral effects to the particular instances where the merging parties are winner and runner-up, the Guidelines state that unilateral effects as a result of the merger are *in proportion* to the frequency with which one of the merging parties is the runner up when the other wins. This frequency or probability is just the "bidding analog of the diversion ratio," not a special requirement for bargaining and auction settings. *See* Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 Antitrust L.J. 49, 83 (2010).

68.     It is true that the merger is likely to harm authors whose books are sold in a multi-round auction where PRH and S&S are the top two bidders. But this does not suggest that for authors whose books are acquired in best-bids auctions, the only harm will be to those authors for whom the merging parties were winner and runner-up. As explained by Dr. Hill and the Merger Guidelines, in settings in which the merging parties are explicitly bidding each other up,

such as round robin auctions, harm for each individual author will be particularly great, whereas for authors whose books are acquired via a best-bid auction, harm to each individual author will be less, but the harm will be spread over a greater number of authors. *See* Trial Tr. 3086:4–3088:7 (Hill) (discussing Merger Guidelines § 6.2).

69.     Similarly, Defendants' attempt to paint their executives or employees as too naïve to exercise market power defies common sense and the fundamental tenets of the antitrust laws. *See, e.g.*, Dkt. 178 at 89–92 (Defs. PFOF ¶¶ 219–24); Trial Tr. 3291:6–3292:19 (Defs. Closing Argument).[12]  First, in some auctions and negotiations, the auction or negotiation will end earlier as a result of eliminating competition between PRH and S&S, and no conscious decision to lower advances would be required. *See* Trial Tr. 1728:18–1729:5 (Hill); Trial Tr. 3201:9–3202:3 (Hill); *see also* Trial Tr. 180:2–182:1 (Pietsch).

70.     Second, lowering bids in a best-bid auction or negotiation is far from alchemy. Today, Defendants bid more aggressively when they perceive more competition and less aggressively when they perceive less competition. *See* Trial Tr. 1267:13–1268:21 (Hill) (discussing two examples in which the merging parties planned to bid less aggressively because they perceived less competition).  S&S's own CEO agreed that "anytime there is a competitive situation," including best-bid auctions, "competition raises advance levels, less competition

_____

[12] In support of these claims, Defendants repeatedly attempt to distinguish book acquisitions from differentiated product markets such as beer or electric vehicles. *See, e.g.*, Dkt. 178 at 86–89 (Defs. PFOF ¶¶ 214, 218–19).  Such claims are unavailing.  The economics of bidding and negotiation markets such as book acquisition are similar to markets with differentiated products. *See* Trial Tr. 3088:20–3089:25 (Hill); Merger Guidelines § 6.2 (stating that unilateral effects in bargaining and auction markets are analyzed "using similar approaches to those" used in the differentiated products context); Shapiro, *The 2010 Horizontal Merger Guidelines* at 82 ("As a matter of formal economics, [a sealed-bid auction] is very similar to [a differentiated products market], where suppliers set prices and each of many customers each picks his or her preferred product.").

lowers them." Trial Tr. 499:6–500:12 (Karp). Reducing offers in best-bid auctions or negotiations is merely a corollary of what Defendants already do.

71.     When asked by Defendants' counsel how the merged firm would lower advances post-merger, Dr. Hill explained, "if you're competing frequently with an opponent in auctions or negotiations and they are removed from the competition, it is profit maximizing to take account of the fact that competition has lessened and to lower your bids, in general, in best bids, and negotiations to be less aggressive." Trial Tr. 1728:18–1729:1 (Hill). Defendants' CEOs do not contest that they compete frequently with each other. Mr. Karp testified that S&S bids against PRH more than any other publisher. Trial Tr. 595:23–25 (Karp). Ms. McIntosh testified that for book acquisitions where she plays a role, S&S is one of PRH's most frequent competitors. *See* Trial Tr. 2350:20–23 (McIntosh). And despite Defendants' claims that they don't know who they compete against, *see* Dkt. 178 at 89 (Defs. PFOF ¶ 219), Mr. Karp testified that after auctions conclude, "agents usually tell us who we were competing against. They very rarely don't." Trial Tr. 495:25–496:4 (Karp); *see also* PX-790. Similarly, two of Dr. Hill's diversion ratio calculations—using win/loss data and editorial minutes data—were based on documents kept by the merging parties. *See* Dkt. 177 at 137–38 (U.S. PFOF ¶¶ 270, 273). Both of those calculations showed that the merging parties compete with each other frequently. *See* PX-970. In the case of S&S, they show that when S&S loses, it loses to PRH 55–60% of the time. *See* PX-970. One does not need a crystal ball to intuit that if your most frequent competitor, who wins the majority of your losses, is eliminated it would be profit maximizing to lower your bids.

