**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

United States of America,      ) Civil Action
                               ) No. 1:21-cv-02886-FYP
                 Plaintiff,    )
                               )
vs.                            ) **Bench Trial - a.m. session**
                               )
Bertelsmann SE & Co. KGaA,     )
et al.                         ) **Washington, D.C.**
                               ) **August 1, 2022**
                 Defendants.   ) Time:  9:30 a.m.
_____

**Transcript of Bench Trial - a.m. session**
**Held Before**
**The Honorable Florence Y. Pan**
**United States District Judge**

A P P E A R A N C E S

For the United States:   **John R. Read**
                         **Ihan Kim**
                         **Sarah H. Licht**
                         **Melvin A. Schwarz**
                         **Amanda Strick**
                         **Jeffrey G. Vernon**
                         U.S. DEPARTMENT OF JUSTICE
                         Antitrust Division
                         450 Fifth Street, Northwest
                         Washington, D.C. 20530

For the Defendants Bertelsmann SE & Co. KGaA and Penguin Random
House, LLC:              **Daniel M. Petrocelli**
                         **Drew E. Breuder**
                         **M. Randall Oppenheimer**
                         **Megan K. Smith**
                         **Vision Winter**
                         O'MELVENY & MYERS LLP
                         1999 Avenue of the Stars, 8th Floor
                         Los Angeles, California 90067

                         **Daniel L. Cantor**
                         **Andrew J. Frackman**
                         **Abby F. Rudzin**
                         O'MELVENY & MYERS LLP
                         7 Times Square, Times Square Tower
                         New York, New York 10036

1                    A P P E A R A N C E S, continued

2    For the Defendants Bertelsmann SE & Co. KGaA and Penguin Random
     House, LLC (continued):
3                              **Jonathan Hacker**
                               O'MELVENY & MYERS LLP
4                              1625 Eye Street, Northwest
                               Washington, D.C. 20006
5
     For the Defendants ViacomCBS, Inc. and Simon & Schuster, Inc.:
6                              **Stephen Fishbein**
                               **Noni Nelson**
7                              SHEARMAN & STERLING LLP
                               599 Lexington Avenue
8                              New York, New York 10022

9                              **Rachel E. Mossman**
                               SHEARMAN & STERLING LLP
10                             2828 North Harwood Street, 18th Floor
                               Dallas, Texas 75201
11
                               **Ryan A. Shores**
12                             SHEARMAN & STERLING LLP
                               401 9th Street, Northwest
13                             Washington, D.C. 20004

14   _____

     Stenographic Official Court Reporter:
15                             Nancy J. Meyer
                               Registered Diplomate Reporter
16                             Certified Realtime Reporter
                               333 Constitution Avenue, Northwest
17                             Washington, D.C. 20001
                               202-354-3118
18

19

20

21

22

23

24

25

1                               **I N D E X**

2                                                                **PAGE:**

3       **Opening Statements:**

4             By Mr. Read....................................... 18
              By Mr. Petrocelli................................ 57
5             By Mr. Fishbein.................................. 86

6

7       **Witnesses:**

8       Michael Pietsch

9             Direct Examination by Mr. Vernon................. 95

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  This is Civil Case

3    No. 21-2886, United States of America v. Bertelsmann SE & Co.,

4    et al.

5          Will counsel please approach the podium and introduce

6    yourselves for the record.

7          MR. READ:  Your Honor, John Read representing the

8    United States of America.  With me at counsel table are Amanda

9    Strick, who will handle any confidentiality issues we have;

10   Mel Schwarz, who will handle any issues on order of witnesses,

11   trying to streamline; and Ashley Hare and Lizzy McMahon, who

12   will handle the tech for us this morning in opening.

13         Thank you.

14          THE COURT:  Great.  Thank you.  Good morning.

15          MR. PETROCELLI:  Good morning, Your Honor.  Daniel

16   Petrocelli for Bertelsmann and Penguin Random House, and at

17   counsel table I have Megan Smith, Abby Rudzin, Dan Cantor,

18   Randy Oppenheimer, and John Hacker, and others.

19         Thank you.

20          THE COURT:  All right.  Good morning to you, all.

21          MR. FISHBEIN:  Your Honor, Stephen Fishbein for

22   ViacomCBS and Simon & Schuster, and I'm with Ryan Shores and

23   Rachel Mossman and Noni Nelson.

24          THE COURT:  Good morning.

25          All right.  So this case is here for trial, and I think

1   there's some preliminary matters that we should address.

2          I did receive a proposed order regarding the handling of

3   confidential information, which I'm prepared to sign today.  I

4   just wanted to confirm that the proposed order was circulated

5   among the third parties, and I just want to understand the

6   procedure you followed to make sure that we've done what we can

7   to make sure there are no objections from the third parties.

8          MS. STRICK:  Good morning, Your Honor.

9          I don't think we have circulated that to the third

10  parties, but we can do that this morning.  And we spoke to them

11  individually to discuss -- to discuss what was going to be

12  stipulated.

13         THE COURT:  Okay.  That's fine.  Then I will hold off

14  on signing it until you've circulated it to them, and if you

15  want to make any amendments to it, that's fine.

16         Okay.  And I do appreciate the parties working together

17  on that.  I think it's a good procedure that you've proposed.

18         All right.  I think there's also another preliminary

19  matter regarding the presentation of evidence of efficiencies

20  from the merger that the defendants had planned to introduce.

21  I'll note I received an email from the parties saying that they

22  had not been able to reach an agreement on this, and I wanted

23  to check in with the parties to see if you've made any progress

24  on that before we address it.

25         MR. SCHWARZ:  Good morning, Your Honor.  Mel Schwarz

1    for the United States.

2           Unfortunately, no.  I think -- I don't think we're that

3    far apart with respect to one of our two options.  We're trying

4    to get, as Your Honor -- following Your Honor's suggestion, to

5    get the verification issue -- if I can call it that -- neutral

6    word -- resolved before we have other evidence, a lot of other

7    evidence.  And we proposed either that Mr. Sansigre -- and

8    perhaps, I think, also, they also want to call Malaviya on that

9    issue.  We were prepared to do it out of order later this week;

10   Wednesday afternoon, Thursday would be convenient for us.

11          Then if they didn't want to do that, which they

12   definitely did not, apparently, they -- we suggested that we

13   hold off witnesses that we might otherwise examine on

14   efficiencies issues and move that to their case.  And if they

15   agreed to call Sansigre and Malaviya before so we could resolve

16   that issue and before Dr. Snyder testified.

17          THE COURT:  No, I understand.

18          MR. SCHWARZ:  Okay.  And we're -- I think part of our

19   problem is that they don't want to contemplate cutting anything

20   off at the verification level.

21          THE COURT:  No, I understand.  So let me -- let me

22   just say a few words on the record before we get into the

23   details of this discussion.

24          You can have a seat, Mr. Schwarz.  You can have a seat.

25   Thank you.

```
1              MR. SCHWARZ:  You said I can sit?  I didn't hear you.
2              THE COURT:  Yes.  Yes, please.
3         The background on this is the government filed a motion
4    in limine to preclude certain expert testimony of Dr. Snyder
5    related to efficiencies that the defendants believe that this
6    merger will create, and there was a motion in limine to
7    preclude that evidence under Rule 702 because the expert
8    testimony was not reliable, not based on sufficient facts and
9    data.
10        I'll note that I considered this a very standard motion
11   in limine, a motion to preclude evidence, not a dispositive
12   motion, as the defendants have stated.  I think of a
13   dispositive motion as a motion to dismiss or a motion for
14   summary judgment that disposes of the case or a cause of action
15   in the case.  This is a Rule 702 motion.  I've seen many of
16   these in many cases.  I've never considered them dispositive
17   motions, and I've never heard of any other party characterize
18   them as such.
19        In any event, one argument made by the government was
20   that this evidence about efficiencies that was used in
21   Dr. Snyder's analysis was not verified and not verifiable.  The
22   parties dispute whether the efficiencies evidence must be
23   verified in order to be admissible or whether such evidence
24   just must be verifiable.  And they also dispute whether the
25   evidence is, in fact, verifiable.
```

1          I heard oral argument on this issue at our last hearing

2    because I thought that the government's argument on this point

3    was potentially meritorious.  I determined that I should hear

4    evidence about the verifiability of the efficiencies before

5    ruling.  And if this were a jury trial, I would have heard the

6    evidence before trial, made a ruling on the motion before the

7    trial.  But because this is a bench trial, I thought that we

8    had leeway to hear this evidence during the trial.

9          But I asked the parties to please meet and confer about

10   how this evidence could be presented so that I could address

11   the issue of verifiability first, and if I determined to grant

12   the government's motion, then we would not have to hear the

13   other evidence about efficiencies that is part of Dr. Snyder's

14   analysis, and there's plenty more evidence, and I thought it

15   would be more efficient to proceed this way.

16         And so I was very surprised when I received a bench memo

17   from the defendants that appeared to forget or overlook that we

18   had had this conversation in court.  I thought perhaps I had

19   not been clear, but I went back to the transcript, pages 58 and

20   59.  I said, "Is there a way to efficiently present this so

21   that we don't have to hear evidence if I don't need to get

22   there, because we can't even get past verifiable?"

23         And I also said, "Let's make sure that we present the

24   evidence in a way that I can address this issue first without

25   having to get into other things we might not need to get into

1    if this is dispositive of this particular analysis."

2         So I guess my first question is, Mr. Petrocelli or

3    Mr. Frackman, whoever is speaking for the defendants on this,

4    why have you filed a bench memo that disregards what I said in

5    my first hearing?

6         MR. PETROCELLI:  Your Honor, we thought that we had

7    not done a good job of explaining our position the first time,

8    and so that's the reason we filed the bench memo.

9         Your Honor, I don't really think there's much of a

10   difference between where the parties stand right now.  We had

11   agreed not to -- to let them recall our witnesses after

12   Mr. Sansigre testified.  They could call any one of them back.

13   They don't have to ask any questions about efficiencies.  If

14   they're calling our witnesses in their case in chief, in our

15   case, we would present Mr. Sansigre and some others, and then

16   if they wanted to examine our witnesses, they could do so.

17        The only issue, which I tried to explain in the email,

18   was that there are a couple of third-party witnesses in the

19   plaintiff's case, including the first witness, that we have

20   questions about, and a couple of others, regarding things that

21   relate to efficiencies.  Probably we're talking about no more

22   than about -- with cross and direct for these witnesses,

23   probably a half an hour at most.

24        I understood the government's position to be that we

25   couldn't ask any witnesses any questions, including third-party

1    witnesses, about anything related to efficiencies, and we,

2    obviously, can't call those witnesses back in our case in chief

3    to ask them five minutes of questions.  That was the only area

4    where we differed.

5           THE COURT:  All right.  Well, to be clear, this

6    discussion that we had at our prior hearing was about

7    Dr. Snyder's expert testimony about efficiencies, and that

8    doesn't mean that you can't mention efficiencies in other parts

9    of the trial.

10          MR. PETROCELLI:  Okay.

11          THE COURT:  So with that understanding, are we

12   straight?

13          MR. PETROCELLI:  I think we're good, Your Honor.

14   Yes, we've agreed that we'll call Sansigre and Malaviya before

15   -- before Dr. Snyder.  We've also agreed that they can recall

16   any of our witnesses if they want to ask them about efficiency

17   questions after the testimony of Dr. Sansigre; so they don't

18   have to be concerned about that now.  And we just have, like, a

19   handful of efficiency-related questions that you'll see today

20   even; and you'll see that they're really of no consequence and

21   no burden on the government.

22          THE COURT:  So I would even consider -- and I want to

23   let the parties have some leeway to decide how they want to do

24   this -- hearing just the evidence about verifiability from

25   Sansigre or whoever else you want to call on that and then

1    hearing Dr. Snyder just about verifiability, but I don't know

2    if that disrupts your presentation too much.

3                MR. PETROCELLI:  No.  No.  And to be clear, that's

4    the way it's been set up, Your Honor; that Sansigre and

5    Malaviya, who has a little piece that leads into Sansigre, will

6    lay out the evidence regarding the verifiability of the

7    efficiencies.

8           If you want to have argument at that point, whether we

9    go forward on efficiencies, we will do so.  And then after

10   that, Your Honor, we're prepared to call Professor Snyder who

11   touches upon the verification issue, but actually he's there

12   for two other issues:  pass-through and merger specificity.

13   He's not really the verifying person; that's Sansigre.

14               THE COURT:  I understand, but I think it would be

15   appropriate to ask him why he didn't verify.

16               MR. PETROCELLI:  We -- I'm sure they can ask him

17   those questions, and Your Honor can as well.

18               THE COURT:  All right.  Thank you.

19               MR. PETROCELLI:  Okay.

20               THE COURT:  All right.  Thank you.

21          Anything else from the government on this point, or are

22   we -- are we resolved?

23               MR. SCHWARZ:  Following Your Honor's suggestions --

24   and I think, hopefully, we can get this resolved before we --

25   at least before we have to have a lot of our own rebuttal

1     evidence.  That will at least save that much time and perhaps

2     others.

3               THE COURT:  Thank you.

4               MR. SCHWARZ:  One other scheduling issue, which the

5     defendants have asked that a gentleman named John Glusman be --

6     who cannot testify, I believe, until -- any time after

7     August 8th -- be able to be called in our case.  Reluctantly,

8     because although they waited for a month to figure this out,

9     we'll agree to do that, Your Honor, just so you understand it's

10    not our witness; it's theirs.

11              THE COURT:  I understand.  Thank you for

12    accommodating them.

13         Are there any preliminary matters before we go to

14    opening statements?

15              MR. CANTOR:  Good morning, Your Honor.  Daniel Cantor

16    from O'Melveny & Myers.

17         On Saturday evening at around 6 o'clock, we were

18    notified by the government that during their opening statement

19    they're going to be playing about a 5-minute video clip from

20    the deposition of Mr. Sansigre.  We were informed this morning

21    that there would also be deposition clips from Mr. Dohle played

22    during opening.

23         Your Honor, we believe that this is improper and that

24    the government should be precluded from including those video

25    clips in their opening statement.  As Your Honor well knows, an

1    opening is supposed to be the outline of the case and not the

2    evidence in the case.  And while the rules have changed over

3    time and different courts have different approaches in terms of

4    how much evidence they will allow someone to mention during

5    openings, the guiding point has always been that it has to be

6    evidence.

7         And in this case, what they're proposing to play is not,

8    in fact, evidence.  Mr. Sansigre and Mr. Dohle will both be

9    testifying live in this trial.  The government did not

10   designate either Mr. Sansigre or Mr. Dohle's deposition

11   testimony as something that they would or even might play

12   during the trial.

13        So the video part -- the video of the depositions was

14   never going to be an exhibit at trial.  And it's totally

15   improper, therefore, Your Honor, for them to be displaying a

16   piece of nonevidence during their opening statements.

17             THE COURT:  Can I ask you a question?

18             MR. CANTOR:  Sure.

19             THE COURT:  Is it your position that the substance of

20   what will be said in those video clips is not admissible

21   evidence?

22             MR. CANTOR:  No, Your Honor.  We're -- we're not

23   taking the position that they couldn't ask questions of the

24   live witness along those lines, but it is inappropriate to put

25   the video testimony in.  It would be inappropriate for them to

1    quote from the deposition transcript, the written deposition

2    transcripts themselves.  What they're free to do is ask

3    questions.  And if they get an answer that they think gives

4    rise to impeachment, then they can use the written transcript

5    in that way, but this is totally --

6              THE COURT:  Okay.

7              MR. CANTOR:  -- aside from that, Your Honor.

8              THE COURT:  Okay.  So is the difference between what

9    you're objecting to and what you think is permissible, them

10   saying the evidence will show that and then stating those

11   things versus showing a video of what they think the evidence

12   will show?

13             MR. CANTOR:  That -- that is exactly it, Your Honor.

14   I mean, the traditional way one does an opening is to say we

15   believe the evidence will show X, Y, and Z.  We will call -- we

16   will talk to Mr. Sansigre in this case.  We believe he will say

17   this, that, or the other thing.  It's not permissible,

18   especially when it cannot ever be evidence in the case, for

19   them to say, here's what Mr. Sansigre had to say during his

20   deposition.

21             THE COURT:  Okay.  Thank you.

22        Does the government want to respond to that?

23             MR. CANTOR:  Thank you.

24             MS. STRICK:  Your Honor, first, under Rule 32(a)(3),

25   deposition testimony of officers can be used for any purpose.

1    There are -- deposition video clips have played in openings

2    since 2002.  That includes -- I can list some cases, *Northfield*

3    *Insurance Company v. Royal Surplus Lines Insurance*, from 2003,

4    WL 25948971, in which a court's -- Rule 32(a)(2) saying party

5    depositions are permitted and allowing video clips to be

6    played.

7         Other cases that allowed video clips to be played, *MDI*

8    *Partners, L.P. v. Chronicle Publishing Company*, from 2002,

9    WL 32349903.  And there are others.

10        This is a -- this is -- this is a bench trial.  We're

11   putting this in for -- to say -- this is not an exhibit.  We're

12   putting this in to show the evidence will show.  To the extent

13   that defendants are worried about how this is characterized,

14   both witnesses for the defendants are going to be -- are going

15   to be in the -- in the court later and will -- and they can --

16   they can question them about this.

17        So we -- we think that this is just permitted, both

18   under Rule 32(a)(3) and just plain common sense.

19             THE COURT:  Okay.  Thank you.

20             MR. CANTOR:  Your Honor, may I respond to that?

21             THE COURT:  I don't think that's necessary.  I'm just

22   going to overrule your objection at this time.  I think that

23   the government's raised a good point.  This is a bench trial,

24   and so to the extent I -- it might be more prudent to be

25   cautious if a jury were involved; this is just going to be

1    before me, and I think this objection is pretty narrow.

2    Because while the government can say they are -- the evidence

3    will show that and state what the -- what the witnesses will

4    say consistent with what was in their deposition, I don't think

5    there's much difference between them saying that and just

6    playing the deposition tape itself.

7         And the defense has said that they don't object to the

8    substance of what is in those videotapes.  That's not

9    inadmissible evidence, and so this really is a presentation

10   issue.  And given that it's a bench trial, I'm going to

11   overrule your objection.

12        MR. CANTOR:  Thank you.

13        THE COURT:  All right.  Are there any other

14   preliminary matters before we begin?

15        MS. STRICK:  Your Honor, just -- just one more.

16   Later today there's -- if there's time, we plan on playing a

17   deposition video of -- for the witness for Kensington.  Right

18   now we have two versions available.  One is entirely -- because

19   there's confidential information, one of that is entirely to be

20   played in closed court.  The other one we have tried to -- the

21   confidential clips are interspersed.  So we have attempted to

22   have one section which is confidential information with enough

23   context and the other one which can be played -- that would be

24   played in closed court.  The other one, nothing is

25   confidential; could be played in open court.

1      We have sent that to defendants, who I believe are

2  looking and confirming that they're fine with this, but we

3  wanted to know if you had a preference as to which would be

4  played, if we play the Kensington deposition.

5          THE COURT:  Are you contemplating that we would have

6  an open-court session where you would play part of the video

7  and then go to closed court and play the confidential part?

8          MS. STRICK:  Correct.  Or because it's interspersed,

9  we wanted to give you the option as well to play it all in

10  closed court.

11          THE COURT:  So if we played it all in -- you mean the

12  whole thing in closed court?

13          MS. STRICK:  Yes.  We can give the court reporter,

14  then, a -- the -- the transcript which will show which portions

15  are actually confidential, which aren't for the record, but

16  just for your -- so you can -- so -- because things are

17  interspersed, we just wanted to make sure that if you wanted

18  something that would be a little chopped up, but that could be

19  played in video now versus giving you a --

20          THE COURT:  I see.  Thank you.

21      I would err on the side of openness, if possible.  So I

22  would like to play what we can play in open court in open court

23  before going to a closed session.

24          MS. STRICK:  Okay.

25          THE COURT:  I think that's an important part of this

1    trial, to -- to be as transparent as possible and let the

2    public see as much as they can.

3                 MS. STRICK:  Thank you very much.

4                 THE COURT:  All right.  And if there are no further

5    open -- preliminary matters, I'll hear the government's

6    opening.

7                 MR. READ:  Thank you, Your Honor.

8         We have a hard copy of the presentation.  If the

9    Your Honor would like one, we can pass it out to you and

10    opposing counsel.

11                THE COURT:  All right.

12                MR. READ:  And then, as Ms. McMahon is passing out

13    those, for your timing purposes, I expect the opening to last

14    about an hour.

15                THE COURT:  Okay.

16                MR. READ:  Okay.

17         All right.  May it please the Court.

18         This proposed merger must be stopped.  It would, in

19    defendants' own words, cement Penguin Random House's dominance

20    in the American publishing market.  Penguin Random House is

21    already the largest book publisher in the United States.  If it

22    acquires Simon & Schuster, it will get even bigger; more than

23    twice the size of its next largest competitor.

24         Your Honor, there will be significant evidence during

25    this trial about advances paid in the publishing industry.

1    Those advances are the main way that publishers pay authors for

2    their books.  The vast majority of advances that publishers pay

3    go to authors of anticipated top sellers.  After the combined

4    firm -- after firms combine, they will own nearly half of that

5    market.  The new super-sized Penguin Random House will exercise

6    outside influence over what books get published in this country

7    and how authors are compensated.

8         This is an industry that's already concentrated.  In

9    fact, the next -- no publishers have cracked the inside circle

10   of that Big 5 in almost three decades.  This merger would make

11   that concentration worse.  Indeed, the merger is so

12   problematic, it is presumptively illegal.  The merger will

13   reduce compensation, harming authors who are the creative

14   lifeblood of this industry.

15        As the evidence will show, the industry trades in ideas

16   and creativity in work that's deeply meaningful to the people

17   who author it.  Those books, both nonfiction and fiction, have

18   shaped modern political discourse, and social and economic

19   discourse.  This lawsuit is designed to protect those authors

20   of those books.

21        This current competition between Penguin Random House

22   and Simon & Schuster benefits those authors.  You will hear

23   Dr. Nicholas Hill -- he's the United States economic expert --

24   testify using consumption- -- assumptions in defendants' favor;

25   that if this merger goes through, he predicts Penguin Random

1    House authors will receive 40,000 less per anticipated top

2    seller, and Simon & Schuster authors will receive 100,000 less

3    per anticipated top seller.

4        The authors of those anticipated top sellers aren't just

5    the elite or those already making a lot of money.  In that

6    group are journalists who need the advances to take a

7    sabbatical from her job, to finance a socially beneficial

8    investment in a project.  It includes public figures who are

9    ready to share their memoirs and the fiction author who's

10   already toiled uncompensated for years to write their dream

11   novel before finally selling it to a publisher.

12       The author's advance is compensation for their work, for

13   a job.  To put simply, these funds are essential to an author's

14   livelihood, just like a salary.  It's essential to an employee

15   of a company.  That's what it's like.  And in most

16   circumstances, these advances are paid out in installments over

17   years.  So to think an author who receives a 250,000 advance

18   may only be paid 60,000 a year, that's real money to real

19   people.

20       Some authors have anticipated top sellers sell so well

21   that they earn additional royalties later.  But as I'll explain

22   shortly, most authors of anticipated top sellers never earn a

23   penny beyond their initial advance.  The evidence will show

24   that the advance is, essentially, the whole ball game for those

25   authors.  The thousands of authors whose income is at stake

1    need, deserve, and are entitled to the protection of the

2    Clayton Act.

3         Finally, competition for anticipated top selling books

4    matters.  Defendants suggest that competition in this

5    marketplace can be sacrificed to the corporate bottom-line

6    because it only includes 2 percent of the books.  Let's unpack

7    that.  The evidence will show that those 2 percent of books

8    account for more than 1 billion in annual spending by the

9    publishing industry.  More significantly, that 1 billion

10   accounts for roughly 70 percent of what defendants spend on

11   advances every year.

12        These are the books that sell, that consumers demand,

13   and that most influence our public discourse.  Anticipated top

14   selling books are not some little corner of the book market.

15   This market is the bread-and-butter business for publishers

16   of -- like Penguin Random House and Simon & Schuster.  That's

17   why they compete so fiercely for these authors.  They compete

18   by offering bigger advances, better editorial services, better

19   art design, superior promotion, marketing support, and the

20   other services that authors need to have their book be a

21   success.

22        The competition matters.  I'm going to talk later about

23   what the data shows and how close they compete because of that

24   data.  But let me share with you one example of how beneficial

25   the competition is between Penguin Random House and Simon &

1    Schuster to an individual author.  Your author -- Your Honor

2    will hear during the trial about an author who wanted to write

3    a compelling memoir of her life.  We'll not refer to that

4    author by name or her title right now so we don't invade her

5    privacy, because we want to talk more compellingly about the

6    competition for her work and what it means.

7        Both Penguin Random House and Simon & Schuster highly

8    valued this book internally and anticipated it would be very

9    successful.  The author's memoir generated a lot of interest in

10   the -- initially in the industry.  And so we begin, on the

11   slide, the morning of February 24th.  There are initially seven

12   bidders.  Penguin Random House is top at 550,000.  Simon &

13   Schuster next at 510; Hachette at 300.  And they're followed by

14   Macmillan, HarperCollins, Norton, and Bloomsbury.  Those two

15   smaller publishers each bid at 100,000 or less.

16       The next day there's additional bidding, and at

17   midday -- and then there's bidding until 6:00 p.m.  Penguin

18   Random House has raised its bid to 645,000 and leads.  Simon &

19   Schuster is a close second at 625.  Hachette is still in the

20   game at 605,000.  All the other participants did not raise

21   their bid, and they drop out at levels below 300- -- 250,000.

22       The next day bids were submitted around 10:30 in the

23   morning, and you see a three-bidder horse race.  Penguin Random

24   House, as you see, comes out at top at 685.  Simon & Schuster

25   at 665.  And Hachette's right there in third place at 650.  But

1    that's Hachette's last bid.

2         The next day, from 10:30 a.m. to 6:00 p.m., Penguin

3    Random House bid back and forth, back and forth, alternating in

4    rounds raising at 20,000 increments.  The highest bid goes to

5    705.  Then it goes to 725.  Simon & Schuster's last bid comes

6    in at 745, end of the day, and then Penguin Random House tops

7    at 765.  Hachette long ago dropped out.

8         The next day at 10:40 in the morning, Simon & Schuster

9    raises its bid to 765, passing -- or 785, passing Penguin

10   Random House.  A few minutes later, Penguin Random House takes

11   the lead again with a bid of 805,000.

12        Then before 3:40, Simon & Schuster matches Penguin

13   Random House at 805.  But Penguin Random House comes in a few

14   minutes later with another 20,000; wins the bidding with the

15   high of 825.  Penguin Random House's high bid of 825 comes well

16   after Hachette drops out.  Remember when it was at 650?  The

17   only two remaining bidders were the defendants.

18        It was only Simon & Schuster's aggressive independent

19   bidding that forces Penguin Random House to more fully pay what

20   it believes the author's book is worth.  This author's labor

21   benefits by close to 200,000 because Simon & Schuster alone

22   continues to compete against Penguin Random House.  That

23   competition is worth protecting.  And there are many other

24   examples you're going to hear of during this trial; examples

25   that would be lost if this merger proceeds.

1     One note, this auction is a little unique in that all

2     the Big 5 originally participated.  Often only some of the

3     Big 5 participate.  And then the loss of Simon & Schuster

4     matters even more.

5     Now defendants' attempt to disparage the facts of this

6     loss and others by suggesting that in a conservative estimate

7     of harm by our economist, over tens of millions of dollars, you

8     know, are at stake each year.  I think they called that

9     minuscule in one of the writings before this Court.

10    In all the numbers and evidence the Court will hear,

11    let's not lose this:  Whether it's 200,000 for one author or

12    tens of millions for many authors for many books, competition

13    results in authors being paid more fully for their hard labor.

14    There's no good reason to lessen that competition so those

15    minuscule amounts of money can flow to Bertelsmann.  Frankly,

16    tens of millions of dollars year in, year out are not minuscule

17    for most of us, and they're certainly not trivial for the

18    authors who often work hard to write these books.

19    During trial, economist Nick Hill will walk more fully

20    through the effects of the merger.  Yet certain parts of his

21    analysis don't need very much explanation, like how important

22    the Big 5 are to the authors of the anticipated top sellers.

23    This bar chart shows how many of the books with advances

24    greater than 250,000 each publisher has acquired.  You see on

25    the left, Penguin Random House in dark blue, and Simon &

1    Schuster in green; towering over every other publisher in the

2    industry, even other members of the Big 5 after the merger.

3    Dr. Hill listed first in order of share of acquisitions, the

4    publishers, the combined share of Penguin Random House and

5    Simon & Schuster's almost half the market.  And the share of

6    all the Big 5 is 90 percent of the market.

7         Then you see five small publishers, each with about

8    1 percent share each.  And then just for convenience, we've

9    aggregated all the other small publishers.  They all have a

10   fraction of a percent -- and there's scores of them -- and they

11   total about 5 percent each [sic].

12        Now, we expect, Your Honor, defendants will elicit

13   testimony of a publisher winning one prominent author here --

14   one of these small ones -- winning one publisher [sic] here and

15   another one winning another publisher [sic] there.  And, of

16   course, that's why they have some share, but their wins are

17   relatively rare as evidenced by their low share.

18        In contrast, Penguin Random House, Simon & Schuster,

19   HarperCollins, Hachette, and Macmillan -- all the bars to the

20   left -- they're called the Big 5 because they've long dominated

21   the industry.  They've got the capital, they've got editorial

22   capacity, marketing, sales force; most importantly, reputation.

23   Reputation to successfully churn out best sellers time after

24   time and convince authors that they're the ones to do it.  They

25   have the ability to take on the risk of an inexpensive book

1    that may not sell well.

2         The internal documents of Penguin Random House

3    acknowledge how dominant it is.  They indicate the merger was

4    designed to, quote, cement Penguin Random House as the largest

5    dominant publisher in the United States, and it does.

6         Here's one of the clips we talked about earlier.  It's

7    the CEO of Penguin Random House, who's here, I think -- oh, I

8    guess the -- they hope for the TV in the gallery.  I'm being

9    asked if we can turn on the TV --

10             THE COURT:  Can we do that?

11             MR. READ:  -- so that others can hear -- or see.

12             THE COURT:  Is it on?  Okay.

13             MR. READ:  Is it on?

14             THE COURTROOM DEPUTY:  Yes.

15             MR. READ:  Okay.  All right.

16         Your indulgence, Your Honor.  So this is the CEO of

17    Simon & Schu- -- of Penguin Random House.  He's here today, and

18    you'll hear how he reluctantly had to agree that this merger

19    cements Penguin Random House as number one in the industry.

20         We're working through a technical issue.  There it is.

21             (An audio-video recording was played.)

22             MR. READ:  If Penguin Random House cements its

23    dominance in the United States market, hardens it so it does

24    not need to worry about rivals overtaking it, that benefits one

25    and only group, its shareholder, its owner, Bertelsmann.

1          Now, during this opening I'd like to cover some industry

2     background, the legal standard for the merger, the product

3     market, competition in the marketplace and harm, and, finally,

4     some of the mitigating factors that defendants argue.

5          But before we cover those topics, I just want to give

6     you a brief overview of the types of witnesses you'll hear from

7     and the kinds of evidence you'll hear.

8          First, you'll hear from literary agents, such as

9     Ayesha Pande, and famed author Stephen King.  Or at least

10    early, probably tomorrow.  Based on their years of experience,

11    they'll explain how the publishers acquire the rights to books,

12    the importance of competition in obtaining a fair price for an

13    author's labor.  They'll help you see through an author's eyes

14    what your options are if you craft an important book and need a

15    publisher who can make that book a success.

16         In addition to agents and authors, Your Honor will hear

17    from editors at defendants and other companies.  They'll

18    explain the internal process for valuing a book, for using

19    comparables to determine the likely success of a book, and how

20    they compete to win books for competitors.

21         Your Honor will also hear from the CEOs of each one of

22    the Big 5 publishers in person, including today the CEO of

23    Hachette.  You'll also hear from the CEOs of several smaller

24    publishers by deposition.  These CEOs will provide you with a

25    rich record for your decision.  The big -- the Big 5 CEOs will

1    describe how they compete with other Big 5 publishers, and the

2    CEOs of the smaller publishers will tell you about how uneven

3    the playing field is for them, which will make it clear that

4    these small publishers cannot suddenly grow and expand to

5    replace the force of Simon & Schuster.

6         You'll then hear late in the government's case, the

7    expert Dr. Hill.  He's an economist.  He's been recognized in

8    several courts as an expert.  He's testified both in support of

9    and against the Department of Justice and Federal Trade

10   Commission.  He will explain as a matter of economics how the

11   acquisition of anticipated top selling books are a market and

12   the shares of that market.  He'll discuss the degree of

13   competition from smaller publishers, barriers to expansion that

14   small publishers face.  He'll estimate for you, even though he

15   doesn't have to, the harm authors will face based on

16   well-accepted economic models.

17        If defendants present a viable efficiencies defense,

18   you'll hear in rebuttal the testimony of Dr. Hammer, an

19   accountant, to talk about the viability of their claim.  You'll

20   also hear Dr. Hill probably in rebuttal to respond to any

21   claims by defendants' expert.

22        Finally, you'll see contemporaneous documents of the

23   merging parties and other industry players that corroborate the

24   key points of the testimony and all the elements necessary for

25   the defendants -- for the United States to prove its case.

```
1              So let's begin with the background.  And we're mindful
2      Your Honor has read lengthy pretrial briefs; so I'll be brief
3      here.  I just want to highlight a few things that the witnesses
4      will speak to.  Authors typically work with a literary agent to
5      sell the publishing rights to a book, and that's either in
6      direct negotiations or in an auction.  And the key term is the
7      advance because that's guaranteed compensation to the authors.
8      There -- there are prepayment of royalties, and the reality
9      is that 85 percent of the time, an author of anticipated top
10     selling books, that's all they get is the advance, is the whole
11     payment.
12             These advance payments are not lump-sum windfalls.
13     While we think about books like, you know, fiction books you
14     curl up with, there's also included in this a lot of nonfiction
15     books.  And for a nonfiction writer, like a professor who's
16     writing about a moment in history or a journalist who's doing
17     investigative reporting, that advance goes to traveling for
18     interviews.  It goes to original research.  It goes to hiring a
19     photographer or an illustrator for the materials in the book.
20     That advance is paid out over time; so it's not one lump-sum
21     payment for an author.
22             And Your Honor will hear that even if the --
23             THE COURT REPORTER:  I'm sorry.  Can you say that
24     again.  And Your Honor will hear that even if the --
25             MR. READ:  Advance does not earn out, if the author
```

1    does not get royalties later, the publisher can still make

2    money on the book.  Often does.

3         As we get to this final bullet about imprints, I wanted

4    to note that Penguin Random House is the result of years of

5    consolidation.  Its name tells that story.  Penguin and Random

6    House.  Those were two separate large publishers, part of the

7    Big 6 of American publishing, that merged to bring it down to a

8    Big 5.  As a result, you're about to see, Penguin Random House

9    owns 90 U.S. publishing imprints that it's acquired over

10   time -- most of which it has acquired over this time.

11        This slide gives a sense of the breadth and scope of

12   Penguin Random House and Simon & Schuster's imprints.  Those

13   are essentially -- by the way, imprints are brand names of

14   different publishing groups, which I think Your Honor knows,

15   with different editorial focus.  Now, it can be a challenge to

16   keep track of which publishing house controls which imprints.

17   Included in this list, the Penguin Random House imprints are

18   such well-known publishers as Crown, Ballantine, Bantam,

19   Del Rey, Delacorte Press, Clarkson Potter, Viking.  And I could

20   go on, but I don't want to go too fast for the court reporter.

21             THE COURT REPORTER:  Thank you.

22             MR. READ:  And Simon & Schuster has imprints that are

23   well known, such as Atria, Scribner, and Gallery.  And each of

24   these imprints -- this is what shouldn't be lost -- is under

25   the control of senior management.  Your Honor will hear

1    evidence advancing that senior management has and undoubtedly

2    will continue to change and consolidate these imprints.  They

3    ensure these imprints row in the same direction, and

4    particularly the level of advance -- of advances at issue;

5    senior management ensures that different imprints don't

6    competitively undercut each other.

7            Let's spend a moment on the market.  You may have

8    wondered why -- which authors are most likely harmed by this

9    murder -- merger.  So we've defined a market around that with

10    that question in mind.  And, therefore, our proof at trial will

11    focus on authors of anticipated top selling books.  These books

12    are, by definition, expected to sell well.  And authors of

13    these books usually, therefore, receive a generous advance.

14    We'll use 250,000 and greater as a threshold for anticipated

15    top selling books.  But that doesn't mean there isn't harm on

16    the other side of that 250,000.

17            In fact, the Court will see that choosing a

18    significantly higher or lower threshold does not materially

19    affect the analysis.  This marketplace is so concentrated, it's

20    presumptively illegal whether the threshold is 100,000 or

21    1 million.

22            As we turn to the legal standard, I want to clarify

23    something defendants put in their pretrial brief.  The standard

24    here is what may occur, not what is likely to happen.  Congress

25    made this clear in the plain text of Section 7 of the

1    Clayton Act.  That prohibits mergers whose effect, quote, may

2    substantially lessen competition.  Congress intended courts to

3    stop industry trends toward consolidation in their incipiency

4    before they, quote, tend to create a monopoly.

5        This statute, the Clayton Act, Your Honor is about to

6    deal with, is different than most; right?  It -- it makes you

7    anticipate the future rather than determine past events.

8    Recognizing the difficulties of projecting the future,

9    Section 7 of the Clayton Act only requires the Court to

10    determine whether a lessening competition may occur.

11        Let's read how Judge Posner expanded on this point,

12    which has been adopted by the D.C. Circuit in *Heinz*.

13    Judge Posner noted that Section 7 does not require proof that a

14    merger or other acquisition has caused higher prices.  All

15    that's necessary is that the merger create an appreciable

16    danger of such consequences in the future.  A predictive

17    judgment, necessarily probabilistic and judgmental rather than

18    demonstrable is called for.  We're likely to come back to this

19    point again, Your Honor, because we respectfully request that

20    the Court reject defendants' invitation to raise the bar on the

21    burden.  It's no higher than the plain text of the Clayton Act.

22    The merger should be enjoined if this -- if this consolidation

23    may lessen competition.  Recognizing the difficulty improving

24    what the future may hold and to fulfill Congress's intent, the

25    Supreme Court also created a presumption that a merger is

1    illegal if the merger significantly concentrates a market.

2    That presumption began in the *Philadelphia National Bank* case

3    before the Supreme Court, and the Supreme Court presumed harm

4    to competition when the merger -- when the merged firm

5    significantly concentrated that market by merging to

6    30 percent.  Your Honor will see that this merger well

7    surpasses that 30 percent threshold, as we're looking close to

8    half the market.

9         Now, today courts and enforcement agencies have adopted

10   a more sophisticated mathematical analysis of the market

11   concentration.  We call it the Hirschman --

12   Herfindahl-Hirschman Index, or HHI.  The D.C. Circuit and other

13   appellate courts have adopted that HHI analysis and test to

14   determine whether a presumption applies.  And as you can see,

15   that -- thresholds are 2,500; that the post-merger

16   concentration is.  And the merger needs to increase

17   concentration by 200.

18        Dr. Hill will explain how the merger easily surpasses

19   those standards that the D.C. Circuit has recognized, and you

20   will learn that the presumption applies even if the threshold

21   from our definition is lowered, as I spoke before, even to a

22   hundred thousand.

23        Here the presumption is strong.  Dr. Hill will testify

24   the HHI numbers will exceed 3,100 and well exceed 800 because

25   of the merger.  What that means is that if defendants cannot

1    rebut the presumption that applies, this merger cannot proceed.

2    When, as here, the presumption of illegality is triggered,

3    courts shift the burden to defendants to show that the benefits

4    of the merger are so compelling that they overwhelm this

5    presumption of illegality.

6         As the D.C. Circuit stated, the defendants need to

7    produce evidence showing that the market share statistics give

8    an inaccurate account of the merger's probable effect on

9    competition.  That comes from *Heinz*.  Your Honor will see

10   defendants cannot meet that burden, which is not surprising.

11   And case after case in this Court's circuit, courts have found

12   defendant's attempts to rebut the presumption insufficient and

13   enjoined the challenged merger.  Those cases include cases by

14   your colleagues from *H&R Block*, *Sysco*, *Staples*, *Aetna*, *Anthem*,

15   *Wilhelmsen*, the D.C. Circuit in *Heinz Beech-Nut*, *CCC Holdings*,

16   and *Tronox*.

17        THE COURT REPORTER:  *CCC Holdings* --

18        MR. READ:  *CCC Holdings* -- three Cs -- and *Tronox*.

19        Your Honor, this gives me the opportunity to respond to

20   two unusual arguments in -- defendants raised in their pretrial

21   brief.  First, defendants claim that the HHIs and the

22   presumption of illegality from concentrating a market don't

23   apply to what antitrust lawyers call a unilateral case.

24   Defendants' claim is just wrong.  Unilateral effects cases are

25   those where the merger gives the merging party the power to

1    profitably worsen prices on its own.

2          Defendants' characterization of the case law and

3    academic literature in the pretrial brief is, frankly,

4    misleading.  We will have more to say about that in our

5    post-trial briefing but wanted to put you on notice of that.

6    Suffice it to say that courts, such as *Anthem*, *Aetna*, *Sysco*,

7    and others, routinely apply the presumption to unilateral

8    effects cases.  It's not controversial.

9          Second, defendants spend some time in their pretrial

10   brief asserting this merger should not proceed because any

11   anticompetitive harm suffered by authors is insufficient on its

12   own to establish a violation of law.  They, essentially, say

13   that even if Your Honor finds that authors will be harmed, you

14   should reject the government's case because we haven't shown

15   that that will lead to fewer books.

16         Economists call this an output effect.  First,

17   defendants cite no case law for this novel attempt to increase

18   the government's burden, and we discussed relevant cases in our

19   opening -- in our pretrial brief on that as well.  For example,

20   a court that blocked the purchase of Penn Grade crude oil

21   without requiring any proof of a reduction in output.  We'll

22   have more to say about that in our post-trial briefing as well.

23   But, frankly, it should be a nonissue.

24         While it's not the government's burden to show that the

25   supply of books will go down, let's take a moment to listen to

1    the Penguin Random House's CEO, Markus Dohle, explain in

2    different context what happens when you lower advances to

3    authors.  This takes a moment as Mr. Dohle gives thought to the

4    response.

5              (An audio-video recording was played.)

6              MR. READ:  The government could but won't simply rely

7    on the presumption of illegality.  Your Honor will hear

8    testimony and receive documentary evidence from market

9    participants that validates what the shares show; that Penguin

10   Random House will dominate the market if the merger proceeds,

11   and that the Big 5 stand apart from the other publishers.

12             The merging parties understand this.  You will see their

13   internal documents corroborate the implication of the high

14   market shares.  This document was drafted by the former CEO of

15   Simon & Schuster Carolyn Reidy.  She, sadly, passed away in

16   May 2020.  She created this document in 2019 in response to

17   questions asked during due diligence from the merger of Viacom

18   and CBS; and CBS had owned Simon & Schuster.

19             Viacom executives wanted Ms. Reidy's input to better

20   understand and analyze her business.  She describes for them

21   the threat level of large and of small publishers.  With regard

22   to large publishers she writes, "The U.S. publishing market is

23   made of what is known as the 'Big Five.'"

24             THE COURT REPORTER:  Mr. Read, can you please slow

25   down when you're reading?

1          MR. READ:  Yes.

2          THE COURT REPORTER:  Thank you.

3          MR. READ:  "The U.S. publishing market is made up of

4     what is known as the 'Big Five' - [Penguin Random House]

5     dominates with the largest market share, followed by Harper

6     Collins and then [Simon & Schuster].  Hachette is a close

7     fourth, followed by Macmillan.  These companies are our biggest

8     competitors, especially for books by already bestselling

9     authors and celebrities, since they are the most likely to come

10    up with high advance payments required and are known for their

11    strong editorial and publishing skills."

12         Note that Ms. Reidy understood even before this proposed

13    merger that Penguin Random House dominates, and she understood

14    that competition is especially fierce between Penguin Random

15    House and Simon & Schuster and the other Big 5 for best selling

16    authors.  And the reason is because those publishers have the

17    high advance -- can come up with the high advance payments

18    required, and have the strong editorial and publishing skills.

19         Next Ms. Reidy addresses competition from the small

20    publishers.  She writes, "There are myriad smaller

21    publishers . . . they too can compete with us for the

22    bestseller list at any one time . . . but they rarely compete

23    with us in auctions for new properties.  Often these publishers

24    become farm teams for authors who then want to move to a

25    larger, more financially stable major publisher."

1          Ms. Reidy's turn of phrase about farm teams -- minor

2     league baseball teams that nurture raw talent and then lose

3     them to the big league teams once the talent is ready to

4     succeed -- is especially apt.  Her message that all those

5     smaller publishers rarely compete in auctions for big sellers,

6     that they act as farm teams developing talent for the Big 5

7     publishers that later acquire them is consistent with the

8     implication of the market share data you will see.

9          Turning to product market.  The defendants spent a lot

10    of time in their pretrial brief attacking the product market in

11    this case.  They say it's not recognized by the industry, it's

12    not supported by economics, but those arguments won't square

13    with the evidence.  The product market we focused on here draws

14    from Ms. Reidy's recognition that the Big 5, especially,

15    compete for best selling authors and celebrities.  The product

16    market is based on how the industry actually operates.  It's

17    confirmed by economic analysis.  In fact, the 250,000 line

18    means something in defendants' own business.  Per its own

19    policies, defendants require higher approval levels and

20    documentation before offering 250,000 or higher advances.

21         Let's talk about why we define a relative market in the

22    first place.  Courts define a relevant market to focus their

23    inquiry on a -- where the Supreme Court says, in fact,

24    competition exists.  As an initial matter, we note that the

25    defendants don't seriously dispute that the hypothetical

1    monopolist's test is satisfied here.  What's that mean?

2         Economic experts in courts look to that test to answer

3    that question of whether there is a relevant product market.

4    In other words, whether there are insufficient alternatives to

5    protect authors if the market goes to a monopoly.  Here there's

6    little disagreement that a monopoly publisher or, more

7    technically, a monopolist publisher could harm authors of

8    anticipated top sellers by lowering advances because those

9    authors don't have a good alternative.  Self-publishing is an

10   unappealing option for most authors of anticipated top selling

11   books.

12        Now, defendants quibble -- unlike most cases -- is that

13   authors can protect themselves.  It's not that authors cannot

14   protect themselves by choosing a self-publishing; rather, they

15   argue there's no proper line or boundary that can be drawn.

16   But that misses the point.  Line drawing exists to help the

17   Court -- to help the Court evaluate the potential

18   anticompetitive effects of the merger.

19        The drawing of the line and the specific line that is

20   drawn isn't an end to itself.  The reality is an industry

21   rarely presents a court with a perfectly drawn bright line that

22   can be used to separate where there's harm and where there's

23   not.  That's why courts say that the boundary line for a market

24   does not need to be defined by perfect, quote, metes and

25   bounds.  Any reasonable boundary line here will show the

1    importance of the Big 5 and Penguin Random House's dominance

2    after the merger.

3        Broad markets, like the, essentially, unchallenged

4    market for all books acquired, can include submarkets, which

5    the Supreme Court has said made themselves, quote, constitute

6    product markets for antitrust purposes.  This anticipated top

7    seller market is such a submarket.  Defining a market around

8    those authors who will most likely be harmed follows the law in

9    this and other circuits.

10        Listed on this slide are three cases from this district

11    that define the market around the set of customers most likely

12    to be targeted or harmed by the merger.  These cases all

13    illustrate that line drawing for market definition purposes

14    need not be surgically precise but, rather, is done to provide

15    the courts with a useful framework for analyzing the likely

16    effects of the proposed merger.

17        In *Anthem*, the court recognized a market bounded around

18    national customers of health insurance; meaning in that case,

19    those that had 5,000 or more employees.  Customers with 4,900

20    employees were excluded from the market, even though that

21    didn't mean they weren't harmed.

22        In *Staples*, the court analyzed the market around large

23    customers, which were defined as those customers who spent over

24    500,000 or more on office supplies.  Those customers who spent

25    a little less were out of the market.

1          In *Wilhelmsen*, the Court approved a market of global

2     fleets consisting of companies of ten or more vessels.  It

3     excluded those fleets of nine or fewer ships.  Emphasizing the

4     point that the boundary line does not have to be -- have

5     perfect precision around where the competition of --

6     competitive harm would end, the Court approved the cutoff of

7     ten vessels because of, quote, its roundness and simplicity.

8     Roundness and simplicity are far from the hypertechnical

9     precision defendants insist are required.

10         The *Wilhelmsen* court noted that the parties had high

11    market shares both above and below the round number.  The court

12    indicated it was sufficient.  There was enough competitive harm

13    among those customers with ten vessels or more to enjoin the

14    merger, and that's all true here.

15         Focusing on anticipated top sellers is consistent with

16    Ms. Reidy's statement about where the Big 5 especially compete.

17    It's also consistent with the Ninth Circuit decision in an

18    antitrust case in another creative industry, movies.  When

19    looking at how movies would be affected by the alleged

20    anticompetitive conduct, the Ninth Circuit upheld a product

21    market of industry-anticipated top grossing films.  That proper

22    product market distinguished those movies that were anticipated

23    to be successful and forged the anticompetitive conduct would

24    cause the most harm from those not so anticipated.  We do the

25    same here.

1          Our common sense tells us that the competition looks

2    different for anticipated top selling books and other books.

3    And the economics supports that.  These columns, which

4    Your Honor will see evidence of later in trial, show that the

5    competitive environment for books looks very different where

6    advances are high and where they are low.  This will come from

7    Dr. Hill.

8          To show the change in the competitive success of the

9    small publishers, the slide is reoriented -- the columns are

10   reoriented.  So at the bottom in dark purple are the small

11   publishers all grouped together.  And then above them are the

12   Big 5 in descending order, with Penguin Random House in dark

13   blue, and Simon & Schuster in green, and the other Big 5.

14         On the left, the small publishers -- this is for the

15   advance of 250,000 or above -- the small publishers account for

16   a 9 percent share.  By comparison on the right, looking at

17   acquisitions below 250,000 that are much smaller, you see there

18   the small publishers have a much larger share of 45 percent.

19   The contrast with the columns on the right and the left is

20   stark.  On the right, the small publishers are sizable, but

21   they've clearly lost their competitive punch at the higher

22   advanced levels, where they're no longer selling books to small

23   niche audiences or books that have limited sales potential.

24         You will hear testimony -- and this -- this information

25   comes from the data of -- that defendants' expert likes.  You

1    will hear testimony from large and small publishers that

2    confirm this data; that the small publishers find less success

3    and compete less aggressively for advances above 250,000.

4        We wanted to play one clip.  You will hear this

5    deposition clip during trial.  It's from Liate Stehlik.  She's

6    a senior publishing executive at HarperCollins, and she

7    testifies the smaller publishers are not very -- are not in the

8    very expensive auctions because they can't absorb the losses.

9            (An audio-video recording was played.)

10           MR. READ:  There will be more to that testimony that

11   Your Honor will hear.  As you previewed -- where you draw the

12   line here is not particularly sensitive.  The shares show that

13   Penguin Random House will dominate no matter how -- the metric

14   used as a threshold for anticipated top selling books.

15       We're going to put on the screen one more slide from

16   Dr. Hill to make this point.  This slide shows different

17   columns for different thresholds of advances.  On the far left

18   is if you used a threshold of 150,000 for an anticipated top

19   seller.  Next column is 250,000 in yellow because that's what

20   we're using.  And then you can see 350, 500, 1 million.  What

21   is important is that the blue and the green, the Penguin Random

22   House and the Simon & Schuster at the bottom, you see that

23   they're approximately 50 percent regardless of the threshold.

24       You see that the blue, green, red, lighter blue, and

25   orange -- the Big 5 -- are about 90 percent regardless of the

1    threshold.  The key is that regardless of the threshold, this

2    merger -- and is anticompetitive, presumptively illegal, and we

3    could draw the line at 150 or a hundred thousand.  We could

4    have captured more volume of commerce and, theoretically, more

5    harm, but we wanted to be conservative, and we chose 250,000.

6    But either way, it's a huge market with huge concentration.

7          Let's turn to the marketplace competition and harm.

8    Penguin Random House's and Simon & Schuster's vigorous --

9          THE COURT REPORTER:  Hold on.  You've got to slow

10   down, Mr. Read.

11         MR. READ:  I'm sorry.

12         THE COURT REPORTER:  You're reading.  So I need you

13   to slow down for me.

14         MR. READ:  I will.  I promised I'd keep this at an

15   hour, and I'm trying to do that.

16         THE COURT REPORTER:  Penguin Random House's and Simon

17   & Schuster's --

18         MR. READ:  Well done.

19         -- head-to-head competition for anticipated top sellers

20   has resulted in higher advances, better service, more favorable

21   contract terms, which has real-world consequences for authors.

22         When I began, Your Honor, I talked about that author who

23   benefited by 200,000.  That's far from an isolated incident.

24   You're going to hear other evidences of head-to-head

25   competition that will be lost by this merger.  I won't go

1  through those now, but I will tell you that Simon & Schuster

2  and Penguin Random House know that they compete frequently

3  against each other, and they don't like losing to each other.

4  Here's -- you're going to see four examples just from their

5  documents that are illustrative.  The first one, "We also lost

6  the homeless auction to Crown" -- which is a Penguin Random

7  House imprint.  "This was the third beauty contest we lost this

8  week to PRH."  These are all Simon & Schuster documents.

9       The next.  "I did everything I could and we lost to

10  Random House . . . Frustrating."

11       Third, another auction.  "I'm concerned that if we offer

12  less than $8 million, [the agency] will go back to PRH.  [The

13  agent] said they were willing to offer more."

14       Another.  "Portfolio" -- another Penguin Random House

15  imprint -- "offered $1 million for World."  That means world

16  rights.  "To win the book, we'll have to offer

17  $1.1 million . . . I think we should top Portfolio . . . for

18  the following reasons . . . I don't want to let [Penguin Random

19  House] steal an author we've invested in and developed."

20       This harm is not limited to auctions alone.  If Simon &

21  Schuster is negotiating with an author, both sides know that if

22  Simon & Schuster does not offer enough, the author can turn to

23  Penguin Random House, Simon & Schuster's biggest competitor, to

24  get another quote.

25       Now, these former competitors seek to be partners.

1    Your Honor will see not only individual examples of

2    competition, but data, specifically diversion-ratio data, which

3    quantifies the extent of the competition.  The data on

4    diversion will indicate that the market shares accurately

5    portray the degree of competition.  Simon & Schuster loses more

6    book contracts to Penguin Random House than anyone else, and

7    Penguin Random House loses a significant amount to Simon &

8    Schuster as represented by a significant share.

9        The data will show there's little diversion to the small

10   publishers reflecting their small shares accurately reflect

11   their limited competitive strength.

12       We expect, Your Honor, defendants will spend a lot of

13   time at trial pointing to dozens of small publishers, many so

14   small they have a fraction of a percent, and claim that just

15   the existence of all of them means the merger cannot

16   substantially harm competition.  You'll see examples of a small

17   publisher nurturing a top seller -- selling author and that

18   author staying loyal to the small publisher.  But you'll also

19   hear why these small publishers remain small publishers and

20   that none of them have been able to grow to become one of the

21   Big 5 in over 30 years.

22       If we think about all that's happened in business and

23   commerce in the last 30 years -- the rise of the internet, how

24   books are sold, how other commodities are sold -- and it's

25   remarkable to think that the Big 5 remained unchanged with the

1    exception of what used to be the Big 6 -- these small

2    publishers have never established a reputation for churning out

3    best seller after best seller like the Big 5 have.  They do not

4    possess the same assets.

5         Please -- please listen to the testimony of Michael

6    Jacobs.  He's going to testify by video.  He's the CEO of

7    Abrams.  It's one of the small publishers, although it's one of

8    the bigger ones.  And he testifies what he says are to the

9    reality of things that Abrams as a small publisher is

10   constantly outbid.

11        (An audio-video recording was played.)

12        MR. READ:  Your Honor, a small publisher has to

13   really, really believe in a particular book and be willing to

14   stretch for it because it cannot as routinely and as

15   cost-effectively turn that book into lots of sales.  And after

16   the merger, these small publishers are not to magically start

17   stretching further to win more anticipated top selling books as

18   they do today.

19        We spend a moment on harm.  Because of the presumption

20   of illegality and its application, we could end the analysis

21   here.  But while the government doesn't have to show evidence

22   of harm, you'll see some at trial.  For example, consider

23   Christy Fletcher.  Ms. Fletcher is a successful literary agent.

24   She was on defendants' initial witness list, and she lived

25   through the prior merger of Penguin with Random House.  Based

1      on her experience, she testifies of her concern that authors

2      would potentially receive less of their labor -- for their

3      labor if this merger is handled in the same way as the last

4      one.  Please listen.

5                  (An audio-video recording was played.)

6                  MR. READ:  Dr. Hill will provide for you a

7      quantification of a potential harm to authors, and as I said

8      early, he predicts using a standard economic model and

9      conservative assumptions that it will harm Penguin Random House

10     anticipated top selling authors by 40,000, and Simon & Schuster

11     top selling authors by a hundred thousand.  Losing a hundred

12     thousand in advances can't help but affect the quality and

13     number of books those authors write.  Imagine any other

14     industry where the losses were a hundred thousand for the

15     laborers.

16                 The prediction in -- the model makes about the impact is

17     consistent with the other evidence the Court will see about the

18     importance of head-to-head competition and the expectation by

19     industry participants that the merger will pay for lower

20     advances -- will lead to lower advances for authors.  In

21     addition to head-to-head competition, Your Honor will also hear

22     evidence that the merger leads to an increased risk of what we

23     call tacit or explicit coordination among the remaining major

24     competitors.

25                 As stated by the trial court in this district in *CCC*

1    *Holdings*, merger law rests upon the theory that where rivals

2    are few, firms will be able to coordinate their behavior,

3    either by overt collusion or implicit understanding, in order

4    to restrict output and achieve profits above competitive

5    levels.  The theory follows that extraordinary circumstances --

6    that absent extraordinary circumstances, a merger that results

7    in an increase in competition -- concentration above certain

8    levels raises the likelihood of interdependent anticompetitive

9    conduct.

10        That implicit understanding referred to can simply be

11    that once one firm becomes dominant in the market, the other

12    firms decide to play follow the leader in their choices about

13    how to compensate authors or the terms in which they set for

14    authors.  But this implicit or expected understanding is

15    generally -- one thing to note is this implicit understanding

16    is not actionable generally under the antitrust laws once the

17    merger is approved.  It's too late.  There's no legal action an

18    author or the government can take after the merger to prevent

19    publishers from interdependently choosing to just follow the

20    lead of Penguin Random House.  As a result, the same

21    presumption of illegality I discussed earlier attaches to

22    coordinated effects cases.

23        And the court puts the burden, quote -- it's from the

24    same court -- on the defendants to demonstrate structural

25    barriers unique to the industry that are sufficient to defeat

1    the ordinary presumption of collusion that attaches to a

2    merger.

3        Defendants will not be able to make that showing.  We

4    already know that in this industry a court found

5    coordination -- specific, that Simon & Schuster and Penguin --

6    before the merger with Random House -- were both found by the

7    Second Circuit to have colluded to raise e-book prices.  After

8    this merger, the market will be even more ripe for

9    coordination, even simple legal coordination of a

10   follow-the-leader variety.

11       Penguin Random House's unsurpassed position as the

12   dominant publisher will give it greater ability and incentive

13   to publish --- to punish any other publisher it believes is

14   acting as a maverick and not following the industry lead.

15       Let's turn to the last part of the presentation.

16   Defendants have raised one purported defense, efficiencies, and

17   identified three other mitigating factors:  expansion, agent

18   power, and the promise of internal bidding.

19       Efficiencies are a common defense theme, but they're

20   easy for optimistic business executives to puff up, and for

21   that reason -- and it's hard for courts to get underneath them

22   and test them.  For that reason, the Supreme Court long ago

23   rejected efficiencies as a defense.  The Court of Appeals

24   expressed skepticism of them.  And in this circuit,

25   efficiencies have never justified an otherwise anticompetitive

1    merger.

2          As this Court is well aware, to even begin to consider

3    efficiencies, they have to be verified.  There are other

4    important requirements, but if the claimed efficiencies can't

5    be verified by someone independent of the parties, the inquiry

6    ends.  Your Honor will see that defendants' rosy efficiency

7    claims have not been verified by any independent actor.

8          In a deposition where he spoke as a corporate

9    representative on efficiencies, a 30(b)(6) deposition,

10   Manuel Sansigre, who we're about to introduce to you, explained

11   his investment spreadsheet; how it's a top-down model, and how

12   he could not know if Penguin Random House could achieve these

13   efficiencies until he had more confidential data and

14   discussions with Simon & Schuster, which they had not done

15   while the deal was pending.  Let's -- let's meet Mr. Sansigre.

16              (An audio-video recording was played.)

17          MR. READ:  Based on testimony like that, there will

18   be no evidence of verifiable efficiencies and nothing to weigh

19   against the harm of the merger.

20          Turning to the last three mitigating factors.  With

21   regard to the claim of injury, the idea behind that claim is

22   that the small publishers will suddenly grow so they can

23   replace the competitive pressure that comes from Simon &

24   Schuster.  Defendants won't make such a showing.  There are,

25   and Your Honor will see, high barriers to expanding and

1    becoming a major publisher that can meaningfully compete to

2    routinely acquire anticipated top selling books.

3          There have been no changes among the Big 5 publishers

4    for decades, with the exception of some being bought out.

5    That's hardly a story of powerful entry.  Your Honor will hear

6    testimony from the CEO of one small publisher explaining that

7    it is, quote, very difficult, end quote, to compete against the

8    Big 5 for books with an advance of 250,000 or higher.

9          To combat the fact that existing small publishers have

10   been unable to grow in the anticipated top-selling market over

11   time, defendants' expert identified four brand-new companies

12   that entered, and these are his poster examples of new entry.

13   But the entry defendants' expert will point to has been

14   minuscule, as Your Honor will see.

15         These are charts from Dr. Hill's report.  They're based

16   on data from defendants' expert, and they show how small that

17   new entry is.  Each column represents a different year.  For

18   simplicity, the shares of the Big 5 are all combined at the

19   bottom and have a steady 90 percent.  The smaller publishers

20   are combined and have the rest of the share, which has been

21   steady, except the big four poster examples have had their

22   actual share combined.  And in bright red, there are small

23   slivers, as you see, in the very last year.  That's the extent

24   of new entry that defendants' expert points to.

25         Your Honor will also hear -- and let it not be lost --

1    that Amazon entered the publishing industry with a splash about

2    a decade ago.  Even with all its scales and resources, Amazon

3    has had to retrench, and now it's just one of the many small

4    competitors with a 1 percent share or less.

5         And then Your Honor will hear testimony that there's a

6    shortage of book printing capacity in this country.  One of the

7    printing providers is a Bertelsmann subsidiary, a sister

8    company to Penguin Random House.  Many publishers that

9    defendants claim will expand to compete against Penguin Random

10   House post-merger are actually beholden to the Bertelsmann

11   printing company and its capacity.

12        The CEOs of HarperCollins and Macmillan will come before

13   you.  They're expected to testify that even they -- with their

14   large share and size -- will find it harder to compete

15   afterwards against Penguin Random House because of the printing

16   and the retailing muscle that Penguin Random House will have.

17   What they face, as big publishers install their expansion,

18   exists in spades for the smaller publishers.

19        The next mitigating factor, agent power.  Your Honor

20   will hear from defendants that the agents control the auctions,

21   just like your real estate agent does when selling your home;

22   but the evidence will show that just because agents have

23   alternative ways to ask for bids, it doesn't prevent the harm

24   from the loss of competition from losing an aggressive bidder.

25   The real estate agent can't manufacture competition and desires

1    an enthusiastic bidder.  A different auction approach can't

2    substitute for that.

3         Ms. Fletcher, a long-time agent, who we showed the clip

4    of before, succinctly and, obviously, testified -- and you will

5    hear it -- quote, with fewer bidders, it's harder to drive the

6    advances up.

7         Let's turn to the last mitigating factor, the promise to

8    have Simon & Schuster continue to compete.  No court has ever

9    approved a merger based on a promise quite like this.  In fact,

10   it's hard to find another case where defendants have made such

11   a flimsy promise to justify the merger.  The fact that Penguin

12   Random House is making it implies that this merger is a bad

13   deal for authors.  Here's a slide showing when the deal was

14   announced.  Twitter was -- a lot of authors and agents were on

15   Twitter expressing their concern about the harmful effects, and

16   the result is -- here are some of those tweets.

17        The result is Penguin Random House has been working to

18   assuage those concerns, and as part of that effort, it's

19   promised what it has not done before in -- contrary to its

20   current policy; that even though there are no other bidders for

21   a book, it's going to let Simon & Schuster and Penguin Random

22   House imprints go after head to head, driving up prices and

23   increasing Penguin Random House's own costs.

24        Beyond that public relations promise, the public -- who

25   this promise is supposed to protect -- can't enforce it.

1    Penguin Random House will still control those imprints.  It

2    will still be able to combine them together, focus them on

3    different genres so they aren't competing for the same books;

4    and nobody outside of Penguin Random House is going to be able

5    to verify or monitor the promise.

6         Let's hear the last video clip.  This is from the CEO of

7    Kensington, Steve Zacharius.  He's another small publisher,

8    although one of the largest, and he testifies to the economic

9    irrationality of the promise.  Let's hear a fellow CEO explain

10   it.

11              (An audio-video recording was played.)

12              MR. READ:  Given the Supreme Court's *Copperweld*

13   decision, which allows 100 percent-owned subsidiaries to

14   legally collude, Penguin Random House at any time can stop

15   Simon & Schuster from competing legally.  Defendants are asking

16   you to bet on their goodwill; that they'll continue their

17   promise in perpetuity.  But goodwill bends often to exigencies

18   of time, earning statements, market demands.  And authors

19   shouldn't bear that risk.

20              I'd like to conclude.  Over the next few weeks,

21   Your Honor will have the opportunity to hear several DOJ

22   attorneys conduct examination given their knowledge of the case

23   and hard work in gathering the evidence.  We're a team.  And

24   what will be clear that comes from that team is that if this

25   merger is allowed to proceed, Penguin Random House will achieve

1    its stated goal of cementing itself as number one in the

2    United States.  That will be good for Penguin Random House's

3    business but bad for the marketplace of ideas, for the authors

4    who contribute to that, and its sacrifices paid to the authors

5    for market consolidation, which is bad.

6         At the conclusion of all this evidence, Your Honor, it

7    won't surprise you that we will ask the Court to use the

8    Clayton Act to protect authors and the publishers [sic] who

9    read the book of authors and to enjoin this merger.

10        Thank you.

11        THE COURT:  Thank you, Mr. Read.

12        Can I ask you two questions?  First, what was the Second

13   Circuit case that found coordination in the industry?

14        MR. READ:  I'm sorry?

15        THE COURT:  What was the Second Circuit case that

16   found coordination in the industry?

17        MR. READ:  Apple v. -- *United States v. Apple*,

18   Your Honor.

19        THE COURT:  Okay.  And another question.  I didn't --

20   haven't seen this in everything I read, but do the sales and

21   the downstream market for books correlate strongly to the level

22   of advances paid?

23        MR. READ:  Yes.

24        THE COURT:  So if anticipated top selling books

25   account for 70 percent of advances, do 70 percent of books sold

```
1    have advances paid of more than 250,000?
2              MR. READ:  If I understand the question right, yes.
3    Your Honor will see that there's a correlation between the size
4    of the advance and the success of the book in retail sales,
5    yes.
6              THE COURT:  Okay.  All right.  Thank you.
7         Let's take a break before we hear the defendants'
8    opening argument.  Let's take 15 minutes at this time.
9              (Recess taken.)
10             THE COURT:  All right.  Good afternoon [sic], again.
11             MR. PETROCELLI:  May I begin, Your Honor?
12             THE COURT:  Yes, you may begin.  Thank you.
13             MR. PETROCELLI:  Thank you.  For the record, Daniel
14   Petrocelli for defendants Bertelsmann and Penguin Random House.
15        And I speak more slowly than Mr. Read.  I may go a
16   little bit over an hour, but I'll try to keep it within that
17   time.
18             THE COURT:  All right.
19             MR. PETROCELLI:  So, Your Honor, as you know,
20   Section 7 of the Clayton Act requires the government to prove
21   that the likely effect of the merger is to substantially lessen
22   competition.  We submit the trial evidence will show the
23   government cannot meet that burden.  And although it's not our
24   burden, we also suggest, Your Honor, the evidence is going to
25   show just the opposite; that the combination of these two
```

1    firms, Penguin Random House and Simon & Schuster, will only

2    enhance the fierce competition that exists both downstream and

3    upstream in the publishing business.  Author advances are not

4    going to go down.  They will continue to go up.

5         Now, when we look at how we got here, Your Honor, what

6    we see is what I call an incredible shrinking of the

7    government's case.  And I say that -- the reason that -- the

8    first question the government would have examined as it does in

9    all mergers is whether this merger would harm consumers.  The

10   answer was a resounding no.  There's no harm to competition in

11   the sale of books.  There's no higher prices to booksellers, no

12   higher prices to book readers, no fewer books, no reduction in

13   quality, no harm at all to consumers or booksellers as a result

14   of this merger.

15        And the reason for that, Your Honor, is that the

16   downstream market is not concentrated.  Publishers of all types

17   and sizes compete aggressively to sell the books that readers

18   want to read; and the government will concede that after this

19   merger, there will continue to be robust competition

20   downstream.

21        If you could just look at these shares.  This is the

22   public version; so I've kept some numbers off of here,

23   Your Honor.  And also I will tell you that this is based on

24   Dr. Hill's data.  And as I will show you in a minute, the

25   actual shares for Penguin Random House and Simon & Schuster are

1    significantly less.

2         But this is what the downstream market looks like, and

3    you're also going to hear that Penguin Random House has been

4    losing share downstream for years to non-Big 5 publishers, as

5    well as self-publishing.

6         Now, why am I showing this to you, Your Honor?  Why are

7    we talking about the downstream case when this is a monopsony

8    case?  Because it means that every one of those publishers

9    downstream has a strong incentive to compete and sell books,

10   which, in turn, means that they must compete vigorously

11   upstream to get the books the readers want.

12        Remember, Your Honor, this is not a case where we're

13   dealing with a product component, like brakes on a car.  The

14   product that's being acquired upstream is the product the

15   publishers are competing to sell downstream, and every book is

16   unique.  We're not dealing with bushels of wheat.  Every book

17   is a new product that has never existed before, and the

18   competition to win that book is zealous, because if you don't

19   win that book, you have nothing to sell.

20        When the government concluded there was no harm

21   downstream, they went looking upstream into the market for the

22   acquisition of all books.  And when it filed this case last

23   year, if you go back to the complaint, you'll see that the

24   government alleged that the merger would substantially lessen

25   competition in this overall book market; but as events have

60

1    unfolded, as events -- as the evidence has come out, including

2    their own expert, they cannot make that claim.  They cannot

3    support that claim.

4         And here -- here's a graph or a chart of the upstream

5    acquisition market.  This is an unconcentrated market.  It will

6    remain unconcentrated after the merger, and importantly --

7    although the government, I'm sure, ran it -- there is no

8    presumption, no HHI that is triggered in this market for all

9    trade books.

10        And now I would ask that the public-facing monitor be

11   turned off.  I'll -- and if you look at these pie charts,

12   here's the downstream.  And this is what I want to point out

13   to -- to Your Honor.  With better data -- this was prepared by

14   Dr. Hill using data reported by booksellers.  When you look at

15   all of the book sales, not just to retailers, but also to

16   institutions, educational places, like -- and libraries --

17   Penguin Random House's share, Your Honor, is -- is just a

18   little bit of half that number that you see.  And the same is

19   true of Simon & Schuster.  Because this chart prepared by

20   Dr. Hill doesn't take into account the sale of all books.

21        So not able to show any harm to the overall trade book

22   acquisition market, what did the government do next,

23   Your Honor?  And that whole market, Your Honor, is about 55,000

24   to 65,000 books a year that are published.  So the government

25   went looking for harm, and what they did is they shrunk their

1    case down to a tiny corner of this market, focusing only on

2    those acquisitions where an advance of $250,000 or more per

3    book is paid.

4         And I heard Mr. Read talk about how it doesn't matter if

5    it's 300 or 100.  In a sense he's right, Your Honor, because

6    those -- if it's 100, that 2 percent is probably 1 percent.

7    And if it's a 300 -- or $350,000 threshold, it's probably no

8    more than about 3 or 3 and a half percent.  So we're talking no

9    matter how much they want to slide the 250,000 number, we're

10   talking about a tiny increment of the overall market.

11        So what the government is telling us in this trial is we

12   know the overall market is competitive.  We know there is no

13   harm to 98 percent of all acquisitions.  But if you look way

14   down there in that tiny corner, we may have some harm.  And so

15   what did they do?  They hired the expert to conduct a

16   mathematical analysis of transactions in that little corner.

17   And as you will hear, he applied a counterfactual model; one

18   that always finds harm from any horizontal merger.  And there

19   are a number of problems with that.  I won't detail them now.

20        But I'll just say this:  The way those models work,

21   Your Honor, is they focus solely on transactions where the

22   models assume the merging parties were the final two bidders

23   with the two highest bids.  And so the models assume one lost

24   out to the other, and they ask what would happen if you removed

25   one of those two top bidders from those transactions.  How much

1    would eliminating that runner-up affect the advances paid in

2    those transactions?

3          And I'd like to make this point, because it took me a

4    while to really understand it, but the model is predicting harm

5    only when post-merger a book is acquired by the combined firm,

6    and only when it can be assumed that pre-merger Penguin Random

7    House and Simon & Schuster would have been the final two

8    bidders.

9          Now, putting aside the dubiousness of that proposition,

10   I'm sure the government expected that PRH and S&S would

11   frequently be the top two bidders given their focus on just

12   this tiny 2 percent market.

13         But, again, look what happened when Dr. Hill ran his

14   model, his second score auction model in this 2 percent of the

15   market, it projected that PRH and S&S would be the two top

16   bidders in only 12 percent of some 1200 acquisitions in that

17   market.  Twelve percent.  So, Your Honor, that's 145 books a

18   year.  And when you use more accurate real-world data, the

19   12 percent figure is actually 7 percent, a grand total of

20   85 books a year.

21         So that's why we're here.  They're asking the Court to

22   block this important merger for under a hundred books a year.

23   And although Dr. Hill didn't run his dollar-harm value, we did.

24   And it projected a reduction in total author advances of

25   $29 million annually out of advances paid annually in this

1    2 percent segment of the market of more than 1 billion, not to

2    mention, several billions across the entire actual market.

3    And, Your Honor, that 29 million is without correcting for a

4    single error or omission, which reduces the harm to zero.

5        So even if you accept the 29 million -- and before

6    correcting for the flaws, there are at least two immediate

7    problems.  One, of course, is the harm is not substantial.

8    But, more importantly, Your Honor, the prediction isn't

9    reliable.  Nobody demands perfection in modeling.  But the

10   figures here are so low that they leave no margin of error and

11   no confidence that, in fact, there is any harm.  If you tweak

12   any of the dials on the model, even just a little, or you

13   include any of the projected efficiencies that go to the

14   benefit of the authors, the projected harm rapidly diminishes

15   to zero.

16       So that's how we got here, an incredibly shrinking case

17   shriveled down all the way to statistical insignificance.  In

18   simple terms, the government has created an artificial market

19   to create artificial concentration to create artificial harm.

20       So mindful that you've read everything -- we've learned

21   that by now, Your Honor -- we're going to be -- I'm going to be

22   careful not to try to repeat, you know, the dense briefing.

23   But I do want to highlight some of the insurmountable problems

24   in the government's case that the evidence will expose, but I

25   want -- what I want to start with, though, is at least an

1    implicit underlying theme of the government's case, which --

2    which was alluded to by Mr. Read.

3         There's been a lot of attention recently in antitrust

4    circles about using antitrust laws to prevent harm to labor

5    markets.  And the government may think this is kind of a test

6    case for this mission, and, if so, I submit they picked the

7    wrong case.  We take no issue with the idea that mergers can

8    harm labor markets.  Some mergers do pose real monopsony risks.

9         You can imagine when three hospitals in a town merge or

10   the only two local lumber mills merge, it's easy to see how

11   wages might be depressed.  A nurse or a mill worker can't drive

12   a couple of hundred miles to find a better-paying job, or they

13   don't want to substitute their job for some local fast-food or

14   other job.  In other words, they can be stranded.

15        The situation here is quite different, Your Honor.

16   Agents have and will continue to have many competitive options

17   to get their works published.  They have agents who, as you

18   will hear, will control and do control the bargaining process

19   with publishers.  The agents have a number of tools in their

20   toolbox to get the best possible deals for their authors in

21   their negotiations with publishers.  And, you know, there's a

22   saying in the publishing industry that the way you know the

23   agents have all the power is that the publishers always pay for

24   lunch.

25        And that is particularly true, Your Honor, when we're

1    talking about agents' leverage in negotiating the top 2 percent

2    of all acquisitions with six-, seven-, and eight-figure author

3    advances.  You can be sure that agents will be able to resist

4    and counter any attempt if a publisher or the merged firm were

5    silly enough to try to lower an advance.  It would take an

6    agent no less than five minutes to knock on another publisher's

7    door who would like nothing more than to win a book, especially

8    one the government would say is anticipated to be a top seller.

9        Let me start with the market definition, which, of

10    course, the government has the burden to prove.  It has to be a

11    distinct cognizable market, but why is this important?  The

12    reason it's so important, particularly in this case, is because

13    the wrong market definition can lead to serious mistakes.

14        Antitrust law operates on the core assumption that

15    competition promotes greater market output, meaning lower

16    prices and more goods for consumers.  But if you just focus on

17    the 2 percent or the one part of a market and ignore the rest,

18    you could end up blocking a merger, Your Honor, that will

19    expand overall output and enhance consumer welfare.  So to

20    avoid that outcome, courts have always insisted that right

21    up-front, the government must identify a market that includes

22    all products that actually compete with one another.  And the

23    evidence is going to be overwhelming that the government's

24    proposed product market is fundamentally wrong.

25        As you heard, the government bases this merger challenge

1    on a so-called market for anticipated top selling books, which

2    it further defines to mean books with advances of at least

3    $250,000.  Now, what you're going to hear is that no one in the

4    publishing business has ever heard of this before.  It does not

5    exist.  The critical point is that the only defining

6    characteristic of a book in the government's alleged market,

7    the only way to know whether it's in or out of the market, is

8    that it was ultimately acquired for an advance of at least

9    $250,000.  And we submit the government's case fails right

10   there.  The price segment of books that after bargaining were

11   acquired for advances of $250,000 or more is just that.  It's a

12   price segment in an overall market.  It is not a distinct

13   market of its own.

14        The courts do not recognize markets based solely on

15   price, where the price is just a continuum of the same product

16   sold for different values.  What the courts do recognize,

17   Your Honor, are markets based on price where the products

18   themselves have distinctive characteristics other than just the

19   amount paid for them.

20        Now, I won't go through all of the practical indicia

21   factors from the Supreme Court's *Brown Shoe* case, but the key

22   takeaway is this:  The evidence will be -- will be irrefutable

23   that nobody in the industry treats books that yield advances of

24   $250,000 or more as if they exist in their own category of

25   competition separate from other books.

1          You will hear from agents and editors that nobody uses

2     the term "anticipated top selling books."  Publishers do not

3     have editors or imprints or divisions dedicated to books where

4     they plan to offer more than 250,000.  Publishers have no

5     special marketing services, no special distribution channels,

6     no special printing facilities used for books 250,000 or over.

7     And that's what distinguishes this case from the ones Mr. Read

8     mentioned; cases like *Syufy*, *Staples*, and *Whole Foods*.

9          Now, let me mention a few words about *Syufy* because it

10    has a superficially appealing similar product definition for

11    the exhibition of, quote, industry anticipated top-grossing

12    films.  Unlike this case, that market definition made sense.

13    We were dealing with films that are already completed, and they

14    had all characteristics that enabled industry participants, in

15    the words of the court in that case, to identify, quote, from

16    an ex-antiperspective, this particular subset of films as

17    different, meaningfully and categorically from other films,

18    including facts such as they were filmed by major directors.

19         They had big stars.  They involved larger budgets.  They

20    had distinctive exhibition bookings in first-class theaters.

21    But interestingly, Your Honor, one factor the court did not

22    identify as a basis for defining the market there was the

23    prices that were paid to the script authors for rights to

24    develop and distribute the film prior to production, which

25    would be parallel to what the government is saying here.

 1          There are no agreed-upon objective criteria that this

 2     industry applies in advance to determine which books will yield

 3     advances for $250,000 and which will not.  When you get right

 4     down to it, Your Honor, what the government is sort of

 5     imagining is that you could take the approximately 55,000 books

 6     that are published every year, you could give them to a panel

 7     of participants, and you could ask them and they should be able

 8     to identify the books where the advances were 250,000 or more,

 9     and that's completely implausible.

10          Now, when -- there are authors, Your Honor, whose books

11     everyone knows in advance will command large advances.

12     John Grisham.  We're going to see Stephen King tomorrow.

13     Celebrities like Dolly Parton, public figures like

14     President Obama and Michelle Obama.  But I think, as Mr. King

15     himself will acknowledge, these authors and their books are not

16     what this alleged market is about.  They're going to be the

17     first to admit, they will not be harmed by this merger.

18          And this is an important point in this case because when

19     you hear vague terms like "high advances" or "significant

20     deals" and you're thinking about obvious hit books, that's not

21     what the government means by $250,000 or more.  These

22     big-ticket authors command advances vastly more -- often in the

23     millions, tens of millions -- than $250,000.

24          And the government has not purported to draw a price

25     boundary that is so small as to capture only those

1    transactions.  So what they're focusing on in their price

2    segment are authors who are debut authors, unknown authors,

3    lesser-known authors.  These are the authors to obtain advances

4    of 250,000 or more, but not because they fall into some

5    category recognized by the industry, but because it happens to

6    be that somebody decided as a result of an auction or

7    negotiation to pay that author $250,000 or more.

8            And, yes, that editor who bought that book may have

9    hoped and even anticipated that the title would be a top

10   seller.  But, Your Honor, when you think about it, every book

11   starts out as an anticipated top seller in the gleam of an

12   author's or editor's eye; right?  Every book is a dream.

13   Where -- where -- this is a business of out -- outcoming, not

14   algorithms.  And sometimes dreams come true.  And sometimes

15   they don't.  And the history of publishing is littered with

16   very, very high advance books that flop and very, very low

17   advance books that soar.

18           And, you know, it's interesting, but you asked that

19   question at the end about whether there was a correlation

20   between advance -- books that have high advances and -- and

21   whether -- I think you said 70 percent of the market using

22   Mr. Read's figure, whether -- whether those books constitute

23   70 percent of sales.  And, you know, to my knowledge, nobody on

24   either side of -- of this aisle here has done that calculation.

25   I think it might be difficult to do, but it may be doable.  I

1    would -- I would think, Your Honor -- and I hazard a guess

2    here -- that there may be just a rough correlation, but I think

3    what you would see is that 70 percent of sales are not

4    high-advance books.  I think you would see a number lower than

5    that.  For one reason, half the sales in the downstream market

6    are backlist sales, and you would have to --

7              THE COURT:  I'm sorry.  What sales?

8              MR. PETROCELLI:  Backlist sales.  They're -- they're

9    books that were published a long time ago or more than a year

10   ago.  But we're going to take -- we're going to take a look at

11   that.

12             But my point here is that you cannot define an antitrust

13   market on the idea that you think a book is going to be a top

14   seller.

15             We heard Mr. Read mention, in order to try to support

16   this market definition, that, for example, publishers have

17   internal approval levels and some -- and PRH might have one

18   such level at 250,000; that has nothing to do with -- with the

19   market definition.  These publishers have all kinds of

20   different internal approval levels depending on who the -- who

21   the executives and who the editors are, and they change all the

22   time, Your Honor, and there's no categorical difference between

23   the books themselves.  That's the key.  It's just based on

24   somebody needs someone's approval if you go above a certain

25   level.

1           Now, the last market definition point I want to mention

2      is the government's focus on the Big 5.  Again, on this market

3      definition point, the government is suggesting that only five

4      publishers can provide services for authors with $250,000

5      advances or more.  And they're just completely wrong about

6      that, Your Honor.

7           There are many publishers who provide those same

8      services.  I mean, because the Big 5 are bigger, they provide

9      more of them, but they're the same services that are being

10     provided by everybody, including elite publishing houses like

11     Norton, and Scholastic, Abrams, Hay House, not to mention some

12     of the largest companies in the world like Amazon and Disney.

13          More than 30 publishers compete for and win books with

14     advances of $250,000 or more.  And there is no strict

15     market-defining division between the Big 5 and these other

16     major publishers.  They all provide first-class services to

17     authors at all price levels.

18          At the end of the day, the government is just putting

19     out a price level, and that's the only differentiating factor

20     in their market; and by their own logic, that line could be

21     drawn anywhere.  It could be a hundred thousand, could be

22     500,000, could be 5 million.

23          So, again, Your Honor, treating an arbitrary 2 percent

24     of the overall market as its own antitrust market would be

25     putting the Court in the position of disregarding the

1    continuing and enhanced competition throughout the other

2    98 percent of the real market.  That's where the government

3    couldn't find harm.  That's where they should have stopped.

4    And the only reason I suggest they came up with this tiny

5    2 percent market is to create high concentration in order to

6    trigger a presumption of harm that we say has no place in this

7    case.

8        So let me talk about the presumption.  Obviously, the --

9    the HHA [sic] was calculated and the presumption is triggered

10   according to the numbers.  But to be clear, it was based on

11   this 2 percent of the market, and if you ran the HHI for the

12   entire market, no presumption would be triggered.  Okay?  And

13   although a lot of weight is being put on this presumption by

14   the government, as you saw from Mr. Read's opening statement,

15   the government cannot prevail on a presumption alone.

16       The D.C. Court made that clear in *Baker Hughes* that the

17   HHI presumptions cannot guarantee litigation victories.

18   Because to allow the government, quote, virtually to rest its

19   case at that point, leaving the defendant to prove the core of

20   the dispute would grossly inflate the role of statistics in

21   actions brought under Section 7.

22       Now, to rebut the presumption, just to give an overview

23   of the legal framework, our burden is a burden of production,

24   Your Honor, not of persuasion.  We have to produce evidence

25   showing that the market shares alone do not accurately capture

1    effects on competitive conditions.

2         And once we rebut that presumption, the presumption

3    vanishes and the government has to prove their case without the

4    benefit of a legal presumption, which, after all, is a

5    substitute for evidence.  Now they have to actually produce the

6    evidence to show -- to show harm.

7         And the evidence that you'll see in the trial,

8    Your Honor, readily and easily rebuts the presumption and

9    demonstrates that market shares do not actually capture

10   real-world competitive effects.  And here are just some of the

11   key reasons that I'll run through.

12        First, strong competitive rivals.  Judge Mehta put the

13   point well in the *Sysco* case.  "[E]ven if the merging parties

14   had large market shares, if they were not particularly close

15   competitors, then the market shares might overstate the extent

16   to which the merger would harm competition."

17        Now, that was not a problem in *Sysco* where you had these

18   two giant companies who were neck and neck merging and other

19   competitors were a far, far, far distant third.  And so as a

20   result, if you go into that case, Your Honor, those two

21   companies lost to each other, more than they lost to all the

22   other competitors combined.  So it was very easy to see how

23   eliminating the biggest sellers' only serious competitor would

24   cause a material increase in prices.  That was a sale -- that

25   was a monopoly -- monopoly case, not a monopsony case.

1          This case is completely different, and it's exactly what

2    Judge Mehta was referring to.  Despite significant combined

3    market shares, the merging parties -- S&S and PRH -- they are

4    not particularly close competitors, and that's because you,

5    obviously, have three other major publishing houses, the three

6    other members of the Big 5:  HarperCollins, Macmillan, and

7    Hachette.  They compete, they win, and they're not going

8    anywhere.

9          But you have the other publishers in the top 30, the

10   names I mentioned before, like Norton, Scholastic, Abrams,

11   Disney, Amazon, and the government showed you Figure 8 from

12   Dr. Hill's report to suggest that the non-Big 5 publishers

13   acquire only an insignificant number of books for advances of

14   $250,000 or more, and that's just contrary to the facts.

15         When you add up all those Big 5 publishers' market

16   shares -- excuse me.  When you add up all those non-Big 5

17   publishers' market shares collectively, they win about as many

18   books in the government's 2 percent price segment as do

19   individual members of the Big 5.

20         And this is a confidential chart.  If I could have it

21   displayed for the benefit of the Court, Pam.

22         What you're also going to hear, Your Honor, is that the

23   non-Big 5 publishers collectively win or come in second in

24   about 23 percent of auctions.  So in a real sense, this is not

25   a five-to-four merger but a six-to-five merger.  And as I said

1    earlier, Your Honor, PRH and S&S are rarely the top two bidders

2    in acquisitions; 12 percent according to the government;

3    7 percent according to more accurate bidding data.  Either way,

4    whether it's 12 percent or 70 [sic] percent, that means that

5    Penguin Random House and Simon & Schuster are not close

6    competitors with each other in about almost 90 percent of

7    acquisitions in the government's market.

8         The next -- the next factor I want to point out is about

9    the agents and their acquisition formats, and Mr. Read alluded

10   to that.  I believe he anticipated some of the points I was

11   going to make.  But the evidence will be undisputed that agents

12   have complete control over how acquisitions are structured,

13   and, more importantly, that market shares play no role

14   whatsoever in that process.

15        Most acquisitions, Your Honor, are one-on-one

16   negotiations where you don't have a runner-up.  The agent

17   negotiates a deal with the author's existing publisher, or she

18   may decide to negotiate with a single editor she thinks is the

19   right match.  There's a lot of matchmaking that goes on in this

20   business between editor and author.  Or the editor might submit

21   a work to a number of editors, but then preempt -- preempt the

22   work from the market to take it off the market.  And sometimes

23   the editors will -- or the agent will put the book through an

24   auction.

25        However she decides to proceed, the one thing they do

1    not do is choose a process based on a publisher's upstream

2    market shares.  So before this case and the government's

3    pursuit of this theory, I believe it's fair to say that no one

4    in publishing, Your Honor, has ever even calculated upstream

5    shares.  It's not a relevant factor in the way the business is

6    conducted.

7        The -- the next point I'll make on the last one on here

8    is about the ease of expansion, and we heard a little bit about

9    that as well.  Now, this is actually important, Your Honor,

10   because the HHI presumption relies entirely on static

11   backward-looking shares.  It just assumes that after the merger

12   the market will be exactly the same, except that you're

13   combining two of the entities.  But what happens if, as the

14   government claims, the post-merged entities start driving

15   prices down to below-market levels?

16       In that situation, the guidelines in case law tell us

17   that if other rivals, other publishers here, would have the

18   ability and the incentive to step in and pick up that slack,

19   then it is not appropriate to rely on existing market shares

20   alone to project reduced competition.  And that's what the

21   evidence will show here.

22       If the -- if Penguin Random House after this merger were

23   foolish enough to begin unilaterally pushing down prices, you

24   can be sure that other publishers would jump in at the

25   opportunity to grab valuable books.  And I'm not talking just

1    about new entrance, although there are several that have

2    emerged recently, as you'll hear.

3         But this applies with more force to expansion by

4    existing publishers; those who are already active in the

5    250,000 market and perhaps those who are less active.  These

6    existing publishers already have skilled and experienced

7    editors.  They already have the knowledge and the

8    infrastructure required to successfully acquire books at any

9    advance level, and some already have plans to expand by

10   increasing their book acquisitions.

11        Mr. Read mentioned the printing issue as a potential

12   obstacle to expansion.  That's not a credible argument,

13   Your Honor.  It is true that Bertelsmann owns printing

14   facilities, but there will be no evidence that it favors

15   Penguin Random House and no basis for assuming it would do so

16   after the merger.  It's just pure speculation.  The deals

17   between PRH and Bertelsmann for printing are at arm's length;

18   and Bertelsmann serves many different publishers in the

19   industry.  So we believe all of that, and more that you'll

20   hear, readily rebuts the presumption.

21        So now where does that take us?  What is the additional

22   evidence absent the assumption the government has to prove

23   harm?

24        Well, you're going to hear, Your Honor, about several

25   sources of evidence.  One of them will be other publishers,

1    starting with Mr. Pietsch this afternoon, who's the CEO of

2    Hachette.

3         Now, let's be -- let's be fair about this.  The other

4    publishers, the big publishers, in particular, they don't want

5    this merger to go through; right?  They -- they think Penguin

6    Random House will be able to compete more aggressively, buy

7    more books, drive up the price, and they're going to have to

8    pay more.  When you think about it, under the government's

9    theory where advances are going to go down, these publishers

10   should be happy about this merger.  They should be supporting

11   it because there would be lower prices for advances, but that's

12   not what's happening here.

13        We're also -- we're also going to see a number of --

14   hear about a number of anecdotal accounts, as Mr. Read

15   mentioned, where Penguin Random House and Simon & Schuster were

16   the final two bidders.  And we are not going to dispute,

17   Your Honor, that there are instances when both of those

18   companies are the final two bidders.  Of course, that happens.

19        But to -- to the 50 or so examples that the government

20   may show the Court, there's a remaining 1,150 examples that

21   they're not going to show the Court where Penguin Random House

22   and Simon & Schuster were not -- were not one and two, were not

23   the final two bidders.

24        The government will rely heavily on emails, like the

25   one the late Ms. Reidy wrote, and my colleague Mr. Fishbein

1    will address that.  But I'll just say one thing about the

2    kind -- those kinds of documents you'll see.  Those documents,

3    by and large, all say the same thing; that the five big

4    publishers all compete against each other, and they do.  That's

5    what it means to be the five biggest.  But they're not saying

6    that competition is weak or that competition is soft.  You're

7    not going to see anything like that, and they're not saying

8    that there are no other 5, 10, or 20 largest publishers who

9    never compete, because the data shows they do.

10         But, Your Honor, what you won't see are the kind of

11   internal documents, for example, that we saw in *Sysco* where the

12   merging parties each referred to each other as the primary

13   competitor, the main rival, the only rival, because nobody in

14   this business thinks Penguin Random House and Simon & Schuster

15   are each other's only or main rivals.

16         You will see documents to the contrary, like this one

17   published by a news corp on behalf of its company

18   HarperCollins, discussing how highly competitive the market is,

19   how there's competition with all publishers.  And, importantly,

20   competition could also come from new entrance as barriers to

21   entry in book publishing are low.  And that was the point that

22   I was making to you before.  You don't have to go out and --

23   and get a couple of billion dollars of capital to build a

24   facility, a manufacturing plant or a fabrication plant.

25         And here's another one by HarperCollins, which has to be

1    displayed confidentially.  This one was just a few months ago,

2    Your Honor, back in January after the merger was announced.

3    And what you will see -- and I won't say it out loud,

4    Your Honor, but the -- the statement that's in yellow and

5    underlined about authors' spending -- and this is after this

6    merger was announced -- is completely contrary to the

7    government's suggestion that advances are going to go down.

8         The last piece of evidence -- and we did not hear too

9    much about it in the --

10        THE COURT:  I'm sorry.  Can you put that up again.

11        MR. PETROCELLI:  Should I proceed?

12        THE COURT:  I'm sorry.  That increase reflects an

13   increased number of books, not advances per book?

14        MR. PETROCELLI:  That's how I would read it,

15   Your Honor, or it could be both.

16        THE COURT:  Thank you.

17        Go ahead.  Thank you.

18        MR. PETROCELLI:  Yes.

19        I want to say a few words about the government's

20   modeling by Dr. Hill.  And as Your Honor knows, the model is

21   only good if it fits, and fits the real world meaningfully

22   enough to give you meaningful results, and our position is his

23   models do not fit because he's modeling an outcome of an

24   auction that's not representative of how books are usually

25   acquired.  Think -- think, as you've read, the second-score

1    model assumes an auction where the highest bidder is the

2    winner, but that winner pays the runner-up price.  Doesn't pay

3    the winning price, pays the runner-up price.

4         The theory is the runner-up constrains the amount of the

5    winning bid.  The model then tries to determine what would

6    happen to the price in those auctions if the merger removed

7    that runner-up.  That inquiry makes sense, if at all, if

8    there's a runner-up bid.

9         And here's the problem:  Most acquisitions do not have a

10   runner-up bid that constrains the amount of the winning bid at

11   all.  I think, as I indicated, half of the acquisitions occur

12   without multiple bidders.  And where there are multiple

13   bidders, agents often use a best-bid auction where the

14   publishers are invited to submit a blind bid.

15        And that's not the only fit problem.  Dr. Hill's model

16   assumes every publisher participates in every acquisition in

17   that post-merger.  Because of the combination of the two firms,

18   there will be one fewer bidder.  That's one of the reasons the

19   model always predicts harm, but that's not how it works.  Not

20   all publishers are invited to bid on a book.  And even when

21   they are, they don't always participate.  So agents can readily

22   find other editors -- other editors and publishers to pitch a

23   book to or submit a book to.  It's not a closed universe.

24        And there are also other problems, such as inflated

25   profit margins and other inaccurate inputs that Professor

1      Snyder will go over in detail.

2           On efficiencies, Dr. Hill's models also do not take into

3      account any efficiencies.  And efficiencies are important,

4      Your Honor, in assessing the incentive effects of the merger.

5      Because here the government is looking at the dynamics that

6      potentially create downward pressure on advances, we also need

7      to evaluate the dynamics that create upward pressure on

8      advances.  And that's the only way to understand and project

9      what effects a merger will have.

10          And here there is uniform agreement that merging Simon &

11     Schuster will create efficiencies.  You're going to hear it

12     from Mr. Pietsch of Hachette, Mr. Murray of HarperCollins,

13     Mr. Berkett of Simon & Schuster; and the government's own

14     expert, Ms. Hammer, acknowledges there would be efficiencies

15     from a transaction like this.  And this is another confidential

16     exhibit with -- with more specific information about that.

17          And we've had a lot of discussion about verify.  I think

18     when Your Honor finally gets to hear the extensive work that

19     went into the efficiencies model prepared by the company that

20     included not just Mr. Sansigre, but also vetted by financial

21     groups at Bertelsmann, I think Your Honor will see that they're

22     not hardcore numbers taken, you know, off the top of his head,

23     but was a result of a couple of hundred hours of hard work to

24     develop these synergies.  And the Court will hear that

25     evidence.

1          And the Court raised questions about what its role is.

2     Your role, Your Honor, is not to be the verifier.  Your role is

3     to evaluate the verification evidence that you receive, just

4     like any other evidence, and determine whether it's credible,

5     whether it's reasonable, whether it's persuasive.  And the

6     witness will go through each -- each of the items, and

7     you'll -- you'll make the judgment yourself whether -- whether

8     that process produced estimates.  Remember, we're not talking

9     about hardcore numbers.  We're talking about future

10    estimates that are reliable.

11         Now, we don't need to prove any efficiencies at all in

12    this case because we don't believe there can be any

13    demonstration of harm, but -- but even a portion of the

14    efficiencies here would be sufficient to counteract the

15    government's claimed harm because it is so small.

16         I will -- I want to mention one thing about this

17    independent bidding, which Mr. Read mentioned.  For decades,

18    Your Honor, Penguin Random House has had internal competition

19    among its imprints.  This is not something new that it just

20    came up with, and it's in the DNA of the company.  And why do

21    they do it?  We heard that clip from one of the editors

22    questioning -- you know, you're just negotiating against

23    yourself.  Maybe so, Your Honor.

24         But that is the best way the company believes that it

25    can win the book.  Because what they're trying to do is match

1    the most passionate editor with the author and the agent for

2    that particular book.  And one editor may say it's worth a

3    hundred thousand dollars in the same company, and the other

4    editor may say it's worth a million dollars.  And so there is

5    vibrant internal competition that has gone on, and it's the

6    belief of the company that this is the best way to achieve

7    success in winning the book and fostering a partnership, a

8    long-standing partnership, not just the one-off transaction

9    between the author and the publisher.  And the -- the author

10   community recognizes it.  The agent community recognizes this,

11   and -- and they exploit this.  They often submit proposals to

12   multiple imprints.

13        So what -- the statement Mr. Dohle had made was to try

14   to calm anxiety, that somehow that was going to be disrupted.

15   No, the answer was it was not.  But he went beyond that, and he

16   said that post-merger, he'll allow S&S not only to internally

17   compete against each other, just like the Penguin Random House

18   editors do, but he'll even let competition go on even when S&S

19   and PRH are the only bidders remaining in an auction, let's

20   say, or in some kind of negotiation.

21        And we're not resting our case on that.  Okay?  And we

22   don't need that to win this case at all, but the idea is also

23   wrong, Your Honor, that the day after the merger or year after,

24   he can just pull the plug on that, he can just renege on it,

25   which is sort of the suggestion being made, because that would

1    destroy all trust and credibility that the company has

2    nourished over generations.

3         On coordinated effects, I think it's sufficient to say

4    there's no evidence at all to support that theory.  Dr. Hill

5    barely mentioned it in his report, and we don't believe he will

6    testify that the merger is more likely to increase coordination

7    among publishers.  For obvious reasons, Your Honor, because

8    there isn't any price transparency in this business, there's no

9    way for publishers to coordinate or follow prices of other deal

10   terms.  They're not public, and they're not visible.  And you

11   will hear that the agents control and keep that information

12   tightly to themselves.

13        There was a reference about the old e-books case, the

14   Second Circuit case, and to be clear, Bertelsmann and

15   Random House were not parties to that case, Your Honor.

16        So in closing, let me say this:  Bertelsmann has been in

17   the publishing business for almost 200 years.  Its mission is

18   to serve readers around the world for generations to come.

19   There is universal agreement, even among those who oppose this

20   merger, Your Honor, that Bertelsmann and Penguin Random House

21   are the best stewards and home for these important and iconic

22   Simon & Schuster imprints.  That is where they can continue to

23   flourish.  That is where they can continue to spur competition

24   for the benefit of authors, booksellers, and readers.  And we

25   submit the evidence you will hear will leave no doubt about

1    that.

2            Thank you for your patience.

3            THE COURT:  Okay.  Thank you, Mr. Petrocelli.

4        So just a follow-up on the question I asked Mr. Read.

5    Is it correct, then, that 2 percent of the books account for

6    70 percent of the advances?  Because he uses the 70 percent

7    number, and you're saying it's only 2 percent --

8            MR. PETROCELLI:  I believe -- I believe -- on the

9    acquisition side, yeah, I believe that's correct, but I'll

10    double-check if I'm -- and let you know if I'm mistaken.

11            THE COURT:  Okay.  Thank you.

12            MR. FISHBEIN:  Thank you, Your Honor.

13    Stephen Fishbein for ViacomCBS and Simon & Schuster.

14            And, Your Honor, I'm not going to repeat what

15    Mr. Petrocelli said, but I would like to take just a few

16    minutes to address briefly what the evidence will show from the

17    perspective of ViacomCBS and Simon & Schuster.  And let me

18    start with why ViacomCBS is selling Simon & Schuster and why

19    they chose to sell it to Penguin Random House.

20            ViacomCBS, which changed its name this year to Paramount

21    Global, is a global media company.  They own television

22    networks, the Paramount Pictures film studio, and the Paramount

23    Plus streaming service.

24            In recent years, ViacomCBS has chosen to focus on those

25    core business activities of television, film, and streaming.

1    To align with that strategic focus, ViacomCBS's CEO in March of

2    2020 announced publicly that Simon & Schuster would be sold.

3    And he explained book publishing is a great business, but it's

4    not television, it's not film, it's not streaming.  So we're

5    going to sell it.

6         Your Honor, the evidence will show that that decision to

7    sell Simon & Schuster is a firm one.  Simon & Schuster will be

8    sold to somebody, and that somebody, if it's not Penguin Random

9    House, is very, very likely to be another book publisher

10   because it's the other book publishers who can obtain the

11   highest efficiencies that we've been talking about by combining

12   their operations with Simon & Schuster.

13        Now, the Court -- the government, Mr. Read, said that

14   he's going to call as witnesses some of the other publishers

15   who are going to complain that this transaction is

16   anticompetitive.  Two of those major publishers, Harper and

17   Hachette, made their own efforts to acquire Simon & Schuster.

18   And the CEOs of those publishers are going to say eliminating

19   an independent Simon & Schuster is going to be bad for

20   competition.  But the Court, of course, should be aware that

21   they had no problem with the elimination of an independent

22   Simon & Schuster if they were the ones acquiring it.

23        And, of course, they stand to benefit if the Court

24   blocks the transaction because that gives them another chance

25   to accomplish what they failed to do the first time.

1          Now, Your Honor, you'll hear from our witnesses why they

2     chose Penguin Random House over these other bidders.

3     Obviously, Bertelsmann has offered to pay over $2 billion, was

4     an important consideration, but as everybody agrees and

5     Mr. Read said, the book publishing business, you know, it's as

6     much an art as an industry.  And I think the people in this

7     business, they recognize that in important ways they're

8     stewards of an important part of our culture.

9          And you're going to hear from the Simon & Schuster CEO,

10    from others, that with those considerations in mind, they do

11    believe that Penguin Random House is an excellent home for

12    Simon & Schuster and for the legacy they've built; for the

13    reasons that Mr. Petrocelli said, deep respect for publishing.

14    They've been in the business since the 19th century;

15    author-friendly, and a commitment to the independence of Simon

16    & Schuster on the creative side, creative and editorial

17    independence.

18          Now, the government in their opening gave a lot of

19    attention, a lot of emphasis, to the words of a Simon &

20    Schuster employee who you're not going to hear from as a

21    witness, which is Carolyn Reidy, the former and, unfortunately,

22    deceased CEO.  And the government has touted that that document

23    that they put up on the screen -- let me give you some context

24    for that.

25          Ms. Reidy wrote those notes over three years ago.  The

1    circumstances were that she was presenting her business during

2    due diligence to Viacom and the lead-up to the merger between

3    Viacom and CBS back in 2019.  And as is common in due diligence

4    exercises, she wanted to present Simon & Schuster in the best

5    possible light that she could, and that's not just an inference

6    from the circumstances.

7         The email chain on top of that document said -- that

8    Ms. Reidy says to her colleague:  Am I presenting this positive

9    enough?  Am I making it look positive enough?  So what did she

10   say when she was trying to make Simon & Schuster look good?

11   One thing she said was that the four other major publishers are

12   significant competitors -- I think she said the biggest

13   competitors -- of Simon & Schuster.

14        And we don't dispute that.  We don't dispute that

15   there's competition, significant competition, with the Big 5.

16   What we do dispute is treating the Big 5 as a unit.  And

17   Mr. Read continuously -- and the government, you'll hear --

18   they're always saying Big 5 instead of HarperCollins, Hachette,

19   and Macmillan, as if this Big 5 is a monolith and it's, you

20   know, one monopolistic entity.

21        What the evidence will show is that HarperCollins -- a

22   strong second -- ferociously, continuously, unrelentingly

23   competes with Simon & Schuster, as does Hachette and Macmillan.

24   And we can't lose sight of the fact that in addition to all the

25   other competitors beyond the Big 5 -- the Big 5 itself, there's

1    tremendous competition.

2        Now, Ms. Reidy also in those comments that -- that they

3    put up, she described the publishers outside the Big 5 as -- I

4    forget -- minor league or farm teams.  And if I may,

5    Your Honor, I think the government is swinging for the fences

6    with that analogy, and I look forward to what the evidence is

7    going to show in this case as to whether that analogy holds up;

8    whether the smaller publishers are really like farm teams,

9    where their purpose is to groom people for the majors.  Let's

10   see whether they compete with each other and what the story is

11   in terms of movement from big publishers to small, et cetera,

12   and we'll come back to that in due course.

13       In any event, those are Ms. Reidy's words, but we can't

14   really know what she meant by that because she's not here to --

15   to explain it.  And she certainly didn't address the central

16   issue here; is whether advances would go down if there were a

17   merger between Simon & Schuster and Penguin Random House.

18       And, Your Honor, with -- I respectfully submit that the

19   Court will find much more persuasive than these three-year-old

20   comments that were done about a different merger from somebody

21   who can't explain them -- you will find much more persuasive

22   the testimony of the current CEO of Simon & Schuster, Jon Karp,

23   who took the helm when Ms. Reidy passed away several years ago.

24   He's a witness.  He's going to testify.

25       And he and his colleagues are going to explain to you,

1      they work with editors -- excuse me -- with authors and with

2      agents every day, and they will explain and give you specific

3      examples that there are many, many, many options for authors,

4      including the other Big 5, small and medium publishers, recent

5      upstarts, Amazon, and self-publishing.

6              And just on the recent upstarts, you know, Mr. Read put

7      up that slide.  He said, well, today the recent upstarts don't

8      have much of a share.  You know, by definition, the recent

9      entrants are recent, and we don't have to show that they

10     already have a significant share.  The analysis is prospective,

11     what will happen in the future.  And the very fact that small

12     publishers are motivated, people are motivated to create small

13     publishing companies, even today, and that they have a hope of

14     success in the future shows that, you know, they have a

15     reputation, they have -- anticipate success.  And you're going

16     to hear plenty of evidence about that, about new entrance into

17     the market.

18             The ultimate issue, Your Honor, and what the government

19     has to prove is that a combined Penguin Random House/Simon &

20     Schuster would dare to lower advances to their highest paid

21     authors and that they would get away with it.  Not only would

22     losing those authors -- the government -- I think Mr. Read said

23     that Simon & Schuster is going to lower advances by a hundred

24     thousand dollars -- I assume he meant per book -- which is a

25     significant amount.  Not only would that deprive Simon &

```
 1        Schuster of the books that it needs to capture the attention of

 2        readers, but the evidence will show that HarperCollins,

 3        Macmillan, Hachette, Norton, Scholastic, Amazon, many other

 4        competitors would happily step in if Simon & Schuster underpays

 5        authors or mistreats them in some way.

 6              Your Honor, lowering author compensation for Simon &

 7        Schuster would be biting the proverbial hand that feeds them.

 8        The government will not be able to show that such reductions

 9        are likely, much less that they're substantial, and we

10        respectfully submit that the government will not be able to

11        prove its case.

12              Thank you.

13              THE COURT:  All right.  Thank you, Mr. Fishbein.

14              All right.  The government may call its first witness.

15              MR. READ:  As indicated, the first witness will be

16        Michael Pietsch, the CEO of Hachette.  Jeff Vernon, my

17        colleague, will take that examination.

18              THE COURT:  Thank you.

19              MR. PETROCELLI:  Your Honor?

20              THE COURT:  Yes.

21              MR. PETROCELLI:  Just a little clarification with

22        what the Court's practice is about the -- first of all, the

23        exclusion rule about no other witnesses --

24              THE COURT:  Oh, yes.  A rule on witnesses; that will

25        be in effect; so there shouldn't be any witnesses in the
```

1    courtroom.

2    MR. PETROCELLI:  And I should let the Court know that

3    we have two corporate representatives -- one from

4    Bertelsmann -- that's Markus Dohle -- and one for Penguin

5    Random House -- that's Nihar Malaviya -- who are in the

6    courtroom.

7    The other question I have, Your Honor, is what the

8    Court's practice is about talking to a witness while the

9    witness is still on the stand.

10    THE COURT:  That should not be permitted.

11    MR. PETROCELLI:  Okay.

12    THE COURT:  But you're going to have your corporate

13    representatives in the courtroom because they're parties, even

14    if they're also witnesses?

15    MR. PETROCELLI:  Yes, Your Honor.

16    THE COURT:  That's fine.

17    MR. READ:  We would object to that, Your Honor.

18    There's significant important testimony from Mr. Dohle and

19    Mr. Malaviya that hearing the prior testimony might affect.

20    THE COURT:  So --

21    MR. READ:  There are ample corporate representatives

22    that aren't going to be witnesses in this case that they could

23    choose from.

24    THE COURT:  So, generally speaking, I think parties

25    have a right to be in the courtroom when it's their case, and

1    so given that these are corporate parties, they're represented

2    by their executives.  And I think that each corporate defendant

3    may have one corporate representative in the courtroom, even if

4    they're also a witness.

5                MR. READ:  Thank you.

6                THE COURT:  Okay.

7                THE COURT REPORTER:  Could you introduce yourself to

8    me, sir.

9                MR. VERNON:  Sure.  Hi.  It's Jeff Vernon.  And my

10   apologies in advance if I speak too quickly.  I'll try to speak

11   slowly.

12               THE COURT:  Ms. Meyer, you should feel free to tell

13   him to slow down, if you need to.

14               THE COURT REPORTER:  Thank you.

15               MR. VERNON:  Sure.

16         Your Honor, is this a good time to distribute binders?

17               THE COURT:  Yes, that would be great.

18               MR. VERNON:  Okay.

19         Your Honor, we're getting him now.  He was in another

20   room.

21               THE COURT:  That's fine.

22               MR. VERNON:  Someone is grabbing him.

23               THE COURT:  All right.  We'll sit until 1 o'clock,

24   just so you know.

25               MR. VERNON:  Thank you, Your Honor.

1          Your Honor, would you like to take a five-minute recess?

2     We think he's here, but we were just-- we were checking for

3     him.  My apologies.

4               THE COURT:  You can approach the witness stand, sir,

5     right up here.  Good afternoon.

6               THE WITNESS:  Good afternoon.

7               THE COURT:  If you can remain standing for a moment.

8               THE COURTROOM DEPUTY:  Raise your right hand.

9               (Oath administered.)

10              THE WITNESS:  I do.

11              THE COURT:  Thank you.  You may be seated.

12              THE WITNESS:  May I take off my mask.

13              THE COURT:  You can remove it, if you prefer.

14              MR. VERNON:  Your Honor, with your permission, may we

15     hand the binder to the witness?

16              THE COURT:  Yes.

17              THE WITNESS:  Yes, sir.

18                          DIRECT EXAMINATION

19     BY MR. VERNON:

20     Q.  Good afternoon, Mr. Pietsch.

21     A.  Good afternoon.

22     Q.  Can you state your name for the record.

23     A.  Michael Pietsch.

24     Q.  What is your title?

25     A.  Chief executive officer.

1    Q.  And when did you become CEO?

2    A.  '13 -- 2013, January.

3    Q.  And just for the record, you're CEO of which company?

4    A.  Of Hachette Book Group.

5    Q.  Can you briefly describe the publishing jobs that you held

6    prior to joining Hachette?

7    A.  Very briefly, my first publishing job was an intern at a

8    small publisher in Boston in 1977; then an assistant and then

9    editor at Charles Scribner's Sons, from 1979 to 1985.  From

10   1985 to '91, I was editor, senior editor at -- at Harmony

11   Books, a division of Crown; and from 19- -- 1991 I came to

12   Little, Brown as executive editor; and was after that editor in

13   chief, and publisher at Little, Brown for about a dozen years

14   before becoming CEO.

15   Q.  Let me ask you to take one step back.  For the jobs that

16   you held prior to working at Hachette, what was your

17   involvement in acquiring books, if any?

18   A.  In -- all of my jobs before acquiring -- before becoming

19   CEO of Hachette, before joining Hachette, except as an intern,

20   my job was to acquire books.

21   Q.  And I think you said when you came to Hachette, you worked

22   for Little, Brown.  Did I get that right?

23   A.  Yes.  Little, Brown is one of the imprints of Hachette Book

24   Group at this time.

25   Q.  Can you describe the jobs that you held at Little, Brown.

1    A.  At Little, Brown, first I was an executive editor, which

2    has been honorific.  I was an editor.  My job was to find books

3    for publication, persuade the company to invest in them, and

4    then to oversee working with the author on -- on the book,

5    editing it, and then working with the publishing company to

6    bring the book into the world.

7        After being executive editor, I was editor in chief.  As

8    editor in chief, my job was to continue acquiring books for

9    publication and to oversee the staff of editors who worked at

10   Little, Brown, for probably about a dozen editors who -- who

11   have the same job or the same basic role.  My job was to manage

12   them and to work with them on their -- on their solicitation of

13   books and the way they -- they brought them forward and brought

14   them into the world.

15       And then, after, I became publisher.  Do you want me to

16   describe that job?

17   Q.  Yeah.  If you can please describe what the publisher job

18   entails.

19   A.  Yes.  Of course.  The publisher job is the person who --

20   for that imprint or division -- in this case it was an

21   imprint -- is responsible for the -- for the -- the totality of

22   the -- of the publishing that that -- that imprint does for

23   acquiring books, for overseeing the staff of editors, staff of

24   publicists, the staff of marketers and designers; who all work

25   together to bring in books and bring them into the world.

1          As publisher -- the publisher -- the publisher's

2     responsibility is the P&L for that group; to invest wisely and

3     effectively in -- in attracting books, paying advances against

4     royalties, getting good rights, grants, and then publishing the

5     books with force, fervor, effectiveness, getting them --

6          THE COURT REPORTER:  Hold on.  Can you slow down.

7          THE WITNESS:  Sure.  I think I said to bring them

8     into the world effectively and to be profitable.  The

9     publisher's job is the profitability of the imprint they

10    oversee.  They're responsible for hiring, managing, developing

11    the people in all these areas who work with books, and doing so

12    in a way that is profitable for the -- the publishing company

13    that oversees and employs them.

14    BY MR. VERNON:

15    Q.  And can you briefly describe your responsibilities as CEO.

16    A.  As CEO I'm responsible for the profitability and strategy

17    and direction and personnel of the Hachette Book Group, which

18    is the U.S. division of Hachette Livre, a French -- a global

19    publishing company based in France.

20         And the CEO's job is to oversee all of the publishing

21    divisions and all the other parts of the company that work with

22    the publishing divisions.  And those are the groups like the

23    sales force, the central marketing group, the central

24    communications group, legal, contracts, the warehouse and

25    operations of the fulfillment of orders, the sales force that

1    solicits orders from retailers and work with those retailers to

2    bring books out.  Managing an editorial group that works with

3    the publishing teams on the copyright team; the production

4    group that -- that works with manufacturers to obtain paper,

5    get the books manufactured, get them delivered.

6          Basically, the totality of the publishing company in the

7    United States is my responsibility.  I'm responsible for

8    delivering a profit to our shareholder, to -- I'm responsible

9    for making sure that we're well staffed with creative and --

10   creative, talented, hard-working individuals in all roles; and

11   for looking into the future and imagining what the business

12   might be in the future and preparing our company to meet the

13   demands we see coming soon on -- and to be competitive.

14   Q.  As CEO of Hachette, what involvement, if anything, do you

15   have in acquiring books?

16   A.  As CEO I oversee all of the publishing divisions.  All the

17   publishers of our publishing groups report to me.  And I work

18   with them on the books -- the kind of books they decide to go

19   after, how they -- what their strategy is, how they stand out

20   in the marketplace; and make sure they work with them to make

21   sure they have strong teams of editors and marketers and

22   publicists, and work with them to attract and acquire books.

23         I'm specifically responsible for overseeing the advances

24   they pay to authors above a certain level.  All the publishers

25   have a certain authorization level they can authorize in

1    advance, up to a certain amount, above which they need to come

2    to me for approval on those higher-advance books.  I am more

3    involved in looking at the projects with them and discussing

4    them with them the -- their assumptions in signing the book up

5    and -- and how it will stand out in the market.

6         I also acquire books myself.  I still -- I continue to

7    edit a few books a year as CEO.  And so I'm directly involved

8    in acquiring books in that role.

9    Q.  Why do you still as CEO continue to edit books personally?

10   A.  Having been an editor for most of my career, I've found in

11   working with writers directly, extraordinarily gratifying,

12   challenging.  It enlarges me.  And it's the central -- it's the

13   core work of our company; working with authors on the books

14   that they're creating and how they -- how they complete them in

15   making the book they want it to be, and then helping -- working

16   with them to bring the book into the world effectively.

17        I've always found that book -- that work just kind of

18   soul filling, gratifying, important.  And because it's the core

19   work of our company, I find doing that as CEO keeps me in touch

20   with the work that all the publishing teams are doing; and it's

21   also a good representation to the world of authors and agents

22   that this company is led by someone who works directly with

23   authors and knows what their experience is like and what

24   they're looking for in publication.

25   Q.  I may have to ask you to speak a little more slowly.

1    A.  Sorry.  Excuse me.

2    Q.  Can you briefly list a few of the noteworthy books that

3    you've edited personally over the course of your career?

4    A.  I -- one of the first was I had the pleasure of editing a

5    posthumous Ernest Hemingway memoir called *The Dangerous Summer*

6    when I was an editor at Scribner.

7          In fiction, I've worked with a broad range of writers.

8    I've worked with James Patterson on dozens and dozens of his

9    thrillers.  Worked with the thriller writer Michael Conway on

10   many of his books as editor.  The great George -- George

11   Pelecanos, the great D.C. crime writer, I've worked with as

12   editor on many of his books.  Walter Mosley.  So I've worked a

13   lot in suspense fiction and thrillers.

14         In literary fiction, I've worked with Donna Tartt on her

15   novel *The Goldfinch*; with J. K. Rowling on her first novel for

16   adults, *The Casual Vacancy*.  Worked with David Foster Wallace

17   on *Infinite Jest* and his posthumous book, *The Pale King*.

18         In -- in nonfiction I've worked with Stacy Schiff on her

19   book *Cleopatra,* and her forthcoming book about Samuel Adams

20   called *The Revolutionary*, a book called *The Witches*.  I worked

21   with John Feinstein, a D.C. sports writer, on many of his -- on

22   *A Good Walk Spoiled*, on many of his books.

23         And many -- I love music, and I've worked with a bunch

24   of musicians.  I've worked with Keith Richards of the

25   Rolling Stones on his memoir called *Life*; and with Chuck Berry

1    on his book which was called *The Autobiography*.  Those are a

2    few.

3    Q.  How many years of experience do you have in the book

4    publishing business?

5    A.  Right on 45 years.

6    Q.  How many years of experience do you have acquiring books?

7    A.  At least 40.

8    Q.  And I won't hold you to a specific number, but

9    approximately how many books have you acquired over the course

10    of your career?

11    A.  Excuse me.  I'm guessing the range of three to four

12    hundred.

13    Q.  What is Workman Publishing?

14    A.  Workman Publishing is a publishing company that was founded

15    by Peter Workman around 50 years ago that specialized in --

16    specializes in creative nonfiction, practical nonfiction, books

17    for -- books for children.  Many kinds of books of --

18    descriptive books with very creative formats:  books with

19    wheels on them, books with magnifying glasses inside them,

20    books with beads.  Very creative nonfiction publishing group

21    that Hachette Book Group acquired last September.

22    Q.  I'm sorry.  Can you say it again.  When did Hachette

23    acquire Workman?

24    A.  September of 2021.

25    Q.  What is Black Dog & Leventhal?

1    A.  Black Dog & Leventhal is a publisher of illustrated and art

2    books that was distributed -- a distribution client of Workman

3    for many years and that Hachette Book Group acquired, I think,

4    around seven years ago.

5    Q.  Let me ask you, first, to explain a few things and a few

6    concepts in the publishing industry.  I'm going to start by

7    asking you just to describe some of the work that publishers

8    do.

9         Can you explain what work do publishers do with respect

10   to the design and editing of books?

11   A.  Publishers sign -- sign a contract with an author to

12   publish their work and over -- while -- as part of that

13   contract, first on the editing side, the editor -- the

14   publishers employ editors whose job it is to work with the

15   author, to read the manuscript, to read the outline, to -- to

16   work with them to make the book everything that -- that the

17   author wants it to be, and that the publisher at the same time

18   believes can -- it will be a -- they can sell effectively and

19   market effectively.

20        That's work that can be -- happen all in one-fell swoop

21   or it can happen over many, many years, depending on the pace

22   of the writing and the way the author wants to work with the

23   publisher.

24        The designers -- publishers employ designers who create

25   the jacket art that is the face of the book that's brought into

1    the world, is intended to make it -- to make it visible,

2    exciting, pair with what's inside the book and attract the

3    purchases.  They also design the interior -- the interior, the

4    text, the type, the headlines; and, in the case of illustrated

5    books, very, very complicated interplay of images and texts.

6    Q.  What work, just at a high level, do publishers do to help

7    publicize books?

8    A.  I would say that it's an extremely important part of the

9    publisher's function.  There are tens of thousands of books

10    that are published -- sorry.

11         THE COURT REPORTER:  I would say that it's an

12    extremely important part of the --

13    A.  Publisher's role.  There are tens of thousands of books

14    published every year; and every one of them is competing not

15    just with all the other books published, but all the other

16    available entertainments and the activities that people could

17    be doing at any time.  So getting attention for any one book at

18    any one moment is a gigantic, gigantic challenge that

19    publishers -- publishers fight hard to -- to accomplish.  So

20    publicity, getting publicity for the book is hugely, hugely

21    important when you bring your book into the world.

22         People don't know that any one book exists unless

23    they hear about it in various ways, or unless they come upon it

24    in the bookstore and happen to pick it up and find it

25    interesting.

1    BY MR. VERNON:

2    Q.   What work do publishers do to help that -- to help ensure

3    that books get sold and promoted at retailers?

4    A.   Publishers -- most publishers have a very large sales

5    force, it's called.  It's a team of executives and employees

6    who interact with all of the retailers who sell books, which

7    goes -- covers the range from independent bookstores, with

8    bookstores who do nothing but sell books; chain bookstores,

9    like Barnes & Noble or Books-A-Million, that sell -- that do

10   nothing but sell books and some games and sidelines.

11        And then all the other kind of retailers who -- who

12   carry books as part of their mix of products that they make

13   available for their customers, like Walmarts, and Sam's Clubs

14   and Targets and -- just -- I'm drawing a blank for a minute on

15   the whole range.  But yet you think of all the places you find

16   books.  They're in -- Costco is another major retailer.  And

17   they're places like -- there's clothing stores that sell --

18   that sell books.

19        So our sales force is working with the companies that --

20   that sell books, the retailers that sell books, as well as

21   companies that don't sell books yet, and we want to persuade

22   them to carry books as part of their mix.  Through Workman, we

23   work with a place called Tractor Supply, which is a farm and

24   trac- -- supply store that carries books.

25        And, of course, there's the whole range of digital

106

```
 1   retailers -- Amazon and Apple and Google -- who sell books as
 2   part of their product mix.  And we have executives working
 3   constantly with them.  And our goal is to make them aware of
 4   the books that we publish, to bring them the ones that are best
 5   suited for their customers, persuade them to -- that they
 6   should stock these books if they're a physical retailer.  And
 7   then work with them on how to make the book stand out within
 8   their -- within their store; how it's displayed, how it's
 9   discounted, when it's -- what -- what assortment it might be
10   included in.
11        So our job is to work with these retailers to help them
12   sell books in a way that's profitable for them and, of course,
13   profitable for us.
14   Q.  Who are the Big 5 publishers?
15   A.  The Big 5 is a common term for the five largest publishers
16   of general interest books for adults and children.  They are --
17   Penguin Random House, by far the largest; HarperCollins;
18   Simon & Schuster; Hachette Book Group; and Macmillan are the
19   five in order of size.
20   Q.  Can you explain how an advance works, focusing on trade
21   book publishing.
22   A.  Yes.  In signing a contract with an author to publish their
23   book, our contract includes a grant of rights of the ability to
24   sell it in a particular territory, usually in -- often
25   North America, sometimes world -- around the world, including
```

1    translation rights.  And it includes a guarantee of a royalty

2    that will pay the author for each copy that's sold.  And the

3    royalty's different depending upon the format of the book,

4    whether it's a hardcover, a trade --

5              THE COURT REPORTER:  Hold on.  It's a hardcover, a

6    trade . . .

7    A.  Trade paperback, mass-market paperback, e-book,

8    downloadable audio.  Each of them has a different -- different

9    royalty rate that we pay on each copy sold.  And then there are

10   royalties we pay on books that are licensed for translation or

11   licensed for -- for instance, for serialization in a magazine.

12   We -- so each of them -- each of those rights -- rights that we

13   can exploit has a royalty rate.

14             In competition -- in signing books up, authors are

15   usually looking -- usually would like to be paid in advance for

16   their work before it's published.  So what's called an advance

17   is an advance against future royalty earnings that we agree to

18   pay to the author as part of the contract, and the advance is

19   paid -- is recouped from each sale in each of those formats

20   until the royalty is earned equal the advance paid, after which

21   we pay the author for the royalties on future earnings.

22             And the advance is not recoupable by the author if the

23   book does not rise -- sales do not rise to the level of the

24   advance.  I'm sorry.  It's not recouped by the publisher.  I

25   misspoke.

1    BY MR. VERNON:

2    Q.  Can you explain what the term "earning out" means?

3    A.  Earning out.  I'm sorry.  I was getting ahead.  Earning out

4    is what I was just describing.  Earning out is if we pay an

5    author in advance of a hundred thousand dollars for the rights

6    to publish the book, once the total royalty or earnings from

7    all formats rise to a hundred thousand dollars, the book has

8    earned out.

9    Q.  For Hachette, how often do Hachette's books earn out the

10   advance?

11   A.  Roughly half the time.  About half the books we publish

12   earn out their advances.

13   Q.  At the higher-advance levels, meaning above 200,000 for

14   Hachette, how often does Hachette's books earn out the advance?

15   A.  I don't have -- I don't have a specific statistic for that,

16   but it is -- a large proportion of the books we pay high

17   advances for do not recover their advances.

18   Q.  And I think you may have described this briefly, but if a

19   book does not earn out, does the author need to pay the advance

20   back?

21   A.  It does not.  And I just want to say, I believe I misspoke

22   when I said half of our books earn out -- do not earn out.  I

23   don't have that number clear in my head.  It's probably a

24   little more than half that don't -- that don't earn out their

25   advance.  I don't have a specific statistic about that in my

1    head.

2    Q.  So let me see if I can just clarify.  For -- for books

3    where the advance is above 200,000 for Hachette,

4    approximately -- roughly how often do books earn out the

5    advance?

6    A.  At the higher-advance levels, $200,000 and above -- this is

7    an educated guess; I've not done an analysis of this -- I would

8    say at that level, around half the books --

9            THE COURT REPORTER:  Half the level --

10   A.  About half of the books we publish earn back their advance.

11   BY MR. VERNON:

12   Q.  In your experience, what financial -- financial term is the

13   most important when Hachette is negotiating with agents and

14   authors?

15   A.  The advance against royalties is the term upon which the

16   negotiations and auctions are based.  It's almost entirely

17   always on the advance against royalties.

18   Q.  Why is that?  Why is the most important term for

19   negotiations the advance?

20   A.  Well, authors are devoting a great deal of work and long,

21   long stretches of time to creating the book, and they want

22   to -- they want to be paid for their work.  And the way that

23   they often decide who they're going to be published by is in a

24   competitive situation where the highest advance for the book is

25   what gets the right -- gets the publisher the right to publish

1  the book.  Authors are looking to maximize their earnings.

2  They almost -- all the authors we work with are represented by

3  literary agents who, likewise, are looking to maximize their

4  own earnings.

5  Q.  In your experience, how often do authors turn down an offer

6  with a higher advance to accept an offer with a lower advance

7  but a higher royalty rate?

8  A.  That is extraordinarily rare that the royalty rate is the

9  foundation for a -- a decision like that.  The -- the deciding

10  factor is almost always the size of the advance.

11  Q.  Can you explain what a work-for-hire deal is?

12  A.  A work-for-hire deal is a deal in which the author does not

13  receive royalties.  They simply are paid a flat fee for the

14  work on their book, and that's the amount that they earn

15  regardless of how many copies the book sells.

16  Q.  In your experience, how often do authors turn down an offer

17  with a higher advance to accept a work-for-hire offer?

18  A.  I can't think of a single occasion that's been the case.

19  Q.  What relationship, if any, is there between the sales that

20  Hachette expects for a particular book and the advance?

21  A.  The advance we pay is based on our projection -- the

22  advance that we're willing to pay is based on our projection of

23  how many copies we think we can sell of a particular book.  So

24  the relationship is an extremely close one.  We pay -- we're

25  willing to pay a higher advance when we think we can sell more

1    copies.

2    Q.  And let me come back to the 50 percent figure for earning

3    out really quickly.  I think you said at one point, 50 percent

4    of advances earn out.  Was that for books above $200,000 or

5    books at all advance levels, or what was it for?

6    A.  That was for the higher-advance books.  It's not a figure I

7    have in my head for all the books we publish.

8    Q.  Okay.  What is an auction?

9    A.  In the context of book publishing, an auction is a

10   situation in which a literary agent or the representative of an

11   author approaches multiple publishers to solicit their interest

12   in publishing a particular book.  And once they -- if they find

13   themselves in a situation where there's multiple publishers

14   who've indicated an interest in making an offer to publish the

15   book, they make it -- they decide how they want to sell the

16   book, how to choose among those publishers, and they often set

17   it up in the form of an auction.

18        And it's an auction, like in many other kinds of

19   businesses, where they ask each of the bidders to make an

20   opening bid.  And then a common approach after that is called a

21   round-robin auction in which the person with the lowest opening

22   bid is approached and told what the highest bid at that point

23   is and told that in order to stay in the auction, they have to

24   offer above the highest bid.  And if they don't, they're

25   dropped out.  If they do, then that's the bid that's brought to

1    the next -- the next highest bidder.  And it keeps going around

2    like that until -- until there's one publisher left who wins

3    the rights to the book.

4    Q.  Let me ask you to list briefly -- just list the most common

5    auction formats that you see, other than the round-robin, which

6    you described.  And then after you list them, I'll ask you to

7    describe them.

8    A.  The -- excuse me.  The round-robin auction is the most

9    common form of auction.  The -- there are other kinds.

10         There's what is called a best-bids auction in which the

11   agent will tell interested publishers that they should -- they

12   just get one shot, and they say what they think they want to

13   bid, and that's it.  They don't get a chance to improve it

14   after that.

15         And then there are many variations of that; where an

16   agent will say, I will accept opening best bids and then the

17   three first best bids will get to proceed into subsequent

18   rounds as a way of -- a way of extracting the highest possible

19   advance.

20         And then there are others that are much looser.  Some

21   agents offer a book to a lot of publishers and just keep

22   talking to them about what they're offering without really

23   telling anyone else what's going on until they found what's the

24   best -- what's the best bid that way.

25         There is no set of -- the industry doesn't have rules

1    defining how books can be sold.  Agents are all independent

2    operators who -- who set up their -- the -- the sale of the

3    books they represent and the way that they think is going to be

4    most effective for them and their client.

5    Q.  Can you explain what acquiring books -- books through an

6    option means?

7    A.  In our contract with an author, we have what is called an

8    option clause.  And I believe most publishers have this.  And

9    it is an option to consider first, before it's submitted

10   elsewhere, the author's next book, usually in the form of an

11   outline or proposal.  It's -- it's -- usually has a term on it.

12   It does not -- a term -- a time term.  Usually it's a period of

13   30 or 60 days that the publisher who published the previous

14   book may consider and discuss with the author their -- what

15   their offer will be for the next book.  There's -- from my

16   experience, there aren't any that are really binding in terms

17   of setting a price in advance.  It's simply an option to

18   consider before it goes elsewhere.

19   Q.  When Hachette acquires a book in a situation in which no

20   other publishers have bid, what factors affect the advance that

21   Hachette offers?

22   A.  Can you repeat that, please.

23   Q.  Sure.  When Hachette acquires a book in a situation in

24   which no other publishers have bid, what factors affect the

25   advance that Hachette offers?

1   A.  We can find ourselves in a situation in which no other

2   publisher has bid in quite a few ways.  Sometimes an agent

3   submits a book to many publishers and only one publisher is

4   interested in making an offer.  In which case, we make an offer

5   that we think is an amount that will -- that the author -- that

6   we feel that we can have a profitable publication with.  It's

7   an advance that will allow the author to write the book.  In

8   that negotiation, you're negotiating only against the author's

9   willingness to write the book.  They can say, well, no, for

10  that amount of money I would just rather not, or I would rather

11  go try a different one.

12      Other situations in which we're not bidding against

13  another publisher can be if -- and in a situation of an option

14  publication, such as you just mentioned, where the author comes

15  back to us and says they would like to publish -- wants to

16  publish their next book.  And, usually, the agent will say what

17  kind of advance they are looking for based on their experience

18  of the book's previous sales and their hopes for the next book.

19  Sometimes we'll say first what we would like to offer.  So

20  that's a negotiation without another party.

21      There's a negotiation in which it is implicit or

22  explicit that the agent is able to -- if we do not reach

23  agreement, to take the book on the market and bring in bids

24  from other parties.

25  Q.  So I think you said in those negotiations, the agent could

1    implicitly or explicitly take the book to other parties.  What

2    effect, if any, does that have on the advance that Hachette

3    offers in that situation?

4    A.  The situations we -- we end up bidding against what we

5    imagine the market would be if the book were taken out.  So it

6    can lead to us increasing our offers quite significantly.

7    Q.  Can you explain what a preempt is?

8    A.  A preempt is the term for a preemptive offer on which a

9    publisher attempts to acquire a book without going through a

10   competitive process.  So a publisher will, in that situation,

11   say to the agent:  We love this book so extraordinarily much

12   and we feel we're the perfect publisher for it.  We have a

13   great plan for it.  And to make this really easy for you, we're

14   going to bring you an advance.  And name an advance that is

15   appropriate that -- that they think is high enough that it will

16   be worth the agent's and author's while to say, you know, we

17   won't go through the competitive process and -- and perhaps not

18   end up with this publisher.

19        So it's -- it's an attempt to -- to take on a book

20   without going through the competitive process.

21   Q.  When Hachette acquires a book through a preempt, what

22   factors affect the advance that Hachette offers?

23   A.  When we're calculating a preempt, we want to bring an

24   advance that we believe the agent will consider a good advance;

25   that they will think, yes, there's a chance that if I take this

1    to auction, I might not get this much or this is the range that

2    it might end up at.  And so we try to offer a high advance that

3    we think will be compelling to -- to the agent, in addition --

4    along with our enthusiasm and the marketing proposals we're

5    bringing.

6    Q.  What effect, if any, does the advance that the agent could

7    get in an auction affect the advance that Hachette offers in a

8    preempt?

9    A.  In a preempt conversation with the agent, the agent can

10   say, I know I could get a million dollars for this book at

11   auction.  I'm just not going to consider that if you're not at

12   a level.  So there could be kind of a -- you know, it's -- the

13   publisher who's made the preempt is -- is bidding against what

14   they think the market will be, and with the agent's help and

15   guidance often.

16   Q.  Let me ask you one question about contracts, author

17   contracts.  When Hachette signs a contract to pay an advance to

18   an author, how many books does that contract typically cover?

19   A.  Each contract is different.  Most of our book contracts are

20   for one book at a time.  We have contracts for two books, three

21   books.  Usually when there's a series -- when the books connect

22   to each other, that's quite common.  It's quite common in

23   children's book publishing, and we have authors -- we have

24   authors we sign contracts for 30 books at a time.  I wouldn't

25   say authors.  We have one author we have signed a contract for

1   30 books at a time.

2             THE COURT:  Can I ask a question.

3             THE WITNESS:  Yes.

4             THE COURT:  If you're in a preempt situation and the

5   agent doesn't accept your preempt, do you then bid in the

6   auction or are you not allowed?

7             THE WITNESS:  The -- the leverage in making a

8   preempt -- preemptive offer is that we -- if the agent does not

9   accept our offer, then we usually say, well, then we're taking

10  the offer off the table.  When you put the book out for

11  auction, we'll come back in and we'll bid in whatever format

12  you set up the auction in.  And the leverage is that the agent

13  is risking that in that situation; the high bid might be less

14  than what we tried at a preempt.  But, yes, we will almost

15  always say, yes, we're still interested in publishing this

16  book, even if we can't win it by a preempt.

17            THE COURT:  Okay.  Thank you.

18  BY MR. VERNON:

19  Q.  Briefly, can you explain what backlist means with respect

20  to trade book publishing?

21  A.  Backlist is a term for all the books that a publishing

22  company has in its back catalog.  It's the books that it has

23  published in the past, acquired in the past, published in the

24  past, and has the rights to -- the rights to continue

25  publishing in all formats.  Excuse me.

1          So it's in opposition to frontlist.  Frontlist is what

2     we call the books we're bringing out at this time, the books

3     that are new that we're trying to get a lot of excitement

4     around as they're coming into the world.

5          Backlist is the body of books that we continue to sell

6     year after year after year.  And the backlist is the financial

7     foundation of -- of a publishing company, certainly the Big 5

8     publishing companies, because backlist is all the books that

9     continue selling because retailers know they have customers for

10    them.  They continue to reorder them, to stock them, and

11    they -- and they require much less work and much less

12    investment for the publisher to sell.  So they're much more

13    profitable.  The backlist is the most profitable part of a

14    publisher's portfolio of publications.

15    Q.  I think you said backlist is the financial foundation for a

16    publisher like Hachette.

17    A.  Yes.

18    Q.  If I got that right, can you explain what you meant by

19    that?

20    A.  What I mean is that Hachette and the other major

21    publishers, the Big 5 -- and Scholastic, the children's book

22    publisher; is kind of the biggest children's book publisher --

23    all have these books that we keep in stock, we make available

24    electronically and through physical bookstores and that are

25    reordered routinely.  And they're very, very profitable.

1          They take -- they take less work than new books.  They

2     take -- they take -- require much less marketing work.  And

3     in almost all those cases, the advance for the book is long

4     sensed earned back.  So they're extremely, extremely

5     profitable, and the -- they're the foundation because

6     that's profit -- that's -- profit -- revenue and profit that

7     the publisher keeps achieving year after year after year; so

8     it's very reliable.

9          As opposed to the frontlist, which is extremely high

10    risk, and a lot of the frontlist books lose money and -- and

11    deliver a very, very poor margin to publishers.

12    Q.  Let me switch gears slightly and ask you briefly about

13    Hachette's publisher services business.  And I think my first

14    question is:  Can you explain what that business is?

15    A.  Our publisher services business is a business where we take

16    on distribution and order fulfillment and sometimes sales

17    solicitation for -- for smaller publishers who choose not to

18    take on the expense of building their own warehouse and, you

19    know, doing all that operations work.  So -- so it's the way we

20    leverage our systems.  Our warehouse -- our fulfillment systems

21    are order-to-cash systems, but by providing the service at a

22    markup for -- for a -- for a fee to -- to smaller publishers.

23    Q.  Is the publisher services business sometimes referred to as

24    distribution?

25    A.  Distribution is usually what it's referred to as, yes.

1    Q.  When Hachette provides distribution services to another

2    publisher, who does the publicity on behalf of that other

3    publisher's book?  Is it Hachette or the other publisher?

4    A.  It's the other publisher.  We provide distribution

5    fulfillment and, occasionally, sometimes sales services.  The

6    originating publisher does their own marketing and publicity.

7    Q.  You may have anticipated my next question.  When Hachette

8    provides distribution services to another publisher, who does

9    the marketing on behalf of the books of that other publisher?

10   Is it Hachette or the other publisher?

11   A.  It's the other publisher; the originating publisher.

12   Q.  When Hachette provides distribution services to another --

13   to another publisher, does Hachette share a portion of its

14   backlist revenue with that publisher?

15   A.  No.

16   Q.  I have a couple more questions, and then --

17          MR. VERNON:  I recognize Your Honor wanted to break

18   at 1:00.  I think we can do that.

19          THE COURT:  Yes.

20   BY MR. VERNON:

21   Q.  Briefly, can you just explain what book printing is.

22   A.  Book printing is -- well, the books we publish have a

23   physical form.  And book printing is a service we obtain from

24   companies that specialize in -- in printing; usually many kinds

25   of printed products, but including books.  Printing is setting

1    ink on the pages, binding the pages up, printing the covers,

2    printing the jackets --

3                THE COURT REPORTER:  Hold on.  Jackets --

4    A.  Manufacturing the covers, printing the jacket that's

5    wrapped around the covers -- the hard covers of a hardcover

6    book, and bringing it all together into a book.

7    BY MR. VERNON:

8    Q.  And just at a very high level, can you explain some of the

9    issues that Hachette has seen with printing capacity in recent

10   years?

11   A.  In recent years, the number of the largest print --

12   printers in the U.S. have gone out of business, and there

13   has -- where there was reliable capacity for most of my career

14   and several printers against who we could negotiate with to get

15   good terms, there are now far fewer printers.  And their

16   capacity to print all the books that are offered to them to

17   print is very strained.  So printings have been delayed; hard

18   to get; and much, much more expensive in -- in recent years in

19   ways I have never seen before.

20   Q.  Does Hachette own any book printing companies?

21   A.  It does not.

22                MR. VERNON:  Your Honor, with your permission, I

23   think we've reached a break point, and it's two minutes to one.

24   So happy to stop or not stop.

25                THE COURT:  That's fine.  Let's take our lunch break

1    now.

2        Thank you, Mr. Pietsch.  Please don't talk to anybody

3    about your testimony during the lunch break.

4        Let's take an hour for lunch and come back at 2 o'clock.

5    Thank you.

6        The parties are excused.

7            (The morning proceedings were concluded at

8    12:58 p.m.)

9            (REPORTER'S NOTE:  The p.m. portion of the

10    proceedings was reported and transcribed by Lisa Edwards and is

11    bound under separate cover.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                      Dated this 1st day of August, 2022.

10

11                 /s/ Nancy J. Meyer
                   Nancy J. Meyer
12                 Official Court Reporter
                   Registered Diplomate Reporter
13                 Certified Realtime Reporter
                   333 Constitution Avenue Northwest
14                 Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

# $

**$200,000** [2] - 109:6, 111:4
**$250,000** [12] - 61:2, 66:3, 66:9, 66:11, 66:24, 68:3, 68:21, 68:23, 69:7, 71:4, 71:14, 74:14
**$29** [1] - 62:25
**$350,000** [1] - 61:7

# '

**'13** [1] - 96:2
**'91** [1] - 96:10
**'Big** [2] - 36:23, 37:4

# 1

**1** [10] - 21:8, 21:9, 25:8, 31:21, 43:20, 45:15, 53:4, 61:6, 63:1, 94:23
**1,150** [1] - 78:20
**1.1** [1] - 45:17
**10** [1] - 79:8
**100** [3] - 55:13, 61:5, 61:6
**100,000** [3] - 20:2, 22:15, 31:20
**10:30** [2] - 22:22, 23:2
**10:40** [1] - 23:8
**12** [4] - 62:16, 62:19, 75:2, 75:4
**1200** [1] - 62:16
**12:58** [1] - 122:8
**145** [1] - 62:17
**15** [1] - 57:8
**150** [1] - 44:3
**150,000** [1] - 43:18
**18** [1] - 3:4
**19** [1] - 96:11
**1977** [1] - 96:8
**1979** [1] - 96:9
**1985** [2] - 96:9, 96:10
**1991** [1] - 96:11
**19th** [1] - 88:14
**1:00** [1] - 120:18

# 2

**2** [16] - 21:6, 21:7, 61:6, 62:12, 62:14, 63:1, 65:1, 65:17, 71:23, 72:5, 72:11, 74:18, 86:5, 86:7, 88:3, 122:4
**2,500** [1] - 33:15
**20** [1] - 79:8
**20,000** [2] - 23:4,

23:14
**200** [2] - 33:17, 85:17
**200,000** [5] - 23:21, 24:11, 44:23, 108:13, 109:3
**2002** [2] - 15:2, 15:8
**2003** [1] - 15:3
**2013** [1] - 96:2
**2019** [2] - 36:16, 89:3
**2020** [2] - 36:16, 87:2
**2021** [1] - 102:24
**21-2886** [1] - 4:3
**23** [1] - 74:24
**24th** [1] - 22:11
**250,000** [21] - 20:17, 22:21, 24:24, 31:14, 31:16, 38:17, 38:20, 42:15, 42:17, 43:3, 43:19, 44:5, 52:8, 57:1, 61:9, 67:4, 67:6, 68:8, 69:4, 70:18, 77:5
**25948971** [1] - 15:4
**29** [1] - 63:3, 63:5

# 3

**3** [2] - 61:8
**3,100** [1] - 33:24
**30** [9] - 33:6, 33:7, 46:21, 46:23, 71:13, 74:9, 113:13, 116:24, 117:1
**30(b)(6** [1] - 51:9
**300** [4] - 22:13, 22:21, 61:5, 61:7
**32(a)(2** [1] - 15:4
**32(a)(3** [2] - 14:24, 15:18
**32349903** [1] - 15:9
**350** [1] - 43:20
**3:40** [1] - 23:12

# 4

**4,900** [1] - 40:19
**40** [1] - 102:7
**40,000** [2] - 20:1, 48:10
**45** [2] - 42:18, 102:5

# 5

**5** [51] - 19:10, 24:2, 24:3, 24:22, 25:2, 25:6, 25:11, 25:20, 27:22, 27:25, 28:1, 30:8, 36:11, 37:15, 38:6, 38:14, 40:1, 41:16, 42:12, 42:13, 43:25, 46:21, 46:25,

47:3, 52:3, 52:8, 52:18, 59:4, 71:2, 71:8, 71:15, 71:22, 74:6, 74:12, 74:15, 74:16, 74:19, 74:23, 79:8, 89:15, 89:16, 89:18, 89:19, 89:25, 90:3, 91:4, 106:14, 106:15, 118:7, 118:21
**5,000** [1] - 40:19
**5-minute** [1] - 12:19
**50** [5] - 43:23, 78:19, 102:15, 111:2, 111:3
**500** [1] - 43:20
**500,000** [2] - 40:24, 71:22
**510** [1] - 22:13
**55,000** [2] - 60:23, 68:5
**550,000** [1] - 22:12
**57** [1] - 3:4
**58** [1] - 8:19
**59** [1] - 8:20

# 6

**6** [3] - 12:17, 30:7, 47:1
**60** [1] - 113:13
**60,000** [1] - 20:18
**605,000** [1] - 22:20
**625** [1] - 22:19
**645,000** [1] - 22:18
**65,000** [1] - 60:24
**650** [2] - 22:25, 23:16
**665** [1] - 22:25
**685** [1] - 22:24
**6:00** [2] - 22:17, 23:2

# 7

**7** [7] - 31:25, 32:9, 32:13, 57:20, 62:19, 72:21, 75:3
**70** [9] - 21:10, 56:25, 69:21, 69:23, 70:3, 75:4, 86:6
**702** [2] - 7:7, 7:15
**705** [1] - 23:5
**725** [1] - 23:5
**745** [1] - 23:8
**765** [2] - 23:7, 23:9
**785** [1] - 23:9

# 8

**8** [2] - 45:12, 74:11
**800** [1] - 23:13
**805** [1] - 23:13
**805,000** [1] - 23:11

**825** [2] - 23:15
**85** [2] - 29:9, 62:20
**86** [1] - 3:5
**8th** [1] - 12:7

# 9

**9** [1] - 42:16
**90** [5] - 25:6, 30:9, 43:25, 52:19, 75:6
**95** [1] - 3:9
**98** [2] - 61:13, 72:2

# A

**a.m** [1] - 23:2
**Abby** [1] - 4:17
**ability** [4] - 25:25, 50:12, 76:18, 106:23
**able** [4] - 5:22, 12:7, 46:20, 49:2, 50:3, 55:2, 55:4, 60:21, 65:3, 68:7, 78:6, 92:8, 92:10, 114:22
**Abrams** [4] - 47:7, 47:9, 71:11, 74:10
**absent** [2] - 49:6, 77:22
**absorb** [1] - 43:8
**academic** [1] - 35:3
**accept** [6] - 63:5, 110:6, 110:17, 112:16, 117:5, 117:9
**accepted** [1] - 28:16
**accommodating** [1] - 12:12
**accomplish** [2] - 87:25, 104:19
**according** [3] - 72:10, 75:2, 75:3
**account** [7] - 21:8, 34:8, 42:15, 56:25, 60:20, 82:3, 86:5
**accountant** [1] - 28:19
**accounts** [2] - 21:10, 78:14
**accurate** [2] - 62:18, 75:3
**accurately** [3] - 46:4, 46:10, 72:25
**achieve** [4] - 49:4, 51:12, 55:25, 84:6
**achieving** [1] - 119:7
**acknowledge** [2] - 26:3, 68:15
**acknowledges** [1] - 82:14
**acquire** [11] - 27:11, 38:7, 52:2, 74:13, 77:8, 87:17, 96:20,

99:22, 100:6, 102:23, 115:9
**acquired** [13] - 24:24, 30:9, 30:10, 40:4, 59:14, 62:5, 66:8, 66:11, 80:25, 102:9, 102:21, 103:3, 117:23
**acquires** [4] - 18:22, 113:19, 113:23, 115:21
**acquiring** [9] - 87:22, 96:17, 96:18, 97:8, 97:23, 99:15, 100:8, 102:6, 113:5
**acquisition** [8] - 28:11, 32:14, 59:22, 60:5, 60:22, 75:9, 81:16, 86:9
**acquisitions** [13] - 25:3, 42:17, 61:2, 61:13, 62:16, 65:2, 75:2, 75:7, 75:12, 75:15, 77:10, 81:9, 81:11
**act** [1] - 38:6
**Act** [7] - 21:2, 32:1, 32:5, 32:9, 32:21, 56:8, 57:20
**acting** [1] - 50:14
**action** [2] - 7:14, 49:17
**actionable** [1] - 49:16
**actions** [1] - 72:21
**active** [2] - 77:4, 77:5
**activities** [2] - 86:25, 104:16
**actor** [1] - 51:7
**actual** [3] - 52:22, 58:25, 63:2
**Adams** [1] - 101:19
**add** [2] - 74:15, 74:16
**addition** [4] - 27:16, 48:21, 89:24, 116:3
**additional** [3] - 20:21, 22:16, 77:23
**address** [7] - 5:1, 5:24, 8:10, 8:24, 79:1, 86:16, 90:15
**addresses** [1] - 37:19
**administered** [1] - 95:9
**admissible** [2] - 7:23, 13:20
**admit** [1] - 68:17
**adopted** [2] - 32:12, 33:9, 33:13
**adults** [2] - 101:16, 106:16
**advance** [80] - 20:12,

20:17, 20:23, 20:24, 29:7, 29:10, 29:12, 29:17, 29:20, 29:25, 31:4, 31:13, 37:10, 37:17, 42:15, 52:8, 57:4, 61:2, 65:5, 66:8, 68:2, 68:11, 69:16, 69:17, 69:20, 70:4, 77:9, 94:10, 100:1, 100:2, 106:20, 107:15, 107:16, 107:17, 107:18, 107:20, 107:22, 107:24, 108:5, 108:10, 108:13, 108:14, 108:19, 108:25, 109:3, 109:5, 109:6, 109:10, 109:15, 109:17, 109:19, 109:24, 110:6, 110:10, 110:17, 110:20, 110:21, 110:22, 110:25, 111:5, 111:6, 112:19, 113:17, 113:20, 113:25, 114:7, 114:17, 115:2, 115:14, 115:22, 115:24, 116:2, 116:6, 116:7, 116:17, 119:3
**advanced** [1] - 42:22
**advances** [57] - 18:25, 19:1, 19:2, 20:6, 20:16, 21:11, 21:18, 24:23, 31:4, 36:2, 38:20, 39:8, 42:6, 43:3, 43:17, 44:20, 48:12, 48:20, 54:6, 56:22, 56:25, 57:1, 58:3, 62:1, 62:24, 62:25, 65:3, 66:2, 66:11, 66:23, 68:3, 68:8, 68:11, 68:19, 68:22, 69:3, 69:20, 71:5, 71:14, 74:13, 78:9, 78:11, 80:7, 80:13, 82:6, 82:8, 86:6, 90:16, 91:20, 91:23, 98:3, 99:23, 108:12, 108:17, 111:4
**advancing** [1] - 31:1
**Aetna** [2] - 34:14, 35:6
**affect** [8] - 31:19, 48:12, 62:1, 93:19, 113:20, 113:24, 115:22, 116:7
**affected** [1] - 41:19

**afternoon** [7] - 6:10, 57:10, 78:1, 95:5, 95:6, 95:20, 95:21
**afterwards** [1] - 53:15
**agencies** [1] - 33:9
**agency** [1] - 45:12
**agent** [29] - 29:4, 45:13, 47:23, 50:17, 53:19, 53:21, 53:25, 54:3, 65:6, 75:16, 75:23, 84:1, 84:10, 111:10, 112:11, 112:16, 114:2, 114:16, 114:22, 114:25, 115:11, 115:24, 116:3, 116:6, 116:9, 117:5, 117:8, 117:12
**agent's** [2] - 115:16, 116:14
**agents** [22] - 27:8, 27:16, 53:20, 53:22, 54:14, 64:16, 64:17, 64:19, 64:23, 65:3, 67:1, 75:9, 75:11, 81:13, 81:21, 85:11, 91:2, 100:21, 109:13, 110:3, 112:21, 113:1
**agents'** [1] - 65:1
**aggregated** [1] - 25:9
**aggressive** [2] - 23:18, 53:24
**aggressively** [3] - 43:3, 58:17, 78:6
**ago** [10] - 23:7, 50:22, 53:2, 70:9, 70:10, 80:1, 88:25, 90:23, 102:15, 103:4
**agree** [3] - 12:9, 26:18, 107:17
**agreed** [5] - 6:15, 9:11, 10:14, 10:15, 68:1
**agreed-upon** [1] - 68:1
**agreement** [4] - 5:22, 82:10, 85:19, 114:23
**agrees** [1] - 88:4
**ahead** [2] - 80:17, 108:3
**aisle** [1] - 69:24
**al** [1] - 4:4
**algorithms** [1] - 69:14
**align** [1] - 87:1
**alleged** [4] - 41:19, 59:24, 66:6, 68:16
**allow** [4] - 13:4, 72:18, 84:16, 114:7
**allowed** [3] - 15:7,

55:25, 117:6
**allowing** [1] - 15:5
**allows** [1] - 55:13
**alluded** [2] - 64:2, 75:9
**almost** [9] - 19:10, 25:5, 75:6, 85:17, 109:16, 110:2, 110:10, 117:14, 119:3
**alone** [5] - 23:21, 45:20, 72:15, 72:25, 76:20
**alternating** [1] - 23:3
**alternative** [2] - 39:9, 53:23
**alternatives** [1] - 39:4
**Amanda** [1] - 4:8
**Amazon** [7] - 53:1, 53:2, 71:12, 74:11, 91:5, 92:3, 106:1
**amendments** [1] - 5:15
**America** [3] - 4:3, 4:8, 106:25
**American** [2] - 18:20, 30:7
**amount** [9] - 46:7, 66:19, 81:4, 81:10, 91:25, 100:1, 110:14, 114:5, 114:10
**amounts** [1] - 24:15
**ample** [1] - 93:21
**analogy** [2] - 90:6, 90:7
**analysis** [12] - 7:21, 8:14, 9:1, 24:21, 31:19, 33:10, 33:13, 38:17, 47:20, 61:16, 91:10, 109:7
**analyze** [1] - 36:20
**analyzed** [1] - 40:22
**analyzing** [1] - 40:15
**anecdotal** [1] - 78:14
**announced** [4] - 54:14, 80:2, 80:6, 87:2
**annual** [1] - 21:8
**annually** [2] - 62:25
**answer** [4] - 14:3, 39:2, 58:10, 84:15
**Anthem** [3] - 34:14, 35:6, 40:17
**anticipate** [2] - 32:7, 91:15
**anticipated** [38] - 19:3, 20:1, 20:3, 20:4, 20:20, 20:22, 21:3, 21:13, 22:8, 24:22,

28:11, 29:9, 31:11, 31:14, 39:8, 39:10, 40:6, 41:15, 41:21, 41:22, 41:24, 42:2, 43:14, 43:18, 44:19, 47:17, 48:10, 52:2, 52:10, 56:24, 65:8, 66:1, 67:2, 67:11, 69:9, 69:11, 75:10, 120:7
**anticompetitive** [8] - 35:11, 39:18, 41:20, 41:23, 44:2, 49:8, 50:25, 87:16
**antiperspective** [1] - 67:16
**antitrust** [9] - 34:23, 40:6, 41:18, 49:16, 64:3, 64:4, 65:14, 70:12, 71:24
**anxiety** [1] - 84:14
**apart** [2] - 6:3, 36:11
**apologies** [2] - 94:10, 95:3
**appealing** [1] - 67:10
**Appeals** [1] - 50:23
**appeared** [1] - 8:17
**appellate** [1] - 33:13
**Apple** [1] - 106:1
**apple** [2] - 56:17
**application** [1] - 47:20
**applied** [1] - 61:17
**applies** [5] - 33:14, 33:20, 34:1, 68:2, 77:3
**apply** [2] - 34:23, 35:7
**appreciable** [1] - 32:15
**appreciate** [1] - 5:16
**approach** [4] - 4:5, 54:1, 95:4, 111:20
**approached** [1] - 111:22
**approaches** [2] - 13:3, 111:11
**appropriate** [3] - 11:15, 76:19, 115:15
**approval** [5] - 38:19, 70:17, 70:20, 70:24, 100:2
**approved** [4] - 41:1, 41:6, 49:17, 54:9
**apt** [1] - 38:4
**arbitrary** [1] - 71:23
**area** [1] - 10:3
**areas** [1] - 98:11
**argue** [2] - 27:4, 39:15
**argument** [6] - 7:19, 8:1, 8:2, 11:8, 57:8, 77:12

**arguments** [2] - 34:20, 38:12
**arm's** [1] - 77:17
**art** [4] - 21:19, 88:6, 103:1, 103:25
**artificial** [3] - 63:18, 63:19
**Ashley** [1] - 4:11
**aside** [2] - 14:7, 62:9
**asserting** [1] - 35:10
**assessing** [1] - 82:4
**assets** [1] - 47:4
**assistant** [1] - 96:8
**assortment** [1] - 106:9
**assuage** [1] - 54:18
**assume** [3] - 61:22, 61:23, 91:24
**assumed** [1] - 62:6
**assumes** [3] - 76:11, 81:1, 81:16
**assuming** [1] - 77:15
**assumption** [2] - 65:14, 77:22
**assumptions** [3] - 19:24, 48:9, 100:4
**Atria** [1] - 30:23
**attaches** [2] - 49:21, 50:1
**attacking** [1] - 38:10
**attempt** [4] - 24:5, 35:17, 65:4, 115:19
**attempted** [1] - 16:21
**attempts** [2] - 34:12, 115:9
**attention** [4] - 64:3, 88:19, 92:1, 104:17
**attorneys** [1] - 55:22
**attract** [2] - 99:22, 104:2
**attracting** [1] - 98:3
**auction** [28] - 24:1, 29:6, 45:6, 45:11, 54:1, 62:14, 69:6, 75:24, 80:24, 81:1, 81:13, 84:19, 111:8, 111:9, 111:17, 111:18, 111:21, 111:23, 112:5, 112:8, 112:9, 112:10, 116:1, 116:7, 116:11, 117:6, 117:11, 117:12
**auctions** [8] - 37:23, 38:5, 43:8, 45:20, 53:20, 74:24, 81:6, 109:16
**audiences** [1] - 42:23
**audio** [8] - 26:21, 36:5, 43:9, 47:11,

48:5, 51:16, 55:11, 107:8
**audio-video** [7] - 26:21, 36:5, 43:9, 47:11, 48:5, 51:16, 55:11
**August** [1] - 12:7
**author** [52] - 19:17, 20:9, 20:17, 22:1, 22:2, 22:4, 24:11, 25:13, 27:9, 29:9, 29:21, 29:25, 44:22, 45:19, 45:21, 45:22, 46:17, 46:18, 49:18, 58:3, 62:24, 65:2, 69:7, 75:20, 84:1, 84:9, 88:15, 92:6, 97:4, 103:11, 103:15, 103:17, 103:22, 106:22, 107:2, 107:18, 107:21, 107:22, 108:5, 108:19, 110:12, 111:11, 113:7, 113:14, 114:5, 114:7, 114:14, 116:16, 116:18, 116:25
**author's** [12] - 20:12, 20:13, 22:9, 23:20, 27:13, 69:12, 75:17, 113:10, 114:8, 115:16
**author-friendly** [1] - 88:15
**authorization** [1] - 99:25
**authorize** [1] - 99:25
**authors** [90] - 19:1, 19:3, 19:7, 19:13, 19:19, 19:22, 20:1, 20:2, 20:4, 20:20, 20:22, 20:25, 21:17, 21:20, 24:12, 24:13, 24:18, 24:22, 25:24, 27:16, 28:15, 29:4, 29:7, 31:8, 31:11, 31:12, 35:11, 35:13, 36:3, 37:9, 37:16, 37:24, 38:15, 39:5, 39:7, 39:9, 39:10, 39:13, 40:8, 44:21, 48:1, 48:7, 48:10, 48:11, 48:13, 48:20, 49:13, 49:14, 54:13, 54:14, 55:18, 56:3, 56:4, 56:8, 56:9, 63:14, 64:20, 67:23, 68:10, 68:15, 68:22, 69:2, 69:3, 71:4,

77:15
**beads** [1] - 102:20
**bear** [1] - 55:19
**beauty** [1] - 45:7
**became** [1] - 97:15
**become** [3] - 37:24, 46:20, 96:1
**becomes** [1] - 49:11
**becoming** [3] - 52:1, 96:14, 96:18
**Beech** [1] - 34:15
**Beech-Nut** [1] - 34:15
**began** [2] - 33:2, 44:22
**begin** [7] - 16:14, 22:10, 29:1, 51:2, 57:11, 57:12, 76:23
**behalf** [3] - 79:17, 120:2, 120:9
**behavior** [1] - 49:2
**behind** [1] - 51:21
**beholden** [1] - 53:10
**belief** [1] - 84:6
**believes** [4] - 23:20, 50:13, 83:24, 103:18
**below** [4] - 22:21, 41:11, 42:17, 76:15
**below-market** [1] - 76:15
**bench** [7] - 8:7, 8:16, 9:4, 9:8, 15:10, 15:23, 16:10
**bends** [1] - 55:17
**beneficial** [2] - 20:7, 21:24
**benefit** [5] - 63:14, 73:4, 74:21, 85:24, 87:23
**benefited** [1] - 44:23
**benefits** [4] - 19:22, 23:21, 26:24, 34:3
**Berkett** [1] - 82:13
**Berry** [1] - 101:25
**Bertelsmann** [16] - 4:3, 4:16, 24:15, 26:25, 53:7, 53:10, 57:14, 77:13, 77:17, 77:18, 82:21, 85:14, 85:16, 85:20, 88:3, 93:4
**best** [17] - 25:23, 37:15, 38:15, 47:3, 64:20, 81:13, 83:24, 84:6, 85:21, 89:4, 106:4, 112:10, 112:16, 112:17, 112:24
**best-bid** [1] - 81:13
**best-bids** [1] - 112:10
**bestseller** [1] - 37:22

**bestselling** [1] - 37:8
**bet** [1] - 55:16
**better** [6] - 21:18, 36:19, 44:20, 60:13, 64:12
**better-paying** [1] - 64:12
**between** [16] - 9:10, 14:8, 16:5, 19:21, 21:25, 37:14, 57:3, 69:20, 70:22, 71:15, 75:20, 77:17, 84:9, 89:2, 90:17, 110:19
**beyond** [4] - 20:23, 54:24, 84:15, 89:25
**bid** [30] - 22:15, 22:18, 22:21, 23:1, 23:3, 23:4, 23:5, 23:9, 23:11, 23:15, 81:5, 81:8, 81:10, 81:13, 81:14, 81:20, 111:20, 111:22, 111:24, 111:25, 112:13, 112:24, 113:20, 113:24, 114:2, 117:5, 117:11, 117:13
**bidder** [6] - 22:23, 53:24, 54:1, 81:1, 81:18, 112:1
**bidders** [18] - 22:12, 23:17, 54:5, 54:20, 61:22, 61:25, 62:8, 62:11, 62:16, 75:1, 78:16, 78:18, 78:23, 81:12, 81:13, 84:19, 88:2, 111:19
**bidding** [10] - 22:16, 22:17, 23:14, 23:19, 50:18, 75:3, 83:17, 114:12, 115:4, 116:13
**bids** [7] - 22:22, 53:23, 61:23, 112:10, 112:16, 112:17, 114:23
**Big** [50] - 19:10, 24:2, 24:3, 24:22, 25:2, 25:6, 25:20, 27:22, 27:25, 28:1, 30:7, 30:8, 36:11, 37:15, 38:6, 38:14, 40:1, 41:16, 42:12, 42:13, 43:25, 46:21, 46:25, 47:1, 47:3, 52:3, 52:8, 52:18, 59:4, 71:2, 71:8, 71:15, 74:6, 74:12, 74:15, 74:16, 74:19, 74:23, 89:15, 89:16, 89:18,

89:19, 89:25, 90:3, 91:4, 106:14, 106:15, 118:7, 118:21
**big** [10] - 27:25, 38:3, 38:5, 52:21, 53:17, 67:19, 68:22, 78:4, 79:3, 90:11
**big-ticket** [1] - 68:22
**bigger** [4] - 18:22, 21:18, 47:8, 71:8
**biggest** [6] - 37:7, 45:23, 73:23, 79:5, 89:12, 118:22
**billion** [5] - 21:8, 21:9, 63:1, 79:23, 88:3
**billions** [1] - 63:2
**binder** [1] - 95:15
**binders** [1] - 94:16
**binding** [2] - 113:16, 121:1
**bit** [3] - 57:16, 60:18, 76:8
**biting** [1] - 92:7
**Black** [2] - 102:25, 103:1
**blank** [1] - 105:14
**blind** [1] - 81:14
**block** [1] - 62:22
**Block** [1] - 34:14
**blocked** [1] - 35:20
**blocking** [1] - 65:18
**blocks** [1] - 87:24
**Bloomsbury** [1] - 22:14
**blue** [5] - 24:25, 42:13, 43:21, 43:24
**body** [1] - 118:5
**Book** [6] - 96:4, 96:23, 98:17, 102:21, 103:3, 106:18
**book** [128] - 18:21, 21:14, 21:20, 22:8, 23:20, 25:25, 27:14, 27:15, 27:18, 27:19, 29:5, 29:19, 30:2, 45:16, 46:6, 47:13, 47:15, 50:7, 53:6, 54:21, 56:9, 57:4, 58:12, 59:15, 59:16, 59:18, 59:19, 59:25, 60:15, 60:21, 61:3, 62:5, 65:7, 66:6, 69:8, 69:10, 69:12, 70:13, 75:23, 77:10, 79:21, 80:13, 81:20, 81:23, 83:25, 84:2, 84:7, 87:3, 87:9, 87:10, 88:5, 91:24, 97:4, 97:6, 100:4,

## B

**background** [3] - 7:3, 27:2, 29:1
**backlist** [10] - 70:6, 70:8, 117:19, 117:21, 118:5, 118:6, 118:8, 118:13, 118:15, 120:14
**backward** [1] - 76:11
**backward-looking** [1] - 76:11
**bad** [4] - 54:12, 56:3, 56:5, 87:19
**Baker** [1] - 72:16
**ball** [1] - 20:24
**Ballantine** [1] - 30:18
**Bank** [1] - 33:2
**Bantam** [1] - 30:18
**bar** [2] - 24:23, 32:20
**barely** [1] - 85:5
**bargaining** [2] - 64:18, 66:10
**Barnes** [1] - 105:9
**barriers** [4] - 28:13, 49:25, 51:25, 79:20
**bars** [1] - 25:19
**baseball** [1] - 38:2
**based** [19] - 7:8, 27:10, 28:15, 38:16, 47:25, 51:17, 52:15, 54:9, 58:23, 66:14, 66:17, 70:23, 72:10, 76:1, 98:19, 109:16, 110:21, 110:22, 114:17
**bases** [1] - 65:25
**basic** [1] - 97:11
**basis** [2] - 67:22,

**authors'** [1] - 80:5
**Autobiography** [1] - 102:1
**available** [4] - 16:18, 104:16, 105:13, 118:23
**avoid** [1] - 65:20
**aware** [3] - 51:2, 87:20, 106:3
**Ayesha** [1] - 27:9

71:17, 85:24, 91:1, 91:3, 91:21, 91:22, 92:5, 99:24, 100:13, 100:21, 100:23, 107:14, 109:14, 109:20, 110:1, 110:2, 110:5, 110:16, 116:23, 116:24, 116:25

100:15, 100:16,
100:17, 101:17,
101:19, 101:20,
102:1, 102:3,
103:16, 103:25,
104:2, 104:17,
104:20, 104:21,
104:22, 106:7,
106:21, 106:23,
107:3, 107:7,
107:23, 108:6,
108:7, 108:19,
109:21, 109:24,
110:1, 110:14,
110:15, 110:20,
110:23, 111:9,
111:12, 111:15,
111:16, 112:3,
112:21, 113:10,
113:14, 113:15,
113:19, 113:23,
114:3, 114:7, 114:9,
114:16, 114:18,
114:23, 115:1,
115:5, 115:9,
115:11, 115:19,
115:21, 116:10,
116:19, 116:20,
116:23, 117:10,
117:16, 117:20,
118:21, 118:22,
119:3, 120:3,
120:21, 120:22,
120:23, 121:6,
121:20
**book's** [1] - 114:18
**bookings** [1] - 67:20
**books** [184] - 19:2,
19:6, 19:17, 19:20,
21:3, 21:6, 21:7,
21:12, 21:14, 24:12,
24:18, 24:23, 27:11,
27:20, 28:11, 29:10,
29:13, 29:15, 31:11,
31:13, 31:15, 35:15,
35:25, 37:8, 39:11,
40:4, 42:2, 42:5,
42:22, 42:23, 43:14,
46:24, 47:17, 48:13,
52:2, 52:8, 55:3,
56:21, 56:24, 56:25,
58:11, 58:12, 58:17,
59:9, 59:11, 59:22,
60:9, 60:20, 60:24,
62:17, 62:20, 62:22,
66:1, 66:2, 66:10,
66:23, 66:25, 67:2,
67:3, 67:6, 68:2,
68:5, 68:8, 68:10,
68:15, 68:20, 69:16,
69:17, 69:20, 69:22,

70:4, 70:9, 70:23,
71:13, 74:13, 74:18,
76:25, 77:8, 78:7,
80:13, 80:24, 85:13,
86:5, 92:1, 96:17,
96:20, 97:2, 97:8,
97:13, 97:23, 97:25,
98:3, 98:5, 98:11,
99:2, 99:5, 99:15,
99:18, 99:22, 100:2,
100:6, 100:7, 100:8,
100:9, 100:13,
101:2, 101:10,
101:12, 101:22,
102:6, 102:9,
102:16, 102:17,
102:18, 102:19,
102:20, 103:2,
103:10, 104:5,
104:7, 104:9,
104:13, 104:15,
105:3, 105:6, 105:8,
105:10, 105:12,
105:16, 105:18,
105:20, 105:21,
105:22, 105:24,
106:1, 106:4, 106:6,
106:12, 106:16,
107:10, 107:14,
108:9, 108:11,
108:14, 108:16,
108:22, 109:2,
109:4, 109:8,
109:10, 111:4,
111:5, 111:6, 111:7,
113:1, 113:3, 113:5,
116:18, 116:20,
116:21, 116:24,
117:1, 117:21,
117:22, 118:2,
118:5, 118:8,
118:23, 119:1,
119:10, 120:9,
120:22, 120:25,
121:16
**Books** [2] - 96:11,
105:9
**Books-A-Million** [1] -
105:9
**booksellers** [4] -
58:11, 58:13, 60:14,
85:24
**bookstore** [1] - 104:24
**bookstores** [4] -
105:7, 105:8, 118:24
**Boston** [1] - 96:8
**bottom** [4] - 21:5,
42:10, 43:22, 52:19
**bottom-line** [1] - 21:5
**bought** [2] - 52:4, 69:8

**bound** [1] - 122:11
**boundary** [5] - 39:15,
39:23, 39:25, 41:4,
68:25
**bounded** [1] - 40:17
**bounds** [1] - 39:25
**brakes** [1] - 59:13
**brand** [2] - 30:13,
52:11
**brand-new** [1] - 52:11
**bread** [1] - 21:15
**bread-and-butter** [1] -
21:15
**breadth** [1] - 30:11
**break** [5] - 57:7,
120:17, 121:23,
121:25, 122:3
**brief** [8] - 27:6, 29:2,
31:23, 34:21, 35:3,
35:10, 35:19, 38:10
**briefing** [3] - 35:5,
35:22, 63:22
**briefly** [10] - 86:16,
96:5, 96:7, 98:15,
101:2, 108:18,
112:4, 117:19,
119:12, 120:21
**briefs** [1] - 29:2
**bright** [2] - 39:21,
52:22
**bring** [12] - 30:7, 97:6,
97:25, 98:7, 99:2,
100:16, 104:21,
106:4, 114:23,
115:14, 115:23
**bringing** [3] - 116:5,
118:2, 121:6
**broad** [2] - 40:3, 101:7
**brought** [5] - 72:21,
97:13, 103:25,
111:25
**Brown** [8] - 66:21,
96:12, 96:13, 96:22,
96:23, 96:25, 97:1,
97:10
**budgets** [1] - 67:19
**build** [1] - 79:23
**building** [1] - 119:18
**built** [1] - 88:12
**bullet** [1] - 30:3
**bunch** [1] - 101:23
**burden** [12] - 10:21,
32:21, 34:3, 34:10,
35:18, 35:24, 49:23,
57:23, 57:24, 65:10,
72:23
**bushels** [1] - 59:16
**business** [28] - 21:15,
36:20, 38:18, 46:22,
50:20, 56:3, 58:3,

66:4, 69:13, 75:20,
76:5, 79:14, 85:8,
85:17, 86:25, 87:3,
88:5, 88:7, 88:14,
89:1, 99:11, 102:4,
119:13, 119:14,
119:15, 119:23,
121:12
**businesses** [1] -
111:19
**butter** [1] - 21:15
**buy** [1] - 78:6

## C

**calculated** [2] - 72:9,
76:4
**calculating** [1] -
115:23
**calculation** [1] - 69:24
**calm** [1] - 84:14
**cannot** [15] - 12:6,
14:18, 28:4, 33:25,
34:1, 34:10, 39:13,
46:15, 47:14, 57:23,
60:2, 70:12, 72:15,
72:17
**Cantor** [2] - 4:17,
12:15
**CANTOR** [8] - 12:15,
13:18, 13:22, 14:7,
14:13, 14:23, 15:20,
16:12
**capacity** [6] - 25:22,
53:6, 53:11, 121:9,
121:13, 121:16
**capital** [2] - 25:21,
79:23
**capture** [4] - 68:25,
72:25, 73:9, 92:1
**captured** [1] - 44:4
**car** [1] - 59:13
**career** [4] - 100:10,
101:3, 102:10,
121:13
**careful** [1] - 63:22
**Carolyn** [2] - 36:15,
88:21
**carries** [1] - 105:24
**carry** [2] - 105:12,
105:22
**Case** [1] - 4:2
**case** [72] - 4:25, 6:14,
7:14, 7:15, 9:14,
9:15, 9:19, 10:2,
12:7, 13:1, 13:2,
13:7, 14:16, 14:18,
28:6, 28:25, 33:2,
34:11, 34:23, 35:2,
35:14, 35:17, 38:11,

40:18, 41:18, 54:10,
55:22, 56:13, 56:15,
58:7, 59:7, 59:8,
59:12, 59:22, 61:1,
63:16, 63:24, 64:1,
64:6, 64:7, 65:12,
66:9, 66:21, 67:7,
67:12, 67:15, 68:18,
72:7, 72:19, 73:3,
73:13, 73:20, 73:25,
74:1, 76:2, 76:16,
83:12, 84:21, 84:22,
85:13, 85:14, 85:15,
90:7, 92:11, 93:22,
93:25, 97:20, 104:4,
110:18, 114:4
**cases** [14] - 7:16, 15:2,
15:7, 34:13, 34:24,
35:8, 35:18, 39:12,
40:10, 40:12, 49:22,
67:8, 119:3
**cash** [1] - 119:21
**Casual** [1] - 101:16
**catalog** [1] - 117:22
**categorical** [1] - 70:22
**categorically** [1] -
67:17
**category** [2] - 66:24,
69:5
**caused** [1] - 32:14
**cautious** [1] - 15:25
**CBS** [3] - 36:18, 89:3
**CCC** [4] - 34:15,
34:17, 34:18, 48:25
**celebrities** [3] - 37:9,
38:15, 68:13
**cement** [2] - 18:19,
26:4
**cementing** [1] - 56:1
**cements** [2] - 26:19,
26:22
**central** [4] - 90:15,
98:23, 100:12
**century** [1] - 88:14
**CEO** [26] - 26:7, 26:16,
27:22, 36:1, 36:14,
47:6, 52:6, 55:6,
55:9, 78:1, 87:1,
88:9, 88:22, 90:22,
92:16, 96:1, 96:3,
96:14, 96:19, 98:15,
98:16, 99:14, 99:16,
100:7, 100:9, 100:19
**CEO's** [1] - 98:20
**CEOs** [7] - 27:21,
27:23, 27:24, 27:25,
28:2, 53:12, 87:18
**certain** [7] - 7:4,
24:20, 49:7, 70:24,
99:24, 99:25, 100:1

certainly [3] - 24:17, 90:15, 118:7
cetera [1] - 90:11
chain [2] - 89:7, 105:8
challenge [3] - 30:15, 65:25, 104:18
challenged [1] - 34:13
challenging [1] - 100:12
chance [3] - 87:24, 112:13, 115:25
change [3] - 31:2, 42:8, 70:21
changed [2] - 13:2, 86:20
changes [1] - 52:3
channels [1] - 67:5
characteristic [1] - 66:6
characteristics [2] - 66:18, 67:14
characterization [1] - 35:2
characterize [1] - 7:17
characterized [1] - 15:13
Charles [1] - 96:9
chart [4] - 24:23, 60:4, 60:19, 74:20
charts [2] - 52:15, 60:11
check [2] - 5:23, 86:10
checking [1] - 95:2
chief [6] - 9:14, 10:2, 95:25, 96:13, 97:7, 97:8
children [2] - 102:17, 106:16
children's [3] - 116:23, 118:21, 118:22
choices [1] - 49:12
choose [4] - 76:1, 93:23, 111:16, 119:17
choosing [3] - 31:17, 39:14, 49:19
chopped [1] - 17:18
chose [3] - 44:5, 86:19, 88:2
chosen [1] - 86:24
Christy [1] - 47:23
Chronicle [1] - 15:8
Chuck [1] - 101:25
churn [1] - 25:23
churning [1] - 47:2
circle [1] - 19:9
circles [1] - 64:4
circuit [2] - 34:11, 50:24

Circuit [11] - 32:12, 33:12, 33:19, 34:6, 34:15, 41:17, 41:20, 50:7, 56:13, 56:15, 85:14
circuits [1] - 40:9
circulated [3] - 5:4, 5:9, 5:14
circumstances [5] - 20:16, 49:5, 49:6, 89:1, 89:6
cite [1] - 35:17
Civil [1] - 4:2
claim [9] - 28:19, 34:21, 34:24, 46:14, 51:21, 53:9, 60:2, 60:3
claimed [2] - 51:4, 83:15
claims [3] - 28:21, 51:7, 76:14
clarification [1] - 92:21
clarify [2] - 31:22, 109:2
Clarkson [1] - 30:19
class [2] - 67:20, 71:16
clause [1] - 113:8
Clayton [7] - 21:2, 32:1, 32:5, 32:9, 32:21, 56:8, 57:20
clear [10] - 8:19, 10:5, 11:3, 28:3, 31:25, 55:24, 72:10, 72:16, 85:14, 108:23
clearly [1] - 42:21
Cleopatra [1] - 101:19
client [2] - 103:2, 113:4
clip [6] - 12:19, 43:4, 43:5, 54:3, 55:6, 83:21
clips [8] - 12:21, 12:25, 13:20, 15:1, 15:5, 15:7, 16:21, 26:6
close [9] - 21:23, 22:19, 23:21, 33:7, 37:6, 73:14, 74:4, 75:5, 110:24
closed [7] - 16:20, 16:24, 17:7, 17:10, 17:12, 17:23, 81:23
closing [1] - 85:16
clothing [1] - 105:17
Clubs [1] - 105:13
Co [1] - 4:3
cognizable [1] - 65:11
colleague [3] - 78:25,

89:8, 92:17
colleagues [2] - 34:14, 90:25
collectively [2] - 74:17, 74:23
Collins [1] - 37:6
collude [1] - 55:14
colluded [1] - 50:7
collusion [2] - 49:3, 50:1
column [2] - 43:19, 52:17
columns [4] - 42:3, 42:9, 42:19, 43:17
combat [1] - 52:9
combination [2] - 57:25, 81:17
combine [2] - 19:4, 55:2
combined [9] - 19:3, 25:4, 52:18, 52:20, 52:22, 62:5, 73:22, 74:2, 91:19
combining [2] - 76:13, 87:11
coming [2] - 99:13, 118:4
command [2] - 68:11, 68:22
comments [2] - 90:2, 90:20
commerce [2] - 44:4, 46:23
Commission [1] - 28:10
commitment [1] - 88:15
commodities [1] - 46:24
common [10] - 15:18, 42:1, 50:19, 89:3, 106:15, 111:20, 112:4, 112:9, 116:22
communications [1] - 98:24
community [2] - 84:10
companies [14] - 27:17, 37:7, 41:2, 52:11, 71:12, 73:18, 73:21, 78:18, 91:13, 105:19, 105:21, 118:8, 120:24, 121:20
Company [2] - 15:3, 15:8
company [25] - 20:15, 53:8, 53:11, 59:17, 82:19, 83:20, 83:24, 84:3, 84:6, 85:1, 86:21, 96:3, 97:3,

97:5, 98:12, 98:19, 98:21, 99:6, 99:12, 100:13, 100:19, 100:22, 102:14, 117:22, 118:7
comparables [1] - 27:19
comparison [1] - 42:16
compelling [3] - 22:3, 34:4, 116:3
compellingly [1] - 22:5
compensate [1] - 49:13
compensated [1] - 19:7
compensation [4] - 19:13, 20:12, 29:7, 92:6
compete [29] - 21:17, 21:23, 23:22, 27:20, 28:1, 37:21, 37:22, 38:5, 38:15, 41:16, 43:3, 45:2, 52:1, 52:7, 53:9, 53:14, 54:8, 58:17, 59:9, 59:10, 65:22, 71:13, 74:7, 78:6, 79:4, 79:9, 84:17, 90:10
competes [1] - 89:23
competing [4] - 55:3, 55:15, 59:15, 104:14
competition [58] - 19:21, 21:3, 21:4, 21:22, 21:25, 22:6, 23:23, 24:12, 24:14, 27:3, 27:12, 28:13, 32:2, 32:10, 32:23, 33:4, 34:9, 37:14, 37:19, 38:24, 41:5, 42:1, 44:7, 44:19, 44:25, 46:2, 46:3, 46:5, 46:16, 48:18, 48:21, 49:7, 53:24, 53:25, 57:22, 58:2, 58:10, 58:19, 59:18, 59:25, 65:15, 66:25, 72:1, 73:16, 76:20, 79:6, 79:19, 79:20, 83:18, 84:5, 84:18, 85:23, 87:20, 89:15, 90:1, 107:14
competitive [19] - 41:6, 41:12, 42:5, 42:8, 42:21, 46:11, 49:4, 51:23, 61:12, 64:16, 73:1, 73:10, 73:12, 79:18, 99:13, 109:24, 115:10,

115:17, 115:20
competitively [1] - 31:6
competitor [4] - 18:23, 45:23, 73:23, 79:13
competitors [14] - 27:20, 37:8, 45:25, 48:24, 53:4, 73:15, 73:19, 73:22, 74:4, 75:6, 89:12, 89:13, 89:25, 92:4
complain [1] - 87:15
complaint [1] - 59:23
complete [2] - 75:12, 100:14
completed [1] - 67:13
completely [4] - 68:9, 71:5, 74:1, 80:6
complicated [1] - 104:5
component [1] - 59:13
concede [1] - 58:18
concentrated [4] - 19:8, 31:19, 33:5, 58:16
concentrates [1] - 33:1
concentrating [1] - 34:22
concentration [8] - 19:11, 33:11, 33:16, 33:17, 44:6, 49:7, 63:19, 72:5
concepts [1] - 103:6
concern [2] - 48:1, 54:15
concerned [2] - 10:18, 45:11
concerns [1] - 54:18
conclude [1] - 55:20
concluded [2] - 59:20, 122:7
conclusion [1] - 56:6
conditions [1] - 73:1
conduct [5] - 41:20, 41:23, 49:9, 55:22, 61:15
conducted [1] - 76:6
confer [1] - 8:9
confidence [1] - 63:11
confidential [10] - 5:3, 16:19, 16:21, 16:22, 16:25, 17:7, 17:15, 51:13, 74:20, 82:15
confidentiality [1] - 4:9
confidentially [1] - 80:1
confirm [2] - 5:4, 43:2

**confirmed** [1] - 38:17
**confirming** [1] - 17:2
**Congress** [2] - 31:24, 32:2
**Congress's** [1] - 32:24
**connect** [1] - 116:21
**consequence** [1] - 10:20
**consequences** [2] - 32:16, 44:21
**conservative** [3] - 24:6, 44:5, 48:9
**consider** [5] - 10:22, 47:22, 51:2, 113:9, 113:14, 113:18, 115:24, 116:11
**consideration** [1] - 88:4
**considerations** [1] - 88:10
**considered** [2] - 7:10, 7:16
**consistent** [5] - 16:4, 38:7, 41:15, 41:17, 48:17
**consisting** [1] - 41:2
**consolidate** [1] - 31:2
**consolidation** [4] - 30:5, 32:3, 32:22, 56:5
**constantly** [2] - 47:10, 106:3
**constitute** [2] - 40:5, 69:22
**constrains** [2] - 81:4, 81:10
**consumer** [1] - 65:19
**consumers** [4] - 21:12, 58:9, 58:13, 65:16
**consumption** [1] - 19:24
**contemplate** [1] - 6:19
**contemplating** [1] - 17:5
**contemporaneous** [1] - 28:22
**contest** [1] - 45:7
**context** [4] - 16:23, 36:2, 88:23, 111:9
**continue** [15] - 31:2, 54:8, 55:16, 58:4, 58:19, 64:16, 85:22, 85:23, 97:8, 100:6, 100:9, 117:24, 118:5, 118:9, 118:10
**continues** [1] - 23:22
**continuing** [1] - 72:1
**continuously** [2] - 89:17, 89:22

**continuum** [1] - 66:15
**contract** [11] - 44:21, 103:11, 103:13, 106:22, 106:23, 107:18, 113:7, 116:17, 116:18, 116:19, 116:25
**contracts** [7] - 46:6, 98:24, 116:16, 116:17, 116:19, 116:20, 116:24
**contrary** [4] - 54:19, 74:14, 79:16, 80:6
**contrast** [2] - 25:18, 42:19
**contribute** [1] - 56:4
**control** [7] - 30:25, 53:20, 55:1, 64:18, 75:12, 85:11
**controls** [1] - 30:16
**controversial** [1] - 35:8
**convenience** [1] - 25:8
**convenient** [1] - 6:10
**conversation** [2] - 8:18, 116:9
**convince** [1] - 25:24
**Conway** [1] - 101:9
**coordinate** [2] - 49:2, 85:9
**coordinated** [2] - 49:22, 85:3
**coordination** [7] - 48:23, 50:5, 50:9, 56:13, 56:16, 85:6
**copies** [3] - 110:15, 110:23, 111:1
**Copperweld** [1] - 55:12
**copy** [3] - 18:8, 107:2, 107:9
**copyright** [1] - 99:3
**core** [5] - 65:14, 72:19, 86:25, 100:13, 100:18
**corner** [4] - 21:14, 61:1, 61:14, 61:16
**corp** [1] - 79:17
**corporate** [8] - 21:5, 51:8, 93:3, 93:12, 93:21, 94:1, 94:2, 94:3
**correct** [3] - 17:8, 86:5, 86:9
**correcting** [2] - 63:3, 63:6
**correlate** [1] - 56:21
**correlation** [3] - 57:3, 69:19, 70:2

**corroborate** [2] - 28:23, 36:13
**cost** [1] - 47:15
**cost-effectively** [1] - 47:15
**Costco** [1] - 105:16
**costs** [1] - 54:23
**counsel** [4] - 4:5, 4:8, 4:17, 18:10
**counter** [1] - 65:4
**counteract** [1] - 83:14
**counterfactual** [1] - 61:17
**country** [2] - 19:6, 53:6
**couple** [6] - 9:18, 9:20, 64:12, 79:23, 82:23, 120:16
**course** [12] - 25:16, 63:7, 65:10, 78:18, 87:20, 87:23, 90:12, 97:19, 101:3, 102:9, 105:25, 106:12
**COURT** [85] - 4:14, 4:20, 4:24, 5:13, 6:17, 6:21, 7:2, 10:5, 10:11, 10:22, 11:14, 11:18, 11:20, 12:3, 12:11, 13:17, 13:19, 14:6, 14:8, 14:21, 15:19, 15:21, 16:13, 17:5, 17:11, 17:20, 17:25, 18:4, 18:11, 18:15, 26:10, 26:12, 29:23, 30:21, 34:17, 36:24, 37:2, 44:9, 44:12, 44:16, 56:11, 56:15, 56:19, 56:24, 57:6, 57:10, 57:12, 57:18, 70:7, 80:10, 80:12, 80:16, 86:3, 86:11, 92:13, 92:18, 92:20, 92:24, 93:10, 93:12, 93:16, 93:20, 93:24, 94:6, 94:7, 94:12, 94:14, 94:17, 94:21, 94:23, 95:4, 95:7, 95:11, 95:13, 95:16, 98:6, 104:11, 107:5, 109:9, 117:2, 117:4, 117:17, 120:19, 121:3, 121:25
**court** [26] - 8:18, 15:15, 16:20, 16:24, 16:25, 17:6, 17:7, 17:10, 17:12, 17:13, 17:22, 30:20, 35:20, 39:21, 40:17, 40:22, 41:10, 41:11, 48:25,

49:23, 49:24, 50:4, 54:8, 67:15, 67:21
**Court** [33] - 18:17, 24:9, 24:10, 31:17, 32:9, 32:20, 32:25, 33:3, 38:23, 39:17, 40:5, 41:1, 41:6, 48:17, 50:22, 50:23, 51:2, 56:7, 62:21, 71:25, 72:16, 74:21, 78:20, 78:21, 82:24, 83:1, 87:13, 87:20, 87:23, 90:19, 93:2
**court's** [1] - 15:4
**Court's** [5] - 34:11, 55:12, 66:21, 92:22, 93:8
**courtroom** [1] - 93:1, 93:6, 93:13, 93:25, 94:3
**COURTROOM** [3] - 4:2, 26:14, 95:8
**courts** [16] - 13:3, 28:8, 32:2, 33:9, 33:13, 34:3, 34:11, 35:6, 38:22, 39:2, 39:23, 40:15, 50:21, 65:20, 66:14, 66:16
**cover** [4] - 27:1, 27:5, 116:18, 122:11
**covers** [5] - 105:7, 121:1, 121:4, 121:5
**cracked** [1] - 19:9
**craft** [1] - 27:14
**create** [11] - 7:6, 32:4, 32:15, 63:19, 72:5, 82:6, 82:7, 82:11, 91:12, 103:24
**created** [3] - 32:25, 36:16, 63:18
**creating** [2] - 100:14, 109:21
**creative** [9] - 19:13, 41:18, 88:16, 99:9, 99:10, 102:16, 102:18, 102:20
**creativity** [1] - 19:16
**credibility** [1] - 85:1
**credible** [2] - 77:12, 83:4
**crime** [1] - 101:11
**criteria** [1] - 68:1
**critical** [1] - 66:5
**cross** [1] - 9:22
**Crown** [3] - 30:18, 45:6, 96:11
**crude** [1] - 35:20
**Cs** [1] - 34:18
**culture** [1] - 88:8
**curl** [1] - 29:14

**current** [3] - 19:21, 54:20, 90:22
**customers** [10] - 40:11, 40:18, 40:19, 40:23, 40:24, 41:13, 105:13, 106:5, 118:9
**cutoff** [1] - 41:6
**cutting** [1] - 6:19

## D

**D.C** [8] - 32:12, 33:12, 33:19, 34:6, 34:15, 72:16, 101:11, 101:21
**Dan** [1] - 4:17
**danger** [1] - 32:16
**Dangerous** [1] - 101:5
**Daniel** [3] - 4:15, 12:15, 57:13
**dare** [1] - 91:20
**dark** [3] - 24:25, 42:10, 42:12
**data** [18] - 7:9, 21:23, 21:24, 38:8, 42:25, 43:2, 46:2, 46:3, 46:9, 51:13, 52:16, 58:24, 60:13, 60:14, 62:18, 75:3, 79:9
**David** [1] - 101:16
**days** [1] - 113:13
**deal** [10] - 32:6, 51:15, 54:13, 75:17, 85:9, 109:20, 110:11, 110:12
**dealing** [3] - 59:13, 59:16, 67:13
**deals** [3] - 64:20, 68:20, 77:16
**debut** [1] - 69:2
**decade** [1] - 53:2
**decades** [3] - 19:10, 52:4, 83:17
**deceased** [1] - 88:22
**decide** [6] - 10:23, 49:12, 75:18, 99:18, 109:23, 111:15
**decided** [1] - 69:6
**decides** [1] - 75:25
**deciding** [1] - 110:9
**decision** [5] - 27:25, 41:17, 55:13, 87:6, 110:9
**dedicated** [1] - 67:3
**deep** [1] - 88:13
**deeply** [1] - 19:16
**defeat** [1] - 49:25
**defendant** [2] - 72:19, 94:2
**defendant's** [1] -

34:12
**defendants** [41] -
5:20, 7:5, 7:12, 8:17,
9:3, 12:5, 15:13,
15:14, 17:1, 21:4,
21:10, 23:17, 25:12,
27:4, 27:17, 28:17,
28:25, 31:23, 33:25,
34:3, 34:6, 34:10,
34:20, 34:21, 35:9,
35:17, 38:9, 38:19,
38:25, 39:12, 41:9,
46:12, 49:24, 50:3,
50:16, 51:24, 53:9,
53:20, 54:10, 55:15,
57:14
**defendants'** [16] -
18:19, 19:24, 24:5,
28:21, 32:20, 34:24,
35:2, 38:18, 42:25,
47:24, 51:6, 52:11,
52:13, 52:16, 52:24,
57:7
**defense** [5] - 16:7,
28:17, 50:16, 50:19,
50:23
**define** [4] - 38:21,
38:22, 40:11, 70:12
**defined** [3] - 31:9,
39:24, 40:23
**defines** [1] - 66:2
**defining** [5] - 40:7,
66:5, 67:22, 71:15,
113:1
**definitely** [1] - 6:12
**definition** [12] - 31:12,
33:21, 40:13, 65:9,
65:13, 67:10, 67:12,
70:16, 70:19, 71:1,
71:3, 91:8
**degree** [2] - 28:12,
46:5
**Del** [1] - 30:19
**Delacorte** [1] - 30:19
**delayed** [1] - 121:17
**deliver** [1] - 119:11
**delivered** [1] - 99:5
**delivering** [1] - 99:8
**demand** [1] - 21:12
**demands** [3] - 55:18,
63:9, 99:13
**demonstrable** [1] -
32:18
**demonstrate** [1] -
49:24
**demonstrates** [1] -
73:9
**demonstration** [1] -
83:13
**dense** [1] - 63:22

Department [1] - 28:9
**deposition** [16] -
12:20, 12:21, 13:10,
14:1, 14:20, 14:25,
15:1, 16:4, 16:6,
16:17, 17:4, 27:24,
43:5, 51:8, 51:9
**depositions** [2] -
13:13, 15:5
**depressed** [1] - 64:11
**deprive** [1] - 91:25
**DEPUTY** [3] - 4:2,
26:14, 95:8
**descending** [1] -
42:12
**describe** [8] - 28:1,
96:5, 96:25, 97:16,
97:17, 98:15, 103:7,
112:7
**described** [3] - 90:3,
108:18, 112:6
**describes** [1] - 36:20
**describing** [1] - 108:4
**descriptive** [1] -
102:18
**deserve** [1] - 21:1
**design** [3] - 21:19,
103:10, 104:3
**designate** [1] - 13:10
**designed** [2] - 19:19,
26:4
**designers** [3] - 97:24,
103:24
**desires** [1] - 53:25
**despite** [1] - 74:2
**destroy** [1] - 85:1
**detail** [2] - 61:19, 82:1
**details** [1] - 6:23
**determine** [7] - 27:19,
32:7, 32:10, 33:14,
68:2, 81:5, 83:4
**determined** [2] - 8:3,
8:11
**develop** [2] - 67:24,
82:24
**developed** [1] - 45:19
**developing** [2] - 38:6,
98:10
**devoting** [1] - 109:20
**dials** [1] - 63:12
**differed** [1] - 10:4
**difference** [4] - 9:10,
14:8, 16:5, 70:22
**different** [26] - 13:3,
30:14, 30:15, 31:5,
32:6, 36:2, 42:2,
42:5, 43:16, 43:17,
52:17, 54:1, 55:3,
64:15, 66:16, 67:17,
70:20, 74:1, 77:18,

90:20, 107:3, 107:8,
114:11, 116:19
**differentiating** [1] -
71:19
**difficult** [2] - 52:7,
69:25
**difficulties** [1] - 32:8
**difficulty** [1] - 32:23
**digital** [1] - 105:25
**diligence** [3] - 36:17,
89:2, 89:3
**diminishes** [1] - 63:14
**Direct** [1] - 3:9
**DIRECT** [1] - 95:18
**direct** [2] - 9:22, 29:6
**direction** [2] - 31:3,
98:17
**directly** [3] - 100:7,
100:11, 100:22
**directors** [1] - 67:18
**disagreement** [1] -
39:6
**discounted** [1] - 106:9
**discourse** [3] - 19:18,
19:19, 21:13
**discuss** [4] - 5:11,
28:12, 113:14
**discussed** [2] - 35:18,
49:21
**discussing** [2] -
79:18, 100:3
**discussion** [3] - 6:23,
10:6, 82:17
**discussions** [1] -
51:14
**dismiss** [1] - 7:13
**Disney** [2] - 71:12,
74:11
**disparage** [1] - 24:5
**displayed** [3] - 74:21,
80:1, 106:8
**displaying** [1] - 13:15
**disposes** [1] - 7:14
**dispositive** [4] - 7:11,
7:13, 7:16, 9:1
**dispute** [8] - 7:22,
7:24, 38:25, 72:20,
78:16, 89:14, 89:16
**disregarding** [1] -
71:25
**disregards** [1] - 9:4
**disrupted** [1] - 84:14
**disrupts** [1] - 11:2
**distant** [1] - 73:19
**distinct** [2] - 65:11,
66:12
**distinctive** [1] - 66:18,
67:20
**distinguished** [1] -
41:22

distinguishes [1] -
67:7
**distribute** [2] - 67:24,
94:16
**distributed** [1] - 103:2
**distribution** [9] - 67:5,
103:2, 119:16,
119:24, 119:25,
120:1, 120:4, 120:8,
120:12
**district** [2] - 40:10,
48:25
**diversion** [3] - 46:2,
46:4, 46:9
**diversion-ratio** [1] -
46:2
**division** [4] - 71:15,
96:11, 97:20, 98:18
**divisions** [4] - 67:3,
98:21, 98:22, 99:16
**DNA** [1] - 83:20
**doable** [1] - 69:25
**document** [4] - 36:14,
36:16, 88:22, 89:7
**documentary** [1] -
36:8
**documentation** [1] -
38:20
**documents** [9] - 26:2,
28:22, 36:13, 45:5,
45:8, 79:2, 79:11,
79:16
**Dog** [2] - 102:25,
103:1
**Dohle** [7] - 12:21,
13:8, 36:1, 36:3,
84:13, 93:4, 93:18
**Dohle's** [1] - 13:10
**DOJ** [1] - 55:21
**dollar** [1] - 62:23
**dollar-harm** [1] -
62:23
**dollars** [9] - 24:7,
24:16, 79:23, 84:3,
84:4, 91:24, 108:5,
108:7, 116:10
**Dolly** [1] - 68:13
**dominance** [3] -
18:19, 26:23, 40:1
**dominant** [4] - 26:3,
26:5, 49:11, 50:12
**dominate** [2] - 36:10,
43:13
**dominated** [1] - 25:20
**dominates** [2] - 37:5,
37:13
**done** [9] - 5:6, 9:7,
40:14, 44:18, 51:14,
54:19, 69:24, 90:20,
109:7

Donna [1] - 101:14
**door** [1] - 65:7
**double** [1] - 86:10
**double-check** [1] -
86:10
**doubt** [1] - 85:25
**down** [20] - 30:7,
35:25, 36:25, 44:10,
44:13, 51:11, 58:4,
61:1, 61:14, 63:17,
68:4, 76:15, 76:23,
78:9, 80:7, 90:16,
94:13, 98:6, 110:5,
110:16
**downloadable** [1] -
107:8
**downstream** [12] -
56:21, 58:2, 58:16,
58:20, 59:2, 59:4,
59:7, 59:9, 59:15,
59:21, 60:12, 70:5
**downward** [1] - 82:6
**dozen** [2] - 96:13,
97:10
**dozens** [2] - 46:13,
101:8
**dr** [1] - 25:3
**Dr** [28] - 6:16, 7:4,
7:21, 8:13, 10:7,
10:15, 10:17, 11:1,
19:23, 28:7, 28:18,
28:20, 33:18, 33:23,
42:7, 43:16, 48:6,
52:15, 58:24, 60:14,
60:20, 62:13, 62:23,
74:12, 80:20, 81:15,
82:2, 85:4
**drafted** [1] - 36:14
**draw** [3] - 43:11, 44:3,
68:24
**drawing** [4] - 39:16,
39:19, 40:13, 105:14
**drawn** [4] - 39:15,
39:20, 39:21, 71:21
**draws** [1] - 38:13
**dream** [2] - 20:10,
69:12
**dreams** [1] - 69:14
**drive** [3] - 54:5, 64:11,
78:7
**driving** [2] - 54:22,
76:14
**drop** [1] - 22:21
**dropped** [2] - 23:7,
111:25
**drops** [1] - 23:16
**dubiousness** [1] -
62:9
**due** [4] - 36:17, 89:2,
89:3, 90:12

**during** [16] - 8:8, 12:18, 12:22, 13:4, 13:12, 13:16, 14:19, 18:24, 22:2, 23:24, 24:19, 27:1, 36:17, 43:5, 89:1, 122:3
**dynamics** [2] - 82:5, 82:7

# E

**e-book** [2] - 50:7, 107:7
**e-books** [1] - 85:13
**E]ven** [1] - 73:13
**early** [2] - 27:10, 48:8
**earn** [14] - 20:21, 20:22, 29:25, 108:9, 108:12, 108:14, 108:19, 108:22, 108:24, 109:4, 109:10, 110:14, 111:4
**earned** [3] - 107:20, 108:8, 119:4
**earning** [6] - 55:18, 108:2, 108:3, 108:4, 111:2
**earnings** [5] - 107:17, 107:21, 108:6, 110:1, 110:4
**ease** [1] - 76:8
**easily** [2] - 33:18, 73:8
**easy** [4] - 50:20, 64:10, 73:22, 115:13
**economic** [7] - 19:18, 19:23, 28:16, 38:17, 39:2, 48:8, 55:8
**economics** [3] - 28:10, 38:12, 42:3
**economist** [3] - 24:7, 24:19, 28:7
**economists** [1] - 35:16
**edit** [2] - 100:7, 100:9
**edited** [1] - 101:3
**editing** [4] - 97:5, 101:4, 103:10, 103:13
**editor** [22] - 69:8, 75:18, 75:20, 84:1, 84:2, 84:4, 96:9, 96:10, 96:12, 97:1, 97:2, 97:7, 97:8, 100:10, 101:6, 101:10, 101:12, 103:13
**editor's** [1] - 69:12
**editorial** [7] - 21:18, 25:21, 30:15, 37:11,

37:18, 88:16, 99:2
**editors** [17] - 27:17, 67:1, 67:3, 70:21, 75:21, 75:23, 77:7, 81:22, 83:21, 84:18, 91:1, 97:9, 97:10, 97:23, 99:21, 103:14
**educated** [1] - 109:7
**educational** [1] - 60:16
**Edwards** [1] - 122:10
**effect** [7] - 32:1, 34:8, 35:16, 57:21, 92:25, 115:2, 116:6
**effective** [1] - 113:4
**effectively** [6] - 47:15, 98:3, 98:8, 100:16, 103:18, 103:19
**effectiveness** [1] - 98:5
**effects** [12] - 24:20, 34:24, 35:8, 39:18, 40:16, 49:22, 54:15, 73:1, 73:10, 82:4, 82:9, 85:3
**efficiencies** [34] - 5:19, 6:14, 7:5, 7:20, 7:22, 8:4, 8:13, 9:13, 9:21, 10:1, 10:7, 10:8, 11:7, 11:9, 28:17, 50:16, 50:19, 50:23, 50:25, 51:3, 51:4, 51:9, 51:13, 51:18, 63:13, 82:2, 82:3, 82:11, 82:14, 82:19, 83:11, 83:14, 87:11
**efficiency** [3] - 10:16, 10:19, 51:6
**efficiency-related** [1] - 10:19
**efficient** [1] - 8:15
**efficiently** [1] - 8:20
**effort** [1] - 54:18
**efforts** [1] - 87:17
**eight** [1] - 65:2
**eight-figure** [1] - 65:2
**either** [7] - 6:7, 13:10, 29:5, 44:6, 49:3, 69:24, 75:3
**electronically** [1] - 118:24
**elements** [1] - 28:24
**elicit** [1] - 25:12
**eliminating** [3] - 62:1, 73:23, 87:18
**elimination** [1] - 87:21
**elite** [2] - 20:5, 71:10
**elsewhere** [2] - 113:10, 113:18

**email** [3] - 5:21, 9:17, 89:7
**emails** [1] - 78:24
**emerged** [1] - 77:2
**emphasis** [1] - 88:19
**emphasizing** [1] - 41:3
**employ** [2] - 103:14, 103:24
**employee** [2] - 20:14, 88:20
**employees** [3] - 40:19, 40:20, 105:5
**employs** [1] - 98:13
**enabled** [1] - 67:14
**end** [11] - 23:6, 39:20, 41:6, 47:20, 52:7, 65:18, 69:19, 71:18, 115:4, 115:18, 116:2
**ends** [1] - 51:6
**enforce** [1] - 51:6
**enforcement** [1] - 33:9
**enhance** [1] - 58:2, 65:19
**enhanced** [1] - 72:1
**enjoin** [2] - 41:13, 56:9
**enjoined** [2] - 32:22, 34:13
**enlarges** [1] - 100:12
**ensure** [2] - 31:3, 105:2
**ensures** [1] - 31:5
**entails** [1] - 97:18
**entered** [2] - 52:12, 53:1
**entertainments** [1] - 104:16
**enthusiasm** [1] - 116:4
**enthusiastic** [1] - 54:1
**entire** [2] - 63:2, 72:12
**entirely** [4] - 16:18, 16:19, 76:10, 109:16
**entities** [2] - 76:13, 76:14
**entitled** [1] - 21:1
**entity** [1] - 89:20
**entrance** [3] - 77:1, 79:20, 91:16
**entrants** [1] - 91:9
**entry** [6] - 52:5, 52:12, 52:13, 52:17, 52:24, 79:21
**environment** [1] - 42:5
**equal** [1] - 107:20
**Ernest** [1] - 101:5
**err** [1] - 17:21
**error** [2] - 63:4, 63:10
**especially** [7] - 14:18,

37:8, 37:14, 38:4, 38:14, 41:16, 65:7
**essential** [2] - 20:13, 20:14
**essentially** [4] - 20:24, 30:13, 35:12, 40:3
**establish** [1] - 35:12
**established** [1] - 47:2
**estate** [2] - 53:21, 53:25
**estimate** [2] - 24:6, 28:14
**estimates** [2] - 83:8, 83:10
**et** [2] - 4:4, 90:11
**evaluate** [3] - 39:17, 82:7, 83:3
**evening** [1] - 12:17
**event** [2] - 7:19, 90:13
**events** [3] - 32:7, 59:25, 60:1
**evidence** [77] - 5:19, 6:6, 6:7, 7:7, 7:11, 7:20, 7:22, 7:23, 7:25, 8:4, 8:6, 8:8, 8:10, 8:13, 8:14, 8:21, 8:24, 10:24, 11:6, 12:1, 13:2, 13:4, 13:6, 13:8, 13:21, 14:10, 14:11, 14:15, 14:18, 15:12, 16:2, 16:9, 18:24, 19:15, 20:23, 21:7, 24:10, 27:7, 31:1, 34:7, 36:8, 38:13, 42:4, 47:21, 48:17, 48:22, 51:18, 53:22, 55:23, 56:6, 57:22, 57:24, 60:1, 63:24, 65:23, 66:22, 72:24, 73:5, 73:6, 73:7, 75:11, 76:21, 77:14, 77:22, 77:25, 80:8, 82:25, 83:3, 83:4, 85:4, 85:25, 86:16, 87:6, 89:21, 90:6, 91:16, 92:2
**evidenced** [1] - 25:17
**evidences** [1] - 44:24
**ex** [1] - 67:16
**ex-antiperspective** [1] - 67:16
**exactly** [3] - 14:13, 74:1, 76:12
**examination** [2] - 55:22, 92:17
**EXAMINATION** [1] - 95:18
**Examination** [1] - 3:9
**examine** [2] - 6:13,

9:16
**examined** [1] - 58:8
**example** [5] - 21:24, 35:19, 47:22, 70:16, 79:11
**examples** [10] - 23:24, 45:4, 46:1, 46:16, 52:12, 52:21, 78:19, 78:20, 91:3
**exceed** [2] - 33:24
**excellent** [1] - 88:11
**except** [3] - 52:21, 76:12, 96:19
**exception** [2] - 47:1, 52:4
**excitement** [1] - 118:3
**exciting** [1] - 104:2
**excluded** [2] - 40:20, 41:3
**exclusion** [1] - 92:23
**excuse** [6] - 74:16, 91:1, 101:1, 102:11, 112:8, 117:25
**excused** [1] - 122:6
**executive** [5] - 43:6, 95:25, 96:12, 97:1, 97:7
**executives** [6] - 36:19, 50:20, 70:21, 94:2, 105:5, 106:2
**exercise** [1] - 19:5
**exercises** [1] - 89:4
**exhibit** [3] - 13:14, 15:11, 82:16
**exhibition** [2] - 67:11, 67:20
**exigencies** [1] - 55:17
**exist** [2] - 66:5, 66:24
**existed** [1] - 59:17
**existence** [1] - 46:15
**existing** [5] - 52:9, 75:17, 76:19, 77:4, 77:6
**exists** [5] - 38:24, 39:16, 53:18, 58:2, 104:22
**expand** [4] - 28:4, 53:9, 65:19, 77:9
**expanded** [1] - 32:11
**expanding** [1] - 51:25
**expansion** [6] - 28:13, 50:17, 53:17, 76:8, 77:3, 77:12
**expect** [3] - 18:13, 25:12, 46:12
**expectation** [1] - 48:18
**expected** [4] - 31:12, 49:14, 53:13, 62:10
**expects** [1] - 110:20

expense [1] - 119:18
expensive [2] - 43:8, 121:18
experience [10] - 27:10, 48:1, 100:23, 102:3, 102:6, 109:12, 110:5, 110:16, 113:16, 114:17
experienced [1] - 77:6
expert [15] - 7:4, 7:7, 10:7, 19:23, 28:7, 28:8, 28:21, 42:25, 52:11, 52:13, 52:16, 52:24, 60:2, 61:15, 82:14
experts [1] - 39:2
explain [24] - 9:17, 20:21, 27:11, 27:18, 28:10, 33:18, 36:1, 55:9, 90:15, 90:21, 90:25, 91:2, 103:5, 103:9, 106:20, 108:2, 110:11, 113:5, 115:7, 117:19, 118:18, 119:14, 120:21, 121:8
explained [2] - 51:10, 87:3
explaining [2] - 9:7, 52:6
explanation [1] - 24:21
explicit [2] - 48:23, 114:22
explicitly [1] - 115:1
exploit [2] - 84:11, 107:13
expose [1] - 63:24
expressed [1] - 50:24
expressing [1] - 54:15
extensive [1] - 82:18
extent [5] - 15:12, 15:24, 46:3, 52:23, 73:15
extracting [1] - 112:18
extraordinarily [3] - 100:11, 110:8, 115:11
extraordinary [2] - 49:5, 49:6
extremely [6] - 104:8, 104:12, 110:24, 119:4, 119:9
eye [1] - 69:12
eyes [1] - 27:13

F

fabrication [1] - 79:24
face [4] - 28:14, 28:15, 53:17, 103:25
facilities [2] - 67:6, 77:14
facility [1] - 79:24
facing [1] - 60:10
fact [12] - 7:25, 13:8, 19:9, 31:17, 38:17, 38:23, 52:9, 54:9, 54:11, 63:11, 89:24, 91:11
factor [7] - 53:19, 54:7, 67:21, 71:19, 75:8, 76:5, 110:10
factors [7] - 27:4, 50:17, 51:20, 66:21, 113:20, 113:24, 115:22
facts [4] - 7:8, 24:5, 67:18, 74:14
failed [1] - 87:25
fails [1] - 66:9
fair [3] - 27:12, 76:3, 78:3
fall [1] - 69:4
famed [1] - 27:9
far [9] - 6:3, 41:8, 43:17, 44:23, 73:19, 106:17, 121:15
farm [6] - 37:24, 38:1, 38:6, 90:4, 90:8, 105:23
fast [2] - 30:20, 64:13
fast-food [1] - 64:13
favor [1] - 19:24
favorable [1] - 44:20
favors [1] - 77:14
February [1] - 22:11
Federal [1] - 28:9
fee [2] - 110:13, 119:22
feeds [1] - 92:7
Feinstein [1] - 101:21
fell [1] - 103:20
fellow [1] - 55:9
fences [1] - 90:5
ferociously [1] - 89:22
fervor [1] - 98:5
few [16] - 6:22, 23:10, 23:13, 29:3, 49:2, 55:20, 67:9, 80:1, 80:19, 86:15, 100:7, 101:2, 102:2, 103:5, 114:2
fewer [6] - 35:15, 41:3, 54:5, 58:12, 81:18, 121:15

fiction [6] - 19:17, 20:9, 29:13, 101:7, 101:13, 101:14
field [1] - 28:3
fierce [2] - 37:14, 58:2
fiercely [1] - 21:17
fight [1] - 104:19
Figure [1] - 74:11
figure [6] - 12:8, 62:19, 65:2, 69:22, 111:2, 111:6
figures [2] - 20:8, 63:10, 68:13
filed [4] - 7:3, 9:4, 9:8, 59:22
filling [1] - 100:18
film [4] - 67:24, 86:22, 86:25, 87:4
filmed [1] - 67:18
films [2] - 41:21, 67:12, 67:13, 67:16, 67:17
final [6] - 30:3, 61:22, 62:7, 78:16, 78:18, 78:23
finally [5] - 20:11, 21:3, 27:3, 28:22, 82:18
finance [1] - 20:7
financial [5] - 82:20, 109:12, 118:6, 118:15
financially [1] - 37:25
fine [6] - 5:13, 5:15, 17:2, 93:16, 94:21, 121:25
firm [6] - 19:4, 33:4, 49:11, 62:5, 65:4, 87:7
firms [5] - 19:4, 49:2, 49:12, 58:1, 81:17
first [33] - 8:11, 8:24, 9:2, 9:5, 9:7, 9:19, 14:24, 25:3, 27:8, 34:21, 35:16, 38:22, 45:5, 56:12, 58:8, 67:20, 68:17, 71:16, 73:12, 87:25, 92:14, 92:15, 92:22, 96:7, 97:1, 101:4, 101:15, 103:5, 103:13, 112:17, 113:9, 114:19, 119:13
first-class [2] - 67:20, 71:16
FISHBEIN [2] - 4:21, 86:12
Fishbein [4] - 4:21, 78:25, 86:13, 92:13
Fishbein....................

............ [1] - 3:5
fit [2] - 80:23, 81:15
fits [2] - 80:21
five [11] - 10:3, 25:7, 65:6, 71:3, 74:25, 79:3, 79:5, 95:1, 106:15, 106:19
Five [1] - 36:23
Five' [1] - 37:4
five-minute [1] - 95:1
five-to-four [1] - 74:25
flat [1] - 110:13
flaws [1] - 63:6
fleets [2] - 41:2, 41:3
Fletcher [3] - 47:23, 54:3
flimsy [1] - 54:11
flop [1] - 69:16
flourish [1] - 85:23
flow [1] - 24:15
focus [10] - 30:15, 31:11, 38:22, 55:2, 61:21, 62:11, 65:16, 71:2, 86:24, 87:1
focused [1] - 38:13
focusing [4] - 41:15, 61:1, 69:1, 106:20
follow [5] - 49:12, 49:19, 50:10, 85:9, 86:4
follow-the-leader [1] - 50:10
follow-up [1] - 86:4
followed [4] - 5:6, 22:13, 37:5, 37:7
following [4] - 6:4, 11:23, 45:18, 50:14
follows [2] - 40:8, 49:5
food [1] - 64:13
Foods [1] - 67:8
foolish [1] - 76:23
force [8] - 25:22, 28:5, 77:3, 98:5, 98:23, 98:25, 105:5, 105:19
forces [1] - 23:19
forged [1] - 41:23
forget [2] - 8:17, 90:4
form [4] - 111:17, 112:9, 113:10, 120:23
format [2] - 107:3, 117:11
formats [5] - 75:9, 102:18, 107:19, 108:7, 112:5, 117:25
former [3] - 36:14, 45:25, 88:21
forth [2] - 23:3
forthcoming [1] - 101:19

forward [3] - 11:9, 90:6, 97:13
Foster [1] - 101:16
fostering [1] - 84:7
foundation [4] - 110:9, 118:7, 118:15, 119:5
founded [1] - 102:14
four [6] - 45:4, 52:11, 52:21, 74:25, 89:11, 102:11
fourth [1] - 37:7
Frackman [1] - 9:3
fraction [2] - 25:10, 46:14
framework [2] - 40:15, 72:23
France [1] - 98:19
frankly [3] - 24:15, 35:3, 35:23
free [2] - 14:2, 94:12
French [1] - 98:18
frequently [2] - 45:2, 62:11
friendly [1] - 88:15
front [1] - 65:21
frontlist [4] - 118:1, 119:9, 119:10
Frustrating [1] - 45:10
fulfill [1] - 32:24
fulfillment [4] - 98:25, 119:16, 119:20, 120:5
fully [3] - 23:19, 24:13, 24:19
function [1] - 104:9
fundamentally [1] - 65:24
funds [1] - 20:13
future [11] - 32:7, 32:8, 32:16, 32:24, 83:9, 91:11, 91:14, 99:11, 99:12, 107:17, 107:21

G

Gallery [1] - 30:23
gallery [1] - 26:8
game [2] - 20:24, 22:20
games [1] - 105:10
gathering [1] - 55:23
gears [1] - 119:12
general [1] - 106:16
generally [3] - 49:15, 49:16, 93:24
generated [1] - 22:9
generations [2] - 85:2, 85:18

**generous** [1] - 31:13
**genres** [1] - 55:3
**gentleman** [1] - 12:5
**George** [2] - 101:10
**giant** [1] - 73:18
**gigantic** [2] - 104:18
**given** [5] - 16:10,
55:12, 55:22, 62:11,
94:1
**glasses** [1] - 102:19
**gleam** [1] - 69:11
**global** [4] - 41:1,
86:21, 98:18
**Global** [1] - 86:21
**Glusman** [1] - 12:5
**goal** [2] - 56:1, 106:3
**Goldfinch** [1] - 101:15
**goods** [1] - 65:16
**goodwill** [2] - 55:16,
55:17
**Google** [1] - 106:1
**government** [57] - 7:3,
7:19, 10:21, 11:21,
12:18, 12:24, 13:9,
14:22, 16:2, 36:6,
47:21, 49:18, 57:20,
57:23, 58:8, 58:18,
59:20, 59:24, 60:7,
60:22, 60:24, 61:11,
62:10, 63:18, 64:5,
65:8, 65:10, 65:21,
65:25, 67:25, 68:4,
68:21, 68:24, 71:3,
71:18, 72:2, 72:14,
72:15, 72:18, 73:3,
74:11, 75:2, 76:14,
77:22, 78:19, 78:24,
82:5, 87:13, 88:18,
88:22, 89:17, 90:5,
91:18, 91:22, 92:8,
92:10, 92:14
**government's** [24] -
8:2, 8:12, 9:24,
15:23, 18:5, 28:6,
35:14, 35:18, 35:24,
58:7, 63:24, 64:1,
65:23, 66:6, 66:9,
71:2, 74:18, 75:7,
76:2, 78:8, 80:7,
80:19, 82:13, 83:15
**grab** [1] - 76:25
**grabbing** [1] - 94:22
**Grade** [1] - 35:20
**grand** [1] - 62:19
**grant** [2] - 8:11,
106:23
**grants** [1] - 98:4
**graph** [1] - 60:4
**gratifying** [2] - 100:11,
100:18

**great** [7] - 4:14, 87:3,
94:17, 101:10,
101:11, 109:20,
115:13
**greater** [4] - 24:24,
31:14, 50:12, 65:15
**green** [4] - 25:1,
42:13, 43:21, 43:24
**Grisham** [1] - 68:12
**groom** [1] - 90:9
**grossing** [2] - 41:21,
67:11
**grossly** [1] - 72:20
**group** [8] - 20:6,
26:25, 98:2, 98:23,
98:24, 99:2, 99:4,
100:20
**Group** [6] - 96:4,
96:24, 98:17,
102:21, 103:3,
106:18
**grouped** [1] - 42:11
**groups** [4] - 30:14,
82:21, 98:22, 99:17
**grow** [4] - 28:4, 46:20,
51:22, 52:10
**guarantee** [2] - 72:17,
107:1
**guaranteed** [1] - 29:7
**guess** [4] - 9:2, 26:8,
70:1, 109:7
**guessing** [1] - 102:11
**guidance** [1] - 116:15
**guidelines** [1] - 76:16
**guiding** [1] - 13:5

# H

**H&R** [1] - 34:14
**Hachette** [53] - 22:13,
22:19, 23:7, 23:16,
25:19, 27:23, 37:6,
74:7, 78:2, 82:12,
87:17, 89:18, 89:23,
92:3, 92:16, 96:4,
96:6, 96:16, 96:19,
96:21, 96:23, 98:17,
98:18, 99:14,
102:21, 102:22,
103:3, 106:18,
108:9, 108:14,
109:3, 109:13,
110:20, 113:19,
113:21, 113:23,
113:25, 115:2,
115:21, 115:22,
116:7, 116:17,
118:16, 118:20,
120:1, 120:3, 120:7,
120:10, 120:12,

120:13, 121:9,
121:20
**Hachette's** [5] - 22:25,
23:1, 108:9, 108:14,
119:13
**Hacker** [1] - 4:18
**half** [15] - 9:23, 19:4,
25:5, 33:8, 60:18,
61:8, 70:5, 81:11,
108:11, 108:22,
108:24, 109:8,
109:9, 109:10
**hammer** [2] - 28:18,
82:14
**hand** [3] - 92:7, 95:8,
95:15
**handful** [1] - 10:19
**handle** [3] - 4:9, 4:10,
4:12
**handled** [1] - 48:3
**handling** [1] - 5:2
**happily** [1] - 92:4
**happy** [2] - 78:10,
121:24
**hard** [11] - 18:8, 24:13,
24:18, 50:21, 54:10,
55:23, 82:23, 99:10,
104:19, 121:5,
121:17
**hard-working** [1] -
99:10
**hardcore** [2] - 82:22,
83:9
**hardcover** [3] - 107:4,
107:5, 121:5
**hardens** [1] - 26:23
**harder** [2] - 53:14,
54:5
**hardly** [1] - 52:5
**Hare** [1] - 4:11
**harm** [47] - 24:7, 27:3,
28:15, 31:15, 33:3,
35:11, 39:7, 39:22,
41:6, 41:12, 41:24,
44:5, 44:7, 45:20,
46:16, 47:19, 47:22,
48:7, 48:9, 51:19,
53:23, 58:9, 58:10,
58:13, 59:20, 60:21,
60:25, 61:13, 61:14,
61:18, 62:4, 62:23,
63:4, 63:7, 63:11,
63:14, 63:19, 64:4,
64:8, 72:3, 72:6,
73:6, 73:16, 77:23,
81:19, 83:13, 83:15
**harmed** [6] - 31:8,
35:13, 40:8, 40:12,
40:21, 68:17
**harmful** [1] - 54:15

**harming** [1] - 19:13
**Harmony** [1] - 96:10
**Harper** [2] - 37:5,
87:16
**HarperCollins** [12] -
22:14, 25:19, 43:6,
53:12, 74:6, 79:18,
79:25, 82:12, 89:18,
89:21, 92:2, 106:17
**Hay** [1] - 71:11
**hazard** [1] - 70:1
**head** [14] - 44:19,
44:24, 48:18, 48:21,
54:22, 82:22,
108:23, 109:1, 111:7
**head-to-head** [4] -
44:19, 44:24, 48:18,
48:21
**headlines** [1] - 104:4
**health** [1] - 40:18
**hear** [64] - 7:1, 8:3,
8:8, 8:12, 8:21, 18:5,
19:22, 22:2, 23:24,
24:10, 26:11, 26:18,
27:6, 27:7, 27:8,
27:16, 27:21, 27:23,
28:6, 28:18, 28:20,
29:22, 29:24, 30:25,
36:7, 42:24, 43:1,
43:4, 43:11, 44:24,
46:19, 48:21, 52:5,
52:25, 53:5, 53:20,
54:5, 55:6, 55:9,
55:21, 57:7, 59:3,
61:17, 64:18, 66:3,
67:1, 68:19, 74:22,
77:2, 77:20, 77:24,
78:14, 80:8, 82:11,
82:18, 82:24, 85:11,
85:25, 88:1, 88:9,
88:20, 89:17, 91:16,
104:23
**heard** [9] - 7:17, 8:1,
8:5, 61:4, 65:25,
66:4, 70:15, 76:8,
83:21
**hearing** [6] - 8:1, 9:5,
10:6, 10:24, 11:1,
93:19
**heavily** [1] - 78:24
**Heinz** [3] - 32:12,
34:9, 34:15
**held** [3] - 96:5, 96:16,
96:25
**helm** [1] - 90:23
**help** [9] - 27:13, 39:16,
39:17, 48:12, 104:6,
105:2, 106:11,
116:14
**helping** [1] - 100:15

**Hemingway** [1] -
101:5
**Herfindahl** [1] - 33:12
**Herfindahl-**
**Hirschman** [1] -
33:12
**HHA** [1] - 72:9
**HHI** [7] - 33:12, 33:13,
33:24, 60:8, 72:11,
72:17, 76:10
**HHIs** [1] - 34:21
**Hi** [1] - 94:9
**high** [21] - 23:15,
36:13, 37:10, 37:17,
41:10, 42:6, 51:25,
68:19, 69:16, 69:20,
70:4, 72:5, 104:6,
108:16, 115:15,
116:2, 117:13,
119:9, 121:8
**high-advance** [1] -
70:4
**higher** [18] - 31:18,
32:14, 32:21, 38:19,
38:20, 42:21, 44:20,
52:8, 58:11, 58:12,
100:2, 108:13,
109:6, 110:6, 110:7,
110:17, 110:25,
111:6
**higher-advance** [4] -
100:2, 108:13,
109:6, 111:6
**highest** [10] - 23:4,
61:23, 81:1, 87:11,
91:20, 109:24,
111:22, 111:24,
112:1, 112:18
**highlight** [2] - 29:3,
63:23
**highly** [2] - 22:7,
79:18
**Hill** [16] - 19:23, 24:19,
25:3, 28:7, 28:20,
33:18, 33:23, 42:7,
43:16, 48:6, 60:14,
60:20, 62:13, 62:23,
80:20, 85:4
**Hill's** [5] - 52:15,
58:24, 74:12, 81:15,
82:2
**himself** [1] - 68:15
**hire** [3] - 110:11,
110:12, 110:17
**hired** [1] - 61:15
**hiring** [2] - 29:18,
98:10
**Hirschman** [2] -
33:11, 33:12
**history** [2] - 29:16,

69:15
**hit** [1] - 68:20
**Hold** [1] - 98:6
**hold** [7] - 5:13, 6:13, 32:24, 44:9, 102:8, 107:5, 121:3
**Holdings** [4] - 34:15, 34:17, 34:18, 49:1
**holds** [1] - 90:7
**home** [3] - 53:21, 85:21, 88:11
**homeless** [1] - 45:6
**Honor** [136] - 4:7, 4:15, 4:21, 5:8, 5:25, 6:4, 9:6, 9:9, 10:13, 11:4, 11:10, 11:17, 12:9, 12:15, 12:23, 12:25, 13:15, 13:22, 14:7, 14:13, 14:24, 15:20, 16:15, 18:7, 18:9, 18:24, 22:1, 25:12, 26:16, 27:16, 27:21, 29:2, 29:22, 29:24, 30:14, 30:25, 32:5, 32:19, 33:6, 34:9, 34:19, 35:13, 36:7, 42:4, 43:11, 44:22, 46:1, 46:12, 47:12, 48:21, 51:6, 51:25, 52:5, 52:14, 52:25, 53:5, 53:19, 55:21, 56:6, 56:18, 57:3, 57:11, 57:19, 57:24, 58:5, 58:15, 58:23, 59:6, 59:12, 60:13, 60:17, 60:23, 61:5, 61:21, 62:17, 63:3, 63:8, 63:21, 64:15, 64:25, 65:18, 66:17, 67:21, 68:4, 68:10, 69:10, 70:1, 70:22, 71:6, 71:23, 72:24, 73:8, 73:20, 74:22, 75:1, 75:15, 76:4, 76:9, 77:13, 77:24, 78:17, 79:10, 80:2, 80:4, 80:15, 80:20, 82:4, 82:18, 82:21, 83:2, 83:18, 83:23, 84:23, 85:7, 85:15, 85:20, 86:12, 86:14, 87:6, 88:1, 90:5, 90:18, 91:18, 92:6, 92:19, 93:7, 93:15, 93:17, 94:16, 94:19, 94:25, 95:1, 95:14, 120:17, 121:22
**Honor's** [2] - 6:4, 11:23

**honorific** [1] - 97:2
**hope** [2] - 26:8, 91:13
**hoped** [1] - 69:9
**hopefully** [1] - 11:24
**hopes** [1] - 114:18
**horizontal** [1] - 61:18
**horse** [1] - 22:23
**hospitals** [1] - 64:9
**hour** [5] - 9:23, 18:14, 44:15, 57:16, 122:4
**hours** [1] - 82:23
**house** [1] - 30:16
**House** [88] - 4:16, 18:20, 19:5, 19:21, 20:1, 21:16, 21:25, 22:7, 22:12, 22:18, 22:24, 23:3, 23:6, 23:10, 23:13, 23:19, 23:22, 24:25, 25:4, 25:18, 26:2, 26:4, 26:7, 26:17, 26:19, 26:22, 30:4, 30:6, 30:8, 30:12, 30:17, 36:10, 37:4, 37:13, 37:15, 42:12, 43:13, 43:22, 45:2, 45:7, 45:10, 45:14, 45:19, 45:23, 46:6, 46:7, 47:25, 48:9, 49:20, 50:6, 51:12, 53:8, 53:10, 53:15, 53:16, 54:12, 54:17, 54:22, 55:1, 55:4, 55:14, 55:25, 57:14, 58:1, 58:25, 59:3, 62:7, 71:11, 75:5, 76:22, 77:15, 78:6, 78:15, 78:21, 79:14, 83:18, 84:17, 85:15, 85:20, 86:19, 87:9, 88:2, 88:11, 90:17, 93:5, 106:17
**House's** [10] - 18:19, 23:15, 36:1, 40:1, 44:8, 44:16, 50:11, 54:23, 56:2, 60:17
**House/Simon** [1] - 91:19
**houses** [2] - 71:10, 74:5
**huge** [2] - 44:6
**hugely** [1] - 104:20
**Hughes** [1] - 72:16
**hundred** [14] - 33:22, 44:3, 48:11, 48:14, 62:22, 64:12, 71:21, 82:23, 84:3, 91:23, 102:12, 108:5, 108:7
**hypertechnical** [1] - 41:8

**hypothetical** [1] - 38:25

# I

**iconic** [1] - 85:21
**idea** [4] - 51:21, 64:7, 70:13, 84:22
**ideas** [2] - 19:15, 56:3
**identified** [2] - 50:17, 52:11
**identify** [4] - 65:21, 67:15, 67:22, 68:8
**ignore** [1] - 65:17
**illegal** [4] - 19:12, 31:20, 33:1, 44:2
**illegality** [6] - 34:2, 34:5, 34:22, 36:7, 47:20, 49:21
**illustrate** [1] - 40:13
**illustrated** [2] - 103:1, 104:4
**illustrative** [1] - 45:5
**illustrator** [1] - 29:19
**images** [1] - 104:5
**imagine** [3] - 48:13, 64:9, 115:5
**imagining** [2] - 68:5, 99:11
**immediate** [1] - 63:6
**impact** [1] - 48:16
**impeachment** [1] - 14:4
**implausible** [1] - 68:9
**implication** [2] - 36:13, 38:8
**implicit** [6] - 49:3, 49:10, 49:14, 49:15, 64:1, 114:21
**implicitly** [1] - 115:1
**implies** [1] - 54:12
**importance** [3] - 27:12, 40:1, 48:18
**important** [22] - 17:25, 24:21, 27:14, 43:21, 51:4, 62:22, 65:11, 65:12, 68:18, 76:9, 82:3, 85:21, 88:4, 88:7, 88:8, 93:18, 100:18, 104:8, 104:12, 104:21, 109:13, 109:18
**importantly** [5] - 25:22, 60:6, 63:8, 75:13, 79:19
**imprint** [6] - 45:7, 45:15, 97:20, 97:21, 97:22, 98:9
**imprints** [18] - 30:3, 30:9, 30:12, 30:13,

30:16, 30:17, 30:22, 30:24, 31:2, 31:3, 31:5, 54:22, 55:1, 67:3, 83:19, 84:12, 85:22, 96:23
**improper** [2] - 12:23, 13:15
**improve** [1] - 112:13
**improving** [1] - 32:23
**inaccurate** [2] - 34:8, 81:25
**inadmissible** [1] - 16:9
**inappropriate** [2] - 13:24, 13:25
**incentive** [4] - 50:12, 59:9, 76:18, 82:4
**incident** [1] - 44:23
**incipiency** [1] - 32:3
**include** [3] - 34:13, 40:4, 63:13
**included** [4] - 29:14, 30:17, 82:20, 106:10
**includes** [6] - 15:2, 20:8, 21:6, 65:21, 106:23, 107:1
**including** [10] - 9:19, 9:25, 12:24, 27:22, 60:1, 67:18, 71:10, 91:4, 106:25, 120:25
**income** [1] - 20:25
**increase** [6] - 33:16, 35:17, 49:7, 73:24, 80:12, 85:6
**increased** [2] - 48:22, 80:13
**increasing** [3] - 54:23, 77:10, 115:6
**incredible** [1] - 58:6
**incredibly** [1] - 63:16
**increment** [1] - 61:10
**increments** [1] - 23:4
**indeed** [1] - 19:11
**independence** [2] - 88:15, 88:17
**independent** [8] - 23:18, 51:5, 51:7, 83:17, 87:19, 87:21, 105:7, 113:1
**Index** [1] - 33:12
**indicate** [2] - 26:3, 46:4
**indicated** [4] - 41:12, 81:11, 92:15, 111:14
**indicia** [1] - 66:20
**individual** [3] - 22:1, 46:1, 74:19
**individually** [1] - 5:11
**individuals** [1] - 99:10
**indulgence** [1] - 26:16

**industry** [35] - 18:25, 19:8, 19:14, 19:15, 21:9, 22:10, 25:2, 25:21, 26:19, 27:1, 28:23, 32:3, 38:11, 38:16, 39:20, 41:18, 41:21, 48:14, 48:19, 49:25, 50:4, 50:14, 53:1, 56:13, 56:16, 64:22, 66:23, 67:11, 67:14, 68:2, 69:6, 77:19, 88:6, 103:6, 112:25
**industry-anticipated** [1] - 41:21
**inexpensive** [1] - 25:25
**inference** [1] - 89:5
**Infinite** [1] - 101:17
**inflate** [1] - 72:20
**inflated** [1] - 81:24
**influence** [2] - 19:6, 21:13
**information** [6] - 5:3, 16:19, 16:22, 42:24, 82:16, 85:11
**informed** [1] - 12:20
**infrastructure** [1] - 77:8
**initial** [3] - 20:23, 38:24, 47:24
**injury** [1] - 51:21
**ink** [1] - 121:1
**input** [1] - 36:19
**inputs** [1] - 81:25
**inquiry** [3] - 38:23, 51:5, 81:7
**inside** [3] - 19:9, 102:19, 104:2
**insignificance** [1] - 63:17
**insignificant** [1] - 74:13
**insist** [1] - 41:9
**insisted** [1] - 65:20
**install** [1] - 53:17
**installments** [1] - 20:16
**instance** [1] - 107:11
**instances** [1] - 78:17
**instead** [1] - 89:18
**institutions** [1] - 60:16
**insufficient** [1] - 34:12, 35:11, 39:4
**insurance** [1] - 40:18
**Insurance** [2] - 15:3
**insurmountable** [1] - 63:23
**intended** [2] - 32:2, 104:1

**intent** [1] - 32:24
**interact** [1] - 105:6
**interdependent** [1] - 49:8
**interdependently** [1] - 49:19
**interest** [4] - 22:9, 106:16, 111:11, 111:14
**interested** [3] - 112:11, 114:4, 117:15
**interesting** [2] - 69:18, 104:25
**interestingly** [1] - 67:21
**interior** [2] - 104:3
**intern** [2] - 96:7, 96:19
**internal** [9] - 26:2, 27:18, 36:13, 50:18, 70:17, 70:20, 79:11, 83:18, 84:5
**internally** [2] - 22:8, 84:16
**internet** [1] - 46:23
**interplay** [1] - 104:5
**interspersed** [3] - 16:21, 17:8, 17:17
**interviews** [1] - 29:18
**introduce** [4] - 4:5, 5:20, 51:10, 94:7
**invade** [1] - 22:4
**invest** [2] - 97:3, 98:2
**invested** [1] - 45:19
**investigative** [1] - 29:17
**investment** [3] - 20:8, 51:11, 118:12
**invitation** [1] - 32:20
**invited** [2] - 81:14, 81:20
**involved** [4] - 15:25, 67:19, 100:3, 100:7
**involvement** [2] - 96:17, 99:14
**irrationality** [1] - 55:9
**irrefutable** [1] - 66:22
**isolated** [1] - 44:23
**issue** [16] - 6:5, 6:9, 6:16, 8:1, 8:11, 8:24, 9:17, 11:11, 12:4, 16:10, 26:20, 31:4, 64:7, 77:11, 90:16, 91:18
**issues** [5] - 4:9, 4:10, 6:14, 11:12, 121:9
**items** [1] - 83:6
**itself** [4] - 16:6, 39:20, 56:1, 89:25

## J

**jacket** [2] - 103:25, 121:4
**jackets** [1] - 121:2
**Jackets** [1] - 121:3
**Jacobs** [1] - 47:6
**James** [1] - 101:8
**January** [2] - 80:2, 96:2
**Jeff** [2] - 92:16, 94:9
**Jest** [1] - 101:17
**job** [19] - 9:7, 20:7, 20:13, 64:12, 64:13, 64:14, 96:7, 96:20, 97:2, 97:8, 97:11, 97:16, 97:17, 97:19, 98:9, 98:20, 103:14, 106:11
**jobs** [4] - 96:5, 96:15, 96:18, 96:25
**John** [5] - 4:7, 4:18, 12:5, 68:12, 101:21
**joining** [2] - 96:6, 96:19
**Jon** [1] - 90:22
**journalist** [1] - 29:16
**journalists** [1] - 20:6
**Judge** [4] - 32:11, 32:13, 73:12, 74:2
**judgment** [3] - 7:14, 32:17, 83:7
**judgmental** [1] - 32:17
**jump** [1] - 76:24
**jury** [2] - 8:5, 15:25
**Justice** [1] - 28:9
**justified** [1] - 50:25
**justify** [1] - 54:11

## K

**Karp** [1] - 90:22
**keep** [6] - 30:16, 44:14, 57:16, 85:11, 112:21, 118:23
**keeps** [3] - 100:19, 112:1, 119:7
**Keith** [1] - 101:24
**Kensington** [3] - 16:17, 17:4, 55:7
**kept** [1] - 58:22
**key** [6] - 28:24, 29:6, 44:1, 66:21, 70:23, 73:11
**kind** [10] - 64:5, 79:2, 79:10, 84:20, 99:18, 100:17, 105:11, 114:17, 116:12, 118:22
**kinds** [7] - 27:7, 70:19,

79:2, 102:17, 111:18, 112:9, 120:24
**king** [1] - 68:14
**King** [3] - 27:9, 68:12, 101:17
**knock** [1] - 65:6
**knowledge** [3] - 55:22, 69:23, 77:7
**known** [6] - 30:18, 30:23, 36:23, 37:4, 37:10, 69:3
**knows** [5] - 12:25, 30:14, 68:11, 80:20, 100:23

## L

**L.P** [1] - 15:8
**labor** [7] - 23:20, 24:13, 27:13, 48:2, 48:3, 64:4, 64:8
**laborers** [1] - 48:15
**large** [11] - 30:6, 36:21, 36:22, 40:22, 43:1, 53:14, 68:11, 73:14, 79:3, 105:4, 108:16
**larger** [3] - 37:25, 42:18, 67:19
**largest** [10] - 18:21, 18:23, 26:4, 37:5, 55:8, 71:12, 79:8, 106:15, 106:17, 121:11
**last** [16] - 8:1, 18:13, 23:1, 23:5, 46:23, 48:3, 50:15, 51:20, 52:23, 54:7, 55:6, 59:22, 71:1, 76:7, 80:8, 102:21
**late** [3] - 28:6, 49:17, 78:25
**law** [7] - 35:2, 35:12, 35:17, 40:8, 49:1, 65:14, 76:16
**laws** [2] - 49:16, 64:4
**lawsuit** [1] - 19:19
**lawyers** [1] - 34:23
**lay** [1] - 11:6
**lead** [8] - 23:11, 35:15, 48:20, 49:20, 50:14, 65:13, 89:2, 115:6
**lead-up** [1] - 89:2
**leader** [2] - 49:12, 50:10
**leads** [3] - 11:5, 22:18, 48:22
**league** [3] - 38:2, 38:3, 90:4

**learn** [1] - 33:20
**learned** [1] - 63:20
**least** [8] - 11:25, 12:1, 27:9, 63:6, 63:25, 66:2, 66:8, 102:7
**leave** [2] - 63:10, 85:25
**leaving** [1] - 72:19
**led** [1] - 100:22
**leeway** [2] - 8:8, 10:23
**left** [6] - 24:25, 25:20, 42:14, 42:19, 43:17, 112:2
**legacy** [1] - 88:12
**legal** [7] - 27:2, 31:22, 49:17, 50:9, 72:23, 73:4, 98:24
**legally** [2] - 55:14, 55:15
**length** [1] - 77:17
**lengthy** [1] - 29:2
**less** [18] - 20:1, 20:2, 22:15, 40:25, 43:2, 43:3, 45:12, 48:2, 53:4, 59:1, 65:6, 77:5, 92:9, 117:13, 118:11, 119:1, 119:2
**lessen** [5] - 24:14, 32:2, 32:23, 57:21, 59:24
**lessening** [1] - 32:10
**lesser** [1] - 69:3
**lesser-known** [1] - 69:3
**level** [16] - 6:20, 31:4, 36:21, 56:21, 70:18, 70:25, 71:19, 77:9, 99:24, 99:25, 104:6, 107:23, 109:8, 109:9, 116:12, 121:8
**levels** [12] - 22:21, 38:19, 42:22, 49:5, 49:8, 70:17, 70:20, 71:17, 76:15, 108:13, 109:6, 111:5
**Leventhal** [2] - 102:25, 103:1
**leverage** [4] - 65:1, 117:7, 117:12, 119:20
**Liate** [1] - 43:5
**libraries** [1] - 60:16
**licensed** [2] - 107:10, 107:11
**life** [1] - 22:3
**Life** [1] - 101:25
**lifeblood** [1] - 19:14
**light** [1] - 89:5
**lighter** [1] - 43:24
**likelihood** [1] - 49:8

**likely** [12] - 27:19, 31:8, 31:24, 32:18, 37:9, 40:8, 40:11, 40:15, 57:21, 85:6, 87:9, 92:9
**likewise** [1] - 110:3
**limine** [3] - 7:4, 7:6, 7:11
**limited** [3] - 42:23, 45:20, 46:11
**line** [14] - 21:5, 38:17, 39:15, 39:16, 39:19, 39:21, 39:23, 39:25, 40:13, 41:4, 43:12, 44:3, 71:20
**lines** [1] - 13:24
**Lines** [1] - 15:3
**Lisa** [1] - 122:10
**list** [8] - 15:2, 30:17, 37:22, 47:24, 101:2, 112:4, 112:6
**listed** [2] - 25:3, 40:10
**listen** [3] - 35:25, 47:5, 48:4
**literary** [6] - 27:8, 29:4, 47:23, 101:14, 110:3, 111:10
**literature** [1] - 35:3
**litigation** [1] - 72:17
**littered** [1] - 69:15
**live** [2] - 13:9, 13:24
**lived** [1] - 47:24
**livelihood** [1] - 20:14
**Livre** [1] - 98:18
**Lizzy** [1] - 4:11
**local** [2] - 64:10, 64:13
**logic** [1] - 71:20
**long-standing** [1] - 84:8
**long-time** [1] - 54:3
**look** [11] - 39:2, 58:5, 58:21, 60:11, 60:14, 61:13, 62:13, 70:10, 89:9, 89:10, 90:6
**looking** [15] - 17:2, 33:7, 41:19, 42:16, 59:21, 60:25, 76:11, 82:5, 99:11, 100:3, 100:24, 107:15, 110:1, 110:3, 114:17
**looks** [3] - 42:1, 42:5, 59:2
**looser** [1] - 112:20
**lose** [4] - 24:11, 38:2, 89:24, 119:10
**loses** [2] - 46:5, 46:7
**losing** [5] - 45:3, 48:11, 53:24, 59:4, 91:22
**loss** [3] - 24:3, 24:6,

53:24
**losses** [2] - 43:8, 48:14
**lost** [11] - 23:25, 30:24, 42:21, 44:25, 45:5, 45:7, 45:9, 52:25, 61:23, 73:21
**loud** [1] - 80:3
**love** [2] - 101:23, 115:11
**low** [5] - 25:17, 42:6, 63:10, 69:16, 79:21
**lower** [11] - 31:18, 36:2, 48:19, 48:20, 65:5, 65:15, 70:4, 78:11, 91:20, 91:23, 110:6
**lowered** [1] - 33:21
**lowering** [2] - 39:8, 92:6
**lowest** [1] - 111:21
**loyal** [1] - 46:18
**lumber** [1] - 64:10
**lump** [2] - 29:12, 29:20
**lump-sum** [2] - 29:12, 29:20
**lunch** [4] - 64:24, 121:25, 122:3, 122:4

---

**M**

**Macmillan** [9] - 22:14, 25:19, 37:7, 53:12, 74:6, 89:19, 89:23, 92:3, 106:18
**magazine** [1] - 107:11
**magically** [1] - 47:16
**magnifying** [1] - 102:19
**main** [3] - 19:1, 79:13, 79:15
**major** [10] - 37:25, 48:23, 52:1, 67:18, 71:16, 74:5, 87:16, 89:11, 105:16, 118:20
**majority** [1] - 19:2
**majors** [1] - 90:9
**Malaviya** [6] - 6:8, 6:15, 10:14, 11:5, 93:5, 93:19
**manage** [1] - 97:11
**management** [3] - 30:25, 31:1, 31:5
**managing** [2] - 98:10, 99:2
**Manuel** [1] - 51:10
**manufacture** [1] - 53:25

**manufactured** [1] - 99:5
**manufacturers** [1] - 99:4
**manufacturing** [2] - 79:24, 121:4
**manuscript** [1] - 103:15
**March** [1] - 87:1
**margin** [2] - 63:10, 119:11
**margins** [1] - 81:25
**market** [127] - 18:20, 19:5, 21:14, 21:15, 25:5, 25:6, 26:23, 27:3, 28:11, 28:12, 31:7, 31:9, 33:1, 33:5, 33:8, 33:10, 34:7, 34:22, 36:8, 36:10, 36:14, 36:22, 37:3, 37:5, 38:8, 38:9, 38:10, 38:13, 38:16, 38:21, 38:22, 39:3, 39:5, 39:23, 40:4, 40:7, 40:11, 40:13, 40:17, 40:20, 40:22, 40:25, 41:1, 41:11, 41:21, 41:22, 44:6, 46:4, 49:11, 50:8, 52:10, 55:18, 56:5, 56:21, 58:16, 59:2, 59:21, 59:25, 60:5, 60:8, 60:22, 60:23, 61:1, 61:10, 61:12, 62:12, 62:15, 62:17, 63:1, 63:2, 63:18, 65:9, 65:11, 65:13, 65:15, 65:17, 65:21, 65:24, 66:1, 66:6, 66:7, 66:12, 66:13, 67:12, 67:22, 68:16, 69:21, 70:5, 70:13, 70:16, 70:19, 71:1, 71:2, 71:15, 71:20, 71:24, 72:2, 72:5, 72:11, 72:12, 72:25, 73:9, 73:14, 73:15, 74:3, 74:15, 74:17, 75:7, 75:13, 75:22, 76:2, 76:12, 76:15, 76:19, 77:5, 79:18, 91:17, 100:5, 103:19, 107:7, 114:23, 115:5, 116:14
**market-defining** [1] - 71:15
**marketers** [2] - 97:24, 99:21
**marketing** [8] - 21:19,

25:22, 67:5, 98:23, 116:4, 119:2, 120:6, 120:9
**marketplace** [6] - 21:5, 27:3, 31:19, 44:7, 56:3, 99:20
**markets** [6] - 40:3, 40:6, 64:5, 64:8, 66:14, 66:17
**markup** [1] - 119:22
**Markus** [2] - 36:1, 93:4
**mask** [1] - 95:12
**mass** [1] - 107:7
**mass-market** [1] - 107:7
**match** [2] - 75:19, 83:25
**matches** [1] - 23:12
**matchmaking** [1] - 75:19
**material** [1] - 73:24
**materially** [1] - 31:18
**materials** [1] - 29:19
**mathematical** [1] - 33:10, 61:16
**matter** [6] - 5:19, 28:10, 38:24, 43:13, 61:4, 61:9
**matters** [7] - 5:1, 12:13, 16:14, 18:5, 21:4, 21:22, 24:4
**maverick** [1] - 50:14
**maximize** [2] - 110:1, 110:3
**McMahon** [2] - 4:11, 18:12
**MDI** [1] - 15:7
**mean** [9] - 10:8, 14:14, 17:11, 31:15, 39:1, 40:21, 66:2, 71:8, 118:20
**meaning** [3] - 40:18, 65:15, 108:13
**meaningful** [2] - 19:16, 80:22
**meaningfully** [3] - 52:1, 67:17, 80:21
**means** [13] - 22:6, 33:25, 38:18, 45:15, 46:15, 59:8, 59:10, 68:21, 75:4, 79:5, 108:2, 113:6, 117:19
**meant** [3] - 90:14, 91:24, 118:18
**media** [1] - 86:21
**medium** [1] - 91:4
**meet** [5] - 8:9, 34:10, 51:15, 57:23, 99:12
**Megan** [1] - 4:17
**Mehta** [2] - 73:12, 74:2

**Mel** [2] - 4:10, 5:25
**members** [3] - 25:2, 74:6, 74:19
**memo** [3] - 8:16, 9:4, 9:8
**memoir** [4] - 22:3, 22:9, 101:5, 101:25
**memoirs** [1] - 20:9
**mention** [8] - 10:8, 13:4, 63:2, 67:9, 70:15, 71:1, 71:11, 83:16
**mentioned** [7] - 67:8, 74:10, 77:11, 78:15, 83:17, 85:5, 114:14
**merge** [2] - 64:9, 64:10
**merged** [4] - 30:7, 33:4, 65:4, 76:14
**merger** [96] - 5:20, 7:6, 11:12, 18:18, 19:10, 19:11, 19:12, 19:25, 23:25, 24:20, 25:2, 26:3, 26:18, 27:2, 31:9, 32:14, 32:15, 32:22, 32:25, 33:1, 33:4, 33:6, 33:15, 33:16, 33:18, 33:25, 34:1, 34:4, 34:13, 34:25, 35:10, 36:10, 36:17, 37:13, 39:18, 40:2, 40:12, 40:16, 41:14, 44:2, 44:25, 46:15, 47:16, 47:25, 48:3, 48:19, 48:22, 49:1, 49:6, 49:17, 49:18, 50:2, 50:6, 50:8, 51:1, 51:19, 53:10, 54:9, 54:11, 54:12, 55:25, 56:9, 57:21, 58:9, 58:14, 58:19, 59:24, 60:6, 61:18, 62:5, 62:6, 62:22, 65:18, 65:25, 68:17, 73:16, 74:25, 76:11, 76:22, 77:16, 78:5, 78:10, 80:2, 80:6, 81:6, 81:17, 82:4, 82:9, 84:16, 84:23, 85:6, 85:20, 89:2, 90:17, 90:20
**merger's** [1] - 34:8
**mergers** [4] - 32:1, 58:9, 64:7, 64:8
**merging** [10] - 28:23, 33:5, 34:25, 36:12, 61:22, 73:13, 73:18, 74:3, 79:12, 82:10
**meritorious** [1] - 8:3

**message** [1] - 38:4
**metes** [1] - 39:24
**metric** [1] - 43:13
**Meyer** [1] - 94:12
**Michael** [5] - 3:8, 47:5, 92:16, 95:23, 101:9
**Michelle** [1] - 68:14
**midday** [1] - 22:17
**might** [15] - 6:13, 8:25, 13:11, 15:24, 64:11, 69:25, 70:17, 73:15, 75:20, 93:19, 99:12, 106:9, 116:1, 116:2, 117:13
**miles** [1] - 64:12
**mill** [1] - 64:11
**Million** [1] - 105:9
**million** [11] - 31:21, 43:20, 45:12, 45:15, 45:17, 62:25, 63:3, 63:5, 71:22, 84:4, 116:10
**millions** [5] - 24:7, 24:12, 24:16, 68:23
**mills** [1] - 64:10
**mind** [2] - 31:10, 88:10
**mindful** [2] - 29:1, 63:20
**minor** [2] - 38:1, 90:4
**minuscule** [4] - 24:9, 24:15, 24:16, 52:14
**minute** [3] - 58:24, 95:1, 105:14
**minutes** [7] - 10:3, 23:10, 23:14, 57:8, 65:6, 86:16, 121:23
**misleading** [1] - 35:4
**misses** [1] - 39:16
**mission** [2] - 64:6, 85:17
**misspoke** [2] - 107:25, 108:21
**mistaken** [1] - 86:10
**mistakes** [1] - 65:13
**mistreats** [1] - 92:5
**mitigating** [5] - 27:4, 50:17, 51:20, 53:19, 54:7
**mix** [3] - 105:12, 105:22, 106:2
**model** [14] - 48:8, 48:16, 51:11, 61:17, 62:4, 62:14, 63:12, 80:20, 81:1, 81:5, 81:15, 81:19, 82:19
**modeling** [3] - 63:9, 80:20, 80:23
**models** [6] - 28:16, 61:20, 61:22, 61:23,

80:23, 82:2
**modern** [1] - 19:18
**moment** [7] - 29:16, 31:7, 35:25, 36:3, 47:19, 95:7, 104:18
**money** [6] - 20:5, 20:18, 24:15, 30:2, 114:10, 119:10
**monitor** [2] - 55:5, 60:10
**monolith** [1] - 89:19
**monopolist** [1] - 39:7
**monopolist's** [1] - 39:1
**monopolistic** [1] - 89:20
**monopoly** [5] - 32:4, 39:5, 39:6, 73:25
**monopsony** [3] - 59:7, 64:8, 73:25
**month** [1] - 12:8
**months** [1] - 80:1
**morning** [14] - 4:12, 4:14, 4:15, 4:20, 4:24, 5:8, 5:10, 5:25, 12:15, 12:20, 22:11, 22:23, 23:8, 122:7
**Mosley** [1] - 101:12
**Mossman** [1] - 4:23
**most** [29] - 9:23, 20:15, 20:22, 21:13, 24:17, 25:22, 30:10, 31:8, 32:6, 37:9, 39:10, 39:12, 40:8, 40:11, 41:24, 75:15, 81:9, 84:1, 100:10, 105:4, 109:13, 109:18, 112:4, 112:8, 113:4, 113:8, 116:19, 118:13, 121:13
**motion** [11] - 7:3, 7:6, 7:10, 7:11, 7:12, 7:13, 7:15, 8:6, 8:12
**motions** [1] - 7:17
**motivated** [2] - 91:12
**move** [2] - 6:14, 37:24
**movement** [1] - 90:11
**movies** [3] - 41:18, 41:19, 41:22
**multiple** [5] - 81:12, 84:12, 111:11, 111:13
**murder** [1] - 31:9
**Murray** [1] - 82:12
**muscle** [1] - 53:16
**music** [1] - 101:23
**musicians** [1] - 101:24
**must** [5] - 7:22, 7:24,

18:18, 59:10, 65:21
**Myers** [1] - 12:16
**myriad** [1] - 37:20

## N

**name** [5] - 22:4, 30:5, 86:20, 95:22, 115:14
**named** [1] - 12:5
**names** [2] - 30:13, 74:10
**narrow** [1] - 16:1
**National** [1] - 33:2
**national** [1] - 40:18
**nearly** [1] - 19:4
**necessarily** [1] - 32:17
**necessary** [5] - 15:21, 28:24, 32:15
**neck** [2] - 73:18
**need** [18] - 8:21, 8:25, 20:6, 21:1, 21:20, 24:21, 26:24, 27:14, 34:6, 39:24, 40:14, 44:12, 82:6, 83:11, 84:22, 94:13, 100:1, 108:19
**needs** [3] - 33:16, 70:24, 92:1
**negotiate** [2] - 75:18, 121:14
**negotiates** [1] - 75:17
**negotiating** [5] - 45:21, 65:1, 83:22, 109:13, 114:8
**negotiation** [5] - 69:7, 84:20, 114:8, 114:20, 114:21
**negotiations** [6] - 29:6, 64:21, 75:16, 109:16, 109:19, 114:25
**Nelson** [1] - 4:23
**networks** [1] - 86:22
**neutral** [1] - 6:5
**never** [9] - 7:16, 7:17, 13:14, 20:22, 47:2, 50:25, 59:17, 79:9, 121:19
**new** [13] - 19:5, 37:23, 52:11, 52:12, 52:17, 52:24, 59:17, 77:1, 79:20, 83:19, 91:16, 118:3, 119:1
**news** [1] - 79:17
**next** [23] - 18:23, 19:9, 22:13, 22:16, 22:22, 23:2, 23:8, 37:19, 43:19, 45:9, 53:19, 55:20, 60:22, 75:8, 76:7, 112:1, 113:10,

113:15, 114:16, 114:18, 120:7
**niche** [1] - 42:23
**Nicholas** [1] - 19:23
**Nick** [1] - 24:19
**Nihar** [1] - 93:5
**nine** [1] - 41:3
**Ninth** [2] - 41:17, 41:20
**Noble** [1] - 105:9
**nobody** [5] - 55:4, 63:9, 66:23, 67:1, 69:23, 79:13
**non** [4] - 59:4, 74:12, 74:16, 74:23
**non-Big** [4] - 59:4, 74:12, 74:16, 74:23
**none** [1] - 46:20
**nonevidence** [1] - 13:16
**nonfiction** [7] - 19:17, 29:14, 29:15, 101:18, 102:16, 102:20
**Noni** [1] - 4:23
**nonissue** [1] - 35:23
**North** [1] - 106:25
**Northfield** [1] - 15:2
**Norton** [4] - 22:14, 71:11, 74:10, 92:3
**NOTE** [1] - 122:9
**note** [7] - 5:21, 7:10, 24:1, 30:4, 37:12, 38:24, 49:15
**noted** [2] - 32:13, 41:10
**notes** [1] - 88:25
**noteworthy** [1] - 101:2
**nothing** [7] - 16:24, 51:18, 59:19, 65:7, 70:18, 105:8, 105:10
**notice** [1] - 35:5
**notified** [1] - 12:18
**nourished** [1] - 85:2
**novel** [4] - 20:11, 35:17, 101:15
**number** [18] - 26:19, 41:11, 48:13, 56:1, 60:18, 61:9, 61:19, 64:19, 70:4, 74:13, 75:21, 78:13, 78:14, 80:13, 86:7, 102:8, 108:23, 121:11
**numbers** [6] - 24:10, 33:24, 58:22, 72:10, 82:22, 83:9
**nurse** [1] - 64:11
**nurture** [1] - 38:2
**nurturing** [1] - 46:17
**Nut** [1] - 34:15

## O

**o'clock** [3] - 12:17, 94:23, 122:4
**O'Melveny** [1] - 12:16
**Oath** [1] - 95:9
**Obama** [2] - 68:14
**object** [2] - 16:7, 93:17
**objecting** [1] - 14:9
**objection** [3] - 15:22, 16:1, 16:11
**objections** [1] - 5:7
**objective** [1] - 68:1
**obstacle** [1] - 77:12
**obtain** [4] - 69:3, 87:10, 99:4, 120:23
**obtaining** [1] - 67:21
**obvious** [2] - 68:20, 85:7
**obviously** [5] - 10:2, 54:4, 72:8, 74:5, 88:3
**occasion** [1] - 110:18
**occasionally** [1] - 120:5
**occur** [3] - 31:24, 32:10, 81:11
**offer** [21] - 45:11, 45:13, 45:16, 45:22, 67:4, 110:5, 110:6, 110:16, 110:17, 111:14, 111:24, 112:21, 113:15, 114:4, 114:19, 115:8, 116:2, 117:8, 117:9, 117:10
**offered** [3] - 45:15, 88:3, 121:16
**offering** [3] - 21:18, 38:20, 112:22
**offers** [6] - 113:21, 113:25, 115:3, 115:6, 115:22, 116:7
**office** [1] - 40:24
**officer** [1] - 95:25
**officers** [1] - 14:25
**often** [17] - 24:2, 24:18, 30:2, 37:23, 55:17, 68:22, 81:13, 84:11, 106:24, 108:9, 108:14, 109:4, 109:23, 110:5, 110:16, 111:16, 116:15
**oil** [1] - 35:20
**old** [2] - 85:13, 90:19
**omission** [1] - 63:4
**once** [6] - 38:3, 49:11, 49:16, 73:2, 108:6,

111:12
**one** [96] - 6:3, 7:19, 9:12, 12:4, 14:14, 16:15, 16:18, 16:19, 16:20, 16:22, 16:23, 16:24, 18:9, 21:24, 24:1, 24:9, 24:11, 25:13, 25:14, 25:15, 26:6, 26:19, 26:24, 27:21, 29:20, 37:22, 43:4, 43:15, 45:5, 46:20, 47:7, 48:4, 49:11, 49:15, 50:16, 52:6, 53:3, 53:6, 55:8, 56:1, 59:8, 61:17, 61:23, 61:25, 63:7, 65:8, 65:17, 65:22, 66:3, 67:21, 70:5, 70:17, 75:15, 75:25, 76:3, 76:7, 77:25, 78:22, 78:25, 79:1, 79:16, 79:25, 80:1, 81:18, 83:16, 83:21, 84:2, 84:8, 87:7, 89:11, 89:20, 93:3, 93:4, 94:3, 96:15, 96:23, 101:4, 103:20, 104:14, 104:17, 104:18, 104:22, 110:24, 111:3, 112:2, 112:12, 114:3, 114:11, 116:16, 116:20, 116:25, 121:23
**one-fell** [1] - 103:20
**one-off** [1] - 84:8
**one-on-one** [1] - 75:15
**ones** [6] - 25:14, 25:24, 47:8, 67:7, 87:22, 106:4
**open** [5] - 16:25, 17:6, 17:22, 18:5
**open-court** [1] - 17:6
**Opening** [1] - 3:3
**opening** [8] - 4:12, 12:14, 12:18, 12:22, 12:25, 13:1, 13:16, 14:14, 18:6, 18:13, 27:1, 35:19, 57:8, 72:14, 88:18, 111:20, 111:21, 112:16
**openings** [2] - 13:5, 15:1
**openness** [1] - 17:21
**operates** [2] - 38:16, 65:14
**operations** [3] - 87:12,

98:25, 119:19
**operators** [1] - 113:2
**Oppenheimer** [1] - 4:18
**opportunity** [3] - 34:19, 55:21, 76:25
**oppose** [1] - 85:19
**opposed** [1] - 119:9
**opposing** [1] - 18:10
**opposite** [1] - 57:25
**opposition** [1] - 118:1
**optimistic** [1] - 50:20
**option** [7] - 17:9, 39:10, 113:6, 113:8, 113:9, 113:17, 114:13
**options** [4] - 6:3, 27:14, 64:16, 91:3
**oral** [1] - 8:1
**orange** [1] - 43:25
**order** [14] - 4:10, 5:2, 5:4, 6:9, 7:23, 25:3, 42:12, 49:3, 70:15, 72:5, 106:19, 111:23, 119:16, 119:21
**order-to-cash** [1] - 119:21
**orders** [2] - 98:25, 99:1
**ordinary** [1] - 50:1
**original** [1] - 29:18
**originally** [1] - 24:2
**originating** [2] - 120:6, 120:11
**otherwise** [2] - 6:13, 50:25
**ourselves** [1] - 114:1
**outbid** [1] - 47:10
**outcome** [2] - 65:20, 80:23
**outcoming** [1] - 69:13
**outline** [3] - 13:1, 103:15, 113:11
**output** [5] - 35:16, 35:21, 49:4, 65:15, 65:19
**outside** [3] - 19:6, 55:4, 90:3
**overall** [7] - 59:25, 60:21, 61:10, 61:12, 65:19, 66:12, 71:24
**overlook** [1] - 8:17
**overrule** [2] - 15:22, 16:11
**oversee** [5] - 97:4, 97:9, 98:10, 98:20, 99:16
**overseeing** [2] - 97:23, 99:23

**oversees** [1] - 98:13
**overstate** [1] - 73:15
**overt** [1] - 49:3
**overtaking** [1] - 26:24
**overview** [2] - 27:6, 72:22
**overwhelm** [1] - 34:4
**overwhelming** [1] - 65:23
**own** [20] - 11:25, 18:19, 19:4, 35:1, 35:12, 38:18, 54:23, 60:2, 66:13, 66:24, 71:20, 71:24, 82:13, 86:21, 87:17, 110:4, 119:18, 120:6, 121:20
**owned** [2] - 36:18, 55:13
**owner** [1] - 26:25
**owns** [2] - 30:9, 77:13

## P

**P&L** [1] - 98:2
**p.m** [4] - 22:17, 23:2, 122:8, 122:9
**pace** [1] - 103:21
**PAGE** [1] - 3:2
**pages** [3] - 8:19, 121:1
**paid** [19] - 18:25, 20:16, 20:18, 24:13, 29:20, 56:4, 56:22, 57:1, 61:3, 62:1, 62:25, 66:19, 67:23, 91:20, 107:15, 107:19, 107:20, 109:22, 110:13
**pair** [1] - 104:2
**Pale** [1] - 101:17
**Pam** [1] - 74:21
**Pande** [1] - 27:9
**panel** [1] - 68:6
**paper** [1] - 99:4
**paperback** [2] - 107:7
**parallel** [1] - 67:25
**Paramount** [3] - 86:20, 86:22
**part** [19] - 6:18, 8:13, 13:13, 17:6, 17:7, 17:25, 30:6, 50:15, 54:18, 65:17, 88:8, 103:12, 104:8, 104:12, 105:12, 105:22, 106:2, 107:18, 118:13
**participants** [5] - 22:20, 36:9, 48:19, 67:14, 68:7
**participate** [2] - 24:3,

81:21
**participated** [1] - 24:2
**participates** [1] - 81:16
**particular** [9] - 9:1, 47:13, 67:16, 78:4, 84:2, 106:24, 110:20, 110:23, 111:12
**particularly** [6] - 31:4, 43:12, 64:25, 65:12, 73:14, 74:4
**parties** [25] - 5:5, 5:7, 5:10, 5:16, 5:21, 5:23, 7:22, 8:9, 9:10, 10:23, 28:23, 36:12, 41:10, 51:5, 61:22, 73:13, 74:3, 79:12, 85:15, 93:13, 93:24, 94:1, 114:24, 115:1, 122:6
**partners** [1] - 45:25
**Partners** [1] - 15:8
**partnership** [2] - 84:7, 84:8
**Parton** [1] - 68:13
**parts** [3] - 10:8, 24:20, 98:21
**party** [6] - 7:17, 9:18, 9:25, 15:4, 34:25, 114:20
**pass** [2] - 11:12, 18:9
**pass-through** [1] - 11:12
**passed** [2] - 36:15, 90:23
**passing** [3] - 18:12, 23:9
**passionate** [1] - 84:1
**past** [5] - 8:22, 32:7, 117:23, 117:24
**patience** [1] - 86:2
**Patterson** [1] - 101:8
**pay** [3] - 19:1, 19:2, 23:19, 48:19, 64:23, 69:7, 78:8, 81:2, 88:3, 99:24, 107:2, 107:9, 107:10, 107:18, 107:21, 108:4, 108:16, 108:19, 110:21, 110:22, 110:24, 110:25, 116:17
**paying** [2] - 64:12, 98:3
**payment** [1] - 29:11, 29:21
**payments** [3] - 29:12, 37:10, 37:17
**pays** [2] - 81:2, 81:3

**Pelecanos** [1] - 101:11
**pending** [1] - 51:15
**Penguin** [96] - 4:16, 18:19, 18:20, 19:5, 19:21, 19:25, 21:16, 21:25, 22:7, 22:12, 22:17, 22:23, 23:2, 23:6, 23:9, 23:10, 23:12, 23:13, 23:15, 23:19, 23:22, 24:25, 25:4, 25:18, 26:2, 26:4, 26:7, 26:17, 26:19, 26:22, 30:4, 30:5, 30:8, 30:12, 30:17, 36:1, 36:9, 37:4, 37:13, 37:14, 40:1, 42:12, 43:13, 43:21, 44:8, 44:16, 45:2, 45:6, 45:14, 45:18, 45:23, 46:6, 46:7, 47:25, 48:9, 49:20, 50:5, 50:11, 51:12, 53:8, 53:9, 53:15, 53:16, 54:11, 54:17, 54:21, 54:23, 55:1, 55:4, 55:14, 55:25, 56:2, 57:14, 58:1, 58:25, 59:3, 60:17, 62:6, 75:5, 76:22, 77:15, 78:5, 78:15, 78:21, 79:14, 83:18, 84:17, 85:20, 86:19, 87:8, 88:2, 88:11, 90:17, 91:19, 93:4, 106:17
**Penn** [1] - 35:20
**penny** [1] - 20:23
**people** [8] - 19:16, 20:19, 88:6, 90:9, 91:12, 98:11, 104:16, 104:22
**per** [6] - 20:1, 20:3, 38:18, 61:2, 80:13, 91:24
**percent** [53] - 21:6, 21:7, 21:10, 25:6, 25:8, 25:10, 25:11, 29:9, 33:6, 33:7, 42:16, 42:18, 43:23, 43:25, 46:14, 52:19, 53:4, 55:13, 56:25, 61:6, 61:8, 61:13, 62:12, 62:14, 62:16, 62:17, 62:19, 63:1, 65:1, 65:17, 69:21, 69:23, 70:3, 71:23, 72:2, 72:5, 72:11, 74:18, 74:24, 75:2, 75:3, 75:4, 75:6,

86:5, 86:6, 86:7, 111:2, 111:3
**percent-owned** [1] - 55:13
**perfect** [3] - 39:24, 41:5, 115:12
**perfection** [1] - 63:9
**perfectly** [1] - 39:21
**perhaps** [5] - 6:8, 8:18, 12:1, 77:5, 115:17
**period** [1] - 113:12
**permissible** [2] - 14:9, 14:17
**permission** [2] - 95:14, 121:22
**permitted** [3] - 15:5, 15:17, 93:10
**perpetuity** [1] - 55:17
**person** [4] - 11:13, 27:22, 97:19, 111:21
**personally** [2] - 100:9, 101:3
**personnel** [1] - 98:17
**perspective** [1] - 86:17
**persuade** [3] - 97:3, 105:21, 106:5
**persuasion** [1] - 72:24
**persuasive** [3] - 83:5, 90:19, 90:21
**Peter** [1] - 102:15
**PETROCELLI** [20] - 4:15, 9:6, 10:10, 10:13, 11:3, 11:16, 11:19, 57:11, 57:13, 57:19, 70:8, 80:11, 80:14, 80:18, 86:8, 92:19, 92:21, 93:2, 93:11, 93:15
**Petrocelli** [6] - 4:16, 9:2, 57:14, 86:3, 86:15, 88:13
**Petrocelli...................
............** [1] - 3:4
**Philadelphia** [1] - 33:2
**photographer** [1] - 29:19
**phrase** [1] - 38:1
**physical** [3] - 106:6, 118:24, 120:23
**pick** [2] - 76:18, 104:24
**picked** [1] - 64:6
**Pictures** [1] - 86:22
**pie** [1] - 60:11
**piece** [3] - 11:5, 13:16, 80:8
**Pietsch** [7] - 3:8, 78:1, 82:12, 92:16, 95:20,

95:23, 122:2
**pitch** [1] - 81:22
**place** [4] - 22:25,
38:22, 72:6, 105:23
**places** [3] - 60:16,
105:15, 105:17
**plain** [3] - 15:18,
31:25, 32:21
**plaintiff's** [1] - 9:19
**plan** [3] - 16:16, 67:4,
115:13
**planned** [1] - 5:20
**plans** [1] - 77:9
**plant** [2] - 79:24
**play** [11] - 13:7, 13:11,
17:4, 17:6, 17:7,
17:9, 17:22, 43:4,
49:12, 75:13
**played** [18] - 12:21,
15:1, 15:6, 15:7,
16:20, 16:23, 16:24,
16:25, 17:4, 17:11,
17:19, 26:21, 36:5,
43:9, 47:11, 48:5,
51:16, 55:11
**players** [1] - 28:23
**playing** [4] - 12:19,
16:6, 16:16, 28:3
**pleasure** [1] - 101:4
**plenty** [2] - 8:14, 91:16
**plug** [1] - 84:24
**Plus** [1] - 86:23
**podium** [1] - 4:5
**point** [26] - 8:2, 11:8,
11:21, 13:5, 15:23,
32:11, 32:19, 39:16,
41:4, 43:16, 52:13,
60:12, 62:3, 66:5,
68:18, 70:12, 71:1,
71:3, 72:19, 73:13,
75:8, 76:7, 79:21,
111:3, 111:22,
121:23
**pointing** [1] - 46:13
**points** [3] - 28:24,
52:24, 75:10
**policies** [1] - 38:19
**policy** [1] - 54:20
**political** [1] - 19:18
**poor** [1] - 119:11
**Portfolio** [2] - 45:14,
45:17
**portfolio** [1] - 118:14
**portion** [3] - 83:13,
120:13, 122:9
**portions** [1] - 17:14
**portray** [1] - 46:5
**pose** [1] - 64:8
**position** [7] - 9:7,
9:24, 13:19, 13:23,

50:11, 71:25, 80:22
**positive** [2] - 89:8,
89:9
**Posner** [2] - 32:11,
32:13
**possess** [1] - 47:4
**possible** [5] - 17:21,
18:1, 64:20, 89:5,
112:18
**post** [8] - 33:15, 35:5,
35:22, 53:10, 62:5,
76:14, 81:17, 84:16
**post-merged** [1] -
76:14
**post-merger** [5] -
33:15, 53:10, 62:5,
81:17, 84:16
**post-trial** [2] - 35:5,
35:22
**poster** [2] - 52:12,
52:21
**posthumous** [2] -
101:5, 101:17
**potential** [4] - 39:17,
42:23, 48:7, 77:11
**potentially** [3] - 8:3,
48:2, 82:6
**Potter** [1] - 30:19
**power** [4] - 34:25,
50:18, 53:19, 64:23
**powerful** [1] - 52:5
**practical** [2] - 66:20,
102:16
**practice** [2] - 92:22,
93:8
**pre** [1] - 62:6
**pre-merger** [1] - 62:6
**precise** [1] - 40:14
**precision** [2] - 41:5,
41:9
**preclude** [3] - 7:4, 7:7,
7:11
**precluded** [1] - 12:24
**predicting** [1] - 62:4
**prediction** [2] - 48:16,
63:8
**predictive** [1] - 32:16
**predicts** [3] - 19:25,
48:8, 81:19
**preempt** [14] - 75:21,
115:7, 115:8,
115:21, 115:23,
116:8, 116:9,
116:13, 117:4,
117:5, 117:8,
117:14, 117:16
**preemptive** [2] -
115:8, 117:8
**prefer** [1] - 95:13
**preference** [1] - 17:3

**preliminary** [5] - 5:1,
5:18, 12:13, 16:14,
18:5
**prepared** [6] - 5:3, 6:9,
11:10, 60:13, 60:19,
82:19
**preparing** [1] - 99:12
**prepayment** [1] - 29:8
**present** [5] - 8:20,
8:23, 9:15, 28:17,
89:4
**presentation** [5] -
5:19, 11:2, 16:9,
18:8, 50:15
**presented** [1] - 8:10
**presenting** [2] - 89:1,
89:8
**presents** [1] - 39:21
**President** [1] - 68:14
**Press** [1] - 30:19
**pressure** [3] - 51:23,
82:6, 82:7
**presumed** [1] - 33:3
**presumption** [29] -
32:25, 33:2, 33:14,
33:20, 33:23, 34:1,
34:2, 34:5, 34:12,
34:22, 35:7, 36:7,
47:19, 49:21, 50:1,
60:8, 72:6, 72:8,
72:9, 72:12, 72:13,
72:15, 72:22, 73:2,
73:4, 73:8, 76:10,
77:20
**presumptions** [1] -
72:17
**presumptively** [3] -
19:12, 31:20, 44:2
**pretrial** [7] - 29:2,
31:23, 34:20, 35:3,
35:9, 35:19, 38:10
**pretty** [1] - 16:1
**prevail** [1] - 72:15
**prevent** [3] - 49:18,
53:23, 64:4
**previewed** [1] - 43:11
**previous** [2] - 113:13,
114:18
**PRH** [9] - 45:8, 45:12,
62:10, 62:15, 70:17,
74:3, 75:1, 77:17,
84:19
**price** [18] - 27:12,
66:10, 66:12, 66:15,
66:17, 68:24, 69:1,
71:17, 71:19, 74:18,
78:7, 81:2, 81:3,
81:6, 85:8, 113:17
**prices** [13] - 32:14,
35:1, 50:7, 54:22,

58:11, 58:12, 65:16,
67:23, 73:24, 76:15,
76:23, 78:11, 85:9
**primary** [1] - 79:12
**print** [3] - 121:11,
121:16, 121:17
**printed** [1] - 120:25
**printers** [3] - 121:12,
121:14, 121:15
**printing** [18] - 53:6,
53:7, 53:11, 53:15,
67:6, 77:11, 77:13,
77:17, 120:21,
120:22, 120:23,
120:24, 120:25,
121:1, 121:2, 121:4,
121:9, 121:20
**printings** [1] - 121:17
**privacy** [1] - 22:5
**probabilistic** [1] -
32:17
**probable** [1] - 34:8
**problem** [5] - 6:19,
73:17, 81:9, 81:15,
87:21
**problematic** [1] -
19:12
**problems** [4] - 61:19,
63:7, 63:23, 81:24
**procedure** [2] - 5:6,
5:17
**proceed** [7] - 8:15,
34:1, 35:10, 55:25,
75:25, 80:11, 112:17
**proceedings** [2] -
122:7, 122:10
**proceeds** [2] - 23:25,
36:10
**process** [8] - 27:18,
64:18, 75:14, 76:1,
83:8, 115:10,
115:17, 115:20
**produce** [3] - 34:7,
72:24, 73:5
**produced** [1] - 83:8
**product** [17] - 27:2,
38:9, 38:10, 38:13,
38:15, 39:3, 40:6,
41:20, 41:22, 59:13,
59:14, 59:17, 65:24,
66:15, 67:10, 106:2
**production** [3] -
67:24, 72:23, 99:3
**products** [4] - 65:22,
66:17, 105:12,
120:25
**Professor** [2] - 11:10,
81:25
**professor** [1] - 29:15
**profit** [5] - 81:25, 99:8,

119:6
**profitability** [2] - 98:9,
98:16
**profitable** [9] - 98:8,
98:12, 106:12,
106:13, 114:6,
118:13, 118:25,
119:5
**profitably** [1] - 35:1
**profits** [1] - 49:4
**progress** [1] - 5:23
**prohibits** [1] - 32:1
**project** [2] - 20:8,
76:20, 82:8
**projected** [4] - 62:15,
62:24, 63:13, 63:14
**projecting** [1] - 32:8
**projection** [2] -
110:21, 110:22
**projects** [1] - 100:3
**prominent** [1] - 25:13
**promise** [9] - 50:18,
54:7, 54:9, 54:11,
54:24, 54:25, 55:5,
55:9, 55:17
**promised** [2] - 44:14,
54:19
**promoted** [1] - 105:3
**promotes** [1] - 65:15
**promotion** [1] - 21:19
**proof** [2] - 31:10,
32:13, 35:21
**proper** [2] - 39:15,
41:21
**properties** [1] - 37:23
**proportion** [1] -
108:16
**proposal** [1] - 113:11
**proposals** [2] - 84:11,
116:4
**proposed** [8] - 5:2,
5:4, 5:17, 6:7, 18:18,
37:12, 40:16, 65:24
**proposing** [1] - 13:7
**proposition** [1] - 62:9
**prospective** [1] -
91:10
**protect** [6] - 19:19,
39:5, 39:13, 39:14,
54:25, 56:8
**protecting** [1] - 23:23
**protection** [1] - 21:1
**prove** [9] - 28:25,
57:20, 65:10, 72:19,
73:3, 77:22, 83:11,
91:19, 92:11
**proverbial** [1] - 92:7
**provide** [8] - 27:24,
40:14, 48:6, 71:4,
71:7, 71:8, 71:16,

140

120:4
**provided** [1] - 71:10
**providers** [1] - 53:7
**provides** [3] - 120:1, 120:8, 120:12
**providing** [1] - 119:21
**prudent** [1] - 15:24
**public** [9] - 18:2, 20:8, 21:13, 54:24, 58:22, 60:10, 68:13, 85:10
**public-facing** [1] - 60:10
**publication** [5] - 97:3, 97:9, 100:24, 114:6, 114:14
**publications** [1] - 118:14
**publicists** [2] - 97:24, 99:22
**publicity** [4] - 104:20, 120:2, 120:6
**publicize** [1] - 104:7
**publicly** [1] - 87:2
**publish** [13] - 50:13, 103:12, 106:4, 106:22, 108:6, 108:11, 109:10, 109:25, 111:7, 111:14, 114:15, 114:16, 120:22
**published** [14] - 19:6, 60:24, 64:17, 68:6, 70:9, 79:17, 104:10, 104:14, 104:15, 107:16, 109:23, 113:13, 117:23
**publisher** [68] - 18:21, 20:11, 24:24, 25:1, 25:13, 25:14, 25:15, 26:5, 27:15, 30:1, 37:25, 39:6, 39:7, 46:17, 46:18, 47:9, 47:12, 50:12, 50:13, 52:1, 52:6, 55:7, 65:4, 75:17, 81:16, 84:9, 87:9, 96:8, 96:13, 97:15, 97:17, 97:19, 98:1, 103:1, 103:17, 103:23, 107:24, 109:25, 112:2, 113:13, 114:2, 114:3, 114:13, 115:9, 115:10, 115:12, 115:18, 116:13, 118:12, 118:16, 118:22, 119:7, 119:13, 119:15, 119:23, 120:2, 120:3, 120:4, 120:6,

120:8, 120:9, 120:10, 120:11, 120:13, 120:14
**publisher's** [8] - 65:6, 76:1, 98:1, 98:9, 104:9, 104:13, 118:14, 120:3
**publishers** [125] - 19:1, 19:2, 19:9, 21:15, 22:15, 25:4, 25:7, 25:9, 27:11, 27:22, 27:24, 28:1, 28:2, 28:4, 28:13, 28:14, 30:6, 30:18, 36:11, 36:21, 36:22, 37:16, 37:20, 37:21, 37:23, 38:5, 38:7, 42:9, 42:11, 42:14, 42:15, 42:18, 42:20, 43:1, 43:2, 43:7, 46:10, 46:13, 46:19, 47:2, 47:7, 47:16, 49:19, 51:22, 52:3, 52:9, 52:19, 53:8, 53:17, 53:18, 56:8, 58:16, 59:4, 59:8, 59:15, 64:19, 64:21, 64:23, 67:2, 67:4, 70:16, 70:19, 71:4, 71:7, 71:13, 71:16, 74:9, 74:12, 74:23, 76:17, 76:24, 77:4, 77:6, 77:18, 77:25, 78:4, 78:9, 79:4, 79:8, 79:19, 81:14, 81:20, 81:22, 85:7, 85:9, 87:10, 87:14, 87:16, 87:18, 89:11, 90:3, 90:8, 90:11, 91:4, 91:12, 99:17, 99:24, 103:7, 103:9, 103:11, 103:14, 103:24, 104:6, 104:19, 105:2, 105:4, 106:14, 106:15, 111:11, 111:13, 111:16, 112:11, 112:21, 113:8, 113:20, 113:24, 114:3, 118:21, 119:11, 119:17, 119:22
**publishers'** [2] - 74:15, 74:17
**Publishing** [3] - 15:8, 102:13, 102:14
**publishing** [59] - 18:20, 18:25, 21:9, 29:5, 30:7, 30:9, 30:14, 30:16, 36:22,

37:3, 37:11, 37:18, 39:9, 39:14, 43:6, 53:1, 58:3, 59:5, 64:22, 66:4, 69:15, 71:10, 74:5, 76:4, 79:21, 85:17, 87:3, 88:5, 88:13, 91:5, 91:13, 96:5, 96:7, 97:5, 97:22, 98:4, 98:12, 98:19, 98:20, 98:22, 99:3, 99:6, 99:16, 99:17, 100:20, 102:4, 102:14, 102:20, 103:6, 106:21, 111:9, 111:12, 116:23, 117:15, 117:20, 117:21, 117:25, 118:7, 118:8
**puff** [1] - 50:20
**pull** [1] - 84:24
**punch** [1] - 42:21
**punish** [1] - 50:13
**purchase** [1] - 35:20
**purchases** [1] - 104:3
**pure** [1] - 77:16
**purple** [1] - 42:10
**purported** [2] - 50:16, 68:24
**purpose** [2] - 14:25, 90:9
**purposes** [3] - 18:13, 40:6, 40:13
**pursuit** [1] - 76:3
**pushing** [1] - 76:23
**puts** [1] - 49:23
**putting** [5] - 15:11, 15:12, 62:9, 71:18, 71:25

## Q

**quality** [2] - 48:12, 58:13
**quantification** [1] - 48:7
**quantifies** [1] - 46:3
**questioning** [1] - 83:22
**questions** [13] - 9:13, 9:20, 9:25, 10:3, 10:17, 10:19, 11:17, 13:23, 14:3, 36:17, 56:12, 83:1, 120:16
**quibble** [1] - 39:12
**quickly** [2] - 94:10, 111:3
**quite** [6] - 54:9, 64:15, 114:2, 115:6, 116:22
**quote** [15] - 14:1, 26:4,

32:1, 32:4, 39:24, 40:5, 41:7, 45:24, 49:23, 52:7, 54:5, 67:11, 67:15, 72:18

## R

**race** [1] - 22:23
**Rachel** [1] - 4:23
**raise** [4] - 22:20, 32:20, 50:7, 95:8
**raised** [5] - 15:23, 22:18, 34:20, 50:16, 83:1
**raises** [2] - 23:9, 49:8
**raising** [1] - 23:4
**ran** [3] - 60:7, 62:13, 72:11
**Random** [98] - 4:16, 18:19, 18:20, 19:5, 19:21, 19:25, 21:16, 21:25, 22:7, 22:12, 22:18, 22:23, 23:3, 23:6, 23:10, 23:13, 23:15, 23:19, 23:22, 24:25, 25:4, 25:18, 26:2, 26:4, 26:7, 26:17, 26:19, 26:22, 30:4, 30:5, 30:8, 30:12, 30:17, 36:1, 36:10, 37:4, 37:13, 37:14, 40:1, 42:12, 43:13, 43:21, 44:8, 44:16, 45:2, 45:6, 45:10, 45:14, 45:18, 45:23, 46:6, 46:7, 47:25, 48:9, 49:20, 50:6, 50:11, 51:12, 53:8, 53:9, 53:15, 53:16, 54:12, 54:17, 54:21, 54:23, 55:1, 55:4, 55:14, 55:25, 56:2, 57:14, 58:1, 58:25, 59:3, 60:17, 62:6, 75:5, 76:22, 77:15, 78:6, 78:15, 78:21, 79:14, 83:18, 84:17, 85:15, 85:20, 86:19, 87:8, 88:2, 88:11, 90:17, 91:19, 93:5, 106:17
**Randy** [1] - 4:18
**range** [6] - 101:7, 102:11, 105:7, 105:15, 105:25, 116:1
**rapidly** [1] - 63:14
**rare** [2] - 25:17, 110:8
**rarely** [4] - 37:22, 38:5, 39:21, 75:1
**rate** [4] - 107:9,

107:13, 110:7, 110:8
**rather** [6] - 32:7, 32:17, 39:14, 40:14, 114:10
**ratio** [1] - 46:2
**raw** [1] - 38:2
**reach** [2] - 5:22, 114:22
**reached** [1] - 121:23
**read** [10] - 29:2, 32:11, 56:9, 56:20, 58:18, 63:20, 80:14, 80:25, 103:15
**READ** [30] - 4:7, 18:7, 18:12, 18:16, 26:11, 26:13, 26:15, 26:22, 29:25, 30:22, 34:18, 36:6, 37:1, 37:3, 43:10, 44:11, 44:14, 44:18, 47:12, 48:6, 51:17, 55:12, 56:14, 56:17, 56:23, 57:2, 92:15, 93:17, 93:21, 94:5
**Read** [19] - 4:7, 36:24, 44:10, 56:11, 57:15, 61:4, 64:2, 67:7, 70:15, 75:9, 77:11, 78:14, 83:17, 86:4, 87:13, 88:5, 89:17, 91:6, 91:22
**Read's** [2] - 69:22, 72:14
**Read.......................... ..........** [1] - 3:4
**readers** [6] - 58:12, 58:17, 59:11, 85:18, 85:24, 92:2
**readily** [3] - 73:8, 77:20, 81:21
**reading** [2] - 36:25, 44:12
**ready** [2] - 20:9, 38:3
**real** [11] - 20:18, 44:21, 53:21, 53:25, 62:18, 64:8, 72:2, 73:10, 74:24, 80:21
**real-world** [3] - 44:21, 62:18, 73:10
**reality** [3] - 29:8, 39:20, 47:9
**really** [13] - 9:9, 10:20, 11:13, 16:9, 47:13, 62:4, 90:8, 90:14, 111:3, 112:22, 113:16, 115:13
**reason** [10] - 9:8, 24:14, 37:16, 50:21, 50:22, 58:7, 58:15, 65:12, 70:5, 72:4

**reasonable** [2] - 39:25, 83:5
**reasons** [5] - 45:18, 73:11, 81:18, 85:7, 88:13
**rebut** [4] - 34:1, 34:12, 72:22, 73:2
**rebuts** [2] - 73:8, 77:20
**rebuttal** [3] - 11:25, 28:18, 28:20
**receive** [8] - 5:2, 20:1, 20:2, 31:13, 36:8, 48:2, 83:3, 110:13
**received** [2] - 5:21, 8:16
**receives** [1] - 20:17
**recent** [9] - 86:24, 91:4, 91:6, 91:7, 91:8, 91:9, 121:9, 121:11, 121:18
**recently** [2] - 64:3, 77:2
**recess** [1] - 95:1
**Recess** [1] - 57:9
**recognition** [1] - 38:14
**recognize** [4] - 66:14, 66:16, 88:7, 120:17
**recognized** [5] - 28:7, 33:19, 38:11, 40:17, 69:5
**recognizes** [2] - 84:10
**recognizing** [2] - 32:8, 32:23
**record** [7] - 4:6, 6:22, 17:15, 27:25, 57:13, 95:22, 96:3
**recording** [7] - 26:21, 36:5, 43:9, 47:11, 48:5, 51:16, 55:11
**recoupable** [1] - 107:22
**recouped** [2] - 107:19, 107:24
**recover** [1] - 108:17
**red** [2] - 43:24, 52:22
**reduce** [1] - 19:13
**reduced** [1] - 76:20
**reduces** [1] - 63:4
**reduction** [3] - 35:21, 58:12, 62:24
**reductions** [1] - 92:8
**refer** [1] - 22:3
**reference** [1] - 85:13
**referred** [4] - 49:10, 79:12, 119:23, 119:25
**referring** [1] - 74:2
**reflect** [1] - 46:10

**reflecting** [1] - 46:10
**reflects** [1] - 80:12
**regard** [2] - 36:21, 51:21
**regarding** [4] - 5:2, 5:19, 9:20, 11:6
**regardless** [4] - 43:23, 43:25, 44:1, 110:15
**Reidy** [9] - 36:15, 37:12, 37:19, 78:25, 88:21, 88:25, 89:8, 90:2, 90:23
**reidy's** [1] - 36:19
**Reidy's** [4] - 38:1, 38:14, 41:16, 90:13
**reject** [2] - 32:20, 35:14
**rejected** [1] - 50:23
**relate** [1] - 9:21
**related** [3] - 7:5, 10:1, 10:19
**relations** [1] - 54:24
**relationship** [2] - 110:19, 110:24
**relative** [1] - 38:21
**relatively** [1] - 25:17
**relevant** [4] - 35:18, 38:22, 39:3, 76:5
**reliable** [5] - 7:8, 63:9, 83:10, 119:8, 121:13
**relies** [1] - 76:10
**reluctantly** [2] - 12:7, 26:18
**rely** [3] - 36:6, 76:19, 78:24
**remain** [3] - 46:19, 60:6, 95:7
**remained** [1] - 46:25
**remaining** [4] - 23:17, 48:23, 78:20, 84:19
**remarkable** [1] - 46:25
**remember** [3] - 23:16, 59:12, 83:8
**remove** [1] - 95:13
**removed** [2] - 61:24, 81:6
**renege** [1] - 84:24
**reorder** [1] - 118:10
**reordered** [1] - 118:25
**reoriented** [2] - 42:9, 42:10
**repeat** [3] - 63:22, 86:14, 113:22
**replace** [2] - 28:5, 51:23
**report** [4] - 52:15, 74:12, 85:5, 99:17
**reported** [2] - 60:14, 122:10
**reporter** [2] - 17:13,

30:20
**REPORTER** [15] - 29:23, 30:21, 34:17, 36:24, 37:2, 44:9, 44:12, 44:16, 94:7, 94:14, 98:6, 104:11, 107:5, 109:9, 121:3
**REPORTER'S** [1] - 122:9
**reporting** [1] - 29:17
**represent** [1] - 113:3
**representation** [1] - 100:21
**representative** [4] - 51:9, 80:24, 94:3, 111:10
**representatives** [3] - 93:3, 93:13, 93:21
**represented** [3] - 46:8, 94:1, 110:2
**representing** [1] - 4:7
**represents** [1] - 52:17
**reputation** [4] - 25:22, 25:23, 47:2, 91:15
**request** [1] - 32:19
**require** [4] - 32:13, 38:19, 118:11, 119:2
**required** [4] - 37:10, 37:18, 41:9, 77:8
**requirements** [1] - 51:4
**requires** [2] - 32:9, 57:20
**requiring** [1] - 35:21
**research** [1] - 29:18
**resist** [1] - 65:3
**resolve** [1] - 6:15
**resolved** [3] - 6:6, 11:22, 11:24
**resounding** [1] - 58:10
**resources** [1] - 53:2
**respect** [6] - 6:3, 88:13, 103:9, 117:19
**respectfully** [3] - 32:19, 90:18, 92:10
**respond** [4] - 14:22, 15:20, 28:20, 34:19
**response** [2] - 36:4, 36:16
**responsibilities** [1] - 98:15
**responsibility** [2] - 98:2, 99:7
**responsible** [6] - 97:21, 98:10, 98:16, 99:7, 99:8, 99:23
**rest** [3] - 52:20, 65:17, 72:18
**resting** [1] - 84:21

**restrict** [1] - 49:4
**rests** [1] - 49:1
**result** [9] - 30:4, 30:8, 49:20, 54:16, 54:17, 58:13, 69:6, 73:20, 82:23
**resulted** [1] - 44:20
**results** [3] - 24:13, 49:6, 80:22
**retail** [1] - 57:4
**retailer** [2] - 105:16, 106:6
**retailers** [10] - 60:15, 99:1, 105:3, 105:6, 105:11, 105:20, 106:1, 106:11, 118:9
**retailing** [1] - 53:16
**retrench** [1] - 53:3
**revenue** [2] - 119:6, 120:14
**Revolutionary** [1] - 101:20
**Rey** [1] - 30:19
**rich** [1] - 27:25
**Richards** [1] - 101:24
**rights** [13] - 27:11, 29:5, 45:16, 67:23, 98:4, 106:23, 107:1, 107:12, 108:5, 112:3, 117:24
**ripe** [1] - 50:8
**rise** [5] - 14:4, 46:23, 107:23, 108:7
**risk** [4] - 25:25, 48:22, 55:19, 119:10
**risking** [1] - 117:13
**risks** [1] - 64:8
**rival** [1] - 79:13
**rivals** [5] - 26:24, 49:1, 73:12, 76:17, 79:15
**robin** [3] - 111:21, 112:5, 112:8
**robust** [1] - 58:19
**role** [8] - 72:20, 75:13, 83:1, 83:2, 97:11, 100:8, 104:13
**roles** [1] - 99:10
**Rolling** [1] - 101:25
**room** [1] - 94:20
**rosy** [1] - 51:6
**rough** [1] - 70:2
**roughly** [3] - 21:10, 108:11, 109:4
**round** [4] - 41:11, 111:21, 112:5, 112:8
**round-robin** [3] - 111:21, 112:5, 112:8
**roundness** [2] - 41:7, 41:8
**rounds** [2] - 23:4,

112:18
**routinely** [4] - 35:7, 47:14, 52:2, 118:25
**row** [1] - 31:3
**Rowling** [1] - 101:15
**Royal** [1] - 15:3
**royalties** [9] - 20:21, 29:8, 30:1, 98:4, 107:10, 107:21, 109:15, 109:17, 110:13
**royalty** [8] - 107:1, 107:9, 107:13, 107:17, 107:20, 108:6, 110:7, 110:8
**royalty's** [1] - 107:3
**Rudzin** [1] - 4:17
**rule** [5] - 92:23, 92:24
**Rule** [5] - 7:7, 7:15, 14:24, 15:4, 15:18
**rules** [2] - 13:2, 112:25
**ruling** [2] - 8:5, 8:6
**run** [2] - 62:23, 73:11
**runner** [8] - 62:1, 75:16, 81:2, 81:3, 81:4, 81:7, 81:8, 81:10
**runner-up** [8] - 62:1, 75:16, 81:2, 81:3, 81:4, 81:7, 81:8, 81:10
**Ryan** [1] - 4:22

# S

**S&S** [6] - 62:10, 62:15, 74:3, 75:1, 84:16, 84:18
**sabbatical** [1] - 20:7
**sacrificed** [1] - 21:5
**sacrifices** [1] - 56:4
**sadly** [1] - 36:15
**salary** [1] - 20:14
**sale** [5] - 58:11, 60:20, 73:24, 107:19, 113:2
**sales** [21] - 25:22, 42:23, 47:15, 56:20, 57:4, 60:15, 69:23, 70:3, 70:5, 70:6, 70:7, 70:8, 98:23, 98:25, 105:4, 105:19, 107:23, 110:19, 114:18, 119:16, 120:5
**Sam's** [1] - 105:13
**Samuel** [1] - 101:19
**Sansigre** [18] - 6:7, 6:15, 9:12, 9:15, 10:14, 10:17, 10:25,

11:4, 11:5, 11:13, 12:20, 13:8, 13:10, 14:16, 14:19, 51:10, 51:15, 82:20
**satisfied** [1] - 39:1
**Saturday** [1] - 12:17
**save** [1] - 12:1
**saw** [2] - 72:14, 79:11
**scales** [1] - 53:2
**scheduling** [1] - 12:4
**Schiff** [1] - 101:18
**Scholastic** [4] - 71:11, 74:10, 92:3, 118:21
**Schu** [1] - 26:17
**Schuster** [73] - 4:22, 18:22, 19:22, 20:2, 21:16, 22:1, 22:7, 22:13, 22:19, 22:24, 23:8, 23:12, 23:21, 24:3, 25:1, 25:18, 28:5, 30:22, 36:15, 36:18, 37:15, 42:13, 43:22, 45:1, 45:8, 45:21, 45:22, 46:5, 46:8, 48:10, 50:5, 51:14, 51:24, 54:8, 54:21, 55:15, 58:1, 58:25, 60:19, 62:7, 75:5, 78:15, 78:22, 79:14, 82:11, 82:13, 85:22, 86:13, 86:17, 86:18, 87:2, 87:7, 87:12, 87:17, 87:19, 87:22, 88:9, 88:12, 88:16, 88:20, 89:4, 89:10, 89:13, 89:23, 90:17, 90:22, 91:20, 91:23, 92:1, 92:4, 92:7, 106:18
**Schuster's** [7] - 23:5, 23:18, 25:5, 30:12, 44:8, 44:17, 45:23
**Schuster]** [1] - 37:6
**SCHWARZ** [5] - 5:25, 6:18, 7:1, 11:23, 12:4
**Schwarz** [3] - 4:10, 5:25, 6:24
**scope** [1] - 30:11
**score** [2] - 62:14, 80:25
**scores** [1] - 25:10
**screen** [2] - 43:15, 88:23
**Scribner** [2] - 30:23, 101:6
**Scribner's** [1] - 96:9
**script** [1] - 67:23
**SE** [1] - 4:3
**seat** [2] - 6:24

**seated** [1] - 95:11
**second** [6] - 22:19, 35:9, 62:14, 74:23, 80:25, 89:22
**Second** [4] - 50:7, 56:12, 56:15, 85:14
**second-score** [1] - 80:25
**Section** [5] - 31:25, 32:9, 32:13, 57:20, 72:21
**section** [1] - 16:22
**see** [54] - 5:23, 10:19, 10:20, 17:20, 18:2, 22:23, 22:24, 24:24, 25:7, 26:11, 27:13, 28:22, 30:8, 31:17, 33:6, 33:14, 34:9, 36:12, 38:8, 42:4, 42:17, 43:20, 43:22, 43:24, 45:4, 46:1, 46:16, 47:22, 48:17, 51:6, 51:25, 52:14, 52:23, 57:3, 58:6, 59:23, 60:18, 64:10, 68:12, 70:3, 70:4, 73:7, 73:22, 78:13, 79:2, 79:7, 79:10, 79:16, 80:3, 82:21, 90:10, 99:13, 109:2, 112:5
**seek** [1] - 45:25
**segment** [5] - 63:1, 66:10, 66:12, 69:2, 74:18
**self** [4] - 39:9, 39:14, 59:5, 91:5
**self-publishing** [4] - 39:9, 39:14, 59:5, 91:5
**sell** [30] - 20:20, 21:12, 26:1, 29:5, 31:12, 52:17, 59:9, 59:15, 59:19, 86:19, 87:5, 87:7, 103:18, 105:6, 105:8, 105:9, 105:10, 105:17, 105:18, 105:20, 105:21, 106:1, 106:12, 106:24, 110:23, 110:25, 111:15, 118:5, 118:12
**seller** [11] - 20:2, 20:3, 40:7, 43:19, 46:17, 47:3, 65:8, 69:10, 69:11, 70:14
**sellers** [10] - 19:3, 20:4, 20:20, 20:22, 24:22, 25:23, 38:5,

39:8, 41:15, 44:19
**sellers'** [1] - 73:23
**selling** [25] - 20:11, 21:3, 21:14, 28:11, 29:10, 31:11, 31:15, 37:15, 38:15, 39:10, 42:2, 42:22, 43:14, 46:17, 47:17, 48:10, 48:11, 52:2, 52:10, 53:21, 56:24, 66:1, 67:2, 86:18, 118:9
**sells** [1] - 110:15
**senior** [5] - 30:25, 31:1, 31:5, 43:6, 96:10
**sense** [7] - 15:18, 30:11, 42:1, 61:5, 67:12, 74:24, 81:7
**sensed** [1] - 119:4
**sensitive** [1] - 43:12
**sent** [1] - 17:1
**separate** [4] - 30:6, 39:22, 66:25, 122:11
**September** [2] - 102:21, 102:24
**serialization** [1] - 107:11
**series** [1] - 116:21
**serious** [2] - 65:13, 73:23
**seriously** [1] - 38:25
**serve** [1] - 85:18
**serves** [1] - 77:18
**service** [4] - 44:20, 86:23, 119:21, 120:23
**services** [14] - 21:18, 21:20, 67:5, 71:4, 71:8, 71:9, 71:16, 119:13, 119:15, 119:23, 120:1, 120:5, 120:8, 120:12
**session** [2] - 17:6, 17:23
**set** [7] - 11:4, 40:11, 49:13, 111:16, 112:25, 113:2, 117:12
**setting** [2] - 113:17, 120:25
**seven** [3] - 22:11, 65:2, 103:4
**several** [8] - 27:23, 28:8, 55:21, 63:2, 77:1, 77:24, 90:23, 121:14
**shaped** [1] - 19:18
**share** [23] - 20:9, 21:24, 25:3, 25:4, 25:5, 25:8, 25:16,

25:17, 34:7, 37:5, 38:8, 42:16, 42:18, 46:8, 52:20, 52:22, 53:4, 53:14, 59:4, 60:17, 91:8, 91:10, 120:13
**shareholder** [2] - 26:25, 99:8
**shares** [22] - 28:12, 36:9, 36:14, 41:11, 43:12, 46:4, 46:10, 52:18, 58:21, 58:25, 72:25, 73:9, 73:14, 73:15, 74:3, 74:16, 74:17, 75:13, 76:2, 76:5, 76:11, 76:19
**shift** [1] - 34:3
**ships** [1] - 41:3
**Shoe** [1] - 66:21
**Shores** [1] - 4:22
**shortage** [1] - 53:6
**shortly** [1] - 20:22
**shot** [1] - 112:12
**show** [37] - 14:10, 14:12, 14:15, 15:12, 16:3, 17:14, 19:15, 20:23, 21:7, 34:3, 35:24, 36:9, 39:25, 42:4, 42:8, 43:12, 46:9, 47:21, 52:16, 53:22, 57:22, 57:25, 58:24, 60:21, 73:6, 76:21, 78:20, 78:21, 86:16, 87:6, 89:21, 90:7, 91:9, 92:2, 92:8
**showed** [2] - 54:3, 74:11
**showing** [7] - 14:11, 34:7, 50:3, 51:24, 54:13, 59:6, 72:25
**shown** [1] - 35:14
**shows** [5] - 21:23, 24:23, 43:16, 79:9, 91:14
**shrinking** [2] - 58:6, 63:16
**shriveled** [1] - 63:17
**shrunk** [1] - 60:25
**sic** [6] - 25:14, 25:15, 56:8, 57:10, 72:9, 75:4
**sic]** [1] - 25:11
**side** [6] - 17:21, 31:16, 69:24, 86:9, 88:16, 103:13
**sidelines** [1] - 105:10
**sides** [1] - 45:21
**sight** [1] - 89:24
**sign** [4] - 5:3, 103:11,

116:24
**signed** [1] - 116:25
**significant** [10] - 18:24, 46:7, 46:8, 68:19, 74:2, 89:12, 89:15, 91:10, 91:25, 93:18
**significantly** [6] - 21:9, 31:18, 33:1, 33:5, 59:1, 115:6
**signing** [4] - 5:14, 100:4, 106:22, 107:14
**signs** [1] - 116:17
**silly** [1] - 65:5
**similar** [1] - 67:10
**Simon** [81] - 4:22, 18:22, 19:22, 20:2, 21:16, 21:25, 22:7, 22:12, 22:18, 22:24, 23:5, 23:8, 23:12, 23:18, 23:21, 24:3, 24:25, 25:5, 25:18, 26:17, 28:5, 30:12, 30:22, 36:15, 36:18, 37:6, 37:15, 42:13, 43:22, 44:8, 44:16, 45:1, 45:8, 45:20, 45:22, 45:23, 46:5, 46:7, 48:10, 50:5, 51:14, 51:23, 54:8, 54:21, 55:15, 58:1, 58:25, 60:19, 62:7, 75:5, 78:15, 78:22, 79:14, 82:10, 82:13, 85:22, 86:13, 86:17, 86:18, 87:2, 87:7, 87:12, 87:17, 87:19, 87:22, 88:9, 88:12, 88:15, 88:19, 89:4, 89:10, 89:13, 89:23, 90:17, 90:22, 91:23, 91:25, 92:4, 92:6, 106:18
**simple** [2] - 50:9, 63:18
**simplicity** [3] - 41:7, 41:8, 52:18
**simply** [5] - 20:13, 36:6, 49:10, 110:13, 113:17
**single** [3] - 63:4, 75:18, 110:18
**sister** [1] - 53:7
**sit** [2] - 7:1, 94:23
**situation** [13] - 64:15, 76:16, 109:24, 111:10, 111:13, 113:19, 113:23, 114:1, 114:13,

115:3, 115:10,
117:4, 117:13
**situations** [2] -
114:12, 115:4
**six** [2] - 65:2, 74:25
**six-to-five** [1] - 74:25
**sizable** [1] - 42:20
**size** [5] - 18:23, 53:14,
57:3, 106:19, 110:10
**sized** [1] - 19:5
**sizes** [1] - 58:17
**skepticism** [1] - 50:24
**skilled** [1] - 77:6
**skills** [2] - 37:11,
37:18
**slack** [1] - 76:18
**slide** [9] - 22:11,
30:11, 40:10, 42:9,
43:15, 43:16, 54:13,
61:9, 91:7
**slightly** [1] - 119:12
**slivers** [1] - 52:23
**slow** [5] - 36:24, 44:9,
44:13, 94:13, 98:6
**slowly** [3] - 57:15,
94:11, 100:25
**small** [43] - 25:7, 25:9,
25:14, 28:4, 28:14,
36:21, 37:19, 42:9,
42:10, 42:14, 42:15,
42:18, 42:20, 42:22,
43:1, 43:2, 46:9,
46:10, 46:13, 46:14,
46:16, 46:18, 46:19,
47:1, 47:7, 47:9,
47:12, 47:16, 51:22,
52:6, 52:9, 52:16,
52:22, 53:3, 55:7,
68:25, 83:15, 90:11,
91:4, 91:11, 91:12,
96:8
**smaller** [13] - 22:15,
27:23, 28:2, 28:13,
37:20, 38:5, 42:17,
43:7, 52:19, 53:18,
90:8, 119:17, 119:22
**Smith** [1] - 4:17
**Snyder** [6] - 6:16, 7:4,
10:15, 11:1, 11:10,
82:1
**Snyder's** [3] - 7:21,
8:13, 10:7
**so-called** [1] - 66:1
**soar** [1] - 69:17
**social** [1] - 19:18
**socially** [1] - 20:7
**soft** [1] - 79:6
**sold** [10] - 46:24,
56:25, 66:16, 87:2,
87:8, 105:3, 107:2,

107:9, 113:1
**solely** [2] - 61:21,
66:14
**solicit** [1] - 111:11
**solicitation** [2] -
97:12, 119:17
**solicits** [1] - 99:1
**someone** [4] - 13:4,
51:5, 94:22, 100:22
**sometimes** [9] -
69:14, 75:22,
106:25, 114:2,
114:19, 119:16,
119:23, 120:5
**Sons** [1] - 96:9
**soon** [1] - 99:13
**sophisticated** [1] -
33:10
**sorry** [11] - 29:23,
44:11, 56:14, 70:7,
80:10, 80:12, 101:1,
102:22, 104:10,
107:24, 108:3
**sort** [2] - 68:4, 84:25
**soul** [1] - 100:18
**sources** [1] - 77:25
**spades** [1] - 53:18
**speaking** [2] - 9:3,
93:24
**special** [3] - 67:5, 67:6
**specialize** [1] - 120:24
**specialized** [1] -
102:15
**specializes** [1] -
102:16
**specific** [7] - 39:19,
50:5, 82:16, 91:2,
102:8, 108:15,
108:25
**specifically** [2] - 46:2,
99:23
**specificity** [1] - 11:12
**speculation** [1] -
77:16
**spend** [5] - 21:10,
31:7, 35:9, 46:12,
47:19
**spending** [2] - 21:8,
80:5
**spent** [3] - 38:9,
40:23, 40:24
**splash** [1] - 53:1
**Spoiled** [1] - 101:22
**sports** [1] - 101:21
**spreadsheet** [1] -
51:11
**spur** [1] - 85:23
**square** [1] - 38:12
**stable** [1] - 37:25
**Stacy** [1] - 101:18

**staff** [4] - 97:9, 97:23,
97:24
**Stones** [1] - 101:25
**staffed** [1] - 99:9
**stake** [2] - 20:25, 24:8
**stand** [8] - 9:10,
36:11, 87:23, 93:9,
95:4, 99:19, 100:5,
106:7
**standard** [5] - 7:10,
27:2, 31:22, 31:23,
48:8
**standards** [1] - 33:19
**standing** [2] - 84:8,
95:7
**Staples** [3] - 34:14,
40:22, 67:8
**stark** [1] - 42:20
**stars** [1] - 67:19
**start** [6] - 47:16,
63:25, 65:9, 76:14,
86:18, 103:6
**starting** [1] - 78:1
**starts** [1] - 69:11
**state** [2] - 16:3, 95:22
**statement** [6] - 12:18,
12:25, 41:16, 72:14,
80:4, 84:13
**Statements** [1] - 3:3
**statements** [3] -
12:14, 13:16, 55:18
**States** [11] - 4:3, 4:8,
6:1, 18:21, 19:23,
26:5, 26:23, 28:25,
56:2, 56:17, 99:7
**static** [1] - 76:10
**stating** [1] - 14:10
**statistic** [2] - 108:15,
108:25
**statistical** [1] - 63:17
**statistics** [2] - 34:7,
72:20
**statute** [1] - 32:5
**stay** [1] - 111:23
**staying** [1] - 46:18
**steady** [2] - 52:19,
52:21
**steal** [1] - 45:19
**Stehlik** [1] - 43:5
**step** [3] - 76:18, 92:4,
96:15
**Stephen** [4] - 4:21,
27:9, 68:12, 86:13
**Steve** [1] - 55:7
**stewards** [2] - 85:21,
88:8
**still** [8] - 22:19, 30:1,
55:1, 55:2, 93:9,
100:6, 100:9, 117:15
**stipulated** [1] - 5:12
**stock** [3] - 106:6,

118:10, 118:23
**Stones** [1] - 101:25
**stop** [4] - 32:3, 55:14,
121:24
**stopped** [2] - 18:18,
72:3
**store** [2] - 105:24,
106:8
**stores** [1] - 105:17
**story** [3] - 30:5, 52:5,
90:10
**straight** [1] - 10:12
**strained** [1] - 121:17
**stranded** [1] - 64:14
**strategic** [1] - 87:1
**strategy** [2] - 98:16,
99:19
**streaming** [3] - 86:23,
86:25, 87:4
**streamline** [1] - 4:11
**strength** [1] - 46:11
**stretch** [1] - 47:14
**stretches** [1] - 109:21
**stretching** [1] - 47:17
**STRICK** [7] - 5:8,
14:24, 16:15, 17:8,
17:13, 17:24, 18:3
**Strick** [1] - 4:9
**strict** [1] - 71:14
**strong** [7] - 33:23,
37:11, 37:18, 59:9,
73:12, 89:22, 99:21
**strongly** [1] - 56:21
**structural** [1] - 49:24
**structured** [1] - 75:12
**studio** [1] - 86:22
**submarket** [1] - 40:7
**submarkets** [1] - 40:4
**submit** [10] - 57:22,
64:6, 66:9, 75:20,
81:14, 81:23, 84:11,
85:25, 90:18, 92:10
**submits** [1] - 114:3
**submitted** [2] - 22:22,
113:9
**subsequent** [1] -
112:17
**subset** [1] - 67:16
**subsidiaries** [1] -
55:13
**subsidiary** [1] - 53:7
**substance** [2] - 13:19,
16:8
**substantial** [2] - 63:7,
92:9
**substantially** [4] -
32:2, 46:16, 57:21,
59:24
**substitute** [3] - 54:2,
64:13, 73:5

**succeed** [1] - 38:4
**success** [9] - 21:21,
27:15, 27:19, 42:8,
43:2, 57:4, 84:7,
91:14, 91:15
**successful** [3] - 22:9,
41:23, 47:23
**successfully** [2] -
25:23, 77:8
**succinctly** [1] - 54:4
**suddenly** [2] - 28:4,
51:22
**suffered** [1] - 35:11
**suffice** [1] - 35:6
**sufficient** [5] - 7:8,
41:12, 49:25, 83:14,
85:3
**suggest** [4] - 21:4,
57:24, 72:4, 74:12
**suggested** [1] - 6:12
**suggesting** [2] - 24:6,
71:3
**suggestion** [3] - 6:4,
80:7, 84:25
**suggestions** [1] -
11:23
**suited** [1] - 106:5
**sum** [2] - 29:12, 29:20
**summary** [1] - 7:14
**Summer** [1] - 101:5
**super** [1] - 19:5
**super-sized** [1] - 19:5
**superficially** [1] -
67:10
**superior** [1] - 21:19
**supplies** [1] - 40:24
**supply** [2] - 35:25,
105:24
**Supply** [1] - 105:23
**support** [5] - 21:19,
28:8, 60:3, 70:15,
85:4
**supported** [1] - 38:12
**supporting** [1] - 78:10
**supports** [1] - 42:3
**supposed** [2] - 13:1,
54:25
**Supreme** [8] - 32:25,
33:3, 38:23, 40:5,
50:22, 55:12, 66:21
**surgically** [1] - 40:14
**surpasses** [2] - 33:7,
33:18
**Surplus** [1] - 15:3
**surprise** [1] - 56:7
**surprised** [1] - 8:16
**surprising** [1] - 34:10
**suspense** [1] - 101:13
**swinging** [1] - 90:5
**switch** [1] - 119:12

144

**swoop** [1] - 103:20
**synergies** [1] - 82:24
**Sysco** [5] - 34:14,
35:6, 73:13, 73:17,
79:11
**systems** [3] - 119:20,
119:21
**Syufy** [2] - 67:8, 67:9

**T**

**table** [3] - 4:8, 4:17,
117:10
**tacit** [1] - 48:23
**takeaway** [1] - 66:22
**talent** [3] - 38:2, 38:3,
38:6
**talented** [1] - 99:10
**tape** [1] - 16:6
**targeted** [1] - 40:12
**Targets** [1] - 15:14
**Tartt** [1] - 101:14
**team** [4] - 55:23,
55:24, 99:3, 105:5
**teams** [10] - 37:24,
38:1, 38:2, 38:3,
38:6, 90:4, 90:8,
99:3, 99:21, 100:20
**tech** [1] - 4:12
**technical** [1] - 26:20
**technically** [1] - 39:7
**television** [3] - 86:21,
86:25, 87:4
**ten** [3] - 41:2, 41:7,
41:13
**tend** [1] - 32:4
**tens** [6] - 24:7, 24:12,
24:16, 68:23, 104:9,
104:13
**term** [12] - 29:6, 67:2,
106:15, 108:2,
109:12, 109:15,
109:18, 113:11,
113:12, 115:8,
117:21
**terms** [9] - 13:3,
44:21, 49:13, 63:18,
68:19, 85:10, 90:11,
113:16, 121:15
**territory** [1] - 106:24
**test** [5] - 33:13, 39:1,
39:2, 50:22, 64:5
**testified** [4] - 6:16,
9:12, 28:8, 54:4
**testifies** [4] - 43:7,
47:8, 48:1, 55:8
**testify** [7] - 12:6,
19:24, 33:23, 47:6,
53:13, 85:6, 90:24
**testifying** [1] - 13:9

**testimony** [22] - 7:4,
7:8, 10:7, 10:17,
13:11, 13:25, 14:25,
25:13, 28:18, 28:24,
36:8, 42:24, 43:1,
43:10, 47:5, 51:17,
52:6, 53:5, 90:22,
93:18, 93:19, 122:3
**text** [3] - 31:25, 32:21,
104:4
**texts** [1] - 104:5
**theaters** [1] - 67:20
**theirs** [1] - 12:10
**theme** [2] - 50:19,
64:1
**themselves** [8] - 14:2,
39:13, 39:14, 40:5,
66:18, 70:23, 85:12,
111:13
**theoretically** [1] - 44:4
**theory** [6] - 49:1, 49:5,
76:3, 78:9, 81:4,
85:4
**therefore** [3] - 13:15,
31:10, 31:13
**they've** [6] - 25:20,
25:21, 42:21, 88:12,
88:14
**thinking** [1] - 68:20
**thinks** [2] - 75:18,
77:4
**third** [9] - 5:5, 5:7, 5:9,
9:18, 9:25, 22:25,
45:7, 45:11, 73:19
**third-party** [2] - 9:18,
9:25
**thousand** [10] - 33:22,
44:3, 48:11, 48:12,
48:14, 71:21, 84:3,
91:24, 108:5, 108:7
**thousands** [3] - 20:25,
104:9, 104:13
**threat** [1] - 36:21
**three** [14] - 19:10,
22:23, 34:18, 40:10,
50:17, 51:20, 64:9,
74:5, 88:25, 90:19,
102:11, 112:17,
116:20
**three-bidder** [1] -
22:23
**three-year-old** [1] -
90:19
**threshold** [11] - 31:14,
31:18, 31:20, 33:7,
33:20, 43:14, 43:18,
43:23, 44:1, 61:7
**thresholds** [2] - 33:15,
43:17
**thriller** [1] - 101:9

**thrillers** [2] - 101:9,
101:13
**throughout** [1] - 72:1
**Thursday** [1] - 6:10
**ticket** [1] - 68:22
**tightly** [1] - 85:12
**timing** [1] - 18:13
**tiny** [5] - 61:1, 61:10,
61:14, 62:12, 72:4
**title** [3] - 22:4, 69:9,
95:24
**today** [9] - 5:3, 10:19,
16:16, 26:17, 27:22,
33:9, 47:18, 91:7,
91:13
**together** [5] - 5:16,
42:11, 55:2, 97:25,
121:6
**toiled** [1] - 20:10
**tomorrow** [2] - 27:10,
68:12
**took** [2] - 62:3, 90:23
**toolbox** [1] - 64:20
**tools** [1] - 64:19
**top** [48] - 19:3, 20:1,
20:3, 20:4, 20:20,
20:22, 21:3, 21:13,
22:12, 22:24, 24:22,
28:11, 29:9, 31:11,
31:15, 39:8, 39:10,
40:6, 41:15, 41:21,
42:2, 43:14, 43:18,
44:19, 45:17, 46:17,
47:17, 48:10, 48:11,
51:11, 52:2, 52:10,
56:24, 61:25, 62:11,
62:15, 65:1, 65:8,
66:1, 67:2, 67:11,
69:9, 69:11, 70:13,
74:9, 75:1, 82:22,
89:7
**top-down** [1] - 51:11
**top-grossing** [1] -
67:11
**top-selling** [1] - 52:10
**topics** [1] - 27:5
**tops** [1] - 23:6
**total** [6] - 25:11,
62:19, 62:24, 108:6
**totality** [2] - 97:21,
99:6
**totally** [2] - 13:14, 14:5
**touch** [1] - 100:19
**touches** [1] - 11:11
**touted** [1] - 88:22
**toward** [1] - 32:3
**towering** [1] - 25:1
**town** [1] - 64:9
**trac** [1] - 105:24
**track** [1] - 30:16

**Tractor** [1] - 105:23
**Trade** [1] - 28:9
**trade** [7] - 60:9, 60:21,
106:20, 107:4,
107:6, 107:7, 117:20
**trades** [1] - 19:15
**traditional** [1] - 14:14
**transaction** [4] -
82:15, 84:8, 87:15,
87:24
**transactions** [5] -
61:16, 61:21, 61:25,
62:2, 69:1
**transcribed** [1] -
122:10
**transcript** [4] - 8:19,
14:1, 14:4, 17:14
**transcripts** [1] - 14:2
**translation** [2] - 107:1,
107:10
**transparency** [1] -
85:8
**transparent** [1] - 18:1
**traveling** [1] - 29:17
**treating** [2] - 71:23,
89:16
**treats** [1] - 66:23
**tremendous** [1] - 90:1
**trends** [1] - 32:3
**trial** [29] - 4:25, 8:5,
8:6, 8:7, 8:8, 10:9,
13:9, 13:12, 13:14,
15:10, 15:23, 16:10,
18:1, 18:25, 22:2,
23:24, 24:19, 31:10,
35:5, 35:22, 42:4,
43:5, 46:13, 47:22,
48:25, 57:22, 61:11,
73:7
**tried** [3] - 9:17, 16:20,
117:14
**tries** [1] - 81:5
**trigger** [1] - 72:6
**triggered** [4] - 34:2,
60:8, 72:9, 72:12
**trivial** [1] - 24:17
**Tronox** [2] - 34:16,
34:18
**true** [5] - 41:14, 60:19,
64:25, 69:14, 77:13
**trust** [1] - 85:1
**try** [8] - 57:16, 63:22,
65:5, 70:15, 84:13,
94:10, 114:11, 116:2
**trying** [6] - 4:11, 6:3,
44:15, 83:25, 89:10,
118:3
**turn** [14] - 26:9, 31:22,
38:1, 44:7, 45:22,
47:15, 50:15, 54:7,

59:10, 110:5, 110:16
**turned** [1] - 60:11
**turning** [2] - 38:9,
51:20
**TV** [2] - 26:8, 26:9
**tweak** [1] - 63:11
**tweets** [1] - 54:16
**twelve** [1] - 62:17
**twice** [1] - 18:23
**Twitter** [2] - 54:14,
54:15
**two** [30] - 6:3, 11:12,
16:18, 22:14, 23:17,
30:6, 34:20, 56:12,
57:25, 61:22, 61:23,
61:25, 62:7, 62:11,
62:15, 63:6, 64:10,
73:18, 73:20, 75:1,
76:13, 78:16, 78:18,
78:22, 78:23, 81:17,
87:16, 93:3, 116:20,
121:23
**type** [1] - 104:4
**types** [2] - 27:6, 58:16
**typically** [2] - 29:4,
116:18

**U**

**U.S** [5] - 30:9, 36:22,
37:3, 98:18, 121:12
**ultimate** [1] - 91:18
**ultimately** [1] - 66:8
**unable** [1] - 52:10
**unappealing** [1] -
39:10
**unchallenged** [1] -
40:3
**unchanged** [1] - 46:25
**uncompensated** [1] -
20:10
**unconcentrated** [2] -
60:5, 60:6
**under** [9] - 7:7, 14:24,
15:18, 30:24, 49:16,
62:22, 72:21, 78:8,
122:11
**undercut** [1] - 31:6
**underlined** [1] - 80:5
**underlying** [1] - 64:1
**underneath** [1] -
50:21
**underpays** [1] - 92:4
**understood** [3] - 9:24,
37:12, 37:13
**undisputed** [1] - 75:11
**undoubtedly** [1] -
31:1
**uneven** [1] - 28:2
**unfolded** [1] - 60:1

**unfortunately** [2] - 6:2, 88:21
**uniform** [1] - 82:10
**unilateral** [3] - 34:23, 34:24, 35:7
**unilaterally** [1] - 76:23
**unique** [3] - 24:1, 49:25, 59:16
**unit** [1] - 89:16
**United** [11] - 4:3, 4:8, 6:1, 18:21, 19:23, 26:5, 26:23, 28:25, 56:2, 56:17, 99:7
**universal** [1] - 85:19
**universe** [1] - 81:23
**unknown** [1] - 69:2
**unless** [2] - 104:22, 104:23
**unlike** [2] - 39:12, 67:12
**unpack** [1] - 21:6
**unrelentingly** [1] - 89:22
**unsurpassed** [1] - 50:11
**unusual** [1] - 34:20
**up** [45] - 11:4, 17:18, 29:14, 37:3, 37:10, 37:17, 50:20, 54:6, 54:22, 58:4, 62:1, 65:18, 65:21, 72:4, 74:15, 74:16, 75:16, 76:18, 78:7, 80:10, 81:2, 81:3, 81:4, 81:7, 81:8, 81:10, 83:20, 86:4, 88:23, 89:2, 90:3, 90:7, 91:7, 95:5, 100:1, 100:4, 104:24, 107:14, 111:17, 113:2, 115:4, 115:18, 116:2, 117:12, 121:1
**up-front** [1] - 65:21
**upheld** [1] - 41:20
**upstarts** [3] - 91:5, 91:6, 91:7
**upstream** [7] - 58:3, 59:11, 59:14, 59:21, 60:4, 76:1, 76:4
**upward** [1] - 82:7
**useful** [1] - 40:15
**uses** [2] - 67:1, 86:6

## V

**Vacancy** [1] - 101:16
**vague** [1] - 68:19
**validates** [1] - 36:9
**valuable** [1] - 76:25

**value** [1] - 62:23
**valued** [1] - 22:8
**values** [1] - 66:16
**valuing** [1] - 27:18
**vanishes** [1] - 73:3
**variations** [1] - 112:15
**variety** [1] - 50:10
**various** [1] - 104:23
**vast** [1] - 19:2
**vastly** [1] - 68:22
**verifiability** [5] - 8:4, 8:11, 10:24, 11:1, 11:6
**verifiable** [5] - 7:21, 7:24, 7:25, 8:22, 51:18
**verification** [4] - 6:5, 6:20, 11:11, 83:3
**verified** [5] - 7:21, 7:23, 51:3, 51:5, 51:7
**verifier** [1] - 83:2
**verify** [3] - 11:15, 55:5, 82:17
**verifying** [1] - 11:13
**Vernon** [2] - 92:16, 94:9
**VERNON** [16] - 94:9, 94:15, 94:18, 94:22, 94:25, 95:14, 95:19, 98:14, 105:1, 108:1, 109:11, 117:18, 120:17, 120:20, 121:7, 121:22
**Vernon**................ [1] - 3:9
**version** [1] - 58:22
**versions** [1] - 16:18
**versus** [2] - 14:11, 17:19
**vessels** [3] - 41:2, 41:7, 41:13
**vetted** [1] - 82:20
**viability** [1] - 28:19
**viable** [1] - 28:17
**Viacom** [4] - 36:17, 36:19, 89:2, 89:3
**ViacomCBS** [6] - 4:22, 86:13, 86:17, 86:18, 86:20, 86:24
**ViacomCBS's** [1] - 87:1
**vibrant** [1] - 84:5
**victories** [1] - 72:17
**video** [22] - 12:19, 12:24, 13:13, 13:20, 13:25, 14:11, 15:1, 15:5, 15:7, 16:17, 17:6, 17:19, 26:21, 36:5, 43:9, 47:6,

47:11, 48:5, 51:16, 55:6, 55:11
**videotapes** [1] - 16:8
**vigorous** [1] - 44:8
**vigorously** [1] - 59:10
**Viking** [1] - 30:19
**violation** [1] - 35:12
**virtually** [1] - 72:18
**visible** [2] - 85:10, 104:1
**volume** [1] - 44:4

## W

**wages** [1] - 64:11
**waited** [1] - 12:8
**walk** [1] - 24:19
**Walk** [1] - 101:22
**Wallace** [1] - 101:16
**Walmarts** [1] - 105:13
**Walter** [1] - 101:12
**wants** [3] - 103:17, 103:22, 114:15
**warehouse** [3] - 98:24, 119:18, 119:20
**ways** [5] - 53:23, 88:7, 104:23, 114:2, 121:19
**weak** [1] - 79:6
**Wednesday** [1] - 6:10
**week** [2] - 6:9, 45:8
**weeks** [1] - 55:20
**weigh** [1] - 51:18
**weight** [1] - 72:13
**welfare** [1] - 65:19
**well-accepted** [1] - 28:16
**well-known** [1] - 30:18
**whatsoever** [1] - 75:14
**wheat** [1] - 59:16
**wheels** [1] - 102:19
**who've** [1] - 111:14
**whole** [6] - 17:12, 20:24, 29:10, 60:23, 105:15, 105:25
**Whole** [1] - 67:8
**Wilhelmsen** [1] - 34:15, 41:1, 41:10
**willing** [4] - 45:13, 47:13, 110:22, 110:25
**willingness** [1] - 114:9
**win** [13] - 27:20, 45:16, 47:17, 59:18, 59:19, 65:7, 71:13, 74:7, 74:17, 74:23, 83:25, 84:22, 117:16
**windfalls** [1] - 29:12

**winner** [2] - 81:2
**winning** [7] - 25:13, 25:14, 25:15, 81:3, 81:5, 81:10, 84:7
**wins** [3] - 23:14, 25:16, 112:2
**wisely** [1] - 98:2
**Witches** [1] - 101:20
**WITNESS** [7] - 95:6, 95:10, 95:12, 95:17, 98:7, 117:3, 117:7
**witness** [15] - 9:19, 12:10, 13:24, 16:17, 47:24, 83:6, 88:21, 90:24, 92:14, 92:15, 93:8, 93:9, 94:4, 95:4, 95:15
**Witnesses** [1] - 3:7
**witnesses** [22] - 4:10, 6:13, 9:11, 9:14, 9:16, 9:18, 9:22, 9:25, 10:1, 10:2, 10:16, 15:14, 16:3, 27:6, 29:3, 87:14, 88:1, 92:23, 92:24, 92:25, 93:14, 93:22
**WL** [2] - 15:4, 15:9
**wondered** [1] - 31:8
**word** [1] - 6:6
**words** [9] - 6:22, 18:19, 39:4, 64:14, 67:9, 67:15, 80:19, 88:19, 90:13
**work-for-hire** [3] - 110:11, 110:12, 110:17
**worker** [1] - 64:11
**Workman** [6] - 102:13, 102:14, 102:15, 102:23, 103:2, 105:22
**works** [6] - 64:17, 81:19, 99:2, 99:4, 100:22, 106:20
**World** [1] - 45:15
**world** [18] - 44:21, 45:15, 62:18, 71:12, 73:10, 80:21, 85:18, 97:6, 97:14, 97:25, 98:8, 100:16, 100:21, 104:1, 104:21, 106:25, 118:4
**worried** [1] - 15:13
**worry** [1] - 26:24
**worse** [1] - 19:11
**worsen** [1] - 35:1
**worth** [5] - 23:20, 23:23, 84:2, 84:4, 115:16

**wrapped** [1] - 121:5
**write** [6] - 20:10, 22:2, 24:18, 48:13, 114:7, 114:9
**writer** [4] - 29:15, 101:9, 101:11, 101:21
**writers** [2] - 100:11, 101:7
**writes** [2] - 36:22, 37:20
**writing** [2] - 29:16, 103:22
**writings** [1] - 24:9
**written** [2] - 14:1, 14:4
**wrote** [2] - 78:25, 88:25

## Y

**year** [25] - 20:18, 21:11, 24:8, 24:16, 52:17, 52:23, 59:23, 60:24, 62:18, 62:20, 62:22, 68:6, 70:9, 84:23, 86:20, 90:19, 100:7, 104:14, 118:6, 119:7
**years** [22] - 20:10, 20:17, 27:10, 30:4, 46:21, 46:23, 59:4, 85:17, 86:24, 88:25, 90:23, 96:13, 102:3, 102:5, 102:6, 102:15, 103:3, 103:4, 103:21, 121:10, 121:11, 121:18
**yellow** [2] - 43:19, 80:4
**yield** [2] - 66:23, 68:2
**yourself** [3] - 83:7, 83:23, 94:7
**yourselves** [1] - 4:6

## Z

**Zacharius** [1] - 55:7
**zealous** [1] - 59:18
**zero** [2] - 63:4, 63:15