1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

2

————————————————————————

3    United States of America,        )  Civil Action
                                      )  No. 1:21-cv-02886-FYP
4                      Plaintiff,     )
                                      )
5    vs.                              )  **Bench Trial - p.m. session**
                                      )
6    Bertelsmann SE & Co. KGaA,       )
     et al.                           )  Washington, D.C.
7                                     )  **August 3, 2022**
                     Defendants.      )  Time:  1:30 p.m.
8

————————————————————————

9              **Transcript of Bench Trial - p.m. session**
                              **Held Before**
10               **The Honorable Florence Y. Pan**
                  **United States District Judge**
11

12                    A P P E A R A N C E S

13   For the United States:    **John R. Read**
                               **Collier T. Kelley**
                               **Ihan Kim**
14                             **Lauren Riker**
                               U.S. DEPARTMENT OF JUSTICE
15                             Antitrust Division
                               450 Fifth Street, Northwest
16                             Washington, D.C. 20530

17   For the Defendants Bertelsmann SE & Co. KGaA and Penguin Random
     House, LLC:                **Daniel M. Petrocelli**
18                             O'MELVENY & MYERS LLP
                               1999 Avenue of the Stars, 8th Floor
19                             Los Angeles, California 90067

20                             **Daniel L. Cantor**
                               O'MELVENY & MYERS LLP
21                             7 Times Square, Times Square Tower
                               New York, New York 10036

22

23                             **Jefferson Harwell**
                               O'MELVENY & MYERS LLP
24                             1625 Eye Street, Northwest
                               Washington, D.C. 20006

25

1                    A P P E A R A N C E S, continued

2       For the Defendants ViacomCBS, Inc. and Simon & Schuster, Inc.:
                              **Stephen Fishbein**
3                             SHEARMAN & STERLING LLP
                              599 Lexington Avenue
4                             New York, New York 10022

5                             **Rachel E. Mossman**
                              SHEARMAN & STERLING LLP
6                             2828 North Harwood Street, 18th Floor
                              Dallas, Texas 75201

7
                              **Ryan A. Shores**
8                             SHEARMAN & STERLING LLP
                              401 9th Street, Northwest
9                             Washington, D.C. 20004

10      _____

        Stenographic Official Court Reporter:
11                            Nancy J. Meyer
                              Registered Diplomate Reporter
12                            Certified Realtime Reporter
                              333 Constitution Avenue, Northwest
13                            Washington, D.C. 20001
                              202-354-3118

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

PAGE:

**Witnesses**:

Adriana Porro

    Direct Examination by Ms. Riker................... 658
    Cross-Examination by Mr. Shores.................. 685


**Exhibits Admitted**:

    PX 932-B through PX 958-B........................ 667

```
 1                  P R O C E E D I N G S
 2              (REPORTER'S NOTE:  The a.m. portion of the
 3     proceedings was reported and transcribed by Tammy Nestor and is
 4     under separate cover.)
 5              THE COURT:  Good afternoon.
 6          Have we resolved our technical issue?  So where do we
 7     stand on the technical issue, Mr. Read?
 8              MR. READ:  It's good, Your Honor.  I'm told it's
 9     good.
10              THE COURT:  It's good?  Okay.
11              MR. READ:  I do have a question of your preference.
12              THE COURT:  Okay.
13              MR. READ:  While we're -- before everybody is fully
14     seated, we could play that three minutes of confidential
15     information now.
16              THE COURT:  And then open the courtroom?
17              MR. READ:  And then open the courtroom for the rest,
18     if you want.  We have that -- we think we have that ability.
19              THE COURT:  Okay.
20              MR. READ:  And I have an answer on your binder.
21              THE COURT:  Okay.
22              MR. READ:  So they blacked out everything not
23     designated, and then in red --
24              THE COURT:  Yes.
25              MR. READ:  -- that's the confidential portion.
```

```
1              THE COURT:  I see.  Okay.  Thank you.  I appreciate
2       that.  Now I understand.
3              All right.  And so for the members of the public and
4       spectators in the audience, we're going to close the courtroom
5       for a three-minute video segment, and then we'll reopen the
6       courtroom.  So I'm going to ask you to vacate the courtroom
7       just for three to five minutes, and we'll let you in when we're
8       ready.
9              Thank you.
10             (Proceedings held in closed court.)
11             THE COURT:  All right.  And everybody remaining
12      should be here?  Just want to make sure the parties confirm
13      this.
14             All right.  Let's play the closed portion.
15             (A confidential audio-video recording of the
16      deposition of Liate Stehlik was played.)
17             MR. READ:  I think that's it.
18             THE COURT:  Oh, that's it.  Okay.  Great.
19             MR. READ:  Just for your information, Your Honor, it
20      was about page 148 where we left off before in the transcript.
21      So we'll go up a couple of questions.
22             Oh.  I am told that there was a portion of what was
23      played before that was identified as confidential.  It was
24      played in open court earlier.
25             THE COURT:  Whoops.
```

```
1          MR. READ:  It was part of the transcript at page 133,
2    lines 19 to 23.  So we'll make, I guess, a motion to seal that.
3          THE COURT:  All right.
4          MR. READ:  I think it was about the advance levels at
5    HarperCollins.
6          THE COURT:  I see.  So I will grant the motion to
7    seal that.  Is there any corrective action to be taken about
8    the fact that it was played?
9          MR. READ:  I don't think there's anything we can do
10   beyond that, Your Honor.
11          THE COURT:  Okay.  So this was the section about what
12   she can approve and the levels?
13          MR. READ:  Exactly.
14          THE COURT:  Okay.  All right.  So it will be sealed
15   going forward.
16          MR. READ:  Thank you.
17          THE COURT:  All right.  And can somebody, sort of,
18   let the members of the public know they can come back in.
19        Thank you.
20          (Proceedings held in open court.)
21          THE COURT:  All right.  And at this time, the
22   government will resume playing its videotape.
23          (An audio-video recording of the deposition of Liate
24   Stehlik was played.)
25          MR. READ:  No tech issues, Your Honor.
```

```
 1                  THE COURT:  Okay.

 2                  MR. READ:  We're ready to call our next witness, if

 3      Your Honor is.

 4                  THE COURT:  Let's go on to the next witness.

 5                  MR. READ:  We call Ana Porro.  She's a 1006 summary

 6      witness for the government.

 7                  THE COURT:  Okay.

 8                  MR. READ:  Ms. Lauren Riker will handle that.

 9                  THE COURT:  Remain standing for a moment and raise

10      your right hand.

11                  (Oath administered.)

12                  THE WITNESS:  I do.

13                  THE COURT:  You can be seated.  Thank you.

14                  MS. RIKER:  May I proceed, Your Honor?

15                  THE COURT:  You may.

16                  MS. RIKER:  Thank you.

17              Good morning, Ms. Porro.

18                  THE WITNESS:  Good morning.

19                  MS. RIKER:  Good afternoon.  Sorry.

20                  THE WITNESS:  May I remove my mask?

21                  THE COURT:  You may.

22                  THE WITNESS:  Thank you.

23                            DIRECT EXAMINATION

24      BY MS. RIKER:

25      Q.  Would you please state and spell your name for the record.
```

```
1    A.  Of course.  My name is Adriana Porro; spelled A-d-r-i-a-n-a
2    P-o-r-r-o.
3    Q.  I'd like to talk a little bit about -- about your
4    background.  Where do you work?
5    A.  I work at the antitrust division of the Department of
6    Justice.
7    Q.  And what is your title?
8    A.  My formal title is statistician, but, internally, I'm
9    referred to as an RA, a research analyst.
10   Q.  And what is an RA?
11   A.  An RA is somebody who works predominantly with economists,
12   and that's kind of the lingo that they normally use.  But I
13   work with data, most predominantly, and coding.  Those are
14   my --
15   Q.  How long have you worked at the antitrust division?
16   A.  As of September, it will be three years.
17           THE COURT REPORTER:  Can you pull the microphone just
18   a little bit closer to you.
19           THE WITNESS:  Yes.
20           THE COURT REPORTER:  Thank you.
21           THE WITNESS:  Absolutely.
22   BY MS. RIKER:
23   Q.  Have you had the same title the whole time?
24   A.  Yes, I have.
25   Q.  What did you do before working at the antitrust division?
```

```
1    A.  This is my first job after I graduated from college.

2    Q.  What degree did you get?

3    A.  I have B.A.s in economics and art history.

4    Q.  Ms. Porro --

5              THE COURT:  You're not using your art history

6    background, are you?

7              THE WITNESS:  No.  No, I'm not.

8    BY MS. RIKER:

9    Q.  Ms. Porro, what was your assignment on the Penguin Random

10   House/Simon & Schuster team?

11   A.  My assignment was to oversee an accurate summarization of

12   the documents that I was presented with.

13   Q.  What do you mean by that?

14   A.  More specifically, I mean a summarization of the bidding

15   details that were in the documents that I reviewed.

16   Q.  What did you create for your assignment?

17   A.  For my assignment, I created 27 summaries.

18   Q.  And what do you mean by "bidding details"?

19   A.  Yeah.  By bidding details, I mean information about the

20   different bidding events that were captured within the

21   documents, such as -- would it help for an example?  Such as

22   the participants within a bidding event, the amount of money or

23   bid -- for a particular bid, things like that.

24   Q.  When did you start working on the 27 summaries?

25   A.  I started working on the summaries in May.
```

1   Q.  May of this year?

2   A.  Yes.  Sorry.

3   Q.  And did you have any role in the department's investigation

4   of the Penguin Random House/Simon & Schuster merger?

5   A.  So in July of the last year -- 2021 -- I was asked to help

6   out with doing a quick data check on a data production that was

7   received for this matter.

8   Q.  What do you mean by "data check"?

9   A.  Yes.  So it's very normal course, preliminary, at a high

10  level, just identifying if there are any issues with the data,

11  any breaks or -- if a -- the data is corrupted, and just

12  flagging that for an economist.

13  Q.  Did you have any role in analyzing the data once the data

14  check was complete?

15  A.  I did not.

16  Q.  And how long did you work on that data-check project?

17  A.  I'd say it was about two weeks.

18  Q.  And when was the data-check project?

19  A.  July of 2021.

20  Q.  Other than the data-check project, did you have any role in

21  the department's investigation of Penguin Random House and

22  Simon & Schuster's merger?

23  A.  I did not.

24  Q.  And did you have any involvement in the recommendation to

25  sue?

```
1    A.  I did not.

2    Q.  Did you attend team meetings?

3    A.  I believe I may have attended one team meeting when I was

4    doing the data check, but nothing beyond that.

5    Q.  Did you work on any data analysis for the government's

6    expert?

7    A.  I did not.

8    Q.  Ms. Porro, I'd like to turn to your binders.  Let me grab

9    them.

10              MS. RIKER:  May I approach?

11              THE COURT:  Yes, you may.

12              THE WITNESS:  Thank you.

13              THE COURT:  Thank you.

14   BY MS. RIKER:

15   Q.  Okay.  Ms. Porro, I'd like you to open the binder in front

16   of you that contains exhibits that have been marked for

17   identification purposes as PX 932-B through PX 958-B.  And are

18   you familiar with PX 932-B through PX 958-B?

19   A.  Yes, these are the summaries that I created.

20              MS. RIKER:  Two housekeeping items about this -- the

21   binders.  They include two copies of each summary.  The top

22   copy has a red box around confidential material, and there is a

23   clean copy behind each of those.

24         And second, the -- in the front of the binders there

25   should be a key that ties the author names with the master key.
```

1    So the key uses the last two digits of the PX number.  So for

2    the purposes of this exam, the PX number and the last two

3    digits of the PX number can be used interchangeably to refer to

4    the confidential author names and book titles.

5         THE COURT:  Thank you.

6    BY MS. RIKER:

7    Q.  Ms. Porro, are these the summaries you created?

8    A.  Yes, they are.

9    Q.  Starting with the big picture, what types of information

10   are summarized in PX 932-B through PX 958-B?

11   A.  At a high level, details about the bidding event from the

12   documents I reviewed are captured in my summary.  So

13   information about participants, bid values, a bit about the

14   structure of the bidding event, and the winner, things like

15   that.

16   Q.  How did you decide what to include in the summaries?

17   A.  Yes.  So I wanted my summaries to be direct and succinctly

18   summarize the information that I found -- that I read in my

19   documents.  And since the documents revolved around the bid --

20   the particular bidding event, I wanted to highlight and call

21   out those details.  So identifying the participants, the bids

22   that they made, and more about the structure.

23   Q.  What types of documents did you summarize in PX 932-B

24   through PX 958-B?

25   A.  I looked at a variety of documents.  Some were email

1    chains.  Others were meeting minutes, information about

2    potential acquisitions, and spreadsheets; maybe like an agent

3    spreadsheet, for example.

4    Q.  And at a high level, what types of entities produce these

5    documents?

6    A.  Yes.  So I looked at documents from Simon & Schuster,

7    Penguin Random House, other third-party publishers, and agents.

8    Q.  And how many documents did you review to prepare the

9    summaries?

10   A.  I believe I reviewed around 250 documents.

11   Q.  And earlier you mentioned spreadsheets.  Does the number of

12   documents that you reviewed include spreadsheets?

13   A.  Yes, it does.

14   Q.  And how would you describe the volume of information

15   contained in spreadsheets that you reviewed?

16   A.  Yeah.  The vast majority of the workbooks that I reviewed

17   had tens of thousands of observations and multiple tabs of

18   information.

19   Q.  Did you review the same type of information to prepare each

20   of the summaries, PX 932-B through PX 958-B?

21   A.  Yes, I did.

22   Q.  And is the same types of information summarized in each of

23   PX 932-B through 958-B?

24   A.  Yes, it is.

25   Q.  Let's walk through how you prepared the summaries.  How

1   much time did you spend preparing them?

2   A.   I believe I spent over 200 hours on the summaries.

3   Q.   What did you spend those 200 hours doing?

4   A.   Yes.   That's a long amount of time.   So I'd say that the

5   biggest category of time -- I'll break them down into -- that

6   time into just sections, if that's helpful.   So the largest

7   section of time that I spent was on reading the documents.   I

8   had no prior information about the industry or things like

9   that, and so I was reading the documents for comprehension of

10  understanding, what information is present, what is information

11  that's being discussed, or what -- what are meeting minutes.

12  And then -- so I'd say the longest time was spent reading for

13  comprehension.

14        And then the second bucket of time, I'd say, was making

15  sure that the tables that were in the summary, like validating

16  the values and tables in the summary and making sure that the

17  information in the documents was accurate and supported those

18  values.   So verification was also there and also involved

19  looking at the documents again.

20        And then I'd say the third, kind of, bucket -- that's

21  kind of associated with the second -- was while I was reviewing

22  the documents to make sure that the values in the table were

23  correct and consistent, I also made sure to cite the documents

24  and cite them accurately.   So that was another component of

25  incorporating the citations and making sure that the citations

 1    were correct.

 2         And then I'd say the last chunk of time was on just

 3    making sure that my summaries were standardized; and if a

 4    change was made to one of the 27 summaries, it would need to be

 5    carried over and consistent for all of them.  So I did that.

 6         And the last, last thing I did -- sorry -- was I made a

 7    few edits to the summaries after my deposition.

 8    Q.  What's involved in reviewing all the documents for -- for

 9    comprehension?

10    A.  Yes.  Lots of reading.  And not in the sense of skimming,

11    because I know that's some type of reading, but as I did not

12    know what was going on, I wanted to -- sorry.  Before -- before

13    I started, I wanted to spend the time with the documents to

14    make sure that I understood what was happening and picking up

15    nuances or things like that.  So lots of intensive reading.

