```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3      * * * * * * * * * * * * * *   )
        THE UNITED STATES OF AMERICA,    )    Civil Action
 4                                       )    No. 21-02886
                       Plaintiff,        )
 5                                       )
          vs.                            )
 6                                       )
        BERTELSMANN SE & CO. KGAA,       )    Washington, D.C.
 7      et al.,                          )    August 8, 2022
                                         )    2:03 p.m.
 8                     Defendants.       )    AFTERNOON SESSION
                                         )
 9      * * * * * * * * * * * * * *   )

10

11                   TRANSCRIPT OF BENCH TRIAL
                BEFORE THE HONORABLE FLORENCE Y. PAN,
12                   UNITED STATES DISTRICT JUDGE

13

14      APPEARANCES:

15      FOR THE PLAINTIFF:       JOHN R. READ, ESQ.
                                 ETHAN STEVENSON, ESQ.
16                               IHAN KIM, ESQ.
                                 MELVIN A. SCHWARZ, I, ESQ.
17                               JESSICA LEAL, ESQ.
                                 UNITED STATES DEPARTMENT OF JUSTICE
18                               ANTITRUST DIVISION
                                 450 Fifth Street, Northwest
19                               Washington, D.C. 20530

20
        FOR THE DEFENDANTS       DANIEL M. PETROCELLI, ESQ.
21      BERTELSMANN and          M. RANDALL OPPENHEIMER, ESQ.
        PENGUIN RANDOM HOUSE:    MEGAN SMITH, ESQ.
22                               ROXANA GUIDERO, ESQ.
                                 SCOTT VOELZ, ESQ.
23                               O'MELVENY & MYERS, LLP
                                 1999 Avenue of the Stars
24                               Eighth Floor
                                 Los Angeles, California 90067
25
```

```
1      APPEARANCES, CONT'D:

2

3      FOR THE DEFENDANTS        STEPHEN FISHBEIN, ESQ.
       VIACOMMCBS and            SHEARMAN & STERLING, LLP
       SIMON & SCHUSTER:         599 Lexington Avenue
4                                New York, New York 10022

5                                RYAN A. SHORES, ESQ.
                                 SHEARMAN & STERLING, LLP
6                                401 Ninth Street, Northwest
                                 Washington, D.C. 20004
7

8      REPORTED BY:             LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
9                                United States District Court for the
                                   District of Columbia
10                               333 Constitution Avenue, Northwest
                                 Room 6706
11                               Washington, D.C. 20001
                                 (202) 354-3269
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2
                                    Direct    Cross     Redirect
3

4    WITNESSES FOR THE PLAINTIFF:

5    Nicholas Hill, Ph.D.          1219

6


7


8    EXHIBITS RECEIVED IN EVIDENCE                        PAGE

9
     Plaintiff's Exhibit No. 0963                         1236
10   Plaintiff's Exhibit No. 0972                         1237
     Plaintiff's Exhibit No. 0969                         1249
11   Plaintiff's Exhibit No. 0959                         1253
     Plaintiff's Exhibit No. 0960                         1255
12   Plaintiff's Exhibit No. 0970                         1288
     Plaintiff's Exhibit No. 964                          1321
13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Good afternoon.

2           MR. STEVENSON:  Good afternoon, your Honor.

3           THE COURT:  And the Government may call its next

4    witness.

5           MR. READ:  We call Dr. Nicholas Hill.  Mr. Ethan

6    Stevenson will do that examination for the Government.

7           THE COURT:  Thank you.

8           (Thereupon, the witness entered the courtroom and

9    the following proceedings were had:)

10          THE COURT:  Good afternoon.  Could you remain

11   standing and raise your right hand, please.

12       NICHOLAS HILL, Ph.D., GOVERNMENT WITNESS, SWORN.

13          MR. STEVENSON:  Good afternoon.

14          THE COURT:  Good afternoon.  You may proceed.

15          MR. STEVENSON:  Good afternoon, your Honor.

16          May we present some binders to the witness and the

17   Court?

18          THE COURT:  Yes, of course.

19          MR. STEVENSON:  Thank you.

20          (Tenders documents to the Court and witness.)

21          THE COURT:  Two binders.  Excellent.

22          MR. STEVENSON:  May I proceed?

23          THE COURT:  Yes.  Thank you.

24                    DIRECT EXAMINATION

25

1    BY MR. STEVENSON:

2    Q.  Good afternoon, Dr. Hill.  Would you please state and

3    spell your name for the record.

4    A.  Sure.  My name is Nicholas Hill, N-I-C-H-O-L-A-S

5    H-I-L-L.

6    Q.  Dr. Hill, what is your academic training?

7    A.  I have a Ph.D. in economics from the University of

8    Warwick.

9            THE COURT REPORTER:  Excuse me.  What was the name

10   of the university?

11           THE WITNESS:  Sorry.  Johns Hopkins University.

12   Warwick is my undergraduate degree.  Apologies.

13   BY MR. STEVENSON:

14   Q.  What work have you done since obtaining your Ph.D. at

15   Johns Hopkins?

16   A.  After getting my Ph.D., I moved to the Department of

17   Justice's antitrust division, where I worked as a staff

18   economist for seven years.

19           Then I moved to the Federal Trade Commission, to

20   the bureau of economics, and I worked there for two years as

21   a staff economist.

22           Then I returned to the antitrust division for

23   three years as a supervisory economist.

24           And for the past five years, I've been a partner

25   at Bates White Economic Consulting.

1    Q.  At a high level, what were your responsibilities during

2    your time at the antitrust distribution in the FTC?

3    A.  When I was a staff economist, my responsibilities were

4    to work directly on antitrust matters, primarily mergers,

5    your Honor.  And then when I returned as a supervisory

6    economist, I supervised other economists who were working on

7    such matters.  And in that role, I also interacted

8    frequently with the legal staff.

9    Q.  Did you receive any awards while working for the

10   government?

11   A.  I did.

12   Q.  Which ones?

13   A.  For my work on and Aetna and Humana, I received the

14   attorney general's award of distinguished service.

15   Q.  What type of consulting work do you do with Bates White

16   today?

17   A.  So my practice largely focuses on mergers, but I work on

18   other antitrust matters as well.

19   Q.  Over the course of your time at the government and Bates

20   White, how many mergers have you analyzed, roughly?

21   A.  I don't have an exact number, but it's certainly more

22   than 100.

23   Q.  Have you analyzed mergers in different industries?

24   A.  Yes.  I've worked in a wide range of industries.  I've

25   worked on chemicals, airlines, healthcare, wireless telecom,

1    wired telecom, defense.  I've worked on -- I'm not aware of

2    a major industry I have not worked on.

3    Q.  Have you ever published on the subject of merger

4    analysis?

5    A.  Yes, I have.

6    Q.  Have you ever been recognized by a court as an economic

7    expert in litigation?

8    A.  Yes.  I've been recognized four times.

9    Q.  Which times?

10   A.  Once in the Tronox matter, once in the Ivonik matter,

11   once in Peabody/Arch and then once in the U.S. Sugar matter

12   in Delaware.

13            MR. STEVENSON:  Your Honor, at this point I would

14   like to offer Dr. Hill as an expert in economics.

15            THE COURT:  Any objection?

16            MR. OPPENHEIMER:  No objection, your Honor.

17            THE COURT:  He will be so qualified.

18            One question:  Have you ever testified on behalf

19   of the defendants in an antitrust action?

20            THE WITNESS:  Yes, your Honor.  In Tronox and

21   Arch/Peabody, I was on behalf of the FTC.  In Ivonik, I was

22   on behalf of the defendants against the FTC.  Then in the

23   recent sugar trial in Delaware, I was on behalf of the

24   defendants against the Department of Justice.

25            THE COURT:  Thank you.

1     You may proceed.

2           MR. STEVENSON:  Thank you.

3     BY MR. STEVENSON:

4     Q.  Dr. Hill, have you prepared a slide presentation to

5     assist with your testimony today?

6     A.  I have.

7           MR. STEVENSON:  Your Honor, may we publish this

8     slide presentation?

9           THE COURT:  Any objection?

10          MR. OPPENHEIMER:  Your Honor, we have no

11    objection.  We have an understanding with counsel that these

12    are being used as part of 703 and 705 as his reliance

13    materials.  They're not coming in for the truth of the

14    matter.

15          And where there are exhibits that are to be

16    introduced, they'll be done in the normal course.

17          THE COURT:  All right.  Do you agree with that?

18          MR. STEVENSON:  Yes, your Honor.  There are

19    figures in the PowerPoint that we will -- that I will likely

20    move to admit.  But --

21          THE COURT:  But separately?

22          MR. STEVENSON:  -- those are separate.  Those have

23    exhibit numbers.

24          THE COURT:  So anything that's not specifically

25    moved for the truth will not be admitted for the truth.

```
 1              MR. STEVENSON:  Correct.

 2              THE COURT:  Got it.

 3              MR. STEVENSON:  We have a public version that

 4    we're going to display, but your Honor has a version that I

 5    think should be kept under seal in your binder.  If you'd

 6    like, we can email a copy to chambers, too.

 7              THE COURT:  That's okay.  Which binder should we

 8    be looking at?

 9              MR. STEVENSON:  The narrower one or the thinner

10    one.

11              THE COURT:  Okay.

12              MR. OPPENHEIMER:  Sorry.  I don't mean to

13    interject, your Honor.

14              Just by way of clarification, our understanding is

15    that none of the demonstratives are coming in.  They're just

16    demonstratives.  But those exhibits that are moved will be

17    handled in due course.

18              MR. STEVENSON:  Yes.  That's correct.

19              THE COURT:  Thank you.

20    BY MR. STEVENSON:

21    Q.  Dr. Hill, does this slide give an overview of your

22    testimony today?

23    A.  It does, yes.

24    Q.  Did the United States give you a particular assignment

25    with regard to Penguin Random House's proposed acquisition
```

```
 1    of Simon & Schuster?

 2    A.  Yes.

 3    Q.  What was that assignment?

 4    A.  If we advance one more slide, please, you'll see a

 5    summary.

 6            My assignment was to evaluate the likely effect of

 7    the transaction on competition.

 8    Q.  How do you carry out that assignment?

 9    A.  So if you advance two more, please.

10            I carried it out by using the merger analysis

11    framework and the horizontal merger guidelines.

12    Q.  At a high level, would you please describe the

13    horizontal merger guidelines analysis --

14    A.  Sure.

15    Q.  -- versus the framework?

16    A.  Sure.

17    Q.  Thank you.

18    A.  Your Honor, typically one splits it up into sort of four

19    buckets.  One is market definition; one is market shares and

20    concentration; one is competitive effects; and then one is

21    looking at mitigating factors.

22    Q.  Would you please summarize your high-level conclusions

23    about this merger following the merger guidelines framework.

24    A.  Sure.  If we could advance one more slide, there's a

25    summary.
```

1      Your Honor, I think the relevant market here is

2  the acquisition of U.S. rights to anticipated top sellers.

3  I think the merger will substantially increase concentration

4  in the market and result in a highly concentrated market.

5      I think that the qualitative and quantitative

6  evidence show that the merger is likely to significantly

7  reduce competition.

8      And I think it's unlikely that the mitigating

9  factors will fully mitigate the anticompetitive effects.

10  Q.  Dr. Hill, let's first focus on market definition, the

11  first step in your analysis.

12      Staying at a high level, what is the purpose of

13  defining a market for antitrust analysis?

14  A.  Sure.  So if we could advance one more than slide,

15  please.

16      So I think, your Honor, the U.S. economy has many

17  products and services.  And considering all of those to

18  analyze any particular merger is generally both unnecessary

19  and very challenging.

20      I think of market definition as accomplishing two

21  things:  Let's try to find an area where the parties compete

22  with each other substantially and, two, identify all of the

23  reasonable substitutes to the parties' products.

24  Q.  Did you identify an area in which the parties compete

25  significantly?

Hill - DIRECT - By Mr. Stevenson

```
1    A.   Yes, I did.

2    Q.   What area was that?

3    A.   The purchase of the U.S. rights for anticipated top

4    sellers.

5    Q.   What is an anticipated top seller?

6    A.   So an anticipated top seller is a book that is expected

7    to sell a significant number of copies.

8    Q.   Who is the -- who is selling the rights to anticipated

9    top sellers?

10   A.   Authors.

11   Q.   Do you have an example of the type of book you're

12   thinking about?

13   A.   Yeah.  I think you've heard testimony on this, your

14   Honor.  It's a book written by a celebrity or an important

15   political figure, an established author.  It may also be a

16   first-time author who has a particularly strong book.

17   Q.   Who primarily competes with the merging parties to

18   purchase the rights to anticipated top sellers?

19   A.   So the competition is from other publishers,

20   particularly members of the so-called Big 5.

21   Q.   Have you seen evidence that this is where the merging

22   parties and other members of the Big 5 compete

23   significantly?

24   A.   Yes.  If we could please advance one more slide.

25                So this slide is a discussion of some of the
```

 1    evidence that's occurred in this trial.  Without reading too

 2    much detail from the slides, I'll just direct your Honor to

 3    the last of the quotes here:  For books with advances above

 4    a certain level, how frequently does Hachette lose to a

 5    non-Big 5 publisher?

 6              And the answer is:  Quite rarely.

 7              And I think these other quotes are also consistent

 8    with the idea that there's a group of books for which

 9    publishers compete, particularly the Big 5.

10    Q.  Other than publishers, what substitutes for the merging

11    parties do you consider as part of your analysis?

12    A.  I consider self-publishing.

13    Q.  Is self-publishing a reasonable substitute to a

14    publisher for authors of anticipated top sellers?

15    A.  No.  I don't believe.

16    Q.  Have you seen any evidence that self-publishing is not a

17    reasonable substitute?

18    A.  Yeah.  If we could please advance one more slide.

19              So here again, your Honor, we'll see some

20    testimony on this point.  And I'll direct you to the bottom

21    quote to begin with, your Honor:  Self-publishing is a

22    different market category, and we don't directly compete

23    with it.

24              And then in the top quote, you can also see an

25    author talking about self-publishing compared to publishers.

1    That doesn't mean there aren't authors who self-publish, but

2    for the majority of authors who are publishing, other

3    publishers are the best alternative to their current

4    publisher.

5    Q.  Collectively, what does the evidence on these two points

6    tell you?

7    A.  So the collective evidence shows, I think, that -- your

8    Honor, we talked about identifying an area where the parties

9    meaningfully compete with one another.  I think that's these

10   anticipated top sellers.  And then we talked about finding

11   reasonable substitutes.  I think that the other publishers

12   are the most reasonable substitutes, such that one should

13   include them when analyzing competition.  And I think

14   self-publishing is too distant to be included.

15   Q.  To be clear, does the market for anticipated top sellers

16   include all trade books or just anticipated top sellers?

17   A.  It just includes anticipated top sellers.

18   Q.  Is it common to define a market around only a subset of

19   sellers?

20   A.  Yeah.  If we could please advance one more slide.

21          This is some language, your Honor, from the

22   hypothetical -- from the horizontal merger guidelines.  And

23   it's talking about this idea of what are commonly called

24   targeted customers, so the idea that some customers may be

25   vulnerable, but other customers may not be.

```
 1                So in our context, we're thinking of sellers, your
 2      Honor.  So some sellers could be harmed by a merger when
 3      others would not.  And the merger guidelines have an example
 4      that they use of glass jar makers.  If glass jar makers
 5      merged, some current customers could potentially switch to
 6      other substitutes.  But it may be that, for example, baby
 7      food manufacturers really prefer having glass compared to
 8      some kind of metal and they would not be able to switch.
 9      And so this idea is that there may be some customers who are
10      harmed when others are not.
11      Q.  What needs to be true to define a market around only a
12      subset of sellers?
13      A.  So there's two conditions.  And you can see them, your
14      Honor, in the second of the two boxes here, the one at the
15      bottom:  differential pricing and limited arbitrage.
16      Q.  What is differential pricing?
17      A.  So if you're going to target particular sellers, your
18      Honor, you have to be able to identify them and price to
19      them differently.
20      Q.  Can publishers price differently to authors of
21      anticipated top sellers than other authors?
22      A.  Yes.
23      Q.  Why?
24      A.  The negotiations between the publishers and the authors
25      are an individual negotiation.  So they are able to identify
```

1    and they see either the book proposal or the

2    close-to-finished manuscript.  So they're able to identify,

3    does it look like a book -- and I believe the witness from

4    Hachette described it as:  Is this a book that is going to

5    appeal to a broad audience -- I apologize -- potentially

6    appeal to a broad audience?

7    Q.  You mentioned arbitrage.  What is that?

8    A.  So arbitrage, if you're attempting to change -- if

9    you're attempting to target certain sellers, arbitrage would

10   be the ability of the sellers to avoid that targeting by

11   selling to a third party who would then sell to the

12   publishers.

13   Q.  Is arbitrage feasible in this market?

14   A.  I don't believe so, your Honor.

15   Q.  Why not?

16   A.  So if an author were to sell the book to a third party,

17   to then sell to a publisher, the publishers will still

18   observe either the book proposal or the manuscript.  I think

19   the best case would be that -- I mean, even in the best

20   case, if they were successful, then it would be classified

21   as not being an anticipated top seller and might earn a

22   lower advance amount.  So I don't think arbitrage is

23   realistic here.

24   Q.  Stepping back, does the market for anticipated top

25   sellers meet the horizontal merger guidelines criteria for

1    defining a market around a targeted seller group?

2    A.  Yes.  I think publishers can identify this group of

3    authors, and authors can't easily avoid that targeting

4    through arbitrage.

5    Q.  Why did you define a market around only a subset of

6    sellers to analyze this merger?

7    A.  So anticipated authors -- authors of anticipated top

8    sellers have different preferences for publishers and for

9    self-publishing than other authors.  And the competitive

10   conditions that they face also are different.

11   Q.  What is different about the preferences and competitive

12   conditions for anticipated top sellers?

13   A.  So authors of anticipated top sellers, these books that

14   are aimed at a broad market, have more of a taste for strong

15   distribution, strong marketing and a strong reputation.

16          And similarly, on the supply side, there's only --

17   the number of publishers that regularly compete to purchase

18   these books is different for authors of anticipated top

19   sellers than for other authors.

20          THE COURT:  Don't all authors want all of those

21   things, reputation, distribution, marketing?

22          THE WITNESS:  Yes.  So I think what I found

23   helpful in this case was the testimony from Mr. King, who

24   said when he's got one of his bestsellers, he is taking that

25   to his Big 5 publisher who publishes it.  And then when he

1    has a niche book that he thinks is targeting a hard-boiled

2    crime demographic or a sci-fi or Western demographic, he

3    seeks out a different type of publisher.

4            So I think there are -- you know, these books

5    by -- if you're a major political figure and you're having

6    your 15 minutes of fame, you want your book everywhere and

7    get it sold.  And you may have different preferences than

8    authors who are doing different things.

9            So I agree with you in general that they --

10   everyone would like these things.  But the intensity of the

11   taste may vary.

12   BY MR. STEVENSON:

13   Q.  How did you define an anticipated top seller?

14   A.  So if we advance one more slide, I think we'll see

15   something that's helpful here.

16           So, your Honor, there's this idea of these types

17   of books.  And then the challenge for the antitrust analysis

18   was:  How are we going to find them in the data so we can

19   perform analysis on them?

20           And I defined them as books that receive an

21   advance of $250,000 or more.

22   Q.  Why did you use an advance threshold to -- as the

23   defining characteristic of an anticipated top seller?

24   A.  So advances, as I believe you've heard, your Honor, are

25   correlated with expected sales.  And so this was a way of

1    trying to get at what books are there that are expected to

2    hit this broad market and sell a lot of books.

3    Q.  How did you arrive at the $250,000 threshold in

4    particular?

5    A.  So there were a number of things that led me to 250,000,

6    and they're displayed here on the slide.  So one is

7    Publishers Marketplace in their deal reports say if the deal

8    has an advance of 250,000 or above, it's a significant or

9    major deal.  And then there are publishers, including the

10   parties and some others, who use 250,000 as an internal

11   approval threshold.

12            So, your Honor, for books above this level, an

13   additional level of review is necessary.

14   Q.  Are any of your opinions in this case sensitive to the

15   exact threshold you used to define anticipated top seller?

16   A.  No.

17            So, your Honor, as we go through, you'll see that

18   I've repeated many of my analyses for other thresholds to

19   see if a small change away from 250,000 makes a significant

20   difference.  And the answer is no.

21   Q.  Did you develop any quantitative evidence showing that

22   authors of anticipated top sellers have different

23   preferences than other authors?

24   A.  Yes.

25   Q.  What evidence did you develop?

```
 1    A.  So if we could advance one more slide, please.

 2             Your Honor, here, these are some data looking at

 3    the share of books for authors of anticipated top sellers on

 4    the left and non-anticipated top sellers on the right.  And

 5    one thing that immediately jumps out here is for the

 6    anticipated top sellers, the non-Big 5 are about 10 --

 7             MR. OPPENHEIMER:  Your Honor, I believe this may

 8    be confidential.

 9             THE COURT:  Is that right?

10             MR. OPPENHEIMER:  Can you take it down?

11             THE COURT:  Let's turn it off while they discuss.

12    I'll give you guys a moment to confer.  Do you want to

13    confer?

14             (Counsel confer privately.)

15             MR. OPPENHEIMER:  May I make a suggestion, your

16    Honor?

17             May we keep this off the public slides and

18    continue to display to the Court and we can resolve it?

19    There may be a miscommunication involved.  I'm not sure.

20    Our records indicate it's confidential.

21             THE COURT:  How long is it going to take you to

22    resolve that?

23             MR. STEVENSON:  I understood we met and conferred

24    on this last night, and it was decided that the public

25    versions of these slides were not confidential.
```

```
 1                    MR. OPPENHEIMER:  May I ask for 30 seconds?

 2                    THE COURT:  Yes.

 3                    MR. OPPENHEIMER:  Thank you, your Honor.

 4                    (Counsel confer privately.)

 5                    MR. OPPENHEIMER:  Your Honor, my apologies for the

 6          delay.  It looks like that is the public version.  My

 7          apologies.

 8                    THE COURT:  Thank you.

 9                    So we can display those.

10                    THE WITNESS:  Yes.  So -- and I will be careful

11          about names, given the confidentiality.

12                    So, your Honor, if we look on the left at

13          anticipated top sellers, you can see the non-Big 5 are about

14          10 percent.  On the right for non-anticipated top sellers,

15          the non-Big 5 publishers are about 45 percent.

16                    And you can also see significant differences for

17          the parties, particularly for Penguin Random House.  And in

18          general, the Big 5 publishers are significantly larger for

19          anticipated top sellers than for non-anticipated top

20          sellers.  So the authors of anticipated top sellers are

21          making different choices than other authors.

22                    MR. STEVENSON:  Your Honor, the figure on this

23          slide is a re-creation of PX 0963.  And I move to admit PX

24          0963.

25                    THE COURT:  Any objection?
```

Hill - DIRECT - By Mr. Stevenson

```
1                  MR. OPPENHEIMER:  No, your Honor.

2                  THE COURT:  That will be admitted.

3                  (Whereupon, Plaintiff's Exhibit No. 0963 was

4       entered into evidence.)

5       BY MR. STEVENSON:

6       Q.  Dr. Hill, why in your opinion do authors of anticipated

7       top sellers select Big 5 publishers more frequently than

8       other authors?

9       A.  So I think it's for the advantages I listed earlier:

10      for marketing, distribution and reputation.

11      Q.  Did you prepare any evidence analyzing the importance of

12      any of those factors?

13      A.  I did.

14      Q.  What evidence did you prepare?

15      A.  We'll get to some of this in the course of the

16      presentation.  But there's one slide here that -- if we

17      could advance one more slide, please.

18                  This, your Honor, is a look at marketing spend.

19      This is from actual P&Ls, so actual spend on book titles.

20      On the far left, we have zero to $250,000.

21                  THE COURT:  I'm sorry.  When you say P&Ls, do you

22      mean the P&Ls that they create before they bid or is this a

23      different P&L?

24                  THE WITNESS:  These are actual results, not

25      pre-bidding.  And so this is what actually happened, your
```

```
 1    Honor.
 2              THE COURT:  Thank you.
 3              THE WITNESS:  On the left, we have the bucket for
 4    zero to 250,000.  And then we have three other buckets,
 5    ranging up to 1 million, so three slices of anticipated top
 6    sellers.  And you can see that the marketing spend for
 7    anticipated top sellers is higher than for non-anticipated
 8    top sellers.
 9              MR. STEVENSON:  Your Honor, this figure is a
10    re-creation of PX 0972.  I move to admit PX 0972.
11              THE COURT:  Any objection?
12              MR. OPPENHEIMER:  No objection.
13              THE COURT:  That will be admitted.
14              (Whereupon, Plaintiff's Exhibit No. 0972 was
15    entered into evidence.)
16    BY MR. STEVENSON:
17    Q.  Dr. Hill, have you had the opportunity to review the
18    reports of Defendants' expert Dr. Edward Snyder in this
19    case?
20    A.  I have.
21    Q.  What is your understanding of Dr. Snyder's view of your
22    $250,000 threshold?
23    A.  He believes it's arbitrary, is my understanding.
24    Q.  Do you agree?
25    A.  I don't.
```

1    Q.  Why not?

2    A.  So I think, your Honor, there's a reasonable basis for

3    using this particular cutoff.  If we look at the results, as

4    we've just seen, the cutoff seems to identify a group of

5    authors who have different preferences.  So I think there's

6    a reasonable basis for using it for those reasons.

7         But it's also true that if we change the threshold

8    by a significant amount, so if we move it down or up a

9    little bit, we get to substantively the same conclusions.

10        So I think the issue is perhaps not a particularly

11   significant one.  This particular cutoff is identifying a

12   different group of authors, and the results don't materially

13   change if you move a little bit up or down from this

14   threshold.

15        THE COURT:  So aren't you saying that the cutoff

16   may be arbitrary, but it doesn't matter?  At 250,000, that

17   number could be arbitrary, but that doesn't matter.

18        THE WITNESS:  I think "arbitrary" is too strong

19   just in the sense, your Honor, that there were -- in the

20   industry, people do think of 250,000 as a cutoff.  Different

21   publishers have different cutoffs.  So I'm not saying every

22   publisher has it.

23        But Publishers Marketplace does use this

24   particular cutoff.  The parties use this cutoff.

25        So I think you could say:  Is it absolutely 100

Hill - DIRECT - By Mr. Stevenson

1    percent certain this is the threshold?  The answer is no.

2    Some anticipated top sellers are in our market, but they're

3    not -- or some books are in our market, but they're probably

4    not anticipated top sellers, and vice versa.  But the

5    threshold is identifying a group of books and authors that

6    are different than other authors.  So I don't know if that

7    helps.

8                    THE COURT:  I think so.  Thank you.

9    BY MR. STEVENSON:

10   Q.  Dr. Hill, now that we have identified your candidate

11   market, I would like to take a step back and ask some basic

12   questions about it.

13                    How big is the market for anticipated top sellers?

14   A.  It's on the order of a billion dollars a year in

15   commerce.

16   Q.  Relative to your past experience analyzing mergers, how

17   substantial a market is that?

18   A.   It's a significantly sized market.  I've worked on

19   smaller cases and I've worked on larger ones.

20   Q.  How much of publishers' advance spending goes towards

21   anticipated top sellers?

22   A.  So across all of the data that I have available, your

23   Honor, it's about 70 percent of spending on anticipated --

24   of advance spending is on anticipated top sellers.

25   Q.  You've referenced advances a couple times.  Why did you

1    focus your analysis on advances?

2    A.   Sure.  So, your Honor, for anticipated top sellers,

3    about 85 percent of them never earn out in my data.  So

4    that, as you know, means they didn't -- royalties don't

5    fully cover the advance.

6            So for a large swath of authors, the advance is

7    the most significant part of their compensation.  So it

8    seemed a reasonable thing to study.

9    Q.   How, if at all, does earning out an advance relate to

10   the profitability of a particular title?

11   A.   So a title can be profitable, your Honor, without the

12   advance being earned out.

13   Q.   Now I would like to ask a couple questions about the

14   next step in your analysis.

15           After identifying a candidate market -- or after

16   identifying the candidate market for this merger, did you do

17   anything to determine that that market was properly defined

18   for antitrust analysis?

19   A.   Yes, I did.

20   Q.   What did you do?

21   A.   So I tested the market using the hypothetical

22   Monopsonist test.

23           THE COURT REPORTER:  Can you repeat that, please?

24           THE WITNESS:  Monopsonist test.

25           And if we could please turn the slides back on, I

1    think we've got a slide that will help with the spelling.

2    BY MR. STEVENSON:

3    Q.  At a high level, what is the hypothetical Monopsonist?

4    A.   So, your Honor, the hypothetical Monopsonist test is a

5    way of testing:  Is the market too narrowly defined?  Have

6    we excluded from the market important substitutes from the

7    perspective of authors?

8    Q.  Again, what substitutes for the merging parties does

9    your market for anticipated top sellers include?

10   A.  So it includes all other publishers.

11   Q.  Would you please remind us what substitutes it does not

12   include?

13   A.  It doesn't include self-publishing.

14   Q.  Would you please explain to the Court how the

15   hypothetical Monopsonist test works in this context?

16   A.  Sure.

17           So the idea, your Honor, is today we have

18   competition among publishers for authors of anticipated top

19   sellers.  The test essentially asks:  If I were to eliminate

20   all of that competition, would advances increase by a

21   significant amount?  So we're in a sense testing:  Is the

22   competition today between publishers valuable?  And we mean

23   "valuable" in a very specific way.  We mean:  Would its

24   elimination lead to worse outcomes for authors?

25           THE COURT:  So "decrease."  You said "increase."

