1682

1                 **UNITED STATES DISTRICT COURT**
              **FOR THE DISTRICT OF COLUMBIA**

2    ——————————————————————————

3   United States of America,   ) Civil Action
                             ) No. 1:21-cv-02886-FYP

4             Plaintiff,   )
                             )

5   vs.                      ) **Bench Trial - a.m. session**
                             )

6   Bertelsmann SE & Co. KGaA,   )
   et al.                  ) Washington, D.C.

7                     ) **August 10, 2022**
            Defendants. ) Time: 9:30 a.m.

8    ——————————————————————————

9         **Transcript of Bench Trial - a.m. session**
                   **Held Before**

10        **The Honorable Florence Y. Pan**
          **United States District Judge**

11             A P P E A R A N C E S

12

13   For the United States:   **John R. Read**
                        **Meagan K. Bellshaw**

                        **Ihan Kim**

14                    **January Kim**
                        **Ethan D. Stevenson**

15                    U.S. DEPARTMENT OF JUSTICE
                    Antitrust Division

16                    450 Fifth Street, Northwest
                    Washington, D.C. 20530

17

   For the Defendants Bertelsmann SE & Co. KGaA and Penguin Random

18   House, LLC:          **Daniel M. Petrocelli**
                        **M. Randall Oppenheimer**

19                    **Scott Voelz**
                    O'MELVENY & MYERS LLP

20                    1999 Avenue of the Stars, 8th Floor
                    Los Angeles, California 90067

21

                    **Abby F. Rudzin**

22                    O'MELVENY & MYERS LLP
                    7 Times Square, Times Square Tower

23                    New York, New York 10036

24

25

1                    A P P E A R A N C E S, continued

2   For the Defendants Bertelsmann SE & Co. KGaA and Penguin Random
    House, LLC (continued):
3                              **Julia Schiller**
                               O'MELVENY & MYERS LLP
4                              1625 Eye Street, Northwest
                               Washington, D.C. 20006
5
    For the Defendants ViacomCBS, Inc. and Simon & Schuster, Inc.:
6                              **Stephen Fishbein**
                               SHEARMAN & STERLING LLP
7                              599 Lexington Avenue
                               New York, New York 10022
8   _____

9   Stenographic Official Court Reporter:
                               Nancy J. Meyer
10                             Registered Diplomate Reporter
                               Certified Realtime Reporter
11                             333 Constitution Avenue, Northwest
                               Washington, D.C. 20001
12                             202-354-3118

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **I N D E X**

2                                                          PAGE:

3    **Witnesses**:

4    Nicholas Hill, Ph.D.

5        Cross-Examination, cont., by Mr. Oppenheimer..... 1687
         Redirect Examination by Mr. Stevenson............ 1734
6        Recross-Examination by Mr. Oppenheimer.......... 1736

7    Jennifer Rudolph Walsh

8        Direct Examination by Ms. Rudzin................. 1743

9

10   **Exhibits Admitted**:

11       PX 858........................................... 1738
         PX 862........................................... 1738
12       PX 863........................................... 1738
         PX 882........................................... 1738
13       U.S. Demonstrative 5............................. 1738

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        P R O C E E D I N G S

2            THE COURT:  Good morning.

3            MR. OPPENHEIMER:  Good morning, Your Honor.

4            THE COURTROOM DEPUTY:  Good morning, Your Honor.

5        This is Civil Case 21-2886, the United States of

6    America v. Bertelsmann SE & Co. et al.

7        Will counsel please approach the podium to state their

8    appearances for the record.

9            MR. READ:  John Read for the United States.  With me

10   at counsel table are Ethan Stevenson, Meagan Bellshaw, and

11   January Kim.

12           THE COURT:  Good morning.

13           MR. READ:  Good morning.

14           MR. PETROCELLI:  Good morning, Your Honor.  Daniel

15   Petrocelli, together with my colleagues, Randy Oppenheimer,

16   Scott Voelz, Julia Schiller for Bertelsmann and Penguin Random

17   House.

18           THE COURT:  Good morning.

19           MR. FISHBEIN:  Good morning, Your Honor.

20   Stephen Fishbein for ViacomCBS and Simon & Schuster.

21           THE COURT:  Good morning.

22           MR. OPPENHEIMER:  Good morning, Your Honor.

23       We have tried to simplify things a little bit.  Maybe

24   two preliminary observations.  One, I think we'll run about an

25   hour.  If we can do it in less, we will.
```

```
 1                    THE COURT:  Okay.

 2                    MR. OPPENHEIMER:  And, secondly, we have provided

 3       Your Honor with a smaller notebook.

 4                    THE COURT:  Oh, thank you.  I like this one.

 5                    MR. OPPENHEIMER:  Thank you.  And we have used it

 6       before.  So we're learning.  And the only other notebook that

 7       Your Honor might need would be the notebook of the deposition

 8       of Dr. Hill, in case there's any impeachment.  So, hopefully,

 9       that will simplify things.

10                    THE COURT:  So I have a -- a whole notebook of

11       depositions from other people.  So this is the one that we use?

12                    MR. OPPENHEIMER:  Yes, Your Honor.  No, I'm sorry.

13       Pardon me.  Your Honor, there's a separate Hill deposition

14       notebook.

15                    THE COURT:  The Hill prior testimony notebook?

16                    MR. OPPENHEIMER:  Okay.  Good.

17                    THE COURT:  Oh.  Transcript of Hill July 1st.  Got

18       it.  Okay.

19                    MR. OPPENHEIMER:  Thank you.

20                    THE COURT:  So I can put the rest of them away.

21       Thank you.

22                    MR. OPPENHEIMER:  And good morning, Dr. Hill.

23                    THE WITNESS:  Good morning.

24                    THE COURT:  Can I give them back to you, actually?

25                    MR. OPPENHEIMER:  Sure.
```

1          THE COURT:  Okay.  Let's see.  Expert reports, I

2     might need that one.

3          MR. OPPENHEIMER:  Yes.

4          THE COURT:  These I'll give back, especially this

5     one.  Thank you.

6          THE WITNESS:  Sorry.  I took this out of its binder.

7     So that's -- and these, I think, also.  Oh, okay.  Thank you.

8               CROSS-EXAMINATION, continuing

9     BY MR. OPPENHEIMER:

10    Q.  Good morning, Dr. Hill.

11    A.  Good morning, Mr. Oppenheimer.

12    Q.  And do you have the same two notebooks?

13    A.  I do, sir.

14    Q.  Okay.  Thanks so much.

15         So I wanted to pick up where we left off and ask you

16    some questions about market shares.  Okay?

17    A.  Okay.

18    Q.  So market shares tell you who won; correct?

19    A.  Correct.

20    Q.  And market shares don't actually tell you how often two

21    companies compete; correct?

22    A.  You can use them to draw an inference, but in and of

23    themselves, they are a record of who won.

24    Q.  Exactly.

25         And it's possible that you can have a situation where

1    you have market shares that are quite different from the actual

2    incidence of one-to-one competition in a market; correct?

3    A.  That's correct.

4    Q.  What I'd like to do -- and Mr. Read and I may be the last

5    champions of ELMO technology around here, but I'd like to use

6    the ELMO for one illustration.

7              THE COURT:  Okay.

8              MR. OPPENHEIMER:  Do I press this button?  Do I press

9    the button?  I don't.  It's been taken care of.

10   BY MR. OPPENHEIMER:

11   Q.  Okay.  Good.

12        All right.  So I'd like to just do a brief example and

13   see if we're on the same page on this.  I'd like you to assume,

14   Dr. Hill, that you take the shares that you have used --

15   A.  You -- at least on my screen, your drawing is a little off

16   the -- you may need to zoom out the focus.

17   Q.  Okay.  You know what?  Maybe -- should we do the smaller

18   print?

19   A.  I think you're good if you just refocus.

20              THE COURTROOM DEPUTY:  Other way.

21              MR. OPPENHEIMER:  Terrific.  Great.

22   BY MR. OPPENHEIMER:

23   Q.  Can you see that now, Dr. Hill?

24   A.  I can.

25              MR. OPPENHEIMER:  Okay.  Oh, I'm sorry.  This is not

```
 1    going to be confidential.

 2               THE COURTROOM DEPUTY:  I just published it.

 3               MR. OPPENHEIMER:  Great.

 4    BY MR. OPPENHEIMER:

 5    Q.  So these are the two shares that you use in your report,

 6    respectively, for PRH and Simon & Schuster; correct?

 7    A.  That's correct.

 8    Q.  Okay.  Now, I'd like to assume a world in which we're just

 9    in auctions.  Okay?  And I'd like you to further assume that

10    each of these parties wins half the auctions they're in and

11    loses half the auctions.  Okay?

12    A.  Okay.

13    Q.  So what I'm going to do, I'm going to represent that -- in

14    this manner by saying that they're in auctions twice as often

15    as they win.  Okay?

16    A.  Okay.

17    Q.  Okay.  So that would tell us the percentage of time that

18    they are participants in an auction; correct?

19    A.  Correct.

20    Q.  So in that world, PRH -- pardon me.  This is all you need

21    to know about my math.  This is 74.

22    A.  And my math.

23    Q.  Okay.  You get a pass then.

24         All right.  So in this world, PRH is in 74 percent of

25    the auctions in the market, winning half the time; and Simon &
```

1    Schuster is in 24 percent of the auctions in the market,

2    winning half of the time.  Agree?

3    A.  Agreed.

4    Q.  And they would never bump into each other?

5    A.  They might or they might not.

6    Q.  Fair enough.  You -- this could -- absolutely knowing just

7    this -- be a situation -- and this is only for illustrative

8    purposes because we know they do bump into each, but this -- in

9    this scenario, they would never bump into each other?

10   A.  By your assumption, yes, these are completely -- they could

11   never bump into each other if they -- one competed in -- if

12   they competed in completely different auctions.

13   Q.  Okay.

14   A.  Yes.

15   Q.  So we could have stipulated, you and I, that Penguin Random

16   House has a 37 percent share of the book market and Simon &

17   Schuster has a 12 percent share of the book market.  And based

18   on that alone, we would not know how often they encountered

19   each other in the marketplace?

20   A.  Yeah, as in my previous answer, we frequently draw the

21   inference substitutions according to share, but it is not

22   necessarily the case that they -- substitution is according to

23   share.

24   Q.  And the -- the notion that we can determine that people

25   encounter each other in the market, actually compete head to

1    head in the market, in proportion to their market shares is

2    exactly what you said, an assumption; correct?

3    A.  No.  I mean, I think you also check the -- the evidence.

4    Do you see in other sources of information indication that they

5    can compete more frequently or less frequently than according

6    to share?

7    Q.  Right.  But if we're only looking at the market shares,

8    it's just an assumption that it follows proportionately?

9    A.  If we just had the market shares, then -- and that was the

10   only piece of information you would have; correct.

11   Q.  Okay.  And you saw -- we talked about this yesterday in the

12   agency data that Professor Snyder developed that PRH -- that

13   only about half the time that PRH and S&S wins, the others in

14   that auc- -- in that competition?

15   A.  Could you refresh my memory on that, please.

16   Q.  Sure.  In about -- in about half the contracts, the other

17   party didn't even submit a bid; correct?

18   A.  And you're talking just about auctions?

19   Q.  Sure.  We'll start there.

20   A.  Well, is that -- where is the number coming from?  Is it

21   for just auctions, or does it include renegotiations?

22   Q.  Do -- let's start with auctions.  Do you know the answer to

23   auctions?

24   A.  I'm not familiar with that number.  I'm familiar with the

25   estimates of how often there are runners-up, but I don't know

1    how often one participated when the other won.

2    Q.  Okay.  Let's just focus, then, on multi-bidder contracts

3    and Professor Snyder's database.

4    A.  Okay.

5    Q.  Okay.  And would you agree with me that in about half of

6    the multi-bidder acquisitions, that when one party wins, the

7    other party did not even submit a bid?

8    A.  I believe we talked about that.  I don't recall the number,

9    but I -- I -- I have not analyzed it separately.  So I don't

10   need any reason to push back.

11   Q.  Right.  And just taking our -- our market share example, if

12   all you had was the market share, would you not be able to tell

13   just from it how often Penguin Random House or Simon & Schuster

14   were not the runner-up in any bidding from the market shares?

15   Correct?

16   A.  If you just know the market shares, then you would just

17   know who won.  You wouldn't have information, direct

18   information, about who was the runner-up.

19   Q.  Right.  And you could say the same thing about who was

20   number three for market shares -- correct? -- if you only had

21   market shares?

22   A.  If you only had market shares, you -- I mean, you could

23   draw an inference based on the shares, but they wouldn't be

24   direct evidence on who was the third-place bidder.

25   Q.  And the market shares don't tell you at all how often a

1693

1    publisher participates in a bid; correct?

2    A.  That's correct.

3    Q.  And they don't tell you at all how often --

4    A.  Well, I apologize.  They don't tell you exactly how often

5    they participated, but, clearly, they'll tell you that PRH

6    participated at least 37 percent of the time and S&S

7    12 percent.  So you couldn't narrow it down.  But they would

8    tell you they're participating at least as often as they want.

9    Q.  Sure.  That makes perfect sense.  But you'd have no idea

10   how often they bid in order to achieve those winnings?

11   A.  Correct.

12   Q.  Okay.

13   A.  Except that it was more than their share, yes.

14   Q.  Absolutely.  And that's -- that's what we showed on the

15   ELMO.

16          THE COURT:  So you have no sense of how often they

17   win when they bid?  That's not part of your analysis?

18          THE WITNESS:  No, Your Honor.  I didn't separately

19   analyze that.

20          THE COURT:  Okay.

21   BY MR. OPPENHEIMER:

22   Q.  And a publisher's share could be smaller than their actual

23   participation; correct?

24   A.  So you mean they could win less than they bid?

25   Q.  No.  My question wasn't clear.

1    A party -- a publisher's share, market share, could be

2    less than the times they participate in a bid?

3        THE COURT:  Should be, unless they're winning every

4    time; right?

5        THE WITNESS:  Yeah.  So they bid more often than they

6    win?

7    BY MR. OPPENHEIMER:

8    Q.  Right.  And it doesn't tell you -- it doesn't tell you the

9    ratio of their participation in bidding to their winning?

10   A.  Correct.

11   Q.  Okay.

12   A.  Yeah, it -- yeah.

13   Q.  And it doesn't -- it doesn't tell you how often they're a

14   runner-up?

15   A.  Correct.

16   Q.  Okay.  And, conversely, a publisher could be a runner-up

17   more often than the share would predict?

18   A.  Correct.

19   Q.  So in addition to deriving your head-to-head competition

20   percentage of 12 percent from a share analysis, you also looked

21   at other sources, such as editorial minutes?

22   A.  So I don't believe I derived the 12 percent.  I think that

23   was one of Dr. Snyder's calculations.

24   Q.  It's implicit in your calculation, however; correct?

25   A.  I don't know if I would -- I mean, you could figure out

1    something like that, but I never calculated it.  But at any

2    rate, to your question, yes, I also considered editorial

3    minutes.

4    Q.  Okay.  And that was to get outside just looking at shares,

5    to look at something else?

6    A.  Yeah.  As I said, I wanted to look at various different

7    measures of diversion.

8    Q.  Okay.  So let's -- let's start with the editorial minutes.

9    You looked at editorial minutes from Penguin Random House and

10   Simon & Schuster; correct?

11   A.  Correct.

12   Q.  No one else?

13   A.  Correct.

14   Q.  All right.  And you -- you understood when you were doing

15   that that those minutes capture whatever books happened to be

16   raised at a meeting that was of particular interest to that

17   group?

18   A.  The -- the imprints are recording the books that they talk

19   about in the editorial meeting, yes.

20   Q.  But you know those editorial minutes aren't -- they're not

21   comprehensive?

22   A.  They need not be; correct.

23   Q.  And sometimes they're a little bit haphazard?

24   A.  I mean, I've heard testimony.  I haven't seen any

25   quantitative evidence on that.

1   Q.  And do you recall that one of the publishers at S&S

2   referred to them as slapdash?  Does that ring a bell?

3   A.  I don't recall that, but I recall that there was some

4   testimony that they may not be systematic.

5   Q.  Okay.  And you had to actually go through those minutes and

6   try to decipher them and figure out as best you could who was

7   first and who was second?

8   A.  No.  No, sir.

9   Q.  So what were you actually looking for?

10  A.  We were actually looking in the editorial minutes for

11  opportunities that either Penguin Random House or Simon &

12  Schuster submitted a bid for.

13  Q.  And did you actually find throughout all of the editorial

14  minutes evidence of who's number one and who's number two in

15  the bidding?

16  A.  No.  I was looking for opportunities where Penguin Random

17  House or Simon & Schuster bid, and then I identified who won

18  the book using the anticipated top seller database.

19  Q.  And did you on that basis assume that those two entities

20  were winner and runner-up?

21  A.  I used it as an estimate of that.  So it's -- the question

22  was when one publisher bids, how often does the other publisher

23  win.  And, you know, if it was often HarperCollins, then that

24  will be reflected.  And if it's often one of the parties, that

25  will be reflected.

1    Q.  And could you actually tell from looking at the editorial

2    minutes who was number one and number two?

3    A.  No.

4    Q.  Okay.  And you didn't review all of the editorial minutes;

5    correct?

6    A.  I tried to review all -- I think in the end I had data from

7    13 PRH imprints and 12 Simon & Schuster imprints.

8    Q.  Yes, I believe that's what your report says.

9        Do you know how many -- so 13 PRH imprints.  Do you know

10   how many imprints there are at PRH?

11   A.  I believe they have about a hundred.

12   Q.  Yeah.  So 13 out of a hundred?

13   A.  Right.  But I took the data for all the ones I had.

14   Q.  Sure.  No.  I -- this was hard work for you; right?

15   A.  It took a long time.

16   Q.  Yeah.  And it was basically having to review all these

17   individually?

18   A.  It turns out that you can do some of it by reading them in.

19   Some of them are in a -- sort of a standard format, Your Honor,

20   so you can read it in and they'll have a standard language for

21   identifying.  But it turned out to be much more labor-intensive

22   than I anticipated.

23   Q.  Okay.  And you got through 13 out of -- out of a

24   hundred-plus imprints?

25   A.  I got through all the ones I had editorial minutes for.

1  Q.  Okay.

2  A.  But that was 13 out of roughly 100.  I don't remember the

3  exact number.

4  Q.  And you reviewed 12 of the imprints at Simon & Schuster?

5  A.  Correct.

6  Q.  That -- and they have -- do you know how many imprints they

7  have?

8  A.  I don't.

9  Q.  Does it refresh you if I say 38?

10  A.  That sounds reasonable.

11  Q.  Okay.  So 12 out of 38 of Simon & Schuster.

12       Now, you're aware from Professor Snyder's report that

13  there are some inaccuracies in your editorial minutes data;

14  correct?

15  A.  When -- I believe he identified cases where he said that

16  the -- they were not actually the runner-up, but that wasn't

17  what I was trying to estimate.

18  Q.  But you did -- you did report winner and runner-up data

19  from your review of the editorial minutes?

20  A.  No.  The goal in the editorial minutes was to say which

21  books are important enough that one of the parties bid on and

22  then how often was that book won by each of the other potential

23  publishers.  It was used as an estimate of how often they're

24  first and second, but it was not actually an estimate of who

25  was the winner and the runner-up.

