1             **UNITED STATES DISTRICT COURT**
              **FOR THE DISTRICT OF COLUMBIA**

2  ————————————————————————————

3  United States of America,   ) Civil Action
                             ) No. 1:21-cv-02886-FYP

4              Plaintiff,  )
                             )

5  vs.                    ) **Bench Trial - p.m. session**
                             )

6  Bertelsmann SE & Co. KGaA,  )
  et al.                  ) Washington, D.C.

7                      ) **August 11, 2022**
             Defendants.  ) Time:  2:00 p.m.

8  ————————————————————————————

9       **Transcript of Bench Trial - p.m. session**
               **Held Before**

10      **The Honorable Florence Y. Pan**
         **United States District Judge**

11         A P P E A R A N C E S

12

13  For the United States:   **John R. Read**
                          **Anna E. Cross**

14                     **Jonathan S. Goldsmith**
                          **Collier T. Kelley**

15                     **Ihan Kim**
                          **Lisa Scanlon**

16                     **Robert P. Vance, Jr.**
                        U.S. DEPARTMENT OF JUSTICE

17                     Antitrust Division
                        450 Fifth Street, Northwest

18                     Washington, D.C. 20530

19  For the Defendants Bertelsmann SE & Co. KGaA and Penguin
  Random House, LLC:      **Daniel M. Petrocelli**

20                     **M. Randall Oppenheimer**
                        **Megan K. Smith**

21                     O'MELVENY & MYERS LLP
                        1999 Avenue of the Stars, 8th Floor

22                     Los Angeles, California 90067

23                     **Daniel L. Cantor**
                     **Abby F. Rudzin**

24                     O'MELVENY & MYERS LLP
                        7 Times Square, Times Square Tower
                        New York, New York 10036

25

1

A P P E A R A N C E S, continued

2

For the Defendants ViacomCBS, Inc. and Simon & Schuster, Inc.:

3                              **Stephen Fishbein**
                               SHEARMAN & STERLING LLP

4                              599 Lexington Avenue
                               New York, New York 10022

5
                               **Ryan A. Shores**
6                              SHEARMAN & STERLING LLP
                               401 9th Street, Northwest

7                              Washington, D.C. 20004

8   _____

Stenographic Official Court Reporter:

9                              Nancy J. Meyer
                               Registered Diplomate Reporter

10                             Certified Realtime Reporter
                               333 Constitution Avenue, Northwest

11                             Washington, D.C. 20001
                               202-354-3118

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2                                                          PAGE:

3       **Witnesses**:

4       Elyse Cheney

5            Direct Examination by Mr. Petrocelli............. 2040
             Cross-Examination by Mr. Goldsmith.............. 2074
6
        Andrew Wylie
7
             Direct Examination by Mr. Petrocelli............. 2082
8            Cross-Examination by Ms. Cross.................. 2098
             Redirect Examination by Mr. Petrocelli.......... 2106
9
        Gail Ross
10
             Direct Examination by Mr. Petrocelli............. 2112
11           Cross-Examination by Mr. Vance.................. 2138

12

13      **Exhibits Admitted**:

14           PX 749........................................ 2042
             PX 837........................................ 2143
15           PX 838........................................ 2115
             PX 838........................................ 2137
16           PX 856........................................ 2086
             PX 857........................................ 2085
17
             DX 236........................................ 2072
18           DX 413........................................ 2039

19

20      **Deposition Transcripts Admitted**:

21           Ross Transcript page 83, lines 23 through 25..... 2141
             Ross Transcript page 196, lines 2 through 6...... 2146
22           Ross Transcript page 196, lines 2 through 9...... 2147

23           Wylie Transcript page 31, lines 19 through 22.... 2100

24

25

```
 1                    P R O C E E D I N G S

 2              (REPORTER'S NOTE:  The a.m. portion of the trial was

 3      reported by Lisa Edwards, who prepared said transcript.)

 4              THE COURT:  Good afternoon.

 5              MR. PETROCELLI:  Good afternoon, Your Honor.  We call

 6      Elyse Cheney.

 7              THE COURT:  All right.

 8              MR. PETROCELLI:  And, also, Your Honor, I'd like to

 9      admit DX 413 from Ms. Rudzin's examination.  It was the decoder

10      sheet.  There's no objection.

11              THE COURT:  All right.  That will be admitted.  Thank

12      you.

13              (DX Exhibit 413 admitted into evidence.)

14              THE COURT:  Hello.  Yes.  Could you please remain

15      standing for a moment and raise your right hand.

16              (Oath administered.)

17              THE WITNESS:  Yes.

18              THE COURT:  You can be seated.  And if you'd like,

19      you can remove your mask.  It's up to you.

20              THE WITNESS:  Oh, thank you.

21              THE COURT:  Sure.

22              MR. PETROCELLI:  Can we hand up a few documents?

23              THE COURT:  Yes.  Of course.

24              MR. PETROCELLI:  No binders, Your Honor.

25              THE COURT:  Okay.  Thank you.  I'm going to make some
```

1    room here.

2         Please proceed.

3                    DIRECT EXAMINATION

4    BY MR. PETROCELLI:

5    Q.   Ms. Cheney, please state your name for the record.

6    A.   Elyse Cheney.

7    Q.   What is your occupation?

8    A.   I'm a literary agent, and I own a literary agency.

9    Q.   How long have you been a literary agent?

10   A.   About 26 years.

11   Q.   What's the name of your agency?

12   A.   The Cheney Agency.

13   Q.   When did you start it?

14   A.   January 2005.

15   Q.   How many agents work with you?

16   A.   There are four of us total.

17   Q.   So going back, can you trace what you did before you

18   started your own agency?

19   A.   Sure.  I was an agent at Sanford Greenburger Associates for

20   eight years.  I was an agent for eight years.  Sorry.

21               THE COURT REPORTER:  You can move that microphone so

22   you don't --

23               THE WITNESS:  Oh.  Is it too loud?

24               THE COURT REPORTER:  No, no, no.  So you don't have

25   to --

```
1                   THE WITNESS:  Good.

2                   THE COURT REPORTER:  Yeah.

3                   THE WITNESS:  Okay.

4     BY MR. PETROCELLI:

5     Q.  Before you started your -- your firm, you were a literary

6     agent for eight years?

7     A.  Yes.

8     Q.  And before that?

9     A.  I was two years working part-time as, kind of, a reader for

10    a small literary agency on the Upper East Side.

11    Q.  Okay.  You -- what kind of authors do you represent?

12    A.  Primarily serious nonfiction and occasionally fiction.

13    Q.  Okay.  And can you look at the first demonstrative that I'm

14    going to put on the -- on the monitor; and that will be

15    Demonstrative 3.

16                   MR. PETROCELLI:  Defendants' Demonstrative 3,

17    Your Honor.

18                   THE COURT:  All right.

19    BY MR. PETROCELLI:

20    Q.  Are these some of the books and authors whom you represent?

21    A.  Yes.

22    Q.  Is there any particular type of book or author whom you

23    represent?

24    A.  I mean, again, tends to be in the serious nonfiction

25    category.  Some memoirs, some individuals who may have unique
```

1      experiences.

2      Q.  Now, could you turn to the other exhibit you have in front

3      of you, which is Plaintiff 749.

4            I also have as a demonstrative a color-coded version of

5      that just to make it a little bit easier for you and for us to

6      go through it.  But you have 749 in front of you?

7      A.  I do.

8      Q.  And what is that?

9      A.  It's a chart of my deals from -- my personal deals from

10     2018 to 2021.

11     Q.  Okay.

12            MR. PETROCELLI:  Your Honor, I'd ask to admit

13     Plaintiff's 749.

14            THE COURT:  Is there any objection?

15            MR. GOLDSMITH:  No objection.

16            THE COURT:  And this is under seal?

17            THE COURT REPORTER:  Can I get your name?

18            MR. GOLDSMITH:  Jonathan Goldsmith.

19            THE COURT REPORTER:  Thank you.

20            THE COURT:  Is this under seal?  Is this under seal?

21            MR. PETROCELLI:  Oh.  Thank you.  It is, Your Honor.

22     Thank you.

23            THE COURT:  All right.  Thank you.  It will be

24     admitted under seal.

25            (PX Exhibit 749 admitted into evidence.)

1          MR. PETROCELLI:  And, also, I'm going to mark the

2    color-coded version as Defendants' Demonstrative 4.

3          THE COURT:  All right.

4       It says 6 on it.

5          MR. PETROCELLI:  Excuse me?

6          THE COURT:  It says Defendants' Demonstrative 6 on

7    the copy I got.

8          MR. PETROCELLI:  Well, I think it's because we were

9    anticipating some others to come before it.

10          THE COURT:  Okay.

11          MR. PETROCELLI:  Let's call it Defendants'

12    Demonstrative 6, then, since it's already on the document.

13          THE COURT:  Okay.

14          MR. PETROCELLI:  Thank you.

15    BY MR. PETROCELLI:

16    Q.  So these are the deals that you did between 2018 and 2021;

17    right?

18    A.  Yes.  I think that there are two books that I personally

19    did not sell, but someone else in my agency did.

20    Q.  So there's some corrections to this?

21    A.  Yes.

22    Q.  Okay.  Let's -- why don't you tell us what those

23    corrections are.

24    A.  Number 15.

25    Q.  And what's the correction on 15?

1    A.  That was sold by somebody else at my agency, but I don't

2    have all the --

3    Q.  And did you have any other corrections?

4    A.  Number 34.

5    Q.  15 was done by someone else, and --

6    A.  Yeah.

7    Q.  And No. 34 was done by someone else; is that correct?

8    A.  Correct.

9    Q.  So -- and then did you have any additions that you noted

10   should be added?

11   A.  Yeah.  There's one more that's missing that was done with

12   Bloomsbury.

13   Q.  And if you look at Demonstrative 6, the color-coded version

14   of Plaintiff's 749, you'll see that that's been added at the

15   end; right?

16   A.  Yes.

17   Q.  That's a deal that you did with Bloomsbury you said.  Okay?

18   A.  Correct.

19   Q.  So just to speed this along, we've made a -- a list of the

20   deals that you have done based on Exhibit 749, as you have just

21   corrected, above 250,000 and below 250,000.  So I'd like to

22   mark that as the next demonstrative.

23           MR. PETROCELLI:  And I'll use Demonstrative 4 for

24   that one, Your Honor.

25           THE COURT:  All right.

1          MR. PETROCELLI:  And I think this can be displayed

2     publicly.

3     BY MR. PETROCELLI:

4     Q.  You have that in front of you?

5     A.  I do.

6     Q.  Okay.  And with the corrections that you made, this sets

7     forth the various deals that you have done with publishers from

8     2018 to 2021 for $250,000 advances and above.  And then the

9     second column is all your deals; correct?

10    A.  Yes.

11    Q.  Okay.  And you'll see here that you did 28 out of 44 deals

12    for 250,000 and above?

13    A.  Yes.

14    Q.  And this indicates, for the record, that you did zero with

15    Hachette?

16    A.  Correct.

17    Q.  Two with HarperCollins?

18    A.  Right.

19    Q.  Three with Macmillan?

20    A.  Right.

21    Q.  Two with Norton?

22    A.  Yes.

23    Q.  One with other?  Do you know who that is?

24    A.  I do.

25    Q.  Who is that?

1    A.  Workman.

2    Q.  Was that prior to the time it was acquired?

3    A.  Yeah.

4    Q.  And 17 with Penguin Random House?

5    A.  Yes.

6    Q.  And three with Simon & Schuster; right?

7    A.  Right.

8    Q.  And then the all deals adds the additional ones that you

9    did below 250; right?

10   A.  Uh-huh.

11   Q.  And do you happen to remember who the -- who the publishers

12   were for the four all deals?  We know one is -- one is Workman.

13   Two -- well, why don't you tell us, if you can remember.

14   A.  Workman, and Bloomsbury, Yale University Press, and --

15   Q.  And there's an additional Workman; right?

16   A.  Oh, right.  That's right.  Yes.

17   Q.  So --

18   A.  Additional Workman.

19   Q.  -- two Workmans, one Yale, and one Bloomsbury make up that

20   column; right?

21   A.  Yes.

22   Q.  Okay.  Thank you.

23        Now, with respect to the 250-and-above deals that you

24   did with the non-Big 5, what's your view of the level of

25   service that your author clients received from those publishers

1    as compared to services rendered by the Big 5?

2    A.  In some cases, they've been phenomenal.  I mean, Workman is

3    an incredible publisher, and they put tremendous resources

4    behind their publications.  I would say they're either -- you

5    know, in that case, really outstanding, but otherwise pretty

6    equal.

7    Q.  In your experience, have you observed any qualitative

8    differences in the publishing services rendered by the Big 5

9    versus the non-Big 5?

10   A.  Broadly, no.  It's pretty similar.  I mean, it's a process

11   of bringing a book to market, to -- everybody's travel to the

12   bookstores is pretty similar.

13   Q.  Why is it, then, that as we've seen in this trial, there

14   are so many deals 250 and above that are done with the Big 5 as

15   opposed to the non-Big 5?  Do you have a view about that?

16   A.  I think the non-Big 5, you know, are just not going to play

17   in that sandbox too many times.  They don't have the same

18   scale.  The Big 5 have -- you know, I don't -- to be honest, I

19   don't think about it as the Big 5.  So if I think about Penguin

20   Random House, I'm thinking about -- I don't know -- have 15

21   imprints I might be working with.  Same with Simon & Schuster.

22   Whereas, if it's Norton, you're pretty much going to Norton.

23   If it's Workman, you're going to Workman.  So the scale is very

24   different.

25   Q.  So other than scale, have you, in your experience, observed

1    any qualitative differences in the work performed by these

2    publishers?

3    A.  No, not at all.

4    Q.  Okay.  So we've done another cut of your -- of your

5    44 deals, and that is going to be set forth on Defendants'

6    Demonstrative 5 [sic], and this can be publicly displayed as

7    well.

8    A.  Uh-huh.

9    Q.  And what does this reflect, Ms. Cheney?

10   A.  The -- the format of how I sold the book, of each book.

11   Q.  So the formats being auction, preempt, option, and

12   exclusive?

13   A.  Right.

14   Q.  Okay.

15          THE COURT:  I think -- should this be

16   Demonstrative 7?  I already had something done as

17   Demonstrative 5.

18          MR. PETROCELLI:  It'll be 7.  Thank you, Your Honor.

19          THE COURT:  Thank you.

20   BY MR. PETROCELLI:

21   Q.  So with respect to these different formats, by "auction,"

22   what kind of auctions are we talking about?  The eight auctions

23   for 250 and above.

24   A.  What format auction, because there's different --

25   Q.  Yeah.

1    A.  I mean, just to clarify, auction, I think in a lot of

2    people's minds means, you know, a bunch of people in a room

3    raising paddles.  In this case, an auction usually can take

4    primarily two forms.

5         One is a traditional auction of going round by round

6    where there's initially -- everybody puts in a blind bid and

7    then you go back to the lowest bidder with the high bid and you

8    go in rounds.  Even there you can stop and say -- reserve the

9    right to go to best bids at any time.

10        Or you can do what's still called an auction, but I

11   think probably isn't really an auction, which is called best

12   bids.  And that's where you send out instructions to interested

13   publishers and you say, you know:  By noon tomorrow, please

14   give us your best offer.  In which case, each publisher is

15   flying blind, and they're coming up with an offer that they

16   think is based on what they can sell, whether they want to sign

17   the author up for the long term.  They may have lots of

18   different reasons for coming up with their bid, but they're

19   basically going in with what they think it's worth.

20   Q.  So how many of your eight auctions for 250 and above were

21   round-robin auctions that went the whole distance as a

22   round-robin instead of ending with a best-bid or a better best

23   bid?

24   A.  I believe none.

25   Q.  And same question for the -- the additional four below 250,

1    if you remember.

2    A.  I don't remember not ever just ending, you know, sort of

3    expiring with -- it always goes to best bids pretty much.

4    Q.  Okay.  And in these 12 auctions that you have listed on

5    Demonstrative 5 [sic], do you know if in any of them PRH or S&S

6    was the winner?

7    A.  I'm not sure.

8    Q.  Okay.

9    A.  I'm sure --

10   Q.  If we looked at your --

11   A.  Right, right, right.

12   Q.  -- color-coded chart --

13   A.  Uh-huh.

14   Q.  -- if you look at the red, that tells you it's an auction.

15   If you look at the purple or the white, that tells you if it's

16   S&S and PRH.  And to speed this up, if I told you that of the

17   12 auctions Penguin Random House or Simon & Schuster was the

18   winner in five of them; does that sound right?

19   A.  Yes.

20   Q.  And if I told you those were Books 23, 24, 30, 31, and 32,

21   would you agree with that?

22   A.  Yes.  That's correct.

23   Q.  Okay.  And of those five auctions in which either Penguin

24   Random House or Simon & Schuster acquired the book, did any

25   result in Penguin Random House and Simon & Schuster finishing

1    one and two?

2    A.  No.  There's one that I'm not entirely sure, but I'm pretty

3    sure the number two was Harper.

4    Q.  Which one is that?

5    A.  The *Uprising*.  Sorry.

6    Q.  What number?

7    A.  Oh, number.  Sorry.

8    Q.  Is that 31?

9    A.  31, yeah.  But I'm pretty sure the answer remains no for

10   all five.

11   Q.  You think no, but, maybe, possibly No. 31?

12   A.  Small possibility.  Yeah.

13   Q.  Okay.

14   A.  Based on my records.

15   Q.  We'll leave it there.

16   A.  Okay.

17   Q.  In your experience, do you include PRH and Simon & Schuster

18   in every acquisition format?

19   A.  No.

20   Q.  Why not?

21   A.  Really, first, again, just -- I don't think of it as PRH

22   and Simon & Schuster.  I think per imprint, and for particular

23   books, you know, I'm going to try to find the imprint that's

24   going to be best suited for -- and the editors best suited for

25   the material.  So I might decide to send it to, you know,

 1    Macmillan, Norton, and someone else.  I don't always have to

 2    include everybody in every auction that I do or every

 3    submission.  I just try to keep it limited to the people I know

 4    would do a great job with the book.

 5    Q.  As we see on Defendants' Demonstrative 7, you have 20 of

 6    the 250,000-and-above deals conducted other than by auction.

 7    Do you see that?

 8    A.  Yeah.

 9    Q.  Okay.  Preempt option and exclusive?

10    A.  Right.

11    Q.  In -- in each of those three circumstances, is the

12    acquisition process, essentially, a direct negotiation with a

13    single publisher?

14    A.  Yes, definitely.  For option and it's an exclusive

15    negotiation, you're not allowed to, you know, shop the offer to

16    someone outside of the -- whoever you have the contract with.

17    And then for -- my -- my screen just went off.

18         For a preempt, like, that's a publisher coming forward

19    and saying:  I want to take this off the table before there's

20    any auction.  We are so excited about this.  We have to have

21    it.  Here's X amount of money.

22         So they're -- usually what they're doing is saying we

23    see this as a really big project and so we're going to throw

24    down our best shot and hope you're going to take it.  And so

25    then you either decide you're interested in negotiating with

2053

1   them or you're not.

2   Q.  So let me follow up on these direct negotiations.  Since

3   you're not doing a competitive auction, either a full

4   round-robin or one that ends in a -- some type of best bid, how

5   do you know when you're just negotiating with one publisher

6   that you're getting the best deal for your client?

7   A.  Well, I mean, I think we should define what the best deal

8   for my client means.  In my mind, the promise that we make to

9   authors is we're going to try to help you find the widest

10  audience possible for your books.  So in order to do that, that

11  may mean going with the publisher who has the highest bid, but

12  it might also mean going with the publisher who has the most

13  experience in that kind of project, and that -- the imprint,

14  and -- and the editor who has the most experience and success

15  rate for that kind of project.

16  Q.  When you said it may mean going to the publisher with the

17  highest bid, if you don't have an auction, how do you know if

18  there's a better bid out there, a higher bid out there, when

19  you're pursuing a direct negotiation?

20  A.  Well, I think -- just to back up for a minute.  I think

21  that there's a misapprehension that the primary determinant of

22  the value of the project is competitive auctions or competitive

23  bidding.  Really, when I start working on a project, it's far

24  in advance of any kind of submission.  I'm working on the

25  project in order to create something that has inherent value

1    for the culture.  So I'm working on something that I hope is

2    going to become a nondeniable proposition in the mind of the

3    editor.  So something that's so exciting or so important to the

4    polit- -- pol- -- political culture or so moving that they call

5    me and they say:  I have to have this.  What do I have to pay

6    for it?

7         Can you repeat the question again just so I can --

8    Q.  Yeah.  I'm exploring the notion that in this book

9    acquisition process --

10   A.  Uh-huh.

11   Q.  -- that we've learned so much about during this trial --

12   and since this is a trial about competition -- you represent a

13   client; right?

14   A.  Uh-huh.

15   Q.  You have to answer audibly, by the way.

16   A.  Oh, yes.  Yeah.  I just need a reminder of the question so

17   I can go back.

18   Q.  I'm going to get to it --

19   A.  Okay.

20   Q.  -- but I want you to understand where I'm going.

21   A.  Okay.

22   Q.  You -- and you work on a commission; right?

23   A.  Yes.

24   Q.  So the more money you can get for the author, the more

25   money you make; right?

1    A.  Yes.

2    Q.  So you, like your client, the author, have an incentive to

3    get the most amount of money; right?

4    A.  Yes.

5    Q.  Okay.  So when you're pursuing a direct negotiation as

6    opposed to a competitive auction process -- which apparently

7    happens here most of the time according to your chart -- how

8    can you be assured that you're getting the most amount of money

9    for your client?

10   A.  Well, I think there's several, kind of, hidden factors in

11   this kind of relationship.  If I go to somebody with this one

12   particular project that I think is very valuable, I'm going to

13   the person who has the highest success rate with that kind of

14   book.  I'm going to the person who understands how to position

15   that book in the world.  I'm going to the person who knows how

16   to work with my author to get the best book possible out of

17   them.  If that person, that editor, and I see eye to eye, we're

18   both going to see the maximum value of that particular project.

19        So I'm going to them and saying, you know, I've got

20   this.  Now, they're not just bidding on that project.  I have

21   200 other clients waiting behind me.  So if they want to do

22   business with me and they want to do -- get the kind of

23   projects that I represent, then -- and they're interested,

24   obviously, in the particular project, they're going to bid, you

25   know, strongly in order to continue that relationship, to

1    continue to get successful books that, hopefully, I'm

2    representing.

3         If they're going to make it really painful for me or

4    they're going to make it -- start lowballing me, I'm probably

5    just not going to ever take them exclusive again.

6         Yeah.  So that's -- those are the different components

7    that are going into -- the other thing is that I think that

8    sometimes auctions -- I think publishers prefer auctions

9    because it's a much safer route for them.

10   Q.  Why?

11   A.  But not for the author.

12   Q.  Why is an auction safer for a publisher?

13   A.  Well, the publishers always say, you know, we prefer to do

14   an auction because then we can kind of go up incrementally, and

15   then, you know, there will be an auction fever and, you know,

16   you'll probably end up getting more money.  And I'm like, that

17   has not been my experience at all.

18        Again, it's not -- we're not all sitting in a room and

19   I'm saying you, you, you, and everybody is going up in some

20   kind of emotional contagion.  It's actually a very protracted

21   process where I call so-and-so.  I tell them the bid that they

22   have to beat.  They go to their boss.  They call me two hours

23   later.  This is not impulsive.

24        So I actually don't -- I think that's kind of a myth,

25   the whole auction thing, and sort of overplayed.  Plus, if I

1    have an auction -- let's say I go two rounds of that auction

2    and I'm at $300,000 and I'm thinking, well, maybe at this point

3    I should go to best bids because I know so-and-so, you know --

4    a few of those -- few of these bidders might be dropping out in

5    the next round.  So -- but I know Bidder 4 probably has

6    600,000.  So if I go to best bids, I still might not get that

7    600,000 because I'm ending Round 2 at 300.

8            However, if I decide to go to the person that --

9    exclusively to the person that I know is the best person for

10   this -- maybe that person is not going to give me every single

11   cent that I want, but I know it's the best person because

12   they're going to give me the right price, which is almost as

13   important.

14           I can explain that.  Why?  If I do an auction either as

15   a best-bids or I do it exclusively, then I'm getting the guy

16   who has 600 no matter what because he's going to -- he thinks

17   it's worth 600.  So I'm not ending up at 450, where I might not

18   end up at 450 with an auction.  I think the auction idea is a

19   little overplayed.

20   Q.  When you have conducted direct negotiations for any number

21   of these reasons as you've indicated, have you ever found out

22   afterwards that you left a fair amount of money on the table?

23   Has a publisher ever called you and said -- or an editor said,

24   by the way, you know, I stole this from you?  That ever happen?

25   A.  The only thing that's happened, actually, is that I knew --

1    in one case, I left money on the table at an auction situation,

2    and I -- if I had gone for the person who I knew I sort of had,

3    but the author really wanted to meet everyone, I could have

4    gotten probably $150,000 more.

5         So I was bummed about that, but, generally, no.  I mean,

6    I think if you could look at the -- the number of deals I've

7    had that are for a lot of money, I think it sort of speaks for

8    itself.

9    Q.  When you're doing direct negotiations, are you -- in the

10   back of your mind or even the front of your mind, are you

11   thinking about the competition, if you're not able to make a

12   deal?  And, in particular, are you thinking about the

13   competition in proportion to their market shares?

14   A.  Market share, I mean, absolutely not.  What I'm always

15   thinking about is:  Is this book going to sell in the stores?

16   Can I -- can this book connect with readers?  Is it going to

17   change their minds?  Is it going to change their hearts about

18   something?  Is it going to change -- you know, wake them up to

19   some reality that they didn't realize?  So I'm thinking, like,

20   who is going to help my author get to the most readers as

21   possible.  That's what I'm thinking of it.  I'm sorry.  Yeah.

22   Q.  Do you track market share -- not downstream retail sales, I

23   mean -- but market share of the various publishers with respect

24   to the acquisition of books?

25   A.  It's totally irrelevant to me, to be honest.

```
 1   Q.  Do you track that?

 2   A.  No.

 3   Q.  Okay.  When you're doing these negotiations and you --

 4           THE COURT:  I'm sorry.  Can we get an answer to the

 5   question?  When you're doing direct negotiations, are you

 6   thinking about the competition?  Are you thinking that you can

 7   get more in a direct negotiation if there are other people who

 8   want this book?  I think that was the question.

 9           THE WITNESS:  No.  I mean, for example, I do -- as

10   you can see, I do a lot of exclusive negotiations, and often,

11   you know, you sort of get to know who is -- who is willing to

12   pay, who is not, who understands the kind of books that you do,

13   who doesn't, who does them well.  So you kind of know where

14   they're going to come in at some point.  You know, you have an

15   idea if you're going to them where you can get them, and you

16   have an idea that usually that person is probably going to pay

17   top dollar for that kind of book.

18       So I'm not thinking about -- in fact, I know that if I

19   went to another publisher who is purely thinking about sell,

20   sell, sell -- and maybe I'll get a couple hundred thousand

21   more -- that in the end I could have a big bomb, and that

22   really, actually, hurts the author's career.

23       So, like, in other words, if you go to a place -- if you

24   go to -- and this is one of the reasons that I am very cautious

25   about auctions.  If you go to -- you know, round by round, best
```

1    bids, whatever, and you end up getting, like, an insane amount

2    of money from a publisher that you don't actually think is the

3    right publisher and then it becomes hard for the author to turn

4    it down, you can really kind of screw the author up and screw

5    the potential of success, because there's a huge range of

6    talents and a huge range of skill sets in the industry and

7    amongst the imprints.

8    BY MR. PETROCELLI:

9    Q.  When you're doing these exclusive negotiations, though, are

10   you -- are you telling the publishers that the -- if they're

11   not meeting your price that you're going to go elsewhere?

12   A.  No.  I mean, what you're trying to do is reframe things for

13   them.

14        So, you know, recently, a younger person in my office

15   got a preemptive offer for like 700.  I'm like, go back.  She

16   went back.  She got 800.  And she's like, okay.  I'm done.  You

17   know, this is it.  They said it's final.  And I was like, no,

18   you're not done, actually.  Let's talk about what this book is.

19        So we talk about the book.  And then I start to think,

20   like, how can we reframe this so that the editor understands

21   just -- they have the artillery to get it because they want it.

22   How can I give them what they need to sell it to their boss,

23   because I'm going to reframe exactly how they're thinking about

24   it.

25        So it's partly a generative process.  That's how I get

2061

1    more money.  Everybody thinks -- you know, it's not standard,

2    sort of, negotiation.

3    Q.  Well, look, we're talking -- we're in this trial because

4    there's going to -- if -- there may be a merger of two --

5    A.  Right.

6    Q.  -- big publishers -- right? -- Simon & Schuster and Penguin

7    Random House, depending on the outcome of this case.  You

8    understand that; right?

9    A.  Yes.

10   Q.  So right now when you're having these direct

11   negotiations -- and let's say you're talking to Penguin

12   Random House, you know that out there somewhere is Simon &

13   Schuster and you may be able to go there if you're not able to

14   make a deal with Penguin Random House.  I mean, that enters

15   your thinking?

16   A.  I'm pretty determined.  So if I decide that I want this

17   particular editor to do this book, I'm usually -- it's

18   usually -- it would be a surprise to me if they didn't and that

19   we couldn't come to a deal.  Because you kind of get to know

20   people.  You get a feel for it.  You know how to ride it.

21   Q.  Do you feel these direct negotiations -- if this merger

22   goes through and Simon & Schuster and Penguin Random House are

23   now owned by the same corporate parent --

24   A.  Uh-huh.

25   Q.  -- that in those direct negotiations that you were having

2062

1    premerger, now the day after the merger, do you believe in some

2    way you're going to be disadvantaged?

3    A.   No.  I mean, the -- the -- the one I was just telling you

4    about where we went from 700 to a million was with a Penguin

5    Random House, you know, imprint.  It's just -- I'm not thinking

6    about Simon & Schuster.  I'm just not thinking about them,

7    because I want a very particular person to do the project,

8    because I know who the best people are going to be, and that's

9    the most important thing to me and usually my author.

10   Q.   Okay.  And is the advance the most important part of the --

11   of the deal?

12   A.   It's really not.  I mean, of course, everybody wants to

13   make a lot of money.  Obviously, I do as well, but I regularly

14   suggest that people don't take the largest advance, and that

15   could be a half-a-million-dollar cut.  It could be a $200,000

16   cut.

17   Q.   Let me stop you there.

18   A.   Sure.

19   Q.   I'm not in your business.  That sounds -- that sounds

20   implausible in a way that you could leave a half a million

21   dollars.  You get a piece of that.  Your client gets --

22   A.   Yeah.

23   Q.   -- a much bigger piece of that.

24   A.   Yeah.

25   Q.   I assume you would do that with your client's consent?

1    A.  Of course.

2    Q.  Okay.

3    A.  Yeah.

4    Q.  So why would you do that?

5    A.  I mean, I have sophisticated clients; so they want to work

6    with the best people.  They're -- the reason they're doing the

7    book is because they have a story to tell, and they're trying

8    to make meaning of something.  They're trying to communicate

9    something.  And the editor who can help them bring -- make the

10   richest, most robust project, that means the world to them.

11   It's huge.

12        It's like -- and then how that editor then

13   communicates -- and that editor is sort of like the orchestra

14   leader.  How that editor communicates what this book is about

15   and how important it is to their sales force, to the marketing

16   department, to the publicity department, that is so essential

17   to the success of the book.

18        I mean, I could give you example after example after

19   example of places where, you know, there was -- there's another

20   story, actually, where at an auction and everybody else was

21   about $500,000 less than this one other publisher, that

22   publisher went way beyond in a best -- it was off rounds and

23   then we went to best bids, $500 spread -- $700,000 spread.  And

24   I thought, oh, all right.  Well, maybe I should do this more

25   often.  And then, literally, I had to work every single day for

1    the next three years in order to help make that project right.

2            And we took -- and it just never was right, and it was

3    incredibly frustrating because they just didn't understand how

4    to do this particular kind of book.  And it's so sensitive and

5    subtle, and, you know, that has made a -- has -- that's bad

6    because, basically, the book ended up selling a pittance

7    compared to the advance, like -- and that's not good for the

8    authors.

9    Q.  Okay.  I just have a couple of --

10           THE COURT:  Can I ask a question:  Are you saying

11   that competition doesn't matter in book acquisition because you

12   hand select editors and you don't consider competition?

13           THE WITNESS:  The main thing that I'm considering and

14   the main thing that I think adds value is really the -- the

15   thing that drives the most value is the quality of the project,

16   the timeliness of the project, the ability for it to last, you

17   know, the ability for it to become something that's adopted in

18   colleges and --

19           THE COURT:  No, I understand that, but my question

20   is:  Are you telling me that you think that competition doesn't

21   matter in book acquisition because you are hand selecting

22   editors based on these factors that you know about?

23           THE WITNESS:  I mean, would I say it a hundred

24   percent doesn't matter, like if there were only one publisher,

25   I think I would still have leverage because I have what they

1    need?

2                    THE COURT:  Right.

3                    THE WITNESS:  In order for them to survive, I have

4    those keys to the kingdom.  So I still have leverage.  You

5    know, I think right now there's absolutely enough competition,

6    if I need to go out to multiple people in order to sort of,

7    create, you know, value, but that's not the primary thing I'm

8    thinking about, yeah.

9                    THE COURT:  So you think competition doesn't matter?

10                   THE WITNESS:  Does or doesn't?

11                   THE COURT:  Does not matter.

12                   THE WITNESS:  I don't think it's the most important

13   factor.

14                   THE COURT:  From what you said, it sounded like you

15   don't think it matters.

16                   THE WITNESS:  I wouldn't say I don't think it matters

17   at all.  I just don't think that's the primary determinative of

18   the price.

19                   THE COURT:  Okay.

20   BY MR. PETROCELLI:

21   Q.  So just a couple of other topics.  One is there's been

22   reference at this trial to something called anticipated top

23   selling books.  Is that a term with which you're familiar, at

24   least prior to this case?

25   A.  No.

1   Q.  How do you -- let me ask you this, then:  How do you decide

2   what kind of money to ask for when you're representing an

3   author and you're -- you're seeing a proposal or a manuscript

4   or whatever it is that you have in front of you?  How do you

5   decide how to start pricing that?

6   A.  Well, usually it's -- you know, what you're going to get is

7   variable, and it could have a -- there could be a huge range in

8   terms of, you know, where something might end up.  You could

9   have somebody literally spending a million dollars more than

10  somebody else.

11          So what I'm thinking of is what's the best in class

12  here?  What's the book in this category that has really

13  rocketed to success?  And as long as it's not a ridiculous

14  comparison, that's what I'm -- you know, because it was such a

15  runaway -- a best seller.  I'm thinking, okay, so that book

16  sold that many copies.  Then let me do the numbers and let me

17  think of, you know, where I can go then based on the numbers of

18  other -- of the comps.

