```
 1                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3   * * * * * * * * * * * * * * *   )
     THE UNITED STATES OF AMERICA,   )   Civil Action
 4                                   )   No. 21-02886
                    Plaintiff,       )
 5                                   )
        vs.                          )
 6                                   )
     BERTELSMANN SE & CO. KGAA,      )   Washington, D.C.
 7   et al.,                         )   August 16, 2022
                                     )   2:23 p.m.
 8                   Defendants.     )   AFTERNOON SESSION
                                     )
 9   * * * * * * * * * * * * * * *   )

10

11                  TRANSCRIPT OF BENCH TRIAL
               BEFORE THE HONORABLE FLORENCE Y. PAN,
12                 UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   FOR THE PLAINTIFF:      JOHN R. READ, ESQ.
                             ETHAN STEVENSON, ESQ.
16                           IHAN KIM, ESQ.
                             MELVIN A. SCHWARZ, I, ESQ.
17                           JESSICA LEAL, ESQ.
                             UNITED STATES DEPARTMENT OF JUSTICE
18                           ANTITRUST DIVISION
                             450 Fifth Street, Northwest
19                           Washington, D.C. 20530

20
     FOR THE DEFENDANTS      DANIEL M. PETROCELLI, ESQ.
21   BERTELSMANN and         M. RANDALL OPPENHEIMER, ESQ.
     PENGUIN RANDOM HOUSE:   ROXANA GUIDERO, ESQ.
22                           SCOTT VOELZ, ESQ.
                             O'MELVENY & MYERS, LLP
23                           1999 Avenue of the Stars
                             Eighth Floor
24                           Los Angeles, California 90067

25
```

```
 1        APPEARANCES, CONT'D:

 2        FOR THE DEFENDANTS        ANDREW FRACKMAN, ESQ.
          BERTELSMANN and          ABBY RUDZIN, ESQ.
 3        PENGUIN RANDOM HOUSE:     DANIEL L. CANTOR, ESQ.
                                    O'MELVENY & MYERS, LLP
 4                                  Seven Times Square
                                    New York, New York 10036
 5

 6        FOR THE DEFENDANTS        STEPHEN FISHBEIN, ESQ.
          VIACOMMCBS and           SHEARMAN & STERLING, LLP
 7        SIMON & SCHUSTER:         599 Lexington Avenue
                                    New York, New York 10022
 8
                                    RYAN A. SHORES, ESQ.
 9                                  SHEARMAN & STERLING, LLP
                                    401 Ninth Street, Northwest
10                                  Washington, D.C. 20004

11
          REPORTED BY:             LISA EDWARDS, RDR, CRR
12                                 Official Court Reporter
                                   United States District Court for the
13                                    District of Columbia
                                   333 Constitution Avenue, Northwest
14                                 Room 6706
                                   Washington, D.C. 20001
15                                 (202) 354-3269

16

17

18

19

20

21

22

23

24

25
```

I N D E X

|  | Direct | Cross | Redirect |
|---|---|---|---|

WITNESSES FOR THE DEFENDANTS:

Edward A. Snyder, Ph.D.       2619

```
1              THE COURT:  Good afternoon.

2              MR. OPPENHEIMER:  Good afternoon, your Honor.

3              MR. SCHWARZ:  Good afternoon, your Honor.

4              THE COURT:  I apologize for keeping you all

5    waiting.  I wanted to be in a position to rule on the

6    efficiencies issue today.  And I think I am now in that

7    position, so it was time well spent.  But I apologize for

8    keeping people waiting.

9              So what's happening, Mr. Petrocelli?

10             MR. PETROCELLI:  We're going to defer Mr. Nihar

11   until after Professor Snyder, because I noted a typo on the

12   demonstrative and I wanted to give the Government more time

13   to review the materials.  So we'll call him next, after

14   Professor Snyder.  And so we don't need to be in closed

15   session, then.

16             THE COURT:  Okay.  I'm prepared to do that.  I'm

17   also prepared to hear argument on the efficiencies issue.

18             MR. PETROCELLI:  Okay.

19             THE COURT:  What is better for you in terms of

20   your witness?

21             MR. PETROCELLI:  Would you like to hear the

22   efficiencies argument now, your Honor?  Because --

23             THE COURT:  So I have flexibility in when I do

24   that.  I just want to be mindful of your witnesses and their

25   time.
```

```
 1                    MR. PETROCELLI:  Well --

 2                    THE COURT:  However you want to do it.

 3                    MR. PETROCELLI:  Well, do you want to start with

 4      Professor Snyder?

 5                    MR. OPPENHEIMER:  It's up to you.

 6                    MR. PETROCELLI:  Can we start with Professor

 7      Snyder?

 8                    THE COURT:  Yes.  That would be fine.

 9                    MR. PETROCELLI:  Thank you.

10                    (Thereupon, the witness entered the courtroom and

11      the following proceedings were had:)

12                    THE COURT:  You can step right up here, sir.  If

13      you'd remain standing and raise your right hand.

14          EDWARD A. SNYDER, Ph.D., DEFENSE WITNESS, SWORN.

15                    THE COURT:  Please be seated.  You may remove your

16      mask if you like.

17                    THE WITNESS:  Thank you.

18                    MR. OPPENHEIMER:  Your Honor, good morning.  We

19      have some notebooks we'd like to hand up.

20                    THE COURT:  Okay.

21                    MR. OPPENHEIMER:  Mr. Schwarz and I do have a

22      preliminary matter that we'd like to raise with the Court.

23      Despite having been virtual classmates at the University of

24      Chicago 45 years ago, we have one disagreement today --

25                    THE COURT:  Okay.
```

```
1              MR. OPPENHEIMER:  -- that we'd like to raise with

2    your Honor having to do with some very few objections, but

3    some objections that Mr. Schwarz had to some of our slide

4    show, which is otherwise unobjectionable.  So perhaps I can

5    let Mr. Schwarz explain.

6              THE COURT:  Sure.

7              MR. SCHWARZ:  Does the Court have the deck yet?

8              THE COURT:  Is it in one of these binders.

9              MR. SCHWARZ:  I don't know.

10             Did you hand one of those to the Court?

11             MR. OPPENHEIMER:  Your Honor, I have a collection

12   of the documents that were the subject of the objection

13   during the meet-and-confer.

14             MR. SCHWARZ:  Yes.

15             MR. OPPENHEIMER:  Perhaps I could provide them to

16   your Honor, if that helps.

17             THE COURT:  Okay.

18             MR. SCHWARZ:  That would be fine.

19             MR. OPPENHEIMER:  (Tenders documents to the

20   Court.)

21             THE COURT:  Thank you.

22             MR. SCHWARZ:  Your Honor, I believe hopefully we

23   have the same documents.  They're numbered 85 to 89.

24             THE COURT:  Yes.

25             MR. SCHWARZ:  Those are documents which we had not
```

1    seen until last night.  And they are also -- I am told by my

2    economist who helped me with these things that they are

3    unable to determine how these were calculated.  We have --

4    I'm not suggesting we don't probably have the base code data

5    from BookScan and other items.  But there are all sorts of

6    built-in assumptions and coding and categorizations of

7    variation things that we have no idea what they are.

8            And we've never had discovery on this.  I can't

9    cross-examine Dr. Snyder on this because I don't know what

10   they are.

11           So I would ask that they not be permitted to be

12   used.

13           THE COURT:  Do you want to respond to that?

14           MR. OPPENHEIMER:  Yes, your Honor.

15           I think this is relatively straightforward.  All

16   of the materials come from produced documents and materials

17   that were in the reliance works of both experts.  This is

18   all about just remarkably simple math.

19           There is a part of Dr. Snyder's testimony that

20   pertains to the 2013 merger, which you'll hear we describe

21   as a natural experiment.  There's a very simple proposition

22   associated with that, which is that Dr. Hill suggests that

23   average advances went down after 2013 and Dr. Snyder has a

24   different view.

25           Dr. Hill simply has a box that includes average

1    advances for anticipated top sellers for a period before the

2    merger and a box with average advances for the same

3    anticipated top sellers after.  He does the same thing for

4    advances for below-top sellers, before the merger in 2013

5    and after.  And he just does averages.

6            We literally did two things:  One, we took the

7    averages that are depicted in his material that come from

8    the documents that we all have and we simply took the

9    denominator of his averages, which is the number of titles

10   and contracts, and said:  If you look at that, you will see

11   that the number of titles and the number of contracts after

12   2013 went up.  It's in the average.  There's nothing new.

13   It's in his denominator.

14           THE COURT:  Okay.  What I'm hearing the Government

15   saying is that they don't know how to deal with your

16   exhibits.  So you can make that point without these

17   exhibits.

18           MR. OPPENHEIMER:  Your Honor, these are actually

19   only demos.  That's the other thing.  These are only

20   demonstratives.  So they're only to facilitate Dr. Snyder's

21   testimony.

22           THE COURT:  Fine.  I'm going to preclude them, and

23   you can still make these points without the demonstratives.

24           MR. OPPENHEIMER:  Very good.

25           THE COURT:  Thank you.

```
 1                    MR. OPPENHEIMER:  One related point:  I think
 2      Mr. Schwarz and I are in agreement that for purposes of
 3      display -- and it will also be illustrative, your Honor --
 4      but we have an unobjected-to exhibit, Defendants' DX 385.
 5      We're in agreement that for purposes of Dr. Snyder's
 6      testimony, we'll use that as kind of a surrogate or proxy.
 7                    THE COURT:  Okay.
 8                    MR. OPPENHEIMER:  Very good.
 9                    THE COURT:  And you may proceed with your direct.
10                    MR. OPPENHEIMER:  Thanks.  Thank you, your Honor.
11                         DIRECT EXAMINATION
12      BY MR. OPPENHEIMER:
13      Q.  Professor Snyder, good afternoon.  Would you briefly
14      describe your academic background.
15                    THE COURT REPORTER:  Sorry.  I need the witness's
16      first name, please.
17                    MR. OPPENHEIMER:  Oh, I'm sorry.
18      BY MR. OPPENHEIMER:
19      Q.  Would you state your name for the record, please.
20      A.  My name is Edward A. Snyder.
21      Q.  And would you describe briefly your academic background.
22      A.  I went to school in Maine, Colby College, and then I
23      earned my master's degree in public policy and my Ph.D. in
24      economics from the University of Chicago.
25      Q.  As an economist, what is your area of specialization?
```

1    A.  Industrial organization.  IO is the field of economics

2    that deals most directly with competitor interactions and

3    pricing and antitrust issues.

4    Q.  What is your current profession?

5    A.  I am the William S. Beinecke professor of economics and

6    management at Yale University.

7    Q.  Do you hold any secondary appointments?

8    A.  I do; in the economics department at Yale.

9    Q.  And could you briefly walk us through your academic

10   career.

11   A.  Yes.  I earned tenure at University of Michigan's

12   business school, and then I became dean of three top

13   business schools, where I worked over roughly a two-decade

14   time period.  The first was University of Virginia's Darden

15   School; second was the University of Chicago's Booth School;

16   and then most recently, the Yale School of Management.

17   Q.  Have you also been teaching?

18   A.  Yes.  I've taught, actually, from the beginning of my

19   career, pretty much throughout my career.  And since I

20   stopped deaning three years ago, I've developed a new course

21   on economic analysis of high-tech industries, an exciting

22   topic and quite successful course.

23        Prior to that, I taught courses on microeconomics.

24   When I was at Michigan, I developed a course that basically

25   leveraged IO content called competitive tactics.

 1                And then I had the great joy of teaching with

 2     Nobel laureate Gary Becker for nine years, a course on major

 3     policy issues.

 4     Q.  And do you continue to do research?

 5     A.  I do.  I find it rewarding.  I have a published article

 6     very recently on the vertical merger guidelines.  I have a

 7     chapter that's coming out in an annual book on antitrust

 8     cases.  And I recently submitted a paper to a journal for

 9     their traditional lined review.

10     Q.  And have you ever served in government?

11     A.  Yes.  I started my professional career at the U.S.

12     Department of Justice in the antitrust division.

13     Q.  Have you served as an expert in antitrust cases?

14     A.  Yes; in a wide variety of industries, ranging from

15     high-tech, pharmaceuticals, medical technologies, financial

16     matters.

17     Q.  And have you previously been designated as an expert and

18     qualified as an expert in these cases?

19     A.  Yes.

20     Q.  Have any of your roles involved monopson issues?

21     A.  Yes.  Three come to mind.  One is the litigation

22     involving dairy farmers.  The second one is litigation

23     involving cranberry farmers.  And the third one is high-tech

24     employees.

25     Q.  Was the dairy farmers case 2019, Vermont?

1    A.  I believe so.  Yes.

2    Q.  Have you recently testified on coordination issues?

3    A.  I did.  I testified two times earlier this year on

4    coordination issues in federal court in Denver involving

5    allegations of price-fixing in the broiler chicken industry.

6    Q.  And have you worked on behalf of plaintiffs and

7    defendants?

8    A.  Yes.  I've not testified recently on behalf of

9    plaintiffs.  However, in the last four years, I've been

10   retained by three different plaintiffs, two in the high-tech

11   context, one being video streaming and the other within

12   gaming, and the third one involving a specific medical

13   technology.

14   Q.  Have you served as an economics expert in a merger?

15   A.  The work that I've done on mergers corresponds to what

16   Dr. Hill referred to as the advocacy phase.  And I've gone

17   before the agencies on three separate occasions.  One

18   involved a particular medical technology.  Another one

19   involved fleet cards.  Those are basically credit cards that

20   firms use for their fleets of vehicles.

21          And I can't remember the third right now.  Oh, it

22   was hotel services.

23   Q.  And do you have experience in financial accounting?

24   A.  I have a lot of experience with financial accounting and

25   decisions involving investments and programs and so forth.

```
 1              MR. OPPENHEIMER:  Your Honor, at this time we'd
 2       move to qualify Professor Snyder as an expert on economics.
 3              THE COURT:  Any objection?
 4              MR. SCHWARZ:  No objection, your Honor.
 5              THE COURT:  He will be so qualified.
 6       BY MR. OPPENHEIMER:
 7       Q.  Professor Snyder, have you prepared a slide presentation
 8       to assist with your testimony today?
 9       A.  I have.
10              MR. OPPENHEIMER:  Your Honor, we will not use any
11       portion, of course, that was the subject of earlier
12       colloquy.  But subject to that, and subject to
13       confidentiality, may we publish as we proceed those slides?
14              THE COURT:  Yes.
15              MR. OPPENHEIMER:  Thank you.
16              Let's put up Slide 2, Pam.  Thank you.
17       BY MR. OPPENHEIMER:
18       Q.  One --
19              THE COURT:  For the record, what is this exhibit?
20              MR. OPPENHEIMER:  Pardon me?
21              THE COURT:  For the record, what is this exhibit?
22              MR. OPPENHEIMER:  Your Honor, this is a
23       demonstrative.  This is the first part of the slide show.
24              THE COURT:  It doesn't have a number?
25              MR. OPPENHEIMER:  It does not, your Honor.
```

1    We're -- we can designate this as Slide 2.

2            THE COURT:  I think you already have a Defendants'

3    demonstrative --

4            MR. OPPENHEIMER:  Demonstrative 16, your Honor.

5            THE COURT:  We already have a Demonstrative 16, I

6    think.

7            MR. OPPENHEIMER:  18, your Honor.  Demonstrative

8    18.

9            THE COURT:  All right.

10   BY MR. OPPENHEIMER:

11   Q.  Dr. Snyder, Professor Snyder, what were you asked to do

12   in this case?

13   A.  I was asked to assess the likely competitive effects of

14   the proposed merger and, of course, to respond to the

15   opinions and the analyses offered by the Government's

16   expert, Dr. Nicholas Hill.

17   Q.  And did you reach conclusions?

18   A.  I did.  My overall conclusion was very simple:  The

19   Government has not proven that there will be a substantial

20   lessening of competition as a result of the merger.

21           And then I have identified some additional more

22   specific opinions.  That's what's here on this slide.

23   Q.  Let's start with No. 1.  Can you explain your first

24   opinion and briefly the basis for it?

25   A.  Well, this is actually more of an observation than an

1    opinion.  It's simply that there's no allegation of harm to

2    consumers in the sale of books that would result from this

3    merger.

4    Q.  And for your analysis, what's the implication of that?

5    A.  Simply that the issues concerning this matter focus on

6    the upstream, the acquisition of books.

7    Q.  Can you explain your second conclusion and the basis for

8    it?

9    A.  My second opinion is that there's no harm to authors in

10   the broad market of all trade books.  The main basis for

11   that is that there is a lot of competition in that industry

12   to acquire books and the merger is not going to reduce that

13   competition.

14   Q.  When you refer to the broad market, can you just explain

15   for us what you mean by that?

16   A.  Yes.  "All trade books" refers to all kind of books that

17   most people are interested in reading:  fiction, nonfiction,

18   historical books, biographies, science fiction.  It does not

19   include academic textbooks, for example, but it's the broad

20   category of books that consumers read.

21   Q.  Is it subject to any advance level cutoffs?

22   A.  No.

23   Q.  Let's go to your third conclusion, where you say:  Books

24   with advances of $250,000 or more are not a valid market.

25   Would you elaborate on that?

1    A.  Yes.  I've reached the conclusion that the proposed

2    market segments starting at 250,000 for anticipated top

3    sellers is not a valid market.  I have several reasons for

4    that.

5            As Dr. Hill correctly identified, I believe that

6    it is indeed an arbitrary cutoff.  I do not see that firms

7    operate differently below and above that threshold.  The

8    competitive conditions for an author who ends up getting a

9    $100,000 advance, I don't see that those are different from

10   an author who gets a $400,000 advance.

11           The other aspect of the market definition that is,

12   I think, maybe not appreciated fully in this matter is that

13   it has the word "anticipated" in it.  And the question of

14   the anticipation -- I'll go through this in more detail --

15   gets at whether it's possible for publishers, editors, to

16   identify and then target authors.

17           And this is a fundamental problem with the

18   proposed market.

19   Q.  Do you believe in this industry as you've studied it

20   that publishers can identify and target authors?

21   A.  As I wrote in my report, the question of targeting or

22   identification -- excuse me -- identification, which is

23   closely connected to the idea of anticipation, that's a

24   question of by whom and when.  And certainly it is the case

25   that for some authors we all know they're going to be

1    bestsellers when their book comes out.  But it's -- that

2    then raises the question of:  Are those also the authors

3    that there's any chance of targeting, meaning cutting their

4    advances?

5            And that's the important part of this combination

6    of identification and targeting, because those are the

7    authors we all agree are anticipated, but they're also the

8    ones who have all the leverage.  So it's unlikely that you

9    would get both identification and targeting.

10            Now, for others, yes.  It's going to be the case

11    that maybe you can identify, anticipate; but it's not going

12    to be done consistently, especially with an ex post approach

13    to defining the market.

14    Q.  We'll get into that a little bit more a little bit

15    later.

16            What is your fourth opinion?

17    A.  The fourth conclusion is that there's no harm to authors

18    who receive advances of 250,000 and above.  This price

19    segment as well as the broad market is highly competitive.

20    It's going to remain so.  Not only do you have PRH and S&S;

21    you've got the other so-called Big 3.  You have a large

22    number of middle and smaller publishers.  You've got imprint

23    competition.  You have agents who represent authors who are

24    soliciting bids, and a large number of publishers are

25    responding to those bids.

1          The other fact that I would want to point out here

2     is that PRH and S&S are rarely the winner and runner-up.

3     And that is the essential element of the Government's claim,

4     that there will be a loss of head-to-head competition and

5     there will be so-called unilateral effects that result.

6          Those are straight out of the Government's

7     complaint; and I think Dr. Hill and I agree those are the

8     necessary conditions for harm.  But if you take Dr. Hill's

9     market share data or my market share data, the prediction is

10    that the two parties will be winner and runner-up in only 12

11    percent of the time.  That means that in 88 percent of the

12    time, that condition for harm doesn't exist.

13    Q.  Professor Snyder, why is that an important observation

14    with respect to the Government's theory?

15    A.  It raises the question that is not answered by the

16    models that Dr. Hill has offered, which is:  How will

17    actual -- how will this theory of cutting advances work in

18    practice?  How will editors actually know when to cut

19    advances when that necessary condition of winner and

20    runner-up is only met 12 percent of the time?

21    Q.  You mentioned model s.  What is your view of Dr. Hill's

22    second score auction model?

23    A.  The second score auction model is in this setting a

24    wrong fit for the industry.  It's unreliable in terms of how

25    it's been estimated, and the results from it are really

Snyder - DIRECT - By Mr. Oppenheimer

1    quite striking.

2         What comes out of -- what goes into that model are

3    of course market shares and margins.  Once those are in the

4    model, it's important to understand -- I think, your Honor,

5    you understand this -- but no publisher changes their bid in

6    the model.  There's no competitive response inside the

7    model.  Agents play no role inside the model.

8         So the results of the model are really

9    disconnected from the industry, especially when we take into

10    account that the model presumes an acquisition format,

11    rounds to completion, that so-called round-robin format,

12    that agents rarely choose.  So I'm putting aside the issues

13    with inputs for now, but this is really a bad fit with the

14    industry.

15         Again, competitor responses:  Not there.  The

16    parties get a free lunch, exercise of monopsony power and no

17    loss of market share.  Authors are harmed, but there are no

18    responses by competitors.

19         And agents don't do anything.

20    Q.  You did allude to inputs, so I want to pause on that for

21    a minute.

22         Do you have a view on the inputs that were used

23    with respect to the second score auction model?

24    A.  Well, the inputs, as I mentioned, are market shares and

25    margins.  Market shares have to go into this model.  That's

1    just a requirement.  So Dr. Hill uses market shares, and I

2    really don't have an objection to that.

3            My focus is more on the issue of margins.  And his

4    approach to margins was inconsistent at the outset.  And

5    then when he responded to my criticism and he developed

6    consistent margins, the results of the SSA model are that it

7    fails the reliability test that the developer of the model,

8    Nathan Miller, specified.

9            So in my view, both efforts in Dr. Hill's first

10   report and in his third report fail, one on inconsistency

11   and the other one on reliability.

12   Q.  Taking these factors into account and mindful of the

13   output of the second score auction model, what is your

14   overall assessment of the model?

15   A.  Well, based on its lack of fit, again, agents are stuck

16   with a format that they rarely choose.  There's no

17   competitor response.  And then when you actually estimate

18   the model, it's either based on inconsistent inputs or

19   unreliable results.

20           I don't find that the SSA model in this context

21   offers any value in terms of the fundamental economic

22   analysis.

23   Q.  Is your opinion of the model influenced by the degree of

24   harm it purports to identify?

25   A.  Well, the harm that it identifies is a little bit less

1    than 30 million annually.  So my observation would be simply

2    that's not a very large number in the context of a

3    billion-dollar annual advance level.

4            And by the way, I should just make it clear:  Of

5    course, Dr. Hill's estimation of the model is for his

6    proposed pricing.  It's above $250,000, not the broad

7    market.

8            So that's not a very large number.  If one were to

9    really think about using that estimate, I believe sound

10   adjustments to the model would bring that down from that

11   $30 million annual amount as you would, for example, include

12   imprint competition, as you would include the different

13   margins.

14           So I have a view about what margins should be

15   included.  Dr. Hill may disagree.  But mine are consistent,

16   and they are grounded in the book-level P&Ls that the

17   parties actually use when they're bidding.  So I think I

18   have a very strong argument for using the margins the way I

19   identified them.  And when you incorporate those sound

20   adjustments -- I'm not talking about efficiencies -- that

21   brings down that $30 million annual estimate to a much lower

22   number.

23   Q.  Now, in his subsequent report after your report,

24   Dr. Hill applied the GUPPI calculations to his analysis.

25           What is your opinion of Dr. Hill's use of the

1    GUPPI index?

2    A.  His calculations of the GUPPI index do not confirm the

3    SSA model.

4         Before I get into that, I'd just observe that if

5    one were to think about doing a GUPPI calculation, that's a

6    screening device.  That's typically used at the outset.  And

7    then it's followed by, as the developers of the GUPPI index

8    have said, then you get into modeling further analysis,

9    including merger simulations.

10        So one of the things that struck me was, this is

11   an odd thing to come in the third report to attempt to

12   confirm the original SSA model.  In terms of whether it can

13   do that, the answer is no.  It's got the same problems with

14   lack of fit to the industry.  It's got the same problems

15   with respect to inputs.  It also cannot account for agent

16   behavior.  There's no competitor response.  So I don't find

17   the GUPPI model at all persuasive in this context.  Again,

18   it's a screening device.

19        THE COURT:  Can you explain what you mean by

20   competitor response?

21        THE WITNESS:  Well, in the SSA model, your Honor,

22   no publisher changes any bids.  The effect of harm comes

23   from elimination of bids due to the merger; and you slide

24   down to the next-second-best, which determines the price.

25        THE COURT:  So you're saying it's a one-round

1    auction?

2             THE WITNESS:  It's a one-round auction.  Automatic

3    harm.  No -- no publisher changes their bids in the SSA

4    model.

5             THE COURT:  Because it's a one-round auction?

6             THE WITNESS:  Correct.  They bid their maximum

7    from the outset.  And agents can't go to them and say

8    anything, because they've already bid their max.

9             The GUPPI calculation also has no competitor

10   responses.  There's no agent role.  And it's not what

11   economists would call an equilibrium, because any

12   equilibrium in any real market has to take into account how

13   parties on each side of the market are adjusting their

14   behavior.  And in the GUPPI model, we have no agent, no

15   author adjustments.  They're stuck.  They're either in the

16   single bidder or hybrid or whatever.  And then on the rival

17   side, there's no competitor response.

18            So this is not what economists would refer to as

19   an equilibrium model, which goes back to the point I

20   mentioned earlier:  It's a screening device that then is

21   intended, according to its developers, former chief

22   economists Farrell and Shapiro -- it's intended to then lead

23   to further analysis to get at, well, how will this actually

24   work in taking into account actions on both sides of the

25   market?

1    BY MR. OPPENHEIMER:

2    Q.  Let's switch to a different area, coordinated effects.

3    Would you describe your fifth conclusion, no coordinated

4    effects, and the basis for it?

5    A.  Well, coordinated effects is part of what the DOJ

6    alleges.  And Dr. Hill makes the case for coordinated

7    effects.

8            I have to disagree, however.  According to the

9    guidelines, what's important for coordinated effects are a

10   mechanism of harm, the ability to detect and monitor.  And

11   in this context, these are one-off acquisition processes

12   with many dimensions that are not observable by other

13   rivals.

14           Eventually, on this point -- I agree with

15   Dr. Hill -- eventually, the identity of the winner is known.

16   However, that does not tell you what you need to know to

17   coordinate during the acquisition processes.  And as I said,

18   there are just so many dimensions of competition during the

19   acquisition process.

20           So this claim has no conceptual force grounded in

21   the guidelines and in fundamental economics.

22           MR. OPPENHEIMER:  Your Honor, we're going to

23   bypass efficiencies.

24   BY MR. OPPENHEIMER:

25   Q.  What role in your analysis did the 2013 merger of

1    Penguin and Random House play?

2    A.  Well, Mr. Oppenheimer, you referred to that as the

3    natural experiment earlier this afternoon.  That is

4    something that economists would look at, a merger in 2013,

5    to see what happened.

6         The number one thing as an economist that I would

7    be interested in seeing is what effect it had on output.

8    And then a second thing would be:  What effect did it have

9    on advances, both in total and based on averages?

10        And what I see with respect to output is output

11   increases in terms of titles and contracts.  Total advances

12   increase.  And this is the analysis that I think was

13   discussed before I started testifying.  But when you look at

14   buckets, categories of advances --

15   Q.  Professor Snyder, I'm going to ask you not to go into

16   that.  That was the subject of colloquy with the Court.  So

17   we'll continue on to the next topic.

18   A.  Okay.

19   Q.  How did you approach your assignment?

20   A.  Well, the first thing I did was I studied the industry.

21   That's what I do in every case I take on.

22   Q.  What did you do after that?

23   A.  After that, I conducted empirical analyses.  And they

24   tied into what I was just talking about earlier :  What

25   adjustments are being made on the author's side and the

1    agent's side with respect to selecting, acquisition formats,

2    making adjustments?  And what publishers do they consider

3    when they engage publishers, seek responses from them and

4    ultimately contract with?

5            And then the second set of empirical analyses

6    focuses on, well, what's the source of competition here from

7    the publisher side?  That's imprints; it's competition among

8    the top publishers; it's also competition with middle and

9    smaller publishers who are already bidding and winning

10   contracts; and then it's also publishers that are operating

11   right below the $250,000 threshold.  They've already got

12   operations set up to be a competitor.  What's different for

13   them is they have not yet secured a contract above 250.

14           So I focused on all those things on the publishing

15   side.

16   Q.  And what information and data did you use for that

17   analysis?

18   A.  I reviewed a lot of information from a lot of different

19   sources.  Of course, the examples that have been presented

20   in the complaint are a source of information.  There's

21   documentary evidence.  But there are also six different data

22   sets here.

23           And Dr. Hill, to his credit, he and his team

24   developed some important data sets.  I've developed a data

25   set around the so-called agency data.  And so I've reviewed

 1    all those data and, where appropriate, I used them.

 2               MR. OPPENHEIMER:  May we bring up Slide 4, Pam?

 3    BY MR. OPPENHEIMER:

 4    Q.  Based on your study, what are the features of the

 5    publishing industry that are important to your economic

 6    analysis?

 7    A.  I know your Honor has heard a lot of this.  On the

 8    agency side, I would just point out that the agents are

 9    critically important.  They choose among a mix of

10    acquisition processes.  And there's a mix of authors and

11    agents, some of which are repeat players when it comes to

12    successful authors.  Other authors have different profiles,

13    of course.

14               For example, there are celebrities.  And then

15    there are also authors who are more of the classic debut

16    authors.

17               MR. OPPENHEIMER:  May we put up Slide 5?

18    BY MR. OPPENHEIMER:

19    Q.  Does this identify, this slide, some of the

20    characteristics you've identified in connection with agents?

21    A.  Yes.  And I don't -- given what I just said, I don't

22    need to read this slide.  I think I would just call out that

23    whatever acquisition process they pick, agents can change

24    it.  And as Dr. Hill has explained, agents sometimes start

25    out with a rounds auction but then switch to a best bids

1    auction.  And that's called a hybrid.  And he and I agree on

2    that.

3    Q.  And so let's go back to your industry future summary

4    slide.

5           MR. OPPENHEIMER:  Slide 6, Pam.

6    BY MR. OPPENHEIMER:

7    Q.  What did you learn about publishers that is relevant to

8    your economic analysis?

9    A.  Well, again, this is well-known.  I mean, editors end

10   up to varying degrees co-developing books with authors.