72.     Because Defendants know that they compete against each other frequently—or have the information necessary to know—it will be profit maximizing for them to lower advances post-merger in best-bid auctions and negotiations. As a result, whatever "conscious

decision" Defendants assert must take place to lower advances, *see* Dkt. 178 at 159 (Defs. PCOL ¶ 112), it is already assumed by the antitrust laws, and is not an element of the government's proof.  As put by the leading antitrust treatise: "As a general proposition business firms are (or must be assumed to be) profit maximizers, which means that they constructively 'intend' to take the course of action that maximizes their returns . . . ."  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 113 (5th ed. 2022).

**B. PRH and S&S Are Close Competitors to Each Other**

73.     Defendants argue that "overall market shares are a highly misleading indicator of competitive effects because PRH and S&S are not particularly close competitors."  Dkt. 178 at 140 (Defs. PCOL ¶ 60).  This claim is wrong.  The record shows that PRH is the closest competitor for S&S—and that S&S is one of PRH's main competitors.

74.     These conclusions are supported by testimony of senior executives at both firms and by Dr. Hill's analysis.  As discussed in the United States' Proposed Findings, Mr. Karp testified that PRH likely is the firm that S&S competes with most frequently, while Ms. McIntosh stated that S&S is one of the competitors that PRH competes with the most.  Dkt. 177 at 126 (U.S. PFOF ¶ 251) (citing Trial Tr. 595:23–25 (Karp) and Trial Tr. 2360:20–23 (McIntosh)).  In addition, Dr. Hill analyzed the closeness of competition between the firms using three different sets of data: win/loss reports, the "runner up" data, and a database based on Defendants' editorial meeting minutes.  All three studies showed either that PRH and S&S competed as closely as market shares would predict—or, actually, more closely.  *See* Dkt. 177 at 136–138 (U.S. PFOF ¶¶ 270–274).  And, according to this data, approximately 55–60% of S&S's losses are to PRH.  *See* Dkt. 177 at 137–138 (U.S. PFOF ¶¶ 272–273).

75.    Neither of the two arguments Defendants rely on to support their claim undercuts the evidence discussed above.  First, Defendants argue that PRH and S&S are not close competitors for Christian books.  Dkt. 178 at 80 (Defs. PFOF ¶ 196).  But Christian books only make up 2% of PRH's total business.  Trial Tr. 2299:14–19 (McIntosh).  For that reason, evidence regarding Christian books has no bearing on how often S&S and PRH compete for the vast majority of PRH's anticipated top sellers.  Significantly, under any measure—win/loss, runner up, and editorial minutes—the result is the same: PRH and S&S are close competitors.

76.    Second, Defendants rely on testimony from a few agents stating that PRH and S&S rarely were the top two bidders for particular books.  Dkt. 178 at 79 (Defs. PFOF ¶¶ 192–194).  But these agents account for a small portion of the market.  *See* PX-749 (Cheney deal sheet shows that she only sold ▮ anticipated top sellers per year); Trial Tr.  2043:16–2044:12 (Cheney) (making a few corrections to PX-749) PX-856 at 2 (Wylie, ▮▮▮▮▮▮▮▮).  By contrast, the data that Dr. Hill relies on is far more systematic; his win-loss, runner-up, and editorial minutes analyses are based on approximately 350 multi-bidder acquisitions.  PX-996.