16    Q.  And how did you validate the information in the tables in

17    the summaries?

18    A.  Yes.  I cross-referenced the values that were in the tables

19    to the documents that I reviewed.

20    Q.  And where did the templates come from for the summaries?

21    A.  Yes.  So as I had never made a summary before for a legal

22    audience, I wasn't sure exactly where to start.  So I asked for

23    help from my team to give me examples of what a summary could

24    look like.  And so I worked on -- and evolved -- my summaries

25    based on those initial templates.

1    Q.  And what did you do so you could feel comfortable that you

2    were viewing the complete set of documents for each bidding

3    event?

4    A.  Yes.  So if I was reviewing a particular bidding event and

5    I had some questions about -- maybe a little bit, like, of

6    ambiguity, I'm not quite sure I'm understanding what's

7    happening here, I asked if there were any other documents that

8    could speak to this particular event or this particular point

9    in time.  And I asked the team about that.

10   Q.  And you mentioned that you revised the summaries after your

11   deposition.  Why did you do that?

12   A.  So I made my edit specifically to clarify ambiguities that

13   were brought to my attention during my deposition.

14   Q.  And did you follow the same process for all of the

15   summaries?

16   A.  Yes, I did.

17           MS. RIKER:  Your Honor, I move to admit Ms. Porro's

18   summaries of the bidding events, PX 932-B through PX 958-B into

19   evidence.

20           THE COURT:  Any objection?

21           MR. SHORES:  No objection, Your Honor.

22           THE COURT:  All right.  Those would be admitted.

23           (PX 932-B through PX 958-B admitted into evidence.)

24           MS. RIKER:  At this point I'd like to walk through a

25   few of the summaries.  Your Honor, may we publish the redacted

1    summaries to the public monitors?

2              THE COURT:  Yes.

3    BY MS. RIKER:

4    Q.  Ms. Porro, would you please turn in your binder to

5    PX 937-B.

6    A.  Yes.  Thank you.  I have it up.

7    Q.  And without referring to the name of the author or the

8    title of the book, what is PX 937-B?

9    A.  This is one of the summaries of a bidding event that I

10   looked at.

11   Q.  Now, I'll ask about the table in a minute, but first I want

12   to talk about the information above the table.  What

13   information is above the table?

14   A.  Above the table I'm highlighting the winning publisher and

15   imprint of this particular bidding event or auction, the

16   winning advance value, and the date in which the auction or

17   bidding event took place.

18   Q.  Who was the winning publisher for PX 937-B?

19   A.  For this particular example, Penguin Random House was the

20   winner.

21   Q.  And how did you confirm that Penguin Random House won

22   PX 937-B?

23   A.  So referring to my footnotes, I cite two separate documents

24   supporting this conclusion.

25   Q.  What was the winning advance for PX 937-B?

1    A.   The winning advance was $550,000.

2    Q.   How did you confirm the winning advance for PX 937-B?

3    A.   So looking specifically at my footnotes, I cite to an

4    advance spreadsheet that's kept by, in this case, Penguin

5    Random House that details all of their acquired titles for a

6    certain period of time and the advance that corresponds to

7    that.

8    Q.   Did you follow the same process for confirming the winning

9    publisher and advance for each of the other summaries,

10   PX 937 -- or 932-B through PX 958-B?

11   A.   Yes, I did.  And I would like to clarify that Simon &

12   Schuster also has a similar advance spreadsheet that I looked

13   at.

14   Q.   Above the table there's also a date.  What does the date

15   represent?

16   A.   Yes.  The date captures the time range -- or a general

17   month, time frame of when the bidding event or auction took

18   place.

19   Q.   And there's not a footnote next to the date.  How did you

20   confirm the date?

21   A.   So I pieced together the date or identified the general

22   time frame by looking at the dates within the emails that I

23   looked at pertaining to a particular bidding event.

24   Q.   And, Ms. Porro, please turn your attention to the table in

25   PX 937-B.  At a high level, what information is captured in the

```
 1    table?
 2    A.  Yes.  So in the table, I wanted to highlight and clearly
 3    communicate what happened within the bidding event; so
 4    information on the participants, the general structure of the
 5    bidding event, and information about the bids.
 6    Q.  And let's look at the first column in the table labeled
 7    publisher and then with imprint in parenthesis.  What's this
 8    column showing?
 9    A.  This column captures the different identities of the
10    bidders in this particular auction.  So the name is -- the
11    first name, Penguin Random House, is the publisher, and then
12    the imprint is in parentheses.  So Viking, the imprint of
13    Penguin Random House, and the division, PPG, Penguin Publishing
14    Group.
15    Q.  How did you decide which publishers and imprints to list in
16    the table for PX 937-B?
17    A.  I identified the publishers for which I had the information
18    that they bidded -- oops.  Excuse me -- that they bid, and I
19    confirmed that these were the only two bidders in this auction
20    by ref- -- by being able to see the number of bids that were
21    placed in that particular round.  And that's the final row of
22    the table.
23    Q.  Did you use the same process for listing publishers and
24    imprints in each of PX 932-B through 958-B?
25    A.  Yes, I did.
```

1  Q.  And the row for PRH has PPG before Viking.  What does PPG

2  refer to?

3  A.  PPG refers to Penguin Publishing Group.

4  Q.  And why do you include the information -- why did you list

5  Penguin Publishing Group next to the PRH bid?

6  A.  Absolutely.  So to my understanding, Penguin Random House

7  has multiple divisions of -- in their publishing group, and

8  individual imprints from those divisions bid.  So I

9  specifically wanted to call out the division in my table

10  because in other bidding events, there can be multiple

11  divisions within Penguin Random House that are bidding.  So I

12  wanted to make sure that it was clear in a distinction of --

13  these are the imprint or imprints that bid and if they're from

14  this division.

15  Q.  And what abbreviations did you use for the other Penguin

16  Random House divisions?

17  A.  Yes.  I believe I used KDD for Knopf Doubleday, and then

18  PPG -- I'm sorry.  RH for Random House, and I think that

19  captures -- I think that covers it.

20  Q.  Did you use the same naming convention for the PRH

21  divisions for all of the PRH bids in each of the other

22  summaries?

23  A.  Yes, I did.

24  Q.  Looking at the other headers in the table, one is initial

25  offer and the other is best bids with final offer in

1    parentheses.  Why did you organize the bids for PX 937-B into

2    these two columns?

3    A.  Yes.  So specifically for the column titles in my table, I

4    pulled directly from language that was used in the documents

5    that I reviewed.  So if the first round were called initial

6    offers and the second round was called best bids, I pulled that

7    language directly from the documents.

8    Q.  And did you use the same naming convention for the column

9    headers in each of the other summaries, PX 932-B through PX

10   958-B?

11   A.  Yes.  I sourced the titles based on information that I saw

12   in the documents pertaining to a particular bidding event.

13   Q.  And the last header, best bids final offer, seems to cover

14   two columns.  What information is captured in those two

15   columns?

16   A.  Yes.  So the final offer column includes not only the final

17   advance that was made as the bid but also differentiating

18   bidding details for the final bids.

19   Q.  Why did you include differentiating -- or what do you mean

20   by "differentiating bidding details"?

21   A.  Yes.  So as this was the final round bid, I know that terms

22   generally are significant, and so I called out information that

23   had -- that gave insight and was included in the final offer.

24   And, specifically, I made sure to highlight in this column

25   information that differentiated bids.  So, for example, if --

1    in this case, both PPG and Viking and S&S decided to propose

2    something of -- like the same -- the same feature of their bid,

3    I would not call that out.  I just wanted to highlight the

4    differences, as it was important that my summary be readable

5    and concise, and highlighting the differences is an important

6    part of that.

7    Q.  And do all the summaries include those differentiating bid

8    details?

9    A.  Not all of them, no.

10   Q.  Why not?

11   A.  If there was a situation in which the final offers had all

12   of the same bidding characteristics, I didn't call those out.

13   Q.  And how did you indicate the source for the information

14   that you cite in your summaries?

15   A.  Yes.  All of the citations and sources for the numbers and

16   information cited are in the footnotes.

17   Q.  And I want to raise one minor issue in PX 937-B.  There is

18   no Footnote 3.  Why not?

19   A.  Yes.  Unfortunately, that is a formatting issue.  It -- as

20   I was implementing my edits after my deposition, deleting

21   certain fields that previously had a footnote caused a little

22   bit of a formatting mix-up.  But I want to stress that all of

23   the information is still fully present and correctly accounted

24   for in the footnotes, and the footnotes themselves still

25   correspond to the correct number in the table.

1    Q.  And in the other summaries that do not have a Footnote 3,

2    is it for the same reason?

3    A.  Yes, it is.

4    Q.  Okay.  You can put aside PX 937-B.

5            THE COURT:  I'm sorry.  Can you explain how the bonus

6    would be paid in this deal?  Do you remember?

7            THE WITNESS:  Why I mentioned a bonus?

8            THE COURT:  No.  I'm wondering how the bonus works.

9    Maybe you're not the right answer for this -- right witness for

10   this, but I'm just wondering if it -- when does that bonus get

11   paid in this deal?

12           THE WITNESS:  To my understanding -- so I

13   highlighted -- if it was one bonus, I used the word bonus and

14   then put the value.  And if there were a series of multiple

15   bonuses, I used the word bonuses and summarized those.  I did

16   not call out the terms in which the bonus would be received, if

17   that makes sense --

18           THE COURT:  Okay.

19           THE WITNESS:  -- in my summaries.

20           THE COURT:  Okay.  I'll ask another witness.  Thank

21   you.

22           THE WITNESS:  Sorry.

23   BY MS. RIKER:

24   Q.  I don't want to go through each summary in detail, but I

25   would like to ask some questions about how you handled certain

1    situations in your summaries.

2    A.  Uh-huh.

3    Q.  So if -- do any of your summaries, Ms. Porro, indicate that

4    some information was unknown?

5    A.  Yes, they do.

6    Q.  I'd like to look at an example with some unknown

7    information.  If you would please turn to PX 935-B, and let me

8    know when you're there.

9    A.  Great.  I have the document open.

10   Q.  Looking at the table in PX 935-B, would you explain your

11   use of the abbreviation UNK?

12   A.  Yes.  So specifically in this example, I use the

13   abbreviation UNK to represent that's an unknown value for that

14   particular cell in my table.  So in this case, for example, for

15   Macmillan, I had information from my documents that Macmillan

16   bid.  I just didn't know what the monetary value of their bid

17   was.  So they bid, but I don't know the value.  So unknown

18   represents that.  And then the total number of bids collected

19   is unknown.  So I'm not sure -- there was -- the information

20   was not present in the documents to indicate the total number

21   of bids collected in the first round.  So I represent that by

22   UNK.

23   Q.  And for the total number of bidders, did you leave out any

24   bidders that you knew about in the table?

25   A.  No, I did not.

1    Q.  And did you use unknown where it appears the same way in

2    each of the summaries, PX 932-B through 958-B?

3    A.  Yes, I did.

4    Q.  Would you look at the row for Penguin Random House.  And it

5    lists the imprint as house bid.  What does that mean?

6    A.  I used the terminology house bid to indicate when multiple

7    imprints submitted bids together from a particular publisher.

8    Or in this case, for Penguin Random House, a particular

9    division.

10   Q.  How did you indicate which imprints participated in the

11   house bid?

12   A.  I called out the -- and identified -- all of the imprints

13   who participated in each round in the footnotes for the bid

14   corresponding to every round.

15   Q.  And it appears that Crown and Random House participated in

16   the Random House division bid through all four rounds of the

17   auction.  But how would you have indicated if one of them had

18   dropped out in the bidding?

19   A.  Yes.  So if one of them had dropped out, I would have noted

20   in the footnote, in this round this imprint dropped out.  The

21   bidder -- the imprint who bid in this round is X.

22   Q.  Did you use the same method for indicating the imprints

23   that participated in a house bid where it appears the same way

24   in each of the other summaries, PX 932-B through PX 958-B?

25   A.  Yes, I did.

1    Q.  Ms. Porro, there's a see, s-e-e, signal at the beginning

2    of -- in Footnote 15 through 18 and PX 935-B.  Why did you use

3    a see signal there?

4    A.  Yes.  So I used a see signal to indicate that I had

5    information in the documents to identify that whatever

6    particular value I put there was the number of bids for that

7    particular round.  So using Round 2 as an example in the

8    documents, I was able to identify that there were two bids

9    collected in Round 2.  However, the documents did not

10   explicitly say the words two bidders or two bids.

11   Q.  And have you been made aware of any information that

12   suggests that any other publisher bid in Rounds 2 through 4 of

13   PX 935-B?

14   A.  I have not.

15   Q.  And did you use the see signal where it appears the same

16   way in each of the other summaries, PX 932-B through 958-B?

17   A.  Yes, I did.

18   Q.  Okay.  You can put aside PX 935-B.

19       Ms. Porro, in any of the summaries, did you ever have

20   documents indicating differing amounts for the same bid?

21   A.  Yes, I did.

22   Q.  Let's look at an example.  Please turn in your binder to

23   PX 932-B.

24   A.  Thank you.  I have that open.

25   Q.  Does PX 932-B contain an example of a bid that has a

1    different -- example of bids that have different amounts in the

2    documents you reviewed?

3    A.  Yes, it does.

4    Q.  And where is that?

5    A.  That would be for Simon & Schuster's Round 1 bid.

6    Q.  And how did you indicate that there were different values

7    for that bid in the documents you reviewed?

8    A.  Yes.  So when -- I indicated that there were two

9    different -- that there were differing values by noting in the

10   footnote, specifically, using a but-see to identify the

11   document that had differing information.  And I used -- I

12   called out the quote from the document to identify what the

13   language was.  But, more specifically, I determined the value

14   to put in the table by relying on if I was faced with two

15   different documents that had differing information, if one of

16   them had information from a source.

17       So that being the editor or publisher submitting their

18   bid or an agent receiving the bid.  So a source on either end

19   of the bid, I used that information and put that in the table

20   and used the but-see signal to call out any other information

21   that was there.

22   Q.  And did you use the but-see signal where it appears the

23   same way in the endnotes for each of the other summaries

24   PX 932-B through 958-B?

25   A.  Yes, I did.

1    Q.  And PX 932-B lists the third and fourth bidders as

2    Publisher A and B.  Would you explain what that means?

3    A.  Yes.  So in this particular situation, from the documents,

4    I knew that four bids were collected in Round 1.  And also from

5    the documents, I was able to determine that -- the identity of

6    two of the bidders, Penguin Random House and Simon & Schuster.

7    I was not able to identify the identities of the third and

8    fourth publisher.  So I used Publisher A and Publisher B as

9    placeholders to say this is a publish- -- like this is an

10   unknown publisher and this is another unknown publisher.

11   Q.  And did you use the same naming convention for unknown

12   publishers where they appear in each of the summaries, PX 932-B

13   through 958-B?

14   A.  Yes, I did, but I would like to say as well, if there's a

15   Publisher A in one summary and a Publisher A in another

16   summary, those -- I'm not trying to draw equivalencies.

17   They're not supposed to represent the same person.  It's just

18   based on the number of publishers that I did not know the

19   identity of.

20   Q.  Thank you.

21       You can put aside PX 932-B.

22   A.  Okay.

23   Q.  And, Ms. Porro, in any of the summaries, do you ever know a

24   range for a bid but not an exact value?

25   A.  Yes.

1    Q.  Okay.  Let's look at an example.  Would you turn in your

2    binder to PX 950-B, and let me know when you're there.

3    A.  Okay.  I have the summary open.  Thank you.

4    Q.  Looking at the Round 2 bid for Hachette, why'd you put the

5    bid value as greater than 270- and less than $290,000?