```
 1              THE WITNESS:  I apologize, your Honor.  Yes.
 2    Decrease.
 3    BY MR. STEVENSON:
 4    Q.  Just to be clear, who is the hypothetical Monopsonist in
 5    in context?
 6    A.  So the hypothetical Monopsonist is the combination of
 7    all publishers.  So everybody who's included in the market
 8    has now been Monopsonized, and they are the only
 9    publisher -- the only owner of publishers.
10    Q.  Why might the hypothetical Monopsonist not lower
11    advances for one of the merging parties?
12    A.  So one way that could happen, your Honor, is let's
13    consider authors at Penguin Random House.  So suppose that
14    there's a Monopsonist of all publishers and it decides to
15    lower advances at Penguin Random House.  And if many
16    authors -- some authors at Penguin Random House will be
17    unhappy.  They're getting lower advances.  Things are not as
18    good as they were.  Some of them will seek a new solution
19    for their books.
20              If many of those authors would switch to
21    self-publishing, which is outside the market, then the
22    Monopsonist would lose those books.  If many of those
23    authors say:  You know, I can't get a good deal with
24    Penguin; I'm going to switch to Macmillan or Simon &
25    Schuster, then most of them are switching inside the market
```

1    and the Monopsonist is not really losing them; they're just

2    switching to another publisher controlled by the

3    Monopsonist.

4         So really the test is just asking:  Are a lot of

5    these authors going to leave and go to self-publishing?  And

6    if the answer is yes, then it's not a market.  If the answer

7    is no, then it is a market.  So we're really trying to test

8    how serious a constraint is self-publishing compared to

9    other publishers.

10        THE COURT:  Can I ask a question?

11        THE WITNESS:  Sure.

12        THE COURT:  Wouldn't this test hold true for all

13   of the books?  Like why does this test your market, which

14   talks about books of 250,000 or more in terms of advance?

15        THE WITNESS:  Yes, your Honor.  You can also

16   implement the test for all the books and ask the question

17   for all authors:  Is self-publishing not a sufficient

18   substitute?  So here, I've defined this group of anticipated

19   top sellers because competitive conditions for them look

20   different.  So I want to analyze them separately.  I'm going

21   to test for them:  Would those authors switch to

22   self-publishing?

23        But I could equally -- and in my reports, I do,

24   your Honor -- test:  How about for all books?  Would it also

25   be the case that all authors don't have a strong taste for

 1    self-publishing and prefer publishers?

 2            THE COURT:  I see.  So this tests whether the

 3    market you've chosen passes the Monopsonist test, but it

 4    doesn't necessarily validate your demarcation point at

 5    250,000 or more?

 6            THE WITNESS:  That's fair, your Honor.  What we're

 7    really testing here is, does this market -- you know,

 8    remember, I said there are these two parts.  Where do the

 9    parties compete significantly?  And who should be in there

10    competing with them when we analyze it?

11            The hypothetical Monopsonist test is addressing

12    the second issue.  It's saying:  How many -- should we

13    include self-publishing in addition to all other publishers

14    as significant competitors?

15            THE COURT:  Thank you.

16    BY MR. STEVENSON:

17    Q.  What type of evidence do you consider to assess whether

18    self-publishing is a reasonable substitute for authors of

19    anticipated top sellers?

20    A.  So I looked at both quantitative and qualitative

21    evidence about whether it's likely that authors would switch

22    in large numbers to self-publishing.

23    Q.  What quantitative analysis did you do?

24    A.  I implemented the hypothetical Monopsonist test using

25    what is known as the aggregate diversion ratio methodology.

1   Q.  Excuse me.  Before we move too far, you mentioned a term

2   that I think we'll hear more about this afternoon or

3   tomorrow, and that's diversion ratio.  What is that?

4   A.  So, your Honor, a diversion ratio essentially measures

5   if one publisher, let's say Penguin Random House, were to

6   lower advances and some authors were to leave, the diversion

7   ratio from Penguin Random House to Simon & Schuster measures

8   what proportion of those authors would switch to Simon &

9   Schuster.

10          Similarly, you could do a diversion ratio if

11  Penguin Random House lowers advances, what proportion of

12  authors switch to publishers and what proportion switch to

13  self-publishing.

14  Q.  What is the aggregate diversion ratio methodology?

15  A.  So if we could advance one more slide, please.

16          So the aggregate diversion ratio methodology is a

17  way of implementing the hypothetical Monopsonist test.  It's

18  part of an approach known as critical loss methods.  And in

19  these methods, your Honor, I think of there as being three

20  steps.

21          So the first you can see in the red box here.  We

22  ask:  How much switching to self-publishing would be

23  necessary for the hypothetical Monopsonist to not decrease

24  his advances -- not decrease advances significantly?  So

25  that's Step 1, the critical diversion.

Hill - DIRECT - By Mr. Stevenson

1    And then we're going to ask:  What's the actual

2    diversion?  If this happened, if Penguin Random House

3    lowered its advances, how much switching to self-publishing

4    would there actually be?

5    And then the third step is we put them together.

6    We say:  If the actual diversion is less than the critical

7    diversion, then the market is properly defined.  So

8    self-publishing is not a significant enough substitute to

9    include in the market.

10    Q.  How did you calculate the critical diversion?

11    A.  So the critical diversion is collected using two inputs.

12    One is the size of the decrease in advances.  And here, I

13    used 10 percent.  And then the other input is a variable

14    profit margin for the hypothetical Monopsonist.

15    Q.  Why do you use the variable profit margin for the

16    hypothetical Monopsonist?

17    A.  That's a measure, your Honor, of how painful it is for

18    the Monopsonist to lose a sale.  So we're going to ask:  How

19    many sales would it lose and how profitable -- how painful

20    is that from a profit perspective?

21    Q.  Let's go to the actual diversion.  How did you calculate

22    that?

23    A.  So I did it two ways.  Here, I did it, your Honor, using

24    data on sales revenue for publishing and self-publishing.

25    And then I also did it using win-loss data.

1    Q.  How were you able to calculate a diversion ratio from

2    sales data?

3    A.  So here, your Honor, I was assuming that diversion would

4    be proportional to sales.  So I calculated all the sales

5    for -- all the revenue from publishing and all the revenue

6    from self-publishing.

7              And I asked the question:  If someone left Penguin

8    Random House, they would switch in proportion to that.  So

9    if 90 percent of the revenue excluding Penguin Random House

10   is from publishers and 10 percent is from self-publishing,

11   then an author has a 90 percent chance of going to

12   publishing rather than self-publishing.

13   Q.  You mentioned win-loss data.  And what are win-loss

14   data?

15   A.  So win-loss data -- in the ordinary course of events, a

16   firm may track when it loses an opportunity or wins one,

17   your Honor.  I think you heard Mr. Pietsch from Hachette

18   talk about this, that Hachette tracks losses above a certain

19   threshold.

20             So win-loss data here, you can use it to say:

21   When Penguin Random House loses an author, how often does

22   that author switch to publishers and how often does that

23   author switch to self-publishing?

24   Q.  How did your actual diversions compare to the critical

25   diversion?

Hill - DIRECT - By Mr. Stevenson

1    A.  So if we could please advance one more slide.

2              This table, your Honor, is summarizing our

3    results.  So we have one row from Penguin Random House and

4    one row for Simon & Schuster.  So in the Penguin Random

5    House row, I'm asking:  If Penguin Random House lowered

6    advances by 10 percent, what is its critical diversion?

7    That's in the red column.  And you can see, your Honor, it's

8    about 75 percent.

9              So if 75 percent of the authors it lost went to

10   self-publishing, that it wouldn't be profitable for it to

11   decrease advances by that much.  And when I say "it," I mean

12   the hypothetical Monopsonist.

13             The first blue column is actual diversion using

14   sales revenue.  So you can see, your Honor, it's about 10

15   percent.  And then in the second of the blue columns, we

16   have the win-loss data.  How often in Penguin Random House's

17   win-loss data when it loses an author does that author

18   switch to self-publishing?  And the answer is about

19   1 percent of the time.

20             So in this case, both of the actual diversions are

21   significantly below the critical diversion.  And so the

22   market is passing the hypothetical Monopsonist test.

23             And then the second row of the table is doing the

24   same thing, except it's asking:  If the hypothetical

25   Monopsonist lowered advances for Simon & Schuster by 10

1    percent, would that increase the profits of the hypothetical

2    Monopsonist?  And you can see, your Honor, that there, too,

3    the critical diversion is about 75 percent and the actual

4    diversions are roughly 10 percent and 1 percent.  So it

5    again passes -- comfortably passes the hypothetical

6    Monopsonist test.

7    Q.  What are the implications of passing the hypothetical

8    Monopsonist test?

9    A.  So the implications here are that the market is not too

10   narrowly defined.

11           As you put it earlier, your Honor, we've tested

12   whether we're including the right set of substitutes.

13           MR. STEVENSON:  Your Honor, this figure with, I

14   admit, a few cosmetic changes is a re-creation of PX 0969.

15   I move to admit PX 0969.

16           THE COURT:  Any objection?

17           MR. OPPENHEIMER:  No objection, your Honor.

18           THE COURT:  That will be admitted.

19           (Whereupon, Plaintiff's Exhibit No. 0969 was

20   entered into evidence.)

21   BY MR. STEVENSON:

22   Q.  What is your understanding of Dr. Snyder's arguments

23   regarding your hypothetical Monopsonist test?

24   A.  Dr. Snyder argued, your Honor, that some publishers have

25   never wanted an anticipated top seller, and they should be

1    considered outside the market with the self-publishing.  So

2    when I'm testing the market, I should say:  How much

3    diversion would there be from publishers who ever won an

4    anticipated top seller to publishers who have never

5    published one and to self-publishing?  So he wanted to

6    expand the actual diversion by looking at diversion to

7    publishers who have never presently won an anticipated top

8    seller.

9    Q.  Did you agree with that argument?

10   A.  I don't.

11   Q.  Why not?

12   A.  So I think the market here includes all publishers.  I'm

13   thinking about all publishers competing with the parties.

14          But just to check, using Dr. Snyder's proposed

15   approach, I reran the hypothetical Monopsonist test in my

16   reply report.  And when I include publishers who are not --

17   who have never won an anticipated top seller, the results

18   are the same.  The market passes the hypothetical

19   Monopsonist test.

20   Q.  Before we move on, would you please summarize your

21   conclusions regarding market definition in your analysis of

22   this merger.

23   A.  Sure.  My conclusions are that there is a market for

24   anticipated top sellers and that it is properly defined.  It

25   includes as alternatives all the publishers, including the

1    parties.

2    Q.  After concluding that the market for anticipated top

3    sellers was properly defined, what was the next step in your

4    analysis of this merger?

5    A.  So, your Honor, having calculated -- having identified a

6    market and defined it, the next step is to calculate market

7    shares and to calculate concentration in that market.

8    Q.  Let's start by focusing on market shares.  What is the

9    purpose of calculating market shares?

10   A.  So market shares, your Honor, can give an indication of

11   the competitive significance of firms in the market.

12   Q.  How did you calculate market shares in this case?

13   A.  I used a data set of advances paid for anticipated top

14   sellers and other books from over 60 publishers and I

15   collected that all together and then I calculated market

16   shares based on the number of titles won by each publisher

17   for anticipated top sellers.

18   Q.  How comprehensive are the data that you used?

19   A.  I believe it to be comprehensive.  I'm not aware of any

20   missing anticipated top sellers.

21   Q.  How does this data compare to --

22           THE COURT:  I'm sorry.  Over what period of time

23   was that?

24           THE WITNESS:  So, your Honor, it goes from January

25   2019 to June 2021.  In the reply report, there's some

1    extension of it to the end of 2021.  But the data we're

2    going to talk about today are focused on January 2019 to

3    June 2021.

4                THE COURT:  Thank you.

5    BY MR. STEVENSON:

6    Q.  How does this data compare to data sets you've used to

7    calculate market shares in other matters?

8    A.  Favorably.  It's a comprehensive data set.

9                And it's what I would call contemporaneous, your

10   Honor, so these are recently concluded situations in which a

11   book was acquired.  In some products or markets, you may

12   have a firm that won a contract many, many years before; and

13   so they still have significant shares, but they're not today

14   actively competing.  In some defense technology areas, that

15   can be the case.

16   Q.  Can you please share the results of your market share

17   calculations with us?

18   A.  Sure.  If we could please advance one more slide.

19               So again, your Honor, I'm trying to be careful

20   here about not saying anything that'll get me into hot water

21   in confidentiality.

22               If we look at the -- this is a measure of the

23   market shares and the market for anticipated top sellers.

24   If we look on the far left, we can see the combined market

25   share for Penguin Random House and Simon & Schuster.  You

1    can see Penguin Random House's share in blue and Simon &

2    Schuster's share in green.  And then you can see after that

3    bars representing the other three Big 5 publishers.  Then

4    you can see five bars for some non-Big 5 publishers.  And

5    then the gray bar at the end, your Honor, represents all

6    other publishers.

7            MR. STEVENSON: Your Honor, this figure is a

8    re-creation of PX 0959.  I move to admit PX 0959.

9            THE COURT:  Any objection?

10           MR. OPPENHEIMER:  No objection.

11           THE COURT:  That will be admitted.

12           (Whereupon, Plaintiff's Exhibit No. 0959 was

13   entered into evidence.)

14   BY MR. STEVENSON:

15   Q.  Dr. Hill, did you prepare a detailed table of your

16   market share calculations?

17   A.  I did.

18   Q.  And --

19   A.  If we --

20   Q.  Go ahead.

21   A.  I apologize.

22   Q.  Please share that with us.

23   A.  Yes.  If we could please advance one more slide.

24           Here is just a summary, your Honor, of the market

25   shares on the previous slide, if you want to have exact

1    numbers.  But the -- all the non-Big 5 publishers are being

2    combined into one at the bottom.

3    Q.  For the benefit of the record, what are the shares of

4    Penguin Random House and Simon & Schuster?

5    A.  So for Penguin Random House it's 37 percent.  For

6    Simon & Schuster, it's 12 percent.

7    Q.  Did you perform any alternative market share

8    calculations?

9    A.  I did.  If we advance one more slide.

10            So, your Honor, here we're looking at market

11    shares for different thresholds.  So the market shares are

12    displayed here as a vertical bar.  You can see the color

13    coding identifies each group of publishers, with purple

14    again being all the non-Big 5 publishers.

15            The yellow is highlighting the cutoff of 250,000,

16    your Honor.  This is my definition of an anticipated top

17    seller.

18            And then I also look at market shares with a

19    threshold below that of 150,000, one above it of 350,000,

20    then 500,000 and then 1 million.

21            What you can see, your Honor, is that by and large

22    the market shares are fairly stable across these thresholds.

23    The share of the non-Big 5 shrinks a little bit as the

24    threshold increases.  But by and large, I would say that the

25    market shares look pretty similar across this.

1          MR. STEVENSON: Your Honor, this figure is a

2    re-creation of PX 0960.  I move to admit PX 0960.

3          THE COURT:  Any objection?

4          MR. OPPENHEIMER:  No objection.

5          THE COURT:  That'll be admitted.

6          (Whereupon, Plaintiff's Exhibit No. 0960 was

7    entered into evidence.)

8    BY MR. STEVENSON:

9    Q.  Let's switch our focus to market concentration.  What is

10   the purpose of market concentration -- or measuring market

11   concentration?

12   A.  So market concentration can give an initial read on the

13   likely competitive effects of a transaction.  And here is

14   some language from the merger guidelines talking about this

15   in the first box, your Honor.  And typically in looking at

16   market concentration, one looks at two things:  so the

17   change in concentration that may result from a merger and

18   then the level of concentration post-merger.

19   Q.  How did you measure concentration in this case?

20   A.  I used a standard antitrust measure known as the

21   Herfindahl-Hirschman index.  But it's very common to refer

22   to this as the HHI for brevity.

23   Q.  What is the HHI?

24   A.  So to calculate the HHI, you square the share of each

25   participant in the market and then you add up each of those

1    squares.  And that total number is the value of the HHI.

2         So if there's a single firm in the industry, your

3    Honor, it will have 100 percent market share.  When I square

4    that, I'll get 10,000.  So that's the maximum value for the

5    HHI.

6         If there's so many firms in the market that they

7    all have shares that are close to zero, and I square all

8    those zeroes and add them up, I get zero.  So the scale runs

9    from zero to 10,000.  The cutoff, according to the

10   horizontal merger guidelines for highly concentrated, is

11   2500.

12   Q.  So I'd like to follow up on that point.

13        Are there certain HHI values that raise concern

14   about harm to authors?

15   A.  Yes.  So more generally, a transaction -- the language

16   in the horizontal merger guidelines, your Honor, if you look

17   at the second box here, says that a merger that causes --

18   sorry -- mergers that cause a significant increase in

19   concentration and result in highly concentrated markets are

20   presumed to be likely to enhance market power.

21        So if the transaction increases the HHI by 200

22   points and results in an HHI above 2500, that merger is

23   presumed to be likely to enhance market power.

24   Q.  What were the results of your market concentration

25   calculations?

 1    A.  Yeah.  If we could please advance one more slide.

 2              This is a slide, your Honor, both summarizing my

 3    results and visualizing the thresholds that were described

 4    on the previous screen.  So let me start by situating us a

 5    little bit in the graph.

 6              If you look at the vertical axis, the one that's

 7    labeled "increase in HHI," this is the change in the HHI

 8    that will result from the merger.

 9              And on the horizontal axis, the one that's labeled

10    "post-merger HHI," this is the HHI in the market after the

11    transaction, were the merger to be approved.

12              And then you can see, your Honor, there are two

13    green dashed lines.  The vertical dashed green line -- to

14    the right of this, these are values for which the

15    post-merger HHI is greater than 2500.  And the horizontal

16    dashed line is labeled "increase in HHI greater than 200."

17    So dots above this point increased HHI by more than 200

18    points.

19              And then there's a pink region.  Any dots in this

20    area increase the HHI by more than 200 points and result in

21    a highly concentrated market.  And they're presumed to be

22    likely to enhance market power.

23              So that's sort of the visualization of what's

24    called the structural presumption we saw in the previous

25    slide.

Hill - DIRECT - By Mr. Stevenson

1          And then the dots here are representing the values

2     I get if I use my data.  So the blue dot is my data from

3     January 2019 to June 2021.  These are the data, your Honor,

4     I used to calculate market shares.  And you can see the

5     post-merger HHI is about 3100, so above 2500.  And the

6     increase in the HHI is about 900, so above 200.

7          And then the other dots, green, orange and red,

8     these are looking at different years.  So I calculated the

9     concentration values not just for all of the data, but also

10    for different years, to see if this result seemed to be

11    robust.

12    Q.  Did you examine market concentration using different

13    advance thresholds to define an anticipated top seller?

14    A.  I did.  So if we could please advance one more slide.

15         On this slide, your Honor, I'm looking both at

16    different advance levels and different cuts of the data.  So

17    the shapes here are giving the advance level I'm using to

18    define an anticipated top seller.  So the triangles are

19    150,000.  The circles are 250,000.  The squares are 350,000.

20    And diamonds are 500,000.

21         And then I look at the data, both for the complete

22    sample in blue and then also for 2019, 2020 and the first

23    half of 2021.  And you can see that for all of these

24    different cuts of the data, these different thresholds, the

25    transaction is presumed to be likely to enhance market

Hill - DIRECT - By Mr. Stevenson

1    power.

2    Q.  Did you prepare a table that summarizes the detailed

3    results of your concentration analysis?

4    A.  Yes.  If we could please advance one more slide.

5            Here you see, your Honor, this is a table

6    summarizing the precise numbers from the previous chart.

7    The blue column here is my definition of an anticipated top

8    seller.  And then the other columns are looking at

9    thresholds of 150,000, 350,000 and 500,000.  And you can see

10   for the definition of 250,000, the pre-merger HHI is 2,220.

11   The increase in the HHI is 891.  And the post-merger HHI is

12   3,111.

13   Q.  After calculating market shares and market

14   concentration, what is the next step in the economic

15   analysis of a merger following the framework of the

16   horizontal merger guidelines?

17   A.  So the next step, your Honor, is to look at competitive

18   effects.

19   Q.  What are competitive effects?

20   A.  So competitive effects are an attempt to estimate:

21   What's the impact of losing competition in this market

22   likely to be?

23   Q.  What types of competitive effects are usually

24   considered?

25   A.  So if we advance one more slide, we have a summary of

1    the two major types one looks at.  Your Honor, they're

2    unilateral effects and coordinated effects.

3    Q.  What are unilateral effects?

4    A.  So unilateral effects are when just the elimination of

5    the head-to-head competition between the parties is by

6    itself sufficient to reduce competition.

7    Q.  What are coordinated effects?

8    A.  Coordinated effects are when a transaction leads a group

9    of firms in the industry to collectively pull their punches,

10   to compete less aggressively in coordination with one

11   another.

12   Q.  Did you consider any general evidence regarding

13   competitive effects?

14   A.  I did.

15   Q.  What evidence did you consider?

16   A.  If we advance one more slide, please.  Thank you.

17           So on this slide, your Honor, these are some

18   testimony from literary agents and from an author talking

19   about the transaction.  And I'll just read the top one

20   without identifying the speaker:  I will be very

21   disappointed if this merger is permitted.  It's obviously

22   anticompetitive in every direction.

23           So, you know, the other quotes here are variants

24   of this, the idea that there are market participants who

25   feel that the transaction is likely to be anticompetitive.

1    Q.  Why did you consider this type of statement?

2    A.  I think it's useful to look at the qualitative evidence

3    and see what participants in the industry are saying about

4    the transaction.

5    Q.  Do all industry participants share the views that are

6    displayed on the screen?

7    A.  No.

8    Q.  And are the views of industry participants who support

9    the proposed merger consistent with your opinions in this

10   case?

11   A.  Yes.  They can be.  So, your Honor, some agents, for

12   example, may have a clientele for which Penguin Random House

13   and Simon & Schuster compete aggressively.  So agents in

14   that bucket may feel this transaction is likely to be

15   harmful.

16        Some agents may not see a great deal of

17   competition between Penguin Random House and Simon &

18   Schuster for their authors.  So people in the industry may

19   have different views of whether the transaction's likely to

20   significantly affect competition.

21   Q.  Let's focus first on unilateral effects.  We'll come

22   back to coordinated effects.

23        Why does head-to-head competition between the

24   merging parties matter?

25   A.  So if we advance one more slide, I believe.

Hill - DIRECT - By Mr. Stevenson

1        Here we have some language just from the

2    horizontal merger guidelines, thinking about unilateral

3    effects.  And I think, your Honor, here an example is

4    probably the easiest to think about.

5        I believe you've seen some testimony about -- I'll

6    call them rounds options, where Simon & Schuster and Penguin

7    Random House were the last two competitors and they competed

8    with one another to push the advance up to a higher level

9    than it otherwise would have been.  Eliminating that

10   competition between them would have resulted in a lower

11   advance amount for that author.  So that's an example of

12   unilateral head-to-head competition whose elimination could

13   have an adverse effect on authors.

14   Q.  At a high level, what were your conclusions about the

15   likely unilateral effects of this merger?

16   A.  I think that the transaction is likely to substantially

17   reduce unilateral competition, your Honor.

18   Q.  What types of evidence did you consider to arrive at

19   that opinion?

20   A.  So I put it into four broad buckets.  The first bucket

21   we've already looked at, your Honor.  It's evidence on

22   concentration, so a presumption of an anticompetitive

23   effect.

24        The second, there's evidence on -- we'll look at

25   some qualitative evidence that I've considered.

1    Third is diversion ratios, so an attempt to

2    estimate directly how much head-to-head competition there is

3    between the parties.

4    And then, fourth, economic models to try to

5    simulate the effect of the merger.

6    Q.  I know we already spoke about it, so I'll be brief.

7    Why is market concentration relevant to unilateral

8    effects analysis?

9    A.  So a high level of concentration means that there's not

10   a lot of competition in a market and a low level of

11   concentration means there's a lot of competition.  And the

12   less competition there is, and if that competition is

13   reduced by a merger, it can reduce head-to-head competition

14   between parties.

15   Q.  Let's now focus on the qualitative evidence that you

16   referred to.

17   What types of qualitative evidence did you

18   consider regarding unilateral effects?

19   A.  So I looked at two types, sort of general statements

20   from the parties about competing head-to-head with one

21   another and then more specific evidence about specific

22   instances of that competition.

23   Q.  Let's start with the general statements.  Why did you

24   consider those?

25   A.  I think it's useful to look at the parties' documents

1    and see:  Are the parties perceiving themselves as competing

2    with one another at a level?

3    Q.  Did you see any evidence of that?

4    A.  Yeah.  If we could please advance one more slide, you'll

5    see a summary of some of that evidence.

6              So if you look on the left-hand column, you have

7    some evidence from Penguin Random House.  And on the

8    right-hand side, you have some evidence from Simon &

9    Schuster.

10             On the upper left-hand corner, we have:  "Well,

11   editor at S&S continues her role as imprint-wide nemesis"

12   from someone at Penguin Random House.  So this is evidence

13   of significant competition with Simon & Schuster.

14             And then if we look in the lower right-hand

15   corner, we see a quote:  "This was the third beauty contest

16   we lost this week to PRH.  There may have been a fourth we

17   lost to PRH."

18             So again, this is evidence that the parties

19   perceived themselves as competing with one another.

20   Q.  Let's move on to the specific episodes that you

21   referenced.

22             Why did you consider that type of evidence?

23   A.  So having looked at the high-level indications of

24   competition between the parties, I think it's helpful to

25   look at specific incidents to see how that loss in

1    competition may manifest itself in the market.

2    Q.  In what acquisition settings did the merging parties

3    compete head-to-head?

4    A.  So if we could advance one more slide, please.

5            So here, your Honor, we have sort of five groups

6    of potential competition or acquisition scenarios.  So we

7    have rounds auctions.  This is auctions where publishers bid

8    against one another in rounds.  We have best bid auctions,

9    where there may be a single round; hybrid auctions, which

10   may be some combination of the two; negotiations, which may

11   be a publisher negotiating with an author; and then finally

12   what I've called poaching, so this would be one publisher

13   trying to steal another publisher's established authors.

14   Q.  We'll get to all these except actually the hybrid

15   auctions.

16           But let's focus first on rounds auctions.  How do

17   the merging parties compete in rounds auctions?

18   A.  So, your Honor, here I think an example is pretty

19   helpful.  If we could please advance one more slide.

20           So, your Honor, from looking at the transcripts, I

21   believe you've seen several examples of this.  I'll just

22   walk through a few.

23           This is competition in 2020 for a memoir.  We can

24   see in the right-hand box at the lower left only Penguin

25   Random House and Simon & Schuster left.  Another publisher

Hill - DIRECT - By Mr. Stevenson

1    dropped out at 650,000.  And then in the upper right of that

2    box, Penguin Random House's offer of 825,000 is accepted

3    after some back-and-forth between the parties.

4         So the author was driven up to 25 percent from the

5    level of 650,000 to the advance that the author received of

6    825,000.

7         And then on the left, your Honor, we have some

8    quotes just talking about the competition.

9    Q.   In the rounds auctions, where the merging parties are

10   the first and second bidders, can you determine what the

11   extent of harm to an author might be?

12   A.   Yeah.  So here you can see, your Honor, the third-party

13   publisher dropped out at 650,000.  So if you imagine that

14   Penguin Random House and Simon & Schuster were not competing

15   against one another, after the 650,000 point, that's where

16   the competition would stop.  So you can compare the

17   additional benefit of getting to 825,000 compared to

18   650,000.

19   Q.   Have you observed other examples of similar auctions?

20   A.   Yeah.  If we can advance to one more slide, please.

21   Your Honor, I'll do only this additional one.  There are

22   many more examples in my reports.

23        So here, again, we have an auction, this time for

24   a biography as opposed to a memoir.  And if I could focus

25   you on the area where it says:  Three publishers bid;

Hill - DIRECT - By Mr. Stevenson

1    highest third-party bid is 500,000.  This is the last bid by

2    a third party.  And after that, Penguin Random House and

3    Simon & Schuster bid against each other until the final

4    advance amount of 750,000.

5         So here, the final advance went up about 50

6    percent from the level at which the third most interested

7    publisher dropped out.

8    Q.  Are examples of auctions like the ones you just

9    discussed outliers?

10   A.  No.  As I said, there are many examples of this type in

11   my expert reports.  And it's also consistent with the

12   quantitative evidence we'll see later.

13   Q.  Let's move to best bid auctions.  How do the merging

14   parties compete in best bid auctions?

15   A.  So again, I think here an example is helpful.  If we

16   could look at -- move forward one more slide.

17        So here, your Honor, we have two examples of best

18   bid auctions.  At the top we have a 2019 auction for a young

19   adult novel.  And the quote here says:  "Sally's best bid

20   for title is due tomorrow morning.  As there are only three

21   players, she says, 'I think we can be more guarded in our

22   bidding.'"

23        And the second quote says, for a different

24   auction:  "Another editor and I discussed bringing our offer

25   significantly down yesterday based on the sense I got from

1    the agent that she doesn't have many interested bidders."

2            So this is a correlation between when you have a

3    large number of bidders, you may need to be more aggressive

4    in your bidding.  And when you feel like there isn't as much

5    competition, you can bid less aggressively.  And if you have

6    a lot of head-to-head competition with another firm, the

7    elimination of that competition can lead you to bid less

8    aggressively.

9            And sometimes it's helpful to think of that at

10   extremes.  If Penguin Random House never lost to Simon &

11   Schuster, then in these best bid settings it may say

12   post-merger:  We never lost to these guys anyway, so we're

13   not going to change our behavior.

14           If Penguin and Random House always lost to Simon &

15   Schuster, they could say post-merger:  This is great.  The

16   competition has softened significantly.

17           And then somewhere in between is the middle ground

18   where they competed sometimes, but not always.  And so you

19   may soften -- feel competition softened.  How much it

20   softened depends on how often you compete with the other

21   party.

22   Q.  Will the strategy of altering bids in reaction to

23   softening competition only affect Penguin Random House and

24   Simon & Schuster?

25   A.  Not necessarily.  So, your Honor, when you're thinking

Hill - DIRECT - By Mr. Stevenson

1    about a best bid auction, if you're putting in one bid on a

2    house, you put -- for example, or for a book, you're trading

3    off two things:  the probability that you win and the margin

4    you can make if you win.

5            So if you bid a billion dollars, your probability

6    of winning is very high, but your margin is probably going

7    to be very low or negative.  If you bid one dollar, your

8    probability of winning is very low; but if you were to win,

9    it could be an excellent deal for you.

10           And in between that, as a publisher you're playing

11   off -- if I bid higher, I win more often, but I get less

12   margin.  And when you've got those two things balanced, you

13   say:  This is the level I'm comfortable bidding, given the

14   valuation I put on this book.

15           And so the parties, since they compete directly

16   with one another, the transaction -- if they compete

17   significantly, then the transaction can increase the chance

18   of winning for any given bid.  And that gives you an

19   incentive to bid slightly less aggressively.

20           Third parties may also have a second-order effect,

21   where they observe that the merged firm is less aggressive

22   and so they can also bid as they were before or even bid a

23   little less aggressively because their probability of

24   winning has also gone up.

25   Q.  Is it necessary for publishers to know who they're

1    bidding against for this merger to have the effect you're

2    talking about?

3    A.   No.  And we already saw it in the case of rounds

4    auctions.  You don't necessarily need to know who you're

5    bidding against.

6             Here, for best bids, the really key thing is how

7    you perceive the competitiveness of the field.  If you think

8    that there was a lot of competition between you and your

9    merger partner and removing that competition will make the

10   field less competitive, then you may bid less aggressively,

11   even if you don't know who you're facing in a particular

12   opportunity.

13   Q.  Let's focus now on negotiations.

14            How do the merging parties compete in

15   negotiations?

16   A.   Sure.  So again, if we could advance one more slide,

17   please.  I think an example helps here.

18            Here on the right-hand side, your Honor, we have

19   little blue dots that are representing the stages in a

20   negotiation.  And the arrow is showing time moving from left

21   to right and ending with the offer being accepted.

22            And for the moment, I'd like to focus on that

23   graphic.  So we can see if we look at the smallest of the

24   blue dots, where Penguin Random House offers 1.5 million,

25   and the agent counters 3 million for this book.

1          The second round of negotiations:  Penguin Random

2     House increases its offer to 2.25 million; the agent

3     counters with 3 million.  And the Penguin Random House offer

4     here is for two books.

5          The agent then counters for 2.75 million.  And

6     then finally, Penguin Random House counters with 2.5 million

7     for one book and a $500,000 bonus for a prior book.  And

8     that offer is accepted by the author.

9          And then on the left, your Honor -- so we have a

10    negotiation here where the price went up from -- or the

11    advance went up from 1.5 million to 3 million.  And on the

12    left we have a quote from the president and publisher of the

13    Penguin Random House imprint saying, "The agent says she is

14    certain she can get over 3 million from someone at S&S."

15         So this is an example of using the other party as

16    leverage to get a better negotiated term.  And a transaction

17    that eliminates that leverage can reduce advances and harm

18    authors.

19    Q.  Have you observed any other examples of this negotiating

20    dynamic?

21    A.  Sure.  I'll just do one more, if I may.  If we could

22    please advance one more slide.

23         This is a similar dynamic, but it's for the

24    Simon & Schuster side.  Again, we can see the offers here

25    start at -- Simon & Schuster offers 1.5 million.  The agent

1    counters with 275,000.  In the end, the accepted offer is

2    250,000.

3            And we can see some quotes on the left.  If we

4    start with the top one:  "I'm here to tell you that if this

5    book made its way to 1745 Broadway," which is Penguin Random

6    House's address, "we are talking 300 to 400 baseline.  And

7    if Knopf, not-so-little Random/Doubleday start all going

8    after it, 500 to 750 easy."  And so this is again one of the

9    parties recognizing the competitive impact of the other.

10           And in the middle, we see a similar quote just

11   saying:  "I'm certain the agent could get this and more on

12   the open market."

13   Q.  Finally, you mentioned instances where the merging

14   parties poach each other's established authors.  How, if at

15   all, do those efforts affect authors?

16   A.  So they can -- they result in better terms for authors.

17   It gives established authors a chance to realize the

18   benefits of competition.

19           And if we advance one more slide, we'll see an

20   example of -- two examples of this.

21           So I'll just focus, your Honor, on the first one

22   here.  It's a quote from a senior vice president at Simon &

23   Schuster talking about the fact that Simon & Schuster has

24   successfully poached a pair of authors from Penguin Random

25   House.  And then the bottom quotes are:  "Penguin Random

Hill - DIRECT - By Mr. Stevenson

1    House personnel discussing poaching a book from Simon &

2    Schuster."  So this existence of competition to take one's

3    established authors is valuable.

4    Q.  What conclusions, if any, did you draw from these

5    episodes of head-to-head competition between the merging

6    parties?

7    A.  So I draw two conclusions.  One, your Honor, I think

8    they show that there's substantial head-to-head competition

9    between the parties.  And, two, I think they illustrate some

10   of the mechanisms by which this head-to-head competition can

11   be important for different acquisition formats.

12   Q.  Did those episodes of head-to-head competition mean that

13   the merging parties don't compete with other publishers?

14   A.  No, they don't.

15   Q.  Let's move on from the qualitative evidence you

16   considered.  And would you please remind us what other types

17   of evidence you considered regarding unilateral effects?

18   A.  So, your Honor, I also tried to directly identify how

19   much or estimate how much head-to-head competition is there

20   between the parties.  And then I also looked at economic

21   modeling to say:  What would economic models predict about

22   the likely effect of the merger?

23   Q.  Let's start with your estimates of how much the merging

24   parties compete head-to-head.

25          How did you estimate that in this case?

Hill - DIRECT - By Mr. Stevenson

1    A.  So I used diversion ratios.

2    Q.  Do the horizontal merger guidelines discuss the

3    diversion ratios?

4    A.  They do.  So this slide here is talking about the fact

5    that you can use diversion ratios to measure how much

6    head-to-head competition between the parties there is.

7            And the guidelines go on to say, your Honor, that

8    when you're thinking about unilateral effects in a market

9    for differentiated products, the really key point is the

10   diversion between the parties.  Is there significant

11   division between the parties?  And diversion to other

12   parties is a second-order concern.

13   Q.  I know you told us this earlier.  But would you please

14   briefly remind us what a diversion ratio is?

15   A.  Sure.  I think this time we can walk through an example,

16   if we'd advance one more slide, please.

17           So here, your Honor, we're trying to visually

18   represent what diversion might look like.  We start with

19   Simon & Schuster and we're asking:  What is a Simon &

20   Schuster author's next best option?  So if advances went

21   down, where might that author go?

22           And then on the right-hand side, we're

23   representing diversion to Penguin Random House.  What

24   proportion of those lost authors would go to Penguin Random

25   House?  And then what proportion would go to other Big 5

1    publishers and then to the non-Big 5?

2          And so this is -- diversion here is measuring:

3    How often is the next best alternative the other party?  So

4    how much head-to-head competition is there?

5    Q.  How many sources of data did you use to estimate

6    diversion in this case?

7    A.  So in my initial report, I used four.

8    Q.  And why did you use four data sources to estimate

9    diversion?

10   A.  So I think it's important to get as many estimates as

11   you can on this diversion ratio, this head-to-head

12   competition.  No single one measure is perfect.  But the

13   more ways we can look at it, the more we can learn about it.

14   Q.  Would you please list the four data sources you used to

15   calculate diversion ratios.

16   A.  Sure.  So the first is I looked at diversion according

17   to share.  So I looked at data on market shares to try to

18   estimate diversions.

19          Second, I looked at win-loss data.

20          Third, I tried, your Honor, to go through the

21   documents and data and tried to identify when one party lost

22   an auction, to whom did it lose?  I call that the runner-up

23   study.

24          And then, fourth, I looked at editorial minutes.

25   Q.  We'll break down all those results in a minute.  But

1    would you first tell us what the general results of your

2    diversion ratio calculations were?

3    A.  Sure.  However I looked at it, your Honor, I found

4    significant diversion from Simon & Schuster to Penguin

5    Random House and from Penguin Random House to Simon &

6    Schuster.

7    Q.  Let's start with diversion according to share.

8         What were the results of that diversion

9    calculation?

10   A.  So if we could advance one more slide, please.

11        We'll see here for Penguin Random House to Simon &

12   Schuster, so if Penguin Random House loses an author, what

13   proportion of the lost authors go to Simon & Schuster?  The

14   answer is about 20 percent.

15        And then on the right, for Simon & Schuster, if it

16   loses a bunch of authors, we would expect about 40 percent

17   to go to Penguin Random House.

18   Q.  I know you explained this in the context of

19   self-publishing earlier, but would you please remind us what

20   diversion according to share means?

21   A.  Sure.  So, your Honor, diversion according to share

22   means that market shares are reflective of how attractive a

23   publisher is to authors.

24        So if one author loses an author --

25        THE COURT REPORTER:  Sorry.  "If an author loses

1    an author"?

2              THE WITNESS:  Excuse me.  If an author leaves a

3    publisher, the probability that it picked another publisher

4    is proportional to that publisher's market share.

5    BY MR. STEVENSON:

6    Q.  Is that a common approach in antitrust economics?

7    A.  Yes.  It's widely used.

8    Q.  What is your understanding as to why?

9    A.  So as an -- inside of a market is a default assumption.

10   It's common to think that market shares are representing how

11   attractive a firm is.

12              If you have strong evidence that a particular pair

13   of publishers are not close substitutes, or are

14   closer-than-expected substitutes, then you may wish not to

15   use diversion according to share.  But in many settings,

16   it's a reasonable approach to estimating diversion.

17   Q.  Are there situations in which -- and I think you just

18   mentioned, but you might -- when -- excuse me.  Let me try

19   again.

20              When might you not use market shares to calculate

21   diversion ratios?

22   A.  Sure.  So, your Honor, I can give you two examples of

23   one where you might not want to do it and one where you --

24   well, two where you might not want to do it for different

25   reasons.

```
 1              So if you imagine a market for passenger vehicles
 2     and you think, Well, minivans are in that market and sports
 3     cars are in that market.  And if you have a merger between a
 4     sports carmaker and a minivan maker, you may think, Most
 5     consumers aren't choosing between a sports car and a
 6     minivan.  So even if I know their market shares, probably
 7     diversion is not going to be according to share there,
 8     because they're a little more distant.  They're different
 9     groups of consumers.
10              If you're thinking about a merger of brewers and
11     you were thinking about Bud Light and Miller Lite, you might
12     say:  Wow, those are very close substitutes from the
13     perspective of a lot of customers.  Diversion's probably
14     higher than according to share.
15              So when you have that kind of information,
16     qualitative or quantitative, that makes you think:
17     Diversion's probably not proportional to share.  Then you
18     may not want to assume that it is proportional to share, as
19     I have here.
20              THE COURT:  In your first example, with the
21     minivans and the sports cars, how are you calculating market
22     share?  Market share of minivans and market share of the
23     sports --
24              THE WITNESS:  Yes.  So if you did market shares of
25     all passenger vehicles, your Honor, and let's say each
```

Hill - DIRECT - By Mr. Stevenson

```
1    was --
2              THE COURT:  Oh, I see.
3              THE WITNESS:  So then you would think, Oh, wait a
4    minute.  That's probably not a great assumption.
5              THE COURT:  I see.  So they're both in a broad
6    general market, but they each specialize in different
7    things?
8              THE WITNESS:  That's correct.  And in my beer
9    example, it would be all beer.  So you'd have high-end
10   beers, imported beers.
11             Two domestic light beers are probably really
12   competing more closely with one another than you'd just
13   guess from their share of all beer.
14             THE COURT:  I see.  Okay.
15   BY MR. STEVENSON:
16   Q.  Have you seen any evidence in this case suggesting that
17   publishers compete in ways that are not reflected in their
18   market shares?
19   A.  No.  I would say on balance, the evidence suggests, if
20   anything, there might be -- yeah.  I would say on evidence,
21   on balance, the evidence is consistent with diversion
22   according to share.
23   Q.  Let's turn to your second method to calculate -- excuse
24   me -- your --
25             THE COURT:  Is this a good time for a break?
```

```
 1              MR. STEVENSON:  Yeah.  Sure.

 2              THE COURT:  It's almost 3:30.  Let's take a

 3     15-minute break at this time.

 4              MR. STEVENSON:  Okay.  Thank you.

 5              THE COURT:  Thank you.

 6              Dr. Hill, don't talk to anybody about your

 7     testimony during the break.

 8              THE COURT:  I will not, your Honor.  Thank you.

 9              (Thereupon a recess was taken, after which the

10     following proceedings were had:)

11              THE COURT:  Good afternoon.

12              MR. STEVENSON:  Good afternoon, your Honor.

13              THE WITNESS:  Good afternoon.

14              MR. STEVENSON:  May I proceed?

15              THE COURT:  Yes.  Ready when you are.

16     BY MR. STEVENSON:

17     Q.  Dr. Hill, I think you were at your second source of data

18     to calculate diversion, which was the win-loss data.  What

19     was the result of your diversion calculation using the

20     win-loss data?

21     A.  Sure.  If we could please advance one more slide.

22              Here you see on the left, your Honor, for

23     diversion from Penguin Random House to Simon & Schuster, the

24     win-loss data is about 20 percent.  And for Simon & Schuster

25     to Penguin Random House, it's about 60 percent.
```

1          So for Penguin Random House to Simon & Schuster,

2    the two are very similar.  For Simon & Schuster to Penguin

3    Random House, the win-loss is giving a higher estimate than

4    proportional to share.

5          THE COURT:  So can you explain, like, the win-loss

6    ratio?  Like they won 19 percent?

7          THE WITNESS:  Sure.  So, your Honor, on the left

8    here, I looked at:  When Penguin Random House lost a

9    competition, how often was Simon & Schuster the winner?

10          THE COURT:  Oh, I see.

11          THE WITNESS:  The answer was --

12          THE COURT:  19 percent of the time they lost to

13    Simon & Schuster.

14          THE WITNESS:  That's correct.

15          On the other side, it's when Simon & Schuster

16    lost.  60 percent of the time, Penguin Random House was the

17    winner.

18    BY MR. STEVENSON:

19    Q.  Are win-loss data commonly used by economists to

20    estimate diversion ratios?

21    A.  Yes.  They're one of the most commonly used

22    methodologies.

23    Q.  So the merger guidelines discuss whether win-loss data

24    are a useful source to estimate diversion?

25    A.  Yes.  The merger guidelines call them out as one source

1    for estimating diversion.

2    Q.  Do the merging parties contest whether their win-loss

3    data are systematically maintained?

4    A.  Yes.  I think the parties would argue that their

5    win-loss data is not systematically maintained.  So it may

6    include some competitions, your Honor, but not others.

7    Q.  Given that, why did you nevertheless rely on it?

8    A.  So in my experience, it's common for win-loss data to

9    not be fully systematic.  Salespeople will record some

10    competitions and not others in other industries and in this

11    industry.

12          I nevertheless think it's useful to look at what

13    records there are as part of a holistic look at the degree

14    of head-to-head competition.

15    Q.  Let's move to your third diversion calculation, which

16    you referred to as the runner-up study.

17          What were the results of that diversion

18    calculation?

19    A.  So if we advance one more slide, please.  Yes.  Thank

20    you.

21          So here, for Penguin Random House to Simon &

22    Schuster, the runner-up study finds about 25 percent

23    diversion.  And for Simon & Schuster to Penguin Random

24    House, it's about 60 percent.

25    Q.  Will you please describe the methodology behind this --

```
1    the runner-up study?

2    A.  Sure.  So this was an attempt, your Honor, to, as much

3    as I could, look at when one party lost, did the other party

4    win?  And I did something similar to this on the Ivonik

5    matter.

6              THE COURT:  How is that different from the

7    win-loss ratio?

8              THE WITNESS:  It's really getting at a similar

9    thing, your Honor, but I'd say there are two principal

10   differences.  My hope in the runner-up study was to look at

11   as many of these competitions as I could.  But the other

12   difference -- and the win-loss data, as you heard, is not

13   necessarily systematically maintained.

14             And then the other difference is in the runner-up

15   study, your Honor, I was really looking for, I have concrete

16   evidence that one party is first and the other party is

17   second.

18             In the win-loss data, we know that Penguin Random

19   House records that it lost and Simon & Schuster won.  But we

20   don't necessarily know that Penguin Random House was the

21   second closest bidder; we just know they competed.