```
1    Q.  In what respect does it tell us who was first and second?
2    A.  So it's useful to look at how often one party competes and
3    the other party wins.
4    Q.  But in each of these specific cases, you couldn't tell for
5    the book that was the subject of the minutes you reviewed who
6    was actually one and two?
7    A.  That's correct.
8    Q.  Now --
9            THE COURT:  Can you give me a sense of how many
10   auctions we're talking about in the editorial minutes?
11           THE WITNESS:  Yes, Your Honor.  It's -- it's in my
12   report.  I believe it's on the order of about 75 or -- 75 for
13   each publisher, and it -- it -- I was only able to do it for
14   2020, Your Honor.
15   BY MR. OPPENHEIMER:
16   Q.  And --
17   A.  I apologize, Mr. Oppenheimer.
18           THE WITNESS:  If you're interested, the number is in
19   my report, and we could look it up, if you're -- if you'd like
20   to.
21           THE COURT:  Okay.
22   BY MR. OPPENHEIMER:
23   Q.  And your --
24           THE WITNESS:  It's in the -- should --
25           MR. OPPENHEIMER:  If Your Honor is checking it, sure.
```

1           THE WITNESS:  Sure.  Let me just see.

2           THE COURT:  Do you know where that would be?

3           THE WITNESS:  Yeah.  I believe it would be in the

4    reply report, Your Honor.

5           THE COURT:  The rebuttal?

6           THE WITNESS:  My reply report.

7           THE COURT:  Your reply report.

8           THE WITNESS:  Oh, you know, actually, it's in the --

9    so in the reply report on page 22, there's a figure summarizing

10   it, Figure 13.

11          So there's -- in the reply report, Your Honor, that

12   Figure 13 is summarizing.  And then in the initial report on

13   page 88, there's a table with the numbers.  So it's 90 books

14   for Penguin Random House, and it's 78 for Simon & Schuster.

15   And that's page 88 of the initial report.

16          THE COURT:  I see.  Thank you.

17          THE WITNESS:  Sorry about that.

18   BY MR. OPPENHEIMER:

19   Q.  And do you have an understanding of the mechanism that

20   Professor Snyder used to determine where the editorial minutes

21   were actually not identifying the winner and the runner-up?

22   A.  As I recall, he compared books that were in the editorial

23   minutes to his agency data.

24   Q.  And let's just pause on the agency data for a minute.  You

25   and -- and Professor Snyder have collected information, would

1    it be fair to say, that no one in the publishing industry has

2    collected before?

3    A.  I think that's fair to say, because we had access to data

4    from multiple publishers.

5    Q.  And the parties here, pursuant to confidentiality orders

6    and whatnot, have been able to amass information about the

7    activities of publishers that are not public?

8    A.  Yeah.  I mean, for example, the advance data has a complete

9    record of all anticipated top sellers from 2019 to 2021.

10   Q.  Your advance data is the -- are you referring to your

11   acquisition data?

12   A.  I call it the advance data, but we could call it the

13   acquisition data.

14   Q.  Yeah.  And so that -- that data, just to be clear, that

15   only tells you who won; correct?

16   A.  It tells us the date, who won, and the amount.

17   Q.  Yeah.  Nothing about who was second or third or anything

18   else?

19   A.  That's correct, but I -- to your point, I don't believe

20   anyone has a data set of this type.

21   Q.  Yeah.  Understood.  And you're aware that Professor Snyder

22   collected bidding information with respect to almost a thousand

23   acquisitions?

24   A.  I don't remember the total number.  There's -- there's 22

25   Simon & Schuster wins and, I think, around 70 Penguin Random

1    House wins.

2    Q.  But you know there's well over 900 acquisitions in the

3    agency database that was compiled by Professor Snyder and his

4    team; correct?

5    A.  Are you talking about anticipated top sellers or all books?

6    Q.  Yes -- no.  Anticipated top sellers.

7    A.  I don't recall the numbers, sir.

8         THE COURT:  I'm sorry.  What did you mean by 22 Simon

9    & Schuster wins and 70 Penguin Random House wins?

10        THE WITNESS:  So in the data, Dr. Snyder looks at

11   competitions that were won by Simon & Schuster or Penguin

12   Random House, and then he tries to estimate who was the

13   runner-up, and then he calculates diversion using that

14   methodology.

15        So for Simon & Schuster, he has 22 auctions that were

16   won by Simon & Schuster.

17        THE COURT:  Out of 900?  That doesn't seem right.

18        THE WITNESS:  Yeah, that's why the 900 strikes me as

19   being quite strange, and I calculated market shares using his

20   data.  And it also doesn't match that, but I -- so I'm

21   struggling to understand the 900.

22   BY MR. OPPENHEIMER:

23   Q.  So of the 900, does it ring a bell that 360 are in the

24   segment of $250,000-and-up advances?

25   A.  Oh.  So I just asked if you meant anticipated top sellers,

1    and you said yes.  But, in fact, the 900 includes

2    nonanticipated top sellers?

3    Q.  Correct.  Did you understand that?

4    A.  Oh, okay.  No, no.  That's why I asked you, and you said

5    yes, but --

6    Q.  I apologize.  I probably misunderstood your question.  So

7    you understand there are 360 acquisitions in the agency

8    database that involve the price segment that you're proposing?

9    A.  That sounds correct, including both negotiations and

10   auctions.

11   Q.  Okay.  And you understand that --

12            THE COURT:  Wait.  Can I just ask a second -- I'm

13   sorry.  But if we're talking about 360 auctions and Penguin

14   Random House, does that match up with their market share?

15            THE WITNESS:  Yeah.  Your Honor, if we look at the --

16   my -- if you would like to go -- yes.  So if you look in my

17   reply report, I believe I have a table of market shares from

18   Dr. Snyder's data.

19            THE COURT:  Okay.

20            THE WITNESS:  Let me find that quickly, if I can.  It

21   should be -- I think it's Section 4.

22            THE COURT:  Page 16?

23            THE WITNESS:  Oh, rats.  Ah.  Oh.  Let me see.

24            THE COURT:  I think it's page 16.

25            THE WITNESS:  Oh.  Thank you, Your Honor.

1    Oh, yeah.  There we go.  And the discrepancy for the 22

2    versus 360 is when Dr. Snyder is calculating his diversions,

3    Your Honor, he uses auctions.  Because in a -- in a one-on-one

4    negotiation, he may not have information about who's the

5    runner-up.  So when he's thinking about diversions, he says,

6    let's look at ones where there was an auction and I can

7    identify the runner-up.

8    And then for the total share markets here, I believe

9    we're using all the opportunities, and that would be the 360.

10   And some of those, it's just not possible to say who the

11   runner-up is.

12   THE COURT:  Okay.

13   BY MR. OPPENHEIMER:

14   Q.  Right.  So you have to limit it to the ones where you can

15   actually determine who was actually the runner-up; correct?

16   A.  Dr. Snyder had a methodology for identifying it, which was

17   to take the second-highest bidder and assume that was the

18   runner-up.  And I think he also only looked at auctions where

19   he felt he had a complete record.  So he didn't -- if he felt

20   like there might be missing bidders, he -- I believe he

21   excluded those opportunities.

22   Q.  Right.  Your understanding is that Professor Snyder's

23   approach was to only rely on information where he could verify

24   who was number one and number two; correct?

25   A.  I don't believe he could verify number two.  I think he

1    assumed that the second-highest bidder would be the runner-up.

2    Q.  All right.  But if you couldn't determine the

3    second-highest bidder, he would not base the calculation on it?

4    A.  If he -- I think he -- I think he went further.  He said if

5    I don't have a complete record.  I think this was his

6    intention, and he -- he'll be able to tell you that if he

7    didn't feel he had the full record of the auction, then he

8    didn't include that.

9    Q.  Right.

10   A.  Including knowing who the second-highest bidder was.

11   Q.  Right.  Those were part of his protocols for the agency

12   study; correct?

13   A.  I believe so.

14   Q.  Okay.

15          THE COURT:  When would the second-highest bidder not

16   be the runner-up?  You said he's assuming that.  But if he has

17   the complete data, isn't that the runner-up?

18          THE WITNESS:  So, Your Honor, you may have heard

19   about underbidders.  There are cases where someone will bid a

20   higher value but they will not be selected.  So there's an

21   example where a prominent political figure received a much

22   higher bid but went with an underbidder who was about half the

23   size of the -- of the -- the bid that didn't win.

24   BY MR. OPPENHEIMER:

25   Q.  Right.  Correct.  A good example.

1    And when that happened, Professor Snyder would control

2    for that; correct?

3    A.  I think he -- I don't know how he -- I don't recall how

4    he --

5    Q.  Okay.  That's fine.  He can go into more detail.  But data

6    all comes from agencies; correct?

7    A.  The data comes from agencies, but not from all agencies.

8    Q.  Correct.

9    A.  He had some criteria for selecting which agencies were

10   included.

11   Q.  But all of the data that is in the agency data set comes

12   from agencies?

13   A.  I believe -- yes.

14   Q.  And all of the data sets that we're talking about in this

15   case and that you're using, that's the only data set that comes

16   exclusively from agencies; correct?

17   A.  Exclusively from agencies would be correct, but the

18   runner-up study uses agency data as well.

19   Q.  Right.  But would you agree with me that the agents are

20   uniquely positioned to see the entirety of the competitive

21   landscape of a bid or acquisition?

22   A.  No.  Because by looking in the runner-up study, for

23   example, I know who is perceived as the second-best bidder

24   rather than having to assume it was the second-highest bid.

25   Q.  I just want to make sure I understand what you just said.

1    You're saying that you have seen some anecdotal information

2    that publishers are thinking about who they might be bidding

3    against in certain circumstances?

4    A.  I disagree with your characterization as anecdotal.  And I

5    think it goes back to your point, but I being able to construct

6    and Dr. Snyder have constructed data sets that no one else in

7    the industry has the equal of.

8    Q.  And would you agree with me that the parties who have a

9    view -- they can actually see who all the bidders were for a

10   particular book -- are the agents?

11   A.  Yeah, I think that's fair.

12   Q.  And that a vast amount of the information in that database

13   is not now publicly known and has never been publicly known?

14   A.  That's reasonable.  Well, I would -- yeah, the winner is

15   always known, but there's parts of it that are unknown,

16   certainly.

17          THE COURT:  And can I just ask:  If he's got 360

18   anticipated top seller auctions in his agency database, what

19   percentage of all of the ATX auctions is that?

20          THE WITNESS:  So in a given year, you can think that

21   there's about a thousand to 1200.  So over -- I think his -- I

22   think his agency data covers four years.  One way to think

23   about it is Simon & Schuster would win about 100 anticipated

24   top sellers in a year, give or take.  So over four years it

25   would win 400, and he has 22.  I think those numbers are

1    roughly correct.  Others can check.

2    BY MR. OPPENHEIMER:

3    Q.  And this was as a result of the quality-control protocol

4    that you described earlier?

5    A.  Well, and also I believe all of his agency data comes from

6    subpoenas, and particularly from party subpoenas, but I'm

7    not -- I'm not a hundred percent sure which of the

8    subpoenas were --

9    Q.  All right.  We'll have him explain in more detail.  But a

10   large -- a large -- and would you say unprecedented study?

11   A.  I would -- yeah, in the sense that it has never been done

12   before.

13   Q.  Okay.  And let's go back now to the editorial minutes.  And

14   you're aware that Professor Snyder looked at the results of the

15   editorial minutes examination and identified places where the

16   winning publisher and runner-up publisher were not as

17   identified in your conclusions about those minutes?

18   A.  I -- I disagree with the last part of your point there.  I

19   never intended in the editorial minutes to claim that these

20   were necessarily the winner and the runner-up.  It was, rather,

21   to look at another source of information about how often the

22   parties are losing to one another, but they can also be losing

23   to others.

24        So, similarly, in the editorial minutes, if the book is

25   in, let's say, Simon & Schuster's editorial minutes and

1    HarperCollins was the winner, then that would be counted as

2    Simon & Schuster being the runner-up to HarperCollins.

3    Q.  Let's take a look at Tab 2, which is --

4    A.  Certainly, sir.  Which -- in the cross exhibits?

5    Q.  In the thin book.  The new thin book.  This is Defendant's

6    Exhibit 384.  This is from Professor Snyder's rebuttal report.

7    It's page 190 of his report, Exhibit X.9.

8    A.  Sure.

9    Q.  Do you recall seeing this -- oh, I'm sorry.  This is

10   confidential.

11         Do you recall seeing this report?

12   A.  It is unprecedented.

13   Q.  Did you recall seeing this report?

14   A.  I do.

15   Q.  Okay.  And do you understand that when -- that Professor

16   Snyder had compared the results of your editorial analysis to

17   the agency database?  Do you understand that was his basic

18   approach?

19   A.  Correct.

20   Q.  Okay.  And what he did -- there's a column that says

21   Editorial Meeting Minutes Source.  You understand that

22   identifies whose editorial minutes these are; correct?

23   A.  Correct.

24   Q.  Okay.  And then he identified the publisher who actually

25   won based on the agency data in the next column?

1    A.  Correct.

2    Q.  And he identified the actual runner-up from the agency data

3    in the last column; correct?

4    A.  Correct.

5    Q.  All right.  And those conclusions about who was the winning

6    publisher and who was the runner-up publisher differ from the

7    conclusions you drew with respect to these titles in the

8    editorial minute review; correct?

9    A.  So, again, I disagree.  The goal of the editorial meeting

10   -- minutes was never to say this is absolutely the winner and

11   the runner-up.  It was, rather, to ask a more general question:

12   When one party is competing, how often is the other the winner?

13   And I used it, to your point, to draw an inference about how

14   often they were likely to be runner-up.

15   Q.  So I understand, with respect to the titles that are

16   identified in DX 384, were you suggesting that any inference

17   whatsoever be drawn about whether Penguin Random House or Simon

18   & Schuster were winner and runner-up with respect to these?

19   A.  So here you've picked one side.  If you look at other ones,

20   you may have examples that go in the other direction.  But at a

21   high level, I looked at all of this information for the

22   editorial minutes to get a sense of how often the parties

23   compete.  And I think it's a reasonable way to get us another

24   look at how often are the parties winner and runner-up.  That

25   doesn't mean that if it's in one party's editorial minute as a

1    bid, the other side was definitely the -- and the other side

2    was the winner, that they were definitely the runner-up.

3    Q.  So can we agree, then, before we move on to win-loss

4    data, that the editorial minutes don't tell us who's one and

5    two?

6    A.  I think they're informative about how often the parties are

7    competing head to head.  But the editorial minutes, if you look

8    for who bid and who won, it does not tell you for sure that the

9    bidder was the runner-up.  Yes, we can agree on that.

10   Q.  Okay.  Let's turn to your win-loss data.

11   A.  Sure.

12   Q.  This was another source you looked at outside of shares.

13   And this was a collection of materials you went through that

14   the parties maintained that were records, as best they kept

15   them, of literally who won and who lost in acquisitions?

16   A.  Correct.  It was if the -- if the party maintaining the

17   record lost, who was the winner.  And then I believe I also

18   looked at when one party won, who was the -- the -- the

19   winner -- or who was the -- no, yeah.  The loss side.

20   Q.  Right.  And -- and I believe you've previously acknowledged

21   that these only sporadically -- the information of this type is

22   only sporadically kept by the parties; correct?

23   A.  My recollection of the letters about them said that they

24   are not necessarily systematic.

25   Q.  And that, in fact, they were sporadic; correct?

1    A.  If you have that information, we can certainly review that.

2    I don't recall that.  It's -- there's a footnote in my report

3    about it.  I don't recall the exact language.

4    Q.  We can go to the footnote, if necessary.  Let me just ask:

5    Do you recall that the footnote indicated that Simon & Schuster

6    said they had limited and unsystematic data on such bids?

7    A.  Correct.  That sounds right.

8    Q.  Does that sound right?

9          Okay.  So can we agree that the win-loss data that

10   was submitted to you by the parties was limited on systematic

11   data?

12   A.  On the side of Simon & Schuster, yes; and Penguin Random

13   House had slightly different language, which --

14   Q.  But, ultimately, to the same effect; correct?

15   A.  I don't recall their exact language, but it was certainly

16   to the effect that they were not systematic.  They -- they

17   certainly represented that not every competition we're in is

18   recorded in win-loss data; and that's certainly true given the

19   number of observations.

20   Q.  Okay.  And the win-loss data produced by the parties

21   doesn't tell you who the runner-up for any particular book is;

22   right?

23   A.  That's correct.

24   Q.  Okay.  And the -- the data that was produced in this data

25   set that you used doesn't tell you whether they were -- whether

1   the parties were second, third, fourth, fifth, or runner-up;

2   correct?

3   A.   Correct.  All it tells you is one of them competed and --

4   or it tells you that the party keeping the data competed, and

5   then it tells you who the eventual winner was.

6   Q.   Right.  So in the win-loss database, the documents from PRH

7   would perhaps let you know that it lost to Simon & Schuster or

8   vice versa, but they don't in many cases even know who the

9   runner-up is; correct?

10  A.   That's correct.

11  Q.   Okay.  But in your calculation of diversion rates from

12  these documents, you treated the win-loss data as if it

13  established winner and runner-up; correct?

14  A.   It's common in antitrust analysis, Your Honor, to look at

15  win-loss data and use it to draw inference about head-to-head

16  competition, and that's what I used it for.  I took the

17  estimates from the win-loss data, and I used them to estimate

18  how much head-to-head competition there was.

19  Q.   Even though they didn't actually tell you who was one and

20  two?

21  A.   They do not tell you if one party was the winner or the

22  other was the runner-up.  That is correct.

23  Q.   When you -- by the way, did you identify that qualification

24  in your report?

25  A.   That they don't actually tell you?

1    Q.  Correct.

2    A.  I don't recall my exact discussion of it.

3    Q.  Okay.

4    A.  But it's -- to anyone who uses win-loss data regularly, it

5    is not going to be a mystery.

6    Q.  And you -- you used the win-loss data to verify the

7    diversion rates that you get for market share?

8    A.  I used all my estimates of diversion.  As I said, I think I

9    considered the full range of them to get a picture of what

10   diversion likely looks like.

11   Q.  But just to be clear, you used the win-loss data to confirm

12   the diversions that you got for market shares, even though they

13   don't literally tell you who's one and two?

14   A.  I think the way I would say it is the diversion, according

15   to share, is based on the largest sample and is any preferred

16   methodology.  And I think the estimates from the other

17   samples -- the other methods are largely consistent with them,

18   including the win-loss data and the editorial minutes.

19   Q.  Neither of which actually tell you who's one and two;

20   correct?

21   A.  That's correct.

22   Q.  Now, let's -- and those were the -- those were the three

23   corroborations you made of the diversions proportional to

24   shares -- is that correct? -- your win-loss database, which

25   we've talked about, the runner-up database that we've talked

1    about, and the editorial minutes; correct?

2    A.  In my initial report, that's correct.

3    Q.  Okay.  Let's talk about imprint competition.

4    A.  Okay.

5    Q.  You agree that it's possible that Penguin Random House

6    imprints finish first and second -- can finish first and second

7    in a given auction; correct?

8    A.  It's possible, yes.

9    Q.  And, in fact, that -- that certainly can happen in a

10   best-bid situation; correct?

11   A.  In a best-bid situation, did you say?

12   Q.  Yes.

13   A.  Yes.

14   Q.  And it even happens in other auctions that aren't best

15   bids; correct?

16   A.  It can, yes.

17   Q.  Right.  Now, if -- if Simon & Schuster joins the Penguin

18   Random House family of imprints, you understand that the intent

19   is to treat them at least as another imprint?  You understand

20   that?

21   A.  I don't understand that.

22   Q.  Okay.  You --

23   A.  I understand the text of the bidding promise, but -- I

24   don't know exactly what you mean by treat them as at least

25   another imprint.

1    Q.  I want to divide this up so we separate questions about

2    Mr. Dohle's letter.  And just assuming for a moment that letter

3    doesn't exist -- you're familiar with the letter I'm talking

4    about?

5    A.  Correct, sir.

6    Q.  Okay.  Assume that doesn't exist.  After the merger, as far

7    as you know, all of the Simon & Schuster imprints will be moved

8    over into the Penguin Random House company but they'll all

9    still exist?

10   A.  I believe there's been discussions of collapsing some of

11   the children's imprints, but on the adult side, I'm not aware

12   of any discussion of collapsing any of them.

13   Q.  And you understand it is the long-standing practice of

14   Penguin Random House to allow imprint competition in bidding;

15   correct?

16   A.  I would say limited imprint competition.

17   Q.  What is the limitation you have in mind?

18   A.  If the two Penguin Random House imprints are the last

19   bidders, they are not allowed to -- they can match -- the lower

20   of the two can match -- or the lower imprints can match the

21   higher, but they cannot go higher.

22   Q.  Right.  So as long as there is an outside bidder, a bidder

23   who is not part of the Penguin Random House imprint family, the

24   imprints are free to compete against each other?

25   A.  They're free to -- correct.

1    Q.  And often do?

2    A.  Correct.  Well, I don't know about often.  What do you mean

3    by "often"?

4    Q.  Well, let's just leave it.  That they're free to compete

5    with each other?

6    A.  Correct.

7    Q.  And they drive bids up on each other; correct?

8    A.  I wouldn't say that, because I think if you removed the

9    independent bidder, then they couldn't go higher.  So it's that

10   presence of the independent bidder that is allowing the bid to

11   go up.

12   Q.  In all situations where there is an independent bidder, the

13   imprints fight with each other and they drive their bids up;

14   correct?

15   A.  Again, the way I interpret it is if we imagine we have a

16   rounds auction and from Round 2 onwards there's only one

17   independent publisher present -- and let's say we go to

18   Round 7 -- that value in Round 7 only happened because of the

19   presence of the independent publisher.

20   Q.  But you would agree with me that until the outside bidder

21   drops out, the top two bids could be two Penguin Random House

22   imprints fighting with each other; correct?

23   A.  I haven't seen examples of that.  Dr. Snyder had some in

24   his report, but it turned out that other bidders were the

25   second- or first-highest bidder, but there may be examples of

1718

1    it.

2    Q.  And in the best-bid situation, just to clarify to an even

3    simpler concept, when the bids are submitted, the individual

4    imprints have no idea who they're bidding against most of the

5    time; correct?

6    A.  Your last bit there was most of the time?

7    Q.  Well, perhaps all the time.  But I'm just trying to --

8    A.  Well, sometimes --

9    Q.  In a best-bid situation, you submit a bid, you -- you --

10   most of the time you do not know who you're bidding against;

11   correct?

12   A.  There are situations where that's true.  I can't put a

13   number on it for you, because there are situations where the

14   Penguin Random House imprints discuss and coordinate prior to

15   the bidding what they wish to bid.  I -- I don't have a number

16   for you about how frequent that is compared to bidding without

17   knowledge.

18   Q.  But you know that there are best-bid situations where the

19   top two bidders have been two imprints from Penguin Random

20   House; correct?

21   A.  Correct.

22   Q.  And the winner has been chosen between the two?

23   A.  I don't know -- I can't characterize it that way, but I

24   will say that the author has picked one of the Penguin Random

25   House imprints.

1    Q.  Okay.  And you know that this is a long-standing business

2    practice of Penguin Random House?

3    A.  I believe so.

4    Q.  And, in fact, you believe that it is economically -- it can

5    well be profit maximizing to have this structure?

6    A.  I think the structure can have advantages, if you allow the

7    competition -- if you take rounds auctions -- I think is the

8    easiest way to think about it -- allow the imprints to bid

9    against -- to bid independently until they run up to a point

10   where there's no competition left, and that additional bidding

11   is negative.

12   Q.  But in its simplest forms, you would agree with me that the

13   current structure at Penguin Random House of allowing its

14   imprints to compete with each other may be profit maximizing;

15   correct?

16   A.  Yes, could be.

17   Q.  And you also understand that Hachette has the same system?

18   A.  I don't recall Mr. Pietsch's testimony on that point.  I

19   apologize.  I know Simon & Schuster has a slightly different --

20   I just don't recall Hachette or Macmillan or HarperCollins.

21   Q.  But they're not -- Penguin Random House is not the only

22   publisher operating today that allows imprint competition?

23   A.  I -- I -- I'll take your word for it.  I just don't recall.

24   Q.  Okay.  Let's take a quick look back at a slide that was

25   used, I believe, from your presentation.

1    MR. OPPENHEIMER:  Pam, this is Tab 7.  This is not

2    confidential.  And I believe this was Slide 39 of the

3    government's deck on the presentation.

4    A.  I'm there.

5    BY MR. OPPENHEIMER:

6    Q.  Okay.  You recognize this slide?  This is your slide?

7    A.  I do.

8    Q.  And -- and I just draw your attention to the highlighted

9    language to the line there that says, ". . . if this book" --

10   "if this book made its way to 1745 Broadway [Penguin Random

11   House's address], we are talking 300-400 baseline."  What did

12   you understand that to mean?

13   A.  This is someone at Simon & Schuster saying that if this

14   book were to go to the open market or to get to Penguin Random

15   House, then the -- Penguin Random House would be willing to

16   offer a significant amount relative to the values we see on the

17   right.

18   Q.  Right.  And then it says, ". . . and if Knopf/not-so-little

19   Random/Doubleday start all going after it, 500-750 easy."  Do

20   you see that?

21   A.  I do.

22   Q.  So here this -- the -- the point is being made by the

23   vice president at Simon & Schuster that the imprint competition

24   that could ensue once this gets over to Penguin Random House

25   could drive the bidding up even higher than it was; correct?

1    A.  With a minor -- you said vice president of Simon &

2    Schuster.  I think this is just the vice president of the

3    imprint.

4    Q.  Pardon me.  Correct.  But you would agree with that

5    comment?

6    A.  The -- the -- this vice president is saying Penguin Random

7    House would be very interested in this book; correct.

8    Q.  And its imprints would compete with each other and drive

9    the price up; correct?

10    A.  I don't know if I would say that necessarily.

11    Q.  It's your slide.  So I'm not sure, but it -- you don't read

12    it that way?

13    A.  I -- no.  I --

14    Q.  Okay.  Let's switch and talk about your theory of harm and

15    unilateral effects.

16    A.  Okay.  Unilateral effects?

17    Q.  Yes.

18    A.  Sure.

19    Q.  Now, the theory, in general, relies on the bidders being

20    one and two; correct?

21    A.  No.  That's true in rounds -- rounds auctions, but not

22    necessarily in other formats.

23    Q.  Well, let's be clear.  The theory of unilateral effects

24    you're talking about does not predict harm if Penguin Random

25    House and Simon & Schuster never bid against each other;

```
1    correct?
2    A.  That's -- well, that would be fair in auctions, yes.
3    Q.  Well, auctions is the model you used to model the entire
4    set of acquisitions in the SSA; correct?
5    A.  That's true.
6    Q.  All right.  So -- and the theory does not predict harm if
7    the number of bidders is reduced where PRH and Simon & Schuster
8    weren't one and two; correct?
9    A.  I'm sorry.  Are we talking about the SSA, or are we talking
10   about --
11   Q.  No.  I'm talking about your theory of harm in general at
12   this point.
13   A.  No, I don't agree with that.
14   Q.  Let's take a situation where Penguin Random House, Simon &
15   Schuster, HarperCollins, and Norton bid before the merger.
16   Okay?  It's just --
17   A.  Sure.
18   Q.  No merger.  Simon & Schuster is a separate company.  So
19   it's Penguin House [sic], Simon & Schuster, HarperCollins, and
20   Norton.  Okay?
21   A.  Okay.
22   Q.  Now, if Norton won that hypothetical auction, your
23   unilateral effects theory doesn't tell you anything about
24   whether there will be harm even if post-merger Simon & Schuster
25   couldn't bid on the book?
```

1    A.  It may.  I mean, it -- are you talking about best bids or

2    rounds?

3    Q.  Either.

4    A.  Well, no.  So in a best-bids, you know, there can be the

5    second-order effect of -- the parties can -- so in -- in the --

6    Q.  Let me stop you.

7    A.  Sure.

8    Q.  Can you answer the question without respect to second

9    order?  Then I'll ask you about second order.

10   A.  Yeah.  The answer is no.  Or wait.  I can't remember the

11   question.  But there can still be a loss of competition in that

12   setting, because Norton may perceive this -- if it's a best-bid

13   competition, they perceive the softening of the competition,

14   and so they bid less aggressively.

15   Q.  So I'm clear, when you say "second order," you're referring

16   to a situation where parties other than Penguin Random House

17   and Simon & Schuster somehow soften their bidding because

18   they're observing behavior by the merged entity?

19   A.  There -- that is an effect, yes.

20   Q.  And you haven't modeled that effect anyplace; correct?

21   A.  It's not -- well, it's discu- -- I mean, the best-bids

22   auctions are capturing this general idea.  The best-bids GUPPI

23   is looking at the idea of if we have a best-bid setting, what

24   is likely to be the effect.

25   Q.  But it is not examining this softening effect on parties

1   other than the merging parties; correct?

2   A.   Correct.

3   Q.   Okay.  And neither is the second-score auction; correct?

4   A.   Correct.

5   Q.   Okay.  And -- and neither of your models predicts harm just

6   because there's one fewer bidder; correct?

7   A.   Could you -- could you say more?

8   Q.   In other words, your analysis examines harm only in

9   situations where Penguin Random House and Simon & Schuster are

10  number one and number two; correct?

11  A.   I don't agree with that.

12  Q.   Okay.  Your models are not telling you that there's a --

13  that there's a reduction in harm simply by eliminating one of

14  the publishers in the publisher population; correct?

15  A.   I disagree.

16  Q.   Now, you're aware that other publishers in this case have

17  testified that they don't intend to reduce their advances after

18  the merger; correct?

19  A.   Correct.

20  Q.   And you don't have any reason to doubt that, do you?

21  A.   Well, I think the -- the testimony, at least as I have

22  heard it from HarperCollins and -- well, I -- I have to be

23  careful here.  I would say both HarperCollins and Macmillan

24  have concerns about whether they'll be able to compete as they

25  might wish to after the transaction is completed.

1    Q.  Right.  But you don't have any --

2    A.  Other --

3    Q.  You don't have any question about the fact that the

4    publisher executives who testified in this trial, that they

5    don't intend to reduce their bids or are telling you what they

6    believe; correct?

7    A.  It's a pretty broad statement.  Could you be more specific?

8    I'll put it this way.  Maybe this will help.  I'm not aware of

9    any executive testifying after the transaction I intend to

10   reduce my bids.

11   Q.  All right.  Now, your -- your prediction is that advances

12   are going to go down by roughly 6 percent for PRH and S&S

13   authors if the merger is approved; correct?

14   A.  Yeah, about 4 percent for Penguin Random House and -- but,

15   again, I would caution against putting too much weight on the

16   specific number.

17   Q.  Right.  And -- and you said that could go down to as low as

18   3 percent?

19   A.  I think you said that.  And I said that there's a true

20   effect that we're trying to estimate using a variety of things,

21   and the -- the 4 percent for Penguin Random House and 11 and a

22   half for Simon & Schuster are estimates of that.  But, again, I

23   don't put a great deal of weight on them being the precise

24   number.

25   Q.  All right.  But you agree it could go down to 3 percent?

1    A.  The true number could be 3; it could be 10.  My best

2    estimate is what you see in the report -- or my conservative

3    estimate is what you see in the report.  I don't -- you know,

4    it's an estimate of the -- whatever the true value is.

5    Q.  Okay.  And do you recall -- we talked a little bit

6    yesterday about your testimony in the United States v.

7    Sugar [sic] case?

8    A.  Correct.

9    Q.  Okay.  And in that case, did you testify that the

10   government was asserting that the merged firm would have a 3 to

11   4 percent price increase?

12   A.  My -- my models were under 0.5 percent.  The -- the

13   government had a range of models, some of which went under

14   1 percent and some of which were higher.  I think their

15   second-score auction model might have been in that range.

16   Q.  And do you recall testifying that a 3 to 4 percent price

17   effect for the merged firm in that case was not significant?

18   A.  I don't recall using that language.

19   Q.  Okay.  Let's talk about implementing the model.  We talked

20   yesterday about the fact that the market shares you calc- --

21   under the market shares you calculated, almost nine times out

22   of ten, Penguin Random House and Simon & Schuster would not be

23   first and second; correct?

24   A.  Could you repeat that, please?

25   Q.  Sure.  That according to the market shares you calculated,

1    almost nine times out of ten, Penguin Random House and Simon &
2    Schuster would not be first and second?
3    A.  You mean if you're assuming diversion according to share?
4    Q.  Correct.
5    A.  Yeah, I believe it's around about 12 percent.
6    Q.  Okay.  And so if Penguin Random House lowered advance
7    offers for every book acquisition with the idea that S&S is no
8    longer operating as their main competitive constraint, they'd
9    be wrong about 88 percent of the time; correct?
10   A.  You're using the aggregate calculation.  You would get a
11   different percentage for both Simon & Schuster and Penguin
12   Random House.
13   Q.  But, overall, for the merged entity, they would be wrong
14   about 88 percent of the time; correct?
15   A.  I haven't thought it through.  I -- I mean, I don't -- so I
16   wouldn't think of it as being wrong, I guess, is what I would
17   say.  If you imagine a situation where you have a best-bids
18   competition and I know I'm competing against -- frequently
19   against, let's say, HarperCollins and HarperCollins is removed,
20   then it is optimal for me to reduce my bids even if I'm not
21   always losing to HarperCollins, or even if I don't lose to them
22   as much as 40 percent or 50 percent of the time.
23   Q.  Well, if -- if you're -- if you put yourself in the
24   position now of the merged firm and you're looking at an
25   auction, the place where you're going to have limited

1   competition is where Simon & Schuster and Penguin Random House

2   would have been one and two previously; correct?

3   A.  I disagree, again.  In the -- and if I may, I just -- in

4   the best-bid setting or negotiations, you're thinking about how

5   often is this other party competing with -- with me a

6   significant percentage of the time.  It's not like the

7   second-score setting where it is -- first and second is the key

8   question.

9   Q.  So if you're contemplating any type of auction -- let's

10  take -- let's take the blind-bid auction or the best-bid

11  auction -- and you knew that Simon & Schuster was a runner-up

12  in prior bidding, you wouldn't know whether they were going to

13  turn up again in the next bid; correct?

14  A.  Correct.  You're using your knowledge of the past to make a

15  prediction about how likely it is they will compete with you.

16  If that's very rare, then you may not change your bid a lot.

17  If it's very frequent, you may change your bid more frequently.

18  Q.  And what is the mechanism by which the merged entity could

19  implement this ability to lower overall advances by 6 percent?

20  How do they do that?

21  A.  So if you're competing frequently with an opponent in

22  auctions or negotiations and they are removed from the

23  competition, it is profit maximizing to take account of the

24  fact that competition has been lessened and to lower your bids,

25  in general, in best bids, and negotiations to be less

1729

1    aggressive.

2         In rounds auctions you don't really need to take any

3    action.  You continue to bid the way you did before, and some

4    auctions will just end before they otherwise would have, and

5    you will pay less.

6    Q.  But take the best-bid auction, you don't know whether --

7    you don't know who is going to show up at the auction; correct?

8    A.  Right.  But you also don't know that today, and you make an

9    inference about how much competition is out there when you're

10   forming your bid.  If that competition has been lessened, you

11   bid less post-merger.  It's the same intuition as what you do

12   today.

13   Q.  And so for you, this turns on whether the person placing

14   the bid has a perception that a particular competitor is going

15   to appear on the scene, either to make a bid in a best-bid or

16   to make an actual bid in an auction or to be the outside option

17   in a bilateral negotiation; that it's that publisher's

18   perception of who their primary competition is?

19   A.  In my -- it doesn't have to be their primary competition.

20   So, again, in my experience with firms, when they're looking

21   across their industry or they're looking at particular markets

22   they compete in, they have a sense of the intensity of the

23   competition in that market.

24        And they adjust their bidding and their behavior based

25   on that.  If it's very competitive, they're more aggressive.

1    If it's uncompetitive, they're less aggressive.  And when

2    there's a change in competition, either because of a merger or

3    a firm goes out of business, they will modify their behavior

4    accordingly.

5    Q.  Isn't it true that --

6                THE COURT:  Mr. Oppenheimer, I feel like we're

7    plowing the same ground a lot.  Can we move forward?

8                MR. OPPENHEIMER:  If I may, Your Honor, just -- just

9    one last --

10               THE COURT:  Okay.

11   BY MR. OPPENHEIMER:

12   Q.  Do the publishers typically know who was second in a bid?

13   Do they have that information?

14   A.  No.  They typically -- I would say generally they don't.

15   They usually know the winner, but they don't generally know

16   who's second.

17   Q.  Okay.  If -- if -- let me take us to a situation where

18   we're in a bilateral negotiation for a repeat author, somebody

19   with whom we have an existing relationship.

20   A.  Sure.

21   Q.  Okay.  And let me further assume that that author is at the

22   high end of the advance scale, somebody who's making --

23   historically has made large advances.  Okay?

24   A.  Okay.

25   Q.  All right.  We can agree that that's probably an important

1   negotiation to the publisher?

2   A.  If it's profitable, yes.

3   Q.  All right.  And at -- at the very highest levels for the

4   parties that are making not $250,000 in advances, but many

5   millions of dollars in advances, do you believe that those

6   negotiations will also -- the bidders or the negotiators in

7   those negotiations will shave their offers after the merger

8   because of this 6 percent pricing effect?

9   A.  Well, the 6 percent is the prediction of the model.  The

10  question, rather, is today Simon & Schuster knows that

11  Penguin Random House wins four out of ten books, and when

12  they're thinking I've got an author coming up for negotiation,

13  how aggressive do I want to be in terms of the offer I make,

14  they're thinking about their competition.  What other options

15  might the author have if I can't reach a satisfactory agreement

16  with the author?

17  Q.  They're also thinking about the fact that if they lose an

18  author at those very high echelons, they also potentially lose

19  their incumbency and the benefit of the future work of those

20  authors; correct?

21  A.  That's correct.

22  Q.  Would you think, as an economist, that they would have to

23  have a very substantial price advantage to make a reduction in

24  their normal offering strategy in that situation?

25  A.  Could you repeat the wording, please.

1    Q.  Yeah.  Do you -- do you think in a situation in which

2    you're negotiating for the continuation of an incumbent

3    relationship with a very high-profile author, that it would be

4    very important to you to not lose that contract?

5    A.  So we've seen examples of the parties losing these types of

6    authors to each other, and I believe there were examples of

7    HarperCollins losing these types of authors to the parties.

8    Established authors do switch.  And, you know, the -- this is a

9    business, and you -- based on how much competition you think

10   there would be, you come to a determination about your bid but

11   also about the factors you're talking about.  We have a

12   relationship.  We may wish to keep this author.

13   Q.  And do you --

14   A.  Or -- so if I may, just looking for the runner-up study,

15   you see both sides of this coin.  There are cases where a party

16   will say, this is a strong author for us; we're very motivated

17   to keep them.  And there are other cases where they say, this

18   author has seen some declining sales.  We love them, but this

19   is time for them to take a haircut.  In both of those settings,

20   the author who's very popular, there's also a stronger

21   incentive for a rival to steal them.  And in the case with the

22   author who has to take a haircut, if they are unhappy, then

23   that may be an opportunity for a rival.

24        So I can't characterize that certain of those

25   established relationships will have more or less aggressive

1  bidding by the incumbent.

2  Q.  Let's talk about coordinated effects, briefly.

3  A.  Sure.

4  Q.  Okay.  You have not estimated any sort of price impact from

5  any sort of coordinated effects in this case; correct?

6  A.  That's correct.

7  Q.  And you haven't calculated a percentage likelihood that

8  publishers will coordinate post-merger; correct?

9  A.  That's correct.

10  Q.  And you're not able to tell us how much more likely

11  coordination is post-merger than it was premerger; correct?

12  A.  Correct.  I can't quantify it.

13  Q.  You -- you can't tell us whether it's more than 50/50 or

14  any other thing; correct?

15  A.  That's correct.

16  Q.  Okay.  Are you aware of any current coordination that's

17  occurring in the industry?

18  A.  I am not.

19  Q.  To be clear, you're not offering any opinion that

20  publishers will coordinate on the timing of payments; correct?

21  A.  I am not offering any such opinion.  And I am, in general,

22  not saying -- we can go on to your questions.  Sure.

23  Q.  Not offering an opinion that publishers will enter into

24  no-poach agreements; correct?

25  A.  Correct.

1734

```
1    Q.  Let's talk about printing briefly.