19          Or -- but there are other factors too, because perhaps I

20  know that, you know, HarperCollins really needs to fill their

21  fall list and they're looking for a big book.  That's the

22  signal of, oh, we're going to pay -- overpay for something if

23  you give us something if it's slotted in there.  So then I'm

24  thinking, okay, I have this price, but I could add maybe

25  200,000 or 300,000 dollars on to it because they want -- they

1    want something for right now.

2    Q.  In your experience, is $250,000 or any number thereabouts

3    some kind of dividing line above which books are treated

4    differently than below that line?

5    A.  $250,000 is not -- certainly doesn't fit into the top

6    seller category.  It's just not a relevant number.

7    Q.  Is there some other number that separates books in a

8    qualitative way such that they're treated differently if

9    they're above that number and treated differently if they're

10   below that number?  Is there any bright line number?

11   A.  You would think that would be the case.  You would think

12   that a book that had -- that sold for $1.1 million would get

13   different treatment than a book that sold for 200,000.  That

14   seems like a logical conclusion; right?

15   Q.  And what different --

16   A.  And yet it's not.

17   Q.  What different treatments would you expect?

18   A.  You would think that the publisher would spend, sort of,

19   more marketing money on it.  You think the -- you would think

20   that the publisher might, for example, do a special advance

21   reading copy for -- for the million-dollar book.  But, in fact,

22   that's not the case.

23        I just recently have two books, one over a million, one

24   over 700; one of them extremely timely.  And -- and this is

25   where I don't think marketing is, frankly, that big of a

1   category -- of a driver of sales.  In both, I asked the editor:

2   Can you do a, sort of, fancier ARE [sic] rather than this

3   galley, which is kind of like -- they can do it pretty cheaply

4   and it looks cheap.  No.  I was told no twice.

5       Now, you would think -- they've just made a huge

6   investment in both of these books.  They're not even going to

7   do a really beautiful galley to send out to reviewers?  No.

8   No.  I had to call three times.  Finally, I called the head of

9   the company, and I was like:  This is what we need.  And they

10  said:  Okay.  Fine.

11      But, like -- and you would think that they would be

12  ahead in terms of -- you know, another thing you could do --

13  and these are all things that the margins -- another thing you

14  could do is, like, the editor is ahead and they're, like, let's

15  go out and get endorsements now so that we can put them on the

16  galley so that people in sales and people at the bookseller,

17  you know, level will see that famous author has just blurbed

18  this book.  Half the time they're not even -- it just happened

19  to me.  Same book.  No, we don't even have the list together.

20  So I'm the one who's doing that.  I'm the one who's driving it

21  half the time.

22      I mean, I did a deal with, actually, the same publisher,

23  $1.1 million, and I said to her afterwards -- because it's

24  always -- it's actually a point of frustration, I think, for a

25  lot of agents.  Why didn't you spend more money on marketing?

1   And she said:  Well, we just spent it all on the advance.

2        And why do people get that advance?  People get that

3   advance, in part, because the author has their own marketing --

4   they already have an audience that is, sort of, built in.

5   They're coming, in a way, with their own marketing machine.

6   They're -- they're probably going to get attention because of

7   who they are or because they have unique information to

8   transmit.

9        So the publishers kind of know it's not -- they're not

10  the ones through marketing to drive this book.  Publicity is

11  what sells books.

12  Q.  Final questions I have:  What impact, if any, do you think

13  the merger between Penguin Random House and Simon & Schuster

14  will have on your clients?

15  A.  I would say it's neutral to positive.  Do you want me to

16  elaborate?

17  Q.  How so?

18  A.  Well, I think, in general, Penguin Random House has

19  really -- has made a commitment to books over a very, very long

20  period of time, and because they're a private company, they can

21  invest long-term in things like infrastructure, printing,

22  whatever, you know.  Whereas, a company like Simon & Schuster,

23  which is shareholder driven and quarterly-report driven, it

24  cannot make those kinds of investments.  So I do think that

25  Simon & Schuster could benefit from some of the tools that

1    Penguin Random House has developed over time.

2         So that's one thing.

3         That's what's coming to mind right now, but --

4    Q.  And what if post-merger the merged firm sought to reduce

5    advances that you typically would have expected from -- I

6    realize every book is different; right?

7    A.  Yeah.

8    Q.  But let's say it's the type of book you would have expected

9    $300,000 for premerger and now post-merger they're offering you

10   250 or 260.  You have -- in your judgment, you think it's worth

11   more and you would have gotten more before.  That's my --

12   that's my hypo.  Are you with me?

13   A.  I am.

14   Q.  Is there anything --

15   A.  It's a little hard because the difference is not that much,

16   you know.

17   Q.  Well, okay.  You can make up any numbers you want.

18   A.  It would have to be something that would be more dramatic.

19             THE COURT REPORTER:  Hold on.  One at a time.

20             THE WITNESS:  Sorry.

21   BY MR. PETROCELLI:

22   Q.  My question to you is whether you think post-merger if you

23   were faced with what you perceived to be a lowering of

24   advances, you could resist it, especially given, you know, the

25   size of the merged firm?

1    A.  So what I'm hearing is -- you're saying if I started to

2    notice a pattern of reduced advances?

3    Q.  Yes.

4    A.  Which would probably mean there was some coordination at

5    the top of a company, because how else -- because it's a

6    decentralized company, I'm not sure how that reduction would

7    happen.

8    Q.  Let's assume it happened.

9    A.  Okay.  So it happened.  That would be unfortunate, but it

10   would mean I would need to take my 200 authors and, you know,

11   call up Hachette, call up HarperCollins, call up, you know,

12   Norton.  Call up these places and say:  We're not getting this.

13   Plus, we're not getting what we used to have, and, you know,

14   this -- there was an implicit promise that, in fact, our

15   authors were supposed to get more money if this merger

16   happened.  So what happened to that promise?

17   Q.  Speaking of promises, the last thing I'm going to ask you

18   about is Defendants' 236 -- which I think you have in front of

19   you -- which is a letter to the literary agent community from

20   Markus Dohle.  Do you have that?

21   A.  I do.

22   Q.  And this is a letter you received at or about the date that

23   it bears, February 4, 2022?

24   A.  Right.

25   Q.  Okay.

```
1              MR. PETROCELLI:  Your Honor, I would ask that this be
2      admitted into evidence.
3              THE COURT:  All right.  Any objection?
4              MR. GOLDSMITH:  No objection.
5              THE COURT:  That'll be admitted.
6              (DX Exhibit 236 admitted into evidence.)
7      BY MR. PETROCELLI:
8      Q.  How -- I assume you read this letter?
9      A.  Yes.
10     Q.  And what role, if any, has it played in your thinking about
11     this merger?
12     A.  I mean, I was already -- felt comfortable with the merger
13     before this letter came about.  This letter is great, but I --
14     you know, I had already supported it.
15     Q.  Okay.
16     A.  I mean, this is wonderful information, but, you know, I was
17     already on board.
18     Q.  And so one more hypo.  Assume that after this merger --
19     maybe not the day after, but sometime after -- the company
20     reneged on this letter and said, no, we're not going to treat
21     Simon & Schuster as an external bidder, which they would have
22     the legal right to do.
23     A.  Uh-huh.
24     Q.  So what would you do about that, if anything?  Or what
25     could you do about that, if anything?
```

1    A.  Well, I mean, I think we have to remember, this is a very

2    relationship-based business.  So if -- it's very trust-based.

3    Like I said, we don't -- when we're doing an auction, we're

4    just doing it by phone and everybody is trusting that everybody

5    else is being aboveboard.  Because if somebody starts to break

6    a trust, then you don't really want to do that much business

7    with them.

8         So if that happened, I think there would be a number of

9    different tools that I would have in my tool kit to deal with

10   it.  First of all, you know, right now I have with Penguin a

11   book that was number one on the best seller list.  And I would

12   probably call Michael Pietsch and say, you know, this guy has

13   had two number one best sellers.  Maybe you're interested in

14   the next book.  Let's make a deal.

15   Q.  Call whom?

16   A.  I would call the head of Hachette.

17   Q.  Oh.  Michael Pietsch you said?

18   A.  Yeah, Michael Pietsch.  Yeah.

19        So slowly there would be a dribble away from Penguin

20   Random House, and I -- you know, I have 200 clients, but I'm a

21   small -- you know, medium-sized agency compared to a lot of

22   other agencies, which might have a thousand or 800 clients.  If

23   those people start to leave as well, that would have a real

24   impact on Penguin Random House's business.  I mean, that

25   betrayal would be a big issue.

 1          And, I mean, I represent the media.  I represent people

 2     all over *The New York Times*, *The Atlantic*, every single major

 3     newspaper and magazine.  And I would be on the phone with them

 4     very quickly.  I would have no problem doing that.

 5     Q.   Okay.  Thank you, Ms. Cheney.

 6          MR. PETROCELLI:  Pass the witness, Your Honor.

 7          THE COURT:  All right.  Thank you.

 8          Any cross?

 9          MR. GOLDSMITH:  Yes, Your Honor.

10          Good afternoon, Your Honor.

11          THE COURT:  Good afternoon.

12          MR. GOLDSMITH:  Jonathan Goldsmith for the

13     United States.

14          May I proceed?

15          THE COURT:  Yes.

16                       CROSS-EXAMINATION

17     BY MR. GOLDSMITH:

18     Q.   Good afternoon, Ms. Cheney.

19          I'd like to start by continuing to discuss the same

20     slides, defendants' demonstrative, that we were just looking

21     at.

22     A.   Sure.

23     Q.   So the first page, I have at least stickered Defendants'

24     Demonstrative 3.  Are you looking at that?

25     A.   These are my books?

1    Q.  Yes.  The title is Works Represented by Elyse Cheney.

2    A.  Yes.

3    Q.  And earlier you described these as some of the authors you

4    represent; right?

5    A.  These are books that I've represented.  At this point I

6    don't represent -- there's one author that I don't represent

7    anymore -- actually, two -- but they're from, like, 20 years

8    ago.

9    Q.  Every one of these books on this list was sold to either

10   Penguin Random House or Simon & Schuster; is that right?

11   A.  Yes.

12   Q.  Can we move on to the next page.

13   A.  Sure.

14   Q.  Earlier you said that the one deal above $250,000 sold to

15   other was to Workman, who you mentioned was acquired after this

16   deal; is that right?

17   A.  Yeah.  Correct.  Right.

18   Q.  Workman was acquired by one of the Big 5 publishers; is

19   that right?

20   A.  Yes.

21   Q.  And 25 of your 28 deals from 2018 through 2021 with

22   advances of $250,000 or more went to Big 5 publishers; right?

23   A.  I -- I'm assuming you're correct.

24   Q.  And for this same group, your deals from 2018 through 2021

25   with advances of $250,000 or more, 17 out of the 28 went to

1    Penguin Random House; right?

2    A.  Yes.

3    Q.  So that's 60 percent?

4    A.  Uh-huh.  Yes.

5    Q.  And earlier you called the industry a relationship

6    business; right?

7    A.  I did.

8    Q.  You have important relationships with editors; right?

9    A.  Yep.

10   Q.  And important relationships with multiple editors at the

11   same publisher; right?

12   A.  Yes.

13   Q.  And these relationships factor into the acquisition

14   process; right?

15   A.  Yeah.

16   Q.  Based on the number of deals you do with Penguin

17   Random House, would it be fair to say that you have many

18   important relationships with editors at Penguin Random House?

19   A.  I do.

20   Q.  In addition, Markus Dohle, the CEO of Penguin Random House,

21   is a friend of yours; right?

22   A.  Yep.

23   Q.  You've had multiple discussions with Mr. Dohle about this

24   merger; right?

25   A.  A few.

1    Q.  You can put that document aside.  I'd like to look at the

2    color-coded version of your deal chart that was marked, I

3    think, as Defendants' Demonstrative 6.

4    A.  Uh-huh.  7- -- 749?

5    Q.  Yes.  So it's 749 with the -- with the color coding.

6    A.  Yeah.

7    Q.  Looking at page 1 -- as you previously said, this is sorted

8    by advance; right?

9    A.  Yes.

10   Q.  So looking at page 1, the first three deals with the lowest

11   advances are all children's books; right?

12   A.  Yes.  Actually, no, because the -- No. 46 was not a

13   children's book, and that's -- I believe it's 70,000.

14   Q.  Okay.  So three -- so Nos. 1, 2, and 3 were all children's

15   books; right?

16   A.  Yeah.  The numbers here, yes.

17   Q.  And the book in Row 5 is a cookbook; right?

18   A.  Yes.  Oh, you know what?  Actually, that number is wrong.

19   Oh, no, it's not wrong.  No, no, no.  Sorry.  I just did

20   another deal for her.  It's -- it's right.

21   Q.  Like I said, the book in Row 5 is a cookbook; right?

22   A.  Yeah.

23   Q.  The book in Row 7 is another children's book or young

24   reader book?

25   A.  Yes.

1    Q.  That's a young reader version of another book on your list,

2    the book in Row 42; is that right?

3              THE COURT REPORTER:  Can you repeat that question,

4    please.

5              MR. GOLDSMITH:  Sure.

6    BY MR. GOLDSMITH:

7    Q.  That's a young reader version of another book on your list,

8    the book in Row 42; right?

9    A.  Yes.

10   Q.  And the advance for the adult version is more than

11   ten times greater the advance for the young reader version;

12   right?

13   A.  Correct.

14   Q.  Back on the first page, the book in Row 9 is another

15   children's book; right?

16   A.  Yes.

17   Q.  And all of these books that we just discussed are below

18   $250,000; right?

19   A.  Yes.

20   Q.  And they're all below $150,000; right?

21   A.  They are.  I mean, there are a couple others on the list

22   that aren't children's books that are less than 150,000, but

23   yeah.

24   Q.  There are no cookbooks on this deal sheet with advances at

25   or above $250,000; right?

1    A.  Right.

2    Q.  And none of your children's or young adult books you sold

3    in this time period had advances at or above $250,000?

4    A.  That's correct.  I mean, I'm not -- just to clarify, I'm

5    not in the children's book business.  It's usually an

6    ancillary, you know, thing that you build off of the -- a

7    successful book.

8    Q.  But the handful of children's books that you did sell

9    during this time period all had advances below $150,000; right?

10   A.  Yeah.  They're spin-offs.

11   Q.  None of your deals in this time period were with

12   Scholastic; right?

13   A.  Yeah.  This is -- usually if you have a book that's kind of

14   a spin, like in the one you were talking about just now, No. 7,

15   usually you're going to the same publisher who did the adult

16   book.

17   Q.  None of the deals that you had in this time period were

18   with Amazon; is that right?

19   A.  Right.

20   Q.  In fact, you've never sold a deal to Amazon as a publisher

21   for a print format book; right?

22   A.  Right.

23            MR. GOLDSMITH:  Thank you.  No further questions at

24   this time, Your Honor.

25            THE COURT:  Thank you.

1          I had a question.  In response to Mr. Petrocelli's

2    questions about what you would do if advance levels got

3    lowered --

4          THE WITNESS:  Uh-huh.

5          THE COURT:  -- you said you would take your books to

6    another publisher.

7          THE WITNESS:  Right.

8          THE COURT:  Why would you do that when you also

9    testified that the editor is the most important thing and the

10   advances don't determine which publisher you choose?

11         THE WITNESS:  Well, it's like a give-and-take

12   relationship.  I mean, I'm not planning on doing it for the

13   rest of my career, hopefully, but you're sending a message.  So

14   I've actually done this very thing before.  I had a situation

15   with one of my authors --

16         THE COURT:  If I may, I -- I think I'm asking:  Why

17   would you care to do anything about this when it doesn't affect

18   the way you do your business?

19         THE WITNESS:  Can you explain -- can you repeat the

20   question, then.

21         THE COURT:  I understood your testimony to be that

22   you're just looking for the best editor.

23         THE WITNESS:  Uh-huh.

24         THE COURT:  And the advances are not as important,

25   and it's not about competition for you; that it's -- it's these

1    other factors that based on your expertise you're finding the

2    best home for the book --

3              THE WITNESS:  Uh-huh.

4              THE COURT:  -- et cetera.  So why would you respond

5    to -- to lowered advances when that's not the way you run your

6    business?  You're looking for editors.  So you would leave the

7    editors that you were saying are the best because of lowered

8    advances that you don't rely on?

9              THE WITNESS:  I think we're talking about a

10   gradation.  So you -- if the advances were suddenly cut in

11   half, I would absolutely -- you know, that would be a really

12   big problem for me.  If the -- so I'm not saying the money is

13   not important, but there are other editors at each -- you know,

14   at Macmillan that -- that are -- for example, with serious

15   nonfiction, there's some phenomenal people at Penguin

16   Random House.  There's also great people at Macmillan.  So I'd

17   probably go there.

18             THE COURT:  Okay.  Thank you.

19             MR. PETROCELLI:  Nothing, Your Honor.

20             THE COURT:  All right.  Thank you.

21         Thank you for your testimony.  You can step down.

22             THE WITNESS:  Thank you.

23             MR. PETROCELLI:  Your Honor, our next witness is

24   Andrew Wylie.

25             THE COURT:  Okay.  Thank you.

```
 1              All right.  You can step right up here, sir.

 2              THE WITNESS:  Where do you want me?

 3              THE COURT:  Right over here.  There's a chair right

 4    here to my left.  But before you sit down, could you please

 5    remain standing and raise your right hand.

 6              (Oath administered.)

 7              THE WITNESS:  I do.

 8              THE COURT:  You may sit down, and you can remove your

 9    mask, if you wish.

10              THE WITNESS:  Thank you.

11              MR. PETROCELLI:  May we hand up some documents,

12    Your Honor?

13              THE COURT:  Yes.

14              MR. PETROCELLI:  Thank you.

15          May I proceed?

16              THE COURT:  Yes.

17              MR. PETROCELLI:  Thank you.

18                          DIRECT EXAMINATION

19    BY MR. PETROCELLI:

20    Q.  Please state your full name for the record.

21    A.  Andrew Wylie.

22    Q.  What do you do for a living?

23    A.  I'm a literary agent.

24    Q.  Where do you work?

25    A.  At the Wylie Agency.
```

1    Q.  How many other agents work with you?

2    A.  Total number of employees is about 50.  And agents, about

3    20.

4    Q.  Approximately how many authors does your agency represent?

5    A.  Fifteen hundred.

6    Q.  Approximately how many do you personally represent?

7    A.  Probably 80 to a hundred, although I would say that the

8    number is significantly higher because I -- I closely consult

9    on most of the arrangements made through the agency.

10   Q.  Can you tell the Court a little bit about your background.

11   A.  I grew up in New England.  I went to Harvard.  I had a

12   traveling fellowship after college and went to Europe and came

13   back and had a bookstore in New York for a couple years and

14   interviewed people for magazines.  And then I began the agency

15   in 1980.

16   Q.  And what did your father do?

17   A.  He was a publisher at Houghton Mifflin.  He was editor and

18   then editor in chief.

19   Q.  How long have you been a literary agent?

20   A.  Forty-two years.

21   Q.  Okay.  What type of books do you generally sell?

22           MR. PETROCELLI:  And, Your Honor, I've been messing

23   up these numbers, but I think we're at Defendants'

24   Demonstrative 8.

25           THE COURT:  Okay.

```
1              MR. PETROCELLI:  If we can display that.

2     BY MR. PETROCELLI:

3     Q.  You want to tell us a little bit about your clients.  You

4     can brag a little bit, if you want.

5     A.  From the beginning, we sort out books of high quality, both

6     in fiction and nonfiction.  It interested me that the books

7     that received the highest advances and the most prominent

8     distribution were not books that I deemed to be of great

9     quality, and I felt that the -- the highest quality books were

10    not either well represented or well published.  So that was the

11    area that we looked at, and we've continued on that path for

12    42 years.

13    Q.  And by estates, we are referring to authors who are

14    deceased?

15    A.  Yes.

16    Q.  And -- and you represent their personal representatives in

17    connection with their literary works?

18    A.  Yes.

19    Q.  Okay.  So you have in front of you, Mr. Wiley, two trial

20    exhibits.  One is Plaintiff's Exhibit 857.  The other is

21    Plaintiff's 856.  Starting with 857, you recognize this

22    document?

23    A.  Yes.

24    Q.  What is it?

25    A.  It's a record of contracts entered into by clients of ours;
```

1    contracts that we have represented, that we've negotiated.

2             MR. PETROCELLI:  Your Honor, I'd ask that this be

3    admitted into evidence.

4             THE COURT:  Any objection?

5             MS. CROSS:  No.

6             THE COURT:  That will be admitted.

7             MR. PETROCELLI:  And this is under seal, Your Honor.

8             THE COURT:  Okay.

9             MR. PETROCELLI:  And so is the next one as well, when

10   I get to it.

11            (PX Exhibit 857 was admitted into evidence.)

12   BY MR. PETROCELLI:

13   Q.  So if you look at the 14 pages, there are different

14   initials on the left-hand side under staff.  What does that

15   signify?

16   A.  The agent in charge of a particular client.

17   Q.  Okay.  And if you look at pages 15, 16, and 17, at the

18   bottom left it says, "AW deals."  I take it those are your

19   deals?

20   A.  Yes.

21   Q.  Okay.  And I'm not going to ask you to count.  I'll

22   represent to you that there are 158 deals on pages 15, 16, and

23   17.  Okay?

24   A.  Yep.

25   Q.  Now --

```
 1              THE COURT:  I'm sorry.  What period of time are we
 2     talking about?
 3     BY MR. PETROCELLI:
 4     Q.  2018 through 2021; is that right, Mr. Wylie?
 5     A.  Yes.
 6     Q.  Okay.  Now, Exhibit 856, do you recognize this document?
 7     A.  Yes.
 8     Q.  What is it?
 9     A.  I'm sorry?
10     Q.  And what is it?
11     A.  It's a record of sales made by the agency.
12     Q.  Now, it might assist your recollection if I represent
13     to you that these are -- these are 52 of your deals in
14     which Penguin Random House or Simon & Schuster acquired the
15     book.
16     A.  Okay.
17     Q.  Would you agree with that?
18     A.  Yes.
19     Q.  Okay.
20              MR. PETROCELLI:  And, Your Honor, I would ask that
21     Exhibit 856 be admitted also under seal.
22              THE COURT:  Any objection?
23              MS. CROSS:  No.
24              THE COURT:  That will be admitted.
25              (PX Exhibit 856 admitted into evidence.)
```

1    BY MR. PETROCELLI:

2    Q.  Okay.  I'm going to focus on 856 for the moment, your --

3    your deals where Penguin Random House and Simon & Schuster, one

4    or the other, acquired the book.  Okay?

5    A.  Yes.

6    Q.  Again, not making you count them up, but there are 36 of

7    the 52 in which under the column "Single or multiple

8    submission?" it states "single."

9    A.  Okay.

10   Q.  What does that mean?

11   A.  That means the proposal or book was submitted only to one

12   editor at one publishing house.

13   Q.  And then there are 16 in that same column where it states

14   "multiple."  What does that mean?

15   A.  That means that the project was submitted to more than one

16   editor at one publishing house.

17   Q.  And then the last column says "Other bidders."  To what

18   does that refer?

19   A.  Other publishers who bid for the project but failed to

20   acquire the rights.

21   Q.  And sometimes next to multiple, under "Other bidders," it

22   says "None."  What does that mean?

23   A.  No other house bid for the project.

24   Q.  I note that Penguin Random House is not listed as the other

25   bidder for any of the books won by S&S.

1    A.  Right.

2    Q.  Nor is Simon & Schuster listed as a -- another bidder for

3    any book won by Penguin Random House.

4    A.  Correct.

5    Q.  Okay.  Does that mean that you have not sold a book since

6    2018 in which both Penguin Random House and Simon & Schuster

7    submitted a bid for the book?

8    A.  That's correct.

9    Q.  And I notice that there are no auctions listed here.

10   A.  We don't conduct auctions.

11   Q.  Now, who is the "we"?

12   A.  Our agency.

13   Q.  The Wylie Agency, some 20 agents or so, including yourself,

14   your testimony is that the firm does not conduct auctions in

15   transacting book sales to publishers?

16   A.  Correct.

17   Q.  Okay.  I'm going to follow up on that, but before I do,

18   does it follow that given that Simon & Schuster and PRH --

19   Penguin Random House -- have not both submitted a bid for one

20   of your books, that they've never finished one and two in any

21   acquisition process?

22   A.  I don't think it's ever happened.

23   Q.  Okay.  Now --

24           THE COURT:  So can I understand:  When it says

25   "multiple" here, that just means you sent it out to more than

```
1     one editor?

2               THE WITNESS:  Yes.

3               THE COURT:  And then you did a one-on-one

4     negotiation?

5               THE WITNESS:  Well, in a multiple submission, we

6     submit to more than one house.  The houses we submit to either

7     decline to offer or place offers.  We take a look at them, and

8     if -- if one offer is markedly stronger than another and the

9     house has an editor we feel would be ideally suited to edit the

10    book, then we -- we would accept that bid on behalf of the

11    author.

12              THE COURT:  So is -- that's not a best-bids auction?

13              THE WITNESS:  I'm sorry.  What?

14              THE COURT:  That is not a best-bids auction?

15              THE WITNESS:  No, no.  No.  An auction has rules and

16    compels the agent and author to accept the strongest bid.  The

17    strongest financial terms offered do not compose, necessarily,

18    the best offer, in my view, because you also have to consider

19    the editor who would be working with the author and the context

20    from which the book would -- would come; what else the

21    publisher is publishing, and the strengths or weaknesses of

22    the -- of the publishing house.

23              THE COURT:  Thank you.  My question is:  How is what

24    you do different from a best-bids auction?

25              THE WITNESS:  My understanding is that other agents
```

1    say this is an auction.  They have rules.  You place first bids

2    by Tuesday.  You will then be asked to place second bids by

3    Friday, and third bids next week; and the strongest financial

4    offer will be accepted.

5              THE COURT:  And you send out to a bunch of editors,

6    and they make bids to you, and then you pick the one you like

7    the best, but there are no rules?

8              THE WITNESS:  No rules.

9              THE COURT:  Okay.

10   BY MR. PETROCELLI:

11   Q.  So can you just elaborate a little bit more on that,

12   because we're trying to understand the difference between a

13   formal auction where there's a best-bid process in place, which

14   involves multiple bidders all making bids, and presumably the

15   one who makes the best bid is the winner.  And you're not

16   calling it an auction -- right? -- but you are submitting it to

17   multiple bidders, and you're getting multiple responses back.

18   And are you always picking the best one?

19   A.  No.

20   Q.  So how do you choose?

21   A.  We -- we are picking one that we feel presents the

22   strongest combination of financial terms plus editorial

23   engagement and context for the author.

24   Q.  Well, why don't you conduct an auction, a more formal

25   auction, in which you try to, you know, drum up more direct

1    competition, let's say, in the form of a round-robin auction?

2    A.  Well, to achieve our goals, we would have to say:  Submit

3    your bid and your editor's name.  And then if we were to select

4    one house over another house -- and let's say that that house

5    had a lower financial offer but a better editor, then we would

6    be offending people unnecessarily.

7    Q.  I notice in your answers, you've been using the term

8    "financial terms."

9    A.  Hmm.

10   Q.  Are there financial terms that you negotiate for your

11   author clients besides the advance?

12   A.  Yes, indeed.  Territorial rights, royalty rates, division

13   of revenue for second serial rights.  Multiple aspects of a

14   contract are negotiated.

15   Q.  There's been testimony in this case that the advances that

16   we've been essentially dealing with are the North America

17   rights.  You understand that?

18   A.  Well, I understand that we're talking about North American

19   rights.  For our agency, we operate globally, operate directly

20   into all markets around the globe.  So about 50 percent of our

21   business is -- is in the U.S., and the other 50 percent in the

22   rest of the world combined.

23   Q.  So to be clear, in the representation of your clients, do

24   you, on behalf of your clients, convey the worldwide rights or

25   just the North America rights?

1    A.  In -- in talking to publishers in the U.S., we convey only

2    North American rights, except in the case of photographic work,

3    where production considerations dictate that it should be a

4    global deal.

5    Q.  And then do you negotiate similar deals with countries

6    outside the U.S.?

7    A.  Yes.

8    Q.  And those deals have nothing to do with the U.S. publisher?

9    A.  Correct.

10   Q.  Okay.  And that's -- and your -- and your -- your author

11   clients get additional compensation from those deals?

12   A.  Yes, they do.

13   Q.  Okay.

14   A.  And the balance is roughly half the author's revenue comes

15   from the U.S. and the other half comes from the rest of the

16   world combined.

17   Q.  Are you doing this, essentially, all around the same time,

18   or are you -- first do the U.S. and then wait for the book to

19   come out and then do the rest of the world?

20   A.  Depends entirely on -- on the -- on the project involved.

21   We represent authors -- Italian authors, German authors, French

22   authors, Japanese authors, and in those cases, we would usually

23   negotiate first in the author's home territory and then spread

24   around the world.  So the U.S. could be the third or fourth

25   publisher we turn to.

1          And even with U.S. resident authors, we sometimes make

2     arrangements outside of the U.S. first to indicate to

3     U.S. publishers the strength with which the project is viewed

4     outside of the U.S.

5     Q.  We talked a bit about your multiple-bidder process.  What

6     about the single-bidder process?  What -- what -- what

7     circumstances are they?

8     A.  Well, either if an author has been published by an editor

9     and publisher and has had a happy experience and wants to

10    remain with that editor and publisher, or if we feel that the

11    ideal match between author and editor and publisher is

12    identifiable and we calculate the price we would like the

13    author to be paid as an advance for the book, then we go to a

14    single submission.  And in most cases, the deal is done with

15    one editor without broadening the submission or having

16    discussions outside of that editor and publisher.

17    Q.  So focusing on the single submissions, given your work in

18    trying to get your client the very best deal, how do you

19    satisfy yourself that you're getting the very best deal when

20    you're only negotiating with one party?

21    A.  Well, I've been doing it for 42 years, and I can calculate

22    with a high degree of accuracy the amount we would be able to

23    achieve through a multiple submission; and if we can achieve

24    that through a single submission, then we do a single

25    submission.

1    Q.  Well, how -- how do you take into account what you might

2    achieve outside of that single submission in order to judge

3    whether you're getting a reasonable proposal from the publisher

4    with whom you're negotiating?

5    A.  Experience.

6    Q.  Is there any rule of thumb?

7    A.  Not really, no.  It's -- it's just detailed knowledge of

8    the business, of the publishers, and of the editors in the

9    industry.

10   Q.  So you understand this is a trial about whether Penguin

11   Random House and Simon & Schuster can merge and thereby be

12   owned by one corporate parent?

13   A.  Yes.

14   Q.  Okay.  Do you have -- what impact, if any, do you believe

15   this merger would have on -- on your business, on your

16   representation of your clients, and your ability to get them

17   the best possible deal?

18   A.  Generally speaking, I think it would be a positive result.

19   Q.  And why is that?

20   A.  Because what is important, in my view, for Simon & Schuster

21   is to have its enterprise supported by an understanding parent

22   company.  So if it were, for instance, to go to private equity,

23   as happened originally with Houghton Mifflin, the private

24   equity company wouldn't understand the business it was in;

25   would, say, load it with debt as Blackstone did to

1    Houghton Mifflin, basically destroying the publishing house so

2    that it was sold at a discount later to one of the Big 5.

3    Q.  Now, you mentioned the Big 5.  I'm reminded -- and I was

4    going to ask you:  Looking through your sheet, your deal sheet,

5    almost all of your, you know, higher amounts of -- of advances

6    are with Big 5 firms.  Why is that?

7    A.  Well, I think they have the broadest talent editorially.

8    They are generally well financed, and their production and

9    distribution is expert.

10   Q.  Do you make deals from time to time with non-Big 5 firms?

11   A.  Absolutely.  To take an example, years ago Al Gore, whom we

12   represent, came to see me carrying a computer and gave me a

13   slide presentation of a lecture, which he thought could

14   possibly become a book.  He had in mind to call it

15   *An Inconvenient Truth*, and he asked me about how it -- I told

16   him I thought it would be an important book.

17          And he asked me who the best publisher would be and what

18   the best arrangement would be, and I said Rodale.  And we

19   submitted only to Rodale and made an arrangement with Rodale to

20   publish that book.

21   Q.  In your --

22   A.  The ramification --

23          THE COURT:  Is that -- I'm sorry.  Is -- is Rodale an

24   imprint from a Big 5 publisher or --

25          THE WITNESS:  I'm sorry.  I can't hear you.

1          THE COURT:  I'm just trying to understand who Rodale

2     is.  Is that an imprint for a Big 5 publisher, or is it a

3     smaller independent one?

4          THE WITNESS:  No.  It was at the time an independent

5     publisher which had a magazine publication and -- and related

6     environmental interests.

7          THE COURT:  Thank you.

8     BY MR. PETROCELLI:

9     Q.  In your experience in dealing with non-Big 5 publishers,

10    irrespective of the amount of the advance, what's -- what's

11    your view been about the quality of the services that they

12    provide?

13    A.  Generally, the services provided by non-Big 5 publishers

14    are -- are professional and -- and -- and really quite -- quite

15    strong.

16    Q.  There's been talk in this trial about something called

17    anticipated top selling books.  Is that an expression in the

18    course of your career with which you are familiar?

19    A.  I am familiar with it, but it is not part of the business

20    that we are active in.

21    Q.  What do you mean by that?

22    A.  We don't represent top selling authors.  We don't represent

23    authors like John Grisham or Danielle Steel or --

24    Q.  Why not?

25    A.  Because what we are aspiring to do, to be selfish, is enjoy

1    the work that we're representing, enjoy reading it, and I --

2    and not to have our primary goal be purely financial but,

3    rather, to be literary.  And I would argue that the performance

4    of works of interest is stronger over time than the purely

5    commercial work, which flares and dies quite rapidly.

6    Q.   Thank you, Mr. Wylie.

7            MR. PETROCELLI:  I pass the witness, Your Honor.

8            THE COURT:  All right.  Thank you.  Let's take a

9    break at this time.  Let's take 15 minutes and resume at 3:45.

10           MR. PETROCELLI:  You might want to let the witness

11   know we can't talk.

12           THE COURT:  Yes.

13       Please don't talk about your testimony during this break

14   with anybody.

15           THE WITNESS:  Okay.

16           THE COURT:  Thank you.

17           MR. PETROCELLI:  Thank you, Your Honor.

18           (Recess taken.)

19           THE COURT:  Good afternoon.  I see you have another

20   binder.  Excellent.

21           MS. CROSS:  We do, but it's a thin one, Your Honor.

22           THE COURT:  Okay.

23           MS. CROSS:  May it please the court.  Anna Cross for

24   the United States.