11          The other thing that is striking about this

12   industry, though, is that many publishers combine firm-wide

13   capabilities with entrepreneurial and creative efforts at

14   the imprint level.  That's the second bullet point there.

15   Q.  Well, what are you addressing with your last bullet

16   point under publishers?

17   A.  Well, there's just a great diversity of publishers.

18   Yes, there are the so-called Big 5, but there are many

19   publishers with different profiles, with different

20   approaches to engaging prospective authors and contracting

21   with them.

22   Q.  What did you learn about consumers that is relevant to

23   your analysis?

24   A.  I think the most interesting thing about this industry

25   is that what consumers read is what publishers acquire.  So

1    you've got a very one-to-one relationship between the

2    downstream and the upstream.

3    Q.  From an economic perspective, do the industry features

4    you've identified pose challenges for industry participants?

5             MR. OPPENHEIMER:  That'll be Slide 7, please.

6             THE WITNESS:  Yes.  And I have a demonstrative on

7    this.  There are many different challenges.  But oftentimes,

8    I do like to think about:  What are salient challenges for

9    the economic analysis?  And the first one I have here is

10   matching authors to editors.

11   BY MR. OPPENHEIMER:

12   Q.  What is the significance of that for you?

13   A.  Well, again, this has been well-established.  But this

14   is a market where that creative match between editors and

15   authors ends up being a driving force; and indeed, editors,

16   when they do find a potential match with an author, that's

17   when they're likely to bid and bid more.

18             This is a central component of the industry.  And

19   it ties in, of course, to the way firms are organized.

20   Again, not all firms, but many firms use imprints to

21   increase their chances of a successful match.

22   Q.  And what role do agents play in matching authors to

23   editors?

24   A.  Well, they are the agents who can contact and basically

25   provide potential vision and profile of the author and

1    engage editors to spark their interest and generate the

2    potential match.

3    Q.  Would you describe for us what economic matching theory

4    is and its relevance to your analysis in this case?

5          MR. OPPENHEIMER:  Pam, may we have Slide 8?

6          THE WITNESS:  Well, it's good to every once in a

7    while pay attention to Nobel prize winners.

8          I just wanted to make it clear that economists for

9    a long time didn't think about the role of matching, but

10   over the last two decades economists have.  And two American

11   economists, Roth and Shapley, won the Nobel Prize for their

12   work on matching.  And it's in contexts where price doesn't

13   by itself clear the market.

14         So I just wanted to make sure that it's -- this is

15   not an unheard-of or certainly completely unusual feature of

16   an industry.  Matching is important.

17   BY MR. OPPENHEIMER:

18   Q.  And do publishers organize themselves to address this

19   matching issue?

20   A.  Yes.  That's what the idea of the hybrid organization,

21   combining firm-wide capabilities with entrepreneurial

22   efforts at the imprint level, is all about.  It's a way to

23   empower editors to be creative, to be entrepreneurial; and

24   that is in the interest of the publisher because it

25   increases the likelihood that they will -- that there will

 1    be a match and they'll eventually win the contract.

 2                    MR. OPPENHEIMER:   Slide 9.

 3    BY MR. OPPENHEIMER:

 4    Q.  What is the second challenge that must be addressed as

 5    part of your economic analysis?

 6    A.  It's what to bid.  These products are uncertain in terms

 7    of what their value is.  The profiles of the authors vary

 8    greatly.  So this is a fundamental problem.  And even if an

 9    editor is particularly excited about the book, she won't

10    necessarily know how much to bid.

11    Q.  What does economic theory tell us about the approach to

12    valuing truly unique products like books?

13    A.  Economics organizes this answer based on the following

14    distinction:  Editors have two types of factors that

15    influence the maximum that they're willing to bid.  One is

16    so-called common factors.  So it's a well-known author, a

17    long track record, observable prior work; comps are known.

18    You can put that into your book-level P&L.  Those are common

19    factors because everybody can see them.  They're common

20    across potential bidders.

21                    The other kind of factor is individual factors

22    that vary across editors.  And those concern things like:

23    What's the vision for the book?  What's the likely

24    receptivity in the market to the book?  And these -- this is

25    an important insight for me because the mix of common

1    factors and individualized factors varies.

2         And when you take the very high end, profile

3    authors with long track records, common factors are going to

4    denominate.  You're going to have very similar valuations.

5    You still can have differences, but you'll tend to have more

6    similar valuations.  And I think this is consistent with the

7    testimony by Mr. Wylie.

8         And then as you go to the more classic debut

9    author, individualized factors before more important.  So

10   the mix of the two varies across advance levels.

11        MR. OPPENHEIMER:  Slide 10, please.

12   BY MR. OPPENHEIMER:

13   Q.  And you indicated you observed this in some of the

14   testimony.  Is this another example of that that you've seen

15   in the testimony to date?

16   A.  Yes.  The testimony from Jennifer Bergstrom -- I'll just

17   identify the bottom statement.  She's talking about authors

18   for whom she doesn't have a track record.  But she says:

19   There's a lot of uncertainty there.  Much more so -- excuse

20   me -- more so than actually the million-plus.

21   Q.  Professor Snyder, this distinction between the

22   identification of common factors and private individualized

23   factors, do you see anything significant in your work about

24   authors who are paid advances in excess of $250,000 with

25   respect to that distinction?

1    A.  Well, it goes back to the issue of identification, which

2    is tied to who's anticipated to be a top seller.  And it

3    goes to the issue of targeting.

4            And I don't want to repeat myself; but with the

5    benefit of common factor versus individualized factors, that

6    distinction in mind, there are going to be some authors who

7    can be anticipated to be bestsellers, but those are the ones

8    for whom common factors are going to denominate or be more

9    important, at least, in the valuations.  And as a result,

10   there's going to be more -- tighter distribution of

11   willingness to pay and, of course, those are the ones with

12   respect to targeting who have the leverage.

13   Q.  You've indicated that the industry has some distinctive

14   features.  But are there underlying economic fundamentals

15   that are important to your analysis?

16   A.  Industry features help explain how competition will

17   unfold.  But the underlying competitive factors are the same

18   in every industry and every market I've ever looked at.

19            MR. OPPENHEIMER:  Slide 12, Pam.

20   BY MR. OPPENHEIMER:

21   Q.  Do you believe that observation is reflected in the

22   horizontal guidelines, horizontal merger guidelines?

23   A.  I do.  And if we were to take the more typical antitrust

24   issue of sellers providing goods and services downstream to

25   consumers, the two core economic forces relate to what I

1    said earlier, which is on the buy side, what alternatives do

2    buyers have?  And what is their willingness to make

3    substitutions?

4         And then on the supply side, it's the responses of

5    rival suppliers.  Those are the two things.  Both sides of

6    the market:  demand and supply.

7    Q.  Now, given that we're focused on the upstream

8    acquisition of books in this case, can you put these two

9    fundamental forces into this context for us?

10   A.  Yes.  In the monopsony context, the issue is:  Can

11   authors and agents make adjustments and find alternatives to

12   avoid the exercise of monopsony power?

13        And then the second factor is:  Are there

14   competitors, rival publishers, who can discipline the

15   potential exercise of monopsony power?

16   Q.  Did this framework guide your empirical analysis?

17   A.  Absolutely.

18   Q.  Can you explain that?

19   A.  On the author/agent side, I wanted to understand how

20   agents choose the acquisition processes that they select and

21   the frequency with which they select them.

22        And I also wanted to identify:  To what extent

23   were authors and agents willing to choose among different

24   publishers?  We of course hear about the two merging

25   parties.  We've got the other three, the Big 5.  We also

 1    have the middle and smaller publishers.

 2            So I looked at:  Are there from the point of view

 3    of at least a substantial number of authors alternatives to

 4    any of the above?

 5    Q.  Could you use a model rather than conduct these

 6    empirical analyses?

 7    A.  So that's a good question.  And I certainly have

 8    sympathy with Dr. Hill's observations about the challenges

 9    of modeling the different acquisition formats.  I think I

10    heard his testimony to the effect that he considered but

11    wasn't able to model, for example -- I think it was

12    single-bidder or one-on-one negotiations.

13            What makes this a difficult challenge to model is

14    that you've got the different acquisition formats; you have

15    the agents doing the selection; and you have a very

16    multidimensional, one-book-at-a-time set of acquisitions.

17    Q.  Do either of the SSA model or the GUPPI calculation

18    embody the fundamental economic forces that you identified

19    in your earlier answer?

20    A.  No.  There's no agent role in selecting and making

21    adjustments and there are no competitive responses.  And

22    that's, I think, one of the most important points for me

23    when I evaluate the SSA model and when I evaluate the GUPPI

24    calculations.  Those two fundamental forces are absent.

25    Q.  So I know we've talked a lot about data in this case.

1    And you've talked about data.

2              I'd like to go over some of the data sets that you

3    and Dr. Hill have been using, sometimes jointly.

4              MR. OPPENHEIMER:  Pam, if we could bring up Slide

5    13.

6    BY MR. OPPENHEIMER:

7    Q.  Professor Snyder, could you describe what this slide is

8    showing us?

9    A.  Yes.  And I should just preface this by saying there are

10   other data snippets and sources, for example, on particular

11   acquisition processes and so forth.  But these are the

12   primary data sets that I think have been discussed in the

13   course of the trial.

14             And I'll start on the left.  The number one data

15   set is the advance data, organized by Professor Hill --

16   Dr. Hill.  Excuse me.  And sometimes, your Honor, I may

17   refer to these as the acquisition data because they're the

18   ones that we also used to generate market shares.  But I'll

19   just refer to them here as the advance data.

20             And Dr. Hill's data go from 2019 through midway

21   2021.  That's analogous to the advance data in Column 5 that

22   I developed.  The only difference is that I extended those

23   data to complete 2021.  So those two data sets have a lot of

24   observations, 24,000 in the case of Dr. Hill and nearly

25   30,000 in the case of my advance data.

1          And then the number of observations in the

2    proposed segment are identified in the bottom row.

3    Q.  What is the win-loss data?

4    A.  2, 3 and 4 -- let's start with 2.  These are the more

5    curated data sets that Dr. Hill developed.  The win-loss

6    data use information from the two merging parties, PRH and

7    Simon & Schuster.  It covers this time period identified

8    here.

9          924 observations are identified in the broad

10   market, 206 in the proposed market with advances above

11   250,000.

12         These -- to get this information, there's a lot of

13   work to evaluate information from the two parties.  And it

14   was done from each of their points of view.

15   Q.  And what are the editorial minutes?

16   A.  The editorial minutes also involved a lot of work, also

17   relied on information from the parties.  So Dr. Hill and his

18   team reviewed editorial minutes over the time period

19   indicated here.

20         The number of observations, 784, these are not by

21   definition going to give you all the observations because at

22   the meetings, members of the meetings don't talk about every

23   acquisition.  But the result here is 284 observations in the

24   $250,000 segment.

25   Q.  And the runner-up data?

1    A.  The runner-up data, again, a lot of work.  Dr. Hill

2    developed these data for one year, 2020.  As he testified,

3    he started from the top, the maximum advances, and worked

4    his way down.  When he got to 500,000, my understanding from

5    his testimony is that he did look at some observations below

6    500,000 down to 250,000, but he didn't develop those data

7    systematically.  So these data go from as a result 500,000

8    on up and do not include 250,000 to 500,000.

9    Q.  We may get into this in more detail later.  But just

10   generally, does that affect the results of analyses done on

11   the runner-up data?

12   A.  I'm sorry.  What was the end of the question?

13   Q.  Yes.  The fact that they analyzed data from advances of

14   $500,000 and up, does that affect the conclusions that can

15   be derived from the runner-up data?

16   A.  I think the data are useful.  The data sets have various

17   limitations.  I think when each of us has been using the

18   data sets, I think we've been aware of these limitations.

19          But you try to get to various insights.  But

20   you're right:  I mean, you have to keep in mind that each

21   data set has some limitations.  And this one is not complete

22   with respect to that range.

23          BY MR. OPPENHEIMER:  Let's go to the Slide 14,

24   please.

25

1    BY MR. OPPENHEIMER:

2    Q.  So here we have the same data sets arrayed with certain

3    features.  Can you explain, what are we seeing in Slide 14?

4    A.  Well, I wanted to identify in Slide 14:  What data do

5    you see from each data set?  And so this slide has the five

6    that I've already discussed, plus it adds in the agency data

7    that I developed and my team developed.  And along the rows

8    I've got:  Well, what do we see?  Do we see the runner-up?

9    Well, it turns out that two data sources, Dr. Hill's

10    runner-up data and the agency data, generate insights about

11    runner-up.

12            What about other bidders and their bids?  The

13    first five data sets -- and that includes my data set on

14    advances -- does not provide that information.

15            Do we know whether the process was at least -- was

16    a multi-bidder or single process?  You could go into more

17    fine-grained categorizations.  But do you get insights on

18    that?  You do in Dr. Hill's runner-up data, but not in the

19    other data sets, 1 through 5.

20            And do you get any insights about imprint

21    competition?  No.  And it's because of these features of the

22    databases that I've identified, 1 through 5.  That's what

23    led me to say:  Maybe we could get better data, more

24    complete, more 360-style data, by looking at this from the

25    point of view of agents.

1    Q.  Would it be a fair summary that the agency data is the

2    only data that addresses winner, runner-up, other bidders

3    and bids, multi- or single-bidder process and imprint

4    competition?

5    A.  Yes.

6    Q.  What is the feature of the agency data that allows it to

7    address all of those issues where the other data sets

8    cannot?

9    A.  Well, as I mentioned, for example, when you look at the

10   win-loss data or the editorial minutes data, you're looking

11   at those questions from the point of view of only two

12   parties, PRH and S&S.  But the agency data allow you to look

13   at it from the point of view of the agents.  They're in

14   effect like the hub and they've got spokes to not just those

15   two parties, but to others.

16   Q.  Have you heard the observation that the agency data are

17   not representative?

18   A.  Well, it's a small data set.  And I'll get into more

19   details about that.

20          They are not representative in one important

21   respect.  I think Dr. Hill and I agree on this.  And that's

22   that the agency data end up overrepresenting PRH and S&S.

23   And depending on the metric that I use, it's a substantial

24   overrepresentation of the merging parties.  Maybe it's 15 --

25   I can't recall, but maybe 15 to 20 percent.

Snyder - DIRECT - By Mr. Oppenheimer

1    Q.  Can you identify some of the -- just very briefly --

2    some of the consequences of that overrepresentation?

3    A.  Well --

4              THE COURT:  I'm sorry.  What is the 15 or 20

5    percent?

6              THE WITNESS:  So if, your Honor, I look at either

7    Dr. Hill's advance data or my advance data, you can get

8    pretty reliable measures of market share.  And I think those

9    market shares are in the range of 47 to 49 percent,

10   combined.

11             But if you look at the agency data, then their

12   combined market share goes to 57 percent.  I might not have

13   done the math right, but the numbers that I just gave are

14   right.

15             THE COURT:  I see.  I see.

16   BY MR. OPPENHEIMER:

17   Q.  Would it be a fair summary that there are occasions when

18   relying on the agency data will overstate the shares of

19   Penguin Random House and Simon & Schuster?

20   A.  Yes.

21   Q.  Stepping back, which data sets did you primarily use for

22   your empirical work?

23   A.  I used different data sets for different purposes.

24   Q.  And can you give us an overview of how you approached

25   the different data sets in your work?

1    A.  Well, I was, consistent with my earlier testimony, very

2    interested in the mix of acquisitions.  And that is --

3    that's something that I could see observed in the agency

4    data.  I could see imprint competition, because the agents

5    are engaging imprints from within the same publisher.  You

6    can see that there.

7           So several of my analyses focused my attention on:

8    Well, what will the agency data show?

9    Q.  Let's talk about that --

10          THE COURT:  When you say "mix of acquisitions,"

11   what do you mean?

12          THE WITNESS:  I mean whether they are single

13   bidder or multi-bidder.  And when I present the agency data,

14   your Honor, I'll just use that -- those two categories.

15          But one can see in the agency discovery a richer

16   set of acquisition formats and you can see the adjustments

17   and get a really good feel for the role of agents in

18   orchestrating the acquisition processes, not just going

19   through a door and say, I'm going to have to stay there, but

20   I'm going to test that and maybe make adjustments.

21   BY MR. OPPENHEIMER:

22   Q.  Just to clarify, do the agents have information that is

23   unavailable to the publishers?

24   A.  Yes, because they are the hub.  If they've engaged 14

25   different editors, that information will not be available in

 1    the data sets No. 5 as well as the ones to the left.

 2    Q.  So let's take a look at the agency data a little more

 3    closely.

 4              What is the --

 5              BY MR. OPPENHEIMER:  Let's bring up Slide 15.

 6    BY MR. OPPENHEIMER:

 7    Q.  What is the scope of the agency data you analyzed?

 8    A.  Well, the agency data come from agents, 18 different

 9    agents, who responded to a broad discovery request.  And --

10    Q.  May I interrupt you, Professor Snyder, just one second?

11    You said 18 agents.  Did you mean agencies?

12    A.  Yes.  Sorry.

13              It covers a four-year time period, starting in

14    2018 to 2021.  Total observations there are 973.  You'll

15    note 2018 was light in terms of observations, because the

16    discovery request didn't lead to as many observations in the

17    earlier year, 2018.

18              And the other thing on this slide is just -- it

19    identifies the split between on the left-hand side the

20    number of observations below -- it ended up with advances

21    below 250,000, and on the right-hand side the number that

22    ended up with advances above 250,000.

23              So focusing on the right-hand side, with the

24    proposed segment, the agency data yield 360 of the 973

25    total.

1    Q.  So we brought up a slide now that I believe focuses on

2    that group of titles that you selected over 250.

3              Can you walk us through what this slide is telling

4    us about the way you managed and dealt with this data?

5    A.  Well, I was interested in learning a few things.  And I

6    won't go into all of them right now, but if I may I'll point

7    out three.

8              Number one, I did want to understand:  Do I see a

9    mix of acquisitions in the data?  And in the upper left-hand

10   side, you see the single bidder.  149 of those out of -- I

11   should explain this.  I'm sorry.  Let me start again.

12             If you look at the yellow-orange at the top, there

13   are 360 observations above 250,000.  61 of them I and my

14   team could not develop reliable information for.  That

15   leaves 299.

16             Going back to the point about the mix of

17   acquisitions, 149 of them are single and 150 involve

18   multi-bid auctions with known runner-up.

19   Q.  And before you go beyond that, just a quick question:

20   How many of the acquisition processes in this data set that

21   you examined were pure round robins?

22   A.  Very few.  And I don't think there's a reliable number

23   across all of the data sets and all of the information.  But

24   in the course of reviewing the 360 on the right-hand side,

25   we saw very few.  And I've seen very few from other sources

Snyder - DIRECT - By Mr. Oppenheimer

1    of material, leading me to believe that rounds auctions,

2    where they begin at rounds and go to completion, are very

3    rare, probably less than 10 percent.

4    Q.  When you say "go to completion," you mean go to

5    completion as a round?

6    A.  Correct; as opposed to, as Dr. Hill explained, some of

7    these start out at rounds and then they switch to best bids.

8    Those are hybrids, not pure round-robin auctions to

9    completion.

10   Q.  And you said "very few."  Can you give us some sense of

11   the magnitude of how many were observed?

12   A.  A handful.  A few.  Less than -- certainly less than ten

13   that I can recall seeing in any context here.

14   Q.  Now --

15            THE COURT:  Can I ask you a question?

16            MR. OPPENHEIMER:  Sure.

17            THE COURT:  Can you capture how many observations

18   there were where both Penguin Random House and S&S bid but

19   neither won?  That seems to be missing from this chart.

20            THE WITNESS:  Good catch, your Honor.

21            Because the observation in orange-pink won by PRH

22   or S&S, that's 96.  The other party didn't bid in 45 of

23   those.  But you're asking the question -- could you repeat

24   the question?

25            THE COURT:  I guess the question is:  Did you

Snyder - DIRECT - By Mr. Oppenheimer

1    capture -- are there instances where both PRH and S&S bid

2    but they did not win?  That would give a better picture of

3    how often they are actually competing, because this only

4    captures when one of them won.  There could be more times

5    where they're competing but neither of them won.

6            THE WITNESS:  One of the problems I had in

7    constructing this chart is that there are a lot of ways to

8    divide the chart.

9            I can check to see if I can provide that

10   information.

11           THE COURT:  Okay.  Thank you.

12   BY MR. OPPENHEIMER:

13   Q.  Professor Snyder, given the Government's theory of harm

14   in this case under their unilateral effects analysis, is it

15   important to you to know when Penguin Random House and

16   Simon & Schuster are involved in bidding when they are

17   neither winner nor runner-up?

18   A.  Yes, because then you don't have head-to-head

19   competition, if I understand your question.

20           THE COURT:  Why is that not head-to-head

21   competition?  They're both in the auction.  They're

22   competing.  They just didn't win.

23           THE WITNESS:  I might have misunderstood

24   Mr. Oppenheimer's question.

25

```
1     BY MR. OPPENHEIMER:

2     Q.  Well, but her Honor's question is really to the point.

3     So if PRH and S&S are both in a competition for books at an

4     auction and neither wins and neither is the runner-up, does

5     that have relevance for your analysis of the Government's

6     unilateral effects case?

7     A.  I think it's useful to point out the bottom-left number.

8     So we have a total of 299 observations; let's call it 300.

9     The two parties are winner and runner-up 21 times, according

10    to the data.  So that's infrequent.  And that, I think, is

11    informative about the question.  But I just don't see it on

12    the chart here.

13    Q.  Under the Government's theory of harm, is it relevant

14    data when the parties are both in an auction but neither

15    ends up being first or second?

16    A.  Yes.  That means that neither is a relevant competitive

17    constraint.  To be a competitive constraint, according to

18    the DOJ's theory and the basic idea of unilateral effects in

19    this context, they have to be winner or runner-up to exert

20    competitive influence.

21    Q.  Under the Government's theory, if they're neither winner

22    nor runner-up, is there any competitive constraint

23    recognized by the analysis?

24    A.  Well, there's no change in the relevant competitive

25    constraint.  What's happening is, HarperCollins and Norton
```

1    are one and two.  And nothing will change as a result of the

2    merger.

3    Q.  Is it --

4              THE COURT:  So what you're talking about right now

5    is just about the second score auction model, which is not

6    the entirety of the Government's theory.  Right?

7              THE WITNESS:  Well, may I put aside coordinated

8    effects here?  You're talking about --

9              THE COURT:  I just think that what you two are

10   talking about is about the second score auction model.  Am I

11   correct?

12             THE WITNESS:  It's about the second score auction,

13   but not only about that, because when I read the

14   Government's complaint, it's about the loss of head-to-head

15   competition.

16             And that's going to matter when the parties are

17   winner or runner-up.  If they're not winner or runner-up,

18   then the loss of head-to-head competition does not generate

19   harm.  And it's not just inside the SSA model; it's the

20   basic idea of the case.

21             THE COURT:  So my understanding -- maybe it's not

22   captured in what you're talking about -- is that general

23   competition affects each of the different types of

24   acquisition models.

25             Because if you're in a one-on-one negotiation,

1    knowing that this author could walk at any moment and go to

2    somebody else, that can affect the amount that you offer in

3    your one-on-one negotiation.  If you are in an auction,

4    knowing there are more competitors or knowing there's a lot

5    of interest in the book could affect how much you offer.

6    And that doesn't depend on if you're number one or number

7    two.

8              And in the situations where there's imprint

9    bidding, there has to be some kind of a third party in the

10   mix for those two imprints to keep competitively bidding.

11   And that doesn't depend on if you're number one or number

12   two; that just depends on if there's more people involved.

13   So I'm wondering how all that fits into what you're talking

14   about.

15             THE WITNESS:  That's a big question.  I'll just

16   say the following:  I think what you're getting at is this

17   general idea of the outside auction, and is there a

18   lessening of the outside auction that would actually impact

19   competition?

20             And if you're talking about a single bidder, a

21   one-on-one negotiation situation, the challenge I would have

22   is really just understanding:  Well, how will that actually

23   affect that negotiation when there's so many different

24   potential bidders?  And the agent will not confront that

25   question unless the negotiation fails.

```
1              So it seems to me to be in theory something that,

2     yes, I can understand this idea of general weakening of

3     competition.  But when I look at the actual numbers of

4     rivals and the frequency with which other Big 5 are bidding

5     and so on and so forth, it would be hard for me to

6     understand how that would actually get traction, how it

7     would be implemented.

8              THE COURT:  It just seems to me there's just a lot

9     more than you need to be number one or number two to affect

10    competition.  That's why I'm a little, I guess, confused by

11    the testimony.

12             THE WITNESS:  I think, your Honor, when we go away

13    from that, we're moving away from unilateral effects.  And

14    I'll just say my understanding of the Government's

15    complaint:  We're moving into something that's broader; and

16    as you rightly say, it's not in the model for sure.  But I

17    see it as a more general argument about whether there's

18    going to be this softening of the outside constraint and

19    that could have some effects.

20             Am I at least hearing your question correctly?

21             THE COURT:  I think that's part of it.  Yes.

22             THE WITNESS:  I think my bottom-line view is,

23    post-merger, we still have PRH imprints competing.  I mean,

24    I know legally they could stop that.  But I believe there's

25    every reason to believe that's going to continue.
```

1              I believe that, based on the testimony, other

2      so-called Big 5 are going to be in there competing.  The

3      data show that 90 percent of the time when PRH and S&S bid,

4      they've got competition from one other of the so-called Big

5      5.  And then you have all of these other numerous mid-sized

6      and lower-tier publishers.  And agents already go to them,

7      and they already respond.  They're very much in the mix.

8      BY MR. OPPENHEIMER:

9      Q.  Professor Snyder, do the -- let me break this into a

10     couple of parts as well.

11             Do the Government's models identify harm in any

12     context where Penguin Random House and Simon & Schuster are

13     not one and two?

14     A.  The answer is no.

15     Q.  And are you aware of any empirical analysis done by

16     Dr. Hill outside the models that establishes unilateral

17     harm?

18     A.  No.

19     Q.  We'll come back to this.

20             You had mentioned that 47 percent of the time when

21     one of Penguin Random House or Simon & Schuster bids, that

22     the other did not bid.  Do I have that correct?

23     A.  Yes.  In terms of the slide, the 96 is in the

24     pink-orange.  And then you see underneath that other party

25     did not bid, the second gray at the bottom.  That's 45.

1    That's how you get the 47 percent of the time that the

2    contract was won by one of the two parties.  The other one

3    did not bid.  And this is all within the context of

4    multi-bidder auctions.

5    Q.  Do you believe that the analyses produced by the second

6    score auction can be analogized to bilateral negotiations?

7    A.  No.  And I think on this point, I mean, Dr. Hill and I

8    agree that there's no model that's been developed and

9    offered for bilateral negotiations.  As to whether it can be

10   generalized, that's a different question.  And I think

11   what's important to understand is that the model -- and I

12   paid attention, your Honor, to your, I think, framework --

13   the model has inputs.  The market share captures how the

14   parties are doing in all kind of situations.

15            So that part, I think, would say:  Yeah.  Well,

16   maybe the model can work.

17            The problem is with what's inside the model.  And

18   when you go inside the model, the machinations of the model

19   that generate harm automatically are all based on an

20   acquisition process that we very rarely see.  So it's not

21   possible in my opinion to generalize from a model that is so

22   disconnected from what agents and authors actually do.

23            And you have to go back to the fundamental

24   question:  If agents aren't choosing rounds auctions with

25   any substantial frequency, where they start from the

Snyder - DIRECT - By Mr. Oppenheimer

 1     beginning and end, why model harm based on that format?

 2     It's got to generate an overestimate of harm.

 3                 THE COURT:  So I asked Dr. Hill this very

 4     question.

 5                 THE WITNESS:  I was here, your Honor.

 6                 THE COURT:  And his response was that he's not

 7     trying to model exactly what's going on in the real world.

 8     He's using a more simplified version and inputting, based on

 9     market shares, this is how often you would expect to see

10     these two entities compete with one another.  And based on

11     the margins, this is how aggressively they would bid.

12                 And he's just trying to get a very general sense.

13     He's not trying to be specific.  He doesn't think the actual

14     number is important.  It's just more of a sense.  And that's

15     why he's trying to compare it to all these other things,

16     like the GUPPI, but also his nonquantitative assessments.

17     Like he's just trying to paint an overall picture and say:

18     All of these things are consistent.

19                 So his focus is not on the precise manner in which

20     things are happening in the real world.  He's just trying to

21     get a sense of competition between these two and is using a

22     rough-cut way of modeling the competition between these two.

23     And removing the competition between these two would result

24     in some harm.

25                 And he's saying -- he said:  I don't put a lot of

```
 1    weight on the exact number.  That's not what I'm going for

 2    here.  It's more about, you know, to show there would be

 3    harm and cross-referencing it with all these other things

 4    he's done to build sort of more of a mosaic, not just

 5    relying on the second score auction.  I think that's what I

 6    interpreted him to be explaining.

 7              THE WITNESS:  That's what I heard as well.  Very

 8    often he said a mix of things that he looked at; this was

 9    directional and so forth.

10              Your Honor, I would just say, if you're going to

11    rely on -- you know, you can look at it from the point of

12    view of the other types of evidence one could look at.  You

13    could just start with market shares and say 12 percent of

14    the time, based on market shares, you're going to have the

15    parties winner and runner-up.  You don't need a model for

16    that.

17              What I'm -- my opinion is that the model should be

18    left behind.  It has no value.  It is fundamentally flawed

19    with respect to fit.  And I can go into more detail, but I

20    think you already get the sense of why I believe it's not a

21    fit.

22              THE COURT:  I don't think anybody thinks it fits

23    exactly.

24              THE WITNESS:  Okay.  And then in terms of giving

25    some guidance, it's 30 million annually with inputs that in
```

```
1    this first try are inconsistent and in the second try result

2    in unreliable results based on the person, Dr. Nathan

3    Hill -- Dr. Nathan Miller; excuse me -- who developed the

4    model.  And on his second try, those results are unreliable.

5              So I understand your Honor's question and your

6    characterization of how he's approaching it.  But what I'm

7    saying is, the SSA model, whatever -- it adds no value to

8    the other stuff.  It needs to be in my opinion completely

9    left behind.

10             THE COURT:  I get that.  So let's not talk about

11   the SSA anymore.

12             THE WITNESS:  Thank you, your Honor.  Understood.

13   BY MR. OPPENHEIMER:

14   Q.  So let's do something else.  Let's move back and talk a

15   little bit about the broader market.  Okay?  Very good.

16             THE COURT:  Is now a good time for a break?  I

17   feel like we should give the court reporter some break this

18   afternoon.  Maybe now is a good time.

19             MR. OPPENHEIMER:  Sure.

20             THE COURT:  So let's take a break right now.

21   We'll return in 15 minutes, at 4:00.

22             (Thereupon a recess was taken, after which the

23   following proceedings were had:)

24             THE COURT:  Good afternoon.

25             So I looked at my notes over the break, including
```

 1    my notes on Dr. Hill's testimony.  And he did not rely only

 2    on the merging parties being number one and number two,

 3    according to my notes.  Under the win-loss ratio, he asked:

 4    When Simon & Schuster lost, how often did Penguin Random

 5    House win?  And that was 59 percent of the time.

 6            And when Penguin Random House lost, how often did

 7    they lose to Simon & Schuster?  That was 19 percent of the

 8    time.