77.    Finally, Defendants argue that unilateral effects are only possible where the merging parties are the only (or maybe the main) competitors.  Dkt. 178 at 141–142 (Defs. PCOL ¶¶ 63–64).  As discussed above, the caselaw does not support this argument.  *See supra* II.  Neither do the relevant economic principles.  Under the Merger Guidelines and economic theory, a merger can result in unilateral effects even when the merging parties are not the only two competitors.  *See* Guidelines § 6.1 ("A merger may produce significant unilateral effects for a given product even though many more sales are diverted to products sold by non-merging firms than to products previously sold by the merger partner."); Merger Guidelines § 6 ("[U]nilateral effects are by no means limited" to "merger[s] to monopoly"); Trial Tr. 1581:7–20 (Hill).

Instead, the key question is whether there is a significant amount of competition between the two firms. *See* Merger Guidelines § 6.1 ("The extent of direct competition between the products sold by the merging parties is central to the evaluation of unilateral price effects."); Trial Tr. 1274:2–12 (Hill). And here, because PRH is S&S's closest competitor and S&S is one of PRH's main competitors, it clearly is the case that there is a significant amount of competition to be lost between PRH and S&S.

### C. Defendants' Criticisms of Dr. Hill's Models Are Unavailing

78.    Defendants make several criticisms of Dr. Hill's models, many of which were already addressed in the United States' Proposed Findings. *See* Dkt. 177 at 143–46 (U.S. PFOF ¶¶ 289–97). None undermine the fundamental conclusion shared by his models: the proposed merger is likely to substantially harm authors of anticipated top sellers.

79.    Defendants state that Dr. Hill's models only measure harm where PRH and S&S are the first and second-place bidders in multi-round auctions. Dkt. 178 at 87 (Defs. PFOF ¶ 215). That is incorrect. Trial Tr. 3088:8–22 (Hill). Both the best-bids and hybrid GUPPI models predict harm outside those scenarios, and Dr. Hill interpreted his second-score auction model more broadly. Trial Tr. 3088:8–22 (Hill).

80.    Defendants attempt to discount Dr. Hill's second-score auction model by asserting that in best-bid auctions and bilateral negotiations, a publisher must pay "an amount at or near" its maximum willingness to pay. Dkt. 178 at 100 (Defs. PFOF ¶ 249). The implication is that a merger could not reduce advances in best-bid auctions or negotiations because in these settings publishers always, regardless of perceived competitive conditions, offer the author the absolute maximum that they would be willing to pay for the book. Dr. Hill, however, reviewed examples of Defendants' employees bidding lower when they expect to have few competitors—

the opposite behavior of what Defendants allege.  *See* Trial Tr. 1267:13–1268:21 (Hill).[13]  If

Defendants' assertions were correct that publishers always pay their maximum amount when

making a best bid or negotiating, agents should never sell books via multi-round auction because

they would consistently yield inferior results, yet they do.  *See, e.g.,* Trial Tr. 112:4–9 (Pietsch).

81.    Defendants further allege that when using Dr. Snyder's preferred inputs, the

GUPPI models fall below a "safe harbor" articulated by the former Deputy Assistant Attorney

General for Economics and co-creator of the GUPPI, Carl Shapiro.  This argument is misleading

and incorrect.  First, the output of Dr. Snyder's GUPPI calculation cannot be verified because he

did not produce any backup.  Trial Tr. 3142:3–6 (Hill).  As a result, it is unclear whether the

"safe harbor" is triggered at all.  Dr. Snyder only presented a GUPPI of the weighted average for

S&S and PRH, which was 4.7%, instead of individual GUPPIs for PRH and S&S as Dr. Hill did.

*See* PX-964.  But the putative "safe harbor" applies only when the GUPPI value of *all* the

merging firms' products (*i.e.* all the individual GUPPIs)—*not* the weighted average GUPPI—is

below 5%.  Carl Shapiro, *Update from the Antitrust Division*, 24 (2010), *at*

https://www.justice.gov/atr/file/518246/download.  Given that S&S's GUPPI was materially

larger than PRH's under Dr. Hill's calculations and Dr. Snyder's average GUPPI was 4.7%, it is

likely that Dr. Snyder's GUPPI for S&S was above 5% and outside the putative safe harbor.  *See*

PX-964; Trial Tr. 3141:8–20 (Hill).