6    A.  Yes.  So, specifically, for this example, I had information

7    that Hachette bid in Round 2, and I didn't know their exact

8    bid.  However, for this particular auction, the agent used

9    specific auction -- specific auction rules that were the order

10   of bids collected in rounds after Round 1 are set by the value

11   of bids in the first round.

12          So, specifically, the first bidder in Round 2 was the

13   lowest bidder in Round 1, and they have to improve upon the

14   highest bid in Round 1.

15          So because of the order of bids in Round 1 -- and I knew

16   all of the values there -- I could place the order in which

17   bids were received.  So I know that Hachette bid after Penguin

18   Random House -- Random House division, imprint Crown.  So the

19   first cell in Round 2.  And I knew that they bid before Simon &

20   Schuster, who bid $290,000.  So because of the order, I could

21   place that their bid was somewhere between 270,000 and 290,000

22   dollars.

23   Q.  And how did you know the auction rules for PX 950-B?

24   A.  Yes.  The auction rules were explicitly stated in the

25   documents that I looked at.

1    Q.  And looking at the initial best-bid round, why did you list

2    HarperCollins and Hachette's bids as less than $510,000?

3    A.  So the agent set terms, again, for this particular round

4    and said the top two bidders from this round will proceed to

5    the final best-bids round, which is the next column.  And I

6    knew the values of the bids for Simon & Schuster and Penguin

7    Random House, and I know that they both proceeded to the final

8    best-bids round.

9         So I know that the four active bidders in Round 3 were

10   given the opportunity to bid, but I wasn't sure of the value of

11   their bids; but knowing that they didn't progress, I knew they

12   had to be lower than the lowest of the highest bids in the

13   initial best-bids round.

14   Q.  And did you use the greater-than and less-than symbols

15   where they appear the same way in each of PX 932-B through

16   958-B?

17   A.  Yes, I did.

18   Q.  And in the initial best-bids round in 950-B, the table says

19   two to four bids were received.  Why did you use a range there?

20   A.  Yes.  So I used a range here because I knew from the

21   documents with certainty that Simon & Schuster and Penguin

22   Random House bid in the initial best-bids round, but I wasn't

23   sure -- I didn't have the evidence in the documents to indicate

24   whether or not HarperCollins and Hachette actually made a bid.

25   So to account for that ambiguity, I used the range of two to

1    four bids.

2         THE COURT:  I think we should take a break now.  Is

3    this a good time to take a break?

4         Thank you.  Let's take 15 minutes; be considerate of the

5    court reporter here.

6         Please do not talk to anybody about your testimony

7    during the break.

8         THE WITNESS:  Absolutely.  Thank you so much.

9         (Recess taken.)

10        THE COURT:  I just want to take a pause while my law

11   clerk gets my laptop.  I keep forgetting to bring it back and

12   forth with me, because I'm doing these motions, as the motions

13   judge, through the breaks.

14        Let me ask.  I think these exhibits are very clear.  I

15   think that you did a really good job and the notes are very

16   self-explanatory.  And so I'm wondering:  Is it necessary to go

17   into the detail that we're going into about how these exhibits

18   were put together?

19        And it could be that I need to ask Mr. Shores:  Are you

20   planning to challenge the way these were put together?

21        MR. SHORES:  Your Honor, we just have a very brief

22   set of questions that won't go into the details of how they

23   were put together.

24        THE COURT:  Okay.  So with that in mind, do you

25   think you could maybe shorten and summarize what you've been

```
 1    doing?

 2              MS. RIKER:  Sure.  You know, I was going to go

 3    through a couple of examples of other places where -- where it

 4    may be actually clear on the face of the summary what was

 5    intended, but let me look.  I think there are one or two

 6    examples that would be helpful to go through, and then we can

 7    pass Ms. Porro.

 8              THE COURT:  That's fine.

 9    BY MS. RIKER:

10    Q.  And, Ms. Porro, I'd like to look at the number of bids row

11    in PX 950-B.  And in Round 2, the number of bids is four

12    advancing, five bids total.  What does that mean?  And we're on

13    PX 950-B.

14    A.  Thank you so much.  I closed my binder.  950.  Okeydokey.

15    I'm sorry.  Would you mind repeating that.

16    Q.  No problem.

17              In Round 2 the number of bids is listed as four

18    advancing, five bids total.

19    A.  Yes.

20    Q.  What does that mean?

21    A.  Yes.  So in this particular case, five bids were received

22    in this round.  However, one of them was a terminal bid --

23    whoops.  Sorry.  One of them was a terminal bid or a last bid

24    by one of the publisher participants.  So it didn't contribute

25    towards advancing the auction.  It just counted as their last
```

1    bid.  It didn't follow the auction rules.  So they were

2    considered out and not progressing the auction further.  So

3    I wanted to make sure that their final bid was captured in

4    my summary, and that is in the five bids total in parentheses,

5    but noting that only four of the other bidders were

6    continually advancing and were considered as active

7    participants.

8    Q.  Thank you.

9        I'd like to look at -- you can put aside PX 950.  I'd

10   like to look at PX 954.  And how many -- in the number of bids

11   row for Round 3, the table says one bid, partial round.  Would

12   you explain what you meant by that.

13   A.  Yes.  So in this particular auction, the first bid was

14   collected in Round 3, and then the agent moved the auction to

15   best bids.  So a bid was still received, but the auction

16   changed and it was immediately put into the best-bids round.

17   So I noted the number of bids collected in that official

18   Round 3 round, which is one bid, and then indicated that it's

19   a partial round.  So there wasn't -- everyone didn't just

20   decide to drop out and not bid in that round.  It was just

21   expedited.

22   Q.  Thank you.

23       MS. RIKER:  Those are all the questions I have for

24   now, Your Honor.  I pass the witness.

25       THE COURT:  Okay.  Thank you.

```
 1                        CROSS-EXAMINATION

 2    BY MR. SHORES:

 3    Q.  Good afternoon, Ms. Porro.

 4    A.  Good afternoon.

 5    Q.  My name is Ryan Shores, and I'm counsel for Paramount and

 6    Simon & Schuster.  I'm just going to ask you a few questions

 7    about your summaries.

 8    A.  Okay.

 9    Q.  So there are 27 summaries in total; is that correct?

10    A.  That's correct.

11    Q.  And my understanding is that each of these summaries

12    represents an instance in which Penguin Random House and Simon

13    & Schuster were among the last two bidders; is that correct?

14    A.  Yes, that's correct.

15    Q.  And so there's no instances, for example, on which Penguin

16    Random House only competed against HarperCollins?  No instances

17    like that?

18    A.  No.  These summaries capture head to heads; so instances

19    where both Penguin Random House and Simon & Schuster are

20    present.

21    Q.  Right.  And not just present, but they're both among the

22    last two bidders; isn't that correct?

23    A.  I believe the focus was more that they were both in the

24    auction, less that -- I'm sorry.  I don't know.

25    Q.  Okay.  Well, I'll represent to you that I reviewed them --
```

1    A.  Okay.

2    Q.  -- and Penguin Random House and Simon & Schuster are among

3    the last two bidders in each of the final stages.

4    A.  Okay.

5    Q.  None of the summaries show any instance in which an agent

6    negotiated exclusively with just one publisher; is that

7    correct?

8    A.  No.  These bidding events include multiple bidders.

9    Q.  Okay.  Now, these summaries span, as I understand it, about

10   three and a half years; is that right?  Let's take a look.  I

11   don't want you to have to guess.  If we could look quickly at

12   PX 957-B.

13   A.  Uh-huh.

14   Q.  And you see at the top there where it says January 2018?

15   A.  Yes, I do.

16   Q.  And then let's take that down and look at PX 933-B.  And

17   the date on this acquisition is August of 2021.  Do you see

18   that?

19   A.  Uh-huh.

20   Q.  So January 2018 to August 2021, about a

21   three-and-a-half-year period; is that fair?

22   A.  Yes, between these two examples.

23   Q.  Okay.  And in the summaries, you've included titles where

24   the advance -- the ultimate winning advance was above $250,000;

25   is that correct?

1    A.  I'm not sure off the top of my head.

2    Q.  Okay.  Well, again, I'll represent to you that it includes

3    titles where the advance -- winning advance was above 250,000,

4    and I think we saw some examples of those, didn't we?

5    A.  Yes, sir.  Apologies.  I didn't hear your question.

6    Q.  Oh, that's okay.  That's okay.

7         And then some of the summaries reflect titles where the

8    winning advance was below $250,000; is that right?

9    A.  I believe so, but I would need to look at all of them too.

10   Q.  Okay.  Well, let's take a look quickly at an example.  How

11   about 934-B.  Do you want to take a look at that one?

12   A.  Great.  Yes.  I have that open, and I see the $160,000

13   advance.

14   Q.  Right.  Okay.  And that's below $250,000; right?

15   A.  Yes, it is.

16   Q.  Now, Ms. Porro, you didn't have any role in deciding which

17   titles for which summaries would be created; is that correct?

18   A.  That's correct.  I did not choose the documents that I

19   reviewed.

20   Q.  And do you have an understanding of why these particular 27

21   titles were selected from all of the books published over a

22   three-and-a-half-year period?

23   A.  I do not.

24   Q.  And do you know how many trade books are published each

25   year in the United States?

```
 1    A.  I do not.

 2    Q.  Well, I'll represent to you that there's more than 55,000

 3    trade books published in the United States each year, which

 4    over a three-year period would be roughly 165,000 books.

 5    A.  Okay.

 6    Q.  And my question, Ms. Porro, is:  Did you do any type of

 7    statistical analysis to determine whether 27 is statistically

 8    significant relative to the tens of thousands of books

 9    published each year?

10    A.  I did not perform any statistical analyses for my

11    assignment.  That was not my assignment.

12    Q.  Okay.  Thank you, Ms. Porro.

13    A.  Thank you.

14            MS. RIKER:  No further questions, Your Honor.

15            THE COURT:  All right.  Thank you.

16        You can step down.  Thank you very much for your

17    testimony.

18            THE WITNESS:  Thank you so much, Your Honor.

19            THE COURT:  The government may call its next witness.

20            MR. READ:  Yes, Your Honor.  If I can provide you our

21    plan for the next little bit.

22            THE COURT:  Sure.

23            MR. READ:  Our plan is to call by deposition Andrew

24    Solomon, an author.  We'll pass out notebooks before we start

25    that video.  That will be about a half hour.  Then our plan is
```

```
 1    to call by video the CEO of Abrams, Mr. Jacobs.  Then if --
 2    with Your Honor's permission, Mr. Petrocelli and I have agreed
 3    we will call first thing tomorrow morning Mr. Dohle.
 4              THE COURT:  Okay.  That's fine.
 5              MR. READ:  Can we pass out the notebooks?
 6              THE COURT:  Thank you.
 7              (An audio-video recording of the deposition of Andrew
 8    Solomon was played.)
 9              MR. READ:  Can we go to the next video?
10              THE COURT:  Sure.
11         Yes, Mr. Read.
12              MR. READ:  I'm reminded there are a few minutes of
13    confidentiality in this one.  I suggest we play that at the
14    end, after we're done.
15              THE COURT:  Okay.  Let's do that at the end.  Thank
16    you.
17              (An audio-video recording of the deposition of
18    Michael Jacobs was played.)
19              MR. READ:  We have a short confidential clip.
20         And then, Your Honor, at the beginning of the day today,
21    there was a discussion about the Fletcher deposition and
22    hearsay issues on that.  I think both the plaintiff and
23    defendants have attorneys here ready to argue that so that if
24    there needs to be a change, it can be done for tomorrow or
25    Monday.
```

```
1              THE COURT:  Is that an open- or closed-session
2    discussion?
3              MR. READ:  That can be an open discussion.
4              THE COURT:  Okay.  So why don't we talk about that
5    first, and then we'll close the courtroom and hear the
6    confidential clip.
7              MR. READ:  And from the government's side, it will be
8    Collier Kelley who will make the argument.
9              THE COURT:  All right.
10             MR. READ:  But I think it's defendants' motion.
11             THE COURT:  Does anybody have a copy of the tweets in
12   question?
13             MR. CANTOR:  Your Honor, we've got a set that -- the
14   way we had organized it -- obviously, any way you want to do it
15   is fine, but we've organized it by the five exhibits that we're
16   talking about.  And behind each exhibit is the testimony that
17   would also be relevant.
18             THE COURT:  Okay.
19             MR. CANTOR:  So we can talk about them together,
20   separately, however you prefer.
21             THE COURT:  Could you pass them up so I can take a
22   look?
23             MR. CANTOR:  Yep.  Absolutely.
24        So, again, Your Honor, the basic idea here, obviously,
25   is that when it comes to documents, pure and simple, they are
```

1    out-of-court statements being offered for the truth of the

2    matter asserted.

3           I think maybe it's useful to take them slightly out of

4    numeric order.  So I would start with 876, which is, as you can

5    see, a -- a tweet.  This is actually a case of double hearsay,

6    Your Honor, because at the very top of the document, you can

7    see that there's a tweet there from -- and I -- I won't say her

8    name out loud -- but an individual who's an author who had seen

9    Ms. Fletcher's first series of tweets, which, in retrospect, I

10   probably should have started with.

11          But, in any event, so -- so what you've got here is a

12   tweet from Ms. Fletcher responding to the tweet from this

13   author who had responded to Ms. Fletcher's initial -- initial

14   series of -- of tweets.  And, again, obviously, those are all

15   out-of-court statements.  To the extent this is a document from

16   Ms. Fletcher's Twitter account, the author tweet would be an

17   instance of double hearsay.

18          If you then flip to the -- to the testimony, Your Honor,

19   right behind the document --

20          THE COURT:  I'm sorry.  Just so I understand

21   this part of --

22          MR. CANTOR:  I'm sorry.

23          THE COURT:  -- your objection.  So this is 876.  And

24   you're objecting to this entire -- all three sections of this

25   tweet?

```
 1              MR. CANTOR:  We are.  Yes, Your Honor.

 2              THE COURT:  Okay.  I'm just looking at the third one.

 3              MR. CANTOR:  So if you then turn to the testimony,

 4    Your Honor, even if the document were to be -- were to be ruled

 5    inadmissible, you can see beginning at the -- with the question

 6    at the bottom of 88 there, line 17, and continuing on.

 7         So -- so there's a description of what the document is,

 8    and then the question is prefaced by she wrote and then quotes

 9    the document, quotes Ms. Fletcher's response on the next page,

10    at lines 3 through 5, and then asks Ms. Fletcher, "What did you

11    mean by that?"  Ms. Fletcher gives a response.  And then a few

12    lines down on line 11, the next question is:  "And you wrote

13    that?"  And it, again, quotes from the tweets and asks, you

14    know, questions about what was meant or what was intended.

15              THE COURT:  So let me ask you this -- I mean, this is

16    a bench trial.

17              MR. CANTOR:  True.

18              THE COURT:  So we have some flexibility here to look

19    at things like the tweets in Exhibit 876, just as this is what

20    you're commenting on and the testimony is the -- is the

21    evidence.  Your comments about the tweet -- like we could admit

22    876 not for the truth of the matter asserted but just to give

23    context to the testimony that is then given about the tweet.

24         Are you objecting to the testimony about the tweet or --

25              MR. CANTOR:  Yes, Your Honor.
```

```
1              THE COURT:  -- just the tweet itself?

2              MR. CANTOR:  We're objecting -- well, if Your Honor

3      overrules my objection on the document, then I really don't

4      have much of a leg to stand on with respect to the testimony

5      about it, obviously, but --

6              THE COURT:  So I should say, I would agree with you

7      that if they were just admitting this tweet, it looks like it's

8      an out-of-court statement offered for the truth of the matter

9      asserted.

10             MR. CANTOR:  Right.

11             THE COURT:  But if they're trying to admit the

12     deposition testimony that talks about the tweet, given that

13     it's a bench trial, I can see a middle path where this comes in

14     not for the truth of the matter asserted, but just to give

15     context to the testimony.  Because what it seems like they're

16     getting at in the testimony is her actual opinion, which it

17     would be --

18             MR. CANTOR:  Well, I would think, Your Honor --

19             THE COURT:  -- potentially admissible.

20             MR. CANTOR:  My position, Your Honor, would be that

21     under no circumstances should the document be a part of the

22     trial.  If Your Honor wants to rule that -- that the testimony

23     itself can come in, I think that -- I think that would be an

24     incorrect ruling.  I think it would be an end run around the

25     hearsay rule that -- that --
```

1           THE COURT:  Oh, I'm -- I think there are cases

2     that -- that say that statements that just give context to

3     other things that are admissible are okay.  They're just not

4     admitted for the truth of the matter asserted; like I couldn't

5     rely on the tweets for the truth of the matter asserted.