22   BY MR. STEVENSON:

23   Q.  Dr. Hill, I'd like to take a step back.  I think you

24   misspoke, which may have led to the confusion.  Did you

25   implement your runner-up study using books that you knew the
```

1   merging parties won?

2   A.  Yes.  I started with books won by Penguin Random House

3   and won by Simon & Schuster.

4   Q.  And then from that, what were you trying to identify?

5   A.  I was trying to identify the identity of the runner-up.

6   Sorry if I was unclear.

7   Q.  Is calculating diversion based on the identity of the

8   runner-up when a party wins a common way to estimate

9   diversion?

10  A.  Yes.

11  Q.  What were the criteria you used to select the books for

12  which you attempted to find the runner-up?

13  A.  So I used data from 2020 that had an advance amount of

14  500,000 or above.

15  Q.  Why did you only examine books that received advances of

16  $500,000 or more?

17  A.  Two reasons:  First, the study turned out to be a lot

18  more time-consuming than I had expected.  And it didn't seem

19  fully feasible to do it for additional years or other

20  advance amounts.

21          And second, when I looked at 250,000 to 500,000, I

22  was often finding there just wasn't an evidentiary record.

23  I wasn't able to identify with much confidence who was the

24  runner-up in the competition.

25  Q.  Roughly how many books do you end up examining as part

1   of this study?

2   A.  Around about 285.

3   Q.  You mentioned that you attempted to identify the

4   runner-up for those books.

5           What did that entail?

6   A.   So, your Honor, I reviewed documents and data related

7   to each of these wins by Penguin Random House and Simon &

8   Schuster.  In the end, I think I reviewed more than 1200

9   documents.  And so I looked through and tried to see if I

10  could determine from the emails, from any records, from

11  agents, any data I had available, if one party won, who was

12  the runner-up?

13  Q.  Were there any books where you were unable to determine

14  who the runner-up was?

15  A.  Yeah.  There were some books where I wasn't able to

16  determine who the runner-up was.  And I would split those

17  into two categories.

18          One was a category where I wasn't sure who the

19  runner-up was, but I was sure it wasn't the other party.  So

20  I could keep those in the study and could classify them as

21  "diversion to other," because I'm really looking at

22  diversion from one party to another.  And if I don't know

23  exactly who it went to, but I know it didn't go to the other

24  party, I can include it in the study.

25          And then there was a second class of books, about

Hill - DIRECT - By Mr. Stevenson

1    20 percent, where I just couldn't tell who the runner-up

2    was.  And those ones I excluded from the study.

3    Q.  Now I'd like to ask a couple questions about your last

4    source of data to calculate diversion, the editorial

5    minutes.

6           Will you please share the results of that

7    calculation with us?

8    A.  Sure.  If we advance one more slide, please.

9           So if we see for Penguin Random House to Simon &

10   Schuster, the diversion is again about 20 percent, your

11   Honor.  And then for Simon & Schuster to Penguin Random

12   House, the diversion's about 55 percent.

13   Q.  What are editorial minutes?

14   A.  So I think you heard the witness from Macmillan talking

15   about editorial meetings, where the editorial staff at an

16   imprint will gather weekly or with some other frequency and

17   discuss books that are of interest to the imprint.  These

18   may be books that they have identified as of interest; they

19   may be books they have won; it may be books they have lost.

20   And I -- your Honor, I looked for books that they had bid

21   for, that either of the merging parties recorded in their

22   editorial minutes that they had bid for.

23   Q.  How were you able to use that information to estimate a

24   diversion ratio?

25   A.  So I was able to merge it with my advance data for

1    anticipated top sellers and see how often, when one party

2    bid for a book and lost that book, to whom did they lose?

3    Did they lose to the other party?  Did they lose to some

4    other publisher?

5              THE COURT:  So on this one, you wouldn't have to

6    be number one and number two?  It's just whoever ultimately

7    won?

8              THE WITNESS:  Yeah.  It was -- if you bid and you

9    recorded it, then I was just asking:  Did HarperCollins win?

10   Did Simon & Schuster win?  Correct, your Honor.

11             And -- yes.  Sorry.

12   BY MR. STEVENSON:

13   Q.  Go ahead.

14   A.  I was just going to say, your Honor, these are all

15   different ways of looking at it.  I was trying to take a

16   different approach each time.

17   Q.  I would like to follow up on that.  Given that a book

18   appearing in a publisher's editorial minutes doesn't

19   necessarily mean that the publisher was a runner-up, why did

20   you use this methodology?

21   A.  So I think it's -- I still think it's a useful measure

22   of how much competition there is.  I don't know precisely

23   who the runner-up is, but I know them.

24             I know one publisher thought enough about it to

25   record it in the editorial minutes.

 1          And then I'm going to ask:  Who won?  It could be

 2    HarperCollins; it could be Macmillan; it could be

 3    Scholastic; it could be some other publisher.  It could also

 4    be the party, the other party.  And so that's what -- I was

 5    just using a measure of how much competition there is.

 6    Q.  Stepping back, did you draw any conclusions from all

 7    four of your diversion ratio calculations?

 8    A.  Yeah.  I mean, looking at them, I think that there is

 9    significant diversion both from Penguin Random House to

10    Simon & Schuster and from Simon & Schuster to Penguin Random

11    House.

12          MR. STEVENSON:  Your Honor, this figure with a

13    slight alteration is a version of PX 0970.  I move to submit

14    PX 0970.

15          THE COURT:  Any objection?

16          MR. OPPENHEIMER:  No.

17          THE COURT:  That will be admitted.

18          (Whereupon, Plaintiff's Exhibit No. 0970 was

19    entered into evidence.)

20    BY MR. STEVENSON:

21    Q.  Does Dr. Snyder propose an alternative way to measure

22    diversion?

23    A.  He does.

24    Q.  Would you please briefly describe his approach?

25    A.  Sure.  So, your Honor, Dr. Snyder gathered bidding

1    records from agencies and so he looked at:  Can I gather

2    information about competitions from the agency side?  And in

3    particular, he looked for instances in which there was a

4    complete bidding record, so lists of who bid and how much.

5         And then he asked:  How often when one party was

6    the winner was the other party the runner-up?

7    Q.  Does Dr. Snyder have a view of your diversion

8    calculations?

9    A.  Yes.  He feels that these estimates are not reliable and

10   he prefers his estimate.

11   Q.  And what is your opinion of Dr. Snyder's diversion

12   estimate?

13   A.  I think it's useful as part of the more holistic picture

14   of "We now have five estimates of diversion, and I think

15   it's useful to look at all five."

16        THE COURT:  Were his results consistent with

17   yours?

18        THE WITNESS:  So I would say his results were

19   consistent with mine.  And we'll go through that in a

20   minute, your Honor, in a little more detail.

21   BY MR. STEVENSON:

22   Q.  Did you identify any flaws in Dr. Snyder's approach?

23   A.  So, your Honor, Dr. Snyder did the best that he could.

24   But his -- he has a sample of the anticipated top sellers.

25   And there are times when his sample does not appear to be

1    representative of the population.

2    Q.  What does it mean to not be representative?

3    A.  So a sample is not representative of the population if

4    the values that it has don't look like -- are not likely to

5    be drawn from a particular population.  So if you were

6    trying to estimate the average height of males in the United

7    States and you sampled only professional basketball players,

8    you might get a misleading view of the height of

9    professional basketball players -- or the men on average.

10   Sorry.

11            THE COURT:  So who did he sample?

12            THE WITNESS:  So he sampled what he could -- he

13   can explain better than you his exact sample -- I mean,

14   better than me.  I apologize.

15            But he essentially looked for competitions in the

16   agents' data where he had something close to a complete

17   record, so some record recording who bid against whom and

18   how much.  And the challenge he had, as we'll see in a

19   second -- actually, if we can advance one more slide, we can

20   probably talk about it a little bit.

21            So, your Honor, this is sort of starting by

22   looking at the problem.  So here, the advance data are in

23   blue.  And the agency data, which is what Dr. Snyder calls

24   his data set, are in red.  And the variable we're

25   summarizing here is the average contracted amount for an

1    anticipated top seller.

2           So you can see in the advance data, which contains

3    all of the anticipated top sellers, the average for Penguin

4    Random House -- I don't know.  Can I say these numbers or

5    should I keep these off?

6           THE COURT:  I can see the numbers.  You don't need

7    to --

8           THE WITNESS:  Yes.  You can see the numbers, your

9    Honor.

10          THE COURT:  They're higher.

11          THE WITNESS:  So you can see they're significantly

12   higher for the advance data than they are for the agency

13   data.  It's particularly true in the case of Simon &

14   Schuster.

15          And I think part of the issue here, your Honor, is

16   Dr. Snyder found more examples of Penguin Random House wins,

17   because Penguin Random House has a larger market share, than

18   he did Simon & Schuster.  So for Simon & Schuster, he has

19   about 22 competitions won by Simon & Schuster.  And so the

20   data look -- they don't look representative of the average

21   contract amount.

22          THE COURT:  That's much fewer than Simon &

23   Schuster would publish in a year.

24          THE WITNESS:  Yes.  If you look at the full

25   advance data, the average contracted amount is much higher.

1     For reasons that aren't clear to me, and I don't

2     think they're clear to Dr. Snyder, his data has competitions

3     that on average had much lower advance amounts.  And he only

4     has 22 events.  So it's not a huge sample for Simon &

5     Schuster.

6     I mean, this Penguin Random House number, your

7     Honor, if you do some statistical testing, it's within the

8     95 percent confidence interval.  But the number on the right

9     for Simon & Schuster is not.  And it's not entirely clear

10    why the sample of agency competitions is not representative

11    for Simon & Schuster.  But it's highly likely it's tied to

12    the relatively small sample size.

13    THE COURT:  And so it just depends on whether the

14    agents were keeping complete records or not, basically?

15    THE WITNESS:  Yeah.  And Dr. Snyder's sample of

16    agents wasn't random.  We didn't go out and randomly sample

17    agents.  If you did that, you would -- and some agents don't

18    keep good data.  So some, you just don't have a record for

19    it.  And it just turned out not to quite look like the

20    population.

21    THE COURT:  Okay.

22    BY MR. STEVENSON:

23    Q.  Is there a worth -- or is -- or actually, I'll save that

24    for a second.

25    How did Dr. Snyder's diversion calculations

```
 1    compare to yours?
 2    A.   Sure.  So if we could advance one more slide.
 3              This is what you were asking about earlier, your
 4    Honor.  We'll start by looking at diversion from Penguin
 5    Random House to Simon & Schuster.  You have my estimates in
 6    blue and then the agency data estimate is in red.
 7              So similar to the -- I'd say his results here are
 8    broadly similar with my results.
 9    Q.   How did Dr. Snyder's diversion calculation of Simon &
10    Schuster to Penguin Random House compare with yours?
11    A.   So he found a lower estimate.  If we advance one more --
12    than some of my estimates.
13              So here, your Honor, my estimates are in green and
14    Dr. Snyder's estimate is in red.  You can see that the three
15    bars in the middle, the win-loss, runner-up and editorial
16    minutes, are significantly higher.
17              Proportional to share is higher; but
18    statistically, the proportional to share and agency are
19    statistically consistent with one another.
20    Q.   Stepping back, what is your view of this group of
21    diversion estimates?
22    A.   So I think they all show significant diversion.  Of this
23    group, my preference is to take proportional to share.  It's
24    based on the largest sample.
25              Here we're seeing them all at once, your Honor, so
```

Hill - DIRECT - By Mr. Stevenson

1   let me be more systematic.  If we look at Penguin Random

2   House to Simon & Schuster, the numbers are broadly

3   consistent with one another.  The runner-up study is a

4   little higher.  But I think it's reasonable here to take

5   proportional to share, about 20 percent.  And then for Simon

6   & Schuster to Penguin Random House, we see more variation.

7   And in general, we have smaller sample sizes.  But I think

8   the 42 percent is a reasonable estimate for this group.

9   It's based on the largest sample.  And if -- and it's

10  something of a midpoint in between the higher estimates and

11  the lower estimate.

12  Q.  You mentioned that Dr. Snyder's agency data sample was

13  about 22.  Don't you rely on some small samples to calculate

14  diversion ratios?

15  A.  Yes.  The runner-up study, I think, is only slightly

16  larger than the agency data for Simon & Schuster to Penguin

17  Random House.  The win-loss data and editorial minutes are a

18  little bigger.  And then proportional to share is using a

19  much larger number of competitions, your Honor.

20  Q.  Why did you nevertheless rely on those estimates despite

21  their small sample sizes?

22  A.  So I think here, your Honor, we're trying to get a

23  holistic understanding of what diversion might look like.

24  And we're looking at five different ways of looking at it.

25  And I think each of them has their challenges.

```
 1              I think proportional to share is probably the most
 2    reliable here, especially given the largest sample size.
 3    But I think it's also helpful to look at all of the
 4    different estimates.
 5    Q.  Do you agree with Dr. Snyder that only his diversion
 6    estimates are reliable here?
 7    A.  No.  I think it's more sensible to look at the set of
 8    five together.
 9    Q.  And we discussed the representativeness of the sample --
10    of a sample.  Is a diversion estimate based on a
11    representative sample worthless?
12    A.  No.  I think it's useful to look at all five of these
13    estimates.
14    Q.  Now that we've discussed diversion ratios, I would like
15    to move on to the next step of your analysis, which was
16    using an economic model to simulate the effect of the
17    merger, I think you said.
18              What is the point of using an economic model?
19    A.  So economic models, your Honor, give us another
20    perspective on the likely effect on unilateral competition.
21    Q.  What kind of model did you use in this case?
22    A.  I used what's known as the second score auction model.
23    Q.  Why was this model developed?
24    A.  It was developed by one of my former colleagues at the
25    antitrust division to look at mergers in industries that use
```

Hill - DIRECT - By Mr. Stevenson

1    auctions or frequently use auctions to allocate goods and in

2    which there's not -- there's relatively low-quality

3    information available, so you don't have a full history of

4    all bids for most auctions.

5    Q.  At a high level, what does the second score option model

6    do?

7    A.  So the second score auction model, your Honor, takes

8    information at an aggregate level about the industry and

9    uses that to simulate current competition.  And then it

10   says:  Let's imagine that competition is changed by a

11   merger.  And it asks:  What would the effect of that be on

12   competition?

13   Q.  To clarify, are the results of this model projected

14   across all of the merging parties' anticipated top sellers

15   or just ones that are sold by auction?

16   A.  So the model itself is narrowly looking at the mechanism

17   in the model as the second price auction, which is similar

18   in some ways to a rounds auction.  But I interpret this more

19   broadly.  I'm taking aggregate information about the

20   industry and I'm using it to try to make a prediction about

21   how competition may be affected.

22   Q.  So would you tell us what a second score auction is?

23   A.  Sure.  So, your Honor, the way I think about it is

24   there's an author who's trying to sell a book and publishers

25   submit bids for that book.  And the publisher with the most

1     attractive bid wins and the publisher -- but the price or --

2     sorry -- the advance depends upon the second most attractive

3     bid.

4     Q.  Why is the advance that the winner pays based on the

5     attractiveness of the second best bid?

6     A.  So in some sense, the advance ends up depending on the

7     second-highest bidder.

8           And so if you think about auctions, you often see

9     in television or in movies an open outcry auction where

10    there's an object and I say, I'll pay $10 and you say, I'll

11    pay $15, and we keep bidding.  And Mr. Stevenson says, I'll

12    pay 25.

13          And eventually, at some point, everybody drops out

14    but the winner.  And the point you stop at is the point that

15    the second best bidder decides that they've had enough.

16    They've hit their valuation.  They're not going higher.

17    That's where the price ends up.  So that's the high level

18    intuition of what a second price auction looks like.

19          THE COURT:  So does your model only look at a

20    portion of the market, of the relevant market, because it

21    only looks at the portion that uses auctions?

22          THE WITNESS:  Yes.  So technically, it's just

23    looking at ones with auctions of a particular type.  I again

24    interpret it more broadly because what I'm going to give --

25    the information I'm going to put into the model is the

1    market shares and diversion, hence diversions between the

2    parties, and then also an aggregate margin measuring their

3    margin in all types of competitions.  And it's going to try

4    to translate those into a price effect.

5                 So whenever you're modeling, you have to make --

6    to make progress, you have to make some assumptions and fix

7    some things.  And then in return, you get more precise

8    predictions than just a measure of diversion.  So we're

9    getting a more precise prediction about whether harm is

10    likely, but we have to make some modeling assumptions.  And

11    this model is often used in the context of mergers involving

12    auctions.

13                 THE COURT:  I'm not sure I quite understand,

14    because we're talking about a market where some of the

15    acquisitions are done through auction, but a lot of them are

16    not.  But you're using the data for all of the transactions,

17    including the ones that are not auctions, and plugging them

18    into a model that talks about auctions.

19                 THE WITNESS:  That's correct.

20                 THE COURT:  Why does that work?

21                 THE WITNESS:  So I think the model is -- at a high

22    level, it's trying to ask a question of:  What happens if

23    competition is disturbed?  And it is true it's using

24    aggregate information on all types and using a specific

25    mechanism to estimate it.

1            But I think of it more holistically, as just we're

2    using a particular mechanism of competition with our data to

3    make a prediction.  And we'll see that when I try other

4    models to estimate the effect, we'll see that the second

5    score auctions model is consistent with them even though

6    they're using different models of competition.

7    BY MR. STEVENSON:

8    Q.  Would you please explain to the Court how the second

9    score model simulates the effect of the merger.

10   A.  Sure.  So again, it assumes -- it takes aggregate

11   information, makes a prediction about the outcome of current

12   competition, and then it changes the competition so that the

13   merged firm only submits one bid.

14            So previously, it submitted two.  Post-merger, it

15   only submits the bid of -- the higher bid of the two

16   publishers.

17   Q.  Does the model predict that some authors will be harmed

18   by the merger?

19   A.  It does.

20   Q.  And when does the model predict that authors will be

21   harmed?

22   A.  So an author will be harmed if the parties are the first

23   and second highest bidder for that author.

24   Q.  Why is that?

25   A.  So in those cases, your Honor, if you have a second

Hill - DIRECT - By Mr. Stevenson

 1    score -- a second price auction, the highest bidder wins and

 2    the second highest bidder sets the level of the advance.

 3              And what we're thinking about is, if you eliminate

 4    one of the parties, the second highest bid leaves the

 5    market, and now the advance is set by the third highest

 6    bidder.  So when the parties are the first and second

 7    closest bidders, an author can be harmed.

 8              THE COURT:  I don't see why this wouldn't be true

 9    for any auction.

10              THE WITNESS:  So I mean, I think at a high level,

11    I think it's reasonable -- I agree with you, your Honor.

12    The specific mechanism here is saying auctions where the

13    parties are first and second, and we're eliminating that

14    competition and we're going to narrow in on that

15    competition.  But you could also interpret this as a broader

16    statement about the average effect of the transaction.  So

17    what's the average effect of eliminating the head-to-head

18    competition between the parties?

19              I don't know if --

20              THE COURT:  I guess what I'm confused about is,

21    isn't it a truism that if you have an auction and you

22    eliminate the top few, it's going to be a lower price?

23              THE WITNESS:  Right.

24              So, your Honor, the way -- the example I might

25    give is we talked about sort of an open outcry auction where

Hill - DIRECT - By Mr. Stevenson

1    we end up with the second highest bidder as setting the

2    price.

3              If you think about a best bids auction, where you,

4    Mr. Stevenson and I all submit bids, then let's say I have

5    the highest bid, your Honor.  I will win; and the advance is

6    the amount I bid.

7              So if I didn't know what you two bid, I could

8    eliminate Mr. Stevenson.  And if I bid the same, even though

9    he's been eliminated, then the amount wouldn't change.

10             But if I knew ahead of time that Mr. Stevenson --

11   so to your point, if I knew that Mr. Stevenson was

12   eliminated, I might say:  Well, her Honor is bidding against

13   me.  Mr. Stevenson is not here.  It's not going to be as

14   aggressive.  I'll bid less high.

15             So your intuition is right that the general thing

16   the model is testing is:  How often are the parties first

17   and second?  And how often does that mean there's going to

18   be some kind of reduction in competition?  If they're rarely

19   first and second, the model is going to predict no

20   significant effect.  If they're always first and second,

21   there's going to be a big effect.

22             And that is a general intuition, as you say, that

23   I think applies across auctions.

24             THE COURT:  You're saying it works for best bids

25   auctions when you don't even know who is bidding?

Hill - DIRECT - By Mr. Stevenson

1           THE WITNESS:  In a different form.  Right?

2    Because in a best bids auction, the question is:  Has the

3    competition with the field decreased?  Do I think there's

4    less competition?  And if I know that someone I compete with

5    a lot has been eliminated, I may say:  Okay.  Now there's

6    less competition.  And I can bid less aggressively than I

7    used to.

8           THE COURT:  Okay.

9           THE WITNESS:  So it varies depending on the

10   specific format.

11          But one way people sometimes think about it is, in

12   an auction you're trying to beat the second best person and

13   by as little as you have to.  So you want to be highest, but

14   by no more than is necessary.  And that's kind of a common

15   intuition.

16          And in this particular model, it's using a second

17   price setting.  But again, I think that it's a more general

18   idea of what's the effect of a merger in an industry with

19   auctions.

20   BY MR. STEVENSON:

21   Q.  To follow up on that, does this prediction of your model

22   mean that the only authors who might be harmed by this

23   merger are ones that would have had the merging parties as

24   the top two bidders in an auction?

25   A.  So again, narrowly in the model, in the second score

                    Hill - DIRECT - By Mr. Stevenson

1    auction model, those authors for whom the parties are number

2    one and number two are the ones who are being affected.  But

3    the prediction of the model is going to be an average effect

4    across all authors of the parties.

5    Q.  That includes other acquisition types?

6    A.  I'm using it for a much broader purpose.  Yes.

7    Q.  How does the second score model determine the extent of

8    harm to authors?

9    A.  So in this model, your Honor, the first -- there's harm

10   if the parties are number one and number two.  And you

11   remember I said, well, the effect of the merger is to

12   eliminate the second highest bid.  So now the advance is set

13   by the third highest bid.  If bids are very close together,

14   everyone who bids has a very similar valuation for the book,

15   then moving from the second best bidder to the third best

16   bidder will have no big effect.

17          If there's a big difference between the valuations

18   of the second and third closest bidder, then the merger can

19   have a more substantial effect.

20          So the size of the effect depends upon the

21   difference on average between the second best bidder and the

22   third best bidder.

23   Q.  Have you observed any evidence on the difference between

24   the second best and third best bidders in book auctions?

25   A.  Yes.  If we could please turn the screens back on and

1    advance one slide.  Yes.  Thank you.

2         So, your Honor, this slide is looking for all

3    contracts and for anticipated top seller contracts.  Using

4    Dr. Snyder's advance data, what's the average difference

5    between the second and third highest publisher's bid?  And

6    you can see if we look at all contracts or anticipated top

7    seller contracts, it's about 20 percent.  Or for advance --

8    anticipated top seller contracts, it's on the order of

9    $100,000.

10   Q.  You said that this was based on Dr. Snyder's advance

11   data.  I think you misspoke.

12   A.  I apologize.  It's his agency data.

13   Q.  Have you observed any qualitative evidence regarding the

14   distance between the second and third bidders?

15   A.  Yeah.  I think there's been a good deal of testimony.

16   The testimony of Mr. Karp comes to mind of participants in

17   the industry saying that there's often significantly

18   different valuations of a book across publishers.

19        And this chart is essentially a qualitative -- a

20   quantitative version of that, finding that the second and

21   third bidder are roughly 20 percent apart in their valuation

22   and their bid.

23        THE COURT:  This is an average.  Did you find it

24   was fairly consistent or is this --

25        THE WITNESS:  No.  It can vary significantly, your

 1    Honor.  In some competitions, it may be high; and in others,

 2    the third bidder may be close.

 3    BY MR. STEVENSON:

 4    Q.  Let's delve into the implementation of your model.

 5                 What are the inputs to the second score auction

 6    model?

 7    A.  So if we could please advance one more slide.  Thank

 8    you.

 9                 Yes.  So there are two key inputs here, your

10    Honor.  The first one is market shares.  And the market

11    shares are used to estimate how often the parties are the

12    top two bidders.  So using diversion according to share, how

13    often is one party the winner and the other party the

14    runner-up on average?

15                 And here, the higher the market shares for the

16    party, the higher the diversion and the greater the

17    predicted harm in the model.

18                 The second input is a variable profit margin.  So

19    this in the model is measuring how close together are

20    publishers' bids to one another on average.  If publisher

21    bids are all very close together, then margins are going to

22    be low.  If there's significant variation, then margins will

23    be higher.

24                 So a higher variable profit margin leads to

25    greater variation in bids or is associated with greater

1    variation in bids and leads to more harm.  And smaller

2    margins means more tightly clustered bids and it means less

3    harm.

4              THE COURT:  Why is there a correlation between

5    variable profit margins and how close the bids are?

6              THE WITNESS:  So if I -- if we're all driving up

7    to our valuation of the book, your Honor, and let's say you

8    value the book at $500,000 and I value it at $250,000.  I'll

9    only drive you up to 250,000.  So now you're getting a book

10   you value for 500,000 for 250,000.  So you can make a

11   significant profit there.

12             If I drive you up to 495, I've put you within

13   $5,000 of your valuation.  So you're going to expect to earn

14   a lower margin because you have to pay a higher advance than

15   you would if my valuation was lower.

16             THE COURT:  Let me think about that for a second.

17             THE WITNESS:  Sure.

18             THE COURT:  How does that correlate with what I'm

19   bidding compared with what other people are bidding?

20             THE WITNESS:  So the closer all of our bids are,

21   the -- so you can think of your bid as being based on your

22   valuation.  You don't want to go above your valuation.  And

23   if the other bidders are very close to you, you get forced

24   to bid up to your valuation and you're paying a

25   significantly higher advance.

1    So let's say the book is going to generate

2    $500,000 in sales.  You're right about that.  That's going

3    to be the value above the advance that you're going to get,

4    but not counting the advance.

5    If I force you to pay 495,000, you're only going

6    to make a $5,000 profit on the book.  If my valuation is

7    very low, you're going to get the book for much lower than

8    your valuation and your profit will be higher because you'll

9    have to pay the author a lower advance.

10    THE COURT:  I understand that.

11    I'm just trying to understand the relationship

12    between the bidders.  Are you saying that if they're bidding

13    around the same amount, they have the same variable profit

14    margins?

15    THE WITNESS:  Yes.  Well, in general, I'm saying

16    if there's less variation across them, we all sort of think

17    the book is worth about the same, and we're all roughly

18    correct, then there's not a lot of room for any of us to

19    earn profit because we're all driving each other up.

20    But if someone values it more highly and others

21    value it more lowly -- at a lower level, that dispersion

22    creates the ability to get some additional profit that

23    wouldn't be there otherwise.

24    THE COURT:  But this is actual profit margin and

25    not predicted profit margin.

Hill - DIRECT - By Mr. Stevenson

1           THE WITNESS:  Right.  So in the model, the

2    language here is a little bit loose, your Honor.   In

3    general, the idea is, in the actual profit margins, if

4    there's -- to earn a big profit margin, you have to be

5    correct about it and it has to be the case that the other

6    publishers don't value it as highly as you do.  So on

7    average, you're making more for a book because the

8    competition for it is less intense.

9           THE COURT:  I think I kind of understand that.

10           THE WITNESS:  Yes.  So maybe if we switch the

11    context.

12           If you imagine you were buying houses, fixing them

13    up and then selling them, let's just say on average you have

14    a pretty good sense of the valuations in the market, on

15    average.  And you're competing for a series of houses.

16           If I'm in there and I have the same sense as you

17    and I'm also pretty good at it, you and I are going to end

18    up paying about what we think we can get for the house.  So

19    there's not a lot of room left over for us to make a profit

20    margin.

21           But if I don't value the houses, you look at a

22    Victorian house and say, "Someone will really like this when

23    it's fixed up," and a Victorian house is not to my taste, I

24    won't push you up to bid the full value.

25           So you can bid under what you think it's going to

Hill - DIRECT - By Mr. Stevenson

1    get.  You get it for less than it's actually worth.  And

2    when you fix it up, you're able to sell it for more because

3    I'm not right there pushing you to go up to the final value

4    of the product.

5              THE COURT:  So I understand what you're saying

6    there.  I'm just not sure how it plays into this analysis.

7    I don't want to belabor this.

8              THE WITNESS:  Sure.  I think we'll see an actual

9    example of this in a second.

10             But the general point I was just trying to make

11   here is just that when there's higher profit margins,

12   there's generally going to be more harm.  And the mechanism

13   that's coming through is, when everybody is valuing things

14   very closely together, there's just not a lot of room to

15   make a profit.  Everybody is really on it and they all

16   know -- they all value things very similarly.

17             THE COURT:  Thank you.

18   BY MR. STEVENSON:

19   Q.  Dr. Hill, do the horizontal merger guidelines discuss

20   how profit margins are -- may predict harm in auction

21   settings?

22   A.  Yes.  I believe they do.

23   Q.  What is your understanding of what the merger guidelines

24   say?

25   A.  I think they say that higher margins in the auctions are

Hill - DIRECT - By Mr. Stevenson

1    likely to be correlated with more harm.

2    Q.  So we've been discussing margins for a couple minutes.

3    How do you as an economist calculate a publisher's variable

4    profit margin?

5    A.  So a variable profit margin is sort of asking, your

6    Honor, what's the incremental value of an additional book?

7    If I add this additional book, how much additional revenue

8    will it bring in?  And how much additional will I have to

9    pay to acquire it?

10           And when you think about it in those terms, your

11   Honor, let's say I'm already publishing 100 books and I'm

12   thinking of adding one more book to get to 101.  The new

13   book will bring in some stream of revenue and it will lead

14   to some incremental costs.  So I'll have to pay for copies

15   of the book, for example, to distribute it.

16           But I won't have to pay myself the CEO's salary

17   again.  I won't have to pay rental on a warehouse where I

18   store books.  I can just use already-paid costs.  So those

19   are what we might call fixed costs.

20           And then incremental costs are things like paying

21   for the printing of the book, paying the advance to the

22   author.

23           And so in a variable profit margin, you're just

24   asking:  How much additional revenue do I get and how much

25   additional cost do I have to bear?

1    Q.  Can you describe in just a little more detail the

2    intuition for why you don't consider fixed costs when

3    calculating a variable margin?

4            THE COURT:  I've got that.

5            MR. STEVENSON:  Oh, okay.

6    BY MR. STEVENSON:

7    Q.  How did you calculate variable profit margins in this

8    case?

9    A.  So I used title-level P&L data.

10           So, your Honor, to your earlier question, this is

11   actual realized results.  So what happened to each of these

12   titles in terms of revenue and what happened to each of

13   these titles in terms of costs?

14   Q.  What did you do with the title-level P&L data?

15   A.  So, your Honor, I calculated the revenue and then I

16   split the costs into costs that were likely variable and

17   costs that were likely fixed.

18   Q.  And were there any costs that were difficult to

19   categorize?

20   A.  So for Simon & Schuster, it was relatively

21   straightforward.

22           For Penguin Random House, there was a category of

23   costs called direct operating expenses, your Honor, that

24   looked like some mix of both variable and fixed costs.

25   Q.  What did you do with that category of costs?

1    A.  I treated them -- to be conservative, I treated them all

2    as being variable.

3    Q.  Why is that conservative?

4    A.  It's conservative with respect to harm in the model

5    because if I make Penguin Random House's margin lower, it

6    reduces the predictions of harm in the model.

7    Q.  Dr. Hill, would you please share the results of your

8    model with us?

9    A.  Sure.  So if we could please advance one more slide.

10            Your Honor, here on the left, we have the

11    predicted average decrease in advances for Penguin Random

12    House authors.  It's about 4 percent.

13            And on the right, we have the predicted decrease

14    in advances for Simon & Schuster.  And it's about 11.5

15    percent on average.

16    Q.  How does that translate to dollar terms for the benefit

17    of the record?

18    A.  Sure.  So for Penguin Random House, it's about $44,000

19    per book in advance reduction.  For Simon & Schuster, it's

20    about a $105,000 reduction per book.

21            THE COURT:  That's all books, not just the ones at

22    auction?

23            THE WITNESS:  Right.  This is -- the prediction

24    here is -- I'm using it for all Penguin Random House authors

25    and all Simon & Schuster authors, your Honor.

1    BY MR. STEVENSON:

2    Q.  Just a minute ago we were discussing margins.  Did

3    Dr. Snyder calculate a different margin?  I think that was

4    redundant.

5    A.  Yes.  Dr. Snyder did calculate margins differently.

6    Q.  Did he estimate the results of your model using his

7    margins?

8    A.  Yes, he did.

9    Q.  Roughly, what were those results?

10   A.  So at a high level, it reduced the harm by about 30

11   percent, your Honor.

12            THE COURT:  For both?

13            THE WITNESS:  Yeah.  Your Honor, I can't quite

14   remember the breakdown by firm.  So that's an average

15   breakdown across both.

16   BY MR. STEVENSON:

17   Q.  Is a reduction in advances the only harm you expect to

18   result from this merger?

19   A.  Not necessarily.  Your Honor, when we're creating these

20   economic models, we often focus on something we can

21   quantify; so prices in some mergers, in this case advances.

22   So I focused on advances.

23            But the -- you know, the merger guidelines have

24   language about these sorts of what are called merger

25   simulations.  It's more of a question about:  How

1    significant is the reduction in unilateral effects here?

2            The specific numbers are not the thing to focus

3    on.  And the harm need not be restricted to advances.

4            So it's more a question about:  Is there a

5    reduction in unilateral competition?  And that could

6    manifest itself in changes in advances; it could manifest

7    itself in worse terms.  But the model is actually measuring

8    it in something that's quantifiable, which is the change in

9    advances.

10   Q.  We discussed the direct operating expenses of Penguin

11   Random House.  Did you investigate the results of your model

12   treating those costs as fixed instead of variable?

13   A.  Yes, I did.  And if we could advance one more slide,

14   please, we'll see those results.

15           So here, your Honor, on the left, this is the

16   Penguin Random House average effect per author.  If we treat

17   the direct operating expense as fixed, it's about a 6

18   percent reduction per book, or about $60,000 per book.

19           On the right, for Simon & Schuster, it's about a

20   15 percent reduction in advances, or about 140,000.

21   Q.  Do you have a baseline version of your second score

22   auction model?

23   A.  Yeah.  The one I presented in my initial report assumes

24   that the direct operating expenses are variable.  And I used

25   that because it is conservative relative to assuming that

1    they are all fixed.

2            Somewhere in between, your Honor, I think is

3    probably the correct number.  There's some portion of the

4    direct operating expenses that's variable and some portion

5    that's fixed.  So it's somewhere between the results on

6    these two slides.

7    Q.  Did you run your model for different advance thresholds

8    that defined an anticipated top seller?

9    A.  I did.  I also ran the model, your Honor, using a

10   threshold of 150,000 and I did it using a threshold of

11   350,000.  And the results were, broadly speaking, similar.

12   And then I also ran it for a special subset of authors,

13   those who received an advance between 150,000 and 250,000.

14   And the model also predicted that those authors would likely

15   see a reduction in advances.

16   Q.  Did Dr. Snyder criticize your modeling approach in this

17   case?

18   A.  Yes.

19   Q.  Will you please briefly summarize his criticisms?

20   A.   I think his top-level criticism is he disagrees with

21   using the second score auction model to look at all

22   competitive situations and all auctions.

23   Q.  Do you agree with that criticism?

24   A.  No.  I think in modeling one always has to make some

25   assumptions.  And I think this is a reasonable model to look

1    at the aggregate effect of the transaction.

2    Q.  Do you conduct any analysis to assess Dr. Snyder's

3    claims?

4    A.  I did.

5    Q.  What analysis did you do?

6    A.  So I also tried to analyze the effect of the transaction

7    using a series of models derived by the economists working

8    on behalf of the parties that look at what are known as

9    gross upward pricing pressure index.  That's often shortened

10   to an acronym of GUPPI, which is G-U-P-P-I.

11   Q.  Could you please explain to the Court what GUPPI is?

12   A.  So the GUPPI model was developed by two former head --

13   chief economists at the Department of Justice and the FTC.

14   It's an attempt to look at what is the change in incentives,

15   the pricing incentives, of firms in the case -- unilateral

16   change in pricing incentives for the firms in a merger?

17   Q.  And is GUPPI discussed in the horizontal merger

18   guidelines?

19   A.  Yes.  If we advance one more slide, in the section of

20   the guidelines, your Honor, that talks about unilateral

21   competitive effects, there's language discussing the use of

22   upward pricing pressure to estimate the effect of

23   competitive -- unilateral competitive effect.

24   Q.  Why did you use these GUPPI models?

25   A.  Dr. Snyder criticized the second score auction model for

1    being focused on a particular second score auction.  The

2    GUPPI models developed by the parties' economists looked at

3    three different types of auctions -- sorry -- of competitive

4    situations.  So it was a way of trying to answer

5    Dr. Snyder's criticism.

6    Q.  At a high level, would you please describe what the

7    Defendants' economists developed with regard to the GUPPI

8    models?

9    A.  Sure.  So they took the baseline GUPPI methodology and

10   they looked at three mechanisms, your Honor.  One was a best

11   bids-type auction.  One was a rounds auction.  And then they

12   looked at a hybrid approach, which is a rounds auction

13   followed by negotiations.

14   Q.  Did the Defendants' economists state which version is

15   the most reliable?

16   A.  Their preference, your Honor, is to take whichever of

17   the three makes the lowest prediction about the aggregate

18   price effect.

19   Q.  Did you follow that approach?

20   A.  I did not.

21   Q.  Why not?

22   A.  So that approach, as I understand it, is based on the

23   idea that the agent will unerringly select the most

24   advantageous of those mechanisms.  I think it's probably

25   more realistic to look at each of the different

1    possibilities separately.

2    Q.  What are the inputs to the GUPPI models?

3    A.  If we could please advance -- yes.  Thank you.

4            So here, your Honor, the GUPPI model takes similar

5    inputs to the second score auction model.  So first, it

6    takes a measure of diversion and then it takes a variable

7    profit margin.

8    Q.  How do these inputs compare to the second score auction

9    models?

10   A.  So they're the same.  In the second score auction model,

11   we used market shares to estimate diversion.  In GUPPI, we

12   can -- we also have a diversion estimate.  And then both

13   models take the variable profit margin.

14   Q.  How does a diversion ratio affect the GUPPI model?

15   A.  So the higher the diversion ratio, the higher the great

16   predicted harm in the model.

17   Q.  And how about the margin?

18   A.  So as in the second score auction model, the higher

19   variable profit margin leads to greater predicted harm.

20   Q.  Which diversion ratio calculation did you use for the

21   GUPPI models?

22   A.  So, your Honor, here I used two.  I used my estimate,

23   which is diversion proportional to share, and then I used

24   Dr. Snyder's estimate, which is based on his agency data.

25   Q.  Which profit margin calculation did you use in the GUPPI

1    models?

2    A.  I used my calculation that treats the direct operating

3    expenses as being variable.

4              THE COURT:  That's the more conservative approach?

5              THE WITNESS:  Correct, because it leads to a lower

6    profit margin.

7    BY MR. STEVENSON:

8    Q.  Would you please share the results of the GUPPI models

9    with us?

10   A.  Sure.  If we could please advance one more slide.  Thank

11   you.

12             So in this, your Honor, here we're looking at the

13   multi-round bidding GUPPI model.  So this is the equivalent

14   to a rounds auction.  On the left-hand side, we have Penguin

15   Random House.  So this is the average effect on Penguin

16   Random House authors.

17             The blue bars are the GUPPI estimate using

18   diversion proportional to share.  The green bars are the

19   GUPPI results using the agency data to estimate diversion.

20   And the orange bars are the second score auction models

21   prediction.

22             So under the multi-round bidding GUPPI model, the

23   models predicting -- using either my preferred diversions or

24   Dr. Snyder's, it's showing significantly higher reductions

25   in advances than the second score auction model.

1            If we look on the right-hand side, we have the

2    same information for Simon & Schuster.  We can see that the

3    GUPPI prediction using diversion proportional to share is

4    about twice the size of the reduction for the second score

5    auction model.

6            And for the GUPPI using the agency data diversion,

7    the value is about the same.

8    Q.  The same as the second score auction model?

9    A.  That's correct.

10   Q.  What were the results of the GUPPI models for the best

11   bid in hybrid scenarios?

12   A.  If we could advance one more slide, please.

13           Here you see -- it turns out, your Honor, the

14   single round in hybrid GUPPI models -- so that was

15   essentially a best bids-type model -- and then a model where

16   there's a rounds auction followed by negotiations, they

17   ended up giving the same prediction.

18           So on the left, for Penguin Random House, the

19   GUPPI model's predictions are similar to the second score

20   auction model's prediction.

21           On the right, for Simon & Schuster, using

22   diversion proportional to share, the GUPPI model's effect is

23   slightly smaller than for the second score auction model.

24           And then for the GUPPI using Dr. Snyder's agency

25   data, the prediction's about half the size but still

1    significant.

2    Q.  Stepping back, what conclusions, if any, did you reach

3    from the results of the GUPPI models?

4    A.  So I think the GUPPI models support the idea that the

5    second score auction model is a reasonable approach to

6    estimating harm here.  It uses some different mechanisms for

7    acquisitions of books and it reaches qualitatively similar

8    results.

9              MR. STEVENSON:  Your Honor, this figure and the

10    one on the previous slide are collectively re-creations of

11    PX 0964.  I move to admit PX 964.

12              THE COURT:  Any objection?

13              MR. OPPENHEIMER:  No objection.

14              THE COURT:  Thank you.  It'll be admitted.

15              (Whereupon, Plaintiff's Exhibit No. 964 was

16    entered into evidence.)

17              THE COURT:  Can I ask a question?

18              THE WITNESS:  Sure.

19              THE COURT:  So not being a Ph.D. in economics, I

20    don't really understand the intricacies of these models.

21              And I'm wondering if the dispute between the

22    experts is more about the inputs as opposed to the

23    methodology, because if the dispute's about the inputs, I

24    think I understand that.  But if the dispute is about the

25    methodology, I feel like I have to understand this better.

1          THE WITNESS:  Sure.  So let's take the second

2     point first.

3          I would say that Dr. Snyder and I disagree

4     somewhat about the inputs.  As you can see on these slides

5     and the previous one, sometimes our diversions give

6     different answers; and similarly, we saw if you give

7     different margins, you get somewhat different results.

8          THE COURT:  Yes.  I understand that part.

9          THE WITNESS:  Yes.  And then similarly, which I

10     won't go into in any detail here, because I understand it's

11     going to be handled later, but if you include efficiencies,

12     the way Dr. Snyder would like to, there are also different

13     results.

14          On the methodological differences, I think

15     Dr. Snyder's concern is that he feels the second score

16     auction model is not addressing all the different ways in

17     which books are acquired.  And I would say because it

18     assumes the second score auction format.

19          THE COURT:  But if I understood you correctly, you

20     inputted data about all the different ways that books are

21     acquired.  But you made an assumption and put it into a

22     second score auction framework.  But the data is from all of

23     the books.

24          And so you are assuming, if we put that into this

25     framework, we can get some idea of what the competitive

Hill - DIRECT - By Mr. Stevenson

1    effects would be.  That's kind of what I understood you to

2    be saying.

3                THE WITNESS:  That's right.  I think that's fair.

4                And the second score auction model is often used

5    in models with auctions in which the auctions may not be

6    second score auctions.  It's -- but it's a way of -- the

7    thing about the second score auctions model, your Honor,

8    without going into too many details, is it's very easy to

9    solve, because in it, it turns out that everyone has an

10   incentive to just -- in certain circumstances, the

11   competitors bid their true valuations.  It works out that

12   you just reveal your true valuation.  And so it's very easy

13   to solve.

14               Under some circumstances, it gives the same

15   predictions as best bid auctions or other formats.  It's not

16   guaranteed to do that, but it often does.  So people often

17   use it because economic models can be very hard to solve,

18   especially best bid-type auctions.

19               I tried to do a best bids auction here.  And the

20   data -- you know, in a best bids auctions, if you're going

21   to model it, you would really like to have data for every

22   auction, who bid and how much they bid and when they bid.

23   In some settings you have that information, your Honor,

24   particularly ones involving public procurement.  But here,

25   you don't have that kind of information.  So my attempts to

1    do that --

2            THE COURT:  Well, you have the agency data.  But

3    you think it's incomplete?

4            THE WITNESS:  The agency data are incomplete.  I

5    tried to use something like the agency data to make a

6    prediction, and I ended up with significantly higher price

7    effects.  And they were higher enough that I didn't think

8    that they were credible based on what I knew about the

9    market.

10            And so I used the second score auction model.

11    It's a widely used model.  It's broadly reliable.  So I

12    thought it was a reasonable approach.

13            And the -- and then Dr. Snyder criticized it and I

14    tried these GUPPI models, which look at a best bids setting;

15    they look at a second price setting; and then they look at

16    this hybrid setting, which is rounds followed by

17    negotiations.  So they're giving some flavor of a broader

18    set of settings.

19            THE COURT:  Is there a dispute about the

20    methodology in the GUPPI analysis or just the inputs?

21            THE WITNESS:  I don't believe so, your Honor, with

22    the brief exception that the parties' economists said:  You

23    should look at the three GUPPI models and take the lowest.

24    So they would say:  Look at this slide.  Don't think about

25    the previous slide.

1          My view is you should look at both of them when

2     you're thinking about it.  But I think -- I don't believe

3     that there's a dispute about that point.

4          THE COURT:  Thank you.

5          THE WITNESS:  And then if I may, your Honor, with

6     respect to the second score auction model, there's also --

7     one of the ways that the creator of the model talked about

8     evaluating whether it's performing well is to compare the

9     model takes -- the model will take the inputs you give it,

10    profit margins and market shares, and then it'll predict

11    what margins should look like in the model.  And you can

12    compare those to actual margins and say:  How well are these

13    matching?

14         My view is that the model -- the match there is

15    good.  And Dr. Snyder, I believe, will testify that he

16    doesn't think the match is good.  So that's something

17    that'll -- you'll probably hear about that in addition.

18         THE COURT:  Thank you.

19    BY MR. STEVENSON:

20    Q.  Dr. Hill, before we move on from unilateral effects,

21    will you please summarize your primary conclusions on the

22    topic?

23    A.  Yeah.  So I looked at here four buckets of information

24    about unilateral effects.  So concentration, qualitative

25    evidence, diversion ratios and economic models.  And I think

1    they're all consistent with the idea that the transaction

2    will substantially reduce unilateral competition.

3    Q.  Let's switch our focus to coordinated effects.  Would

4    you please remind us what coordinated effects are?

5    A.  Sure.  So if we advance one more slide, please.

6          So this is language from the merger guidelines

7    summarizing the idea of coordinated interaction.  And

8    essentially, the idea is a merger may reduce competition in

9    a way that makes it easier for firms to pull -- pull their

10   punches when competing with one another.

11   Q.  What do you have in mind when you think of coordinated

12   interaction?

13   A.  So there's usually two types that one thinks about, your

14   Honor.  One is explicit coordination and the other is tacit

15   coordination.

16          Explicit, I think, is easier to think about.  You

17   could think of an example of this as being price-fixing or

18   market allocation.  So the firms in an industry get together

19   and say:  We're going to -- today we're charging $5 when

20   we're competing.  Wouldn't it be better if we could charge

21   7?  Let's all charge 7.  So it's an explicit agreement.

22          Or a market allocation:  You take that half of the

23   country; we'll take this half.  And let's not compete

24   because competition leads to lower margins.  That's what

25   explicit coordination might look like.

1    Tacit coordination, your Honor, is through

2    repeated interaction, firms learn that things, you know, go

3    better when we don't compete aggressively for one another's

4    business.  And so they learn to be accommodating rather than

5    to compete aggressively.

6    Q.  And do explicit and tacit coordination share any

7    features?

8    A.  Yeah.  I think at a high level for coordination, there

9    are three things you think are necessary.  One is you need

10    some form of common understanding.  You need an agreement

11    that you're, be it tacit or explicit, that you're going to

12    pull your punches.

13    A second is the ability to monitor and detect.  So

14    you need to be able to see if other firms are adhering to

15    the coordination.  If you can't tell if anyone else is

16    coordinating, it's very hard to coordinate.

17    And then third is some form of punishment.  So,

18    your Honor, on this quote we see "Coordinated interaction

19    involves conduct by multiple firms that is profitable for

20    each of them only as a result of the accommodating reactions

21    of the others."

22    So when coordination is ongoing, it's often the

23    case that the firms have a unilateral incentive to leave the

24    coordination, to cheat.  So we all agreed we'd fix prices at

25    $7.  I charge $6.95 and I steal the whole market.  That's my

Hill - DIRECT - By Mr. Stevenson

1    incentive to cheat.  So you need to be able to detect that.

2              And then the third common element is you need some

3    sort of punishment.  If we -- if someone leaves the

4    coordination, how do we punish them for doing that and

5    thereby incentivize them to stick with the coordination?

6    Q.  Did you reach any opinions about the likelihood of

7    coordinated effects arising from this merger?

8    A.  I did.

9    Q.  What were those opinions?

10   A.  I think that the transaction is likely to increase the

11   risk of coordination.

12   Q.  How did you reach that opinion?

13   A.  So if we can advance -- oh, we're there.

14             So this is some language, your Honor, from the

15   horizontal merger guidelines.  The guidelines sort of set

16   three conditions for thinking about what it would look like

17   for a merger to increase the risk of coordination.  So

18   number one is:  The merger must significantly increase

19   concentration and lead to a moderately or highly

20   concentrated market.  So we've seen that that's the case in

21   this market.

22             Second, the market has to show some signs of

23   vulnerability to coordinated conduct.

24             And then, third, the agencies have a credible

25   basis on which to conclude that the merger may enhance that

1    vulnerability.

2            So these three points are the framework I use to

3    look at coordinated effects of this market.

4    Q.  Let's start with this -- the market's signs of

5    vulnerability to coordinated conducted.

6            Did you observe any of those?

7    A.  I did.  So if we could please advance one more slide.

8            Your Honor, here I've listed some of the reasons

9    why I think the market is susceptible to coordinated

10   conduct.  The first is there's some history here of

11   coordination among publishers.  Now, that coordination,

12   which is -- I'm thinking here of the e-books price-fixing,

13   which was in a different market.  But in that coordination,

14   the heads of five of the major six publishers were able to

15   meet and come to an agreement.  And that ability to reach an

16   agreement, I think, raises the chance that there's a

17   susceptibility to coordination.

18           Second, coordination is more likely when you have

19   a small number of significant firms.  Your Honor, I think

20   you've already seen evidence that here there's the Big 5.

21   And so that makes it easier to monitor and detect.

22           Your Honor, greater transparency typically makes

23   coordinations easier because it aids in the monitoring and

24   punishment.  And I think here we see some hallmarks of that

25   transparency.

1        Fourth:  frequency of purchase.  Small, frequent

2    purchases make coordination easier to sustain.  Larger,

3    regular purchases make coordination harder to sustain.

4        And here, your Honor, we have a lot of frequent

5    purchases.  I think there's on the order of 1,000

6    anticipated top sellers a year.

7        And then finally, there's some evidence that the

8    reliance of other firms on the Big 5 publishers for printing

9    and distribution may make it more challenging for them to

10   disrupt any coordination should it appear.

11   Q.  You mentioned that there's some hallmarks of

12   transparency here.

13        What are you referring to?

14   A.  Sure.  So I think, your Honor, you heard testimony today

15   and also from some other publishers, including Mr. Pietsch

16   and Mr. Karp, that information is available on who wins

17   competitions.  They may not know who they're competing with

18   at the time, but they typically observe after the auction's

19   over who was the winner.  So there's an ability to know to

20   whom you're losing.  And if one of your established authors

21   is poached, for example, you often know to whom they've

22   switched.

23   Q.  Why is the merger likely to increase the market's

24   vulnerability to coordination?

25   A.  So today, your Honor, we have the Big 5.  And after the

Hill - DIRECT - By Mr. Stevenson