2    A.  Sure.

3    Q.  You have not rendered an opinion on printing in this case;

4    correct?

5    A.  That is correct.

6    Q.  Of any kind; correct?

7    A.  Correct.

8    Q.  Okay.

9          MR. OPPENHEIMER:  Your Honor, that's all I have.

10         THE COURT:  Okay.  Thank you, Mr. Oppenheimer.

11      Any redirect?

12         MR. STEVENSON:  Yes, just a few questions.

13                     REDIRECT EXAMINATION

14   BY MR. STEVENSON:

15   Q.  Dr. Hill, on -- excuse me.  On Monday you testified

16   that you tried to build a best-bids auction model using

17   something like the agency data and ended up with significantly

18   higher price effects, and they were enough that you didn't

19   think they were credible based on what you knew about the

20   market, and so you used the second-score auction model.  Do you

21   remember that?

22   A.  I do.

23   Q.  And then yesterday you testified that you experimented with

24   the first-price auction.  You weren't able to get results that

25   you thought were credible, and you also thought -- and you also
```

1    didn't make a great deal of progress with the negotiations

2    model, and there were a couple other types you considered.  And

3    the Court asked, "So your choice of model depended in part on

4    what the results were and if they looked right to you?"  Do you

5    recall that?

6    A.  Yes.

7    Q.  Was the first-price auction you referred to yesterday with

8    results that you didn't think were credible the same one that

9    you described on Monday that predicted higher price effects

10   than what you thought was credible?

11   A.  Yes.

12   Q.  Do you reject any models in your analysis of this merger

13   because the harm predicted by the model was too low?

14   A.  I did not.

15   Q.  Dr. Hill, at the outset of Mr. Oppenheimer's questions this

16   morning, he asked about a hypothetical where Penguin Random

17   House and Simon & Schuster, despite their market shares, don't

18   compete.  Do you recall that?

19   A.  I do.  The one on the overhead?

20   Q.  On the ELMO, yeah.

21         Is that hypothetical at all consistent with the evidence

22   and analysis you've conducted in this case?

23   A.  No.  I don't think it's likely that Penguin Random House

24   and Simon & Schuster never compete with one another in an

25   auction.

```
 1              MR. STEVENSON:  I have no further questions.
 2              THE COURT:  Okay.  Thank you.
 3          Anything else?
 4              MR. OPPENHEIMER:  Just briefly, Your Honor.
 5                      RECROSS-EXAMINATION
 6   BY MR. OPPENHEIMER:
 7   Q.  Doesn't the inability that you confronted to build a
 8   first-price model, negotiating model, show that the industry
 9   may be unmodelable?
10   A.  I think it shows there are challenges in modeling
11   first-price auctions in general, but I -- again, I think
12   we've been over this ground.  I feel like the second-price
13   auction and then, subsequently, the GUPPI models are a
14   reasonable way to estimate whether there's likely to be a
15   unilateral effect.
16   Q.  And you mentioned the GUPPIs again.  You -- you do not have
17   a GUPPI for the bilateral; correct?  You only have the hybrid
18   GUPPI; correct?
19   A.  There's the hybrid and then the two model ones -- auction
20   ones, yes.
21   Q.  Right.  But you do not have a GUPPI for the bilateral
22   negotiation context; correct?
23   A.  Correct.
24   Q.  Okay.
25   A.  I mean, except to the extent that the hybrid includes it,
```

1    yes.

2              MR. OPPENHEIMER:  Okay.  And then, Pam, if we could

3    quickly put up Slide 68.

4    BY MR. OPPENHEIMER:

5    Q.  This was a slide that you used in your -- your opening

6    comments.  I'm going to spend a very short time based on what

7    you just said.  With respect to the various entries that you --

8              MR. STEVENSON:  Objection.  This is beyond the scope

9    of my redirect.

10             THE COURT:  Sustained.

11             MR. OPPENHEIMER:  Okay.  Thank you, Dr. Hill.

12             THE WITNESS:  Thank you.

13             THE COURT:  Okay.  Anything else from you,

14   Mr. Stevenson?

15             MR. STEVENSON:  May I just suggest that -- we intend

16   to call Dr. Hill in rebuttal, and I suggest -- to save our

17   paralegals a little bit of time and maybe a couple trees --

18   that we save the binders of his reports that, I suspect, will

19   be passed out again.

20             THE COURT:  Okay.  That's fine.

21        All right.  You can step down for now.

22             THE WITNESS:  Thank you, Your Honor.

23             THE COURT:  We'll see you later.  Thank you,

24   Dr. Hill.

25        And the government may call its next witness.

```
1            MR. READ:  If I may -- if I may do one housekeeping

2      matter first, Your Honor.

3            THE COURT:  Yes, of course.

4            MR. READ:  So we have four exhibits we would like

5      admitted.  These are -- two of them are defendants' responses

6      to interrogatories and two are responses to requests for

7      admission.  If I can -- I think this is going to be by

8      stipulation.

9            THE COURT:  Okay.

10           MR. READ:  This would be PX 858, PX 862, PX 863, and

11     PX 882.  And then we'd also like the U.S. Demonstrative No. 5,

12     which has the list of the 40 titles we've been talking about,

13     under seal.  So if I can -- those can be admitted.  And I can

14     hand those out.

15           THE COURT:  Okay.  Thank you.

16        Any objection to any of those exhibits?

17           MR. PETROCELLI:  No, Your Honor.

18           THE COURT:  All right.  So those will be admitted.

19           (PX Exhibit No. 858, 862, 863, 882, and U.S.

20     Demonstrative Exhibit 5 admitted into evidence.)

21           MR. READ:  We will now call our last witness before

22     we rest, Christy Fletcher, the agent who is on defendants'

23     initial witness list.

24           THE COURT:  And how long is this video?

25           MR. READ:  It's an hour and 15 minutes.
```

1          THE COURT:  Okay.  I wonder if we should just take

2    our morning break now a little bit early, and then we can watch

3    the whole video.

4          MR. READ:  One fact.  There is a significant portion

5    of this that's under seal.

6          THE COURT:  Okay.  So how much of it is not under

7    seal?

8          MR. READ:  I think it's about half.  I think we're at

9    about -- I have these answers.  Forty-five minutes public.

10   Twenty minutes confidential.

11         THE COURT:  Okay.  Forty-five minutes is a little

12   long to go right now.  So why don't we take our break now, and

13   we'll come back in 15 minutes, at about 11 o'clock, and we'll

14   do the 45 minutes public.

15         MR. READ:  Thank you, Your Honor.

16         THE COURT:  So during the break, I'm going to ask the

17   defendants to try to clean the ink off the ELMO that was left

18   there when we were drawing.

19      Thank you.

20         (Recess taken.)

21         THE COURT:  All right.  Good morning, again.

22         MR. READ:  We've provided the binders for the

23   exhibits, and I think we're ready to go.

24         THE COURT:  Okay.  Thank you.  Yes.  Please proceed.

25         (An audio-video recording of the deposition of

1740

```
 1    Christy Fletcher was played.)

 2              MR. READ:  Your Honor, now we have the 20 minutes of

 3    sealed.

 4              THE COURT:  All right.  Thank you.

 5         I'm going to ask the members of the public to leave the

 6    courtroom at this time.  We're going to be playing 20 minutes

 7    of sealed testimony, and then we'll reopen the courtroom.

 8              (Proceedings held in closed court.)

 9              THE COURT:  All right.  And I'll ask the parties just

10    to confirm everybody in the courtroom should be in the

11    courtroom.

12              MR. READ:  Looks good on the government's side.

13              THE COURT:  Okay.  Thank you.

14         All right.  Thank you.

15         Let's play the sealed portion.

16              (A confidential audio-video recording of the

17    deposition of Christy Fletcher was played.)

18              MR. READ:  The United States rests.

19              THE COURT:  Thank you.

20              MR. READ:  We will make -- reserve the right to call

21    some rebuttal witnesses, if necessary.

22              THE COURT:  All right.  Thank you very much.

23         Can somebody let the public back into the courtroom?

24              (Proceedings held in open court.)

25              THE COURT:  All right.  So the government has rested
```

1741

```
 1        its case.
 2             And how does the defense want to proceed at this time?
 3             MR. PETROCELLI:  Your Honor, would it make sense to
 4        take our lunch break now, or do you want to begin?
 5             THE COURT:  That's what I wanted to ask you; what
 6        you're planning.
 7             MR. PETROCELLI:  Well, let me just give you a brief
 8        overview of what we intend to do, and we can start now or after
 9        lunch, whatever is most convenient for you.
10             THE COURT:  Okay.
11             MR. PETROCELLI:  We're going to begin our case by
12        calling Jennifer Walsh, the expert witness who spent her career
13        as an agent.  And I understand, Your Honor -- but correct me if
14        I am mistaken -- that it's permissible for us to now ask her
15        about the impact of the merger.
16             THE COURT:  Yes.
17             MR. PETROCELLI:  Thank you.
18             Following Ms. Walsh, we will be calling
19        Jennifer Bergstrom, who is a publisher of the Gallery imprint
20        at Simon & Schuster; followed by Sally Kim, who is a publisher
21        of the Putnam imprint at Penguin Random House.
22             And then we will have several agents who will testify
23        beginning with Elyse -- that's E-l-y-s-e -- Cheney,
24        C-h-e-n-e-y.  And we expect that will be followed by the
25        Penguin Random House chief executive officer, Madeline
```

```
 1    McIntosh.
 2          Now I think we're on to Monday.  Also Alex Berkett on
 3    Monday will be testifying.  He's with Viacom.  And that should
 4    then -- we also have Charles Duhigg, an author, who will be
 5    testifying.
 6          A number of these examinations, Your Honor, you know,
 7    will be shorter than what we've had so far given that
 8    Your Honor seems to have a very good grasp of a lot of the
 9    basic background of the industry and doesn't need to hear the
10    same thing over and over again.
11          THE COURT:  I appreciate that.  Thank you.
12          MR. PETROCELLI:  And then we will be calling the --
13    the witnesses related to efficiencies, and that could happen
14    either end of day Monday or early Tuesday.  And then we take it
15    from there, you know.
16          After that we have our economist, Professor Snyder.  And
17    maybe some other witnesses have to take the stand, if the
18    government so requests, like Mr. Dohle.
19          THE COURT:  All right.  Thank you.
20          And so your first witness is Madeline -- I'm sorry -- is
21    Ms. Walsh?
22          MR. PETROCELLI:  That's correct.
23          THE COURT:  Okay.  And it is only 12:20.  So I think
24    we should start with your first witness and go until 1:00.
25    Okay?
```

```
1              MR. PETROCELLI:  Okay.  Thank you.
2         So we call Jennifer Rudolph Walsh, and Ms. Rudzin will
3    be conducting the examination.
4              THE COURT:  All right.  Thank you.
5         You can step right up here, and can you remain standing
6    for a moment and raise your right hand.
7              (Oath administered.)
8              THE WITNESS:  I do.
9              THE COURT:  You can be seated.  If you would like,
10   you can remove your mask, but it's up to you.
11             MS. RUDZIN:  Good morning, Your Honor.
12             THE COURT:  Good morning, Ms. Rudzin.
13                       DIRECT EXAMINATION
14   BY MS. RUDZIN:
15   Q.  Ms. Walsh, can you please state your full name for the
16   record.
17   A.  Jennifer Rudolph Walsh.
18   Q.  Please tell us how you started in publishing.
19   A.  I started as a summer intern for Virginia Barber at the
20   Virginia Barber Literary Agency my junior year in college.  And
21   I fell so in love with book publishing -- and, fortunately,
22   Virginia fell in love with me too.  So she hired me to work
23   full-time, and from my senior-year dorm room, I was her
24   assistant.  And then I graduated in -- on a Saturday and began
25   work full-time for her that Monday, and that was 1989.
```

1  Q.  How long did you stay at the Virginia Barber Literary

2  Agency?

3  A.  I stayed there until I bought the business in 1997 and

4  renamed it the Writers Shop.

5  Q.  And how long were you at the Writers Shop?

6  A.  I was at the Writers Shop from '97 to 2001 when I sold the

7  Writers Shop to William Morris Agency.

8  Q.  And what is William Morris Agency?

9  A.  The William Morris Agency is the oldest entertainment

10  agency in the world, over 120 years old.

11  Q.  After you sold the Writers Shop to William Morris, did you

12  continue to work there?

13  A.  I did.  I went over there as the head of their book

14  division.

15  Q.  And did you have a title or other roles at William Morris?

16  A.  Yes.  I was the head -- the global head of the book

17  division; and I also had the honor of being the first woman

18  ever on the board of directors, as well as the youngest person

19  ever.

20  Q.  While you had these executive responsibilities, did you

21  continue to act as a literary agent?

22  A.  Always.

23  Q.  About how many deals would you say you did?

24  A.  It would vary year to year, but between, I'd say, 50 and a

25  hundred.

1    Q.  Per year?

2    A.  Per year.

3    Q.  What was the size of the literary department at WMA?

4    A.  When I got there, it was quite small.  But during the

5    course of my tenure, we grew and grew and, ultimately -- sort

6    of, 20 to 25 agents altogether and then support staff.

7    Q.  Did you have a role in supervising those 20 to 25 agents?

8    A.  Yes, I did.

9    Q.  What was that role?

10   A.  It was -- I oversaw all of their -- all of their deals, and

11   I strategized for growth possibilities.  I did their

12   evaluations and I -- I weighed in on their -- on their bonuses.

13   Q.  Did you personally get involved in any of their actual

14   deals?

15   A.  I did.  I had a thing that I would say to them, which is,

16   "Come to me for the four Cs."

17        So the first C was the creation of the relationship, or

18   otherwise known as signing.

19        The second one was contracts.  Anything that had to do

20   with contractual issues.

21        The third was crisis, which is pretty self-explanatory.

22        And the fourth was celebration.

23        So that was where I would be.

24   Q.  Okay.  And just to be clear, when you talk about the

25   creation of the relationship and the signing, what are you

```
1    talking about?

2    A.  Agents signing clients.

3    Q.  So before the agent has sold any books?

4    A.  Exactly or -- yes.

5    Q.  And how long did you work at William Morris?

6    A.  I worked at William Morris from 2001 to 2009 when I was on

7    a small executive board committee that merged William Morris

8    with Endeavor, forming WME.

9    Q.  And did you continue to work at WME after the merger?

10   A.  I did.

11   Q.  What was your role?

12   A.  I remained a literary agent, and I remained the global head

13   of the book division.  And I added lectures and theater to my

14   oversight.

15   Q.  Did you remain on the board?

16   A.  I did.

17   Q.  What can you tell us about WME's book division?

18   A.  It's amazing.  It's the largest content provider.  It

19   publishes about 200 books a year, a third of which are *New York

20   Times* best sellers, and it does about a thousand deals globally

21   per year.

22   Q.  A thousand book deals?

23   A.  Yes.

24   Q.  Thank you.

25        Are you still at WME today?
```

1    A.   I'm not.

2    Q.   And why have you left?

3    A.   I left at the end of 2019 to focus on a women's tour that I

4    had founded four years earlier called Together Live; and this

5    was a tour that went around the country with a diverse and

6    inclusive group of women sharing their stories of courage and

7    resilience.  And so I left to focus on that.

8    Q.   And are you still working on Together Live?

9    A.   Sadly, I closed it during the pandemic.

10    Q.   So what have you been doing with your time since then?

11    A.   Well, I've been selling -- smelling the roses for the first

12    time in my entire life.  I published a book of essays from the

13    speakers from Together Live called *Hungry Hearts* that I wrote

14    the introduction for, and I've been doing a tiny amount of

15    consulting.

16    Q.   And what are you here to testify about today?

17    A.   I'm here to testify about the publishing industry as a

18    whole and, specifically, the literary agent's role within that

19    industry.

20         MS. RUDZIN:  Your Honor, based on this foundation of

21    Ms. Walsh's experience and qualifications, defendants move that

22    Ms. Walsh be accepted as an expert on the publishing industry

23    and the role of the agent in it.

24         THE COURT:  Any objection?

25         MR. READ:  No objection to being qualified as an

1    expert as a literary agent --

2              THE COURT REPORTER:  I'm sorry.  Literary agent --

3              MR. READ:  Experience as a literary agent in the

4    industry; experience in that sense.

5              THE COURT:  Okay.  Were you planning to go beyond

6    that at all, Ms. Rudzin?

7              MS. RUDZIN:  No.

8              THE COURT:  Okay.  Then I will qualify her as an

9    expert as a literary agent.  Thank you.

10   BY MS. RUDZIN:

11   Q.  Ms. Walsh, can you please describe for the Court the role

12   of the literary agent in the publishing industry.

13   A.  The literary agent finds the author, then helps the author

14   decide what is the form that they want to submit to a

15   publisher, and then helps make the match between the author

16   and the publisher.  And once that match is made, the literary

17   agent stays involved through the publication; as well as

18   exploits other ancillary rights of the book, like movie rights,

19   foreign translation rights, TV rights, podcast rights,

20   et cetera.

21   Q.  Do literary agents owe any duties to their clients?

22   A.  Yes.  Literary agents are a fiduciary, which means that

23   we are honor bound to act in the best interest of our clients.

24   Q.  So I think you said that one of the things literary

25   agents do is sell book rights.  Can you tell us about that

1   process.

2   A.  Absolutely.  So -- well, a majority -- if you're an

3   experienced agent, a majority of the book deals that you're

4   doing are likely to be for authors who already have a

5   publisher.  So if that's the case, you're -- you would be

6   negotiating with the existing publisher, perhaps; or if it's a

7   new author or an author who does have a track record but wishes

8   to move.  That's -- those are the most common three things that

9   a literary agent is doing.

10  Q.  So let's talk about the process for a debut author.  How

11  does that start?

12  A.  Well, it starts when you bind the author, which is an

13  important role that literary agents play for the publisher, is

14  that we're the curator.  We receive many, many submissions, and

15  we only choose the things that we are very enthusiastic about.

16        So when you decide to sell a book, the first thing you

17  do is start talking about it, and you -- we call this

18  preseeding or creating buzz.  You go out for lunch with

19  editors, you talk about the book, and you start getting

20  feedback.  And you might start getting some information about

21  comparison titles or the perfect editor.

22  Q.  What happens after the agent preseeds the marketplace?

23  A.  Then the agent works with the author to determine what is

24  the best form of the submissions.  So it could be a sample

25  chapter.  It could be a table of contents.  It could be a

1    partial manuscript.  So, you know, essentially, the submission

2    is a sales tool.  So you want to put your best foot forward.

3    So you try to determine what that is.

4    Q.  For fiction authors, is it generally a complete manuscript?

5    A.  You know, I would say commonly, for a first-time author, it

6    would be a complete manuscript, but even with first-time

7    authors, you can submit a partial if it's really strong.

8    Q.  What does the agent do next after it determines the actual

9    form of the submission?

10   A.  Then the agent decides how they want to submit it.  So do

11   they want to submit it exclusively to one person or to two

12   people, or do they want to go out -- we call it wide.

13   Q.  If the agent goes wide, does the agent include more than

14   one editor at the same publishing house on the list of people

15   to send it to?

16   A.  Oh, absolutely.  An agent isn't submitting to a publishing

17   house.  An agent is submitting to editors and imprints.

18   Q.  How many imprints are there for agents to consider making

19   submissions to?

20   A.  Hundreds.

21   Q.  And how many editors are available for the agent to submit

22   to?

23   A.  Hundreds.

24   Q.  How many editors does the agent typically submit a book to?

25   A.  There is no typical.  And I know that's strange, but every

1    book is different; and, therefore, every submission process is

2    different.  So, you know, we're not -- we're not looking for

3    the largest amount of submissions.  We're looking for the

4    perfect match.

5    Q.  How does the agent decide whom to include on the submission

6    list?

7    A.  Well, a big -- a big responsibility of an agent is having

8    relationships in the publishing business.  And so agents know

9    editors very well, and they know their background, and they

10   know what books they love and what books they've published or

11   missed out on.  So that deep knowledge helps us create what I

12   call a bespoke submission list.  So if I'm doing a book about a

13   cult and I happen to know an editor who grew up in a cult,

14   then, you know -- then I have information that would help me

15   make that perfect match.

16   Q.  Ms. Walsh, have you been watching the trial?

17   A.  I was here Monday and Tuesday.

18   Q.  Have you read transcripts of the -- last week?

19   A.  I've reviewed partial -- partial transcripts.

20   Q.  Did you review Ms. Pande's testimony?

21   A.  Yes, I did.

22   Q.  Ms. Pande testified that when she submits her books widely,

23   she always submits to Penguin Random House and Simon &

24   Schuster.  Do you recall that testimony?

25   A.  Yes.

1    Q.  In your view, do agents always submit their books to both

2    Penguin Random House and Simon & Schuster?

3    A.  Agents submit to editors and imprints.  So when you're

4    making a submission list, you're not only thinking of the

5    umbrella level.  So it would not be -- it would not be

6    necessary for us to think in terms of what the umbrella company

7    was.  The answer for me would be no.

8    Q.  You mentioned that an agent might submit projects to only a

9    single editor.  Why would an agent ever do that?

10   A.  I know this is going to sound very counterintuitive, but

11   it's very exciting for us to make a perfect match.  And if you

12   feel that you know exactly who's right for the book and you

13   send it to them, it's like a badge of honor.  So we love to do

14   that.

15   Q.  And why are agents focused on finding what you call the

16   perfect match rather than just selling the book to someone who

17   will pay a lot of money for it?

18   A.  Well, you know, writers are artists, and whatever they've

19   created represents their heart.  It's -- you know, it's a

20   sacred work of art, and so it really matters.  And not only

21   that, but the collaboration between the editor and the author

22   has a very real -- a very real outcome in terms of the books.

23   So a good match is good business.

24   Q.  What happens if the agent sends the project to only one

25   editor and they can't do a deal?

1  A.  Well, likely in that situation, the editor will have given

2  generous editorial feedback, because editors are incredibly

3  generous about books.  So it might be that you take that

4  feedback and tweak the project a little.  I've done that and

5  gone back to the same editor -- or you move on.  There are

6  plenty of fish in the sea.

7  Q.  What would you do if you were moving on?

8  A.  Well, it depends if I thought I want to go another single

9  submission or if I want to go out wider.  So for the sake of

10  this, let's say I'm going out wider.  Then I would create my

11  submission list.

12  Q.  And what happens after the agent has created her submission

13  list?

14  A.  Then you call everybody on the list and you pitch the book

15  verbally.  And that's giving you more information.  I mean, an

16  editor will say to you on the phone, I think this sounds better

17  for a colleague of mine, or an editor you can see just isn't

18  responding.  So the whole time you're making your calls, you're

19  polishing your final submission list.

20        Once you're done with that, then you write the

21  personalized cover note.  And that's just, you know, "Great to

22  have lunch with you the other day.  You know, as

23  discussed . . ."  And then you have an elevator pitch, for lack

24  of a better word, describing the book.  You'll use some

25  favorable comparison titles.  We call those comps.  And then

1  you press send and you -- with all your best hopes, and you

2  wait.

3  Q.  Does the author ever meet any of the editors?

4  A.  Yes.  So once the editors start coming to you with their

5  reactions, you determine whether you think an author meeting

6  would be a good idea, and sometimes you -- you suggest

7  meetings.  Sometimes the editor suggests meetings.  But you

8  don't always let the author meet with everybody, because, for

9  one thing, it's a fragile part of the process.  And if an

10  editor has a strong constructive criticism that you feel like

11  is not going to be in alignment with the author, you sort of

12  try to -- you want the author to have the truth, but you also

13  protect the process so that the fragility of that early

14  creative period is not crushed.

15  Q.  But, presumably, editors want to meet the author before

16  they make a bid.  So if you're limiting the meetings, you're

17  limiting the numbers of bidders; right?

18  A.  Yeah, you could be, because -- again, with the

19  counterintuitive; but more isn't necessarily more in this

20  process.  And so you just want to make sure that you're really

21  making the best matches.  And then it's from the matches that

22  you look for the best offer.  But the match is certainly

23  multiple truths.  It's just as important as the -- as the

24  advance level, and in some cases even more important.

25  Q.  Okay.  So the author has meetings with editors.  Now it's a

1    more narrowed list.  Then what happens?

2    A.  So, you know, sometimes after one of these meetings, an

3    editor is so excited and the author is so excited that you just

4    say, okay, this is the one, you know, this is -- this is my

5    true love, and this is what I want.  And the agent might decide

6    to just negotiate exclusively with that editor.

7         Some people call that inviting a preempt, just to give

8    you the language.

9    Q.  Why would the agent invite a preempt or choose to negotiate

10   with just a single editor when there are potentially other

11   editors interested?

12   A.  Well, if it's an absolute dream match for the author, if

13   both the editor and the imprint are exactly right for the

14   author's priorities and even dreams, then it's really just

15   about coming to a -- to a -- to a good number where everybody

16   feels happy.  And, you know, the agent goes into it with a

17   pretty good working understanding of what -- of what the book

18   is worth.

19        And the agent has been collecting information the whole

20   way, you know; hearing from every editor, getting their

21   feedback.  So they've honed that expectation.  And, honestly,

22   preempts, sometimes you actually even do better than if you had

23   gone to auction.  Because it's very exciting for the editor to

24   preempt a process, and you get to a -- you get to a very good

25   place, and it's -- it's -- you declare a victory.  Everybody is

1   very happy in those situations.

2   Q.  Well, assuming the author wants a particular editor and

3   everybody is happy and all that kind of stuff, how does the

4   agent know that she's getting the most advance she can get from

5   that editor?

6   A.  Well -- well, experience and skill helps.  But the truth is

7   that we're not always looking to take every single dollar out

8   of the editor's pocket.  We want to get to a place where the

9   editor is maybe paying, ideally, a little more than they wanted

10   to and the author is getting more than she expected to, but

11   that the relationship feels healthy and everybody is excited

12   and sort of rowing in the same direction.

13          THE COURT:  Can I ask how that's -- how does that --

14   how's that consistent with your fiduciary duty to your

15   author that you're not trying to get the most money for that

16   author?

17          THE WITNESS:  Thank you so much for that question.

18          Because our -- our closing note; every agent that I'm

19   aware of closes the letter with we reserve the right to decide

20   what constitutes the best offer.  So it tells you a lot about

21   our culture that we all use this sentence.  Because the best

22   offer may not necessarily be the highest dollar amount, but

23   it's the best offer from the best editor at the best imprint

24   for that author.

25          THE COURT:  So you interpret fiduciary duty to be the

1    best offer, but not necessarily the most money?

2           THE WITNESS:  Exactly.  The best offer isn't

3    necessarily the highest offer.  It can be, but it's not

4    necessary for it to be.  And, you know, all imprints are not

5    created equal for the author.  So if you're a literary author,

6    being with Knopf or Farrar, Straus, you know, might -- might

7    bring you prizes and things that are ultimately worth more to

8    you in the fullness of time.

9           THE COURT:  Thank you.

10   BY MS. RUDZIN:

11   Q.  Why would an -- I think you said maybe an editor would pay

12   a premium in a preempt.  Do you have an understanding as to

13   why?

14   A.  Well, they don't want to risk losing the book.  And if the

15   book goes to an auction or to a best-bid situation, you know,

16   there's risk; and if they really love it, they're -- they're

17   really going to fight hard for it.

18   Q.  You seem to be -- have just distinguished between a

19   best-bids and an auction.  Isn't a best-bids a type of auction?

20   A.  You know, not in my opinion.  In my opinion, it's a

21   process.  So an auction to me is where people are bidding

22   against one another.  Whereas, a best-bids is each editor is

23   just coming forward with their best offer and they're not

24   bidding against one another.  It's just they're bidding

25   directly for the book.  So to me that's not an auction.

1    THE COURT:  So I was thinking about what you said

2    about your fiduciary duty.  But wouldn't it be your fiduciary

3    duty to get that editor -- the one that's the best fit for the

4    most money?

5    THE WITNESS:  Well, we are trying to get the most

6    money from that editor, but -- but, you know, do we know if

7    we've gotten every last dollar?  No.

8    It's an art and a science.  So you push it as far as you

9    can until you get to a place where -- again, these are people

10    you know and you've done business with in the past -- until you

11    get to the place where you feel like this is -- this is the

12    right stop.  And as I said, it's an art and a science.  It's

13    something that you feel.

14    THE COURT:  So -- but why wouldn't you go to auction

15    and test the market and then try to get more money out of the

16    one you want to go with anyway?

17    THE WITNESS:  Well, once I've gone to auction, then

18    I've lost my ability to have this hope and potential with

19    this -- with this one person who's very excited and very

20    aggressively willing to take it off the table.  I can't put

21    the genie back in the bottle.  So once I've gone to auction,

22    I've lost my ability to have white space for where the advance

23    is.

24    THE COURT:  Could you explain that, because I thought

25    they can also participate in the auction.

 1              THE WITNESS:  Well, they can, but if they come to the

 2    auction -- let's put best bids aside for a second.  If they

 3    come to the auction and I have a lot of people that are bidding

 4    low and slow, they might feel they don't have to go anywhere

 5    near what that original preemptive number was.  So I've lost

 6    that ability to go back and negotiate exclusively.

 7              THE COURT:  Okay.  So I guess it could go either way,

 8    because --

 9              THE WITNESS:  Oh, yeah.

10              THE COURT:  -- the auction could go above the preempt

11    too?

12              THE WITNESS:  It can.  It can.  You just don't know.

13    It's -- it's a chance that you're taking.  And so, you know,

14    with your experience and with your skill, you -- and with your

15    relationships and your understanding of the marketplace, you

16    make your best educated guess.

17              THE COURT:  And is your guess mostly based on comps?

18              THE WITNESS:  It's comps.  But, you know, comps

19    are -- since no two books are alike, comps are not really a

20    perfect best guess.  So for -- for many agents, they use other

21    things as well.

22         It matters who the author is.  It matters what their

23    platform is.  It matters who they know.  It matters how

24    charismatic they are.  So you're kind of factoring all that

25    stuff in, and you come to a -- come to a place that you feel

1    like it's a generous, fair number.  And if you get that number

2    from the right editor at the right imprint, then -- you -- you

3    know, it's obviously the author's final decision, but you

4    support that decision.

5              THE COURT:  Okay.  Thank you.

6              THE WITNESS:  Thank you.

7    BY MS. RUDZIN:

8    Q.  So turning to the auction or -- or best bids, does the

9    agent ask for anything in terms of a bid besides the advance

10   amount?

11   A.  Yes.  Agents generally ask for a marketing -- a marketing

12   plan, a love letter.  They want to know what the scope of

13   rights are that the -- that the person is buying.  In other

14   words, world rights or U.S./Canada or, you know, whatever the

15   scope is.  They want to know how many books they're looking to

16   buy.  And all of that is presented at once in a best -- in a

17   best-bids situation.

18   Q.  So let's talk about a couple of those.  Why would the agent

19   ask for a marketing plan?

20   A.  Well, it's aspirational.  And I know you've learned about

21   the P&L's also aspirational.  But it gives the author and the

22   agent some sense of how the editor and the publisher is seeing

23   the book.

24   Q.  How, if at all, does that marketing plan that comes with

25   the bids resemble how the bid -- the book is actually marketed?

1   A.  Well, actually, probably not so much because, you know, it

2   could be one to three years later when the book is being

3   published.  So, you know, a marketing plan that was three years

4   ago wouldn't have TikTok on it, for example.  So things change

5   a lot, and the book is often acquired.  It's just -- it's just

6   a partial or it's a proposal.  Now it's a full manuscript and a

7   full book, and the publisher is getting reads from their

8   booksellers and from people in their publicity department.

9   They have a much better sense at that time what the actual

10  marketing plan will be.

11  Q.  Does the agent ever go back to the marketing plan that was

12  submitted with the bids and say to the editor:  You promised to

13  do this.  Why aren't you doing this?

14  A.  I mean, if we -- if it served our author, we would, but --

15  but, no, I can't think of -- of an instance where we've done

16  that.  I mean, in the old days where you used to get a

17  guaranteed -- if you got a guaranteed, like, ad in *The New York*

18  *Times*, which was the big gold -- gold ring, you know, years

19  ago, then, of course, that's something that, you know, you

20  would go back and say:  Hey, where's my ad?  But nobody runs

21  ads in *The New York Times* in the same way anymore.

22  Q.  And in your experience when you're negotiating contracts,

23  do you get a commitment from the publisher about how much money

24  will be spent on marketing in the future?

25  A.  It's rare, but you can.

1762

1    Q.  You also referred to a love letter.  What does that mean in

2    this context?

3    A.  Well, you've heard a lot of people talk about love and

4    passion in this courtroom.  And a love letter could be the

5    deciding factor for an author.  It's written by the editor

6    about how they feel about the work and why they want to publish

7    it.  And, you know, sometimes it has some feedback too and

8    compares it to other books.  And, I mean, those letters mean

9    the world to authors.

10   Q.  Turning back to best bids, what information does a bidding

11   editor have about other potential bidders in a best-bids

12   process?

13   A.  None.  It's -- they bid completely blind.

14   Q.  How many editors need to be interested in a book for there

15   be to a best-bids process?

16   A.  Just one enthusiastic editor.

17   Q.  Would the agent tell the editor she's the only bidder?

18   A.  I can't imagine why she would.

19   Q.  Ms. Pande testified that she would need more than two

20   interested editors to run a best-bids process.  Do you recall

21   that testimony?

22   A.  Yes.

23   Q.  And what is your response?

24   A.  I don't understand it.  Because in the best-bid process,

25   the way I understand it, they're just putting the bid on the

1    table; so I don't know why you would need more than one.

2    Q.  Is it true that the more bidders the agent has

3    participating in a best-bids process, the higher the advance

4    offers will be?

5    A.  It's actually not true.  And, again, I know this is

6    counterintuitive, but more is not necessarily more.

7         And one of the reasons I love best bids and so many

8    agents love best bids is because you're not getting competition

9    with an editor competing with another editor.  You're just

10   seeing their clean take of the book.  And you'll get, you know,

11   one offer for a hundred thousand dollars, say three for

12   $200,000, and then one for a million, and you're like, wow.

13   This person sees this book very differently.  And beauty is in

14   the eye of the beholder.

15   Q.  Is every best-bids process a single round?

16   A.  No.  There's another variation on best bids, which I would

17   call an auction, which we call better best.  And that tends to

18   be a two-round auction, although even that can go a third

19   round, if that's what the agent wants.

20   Q.  In that multi-round best-bid auction, does every editor

21   that wants to get to move on to the next round?

22   A.  Well, it depends on what the agent decides.  So sometimes,

23   yes, all are welcome; and sometimes agents tell the bidders in

24   advance that only two people are going to go to the next round.

25   And she'll do that to create some -- some competitive pressure

1    so that people don't come in with a low first bid.

2    Q.  Wouldn't it be to the agent's advantage to have more

3    bidders even in the second round?

4    A.  I'm going to sound like a broken record here.  More isn't

5    necessarily more.  What the agent is trying to do is to get the

6    most enthusiastic editor from the -- from the best imprint for

7    that book and then create the best opportunity for a good offer

8    or a great offer from that person.  So, you know, the

9    enthusiasm is a very big piece of that, and so it only takes

10   two to keep going.

11   Q.  In a multi-round best bid, does the agent tell the editors

12   how many bidders there were in the previous round or how many

13   are being invited to the next round?

14   A.  You know, the agent decides this, but unless it's in the

15   author's best interest to pass on the information, they don't.

16   Q.  Does the agent tell editors going into the next round what

17   the bids were in the previous round?

18   A.  Again, it's agent-specific; but, generally no.  They would

19   probably just be more directional.  Like, you're going to have

20   to come up; but, generally, no.

21   Q.  So let's turn to round-robin auctions.  How many rounds are

22   they usually?

23   A.  There's -- there's no usual.  Every situation is different.

24   Q.  How does a round-robin auction end?

25   A.  Well, you know, it can end a few different ways.  Perhaps

1765

1    the agent feels that people are running out of gas; and you can

2    feel that.  They're taking longer to call you back.  They're

3    coming up in smaller increments.  So you get a sense that

4    they're -- they're -- they're losing some momentum.

5            Sometimes, also, you might see that you're heading into

6    a situation where the only bidders that are left are imprints

7    of PRH.  And PRH has a policy where the imprints could bid

8    against each other in a round-robin auction until it's just PRH

9    imprints.  So there has to be an external bidder.

10           So if the agent feels like they might be losing their

11   external bidder, they might just go to best bids as a way of

12   ending the auction.  And it's also possible that at any time

13   during the auction, the agent just decides to negotiate with

14   one person exclusively.

15   Q.  If the agent calls for best bids when she believes that

16   only Penguin Random House imprints will put in a better bid, is

17   that a violation of the Penguin Random House rule?

18   A.  Not to my understanding.

19   Q.  Will the agent ever share how many bidders there are in a

20   round-robin auction?

21   A.  You know, it's the agent's decision to share, but unless it

22   really serves their author, they don't.  And, you know, finding

23   out the number can cut both ways.

24   Q.  How so?

25   A.  Well, you know, again, intuitively, you think the more

1    people the better.  But, actually, it -- it sometimes has the

2    unintended consequence of making people feel like they don't

3    want to compete.  And it also gets your material out there in

4    a -- in a way that you can't control.  And, remember, this is

5    still just a draft.

6    Q.  Will the agent ever share who the other bidders are in a

7    round-robin auction?

8    A.  Very rarely.  I mean, it would have to serve the author.

9    Maybe so if there were some rivalry that they were trying to

10   spur on, perhaps, but very rarely.

11            THE COURT:  Aren't there confidentiality agreements

12   about the draft?  You can't -- you said once the --

13            THE WITNESS:  Yeah.

14            THE COURT:  -- you put the draft out, you can't

15   control it.  Isn't there -- aren't there ethics about that?

16            THE WITNESS:  Well, there's ethics, of course, but --

17   I don't want to get too confusing.  But there's a thing called

18   literary scouts, and they work for TV companies, film

19   companies, foreign publishers, and it's their job to sort of

20   try to grab material.  And so you just have to be careful.  We

21   don't sign -- we don't sign NDAs with our editors.  It's a

22   trust -- it's a good-faith business.

23            THE COURT:  Okay.  Thanks.

24   BY MS. RUDZIN:

25   Q.  Have you read Mr. Pietsch's testimony?

1  A.  Yes.

2  Q.  Mr. Pietsch testified that round-robin auctions are the

3  most common form of auction.  Do you recall that testimony?

4  A.  Yeah.  I was surprised by that.

5  Q.  Why?

6  A.  Because it's -- it's been so many years since, really,

7  that was the common way of doing things.  And most of my

8  colleagues and most of my associates seem to do best bids or

9  better best.

10  Q.  And why do you think there's been that shift of best bids?

11  A.  I think people like the idea of just sort of seeing the

12  whole story and -- rather than, you know, seeing how people

13  could potentially, you know, get auction fever about something

14  and end up with remorse because they ended up paying for

15  something that doesn't come in the way they wanted it to; and

16  it could -- it could negatively affect the book.

17  Q.  Once the deal is final, does the agent share the outcome

18  with other bidders in the auction?

19  A.  The agent decides.  You know, many don't, and at most, they

20  would share just the winner.

21  Q.  So we've been talking about the process for a debut author.

22  Is it different for a repeat author that wants to leave her

23  publisher?

24  A.  Yes and no.  So if it's a repeat author that wants to leave

25  their publisher, they have something in their contract called

1    an option clause.  And the option clause, while it's not

2    binding, most agents respect and honor that clause.  So even if

3    the author wishes to leave, you still might submit a synopsis

4    of a book or try to get into some conversation with the

5    existing publisher.  And you don't have to take any offer.

6        You just -- you just want to respect that period of time

7    and, sort of, be honorably released from your -- from your

8    option clause.  And then it depends.  You might do an exclusive

9    submission to somebody who's been a fan of that author for a

10   long period of time, or you might decide to go out slightly

11   wider.

12       THE COURT:  I'm sorry.  Is there an actual formal

13   release from the option clause?

14       THE WITNESS:  No.  It's informal.  I mean, sometimes

15   people ask for it in writing, but it really isn't necessary.

16       THE COURT:  So can you explain that.  You send it to

17   your former editor, and then there has to be an actual

18   conversation you are released?

19       THE WITNESS:  Yes.  Yes.

20       THE COURT:  Okay.

21       THE WITNESS:  I mean, you know, sometimes you leave

22   and tell the editor from the beginning:  This person doesn't

23   want to continue.  And often, you know, if it's gone wrong, it

24   could be mutual, in which case they won't even review the

25   material and they'll just say, you know, go with God.