25           THE COURT:  Good afternoon.

1                        CROSS-EXAMINATION

2    BY MS. CROSS:

3    Q.  Good afternoon, Mr. Wylie.

4    A.  Good afternoon.

5    Q.  Mr. Wylie, one clarification on a question that

6    Mr. Petrocelli asked you.  You testified that you published

7    Al Gore's *An Inconvenient Truth* through Rodale.

8    A.  I didn't publish it.  I represented it.

9    Q.  Okay.  So Rodale published that book; is that correct?

10   A.  Yes.

11   Q.  And Rodale is now owned by Penguin Random House?

12   A.  Correct.

13   Q.  And I'm not sure it came up in your testimony, but you

14   represent authors Charles Duhigg and Andrew Solomon; is that

15   right?

16   A.  Yes.

17   Q.  And Charles Duhigg publishes with Penguin Random House; is

18   that right?

19   A.  Yes.

20   Q.  And Andrew Solomon publishes with Simon & Schuster?

21   A.  Yes.

22   Q.  You view it as your role as an agent to try to get an

23   advance that the author doesn't earn out; isn't that right?

24   A.  I think I've said that with levity as much as profundity.

25   Q.  Do you believe it's your role as an agent to try to get an

1    advance that an author doesn't earn out?

2    A.  Well, if the book is going to earn a hundred dollars and

3    the author is paid $200, then the author is happier than if the

4    book earned a hundred dollars and the author was paid 50.  So

5    yes.

6    Q.  And very few of the books you represent earn out their

7    advance; is that right?

8         THE COURT:  I'm sorry.  Did we get --

9    A.  It was a few years ago, but it's not anymore.

10        THE COURT:  I'm sorry.  Did we get an answer to the

11   question?

12        THE WITNESS:  I'm sorry.

13        THE COURT:  Did you answer the question is -- whether

14   your role is to get an advance that the author does not earn

15   out?

16        THE WITNESS:  I'm sorry.  I can't hear you.

17        THE COURT:  Sorry.  I believe counsel asked you if

18   you view your role as getting an advance for your client that

19   the author does not earn out, and I wasn't sure I heard an

20   answer to the question and what you said.

21        THE WITNESS:  Well, I -- I mean, it's a complicated

22   question, in my view, because, ideally, the author would earn

23   out, and both publisher and author would be very happy.  If the

24   author does not earn out, then the author's appraisal of the

25   job the agent has done is that the agent has secured more money

1    for the author than the author would otherwise have obtained.

2    And so that's advantageous to a certain degree.  But that's a

3    short-term view.

4    BY MS. CROSS:

5    Q.  And just so I understand your position, do you believe it's

6    your role as an agent to try to get an advance that an author

7    doesn't earn out?

8    A.  Not necessarily.

9    Q.  Okay.  You gave a deposition in this matter on April 21st,

10   2022; is that right?

11   A.  Yes.

12   Q.  Could you please turn to the tab in your binder marked

13   deposition, and then turn to page 31.  I'm going to read from

14   lines 19 through 22.

15        "QUESTION:  Do you believe it's your role as an agent to

16   try to get an advance that an author doesn't earn out?

17        "ANSWER:  Correct."

18        Did I read that correctly?

19   A.  You did.

20        MS. CROSS:  Your Honor, I move to admit page 31,

21   lines 19 through 22 from Mr. Wylie's transcript into evidence.

22        THE COURT:  Any objection?

23        MR. PETROCELLI:  No, Your Honor.

24        THE COURT:  That's admitted.

25        (Wylie Deposition Transcript page 31, lines 19

1    through 22 admitted into evidence.)

2    BY MS. CROSS:

3    Q.  And you have estimated that 5 percent of your books -- of

4    the books you represent earn out their advance; is that right?

5    A.  That's probably right.

6    Q.  For most authors you represent, the advance level matters

7    to their daily existence; is that right?

8    A.  Yes.

9    Q.  You testified about financial terms other than the advance

10   before the break.  Do you recall that?

11   A.  Yes.

12   Q.  Okay.  I want to talk specifically about digital royalties,

13   e-book royalties.

14   A.  Mm-hmm.

15   Q.  There are standard digital royalty rates in the publishing

16   industry; is that right?

17   A.  Yes.

18   Q.  And I want to take you back to 2010 to a project you

19   started called Odyssey Editions.  Do you recall that project?

20   A.  Yes.

21   Q.  In 2010 publishers were paying e-book royalties of

22   25 percent; is that right?

23   A.  Some.  Some were paying less, and some were paying more.

24   Q.  You decided to create Odyssey Editions because you thought

25   the royalty rate for e-books should be higher than 25 percent;

1    right?

2    A.  Yes.  And I also felt that were it not increased by

3    publishers, that they ran the risk of losing control of those

4    rights because the authors would publish digitally outside of

5    their print publishing agreements, and that would be damaging

6    to the fundamentals of the publishing industry.

7    Q.  You had conversations with publishers about increasing the

8    e-book royalty rate prior to launching Odyssey Editions; right?

9    A.  Yes.

10   Q.  And you couldn't get a publisher to agree to a higher

11   e-book royalty; right?

12   A.  Correct.  Yeah.

13   Q.  And so you were trying to improve e-book royalties through

14   Odyssey Editions; right?

15   A.  Well, I was trying to show what could happen if the

16   authors' concerns, which I felt were legitimate, were not

17   addressed.

18   Q.  And let's talk about what Odyssey Editions was.  You

19   selected 20 books to be distributed electronically, exclusively

20   through Amazon, and you called that Odyssey Editions; right?

21   A.  Yes.  Well, there was a distribution agreement for

22   two years with Amazon.

23   Q.  Random House was the original print publisher of many of

24   the books you tried to distribute on Amazon through Odyssey

25   Editions; right?

1    A.  Yes.

2    Q.  Authors received 100 percent of the digital royalties for

3    Odyssey Edition e-books and paid you a commission; is that

4    right?

5    A.  Yes.

6    Q.  After you launched Odyssey Editions, Random House announced

7    through *The New York Times* that they would no longer do

8    business with you as a result of Odyssey Editions; right?

9    A.  Yes.

10   Q.  You were concerned about not being able to do business with

11   Random House; right?

12   A.  As I would have been with any other substantial publisher,

13   yes.

14   Q.  And after *The New York Times* announcement by Random House

15   that they would no longer do business with you, you had

16   meetings with Markus Dohle, who was the CEO of Random House at

17   the time; is that right?

18   A.  Yes.

19            THE COURT:  Can I just ask:  You're saying

20   Random House, do you mean Penguin Random House, or do you mean

21   the imprint Random House?

22            MS. CROSS:  Your Honor, this was in 2010, prior to

23   the merger of Penguin Random House --

24            THE COURT:  Okay.  I see.  Thank you.

25            MS. CROSS:  -- and so it was his position at the

```
 1    time.
 2              THE COURT:  Thank you.
 3              MS. CROSS:  Yeah.
 4    BY MS. CROSS:
 5    Q.  After the meetings with Mr. Dohle, you withdrew the
 6    Random House books that you had been trying to distribute
 7    through Odyssey Editions from Amazon; is that right?
 8    A.  Yes.
 9    Q.  And the digital rights for the books Random House had
10    published in print form that you put on Odyssey Editions went
11    to Random House after your conversations with Mr. Dohle; right?
12    A.  Yes.
13    Q.  It's fair to say Odyssey Editions doesn't go into conflict
14    with publishers anymore; right?
15    A.  Yes.
16    Q.  And most publishers still offer a 25 percent digital
17    royalty; right?
18    A.  Yes.
19    Q.  Penguin Random House offers a digital royalty of
20    25 percent?
21    A.  Yes.
22    Q.  And you -- you still think that a 25 percent digital
23    royalty is unfair to authors; right?
24    A.  I feel it could be higher because the publisher is not
25    bearing an equivalent cost of production to that involved in --
```

1    in print publishing, book publishing.

2    Q.  And just to make sure I get an answer to my question:  Do

3    you think 25 percent for a digital royalty rate is fair to

4    authors?

5    A.  No.

6    Q.  Turning to another topic, you don't think self-publishing

7    is an effective way to publish; is that right?

8    A.  Yes.

9    Q.  And you haven't sold any print titles to Amazon?

10   A.  No.

11   Q.  If one of your authors wanted to publish with Amazon, you'd

12   try to talk them out of it; is that right?

13   A.  Yes.

14   Q.  You testified in response to Mr. Petrocelli's questioning

15   that you don't do auctions, and I just want to clarify a point

16   about that.  As you testified, you do multiple submissions; is

17   that right?

18   A.  Yes.

19   Q.  And sometimes you do submit proposals or manuscripts to as

20   many as 15 different editors; is that right?

21   A.  Yes.

22   Q.  Okay.  And sometimes you submit them in waves if you don't

23   in the first round of submissions get an offer that you want;

24   is that right?

25   A.  Yes.

1    Q.  You generally sell books to the highest bidder; right?

2    A.  Generally, but there are a number of exceptions to that.

3    Q.  You only rarely sell books to an underbidder; right?

4    A.  It's not that rare.

5    Q.  Do you recall giving a ballpark for how often do you sell

6    to an underbidder of 7 and a half percent?

7    A.  That sounds about right, yeah.

8    Q.  Let's turn to the backlist.  You believe that the backlist

9    is important for a publisher; right?

10   A.  Yes.

11   Q.  In fact, you've analogized the backlist to the basement of

12   a house.  It plays the same role for a house you live in for

13   the publishing house; right?

14   A.  Yes.

15   Q.  And you've also noted that if you don't have a solid

16   basement, your house is unstable; is that right?

17   A.  Tends to blow away in a storm, yes.

18          MS. CROSS:  No further questions.

19          THE COURT:  Thank you.

20       Any redirect?

21                   REDIRECT EXAMINATION

22   BY MR. PETROCELLI:

23   Q.  Following up on the questions regarding Odyssey, did I

24   understand that you wanted to withhold audio rights -- or

25   digital rights -- excuse me -- from the publisher and transact

```
1    separately with Amazon?

2    A.  No.  The calculation was that for the books that we

3    digitally distributed through Odyssey, the contracts had been

4    entered into prior to e-book production.  So we were conveying

5    rights that were not covered in the print publishing agreement

6    between the author and the publisher at the time of publication

7    of the books.

8    Q.  You took the position that since the contracts were drafted

9    before the advent of e-books, that e-books were not within the

10   scope of rights conveyed?

11   A.  Exactly.

12   Q.  Okay.  And there was a dispute about that?

13   A.  Yes.

14   Q.  And did you resolve it?

15   A.  Yes.

16   Q.  How did you resolve it?

17   A.  To my satisfaction.

18   Q.  Of course.

19       With respect to the 20 books, was there some kind of

20   compromise reached?

21   A.  The discussion and the agreement are confidential by --

22   by --

23   Q.  But there was an agreement reached?

24   A.  Yes.

25   Q.  Okay.
```

1          MR. PETROCELLI:  Thank you, Your Honor.  Nothing

2    further.

3          THE COURT:  Thank you.

4     I just have sort of a general question for you about

5    your business and negotiating these deals.

6          THE WITNESS:  Yeah.

7          THE COURT:  And my understanding is that all these

8    deals are different.

9          THE WITNESS:  Uh-huh.

10          THE COURT:  And like in any bargaining situation, do

11    you sometimes feel like you have more leverage and sometimes

12    you feel like you have less leverage in any individual deal?

13          THE WITNESS:  Yes.

14          THE COURT:  So what kind of factors go into giving

15    you more leverage?

16          THE WITNESS:  Really the quality of the -- of the

17    project.

18          THE COURT:  And that's subjective, though, is it not?

19          THE WITNESS:  Yes.  But I think there are

20    recognizable qualities in -- in books that people who have been

21    in the business for a long time would easily recognize.

22          THE COURT:  And so would you say for some books

23    there's a consensus that this is going to be a successful book?

24          THE WITNESS:  Yes.

25          THE COURT:  And those types of negotiations, can you

1   just describe how those negotiations differ from others, if

2   they do?

3           THE WITNESS:  Well, yes.  To give an example, if

4   there's a young writer who has not previously published who may

5   be at the Iowa Writers' school [sic] and who has a collection

6   of stories, which we deem to be worthy, the reception in the

7   publishing community can vary by -- by quite a margin.  Some

8   publishers would say we're not going to publish stories.  Other

9   would say I will only offer on this book of stories if I get

10  the next book, which must be a novel.  And still others would

11  say the writer is a genius and I must acquire this book,

12  probably with an option clause on the next book.

13          THE COURT:  And how do you -- so you've identified

14  this is a book that --

15          THE WITNESS:  Yeah.  So we would go --

16          THE COURT:  -- could be successful.  So how do you

17  deal with this?

18          THE WITNESS:  -- probably to a broader number of

19  publishers with that collection of stories coming out of the

20  Iowa Writers' Workshop than we would with the next novel of a

21  young Irish writer called Sally Rooney, let's say.

22          THE COURT:  Okay.  So you would go broader with

23  something that looks like it could generate interest among --

24          THE WITNESS:  I'm sorry.  What?

25          THE COURT:  You would go broader with something that

 1    looks like it could generate interest among --

 2            THE WITNESS:  I didn't hear the beginning of that.

 3    I'm sorry.

 4            THE COURT:  You would go broader with a project that

 5    you determine --

 6            THE WITNESS:  Yeah.  In a way, the less sure we are

 7    of the value of a project, the broader the submission.  If we

 8    know pretty much exactly what the book will receive or would

 9    receive through an auction or multiple-submission process, we

10    will usually go to the ideal editor and publisher on a

11    single-submission basis.

12            THE COURT:  I see.

13            THE WITNESS:  And if they meet our goal, then that's

14    that.  The deal is done.

15            THE COURT:  And last question:  So if it's a

16    situation where you want to go broad, it's because sometimes

17    there's going to be an editor who says I must have this --

18            THE WITNESS:  Uh-huh.

19            THE COURT:  -- versus other people who are going to

20    say don't want it?

21            THE WITNESS:  Yeah.

22            THE COURT:  Does it help to have more, I guess,

23    choice in who you send it to because you're looking for that

24    editor that loves this particular book?

25            THE WITNESS:  Yes, because everyone has -- has

```
 1    different tastes and judgment.

 2         So -- and sometimes people who you believe would respond

 3    positively to a project don't do so.  And -- and -- and others

 4    whom you think would be hesitant to be enthusiastic are wildly

 5    enthusiastic.

 6              THE COURT:  Okay.  Thank you.

 7         Any questions based on my questioning?

 8              MR. PETROCELLI:  No, Your Honor.

 9              THE COURT:  All right.  Thank you.

10         Anything from you?  No.

11         All right.  Thank you so much.  Thank you for your

12    testimony.  You can step down.

13              THE WITNESS:  Okay.

14              MR. PETROCELLI:  Thank you.

15         Your Honor, our next witness is Gail Ross.

16              THE COURT:  All right.  Thank you.

17         You can step right up here, ma'am, and if you can remain

18    standing for a moment and raise your right hand.

19              (Oath administered.)

20              THE WITNESS:  I do.

21              THE COURT:  Thank you.  You may be seated, and you

22    can remove your mask, if you'd like.

23              THE WITNESS:  Thank you.

24              MR. PETROCELLI:  Permission to hand up the documents?

25              THE COURT:  Yes.  Thank you.
```

```
1              THE WITNESS:  Thank you, sir.
2                        DIRECT EXAMINATION
3    BY MR. PETROCELLI:
4    Q.  Good afternoon.
5    A.  Good afternoon.
6              MR. PETROCELLI:  Should I begin, Your Honor?
7              THE COURT:  Yes.  Go ahead.
8    BY MR. PETROCELLI:
9    Q.  Please state your full name for the record.
10   A.  Gail Ross.
11   Q.  What do you do for a living?
12   A.  I am a literary agent and media lawyer.
13   Q.  Media lawyer?
14   A.  Yes.
15   Q.  Okay.  Where do you practice?
16   A.  I'm the president of the Ross Yoon literary agency, and I
17   am a partner in the law firm of Trister, Ross, Schadler & Gold
18   here in the District.
19   Q.  You live and work here in Washington?
20   A.  I do.
21   Q.  Okay.  Now, when did you become a lawyer?
22   A.  I graduated from Georgetown in 1980.
23   Q.  1980?
24   A.  Uh-huh.
25   Q.  And how long have you been a literary agent?
```

1    A.  I started -- I sold my first book in 1986.

2    Q.  Okay.  And as between your work as a lawyer and your work

3    as a literary agent, what's the breakdown?

4    A.  Oh, I try to practice law as little as possible.  It varies

5    week to week.  It might be a couple hours a week.  It's usually

6    work -- I review publishing law contracts for academics who

7    might come in, a university press contract or something like

8    that, or I do some work for clients in the agen- -- at the

9    agency who negotiate their consulting agreements with CNN or

10   something like that, but it's a minimum.  It's minimal.

11   Q.  Okay.  So your primary work is as a literary agent?

12   A.  Yes.

13   Q.  And you're not an antitrust lawyer, are you?

14   A.  No.

15   Q.  Okay.  So let me ask you to refer to what I have marked as

16   Defendants' Demonstrative 9.  And can you identify for the

17   Court what this is?

18   A.  Yes.  This is a selection of books that I represented.

19   Q.  Is there any particular type of book or genre that you

20   specialize in?

21   A.  I represent primarily nonfiction.  Just an occasional

22   novel.  I love to read them, but I can't sell them.  And my

23   nonfiction breaks down into categories.  I'm lucky enough that

24   it breaks down into categories I care a lot about, and so it

25   tends to be politics, history, science, social justice issues,

1    women's issues, environment, psychology, a little religion.

2    Q.  The Ross Yoon literary agency, that's the name of your

3    firm?

4    A.  Yes, it is.

5    Q.  And how many agents work with you?

6    A.  One -- we are pretty lean and mean.  There are one, two --

7    there are only five of us, currently.

8    Q.  Including yourself?

9    A.  Yes.

10   Q.  Okay.  Now, you have also in front of you Plaintiff's

11   Exhibit 838.

12   A.  The famous lists.

13   Q.  Yeah.  And could you identify to the Court what that is?

14   A.  The first page or all of it or?

15   Q.  Well, just the entire document, and then I'll go through

16   the different pages with you.

17   A.  Oh.  The document represents a compendium of different

18   breakdowns of sales of mine -- just mine -- during the relevant

19   years that -- 2018, 2019, 2020, and 20- -- no.  2020 and 2021.

20   Q.  2018 to 2021?

21   A.  '21.  Correct.

22   Q.  Your deals?

23   A.  Just my deals, yes.

24   Q.  Okay.  And those deals -- and I will represent to you --

25   total 89 and are listed on pages 1, 2, and 3.

```
1    A.  That's correct.

2    Q.  Okay.  Then we get to page 4, which is not easy to read.

3            MR. PETROCELLI:  And this a confidential document,

4    Your Honor.  And by the way, I'd ask that this be admitted

5    under seal.

6            THE COURT:  Any objection?

7            MR. VANCE:  No objection.

8            THE COURT:  All right.  This will be admitted.

9            (PX Exhibit 838 admitted into evidence.)

10   BY MR. PETROCELLI:

11   Q.  Okay.  So 1, 2, and 3 are the totality of the deals.  I

12   think they number 89; right?

13   A.  Correct.

14   Q.  Now, on page 4, which is the tiny print, what is that?

15   A.  I don't know.  No.  Kidding.  This list represents my sales

16   during that relevant period to an imprint at either PRH or

17   Simon & Schuster.

18   Q.  Okay.  I'll represent to you that there are 43 deals there.

19   And these, again, are deals in which the books were sold either

20   to Penguin Random House or Simon & Schuster; is that right?

21   A.  That's correct.

22   Q.  Okay.

23   A.  Although I have to say, I can't see it very well, but I see

24   it at the bottom it says that.

25   Q.  Well, you have the monitor in front of you.
```

1   A.  Oh, there we are.  Okay.

2   Q.  So I just want to make sure we understand some of the

3   columns here.

4   A.  Yes.

5   Q.  So under "Manner Sold," you can see that there are

6   references to option, exclusive submission, auction?

7   A.  Yes.

8   Q.  And preempt; right?

9   A.  Yes.

10  Q.  Okay.  And so based on what we heard throughout this trial,

11  you need not explain, you know, what those types of submissions

12  are, but suffice it to say, that three of them, options,

13  exclusive submissions, preempts, involve direct negotiations as

14  opposed to an auction; right?

15  A.  Correct.

16  Q.  Okay.  And with respect to the auctions, how do you conduct

17  your auctions?

18  A.  They typically fall into two categories, at least how I do

19  it.  I'm a little old-fashioned.  So I do two types:  rounds,

20  which I can explain, and best-bids.

21      The rounds begin -- do you want me to explain how rounds

22  work?

23  Q.  Please.

24  A.  The rounds begin -- and all this is spelled out in a memo

25  that's gone to the participants that says what the rule -- my

1    rules for conducting the auction.  So if it's a rounds auction,

2    it begins with publishers submitting blind first bids, either

3    by phone or electronically.

4        And then I take the first-round bids and put them in

5    ascending order, such that -- to go to Round 2, the high -- the

6    lowest bidder in Round 1 has to beat the highest bidder in

7    Round 1 by -- by a prescribed percentage or dollar amount

8    usually, and that's also in the rules.  I tend to do $10,000

9    increments, but other people do 10 percent increments.

10   Q.  Let me just pause right there.

11   A.  Sure.

12   Q.  Do the participants -- and by participants, you mean the

13   publishers; right?

14   A.  Yes.

15   Q.  And you don't invite all publishers, do you?

16   A.  No.

17   Q.  Okay.  So the first step is you identify who you want to

18   invite?

19   A.  Well, I have -- at that -- by the point I'm going to an

20   auction, it's been a fairly, you know, long process by which I

21   made decisions about where I'm going to submit, the imprints to

22   which I'm going to submit to, the proposal.  I've worked on

23   this incredible book proposal with my wonderful client, and

24   then we submit it to the appropriate imprints.  And then we

25   typically have meetings -- or used to go to New York with my

1    clients and spend days running around Manhattan.  That has not

2    happened since March of 2020 because of COVID.

3    Q.  Because of the pandemic; right?

4    A.  Yes.  So --

5    Q.  And this is all prior to the auction; right?

6    A.  Yes.  This is way -- very much prior to the auction.  And I

7    don't set auction dates or anything and the like when I submit

8    the proposals.  I'm really -- I'm working with what comes to me

9    as it comes to me.  All the -- try to collect all the

10   information as the process proceeds.

11   Q.  Do you submit to more publishers than you invite to the

12   auction?

13   A.  It de- -- I mean, really, the invitations to the auction

14   depend on them and not on me.  I submit to people I think are

15   appropriate.  And then we see after these meetings, and whether

16   it's going to go to auction.  Sometimes I only have one

17   interested party.  Sometimes my author has fallen in love with

18   someone based on these editorial discussions and meetings that

19   we've had and says to me:  Go see if you want to solicit a

20   preempt because I'd love to be there.

21           And then vice versa.  After the meetings and maybe more

22   discussions, a particular publisher -- imprint, I should say,

23   will want to make a preemptive bid prior to my even sending out

24   the rules.  I mean, a preempt can happen at any time between a

25   submission of the proposal to the beginning of the auction.

1    Q.   Now, once the -- once you start the auction, send out the

2    rules, do you tell the publishers how many are participating

3    and who they are?

4    A.   No.

5    Q.   Do you tell them how many are participating?

6    A.   If it serves my client's interests.  I don't have to.  I

7    get to control that kind of information, unless, of course, you

8    know, you get into the rules of imprints bidding against

9    imprints within houses and those things, but aside from that, I

10   tell them nothing.

11   Q.   Okay.  And you -- your reference to unless you get into

12   internal imprinting, were you referring to the rule at some

13   publishers that allow imprints to internally compete provided

14   there's an external bidder?

15   A.   That, and also some of the houses go to house bids.  And so

16   they will ask if someone -- if another imprint -- there's a --

17   HarperCollins, for example, and Simon & Schuster currently do

18   house -- if they have more than one imprint involved and -- at

19   similar levels of interests, they'll do a house bid.  So in

20   order to coordinate that house bid, we have to tell them of the

21   interest.

22   Q.   Those are the two firms that you have to tell because they

23   only do house bids?

24   A.   Yes.

25   Q.   Okay.  So -- okay.  So we were talking about the auction,

1    and you were explaining how the rounds work.

2    A.  Yes.

3    Q.  Okay.  And do you let the -- the round -- that's a

4    round-robin auction.  Do you let it go the distance, all the

5    way to the end?

6    A.  Rarely.  I haven't let it go the distance in memory.  And

7    based on -- this sheet was very helpful.  I want to thank the

8    government for making me see some of my history.

9         And I haven't gone to -- round ro- -- to the end because

10   it -- we always say in our -- in our memos that -- that we

11   reserve the right at any time to ask for best bids.  And best

12   bids isn't necessarily the highest bid, but best bids is when

13   you would end the rounds, perhaps after Round 3 or Round 4.

14   It's really a feel that I have for the strategy.  And then tell

15   everyone -- tell the people who are left that they get to make

16   a best bid, which would include the whole gamut of everything

17   they want to say, editorial letters that are consistent with

18   what the -- my client and the editor have discussed, promotion

19   plans, and any other things that are of interest.

20        Payouts can be different in terms of -- in terms of

21   proportionality.  Some of the payouts are in quarters, but

22   they're -- four payments, but they're not in quarters.

23   Q.  So when you call for best bids, do I understand you're not

24   just getting, like, a number back, but you're getting more of a

25   fulsome proposal?

 1    A.  I ask for as much as they want to give me at that point.  I

 2    want to listen to everything because my -- the more -- the more

 3    that comes in for my client, the more we're better to -- we're

 4    better able to determine the real -- I mean, best bids means

 5    the best place for them to be.

 6    Q.  Why do you go to best bids rather than just let the

 7    round-robin go to conclusion?

 8    A.  There usually comes a point in an auction when you're, sort

 9    of -- everybody is kind of saying uncle.  And you want to

10    respect that and also get everything you can in front of the

11    client.  I mean, it's -- you know, it's really the author's

12    decision.

13    Q.  Okay.  So if you turn to page 5 --

14    A.  Yes.

15    Q.  -- of Exhibit 838.

16    A.  This one I can see.

17    Q.  Okay.  And do I understand that these are just the auctions

18    taken from the prior page of 43 transactions in which -- in

19    which either Penguin Random House or Simon & Schuster acquired

20    the book?

21    A.  That's right.  But I would like to, if I could -- it was

22    one of the great things about the deposition was I was able to

23    go back and -- and find some changes I wanted to make,

24    clarifications, if I could.

25    Q.  Please.

1    A.  The -- we talked in the deposition about *Sandy Hook* -- oh,

2    I wasn't supposed to say that.

3    Q.  Well --

4    A.  The one on 5/1/2019.  Sorry.

5    Q.  5/1/2019.

6    A.  Correct.

7    Q.  You mean the date?

8    A.  The date of the auction.  Right.

9    Q.  The auction date of May 1, 2019, on page 5 of Exhibit 838.

10   What about it?

11   A.  All I want to say about that is it was a preempt.

12   Q.  Okay.

13   A.  Okay.  I discussed in the deposition that the two players

14   that are listed as the final bidders were very interested, but

15   in going back, I saw that I hadn't sent an auction memo out

16   yet, and so that would be a preempt.

17   Q.  Okay.  So that takes us down to -- from 16 then to 15.  But

18   you have another correction?

19   A.  Right.  Yes.  I have one more correction.  It just should

20   have been an asterisk on the -- there was a deal on -- I'm

21   sorry.

22   Q.  Page 4?

23   A.  Yes.  On page 4.  Thank you.

24   Q.  Is it the fourth --

25   A.  Fourth one down.  I did that --

```
1    Q.  The fourth one down -- hold on.

2    A.  I co- --

3    Q.  I just want to identify --

4            THE COURT REPORTER:  Hold on.  You're speaking over

5    each other.

6    BY MR. PETROCELLI:

7    Q.  I just want to identify for the record --

8    A.  I'm so sorry.

9    Q.  Just for the record, I just want to identify what you're

10   referring to.  So it's page 4 of Exhibit 838, and it's the

11   fourth item from the top?

12   A.  That's correct.

13           MR. PETROCELLI:  This is confidential, by the way.

14           THE COURT:  Uh-huh.

15           MR. PETROCELLI:  Okay.

16   BY MR. PETROCELLI:

17   Q.  You can see it on your monitor, though; right?

18   A.  Yes.

19   Q.  And that one -- what about that one?

20   A.  I meant to include an asterisk because I conducted -- I was

21   a co-agent on that.  It's two authors, and the other author had

22   a different agency, and I -- the other agency did most of the

23   auction because I had -- I was sick or -- I can't remember, but

24   I didn't have enough paperwork.  So I just put an asterisk to

25   say that I -- that I didn't conduct it.  And so I didn't really
```

1    have enough to show you.

2    Q.  Okay.  But that was an auction won by Simon & Schuster?

3    A.  Correct.  Yes.

4    Q.  So that would, then, bring our total back on page 5 from 15

5    to 16?

6    A.  Correct.

7    Q.  Okay.  And by my count, there are 9 of the 16 in which

8    Penguin Random House acquired the book and 7 with -- when Simon

9    & Schuster did.  Does that sound right to you?

10    A.  Yes.

11    Q.  Okay.  Now, of these 16 auctions in which either Penguin

12    Random House or Simon & Schuster acquired the book, was there

13    ever an occasion when they were runners-up, one and two, in the

14    auction?

15    A.  Yes.

16    Q.  How many times?

17    A.  The auction on 5/7/2021.

18    Q.  Hold on.  This is page 5 again -- right? -- of --

19    A.  Yes.

20    Q.  What was that date?

21    A.  5/7/2021.

22    Q.  Okay.  Second from the bottom; right?

23    A.  That's correct.

24    Q.  Okay.  Now, with respect to the -- you said of the 43 on

25    your deal sheet in which Penguin Random House or Simon &

1    Schuster acquired the book, 16 were auctions.  So that would

2    leave 27 that were not auctions.  Okay?

3    A.   Uh-huh.

4    Q.   And those 27 fall in the category of direct negotiations?

5    A.   Correct.

6    Q.   Okay.  So I want to ask you some questions about that.  So

7    in direct negotiations, can you please explain why you believe

8    that you are getting your client the best possible deal without

9    conducting an auction.

10   A.   For a variety of reasons.  Part of it depends on the needs

11   of my client.  I -- by the time I'm deciding how to sell it,

12   I've worked very hard with the client on a -- on the proposal.

13   I know their needs, their wants, their expectations.  Sometimes

14   there's just the perfect editor at a given imprint.

15        But in terms of how do I get to that number?  I mean, it

16   all goes back to -- I teach this to my clients too.  I -- when

17   I got out of law school, I took the Harvard negotiation project

18   training, and I -- and I took a mediation training.  And I

19   always -- I always think about the idea of the best

20   alternative -- the BATNA, which is from the negotiation project

21   where you have an agreement in front of you or a person -- or a

22   publisher in this case -- that you're negotiating with.  And

23   the best way to get the best deal from them is to improve your

24   BATNA, your best alternative to what's in front of you.

25        And so I spent a lot of time in my head and in

1    information gathering and the like figuring out what that BATNA

2    is and trying to get it this way.  And sometimes it's -- it's a

3    give and take.  But for a variety of reasons, my client either

4    has been -- if it's an option, they've been with that publisher

5    and they want to have the books together.  I mean, there's a

6    huge, huge advantage to have your book -- Book 1 and Book 2

7    together.  Because when Book 2 comes out, then you get a whole

8    other round of promotion on Book 1.  So ofttimes that's a

9    factor if they've been at the same publisher.

10        If they -- if they need a certain kind of editing or

11   they want a certain kind of list, a particular list, they --

12   you know, it's -- it's just -- it comes from experience and

13   knowledge of the business and what a particular editor might be

14   able to do.

15   Q.  Does your BATNA take into account nonfinancial terms?

16   A.  I mean, it always does because you want to -- because --

17   because in order to get to this negotiated agreement, that's

18   totally taking into nonfinancial terms -- right? -- all these

19   ephemeral things like an editorial relationship and a love of a

20   particular house or the fact the book wasn't there.

21        I mean, obviously, my BATNA can't -- can't give me

22   the -- the passbook if we're negotiating just with someone who

23   bought Book A.  Book A is here with the publisher in front of

24   me, and the BATNA can't provide that support between their

25   books; right?

1    Q.  You understand that --

2                THE COURT:  I'm sorry, what does BATNA stand for?

3                THE WITNESS:  I'm sorry.  It's a term that the

4    Harvard negotiation project uses in a book called *Getting*

5    *Yes* [sic].  And it means the best alternative to the -- to --

6    to the negotiation you're having.  Okay.  So -- if the better

7    your BATNA is, if you can walk away from something, then it's

8    easier to push to the terms that you think are fair and right,

9    and so I try to use that.

10           Sometimes you can -- I mean, it's always easier to walk

11   if you know what you're walking to.  And in this business,

12   there's always the other competitor.  Whether it's -- whether

13   they're bidding or not, they're always there.

14   BY MR. PETROCELLI:

15   Q.  Well, that's where I wanted to go.  Right?

16   A.  Okay.  Sorry.

17   Q.  Okay.  So you know this is a trial about competition?

18   A.  Yes.  Of course.

19   Q.  And it's a trial about whether Simon & Schuster and Penguin

20   Random House can merge; right?

21   A.  Yes.

22   Q.  And I'm sure you understand that right now they're two

23   separate corporate entities, but post-merger, they would be

24   owned by the same corporate parent; right?

25   A.  Correct.  Yes.

1    Q.  So when you're doing your direct negotiations and you're

2    thinking through the -- the best alternative to a negotiated

3    agreement, are you taking into account not only who the other

4    publishers out there who could possibly be interested but also

5    what their market shares are in the acquisition market?

6    A.  I'm embarrassed to admit this, but I don't know what their

7    market shares are.

8    Q.  Okay.  So let me follow up on that.  And to be clear, I'm

9    not talking about downstream retail sales.

10   A.  Oh, okay.

11   Q.  I'm talking about, like, how -- what their -- the

12   percentage of books that one publisher acquires from authors

13   relative to other publishers.  That's not something you track;

14   right?

15   A.  No.

16   Q.  Okay.  So when you're thinking about these other

17   publishers, these other competitors, you're -- are you thinking

18   that you can't make a deal, you know you have other

19   alternatives?

20   A.  Yes.

21   Q.  Okay.  Are you ranking them in some way or -- I mean, how

22   are you thinking about these other competitors?