 9            And they didn't have to be number one and number

10    two under that way of looking at it.  And he also made the

11    points that I was making about general competition in his

12    testimony, according to my notes.

13            MR. OPPENHEIMER:  Perhaps I could explore that a

14    little bit, your Honor.

15            THE COURT:  Sure.

16            MR. OPPENHEIMER:  Great.

17    BY MR. OPPENHEIMER:

18    Q.  So, Professor Snyder, let's follow this line of inquiry

19    that we started.

20            Under the Government's theory of unilateral harm,

21    is it required for there to be harm that Penguin Random

22    House and Simon & Schuster be in head-to-head competition?

23    A.  That's my understanding.  Yes.

24    Q.  And what do you understand head-to-head competition to

25    be in that context?

1    A.  I consider that to be sort of the first step in getting

2    at the relevant conditions for harm.  So you have to be

3    head-to-head, which means -- let's be clear -- you're both

4    competing for the same acquisition.

5            That -- unless that happens, it's not possible to

6    have both parties be one and two.  So that's a step towards

7    under what circumstances you would get unilateral effect

8    harm.

9            But it's not the condition that I see in the

10   Government's complaint.

11   Q.  Before we get into how that would play out, just

12   following this, does the Government compute any harm in any

13   circumstances where Penguin Random House and Simon &

14   Schuster are not in one and two competition with each other?

15   A.  When you say "compute," Mr. Oppenheimer, do you mean in

16   terms of the model?

17   Q.  Any form of computation.

18   A.  With respect to the SSA and to the GUPPI calculations,

19   both rely on diversion, which is premised by -- which is

20   premised on the condition where you're one and two or two

21   and one.

22   Q.  And is there any basis for inferring a softening of

23   competition under the Government's theory without an

24   analysis of the times when Penguin Random House and Simon &

25   Schuster are number one and number two?

Snyder - DIRECT - By Mr. Oppenheimer

1    A.  Well, I think that goes to your Honor's question.  And

2    my view is, when you go to the more general arguments about

3    softening of competition, I won't repeat myself, but you

4    leave the model behind.  I think that's clear.

5         Then the question is:  What does softening of

6    competition mean?  It means that there's some process, some

7    set of cascading actions, where individual editors and

8    publishers will cut their bids, will reduce their advance

9    offers.  That requires -- well, there's been no analysis of

10   that.

11        But the most important thing for me is, how --

12   it's completely unclear how Dr. Hill imagines this cascading

13   starts when, from the point of view of PRH and S&S, they're

14   only hitting each other 12 percent of the time.  And the

15   same analysis applies to anybody else.  If you cut your

16   advances and the competitive conditions for harm aren't met,

17   meaning you're not -- you don't actually have a lessening of

18   competition, then you can be making a mistake.

19        So the core of this is:  When will firms actually

20   cut their advances in this market?  Maybe I should be more

21   succinct.  They don't know.

22        And the problem is, they have so many rivals

23   there, it would not make sense as an across-the-board

24   pricing strategy.  It would result in mistakes where you do

25   loss of business.

```
 1              And I don't see that the competitive conditions

 2    generate that process of softening of competition in this

 3    context because of the strength of competition.

 4    Q.  So --

 5              THE COURT:  May I inquire?

 6              MR. OPPENHEIMER:  Of course.

 7              THE COURT:  This is something I've been thinking

 8    about.

 9              I don't think that the theory requires a conscious

10    decision to lower advances.  Wouldn't it be that you're just

11    winning at lower levels because there's less competition?

12    There's less competition, so people aren't bidding up the

13    prices.

14              So you're not going in thinking:  I'm going to

15    start lowering my advances.  But everybody wants to acquire

16    the book at the lowest price they can pay in order to win.

17    And now they're just going to win at an earlier point in

18    time because there's less competition.  Isn't that the way

19    advances get lowered, not as a result of a conscious

20    decision to lower advances?

21              THE WITNESS:  I understand your Honor's theory.

22    It --

23              THE COURT:  It's a question.  Isn't that the way

24    markets work?  Isn't that the way it should work?

25              THE WITNESS:  Well, no.  It doesn't work in terms
```

1    of actual decisions to cut your advances because it doesn't

2    make sense to cut your advances if you're going to lose

3    business.

4                THE COURT:  I'm saying that there will be no

5    decisions to cut advances, but you'll get to pay lower

6    advances and still win because there's less competition.

7                THE WITNESS:  I think this isolates the issue.  I

8    don't see that there's going to be a lessening of

9    competition here.  You still have --

10               THE COURT:  That's the ultimate question.

11               THE WITNESS:  Right.

12               You still have the Big 3, the other top firms.

13   They're saying they're not going to cut advances.  The CEO

14   of --

15               THE COURT:  Because that's how it works.  You

16   don't say, I'm going to cut advances.  You just keep bidding

17   and it turns out you can win at lower levels because there

18   are fewer people bidding now.  I think that's the theory.

19               THE WITNESS:  That's the theory.  But again, it

20   goes to how this industry actually works and where there

21   will be an actual reduction of competition.

22               If your idea -- and I think this is Dr. Hill's

23   general idea, that you're going to have this opportunity.

24   But you have to ask the question:  Will it actually present

25   itself?  Will there be any reduction of competition when

1    agents control the acquisition processes and we have imprint

2    competition, we have competition from the other Big 3 and we

3    have competition, as I'll get to at some point, from a large

4    number of other publishers?

5           So I understand, well, maybe in some circumstances

6    the result that you're identifying could happen.  But then

7    you have a very interesting question:  Why did I win?  Is

8    that something I want to replicate?

9           It's really hard to implement the intuition that

10    Dr. Hill -- the general intuition about the tradeoff.  Well,

11    there's less competition out there, and therefore I will

12    reduce my bid when the competitive conditions vary so much

13    across situations.  And you really don't know when you

14    should.  You're going to be wrong most of the time, and you

15    can't learn from what the outcomes are.

16           THE COURT:  So it seems to me from the testimony

17    that I've heard that the publishers and editors kind of go

18    in thinking:  I can go up to a certain amount.  But I'm

19    going to start at this lower amount and I'm just going to

20    keep, you know, bidding up, depending on the form of the

21    negotiation or the auction and try to get it at the lowest

22    price that I can.  But I'm willing to go pretty high.  I'm

23    willing to go to some high number.

24           And if there's less competition, they end up

25    paying less because, even though they were willing to go

```
 1    high -- so they've not made a conscious decision to come in
 2    with lower advances; they're just able to win at an earlier
 3    point in the process because, for example, if Penguin Random
 4    House had been in the process or if Simon & Schuster had
 5    been in the process, maybe they would have bid something
 6    that would have forced you to bid higher.  But they're not
 7    there anymore.  So now, look, I can win at a lower rate.
 8              And systemically, over time, this results in a
 9    general lower level of advances because there are fewer
10    people competing.  You don't have to compete as high or as
11    long to get to the end result.  The end result is generally
12    lower.
13              THE WITNESS:  I think I now understand your
14    Honor's question.
15              THE COURT:  That's what I'm saying.
16              THE WITNESS:  So what that process has in mind, I
17    think, is that you have these rounds situations and they
18    progress and you don't have to keep raising your offer.  You
19    get it earlier.
20              I think that's --
21              THE COURT:  But it's true in a one-on-one
22    negotiation, too, because you might come in lower and
23    realize you don't have to go as high because there's less
24    competition out there.  I mean, I think it goes across
25    formats potentially.
```

 1              THE WITNESS:  I can only do one at a time.

 2              THE COURT:  Okay.

 3              THE WITNESS:  But in the rounds situation, that's

 4    why it's important to realize we don't see that going to

 5    completion.  It's very rare.  And if it was a good auction

 6    format for agents, they would be choosing it.  They don't

 7    choose it, based on my understanding.  I know there's one

 8    bit of testimony that said it's still used a lot.  I didn't

 9    see it in any of the data and in the information I looked

10    at.

11              So what that's telling me is that the agents have

12    tools to avoid the situation that you described, because

13    then if you go to -- from rounds to best bid, how do you

14    know if you're an individual editor that you should reduce

15    your bid?  That's -- you're going to be wrong far more than

16    you're going to be right.  And where you're wrong or right,

17    you're not going to learn and figure out how to do it.

18              This is a very different market from the

19    electronic vehicle market, where you're setting prices and

20    you're getting a variable response in terms of quantity

21    demanded.  This is yes or no.  Should I or not?  Do I win?

22    Do I lose?

23              THE COURT:  Okay.  Depending on the format, I

24    guess.

25              THE WITNESS:  So yeah.  If it's a negotiation,

1       then I think we established before the break there's the

2       issue of, well, maybe there is a reduction in the outside

3       option, the strength of the outside option.

4               But even there, if I'm in a negotiation with an

5       author, an agent, do I really know that there has been a

6       lessening of competition, given the other imprint

7       competition, the other Big 3 competition and all of the

8       other publishers out there?

9               I get the idea.  But I don't believe that

10      editors -- especially because they're going to want to get

11      the book.  That's what they're motivated to do.  I don't see

12      it.

13              One last point, your Honor.  There are situations,

14      yes, where an imprint gets a book for less than the maximum

15      willingness to pay.  But that's not an indicator of lack of

16      competition in my opinion, because you also get outcomes

17      where the agent and author are getting way more than what

18      their reservation price was.  That's just the nature of

19      one-on-one negotiations.

20              THE COURT:  Thank you.

21      BY MR. OPPENHEIMER:

22      Q.  So, Professor Snyder, in this context, I want to come

23      back to the Government's theory of unilateral effects.  Do

24      you have that in mind?

25      A.  Yes.

Snyder - DIRECT - By Mr. Oppenheimer

1    Q.  Okay.  And could you describe for us briefly how the

2    Government's theory is treated under the horizontal merger

3    guidelines?  What is the theory focused on?

4    A.  It's the -- unilateral effects refers to how the merging

5    parties will alter their behavior post-merger to the

6    detriment of competition.

7    Q.  And is it focused on the competitive interactions of the

8    two merging parties?

9    A.  The basic idea is that post-merger, before -- in this

10   context, the publisher is thinking about lowering advances,

11   say, across the board.  They know that if they do that,

12   they're going to lose business to rivals.

13            But now, in the context of post-merger, some of

14   that lost business doesn't go to rivals; it goes to the

15   party with whom you've merged.

16   Q.  So for purposes of unilateral effects -- let's take an

17   example:  In analyzing this merger with Penguin Random House

18   and Simon & Schuster, does it matter if PRH is the runner-up

19   to, say, HarperCollins in a certain percentage of the

20   acquisitions?

21   A.  No.  The unilateral effects conditions are one and two.

22   The two parties have to be one and two.

23   Q.  So the theory itself is based on the proposition that it

24   is the elimination of the competition between the two

25   merging parties.  Is that fair to say?

1    A.  Yes, and how they change their behavior as a result.

2    The model -- well, I'll just stop there.

3    Q.  And in that context -- strike that.

4         Is there any analysis by Dr. Hill of unilateral

5    effects that does not rely upon measuring the competition

6    specifically between Penguin Random House and Simon &

7    Schuster?

8    A.  No.

9    Q.  Is there any specific analysis in Dr. Hill's work that

10   measures or defines soft competition outside of that

11   relationship?

12   A.  And the first part of your question was, is there any

13   modeling?

14   Q.  Or analysis of the softening of competition outside of

15   the relationship between Penguin Random House and Simon &

16   Schuster.

17   A.  There's no analysis, no modeling.  That's what he says,

18   his description of softening of competition.  But from my

19   listening to his analysis, there's no explanation of how

20   this would actually work.  And the implementation of when an

21   editor -- when she's going to cut advances is necessary.

22   And he has not addressed that.

23   Q.  Again, I'll come back to that.

24        Is there any -- put aside modeling.  Is there any

25   identification of harm in Dr. Hill's theories regarding

1    unilateral effects other than with respect to the

2    elimination of competition between Penguin Random House and

3    Simon & Schuster?

4    A.  I'm not sure that you're asking me a different question

5    from a couple questions ago.

6            The answer is no.

7    Q.  I want to skip over market for a second, Professor

8    Snyder.  You've alluded a couple of times to your view that

9    there is ample competition, including in the portion of the

10   market that involves authors who receive advances in excess

11   of $250,000.

12           Do you have that in mind?

13   A.  Yes.

14   Q.  Okay.  We'll come back to it.  But just to set the

15   table, do you believe that there is a cognizable market for

16   anticipated top sellers measured by advances in excess of

17   $250,000?

18   A.  I don't.

19   Q.  So we're just using that now for purposes of focusing on

20   that segment which is in the Government's argument.

21           Is it your view that there will be no substantial

22   reduction in competition in that market segment with the

23   merger?

24   A.  That's correct.  Competition is strong, and it's going

25   to remain strong.  Imprints are not going to go away.  The

```
 1    other Big 3 are present in the vast majority of situations
 2    where Penguin Random House and S&S bid.  You've also got a
 3    large number of other publishers that are bidding, winning
 4    and constraining.
 5    Q.  So let's talk about each of the things that you've just
 6    mentioned.
 7            Do you have some demonstratives that show some of
 8    the evidence you've identified regarding the current
 9    competitive significance of the other major publishers?
10    A.  Yes.
11            MR. OPPENHEIMER:  Let's go to 35.
12    BY MR. OPPENHEIMER:
13    Q.  What's the observation you make with respect to
14    HarperCollins?
15    A.  CEO Murray said:  I don't intend to hold back
16    post-merger.  We have the tools to go forward.
17            MR. OPPENHEIMER:  Let's go to 36.
18    BY MR. OPPENHEIMER:
19    Q.  And with respect to Mr. Weisberg from Macmillan, what is
20    your analysis?  How does this fit into your analysis?
21    A.  Well, beyond the statements, it goes to the point that
22    from an editor's point of view within PRH or S&S,
23    post-merger, they're running into Macmillan and Hachette and
24    HarperCollins with very high frequency.  And at least you
25    have to credit to some extent the statements that they're
```

1    not going to cut back.  And individual publishers, including

2    within these three and others, have plans to expand and gain

3    market share.

4                MR. OPPENHEIMER:  37, please.

5    BY MR. OPPENHEIMER:

6    Q.  What is the significance to you -- first of all, is the

7    data on this slide correct based on your understanding?

8    A.  These data are derived from the agency data.  And I

9    alluded to this earlier.  When PRH or S&S bid, at least one

10   of the other so-called Big 5, HarperCollins, Hachette,

11   Macmillan, bid 90 percent of the time.

12   Q.  What's the significance to you of that for purposes of

13   competition in the market segment over 250,000?

14   A.  Well, it's one of the reasons why if you're taking the

15   point of view of the S&S or PRH editor and saying, Has my

16   competition been relaxed, before you answer yes, you'd

17   better recognize that you're going to face competition from

18   these others.  And this doesn't get into imprint

19   competition.  It doesn't get into competition outside the

20   Big 5.

21   Q.  Well, doesn't the fact that the combined entity will

22   have nearly half of the market share of this $250,000-and-up

23   price segment demonstrate that the merger will reduce

24   competition?

25   A.  Market share tells me how frequently they're winning.

1    It doesn't tell me, can they lower advances?  And that's

2    when I talked about the fundamental forces in all markets.

3    You've got to take into account the behavior of agents and

4    the responses of rivals.

5    Q.  You mentioned a couple of times mid-sized and smaller

6    publishers that compete at the higher advance levels.

7             MR. OPPENHEIMER:  Let's take a look at Slide 38,

8    please.

9    BY MR. OPPENHEIMER:

10    Q.  Can you describe for us what we're seeing on Slide 38?

11    A.  First of all, the source of these data are my advance

12    data, which again are similar to Dr. Hill's advance data,

13    except for it now covers all of 2021.  And from those data I

14    identified the number of publishers acquiring contracts with

15    advances of at least $250,000 over this three-year time

16    period.

17             And that number is 29 for 2019 and then it grows

18    to 33 in 2021.  Again, this is not just bidding; this is

19    winning.

20    Q.  Is that a relevant consideration under the horizontal

21    merger guidelines?

22    A.  Yes.  The guidelines the way I read them stress the

23    importance of numbers of options.

24    Q.  We've just put up a portion of the horizontal merger

25    guidelines.  Can you explain the significance of this to

1    your analysis?

2    A.  Yes.  I mean, granted, high market shares, but the

3    potential market power is talked about in this context.

4    Market power on the buying side of the market is not a

5    significant concern if suppliers have numerous attractive

6    outlets for their goods or services.

7    Q.  And are the publishers that you're talking about in the

8    competitive landscape able to commit large amounts to

9    acquire books?

10   A.  Yes.  I've studied that; and the answer is yes.

11        MR. OPPENHEIMER:  Your Honor, the next slide is

12   confidential, so we'll block it from public view.

13        THE COURT:  All right.

14        MR. OPPENHEIMER:  May we have Slide 40?

15   BY MR. OPPENHEIMER:

16   Q.  And is this a slide showing some of the evidence you've

17   gathered about publishers' willingness to enter into large

18   contracts?

19   A.  Yes.  Using the same data set, the advance data over

20   three years, 2019, 2020 and 2021, from those data, I

21   identified the number of publishers who entered into

22   contracts with advances of $1 million or more.  And I found

23   that there were 20 during this time period.

24        So they are committing at least a million dollars

25   for a single contract.

1          And just to be clear, the so-called Big 5 are

2     among the 20, and there are 15 others committing at least

3     that level of financial resources.

4     Q.  And that's 15 who are non-Big 5?

5     A.  Correct.

6     Q.  Well, along with the number of publishers willing to

7     participate and able to participate at this level of

8     advance, what else is relevant?

9     A.  Well, I see in this list -- and I realize I'm not

10    allowed to identify the names -- I was not surprised to find

11    certain publishers who are part of large enterprises, public

12    companies, able to do this and actually doing it.  But I was

13    surprised to see a lot of other smaller publishers able to

14    commit at least a million dollars.

15    Q.  So we have numbers running down the left side of

16    Slide 40.  Can you identify just a few that you have in mind

17    by number?

18    A.  Yes.  So, for example, No. 6:  Over 9.6 million

19    committed to a single contract.

20          No. 10:  A very well-known publisher.  $2 million.

21          And then down to, for example, No. 15 and 16:  At

22    or above 1.2 million.

23    Q.  So how often do you see smaller publishers as a group

24    entering into contracts for $250,000?

25    A.  So as group, if you combine their share, I have a slide

 1    on that.  That's the next slide.

 2              MR. OPPENHEIMER:  It's confidential, your Honor.

 3              THE WITNESS:  So what this slide identifies -- and

 4    this is using Dr. Hill's advance data -- is the number of

 5    titles acquired by the individual members of the so-called

 6    Big 5 along with non-Big 5 publishers as a group.  And what

 7    it shows is the non-Big 5 publishers as a group in red, that

 8    group is roughly comparable to Simon & Schuster, to

 9    Macmillan and to Hachette.

10    BY MR. OPPENHEIMER:

11    Q.  We've heard the observation made that there's something

12    inappropriate when analyzing competition about looking at

13    the non-Big 5 publishers as a group.

14              Do you agree with that?

15    A.  Well, it's hard not to, given the prevalence of the term

16    and the idea of, well, maybe these others are -- should be

17    lumped together.

18              But these 15 publishers based on the earlier

19    slide -- and it's many more based on the numbers slide that

20    I presented; it's over 30 -- excuse me -- it's over 25 in

21    2021 -- they have different strategies.  They're being

22    engaged by different agents at different points in time.

23    And they are important competitive influences on

24    acquisitions in this proposed segment.

25    Q.  If the non-Big 5 publishers are competing in the

Snyder - DIRECT - By Mr. Oppenheimer

1    $250,000-and-up range at the same rate as Macmillan and

2    Hachette and Simon & Schuster and a little less than

3    HarperCollins, should they only be thought of in terms of

4    their individual levels of participation as individual

5    publishers or is it also relevant to think of them as a

6    group effect on competition?

7    A.  Well, when you don't know who are going to be your

8    rivals, it might be hard to figure out who among the non-Big

9    5 is going to be there.  But these data show that

10   collectively they're important.  But it's also relevant to

11   look at them individually and understand their competitive

12   influence.

13   Q.  Now, have you taken a look at how often smaller and

14   mid-sized publishers are runner-up in bidding in this price

15   segment?

16   A.  Yes.  That was to me an important question with respect

17   to unilateral effects and where does the competitive

18   constraint come from.

19        So using the agency data, I wanted to go beyond

20   just how often do these mid-sized and smaller publishers

21   win, but I also wanted to identify the frequency with which

22   they were winner or runner-up because, again, that's central

23   to the theory of unilateral effect harm.

24   Q.  So if I understand Slide 42, you've calculated that

25   mid-sized and smaller publishers as winners or runners-up in

1    the 250,000-plus segment between 2019 and 2021 are winner or

2    runner-up 23 percent of the time?

3    A.  That's right.  And this is going back to the earlier

4    exhibit with the forks in the road, the agency data

5    overview.  This is -- your Honor, the number here is 150.

6    So it's 23 percent of that number based on the agency data.

7    Q.  And have you also taken a look at how frequently the

8    non-Big 5 as a group participate in acquisition processes

9    even when they're not winners?

10   A.  Yes.  I have a slide on that.

11              MR. OPPENHEIMER:  Let's go to 43.

12   BY MR. OPPENHEIMER:

13   Q.  Would you tell us what we're seeing here?

14   A.  This is from the agency data.  250,000-and-above

15   advances on a per-title basis for the same three-year

16   period.  What's shown here is simply the percentage of time

17   that mid-sized and smaller publishers are bidding on these

18   potential acquisitions.  And it's 54 percent of the time.

19              So again, you go back to -- from the point of view

20   of an individual editor, you expect them to compete against

21   you more than half the time.

22   Q.  So if we put these two charts together in more than half

23   of the multi-bidder situations, the non-Big 5 as a group are

24   participating and they're winner or runner-up in roughly 23

25   percent of those -- of the total situations?

 1    A.  Based on the agency data, that's right.

 2            And again, just to be clear, that's the only

 3    source of data that can illuminate this question.  Dr.

 4    Hill's runner-up data shows runner-up, but not for these

 5    small and mid-sized publishers.

 6            THE COURT:  Is your 23 percent comparable to his

 7    runner-up data?

 8            THE WITNESS:  Where the data have overlapped

 9    observations, we get the same results, which is good.

10            The --

11            THE COURT:  His runner-up only looked at the two

12    merging parties.  Right?

13            THE WITNESS:  Yes.

14            THE COURT:  So you can't compare that to your 23

15    percent?

16            THE WITNESS:  Correct.

17            THE COURT:  I see.

18            THE WITNESS:  So we have observations in the

19    agency data that are not included in his data and vice

20    versa.

21    BY MR. OPPENHEIMER:

22    Q.  Doesn't this just show that they bid a lot but lose a

23    lot?

24    A.  I don't know that we have systematic data on bidding by

25    the full set of publishers.  But my read of the overall

1    record is that publishers bid a lot and they lose a lot.

2    And this isn't just the small and mid-sized.

3    Q.  So let's turn a second to authors and agents.

4            What did you conclude about their willingness to

5    consider a broad range of publishers for works that end up

6    in Dr. Hill's proposed market?

7    A.  Again, this is one of the two fundamental questions.

8    Are authors and agents willing to choose alternatives

9    outside a particular group, whether it's the two merging

10   parties or the so-called Big 5?

11           So I studied that using the advance data from the

12   three-year period.  And I've just identified a selected

13   group of authors who have chosen to publish with non-Big 5

14   publishers.

15   Q.  Professor Snyder, we've got one of your slides up,

16   Slide 44.

17           MR. OPPENHEIMER:  And that's confidential.

18   BY MR. OPPENHEIMER:

19   Q.  But can you tell us what we're seeing here that's of

20   significance for your work?

21   A.  Well, if you could advance the slide to show the second

22   part of it.

23           So these two slides identify this set of

24   authors -- I'm trying to remember.  I'm not claiming this is

25   a representative set, but I think it's 37 in number.  And

1    then what I've identified is:  Who have they decided to

2    contract with to have their works published?

3            And it may be that some of these individual

4    authors had no Big 5 option.  There's the famous story about

5    J. K. Rowling; and I'm not saying she's on this slide.  But,

6    you know, she had trouble getting traction with her work.

7            But when I look at this list, I see a lot of

8    savvy, well-known authors choosing to go outside the Big 5.

9    And that's the point.

10   Q.  What does that tell you?

11   A.  The --

12           THE COURT:  So I'm sorry.  You said "choosing."

13   But this is just a list of people who publish with non-Big

14   5.  You didn't actually look to see whether they had a Big 5

15   option in each case?

16           THE WITNESS:  That's correct.

17           THE COURT:  Okay.

18           THE WITNESS:  And I probably shouldn't have

19   mentioned anybody by name.  But it's possible that

20   individual authors, especially debut authors, would not have

21   a Big 5 option.  But again, if you look at this list, there

22   are a large number of very well-known people on the list.  I

23   would be surprised if they didn't have Big 5.  But you're

24   right, your Honor:  I don't know for sure.

25

1    BY MR. OPPENHEIMER:

2    Q.  What does it tell you about the services that can be

3    provided by non-Big 5 publishers?

4    A.  Well, in the bottom analysis, these high-profile, savvy

5    authors are willing to go with them.  They are viable

6    alternatives.  That's the key point.

7    Q.  What does it tell you about publishers such as Chronicle

8    and Norton in terms of whether they're a competitive

9    constraint in this market?

10    A.  This goes back to:  Are they a relevant option?  Now and

11    post-merger, the answer is yes.

12    Q.  But isn't it true that they also have smaller market

13    share?

14    A.  Yes.

15    Q.  And what does that tell you about whether they're a

16    competitive constraint in the market?

17    A.  Market shares are different from ability to constrain.

18    And you go back to the earlier evidence.  They're able to

19    make large financial commitments.

20         You take individual -- I'm sorry.  You take the

21    non-Big 5 as a group.  They're in there constraining 23

22    percent of the time.  That's the kind of analysis that goes

23    beyond market share.  There are a lot of firms that have big

24    market shares at one point or another.  You've got Tesla as

25    an example from my class.  You've got NetFlix as an example

 1    from my class.  They had big market shares.  But they're in

 2    very rivalrous situations that constrain their market power.

 3    Q.  Let's move on to your second observation about

 4    competition in the $250,000-and-up segment.

 5            MR. OPPENHEIMER:  47, Pam.

 6    BY MR. OPPENHEIMER:

 7    Q.  You say publishers are entering and expanding.

 8            How does this support your conclusion with respect

 9    to competition in this segment?

10    A.  Well, part of the competitive constraint comes from the

11    potential for new entry.

12            And here, this is confidential.  Is that correct?

13    Q.  This slide is not.

14    A.  Oh, I have a slide if I could advance.

15    Q.  Sure.  We'll advance to -- we will advance to Slide 47,

16    which is not confidential.

17            And is this the slide that you had in mind,

18    Professor?

19    A.  Thank you.  Yes.

20            So in the left-hand side, I've just identified

21    three recent new entrants.  And in the middle column, I've

22    identified publishers that have recently expanded.  They

23    were already operating in the 250,000-plus advance category.

24            And then what I've identified on the right are

25    publishers that are operating just below the 250,000

Snyder - DIRECT - By Mr. Oppenheimer

1    threshold and they're very successful.  So they have the

2    potential to move into the 250-plus category.

3    Q.  To be clear, those are entities that are already in the

4    market to acquire books.  Correct?

5    A.  They're in and they're succeeding.  Yes.

6         MR. OPPENHEIMER:  Let's go to Slide 48.  This is

7    confidential.

8    BY MR. OPPENHEIMER:

9    Q.  So, Professor Snyder, can you walk us through this

10   without mentioning names and tell us what it is these data

11   convey in terms of your analysis?

12   A.  So the set of publishers -- I hope I can at least say

13   it's a mix, Big 5, non-Big 5.  Each one of these pieces of

14   testimony indicate that the publisher intends to expand and

15   compete aggressively.

16        So, for example, the fourth one, quote -- and I'm

17   just quoting from a slide:  This particular publisher,

18   quote, "has tripled the amount of advances it paid between

19   2014 and 2021 and anticipates continued growth through

20   increasing audio books, advance amounts and the number of

21   books acquired."

22        That's from deposition testimony.  And the other

23   statements are variants on that theme.

24   Q.  And why is the competitor's ability to expand relevant

25   to the question of whether the combined company can reduce

```
 1    advances?
 2    A.  The basic idea here is that even if you have a big
 3    market share -- I'm going to put aside the imprint and
 4    competition for a moment right now -- whether you can
 5    exercise market power depends on the elasticity of supply
 6    among rivals.  That's the technical term.
 7              Are there a lot of them?  Do they have the
 8    capacity?  Are they already succeeding?  Do they have the
 9    plans?
10              And that's what this speaks to.  And when you have
11    robust supply of rivals, that constrains any potential
12    exercise of monopsony power.
13    Q.  Let's go to your third observation.  And I know you've
14    been putting aside imprint competition, but let's go to it
15    now.
16              MR. OPPENHEIMER:  49.
17    BY MR. OPPENHEIMER:
18    Q.  What are your observations regarding imprint
19    competition?
20    A.  Just very quickly I'll go back to the importance of
21    matching.  It's in the interest of publishers, many
22    publishers, to use imprints, to delegate to them, encourage
23    them to compete to find authors and match with authors and
24    win contracts.
25              So they're encouraged to be entrepreneurial and
```

1    they are not constrained in most acquisition processes.

2    That -- specifically, they're not constrained at all in

3    one-on-one negotiations, in preempts, in best bids or

4    hybrids.

5           My understanding of what's in the record is that

6    there are constraints in situations where you have round

7    acquisitions and there are no external bidders.  I'll just

8    note there's also testimony that suggests that that is rare;

9    and when it happens, agents have a work-around.

10   Q.  As long as you've mentioned that, can we bring up

11   Slide 54?

12          THE COURT:  What's the work-around?

13          MR. OPPENHEIMER:  I can take us there, too, your

14   Honor.

15          THE COURT:  I'm just wondering.  What's the

16   work-around?