---

[13] For example, Ms. Kim testified that in a best-bids auction, she had been approved to
offer up to $350,000, but acquired it for over 20% less than that, $275,000.  *See* Trial Tr.
2008:22–24 (Kim); Trial Tr. 2009:3–5 (Kim); 2009:22–2010:3 (Kim); PX-42 at 2.  Similarly,
Dr. Hill reviewed an example of a bilateral negotiation where an S&S editor received
authorization to offer a $500,000 advance—and requested authorization up to $750,000—but
acquired it for $150,000, a third of the $500,000.  Trial Tr. 1492:9–1493:3 (Hill) (discussing U.S.
Demonstrative 4 at 83).

82.     Second, to arrive at this result, Dr. Snyder used incorrect margins and unreliable diversion ratios.  He subtracted fixed costs from profit margins, an approach at odds with the GUPPI formula.  Trial Tr. 3093:2–6 (Hill); Dkt. 177 at 144–45 (U.S. PFOF ¶ 293).  As discussed *supra* at ¶ 49, Dr. Snyder's diversion ratio from S&S to PRH is based on an unrepresentative sample of 22 S&S wins over a four-year period.  Relying on this limited sample to fall under the putative "safe harbor" by 0.3% would be incorrect.  Moreover, the logic of the "safe harbor" is that there might be some entry or efficiencies.  Trial Tr. 3109:14–23 (Hill).  But here, Defendants failed to present cognizable efficiencies or show that substantial entry will occur post-merger.

**D.  Defendants Overstate the Competitiveness of Non-Big Five Publishers.**

83.     Defendants make several claims about competition from the non-Big Five publishers.  These arguments are inconsistent with both the record and economic theory.

**1.  Big Five Publishers Do Have Competitive Advantages Over Other Publishers**

84.     First, Defendants argue that non-Big Five publishers provide the "same quality editorial, publicity, marketing, and sales services necessary to successfully publish" anticipated top-selling books.  Dkt. 178 at 33–34 (Defs. PFOF ¶ 65).  This ignores the testimony of S&S's CEO, who admitted that Big Five publishers have a competitive advantage in marketing and publicity, Trial Tr. 451:21–454:9 (Karp), and the author Mr. Solomon, who testified at length about the advantages of the Big Five in marketing, publicity, and sales.  PX-2004 at 54 (Solomon Dep. 93:5–20); *see also* PX-2004 at 62–64 (Solomon Dep. 101:22–103:18) (describing advantages of Big Five in publicity/marketing); PX-2004 at 17–19 (Solomon Dep. 40:15–42:21) (sales); PX-2004 at 95:4–96:10 (publicity/marketing).  And, of course, Defendants also ignore a mountain of other evidence presented at trial regarding the advantages of the Big Five in these (and other) areas, including documents and/or testimony from S&S's former CEO, PRH's U.S.

CEO, Hachette's CEO, and a variety of other industry participants. *See* Dkt. 177 at 75–81 (U.S. PFOF ¶¶ 145–152) (collecting evidence on the competitive advantages of the Big Five); PX-530 at 2.

85.    In addition, while Defendants rely heavily on testimony from three agents about the services of non-Big Five publishers, Dkt. 178 at 33–34 (Defs. PFOF ¶ 65), Defendants ignore these agents' actual behavior as these agents direct their clients to the Big Five Publishers, thereby undercutting Defendants' claims that the non-Big Five offer the "same" quality. Two of the agents that Defendants rely on—Ms. Fletcher and Mr. Wylie—sold ███████████ of their anticipated top sellers to Big Five publishers, respectively. PX-874 (Fletcher deal sheet shows that she sold █████ of her anticipated top sellers to the Big Five); PX-857 at 16–18 (Wylie, █████ And Defendants' other agent witnesses, Ms. Ross and Ms. Cheney, also sold approximately █████ of their anticipated top-selling books to the Big Five. PX-838 (Ross, ██████ PX-749 (Cheney, █████ Trial Tr. 2043:16–2044:12 (Cheney) (making a few corrections to PX-749.[14]