6           MR. CANTOR:  The problem is, Your Honor, they -- they

7     absolutely want -- they either want you to rely on --

8           THE COURT:  But I won't -- our whole justice system

9     functions on the idea that we can separate things that are

10    admissible and not admissible.

11          MR. CANTOR:  No.  My point is slightly different,

12    Your Honor.  If they're not relying on it for the truth of

13    what's asserted, then it's irrelevant.  There's no purpose to

14    it.

15          THE COURT:  The purpose is to give context to the

16    testimony that is admissible.

17          MR. CANTOR:  But you can't do that, Your Honor,

18    without -- there's no way to divide the admissible and

19    inadmissible part of it.  They are providing you with

20    inadmissible out-of-court testimony they want you to take as

21    true; otherwise there would be no reason for them to offer it.

22          THE COURT:  I know.  I understand your argument, but

23    I think what I'm pushing back on you on is the fact that it's a

24    bench trial.  I'm a very experienced judge.  I often see

25    evidence that I, then, find inadmissible and I don't rely on

1        it.

2              And I'm familiar with cases -- and maybe they're

3        Superior Court cases, but I don't think it's a novel concept

4        that things can be admitted to provide context for what is

5        admissible.  And if the Court says I'm not going rely on this

6        for the truth of the matter asserted, but it just gives context

7        to what is admissible, I'm not misusing that information.

8              MR. CANTOR:  Right.  But the problem is, Your Honor,

9        that the questions and answers -- the answers that follow

10       essentially incorporate in -- it's not as if, Your Honor, there

11       was an inadmissible document out there and they asked a proper

12       question at -- at deposition.  You know, on or about

13       November 25th, 2020, did you have a discussion with this author

14       about the deal?  Yes, I did.  Do you recall what you discussed?

15       Yes, I do.  Did you express any concerns?  Yes, I did.  What

16       were they?  Et cetera, et cetera.

17             What they've done, though, is -- is -- intentionally or

18       not -- and I assume it was unintentionally, but you have to

19       live with the consequences of what they did at the deposition;

20       is that they've done it in a manner that is going to import

21       wholesale the out-of-court statement which they expect you then

22       to credit as evidence in support of their argument.

23             THE COURT:  That's the part that I don't necessarily

24       agree with you.  I mean, I want to hear from the government on

25       this, but I don't have to credit it.  I don't have to look for

1    the truth of the matter asserted.  I can see the deposition

2    testimony or the testimony about the tweet to be admissible

3    evidence, and the tweet just puts it in context, and I won't

4    rely on what is said in the tweet for the truth of the tweet.

5    So somebody said this.  I don't know who said that.  I can't

6    test the credibility of that person, but here's your reaction

7    to it.  The reaction is the admissible evidence.

8              MR. CANTOR:  But that may be the reaction to this

9    third-party's statement, the author's statement; but

10   Ms. Fletcher's statements themselves are -- are being offered

11   for the truth.

12             THE COURT:  But I could not admit them for the truth.

13             MR. CANTOR:  But then they're irrelevant.

14             THE COURT:  Okay.  Only to give context to her

15   testimony, if they do.

16             MR. CANTOR:  No, no.  Again, Your Honor --

17             THE COURT:  If they don't, they don't.

18             MR. CANTOR:  I apologize if I'm not being clear.

19             THE COURT:  I think you're being clear.  I think

20   you're just not understanding what I'm saying.

21             MR. CANTOR:  You know what?  I do hear you, but

22   that's why I think we're kind of talking past each other,

23   respectfully, and that's why --

24             THE COURT:  Okay.

25             MR. CANTOR:  There is no way for them to tell the

1    story of what Ms. Fletcher thinks about the deal without using

2    the tweets as the basis for that.  If she was --

3              THE COURT:  Correct.

4              MR. CANTOR:  -- here, it would be a different story.

5              THE COURT:  Oh.  She's not testifying?

6              MR. CANTOR:  No.  Well, I mean, she's -- her

7    deposition is -- is being played, but --

8              THE COURT:  Okay.

9              MR. CANTOR:  -- it might be a different story if she

10   were here and they could ask proper questions.  Under

11   Rule 32(b), they have to -- if they're going to use deposition

12   testimony, they still have to make it admissible as if she were

13   testifying live; right?  And so it's -- she's not going to be

14   here.  That's -- that's the problem.

15             THE COURT:  Okay.  So --

16             MR. CANTOR:  So they don't have a chance to ask a

17   better question.

18             THE COURT:  So I haven't had a chance to study the

19   deposition testimony.

20             MR. CANTOR:  Sure.

21             THE COURT:  Does the deposition testimony just

22   comment about the tweets, and is that the evidence that --

23   maybe I should ask the government this.  Is that what they're

24   trying to get in, the comments about the tweets?

25             MR. CANTOR:  Well, to be clear, because I'm not sure

1    I understood your question, the -- the lines that we are

2    objecting to, the answer to that is yes.  There's more to the

3    deposition transcript -- to the deposition designation, if we

4    were to succeed in our motion in all or in part; they're just

5    going to just have to cut it down and submit to you a different

6    one.  So it's not as if you won't hear from Ms. Fletcher at

7    all.

8         But with respect to these documents and the questions

9    that follow on when they were introduced in the deposition, the

10   testimony that we're objecting to is testimony about the

11   substance of the documents.

12             THE COURT:  I understand.  Okay.  Let me hear from

13   the government.

14             MR. KELLEY:  Good afternoon, Your Honor.  My name is

15   Collier Kelley.

16        Just to kick off, yes, the question and answers have to

17   do with the context of the argument.  So most of the questions

18   are, essentially, you said this.  Why did you say that?  What

19   are your thoughts?  And it gives further substantive evidence

20   of her thoughts about the publishing industry.  So the tweets

21   themselves are not necessarily for the truth of the matter but,

22   rather, to give context to the rest of the deposition.

23        So this -- this witness, in particular, was initially on

24   the defendants' preliminary witness list, and so we deposed her

25   to understand the dichotomy between these tweets and why she

1    ended up on their witness list.  So these tweets are to give

2    the whole context of the deposition.

3          If you have any further questions, I'm happy to answer

4    them.  Other than that --

5          THE COURT:  Let me just take a look at the deposition

6    testimony for a moment.

7          Okay.  So let me say this:  I've read the tweet.  So one

8    way or the other, I'm aware of what it says, and I think that

9    the parties are now debating something that is very technical

10   and something that only lawyers could care about, which is

11   whether I consider it for the truth of the matter asserted or

12   whether I consider it as just context for what's coming next.

13         This is a bench trial.  If we had a jury sitting in the

14   box, maybe we don't want them to see these tweets if they're

15   not admitted for the truth of the matter asserted because they

16   might not be able to understand that they can't think of it for

17   the truth of the matter asserted.  But as a judge for 13 years,

18   I have many times been able to separate these types of reasons

19   for admitting a piece of evidence.

20         And I'm going to overrule the objection.  I'm going to

21   allow the tweets.  I'm not going admit them for the truth of

22   the matter asserted.  They are only admitted for the purpose of

23   giving context to the testimony, which I think is admissible,

24   where this witness is being asked to comment about what is in

25   the tweets.

1              So to be clear, I've read that somebody named

2      Zoe Whittall says it happened to her; that Penguin Random House

3      put in bids because they're all under the same umbrella.  That

4      left other companies to bid way above them.  Authors are going

5      to lose.  I see that she read that, but I'm not going to

6      consider that for the truth of the matter asserted.  It is not

7      evidence in this trial that that happened to Zoe Whittall.  I'm

8      not going to consider it as an example of something bad that

9      happened as a result of consolidation in the industry.

10             Rather, it is admitted merely for the purpose of

11     allowing this testimony where another witness,

12     Christy Fletcher, was asked to comment about the tweet, and --

13     and what she said about the tweet is admissible because it was

14     done under oath and subject to cross-examination, et cetera.

15             So I'm going to overrule the objection on that basis,

16     but I'll note that I will not admit any of that for the truth

17     of the matter asserted.

18             Okay.  Does that take care of all of the examples in

19     here?

20                  MR. CANTOR:  Excuse me?

21                  THE COURT:  Does that take care of all the examples

22     in the binder, or are there other ones with --

23                  MR. CANTOR:  They're all in the same piece,

24     Your Honor.  I mean, there are different kinds of documents --

25     sorry.

1          THE COURT:  That's okay.

2          MR. CANTOR:  They're all of a different -- you know,

3    same kinds of documents.  But, yes, they are either tweets or

4    they're emails where they're going to ask about a sentence in

5    an email.  There's -- one of the emails is another double

6    hearsay sort of situation.  But, essentially, it's the same

7    idea, Your Honor.

8          THE COURT:  Okay.  And I will -- I will not consider

9    any of the hearsay for the truth of the matter asserted but

10   only to provide context for the testimony that speaks about

11   these missives.

12         MR. CANTOR:  Thank you, Your Honor.

13         THE COURT:  All right.  Thank you.

14      And so we just have something to play in the closed

15   session.  So at this time, I'm going to ask members of the

16   public to please exit the courtroom.  We are going to do a

17   closed session for the remainder of the day, and we'll resume

18   tomorrow at 9:30.

19         (Proceedings held in closed court.)

20         THE COURT:  Okay.  I think you can play your clip.

21         (A confidential audio-video recording of the

22   deposition of Michael Jacobs was played.)

23         (Proceedings held in open court.)

24         THE COURT:  All right.  Thank you.

25      I have just one housekeeping issue before we break.  I

 1    got an email that there was an inquiry from the press about

 2    putting the redacted exhibits onto the court docket.  And my

 3    understanding is -- do the parties want that?  I mean, I -- I'm

 4    not aware of -- this has not been a practice that I have done

 5    before, putting trial exhibits onto the court docket.

 6              THE COURT REPORTER:  Your Honor, do you want this in

 7    open court or closed court?

 8              THE COURT:  This can be open.

 9              MR. READ:  I'm not either, Your Honor.  In some other

10    cases, the antitrust division has put up some exhibits on its

11    website for transparency.  We have not done that in this case.

12    And so, you know, there may be some questions from the press

13    that should probably be more directed to us of whether we are

14    going to do that, and we have not decided how we're going to

15    handle that.

16              THE COURT:  Okay.  So I'll just tell the person they

17    contacted, who's a member of court staff, to tell them to

18    contact you, and perhaps you'll put it onto your court website.

19    I just think that would really crowd our docket to put these

20    voluminous exhibits onto the docket.  I would prefer not to do

21    that; yet I recognize that access to these exhibits should be

22    allowed.  So I think using your court website would be a really

23    good way to handle it, if you're willing to do it.

24              But I'll have -- I'll tell them to have them contact

25    you.

1           MR. READ:  Okay.  Thank you, Your Honor.

2           THE COURT:  All right.  Thank you.

3       All right.  Thank you.  So we're going to break for the

4   day, and I'll see everybody at 9:30 tomorrow.  Thank you.

5       And I do want to thank all the parties.  I think

6   everybody's been really well organized, and I very much

7   appreciate on both sides how smoothly things are going from my

8   perspective.

9       So thank you.  Have a good night.

10      (Proceedings were concluded at 5:15 p.m.)

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                        Dated this 3rd day of August, 2022.

10

11                   /s/ Nancy J. Meyer
                     Nancy J. Meyer
12                   Official Court Reporter
                     Registered Diplomate Reporter
13                   Certified Realtime Reporter
                     333 Constitution Avenue Northwest
14                   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

## $

**$160,000** [1] - 687:12
**$250,000** [3] - 686:24,
  687:8, 687:14
**$290,000** [2] - 680:5,
  680:20
**$510,000** [1] - 681:2
**$550,000** [1] - 669:1

## 1

**1** [6] - 678:5, 679:4,
  680:10, 680:13,
  680:14, 680:15
**1006** [1] - 658:5
**11** [1] - 692:12
**13** [1] - 699:17
**133** [1] - 657:1
**148** [1] - 656:20
**15** [2] - 677:2, 682:4
**165,000** [1] - 688:4
**17** [1] - 692:6
**18** [1] - 677:2
**19** [1] - 657:2

## 2

**2** [9] - 677:7, 677:9,
  677:12, 680:4,
  680:7, 680:12,
  680:19, 683:11,
  683:17
**200** [2] - 665:2, 665:3
**2018** [2] - 686:14,
  686:20
**2020** [1] - 695:13
**2021** [4] - 661:5,
  661:19, 686:17,
  686:20
**23** [1] - 657:2
**250** [1] - 664:10
**250,000** [1] - 687:3
**25th** [1] - 695:13
**27** [6] - 660:17,
  660:24, 666:4,
  685:9, 687:20, 688:7
**270** [1] - 680:5
**270,000** [1] - 680:21
**290,000** [1] - 680:21

## 3

**3** [7] - 673:18, 674:1,
  681:9, 684:11,
  684:14, 684:18,
  692:10
**32(b** [1] - 697:11

## 4

**4** [1] - 677:12

## 5

**5** [1] - 692:10
**55,000** [1] - 688:2
**5:15** [1] - 703:10

## 6

**658** [1] - 654:5
**667** [1] - 654:8
**685** [1] - 654:5

## 8

**876** [4] - 691:4,
  691:23, 692:19,
  692:22
**88** [1] - 692:6

## 9

**932-B** [22] - 654:8,
  662:17, 662:18,
  663:10, 663:23,
  664:20, 664:23,
  667:18, 667:23,
  669:10, 670:24,
  672:9, 676:2,
  676:24, 677:16,
  677:23, 677:25,
  678:24, 679:1,
  679:12, 679:21,
  681:15
**933-B** [1] - 686:16
**934-B** [1] - 687:11
**935-B** [5] - 675:7,
  675:10, 677:2,
  677:13, 677:18
**937** [1] - 669:10
**937-B** [11] - 668:5,
  668:8, 668:18,
  668:22, 668:25,
  669:2, 669:25,
  670:16, 672:1,
  673:17, 674:4
**950** [2] - 683:14, 684:9
**950-B** [5] - 680:2,
  680:23, 681:18,
  683:11, 683:13
**954** [1] - 684:10
**957-B** [1] - 686:12
**958-B** [17] - 662:17,
  662:18, 663:10,
  663:24, 664:20,
  664:23, 667:18,
  667:23, 669:10,
  670:24, 672:10,
  676:2, 676:24,
  677:16, 678:24,
  679:13, 681:16
**958-B**.......................
  [1] - 654:8
**9:30** [2] - 701:18,
  703:4