```
 1    transaction, it'll be the Big 4.  And reductions in the
 2    number of firms simplify monitoring detection.  They can
 3    simplify punishment.  And they can simplify reaching an
 4    agreement.
 5              MR. STEVENSON:  Your Honor, I'm at the end of this
 6    topic.  I'm happy to start on the next one for five minutes.
 7              THE COURT:  I think maybe it's a good time to
 8    break, then.
 9              So how much more do you have?
10              MR. STEVENSON:  I think probably about 40 minutes
11    would be my guess.
12              THE COURT:  Okay.  Well, let's break for the day,
13    then.  And we'll resume tomorrow at 9:30.
14              Dr. Hill, could you please not talk about your
15    testimony to anybody over the break.
16              THE WITNESS:  Yes, your Honor.
17              THE COURT:  Thank you.
18              So we'll have Dr. Hill; then you have another
19    witness.  Is that correct?
20              MR. REED:  Correct.  We want to get the
21    HarperCollins CEO in in the morning, if we can.  So we'll
22    have to maybe take a pause in this and do that.
23              THE COURT:  That's fine.
24              And then you'll be done?  You're still on track?
25              MR. REED:  There's the one video of Ms. Fletcher,
```

Hill - DIRECT - By Mr. Stevenson

1332

1    the agent.  Then we'll be done.

2            THE COURT:  But you think you're on track to be

3    done tomorrow?

4            MR. REED:  I think so.

5            THE COURT:  That's great.  Thank you.

6            So we'll break for the day.  Thank you very much.

7    We'll resume tomorrow at 9:30.

8            (Proceedings concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        <u>**CERTIFICATE**</u>

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10                   Dated this 8th day of August, 2022.

11

12               <u>/s/ Lisa Edwards, RDR, CRR</u>
                 Official Court Reporter
13               United States District Court for the
                   District of Columbia
14               333 Constitution Avenue, Northwest
                 Washington, D.C. 20001
15               (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 1297:10
**$100,000** [1] - 1304:9
**$105,000** [1] - 1312:20
**$15** [1] - 1297:11
**$250,000** [5] - 1232:21, 1233:3, 1236:20, 1237:22, 1306:8
**$44,000** [1] - 1312:18
**$5,000** [2] - 1306:13, 1307:6
**$500,000** [4] - 1271:7, 1284:16, 1306:8, 1307:2
**$6.95** [1] - 1327:25
**$60,000** [1] - 1314:18
**$7** [1] - 1327:25

## /

**/s** [1] - 1333:12

## 0

**0959** [4] - 1217:11, 1253:8, 1253:12
**0960** [4] - 1217:11, 1255:2, 1255:6
**0963** [4] - 1217:9, 1235:23, 1235:24, 1236:3
**0964** [1] - 1321:11
**0969** [4] - 1217:10, 1249:14, 1249:15, 1249:19
**0970** [4] - 1217:12, 1288:13, 1288:14, 1288:18
**0972** [4] - 1217:10, 1237:10, 1237:14

## 1

**1** [5] - 1237:5, 1245:25, 1248:19, 1249:4, 1254:20
**1,000** [1] - 1330:5
**1.5** [3] - 1270:24, 1271:11, 1271:25
**10** [8] - 1234:6, 1235:14, 1246:13, 1247:10, 1248:6, 1248:14, 1248:25, 1249:4

**10,000** [2] - 1256:4, 1256:9
**100** [4] - 1220:22, 1238:25, 1256:3, 1310:11
**10022** [1] - 1216:4
**101** [1] - 1310:12
**11.5** [1] - 1312:14
**12** [1] - 1254:6
**1200** [1] - 1285:8
**1219** [1] - 1217:5
**1236** [1] - 1217:9
**1237** [1] - 1217:10
**1249** [1] - 1217:10
**1253** [1] - 1217:11
**1255** [1] - 1217:11
**1288** [1] - 1217:12
**1321** [1] - 1217:12
**140,000** [1] - 1314:20
**15** [2] - 1232:6, 1314:20
**15-minute** [1] - 1280:3
**150,000** [5] - 1254:19, 1258:19, 1259:9, 1315:10, 1315:13
**1745** [1] - 1272:5
**19** [2] - 1281:6, 1281:12
**1999** [1] - 1215:23

## 2

**2,220** [1] - 1259:10
**2.25** [1] - 1271:2
**2.5** [1] - 1271:6
**2.75** [1] - 1271:5
**20** [7] - 1276:14, 1280:24, 1286:1, 1286:10, 1294:5, 1304:7, 1304:21
**200** [5] - 1256:21, 1257:16, 1257:17, 1257:20, 1258:6
**20001** [2] - 1216:11, 1333:14
**20004** [1] - 1216:6
**2019** [5] - 1251:25, 1252:2, 1258:3, 1258:22, 1267:18
**202** [2] - 1216:11, 1333:15
**2020** [3] - 1258:22, 1265:23, 1284:13
**2021** [5] - 1251:25, 1252:1, 1252:3, 1258:3, 1258:23
**2022** [2] - 1215:7,

1333:10
**20530** [1] - 1215:19
**21-02886** [1] - 1215:4
**22** [3] - 1291:19, 1292:4, 1294:13
**25** [3] - 1266:4, 1282:22, 1297:12
**250,000** [17] - 1233:5, 1233:8, 1233:10, 1233:19, 1237:4, 1238:16, 1238:20, 1243:14, 1244:5, 1254:15, 1258:19, 1259:10, 1272:2, 1284:21, 1306:9, 1306:10, 1315:13
**2500** [4] - 1256:11, 1256:22, 1257:15, 1258:5
**275,000** [1] - 1272:1
**285** [1] - 1285:2
**2:03** [1] - 1215:7

## 3

**3** [4] - 1270:25, 1271:3, 1271:11, 1271:14
**3,111** [1] - 1259:12
**30** [2] - 1235:1, 1313:10
**300** [1] - 1272:6
**3100** [1] - 1254:8
**333** [2] - 1216:10, 1333:14
**350,000** [4] - 1254:19, 1258:19, 1259:9, 1315:11
**354-3269** [2] - 1216:11, 1333:15
**37** [1] - 1254:5
**3:30** [1] - 1280:2

## 4

**4** [2] - 1312:12, 1331:1
**40** [2] - 1276:16, 1331:10
**400** [1] - 1272:6
**401** [1] - 1216:6
**42** [1] - 1294:8
**45** [1] - 1235:15
**450** [1] - 1215:18
**495** [1] - 1306:12
**495,000** [1] - 1307:5

## 5

**5** [21] - 1226:20, 1226:22, 1227:5, 1227:9, 1231:25, 1234:6, 1235:13, 1235:15, 1235:18, 1236:7, 1253:3, 1253:4, 1254:1, 1254:14, 1254:23, 1274:25, 1275:1, 1326:19, 1329:20, 1330:8, 1330:25
**50** [1] - 1267:5
**500** [1] - 1272:8
**500,000** [7] - 1254:20, 1258:20, 1259:9, 1267:1, 1284:14, 1284:21, 1306:10
**55** [1] - 1286:12
**599** [1] - 1216:3

## 6

**6** [1] - 1314:17
**60** [4] - 1251:14, 1280:25, 1281:16, 1282:24
**650,000** [5] - 1266:1, 1266:5, 1266:13, 1266:15, 1266:18
**6706** [1] - 1216:10

## 7

**7** [2] - 1326:21
**70** [1] - 1239:23
**703** [1] - 1222:12
**705** [1] - 1222:12
**75** [2] - 1248:8, 1248:9, 1249:3
**750** [1] - 1272:8
**750,000** [1] - 1267:4

## 8

**8** [1] - 1215:7
**825,000** [3] - 1266:2, 1266:6, 1266:17
**85** [1] - 1240:3
**891** [1] - 1259:11
**8th** [1] - 1333:10

## 9

**90** [2] - 1247:9, 1247:11
**900** [1] - 1258:6
**90067** [1] - 1215:24
**95** [1] - 1292:8
**964** [3] - 1217:12, 1321:11, 1321:15
**9:30** [2] - 1331:13, 1332:7

## A

**ability** [6] - 1230:10, 1307:22, 1327:13, 1329:15, 1330:19, 1333:7
**able** [13] - 1229:8, 1229:18, 1229:25, 1230:2, 1247:1, 1284:23, 1285:15, 1286:23, 1286:25, 1309:2, 1327:14, 1328:1, 1329:14
**absolutely** [1] - 1238:25
**academic** [1] - 1219:6
**accepted** [4] - 1266:2, 1270:21, 1271:8, 1272:1
**accommodating** [2] - 1327:4, 1327:20
**accomplishing** [1] - 1225:20
**according** [10] - 1256:9, 1275:16, 1276:7, 1276:20, 1276:21, 1277:15, 1278:7, 1278:14, 1279:22, 1305:12
**accurate** [1] - 1333:4
**acquire** [1] - 1310:9
**acquired** [3] - 1252:11, 1322:17, 1322:21
**acquisition** [6] - 1223:25, 1225:2, 1265:2, 1265:6, 1273:11, 1303:5
**acquisitions** [2] - 1298:15, 1321:7
**acronym** [1] - 1316:10
**Action** [1] - 1215:3
**action** [1] - 1221:19
**actively** [1] - 1252:14

1335

**actual** [16] - 1236:19, 1236:24, 1246:1, 1246:6, 1246:21, 1247:24, 1248:13, 1248:20, 1249:3, 1250:6, 1307:24, 1308:3, 1309:8, 1311:11, 1325:12

**add** [3] - 1255:25, 1256:8, 1310:7

**adding** [1] - 1310:12

**addition** [2] - 1244:13, 1325:17

**additional** [11] - 1233:13, 1266:17, 1266:21, 1284:19, 1307:22, 1310:6, 1310:7, 1310:8, 1310:24, 1310:25

**address** [1] - 1272:6

**addressing** [2] - 1244:11, 1322:16

**adhering** [1] - 1327:14

**admit** [8] - 1222:20, 1235:23, 1237:10, 1249:14, 1249:15, 1253:8, 1255:2, 1321:11

**admitted** [8] - 1222:25, 1236:2, 1237:13, 1249:18, 1253:11, 1255:5, 1288:17, 1321:14

**adult** [1] - 1267:19

**advance** [94] - 1224:4, 1224:9, 1224:24, 1225:14, 1226:24, 1227:18, 1228:20, 1230:22, 1232:14, 1232:21, 1232:22, 1233:8, 1234:1, 1236:17, 1239:20, 1239:24, 1240:5, 1240:6, 1240:9, 1240:12, 1243:14, 1245:15, 1248:1, 1252:18, 1253:23, 1254:9, 1257:1, 1258:13, 1258:14, 1258:16, 1258:17, 1259:4, 1259:25, 1260:16, 1261:25, 1262:8, 1262:11, 1264:4, 1265:4, 1265:19, 1266:5, 1266:20, 1267:4, 1267:5, 1270:16, 1271:11, 1271:22, 1272:19,

1274:16, 1276:10, 1280:21, 1282:19, 1284:13, 1284:20, 1286:8, 1286:25, 1290:19, 1290:22, 1291:2, 1291:12, 1291:25, 1292:3, 1293:2, 1293:11, 1297:2, 1297:4, 1297:6, 1300:2, 1300:5, 1301:5, 1303:12, 1304:1, 1304:4, 1304:7, 1304:10, 1305:7, 1306:14, 1306:25, 1307:3, 1307:4, 1307:9, 1310:21, 1312:9, 1312:19, 1314:13, 1315:7, 1315:13, 1316:19, 1318:3, 1319:10, 1320:12, 1326:5, 1328:13, 1329:7

**advances** [32] - 1227:3, 1232:24, 1239:25, 1240:1, 1241:20, 1242:11, 1242:15, 1242:17, 1245:6, 1245:11, 1245:24, 1246:3, 1246:12, 1248:6, 1248:11, 1248:25, 1251:13, 1271:17, 1274:20, 1284:15, 1312:11, 1312:14, 1313:17, 1313:21, 1313:22, 1314:3, 1314:6, 1314:9, 1314:20, 1315:15, 1319:25

**advantageous** [1] - 1317:24

**advantages** [1] - 1236:9

**adverse** [1] - 1262:13

**Aetna** [1] - 1220:13

**affect** [4] - 1261:20, 1268:23, 1272:15, 1318:14

**affected** [2] - 1296:21, 1303:2

**afternoon** [12] - 1215:8, 1218:1, 1218:2, 1218:10, 1218:13, 1218:14, 1218:15, 1219:2, 1245:2, 1280:11, 1280:12, 1280:13

**agencies** [2] -

1289:1, 1328:24

**agency** [16] - 1289:2, 1290:23, 1291:12, 1292:10, 1293:6, 1293:18, 1294:12, 1294:16, 1304:12, 1318:24, 1319:19, 1320:6, 1320:24, 1324:2, 1324:4, 1324:5

**agent** [9] - 1268:1, 1270:25, 1271:2, 1271:5, 1271:13, 1271:25, 1272:11, 1317:23, 1332:1

**agents** [9] - 1260:18, 1261:11, 1261:13, 1261:16, 1285:11, 1292:14, 1292:16, 1292:17

**agents'** [1] - 1290:16

**aggregate** [10] - 1244:25, 1245:14, 1245:16, 1296:8, 1296:19, 1298:2, 1298:24, 1299:10, 1316:1, 1317:17

**aggressive** [3] - 1268:3, 1269:21, 1301:14

**aggressively** [10] - 1260:10, 1261:13, 1268:5, 1268:8, 1269:19, 1269:23, 1270:10, 1302:6, 1327:3, 1327:5

**ago** [1] - 1313:2

**agree** [7] - 1222:17, 1232:9, 1237:24, 1250:9, 1295:5, 1300:11, 1315:23

**agreed** [1] - 1327:24

**agreement** [5] - 1326:21, 1327:10, 1329:15, 1329:16, 1331:4

**ahead** [3] - 1253:20, 1287:13, 1301:10

**aids** [1] - 1329:23

**aimed** [1] - 1231:14

**airlines** [1] - 1220:25

**al** [1] - 1215:7

**allocate** [1] - 1296:1

**allocation** [2] - 1326:18, 1326:22

**almost** [1] - 1280:2

**already-paid** [1] - 1310:18

**alteration** [1] - 1288:13

**altering** [1] - 1268:22

**alternative** [4] - 1228:3, 1254:7, 1275:3, 1288:21

**alternatives** [1] - 1250:25

**AMERICA** [1] - 1215:3

**amount** [12] - 1230:22, 1238:8, 1241:21, 1262:11, 1267:4, 1284:13, 1290:25, 1291:21, 1291:25, 1301:6, 1301:9, 1307:13

**amounts** [2] - 1284:20, 1292:3

**analyses** [1] - 1233:18

**analysis** [22] - 1221:4, 1224:10, 1224:13, 1225:11, 1225:13, 1227:11, 1232:17, 1232:19, 1240:1, 1240:14, 1240:18, 1244:23, 1250:21, 1251:4, 1259:3, 1259:15, 1263:8, 1295:15, 1309:6, 1316:2, 1316:5, 1324:20

**analyze** [5] - 1225:18, 1231:6, 1243:20, 1244:10, 1316:6

**analyzed** [2] - 1220:20, 1220:23

**analyzing** [3] - 1228:13, 1236:11, 1239:16

**Angeles** [1] - 1215:24

**another's** [1] - 1327:3

**answer** [9] - 1227:6, 1233:20, 1239:1, 1243:6, 1248:18, 1276:14, 1281:11, 1317:4

**answers** [1] - 1322:6

**anticipated** [70] - 1225:2, 1226:3, 1226:5, 1226:6, 1226:8, 1226:18, 1227:14, 1228:10, 1228:15, 1228:16, 1228:17, 1229:21, 1230:21, 1230:24, 1231:7, 1231:12, 1231:13, 1231:18,

1232:13, 1232:23, 1233:15, 1233:22, 1234:3, 1234:4, 1234:6, 1235:13, 1235:14, 1235:19, 1235:20, 1236:6, 1237:5, 1237:7, 1239:2, 1239:4, 1239:13, 1239:21, 1239:23, 1239:24, 1240:2, 1241:9, 1241:18, 1243:18, 1244:19, 1249:25, 1250:4, 1250:7, 1250:17, 1250:24, 1251:2, 1251:13, 1251:17, 1251:20, 1252:23, 1254:16, 1258:13, 1258:18, 1259:7, 1287:1, 1289:24, 1291:1, 1291:3, 1296:14, 1304:3, 1304:6, 1304:8, 1315:8, 1330:6

**anticompetitive** [4] - 1225:9, 1260:22, 1260:25, 1262:22

**antitrust** [12] - 1219:17, 1219:22, 1220:2, 1220:4, 1220:18, 1221:19, 1225:13, 1232:17, 1240:18, 1255:20, 1277:6, 1295:25

**ANTITRUST** [1] - 1215:18

**anyway** [1] - 1268:12

**apart** [1] - 1304:21

**apologies** [3] - 1219:12, 1235:5, 1235:7

**apologize** [5] - 1230:5, 1242:1, 1253:21, 1290:14, 1304:12

**appeal** [2] - 1230:5, 1230:6

**appear** [2] - 1289:25, 1330:10

**APPEARANCES** [1] - 1216:1

**aPPEARANCES** [1] - 1215:14

**appearing** [1] - 1287:18

**applies** [1] - 1301:23

**approach** [14] - 1245:18, 1250:15, 1277:6, 1277:16,

1336

1287:16, 1288:24, 1289:22, 1315:16, 1317:12, 1317:19, 1317:22, 1319:4, 1321:5, 1324:12

**approval** [1] - 1233:11

**approved** [1] - 1257:11

**arbitrage** [7] - 1229:15, 1230:7, 1230:8, 1230:9, 1230:13, 1230:22, 1231:4

**arbitrary** [4] - 1237:23, 1238:16, 1238:17, 1238:18

**Arch/Peabody** [1] - 1221:21

**area** [6] - 1225:21, 1225:24, 1226:2, 1228:8, 1257:20, 1266:25

**areas** [1] - 1252:14

**argue** [1] - 1282:4

**argued** [1] - 1249:24

**argument** [1] - 1250:9

**arguments** [1] - 1249:22

**arising** [1] - 1328:7

**arrive** [2] - 1233:3, 1262:18

**arrow** [1] - 1270:20

**assess** [2] - 1244:17, 1316:2

**assignment** [4] - 1223:24, 1224:3, 1224:6, 1224:8

**assist** [1] - 1222:1

**associated** [1] - 1305:25

**assume** [1] - 1278:18

**assumes** [3] - 1299:10, 1314:23, 1322:18

**assuming** [3] - 1247:3, 1314:25, 1322:24

**assumption** [3] - 1277:9, 1279:4, 1322:21

**assumptions** [3] - 1298:6, 1298:10, 1315:25

**attempt** [4] - 1259:20, 1263:1, 1283:2, 1316:14

**attempted** [2] -

---

1284:12, 1285:3

**attempting** [2] - 1230:8, 1230:9

**attempts** [1] - 1323:25

**attorney** [1] - 1220:14

**attractive** [4] - 1276:22, 1277:11, 1297:1, 1297:2

**attractiveness** [1] - 1297:5

**auction** [54] - 1266:23, 1267:18, 1267:24, 1269:1, 1275:22, 1295:22, 1296:7, 1296:15, 1296:17, 1296:18, 1296:22, 1297:9, 1297:18, 1298:15, 1300:1, 1300:9, 1300:21, 1300:25, 1301:3, 1302:2, 1302:12, 1302:24, 1303:1, 1305:5, 1309:20, 1312:22, 1314:22, 1315:21, 1316:25, 1317:1, 1317:11, 1317:12, 1318:5, 1318:8, 1318:10, 1318:18, 1319:14, 1319:20, 1319:25, 1320:5, 1320:8, 1320:16, 1320:20, 1320:23, 1321:5, 1322:16, 1322:18, 1322:22, 1323:4, 1323:19, 1323:22, 1324:10, 1325:6

**auction's** [1] - 1330:18

**auctions** [39] - 1265:7, 1265:8, 1265:9, 1265:15, 1265:16, 1265:17, 1266:9, 1266:19, 1267:8, 1267:13, 1267:14, 1267:18, 1270:4, 1296:1, 1296:4, 1297:8, 1297:21, 1297:23, 1298:12, 1298:17, 1298:18, 1299:5, 1300:12, 1301:23, 1301:25, 1302:19, 1303:24, 1309:25, 1315:22, 1317:3, 1323:5, 1323:6, 1323:7, 1323:15,

---

1323:18, 1323:20

**audience** [2] - 1230:5, 1230:6

**August** [2] - 1215:7, 1333:10

**author** [31] - 1226:15, 1226:16, 1227:25, 1230:16, 1247:11, 1247:21, 1247:22, 1247:23, 1248:17, 1260:18, 1262:11, 1265:11, 1266:4, 1266:5, 1266:11, 1271:8, 1274:21, 1276:12, 1276:24, 1276:25, 1277:1, 1277:2, 1296:24, 1299:22, 1299:23, 1300:7, 1307:9, 1310:22, 1314:16

**author's** [1] - 1274:20

**authors** [75] - 1226:10, 1227:14, 1228:1, 1228:2, 1229:20, 1229:21, 1229:24, 1231:3, 1231:7, 1231:9, 1231:13, 1231:18, 1231:19, 1231:20, 1232:8, 1233:22, 1233:23, 1234:3, 1235:20, 1235:21, 1236:6, 1236:8, 1238:5, 1238:12, 1239:5, 1239:6, 1240:6, 1241:7, 1241:18, 1241:24, 1242:13, 1242:16, 1242:20, 1242:23, 1243:5, 1243:17, 1243:21, 1243:25, 1244:18, 1244:21, 1245:6, 1245:8, 1245:12, 1248:9, 1256:14, 1261:18, 1262:13, 1265:13, 1271:18, 1272:14, 1272:15, 1272:16, 1272:17, 1272:24, 1273:3, 1274:24, 1276:13, 1276:16, 1276:23, 1299:17, 1299:20, 1302:22, 1303:1, 1303:4, 1303:8, 1312:12, 1312:14, 1312:25, 1315:12, 1315:14, 1319:16, 1330:20

---

**available** [4] - 1239:22, 1285:11, 1296:3, 1330:16

**Avenue** [4] - 1215:23, 1216:3, 1216:10, 1333:14

**average** [23] - 1290:6, 1290:9, 1290:25, 1291:3, 1291:20, 1291:25, 1292:3, 1300:16, 1300:17, 1303:3, 1303:21, 1304:4, 1304:23, 1305:14, 1305:20, 1308:7, 1308:13, 1308:15, 1312:11, 1312:15, 1313:14, 1314:16, 1319:15

**avoid** [2] - 1230:10, 1231:3

**award** [1] - 1220:14

**awards** [1] - 1220:9

**aware** [2] - 1221:1, 1251:19

**axis** [2] - 1257:6, 1257:9

---

# B

**baby** [1] - 1229:6

**back-and-forth** [1] - 1266:3

**balance** [2] - 1279:19, 1279:21

**balanced** [1] - 1269:12

**bar** [2] - 1253:5, 1254:12

**bars** [6] - 1253:3, 1253:4, 1293:15, 1319:17, 1319:18, 1319:20

**based** [12] - 1251:16, 1267:25, 1284:7, 1293:24, 1294:9, 1295:10, 1297:4, 1304:10, 1306:21, 1317:22, 1318:24, 1324:8

**baseline** [1] - 1272:6, 1314:21, 1317:9

**basic** [1] - 1239:11

**basis** [3] - 1238:2, 1238:6, 1328:25

**basketball** [2] - 1290:7, 1290:9

**Bates** [3] - 1219:25,

---

1220:15, 1220:19

**bear** [1] - 1310:25

**beat** [1] - 1302:12

**beauty** [1] - 1264:15

**beer** [3] - 1279:8, 1279:9, 1279:13

**beers** [3] - 1279:10, 1279:11

**BEFORE** [1] - 1215:11

**begin** [1] - 1227:21

**behalf** [5] - 1221:18, 1221:21, 1221:22, 1221:23, 1316:8

**behavior** [1] - 1268:13

**behind** [1] - 1282:25

**belabor** [1] - 1309:7

**believes** [1] - 1237:23

**below** [2] - 1248:21, 1254:19

**BENCH** [1] - 1215:11

**benefit** [3] - 1254:3, 1266:17, 1312:16

**benefits** [1] - 1272:18

**BERTELSMANN** [2] - 1215:6, 1215:21

**best** [35] - 1228:3, 1230:19, 1265:8, 1267:13, 1267:14, 1267:17, 1267:19, 1268:11, 1269:1, 1270:6, 1274:20, 1275:3, 1289:23, 1297:5, 1297:15, 1301:3, 1301:24, 1302:2, 1302:12, 1303:15, 1303:21, 1303:22, 1303:24, 1317:10, 1320:10, 1320:15, 1323:15, 1323:18, 1323:19, 1323:20, 1324:14, 1333:7

**bestsellers** [1] - 1231:24

**better** [7] - 1271:16, 1272:16, 1290:13, 1290:14, 1321:25, 1326:20, 1327:3

**between** [36] - 1229:24, 1241:22, 1260:5, 1261:17, 1261:23, 1262:10, 1263:3, 1263:14, 1264:24, 1266:3, 1268:2, 1268:17, 1269:10, 1270:8,

1273:5, 1273:9, 1273:20, 1274:6, 1274:10, 1274:11, 1278:3, 1278:5, 1294:10, 1298:1, 1300:18, 1303:17, 1303:21, 1303:23, 1304:5, 1304:14, 1306:4, 1307:12, 1315:2, 1315:5, 1315:13, 1321:21

**bid** [58] - 1236:22, 1265:7, 1265:8, 1266:25, 1267:1, 1267:3, 1267:13, 1267:14, 1267:18, 1267:19, 1268:5, 1268:7, 1268:11, 1269:1, 1269:5, 1269:7, 1269:11, 1269:18, 1269:19, 1269:22, 1270:10, 1286:20, 1286:22, 1287:2, 1287:8, 1289:4, 1290:17, 1297:1, 1297:3, 1297:5, 1299:13, 1299:15, 1300:4, 1301:5, 1301:6, 1301:7, 1301:8, 1301:14, 1302:6, 1303:12, 1303:13, 1304:5, 1304:22, 1306:21, 1306:24, 1308:24, 1308:25, 1320:11, 1323:11, 1323:15, 1323:18, 1323:22

**bid-type** [1] - 1323:18

**bidder** [15] - 1283:21, 1297:7, 1297:15, 1299:23, 1300:1, 1300:2, 1300:6, 1301:1, 1303:15, 1303:16, 1303:18, 1303:21, 1303:22, 1304:21, 1305:2

**bidders** [10] - 1266:10, 1268:1, 1268:3, 1300:7, 1302:24, 1303:24, 1304:14, 1305:12, 1306:23, 1307:12

**bidding** [16] - 1236:25, 1267:22, 1268:4, 1269:13, 1270:1, 1270:5, 1288:25, 1289:4,

1297:11, 1301:12, 1301:25, 1306:19, 1307:12, 1319:13, 1319:22

**bids** [22] - 1268:22, 1270:6, 1296:4, 1296:25, 1301:3, 1301:4, 1301:24, 1302:2, 1303:13, 1303:14, 1305:20, 1305:21, 1305:25, 1306:1, 1306:2, 1306:5, 1306:20, 1317:11, 1320:15, 1323:19, 1323:20, 1324:14

**bids-type** [2] - 1317:11, 1320:15

**big** [5] - 1239:13, 1301:21, 1303:16, 1303:17, 1308:4

**Big** [21] - 1226:20, 1226:22, 1227:5, 1227:9, 1231:25, 1234:6, 1235:13, 1235:15, 1235:18, 1236:7, 1253:3, 1253:4, 1254:1, 1254:14, 1254:23, 1274:25, 1275:1, 1329:20, 1330:8, 1330:25, 1331:1

**bigger** [1] - 1294:18

**billion** [2] - 1239:14, 1269:5

**binder** [2] - 1223:5, 1223:7

**binders** [2] - 1218:16, 1218:21

**biography** [1] - 1266:24

**bit** [6] - 1238:9, 1238:13, 1254:23, 1257:5, 1290:20, 1308:2

**blue** [11] - 1248:13, 1248:15, 1253:1, 1258:2, 1258:22, 1259:7, 1270:19, 1270:24, 1290:23, 1293:6, 1319:17

**boiled** [1] - 1232:1

**bonus** [1] - 1271:7

**book** [46] - 1226:6, 1226:11, 1226:14, 1226:16, 1230:1, 1230:3, 1230:4, 1230:16, 1230:18, 1232:1, 1232:6, 1236:19, 1252:11,

1269:2, 1269:14, 1270:25, 1271:7, 1272:5, 1273:1, 1287:2, 1287:17, 1296:24, 1296:25, 1303:14, 1303:24, 1304:18, 1306:7, 1306:8, 1306:9, 1307:1, 1307:6, 1307:7, 1307:17, 1308:7, 1310:6, 1310:7, 1310:12, 1310:13, 1310:15, 1310:21, 1312:19, 1312:20, 1314:18

**books** [44] - 1227:3, 1227:8, 1228:16, 1231:13, 1231:18, 1232:4, 1232:17, 1232:20, 1233:1, 1233:2, 1233:12, 1234:3, 1239:3, 1239:5, 1242:19, 1242:22, 1243:13, 1243:14, 1243:16, 1243:24, 1251:14, 1271:4, 1283:25, 1284:2, 1284:11, 1284:15, 1284:25, 1285:4, 1285:13, 1285:15, 1285:25, 1286:17, 1286:18, 1286:19, 1286:20, 1310:11, 1310:18, 1312:21, 1321:7, 1322:17, 1322:20, 1322:23, 1329:12

**bottom** [4] - 1227:20, 1229:15, 1254:2, 1272:25

**box** [5] - 1245:21, 1255:15, 1256:17, 1265:24, 1266:2

**boxes** [1] - 1229:14

**break** [8] - 1275:25, 1279:25, 1280:3, 1280:7, 1331:8, 1331:12, 1331:15, 1332:6

**breakdown** [2] - 1313:14, 1313:15

**brevity** [1] - 1255:22

**brewers** [1] - 1278:10

**brief** [2] - 1263:6, 1324:22

**briefly** [3] - 1274:14, 1288:24, 1315:19

**bring** [2] - 1310:8, 1310:13

**bringing** [1] - 1267:24

**broad** [6] - 1230:5, 1230:6, 1231:14, 1233:2, 1262:20, 1279:5

**broader** [3] - 1300:15, 1303:6, 1324:17

**broadly** [6] - 1293:8, 1294:2, 1296:19, 1297:24, 1315:11, 1324:11

**Broadway** [1] - 1272:5

**bucket** [3] - 1237:3, 1261:14, 1262:20

**buckets** [4] - 1224:19, 1237:4, 1262:20, 1325:23

**Bud** [1] - 1278:17

**bunch** [1] - 1276:16

**bureau** [1] - 1219:20

**business** [1] - 1327:4

**buying** [1] - 1308:12

**BY** [34] - 1216:8, 1219:1, 1219:13, 1222:3, 1223:20, 1232:12, 1236:5, 1237:16, 1239:9, 1241:2, 1242:3, 1244:16, 1249:21, 1252:5, 1253:14, 1255:8, 1277:5, 1279:15, 1280:16, 1281:18, 1283:22, 1287:12, 1288:20, 1289:21, 1292:22, 1299:7, 1302:20, 1305:3, 1309:18, 1311:6, 1313:1, 1313:16, 1319:7, 1325:19

**C**

**calculate** [19] - 1246:10, 1246:21, 1247:1, 1251:6, 1251:7, 1251:12, 1252:7, 1255:24, 1258:4, 1275:15, 1277:20, 1279:23, 1280:18, 1286:4, 1294:13, 1310:3, 1311:7, 1313:3, 1313:5

**calculated** [5] - 1247:4, 1251:5,

1251:15, 1258:8, 1311:15

**calculating** [5] - 1251:9, 1259:13, 1278:21, 1284:7, 1311:3

**calculation** [9] - 1276:9, 1280:19, 1282:15, 1282:18, 1286:7, 1293:9, 1318:20, 1318:25, 1319:2

**calculations** [8] - 1252:17, 1253:16, 1254:8, 1256:25, 1276:2, 1288:7, 1289:8, 1292:25

**California** [1] - 1215:24

**candidate** [3] - 1239:10, 1240:15, 1240:16

**car** [1] - 1278:5

**careful** [2] - 1235:10, 1252:19

**carmaker** [1] - 1278:4

**carried** [1] - 1224:10

**carry** [1] - 1224:8

**cars** [2] - 1278:3, 1278:21

**case** [24] - 1230:19, 1230:20, 1231:23, 1233:14, 1237:19, 1243:25, 1248:20, 1251:12, 1252:15, 1255:19, 1261:10, 1270:3, 1273:25, 1275:6, 1279:16, 1291:13, 1295:21, 1308:5, 1311:8, 1313:21, 1315:17, 1316:15, 1327:23, 1328:20

**cases** [2] - 1239:19, 1299:25

**categories** [1] - 1285:17

**categorize** [1] - 1311:19

**category** [4] - 1227:22, 1285:18, 1311:22, 1311:25

**causes** [1] - 1256:17

**celebrity** [1] - 1226:14

**CEO** [1] - 1331:21

**CEO's** [1] - 1310:16

**certain** [8] - 1227:4, 1230:9, 1239:1,

1338

1247:18, 1256:13, 1271:14, 1272:11, 1323:10
**certainly** [1] - 1220:21
**CERTIFICATE** [1] - 1333:1
**certify** [1] - 1333:4
**challenge** [2] - 1232:17, 1290:18
**challenges** [1] - 1294:25
**challenging** [2] - 1225:19, 1330:9
**chambers** [1] - 1223:6
**chance** [4] - 1247:11, 1269:17, 1272:17, 1329:16
**change** [11] - 1230:8, 1233:19, 1238:7, 1238:13, 1255:17, 1257:7, 1268:13, 1301:9, 1314:8, 1316:14, 1316:16
**changed** [1] - 1296:10
**changes** [3] - 1249:14, 1299:12, 1314:6
**characteristic** [1] - 1232:23
**charge** [3] - 1326:20, 1326:21, 1327:25
**charging** [1] - 1326:19
**chart** [2] - 1259:6, 1304:19
**cheat** [2] - 1327:24, 1328:1
**check** [1] - 1250:14
**chemicals** [1] - 1220:25
**chief** [1] - 1316:13
**choices** [1] - 1235:21
**choosing** [1] - 1278:5
**chosen** [1] - 1244:3
**circles** [1] - 1258:19
**circumstances** [2] - 1323:10, 1323:14
**Civil** [1] - 1215:3
**claims** [1] - 1316:3
**clarification** [1] - 1223:14
**clarify** [1] - 1296:13
**class** [1] - 1285:25
**classified** [1] - 1230:20

**classify** [1] - 1285:20
**clear** [5] - 1228:15, 1242:4, 1292:1, 1292:2, 1292:9
**clientele** [1] - 1261:12
**close** [11] - 1230:2, 1256:7, 1277:13, 1278:12, 1290:16, 1303:13, 1305:2, 1305:19, 1305:21, 1306:5, 1306:23
**close-to-finished** [1] - 1230:2
**closely** [2] - 1279:12, 1309:14
**closer** [2] - 1277:14, 1306:20
**closer-than-expected** [1] - 1277:14
**closest** [3] - 1283:21, 1300:7, 1303:18
**clustered** [1] - 1306:2
**CO** [1] - 1215:6
**coding** [1] - 1254:13
**colleagues** [1] - 1295:24
**collected** [2] - 1246:11, 1251:15
**collective** [1] - 1228:7
**collectively** [3] - 1228:5, 1260:9, 1321:10
**color** [1] - 1254:12
**COLUMBIA** [1] - 1215:1
**Columbia** [2] - 1216:9, 1333:13
**column** [4] - 1248:7, 1248:13, 1259:7, 1264:6
**columns** [2] - 1248:15, 1259:8
**combination** [2] - 1242:6, 1265:10
**combined** [2] - 1252:24, 1254:2
**comfortable** [1] - 1269:13
**comfortably** [1] - 1249:5
**coming** [3] - 1222:13, 1223:15, 1309:13
**commerce** [1] - 1239:15
**Commission** [1] -

1219:19