```
1              THE COURT:  Okay.
2      BY MS. RUDZIN:
3      Q.  Does the option clause require the author to sell the book
4      to the publisher with the option?
5      A.  No.
6      Q.  It's just for that first look; right?
7      A.  Exa- -- it's a first look and an exclusive period.  You can
8      even accept an offer less than from -- if they make an offer
9      and you don't accept it and then you go out and accept an offer
10     less than, that's fine too.
11     Q.  If you have an author who wants to move and you just send
12     her to another editor, is that poaching?
13     A.  Well, you know, it's -- first of all, it's not.  Poaching
14     is one of those funny words that sounds bigger than what it
15     actually is.  I mean, you know, really what poaching is is
16     telling somebody you're a fan of their work, which editors do
17     all the time.  You know, I know so-and-so is under contract,
18     but I'm a big fan.  And all that means is that when it's time
19     to move, you know who the fans are, and you factor that fandom
20     into your submission strategy.
21     Q.  Does that mean you can move an author from one Penguin
22     Random House imprint to another Penguin Random House imprint?
23     A.  Yes.
24     Q.  So let's just finish up with repeat authors.  You said most
25     book deals are for repeat authors.  Do you have a more precise
```

1    estimate?

2    A.  Well, you know, if you're 30 years into your career, 75 to

3    80 percent of your authors are repeat.  And, you know, a big

4    role of the literary agent is keeping publishers and agents --

5    pardon me -- and authors in happy relationships.  So an ideal

6    is that you find a home for life.

7    Q.  And if the author does want to stay with her editor, how

8    does the agent sell the right to the author's next book?

9    A.  In an exclusive negotiation with that editor.

10   Q.  Does the agent threaten to take the author elsewhere to get

11   the editor to put more money on the table?

12   A.  Let's think of it this way:  Competition is a dial, and the

13   agent has their hand on the dial the whole entire time.  So if

14   we want to, call a rounds auction a ten on the dial, because

15   it's the most overt competition.

16        An exclusive negotiation, it might be at a one to two,

17   but the editor is still completely aware of the fact that the

18   agent can take the author elsewhere.  So, no, you would very

19   rarely threaten to leave.  Because, remember, these are close,

20   intimate relationships.  An editor might stay at an author's

21   house for a few days while they're editing their book together.

22        These are generally -- in the best-case scenario, these

23   are happy, intimate relationships, and so it's not a

24   contentious thing.

25   Q.  Have you reviewed Dr. Hill's testimony from yesterday?

```
 1    A.  Yes.

 2    Q.  Or, actually, now it might be the day before.

 3    A.  I just lost track of days, but, yes, I -- yes.

 4    Q.  Dr. Hill testified that agents don't have a magic wand to

 5    prevent harm to authors and cited as evidence of that examples

 6    where from the documents he could tell that an editor had money

 7    left in her pocket after she acquired a book.  Do you recall

 8    that testimony?

 9    A.  I do.

10              MR. READ:  Objection, Your Honor.

11              THE COURT:  And what's the objection?

12              MR. READ:  The motion in limine that -- your motion

13    in limine that she's not qualified to give opinions about

14    economic testimony.  She's a 701 witness for opinions.

15              THE COURT:  Yes.  Yes.  It's not clear to me that

16    this is economic testimony yet.  So I'd like to hear the

17    foundation a bit more.

18              THE WITNESS:  I'm sorry.  Could you repeat the

19    question.

20    BY MS. RUDZIN:

21    Q.  Sure.  Dr. Hill testified that agents don't have a magic

22    wand.  Do you recall that?

23    A.  Yes.

24    Q.  What's your reaction to that?

25              THE COURT:  I'm sorry.  I need more context for what
```

```
 1    that meant.
 2    BY MS. RUDZIN:
 3    Q.  I'll read a little bit more of his -- his testimony.
 4         He said that agents ". . . don't have a magic wand."
 5    They can't prevent harm to authors because there are -- this is
 6    an exact quote.  ". . . there are examples of competitions
 7    where the publishers were willing to pay more than they
 8    eventually did."
 9         ". . . if agents were so good at preventing any harm to
10    authors, you wouldn't expect to see that."
11              THE COURT:  I'm going to overrule the objection.  You
12    can comment on that.
13              THE WITNESS:  Okay.  Well, I actually do have a magic
14    wand that was given to me by my author Sue Monk Kidd, who
15    thought I was magic.
16         So what I would say is that agents have tools to get to
17    the best offer from the best editor and the best imprint.
18    There are times when, indeed, the -- the editor would have paid
19    more.  Also, there are times when the editor has to pay more
20    than they want to.  But as long as the author has gotten to a
21    place where they feel happy with the offer and the editor and
22    the imprint, I don't consider that a loss because, in the
23    aggregate, there's a better book.
24         Remember, the pie -- there is a pie that is the book.
25    The advance is one -- the North American advance is one -- is
```

1    one wedge of that pie.  If we picked an editor that the

2    collaboration is very successful, the book will be better as a

3    result.  It will sell more; so royalties.  But also

4    internationally, it will sell more in more territories, which

5    is money that goes directly to the author, as well as

6    potentially more likely to get a book -- or -- or a TV deal --

7    a film or TV deal.  So that's the full pie.

8          THE COURT:  Can I ask you:  So in a situation,

9    hypothetically, where the publisher was willing to pay $750,000

10   and the agent just asked for 250 and that's what they got,

11   would you think that that agent had done a good job in that

12   deal?

13         THE WITNESS:  No, I would not.  No, I would not.  I

14   mean, not all agents are equal in their skill -- in their

15   skills, just like not all writers are equal.  So -- but,

16   generally, I think you might find they had a little bit left in

17   their pockets sometimes, and sometimes you take a little bit

18   more out of their pocket than they wanted to give.

19         THE COURT:  Okay.  Thank you.

20         MS. RUDZIN:  Your Honor, I'm going to be moving to a

21   different topic.  Is this a good time for lunch?

22         THE COURT:  Oh, yes.  Let's do that.  It's 1 o'clock.

23   Thank you, Ms. Rudzin.

24   Let's take our lunch break at this time and resume at

25   2 o'clock.

1    During the lunch break, please don't talk about your

2    testimony with anybody.  Okay?

3    All right.  Thank you.  I'll see everybody at 2 o'clock.

4    Have a nice lunch.

5    (Recess taken.)

6    (REPORTER'S NOTE:  The p.m. portion of the trial was

7    reported by Tammy Nestor who prepared said transcript.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3          I, Nancy J. Meyer, Registered Diplomate Reporter,

 4     Certified Realtime Reporter, do hereby certify that the above

 5     and foregoing constitutes a true and accurate transcript of my

 6     stenograph notes and is a full, true, and complete transcript

 7     of the proceedings to the best of my ability.

 8

 9                         Dated this 10th day of August, 2022.

10

11                   /s/ Nancy J. Meyer
                     Nancy J. Meyer
12                   Official Court Reporter
                     Registered Diplomate Reporter
13                   Certified Realtime Reporter
                     333 Constitution Avenue Northwest
14                   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25
```

1776

## $

**$200,000** [1] - 1763:12
**$250,000** [1] - 1731:4
**$750,000** [1] - 1773:9

## '

**'97** [1] - 1744:6

## 0

**0.5** [1] - 1726:12

## 1

**1** [2] - 1726:14,
1773:22
**10** [1] - 1726:1
**100** [2] - 1698:2,
1707:23
**11** [2] - 1725:21,
1739:13
**12** [8] - 1690:17,
1693:7, 1694:20,
1694:22, 1697:7,
1698:4, 1698:11,
1727:5
**120** [1] - 1744:10
**1200** [1] - 1707:21
**12:20** [1] - 1742:23
**13** [7] - 1697:7,
1697:9, 1697:12,
1697:23, 1698:2,
1700:10, 1700:12
**15** [2] - 1738:25,
1739:13
**16** [2] - 1703:22,
1703:24
**1687** [1] - 1684:5
**1734** [1] - 1684:5
**1736** [1] - 1684:6
**1738** [5] - 1684:11,
1684:11, 1684:12,
1684:12, 1684:13
**1743** [1] - 1684:8
**1745** [1] - 1720:10
**190** [1] - 1709:7
**1989** [1] - 1743:25
**1997** [1] - 1744:3
**1:00** [1] - 1742:24
**1st** [1] - 1686:17

## 2

**2** [4] - 1709:3,
1717:16, 1773:25,
1774:3
**20** [4] - 1740:2,
1740:6, 1745:6,
1745:7

**200** [1] - 1746:19
**2001** [2] - 1744:6,
1746:6
**2009** [1] - 1746:6
**2019** [2] - 1701:9,
1747:3
**2020** [1] - 1699:14
**2021** [1] - 1701:9
**21-2886** [1] - 1685:5
**22** [6] - 1700:9,
1701:24, 1702:8,
1702:15, 1704:1,
1707:25
**24** [1] - 1690:1
**25** [2] - 1745:6, 1745:7
**250** [1] - 1773:10
**250,000-and-up** [1] -
1702:24

## 3

**3** [5] - 1725:18,
1725:25, 1726:1,
1726:10, 1726:16
**30** [1] - 1770:2
**300-400** [1] - 1720:11
**360** [6] - 1702:23,
1703:7, 1703:13,
1704:2, 1704:9,
1707:17
**37** [2] - 1690:16,
1693:6
**38** [2] - 1698:9,
1698:11
**384** [2] - 1709:6,
1710:16
**39** [1] - 1720:2

## 4

**4** [5] - 1703:21,
1725:14, 1725:21,
1726:11, 1726:16
**40** [2] - 1727:22,
1738:12
**400** [1] - 1707:25
**45** [1] - 1739:14

## 5

**5** [2] - 1738:11,
1738:20
**5............................** [1]
- 1684:13
**50** [2] - 1727:22,
1744:24
**50/50** [1] - 1733:13
**500-750** [1] - 1720:19

## 6

**6** [4] - 1725:12,
1728:19, 1731:8,
1731:9
**68** [1] - 1737:3

## 7

**7** [3] - 1717:18, 1720:1
**70** [2] - 1701:25,
1702:9
**701** [1] - 1771:14
**74** [2] - 1689:21,
1689:24
**75** [3] - 1699:12,
1770:2
**78** [1] - 1700:14

## 8

**80** [1] - 1770:3
**858** [2] - 1738:10,
1738:19
**858............................
............** [1] - 1684:11
**862** [2] - 1738:10,
1738:19
**862............................
............** [1] - 1684:11
**863** [2] - 1738:10,
1738:19
**863............................
............** [1] - 1684:12
**88** [4] - 1700:13,
1700:15, 1727:9,
1727:14
**882** [2] - 1738:11,
1738:19
**882............................
............** [1] - 1684:12

## 9

**90** [1] - 1700:13
**900** [6] - 1702:2,
1702:17, 1702:18,
1702:21, 1702:23,
1703:1

## A

**ability** [4] - 1728:19,
1758:18, 1758:22,
1759:6
**able** [8] - 1692:12,
1699:13, 1701:6,
1705:6, 1707:5,
1724:24, 1733:10,
1734:24
**absolute** [1] - 1755:12

**absolutely** [5] -
1690:6, 1693:14,
1710:10, 1749:2,
1750:16
**accept** [3] - 1769:8,
1769:9
**accepted** [1] - 1747:22
**access** [1] - 1701:3
**according** [6] -
1690:21, 1690:22,
1691:5, 1714:14,
1726:25, 1727:3
**accordingly** [1] -
1730:4
**account** [1] - 1728:23
**achieve** [1] - 1693:10
**acknowledged** [1] -
1711:20
**acquired** [2] - 1761:5,
1771:7
**acquisition** [4] -
1701:11, 1701:13,
1706:21, 1727:7
**acquisitions** [6] -
1692:6, 1701:23,
1702:2, 1703:7,
1711:15, 1722:4
**act** [2] - 1744:21,
1748:23
**action** [1] - 1729:3
**activities** [1] - 1701:7
**actual** [9] - 1688:1,
1693:22, 1710:2,
2729:16, 1745:13,
1750:8, 1761:9,
1768:12, 1768:17
**ad** [2] - 1761:17,
1761:20
**added** [1] - 1746:13
**addition** [1] - 1694:19
**additional** [1] -
1719:10
**address** [1] - 1720:11
**adjust** [1] - 1729:24
**administered** [1] -
1743:7
**admission** [1] -
1738:7
**Admitted** [1] - 1684:10
**admitted** [4] - 1738:5,
1738:13, 1738:18,
1738:20
**ads** [1] - 1761:21
**adult** [1] - 1716:11
**advance** [13] - 1701:8,
1701:10, 1701:12,
1727:6, 1730:22,
1754:24, 1756:4,
1758:22, 1760:9,
1763:3, 1763:24,

1772:25
**advances** [7] -
1702:24, 1724:17,
1725:11, 1728:19,
1730:23, 1731:4,
1731:5
**advantage** [2] -
1731:23, 1764:2
**advantages** [1] -
1719:6
**affect** [1] - 1767:16
**agencies** [7] - 1706:6,
1706:7, 1706:9,
1706:12, 1706:16,
1706:17
**agency** [16] - 1691:12,
1700:23, 1700:24,
1702:3, 1703:7,
1705:11, 1706:11,
1706:18, 1707:18,
1707:22, 1708:5,
1709:17, 1709:25,
1710:2, 1734:17,
1744:10
**Agency** [5] - 1743:20,
1744:2, 1744:7,
1744:8, 1744:9
**agent** [65] - 1738:22,
1741:13, 1744:21,
1746:3, 1746:12,
1747:23, 1748:1,
1748:2, 1748:3,
1748:9, 1748:12,
1748:13, 1748:17,
1749:3, 1749:9,
1749:22, 1749:23,
1750:8, 1750:10,
1750:13, 1750:16,
1750:17, 1750:21,
1750:24, 1751:5,
1751:7, 1752:8,
1752:9, 1752:24,
1753:12, 1755:5,
1755:9, 1755:16,
1755:19, 1756:4,
1756:18, 1760:9,
1760:18, 1760:22,
1761:11, 1762:17,
1763:2, 1763:19,
1763:22, 1764:5,
1764:11, 1764:14,
1764:16, 1764:18,
1765:1, 1765:10,
1765:13, 1765:15,
1765:19, 1766:6,
1767:17, 1767:19,
1770:4, 1770:8,
1770:10, 1770:13,
1770:18, 1773:10,
1773:11

**agent's** [3] - 1747:18, 1764:2, 1765:21
**agent-specific** [1] - 1764:18
**agents** [27] - 1706:19, 1707:10, 1741:22, 1745:6, 1745:7, 1746:2, 1748:21, 1748:22, 1748:25, 1749:13, 1750:18, 1751:8, 1752:1, 1752:3, 1752:15, 1759:20, 1760:11, 1763:8, 1763:23, 1768:2, 1770:4, 1771:4, 1771:21, 1772:4, 1772:9, 1772:16, 1773:14
**aggregate** [2] - 1727:10, 1772:23
**aggressive** [5] - 1729:1, 1729:25, 1730:1, 1731:13, 1732:25
**aggressively** [2] - 1723:14, 1758:20
**ago** [2] - 1761:4, 1761:19
**agree** [15] - 1690:2, 1692:5, 1706:19, 1707:8, 1711:3, 1711:9, 1712:9, 1715:5, 1717:20, 1719:12, 1721:4, 1722:13, 1724:11, 1725:25, 1730:25
**agreed** [1] - 1690:3
**agreement** [1] - 1731:15
**agreements** [2] - 1733:24, 1766:11
**al** [1] - 1685:6
**Alex** [1] - 1742:2
**alignment** [1] - 1754:11
**alike** [1] - 1759:19
**allow** [3] - 1716:14, 1719:6, 1719:8
**allowed** [1] - 1716:19
**allowing** [2] - 1717:10, 1719:13
**allows** [1] - 1719:22
**almost** [3] - 1701:22, 1726:21, 1727:1
**alone** [1] - 1690:18
**altogether** [1] - 1745:6
**amass** [1] - 1701:6
**amazing** [1] - 1746:18
**America** [1] - 1685:6
**American** [1] -

1772:25
**amount** [7] - 1701:16, 1707:12, 1720:16, 1747:14, 1751:3, 1756:22, 1760:10
**analysis** [7] - 1693:17, 1694:20, 1709:16, 1713:14, 1724:8, 1735:12, 1735:22
**analyze** [1] - 1693:19
**analyzed** [1] - 1692:9
**ancillary** [1] - 1748:18
**anecdotal** [2] - 1707:1, 1707:4
**answer** [5] - 1690:20, 1691:22, 1723:8, 1723:10, 1752:7
**answers** [1] - 1739:9
**anticipated** [8] - 1696:18, 1697:22, 1701:9, 1702:5, 1702:6, 1702:25, 1707:18, 1707:23
**antitrust** [1] - 1713:14
**anyplace** [1] - 1723:20
**anyway** [1] - 1758:16
**apologize** [4] - 1693:4, 1699:17, 1703:6, 1719:19
**appear** [1] - 1729:15
**appearances** [1] - 1685:8
**appreciate** [1] - 1742:11
**approach** [3] - 1685:7, 1704:23, 1709:18
**approved** [1] - 1725:13
**art** [3] - 1752:20, 1758:8, 1758:12
**artists** [1] - 1752:18
**aside** [1] - 1759:2
**aspirational** [2] - 1760:20, 1760:21
**asserting** [1] - 1726:10
**assistant** [1] - 1743:24
**associates** [1] - 1767:8
**assume** [8] - 1688:13, 1689:8, 1689:9, 1696:19, 1704:17, 1706:24, 1716:6, 1730:21
**assumed** [1] - 1705:1
**assuming** [4] - 1705:16, 1716:2, 1727:3, 1756:2
**assumption** [3] - 1690:10, 1691:2,

1691:8
**attention** [1] - 1720:8
**ATX** [1] - 1707:19
**auc** [1] - 1691:14
**auction** [49] - 1689:18, 1704:6, 1705:7, 1715:7, 1717:16, 1722:22, 1724:3, 1726:15, 1727:25, 1728:9, 1728:10, 1728:11, 1729:6, 1729:7, 1729:16, 1734:16, 1734:20, 1734:24, 1735:7, 1735:25, 1736:13, 1736:19, 1755:23, 1757:15, 1757:19, 1757:21, 1757:25, 1758:14, 1758:17, 1758:21, 1758:25, 1759:2, 1759:3, 1759:10, 1760:8, 1763:17, 1763:18, 1763:20, 1764:24, 1765:8, 1765:12, 1765:13, 1765:20, 1766:7, 1767:3, 1767:13, 1767:18, 1770:14
**auctions** [31] - 1689:9, 1689:10, 1689:11, 1689:14, 1689:25, 1690:1, 1690:12, 1691:18, 1691:21, 1691:22, 1691:23, 1699:10, 1702:15, 1703:10, 1703:13, 1704:3, 1704:18, 1707:18, 1707:19, 1715:14, 1719:7, 1721:21, 1722:2, 1722:3, 1723:22, 1728:22, 1729:2, 1729:4, 1736:11, 1764:21, 1767:2
**audio** [2] - 1739:25, 1740:16
**audio-video** [2] - 1739:25, 1740:16
**author** [60] - 1718:24, 1730:18, 1730:21, 1731:12, 1731:15, 1731:16, 1731:18, 1732:3, 1732:12, 1732:16, 1732:18, 1732:20, 1732:22, 1742:4, 1748:13, 1748:15, 1749:7, 1749:10, 1749:12, 1749:23, 1750:5,