23   A.  Well, we're -- are we just now talking with when I'm --

24   Q.  I'm talking about the premerger world right now.

25   A.  Right.  But we were also just talking about when I'm in a

1    direct negotiation.  Still --

2    Q.  Yes.

3    A.  No.  I -- I mean, there's certain information you gather.

4    I have authors who other editors at different imprints and

5    different publishers have expressed interest in in the past,

6    and -- or I know that somebody else might be really interested

7    in that author.  So, I mean, you're just always -- I'm always

8    gathering information.  You know, I'm sort of a -- it all comes

9    in, and I have to use my best judgment.  Because at the end of

10    the day, it's all about what's the best place for my client to

11    go at that moment.

12    Q.  So if this merger were to occur -- and we're now in a world

13    where a Simon & Schuster and Penguin Random House are owned by

14    the same corporate parent -- do you think you would be thinking

15    about -- and I know this is a hypothetical, but do you think

16    you would be thinking about this BATNA or your other

17    competitive alternatives in a different way?

18    A.  No.  There's plenty of competitors out there.

19    Q.  What do you mean by that?

20    A.  Well, I mean that -- that -- I mean, I only -- it only

21    takes one competitor in a sense or the idea of one competitor

22    to make my negotiations strong.  And if we're going out more

23    widely, then there are plenty of competitors.

24    Q.  Who are the competitors -- who are the publishers who

25    compete for works that you sell?

1    A.  I do a fair amount of work with Hachette -- do you want the

2    imprints or -- because I think of everything in terms of

3    editors and imprints and not -- not Big 4 or Big 5.

4    Q.  I'm embarrassed to say that if you name the imprint, I

5    might not know the --

6    A.  Okay.

7    Q.  -- corporate publisher.  So maybe you can give me the

8    parent name.

9    A.  Sure.  Well, I work with all -- I sell to all of the -- the

10   Big 5, Big 4, and -- and then I -- I submit an -- a lot to

11   Norton.  I did a lot with Houghton Mifflin before HarperCollins

12   bought them.  I submit often to Grove Atlantic.  This book

13   *Solitary* that's on here was wonderfully published by

14   Grove Atlantic.  It was a National Book Award finalist.  He

15   just passed away last week so it makes me sad.  And I submit to

16   Blooms- -- I do books with Bloomsbury, and I just sold a book

17   to Nat Geo books.  So --

18   Q.  In your experience, the Big 5 buy more books than the other

19   publishers; fair?

20   A.  Sure.

21   Q.  Okay.

22   A.  They're -- they're -- they're bigger and they need -- they

23   have larger lists, and they need to fill those lists.  So of

24   course.

25   Q.  So when you do deal with a publisher outside that group, is

1    it -- what's your experience with the quality of the publishing

2    services that they render?

3    A.  I try not to submit my books to anybody who doesn't have

4    the capacity to publish with quality and vigor.  So I think

5    it -- you know, but they have to pick different shots.  I mean,

6    the bigger publishers have more slots, if you will.  The

7    other -- the smaller publishers have -- pick their shots a

8    little bit more carefully in the sense that they have less --

9    less slots to fill.

10   Q.  That's scale?

11   A.  Yes.  Of course.

12   Q.  The -- let me go back to the auctions again.  You are

13   familiar with the rule at Penguin Random House as -- I think

14   Hachette may have it also --

15   A.  Of course.

16   Q.  -- where the imprints can bid so long as there's an

17   external bidder; right?  So what -- and then if there are no

18   external bidder, you have to then tell the publisher -- in this

19   case Penguin Random House -- there's no external bidder?

20   A.  Yes.

21   Q.  Are you with me?

22   A.  Yes.

23   Q.  How often, if at all, does it happen in your auctions that

24   you have to make that notification to Penguin Random House?

25   A.  I've had it happen once in 36 years.

```
1    Q.  Once?

2    A.  Yes.

3    Q.  And --

4    A.  It was a dec- -- over a decade ago.

5    Q.  And why is it that it happened only once?

6    A.  Because people like myself who represent authors that go to

7    auction like this know how to -- that's one of the reasons you

8    go to best bids at a certain time.  If you're in an auction,

9    you go to best bids because you know -- you can see where it's

10   going, and you -- and you want to keep a non-PRH player in the

11   auction.

12   Q.  And -- and best bid is one way to accomplish that?

13   A.  Yes.

14   Q.  There's been a lot of discussion in this trial about

15   something called anticipated top sellers.  Prior to, you know,

16   being involved in this case as a witness, had you ever heard of

17   that before?

18   A.  No.  The first time is when I read the complaint.

19   Q.  And do you generally know what's being referred there,

20   books that you can tell in advance are going to be top sellers?

21   I'll just characterize it that way for purposes of my

22   questions.

23   A.  Right.

24   Q.  Is there -- is there something like that in your industry?

25   A.  You know, I always say the phrase publishing business is an
```

1    oxymoron.  And in this case, it's very difficult.  It's very

2    difficult.  There's factors that aren't -- you're not in

3    control of.  And, I mean, look, as agents you take -- you have

4    a certain -- I try in my mind to -- to take on books that I can

5    afford to take on unless I'm -- I have to do it because

6    something -- you know, a social cause or something that I feel

7    that I can find a very small publisher for them and I want to

8    help somebody.

9         But I'm -- I'm typically taking on books that I think

10   are going to go from high-five figures to millions of dollars.

11   So there -- I have that.  But that's more gut than anything

12   else.  And -- and it's looking at similar kinds of books.  It's

13   looking at the marketplace that exists now and trying to

14   project the marketplace that exists two years from now, but --

15   when the book may be published, but we don't have a crystal

16   ball.

17   Q.  Is -- in your -- in your world, in your business, is there

18   some kind of demarcation by the reference to an advance

19   level -- let's say $250,000 -- where the industry treats books

20   above that amount in a certain way in contrast with how they

21   would treat books below that amount?

22   A.  No.

23   Q.  And if I asked you the same question but just putting in

24   another number, either a hundred or 400 or 600 or any number,

25   is there any such line in -- that -- that exists in your

1    business?

2    A.   There's no bright line like that that I know of.  There are

3    many books that have had great success with a

4    hundred-thousand-dollar advance, and there are many books with

5    a million-dollar advance that have been a flop.

6         The worst day of a life of an agent and an author is

7    when they've gotten a large advance and you go on BookScan and

8    you see their first few months' sales and it says 4,000 copies

9    or something like that.  It happens.  It happens more than any

10   of us would like.

11   Q.   What impact, if any, do you believe this merger would have

12   on your clients?

13   A.   Well, I'm focusing primarily on my Simon & Schuster

14   clients.  I have a lot of Simon & Schuster clients whose books

15   will be published in the next several years.  And I think -- I

16   think it will be terrific for them because, you know, Simon &

17   Schuster has sort of been on the -- for sale for quite some

18   time, even though the actual sale didn't -- you know, didn't

19   happen until March of -- March of 2020 when it was -- they were

20   official.

21        But we've known that Viacom didn't want them for -- for

22   a long time, and -- and they're -- they are doing very well.  I

23   mean, I would -- I'd clearly say that they are punching above

24   their weight, but they are understaffed and need -- need an

25   infusion.  And if this doesn't work, it seems to me, then we're

1    talking about private equity, and that -- that won't happen.  I

2    mean, that would be terrible, in my opinion.  And so I think

3    that Random House and Simon & Schuster, particularly the

4    imprints that I do the most with are --

5    Q.  When you said "Random House," again, do you mean Penguin

6    Random House?

7    A.  Excuse me.  PRH.

8    Q.  Okay.  I apologize.  Continue.

9    A.  Yeah.  The imprints in -- at PRH and at Simon & Schuster

10   that I work the most with are -- have -- I mean, it's --

11   they're both places that care a lot about books and authors,

12   and the ecosystem is so author friendly and focused.  And PRH

13   just has better systems than Simon & Schuster does.

14        And they -- and the other thing that's really important

15   to me about my clients is a lot of my clients do very well in

16   independent bookstores.  And I go around the country and I ask

17   bookstore people about their various publishers.  And, you

18   know, everyone thinks that PRH has the best relations with the

19   independent bookstores in the business.  And I'm just looking

20   forward to that for my Simon & Schuster authors.

21             MR. VANCE:  Your Honor, we object to the testimony

22   about private equity as speculation.

23             THE COURT:  That's sustained.

24   BY MR. PETROCELLI:

25   Q.  The -- do you have a concern that this merged company

1    being -- being much bigger than either one today would be in a

2    position to lower author compensation?

3    A.   No, I don't, because my understanding is -- is that PRH

4    really wants to invest in Simon & Schuster and the people at

5    Simon & Schuster, who -- I mean, the people I know at Simon &

6    Schuster are very much looking forward to this.  And the idea

7    would be that they'd be -- have more money than they have now

8    to offer in advances, to work with bookstores, to do the --

9    the -- you know, the -- their publicity and social media stuff

10   is just not as good as most of the other --

11   Q.   Whose?

12   A.   Simon & Schuster.  I'm sorry.

13   Q.   I'm sorry.  Whose publicity?

14   A.   Simon & Schuster.

15   Q.   Okay.

16   A.   They work really hard.  They work so hard, but they don't

17   have a lot -- they don't have the staff that the other

18   publishers tend to have.

19   Q.   But if -- to make it a hypothetical --

20   A.   Sure.

21   Q.   -- if they did over time try to lower advances on your

22   authors, is there anything you could do about that?

23   A.   Well, I'd be spending more time across town with the other

24   publishers than -- than Simon & Schuster and PRH.  I don't

25   think it's going to happen.  I -- I don't remember -- it

 1    just -- the idea of this lowering advances across the board is

 2    something -- you know, the economy could tank and then

 3    everybody will lower advances, but because of the merger, no, I

 4    don't see it.

 5    Q.  Well, let me follow up on that back to the time when

 6    Penguin and Random House merged back, I think, in 2013.  You

 7    were -- you were working actively in your business at that

 8    time; right?

 9    A.  Yes.

10    Q.  And did you over the ensuing years observe any impact on

11    author advances following that merger?

12    A.  Certainly not negative.  I mean, my business has grown

13    and grown and grown.  So to the extent that I do some

14    percentage of the business with PRH, I have not seen anything

15    negative.

16    Q.  Okay.

17              MR. PETROCELLI:  Your Honor, did I seek to admit

18    Plaintiff's Exhibit 838 under seal?  If I haven't, I now do.

19              THE COURT:  All right.  That'll be admitted.

20              (PX Exhibit 838 admitted into evidence.)

21              MR. PETROCELLI:  Okay.  Thank you.

22          And I'll pass the witness.

23              THE COURT:  Okay.  Thank you.

24              MR. VANCE:  May I proceed, Your Honor?

25              THE COURT:  Yes.

```
 1                         CROSS-EXAMINATION

 2     BY MR. VANCE:

 3     Q.  Ms. Ross, nice to see you again.

 4     A.  Nice to see you too, sir.

 5     Q.  I want to start with PX 838, which was the document that

 6     Mr. Petrocelli was reviewing with you.

 7     A.  Yep.

 8     Q.  If you could turn to page 2 of that document.

 9     A.  Yes.

10     Q.  You see the first 2000 -- I mean 2021 sale is listed to

11     Macmillan?

12     A.  Yes.  I've changed that.

13     Q.  That should be PRH; correct?

14     A.  That's correct.  That was changed before the deposition.

15     Q.  Then if you could turn to page 5, please.

16     A.  Yes.

17     Q.  And --

18     A.  Oh, I'd like to change -- could I -- is it okay if I

19     change -- tell you one other thing that I found after I went

20     over our deposition?  We need to take Celadon out of the -- you

21     pointed out -- and I found out afterwards -- Celadon dropped

22     out right before the best-bid round.  Okay.  This is for

23     5/7/2021.

24     Q.  Do you mean 3/1/2019?

25     A.  I'm sorry?
```

2139

1   Q.  Sorry.  You said 5/7/21.  That's a different auction.

2   A.  Oh.  I'm on a different page.  I'm on page 5.

3   Q.  Let me -- let me start -- so you previously with

4   Mr. Petrocelli corrected the one on 5/7/21; right?

5   A.  Oh, I did?  Oh, I'm sorry.  I thought I corrected -- no, I

6   corrected 5/1/2019.

7   Q.  All right.  You'd agree -- let's look at the second from

8   the bottom.

9   A.  Yes.

10  Q.  The one at 5/7/21.

11  A.  Yes.

12  Q.  You would agree that Celadon --

13  A.  Dropped out before the --

14  Q.  -- dropped out?

15  A.  Yeah, we went through that.  And you were right.

16  Q.  All right.

17  A.  Thank you.

18  Q.  And then look at one more.  The one on 3/1/2019.

19  A.  Right.

20  Q.  Do you see that one?

21  A.  Yes.

22  Q.  Do you agree Celadon had dropped out of that one?

23  A.  No.  I double-checked that after our deposition, and that

24  is -- it did not.

25  Q.  You were deposed in this matter; right?

```
1    A.  Yes.

2    Q.  The last tab of your --

3            MR. VANCE:  Oh, excuse me.  Could we hand out our --

4    our binders?  I apologize.

5            THE WITNESS:  Oh, it's not this one?

6            MR. VANCE:  Your Honor, may we approach with binders,

7    please?

8            THE COURT:  Yes.

9            THE WITNESS:  Don't I get a binder?

10           THE COURT:  Yes.

11           THE WITNESS:  Thank you.

12   BY MR. VANCE:

13   Q.  Let me direct you to the last tab of the depo- -- of the

14   binder, which is your deposition transcript --

15   A.  Yes.

16   Q.  -- to page 83.  And let me know when you're there.

17   A.  Okay.

18   Q.  All right.  So I'd like you to read lines [sic] 83, 22

19   through 25 to yourself.  I'm not going to read them out loud

20   because they're marked as confidential, but let me know when

21   you're done.

22   A.  Okay.

23   Q.  Were you asked that question, and did you give that answer?

24   A.  What I said then -- what I should have said then -- I mean,

25   I don't have the paperwork in front of me.  I'll -- if this is
```

1    impeachable, go ahead.  But, I mean, this is one thing --

2    Q.  Were you asked that question, and did you give that answer?

3    A.  When Ms. Raab responds that she's bowing out; correct.

4    Yes.

5           MR. VANCE:  Your Honor, I move to admit the testimony

6    at page 83, line 22 through 25, into evidence as impeachment in

7    substance.

8           THE COURT:  I'm really not sure what this is

9    impeaching, Mr. Vance.

10          MR. PETROCELLI:  Your Honor, I'm not sure what the

11   answer was to which this is being --

12          THE COURT:  Exactly.

13          MR. VANCE:  So -- sure.  So on page 5 of PX 838 --

14          THE COURT:  Okay.

15          MR. VANCE:  -- there's three final bidders listed in

16   the row with the date 3/1/2019.

17          THE COURT:  Oh, I see.

18          MR. VANCE:  And one is listed as Celadon.

19          THE COURT:  Yes.

20          MR. VANCE:  Which we reviewed at Ms. Ross's

21   deposition.  And then this testimony is establishing that

22   Celadon had, in fact, dropped out.

23          THE COURT:  Okay.  For what it's worth, I'll admit

24   that.

25          (Ross Deposition Transcript page 83, lines 23 through

```
1    25 admitted into evidence.)
2              THE WITNESS:  I'm sorry to say, but I --
3              THE COURT:  It's okay.  Ma'am, you're not here as a
4    lawyer.  You're a witness.
5         Okay.  Go ahead, Mr. Vance.
6    BY MR. VANCE:
7    Q.  So I want to move on to our version of this chart.  We have
8    a different exhibit in your binder.  If I could ask you to turn
9    to PX 837, and let me know when you're there.
10   A.  Okay.
11   Q.  So you'll see what has been marked for identification
12   purposes as PX 837 in your binder.  This is also the document
13   that you produced in the -- in response to the DOJ subpoena;
14   correct?
15   A.  Yes.
16   Q.  All right.  You see at the bottom left it says "All sales";
17   right?
18   A.  Yes.
19   Q.  So this tab reflects all your deals for the year 2018
20   through 2021; correct?
21   A.  Well, except for the changes that we -- yes.
22   Q.  Okay.
23              MR. VANCE:  Your Honor, I move to admit PX 837 into
24   evidence.
25              THE COURT:  Any objection?
```

```
 1                  MR. PETROCELLI:  No.

 2                  THE COURT:  837 is admitted.

 3                  (PX Exhibit 837 admitted into evidence.)

 4    BY MR. VANCE:

 5    Q.  So to make these next questions a little easier, we've

 6    prepared a highlighted version behind the green slip sheet, and

 7    we've numbered the rows.  I'm trying to avoid making you count

 8    here.  So we're going to use this version for a few questions.

 9    A.  This is -- this is in the -- this -- after this green

10    sheet?

11    Q.  Yes.

12    A.  Okay.  Go ahead.

13    Q.  All right.  So you understand the term Big 5 publisher to

14    include Simon & Schuster, Penguin Random House, Macmillan,

15    Hachette, and HarperCollins; right?

16    A.  Yes.

17    Q.  Can you confirm that in blue are your deals with the Big 5

18    publishers?

19    A.  Yes.

20    Q.  Can you confirm in white are your deals with the non-Big 5

21    publishers?

22    A.  Yes.

23    Q.  So let's count the deals with the non-Big 5 publishers.

24    There are two in 2018; right?

25    A.  Correct.
```

1    Q.  There are two in 2019; correct?

2    A.  Yes.

3    Q.  There are two in 2020; right?

4    A.  Yes.

5    Q.  There are two in 2021; correct?

6    A.  Yes.

7    Q.  Of the 89 deals listed here for the years 2018 through

8    2021, only eight are with a non-Big 5 publisher; correct?

9    A.  Yes.

10   Q.  Two of those deals are with HMH; right?

11   A.  Correct.

12   Q.  HMH is now owned by HarperCollins; correct?

13   A.  That's correct.

14   Q.  Of the eight deals you had with a non-Big 5 publisher, only

15   two received advances of more than 250,000; correct?

16   A.  In those years, yes.

17   Q.  And one of those two deals was with HMH; right?

18   A.  Correct.

19   Q.  For the years 2018 through 2021, you didn't sell the

20   publishing rights to any books to Disney; right?

21   A.  No.

22   Q.  For the years 2018 through 2021, you didn't sell the

23   publishing rights to any books to Amazon; correct?

24   A.  No.

25   Q.  If eight of your 89 deals for the years 2018 through 2021

1    are with non-Big 5 publishers, then 81 of your 89 deals for

2    those years are with a Big 5 publisher; correct?

3    A.  Uh-huh.

4    Q.  There's no --

5    A.  Yes.

6    Q.  There's no question that the Big 5 publishers are where

7    most of your clients do business; right?

8    A.  That's correct.

9    Q.  The reasons that most of your clients do business with the

10   Big 5 are because of their editorial, sales, and promotional

11   capabilities, along with the ability to pay higher advances;

12   right?

13   A.  Sure.  But I will say there have been other years the --

14   this -- the breakdown is different.  This is for those

15   four years, but --

16   Q.  I want to talk about your book submission process.  You

17   sell a lot of books to Penguin Random House and Simon &

18   Schuster; right?

19   A.  Yeah.  I -- I used to know the percentage, but I don't

20   right now.

21   Q.  Except for options and exclusive submissions, you've always

22   offered a book that you were selling to Penguin Random House;

23   correct?

24   A.  Not necessarily.

25   Q.  All right.  I'd like you to turn to your deposition

1    transcript.

2    A.  No, no, but I thought you said --

3            THE COURT:  Ma'am, you are a witness.

4            THE WITNESS:  I'm sorry.

5            THE COURT:  Please turn to your deposition

6    transcript.

7    BY MR. VANCE:

8    Q.  Page 196, line 2 through 6.

9        "QUESTION:  Have you sold proposed books without

10   offering them to Penguin Random House?

11       "ANSWER:  There are a lot of imprints of Penguin

12   Random House.  I have, yes, but those were exclusive

13   submissions or option."

14        Did I read that correctly?

15   A.  Uh-huh.

16   Q.  That was the question.  You gave that answer?

17   A.  (Nods head.)

18            MR. VANCE:  Your Honor, I'd move to admit the lines

19   as impeachment in substance.

20            THE COURT:  Any objection?  Those are admitted.

21            (Ross Deposition Transcript page 196, lines 2 through

22   6 admitted into evidence.)

23   BY MR. VANCE:

24   Q.  Except for options and exclusive submissions, you've always

25   offered a book that you were selling to Simon & Schuster;

1    correct?

2    A.  During this period?  I -- I'd have to study that.

3    Q.  All right.  Let's look back at 196, lines 2 through 9.

4         "Have you sold . . . books without offering them to

5    Penguin Random House?

6         "There are a lot of imprints of Penguin Random House.  I

7    have, yes, but those were exclusive submissions or option.

8         "Have you sold proposed books without offering them to

9    Simon & Schuster?

10        "Well, the same answer."

11        Did I read those questions and answers correctly?

12   A.  Yes.  I'm just trying to figure out whether you're talking

13   about in general or --

14             THE COURT:  Ma'am, could you just answer the question

15   that the attorney asked you.

16             THE WITNESS:  Yes.

17             MR. VANCE:  Your Honor, I move to admit the testimony

18   into evidence.

19             THE COURT:  Any objection?

20             MR. PETROCELLI:  No.

21             THE COURT:  It's admitted.

22             (Ross Deposition Transcript page 196, lines 2 through

23   9 admitted into evidence.)

24   BY MR. VANCE:

25   Q.  I want to talk to you about your earlier testimony now

2148

1    about the effect of the Penguin and Random House merger on

2    author competition.  That opinion was based on your anecdotal

3    experience; correct?

4    A.  Yes.

5    Q.  You haven't conducted an industrywide study of how the

6    Penguin and Random House merger impacted author compensation;

7    right?

8    A.  No.

9            MR. VANCE:  I reserve time for recross.

10           THE COURT:  All right.  Thank you.

11           MR. PETROCELLI:  Nothing.

12           THE COURT:  All right.  Thank you.  Let's see.  I

13   have a couple questions for you.  Mr. Petrocelli asked you some

14   questions about anticipating sales.

15           THE WITNESS:  I'm sorry?

16           THE COURT:  Mr. Petrocelli asked you some questions

17   about anticipating what the sales level of a book would be.

18           THE WITNESS:  Yes.

19           THE COURT:  And you said that that's very hard to do.

20   But isn't it true that all of the advances that are being

21   offered are based on estimates of expected sales?  Can you

22   explain your answer in that context.

23           THE WITNESS:  Sure.  We -- just like publishers have

24   profit and loss statements, we all make estimates of what they

25   think they can sell, what the other books like that have sold,

1    what kind of track record my client has with other books or --

2    you look at things like the -- as -- as the -- the platform of

3    the author, what they have the ability -- you know, we talk

4    about concentric circles of audiences and the -- you know,

5    besides your -- the smaller group that you work in, a lot of my

6    authors have, you know, an ability to get to other audiences.

7    And that, you know, out here is a huge seller.

8         But in here you want to make sure you get to the

9    other -- other -- if it's a psychologist, you want to get to

10   the other psychologists, you want to get to psychiatrists, you

11   want to get to the social workers; you want to make sure you

12   get to those audiences.  And some clients bring a really good

13   apparatus, if you will, or some sort of platform where they can

14   help get to audiences.  So that's weighed in by the authors as

15   well -- by the imprints and editors as well.

16        THE COURT:  And so some of those clients are expected

17   to have strong sales based on those audiences?

18        THE WITNESS:  There's a -- we have expectations of

19   strong sales.  Unfortunately, the market doesn't often always

20   get us to those expectations.

21        THE COURT:  Okay.  And when you're negotiating for a

22   book, it seems that sometimes you have more leverage and

23   sometimes you have less.  Can you talk about what factors go

24   into whether you have more leverage?

25        THE WITNESS:  Sure.  You have to look at -- well, one

1    thing is how the author has done in the past.  If the author

2    has written books in the past that have not sold -- you know,

3    there's an old saw, that you're only as good as your last track

4    -- right? -- sales track.

5            Then -- then there's a burden on the -- that the next

6    book idea has to be that much better, and the publisher has

7    to -- the imprints have to fall in love with that idea and see

8    it as -- as making up for the last -- the last track.  So, you

9    know -- and part of it depends on externals, like what's going

10    on in the world.

11            My client just -- client of mine a couple weeks ago won

12    the Pulitzer Prize.  So that -- that's -- it's all -- what's

13    going on -- you know, I had -- I made four book deals right

14    after Donald Trump was elected President that weren't even in

15    the ideas -- in the heads of my clients.  But the externals

16    happened.  And thank goodness I didn't have a Hillary Clinton

17    book at that time.  So there's so many factors that go into

18    that.

19            THE COURT:  And in terms of the factors that go into

20    it, do you sometimes see there's a consensus among editors

21    that -- about these factors that this is going to be a good

22    book?

23            THE WITNESS:  Yes.

24            THE COURT:  Okay.  Any questioning based on my

25    questioning?

```
 1                 MR. PETROCELLI:  Not from me, Your Honor.

 2                 MR. VANCE:  No, Your Honor.

 3                 THE COURT:  All right.  Thank you for your testimony.

 4                 THE WITNESS:  I'm sorry about that.

 5                 THE COURT:  That's okay.

 6                 THE WITNESS:  I sometimes can't keep my mouth shut.

 7                 THE COURT:  Not at all.

 8            So perfect timing.  It's 5 o'clock.  So let's break for

 9      today.  We will resume on Monday.

10            Do you want to give me a sense of where we stand,

11      Mr. Petrocelli, timing-wise?  Are you expecting to -- I've

12      cleared my matter on the following Monday, in case we need to

13      go over, but I just wanted to check in with you.

14                 MR. PETROCELLI:  I think we're on schedule, maybe

15      even a little bit ahead of schedule.

16                 THE COURT:  Okay.

17                 MR. PETROCELLI:  So I think we will -- we should be

18      able to finish next week.  And then if we could wait until

19      maybe Tuesday or Wednesday to decide whether we need that

20      Monday for closing.

21                 THE COURT:  Sure.

22                 MR. PETROCELLI:  Okay.

23                 THE COURT:  And what is your plan for Monday?

24                 MR. PETROCELLI:  Monday is Viacom witness

25      Alex Berkett; followed by the -- the Penguin Random House
```

```
 1    U.S. CEO, Madeline McIntosh.  And after that, I think we have

 2    Nihar Malaviya and Manuel Sansigre.  Now, these two witnesses

 3    are relevant, at least in part, to the efficiencies issue.

 4                THE COURT:  Okay.

 5                MR. PETROCELLI:  And I know Your Honor wanted me to

 6    give you a heads-up about that.  So we should start seeing them

 7    on Monday.

 8                THE COURT:  Okay.  I appreciate that.  Thank you.

 9                MR. PETROCELLI:  Thank you.

10                THE COURT:  You're expecting Snyder on Tuesday?

11                MR. PETROCELLI:  Snyder would be -- yeah.  Yeah.

12    Tuesday or -- you know, probably perhaps spilling over to

13    Wednesday with cross.  I don't know how long the cross will be.

14    And then it's up to the government about any -- they have the

15    right to call -- recall some of our witnesses depending on

16    Your Honor's ruling regarding efficiencies.

17                THE COURT:  I see.  Thank you.

18          All right.  Thank you.  I appreciate that.  So let's

19    break for the day and for the weekend.  Everybody, have a good

20    weekend.  See you-all on Monday.

21                (Proceedings were concluded at 5:01 p.m.)

22

23

24

25
```

1                    <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3           I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                         Dated this 11th day of August, 2022.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

2154

## $

**$10,000** [1] - 2117:8
**$150,000** [3] - 2058:4, 2078:20, 2079:9
**$200** [1] - 2099:3
**$200,000** [1] - 2062:15
**$250,000** [10] - 2045:8, 2067:2, 2067:5, 2075:14, 2075:22, 2075:25, 2078:18, 2078:25, 2079:3, 2133:19
**$300,000** [2] - 2057:2, 2070:9
**$500** [1] - 2063:23
**$500,000** [1] - 2063:21
**$700,000** [1] - 2063:23

## '

**'21** [1] - 2114:21

## 1

**1** [10] - 2077:7, 2077:10, 2077:14, 2114:25, 2115:11, 2117:6, 2117:7, 2122:9, 2126:6, 2126:8
**1.1** [2] - 2067:12, 2068:23
**10** [1] - 2117:9
**100** [1] - 2103:2
**12** [2] - 2050:4, 2050:17
**14** [1] - 2085:13
**15** [10] - 2043:24, 2043:25, 2044:5, 2047:20, 2085:17, 2085:22, 2097:9, 2105:20, 2122:17, 2124:4
**150,000** [1] - 2078:22
**158** [1] - 2085:22
**16** [8] - 2085:17, 2085:22, 2087:13, 2122:17, 2124:5, 2124:7, 2124:11, 2125:1
**17** [4] - 2046:4, 2075:25, 2085:17, 2085:23
**19** [4] - 2038:23, 2100:14, 2100:21, 2100:25
**196** [6] - 2038:21, 2038:22, 2146:8, 2146:21, 2147:3, 2147:22

## 2

**1980** [3] - 2083:15, 2112:22, 2112:23
**1986** [1] - 2113:1

## 2

**2** [14] - 2038:21, 2038:22, 2057:7, 2077:14, 2114:25, 2115:11, 2117:5, 2126:6, 2126:7, 2138:8, 2146:8, 2146:21, 2147:3, 2147:22
**20** [7] - 2052:5, 2075:7, 2083:3, 2088:13, 2102:19, 2107:19, 2114:19
**200** [3] - 2055:21, 2071:10, 2073:20
**200,000** [2] - 2066:25, 2067:13
**2000** [1] - 2138:10
**2005** [1] - 2040:14
**2010** [3] - 2101:18, 2101:21, 2103:22
**2013** [1] - 2137:6
**2018** [15] - 2042:10, 2043:16, 2045:8, 2075:21, 2075:24, 2086:4, 2088:6, 2114:19, 2114:20, 2142:19, 2143:24, 2144:7, 2144:19, 2144:22, 2144:25
**2019** [3] - 2114:19, 2122:9, 2144:1
**2020** [5] - 2114:19, 2118:2, 2134:19, 2144:3
**2021** [15] - 2042:10, 2043:16, 2045:8, 2075:21, 2075:24, 2086:4, 2114:19, 2114:20, 2138:10, 2142:20, 2144:5, 2144:8, 2144:19, 2144:22, 2144:25
**2022** [2] - 2071:23, 2100:10
**2039** [1] - 2038:18
**2040** [1] - 2038:5
**2042** [1] - 2038:14
**2072** [1] - 2038:17
**2074** [1] - 2038:5
**2082** [1] - 2038:7
**2085** [1] - 2038:16
**2086** [1] - 2038:16
**2098** [1] - 2038:8
**2100** [1] - 2038:23

## 3

**2106** [1] - 2038:8
**2112** [1] - 2038:10
**2115** [1] - 2038:15
**2137** [1] - 2038:15
**2138** [1] - 2038:11
**2141** [1] - 2038:21
**2143** [1] - 2038:14
**2146** [1] - 2038:21
**2147** [1] - 2038:22
**21st** [1] - 2100:9
**22** [5] - 2100:14, 2100:21, 2101:1, 2140:18, 2141:6
**22...** [1] - 2038:23
**23** [3] - 2038:21, 2050:20, 2141:25
**236** [2] - 2071:18, 2072:6
**236.............................
..............** [1] - 2038:17
**24** [1] - 2050:20
**25** [10] - 2075:21, 2101:22, 2101:25, 2104:16, 2104:20, 2104:22, 2105:3, 2140:19, 2141:6, 2142:1
**25....** [1] - 2038:21
**250** [6] - 2046:9, 2047:14, 2048:23, 2049:20, 2049:25, 2070:10
**250,000** [4] - 2044:21, 2045:12, 2144:15
**250,000-and-above** [1] - 2052:6
**250-and-above** [1] - 2046:23
**26** [1] - 2040:10
**260** [1] - 2070:10
**27** [2] - 2125:2, 2125:4
**28** [3] - 2045:11, 2075:21, 2075:25

## 3

**3** [7] - 2041:15, 2041:16, 2074:24, 2077:14, 2114:25, 2115:11, 2120:13
**3/1/2019** [3] - 2138:24, 2139:18, 2141:16
**30** [1] - 2050:20
**300** [1] - 2057:7
**300,000** [1] - 2066:25
**31** [8] - 2038:23, 2050:20, 2051:8, 2051:9, 2051:11, 2100:13, 2100:20, 2100:25

## 4

**32** [1] - 2050:20
**34** [2] - 2044:4, 2044:7
**36** [2] - 2087:6, 2131:25
**3:45** [1] - 2097:9

## 4

**4** [12] - 2043:2, 2044:23, 2057:5, 2071:23, 2115:2, 2115:14, 2120:13, 2122:22, 2122:23, 2123:10, 2130:3, 2130:10
**4,000** [1] - 2134:8
**400** [1] - 2133:24
**413** [2] - 2039:9, 2039:13
**413.............................
..............** [1] - 2038:18
**42** [4] - 2078:2, 2078:8, 2084:12, 2093:21
**43** [3] - 2115:18, 2121:18, 2124:24
**44** [2] - 2045:11, 2048:5
**450** [2] - 2057:17, 2057:18
**46** [1] - 2077:12

## 5

**5** [46] - 2046:24, 2047:1, 2047:8, 2047:9, 2047:14, 2047:15, 2047:16, 2047:18, 2047:19, 2048:6, 2048:17, 2050:5, 2075:18, 2075:22, 2077:17, 2077:21, 2095:2, 2095:3, 2095:6, 2095:10, 2095:24, 2096:2, 2096:9, 2096:13, 2101:3, 2121:13, 2122:9, 2124:4, 2124:18, 2130:3, 2130:10, 2130:18, 2138:15, 2139:2, 2141:3, 2143:13, 2143:17, 2143:20, 2143:23, 2144:8, 2144:14, 2145:1, 2145:2, 2145:6, 2145:10, 2151:8
**5/1/2019** [3] - 2122:4, 2122:5, 2139:6
**5/7/2021** [3] - 2124:17,

## 6

2124:21, 2138:23
**5/7/21** [3] - 2139:1, 2139:4, 2139:10
**50** [4] - 2083:2, 2091:20, 2091:21, 2099:4
**52** [2] - 2086:13, 2087:7
**5:01** [1] - 2152:21

## 6

**6** [7] - 2043:4, 2043:6, 2043:12, 2044:13, 2077:3, 2146:8, 2146:22
**6.....** [1] - 2038:21
**60** [1] - 2076:3
**600** [3] - 2057:16, 2057:17, 2133:24
**600,000** [2] - 2057:6, 2057:7