17          THE WITNESS:  Oh, I'm sorry.  Sorry, your Honor.

18          I thought -- the work-around is that if an agent

19   gets to a situation where, say, they're -- where the two top

20   bidders are from within the same house, say two PRH bidders,

21   they don't have to notify PRH according to practice if they

22   carry forward another external bidder, even if the bidder's

23   number three.

24          So the agent has a way to not reveal the

25   information about the two PRH imprints being number one and

1   number two.  And then the agent can in that situation -- and

2   this is what I learned from the record -- then the agent has

3   the ability to shift to best bid, for example.  And the

4   imprints from PRH are in the situation where they have to

5   decide how much to bid.

6   BY MR. OPPENHEIMER:

7   Q.  So if I understand, in a situation where you have two

8   PRH imprints and a third party, the third party can be the

9   third -- the bottom rung of the bidding.  As long as they're

10   there, the two PRH imprints have to keep competing against

11   each other?

12   A.  Well, they don't know that they shouldn't.  That's for

13   sure.  The rule doesn't kick in.

14          And there's very clear testimony that the agents

15   can set the auction rules to extend external imprint --

16   excuse me -- external competition and thereby sustain

17   within-firm imprint competition.

18   Q.  So we've brought up Slide 53 from your deck in response

19   to her Honor's question about work-around.

20          This is a note of bidding rules that was sent out

21   by one of the agents.  Can you describe for us what we're

22   seeing here, Professor Snyder?

23   A.  Well, this is indeed the -- the work-around.  Quote:  If

24   in any round all the top bidders are in the same

25   corporation, then I will include the next-highest bidder.

 1    That -- by doing so, this agent doesn't have to let PRH, for

 2    example, know your imprints are the last two.

 3            And this agent further says what is standard, what

 4    I see in all the contracts:  The agent has the right to

 5    accept or reject any bid at any time.

 6    Q.  I mean, I may be missing something.  But does that not

 7    effectively completely end-run the limitation on imprint

 8    bidding by the requirement of there being an outside bidder?

 9    A.  Correct.  And that's why the testimony is so clear that

10    it happens so rarely that the rule is actually put into

11    force.

12            THE COURT:  I guess it depends on how many bidders

13    there are.

14            THE WITNESS:  Correct.

15            MR. OPPENHEIMER:  If we could bring up Slide 54.

16    BY MR. OPPENHEIMER:

17    Q.  You had mentioned testimony that it is very seldom that

18    notification is given by agents to Penguin Random House that

19    would stop the imprint bidding.

20            Is this an example of the evidence you had in

21    mind, the testimony that's displayed on 54?

22    A.  Yes.  I'm not saying that the rule is never put into

23    force.  But when I read testimony like this, this particular

24    agent has been in the business a long time.

25            How often does it happen that you have to notify

1    Penguin Random House?

2           I've had it happen -- I've had it happen once in

3    36 years.

4           Again, that might be a skewed result.  But it's a

5    striking result.  And the actual number of examples that I

6    read about in the complaint and in Dr. Hill's reports, it's

7    striking that it does confirm that the rules only kick in

8    late in the process and then only sometimes.  And then even

9    late in the process they don't always have an effect and the

10   imprints still continue to bid aggressively.

11   Q.  Let's take an example of one of those that I know is

12   near and dear to the heart of a colleague of mine.

13           MR. OPPENHEIMER:  Can we bring up Slide 52?

14           And this is confidential, your Honor.

15   BY MR. OPPENHEIMER:

16   Q.  So, Professor Snyder, what are we looking at here in

17   imprint competition on this identified title?  And please

18   don't mention the name of the book or the names of the

19   imprints.  But you can identify whose company they're from

20   and the amounts.

21   A.  Okay.  I think I've got the rules.

22           This example came out of the agency data work.

23   Each one of the 900-plus acquisitions involved studying the

24   process, who bid and the amounts.  And what we see in this

25   particular situation is that the top two bidders are from

 1    the same publishing house.

 2           And there's a huge gap between the number one

 3    imprint from that publishing house and the number two

 4    imprint from that publishing house.  And this is at best

 5    bid, so what was bid is what was paid, which is what the

 6    author received.

 7    Q.  So the imprint competition here resulted in one of the

 8    Penguin Random House imprints paying a million more than the

 9    next highest bid?

10           MR. SCHWARZ:  Objection.  Leading.

11           THE COURT:  Sustained.

12    BY MR. OPPENHEIMER:

13    Q.  And so going back to the theory of harm in this case,

14    Professor Snyder, who in this example is pushing up the

15    bidding?

16    A.  I could answer that narrowly and say the number two

17    imprint.  But I think what's going on here is that the agent

18    has really struck a good relationship with the top bidder

19    and the top bidder is very excited about it when it goes to

20    best bids.  They bid a lot.

21           MR. SCHWARZ:  Your Honor, pure speculation.  He

22    has no idea what --

23           THE COURT:  I'll sustain the objection.

24    BY MR. OPPENHEIMER:

25    Q.  Professor Snyder, it's the end of the day and it was

1    actually a trick question.  And I shouldn't do that because

2    I end up only tricking myself.

3            But I want to take you back to the fact that this

4    is a best bids auction.

5    A.  Yes.

6    Q.  So what is the competitive constraint in the best bids

7    auction that we're seeing here?

8    A.  Well, there's no obvious competitive constraint.  The

9    best bid wins.  And if the party that had bid the top amount

10   bid lower, then the competitive constraint would have been

11   the second one.

12   Q.  And what -- in this best bids situation, what do the

13   three Penguin Random House imprint publishers and the two

14   outside publishers who submitted their bids -- what do

15   they -- what do they know about their competition?

16           MR. SCHWARZ:  Your Honor, again, I don't know that

17   he can possibly tell us what they know.

18           THE COURT:  I'm going to sustain the objection.

19           MR. OPPENHEIMER:  Let me rephrase, your Honor,

20   please, if I may.  I'm just trying to get at the structural

21   question.

22   BY MR. OPPENHEIMER:

23   Q.  Assuming only, Professor Snyder, that they have been

24   invited to a best bids auction and they know nothing else,

25   they've had no other communications other than their

1    assessment of this particular book, and that's all each of

2    them knows, are they able to evaluate the effect on their

3    bid of the presence of other bidders in this best bids

4    situation?

5    A.  Apparently not.  That's all I can say.

6    Q.  I --

7              THE COURT:  Is this a good time to break for the

8    day?

9              MR. OPPENHEIMER:  Certainly, your Honor.

10             THE WITNESS:  Of course.

11             THE COURT:  So let's break for the day and we'll

12   resume tomorrow at 9:30.

13             Please don't talk about your testimony during the

14   day.

15             THE WITNESS:  Thank you.

16             (Witness excused.)

17             THE COURT:  Thank you.  Have a good evening.

18             When do the parties want to address the

19   efficiencies issue?

20             MR. FRACKMAN:  I'll let the Government go first.

21             MR. SCHWARZ:  Whenever your Honor would like to

22   hear it, I'm ready.  They're ready.

23             THE COURT:  Okay.

24             MR. SCHWARZ:  I don't know what you need to hear,

25   but I'm happy to talk at length.

1          THE COURT:  So I'm ready also.  It's just a

2     question of in terms of the Defendants' presentation of

3     their case when it would be an appropriate time to break

4     from your otherwise presentation.

5          MR. FRACKMAN:  Well --

6          MR. SCHWARZ:  My understanding was we were going

7     to deal with the -- only with the verification portion of

8     the efficiencies.

9          THE COURT:  Yes.

10         MR. SCHWARZ:  And with respect to that, I also

11    understood from our last segment just before we broke for

12    lunch that all the factual evidence had been presented on

13    that subject by the defense.

14         THE COURT:  I think we're ready.  It's just a

15    question of whether they want to stop what they're doing to

16    address that or if they, because of the schedules of their

17    witnesses, want to do other things first.

18         MR. FRACKMAN:  We'll do whatever the Court would

19    prefer.  We could go now.  We can also do it first thing

20    tomorrow.  Whatever is best.

21         THE COURT:  The question would be first thing

22    tomorrow or do you want to complete Dr. Snyder?  Do you want

23    to do the efficiencies first thing in the morning?

24         MR. FRACKMAN:  That's great.

25         THE COURT:  So let's do that at 9:30 first and

1    then we'll go back to Dr. Snyder.

2              MR. FRACKMAN:  Thank you, your Honor.

3              THE COURT:  Thank you.

4              (Proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **<u>CERTIFICATE</u>**

2

3                  I, LISA EDWARDS, RDR, CRR, do hereby

4      certify that the foregoing constitutes a true and accurate

5      transcript of my stenographic notes, and is a full, true,

6      and complete transcript of the proceedings produced to the

7      best of my ability.

8

9

10                 Dated this 16th day of August, 2022.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$100,000** [1] - 2630:9
**$250,000** [9] -
2629:24, 2635:6,
2640:11, 2646:24,
2651:24, 2681:11,
2681:17, 2684:15,
2686:24
**$30** [2] - 2635:11,
2635:21
**$400,000** [1] -
2630:10
**$500,000** [1] -
2652:14

## /

**/s** [1] - 2706:12

## 1

**1** [4] - 2628:23,
2653:19, 2653:22,
2685:22
**1.2** [1] - 2686:22
**10** [3] - 2646:11,
2659:3, 2686:20
**10022** [1] - 2616:7
**10036** [1] - 2616:4
**12** [5] - 2632:10,
2632:20, 2647:19,
2668:13, 2672:14
**13** [1] - 2650:5
**14** [4] - 2652:23,
2653:3, 2653:4,
2656:24
**149** [2] - 2658:10,
2658:17
**15** [9] - 2654:24,
2654:25, 2655:4,
2657:5, 2669:21,
2686:2, 2686:4,
2686:21, 2687:18
**150** [2] - 2658:17,
2689:5
**16** [4] - 2615:7,
2628:4, 2628:5,
2686:21
**16th** [1] - 2706:10
**18** [4] - 2628:7,
2628:8, 2657:8,
2657:11
**19** [1] - 2670:7
**1999** [1] - 2615:23

## 2

**2** [5] - 2627:16,
2628:1, 2651:4,
2686:20
**20** [4] - 2654:25,
2655:4, 2685:23,
2686:2
**20001** [2] - 2616:14,
2706:14
**20004** [1] - 2616:10
**2013** [3] - 2621:20,
2621:23, 2622:4,
2622:12, 2638:25,
2639:4
**2014** [1] - 2695:19
**2018** [3] - 2657:14,
2657:15, 2657:17
**2019** [5] - 2625:25,
2650:20, 2684:17,
2685:20, 2689:1
**202** [2] - 2616:15,
2706:15
**2020** [2] - 2652:2,
2685:20
**2021** [9] - 2650:21,
2650:23, 2657:14,
2684:13, 2684:18,
2685:20, 2687:21,
2689:1, 2695:19
**2022** [2] - 2615:7,
2706:10
**20530** [1] - 2615:19
**206** [1] - 2651:10
**21** [1] - 2661:9
**21-02886** [1] - 2615:4
**23** [6] - 2689:2,
2689:6, 2689:24,
2690:6, 2690:14,
2693:21
**24,000** [1] - 2650:24
**25** [1] - 2687:20
**250** [2] - 2640:13,
2658:2
**250,000** [10] -
2630:2, 2631:18,
2651:11, 2652:6,
2652:8, 2657:21,
2657:22, 2658:13,
2683:13, 2694:25
**250,000-and-above**
[1] - 2689:14
**250,000-and-up** [3] -
2683:22, 2688:1,
2694:4
**250,000-plus** [2] -
2689:1, 2694:23
**250-plus** [1] - 2695:2
**2619** [1] - 2617:5

**284** [1] - 2651:23
**29** [1] - 2684:17
**299** [2] - 2658:15,
2661:8
**2:23** [1] - 2615:7

## 3

**3** [6] - 2631:21,
2651:4, 2674:12,
2675:2, 2678:7,
2682:1
**30** [3] - 2635:1,
2668:25, 2687:20
**30,000** [1] - 2650:25
**300** [1] - 2661:8
**33** [1] - 2684:18
**333** [2] - 2616:13,
2706:14
**35** [1] - 2682:11
**354-3269** [2] -
2616:15, 2706:15
**36** [2] - 2682:17,
2700:3
**360** [3] - 2657:24,
2658:13, 2658:24
**360-style** [1] -
2653:24
**37** [2] - 2683:4,
2691:25
**38** [2] - 2684:7,
2684:10
**385** [1] - 2623:4

## 4

**4** [2] - 2641:2, 2651:4
**40** [2] - 2685:14,
2686:16
**401** [1] - 2616:9
**42** [1] - 2688:24
**43** [1] - 2689:11
**44** [1] - 2691:16
**45** [3] - 2619:24,
2659:22, 2665:25
**450** [1] - 2615:18
**47** [5] - 2655:9,
2665:20, 2666:1,
2694:5, 2694:15
**48** [1] - 2695:6
**49** [2] - 2655:9,
2696:16
**4:00** [1] - 2669:21

## 5

**5** [34] - 2641:17,
2642:18, 2648:25,

2650:21, 2653:19,
2653:22, 2657:1,
2664:4, 2665:2,
2665:5, 2683:10,
2683:20, 2686:1,
2686:4, 2687:6,
2687:7, 2687:13,
2687:25, 2688:9,
2689:8, 2689:23,
2691:10, 2691:13,
2692:4, 2692:8,
2692:14, 2692:21,
2692:23, 2693:3,
2693:21, 2695:13
**500,000** [4] - 2652:4,
2652:6, 2652:7,
2652:8
**52** [1] - 2700:13
**53** [1] - 2698:18
**54** [4] - 2689:18,
2697:11, 2699:15,
2699:21
**57** [1] - 2655:12
**59** [1] - 2670:5
**599** [1] - 2616:7

## 6

**6** [2] - 2642:5,
2686:18
**61** [1] - 2658:13
**6706** [1] - 2616:14

## 7

**7** [1] - 2643:5
**784** [1] - 2651:20

## 8

**8** [1] - 2644:5
**85** [1] - 2620:23
**88** [1] - 2632:11
**89** [1] - 2620:23

## 9

**9** [1] - 2645:2
**9.6** [1] - 2686:18
**90** [2] - 2665:3,
2683:11
**900-plus** [1] -
2700:23
**90067** [1] - 2615:24
**924** [1] - 2651:9
**96** [2] - 2659:22,
2665:23

**973** [2] - 2657:14,
2657:24
**9:30** [2] - 2703:12,
2704:25

## A

**ABBY** [1] - 2616:2
**ability** [5] - 2638:10,
2693:17, 2695:24,
2698:3, 2706:7
**able** [8] - 2649:11,
2676:2, 2685:8,
2686:7, 2686:12,
2686:13, 2693:18,
2703:2
**absent** [1] - 2649:24
**absolutely** [1] -
2648:17
**academic** [4] -
2623:14, 2623:21,
2624:9, 2629:19
**accept** [1] - 2699:5
**according** [7] -
2637:21, 2638:8,
2661:9, 2661:17,
2670:3, 2670:12,
2697:21
**account** [6] -
2633:10, 2634:12,
2636:15, 2637:12,
2637:24, 2684:3
**accounting** [2] -
2626:23, 2626:24
**accurate** [1] - 2706:4
**acquire** [5] -
2629:12, 2642:25,
2673:15, 2685:9,
2695:4
**acquired** [2] -
2687:5, 2695:21
**acquiring** [1] -
2684:14
**acquisition** [24] -
2629:6, 2633:10,
2638:11, 2638:17,
2638:19, 2640:1,
2641:10, 2641:23,
2648:8, 2648:20,
2649:9, 2649:14,
2650:11, 2650:17,
2651:23, 2656:16,
2656:18, 2658:20,
2662:24, 2666:20,
2671:4, 2675:1,
2689:8, 2697:1
**acquisitions** [10] -
2649:16, 2656:2,
2656:10, 2658:9,

2658:17, 2679:20, 2687:24, 2689:18, 2697:7, 2700:23
**across-the-board** [1] - 2672:23
**Action** [1] - 2615:3
**actions** [2] - 2637:24, 2672:7
**actual** [6] - 2632:17, 2664:3, 2667:13, 2674:1, 2674:21, 2700:5
**additional** [1] - 2628:21
**address** [4] - 2644:18, 2654:7, 2703:18, 2704:16
**addressed** [2] - 2645:4, 2680:22
**addresses** [1] - 2654:2
**addressing** [1] - 2642:15
**adds** [2] - 2653:6, 2669:7
**adjusting** [1] - 2637:13
**adjustments** [9] - 2635:10, 2635:20, 2637:15, 2639:25, 2640:2, 2648:11, 2649:21, 2656:16, 2656:20
**advance** [25] - 2629:21, 2630:9, 2630:10, 2635:3, 2646:10, 2650:15, 2650:19, 2650:21, 2650:25, 2655:7, 2672:8, 2684:6, 2684:11, 2684:12, 2685:19, 2686:8, 2687:4, 2691:11, 2691:21, 2694:14, 2694:15, 2694:23, 2695:20
**advances** [43] - 2621:23, 2622:1, 2622:2, 2622:4, 2629:24, 2631:4, 2631:18, 2632:17, 2632:19, 2639:9, 2639:11, 2639:14, 2646:24, 2651:10, 2652:3, 2652:13, 2653:14, 2657:20, 2657:22, 2672:16, 2672:20, 2673:10, 2673:15, 2673:19, 2673:20, 2674:1,

2674:2, 2674:5, 2674:6, 2674:13, 2674:16, 2676:2, 2676:9, 2679:10, 2680:21, 2681:10, 2681:16, 2684:1, 2684:15, 2685:22, 2689:15, 2695:18, 2696:1
**advocacy** [1] - 2626:16
**affect** [6] - 2652:10, 2652:14, 2663:2, 2663:5, 2663:23, 2664:9
**affects** [1] - 2662:23
**afternoon** [8] - 2615:8, 2618:1, 2618:2, 2618:3, 2623:13, 2639:3, 2669:18, 2669:24
**agencies** [2] - 2626:17, 2657:11
**agency** [27] - 2640:25, 2641:8, 2653:6, 2653:10, 2654:1, 2654:6, 2654:12, 2654:16, 2654:22, 2655:11, 2655:18, 2656:3, 2656:8, 2656:13, 2656:15, 2657:2, 2657:7, 2657:8, 2657:24, 2683:8, 2688:19, 2689:4, 2689:6, 2689:14, 2690:1, 2690:19, 2700:22
**agent** [16] - 2636:15, 2637:10, 2637:14, 2649:20, 2663:24, 2678:5, 2678:17, 2697:18, 2697:24, 2698:1, 2698:2, 2699:1, 2699:3, 2699:4, 2699:24, 2701:17
**agent's** [1] - 2640:1
**agents** [39] - 2631:23, 2633:7, 2633:12, 2633:19, 2634:15, 2637:7, 2641:8, 2641:11, 2641:20, 2641:23, 2641:24, 2643:22, 2643:24, 2648:11, 2648:20, 2648:23, 2649:15, 2653:25, 2654:13, 2656:4, 2656:17, 2656:22,

2657:8, 2657:9, 2657:11, 2665:6, 2666:22, 2666:24, 2675:1, 2677:6, 2677:11, 2684:3, 2687:22, 2691:3, 2691:8, 2697:9, 2698:14, 2698:21, 2699:18
**aggressively** [3] - 2667:11, 2695:15, 2700:10
**ago** [3] - 2619:24, 2624:20, 2681:5
**agree** [7] - 2631:7, 2632:7, 2638:14, 2642:1, 2654:21, 2666:8, 2687:14
**agreement** [2] - 2623:2, 2623:5
**al** [1] - 2615:7
**allegation** [1] - 2629:1
**allegations** [1] - 2626:5
**alleges** [1] - 2638:6
**allow** [1] - 2654:12
**allowed** [1] - 2686:10
**allows** [1] - 2654:6
**allude** [1] - 2633:20
**alluded** [2] - 2681:8, 2683:9
**alter** [1] - 2679:5
**alternatives** [5] - 2648:1, 2648:11, 2649:3, 2691:8, 2693:6
**AMERICA** [1] - 2615:3
**American** [1] - 2644:10
**amount** [6] - 2635:11, 2663:2, 2675:18, 2675:19, 2695:18, 2702:9
**amounts** [4] - 2685:8, 2695:20, 2700:20, 2700:24
**ample** [1] - 2681:9
**analogized** [1] - 2666:6
**analogous** [1] - 2650:21
**analyses** [7] - 2628:15, 2639:23, 2640:5, 2649:6, 2652:10, 2656:7, 2666:5
**analysis** [35] - 2624:21, 2629:4,

2634:22, 2635:24, 2636:8, 2637:23, 2638:25, 2639:12, 2640:17, 2641:6, 2642:8, 2642:23, 2643:9, 2644:4, 2645:5, 2647:15, 2648:16, 2660:14, 2661:5, 2661:23, 2665:15, 2671:24, 2672:9, 2672:15, 2680:4, 2680:9, 2680:14, 2680:17, 2680:19, 2682:20, 2685:1, 2693:4, 2693:22, 2695:11
**analyzed** [2] - 2652:13, 2657:7
**analyzing** [2] - 2679:17, 2687:12
**ANDREW** [1] - 2616:2
**Angeles** [1] - 2615:24
**annual** [4] - 2625:7, 2635:3, 2635:11, 2635:21
**annually** [2] - 2635:1, 2668:25
**answer** [9] - 2636:13, 2645:13, 2649:19, 2665:14, 2681:6, 2683:16, 2685:10, 2693:11, 2701:16
**answered** [1] - 2632:15
**anticipate** [1] - 2631:11
**anticipated** [8] - 2622:1, 2622:3, 2630:2, 2630:13, 2631:7, 2647:2, 2647:7, 2681:16
**anticipates** [1] - 2695:19
**anticipation** [2] - 2630:14, 2630:23
**ANTITRUST** [1] - 2615:18
**antitrust** [5] - 2624:3, 2625:7, 2625:12, 2625:13, 2647:23
**apologize** [2] - 2618:4, 2618:7
**APPEARANCES** [1] - 2616:1
**aPPEARANCES** [1] - 2615:14

**applied** [1] - 2635:24
**applies** [1] - 2672:15
**appointments** [1] - 2624:7
**appreciated** [1] - 2630:12
**approach** [4] - 2631:12, 2634:4, 2639:19, 2645:11
**approached** [1] - 2655:24
**approaches** [1] - 2642:20
**approaching** [1] - 2669:6
**appropriate** [2] - 2641:1, 2704:3
**arbitrary** [1] - 2630:6
**area** [2] - 2623:25, 2638:2
**argument** [5] - 2618:17, 2618:22, 2635:18, 2664:17, 2681:20
**arguments** [1] - 2672:2
**arrayed** [1] - 2653:2
**article** [1] - 2625:5
**aside** [3] - 2633:12, 2662:7, 2680:24, 2696:3, 2696:14
**aspect** [1] - 2630:11
**assess** [1] - 2628:13
**assessment** [2] - 2634:14, 2703:1
**assessments** [1] - 2667:16
**assignment** [1] - 2639:19
**assist** [1] - 2627:8
**associated** [1] - 2621:22
**assuming** [1] - 2702:23
**assumptions** [1] - 2621:6
**attempt** [1] - 2636:11
**attention** [3] - 2644:7, 2656:7, 2666:12
**attractive** [1] - 2685:5
**auction** [26] - 2632:22, 2632:23, 2633:23, 2634:13, 2637:1, 2637:2, 2637:5, 2641:25, 2642:1, 2660:21, 2661:4, 2661:14, 2662:5, 2662:10,

2662:12, 2663:3, 2663:17, 2663:18, 2666:6, 2668:5, 2675:21, 2677:5, 2698:15, 2702:4, 2702:7, 2702:24

**auctions** [5] - 2658:18, 2659:1, 2659:8, 2666:4, 2666:24

**audio** [1] - 2695:20

**August** [2] - 2615:7, 2706:10

**author** [11] - 2630:8, 2630:10, 2637:15, 2643:16, 2643:25, 2645:16, 2646:9, 2663:1, 2678:5, 2678:17, 2701:6

**author's** [1] - 2639:25

**author/agent** [1] - 2648:19

**authors** [40] - 2629:9, 2630:16, 2630:20, 2630:25, 2631:2, 2631:7, 2631:17, 2631:23, 2633:17, 2641:10, 2641:12, 2641:15, 2641:16, 2642:10, 2642:20, 2643:10, 2643:15, 2643:22, 2645:7, 2646:3, 2646:17, 2646:24, 2647:6, 2648:11, 2648:23, 2649:3, 2666:22, 2681:10, 2691:3, 2691:8, 2691:13, 2691:24, 2692:4, 2692:8, 2692:20, 2693:5, 2696:23

**automatic** [1] - 2637:2

**automatically** [1] - 2666:19

**available** [1] - 2656:25

**Avenue** [4] - 2615:23, 2616:7, 2616:13, 2706:14

**average** [4] - 2621:23, 2621:25, 2622:2, 2622:12

**averages** [4] - 2622:5, 2622:7, 2622:9, 2639:9

**avoid** [2] - 2648:12, 2677:12

**aware** [2] - 2652:18, 2665:15

## B

**background** [2] - 2623:14, 2623:21

**bad** [1] - 2633:13

**base** [1] - 2621:4

**based** [19] - 2634:15, 2634:18, 2639:9, 2641:4, 2645:13, 2665:1, 2666:19, 2667:1, 2667:8, 2667:10, 2668:14, 2669:2, 2677:7, 2679:23, 2683:7, 2687:18, 2687:19, 2689:6, 2690:1

**basic** [4] - 2661:18, 2662:20, 2679:9, 2696:2

**basis** [6] - 2628:24, 2629:7, 2629:10, 2638:4, 2671:22, 2689:15

**became** [1] - 2624:12

**Becker** [1] - 2625:2

**BEFORE** [1] - 2615:11

**begin** [1] - 2659:2

**beginning** [2] - 2624:18, 2667:1

**behalf** [2] - 2626:6, 2626:8

**behavior** [5] - 2636:16, 2637:14, 2679:5, 2680:1, 2684:3

**behind** [3] - 2668:18, 2669:9, 2672:4

**Beinecke** [1] - 2624:5

**below** [7] - 2622:4, 2630:7, 2640:11, 2652:5, 2657:20, 2657:21, 2694:25

**below-top** [1] - 2622:4

**BENCH** [1] - 2615:11

**benefit** [1] - 2647:5

**Bergstrom** [1] - 2646:16

**BERTELSMANN** [3] - 2615:6, 2615:21, 2616:2

**best** [16] - 2636:24, 2641:25, 2659:7,

2677:13, 2697:3, 2698:3, 2701:4, 2701:20, 2702:4, 2702:6, 2702:9, 2702:12, 2702:24, 2703:3, 2704:20, 2706:7

**bestsellers** [2] - 2631:1, 2647:7

**better** [4] - 2618:19, 2653:23, 2660:2, 2683:17

**between** [14] - 2643:1, 2643:14, 2646:21, 2657:19, 2667:21, 2667:22, 2667:23, 2679:24, 2680:6, 2680:15, 2681:2, 2689:1, 2695:18, 2701:2

**beyond** [4] - 2658:19, 2682:21, 2688:19, 2693:23

**bid** [40] - 2633:5, 2637:6, 2637:8, 2643:17, 2645:6, 2645:10, 2645:15, 2658:18, 2659:18, 2659:22, 2660:1, 2665:3, 2665:22, 2665:25, 2666:3, 2667:11, 2675:12, 2676:5, 2676:6, 2677:13, 2677:15, 2682:2, 2683:9, 2683:11, 2690:22, 2691:1, 2698:3, 2698:5, 2699:5, 2700:10, 2700:24, 2701:5, 2701:9, 2701:20, 2702:9, 2702:10, 2703:3

**bidder** [15] - 2637:16, 2649:12, 2653:16, 2654:3, 2656:13, 2658:10, 2663:20, 2666:4, 2689:23, 2697:22, 2698:25, 2699:8, 2701:18, 2701:19

**bidder's** [1] - 2697:22

**bidders** [11] - 2645:20, 2653:12, 2654:2, 2663:24, 2697:7, 2697:20, 2698:24, 2699:12, 2700:25, 2703:3

**bidding** [20] - 2635:17, 2640:9,

2660:16, 2663:9, 2663:10, 2664:4, 2673:12, 2674:16, 2674:18, 2675:20, 2682:3, 2684:18, 2688:14, 2689:17, 2690:24, 2698:9, 2698:20, 2699:8, 2699:19, 2701:15

**bids** [19] - 2631:24, 2631:25, 2636:22, 2636:23, 2637:3, 2641:25, 2653:12, 2654:3, 2659:7, 2665:21, 2672:8, 2697:3, 2701:20, 2702:4, 2702:6, 2702:12, 2702:14, 2702:24, 2703:3

**big** [4] - 2663:15, 2663:23, 2694:1, 2696:2

**Big** [34] - 2631:21, 2642:18, 2648:25, 2664:4, 2665:2, 2665:4, 2674:12, 2675:2, 2678:7, 2682:1, 2683:10, 2683:20, 2686:1, 2686:4, 2687:6, 2687:7, 2687:13, 2687:25, 2688:8, 2689:8, 2689:23, 2691:10, 2691:13, 2692:4, 2692:8, 2692:13, 2692:14, 2692:21, 2692:23, 2693:3, 2693:21, 2695:13

**bilateral** [2] - 2666:6, 2666:9

**billion** [1] - 2635:3

**billion-dollar** [1] - 2635:3

**binders** [1] - 2620:8

**biographies** [1] - 2629:18

**bit** [6] - 2631:14, 2634:25, 2669:15, 2670:14, 2677:8

**block** [1] - 2685:12

**board** [2] - 2672:23, 2679:11

**book** [14] - 2625:7, 2631:1, 2635:16, 2645:9, 2645:18, 2645:23, 2645:24, 2649:16, 2663:5, 2673:16, 2678:11, 2678:14, 2700:18,

2703:1

**book-level** [2] - 2635:16, 2645:18

**books** [17] - 2629:2, 2629:6, 2629:10, 2629:12, 2629:16, 2629:18, 2629:20, 2629:23, 2642:10, 2645:12, 2648:8, 2661:3, 2685:9, 2695:4, 2695:20, 2695:21