### 2.    Defendants' Aggregation of Non-Big Five Publishers Is Incorrect

86.    Defendants argue that this is an "effective 6-5 merger" and that the Court should "aggregate" all the small publishers and treat them as one large competitor. Dkt. 178 at 142 (Defs. PCOL ¶ 640; Dkt. 178 at 146 (Defs. PCOL ¶ 76). The United States explained in its Proposed Findings why aggregating the fringe into a single competitor is wrong and why the Court should properly view this as a five-to-four merger of significant competitors, with a fractured fringe of numerous small publishers who are unable to constrain the majors. Dkt. 177

---

[14] Defendants also called Ms. Walsh as an expert witness. Ms. Walsh worked as an agent until 2019, Trial Tr. 1747:2–7 (Walsh); the record does not show the percentage of anticipated top sellers that she sold to non-Big Five publishers before then.

at 60–61 (U.S. PFOF ¶¶ 133–134).  Accordingly, it is not legally or economically correct to treat scores of small independently-operated publishers as the equivalent of a single competitor.  *Id.*

87.     Defendants also falsely claim that Hachette's win/loss tracker (the "Ones that Got Away") proves that the small publishers are collectively as competitively significant as S&S, HarperCollins, and Macmillan individually.  *See* Dkt. 178 at 72 (Defs. PFOF at ¶ 171) (claiming the tracker "demonstrates that, collectively, the non-Big Five publishers represent as much of a competitive threat to Hachette as any one of the other Big Five publishers").  The tracker does not show that.  The win/loss document tracks more than 300 losses and allots ~30 of them to Houghton Mifflin Harcourt (HMH) and other small publishers.  In their filing, Defendants omit the fact that almost half of those 30 losses were to HMH, which HarperCollins has since acquired.  PX-790; Trial Tr. 192:15–193:5 (Pietsch).  That means only 5–6% of the losses are to *current* non-Big 5—which is far less than the losses to any of HarperCollins, S&S, and Macmillan.  In addition, the tracker supports the government's product market.  It is another example of *Brown Shoe* support because Hachette treats high-advance books differently—tracking them separately.  Trial Tr. 1907:7–18 (Pietsch); *see also* Dkt. 177 at 42–43 (U.S. PFOF ¶ 99) (noting additional evidence).

## VI.    DEFENDANTS MISSTATE THE FACTS AND THE LAW ON COORDINATED EFFECTS

88.     Defendants misstate the facts and law on coordinated effects.  First, Defendants incorrectly imply that the presumption of harm from greater coordination does not apply because the government's expert did not discuss "current coordination in the industry" and failed to "quantify any price impact from purported coordination."  Dkt. 178 at 112 (Defs. PFOF ¶ 274).  The law requires no such showing, and Defendants cite no case that demands one.  *See, e.g., Heinz* 246 F. 3d at 724 (finding a "recipe for price coordination" based on market concentration,

barriers to entry, and "past price leadership"). Moreover, Defendants ignore the evidence, discussed in the United States' Proposed Findings, regarding parallel behavior with respect to audio rights and contractual terms. Dkt. 177 at 154 (U.S. PFOF ¶ 315–316).

89.    Second, Defendants do not, and cannot, square Dr. Snyder's assertion that there would be no harm to authors if publishers—in a coordinated fashion—worsened contract terms because the advance would still be negotiable, Dkt. 178 at 114 (Defs. PFOF ¶ 281) (quoting Dr. Snyder as testifying it would not "actually result[] in a bottom line reduction in competition"), with the Supreme Court's decision in *Catalano v. Target Stores*, 446 U.S. 643 (1980). *See* Dkt. 177 at 157 (U.S. PFOF ¶ 325). Nor do Defendants explain why publishers, like PRH and S&S, currently modify contract terms in ways that are worse for authors (*e.g.*, lengthening the time for the payout of the advance or lowering the digital e-book royalty) if the modifications have no material financial impact because the advance is still negotiable.