## A

**a.m** [1] - 655:2
**abbreviation** [2] -
  675:11, 675:13
**abbreviations** [1] -
  671:15
**ability** [1] - 655:18
**able** [6] - 670:20,
  677:8, 679:5, 679:7,
  699:16, 699:18
**Abrams** [1] - 689:1
**absolutely** [5] -
  659:21, 671:6,
  682:8, 690:23, 694:7
**access** [1] - 702:21
**account** [2] - 681:25,
  691:16
**accounted** [1] -
  673:23
**accurate** [2] - 660:11,
  665:17
**accurately** [1] -
  665:24
**acquired** [1] - 669:5
**acquisition** [1] -
  686:17
**acquisitions** [1] -
  664:2
**action** [1] - 657:7
**active** [2] - 681:9,
  684:6
**actual** [1] - 693:16
**administered** [1] -
  658:11
**admissible** [13] -
  693:19, 694:3,
  694:10, 694:16,
  694:18, 695:5,
  695:7, 696:2, 696:7,
  697:12, 699:23,
  700:13
**Admitted** [1] - 654:7
**admitted** [7] - 667:22,
  667:23, 694:4,
  695:4, 699:15,
  699:22, 700:10
**admitting** [2] - 693:7,
  699:19

**ADRIANA** [1] - 659:1
**Adriana** [2] - 654:4,
  659:1
**advance** [16] - 657:4,
  668:16, 668:25,
  669:1, 669:2, 669:4,
  669:6, 669:9,
  669:12, 672:17,
  686:24, 687:3,
  687:8, 687:13
**advancing** [4] -
  683:12, 683:18,
  683:25, 684:6
**afternoon** [5] - 655:5,
  658:19, 685:3,
  685:4, 698:14
**agent** [6] - 664:2,
  678:18, 680:8,
  681:3, 684:14, 686:5
**agents** [1] - 664:7
**agree** [2] - 693:6,
  695:24
**agreed** [1] - 689:2
**allow** [1] - 699:21
**allowed** [1] - 702:22
**allowing** [1] - 700:11
**ambiguities** [1] -
  667:12
**ambiguity** [2] - 667:6,
  681:25
**amount** [2] - 660:22,
  665:4
**amounts** [2] - 677:20,
  678:1
**Ana** [1] - 658:5
**analyses** [1] - 688:10
**analysis** [2] - 662:5,
  688:7
**analyst** [1] - 659:9
**analyzing** [1] - 661:13
**Andrew** [2] - 688:23,
  689:7
**answer** [4] - 655:20,
  674:9, 698:2, 699:3
**answers** [3] - 695:9,
  698:16
**antitrust** [4] - 659:5,
  659:15, 659:25,
  702:10
**apologies** [1] - 687:5
**apologize** [1] - 696:18
**appear** [2] - 679:12,
  681:15
**appreciate** [2] - 656:1,
  703:7
**approach** [1] - 662:10
**approve** [1] - 657:12
**argue** [1] - 689:23
**argument** [4] - 690:8,
  694:22, 695:22,

**698:17
**art** [2] - 660:3, 660:5
**aside** [4] - 674:4,
  677:18, 679:21,
  684:9
**asserted** [16] - 691:2,
  692:22, 693:9,
  693:14, 694:4,
  694:5, 694:13,
  695:6, 696:1,
  699:11, 699:15,
  699:17, 699:22,
  700:6, 700:17, 701:9
**assignment** [6] -
  660:9, 660:11,
  660:16, 660:17,
  688:11
**associated** [1] -
  665:21
**assume** [1] - 695:18
**attend** [1] - 662:2
**attended** [1] - 662:3
**attention** [2] - 667:13,
  669:24
**attorneys** [1] - 689:23
**auction** [18] - 668:15,
  668:16, 669:17,
  670:10, 670:19,
  676:17, 680:8,
  680:9, 680:23,
  680:24, 683:25,
  684:1, 684:2,
  684:13, 684:14,
  684:15, 685:24
**audience** [2] - 656:4,
  666:22
**audio** [5] - 656:15,
  657:23, 689:7,
  689:17, 701:21
**audio-video** [5] -
  656:15, 657:23,
  689:7, 689:17,
  701:21
**August** [2] - 686:17,
  686:20
**author** [8] - 662:25,
  663:4, 668:7,
  688:24, 691:8,
  691:13, 691:16,
  695:13
**author's** [1] - 696:9
**authors** [1] - 700:4
**aware** [3] - 677:11,
  699:8, 702:4

## B

**B.A.s** [1] - 660:3
**background** [2] -
  659:4, 660:6

**bad** [1] - 700:8
**based** [3] - 666:25, 672:11, 679:18
**basic** [1] - 690:24
**basis** [2] - 697:2, 700:15
**beginning** [3] - 677:1, 689:20, 692:5
**behind** [3] - 662:23, 690:16, 691:19
**below** [2] - 687:8, 687:14
**bench** [4] - 692:16, 693:13, 694:24, 699:13
**best** [11] - 671:25, 672:6, 672:13, 681:1, 681:5, 681:8, 681:13, 681:18, 681:22, 684:15, 684:16
**best-bid** [1] - 681:1
**best-bids** [6] - 681:5, 681:8, 681:13, 681:18, 681:22, 684:16
**better** [1] - 697:17
**between** [2] - 680:21, 686:22, 698:25
**beyond** [2] - 657:10, 662:4
**bid** [55] - 660:23, 663:13, 663:19, 670:18, 671:5, 671:8, 671:13, 672:17, 672:21, 673:2, 673:7, 675:16, 675:17, 676:5, 676:6, 676:11, 676:13, 676:16, 676:21, 676:23, 677:12, 677:20, 677:25, 678:5, 678:7, 678:18, 678:19, 679:24, 680:4, 680:5, 680:7, 680:8, 680:14, 680:17, 680:19, 680:20, 680:21, 681:1, 681:10, 681:22, 681:24, 683:22, 683:23, 684:1, 684:3, 684:11, 684:13, 684:15, 684:18, 684:20, 700:4
**bidded** [1] - 670:18
**bidder** [3] - 676:21, 680:12, 680:13

**bidders** [14] - 670:10, 670:19, 675:23, 675:24, 677:10, 679:1, 679:6, 681:4, 681:9, 684:5, 685:13, 685:22, 686:3, 686:8
**bidding** [26] - 660:14, 660:18, 660:19, 660:20, 660:22, 663:11, 663:14, 663:20, 667:2, 667:4, 667:18, 668:9, 668:15, 668:17, 669:17, 669:23, 670:3, 670:5, 671:10, 671:11, 672:12, 672:18, 672:20, 673:12, 676:18, 686:8
**bids** [45] - 663:21, 670:5, 670:20, 671:21, 671:25, 672:1, 672:6, 672:13, 672:18, 672:25, 675:18, 675:21, 676:7, 677:6, 677:8, 677:10, 678:1, 679:4, 680:10, 680:11, 680:15, 680:17, 681:2, 681:5, 681:6, 681:8, 681:11, 681:12, 681:13, 681:18, 681:19, 681:22, 682:1, 683:10, 683:11, 683:12, 683:17, 683:18, 683:21, 684:4, 684:10, 684:15, 684:16, 684:17, 700:3
**big** [1] - 663:9
**biggest** [1] - 665:5
**binder** [7] - 655:20, 662:15, 668:4, 677:22, 680:2, 683:14, 700:22
**binders** [3] - 662:8, 662:21, 662:24
**bit** [6] - 659:3, 659:18, 663:13, 667:5, 673:22, 688:21
**blacked** [1] - 655:22
**bonus** [7] - 674:5, 674:7, 674:8, 674:10, 674:13, 674:16

**bonuses** [2] - 674:15
**book** [2] - 663:4, 668:8
**books** [5] - 687:21, 687:24, 688:3, 688:4, 688:8
**bottom** [1] - 692:6
**box** [2] - 662:22, 699:14
**break** [6] - 665:5, 682:2, 682:3, 682:7, 701:25, 703:3
**breaks** [2] - 661:11, 682:13
**brief** [1] - 682:21
**bring** [1] - 682:11
**brought** [1] - 667:13
**bucket** [2] - 665:14, 665:20
**but-see** [3] - 678:10, 678:20, 678:22

# C

**CANTOR** [32] - 690:13, 690:19, 690:23, 691:22, 692:1, 692:3, 692:17, 692:25, 693:2, 693:10, 693:18, 693:20, 694:6, 694:11, 694:17, 695:8, 696:8, 696:13, 696:16, 696:18, 696:21, 696:25, 697:4, 697:6, 697:9, 697:16, 697:20, 697:25, 700:20, 700:23, 701:2, 701:12
**capture** [1] - 685:18
**captured** [5] - 660:20, 663:12, 669:25, 672:14, 684:3
**captures** [3] - 669:16, 670:9, 671:19
**care** [3] - 699:10, 700:18, 700:21
**carried** [1] - 666:5
**case** [7] - 669:4, 673:1, 675:14, 676:8, 683:21, 691:5, 702:11
**cases** [4] - 694:1, 695:2, 695:3, 702:10
**category** [1] - 665:5
**caused** [1] - 673:21
**cell** [2] - 675:14, 680:19

**CEO** [1] - 689:1
**certain** [3] - 669:6, 673:21, 674:25
**certainty** [1] - 681:21
**cetera** [3] - 695:16, 700:14
**chains** [1] - 664:1
**challenge** [1] - 682:20
**chance** [2] - 697:16, 697:18
**change** [2] - 666:4, 689:24
**changed** [1] - 684:16
**characteristics** [1] - 673:12
**check** [7] - 661:6, 661:8, 661:14, 661:16, 661:18, 661:20, 662:4
**choose** [1] - 687:18
**Christy** [1] - 700:12
**chunk** [1] - 666:2
**circumstances** [1] - 693:21
**citations** [3] - 665:25, 673:15
**cite** [5] - 665:23, 665:24, 668:23, 669:3, 673:14
**cited** [1] - 673:16
**clarify** [2] - 667:12, 669:11
**clean** [1] - 662:23
**clear** [7] - 671:12, 682:14, 683:4, 696:18, 696:19, 697:25, 700:1
**clearly** [1] - 670:2
**clerk** [1] - 682:11
**clip** [3] - 689:19, 690:6, 701:20
**close** [2] - 656:4, 690:5
**closed** [8] - 656:10, 656:14, 683:14, 690:1, 701:14, 701:17, 701:19, 702:7
**closed-session** [1] - 690:1
**closer** [1] - 659:18
**coding** [1] - 659:13
**collected** [7] - 675:18, 675:21, 677:9, 679:4, 680:10, 684:14, 684:17
**college** [1] - 660:1
**Collier** [2] - 690:8, 698:15
**column** [8] - 670:6,

670:8, 670:9, 672:3, 672:8, 672:16, 672:24, 681:5
**columns** [3] - 672:2, 672:14, 672:15
**comfortable** [1] - 667:1
**coming** [1] - 699:12
**comment** [3] - 697:22, 699:24, 700:12
**commenting** [1] - 692:20
**comments** [2] - 692:21, 697:24
**communicate** [1] - 670:3
**companies** [1] - 700:4
**competed** [1] - 685:16
**complete** [2] - 661:14, 667:2
**component** [1] - 665:24
**comprehension** [3] - 665:9, 665:13, 666:9
**concept** [1] - 695:3
**concerns** [1] - 695:15
**concise** [1] - 673:5
**concluded** [1] - 703:10
**conclusion** [1] - 668:24
**confidential** [9] - 655:14, 655:25, 656:15, 656:23, 662:22, 663:4, 689:19, 690:6, 701:21
**confidentiality** [1] - 689:13
**confirm** [4] - 656:12, 668:21, 669:2, 669:20
**confirmed** [1] - 670:19
**confirming** [1] - 669:8
**consequences** [1] - 695:19
**consider** [5] - 699:11, 699:12, 700:6, 700:8, 701:8
**considerate** [1] - 682:4
**considered** [2] - 684:2, 684:6
**consistent** [2] - 665:23, 666:5
**consolidation** [1] - 700:9
**contact** [2] - 702:18, 702:24
**contacted** [1] - 702:17

**contain** [1] - 677:25
**contained** [1] - 664:15
**contains** [1] - 662:16
**context** [14] - 692:23,
693:15, 694:2,
694:15, 695:4,
695:6, 696:3,
696:14, 698:17,
698:22, 699:2,
699:12, 699:23,
701:10
**continually** [1] - 684:6
**continuing** [1] - 692:6
**contribute** [1] -
683:24
**convention** [3] -
671:20, 672:8,
679:11
**copies** [1] - 662:21
**copy** [3] - 662:22,
662:23, 690:11
**correct** [13] - 665:23,
666:1, 673:25,
685:9, 685:10,
685:13, 685:14,
685:22, 686:7,
686:25, 687:17,
687:18, 697:3
**corrective** [1] - 657:7
**correctly** [1] - 673:23
**correspond** [1] -
673:25
**corresponding** [1] -
676:14
**corresponds** [1] -
669:6
**corrupted** [1] - 661:11
**counsel** [1] - 685:5
**counted** [1] - 683:25
**couple** [2] - 656:21,
683:3
**course** [2] - 659:1,
661:9
**Court** [2] - 695:3,
695:5
**COURT** [92] - 655:5,
655:10, 655:12,
655:16, 655:19,
655:21, 655:24,
656:1, 656:11,
656:18, 656:25,
657:3, 657:6,
657:11, 657:14,
657:17, 657:21,
658:1, 658:4, 658:7,
658:9, 658:13,
658:15, 658:21,
659:17, 659:20,
660:5, 662:11,
662:13, 663:5,

667:20, 667:22,
668:2, 674:5, 674:8,
674:18, 674:20,
682:2, 682:10,
682:24, 683:8,
684:25, 688:15,
688:19, 688:22,
689:4, 689:6,
689:10, 689:15,
690:1, 690:4, 690:9,
690:11, 690:18,
690:21, 691:20,
691:23, 692:2,
692:15, 692:18,
693:1, 693:6,
693:11, 693:19,
694:1, 694:8,
694:15, 694:22,
695:23, 696:12,
696:14, 696:17,
696:19, 696:24,
697:3, 697:5, 697:8,
697:15, 697:18,
697:21, 698:12,
699:5, 700:21,
701:1, 701:8,
701:13, 701:20,
701:24, 702:6,
702:8, 702:16, 703:2
**court** [18] - 656:10,
656:24, 657:20,
682:5, 691:1,
691:15, 693:8,
694:20, 695:21,
701:19, 701:23,
702:2, 702:5, 702:7,
702:17, 702:18,
702:22
**courtroom** [7] -
655:16, 655:17,
656:4, 656:6, 690:5,
701:16
**cover** [2] - 655:4,
672:13
**covers** [1] - 671:19
**create** [1] - 660:16
**created** [4] - 660:17,
662:19, 663:7,
687:17
**credibility** [1] - 696:6
**credit** [2] - 695:22,
695:25
**cross** [2] - 666:18,
700:14
**CROSS** [1] - 685:1
**Cross** [1] - 654:5
**cross-examination** [1]
- 700:14
**Cross-Examination**
[1] - 654:5

**CROSS-
EXAMINATION** [1] -
685:1
**cross-referenced** [1] -
666:18
**crowd** [1] - 702:19
**Crown** [2] - 676:15,
680:18
**cut** [1] - 698:5