**common** [9] - 1228:18, 1255:21, 1277:6, 1277:10, 1282:8, 1284:8, 1302:14, 1327:10, 1328:2
**commonly** [3] - 1228:23, 1281:19, 1281:21
**compare** [9] - 1247:24, 1251:21, 1252:6, 1266:16, 1293:1, 1293:10, 1318:8, 1325:8, 1325:12
**compared** [5] - 1227:25, 1229:7, 1243:8, 1266:17, 1306:19
**compensation** [1] - 1240:7
**compete** [24] - 1225:21, 1225:24, 1226:22, 1227:9, 1227:22, 1228:9, 1231:17, 1244:9, 1260:10, 1261:13, 1265:3, 1265:17, 1267:14, 1268:20, 1269:15, 1269:16, 1270:14, 1273:13, 1273:24, 1279:17, 1302:4, 1326:23, 1327:3, 1327:5
**competed** [3] - 1262:7, 1268:18, 1283:21
**competes** [1] - 1226:17
**competing** [12] - 1244:10, 1250:13, 1252:14, 1263:20, 1264:1, 1264:19, 1266:14, 1279:12, 1308:15, 1326:10, 1326:20, 1330:17
**competition** [75] - 1224:7, 1225:7, 1226:19, 1228:13, 1241:18, 1241:20, 1241:22, 1259:21, 1260:5, 1260:6, 1261:17, 1261:20, 1261:23, 1262:10, 1262:12, 1262:17, 1263:2, 1263:10, 1263:11, 1263:12, 1263:13, 1263:22, 1264:13, 1264:24,

1265:1, 1265:6, 1265:23, 1266:8, 1266:16, 1268:5, 1268:6, 1268:7, 1268:16, 1268:19, 1268:23, 1270:8, 1270:9, 1272:18, 1273:2, 1273:5, 1273:8, 1273:10, 1273:12, 1273:19, 1274:6, 1275:4, 1275:12, 1281:9, 1282:14, 1284:24, 1287:22, 1288:5, 1295:20, 1296:9, 1296:10, 1296:12, 1296:21, 1298:23, 1299:2, 1299:6, 1299:12, 1300:14, 1300:15, 1300:18, 1301:18, 1302:3, 1302:4, 1302:6, 1308:8, 1314:5, 1326:2, 1326:8, 1326:24
**competitions** [12] - 1282:6, 1282:10, 1283:11, 1289:2, 1290:15, 1291:19, 1292:2, 1292:10, 1294:19, 1298:3, 1305:1, 1330:17
**competitive** [19] - 1224:20, 1231:9, 1231:11, 1243:19, 1251:11, 1255:13, 1259:17, 1259:19, 1259:20, 1259:23, 1260:13, 1270:10, 1272:9, 1315:22, 1316:21, 1316:23, 1317:3, 1322:25
**competitiveness** [1] - 1270:7
**competitors** [3] - 1244:14, 1262:7, 1323:11
**complete** [5] - 1258:21, 1289:4, 1290:16, 1292:14, 1333:6
**comprehensive** [3] - 1251:18, 1251:19, 1252:8
**concentrated** [5] - 1225:4, 1256:10, 1256:19, 1257:21, 1328:20
**concentration** [23] - 1224:20, 1225:3,

1251:7, 1255:9, 1255:10, 1255:11, 1255:12, 1255:16, 1255:17, 1255:18, 1255:19, 1256:19, 1256:24, 1258:9, 1258:12, 1259:3, 1259:14, 1262:22, 1263:7, 1263:9, 1263:11, 1325:24, 1328:19
**concern** [3] - 1256:13, 1274:12, 1322:15
**conclude** [1] - 1328:25
**concluded** [2] - 1252:10, 1332:8
**concluding** [1] - 1251:2
**conclusions** [10] - 1224:22, 1238:9, 1250:21, 1250:23, 1262:14, 1273:4, 1273:7, 1288:6, 1321:2, 1325:21
**concrete** [1] - 1283:15
**conditions** [5] - 1229:13, 1231:10, 1231:12, 1243:19, 1328:16
**conduct** [4] - 1316:2, 1327:19, 1328:23, 1329:10
**conducted** [1] - 1329:5
**confer** [4] - 1234:12, 1234:13, 1234:14, 1235:4
**conferred** [1] - 1234:23
**confidence** [2] - 1284:23, 1292:8
**confidential** [3] - 1234:8, 1234:20, 1234:25
**confidentiality** [2] - 1235:11, 1252:21
**confused** [1] - 1300:20
**confusion** [1] - 1283:24
**conservative** [5] - 1312:1, 1312:3, 1312:4, 1314:25, 1319:4
**consider** [12] - 1227:11, 1227:12, 1242:13, 1244:17,

1260:12, 1260:15, 1261:1, 1262:18, 1263:18, 1263:24, 1264:22, 1311:2
**considered** [5] - 1250:1, 1259:24, 1262:25, 1273:16, 1273:17
**considering** [1] - 1225:17
**consistent** [11] - 1227:7, 1261:9, 1267:11, 1279:21, 1289:16, 1289:19, 1293:19, 1294:3, 1299:5, 1304:24, 1326:1
**constitutes** [1] - 1333:4
**Constitution** [2] - 1216:10, 1333:14
**constraint** [1] - 1243:8
**Consulting** [1] - 1219:25
**consulting** [1] - 1220:15
**consumers** [2] - 1278:5, 1278:9
**consuming** [1] - 1284:18
**CONT'D** [1] - 1216:1
**contains** [1] - 1291:2
**contemporaneous** [1] - 1252:9
**contest** [2] - 1264:15, 1282:2
**context** [6] - 1229:1, 1241:15, 1242:5, 1276:18, 1298:11, 1308:11
**continue** [1] - 1234:18
**continues** [1] - 1264:11
**contract** [2] - 1252:12, 1291:21
**contracted** [2] - 1290:25, 1291:25
**contracts** [5] - 1304:3, 1304:6, 1304:7, 1304:8
**controlled** [1] - 1243:2
**coordinate** [1] - 1327:16
**coordinated** [14] - 1260:2, 1260:7, 1260:8, 1261:22, 1326:3, 1326:4,

1326:7, 1326:11, 1327:18, 1328:7, 1328:23, 1329:3, 1329:5, 1329:9
**coordinating** [1] - 1327:16
**coordination** [23] - 1260:10, 1326:14, 1326:15, 1326:25, 1327:1, 1327:6, 1327:8, 1327:15, 1327:22, 1327:24, 1328:4, 1328:5, 1328:11, 1328:17, 1329:11, 1329:13, 1329:17, 1329:18, 1330:2, 1330:3, 1330:10, 1330:24
**coordinations** [1] - 1329:23
**copies** [2] - 1226:7, 1310:14
**copy** [1] - 1223:6
**corner** [2] - 1264:10, 1264:15
**correct** [13] - 1223:1, 1223:18, 1279:8, 1281:14, 1287:10, 1298:19, 1307:18, 1308:5, 1315:3, 1319:5, 1320:9, 1331:19, 1331:20
**correctly** [1] - 1322:19
**correlate** [1] - 1306:18
**correlated** [2] - 1232:25, 1310:1
**correlation** [2] - 1268:2, 1306:4
**cosmetic** [1] - 1249:14
**cost** [1] - 1310:25
**costs** [14] - 1310:14, 1310:18, 1310:19, 1310:20, 1311:2, 1311:13, 1311:16, 1311:17, 1311:18, 1311:23, 1311:24, 1311:25, 1314:12
**Counsel** [1] - 1235:4
**counsel** [2] - 1222:11, 1234:14
**counters** [5] - 1270:25, 1271:3, 1271:5, 1271:6, 1272:1
**counting** [1] - 1307:4
**country** [1] - 1326:23
**couple** [4] - 1239:25,

1240:13, 1286:3, 1310:2
**course** [6] - 1218:18, 1220:19, 1222:16, 1223:17, 1236:15, 1247:15
**Court** [10] - 1216:8, 1216:9, 1218:17, 1218:20, 1234:18, 1241:14, 1299:8, 1316:11, 1333:12, 1333:13
**COURT** [110] - 1215:1, 1218:1, 1218:3, 1218:7, 1218:10, 1218:14, 1218:18, 1218:21, 1218:23, 1219:9, 1221:15, 1221:17, 1221:25, 1222:9, 1222:17, 1222:21, 1222:24, 1223:2, 1223:7, 1223:11, 1223:19, 1231:20, 1234:9, 1234:11, 1234:21, 1235:2, 1235:8, 1235:25, 1236:2, 1236:21, 1237:2, 1237:11, 1237:13, 1238:15, 1239:8, 1240:23, 1241:25, 1243:10, 1243:12, 1244:2, 1244:15, 1249:16, 1249:18, 1251:22, 1252:4, 1253:9, 1253:11, 1255:3, 1255:5, 1276:20, 1278:20, 1279:2, 1279:5, 1279:14, 1279:25, 1280:2, 1280:5, 1280:8, 1280:11, 1280:15, 1281:5, 1281:10, 1281:12, 1283:6, 1287:5, 1288:15, 1288:17, 1289:16, 1290:11, 1291:6, 1291:10, 1291:22, 1292:13, 1292:21, 1297:19, 1298:13, 1298:20, 1300:8, 1300:20, 1301:24, 1302:8, 1304:23, 1306:4, 1306:16, 1306:18, 1307:10, 1307:24, 1308:9, 1309:5, 1309:17, 1311:4, 1312:21, 1313:12, 1319:4, 1321:12, 1321:14,

1321:17, 1321:19, 1322:8, 1322:19, 1324:2, 1324:19, 1325:4, 1325:18, 1331:7, 1331:12, 1331:17, 1331:23, 1332:2, 1332:5
**court** [1] - 1221:6
**courtroom** [1] - 1218:8
**cover** [1] - 1240:5
**create** [1] - 1236:22
**creates** [1] - 1307:22
**creating** [1] - 1313:19
**creation** [5] - 1235:23, 1237:10, 1249:14, 1253:8, 1255:2
**creations** [1] - 1321:10
**creator** [1] - 1325:7
**credible** [1] - 1324:8, 1328:24
**crime** [1] - 1232:2
**criteria** [2] - 1230:25, 1284:11
**critical** [9] - 1245:18, 1245:25, 1246:6, 1246:10, 1246:11, 1247:24, 1248:6, 1248:21, 1249:3
**criticism** [3] - 1315:20, 1315:23, 1317:5
**criticisms** [1] - 1315:19
**criticize** [1] - 1315:16
**criticized** [2] - 1316:25, 1324:13
**Cross** [1] - 1217:2
**CRR** [3] - 1216:8, 1333:3, 1333:12
**current** [4] - 1228:3, 1229:5, 1296:9, 1299:11
**customers** [6] - 1228:24, 1228:25, 1229:5, 1229:9, 1278:13
**cutoff** [9] - 1238:3, 1238:4, 1238:11, 1238:15, 1238:20, 1238:24, 1254:15, 1256:9
**cutoffs** [1] - 1238:21
**cuts** [2] - 1258:16, 1258:24

**D**

**D.C** [5] - 1215:6, 1215:19, 1216:6, 1216:11, 1333:14
**DANIEL** [1] - 1215:20
**dashed** [3] - 1257:13, 1257:16
**data** [82] - 1232:18, 1234:2, 1239:22, 1240:3, 1246:24, 1246:25, 1247:2, 1247:13, 1247:14, 1247:15, 1247:20, 1248:16, 1248:17, 1251:13, 1251:18, 1251:21, 1252:1, 1252:6, 1252:8, 1258:2, 1258:3, 1258:9, 1258:16, 1258:21, 1258:24, 1275:5, 1275:8, 1275:14, 1275:17, 1275:19, 1275:21, 1280:17, 1280:18, 1280:20, 1280:24, 1281:19, 1281:23, 1282:3, 1282:5, 1282:8, 1283:12, 1283:18, 1284:13, 1285:6, 1285:11, 1286:4, 1286:25, 1290:16, 1290:22, 1290:23, 1290:24, 1291:2, 1291:12, 1291:13, 1291:20, 1291:25, 1292:2, 1292:18, 1293:6, 1294:12, 1294:16, 1294:17, 1298:16, 1299:2, 1304:4, 1304:11, 1304:12, 1311:9, 1311:14, 1318:24, 1319:19, 1320:6, 1320:25, 1322:20, 1322:22, 1323:20, 1323:21, 1324:2, 1324:4, 1324:5
**Dated** [1] - 1333:10
**deal** [7] - 1233:7, 1233:9, 1242:23, 1261:16, 1269:9, 1304:15
**decided** [1] - 1234:24
**decides** [2] - 1242:14, 1297:15
**decrease** [8] - 1241:25, 1242:2,

1340

1245:23, 1245:24, 1246:12, 1248:11, 1312:11, 1312:13
**decreased** [1] - 1302:3
**default** [1] - 1277:9
**defendants** [3] - 1221:19, 1221:22, 1221:24
**Defendants** [1] - 1215:8
**DEFENDANTS** [2] - 1215:20, 1216:2
**Defendants'** [3] - 1237:18, 1317:7, 1317:14
**defense** [2] - 1221:1, 1252:14
**define** [7] - 1228:18, 1229:11, 1231:5, 1232:13, 1233:15, 1258:13, 1258:18
**defined** [10] - 1232:20, 1240:17, 1241:5, 1243:18, 1246:7, 1249:10, 1250:24, 1251:3, 1251:6, 1315:8
**defining** [3] - 1225:13, 1231:1, 1232:23
**definition** [7] - 1224:19, 1225:10, 1225:20, 1250:21, 1254:16, 1259:7, 1259:10
**degree** [2] - 1219:12, 1282:13
**Delaware** [1] - 1221:12, 1221:23
**delay** [1] - 1235:6
**delve** [1] - 1305:4
**demarcation** [1] - 1244:4
**demographic** [2] - 1232:2
**demonstratives** [2] - 1223:15, 1223:16
**Department** [3] - 1219:16, 1221:24, 1316:13
**DEPARTMENT** [1] - 1215:17
**derived** [1] - 1316:7
**describe** [5] - 1224:12, 1282:25, 1288:24, 1311:1, 1317:6
**described** [2] - 1230:4, 1257:3

**despite** [1] - 1294:20
**detail** [4] - 1227:2, 1289:20, 1311:1, 1322:10
**detailed** [2] - 1253:15, 1259:2
**details** [1] - 1323:8
**detect** [3] - 1327:13, 1328:1, 1329:21
**detection** [1] - 1331:2
**determine** [6] - 1240:17, 1266:10, 1285:10, 1285:13, 1285:16, 1303:7
**develop** [2] - 1233:21, 1233:25
**developed** [5] - 1295:23, 1295:24, 1316:12, 1317:2, 1317:7
**diamonds** [1] - 1258:20
**difference** [7] - 1233:20, 1283:12, 1283:14, 1303:17, 1303:21, 1303:23, 1304:4
**differences** [3] - 1235:16, 1283:10, 1322:14
**different** [52] - 1220:23, 1227:22, 1231:8, 1231:10, 1231:11, 1231:18, 1232:3, 1232:7, 1232:8, 1233:22, 1235:21, 1236:23, 1238:5, 1238:12, 1238:20, 1238:21, 1239:6, 1243:20, 1254:11, 1258:8, 1258:10, 1258:12, 1258:16, 1258:24, 1261:19, 1267:23, 1273:11, 1277:24, 1278:8, 1279:6, 1283:6, 1287:15, 1287:16, 1294:24, 1295:4, 1299:6, 1302:1, 1304:18, 1313:3, 1315:7, 1317:3, 1317:25, 1321:6, 1322:6, 1322:7, 1322:12, 1322:16, 1322:20, 1329:13
**differential** [2] - 1229:15, 1229:16
**differentiated** [1] -

1274:9
**differently** [3] - 1229:19, 1229:20, 1313:5
**difficult** [1] - 1311:18
**Direct** [1] - 1217:2
**direct** [8] - 1227:2, 1227:20, 1311:23, 1314:10, 1314:17, 1314:24, 1315:4, 1319:2
**DIRECT** [1] - 1218:24
**direction** [1] - 1260:22
**directly** [5] - 1220:4, 1227:22, 1263:2, 1269:15, 1273:18
**disagree** [1] - 1322:3
**disagrees** [1] - 1315:20
**disappointed** [1] - 1260:21
**discuss** [5] - 1234:11, 1274:2, 1281:23, 1286:17, 1309:19
**discussed** [6] - 1267:9, 1267:24, 1295:9, 1295:14, 1314:10, 1316:17
**discussing** [4] - 1273:1, 1310:2, 1313:2, 1316:21
**discussion** [1] - 1226:25
**dispersion** [1] - 1307:21
**display** [3] - 1223:4, 1234:18, 1235:9
**displayed** [3] - 1233:6, 1254:12, 1261:6
**dispute** [4] - 1321:21, 1321:24, 1324:19, 1325:3
**dispute's** [1] - 1321:23
**disrupt** [1] - 1330:10
**distance** [1] - 1304:14
**distant** [2] - 1228:14, 1278:8
**distinguished** [1] - 1220:14
**distribute** [1] - 1310:15
**distribution** [5] - 1220:2, 1231:15, 1231:21, 1236:10,

1330:9
**DISTRICT** [3] - 1215:1, 1215:1, 1215:12
**District** [3] - 1216:9, 1216:9, 1333:13
**district** [1] - 1333:13
**disturbed** [1] - 1298:23
**diversion** [99] - 1244:25, 1245:3, 1245:4, 1245:6, 1245:10, 1245:14, 1245:16, 1245:25, 1246:2, 1246:6, 1246:7, 1246:10, 1246:11, 1246:21, 1247:1, 1247:3, 1247:25, 1248:6, 1248:13, 1248:21, 1249:3, 1250:3, 1250:6, 1263:1, 1274:1, 1274:3, 1274:5, 1274:10, 1274:11, 1274:14, 1274:18, 1274:23, 1275:2, 1275:6, 1275:9, 1275:11, 1275:15, 1275:16, 1276:2, 1276:4, 1276:7, 1276:8, 1276:20, 1276:21, 1277:15, 1277:16, 1277:21, 1278:7, 1279:21, 1280:18, 1280:19, 1280:23, 1281:20, 1281:24, 1282:1, 1282:15, 1282:17, 1282:23, 1284:7, 1284:9, 1285:21, 1285:22, 1286:4, 1286:10, 1286:24, 1288:7, 1288:9, 1288:22, 1289:7, 1289:11, 1289:14, 1292:25, 1293:4, 1293:9, 1293:21, 1293:22, 1294:14, 1294:23, 1295:5, 1295:10, 1295:14, 1298:1, 1298:8, 1305:12, 1305:16, 1318:6, 1318:11, 1318:12, 1318:14, 1318:15, 1318:20, 1318:23, 1319:18, 1319:19, 1320:3, 1320:6, 1320:22, 1325:25
**diversion's** [3] -

1278:13, 1278:17, 1286:12
**diversions** [7] - 1247:24, 1248:20, 1249:4, 1275:18, 1298:1, 1319:23, 1322:5
**DIVISION** [1] - 1215:18
**division** [4] - 1219:17, 1219:22, 1274:11, 1295:25
**documents** [5] - 1218:20, 1263:25, 1275:21, 1285:6, 1285:9
**dollar** [2] - 1269:7, 1312:16
**dollars** [2] - 1239:14, 1269:5
**domestic** [1] - 1279:11
**done** [6] - 1219:14, 1222:16, 1298:15, 1331:24, 1332:1, 1332:3
**dot** [1] - 1258:2
**dots** [6] - 1257:17, 1257:19, 1258:1, 1258:7, 1270:19, 1270:24
**down** [6] - 1234:10, 1238:8, 1238:13, 1267:25, 1274:21, 1275:25
**Dr** [55] - 1218:5, 1219:2, 1219:6, 1221:14, 1222:4, 1223:21, 1225:10, 1236:6, 1237:17, 1237:18, 1237:21, 1239:10, 1249:22, 1249:24, 1250:14, 1253:15, 1280:6, 1280:17, 1283:23, 1288:21, 1288:25, 1289:7, 1289:11, 1289:22, 1289:23, 1290:23, 1291:16, 1292:2, 1292:15, 1292:25, 1293:9, 1293:14, 1294:12, 1295:5, 1304:4, 1304:10, 1309:19, 1312:7, 1313:3, 1313:5, 1315:16, 1316:2, 1316:25, 1317:5, 1318:24, 1319:24, 1320:24, 1322:3, 1322:12,

1341

1322:15, 1324:13,
1325:15, 1325:20,
1331:14, 1331:18
**draw** [3] - 1273:4,
1273:7, 1288:6
**drawn** [1] - 1290:5
**drive** [2] - 1306:9,
1306:12
**driven** [1] - 1266:4
**driving** [2] - 1306:6,
1307:19
**dropped** [3] -
1266:1, 1266:13,
1267:7
**drops** [1] - 1297:13
**due** [2] - 1223:17,
1267:20
**during** [2] - 1220:1,
1280:7
**dynamic** [2] -
1271:20, 1271:23

# E

**e-books** [1] -
1329:12
**earn** [5] - 1230:21,
1240:3, 1306:13,
1307:19, 1308:4
**earned** [1] - 1240:12
**earning** [1] - 1240:9
**easier** [5] - 1326:9,
1326:16, 1329:21,
1329:23, 1330:2
**easiest** [1] - 1262:4
**easily** [1] - 1231:3
**easy** [3] - 1272:8,
1323:8, 1323:12
**economic** [11] -
1221:6, 1259:14,
1263:4, 1273:20,
1273:21, 1295:16,
1295:18, 1295:19,
1313:20, 1323:17,
1325:25
**Economic** [1] -
1219:25
**economics** [5] -
1219:7, 1219:20,
1221:14, 1277:6,
1321:19
**economist** [6] -
1219:18, 1219:21,
1219:23, 1220:3,
1220:6, 1310:3
**economists** [8] -
1220:6, 1281:19,
1316:7, 1316:13,
1317:2, 1317:7,

1317:14, 1324:22
**economy** [1] -
1225:16
**editor** [2] - 1264:11,
1267:24
**editorial** [10] -
1275:24, 1286:4,
1286:13, 1286:15,
1286:22, 1287:18,
1287:25, 1293:15,
1294:17
**Edward** [1] - 1237:18
**Edwards** [1] -
1333:12
**EDWARDS** [2] -
1216:8, 1333:3
**effect** [31] - 1224:6,
1262:13, 1262:23,
1263:5, 1269:20,
1270:1, 1273:22,
1295:16, 1295:20,
1296:11, 1298:4,
1299:4, 1299:9,
1300:16, 1300:17,
1301:20, 1301:21,
1302:18, 1303:3,
1303:11, 1303:16,
1303:19, 1303:20,
1314:16, 1316:1,
1316:6, 1316:22,
1316:23, 1317:18,
1319:15, 1320:22
**effects** [32] -
1224:20, 1225:9,
1255:13, 1259:18,
1259:19, 1259:20,
1259:23, 1260:2,
1260:3, 1260:4,
1260:7, 1260:8,
1260:13, 1261:21,
1261:22, 1262:3,
1262:15, 1263:8,
1263:18, 1273:17,
1274:8, 1314:1,
1316:21, 1323:1,
1324:7, 1325:20,
1325:24, 1326:3,
1326:4, 1328:7,
1329:3
**efficiencies** [1] -
1322:11
**efforts** [1] - 1272:15
**Eighth** [1] - 1215:24
**either** [4] - 1230:1,
1230:18, 1286:21,
1319:23
**element** [1] - 1328:2
**eliminate** [5] -
1241:19, 1300:3,
1300:22, 1301:8,

1303:12
**eliminated** [3] -
1301:9, 1301:12,
1302:5
**eliminates** [1] -
1271:17
**eliminating** [3] -
1262:9, 1300:13,
1300:17
**elimination** [4] -
1241:24, 1260:4,
1262:12, 1268:7
**email** [1] - 1223:6
**emails** [1] - 1285:10
**end** [9] - 1252:1,
1253:5, 1272:1,
1279:9, 1284:25,
1285:8, 1301:1,
1308:17, 1331:5
**ended** [2] - 1320:17,
1324:6
**ending** [1] - 1270:21
**ends** [2] - 1297:6,
1297:17
**enhance** [5] -
1256:20, 1256:23,
1257:22, 1258:25,
1328:25
**entail** [1] - 1285:5
**entered** [8] - 1218:8,
1236:4, 1237:15,
1249:20, 1253:13,
1255:7, 1288:19,
1321:16
**entirely** [1] - 1292:9
**episodes** [3] -
1264:20, 1273:5,
1273:12
**equally** [1] - 1243:23
**equivalent** [1] -
1319:13
**especially** [2] -
1295:2, 1323:18
**ESQ** [12] - 1215:15,
1215:15, 1215:16,
1215:16, 1215:17,
1215:20, 1215:21,
1215:21, 1215:22,
1215:22, 1216:2,
1216:5
**essentially** [6] -
1241:19, 1245:4,
1290:15, 1304:19,
1320:15, 1326:8
**established** [6] -
1226:15, 1265:13,
1272:14, 1272:17,
1273:3, 1330:20
**estimate** [32] -
1259:20, 1263:2,

1273:19, 1273:25,
1275:5, 1275:8,
1275:18, 1281:3,
1281:20, 1281:24,
1284:8, 1286:23,
1289:10, 1289:12,
1290:6, 1293:6,
1293:11, 1293:14,
1294:8, 1294:11,
1295:10, 1298:25,
1299:4, 1305:11,
1313:6, 1316:22,
1318:11, 1318:12,
1318:22, 1318:24,
1319:17, 1319:19
**estimates** [13] -
1273:23, 1275:10,
1289:9, 1289:14,
1293:5, 1293:12,
1293:13, 1293:21,
1294:10, 1294:20,
1295:4, 1295:6,
1295:13
**estimating** [3] -
1277:16, 1282:1,
1321:6
**et** [1] - 1215:7
**Ethan** [1] - 1218:5
**ETHAN** [1] - 1215:15
**evaluate** [1] - 1224:6
**evaluating** [1] -
1325:8
**events** [2] - 1247:15,
1292:4
**eventually** [1] -
1297:13
**everywhere** [1] -
1232:6
**EVIDENCE** [1] -
1217:8
**evidence** [50] -
1225:6, 1226:21,
1227:1, 1227:16,
1228:5, 1228:7,
1233:21, 1233:25,
1236:4, 1236:11,
1236:14, 1237:15,
1244:17, 1244:21,
1249:20, 1253:13,
1255:7, 1260:12,
1260:15, 1261:2,
1262:18, 1262:21,
1262:24, 1262:25,
1263:15, 1263:17,
1263:21, 1264:3,
1264:5, 1264:7,
1264:8, 1264:12,
1264:18, 1264:22,
1267:12, 1273:15,
1273:17, 1277:12,

1279:16, 1279:19,
1279:20, 1279:21,
1283:16, 1288:19,
1303:23, 1304:13,
1321:16, 1325:25,
1329:20, 1330:7
**evidentiary** [1] -
1284:22
**exact** [4] - 1220:21,
1233:15, 1253:25,
1290:13
**exactly** [1] - 1285:23
**examination** [1] -
1218:6
**EXAMINATION** [1] -
1218:24
**examine** [2] -
1258:12, 1284:15
**examining** [1] -
1284:25
**example** [20] -
1226:11, 1229:3,
1229:6, 1261:12,
1262:3, 1262:11,
1265:18, 1267:15,
1269:2, 1270:17,
1271:15, 1272:20,
1274:15, 1278:20,
1279:9, 1300:24,
1309:9, 1310:15,
1326:17, 1330:21
**examples** [10] -
1265:21, 1266:19,
1266:22, 1267:8,
1267:10, 1267:17,
1271:19, 1272:20,
1277:22, 1291:16
**excellent** [2] -
1218:21, 1269:9
**except** [2] - 1248:24,
1265:14
**exception** [1] -
1324:22
**excluded** [2] -
1241:6, 1286:2
**excluding** [1] -
1247:9
**excuse** [4] - 1245:1,
1277:2, 1277:18,
1279:23
**Excuse** [1] - 1219:9
**exhibit** [1] - 1222:23
**Exhibit** [14] - 1217:9,
1217:10, 1217:10,
1217:11, 1217:11,
1217:12, 1217:12,
1236:3, 1237:14,
1249:19, 1253:12,
1255:6, 1288:18,
1321:15

1342

**exhibits** [2] - 1222:15, 1223:16
**EXHIBITS** [1] - 1217:8
**existence** [1] - 1273:2
**expand** [1] - 1250:6
**expect** [3] - 1276:16, 1306:13, 1313:17
**expected** [5] - 1226:6, 1232:25, 1233:1, 1277:14, 1284:18
**expense** [1] - 1314:17
**expenses** [5] - 1311:23, 1314:10, 1314:24, 1315:4, 1319:3
**experience** [2] - 1239:16, 1282:8
**expert** [4] - 1221:7, 1221:14, 1237:18, 1267:11
**experts** [1] - 1321:22
**explain** [5] - 1241:14, 1281:5, 1290:13, 1299:8, 1316:11
**explained** [1] - 1276:18
**explicit** [6] - 1326:14, 1326:16, 1326:21, 1326:25, 1327:6, 1327:11
**extension** [1] - 1252:1
**extent** [2] - 1266:11, 1303:7
**extremes** [1] - 1268:10

**F**

**face** [1] - 1231:10
**facing** [1] - 1270:11
**fact** [2] - 1272:23, 1274:4
**factors** [3] - 1224:21, 1225:9, 1236:12
**fair** [2] - 1244:6, 1323:3
**fairly** [2] - 1254:22, 1304:24
**fame** [1] - 1232:6
**far** [3] - 1236:20, 1245:1, 1252:24
**favorably** [1] - 1252:8

**feasible** [2] - 1230:13, 1284:19
**features** [1] - 1327:7
**Federal** [1] - 1219:19
**few** [3] - 1249:14, 1265:22, 1300:22
**fewer** [1] - 1291:22
**fi** [1] - 1232:2
**field** [3] - 1270:7, 1270:10, 1302:3
**Fifth** [1] - 1215:18
**figure** [9] - 1226:15, 1232:5, 1235:22, 1237:9, 1249:13, 1253:7, 1255:1, 1288:12, 1321:9
**figures** [1] - 1222:19
**final** [3] - 1267:3, 1267:5, 1309:3
**finally** [4] - 1265:11, 1267:6, 1272:13, 1330:7
**fine** [1] - 1331:23
**finished** [1] - 1230:2
**firm** [8] - 1247:16, 1252:12, 1256:2, 1268:6, 1269:21, 1277:11, 1299:13, 1313:14
**firms** [14] - 1251:11, 1256:6, 1260:9, 1316:15, 1316:16, 1326:9, 1326:18, 1327:2, 1327:14, 1327:19, 1327:23, 1329:19, 1330:8, 1331:2
**first** [28] - 1225:10, 1225:11, 1226:16, 1245:21, 1248:13, 1255:15, 1258:22, 1261:21, 1262:20, 1265:16, 1266:10, 1272:21, 1275:16, 1276:1, 1278:20, 1283:16, 1284:17, 1299:22, 1300:6, 1300:13, 1301:16, 1301:19, 1301:20, 1303:9, 1305:10, 1318:5, 1322:2, 1329:10
**first-time** [1] - 1226:16
**FISHBEIN** [1] - 1216:2
**five** [10] - 1219:24, 1253:4, 1265:5, 1289:14, 1289:15, 1294:24, 1295:8,

1295:12, 1329:14, 1331:6
**fix** [3] - 1298:6, 1309:2, 1327:24
**fixed** [9] - 1308:23, 1310:19, 1311:2, 1311:17, 1311:24, 1314:12, 1314:17, 1315:1, 1315:5
**fixing** [3] - 1308:12, 1326:17, 1329:12
**flavor** [1] - 1324:17
**flaws** [1] - 1289:22
**Fletcher** [1] - 1331:25
**Floor** [1] - 1215:24
**FLORENCE** [1] - 1215:11
**focus** [13] - 1225:10, 1240:1, 1255:9, 1261:21, 1263:15, 1265:16, 1266:24, 1270:13, 1270:22, 1272:21, 1313:20, 1314:2, 1326:3
**focused** [3] - 1252:2, 1313:22, 1317:1
**focuses** [1] - 1220:17
**focusing** [1] - 1251:8
**follow** [4] - 1256:12, 1287:17, 1302:21, 1317:19
**followed** [3] - 1317:13, 1320:16, 1324:16
**following** [4] - 1218:9, 1224:23, 1259:15, 1280:10
**food** [1] - 1229:7
**FOR** [5] - 1215:1, 1215:15, 1215:20, 1216:2, 1217:4
**force** [1] - 1307:5
**forced** [1] - 1306:23
**foregoing** [1] - 1333:4
**form** [3] - 1302:1, 1327:10, 1327:17
**format** [2] - 1302:10, 1322:18
**formats** [2] - 1273:11, 1323:15
**former** [2] - 1295:24, 1316:12
**forth** [1] - 1266:3
**forward** [1] - 1267:16
**four** [8] - 1221:8, 1224:18, 1262:20, 1275:7, 1275:8,

1275:14, 1288:7, 1325:23
**fourth** [4] - 1263:4, 1264:16, 1275:24, 1330:1
**framework** [7] - 1224:11, 1224:15, 1224:23, 1259:15, 1322:22, 1322:25, 1329:2
**frequency** [2] - 1286:16, 1330:1
**frequent** [2] - 1330:1, 1330:4
**frequently** [4] - 1220:8, 1227:4, 1236:7, 1296:1
**FTC** [4] - 1220:2, 1221:21, 1221:22, 1316:13
**full** [4] - 1291:24, 1296:3, 1308:24, 1333:5
**fully** [4] - 1225:9, 1240:5, 1282:9, 1284:19

**G**

**G-U-P-P-I** [1] - 1316:10
**gather** [2] - 1286:16, 1289:1
**gathered** [1] - 1288:25
**general** [14] - 1232:9, 1235:18, 1260:12, 1263:19, 1263:23, 1276:1, 1279:6, 1294:7, 1301:15, 1301:22, 1302:17, 1307:15, 1308:3, 1309:10
**general's** [1] - 1220:14
**generally** [4] - 1225:18, 1256:15, 1309:12
**generate** [1] - 1307:1
**given** [6] - 1235:11, 1269:13, 1269:18, 1282:7, 1287:17, 1295:2
**glass** [3] - 1229:4, 1229:7
**goods** [1] - 1296:1
**government** [2] - 1220:10, 1220:19
**Government** [2] -

1218:3, 1218:6
**GOVERNMENT** [1] - 1218:12
**graph** [1] - 1257:5
**graphic** [1] - 1270:23
**gray** [1] - 1253:5
**great** [5] - 1261:16, 1268:15, 1279:4, 1318:15, 1332:5
**greater** [7] - 1257:15, 1257:16, 1305:16, 1305:25, 1318:19, 1329:22
**green** [6] - 1253:2, 1257:13, 1258:7, 1293:13, 1319:18
**gross** [1] - 1316:9
**ground** [1] - 1268:17
**group** [12] - 1227:8, 1231:1, 1231:2, 1238:4, 1238:12, 1239:5, 1243:18, 1254:13, 1260:8, 1293:20, 1293:23, 1294:8
**groups** [2] - 1265:5, 1278:9
**guaranteed** [1] - 1323:16
**guarded** [1] - 1267:21
**guess** [3] - 1279:13, 1300:20, 1331:11
**guidelines** [23] - 1224:11, 1224:13, 1224:23, 1228:22, 1229:3, 1230:25, 1255:14, 1256:10, 1256:16, 1259:16, 1262:2, 1274:2, 1274:7, 1281:23, 1281:25, 1309:19, 1309:23, 1313:23, 1316:18, 1316:20, 1326:6, 1328:15
**GUIDERO** [1] - 1215:22
**GUPPI** [31] - 1316:10, 1316:11, 1316:12, 1316:17, 1316:24, 1317:2, 1317:7, 1317:9, 1318:2, 1318:4, 1318:11, 1318:14, 1318:21, 1318:25, 1319:8, 1319:13, 1319:17, 1319:19, 1319:22, 1320:3, 1320:6, 1320:10, 1320:14, 1320:19,

1343