1752:21, 1754:3, 1754:5, 1754:8, 1754:11, 1754:12, 1754:15, 1754:25, 1755:3, 1755:12, 1756:2, 1756:10, 1756:15, 1756:16, 1756:24, 1757:5, 1759:22, 1760:21, 1761:14, 1762:5, 1765:22, 1766:8, 1767:21, 1767:22, 1767:24, 1768:3, 1768:9, 1769:3, 1769:11, 1769:21, 1770:7, 1770:10, 1770:18, 1772:14, 1772:20, 1773:5
**author's** [1] - 1755:14, 1760:3, 1764:15, 1770:8, 1770:20
**authors** [16] - 1725:13, 1731:20, 1732:6, 1732:7, 1732:8, 1749:4, 1750:4, 1750:7, 1762:9, 1769:24, 1769:25, 1770:3, 1770:5, 1771:5, 1772:5, 1772:10
**available** [1] - 1750:21
**aware** [9] - 1698:12, 1701:21, 1708:14, 1716:11, 1724:16, 1725:8, 1733:16, 1756:19, 1770:17

## B

**background** [2] - 1742:9, 1751:9
**badge** [1] - 1752:13
**Barber** [3] - 1743:19, 1743:20, 1744:1
**base** [1] - 1705:3
**based** [10] - 1690:17, 1692:23, 1709:25, 1714:15, 1729:24, 1732:9, 1734:19, 1737:6, 1747:20, 1759:17
**baseline** [1] - 1720:11
**basic** [2] - 1709:17, 1742:9
**basis** [1] - 1696:19
**beauty** [1] - 1763:13
**began** [1] - 1743:24
**begin** [2] - 1741:4, 1741:11
**beginning** [2] - 1741:23, 1768:22

**behavior** [3] - 1723:18, 1729:24, 1730:3
**beholder** [1] - 1763:14
**believes** [1] - 1765:15
**bell** [2] - 1696:2, 1702:23
**Bellshaw** [1] - 1685:10
**benefit** [1] - 1731:19
**Bergstrom** [1] - 1741:19
**Berkett** [2] - 1742:2
**Bertelsmann** [2] - 1685:6, 1685:16
**bespoke** [1] - 1751:12
**best** [74] - 1696:6, 1706:23, 1711:14, 1715:10, 1715:11, 1715:14, 1718:2, 1718:9, 1718:18, 1723:1, 1723:4, 1723:12, 1723:21, 1723:22, 1723:23, 1726:1, 1727:17, 1728:4, 1728:10, 1728:25, 1729:6, 1729:15, 1734:16, 1746:20, 1748:23, 1749:24, 1750:2, 1754:1, 1754:21, 1754:22, 1756:20, 1756:21, 1756:23, 1757:1, 1757:2, 1757:15, 1757:19, 1757:22, 1757:23, 1758:3, 1759:2, 1759:16, 1759:20, 1760:8, 1760:16, 1760:17, 1762:10, 1762:11, 1762:15, 1762:20, 1762:24, 1763:3, 1763:7, 1763:8, 1763:15, 1763:16, 1763:17, 1763:20, 1764:6, 1764:7, 1764:11, 1764:15, 1765:11, 1765:15, 1767:8, 1767:9, 1767:10, 1770:22, 1772:17
**best-bid** [14] - 1715:10, 1715:11, 1718:2, 1718:9, 1718:18, 1723:12, 1723:23, 1728:4, 1728:10, 1729:6, 1729:15, 1757:15, 1762:24, 1763:20
**best-bids** [14] -

1723:4, 1723:21,
1723:22, 1727:17,
1734:16, 1757:19,
1757:22, 1760:17,
1762:11, 1762:15,
1762:20, 1763:3,
1763:15
**best-case** [1] -
1770:22
**better** [10] - 1753:16,
1753:24, 1755:22,
1761:9, 1763:17,
1765:16, 1766:1,
1767:9, 1772:23,
1773:2
**between** [5] - 1718:22,
1744:24, 1748:15,
1752:21, 1757:18
**beyond** [2] - 1737:8,
1748:5
**bid** [62] - 1691:17,
1692:7, 1693:1,
1693:10, 1693:17,
1693:24, 1694:2,
1694:5, 1696:12,
1696:17, 1698:21,
1705:19, 1705:22,
1705:23, 1706:21,
1706:24, 1711:1,
1711:8, 1715:10,
1715:11, 1717:10,
1718:2, 1718:9,
1718:15, 1718:18,
1719:8, 1719:9,
1721:25, 1722:15,
1722:25, 1723:12,
1723:14, 1723:23,
1728:4, 1728:10,
1728:13, 1728:16,
1728:17, 1729:3,
1729:6, 1729:10,
1729:11, 1729:14,
1729:15, 1729:16,
1730:12, 1732:10,
1754:16, 1757:15,
1760:9, 1760:25,
1762:13, 1762:24,
1762:25, 1763:20,
1764:1, 1764:11,
1765:7, 1765:16
**bidder** [21] - 1692:2,
1692:6, 1692:24,
1704:17, 1705:1,
1705:3, 1705:10,
1705:15, 1706:23,
1711:9, 1716:22,
1717:9, 1717:10,
1717:12, 1717:20,
1717:25, 1724:6,
1762:17, 1765:9,

1765:11
**bidders** [18] - 1704:20,
1707:9, 1716:19,
1717:24, 1718:19,
1721:19, 1722:7,
1731:6, 1754:17,
1762:11, 1763:2,
1763:23, 1764:3,
1764:12, 1765:6,
1765:19, 1766:6,
1767:18
**bidding** [22] -
1692:14, 1694:9,
1696:15, 1701:22,
1707:2, 1715:23,
1716:14, 1718:4,
1718:10, 1718:15,
1718:16, 1719:10,
1720:25, 1723:17,
1728:12, 1729:24,
1733:1, 1757:21,
1757:24, 1759:3,
1762:10
**bids** [40] - 1696:22,
1712:6, 1715:15,
1717:7, 1717:13,
1717:21, 1718:3,
1723:1, 1723:4,
1723:21, 1723:22,
1725:5, 1725:10,
1727:17, 1727:20,
1728:24, 1728:25,
1734:16, 1757:19,
1757:22, 1759:2,
1760:8, 1760:17,
1760:25, 1761:12,
1762:10, 1762:11,
1762:15, 1762:20,
1763:3, 1763:7,
1763:8, 1763:15,
1763:16, 1764:17,
1765:11, 1765:15,
1767:8, 1767:10
**big** [6] - 1751:7,
1761:18, 1764:9,
1769:18, 1770:3
**bigger** [1] - 1769:14
**bilateral** [4] - 1729:17,
1730:18, 1736:17,
1736:21
**bind** [1] - 1749:12
**binder** [1] - 1687:6
**binders** [2] - 1737:18,
1739:22
**binding** [1] - 1768:2
**bit** [10] - 1685:23,
1695:23, 1718:6,
1726:5, 1737:17,
1739:2, 1771:17,
1772:3, 1773:16,

1773:17
**blind** [2] - 1728:10,
1762:13
**blind-bid** [1] - 1728:10
**board** [3] - 1744:18,
1746:7, 1746:15
**bonuses** [1] - 1745:12
**book** [59] - 1690:16,
1690:17, 1696:18,
1698:22, 1699:5,
1707:10, 1708:24,
1709:5, 1712:21,
1720:9, 1720:10,
1720:14, 1721:7,
1722:25, 1727:7,
1743:21, 1744:13,
1744:16, 1746:13,
1746:17, 1746:22,
1747:12, 1748:18,
1748:25, 1749:3,
1749:16, 1749:19,
1750:24, 1751:1,
1751:12, 1752:12,
1752:16, 1753:14,
1753:24, 1755:17,
1757:14, 1757:15,
1757:25, 1760:23,
1760:25, 1761:2,
1761:5, 1761:7,
1762:14, 1763:10,
1763:13, 1764:7,
1767:16, 1768:4,
1769:3, 1769:25,
1770:8, 1770:21,
1771:7, 1772:23,
1772:24, 1773:2,
1773:6
**books** [18] - 1695:15,
1695:18, 1698:21,
1700:13, 1700:22,
1702:5, 1731:11,
1746:3, 1746:19,
1751:10, 1751:22,
1752:1, 1752:22,
1753:3, 1759:19,
1760:15, 1762:8
**booksellers** [1] -
1761:8
**bottle** [1] - 1758:21
**bought** [1] - 1744:3
**bound** [1] - 1748:23
**break** [6] - 1739:2,
1739:12, 1739:16,
1741:4, 1773:24,
1774:1
**brief** [2] - 1688:12,
1741:7
**briefly** [3] - 1733:2,
1734:1, 1736:4
**bring** [1] - 1757:7

**broad** [1] - 1725:7
**Broadway** [1] -
1720:10
**broken** [1] - 1764:4
**build** [2] - 1734:16,
1736:7
**bump** [4] - 1690:4,
1690:8, 1690:9,
1690:11
**business** [8] - 1719:1,
1730:3, 1732:9,
1744:3, 1751:8,
1752:23, 1758:10,
1766:22
**button** [2] - 1688:8,
1688:9
**buy** [1] - 1760:16
**buying** [1] - 1760:13
**buzz** [1] - 1749:18

## C

**C-h-e-n-e-y** [1] -
1741:24
**calc** [1] - 1726:20
**calculated** [5] -
1695:1, 1702:19,
1726:21, 1726:25,
1733:7
**calculates** [1] -
1702:13
**calculating** [1] -
1704:2
**calculation** [4] -
1694:24, 1705:3,
1713:11, 1727:10
**calculations** [1] -
1694:23
**cannot** [1] - 1716:21
**capture** [1] - 1695:15
**capturing** [1] -
1723:22
**care** [1] - 1688:9
**career** [2] - 1741:12,
1770:2
**careful** [2] - 1724:23,
1766:20
**case** [16] - 1686:8,
1690:22, 1706:15,
1724:16, 1726:7,
1726:9, 1726:17,
1732:21, 1733:5,
1734:3, 1735:22,
1741:1, 1741:11,
1749:5, 1768:24,
1770:22
**Case** [1] - 1685:5
**cases** [7] - 1698:15,
1699:4, 1705:19,
1713:8, 1732:15,

1732:17, 1754:24
**caution** [1] - 1725:15
**celebration** [1] -
1745:22
**certain** [2] - 1707:3,
1732:24
**certainly** [8] -
1707:16, 1709:4,
1712:1, 1712:15,
1712:17, 1712:18,
1715:9, 1754:22
**cetera** [1] - 1748:20
**challenges** [1] -
1736:10
**champions** [1] -
1688:5
**chance** [1] - 1759:13
**change** [4] - 1728:16,
1728:17, 1730:2,
1761:4
**chapter** [1] - 1749:25
**characterization** [1] -
1707:4
**characterize** [2] -
1718:23, 1732:24
**charismatic** [1] -
1759:24
**Charles** [1] - 1742:4
**check** [2] - 1691:3,
1708:1
**checking** [1] -
1699:25
**Cheney** [1] - 1741:23
**chief** [1] - 1741:25
**children's** [1] -
1716:11
**choice** [1] - 1735:3
**choose** [2] - 1749:15,
1755:9
**chosen** [1] - 1718:22
**Christy** [3] - 1738:22,
1740:1, 1740:17
**circumstances** [1] -
1707:3
**cited** [1] - 1771:5
**Civil** [1] - 1685:5
**claim** [1] - 1708:19
**clarify** [1] - 1718:2
**clause** [6] - 1768:1,
1768:2, 1768:8,
1768:13, 1769:3
**clean** [2] - 1739:17,
1763:10
**clear** [8] - 1693:25,
1701:14, 1714:11,
1721:23, 1723:15,
1733:19, 1745:24,
1771:15
**clearly** [1] - 1693:5
**clients** [3] - 1746:2,

1779

1748:21, 1748:23
**close** [1] - 1770:19
**closed** [2] - 1740:8, 1747:9
**closes** [1] - 1756:19
**closing** [1] - 1756:18
**Co** [1] - 1685:6
**coin** [1] - 1732:15
**collaboration** [2] - 1752:21, 1773:2
**collapsing** [2] - 1716:10, 1716:12
**colleague** [1] - 1753:17
**colleagues** [2] - 1685:15, 1767:8
**collected** [3] - 1700:25, 1701:2, 1701:22
**collecting** [1] - 1755:19
**collection** [1] - 1711:13
**college** [1] - 1743:20
**column** [3] - 1709:20, 1709:25, 1710:3
**coming** [6] - 1691:20, 1731:12, 1754:4, 1755:15, 1757:23, 1765:3
**comment** [2] - 1721:5, 1772:12
**comments** [1] - 1737:6
**commitment** [1] - 1761:23
**committee** [1] - 1746:7
**common** [4] - 1713:14, 1749:8, 1767:3, 1767:7
**commonly** [1] - 1750:5
**companies** [3] - 1687:21, 1766:18, 1766:19
**company** [3] - 1716:8, 1722:18, 1752:6
**compared** [3] - 1700:22, 1709:16, 1718:16
**compares** [1] - 1762:8
**comparison** [2] - 1749:21, 1753:25
**compete** [14] - 1687:21, 1690:25, 1691:5, 1710:23, 1716:24, 1717:4, 1719:14, 1721:8, 1724:24, 1728:15,

1729:22, 1735:18, 1735:24, 1766:3
**competed** [4] - 1690:11, 1690:12, 1713:3, 1713:4
**competes** [1] - 1699:2
**competing** [6] - 1710:12, 1711:7, 1727:18, 1728:5, 1728:21, 1763:9
**competition** [31] - 1688:2, 1691:14, 1694:19, 1712:17, 1713:16, 1713:18, 1715:3, 1716:14, 1716:16, 1719:7, 1719:10, 1719:22, 1720:23, 1723:11, 1723:13, 1727:18, 1728:1, 1728:23, 1728:24, 1729:9, 1729:10, 1729:18, 1729:19, 1729:23, 1730:2, 1731:14, 1732:9, 1763:8, 1770:12, 1770:15
**competitions** [2] - 1702:11, 1772:6
**competitive** [4] - 1706:20, 1727:8, 1729:25, 1763:25
**competitor** [1] - 1729:14
**compiled** [1] - 1702:3
**complete** [6] - 1701:8, 1704:19, 1705:5, 1705:17, 1750:4, 1750:6
**completed** [1] - 1724:25
**completely** [4] - 1690:10, 1690:12, 1762:13, 1770:17
**comprehensive** [1] - 1695:21
**comps** [5] - 1753:25, 1759:17, 1759:18, 1759:19
**concept** [1] - 1718:3
**concerns** [1] - 1724:24
**conclusions** [3] - 1708:17, 1710:5, 1710:7
**conducted** [1] - 1735:22
**conducting** [1] - 1743:3
**confidential** [5] - 1689:1, 1709:10,

1720:2, 1739:10, 1740:16
**confidentiality** [2] - 1701:5, 1766:11
**confirm** [2] - 1714:11, 1740:10
**confronted** [1] - 1736:7
**confusing** [1] - 1766:17
**consequence** [1] - 1766:2
**conservative** [1] - 1726:2
**consider** [2] - 1750:18, 1772:22
**considered** [3] - 1695:2, 1714:9, 1735:2
**consistent** [3] - 1714:17, 1735:21, 1756:14
**constitutes** [1] - 1756:20
**constraint** [1] - 1727:8
**construct** [1] - 1707:5
**constructed** [1] - 1707:6
**constructive** [1] - 1754:10
**consulting** [1] - 1747:15
**cont** [1] - 1684:5
**contemplating** [1] - 1728:9
**content** [1] - 1746:18
**contentious** [1] - 1770:24
**contents** [1] - 1749:25
**context** [3] - 1736:22, 1762:2, 1771:25
**continuation** [1] - 1732:2
**continue** [5] - 1729:3, 1744:12, 1744:21, 1746:9, 1768:23
**continuing** [1] - 1687:8
**contract** [3] - 1732:4, 1767:25, 1769:17
**contracts** [4] - 1691:16, 1692:2, 1745:19, 1761:22
**contractual** [1] - 1745:20
**control** [4] - 1706:1, 1708:3, 1766:4, 1766:15
**convenient** [1] - 1741:9

**conversation** [2] - 1768:4, 1768:18
**conversely** [1] - 1694:16
**coordinate** [3] - 1718:14, 1733:8, 1733:20
**coordinated** [2] - 1733:2, 1733:5
**coordination** [2] - 1733:11, 1733:16
**correct** [138] - 1687:18, 1687:19, 1687:21, 1688:2, 1688:3, 1689:6, 1689:7, 1689:18, 1689:19, 1691:2, 1691:10, 1691:17, 1692:15, 1692:20, 1693:1, 1693:2, 1693:11, 1693:23, 1694:10, 1694:15, 1694:18, 1694:24, 1695:10, 1695:11, 1695:13, 1695:22, 1697:5, 1698:5, 1698:14, 1699:7, 1701:15, 1701:19, 1702:4, 1703:3, 1703:9, 1704:15, 1704:24, 1705:12, 1705:25, 1706:2, 1706:6, 1706:8, 1706:16, 1706:17, 1708:1, 1709:19, 1709:22, 1709:23, 1710:1, 1710:3, 1710:4, 1710:8, 1711:16, 1711:22, 1711:25, 1712:7, 1712:14, 1712:23, 1713:2, 1713:3, 1713:9, 1713:10, 1713:13, 1713:22, 1714:1, 1714:20, 1714:21, 1714:24, 1715:1, 1715:2, 1715:7, 1715:10, 1715:15, 1716:5, 1716:15, 1716:25, 1717:2, 1717:6, 1717:7, 1717:14, 1717:22, 1718:5, 1718:11, 1718:20, 1718:21, 1719:15, 1720:25, 1721:4, 1721:7, 1721:9, 1721:20, 1722:1, 1722:4, 1722:8, 1723:20, 1724:1,

1724:2, 1724:3, 1724:4, 1724:6, 1724:10, 1724:14, 1724:18, 1724:19, 1725:6, 1725:13, 1726:8, 1726:23, 1727:4, 1727:9, 1727:14, 1728:2, 1728:13, 1728:14, 1729:7, 1731:20, 1731:21, 1733:5, 1733:6, 1733:8, 1733:9, 1733:11, 1733:12, 1733:14, 1733:15, 1733:20, 1733:24, 1733:25, 1734:4, 1734:5, 1734:6, 1734:7, 1736:17, 1736:18, 1736:22, 1736:23, 1741:13, 1742:22
**corroborations** [1] - 1714:23
**counsel** [2] - 1685:7, 1685:10
**counted** [1] - 1709:1
**counterintuitive** [3] - 1752:10, 1754:19, 1763:6
**country** [1] - 1747:5
**couple** [3] - 1735:2, 1737:17, 1760:18
**courage** [1] - 1747:6
**course** [4] - 1738:3, 1745:5, 1761:19, 1766:16
**COURT** [94] - 1685:2, 1685:12, 1685:18, 1685:21, 1686:1, 1686:4, 1686:10, 1686:15, 1686:17, 1686:20, 1686:24, 1687:1, 1687:4, 1688:7, 1693:16, 1693:20, 1694:3, 1699:9, 1699:21, 1700:2, 1700:5, 1700:7, 1700:16, 1702:8, 1702:17, 1703:12, 1703:19, 1703:22, 1703:24, 1704:12, 1705:15, 1707:17, 1730:6, 1730:10, 1734:10, 1736:2, 1737:10, 1737:13, 1737:20, 1737:23, 1738:3, 1738:9, 1738:15, 1738:18, 1738:24, 1739:1, 1739:6,

1780

1739:11, 1739:16, 1739:21, 1739:24, 1740:4, 1740:9, 1740:13, 1740:19, 1740:22, 1740:25, 1741:5, 1741:10, 1741:16, 1742:11, 1742:19, 1742:23, 1743:4, 1743:9, 1743:12, 1747:24, 1748:2, 1748:5, 1748:8, 1756:13, 1756:25, 1757:9, 1758:1, 1758:14, 1758:24, 1759:7, 1759:10, 1759:17, 1760:5, 1766:11, 1766:14, 1766:23, 1768:12, 1768:16, 1768:20, 1769:1, 1771:11, 1771:15, 1771:25, 1772:11, 1773:8, 1773:19, 1773:22
**Court** [2] - 1735:3, 1748:11
**court** [2] - 1740:8, 1740:24
**COURTROOM** [3] - 1685:4, 1688:20, 1689:2
**courtroom** [6] - 1740:6, 1740:7, 1740:10, 1740:11, 1740:23, 1762:4
**cover** [2] - 1753:21, 1774:8
**covers** [1] - 1707:22
**create** [4] - 1751:11, 1753:10, 1763:25, 1764:7
**created** [3] - 1752:19, 1753:12, 1757:5
**creating** [1] - 1749:18
**creation** [2] - 1745:17, 1745:25
**creative** [1] - 1754:14
**credible** [4] - 1734:19, 1734:25, 1735:8, 1735:10
**crisis** [1] - 1745:21
**criteria** [1] - 1706:9
**criticism** [1] - 1754:10
**cross** [1] - 1709:4
**Cross** [1] - 1684:5
**CROSS** [1] - 1687:8
**Cross-Examination** [1] - 1684:5
**CROSS-EXAMINATION** [1] -

1687:8
**crushed** [1] - 1754:14
**Cs** [1] - 1745:16
**cult** [2] - 1751:13
**culture** [1] - 1756:21
**curator** [1] - 1749:14
**current** [2] - 1719:13, 1733:16
**cut** [1] - 1765:23

## D

**Daniel** [1] - 1685:14
**data** [49] - 1691:12, 1697:6, 1697:13, 1698:13, 1698:18, 1700:23, 1700:24, 1701:3, 1701:8, 1701:10, 1701:11, 1701:12, 1701:13, 1701:14, 1701:20, 1702:10, 1702:20, 1703:18, 1705:17, 1706:5, 1706:7, 1706:11, 1706:14, 1706:15, 1706:18, 1707:6, 1707:22, 1708:5, 1709:25, 1710:2, 1711:4, 1711:10, 1712:6, 1712:9, 1712:11, 1712:18, 1712:20, 1712:24, 1713:4, 1713:12, 1713:15, 1713:17, 1714:4, 1714:6, 1714:11, 1714:18, 1734:17
**database** [10] - 1692:3, 1696:18, 1702:3, 1703:8, 1707:12, 1707:18, 1709:17, 1713:6, 1714:24, 1714:25
**date** [1] - 1701:16
**days** [3] - 1761:16, 1770:21, 1771:3
**deal** [7] - 1725:23, 1735:1, 1752:25, 1767:17, 1773:6, 1773:7, 1773:12
**deals** [7] - 1744:23, 1745:10, 1745:14, 1746:20, 1746:22, 1749:3, 1769:25
**debut** [2] - 1749:10, 1767:21
**decide** [6] - 1748:14, 1749:16, 1751:5, 1755:5, 1756:19, 1768:10

**decides** [5] - 1750:10, 1763:22, 1764:14, 1765:13, 1767:19
**deciding** [1] - 1762:5
**decipher** [1] - 1696:6
**decision** [3] - 1760:3, 1760:4, 1765:21
**deck** [1] - 1720:3
**declare** [1] - 1755:25
**declining** [1] - 1732:18
**deep** [1] - 1751:11
**Defendant's** [1] - 1709:5
**defendants** [2] - 1739:17, 1747:21
**defendants'** [2] - 1738:5, 1738:22
**defense** [1] - 1741:2
**definitely** [2] - 1711:1, 1711:2
**Demonstrative** [3] - 1684:13, 1738:11, 1738:20
**department** [2] - 1745:3, 1761:8
**depended** [1] - 1735:3
**deposition** [4] - 1686:7, 1686:13, 1739:25, 1740:17
**depositions** [1] - 1686:11
**DEPUTY** [3] - 1685:4, 1688:20, 1689:2
**derived** [1] - 1694:22
**deriving** [1] - 1694:19
**describe** [1] - 1748:11
**described** [2] - 1708:4, 1735:9
**describing** [1] - 1753:24
**despite** [1] - 1735:17
**detail** [2] - 1706:5, 1708:9
**determination** [1] - 1732:10
**determine** [7] - 1690:24, 1700:20, 1704:15, 1705:2, 1749:23, 1750:3, 1754:5
**determines** [1] - 1750:8
**developed** [1] - 1691:12
**dial** [3] - 1770:12, 1770:13, 1770:14
**differ** [1] - 1710:6
**different** [12] - 1688:1, 1690:12, 1695:6,

1712:13, 1719:19, 1727:11, 1751:1, 1751:2, 1764:23, 1764:25, 1767:22, 1773:21
**differently** [1] - 1763:13
**Direct** [1] - 1684:8
**direct** [2] - 1692:17, 1692:24
**DIRECT** [1] - 1743:13
**direction** [2] - 1710:20, 1756:12
**directional** [1] - 1764:19
**directly** [2] - 1757:25, 1773:5
**directors** [1] - 1744:18
**disagree** [5] - 1707:4, 1708:18, 1710:9, 1724:15, 1728:3
**discrepancy** [1] - 1704:1
**discu** [1] - 1723:21
**discuss** [1] - 1718:14
**discussed** [1] - 1753:23
**discussion** [2] - 1714:2, 1716:12
**discussions** [1] - 1716:10
**distinguished** [1] - 1757:18
**diverse** [1] - 1747:5
**diversion** [8] - 1695:7, 1702:13, 1713:11, 1714:7, 1714:8, 1714:10, 1714:14, 1727:3
**diversions** [4] - 1704:2, 1704:5, 1714:12, 1714:23
**divide** [1] - 1716:1
**division** [4] - 1744:14, 1744:17, 1746:13, 1746:17
**documents** [3] - 1713:6, 1713:12, 1771:6
**Dohle** [1] - 1742:18
**Dohle's** [1] - 1716:2
**dollar** [3] - 1756:7, 1756:22, 1758:7
**dollars** [2] - 1731:5, 1763:11
**done** [6] - 1708:11, 1753:4, 1753:20, 1758:10, 1761:15, 1773:11
**dorm** [1] - 1743:23

**doubt** [1] - 1724:20
**down** [5] - 1693:7, 1725:12, 1725:17, 1725:25, 1737:21
**Dr** [20] - 1686:8, 1686:22, 1687:10, 1688:14, 1688:23, 1694:23, 1702:10, 1703:18, 1704:2, 1704:16, 1707:6, 1717:23, 1734:15, 1735:15, 1737:11, 1737:16, 1737:24, 1770:25, 1771:4, 1771:21
**draft** [3] - 1766:5, 1766:12, 1766:14
**draw** [6] - 1687:22, 1690:20, 1692:23, 1710:13, 1713:15, 1720:8
**drawing** [2] - 1688:15, 1739:18
**drawn** [1] - 1710:17
**dream** [1] - 1755:12
**dreams** [1] - 1755:14
**drew** [1] - 1710:7
**drive** [4] - 1717:7, 1717:13, 1720:25, 1721:8
**drops** [1] - 1717:21
**Duhigg** [1] - 1742:4
**during** [5] - 1739:16, 1745:4, 1747:9, 1765:13, 1774:1
**duties** [1] - 1748:21
**duty** [4] - 1756:14, 1756:25, 1758:2, 1758:3
**DX** [1] - 1710:16

## E

**early** [3] - 1739:2, 1742:14, 1754:13
**easiest** [1] - 1719:8
**easy** [1] - 1720:19
**echelons** [1] - 1731:18
**economic** [2] - 1771:14, 1771:16
**economically** [1] - 1719:4
**economist** [2] - 1731:22, 1742:16
**editing** [1] - 1770:21
**editor** [51] - 1749:21, 1750:14, 1751:13, 1752:9, 1752:21, 1752:25, 1753:1,

1753:5, 1753:16, 1753:17, 1754:7, 1754:10, 1755:3, 1755:6, 1755:10, 1755:13, 1755:20, 1755:23, 1756:2, 1756:5, 1756:9, 1756:23, 1757:11, 1757:22, 1758:3, 1758:6, 1760:2, 1760:22, 1761:12, 1762:5, 1762:11, 1762:16, 1762:17, 1763:9, 1763:20, 1764:6, 1768:17, 1768:22, 1769:12, 1770:7, 1770:9, 1770:11, 1770:17, 1770:20, 1771:6, 1772:17, 1772:18, 1772:19, 1772:21, 1773:1

**editor's** [1] - 1756:8

**editorial** [33] - 1694:21, 1695:2, 1695:8, 1695:9, 1695:19, 1695:20, 1696:10, 1696:13, 1697:1, 1697:4, 1697:25, 1698:13, 1698:19, 1698:20, 1699:10, 1700:20, 1700:22, 1708:13, 1708:15, 1708:19, 1708:24, 1708:25, 1709:16, 1709:22, 1710:8, 1710:9, 1710:22, 1710:25, 1711:4, 1711:7, 1714:18, 1715:1, 1753:2

**Editorial** [1] - 1709:21

**editors** [18] - 1749:19, 1750:17, 1750:21, 1750:24, 1751:9, 1752:3, 1753:2, 1754:3, 1754:4, 1754:15, 1754:25, 1755:11, 1762:14, 1762:20, 1764:11, 1764:16, 1766:21, 1769:16