## 7

**7** [8] - 2048:16, 2048:18, 2052:5, 2077:4, 2077:23, 2079:14, 2106:6, 2124:8
**70,000** [1] - 2077:13
**700** [3] - 2060:15, 2062:4, 2067:24
**749** [8] - 2042:3, 2042:6, 2042:13, 2042:25, 2044:14, 2044:20, 2077:4, 2077:5
**749.............................
..............** [1] - 2038:14

## 8

**8** [1] - 2083:24
**80** [1] - 2083:7
**800** [2] - 2060:16, 2073:22
**81** [1] - 2145:1
**83** [5] - 2038:21, 2140:16, 2140:18, 2141:6, 2141:25
**837** [5] - 2142:9, 2142:12, 2142:23, 2143:2, 2143:3
**837.............................
..............** [1] - 2038:14
**838** [9] - 2114:11, 2115:9, 2121:15, 2122:9, 2123:10, 2137:18, 2137:20, 2138:5, 2141:13

**838**............................
............. [2] -
2038:15, 2038:15
**856** [5] - 2084:21,
2086:6, 2086:21,
2086:25, 2087:2
**856**............................
............. [1] - 2038:16
**857** [3] - 2084:20,
2084:21, 2085:11
**857**............................
............. [1] - 2038:16
**89** [5] - 2114:25,
2115:12, 2144:7,
2144:25, 2145:1

---

**9**

**9** [5] - 2078:14,
2113:16, 2124:7,
2147:3, 2147:23
**9.....** [1] - 2038:22

---

**A**

**a.m** [1] - 2039:2
**ability** [6] - 2064:16,
2064:17, 2094:16,
2145:11, 2149:3,
2149:6
**able** [9] - 2058:11,
2061:13, 2093:22,
2103:10, 2121:4,
2121:22, 2126:14,
2151:18
**aboveboard** [1] -
2073:5
**absolutely** [4] -
2058:14, 2065:5,
2081:11, 2095:11
**academics** [1] -
2113:6
**accept** [2] - 2089:10,
2089:16
**accepted** [1] - 2090:4
**accomplish** [1] -
2132:12
**according** [1] - 2055:7
**account** [3] - 2094:1,
2126:15, 2128:3
**accuracy** [1] - 2093:22
**achieve** [4] - 2091:2,
2093:23, 2094:2
**acquire** [2] - 2087:20,
2109:11
**acquired** [10] - 2046:2,
2050:24, 2075:15,
2075:18, 2086:14,
2087:4, 2121:19,
2124:8, 2124:12,
2125:1

**acquires** [1] - 2128:12
**acquisition** [9] -
2051:18, 2052:12,
2054:9, 2058:24,
2064:11, 2064:21,
2076:13, 2088:21,
2128:5
**active** [1] - 2096:20
**actively** [1] - 2137:7
**actual** [1] - 2134:18
**add** [1] - 2066:24
**added** [2] - 2044:10,
2044:14
**addition** [1] - 2076:20
**additional** [5] -
2046:8, 2046:15,
2046:18, 2049:25,
2092:11
**additions** [1] - 2044:9
**addressed** [1] -
2102:17
**adds** [2] - 2046:8,
2064:14
**administered** [3] -
2039:16, 2082:6,
2111:19
**admit** [10] - 2039:9,
2042:12, 2100:20,
2128:6, 2137:17,
2141:5, 2141:23,
2142:23, 2146:18,
2147:17
**Admitted** [2] -
2038:13, 2038:20
**admitted** [27] -
2039:11, 2039:13,
2042:24, 2042:25,
2072:2, 2072:5,
2072:6, 2085:3,
2085:6, 2085:11,
2086:21, 2086:24,
2086:25, 2100:24,
2101:1, 2115:4,
2115:8, 2115:9,
2137:19, 2137:20,
2142:1, 2143:2,
2143:3, 2146:20,
2146:22, 2147:21,
2147:23
**adopted** [1] - 2064:17
**adult** [3] - 2078:10,
2079:2, 2079:15
**advance** [30] -
2053:24, 2062:10,
2062:14, 2064:7,
2067:20, 2069:1,
2069:2, 2069:3,
2077:8, 2078:10,
2078:11, 2080:2,
2091:11, 2093:13,

2096:10, 2098:23,
2099:1, 2099:7,
2099:14, 2099:18,
2100:6, 2100:16,
2101:4, 2101:6,
2101:9, 2132:20,
2133:18, 2134:4,
2134:5, 2134:7
**advances** [26] -
2045:8, 2070:5,
2070:24, 2071:2,
2075:22, 2075:25,
2077:11, 2078:24,
2079:3, 2079:9,
2080:10, 2080:24,
2081:5, 2081:8,
2081:10, 2084:7,
2091:15, 2095:5,
2136:8, 2136:21,
2137:1, 2137:3,
2137:11, 2144:15,
2145:11, 2148:20
**advantage** [1] -
2126:6
**advantageous** [1] -
2100:2
**advent** [1] - 2107:9
**affect** [1] - 2080:17
**afford** [1] - 2133:5
**afternoon** [11] -
2039:4, 2039:5,
2074:10, 2074:11,
2074:18, 2097:19,
2097:25, 2098:3,
2098:4, 2112:4,
2112:5
**afterwards** [3] -
2057:22, 2068:23,
2138:21
**agen** [1] - 2113:8
**agencies** [1] - 2073:22
**agency** [18] - 2040:8,
2040:11, 2040:18,
2041:10, 2043:19,
2044:1, 2073:21,
2083:4, 2083:9,
2083:14, 2086:11,
2088:12, 2091:19,
2112:16, 2113:9,
2114:2, 2123:22
**Agency** [3] - 2040:12,
2082:25, 2088:13
**agent** [22] - 2040:8,
2040:9, 2040:19,
2040:20, 2041:6,
2071:19, 2082:23,
2083:19, 2085:16,
2089:16, 2098:22,
2098:25, 2099:25,
2100:6, 2100:15,

2112:12, 2112:25,
2113:3, 2113:11,
2123:21, 2134:6
**agents** [8] - 2040:15,
2068:25, 2083:1,
2083:2, 2088:13,
2089:25, 2114:5,
2133:3
**ago** [5] - 2075:8,
2095:11, 2099:9,
2132:4, 2150:11
**agree** [6] - 2050:21,
2086:17, 2102:10,
2139:7, 2139:12,
2139:22
**agreement** [7] -
2102:21, 2107:5,
2107:21, 2107:23,
2125:21, 2126:17,
2128:3
**agreements** [2] -
2102:5, 2113:9
**ahead** [7] - 2068:12,
2068:14, 2112:7,
2141:1, 2142:5,
2143:12, 2151:15
**AI** [2] - 2095:11,
2098:7
**Alex** [1] - 2151:25
**allow** [1] - 2119:13
**allowed** [1] - 2052:15
**almost** [2] - 2057:12,
2095:5
**alternative** [4] -
2125:20, 2125:24,
2127:5, 2128:2
**alternatives** [2] -
2128:19, 2129:17
**Amazon** [10] -
2079:18, 2079:20,
2102:20, 2102:22,
2102:24, 2104:7,
2105:9, 2105:11,
2107:1, 2144:23
**America** [2] - 2091:16,
2091:25
**American** [2] -
2091:18, 2092:2
**amount** [11] - 2052:21,
2055:3, 2055:8,
2057:22, 2060:1,
2093:22, 2096:10,
2117:7, 2130:1,
2133:20, 2133:21
**amounts** [1] - 2095:5
**analogized** [1] -
2106:11
**ancillary** [1] - 2079:6
**Andrew** [5] - 2038:6,
2081:24, 2082:21,

2098:14, 2098:20
**anecdotal** [1] - 2148:2
**Anna** [1] - 2097:23
**announced** [1] -
2103:6
**announcement** [1] -
2103:14
**answer** [14] - 2051:9,
2054:15, 2059:4,
2099:10, 2099:13,
2099:20, 2105:2,
2140:23, 2141:2,
2141:11, 2146:16,
2147:10, 2147:14,
2148:22
**ANSWER** [2] -
2100:17, 2146:11
**answers** [2] - 2091:7,
2147:11
**anticipated** [3] -
2065:22, 2096:17,
2132:15
**anticipating** [3] -
2043:9, 2148:14,
2148:17
**antitrust** [1] - 2113:13
**apologize** [2] -
2135:8, 2140:4
**apparatus** [1] -
2149:13
**appraisal** [1] -
2099:24
**appreciate** [2] -
2152:8, 2152:18
**approach** [1] - 2140:6
**appropriate** [2] -
2117:24, 2118:15
**April** [1] - 2100:9
**ARE** [1] - 2068:2
**area** [1] - 2084:11
**argue** [1] - 2097:3
**arrangement** [2] -
2095:18, 2095:19
**arrangements** [2] -
2083:9, 2093:2
**artillery** [1] - 2060:21
**ascending** [1] -
2117:5
**aside** [2] - 2077:1,
2119:9
**aspects** [1] - 2091:13
**aspiring** [1] - 2096:25
**assist** [1] - 2086:12
**Associates** [1] -
2040:19
**assume** [4] - 2062:25,
2071:8, 2072:8,
2072:18
**assuming** [1] -
2075:23

**assured** [1] - 2055:8
**asterisk** [3] - 2122:20, 2123:20, 2123:24
**Atlantic** [3] - 2074:2, 2130:12, 2130:14
**attention** [1] - 2069:6
**attorney** [1] - 2147:15
**auction** [66] - 2048:11, 2048:21, 2048:24, 2049:1, 2049:3, 2049:5, 2049:10, 2049:11, 2050:14, 2052:2, 2052:6, 2052:20, 2053:3, 2053:17, 2055:6, 2056:12, 2056:14, 2056:15, 2056:25, 2057:1, 2057:14, 2057:18, 2058:1, 2063:20, 2073:3, 2089:12, 2089:14, 2089:15, 2089:24, 2090:1, 2090:13, 2090:16, 2090:24, 2090:25, 2091:1, 2110:9, 2116:6, 2116:14, 2117:1, 2117:20, 2118:5, 2118:6, 2118:7, 2118:12, 2118:13, 2118:16, 2118:25, 2119:1, 2119:25, 2120:4, 2121:8, 2122:8, 2122:9, 2122:15, 2123:23, 2124:2, 2124:14, 2124:17, 2125:9, 2132:7, 2132:8, 2132:11, 2139:1
**auctions** [23] - 2048:22, 2049:20, 2049:21, 2050:4, 2050:17, 2050:23, 2053:22, 2056:8, 2059:25, 2088:9, 2088:10, 2088:14, 2105:15, 2116:16, 2116:17, 2121:17, 2124:11, 2125:1, 2125:2, 2131:12, 2131:23
**audibly** [1] - 2054:15
**audience** [2] - 2053:10, 2069:4
**audiences** [5] - 2149:4, 2149:6, 2149:12, 2149:14, 2149:17
**audio** [1] - 2106:24
**author** [52] - 2041:22,

2046:25, 2049:17, 2054:24, 2055:2, 2055:16, 2056:11, 2058:3, 2058:20, 2060:3, 2060:4, 2062:9, 2066:3, 2068:17, 2069:3, 2075:6, 2089:11, 2089:16, 2089:19, 2090:23, 2091:11, 2092:10, 2093:8, 2093:11, 2093:13, 2098:23, 2099:1, 2099:3, 2099:4, 2099:14, 2099:19, 2099:22, 2099:23, 2099:24, 2100:1, 2100:6, 2100:16, 2107:6, 2118:17, 2123:21, 2129:7, 2134:6, 2135:12, 2136:2, 2137:11, 2148:2, 2148:6, 2149:3, 2150:1
**author's** [5] - 2059:22, 2092:14, 2092:23, 2099:24, 2121:11
**authors** [34] - 2041:11, 2041:20, 2053:9, 2064:8, 2071:10, 2071:15, 2075:3, 2080:15, 2083:4, 2084:13, 2092:21, 2092:22, 2093:1, 2096:22, 2096:23, 2098:14, 2101:6, 2102:4, 2103:2, 2104:23, 2105:4, 2105:11, 2123:21, 2128:12, 2129:4, 2132:6, 2135:11, 2135:20, 2136:22, 2149:6, 2149:14
**authors'** [1] - 2102:16
**avoid** [1] - 2143:7
**AW** [1] - 2085:18
**Award** [1] - 2130:14

# B

**background** [1] - 2083:10
**backlist** [3] - 2106:8, 2106:11
**bad** [1] - 2064:5
**balance** [1] - 2092:14
**ball** [1] - 2133:16
**ballpark** [1] - 2106:5
**bargaining** [1] - 2108:10

**based** [17] - 2044:20, 2049:16, 2051:14, 2064:22, 2066:17, 2073:2, 2076:16, 2081:1, 2111:7, 2116:10, 2118:18, 2120:7, 2148:2, 2148:21, 2149:17, 2150:24
**basement** [2] - 2106:11, 2106:16
**basis** [1] - 2110:11
**BATNA** [9] - 2125:20, 2125:24, 2126:1, 2126:15, 2126:21, 2126:24, 2127:2, 2127:7, 2129:16
**bearing** [1] - 2104:25
**bears** [1] - 2071:23
**beat** [2] - 2056:22, 2117:6
**beautiful** [1] - 2068:7
**become** [4] - 2054:2, 2064:17, 2095:14, 2112:21
**becomes** [1] - 2060:3
**began** [1] - 2083:14
**begin** [3] - 2112:6, 2116:21, 2116:24
**beginning** [3] - 2084:5, 2110:2, 2118:25
**begins** [1] - 2117:2
**behalf** [2] - 2089:10, 2091:24
**behind** [3] - 2047:4, 2055:21, 2143:6
**below** [9] - 2044:21, 2046:9, 2049:25, 2067:4, 2067:10, 2078:17, 2078:20, 2079:9, 2133:21
**benefit** [1] - 2069:25
**Berkett** [1] - 2151:25
**best** [66] - 2049:9, 2049:11, 2049:14, 2049:22, 2050:3, 2051:24, 2052:24, 2053:4, 2053:6, 2053:7, 2055:16, 2057:3, 2057:6, 2057:9, 2057:11, 2057:15, 2059:25, 2062:8, 2063:6, 2063:22, 2063:23, 2066:11, 2066:15, 2073:11, 2073:13, 2080:22, 2081:2, 2081:7, 2089:12, 2089:14, 2089:18,

2089:24, 2090:7, 2090:13, 2090:15, 2090:18, 2093:18, 2093:19, 2094:17, 2095:17, 2095:18, 2116:20, 2120:11, 2120:12, 2120:16, 2120:23, 2121:4, 2121:5, 2121:6, 2125:8, 2125:19, 2125:23, 2125:24, 2127:5, 2128:2, 2129:9, 2129:10, 2132:8, 2132:9, 2132:12, 2135:18, 2138:22
**best-bid** [3] - 2049:22, 2090:13, 2138:22
**best-bids** [5] - 2057:15, 2089:12, 2089:14, 2089:24, 2116:20
**betrayal** [1] - 2073:25
**better** [8] - 2049:22, 2053:18, 2091:5, 2121:3, 2121:4, 2127:6, 2135:13, 2150:6
**between** [8] - 2043:16, 2069:13, 2090:12, 2093:11, 2107:6, 2113:2, 2118:24, 2126:24
**beyond** [1] - 2063:22
**bid** [29] - 2049:6, 2049:7, 2049:18, 2049:22, 2049:23, 2053:4, 2053:11, 2053:17, 2053:18, 2055:24, 2056:21, 2087:19, 2087:23, 2088:7, 2088:19, 2089:10, 2089:16, 2090:13, 2090:15, 2091:3, 2118:23, 2119:19, 2119:20, 2120:12, 2120:16, 2131:16, 2132:12, 2138:22
**Bidder** [1] - 2057:5
**bidder** [13] - 2049:7, 2072:21, 2087:25, 2088:2, 2093:5, 2093:6, 2106:1, 2117:6, 2119:14, 2131:17, 2131:18, 2131:19
**bidders** [7] - 2057:4, 2087:17, 2087:21, 2090:14, 2090:17,

2122:14, 2141:15
**bidding** [4] - 2053:23, 2055:20, 2119:8, 2127:13
**bids** [29] - 2049:9, 2049:12, 2050:3, 2057:3, 2057:6, 2057:15, 2060:1, 2063:23, 2089:12, 2089:14, 2089:24, 2090:1, 2090:2, 2090:3, 2090:6, 2090:14, 2116:20, 2117:2, 2117:4, 2119:15, 2119:23, 2120:11, 2120:12, 2120:23, 2121:4, 2121:6, 2132:8, 2132:9
**Big** [34] - 2046:24, 2047:1, 2047:8, 2047:9, 2047:14, 2047:15, 2047:16, 2047:18, 2047:19, 2075:18, 2075:22, 2095:2, 2095:3, 2095:6, 2095:10, 2095:24, 2096:2, 2096:9, 2096:13, 2130:3, 2130:10, 2130:18, 2143:13, 2143:17, 2143:20, 2143:23, 2144:8, 2144:14, 2145:1, 2145:2, 2145:6, 2145:10
**big** [7] - 2052:23, 2059:21, 2061:6, 2066:21, 2067:25, 2073:25, 2081:12
**bigger** [4] - 2062:23, 2130:22, 2131:6, 2136:1
**binder** [6] - 2097:20, 2100:12, 2140:9, 2140:14, 2142:8, 2142:12
**binders** [3] - 2039:24, 2140:4, 2140:6
**bit** [8] - 2042:5, 2083:10, 2084:3, 2084:4, 2090:11, 2093:5, 2131:8, 2151:15
**Blackstone** [1] - 2094:25
**blind** [3] - 2049:6, 2049:15, 2117:2
**Blooms** [1] - 2130:16
**Bloomsbury** [5] -

2044:12, 2044:17, 2046:14, 2046:19, 2130:16
**blow** [1] - 2106:17
**blue** [1] - 2143:17
**blurbed** [1] - 2068:17
**board** [2] - 2072:17, 2137:1
**bomb** [1] - 2059:21
**book** [109] - 2041:22, 2047:11, 2048:10, 2050:24, 2052:4, 2054:8, 2055:14, 2055:15, 2055:16, 2058:15, 2058:16, 2059:8, 2059:17, 2060:18, 2060:19, 2061:17, 2063:7, 2063:14, 2063:17, 2064:4, 2064:6, 2064:11, 2064:21, 2066:12, 2066:15, 2066:21, 2067:12, 2067:13, 2067:21, 2068:18, 2068:19, 2069:10, 2070:6, 2070:8, 2073:11, 2073:14, 2077:13, 2077:17, 2077:21, 2077:23, 2077:24, 2078:1, 2078:2, 2078:7, 2078:8, 2078:14, 2078:15, 2079:5, 2079:7, 2079:13, 2079:16, 2079:21, 2081:2, 2086:15, 2087:4, 2087:11, 2088:3, 2088:5, 2088:7, 2088:15, 2089:10, 2089:20, 2092:18, 2093:13, 2095:14, 2095:16, 2095:20, 2098:9, 2099:2, 2099:4, 2101:13, 2101:21, 2102:8, 2102:11, 2102:13, 2105:1, 2107:4, 2108:23, 2109:9, 2109:10, 2109:11, 2109:12, 2109:14, 2110:8, 2110:24, 2113:1, 2113:19, 2117:23, 2121:20, 2124:8, 2124:12, 2125:1, 2126:6, 2126:20, 2127:4, 2130:12, 2130:16, 2133:15, 2145:16, 2145:22, 2146:25,

2148:17, 2149:22, 2150:6, 2150:13, 2150:17, 2150:22
**Book** [7] - 2126:6, 2126:7, 2126:8, 2126:23, 2130:14
**Books** [1] - 2050:20
**books** [78] - 2041:20, 2043:18, 2051:23, 2053:10, 2056:1, 2058:24, 2059:12, 2065:23, 2067:3, 2067:7, 2067:23, 2068:6, 2069:11, 2069:19, 2074:25, 2075:5, 2075:9, 2077:11, 2077:15, 2078:17, 2078:22, 2079:2, 2079:8, 2080:5, 2083:21, 2084:5, 2084:6, 2084:8, 2084:9, 2087:25, 2088:20, 2096:17, 2099:6, 2101:3, 2101:4, 2101:25, 2102:19, 2102:24, 2103:3, 2104:6, 2104:9, 2106:1, 2106:3, 2107:2, 2107:7, 2107:9, 2107:19, 2108:20, 2108:22, 2113:18, 2115:19, 2126:5, 2126:25, 2128:12, 2130:16, 2130:17, 2130:18, 2131:3, 2132:20, 2133:4, 2133:9, 2133:12, 2133:19, 2133:21, 2134:3, 2134:4, 2134:14, 2135:11, 2144:20, 2144:23, 2145:17, 2146:9, 2147:4, 2147:8, 2148:25, 2149:1, 2150:2
**BookScan** [1] - 2134:7
**bookseller** [1] - 2068:16
**bookstore** [2] - 2083:13, 2135:17
**bookstores** [4] - 2047:12, 2135:16, 2135:19, 2136:8
**boss** [2] - 2056:22, 2060:22
**bottom** [5] - 2085:18, 2115:24, 2124:22, 2139:8, 2142:16

**bought** [2] - 2126:23, 2130:12
**bowing** [1] - 2141:3
**brag** [1] - 2084:4
**break** [6] - 2073:5, 2097:9, 2097:13, 2101:10, 2151:8, 2152:19
**breakdown** [2] - 2113:3, 2145:14
**breakdowns** [1] - 2114:18
**breaks** [2] - 2113:23, 2113:24
**bright** [2] - 2067:10, 2134:2
**bring** [3] - 2063:9, 2124:4, 2149:12
**bringing** [1] - 2047:11
**broad** [1] - 2110:16
**broadening** [1] - 2093:15
**broader** [5] - 2109:18, 2109:22, 2109:25, 2110:4, 2110:7
**broadest** [1] - 2095:7
**broadly** [1] - 2047:10
**build** [1] - 2079:6
**built** [1] - 2069:4
**bummed** [1] - 2058:5
**bunch** [2] - 2049:2, 2090:5
**burden** [1] - 2150:5
**business** [30] - 2055:22, 2062:19, 2073:2, 2073:6, 2073:24, 2076:6, 2079:5, 2080:18, 2081:6, 2091:21, 2094:8, 2094:15, 2094:24, 2096:19, 2103:8, 2103:10, 2103:15, 2108:5, 2108:21, 2126:13, 2127:11, 2132:25, 2133:17, 2134:1, 2135:19, 2137:7, 2137:12, 2137:14, 2145:7, 2145:9
**buy** [1] - 2130:18

## C

**calculate** [2] - 2093:12, 2093:21
**calculation** [1] - 2107:2
**cannot** [1] - 2069:24
**capabilities** [1] - 2145:11

**capacity** [1] - 2131:4
**care** [3] - 2080:17, 2113:24, 2135:11
**career** [2] - 2059:22, 2080:13, 2096:18
**carefully** [1] - 2131:8
**carrying** [1] - 2095:12
**case** [15] - 2047:5, 2049:3, 2049:14, 2058:1, 2061:7, 2065:24, 2067:11, 2067:22, 2091:15, 2092:2, 2125:22, 2131:19, 2132:16, 2133:1, 2151:12
**cases** [3] - 2047:2, 2092:22, 2093:14
**categories** [3] - 2113:23, 2113:24, 2116:18
**category** [5] - 2041:25, 2066:12, 2067:6, 2068:1, 2125:4
**cautious** [1] - 2059:24
**Celadon** [6] - 2138:20, 2138:21, 2139:12, 2139:22, 2141:18, 2141:22
**cent** [1] - 2057:11
**CEO** [3] - 2076:20, 2103:16, 2152:1
**certain** [7] - 2100:2, 2126:10, 2126:11, 2129:3, 2132:8, 2133:4, 2133:20
**certainly** [2] - 2067:5, 2137:12
**cetera** [1] - 2081:4
**chair** [1] - 2082:3
**change** [5] - 2058:17, 2058:18, 2138:18, 2138:19
**changed** [2] - 2138:12, 2138:14
**changes** [2] - 2121:23, 2142:21
**characterize** [1] - 2132:21
**charge** [1] - 2085:16
**Charles** [2] - 2098:14, 2098:17
**chart** [5] - 2042:9, 2050:12, 2055:7, 2077:2, 2142:7
**cheap** [1] - 2068:4
**cheaply** [1] - 2068:3
**check** [1] - 2151:13
**checked** [1] - 2139:23
**Cheney** [9] - 2038:4,

2039:6, 2040:5, 2040:6, 2040:12, 2048:9, 2074:5, 2074:18, 2075:1
**chief** [1] - 2083:18
**children's** [9] - 2077:11, 2077:13, 2077:14, 2077:23, 2078:15, 2078:22, 2079:2, 2079:5, 2079:8
**choice** [1] - 2110:23
**choose** [2] - 2080:10, 2090:20
**circles** [1] - 2149:4
**circumstances** [2] - 2052:11, 2093:7
**clarification** [1] - 2098:5
**clarifications** [1] - 2121:24
**clarify** [3] - 2049:1, 2079:4, 2105:15
**class** [1] - 2066:11
**clause** [1] - 2109:12
**clear** [2] - 2091:23, 2128:8
**cleared** [1] - 2151:12
**clearly** [1] - 2134:23
**client** [21] - 2053:6, 2053:8, 2054:13, 2055:2, 2055:9, 2062:21, 2085:16, 2093:18, 2099:18, 2117:23, 2120:18, 2121:3, 2121:11, 2125:8, 2125:11, 2125:12, 2126:3, 2129:10, 2149:1, 2150:11
**client's** [2] - 2062:25, 2119:6
**clients** [26] - 2046:25, 2055:21, 2063:5, 2069:14, 2073:20, 2073:22, 2084:3, 2084:25, 2091:11, 2091:23, 2091:24, 2092:11, 2094:16, 2113:8, 2118:1, 2125:16, 2134:12, 2134:14, 2135:15, 2145:7, 2145:9, 2149:12, 2149:16, 2150:15
**Clinton** [1] - 2150:16
**closely** [1] - 2083:8
**closing** [1] - 2151:20
**CNN** [1] - 2113:9
**co** [2] - 2123:2,

2123:21
**co-agent** [1] - 2123:21
**coded** [5] - 2042:4, 2043:2, 2044:13, 2050:12, 2077:2
**coding** [1] - 2077:5
**collect** [1] - 2118:9
**collection** [2] - 2109:5, 2109:19
**college** [1] - 2083:12
**colleges** [1] - 2064:18
**color** [6] - 2042:4, 2043:2, 2044:13, 2050:12, 2077:2, 2077:5
**color-coded** [5] - 2042:4, 2043:2, 2044:13, 2050:12, 2077:2
**column** [5] - 2045:9, 2046:20, 2087:7, 2087:13, 2087:17
**columns** [1] - 2116:3
**combination** [1] - 2090:22
**combined** [2] - 2091:22, 2092:16
**comfortable** [1] - 2072:12
**coming** [6] - 2049:15, 2049:18, 2052:18, 2069:5, 2070:3, 2109:19
**commercial** [1] - 2097:5
**commission** [2] - 2054:22, 2103:3
**commitment** [1] - 2069:19
**communicate** [1] - 2063:8
**communicates** [2] - 2063:13, 2063:14
**community** [2] - 2071:19, 2109:7
**company** [9] - 2068:9, 2069:20, 2069:22, 2071:5, 2071:6, 2072:19, 2094:22, 2094:24, 2135:25
**compared** [3] - 2047:1, 2064:7, 2073:21
**comparison** [1] - 2066:14
**compels** [1] - 2089:16
**compendium** [1] - 2114:17
**compensation** [3] - 2092:11, 2136:2,

2148:6
**compete** [2] - 2119:13, 2129:25
**competition** [13] - 2054:12, 2058:11, 2058:13, 2059:6, 2064:11, 2064:12, 2064:20, 2065:5, 2065:9, 2080:25, 2091:1, 2127:17, 2148:2
**competitive** [5] - 2053:3, 2053:22, 2055:6, 2129:17
**competitor** [3] - 2127:12, 2129:21
**competitors** [5] - 2128:17, 2128:22, 2129:18, 2129:23, 2129:24
**complaint** [1] - 2132:18
**complicated** [1] - 2099:21
**components** [1] - 2056:6
**compose** [1] - 2089:17
**compromise** [1] - 2107:20
**comps** [1] - 2066:18
**computer** [1] - 2095:12
**concentric** [1] - 2149:4
**concern** [1] - 2135:25
**concerned** [1] - 2103:10
**concerns** [1] - 2102:16
**concluded** [1] - 2152:21
**conclusion** [2] - 2067:14, 2121:7
**conduct** [5] - 2088:10, 2088:14, 2090:24, 2116:16, 2123:25
**conducted** [4] - 2052:6, 2057:20, 2123:20, 2148:5
**conducting** [2] - 2117:1, 2125:9
**confidential** [4] - 2107:21, 2115:3, 2123:13, 2140:20
**confirm** [2] - 2143:17, 2143:20
**conflict** [1] - 2104:13
**connect** [1] - 2058:16
**connection** [1] -

2084:17
**consensus** [2] - 2108:23, 2150:20
**consent** [1] - 2062:25
**consider** [2] - 2064:12, 2089:18
**considerations** [1] - 2092:3
**considering** [1] - 2064:13
**consistent** [1] - 2120:17
**consult** [1] - 2083:8
**consulting** [1] - 2113:9
**contagion** [1] - 2056:20
**context** [3] - 2089:19, 2090:23, 2148:22
**continue** [3] - 2055:25, 2056:1, 2135:8
**continued** [1] - 2084:11
**continuing** [1] - 2074:19
**contract** [3] - 2052:16, 2091:14, 2113:7
**contracts** [5] - 2084:25, 2085:1, 2107:3, 2107:8, 2113:6
**contrast** [1] - 2133:20
**control** [3] - 2102:3, 2119:7, 2133:3
**conversations** [2] - 2102:7, 2104:11
**convey** [2] - 2091:24, 2092:1
**conveyed** [1] - 2107:10
**conveying** [1] - 2107:4
**cookbook** [2] - 2077:17, 2077:21
**cookbooks** [1] - 2078:24
**coordinate** [1] - 2119:20
**coordination** [1] - 2071:4
**copies** [2] - 2066:16, 2134:8
**copy** [2] - 2043:7, 2067:21
**corporate** [6] - 2061:23, 2094:12, 2127:23, 2127:24, 2129:14, 2130:7
**correct** [50] - 2044:7,

2044:8, 2044:18, 2045:9, 2045:16, 2050:22, 2075:17, 2075:23, 2078:13, 2079:4, 2088:4, 2088:8, 2088:16, 2092:9, 2098:9, 2098:12, 2100:17, 2102:12, 2114:21, 2115:1, 2115:13, 2115:21, 2116:15, 2122:6, 2123:12, 2124:3, 2124:6, 2124:23, 2125:5, 2127:25, 2138:13, 2138:14, 2141:3, 2142:14, 2142:20, 2143:25, 2144:1, 2144:5, 2144:8, 2144:11, 2144:12, 2144:13, 2144:15, 2144:18, 2144:23, 2145:2, 2145:8, 2145:23, 2147:1, 2148:3
**corrected** [4] - 2044:21, 2139:4, 2139:5, 2139:6
**correction** [3] - 2043:25, 2122:18, 2122:19
**corrections** [4] - 2043:20, 2043:23, 2044:3, 2045:6
**correctly** [3] - 2100:18, 2146:14, 2147:11
**cost** [1] - 2104:25
**counsel** [1] - 2099:17
**count** [5] - 2085:21, 2087:6, 2124:7, 2143:7, 2143:23
**countries** [1] - 2092:5
**country** [1] - 2135:16
**couple** [8] - 2059:20, 2064:9, 2065:21, 2078:21, 2083:13, 2113:5, 2148:13, 2150:11
**course** [10] - 2039:23, 2062:12, 2063:1, 2096:18, 2107:18, 2119:7, 2127:18, 2130:24, 2131:11, 2131:15
**Court** [3] - 2083:10, 2113:17, 2114:13
**COURT** [153] - 2039:4, 2039:7, 2039:11, 2039:14, 2039:18,

2039:21, 2039:23, 2039:25, 2040:21, 2040:24, 2041:2, 2041:18, 2042:14, 2042:16, 2042:17, 2042:19, 2042:20, 2042:23, 2043:3, 2043:6, 2043:10, 2043:13, 2044:25, 2048:15, 2048:19, 2059:4, 2064:10, 2064:19, 2065:2, 2065:9, 2065:11, 2065:14, 2065:19, 2070:19, 2072:3, 2072:5, 2074:7, 2074:11, 2074:15, 2078:3, 2079:25, 2080:5, 2080:8, 2080:16, 2080:21, 2080:24, 2081:4, 2081:18, 2081:20, 2081:25, 2082:3, 2082:8, 2082:13, 2082:16, 2083:25, 2085:4, 2085:6, 2085:8, 2086:1, 2086:22, 2086:24, 2088:24, 2089:3, 2089:12, 2089:14, 2089:23, 2090:5, 2090:9, 2095:23, 2096:1, 2096:7, 2097:8, 2097:12, 2097:16, 2097:19, 2097:22, 2097:25, 2099:8, 2099:10, 2099:13, 2099:17, 2100:22, 2100:24, 2103:19, 2103:24, 2104:2, 2106:19, 2108:3, 2108:7, 2108:10, 2108:14, 2108:18, 2108:22, 2108:25, 2109:13, 2109:16, 2109:22, 2109:25, 2110:4, 2110:12, 2110:15, 2110:19, 2110:22, 2111:6, 2111:9, 2111:16, 2111:21, 2111:25, 2112:7, 2115:6, 2115:8, 2123:4, 2123:14, 2127:2, 2135:23, 2137:19, 2137:23, 2137:25, 2140:8, 2140:10, 2141:8, 2141:12, 2141:14, 2141:17, 2141:19, 2141:23, 2142:3,

2142:25, 2143:2,
2146:3, 2146:5,
2146:20, 2147:14,
2147:19, 2147:21,
2148:10, 2148:12,
2148:16, 2148:19,
2149:16, 2149:21,
2150:19, 2150:24,
2151:3, 2151:5,
2151:7, 2151:16,
2151:21, 2151:23,
2152:4, 2152:8,
2152:10, 2152:17
**court** [1] - 2097:23
**covered** [1] - 2107:5
**COVID** [1] - 2118:2
**create** [3] - 2053:25,
2065:7, 2101:24
**cross** [3] - 2074:8,
2152:13
**Cross** [4] - 2038:5,
2038:8, 2038:11,
2097:23
**CROSS** [16] - 2074:16,
2085:5, 2086:23,
2097:21, 2097:23,
2098:1, 2098:2,
2100:4, 2100:20,
2101:2, 2103:22,
2103:25, 2104:3,
2104:4, 2106:18,
2138:1
**Cross-Examination**
[3] - 2038:5, 2038:8,
2038:11
**CROSS-
EXAMINATION**[3] -
2074:16, 2098:1,
2138:1
**Cross.................** [1] -
2038:8
**crystal** [1] - 2133:15
**culture** [2] - 2054:1,
2054:4
**cut** [4] - 2048:4,
2062:15, 2062:16,
2081:10