**BookScan** [1] - 2621:5

**Booth** [1] - 2624:15

**bottom** [7] - 2646:17, 2651:2, 2661:7, 2664:22, 2665:25, 2693:4, 2698:9

**bottom-left** [1] - 2661:7

**bottom-line** [1] - 2664:22

**box** [2] - 2621:25, 2622:2

**break** [9] - 2665:9, 2669:16, 2669:17, 2669:20, 2669:25, 2678:1, 2703:7, 2703:11, 2704:3

**briefly** [6] - 2623:13, 2623:21, 2624:9, 2628:24, 2655:1, 2679:1

**bring** [7] - 2635:10, 2641:2, 2650:4, 2657:5, 2697:10, 2699:15, 2700:13

**brings** [1] - 2635:21

**broad** [8] - 2629:10, 2629:14, 2629:19, 2631:19, 2635:6, 2651:9, 2657:9, 2691:5

**broader** [2] - 2664:15, 2669:15

**broiler** [1] - 2626:5

**broke** [1] - 2704:11

**brought** [2] - 2658:1, 2698:18

**buckets** [1] - 2639:14

**build** [1] - 2668:4

**built** [1] - 2621:6

**built-in** [1] - 2621:6

**bullet** [2] - 2642:14, 2642:15

**business** [7] - 2624:12, 2624:13, 2672:25, 2674:3,

2679:12, 2679:14, 2699:24

**buy** [1] - 2648:1
**buyers** [1] - 2648:2
**buying** [1] - 2685:4
**BY** [48] - 2616:11, 2623:12, 2623:18, 2627:6, 2627:17, 2628:10, 2638:1, 2638:24, 2641:3, 2641:18, 2642:6, 2643:11, 2644:17, 2645:3, 2646:12, 2647:20, 2650:6, 2652:23, 2653:1, 2655:16, 2656:21, 2657:5, 2657:6, 2660:12, 2661:1, 2665:8, 2669:13, 2670:17, 2678:21, 2682:12, 2682:18, 2683:5, 2684:9, 2685:15, 2687:10, 2689:12, 2690:21, 2691:18, 2693:1, 2694:6, 2695:8, 2696:17, 2698:6, 2699:16, 2700:15, 2701:12, 2701:24, 2702:22
**bypass** [1] - 2638:23

## C

**calculated** [2] - 2621:3, 2688:24
**calculation** [3] - 2636:5, 2637:9, 2649:17
**calculations** [4] - 2635:24, 2636:2, 2649:24, 2671:18
**California** [1] - 2615:24
**cannot** [2] - 2636:15, 2654:8
**CANTOR** [1] - 2616:3
**capabilities** [2] - 2642:13, 2644:21
**capacity** [1] - 2696:8
**capture** [2] - 2659:17, 2660:1
**captured** [1] - 2662:22
**captures** [2] - 2660:4, 2666:13
**cards** [2] - 2626:19
**career** [4] - 2624:10, 2624:19, 2625:11

**carry** [1] - 2697:22
**cascading** [2] - 2672:7, 2672:12
**case** [17] - 2625:25, 2628:12, 2630:24, 2631:10, 2638:6, 2639:21, 2644:4, 2648:8, 2649:25, 2650:24, 2650:25, 2660:14, 2661:6, 2662:20, 2692:15, 2701:13, 2704:3
**cases** [3] - 2625:8, 2625:13, 2625:18
**catch** [1] - 2659:20
**categories** [2] - 2639:14, 2656:14
**categorizations** [2] - 2621:6, 2653:17
**category** [3] - 2629:20, 2694:23, 2695:2
**celebrities** [1] - 2641:14
**central** [2] - 2643:18, 2688:22
**CEO** [2] - 2674:13, 2682:15
**certain** [4] - 2653:2, 2675:18, 2679:19, 2686:11
**certainly** [5] - 2630:24, 2644:15, 2649:7, 2659:12, 2703:9
**CERTIFICATE** [1] - 2706:1
**certify** [1] - 2706:4
**challenge** [3] - 2645:4, 2649:13, 2663:21
**challenges** [4] - 2643:4, 2643:7, 2643:8, 2649:8
**chance** [1] - 2631:3
**chances** [1] - 2643:21
**change** [4] - 2641:23, 2661:24, 2662:1, 2680:1
**changes** [3] - 2633:5, 2636:22, 2637:3
**chapter** [1] - 2625:7
**characteristics** [1] - 2641:20
**characterization** [1] - 2669:6
**chart** [4] - 2659:19, 2660:7, 2660:8,

2661:12
**charts** [1] - 2689:22
**check** [1] - 2660:9
**Chicago** [2] - 2619:24, 2623:24
**Chicago's** [1] - 2624:15
**chicken** [1] - 2626:5
**chief** [1] - 2637:21
**choose** [7] - 2633:12, 2634:16, 2641:9, 2648:20, 2648:23, 2677:7, 2691:8
**choosing** [4] - 2666:24, 2677:6, 2692:8, 2692:12
**chosen** [1] - 2691:13
**Chronicle** [1] - 2693:7
**circumstances** [3] - 2671:7, 2671:13, 2675:5
**Civil** [1] - 2615:3
**claim** [2] - 2632:3, 2638:20
**claiming** [1] - 2691:24
**clarify** [1] - 2656:22
**class** [2] - 2693:25, 2694:1
**classic** [2] - 2641:15, 2646:8
**classmates** [1] - 2619:23
**clear** [10] - 2635:4, 2644:8, 2644:13, 2671:3, 2672:4, 2686:1, 2690:2, 2695:3, 2698:14, 2699:9
**closed** [1] - 2618:14
**closely** [2] - 2630:23, 2657:3
**CO** [1] - 2615:6
**co** [1] - 2642:10
**co-developing** [1] - 2642:10
**code** [1] - 2621:4
**coding** [1] - 2621:6
**cognizable** [1] - 2681:15
**Colby** [1] - 2623:22
**colleague** [1] - 2700:21
**collection** [1] - 2620:11
**collectively** [1] - 2688:10
**College** [1] - 2623:22

**colloquy** [2] - 2627:12, 2639:16
**Columbia** [2] - 2616:13, 2706:13
**COLUMBIA** [1] - 2615:1
**Column** [1] - 2650:21
**column** [1] - 2694:21
**combination** [1] - 2631:5
**combine** [2] - 2642:12, 2686:25
**combined** [4] - 2655:10, 2655:12, 2683:21, 2695:25
**combining** [1] - 2644:21
**coming** [1] - 2625:7
**commit** [2] - 2685:8, 2686:14
**commitments** [1] - 2693:19
**committed** [1] - 2686:19
**committing** [2] - 2685:24, 2686:2
**common** [8] - 2645:16, 2645:18, 2645:19, 2645:25, 2646:3, 2646:22, 2647:5, 2647:8
**communications** [1] - 2702:25
**companies** [1] - 2686:12
**company** [2] - 2695:25, 2700:19
**comparable** [2] - 2687:8, 2690:6
**compare** [2] - 2667:15, 2690:14
**compete** [5] - 2667:10, 2676:10, 2684:6, 2689:20, 2695:15, 2696:23
**competing** [9] - 2660:3, 2660:5, 2660:22, 2664:23, 2665:2, 2671:4, 2676:10, 2687:25, 2698:10
**competition** [82] - 2628:20, 2629:11, 2629:13, 2631:23, 2632:4, 2635:12, 2638:18, 2640:6, 2640:7, 2640:8, 2647:16, 2653:21, 2654:4, 2656:4,

2660:19, 2660:21, 2661:3, 2662:15, 2662:18, 2662:23, 2663:19, 2664:3, 2664:10, 2665:4, 2667:21, 2667:22, 2667:23, 2670:11, 2670:22, 2670:24, 2671:14, 2671:23, 2672:3, 2672:6, 2672:18, 2673:2, 2673:3, 2673:11, 2673:12, 2673:18, 2674:6, 2674:9, 2674:21, 2674:25, 2675:2, 2675:3, 2675:11, 2675:24, 2676:24, 2678:6, 2678:7, 2678:16, 2679:6, 2679:24, 2680:5, 2680:10, 2680:14, 2680:18, 2681:2, 2681:9, 2681:22, 2681:24, 2683:13, 2683:16, 2683:17, 2683:19, 2683:24, 2687:12, 2688:6, 2694:4, 2694:9, 2696:4, 2696:14, 2696:19, 2698:16, 2698:17, 2700:17, 2701:7, 2702:15
**competitive** [27] - 2624:25, 2628:13, 2630:8, 2631:19, 2633:6, 2647:17, 2649:21, 2661:16, 2661:17, 2661:20, 2661:22, 2661:24, 2672:16, 2673:1, 2675:12, 2679:7, 2682:9, 2685:8, 2687:23, 2688:11, 2688:17, 2693:8, 2693:16, 2694:10, 2702:6, 2702:8, 2702:10
**competitively** [1] - 2663:10
**competitor** [8] - 2624:2, 2633:15, 2634:17, 2636:16, 2636:20, 2637:9, 2637:17, 2640:12
**competitor's** [1] - 2695:24
**competitors** [3] - 2633:18, 2648:14, 2663:4

2711

**complaint** [6] - 2632:7, 2640:20, 2662:14, 2664:15, 2671:10, 2700:6
**complete** [5] - 2650:23, 2652:21, 2653:24, 2704:22, 2706:6
**completely** [4] - 2644:15, 2669:8, 2672:12, 2699:7
**completion** [6] - 2633:11, 2659:2, 2659:4, 2659:5, 2659:9, 2677:5
**component** [1] - 2643:18
**comps** [1] - 2645:17
**computation** [1] - 2671:17
**compute** [2] - 2671:12, 2671:15
**conceptual** [1] - 2638:20
**concern** [2] - 2645:22, 2685:5
**concerning** [1] - 2629:5
**conclude** [1] - 2691:4
**concluded** [1] - 2705:4
**conclusion** [7] - 2628:18, 2629:7, 2629:23, 2630:1, 2631:17, 2638:3, 2694:8
**conclusions** [2] - 2628:17, 2652:14
**condition** [4] - 2632:12, 2632:19, 2671:9, 2671:20
**conditions** [7] - 2630:8, 2632:8, 2671:2, 2672:16, 2673:1, 2675:12, 2679:21
**conduct** [1] - 2649:5
**conducted** [1] - 2639:23
**confer** [1] - 2620:13
**confidential** [7] - 2685:12, 2687:2, 2691:17, 2694:12, 2694:16, 2695:7, 2700:14
**confidentiality** [1] - 2627:13
**confirm** [3] - 2636:2, 2636:12, 2700:7

**confront** [1] - 2663:24
**confused** [1] - 2664:10
**connected** [1] - 2630:23
**connection** [1] - 2641:20
**conscious** [3] - 2673:9, 2673:19, 2676:1
**consequences** [1] - 2655:2
**consider** [3] - 2640:2, 2671:1, 2691:5
**consideration** [1] - 2684:20
**considered** [1] - 2649:10
**consistent** [5] - 2634:6, 2635:15, 2646:6, 2656:1, 2667:18
**consistently** [1] - 2631:12
**constitutes** [1] - 2706:4
**Constitution** [2] - 2616:13, 2706:14
**constrain** [2] - 2693:17, 2694:2
**constrained** [2] - 2697:1, 2697:2
**constraining** [2] - 2682:4, 2693:21
**constrains** [1] - 2696:11
**constraint** [12] - 2661:17, 2661:22, 2661:25, 2664:18, 2688:18, 2693:9, 2693:16, 2694:10, 2702:6, 2702:8, 2702:10
**constraints** [1] - 2697:6
**constructing** [1] - 2660:7
**consumers** [5] - 2629:2, 2629:20, 2642:22, 2642:25, 2647:25
**CONT'D** [1] - 2616:1
**contact** [1] - 2643:24
**content** [1] - 2624:25
**context** [18] - 2626:11, 2634:20, 2635:2, 2636:17, 2638:11, 2648:9,

2648:10, 2659:13, 2661:19, 2665:12, 2666:3, 2670:25, 2673:3, 2678:22, 2679:10, 2679:13, 2680:3, 2685:3
**contexts** [1] - 2644:12
**continue** [4] - 2625:4, 2639:17, 2664:25, 2700:10
**continued** [1] - 2695:19
**contract** [7] - 2640:4, 2640:13, 2645:1, 2666:2, 2685:25, 2686:19, 2692:2
**contracting** [1] - 2642:20
**contracts** [10] - 2622:10, 2622:11, 2639:11, 2640:10, 2684:14, 2685:18, 2685:22, 2686:24, 2696:24, 2699:4
**control** [1] - 2675:1
**convey** [1] - 2695:11
**coordinate** [1] - 2638:17
**coordinated** [6] - 2638:2, 2638:3, 2638:5, 2638:6, 2638:9, 2662:7
**coordination** [2] - 2626:2, 2626:4
**core** [2] - 2647:25, 2672:19
**corporation** [1] - 2698:25
**correct** [13] - 2637:6, 2659:6, 2662:11, 2665:22, 2681:24, 2683:7, 2686:5, 2690:16, 2692:16, 2694:12, 2695:4, 2699:9, 2699:14
**correctly** [2] - 2630:5, 2664:20
**corresponds** [1] - 2626:15
**couple** [4] - 2665:10, 2681:5, 2681:8, 2684:5
**course** [17] - 2624:20, 2624:22, 2624:24, 2625:2, 2627:11, 2628:14, 2633:3, 2635:5, 2640:19, 2641:13, 2643:19, 2647:11,

2648:24, 2650:13, 2658:24, 2673:6, 2703:10
**courses** [1] - 2624:23
**COURT** [92] - 2615:1, 2618:1, 2618:4, 2618:16, 2618:19, 2618:23, 2619:2, 2619:8, 2619:12, 2619:15, 2619:20, 2619:25, 2620:6, 2620:8, 2620:17, 2620:21, 2620:24, 2622:22, 2622:25, 2623:7, 2623:9, 2623:15, 2627:3, 2627:5, 2627:14, 2627:19, 2627:21, 2627:24, 2628:2, 2628:5, 2628:9, 2636:19, 2636:25, 2637:5, 2655:4, 2655:15, 2656:10, 2659:15, 2659:17, 2659:25, 2660:11, 2660:20, 2662:4, 2662:9, 2662:21, 2664:8, 2664:21, 2667:3, 2667:6, 2668:22, 2669:10, 2669:16, 2669:20, 2669:24, 2670:15, 2673:5, 2673:7, 2673:23, 2674:4, 2674:10, 2674:15, 2675:16, 2676:15, 2676:21, 2677:2, 2677:23, 2678:20, 2685:13, 2690:6, 2690:11, 2690:14, 2690:17, 2692:12, 2692:17, 2697:12, 2697:15, 2699:12, 2701:11, 2701:23, 2702:18, 2703:7, 2703:11, 2703:17, 2703:23, 2704:1, 2704:9, 2704:14, 2704:21, 2704:25, 2705:3
**Court** [10] - 2616:12, 2616:12, 2619:22, 2620:7, 2620:10, 2620:20, 2639:16, 2704:18, 2706:12, 2706:13
**court** [2] - 2626:4, 2669:17

**courtroom** [1] - 2619:10
**covers** [3] - 2651:7, 2657:13, 2684:13
**cranberry** [1] - 2625:23
**creative** [3] - 2642:13, 2643:14, 2644:23
**credit** [3] - 2626:19, 2640:23, 2682:25
**critically** [1] - 2641:9
**criticism** [1] - 2634:5
**cross** [2] - 2621:9, 2668:3
**Cross** [1] - 2617:3
**cross-examine** [1] - 2621:9
**cross-referencing** [1] - 2668:3
**CRR** [3] - 2616:11, 2706:3, 2706:12
**curated** [1] - 2651:5
**current** [2] - 2624:4, 2682:8
**cut** [12] - 2632:18, 2667:22, 2672:8, 2672:15, 2672:20, 2674:1, 2674:2, 2674:5, 2674:13, 2674:16, 2680:21, 2683:1
**cutoff** [1] - 2630:6
**cutoffs** [1] - 2629:21
**cutting** [2] - 2631:3, 2632:17

**D**

**D.C** [5] - 2615:6, 2615:19, 2616:10, 2616:14, 2706:14
**dairy** [2] - 2625:22, 2625:25
**DANIEL** [2] - 2615:20, 2616:3
**Darden** [1] - 2624:14
**data** [111] - 2621:4, 2632:9, 2640:16, 2640:21, 2640:24, 2640:25, 2641:1, 2649:25, 2650:1, 2650:2, 2650:10, 2650:12, 2650:14, 2650:15, 2650:17, 2650:19, 2650:20, 2650:21, 2650:23, 2650:25, 2651:3, 2651:5, 2651:6,

2651:25, 2652:1,
2652:2, 2652:6,
2652:7, 2652:11,
2652:13, 2652:15,
2652:16, 2652:18,
2652:21, 2653:2,
2653:4, 2653:5,
2653:6, 2653:9,
2653:10, 2653:13,
2653:18, 2653:19,
2653:23, 2653:24,
2654:1, 2654:2,
2654:6, 2654:7,
2654:10, 2654:12,
2654:16, 2654:18,
2654:22, 2655:7,
2655:11, 2655:18,
2655:21, 2655:23,
2655:25, 2656:4,
2656:8, 2656:13,
2657:1, 2657:2,
2657:7, 2657:8,
2657:24, 2658:4,
2658:9, 2658:20,
2658:23, 2661:10,
2661:14, 2665:3,
2677:9, 2683:7,
2683:8, 2684:11,
2684:12, 2684:13,
2685:19, 2685:20,
2687:4, 2688:9,
2688:19, 2689:4,
2689:6, 2689:14,
2690:1, 2690:3,
2690:4, 2690:7,
2690:8, 2690:19,
2690:24, 2691:11,
2695:10, 2700:22
  **databases** [1] -
2653:22
  **date** [1] - 2646:15
  **Dated** [1] - 2706:10
  **deal** [2] - 2622:15,
2704:7
  **deals** [1] - 2624:2
  **dealt** [1] - 2658:4
  **dean** [1] - 2624:12
  **deaning** [1] -
2624:20
  **dear** [1] - 2700:12
  **debut** [3] - 2641:15,
2646:8, 2692:20
  **decade** [1] - 2624:13
  **decades** [1] -
2644:10
  **decide** [1] - 2698:5
  **decided** [1] - 2692:1
  **decision** [3] -
2673:10, 2673:20,
2676:1

  **decisions** [3] -
2626:25, 2674:1,
2674:5
  **deck** [2] - 2620:7,
2698:18
  **Defendants** [1] -
2615:8
  **defendants** [1] -
2626:7
  **DEFENDANTS** [4] -
2615:20, 2616:12,
2616:6, 2617:4
  **Defendants'** [3] -
2623:4, 2628:2,
2704:2
  **defense** [1] -
2704:13
  **DEFENSE** [1] -
2619:14
  **defer** [1] - 2618:10
  **defines** [1] - 2680:10
  **defining** [1] -
2631:13
  **definition** [2] -
2630:11, 2651:21
  **degree** [2] - 2623:23,
2634:23
  **degrees** [1] -
2642:10
  **delegate** [1] -
2696:22
  **demand** [1] - 2648:6
  **demanded** [1] -
2677:21
  **demonstrate** [1] -
2683:23
  **demonstrative** [6] -
2618:12, 2627:23,
2628:3, 2628:4,
2628:7, 2643:6
  **Demonstrative** [1] -
2628:5
  **demonstratives** [3] -
2622:20, 2622:23,
2682:7
  **demos** [1] - 2622:19
  **denominate** [2] -
2646:4, 2647:8
  **denominator** [2] -
2622:9, 2622:13
  **Denver** [1] - 2626:4
  **DEPARTMENT** [1] -
2615:17
  **department** [1] -
2624:8
  **Department** [1] -
2625:12
  **depicted** [1] - 2622:7
  **deposition** [1] -
2695:22

  **derived** [2] -
2652:15, 2683:8
  **describe** [9] -
2621:20, 2623:14,
2623:21, 2638:3,
2644:3, 2650:7,
2679:1, 2684:10,
2698:21
  **described** [1] -
2677:12
  **description** [1] -
2680:18
  **designate** [1] -
2628:1
  **designated** [1] -
2625:17
  **despite** [1] - 2619:23
  **detail** [3] - 2630:14,
2652:9, 2668:19
  **details** [1] - 2654:19
  **detect** [1] - 2638:10
  **determine** [1] -
2621:3
  **determines** [1] -
2636:24
  **detriment** [1] -
2679:6
  **develop** [2] - 2652:6,
2658:14
  **developed** [12] -
2624:20, 2624:24,
2634:5, 2640:24,
2650:22, 2651:5,
2652:2, 2653:7,
2666:8, 2669:3
  **developer** [1] -
2634:7
  **developers** [2] -
2636:7, 2637:21
  **developing** [1] -
2642:10
  **device** [3] - 2636:6,
2636:18, 2637:20
  **difference** [1] -
2650:22
  **differences** [1] -
2646:5
  **different** [29] -
2621:24, 2626:10,
2630:9, 2635:12,
2638:2, 2640:12,
2640:18, 2640:21,
2641:12, 2642:19,
2643:7, 2648:23,
2649:9, 2649:14,
2655:23, 2655:25,
2656:25, 2657:8,
2662:23, 2663:23,
2666:10, 2677:18,
2681:4, 2687:21,

  **derived** — 
2687:22, 2693:17
  **differently** [1] -
2630:7
  **difficult** [1] - 2649:13
  **dimensions** [2] -
2638:12, 2638:18
  **direct** [1] - 2623:9
  **Direct** [1] - 2617:3
  **DIRECT** [1] -
2623:11
  **directional** [1] -
2668:9
  **directly** [1] - 2624:2
  **disagree** [2] -
2635:15, 2638:8
  **disagreement** [1] -
2619:24
  **discipline** [1] -
2648:14
  **disconnected** [2] -
2633:9, 2666:22
  **discovery** [4] -
2621:8, 2656:15,
2657:9, 2657:16
  **discussed** [3] -
2639:13, 2650:12,
2653:6
  **display** [1] - 2623:3
  **displayed** [1] -
2699:21
  **distinction** [4] -
2645:14, 2646:21,
2646:25, 2647:6
  **distinctive** [1] -
2647:13
  **distribution** [1] -
2647:10
  **District** [3] -
2616:12, 2616:13,
2706:13
  **DISTRICT** [3] -
2615:1, 2615:1,
2615:12
  **district** [1] - 2706:13
  **diversion** [1] -
2671:19
  **diversity** [1] -
2642:17
  **divide** [1] - 2660:8
  **division** [1] -
2625:12
  **DIVISION** [1] -
2615:18
  **documentary** [1] -
2640:21
  **documents** [6] -
2620:12, 2620:19,
2620:23, 2620:25,
2621:16, 2622:8
  **DOJ** [1] - 2638:5

  **DOJ's** [1] - 2661:18
  **dollar** [1] - 2635:3
  **dollars** [2] - 2685:24,
2686:14
  **done** [7] - 2626:15,
2631:12, 2651:14,
2652:10, 2655:13,
2665:15, 2668:4
  **door** [1] - 2656:19
  **down** [8] - 2621:23,
2635:10, 2635:21,
2636:24, 2652:4,
2652:6, 2686:15,
2686:21
  **downstream** [2] -
2643:2, 2647:24
  **Dr** [57] - 2621:9,
2621:19, 2621:22,
2621:23, 2621:25,
2622:20, 2623:5,
2626:16, 2628:11,
2628:16, 2630:5,
2632:7, 2632:8,
2632:16, 2632:21,
2634:1, 2634:9,
2635:5, 2635:15,
2635:24, 2635:25,
2638:6, 2638:15,
2640:23, 2641:24,
2649:8, 2650:3,
2650:16, 2650:20,
2650:24, 2651:5,
2651:17, 2652:1,
2653:9, 2653:18,
2654:21, 2655:7,
2659:6, 2665:16,
2666:7, 2667:3,
2669:2, 2669:3,
2670:1, 2672:12,
2674:22, 2675:10,
2680:4, 2680:9,
2680:25, 2684:12,
2687:4, 2690:3,
2691:6, 2700:6,
2704:22, 2705:1
  **driving** [1] - 2643:15
  **due** [1] - 2636:23
  **during** [5] - 2620:13,
2638:17, 2638:18,
2685:23, 2703:13
  **DX** [1] - 2623:4

## E

  **earned** [2] - 2623:23,
2624:11
  **economic** [12] -
2624:21, 2634:21,
2641:5, 2642:8,
2643:3, 2643:9,

2644:3, 2645:5, 2645:11, 2647:14, 2647:25, 2649:18
**economics** [8] - 2623:24, 2624:1, 2624:5, 2624:8, 2626:14, 2627:2, 2638:21, 2645:13
**economist** [3] - 2621:2, 2623:25, 2639:6
**economists** [7] - 2637:11, 2637:18, 2637:22, 2639:4, 2644:8, 2644:10, 2644:11
**editor** [5] - 2645:9, 2677:14, 2680:21, 2683:15, 2689:20
**editor's** [1] - 2682:22
**editorial** [4] - 2651:15, 2651:16, 2651:18, 2654:10
**editors** [15] - 2630:15, 2632:18, 2642:9, 2643:10, 2643:14, 2643:15, 2643:23, 2644:1, 2644:23, 2645:14, 2645:22, 2656:25, 2672:7, 2675:17, 2678:10
**Edward** [2] - 2617:5, 2623:20
**EDWARD** [1] - 2619:14
**EDWARDS** [2] - 2616:11, 2706:3
**Edwards** [1] - 2706:12
**effect** [10] - 2636:22, 2639:7, 2639:8, 2649:10, 2654:14, 2671:7, 2688:6, 2688:23, 2700:9, 2703:2
**effectively** [1] - 2699:7
**effects** [20] - 2628:13, 2632:5, 2638:2, 2638:4, 2638:5, 2638:7, 2638:9, 2660:14, 2661:6, 2661:18, 2662:8, 2664:13, 2664:19, 2678:23, 2679:4, 2679:16, 2679:21, 2680:5, 2681:1, 2688:17
**efficiencies** [8] -

2618:6, 2618:17, 2618:22, 2635:20, 2638:23, 2703:19, 2704:8, 2704:23
**efforts** [3] - 2634:9, 2642:13, 2644:22
**Eighth** [1] - 2615:23
**either** [4] - 2634:18, 2637:15, 2649:17, 2655:6
**elaborate** [1] - 2629:25
**elasticity** [1] - 2696:5
**electronic** [1] - 2677:19
**element** [1] - 2632:3
**elimination** [3] - 2636:23, 2679:24, 2681:2
**embody** [1] - 2649:18
**empirical** [6] - 2639:23, 2640:5, 2648:16, 2649:6, 2655:22, 2665:15
**employees** [1] - 2625:24
**empower** [1] - 2644:23
**encourage** [1] - 2696:22
**encouraged** [1] - 2696:25
**end** [12] - 2642:9, 2646:2, 2652:12, 2654:22, 2667:1, 2675:24, 2676:11, 2691:5, 2699:7, 2701:25, 2702:2
**end-run** [1] - 2699:7
**ended** [2] - 2657:20, 2657:22
**ends** [3] - 2630:8, 2643:15, 2661:15
**engage** [2] - 2640:3, 2644:1
**engaged** [2] - 2656:24, 2687:22
**engaging** [2] - 2642:20, 2656:5
**enter** [1] - 2685:17
**entered** [2] - 2619:10, 2685:21
**entering** [2] - 2686:24, 2694:7
**enterprises** [1] - 2686:11
**entirety** [1] - 2662:6
**entities** [2] - 2667:10, 2695:3

**entity** [1] - 2683:21
**entrants** [1] - 2694:21
**entrepreneurial** [4] - 2642:13, 2644:21, 2644:23, 2696:25
**entry** [1] - 2694:11
**equilibrium** [3] - 2637:11, 2637:12, 2637:19
**especially** [4] - 2631:12, 2633:9, 2678:10, 2692:20
**ESQ** [14] - 2615:15, 2615:15, 2615:16, 2615:16, 2615:17, 2615:20, 2615:21, 2615:21, 2615:22, 2616:2, 2616:2, 2616:3, 2616:6, 2616:8
**essential** [1] - 2632:3
**established** [2] - 2643:13, 2678:1
**establishes** [1] - 2665:16
**estimate** [3] - 2634:17, 2635:9, 2635:21
**estimated** [1] - 2632:25
**estimation** [1] - 2635:5
**et** [1] - 2615:7
**ETHAN** [1] - 2615:15
**evaluate** [4] - 2649:23, 2651:13, 2703:2
**evening** [1] - 2703:17
**eventually** [3] - 2638:14, 2638:15, 2645:1
**evidence** [7] - 2640:21, 2668:12, 2682:8, 2685:16, 2693:18, 2699:20, 2704:12
**ex** [1] - 2631:12
**exact** [1] - 2668:1
**exactly** [2] - 2667:7, 2668:23
**EXAMINATION** [1] - 2623:11
**examine** [1] - 2621:9
**examined** [1] - 2658:21
**example** [20] - 2629:19, 2635:11,

2641:14, 2646:14, 2649:11, 2650:10, 2654:9, 2676:3, 2679:17, 2686:18, 2686:21, 2693:25, 2695:16, 2698:3, 2699:2, 2699:20, 2700:11, 2700:22, 2701:14
**examples** [2] - 2640:19, 2700:5
**except** [1] - 2684:13
**excess** [3] - 2646:24, 2681:10, 2681:16
**excited** [2] - 2645:9, 2701:19
**exciting** [1] - 2624:21
**excuse** [6] - 2630:22, 2646:19, 2650:16, 2669:3, 2687:20, 2698:16
**excused** [1] - 2703:16
**exercise** [5] - 2633:16, 2648:12, 2648:15, 2696:5, 2696:12
**exert** [1] - 2661:19
**exhibit** [4] - 2623:4, 2627:19, 2627:21, 2689:4
**exhibits** [2] - 2622:16, 2622:17
**exist** [1] - 2632:12
**expand** [3] - 2683:2, 2695:14, 2695:24
**expanded** [1] - 2694:22
**expanding** [1] - 2694:7
**expect** [2] - 2667:9, 2689:20
**experience** [2] - 2626:23, 2626:24
**experiment** [2] - 2621:21, 2639:3
**expert** [6] - 2625:13, 2625:17, 2625:18, 2626:14, 2627:2, 2628:16
**experts** [1] - 2621:17
**explain** [10] - 2620:5, 2628:23, 2629:7, 2629:14, 2636:19, 2647:16, 2648:18, 2653:3, 2658:11, 2684:25
**explained** [2] - 2641:24, 2659:6

**explaining** [1] - 2668:6
**explanation** [1] - 2680:19
**explore** [1] - 2670:13
**extend** [1] - 2698:15
**extended** [1] - 2650:22
**extent** [2] - 2648:22, 2682:25
**external** [4] - 2697:7, 2697:22, 2698:15, 2698:16