90.    Third, Defendants' suggestion that courts are concerned only about whether the merger would increase the risk of "illegal" coordination is wrong. *See, e.g.*, Dkt. 178 at 159 (Defs. PCOL ¶¶ 134–135) (Section III.C: "The Merger Will Not Increase The Likelihood That Hachette, Macmillan, and Other Publishers Will Enter Illegal Anti-Poaching Agreements"). Courts are concerned when mergers increase the likelihood that industry participants can reach tacit understandings that do not rise to violations of the antitrust laws. Dkt. 177 at 150–151 (U.S. PFOF ¶¶ 305–06). Such an understanding could be as simple as the dominant PRH/S&S realizing it no longer needs to be as aggressive to grow share, Trial Tr. 802:11–18 (Dohle), and choosing not to engage in a "zero sum" game where it tries to poach the best authors from Hachette, Macmillan, and HarperCollins as long as they do not poach PRH/S&S's authors. If, however, one of those publishers does not follow the dominant firm's lead and begins to recruit

its authors (as ▅▅▅▅▅ did when it offered ▅▅▅▅▅▅▅▅▅▅ to move from PRH, *see* Dkt. 178 at 94–95 (Defs. PFOF ¶ 233), PRH can retaliate by aggressively using its deep pockets to poach authors and/or Bertelsmann can threaten to make printing more difficult as feared by multiple CEOs. *See* Dkt. 177 at 155 (U.S. PFOF ¶ 319) (collecting testimony).

91.     Fourth, Defendants misstate their own burden and assert that they can prevail as long as they can point to "cartel problems." Dkt. 178 at 158 (Defs. PCOL ¶¶ 127, 132). To rebut the presumption, however, Defendants must prove that the alleged "cartel problems" are "*much greater* in the [publishing industry] than in other industries." *Heinz*, 246 F. 3d at 724 (emphasis added) ("But the district court made no finding that any of these 'cartel problems' are so much greater in the baby food industry than in other industries that they rebut the normal presumption."). For the reasons outlined in the United States' Proposed Findings, Defendants did not make such a showing here. *See* Dkt. 177 at 143–151 (U.S. PFOF ¶¶ 311–332).

92.     To the contrary, the evidence shows that industry players have already figured out how to solve "cartel problems" and will be able to do so more easily after the merger. For example, product differentiation and a lack of transparency on retailer contract terms did not prevent collusion in the e-books case. *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015); *see also Heinz*, 246 F.3d at 724–25 (finding likelihood of coordinated effects in product market differentiated by brand; holding evidence of past price leadership "undermined" expert testimony about "cartel problems"); *see also H & R Block*, 833 F. Supp. 2d at 78 ("[W]hile collusion may, in some instances, be more likely in markets for homogenous products than differentiated products, product differentiation in this market would not necessarily make collusion more difficult."); *Hosp. Corp.*, 807 F.2d at 1389–90 (upholding injunction against merger based on coordinated effects theory even though the relevant services were "complex and heterogenous").

Moreover, *Apple* shows that coordination can be successful and harmful without every publisher participating (as neither Random House nor any small publishers participated).[15]  This history contradicts Defendants' claim that "a no-poach agreement . . . would be ineffective" without the smaller publishers' participation.  Dkt. 178 at 115 (Defs. PFOF ¶ 284).

## VII.    CONCLUSION

The evidence shows that the proposed merger between PRH and S&S likely would substantially lessen competition in the market for the acquisition of U.S. publishing rights to anticipated top-selling books in violation of Section 7 of the Clayton Act.  The Court should therefore permanently enjoin the merger.

---

[15] Although Random House chose not to join that conspiracy, Mr. Dohle had no qualms meeting with the other publishing CEOs in private dinners to discuss "the common challenges they faced" without lawyers present.  *Apple*, 791 F.3d at 300 (internal quotation marks omitted).

Respectfully submitted,


Dated: September 7, 2022                  /s/ John R. Read

John R. Read (DC Bar #419373)
Meagan K. Bellshaw
Anna Cross
Brittney A. Dimond
Jonathan S. Goldsmith
Collier E. Kelly
Owen M. Kendler
Ihan Kim
January Kim
Kevin Krautscheid
Jessica N. Leal
Sarah H. Licht
Bennett J. Matelson
Lauren G.S. Riker
Lisa A. Scanlon
Melvin A. Schwarz
Ethan D. Stevenson
Amanda M. Strick
Robert Vance
Jeffery G. Vernon

United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 725-0165
Fax: (202) 514-7308
Email: john.read@usdoj.gov

*Counsel for Plaintiff United States of America*

46