# D

**data** [13] - 659:13,
661:6, 661:8,
661:10, 661:11,
661:13, 661:16,
661:18, 661:20,
662:4, 662:5
**data-check** [3] -
661:16, 661:18,
661:20
**date** [8] - 668:16,
669:14, 669:16,
669:19, 669:20,
669:21, 686:17
**dates** [1] - 669:22
**deal** [4] - 674:6,
674:11, 695:14,
697:1
**debating** [1] - 699:9
**decide** [3] - 663:16,
670:15, 684:20
**decided** [2] - 673:1,
702:14
**deciding** [1] - 687:16
**defendants** [1] -
689:23
**defendants'** [2] -
690:10, 698:24
**degree** [1] - 660:2
**deleting** [1] - 673:20
**Department** [1] -
659:5
**department's** [2] -
661:3, 661:21
**deposed** [1] - 698:24
**deposition** [25] -
656:16, 657:23,
666:7, 667:11,
667:13, 673:20,
688:23, 689:7,
689:17, 689:21,
693:12, 695:12,
695:19, 696:1,
697:7, 697:11,
697:19, 697:21,
698:3, 698:9,
698:22, 699:2,
699:5, 701:22
**describe** [1] - 664:14

**description** [1] - 692:7
**designated** [1] -
655:23
**designation** [1] -
698:3
**detail** [2] - 674:24,
682:17
**details** [10] - 660:15,
660:18, 660:19,
663:11, 663:21,
669:5, 672:18,
672:20, 673:8,
682:22
**determine** [2] - 679:5,
688:7
**determined** [1] -
678:13
**dichotomy** [1] -
698:25
**differences** [2] -
673:4, 673:5
**different** [13] - 660:20,
670:9, 678:1, 678:6,
678:9, 678:15,
694:11, 697:4,
697:9, 698:5,
700:24, 701:2
**differentiated** [1] -
672:25
**differentiating** [4] -
672:17, 672:19,
672:20, 673:7
**differing** [4] - 677:20,
678:9, 678:11,
678:15
**digits** [2] - 663:1,
663:3
**DIRECT** [1] - 658:23
**Direct** [1] - 654:5
**direct** [1] - 663:17
**directed** [1] - 702:13
**directly** [2] - 672:4,
672:7
**discussed** [2] -
665:11, 695:14
**discussion** [4] -
689:21, 690:2,
690:3, 695:13
**distinction** [1] -
671:12
**divide** [1] - 694:18
**division** [10] - 659:5,
659:15, 659:25,
670:13, 671:9,
671:14, 676:9,
676:16, 680:18,
702:10
**divisions** [5] - 671:7,
671:8, 671:11,
671:16, 671:21

**docket** [4] - 702:2,
702:5, 702:19,
702:20
**document** [12] -
675:9, 678:11,
678:12, 691:6,
691:15, 691:19,
692:4, 692:7, 692:9,
693:3, 693:21,
695:11
**documents** [48] -
660:12, 660:15,
660:21, 663:12,
663:19, 663:23,
663:25, 664:5,
664:6, 664:8,
664:10, 664:12,
665:7, 665:9,
665:17, 665:19,
665:22, 665:23,
666:8, 666:13,
666:19, 667:2,
667:7, 668:23,
672:4, 672:7,
672:12, 675:15,
675:20, 677:5,
677:8, 677:9,
677:20, 678:2,
678:7, 678:15,
679:3, 679:5,
680:25, 681:21,
681:23, 687:18,
690:25, 698:8,
698:11, 700:24,
701:3
**Dohle** [1] - 689:3
**dollars** [1] - 680:22
**done** [7] - 689:14,
689:24, 695:17,
695:20, 700:14,
702:4, 702:11
**double** [3] - 691:5,
691:17, 701:5
**Doubleday** [1] -
671:17
**down** [5] - 665:5,
686:16, 688:16,
692:12, 698:5
**draw** [1] - 679:16
**drop** [1] - 684:20
**dropped** [3] - 676:18,
676:19, 676:20
**during** [2] - 667:13,
682:7

# E

**economics** [1] - 660:3
**economist** [1] -
661:12
**economists** [1] -

659:11
**edit** [1] - 667:12
**editor** [1] - 678:17
**edits** [2] - 666:7,
673:20
**either** [4] - 678:18,
694:7, 701:3, 702:9
**email** [3] - 663:25,
701:5, 702:1
**emails** [3] - 669:22,
701:4, 701:5
**end** [4] - 678:18,
689:14, 689:15,
693:24
**ended** [1] - 699:1
**endnotes** [1] - 678:23
**entire** [1] - 691:24
**entities** [1] - 664:4
**equivalencies** [1] -
679:16
**essentially** [3] -
695:10, 698:18,
701:6
**et** [3] - 695:16, 700:14
**event** [16] - 660:22,
663:11, 663:14,
663:20, 667:3,
667:4, 667:8, 668:9,
668:15, 668:17,
669:17, 669:23,
670:3, 670:5,
672:12, 691:11
**events** [4] - 660:20,
667:18, 671:10,
686:8
**evidence** [12] -
667:19, 667:23,
681:23, 692:21,
694:25, 695:22,
696:3, 696:7,
697:22, 698:19,
699:19, 700:7
**evolved** [1] - 666:24
**exact** [2] - 679:24,
680:7
**exactly** [2] - 657:12,
666:22
**exam** [1] - 663:2
**examination** [1] -
700:14
**EXAMINATION** [2] -
658:23, 685:1
**Examination** [2] -
654:5, 654:5
**example** [16] - 660:21,
664:3, 668:19,
672:25, 675:6,
675:12, 675:14,
677:7, 677:22,
677:25, 678:1,

680:1, 680:6,
685:15, 687:10,
700:8
**examples** [7] - 666:23,
683:3, 683:6,
686:22, 687:4,
700:18, 700:21
**exclusively** [1] - 686:6
**excuse** [2] - 670:18,
700:20
**exhibit** [1] - 690:16
**Exhibit** [1] - 692:19
**exhibits** [10] - 654:7,
662:16, 682:14,
682:17, 690:15,
702:2, 702:5,
702:10, 702:20,
702:21
**exit** [1] - 701:16
**expect** [1] - 695:21
**expedited** [1] - 684:21
**experienced** [1] -
694:24
**expert** [1] - 662:6
**explain** [4] - 674:5,
675:10, 679:2,
684:12
**explanatory** [1] -
682:16
**explicitly** [2] - 677:10,
680:24
**express** [1] - 695:15
**extent** [1] - 691:15

F

**face** [1] - 683:4
**faced** [1] - 678:14
**fact** [2] - 657:8, 694:23
**fair** [1] - 686:21
**familiar** [2] - 662:18,
695:2
**feature** [1] - 673:2
**few** [5] - 666:7,
667:25, 685:6,
689:12, 692:11
**fields** [1] - 673:21
**final** [13] - 670:21,
671:25, 672:13,
672:16, 672:18,
672:21, 672:23,
673:11, 681:5,
681:7, 684:3, 686:3
**fine** [3] - 683:8, 689:4,
690:15
**first** [13] - 660:1,
668:11, 670:6,
670:11, 672:5,
675:21, 680:11,
680:12, 680:19,

684:13, 689:3,
690:5, 691:9
**five** [6] - 656:7,
683:12, 683:18,
683:21, 684:4,
690:15
**flagging** [1] - 661:12
**Fletcher** [7] - 689:21,
691:12, 692:10,
692:11, 697:1,
698:6, 700:12
**Fletcher's** [5] - 691:9,
691:13, 691:16,
692:9, 696:10
**flexibility** [1] - 692:18
**flip** [1] - 691:18
**focus** [1] - 685:23
**follow** [5] - 667:14,
669:8, 684:1, 695:9,
698:9
**Footnote** [3] - 673:18,
674:1, 677:2
**footnote** [4] - 669:19,
673:21, 676:20,
678:10
**footnotes** [6] - 668:23,
669:3, 673:16,
673:24, 676:13
**forgetting** [1] - 682:11
**formal** [1] - 659:8
**formatting** [2] -
673:19, 673:22
**forth** [1] - 682:12
**forward** [1] - 657:15
**four** [8] - 676:16,
679:4, 681:9,
681:19, 682:1,
683:11, 683:17,
684:5
**fourth** [2] - 679:1,
679:8
**frame** [2] - 669:17,
669:22
**front** [2] - 662:15,
662:24
**fully** [2] - 655:13,
673:23
**functions** [1] - 694:9

G

**general** [3] - 669:16,
669:21, 670:4
**generally** [1] - 672:22
**given** [3] - 681:10,
692:23, 693:12
**government** [6] -
657:22, 658:6,
688:19, 695:24,
697:23, 698:13

**government's** [2] -
662:5, 690:7
**grab** [1] - 662:8
**graduated** [1] - 660:1
**grant** [1] - 657:6
**great** [3] - 656:18,
675:9, 687:12
**greater** [2] - 680:5,
681:14
**greater-than** [1] -
681:14
**Group** [3] - 670:14,
671:3, 671:5
**group** [1] - 671:7
**guess** [2] - 657:2,
686:11

H

**Hachette** [4] - 680:4,
680:7, 680:17,
681:24
**Hachette's** [1] - 681:2
**half** [4] - 686:10,
686:21, 687:22,
688:25
**hand** [1] - 658:10
**handle** [3] - 658:8,
702:15, 702:23
**handled** [1] - 674:25
**happy** [1] - 699:3
**HarperCollins** [4] -
657:5, 681:2,
681:24, 685:16
**head** [2] - 685:18,
687:1
**header** [1] - 672:13
**headers** [2] - 671:24,
672:9
**heads** [1] - 685:18
**hear** [6] - 687:5,
690:5, 695:24,
696:21, 698:6,
698:12
**hearsay** [6] - 689:22,
691:5, 691:17,
693:25, 701:6, 701:9
**held** [4] - 656:10,
657:20, 701:19,
701:23
**help** [3] - 660:21,
661:5, 666:23
**helpful** [2] - 665:6,
683:6
**high** [4] - 661:9,
663:11, 664:4,
669:25
**highest** [2] - 680:14,
681:12
**highlight** [1] - 663:20,

670:2, 672:24, 673:3
**highlighted** [1] -
674:13
**highlighting** [2] -
668:14, 673:5
**history** [2] - 660:3,
660:5
**Honor** [39] - 655:8,
656:19, 657:10,
657:25, 658:3,
658:14, 667:17,
667:21, 667:25,
682:21, 684:24,
688:14, 688:18,
688:20, 689:20,
690:13, 690:24,
691:6, 691:18,
692:1, 692:4,
692:25, 693:2,
693:18, 693:20,
693:22, 694:6,
694:12, 694:17,
695:8, 695:10,
696:16, 698:14,
700:24, 701:7,
701:12, 702:6,
702:9, 703:1
**Honor's** [1] - 689:2
**hour** [1] - 688:25
**hours** [2] - 665:2,
665:3
**House** [25] - 661:21,
664:7, 668:19,
668:21, 669:5,
670:11, 670:13,
671:6, 671:11,
671:16, 671:18,
676:4, 676:8,
676:15, 676:16,
676:9, 680:18,
681:7, 681:22,
685:12, 685:16,
685:19, 686:2, 700:2
**house** [4] - 676:5,
676:6, 676:11,
676:23
**House/Simon** [2] -
660:10, 661:4
**housekeeping** [2] -
662:20, 701:25

I

**idea** [3] - 690:24,
694:9, 701:7
**identification** [1] -
662:17
**identified** [4] - 656:23,
669:21, 670:17,
676:12
**identify** [5] - 677:5,

677:8, 678:10,
678:12, 679:7
**identifying** [2] -
661:10, 663:21
**identities** [2] - 670:9,
679:7
**identity** [2] - 679:5,
679:19
**immediately** [1] -
684:16
**implementing** [1] -
673:20
**import** [1] - 695:20
**important** [2] - 673:4,
673:5
**imprint** [9] - 668:15,
670:7, 670:12,
671:13, 676:5,
676:20, 676:21,
680:18
**imprints** [8] - 670:15,
670:24, 671:8,
671:13, 676:7,
676:10, 676:12,
676:22
**improve** [1] - 680:13
**inadmissible** [5] -
692:5, 694:19,
694:20, 694:25,
695:11
**include** [7] - 662:21,
663:16, 664:12,
671:4, 672:19,
673:7, 686:8
**included** [2] - 672:23,
686:23
**includes** [2] - 672:16,
687:2
**incorporate** [1] -
695:10
**incorporating** [1] -
665:25
**incorrect** [1] - 693:24
**indicate** [8] - 673:13,
675:3, 675:20,
676:6, 676:10,
677:4, 678:6, 681:23
**indicated** [2] - 676:17,
678:8, 684:18
**indicating** [2] -
676:22, 677:20
**individual** [2] - 671:8,
691:8
**industry** [3] - 665:8,
698:20, 700:9
**information** [43] -
655:15, 656:19,
660:19, 663:9,
663:13, 663:18,
664:1, 664:14,

664:18, 664:19,
664:22, 665:8,
665:10, 665:17,
666:16, 668:12,
668:13, 669:25,
670:4, 670:5,
670:17, 671:4,
672:11, 672:14,
672:22, 672:25,
673:13, 673:16,
673:23, 675:4,
675:7, 675:15,
675:19, 677:5,
677:11, 678:11,
678:15, 678:16,
678:19, 678:20,
680:6, 695:7
**initial** [9] - 666:25,
671:24, 672:5,
681:1, 681:13,
681:18, 681:22,
691:13
**inquiry** [1] - 702:1
**insight** [1] - 672:23
**instance** [3] - 685:12,
686:5, 691:17
**instances** [3] -
685:15, 685:16,
685:18
**intended** [2] - 683:5,
692:14
**intensive** [1] - 666:15
**intentionally** [1] -
695:17
**interchangeably** [1] -
663:3
**internally** [1] - 659:8
**introduced** [1] - 698:9
**investigation** [2] -
661:3, 661:21
**involved** [2] - 665:18,
666:8
**involvement** [1] -
661:24
**irrelevant** [2] - 694:13,
696:13
**issue** [5] - 655:6,
655:7, 673:17,
673:19, 701:25
**issues** [3] - 657:25,
661:10, 689:22
**items** [1] - 662:20
**itself** [2] - 693:1,
693:23

## J

**Jacobs** [3] - 689:1,
689:18, 701:22
**January** [2] - 686:14,

686:20
**job** [2] - 660:1, 682:15
**judge** [3] - 682:13,
694:24, 699:17
**July** [2] - 661:5,
661:19
**jury** [1] - 699:13
**Justice** [1] - 659:6
**justice** [1] - 694:8

## K

**KDD** [1] - 671:17
**keep** [1] - 682:11
**Kelley** [2] - 690:8,
698:15
**KELLEY** [1] - 698:14
**kept** [1] - 669:4
**key** [3] - 662:25, 663:1
**kick** [1] - 698:16
**kind** [4] - 659:12,
665:20, 665:21,
696:22
**kinds** [2] - 700:24,
701:3
**Knopf** [1] - 671:17
**knowing** [1] - 681:11

## L

**labeled** [1] - 670:6
**language** [3] - 672:4,
672:7, 678:13
**laptop** [1] - 682:11
**largest** [1] - 665:6
**last** [12] - 661:5,
663:1, 663:2, 666:2,
666:6, 672:13,
683:23, 683:25,
685:13, 685:22,
686:3
**Lauren** [1] - 658:8
**law** [1] - 682:10
**lawyers** [1] - 699:10
**leave** [1] - 675:23
**left** [2] - 656:20, 700:4
**leg** [1] - 693:4
**legal** [1] - 666:21
**less** [4] - 680:5, 681:2,
681:14, 685:24
**less-than** [1] - 681:14
**level** [4] - 661:10,
663:11, 664:4,
669:25
**levels** [2] - 657:4,
657:12
**Liate** [2] - 656:16,
657:23
**line** [2] - 692:6, 692:12
**lines** [4] - 657:2,