1320:22, 1320:24, 1321:3, 1321:4, 1324:14, 1324:20, 1324:23

**guys** [2] - 1234:12, 1268:12

# H

**H-I-L-L** [1] - 1219:5
**Hachette** [4] - 1227:4, 1230:4, 1247:17, 1247:18
**half** [4] - 1258:23, 1320:25, 1326:22, 1326:23
**hallmarks** [2] - 1329:24, 1330:11
**hand** [10] - 1218:11, 1264:6, 1264:8, 1264:10, 1264:14, 1265:24, 1270:18, 1274:22, 1319:14, 1320:1
**handled** [2] - 1223:17, 1322:11
**happy** [1] - 1331:6
**hard** [3] - 1232:1, 1323:17, 1327:16
**hard-boiled** [1] - 1232:1
**harder** [1] - 1330:3
**harm** [20] - 1256:14, 1266:11, 1271:17, 1298:9, 1303:8, 1303:9, 1305:17, 1306:1, 1306:3, 1309:12, 1309:20, 1310:1, 1312:4, 1312:6, 1313:10, 1313:17, 1314:3, 1318:16, 1318:19, 1321:6
**harmed** [7] - 1229:2, 1229:10, 1299:17, 1299:21, 1299:22, 1300:7, 1302:22
**harmful** [1] - 1261:15
**HarperCollins** [3] - 1287:9, 1288:2, 1331:21
**head** [39] - 1260:5, 1261:23, 1262:12, 1263:2, 1263:13, 1263:20, 1265:3, 1268:6, 1273:5, 1273:8, 1273:10, 1273:12, 1273:19, 1273:24, 1274:6, 1275:4, 1275:11,

1282:14, 1300:17, 1316:12
**head-to-head** [19] - 1260:5, 1261:23, 1262:12, 1263:2, 1263:13, 1263:20, 1265:3, 1268:6, 1273:5, 1273:8, 1273:10, 1273:12, 1273:19, 1273:24, 1274:6, 1275:4, 1275:11, 1282:14, 1300:17
**heads** [1] - 1329:14
**healthcare** [1] - 1220:25
**hear** [2] - 1245:2, 1325:17
**heard** [6] - 1226:13, 1232:24, 1247:17, 1283:12, 1286:14, 1330:14
**height** [2] - 1290:6, 1290:8
**help** [1] - 1241:1
**helpful** [7] - 1231:23, 1232:15, 1264:24, 1265:19, 1267:15, 1268:9, 1295:3
**helps** [2] - 1239:7, 1270:17
**hence** [1] - 1298:1
**hereby** [1] - 1333:3
**Herfindahl** [1] - 1255:21
**Herfindahl-Hirschman** [1] - 1255:21
**HHI** [21] - 1255:22, 1255:23, 1255:24, 1256:1, 1256:5, 1256:13, 1256:21, 1256:22, 1257:7, 1257:10, 1257:15, 1257:16, 1257:17, 1257:20, 1258:5, 1258:6, 1259:10, 1259:11
**high** [19] - 1220:1, 1224:12, 1224:22, 1225:12, 1241:3, 1262:14, 1263:9, 1264:23, 1269:6, 1279:9, 1296:5, 1297:17, 1298:21, 1300:10, 1301:14, 1305:1, 1313:10, 1317:6, 1327:8
**high-end** [1] - 1279:9
**high-level** [2] -

1224:22, 1264:23
**higher** [29] - 1237:7, 1262:8, 1269:11, 1278:14, 1281:3, 1291:10, 1291:12, 1291:25, 1293:16, 1293:17, 1294:4, 1294:10, 1297:16, 1299:15, 1305:15, 1305:16, 1305:23, 1305:24, 1306:14, 1306:25, 1307:8, 1309:11, 1309:25, 1318:15, 1318:18, 1319:24, 1324:6, 1324:7
**highest** [13] - 1267:1, 1297:7, 1299:23, 1300:1, 1300:2, 1300:4, 1300:5, 1301:1, 1301:5, 1302:13, 1303:12, 1303:13, 1304:5
**highlighting** [1] - 1254:15
**highly** [8] - 1225:4, 1256:10, 1256:19, 1257:21, 1292:11, 1307:20, 1308:6, 1328:19
**Hill** [21] - 1217:5, 1218:5, 1219:2, 1219:4, 1219:6, 1221:14, 1222:4, 1223:21, 1225:10, 1236:6, 1237:17, 1239:10, 1253:15, 1280:6, 1280:17, 1283:23, 1309:19, 1312:7, 1325:20, 1331:14, 1331:18
**HILL** [1] - 1218:12
**Hirschman** [1] - 1255:21
**history** [2] - 1296:3, 1329:10
**hit** [2] - 1233:2, 1297:16
**hold** [1] - 1243:12
**holistic** [3] - 1282:13, 1289:13, 1294:23
**holistically** [1] - 1299:1
**Honor** [189] - 1218:2, 1218:15, 1220:5, 1221:13, 1221:16, 1221:20, 1222:7, 1222:10, 1222:18,

1223:4, 1223:13, 1224:18, 1225:1, 1225:16, 1226:14, 1227:2, 1227:19, 1227:21, 1228:8, 1228:21, 1229:2, 1229:14, 1229:18, 1230:14, 1232:16, 1232:24, 1233:12, 1233:17, 1234:2, 1234:7, 1234:16, 1235:3, 1235:5, 1235:12, 1235:22, 1236:1, 1236:18, 1237:1, 1237:9, 1238:2, 1238:19, 1239:23, 1240:2, 1240:11, 1241:4, 1241:17, 1242:1, 1242:12, 1243:15, 1243:24, 1244:6, 1245:4, 1245:19, 1246:17, 1246:23, 1247:3, 1247:17, 1248:2, 1248:7, 1248:14, 1249:2, 1249:11, 1249:13, 1249:17, 1249:24, 1251:5, 1251:10, 1251:24, 1252:10, 1252:19, 1253:5, 1253:7, 1253:24, 1254:10, 1254:16, 1254:21, 1255:1, 1255:15, 1256:3, 1256:16, 1257:2, 1257:12, 1258:3, 1258:15, 1259:5, 1259:17, 1260:1, 1260:17, 1261:11, 1262:3, 1262:17, 1262:21, 1265:5, 1265:18, 1265:20, 1266:7, 1266:12, 1266:21, 1267:17, 1268:25, 1270:18, 1271:9, 1272:21, 1273:7, 1273:18, 1274:7, 1274:17, 1275:20, 1276:3, 1276:21, 1277:22, 1278:25, 1280:8, 1280:12, 1280:22, 1281:7, 1282:6, 1283:2, 1283:9, 1283:15, 1285:6, 1286:11, 1286:20, 1287:10, 1287:14, 1288:12, 1288:25, 1289:20, 1289:23, 1290:21, 1291:9,

1291:15, 1292:7, 1293:4, 1293:13, 1293:25, 1294:19, 1294:22, 1295:19, 1296:7, 1296:23, 1299:25, 1300:11, 1300:24, 1301:5, 1301:12, 1303:9, 1304:2, 1305:1, 1305:10, 1306:7, 1308:2, 1310:6, 1310:11, 1311:10, 1311:15, 1311:23, 1312:10, 1312:25, 1313:11, 1313:13, 1313:19, 1314:15, 1315:2, 1315:9, 1316:20, 1317:10, 1317:16, 1318:4, 1318:22, 1319:12, 1320:13, 1321:9, 1323:7, 1323:23, 1324:21, 1325:5, 1326:14, 1327:1, 1327:18, 1328:14, 1329:8, 1329:19, 1329:22, 1330:4, 1330:14, 1330:25, 1331:5, 1331:16
**HONORABLE** [1] - 1215:11
**hope** [1] - 1283:10
**Hopkins** [2] - 1219:11, 1219:15
**horizontal** [14] - 1224:11, 1224:13, 1228:22, 1230:25, 1256:10, 1256:16, 1257:9, 1257:15, 1259:16, 1262:2, 1274:2, 1309:19, 1316:17, 1328:15
**hot** [1] - 1252:20
**house** [4] - 1269:2, 1308:18, 1308:22, 1308:23
**House** [76] - 1235:17, 1242:13, 1242:15, 1242:16, 1245:5, 1245:7, 1245:11, 1246:2, 1247:8, 1247:9, 1247:21, 1248:3, 1248:5, 1252:25, 1254:4, 1254:5, 1261:12, 1261:17, 1262:7, 1264:7, 1264:12, 1265:25, 1266:14, 1267:2, 1268:10, 1268:14,

1268:23, 1270:24, 1271:2, 1271:3, 1271:6, 1271:13, 1272:25, 1273:1, 1274:23, 1274:25, 1276:5, 1276:11, 1276:12, 1276:17, 1280:23, 1280:25, 1281:1, 1281:3, 1281:8, 1281:16, 1282:21, 1282:24, 1283:19, 1283:20, 1284:2, 1285:7, 1286:9, 1286:12, 1288:9, 1288:11, 1291:4, 1291:16, 1291:17, 1292:6, 1293:5, 1293:10, 1294:2, 1294:6, 1294:17, 1311:22, 1312:12, 1312:18, 1312:24, 1314:11, 1314:16, 1319:15, 1319:16, 1320:18

**HOUSE** [1] - 1215:21

**House's** [6] - 1223:25, 1248:16, 1253:1, 1266:2, 1272:6, 1312:5

**houses** [3] - 1308:12, 1308:15, 1308:21

**huge** [1] - 1292:4

**Humana** [1] - 1220:13

**hybrid** [6] - 1265:9, 1265:14, 1317:12, 1320:11, 1320:14, 1324:16

**hypothetical** [23] - 1228:22, 1240:21, 1241:3, 1241:4, 1241:15, 1242:4, 1242:6, 1242:10, 1244:11, 1244:24, 1245:17, 1245:23, 1246:14, 1246:16, 1248:12, 1248:22, 1248:24, 1249:1, 1249:5, 1249:7, 1249:23, 1250:15, 1250:18

### I

**idea** [15] - 1227:8, 1228:23, 1228:24, 1229:9, 1232:16, 1241:17, 1260:24, 1302:18, 1308:3,

1317:23, 1321:4, 1322:25, 1326:1, 1326:7, 1326:8

**identified** [3] - 1239:10, 1251:5, 1286:18

**identifies** [1] - 1254:13

**identify** [14] - 1225:22, 1225:24, 1229:18, 1229:25, 1230:2, 1231:2, 1238:4, 1273:18, 1275:21, 1284:4, 1284:5, 1284:23, 1285:3, 1289:22

**identifying** [6] - 1228:8, 1238:11, 1239:5, 1240:15, 1240:16, 1260:20

**identity** [2] - 1284:5, 1284:7

**IHAN** [1] - 1215:16

**illustrate** [1] - 1273:9

**imagine** [4] - 1266:13, 1278:1, 1296:10, 1308:12

**immediately** [1] - 1234:5

**impact** [2] - 1259:21, 1272:9

**implement** [2] - 1243:16, 1283:25

**implementation** [1] - 1305:4

**implemented** [1] - 1244:24

**implementing** [1] - 1245:17

**implications** [2] - 1249:7, 1249:9

**importance** [1] - 1236:11

**important** [4] - 1226:14, 1241:6, 1273:11, 1275:10

**imported** [1] - 1279:10

**imprint** [4] - 1264:11, 1271:13, 1286:16, 1286:17

**imprint-wide** [1] - 1264:11

**IN** [1] - 1217:8

**incentive** [4] - 1269:19, 1323:10, 1327:23, 1328:1

**incentives** [3] - 1316:14, 1316:15, 1316:16

**incentivize** [1] - 1328:5

**incidents** [1] - 1264:25

**include** [11] - 1228:13, 1228:16, 1241:9, 1241:12, 1241:13, 1244:13, 1246:9, 1250:16, 1282:6, 1285:24, 1322:11

**included** [2] - 1228:14, 1242:7

**includes** [5] - 1228:17, 1241:10, 1250:12, 1250:25, 1303:5

**including** [5] - 1233:9, 1249:12, 1250:25, 1298:17, 1330:15

**incomplete** [2] - 1324:3, 1324:4

**increase** [15] - 1225:3, 1241:20, 1241:25, 1249:1, 1256:18, 1257:7, 1257:16, 1257:20, 1258:6, 1259:11, 1269:17, 1328:10, 1328:17, 1328:18, 1330:23

**increased** [1] - 1257:17

**increases** [3] - 1254:24, 1256:21, 1271:2

**incremental** [3] - 1310:6, 1310:14, 1310:20

**index** [2] - 1255:21, 1316:9

**indicate** [1] - 1234:20

**indication** [1] - 1251:10

**indications** [1] - 1264:23

**individual** [1] - 1229:25

**industries** [4] - 1220:23, 1220:24, 1282:10, 1295:25

**industry** [14] - 1221:2, 1238:20, 1256:2, 1260:9, 1261:3, 1261:5, 1261:8, 1261:18, 1282:11, 1296:8, 1296:20, 1302:18,

1304:17, 1326:18

**information** [14] - 1278:15, 1286:23, 1289:2, 1296:3, 1296:8, 1296:19, 1297:25, 1298:24, 1299:11, 1320:2, 1323:23, 1323:25, 1325:23, 1330:16

**initial** [3] - 1255:12, 1275:7, 1314:23

**input** [2] - 1246:13, 1305:18

**inputs** [11] - 1246:11, 1305:5, 1305:9, 1318:2, 1318:5, 1318:8, 1321:22, 1321:23, 1322:4, 1324:20, 1325:9

**inputted** [1] - 1322:20

**inside** [2] - 1242:25, 1277:9

**instances** [3] - 1263:22, 1272:13, 1289:3

**instead** [1] - 1314:12

**intense** [1] - 1308:8

**intensity** [1] - 1232:10

**interacted** [1] - 1220:7

**interaction** [4] - 1326:7, 1326:12, 1327:2, 1327:18

**interest** [2] - 1286:17, 1286:18

**interested** [1] - 1267:6, 1268:1

**interject** [1] - 1223:13

**internal** [1] - 1233:10

**interpret** [3] - 1296:18, 1297:24, 1300:15

**interval** [1] - 1292:8

**intricacies** [1] - 1321:20

**introduced** [1] - 1222:16

**intuition** [5] - 1297:18, 1301:15, 1301:22, 1302:15, 1311:2

**investigate** [1] - 1314:11

**involved** [1] - 1234:19

**involves** [1] -

1327:19

**involving** [2] - 1298:11, 1323:24

**issue** [3] - 1238:10, 1244:12, 1291:15

**it'll** [3] - 1321:14, 1325:10, 1331:1

**itself** [5] - 1260:6, 1265:1, 1296:16, 1314:6, 1314:7

**Ivonik** [3] - 1221:10, 1221:21, 1283:4

### J

**January** [3] - 1251:24, 1252:2, 1258:3

**jar** [2] - 1229:4

**JESSICA** [1] - 1215:17

**JOHN** [1] - 1215:15

**Johns** [2] - 1219:11, 1219:15

**JUDGE** [1] - 1215:12

**jumps** [1] - 1234:5

**June** [3] - 1251:25, 1252:3, 1258:3

**JUSTICE** [1] - 1215:17

**Justice** [2] - 1221:24, 1316:13

**Justice's** [1] - 1219:17

### K

**Karp** [2] - 1304:16, 1330:16

**keep** [5] - 1234:17, 1285:20, 1291:5, 1292:18, 1297:11

**keeping** [1] - 1292:14

**kept** [1] - 1223:5

**key** [3] - 1270:6, 1274:9, 1305:9

**kGAA** [1] - 1215:6

**KIM** [1] - 1215:16

**kind** [8] - 1229:8, 1278:15, 1295:21, 1301:18, 1302:14, 1308:9, 1323:1, 1323:25

**king** [1] - 1231:23

**Knopf** [1] - 1272:7

**known** [5] - 1244:25, 1245:18, 1255:20, 1295:22, 1316:8

# L

**labeled** [3] - 1257:7, 1257:9, 1257:16
**language** [9] - 1228:21, 1255:14, 1256:15, 1262:1, 1308:2, 1313:24, 1316:21, 1326:6, 1328:14
**large** [5] - 1240:6, 1244:22, 1254:21, 1254:24, 1268:3
**largely** [1] - 1220:17
**larger** [6] - 1235:18, 1239:19, 1291:17, 1294:16, 1294:19, 1330:2
**largest** [3] - 1293:24, 1294:9, 1295:2
**last** [5] - 1227:3, 1234:24, 1262:7, 1267:1, 1286:3
**lead** [4] - 1241:24, 1268:7, 1310:13, 1328:19
**leads** [6] - 1260:8, 1305:24, 1306:1, 1318:19, 1319:5, 1326:24
**LEAL** [1] - 1215:17
**learn** [3] - 1275:13, 1327:2, 1327:4
**leave** [3] - 1243:5, 1245:6, 1327:23
**leaves** [3] - 1277:2, 1300:4, 1328:3
**led** [2] - 1233:5, 1283:24
**left** [22] - 1234:4, 1235:12, 1236:20, 1237:3, 1247:7, 1252:24, 1264:6, 1264:10, 1265:24, 1265:25, 1266:7, 1270:20, 1271:9, 1271:12, 1272:3, 1280:22, 1281:7, 1308:19, 1312:10, 1314:15, 1319:14, 1320:18
**left-hand** [3] - 1264:6, 1264:10, 1319:14
**legal** [1] - 1220:8
**less** [19] - 1246:6, 1260:10, 1263:12, 1268:5, 1268:7, 1269:11, 1269:19,

1269:21, 1269:23, 1270:10, 1301:14, 1302:4, 1302:6, 1306:2, 1307:16, 1308:8, 1309:1
**level** [32] - 1220:1, 1224:12, 1224:22, 1225:12, 1227:4, 1233:12, 1233:13, 1241:3, 1255:18, 1258:17, 1262:8, 1262:14, 1263:9, 1263:10, 1264:2, 1264:23, 1266:5, 1267:6, 1269:13, 1296:5, 1296:8, 1297:17, 1298:22, 1300:2, 1300:10, 1307:21, 1311:9, 1311:14, 1313:10, 1315:20, 1317:6, 1327:8
**levels** [1] - 1258:16
**leverage** [2] - 1271:16, 1271:17
**Lexington** [1] - 1216:3
**Light** [1] - 1278:11
**light** [1] - 1279:11
**likelihood** [1] - 1328:6
**likely** [27] - 1222:19, 1224:6, 1225:6, 1244:21, 1255:13, 1256:20, 1256:23, 1257:22, 1258:25, 1259:22, 1260:25, 1261:14, 1261:19, 1262:15, 1262:16, 1273:22, 1290:4, 1292:11, 1295:20, 1298:10, 1310:1, 1311:16, 1311:17, 1315:14, 1328:10, 1329:18, 1330:23
**limited** [1] - 1229:15
**line** [2] - 1257:13, 1257:16
**lines** [1] - 1257:13
**Lisa** [1] - 1333:12
**LISA** [2] - 1216:8, 1333:3
**list** [1] - 1275:14
**listed** [2] - 1236:9, 1329:8
**lists** [1] - 1289:4
**Lite** [1] - 1278:11
**literary** [1] - 1260:18
**litigation** [1] - 1221:7
**LLP** [3] - 1215:23,

1216:3, 1216:5
**look** [58] - 1230:3, 1235:12, 1236:18, 1238:3, 1243:19, 1252:22, 1252:24, 1254:18, 1254:25, 1256:16, 1257:6, 1258:21, 1259:17, 1261:2, 1262:24, 1263:25, 1264:6, 1264:14, 1264:25, 1267:16, 1270:23, 1274:18, 1275:13, 1282:12, 1282:13, 1283:3, 1283:10, 1289:15, 1290:4, 1291:20, 1291:24, 1292:19, 1294:1, 1294:23, 1295:3, 1295:7, 1295:12, 1295:25, 1297:19, 1304:6, 1308:21, 1315:21, 1315:25, 1316:8, 1316:14, 1317:25, 1320:1, 1324:14, 1324:15, 1324:23, 1324:24, 1325:1, 1325:11, 1326:25, 1328:16, 1329:3
**looked** [22] - 1244:20, 1262:21, 1263:19, 1264:23, 1273:20, 1275:16, 1275:17, 1275:19, 1275:24, 1276:3, 1281:8, 1284:21, 1285:9, 1286:20, 1289:1, 1289:3, 1290:15, 1311:24, 1317:2, 1317:10, 1317:12, 1325:23
**looking** [22] - 1223:8, 1224:21, 1234:2, 1250:6, 1254:10, 1255:15, 1258:8, 1258:15, 1259:8, 1265:20, 1283:15, 1285:21, 1287:15, 1288:8, 1290:22, 1293:4, 1294:24, 1296:16, 1297:23, 1304:2, 1319:12
**looks** [5] - 1235:6, 1255:16, 1260:1, 1297:18, 1297:21
**loose** [1] - 1308:2
**Los** [1] - 1215:24
**lose** [8] - 1227:4,

1242:22, 1246:18, 1246:19, 1275:22, 1287:2, 1287:3
**loses** [7] - 1247:16, 1247:21, 1248:17, 1276:12, 1276:16, 1276:24, 1276:25
**losing** [1] - 1243:1, 1259:21, 1330:20
**loss** [25] - 1245:18, 1246:25, 1247:13, 1247:15, 1247:20, 1248:16, 1248:17, 1264:25, 1275:19, 1280:18, 1280:20, 1280:24, 1281:3, 1281:5, 1281:19, 1281:23, 1282:2, 1282:5, 1282:8, 1283:7, 1283:12, 1283:18, 1293:15, 1294:17
**losses** [1] - 1247:18
**lost** [16] - 1248:9, 1264:16, 1264:17, 1268:10, 1268:12, 1268:14, 1274:24, 1275:21, 1276:13, 1281:8, 1281:12, 1281:16, 1283:3, 1283:19, 1286:19, 1287:2
**low** [6] - 1263:10, 1269:7, 1269:8, 1296:2, 1305:22, 1307:7
**low-quality** [1] - 1296:2
**lower** [20] - 1230:2, 1242:10, 1242:15, 1242:17, 1245:6, 1262:10, 1264:14, 1265:24, 1292:3, 1293:11, 1294:11, 1300:22, 1306:14, 1306:15, 1307:7, 1307:9, 1307:21, 1312:5, 1319:5, 1326:24
**lowered** [3] - 1246:3, 1248:5, 1248:25
**lowers** [1] - 1245:11
**lowest** [2] - 1317:17, 1324:23
**lowly** [1] - 1307:21

---

# M

**Macmillan** [3] - 1242:24, 1286:14,

1288:2
**maintained** [3] - 1282:3, 1282:5, 1283:13
**major** [5] - 1221:2, 1232:5, 1233:9, 1260:1, 1329:14
**majority** [1] - 1228:2
**maker** [1] - 1278:4
**makers** [2] - 1229:4
**males** [1] - 1290:6
**manifest** [3] - 1265:1, 1314:6
**manufacturers** [1] - 1229:7
**manuscript** [2] - 1230:2, 1230:18
**margin** [26] - 1246:14, 1246:15, 1269:3, 1269:6, 1269:12, 1298:2, 1298:3, 1305:18, 1305:24, 1306:14, 1307:24, 1307:25, 1308:4, 1308:20, 1310:4, 1310:5, 1310:23, 1311:3, 1312:5, 1313:3, 1318:7, 1318:13, 1318:17, 1318:19, 1318:25, 1319:6
**margins** [19] - 1305:21, 1305:22, 1306:2, 1306:5, 1307:14, 1308:3, 1309:11, 1309:20, 1309:25, 1310:2, 1311:7, 1313:2, 1313:5, 1313:7, 1322:7, 1325:10, 1325:11, 1325:12, 1326:24
**market** [136] - 1224:19, 1225:1, 1225:4, 1225:10, 1225:13, 1225:20, 1227:22, 1228:15, 1228:18, 1229:11, 1230:13, 1230:24, 1231:1, 1231:5, 1231:14, 1233:2, 1239:2, 1239:3, 1239:11, 1239:13, 1239:17, 1239:18, 1240:15, 1240:16, 1240:17, 1240:21, 1241:5, 1241:6, 1241:9, 1242:7, 1242:21, 1242:25, 1243:6, 1243:7,

1346

1243:13, 1244:3,
1244:7, 1246:7,
1246:9, 1248:22,
1249:9, 1250:1,
1250:2, 1250:12,
1250:18, 1250:21,
1250:23, 1251:2,
1251:6, 1251:7,
1251:8, 1251:9,
1251:10, 1251:11,
1251:12, 1251:15,
1252:7, 1252:16,
1252:23, 1252:24,
1253:16, 1253:24,
1254:7, 1254:10,
1254:11, 1254:18,
1254:22, 1254:25,
1255:9, 1255:10,
1255:12, 1255:16,
1255:25, 1256:3,
1256:6, 1256:20,
1256:23, 1256:24,
1257:10, 1257:21,
1257:22, 1258:4,
1258:12, 1258:25,
1259:13, 1259:21,
1260:24, 1263:7,
1263:10, 1265:1,
1272:12, 1274:8,
1275:17, 1276:22,
1277:4, 1277:9,
1277:10, 1277:20,
1278:1, 1278:2,
1278:3, 1278:6,
1278:21, 1278:22,
1278:24, 1279:6,
1279:18, 1291:17,
1297:20, 1298:1,
1298:14, 1300:5,
1305:10, 1305:15,
1308:14, 1318:11,
1324:9, 1325:10,
1326:18, 1326:22,
1327:25, 1328:20,
1328:21, 1328:22,
1329:3, 1329:9,
1329:13
  **market's** [2] -
1329:4, 1330:23
  **marketing** [5] -
1231:15, 1231:21,
1236:10, 1236:18,
1237:6
  **Marketplace** [2] -
1233:7, 1238:23
  **markets** [2] -
1252:11, 1256:19
  **match** [2] - 1325:14,
1325:16
  **matching** [1] -

1325:13
  **materially** [1] -
1238:12
  **materials** [1] -
1222:13
  **matter** [8] - 1221:10,
1221:11, 1222:14,
1238:16, 1238:17,
1261:24, 1283:5
  **matters** [4] - 1220:4,
1220:7, 1220:18,
1252:7
  **maximum** [1] -
1256:4
  **mean** [16] - 1223:12,
1228:1, 1230:19,
1236:22, 1241:22,
1241:23, 1248:11,
1273:12, 1287:19,
1288:8, 1290:2,
1290:13, 1292:6,
1300:10, 1301:17,
1302:22
  **meaningfully** [1] -
1228:9
  **means** [7] - 1240:4,
1263:9, 1263:11,
1276:20, 1276:22,
1306:2
  **measure** [11] -
1246:17, 1252:22,
1255:19, 1255:20,
1274:5, 1275:12,
1287:21, 1288:5,
1288:21, 1298:8,
1318:6
  **measures** [2] -
1245:4, 1245:7
  **measuring** [5] -
1255:10, 1275:2,
1298:2, 1305:19,
1314:7
  **mechanism** [5] -
1296:16, 1298:25,
1299:2, 1300:12,
1309:12
  **mechanisms** [4] -
1273:10, 1317:10,
1317:24, 1321:6
  **meet** [2] - 1230:25,
1329:15
  **meetings** [1] -
1286:15
  **MEGAN** [1] - 1215:21
  **MELVIN** [1] -
1215:16
  **members** [2] -
1226:20, 1226:22
  **memoir** [2] -
1265:23, 1266:24

  **men** [1] - 1290:9
  **mentioned** [8] -
1230:7, 1245:1,
1247:13, 1272:13,
1277:18, 1285:3,
1294:12, 1330:11
  **merge** [1] - 1286:25
  **merged** [3] - 1229:5,
1269:21, 1299:13
  **merger** [73] - 1221:3,
1224:10, 1224:11,
1224:13, 1224:23,
1225:3, 1225:6,
1225:18, 1228:22,
1229:2, 1229:3,
1230:25, 1231:6,
1240:16, 1250:22,
1251:4, 1255:14,
1255:17, 1255:18,
1256:10, 1256:16,
1256:22, 1257:2,
1257:8, 1257:10,
1257:11, 1257:15,
1258:5, 1259:10,
1259:11, 1259:15,
1259:16, 1260:21,
1261:9, 1262:2,
1262:15, 1263:5,
1263:13, 1268:12,
1268:15, 1270:1,
1270:9, 1273:22,
1274:2, 1278:3,
1278:10, 1281:23,
1281:25, 1295:17,
1296:11, 1299:9,
1299:14, 1299:18,
1302:18, 1302:23,
1303:11, 1303:18,
1309:19, 1309:23,
1313:18, 1313:23,
1313:24, 1316:16,
1316:17, 1326:6,
1326:8, 1328:7,
1328:15, 1328:17,
1328:18, 1328:25,
1330:23
  **mergers** [9] - 1220:4,
1220:17, 1220:20,
1220:23, 1239:16,
1256:18, 1295:25,
1298:11, 1313:21
  **merging** [20] -
1226:17, 1226:21,
1227:10, 1241:8,
1242:11, 1261:24,
1265:2, 1265:17,
1266:9, 1267:13,
1270:14, 1272:13,
1273:5, 1273:13,
1273:23, 1282:2,

1284:1, 1286:21,
1296:14, 1302:23
  **met** [1] - 1234:23
  **metal** [1] - 1229:8
  **method** [1] - 1279:23
  **methodological** [1] -
1322:14
  **methodologies** [1] -
1281:22
  **methodology** [9] -
1244:25, 1245:14,
1245:16, 1282:25,
1287:20, 1317:9,
1321:23, 1321:25,
1324:20
  **methods** [2] -
1245:18, 1245:19
  **middle** [3] - 1268:17,
1272:10, 1293:15
  **midpoint** [1] -
1294:10
  **might** [18] - 1230:21,
1242:10, 1266:11,
1274:18, 1274:21,
1277:18, 1277:20,
1277:23, 1277:24,
1278:11, 1279:20,
1290:8, 1294:23,
1300:24, 1301:12,
1302:22, 1310:19,
1326:25
  **Miller** [1] - 1278:11
  **million** [12] - 1237:5,
1254:20, 1270:24,
1270:25, 1271:2,
1271:3, 1271:5,
1271:6, 1271:11,
1271:14, 1271:25
  **mind** [2] - 1304:16,
1326:11
  **mine** [1] - 1289:19
  **minivan** [2] - 1278:4,
1278:6
  **minivans** [3] -
1278:2, 1278:21,
1278:22
  **minute** [4] - 1275:25,
1279:4, 1289:20,
1313:2
  **minutes** [12] -
1232:6, 1275:24,
1286:5, 1286:13,
1286:22, 1287:18,
1287:25, 1293:16,
1294:17, 1310:2,
1331:6, 1331:10
  **miscommunication**
[1] - 1234:19
  **misleading** [1] -
1290:8

  **missing** [1] -
1251:20
  **misspoke** [2] -
1283:24, 1304:11
  **mitigate** [1] - 1225:9
  **mitigating** [2] -
1224:21, 1225:8
  **mix** [1] - 1311:24
  **model** [74] - 1295:16,
1295:18, 1295:21,
1295:22, 1295:23,
1296:5, 1296:7,
1296:13, 1296:16,
1296:17, 1297:19,
1297:25, 1298:11,
1298:18, 1298:21,
1299:5, 1299:9,
1299:17, 1299:20,
1301:16, 1301:19,
1302:16, 1302:21,
1302:25, 1303:1,
1303:3, 1303:7,
1303:9, 1305:4,
1305:6, 1305:17,
1305:19, 1308:1,
1312:4, 1312:6,
1312:8, 1313:6,
1314:7, 1314:11,
1314:22, 1315:7,
1315:9, 1315:14,
1315:21, 1315:25,
1316:12, 1316:25,
1318:4, 1318:5,
1318:10, 1318:14,
1318:16, 1318:18,
1319:13, 1319:22,
1319:25, 1320:5,
1320:8, 1320:15,
1320:23, 1321:5,
1322:16, 1323:4,
1323:7, 1323:21,
1324:10, 1324:11,
1325:6, 1325:7,
1325:9, 1325:11,
1325:14
  **model's** [3] -
1320:19, 1320:20,
1320:22
  **modeling** [5] -
1273:21, 1298:5,
1298:10, 1315:16,
1315:24
  **models** [28] - 1263:4,
1273:21, 1295:19,
1299:4, 1299:6,
1313:20, 1316:7,
1316:24, 1317:2,
1317:8, 1318:2,
1318:9, 1318:13,
1318:21, 1319:1,

1347

1319:8, 1319:20, 1319:23, 1320:10, 1320:14, 1321:3, 1321:4, 1321:20, 1323:5, 1323:17, 1324:14, 1324:23, 1325:25
**moderately** [1] - 1328:19
**moment** [2] - 1234:12, 1270:22
**monitor** [2] - 1327:13, 1329:21
**monitoring** [2] - 1329:23, 1331:2
**Monopsonist** [29] - 1240:22, 1240:24, 1241:3, 1241:4, 1241:15, 1242:4, 1242:6, 1242:10, 1242:14, 1242:22, 1243:1, 1243:3, 1244:3, 1244:11, 1244:24, 1245:17, 1245:23, 1246:14, 1246:16, 1246:18, 1248:12, 1248:22, 1248:25, 1249:2, 1249:6, 1249:8, 1249:23, 1250:15, 1250:19
**Monopsonized** [1] - 1242:8
**morning** [2] - 1267:20, 1331:21
**most** [12] - 1228:12, 1240:7, 1242:25, 1267:6, 1278:4, 1281:21, 1295:1, 1296:4, 1296:25, 1297:2, 1317:15, 1317:23
**move** [19] - 1222:20, 1235:23, 1237:10, 1238:8, 1238:13, 1245:1, 1249:15, 1250:20, 1253:8, 1255:2, 1264:20, 1267:13, 1267:16, 1273:15, 1282:15, 1288:13, 1295:15, 1321:11, 1325:20
**moved** [4] - 1219:16, 1219:19, 1222:25, 1223:16
**movies** [1] - 1297:9
**moving** [2] - 1270:20, 1303:15
**MR** [82] - 1218:2, 1218:5, 1218:13,

1218:15, 1218:19, 1218:22, 1219:1, 1219:13, 1221:13, 1221:16, 1222:2, 1222:3, 1222:7, 1222:10, 1222:18, 1222:22, 1223:1, 1223:3, 1223:9, 1223:12, 1223:18, 1223:20, 1232:12, 1234:7, 1234:10, 1234:15, 1234:23, 1235:1, 1235:3, 1235:5, 1235:22, 1236:1, 1236:5, 1237:9, 1237:12, 1237:16, 1239:9, 1241:2, 1242:3, 1244:16, 1249:13, 1249:17, 1249:21, 1252:5, 1253:7, 1253:10, 1253:14, 1255:1, 1255:4, 1255:8, 1277:5, 1279:15, 1280:1, 1280:4, 1280:12, 1280:14, 1280:16, 1281:18, 1283:22, 1287:12, 1288:12, 1288:16, 1288:20, 1289:21, 1292:22, 1299:7, 1302:20, 1305:3, 1309:18, 1311:5, 1311:6, 1313:1, 1313:16, 1319:7, 1321:9, 1321:13, 1325:19, 1331:5, 1331:10, 1331:20, 1331:25, 1332:4
**multi** [2] - 1319:13, 1319:22
**multi-round** [2] - 1319:13, 1319:22
**multiple** [1] - 1327:19
**must** [1] - 1328:18
**MYERS** [1] - 1215:23

# N

**name** [3] - 1219:3, 1219:4, 1219:9
**names** [1] - 1235:11
**narrow** [1] - 1300:14
**narrower** [1] - 1223:9
**narrowly** [4] - 1241:5, 1249:10, 1296:16, 1302:25

**necessarily** [7] - 1244:4, 1268:25, 1270:4, 1283:13, 1283:20, 1287:19, 1313:19
**necessary** [5] - 1233:13, 1245:23, 1269:25, 1302:14, 1327:9
**need** [9] - 1268:3, 1270:4, 1291:6, 1314:3, 1327:9, 1327:10, 1327:14, 1328:1, 1328:2
**needs** [1] - 1229:11
**negative** [1] - 1269:7
**negotiated** [1] - 1271:16
**negotiating** [2] - 1265:11, 1271:19
**negotiation** [3] - 1229:25, 1270:20, 1271:10
**negotiations** [8] - 1229:24, 1265:10, 1270:13, 1270:15, 1271:1, 1317:13, 1320:16, 1324:17
**nemesis** [1] - 1264:11
**never** [7] - 1240:3, 1249:25, 1250:4, 1250:7, 1250:17, 1268:10, 1268:12
**nevertheless** [3] - 1282:7, 1282:12, 1294:20
**new** [2] - 1242:18, 1310:12
**New** [2] - 1216:4
**next** [10] - 1218:3, 1240:14, 1251:3, 1251:6, 1259:14, 1259:17, 1274:20, 1275:3, 1295:15, 1331:6
**niche** [1] - 1232:1
**Nicholas** [3] - 1217:5, 1218:5, 1219:4
**NICHOLAS** [2] - 1218:12, 1219:4
**night** [1] - 1234:24
**Ninth** [1] - 1216:6
**non** [13] - 1227:5, 1234:4, 1234:6, 1235:13, 1235:14, 1235:15, 1235:19, 1237:7, 1253:4, 1254:1, 1254:14,

1254:23, 1275:1