**educated** [1] - 1759:16

**effect** [11] - 1712:14, 1712:16, 1723:5, 1723:19, 1723:20, 1723:24, 1723:25, 1725:20, 1726:17, 1731:8, 1736:15

**effects** [8] - 1721:15, 1721:16, 1721:23, 1722:23, 1733:2, 1733:5, 1734:18, 1735:9

**efficiencies** [1] - 1742:13

**either** [6] - 1696:11, 1723:3, 1729:15, 1730:2, 1742:14, 1759:7

**elevator** [1] - 1753:23

**eliminating** [1] - 1724:13

**ELMO** [5] - 1688:5, 1688:6, 1693:15, 1735:20, 1739:17

**elsewhere** [2] - 1770:10, 1770:18

**Elyse** [1] - 1741:23

**ELYSE** [1] - 1741:23

**encounter** [1] - 1690:25

**encountered** [1] - 1690:18

**end** [8] - 1697:6, 1729:4, 1730:22, 1742:14, 1747:3, 1764:24, 1764:25, 1767:14

**Endeavor** [1] - 1746:8

**ended** [2] - 1734:17, 1767:14

**ending** [1] - 1765:12

**ensue** [1] - 1720:24

**enter** [1] - 1733:23

**entertainment** [1] - 1744:9

**enthusiasm** [1] - 1764:9

**enthusiastic** [3] - 1749:15, 1762:16, 1764:6

**entire** [3] - 1722:3, 1747:12, 1770:13

**entirety** [1] - 1706:20

**entities** [1] - 1696:19

**entity** [3] - 1723:18, 1727:13, 1728:18

**entries** [1] - 1737:7

**equal** [4] - 1707:7, 1757:5, 1773:14, 1773:15

**especially** [1] - 1687:4

**essays** [1] - 1747:12

**essentially** [1] - 1750:1

**established** [3] - 1713:13, 1732:8, 1732:25

**estimate** [12] - 1696:21, 1698:17, 1698:23, 1698:24, 1702:12, 1713:17, 1725:20, 1726:2, 1726:3, 1726:4, 1736:14, 1770:1

**estimated** [1] - 1733:4

**estimates** [5] - 1691:25, 1713:17, 1714:8, 1714:16, 1725:22

**et** [2] - 1685:6, 1748:20

**Ethan** [1] - 1685:10

**ethics** [2] - 1766:15, 1766:16

**evaluations** [1] - 1745:12

**eventual** [1] - 1713:5

**eventually** [1] - 1772:8

**evidence** [7] - 1691:3, 1692:24, 1695:25, 1696:14, 1735:21, 1738:20, 1771:5

**exa** [1] - 1769:7

**exact** [5] - 1698:3, 1712:3, 1712:15, 1714:2, 1772:6

**exactly** [8] - 1687:24, 1691:2, 1693:4, 1715:24, 1746:4, 1752:12, 1755:13, 1757:2

**examination** [2] - 1708:15, 1743:3

**EXAMINATION** [4] - 1687:8, 1734:13, 1736:5, 1743:13

**Examination** [4] - 1684:5, 1684:6, 1684:6, 1684:8

**examinations** [1] - 1742:6

**examines** [1] - 1724:8

**examining** [1] - 1723:25

**example** [7] - 1688:12, 1692:11, 1701:8, 1705:21, 1705:25, 1706:23, 1761:4

**examples** [7] - 1710:20, 1717:23, 1717:25, 1732:5, 1732:6, 1771:5, 1772:6

**except** [2] - 1693:13, 1736:25

**excited** [4] - 1755:3, 1756:11, 1758:19

**exciting** [2] - 1752:11, 1755:23

**excluded** [1] - 1704:21

**exclusive** [4] - 1768:8, 1769:7, 1770:9, 1770:16

**exclusively** [6] - 1706:16, 1706:17, 1750:11, 1755:6, 1759:6, 1765:14

**excuse** [1] - 1734:15

**executive** [4] - 1725:9, 1741:25, 1744:20, 1746:7

**executives** [1] - 1725:4

**Exhibit** [4] - 1709:6, 1709:7, 1738:19, 1738:20

**exhibits** [5] - 1684:10, 1709:4, 1738:4, 1738:16, 1739:23

**exist** [3] - 1716:3, 1716:6, 1716:9

**existing** [3] - 1730:19, 1749:6, 1768:5

**expect** [2] - 1741:24, 1772:10

**expectation** [1] - 1755:21

**expected** [1] - 1756:10

**experience** [7] - 1729:20, 1747:21, 1748:3, 1748:4, 1756:6, 1759:14, 1761:22

**experienced** [1] - 1749:3

**experimented** [1] - 1734:23

**expert** [5] - 1687:1, 1741:12, 1747:22, 1748:1, 1748:9

**explain** [3] - 1708:9, 1758:24, 1768:16

**explanatory** [1] - 1745:21

**exploits** [1] - 1748:18

**extent** [1] - 1736:25

**external** [2] - 1765:9, 1765:11

**eye** [1] - 1763:14

## F

**fact** [10] - 1703:1, 1711:25, 1715:9, 1719:4, 1725:3, 1726:20, 1728:24,

1731:17, 1739:4, 1770:17

**factor** [2] - 1762:5, 1769:19

**factoring** [1] - 1759:24

**factors** [1] - 1732:11

**fair** [6] - 1690:6, 1701:1, 1701:3, 1707:11, 1722:2, 1760:1

**faith** [1] - 1766:22

**familiar** [3] - 1691:24, 1716:3

**family** [2] - 1715:18, 1716:23

**fan** [3] - 1768:9, 1769:16, 1769:18

**fandom** [1] - 1769:19

**fans** [1] - 1769:19

**far** [3] - 1716:6, 1742:7, 1758:8

**Farrar** [1] - 1757:6

**favorable** [1] - 1753:25

**feedback** [5] - 1749:20, 1753:2, 1753:4, 1755:21, 1762:7

**fell** [2] - 1743:21, 1743:22

**felt** [2] - 1704:19

**fever** [1] - 1767:13

**few** [3] - 1734:12, 1764:25, 1770:21

**fewer** [1] - 1724:6

**fiction** [1] - 1750:4

**fiduciary** [5] - 1748:22, 1756:14, 1756:25, 1758:2

**fifth** [1] - 1713:1

**fight** [2] - 1717:13, 1757:17

**fighting** [1] - 1717:22

**figure** [4] - 1694:25, 1696:6, 1700:9, 1705:21

**Figure** [2] - 1700:10, 1700:12

**film** [2] - 1766:18, 1773:7

**final** [3] - 1753:19, 1760:3, 1767:17

**fine** [3] - 1706:5, 1737:20, 1769:10

**finish** [3] - 1715:6, 1769:24

**firm** [4] - 1726:10, 1726:17, 1727:24, 1730:3

**firms** [1] - 1729:20

**first** [26] - 1696:7, 1698:24, 1699:1, 1715:6, 1717:25, 1726:23, 1727:2, 1728:7, 1734:24, 1735:7, 1736:8, 1736:11, 1738:2, 1742:20, 1742:24, 1744:17, 1745:17, 1747:11, 1749:16, 1750:5, 1750:6, 1764:1, 1769:6, 1769:7, 1769:13
**first-highest** [1] - 1717:25
**first-price** [4] - 1734:24, 1735:7, 1736:8, 1736:11
**first-time** [2] - 1750:5, 1750:6
**fish** [1] - 1753:6
**FISHBEIN** [1] - 1685:19
**Fishbein** [1] - 1685:20
**fit** [1] - 1758:3
**five** [2] - 1739:9, 1739:11
**Fletcher** [3] - 1738:22, 1740:1, 1740:17
**focus** [4] - 1688:16, 1692:2, 1747:3, 1747:7
**focused** [1] - 1752:15
**followed** [2] - 1741:20, 1741:24
**following** [1] - 1741:18
**follows** [1] - 1691:8
**foot** [1] - 1750:2
**footnote** [3] - 1712:2, 1712:4, 1712:5
**foreign** [2] - 1748:19, 1766:19
**form** [4] - 1748:14, 1749:24, 1750:9, 1767:3
**formal** [1] - 1768:12
**format** [1] - 1697:19
**formats** [1] - 1721:22
**former** [1] - 1768:17
**forming** [2] - 1729:10, 1746:8
**forms** [1] - 1719:12
**fortunately** [1] - 1743:21
**forty** [2] - 1739:9, 1739:11
**forty-five** [2] - 1739:9, 1739:11
**forward** [3] - 1730:7,

1750:2, 1757:23
**foundation** [2] - 1747:20, 1771:17
**founded** [1] - 1747:4
**four** [6] - 1707:22, 1707:24, 1731:11, 1738:4, 1745:16, 1747:4
**fourth** [2] - 1713:1, 1745:22
**fragile** [1] - 1754:9
**fragility** [1] - 1754:13
**free** [3] - 1716:24, 1716:25, 1717:4
**frequent** [2] - 1718:16, 1728:17
**frequently** [6] - 1690:20, 1691:5, 1727:18, 1728:17, 1728:21
**full** [8] - 1705:7, 1714:9, 1743:15, 1743:23, 1743:25, 1761:6, 1761:7, 1773:7
**full-time** [2] - 1743:23, 1743:25
**fullness** [1] - 1757:8
**funny** [1] - 1769:14
**future** [2] - 1731:19, 1761:24

**G**

**Gallery** [1] - 1741:19
**gas** [1] - 1765:1
**general** [7] - 1710:11, 1721:19, 1722:11, 1723:22, 1728:25, 1733:21, 1736:11
**generally** [8] - 1730:14, 1730:15, 1750:4, 1760:11, 1764:18, 1764:20, 1770:22, 1773:16
**generous** [3] - 1753:2, 1753:3, 1760:1
**genie** [1] - 1758:21
**given** [6] - 1707:20, 1712:18, 1715:7, 1742:7, 1753:1, 1772:14
**global** [2] - 1744:16, 1746:12
**globally** [1] - 1746:20
**goal** [2] - 1698:20, 1710:9
**God** [1] - 1768:25
**gold** [2] - 1761:18
**good-faith** [1] -

1766:22
**government** [5] - 1726:10, 1726:13, 1737:25, 1740:25, 1742:18
**government's** [2] - 1720:3, 1740:12
**grab** [1] - 1766:20
**graduated** [1] - 1743:24
**grasp** [1] - 1742:8
**Great** [1] - 1753:21
**great** [5] - 1688:21, 1689:3, 1725:23, 1735:1, 1764:8
**grew** [3] - 1745:5, 1751:13
**ground** [2] - 1730:7, 1736:12
**group** [2] - 1695:17, 1747:6
**growth** [1] - 1745:11
**guaranteed** [2] - 1761:17
**guess** [5] - 1727:16, 1759:7, 1759:16, 1759:17, 1759:20
**GUPPI** [5] - 1723:22, 1736:13, 1736:17, 1736:18, 1736:21
**GUPPIs** [1] - 1736:16

**H**

**Hachette** [2] - 1719:17, 1719:20
**haircut** [2] - 1732:19, 1732:22
**half** [10] - 1689:10, 1689:11, 1689:25, 1690:2, 1691:13, 1691:16, 1692:5, 1705:22, 1725:22, 1739:8
**hand** [3] - 1738:14, 1743:6, 1770:13
**haphazard** [1] - 1695:23
**happy** [6] - 1755:16, 1756:1, 1756:3, 1770:5, 1770:23, 1772:21
**hard** [2] - 1697:14, 1757:17
**harm** [12] - 1721:14, 1721:24, 1722:6, 1722:11, 1722:24, 1724:5, 1724:8, 1724:13, 1735:13, 1771:5, 1772:5,

1772:9
**HarperCollins** [12] - 1696:23, 1709:1, 1709:2, 1719:20, 1722:15, 1722:19, 1724:22, 1724:23, 1727:19, 1727:21, 1732:7
**head** [14] - 1690:25, 1691:1, 1694:19, 1711:7, 1713:15, 1713:18, 1744:13, 1744:16, 1746:12
**head-to-head** [3] - 1694:19, 1713:15, 1713:18
**heading** [1] - 1765:5
**healthy** [1] - 1756:11
**hear** [2] - 1742:9, 1771:16
**heard** [4] - 1695:24, 1705:18, 1724:22, 1762:3
**hearing** [1] - 1755:20
**heart** [1] - 1752:19
**Hearts** [1] - 1747:13
**held** [2] - 1740:8, 1740:24
**help** [2] - 1725:8, 1751:14
**helps** [4] - 1748:13, 1748:15, 1751:11, 1756:6
**high** [4] - 1710:21, 1730:22, 1731:18, 1732:3
**high-profile** [1] - 1732:3
**higher** [10] - 1705:20, 1705:22, 1716:21, 1717:9, 1720:25, 1726:14, 1734:18, 1735:9, 1763:3
**highest** [10] - 1704:17, 1705:1, 1705:3, 1705:10, 1705:15, 1706:24, 1717:25, 1731:3, 1756:22, 1757:3
**highlighted** [1] - 1720:8
**Hill** [16] - 1684:4, 1686:8, 1686:13, 1686:15, 1686:17, 1686:22, 1687:10, 1688:14, 1688:23, 1734:15, 1735:15, 1737:11, 1737:16, 1737:24, 1771:4, 1771:21

**Hill's** [1] - 1770:25
**hired** [1] - 1743:22
**historically** [1] - 1730:23
**home** [1] - 1770:6
**honed** [1] - 1755:21
**honestly** [1] - 1755:21
**Honor** [37] - 1685:3, 1685:4, 1685:14, 1685:19, 1685:22, 1686:3, 1686:7, 1686:12, 1686:13, 1693:18, 1697:19, 1699:11, 1699:14, 1699:25, 1700:4, 1700:11, 1703:15, 1703:25, 1704:3, 1705:18, 1713:14, 1730:8, 1734:9, 1736:4, 1737:22, 1738:2, 1738:17, 1739:15, 1740:2, 1741:3, 1741:13, 1742:6, 1742:8, 1743:11, 1747:20, 1771:10, 1773:20
**honor** [4] - 1744:17, 1748:23, 1752:13, 1768:2
**honorably** [1] - 1768:7
**hope** [1] - 1758:18
**hopefully** [1] - 1686:8
**hopes** [1] - 1754:1
**hour** [2] - 1685:25, 1738:25
**house** [3] - 1750:14, 1750:17, 1770:21
**House** [53] - 1685:17, 1690:16, 1692:13, 1695:9, 1696:11, 1696:17, 1700:14, 1702:1, 1702:9, 1702:12, 1703:14, 1710:17, 1712:13, 1715:5, 1715:18, 1716:8, 1716:14, 1716:18, 1716:23, 1717:21, 1718:14, 1718:20, 1718:25, 1719:2, 1719:13, 1719:21, 1720:15, 1720:24, 1721:7, 1721:25, 1722:14, 1722:19, 1723:16, 1724:9, 1725:14, 1725:21, 1726:22, 1727:1, 1727:6, 1727:12, 1728:1, 1731:11, 1735:17, 1735:23, 1741:21,

1783

1741:25, 1751:23,
1752:2, 1765:16,
1765:17, 1769:22
**House's** [1] - 1720:11
**housekeeping** [1] -
1738:1
**hundred** [6] - 1697:11,
1697:12, 1697:24,
1708:7, 1744:25,
1763:11
**hundred-plus** [1] -
1697:24
**hundreds** [2] -
1750:20, 1750:23
**Hungry** [1] - 1747:13
**hybrid** [3] - 1736:17,
1736:19, 1736:25
**hypothetical** [3] -
1722:22, 1735:16,
1735:21
**hypothetically** [1] -
1773:9

**I**

**idea** [7] - 1693:9,
1718:4, 1723:22,
1723:23, 1727:7,
1754:6, 1767:11
**ideal** [1] - 1770:5
**ideally** [1] - 1756:9
**identified** [7] -
1696:17, 1698:15,
1708:15, 1708:17,
1709:24, 1710:2,
1710:16
**identifies** [1] -
1709:22
**identify** [2] - 1704:7,
1713:23
**identifying** [3] -
1697:21, 1700:21,
1704:16
**illustration** [1] -
1688:6
**illustrative** [1] -
1690:7
**imagine** [3] - 1717:15,
1727:17, 1762:18
**impact** [2] - 1733:4,
1741:15
**impeachment** [1] -
1686:8
**implement** [1] -
1728:19
**implementing** [1] -
1726:19
**implicit** [1] - 1694:24
**important** [6] -
1698:21, 1730:25,

1732:4, 1749:13,
1754:23, 1754:24
**imprint** [19] - 1715:3,
1715:19, 1715:25,
1716:14, 1716:16,
1716:23, 1719:22,
1720:23, 1721:3,
1741:19, 1741:21,
1755:13, 1756:23,
1760:2, 1764:6,
1769:22, 1772:17,
1772:22
**imprints** [32] -
1695:18, 1697:7,
1697:9, 1697:10,
1697:24, 1698:4,
1698:6, 1715:6,
1715:18, 1716:7,
1716:11, 1716:18,
1716:20, 1716:24,
1717:13, 1717:22,
1718:4, 1718:14,
1718:19, 1718:25,
1719:8, 1719:14,
1721:8, 1750:17,
1750:18, 1752:3,
1757:4, 1765:6,
1765:7, 1765:9,
1765:16
**inability** [1] - 1736:7
**inaccuracies** [1] -
1698:13
**incentive** [1] - 1732:21
**incidence** [1] - 1688:2
**include** [4] - 1691:21,
1705:8, 1750:13,
1751:5
**included** [1] - 1706:10
**includes** [2] - 1703:1,
1736:25
**including** [3] - 1703:9,
1705:10, 1714:18
**inclusive** [1] - 1717:4
**increase** [1] - 1726:11
**incredibly** [1] - 1753:2
**increments** [1] -
1765:3
**incumbency** [1] -
1731:19
**incumbent** [2] -
1732:2, 1733:1
**indeed** [1] - 1772:18
**independent** [5] -
1717:9, 1717:10,
1717:12, 1717:17,
1717:19
**independently** [1] -
1719:9
**indicated** [1] - 1712:5
**indication** [1] - 1691:4

**individual** [1] - 1718:3
**individually** [1] -
1697:17
**industry** [11] - 1701:1,
1707:7, 1729:21,
1733:17, 1736:8,
1742:9, 1747:17,
1747:19, 1747:22,
1748:4, 1748:12
**inference** [7] -
1687:22, 1690:21,
1692:23, 1710:13,
1710:16, 1713:15,
1729:9
**informal** [1] - 1768:14
**information** [22] -
1691:4, 1691:10,
1692:17, 1692:18,
1700:25, 1701:6,
1701:22, 1704:4,
1704:23, 1707:1,
1707:12, 1708:21,
1710:21, 1711:21,
1712:1, 1730:13,
1749:20, 1751:14,
1753:15, 1755:19,
1762:10, 1764:15
**informative** [1] -
1711:6
**initial** [4] - 1700:12,
1700:15, 1715:2,
1738:23
**ink** [1] - 1739:17
**instance** [1] - 1761:15
**intend** [5] - 1724:17,
1725:5, 1725:9,
1737:15, 1741:8
**intended** [1] - 1708:19
**intensity** [1] - 1729:22
**intensive** [1] - 1697:21
**intent** [1] - 1715:18
**intention** [1] - 1705:6
**interest** [3] - 1695:16,
1748:23, 1764:15
**interested** [5] -
1699:18, 1721:7,
1755:11, 1762:14,
1762:20
**intern** [1] - 1743:19
**internationally** [1] -
1773:4
**interpret** [2] - 1717:15,
1756:25
**interrogatories** [1] -
1738:6
**intimate** [2] - 1770:20,
1770:23
**introduction** [1] -
1747:14
**intuition** [1] - 1729:11

**intuitively** [1] -
1765:25
**invite** [1] - 1755:9
**invited** [1] - 1764:13
**inviting** [1] - 1755:7
**involve** [1] - 1703:8
**involved** [2] - 1745:13,
1748:17
**issues** [1] - 1745:20

**J**

**January** [1] - 1685:11
**Jennifer** [5] - 1684:7,
1741:12, 1741:19,
1743:2, 1743:17
**job** [2] - 1766:19,
1773:11
**John** [1] - 1685:9
**joins** [1] - 1715:17
**Julia** [1] - 1685:16
**July** [1] - 1686:17
**junior** [1] - 1743:20

**K**

**keep** [3] - 1732:12,
1732:17, 1764:10
**keeping** [2] - 1713:4,
1770:4
**kept** [2] - 1711:14,
1711:22
**key** [1] - 1728:7
**Kidd** [1] - 1772:14
**Kim** [2] - 1685:11,
1741:20
**kind** [3] - 1734:6,
1756:3, 1759:24
**Knopf** [1] - 1757:6
**Knopf/not** [1] -
1720:18
**Knopf/not-so-little** [1]
- 1720:18
**knowing** [2] - 1690:6,
1705:10
**knowledge** [3] -
1718:17, 1728:14,
1751:11
**known** [4] - 1707:13,
1707:15, 1745:18
**knows** [1] - 1731:10

**L**

**labor** [1] - 1697:21
**labor-intensive** [1] -
1697:21
**lack** [1] - 1753:23
**landscape** [1] -
1706:21
**language** [7] -

1697:20, 1712:3,
1712:13, 1712:15,
1720:9, 1726:18,
1755:8
**large** [3] - 1708:10,
1730:23
**largely** [1] - 1714:17
**largest** [3] - 1714:15,
1746:18, 1751:3
**last** [9] - 1688:4,
1708:18, 1710:3,
1716:18, 1718:6,
1730:9, 1738:21,
1751:18, 1758:7
**learned** [1] - 1760:20
**learning** [1] - 1686:6
**least** [6] - 1688:15,
1693:6, 1693:8,
1715:19, 1715:24,
1724:21
**leave** [7] - 1717:4,
1740:5, 1767:22,
1767:24, 1768:3,
1768:21, 1770:19
**lectures** [1] - 1746:13
**left** [9] - 1687:15,
1719:10, 1739:17,
1747:2, 1747:3,
1747:7, 1765:6,
1771:7, 1773:16
**less** [12] - 1685:25,
1691:5, 1693:24,
1694:2, 1723:14,
1728:25, 1729:5,
1729:11, 1730:1,
1732:25, 1769:8,
1769:10
**lessened** [2] -
1728:24, 1729:10
**letter** [7] - 1716:2,
1716:3, 1756:19,
1760:12, 1762:1,
1762:4
**letters** [2] - 1711:23,
1762:8
**level** [3] - 1710:21,
1752:5, 1754:24
**levels** [1] - 1731:3
**life** [2] - 1747:12,
1770:6
**likelihood** [1] - 1733:7
**likely** [10] - 1710:14,
1714:10, 1723:24,
1728:15, 1733:10,
1735:23, 1736:14,
1749:4, 1753:1,
1773:6
**limine** [2] - 1771:12,
1771:13
**limit** [1] - 1704:14

1784

**limitation** [1] - 1716:17
**limited** [4] - 1712:6, 1712:10, 1716:16, 1727:25
**limiting** [2] - 1754:16, 1754:17
**line** [1] - 1720:9
**list** [11] - 1738:12, 1738:23, 1750:14, 1751:6, 1751:12, 1752:4, 1753:11, 1753:13, 1753:14, 1753:19, 1755:1
**literally** [2] - 1711:15, 1714:13
**Literary** [2] - 1743:20, 1744:1
**literary** [19] - 1744:21, 1745:3, 1746:12, 1747:18, 1748:1, 1748:2, 1748:3, 1748:9, 1748:12, 1748:13, 1748:16, 1748:21, 1748:22, 1748:24, 1749:9, 1749:13, 1757:5, 1766:18, 1770:4
**Live** [3] - 1747:4, 1747:8, 1747:13
**long-standing** [2] - 1716:13, 1719:1
**look** [17] - 1695:5, 1695:6, 1699:2, 1699:19, 1703:15, 1703:16, 1704:6, 1708:21, 1709:3, 1710:19, 1710:24, 1711:7, 1713:14, 1719:24, 1754:22, 1769:6, 1769:7
**looked** [8] - 1694:20, 1695:9, 1704:18, 1708:14, 1710:21, 1711:12, 1711:18, 1735:4
**looking** [16] - 1691:7, 1695:4, 1696:9, 1696:10, 1696:16, 1697:1, 1706:22, 1723:23, 1727:24, 1729:20, 1729:21, 1732:14, 1751:2, 1751:3, 1756:7, 1760:15
**looks** [3] - 1702:10, 1714:10, 1740:12
**lose** [4] - 1727:21, 1731:17, 1731:18, 1732:4

**loses** [1] - 1689:11
**losing** [8] - 1708:22, 1727:21, 1732:5, 1732:7, 1757:14, 1765:4, 1765:10
**loss** [17] - 1711:3, 1711:10, 1711:19, 1712:9, 1712:18, 1712:20, 1713:6, 1713:12, 1713:15, 1713:17, 1714:4, 1714:6, 1714:11, 1714:18, 1714:24, 1723:11, 1772:22
**lost** [7] - 1711:15, 1711:17, 1713:7, 1758:18, 1758:22, 1759:5, 1771:3
**love** [13] - 1732:18, 1743:21, 1743:22, 1751:10, 1752:13, 1755:5, 1757:16, 1760:12, 1762:1, 1762:3, 1762:4, 1763:7, 1763:8
**low** [4] - 1725:17, 1735:13, 1759:4, 1764:1
**lower** [4] - 1716:19, 1716:20, 1728:19, 1728:24
**lowered** [1] - 1727:6
**lunch** [8] - 1741:4, 1741:9, 1749:18, 1753:22, 1773:21, 1773:24, 1774:1, 1774:4

# M

**Macmillan** [2] - 1719:20, 1724:23
**Madeline** [2] - 1741:25, 1742:20
**magic** [5] - 1771:4, 1771:21, 1772:4, 1772:13, 1772:15
**main** [1] - 1727:8
**maintained** [1] - 1711:14
**maintaining** [1] - 1711:16
**majority** [2] - 1749:2, 1749:3
**manner** [1] - 1689:14
**manuscript** [4] - 1750:1, 1750:4, 1750:6, 1761:6
**market** [36] - 1687:16, 1687:18, 1687:20,

1688:1, 1688:2, 1689:25, 1690:1, 1690:16, 1690:17, 1690:25, 1691:1, 1691:7, 1691:9, 1692:11, 1692:12, 1692:14, 1692:16, 1692:20, 1692:21, 1692:22, 1692:25, 1694:1, 1702:19, 1703:14, 1703:17, 1714:7, 1714:12, 1720:14, 1726:20, 1726:21, 1726:25, 1729:23, 1734:20, 1735:17, 1758:15
**marketed** [1] - 1760:25
**marketing** [8] - 1760:11, 1760:19, 1760:24, 1761:3, 1761:10, 1761:11, 1761:24
**marketplace** [3] - 1690:19, 1749:22, 1759:15
**markets** [2] - 1704:8, 1729:21
**mask** [1] - 1743:10
**match** [14] - 1702:20, 1703:14, 1716:19, 1716:20, 1748:15, 1748:16, 1751:4, 1751:15, 1752:11, 1752:16, 1752:23, 1754:22, 1755:12
**matches** [2] - 1754:21
**material** [3] - 1766:3, 1766:20, 1768:25
**materials** [1] - 1711:13
**math** [3] - 1689:21, 1689:22
**matter** [1] - 1738:2
**matters** [5] - 1752:20, 1759:22, 1759:23
**maximizing** [3] - 1719:5, 1719:14, 1728:23
**McIntosh** [1] - 1742:1
**Meagan** [1] - 1685:10
**mean** [28] - 1691:3, 1692:22, 1693:24, 1694:25, 1695:24, 1701:8, 1702:8, 1710:25, 1715:24, 1717:2, 1720:12, 1723:1, 1723:21, 1727:3, 1727:15, 1736:25, 1753:15,

1761:14, 1761:16, 1762:1, 1762:8, 1766:8, 1768:14, 1768:21, 1769:15, 1769:21, 1773:14
**means** [2] - 1748:22, 1769:18
**meant** [2] - 1702:25, 1772:1
**measures** [1] - 1695:7
**mechanism** [2] - 1700:19, 1728:18
**meet** [3] - 1754:3, 1754:8, 1754:15
**Meeting** [1] - 1709:21
**meeting** [4] - 1695:16, 1695:19, 1710:9, 1754:5
**meetings** [5] - 1754:7, 1754:16, 1754:25, 1755:2
**members** [1] - 1740:5
**memory** [1] - 1691:15
**mentioned** [2] - 1736:16, 1752:8
**merged** [7] - 1723:18, 1726:10, 1726:17, 1727:13, 1727:24, 1728:18, 1746:7
**merger** [14] - 1716:6, 1722:15, 1722:18, 1722:24, 1724:18, 1725:13, 1729:11, 1730:2, 1731:7, 1733:8, 1733:11, 1735:12, 1741:15, 1746:9
**merging** [1] - 1724:1
**methodology** [3] - 1702:14, 1704:16, 1714:16
**methods** [1] - 1714:17
**might** [26] - 1686:7, 1687:2, 1690:5, 1704:20, 1707:2, 1724:25, 1726:15, 1731:15, 1749:20, 1752:8, 1753:3, 1755:5, 1757:6, 1759:4, 1765:5, 1765:10, 1765:11, 1768:3, 1768:8, 1768:10, 1770:16, 1770:20, 1771:2, 1773:16
**million** [1] - 1763:12
**millions** [1] - 1731:5
**mind** [1] - 1716:17
**mine** [1] - 1753:17
**minor** [1] - 1721:1