## D

**daily** [1] - 2101:7
**damaging** [1] - 2102:5
**Danielle** [1] - 2096:23
**date** [6] - 2071:22,
2122:7, 2122:8,
2122:9, 2124:20,
2141:16
**dates** [1] - 2118:7
**days** [1] - 2118:1
**de** [1] - 2118:13

**deal** [31] - 2044:17,
2053:6, 2053:7,
2058:12, 2061:14,
2061:19, 2062:11,
2068:22, 2073:9,
2073:14, 2075:14,
2075:16, 2077:2,
2077:20, 2078:24,
2079:20, 2092:4,
2093:14, 2093:18,
2093:19, 2094:17,
2095:4, 2108:12,
2109:17, 2110:14,
2122:20, 2124:25,
2125:8, 2125:23,
2128:18, 2130:25
**dealing** [2] - 2091:16,
2096:9
**deals** [48] - 2042:9,
2043:16, 2044:20,
2045:7, 2045:9,
2045:11, 2046:8,
2046:12, 2046:23,
2047:14, 2048:5,
2052:6, 2058:6,
2075:21, 2075:24,
2076:16, 2077:10,
2079:11, 2079:17,
2085:18, 2085:19,
2085:22, 2086:13,
2087:3, 2092:5,
2092:8, 2092:11,
2095:10, 2108:5,
2108:8, 2114:22,
2114:23, 2114:24,
2115:11, 2115:18,
2115:19, 2142:19,
2143:17, 2143:20,
2143:23, 2144:7,
2144:10, 2144:14,
2144:17, 2144:25,
2145:1, 2150:13
**debt** [1] - 2094:25
**dec** [1] - 2132:4
**decade** [1] - 2132:4
**deceased** [1] -
2084:14
**decentralized** [1] -
2071:6
**decide** [7] - 2051:25,
2052:25, 2057:8,
2061:16, 2066:1,
2066:5, 2151:19
**decided** [1] - 2101:24
**deciding** [1] - 2125:11
**decision** [1] - 2121:12
**decisions** [1] -
2117:21
**decline** [1] - 2089:7
**decoder** [1] - 2039:9

**deem** [1] - 2109:6
**deemed** [1] - 2084:8
**defendants'** [1] -
2074:20
**Defendants'** [11] -
2041:16, 2043:2,
2043:6, 2043:11,
2048:5, 2052:5,
2071:18, 2074:23,
2077:3, 2083:23,
2113:16
**define** [1] - 2053:7
**definitely** [1] -
2052:14
**degree** [2] - 2093:22,
2100:2
**demarcation** [1] -
2133:18
**demonstrative** [4] -
2041:13, 2042:4,
2044:22, 2074:20
**Demonstrative** [16] -
2041:15, 2041:16,
2043:2, 2043:6,
2043:12, 2044:13,
2044:23, 2048:6,
2048:16, 2048:17,
2050:5, 2052:5,
2074:24, 2077:3,
2083:24, 2113:16
**department** [2] -
2063:16
**depo** [1] - 2140:13
**deposed** [1] - 2139:25
**deposition** [12] -
2100:9, 2100:13,
2121:22, 2122:1,
2122:13, 2138:14,
2138:20, 2139:23,
2140:14, 2141:21,
2145:25, 2146:5
**Deposition** [5] -
2038:20, 2100:25,
2141:25, 2146:21,
2147:22
**describe** [1] - 2109:1
**described** [1] - 2075:3
**destroying** [1] -
2095:1
**detailed** [1] - 2094:7
**determinant** [1] -
2053:21
**determinative** [1] -
2065:17
**determine** [3] -
2080:10, 2110:5,
2121:4
**determined** [1] -
2061:16
**developed** [1] -

2070:1
**dictate** [1] - 2092:3
**dies** [1] - 2097:5
**differ** [1] - 2109:1
**difference** [2] -
2070:15, 2090:12
**differences** [2] -
2047:8, 2048:1
**different** [27] -
2047:24, 2048:21,
2048:24, 2049:18,
2056:6, 2067:13,
2067:15, 2067:17,
2070:6, 2073:9,
2085:13, 2089:24,
2105:20, 2108:8,
2111:1, 2114:16,
2114:17, 2120:20,
2123:22, 2129:4,
2129:5, 2129:17,
2131:5, 2139:1,
2139:2, 2142:8,
2145:14
**differently** [3] -
2067:4, 2067:8,
2067:9
**difficult** [2] - 2133:1,
2133:2
**digital** [9] - 2101:12,
2101:15, 2103:2,
2104:9, 2104:16,
2104:19, 2104:22,
2105:3, 2106:25
**digitally** [2] - 2102:4,
2107:3
**DIRECT** [3] - 2040:3,
2082:18, 2112:2
**Direct** [3] - 2038:5,
2038:7, 2038:10
**direct** [18] - 2052:12,
2053:2, 2053:19,
2055:5, 2057:20,
2058:9, 2059:5,
2059:7, 2061:10,
2061:21, 2061:25,
2090:25, 2116:13,
2125:4, 2125:7,
2128:1, 2129:1,
2140:13
**directly** [1] - 2091:19
**disadvantaged** [1] -
2062:2
**discount** [1] - 2095:2
**discuss** [1] - 2074:19
**discussed** [2] -
2078:17, 2120:18,
2122:13
**discussion** [2] -
2107:21, 2132:14
**discussions** [4] -

2076:23, 2093:16,
2118:18, 2118:22
**Disney** [1] - 2144:20
**display** [1] - 2084:1
**displayed** [2] - 2045:1,
2048:6
**dispute** [1] - 2107:12
**distance** [3] -
2049:21, 2120:4,
2120:6
**distribute** [2] -
2102:24, 2104:6
**distributed** [2] -
2102:19, 2107:3
**distribution** [3] -
2084:8, 2095:9,
2102:21
**District** [1] - 2112:18
**dividing** [1] - 2067:3
**division** [1] - 2091:12
**document** [10] -
2043:12, 2077:1,
2084:22, 2086:6,
2114:15, 2114:17,
2115:3, 2138:5,
2138:8, 2142:12
**documents** [3] -
2039:22, 2082:11,
2111:24
**Dohle** [6] - 2071:20,
2076:20, 2076:23,
2103:16, 2104:5,
2104:11
**DOJ** [1] - 2142:13
**dollar** [6] - 2059:17,
2062:15, 2067:21,
2117:7, 2134:4,
2134:5
**dollars** [6] - 2062:21,
2066:9, 2066:25,
2099:2, 2099:4,
2133:10
**Donald** [1] - 2150:14
**done** [16] - 2044:5,
2044:7, 2044:11,
2044:20, 2045:7,
2047:14, 2048:4,
2048:16, 2060:16,
2060:18, 2080:14,
2093:14, 2099:25,
2110:14, 2140:21,
2150:1
**double** [1] - 2139:23
**double-checked** [1] -
2139:23
**down** [11] - 2052:24,
2060:4, 2081:21,
2082:4, 2082:8,
2111:12, 2113:23,
2113:24, 2122:17,

2122:25, 2123:1
**downstream** [2] -
2058:22, 2128:9
**drafted** [1] - 2107:8
**dramatic** [1] - 2070:18
**dribble** [1] - 2073:19
**drive** [1] - 2069:10
**driven** [2] - 2069:23
**driver** [1] - 2068:1
**drives** [1] - 2064:15
**driving** [1] - 2068:20
**dropped** [5] - 2138:21,
2139:13, 2139:14,
2139:22, 2141:22
**dropping** [1] - 2057:4
**drum** [1] - 2090:25
**Duhigg** [2] - 2098:14,
2098:17
**during** [6] - 2054:14,
2079:9, 2097:13,
2114:18, 2115:16,
2147:2
**DX** [5] - 2038:17,
2038:18, 2039:9,
2039:13, 2072:6

---

### E

**e-book** [6] - 2101:13,
2101:21, 2102:8,
2102:11, 2102:13,
2107:4
**e-books** [4] - 2101:25,
2103:3, 2107:9
**earn** [11] - 2098:23,
2099:1, 2099:2,
2099:6, 2099:14,
2099:19, 2099:22,
2099:24, 2100:7,
2100:16, 2101:4
**earned** [1] - 2099:4
**easier** [4] - 2042:5,
2127:8, 2127:10,
2143:5
**easily** [1] - 2108:21
**East** [1] - 2041:10
**easy** [1] - 2115:2
**economy** [1] - 2137:2
**ecosystem** [1] -
2135:12
**edit** [1] - 2089:9
**editing** [1] - 2126:10
**Edition** [1] - 2103:3
**Editions** [12] -
2101:19, 2101:24,
2102:8, 2102:14,
2102:18, 2102:20,
2102:25, 2103:6,
2103:8, 2104:7,
2104:10, 2104:13

**editor** [33] - 2053:14,
2054:3, 2055:17,
2057:23, 2060:20,
2061:17, 2063:9,
2063:12, 2063:13,
2063:14, 2068:1,
2068:14, 2080:9,
2080:22, 2083:17,
2083:18, 2087:12,
2087:16, 2089:1,
2089:9, 2089:19,
2091:5, 2093:8,
2093:10, 2093:11,
2093:15, 2093:16,
2110:10, 2110:17,
2110:24, 2120:18,
2125:14, 2126:13
**editor's** [1] - 2091:3
**editorial** [5] - 2090:22,
2118:18, 2120:17,
2126:19, 2145:10
**editorially** [1] - 2095:7
**editors** [16] - 2051:24,
2064:12, 2064:22,
2076:8, 2076:10,
2076:18, 2081:6,
2081:7, 2081:13,
2090:5, 2094:8,
2105:20, 2129:4,
2130:3, 2149:15,
2150:20
**Edwards** [1] - 2039:3
**effect** [1] - 2148:1
**effective** [1] - 2105:7
**efficiencies** [2] -
2152:3, 2152:16
**eight** [8] - 2040:20,
2041:6, 2048:22,
2049:20, 2144:8,
2144:14, 2144:25
**either** [17] - 2047:4,
2050:23, 2052:25,
2053:3, 2057:14,
2075:9, 2084:10,
2089:6, 2093:8,
2115:16, 2115:19,
2117:2, 2121:19,
2124:11, 2126:3,
2133:24, 2136:1
**elaborate** [2] -
2069:16, 2090:11
**elected** [1] - 2150:14
**electronically** [2] -
2102:19, 2117:3
**elsewhere** [1] -
2060:11
**Elyse** [4] - 2038:4,
2039:6, 2040:6,
2075:1
**embarrassed** [2] -

2128:6, 2130:4
**emotional** [1] -
2056:20
**employees** [1] -
2083:2
**end** [10] - 2044:15,
2056:16, 2057:18,
2059:21, 2060:1,
2066:8, 2120:5,
2120:9, 2120:13,
2129:9
**ended** [1] - 2064:6
**ending** [4] - 2049:22,
2050:2, 2057:7,
2057:17
**endorsements** [1] -
2068:15
**ends** [1] - 2053:4
**engagement** [1] -
2090:23
**England** [1] - 2083:11
**enjoy** [2] - 2096:25,
2097:1
**ensuing** [1] - 2137:10
**entered** [2] - 2084:25,
2107:4
**enterprise** [1] -
2094:21
**enters** [1] - 2061:14
**enthusiastic** [2] -
2111:4, 2111:5
**entire** [1] - 2114:15
**entirely** [2] - 2051:2,
2092:20
**entities** [1] - 2127:23
**environment** [1] -
2114:1
**environmental** [1] -
2096:6
**ephemeral** [1] -
2126:19
**equal** [1] - 2047:6
**equity** [4] - 2094:22,
2094:24, 2135:1,
2135:22
**equivalent** [1] -
2104:25
**especially** [1] -
2070:24
**essential** [1] - 2063:16
**essentially** [3] -
2052:12, 2091:16,
2092:17
**establishing** [1] -
2141:21
**estates** [1] - 2084:13
**estimated** [1] - 2101:3
**estimates** [2] -
2148:21, 2148:24
**et** [1] - 2081:4

**Europe** [1] - 2083:12
**evidence** [18] -
2039:13, 2042:25,
2072:2, 2072:6,
2085:3, 2085:11,
2086:25, 2100:21,
2101:1, 2115:9,
2137:20, 2141:6,
2142:1, 2142:24,
2143:3, 2146:22,
2147:18, 2147:23
**exactly** [4] - 2060:23,
2107:11, 2110:8,
2141:12
**Examination** [7] -
2038:5, 2038:5,
2038:7, 2038:8,
2038:8, 2038:10,
2038:11
**examination** [1] -
2039:9
**EXAMINATION** [7] -
2040:3, 2074:16,
2082:18, 2098:1,
2106:21, 2112:2,
2138:1
**example** [9] - 2059:9,
2063:18, 2063:19,
2067:20, 2081:14,
2095:11, 2109:3,
2119:17
**excellent** [1] - 2097:20
**except** [4] - 2092:2,
2142:21, 2145:21,
2146:24
**exceptions** [1] -
2106:2
**excited** [1] - 2052:20
**exciting** [1] - 2054:3
**exclusive** [12] -
2048:12, 2052:9,
2052:14, 2056:5,
2059:10, 2060:9,
2116:6, 2116:13,
2145:21, 2146:12,
2146:24, 2147:7
**exclusively** [3] -
2057:9, 2057:15,
2102:19
**Exhibit** [17] - 2039:13,
2042:25, 2044:20,
2072:6, 2084:20,
2085:11, 2086:6,
2086:21, 2086:25,
2114:11, 2115:9,
2121:15, 2122:9,
2123:10, 2137:18,

2137:20, 2143:3
**exhibit** [2] - 2042:2,
2142:8
**exhibits** [2] - 2038:13,
2084:20
**existence** [1] - 2101:7
**exists** [3] - 2133:13,
2133:14, 2133:25
**expect** [1] - 2067:17
**expectations** [3] -
2125:13, 2149:18,
2149:20
**expected** [4] - 2070:5,
2070:8, 2148:21,
2149:16
**expecting** [2] -
2151:11, 2152:10
**experience** [14] -
2047:7, 2047:25,
2051:17, 2053:13,
2053:14, 2056:17,
2067:2, 2093:9,
2094:5, 2096:9,
2126:12, 2130:18,
2131:1, 2148:3
**experiences** [1] -
2042:1
**expert** [1] - 2095:9
**expertise** [1] - 2081:1
**expiring** [1] - 2050:3
**explain** [7] - 2057:14,
2080:19, 2116:11,
2116:20, 2116:21,
2125:7, 2148:22
**explaining** [1] -
2120:1
**exploring** [1] - 2054:8
**expressed** [1] -
2129:5
**expression** [1] -
2096:17
**extent** [1] - 2137:13
**external** [5] - 2072:21,
2119:14, 2131:17,
2131:18, 2131:19
**externals** [2] - 2150:9,
2150:15
**extremely** [1] -
2067:24
**eye** [2] - 2055:17

---

### F

**faced** [1] - 2070:23
**fact** [7] - 2059:18,
2067:21, 2071:14,
2079:20, 2106:11,
2126:20, 2141:22
**factor** [3] - 2065:13,
2076:13, 2126:9

**factors** [10] - 2055:10, 2064:22, 2066:19, 2081:1, 2108:14, 2133:2, 2149:23, 2150:17, 2150:19, 2150:21
**failed** [1] - 2087:19
**fair** [7] - 2057:22, 2076:17, 2104:13, 2105:3, 2127:8, 2130:1, 2130:19
**fairly** [1] - 2117:20
**fall** [4] - 2066:21, 2116:18, 2125:4, 2150:7
**fallen** [1] - 2118:17
**familiar** [4] - 2065:23, 2096:18, 2096:19, 2131:13
**famous** [2] - 2068:17, 2114:12
**fancier** [1] - 2068:2
**far** [1] - 2053:23
**fashioned** [1] - 2116:19
**father** [1] - 2083:16
**February** [1] - 2071:23
**fellowship** [1] - 2083:12
**felt** [4] - 2072:12, 2084:9, 2102:2, 2102:16
**fever** [1] - 2056:15
**few** [8] - 2039:22, 2057:4, 2076:25, 2099:6, 2099:9, 2134:8, 2143:8
**fiction** [2] - 2041:12, 2084:6
**fifteen** [1] - 2083:5
**figure** [1] - 2147:12
**figures** [1] - 2133:10
**figuring** [1] - 2126:1
**fill** [3] - 2066:20, 2130:23, 2131:9
**final** [4] - 2060:17, 2069:12, 2122:14, 2141:15
**finalist** [1] - 2130:14
**finally** [1] - 2068:8
**financed** [1] - 2095:8
**financial** [8] - 2089:17, 2090:3, 2090:22, 2091:5, 2091:8, 2091:10, 2097:2, 2101:9
**fine** [1] - 2068:10
**finish** [1] - 2151:18
**finished** [1] - 2088:20
**finishing** [1] - 2050:25

**firm** [6] - 2041:5, 2070:4, 2070:25, 2088:14, 2112:17, 2114:3
**firms** [3] - 2095:6, 2095:10, 2119:22
**first** [19] - 2041:13, 2051:21, 2073:10, 2074:23, 2077:10, 2078:14, 2090:1, 2092:18, 2092:23, 2093:2, 2105:23, 2113:1, 2114:14, 2117:2, 2117:4, 2117:17, 2132:18, 2134:8, 2138:10
**first-round** [1] - 2117:4
**fit** [1] - 2067:5
**five** [5] - 2050:18, 2050:23, 2051:10, 2114:7, 2133:10
**flares** [1] - 2097:5
**flop** [1] - 2134:5
**flying** [1] - 2049:15
**focus** [1] - 2087:2
**focused** [1] - 2135:12
**focusing** [2] - 2093:17, 2134:13
**follow** [5] - 2053:2, 2088:17, 2088:18, 2128:8, 2137:5
**followed** [1] - 2151:25
**following** [3] - 2106:23, 2137:11, 2151:12
**force** [1] - 2063:15
**form** [2] - 2091:1, 2104:10
**formal** [2] - 2090:13, 2090:24
**format** [4] - 2048:10, 2048:24, 2051:18, 2079:21
**formats** [2] - 2048:11, 2079:21
**forms** [1] - 2049:4
**forth** [2] - 2045:7, 2048:5
**forty** [1] - 2083:20
**forty-two** [1] - 2083:20
**forward** [3] - 2052:18, 2135:20, 2136:6
**four** [6] - 2040:16, 2046:12, 2049:25, 2120:22, 2145:15, 2150:13
**fourth** [5] - 2092:24, 2122:24, 2122:25, 2123:1, 2123:11

**frankly** [1] - 2067:25
**French** [1] - 2092:21
**Friday** [1] - 2090:3
**friend** [1] - 2076:21
**friendly** [1] - 2135:12
**front** [14] - 2042:2, 2042:6, 2045:4, 2058:10, 2066:4, 2071:18, 2084:19, 2114:10, 2115:25, 2121:10, 2125:21, 2125:24, 2126:23, 2140:25
**frustrating** [1] - 2064:3
**frustration** [1] - 2068:24
**full** [3] - 2053:3, 2082:20, 2112:9
**fulsome** [1] - 2120:25
**fundamentals** [1] - 2102:6

# G

**Gail** [3] - 2038:9, 2111:15, 2112:10
**galley** [3] - 2068:3, 2068:7, 2068:16
**gamut** [1] - 2120:16
**gather** [1] - 2129:3
**gathering** [2] - 2126:1, 2129:8
**general** [3] - 2069:18, 2108:4, 2147:13
**generally** [8] - 2058:5, 2083:21, 2094:18, 2095:8, 2096:13, 2106:1, 2106:2, 2132:19
**generate** [2] - 2109:23, 2110:1
**generative** [1] - 2060:25
**genius** [1] - 2109:11
**genre** [1] - 2113:19
**Geo** [1] - 2130:17
**Georgetown** [1] - 2112:22
**German** [1] - 2092:21
**give-and-take** [1] - 2080:11
**given** [4] - 2070:24, 2088:18, 2093:17, 2125:14
**global** [1] - 2092:4
**globally** [1] - 2091:19
**globe** [1] - 2091:20
**goal** [2] - 2097:2, 2110:13

**goals** [1] - 2091:2
**Gold** [1] - 2112:17
**GOLDSMITH** [9] - 2042:15, 2042:18, 2072:4, 2074:9, 2074:12, 2074:17, 2078:5, 2078:6, 2079:23
**Goldsmith** [2] - 2042:18, 2074:12
**Goldsmith.............** [1] - 2038:5
**goodness** [1] - 2150:16
**Gore** [1] - 2095:11
**Gore's** [1] - 2098:7
**government** [2] - 2120:8, 2152:14
**gradation** [1] - 2081:10
**graduated** [1] - 2112:22
**great** [6] - 2052:4, 2072:13, 2081:16, 2084:8, 2121:22, 2134:3
**greater** [1] - 2078:11
**green** [2] - 2143:6, 2143:9
**Greenburger** [1] - 2040:19
**grew** [1] - 2083:11
**Grisham** [1] - 2096:23
**group** [3] - 2075:24, 2130:25, 2149:5
**Grove** [2] - 2130:12, 2130:14
**grown** [2] - 2137:12, 2137:13
**guess** [1] - 2110:22
**gut** [1] - 2133:11
**guy** [2] - 2057:15, 2073:12

# H

**Hachette** [6] - 2045:15, 2071:11, 2073:16, 2130:1, 2131:14, 2143:15
**half** [8] - 2062:15, 2062:20, 2068:18, 2068:21, 2081:11, 2092:14, 2092:15, 2106:6
**half-a-million-dollar** [1] - 2062:15
**hand** [10] - 2039:15, 2039:22, 2064:12, 2064:21, 2082:5,

2082:11, 2085:14, 2111:18, 2111:24, 2140:3
**handful** [1] - 2079:8
**happier** [1] - 2099:3
**happy** [2] - 2093:9, 2099:23
**hard** [6] - 2060:3, 2070:15, 2125:12, 2136:16, 2148:19
**Harper** [1] - 2051:3
**HarperCollins** [7] - 2045:17, 2066:20, 2071:11, 2119:17, 2130:11, 2143:15, 2144:12
**Harvard** [3] - 2083:11, 2125:17, 2127:4
**head** [4] - 2068:8, 2073:16, 2125:25, 2146:17
**heads** [2] - 2150:15, 2152:6
**heads-up** [1] - 2152:6
**hear** [3] - 2095:25, 2099:16, 2110:2
**heard** [3] - 2099:19, 2116:10, 2132:16
**hearing** [1] - 2071:1
**hearts** [1] - 2058:17
**hello** [1] - 2039:14
**help** [7] - 2053:9, 2058:20, 2063:9, 2064:1, 2110:22, 2133:8, 2149:14
**helpful** [1] - 2120:7
**hesitant** [1] - 2111:4
**hidden** [1] - 2055:10
**high** [5] - 2049:7, 2084:5, 2093:22, 2117:5, 2133:10
**high-five** [1] - 2133:10
**higher** [7] - 2053:18, 2083:8, 2095:5, 2101:25, 2102:10, 2104:24, 2145:11
**highest** [8] - 2053:11, 2053:17, 2055:13, 2084:7, 2084:9, 2106:1, 2117:6, 2120:12
**highlighted** [1] - 2143:6
**Hillary** [1] - 2150:16
**history** [2] - 2113:25, 2120:8
**HMH** [3] - 2144:10, 2144:12, 2144:17
**hmm** [2] - 2091:9, 2101:14

**hold** [4] - 2070:19, 2123:1, 2123:4, 2124:18
**home** [2] - 2081:2, 2092:23
**honest** [2] - 2047:18, 2058:25
**Honor** [43] - 2039:5, 2039:8, 2039:24, 2041:17, 2042:12, 2042:21, 2044:24, 2048:18, 2072:1, 2074:6, 2074:9, 2074:10, 2079:24, 2081:19, 2081:23, 2082:12, 2083:22, 2085:2, 2085:7, 2086:20, 2097:7, 2097:17, 2097:21, 2100:20, 2100:23, 2103:22, 2108:1, 2111:8, 2111:15, 2112:6, 2115:4, 2135:21, 2137:17, 2137:24, 2140:6, 2141:5, 2141:10, 2142:23, 2146:18, 2147:17, 2151:1, 2151:2, 2152:5
**Honor's** [1] - 2152:16
**Hook** [1] - 2122:1
**hope** [2] - 2052:24, 2054:1
**hopefully** [2] - 2056:1, 2080:13
**Houghton** [4] - 2083:17, 2094:23, 2095:1, 2130:11
**hours** [2] - 2056:22, 2113:5
**house** [20] - 2087:12, 2087:16, 2087:23, 2089:6, 2089:9, 2089:22, 2091:4, 2095:1, 2106:12, 2106:13, 2106:16, 2119:15, 2119:18, 2119:19, 2119:20, 2119:23, 2126:20
**House** [66] - 2046:4, 2047:20, 2050:17, 2050:24, 2050:25, 2061:7, 2061:12, 2061:14, 2061:22, 2062:5, 2069:13, 2069:18, 2070:1, 2073:20, 2075:10, 2076:1, 2076:17, 2076:18, 2076:20, 2081:16, 2086:14,

2087:3, 2087:24, 2088:3, 2088:6, 2088:19, 2094:11, 2098:11, 2098:17, 2102:23, 2103:6, 2103:11, 2103:14, 2103:16, 2103:20, 2103:21, 2103:23, 2104:6, 2104:9, 2104:11, 2104:19, 2115:20, 2121:19, 2124:8, 2124:12, 2124:25, 2127:20, 2129:13, 2131:13, 2131:19, 2131:24, 2135:3, 2135:5, 2135:6, 2137:6, 2143:14, 2145:17, 2145:22, 2146:10, 2146:12, 2147:5, 2147:6, 2148:1, 2148:6, 2151:25
**House's** [1] - 2073:24
**houses** [3] - 2089:6, 2119:9, 2119:15
**huge** [8] - 2060:5, 2060:6, 2063:11, 2066:7, 2068:5, 2126:6, 2149:7
**hundred** [8] - 2059:20, 2064:23, 2083:5, 2083:7, 2099:2, 2099:4, 2133:24, 2134:4
**hundred-thousand-dollar** [1] - 2134:4
**hurts** [1] - 2059:22
**hypo** [2] - 2070:12, 2072:18
**hypothetical** [2] - 2129:15, 2136:19

**I**

**idea** [9] - 2057:18, 2059:15, 2059:16, 2125:19, 2129:21, 2136:6, 2137:1, 2150:6, 2150:7
**ideal** [2] - 2093:11, 2110:10
**ideally** [2] - 2089:9, 2099:22
**ideas** [1] - 2150:15
**identifiable** [1] - 2093:12
**identification** [1] - 2142:11
**identified** [1] - 2109:13

**identify** [6] - 2113:16, 2114:13, 2117:17, 2123:3, 2123:7, 2123:9
**impact** [5] - 2069:12, 2073:24, 2094:14, 2134:11, 2137:10
**impacted** [1] - 2148:6
**impeachable** [1] - 2141:1
**impeaching** [1] - 2141:9
**impeachment** [2] - 2141:6, 2146:19
**implausible** [1] - 2062:20
**implicit** [1] - 2071:14
**important** [16] - 2054:3, 2057:13, 2062:9, 2062:10, 2063:15, 2065:12, 2076:8, 2076:10, 2076:18, 2080:9, 2080:24, 2081:13, 2094:20, 2095:16, 2106:9, 2135:14
**imprint** [13] - 2051:22, 2051:23, 2053:13, 2062:5, 2095:24, 2096:2, 2103:21, 2115:16, 2118:22, 2119:16, 2119:18, 2125:14, 2130:4
**imprinting** [1] - 2119:12
**imprints** [17] - 2047:21, 2060:7, 2117:21, 2117:24, 2119:8, 2119:9, 2119:13, 2129:4, 2130:2, 2130:3, 2131:16, 2135:4, 2135:9, 2146:11, 2147:6, 2149:15, 2150:7
**improve** [2] - 2102:13, 2125:23
**impulsive** [1] - 2056:23
**incentive** [1] - 2055:2
**include** [5] - 2051:17, 2052:2, 2120:16, 2123:20, 2143:14
**including** [2] - 2088:13, 2114:8
**Inconvenient** [2] - 2095:15, 2098:7
**increased** [1] - 2102:2
**increasing** [1] - 2102:7

**incredible** [2] - 2047:3, 2117:23
**incredibly** [1] - 2064:3
**incrementally** [1] - 2056:14
**increments** [2] - 2117:9
**indeed** [1] - 2091:12
**independent** [4] - 2096:3, 2096:4, 2135:16, 2135:19
**indicate** [1] - 2093:2
**indicated** [1] - 2057:21
**indicates** [1] - 2045:14
**individual** [1] - 2108:12
**individuals** [1] - 2041:25
**industry** [7] - 2060:6, 2076:5, 2094:9, 2101:16, 2102:6, 2132:24, 2133:19
**industrywide** [1] - 2148:5
**information** [7] - 2069:7, 2072:16, 2118:10, 2119:7, 2126:1, 2129:3, 2129:8
**infrastructure** [1] - 2069:21
**infusion** [1] - 2134:25
**inherent** [1] - 2053:25
**initials** [1] - 2085:14
**insane** [1] - 2060:1
**instance** [1] - 2094:22
**instead** [1] - 2049:22
**instructions** [1] - 2049:12
**interest** [6] - 2097:4, 2109:23, 2110:1, 2119:21, 2120:19, 2129:5
**interested** [9] - 2049:12, 2052:25, 2055:23, 2073:13, 2084:6, 2118:17, 2122:14, 2128:4, 2129:6
**interests** [3] - 2096:6, 2119:6, 2119:19
**internal** [1] - 2119:12
**internally** [1] - 2119:13
**interviewed** [1] - 2083:14
**invest** [2] - 2069:21, 2136:4

**investment** [1] - 2068:6
**investments** [1] - 2069:24
**invitations** [1] - 2118:13
**invite** [3] - 2117:15, 2117:18, 2118:11
**involve** [1] - 2116:13
**involved** [4] - 2092:20, 2104:25, 2119:18, 2132:16
**involves** [1] - 2090:14
**Iowa** [2] - 2109:5, 2109:20
**Irish** [1] - 2109:21
**irrelevant** [1] - 2058:25
**irrespective** [1] - 2096:10
**issue** [2] - 2073:25, 2152:3
**issues** [2] - 2113:25, 2114:1
**it'll** [1] - 2048:18
**Italian** [1] - 2092:21
**item** [1] - 2123:11
**itself** [1] - 2058:8

**J**

**January** [1] - 2040:14
**Japanese** [1] - 2092:22
**job** [2] - 2052:4, 2099:25
**John** [1] - 2096:23
**Jonathan** [2] - 2042:18, 2074:12
**judge** [1] - 2094:2
**judgment** [3] - 2070:10, 2111:1, 2129:9
**justice** [1] - 2113:25

**K**

**keep** [3] - 2052:3, 2132:10, 2151:6
**keys** [1] - 2065:4
**kidding** [1] - 2115:15
**kind** [32] - 2041:9, 2041:11, 2048:22, 2053:13, 2053:15, 2053:24, 2055:10, 2055:11, 2055:13, 2055:22, 2056:14, 2056:20, 2056:24, 2059:12, 2059:13, 2059:17, 2060:4,

2061:19, 2064:4,
2066:2, 2067:3,
2068:3, 2069:9,
2079:13, 2107:19,
2108:14, 2119:7,
2121:9, 2126:10,
2126:11, 2133:18,
2149:1
**kinds** [1] - 2069:24,
2133:12
**kingdom** [1] - 2065:4
**kit** [1] - 2073:9
**knowledge** [2] -
2094:7, 2126:13
**known** [1] - 2134:21
**knows** [1] - 2055:15

**L**

**large** [1] - 2134:7
**larger** [1] - 2130:23
**largest** [1] - 2062:14
**last** [10] - 2064:16,
2071:17, 2087:17,
2110:15, 2130:15,
2140:2, 2140:13,
2150:3, 2150:8
**launched** [1] - 2103:6
**launching** [1] - 2102:8
**law** [4] - 2112:17,
2113:4, 2113:6,
2125:17
**lawyer** [6] - 2112:12,
2112:13, 2112:21,
2113:2, 2113:13,
2142:4
**leader** [1] - 2063:14
**lean** [1] - 2114:6
**learned** [1] - 2054:11
**least** [4] - 2065:24,
2074:23, 2116:18,
2152:3
**leave** [5] - 2051:15,
2062:20, 2073:23,
2081:6, 2125:2
**lecture** [1] - 2095:12
**left** [7] - 2057:22,
2058:1, 2082:4,
2085:14, 2085:18,
2120:15, 2142:16
**left-hand** [1] - 2085:14
**legal** [1] - 2072:22
**legitimate** [1] -
2102:16
**less** [8] - 2063:21,
2078:22, 2101:23,
2108:12, 2110:6,
2131:8, 2131:9,
2149:23
**letter** [6] - 2071:19,

2071:22, 2072:8,
2072:13, 2072:20
**letters** [1] - 2120:17
**level** [5] - 2046:24,
2068:17, 2101:6,
2133:19, 2148:17
**levels** [2] - 2080:2,
2119:19
**leverage** [7] - 2064:25,
2065:4, 2108:11,
2108:12, 2108:15,
2149:22, 2149:24
**levity** [1] - 2098:24
**life** [1] - 2134:6
**limited** [1] - 2052:3
**line** [7] - 2067:3,
2067:4, 2067:10,
2133:25, 2134:2,
2141:6, 2146:8
**lines** [13] - 2038:21,
2038:21, 2038:22,
2038:23, 2100:14,
2100:21, 2100:25,
2140:18, 2141:25,
2146:18, 2146:21,
2147:3, 2147:22
**Lisa** [1] - 2039:3
**list** [11] - 2044:19,
2066:21, 2068:19,
2073:11, 2075:9,
2078:1, 2078:7,
2078:21, 2115:15,
2126:11
**listed** [10] - 2050:4,
2087:24, 2088:2,
2088:9, 2114:25,
2122:14, 2138:10,
2141:15, 2141:18,
2144:7
**listen** [1] - 2121:2
**lists** [3] - 2114:12,
2130:23
**literally** [2] - 2063:25,
2066:9
**literary** [16] - 2040:8,
2040:9, 2041:5,
2041:10, 2071:19,
2082:23, 2083:19,
2084:17, 2097:3,
2112:12, 2112:16,
2112:25, 2113:3,
2113:11, 2114:2
**live** [2] - 2106:12,
2112:19
**living** [2] - 2082:22,
2112:11
**load** [1] - 2094:25
**logical** [1] - 2067:14
**long-term** [1] -
2069:21