## F

**face** [1] - 2683:17
**facilitate** [1] - 2622:20
**fact** [4] - 2632:1, 2652:13, 2683:21, 2702:3
**factor** [3] - 2645:21, 2647:5, 2648:13
**factors** [14] - 2634:12, 2645:14, 2645:16, 2645:19, 2645:21, 2646:1, 2646:3, 2646:9, 2646:22, 2646:23, 2647:5, 2647:8, 2647:17
**factual** [1] - 2704:12
**fail** [1] - 2634:10
**fails** [2] - 2634:7, 2663:25
**fair** [3] - 2654:1, 2655:17, 2679:25
**famous** [1] - 2692:4
**far** [1] - 2677:15
**farmers** [3] - 2625:22, 2625:23, 2625:25
**Farrell** [1] - 2637:22
**feature** [2] - 2644:15, 2654:6
**features** [6] - 2641:4, 2643:3, 2647:14, 2647:16, 2653:3, 2653:21
**federal** [1] - 2626:4
**few** [8] - 2620:2, 2658:5, 2658:22, 2658:25, 2659:10, 2659:12, 2686:16
**fewer** [2] - 2674:18, 2676:9
**fiction** [2] - 2629:17, 2629:18

field [1] - 2624:1
fifth [1] - 2638:3
Fifth [1] - 2615:18
figure [2] - 2677:17,
2688:8
financial [5] -
2625:15, 2626:23,
2626:24, 2686:3,
2693:19
fine [4] - 2619:8,
2620:18, 2622:22,
2653:17
fine-grained [1] -
2653:17
firm [3] - 2642:12,
2644:21, 2698:17
firm-wide [2] -
2642:12, 2644:21
firms [8] - 2626:20,
2630:6, 2643:19,
2643:20, 2672:19,
2674:12, 2693:23
first [20] - 2623:16,
2624:14, 2627:23,
2628:23, 2634:9,
2639:20, 2643:9,
2653:13, 2661:15,
2669:1, 2671:1,
2680:12, 2683:6,
2684:11, 2703:20,
2704:17, 2704:19,
2704:21, 2704:23,
2704:25
FISHBEIN [1] -
2616:6
fit [7] - 2632:24,
2633:13, 2634:15,
2636:14, 2668:19,
2668:21, 2682:20
fits [2] - 2663:13,
2668:22
five [2] - 2653:5,
2653:13
fixing [1] - 2626:5
flawed [1] - 2626:18
fleet [1] - 2626:19
fleets [1] - 2626:20
flexibility [1] -
2618:23
Floor [1] - 2615:23
FLORENCE [1] -
2615:11
focus [3] - 2629:5,
2634:3, 2667:19
focused [5] -
2640:14, 2648:7,
2656:7, 2679:3,
2679:7
focuses [2] - 2640:6,
2658:1

focusing [2] -
2657:23, 2681:19
follow [1] - 2670:18
followed [1] - 2636:7
following [5] -
2619:11, 2645:13,
2663:16, 2669:23,
2671:12
FOR [6] - 2615:1,
2615:15, 2615:20,
2616:2, 2616:6,
2617:4
force [4] - 2638:20,
2643:15, 2699:11,
2699:23
forced [1] - 2676:6
forces [5] - 2647:25,
2648:9, 2649:18,
2649:24, 2684:2
foregoing [1] -
2706:4
forks [1] - 2689:4
form [2] - 2671:17,
2675:20
format [6] - 2633:10,
2633:11, 2634:16,
2667:1, 2677:6,
2677:23
formats [5] - 2640:1,
2649:9, 2649:14,
2656:16, 2676:25
former [1] - 2637:21
forth [4] - 2626:25,
2650:11, 2664:5,
2668:9
forward [2] -
2682:16, 2697:22
four [2] - 2626:9,
2657:13
four-year [1] -
2657:13
fourth [3] - 2631:16,
2631:17, 2695:16
FRACKMAN [6] -
2616:2, 2703:20,
2704:5, 2704:18,
2704:24, 2705:2
framework [2] -
2648:16, 2666:12
free [1] - 2633:16
frequency [5] -
2648:21, 2664:4,
2666:25, 2682:24,
2688:21
frequently [2] -
2683:25, 2689:7
full [2] - 2690:25,
2706:5
fully [1] - 2630:12
fundamental [10] -

2630:17, 2634:21,
2638:21, 2645:8,
2648:9, 2649:18,
2649:24, 2666:23,
2684:2, 2691:7
fundamentally [1] -
2668:18
fundamentals [1] -
2647:14
future [1] - 2642:3

G

gain [1] - 2683:2
gaming [1] - 2626:12
gap [1] - 2701:2
Gary [1] - 2625:2
gathered [1] -
2685:17
general [10] -
2662:22, 2663:17,
2664:2, 2664:17,
2667:12, 2670:11,
2672:2, 2674:23,
2675:10, 2676:9
generalize [1] -
2666:21
generalized [1] -
2666:10
generally [2] -
2652:10, 2676:11
generate [7] -
2644:1, 2650:18,
2653:10, 2662:18,
2666:19, 2667:2,
2673:2
given [6] - 2641:21,
2648:7, 2660:13,
2678:6, 2687:15,
2699:18
goods [2] - 2647:24,
2685:6
government [1] -
2625:10
Government [5] -
2618:12, 2622:14,
2628:19, 2671:12,
2703:20
Government's [18] -
2628:15, 2632:3,
2632:6, 2632:14,
2660:13, 2661:5,
2661:13, 2661:21,
2662:6, 2662:14,
2664:14, 2665:11,
2670:20, 2671:10,
2671:23, 2678:23,
2679:2, 2681:20
grained [1] - 2653:17

granted [1] - 2685:2
gray [1] - 2665:25
great [4] - 2625:1,
2642:17, 2670:16,
2704:24
greatly [1] - 2645:8
grounded [2] -
2635:16, 2638:20
group [13] - 2658:2,
2686:23, 2686:25,
2687:6, 2687:7,
2687:8, 2687:13,
2688:6, 2689:8,
2689:23, 2691:9,
2691:13, 2693:21
grows [1] - 2684:17
growth [1] - 2695:19
guess [2] - 2659:25,
2664:10, 2677:24,
2699:12
guidance [1] -
2668:25
guide [1] - 2648:16
guidelines [9] -
2625:6, 2638:9,
2638:21, 2647:22,
2679:3, 2684:21,
2684:22, 2684:25
GUIDERO [1] -
2615:21
GUPPI [12] -
2635:24, 2636:1,
2636:2, 2636:5,
2636:7, 2636:17,
2637:9, 2637:14,
2649:17, 2649:23,
2667:16, 2671:18

H

Hachette [4] -
2682:23, 2683:10,
2687:9, 2688:2
half [3] - 2683:22,
2689:21, 2689:22
hand [9] - 2619:13,
2619:19, 2620:10,
2657:19, 2657:21,
2657:23, 2658:9,
2658:24, 2694:20
handful [1] - 2659:12
happy [1] - 2703:25
hard [4] - 2664:5,
2675:9, 2687:15,
2688:8
harm [29] - 2629:1,
2629:9, 2631:17,
2632:8, 2632:12,
2634:24, 2634:25,

2636:22, 2637:3,
2638:10, 2660:13,
2661:13, 2662:19,
2665:11, 2665:17,
2666:19, 2667:1,
2667:2, 2667:24,
2668:3, 2670:20,
2670:21, 2671:2,
2671:8, 2671:12,
2672:16, 2680:25,
2688:23, 2701:13
harmed [1] - 2633:17
HarperCollins [6] -
2661:25, 2679:19,
2682:14, 2682:24,
2683:10, 2688:3
head [16] - 2632:4,
2660:18, 2660:20,
2662:14, 2662:18,
2670:22, 2670:24,
2671:3
head-to-head [8] -
2632:4, 2660:18,
2660:20, 2662:14,
2662:18, 2670:22,
2670:24, 2671:3
hear [6] - 2618:17,
2618:21, 2621:20,
2648:24, 2703:22,
2703:24
heard [2] - 2641:7,
2649:10, 2654:16,
2668:7, 2675:17,
2687:11
hearing [2] -
2622:14, 2664:20
heart [1] - 2700:12
help [1] - 2647:16
helped [1] - 2621:2
helps [1] - 2620:16
hereby [1] - 2706:3
high [13] - 2624:21,
2625:15, 2625:23,
2626:10, 2646:2,
2675:22, 2675:23,
2676:1, 2676:10,
2676:23, 2682:24,
2685:2, 2693:4
high-profile [1] -
2693:4
high-tech [4] -
2624:21, 2625:15,
2625:23, 2626:10
higher [2] - 2676:6,
2684:6
highest [2] -
2698:25, 2701:9
highly [1] - 2631:19
Hill [28] - 2621:22,
2621:25, 2628:16,

2630:5, 2632:16, 2634:1, 2635:15, 2635:24, 2638:6, 2638:15, 2640:23, 2641:24, 2650:3, 2650:15, 2650:16, 2650:24, 2651:5, 2651:17, 2652:1, 2654:21, 2659:6, 2665:16, 2666:7, 2667:3, 2669:3, 2672:12, 2675:10, 2680:4

**hill** [2] - 2626:16, 2632:7

**hill's** [1] - 2632:8

**Hill's** [18] - 2632:21, 2634:9, 2635:5, 2635:25, 2649:8, 2650:20, 2653:9, 2653:18, 2655:7, 2670:1, 2674:22, 2680:9, 2680:25, 2684:12, 2687:4, 2690:4, 2691:6, 2700:6

**historical** [1] - 2629:18

**hitting** [1] - 2672:14

**hold** [2] - 2624:7, 2682:15

**Honor** [47] - 2618:2, 2618:3, 2618:22, 2619:18, 2620:2, 2620:11, 2620:16, 2620:22, 2621:14, 2622:18, 2623:3, 2623:10, 2627:1, 2627:4, 2627:10, 2627:22, 2627:25, 2628:4, 2628:7, 2633:4, 2636:21, 2638:22, 2641:7, 2650:16, 2655:6, 2656:14, 2659:20, 2664:12, 2666:12, 2667:5, 2668:10, 2669:12, 2670:14, 2678:13, 2685:11, 2687:2, 2689:5, 2692:24, 2697:14, 2697:17, 2700:14, 2701:21, 2702:16, 2702:19, 2703:9, 2703:21, 2705:2

**Honor's** [6] - 2661:2, 2669:5, 2672:1, 2673:21, 2676:14, 2698:19

**HONORABLE** [1] -

2615:11

**hope** [1] - 2695:12

**hopefully** [1] - 2620:22

**horizontal** [5] - 2647:22, 2679:2, 2684:20, 2684:24

**hotel** [1] - 2626:22

**House** [21] - 2639:1, 2655:19, 2659:18, 2660:15, 2665:12, 2665:21, 2670:5, 2670:6, 2670:22, 2671:13, 2671:24, 2676:4, 2679:17, 2680:6, 2680:15, 2681:2, 2682:2, 2699:18, 2700:1, 2701:8, 2702:13

**HOUSE** [2] - 2615:21, 2616:3

**house** [4] - 2697:20, 2701:1, 2701:3, 2701:4

**hub** [2] - 2654:14, 2656:24

**huge** [1] - 2701:2

**hybrid** [3] - 2637:16, 2642:1, 2644:20

**hybrids** [2] - 2659:8, 2697:4

---

**I**

---

**idea** [14] - 2621:7, 2630:23, 2644:20, 2661:18, 2662:20, 2663:17, 2664:2, 2674:22, 2674:23, 2678:9, 2679:9, 2687:16, 2696:2, 2701:22

**identification** [7] - 2630:22, 2631:6, 2631:9, 2646:22, 2647:1, 2680:25

**identified** [19] - 2628:21, 2630:5, 2635:19, 2641:20, 2643:4, 2649:18, 2651:2, 2651:7, 2651:9, 2653:22, 2682:8, 2684:14, 2685:21, 2691:12, 2692:1, 2694:20, 2694:22, 2694:24, 2700:17

**identifies** [3] - 2634:25, 2657:19, 2687:3

**identify** [15] - 2630:16, 2630:20, 2631:11, 2634:24, 2641:19, 2646:17, 2648:22, 2653:4, 2653:1, 2665:11, 2686:10, 2686:16, 2688:21, 2691:23, 2700:19

**identifying** [1] - 2675:6

**identity** [1] - 2638:15

**IHAN** [1] - 2615:16

**illuminate** [1] - 2690:3

**illustrative** [1] - 2623:3

**imagines** [1] - 2672:12

**impact** [1] - 2663:18

**implement** [1] - 2675:9

**implementation** [1] - 2680:20

**implemented** [1] - 2664:7

**implication** [1] - 2629:4

**importance** [2] - 2684:23, 2696:20

**important** [22] - 2631:5, 2632:13, 2633:4, 2638:9, 2640:24, 2641:5, 2641:9, 2644:16, 2645:25, 2646:9, 2647:9, 2647:15, 2649:22, 2654:20, 2660:15, 2666:11, 2667:14, 2672:11, 2677:4, 2687:23, 2688:10, 2688:16

**imprint** [25] - 2631:22, 2635:12, 2642:14, 2644:22, 2653:20, 2654:3, 2656:4, 2663:8, 2675:1, 2678:6, 2678:14, 2683:18, 2696:3, 2696:14, 2696:18, 2698:15, 2698:17, 2699:7, 2699:19, 2700:17, 2701:3, 2701:4, 2701:7, 2701:17, 2702:13

**imprints** [15] - 2640:7, 2643:20, 2656:5, 2663:10, 2664:23, 2681:25,

2696:22, 2697:25, 2698:4, 2698:8, 2698:10, 2699:2, 2700:10, 2700:19, 2701:8

**inappropriate** [1] - 2687:12

**include** [5] - 2629:19, 2635:11, 2635:12, 2652:8, 2698:25

**included** [2] - 2635:15, 2690:19

**includes** [2] - 2621:25, 2653:13

**including** [4] - 2636:9, 2669:25, 2681:9, 2683:1

**inconsistency** [1] - 2634:10

**inconsistent** [3] - 2634:4, 2634:18, 2669:1

**incorporate** [1] - 2635:19

**increase** [2] - 2639:12, 2643:21

**increases** [2] - 2639:11, 2644:25

**increasing** [1] - 2695:20

**indeed** [3] - 2630:6, 2643:15, 2698:23

**index** [3] - 2636:1, 2636:2, 2636:7

**indicate** [1] - 2695:14

**indicated** [3] - 2646:13, 2647:13, 2651:19

**indicator** [1] - 2678:15

**individual** [11] - 2645:21, 2672:7, 2677:14, 2683:1, 2687:5, 2688:4, 2689:20, 2692:3, 2692:20, 2693:20

**individualized** [4] - 2646:1, 2646:9, 2646:22, 2647:5

**individually** [1] - 2688:11

**industrial** [1] - 2624:1

**industries** [2] - 2624:21, 2625:14

**industry** [20] - 2626:5, 2629:11, 2630:19, 2632:24,

2633:9, 2633:14, 2636:14, 2639:20, 2641:5, 2642:3, 2642:12, 2642:24, 2643:3, 2643:4, 2643:18, 2644:16, 2647:13, 2647:16, 2647:18, 2674:20

**inferring** [1] - 2671:22

**influence** [3] - 2645:15, 2661:20, 2688:12

**influenced** [1] - 2634:23

**influences** [1] - 2687:23

**information** [15] - 2640:16, 2640:18, 2640:20, 2651:6, 2651:12, 2651:13, 2651:17, 2653:14, 2656:22, 2656:25, 2658:14, 2658:23, 2660:10, 2677:9, 2697:25

**informative** [1] - 2661:11

**infrequent** [1] - 2661:10

**inputs** [8] - 2633:13, 2633:20, 2633:22, 2633:24, 2634:18, 2636:15, 2666:13, 2668:25

**inputting** [1] - 2667:8

**inquire** [1] - 2673:5

**inquiry** [1] - 2670:18

**inside** [3] - 2633:6, 2633:7, 2662:19, 2666:17, 2666:18

**insight** [1] - 2645:25

**insights** [4] - 2652:19, 2653:10, 2653:17, 2653:20

**instances** [1] - 2660:1

**intend** [1] - 2682:15

**intended** [2] - 2637:21, 2637:22

**intends** [1] - 2695:14

**interactions** [2] - 2624:2, 2679:7

**interest** [4] - 2644:1, 2644:24, 2663:5, 2696:21

**interested** [4] - 2629:17, 2639:7, 2656:2, 2658:5

**interesting** [2] - 2642:24, 2675:7
**interpreted** [1] - 2668:6
**interrupt** [1] - 2657:10
**intuition** [2] - 2675:9, 2675:10
**investments** [1] - 2626:25
**invited** [1] - 2702:24
**involve** [1] - 2658:17
**involved** [7] - 2625:20, 2626:18, 2626:19, 2651:16, 2660:16, 2663:12, 2700:23
**involves** [1] - 2681:10
**involving** [5] - 2625:22, 2625:23, 2626:4, 2626:12, 2626:25
**IO** [2] - 2624:1, 2624:25
**isolates** [1] - 2674:7
**issue** [11] - 2618:6, 2618:17, 2634:3, 2644:19, 2647:1, 2647:3, 2647:24, 2648:10, 2674:7, 2678:2, 2703:19
**issues** [8] - 2624:3, 2625:3, 2625:20, 2626:2, 2626:4, 2629:5, 2633:12, 2654:7
**items** [1] - 2621:5
**itself** [3] - 2644:13, 2674:25, 2679:23

**J**

**Jennifer** [1] - 2646:16
**JESSICA** [1] - 2615:17
**JOHN** [1] - 2615:15
**jointly** [1] - 2650:3
**journal** [1] - 2625:8
**joy** [1] - 2625:1
**JUDGE** [1] - 2615:12
**Justice** [1] - 2625:12
**JUSTICE** [1] - 2615:17

**K**

**keep** [6] - 2652:20,

2663:10, 2674:16, 2675:20, 2676:18, 2698:10
**keeping** [2] - 2618:4, 2618:8
**key** [1] - 2693:6
**kGAA** [1] - 2615:6
**kick** [2] - 2698:13, 2700:7
**KIM** [1] - 2615:16
**kind** [7] - 2623:6, 2629:16, 2645:21, 2663:9, 2666:14, 2675:17, 2693:22
**knowing** [3] - 2663:1, 2663:4
**known** [8] - 2638:15, 2642:9, 2645:16, 2645:17, 2658:18, 2686:20, 2692:8, 2692:22
**knows** [1] - 2703:2

**L**

**lack** [3] - 2634:15, 2636:14, 2678:15
**landscape** [1] - 2685:8
**large** [11] - 2631:21, 2631:24, 2635:2, 2638:24, 2675:3, 2682:3, 2685:8, 2685:17, 2686:11, 2692:22, 2693:19
**last** [7] - 2621:1, 2626:9, 2642:15, 2644:10, 2678:13, 2699:2, 2704:11
**late** [2] - 2700:8, 2700:9
**laureate** [1] - 2625:2
**lead** [2] - 2637:22, 2657:16
**leading** [2] - 2659:1, 2701:10
**LEAL** [1] - 2615:17
**learn** [4] - 2642:7, 2642:22, 2675:15, 2677:17
**learned** [1] - 2698:2
**learning** [1] - 2658:5
**least** [11] - 2647:9, 2649:3, 2653:15, 2664:20, 2682:24, 2683:9, 2684:15, 2685:24, 2686:2, 2686:14, 2695:12
**leave** [1] - 2672:4

**leaves** [1] - 2658:15
**led** [1] - 2653:23
**left** [9] - 2650:14, 2657:1, 2657:19, 2658:9, 2661:7, 2668:18, 2669:9, 2686:15, 2694:20
**left-hand** [3] - 2657:19, 2658:9, 2694:20
**legally** [1] - 2664:24
**length** [1] - 2703:25
**less** [14] - 2634:25, 2659:3, 2659:12, 2673:11, 2673:12, 2673:18, 2674:6, 2675:11, 2675:24, 2675:25, 2676:23, 2678:14, 2688:2
**lessening** [5] - 2628:20, 2663:18, 2672:17, 2674:8, 2678:6
**level** [9] - 2629:21, 2635:3, 2635:16, 2642:14, 2644:22, 2645:18, 2676:9, 2686:3, 2686:7
**levels** [5] - 2646:10, 2673:11, 2674:17, 2684:6, 2688:4
**leverage** [2] - 2631:8, 2647:12
**leveraged** [1] - 2624:25
**Lexington** [1] - 2616:7
**light** [1] - 2657:15
**likelihood** [1] - 2644:25
**likely** [3] - 2628:13, 2643:17, 2645:23
**limitation** [1] - 2699:7
**limitations** [3] - 2652:17, 2652:18, 2652:21
**line** [2] - 2664:22, 2670:18
**lined** [1] - 2625:9
**Lisa** [1] - 2706:12
**LISA** [2] - 2616:11, 2706:3
**list** [5] - 2686:9, 2692:7, 2692:13, 2692:21, 2692:22
**listening** [1] - 2680:19
**literally** [1] - 2622:6
**litigation** [2] -

2625:21, 2625:22
**LLP** [4] - 2615:22, 2616:3, 2616:6, 2616:9
**look** [21] - 2622:10, 2639:4, 2639:13, 2652:5, 2654:9, 2654:12, 2655:6, 2655:11, 2657:2, 2658:12, 2664:3, 2668:11, 2668:12, 2676:7, 2684:7, 2688:11, 2688:13, 2689:7, 2692:7, 2692:14, 2692:21
**looked** [6] - 2647:18, 2649:2, 2668:8, 2669:25, 2677:9, 2690:11
**looking** [5] - 2653:24, 2654:10, 2670:10, 2687:12, 2700:16
**Los** [1] - 2615:24
**lose** [6] - 2670:7, 2674:2, 2677:22, 2679:12, 2690:22, 2691:1
**loss** [9] - 2632:4, 2633:17, 2651:3, 2651:5, 2654:10, 2662:14, 2662:18, 2670:3, 2672:25
**lost** [2] - 2670:4, 2670:6, 2679:14
**lower** [15] - 2635:21, 2665:6, 2673:10, 2673:11, 2673:20, 2674:5, 2674:17, 2675:19, 2676:2, 2676:7, 2676:9, 2676:12, 2676:22, 2684:1, 2702:10
**lower-tier** [1] - 2665:6
**lowered** [1] - 2673:19
**lowering** [2] - 2673:15, 2679:10
**lowest** [2] - 2673:16, 2675:21
**lumped** [1] - 2687:17
**lunch** [2] - 2633:16, 2704:12

**M**

**machinations** [1] - 2666:18

**Macmillan** [5] - 2682:19, 2682:23, 2683:11, 2687:9, 2688:1
**magnitude** [1] - 2659:11
**main** [1] - 2629:10
**Maine** [1] - 2623:22
**major** [2] - 2625:2, 2682:9
**majority** [1] - 2682:1
**managed** [1] - 2658:4
**management** [1] - 2624:6
**Management** [1] - 2624:16
**manner** [1] - 2667:19
**margins** [9] - 2633:3, 2633:25, 2634:3, 2634:4, 2634:6, 2635:13, 2635:14, 2635:18, 2667:11
**market** [63] - 2629:10, 2629:14, 2629:24, 2630:2, 2630:3, 2630:11, 2630:18, 2631:13, 2631:19, 2632:9, 2633:3, 2633:17, 2633:24, 2633:25, 2634:1, 2635:7, 2637:12, 2637:13, 2637:25, 2643:14, 2644:13, 2645:24, 2647:18, 2648:6, 2650:18, 2651:10, 2655:8, 2655:9, 2655:12, 2666:13, 2667:9, 2668:13, 2668:14, 2669:15, 2672:20, 2677:18, 2677:19, 2681:7, 2681:10, 2681:15, 2681:22, 2683:3, 2683:13, 2683:22, 2683:25, 2685:2, 2685:3, 2685:4, 2691:6, 2693:9, 2693:12, 2693:16, 2693:17, 2693:23, 2693:24, 2694:1, 2694:2, 2695:4, 2696:3, 2696:5
**markets** [2] - 2673:24, 2684:2
**mask** [1] - 2619:16
**master's** [1] - 2623:23
**match** [6] - 2643:14,

2643:16, 2643:21, 2644:2, 2645:1, 2696:23

**matching** [8] - 2643:10, 2643:22, 2644:3, 2644:9, 2644:12, 2644:16, 2644:19, 2696:21

**material** [2] - 2622:7, 2659:1

**materials** [3] - 2618:13, 2621:16

**math** [2] - 2621:18, 2655:13

**matter** [5] - 2619:22, 2629:5, 2630:12, 2662:16, 2679:18

**matters** [1] - 2625:16

**max** [1] - 2637:8

**maximum** [4] - 2637:6, 2645:15, 2652:3, 2678:14

**mean** [15] - 2629:15, 2636:19, 2642:9, 2652:20, 2656:11, 2656:12, 2657:11, 2659:4, 2664:23, 2666:7, 2671:15, 2672:6, 2676:24, 2685:2, 2699:6

**meaning** [2] - 2631:3, 2672:17

**means** [4] - 2632:11, 2661:16, 2671:3, 2672:6

**measured** [1] - 2681:16

**measures** [2] - 2655:8, 2680:10

**measuring** [1] - 2680:5

**mechanism** [1] - 2638:10

**medical** [3] - 2625:15, 2626:12, 2626:18

**meet** [1] - 2620:13

**meet-and-confer** [1] - 2620:13

**meetings** [2] - 2651:22

**MELVIN** [1] - 2615:16

**members** [2] - 2651:22, 2687:5

**mention** [1] - 2700:18

**mentioned** [10] - 2632:21, 2633:24, 2637:20, 2654:9,

2665:20, 2682:6, 2684:5, 2692:19, 2697:10, 2699:17

**mentioning** [1] - 2695:10

**merged** [1] - 2679:15

**merger** [28] - 2621:20, 2622:2, 2622:4, 2625:6, 2626:14, 2628:14, 2628:20, 2629:3, 2629:12, 2636:9, 2636:23, 2638:25, 2639:4, 2647:22, 2662:2, 2664:23, 2679:2, 2679:5, 2679:9, 2679:13, 2679:17, 2681:23, 2682:16, 2682:23, 2683:23, 2684:21, 2684:24, 2693:11

**mergers** [1] - 2626:15

**merging** [9] - 2648:24, 2651:6, 2654:24, 2670:2, 2679:4, 2679:8, 2679:25, 2690:12, 2691:9

**met** [2] - 2632:20, 2672:16

**metric** [1] - 2654:23

**Michigan** [1] - 2624:24

**Michigan's** [1] - 2624:11

**microeconomics** [1] - 2624:23

**mid** [8] - 2665:5, 2684:5, 2688:14, 2688:20, 2688:25, 2689:17, 2690:5, 2691:2

**mid-sized** [8] - 2665:5, 2684:5, 2688:14, 2688:20, 2688:25, 2689:17, 2690:5, 2691:2

**middle** [4] - 2631:22, 2640:8, 2649:1, 2694:21

**midway** [1] - 2650:20

**might** [5] - 2655:12, 2660:23, 2676:22, 2688:8, 2700:4

**Miller** [2] - 2634:8, 2669:3

**million** [12] - 2635:1, 2635:11, 2635:21, 2646:20, 2668:25,

2685:22, 2685:24, 2686:14, 2686:18, 2686:20, 2686:22, 2701:8

**million-plus** [1] - 2646:20

**mind** [9] - 2625:21, 2647:6, 2652:20, 2676:16, 2678:24, 2681:12, 2686:16, 2694:17, 2699:21

**mindful** [2] - 2618:24, 2634:12

**mine** [2] - 2635:15, 2700:12

**minute** [1] - 2633:21

**minutes** [5] - 2651:15, 2651:16, 2651:18, 2654:10, 2669:21

**missing** [2] - 2659:19, 2699:6

**mistake** [1] - 2672:18

**mistakes** [1] - 2672:24

**misunderstood** [1] - 2660:23

**mix** [12] - 2641:9, 2641:10, 2645:25, 2646:10, 2656:2, 2656:10, 2658:9, 2658:16, 2663:10, 2665:7, 2668:8, 2695:13

**model** [54] - 2632:21, 2632:22, 2632:23, 2633:2, 2633:4, 2633:6, 2633:7, 2633:8, 2633:10, 2633:23, 2633:25, 2634:6, 2634:7, 2634:13, 2634:14, 2634:18, 2634:20, 2634:23, 2635:5, 2635:10, 2636:3, 2636:12, 2636:17, 2636:21, 2637:4, 2637:14, 2637:19, 2649:5, 2649:11, 2649:13, 2649:17, 2649:23, 2662:5, 2662:10, 2662:19, 2664:16, 2666:8, 2666:11, 2666:13, 2666:16, 2666:17, 2666:18, 2666:21, 2667:1, 2667:7, 2668:15, 2668:17, 2669:4, 2669:7,

2671:16, 2672:4, 2680:2

**modeling** [6] - 2636:8, 2649:9, 2667:22, 2680:13, 2680:17, 2680:24

**models** [4] - 2632:16, 2662:24, 2665:11, 2665:16

**moment** [2] - 2663:1, 2696:4

**monitor** [1] - 2638:10

**monopson** [1] - 2625:20

**monopsony** [5] - 2633:16, 2648:10, 2648:12, 2648:15, 2696:12

**morning** [2] - 2619:18, 2704:23

**mosaic** [1] - 2668:4

**most** [8] - 2624:2, 2624:16, 2629:17, 2642:24, 2649:22, 2672:11, 2675:14, 2697:1

**motivated** [1] - 2678:11

**move** [4] - 2627:2, 2669:14, 2694:3, 2695:2

**moving** [2] - 2664:13, 2664:15

**MR** [129] - 2618:2, 2618:3, 2618:10, 2618:18, 2618:21, 2619:1, 2619:3, 2619:5, 2619:6, 2619:9, 2619:18, 2619:21, 2620:1, 2620:7, 2620:9, 2620:11, 2620:14, 2620:15, 2620:18, 2620:19, 2620:22, 2620:25, 2621:14, 2622:18, 2622:24, 2623:1, 2623:8, 2623:10, 2623:12, 2623:17, 2623:18, 2627:1, 2627:4, 2627:6, 2627:10, 2627:15, 2627:17, 2627:20, 2627:22, 2627:25, 2628:4, 2628:7, 2628:10, 2638:1, 2638:22, 2638:24, 2641:2, 2641:3, 2641:17, 2641:18, 2642:5,