692:10, 692:12,
698:1
**lingo** [1] - 659:12
**list** [5] - 670:15, 671:4,
681:1, 698:24, 699:1
**listed** [1] - 683:17
**listing** [1] - 670:23
**lists** [2] - 676:5, 679:1
**live** [2] - 695:19,
697:13
**longest** [1] - 665:12
**look** [20] - 666:24,
670:6, 675:6, 676:4,
677:22, 680:1,
683:5, 683:10,
684:9, 684:10,
686:10, 686:11,
686:16, 687:9,
687:10, 687:11,
690:22, 692:18,
695:25, 699:5
**looked** [6] - 663:25,
664:6, 668:10,
669:12, 669:23,
680:25
**looking** [8] - 665:19,
669:3, 669:22,
671:24, 675:10,
680:4, 681:1, 692:2
**looks** [1] - 693:7
**lose** [1] - 700:5
**loud** [1] - 691:8
**lower** [1] - 681:12
**lowest** [2] - 680:13,
681:12

## M

**Macmillan** [2] - 675:15
**majority** [1] - 664:16
**manner** [1] - 695:20
**marked** [1] - 662:16
**mask** [1] - 658:20
**master** [1] - 662:25
**material** [1] - 662:22
**matter** [17] - 661:7,
691:2, 692:22,
693:8, 693:14,
694:4, 694:5, 695:6,
696:1, 698:21,
699:11, 699:15,
699:17, 699:22,
700:6, 700:17, 701:9
**mean** [15] - 660:13,
660:14, 660:18,
660:19, 661:8,
672:19, 676:5,
683:12, 683:20,
692:11, 692:15,
695:24, 697:6,

692:10, 692:12,
698:1
**means** [1] - 679:2
**meant** [2] - 684:12,
692:14
**meeting** [3] - 662:3,
664:1, 665:11
**meetings** [1] - 662:2
**member** [1] - 702:17
**members** [3] - 656:3,
657:18, 701:15
**mentioned** [3] -
664:11, 667:10,
674:7
**merely** [1] - 700:10
**merger** [2] - 661:4,
661:22
**method** [1] - 676:22
**Michael** [2] - 689:18,
701:22
**microphone** [1] -
659:17
**middle** [1] - 693:13
**might** [2] - 697:9,
699:16
**mind** [2] - 682:24,
683:15
**minor** [1] - 673:17
**minute** [2] - 656:5,
668:11
**minutes** [6] - 655:14,
656:7, 664:1,
665:11, 682:4,
689:12
**missives** [1] - 701:11
**misusing** [1] - 695:7
**mix** [1] - 673:22
**mix-up** [1] - 673:22
**moment** [2] - 658:9,
699:6
**Monday** [1] - 689:25
**monetary** [1] - 675:16
**money** [1] - 660:22
**monitors** [1] - 668:1
**month** [1] - 669:17
**morning** [3] - 658:17,
658:18, 689:3
**most** [2] - 659:13,
698:17
**motion** [4] - 657:2,
657:6, 690:10, 694:8
**motions** [2] - 682:12
**move** [1] - 667:17
**moved** [1] - 684:14
**multiple** [6] - 664:17,
671:7, 671:10,
674:14, 676:6, 686:8

## N

**name** [8] - 658:25,

659:1, 668:7,
670:10, 670:11,
685:5, 691:8, 698:14
**named** [1] - 700:1
**names** [2] - 662:25,
663:4
**naming** [3] - 671:20,
672:8, 679:11
**necessarily** [2] -
695:23, 698:21
**necessary** [1] - 682:16
**need** [3] - 666:4,
682:19, 687:9
**needs** [1] - 689:24
**negotiated** [1] - 686:6
**Nestor** [1] - 655:3
**never** [1] - 666:21
**next** [11] - 658:2,
658:4, 669:19,
671:5, 681:5,
688:19, 688:21,
689:9, 692:9,
692:12, 699:12
**night** [1] - 703:9
**none** [1] - 686:5
**normal** [1] - 661:9
**normally** [1] - 659:12
**NOTE** [1] - 655:2
**note** [1] - 700:16
**notebooks** [2] -
688:24, 689:5
**noted** [2] - 676:19,
684:17
**notes** [1] - 682:15
**nothing** [1] - 662:4
**noting** [2] - 678:9,
684:5
**novel** [1] - 695:3
**November** [1] - 695:13
**nuances** [1] - 666:15
**number** [16] - 663:1,
663:2, 663:3,
664:11, 670:20,
673:25, 675:18,
675:20, 675:23,
677:6, 679:18,
683:10, 683:11,
683:17, 684:10,
684:17
**numbers** [1] - 673:15
**numeric** [1] - 691:4

**O**

**Oath** [1] - 658:11
**oath** [1] - 700:14
**objecting** [5] - 691:24,
692:24, 693:2,
698:2, 698:10
**objection** [6] - 667:20,

667:21, 691:23,
693:3, 699:20,
700:15
**observations** [1] -
664:17
**obviously** [4] -
690:14, 690:24,
691:14, 693:5
**offer** [6] - 671:25,
672:13, 672:16,
672:23, 694:21
**offered** [3] - 691:1,
693:8, 696:10
**offers** [2] - 672:6,
673:11
**official** [1] - 684:17
**often** [1] - 694:24
**okeydokey** [1] -
683:14
**once** [1] - 661:13
**one** [24] - 662:3,
666:4, 668:9,
671:24, 673:17,
674:13, 676:17,
676:19, 678:15,
679:15, 683:5,
683:22, 683:23,
683:24, 684:11,
684:18, 686:6,
687:11, 689:13,
692:2, 698:6, 699:7,
701:5, 701:25
**ones** [1] - 700:22
**oops** [1] - 670:18
**open** [14] - 655:16,
655:17, 656:24,
657:20, 662:15,
675:9, 677:24,
680:3, 687:12,
690:1, 690:3,
701:23, 702:7, 702:8
**opinion** [1] - 693:16
**opportunity** [1] -
681:10
**order** [5] - 680:9,
680:15, 680:16,
680:20, 691:4
**organize** [1] - 672:1
**organized** [3] -
690:14, 690:15,
703:6
**otherwise** [1] - 694:21
**out-of-court** [5] -
691:1, 691:15,
693:8, 694:20,
695:21
**overrule** [2] - 699:20,
700:15
**overrules** [1] - 693:3
**oversee** [1] - 660:11

**P**

**P-o-r-r-o** [1] - 659:2
**p.m** [1] - 703:10
**page** [3] - 656:20,
657:1, 692:9
**PAGE** [1] - 654:2
**paid** [2] - 674:6,
674:11
**Paramount** [1] - 685:5
**parentheses** [3] -
670:12, 672:1, 684:4
**parenthesis** [1] -
670:7
**part** [7] - 657:1, 673:6,
691:21, 693:21,
694:19, 695:23,
698:4
**partial** [2] - 684:11,
684:19
**participants** [6] -
660:22, 663:13,
663:21, 670:4,
683:24, 684:7
**participated** [4] -
676:10, 676:13,
676:15, 676:23
**particular** [23] -
660:23, 663:20,
667:4, 667:8,
668:15, 668:19,
669:23, 670:10,
670:21, 672:12,
675:14, 676:7,
676:8, 677:6, 677:7,
679:3, 680:8, 681:3,
683:21, 684:13,
687:20, 698:23
**parties** [4] - 656:12,
699:9, 702:3, 703:5
**party** [1] - 664:7
**party's** [1] - 696:9
**pass** [5] - 683:7,
684:24, 688:24,
689:5, 690:21
**past** [1] - 696:22
**path** [1] - 693:13
**pause** [1] - 682:10
**Penguin** [26] - 660:9,
661:4, 661:21,
664:7, 668:19,
668:21, 669:4,
670:11, 670:13,
671:3, 671:5, 671:6,
671:11, 671:15,
676:4, 676:8, 679:6,
680:17, 681:6,
681:21, 685:12,
685:15, 685:19,
686:2, 700:2

**perform** [1] - 688:10
**perhaps** [1] - 702:18
**period** [4] - 669:6,
686:21, 687:22,
688:4
**permission** [1] - 689:2
**person** [3] - 679:17,
696:6, 702:16
**perspective** [1] -
703:8
**pertaining** [2] -
669:23, 672:12
**Petrocelli** [1] - 689:2
**picking** [1] - 666:14
**picture** [1] - 663:9
**piece** [2] - 699:19,
700:23
**pieced** [1] - 669:21
**place** [4] - 668:17,
669:18, 680:16,
680:21
**placed** [1] - 670:21
**placeholders** [1] -
679:9
**places** [1] - 683:3
**plaintiff** [1] - 689:22
**plan** [3] - 688:21,
688:23, 688:25
**planning** [1] - 682:20
**play** [5] - 655:14,
656:14, 689:13,
701:14, 701:20
**played** [9] - 656:16,
656:23, 656:24,
657:8, 657:24,
689:8, 689:18,
697:7, 701:22
**playing** [1] - 657:22
**point** [3] - 667:8,
667:24, 694:11
**Porro** [21] - 654:4,
658:5, 658:17,
659:1, 660:4, 660:9,
662:8, 662:15,
663:7, 668:4,
669:24, 675:3,
677:1, 677:19,
679:23, 683:7,
683:10, 685:3,
687:16, 688:6,
688:12
**Porro's** [1] - 667:17
**portion** [4] - 655:2,
655:25, 656:14,
656:22
**position** [1] - 693:20
**potential** [1] - 664:2
**potentially** [1] -
693:19
**PPG** [6] - 670:13,

671:1, 671:3,
671:18, 673:1
**practice** [1] - 702:4
**predominantly** [2] -
659:11, 659:13
**prefaced** [1] - 692:8
**prefer** [2] - 690:20,
702:20
**preference** [1] -
655:11
**preliminary** [2] -
661:9, 698:24
**prepare** [2] - 664:8,
664:19
**prepared** [1] - 664:25
**preparing** [1] - 665:1
**present** [5] - 665:10,
673:23, 675:20,
685:20, 685:21
**presented** [1] - 660:12
**press** [2] - 702:1,
702:12
**previously** [1] -
673:21
**PRH** [4] - 671:1,
671:5, 671:20,
671:21
**problem** [4] - 683:16,
694:6, 695:8, 697:14
**proceed** [2] - 658:14,
681:4
**proceeded** [1] - 681:7
**proceedings** [1] -
655:3
**Proceedings** [5] -
656:10, 657:20,
701:19, 701:23,
703:10
**process** [3] - 667:14,
669:8, 670:23
**produce** [1] - 664:4
**production** [1] - 661:6
**progress** [1] - 681:11
**progressing** [1] -
684:2
**project** [3] - 661:16,
661:18, 661:20
**proper** [2] - 695:11,
697:10
**propose** [1] - 673:1
**provide** [3] - 688:20,
695:4, 701:10
**providing** [1] - 694:19
**public** [4] - 656:3,
657:18, 668:1,
701:16
**publish** [1] - 667:25,
679:9
**published** [4] -
687:21, 687:24,

688:3, 688:9
**publisher** [13] -
668:14, 668:18,
669:9, 670:7,
670:11, 676:7,
677:12, 678:17,
679:8, 679:10,
683:24, 686:6
**Publisher** [5] - 679:2,
679:8, 679:15
**publishers** [6] - 664:7,
670:15, 670:17,
670:23, 679:12,
679:18
**Publishing** [3] -
670:13, 671:3, 671:5
**publishing** [2] - 671:7,
698:20
**pull** [1] - 659:17
**pulled** [2] - 672:4,
672:6
**pure** [1] - 690:25
**purpose** [4] - 694:13,
694:15, 699:22,
700:10
**purposes** [2] - 662:17,
663:2
**pushing** [1] - 694:23
**puts** [1] - 696:3
**putting** [2] - 702:2,
702:5
**PX** [60] - 654:8,
662:17, 662:18,
663:1, 663:2, 663:3,
663:10, 663:23,
663:24, 664:20,
664:23, 667:18,
667:23, 668:5,
668:8, 668:18,
668:22, 668:25,
669:2, 669:10,
669:25, 670:16,
670:24, 672:1,
672:9, 673:17,
674:4, 675:7,
675:10, 676:2,
676:24, 677:2,
677:13, 677:16,
677:18, 677:23,
677:25, 678:24,
679:1, 679:12,
679:21, 680:2,
680:23, 681:15,
683:11, 683:13,
684:9, 684:10,
686:12, 686:16

### Q

**questions** [14] -
656:21, 667:5,

674:25, 682:22,
684:23, 685:6,
688:14, 692:14,
695:9, 697:10,
698:8, 698:17,
699:3, 702:12
**quick** [1] - 661:6
**quickly** [2] - 686:11,
687:10
**quite** [1] - 667:6
**quote** [1] - 678:12
**quotes** [2] - 692:8,
692:9, 692:13

### R

**RA** [3] - 659:9, 659:10,
659:11
**raise** [2] - 658:9,
673:17
**Random** [27] - 660:9,
661:4, 661:21,
664:7, 668:19,
668:21, 669:5,
670:11, 670:13,
671:6, 671:11,
671:16, 671:18,
674:6, 676:8,
676:15, 676:16,
679:6, 680:18,
681:7, 681:22,
685:12, 685:16,
685:19, 686:2, 700:2
**range** [5] - 669:16,
679:24, 681:19,
681:20, 681:25
**rather** [2] - 698:22,
700:10
**reaction** [3] - 696:6,
696:7, 696:8
**read** [4] - 663:18,
699:7, 700:1, 700:5
**Read** [2] - 655:7,
689:11
**READ** [29] - 655:8,
655:11, 655:13,
655:17, 655:20,
655:22, 655:25,
656:17, 656:19,
657:1, 657:4, 657:9,
657:13, 657:16,
657:25, 658:2,
658:5, 658:8,
688:20, 688:23,
689:5, 689:9,
689:12, 689:19,
690:3, 690:7,
690:10, 702:9, 703:1
**readable** [1] - 673:4
**reading** [6] - 665:7,
665:9, 665:12,

666:10, 666:11,
666:15
**ready** [3] - 656:8,
658:2, 689:23
**really** [5] - 682:15,
693:3, 702:19,
702:22, 703:6
**reason** [2] - 674:2,
694:21
**reasons** [1] - 699:18
**received** [6] - 661:7,
674:16, 680:17,
681:19, 683:21,
684:15
**receiving** [1] - 678:18
**Recess** [1] - 682:9
**recognize** [1] - 702:21
**recommendation** [1] -
661:24
**record** [1] - 658:25
**recording** [5] -
656:15, 657:23,
689:7, 689:17,
701:21
**red** [2] - 655:23,
662:22
**redacted** [2] - 667:25,
702:2
**ref** [1] - 670:20
**refer** [2] - 663:3, 671:2
**referenced** [1] -
666:18
**referred** [5] - 659:9
**referring** [2] - 668:7,
668:23
**refers** [1] - 671:3
**reflect** [1] - 687:7
**relative** [1] - 688:8
**relevant** [1] - 690:17
**rely** [5] - 694:5, 694:7,
694:25, 695:5, 696:4
**relying** [2] - 678:14,
694:12
**remain** [1] - 658:9
**remainder** [1] - 701:17
**remaining** [1] - 656:11
**remember** [1] - 674:6
**reminded** [1] - 689:12
**remove** [1] - 658:20
**reopen** [1] - 656:5
**repeating** [1] - 683:15
**reported** [1] - 655:3
**reporter** [1] - 682:5
**REPORTER** [3] -
659:17, 659:20,
702:6
**REPORTER'S** [1] -
655:2
**represent** [7] - 669:15,
675:13, 675:21,