**non-anticipated** [4] - 1234:4, 1235:14, 1235:19, 1237:7
**non-Big** [9] - 1227:5, 1234:6, 1235:13, 1235:15, 1253:4, 1254:1, 1254:14, 1254:23, 1275:1
**none** [1] - 1223:15
**normal** [1] - 1222:16
**Northwest** [4] - 1215:18, 1216:6, 1216:10, 1333:14
**not-so-little** [1] - 1272:7
**notes** [1] - 1333:5
**novel** [1] - 1267:19
**number** [21] - 1220:21, 1226:7, 1231:17, 1233:5, 1238:17, 1251:16, 1256:1, 1268:3, 1287:6, 1292:6, 1292:8, 1294:19, 1303:1, 1303:2, 1303:10, 1315:3, 1328:18, 1329:19, 1331:2
**numbers** [9] - 1222:23, 1244:22, 1254:1, 1259:6, 1291:4, 1291:6, 1291:8, 1294:2, 1314:2

# O

**O'MELVENY** [1] - 1215:23
**object** [1] - 1297:10
**objection** [16] - 1221:15, 1221:16, 1222:9, 1222:11, 1235:25, 1237:11, 1237:12, 1249:16, 1249:17, 1253:9, 1253:10, 1255:3, 1255:4, 1288:15, 1321:12, 1321:13
**observe** [4] - 1230:18, 1269:21, 1329:6, 1330:18
**observed** [4] - 1266:19, 1271:19, 1303:23, 1304:13
**obtaining** [1] - 1219:14
**obviously** [1] -

1260:21
**occurred** [1] - 1227:1
**OF** [4] - 1215:1, 1215:3, 1215:11, 1215:17
**offer** [8] - 1221:14, 1266:2, 1267:24, 1270:21, 1271:2, 1271:3, 1271:8, 1272:1
**offers** [3] - 1270:24, 1271:24, 1271:25
**Official** [1] - 1216:8
**official** [1] - 1333:12
**often** [24] - 1247:21, 1247:22, 1248:16, 1268:20, 1269:11, 1275:3, 1281:9, 1284:22, 1287:1, 1289:5, 1297:8, 1298:11, 1301:16, 1301:17, 1304:17, 1305:11, 1305:13, 1313:20, 1316:9, 1323:4, 1323:16, 1327:22, 1330:21
**once** [5] - 1221:10, 1221:11, 1293:25
**one** [140] - 1221:18, 1223:9, 1223:10, 1224:4, 1224:18, 1224:19, 1224:20, 1224:24, 1225:14, 1226:24, 1227:18, 1228:9, 1228:12, 1228:20, 1229:14, 1231:24, 1232:14, 1233:6, 1234:1, 1234:5, 1236:16, 1236:17, 1238:11, 1242:11, 1242:12, 1245:5, 1245:15, 1246:12, 1247:16, 1248:1, 1248:3, 1248:4, 1250:5, 1252:18, 1253:23, 1254:2, 1254:9, 1254:19, 1255:16, 1257:1, 1257:6, 1257:9, 1258:14, 1259:4, 1259:25, 1260:1, 1260:10, 1260:16, 1260:19, 1261:25, 1262:8, 1263:20, 1264:2, 1264:4, 1264:19, 1265:4, 1265:8, 1265:12, 1265:19, 1266:15, 1266:20,

1348

1266:21, 1267:16, 1269:1, 1269:7, 1269:16, 1270:16, 1271:7, 1271:21, 1271:22, 1272:4, 1272:8, 1272:19, 1272:21, 1273:7, 1274:16, 1275:12, 1275:21, 1276:10, 1276:24, 1277:23, 1279:12, 1280:21, 1281:21, 1281:25, 1282:19, 1283:3, 1283:16, 1285:11, 1285:18, 1285:22, 1286:8, 1287:1, 1287:5, 1287:6, 1287:24, 1289:5, 1290:19, 1293:2, 1293:11, 1293:19, 1294:3, 1295:24, 1299:13, 1300:4, 1302:11, 1303:2, 1303:10, 1304:1, 1305:7, 1305:10, 1305:13, 1305:20, 1310:12, 1312:9, 1314:13, 1314:23, 1315:24, 1316:19, 1317:10, 1317:11, 1319:10, 1320:12, 1321:10, 1322:5, 1325:7, 1326:5, 1326:10, 1326:13, 1326:14, 1327:3, 1327:9, 1328:18, 1329:7, 1330:20, 1331:6, 1331:25
  **one's** [1] - 1273:2
  **ones** [11] - 1220:12, 1239:19, 1267:8, 1286:2, 1296:15, 1297:23, 1298:17, 1302:23, 1303:2, 1312:21, 1323:24
  **ongoing** [1] - 1327:22
  **open** [3] - 1272:9, 1297:9, 1300:25
  **operating** [6] - 1311:23, 1314:10, 1314:17, 1314:24, 1315:4, 1319:2
  **opinion** [4] - 1236:6, 1262:19, 1289:11, 1328:12
  **opinions** [4] - 1233:14, 1261:9, 1328:6, 1328:9
  **OPPENHEIMER** [17]

- 1215:21, 1221:16, 1222:10, 1223:12, 1234:7, 1234:10, 1234:15, 1235:1, 1235:3, 1235:5, 1236:1, 1237:12, 1249:17, 1253:10, 1255:4, 1288:16, 1321:13
  **opportunity** [3] - 1237:17, 1247:16, 1270:12
  **opposed** [2] - 1266:24, 1321:22
  **option** [2] - 1274:20, 1296:5
  **options** [1] - 1262:6
  **orange** [2] - 1258:7, 1319:20
  **order** [5] - 1239:14, 1269:20, 1274:12, 1304:8, 1330:5
  **ordinary** [1] - 1247:15
  **otherwise** [2] - 1262:9, 1307:23
  **outcome** [1] - 1299:11
  **outcomes** [1] - 1241:24
  **outcry** [2] - 1297:9, 1300:25
  **outliers** [1] - 1267:9
  **outside** [2] - 1242:21, 1250:1
  **overview** [1] - 1223:21
  **owner** [1] - 1242:9

## P

  **P&L** [3] - 1236:23, 1311:9, 1311:14
  **P&Ls** [3] - 1236:19, 1236:21, 1236:22
  **p.m** [1] - 1215:7
  **PAGE** [1] - 1217:8
  **paid** [2] - 1251:13, 1310:18
  **painful** [2] - 1246:17, 1246:19
  **pair** [2] - 1272:24, 1277:12
  **PAN** [1] - 1215:11
  **part** [9] - 1222:12, 1227:11, 1240:7, 1245:18, 1282:13, 1284:25, 1289:13, 1291:15, 1322:8

  **participant** [1] - 1255:25
  **participants** [5] - 1260:24, 1261:3, 1261:5, 1261:8, 1304:16
  **particular** [16] - 1223:24, 1225:18, 1229:17, 1233:4, 1238:3, 1238:11, 1238:24, 1240:10, 1270:11, 1277:12, 1289:3, 1290:5, 1297:23, 1299:2, 1302:16, 1317:1
  **particularly** [7] - 1226:16, 1226:20, 1227:9, 1235:17, 1238:10, 1291:13, 1323:24
  **parties** [58] - 1225:21, 1225:24, 1226:17, 1226:22, 1227:11, 1228:8, 1233:10, 1235:17, 1238:24, 1241:8, 1242:11, 1244:9, 1250:13, 1251:1, 1260:5, 1261:24, 1263:3, 1263:14, 1263:20, 1264:1, 1264:18, 1264:24, 1265:2, 1265:17, 1266:3, 1266:9, 1267:14, 1269:15, 1269:20, 1270:14, 1272:9, 1272:14, 1273:6, 1273:9, 1273:13, 1273:20, 1273:24, 1274:6, 1274:10, 1274:11, 1274:12, 1282:2, 1282:4, 1284:1, 1286:21, 1298:2, 1299:22, 1300:4, 1300:6, 1300:13, 1300:18, 1301:16, 1302:23, 1303:1, 1303:4, 1303:10, 1305:11, 1316:8
  **parties'** [5] - 1225:23, 1263:25, 1296:14, 1317:2, 1324:22
  **partner** [2] - 1219:24, 1270:9
  **parts** [1] - 1244:8
  **party** [27] - 1230:11, 1230:16, 1266:12, 1267:1, 1267:2,

1268:21, 1271:15, 1275:3, 1275:21, 1283:3, 1283:16, 1284:8, 1285:11, 1285:19, 1285:22, 1285:24, 1287:1, 1287:3, 1288:4, 1289:5, 1289:6, 1305:13, 1305:16
  **passenger** [2] - 1278:1, 1278:25
  **passes** [4] - 1244:3, 1249:5, 1250:18
  **passing** [2] - 1248:22, 1249:7
  **past** [2] - 1219:24, 1239:16
  **pause** [1] - 1331:22
  **pay** [10] - 1297:10, 1297:11, 1297:12, 1306:14, 1307:5, 1307:9, 1310:9, 1310:14, 1310:16, 1310:17
  **paying** [4] - 1306:24, 1308:18, 1310:20, 1310:21
  **pays** [1] - 1297:4
  Peabody/Arch [1] - 1221:11
  **PENGUIN** [1] - 1215:21
  **Penguin** [83] - 1223:25, 1235:17, 1242:13, 1242:15, 1242:16, 1242:24, 1245:5, 1245:7, 1245:11, 1246:2, 1247:7, 1247:9, 1247:21, 1248:3, 1248:4, 1248:5, 1248:16, 1252:25, 1253:1, 1254:4, 1254:5, 1261:12, 1261:17, 1262:6, 1264:7, 1264:12, 1265:24, 1266:2, 1266:14, 1267:2, 1268:10, 1268:14, 1268:23, 1270:24, 1271:1, 1271:3, 1271:6, 1271:13, 1272:5, 1272:24, 1272:25, 1274:23, 1274:24, 1276:4, 1276:5, 1276:11, 1276:12, 1276:17, 1280:23, 1280:25, 1281:1, 1281:2, 1281:8, 1281:16,

1282:21, 1282:23, 1283:18, 1283:20, 1284:2, 1285:7, 1286:9, 1286:11, 1288:9, 1288:10, 1291:3, 1291:16, 1291:17, 1292:6, 1293:4, 1293:10, 1294:1, 1294:6, 1294:16, 1311:22, 1312:5, 1312:11, 1312:18, 1312:24, 1314:10, 1314:16, 1319:14, 1319:15, 1320:18
  **people** [5] - 1238:20, 1261:18, 1302:11, 1306:19, 1323:16
  **per** [5] - 1312:19, 1312:20, 1314:16, 1314:18
  **perceive** [1] - 1270:7
  **perceived** [1] - 1264:19
  **perceiving** [1] - 1264:1
  **percent** [45] - 1235:14, 1235:15, 1239:1, 1239:23, 1240:3, 1246:13, 1247:9, 1247:10, 1247:11, 1248:6, 1248:8, 1248:9, 1248:15, 1248:19, 1249:1, 1249:3, 1249:4, 1254:5, 1254:6, 1256:3, 1266:4, 1267:6, 1276:14, 1276:16, 1280:24, 1280:25, 1281:6, 1281:12, 1281:16, 1282:22, 1282:24, 1286:1, 1286:10, 1286:12, 1292:8, 1294:5, 1294:8, 1304:7, 1304:21, 1312:12, 1312:15, 1313:11, 1314:18, 1314:20
  **perfect** [1] - 1275:12
  **perform** [2] - 1232:19, 1254:7
  **performing** [1] - 1325:8
  **perhaps** [1] - 1238:10
  **period** [1] - 1251:22
  **permitted** [1] - 1260:21
  **person** [1] - 1302:12

1349

**personnel** [1] - 1273:1

**perspective** [4] - 1241:7, 1246:20, 1278:13, 1295:20

**PETROCELLI** [1] - 1215:20

**Ph.D** [6] - 1217:5, 1218:12, 1219:7, 1219:14, 1219:16, 1321:19

**picked** [1] - 1277:3

**picture** [1] - 1289:13

**Pietsch** [2] - 1247:17, 1330:15

**pink** [1] - 1257:19

**Plaintiff** [1] - 1215:4

**PLAINTIFF** [2] - 1215:15, 1217:4

**Plaintiff's** [14] - 1217:9, 1217:10, 1217:10, 1217:11, 1217:11, 1217:12, 1217:12, 1236:3, 1237:14, 1249:19, 1253:12, 1255:6, 1288:18, 1321:15

**players** [3] - 1267:21, 1290:7, 1290:9

**playing** [1] - 1269:10

**plays** [1] - 1309:6

**plugging** [1] - 1298:17

**poach** [1] - 1272:14

**poached** [2] - 1272:24, 1330:21

**poaching** [2] - 1265:12, 1273:1

**point** [15] - 1221:13, 1227:20, 1244:4, 1256:12, 1257:17, 1266:15, 1274:9, 1295:18, 1297:13, 1297:14, 1301:11, 1309:10, 1322:2, 1325:3

**points** [5] - 1228:5, 1256:22, 1257:18, 1257:20, 1329:2

**political** [2] - 1226:15, 1232:5

**population** [4] - 1290:1, 1290:3, 1290:5, 1292:20

**portion** [4] - 1297:20, 1297:21, 1315:3, 1315:4

**possibilities** [1] - 1318:1

**post** [8] - 1255:18, 1257:10, 1257:15, 1258:5, 1259:11, 1268:12, 1268:15, 1299:14

**post-merger** [8] - 1255:18, 1257:10, 1257:15, 1258:5, 1259:11, 1268:12, 1268:15, 1299:14

**potential** [1] - 1265:6

**potentially** [2] - 1229:5, 1230:18

**power** [4] - 1256:20, 1256:23, 1257:22, 1259:1

**PowerPoint** [1] - 1222:19

**practice** [1] - 1220:17

**pre** [2] - 1236:25, 1259:10

**pre-bidding** [1] - 1236:25

**pre-merger** [1] - 1259:10

**precise** [3] - 1259:6, 1298:7, 1298:9

**precisely** [1] - 1287:22

**predict** [6] - 1273:21, 1299:17, 1299:20, 1301:19, 1309:20, 1325:10

**predicted** [7] - 1305:17, 1307:25, 1312:11, 1312:13, 1315:14, 1318:16, 1318:19

**predicting** [1] - 1319:23

**prediction** [13] - 1296:20, 1298:9, 1299:3, 1299:11, 1302:21, 1303:3, 1312:23, 1317:17, 1319:21, 1320:3, 1320:17, 1320:20, 1324:6

**prediction's** [1] - 1320:25

**predictions** [4] - 1298:8, 1312:6, 1320:19, 1323:15

**prefer** [2] - 1229:7, 1244:1

**preference** [2] - 1293:23, 1317:16

**preferences** [5] - 1231:8, 1231:11,

1232:7, 1233:23, 1238:5

**preferred** [1] - 1319:23

**prefers** [1] - 1289:10

**prepare** [4] - 1236:11, 1236:14, 1253:15, 1259:2

**prepared** [1] - 1222:4

**present** [1] - 1218:16

**presentation** [3] - 1222:4, 1222:8, 1236:16

**presented** [1] - 1314:23

**presently** [1] - 1250:7

**president** [2] - 1271:12, 1272:22

**pressure** [2] - 1316:9, 1316:22

**presumed** [4] - 1256:20, 1256:23, 1257:21, 1258:25

**presumption** [2] - 1257:24, 1262:22

**pretty** [4] - 1254:25, 1265:18, 1308:14, 1308:17

**previous** [7] - 1253:25, 1257:4, 1257:24, 1259:6, 1321:10, 1322:5, 1324:25

**previously** [1] - 1299:14

**PRH** [2] - 1264:16, 1264:17

**price** [17] - 1229:18, 1229:20, 1271:10, 1296:17, 1297:1, 1297:17, 1297:18, 1298:4, 1300:1, 1300:22, 1301:2, 1302:17, 1317:18, 1324:6, 1324:15, 1326:17, 1329:12

**price-fixing** [2] - 1326:17, 1329:12

**prices** [2] - 1313:21, 1327:24

**pricing** [6] - 1229:15, 1229:16, 1316:9, 1316:15, 1316:16, 1316:22

**primarily** [2] - 1220:4, 1226:17

**primary** [1] - 1325:21

**principal** [1] - 1283:9

**printing** [2] - 1310:21, 1330:8

**privately** [2] - 1234:14, 1235:4

**probability** [5] - 1269:3, 1269:5, 1269:8, 1269:23, 1277:3

**problem** [1] - 1290:22

**proceed** [4] - 1218:14, 1218:22, 1222:1, 1280:14

**Proceedings** [1] - 1332:8

**proceedings** [3] - 1218:9, 1280:10, 1333:6

**procurement** [1] - 1323:24

**produced** [1] - 1333:6

**product** [1] - 1309:4

**products** [4] - 1225:17, 1225:23, 1252:11, 1274:9

**professional** [2] - 1290:7, 1290:9

**profit** [30] - 1246:14, 1246:15, 1246:20, 1305:18, 1305:24, 1306:5, 1306:11, 1307:6, 1307:8, 1307:13, 1307:19, 1307:22, 1307:24, 1307:25, 1308:3, 1308:4, 1308:19, 1309:11, 1309:15, 1309:20, 1310:4, 1310:5, 1310:23, 1311:7, 1318:7, 1318:13, 1318:19, 1318:25, 1319:6, 1325:10

**profitability** [1] - 1240:10

**profitable** [4] - 1240:11, 1246:19, 1248:10, 1327:19

**profits** [1] - 1249:1

**progress** [1] - 1298:6

**projected** [1] - 1296:13

**properly** [4] - 1240:17, 1246:7, 1250:24, 1251:3

**proportion** [7] - 1245:8, 1245:11, 1245:12, 1247:8,

1274:24, 1274:25, 1276:13

**proportional** [15] - 1247:4, 1277:4, 1278:17, 1278:18, 1281:4, 1293:17, 1293:18, 1293:23, 1294:5, 1294:18, 1295:1, 1318:23, 1319:18, 1320:3, 1320:22

**proposal** [2] - 1230:1, 1230:18

**propose** [1] - 1288:21

**proposed** [3] - 1223:25, 1250:14, 1261:9

**public** [5] - 1223:3, 1234:17, 1234:24, 1235:6, 1323:24

**publish** [3] - 1222:7, 1228:1, 1291:23

**published** [2] - 1221:3, 1250:5

**publisher** [28] - 1227:5, 1227:14, 1228:4, 1230:17, 1231:25, 1232:3, 1238:22, 1242:9, 1243:2, 1245:5, 1251:16, 1265:11, 1265:12, 1265:25, 1266:13, 1267:7, 1269:10, 1271:12, 1276:23, 1277:3, 1287:4, 1287:19, 1287:24, 1288:3, 1296:25, 1297:1, 1305:20

**publisher's** [5] - 1265:13, 1277:4, 1287:18, 1304:5, 1310:3

**Publishers** [2] - 1233:7, 1238:23

**publishers** [60] - 1226:19, 1227:9, 1227:10, 1227:25, 1228:3, 1228:11, 1229:20, 1229:24, 1230:12, 1230:17, 1231:2, 1231:8, 1231:17, 1233:9, 1235:15, 1235:18, 1236:7, 1238:21, 1241:10, 1241:18, 1241:22, 1242:7, 1242:9, 1242:14, 1243:9, 1244:1,

1350

1244:13, 1245:12, 1247:10, 1247:22, 1249:24, 1250:3, 1250:4, 1250:7, 1250:12, 1250:13, 1250:16, 1250:25, 1251:14, 1253:3, 1253:4, 1253:6, 1254:1, 1254:13, 1254:14, 1265:7, 1266:25, 1269:25, 1273:13, 1275:1, 1277:13, 1279:17, 1296:24, 1299:16, 1304:18, 1308:6, 1329:11, 1329:14, 1330:8, 1330:15

**publishers'** [2] - 1239:20, 1305:20

**publishes** [1] - 1231:25

**publishing** [36] - 1227:12, 1227:13, 1227:16, 1227:21, 1227:25, 1228:2, 1228:14, 1231:9, 1241:13, 1242:21, 1243:5, 1243:8, 1243:17, 1243:22, 1244:1, 1244:13, 1244:18, 1244:22, 1245:13, 1245:22, 1246:3, 1246:8, 1246:24, 1247:5, 1247:6, 1247:10, 1247:12, 1247:23, 1248:10, 1248:18, 1250:1, 1250:5, 1276:19, 1310:11

**pull** [4] - 1260:9, 1326:9, 1327:12

**punches** [3] - 1260:9, 1326:10, 1327:12

**punish** [1] - 1328:4

**punishment** [4] - 1327:17, 1328:3, 1329:24, 1331:3

**purchase** [4] - 1226:3, 1226:18, 1231:17, 1330:1

**purchases** [3] - 1330:2, 1330:3, 1330:5

**purple** [1] - 1254:13

**purpose** [4] - 1225:12, 1251:9, 1255:10, 1303:6

**push** [2] - 1262:8, 1308:24

**pushing** [1] - 1309:3

**put** [9] - 1246:5, 1249:11, 1262:20, 1269:2, 1269:14, 1297:25, 1306:12, 1322:21, 1322:24

**putting** [1] - 1269:1

**PX** [14] - 1235:23, 1237:10, 1249:14, 1249:15, 1253:8, 1255:2, 1288:13, 1288:14, 1321:11

## Q

**qualified** [1] - 1221:17

**qualitative** [11] - 1225:5, 1244:20, 1261:2, 1262:25, 1263:15, 1263:17, 1273:15, 1278:16, 1304:13, 1304:19, 1325:24

**qualitatively** [1] - 1321:7

**quality** [1] - 1296:2

**quantifiable** [1] - 1314:8

**quantify** [1] - 1313:21

**quantitative** [7] - 1225:5, 1233:21, 1244:20, 1244:23, 1267:12, 1278:16, 1304:20

**questions** [3] - 1239:12, 1240:13, 1286:3

**quite** [4] - 1227:6, 1292:19, 1298:13, 1313:13

**quote** [9] - 1227:21, 1227:24, 1264:15, 1267:19, 1267:23, 1271:12, 1272:10, 1272:22, 1327:18

**quotes** [6] - 1227:3, 1227:7, 1260:23, 1266:8, 1272:3, 1272:25

## R

**raise** [2] - 1218:11, 1256:13

**raises** [1] - 1329:16

**ran** [2] - 1315:9, 1315:12

**RANDALL** [1] - 1215:21

**Random** [82] - 1223:25, 1235:17, 1242:13, 1242:15, 1242:16, 1245:5, 1245:7, 1245:11, 1246:2, 1247:8, 1247:9, 1247:21, 1248:3, 1248:4, 1248:6, 1248:16, 1252:25, 1253:1, 1254:4, 1254:5, 1261:12, 1261:17, 1262:7, 1264:7, 1264:12, 1265:25, 1266:2, 1266:14, 1267:2, 1268:10, 1268:14, 1268:23, 1270:24, 1271:1, 1271:3, 1271:6, 1271:13, 1272:5, 1272:24, 1272:25, 1274:23, 1274:24, 1276:5, 1276:11, 1276:12, 1276:17, 1280:23, 1280:25, 1281:1, 1281:3, 1281:8, 1281:16, 1282:21, 1282:23, 1283:18, 1283:20, 1284:2, 1285:7, 1286:9, 1286:11, 1288:9, 1288:10, 1291:4, 1291:16, 1291:17, 1292:6, 1293:5, 1293:10, 1294:1, 1294:6, 1294:17, 1311:22, 1312:5, 1312:11, 1312:18, 1312:24, 1314:11, 1314:16, 1319:15, 1319:16, 1320:18

**RANDOM** [1] - 1215:21

**random** [1] - 1292:16

**Random/ Doubleday** [1] - 1272:7

**randomly** [1] - 1292:16

**range** [1] - 1220:24

**ranging** [1] - 1237:5

**rarely** [2] - 1227:6, 1301:18

**rather** [2] - 1247:12, 1327:4

**ratio** [18] - 1244:25, 1245:3, 1245:4,

1245:7, 1245:10, 1245:14, 1245:16, 1247:1, 1274:14, 1275:11, 1276:2, 1281:6, 1283:7, 1286:24, 1288:7, 1318:14, 1318:15, 1318:20

**ratios** [10] - 1263:1, 1274:1, 1274:3, 1274:5, 1275:15, 1277:21, 1281:20, 1294:14, 1295:14, 1325:25

**RDR** [3] - 1216:8, 1333:3, 1333:12

**re** [6] - 1235:23, 1237:10, 1249:14, 1253:8, 1255:2, 1321:10

**re-creation** [5] - 1235:23, 1237:10, 1249:14, 1253:8, 1255:2

**re-creations** [1] - 1321:10

**reach** [4] - 1321:2, 1328:6, 1328:12, 1329:15

**reaches** [1] - 1321:7

**reaching** [1] - 1331:3

**reaction** [1] - 1268:22

**reactions** [1] - 1327:20

**READ** [2] - 1215:15, 1218:5

**read** [2] - 1255:12, 1260:19

**reading** [1] - 1227:1

**ready** [1] - 1280:15

**realistic** [2] - 1230:23, 1317:25

**realize** [1] - 1272:17

**realized** [1] - 1311:11

**really** [15] - 1229:7, 1243:1, 1243:4, 1243:7, 1244:7, 1270:6, 1274:9, 1279:11, 1283:8, 1283:15, 1285:21, 1308:22, 1309:15, 1321:20, 1323:21

**reasonable** [16] - 1225:23, 1227:13, 1227:17, 1228:11, 1228:12, 1238:2, 1238:6, 1240:8, 1244:18, 1277:16,

1294:4, 1294:8, 1300:11, 1315:25, 1321:5, 1324:12

**reasons** [5] - 1238:6, 1277:25, 1284:17, 1292:1, 1329:8

**receive** [2] - 1220:9, 1232:20

**RECEIVED** [1] - 1217:8

**received** [4] - 1220:13, 1266:5, 1284:15, 1315:13

**recent** [1] - 1221:23

**recently** [1] - 1252:10

**recess** [1] - 1280:9

**recognized** [2] - 1221:6, 1221:8

**recognizing** [1] - 1272:9

**record** [10] - 1219:3, 1254:3, 1282:9, 1284:22, 1287:25, 1289:4, 1290:17, 1292:18, 1312:17

**recorded** [2] - 1286:21, 1287:9

**recording** [1] - 1290:17

**records** [6] - 1234:20, 1282:13, 1283:19, 1285:10, 1289:1, 1292:14

**red** [6] - 1245:21, 1248:7, 1258:7, 1290:24, 1293:6, 1293:14

**Redirect** [1] - 1217:2

**reduce** [7] - 1225:7, 1260:6, 1262:17, 1263:13, 1271:17, 1326:2, 1326:8

**reduced** [2] - 1263:13, 1313:10

**reduces** [1] - 1312:6

**reduction** [10] - 1301:18, 1312:19, 1312:20, 1313:17, 1314:1, 1314:5, 1314:18, 1314:20, 1315:15, 1320:4

**reductions** [2] - 1319:24, 1331:1

**redundant** [1] - 1313:4

**REED** [3] - 1331:20, 1331:25, 1332:4

**refer** [1] - 1255:21

**referenced** [2] -

1351

1239:25, 1264:21
**referred** [2] -
1263:16, 1282:16
**referring** [1] -
1330:13
**reflected** [1] -
1279:17
**reflective** [1] -
1276:22
**regard** [2] - 1223:25,
1317:7
**regarding** [6] -
1249:23, 1250:21,
1260:12, 1263:18,
1273:17, 1304:13
**region** [1] - 1257:19
**regular** [1] - 1330:3
**regularly** [1] -
1231:17
**relate** [1] - 1240:9
**related** [1] - 1285:6
**relationship** [1] -
1307:11
**relative** [2] -
1239:16, 1314:25
**relatively** [3] -
1292:12, 1296:2,
1311:20
**relevant** [3] - 1225:1,
1263:7, 1297:20
**reliable** [5] - 1289:9,
1295:2, 1295:6,
1317:15, 1324:11
**reliance** [2] -
1222:12, 1330:8
**rely** [3] - 1282:7,
1294:13, 1294:20
**remain** [1] - 1218:10
**remember** [3] -
1244:8, 1303:11,
1313:14
**remind** [5] - 1241:11,
1273:16, 1274:14,
1276:19, 1326:4
**removing** [1] -
1270:9
**rental** [1] - 1310:17
**repeat** [1] - 1240:23
**repeated** [2] -
1233:18, 1327:2
**reply** [2] - 1250:16,
1251:25
**report** [4] - 1250:16,
1251:25, 1275:7,
1314:23
**REPORTED** [1] -
1216:8
**REPORTER** [3] -
1219:9, 1240:23,
1276:25

**Reporter** [2] -
1216:8, 1333:12
**reports** [5] - 1233:7,
1237:18, 1243:23,
1266:22, 1267:11
**represent** [1] -
1274:18
**representative** [6] -
1290:1, 1290:2,
1290:3, 1291:20,
1292:10, 1295:11
**representativeness**
[1] - 1295:9
**representing** [5] -
1253:3, 1258:1,
1270:19, 1274:23,
1277:10
**represents** [1] -
1253:5
**reputation** [3] -
1231:15, 1231:21,
1236:10
**reran** [1] - 1250:15
**resolve** [2] -
1234:18, 1234:22
**respect** [2] - 1312:4,
1325:6
**responsibilities** [2] -
1220:1, 1220:3
**restricted** [1] -
1314:3
**result** [10] - 1225:4,
1255:17, 1256:19,
1257:8, 1257:20,
1258:10, 1272:16,
1280:19, 1313:18,
1327:20
**resulted** [1] -
1262:10
**results** [35] -
1236:24, 1238:3,
1238:12, 1248:3,
1250:17, 1252:16,
1256:22, 1256:24,
1257:3, 1259:3,
1275:25, 1276:1,
1276:8, 1282:17,
1286:6, 1289:16,
1289:18, 1293:7,
1293:8, 1296:13,
1311:11, 1312:7,
1313:6, 1313:9,
1314:11, 1314:14,
1315:5, 1315:11,
1319:8, 1319:19,
1320:10, 1321:3,
1321:8, 1322:7,
1322:13
**resume** [2] -
1331:13, 1332:7

**return** [1] - 1298:7
**returned** [2] -
1219:22, 1220:5
**reveal** [1] - 1323:12
**revenue** [10] -
1246:24, 1247:5,
1247:9, 1248:14,
1310:7, 1310:13,
1310:24, 1311:12,
1311:15
**review** [2] - 1233:13,
1237:17
**reviewed** [2] -
1285:6, 1285:8
**right-hand** [6] -
1264:8, 1264:14,
1265:24, 1270:18,
1274:22, 1320:1
**rights** [4] - 1225:2,
1226:3, 1226:8,
1226:18
**risk** [2] - 1328:11,
1328:17
**robust** [1] - 1258:11
**role** [2] - 1220:7,
1264:11
**room** [3] - 1307:18,
1308:19, 1309:14
**Room** [1] - 1216:10
**roughly** [6] -
1220:20, 1249:4,
1284:25, 1304:21,
1307:17, 1313:9
**round** [5] - 1265:9,
1271:1, 1319:13,
1319:22, 1320:14
**rounds** [13] - 1262:6,
1265:7, 1265:8,
1265:16, 1265:17,
1266:9, 1270:3,
1296:18, 1317:11,
1317:12, 1319:14,
1320:16, 1324:16
**row** [4] - 1248:3,
1248:4, 1248:5,
1248:23
**ROXANA** [1] -
1215:22
**royalties** [1] - 1240:4
**run** [1] - 1315:7
**runner** [24] -
1275:22, 1282:16,
1282:22, 1283:1,
1283:10, 1283:14,
1283:25, 1284:5,
1284:8, 1284:12,
1284:24, 1285:4,
1285:12, 1285:14,
1285:16, 1285:19,
1286:1, 1287:19,

1287:23, 1289:6,
1293:15, 1294:3,
1294:15, 1305:14
**runner-up** [24] -
1275:22, 1282:16,
1282:22, 1283:1,
1283:10, 1283:14,
1283:25, 1284:5,
1284:8, 1284:12,
1284:24, 1285:4,
1285:12, 1285:14,
1285:16, 1285:19,
1286:1, 1287:19,
1287:23, 1289:6,
1293:15, 1294:3,
1294:15, 1305:14
**runs** [1] - 1256:8
**RYAN** [1] - 1216:5

## S

**S&S** [2] - 1264:11,
1271:14
**salary** [1] - 1310:16
**sale** [1] - 1246:18
**sales** [8] - 1232:25,
1246:19, 1246:24,
1247:2, 1247:4,
1248:14, 1307:2
**salespeople** [1] -
1282:9
**Sally's** [1] - 1267:19
**sample** [20] -
1258:22, 1289:24,
1289:25, 1290:3,
1290:11, 1290:13,
1292:4, 1292:10,
1292:12, 1292:15,
1292:16, 1293:24,
1294:7, 1294:9,
1294:12, 1294:21,
1295:2, 1295:9,
1295:10, 1295:11
**sampled** [2] -
1290:7, 1290:12
**samples** [1] -
1294:13
**save** [1] - 1292:23
**saw** [3] - 1257:24,
1270:3, 1322:6
**scale** [1] - 1256:8
**scenarios** [2] -
1265:6, 1320:11
**Scholastic** [1] -
1288:3
**SCHUSTER** [1] -
1216:3
**Schuster** [69] -
1224:1, 1242:25,

1245:7, 1245:9,
1248:4, 1248:25,
1252:25, 1254:4,
1254:6, 1261:13,
1261:18, 1262:6,
1264:9, 1264:13,
1265:25, 1266:14,
1267:3, 1268:11,
1268:15, 1268:24,
1271:24, 1271:25,
1272:23, 1273:2,
1274:19, 1274:20,
1276:4, 1276:6,
1276:12, 1276:13,
1276:15, 1280:23,
1280:24, 1281:1,
1281:2, 1281:9,
1281:13, 1281:15,
1282:22, 1282:23,
1283:19, 1284:3,
1285:8, 1286:10,
1286:11, 1287:10,
1288:10, 1291:14,
1291:18, 1291:19,
1291:23, 1292:5,
1292:9, 1292:11,
1293:5, 1293:10,
1294:2, 1294:6,
1294:16, 1311:20,
1312:14, 1312:19,
1312:25, 1314:19,
1320:2, 1320:21
**Schuster's** [1] -
1253:2
**SCHWARZ** [1] -
1215:16
**sci** [1] - 1232:2
**sci-fi** [1] - 1232:2
**score** [33] - 1295:22,
1296:5, 1296:7,
1296:22, 1299:5,
1299:9, 1300:1,
1302:25, 1303:7,
1305:5, 1314:21,
1315:21, 1316:25,
1317:1, 1318:5,
1318:8, 1318:10,
1318:18, 1319:20,
1319:25, 1320:4,
1320:8, 1320:19,
1320:23, 1321:5,
1322:15, 1322:18,
1322:22, 1323:4,
1323:6, 1323:7,
1324:10, 1325:6
**SCOTT** [1] - 1215:22
**screen** [2] - 1257:4,
1261:6
**screens** [1] -
1303:25

**SE** [1] - 1215:6
**seal** [1] - 1223:5
**second** [87] -
1229:14, 1244:12,
1248:15, 1248:23,
1256:17, 1262:24,
1266:10, 1267:23,
1269:20, 1271:1,
1274:12, 1275:19,
1279:23, 1280:17,
1283:17, 1283:21,
1284:21, 1285:25,
1290:19, 1292:24,
1295:22, 1296:5,
1296:7, 1296:17,
1296:22, 1297:2,
1297:5, 1297:7,
1297:15, 1297:18,
1299:4, 1299:8,
1299:23, 1299:25,
1300:1, 1300:2,
1300:4, 1300:6,
1300:13, 1301:1,
1301:17, 1301:19,
1301:20, 1302:12,
1302:16, 1302:25,
1303:7, 1303:12,
1303:15, 1303:18,
1303:21, 1303:24,
1304:5, 1304:14,
1304:20, 1305:5,
1305:18, 1306:16,
1309:9, 1314:21,
1315:21, 1316:25,
1317:1, 1318:5,
1318:8, 1318:10,
1318:18, 1319:20,
1319:25, 1320:4,
1320:8, 1320:19,
1320:23, 1321:5,
1322:1, 1322:15,
1322:18, 1322:22,
1323:4, 1323:6,
1323:7, 1324:10,
1324:15, 1325:6,
1327:13, 1328:22,
1329:18
**second-highest** [1] -
1297:7
**second-order** [2] -
1269:20, 1274:12
**seconds** [1] - 1235:1
**section** [1] - 1316:19
**see** [73] - 1224:4,
1227:19, 1227:24,
1229:13, 1230:1,
1232:14, 1233:17,
1233:19, 1235:13,
1235:16, 1237:6,
1244:2, 1245:21,

1248:7, 1248:14,
1249:2, 1252:24,
1253:1, 1253:2,
1253:4, 1254:12,
1254:21, 1257:12,
1258:4, 1258:10,
1258:23, 1259:5,
1259:9, 1261:3,
1261:16, 1264:1,
1264:3, 1264:5,
1264:15, 1264:25,
1265:24, 1266:12,
1267:12, 1270:23,
1271:24, 1272:3,
1272:10, 1272:19,
1276:11, 1279:2,
1279:5, 1279:14,
1280:22, 1281:10,