**minute** [3] - 1700:24, 1710:8, 1710:25
**Minutes** [1] - 1709:21
**minutes** [40] - 1694:21, 1695:3, 1695:8, 1695:9, 1695:15, 1695:20, 1696:5, 1696:10, 1696:14, 1697:2, 1697:4, 1697:25, 1698:13, 1698:19, 1698:20, 1699:5, 1699:10, 1700:20, 1700:23, 1708:13, 1708:15, 1708:17, 1708:19, 1708:24, 1708:25, 1709:22, 1710:10, 1710:22, 1711:4, 1711:7, 1714:18, 1715:1, 1738:25, 1739:9, 1739:10, 1739:11, 1739:13, 1739:14, 1740:2, 1740:6
**missed** [1] - 1751:11
**missing** [1] - 1704:20
**mistaken** [1] - 1741:14
**misunderstood** [1] - 1703:6
**model** [13] - 1722:3, 1726:15, 1726:19, 1731:9, 1734:16, 1734:20, 1735:2, 1735:3, 1735:13, 1736:8, 1736:19
**modeled** [1] - 1723:20
**modeling** [1] - 1736:10
**models** [6] - 1724:5, 1724:12, 1726:12, 1726:13, 1735:12, 1736:13
**modify** [1] - 1730:3
**moment** [2] - 1716:2, 1743:6
**momentum** [1] - 1765:4
**Monday** [7] - 1734:15, 1735:9, 1742:2, 1742:3, 1742:14, 1743:25, 1751:17
**money** [10] - 1752:17, 1756:15, 1757:1, 1758:4, 1758:6, 1758:15, 1761:23, 1770:11, 1771:6, 1773:5
**Monk** [1] - 1772:14
**morning** [19] - 1685:2, 1685:3, 1685:4,

1785

1685:12, 1685:13, 1685:14, 1685:18, 1685:19, 1685:21, 1685:22, 1686:22, 1686:23, 1687:10, 1687:11, 1735:16, 1739:2, 1739:21, 1743:11, 1743:12
**Morris** [8] - 1744:7, 1744:8, 1744:9, 1744:11, 1744:15, 1746:5, 1746:6, 1746:7
**most** [18] - 1718:4, 1718:6, 1718:10, 1741:9, 1749:8, 1756:4, 1756:15, 1757:1, 1758:4, 1758:5, 1764:6, 1767:3, 1767:7, 1767:8, 1767:19, 1768:2, 1769:24, 1770:15
**mostly** [1] - 1759:17
**motion** [2] - 1771:12
**motivated** [1] - 1732:16
**move** [9] - 1711:3, 1730:7, 1747:21, 1749:8, 1753:5, 1763:21, 1769:11, 1769:19, 1769:21
**moved** [1] - 1716:7
**movie** [1] - 1748:18
**moving** [2] - 1753:7, 1773:20
**multi** [4] - 1692:2, 1692:6, 1763:20, 1764:11
**multi-bidder** [2] - 1692:2, 1692:6
**multi-round** [2] - 1763:20, 1764:11
**multiple** [2] - 1701:4, 1754:23
**mutual** [1] - 1768:24
**mystery** [1] - 1714:5

# N

**name** [1] - 1743:15
**narrow** [1] - 1693:7
**narrowed** [1] - 1755:1
**NDAs** [1] - 1766:21
**near** [1] - 1759:5
**necessarily** [11] - 1690:22, 1708:20, 1711:24, 1721:10, 1721:22, 1754:19, 1756:22, 1757:1,

1757:3, 1763:6, 1764:5
**necessary** [5] - 1712:4, 1740:21, 1752:6, 1757:4, 1768:15
**need** [12] - 1686:7, 1687:2, 1688:16, 1689:20, 1692:10, 1695:22, 1729:2, 1742:9, 1762:14, 1762:19, 1763:1, 1771:25
**negative** [1] - 1719:11
**negatively** [1] - 1767:16
**negotiate** [4] - 1755:6, 1755:9, 1759:6, 1765:13
**negotiating** [4] - 1732:2, 1736:8, 1749:6, 1761:22
**negotiation** [8] - 1704:4, 1729:17, 1730:18, 1731:1, 1731:12, 1736:22, 1770:9, 1770:16
**negotiations** [7] - 1703:9, 1728:4, 1728:22, 1728:25, 1731:6, 1731:7, 1735:1
**negotiators** [1] - 1731:6
**Nestor** [1] - 1774:7
**never** [10] - 1690:4, 1690:9, 1690:11, 1695:1, 1707:13, 1708:11, 1708:19, 1710:10, 1721:25, 1735:24
**new** [2] - 1709:5, 1749:7
**New** [3] - 1746:19, 1761:17, 1761:21
**next** [7] - 1709:25, 1728:13, 1737:25, 1750:8, 1763:21, 1763:24, 1764:13, 1764:16, 1770:8
**nice** [1] - 1774:4
**Nicholas** [1] - 1684:4
**nine** [2] - 1726:21, 1727:1
**no-poach** [1] - 1733:24
**nobody** [1] - 1761:20
**nonanticipated** [1] - 1703:2
**none** [1] - 1762:13

**normal** [1] - 1731:24
**North** [1] - 1772:25
**Norton** [4] - 1722:15, 1722:20, 1722:22, 1723:12
**note** [2] - 1753:21, 1756:18
**NOTE** [1] - 1774:6
**notebook** [6] - 1686:3, 1686:6, 1686:7, 1686:10, 1686:14, 1686:15
**notebooks** [1] - 1687:12
**nothing** [1] - 1701:17
**notion** [1] - 1690:24
**number** [29] - 1691:20, 1691:24, 1692:8, 1692:20, 1696:14, 1697:2, 1698:3, 1699:18, 1701:24, 1704:24, 1704:25, 1712:19, 1718:13, 1718:15, 1722:7, 1724:10, 1725:16, 1725:24, 1726:1, 1742:6, 1755:15, 1759:5, 1760:1, 1765:23
**numbers** [4] - 1700:13, 1702:7, 1707:25, 1754:17

# O

**o'clock** [4] - 1739:13, 1773:22, 1773:25, 1774:3
**Oath** [1] - 1743:7
**objection** [7] - 1737:8, 1738:16, 1747:24, 1747:25, 1771:10, 1771:11, 1772:11
**observations** [2] - 1685:24, 1712:19
**observing** [1] - 1723:18
**obviously** [1] - 1760:3
**occurring** [1] - 1733:17
**offer** [19] - 1720:16, 1731:13, 1754:22, 1756:20, 1756:22, 1756:23, 1757:1, 1757:2, 1757:3, 1757:23, 1763:11, 1764:7, 1764:8, 1768:5, 1769:8, 1769:9, 1772:17, 1772:21

**offering** [4] - 1731:24, 1733:19, 1733:21, 1733:23
**offers** [3] - 1727:7, 1731:7, 1763:4
**officer** [1] - 1741:25
**often** [33] - 1687:20, 1689:14, 1690:18, 1691:25, 1692:1, 1692:13, 1692:25, 1693:3, 1693:4, 1693:8, 1693:10, 1693:16, 1694:5, 1694:13, 1694:17, 1696:22, 1696:23, 1696:24, 1698:22, 1698:23, 1699:2, 1708:21, 1710:12, 1710:14, 1710:22, 1710:24, 1711:6, 1717:1, 1717:2, 1717:3, 1728:5, 1761:5, 1768:23
**old** [2] - 1744:10, 1761:16
**oldest** [1] - 1744:9
**once** [9] - 1720:24, 1748:16, 1753:20, 1754:4, 1758:17, 1758:21, 1760:16, 1766:12, 1767:17
**one** [78] - 1685:24, 1686:4, 1686:11, 1687:2, 1687:5, 1688:2, 1688:6, 1690:11, 1692:1, 1692:6, 1694:23, 1695:12, 1696:1, 1696:14, 1696:22, 1696:24, 1697:2, 1698:21, 1699:2, 1699:6, 1701:1, 1704:3, 1704:24, 1707:6, 1707:22, 1708:22, 1710:12, 1710:19, 1710:25, 1711:4, 1711:18, 1713:3, 1713:19, 1713:21, 1714:13, 1714:19, 1717:16, 1718:24, 1721:20, 1722:8, 1724:6, 1724:10, 1724:13, 1728:2, 1730:9, 1735:8, 1735:19, 1735:24, 1738:1, 1739:4, 1745:19, 1748:24, 1750:11, 1750:14, 1752:24, 1754:9, 1755:2,

1755:4, 1757:22, 1757:24, 1758:3, 1758:16, 1758:19, 1761:2, 1762:16, 1763:1, 1763:7, 1763:11, 1763:12, 1765:14, 1769:14, 1769:21, 1770:16, 1772:25, 1773:1
**one-on-one** [1] - 1704:3
**one-to-one** [1] - 1688:2
**ones** [7] - 1697:13, 1697:25, 1704:6, 1704:14, 1710:19, 1736:19, 1736:20
**onwards** [1] - 1717:16
**open** [2] - 1720:14, 1740:24
**opening** [1] - 1737:5
**operating** [2] - 1719:22, 1727:8
**opinion** [6] - 1733:19, 1733:21, 1733:23, 1734:3, 1757:20
**opinions** [2] - 1771:13, 1771:14
**Oppenheimer** [5] - 1685:15, 1687:11, 1699:17, 1730:6, 1734:10
**OPPENHEIMER** [38] - 1685:3, 1685:22, 1686:2, 1686:5, 1686:12, 1686:16, 1686:19, 1686:22, 1686:25, 1687:3, 1687:9, 1688:8, 1688:10, 1688:21, 1688:22, 1688:25, 1689:3, 1689:4, 1693:21, 1694:7, 1699:15, 1699:22, 1699:25, 1700:18, 1702:22, 1704:13, 1705:24, 1708:2, 1720:1, 1720:5, 1730:8, 1730:11, 1734:9, 1736:4, 1736:6, 1737:2, 1737:4, 1737:11
**Oppenheimer's** [1] - 1735:15
**Oppenheimer....** [1] - 1684:5
**Oppenheimer.........** [1] - 1684:6
**opponent** [1] - 1728:21

1786

**opportunities** [4] - 1696:11, 1696:16, 1704:9, 1704:21
**opportunity** [2] - 1732:23, 1764:7
**optimal** [1] - 1727:20
**option** [7] - 1729:16, 1768:1, 1768:8, 1768:13, 1769:3, 1769:4
**options** [1] - 1731:14
**order** [6] - 1693:10, 1699:12, 1723:5, 1723:9, 1723:15
**orders** [1] - 1701:5
**original** [1] - 1759:5
**otherwise** [2] - 1729:4, 1745:18
**outcome** [2] - 1752:22, 1767:17
**outset** [1] - 1735:10
**outside** [5] - 1695:4, 1711:12, 1716:22, 1717:20, 1729:16
**overall** [2] - 1727:13, 1728:19
**overhead** [1] - 1735:19
**overrule** [1] - 1772:11
**oversaw** [1] - 1745:10
**oversight** [1] - 1746:14
**overt** [1] - 1770:15
**overview** [1] - 1741:8
**owe** [1] - 1748:21

**P**

**P&L's** [1] - 1760:21
**p.m** [1] - 1774:6
**PAGE** [1] - 1684:2
**page** [7] - 1688:13, 1700:9, 1700:13, 1700:15, 1703:22, 1703:24, 1709:7
**paid** [1] - 1772:18
**Pam** [2] - 1720:1, 1737:2
**Pande** [2] - 1751:22, 1762:19
**Pande's** [1] - 1751:20
**pandemic** [1] - 1747:9
**paralegals** [1] - 1737:17
**pardon** [3] - 1689:20, 1721:4, 1770:5
**Pardon** [1] - 1686:13
**part** [6] - 1693:17, 1705:11, 1708:18, 1716:23, 1735:3,

1754:9
**partial** [5] - 1750:1, 1750:7, 1751:19, 1761:6
**participants** [1] - 1689:18
**participate** [2] - 1694:2, 1758:25
**participated** [3] - 1692:1, 1693:5, 1693:6
**participates** [1] - 1693:1
**participating** [2] - 1693:8, 1763:3
**participation** [2] - 1693:23, 1694:9
**particular** [6] - 1695:16, 1707:10, 1712:21, 1729:14, 1729:21, 1756:2
**particularly** [1] - 1708:6
**parties** [22] - 1689:10, 1696:24, 1698:21, 1701:5, 1707:8, 1708:22, 1710:22, 1710:24, 1711:6, 1711:14, 1711:22, 1712:10, 1712:20, 1713:1, 1723:5, 1723:16, 1723:25, 1724:1, 1731:4, 1732:5, 1732:7, 1740:9
**parts** [1] - 1707:15
**party** [14] - 1691:17, 1692:6, 1692:7, 1694:1, 1699:2, 1699:3, 1708:6, 1710:12, 1711:16, 1711:18, 1713:4, 1713:21, 1728:5, 1732:15
**party's** [1] - 1710:25
**pass** [2] - 1689:23, 1764:15
**passed** [1] - 1737:19
**passion** [1] - 1762:4
**past** [2] - 1728:14, 1758:10
**pause** [1] - 1700:24
**pay** [6] - 1729:5, 1752:17, 1757:11, 1772:7, 1772:19, 1773:9
**paying** [2] - 1756:9, 1767:14
**payments** [1] - 1733:20

**Penguin** [54] - 1685:16, 1690:15, 1692:13, 1695:9, 1696:11, 1696:16, 1700:14, 1701:25, 1702:9, 1702:11, 1703:13, 1710:17, 1712:12, 1715:5, 1715:17, 1716:8, 1716:14, 1716:18, 1716:23, 1717:21, 1718:14, 1718:19, 1718:24, 1719:2, 1719:13, 1719:21, 1720:10, 1720:14, 1720:15, 1720:24, 1721:6, 1721:24, 1722:14, 1722:19, 1723:16, 1724:9, 1725:14, 1725:21, 1726:22, 1727:1, 1727:6, 1727:11, 1728:1, 1731:11, 1735:16, 1735:23, 1741:21, 1741:25, 1751:23, 1752:2, 1765:16, 1765:17, 1769:21, 1769:22
**people** [18] - 1686:11, 1690:24, 1750:12, 1750:14, 1755:7, 1757:21, 1758:9, 1759:3, 1761:8, 1762:3, 1763:24, 1764:1, 1765:1, 1766:1, 1766:2, 1767:11, 1767:12, 1768:15
**per** [3] - 1745:1, 1745:2, 1746:21
**perceive** [2] - 1723:12, 1723:13
**perceived** [1] - 1706:23
**percent** [27] - 1689:24, 1690:1, 1690:16, 1690:17, 1693:6, 1693:7, 1694:20, 1694:22, 1708:7, 1725:12, 1725:14, 1725:18, 1725:21, 1725:25, 1726:11, 1726:12, 1726:14, 1726:16, 1727:5, 1727:9, 1727:14, 1727:22, 1728:19, 1731:8, 1731:9, 1770:3
**percentage** [6] - 1689:17, 1694:20,

1707:19, 1727:11, 1728:6, 1733:7
**perception** [2] - 1729:14, 1729:18
**perfect** [7] - 1693:9, 1749:21, 1751:4, 1751:15, 1752:11, 1752:16, 1759:20
**perhaps** [5] - 1713:7, 1718:7, 1749:6, 1764:25, 1766:10
**period** [4] - 1754:14, 1768:6, 1768:10, 1769:7
**permissible** [1] - 1741:14
**person** [9] - 1729:13, 1744:18, 1750:11, 1758:19, 1760:13, 1763:13, 1764:8, 1765:14, 1768:22
**personalized** [1] - 1753:21
**personally** [1] - 1745:13
**PETROCELLI** [9] - 1685:14, 1738:17, 1741:3, 1741:7, 1741:11, 1741:17, 1742:12, 1742:22, 1743:1
**Petrocelli** [1] - 1685:15
**Ph.D** [1] - 1684:4
**phone** [1] - 1753:16
**pick** [1] - 1687:15
**picked** [3] - 1710:19, 1718:24, 1773:1
**picture** [1] - 1714:9
**pie** [4] - 1772:24, 1773:1, 1773:7
**piece** [2] - 1691:10, 1764:9
**Pietsch** [1] - 1767:2
**Pietsch's** [2] - 1719:18, 1766:25
**pitch** [2] - 1753:14, 1753:23
**place** [8] - 1692:24, 1727:25, 1755:25, 1756:8, 1758:9, 1758:11, 1759:25, 1772:21
**places** [1] - 1708:15
**placing** [1] - 1729:13
**plan** [6] - 1760:12, 1760:19, 1760:24, 1761:3, 1761:10, 1761:11
**planning** [2] - 1741:6,

1748:5
**platform** [1] - 1759:23
**play** [2] - 1740:15, 1749:13
**played** [2] - 1740:1, 1740:17
**playing** [1] - 1740:6
**plenty** [1] - 1753:6
**plowing** [1] - 1730:7
**plus** [1] - 1697:24
**poach** [1] - 1733:24
**poaching** [2] - 1769:12, 1769:15
**Poaching** [1] - 1769:13
**pocket** [3] - 1756:8, 1771:7, 1773:18
**pockets** [1] - 1773:17
**podcast** [1] - 1748:19
**podium** [1] - 1685:7
**point** [8] - 1701:19, 1707:5, 1708:18, 1710:13, 1719:9, 1719:18, 1720:22, 1722:12
**policy** [1] - 1765:7
**polishing** [1] - 1753:19
**political** [1] - 1705:21
**popular** [1] - 1732:20
**population** [1] - 1724:14
**portion** [3] - 1739:4, 1740:15, 1774:6
**position** [1] - 1727:24
**positioned** [1] - 1706:20
**possibilities** [1] - 1745:11
**possible** [5] - 1687:25, 1704:10, 1715:5, 1715:8, 1765:12
**post** [4] - 1722:24, 1729:11, 1733:8, 1733:11
**post-merger** [4] - 1722:24, 1729:11, 1733:8, 1733:11
**potential** [3] - 1698:22, 1758:18, 1762:11
**potentially** [4] - 1731:18, 1755:10, 1767:13, 1773:6
**practice** [2] - 1716:13, 1719:2
**precise** [2] - 1725:23, 1769:25
**predict** [3] - 1694:17,

1721:24, 1722:6
**predicted** [2] - 1735:9, 1735:13
**prediction** [3] - 1725:11, 1728:15, 1731:9
**predicts** [1] - 1724:5
**preempt** [5] - 1755:7, 1755:9, 1755:24, 1757:12, 1759:10
**preemptive** [1] - 1759:5
**preempts** [1] - 1755:22
**preferred** [1] - 1714:15
**preliminary** [1] - 1685:24
**premerger** [1] - 1733:11
**premium** [1] - 1757:12
**preseeding** [1] - 1749:18
**preseeds** [1] - 1749:22
**presence** [2] - 1717:10, 1717:19
**present** [1] - 1717:17
**presentation** [2] - 1719:25, 1720:3
**presented** [1] - 1760:16
**president** [4] - 1720:23, 1721:1, 1721:2, 1721:6
**press** [3] - 1688:8, 1754:1
**pressure** [1] - 1763:25
**presumably** [1] - 1754:15
**pretty** [3] - 1725:7, 1745:21, 1755:17
**prevent** [2] - 1771:5, 1772:5
**preventing** [1] - 1772:9
**previous** [3] - 1690:20, 1764:12, 1764:17
**previously** [2] - 1711:20, 1728:2
**PRH** [15] - 1689:6, 1689:20, 1689:24, 1691:12, 1691:13, 1693:5, 1697:7, 1697:9, 1697:10, 1713:6, 1722:7, 1725:12, 1765:7, 1765:8
**price** [13] - 1703:8,

1721:9, 1726:11, 1726:16, 1731:23, 1733:4, 1734:18, 1734:24, 1735:7, 1735:9, 1736:8, 1736:11, 1736:12
**pricing** [1] - 1731:8
**primary** [2] - 1729:18, 1729:19
**print** [1] - 1688:18
**printing** [2] - 1734:1, 1734:3
**priorities** [1] - 1755:14
**prizes** [1] - 1757:7
**proceed** [2] - 1739:24, 1741:2
**Proceedings** [2] - 1740:8, 1740:24
**process** [15] - 1749:1, 1749:10, 1751:1, 1754:9, 1754:13, 1754:20, 1755:24, 1757:21, 1762:12, 1762:15, 1762:20, 1762:24, 1763:3, 1763:15, 1767:21
**produced** [2] - 1712:20, 1712:24
**Professor** [13] - 1691:12, 1692:3, 1698:12, 1700:20, 1700:25, 1701:21, 1702:3, 1704:22, 1706:1, 1708:14, 1709:6, 1709:15, 1742:16
**profile** [1] - 1732:3
**profit** [3] - 1719:5, 1719:14, 1728:23
**profitable** [1] - 1731:2
**progress** [1] - 1735:1
**project** [2] - 1752:24, 1753:4
**projects** [1] - 1752:8
**prominent** [1] - 1705:21
**promise** [1] - 1715:23
**promised** [1] - 1761:12
**proportion** [1] - 1691:1
**proportional** [1] - 1714:23
**proportionately** [1] - 1691:8
**proposal** [1] - 1761:6
**proposing** [1] - 1703:8
**protect** [1] - 1754:13
**protocol** [1] - 1708:3

**protocols** [1] - 1705:11
**provided** [2] - 1686:2, 1739:22
**provider** [1] - 1746:18
**public** [5] - 1701:7, 1739:9, 1739:14, 1740:5, 1740:23
**publication** [1] - 1748:17
**publicity** [1] - 1761:8
**publicly** [2] - 1707:13
**publish** [1] - 1762:6
**published** [4] - 1689:2, 1747:12, 1751:10, 1761:3
**publisher** [31] - 1693:1, 1694:16, 1696:22, 1699:13, 1708:16, 1709:24, 1710:6, 1717:17, 1717:19, 1719:22, 1724:14, 1725:4, 1731:1, 1741:19, 1741:20, 1748:15, 1748:16, 1749:5, 1749:6, 1749:13, 1760:22, 1761:7, 1761:23, 1767:23, 1767:25, 1768:5, 1769:4, 1773:9
**publisher's** [3] - 1693:22, 1694:1, 1729:17
**publishers** [14] - 1696:1, 1698:23, 1701:4, 1701:7, 1707:2, 1724:14, 1724:16, 1730:12, 1733:8, 1733:20, 1733:23, 1766:19, 1770:4, 1772:7
**publishes** [1] - 1746:19
**publishing** [9] - 1701:1, 1743:18, 1743:21, 1747:17, 1747:22, 1748:12, 1750:14, 1750:16, 1751:8
**purposes** [1] - 1690:8
**pursuant** [1] - 1701:5
**push** [2] - 1692:10, 1758:8
**Putnam** [1] - 1741:21
**putting** [2] - 1725:15, 1762:25
**PX** [9] - 1684:11, 1684:11, 1684:12, 1684:12, 1738:10,

1738:11, 1738:19

## Q

**qualification** [1] - 1713:23
**qualifications** [1] - 1747:21
**qualified** [2] - 1747:25, 1771:13
**qualify** [1] - 1748:8
**quality** [1] - 1708:3
**quality-control** [1] - 1708:3
**quantify** [1] - 1733:12
**quantitative** [1] - 1695:25
**questions** [6] - 1687:16, 1716:1, 1733:22, 1734:12, 1735:15, 1736:1
**quick** [1] - 1719:24
**quickly** [2] - 1703:20, 1737:3
**quite** [3] - 1688:1, 1702:19, 1745:4
**quote** [1] - 1772:6

## R

**raise** [1] - 1743:6
**raised** [1] - 1695:16
**Random** [53] - 1685:16, 1690:15, 1692:13, 1695:9, 1696:11, 1696:16, 1700:14, 1701:25, 1702:9, 1702:12, 1703:14, 1710:17, 1712:12, 1715:5, 1715:18, 1716:8, 1716:14, 1716:18, 1716:23, 1717:21, 1718:14, 1718:19, 1718:24, 1719:2, 1719:13, 1719:21, 1720:10, 1720:14, 1720:15, 1720:24, 1721:6, 1721:24, 1722:14, 1723:16, 1724:9, 1725:14, 1725:21, 1726:22, 1727:1, 1727:6, 1727:12, 1728:1, 1731:11, 1735:16, 1735:23, 1741:21, 1741:25, 1751:23, 1752:2, 1765:16, 1765:17, 1769:22
**Random/Doubleday** [1] - 1720:19

**Randy** [1] - 1685:15
**range** [3] - 1714:9, 1726:13, 1726:15
**rare** [2] - 1728:16, 1761:25
**rarely** [3] - 1766:8, 1766:10, 1770:19
**rate** [1] - 1695:2
**rates** [2] - 1713:11, 1714:7
**rather** [6] - 1706:24, 1708:20, 1710:11, 1731:10, 1752:16, 1767:12
**ratio** [1] - 1694:9
**rats** [1] - 1703:23
**reach** [1] - 1731:15
**reaction** [1] - 1771:24
**reactions** [1] - 1754:5
**READ** [19] - 1685:9, 1685:13, 1738:1, 1738:4, 1738:10, 1738:21, 1738:25, 1739:4, 1739:8, 1739:15, 1739:22, 1740:2, 1740:12, 1740:18, 1740:20, 1747:25, 1748:3, 1771:10, 1771:12
**read** [5] - 1697:20, 1721:11, 1751:18, 1766:25, 1772:3
**Read** [2] - 1685:9, 1688:4
**reading** [1] - 1697:18
**reads** [1] - 1761:7
**ready** [1] - 1739:23
**real** [2] - 1752:22
**really** [12] - 1729:2, 1750:7, 1752:20, 1754:20, 1755:14, 1757:16, 1757:17, 1759:19, 1765:22, 1767:6, 1768:15, 1769:15
**reason** [2] - 1692:10, 1724:20
**reasonable** [4] - 1698:10, 1707:14, 1710:23, 1736:14
**reasons** [1] - 1763:7
**rebuttal** [4] - 1700:5, 1709:6, 1737:16, 1740:21
**receive** [1] - 1749:14
**received** [1] - 1705:21
**Recess** [2] - 1739:20, 1774:5
**recognize** [1] - 1720:6
**recollection** [1] -

1788

1711:23
**record** [10] - 1685:8, 1687:23, 1701:9, 1704:19, 1705:5, 1705:7, 1711:17, 1743:16, 1749:7, 1764:4
**recorded** [1] - 1712:18
**recording** [3] - 1695:18, 1739:25, 1740:16
**records** [1] - 1711:14
**RECROSS** [1] - 1736:5
**Recross** [1] - 1684:6
**RECROSS-EXAMINATION** [1] - 1736:5
**Recross-Examination** [1] - 1684:6
**redirect** [2] - 1734:11, 1737:9
**Redirect** [1] - 1684:5
**REDIRECT** [1] - 1734:13
**reduce** [4] - 1724:17, 1725:5, 1725:10, 1727:20
**reduced** [1] - 1722:7
**reduction** [2] - 1724:13, 1731:23
**referred** [3] - 1696:2, 1735:7, 1762:1
**referring** [2] - 1701:10, 1723:15
**reflected** [2] - 1696:24, 1696:25
**refocus** [1] - 1688:19
**refresh** [2] - 1691:15, 1698:9
**regularly** [1] - 1714:4
**reject** [1] - 1735:12
**related** [1] - 1742:13
**relationship** [6] - 1730:19, 1732:3, 1732:12, 1745:17, 1745:25, 1756:11
**relationships** [6] - 1732:25, 1751:8, 1759:15, 1770:5, 1770:20, 1770:23
**relative** [1] - 1720:16
**release** [1] - 1768:13
**released** [2] - 1768:7, 1768:18
**relies** [1] - 1721:19
**rely** [1] - 1704:23
**remain** [2] - 1743:5, 1746:15

remained [2] - 1746:12
**remember** [7] - 1698:2, 1701:24, 1723:10, 1734:21, 1766:4, 1770:19, 1772:24
**remorse** [1] - 1767:14
**remove** [1] - 1743:10
**removed** [3] - 1717:8, 1727:19, 1728:22
**renamed** [1] - 1744:4
**rendered** [1] - 1734:3
**renegotiations** [1] - 1691:21
**reopen** [1] - 1740:7
**repeat** [9] - 1726:24, 1730:18, 1731:25, 1767:22, 1767:24, 1769:24, 1769:25, 1770:3, 1771:18
**reply** [6] - 1700:4, 1700:6, 1700:7, 1700:9, 1700:11, 1703:17
**report** [24] - 1689:5, 1697:8, 1698:12, 1698:18, 1699:12, 1699:19, 1700:4, 1700:6, 1700:7, 1700:9, 1700:11, 1700:12, 1700:15, 1703:17, 1709:6, 1709:7, 1709:11, 1709:13, 1712:2, 1713:24, 1715:2, 1717:24, 1726:2, 1726:3
**reported** [1] - 1774:7
**REPORTER** [1] - 1748:2
**REPORTER'S** [1] - 1732:21, 1732:23
**reports** [2] - 1687:1, 1737:18
**represent** [1] - 1689:13
**represented** [1] - 1712:17
**represents** [1] - 1752:19
**requests** [2] - 1738:6, 1742:18
**require** [1] - 1769:3
**resemble** [1] - 1760:25
**reserve** [2] - 1740:20, 1756:19
**resilience** [1] - 1747:7
**respect** [9] - 1699:1,

1701:22, 1710:7, 1710:15, 1710:18, 1723:8, 1737:7, 1768:2, 1768:6
**respectively** [1] - 1689:6
**responding** [1] - 1753:18
**response** [1] - 1762:23
**responses** [2] - 1738:5, 1738:6
**responsibilities** [1] - 1744:20
**responsibility** [1] - 1751:7
**rest** [2] - 1686:20, 1738:22
**rested** [1] - 1740:25
**rests** [1] - 1740:18
**result** [2] - 1708:3, 1773:3
**results** [5] - 1708:14, 1709:16, 1734:24, 1735:4, 1735:8
**resume** [1] - 1773:24
**review** [8] - 1697:4, 1697:6, 1697:16, 1698:19, 1710:8, 1712:1, 1751:20, 1768:24
**reviewed** [4] - 1698:4, 1699:5, 1751:19, 1770:25
**rights** [8] - 1748:18, 1748:19, 1748:25, 1760:13, 1760:14
**ring** [3] - 1696:2, 1702:23, 1761:18
**risk** [2] - 1757:14, 1757:16
**rival** [2] - 1732:21, 1732:23
**rivalry** [1] - 1766:9
**robin** [6] - 1764:21, 1764:24, 1765:8, 1765:20, 1766:7, 1767:2
**role** [8] - 1745:7, 1745:9, 1746:11, 1747:18, 1747:23, 1748:11, 1749:13, 1770:4
**roles** [1] - 1744:15
**room** [1] - 1743:23
**roses** [1] - 1747:11
**roughly** [3] - 1698:2, 1708:1, 1725:12
**Round** [3] - 1717:16, 1717:18