**look** [16] - 2041:13,
2044:13, 2050:14,
2050:15, 2058:6,
2061:3, 2077:1,
2085:13, 2085:17,
2089:7, 2133:3,
2139:7, 2139:18,
2147:3, 2149:2,
2149:25
**looked** [2] - 2050:10,
2084:11
**looking** [13] - 2066:21,
2074:20, 2074:24,
2077:7, 2077:10,
2080:22, 2081:6,
2095:4, 2110:23,
2133:12, 2133:13,
2135:19, 2136:6
**looks** [3] - 2068:4,
2109:23, 2110:1
**losing** [1] - 2102:3
**loss** [1] - 2148:24
**loud** [2] - 2040:23,
2140:19
**love** [5] - 2113:22,
2118:17, 2118:20,
2126:19, 2150:7
**loves** [1] - 2110:24
**lowballing** [1] -
2056:4
**lower** [4] - 2091:5,
2136:2, 2136:21,
2137:3
**lowered** [3] - 2080:3,
2081:5, 2081:7
**lowering** [2] -
2070:23, 2137:1
**lowest** [3] - 2049:7,
2077:10, 2117:6
**lucky** [1] - 2113:23

**M**

**ma'am** [4] - 2111:17,
2142:3, 2146:3,
2147:14
**machine** [1] - 2069:5
**Macmillan** [6] -
2045:19, 2052:1,
2081:14, 2081:16,
2138:11, 2143:14
**Madeline** [1] - 2152:1
**magazine** [2] - 2074:3,
2096:5
**magazines** [1] -
2083:14
**main** [2] - 2064:13,
2064:14
**major** [1] - 2074:2
**Malaviya** [1] - 2152:2

**Manhattan** [1] -
2118:1
**Manner** [1] - 2116:5
**Manuel** [1] - 2152:2
**manuscript** [1] -
2066:3
**manuscripts** [1] -
2105:19
**March** [3] - 2118:2,
2134:19
**margin** [1] - 2109:7
**margins** [1] - 2068:13
**mark** [2] - 2043:1,
2044:22
**marked** [5] - 2077:2,
2100:12, 2113:15,
2140:20, 2142:11
**markedly** [1] - 2089:8
**market** [9] - 2047:11,
2058:13, 2058:14,
2058:22, 2058:23,
2128:5, 2128:7,
2149:19
**marketing** [7] -
2063:15, 2067:19,
2067:25, 2068:25,
2069:3, 2069:5,
2069:10
**marketplace** [2] -
2133:13, 2133:14
**markets** [1] - 2091:20
**Markus** [3] - 2071:20,
2076:20, 2103:16
**mask** [3] - 2039:19,
2082:9, 2111:22
**match** [1] - 2093:11
**material** [1] - 2051:25
**matter** [9] - 2057:16,
2064:11, 2064:21,
2064:24, 2065:9,
2065:11, 2100:9,
2139:25, 2151:12
**matters** [3] - 2065:15,
2065:16, 2101:6
**maximum** [1] -
2055:18
**McIntosh** [1] - 2152:1
**mean** [68] - 2041:24,
2047:2, 2047:10,
2049:1, 2053:7,
2053:11, 2053:12,
2053:16, 2058:5,
2058:14, 2058:23,
2059:9, 2060:12,
2061:14, 2062:3,
2062:12, 2063:5,
2063:18, 2064:23,
2068:22, 2071:4,
2071:10, 2072:12,
2072:16, 2073:1,

2073:24, 2074:1,
2078:21, 2079:4,
2080:12, 2087:10,
2087:14, 2087:22,
2088:5, 2096:21,
2099:21, 2103:20,
2114:6, 2117:12,
2118:13, 2118:24,
2121:4, 2121:11,
2122:7, 2125:15,
2126:5, 2126:16,
2126:21, 2127:10,
2128:21, 2129:3,
2129:7, 2129:19,
2129:20, 2131:5,
2133:3, 2134:23,
2135:2, 2135:5,
2135:10, 2136:5,
2137:12, 2138:10,
2138:24, 2140:24,
2141:1
**meaning** [1] - 2063:8
**means** [8] - 2049:2,
2053:8, 2063:10,
2087:11, 2087:15,
2088:25, 2121:4,
2127:5
**meant** [1] - 2123:20
**media** [4] - 2074:1,
2112:12, 2112:13,
2136:9
**mediation** [1] -
2125:18
**medium** [1] - 2073:21
**medium-sized** [1] -
2073:21
**meet** [2] - 2058:3,
2110:13
**meeting** [1] - 2060:11
**meetings** [6] -
2103:16, 2104:5,
2117:25, 2118:15,
2118:18, 2118:21
**memo** [2] - 2116:24,
2122:15
**memoirs** [1] - 2041:25
**memory** [1] - 2120:6
**memos** [1] - 2120:10
**mentioned** [2] -
2075:15, 2095:3
**merge** [2] - 2094:11,
2127:20
**merged** [4] - 2070:4,
2070:25, 2135:25,
2137:6
**merger** [21] - 2061:4,
2061:21, 2062:1,
2069:13, 2070:4,
2070:9, 2070:22,
2071:15, 2072:11,

2072:12, 2072:18, 2076:24, 2094:15, 2103:23, 2127:23, 2129:12, 2134:11, 2137:3, 2137:11, 2148:1, 2148:6
**message** [1] - 2080:13
**messing** [1] - 2083:22
**Michael** [3] - 2073:12, 2073:17, 2073:18
**microphone** [1] - 2040:21
**Mifflin** [3] - 2083:17, 2094:23, 2095:1, 2130:11
**might** [17] - 2047:21, 2051:25, 2053:12, 2057:4, 2057:6, 2057:17, 2066:8, 2067:20, 2073:22, 2086:12, 2094:1, 2097:10, 2113:5, 2113:7, 2126:13, 2129:6, 2130:5
**million** [9] - 2062:4, 2062:15, 2062:20, 2066:9, 2067:12, 2067:21, 2067:23, 2068:23, 2134:5
**million-dollar** [2] - 2067:21, 2134:5
**millions** [1] - 2133:10
**mind** [7] - 2053:8, 2054:2, 2058:10, 2070:3, 2095:14, 2133:4
**minds** [2] - 2049:2, 2058:17
**mine** [3] - 2114:18, 2150:11
**minimal** [1] - 2113:10
**minimum** [1] - 2113:10
**minute** [1] - 2053:20
**minutes** [1] - 2097:9
**misapprehension** [1] - 2053:21
**missing** [1] - 2044:11
**moment** [4] - 2039:15, 2087:2, 2111:18, 2129:11
**Monday** [7] - 2151:9, 2151:12, 2151:20, 2151:23, 2151:24, 2152:7, 2152:20
**money** [19] - 2052:21, 2054:24, 2054:25, 2055:3, 2055:8, 2056:16, 2057:22, 2058:1, 2058:7,

2060:2, 2061:1, 2062:13, 2066:2, 2067:19, 2068:25, 2071:15, 2081:12, 2099:25, 2136:7
**monitor** [3] - 2041:14, 2115:25, 2123:17
**months'** [1] - 2134:8
**most** [23] - 2053:12, 2053:14, 2055:3, 2055:7, 2055:8, 2058:20, 2062:9, 2062:10, 2063:10, 2064:15, 2065:12, 2080:9, 2083:9, 2084:7, 2093:14, 2101:6, 2104:16, 2123:22, 2135:4, 2135:10, 2136:10, 2145:7, 2145:9
**mouth** [1] - 2151:6
**move** [8] - 2040:21, 2075:12, 2100:20, 2141:5, 2142:7, 2142:23, 2146:18, 2147:17
**moving** [1] - 2054:4
**multiple** [16] - 2065:6, 2076:10, 2076:23, 2087:7, 2087:14, 2087:21, 2088:25, 2089:5, 2090:14, 2090:17, 2091:13, 2093:5, 2093:23, 2105:16, 2110:9
**multiple-bidder** [1] - 2093:5
**multiple-submission** [1] - 2110:9
**must** [3] - 2109:10, 2109:11, 2110:17
**myth** [1] - 2056:24

## N

**name** [9] - 2040:5, 2040:11, 2042:17, 2082:20, 2091:3, 2112:9, 2114:2, 2130:4, 2130:8
**Nat** [1] - 2130:17
**National** [1] - 2130:14
**necessarily** [4] - 2089:17, 2100:8, 2120:12, 2145:24
**need** [15] - 2054:16, 2060:22, 2065:1, 2065:6, 2068:9, 2071:10, 2116:11, 2126:10, 2130:22, 2130:23, 2134:24,

2138:20, 2151:12, 2151:19
**needs** [3] - 2066:20, 2125:10, 2125:13
**negative** [2] - 2137:12, 2137:15
**negotiate** [4] - 2091:10, 2092:5, 2092:23, 2113:9
**negotiated** [4] - 2085:1, 2091:14, 2126:17, 2128:2
**negotiating** [8] - 2052:25, 2053:5, 2093:20, 2094:4, 2108:5, 2125:22, 2126:22, 2149:21
**negotiation** [12] - 2052:12, 2052:15, 2053:19, 2055:5, 2059:7, 2061:2, 2089:4, 2125:17, 2125:20, 2127:4, 2127:6, 2129:1
**negotiations** [17] - 2053:2, 2057:20, 2058:9, 2059:3, 2059:5, 2059:10, 2060:9, 2061:11, 2061:21, 2065:25, 2108:25, 2109:1, 2116:13, 2125:4, 2125:7, 2128:1, 2129:22
**neutral** [1] - 2069:15
**never** [3] - 2064:2, 2079:20, 2088:20
**New** [6] - 2074:2, 2083:11, 2083:13, 2103:7, 2103:14, 2117:25
**newspaper** [1] - 2074:3
**next** [17] - 2044:22, 2057:5, 2064:1, 2073:14, 2075:12, 2081:23, 2085:9, 2087:21, 2090:3, 2109:10, 2109:12, 2109:20, 2111:15, 2134:15, 2143:5, 2150:5, 2151:18
**nice** [2] - 2138:3, 2138:4
**Nihar** [1] - 2152:2
**non** [13] - 2046:24, 2047:9, 2047:15, 2047:16, 2095:10, 2096:9, 2096:13, 2132:10, 2143:20,

2143:23, 2144:8, 2144:14, 2145:1
**non-Big** [12] - 2046:24, 2047:9, 2047:15, 2047:16, 2095:10, 2096:9, 2096:13, 2143:20, 2143:23, 2144:8, 2144:14, 2145:1
**non-PRH** [1] - 2132:10
**nondeniable** [1] - 2054:2
**none** [4] - 2049:24, 2079:2, 2079:11, 2079:17
**None** [1] - 2087:22
**nonfiction** [6] - 2041:12, 2041:24, 2081:15, 2084:6, 2113:21, 2113:23
**nonfinancial** [2] - 2126:15, 2126:18
**noon** [1] - 2049:13
**North** [4] - 2091:16, 2091:18, 2091:25, 2092:2
**Norton** [6] - 2045:21, 2047:22, 2052:1, 2071:12, 2130:11
**Nos** [1] - 2077:14
**note** [1] - 2087:24
**NOTE** [1] - 2039:2
**noted** [2] - 2044:9, 2106:15
**nothing** [5] - 2081:19, 2092:8, 2108:1, 2119:10, 2148:11
**notice** [3] - 2071:2, 2088:9, 2091:7
**notification** [1] - 2131:24
**notion** [1] - 2054:8
**novel** [3] - 2109:10, 2109:20, 2113:22
**number** [27] - 2043:24, 2044:4, 2051:3, 2051:6, 2051:7, 2057:20, 2058:6, 2067:2, 2067:6, 2067:7, 2067:9, 2067:10, 2073:8, 2073:11, 2073:13, 2076:16, 2077:18, 2083:2, 2083:8, 2106:2, 2109:18, 2115:12, 2120:24, 2125:15, 2133:24
**numbered** [1] - 2143:7
**numbers** [5] -

2066:16, 2066:17, 2070:17, 2077:16, 2083:23

## O

**o'clock** [1] - 2151:8
**Oath** [3] - 2039:16, 2082:6, 2111:19
**object** [1] - 2135:21
**objection** [13] - 2039:10, 2042:14, 2042:15, 2072:3, 2072:4, 2085:4, 2086:22, 2100:22, 2115:6, 2115:7, 2142:25, 2146:20, 2147:19
**observe** [1] - 2137:10
**observed** [2] - 2047:7, 2047:25
**obtained** [1] - 2100:1
**obviously** [3] - 2055:24, 2062:13, 2126:21
**occasion** [1] - 2124:13
**occasional** [1] - 2113:21
**occasionally** [1] - 2041:12
**occupation** [1] - 2040:7
**occur** [1] - 2129:12
**Odyssey** [15] - 2101:19, 2101:24, 2102:8, 2102:14, 2102:18, 2102:20, 2102:24, 2103:3, 2103:6, 2103:8, 2104:7, 2104:10, 2104:13, 2106:23, 2107:3
**offending** [1] - 2091:6
**offer** [13] - 2049:14, 2049:15, 2052:15, 2060:15, 2089:8, 2089:18, 2090:4, 2091:5, 2104:16, 2105:23, 2109:9, 2136:8
**offered** [4] - 2089:17, 2145:22, 2146:25, 2148:21
**offering** [4] - 2070:9, 2146:10, 2147:4, 2147:8
**offers** [2] - 2089:7, 2104:19
**office** [1] - 2060:14

**official** [1] - 2134:20
**offs** [1] - 2079:10
**often** [6] - 2059:10, 2063:25, 2106:5, 2130:12, 2131:23, 2149:19
**ofttimes** [1] - 2126:8
**old** [2] - 2116:19, 2150:3
**old-fashioned** [1] - 2116:19
**once** [5] - 2119:1, 2131:25, 2132:1, 2132:5
**one** [94] - 2044:11, 2044:24, 2045:23, 2046:12, 2046:19, 2049:5, 2051:1, 2051:2, 2051:4, 2053:4, 2053:5, 2055:11, 2058:1, 2059:24, 2062:3, 2063:21, 2064:24, 2065:21, 2067:23, 2067:24, 2068:20, 2070:2, 2070:19, 2072:18, 2073:11, 2073:13, 2075:6, 2075:9, 2075:14, 2075:18, 2079:14, 2080:15, 2084:20, 2085:9, 2087:3, 2087:11, 2087:12, 2087:15, 2087:16, 2088:19, 2088:20, 2089:1, 2089:3, 2089:6, 2089:8, 2090:6, 2090:15, 2090:18, 2090:21, 2091:4, 2093:15, 2093:20, 2094:12, 2095:2, 2096:3, 2097:21, 2098:5, 2105:11, 2114:6, 2118:16, 2119:18, 2121:16, 2121:22, 2122:4, 2122:19, 2122:25, 2123:1, 2123:19, 2124:13, 2128:12, 2129:21, 2132:7, 2132:12, 2136:1, 2138:19, 2139:4, 2139:10, 2139:18, 2139:20, 2139:22, 2140:5, 2141:1, 2141:18, 2144:17, 2149:25
**one-on-one** [1] - 2089:3
**ones** [2] - 2046:8,

2069:10
**operate** [2] - 2091:19
**opinion** [2] - 2135:2, 2148:2
**opposed** [3] - 2047:15, 2055:6, 2116:14
**option** [8] - 2048:11, 2052:9, 2052:14, 2109:12, 2116:6, 2126:4, 2146:13, 2147:7
**options** [3] - 2116:12, 2145:21, 2146:24
**orchestra** [1] - 2063:13
**order** [10] - 2053:10, 2053:25, 2055:25, 2064:1, 2065:3, 2065:6, 2094:2, 2117:5, 2119:20, 2126:17
**original** [1] - 2102:23
**originally** [1] - 2094:23
**otherwise** [2] - 2047:5, 2100:1
**outcome** [1] - 2061:7
**outside** [8] - 2052:16, 2092:6, 2093:2, 2093:4, 2093:16, 2094:2, 2102:4, 2130:25
**outstanding** [1] - 2047:5
**overpay** [1] - 2066:22
**overplayed** [2] - 2056:25, 2057:19
**own** [4] - 2040:8, 2040:18, 2069:3, 2069:5
**owned** [6] - 2061:23, 2094:12, 2098:11, 2127:24, 2129:13, 2144:12
**oxymoron** [1] - 2133:1

**P**

**p.m** [1] - 2152:21
**paddles** [1] - 2049:3
**PAGE** [1] - 2038:2
**page** [34] - 2038:21, 2038:21, 2038:22, 2038:23, 2074:23, 2075:12, 2077:7, 2077:10, 2078:14, 2100:13, 2100:20, 2100:25, 2114:14, 2115:2, 2115:14,

2121:13, 2121:18, 2122:9, 2122:22, 2122:23, 2123:10, 2124:4, 2124:18, 2138:8, 2138:15, 2139:2, 2140:16, 2141:6, 2141:13, 2141:25, 2146:8, 2146:21, 2147:22
**pages** [5] - 2085:13, 2085:17, 2085:22, 2114:16, 2114:25
**paid** [4] - 2093:13, 2099:3, 2099:4, 2103:3
**painful** [1] - 2056:3
**pandemic** [1] - 2118:3
**paperwork** [2] - 2123:24, 2140:25
**parent** [6] - 2061:23, 2094:12, 2094:21, 2127:24, 2129:14, 2130:8
**part** [7] - 2041:9, 2062:10, 2069:3, 2096:19, 2125:10, 2150:9, 2152:3
**part-time** [1] - 2041:9
**participants** [3] - 2116:25, 2117:12
**participating** [2] - 2119:2, 2119:5
**particular** [16] - 2041:22, 2051:22, 2055:12, 2055:18, 2055:24, 2058:12, 2061:17, 2062:7, 2064:4, 2085:16, 2110:24, 2113:19, 2118:22, 2126:11, 2126:13, 2126:20
**particularly** [1] - 2135:3
**partly** [1] - 2060:25
**partner** [1] - 2112:17
**party** [2] - 2093:20, 2118:17
**pass** [3] - 2074:6, 2097:7, 2137:22
**passbook** [1] - 2126:22
**passed** [1] - 2130:15
**past** [3] - 2129:5, 2150:1, 2150:2
**path** [1] - 2084:11
**pattern** [1] - 2071:2
**pause** [1] - 2117:10
**pay** [5] - 2054:5, 2059:12, 2059:16, 2066:22, 2145:11

**paying** [3] - 2101:21, 2101:23
**payments** [1] - 2120:22
**payouts** [2] - 2120:20, 2120:21
**Penguin** [56] - 2046:4, 2047:19, 2050:17, 2050:23, 2050:25, 2061:6, 2061:11, 2061:14, 2061:22, 2062:4, 2069:13, 2069:18, 2070:1, 2073:10, 2073:19, 2073:24, 2075:10, 2076:16, 2076:18, 2076:20, 2081:15, 2086:14, 2087:3, 2087:24, 2088:3, 2088:6, 2088:19, 2094:10, 2098:11, 2098:17, 2103:20, 2103:23, 2104:19, 2115:20, 2121:19, 2124:8, 2124:11, 2124:25, 2127:19, 2129:13, 2131:13, 2131:19, 2131:24, 2135:5, 2137:6, 2143:14, 2145:17, 2145:22, 2146:10, 2146:11, 2147:5, 2147:6, 2148:1, 2148:6, 2151:25
**people** [28] - 2049:2, 2052:3, 2059:7, 2061:20, 2062:8, 2062:14, 2063:6, 2065:6, 2068:16, 2069:2, 2073:23, 2074:1, 2081:15, 2081:16, 2083:14, 2091:6, 2108:20, 2110:19, 2111:2, 2117:9, 2118:14, 2120:15, 2132:6, 2135:17, 2136:4, 2136:5
**people's** [1] - 2049:2
**per** [1] - 2051:22
**perceived** [1] - 2070:23
**percent** [14] - 2064:24, 2076:3, 2091:20, 2091:21, 2101:3, 2101:22, 2101:25, 2103:2, 2104:16, 2104:20, 2104:22, 2105:3, 2106:6,

2117:9
**percentage** [4] - 2117:7, 2128:12, 2137:14, 2145:19
**perfect** [2] - 2125:14, 2151:8
**performance** [1] - 2097:3
**performed** [1] - 2048:1
**perhaps** [3] - 2066:19, 2120:13, 2152:12
**period** [2] - 2069:20, 2079:3, 2079:9, 2079:11, 2079:17, 2086:1, 2115:16, 2147:2
**permission** [1] - 2111:24
**person** [14] - 2055:13, 2055:14, 2055:15, 2055:17, 2057:8, 2057:9, 2057:10, 2057:11, 2058:2, 2059:16, 2060:14, 2062:7, 2125:21
**personal** [2] - 2042:9, 2084:16
**personally** [2] - 2043:18, 2083:6
**PETROCELLI** [79] - 2039:5, 2039:8, 2039:22, 2039:24, 2040:4, 2041:4, 2041:16, 2041:19, 2042:12, 2042:21, 2043:1, 2043:5, 2043:8, 2043:11, 2043:14, 2043:15, 2044:23, 2045:1, 2045:3, 2048:18, 2048:20, 2060:8, 2065:20, 2070:21, 2072:1, 2072:7, 2074:6, 2081:19, 2081:23, 2082:11, 2082:14, 2082:17, 2082:19, 2083:22, 2084:1, 2084:2, 2085:2, 2085:7, 2085:9, 2085:12, 2086:3, 2086:20, 2087:1, 2090:10, 2096:8, 2097:7, 2097:10, 2097:17, 2100:23, 2106:22, 2108:1, 2111:8, 2111:14, 2111:24, 2112:3, 2112:6, 2112:8, 2115:3,

2115:10, 2123:6, 2123:13, 2123:15, 2123:16, 2127:14, 2135:24, 2137:17, 2137:21, 2141:10, 2143:1, 2147:20, 2148:11, 2151:1, 2151:14, 2151:17, 2151:22, 2151:24, 2152:5, 2152:9, 2152:11

**Petrocelli** [6] - 2098:6, 2138:6, 2139:4, 2148:13, 2148:16, 2151:11

**Petrocelli's** [2] - 2080:1, 2105:14

**Petrocelli**.......... [1] - 2038:8

**Petrocelli**............ [3] - 2038:5, 2038:7, 2038:10

**phenomenal** [2] - 2047:2, 2081:15

**phone** [3] - 2073:4, 2074:3, 2117:3

**photographic** [1] - 2092:2

**phrase** [1] - 2132:25

**pick** [3] - 2090:6, 2131:5, 2131:7

**picking** [2] - 2090:18, 2090:21

**piece** [2] - 2062:21, 2062:23

**Pietsch** [3] - 2073:12, 2073:17, 2073:18

**pittance** [1] - 2064:6

**place** [7] - 2059:23, 2089:7, 2090:1, 2090:2, 2090:13, 2121:5, 2129:10

**places** [3] - 2063:19, 2071:12, 2135:11

**Plaintiff** [1] - 2042:3

**Plaintiff's** [6] - 2042:13, 2044:14, 2084:20, 2084:21, 2114:10, 2137:18

**plan** [1] - 2151:23

**planning** [1] - 2080:12

**plans** [1] - 2120:19

**platform** [2] - 2149:2, 2149:13

**play** [1] - 2047:16

**played** [1] - 2072:10

**player** [1] - 2132:10

**players** [1] - 2122:13

**plays** [1] - 2106:12

**plenty** [2] - 2129:18,

2129:23

**plus** [3] - 2056:25, 2071:13, 2090:22

**point** [8] - 2057:2, 2059:14, 2068:24, 2075:5, 2105:15, 2117:19, 2121:1, 2121:8

**pointed** [1] - 2138:21

**pol** [1] - 2054:4

**polit** [1] - 2054:4

**political** [1] - 2054:4

**politics** [1] - 2113:25

**portion** [1] - 2039:2

**position** [5] - 2055:14, 2100:5, 2103:25, 2107:8, 2136:2

**positive** [2] - 2069:15, 2094:18

**positively** [1] - 2111:3

**possibility** [1] - 2051:12

**possible** [6] - 2053:10, 2055:16, 2058:21, 2094:17, 2113:4, 2125:8

**possibly** [3] - 2051:11, 2095:14, 2128:4

**post** [4] - 2070:4, 2070:9, 2070:22, 2127:23

**post-merger** [4] - 2070:4, 2070:9, 2070:22, 2127:23

**potential** [1] - 2060:5

**practice** [2] - 2112:15, 2113:4

**preempt** [4] - 2048:11, 2052:9, 2052:18, 2116:8, 2118:20, 2118:24, 2122:11, 2122:16

**preemptive** [2] - 2060:15, 2118:23

**preempts** [1] - 2116:13

**prefer** [2] - 2056:8, 2056:13

**premerger** [3] - 2062:1, 2070:9, 2128:24

**prepared** [2] - 2039:3, 2143:6

**prescribed** [1] - 2117:7

**presentation** [1] - 2095:13

**presents** [1] - 2090:21

**president** [1] - 2112:16

**President** [1] - 2150:14

**Press** [1] - 2046:14

**press** [1] - 2113:7

**presumably** [1] - 2090:14

**pretty** [11] - 2047:5, 2047:10, 2047:12, 2047:22, 2050:3, 2051:2, 2051:9, 2061:16, 2068:3, 2110:8, 2114:6

**previously** [3] - 2077:7, 2109:4, 2139:3

**PRH** [15] - 2050:5, 2050:16, 2051:17, 2051:21, 2088:18, 2115:16, 2132:10, 2135:7, 2135:9, 2135:12, 2135:18, 2136:3, 2136:24, 2137:14, 2138:13

**price** [5] - 2057:12, 2060:11, 2065:18, 2066:24, 2093:12

**pricing** [1] - 2066:5

**primarily** [4] - 2041:12, 2049:4, 2113:21, 2134:13

**primary** [5] - 2053:21, 2065:7, 2065:17, 2097:2, 2113:11

**print** [8] - 2079:21, 2102:5, 2102:23, 2104:10, 2105:1, 2105:9, 2107:5, 2115:14

**printing** [1] - 2069:21

**private** [5] - 2069:20, 2094:22, 2094:23, 2135:1, 2135:22

**Prize** [1] - 2150:12

**problem** [2] - 2074:4, 2081:12

**proceed** [4] - 2040:2, 2074:14, 2082:15, 2137:24

**Proceedings** [1] - 2152:21

**proceeds** [1] - 2118:10

**process** [15] - 2047:10, 2052:12, 2054:9, 2055:6, 2056:21, 2060:25, 2076:14, 2088:21, 2090:13, 2093:5, 2093:6, 2110:9, 2117:20, 2118:10,

2145:16

**produced** [1] - 2142:13

**production** [4] - 2092:3, 2095:8, 2104:25, 2107:4

**professional** [1] - 2096:14

**profit** [1] - 2148:24

**profundity** [1] - 2098:24

**project** [30] - 2052:23, 2053:13, 2053:15, 2053:22, 2053:23, 2053:25, 2055:12, 2055:18, 2055:20, 2055:24, 2062:7, 2063:10, 2064:1, 2064:15, 2064:16, 2087:15, 2087:19, 2087:23, 2092:20, 2093:3, 2101:18, 2101:19, 2108:17, 2110:4, 2110:7, 2111:3, 2125:17, 2125:20, 2127:4, 2133:14

**projects** [1] - 2055:23

**prominent** [1] - 2084:7

**promise** [3] - 2053:8, 2071:14, 2071:16

**promises** [1] - 2071:17

**promotion** [2] - 2120:18, 2126:8

**promotional** [1] - 2145:10

**proportion** [1] - 2058:13

**proportionality** [1] - 2120:21

**proposal** [8] - 2066:3, 2087:11, 2094:3, 2117:22, 2117:23, 2118:25, 2120:25, 2125:12

**proposals** [2] - 2105:19, 2118:8

**proposed** [2] - 2146:9, 2147:8

**proposition** [1] - 2054:2

**protracted** [1] - 2056:20

**provide** [2] - 2096:12, 2126:24

**provided** [2] - 2096:13, 2119:13

**psychiatrists** [1] -

2149:10

**psychologist** [1] - 2149:9

**psychologists** [1] - 2149:10

**psychology** [1] - 2114:1

**publication** [2] - 2096:5, 2107:6

**publications** [1] - 2047:4

**publicity** [4] - 2063:16, 2069:10, 2136:9, 2136:13

**publicly** [2] - 2045:2, 2048:6

**publish** [7] - 2095:20, 2098:8, 2102:4, 2105:7, 2105:11, 2109:8, 2131:4

**published** [9] - 2084:10, 2093:8, 2098:6, 2098:9, 2104:10, 2109:4, 2130:13, 2133:15, 2134:15

**publisher** [61] - 2047:3, 2049:14, 2052:13, 2052:18, 2053:5, 2053:11, 2053:12, 2053:16, 2056:12, 2057:23, 2059:19, 2060:2, 2060:3, 2063:21, 2063:22, 2064:24, 2067:18, 2067:20, 2068:22, 2076:11, 2079:15, 2079:20, 2080:6, 2080:10, 2083:17, 2089:21, 2092:8, 2092:25, 2093:9, 2093:10, 2093:11, 2093:16, 2094:3, 2095:17, 2095:24, 2096:2, 2096:5, 2099:23, 2102:10, 2102:23, 2103:12, 2104:24, 2106:9, 2106:25, 2107:6, 2110:10, 2118:22, 2125:22, 2126:4, 2126:9, 2126:23, 2128:12, 2130:7, 2130:25, 2131:18, 2133:7, 2143:13, 2144:8, 2144:14, 2145:2, 2150:6

**publishers** [50] - 2045:7, 2046:11,

2046:25, 2048:2, 2049:13, 2056:8, 2056:13, 2058:23, 2060:10, 2061:6, 2069:9, 2075:18, 2075:22, 2087:19, 2088:15, 2092:1, 2093:3, 2094:8, 2096:9, 2096:13, 2101:21, 2102:3, 2102:7, 2104:14, 2104:16, 2109:8, 2109:19, 2117:2, 2117:13, 2117:15, 2118:11, 2119:2, 2119:13, 2128:4, 2128:13, 2128:17, 2129:5, 2129:24, 2130:19, 2131:6, 2131:7, 2135:17, 2136:18, 2136:24, 2143:18, 2143:21, 2143:23, 2145:1, 2145:6, 2148:23

**publishes** [2] - 2098:17, 2098:20

**publishing** [20] - 2047:8, 2087:12, 2087:16, 2089:21, 2089:22, 2095:1, 2101:15, 2102:5, 2102:6, 2105:1, 2105:6, 2106:13, 2107:5, 2109:7, 2113:6, 2131:1, 2132:25, 2144:20, 2144:23

**Pulitzer** [1] - 2150:12

**punching** [1] - 2134:23

**purely** [3] - 2059:19, 2097:2, 2097:4

**purple** [1] - 2050:15

**purposes** [2] - 2132:21, 2142:12

**pursuing** [2] - 2053:19, 2055:5

**push** [1] - 2127:8

**puts** [1] - 2049:6

**putting** [1] - 2133:23

**PX** [17] - 2038:14, 2038:14, 2038:15, 2038:15, 2038:16, 2038:16, 2042:25, 2085:11, 2086:25, 2115:9, 2137:20, 2138:5, 2141:13, 2142:9, 2142:12, 2142:23, 2143:3

## Q

**qualitative** [3] - 2047:7, 2048:1, 2067:8

**qualities** [1] - 2108:20

**quality** [8] - 2064:15, 2084:5, 2084:9, 2096:11, 2108:16, 2131:1, 2131:4

**quarterly** [1] - 2069:23

**quarterly-report** [1] - 2069:23

**quarters** [2] - 2120:21, 2120:22

**QUESTION** [2] - 2100:15, 2146:9

**questioning** [1] - 2105:14, 2111:7, 2150:24, 2150:25

**questions** [14] - 2069:12, 2079:23, 2080:2, 2106:18, 2106:23, 2111:7, 2125:6, 2132:22, 2143:5, 2143:8, 2147:11, 2148:13, 2148:14, 2148:16

**quickly** [1] - 2074:4

**quite** [5] - 2096:14, 2097:5, 2109:7, 2134:17

## R

**Raab** [1] - 2141:3

**raise** [2] - 2039:15, 2082:5, 2111:18

**raising** [1] - 2049:3

**ramification** [1] - 2095:22

**ran** [1] - 2103:3

**Random** [67] - 2046:4, 2047:20, 2050:17, 2050:24, 2050:25, 2061:7, 2061:12, 2061:14, 2061:22, 2062:5, 2069:13, 2069:18, 2070:1, 2073:20, 2073:24, 2075:10, 2076:1, 2076:17, 2076:18, 2076:20, 2081:16, 2086:14, 2087:3, 2087:24, 2088:3, 2088:6, 2088:19, 2094:11, 2098:11, 2098:17, 2102:23, 2103:6, 2103:11, 2103:14, 2103:16, 2103:20, 2103:21,

2103:23, 2104:6, 2104:9, 2104:11, 2104:19, 2115:20, 2121:19, 2124:8, 2124:12, 2124:25, 2127:20, 2129:13, 2131:13, 2131:19, 2131:24, 2135:3, 2135:5, 2135:6, 2137:6, 2143:14, 2145:17, 2145:22, 2146:10, 2146:12, 2147:5, 2147:6, 2148:1, 2148:6, 2151:25

**range** [3] - 2060:5, 2060:6, 2066:7

**ranking** [1] - 2128:21

**rapidly** [1] - 2097:5

**rare** [1] - 2106:4

**rarely** [2] - 2106:3, 2120:6

**rate** [5] - 2053:15, 2055:13, 2101:25, 2102:8, 2105:3

**rates** [2] - 2091:12, 2101:15

**rather** [3] - 2068:2, 2097:3, 2121:6

**reached** [2] - 2107:20, 2107:23

**read** [10] - 2072:8, 2100:13, 2100:18, 2113:22, 2115:2, 2132:18, 2140:18, 2140:19, 2146:14, 2147:11

**reader** [5] - 2041:9, 2077:24, 2078:1, 2078:7, 2078:11

**readers** [2] - 2058:16, 2058:20

**reading** [2] - 2067:21, 2097:1

**real** [2] - 2073:23, 2121:4

**reality** [1] - 2058:19

**realize** [2] - 2058:19, 2070:6

**really** [31] - 2047:5, 2049:11, 2051:21, 2052:23, 2053:23, 2056:3, 2058:3, 2059:22, 2060:4, 2062:12, 2064:14, 2066:12, 2066:20, 2068:7, 2069:19, 2073:6, 2081:11, 2094:7, 2096:14, 2108:16, 2118:8,

2118:13, 2120:14, 2121:11, 2123:25, 2129:6, 2135:14, 2136:4, 2136:16, 2141:8, 2149:12