2642:6, 2643:5, 2643:11, 2644:5, 2644:17, 2645:2, 2645:3, 2646:11, 2646:12, 2647:19, 2647:20, 2650:4, 2650:6, 2652:23, 2653:1, 2655:16, 2656:21, 2657:5, 2657:6, 2659:16, 2660:12, 2661:1, 2665:8, 2669:13, 2669:19, 2670:13, 2670:16, 2670:17, 2673:6, 2678:21, 2682:11, 2682:12, 2682:17, 2682:18, 2683:4, 2683:5, 2684:7, 2684:9, 2685:11, 2685:14, 2685:15, 2687:2, 2687:10, 2689:11, 2689:12, 2690:21, 2691:17, 2691:18, 2693:1, 2694:5, 2694:6, 2695:6, 2695:8, 2696:16, 2696:17, 2697:13, 2698:6, 2699:15, 2699:16, 2700:13, 2700:15, 2701:10, 2701:12, 2701:21, 2701:24, 2702:16, 2702:19, 2702:22, 2703:9, 2703:20, 2703:21, 2703:24, 2704:5, 2704:6, 2704:10, 2704:18, 2704:24, 2705:2

**multi** [6] - 2653:16, 2654:3, 2656:13, 2658:18, 2666:4, 2689:23

**multi-bid** [1] - 2658:18

**multi-bidder** [4] - 2653:16, 2656:13, 2666:4, 2689:23

**multidimensional** [1] - 2649:16

**Murray** [1] - 2682:15

**must** [1] - 2645:4

**MYERS** [2] - 2615:22, 2616:3

## N

**name** [5] - 2623:16, 2623:19, 2623:20, 2692:19, 2700:18

2718

**names** [3] - 2686:10, 2695:10, 2700:18

**narrowly** [1] - 2701:16

**Nathan** [3] - 2634:8, 2669:2, 2669:3

**natural** [2] - 2621:21, 2639:3

**nature** [1] - 2678:18

**near** [1] - 2700:12

**nearly** [2] - 2650:24, 2683:22

**necessarily** [1] - 2645:10

**necessary** [3] - 2632:8, 2632:19, 2680:21

**need** [7] - 2618:14, 2623:15, 2638:16, 2641:22, 2664:9, 2668:15, 2703:24

**needs** [1] - 2669:8

**negotiation** [9] - 2662:25, 2663:3, 2663:21, 2663:23, 2663:25, 2675:21, 2676:22, 2677:25, 2678:4

**negotiations** [5] - 2649:12, 2666:6, 2666:9, 2678:19, 2697:3

**NetFlix** [1] - 2693:25

**never** [2] - 2621:8, 2699:22

**New** [4] - 2616:4, 2616:7

**new** [4] - 2622:12, 2624:20, 2694:11, 2694:21

**next** [7] - 2618:13, 2636:24, 2639:17, 2685:11, 2687:1, 2698:25, 2701:9

**next-highest** [1] - 2698:25

**next-second-best** [1] - 2636:24

**Nicholas** [1] - 2628:16

**night** [1] - 2621:1

**Nihar** [1] - 2618:10

**nine** [1] - 2625:2

**Ninth** [1] - 2616:9

**Nobel** [3] - 2625:2, 2644:7, 2644:11

**non** [13] - 2686:4, 2687:6, 2687:7, 2687:13, 2687:25, 2688:8, 2689:8,

2689:23, 2691:13, 2692:13, 2693:3, 2693:21, 2695:13

**non-Big** [13] - 2686:4, 2687:6, 2687:7, 2687:13, 2687:25, 2688:8, 2689:8, 2689:23, 2691:13, 2692:13, 2693:3, 2693:21, 2695:13

**nonfiction** [1] - 2629:17

**nonquantitative** [1] - 2667:16

**Northwest** [4] - 2615:18, 2616:9, 2616:13, 2706:14

**Norton** [2] - 2661:25, 2693:8

**note** [3] - 2657:15, 2697:8, 2698:20

**notebooks** [1] - 2619:19

**noted** [1] - 2618:11

**notes** [5] - 2669:25, 2670:1, 2670:3, 2670:12, 2706:5

**nothing** [3] - 2622:12, 2662:1, 2702:24

**notification** [1] - 2699:18

**notify** [2] - 2697:21, 2699:25

**number** [54] - 2622:9, 2622:11, 2627:24, 2631:22, 2631:24, 2635:2, 2635:8, 2635:22, 2639:6, 2649:3, 2650:14, 2651:1, 2651:20, 2657:20, 2657:21, 2658:8, 2658:22, 2661:7, 2663:6, 2663:11, 2664:9, 2667:14, 2668:1, 2670:2, 2670:9, 2671:25, 2675:4, 2675:23, 2682:3, 2684:14, 2684:17, 2685:21, 2686:6, 2686:17, 2687:4, 2689:5, 2689:6, 2691:25, 2692:22, 2695:20, 2697:23, 2697:25, 2698:1, 2700:5, 2701:2, 2701:3, 2701:16

**numbered** [1] - 2620:23

**numbers** [2] - 2655:13, 2664:3, 2684:23, 2686:15, 2687:19

**numerous** [2] - 2665:5, 2685:5

## O

**O'MELVENY** [2] - 2615:22, 2616:3

**objection** [7] - 2620:12, 2627:3, 2627:4, 2634:2, 2701:10, 2701:23, 2702:18

**objections** [2] - 2620:2, 2620:3

**observable** [2] - 2638:12, 2645:17

**observation** [10] - 2628:25, 2632:13, 2635:1, 2647:21, 2654:16, 2659:21, 2682:13, 2687:11, 2694:3, 2696:13

**observations** [18] - 2649:8, 2650:24, 2651:1, 2651:9, 2651:20, 2651:21, 2651:23, 2652:5, 2657:14, 2657:15, 2657:16, 2657:20, 2658:13, 2659:17, 2661:8, 2690:9, 2690:18, 2696:18

**observe** [1] - 2636:4

**observed** [3] - 2646:13, 2656:3, 2659:11

**obvious** [1] - 2702:8

**occasions** [2] - 2626:17, 2655:17

**odd** [1] - 2636:11

**OF** [4] - 2615:1, 2615:3, 2615:11, 2615:17

**offer** [3] - 2663:2, 2663:5, 2676:18

**offered** [3] - 2628:15, 2632:16, 2666:9

**offers** [2] - 2634:21, 2672:9

**Official** [1] - 2616:12

**official** [1] - 2706:12

**often** [9] - 2660:3, 2667:9, 2668:8,

2670:4, 2670:6, 2686:23, 2688:13, 2688:20, 2699:25

**oftentimes** [1] - 2643:7

**once** [3] - 2633:3, 2644:6, 2700:2

**one** [89] - 2619:24, 2620:8, 2620:10, 2622:6, 2623:1, 2625:21, 2625:22, 2625:23, 2626:11, 2626:12, 2626:17, 2626:18, 2627:18, 2634:10, 2634:11, 2635:8, 2636:5, 2636:10, 2636:25, 2637:2, 2637:5, 2638:11, 2639:6, 2643:1, 2643:9, 2645:15, 2649:12, 2649:16, 2649:22, 2650:14, 2652:2, 2652:21, 2654:20, 2656:15, 2657:10, 2658:8, 2660:4, 2660:6, 2662:1, 2662:25, 2663:3, 2663:6, 2663:11, 2663:21, 2664:9, 2665:4, 2665:13, 2665:21, 2666:2, 2667:10, 2668:12, 2670:2, 2670:9, 2671:6, 2671:14, 2671:20, 2671:21, 2671:25, 2676:21, 2677:1, 2677:7, 2678:13, 2678:19, 2679:21, 2679:22, 2683:9, 2683:14, 2691:7, 2691:15, 2693:24, 2695:13, 2695:16, 2697:3, 2697:25, 2698:21, 2700:11, 2700:23, 2701:2, 2701:7, 2702:11

**one-book-at-a-time** [1] - 2649:16

**one-off** [1] - 2638:11

**one-on-one** [7] - 2649:12, 2662:25, 2663:3, 2663:21, 2676:21, 2678:19, 2697:3

**one-round** [3] - 2636:25, 2637:2, 2637:5

**one-to-one** [1] -

2643:1

**ones** [5] - 2631:8, 2647:7, 2647:11, 2650:18, 2657:1

**operate** [1] - 2630:7

**operating** [3] - 2640:10, 2694:23, 2694:25

**operations** [1] - 2640:12

**opinion** [10] - 2628:24, 2629:1, 2629:9, 2631:16, 2634:23, 2635:25, 2666:21, 2668:17, 2669:8, 2678:16

**opinions** [2] - 2628:15, 2628:22

**OPPENHEIMER** [103] - 2615:21, 2618:2, 2619:5, 2619:18, 2619:21, 2620:1, 2620:11, 2620:15, 2620:19, 2621:14, 2622:18, 2622:24, 2623:1, 2623:8, 2623:10, 2623:12, 2623:17, 2623:18, 2627:1, 2627:6, 2627:10, 2627:15, 2627:17, 2627:20, 2627:22, 2627:25, 2628:4, 2628:7, 2628:10, 2638:1, 2638:22, 2638:24, 2641:2, 2641:3, 2641:17, 2641:18, 2642:2, 2642:6, 2643:5, 2643:11, 2644:5, 2644:17, 2645:2, 2645:3, 2646:11, 2646:12, 2647:19, 2647:20, 2650:4, 2650:6, 2652:23, 2653:1, 2655:16, 2656:21, 2657:5, 2657:6, 2659:16, 2660:12, 2661:1, 2665:8, 2669:13, 2669:19, 2670:13, 2670:16, 2670:17, 2673:6, 2678:21, 2682:11, 2682:12, 2682:17, 2682:18, 2683:4, 2683:5, 2684:7, 2684:9, 2685:11, 2685:14, 2685:15, 2687:2, 2687:10, 2689:11,

2689:12, 2690:21, 2691:17, 2691:18, 2693:1, 2694:5, 2694:6, 2695:6, 2695:8, 2696:16, 2696:17, 2697:13, 2698:6, 2699:15, 2699:16, 2700:13, 2700:15, 2701:12, 2701:24, 2702:19, 2702:22, 2703:9
**Oppenheimer** [2] - 2639:2, 2671:15
**Oppenheimer's** [1] - 2660:24
**opportunity** [1] - 2674:23
**opposed** [1] - 2659:6
**option** [6] - 2678:3, 2692:4, 2692:15, 2692:21, 2693:10
**options** [1] - 2684:23
**orange** [3] - 2658:12, 2659:21, 2665:24
**orange-pink** [1] - 2659:21
**orchestrating** [1] - 2656:18
**order** [1] - 2673:16
**organization** [2] - 2624:1, 2644:20
**organize** [1] - 2644:18
**organized** [2] - 2643:19, 2650:15
**organizes** [1] - 2645:13
**original** [1] - 2636:12
**otherwise** [2] - 2620:4, 2704:4
**outcomes** [2] - 2675:15, 2678:16
**outlets** [1] - 2685:6
**output** [4] - 2634:13, 2639:7, 2639:10
**outset** [3] - 2634:4, 2636:6, 2637:7
**outside** [13] - 2663:17, 2663:18, 2664:18, 2665:16, 2678:2, 2678:3, 2680:10, 2680:14, 2683:19, 2691:9, 2692:8, 2699:8, 2702:14
**overall** [4] - 2628:18, 2634:14, 2667:17, 2690:25
**overestimate** [1] - 2667:2

**overlapped** [1] - 2690:8
**overrepresentation** [2] - 2654:24, 2655:2
**overrepresenting** [1] - 2654:22
**overstate** [1] - 2655:18
**overview** [2] - 2655:24, 2689:5

**P**

**P&L** [1] - 2645:18
**P&Ls** [1] - 2635:16
**p.m** [1] - 2615:7
**paid** [4] - 2646:24, 2666:12, 2695:18, 2701:5
**paint** [1] - 2667:17
**Pam** [7] - 2627:16, 2641:2, 2642:5, 2644:5, 2647:19, 2650:4, 2694:5
**PAN** [1] - 2615:11
**paper** [1] - 2625:8
**pardon** [1] - 2627:20
**part** [11] - 2621:19, 2627:23, 2631:5, 2638:5, 2645:5, 2664:21, 2666:15, 2680:12, 2686:11, 2691:22, 2694:10
**participants** [1] - 2643:4
**participate** [3] - 2686:7, 2689:8
**participating** [1] - 2689:24
**participation** [1] - 2688:4
**particular** [7] - 2626:18, 2650:10, 2691:9, 2695:17, 2699:23, 2700:25, 2703:1
**particularly** [1] - 2645:9
**parties** [26] - 2632:10, 2633:16, 2635:17, 2637:13, 2648:25, 2651:6, 2651:13, 2651:17, 2654:12, 2654:15, 2654:24, 2661:9, 2661:14, 2662:16, 2666:2, 2666:14, 2668:15, 2670:2, 2671:6, 2679:5,

2679:8, 2679:22, 2679:25, 2690:12, 2691:10, 2703:18
**parts** [1] - 2665:10
**party** [7] - 2659:22, 2663:9, 2665:24, 2679:15, 2698:8, 2702:9
**pause** [1] - 2633:20
**pay** [5] - 2644:7, 2647:11, 2673:16, 2674:5, 2678:15
**paying** [2] - 2675:25, 2701:8
**Penguin** [21] - 2639:1, 2655:19, 2659:18, 2660:15, 2665:12, 2665:21, 2670:4, 2670:6, 2670:21, 2671:13, 2671:24, 2676:3, 2679:17, 2680:6, 2680:15, 2681:2, 2682:2, 2699:18, 2700:1, 2701:8, 2702:13
**PENGUIN** [2] - 2615:21, 2616:3
**people** [8] - 2618:8, 2629:17, 2663:12, 2673:12, 2674:18, 2676:10, 2692:13, 2692:22
**per** [1] - 2689:15
**per-title** [1] - 2689:15
**percent** [23] - 2632:11, 2632:20, 2654:25, 2655:5, 2655:9, 2655:12, 2659:3, 2665:3, 2665:20, 2666:1, 2668:13, 2670:5, 2670:7, 2672:14, 2683:11, 2689:2, 2689:6, 2689:18, 2689:25, 2690:6, 2690:15, 2693:22
**percentage** [2] - 2679:19, 2689:16
**perhaps** [3] - 2620:4, 2620:15, 2670:13
**period** [9] - 2622:1, 2624:14, 2651:7, 2651:18, 2657:13, 2684:16, 2685:23, 2689:16, 2691:12
**permitted** [1] - 2621:11
**person** [1] - 2669:2
**perspective** [1] -

2643:3
**persuasive** [1] - 2636:17
**pertains** [1] - 2621:20
**Petrocelli** [1] - 2618:9
**PETROCELLI** [8] - 2615:20, 2618:10, 2618:18, 2618:21, 2619:1, 2619:3, 2619:6, 2619:9
**Ph.D** [2] - 2617:5, 2619:14, 2623:23
**pharmaceuticals** [1] - 2625:15
**phase** [1] - 2626:16
**pick** [1] - 2641:23
**picture** [2] - 2660:2, 2667:17
**pieces** [1] - 2695:13
**pink** [2] - 2659:21, 2665:24
**pink-orange** [1] - 2665:24
**Plaintiff** [1] - 2615:4
**PLAINTIFF** [1] - 2615:15
**plaintiffs** [3] - 2626:6, 2626:9, 2626:10
**plans** [2] - 2683:2, 2696:9
**play** [4] - 2633:7, 2639:1, 2643:22, 2671:11
**players** [1] - 2641:11
**plus** [2] - 2646:20, 2653:6
**point** [30] - 2622:16, 2623:1, 2632:1, 2637:19, 2638:14, 2641:8, 2642:14, 2642:16, 2649:2, 2653:25, 2654:11, 2654:13, 2658:6, 2658:16, 2661:2, 2661:7, 2668:11, 2672:13, 2673:17, 2675:3, 2676:3, 2678:13, 2682:21, 2682:22, 2683:15, 2689:19, 2692:9, 2693:6, 2693:24
**points** [5] - 2622:23, 2649:22, 2651:14, 2670:11, 2687:22
**policy** [2] - 2623:23, 2625:3

**portion** [4] - 2627:11, 2681:9, 2684:24, 2704:7
**pose** [1] - 2643:4
**position** [2] - 2618:5, 2618:7
**possible** [4] - 2630:15, 2666:21, 2671:5, 2692:19
**possibly** [1] - 2702:17
**post** [8] - 2631:12, 2664:23, 2679:5, 2679:9, 2679:13, 2682:16, 2682:23, 2693:11
**post-merger** [7] - 2664:23, 2679:5, 2679:9, 2679:13, 2682:16, 2682:23, 2693:11
**potential** [11] - 2643:16, 2643:25, 2644:2, 2645:20, 2648:15, 2663:24, 2685:3, 2689:18, 2694:11, 2695:2, 2696:11
**potentially** [1] - 2676:25
**power** [8] - 2633:16, 2648:12, 2648:15, 2685:3, 2685:4, 2694:2, 2696:5, 2696:12
**practice** [2] - 2632:18, 2697:21
**precise** [1] - 2667:19
**preclude** [1] - 2622:22
**prediction** [1] - 2632:9
**preempts** [1] - 2697:3
**preface** [1] - 2650:9
**prefer** [1] - 2704:19
**preliminary** [1] - 2619:22
**premised** [2] - 2671:19, 2671:20
**prepared** [3] - 2618:16, 2618:17, 2627:7
**presence** [1] - 2703:3
**present** [3] - 2656:13, 2674:24, 2682:1
**presentation** [3] - 2627:7, 2704:2,

2720

2704:4
**presented** [3] -
2640:19, 2687:20,
2704:12
**presumes** [1] -
2633:10
**pretty** [3] - 2624:19,
2655:8, 2675:22
**prevalence** [1] -
2687:15
**previously** [1] -
2625:17
**PRH** [22] - 2631:20,
2632:2, 2651:6,
2654:12, 2654:22,
2659:21, 2660:1,
2661:3, 2664:23,
2665:3, 2672:13,
2679:18, 2682:22,
2683:9, 2683:15,
2697:20, 2697:21,
2697:25, 2698:4,
2698:8, 2698:10,
2699:1
**price** [9] - 2626:5,
2631:18, 2636:24,
2644:12, 2673:16,
2675:22, 2678:18,
2683:23, 2688:14
**price-fixing** [1] -
2626:5
**prices** [2] - 2673:13,
2677:19
**pricing** [3] - 2624:3,
2635:6, 2672:24
**primarily** [1] -
2655:21
**primary** [1] - 2650:12
**private** [1] - 2646:22
**prize** [1] - 2644:7
**Prize** [1] - 2644:11
**problem** [4] -
2630:17, 2645:8,
2666:17, 2672:22
**problems** [3] -
2636:13, 2636:14,
2660:6
**proceed** [2] - 2623:9,
2627:13
**proceedings** [3] -
2619:11, 2669:23,
2706:6
**Proceedings** [1] -
2705:4
**process** [15] -
2638:19, 2641:23,
2653:15, 2653:16,
2654:3, 2666:20,
2672:6, 2673:2,
2676:3, 2676:4,

2676:5, 2676:16,
2700:8, 2700:9,
2700:24
**processes** [10] -
2638:11, 2638:17,
2641:10, 2648:20,
2650:11, 2656:18,
2658:20, 2675:1,
2689:8, 2697:1
**produced** [3] -
2621:16, 2666:5,
2706:6
**products** [2] -
2645:6, 2645:12
**profession** [1] -
2624:4
**professional** [1] -
2625:11
**professor** [1] -
2624:5
**Professor** [27] -
2618:11, 2618:14,
2619:4, 2619:6,
2623:13, 2627:2,
2627:7, 2628:11,
2632:13, 2639:15,
2646:21, 2650:7,
2650:15, 2657:10,
2660:13, 2665:9,
2670:18, 2678:22,
2681:7, 2691:15,
2694:18, 2695:9,
2698:22, 2700:16,
2701:14, 2701:25,
2702:23
**profile** [3] - 2643:25,
2646:2, 2693:4
**profiles** [3] -
2641:12, 2642:19,
2645:7
**programs** [1] -
2626:25
**progress** [1] -
2676:18
**proposed** [9] -
2628:14, 2630:1,
2630:18, 2635:6,
2651:2, 2651:10,
2657:24, 2687:24,
2691:6
**proposition** [2] -
2621:21, 2679:23
**prospective** [1] -
2642:20
**proven** [1] - 2628:19
**provide** [4] -
2620:15, 2643:25,
2653:14, 2660:9
**provided** [1] - 2693:3
**providing** [1] -

2647:24
**proxy** [1] - 2623:6
**public** [3] - 2623:23,
2685:12, 2686:11
**publish** [3] -
2627:13, 2691:13,
2692:13
**published** [2] -
2625:5, 2692:2
**publisher** [10] -
2633:5, 2636:22,
2637:3, 2640:7,
2644:24, 2656:5,
2679:10, 2686:20,
2695:14, 2695:17
**publishers** [61] -
2630:15, 2630:20,
2631:22, 2631:24,
2640:2, 2640:3,
2640:8, 2640:9,
2640:10, 2642:7,
2642:12, 2642:16,
2642:17, 2642:19,
2642:25, 2644:18,
2648:14, 2648:24,
2649:1, 2656:23,
2665:6, 2672:8,
2675:4, 2675:17,
2678:8, 2682:3,
2682:9, 2683:1,
2684:6, 2684:14,
2685:7, 2685:21,
2686:6, 2686:11,
2686:13, 2686:23,
2687:6, 2687:7,
2687:13, 2687:18,
2687:25, 2688:5,
2688:14, 2688:20,
2688:25, 2689:17,
2690:5, 2690:25,
2691:1, 2691:5,
2691:14, 2693:3,
2693:7, 2694:7,
2694:22, 2694:25,
2695:12, 2696:21,
2696:22, 2702:13,
2702:14
**publishers'** [1] -
2685:17
**publishing** [5] -
2640:14, 2641:5,
2701:1, 2701:3,
2701:4
**pure** [3] - 2658:21,
2659:8, 2701:21
**purports** [1] -
2634:24
**purposes** [6] -
2623:2, 2623:5,
2655:23, 2679:16,

2681:19, 2683:12
**pushing** [1] -
2701:14
**put** [12] - 2627:16,
2641:17, 2645:18,
2648:8, 2662:7,
2667:25, 2680:24,
2684:24, 2689:22,
2696:3, 2699:10,
2699:22
**putting** [2] - 2633:12,
2696:14

## Q

**qualified** [2] -
2625:18, 2627:5
**qualify** [1] - 2627:2
**quantity** [1] -
2677:20
**questions** [3] -
2654:11, 2681:5,
2691:7
**quick** [1] - 2658:19
**quickly** [1] - 2696:20
**quite** [2] - 2624:22,
2633:1
**quote** [3] - 2695:16,
2695:18, 2698:23
**quoting** [1] - 2695:17

## R

**raise** [3] - 2619:13,
2619:22, 2620:1
**raises** [2] - 2631:2,
2632:15
**raising** [1] - 2676:18
**RANDALL** [1] -
2615:21
**RANDOM** [2] -
2615:21, 2616:3
**Random** [21] -
2639:1, 2655:19,
2659:18, 2660:15,
2665:12, 2665:21,
2670:4, 2670:6,
2670:21, 2671:13,
2671:24, 2676:3,
2679:17, 2680:6,
2680:15, 2681:2,
2682:2, 2699:18,
2700:1, 2701:8,
2702:13
**range** [4] - 2652:22,
2655:9, 2688:1,
2691:5
**ranging** [1] - 2625:14
**rare** [3] - 2659:3,

2677:5, 2697:8
**rarely** [5] - 2632:2,
2633:12, 2634:16,
2666:20, 2699:10
**rate** [2] - 2676:7,
2688:1
**rather** [1] - 2649:5
**ratio** [1] - 2670:3
**RDR** [3] - 2616:11,
2706:3, 2706:12
**reach** [1] - 2628:17
**reached** [1] - 2630:1
**READ** [1] - 2615:15
**read** [8] - 2629:20,
2641:22, 2642:25,
2662:13, 2684:22,
2690:25, 2699:23,
2700:6
**reading** [1] - 2629:17
**ready** [4] - 2703:22,
2704:1, 2704:14
**real** [3] - 2637:12,
2667:7, 2667:20
**realize** [3] - 2676:23,
2677:4, 2686:9
**really** [12] - 2632:25,
2633:8, 2633:13,
2634:2, 2635:9,
2656:17, 2661:2,
2663:22, 2675:9,
2675:13, 2678:5,
2701:18
**reason** [1] - 2664:25
**reasons** [2] - 2630:3,
2683:14
**receive** [2] - 2631:18,
2681:10
**received** [1] - 2701:6
**recent** [1] - 2694:21
**recently** [6] -
2624:16, 2625:6,
2625:8, 2626:2,
2626:8, 2694:22
**receptivity** [1] -
2645:24
**recess** [1] - 2669:22
**recognize** [1] -
2683:17
**recognized** [1] -
2661:23
**record** [8] - 2623:19,
2627:19, 2627:21,
2645:17, 2646:18,
2691:1, 2697:5,
2698:2
**records** [1] - 2646:3
**red** [1] - 2687:7
**Redirect** [1] - 2617:3
**reduce** [6] - 2629:12,
2672:8, 2675:12,

2677:14, 2683:23, 2695:25
**reduction** [4] - 2674:21, 2674:25, 2678:2, 2681:22
**refer** [4] - 2629:14, 2637:18, 2650:17, 2650:19
**referencing** [1] - 2668:3
**referred** [2] - 2626:16, 2639:2
**refers** [2] - 2629:16, 2679:4
**reflected** [1] - 2647:21
**regarding** [3] - 2680:25, 2682:8, 2696:18
**reject** [1] - 2699:5
**relate** [1] - 2647:25
**related** [1] - 2623:1
**relationship** [4] - 2643:1, 2680:11, 2680:15, 2701:18
**relatively** [1] - 2621:15
**relaxed** [1] - 2683:16
**relevance** [2] - 2644:4, 2661:5
**relevant** [12] - 2642:7, 2642:22, 2661:13, 2661:16, 2661:24, 2671:2, 2684:20, 2686:8, 2688:5, 2688:10, 2693:10, 2695:24
**reliability** [2] - 2634:7, 2634:11
**reliable** [3] - 2655:8, 2658:14, 2658:22
**reliance** [1] - 2621:17
**relied** [1] - 2651:17
**rely** [4] - 2668:11, 2670:1, 2671:19, 2680:5
**relying** [2] - 2655:18, 2668:5
**remain** [3] - 2619:13, 2631:20, 2681:25
**remarkably** [1] - 2621:18
**remember** [2] - 2626:21, 2691:24
**remove** [1] - 2619:15
**removing** [1] - 2667:23
**repeat** [4] - 2641:11, 2647:4, 2659:23,

2672:3
**rephrase** [1] - 2702:19
**replicate** [1] - 2675:8
**report** [6] - 2630:21, 2634:10, 2635:23, 2636:11
**REPORTED** [1] - 2616:11
**reporter** [1] - 2669:17
**Reporter** [2] - 2616:12, 2706:12
**REPORTER** [1] - 2623:15
**reports** [1] - 2700:6
**represent** [1] - 2631:23
**representative** [3] - 2654:17, 2654:20, 2691:25
**request** [2] - 2657:9, 2657:16
**required** [1] - 2670:21
**requirement** [2] - 2634:1, 2699:8
**requires** [2] - 2672:9, 2673:9
**research** [1] - 2625:4
**reservation** [1] - 2678:18
**resources** [1] - 2686:3
**respect** [17] - 2632:14, 2633:23, 2636:15, 2639:10, 2640:1, 2646:25, 2647:12, 2652:22, 2654:21, 2668:19, 2671:18, 2681:1, 2682:13, 2682:19, 2688:16, 2694:8, 2704:10
**respond** [3] - 2621:13, 2628:14, 2665:7
**responded** [2] - 2634:5, 2657:9
**responding** [1] - 2631:25
**response** [8] - 2633:6, 2634:17, 2636:16, 2636:20, 2637:17, 2667:6, 2677:20, 2698:18
**responses** [7] - 2633:15, 2633:18, 2637:10, 2640:3, 2648:4, 2649:21,

2684:4
**result** [17] - 2628:20, 2629:2, 2632:5, 2647:9, 2651:23, 2652:7, 2662:1, 2667:23, 2669:1, 2672:24, 2673:19, 2675:6, 2676:11, 2680:1, 2700:4, 2700:5
**resulted** [1] - 2701:7
**results** [9] - 2632:25, 2633:8, 2634:6, 2634:19, 2652:10, 2669:2, 2669:4, 2676:8, 2690:9
**resume** [1] - 2703:12
**retained** [1] - 2626:10
**return** [1] - 2669:21
**reveal** [1] - 2697:24
**review** [2] - 2618:13, 2625:9
**reviewed** [3] - 2640:18, 2640:25, 2651:18
**reviewing** [1] - 2658:24
**rewarding** [1] - 2625:5
**richer** [1] - 2656:15
**right-hand** [3] - 2657:21, 2657:23, 2658:24
**rightly** [1] - 2664:16
**rival** [3] - 2637:16, 2648:5, 2648:14
**rivalrous** [1] - 2694:2
**rivals** [9] - 2638:13, 2664:4, 2672:22, 2679:12, 2679:14, 2684:4, 2688:8, 2696:6, 2696:11
**road** [1] - 2689:4
**robin** [2] - 2633:11, 2659:8
**robins** [1] - 2658:21
**robust** [1] - 2696:11
**role** [7] - 2633:7, 2637:10, 2638:25, 2643:22, 2644:9, 2649:20, 2656:17
**roles** [1] - 2625:20
**Room** [1] - 2616:14
**Roth** [1] - 2644:11
**rough** [1] - 2667:22
**rough-cut** [1] - 2667:22
**roughly** [3] - 2624:13, 2687:8,

2689:24
**round** [9] - 2633:11, 2636:25, 2637:2, 2637:5, 2658:21, 2659:5, 2659:8, 2697:6, 2698:24
**round-robin** [2] - 2633:11, 2659:8
**rounds** [9] - 2633:11, 2641:25, 2659:1, 2659:2, 2659:7, 2666:24, 2676:17, 2677:3, 2677:13
**row** [1] - 2651:2
**Rowling** [1] - 2692:5
**rows** [1] - 2653:7
**ROXANA** [1] - 2615:21
**RUDZIN** [1] - 2616:2
**rule** [4] - 2618:5, 2698:13, 2699:10, 2699:22
**rules** [4] - 2698:15, 2698:20, 2700:7, 2700:21
**run** [1] - 2699:7
**rung** [1] - 2698:9
**runner** [30] - 2632:2, 2632:10, 2632:20, 2651:25, 2652:1, 2652:11, 2652:15, 2653:8, 2653:10, 2653:11, 2653:18, 2654:2, 2658:18, 2660:17, 2661:4, 2661:9, 2661:19, 2661:22, 2662:17, 2668:15, 2679:18, 2688:14, 2688:22, 2689:2, 2689:24, 2690:4, 2690:7, 2690:11
**runner-up** [30] - 2632:2, 2632:10, 2632:20, 2651:25, 2652:1, 2652:11, 2652:15, 2653:8, 2653:10, 2653:11, 2653:18, 2654:2, 2658:18, 2660:17, 2661:4, 2661:9, 2661:19, 2661:22, 2662:17, 2668:15, 2679:18, 2688:14, 2688:22, 2689:2, 2689:24, 2690:4, 2690:7, 2690:11
**runners** [1] - 2688:25
**runners-up** [1] -