679:17, 685:25,
687:2, 688:2
**represents** [2] -
675:18, 685:12
**research** [1] - 659:9
**resolved** [1] - 655:6
**respect** [2] - 693:4,
698:8
**respectfully** [1] -
696:23
**responded** [1] -
691:13
**responding** [1] -
691:12
**response** [2] - 692:9,
692:11
**rest** [2] - 655:17,
698:22
**result** [1] - 700:9
**resume** [2] - 657:22,
701:17
**retrospect** [1] - 691:9
**review** [2] - 664:8,
664:19
**reviewed** [12] -
660:15, 663:12,
664:10, 664:12,
664:15, 664:16,
666:19, 672:5,
678:2, 678:7,
685:25, 687:19
**reviewing** [3] -
665:21, 666:8, 667:4
**revised** [1] - 667:10
**revolved** [1] - 663:19
**RH** [1] - 671:18
**Riker** [1] - 658:8
**RIKER** [18] - 658:14,
658:16, 658:19,
658:24, 659:22,
660:8, 662:10,
662:14, 662:20,
663:6, 667:17,
667:24, 668:3,
674:23, 683:2,
683:9, 684:23,
688:14
**Riker.................** [1] -
654:5
**role** [4] - 661:3,
661:13, 661:20,
687:16
**roughly** [1] - 688:4
**round** [25] - 670:21,
672:5, 672:6,
672:21, 675:21,
676:13, 676:14,
676:20, 676:21,
677:7, 680:11,
681:1, 681:3, 681:4,

681:5, 681:8,
681:13, 681:18,
681:22, 683:22,
684:11, 684:16,
684:18, 684:19,
684:20
**Round** [18] - 677:7,
677:9, 678:5, 679:4,
680:4, 680:7,
680:10, 680:12,
680:13, 680:14,
680:15, 680:19,
681:9, 683:11,
683:17, 684:11,
684:14, 684:18
**rounds** [2] - 676:16,
680:10
**Rounds** [1] - 677:12
**row** [5] - 670:21,
671:1, 676:4,
683:10, 684:11
**Rule** [1] - 697:11
**rule** [2] - 693:22,
693:25
**ruled** [1] - 692:4
**rules** [4] - 680:9,
680:23, 680:24,
684:1
**ruling** [1] - 693:24
**run** [1] - 693:24
**Ryan** [1] - 685:5

### S

**S&S** [1] - 673:1
**saw** [2] - 672:11,
687:4
**Schuster** [12] -
660:10, 661:4,
664:6, 669:12,
679:6, 680:20,
681:6, 681:21,
685:6, 685:13,
685:19, 686:2
**Schuster's** [2] -
661:22, 678:5
**seal** [2] - 657:2, 657:7
**sealed** [1] - 657:14
**seated** [2] - 655:14,
658:13
**second** [2] - 662:24,
665:14, 665:21,
672:6
**section** [2] - 657:11,
665:7
**sections** [2] - 665:6,
691:24
**see** [22] - 656:1, 657:6,
670:20, 677:1,
677:3, 677:4,

677:15, 678:10,
678:20, 678:22,
686:14, 686:17,
687:12, 691:5,
691:7, 692:5,
693:13, 694:24,
696:1, 699:14,
700:5, 703:4
**SEE** [1] - 677:1
**segment** [1] - 656:5
**selected** [1] - 687:21
**self** [1] - 682:16
**self-explanatory** [1] -
682:16
**sense** [2] - 666:10,
674:17
**sentence** [1] - 701:4
**separate** [4] - 655:4,
668:23, 694:9,
699:18
**separately** [1] -
690:20
**September** [1] -
659:16
**series** [3] - 674:14,
691:9, 691:14
**session** [3] - 690:1,
701:15, 701:17
**set** [5] - 667:2, 680:10,
681:3, 682:22,
690:13
**shores** [1] - 682:19
**SHORES** [1] - 667:21,
682:21, 685:2
**Shores** [1] - 685:5
**Shores.................** [1] -
654:5
**short** [1] - 689:19
**shorten** [1] - 682:25
**show** [1] - 686:5
**showing** [1] - 670:8
**side** [1] - 690:7
**sides** [1] - 703:7
**signal** [6] - 677:1,
677:3, 677:4,
677:15, 678:20,
678:22
**significant** [2] -
672:22, 688:8
**similar** [1] - 669:12
**Simon** [12] - 661:22,
664:6, 669:11,
678:5, 679:6,
680:19, 681:6,
681:21, 685:6,
685:12, 685:19,
686:2
**simple** [1] - 690:25
**sitting** [1] - 699:13
**situation** [3] - 673:11,

679:3, 701:6
**situations** [1] - 675:1
**skimming** [1] - 666:10
**slightly** [2] - 691:3,
694:11
**smoothly** [1] - 703:7
**Solomon** [2] - 688:24,
689:8
**somewhere** [1] -
680:21
**sorry** [13] - 658:19,
661:2, 666:6,
666:12, 671:18,
674:5, 674:22,
683:15, 683:23,
685:24, 691:20,
691:22, 700:25
**sort** [2] - 657:17,
701:6
**source** [3] - 673:13,
678:16, 678:18
**sourced** [1] - 672:11
**sources** [1] - 673:15
**span** [1] - 686:9
**speaks** [1] - 701:10
**specific** [2] - 680:9
**specifically** [11] -
660:14, 667:12,
669:3, 671:9, 672:3,
672:24, 675:12,
678:10, 678:13,
680:6, 680:12
**spectators** [1] - 656:4
**spell** [1] - 658:25
**spelled** [1] - 659:1
**spend** [3] - 665:1,
665:3, 666:13
**spent** [3] - 665:2,
665:7, 665:12
**spreadsheet** [3] -
664:3, 669:4, 669:12
**spreadsheets** [4] -
664:2, 664:11,
664:12, 664:15
**staff** [1] - 702:17
**stages** [1] - 686:3
**stand** [2] - 655:7,
693:4
**standardized** [1] -
666:3
**standing** [1] - 658:9
**start** [4] - 660:24,
666:22, 688:24,
691:4
**started** [3] - 660:25,
666:13, 691:10
**starting** [1] - 663:9
**state** [1] - 658:25
**statement** [2] - 693:8,
695:21, 696:9

**statements** [4] -
691:1, 691:15,
694:2, 696:10
**States** [2] - 687:25,
688:3
**statistical** [2] - 688:7,
688:10
**statistically** [1] - 688:7
**statistician** [1] - 659:8
**Stehlik** [2] - 656:16,
657:24
**step** [1] - 688:16
**still** [4] - 673:23,
673:24, 684:15,
697:12
**story** [3] - 697:1,
697:4, 697:9
**stress** [1] - 673:22
**structure** [3] - 663:14,
663:22, 670:4
**study** [1] - 697:18
**subject** [1] - 700:14
**submit** [1] - 698:5
**submitted** [1] - 676:7
**submitting** [1] -
678:17
**substance** [1] -
698:11
**substantive** [1] -
698:19
**succeed** [1] - 698:4
**succinctly** [1] - 663:17
**sue** [1] - 661:25
**suggest** [1] - 689:13
**suggests** [1] - 677:12
**summaries** [48] -
660:17, 660:24,
660:25, 662:19,
663:7, 663:16,
663:17, 664:9,
664:20, 664:25,
665:2, 666:3, 666:4,
666:7, 666:17,
666:20, 666:24,
667:10, 667:15,
667:18, 667:25,
668:1, 668:9, 669:9,
671:22, 672:9,
673:7, 673:14,
674:1, 674:19,
675:1, 675:3, 676:2,
676:24, 677:16,
677:19, 678:23,
679:12, 679:23,
685:7, 685:9,
685:11, 685:18,
686:5, 686:9,
686:23, 687:7,
687:17
**summarization** [2] -

660:11, 660:14
**summarize** [3] -
663:18, 663:23,
682:25
**summarized** [3] -
663:10, 664:22,
674:15
**summary** [14] - 658:5,
662:21, 663:12,
665:15, 665:16,
666:21, 666:23,
673:4, 674:24,
679:15, 679:16,
680:3, 683:4, 684:4
**Superior** [1] - 695:3
**support** [1] - 695:22
**supported** [1] -
665:17
**supporting** [1] -
668:24
**supposed** [1] - 679:17
**symbols** [1] - 681:14
**system** [1] - 694:8

## T

**table** [23] - 665:22,
668:11, 668:12,
668:13, 668:14,
669:14, 669:24,
670:1, 670:2, 670:6,
670:16, 670:22,
671:9, 671:24,
672:3, 673:25,
675:10, 675:14,
675:24, 678:14,
678:19, 681:18,
684:11
**tables** [4] - 665:15,
665:16, 666:16,
666:18
**tabs** [1] - 664:17
**talks** [1] - 693:12
**Tammy** [1] - 655:3
**team** [5] - 660:10,
662:2, 662:3,
666:23, 667:9
**tech** [1] - 657:25
**technical** [3] - 655:6,
655:7, 699:9
**templates** [2] -
666:20, 666:25
**tens** [2] - 664:17,
688:8
**terminal** [2] - 683:22,
683:23
**terminology** [1] -
676:6
**terms** [3] - 672:21,
674:16, 681:3

**test** [1] - 696:6
**testifying** [2] - 697:5,
697:13
**testimony** [27] - 682:6,
688:17, 690:16,
691:18, 692:3,
692:20, 692:23,
692:24, 693:4,
693:12, 693:15,
693:16, 693:22,
694:16, 694:20,
696:2, 696:15,
697:12, 697:19,
697:21, 698:10,
699:6, 699:23,
700:11, 701:10
**themselves** [3] -
673:24, 696:10,
698:21
**they've** [2] - 695:17,
695:20
**thinks** [1] - 697:1
**third** [6] - 664:7,
665:20, 679:1,
679:7, 692:2, 696:9
**third-party** [1] - 664:7
**third-party's** [1] -
696:9
**thoughts** [2] - 698:19,
698:20
**thousands** [2] -
664:17, 688:8
**three** [9] - 655:14,
656:5, 656:7,
659:16, 686:10,
686:21, 687:22,
688:4, 691:24
**three-and-a-half-
year** [2] - 686:21,
687:22
**three-minute** [1] -
656:5
**three-year** [1] - 688:4
**ties** [1] - 662:25
**title** [4] - 659:7, 659:8,
659:23, 668:8
**titles** [9] - 663:4,
669:5, 672:3,
672:11, 686:23,
687:3, 687:7,
687:17, 687:21
**today** [1] - 689:20
**together** [6] - 669:21,
676:7, 682:18,
682:20, 682:23,
690:19
**tomorrow** [4] - 689:3,
689:24, 701:18,
703:4
**took** [2] - 668:17,

713

669:17
**top** [5] - 662:21, 681:4, 686:14, 687:1, 691:6
**total** [7] - 675:18, 675:20, 675:23, 683:12, 683:18, 684:4, 685:9
**towards** [1] - 683:25
**trade** [2] - 687:24, 688:3
**transcribed** [1] - 655:3
**transcript** [3] - 656:20, 657:1, 698:3
**transparency** [1] - 702:11
**trial** [7] - 692:16, 693:13, 693:22, 694:24, 699:13, 700:7, 702:5
**true** [2] - 692:17, 694:21
**truth** [20] - 691:1, 692:22, 693:8, 693:14, 694:4, 694:5, 694:12, 695:6, 696:1, 696:4, 696:11, 696:12, 698:21, 699:11, 699:15, 699:17, 699:21, 700:6, 700:16, 701:9
**trying** [3] - 679:16, 693:11, 697:24
**turn** [7] - 662:8, 668:4, 669:24, 675:7, 677:22, 680:1, 692:3
**tweet** [19] - 691:5, 691:7, 691:12, 691:16, 691:25, 692:21, 692:23, 692:24, 693:1, 693:7, 693:12, 696:2, 696:3, 696:4, 699:7, 700:12, 700:13
**tweets** [16] - 690:11, 691:9, 691:14, 692:13, 692:19, 694:5, 697:2, 697:22, 697:24, 698:20, 698:25, 699:1, 699:14, 699:21, 699:25, 701:3
**Twitter** [1] - 691:16
**two** [24] - 661:17, 662:20, 662:21, 663:1, 663:2, 668:23, 670:19,

672:2, 672:14, 677:8, 677:10, 678:8, 678:14, 679:6, 681:4, 681:19, 681:25, 683:5, 685:13, 685:22, 686:3, 686:22
**type** [3] - 664:19, 666:11, 688:6
**types** [5] - 663:9, 663:23, 664:4, 664:22, 699:18

## U

**ultimate** [1] - 686:24
**umbrella** [1] - 700:3
**under** [5] - 655:4, 693:21, 697:10, 700:3, 700:14
**understood** [2] - 666:14, 698:1
**unfortunately** [1] - 673:19
**unintentionally** [1] - 695:18
**United** [2] - 687:25, 688:3
**UNK** [3] - 675:11, 675:13, 675:22
**unknown** [9] - 675:4, 675:6, 675:13, 675:17, 675:19, 676:1, 679:10, 679:11
**up** [7] - 656:21, 666:14, 668:6, 673:22, 690:21, 699:1, 702:10
**useful** [1] - 691:3
**uses** [1] - 663:1

## V

**vacate** [1] - 656:6
**validate** [1] - 666:16
**validating** [1] - 665:15
**value** [11] - 668:16, 674:14, 675:13, 675:16, 675:17, 677:6, 678:13, 679:24, 680:5, 680:10, 681:10
**values** [9] - 663:13, 665:16, 665:18, 665:22, 666:18, 678:6, 678:9, 680:16, 681:6
**variety** [1] - 663:25
**vast** [1] - 664:16

**verification** [1] - 665:18
**video** [9] - 656:5, 656:15, 657:23, 688:25, 689:1, 689:7, 689:9, 689:17, 701:21
**videotape** [1] - 657:22
**viewing** [1] - 667:2
**Viking** [3] - 670:12, 671:1, 673:1
**volume** [1] - 664:14
**voluminous** [1] - 702:20

## W

**walk** [2] - 664:25, 667:24
**wants** [1] - 693:22
**website** [3] - 702:11, 702:18, 702:22
**weeks** [1] - 661:17
**Whittall** [2] - 700:2, 700:7
**whole** [3] - 659:23, 694:8, 699:2
**wholesale** [1] - 695:21
**whoops** [2] - 656:25, 683:23
**why'd** [1] - 680:4
**willing** [1] - 702:23
**winner** [2] - 663:14, 668:20
**winning** [10] - 668:14, 668:16, 668:18, 668:25, 669:1, 669:2, 669:8, 686:24, 687:3, 687:8
**witness** [12] - 658:2, 658:4, 658:6, 674:9, 674:20, 684:24, 688:19, 698:23, 698:24, 699:1, 699:24, 700:11
**WITNESS** [14] - 658:12, 658:18, 658:20, 658:22, 659:19, 659:21, 660:7, 662:12, 674:7, 674:12, 674:19, 674:22, 682:8, 688:18
**Witnesses** [1] - 654:3
**won** [1] - 668:21
**wondering** [3] - 674:8, 674:10, 682:16
**word** [2] - 674:13, 674:15
**words** [1] - 677:10

**workbooks** [1] - 664:16
**works** [2] - 659:11, 674:8
**wrote** [2] - 692:8, 692:12

## Y

**year** [8] - 661:1, 661:5, 686:21, 687:22, 687:25, 688:3, 688:4, 688:9
**years** [3] - 659:16, 686:10, 699:17

## Z

**Zoe** [2] - 700:2, 700:7