1285:9, 1286:9,
1287:1, 1290:18,
1291:2, 1291:6,
1291:8, 1291:11,
1293:14, 1294:6,
1297:8, 1299:3,
1299:4, 1300:8,
1304:6, 1309:8,
1314:14, 1315:15,
1320:2, 1320:13,
1322:4, 1327:14,
1327:18, 1329:24
**seeing** [1] - 1293:25
**seek** [1] - 1242:18
**seeks** [1] - 1232:3
**seem** [1] - 1284:18
**select** [3] - 1236:7,
1284:11, 1317:23
**self** [32] - 1227:12,
1227:13, 1227:16,
1227:21, 1227:25,
1228:1, 1228:14,
1231:9, 1241:13,
1242:21, 1243:5,
1243:8, 1243:17,
1243:22, 1244:1,
1244:13, 1244:18,
1244:22, 1245:13,
1245:22, 1246:3,
1246:8, 1246:24,
1247:6, 1247:10,
1247:12, 1247:23,
1248:10, 1248:18,
1250:1, 1250:5,
1276:19
**self-publish** [1] -
1228:1
**self-publishing** [31] -
1227:12, 1227:13,
1227:16, 1227:21,
1227:25, 1228:14,
1231:9, 1241:13,

1242:21, 1243:5,
1243:8, 1243:17,
1243:22, 1244:1,
1244:13, 1244:18,
1244:22, 1245:13,
1245:22, 1246:3,
1246:8, 1246:24,
1247:6, 1247:10,
1247:12, 1247:23,
1248:10, 1248:18,
1250:1, 1250:5,
1276:19
**sell** [7] - 1226:7,
1230:11, 1230:16,
1230:17, 1233:2,
1296:24, 1309:2
**seller** [20] - 1226:5,
1226:6, 1230:21,
1231:1, 1232:13,
1232:23, 1233:15,
1249:25, 1250:4,
1250:8, 1250:17,
1254:17, 1258:13,
1258:18, 1259:8,
1291:1, 1304:3,
1304:7, 1304:8,
1315:8
**sellers** [57] - 1225:2,
1226:4, 1226:9,
1226:18, 1227:14,
1228:10, 1228:15,
1228:16, 1228:17,
1228:19, 1229:1,
1229:2, 1229:12,
1229:17, 1229:21,
1230:9, 1230:10,
1230:25, 1231:6,
1231:8, 1231:12,
1231:13, 1231:19,
1233:22, 1234:3,
1234:4, 1234:6,
1235:13, 1235:14,
1235:19, 1235:20,
1236:7, 1237:6,
1237:7, 1237:8,
1239:2, 1239:4,
1239:13, 1239:21,
1239:24, 1240:2,
1241:9, 1241:19,
1243:19, 1244:19,
1250:24, 1251:3,
1251:14, 1251:17,
1251:20, 1252:23,
1287:1, 1289:24,
1291:3, 1296:14,
1330:6
**selling** [3] - 1226:8,
1230:11, 1308:13
**senior** [1] - 1272:22
**sense** [6] - 1238:19,

1241:21, 1267:25,
1297:6, 1308:14,
1308:16
**sensible** [1] - 1295:7
**sensitive** [1] -
1233:14
**separate** [1] -
1222:22
**separately** [3] -
1222:21, 1243:20,
1318:1
**series** [2] - 1308:15,
1316:7
**serious** [1] - 1243:8
**service** [1] - 1220:14
**services** [1] -
1225:17
**SESSION** [1] -
1215:8
**set** [9] - 1249:12,
1251:13, 1252:8,
1290:24, 1295:7,
1300:5, 1303:12,
1324:18, 1328:15
**sets** [2] - 1252:6,
1300:2
**setting** [5] - 1301:1,
1302:17, 1324:14,
1324:15, 1324:16
**settings** [6] - 1265:2,
1268:11, 1277:15,
1309:21, 1323:23,
1324:18
**seven** [1] - 1219:18
**several** [1] - 1265:21
**shapes** [1] - 1258:17
**share** [45] - 1234:3,
1252:16, 1252:25,
1253:1, 1253:2,
1253:16, 1253:22,
1254:7, 1254:23,
1255:24, 1256:3,
1261:5, 1275:17,
1276:7, 1276:20,
1276:21, 1277:4,
1277:15, 1278:7,
1278:14, 1278:17,
1278:18, 1278:22,
1279:13, 1279:22,
1281:4, 1286:6,
1291:17, 1293:17,
1293:18, 1293:23,
1294:5, 1294:18,
1295:1, 1305:12,
1312:7, 1318:23,
1319:8, 1319:18,
1320:3, 1320:22,
1327:6
**shares** [33] -
1224:19, 1251:7,

1251:8, 1251:9,
1251:10, 1251:12,
1251:16, 1252:7,
1252:13, 1252:23,
1253:25, 1254:3,
1254:11, 1254:18,
1254:22, 1254:25,
1256:7, 1258:4,
1259:13, 1275:17,
1276:22, 1277:10,
1277:20, 1278:6,
1278:24, 1279:18,
1298:1, 1305:10,
1305:11, 1305:15,
1318:11, 1325:10
**SHEARMAN** [2] -
1216:3, 1216:5
**SHORES** [1] - 1216:5
**shortened** [1] -
1316:9
**show** [4] - 1225:6,
1273:8, 1293:22,
1328:22
**showing** [3] -
1233:21, 1270:20,
1319:24
**shows** [1] - 1228:7
**shrinks** [1] - 1254:23
**side** [9] - 1231:16,
1264:8, 1270:18,
1271:24, 1274:22,
1281:15, 1289:2,
1319:14, 1320:1
**significance** [1] -
1251:11
**significant** [23] -
1226:7, 1233:8,
1233:19, 1235:16,
1238:8, 1238:11,
1240:7, 1241:21,
1244:14, 1246:8,
1252:13, 1256:18,
1264:13, 1274:10,
1276:4, 1288:9,
1293:22, 1301:20,
1305:22, 1306:11,
1314:1, 1321:1,
1329:19
**significantly** [20] -
1225:6, 1225:25,
1226:23, 1235:18,
1239:18, 1244:9,
1245:24, 1248:21,
1261:20, 1267:25,
1268:16, 1269:17,
1291:11, 1293:16,
1304:17, 1304:25,
1306:25, 1319:24,
1324:6, 1328:18
**signs** [2] - 1328:22,

1353

1329:4
**similar** [15] - 1254:25, 1266:19, 1271:23, 1272:10, 1281:2, 1283:4, 1283:8, 1293:7, 1293:8, 1296:17, 1303:14, 1315:11, 1318:4, 1320:19, 1321:7
**similarly** [5] - 1231:16, 1245:10, 1309:16, 1322:6, 1322:9
**Simon** [70] - 1224:1, 1242:24, 1245:7, 1245:8, 1248:4, 1248:25, 1252:25, 1253:1, 1254:4, 1254:6, 1261:13, 1261:17, 1262:6, 1264:8, 1264:13, 1265:25, 1266:14, 1267:3, 1268:10, 1268:14, 1268:24, 1271:24, 1271:25, 1272:22, 1272:23, 1273:1, 1274:19, 1276:4, 1276:5, 1276:11, 1276:13, 1276:15, 1280:23, 1280:24, 1281:1, 1281:2, 1281:9, 1281:13, 1281:15, 1282:21, 1282:23, 1283:19, 1284:3, 1285:7, 1286:9, 1286:11, 1287:10, 1288:10, 1291:13, 1291:18, 1291:19, 1291:22, 1292:4, 1292:9, 1292:11, 1293:5, 1293:9, 1294:2, 1294:5, 1294:16, 1311:20, 1312:14, 1312:19, 1312:25, 1314:19, 1320:2, 1320:21
**SIMON** [1] - 1216:3
**simplify** [3] - 1331:2, 1331:3
**simulate** [3] - 1263:5, 1295:16, 1296:9
**simulates** [1] - 1299:9
**simulations** [1] - 1313:25
**single** [4] - 1256:2, 1265:9, 1275:12,

1320:14
**situating** [1] - 1257:4
**situations** [4] - 1252:10, 1277:17, 1315:22, 1317:4
**six** [1] - 1329:14
**size** [6] - 1246:12, 1292:12, 1295:2, 1303:20, 1320:4, 1320:25
**sized** [1] - 1239:18
**sizes** [2] - 1294:7, 1294:21
**slices** [1] - 1237:5
**slide** [62] - 1222:4, 1222:8, 1223:21, 1224:4, 1224:24, 1225:14, 1226:24, 1226:25, 1227:18, 1228:20, 1232:14, 1233:6, 1234:1, 1235:23, 1236:16, 1236:17, 1241:1, 1245:15, 1248:1, 1252:18, 1253:23, 1253:25, 1254:9, 1257:1, 1257:2, 1257:25, 1258:14, 1258:15, 1259:4, 1259:25, 1260:16, 1260:17, 1261:25, 1264:4, 1265:4, 1265:19, 1266:20, 1267:16, 1270:16, 1271:22, 1272:19, 1274:4, 1274:16, 1276:10, 1280:21, 1282:19, 1286:8, 1290:19, 1293:2, 1304:1, 1304:2, 1305:7, 1312:9, 1314:13, 1316:19, 1319:10, 1320:12, 1321:10, 1324:24, 1324:25, 1326:5, 1329:7
**slides** [6] - 1227:2, 1234:17, 1234:25, 1240:25, 1315:6, 1322:4
**slight** [1] - 1288:13
**slightly** [3] - 1269:19, 1294:15, 1320:23
**small** [6] - 1233:19, 1292:12, 1294:13, 1294:21, 1329:19, 1330:1
**smaller** [4] - 1239:19, 1294:7,

1306:1, 1320:23
**smallest** [1] - 1270:23
**SMITH** [1] - 1215:21
**Snyder** [18] - 1237:18, 1249:24, 1288:21, 1288:25, 1289:7, 1289:23, 1290:23, 1291:16, 1292:2, 1295:5, 1313:3, 1313:5, 1315:16, 1316:25, 1322:3, 1322:12, 1324:13, 1325:15
**Snyder's** [18] - 1237:21, 1249:22, 1250:14, 1289:11, 1289:22, 1292:15, 1292:25, 1293:9, 1293:14, 1294:12, 1304:4, 1304:10, 1316:2, 1317:5, 1318:24, 1319:24, 1320:24, 1322:15
**so-called** [1] - 1226:20
**soften** [1] - 1268:19
**softened** [3] - 1268:16, 1268:19, 1268:20
**softening** [1] - 1268:23
**sold** [2] - 1232:7, 1296:15
**solution** [1] - 1242:18
**solve** [3] - 1323:9, 1323:13, 1323:17
**Someone** [1] - 1308:22
**someone** [6] - 1247:7, 1264:12, 1271:14, 1302:4, 1307:20, 1328:3
**sometimes** [4] - 1268:9, 1268:18, 1302:11, 1322:5
**somewhat** [2] - 1322:4, 1322:7
**somewhere** [3] - 1268:17, 1315:2, 1315:5
**sorry** [10] - 1219:11, 1223:12, 1236:21, 1251:22, 1256:18, 1284:6, 1287:11, 1290:10, 1297:2, 1317:3
**Sorry** [1] - 1276:25
**sort** [10] - 1224:18,

1257:23, 1263:19, 1265:5, 1290:21, 1300:25, 1307:16, 1310:5, 1328:3, 1328:15
**sorts** [1] - 1313:24
**source** [4] - 1280:17, 1281:24, 1281:25, 1286:4
**sources** [3] - 1275:5, 1275:8, 1275:14
**speaker** [1] - 1260:20
**speaking** [1] - 1315:11
**special** [1] - 1315:12
**specialize** [1] - 1279:6
**specific** [9] - 1241:23, 1263:21, 1264:20, 1264:25, 1298:24, 1300:12, 1302:10, 1314:2
**specifically** [1] - 1222:24
**spell** [1] - 1219:3
**spelling** [1] - 1241:1
**spend** [3] - 1236:18, 1236:19, 1237:6
**spending** [3] - 1239:20, 1239:23, 1239:24
**split** [2] - 1285:16, 1311:16
**splits** [1] - 1224:18
**sports** [5] - 1278:2, 1278:4, 1278:5, 1278:21, 1278:23
**square** [3] - 1255:24, 1256:3, 1256:7
**squares** [2] - 1256:1, 1258:19
**stable** [1] - 1254:22
**staff** [5] - 1219:17, 1219:21, 1220:3, 1220:8, 1286:15
**stages** [1] - 1270:19
**standard** [1] - 1255:20
**standing** [1] - 1218:11
**Stars** [1] - 1215:23
**start** [12] - 1251:8, 1257:4, 1263:23, 1271:25, 1272:4, 1272:7, 1273:23, 1274:18, 1276:7, 1293:4, 1329:4, 1331:6
**started** [1] - 1284:2

**starting** [1] - 1290:21
**state** [2] - 1219:2, 1317:14
**statement** [2] - 1261:1, 1300:16
**statements** [2] - 1263:19, 1263:23
**STATES** [4] - 1215:1, 1215:3, 1215:12, 1215:17
**States** [4] - 1216:9, 1223:24, 1290:7, 1333:13
**statistical** [1] - 1292:7
**statistically** [2] - 1293:18, 1293:19
**staying** [1] - 1225:12
**steal** [2] - 1265:13, 1327:25
**stenographic** [1] - 1333:5
**Step** [1] - 1245:25
**step** [10] - 1225:11, 1239:11, 1240:14, 1246:5, 1251:3, 1251:6, 1259:14, 1259:17, 1283:23, 1295:15
**STEPHEN** [1] - 1216:2
**stepping** [4] - 1230:24, 1288:6, 1293:20, 1321:2
**steps** [1] - 1245:20
**STERLING** [2] - 1216:3, 1216:5
**Stevenson** [7] - 1218:6, 1297:11, 1301:4, 1301:8, 1301:10, 1301:11, 1301:13
**STEVENSON** [63] - 1215:15, 1218:2, 1218:13, 1218:15, 1218:19, 1218:22, 1219:1, 1219:13, 1221:13, 1222:2, 1222:3, 1222:7, 1222:18, 1222:22, 1223:1, 1223:3, 1223:9, 1223:18, 1223:20, 1232:12, 1234:23, 1235:22, 1236:5, 1237:9, 1237:16, 1239:9, 1241:2, 1242:3, 1244:16, 1249:13, 1249:21, 1252:5, 1253:7, 1253:14,

1354

1255:1, 1255:8, 1277:5, 1279:15, 1280:1, 1280:4, 1280:12, 1280:14, 1280:16, 1281:18, 1283:22, 1287:12, 1288:12, 1288:20, 1289:21, 1292:22, 1299:7, 1302:20, 1305:3, 1309:18, 1311:5, 1311:6, 1313:1, 1313:16, 1319:7, 1321:9, 1325:19, 1331:5, 1331:10

**stick** [1] - 1328:5
**still** [5] - 1230:17, 1252:13, 1287:21, 1320:25, 1331:24
**stop** [2] - 1266:16, 1297:14
**store** [1] - 1310:18
**straightforward** [1] - 1311:21
**strategy** [1] - 1268:22
**stream** [1] - 1310:13
**Street** [2] - 1215:18, 1216:6
**strong** [7] - 1226:16, 1231:14, 1231:15, 1238:18, 1243:25, 1277:12
**structural** [1] - 1257:24
**study** [15] - 1240:8, 1275:23, 1282:16, 1282:22, 1283:1, 1283:10, 1283:15, 1283:25, 1284:17, 1285:1, 1285:20, 1285:24, 1286:2, 1294:3, 1294:15
**subject** [1] - 1221:3
**submit** [3] - 1288:13, 1296:25, 1301:4
**submits** [2] - 1299:13, 1299:15
**submitted** [1] - 1299:14
**subset** [4] - 1228:18, 1229:12, 1231:5, 1315:12
**substantial** [3] - 1239:17, 1273:8, 1303:19
**substantially** [4] - 1225:3, 1225:22, 1262:16, 1326:2
**substantively** [1] -

1238:9
**substitute** [5] - 1227:13, 1227:17, 1243:18, 1244:18, 1246:8
**substitutes** [12] - 1225:23, 1227:10, 1228:11, 1228:12, 1229:6, 1241:6, 1241:8, 1241:11, 1249:12, 1277:13, 1277:14, 1278:12
**successful** [1] - 1230:20
**successfully** [1] - 1272:24
**sufficient** [2] - 1243:17, 1260:6
**Sugar** [1] - 1221:11
**sugar** [1] - 1221:23
**suggesting** [1] - 1279:16
**suggestion** [1] - 1234:15
**suggests** [1] - 1279:19
**summarize** [4] - 1224:22, 1250:20, 1315:19, 1325:21
**summarizes** [1] - 1259:2
**summarizing** [5] - 1248:2, 1257:2, 1259:6, 1290:25, 1326:7
**summary** [5] - 1224:5, 1224:25, 1253:24, 1259:25, 1264:5
**supervised** [1] - 1220:6
**supervisory** [2] - 1219:23, 1220:5
**supply** [1] - 1231:16
**support** [2] - 1261:8, 1321:4
**suppose** [1] - 1242:13
**susceptibility** [1] - 1329:17
**susceptible** [1] - 1329:9
**sustain** [2] - 1330:2, 1330:3
**swath** [1] - 1240:6
**switch** [16] - 1229:5, 1229:8, 1242:20, 1242:24, 1243:21, 1244:21, 1245:8, 1245:12, 1247:8,

1247:22, 1247:23, 1248:18, 1255:9, 1308:10, 1326:3
**switched** [1] - 1330:22
**switching** [4] - 1242:25, 1243:2, 1245:22, 1246:3
**SWORN** [1] - 1218:12
**systematic** [2] - 1282:9, 1294:1
**systematically** [3] - 1282:3, 1282:5, 1283:13

---

## T

**table** [5] - 1248:2, 1248:23, 1253:15, 1259:2, 1259:5
**tacit** [4] - 1326:14, 1327:1, 1327:6, 1327:11
**talks** [3] - 1243:14, 1298:18, 1316:20
**target** [2] - 1229:17, 1230:9
**targeted** [2] - 1228:24, 1231:1
**targeting** [3] - 1230:10, 1231:3, 1232:1
**taste** [4] - 1231:14, 1232:11, 1243:25, 1308:23
**technically** [1] - 1297:22
**technology** [1] - 1252:14
**telecom** [2] - 1220:25, 1221:1
**television** [1] - 1297:9
**tenders** [1] - 1218:20
**term** [2] - 1245:1, 1271:16
**terms** [7] - 1243:14, 1272:16, 1310:10, 1311:12, 1311:13, 1312:16, 1314:7
**test** [22] - 1240:22, 1240:24, 1241:4, 1241:15, 1241:19, 1243:4, 1243:7, 1243:12, 1243:13, 1243:16, 1243:21, 1243:24, 1244:3, 1244:11, 1244:24,

1245:17, 1248:22, 1249:6, 1249:8, 1249:23, 1250:15, 1250:19
**tested** [2] - 1240:21, 1249:11
**testified** [1] - 1221:18
**testify** [1] - 1325:15
**testimony** [12] - 1222:5, 1223:22, 1226:13, 1227:20, 1231:23, 1260:18, 1262:5, 1280:7, 1304:15, 1304:16, 1330:14, 1331:15
**testing** [6] - 1241:5, 1241:21, 1244:7, 1250:2, 1292:7, 1301:16
**tests** [1] - 1244:2
**that'll** [3] - 1252:20, 1255:5, 1325:17
**THE** [171] - 1215:1, 1215:3, 1215:11, 1215:15, 1215:20, 1216:2, 1217:4, 1218:1, 1218:3, 1218:7, 1218:10, 1218:14, 1218:18, 1218:21, 1218:23, 1219:9, 1219:11, 1221:15, 1221:17, 1221:20, 1221:25, 1222:9, 1222:17, 1222:21, 1222:24, 1223:2, 1223:7, 1223:11, 1223:19, 1231:20, 1231:22, 1234:9, 1234:11, 1234:21, 1235:2, 1235:8, 1235:10, 1235:25, 1236:2, 1236:21, 1236:24, 1237:2, 1237:3, 1237:11, 1237:13, 1238:15, 1238:18, 1239:8, 1240:23, 1240:24, 1241:25, 1242:1, 1243:10, 1243:11, 1243:12, 1243:15, 1244:2, 1244:6, 1244:15, 1249:16, 1249:18, 1251:22, 1251:24, 1252:4, 1253:9, 1253:11, 1255:3, 1255:5, 1276:25, 1277:2, 1278:20, 1278:24, 1279:2,

1279:3, 1279:5, 1279:8, 1279:14, 1279:25, 1280:2, 1280:5, 1280:8, 1280:11, 1280:13, 1280:15, 1281:5, 1281:7, 1281:10, 1281:11, 1281:12, 1281:14, 1283:6, 1283:8, 1287:5, 1287:8, 1288:15, 1288:17, 1289:16, 1289:18, 1290:11, 1290:12, 1291:6, 1291:8, 1291:10, 1291:11, 1291:22, 1291:24, 1292:13, 1292:15, 1292:21, 1297:19, 1297:22, 1298:13, 1298:19, 1298:20, 1298:21, 1300:8, 1300:10, 1300:20, 1300:23, 1301:24, 1302:1, 1302:8, 1302:9, 1304:23, 1304:25, 1306:4, 1306:6, 1306:16, 1306:17, 1306:18, 1306:20, 1307:10, 1307:15, 1307:24, 1308:1, 1308:9, 1308:10, 1309:5, 1309:8, 1309:17, 1311:4, 1312:21, 1312:23, 1313:12, 1313:13, 1319:4, 1319:5, 1321:12, 1321:14, 1321:17, 1321:18, 1321:19, 1322:1, 1322:8, 1322:9, 1322:19, 1323:3, 1324:2, 1324:4, 1324:19, 1324:21, 1325:4, 1325:5, 1325:18, 1331:7, 1331:12, 1331:16, 1331:17, 1331:23, 1332:2, 1332:5
**themselves** [2] - 1264:1, 1264:19
**thereby** [1] - 1328:5
**Thereupon** [2] - 1218:8, 1280:9
**they've** [3] - 1297:15, 1297:16, 1330:21
**thinking** [13] - 1226:12, 1229:1, 1250:13, 1262:2, 1268:25, 1274:8,

1355

1278:10, 1278:11, 1300:3, 1310:12, 1325:2, 1328:16, 1329:12
**thinks** [2] - 1232:1, 1326:13
**thinner** [1] - 1223:9
**third** [25] - 1230:11, 1230:16, 1246:5, 1263:1, 1264:15, 1266:12, 1267:1, 1267:2, 1267:6, 1269:20, 1275:20, 1282:15, 1300:5, 1303:13, 1303:15, 1303:18, 1303:22, 1303:24, 1304:5, 1304:14, 1304:21, 1305:2, 1327:17, 1328:2, 1328:24
**third-party** [2] - 1266:12, 1267:1
**three** [15] - 1219:23, 1237:4, 1237:5, 1245:19, 1253:3, 1266:25, 1267:20, 1293:14, 1317:3, 1317:10, 1317:17, 1324:23, 1327:9, 1328:16, 1329:2
**threshold** [14] - 1232:22, 1233:3, 1233:11, 1233:15, 1237:22, 1238:7, 1238:14, 1239:1, 1239:5, 1247:19, 1254:19, 1254:24, 1315:10
**thresholds** [8] - 1233:18, 1254:11, 1254:22, 1257:3, 1258:13, 1258:24, 1259:9, 1315:7
**tied** [1] - 1292:11
**tightly** [1] - 1306:2
**time-consuming** [1] - 1284:18
**title** [5] - 1240:10, 1240:11, 1267:20, 1311:9, 1311:14
**title-level** [2] - 1311:9, 1311:14
**titles** [4] - 1236:19, 1251:16, 1311:12, 1311:13
**today** [10] - 1220:16, 1222:5, 1223:22, 1241:17, 1241:22, 1252:2, 1252:13, 1326:19, 1330:14,

1330:25
**together** [8] - 1246:5, 1251:15, 1295:8, 1303:13, 1305:19, 1305:21, 1309:14, 1326:18
**tomorrow** [5] - 1245:3, 1267:20, 1331:13, 1332:3, 1332:7
**took** [1] - 1317:9
**top** [76] - 1225:2, 1226:3, 1226:5, 1226:6, 1226:9, 1226:18, 1227:14, 1227:24, 1228:10, 1228:15, 1228:16, 1228:17, 1229:21, 1230:21, 1230:24, 1231:7, 1231:12, 1231:13, 1231:18, 1232:13, 1232:23, 1233:15, 1233:22, 1234:3, 1234:4, 1234:6, 1235:13, 1235:14, 1235:19, 1235:20, 1236:7, 1237:5, 1237:7, 1237:8, 1239:2, 1239:4, 1239:13, 1239:21, 1239:24, 1240:2, 1241:9, 1241:18, 1243:19, 1244:19, 1249:25, 1250:4, 1250:7, 1250:17, 1250:24, 1251:2, 1251:13, 1251:17, 1251:20, 1252:23, 1254:16, 1258:13, 1258:18, 1259:7, 1260:19, 1267:18, 1272:4, 1287:1, 1289:24, 1291:1, 1291:3, 1296:14, 1300:22, 1302:24, 1304:3, 1304:6, 1304:8, 1305:12, 1315:8, 1315:20, 1330:6
**top-level** [1] - 1315:20
**topic** [2] - 1325:22, 1331:6
**total** [1] - 1256:1
**towards** [1] - 1239:20
**track** [3] - 1247:16, 1331:24, 1332:2
**tracks** [1] - 1247:18
**trade** [1] - 1228:16

**Trade** [1] - 1219:19
**trading** [1] - 1269:2
**training** [1] - 1219:6
**transaction** [21] - 1224:7, 1255:13, 1256:15, 1256:21, 1257:11, 1258:25, 1260:8, 1260:19, 1260:25, 1261:4, 1261:14, 1262:16, 1269:16, 1269:17, 1271:16, 1300:16, 1316:1, 1316:6, 1326:1, 1328:10, 1331:1
**transaction's** [1] - 1261:19
**transactions** [1] - 1298:16
**transcript** [2] - 1333:5, 1333:6
**TRANSCRIPT** [1] - 1215:11
**transcripts** [1] - 1265:20
**translate** [2] - 1298:4, 1312:16
**transparency** [3] - 1329:22, 1329:25, 1330:12
**treat** [1] - 1314:16
**treated** [2] - 1312:1
**treating** [1] - 1314:12
**treats** [1] - 1319:2
**TRIAL** [1] - 1215:11
**trial** [2] - 1221:23, 1227:1
**triangles** [1] - 1258:18
**tried** [8] - 1273:18, 1275:20, 1275:21, 1285:9, 1316:6, 1323:19, 1324:5, 1324:14
**Tronox** [2] - 1221:10, 1221:20
**true** [10] - 1229:11, 1238:7, 1243:12, 1291:13, 1298:23, 1300:8, 1323:11, 1323:12, 1333:4, 1333:5
**truism** [1] - 1300:21
**truth** [3] - 1222:13, 1222:25
**try** [7] - 1225:21, 1263:4, 1275:17, 1277:18, 1296:20, 1298:3, 1299:3
**trying** [16] - 1233:1,

1243:7, 1252:19, 1265:13, 1274:17, 1284:4, 1284:5, 1287:15, 1290:6, 1294:22, 1296:24, 1298:22, 1302:12, 1307:11, 1309:10, 1317:4
**turn** [4] - 1234:11, 1240:25, 1279:23, 1303:25
**turned** [1] - 1284:17, 1292:19
**turns** [2] - 1320:13, 1323:9
**twice** [1] - 1320:4
**two** [44] - 1218:21, 1219:20, 1224:9, 1225:20, 1225:22, 1228:5, 1229:13, 1229:14, 1244:8, 1246:11, 1246:23, 1255:16, 1257:12, 1260:1, 1262:7, 1263:19, 1265:10, 1267:17, 1269:3, 1269:12, 1271:4, 1272:20, 1273:7, 1273:9, 1277:22, 1277:24, 1279:11, 1281:2, 1283:9, 1284:17, 1285:17, 1287:6, 1299:14, 1299:15, 1301:7, 1302:24, 1303:2, 1303:10, 1305:9, 1305:12, 1315:6, 1316:12, 1318:22, 1326:13
**type** [11] - 1220:15, 1226:11, 1232:3, 1244:17, 1261:1, 1264:22, 1267:10, 1297:23, 1317:11, 1320:15, 1323:18
**types** [12] - 1232:16, 1259:23, 1260:1, 1262:18, 1263:17, 1263:19, 1273:16, 1298:3, 1298:24, 1303:5, 1317:3, 1326:13
**typically** [4] - 1224:18, 1255:15, 1329:22, 1330:18

**U**

**U.S** [4] - 1221:11, 1225:2, 1225:16,

1226:3
**ultimately** [1] - 1287:6
**unable** [1] - 1285:13
**unclear** [1] - 1284:6
**under** [4] - 1223:5, 1308:25, 1319:22, 1323:14
**undergraduate** [1] - 1219:12
**understood** [3] - 1234:23, 1322:19, 1323:1
**unerringly** [1] - 1317:23
**unhappy** [1] - 1242:17
**unilateral** [22] - 1260:2, 1260:3, 1260:4, 1261:21, 1262:2, 1262:12, 1262:15, 1262:17, 1263:7, 1263:18, 1273:17, 1274:8, 1295:20, 1314:1, 1314:5, 1316:15, 1316:20, 1316:23, 1325:20, 1325:24, 1326:2, 1327:23
**United** [3] - 1223:24, 1290:6, 1333:13
**united** [1] - 1216:9
**UNITED** [4] - 1215:1, 1215:3, 1215:12, 1215:17
**University** [2] - 1219:7, 1219:11
**university** [1] - 1219:10
**unlikely** [1] - 1225:8
**unnecessary** [1] - 1225:18
**up** [56] - 1224:18, 1237:5, 1238:8, 1238:13, 1255:25, 1256:8, 1256:12, 1262:8, 1266:4, 1267:5, 1269:24, 1271:10, 1271:11, 1275:22, 1282:16, 1282:22, 1283:1, 1283:10, 1283:14, 1283:25, 1284:5, 1284:8, 1284:12, 1284:24, 1284:25, 1285:4, 1285:12, 1285:14, 1285:16, 1285:19, 1286:1, 1287:17, 1287:19, 1287:23, 1289:6,

1293:15, 1294:3,
1294:15, 1297:6,
1297:17, 1301:1,
1302:21, 1305:14,
1306:6, 1306:9,
1306:12, 1306:24,
1307:19, 1308:13,
1308:18, 1308:23,
1308:24, 1309:2,
1309:3, 1320:17,
1324:6
  **upper** [2] - 1264:10,
1266:1
  **upward** [2] - 1316:9,
1316:22
  **useful** [8] - 1261:2,
1263:25, 1281:24,
1282:12, 1287:21,
1289:13, 1289:15,
1295:12
  **uses** [3] - 1296:9,
1297:21, 1321:6

## V

  **validate** [1] - 1244:4
  **valuable** [3] -
1241:22, 1241:23,
1273:3
  **valuation** [13] -
1269:14, 1297:16,
1303:14, 1304:21,
1306:7, 1306:13,
1306:15, 1306:22,
1306:24, 1307:6,
1307:8, 1323:12
  **valuations** [4] -
1303:17, 1304:18,
1308:14, 1323:11
  **value** [14] - 1256:1,
1256:4, 1306:8,
1306:10, 1307:3,
1307:21, 1308:6,
1308:21, 1308:24,
1309:3, 1309:16,
1310:6, 1320:7
  **values** [6] - 1256:13,
1257:14, 1258:1,
1258:9, 1290:4,
1307:20
  **valuing** [1] - 1309:13
  **variable** [22] -
1246:13, 1246:15,
1290:24, 1305:18,
1305:24, 1306:5,
1307:13, 1310:3,
1310:5, 1310:23,
1311:3, 1311:7,
1311:16, 1311:24,
1312:2, 1314:12,

1314:24, 1315:4,
1318:6, 1318:13,
1318:19, 1319:3
  **variants** [1] -
1260:23
  **variation** [5] -
1294:6, 1305:22,
1305:25, 1306:1,
1307:16
  **varies** [1] - 1302:9
  **vary** [2] - 1232:11,
1304:25
  **vehicles** [2] - 1278:1,
1278:25
  **versa** [1] - 1239:4
  **version** [7] - 1223:3,
1223:4, 1235:6,
1288:13, 1304:20,
1314:21, 1317:14
  **versions** [1] -
1234:25
  **versus** [1] - 1224:15
  **vertical** [3] -
1254:12, 1257:6,
1257:13
  **VIACOMMCBS** [1] -
1216:3
  **vice** [2] - 1239:4,
1272:22
  **Victorian** [2] -
1308:22, 1308:23
  **video** [1] - 1331:25
  **view** [6] - 1237:21,
1289:7, 1290:8,
1293:20, 1325:1,
1325:14
  **views** [3] - 1261:5,
1261:8, 1261:19
  **visualization** [1] -
1257:23
  **visualizing** [1] -
1257:3
  **visually** [1] - 1274:17
  **VOELZ** [1] - 1215:22
  **vs** [1] - 1215:5
  **vulnerability** [4] -
1328:23, 1329:1,
1329:5, 1330:24
  **vulnerable** [1] -
1228:25

## W

  **wait** [1] - 1279:3
  **walk** [2] - 1265:22,
1274:15
  **warehouse** [1] -
1310:17
  **Warwick** [2] -

1219:8, 1219:12
  **Washington** [5] -
1215:6, 1215:19,
1216:6, 1216:11,
1333:14
  **water** [1] - 1252:20
  **ways** [9] - 1246:23,
1275:13, 1279:17,
1287:15, 1294:24,
1296:18, 1322:16,
1322:20, 1325:7
  **week** [1] - 1264:16
  **weekly** [1] - 1286:16
  **Western** [1] - 1232:2
  **whichever** [1] -
1317:16
  **White** [3] - 1219:25,
1220:15, 1220:20
  **whole** [1] - 1327:25
  **wide** [2] - 1220:24,
1264:11
  **widely** [2] - 1277:7,
1324:11
  **win** [31] - 1246:25,
1247:13, 1247:15,
1247:20, 1248:16,
1248:17, 1269:3,
1269:4, 1269:8,
1269:11, 1275:19,
1280:18, 1280:20,
1280:24, 1281:3,
1281:5, 1281:19,
1281:23, 1282:2,
1282:5, 1282:8,
1283:4, 1283:7,
1283:12, 1283:18,
1287:9, 1287:10,
1293:15, 1294:17,
1301:5
  **win-loss** [23] -
1246:25, 1247:13,
1247:15, 1247:20,
1248:16, 1248:17,
1275:19, 1280:18,
1280:20, 1280:24,
1281:3, 1281:5,
1281:19, 1281:23,
1282:2, 1282:5,
1282:8, 1283:7,
1283:12, 1283:18,
1293:15, 1294:17
  **winner** [7] - 1281:9,
1281:17, 1289:6,
1297:4, 1297:14,
1305:13, 1330:19
  **winning** [4] - 1269:6,
1269:8, 1269:18,
1269:24
  **wins** [7] - 1247:16,
1284:8, 1285:7,

1291:16, 1297:1,
1300:1, 1330:16
  **wired** [1] - 1221:1
  **wireless** [1] -
1220:25
  **wish** [1] - 1277:14
  **witness** [7] - 1218:4,
1218:8, 1218:16,
1218:20, 1230:3,
1286:14, 1331:19
  **WITNESS** [56] -
1218:12, 1219:11,
1221:20, 1231:22,
1235:10, 1236:24,
1237:3, 1238:18,
1240:24, 1242:1,
1243:11, 1243:15,
1244:6, 1251:24,
1277:2, 1278:24,
1279:3, 1279:8,
1280:13, 1281:7,
1281:11, 1281:14,
1283:8, 1287:8,
1289:18, 1290:12,
1291:8, 1291:11,
1291:24, 1292:15,
1297:22, 1298:19,
1298:21, 1300:10,
1300:23, 1302:1,
1302:9, 1304:25,
1306:6, 1306:17,
1306:20, 1307:15,
1308:1, 1308:10,
1309:8, 1312:23,
1313:13, 1319:5,
1321:18, 1322:1,
1322:9, 1323:3,
1324:4, 1324:21,
1325:5, 1331:16
  **WITNESSES** [1] -
1217:4
  **won** [15] - 1250:3,
1250:7, 1250:17,
1251:16, 1252:12,
1281:6, 1283:19,
1284:1, 1284:2,
1284:3, 1285:11,
1286:19, 1287:7,
1288:1, 1291:19
  **wondering** [1] -
1321:21
  **works** [3] - 1241:15,
1301:24, 1323:11
  **worse** [2] - 1241:24,
1314:7
  **worth** [3] - 1292:23,
1307:17, 1309:1
  **worthless** [1] -
1295:11
  **wow** [1] - 1278:12

  **written** [1] - 1226:14

## Y

  **year** [3] - 1239:14,
1291:23, 1330:6
  **years** [8] - 1219:18,
1219:20, 1219:23,
1219:24, 1252:12,
1258:8, 1258:10,
1284:19
  **yellow** [1] - 1254:15
  **yesterday** [1] -
1267:25
  **York** [2] - 1216:4
  **young** [1] - 1267:18

## Z

  **zero** [5] - 1236:20,
1237:4, 1256:7,
1256:8, 1256:9
  **zeroes** [1] - 1256:8