**round** [18] - 1763:15, 1763:18, 1763:19, 1763:20, 1763:21, 1763:24, 1764:3, 1764:11, 1764:12, 1764:13, 1764:16, 1764:17, 1764:21, 1764:24, 1765:8, 1765:20, 1766:7, 1767:2
**round-robin** [6] - 1764:21, 1764:24, 1765:8, 1765:20, 1766:7, 1767:2
**rounds** [8] - 1717:16, 1719:7, 1721:21, 1723:2, 1729:2, 1764:21, 1770:14
**rowing** [1] - 1756:12
**royalties** [1] - 1773:3
**Rudolph** [3] - 1684:7, 1743:2, 1743:17
**Rudzin** [4] - 1743:2, 1743:12, 1748:6, 1773:23
**RUDZIN** [12] - 1743:11, 1743:14, 1747:20, 1748:7, 1748:10, 1757:10, 1760:7, 1766:24, 1769:2, 1771:20, 1772:2, 1773:20
Rudzin............... [1] - 1684:8
**rule** [1] - 1765:17
**run** [3] - 1685:24, 1719:9, 1762:20
**runner** [39] - 1692:14, 1692:18, 1694:14, 1694:16, 1696:20, 1698:16, 1698:18, 1698:25, 1700:21, 1702:13, 1704:5, 1704:7, 1704:11, 1704:15, 1704:18, 1705:1, 1705:16, 1705:17, 1706:18, 1706:22, 1708:20, 1709:2, 1710:2, 1710:11, 1710:14, 1710:18, 1710:24, 1711:2, 1711:9, 1712:21, 1713:1, 1713:9, 1713:13, 1713:22, 1714:25, 1728:11, 1732:14
**runner-up** [39] - 1692:14, 1692:18, 1694:14, 1694:16,

1696:20, 1698:16, 1698:18, 1698:25, 1700:21, 1702:13, 1704:5, 1704:7, 1704:11, 1704:15, 1704:18, 1705:1, 1705:16, 1705:17, 1706:18, 1706:22, 1708:16, 1708:20, 1709:2, 1710:2, 1710:6, 1710:11, 1710:14, 1710:18, 1710:24, 1711:2, 1711:9, 1712:21, 1713:1, 1713:9, 1713:13, 1713:22, 1714:25, 1728:11, 1732:14
**runners** [1] - 1691:25
**runners-up** [1] - 1691:25
**running** [1] - 1765:1
**runs** [1] - 1761:20

## S

**S&S** [5] - 1691:13, 1693:6, 1696:1, 1725:12, 1727:7
**sacred** [1] - 1752:20
**sadly** [1] - 1747:9
**sake** [1] - 1753:9
**sales** [2] - 1732:18, 1750:2
**Sally** [1] - 1741:20
**sample** [2] - 1714:15, 1749:24
**samples** [1] - 1714:17
**satisfactory** [1] - 1731:15
**Saturday** [1] - 1743:24
**save** [2] - 1737:16, 1737:18
**saw** [1] - 1691:11
**scale** [1] - 1730:22
**scenario** [2] - 1690:9, 1770:22
**scene** [1] - 1729:15
**Schiller** [1] - 1685:16
**Schuster** [49] - 1685:20, 1689:6, 1690:1, 1690:17, 1692:13, 1695:10, 1696:12, 1696:17, 1697:7, 1698:4, 1698:11, 1700:14, 1701:25, 1702:9, 1702:11, 1702:15, 1702:16, 1707:23, 1709:2, 1710:18,

1712:5, 1712:12, 1713:7, 1715:17, 1716:7, 1719:19, 1720:13, 1720:23, 1721:2, 1721:25, 1722:7, 1722:15, 1722:18, 1722:19, 1722:24, 1723:17, 1724:9, 1725:22, 1726:22, 1727:2, 1727:11, 1728:1, 1728:11, 1731:10, 1735:17, 1735:24, 1741:20, 1751:24, 1752:2

**Schuster's** [1] - 1708:25

**science** [2] - 1758:8, 1758:12

**scope** [3] - 1737:8, 1760:12, 1760:15

**score** [4] - 1724:3, 1726:15, 1728:7, 1734:20

**Scott** [1] - 1685:16

**scouts** [1] - 1766:18

**screen** [1] - 1688:15

**SE** [1] - 1685:6

**sea** [1] - 1753:6

**seal** [3] - 1738:13, 1739:5, 1739:7

**sealed** [3] - 1740:3, 1740:7, 1740:15

**seated** [1] - 1743:9

**second** [33] - 1696:7, 1698:24, 1699:1, 1701:17, 1703:12, 1704:17, 1705:1, 1705:3, 1705:10, 1705:15, 1706:23, 1706:24, 1713:1, 1715:6, 1717:25, 1723:5, 1723:8, 1723:9, 1723:15, 1724:3, 1726:15, 1726:23, 1727:2, 1728:7, 1730:12, 1730:16, 1734:20, 1736:12, 1745:19, 1759:2, 1764:3

**second-best** [1] - 1706:23

**second-highest** [6] - 1704:17, 1705:1, 1705:3, 1705:10, 1705:15, 1706:24

**second-order** [1] - 1723:5

**second-price** [1] - 1736:12

**second-score** [4] - 1724:3, 1726:15, 1728:7, 1734:20

**secondly** [1] - 1686:2

**Section** [1] - 1703:21

**see** [19] - 1687:1, 1688:13, 1688:23, 1691:4, 1700:1, 1700:16, 1703:23, 1706:20, 1707:9, 1720:16, 1720:20, 1726:2, 1726:3, 1732:15, 1737:23, 1753:17, 1765:5, 1772:10, 1774:3

**seeing** [7] - 1709:9, 1709:11, 1709:13, 1760:22, 1763:10, 1767:11, 1767:12

**seem** [3] - 1702:17, 1757:18, 1767:8

**sees** [1] - 1763:13

**segment** [2] - 1702:24, 1703:8

**selected** [1] - 1705:20

**selecting** [1] - 1706:9

**self** [1] - 1745:21

**self-explanatory** [1] - 1745:21

**sell** [6] - 1748:25, 1749:16, 1769:3, 1770:8, 1773:3, 1773:4

**seller** [2] - 1696:18, 1707:18

**sellers** [7] - 1701:9, 1702:5, 1702:6, 1702:25, 1703:2, 1707:24, 1746:20

**selling** [2] - 1747:11, 1752:16

**send** [5] - 1750:15, 1752:13, 1754:1, 1768:16, 1769:11

**sends** [1] - 1752:24

**senior** [1] - 1743:23

**senior-year** [1] - 1743:23

**sense** [11] - 1693:9, 1693:16, 1699:9, 1708:11, 1710:22, 1729:22, 1741:3, 1748:4, 1760:22, 1761:9, 1765:3

**sentence** [1] - 1756:21

**separate** [4] - 1686:13, 1716:1, 1722:18, 1774:7

**separately** [2] - 1692:9, 1693:18

**serve** [1] - 1766:8

**served** [1] - 1761:14

**serves** [1] - 1765:22

**set** [5] - 1701:20, 1706:11, 1706:15, 1712:25, 1722:4

**sets** [2] - 1706:14, 1707:6

**setting** [4] - 1723:12, 1723:23, 1728:4, 1728:7

**settings** [1] - 1732:19

**several** [1] - 1741:22

**share** [23] - 1690:16, 1690:17, 1690:21, 1690:23, 1691:6, 1692:11, 1692:12, 1693:13, 1693:22, 1694:1, 1694:17, 1694:20, 1703:14, 1704:8, 1714:7, 1714:15, 1727:3, 1765:19, 1765:21, 1766:6, 1767:17, 1767:20

**shares** [26] - 1687:16, 1687:18, 1687:20, 1688:1, 1688:14, 1689:5, 1691:1, 1691:7, 1691:9, 1692:14, 1692:16, 1692:20, 1692:21, 1692:22, 1692:23, 1692:25, 1695:4, 1702:19, 1703:17, 1711:12, 1714:12, 1714:24, 1726:20, 1726:21, 1726:25, 1735:17

**sharing** [1] - 1747:6

**shave** [1] - 1731:7

**shift** [1] - 1767:10

**Shop** [5] - 1744:4, 1744:5, 1744:6, 1744:7, 1744:11

**short** [1] - 1737:6

**shorter** [1] - 1742:7

**show** [2] - 1729:7, 1736:8

**showed** [1] - 1693:14

**shows** [1] - 1736:10

**sic** [2] - 1722:19, 1726:7

**side** [7] - 1710:19, 1711:1, 1711:19, 1712:12, 1716:11, 1740:12

**sides** [1] - 1732:15

**sign** [2] - 1766:21

**significant** [4] -

1720:16, 1726:17, 1728:6, 1739:4

**significantly** [1] - 1734:17

**signing** [3] - 1745:18, 1745:25, 1746:2

**similarly** [1] - 1708:24

**Simon** [50] - 1685:20, 1689:6, 1689:25, 1690:16, 1692:13, 1695:10, 1696:11, 1696:17, 1697:7, 1698:4, 1698:11, 1700:14, 1701:25, 1702:8, 1702:11, 1702:15, 1702:16, 1707:23, 1708:25, 1709:2, 1710:17, 1712:5, 1712:12, 1713:7, 1715:17, 1716:7, 1719:19, 1720:13, 1720:23, 1721:1, 1721:25, 1722:7, 1722:14, 1722:18, 1722:19, 1722:24, 1723:17, 1724:9, 1725:22, 1726:22, 1727:1, 1727:11, 1728:1, 1728:11, 1731:10, 1735:17, 1735:24, 1741:20, 1751:23, 1752:2

**simpler** [1] - 1718:3

**simplest** [1] - 1719:12

**simplify** [2] - 1685:23, 1686:9

**simply** [1] - 1724:13

**single** [5] - 1752:9, 1753:8, 1755:10, 1756:7, 1763:15

**situation** [18] - 1687:25, 1690:7, 1715:10, 1715:11, 1718:2, 1718:9, 1722:14, 1723:16, 1727:17, 1730:17, 1731:24, 1732:1, 1753:1, 1757:15, 1760:17, 1764:23, 1765:6, 1773:8

**situations** [6] - 1717:12, 1718:12, 1718:13, 1718:18, 1724:9, 1756:1

**size** [2] - 1705:23, 1745:3

**skill** [3] - 1756:6, 1759:14, 1773:14

**skills** [1] - 1773:15

**slapdash** [1] - 1696:2

**slide** [5] - 1719:24, 1720:6, 1721:11, 1737:5

**Slide** [2] - 1720:2, 1737:3

**slightly** [3] - 1712:13, 1719:19, 1768:10

**slow** [1] - 1759:4

**small** [2] - 1745:4, 1746:7

**smaller** [4] - 1686:3, 1688:17, 1693:22, 1765:3

**smelling** [1] - 1747:11

**Snyder** [14] - 1691:12, 1700:20, 1700:25, 1701:21, 1702:3, 1702:10, 1704:2, 1704:16, 1706:1, 1707:6, 1708:14, 1709:16, 1717:23, 1742:16

**Snyder's** [6] - 1692:3, 1694:23, 1698:12, 1703:18, 1704:22, 1709:6

**so-and-so** [1] - 1769:17

**soften** [1] - 1723:17

**softening** [2] - 1723:13, 1723:25

**sold** [3] - 1744:6, 1744:11, 1746:3

**someone** [3] - 1705:19, 1720:13, 1752:16

**sometimes** [15] - 1695:23, 1718:8, 1754:6, 1754:7, 1755:2, 1755:22, 1762:7, 1763:22, 1763:23, 1765:5, 1766:1, 1768:14, 1768:21, 1773:17

**sorry** [13] - 1686:12, 1687:6, 1688:25, 1700:17, 1702:8, 1703:13, 1709:9, 1722:9, 1742:20, 1748:2, 1768:12, 1771:18, 1771:25

**sort** [9] - 1697:19, 1733:4, 1733:5, 1745:5, 1754:11, 1756:12, 1766:19, 1767:11, 1768:7

**sound** [3] - 1712:8, 1752:10, 1764:4

**sounds** [5] - 1698:10,

1703:9, 1712:7,
1753:16, 1769:14
**source** [2] - 1708:21,
1711:12
**Source** [1] - 1709:21
**sources** [2] - 1691:4,
1694:21
**space** [1] - 1758:22
**speakers** [1] - 1747:13
**specific** [4] - 1699:4,
1725:7, 1725:16,
1764:18
**specifically** [1] -
1747:18
**spend** [1] - 1737:6
**spent** [2] - 1741:12,
1761:24
**sporadic** [1] - 1711:25
**sporadically** [2] -
1711:21, 1711:22
**spur** [1] - 1766:10
**SSA** [2] - 1722:4,
1722:9
**staff** [1] - 1745:6
**stand** [1] - 1742:17
**standard** [2] -
1697:19, 1697:20
**standing** [3] -
1716:13, 1719:1,
1743:5
**start** [11] - 1691:19,
1691:22, 1695:8,
1720:19, 1741:8,
1742:24, 1749:11,
1749:17, 1749:19,
1749:20, 1754:4
**started** [2] - 1743:18,
1743:19
**starts** [1] - 1749:12
**state** [2] - 1685:7,
1743:15
**statement** [1] - 1725:7
**States** [4] - 1685:5,
1685:9, 1726:6,
1740:18
**stay** [3] - 1744:1,
1770:7, 1770:20
**stayed** [1] - 1744:3
**stays** [1] - 1748:17
**steal** [1] - 1732:21
**step** [2] - 1737:21,
1743:5
**Stephen** [1] - 1685:20
**STEVENSON** [5] -
1734:12, 1734:14,
1736:1, 1737:8,
1737:15
**Stevenson** [2] -
1685:10, 1737:14
**Stevenson............** [1] -

1684:5
**still** [7] - 1716:9,
1723:11, 1746:25,
1747:8, 1766:5,
1768:3, 1770:17
**stipulated** [1] -
1690:15
**stipulation** [1] -
1738:8
**stop** [2] - 1723:6,
1758:12
**stories** [1] - 1747:6
**story** [1] - 1767:12
**strange** [2] - 1702:19,
1750:25
**strategized** [1] -
1745:11
**strategy** [2] - 1731:24,
1769:20
**Straus** [1] - 1757:6
**strikes** [1] - 1702:18
**strong** [3] - 1732:16,
1750:7, 1754:10
**stronger** [1] - 1732:20
**structure** [3] - 1719:5,
1719:6, 1719:13
**struggling** [1] -
1702:21
**study** [5] - 1705:12,
1706:18, 1706:22,
1708:10, 1732:14
**stuff** [2] - 1756:3,
1759:25
**subject** [1] - 1699:5
**submission** [12] -
1750:1, 1750:9,
1751:1, 1751:5,
1751:12, 1752:4,
1753:9, 1753:11,
1753:12, 1753:19,
1768:9, 1769:20
**submissions** [4] -
1749:14, 1749:24,
1750:19, 1751:3
**submit** [13] - 1691:17,
1692:7, 1718:9,
1748:14, 1750:7,
1750:10, 1750:11,
1750:21, 1750:24,
1752:1, 1752:3,
1752:8, 1768:3
**submits** [2] - 1751:22,
1751:23
**submitted** [4] -
1696:12, 1712:10,
1718:3, 1761:12
**submitting** [2] -
1750:16, 1750:17
**subpoenas** [3] -
1708:6, 1708:8

**subsequently** [1] -
1736:13
**substantial** [1] -
1731:23
**substitution** [1] -
1690:22
**substitutions** [1] -
1690:21
**successful** [1] -
1773:2
**Sue** [1] - 1772:14
**sugar** [1] - 1726:7
**suggest** [3] - 1737:15,
1737:16, 1754:6
**suggesting** [1] -
1710:16
**suggests** [1] - 1754:7
**summarizing** [2] -
1700:9, 1700:12
**summer** [1] - 1743:19
**supervising** [1] -
1745:7
**support** [2] - 1745:6,
1760:4
**surprised** [1] - 1767:4
**suspect** [1] - 1737:18
**sustained** [1] -
1737:10
**switch** [2] - 1721:14,
1732:8
**synopsis** [1] - 1768:3
**system** [1] - 1719:17
**systematic** [4] -
1696:4, 1711:24,
1712:10, 1712:16

## T

**Tab** [2] - 1709:3,
1720:1
**table** [7] - 1685:10,
1700:13, 1703:17,
1749:25, 1758:20,
1763:1, 1770:11
**Tammy** [1] - 1774:7
**team** [1] - 1702:4
**technology** [1] -
1688:5
**ten** [4] - 1726:22,
1727:1, 1731:11,
1770:14
**tends** [1] - 1763:17
**tenure** [1] - 1745:5
**terms** [4] - 1731:13,
1752:6, 1752:22,
1760:9
**terrific** [1] - 1688:21
**territories** [1] - 1773:4
**test** [1] - 1758:15
**testified** [9] - 1724:17,

1725:4, 1734:15,
1734:23, 1751:22,
1762:19, 1767:2,
1771:4, 1771:21
**testify** [4] - 1726:9,
1741:22, 1747:16,
1747:17
**testifying** [4] - 1725:9,
1726:16, 1742:3,
1742:5
**testimony** [18] -
1686:15, 1695:24,
1696:4, 1719:18,
1724:21, 1726:6,
1740:7, 1751:20,
1751:24, 1762:21,
1766:25, 1767:3,
1770:25, 1771:8,
1771:14, 1771:16,
1772:3, 1774:2
**text** [1] - 1715:23
**theater** [1] - 1746:13
**themselves** [1] -
1687:23
**theory** [6] - 1721:14,
1721:19, 1721:23,
1722:6, 1722:11,
1722:23
**therefore** [1] - 1751:1
**they've** [3] - 1751:10,
1752:18, 1755:21
**thin** [2] - 1709:5
**thinking** [8] - 1704:5,
1707:2, 1728:4,
1731:12, 1731:14,
1731:17, 1752:4,
1758:1
**third** [6] - 1692:24,
1701:17, 1713:1,
1745:21, 1746:19,
1763:18
**third-place** [1] -
1692:24
**thousand** [5] -
1701:22, 1707:21,
1746:20, 1746:22,
1763:11
**threaten** [2] - 1770:10,
1770:19
**three** [6] - 1692:20,
1714:22, 1749:8,
1761:2, 1761:3,
1763:11
**throughout** [1] -
1696:13
**TikTok** [1] - 1761:4
**timing** [1] - 1733:20
**tiny** [1] - 1747:14
**title** [1] - 1744:15
**titles** [5] - 1710:7,

1710:15, 1738:12,
1749:21, 1753:25
**today** [6] - 1719:22,
1729:8, 1729:12,
1731:10, 1746:25,
1747:16
**together** [2] - 1685:15,
1770:21
**Together** [3] - 1747:4,
1747:8, 1747:13
**took** [4] - 1687:6,
1697:13, 1697:15,
1713:16
**tool** [1] - 1750:2
**tools** [1] - 1772:16
**top** [10] - 1696:18,
1701:9, 1702:5,
1702:6, 1702:25,
1703:2, 1707:18,
1707:24, 1717:21,
1718:19
**topic** [1] - 1773:21
**total** [2] - 1701:24,
1704:8
**tour** [2] - 1747:3,
1747:5
**track** [2] - 1749:7,
1771:3
**transaction** [2] -
1724:25, 1725:9
**transcribed** [1] -
1774:7
**transcript** [1] -
1686:17
**transcripts** [2] -
1751:18, 1751:19
**translation** [1] -
1748:19
**treat** [2] - 1715:19,
1715:24
**treated** [1] - 1713:12
**trees** [1] - 1737:17
**trial** [3] - 1725:4,
1751:16, 1774:6
**tried** [3] - 1685:23,
1697:6, 1734:16
**tries** [1] - 1702:12
**true** [11] - 1712:18,
1718:12, 1721:21,
1722:5, 1725:19,
1726:1, 1726:4,
1730:5, 1755:5,
1763:2, 1763:5
**trust** [1] - 1766:22
**truth** [2] - 1754:12,
1756:6
**truths** [1] - 1754:23
**try** [7] - 1696:6,
1739:17, 1750:3,
1754:12, 1758:15,

1791

1766:20, 1768:4
**trying** [7] - 1698:17,
1718:7, 1725:20,
1756:15, 1758:5,
1764:5, 1766:9
**Tuesday** [2] - 1742:14,
1751:17
**turn** [3] - 1711:10,
1728:13, 1764:21
**turned** [2] - 1697:21,
1717:24
**turning** [2] - 1760:8,
1762:10
**turns** [2] - 1697:18,
1729:13
**TV** [4] - 1748:19,
1766:18, 1773:6,
1773:7
**tweak** [1] - 1753:4
**twenty** [1] - 1739:10
**twice** [1] - 1689:14
**two** [35] - 1685:24,
1687:12, 1687:20,
1689:5, 1696:14,
1696:19, 1697:2,
1699:6, 1704:24,
1704:25, 1711:5,
1713:20, 1714:13,
1714:19, 1716:18,
1716:20, 1717:21,
1718:19, 1718:22,
1721:20, 1722:8,
1724:10, 1728:2,
1736:19, 1738:5,
1738:6, 1750:11,
1759:19, 1762:19,
1763:18, 1763:24,
1764:10, 1770:16
**two-round** [1] -
1763:18
**type** [4] - 1701:20,
1711:21, 1728:9,
1757:19
**types** [3] - 1732:5,
1732:7, 1735:2
**typical** [1] - 1750:25
**typically** [3] - 1730:12,
1730:14, 1750:24

## U

**U.S** [3] - 1684:13,
1738:11, 1738:19
**U.S./Canada** [1] -
1760:14
**ultimately** [3] -
1712:14, 1745:5,
1757:7
**umbrella** [2] - 1752:5,
1752:6

**uncompetitive** [1] -
1730:1
**under** [8] - 1726:12,
1726:13, 1726:21,
1738:13, 1739:5,
1739:6, 1769:17,
1774:7
**underbidder** [1] -
1705:22
**underbidders** [1] -
1705:19
**understood** [2] -
1695:14, 1701:21
**unhappy** [1] - 1732:22
**unilateral** [5] -
1721:15, 1721:16,
1721:23, 1722:23,
1736:15
**unintended** [1] -
1766:2
**uniquely** [1] - 1706:20
**United** [4] - 1685:5,
1685:9, 1726:6,
1740:18
**unknown** [1] -
1707:15
**unless** [3] - 1694:3,
1764:14, 1765:21
**unmodelable** [1] -
1736:9
**unprecedented** [2] -
1708:10, 1709:12
**unsystematic** [1] -
1712:6
**up** [63] - 1687:15,
1691:25, 1692:14,
1692:18, 1694:14,
1694:16, 1696:20,
1698:16, 1698:18,
1698:25, 1699:19,
1700:21, 1702:13,
1703:14, 1704:5,
1704:7, 1704:11,
1704:15, 1704:18,
1705:1, 1705:16,
1705:17, 1706:18,
1706:22, 1708:16,
1708:20, 1709:2,
1710:2, 1710:6,
1710:11, 1710:14,
1710:18, 1710:24,
1711:2, 1711:9,
1712:21, 1713:1,
1713:9, 1713:13,
1713:22, 1714:25,
1716:1, 1717:7,
1717:11, 1717:13,
1719:9, 1720:25,
1721:9, 1728:11,
1728:13, 1729:7,

1731:12, 1732:14,
1734:17, 1737:3,
1743:5, 1743:10,
1751:13, 1764:20,
1765:3, 1767:14,
1769:24
**useful** [1] - 1699:2
**uses** [3] - 1704:3,
1706:18, 1714:4
**usual** [1] - 1764:23

## V

**value** [3] - 1705:20,
1717:18, 1726:4
**values** [1] - 1720:16
**variation** [1] - 1763:16
**variety** [1] - 1725:20
**various** [2] - 1695:6,
1737:7
**vary** [1] - 1744:24
**vast** [1] - 1707:12
**verbally** [1] - 1753:15
**verify** [3] - 1704:23,
1704:25, 1714:6
**versa** [1] - 1713:8
**versus** [1] - 1704:2
**Viacom** [1] - 1742:3
**ViacomCBS** [1] -
1685:20
**vice** [5] - 1713:8,
1720:23, 1721:1,
1721:2, 1721:6
**victory** [1] - 1755:25
**video** [4] - 1738:24,
1739:3, 1739:25,
1740:16
**view** [2] - 1707:9,
1752:1
**violation** [1] - 1765:17
**Virginia** [4] - 1743:19,
1743:20, 1743:22,
1744:1
**Voelz** [1] - 1685:16

## W

**wait** [3] - 1703:12,
1723:10, 1754:2
**Walsh** [10] - 1684:7,
1741:12, 1741:18,
1742:21, 1743:2,
1743:15, 1743:17,
1747:22, 1748:11,
1751:16
**Walsh's** [1] - 1747:21
**wand** [4] - 1771:4,
1771:22, 1772:4,
1772:14
**wants** [6] - 1756:2,

1763:19, 1763:21,
1767:22, 1767:24,
1769:11
**watch** [1] - 1739:2
**watching** [1] -
1751:16
**ways** [2] - 1764:25,
1765:23
**wedge** [1] - 1773:1
**week** [1] - 1751:18
**weighed** [1] - 1745:12
**weight** [2] - 1725:15,
1725:23
**welcome** [1] - 1763:23
**whatnot** [1] - 1701:6
**whatsoever** [1] -
1710:17
**whereas** [1] - 1757:22
**white** [1] - 1758:22
**whole** [7] - 1686:10,
1739:3, 1747:18,
1753:18, 1755:19,
1767:12, 1770:13
**wide** [2] - 1750:12,
1750:13
**widely** [1] - 1751:22
**wider** [3] - 1753:9,
1753:10, 1768:11
**William** [8] - 1744:7,
1744:8, 1744:9,
1744:11, 1744:15,
1746:5, 1746:6,
1746:7
**willing** [4] - 1720:15,
1758:20, 1772:7,
1773:9
**win** [22] - 1689:15,
1693:17, 1693:24,
1694:6, 1696:23,
1705:23, 1707:23,
1707:25, 1711:3,
1711:10, 1712:9,
1712:18, 1712:20,
1713:6, 1713:12,
1713:15, 1713:17,
1714:4, 1714:6,
1714:11, 1714:18,
1714:24
**win-loss** [14] - 1711:3,
1711:10, 1712:9,
1712:18, 1712:20,
1713:6, 1713:12,
1713:15, 1713:17,
1714:4, 1714:6,
1714:11, 1714:18,
1714:24
**winner** [20] - 1696:20,
1698:18, 1698:25,
1700:21, 1707:14,
1708:20, 1709:1,

1710:10, 1710:12,
1710:18, 1710:24,
1711:2, 1711:17,
1711:19, 1713:5,
1713:13, 1713:21,
1718:22, 1730:15,
1767:20
**winning** [6] - 1689:25,
1690:2, 1694:3,
1694:9, 1708:16,
1710:5
**winnings** [1] -
1693:10
**wins** [9] - 1689:10,
1691:13, 1692:6,
1699:3, 1701:25,
1702:1, 1702:9,
1731:11
**wish** [3] - 1718:15,
1724:25, 1732:12
**wishes** [2] - 1749:7,
1768:3
**witness** [7] - 1737:25,
1738:21, 1738:23,
1741:12, 1742:20,
1742:24, 1771:14
**WITNESS** [40] -
1686:23, 1687:6,
1693:18, 1694:5,
1699:11, 1699:18,
1699:24, 1700:1,
1700:3, 1700:6,
1700:8, 1700:17,
1702:10, 1702:18,
1703:15, 1703:20,
1703:23, 1703:25,
1705:18, 1707:20,
1737:12, 1737:22,
1743:8, 1756:17,
1757:2, 1758:5,
1758:17, 1759:1,
1759:9, 1759:12,
1759:18, 1760:6,
1766:13, 1766:16,
1768:14, 1768:19,
1768:21, 1771:18,
1772:13, 1773:13
**Witnesses** [1] -
1684:3
**witnesses** [3] -
1740:21, 1742:13,
1742:17
**WMA** [1] - 1745:3
**WME** [3] - 1746:8,
1746:9, 1746:25
**WME's** [1] - 1746:17
**woman** [1] - 1744:17
**women** [1] - 1747:6
**women's** [1] - 1747:3
**won** [15] - 1687:18,

1687:23, 1692:1,
1692:17, 1696:17,
1698:22, 1701:15,
1701:16, 1702:11,
1702:16, 1709:25,
1711:8, 1711:15,
1711:18, 1722:22
**wonder** [1] - 1739:1
**word** [2] - 1719:23,
1753:24
**wording** [1] - 1731:25
**words** [3] - 1724:8,
1760:14, 1769:14
**works** [1] - 1749:23
**world** [6] - 1689:8,
1689:20, 1689:24,
1744:10, 1760:14,
1762:9
**worth** [2] - 1755:18,
1757:7
**wow** [1] - 1763:12
**write** [1] - 1753:20
**Writers** [5] - 1744:4,
1744:5, 1744:6,
1744:7, 1744:11
**writers** [2] - 1752:18,
1773:15
**writing** [1] - 1768:15
**written** [1] - 1762:5
**wrote** [1] - 1747:13

## X

**X.9** [1] - 1709:7

## Y

**year** [10] - 1707:20,
1707:24, 1743:20,
1743:23, 1744:24,
1745:1, 1745:2,
1746:19, 1746:21
**years** [9] - 1707:22,
1707:24, 1744:10,
1747:4, 1761:2,
1761:3, 1761:18,
1767:6, 1770:2
**yesterday** [6] -
1691:11, 1726:6,
1726:20, 1734:23,
1735:7, 1770:25
**York** [3] - 1746:19,
1761:17, 1761:21
**youngest** [1] -
1744:18
**yourself** [1] - 1727:23