**reason** [1] - 2063:6

**reasonable** [1] - 2094:3

**reasons** [7] - 2049:18, 2057:21, 2059:24, 2125:10, 2126:3, 2132:7, 2145:9

**receive** [2] - 2110:8, 2110:9

**received** [5] - 2046:25, 2071:22, 2084:7, 2103:2, 2144:15

**recently** [2] - 2060:14, 2067:23

**reception** [1] - 2109:6

**Recess** [1] - 2097:18

**recognizable** [1] - 2108:20

**recognize** [3] - 2084:21, 2086:6, 2108:21

**recollection** [1] - 2086:12

**record** [9] - 2040:5, 2045:14, 2082:20, 2084:25, 2086:11, 2112:9, 2123:7, 2123:9, 2149:1

**records** [1] - 2051:14

**recross** [1] - 2148:9

**red** [1] - 2050:14

**redirect** [1] - 2106:20

**Redirect** [1] - 2038:8

**REDIRECT** [1] - 2106:21

**reduce** [1] - 2070:4

**reduced** [1] - 2071:2

**reduction** [1] - 2071:6

**refer** [2] - 2087:18, 2113:15

**reference** [3] - 2065:22, 2119:11, 2133:18

**references** [1] - 2116:6

**referred** [1] - 2132:19

**referring** [3] - 2084:13, 2119:12, 2123:10

**reflect** [1] - 2048:9

**reflects** [1] - 2142:19

**reframe** [3] - 2060:12, 2060:20, 2060:23

**regarding** [2] - 2106:23, 2152:16

**regularly** [1] - 2062:13

**related** [1] - 2096:5

**relations** [1] - 2135:18

**relationship** [6] - 2055:11, 2055:25, 2073:2, 2076:5, 2080:12, 2126:19

**relationship-based** [1] - 2073:2

**relationships** [4] - 2076:8, 2076:10, 2076:13, 2076:18

**relative** [1] - 2128:13

**relevant** [4] - 2067:6, 2114:18, 2115:16, 2152:3

**religion** [1] - 2114:1

**rely** [1] - 2081:8

**remain** [4] - 2039:14, 2082:5, 2093:10, 2111:17

**remains** [1] - 2051:9

**remember** [7] - 2046:11, 2046:13, 2050:1, 2050:2, 2073:1, 2123:23, 2136:25

**reminded** [1] - 2095:3

**reminder** [1] - 2054:16

**remove** [3] - 2039:19, 2082:8, 2111:22

**render** [1] - 2131:2

**rendered** [2] - 2047:1, 2047:8

**reneged** [1] - 2072:20

**repeat** [3] - 2054:7, 2078:3, 2080:19

**report** [1] - 2069:23

**reported** [1] - 2039:3

**REPORTER** [8] - 2040:21, 2040:24, 2041:2, 2042:17, 2042:19, 2070:19, 2078:3, 2123:4

**REPORTER'S** [1] - 2039:2

**represent** [27] - 2041:11, 2041:20, 2041:23, 2054:12, 2055:23, 2074:1, 2075:4, 2075:6, 2083:4, 2083:6, 2084:16, 2085:22, 2086:12, 2092:21, 2095:12, 2096:22, 2098:14, 2099:6, 2101:4, 2101:6, 2113:21, 2114:24, 2115:18, 2132:6

**representation** [2] -

2091:23, 2094:16
**representatives** [1] - 2084:16
**Represented** [1] - 2075:1
**represented** [5] - 2075:5, 2084:10, 2085:1, 2098:8, 2113:18
**representing** [3] - 2056:2, 2066:2, 2097:1
**represents** [2] - 2114:17, 2115:15
**reserve** [3] - 2049:8, 2120:11, 2148:9
**resident** [1] - 2093:1
**resist** [1] - 2070:24
**resolve** [2] - 2107:14, 2107:16
**resources** [1] - 2047:3
**respect** [7] - 2046:23, 2048:21, 2058:23, 2107:19, 2116:16, 2121:10, 2124:24
**respond** [2] - 2081:4, 2111:2
**responds** [1] - 2141:3
**response** [3] - 2080:1, 2105:14, 2142:13
**responses** [1] - 2090:17
**rest** [4] - 2080:13, 2091:22, 2092:15, 2092:19
**result** [3] - 2050:25, 2094:18, 2103:8
**resume** [2] - 2097:9, 2151:9
**retail** [2] - 2058:22, 2128:9
**revenue** [2] - 2091:13, 2092:14
**review** [1] - 2113:6
**reviewed** [1] - 2141:20
**reviewers** [1] - 2068:7
**reviewing** [1] - 2138:6
**richest** [1] - 2063:10
**ride** [1] - 2061:20
**ridiculous** [1] - 2066:13
**rights** [16] - 2087:20, 2091:12, 2091:13, 2091:17, 2091:19, 2091:24, 2091:25, 2092:2, 2102:4, 2104:9, 2106:24, 2106:25, 2107:5, 2107:10, 2144:20, 2144:23

**risk** [1] - 2102:3
**ro** [1] - 2120:9
**robin** [6] - 2049:21, 2049:22, 2053:4, 2091:1, 2120:4, 2121:7
**robust** [1] - 2063:10
**rocketed** [1] - 2066:13
**Rodale** [8] - 2095:18, 2095:19, 2095:23, 2096:1, 2098:7, 2098:9, 2098:11
**role** [8] - 2072:10, 2098:22, 2098:25, 2099:14, 2099:18, 2100:6, 2100:15, 2106:12
**room** [3] - 2040:1, 2049:2, 2056:18
**Rooney** [1] - 2109:21
**Ross** [13] - 2038:9, 2038:21, 2038:21, 2038:22, 2111:15, 2112:10, 2112:16, 2112:17, 2114:2, 2138:3, 2141:25, 2146:21, 2147:22
**Ross's** [1] - 2141:20
**roughly** [1] - 2092:14
**round** [17] - 2049:5, 2049:21, 2049:22, 2053:4, 2057:5, 2059:25, 2091:1, 2105:23, 2117:4, 2120:3, 2120:4, 2120:9, 2121:7, 2126:8, 2138:22
**Round** [6] - 2057:7, 2117:5, 2117:6, 2117:7, 2120:13
**round-robin** [6] - 2049:21, 2049:22, 2053:4, 2091:1, 2120:4, 2121:7
**rounds** [10] - 2049:8, 2057:1, 2063:22, 2116:19, 2116:21, 2116:24, 2117:1, 2120:1, 2120:13
**route** [1] - 2056:9
**Row** [6] - 2077:17, 2077:21, 2077:23, 2078:2, 2078:8, 2078:14
**row** [1] - 2141:16
**rows** [1] - 2143:7
**royalties** [5] - 2101:12, 2101:13, 2101:21, 2102:13, 2103:2

**royalty** [9] - 2091:12, 2101:15, 2101:25, 2102:8, 2102:11, 2104:17, 2104:19, 2104:23, 2105:3
**Rudzin's** [1] - 2039:9
**rule** [4] - 2094:6, 2116:25, 2119:12, 2131:13
**rules** [9] - 2089:15, 2090:1, 2090:7, 2090:8, 2117:1, 2117:8, 2118:24, 2119:2, 2119:8
**ruling** [1] - 2152:16
**run** [1] - 2081:5
**runaway** [1] - 2066:15
**runners** [1] - 2124:13
**runners-up** [1] - 2124:13
**running** [1] - 2118:1

## S

**S&S** [3] - 2050:5, 2050:16, 2087:25
**sad** [1] - 2130:15
**safer** [2] - 2056:9, 2056:12
**sale** [3] - 2134:17, 2134:18, 2138:10
**sales** [18] - 2058:22, 2063:15, 2068:1, 2068:16, 2086:11, 2088:15, 2114:18, 2115:15, 2128:9, 2134:8, 2142:16, 2145:10, 2148:14, 2148:17, 2148:21, 2149:17, 2149:19, 2150:4
**Sally** [1] - 2109:21
**sandbox** [1] - 2047:17
**Sandy** [1] - 2122:1
**Sanford** [1] - 2040:19
**Sansigre** [1] - 2152:2
**satisfaction** [1] - 2107:17
**satisfy** [1] - 2093:19
**saw** [2] - 2122:15, 2150:3
**scale** [4] - 2047:18, 2047:23, 2047:25, 2131:10
**Schadler** [1] - 2112:17
**schedule** [2] - 2151:14, 2151:15
**Scholastic** [1] - 2079:12
**school** [2] - 2109:5,

2125:17
**Schuster** [51] - 2046:6, 2047:21, 2050:17, 2050:24, 2050:25, 2051:17, 2051:22, 2061:6, 2061:13, 2061:22, 2062:6, 2069:13, 2069:22, 2069:25, 2072:21, 2075:10, 2086:14, 2087:3, 2088:2, 2088:6, 2088:18, 2094:11, 2094:20, 2098:20, 2115:17, 2115:20, 2119:17, 2121:19, 2124:2, 2124:9, 2124:12, 2125:1, 2127:19, 2129:13, 2134:13, 2134:14, 2134:17, 2135:3, 2135:9, 2135:13, 2135:20, 2136:4, 2136:5, 2136:6, 2136:12, 2136:14, 2136:24, 2143:14, 2145:18, 2146:25, 2147:9
**science** [1] - 2113:25
**scope** [1] - 2107:10
**screen** [1] - 2052:17
**screw** [2] - 2060:4
**seal** [8] - 2042:16, 2042:20, 2042:24, 2085:7, 2086:21, 2115:5, 2137:18
**seated** [2] - 2039:18, 2111:21
**second** [5] - 2045:9, 2090:2, 2091:13, 2124:22, 2139:7
**secured** [1] - 2099:25
**see** [36] - 2044:14, 2045:11, 2052:5, 2052:7, 2052:23, 2055:17, 2055:18, 2059:10, 2068:17, 2095:12, 2097:19, 2103:24, 2110:12, 2115:23, 2116:5, 2118:15, 2118:19, 2120:8, 2121:16, 2123:17, 2132:9, 2134:8, 2137:4, 2138:3, 2138:4, 2138:10, 2139:20, 2141:17, 2142:11, 2142:16, 2148:12, 2150:7, 2150:20, 2152:17, 2152:20

**seeing** [2] - 2066:3, 2152:6
**seek** [1] - 2137:17
**select** [2] - 2064:12, 2091:3
**selected** [1] - 2102:19
**selecting** [1] - 2064:21
**selection** [1] - 2113:18
**self** [1] - 2105:6
**self-publishing** [1] - 2105:6
**selfish** [1] - 2096:25
**sell** [20] - 2043:19, 2049:16, 2058:15, 2059:19, 2059:20, 2060:22, 2079:8, 2083:21, 2106:1, 2106:3, 2106:5, 2113:22, 2125:11, 2129:25, 2130:9, 2144:19, 2144:22, 2145:17, 2148:25
**seller** [4] - 2066:15, 2067:6, 2073:11, 2149:7
**sellers** [3] - 2073:13, 2132:15, 2132:20
**selling** [6] - 2064:6, 2065:23, 2096:17, 2096:22, 2145:22, 2146:25
**sells** [1] - 2069:11
**send** [6] - 2049:12, 2051:25, 2068:7, 2090:5, 2110:23, 2119:1
**sending** [2] - 2080:13, 2118:23
**sense** [3] - 2129:21, 2131:8, 2151:10
**sensitive** [1] - 2064:4
**sent** [2] - 2088:25, 2122:15
**separate** [1] - 2127:23
**separately** [1] - 2107:1
**separates** [1] - 2067:7
**serial** [1] - 2091:13
**serious** [3] - 2041:12, 2041:24, 2081:14
**serves** [1] - 2119:6
**service** [1] - 2046:25
**services** [5] - 2047:1, 2047:8, 2096:11, 2096:13, 2131:2
**set** [2] - 2048:5, 2118:7
**sets** [2] - 2045:6,

2060:6
**several** [2] - 2055:10, 2134:15
**share** [3] - 2058:14, 2058:22, 2058:23
**shareholder** [1] - 2069:23
**shares** [3] - 2058:13, 2128:5, 2128:7
**sheet** [8] - 2039:10, 2078:24, 2095:4, 2120:7, 2124:25, 2143:6, 2143:10
**shop** [1] - 2052:15
**short** [1] - 2100:3
**short-term** [1] - 2100:3
**shot** [1] - 2052:24
**shots** [2] - 2131:5, 2131:7
**show** [2] - 2102:15, 2124:1
**shut** [1] - 2151:6
**sic** [5] - 2048:6, 2050:5, 2068:2, 2109:5, 2140:18
**sic]** [1] - 2127:5
**sick** [1] - 2123:23
**Side** [1] - 2041:10
**side** [1] - 2085:14
**sign** [1] - 2049:16
**signal** [1] - 2066:22
**significantly** [1] - 2083:8
**signify** [1] - 2085:15
**similar** [5] - 2047:10, 2047:12, 2092:5, 2119:19, 2133:12
**Simon** [51] - 2046:6, 2047:21, 2050:17, 2050:24, 2050:25, 2051:17, 2051:22, 2061:6, 2061:12, 2061:22, 2062:6, 2069:13, 2069:22, 2069:25, 2072:21, 2075:10, 2086:14, 2087:3, 2088:2, 2088:6, 2088:18, 2094:11, 2094:20, 2098:20, 2115:17, 2115:20, 2119:17, 2121:19, 2124:2, 2124:8, 2124:12, 2124:25, 2127:19, 2129:13, 2134:13, 2134:14, 2134:16, 2135:3, 2135:9, 2135:13, 2135:20, 2136:4, 2136:5,

2136:12, 2136:14, 2136:24, 2143:14, 2145:17, 2146:25, 2147:9
**single** [12] - 2052:13, 2057:10, 2063:25, 2074:2, 2087:8, 2093:6, 2093:14, 2093:17, 2093:24, 2094:2, 2110:11
**Single** [1] - 2087:7
**single-bidder** [1] - 2093:6
**single-submission** [1] - 2110:11
**sit** [2] - 2082:4, 2082:8
**sitting** [1] - 2056:18
**situation** [4] - 2058:1, 2080:14, 2108:10, 2110:16
**size** [1] - 2070:25
**sized** [1] - 2073:21
**skill** [1] - 2060:6
**slide** [1] - 2095:13
**slides** [1] - 2074:20
**slip** [1] - 2143:6
**slots** [2] - 2131:6, 2131:9
**slotted** [1] - 2066:23
**slowly** [1] - 2073:19
**small** [4] - 2041:10, 2051:12, 2073:21, 2133:7
**smaller** [3] - 2096:3, 2131:7, 2149:5
**Snyder** [2] - 2152:10, 2152:11
**so-and-so** [2] - 2056:21, 2057:3
**social** [4] - 2113:25, 2133:6, 2136:9, 2149:11
**sold** [20] - 2044:1, 2048:10, 2066:16, 2067:12, 2067:13, 2075:9, 2075:14, 2079:2, 2079:20, 2088:5, 2095:2, 2105:9, 2113:1, 2115:19, 2130:16, 2146:9, 2147:4, 2147:8, 2148:25, 2150:2
**Sold** [1] - 2116:5
**solicit** [1] - 2118:19
**solid** [1] - 2106:15
**Solitary** [1] - 2130:13
**Solomon** [2] - 2098:14, 2098:20
**someone** [8] -

2043:19, 2044:5, 2044:7, 2052:1, 2052:16, 2118:18, 2119:16, 2126:22
**sometime** [1] - 2072:19
**sometimes** [18] - 2056:8, 2087:21, 2093:1, 2105:19, 2105:22, 2108:11, 2110:16, 2111:2, 2118:16, 2118:17, 2125:13, 2126:2, 2127:10, 2149:22, 2149:23, 2150:20, 2151:6
**somewhere** [1] - 2061:12
**sophisticated** [1] - 2063:5
**sorry** [34] - 2040:20, 2051:5, 2051:7, 2058:21, 2059:4, 2070:20, 2077:19, 2086:1, 2086:9, 2089:13, 2095:23, 2095:25, 2099:8, 2099:10, 2099:12, 2099:16, 2099:17, 2109:24, 2110:3, 2122:4, 2122:21, 2123:8, 2127:2, 2127:3, 2127:16, 2136:12, 2136:13, 2138:25, 2139:1, 2139:5, 2142:2, 2146:4, 2148:15, 2151:4
**sort** [17] - 2050:2, 2056:25, 2058:2, 2058:7, 2059:11, 2061:2, 2063:13, 2065:6, 2067:18, 2068:2, 2069:4, 2084:5, 2108:4, 2121:8, 2129:8, 2134:17, 2149:13
**sorted** [1] - 2077:7
**sought** [1] - 2070:4
**sound** [2] - 2050:18, 2124:9
**sounded** [1] - 2065:14
**sounds** [3] - 2062:19, 2106:7
**speaking** [3] - 2071:17, 2094:18, 2123:4
**speaks** [1] - 2058:7
**special** [1] - 2067:20
**specialize** [1] -

2113:20
**specifically** [1] - 2101:12
**speculation** [1] - 2135:22
**speed** [2] - 2044:19, 2050:16
**spelled** [1] - 2116:24
**spend** [3] - 2067:18, 2068:25, 2118:1
**spending** [2] - 2066:9, 2136:23
**spent** [2] - 2069:1, 2125:25
**spilling** [1] - 2152:12
**spin** [2] - 2079:10, 2079:14
**spin-offs** [1] - 2079:10
**spread** [3] - 2063:23, 2092:23
**staff** [2] - 2085:14, 2136:17
**stand** [2] - 2127:2, 2151:10
**standard** [2] - 2061:1, 2101:15
**standing** [3] - 2039:15, 2082:5, 2111:18
**start** [11] - 2040:13, 2053:23, 2056:4, 2060:19, 2066:5, 2073:23, 2074:19, 2119:1, 2138:5, 2139:3, 2152:6
**started** [5] - 2040:18, 2041:5, 2071:1, 2101:19, 2113:1
**starting** [2] - 2084:21
**starts** [1] - 2073:5
**state** [3] - 2040:5, 2082:20, 2112:9
**statements** [1] - 2148:24
**States** [2] - 2074:13, 2097:24
**states** [2] - 2087:8, 2087:13
**Steel** [1] - 2096:23
**step** [5] - 2081:21, 2082:1, 2111:12, 2111:17, 2117:17
**stickered** [1] - 2074:23
**still** [8] - 2049:10, 2057:6, 2064:25, 2065:4, 2104:16, 2104:22, 2109:10, 2129:1
**stole** [1] - 2057:24

**stop** [2] - 2049:8, 2062:17
**stores** [1] - 2058:15
**stories** [4] - 2109:6, 2109:8, 2109:9, 2109:19
**storm** [1] - 2106:17
**story** [2] - 2063:7, 2063:20
**strategy** [1] - 2120:14
**strength** [1] - 2093:3
**strengths** [1] - 2089:21
**strong** [4] - 2096:15, 2129:22, 2149:17, 2149:19
**stronger** [2] - 2089:8, 2097:4
**strongest** [4] - 2089:16, 2089:17, 2090:3, 2090:22
**strongly** [1] - 2055:25
**study** [2] - 2147:2, 2148:5
**stuff** [1] - 2136:9
**subjective** [1] - 2108:18
**submission** [16] - 2052:3, 2053:24, 2087:8, 2089:5, 2093:14, 2093:15, 2093:23, 2093:24, 2093:25, 2094:2, 2110:7, 2110:9, 2110:11, 2116:6, 2118:25, 2145:16
**submissions** [9] - 2093:17, 2105:16, 2105:23, 2116:11, 2116:13, 2145:21, 2146:13, 2146:24, 2147:7
**submit** [15] - 2089:6, 2091:2, 2105:19, 2105:22, 2117:21, 2117:22, 2117:24, 2118:7, 2118:11, 2118:14, 2130:10, 2130:12, 2130:15, 2131:3
**submitted** [5] - 2087:11, 2087:15, 2088:7, 2088:19, 2095:19
**submitting** [2] - 2090:16, 2117:2
**subpoena** [1] - 2142:13
**substance** [2] - 2141:7, 2146:19

**substantial** [1] - 2103:12
**subtle** [1] - 2064:5
**success** [6] - 2053:14, 2055:13, 2060:5, 2063:17, 2066:13, 2134:3
**successful** [4] - 2056:1, 2079:7, 2108:23, 2109:16
**suddenly** [1] - 2081:10
**suffice** [1] - 2116:12
**suggest** [1] - 2062:14
**suited** [3] - 2051:24, 2089:9
**support** [1] - 2126:24
**supported** [2] - 2072:14, 2094:21
**supposed** [2] - 2071:15, 2122:2
**surprise** [1] - 2061:18
**survive** [1] - 2065:3
**sustained** [1] - 2135:23
**systems** [1] - 2135:13

## T

**tab** [4] - 2100:12, 2140:2, 2140:13, 2142:19
**table** [3] - 2052:19, 2057:22, 2058:1
**talent** [1] - 2095:7
**talents** [1] - 2060:6
**tank** [1] - 2137:2
**tastes** [1] - 2111:1
**teach** [1] - 2125:16
**ten** [1] - 2078:11
**tend** [2] - 2117:8, 2136:18
**tends** [3] - 2041:24, 2106:17, 2113:25
**term** [7] - 2049:17, 2065:23, 2069:21, 2091:7, 2100:3, 2127:3, 2143:13
**terms** [15] - 2066:8, 2068:12, 2089:17, 2090:22, 2091:8, 2091:10, 2101:9, 2120:20, 2125:15, 2126:15, 2126:18, 2127:8, 2130:2, 2150:19
**terrible** [1] - 2135:2
**terrific** [1] - 2134:16
**territorial** [1] - 2091:12

**territory** [1] - 2092:23
**testified** [5] - 2080:9, 2098:6, 2101:9, 2105:14, 2105:16
**testimony** [13] - 2080:21, 2081:21, 2088:14, 2091:15, 2097:13, 2098:13, 2111:12, 2135:21, 2141:5, 2141:21, 2147:17, 2147:25, 2151:3
**that'll** [2] - 2072:5, 2137:19
**thereabouts** [1] - 2067:2
**thereby** [1] - 2094:11
**they've** [6] - 2047:2, 2068:5, 2088:20, 2126:4, 2126:9, 2134:7
**thin** [1] - 2097:21
**thinking** [26] - 2047:20, 2057:2, 2058:11, 2058:12, 2058:15, 2058:19, 2058:21, 2059:6, 2059:18, 2059:19, 2060:23, 2061:15, 2062:5, 2062:6, 2065:8, 2066:11, 2066:15, 2066:24, 2072:10, 2128:2, 2128:16, 2128:17, 2128:22, 2129:14, 2129:16
**thinks** [3] - 2057:16, 2061:1, 2135:18
**third** [2] - 2090:3, 2092:24
**thousand** [3] - 2059:20, 2073:22, 2134:4
**three** [9] - 2045:19, 2046:6, 2052:11, 2064:1, 2068:8, 2077:10, 2077:14, 2116:12, 2141:15
**throughout** [1] - 2116:10
**throw** [1] - 2052:23
**thumb** [1] - 2094:6
**timeliness** [1] - 2064:16
**timely** [1] - 2067:24
**timing** [2] - 2151:8, 2151:11
**timing-wise** [1] - 2151:11
**tiny** [1] - 2115:14

**title** [1] - 2075:1
**titles** [1] - 2105:9
**today** [2] - 2136:1, 2151:9
**together** [3] - 2068:19, 2126:5, 2126:7
**tomorrow** [1] - 2049:13
**took** [4] - 2064:2, 2107:8, 2125:17, 2125:18
**tool** [1] - 2073:9
**tools** [2] - 2069:25, 2073:9
**top** [9] - 2059:17, 2065:22, 2067:5, 2071:5, 2096:17, 2096:22, 2123:11, 2132:15, 2132:20
**topic** [1] - 2105:6
**topics** [1] - 2065:21
**total** [4] - 2040:16, 2083:2, 2114:25, 2124:4
**totality** [1] - 2115:11
**totally** [2] - 2058:25, 2126:18
**town** [1] - 2136:23
**trace** [1] - 2040:17
**track** [7] - 2058:22, 2059:1, 2128:13, 2149:1, 2150:3, 2150:4, 2150:8
**traditional** [1] - 2049:5
**training** [2] - 2125:18
**transact** [1] - 2106:25
**transacting** [1] - 2088:15
**transactions** [1] - 2121:18
**transcript** [5] - 2039:3, 2100:21, 2140:14, 2146:1, 2146:6
**Transcript** [8] - 2038:21, 2038:21, 2038:22, 2038:23, 2100:25, 2141:25, 2146:21, 2147:22
**Transcripts** [1] - 2038:20
**transmit** [1] - 2069:8
**travel** [1] - 2047:11
**traveling** [1] - 2083:12
**treat** [2] - 2072:20, 2133:21
**treated** [3] - 2067:3, 2067:8, 2067:9
**treatment** [1] - 2067:13
**treatments** [1] -

2067:17
**treats** [1] - 2133:19
**tremendous** [1] - 2047:3
**trial** [13] - 2039:2, 2047:13, 2054:11, 2054:12, 2061:3, 2065:22, 2084:19, 2094:10, 2096:16, 2116:10, 2127:17, 2127:19, 2132:14
**tried** [1] - 2102:24
**Trister** [1] - 2112:17
**true** [1] - 2148:20
**Trump** [1] - 2150:14
**trust** [2] - 2073:2, 2073:6
**trust-based** [1] - 2073:2
**trusting** [1] - 2073:4
**Truth** [2] - 2095:15, 2098:7
**try** [15] - 2051:23, 2052:3, 2053:9, 2090:25, 2098:22, 2098:25, 2100:6, 2100:16, 2105:12, 2113:4, 2118:9, 2127:9, 2131:3, 2133:4, 2136:21
**trying** [13] - 2060:12, 2063:7, 2063:8, 2090:12, 2093:18, 2096:1, 2102:13, 2102:15, 2104:6, 2126:2, 2133:13, 2143:7, 2147:12
**Tuesday** [4] - 2090:2, 2151:19, 2152:10, 2152:12
**turn** [1] - 2042:2, 2060:3, 2092:25, 2100:12, 2100:13, 2106:8, 2121:13, 2138:8, 2138:15, 2142:8, 2145:25, 2146:5
**turning** [1] - 2105:6
**twice** [1] - 2068:4
**two** [36] - 2041:9, 2043:18, 2045:17, 2045:21, 2046:13, 2046:19, 2049:4, 2051:1, 2051:3, 2056:22, 2057:1, 2061:4, 2067:23, 2073:13, 2075:7, 2083:20, 2084:19, 2088:20, 2102:22, 2114:6, 2116:18,

2116:19, 2119:22, 2122:13, 2123:21, 2124:13, 2127:22, 2133:14, 2143:24, 2144:1, 2144:3, 2144:5, 2144:10, 2144:15, 2144:17, 2152:2
**type** [5] - 2041:22, 2053:4, 2070:8, 2083:21, 2113:19
**types** [3] - 2108:25, 2116:11, 2116:19
**typically** [4] - 2070:5, 2116:18, 2117:25, 2133:9

## U

**U.S** [12] - 2091:21, 2092:1, 2092:6, 2092:8, 2092:15, 2092:18, 2092:24, 2093:1, 2093:2, 2093:3, 2093:4, 2152:1
**uncle** [1] - 2121:9
**under** [12] - 2042:16, 2042:20, 2042:24, 2085:7, 2085:14, 2086:21, 2087:7, 2087:21, 2115:5, 2116:5, 2137:18
**underbidder** [2] - 2106:3, 2106:6
**understaffed** [1] - 2134:24
**understood** [1] - 2080:21
**unfair** [1] - 2104:23
**unfortunate** [1] - 2071:9
**unfortunately** [1] - 2149:19
**unique** [2] - 2041:25, 2069:7
**United** [2] - 2074:13, 2097:24
**university** [1] - 2113:7
**University** [1] - 2046:14
**unless** [3] - 2119:7, 2119:11, 2133:5
**unnecessarily** [1] - 2091:6
**unstable** [1] - 2106:16
**up** [41] - 2039:19, 2039:22, 2046:19, 2049:15, 2049:17, 2049:18, 2050:16,

2053:2, 2053:20, 2056:14, 2056:16, 2056:19, 2057:17, 2057:18, 2058:18, 2060:1, 2060:4, 2064:6, 2066:8, 2070:17, 2071:11, 2071:12, 2082:1, 2082:11, 2083:11, 2083:23, 2087:6, 2088:17, 2090:25, 2098:13, 2106:23, 2111:17, 2111:24, 2124:13, 2128:8, 2137:5, 2150:8, 2152:6, 2152:14
**Upper** [1] - 2041:10
**Uprising** [1] - 2051:5
**uses** [1] - 2127:4

**V**

**valuable** [1] - 2055:12
**value** [7] - 2053:22, 2053:25, 2055:18, 2064:14, 2064:15, 2065:7, 2110:7
**Vance** [2] - 2141:9, 2142:5
**VANCE** [22] - 2115:7, 2135:21, 2137:24, 2138:2, 2140:3, 2140:6, 2140:12, 2141:5, 2141:13, 2141:15, 2141:18, 2141:20, 2142:6, 2142:23, 2143:4, 2146:7, 2146:18, 2146:23, 2147:17, 2147:24, 2148:9, 2151:2
**Vance.................** [1] - 2038:11
**variable** [1] - 2066:7
**varies** [1] - 2113:4
**variety** [2] - 2125:10, 2126:3
**various** [3] - 2045:7, 2058:23, 2135:17
**vary** [1] - 2109:7
**versa** [1] - 2118:21
**version** [11] - 2042:4, 2043:2, 2044:13, 2077:2, 2078:1, 2078:7, 2078:10, 2078:11, 2142:7, 2143:6, 2143:8
**versus** [2] - 2047:9, 2110:19
**Viacom** [2] - 2134:21,

2151:24
**vice** [1] - 2118:21
**view** [9] - 2046:24, 2047:15, 2089:18, 2094:20, 2096:11, 2098:22, 2099:18, 2099:22, 2100:3
**viewed** [1] - 2093:3
**vigor** [1] - 2131:4

**W**

**wait** [2] - 2092:18, 2151:18
**waiting** [1] - 2055:21
**wake** [1] - 2058:18
**walk** [2] - 2127:7, 2127:10
**walking** [1] - 2127:11
**wants** [4] - 2062:12, 2093:9, 2125:13, 2136:4
**Washington** [1] - 2112:19
**waves** [1] - 2105:22
**weaknesses** [1] - 2089:21
**Wednesday** [2] - 2151:19, 2152:13
**week** [6] - 2090:3, 2113:5, 2130:15, 2151:18
**weekend** [2] - 2152:19, 2152:20
**weeks** [1] - 2150:11
**weighed** [1] - 2149:14
**weight** [1] - 2134:24
**whereas** [2] - 2047:22, 2069:22
**white** [2] - 2050:15, 2143:20
**whole** [4] - 2049:21, 2056:25, 2120:16, 2126:7
**widely** [1] - 2129:23
**widest** [1] - 2053:9
**wildly** [1] - 2111:4
**Wiley** [1] - 2084:19
**willing** [1] - 2059:11
**winner** [3] - 2050:6, 2050:18, 2090:15
**wise** [1] - 2151:11
**wish** [1] - 2082:9
**withdrew** [1] - 2104:5
**withhold** [1] - 2106:24
**WITNESS** [71] - 2039:17, 2039:20, 2040:23, 2041:1, 2041:3, 2059:9, 2064:13, 2064:23,

2065:3, 2065:10, 2065:12, 2065:16, 2070:20, 2080:4, 2080:7, 2080:11, 2080:19, 2080:23, 2081:3, 2081:9, 2081:22, 2082:2, 2082:7, 2082:10, 2089:2, 2089:5, 2089:13, 2089:15, 2089:25, 2090:8, 2095:25, 2096:4, 2097:15, 2099:12, 2099:16, 2099:21, 2108:6, 2108:9, 2108:13, 2108:16, 2108:19, 2108:24, 2109:3, 2109:15, 2109:18, 2109:24, 2110:2, 2110:6, 2110:13, 2110:18, 2110:21, 2110:25, 2111:13, 2111:20, 2111:23, 2112:1, 2127:3, 2140:5, 2140:9, 2140:11, 2142:2, 2146:4, 2147:16, 2148:15, 2148:18, 2148:23, 2149:18, 2149:25, 2150:23, 2151:4, 2151:6
**witness** [10] - 2074:6, 2081:23, 2097:7, 2097:10, 2111:15, 2132:16, 2137:22, 2142:4, 2146:3, 2151:24
**Witnesses** [1] - 2038:3
**witnesses** [2] - 2152:2, 2152:15
**women's** [1] - 2114:1
**won** [4] - 2087:25, 2088:3, 2124:2, 2150:11
**wonderful** [2] - 2072:16, 2117:23
**wonderfully** [1] - 2130:13
**words** [1] - 2059:23
**workers** [1] - 2149:11
**Workman** [10] - 2046:1, 2046:12, 2046:14, 2046:15, 2046:18, 2047:2, 2047:23, 2075:15, 2075:18
**Workmans** [1] - 2046:19

**works** [3] - 2084:17, 2097:4, 2129:25
**Works** [1] - 2075:1
**Workshop** [1] - 2109:20
**world** [10] - 2055:15, 2063:10, 2091:22, 2092:16, 2092:19, 2092:24, 2128:24, 2129:12, 2133:17, 2150:10
**worldwide** [1] - 2091:24
**worst** [1] - 2134:6
**worth** [4] - 2049:19, 2057:17, 2070:10, 2141:23
**worthy** [1] - 2109:6
**writer** [3] - 2109:4, 2109:11, 2109:21
**Writers'** [2] - 2109:5, 2109:20
**written** [1] - 2150:2
**Wylie** [11] - 2038:6, 2038:23, 2081:24, 2082:21, 2082:25, 2086:4, 2088:13, 2097:6, 2098:3, 2098:5, 2100:25
**Wylie's** [1] - 2100:21

**Y**

**Yale** [2] - 2046:14, 2046:19
**year** [1] - 2142:19
**years** [27] - 2040:10, 2040:20, 2041:6, 2041:9, 2064:1, 2075:7, 2083:13, 2083:20, 2084:12, 2093:21, 2095:11, 2099:9, 2102:22, 2114:19, 2131:25, 2133:14, 2134:15, 2137:10, 2144:7, 2144:16, 2144:19, 2144:22, 2144:25, 2145:2, 2145:13, 2145:15
**Yoon** [2] - 2112:16, 2114:2
**York** [5] - 2074:2, 2083:13, 2103:7, 2103:14, 2117:25
**you-all** [1] - 2152:20
**young** [7] - 2077:23, 2078:1, 2078:7, 2078:11, 2079:2, 2109:4, 2109:21

**younger** [1] - 2060:14
**yourself** [4] - 2088:13, 2093:19, 2114:8, 2140:19

**Z**

**zero** [1] - 2045:14