2688:25
**running** [2] - 2682:23, 2686:15
**RYAN** [1] - 2616:8

# S

**S&S** [14] - 2631:20, 2632:2, 2654:12, 2654:22, 2659:18, 2659:22, 2660:1, 2661:3, 2665:3, 2672:13, 2682:2, 2682:22, 2683:9, 2683:15
**sale** [1] - 2629:2
**salient** [1] - 2643:8
**savvy** [2] - 2692:8, 2693:4
**saw** [1] - 2658:25
**schedules** [1] - 2704:16
**School** [3] - 2624:15, 2624:16
**school** [2] - 2623:22, 2624:12
**schools** [1] - 2624:13
**SCHUSTER** [1] - 2616:7
**Schuster** [17] - 2651:7, 2655:19, 2660:16, 2665:12, 2665:21, 2670:4, 2670:7, 2670:22, 2671:14, 2671:25, 2676:4, 2679:18, 2680:7, 2680:16, 2681:3, 2687:8, 2688:2
**Schwarz** [4] - 2619:21, 2620:3, 2620:5, 2623:2
**SCHWARZ** [16] - 2615:16, 2618:3, 2620:7, 2620:9, 2620:14, 2620:18, 2620:22, 2620:25, 2627:4, 2701:10, 2701:21, 2702:16, 2703:21, 2703:24, 2704:6, 2704:10
**science** [1] - 2629:18
**scope** [1] - 2657:7
**score** [9] - 2632:22, 2632:23, 2633:23, 2634:13, 2662:5, 2662:10, 2662:12, 2666:6, 2668:5

**SCOTT** [1] - 2615:22
**screening** [3] -
2636:6, 2636:18,
2637:20
**SE** [1] - 2615:6
**seated** [1] - 2619:15
**second** [29] -
2624:15, 2625:22,
2629:7, 2629:9,
2632:22, 2632:23,
2633:23, 2634:13,
2636:24, 2639:8,
2640:5, 2642:14,
2645:4, 2648:13,
2657:10, 2661:15,
2662:5, 2662:10,
2662:12, 2665:25,
2666:5, 2668:5,
2669:1, 2669:4,
2681:7, 2691:3,
2691:21, 2694:3,
2702:11
**secondary** [1] -
2624:7
**secured** [1] -
2640:13
**see** [39] - 2622:10,
2630:6, 2630:9,
2639:5, 2639:10,
2645:19, 2646:23,
2653:5, 2653:8,
2655:15, 2656:3,
2656:4, 2656:6,
2656:15, 2656:16,
2658:8, 2658:10,
2660:9, 2661:11,
2664:17, 2665:24,
2666:20, 2667:9,
2671:9, 2673:1,
2674:8, 2677:4,
2677:9, 2678:11,
2686:9, 2686:13,
2686:23, 2690:17,
2692:7, 2692:14,
2699:4, 2700:24
**seeing** [8] - 2639:7,
2653:3, 2659:13,
2684:10, 2689:13,
2691:19, 2698:22,
2702:7
**seek** [1] - 2640:3
**segment** [14] -
2631:19, 2651:2,
2651:24, 2657:24,
2681:20, 2681:22,
2683:13, 2683:23,
2687:24, 2688:15,
2689:1, 2694:4,
2694:9, 2704:11
**segments** [1] -

2630:2
**seldom** [1] - 2699:17
**select** [2] - 2648:20,
2648:21
**selected** [2] -
2658:2, 2691:12
**selecting** [2] -
2640:1, 2649:20
**selection** [1] -
2649:15
**seller** [1] - 2647:2
**sellers** [6] - 2622:1,
2622:3, 2622:4,
2630:3, 2647:24,
2681:16
**sense** [7] - 2659:10,
2667:12, 2667:14,
2667:21, 2668:20,
2672:23, 2674:2
**sent** [1] - 2698:20
**separate** [1] -
2626:17
**served** [3] - 2625:10,
2625:13, 2626:14
**services** [4] -
2626:22, 2647:24,
2685:6, 2693:2
**SESSION** [1] -
2615:8
**session** [1] -
2618:15
**set** [19] - 2640:5,
2640:12, 2640:25,
2649:16, 2650:15,
2652:21, 2653:5,
2653:13, 2654:18,
2656:16, 2658:20,
2672:7, 2681:14,
2685:19, 2690:25,
2691:23, 2691:25,
2695:12, 2698:15
**sets** [17] - 2640:22,
2640:24, 2650:2,
2650:12, 2650:23,
2651:5, 2652:16,
2652:18, 2653:2,
2653:13, 2653:19,
2654:7, 2655:21,
2655:23, 2655:25,
2657:1, 2658:23
**setting** [2] - 2632:23,
2677:19
**Seven** [1] - 2616:4
**several** [2] - 2630:3,
2656:7
**Shapiro** [1] -
2637:22
**Shapley** [1] -
2644:11
**share** [13] - 2632:9,

2633:17, 2655:8,
2655:12, 2666:13,
2683:3, 2683:22,
2683:25, 2686:25,
2693:13, 2693:23,
2696:3
**shares** [14] - 2633:3,
2633:24, 2633:25,
2634:1, 2650:18,
2655:9, 2655:18,
2667:9, 2668:13,
2668:14, 2685:2,
2693:17, 2693:24,
2694:1
**SHEARMAN** [2] -
2616:6, 2616:9
**shift** [1] - 2698:3
**SHORES** [1] - 2616:8
**show** [9] - 2620:4,
2627:23, 2656:8,
2665:3, 2668:2,
2682:7, 2688:9,
2690:22, 2691:21
**showing** [2] -
2650:8, 2685:16
**shown** [1] - 2689:16
**shows** [2] - 2687:7,
2690:4
**side** [18] - 2637:13,
2637:17, 2639:25,
2640:1, 2640:7,
2640:15, 2641:8,
2648:1, 2648:4,
2648:19, 2657:19,
2657:21, 2657:23,
2658:10, 2658:24,
2685:4, 2686:15,
2694:20
**sides** [2] - 2637:24,
2648:5
**significance** [6] -
2643:12, 2682:9,
2683:6, 2683:12,
2684:25, 2691:20
**significant** [2] -
2646:23, 2685:5
**similar** [3] - 2646:4,
2646:6, 2684:12
**SIMON** [1] - 2616:7
**Simon** [17] - 2651:7,
2655:19, 2660:16,
2665:12, 2665:21,
2670:4, 2670:7,
2670:22, 2671:13,
2671:24, 2676:4,
2679:18, 2680:6,
2680:15, 2681:3,
2687:8, 2688:2
**simple** [3] - 2621:18,
2621:21, 2628:18

**simplified** [1] -
2667:8
**simply** [6] - 2621:25,
2622:8, 2629:1,
2629:5, 2635:1,
2689:16
**simulations** [1] -
2636:9
**single** [10] - 2637:16,
2649:12, 2653:16,
2654:3, 2656:12,
2658:10, 2658:17,
2663:20, 2685:25,
2686:19
**single-bidder** [2] -
2649:12, 2654:3
**situation** [10] -
2663:21, 2677:3,
2677:12, 2697:19,
2698:1, 2698:4,
2698:7, 2700:25,
2702:12, 2703:4
**situations** [10] -
2663:8, 2666:14,
2675:13, 2676:17,
2678:13, 2682:1,
2689:23, 2689:25,
2694:2, 2697:6
**six** [1] - 2640:21
**sized** [8] - 2665:5,
2684:5, 2688:14,
2688:20, 2688:25,
2689:17, 2690:5,
2691:2
**skewed** [1] - 2700:4
**skip** [1] - 2681:7
**Slide** [27] - 2627:16,
2628:1, 2641:2,
2641:17, 2642:5,
2643:5, 2644:5,
2645:2, 2646:11,
2647:19, 2650:4,
2652:23, 2653:3,
2653:4, 2657:5,
2684:7, 2684:10,
2685:14, 2686:16,
2688:24, 2691:16,
2694:15, 2695:6,
2697:11, 2698:18,
2699:15, 2700:13
**slide** [29] - 2620:3,
2627:7, 2627:23,
2628:22, 2636:23,
2641:19, 2641:22,
2642:4, 2650:7,
2653:5, 2657:18,
2658:1, 2663:3,
2665:23, 2683:7,
2685:11, 2685:16,
2686:25, 2687:1,

2687:3, 2687:19,
2689:10, 2691:21,
2692:5, 2694:13,
2694:14, 2694:17,
2695:17
**slides** [3] - 2627:13,
2691:15, 2691:23
**small** [3] - 2654:18,
2690:5, 2691:2
**smaller** [11] -
2631:22, 2640:9,
2649:1, 2684:5,
2686:13, 2686:23,
2688:13, 2688:20,
2688:25, 2689:17,
2693:12
**snippets** [1] -
2650:10
**Snyder** [32] - 2617:5,
2618:11, 2618:14,
2619:4, 2619:7,
2621:9, 2621:23,
2623:13, 2623:20,
2627:2, 2627:7,
2628:11, 2632:13,
2639:15, 2646:21,
2650:7, 2657:10,
2660:13, 2665:9,
2670:18, 2678:22,
2681:8, 2691:15,
2695:9, 2698:22,
2700:16, 2701:14,
2701:25, 2702:23,
2704:22, 2705:1
**SNYDER** [1] -
2619:14
**Snyder's** [3] -
2621:19, 2622:20,
2623:5
**so-called** [12] -
2631:21, 2632:5,
2633:11, 2640:25,
2642:18, 2645:16,
2665:2, 2665:4,
2683:10, 2686:1,
2687:5, 2691:10
**soft** [1] - 2680:10
**softening** [7] -
2664:18, 2671:22,
2672:3, 2672:5,
2673:2, 2680:14,
2680:18
**soliciting** [1] -
2631:24
**sometimes** [4] -
2641:24, 2650:3,
2650:16, 2700:8
**Sorry** [1] - 2623:15
**sorry** [9] - 2623:17,
2652:12, 2655:4,

2723

2657:12, 2658:11, 2692:12, 2693:20, 2697:17

**sort** [2] - 2668:4, 2671:1

**sorts** [1] - 2621:5

**sound** [2] - 2635:9, 2635:19

**source** [4] - 2640:6, 2640:20, 2684:11, 2690:3

**sources** [4] - 2640:19, 2650:10, 2653:9, 2658:25

**spark** [1] - 2644:1

**speaks** [1] - 2696:10

**specialization** [1] - 2623:25

**specific** [4] - 2626:12, 2628:22, 2667:13, 2680:9

**specifically** [2] - 2680:6, 2697:2

**specified** [1] - 2634:8

**speculation** [1] - 2701:21

**spent** [1] - 2618:7

**split** [1] - 2657:19

**spokes** [1] - 2654:14

**Square** [1] - 2616:4

**SSA** [12] - 2634:6, 2634:20, 2636:3, 2636:12, 2636:21, 2637:3, 2649:17, 2649:23, 2662:19, 2669:7, 2669:11, 2671:18

**standard** [1] - 2699:3

**standing** [1] - 2619:13

**Stars** [1] - 2615:23

**start** [12] - 2619:3, 2619:6, 2628:23, 2641:24, 2650:14, 2651:4, 2658:11, 2659:7, 2666:25, 2668:13, 2673:15, 2675:19

**started** [4] - 2625:11, 2639:13, 2652:3, 2670:19

**starting** [2] - 2630:2, 2657:13

**starts** [1] - 2672:13

**state** [1] - 2623:19

**statement** [1] - 2646:17

**statements** [3] - 2682:21, 2682:25,

2695:23

**STATES** [4] - 2615:1, 2615:3, 2615:12, 2615:17

**States** [2] - 2616:12, 2706:13

**stay** [1] - 2656:19

**stenographic** [1] - 2706:5

**step** [3] - 2619:12, 2671:1, 2671:6

**STEPHEN** [1] - 2616:6

**stepping** [1] - 2655:21

**STERLING** [2] - 2616:6, 2616:9

**STEVENSON** [1] - 2615:15

**still** [8] - 2622:23, 2646:5, 2664:23, 2674:6, 2674:9, 2674:12, 2677:8, 2700:10

**stop** [4] - 2664:24, 2680:2, 2699:19, 2704:15

**stopped** [1] - 2624:20

**story** [1] - 2692:4

**straight** [1] - 2632:6

**straightforward** [1] - 2621:15

**strategies** [1] - 2687:21

**strategy** [1] - 2672:24

**streaming** [1] - 2626:11

**Street** [2] - 2615:18, 2616:9

**strength** [1] - 2673:3, 2678:3

**stress** [1] - 2684:22

**strike** [1] - 2680:3

**striking** [4] - 2633:1, 2642:11, 2700:5, 2700:7

**strong** [3] - 2635:18, 2681:24, 2681:25

**struck** [2] - 2636:10, 2701:18

**structural** [1] - 2702:20

**stuck** [2] - 2634:15, 2637:15

**studied** [4] - 2630:19, 2639:20, 2685:10, 2691:11

**study** [1] - 2641:4

**studying** [1] - 2700:23

**stuff** [1] - 2669:8

**subject** [7] - 2620:12, 2627:11, 2627:12, 2629:21, 2639:16, 2704:13

**submitted** [2] - 2625:8, 2702:14

**subsequent** [1] - 2635:23

**substantial** [5] - 2628:19, 2649:3, 2654:23, 2666:25, 2681:21

**substitutions** [1] - 2648:3

**succeeding** [2] - 2695:5, 2696:8

**successful** [4] - 2624:22, 2641:12, 2643:21, 2695:1

**succinct** [1] - 2672:21

**suggesting** [1] - 2621:4

**suggests** [2] - 2621:22, 2697:8

**summary** [3] - 2642:3, 2654:1, 2655:17

**suppliers** [2] - 2648:5, 2685:5

**supply** [4] - 2648:4, 2648:6, 2696:5, 2696:11

**support** [1] - 2694:8

**surprised** [3] - 2686:10, 2686:13, 2692:23

**surrogate** [1] - 2623:6

**sustain** [3] - 2698:16, 2701:23, 2702:18

**sustained** [1] - 2701:11

**switch** [3] - 2638:2, 2641:25, 2659:7

**SWORN** [1] - 2619:14

**sympathy** [1] - 2649:8

**systematic** [1] - 2690:24

**systematically** [1] - 2652:7

**systemically** [1] - 2676:8

**T**

**table** [1] - 2681:15

**tactics** [1] - 2624:25

**target** [2] - 2630:16, 2630:20

**targeting** [6] - 2630:21, 2631:3, 2631:6, 2631:9, 2647:3, 2647:12

**taught** [2] - 2624:18, 2624:23

**teaching** [2] - 2624:17, 2625:1

**team** [4] - 2640:23, 2651:18, 2653:7, 2658:14

**tech** [1] - 2624:21, 2625:15, 2625:23, 2626:10

**technical** [1] - 2696:6

**technologies** [1] - 2625:15

**technology** [2] - 2626:13, 2626:18

**ten** [1] - 2659:12

**tend** [1] - 2646:5

**tenders** [1] - 2620:19

**tenure** [1] - 2624:11

**term** [2] - 2687:15, 2696:6

**terms** [16] - 2618:19, 2632:24, 2634:21, 2636:12, 2639:11, 2645:6, 2657:15, 2665:23, 2668:24, 2671:16, 2673:25, 2677:20, 2688:3, 2693:8, 2695:11, 2704:2

**Tesla** [1] - 2693:24

**test** [2] - 2634:7, 2656:20

**testified** [4] - 2626:2, 2626:3, 2626:8, 2652:2

**testifying** [1] - 2639:13

**testimony** [26] - 2621:19, 2622:21, 2623:6, 2627:8, 2646:7, 2646:14, 2646:15, 2646:16, 2649:10, 2652:5, 2656:1, 2664:11, 2665:1, 2670:1, 2670:12, 2675:16, 2677:8, 2695:14,

2695:22, 2697:8, 2698:14, 2699:9, 2699:17, 2699:21, 2699:23, 2703:13

**textbooks** [1] - 2629:19

**that'll** [1] - 2643:5

**THE** [140] - 2615:1, 2615:3, 2615:11, 2615:15, 2615:20, 2616:2, 2616:6, 2617:4, 2618:1, 2618:4, 2618:16, 2618:19, 2618:23, 2619:2, 2619:8, 2619:12, 2619:15, 2619:17, 2619:20, 2619:25, 2620:6, 2620:8, 2620:17, 2620:21, 2620:24, 2621:13, 2622:14, 2622:22, 2622:25, 2623:7, 2623:9, 2623:15, 2627:3, 2627:5, 2627:14, 2627:19, 2627:21, 2627:24, 2628:2, 2628:5, 2628:9, 2636:19, 2636:21, 2636:25, 2637:2, 2637:5, 2637:6, 2643:6, 2644:6, 2655:4, 2655:6, 2655:15, 2656:10, 2656:12, 2659:15, 2659:17, 2659:20, 2659:25, 2660:6, 2660:11, 2660:20, 2660:23, 2662:4, 2662:7, 2662:9, 2662:12, 2662:21, 2663:15, 2664:8, 2664:12, 2664:21, 2664:22, 2667:3, 2667:5, 2667:6, 2668:7, 2668:22, 2668:24, 2669:10, 2669:12, 2669:16, 2669:20, 2669:24, 2670:15, 2673:5, 2673:7, 2673:21, 2673:23, 2673:25, 2674:4, 2674:7, 2674:10, 2674:11, 2674:15, 2674:19, 2675:16, 2676:13, 2676:15, 2676:16, 2676:21, 2677:1, 2677:2, 2677:3, 2677:23, 2677:25, 2678:20, 2685:13,

2724

2687:3, 2690:6,
2690:8, 2690:11,
2690:13, 2690:14,
2690:16, 2690:17,
2690:18, 2692:12,
2692:16, 2692:17,
2692:18, 2697:12,
2697:15, 2697:17,
2699:12, 2699:14,
2701:11, 2701:23,
2702:18, 2703:7,
2703:10, 2703:11,
2703:15, 2703:17,
2703:23, 2704:1,
2704:9, 2704:14,
2704:21, 2704:25,
2705:3
  **theme** [1] - 2695:23
  **themselves** [1] -
2644:18
  **theories** [1] -
2680:25
  **theory** [22] -
2632:14, 2632:17,
2644:3, 2645:11,
2660:13, 2661:13,
2661:18, 2661:21,
2662:6, 2664:1,
2670:20, 2671:23,
2673:9, 2673:21,
2674:18, 2674:19,
2678:23, 2679:2,
2679:3, 2679:23,
2688:23, 2701:13
  **thereby** [1] - 2698:16
  **therefore** [1] -
2675:11
  **Thereupon** [2] -
2619:10, 2669:22
  **they've** [7] - 2637:8,
2640:11, 2654:14,
2656:24, 2665:4,
2676:1, 2702:25
  **thinking** [4] - 2673:7,
2673:14, 2675:18,
2679:10
  **thinks** [1] - 2668:22
  **third** [11] - 2625:23,
2626:12, 2626:21,
2629:23, 2634:10,
2636:11, 2663:9,
2696:13, 2698:8,
2698:9
  **three** [15] - 2624:12,
2624:20, 2625:21,
2626:10, 2626:17,
2648:25, 2658:7,
2683:2, 2684:15,
2685:20, 2689:15,
2691:12, 2694:21,

2697:23, 2702:13
  **three-year** [3] -
2684:15, 2689:15,
2691:12
  **threshold** [3] -
2630:7, 2640:11,
2695:1
  **throughout** [1] -
2624:19
  **tied** [2] - 2639:24,
2647:2
  **tier** [1] - 2665:6
  **ties** [1] - 2643:19
  **tighter** [1] - 2647:10
  **title** [2] - 2689:15,
2700:17
  **titles** [5] - 2622:9,
2622:11, 2639:11,
2658:2, 2687:5
  **today** [3] - 2618:6,
2619:24, 2627:8
  **together** [2] -
2687:17, 2689:22
  **tomorrow** [3] -
2703:12, 2704:20,
2704:22
  **took** [2] - 2622:6,
2622:8
  **tools** [2] - 2677:12,
2682:16
  **top** [17] - 2622:1,
2622:3, 2622:4,
2624:12, 2630:2,
2640:8, 2647:2,
2652:3, 2658:12,
2674:12, 2681:16,
2697:19, 2698:24,
2700:25, 2701:18,
2701:19, 2702:9
  **topic** [2] - 2624:22,
2639:17
  **total** [6] - 2639:9,
2639:11, 2657:14,
2657:25, 2661:8,
2689:25
  **towards** [1] - 2671:6
  **track** [3] - 2645:17,
2646:3, 2646:18
  **traction** [2] - 2664:6,
2692:6
  **trade** [1] - 2629:10,
2629:16
  **tradeoff** [1] -
2675:10
  **traditional** [1] -
2625:9
  **TRANSCRIPT** [1] -
2615:11
  **transcript** [2] -
2706:5, 2706:6

  **treated** [1] - 2679:2
  **trial** [1] - 2650:13
  **TRIAL** [1] - 2615:11
  **trick** [1] - 2702:1
  **tricking** [1] - 2702:2
  **tripled** [1] - 2695:18
  **trouble** [1] - 2692:6
  **true** [4] - 2676:21,
2693:12, 2706:4,
2706:5
  **truly** [1] - 2645:12
  **try** [5] - 2652:19,
2669:1, 2669:4,
2675:21
  **trying** [8] - 2667:7,
2667:12, 2667:13,
2667:15, 2667:17,
2667:20, 2691:24,
2702:20
  **turn** [1] - 2691:3
  **turns** [2] - 2653:9,
2674:17
  **two** [62] - 2622:6,
2624:13, 2626:3,
2626:10, 2632:10,
2646:10, 2647:25,
2648:5, 2648:8,
2648:24, 2649:24,
2650:23, 2651:6,
2651:13, 2653:9,
2654:11, 2654:15,
2656:14, 2661:9,
2662:1, 2662:9,
2663:7, 2663:10,
2663:12, 2664:9,
2665:13, 2666:2,
2667:10, 2667:21,
2667:22, 2667:23,
2670:2, 2670:10,
2671:6, 2671:14,
2671:20, 2671:25,
2679:8, 2679:21,
2679:22, 2679:24,
2689:22, 2690:11,
2691:7, 2691:9,
2691:23, 2697:19,
2697:20, 2697:25,
2698:1, 2698:7,
2698:10, 2699:2,
2700:25, 2701:3,
2701:16, 2702:13
  **two-decade** [1] -
2624:13
  **types** [3] - 2645:14,
2662:23, 2668:12
  **typical** [1] - 2647:23
  **typically** [1] - 2636:6
  **typo** [1] - 2618:11

## U

  **U.S** [1] - 2625:11
  **ultimate** [1] -
2674:10
  **ultimately** [1] -
2640:4
  **unable** [1] - 2621:3
  **unavailable** [1] -
2656:23
  **uncertain** [1] -
2645:6
  **uncertainty** [1] -
2646:19
  **unclear** [1] - 2672:12
  **under** [11] - 2642:16,
2660:14, 2661:13,
2661:21, 2670:3,
2670:10, 2670:20,
2671:7, 2671:23,
2679:2, 2684:20
  **underlying** [2] -
2647:14, 2647:17
  **underneath** [1] -
2665:24
  **understood** [2] -
2669:12, 2704:11
  **unfold** [1] - 2647:17
  **unheard** [1] -
2644:15
  **unheard-of** [1] -
2644:15
  **unilateral** [16] -
2632:5, 2660:14,
2661:6, 2661:18,
2664:13, 2665:16,
2670:20, 2671:7,
2678:23, 2679:4,
2679:16, 2679:21,
2680:4, 2681:1,
2688:17, 2688:23
  **unique** [1] - 2645:12
  **United** [1] - 2706:13
  **united** [1] - 2616:12
  **UNITED** [4] - 2615:1,
2615:3, 2615:12,
2615:17
  **University** [6] -
2619:23, 2623:24,
2624:6, 2624:11,
2624:14, 2624:15
  **unless** [2] - 2663:25,
2671:5
  **unlikely** [1] - 2631:8
  **unobjected** [1] -
2623:4
  **unobjected-to** [1] -
2623:4
  **unobjectionable** [1]

  - 2620:4
  **unreliable** [4] -
2632:24, 2634:19,
2669:2, 2669:4
  **unusual** [1] -
2644:15
  **up** [64] - 2619:5,
2619:12, 2619:19,
2622:12, 2627:16,
2630:8, 2632:2,
2632:10, 2632:20,
2640:12, 2641:2,
2641:17, 2642:10,
2643:15, 2650:4,
2651:25, 2652:1,
2652:8, 2652:11,
2652:14, 2652:15,
2653:8, 2653:10,
2653:11, 2653:18,
2654:2, 2654:22,
2657:5, 2657:20,
2657:22, 2658:1,
2658:18, 2660:17,
2661:4, 2661:9,
2661:15, 2661:19,
2661:22, 2662:17,
2668:15, 2673:12,
2675:18, 2675:20,
2675:24, 2679:18,
2684:24, 2688:14,
2688:22, 2688:25,
2689:2, 2689:24,
2690:4, 2690:7,
2690:11, 2691:5,
2691:15, 2697:10,
2698:18, 2699:15,
2700:13, 2701:14,
2702:2
  **upper** [1] - 2658:9
  **upstream** [3] -
2629:6, 2643:2,
2648:7
  **useful** [2] - 2652:16,
2661:7
  **uses** [1] - 2634:1

## V

  **valid** [2] - 2629:24,
2630:3
  **valuations** [3] -
2646:4, 2646:6,
2647:9
  **value** [4] - 2634:21,
2645:7, 2668:18,
2669:7
  **valuing** [1] - 2645:12
  **variable** [1] -
2677:20
  **variants** [1] -

2695:23
**variation** [1] - 2621:7
**varies** [2] - 2646:1, 2646:10
**variety** [1] - 2625:14
**various** [2] - 2652:16, 2652:19
**vary** [3] - 2645:7, 2645:22, 2675:12
**varying** [1] - 2642:10
**vast** [1] - 2682:1
**vehicle** [1] - 2677:19
**vehicles** [1] - 2626:20
**verification** [1] - 2704:7
**Vermont** [1] - 2625:25
**versa** [1] - 2690:20
**version** [1] - 2667:8
**versus** [1] - 2647:5
**vertical** [1] - 2625:6
**viable** [1] - 2693:5
**VIACOMMCBS** [1] - 2616:6
**vice** [1] - 2690:19
**video** [1] - 2626:11
**view** [20] - 2621:24, 2632:21, 2633:22, 2634:9, 2635:14, 2649:2, 2651:14, 2653:25, 2654:11, 2654:13, 2664:22, 2668:12, 2672:2, 2672:13, 2681:8, 2681:21, 2682:22, 2683:15, 2685:12, 2689:19
**Virginia's** [1] - 2624:14
**virtual** [1] - 2619:23
**vision** [2] - 2643:25, 2645:23
**VOELZ** [1] - 2615:22
**vs** [1] - 2615:5

# W

**waiting** [2] - 2618:5, 2618:8
**walk** [4] - 2624:9, 2658:3, 2663:1, 2695:9
**wants** [1] - 2673:15
**Washington** [5] - 2615:6, 2615:19, 2616:10, 2616:14, 2706:14
**ways** [1] - 2660:7

**weakening** [1] - 2664:2
**weight** [1] - 2668:1
**Weisberg** [1] - 2682:19
**well-established** [1] - 2643:13
**well-known** [5] - 2642:9, 2645:16, 2686:20, 2692:8, 2692:22
**wide** [3] - 2625:14, 2642:12, 2644:21
**William** [1] - 2624:5
**willing** [8] - 2645:15, 2648:23, 2675:22, 2675:23, 2675:25, 2686:6, 2691:8, 2693:5
**willingness** [5] - 2647:11, 2648:2, 2678:15, 2685:17, 2691:4
**win** [18] - 2645:1, 2651:3, 2651:5, 2654:10, 2660:2, 2660:22, 2670:3, 2670:5, 2673:16, 2673:17, 2674:6, 2674:17, 2675:7, 2676:2, 2676:7, 2677:21, 2688:21, 2696:24
**win-loss** [4] - 2651:3, 2651:5, 2654:10, 2670:3
**winner** [15] - 2632:2, 2632:10, 2632:19, 2638:15, 2654:2, 2660:17, 2661:9, 2661:19, 2661:21, 2662:17, 2668:15, 2688:22, 2689:1, 2689:24
**winners** [3] - 2644:7, 2688:25, 2689:9
**winning** [5] - 2640:9, 2673:11, 2682:3, 2683:25, 2684:19
**wins** [2] - 2661:4, 2702:9
**within-firm** [1] - 2698:17
**Witness** [1] - 2703:16
**witness** [2] - 2618:20, 2619:10
**WITNESS** [42] - 2619:14, 2619:17, 2636:21, 2637:2,

2637:6, 2643:6, 2644:6, 2655:6, 2656:12, 2659:20, 2660:6, 2660:23, 2662:7, 2662:12, 2663:15, 2664:12, 2664:22, 2667:5, 2668:7, 2668:24, 2669:12, 2673:21, 2673:25, 2674:7, 2674:11, 2674:19, 2676:13, 2676:16, 2677:1, 2677:3, 2677:25, 2687:3, 2690:8, 2690:13, 2690:16, 2690:18, 2692:16, 2692:18, 2697:17, 2699:14, 2703:10, 2703:15
**witness's** [1] - 2623:15
**WITNESSES** [1] - 2617:4
**witnesses** [2] - 2618:24, 2704:17
**won** [6] - 2644:11, 2659:19, 2659:21, 2660:4, 2660:5, 2666:2
**wondering** [2] - 2663:13, 2697:15
**word** [1] - 2630:13
**work-around** [6] - 2697:9, 2697:12, 2697:16, 2697:18, 2698:19, 2698:23
**works** [5] - 2621:17, 2674:15, 2674:20, 2691:5, 2692:2
**world** [2] - 2667:7, 2667:20
**wrote** [1] - 2630:21
**Wylie** [1] - 2646:7

# Y

**Yale** [3] - 2624:6, 2624:8, 2624:16
**year** [7] - 2626:3, 2652:2, 2657:13, 2657:17, 2684:15, 2689:15, 2691:12
**years** [6] - 2619:24, 2624:20, 2625:2, 2626:9, 2685:20, 2700:3
**yellow** [1] - 2658:12
**yellow-orange** [1] - 2658:12

**yield** [1] - 2657:24
**York** [4] - 2616:4, 2616:7