1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3     * * * * * * * * * * * * * * *    )
      THE UNITED STATES OF AMERICA,    )     Civil Action
4                                      )     No. 21-02886
                     Plaintiff,        )
5                                      )
        vs.                            )
6                                      )
      BERTELSMANN SE & CO. KGAA,       )     Washington, D.C.
7     et al.,                          )     August 18, 2022
                                       )     9:33 a.m.
8                    Defendants.       )     **MORNING SESSION**
                                       )
9     * * * * * * * * * * * * * * *    )

10

11                    TRANSCRIPT OF BENCH TRIAL
               BEFORE THE HONORABLE FLORENCE Y. PAN,
12                   UNITED STATES DISTRICT JUDGE

13

14    <u>APPEARANCES:</u>

15    FOR THE PLAINTIFF:        JOHN R. READ, ESQ.
                                ETHAN STEVENSON, ESQ.
16                              IHAN KIM, ESQ.
                                MELVIN A. SCHWARZ, I, ESQ.
17                              JESSICA LEAL, ESQ.
                                UNITED STATES DEPARTMENT OF JUSTICE
18                              ANTITRUST DIVISION
                                450 Fifth Street, Northwest
19                              Washington, D.C. 20530

20
      FOR THE DEFENDANTS        DANIEL M. PETROCELLI, ESQ.
21    BERTELSMANN and           M. RANDALL OPPENHEIMER, ESQ.
      PENGUIN RANDOM HOUSE:     ROXANA GUIDERO, ESQ.
22                              SCOTT VOELZ, ESQ.
                                O'MELVENY & MYERS, LLP
23                              1999 Avenue of the Stars
                                Eighth Floor
24                              Los Angeles, California 90067

25

```
 1     APPEARANCES, CONT'D:

 2     FOR THE DEFENDANTS        ANDREW FRACKMAN, ESQ.
       BERTELSMANN and           ABBY RUDZIN, ESQ.
 3     PENGUIN RANDOM HOUSE:     DANIEL L. CANTOR, ESQ.
                                 MICHAEL ROSENBLATT, ESQ.
 4                               O'MELVENY & MYERS, LLP
                                 Seven Times Square
 5                               New York, New York 10036

 6

 7     FOR THE DEFENDANTS        STEPHEN FISHBEIN, ESQ.
       VIACOMMCBS and            SHEARMAN & STERLING, LLP
 8     SIMON & SCHUSTER:         599 Lexington Avenue
                                 New York, New York 10022

 9                               RYAN A. SHORES, ESQ.
                                 SHEARMAN & STERLING, LLP
10                               401 Ninth Street, Northwest
                                 Washington, D.C. 20004

11

12     REPORTED BY:             LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
13                               United States District Court for the
                                   District of Columbia
14                               333 Constitution Avenue, Northwest
                                 Room 6706
15                               Washington, D.C. 20001
                                 (202) 354-3269
16

17

18

19

20

21

22

23

24

25
```

1

<u>I N D E X</u>

2

3                                <u>Direct</u>   <u>Cross</u>     <u>Redirect</u>

4

<u>WITNESSES FOR THE DEFENDANTS:</u>

5

Edward A. Snyder, Ph.D.                    2985      3021

6

Nicholas Hill, Ph.D.            3042

7

8

<u>EXHIBITS RECEIVED IN EVIDENCE</u>                        <u>PAGE</u>

9

10   Plaintiff's Exhibit Nos. 2000, 2002, 2003,
     2004, 2005, 2006, 2007, 2008 and 2001            3041
11   Plaintiff's Exhibit No. 0994                     3051
     Plaintiff's Exhibit No. 0995                     3078
12   Plaintiff's Exhibit No. 0996                     3085
     Plaintiff's Exhibit No. 0966                     3106
13

14   Defendants' Exhibit Nos. 169 and 435            3037
     Defendants' Exhibit No. 422                      3038
15   Defendants' Exhibit No. 423                      3038
     Defendants' Exhibit No. 370                      3038
16   Defendants' Exhibit Nos. 375, 376, 377, 428 & 436  3039
     Defendants' Exhibit Nos. 437, 438 & 439          3040
17   Defendants' Exhibit No. 369                      3042

18

19

20

21

22

23

24

25

```
1                   THE COURT:  Good morning.

2                   MR. SCHWARZ:  Good morning, your Honor.

3                   MR. OPPENHEIMER:  Good morning, your Honor.

4                   THE COURTROOM DEPUTY:  Good morning, your Honor.

5       This is Civil Case No. 21-2886, the United States of America

6       versus Bertelsmann SE and Co., et al.

7                   Will counsel please approach the podium to state

8       their appearances for the record.

9                   MR. READ:  Yes.  John Read representing the United

10      States.

11                  THE COURT:  Good morning, Mr. Read.

12                  MR. READ:  Thank you.

13                  MR. PETROCELLI:  Daniel Petrocelli for Bertlesmann

14      and Penguin Random House.

15                  THE COURT:  Good morning.

16                  MR. FISHBEIN:  Stephen Fishbein for ViacomCBS and

17      Simon & Schuster.  Good morning, your Honor.

18                  THE COURT:  Good morning.

19                  And so we are continuing with the

20      cross-examination of our expert, Dr. Snyder.

21                  Welcome back.

22                  Could you please stand to be sworn again,

23      Dr. Snyder.

24          EDWARD A. SNYDER, Ph.D., DEFENSE WITNESS, SWORN.

25                  THE COURT:  Please be seated.
```

1          Mr. Schwarz, you may proceed when you're ready.

2          MR. SCHWARZ:  Thank you, your Honor.

3                    CONTINUED CROSS-EXAMINATION

4     BY MR. SCHWARZ:

5     Q.  Dr. Snyder, good morning.

6     A.  Good morning, Mr. Schwarz.

7     Q.  Mel Schwarz for the United States.  I'll take this mask

8     off.

9          Dr. Snyder, I'd like to go back to something that

10    was a challenge yesterday, which was Page 42 of your

11    demonstratives, which -- I think you have your demonstrative

12    exhibits in front of you.  That was the 23 percent figure

13    that we were struggling to figure out.

14          Do you remember that?

15    A.  Yes.

16    Q.  Now, maybe it would be easier if you -- I don't want

17    to -- we can't put two things on the screen.  But we need to

18    look back while we have this in mind to Page 16, your

19    waterfall in the demonstrative binder.

20          MR. SCHWARZ:  Do you have the demonstrative

21    binder?

22          MR. OPPENHEIMER:  Yes.

23          Your Honor, may I approach and provide Dr. Snyder

24    with the demonstrative binder?

25          THE COURT:  Yes.  That's fine.

```
 1                    MR. OPPENHEIMER:  Thank you.
 2               (Tenders document to counsel and witness.)
 3                    MR. SCHWARZ:  Thank you.
 4      BY MR. SCHWARZ:
 5      Q.  Are you with me on Page 16 in your waterfall?  Let me
 6      know.
 7                    THE COURT:  Can you put it on the screen as well?
 8                    MR. SCHWARZ:  I don't know if you can do two at
 9      once.
10                    THE COURT:  Oh, I see.
11                    MR. SCHWARZ:  I wouldn't know, yes or no.
12               There you go.
13                    THE COURT:  Look.  It can be done.
14                    MR. SCHWARZ:  We'd be here all day if I had to do
15      it.
16      BY MR. SCHWARZ:
17      Q.  Are you with me, sir?
18      A.  Yes.  I see both.
19      Q.  Thank you.
20               Am I right that the 23 percent calculation came
21      from the data which is in Page 16?
22      A.  Yes.  From the agency data.
23      Q.  Right.
24               And now just looking at 16, we have 150
25      multi-bidder acquisitions with known runners-up of which, if
```

Snyder - CROSS - By Mr. Schwarz

1    I'm reading this right, 96 were won by PRH or Simon &

2    Schuster and 45 were won by the remaining Big 5.  Correct?

3    A.  Yes.

4    Q.  And my math tells me that is 141 out of 150.

5    A.  Yes.

6    Q.  And that's 94 percent, roughly?

7    A.  Yes.

8    Q.  And do you think that the fact that the Big 5 won all

9    but nine of those 150 contracts is at least part of the

10   explanation why the non-Big 5 were runners-up quite

11   frequently?

12   A.  I didn't catch the last part of your question.

13   Q.  The non-Big 5 seem to be runners-up perhaps 14 times.  I

14   can't be sure what -- about the percentage calculations.

15   But that strikes me with respect to the rest of the data we

16   have as a fairly high number.  And I'm trying to see if that

17   is affected, if that number went up percentage-wise, because

18   the Big 5 won 94 percent of the time.

19   A.  96 were won by the two parties and 45 by the other Big

20   5.

21   Q.  Correct.

22   A.  I mentioned, I think, very early on that these data

23   overrepresent the parties.  So that's one explanation.

24        And then you're right:  What you're seeing here is

25   a relatively small number for the non-Big 5.  It's less than

```
 1    what their share is based on the big data sets that Dr. Hill
 2    and I developed, the so-called advance data.
 3              THE COURT:  Where did you get 14?
 4              MR. SCHWARZ:  I'm --
 5              THE COURT:  You said they seem to be runners-up
 6    perhaps 14 times.
 7              MR. SCHWARZ:  Your Honor, to be fair, that was
 8    just -- that was my subtraction of nine from 23 percent.
 9    But that -- you remember we had a long colloquy about this
10    yesterday.
11              THE COURT:  Oh.  So 14 percent.
12              MR. SCHWARZ:  I have no idea if that's right.  And
13    Dr. Snyder was --
14              THE COURT:  Okay.
15    BY MR. SCHWARZ:
16    Q.  I don't mean -- I don't mean to denigrate you, but you
17    were not completely able to explain how we got to that.
18    A.  No.  I think I did.
19    Q.  Okay.
20    A.  And I explained --
21    Q.  How many --
22    A.  Excuse me.  The --
23              MR. OPPENHEIMER:  Your Honor --
24              THE WITNESS:  May I?
25              THE COURT:  Wait a minute.  We can't all talk at
```

 1    the same time.

 2                    Is there an objection?

 3                    MR. OPPENHEIMER:  Yes, your Honor.

 4                    THE COURT:  If there is, then come to the

 5    microphone.

 6                    MR. SCHWARZ:  I hadn't posed a question.

 7                    MR. OPPENHEIMER:  Your Honor, I would request that

 8    counsel not interrupt the witness so that a complete answer

 9    can be given.

10                    MR. SCHWARZ:  I'll withdraw the question, your

11    Honor.

12    BY MR. SCHWARZ:

13    Q.  Are you able now to tell us on how many occasions the

14    non-Big 5 were runner-up within the 150 known runners-up?

15                    THE COURT:  Didn't we do this calculation

16    yesterday and come up with 67?

17                    MR. SCHWARZ:  Yes.  I've only -- if your Honor

18    wants to know, I'm happy to do that.  But if --

19                    THE COURT:  Go ahead, Mr. Snyder, if you want to

20    confirm.

21                    THE WITNESS:  There are -- the base we agree on.

22    The denominator is 150.  They win in nine.  So what we need

23    is to infer the number of times that they were runner-up

24    such that nine plus that number equals 23 percent of 150.  I

25    think that's about 30 times that they were runner-up, in

Snyder - CROSS - By Mr. Schwarz

1    that ballpark.

2                    MR. SCHWARZ:  Okay.

3                    THE COURT:  Yesterday you said 67.

4                    THE WITNESS:  And I gave an incorrect answer.

5    BY MR. SCHWARZ:

6    Q.  Let's move on, then.

7                    There were a few non-Big 5 publishers that I

8    didn't ask you about, and I'll try to move that along

9    quickly.

10                   Do you know the publisher Regnery, spelled

11   R-E-G-N-E-R-Y?

12   A.  I've heard of it.

13   Q.  Do you know them to publish conservative books, books on

14   the right side of the political spectrum?

15   A.  I don't recall.  And I can check, if you want, the

16   binder.  But I don't recall.

17   Q.  And do you have any idea of how many ATS advances they

18   do in a given year?

19   A.  Their share is small.

20   Q.  Would one to five be about what you are aware of?

21   A.  Not without checking the numbers.

22   Q.  Well, then, let's look at the deposition of Regnery in

23   your binder of exhibits.  That's the one with all the tabs

24   in it, sir.

25   A.  Yes.  I see it.

1    Q.  I'll confess that I did not mark the precise lines in

2    which there is an answer of one to five, but it should be in

3    here.  This one might have gotten past us.  So I will not

4    belabor the point.  We'll figure this out.  Oh, I see my

5    problem.  My problem is very simple:  I have the wrong page.

6    Let's move on.  It seems to be the wrong page.

7              Let's talk about Abrams.  Do you know what Abrams

8    does?

9    A.  It's one of the non-Big 5 publishers that operates in

10   the proposed segment.

11   Q.  Do you know what they specialize in, if anything?

12   A.  I do recall that they publish children's books.  But I

13   don't recall exactly to what extent that is their emphasis.

14   Q.  And do you know whether they also specialize in

15   illustrated books?

16   A.  I don't recall.

17   Q.  And do you know how many -- about how many books of any

18   kind, trade books, that they publish in a given year?

19   A.  Well, just looking at the tab, I see a number 350 to

20   375.

21   Q.  And you have no reason to dispute that, do you?

22   A.  No.

23   Q.  And you wouldn't know how many of those are anticipated

24   top sellers?

25   A.  No, I don't, without checking the data.

```
 1    Q.  And with respect to Chronicle, did you look at the
 2    deposition of the Chronicle witness?
 3    A.  At some point, I did.  Yes.
 4    Q.  Did you note that they testified they had no plans to
 5    increase their production?
 6    A.  I don't recall that.  What I do recall is that they had
 7    been increasing their production.
 8    Q.  Well, take a look at the tab for Chronicle at -- the
 9    answer on Page 100, Lines 7 to 21.  In particular, the
10    question at Line 19:
11          And does Chronicle intend to increase the number
12    of trade books that it publishes each year?
13          Answer:  No.
14    A.  Yes.  I see that.
15          As I mentioned, my other understanding about
16    Chronicle is that they had increased the number of
17    acquisitions and advance spend considerably up to the time
18    that this deposition was taken.
19    Q.  And with respect to Candlewick, did you take note of the
20    fact that they had no plans to increase their acquisition
21    rate for books?
22    A.  Mr. Schwarz, I thought that you asked me about this
23    yesterday.  And I can read the full answer again if you'd
24    like.
25    Q.  Well, I'd like you to take a look at page -- if you have
```

1    it in your book -- Page 120.  If not --

2    A.  So yesterday you asked me about Page 22.  And that's

3    where there was information about their plans with respect

4    to growth.  I see on Page 120 another question regarding

5    plans to acquire books for 250,000 or more.

6    Q.  I'm glad you found that.

7            And the answer was:  No.  I do not have plans to

8    increase that.  At Line 10.  Correct?

9    A.  It's -- the question was:  Do you have any plans to

10   increase the number of offers --

11           It makes --

12   Q.  -- to acquire books at $250,000 or more?

13           Answer:  No?

14   A.  The answer is no.  And, of course, that relates to

15   current competitive conditions.

16   Q.  Right.

17           Do you have your rebuttal report in one of the

18   larger binders?

19   A.  Yes.

20   Q.  Would you turn, then, to Exhibit 9.2, Page 120.

21   A.  Yes.

22   Q.  And what are you depicting there, if you can summarize

23   it briefly?

24   A.  The title of Exhibit 9.2 is Annual Number of Books

25   Acquired From Contracts With Advances of At Least $250,000

1    For the Years 2019 Through 2021.

2    Q.  And you're attempting to put together the maximum

3    production in those years?

4    A.  In the first three columns, it's just the simple

5    numbers.  And then there is a calculation of the yearly

6    average.

7    Q.  And the right-hand column is the maximum year's increase

8    above average year.  Right?

9    A.  Yes.

10   Q.  So looking at the second column from the right, the sum

11   of publishers' yearly maximum, is that an indication at

12   least for those three years of the maximum production of

13   Penguin Random House, Simon & Schuster and all the other

14   publishers for ATS books?

15   A.  It's the highest observed number for that -- for a given

16   year --

17   Q.  Okay.

18   A.  -- over that three-year time period.

19   Q.  And have you made an effort to calculate what the share

20   of that highest production is as between the merging parties

21   and everybody else?  In other words, 1,005 is what

22   percentage of the total of roughly 2,227?

23   A.  It seems to me about 40 percent.  But I could

24   actually --

25   Q.  Maybe a little bit higher.  But not much different than

1    their market share as we calculate it in the anticipated top

2    seller market.  Correct?

3    A.  Correct.

4    Q.  Let's talk about --

5            THE COURT:  Mr. Schwarz, I'd like to go back to

6    that formula for the 23 percent.  If now is not a good time,

7    I can wait.  But I'm looking at it, and I think --

8            MR. SCHWARZ:  If it's a good time for you, it's a

9    good time for us.

10           THE COURT:  Okay.  You said nine plus X equals 23

11   percent of 150.  But we're looking for runners-up.  So

12   shouldn't it be 300?

13           THE WITNESS:  That was a mistake I made yesterday,

14   your Honor.  Here it's just:  Of the total number of actual

15   contract competitions, how often are they winner or

16   runner-up?

17           THE COURT:  I see.  So it should be 23 percent of

18   150.

19           THE WITNESS:  Correct.  I apologize for the error

20   yesterday.

21           THE COURT:  Okay.  Okay.  Got it.  Thank you.

22   BY MR. SCHWARZ:

23   Q.  But I think you said that that number could be skewed a

24   bit because the data overrepresents PRH and Simon & Schuster

25   as well as having the Big 5 win 94 percent of the 150

Snyder - CROSS - By Mr. Schwarz

1    occasions?

2    A.  I think you said a particular number being overskewed.

3    I might have misheard.  So which number are you asking

4    about?

5    Q.  I think -- I just wanted to go back to the point that

6    you were saying that this 150, the data, skewed higher for

7    PRH, Penguin Random House and Simon & Schuster, than the

8    norm.

9    A.  Yes.

10    Q.  And in terms of our market share information, the fact

11    that the Big 5 won 94 percent of the time is slightly higher

12    than we might otherwise expect, which was 91 percent on

13    other occasions when we were calculating that number?

14    A.  I see it somewhat differently.  But I understand your

15    question.  If PRH and S&S are overrepresented --

16    Q.  Yes.

17    A.  -- then the other Big 5 and non-Big 5 are

18    underrepresented.

19    Q.  But the fact that the Big 5 wins 94 percent of the time

20    might skew the runner-up -- runner-up occasions of the

21    non-Big 5 higher than it normally might be?

22    A.  I don't see how that would necessarily follow.

23    Q.  Okay.

24            THE COURT:  But the 23 percent is based on the

25    agency data, which seems to be skewed?

 1          THE WITNESS:  It overrepresents PRH and S&S.  It

 2     underrepresents everybody else.

 3          You see that in the -- compared to Dr. Hill's

 4     advance data shares, my advance data shares.  And you just

 5     look at the titles and shares in the agency data.  You see

 6     them overrepresented.

 7          And, your Honor, I believe it's because of -- the

 8     production came in response to requests from the parties and

 9     then I think it might have been supplemented by the

10     Government.  But the agencies provided the data.  It's

11     possible, at least, that they focused more on acquisitions

12     that the parties were involved with and won.

13          THE COURT:  But the request was for all of their

14     data.  And you're saying that they might have not --

15          THE WITNESS:  I probably shouldn't speculate.  I

16     can only see that they're overrepresented.

17          THE COURT:  Okay.  But in other words, the agency

18     data is not a representative set of data?

19          THE WITNESS:  Correct, in terms of

20     overrepresenting the parties.  It's also not representative

21     with respect to average advances.  My recollection is that

22     the average advances in the agency data are lower.

23          But for my purposes, seeing the mix of

24     acquisitions, seeing the percentage of time that one of the

25     parties wins, does the other party bid, those dimensions of

1    not being representative do not affect my analysis.

2         THE COURT:  Thank you.

3    BY MR. SCHWARZ:

4    Q.  At the risk of going through this too much, one other

5    point comes to mind.  I think we established that the

6    non-Big 5 won nine out of 150 contracts.  Correct?

7    A.  These are 150 multi-bidder contracts for which we have

8    an identified runner-up.

9    Q.  I understand that.

10         I'm just trying to get to the math.  Nine over 150

11   is about 6 percent?

12   A.  Correct.

13   Q.  And that is less frequent than the 9 percent we have

14   seen in other data as the share of ATS books acquired by

15   non-Big 5?

16   A.  Yes.  The other data show 9 to 10 percent.

17   Q.  Now, one more question, then.  If that number, 6

18   percent, is underrepresenting the non-Big 5, you wouldn't be

19   surprised to see that they end up being runner-up more often

20   than normal?

21   A.  I'm sorry, Mr. Schwarz.  I don't see how you can go from

22   that to your provisional result.

23         THE COURT:  Because the market share isn't about

24   runner-up.  Market share --

25         MR. SCHWARZ:  Yes, your Honor.  You're absolutely

1    right.  The market shares are with respect to wins.  But if

2    you win less frequently than normal, perhaps -- well, I

3    don't want to testify.

4              THE COURT:  Okay.

5              MR. SCHWARZ:  And I'm not the economist.

6              THE COURT:  Okay.

7    BY MR. SCHWARZ:

8    Q.  So with respect to imprints -- we're changing gears now;

9    we'll get off math for a while -- are you aware of any legal

10   impediments to Penguin Random House or Simon & Schuster

11   after the merger changing their imprint policy with respect

12   to various imprints bidding for the same book?

13   A.  No.

14   Q.  And are you aware of certain occasions when the editors

15   do coordinate their bids so as not to -- so as to come up

16   with a single bid for a particular book?

17   A.  In certain situations.  I didn't see any in the context

18   of one-on-one negotiations, imprints or best bids.  And I

19   only saw those examples in rounds auctions after a certain

20   point.

21   Q.  And you're aware, of course, that, for example, at

22   Penguin Random House most of these editors work in the same

23   building together?  At least they did before COVID?

24   A.  They're colleagues across the organization, independent

25   of COVID.

1    Q.  And we would never know if they spoke to each other in

2    the hallway, would we, about a particular book?

3    A.  We would not.

4    Q.  I think I asked you this yesterday in a different

5    context, whether you had heard or read Ms. McIntosh's

6    testimony.

7    A.  I do recall your question.

8    Q.  Yeah.  And the answer was, I think, yes, at least to

9    some extent?

10   A.  To some extent.

11   Q.  Did you happen to notice the document, which is PX 411,

12   which was a deck, and on Page 4 of which she said that --

13   Ms. McIntosh said she wanted to increase background

14   coordination to leverage internal demand information better

15   and avoid internal upbidding?

16   A.  I'd like to just find the document, Mr. Schwarz, if you

17   could direct --

18   Q.  I'm not sure that that's in your binder.  But I only ask

19   you:  Are you aware of that at all as you sit here?

20   A.  I don't recall that testimony.

21   Q.  So would it affect your view of the importance of

22   imprint competition if you knew that the head of PRH U.S.

23   would like to reduce the amount of upbidding by the various

24   imprints?

25   A.  You're asking about testimony that I'd like to see

Snyder - CROSS - By Mr. Schwarz

```
 1    before I make --
 2    Q.  Just assume that -- and if I'm wrong, I'm wrong.  But
 3    assume that was the testimony.
 4    A.  And could you restate what the assumption is?
 5    Q.  The assumption is that Ms. McIntosh at PRH, head in the
 6    U.S., wanted to leverage internal demand information better
 7    and avoid internal upbidding.
 8    A.  Compared to the current situation, I'm not sure what
 9    that means.  But I understand that she -- I'm assuming that
10    you're right.
11    Q.  Yes, you are.  That's my question.  If I'm wrong, then
12    I'm wrong.
13    A.  And then what's the question?
14    Q.  Does that affect your view about the importance of
15    imprint competition within Penguin Random House or Penguin
16    Random House and Simon & Schuster?
17    A.  Not really.  I mean, Penguin Random House has 100
18    imprints.  The editors are very entrepreneurial.  The firm
19    is set up for them to be -- to go out and engage potential
20    authors.
21         To have somebody at the top of that saying they
22    would like to potentially coordinate more, I don't -- based
23    on what I understand about the organization, that would not
24    change the intensity of imprint competition.
25    Q.  So you don't think that the CEO wanting to change
```

Snyder - CROSS - By Mr. Schwarz

1    policies in any way will have any effect on editors?

2    A.  What I know about editors is that they are creative and

3    entrepreneurial.  Could it have some effect in some

4    situations?  Sure.  But with 100 imprints and one person

5    saying they'd like to coordinate, no.  I don't see how that

6    can materially affect the extent of imprint competition.

7    Q.  Let's change gears again here --

8              THE COURT:  Wait.  Can I follow up on that?

9              MR. SCHWARZ:  Of course.

10             THE COURT:  So they appointed someone to start

11   coordinating bids internally, according to some of the

12   testimony.  And there are emails of them coordinating bids,

13   like different editors and publishers in different

14   situations saying:  In this one, let's just go up by this

15   amount or Let's all bid the same amount.

16             That doesn't affect your analysis?  Because I

17   thought you were assuming that they were all competing with

18   one another internally, like independently.  But they may

19   not be?

20             THE WITNESS:  I'm not assuming that there's no

21   coordination.  And I'm also aware that for one of the

22   Penguin Random House divisions, there is a structure in

23   place to coordinate and provide house bids in a similar way

24   to Simon & Schuster.

25             THE COURT:  No.  This is not the house bids; this

Snyder - CROSS - By Mr. Schwarz

1    is actually -- they've appointed someone to internally

2    coordinate bidding at PRH.  There's testimony to that

3    effect.  And there are emails of editors saying:  Let's all

4    go up this amount or Let's all bid the same amount.

5              THE WITNESS:  And is that for all of PRH?

6              THE COURT:  It's for various divisions within PRH

7    coordinating.  And the person who's appointed, my

8    understanding, is for PRH for all of North America.

9              THE WITNESS:  Okay.

10             THE COURT:  Does that affect your analysis?

11             THE WITNESS:  Without having this implemented, I

12   really can't speculate.

13             And maybe I should just say:  We'll see.  But my

14   understanding of what editors do is that, again, they are

15   entrepreneurial.  And if there's too much coordination in a

16   situation like that, the firm is going to reduce the

17   motivation for editors.

18             So with that predicate, I'd have to think about --

19   and I think the best thing to do would be to see if that

20   actually had any effect.

21             THE COURT:  But if you assume that they do that,

22   that still doesn't affect your analysis?

23             THE WITNESS:  Well, the question is:  How much

24   coordination?  What actual restrictions on advances would

25   occur?  And in what circumstances?  Is the coordination

Snyder - CROSS - By Mr. Schwarz

1      going to involve best bids?  That would be a very sharp

2      departure.  Is the coordination going to involve one-on-one

3      negotiations?

4              I doubt it.  So we're talking about one particular

5      auction format, if I understand the assumption.

6              THE COURT:  I think not bilateral, but I think it

7      affects everything else.  Okay.

8              THE WITNESS:  Again, agents always have the option

9      to pick the format and make adjustments.

10             THE COURT:  Okay.

11             THE WITNESS:  So it could have an effect in some

12     situations, based on what I'm hearing this morning.

13             THE COURT:  Thank you.

14             MR. SCHWARZ:  May I change gears, your Honor?

15             THE COURT:  Yes.

16             MR. SCHWARZ:  Thank you.

17     BY MR. SCHWARZ:

18     Q.  You testified to some extent about the Penguin Random

19     House merger as to some extent indicative of the fact that a

20     merger did not have a negative effect on advances.  Is that

21     perhaps a too shorthand summary of where you were with

22     Mr. Oppenheimer?

23     A.  For the three buckets of advances from 250 to 500, 500

24     to a million and a million to two, the three-year period

25     before and the three-year period after 2013, it shows an

1    increase in average advances for those three buckets.  And

2    the ones above that, average advances does not show an

3    increase.

4    Q.  I think you're referring to DX 385, so I'm going to --

5    I'm not sure if that's in front of you.  But in any event, I

6    would like to look at DX 385, so I'm going to hand that up

7    to you.

8                MR. SCHWARZ:  With your Honor's permission.

9                THE COURT:  Yes.

10               MR. SCHWARZ:  If I may approach.

11               (Tenders document to the witness.)

12               THE WITNESS:  Thank you.

13   BY MR. SCHWARZ:

14   Q.  This is a chart that you prepared, is it not?

15   A.  Yes.

16   Q.  And it's hard to see exactly the numbers, because

17   they're just pinpoints.  But the way I look at this, if I'm

18   reading it right, in the 500,000-and-above category, the

19   average advances drop between 2010 and 2021.  Likewise, for

20   the average advances of 250 -- 250,000 and above.  Am I

21   reading that correctly?

22   A.  And your start year is not 2013; it's 2010?

23   Q.  I'm looking at your chart, sir.  Yes.

24   A.  Sir, I'm just asking the --

25   Q.  And you started at 2010.  Yes.

```
 1    A.  Thank you.
 2              Yes.  I see that.
 3    Q.  So I'm reading it correctly?  They went down.  Yes?
 4    A.  For --
 5    Q.  For those two categories, 250 and above and 500 and
 6    above.
 7    A.  From 2010 to 2021, yes.
 8    Q.  Right.
 9              And I think even the one from 100,000 and above
10    went down slightly.  Correct?
11    A.  I can't tell.
12    Q.  It's a little bit lower.
13              And how about the zero and above?  I assume -- so
14    is that zero to 100,000, that chart, that bar at the bottom?
15    A.  No.
16              If I may just explain:  That's why I redid the
17    calculations by buckets.  This is just a dollar amount and
18    above.
19              In the earlier question, where I gave the summary,
20    I think it provides much more insights about the buckets
21    because, as we know, when you get to the high numbers, high
22    advance levels, that -- you're influenced greatly by
23    choppiness in the data.  So if you look at buckets, the
24    three buckets that I identified earlier, the advance levels
25    go up.
```

1             However, I'm not doing it for the whole time
2      period, which is why I wanted to clarify why -- that you're
3      starting at 2010.
4      Q.  Right.  It would be great if you would just answer my
5      questions.  And if your counsel wants you to expound, he'll
6      have redirect.
7             My question was:  Is the category zero dollars and
8      above, is that everything from zero up?
9      A.  Yes.
10     Q.  Up to whatever?  Millions?
11     A.  So it's influenced by everything.
12     Q.  And -- but the 500,000 and above is also influenced by
13     everything, too.  Correct?  Everything above it?
14     A.  Correct.
15     Q.  Okay.  So you can help me with the math if I'm wrong.
16     But if you have the -- the only one going up is the zero and
17     above.  And the only thing that you're adding to it is zero
18     to 250.  Everything else is already indicated above that.
19     The only thing that could affect those numbers are zero to
20     250.  Correct?  And so it must be that the zero-to-250
21     category is the part that's increasing that chart?
22     A.  I'm sorry.  This is influenced by the high end.
23     Q.  I know that, sir.  All of them are influenced by the
24     high end, according to your testimony.
25             So therefore, it must be -- I think -- that the

1   zero to 250 is the part that's being added on the bottom and

2   it must be the one going up?

3   A.  No.  And the answer is very simple.  If you look at the

4   buckets from 250 to 500, they are going up.  If you look at

5   the bucket from 500,000 to a million, they are going up.  So

6   it's not -- with these data, you can't -- in fact, you would

7   make a mistake drawing that inference.

8   Q.  Okay.  If you think so.

9           Would you look in your binder of exhibits, our

10  exhibits, which is the one that's got all the tabs in it, at

11  PX 92?

12          MR. SCHWARZ:  And this was admitted into evidence,

13  I believe, with Mr. Sansigre.

14  BY MR. SCHWARZ:

15  Q.  Now, I'm just -- the first question, I guess, would be:

16  Do you recall ever seeing this before today?

17  A.  I just need a moment, Mr. Schwarz.

18  Q.  Certainly.

19  A.  I don't recall seeing this right now.  I've seen data

20  along these lines, but I don't recall this page.

21  Q.  Well, take a look at the bottom of the first page there.

22  You see there's a chart that indicates net sales and

23  advances.  Do you see that?  The bottom of the page.  It's

24  nice and big on your screen.

25  A.  Yes.

 1    Q.  And you see the column, second from the right, 2011 to

 2    2019?

 3    A.  Yes.

 4    Q.  And 2011 is before the Penguin Random House merger?

 5    A.  Yes.

 6    Q.  And 2019 is after?

 7    A.  Yes.

 8    Q.  And 2019 is before the pandemic.  Right?

 9    A.  Yes.

10    Q.  Okay.  And you see there that for those years, total net

11    sales went up.  I assume that's millions, 46 million?

12    A.  I can't make that assumption.  I'm not sure what "net

13    sales" here means.  Are you just -- can you represent that

14    this is downstream?

15    Q.  I'm asking you if it says that net sales for fiction,

16    nonfiction and juvenile books went up 46 million.  That's

17    what it says, anyway, isn't it?

18    A.  I'm just asking what net -- it says those words.  I'm

19    just asking you if you know if this refers to downstream

20    sales.  I assume it does.

21    Q.  I believe it's referring to net sales income of Penguin

22    Random House -- excuse me -- before the merger, Random

23    House; after, Penguin Random House.

24    A.  Okay.

25    Q.  And it's talking about advances in the same column at

1    the bottom.  It shows a minus 73.

2              Do you see that?  I assume again it's millions.

3    A.  Yes.

4    Q.  So is it fair to draw the conclusion from that that for

5    those years, net sales went up and advances went down?

6              MR. OPPENHEIMER:  Your Honor, object to the

7    question.  No foundation for this witness.  It's not his

8    document.

9              THE COURT:  Overruled.

10             THE WITNESS:  As depicted for these three rows,

11   fiction, nonfiction, juvenile, that's what it shows.  I

12   don't know if there's a particular cutoff here or not.  And

13   I don't know how it would take into account the change in

14   strategy with respect to mass merchandise.

15   BY MR. SCHWARZ:

16   Q.  Okay.  You can put that to the side.

17             Lastly, I'd like to talk about coordinated

18   effects.  Okay?  Do you have an understanding of whether or

19   not the horizontal merger guidelines are also concerned with

20   legal tacit coordination as well as unlawful coordination?

21   A.  I don't think it says those words.  But I understand

22   what you're saying.  The concern is not just what is

23   illegal, but also what might be potentially tacit

24   coordination.

25   Q.  To refresh your recollection, I'll read a couple

1    sentences from the merger guidelines:

2         Coordinated interaction alternatively can involve

3    parallel accommodating conduct not pursuant to a prior

4    understanding.  Parallel accommodating conduct includes

5    situations in which each rival's response to competitive

6    moves made by others is individually rational and not

7    motivated by retaliation or deterrence, nor intended to

8    sustain an agreed-upon market outcome, but nevertheless

9    emboldens price increases and weakens competitive incentives

10   to reduce prices or offer customers better terms.

11   Coordinated interaction includes conduct not otherwise

12   condemned by the antitrust laws.

13        Does that refresh your recollection about the

14   concern of the merger guidelines?

15   A.  It doesn't refresh it.  I think I answered it correctly

16   before.

17   Q.  Do you have an understanding of whether or not royalty

18   rates for hardcover books are relatively standard across the

19   industry?

20   A.  As a percentage of retail price.

21   Q.  Yes.  15 percent is the norm?

22   A.  Yes.

23   Q.  And do you also have an understanding that it has come

24   to be the case that at least the Big 5 publishers insist on

25   receiving audio rights when they negotiate contracts?

1    A.   It's not just the Big 5.   This is, I think, the trend in

2    a more global world and a more digital world, to go for a

3    broader set of rights.

4    Q.   And I wasn't sure what you were saying when we were

5    talking about installment payments.   You're aware that

6    advances are typically paid in installments?

7    A.   Yes.

8    Q.   And were you saying that you think it was

9    inconsequential that payments went from three tranches to

10   four?

11   A.   Well, just to clarify, they didn't go from three to four

12   in terms of contracts already in place.   Right?   So --

13   Q.   Right.

14   A.   -- the change was for new contracts.   And what I was

15   saying in terms of interaction with your Honor was that if

16   you have a change in the time intervals and the number of

17   payments, that is relevant, but it doesn't -- because when

18   you get paid, of course, matters.   But it leaves out how

19   much.   And the advance level is negotiated going forward

20   with the change.

21          So that single change does not lead to a reduction

22   in competition unless there is also a constraint on

23   advances.   And then if there's a constraint on advances,

24   what about bonuses, et cetera?

25   Q.   So you think that when payments got changed from three

1    to four quarterly payments, that presumably advances went up

2    in order to compensate for the lost interest or time value

3    of money?

4    A.  I'm just pointing out that that as a coordination

5    mechanism according to the guidelines has to be put in

6    context of the dimensions of competition.  And it would not

7    be sufficient to lessen competition because there are so

8    many other dimensions on which publishers compete.

9    Q.  Are you aware of whether or not when the change was made

10   from three payments to four for advances as a matter of norm

11   that advances went up to compensate for the lost value of

12   the money or the time value of money?

13   A.  Well, that's sort of the point:  You can't know.  And no

14   one could know.  No rival could know if a publisher was

15   altering advances or bonuses or anything else.  That's why

16   the other part of the coordination is about detection,

17   monitoring and punishment.

18          There's no way anybody would know.  And especially

19   not me.

20   Q.  All right.  Let's turn to actual coordination for a

21   minute.

22          Have you read the Court of Appeals decision in

23   *United States versus Apple*?

24   A.  I know the case.

25   Q.  All right.  And just for the record, that's 791 F.3d

1    290, 2015.

2             And referencing -- I'm going to read you a passage

3    from it, sir.  I haven't made it an exhibit, but I'm going

4    to just ask you about a discrete fact.

5             The Court wrote at Page 300:  Conveniently, the

6    Big 6 operated in a close-knit industry and had no qualms

7    communicating about the need to act together.

8             Of course, at this time, Penguin was part of the

9    Big 6.

10             As the District Court found, based on the

11    publisher Defendant's own testimony, quote -- and now

12    quoting the district court:  "On a fairly regular basis,

13    roughly once a quarter, the CEOs of the Big 6 held dinners

14    in the private dining rooms of New York restaurants without

15    counsel or assistants present in order to discuss the common

16    challenges they faced."

17             Are you aware of that happening?

18    A.  Yes.

19    Q.  And the CEOs of the Big 6 were the Big 5 plus Penguin.

20    Correct?

21    A.  I don't think that's correct with respect to Penguin

22    Random House.

23    Q.  Do you think there's another -- a different sixth than

24    Random House?

25    A.  All I'm saying is I don't know if it included all six.

Snyder - CROSS - By Mr. Schwarz

```
 1    I mean, if --
 2    Q.  So you're quarreling with the Court's finding?
 3    A.  I'm just saying I can't square that with some other
 4    information that I'm aware of.
 5    Q.  All right.  And --
 6    A.  I'm not trying to quarrel with anybody.
 7    Q.  Well, let us assume with your noted exception that all
 8    six did meet for private dinners.  I'm not -- I understand
 9    Random House was not a defendant in this case.  But I read
10    you the facts as described by the Court.
11          Let's assume they did that.  Is it possible, given
12    that they talked about the concerns of the day that they
13    faced, that they might have talked about things such as
14    advances?
15    A.  I don't know.
16    Q.  We'll never know, will we?
17    A.  I don't know.
18    Q.  It was the case, however, that these six along with
19    Apple were able to conduct a conspiracy in which they made a
20    great effort to get the prices of e-books up.  Correct?
21    A.  That's my understanding.  Yes.
22    Q.  And they were able to do that by coordinating among
23    those six, weren't they?
24    A.  Apple did the coordination and the prices were
25    observable.
```

1    Q.  And the other six -- putting aside Random House -- went

2    along, correct, happily?

3    A.  I can't get inside the conspiracy.  I know the basic

4    allegations.

5    Q.  Right.  And so let's -- in your testimony with

6    Mr. Oppenheimer, you kept putting aside poaching, if I

7    recall.  Correct?  Poaching authors.

8           Is it not possible that those CEOs could get

9    together and make a deal to not poach each other's

10   anticipated top selling authors or actually top selling

11   authors?

12   A.  So just repeat the last part.  The actual or

13   potential...?

14   Q.  Or potential.  I was just trying to distinguish between

15   anticipated and actual.  So let's make it the ones that they

16   know are top sellers.

17   A.  The reason why I separated that, just to be clear, your

18   Honor, is in that situation, detection would happen right

19   away.  If there was a deviation from the agreement, if an

20   incumbent author was poached, the editor and the publisher

21   would learn about it.  So this is different from the other

22   things.

23           But then the question is -- and I think this is

24   answering your question, Mr. Schwarz -- is it possible for

25   them to do that and implement it?  Not in the real world,

 1    no.

 2    Q.  You, I think, said you were an expert in the high-tech

 3    litigation.  Am I correct?  Out in California?

 4    A.  Yes.

 5    Q.  And that related to antipoaching agreements among

 6    Silicon Valley employers, did it not?

 7    A.  I think it was a broad set of employers, not just in the

 8    Valley.

 9    Q.  And they were able to implement nonpoaching arrangements

10    amongst themselves, were they not?  At least allegedly?

11    A.  Not in a consistent way.  There were allegations and

12    there were -- obviously, there was attempts to establish

13    that there had been restraints.

14    Q.  So is it your testimony that if the Big 5 CEOs got

15    together at dinner on a quarterly basis and agreed that they

16    weren't going to poach each other's top selling authors,

17    that that might not be effectuated?

18    A.  I don't see how it would.  So an agent contacts an

19    editor and says:  You know, my top selling author has a

20    broken relationship with his or her editor.  And this author

21    is in play.  Do you want to talk to me?

22             And then the editor is going to say:  No.  I don't

23    want to?

24             I can't see that happening.  And I don't think a

25    no-poaching agreement would in fact be effective, given

1    those circumstances.

2    Q.  Are you saying it would not be or it would be if they

3    did have that agreement?

4    A.  It would not be effective, because the circumstances

5    that lead somebody to move will come up independently.  And

6    then the question is:  How in the world are editors going to

7    respond?  Are they just going to say:  No, no thank you?

8    And then wait for some other of the 30 publishers to say:

9    No.  I'm not going to follow this agreement.  I want to pick

10   up that author?

11   Q.  So you think --

12   A.  I don't --

13   Q.  You think the CEOs of these corporations have limited or

14   no control over their employees?  Is that basically what

15   you're saying?

16   A.  You have to understand --

17   Q.  Is that what you're saying?  Yes or no.

18   A.  I think I get to give more than a "yes" or "no" answer.

19   You may disagree.  But if the Court wants to instruct me,

20   then of course.

21           So what was the question?

22   Q.  Do you think that the CEOs of these Big 5 publishers

23   have less control over their employees than the typical CEOs

24   of major corporations?

25   A.  Not in a way that would affect this idea of poaching

Snyder - CROSS - By Mr. Schwarz

1  when you have 25 other publishers who would be very happy to

2  get authors who are currently published by the Big 5.

3         And I can go on, but I realize you don't want to

4  have me continue.

5         THE COURT:  Well, I think maybe the hypothetical

6  is somewhat different from what you've answered.  Could they

7  make an agreement that they won't go after each other's

8  authors as opposed to authors approaching them and turning

9  them down?  Could they make an agreement that we won't

10  affirmatively, you know, approach any of your authors?

11         THE WITNESS:  And that, your Honor, is exactly the

12  kind of thing that came up in high-tech.  Were there

13  situations where somebody initiated a move or was it

14  poaching?  What was the communication that was required to

15  distinguish the two of somebody saying "I want to move"

16  versus somebody saying, "Hey, would you possibly move?"

17         That's what I mean.  I think in practice this is a

18  nonstarter.

19         THE COURT:  Because in practice, you can't

20  distinguish between the two readily?

21         THE WITNESS:  Mr. Schwarz's question was focused

22  on the Big 5.  Even within the Big 5, I don't see how

23  individual editors would say, you know:  This great author,

24  we have an agreement among the Big 5.  We're not going to

25  poach.

1          But if in fact -- and it's hard for the agent to

2     know.  If in fact this is a situation where the author's

3     relationship with the imprint and the editor is broken,

4     they're going to leave.

5          So I think it's just too much of a risk to say:

6     No.  I'm going to follow the agreement.  And I don't think

7     the CEOs would want to have their editors follow that

8     agreement.

9          THE COURT:  So your answer is premised on your

10    belief that the editors would not comply with the directive

11    from the CEO to not poach?

12         THE WITNESS:  I don't think it would be in the

13    interest of the CEOs to try to reach this agreement if there

14    were five because --

15         THE COURT:  Putting that aside, if they reached

16    that agreement, you think it wouldn't work because the

17    employees would not follow the directive?

18         THE WITNESS:  They might follow the directive.

19    But the impact on competition is not just poaching from

20    them; it's all the other 25.  This would be a great

21    opportunity for any number of other publishers to get an

22    established author.

23         THE COURT:  So your answers seem to be focused on

24    why this is a bad idea.

25         We're just trying to understand the coordination,

Snyder - CROSS - By Mr. Schwarz

 1    like can the coordination happen?

 2          THE WITNESS:  It would be a bad idea because the

 3    CEOs I don't think would --

 4          THE COURT:  We're not interested in bad ideas;

 5    we're interested in whether the coordination can happen.

 6          THE WITNESS:  And I don't think it can happen

 7    because in terms of affecting competition, I don't think the

 8    five would be able to come up with a mechanism that would

 9    distinguish among the types that your Honor talked about.

10    And even if they did, there would be many other competitors

11    that are very happy.  So the impact on competition would not

12    be there.  And what would the Big 5 be doing?  They would

13    just be hurting themselves.

14          THE COURT:  Okay.  Thank you.

15          MR. SCHWARZ:  I was going to pass the witness,

16    your Honor.

17          THE COURT:  Thank you.

18          MR. SCHWARZ:  Thank you.

19          MR. OPPENHEIMER:  Good morning, your Honor.

20          THE COURT:  Good morning.

21                    REDIRECT EXAMINATION

22    BY MR. OPPENHEIMER:

23    Q.  Good morning, Dr. Snyder.  How are you?

24    A.  Good morning, Mr. Oppenheimer.

25    Q.  I don't think this will be long.  Let's start where you

1    and Mr. Schwarz just left off and just finish that up

2    quickly.

3             In your analysis, did you -- with respect to

4    coordination, did you consider Dr. Hill's opinion regarding

5    the e-books case?

6    A.  I did.

7             MR. OPPENHEIMER:  And may we bring up Slide 68,

8    Pam?

9    BY MR. OPPENHEIMER:

10   Q.  Does the e-books case in your opinion show that the

11   market for acquisition of books, the market for acquisition

12   of books from authors upstream, is vulnerable to coordinated

13   conduct?

14   A.  No.  In fact, the differences are instructive.

15   Q.  Okay.  Would you elaborate by reference to your

16   demonstrative that we have on the screen?

17   A.  As I mentioned earlier, one difference is Apple.  You

18   had a coordinating firm, the so-called hub and spoke.

19             The second major difference is that this

20   conspiracy as alleged concerned downstream prices which were

21   observable.  Neither of those two things are present in the

22   context of the acquisitions of book rights.

23   Q.  And are there any other factors that you observed?

24   A.  Well, those are the two main factors.  And I don't want

25   to get into the -- back into the question of Random House's

1  role.  My understanding is that they were not a defendant.

2  Q.  Understood.

3       Going to the colloquy with Mr. Schwarz with

4  respect to following the orders of a CEO, just talking about

5  practice now, would it be your understanding that as a

6  matter of the economics of coordination that literally every

7  acquiring publisher would have to be told about this

8  coordination?

9  A.  Well, maybe not every one, but you'd have to get more

10  than a small number.

11  Q.  And would it be the case that in every instance in which

12  there was -- let me rephrase.

13       Describe for us, if you would, what the process

14  would need to be for each editor to determine whether they

15  were dealing with a situation where the author that was

16  approaching them had made an independent decision to leave

17  their prior publisher.

18  A.  That gets back to your Honor's question.  It's possible

19  that the CEOs -- let's go with this theory -- are going to

20  say:  We're not going to poach.  And there's five of them.

21       But then they want to carve out an exception:

22  Well, it's okay if we're approached.

23       Well, can that be -- can that approach be

24  manufactured?  How do you distinguish between when somebody

25  is adhering to the agreement?  Per the guidelines, when are

1    the deviations from the agreement detectable?  And what is

2    the punishment going to be?

3            In this situation, unless you say "No poaching,

4    never, we're never going to," then the issue of detection

5    becomes really important.  And then if it's that conspiracy,

6    then I go back to:  Why would a small number of publishers

7    do that unless they had everybody on board or nearly

8    everybody on board?

9    Q.  In your work -- by the way, Professor Snyder, you've

10   testified as an expert in other cases with respect to

11   coordination.  Is that correct?

12   A.  High-tech employees.

13   Q.  And in your work in this area and in this case, have you

14   ever seen reports of coordination in the upstream

15   acquisition market for books?

16   A.  No.  And I don't think Dr. Hill has said that he sees

17   anything either in terms of the baseline type of

18   coordination.

19   Q.  Let's change gears.  I want to ask you some questions.

20   Now we're getting into a bit of housekeeping, Professor

21   Snyder.  We're close to the end here.  I appreciate your

22   patience.

23            But I want to talk a little bit about margins.

24   And you were questioned yesterday by Mr. Schwarz regarding

25   the inclusion of operating costs when calculating margins.

 1              Do you have that question-and-answer sequence in

 2     mind?

 3     A.  I certainly have the topic in mind.

 4     Q.  All right.  And have you had an opportunity to review

 5     Simon & Schuster's Mr. Karp's trial testimony on this point?

 6     A.  Yes.  Parts of it, at least.

 7     Q.  And do you recall that Mr. Karp testified regarding S&S

 8     having targets in the acquisition P&Ls for both gross margin

 9     and operating income margins?

10     A.  My recollection is that both parties reflect operating

11     expenses in that way.

12     Q.  Can you tell us the significance of that or the way in

13     which you treated margins in your analysis?

14     A.  Well, I wanted to follow their practice as reflected in

15     the book-level P&Ls, recognizing that what I called the

16     Economics 101 approach does not work in the context where

17     you have a large number of operating units making bids.  And

18     if all of them were to be willing to bid to a margin that

19     did not allow for some recovery of operating expenses, that

20     would be unsustainable.

21     Q.  And would you explain why, briefly?

22     A.  By exception, it's fine.  But if you do it -- I think

23     this came up very early on.  Suppose you've got 100 books

24     published and now you look at the 101st.  Well, the marginal

25     costs of that are low.  The margins are high.

```
1              But if you did that for all 101, the problem would
2      be the firm would not be through the activities of these
3      distributed imprints capturing enough of their operating
4      expenses, including Mr. Schwarz's, you know, example of the
5      CEO salary.
6              But in general, what firms have to do is not just
7      price for the 101st book; they have to price in a way that
8      sustains the organization.
9      Q.  And do you recall the general standard that Simon &
10     Schuster wants to achieve for operating income in their
11     acquisition P&Ls?
12     A.  Could you repeat that?
13     Q.  Sure.
14              Do you recall the general standard that S&S wants
15     to achieve for operating income margin in their acquisition
16     P&Ls?  And I don't believe an exact number was used.
17     A.  I don't recall.
18     Q.  Do you recall whether it was positive?
19     A.  Yes.
20     Q.  What is the significance of that for you?
21     A.  Well, it's instructive about -- you know, this is
22     Management 201, not Econ. 101.  You have -- I'm just
23     repeating myself.
24     Q.  Pardon me.
25              MR. OPPENHEIMER:  Pam, if we can bring up
```

```
 1          Plaintiff's Exhibit 577.
 2                    Your Honor, this has already been admitted.
 3                    THE COURT:  Okay.
 4     BY MR. OPPENHEIMER:
 5     Q.  I want to draw your attention -- let's see.  We want to
 6     move a couple of pages back.  This is the P&L.  Here we go.
 7                    Do you recognize this as a portion of the
 8     book-level P&L that you examined in your work in this case?
 9                    THE COURT:  This is confidential, correct?
10                    MR. OPPENHEIMER:  Yes, your Honor.  Thank you.
11                    THE WITNESS:  Yes.  This is a book-level P&L.
12     BY MR. OPPENHEIMER:
13     Q.  And I'd like to draw your attention -- we've highlighted
14     it -- it's about two-thirds of the way down the page.
15     There's a gross margin line.
16                    Do you see that?
17     A.  I do.
18     Q.  And then below the gross margin line, there are six
19     categories of fixed expenses.
20                    Do you see those?
21     A.  Fixed expenses.  They include editorial, warehousing,
22     non-titled advertising, production, selling, and the last
23     one is G&A.
24     Q.  And would you classify those as ongoing operating
25     expenses?
```

1    A.  Yes.

2    Q.  Would you explain why?

3    A.  Well, for example, warehousing.  To be in the book

4    business, you have to figure out a way to distribute the

5    books.  So that's an ongoing expense.

6              Selling is an ongoing expense.

7              G&A is a general category.

8              So these are operating expenses that occur on an

9    ongoing basis.  And what's reflected here and what I see

10   consistently is that S&S and PRH are given guidance, not

11   that it can't be put aside by exception, but the guidance

12   here is price in a way that allows us to cover these ongoing

13   operating expenses.  And this is what I mean by Management

14   201.

15   Q.  And below those entries, do you see the line for

16   operating income?

17   A.  Yes.  It's 13.6 percent.

18   Q.  And is the operating income being calculated after

19   accounting for those ongoing operating expenses?

20   A.  Yes.

21   Q.  What does this tell you about how Simon & Schuster

22   treats ongoing operating expenses when calculating profit

23   margins in title-level P&Ls?

24   A.  Unsurprisingly, in this kind of organization that Nobel

25   laureate Oliver Williamson described, where there's

1    delegated authority down to operating units as opposed to

2    top-down control of everything, you end up with a mechanism

3    like this where you provide guidance in the form of

4    book-level P&Ls, guidance that then informs how the

5    individual editors should bid and what targets they have to

6    hit.

7         THE COURT:  Can I ask, are you saying that

8    Dr. Hill in his analysis used the gross margin line, that

9    very high number, instead of the operating income line,

10   which is a much, much lower number?

11        THE WITNESS:  Your Honor, in his first report, for

12   PRH, he included operating expenses; and for Simon &

13   Schuster, he did not.  I pointed --

14        THE COURT:  For Simon & Schuster, he was using the

15   gross margin line?

16        THE WITNESS:  Yes.  That's my -- now -- "yes" is

17   the short answer.  Yes.

18        THE COURT:  Thank you.

19   BY MR. OPPENHEIMER:

20   Q.  And then in closing on this issue, Mr. Snyder, how does

21   this relate to your testimony yesterday that in creating the

22   profit margins to correct Dr. Hill's model inputs, you need

23   to include ongoing operating expenses?

24   A.  I believe the practice here for both companies leads you

25   to when you're selecting margins to include margins that

1    reflect the importance of capturing these ongoing operating

2    expenses.  So in terms of the exhibit, you would go to the

3    lower number, operating income margin of, in this particular

4    example, 13.6 and not use the larger one.

5              I would just add, though, even if you disagree,

6    you should do it consistently.  He did not do it

7    consistently in his first report.  He did it consistently in

8    his second report -- I'm sorry -- in his third report.  But

9    as I testified earlier, those results are completely

10   unreliable based on the reliability test that Dr. Nathan

11   Hill -- Miller, rather -- provided to people using his

12   model.

13             That's based on the predicted margin versus

14   actual.

15   Q.  Thank you.

16             Now, just one of the last, I think, housekeeping

17   matters:  There's been some discussion over the last day or

18   so about whether in the market that's being proposed for

19   books over 250,000 we're talking about 1,200 books a year or

20   1,800 books a year.  So let me ask you a couple questions

21   about that.

22             First, do you and Dr. Hill agree that there are

23   approximately 1,000 to 1,200 books acquired at or over a

24   $250,000-per-book advance annually?

25   A.  Could you slow down a little bit on the number there?

1    Q.  I apologize.

2         Are you and Dr. Hill in agreement that there are

3    approximately 1,000 to 1,200 books acquired at the

4    250-and-up category level?

5    A.  That's the number that I keep hearing about, somewhere

6    around that number.  And again, both Dr. Hill and I have to

7    struggle with contracts versus titles.

8    Q.  Just to close on that point, with respect to your work

9    overall, is the distinction between contracts and titles one

10   that changes any of your outcomes in any material way?

11   A.  No.  I identified the issue as a source of messiness,

12   but it doesn't impact my fundamental analyses in any way.

13   Q.  Okay.  And then just to close off on this, if you could

14   go to your notebook that has the reports, I'd like to have

15   you take a quick look at Dr. Hill's initial report.  That's

16   the May 10 report.  And I know you have a lot of notebooks

17   there, but you should have one with his reports in it.

18   Excellent.

19   A.  His initial report?

20   Q.  Yes.

21         And what I'd like to do is draw your attention to

22   a figure that's in Appendix E, Page E-1.

23         MR. OPPENHEIMER:  This is confidential.

24   BY MR. OPPENHEIMER:

25   Q.  This is Dr. Hill's Figure 25, just to close off the

1    numbering.

2            Do you have that?  I think we have it on the

3    screen as well.

4    A.  Yes.

5    Q.  So this figure, 25, from Dr. Hill's report covers three

6    years.  I'll represent to you that 2021's a partial year in

7    his data.

8            And if I draw your attention down to the bottom,

9    where it says Total Advances Count, do you see there that

10   for the years 2019 and 2020 we're looking respectively for

11   2019, a count of 1,132 and for 2020, 1,294?  Do you see

12   those?

13   A.  I do.

14   Q.  Is this consistent with your understanding that this

15   segment sees about 1,000 to 1,200 titles a year?

16   A.  That's correct.  And you were right about the 2021

17   figure:  His data go through the first six months of that

18   calendar year.

19   Q.  Now, a few general questions and then we're done.

20           I want to go back to best bids briefly,

21   single-round best bid auctions.  Do you have those in mind?

22   A.  Yes.

23   Q.  Just some general questions:

24           In a single-round best bid auction, what causes

25   the highest bidder to pay the most?

Snyder - REDIRECT - By Mr. Oppenheimer

1    A.  It can be influenced by a large number of factors, one

2    of which is the maximum value that the editor and publisher

3    are willing to pay conditioned on the match, provided that

4    that maximum meets the -- in general -- the financial

5    guidance reflected in the book-level P&Ls with respect to

6    operating expenses.

7    Q.  Is it influenced by other bidders in the best bids

8    auction format?

9    A.  It can be.  Not in a specific way, because you don't

10   know who's bidding.  However, you may have a sense that

11   there will be a lot of interest in a particular book.  You

12   may have a sense that maybe not.

13   Q.  And what is the competitive constraint in a single-round

14   best bids auction?

15   A.  Well, in the best bids situation, the top bid pays what

16   they bid.  And if -- but to be the top bid, they have to

17   beat out the second bid, second-highest.

18   Q.  And referring now to the best bid situation, Professor

19   Snyder, the single-round best bid?

20   A.  Single-round best bid, for you to win it, you have to

21   beat the second.

22   Q.  I see.  I'm sorry.  My question is not well designed.

23          Let me ask you this:  Is there an economic basis

24   for believing that the amount other bidders offer in a best

25   bid affects the winning bid in a single-round best bid

1    auction?

2    A.  It depends.

3    Q.  Is there an economic basis for believing that the number

4    of other bidders affects the winning bid in a single-round

5    best bid auction?

6    A.  Well, in general, when you go into the best bid

7    situation, you don't know the number of bidders.  Again, you

8    may have some sense of how much interest there will be in a

9    book.

10         And this goes back to what I described earlier as

11    the role of -- the combination of common factors and private

12    factors.  If it's a well-known author, it's probably not

13    going to go to a single-round best bid.  But in general, for

14    certain authors, the common factors play a bigger role.

15    Q.  I think you said that in a single-round best bid

16    situation, the participants do not know who the other

17    bidders are.  Is that correct?

18    A.  Maybe by exception.  But no.  And you see that in the

19    testimony offered by the agent Pande, where she's inviting

20    multiple imprints from PRH and others to engage.  And in

21    general, when they respond, they don't know who else is

22    involved.  They may have a general sense that:  Well,

23    HarperCollins is likely to be in this or maybe Chronicle

24    will be in this.  But they don't know.

25    Q.  And in a single-round best bid situation, do the bidders

1    know the bids of the other participants?

2    A.  No.

3    Q.  And do they -- again, assuming a single-round best bids

4    situation, do they ever know that before the winning bid is

5    determined?

6    A.  Put it this way:  The agent wants to call best bids, and

7    the agent's not going to provide that information.  The

8    agent wants to get the best bid.

9    Q.  Do you understand one of the Government's theories is

10   predicated on a belief that there will always be, always be,

11   one less competitor participating in every acquisition

12   process?

13   A.  The --

14   Q.  Let -- pardon me.

15   A.  Here we go from the world inside the model where there

16   is always one less bidder to the real world.  And in the

17   real world, I think the Government's overall complaint

18   wouldn't say "always."  But it focuses on when there is a

19   reduction.

20   Q.  And within the model itself, the second-score auction

21   model, it does always assume that there is -- that every

22   publisher's bidding in every acquisition?

23            MR. SCHWARZ:  Objection.  Leading.  It sounds like

24   you're telling him what the answer is.

25            MR. OPPENHEIMER:  Your Honor, it was --

1          THE COURT:  I'm going to overrule that objection.

2          MR. OPPENHEIMER:  Okay.  And I'll withdraw my

3     statement.

4          THE COURT:  It was leading, but it's so clear that

5     I don't think it's --

6          THE WITNESS:  I think I've testified about this.

7     But maybe not.

8          Yes.  The model assumes that all the bidders bid,

9     but there is no imprint competition.  So all that's

10    reflected is a particular bid for one publishing house.

11    They all bid.  And then the merger reduces the number of

12    bidders by one in every case.

13         In contrast to the real world -- call that big

14    number N.  In the real world, agents pick and engage a

15    smaller number.  Call it P.  And whether there's a reduction

16    depends on the circumstances following the merger.  And even

17    if there is, the agent can go to others to replace that

18    bidder.

19         MR. OPPENHEIMER:  No further questions, your

20    Honor.

21         THE COURT:  Thank you.

22         Anything else from you, Mr. Schwarz?

23         MR. SCHWARZ:  No.  I'm finished, your Honor.

24         THE COURT:  Thank you.

25         Thank you for your testimony, Dr. Snyder.

```
1              THE WITNESS:  Thank you, your Honor.

2              THE COURT:  You may step down.

3              (Witness excused.)

4              MR. PETROCELLI:  Your Honor, we have a little bit

5     of housekeeping to introduce some exhibits.  Can we do that

6     after the break?

7              THE COURT:  Sure.  Let's take a break right now

8     for 15 minutes.  Then we'll do the housekeeping.

9              MR. PETROCELLI:  Thank you.

10             (Thereupon a recess was taken, after which the

11    following proceedings were had:)

12             THE COURT:  Good morning again.

13             Mr. Petrocelli, you have housekeeping items?

14             MR. PETROCELLI:  Yes, your Honor.

15             THE COURT:  Okay.

16             MR. PETROCELLI:  I just have a number of exhibits

17    to introduce without objection.

18             THE COURT:  Okay.

19             MR. PETROCELLI:  Mr. Voelz has a few others.  But

20    let me introduce Exhibits Defendants' 169, which concerns

21    the approval levels at Penguin Random House, and Defendants'

22    435, which is a document that the Government used to refresh

23    Ms. McIntosh's recollection on an issue.

24             THE COURT:  Okay.

25             (Whereupon, Defendants' Exhibit Nos. 169 and 435
```

 1    were entered into evidence.)

 2            MR. PETROCELLI:  And I also want to introduce as

 3    Exhibit 422 the transcript of Mr. Glusman's deposition that

 4    was played in open court.

 5            THE COURT:  Okay.

 6            (Whereupon, Defendants' Exhibit No. 422 was

 7    entered into evidence.)

 8            MR. PETROCELLI:  And Defendants' 423 is the

 9    version that contains the confidential portions as well and

10    would be filed under seal.

11            THE COURT:  Okay.

12            (Whereupon, Defendants' Exhibit No. 423 was

13    entered into evidence.)

14            MR. PETROCELLI:  And for that matter, Defendants'

15    435 and 169 would also be filed under seal.

16            THE COURT:  Okay.

17            MR. PETROCELLI:  Mr. Voelz, you have some others?

18            MR. VOELZ:  Good morning, your Honor.

19            THE COURT:  Good morning.

20            MR. VOELZ:  Your Honor, we've conferred with the

21    Government, and there should be no objection to admitting DX

22    370, which is a portion of a figure shown in Professor

23    Snyder's report.

24            THE COURT:  Okay.

25            (Whereupon, Defendants' Exhibit No. 370 was

1    entered into evidence.)

2        MR. VOELZ:  DX 375, again, another figure from

3    Dr. Snyder's report; DX 376, again, a figure from

4    Dr. Snyder's report; DX 377, another figure; and DX 428,

5    which is another figure.

6        And then we'd also like to introduce DX 436, which

7    is a figure that -- from Dr. Hill's report.

8        THE COURT:  Okay.

9        MR. VOELZ:  Figure 40.

10        (Whereupon, Defendant's Exhibit Nos. 375, 376,

11    377, 428 and 436 were entered into evidence.)

12        MR. VOELZ:  And then there are two other exhibits.

13    One was admitted yesterday as 963-A, but just for

14    convenience, we've renumbered that DX 437.  And that was

15    Slide 28 of Professor Snyder's slide demonstrative.

16        And then there's DX 438, which is Slide 29 of

17    Dr. Snyder's demonstrative.  That was admitted yesterday,

18    but no number was assigned to it.  We'd like to assign

19    437 -- I'm sorry -- 438.

20        And then lastly, your Honor, there was a document

21    that was admitted as Defendants' Demonstrative 13 just for

22    identification.  We'd like to label that as DX 439.

23        And I can get the list of which of those figures

24    should remain confidential, and I'll provide that for you.

25        THE COURT:  Thank you.

```
1              THE COURT REPORTER:  Judge, just for the record,

2    are those admitted?

3              THE COURT:  Those all admitted.

4              (Whereupon, Defendants' Exhibit Nos. 437, 438 and

5    439 were entered into evidence.)

6              MR. READ:  With your Honor's permission, we have a

7    couple of housekeeping matters, too.  With your Honor's

8    permission, I'm going to have Mr. Ihan Kim handle that.

9              THE COURT:  Okay.

10             MR. KIM:  Good morning, your Honor.  Ihan Kim for

11   the United States.

12             THE COURT:  Good morning.

13             MR. KIM:  A bit of housekeeping on our end:

14             We have a consolidated Rosetta stone for the

15   examinations that the United States has been doing.  This

16   updates our Demonstrative 5.  And this is labeled

17   Demonstrative 9.

18             THE COURT:  Okay.

19             MR. KIM:  We have copies for your Honor, if you'd

20   like those.

21             THE COURT:  Okay.

22             MR. KIM:  May I hand those up?

23             (Tenders document to the Court.)

24             And, your Honor, just as Defendants have done with

25   Mr. Glusman's deposition, we have also put exhibit numbers
```

 1    for deposition testimony that the United States has

 2    submitted via video.

 3         Those numbers are PX 2000 for Mr. Zacharius's

 4    nonconfidential testimony; PX 2001 for Mr. Zacharius's

 5    confidential testimony; PX 2002 for Liate Stehlik's

 6    confidential testimony; PX 2003 for Liate Stehlik's

 7    confidential testimony; PX 2004 for Andrew Solomon's

 8    deposition testimony; PX 2005 for Michael Jacobs's

 9    nonconfidential testimony; PX 2006 for Michael Jacobs's

10    confidential testimony; and the last two, PX 2007 for

11    Christy Fletcher's nonconfidential testimony and PX 2008 for

12    Ms. Fletcher's confidential testimony.

13         (Whereupon, Plaintiff's Exhibit Nos. 2000, 2002,

14    2003, 2004, 2005, 2006, 2007, 2008 and 2001 were entered

15    into evidence.)

16         MR. KIM:  We have hard copies of these transcripts

17    from -- that's consolidated both from the United States and

18    for Defendants, if this will make life easier for your

19    Honor.  We know you already have copies of these.  But they

20    have the proper exhibit stickers, if it makes it more

21    convenient for you.

22         THE COURT:  I think maybe we'll go through our

23    exhibits and return to you the ones we don't need.  And

24    maybe we'll take that one and use that one instead.

25         MR. KIM:  Very well, your Honor.  Thank you.

1           MR. VOELZ:  Your Honor, I forgot one on my list.

2    We'd also without objection like to admit DX 369, which is

3    again another figure from Professor Snyder's report.

4           THE COURT:  Okay.

5           (Whereupon, Defendants' Exhibit No. 369 was

6    entered into evidence.)

7           MR. PETROCELLI:  Your Honor, with that, Defendants

8    rest.

9           THE COURT:  Thank you very much, Mr. Petrocelli.

10          Any rebuttal?

11          MR. READ:  The United States calls what it

12   anticipates will be its only rebuttal witness, Dr. Hill.

13          (Thereupon, the witness entered the courtroom and

14   the following proceedings were had:)

15          THE COURT:  Could you remain standing for a moment

16   to be sworn.

17      NICHOLAS HILL, Ph.D., PLAINTIFF'S WITNESS, SWORN.

18          THE COURT:  Thank you.  You may be seated.

19          THE WITNESS:  Thank you.

20          MR. STEVENSON:  Good morning, your Honor.  Ethan

21   Stevenson for the United States.

22          May we pass out some notebooks?

23          THE COURT:  Yes.

24          MR. STEVENSON:  (Tenders documents to counsel and

25   the witness.)

1          May I proceed?

2          THE COURT:  You may.  Thank you.

3                    DIRECT EXAMINATION

4   BY MR. STEVENSON:

5   Q.  Good morning, Dr. Hill.

6   A.  Good morning, Mr. Stevenson.

7   Q.  We did this before; but just for the record, will you

8   please state your name.

9   A.  Sure.  Nicholas Hill.

10  Q.  Have you been keeping up with the trial, Dr. Hill?

11  A.  I have been.

12  Q.  Did you observe Dr. Snyder's testimony this week?

13  A.  I did.

14  Q.  Did you prepare a slide presentation to assist with your

15  testimony today?

16  A.  I did.

17          MR. STEVENSON:  Your Honor, may we publish the

18  slide presentation?

19          THE COURT:  You may.  For the record, does that

20  have a number?

21          MR. STEVENSON:  Demonstrative No. 8.  U.S.

22  Demonstrative 8.

23  BY MR. STEVENSON:

24  Q.  Dr. Hill, I'd like to start our conversation this

25  morning by focusing on market definition.

 1                Do you recall testifying last week that about 70

 2      percent of publishers' spending on advances is on

 3      anticipated top sellers?

 4      A.  Yes, I do.

 5      Q.  And have you heard the Defendants' statistic that only 2

 6      percent of all new trade book titles are anticipated top

 7      sellers?

 8      A.  Yes, I have.

 9      Q.  What, if anything, do you make of the difference between

10      the proportion of advance spending on anticipated top

11      sellers versus the proportion of new titles that are

12      anticipated top sellers?

13      A.  So I think those two numbers show, your Honor, that

14      anticipated top sellers are treated differently in the

15      industry.  They're 2 percent of all titles and they are 70

16      percent of all advances.

17      Q.  And last week I think you testified that one way

18      anticipated top sellers are treated differently is that they

19      tend to receive more marketing.

20                Do you recall that, Dr. Hill?

21      A.  I do.  And if you could please advance one more slide.

22                So this is the slide from my report.  And, your

23      Honor, here in the far left, the first bar, this is the

24      average title marketing spend for non-anticipated top

25      sellers.  And then we see the average spending for

                        Hill - DIRECT - By Mr. Stevenson

1    anticipated top sellers with advances from 250,000 to

2    500,000 and then so on.  And you can see that the advance --

3    the anticipated top sellers have significantly more

4    marketing spend.

5           And also, the marketing spend increases with the

6    advance amount.

7    Q.  Are you aware of testimony from some of Defendants'

8    witnesses that marketing personnel at the publishers

9    generally don't know advance amounts when they're making

10   decisions about how to market books?

11   A.  Yes.

12   Q.  How did you react to that testimony?

13   A.  So my reading of the testimony was somewhat mixed.  I

14   understood they generally don't know.  I wasn't entirely

15   clear from the testimony how much oversight there was.

16          But if we take it as a given fact that the

17   marketing folks do not know the advance amount when they're

18   deciding on marketing for a book, they're nevertheless

19   identifying the anticipated top sellers and treating them

20   differently.

21   Q.  In your initial testimony, you discussed that authors of

22   anticipated top sellers primarily publish with the Big 5.

23          Other than what we covered last week, have you

24   observed any additional evidence of why that is?

25   A.  Yes.  If you can please advance one more slide.

Hill - DIRECT - By Mr. Stevenson

 1              These are just some quotes, your Honor, talking

 2      about the advantages of the Big 5 for anticipated top

 3      sellers.  And I would direct you in particular to the

 4      left-hand column here, to the comments from this author

 5      talking about the things that the Big 5 are able to do that

 6      he believes the non-Big 5 are not able to do.

 7      Q.  Now, this week, Dr. Snyder testified a few times, I

 8      think, that in his view anticipated top sellers can't be

 9      targeted.

10              Did you hear that?

11      A.  I did.

12      Q.  What do you make of that testimony?

13      A.  I don't agree with Dr. Snyder on that point.  When a

14      publisher sees a manuscript, they form an expectation of the

15      sales and they have a sense of whether they believe this is

16      anticipated to be a top seller.

17      Q.  Have you seen any additional evidence on that point

18      other than what we covered last week?

19      A.  Yes.  If you could please advance one more slide.

20              So these are some quotes on this point, your

21      Honor.  I think the one on the left is particularly helpful.

22      This is from a literary agent saying:  I think there are

23      recognizable qualities in -- in books that people who have

24      been in the business for a long time would easily recognize.

25              And so would you say for some books there's a

                        Hill - DIRECT - By Mr. Stevenson

1    consensus that this is going to be a successful book?

2              Yes.

3              And I think that's consistent with the idea that

4    people in the industry have a sense of books that are likely

5    to be anticipated top sellers.

6    Q.  Did you hear Dr. Snyder's testimony arguing that your

7    $250,000 threshold is arbitrary?

8    A.  Yes.

9    Q.  What did you think of Dr. Snyder's evidence on this

10   point?

11   A.  So if you could advance one more slide, please.  I think

12   it's helpful to look back at Dr. Snyder's evidence on this

13   point.

14             This is Dr. Snyder's chart.  And he -- my initial

15   chart, your Honor, looked at zero to 250 and then 250-plus.

16   So it's anticipated top sellers and non-anticipated top

17   sellers.

18             Dr. Snyder broke that into zero to 50,000, 50,000

19   to 1 million and then 1 million-plus.  So the second bar

20   here is a mixture of those I defined as non-anticipated top

21   sellers and anticipated top sellers.

22             If we could please advance one more slide.

23             If you recut these data and separate them into

24   four bins, so here, your Honor, on the right-hand side, we

25   have two bins that concern anticipated top sellers, one from

1    250,000 to 1 million and one from 1 million upwards.  And

2    those two bars look very similar to one another.

3            On the far left, your Honor, we have the zero to

4    50,000 that Dr. Snyder identified.  And that bar looks very

5    different.

6            And then in between those two, your Honor, is this

7    bar from 50,000 to 250,000.  And here, it looks like a

8    transition period where it looks more -- it's going in

9    between the zero to 50,000 and the anticipated top sellers.

10   And so I think this is consistent with my initial report,

11   where for the 250,000-plus, the competitive conditions look

12   very different when you cut it either of these two ways.

13   Q.  Dr. Hill, I'd like to bring up a slide -- oh, excuse me.

14   For the record, this is Slide 6 of U.S. Government -- U.S.

15   Demonstrative 8.

16           Now I'd like to show you a slide from Dr. Snyder's

17   presentation, which is Defendants' Demonstrative 18.

18           MR. STEVENSON:  That's Slide 32, please.

19   BY MR. STEVENSON:

20   Q.  Did you observe Dr. Snyder's testimony regarding this

21   slide?

22   A.  I did.

23   Q.  What was your reaction?

24   A.  So I think the point that I'm making here in response to

25   the question is correct, that the hypothetical monopsonist

Hill - DIRECT - By Mr. Stevenson

1    test tells you whether the market you have defined is a

2    properly defined antitrust market.  And the market with the

3    $250,000 threshold passes that test.

4         But as it also says here, it doesn't necessarily

5    tell you that there may not be a market at other cutoffs.

6    And, your Honor, that's why I also performed market

7    definition, concentration and market shares and some

8    modeling for other cutoffs, to see if my results were

9    sensitive to this particular demarcation.

10   Q.  Have you previously defined markets for targeted

11   customers?

12   A.  Yes.  I would target -- defining markets around targeted

13   customers is very common.  I did it in the Tronox

14   litigation.  I've done it frequently in the course of my

15   career.

16   Q.  I'd like to talk now about Dr. Snyder's arguments

17   regarding market shares.

18        Did you agree with Dr. Snyder that market shares

19   in this market are not very informative of the competitive

20   significance of publishers?

21   A.  No.  I don't agree with Dr. Snyder there.

22   Q.  Why not?

23   A.  So for two major reasons:  First, I think that the

24   market share data we have here are comprehensive.  We have

25   all the anticipated top sellers, and they are reflecting

1    contemporaneous competition.  So it's a rich source of

2    information about market shares.

3            Second, we see that those market shares are stable

4    over time, which gives us more confidence that they are

5    accurately reflecting competitive conditions.

6    Q.  What evidence have you seen that these market shares are

7    stable over time?

8    A.  So if we could please return to the deck and advance one

9    slide.  Thank you.

10           So this slide is from my reply report.  And here,

11   your Honor, we're looking in blue at the market share of

12   Penguin Random House and Simon & Schuster; in black, we're

13   looking at other Big 5; and in purple, we're looking at the

14   non-Big 5.  And we're seeing market share values for 2019,

15   2020 and 2021.

16           And we can see as we look across the graph, the

17   market shares here are stable.  And similarly, in my report,

18   I looked at concentration measures for 2019, 2020, 2021 and

19   the combination of years.  And those used year-specific

20   market shares.  And again, all of those results were

21   consistent with one another.

22           MR. STEVENSON:  Your Honor, this slide is a

23   re-creation of PX 0994.  I move to admit PX 0994.

24           THE COURT:  Any objection?

25           MR. OPPENHEIMER:  No objection.

```
 1                 THE COURT:  That will be admitted.

 2                 (Whereupon, Plaintiff's Exhibit No. 0994 was

 3      entered into evidence.)

 4      BY MR. STEVENSON:

 5      Q.  Dr. Hill, did the horizontal merger guidelines discuss

 6      the stability of market shares at all?

 7      A.  Yes.  If you could please advance one more slide.

 8                 This is some language, your Honor, from the merger

 9      guidelines.  And it says:  The agencies give more weight to

10      market concentration when market shares have been stable

11      over time, especially in the face of historical changes in

12      relative prices or costs.

13                 And this is telling us when you have stable market

14      shares, it allows you to put more weight on your market

15      concentration measure.

16      Q.  Dr. Snyder gave a statistic in his testimony that in his

17      agency data, 23 percent of the time non-Big 5 publishers are

18      winner or runner-up.

19                 Did you hear that?

20      A.  I did.

21      Q.  What do you make of that statistic?

22      A.  So I think I can clear up some of the discussion of that

23      statistic.

24                 So I think what Dr. Snyder did, because this was

25      in one of his reports, he took market shares that ranged
```

Hill - DIRECT - By Mr. Stevenson

1    from zero to 100.  So everyone got a market share, including

2    the non-Big 5.  So that sums to 100.

3              Then he took shares of the time that a particular

4    firm was the runner-up.  And that share -- that summed to

5    100.

6              So he's got a base of 200, because the market

7    shares sum up to 100 and the percentage of the time each

8    firm was a runner-up sums up to 100.

9              So Dr. Snyder took the proportion of the time that

10   the non-Big 5 were the winner or the runner-up, and that

11   added up to 23 percent.  If you divide that by 200, which is

12   the base, you get 11.5 percent, which is similar to their

13   market shares in my market share data.

14   Q.  So just to --

15             THE COURT:  Can you just say that one more time?

16             THE WITNESS:  Sure.  So Dr. Snyder is putting

17   together two different things that sum to 100:  the market

18   shares and also the percentage of the time that the firm is

19   a runner-up.

20             And so he finds combined, if you add up the

21   percentage of the time the non-Big 5 win and the percentage

22   of the time they're the runner-up, it sums up to 23.

23             THE COURT:  Oh.

24             THE WITNESS:  But if I sum that up for all the

25   firms, for Penguin Random House -- and I don't have the

1    exact numbers for them, but their market share is around 40

2    percent.  If they're runner-up around 40 percent, you'd get

3    80 percent for them using this metric.  And for another

4    firm, the second-largest, it might be about 50 percent.  You

5    add all those up and they add up to 200.

6         So if you want to understand the relative sizes of

7    the players based on that statistic, you should divide the

8    23 percent by 200.

9         THE COURT:  I see.  Thank you.

10   BY MR. STEVENSON:

11   Q.  And just for a clear record, what is the 23 divided by

12   200?

13   A.  It's about 11 and a half.

14   Q.  Is that number similar to the market shares you

15   calculated?

16   A.  The market share for the non-Big 5 is about 9 percent.

17   So yes.  Those numbers are similar.

18   Q.  Do you view that 23 percent number as meaningful to your

19   analysis?

20   A.  No, I don't.

21   Q.  Why don't you?

22   A.  So I think, your Honor, we have two different -- it's

23   combining two different numbers that are useful.  One is

24   the -- or one number is useful and one can be useful.  So

25   the market share number, your Honor, is a useful measure of

1    competitive significance.  How often do you actually win

2    when all is said and done?

3              Then there's a separate number for unilateral

4    effects, which is a diversion ratio.  When one firm wins,

5    how often does it lose to the other firm?

6              Dr. Snyder's number is taking a market share and

7    the total number of times that the other firm is runner-up.

8    So if some other publisher like HarperCollins were to win,

9    he's counting:  How often is the other firm the runner-up?

10             But for unilateral effects, we focus on diversion

11   ratio.  When one firm wins, how often does the other firm

12   lose?

13             And he's combining the information that's

14   important in there, which is the diversion ratio, with

15   information about when, for example, HarperCollins wins and

16   somebody else is runner-up.  So it's mixing two useful

17   numbers into a new number that doesn't -- I'll say this:

18   I've never seen that figure used before in the course of my

19   career, because it's not entirely clear what it's

20   reflecting.

21             THE COURT:  The figure of -- the percentage of

22   time that you're either the winner or the runner-up, that

23   number, what he said was 23 percent, which you say is 11.5

24   percent, you think it's not useful because it combines two

25   concepts that aren't really combinable?

1          THE WITNESS:  Yeah.  And -- yeah.  Exactly, your

2     Honor.  Because with the runner-up, you don't know who you

3     are runner-up to.  If Simon & Schuster was runner-up all the

4     time to some member of the non-Big 5, that would be

5     different than if you knew it was runner-up to Penguin

6     Random House.  But the figure is just combining those

7     things.  And the diversion ratio is getting at that more

8     directly.

9          THE COURT:  Thank you.

10    BY MR. STEVENSON:

11    Q.  Now I'd like to switch to a related but slightly

12    different topic, still on Dr. Snyder's agency data.

13          Dr. Snyder testified that the merging parties are

14    winner and runner-up only 7 percent of the time and further

15    testified that this is less than the 12 percent implied by

16    the parties' market shares.

17          Do you recall that testimony?

18    A.  I do.

19    Q.  What did you make of that testimony?

20    A.  So I think that the number again has the conceptual

21    problem I've just been talking about.  It's combining market

22    shares and diversions.  And I also think that the

23    calculation is not properly done.  So -- sorry.

24    Q.  Why don't you think the calculation is properly done?

25    A.  So if we could please advance one more slide.

Hill - DIRECT - By Mr. Stevenson

```
 1              So, your Honor, this is a demonstrative that's

 2     taken -- it's based on Dr. Snyder's demonstrative.  And down

 3     here in the green box, we have the total number of books in

 4     which one party was the winner and one party was the

 5     runner-up.  And so to perform his calculation, Dr. Snyder

 6     divides that amount by the 150 books in which there's a

 7     known runner-up and the 149 books sold in a single-bidder

 8     process in which the runner-up is not known.

 9              And I think the more appropriate calculation here

10     is reflected on the left, is to divide the 21 books by the

11     150 books.

12              And yeah.  And just trying not to belabor it too

13     much, you can see in the 360, that's not equal to 149 or

14     150, because there's 61 books Dr. Snyder excluded.  Those

15     were multi-bidder processes in which there was an unknown

16     runner-up.  And so he didn't include them.  But he did

17     include the blue box.  And I don't think including the blue

18     box is appropriate.

19     Q.  Now, you mentioned a conceptual problem that I think you

20     were discussing earlier.  But do you think that 13 or 12

21     percent statistic is meaningful to your analysis?

22     A.  No.  I think again the important -- there's two separate

23     numbers here that are useful:  There's a market share, which

24     is how often a firm wins, and it's a commonly used measure

25     of competitive significance.
```

 1           And then separately there's a diversion ration,

 2    which looks at when one firm wins, how often does the other

 3    lose?

 4           And here, this number is combining that

 5    information with other information about when a third party

 6    wins and some other third party is the runner-up, for

 7    example.

 8    Q.  Do the horizontal merger guidelines touch on this issue

 9    at all?

10    A.  Yes.  If you could please advance one more slide.

11           This is a couple of quotes from the merger

12    guidelines, your Honor.  I'll -- I think they're both

13    informative, but I'll just focus on the second here.  It

14    says:  Diversion ratios between products sold by one merging

15    firm and products sold by the other merging firm can be very

16    informative for assessing unilateral price effects with

17    higher diversion ratios indicating a greater likelihood of

18    such effects.

19           Diversion ratios between products sold by merging

20    firms and those sold by non-merging firms have at most

21    secondary predictive value.

22           So this is my point, that the 12 percent is

23    including these diversion ratios that have secondary value;

24    and it's also including diversion between non-merging firms

25    and non-merging firms.

1              THE COURT:  But you had in your analysis the 12.5

2     percent rate.  Isn't that the same calculation as the 13

3     percent that we've now determined is the better calculation

4     for Dr. Snyder?

5              THE WITNESS:  The 12 percent was calculated by the

6     Defendants, your Honor; it was not my calculation.

7              THE COURT:  Oh, I thought you had a 12.5 percent

8     calculation.

9              THE WITNESS:  No.  The Defendants performed that

10    calculation using my market shares.  But it is not a

11    calculation I relied on.

12             THE COURT:  Oh, I see.  So that's a defense

13    calculation using your market shares, whereas his

14    calculation was using his agency data?

15             THE WITNESS:  That is correct, your Honor.

16             THE COURT:  Okay.

17    BY MR. STEVENSON:

18    Q.  Dr. Hill, I'd like to focus our attention now on the

19    Penguin Random House merger from 2013.

20             Did you examine any evidence on how the Penguin

21    Random House merger may have affected authors of anticipated

22    top sellers?

23    A.  I did.

24    Q.  At a high level, would you please describe the evidence

25    you considered.

1    A.  Sure.  I looked at average advances over time for

2    anticipated top sellers for Penguin Random House.  We didn't

3    have any data for other publishers, your Honor, going back

4    to 2013.  So everything here I talk about is going to be

5    Penguin Random House.

6    Q.  Why did you look at average advances?

7    A.  So if we could advance one more slide, please.

8         This was the metric that Dr. Snyder chose in his

9    report.  So he said:  A natural first step is to examine

10   whether PRH advance amounts changed, if at all, after the

11   2013 merger.  For example, if average advances were

12   increasing prior to 2013, but then flatten out or decrease

13   thereafter, that could be an indication that the 2013

14   Penguin Random House merger had the effect of reducing

15   author advances.

16        So this is in Dr. Snyder's rebuttal report.  He

17   adopted this framework.  Just to minimize disagreement, I

18   used the same framework.  It seemed reasonable to me and it

19   didn't seem -- and I also used his data, similarly to avoid

20   disagreements.

21   Q.  Dr. Snyder testified on Monday that when looking at the

22   2013 merger, the number one thing as an economist I would be

23   interested in is what effect it had on output.

24        Did you hear that?

25   A.  I did.

1    Q.  Did Dr. Snyder analyze Penguin Random House's effect on

2    output in any of his expert reports?

3    A.  He did not.

4    Q.  Did average advances for anticipated top sellers change

5    after the Penguin Random House merger?

6    A.  After the Penguin Random House merger, average advances

7    for anticipated top sellers fell.

8    Q.  Why do you believe that to be the case?

9    A.  So both Dr. Snyder and I found this to be true.  Your

10   Honor, Dr. Snyder found that advances were falling before

11   the merger and continued to fall after.  And he tested:  Was

12   there any significant change after the merger?  And his

13   answer is no.

14          I used a different methodology as he described,

15   and we'll get into that in a minute.  And I also found that

16   average advances fell after the merger.

17   Q.  Could you share with us Dr. Snyder's analysis on this

18   point?

19   A.  Sure.  I believe the Court has seen this before.  But

20   this next slide here is from Dr. Snyder's rebuttal report.

21          And this is looking at average advance amounts for

22   using different thresholds.  And the black line, your Honor,

23   is books with an advance above 500,000 and the red line is

24   books with an advance above 250,000.  And along the

25   horizontal axis, which is marked Year, we have years; and

1    then in the vertical axis we have average dollars per title.

2    So this is taken from Dr. Snyder's analysis.

3            He tests the $250-and-above line and finds that it

4    was decreasing pre-merger and it continued to decrease

5    post-merger.

6            But I should say, he would say:  I didn't find any

7    change in the rate of decrease.  And so it was decreasing

8    after the merger the same as it was decreasing before the

9    merger.

10           THE COURT:  How is that decreasing?  Because if

11    you look from 2013 to 2014, it's all going up.

12           THE WITNESS:  Yes.  So what he's testing is the

13    overall trend, your Honor.  If you start with the 2010 data

14    and you go down to 2021, he was testing:  Is there a

15    downward slope in this line?  On average, if you plot the

16    best fit through that line, it's going to be a

17    downward-sloping line.  And then he tested:  If I look at

18    the line for the first three dots here and then I look at

19    the line for the other dots, do those lines have different

20    slopes?

21           And he found they don't.  They're both

22    downward-sloping.

23           But I think it might be helpful, actually, if we

24    advance to the next slide, your Honor.

25           This is a summary of -- this is what I looked at,

1    your Honor.  I looked at a shorter time period.  I looked at

2    2010 to 2012, which is before the merger, and 2014 to 2016,

3    which is after the merger.  So commonly when looking for the

4    effect of an event, like a merger, you try to limit the time

5    period.  I also did this for the two years before and the

6    two years after.

7         And you can see here in the first line, your

8    Honor, for anticipated top sellers, the average advance went

9    from -- I probably shouldn't read these numbers, actually.

10    But you can see the Penguin Random House average advance for

11    anticipated top sellers went down by about $100,000.

12    BY MR. STEVENSON:

13    Q.  This slide referred to average advances for other books.

14         Why did you calculate average advances for

15    non-anticipated top sellers?

16    A.  Yeah.  So, your Honor, to examine the potential effect

17    of the merger -- and I think Dr. Snyder testified about

18    this -- I used a common econometric technique known as

19    difference in differences.  And to understand the technique,

20    I think it helps to think about it's an attempt to do

21    something similar in the social sciences to a randomized

22    control trial.

23         So if you imagine that a firm is testing whether a

24    drug, new drug, is effective, there's a treated population

25    who gets the drug and there's a control population who get a

1    placebo.

2          And you test whether there has been an effect of

3    the drug by seeing whether the treated population is

4    different -- has a different experience than the control

5    population.

6          So here, what I was trying to do -- and we can

7    talk in a second about the results -- was anticipated top

8    sellers could potentially have been affected by the merger.

9    There was a merger from the Big 6 to the Big 5.  We've seen

10   that those publishers compete more intensively for

11   anticipated top sellers.  So I wanted to see if there was an

12   effect on them.

13         And as my control group I picked "other books,"

14   books that are not anticipated top sellers, where we've seen

15   the non-Big 5 compete more aggressively.

16         And so that was my experimental design, to ask the

17   question:  If I compare those two groups, do they have the

18   same outcome?

19         And just like in a control trial, your Honor, you

20   want your treatment group and your control group to

21   otherwise be as similar as they can be.  So we don't -- in

22   social sciences, one doesn't do control trials for very good

23   reasons.  And you try to pick the best control group you

24   can.  They're never perfect.

25         And I wouldn't claim that "other books" is

1    perfect.  But I think it's a reasonable way to look at the

2    issue.

3            And you can see that the "other books" in this

4    time period, the advances stay flat or maybe a tiny bit

5    upward.

6    Q.  Did you prepare a graphical depiction of this analysis?

7    A.  Yes, I did.  So if you could please advance one more

8    slide.

9            So this is the full-time series here, your Honor.

10   In my analysis I'm going to look at 2010 to 2012 and 2014 to

11   2016.

12           But you can see on the horizontal axis here, we

13   have years.  And on the vertical axis, we have average

14   advance per title indexed to 2012.

15           So a value here of 100 percent, that's the value

16   for average advances for Penguin Random House in 2012.  And

17   then if you see a value above 100, that means average

18   advances have gone up compared to 2012.  If you see a number

19   below 100, that tells you average advances have gone down

20   compared to 2012.

21           The red vertical line is depicting the date of the

22   merger.  The green line here is anticipated top sellers over

23   time.  So it moves from 100 roughly down to about 60 to 70

24   by 2021.  The non-anticipated top sellers are largely flat

25   and then rise up to about 130 by 2021.

Hill - DIRECT - By Mr. Stevenson

1          THE COURT:  Why do you choose 2012 instead of

2     2013?

3          THE WITNESS:  For the date of the merger, your

4     Honor, or you mean the comparison?

5          THE COURT:  As the starting --

6          THE WITNESS:  For indexing?

7          THE COURT:  Because the merger happened in 2013.

8          THE WITNESS:  Right.  So it's common in these

9     kinds of studies to exclude the time period in which the

10    transaction itself is happening, because that year has some

11    time in which the parties were independent and some time in

12    which they were together.  And so I took the last most

13    recent year in which the parties were still independent

14    entities.

15         THE COURT:  I see.

16         THE WITNESS:  If we advance one more slide,

17    please, just to finish this discussion off.

18         This is a summary of what it looked like when I

19    calculated first for anticipated top sellers.  So advances

20    for Penguin Random House went down by about 5 and a half

21    percent.  Advances for other books went up by 9.5 percent.

22    And the -- so the difference-in-differences estimate here is

23    saying:  Comparing the treated group to the control group,

24    advances went down for authors of anticipated top sellers by

25    about 15 percent.

1    BY MR. STEVENSON:

2    Q.  What conclusions did you draw from the

3    difference-in-differences analysis?

4    A.  So I think this is an indication that the merger may

5    have had a negative effect on the advances for anticipated

6    top sellers.

7    Q.  Did you perform any statistical tests to determine

8    whether this result was statistically significant?

9    A.  Yes.  These results are highly statistically

10   significant.

11   Q.  How much weight do you put on this evidence that the

12   merger may have had a negative effect for authors of

13   anticipated top sellers?

14   A.  So it is a piece of evidence that for Penguin Random

15   House its advances to anticipated top sellers went down.

16   But there's a lot of information that we are missing when

17   we're trying to evaluate this overall.

18          So, your Honor, I don't know market shares.  I

19   don't know concentration levels.  I don't know diversion

20   ratios.  I don't have a fulsome qualitative record.

21          So is this indicative that there may have been a

22   negative effect?  Yes.  Is it dispositive?  No.  Because I'm

23   just -- and further, as I said, your Honor, "other books" is

24   the best control group I had available.  I think it has a

25   reasonable basis for being used.  But no control group is

Hill - DIRECT - By Mr. Stevenson

1    perfect.

2            THE COURT:  My question about this is it seemed

3    like there was a big difference between 2012 and 2013.  If

4    you start from 2013, it looks like it went up.  If you start

5    from 2012, it looks like it went down.

6            THE WITNESS:  Yeah.  I looked at this also using

7    2011 and 2012 compared to 2014 and 2015.  But 2013 has -- I

8    didn't look at that, your Honor, because it mixes time

9    periods when they were -- part of that time period they were

10   merged and part of it they were not.

11           THE COURT:  I see.

12   BY MR. STEVENSON:

13   Q.  Dr. Hill, let's discuss imprint competition now.

14           Did you hear testimony from Dr. Snyder about

15   imprint competition?

16   A.  I did.

17   Q.  What did you understand Dr. Snyder's arguments about

18   imprints to be?

19   A.  I think his argument is that imprint competition is an

20   important factor that will help mitigate any anticompetitive

21   effect.

22   Q.  What's your view of that argument?

23   A.  I don't agree with Dr. Snyder.

24   Q.  Why don't you agree with Dr. Snyder?

25   A.  I think that the competition provided by -- well, first,

Hill - DIRECT - By Mr. Stevenson

1    I think that there's clear evidence that publishers limit

2    competition between imprints.  So if we look at Penguin

3    Random House, there are the Penguin Random House bidding

4    rules.  Penguin Random House imprints can and do coordinate

5    with one another.

6          Penguin Random House imprints are unlikely to

7    steal top selling authors from one another.  And some of the

8    adult divisions of Penguin Random House in rounds auctions

9    have house bids.  So there are these limitations on the ways

10   in which Penguin Random House imprints can compete with one

11   another compared to how they can compete with independent

12   publishers.

13   Q.  We discussed this a little bit last week.  But have you

14   seen any additional evidence about how Penguin Random House

15   constrains competition among its imprints?

16   A.  Yeah.  If you can please advance one more slide.

17          This is, your Honor, another auction from 2018 for

18   a nonfiction book.  And this is -- it represents Penguin

19   Random House imprints coordinating with one another in the

20   process of the auction.

21          And there's a lot of information here, but I'll

22   cut down to the last bullet, where it says:  So it seems

23   best for everyone to go with $1,050 to have the best shot.

24   No bonus.  North American rights.  Quarterly payouts.

25          So they're laying out here the bid and other

Hill - DIRECT - By Mr. Stevenson

1    terms, ancillary terms, to the bid.

2           And then you can see in red that the Penguin

3    Random House imprints indeed submitted identical offers in

4    the last round.  If these were independent publishers, this

5    sort of behavior would not be permitted.

6    Q.  Have you seen any examples of imprints across different

7    PRH divisions coordinating in best bid auctions?

8    A.  Yes.  I believe there's some examples in my report.

9    Q.  Dr. Hill, I'm going to have Mr. Masri pull up Page 51 of

10   your reply report.

11          Without revealing the author or title of the book,

12   could you describe what you observed in this instance?

13   A.  Yes.  This is a best bids auction, single-round,

14   involving a book.  And this is discussions among Penguin

15   Random House personnel to figure out the collective Penguin

16   Random House approach to bidding in this auction.

17          I'll -- without reading it, your Honor, I'll

18   direct you down to the last complete sentence here, and then

19   there's a fragment here, just talking about the successful

20   coordination in this case.

21   Q.  You mentioned that imprints don't compete with each

22   other in the same way that they do with independent

23   publishers.  Is there a theoretical reason behind that?

24   A.  Yes.  Your Honor, if you imagine two imprints at Penguin

25   Random House competing with one another, if Imprint A loses

1    to Imprint B, the expected profit from the book stays within

2    Penguin Random House.  It moves from Imprint A to Imprint B.

3         If Imprint A loses a book to Simon & Schuster, the

4    expected profit leaves Penguin Random House.

5         So it's just a fundamentally different level of

6    threat posed by independent publishers vis-à-vis other

7    imprints.

8    Q.  Did Dr. Snyder present any examples of what he considers

9    to be valuable imprint competition?

10   A.  Yes.

11   Q.  Have you reviewed those examples?

12   A.  Yes.  He provided four in his rebuttal report and one in

13   his testimony.

14   Q.  What is your opinion of those examples?

15   A.  I think that on the whole those examples show the value

16   of competition between independent publishers rather than

17   between imprints.

18   Q.  Would you please give us an example of what you mean?

19   A.  Sure.  If we could please advance one more slide.

20        This is an example from Dr. Snyder's rebuttal

21   report, your Honor.  It's a rounds auction.  And in the

22   first column, we have publisher; in the second column, we

23   have the imprint.  And then we have bids in each round and

24   then finally a column for the winner.

25        And I've coded the highest bid or joint highest

1    bid in each round green and the second-highest bid yellow.

2    So in this competition, we can see that the highest bid or

3    second-highest bid in every round is either the first

4    Penguin Random House imprint or an imprint from another Big

5    5 publisher.

6            The second Penguin Random House imprint is never

7    the highest bidder or the second-highest bidder.  And

8    indeed, the imprint exits the auction after the third round

9    when the highest bid is -- I won't characterize it, but you

10   can see, your Honor, between that exit point and Round 6,

11   there's a substantial inflation in the total amount.  That's

12   driven by competition between the Penguin Random House

13   imprint and an imprint from an independent publisher.

14           So from my perspective, this exhibit, this

15   example, shows the value of publisher competition.  It

16   doesn't show the value of imprint competition.

17   Q.  Do you have a sense as to what the advance for this book

18   might have been had the independent publishers not competed

19   for it?

20   A.  Yes.  If we could please advance another slide.

21           Here, your Honor, I've taken out the two

22   independent publishers and asked:  What would have happened?

23   And Penguin Random House imprints cannot bid against one

24   another when they're the last two in an auction.

25           So what we're seeing here is that the winner would

1    have been at a much lower level.  And that difference is

2    summarized for your Honor in the gray box towards the bottom

3    of the slide.

4    Q.  Now, this is just one of Dr. Snyder's examples.  Did you

5    examine the others?

6    A.  Yes.  There were two other examples in his rebuttal

7    report that are similar to this.  They were rounds auctions

8    that I believe show the value of publisher competition

9    rather than imprint competition.  And then once in his

10   rebuttal report and once in his testimony, he cited examples

11   of best bid auctions where Penguin Random House finished

12   first or second.

13   Q.  Did those auctions show the value of imprint

14   competition?

15   A.  I don't believe so.  The example that Dr. Snyder

16   testified about, we saw that there was a very large

17   difference between the first and second-highest bid.  And

18   Dr. Snyder also testified that at the time of bidding,

19   publishers don't know who they're competing with.  So when

20   they're forming their bid, they are thinking about:  How

21   much might my rivals bid here?

22            And seeing that after the merger, after the

23   bidding is finished, that a Penguin Random House imprint is

24   first and second, I think it's hard to conclude that that

25   second Penguin Random House imprint is what that first

1   Penguin Random House imprint had in mind as the competitive

2   threat when it was forming its bid, particularly in

3   Dr. Snyder's example that he testified about, when there was

4   a very large difference between the valuation of the highest

5   bidder and the second-highest bidder.

6   Q.  Did you hear Dr. Snyder's testimony about -- I believe

7   he called it a work-around to stimulate imprint competition?

8   A.  I did.

9   Q.  What did you make of that?

10  A.  So in the course of doing the runner-up survey, your

11  Honor, I reviewed a lot of documents, emails between

12  publishers, within publishers, between agents and

13  publishers, a lot of data.

14          I didn't see -- the evidence that I saw was that

15  in general, agents are respectful of the Penguin Random

16  House bidding rules and they will, when asked, give truthful

17  information about whether Penguin Random House is the last

18  two bidders.  I didn't see any evidence of a work-around.

19          And I also see some tension between the idea --

20  Dr. Snyder's idea that there is this work-around that agents

21  know such that the Penguin Random House bidding rules are

22  invalidated and Mr. Dohle's promise:  If this merger goes

23  through, we won't extend the Penguin Random House bidding

24  rules to Simon & Schuster.

25          If it was true that agents already knew how to

1    circumvent the bidding rules, there would be no need for a

2    letter saying:  Don't worry.  We're not going to extend the

3    bidding rules.

4            So I think there's a tension there.

5            THE COURT:  But he was relying on an actual email

6    that said:  We're going to do this.  I was interested that

7    it was sort of publicly stated.  It was an email to all the

8    auction participants that they were going to -- I think it

9    actually says:  If PRH are the top two, we're going to move

10   forward on an independent bidder.

11           THE WITNESS:  It was -- you mean Mr. Dohle's

12   promise?

13           THE COURT:  No.  I'm talking about the evidence

14   that Dr. Snyder relied upon to talk about the work-around

15   was an actual auction rules process, where the agent

16   informed all the bidders that they were going to do this.

17           THE WITNESS:  I was in the gallery, your Honor.

18   I'm sorry.  I didn't see that document.

19           In general, in my review of the record, I have not

20   seen other examples of that.  But apparently there is one

21   that I wasn't aware of.

22   BY MR. STEVENSON:

23   Q.  I'd like to move on and now focus on entry and

24   expansion, particularly the role of non-Big 5 publishers.

25           This week, Dr. Snyder testified about non-Big 5

1    publishers winning large contracts for anticipated top

2    sellers.

3              Do you recall that?

4    A.  I do.

5    Q.  Have you seen any evidence on how frequently the non-Big

6    5 compete for large contracts as compared to the Big 5

7    publishers?

8    A.  Yes.  If we could please advance one more slide.

9              This is a figure taken from my reply report.  And,

10   your Honor, there are -- the first column here is

11   publishers.  The second column is calculating the share of

12   $1 million-plus contracts.  So let's see how often for these

13   large contracts each of the publishers is winning.

14             And you can see, your Honor, that the shares look

15   very similar to the shares we see for anticipated top

16   sellers in general.  The only notable difference is the

17   non-Big 5 win about 6 percent of these as compared to 9

18   percent of all anticipated top sellers.

19             The second column takes a different look at this

20   issue and says:  These data go from 2019 to 2021.  So there

21   are 36 months that we observe.  It asks the question:  How

22   often does each one of these publishers -- in how many of

23   these months did each publisher win at least one contract of

24   a million dollars or more?

25             And you can see.  The answer for Penguin Random

1     House is all 36.  For Simon & Schuster, it's 33 of the 36.

2     And then the other Big 5 look similar, or smaller in the

3     case of the Publishers 2 and 3.  And then the non-Big 5 have

4     much lower numbers.

5          So winning a $1 million-plus contract is a common

6     occurrence for the Big 5.  It's significantly rarer for the

7     members of the non-Big 5, which is consistent with their

8     market shares.

9     Q.  Now, on the opposite side of the spectrum, Dr. Snyder --

10    or on the advance spectrum, if you will, Dr. Snyder

11    testified that there are several publishers who compete

12    below $250,000 and are poised to expand.

13         Do you recall that?

14    A.  I do.

15    Q.  What do you understand Dr. Snyder's argument to be?

16    A.  So I understand his argument to be -- and in his report,

17    I believe he identifies 21 publishers who have won a book

18    for an advance between 100,000 and 250,000.  And his view is

19    that these publishers are poised to enter the market for

20    anticipated top sellers.

21    Q.  And do you agree that these publishers are poised to

22    enter?

23    A.  I don't agree with him on this point.  If we could

24    please advance one more slide.

25         There's a figure from my reply report analyzing

1    this.  And here, your Honor, I've broken that range from

2    100,000 to 250,000 into six bins of equal size.  And you can

3    see that 75 percent of these publishers have never won a

4    book for more than 175,000 and only one of them has ever won

5    a book above 225,000.

6           So when we look at this group of 21 publishers, we

7    see they're heavily skewed towards the lower end of this

8    100,000-to-$250,000 range.

9    Q.  Changing gears a little bit, have you seen evidence on

10   how much of the books published by non-Big 5 publishers are

11   anticipated top sellers?

12   A.  Yes.  So if we could please advance one more slide.

13          This slide is also from my reply report.  Here,

14   I'm asking a slightly different question than I have before,

15   your Honor, which is:  If we just look at the titles won by

16   publishers, what proportion of them are anticipated top

17   sellers?

18          And you can see the answer for Penguin Random

19   House is about 27 percent.  For Simon & Schuster, it's 19

20   percent.  And then the other Big 5 publishers I won't read,

21   but you can see their values.  And for the non-Big 5

22   publishers, it's 4 percent.

23          So those anticipated top sellers are a very

24   important part of the business for the Big 5 publishers.

25   They're a significantly smaller part of the business for

Hill - DIRECT - By Mr. Stevenson

1    these non-Big 5 publishers.

2              MR. STEVENSON:  Your Honor, this is a re-creation

3    of PX 0995.  I move to admit PX 0995.

4              THE COURT:  Any objection?

5              MR. OPPENHEIMER:  No objection, your Honor.

6              THE COURT:  That will be admitted.

7              (Whereupon, Plaintiff's Exhibit No. 0995 was

8    entered into evidence.)

9    BY MR. STEVENSON:

10   Q.  Now, Dr. Hill, we've heard some testimony from

11   Defendants' witnesses, including Dr. Snyder, that four

12   smaller publishers -- who I won't name for confidentiality

13   purposes, but I'll refer to in an exhibit in a minute -- and

14   those four have recently entered the market for anticipated

15   top sellers.

16             Are you familiar with the testimony at a general

17   level?

18   A.  Yes.

19   Q.  Have you seen any evidence regarding the competitive

20   significance of these publishers?

21   A.  Yes.  So if we could please advance one more slide.

22             And I'll refer to them as the Group of 4 to stay

23   out of trouble with their particular names.  This slide,

24   your Honor, is for 2019, 2020 and 2021, looking at the share

25   of contracts for Penguin Random House in blue, Simon &

                    Hill - DIRECT - By Mr. Stevenson

1    Schuster in green and then each of the four members of the

2    Group of 4 in red, yellow, light blue and pink.

3              And you can see that these firms are not a

4    significant part of the market for anticipated top sellers.

5              MR. STEVENSON:  And for the record, this is part

6    of PX 0968, which I believe has been previously admitted.

7    BY MR STEVENSON:

8    Q.  Do you know how the share of these four entrants stacks

9    up with the rest of the market?

10   A.  Yes.  If we could please advance one more slide.

11             This is from my reply report, your Honor.  Here,

12   2019 -- we have 2019, 2020 and 2021.  The dark blue is

13   showing the Big 5 share of contracts; the purple is showing

14   the share of contracts for the other Big 5 -- or the other

15   non-Big 5; I apologize -- and the red is showing the share

16   for the Group of 4.

17             And you can see here, too, this group are very

18   small compared to the Big 5 and they're also small relative

19   to the other members of the non-Big 5.

20             THE COURT:  So maybe you're going to address this

21   later.  But I think what Dr. Snyder was saying is that it

22   doesn't matter if they're less-frequent winners.  But if

23   they as a group are operating at 9 percent -- he's

24   aggregating them all -- they have the same way of

25   constraining market power as a group as some of the other

Hill - DIRECT - By Mr. Stevenson

1    Big 5, because that 9 percent that represents everybody else

2    is similar to what some of the Big 5 people have on their

3    own.

4            And so his view was:  In an auction, you don't

5    know which one it's going to be.  But if you know that

6    there's an X percent chance that some non-Big 5 person is

7    in, that's constraining competition anyway as a group

8    aggregated.

9            THE WITNESS:  Yeah.  And so two thoughts on that,

10   your Honor:  The 9 percent is included in my modeling.  So I

11   do give -- the non-Big 5 publishers collectively have 9

12   percent.

13           It's included in market shares; it's included in

14   diversions.  So I'm including that in all of their -- the

15   calculations for them.

16           What I think we're seeing here in all of these

17   demonstratives is that the non-Big 5 do see significant

18   barriers to expansion.  And over time, they haven't

19   materially changed their share.

20           If you count them as an aggregate group and you do

21   the concentration numbers, then, as Dr. Snyder testified,

22   the concentration numbers would be even higher than they

23   actually are.  So I think it's -- they're included in the

24   analysis.

25           I think the point here, rather, for this Group of

Hill - DIRECT - By Mr. Stevenson

```
 1    4 is just they are not a significant part of the total

 2    market.

 3              THE COURT:  Not by themselves?

 4              THE WITNESS:  Right.

 5              THE COURT:  But as part of the aggregate,

 6    Dr. Snyder would say they are.

 7              THE WITNESS:  Right.  And collectively, I'm

 8    treating them according to their shares when doing my

 9    analysis.

10              THE COURT:  Okay.

11    BY MR. STEVENSON:

12    Q.  You mentioned that the smaller publishers are included

13    in your modeling.  And I think Dr. Snyder said this, that

14    every publisher bids in the -- in every auction of your

15    second-score auction model.  Is that a fair summary?

16    A.  Correct.

17    Q.  So does that mean that in your modeling, Princeton

18    Universities Press is bidding in every auction?

19    A.  No.  In the model, I believe I combine the non-Big 5

20    into one group and give them a 9 percent market share.

21    Q.  So they're bidding as a sixth bidder.  Am I

22    understanding that right?

23    A.  Correct.

24    Q.  Why did you analyze these four publishers?  Why did you

25    pick them?
```

1    A.  They were mentioned in Dr. Snyder's rebuttal report as

2    an example of entrants who are likely to expand or

3    successful entrants.  And that's why I looked at them in

4    particular.

5    Q.  Setting aside these four publishers in particular,

6    Dr. Snyder testified that several publishers have expanded

7    in recent years.

8           Did you hear that testimony?

9    A.  I did.

10   Q.  What do you make of that testimony?

11   A.  So in his report -- and we talked about this a little

12   bit in my initial presentation -- Dr. Snyder identified a

13   Group of 13 publishers that he said grew their market share

14   from 2019 to 2021.

15          When I looked at that group, there were a couple

16   of problems.  So the first one was, Dr. Snyder calculated

17   market shares excluding Penguin Random House and Simon &

18   Schuster.  So he found -- some of his 13 that he said grew,

19   when you calculate market shares using all market

20   participants, actually lost market share.  So the 13 was a

21   little bit high to begin with.

22          Second, we've seen that the share of the non-Big 5

23   has not changed over time.  And indeed, some members of the

24   non-Big 5 grew and other members of the non-Big 5 decreased

25   by about the same amount.

Hill - DIRECT - By Mr. Stevenson

1         And then finally, your Honor, when we looked at

2    the group of 13, I looked to see how many of those

3    publishers had sustained growth.  So they increased their

4    market share from 2019 to 2020 and from 2021 to -- sorry --

5    from 2020 to 2021.  And the answer was only two of the 13

6    showed the sustained growth.

7    Q.  I think you got to this just a minute ago.  But

8    Dr. Snyder also testified that the number of publishers who

9    were acquiring anticipated top sellers is increasing.

10        What did you make of that?

11   A.  Yeah.  I mean, I think he presented a figure on that in

12   his rebuttal report.  And I don't have any reason to dispute

13   it.

14        But despite that increase in the number of

15   publishers, the collective market share of the non-Big 5 did

16   not change, which must mean that the average share of a

17   member of the non-Big 5 decreased.

18        But regardless, I think the correct measure is:

19   What's the total market share here?  And that did not change

20   materially.

21   Q.  I'd like to briefly discuss diversion ratios, which you

22   mentioned earlier.

23        After hearing from Dr. Snyder this week, have any

24   of your conclusions regarding diversion ratios changed?

25   A.  No.

Hill - DIRECT - By Mr. Stevenson

1    Q.  Would you please remind us what your baseline measure of

2    diversion ratios between the merging parties are?

3    A.  Sure.  So my baseline measure is diversion according to

4    market share.

5    Q.  Why is your baseline measure diversion according to

6    market share?

7    A.  So if we could please advance one more slide.

8            This is a table that I believe we have seen

9    before.  This is looking at the total number of observations

10   that underlines the five measures of market share that I

11   discussed earlier.  And you can see that diversion

12   proportional to share has the highest number of

13   observations.

14           And the agency data, if you look at the number of

15   observations that it uses to estimate diversion from S&S to

16   Penguin Random House, it gives 22 observations.  As

17   Dr. Snyder testified, that sample is not representative.  So

18   I think that number in particular should be taken with a

19   grain of salt.

20           So I like the proportional-to-share numbers,

21   because they're based on a large sample.  And I also like

22   them because for PRH diversion from Penguin Random House to

23   Simon & Schuster, all of the five measures give similar

24   diversion numbers, your Honor.  For Simon & Schuster to

25   Penguin Random House, the diversion proportional to share is

```
1    a midpoint between the higher estimates and the lower

2    estimates.

3              So I think it's a reasonable choice.

4    Q.  Now, I think you misspoke.  You said that these are five

5    measures of market share.  Did you mean diversion ratios?

6    A.  I apologize.  Yes.

7              MR. STEVENSON:  Your Honor, on this slide is a

8    re-creation of PX 0996.  I move to admit PX 0996.

9              THE COURT:  Any objection?

10             MR. OPPENHEIMER:  No objection, your Honor.

11             THE COURT:  That will be admitted.

12             (Whereupon, Plaintiff's Exhibit No. 0996 was

13   entered into evidence.)

14   BY MR. STEVENSON:

15   Q.  You mentioned that diversion according to shares is

16   still your baseline calculation.

17             Have you observed any qualitative evidence during

18   the course of this trial suggesting that that's a reasonable

19   assumption?

20   A.  Yes.  If we could please advance one more slide.

21             These, your Honor, are some quotes from publishers

22   talking about their diversion.  I'll just focus on the

23   first.  It says:  The publishers we're competing with most

24   frequently align with market share.  We compete most

25   frequently with Penguin Random House.  And then they list --
```

1    then the respondent lists a number of other publishers.

2         These are consistent with diversion according to

3    share.  And the same is true for the other two quotes here.

4    Q.  I'd like to focus now on unilateral effects.

5         Did you hear testimony from Dr. Snyder that your

6    theory of harm is only concerned with auctions in which the

7    merging parties are winner and runner-up?

8    A.  Yes.

9    Q.  What was your reaction to that testimony?

10   A.  I don't agree with Dr. Snyder on that point.

11   Q.  Why don't you agree with Dr. Snyder?

12   A.  So if we think about it at a very high level, your

13   Honor, in negotiations, the competition that can be lost

14   here is, when Penguin Random House is negotiating with an

15   author, one of the threats the author has at her disposal is

16   to switch to Simon & Schuster.

17        And Penguin Random House may not know who is

18   number one and number two; but they know in general how

19   often they are losing to other rivals.

20        Similarly, in best bids -- we were talking about

21   this earlier -- when a publisher is forming its bid or an

22   imprint, it's thinking about the possibility of losing to

23   other publishers.  And that -- it may not know exactly who

24   in this best bids is the closest challenger, but it knows in

25   general with whom it is competing closely.

1        So in those settings, it is not the case that they

2    have to be number one and number two.

3        In rounds auctions, the theory here is based on

4    number one and number two.  Those are the situations in

5    which there's likely to be harm for that particular setting.

6    Q.  Do the horizontal merger guidelines address this issue

7    at all?

8    A.  Yes, they do.  If we could please advance one more

9    slide.  And if we could go down to the last paragraph,

10   please.

11       So it's a little bit long, your Honor, but I think

12   it's worth going through:  The mechanisms of these

13   anticompetitive unilateral effects and the indicia of their

14   likelihood differ somewhat according to the bargaining

15   practices used, the auction format and the sellers'

16   information about one another's costs and about buyers'

17   preferences.

18       For example, when the merging sellers are likely

19   to know which buyers they are best and second-best placed to

20   serve, any anticompetitive unilateral effects are apt to be

21   targeted at those buyers.  When sellers are less

22   well-informed, such effects are more apt to be spread over a

23   broader class of buyers.

24       So this last clause here about when sellers are

25   less well-informed, but the harm is spread over a broader

1    class of buyers, this is the idea I was talking about with

2    negotiations.  When Penguin Random House performs a

3    negotiation today, it's aware of the constraint imposed by

4    Simon & Schuster.

5              Post-merger, that constraint is lost; and

6    similarly for Simon & Schuster with respect to Penguin

7    Random House.

8    Q.  Do any of your models predict harm to authors in

9    situations other than when the merging parties are winner

10   and runner-up?

11   A.  Yes.  So the GUPPI models look at best bids, your Honor,

12   and at hybrid situations.  And these are situations where it

13   may not be the case that the parties are number one and

14   number two; it's rather the potential threat of losing to

15   the parties.

16             And with respect to the second-score auction

17   model, we don't need to retread this ground, I think.  But

18   there I'm taking the second-score auction model as a more

19   general statement about competition and what will be lost.

20   Q.  Dr. Snyder discussed this at length, I think, yesterday,

21   about the merging parties being able to predict when they're

22   number one and number two.

23             In your view, will the merging parties need to be

24   able to predict when they would have been the top two

25   bidders for a book for the merged firm to successfully lower

Hill - DIRECT - By Mr. Stevenson

1    advances?

2    A.  No, not necessarily.  So again, in a best bids setting,

3    your Honor, one firm -- let's take Simon & Schuster --

4    today, they lose on the order of 42 percent of the time to

5    Penguin Random House in a best bids context.  And I'm taking

6    that as an estimate using -- across all their losses.

7         They know post-merger that threat has been

8    diminished.  And so that is going to affect their behavior

9    even though in a particular auction they may not know that

10   Penguin Random House is the next most enthusiastic about the

11   book.

12        And it's equivalent -- it's similar to the

13   situation you sometimes observe in consumer products, your

14   Honor, where if when Anheuser-Busch InBev is thinking about

15   pricing Bud Light, it doesn't literally know who the

16   next-favorite beer of all of its customers is.

17        But if it was to buy SABMiller, it would say:

18   Many of our customers like SABMiller.  Now we know that if

19   we lose a sale to SABMiller, it stays within the corporate

20   family, so we can be a little less aggressive in our pricing

21   when we're pricing Bud Light.  That is the intuition for

22   best bids in negotiations.

23        And you don't need to know Nicholas Hill's

24   favorite beer is Bud Light followed by Miller Lite to raise

25   prices to consumers.

1    Q.  Did you hear testimony from Dr. Snyder about the

2    research connecting market concentration to price?

3    A.  I did.

4    Q.  And what was your understanding of Dr. Snyder's

5    testimony on that point?

6    A.  I thought his argument was that studies linking higher

7    concentration to higher prices had been debunked, I think he

8    said.

9    Q.  What was your reaction to that?

10   A.  I don't agree with Dr. Snyder.

11   Q.  Why not?

12   A.  There was a literature in the 1950s that looked at this

13   and there is a modern literature that is looking at the

14   effect of concentration on prices.  And I have a paper in

15   *The Journal of Health Economics* looking at this very issue.

16          So we looked at Part D prescription drug plans.

17   And, your Honor, these are available in 34 regions around

18   the country.  We looked at -- I believe it was a 2013 merger

19   between two providers of these plans.  They competed in some

20   regions and they didn't compete in others.  So we asked:

21   What happened to their premiums as a function of whether or

22   not they were both present in a region?

23          And what we found was that their premiums went up

24   in the regions where they were both competing compared to

25   the regions where they were not.

1          And what's more, we then took the regions where

2     they were competing and we split them into two buckets, your

3     Honor:  ones that were moderately concentrated or higher and

4     ones that were unconcentrated.  And in the moderately

5     concentrated or higher regions, we saw a larger effect than

6     we had previously seen.  And we saw no effect in the regions

7     where they competed but the market was unconcentrated.

8          And I don't mean -- this is a -- I have a coauthor

9     on this paper, Mathis Wagner, whom I should mention.  And

10    this is not the only paper in the literature.  There are

11    many other papers looking at how concentration can affect

12    price.

13    Q.  I'd like to briefly discuss a couple of Dr. Snyder's

14    more technical arguments regarding your second-score auction

15    model.  And let's start with profit margins.

16         Do you agree with Dr. Snyder's characterization of

17    your profit margins?

18    A.  I do not.

19    Q.  Why not?

20    A.  So I think the disagreement between -- or as I perceive

21    it, the important disagreement here is about variable costs

22    versus fixed costs.  And my belief is that variable costs

23    are what one should include in the model.  And that is what

24    I did for Simon & Schuster in my initial report and in my

25    reply report.

 1          As Dr. Snyder said, in my initial report for

 2   Penguin Random House, I included direct operating expenses,

 3   which are a mixture of variable and fixed.  So there were

 4   some fixed costs included.

 5          In my rebuttal report, I reran -- sorry.  In my

 6   reply report, I reran the model excluding those costs so

 7   that they were not present.  And I think that is the

 8   appropriate treatment for Simon & Schuster and it's the

 9   appropriate treatment for Penguin Random House.

10          THE COURT:  I think I remember now that the reason

11   you included it the first time is you were just trying to be

12   conservative, because you didn't know which ones were fixed

13   and which ones were variable, so you assumed they were all

14   variable.  Is that right?

15          THE WITNESS:  That's correct, your Honor.

16          With hindsight, I wish I had just gone through and

17   tried to characterize them as exactly what percentage is

18   fixed, is variable.  But I think that the estimates in my

19   initial report and the estimates in my reply report tell us

20   the range.  It's somewhere between this conservative number

21   in the initial report and the number in the reply report,

22   which is more aggressive.

23          THE COURT:  What about Dr. Snyder's testimony that

24   it's not theoretically correct not to include at least some

25   of the fixed costs, because you have to over time account

 1    for them?

 2              THE WITNESS:  Yes.  So in economics, we -- the

 3    second-score auction model, for example, is explicit that

 4    you should include variable costs.  And the GUPPI

 5    methodology is explicit that you should include variable

 6    costs.  And that is because when you're thinking on the

 7    margin about that additional book, which is what the model

 8    is interested in, you should not be worrying about your

 9    fixed costs.

10              And this is consistent with the testimony from

11    Ms. McIntosh, who I understand is the CEO of Penguin Random

12    House in the U.S., the United States.  She testified that

13    she is -- encourages her editors to look at the variable

14    costs.  That is the right measure to think about when you're

15    competing for a book.

16              THE COURT:  But the P&Ls include fixed costs.

17              THE WITNESS:  So the acquisition P&Ls have a

18    target margin and they have fixed costs, including in that

19    calculation.

20              What I used to calculate margins were the actual

21    P&Ls, what actually happened to the book rather than the

22    acquisition P&Ls.  But you're correct, your Honor:  They

23    include a target margin and they include some fixed costs in

24    them.

25              THE COURT:  And I guess that means that they're

                    Hill - DIRECT - By Mr. Stevenson

 1    taking fixed costs into account when they're bidding for

 2    advances, et cetera.  So how does that fit in with what

 3    you're doing?

 4              THE WITNESS:  So I would -- it is present in their

 5    acquisition P&L.  But when you look through their bidding

 6    histories, the place where they draw the line on "We can't

 7    bid any further here" is when the contribution margin or the

 8    variable cost gets to zero.  So they have a target margin.

 9              And then there's an example in my report, in

10    Section 5.1 of my reply report, involving Mr. Karp and the

11    memoir of a musician, where he's saying:  We're not going to

12    cover our fixed costs, but this still covers -- this is

13    above our variable costs, so we should acquire this book.

14    This is still worthwhile for us.

15              And in general, looking through these

16    competitions, there are many examples like that.

17              THE COURT:  Thank you.

18    BY MR. STEVENSON:

19    Q.  Did you hear Dr. Snyder's testimony regarding the fit of

20    your second-score auction model based on the actual and

21    predicted margins?

22    A.  Yes, I did.

23    Q.  What was your reaction to that testimony?

24    A.  So I disagree with Dr. Snyder.  If we could go back to

25    the deck, please, and advance one more slide.

 1           So this, your Honor, is comparing actual and
 2    predicted margins in my model for Penguin Random House and
 3    Simon & Schuster.  And this is using the baseline
 4    conservative model.  You can see that the match is good.
 5           If we could advance one more slide, please.
 6           This is the comparison when I exclude -- when I
 7    treat direct operating expenses as fixed.  Here, the match
 8    is less good but still acceptable.  Somewhere in between
 9    these two figures is where the truth is, because the direct
10    operating expenses are a mix of fixed and variable.
11           So in my view, this is a perfectly acceptable
12    match.  Dr. Snyder in his presentation implemented the model
13    in a different way and then calculated predicted and actual
14    margins.  And his slide as I recall showed that for the
15    baseline model the match is still close.  It's less close
16    for this model.  And then it's very different when you use
17    his margins.
18           But for the model I ran and implemented, the match
19    between the margins is good.
20    Q.  So --
21           THE COURT:  I'm sorry.  So what did Dr. Snyder do
22    differently?  Because he says that in the second round, when
23    it was corrected, it was found unreliable.  I'm just trying
24    to understand what he did compared to what you did.
25           THE WITNESS:  Yeah.  So when I implemented the

                    Hill - DIRECT - By Mr. Stevenson

1    model, your Honor, I took a blended margin of Penguin Random

2    House and Simon & Schuster and used that to calibrate the

3    model.  So you put one margin in.

4          He then in his demonstrative took either Penguin

5    Random House's margin or Simon & Schuster's margin.  He did

6    not use the blended margin, which is what I actually used

7    when I was estimating my model.

8          THE COURT:  Well, his model would have included

9    the fixed costs, because he thinks you're supposed to

10    include that.  Right?

11          THE WITNESS:  Yes.  If you remember, his

12    demonstrative had the three columns, your Honor.  In the

13    middle column, that was using Dr. Snyder's margins.  And the

14    first and third columns used my margins.

15          And then there's a separate question when

16    you're -- what's called parameterizing the model or setting

17    it up.  You give it information about market shares so it

18    can estimate diversions and then you give it information

19    about margins so it knows how competitive the industry is.

20          THE COURT:  Is that one input, the margins?

21          THE WITNESS:  Yes.

22          You input the margin for just one firm.  And so

23    when I did it -- and I used a blended margin for Penguin

24    Random House and Simon & Schuster.

25          THE COURT:  The third time?

1          THE WITNESS:  So in both of -- yeah.  This is the

2     results here, your Honor, on the screen.

3          THE COURT:  Both times you blended it, but you

4     just blended different numbers?

5          THE WITNESS:  Yes.  Exactly.  Because the direct

6     operating costs had been treated as variable once and is

7     fixed in the other.  That's exactly right.  Dr. Snyder in

8     his Column 2 here used his margins for S&S and his margins

9     for Penguin Random House.  And --

10         THE COURT:  But did he blend them?

11         THE WITNESS:  No.  So in the -- when he's

12    parameterizing the model, that's the rows here, your Honor.

13    The first row is, this is when he parameterizes it using

14    PRH's actual margin.

15         THE COURT:  I see.

16         THE WITNESS:  The one below is when he does it

17    using S&S's actual margin.  And he didn't present the

18    results here when he parameterized it using the blended

19    margin, which is what I actually did in estimating the

20    model.

21         THE COURT:  So these are just his numbers, because

22    he didn't blend ever.  So he just did one for Simon &

23    Schuster and one for Penguin Random House?

24         THE WITNESS:  That's correct in this chart.  And

25    I'm not aware of it in his reports.

1          THE COURT:  Okay.  Thank you.

2    BY MR. STEVENSON:

3    Q.  Now, I want to be very quick about this.  But Dr. Snyder

4    referred a couple times during his testimony about common

5    components of a book's value.

6          Can the second-score auction model handle common

7    components of a book's value?

8    A.  Yes, it can.  They can be incorporated without changing

9    the results.

10   Q.  Aside from the technical issues raised by Dr. Snyder, he

11   raised some general arguments that I think we discussed at

12   length last week.  So I'll be very brief.

13         Have you observed any additional evidence since we

14   spoke last week regarding any similarities in how publishers

15   compete in negotiations versus auctions?

16   A.  Yes.  If we could please return to the deck and advance

17   one slide.  So -- sorry.  One extra.  Apologies.

18         So while we're waiting for the slide, when we get

19   to the slide, it has two quotes on it, your Honor.  On the

20   top, this is a quote from a literary agent who testified

21   about how she's thinking about negotiations when she's

22   negotiating with a publisher.  And she has this idea of:

23   The value I try to get from the publisher I'm negotiating

24   with is the value I think I could get from the next-best

25   alternative out there.

Hill - DIRECT - By Mr. Stevenson

1                    So she refers to it as a BATNA, B-A-T-N-A.

2                    And it says:  And the best way to get the best

3      deal from the publisher you're negotiating with is to

4      improve your BATNA, your best alternative to what's in front

5      of you.  And so I spend a lot of time in my head and in the

6      information-gathering and the like figuring out what the

7      BATNA is and try to get it this way.

8                    So she's walking through this idea of

9      negotiations:  I'm negotiating with one publisher and I'm

10     trying to get as much value as I think I could get if I went

11     to my next-best alternative.

12                   That's the quote from the literary agent about how

13     she performs negotiations.

14                   If we go below, there's a quote from Dr. Miller's

15     paper about the second-score auction model where he says:

16     The second-score approach is strategically equivalent to a

17     specific form of bargaining in which buyers play suppliers

18     off against each other up to the point at which the utility

19     offered by the highest-surplus supplier cannot be matched

20     profitably by the next-best supplier.

21                   So what he's saying there is, the second-score

22     auction model is identical to a particular form of

23     multilateral negotiation, where the person selling the

24     object gets the valuation of the second-highest alternative,

25     which is exactly the outcome that happens in the

1    second-score auction model.

2          And it reflects what this literary agent is saying

3    about how she thinks about negotiations.

4    Q.  I'd like to share a slide from Dr. Snyder's presentation

5    with you, which is Slide 59 of Defendants' Demonstrative 18.

6          Did you hear Dr. Snyder's testimony regarding this

7    slide?

8    A.  I did.

9    Q.  What was your reaction?

10   A.  I don't agree with the characterization on this slide.

11   Q.  Why not?

12   A.  So if we focus first on the -- we'll work from bottom to

13   top, your Honor:  The rival publishers' relevance -- and he

14   says they're not relevant in the SSA and they're not

15   relevant in the GUPPI.

16         In both of these frameworks, rival publishers'

17   market shares affect the market shares of the publishers --

18   of the parties and hence diversions.  And the extent to

19   which rival publishers compete also affects the margins that

20   are realized in the model.

21         So they absolutely affect the predictions of the

22   model.

23         Similarly, the idea that imprints compete and that

24   agents play an important role, these are reflected in the

25   current margins.  If there is a tremendous amount of

1    competition because of the large number of imprints, we'd

2    expect to see very low margins.  And the margins are

3    reflecting both of these forces that occur in the market.

4          And then to the very variety of acquisition

5    processes, I think when testifying he actually said "all

6    possible acquisition processes."  So two thoughts there:

7    One, building a model that has every acquisition process

8    would be very challenging.  But the GUPPI model does address

9    best bids, hybrid negotiations and second-score auctions.

10   And the SSA addresses second-score auctions and, as we just

11   saw, a very particular kind of multilateral bargaining.

12         So it's true:  It does not cover all of them.  But

13   I think it's unfair to say that they're not covering more

14   than one.

15   Q.  I'd like to flip --

16         THE COURT:  Wait.  What about the agent?

17         THE WITNESS:  Yes.  So I put the agents in the

18   same category.  I think we saw some of this in my initial

19   testimony.  If agents are omnipotent, then we would expect

20   to see publishers not earning any real margins because

21   agents are able to extract all the value they can from

22   publishers.

23         But in fact, agents are good at helping extract

24   the value that's created by competition.  And that's

25   reflected in the margins that the publishers are earning.

1    BY MR. STEVENSON:

2    Q.  I'd like to flip to the next slide in Dr. Snyder's

3    presentation, Slide 60.

4              Now, there was some discussion about this

5    yesterday, I believe, on pass-through.  What is

6    pass-through?

7    A.  So the way I think about pass-through, your Honor, is

8    you could start abstracting from GUPPI in general and just

9    think:  If I'm a firm and my costs go up, how much of that

10   cost increase is reflected in my price?

11             If pass-through is 100 percent, when my costs go

12   up by a dollar, my price goes up by a dollar.  If

13   pass-through is zero, a dollar increase in my costs shows no

14   increase in price.

15             So at a high level, that is what pass-through is

16   measuring.

17   Q.  How does that relate to the GUPPI?

18   A.  So in the GUPPI framework, the way I think about this is

19   you have two firms who are independent, Publisher A and

20   Publisher B.  Pre-merger, if Publish A loses a sale to

21   Publisher B, that profit is gone.

22             Post-merger, when they're one firm, it recognizes:

23   Oh, I didn't actually lose that book at all.  It just got

24   recaptured by one of -- my sister agency here.  And so that

25   is an opportunity cost from the perspective of the firm.

1          It used to be if I raised price and I lost 40

2     books to Publisher B, I just lost all that money.  But now

3     it's just transferred over.  And some authors don't leave

4     and I get to pay them lower advances.  So there's an

5     opportunity cost created by internalizing the removal of our

6     competition with each other.

7          THE COURT:  Why is that an opportunity cost?

8          THE WITNESS:  So people sometimes think about it

9     that way, your Honor, because pre-merger, I picked the

10    optimal price that balances the chance that an author leaves

11    and the -- which is bad news; and if I raise the price, I

12    get more margin, which is goods news.  So I was perfectly

13    balanced.

14         Now, Publisher B, if I raise price, I still get

15    the benefits of the higher price.  But the cost is lower,

16    because I don't actually lose some of them.

17         And so there's an opportunity for me to say:  Wait

18    a minute.  I need to raise price to get these things back

19    into balance with each other.  And so I have an opportunity

20    that the individual firms don't think about, but when

21    they're merged they do.

22         So here, pass-through is how much of this

23    opportunity cost will be passed through by the merged firm

24    to its customers, or authors in this case.

25         THE COURT:  Opportunity costs as measured by the

Hill - DIRECT - By Mr. Stevenson

1    raised price?

2              THE WITNESS:  That's right.  The incentive.  How

3    much of the incentive will get passed through.

4              THE COURT:  I understand.

5    BY MR. STEVENSON:

6    Q.  How did you arrive at the pass-through rates you used in

7    the GUPPI models?

8    A.  So here I used the pass-through rates that CRA used when

9    they derived the model.

10   Q.  Who is CRA, just to be clear?

11   A.  I apologize.  The economists working on behalf of the

12   merging parties during the advocacy phase.

13   Q.  Now, at the top of this slide it says that GUPPI is

14   calculated based on a single formula that would be applied

15   to any industry.

16              Do you see that?

17   A.  I do.

18   Q.  Are you aware of GUPPI being used to diagnose unilateral

19   effects in industries that feature negotiations?

20   A.  Yes.  It's a widely used tool, and it was used in a

21   litigated context in the *Sanford/Mid Dakota Clinic* case that

22   involved the FTC and was accepted by that court.

23   Q.  Now, I'd like to step away from Dr. Snyder's criticisms

24   of your second-score auction model.

25              Would you remind us at a conceptual level what the

1   merger guidelines say about merger simulations such as a

2   second-score auction model?

3   A.  Sure.  If you could please advance one more slide.

4        Your Honor, this is some language from the merger

5   guidelines on merger simulations.  And we've talked about

6   this before, the idea being that the specific predictions of

7   the merger simulation are less important than whether it

8   consistently predicts substantial price increases; in this

9   case, substantial advance decreases.

10  Q.  We can be quite quick.  Would you please remind us what

11  your baseline second-score auction model predicts?

12  A.  Sure.  So if we could advance one more slide, please.

13       This is a summary of the effects in the baseline

14  model:  About 4 percent for Penguin Random House authors, a

15  4 percent reduction in advances; about 11 and a half percent

16  for Simon & Schuster authors.

17  Q.  Remind us what the second-score auction model predicted

18  treating direct operating expenses as fixed.

19  A.  Right.  So if we can please advance one more slide.

20       Here, we see for Penguin Random House authors,

21  it's about 6 percent.  For Simon & Schuster authors, it's

22  about 15 percent.

23       And if we could advance one more slide, please.

24       We'll see here a similar result using Dr. Snyder's

25  margins:  3 percent and 8 percent.

Hill - DIRECT - By Mr. Stevenson

 1            And if we advance one more slide, we'll see the

 2     results using Dr. Snyder's agency data in the model for the

 3     market shares.  And there, the effects are about 5 percent

 4     and 15 percent.

 5     Q.  Stepping back, what is your conclusion based on the

 6     collective results of your model?

 7     A.  So these results combined with the other versions of the

 8     model that I ran in my initial report and my reply report

 9     consistently predict a significant reduction in unilateral

10     competition.  And that's consistent, your Honor, with the

11     other buckets of evidence that I had looked at:

12     concentration evidence, qualitative evidence and diversion

13     evidence.  And then the simulation evidence as well all

14     point consistently towards a substantial lessening of

15     competition.

16            MR. STEVENSON:  Your Honor, I think I made one

17     oversight.  And that's -- I failed to admit PX 0966.  I move

18     to admit that at this time.  0966.

19            THE COURT:  Any objection?

20            MR. OPPENHEIMER:  No objection, your Honor.

21            THE COURT:  That will be admitted.

22            (Whereupon, Plaintiff's Exhibit No. 0966 was

23     entered into evidence.)

24            MR. STEVENSON:  And I have no further questions.

25     I pass the witness.

```
 1                    THE COURT:  Thank you.
 2                    I guess the only thing I would note is on the
 3      GUPPI numbers, when you ran it with Dr. Snyder's numbers, he
 4      would say that those are unreliable based on the
 5      reliability -- oh, wait.  That's the second-score auction.
 6                    THE WITNESS:  Yes.
 7                    THE COURT:  So there's no check on the GUPPI
 8      analysis for reliability?
 9                    THE WITNESS:  Yes.  I believe Dr. Snyder
10      presented -- he ran it using his margins.  And he found --
11      so I think he found price increases of about a 4 and a half
12      percent and 2.3 percent effect.
13                    THE COURT:  Okay.
14                    THE WITNESS:  Do you have this slide from
15      Dr. Snyder?
16                    While we're waiting for --
17                    THE COURT:  So are your GUPPI numbers -- are your
18      GUPPI analyses based on his numbers using blended rates
19      while his are separate?  Or what is different between what
20      you did and what he did?
21                    THE WITNESS:  So I ran it using the margins I use
22      in my baseline second-score auction model, so the more
23      conservative margins.  Then he ran it using margins from --
24      his calculated margins for Simon & Schuster and Penguin
25      Random House.
```

```
 1                THE COURT:  Which includes the fixed costs?

 2                THE WITNESS:  That's correct, your Honor.

 3                THE COURT:  And you used -- you input one number

 4     in GUPPI?

 5                THE WITNESS:  In GUPPI, you actually use always

 6     the single firm's -- you use one firm's margin or the other

 7     firm's margin.

 8                THE COURT:  Okay.

 9                THE WITNESS:  Because in GUPPI, the formula -- oh,

10     these are the results, your Honor, if you're interested.

11     Column 1 here are my results and Column 2 are Dr. Snyder's

12     results.

13                And --

14                THE COURT:  But his are less than 5 percent.  He

15     said 5 percent is the cutoff.

16                THE WITNESS:  Yeah.  So actually, I think he

17     misspoke there.  It's a 5 percent GUPPI, not a 5 percent

18     price increase.

19                So when Dr. Shapiro proposed his safe harbor, it

20     was a 5 percent GUPPI value instead of a 5 percent price

21     increase.

22                THE COURT:  Is this a GUPPI value or a price

23     increase?

24                THE WITNESS:  My understanding, these are price

25     increases, your Honor.
```

```
 1                THE COURT:  Okay.
 2                THE WITNESS:  And if you assume 50 percent
 3      pass-through, then the price increase is half the size of
 4      the GUPPI.  So the 4.7 here would correspond to 9.4 percent
 5      GUPPI.
 6                THE COURT:  Oh, so that would be significant.  It
 7      would be above 5?
 8                THE WITNESS:  Correct, your Honor.
 9                THE COURT:  Thank you.
10                MR. STEVENSON:  Your Honor, if I may ask one more
11      question.
12                THE COURT:  Yes.
13      BY MR. STEVENSON:
14      Q.  Dr. Hill, do you know what the logic of the safe harbor
15      was by Dr. Shapiro?
16      A.  Yeah.  Dr. Shapiro's idea was that in many mergers there
17      may be some efficiencies and entry and expansion.  And so he
18      proposed the 5 percent to allow for the possibility that
19      there will be efficiencies or entry.  Absent those, the 5
20      percent is not a safe harbor.  If you knew for sure there
21      were no entry and no efficiencies, then there's no 5 percent
22      safe harbor.  But that's my understanding of what
23      Dr. Shapiro said.
24                MR. STEVENSON:  No further questions.
25                THE COURT:  Thank you.
```

```
1              I think it's a good time for our lunch break.
2     We'll resume at 2:00.
3              Please don't talk about your testimony during the
4     lunch break.
5              THE WITNESS:  Certainly, your Honor.
6              THE COURT:  Thank you.
7              (Thereupon, a luncheon recess was taken, after
8     which the following proceedings were had:)
9              (Morning session concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                           **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4        certify that the foregoing constitutes a true and accurate

5        transcript of my stenographic notes, and is a full, true,

6        and complete transcript of the proceedings produced to the

7        best of my ability.

8

9

10                   Dated this 18th day of August, 2022.

11

12               <u>/s/ Lisa Edwards, RDR, CRR</u>
                 Official Court Reporter
13               United States District Court for the
                   District of Columbia
14               333 Constitution Avenue, Northwest
                 Washington, D.C. 20001
15               (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$1,050** [1] - 3068:23
**$100,000** [1] -
3062:11
**$250,000** [5] -
2993:12, 2993:25,
3047:7, 3049:3,
3076:12

## /

**/s** [1] - 3111:12

## 0

**0966** [4] - 2983:12,
3106:17, 3106:18,
3106:22
**0968** [1] - 3079:6
**0994** [4] - 2983:11,
3050:23, 3051:2
**0995** [4] - 2983:11,
3078:3, 3078:7
**0996** [4] - 2983:12,
3085:8, 3085:12

## 1

**1** [7] - 3047:19,
3048:1, 3075:12,
3076:5, 3108:11
**1,000** [3] - 3030:23,
3031:3, 3032:15
**1,005** [1] - 2994:21
**1,132** [1] - 3032:11
**1,200** [4] - 3030:19,
3030:23, 3031:3,
3032:15
**1,294** [1] - 3032:11
**1,800** [1] - 3030:20
**10** [3] - 2993:8,
2998:16, 3031:16
**100** [15] - 2992:9,
3001:17, 3002:4,
3025:23, 3052:1,
3052:2, 3052:5,
3052:7, 3052:8,
3052:17, 3064:15,
3064:17, 3064:19,
3064:23, 3102:11
**100,000** [4] - 3006:9,
3006:14, 3076:18,
3077:2
**100,000-to-$250,
000** [1] - 3077:8
**10022** [1] - 2982:8

**10036** [1] - 2982:5
**101** [3] - 3025:16,
3026:1, 3026:22
**101st** [2] - 3025:24,
3026:7
**11** [2] - 3053:13,
3105:15
**11.5** [2] - 3052:12,
3054:23
**12** [4] - 3055:15,
3056:20, 3057:22,
3058:5
**12.5** [2] - 3058:1,
3058:7
**120** [3] - 2993:1,
2993:4, 2993:20
**13** [8] - 3039:21,
3056:20, 3058:2,
3082:13, 3082:18,
3082:20, 3083:2,
3083:5
**13.6** [2] - 3028:17,
3030:4
**130** [1] - 3064:25
**14** [4] - 2987:13,
2988:3, 2988:6,
2988:11
**141** [1] - 2987:4
**149** [2] - 3056:7,
3056:13
**15** [5] - 3011:21,
3037:8, 3065:25,
3105:22, 3106:4
**150** [16] - 2986:24,
2987:4, 2987:9,
2989:14, 2989:22,
2989:24, 2995:11,
2995:18, 2995:25,
2996:6, 2998:6,
2998:7, 2998:10,
3056:6, 3056:11,
3056:14
**16** [4] - 2985:18,
2986:5, 2986:21,
2986:24
**169** [4] - 2983:14,
3037:20, 3037:25,
3038:15
**175,000** [1] - 3077:4
**18** [3] - 2981:7,
3048:17, 3100:5
**18th** [1] - 3111:10
**19** [2] - 2992:10,
3077:19
**1950s** [1] - 3090:12
**1999** [1] - 2981:23

## 2

**2** [5] - 3044:5,
3044:15, 3076:3,
3097:8, 3108:11
**2,227** [1] - 2994:22
**2.3** [1] - 3107:12
**200** [5] - 3052:6,
3052:11, 3053:5,
3053:8, 3053:12
**2000** [3] - 2983:10,
3041:3, 3041:13
**20001** [2] - 2982:15,
3111:14
**20004** [1] - 2982:10
**2001** [3] - 2983:10,
3041:4, 3041:14
**2002** [3] - 2983:10,
3041:5, 3041:13
**2003** [3] - 2983:10,
3041:6, 3041:14
**2004** [3] - 2983:10,
3041:7, 3041:14
**2005** [3] - 2983:10,
3041:8, 3041:14
**2006** [3] - 2983:10,
3041:9, 3041:14
**2007** [3] - 2983:10,
3041:10, 3041:14
**2008** [3] - 2983:10,
3041:11, 3041:14
**201** [2] - 3026:22,
3028:14
**2010** [8] - 3005:19,
3005:22, 3005:25,
3006:7, 3007:3,
3061:13, 3062:2,
3064:10
**2011** [3] - 3009:1,
3009:4, 3067:7
**2012** [10] - 3062:2,
3064:10, 3064:14,
3064:16, 3064:18,
3064:20, 3065:1,
3067:3, 3067:5,
3067:7
**2013** [15] - 3004:25,
3005:22, 3058:19,
3059:4, 3059:11,
3059:12, 3059:13,
3059:22, 3061:11,
3065:2, 3065:7,
3067:3, 3067:4,
3067:7, 3090:18
**2014** [4] - 3061:11,
3062:2, 3064:10,
3067:7
**2015** [2] - 3014:1,
3067:7

**2016** [2] - 3062:2,
3064:11
**2018** [1] - 3068:17
**2019** [14] - 2994:1,
3009:2, 3009:6,
3009:8, 3032:10,
3032:11, 3050:14,
3050:18, 3075:20,
3078:24, 3079:12,
3082:14, 3083:4
**202** [2] - 2982:15,
3111:15
**2020** [8] - 3032:10,
3032:11, 3050:15,
3050:18, 3078:24,
3079:12, 3083:4,
3083:5
**2021** [7] - 2994:1,
3005:19, 3006:7,
3032:16, 3050:15,
3050:18, 3061:14,
3064:24, 3064:25,
3075:20, 3078:24,
3079:12, 3082:14,
3083:4, 3083:5
**2021's** [1] - 3032:6
**2022** [2] - 2981:7,
3111:10
**20530** [1] - 2981:19
**21** [4] - 2992:9,
3056:10, 3076:17,
3077:6
**21-02886** [1] - 2981:4
**21-2886** [1] - 2984:5
**22** [2] - 2993:2,
3084:16
**225,000** [1] - 3077:5
**23** [15] - 2985:12,
2986:20, 2988:8,
2989:24, 2995:6,
2995:10, 2995:17,
2996:24, 3051:17,
3052:11, 3052:22,
3053:8, 3053:11,
3053:18, 3054:23
**25** [4] - 3019:1,
3020:20, 3031:25,
3032:5
**250** [8] - 3004:23,
3005:20, 3006:5,
3007:18, 3007:20,
3008:1, 3008:4,
3047:15
**250,000** [9] - 2993:5,
3005:20, 3030:19,
3045:1, 3048:1,
3048:7, 3060:24,
3076:18, 3077:2
**250,000-per-book**
[1] - 3030:24

**250,000-plus** [1] -
3048:11
**250-and-above** [1] -
3061:3
**250-and-up** [1] -
3031:4
**250-plus** [1] -
3047:15
**27** [1] - 3077:19
**28** [1] - 3039:15
**29** [1] - 3039:16
**290** [1] - 3014:1
**2985** [1] - 2983:5
**2:00** [1] - 3110:2

## 3

**3** [2] - 3076:3,
3105:25
**30** [2] - 2989:25,
3018:8
**300** [2] - 2995:12,
3014:5
**3021** [1] - 2983:5
**3037** [1] - 2983:14
**3038** [3] - 2983:14,
2983:15, 2983:15
**3039** [1] - 2983:16
**3040** [1] - 2983:16
**3041** [1] - 2983:10
**3042** [2] - 2983:6,
2983:17
**3051** [1] - 2983:11
**3078** [1] - 2983:11
**3085** [1] - 2983:12
**3106** [1] - 2983:12
**32** [1] - 3048:18
**33** [1] - 3076:1
**333** [2] - 2982:14,
3111:14
**34** [1] - 3090:17
**350** [1] - 2991:19
**354-3269** [2] -
2982:15, 3111:15
**36** [3] - 3075:21,
3076:1
**360** [1] - 3056:13
**369** [3] - 2983:17,
3042:2, 3042:5
**370** [3] - 2983:15,
3038:22, 3038:25
**375** [4] - 2983:16,
2991:20, 3039:2,
3039:10
**376** [3] - 2983:16,
3039:3, 3039:10
**377** [3] - 2983:16,
3039:4, 3039:11
**385** [2] - 3005:4,

3113

3005:6

## 4

**4** [9] - 3000:12, 3077:22, 3078:22, 3079:2, 3079:16, 3081:1, 3105:14, 3105:15, 3107:11
**4.7** [1] - 3109:4
**40** [5] - 2994:23, 3039:9, 3053:1, 3053:2, 3103:1
**401** [1] - 2982:10
**411** [1] - 3000:11
**42** [2] - 2985:10, 3089:4
**422** [3] - 2983:14, 3038:3, 3038:6
**423** [3] - 2983:15, 3038:8, 3038:12
**428** [3] - 2983:16, 3039:4, 3039:11
**435** [4] - 2983:14, 3037:22, 3037:25, 3038:15
**436** [3] - 2983:16, 3039:6, 3039:11
**437** [4] - 2983:16, 3039:14, 3039:19, 3040:4
**438** [4] - 2983:16, 3039:16, 3039:19, 3040:4
**439** [3] - 2983:16, 3039:22, 3040:5
**45** [2] - 2987:2, 2987:19
**450** [1] - 2981:18
**46** [2] - 3009:11, 3009:16

## 5

**5** [87] - 2987:2, 2987:8, 2987:10, 2987:13, 2987:18, 2987:20, 2987:25, 2989:14, 2990:7, 2991:9, 2995:25, 2996:11, 2996:17, 2996:19, 2996:21, 2998:6, 2998:15, 2998:18, 3011:24, 3012:1, 3014:19, 3017:14, 3018:22, 3019:2, 3019:22, 3019:24, 3021:12, 3040:16, 3045:22,

3046:2, 3046:5, 3046:6, 3050:13, 3050:14, 3051:17, 3052:2, 3052:10, 3052:21, 3053:16, 3055:4, 3063:9, 3063:15, 3065:20, 3071:5, 3074:24, 3074:25, 3075:6, 3075:17, 3076:2, 3076:3, 3076:6, 3076:7, 3077:10, 3077:20, 3077:21, 3077:24, 3078:1, 3079:13, 3079:14, 3079:15, 3079:18, 3079:19, 3080:1, 3080:2, 3080:6, 3080:11, 3080:17, 3081:19, 3082:22, 3082:24, 3083:15, 3083:17, 3106:3, 3108:14, 3108:15, 3108:17, 3108:20, 3109:7, 3109:18, 3109:19, 3109:21
**5.1** [1] - 3094:10
**50** [2] - 3053:4, 3109:2
**50,000** [5] - 3047:18, 3048:4, 3048:7, 3048:9
**500** [4] - 3004:23, 3006:5, 3008:4
**500,000** [4] - 3007:12, 3008:5, 3045:2, 3060:23
**500,000-and-above** [1] - 3005:18
**51** [1] - 3069:9
**577** [1] - 3027:1
**59** [1] - 3100:5
**599** [1] - 2982:7

## 6

**6** [11] - 2998:11, 2998:17, 3014:6, 3014:9, 3014:13, 3014:19, 3048:14, 3063:9, 3071:10, 3075:17, 3105:21
**60** [2] - 3064:23, 3102:3
**61** [1] - 3056:14
**67** [2] - 2989:16, 2990:3
**6706** [1] - 2982:14
**68** [1] - 3022:7

## 7

**7** [2] - 2992:9, 3055:14
**70** [3] - 3044:1, 3044:15, 3064:23
**73** [1] - 3010:1
**75** [1] - 3077:3
**791** [1] - 3013:25

## 8

**8** [4] - 3043:21, 3043:22, 3048:15, 3105:25
**80** [1] - 3053:3

## 9

**9** [10] - 2998:13, 2998:16, 3040:17, 3053:16, 3075:17, 3079:23, 3080:1, 3080:10, 3080:11, 3081:20
**9.2** [2] - 2993:20, 2993:24
**9.4** [1] - 3109:4
**9.5** [1] - 3065:21
**90067** [1] - 2981:24
**91** [1] - 2996:12
**92** [1] - 3008:11
**94** [5] - 2987:6, 2987:18, 2995:25, 2996:11, 2996:19
**96** [2] - 2987:1, 2987:19
**963-A** [1] - 3039:13
**9:33** [1] - 2981:7

## A

**a.m** [1] - 2981:7
**ABBY** [1] - 2982:2
**ability** [1] - 3111:7
**able** [11] - 2988:17, 2989:13, 3015:19, 3015:22, 3017:9, 3021:8, 3046:5, 3046:6, 3088:21, 3088:24, 3101:21
**Abrams** [2] - 2991:7
**absent** [1] - 3109:19
**absolutely** [2] - 2998:25, 3100:21
**abstracting** [1] - 3102:8

**acceptable** [2] - 3095:8, 3095:11
**accepted** [1] - 3104:22
**accommodating** [2] - 3011:3, 3011:4
**according** [9] - 3002:11, 3007:24, 3013:5, 3081:8, 3084:3, 3084:5, 3085:15, 3086:2, 3087:14
**account** [3] - 3010:13, 3092:25, 3094:1
**accounting** [1] - 3028:19
**accurate** [1] - 3111:4
**accurately** [1] - 3050:5
**achieve** [2] - 3026:10, 3026:15
**acquire** [2] - 2993:5, 2993:12, 3094:13
**acquired** [3] - 2998:14, 3030:23, 3031:3
**Acquired** [1] - 2993:25
**acquiring** [2] - 3023:7, 3083:9
**acquisition** [15] - 2992:20, 3022:11, 3024:15, 3025:8, 3026:11, 3026:15, 3035:11, 3035:22, 3093:17, 3093:22, 3094:5, 3101:4, 3101:6, 3101:7
**acquisitions** [5] - 2986:25, 2992:17, 2997:11, 2997:24, 3022:22
**act** [1] - 3014:7
**Action** [1] - 2981:3
**activities** [1] - 3026:2
**actual** [14] - 2995:14, 3003:24, 3013:20, 3016:12, 3016:15, 3030:14, 3074:5, 3074:15, 3093:20, 3094:20, 3095:1, 3095:13, 3097:14, 3097:17
**add** [4] - 3030:5, 3052:20, 3053:5
**added** [2] - 3008:1, 3052:11
**adding** [1] - 3007:17

**additional** [5] - 3045:24, 3046:17, 3068:14, 3093:7, 3098:13
**address** [3] - 3079:20, 3087:6, 3101:8
**addresses** [1] - 3101:10
**adhering** [1] - 3023:25
**adjustments** [1] - 3004:9
**admit** [6] - 3042:2, 3050:23, 3078:3, 3085:8, 3106:17, 3106:18
**admitted** [12] - 3008:12, 3027:2, 3039:13, 3039:17, 3039:21, 3040:2, 3040:3, 3051:1, 3078:6, 3079:6, 3085:11, 3106:21
**admitting** [1] - 3038:21
**adopted** [1] - 3059:17
**adult** [1] - 3068:8
**advance** [56] - 2988:2, 2992:17, 2997:4, 3006:22, 3006:24, 3012:19, 3030:24, 3044:10, 3044:21, 3045:2, 3045:6, 3045:9, 3045:17, 3045:25, 3046:19, 3047:11, 3047:22, 3050:8, 3051:7, 3055:25, 3057:10, 3059:7, 3059:10, 3060:21, 3060:23, 3060:24, 3061:24, 3062:8, 3062:10, 3064:7, 3064:14, 3065:16, 3068:16, 3070:19, 3071:17, 3071:20, 3075:8, 3076:10, 3076:18, 3076:24, 3077:12, 3078:21, 3079:10, 3084:7, 3085:20, 3087:8, 3094:25, 3095:5, 3098:16, 3105:3, 3105:9, 3105:12, 3105:19, 3105:23, 3106:1
**advances** [47] - 2990:17, 2997:21,

2997:22, 3003:24, 3004:20, 3004:23, 3005:1, 3005:2, 3005:19, 3005:20, 3008:23, 3009:25, 3010:5, 3012:6, 3012:23, 3013:1, 3013:10, 3013:11, 3013:15, 3015:14, 3044:2, 3044:16, 3045:1, 3059:1, 3059:6, 3059:11, 3059:15, 3060:4, 3060:6, 3060:10, 3060:16, 3062:13, 3062:14, 3064:4, 3064:16, 3064:18, 3064:19, 3065:19, 3065:21, 3065:24, 3066:5, 3066:15, 3089:1, 3094:2, 3103:4, 3105:15

**Advances** [2] - 2993:25, 3032:9

**advantages** [1] - 3046:2

**advertising** [1] - 3027:22

**advocacy** [1] - 3104:12

**affect** [13] - 2998:1, 3000:21, 3001:14, 3002:6, 3002:16, 3003:10, 3003:22, 3007:19, 3018:25, 3089:8, 3091:11, 3100:17, 3100:21

**affected** [3] - 2987:17, 3058:21, 3063:8

**affecting** [1] - 3021:7

**affects** [4] - 3004:7, 3033:25, 3034:4, 3100:19

**affirmatively** [1] - 3019:10

**agencies** [2] - 2997:10, 3051:9

**agency** [11] - 2986:22, 2996:25, 2997:5, 2997:17, 2997:22, 3051:17, 3055:12, 3058:14, 3084:14, 3102:24, 3106:2

**agent** [12] - 3017:18, 3020:1, 3034:19, 3035:6, 3035:8, 3036:17, 3046:22, 3074:15, 3098:20,

3099:12, 3100:2, 3101:16

**agent's** [1] - 3035:7

**agents** [11] - 3004:8, 3036:14, 3073:12, 3073:15, 3073:20, 3073:25, 3100:24, 3101:17, 3101:19, 3101:21, 3101:23

**aggregate** [2] - 3080:20, 3081:5

**aggregated** [1] - 3080:8

**aggregating** [1] - 3079:24

**aggressive** [2] - 3089:20, 3092:22

**aggressively** [1] - 3063:15

**ago** [1] - 3083:7

**agree** [14] - 2989:21, 3030:22, 3046:13, 3049:18, 3049:21, 3067:23, 3067:24, 3076:21, 3076:23, 3086:10, 3086:11, 3090:10, 3091:16, 3100:10

**agreed** [2] - 3011:8, 3017:15

**agreed-upon** [1] - 3011:8

**agreement** [14] - 3016:19, 3017:25, 3018:3, 3018:9, 3019:7, 3019:9, 3019:24, 3020:6, 3020:8, 3020:13, 3020:16, 3023:25, 3024:1, 3031:2

**agreements** [1] - 3017:5

**ahead** [1] - 2989:19

**al** [2] - 2981:7, 2984:6

**align** [1] - 3085:24

**allegations** [2] - 3016:4, 3017:11

**alleged** [1] - 3022:20

**allegedly** [1] - 3017:10

**allow** [2] - 3025:19, 3109:18

**allows** [2] - 3028:12, 3051:14

**altering** [1] - 3013:15

**alternative** [4] - 3098:25, 3099:4, 3099:11, 3099:24

**alternatively** [1] -

3011:2

**America** [2] - 2984:5, 3003:8

**AMERICA** [1] - 2981:3

**American** [1] - 3068:24

**amount** [13] - 3000:23, 3002:15, 3003:4, 3006:17, 3033:24, 3045:6, 3045:17, 3056:6, 3071:11, 3082:25, 3100:25

**amounts** [3] - 3045:9, 3059:10, 3060:21

**analyses** [2] - 3031:12, 3107:18

**analysis** [18] - 2998:1, 3002:16, 3003:10, 3003:22, 3022:3, 3025:13, 3029:8, 3053:19, 3056:21, 3058:1, 3060:17, 3061:2, 3064:6, 3064:10, 3066:3, 3080:24, 3081:9, 3107:8

**analyze** [2] - 3060:1, 3081:24

**analyzing** [1] - 3076:25

**ancillary** [1] - 3069:1

**ANDREW** [1] - 2982:2

**Andrew** [1] - 3041:7

**Angeles** [1] - 2981:24

**Anheuser** [1] - 3089:14

**Anheuser-Busch** [1] - 3089:14

**Annual** [1] - 2993:24

**annually** [1] - 3030:24

**another's** [1] - 3087:16

**answer** [21] - 2989:8, 2990:4, 2991:2, 2992:9, 2992:13, 2992:23, 2993:7, 2993:13, 2993:14, 3000:8, 3007:4, 3008:3, 3018:18, 3020:9, 3025:1, 3029:17, 3035:24, 3073:13, 3075:25, 3077:18, 3083:5

**answered** [2] -

3011:15, 3019:6

**answering** [1] - 3016:24

**answers** [1] - 3020:23

**anticipated** [53] - 2991:23, 2995:1, 3016:10, 3016:15, 3044:3, 3044:6, 3044:10, 3044:12, 3044:14, 3044:18, 3044:24, 3045:1, 3045:3, 3045:19, 3045:22, 3046:2, 3046:8, 3046:16, 3047:5, 3047:16, 3047:20, 3047:21, 3047:25, 3048:9, 3049:25, 3058:21, 3059:2, 3060:4, 3060:7, 3062:8, 3062:11, 3062:15, 3063:7, 3063:11, 3063:14, 3064:22, 3064:24, 3065:19, 3065:24, 3066:5, 3066:13, 3066:15, 3075:1, 3075:15, 3075:18, 3076:20, 3077:11, 3077:16, 3077:23, 3078:14, 3079:4, 3083:9

**anticipates** [1] - 3042:12

**anticompetitive** [1] - 3067:20, 3087:13, 3087:20

**antipoaching** [1] - 3017:5

**ANTITRUST** [1] - 2981:18

**antitrust** [2] - 3011:12, 3049:2

**anyway** [2] - 3009:17, 3080:7

**apologies** [1] - 3098:17

**apologize** [5] - 2995:19, 3031:1, 3079:15, 3085:6, 3104:11

**Appeals** [1] - 3013:22

**APPEARANCES** [1] - 2982:1

**appearances** [2] - 2981:14, 2984:8

**Appendix** [1] - 3031:22

**Apple** [4] - 3013:23,

3015:19, 3015:24, 3022:17

**applied** [1] - 3104:14

**appointed** [3] - 3002:10, 3003:1, 3003:7

**appreciate** [1] - 3024:21

**approach** [8] - 2984:7, 2985:23, 3005:10, 3019:10, 3023:23, 3025:16, 3069:16, 3099:16

**approached** [1] - 3023:22

**approaching** [2] - 3019:8, 3023:16

**appropriate** [4] - 3056:9, 3056:18, 3092:8, 3092:9

**approval** [1] - 3037:21

**apt** [2] - 3087:20, 3087:22

**arbitrary** [1] - 3047:7

**area** [1] - 3024:13

**arguing** [1] - 3047:6

**argument** [5] - 3067:19, 3067:22, 3076:15, 3076:16, 3090:6

**arguments** [4] - 3049:16, 3067:17, 3091:14, 3098:11

**arrangements** [1] - 3017:9

**arrive** [1] - 3104:6

**aside** [6] - 3016:1, 3016:6, 3020:15, 3028:11, 3082:5, 3098:10

**assessing** [1] - 3057:16

**assign** [1] - 3039:18

**assigned** [1] - 3039:18

**assist** [1] - 3043:14

**assistants** [1] - 3014:15

**assume** [11] - 3001:2, 3001:3, 3003:21, 3006:13, 3009:11, 3009:20, 3010:2, 3015:7, 3015:11, 3035:21, 3109:2

**assumed** [1] - 3092:13

**assumes** [1] - 3036:8

3115

**assuming** [4] - 3001:9, 3002:17, 3002:20, 3035:3
**assumption** [5] - 3001:4, 3001:5, 3004:5, 3009:12, 3085:19
**ATS** [3] - 2990:17, 2994:14, 2998:14
**attempt** [1] - 3062:20
**attempting** [1] - 2994:2
**attempts** [1] - 3017:12
**attention** [5] - 3027:5, 3027:13, 3031:21, 3032:8, 3058:18
**auction** [37] - 3004:5, 3032:24, 3033:8, 3033:14, 3034:1, 3034:5, 3035:20, 3068:17, 3068:20, 3069:13, 3069:16, 3070:21, 3071:8, 3071:24, 3074:8, 3074:15, 3080:4, 3081:14, 3081:15, 3081:18, 3087:15, 3088:16, 3088:18, 3089:9, 3091:14, 3093:3, 3094:20, 3098:6, 3099:15, 3099:22, 3100:1, 3104:24, 3105:2, 3105:11, 3105:17, 3107:5, 3107:22
**auctions** [12] - 2999:19, 3032:21, 3068:8, 3069:7, 3072:7, 3072:11, 3072:13, 3086:6, 3087:3, 3098:15, 3101:9, 3101:10
**audio** [1] - 3011:25
**August** [2] - 2981:7, 3111:10
**author** [14] - 3016:20, 3017:19, 3017:20, 3018:10, 3019:23, 3020:22, 3023:15, 3034:12, 3046:4, 3059:15, 3069:11, 3086:15, 3103:10
**author's** [1] - 3020:2
**authority** [1] - 3029:1
**authors** [23] -

3001:20, 3016:7, 3016:10, 3016:11, 3017:16, 3019:2, 3019:8, 3019:10, 3022:12, 3034:14, 3045:21, 3058:21, 3065:24, 3066:12, 3068:7, 3088:8, 3103:3, 3103:24, 3105:14, 3105:16, 3105:20, 3105:21
**available** [2] - 3066:24, 3090:17
**Avenue** [4] - 2981:23, 2982:7, 2982:14, 3111:14
**average** [28] - 2994:6, 2994:8, 2997:21, 2997:22, 3005:1, 3005:2, 3005:19, 3005:20, 3044:24, 3044:25, 3059:1, 3059:6, 3059:11, 3060:4, 3060:6, 3060:16, 3060:21, 3061:1, 3061:15, 3062:8, 3062:10, 3062:13, 3062:14, 3064:13, 3064:16, 3064:17, 3064:19, 3083:16
**avoid** [3] - 3000:15, 3001:7, 3059:19
**aware** [15] - 2990:20, 2999:9, 2999:14, 2999:21, 3000:19, 3002:21, 3012:5, 3013:9, 3014:17, 3015:4, 3045:7, 3074:21, 3088:3, 3097:25, 3104:18
**axis** [4] - 3060:25, 3061:1, 3064:12, 3064:13

---

# B

**B-A-T-N-A** [1] - 3099:1
**background** [1] - 3000:13
**bad** [4] - 3020:24, 3021:2, 3021:4, 3103:11
**balance** [1] - 3103:19
**balanced** [1] - 3103:13
**balances** [1] - 3103:10

**ballpark** [1] - 2990:1
**bar** [5] - 3006:14, 3044:23, 3047:19, 3048:4, 3048:7
**bargaining** [3] - 3087:14, 3099:17, 3101:11
**barriers** [1] - 3080:18
**bars** [1] - 3048:2
**base** [3] - 2989:21, 3052:6, 3052:12
**based** [16] - 2988:1, 2996:24, 3001:22, 3004:12, 3014:10, 3030:10, 3030:13, 3053:7, 3056:2, 3084:21, 3087:3, 3094:20, 3104:14, 3106:5, 3107:4, 3107:18
**baseline** [10] - 3024:17, 3084:1, 3084:3, 3084:4, 3085:16, 3095:3, 3095:15, 3105:11, 3105:13, 3107:22
**basic** [1] - 3016:3
**basis** [6] - 3014:12, 3017:15, 3028:9, 3033:23, 3034:3, 3066:25
**BATNA** [3] - 3099:1, 3099:4, 3099:7
**beat** [2] - 3033:17, 3033:21
**becomes** [1] - 3024:5
**beer** [2] - 3089:16, 3089:24
**BEFORE** [1] - 2981:11
**begin** [1] - 3082:21
**behalf** [1] - 3104:11
**behavior** [2] - 3069:5, 3089:8
**behind** [1] - 3069:23
**belabor** [2] - 2991:4, 3056:12
**belief** [3] - 3020:10, 3035:10, 3091:22
**believes** [1] - 3046:6
**below** [6] - 3027:18, 3028:15, 3064:19, 3076:12, 3097:16, 3099:14
**BENCH** [1] - 2981:11
**benefits** [1] - 3103:15
**Bertelsman** [1] - 2984:6

**BERTELSMANN** [3] - 2981:6, 2981:21, 2982:2
**Bertlesmann** [1] - 2984:13
**best** [46] - 2999:18, 3003:19, 3004:1, 3032:20, 3032:21, 3032:24, 3033:7, 3033:14, 3033:15, 3033:18, 3033:19, 3033:20, 3033:24, 3033:25, 3034:5, 3034:6, 3034:13, 3034:15, 3034:25, 3035:3, 3035:6, 3035:8, 3061:16, 3063:23, 3066:24, 3068:23, 3069:7, 3069:13, 3072:11, 3086:20, 3086:24, 3087:19, 3088:11, 3089:2, 3089:5, 3089:22, 3098:24, 3099:2, 3099:4, 3099:11, 3099:20, 3101:9, 3111:7
**better** [4] - 3000:14, 3001:6, 3011:10, 3058:3
**between** [32] - 2994:20, 3005:19, 3016:14, 3019:20, 3023:24, 3031:9, 3044:9, 3048:6, 3048:9, 3057:14, 3057:19, 3057:24, 3067:3, 3068:2, 3070:16, 3070:17, 3071:10, 3071:12, 3072:17, 3073:4, 3073:11, 3073:12, 3073:19, 3076:18, 3084:2, 3085:1, 3090:19, 3091:20, 3092:20, 3095:8, 3095:19, 3107:19
**bid** [46] - 2997:25, 2999:16, 3002:15, 3003:4, 3025:18, 3029:5, 3032:21, 3032:24, 3033:15, 3033:16, 3033:17, 3033:18, 3033:19, 3033:20, 3033:25, 3034:4, 3034:5, 3034:6, 3034:13, 3034:15, 3034:25, 3035:4, 3035:8, 3036:8, 3036:10,

3036:11, 3068:25, 3069:1, 3069:7, 3070:25, 3071:1, 3071:2, 3071:3, 3071:9, 3071:23, 3072:11, 3072:17, 3072:20, 3072:21, 3073:2, 3086:21, 3094:7
**bidder** [13] - 2986:25, 2998:7, 3032:25, 3035:16, 3036:18, 3056:7, 3056:15, 3071:7, 3073:5, 3074:10, 3081:21
**bidders** [11] - 3033:7, 3033:24, 3034:4, 3034:7, 3034:17, 3034:25, 3036:8, 3036:12, 3073:18, 3074:16, 3088:25
**bidding** [17] - 2999:12, 3003:2, 3033:10, 3035:22, 3068:3, 3069:16, 3072:18, 3072:23, 3073:16, 3073:21, 3073:23, 3074:1, 3074:3, 3081:18, 3081:21, 3094:1, 3094:5
**bids** [26] - 2999:15, 2999:18, 3002:11, 3002:12, 3002:23, 3002:25, 3004:1, 3025:17, 3032:20, 3033:7, 3033:14, 3033:15, 3035:1, 3035:3, 3035:6, 3068:9, 3069:13, 3070:23, 3081:14, 3086:20, 3086:24, 3088:11, 3089:2, 3089:5, 3089:22, 3101:9
**big** [4] - 2988:1, 3008:24, 3036:13, 3067:3
**Big** [79] - 2987:2, 2987:8, 2987:10, 2987:13, 2987:18, 2987:19, 2987:25, 2989:14, 2990:7, 2991:9, 2995:25, 2996:11, 2996:17, 2996:19, 2996:21, 2998:6, 2998:15, 2998:18, 3011:24,

3116

3012:1, 3014:6,
3014:9, 3014:13,
3014:19, 3017:14,
3018:22, 3019:2,
3019:22, 3019:24,
3021:12, 3045:22,
3046:2, 3046:5,
3046:6, 3050:13,
3050:14, 3051:17,
3052:2, 3052:10,
3052:21, 3053:16,
3055:4, 3063:9,
3063:15, 3071:4,
3074:24, 3074:25,
3075:5, 3075:6,
3075:17, 3076:2,
3076:3, 3076:6,
3076:7, 3077:10,
3077:20, 3077:21,
3077:24, 3078:1,
3079:13, 3079:14,
3079:15, 3079:18,
3079:19, 3080:1,
3080:2, 3080:6,
3080:11, 3080:17,
3081:19, 3082:22,
3082:24, 3083:15,
3083:17
  **bigger** [1] - 3034:14
  **bilateral** [1] - 3004:6
  **binder** [7] - 2985:19,
2985:21, 2985:24,
2990:16, 2990:23,
3000:18, 3008:9
  **binders** [1] - 2993:18
  **bins** [3] - 3047:24,
3047:25, 3077:2
  **bit** [14] - 2994:25,
2995:24, 3006:12,
3024:20, 3024:23,
3030:25, 3037:4,
3040:13, 3064:4,
3068:13, 3077:9,
3082:12, 3082:21,
3087:11
  **black** [2] - 3050:12,
3060:22
  **blend** [2] - 3097:10,
3097:22
  **blended** [7] - 3096:1,
3096:6, 3096:23,
3097:3, 3097:4,
3097:18, 3107:18
  **blue** [6] - 3050:11,
3056:17, 3078:25,
3079:2, 3079:12
  **board** [2] - 3024:7,
3024:8
  **bonus** [1] - 3068:24
  **bonuses** [2] -

3012:24, 3013:15
  **book** [33] - 2993:1,
2999:12, 2999:16,
3000:2, 3022:22,
3025:15, 3026:7,
3027:8, 3027:11,
3028:3, 3029:4,
3033:5, 3033:11,
3034:9, 3044:6,
3045:18, 3047:1,
3068:18, 3069:11,
3069:14, 3070:1,
3070:3, 3071:17,
3076:17, 3077:4,
3077:5, 3088:25,
3089:11, 3093:7,
3093:15, 3093:21,
3094:13, 3102:23
  **book's** [2] - 3098:5,
3098:7
  **book-level** [5] -
3025:15, 3027:8,
3027:11, 3029:4,
3033:5
  **books** [48] - 2990:13,
2991:12, 2991:15,
2991:17, 2991:18,
2992:12, 2992:21,
2993:5, 2993:12,
2994:14, 2998:14,
3009:16, 3011:18,
3015:20, 3022:5,
3022:10, 3022:11,
3022:12, 3024:15,
3025:23, 3028:5,
3030:19, 3030:20,
3030:23, 3031:3,
3045:10, 3046:23,
3046:25, 3047:4,
3056:3, 3056:6,
3056:7, 3056:10,
3056:11, 3056:14,
3056:23, 3060:24,
3062:13, 3063:13,
3063:14, 3063:25,
3064:3, 3065:21,
3066:23, 3077:10,
3103:2
  **Books** [1] - 2993:24
  **bottom** [6] - 3006:14,
3008:1, 3008:21,
3008:23, 3010:1,
3032:8, 3072:2,
3100:12
  **box** [4] - 3056:3,
3056:17, 3056:18,
3072:2
  **break** [4] - 3037:6,
3037:7, 3110:1,
3110:4

**brief** [1] - 3098:12
  **briefly** [5] - 2993:23,
3025:21, 3032:20,
3083:21, 3091:13
  **bring** [3] - 3022:7,
3026:25, 3048:13
  **broad** [1] - 3017:7
  **broader** [3] - 3012:3,
3087:23, 3087:25
  **broke** [1] - 3047:18
  **broken** [3] - 3017:20,
3020:3, 3077:1
  **bucket** [1] - 3008:5
  **buckets** [9] -
3004:23, 3005:1,
3006:17, 3006:20,
3006:23, 3006:24,
3008:4, 3091:2,
3106:11
  **Bud** [3] - 3089:15,
3089:21, 3089:24
  **building** [2] -
2999:23, 3101:7
  **bullet** [1] - 3068:22
  **Busch** [1] - 3089:14
  **business** [4] -
3028:4, 3046:24,
3077:24, 3077:25
  **buy** [1] - 3089:17
  **buyers** [5] - 3087:19,
3087:21, 3087:23,
3088:1, 3099:17
  **buyers'** [1] - 3087:16
  **BY** [40] - 2982:12,
2985:4, 2986:4,
2986:16, 2988:15,
2989:12, 2990:5,
2995:22, 2998:3,
2999:7, 3004:17,
3005:13, 3008:14,
3010:15, 3021:22,
3022:9, 3027:4,
3027:12, 3029:19,
3031:24, 3043:4,
3043:23, 3048:19,
3051:4, 3053:10,
3055:10, 3058:17,
3062:12, 3066:1,
3067:12, 3074:22,
3078:9, 3079:7,
3081:11, 3085:14,
3094:18, 3098:2,
3102:1, 3104:5,
3109:13

---

**C**

---

  **calculate** [5] -
2994:19, 2995:1,

3062:14, 3082:19,
3093:20
  **calculated** [8] -
3028:18, 3053:15,
3058:5, 3065:19,
3082:16, 3095:13,
3104:14, 3107:24
  **calculating** [4] -
2996:13, 3024:25,
3028:22, 3075:11
  **calculation** [17] -
2986:20, 2989:15,
2994:5, 3055:23,
3055:24, 3056:5,
3056:9, 3058:2,
3058:3, 3058:6,
3058:8, 3058:10,
3058:11, 3058:13,
3058:14, 3085:16,
3093:19
  **calculations** [3] -
2987:14, 3006:17,
3080:15
  **calendar** [1] -
3032:18
  **calibrate** [1] - 3096:2
  **California** [2] -
2981:24, 3017:3
  **Candlewick** [1] -
2992:19
  **cannot** [2] - 3071:23,
3099:19
  **CANTOR** [1] - 2982:3
  **capturing** [2] -
3026:3, 3030:1
  **career** [2] - 3049:15,
3054:19
  **carve** [1] - 3023:21
  **Case** [1] - 2984:5
  **case** [18] - 3011:24,
3013:24, 3015:9,
3015:18, 3022:5,
3022:10, 3023:11,
3024:13, 3027:8,
3036:12, 3060:8,
3069:20, 3076:3,
3087:1, 3088:13,
3103:24, 3104:21,
3105:9
  **cases** [1] - 3024:10
  **catch** [1] - 2987:12
  **categories** [2] -
3006:5, 3027:19
  **category** [6] -
3005:18, 3007:7,
3007:21, 3028:7,
3031:4, 3101:18
  **causes** [1] - 3032:24
  **CEO** [5] - 3001:25,
3020:11, 3023:4,

3026:5, 3093:11
  **CEOs** [11] - 3014:13,
3014:19, 3016:8,
3017:14, 3018:13,
3018:22, 3018:23,
3020:7, 3020:13,
3021:3, 3023:19
  **certain** [4] - 2999:14,
2999:17, 2999:19,
3034:14
  **certainly** [3] -
3008:18, 3025:3,
3110:5
  **CERTIFICATE** [1] -
3111:1
  **certify** [1] - 3111:4
  **cetera** [2] - 3012:24,
3094:2
  **challenge** [1] -
2985:10
  **challenger** [1] -
3086:24
  **challenges** [1] -
3014:16
  **challenging** [1] -
3101:8
  **chance** [2] - 3080:6,
3103:10
  **change** [16] -
3001:24, 3001:25,
3002:7, 3004:14,
3010:13, 3012:14,
3012:16, 3012:20,
3012:21, 3013:9,
3024:19, 3060:4,
3060:12, 3061:7,
3083:16, 3083:19
  **changed** [5] -
3012:25, 3059:10,
3080:19, 3082:23,
3083:24
  **changes** [2] -
3031:10, 3051:11
  **changing** [4] -
2999:8, 2999:11,
3077:9, 3098:8
  **characterization** [2]
- 3091:16, 3100:10
  **characterize** [2] -
3071:9, 3092:17
  **chart** [8] - 3005:14,
3005:23, 3006:14,
3007:21, 3008:22,
3047:14, 3047:15,
3097:24
  **check** [2] - 2990:15,
3107:7
  **checking** [2] -
2990:21, 2991:25
  **children's** [1] -

2991:12
**choice** [1] - 3085:3
**choose** [1] - 3065:1
**choppiness** [1] - 3006:23
**chose** [1] - 3059:8
**Christy** [1] - 3041:11
**Chronicle** [6] - 2992:1, 2992:2, 2992:8, 2992:11, 2992:16, 3034:23
**circumstances** [4] - 3003:25, 3018:1, 3018:4, 3036:16
**circumvent** [1] - 3074:1
**cited** [1] - 3072:10
**Civil** [2] - 2981:3, 2984:5
**claim** [1] - 3063:25
**clarify** [2] - 3007:2, 3012:11
**class** [2] - 3087:23, 3088:1
**classify** [1] - 3027:24
**clause** [1] - 3087:24
**clear** [8] - 3016:17, 3036:4, 3045:15, 3051:22, 3053:11, 3054:19, 3068:1, 3104:10
**Clinic** [1] - 3104:21
**close** [7] - 3014:6, 3024:21, 3031:8, 3031:13, 3031:25, 3095:15
**close-knit** [1] - 3014:6
**closely** [1] - 3086:25
**closest** [1] - 3086:24
**closing** [1] - 3029:20
**Co** [1] - 2984:6
**CO** [1] - 2981:6
**coauthor** [1] - 3091:8
**coded** [1] - 3070:25
**colleagues** [1] - 2999:24
**collective** [3] - 3069:15, 3083:15, 3106:6
**collectively** [2] - 3080:11, 3081:7
**colloquy** [2] - 2988:9, 3023:3
**Columbia** [2] - 2982:13, 3111:13
**COLUMBIA** [1] - 2981:1
**column** [12] -

2994:7, 2994:10, 3009:1, 3009:25, 3046:4, 3070:22, 3070:24, 3075:10, 3075:11, 3075:19, 3096:13
**Column** [3] - 3097:8, 3108:11
**columns** [3] - 2994:4, 3096:12, 3096:14
**combinable** [1] - 3054:25
**combination** [2] - 3034:11, 3050:19
**combine** [1] - 3081:19
**combined** [2] - 3052:20, 3106:7
**combines** [1] - 3054:24
**combining** [5] - 3053:23, 3054:13, 3055:6, 3055:21, 3057:4
**comments** [1] - 3046:4
**common** [9] - 3014:15, 3034:11, 3034:14, 3049:13, 3062:18, 3065:8, 3076:5, 3098:4, 3098:6
**commonly** [2] - 3056:24, 3062:3
**communicating** [1] - 3014:7
**communication** [1] - 3019:14
**companies** [1] - 3029:24
**compare** [1] - 3063:17
**compared** [11] - 2997:3, 3001:8, 3064:18, 3064:20, 3067:7, 3068:11, 3075:6, 3075:17, 3079:18, 3090:24, 3095:24
**comparing** [2] - 3065:23, 3095:1
**comparison** [2] - 3065:4, 3095:6
**compensate** [2] - 3013:2, 3013:11
**compete** [13] - 3013:8, 3063:10, 3063:15, 3068:10, 3068:11, 3069:21,

3075:6, 3076:11, 3085:24, 3090:20, 3098:15, 3100:19, 3100:23
**competed** [3] - 3071:18, 3090:19, 3091:7
**competing** [8] - 3002:17, 3069:25, 3072:19, 3085:23, 3086:25, 3090:24, 3091:2, 3093:15
**competition** [36] - 3000:22, 3001:15, 3001:24, 3002:6, 3012:22, 3013:6, 3013:7, 3020:19, 3021:7, 3021:11, 3036:9, 3050:1, 3067:13, 3067:15, 3067:19, 3067:25, 3068:2, 3068:15, 3070:9, 3070:16, 3071:2, 3071:12, 3071:15, 3071:16, 3072:8, 3072:9, 3072:14, 3073:7, 3080:7, 3086:13, 3088:19, 3101:1, 3101:24, 3103:6, 3106:10, 3106:15
**competitions** [2] - 2995:15, 3094:16
**competitive** [12] - 2993:15, 3011:5, 3011:9, 3033:13, 3048:11, 3049:19, 3050:5, 3054:1, 3056:25, 3073:1, 3078:19, 3096:19
**competitor** [1] - 3035:11
**competitors** [1] - 3021:10
**complaint** [1] - 3035:17
**complete** [3] - 2989:8, 3069:18, 3111:6
**completely** [2] - 2988:17, 3030:9
**comply** [1] - 3020:10
**components** [2] - 3098:5, 3098:7
**comprehensive** [1] - 3049:24
**concentrated** [2] - 3091:3, 3091:5
**concentration** [12] - 3049:7, 3050:18,

3051:10, 3051:15, 3066:19, 3080:21, 3080:22, 3090:2, 3090:7, 3090:14, 3091:11, 3106:12
**concepts** [1] - 3054:25
**conceptual** [3] - 3055:20, 3056:19, 3104:25
**concern** [3] - 3010:22, 3011:14, 3047:25
**concerned** [3] - 3010:19, 3022:20, 3086:6
**concerns** [2] - 3015:12, 3037:20
**conclude** [1] - 3072:24
**concluded** [1] - 3110:9
**conclusion** [2] - 3010:4, 3106:5
**conclusions** [2] - 3066:2, 3083:24
**condemned** [1] - 3011:12
**conditioned** [1] - 3033:3
**conditions** [3] - 2993:15, 3048:11, 3050:5
**conduct** [5] - 3011:3, 3011:4, 3011:11, 3015:19, 3022:13
**conferred** [2] - 3038:20
**confess** [1] - 2991:1
**confidence** [1] - 3050:4
**confidential** [9] - 3027:9, 3031:23, 3038:9, 3039:24, 3041:5, 3041:6, 3041:7, 3041:10, 3041:12
**confidentiality** [1] - 3078:12
**confirm** [1] - 2989:20
**connecting** [1] - 3090:2
**consensus** [1] - 3047:1
**conservative** [5] - 2990:13, 3092:12, 3092:20, 3095:4, 3107:23
**consider** [1] - 3022:4
**considerably** [1] -

2992:17
**considered** [1] - 3058:25
**considers** [1] - 3070:8
**consistent** [9] - 3017:11, 3032:14, 3047:3, 3048:10, 3050:21, 3076:7, 3086:2, 3093:10, 3106:10
**consistently** [7] - 3028:10, 3030:6, 3030:7, 3105:8, 3106:9, 3106:14
**consolidated** [2] - 3040:14, 3041:17
**conspiracy** [4] - 3015:19, 3016:3, 3022:20, 3024:5
**constitutes** [1] - 3111:4
**Constitution** [2] - 2982:14, 3111:14
**constraining** [2] - 3079:25, 3080:7
**constrains** [1] - 3068:15
**constraint** [5] - 3012:22, 3012:23, 3033:13, 3088:3, 3088:5
**consumer** [1] - 3089:13
**consumers** [1] - 3089:25
**CONT'D** [1] - 2982:1
**contacts** [1] - 3017:18
**contains** [1] - 3038:9
**contemporaneous** [1] - 3050:1
**context** [7] - 2999:17, 3000:5, 3013:6, 3022:22, 3025:16, 3089:5, 3104:21
**continue** [1] - 3019:4
**CONTINUED** [1] - 2985:3
**continued** [2] - 3060:11, 3061:4
**continuing** [1] - 2984:19
**contract** [3] - 2995:15, 3075:23, 3076:5
**Contracts** [1] - 2993:25
**contracts** [15] -

3118

2987:9, 2998:6, 2998:7, 3011:25, 3012:12, 3012:14, 3031:7, 3031:9, 3075:1, 3075:6, 3075:12, 3075:13, 3078:25, 3079:13, 3079:14
**contrast** [1] - 3036:13
**contribution** [1] - 3094:7
**control** [14] - 3018:14, 3018:23, 3029:2, 3062:22, 3062:25, 3063:4, 3063:13, 3063:19, 3063:20, 3063:22, 3063:23, 3065:23, 3066:24, 3066:25
**convenience** [1] - 3039:14
**convenient** [1] - 3041:21
**conveniently** [1] - 3014:5
**conversation** [1] - 3043:24
**coordinate** [6] - 2999:15, 3001:22, 3002:5, 3002:23, 3003:2, 3068:4
**coordinated** [4] - 3010:17, 3011:2, 3011:11, 3022:12
**coordinating** [7] - 3002:11, 3002:12, 3003:7, 3015:22, 3022:18, 3068:19, 3069:7
**coordination** [23] - 3000:14, 3002:21, 3003:15, 3003:24, 3003:25, 3004:2, 3010:20, 3010:24, 3013:4, 3013:16, 3013:20, 3015:24, 3020:25, 3021:1, 3021:5, 3022:4, 3023:6, 3023:8, 3024:11, 3024:14, 3024:18, 3069:20
**copies** [3] - 3040:19, 3041:16, 3041:19
**corporate** [1] - 3089:19
**corporations** [2] - 3018:13, 3018:24
**correct** [35] - 2987:2, 2987:21, 2993:8,

2995:2, 2995:3, 2995:19, 2997:19, 2998:6, 2998:12, 3006:10, 3007:13, 3007:14, 3007:20, 3014:20, 3014:21, 3015:20, 3016:2, 3016:7, 3017:3, 3024:11, 3027:9, 3029:22, 3032:16, 3034:17, 3048:25, 3058:15, 3081:16, 3081:23, 3083:18, 3092:15, 3092:24, 3093:22, 3097:24, 3108:2, 3109:8
**corrected** [1] - 3095:23
**correctly** [3] - 3005:21, 3006:3, 3011:15
**correspond** [1] - 3109:4
**cost** [7] - 3094:8, 3102:10, 3102:25, 3103:5, 3103:7, 3103:15, 3103:23
**costs** [27] - 3024:25, 3025:25, 3051:12, 3087:16, 3091:21, 3091:22, 3092:4, 3092:6, 3092:25, 3093:4, 3093:6, 3093:9, 3093:14, 3093:16, 3093:18, 3093:23, 3094:1, 3094:12, 3094:13, 3096:9, 3097:6, 3102:9, 3102:11, 3102:13, 3103:25, 3108:1
**counsel** [6] - 2984:7, 2986:2, 2989:8, 3007:5, 3014:15, 3042:24
**Count** [1] - 3032:9
**count** [2] - 3032:11, 3080:20
**counting** [1] - 3054:9
**country** [1] - 3090:18
**couple** [8] - 3010:25, 3027:6, 3030:20, 3040:7, 3057:11, 3082:15, 3091:13, 3098:4
**course** [10] - 2993:14, 2999:21, 3002:9, 3012:18, 3014:8, 3018:20, 3049:14, 3054:18,

3073:10, 3085:18
**Court** [11] - 2982:12, 2982:13, 3013:22, 3014:5, 3014:10, 3015:10, 3018:19, 3040:23, 3060:19, 3111:12, 3111:13
**COURT** [150] - 2981:1, 2984:1, 2984:11, 2984:15, 2984:18, 2984:25, 2985:25, 2986:7, 2986:10, 2986:13, 2988:3, 2988:5, 2988:11, 2988:14, 2988:25, 2989:4, 2989:15, 2989:19, 2990:3, 2995:5, 2995:10, 2995:17, 2995:21, 2996:24, 2997:13, 2997:17, 2998:2, 2998:23, 2999:4, 2999:6, 3002:8, 3002:10, 3002:25, 3003:6, 3003:10, 3003:21, 3004:6, 3004:10, 3004:13, 3004:15, 3005:9, 3010:9, 3019:5, 3019:19, 3020:9, 3020:15, 3020:23, 3021:4, 3021:14, 3021:17, 3021:20, 3027:3, 3027:9, 3029:7, 3029:14, 3029:18, 3036:1, 3036:4, 3036:21, 3036:24, 3037:2, 3037:7, 3037:12, 3037:15, 3037:18, 3037:24, 3038:5, 3038:11, 3038:16, 3038:19, 3038:24, 3039:8, 3039:25, 3040:1, 3040:3, 3040:9, 3040:12, 3040:18, 3040:21, 3041:22, 3042:4, 3042:9, 3042:15, 3042:18, 3042:23, 3043:2, 3043:19, 3050:24, 3051:1, 3052:15, 3052:23, 3053:9, 3054:21, 3055:9, 3058:1, 3058:7, 3058:12, 3058:16, 3061:10, 3065:1, 3065:5, 3065:7, 3065:15, 3067:2, 3067:11, 3074:5,

3074:13, 3078:4, 3078:6, 3079:20, 3081:3, 3081:5, 3081:10, 3085:9, 3085:11, 3092:10, 3092:23, 3093:16, 3093:25, 3094:17, 3095:21, 3096:8, 3096:20, 3096:25, 3097:3, 3097:10, 3097:15, 3097:21, 3098:1, 3101:16, 3103:7, 3103:25, 3104:4, 3106:19, 3106:21, 3107:1, 3107:7, 3107:13, 3107:17, 3108:1, 3108:3, 3108:8, 3108:14, 3108:22, 3109:1, 3109:6, 3109:9, 3109:12, 3109:25, 3110:6
**court** [3] - 3014:12, 3038:4, 3104:22
**Court's** [2] - 3015:2
**courtroom** [1] - 3042:13
**COURTROOM** [1] - 2984:4
**cover** [3] - 3028:12, 3094:12, 3101:12
**covered** [2] - 3045:23, 3046:18
**covering** [1] - 3101:13
**covers** [2] - 3032:5, 3094:12
**COVID** [2] - 2999:23, 2999:25
**CRA** [2] - 3104:8, 3104:10
**created** [2] - 3101:24, 3103:5
**creating** [1] - 3029:21
**creation** [3] - 3050:23, 3078:2, 3085:8
**creative** [1] - 3002:2
**criticisms** [1] - 3104:23
**Cross** [1] - 2983:3
**cross** [1] - 2984:20
**CROSS** [1] - 2985:3
**cross-examination** [1] - 2984:20
**CROSS-EXAMINATION** [1] - 2985:3
**CRR** [3] - 2982:12,

3111:3, 3111:12
**current** [3] - 2993:15, 3001:8, 3100:25
**customers** [6] - 3011:10, 3049:11, 3049:13, 3089:16, 3089:18, 3103:24
**cut** [2] - 3048:12, 3068:22
**cutoff** [2] - 3010:12, 3108:15
**cutoffs** [2] - 3049:5, 3049:8

# D

**D.C** [5] - 2981:6, 2981:19, 2982:10, 2982:15, 3111:14
**Dakota** [1] - 3104:21
**Daniel** [1] - 2984:13
**DANIEL** [2] - 2981:20, 2982:3
**dark** [1] - 3079:12
**data** [38] - 2986:21, 2986:22, 2987:15, 2987:22, 2988:1, 2988:2, 2991:25, 2995:24, 2996:6, 2996:25, 2997:4, 2997:5, 2997:10, 2997:14, 2997:18, 2997:22, 2998:14, 2998:16, 3006:23, 3008:6, 3008:19, 3032:7, 3032:17, 3047:23, 3049:24, 3051:17, 3052:13, 3055:12, 3058:14, 3059:3, 3059:19, 3061:13, 3073:13, 3075:20, 3084:14, 3108:17
**date** [2] - 3064:21, 3065:3
**Dated** [1] - 3111:10
**deal** [2] - 3016:9, 3099:3
**dealing** [1] - 3023:15
**debunked** [1] - 3090:7
**deciding** [1] - 3045:18
**decision** [2] - 3013:22, 3023:16
**decisions** [1] - 3045:10
**deck** [4] - 3000:12,

3119

3050:8, 3094:25,
3098:16
**decrease** [3] -
3059:12, 3061:4,
3061:7
**decreased** [2] -
3082:24, 3083:17
**decreases** [1] -
3105:9
**decreasing** [4] -
3061:4, 3061:7,
3061:8, 3061:10
**defendant** [2] -
3015:9, 3023:1
**Defendant's** [2] -
3014:11, 3039:10
**Defendants** [6] -
2981:8, 3040:24,
3041:18, 3042:7,
3058:6, 3058:9
**DEFENDANTS** [4] -
2981:20, 2982:2,
2982:6, 2983:4
**Defendants'** [23] -
2983:14, 2983:14,
2983:15, 2983:15,
2983:16, 2983:16,
2983:17, 3037:20,
3037:21, 3037:25,
3038:6, 3038:8,
3038:12, 3038:14,
3038:25, 3039:21,
3040:4, 3042:5,
3044:5, 3045:7,
3048:17, 3078:11,
3100:5
**defense** [1] -
3058:12
**DEFENSE** [1] -
2984:24
**defined** [4] -
3047:20, 3049:1,
3049:2, 3049:10
**defining** [1] -
3049:12
**definition** [2] -
3043:25, 3049:7
**delegated** [1] -
3029:1
**demand** [2] -
3000:14, 3001:6
**demarcation** [1] -
3049:9
**Demonstrative** [7] -
3039:21, 3040:16,
3040:17, 3043:22,
3048:15, 3048:17,
3100:5
**demonstrative** [12] -
2985:11, 2985:19,

2985:20, 2985:24,
3022:16, 3039:15,
3039:17, 3043:21,
3056:1, 3056:2,
3096:4, 3096:12
**demonstratives** [2] -
2985:11, 3080:17
**denigrate** [1] -
2988:16
**denominator** [1] -
2989:22
**DEPARTMENT** [1] -
2981:17
**departure** [1] -
3004:2
**depicted** [1] -
3010:10
**depicting** [2] -
2993:22, 3064:21
**depiction** [1] -
3064:6
**deposition** [7] -
2990:22, 2992:2,
2992:18, 3038:3,
3040:25, 3041:1,
3041:8
**DEPUTY** [1] - 2984:4
**derived** [1] - 3104:9
**describe** [3] -
3023:13, 3058:24,
3069:12
**described** [4] -
3015:10, 3028:25,
3034:10, 3060:14
**design** [1] - 3063:16
**designed** [1] -
3033:22
**despite** [1] - 3083:14
**detectable** [1] -
3024:1
**detection** [3] -
3013:16, 3016:18,
3024:4
**determine** [2] -
3023:14, 3066:7
**determined** [2] -
3035:5, 3058:3
**deterrence** [1] -
3011:7
**developed** [1] -
2988:2
**deviation** [1] -
3016:19
**deviations** [1] -
3024:1
**diagnose** [1] -
3104:18
**differ** [1] - 3087:14
**difference** [11] -
3022:17, 3022:19,

3044:9, 3062:19,
3065:22, 3066:3,
3067:3, 3072:1,
3072:17, 3073:4,
3075:16
**difference-in-
differences** [2] -
3065:22, 3066:3
**differences** [4] -
3022:14, 3062:19,
3065:22, 3066:3
**different** [27] -
2994:25, 3000:4,
3002:13, 3014:23,
3016:21, 3019:6,
3048:5, 3048:12,
3052:17, 3053:22,
3053:23, 3055:5,
3055:12, 3060:14,
3060:22, 3061:19,
3063:4, 3069:6,
3070:5, 3075:19,
3077:14, 3095:13,
3095:16, 3097:4,
3107:19
**differently** [5] -
2996:14, 3044:14,
3044:18, 3045:20,
3095:22
**digital** [1] - 3012:2
**dimensions** [3] -
2997:25, 3013:6,
3013:8
**diminished** [1] -
3089:8
**dining** [1] - 3014:14
**dinner** [1] - 3017:15
**dinners** [2] -
3014:13, 3015:8
**DIRECT** [1] - 3043:3
**Direct** [1] - 2983:3
**direct** [8] - 3000:17,
3046:3, 3069:18,
3092:2, 3095:7,
3095:9, 3097:5,
3105:18
**directive** [3] -
3020:10, 3020:17,
3020:18
**directly** [1] - 3055:8
**disagree** [3] -
3018:19, 3030:5,
3094:24
**disagreement** [3] -
3059:17, 3091:20,
3091:21
**disagreements** [1] -
3059:20
**discrete** [1] - 3014:4
**discuss** [5] -

3014:15, 3051:5,
3067:13, 3083:21,
3091:13
**discussed** [5] -
3045:21, 3068:13,
3084:11, 3088:20,
3098:11
**discussing** [1] -
3056:20
**discussion** [4] -
3030:17, 3051:22,
3065:17, 3102:4
**discussions** [1] -
3069:14
**disposal** [1] -
3086:15
**dispositive** [1] -
3066:22
**dispute** [2] -
2991:21, 3083:12
**distinction** [1] -
3031:9
**distinguish** [5] -
3016:14, 3019:15,
3019:20, 3021:9,
3023:24
**distribute** [1] -
3028:4
**distributed** [1] -
3026:3
**District** [4] -
2982:13, 2982:13,
3014:10, 3111:13
**district** [2] - 3014:12,
3111:13
**DISTRICT** [3] -
2981:1, 2981:1,
2981:12
**diversion** [26] -
3054:4, 3054:10,
3054:14, 3055:7,
3057:1, 3057:14,
3057:17, 3057:19,
3057:23, 3057:24,
3066:19, 3083:21,
3083:24, 3084:2,
3084:3, 3084:5,
3084:11, 3084:15,
3084:22, 3084:24,
3084:25, 3085:5,
3085:15, 3085:22,
3086:2, 3106:12
**diversions** [4] -
3055:22, 3080:14,
3096:18, 3100:18
**divide** [3] - 3052:11,
3053:7, 3056:10
**divided** [1] - 3053:11
**divides** [1] - 3056:6
**DIVISION** [1] -

2981:18
**divisions** [4] -
3002:22, 3003:6,
3068:8, 3069:7
**document** [9] -
2986:2, 3000:11,
3000:16, 3005:11,
3010:8, 3037:22,
3039:20, 3040:23,
3074:18
**documents** [2] -
3042:24, 3073:11
**Dohle's** [2] -
3073:22, 3074:11
**dollar** [4] - 3006:17,
3102:12, 3102:13
**dollars** [3] - 3007:7,
3061:1, 3075:24
**done** [7] - 2986:13,
3032:19, 3040:24,
3049:14, 3054:2,
3055:23, 3055:24
**dots** [2] - 3061:18,
3061:19
**doubt** [1] - 3004:4
**down** [22] - 3006:3,
3006:10, 3010:5,
3019:9, 3027:14,
3029:1, 3029:2,
3030:25, 3032:8,
3037:2, 3056:2,
3061:14, 3062:11,
3064:19, 3064:23,
3065:20, 3065:24,
3066:15, 3067:5,
3068:22, 3069:18,
3087:9
**downstream** [3] -
3009:14, 3009:19,
3022:20
**downward** [3] -
3061:15, 3061:17,
3061:22
**downward-sloping**
[2] - 3061:17, 3061:22
**Dr** [135] - 2984:20,
2984:23, 2985:5,
2985:9, 2985:23,
2988:1, 2988:13,
2997:3, 3021:23,
3022:4, 3024:16,
3029:8, 3029:22,
3030:10, 3030:22,
3031:2, 3031:6,
3031:15, 3031:25,
3032:5, 3036:25,
3039:3, 3039:4,
3039:7, 3039:17,
3042:12, 3043:5,
3043:10, 3043:12,

3043:24, 3044:20, 3046:7, 3046:13, 3047:6, 3047:9, 3047:12, 3047:14, 3047:18, 3048:4, 3048:13, 3048:16, 3048:20, 3049:16, 3049:18, 3049:21, 3051:5, 3051:16, 3051:24, 3052:9, 3052:16, 3054:6, 3055:12, 3055:13, 3056:2, 3056:5, 3056:14, 3058:4, 3058:18, 3059:8, 3059:16, 3059:21, 3060:1, 3060:9, 3060:10, 3060:17, 3060:20, 3061:2, 3062:17, 3067:13, 3067:14, 3067:17, 3067:23, 3067:24, 3069:9, 3070:8, 3070:20, 3072:4, 3072:15, 3072:18, 3073:3, 3073:6, 3073:20, 3074:14, 3074:25, 3076:9, 3076:10, 3076:15, 3078:10, 3078:11, 3079:21, 3080:21, 3081:6, 3081:13, 3082:1, 3082:6, 3082:12, 3082:16, 3083:8, 3083:23, 3084:17, 3086:5, 3086:10, 3086:11, 3088:20, 3090:1, 3090:4, 3090:10, 3091:13, 3091:16, 3092:1, 3092:23, 3094:19, 3094:24, 3095:12, 3095:21, 3096:13, 3097:7, 3098:3, 3098:10, 3099:14, 3100:4, 3100:6, 3102:2, 3104:23, 3105:24, 3106:2, 3107:3, 3107:9, 3107:15, 3108:11, 3108:19, 3109:14, 3109:15, 3109:16, 3109:23
**draw** [7] - 3010:4, 3027:5, 3027:13, 3031:21, 3032:8, 3066:2, 3094:6
**drawing** [1] - 3008:7
**driven** [1] - 3071:12
**drop** [1] - 3005:19

**drug** [5] - 3062:24, 3062:25, 3063:3, 3090:16
**during** [4] - 3085:17, 3098:4, 3104:12, 3110:3
**DX** [12] - 3005:4, 3005:6, 3038:21, 3039:2, 3039:3, 3039:4, 3039:6, 3039:14, 3039:16, 3039:22, 3042:2

## E

**E-1** [1] - 3031:22
**e-books** [3] - 3015:20, 3022:5, 3022:10
**early** [2] - 2987:22, 3025:23
**earning** [2] - 3101:20, 3101:25
**easier** [2] - 2985:16, 3041:18
**easily** [1] - 3046:24
**Econ** [1] - 3026:22
**econometric** [1] - 3062:18
**economic** [2] - 3033:23, 3034:3
**economics** [2] - 3023:6, 3093:2
**Economics** [2] - 3025:16, 3090:15
**economist** [2] - 2999:5, 3059:22
**economists** [1] - 3104:11
**editor** [7] - 3016:20, 3017:19, 3017:20, 3017:22, 3020:3, 3023:14, 3033:2
**editorial** [1] - 3027:21
**editors** [15] - 2999:14, 2999:22, 3001:18, 3002:1, 3002:2, 3002:13, 3003:3, 3003:14, 3003:17, 3018:6, 3019:23, 3020:7, 3020:10, 3029:5, 3093:13
**EDWARD** [1] - 2984:24
**Edward** [1] - 2983:5
**Edwards** [1] - 3111:12

**EDWARDS** [2] - 2982:12, 3111:3
**effect** [21] - 3002:1, 3002:3, 3003:3, 3003:20, 3004:11, 3004:20, 3059:14, 3059:23, 3060:1, 3062:4, 3062:16, 3063:2, 3063:12, 3066:5, 3066:12, 3066:22, 3067:21, 3090:14, 3091:5, 3091:6, 3107:12
**effective** [3] - 3017:25, 3018:4, 3062:24
**effects** [12] - 3010:18, 3054:4, 3054:10, 3057:16, 3057:18, 3086:4, 3087:13, 3087:20, 3087:22, 3104:19, 3105:13, 3106:3
**effectuated** [1] - 3017:17
**efficiencies** [3] - 3109:17, 3109:19, 3109:21
**effort** [2] - 2994:19, 3015:20
**Eighth** [1] - 2981:23
**either** [5] - 3024:17, 3048:12, 3054:22, 3071:3, 3096:4
**elaborate** [1] - 3022:15
**email** [2] - 3074:5, 3074:7
**emails** [3] - 3002:12, 3003:3, 3073:11
**emboldens** [1] - 3011:9
**emphasis** [1] - 2991:13
**employees** [4] - 3018:14, 3018:23, 3020:17, 3024:12
**employers** [2] - 3017:6, 3017:7
**encourages** [1] - 3093:13
**end** [7] - 2998:19, 3007:22, 3007:24, 3024:21, 3029:2, 3040:13, 3077:7
**engage** [3] - 3001:19, 3034:20, 3036:14
**enter** [2] - 3076:19, 3076:22

**entered** [14] - 3038:1, 3038:7, 3038:13, 3039:1, 3039:11, 3040:5, 3041:14, 3042:6, 3042:13, 3051:3, 3078:8, 3078:14, 3085:13, 3106:23
**enthusiastic** [1] - 3089:10
**entirely** [2] - 3045:14, 3054:19
**entities** [1] - 3065:14
**entrants** [3] - 3079:8, 3082:2, 3082:3
**entrepreneurial** [3] - 3001:18, 3002:3, 3003:15
**entries** [1] - 3028:15
**entry** [4] - 3074:23, 3109:17, 3109:19, 3109:21
**equal** [2] - 3056:13, 3077:2
**equals** [2] - 2989:24, 2995:10
**equivalent** [2] - 3089:12, 3099:16
**error** [1] - 2995:19
**especially** [2] - 3013:18, 3051:11
**ESQ** [15] - 2981:15, 2981:15, 2981:16, 2981:16, 2981:17, 2981:20, 2981:21, 2981:21, 2981:22, 2982:2, 2982:2, 2982:3, 2982:3, 2982:6, 2982:9
**establish** [1] - 3017:12
**established** [2] - 2998:5, 3020:22
**estimate** [4] - 3065:22, 3084:15, 3089:6, 3096:18
**estimates** [4] - 3085:1, 3085:2, 3092:18, 3092:19
**estimating** [2] - 3096:7, 3097:19
**et** [4] - 2981:7, 2984:6, 3012:24, 3094:2
**Ethan** [1] - 3042:20
**ETHAN** [1] - 2981:15
**evaluate** [1] - 3066:17
**event** [2] - 3005:5, 3062:4

**EVIDENCE** [1] - 2983:8
**evidence** [37] - 3008:12, 3038:1, 3038:7, 3038:13, 3039:1, 3039:11, 3040:5, 3041:15, 3042:6, 3045:24, 3046:17, 3047:9, 3047:12, 3050:6, 3051:3, 3058:20, 3058:24, 3066:11, 3068:14, 3068:1, 3068:14, 3073:14, 3073:18, 3074:13, 3075:5, 3077:9, 3078:8, 3078:19, 3085:13, 3085:17, 3098:13, 3106:11, 3106:12, 3106:13, 3106:23
**exact** [2] - 3026:16, 3053:1
**exactly** [9] - 2991:13, 3005:16, 3019:11, 3055:1, 3086:23, 3092:17, 3097:5, 3097:7, 3099:25
**examination** [1] - 2984:20
**EXAMINATION** [3] - 2985:3, 3021:21, 3043:3
**examinations** [1] - 3040:15
**examine** [4] - 3058:20, 3059:9, 3062:16, 3072:5
**examined** [1] - 3027:8
**example** [16] - 2999:21, 3026:4, 3028:3, 3030:4, 3054:15, 3057:7, 3059:11, 3070:18, 3070:20, 3071:15, 3072:15, 3073:3, 3082:2, 3087:18, 3093:3, 3094:9
**examples** [12] - 2999:19, 3069:6, 3069:8, 3070:8, 3070:11, 3070:14, 3070:15, 3072:4, 3072:6, 3072:10, 3074:20, 3094:16
**excellent** [1] - 3031:18
**exception** [5] - 3015:7, 3023:21,

3121

3025:22, 3028:11, 3034:18

**exclude** [2] - 3065:9, 3095:6

**excluded** [1] - 3056:14

**excluding** [2] - 3082:17, 3092:6

**excuse** [3] - 2988:22, 3009:22, 3048:13

**excused** [1] - 3037:3

**Exhibit** [28] - 2983:10, 2983:11, 2983:11, 2983:12, 2983:12, 2983:14, 2983:14, 2983:15, 2983:15, 2983:16, 2983:16, 2983:17, 2993:20, 2993:24, 3027:1, 3037:25, 3038:3, 3038:6, 3038:12, 3038:25, 3039:10, 3040:4, 3041:13, 3042:5, 3051:2, 3078:7, 3085:12, 3106:22

**exhibit** [6] - 3014:3, 3030:2, 3040:25, 3041:20, 3071:14, 3078:13

**Exhibits** [1] - 3037:20

**EXHIBITS** [1] - 2983:8

**exhibits** [8] - 2985:12, 2990:23, 3008:9, 3008:10, 3037:5, 3037:16, 3039:12, 3041:23

**exit** [1] - 3071:10

**exits** [1] - 3071:8

**expand** [2] - 3076:12, 3082:2

**expanded** [1] - 3082:6

**expansion** [3] - 3074:24, 3080:18, 3109:17

**expect** [3] - 2996:12, 3101:2, 3101:19

**expectation** [1] - 3046:14

**expected** [2] - 3070:1, 3070:4

**expense** [2] - 3028:5, 3028:6

**expenses** [18] - 3025:11, 3025:19, 3026:4, 3027:19, 3027:21, 3027:25,

3028:8, 3028:13, 3028:19, 3028:22, 3029:12, 3029:23, 3030:2, 3033:6, 3092:2, 3095:7, 3095:10, 3105:18

**experience** [1] - 3063:4

**experimental** [1] - 3063:16

**expert** [4] - 2984:20, 3017:2, 3024:10, 3060:2

**explain** [4] - 2988:17, 3006:16, 3025:21, 3028:2

**explained** [1] - 2988:20

**explanation** [2] - 2987:10, 2987:23

**explicit** [2] - 3093:3, 3093:5

**expound** [1] - 3007:5

**extend** [2] - 3073:23, 3074:2

**extent** [7] - 2991:13, 3000:9, 3000:10, 3002:6, 3004:18, 3004:19, 3100:18

**extra** [1] - 3098:17

**extract** [2] - 3101:21, 3101:23

## F

**F.3d** [1] - 3013:25

**face** [1] - 3051:11

**faced** [2] - 3014:16, 3015:13

**fact** [13] - 2987:8, 2992:20, 2996:10, 2996:19, 3004:19, 3008:6, 3014:4, 3017:25, 3020:1, 3020:2, 3022:14, 3045:16, 3101:23

**factor** [1] - 3067:20

**factors** [6] - 3022:23, 3022:24, 3033:1, 3034:11, 3034:12, 3034:14

**facts** [1] - 3015:10

**failed** [1] - 3106:17

**fair** [3] - 2988:7, 3010:4, 3081:15

**fairly** [2] - 2987:16, 3014:12

**fall** [1] - 3060:11

**falling** [1] - 3060:10

**familiar** [1] - 3078:16

**family** [1] - 3089:20

**far** [2] - 3044:23, 3048:3

**favorite** [2] - 3089:16, 3089:24

**feature** [1] - 3104:19

**fell** [2] - 3060:7, 3060:16

**few** [4] - 2990:7, 3032:19, 3037:19, 3046:7

**fiction** [2] - 3009:15, 3010:11

**Fifth** [1] - 2981:18

**figure** [21] - 2985:12, 2985:13, 2991:4, 3028:4, 3031:22, 3032:5, 3032:17, 3038:22, 3039:2, 3039:3, 3039:4, 3039:5, 3039:7, 3042:3, 3054:18, 3054:21, 3055:6, 3069:15, 3075:9, 3076:25, 3083:11

**Figure** [2] - 3031:25, 3039:9

**figures** [2] - 3039:23, 3095:9

**figuring** [1] - 3099:6

**filed** [2] - 3038:10, 3038:15

**finally** [2] - 3070:24, 3083:1

**financial** [1] - 3033:4

**fine** [2] - 2985:25, 3025:22

**finish** [2] - 3022:1, 3065:17

**finished** [3] - 3036:23, 3072:11, 3072:23

**firm** [26] - 3001:18, 3003:16, 3022:18, 3026:2, 3052:4, 3052:8, 3052:18, 3053:4, 3054:4, 3054:5, 3054:7, 3054:9, 3054:11, 3056:24, 3057:2, 3057:15, 3062:23, 3088:25, 3089:3, 3096:22, 3102:9, 3102:22, 3102:25, 3103:23

**firm's** [3] - 3108:6, 3108:7

**firms** [9] - 3026:6, 3052:25, 3057:20,

3057:24, 3057:25, 3079:3, 3102:19, 3103:20

**first** [27] - 2994:4, 3008:15, 3008:21, 3029:11, 3030:7, 3030:22, 3032:17, 3044:23, 3049:23, 3059:9, 3061:18, 3062:7, 3065:19, 3067:25, 3070:22, 3071:3, 3072:12, 3072:17, 3072:24, 3072:25, 3075:10, 3082:16, 3085:23, 3092:11, 3096:14, 3097:13, 3100:12

**FISHBEIN** [2] - 2982:6, 2984:16

**Fishbein** [1] - 2984:16

**fit** [3] - 3061:16, 3094:2, 3094:19

**five** [8] - 2990:20, 2991:2, 3020:14, 3021:8, 3023:20, 3084:10, 3084:23, 3085:4

**fixed** [20] - 3027:19, 3027:21, 3091:22, 3092:3, 3092:4, 3092:12, 3092:18, 3092:25, 3093:9, 3093:16, 3093:18, 3093:23, 3094:1, 3094:12, 3095:7, 3095:10, 3096:9, 3097:7, 3105:18, 3108:1

**flat** [2] - 3064:4, 3064:24

**flatten** [1] - 3059:12

**Fletcher's** [2] - 3041:11, 3041:12

**flip** [2] - 3101:15, 3102:2

**Floor** [1] - 2981:23

**FLORENCE** [1] - 2981:11

**focus** [5] - 3054:10, 3057:13, 3058:18, 3074:23, 3085:22, 3086:4, 3100:12

**focused** [3] - 2997:11, 3019:21, 3020:23

**focuses** [1] - 3035:18

**focusing** [1] - 3043:25

**folks** [1] - 3045:17

**follow** [8] - 2996:22, 3002:8, 3018:9, 3020:6, 3020:7, 3020:17, 3020:18, 3025:14

**followed** [1] - 3089:24

**following** [5] - 3023:4, 3036:16, 3037:11, 3042:14, 3110:8

**FOR** [6] - 2981:1, 2981:15, 2981:20, 2982:2, 2982:6, 2983:4

**forces** [1] - 3101:3

**foregoing** [1] - 3111:4

**forgot** [1] - 3042:1

**form** [4] - 3029:3, 3046:14, 3099:17, 3099:22

**format** [4] - 3004:5, 3004:9, 3033:8, 3087:15

**forming** [3] - 3072:20, 3073:2, 3086:21

**formula** [3] - 2995:6, 3104:14, 3108:9

**forward** [2] - 3012:19, 3074:10

**foundation** [1] - 3010:7

**four** [12] - 3012:10, 3012:11, 3013:1, 3013:10, 3047:24, 3070:12, 3078:11, 3078:14, 3079:1, 3079:8, 3081:24, 3082:5

**FRACKMAN** [1] - 2982:2

**fragment** [1] - 3069:19

**framework** [3] - 3059:17, 3059:18, 3102:18

**frameworks** [1] - 3100:16

**frequent** [2] - 2998:13, 3079:22

**frequently** [6] - 2987:11, 2999:2, 3049:14, 3075:5, 3085:24, 3085:25

**front** [3] - 2985:12, 3005:5, 3099:4

**FTC** [1] - 3104:22

**full** [3] - 2992:23, 3064:9, 3111:5
**full-time** [1] - 3064:9
**fulsome** [1] - 3066:20
**function** [1] - 3090:21
**fundamental** [1] - 3031:12
**fundamentally** [1] - 3070:5

## G

**G&A** [2] - 3027:23, 3028:7
**gallery** [1] - 3074:17
**gathering** [1] - 3099:6
**gears** [5] - 2999:8, 3002:7, 3004:14, 3024:19, 3077:9
**general** [21] - 3026:6, 3026:9, 3026:14, 3028:7, 3032:19, 3032:23, 3033:4, 3034:6, 3034:13, 3034:21, 3034:22, 3073:15, 3074:19, 3075:16, 3078:16, 3086:18, 3086:25, 3088:19, 3094:15, 3098:11, 3102:8
**generally** [2] - 3045:9, 3045:14
**given** [8] - 2989:9, 2990:18, 2991:18, 2994:15, 3015:11, 3017:25, 3028:10, 3045:16
**glad** [1] - 2993:6
**global** [1] - 3012:2
**Glusman's** [2] - 3038:3, 3040:25
**goods** [1] - 3103:12
**Government** [4] - 2997:10, 3037:22, 3038:21, 3048:14
**Government's** [2] - 3035:9, 3035:17
**grain** [1] - 3084:19
**graph** [1] - 3050:16
**graphical** [1] - 3064:6
**gray** [1] - 3072:2
**great** [4] - 3007:4, 3015:20, 3019:23, 3020:20
**greater** [1] - 3057:17

**greatly** [1] - 3006:22
**green** [4] - 3056:3, 3064:22, 3071:1, 3079:1
**grew** [3] - 3082:13, 3082:18, 3082:24
**gross** [5] - 3025:8, 3027:15, 3027:18, 3029:8, 3029:15
**ground** [1] - 3088:17
**group** [17] - 3063:13, 3063:20, 3063:23, 3065:23, 3066:24, 3066:25, 3077:6, 3079:17, 3079:23, 3079:25, 3080:7, 3080:20, 3081:20, 3082:15, 3083:2
**Group** [5] - 3078:22, 3079:2, 3079:16, 3080:25, 3082:13
**groups** [1] - 3063:17
**growth** [3] - 2993:4, 3083:3, 3083:6
**guess** [3] - 3008:15, 3093:25, 3107:2
**guidance** [5] - 3028:10, 3028:11, 3029:3, 3029:4, 3033:5
**guidelines** [12] - 3010:19, 3011:1, 3011:14, 3013:5, 3023:25, 3051:5, 3051:9, 3057:8, 3057:12, 3087:6, 3105:1, 3105:5
**GUIDERO** [1] - 2981:21
**GUPPI** [22] - 3088:11, 3093:4, 3100:15, 3101:8, 3102:8, 3102:17, 3102:18, 3104:7, 3104:13, 3104:18, 3107:3, 3107:7, 3107:17, 3107:18, 3108:4, 3108:5, 3108:9, 3108:17, 3108:20, 3108:22, 3109:4, 3109:5

## H

**half** [5] - 3053:13, 3065:20, 3105:15, 3107:11, 3109:3
**hallway** [1] - 3000:2
**hand** [5] - 2994:7,

3005:6, 3040:22, 3046:4, 3047:24
**handle** [2] - 3040:8, 3098:6
**happily** [1] - 3016:2
**happy** [3] - 2989:18, 3019:1, 3021:11
**harbor** [4] - 3108:19, 3109:14, 3109:20, 3109:22
**hard** [4] - 3005:16, 3020:1, 3041:16, 3072:24
**hardcover** [1] - 3011:18
**harm** [4] - 3086:6, 3087:5, 3087:25, 3088:8
**HarperCollins** [3] - 3034:23, 3054:8, 3054:15
**head** [3] - 3000:22, 3001:5, 3099:5
**Health** [1] - 3090:15
**hear** [11] - 3046:10, 3047:6, 3051:19, 3059:24, 3067:14, 3073:6, 3082:8, 3086:5, 3090:1, 3094:19, 3100:6
**heard** [4] - 2990:12, 3000:5, 3044:5, 3078:10
**hearing** [3] - 3004:12, 3031:5, 3083:23
**heavily** [1] - 3077:7
**held** [1] - 3014:13
**help** [2] - 3007:15, 3067:20
**helpful** [3] - 3046:21, 3047:12, 3061:23
**helping** [1] - 3101:23
**helps** [1] - 3062:20
**hence** [1] - 3100:18
**hereby** [1] - 3111:3
**high** [14] - 2987:16, 3006:21, 3007:22, 3007:24, 3017:2, 3019:12, 3024:12, 3025:25, 3029:9, 3058:24, 3082:21, 3086:12, 3102:15
**high-tech** [3] - 3017:2, 3019:12, 3024:12
**higher** [12] - 2994:25, 2996:6, 2996:11, 2996:21, 3057:17, 3080:22,

3085:1, 3090:6, 3090:7, 3091:3, 3091:5, 3103:15
**highest** [18] - 2994:15, 2994:20, 3032:25, 3033:17, 3070:25, 3071:1, 3071:2, 3071:3, 3071:7, 3071:9, 3072:17, 3073:4, 3073:5, 3084:12, 3099:19, 3099:24
**highest-surplus** [1] - 3099:19
**highlighted** [1] - 3027:13
**highly** [1] - 3066:9
**HILL** [1] - 3042:17
**Hill** [21] - 2983:6, 2988:1, 3024:16, 3029:8, 3030:11, 3030:22, 3031:2, 3031:6, 3042:12, 3043:5, 3043:9, 3043:10, 3043:24, 3044:20, 3048:13, 3051:5, 3058:18, 3067:13, 3069:9, 3078:10, 3109:14
**Hill's** [8] - 2997:3, 3022:4, 3029:22, 3031:15, 3031:25, 3032:5, 3039:7, 3089:23
**hindsight** [1] - 3092:16
**historical** [1] - 3051:11
**histories** [1] - 3094:6
**hit** [1] - 3029:6
**Honor** [128] - 2984:2, 2984:3, 2984:4, 2984:17, 2985:2, 2985:23, 2988:7, 2988:23, 2989:3, 2989:7, 2989:11, 2989:17, 2995:14, 2997:7, 2998:25, 3004:14, 3010:6, 3012:15, 3016:18, 3019:11, 3021:9, 3021:16, 3021:19, 3027:2, 3027:10, 3029:11, 3035:25, 3036:20, 3036:23, 3037:1, 3037:4, 3037:14, 3038:18, 3038:20, 3039:20, 3040:10, 3040:19, 3040:24, 3041:19,

3041:25, 3042:1, 3042:7, 3042:20, 3043:17, 3044:13, 3044:23, 3046:1, 3046:21, 3047:15, 3047:24, 3048:3, 3048:6, 3049:6, 3050:11, 3050:22, 3051:8, 3053:22, 3053:25, 3055:2, 3056:1, 3057:12, 3058:6, 3058:15, 3059:3, 3060:10, 3060:22, 3061:13, 3061:24, 3062:1, 3062:8, 3062:16, 3063:19, 3064:9, 3065:4, 3066:18, 3066:23, 3067:8, 3068:17, 3069:17, 3069:24, 3070:21, 3071:10, 3071:21, 3072:2, 3073:11, 3074:17, 3075:10, 3075:14, 3077:1, 3077:15, 3078:2, 3078:5, 3078:24, 3079:11, 3080:10, 3083:1, 3084:24, 3085:7, 3085:10, 3085:21, 3086:13, 3089:3, 3089:14, 3090:17, 3091:3, 3092:15, 3093:22, 3095:1, 3096:1, 3096:12, 3097:2, 3097:12, 3098:19, 3100:13, 3102:7, 3103:9, 3105:4, 3106:10, 3106:16, 3106:20, 3108:2, 3108:10, 3108:25, 3109:8, 3109:10, 3110:5
**Honor's** [4] - 3005:8, 3023:18, 3040:6, 3040:7
**HONORABLE** [1] - 2981:11
**horizontal** [6] - 3010:19, 3051:5, 3057:8, 3060:25, 3064:12, 3087:6
**HOUSE** [2] - 2981:21, 2982:3
**house** [3] - 3002:23, 3002:25, 3036:10, 3068:9
**House** [84] -

2984:14, 2994:13, 2996:7, 2999:10, 2999:22, 3001:15, 3001:16, 3001:17, 3002:22, 3004:19, 3009:4, 3009:22, 3009:23, 3014:22, 3014:24, 3015:9, 3016:1, 3037:21, 3050:12, 3052:25, 3055:6, 3058:19, 3058:21, 3059:2, 3059:5, 3059:14, 3060:5, 3060:6, 3062:10, 3064:16, 3065:20, 3066:15, 3068:3, 3068:4, 3068:6, 3068:8, 3068:10, 3068:14, 3068:19, 3069:3, 3069:15, 3069:16, 3069:25, 3070:2, 3070:4, 3071:4, 3071:6, 3071:12, 3071:23, 3072:11, 3072:23, 3072:25, 3073:1, 3073:16, 3073:17, 3073:21, 3073:23, 3076:1, 3077:19, 3078:25, 3082:17, 3084:16, 3084:22, 3084:25, 3085:25, 3086:14, 3086:17, 3088:2, 3088:7, 3089:5, 3089:10, 3092:2, 3092:9, 3093:12, 3095:2, 3096:2, 3096:24, 3097:9, 3097:23, 3105:14, 3105:20, 3107:25
**House's** [3] - 3022:25, 3060:1, 3096:5
**housekeeping** [7] - 3024:20, 3030:16, 3037:5, 3037:8, 3037:13, 3040:7, 3040:13
**hub** [1] - 3022:18
**hurting** [1] - 3021:13
**hybrid** [2] - 3088:12, 3101:9
**hypothetical** [2] - 3019:5, 3048:25

# I

**idea** [14] - 2988:12, 2990:17, 3018:25,

3020:24, 3021:2, 3047:3, 3073:19, 3073:20, 3088:1, 3098:22, 3099:8, 3100:23, 3105:6, 3109:16
**ideas** [1] - 3021:4
**identical** [2] - 3069:3, 3099:22
**identification** [1] - 3039:22
**identified** [5] - 2998:8, 3006:24, 3031:11, 3048:4, 3082:12
**identifies** [1] - 3076:17
**identifying** [1] - 3045:19
**Ihan** [2] - 3040:8, 3040:10
**IHAN** [1] - 2981:16
**illegal** [1] - 3010:23
**illustrated** [1] - 2991:15
**imagine** [2] - 3062:23, 3069:24
**impact** [3] - 3020:19, 3021:11, 3031:12
**impediments** [1] - 2999:10
**implement** [2] - 3016:25, 3017:9
**implemented** [4] - 3003:11, 3095:12, 3095:18, 3095:25
**implied** [1] - 3055:15
**importance** [3] - 3000:21, 3001:14, 3030:1
**important** [8] - 3024:5, 3054:14, 3056:22, 3067:20, 3077:24, 3091:21, 3100:24, 3105:7
**imposed** [1] - 3088:3
**imprint** [26] - 2999:11, 3000:22, 3001:15, 3001:24, 3002:6, 3020:3, 3036:9, 3067:13, 3067:15, 3067:19, 3070:9, 3070:23, 3071:4, 3071:6, 3071:8, 3071:13, 3071:16, 3072:9, 3072:13, 3072:23, 3072:25, 3073:1, 3073:7, 3086:22
**Imprint** [5] - 3069:25,

3070:1, 3070:2, 3070:3
**imprints** [24] - 2999:8, 2999:12, 2999:18, 3000:24, 3026:3, 3034:20, 3067:18, 3068:2, 3068:4, 3068:6, 3068:10, 3068:15, 3068:19, 3069:3, 3069:6, 3069:21, 3069:24, 3070:7, 3070:17, 3071:23, 3100:23, 3101:1
**improve** [1] - 3099:4
**IN** [1] - 2983:8
**InBev** [1] - 3089:14
**incentive** [2] - 3104:2, 3104:3
**incentives** [1] - 3011:9
**include** [13] - 3027:21, 3029:23, 3029:25, 3056:16, 3056:17, 3091:23, 3092:24, 3093:4, 3093:5, 3093:16, 3093:23, 3096:10
**included** [11] - 3014:25, 3029:12, 3080:10, 3080:13, 3080:23, 3081:12, 3092:2, 3092:4, 3092:11, 3096:8
**includes** [3] - 3011:4, 3011:11, 3108:1
**including** [8] - 3026:4, 3052:1, 3056:17, 3057:23, 3057:24, 3078:11, 3080:14, 3093:18
**inclusion** [1] - 3024:25
**income** [8] - 3009:21, 3025:9, 3026:10, 3026:15, 3028:16, 3028:18, 3029:9, 3030:3
**inconsequential** [1] - 3012:9
**incorporated** [1] - 3098:8
**incorrect** [1] - 2990:4
**increase** [17] - 2992:5, 2992:11, 2992:20, 2993:8, 2993:10, 2994:7,

3000:13, 3005:1, 3005:3, 3083:14, 3102:10, 3102:13, 3102:14, 3108:18, 3108:21, 3108:23, 3109:3
**increased** [2] - 2992:16, 3083:3
**increases** [5] - 3011:9, 3045:5, 3105:8, 3107:11, 3108:25
**increasing** [4] - 2992:7, 3007:21, 3059:12, 3083:9
**incumbent** [1] - 3016:20
**indeed** [3] - 3069:3, 3071:8, 3082:23
**independent** [14] - 2999:24, 3023:16, 3065:11, 3065:13, 3068:11, 3069:4, 3069:22, 3070:6, 3070:16, 3071:13, 3071:18, 3071:22, 3074:10, 3102:19
**independently** [2] - 3002:18, 3018:5
**indexed** [1] - 3064:14
**indexing** [1] - 3065:6
**indicated** [1] - 3007:18
**indicates** [1] - 3008:22
**indicating** [1] - 3057:17
**indication** [3] - 2994:11, 3059:13, 3066:4
**indicative** [2] - 3004:19, 3066:21
**indicia** [1] - 3087:13
**individual** [3] - 3019:23, 3029:5, 3103:20
**individually** [1] - 3011:6
**industries** [1] - 3104:19
**industry** [6] - 3011:19, 3014:6, 3044:15, 3047:4, 3096:19, 3104:15
**infer** [1] - 2989:23
**inference** [1] - 3008:7
**inflation** [1] - 3071:11

**influenced** [7] - 3006:22, 3007:11, 3007:12, 3007:22, 3007:23, 3033:1, 3033:7
**information** [18] - 2993:3, 2996:10, 3000:14, 3001:6, 3015:4, 3035:7, 3050:2, 3054:13, 3054:15, 3057:5, 3066:16, 3068:21, 3073:17, 3087:16, 3096:17, 3096:18, 3099:6
**information-gathering** [1] - 3099:6
**informative** [3] - 3049:19, 3057:13, 3057:16
**informed** [3] - 3074:16, 3087:22, 3087:25
**informs** [1] - 3029:4
**initial** [12] - 3031:15, 3031:19, 3045:21, 3047:14, 3048:10, 3082:12, 3091:24, 3092:1, 3092:19, 3092:21, 3101:18, 3106:8
**initiated** [1] - 3019:13
**input** [3] - 3096:20, 3096:22, 3108:3
**inputs** [1] - 3029:22
**inside** [2] - 3016:3, 3035:15
**insights** [1] - 3006:20
**insist** [1] - 3011:24
**installment** [1] - 3012:5
**installments** [1] - 3012:6
**instance** [2] - 3023:11, 3069:12
**instead** [4] - 3029:9, 3041:24, 3065:1, 3108:20
**instruct** [1] - 3018:19
**instructive** [2] - 3022:14, 3026:21
**intend** [1] - 2992:11
**intended** [1] - 3011:7
**intensity** [1] - 3001:24
**intensively** [1] - 3063:10
**interaction** [3] -

3124

3011:2, 3011:11,
3012:15
  **interest** [4] - 3013:2,
3020:13, 3033:11,
3034:8
  **interested** [6] -
3021:4, 3021:5,
3059:23, 3074:6,
3093:8, 3108:10
  **internal** [4] -
3000:14, 3000:15,
3001:6, 3001:7
  **internalizing** [1] -
3103:5
  **internally** [3] -
3002:11, 3002:18,
3003:1
  **interrupt** [1] - 2989:8
  **intervals** [1] -
3012:16
  **introduce** [5] -
3037:5, 3037:17,
3037:20, 3038:2,
3039:6
  **intuition** [1] -
3089:21
  **invalidated** [1] -
3073:22
  **inviting** [1] - 3034:19
  **involve** [3] - 3004:1,
3004:2, 3011:2
  **involved** [3] -
2997:12, 3034:22,
3104:22
  **involving** [2] -
3069:14, 3094:10
  **issue** [9] - 3024:4,
3029:20, 3031:11,
3037:23, 3057:8,
3064:2, 3075:20,
3087:6, 3090:15
  **issues** [1] - 3098:10
  **items** [1] - 3037:13
  **itself** [2] - 3035:20,
3065:10

## J

  **Jacobs's** [2] -
3041:8, 3041:9
  **JESSICA** [1] -
2981:17
  **John** [1] - 2984:9
  **JOHN** [1] - 2981:15
  **joint** [1] - 3070:25
  **Journal** [1] - 3090:15
  **JUDGE** [1] - 2981:12
  **judge** [1] - 3040:1
  **JUSTICE** [1] -

2981:17
  **juvenile** [2] -
3009:16, 3010:11

## K

  **Karp** [2] - 3025:7,
3094:10
  **Karp's** [1] - 3025:5
  **keep** [1] - 3031:5
  **keeping** [1] -
3043:10
  **kept** [1] - 3016:6
  **kGAA** [1] - 2981:6
  **Kim** [2] - 3040:8,
3040:10
  **KIM** [7] - 2981:16,
3040:10, 3040:13,
3040:19, 3040:22,
3041:16, 3041:25
  **kind** [4] - 2991:18,
3019:12, 3028:24,
3101:11
  **kinds** [1] - 3065:9
  **knit** [1] - 3014:6
  **known** [6] - 2986:25,
2989:14, 3034:12,
3056:7, 3056:8,
3062:18
  **knows** [2] - 3086:24,
3096:19

## L

  **label** [1] - 3039:22
  **labeled** [1] - 3040:16
  **language** [2] -
3051:8, 3105:4
  **large** [9] - 3025:17,
3033:1, 3072:16,
3073:4, 3075:1,
3075:6, 3075:13,
3084:21, 3101:1
  **largely** [1] - 3064:24
  **larger** [3] - 2993:18,
3030:4, 3091:5
  **largest** [1] - 3053:4
  **last** [21] - 2987:12,
3016:12, 3027:22,
3030:16, 3030:17,
3041:10, 3044:1,
3044:17, 3045:23,
3046:18, 3065:12,
3068:13, 3068:22,
3069:4, 3069:18,
3071:24, 3073:17,
3087:9, 3087:24,
3098:12, 3098:14
  **lastly** [2] - 3010:17,

3039:20
  **laureate** [1] -
3028:25
  **laws** [1] - 3011:12
  **laying** [1] - 3068:25
  **lead** [2] - 3012:21,
3018:5
  **leading** [2] -
3035:23, 3036:4
  **leads** [1] - 3029:24
  **LEAL** [1] - 2981:17
  **learn** [1] - 3016:21
  **least** [10] - 2987:9,
2994:12, 2997:11,
2999:23, 3000:8,
3011:24, 3017:10,
3025:6, 3075:23,
3092:24
  **Least** [1] - 2993:25
  **leave** [3] - 3020:4,
3023:16, 3103:3
  **leaves** [3] - 3012:18,
3070:4, 3103:10
  **left** [6] - 3022:1,
3044:23, 3046:4,
3046:21, 3048:3,
3056:10
  **left-hand** [1] - 3046:4
  **legal** [2] - 2999:9,
3010:20
  **length** [2] - 3088:20,
3098:12
  **less** [15] - 2987:25,
2998:13, 2999:2,
3018:23, 3035:11,
3035:16, 3055:15,
3079:22, 3087:21,
3087:25, 3089:20,
3095:8, 3095:15,
3105:7, 3108:14
  **less-frequent** [1] -
3079:22
  **lessen** [1] - 3013:7
  **lessening** [1] -
3106:14
  **letter** [1] - 3074:2
  **level** [15] - 3012:19,
3025:15, 3027:8,
3027:11, 3028:23,
3029:4, 3031:4,
3033:5, 3058:24,
3070:5, 3072:1,
3078:17, 3086:12,
3102:15, 3104:25
  **levels** [4] - 3006:22,
3006:24, 3037:21,
3066:19
  **leverage** [2] -
3000:14, 3001:6
  **Lexington** [1] -

2982:7
  **Liate** [2] - 3041:5,
3041:6
  **life** [1] - 3041:18
  **light** [1] - 3079:2
  **Light** [3] - 3089:15,
3089:21, 3089:24
  **likelihood** [2] -
3057:17, 3087:14
  **likely** [5] - 3034:23,
3047:4, 3082:2,
3087:5, 3087:18
  **likewise** [1] -
3005:19
  **limit** [2] - 3062:4,
3068:1
  **limitations** [1] -
3068:9
  **limited** [3] - 3018:13
  **line** [18] - 3027:15,
3027:18, 3028:15,
3029:8, 3029:9,
3029:15, 3060:22,
3060:23, 3061:3,
3061:15, 3061:16,
3061:17, 3061:18,
3061:19, 3062:7,
3064:21, 3064:22,
3094:6
  **Line** [2] - 2992:10,
2993:8
  **lines** [3] - 2991:1,
3008:20, 3061:19
  **Lines** [1] - 2992:9
  **linking** [1] - 3090:6
  **LISA** [2] - 2982:12,
3111:3
  **Lisa** [1] - 3111:12
  **list** [3] - 3039:23,
3042:1, 3085:25
  **lists** [1] - 3086:1
  **Lite** [1] - 3089:24
  **literally** [2] - 3023:6,
3089:15
  **literary** [4] - 3046:22,
3098:20, 3099:12,
3100:2
  **literature** [3] -
3090:12, 3090:13,
3091:10
  **litigated** [1] -
3104:21
  **litigation** [2] -
3017:3, 3049:14
  **LLP** [4] - 2981:22,
2982:4, 2982:7,
2982:9
  **logic** [1] - 3109:14
  **look** [37] - 2985:18,
2986:13, 2990:22,

2992:1, 2992:8,
2992:25, 2997:5,
3005:6, 3005:17,
3006:23, 3008:3,
3008:4, 3008:9,
3008:21, 3025:24,
3031:15, 3047:12,
3048:2, 3048:11,
3050:16, 3059:6,
3061:11, 3061:17,
3061:18, 3064:1,
3064:10, 3067:8,
3068:2, 3075:14,
3075:19, 3076:2,
3077:6, 3077:15,
3084:14, 3088:11,
3093:13, 3094:5
  **looked** [16] -
3047:15, 3050:18,
3059:1, 3061:25,
3062:1, 3065:18,
3067:6, 3082:3,
3082:15, 3083:1,
3083:2, 3090:12,
3090:16, 3090:18,
3106:11
  **looking** [19] -
2986:24, 2991:19,
2994:10, 2995:7,
2995:11, 3005:23,
3032:10, 3050:11,
3050:13, 3059:21,
3060:21, 3062:3,
3078:24, 3084:9,
3090:13, 3090:15,
3091:11, 3094:15
  **looks** [6] - 3048:4,
3048:7, 3048:8,
3057:2, 3067:4,
3067:5
  **Los** [1] - 2981:24
  **lose** [7] - 3054:5,
3054:12, 3057:3,
3089:4, 3089:19,
3102:23, 3103:16
  **loses** [3] - 3069:25,
3070:3, 3102:20
  **losing** [3] - 3086:19,
3086:22, 3088:14
  **losses** [1] - 3089:6
  **lost** [8] - 3013:2,
3013:11, 3082:20,
3086:13, 3088:5,
3088:19, 3103:1,
3103:2
  **low** [2] - 3025:25,
3101:2
  **lower** [11] - 2997:22,
3006:12, 3029:10,
3030:3, 3072:1,

3125

3076:4, 3077:7,
3085:1, 3088:25,
3103:4, 3103:15
**lunch** [2] - 3110:1,
3110:4
**luncheon** [1] -
3110:7

# M

**main** [1] - 3022:24
**major** [3] - 3018:24,
3022:19, 3049:23
**Management** [2] -
3026:22, 3028:13
**manufactured** [1] -
3023:24
**manuscript** [1] -
3046:14
**margin** [27] - 3025:8,
3025:18, 3026:15,
3027:15, 3027:18,
3029:8, 3029:15,
3030:3, 3030:13,
3093:7, 3093:18,
3093:23, 3094:7,
3094:8, 3096:1,
3096:3, 3096:5,
3096:6, 3096:22,
3096:23, 3097:14,
3097:17, 3097:19,
3103:12, 3108:6,
3108:7
**marginal** [1] -
3025:24
**margins** [35] -
3024:23, 3024:25,
3025:9, 3025:13,
3025:25, 3028:23,
3029:22, 3029:25,
3091:15, 3091:17,
3093:20, 3094:21,
3095:2, 3095:14,
3095:17, 3095:19,
3096:13, 3096:14,
3096:19, 3096:20,
3097:8, 3100:19,
3100:25, 3101:2,
3101:20, 3101:25,
3105:25, 3107:10,
3107:21, 3107:23,
3107:24
**mark** [1] - 2991:1
**marked** [1] - 3060:25
**market** [81] - 2995:1,
2995:2, 2996:10,
2998:23, 2998:24,
2999:1, 3011:8,
3022:11, 3024:15,
3030:18, 3043:25,

3045:10, 3049:1,
3049:2, 3049:5,
3049:6, 3049:7,
3049:17, 3049:18,
3049:19, 3049:24,
3050:2, 3050:3,
3050:6, 3050:11,
3050:14, 3050:17,
3050:20, 3051:6,
3051:10, 3051:13,
3051:14, 3051:25,
3052:1, 3052:6,
3052:13, 3052:17,
3053:1, 3053:14,
3053:16, 3053:25,
3054:6, 3055:16,
3055:21, 3056:23,
3058:10, 3058:13,
3066:18, 3076:8,
3076:19, 3078:14,
3079:4, 3079:9,
3079:25, 3080:13,
3081:2, 3081:20,
3082:13, 3082:17,
3082:19, 3082:20,
3083:4, 3083:15,
3083:19, 3084:4,
3084:6, 3084:10,
3085:5, 3085:24,
3090:2, 3091:7,
3096:17, 3100:17,
3101:3, 3106:3
**marketing** [7] -
3044:19, 3044:24,
3045:4, 3045:5,
3045:8, 3045:17,
3045:18
**markets** [2] -
3049:10, 3049:12
**mask** [1] - 2985:7
**Masri** [1] - 3069:9
**mass** [1] - 3010:14
**match** [6] - 3033:3,
3095:4, 3095:7,
3095:12, 3095:15,
3095:18
**matched** [1] -
3099:19
**material** [1] -
3031:10
**materially** [3] -
3002:6, 3080:19,
3083:20
**math** [4] - 2987:4,
2998:10, 2999:9,
3007:15
**Mathis** [1] - 3091:9
**matter** [4] - 3013:10,
3023:6, 3038:14,
3079:22

**matters** [3] -
3012:18, 3030:17,
3040:7
**maximum** [6] -
2994:2, 2994:7,
2994:11, 2994:12,
3033:2, 3033:4
**McIntosh** [3] -
3000:13, 3001:5,
3093:11
**McIntosh's** [2] -
3000:5, 3037:23
**mean** [14] - 2988:16,
3001:17, 3015:1,
3019:17, 3028:13,
3065:4, 3070:18,
3074:11, 3081:17,
3083:11, 3083:16,
3085:5, 3091:8
**meaningful** [2] -
3053:18, 3056:21
**means** [4] - 3001:9,
3009:13, 3064:17,
3093:25
**measure** [8] -
3051:15, 3053:25,
3056:24, 3083:18,
3084:1, 3084:3,
3084:5, 3093:14
**measured** [1] -
3103:25
**measures** [4] -
3050:18, 3084:10,
3084:23, 3085:5
**measuring** [1] -
3102:16
**mechanism** [3] -
3013:5, 3021:8,
3029:2
**mechanisms** [1] -
3087:12
**meet** [1] - 3015:8
**meets** [1] - 3033:4
**Mel** [1] - 2985:7
**MELVIN** [1] -
2981:16
**member** [2] - 3055:4,
3083:17
**members** [5] -
3076:7, 3079:1,
3079:19, 3082:23,
3082:24
**memoir** [1] - 3094:11
**mention** [1] - 3091:9
**mentioned** [9] -
2987:22, 2992:15,
3022:17, 3056:19,
3069:21, 3081:12,
3082:1, 3083:22,
3085:15

**merchandise** [1] -
3010:14
**merged** [4] -
3067:10, 3088:25,
3103:21, 3103:23
**merger** [53] -
2999:11, 3004:19,
3004:20, 3009:4,
3009:22, 3010:19,
3011:1, 3011:14,
3036:11, 3036:16,
3051:5, 3051:8,
3057:8, 3057:11,
3058:19, 3058:21,
3059:11, 3059:14,
3059:22, 3060:5,
3060:6, 3060:11,
3060:12, 3060:16,
3061:4, 3061:5,
3061:8, 3061:9,
3062:2, 3062:3,
3062:4, 3062:17,
3063:8, 3063:9,
3064:22, 3065:3,
3065:7, 3066:4,
3066:12, 3072:22,
3073:22, 3087:6,
3088:5, 3089:7,
3090:18, 3102:20,
3102:22, 3103:9,
3105:1, 3105:4,
3105:5, 3105:7
**mergers** [1] -
3109:16
**merging** [15] -
2994:20, 3055:13,
3057:14, 3057:15,
3057:19, 3057:20,
3057:24, 3057:25,
3084:2, 3086:7,
3087:18, 3088:9,
3088:21, 3088:23,
3104:12
**messiness** [1] -
3031:11
**methodology** [2] -
3060:14, 3093:5
**metric** [2] - 3053:3,
3059:8
**Michael** [2] - 3041:8,
3041:9
**MICHAEL** [1] -
2982:3
**microphone** [1] -
2989:5
**middle** [1] - 3096:13
**midpoint** [1] - 3085:1
**might** [15] - 2991:3,
2996:3, 2996:12,
2996:20, 2996:21,

2997:9, 2997:14,
3010:23, 3015:13,
3017:17, 3020:18,
3053:4, 3061:23,
3071:18, 3072:21
**Miller** [2] - 3030:11,
3089:24
**Miller's** [1] - 3099:14
**million** [12] -
3004:24, 3008:5,
3009:11, 3009:16,
3047:19, 3048:1,
3075:12, 3075:24,
3076:5
**million-plus** [3] -
3047:19, 3075:12,
3076:5
**millions** [3] -
3007:10, 3009:11,
3010:2
**mind** [6] - 2985:18,
2998:5, 3025:2,
3025:3, 3032:21,
3073:1
**minimize** [1] -
3059:17
**minus** [1] - 3010:1
**minute** [6] - 2988:25,
3013:21, 3060:15,
3078:13, 3083:7,
3103:18
**minutes** [1] - 3037:8
**misheard** [1] -
2996:3
**missing** [1] -
3066:16
**misspoke** [2] -
3085:4, 3108:17
**mistake** [2] -
2995:13, 3008:7
**mitigate** [1] -
3067:20
**mix** [2] - 2997:23,
3095:10
**mixed** [1] - 3045:13
**mixes** [1] - 3067:8
**mixing** [1] - 3054:16
**mixture** [2] -
3047:20, 3092:3
**model** [47] - 3029:22,
3030:12, 3035:15,
3035:20, 3035:21,
3036:8, 3081:15,
3081:19, 3088:17,
3088:18, 3091:15,
3091:23, 3092:6,
3093:3, 3093:7,
3094:20, 3095:2,
3095:4, 3095:12,
3095:15, 3095:16,

3095:18, 3096:1,
3096:3, 3096:7,
3096:8, 3096:16,
3097:12, 3097:20,
3098:6, 3099:15,
3099:22, 3100:1,
3100:20, 3100:22,
3101:7, 3101:8,
3104:9, 3104:24,
3105:2, 3105:11,
3105:14, 3105:17,
3106:2, 3106:6,
3106:8, 3107:22
 **modeling** [4] -
3049:8, 3080:10,
3081:13, 3081:17
 **models** [3] - 3088:8,
3088:11, 3104:7
 **moderately** [2] -
3091:3, 3091:4
 **modern** [1] - 3090:13
 **moment** [2] -
3008:17, 3042:15
 **Monday** [1] -
3059:21
 **money** [4] - 3013:3,
3013:12, 3103:2
 **monitoring** [1] -
3013:17
 **monopsonist** [1] -
3048:25
 **months** [3] -
3032:17, 3075:21,
3075:23
 **Morning** [1] - 3110:9
 **morning** [24] -
2984:1, 2984:2,
2984:3, 2984:4,
2984:11, 2984:15,
2984:17, 2984:18,
2985:5, 2985:6,
3004:12, 3021:19,
3021:20, 3021:23,
3021:24, 3037:12,
3038:18, 3038:19,
3040:10, 3040:12,
3042:20, 3043:5,
3043:6, 3043:25
 **MORNING** [1] -
2981:8
 **most** [7] - 2999:22,
3032:25, 3057:20,
3065:12, 3085:23,
3085:24, 3089:10
 **motivated** [1] -
3011:7
 **motivation** [1] -
3003:17
 **move** [14] - 2990:6,
2990:8, 2991:6,

3018:5, 3019:13,
3019:15, 3019:16,
3027:6, 3050:23,
3074:9, 3074:23,
3078:3, 3085:8,
3106:17
 **moves** [3] - 3011:6,
3064:23, 3070:2
 **MR** [126] - 2984:2,
2984:3, 2984:9,
2984:12, 2984:13,
2984:16, 2985:2,
2985:4, 2985:20,
2985:22, 2986:1,
2986:3, 2986:4,
2986:8, 2986:11,
2986:14, 2986:16,
2988:4, 2988:7,
2988:12, 2988:15,
2988:23, 2989:3,
2989:6, 2989:7,
2989:10, 2989:12,
2989:17, 2990:2,
2990:5, 2995:8,
2995:22, 2998:3,
2998:25, 2999:5,
2999:7, 3002:9,
3004:14, 3004:16,
3004:17, 3005:8,
3005:10, 3005:13,
3008:12, 3008:14,
3010:6, 3010:15,
3021:15, 3021:18,
3021:19, 3021:22,
3022:7, 3022:9,
3026:25, 3027:4,
3027:10, 3027:12,
3029:19, 3031:23,
3031:24, 3035:23,
3035:25, 3036:2,
3036:19, 3036:23,
3037:4, 3037:9,
3037:14, 3037:16,
3037:19, 3038:2,
3038:8, 3038:14,
3038:17, 3038:18,
3038:20, 3039:2,
3039:9, 3039:12,
3040:6, 3040:10,
3040:13, 3040:19,
3040:22, 3041:16,
3041:25, 3042:1,
3042:7, 3042:11,
3042:20, 3042:24,
3043:4, 3043:17,
3043:21, 3043:23,
3048:18, 3048:19,
3050:22, 3050:25,
3051:4, 3053:10,
3055:10, 3058:17,
3062:12, 3066:1,

3067:12, 3074:22,
3078:2, 3078:5,
3078:9, 3079:5,
3079:7, 3081:11,
3085:7, 3085:10,
3085:14, 3094:18,
3098:2, 3102:1,
3104:5, 3106:16,
3106:20, 3106:24,
3109:10, 3109:13,
3109:24
 **multi** [3] - 2986:25,
2998:7, 3056:15
 **multi-bidder** [3] -
2986:25, 2998:7,
3056:15
 **multilateral** [2] -
3099:23, 3101:11
 **multiple** [1] -
3034:20
 **musician** [1] -
3094:11
 **must** [4] - 3007:20,
3007:25, 3008:2,
3083:16
 **MYERS** [2] -
2981:22, 2982:4

## N

 **name** [2] - 3043:8,
3078:12
 **names** [1] - 3078:23
 **Nathan** [1] - 3030:10
 **natural** [1] - 3059:9
 **nearly** [1] - 3024:7
 **necessarily** [3] -
2996:22, 3049:4,
3089:2
 **need** [12] - 2985:17,
2989:22, 3008:17,
3014:7, 3023:14,
3029:22, 3041:23,
3074:1, 3088:17,
3088:23, 3089:23,
3103:18
 **negative** [4] -
3004:20, 3066:5,
3066:12, 3066:22
 **negotiate** [1] -
3011:25
 **negotiated** [1] -
3012:19
 **negotiating** [5] -
3086:14, 3098:22,
3098:23, 3099:3,
3099:9
 **negotiation** [2] -
3088:3, 3099:23

 **negotiations** [12] -
2999:18, 3004:3,
3086:13, 3088:2,
3089:22, 3098:15,
3098:21, 3099:9,
3099:13, 3100:3,
3101:9, 3104:19
 **net** [7] - 3008:22,
3009:10, 3009:12,
3009:15, 3009:18,
3009:21, 3010:5
 **never** [8] - 3000:1,
3015:16, 3024:4,
3054:18, 3063:24,
3071:6, 3077:3
 **nevertheless** [2] -
3011:8, 3045:18
 **new** [5] - 3012:14,
3044:6, 3044:11,
3054:17, 3062:24
 **New** [5] - 2982:5,
2982:8, 3014:14
 **news** [2] - 3103:11,
3103:12
 **next** [8] - 3060:20,
3061:24, 3089:10,
3089:16, 3098:24,
3099:11, 3099:20,
3102:2
 **next-best** [3] -
3098:24, 3099:11,
3099:20
 **next-favorite** [1] -
3089:16
 **nice** [1] - 3008:24
 **NICHOLAS** [1] -
3042:17
 **Nicholas** [3] -
2983:6, 3043:9,
3089:23
 **nine** [7] - 2987:9,
2988:8, 2989:22,
2989:24, 2995:10,
2998:6, 2998:10
 **Ninth** [1] - 2982:10
 **no-poaching** [1] -
3017:25
 **Nobel** [1] - 3028:24
 **non** [49] - 2987:10,
2987:13, 2987:25,
2989:14, 2990:7,
2991:9, 2996:17,
2996:21, 2998:6,
2998:15, 2998:18,
3027:22, 3044:24,
3046:6, 3047:16,
3047:20, 3050:14,
3051:17, 3052:2,
3052:10, 3052:21,
3053:16, 3055:4,

3057:20, 3057:24,
3057:25, 3062:15,
3063:15, 3064:24,
3074:24, 3074:25,
3075:5, 3075:17,
3076:3, 3076:7,
3077:10, 3077:21,
3078:1, 3079:15,
3079:19, 3080:6,
3080:11, 3080:17,
3081:19, 3082:22,
3082:24, 3083:15,
3083:17
 **non-anticipated** [5] -
3044:24, 3047:16,
3047:20, 3062:15,
3064:24
 **non-Big** [40] -
2987:10, 2987:13,
2987:25, 2989:14,
2990:7, 2991:9,
2996:17, 2996:21,
2998:6, 2998:15,
2998:18, 3046:6,
3050:14, 3051:17,
3052:2, 3052:10,
3052:21, 3053:16,
3055:4, 3063:15,
3074:24, 3074:25,
3075:5, 3075:17,
3076:3, 3076:7,
3077:10, 3077:21,
3078:1, 3079:15,
3079:19, 3080:6,
3080:11, 3080:17,
3081:19, 3082:22,
3082:24, 3083:15,
3083:17
 **non-merging** [3] -
3057:20, 3057:24,
3057:25
 **non-titled** [1] -
3027:22
 **nonconfidential** [3] -
3041:4, 3041:9,
3041:11
 **nonfiction** [3] -
3009:16, 3010:11,
3068:18
 **nonpoaching** [1] -
3017:9
 **nonstarter** [1] -
3019:18
 **norm** [3] - 2996:8,
3011:21, 3013:10
 **normal** [2] - 2998:20,
2999:2
 **normally** [1] -
2996:21
 **north** [1] - 3068:24

**North** [1] - 3003:8
**Northwest** [4] - 2981:18, 2982:10, 2982:14, 3111:14
**Nos** [8] - 2983:10, 2983:14, 2983:16, 2983:16, 3037:25, 3039:10, 3040:4, 3041:13
**notable** [1] - 3075:16
**note** [3] - 2992:4, 2992:19, 3107:2
**notebook** [1] - 3031:14
**notebooks** [2] - 3031:16, 3042:22
**noted** [1] - 3015:7
**notes** [1] - 3111:5
**notice** [1] - 3000:11
**number** [72] - 2987:16, 2987:17, 2987:25, 2989:23, 2989:24, 2991:19, 2992:11, 2992:16, 2993:10, 2994:15, 2995:14, 2995:23, 2996:2, 2996:3, 2996:13, 2998:17, 3012:16, 3020:21, 3023:10, 3024:6, 3025:17, 3026:16, 3029:9, 3029:10, 3030:3, 3030:25, 3031:5, 3031:6, 3033:1, 3034:3, 3034:7, 3036:11, 3036:14, 3036:15, 3037:16, 3039:18, 3043:20, 3053:14, 3053:18, 3053:24, 3053:25, 3054:3, 3054:6, 3054:7, 3054:17, 3054:23, 3055:20, 3056:3, 3057:4, 3059:22, 3064:18, 3083:8, 3083:14, 3084:9, 3084:12, 3084:14, 3084:18, 3086:1, 3086:18, 3087:2, 3087:4, 3088:13, 3088:14, 3088:22, 3092:20, 3092:21, 3101:1, 3108:3
**Number** [1] - 2993:24
**numbering** [1] - 3032:1
**numbers** [25] - 2990:21, 2994:5,

3005:16, 3006:21, 3007:19, 3040:25, 3041:3, 3044:13, 3053:1, 3053:17, 3053:23, 3054:17, 3056:23, 3062:9, 3076:4, 3080:21, 3080:22, 3084:20, 3084:24, 3097:4, 3097:21, 3107:3, 3107:17, 3107:18

# O

**O'MELVENY** [2] - 2981:22, 2982:4
**object** [2] - 3010:6, 3099:24
**objection** [14] - 2989:2, 3035:23, 3036:1, 3037:17, 3038:21, 3042:2, 3050:24, 3050:25, 3078:4, 3078:5, 3085:9, 3085:10, 3106:19, 3106:20
**observable** [2] - 3015:25, 3022:21
**observations** [4] - 3084:9, 3084:13, 3084:15, 3084:16
**observe** [4] - 3043:12, 3048:20, 3075:21, 3089:13
**observed** [6] - 2994:15, 3022:23, 3045:24, 3069:12, 3085:17, 3098:13
**obviously** [1] - 3017:12
**occasions** [5] - 2989:13, 2996:1, 2996:13, 2996:20, 2999:14
**occur** [3] - 3003:25, 3028:8, 3101:3
**occurrence** [1] - 3076:6
**OF** [4] - 2981:1, 2981:3, 2981:11, 2981:17
**offer** [2] - 3011:10, 3033:24
**offered** [2] - 3034:19, 3099:19
**offers** [2] - 2993:10, 3069:3
**Official** [1] - 2982:12
**official** [1] - 3111:12

**often** [11] - 2995:15, 2998:19, 3054:1, 3054:5, 3054:9, 3054:11, 3056:24, 3057:2, 3075:12, 3075:22, 3086:19
**Oliver** [1] - 3028:25
**omnipotent** [1] - 3101:19
**once** [5] - 2986:9, 3014:13, 3072:9, 3072:10, 3097:6
**one** [130] - 2987:23, 2990:20, 2990:23, 2991:2, 2991:3, 2991:9, 2993:17, 2997:24, 2998:4, 2998:17, 2999:18, 3002:4, 3002:14, 3002:18, 3002:21, 3004:2, 3004:4, 3006:9, 3007:16, 3008:2, 3008:10, 3013:14, 3022:17, 3023:9, 3027:23, 3030:4, 3030:16, 3031:9, 3031:17, 3033:1, 3035:9, 3035:11, 3035:16, 3036:10, 3036:12, 3039:13, 3041:24, 3042:1, 3044:17, 3044:21, 3045:25, 3046:19, 3046:21, 3047:11, 3047:22, 3047:25, 3048:1, 3048:2, 3050:8, 3050:21, 3051:7, 3051:25, 3052:15, 3053:23, 3053:24, 3054:4, 3054:11, 3055:25, 3056:4, 3057:2, 3057:10, 3057:14, 3059:7, 3059:22, 3063:22, 3064:7, 3065:16, 3068:5, 3068:7, 3068:10, 3068:16, 3068:19, 3069:25, 3070:12, 3070:19, 3071:23, 3072:4, 3074:20, 3075:8, 3075:22, 3075:23, 3076:24, 3077:4, 3077:12, 3078:21, 3079:10, 3080:5, 3081:20, 3082:16, 3084:7, 3085:20, 3086:15, 3086:18, 3087:2, 3087:4,

3087:8, 3087:16, 3088:13, 3088:22, 3089:3, 3091:23, 3094:25, 3095:5, 3096:3, 3096:20, 3096:22, 3097:16, 3097:22, 3097:23, 3098:17, 3099:9, 3101:7, 3101:14, 3102:22, 3102:24, 3105:3, 3105:12, 3105:19, 3105:23, 3106:1, 3106:16, 3108:3, 3108:6, 3109:10
**one-on-one** [2] - 2999:18, 3004:2
**ones** [7] - 3005:2, 3016:15, 3041:23, 3091:3, 3091:4, 3092:12, 3092:13
**ongoing** [9] - 3027:24, 3028:5, 3028:6, 3028:9, 3028:12, 3028:19, 3028:22, 3029:23, 3030:1
**open** [1] - 3038:4
**operated** [1] - 3014:6
**operates** [1] - 2991:9
**operating** [28] - 3024:25, 3025:9, 3025:10, 3025:17, 3025:19, 3026:3, 3026:10, 3026:15, 3027:24, 3028:8, 3028:13, 3028:16, 3028:18, 3028:19, 3028:22, 3029:1, 3029:9, 3029:12, 3029:23, 3030:1, 3030:3, 3033:6, 3079:23, 3092:2, 3095:7, 3095:10, 3097:6, 3105:18
**opinion** [3] - 3022:4, 3022:10, 3070:14
**Oppenheimer** [3] - 3004:22, 3016:6, 3021:24
**OPPENHEIMER** [26] - 2981:21, 2984:3, 2985:22, 2986:1, 2988:23, 2989:3, 2989:7, 3010:6, 3021:19, 3021:22, 3022:7, 3022:9, 3026:25, 3027:4, 3027:10, 3027:12, 3029:19, 3031:23,

3031:24, 3035:25, 3036:2, 3036:19, 3050:25, 3078:5, 3085:10, 3106:20
**opportunity** [9] - 3020:21, 3025:4, 3102:25, 3103:5, 3103:7, 3103:17, 3103:19, 3103:23, 3103:25
**opposed** [2] - 3019:8, 3029:1
**opposite** [1] - 3076:9
**optimal** [1] - 3103:10
**option** [1] - 3004:8
**order** [3] - 3013:2, 3014:15, 3089:4
**orders** [1] - 3023:4
**organization** [4] - 2999:24, 3001:23, 3026:8, 3028:24
**otherwise** [3] - 2996:12, 3011:11, 3063:21
**outcome** [3] - 3011:8, 3063:18, 3099:25
**outcomes** [1] - 3031:10
**output** [2] - 3059:23, 3060:2
**overall** [4] - 3031:9, 3035:17, 3061:13, 3066:17
**overrepresent** [1] - 2987:23
**overrepresented** [3] - 2996:15, 2997:6, 2997:16
**overrepresenting** [1] - 2997:20
**overrepresents** [2] - 2995:24, 2997:1
**overrule** [1] - 3036:1
**overruled** [1] - 3010:9
**oversight** [2] - 3045:15, 3106:17
**overskewed** [1] - 2996:2
**own** [2] - 3014:11, 3080:3

# P

**P&L** [4] - 3027:6, 3027:8, 3027:11, 3094:5
**P&Ls** [11] - 3025:8,

3025:15, 3026:11, 3026:16, 3028:23, 3029:4, 3033:5, 3093:16, 3093:17, 3093:21, 3093:22

**PAGE** [1] - 2983:8
**page** [7] - 2991:5, 2991:6, 2992:25, 3008:20, 3008:21, 3008:23, 3027:14
**Page** [13] - 2985:10, 2985:18, 2986:5, 2986:21, 2992:9, 2993:1, 2993:2, 2993:4, 2993:20, 3000:12, 3014:5, 3031:22, 3069:9
**pages** [1] - 3027:6
**paid** [2] - 3012:6, 3012:18
**Pam** [2] - 3022:8, 3026:25
**PAN** [1] - 2981:11
**Pande** [1] - 3034:19
**pandemic** [1] - 3009:8
**paper** [4] - 3090:14, 3091:9, 3091:10, 3099:15
**papers** [1] - 3091:11
**paragraph** [1] - 3087:9
**parallel** [2] - 3011:3, 3011:4
**parameterized** [1] - 3097:18
**parameterizes** [1] - 3097:13
**parameterizing** [2] - 3096:16, 3097:12
**pardon** [2] - 3026:24, 3035:14
**part** [15] - 2987:9, 2987:12, 3007:21, 3008:1, 3013:16, 3014:8, 3016:12, 3067:9, 3067:10, 3077:24, 3077:25, 3079:4, 3079:5, 3081:1, 3081:5
**Part** [1] - 3090:16
**partial** [1] - 3032:6
**participants** [4] - 3034:16, 3035:1, 3074:8, 3082:20
**participating** [1] - 3035:11
**particular** [20] - 2992:9, 2996:2, 2999:16, 3000:2,

3004:4, 3010:12, 3030:3, 3033:11, 3036:10, 3046:3, 3049:9, 3052:3, 3078:23, 3082:4, 3082:5, 3084:18, 3087:5, 3089:9, 3099:22, 3101:11
**particularly** [3] - 3046:21, 3073:2, 3074:24
**parties** [20] - 2987:19, 2987:23, 2994:20, 2997:8, 2997:12, 2997:20, 2997:25, 3025:10, 3055:13, 3065:11, 3065:13, 3084:2, 3086:7, 3088:9, 3088:13, 3088:15, 3088:21, 3088:23, 3100:18, 3104:12
**parties'** [1] - 3055:16
**parts** [1] - 3025:6
**party** [5] - 2997:25, 3056:4, 3057:5, 3057:6
**pass** [13] - 3021:15, 3042:22, 3102:5, 3102:6, 3102:7, 3102:11, 3102:13, 3102:15, 3103:22, 3104:6, 3104:8, 3106:25, 3109:3
**pass-through** [10] - 3102:5, 3102:6, 3102:7, 3102:11, 3102:13, 3102:15, 3103:22, 3104:6, 3104:8, 3109:3
**passage** [1] - 3014:2
**passed** [2] - 3103:23, 3104:3
**passes** [1] - 3049:3
**past** [3] - 2991:3
**patience** [1] - 3024:22
**pay** [3] - 3032:25, 3033:3, 3103:4
**payments** [6] - 3012:5, 3012:9, 3012:17, 3012:25, 3013:1, 3013:10
**payouts** [1] - 3068:24
**pays** [1] - 3033:15
**Penguin** [84] - 2984:14, 2994:13, 2996:7, 2999:10, 2999:22, 3001:15,

3001:17, 3002:22, 3004:18, 3009:4, 3009:21, 3009:23, 3014:8, 3014:19, 3014:21, 3037:21, 3050:12, 3052:25, 3055:5, 3058:19, 3058:20, 3059:2, 3059:5, 3059:14, 3060:1, 3060:5, 3060:6, 3062:10, 3064:16, 3065:20, 3066:14, 3068:2, 3068:3, 3068:4, 3068:6, 3068:8, 3068:10, 3068:14, 3068:18, 3069:2, 3069:14, 3069:15, 3069:24, 3070:2, 3070:4, 3071:4, 3071:6, 3071:12, 3071:23, 3072:11, 3072:23, 3072:25, 3073:1, 3073:15, 3073:17, 3073:21, 3073:23, 3075:25, 3077:18, 3078:25, 3082:17, 3084:16, 3084:22, 3084:25, 3085:25, 3086:14, 3086:17, 3088:2, 3088:6, 3089:5, 3089:10, 3092:2, 3092:9, 3093:11, 3095:2, 3096:1, 3096:4, 3096:23, 3097:9, 3097:23, 3105:14, 3105:20, 3107:24
**PENGUIN** [2] - 2981:21, 2982:3
**people** [5] - 3030:11, 3046:23, 3047:4, 3080:2, 3103:8
**per** [3] - 3023:25, 3061:1, 3064:14
**perceive** [1] - 3091:20
**percent** [86] - 2985:12, 2986:20, 2987:6, 2987:18, 2988:8, 2988:11, 2989:24, 2994:23, 2995:6, 2995:11, 2995:17, 2995:25, 2996:11, 2996:12, 2996:19, 2996:24, 2998:11, 2998:13, 2998:16, 2998:18, 3011:21, 3028:17,

3044:2, 3044:6, 3044:15, 3044:16, 3051:17, 3052:11, 3052:12, 3053:2, 3053:3, 3053:4, 3053:8, 3053:16, 3053:18, 3054:23, 3054:24, 3055:14, 3055:15, 3056:21, 3057:22, 3058:2, 3058:3, 3058:5, 3058:7, 3064:15, 3065:21, 3065:25, 3075:17, 3075:18, 3077:3, 3077:19, 3077:20, 3077:22, 3079:23, 3080:1, 3080:6, 3080:10, 3080:12, 3081:20, 3089:4, 3102:11, 3105:14, 3105:15, 3105:21, 3105:22, 3105:25, 3106:3, 3106:4, 3107:12, 3108:14, 3108:15, 3108:17, 3108:20, 3109:2, 3109:4, 3109:18, 3109:20, 3109:21
**percentage** [11] - 2987:14, 2987:17, 2994:22, 2997:24, 3011:20, 3052:7, 3052:18, 3052:21, 3054:21, 3092:17
**percentage-wise** [1] - 2987:17
**perfect** [3] - 3063:24, 3064:1, 3067:1
**perfectly** [2] - 3095:11, 3103:12
**perform** [2] - 3056:5, 3066:7
**performed** [2] - 3049:6, 3058:9
**performs** [2] - 3088:2, 3099:13
**perhaps** [4] - 2987:13, 2988:6, 2999:2, 3004:21
**period** [10] - 2994:18, 3004:24, 3004:25, 3007:2, 3048:8, 3062:1, 3062:5, 3064:4, 3065:9, 3067:9
**periods** [1] - 3067:9
**permission** [3] - 3005:8, 3040:6, 3040:8

**permitted** [1] - 3069:5
**person** [4] - 3002:4, 3003:7, 3080:6, 3099:23
**personnel** [2] - 3045:8, 3069:15
**perspective** [2] - 3071:14, 3102:25
**Petrocelli** [3] - 2984:13, 3037:13, 3042:9
**PETROCELLI** [12] - 2981:20, 2984:13, 3037:4, 3037:9, 3037:14, 3037:16, 3037:19, 3038:2, 3038:8, 3038:14, 3038:17, 3042:7
**Ph.D** [2] - 2983:5, 2983:6, 2984:24, 3042:17
**phase** [1] - 3104:12
**pick** [5] - 3004:9, 3018:9, 3036:14, 3063:23, 3081:25
**picked** [2] - 3063:13, 3103:9
**piece** [1] - 3066:14
**pink** [1] - 3079:2
**pinpoints** [1] - 3005:17
**place** [5] - 3002:23, 3012:12, 3094:6
**placebo** [1] - 3063:1
**placed** [1] - 3087:19
**Plaintiff** [1] - 2981:4
**PLAINTIFF** [1] - 2981:15
**PLAINTIFF'S** [1] - 3042:17
**Plaintiff's** [11] - 2983:10, 2983:11, 2983:11, 2983:12, 2983:12, 3027:1, 3041:13, 3051:2, 3078:7, 3085:12, 3106:22
**plans** [8] - 2992:4, 2992:20, 2993:3, 2993:5, 2993:7, 2993:9, 3090:16, 3090:19
**play** [4] - 3017:21, 3034:14, 3099:17, 3100:24
**played** [1] - 3038:4
**players** [1] - 3053:7
**plot** [1] - 3061:15
**plus** [6] - 2989:24,

2995:10, 3014:19, 3047:19, 3075:12, 3076:5
**poach** [5] - 3016:9, 3017:16, 3019:25, 3020:11, 3023:20
**poached** [1] - 3016:20
**poaching** [7] - 3016:6, 3016:7, 3017:25, 3018:25, 3019:14, 3020:19, 3024:3
**podium** [1] - 2984:7
**point** [23] - 2991:4, 2992:3, 2996:5, 2998:5, 2999:20, 3013:13, 3025:5, 3031:8, 3046:13, 3046:17, 3046:20, 3047:10, 3047:13, 3048:24, 3057:22, 3060:18, 3071:10, 3076:23, 3080:25, 3086:10, 3090:5, 3099:18, 3106:14
**pointed** [1] - 3029:13
**pointing** [1] - 3013:4
**poised** [3] - 3076:12, 3076:19, 3076:21
**policies** [1] - 3002:1
**policy** [1] - 2999:11
**political** [1] - 2990:14
**population** [4] - 3062:24, 3062:25, 3063:3, 3063:5
**portion** [2] - 3027:7, 3038:22
**portions** [1] - 3038:9
**posed** [2] - 2989:6, 3070:6
**positive** [1] - 3026:18
**possibility** [2] - 3086:22, 3109:18
**possible** [6] - 2997:11, 3015:11, 3016:8, 3016:24, 3023:18, 3101:6
**possibly** [1] - 3019:16
**post** [4] - 3061:5, 3088:5, 3089:7, 3102:22
**post-merger** [4] - 3061:5, 3088:5, 3089:7, 3102:22
**potential** [4] - 3001:19, 3016:14,

3062:16, 3088:14
**potential..** [1] - 3016:13
**potentially** [3] - 3001:22, 3010:23, 3063:8
**power** [1] - 3079:25
**practice** [5] - 3019:17, 3019:19, 3023:5, 3025:14, 3029:24
**practices** [1] - 3087:15
**pre** [3] - 3061:4, 3102:20, 3103:9
**pre-merger** [3] - 3061:4, 3102:20, 3103:9
**precise** [1] - 2991:1
**predicate** [1] - 3003:18
**predicated** [1] - 3035:10
**predict** [4] - 3088:8, 3088:21, 3088:24, 3106:9
**predicted** [5] - 3030:13, 3094:21, 3095:2, 3095:13, 3105:17
**predictions** [2] - 3100:21, 3105:6
**predictive** [1] - 3057:21
**predicts** [2] - 3105:8, 3105:11
**preferences** [1] - 3087:17
**premised** [1] - 3020:9
**premiums** [2] - 3090:21, 3090:23
**prepare** [2] - 3043:14, 3064:6
**prepared** [1] - 3005:14
**prescription** [1] - 3090:16
**present** [7] - 3014:15, 3022:21, 3070:8, 3090:22, 3092:7, 3094:4, 3097:17
**presentation** [7] - 3043:14, 3043:18, 3048:17, 3082:12, 3095:12, 3100:4, 3102:3
**presented** [2] - 3083:11, 3107:10

**Press** [1] - 3081:18
**presumably** [1] - 3013:1
**previously** [3] - 3049:10, 3079:6, 3091:6
**PRH** [18] - 2987:1, 2995:24, 2996:7, 2996:15, 2997:1, 3000:22, 3001:5, 3003:2, 3003:5, 3003:6, 3003:8, 3028:10, 3029:12, 3034:20, 3059:10, 3069:7, 3074:9, 3084:22
**PRH's** [1] - 3097:14
**price** [25] - 3011:9, 3011:20, 3026:7, 3028:12, 3057:16, 3090:2, 3091:12, 3102:10, 3102:12, 3102:14, 3103:1, 3103:10, 3103:11, 3103:14, 3103:15, 3103:18, 3104:1, 3105:8, 3107:11, 3108:18, 3108:20, 3108:22, 3108:24, 3109:3
**prices** [8] - 3011:10, 3015:20, 3015:24, 3022:20, 3051:12, 3089:25, 3090:7, 3090:14
**pricing** [3] - 3089:15, 3089:20, 3089:21
**primarily** [1] - 3045:22
**Princeton** [1] - 3081:17
**private** [3] - 3014:14, 3015:8, 3034:11
**problem** [5] - 2991:5, 3026:1, 3055:21, 3056:19
**problems** [1] - 3082:16
**proceed** [2] - 2985:1, 3043:1
**proceedings** [4] - 3037:11, 3042:14, 3110:8, 3111:6
**process** [6] - 3023:13, 3035:12, 3056:8, 3068:20, 3074:15, 3101:7
**processes** [3] - 3056:15, 3101:5, 3101:6

**produced** [1] - 3111:6
**production** [7] - 2992:5, 2992:7, 2994:3, 2994:12, 2994:20, 2997:8, 3027:22
**products** [4] - 3057:14, 3057:15, 3057:19, 3089:13
**Professor** [6] - 3024:9, 3024:20, 3033:18, 3038:22, 3039:15, 3042:3
**profit** [7] - 3028:22, 3029:22, 3070:1, 3070:4, 3091:15, 3091:17, 3102:21
**profitably** [1] - 3099:20
**promise** [2] - 3073:22, 3074:12
**proper** [2] - 3041:20
**properly** [3] - 3049:2, 3055:23, 3055:24
**proportion** [4] - 3044:10, 3044:11, 3052:9, 3077:16
**proportional** [3] - 3084:12, 3084:20, 3084:25
**proportional-to-share** [1] - 3084:20
**proposed** [4] - 2991:10, 3030:18, 3108:19, 3109:18
**provide** [5] - 2985:23, 3002:23, 3029:3, 3035:7, 3039:24
**provided** [5] - 2997:10, 3030:11, 3033:3, 3067:25, 3070:12
**providers** [1] - 3090:19
**provides** [1] - 3006:20
**provisional** [1] - 2998:22
**publicly** [1] - 3074:7
**publish** [5] - 2990:13, 2991:12, 2991:18, 3043:17, 3045:22
**Publish** [1] - 3102:20
**published** [3] - 3019:2, 3025:24, 3077:10

**publisher** [22] - 2990:10, 3013:14, 3014:11, 3016:20, 3023:7, 3023:17, 3033:2, 3046:14, 3054:8, 3070:22, 3071:5, 3071:13, 3071:15, 3072:8, 3075:23, 3081:14, 3086:21, 3098:22, 3098:23, 3099:3, 3099:9, 3102:19
**Publisher** [4] - 3102:20, 3102:21, 3103:2, 3103:14
**publisher's** [1] - 3035:22
**Publishers** [1] - 3076:3
**publishers** [67] - 2990:7, 2991:9, 2994:14, 3002:13, 3011:24, 3013:8, 3018:8, 3018:22, 3019:1, 3020:21, 3024:6, 3045:8, 3049:20, 3051:17, 3059:3, 3063:10, 3068:1, 3068:12, 3069:4, 3069:23, 3070:6, 3070:16, 3071:18, 3071:22, 3072:19, 3073:12, 3073:13, 3074:24, 3075:1, 3075:7, 3075:11, 3075:13, 3075:22, 3076:11, 3076:17, 3076:19, 3076:21, 3077:3, 3077:6, 3077:10, 3077:16, 3077:20, 3077:22, 3077:24, 3078:1, 3078:12, 3078:20, 3080:11, 3081:12, 3081:24, 3082:5, 3082:6, 3082:13, 3083:3, 3083:8, 3083:15, 3085:21, 3085:23, 3086:1, 3086:23, 3098:14, 3100:17, 3100:19, 3101:20, 3101:22, 3101:25
**publishers'** [4] - 2994:11, 3044:2, 3100:13, 3100:16
**publishes** [1] - 2992:12
**publishing** [1] - 3036:10

3130

**pull** [1] - 3069:9
**punishment** [2] - 3013:17, 3024:2
**purple** [2] - 3050:13, 3079:13
**purposes** [2] - 2997:23, 3078:13
**pursuant** [1] - 3011:3
**put** [12] - 2985:17, 2986:7, 2994:2, 3010:16, 3013:5, 3028:11, 3035:6, 3040:25, 3051:14, 3066:11, 3096:3, 3101:17
**putting** [4] - 3016:1, 3016:6, 3020:15, 3052:16
**PX** [19] - 3000:11, 3008:11, 3041:3, 3041:4, 3041:5, 3041:6, 3041:7, 3041:8, 3041:9, 3041:10, 3041:11, 3050:23, 3078:3, 3079:6, 3085:8, 3106:17

**Q**

**qualitative** [3] - 3066:20, 3085:17, 3106:12
**qualities** [1] - 3046:23
**qualms** [1] - 3014:6
**quarrel** [1] - 3015:6
**quarreling** [1] - 3015:2
**quarter** [1] - 3014:13
**quarterly** [3] - 3013:1, 3017:15, 3068:24
**question-and-answer** [1] - 3025:1
**questioned** [1] - 3024:24
**questions** [8] - 3007:5, 3024:19, 3030:20, 3032:19, 3032:23, 3036:19, 3106:24, 3109:24
**quick** [3] - 3031:15, 3098:3, 3105:10
**quickly** [2] - 2990:9, 3022:2
**quite** [2] - 2987:10, 3105:10

**quote** [4] - 3014:11, 3098:20, 3099:12, 3099:14
**quotes** [6] - 3046:1, 3046:20, 3057:11, 3085:21, 3086:3, 3098:19
**quoting** [1] - 3014:12

**R**

**raise** [4] - 3089:24, 3103:11, 3103:14, 3103:18
**raised** [4] - 3098:10, 3098:11, 3103:1, 3104:1
**ran** [6] - 3095:18, 3106:8, 3107:3, 3107:10, 3107:21, 3107:23
**RANDALL** [1] - 2981:21
**Random** [87] - 2984:14, 2994:13, 2996:7, 2999:10, 2999:22, 3001:15, 3001:16, 3001:17, 3002:22, 3004:18, 3009:4, 3009:22, 3009:23, 3014:22, 3014:24, 3015:9, 3016:1, 3022:25, 3037:21, 3050:12, 3052:25, 3055:6, 3058:19, 3058:21, 3059:2, 3059:5, 3059:14, 3060:1, 3060:5, 3060:6, 3062:10, 3064:16, 3065:20, 3066:14, 3068:3, 3068:4, 3068:6, 3068:8, 3068:10, 3068:14, 3068:19, 3069:3, 3069:15, 3069:16, 3069:25, 3070:2, 3070:4, 3071:4, 3071:6, 3071:12, 3071:23, 3072:11, 3072:23, 3072:25, 3073:1, 3073:15, 3073:17, 3073:21, 3073:23, 3075:25, 3077:18, 3078:25, 3082:17, 3084:16, 3084:22, 3084:25, 3085:25, 3086:14, 3086:17, 3088:2, 3088:7, 3089:5,

3089:10, 3092:2, 3092:9, 3093:11, 3095:2, 3096:1, 3096:5, 3096:24, 3097:9, 3097:23, 3105:14, 3105:20, 3107:25
**RANDOM** [2] - 2981:21, 2982:3
**randomized** [1] - 3062:21
**range** [3] - 3077:1, 3077:8, 3092:20
**ranged** [1] - 3051:25
**rarer** [1] - 3076:6
**rate** [3] - 2992:21, 3058:2, 3061:7
**rates** [4] - 3011:18, 3104:6, 3104:8, 3107:18
**rather** [6] - 3030:11, 3070:16, 3072:9, 3080:25, 3088:14, 3093:21
**ratio** [4] - 3054:4, 3054:11, 3054:14, 3055:7
**ration** [1] - 3057:1
**rational** [1] - 3011:6
**ratios** [9] - 3057:14, 3057:17, 3057:19, 3057:23, 3066:20, 3083:21, 3083:24, 3084:2, 3085:5
**RDR** [3] - 2982:12, 3111:3, 3111:12
**re** [3] - 3050:23, 3078:2, 3085:8
**re-creation** [3] - 3050:23, 3078:2, 3085:8
**reach** [1] - 3020:13
**reached** [1] - 3020:15
**react** [1] - 3045:12
**reaction** [5] - 3048:23, 3086:9, 3090:9, 3094:23, 3100:9
**READ** [5] - 2981:15, 2984:9, 2984:12, 3040:6, 3042:11
**Read** [1] - 2984:9
**read** [9] - 2984:11, 2992:23, 3000:5, 3010:25, 3013:22, 3014:2, 3015:9, 3062:9, 3077:20
**readily** [1] - 3019:20
**reading** [6] - 2987:1,

3005:18, 3005:21, 3006:3, 3045:13, 3069:17
**ready** [1] - 2985:1
**real** [6] - 3016:25, 3035:16, 3035:17, 3036:13, 3036:14, 3101:20
**realize** [1] - 3019:3
**realized** [1] - 3100:20
**really** [4] - 3001:17, 3003:12, 3024:5, 3054:25
**reason** [5] - 2991:21, 3016:17, 3069:23, 3083:12, 3092:10
**reasonable** [5] - 3059:18, 3064:1, 3066:25, 3085:3, 3085:18
**reasons** [2] - 3049:23, 3063:23
**rebuttal** [12] - 2993:17, 3042:10, 3042:12, 3059:16, 3060:20, 3070:12, 3070:20, 3072:6, 3072:10, 3082:1, 3083:12, 3092:5
**recaptured** [1] - 3102:24
**receive** [1] - 3044:19
**RECEIVED** [1] - 2983:8
**receiving** [1] - 3011:25
**recent** [2] - 3065:13, 3082:7
**recently** [1] - 3078:14
**recess** [2] - 3037:10, 3110:7
**recognizable** [1] - 3046:23
**recognize** [2] - 3027:7, 3046:24
**recognizes** [1] - 3102:22
**recognizing** [1] - 3025:15
**recollection** [5] - 2997:21, 3010:25, 3011:13, 3025:10, 3037:23
**record** [10] - 2984:8, 3013:25, 3040:1, 3043:7, 3043:19, 3048:14, 3053:11, 3066:20, 3074:19,

3079:5
**recovery** [1] - 3025:19
**recut** [1] - 3047:23
**red** [5] - 3060:23, 3064:21, 3069:2, 3079:2, 3079:15
**redid** [1] - 3006:16
**redirect** [1] - 3007:6
**REDIRECT** [1] - 3021:21
**Redirect** [1] - 2983:3
**reduce** [3] - 3000:23, 3003:16, 3011:10
**reduces** [1] - 3036:11
**reducing** [1] - 3059:14
**reduction** [5] - 3012:21, 3035:19, 3036:15, 3105:15, 3106:9
**refer** [2] - 3078:13, 3078:22
**reference** [1] - 3022:15
**referencing** [1] - 3014:2
**referred** [2] - 3062:13, 3098:4
**referring** [3] - 3005:4, 3009:21, 3033:18
**refers** [2] - 3009:19, 3099:1
**reflect** [2] - 3025:10, 3030:1
**reflected** [8] - 3025:14, 3028:9, 3033:5, 3036:10, 3056:10, 3100:24, 3101:25, 3102:10
**reflecting** [4] - 3049:25, 3050:5, 3054:20, 3101:3
**reflects** [1] - 3100:2
**refresh** [4] - 3010:25, 3011:13, 3011:15, 3037:22
**regarding** [12] - 2993:4, 3022:4, 3024:24, 3025:7, 3048:20, 3049:17, 3078:19, 3083:24, 3091:14, 3094:19, 3098:14, 3100:6
**regardless** [1] - 3083:18
**region** [1] - 3090:22
**regions** [7] -

3131

3090:17, 3090:20, 3090:24, 3090:25, 3091:1, 3091:5, 3091:6

**Regnery** [2] - 2990:10, 2990:22

**REGNERY** [1] - 2990:11

**regular** [1] - 3014:12

**relate** [2] - 3029:21, 3102:17

**related** [2] - 3017:5, 3055:11

**relates** [1] - 2993:14

**relationship** [2] - 3017:20, 3020:3

**relative** [3] - 3051:12, 3053:6, 3079:18

**relatively** [2] - 2987:25, 3011:18

**relevance** [1] - 3100:13

**relevant** [3] - 3012:17, 3100:14, 3100:15

**reliability** [3] - 3030:10, 3107:5, 3107:8

**relied** [2] - 3058:11, 3074:14

**relying** [1] - 3074:5

**remain** [2] - 3039:24, 3042:15

**remaining** [1] - 2987:2

**remember** [4] - 2985:14, 2988:9, 3092:10, 3096:11

**remind** [4] - 3084:1, 3104:25, 3105:10, 3105:17

**removal** [1] - 3103:5

**renumbered** [1] - 3039:14

**repeat** [2] - 3016:12, 3026:12

**repeating** [1] - 3026:23

**rephrase** [1] - 3023:12

**replace** [1] - 3036:17

**reply** [12] - 3050:10, 3069:10, 3075:9, 3076:25, 3077:13, 3079:11, 3091:25, 3092:6, 3092:19, 3092:21, 3094:10, 3106:8

**report** [48] - 2993:17,

3029:11, 3030:7, 3030:8, 3031:15, 3031:16, 3031:19, 3032:5, 3038:23, 3039:3, 3039:4, 3039:7, 3042:3, 3044:22, 3048:10, 3050:10, 3050:17, 3059:9, 3059:16, 3060:20, 3069:8, 3069:10, 3070:12, 3070:21, 3072:7, 3072:10, 3075:9, 3076:16, 3076:25, 3077:13, 3079:11, 3082:1, 3082:11, 3083:12, 3091:24, 3091:25, 3092:1, 3092:5, 3092:6, 3092:19, 3092:21, 3094:9, 3094:10, 3106:8

**REPORTED** [1] - 2982:12

**REPORTER** [1] - 3040:1

**Reporter** [2] - 2982:12, 3111:12

**reports** [6] - 3024:14, 3031:14, 3031:17, 3051:25, 3060:2, 3097:25

**represent** [2] - 3009:13, 3032:6

**representative** [4] - 2997:18, 2997:20, 2998:1, 3084:17

**representing** [1] - 2984:9

**represents** [2] - 3068:18, 3080:1

**request** [2] - 2989:7, 2997:13

**requests** [1] - 2997:8

**required** [1] - 3019:14

**reran** [2] - 3092:5, 3092:6

**research** [1] - 3090:2

**respect** [17] - 2987:15, 2992:1, 2992:19, 2993:3, 2997:21, 2999:1, 2999:8, 2999:11, 3010:14, 3014:21, 3022:3, 3023:4, 3024:10, 3031:8, 3033:5, 3088:6, 3088:16

**respectful** [1] -

3073:15

**respectively** [1] - 3032:10

**respond** [2] - 3018:7, 3034:21

**respondent** [1] - 3086:1

**response** [3] - 2997:8, 3011:5, 3048:24

**rest** [3] - 2987:15, 3042:8, 3079:9

**restate** [1] - 3001:4

**restaurants** [1] - 3014:14

**restraints** [1] - 3017:13

**restrictions** [1] - 3003:24

**result** [3] - 2998:22, 3066:8, 3105:24

**results** [14] - 3030:9, 3049:8, 3050:20, 3063:7, 3066:9, 3097:2, 3097:18, 3098:9, 3106:2, 3106:6, 3106:7, 3108:10, 3108:11, 3108:12

**resume** [1] - 3110:2

**retail** [1] - 3011:20

**retaliation** [1] - 3011:7

**retread** [1] - 3088:17

**return** [3] - 3041:23, 3050:8, 3098:16

**revealing** [1] - 3069:11

**review** [2] - 3025:4, 3074:19

**reviewed** [2] - 3070:11, 3073:11

**rich** [1] - 3050:1

**right-hand** [2] - 2994:7, 3047:24

**rights** [4] - 3011:25, 3012:3, 3022:22, 3068:24

**rise** [1] - 3064:25

**risk** [2] - 2998:4, 3020:5

**rival** [4] - 3013:14, 3100:13, 3100:16, 3100:19

**rival's** [1] - 3111:5

**rivals** [2] - 3072:21, 3086:19

**role** [5] - 3023:1, 3034:11, 3034:14, 3074:24, 3100:24

**Room** [1] - 2982:14

**rooms** [1] - 3014:14

**ROSENBLATT** [1] - 2982:3

**Rosetta** [1] - 3040:14

**roughly** [4] - 2987:6, 2994:22, 3014:13, 3064:23

**round** [18] - 3032:21, 3032:24, 3033:13, 3033:19, 3033:20, 3033:25, 3034:4, 3034:13, 3034:15, 3034:25, 3035:3, 3069:4, 3069:13, 3070:23, 3071:1, 3071:3, 3071:8, 3095:22

**Round** [1] - 3071:10

**rounds** [5] - 2999:19, 3068:8, 3070:21, 3072:7, 3087:3

**row** [1] - 3097:13

**rows** [2] - 3010:10, 3097:12

**ROXANA** [1] - 2981:21

**royalty** [1] - 3011:17

**RUDZIN** [1] - 2982:2

**rules** [7] - 3068:4, 3073:16, 3073:21, 3073:24, 3074:1, 3074:3, 3074:15

**runner** [33] - 2989:14, 2989:23, 2989:25, 2995:16, 2996:20, 2998:8, 2998:19, 2998:24, 3051:18, 3052:4, 3052:8, 3052:10, 3052:19, 3052:22, 3053:2, 3054:7, 3054:9, 3054:16, 3054:22, 3055:2, 3055:3, 3055:5, 3055:14, 3056:5, 3056:7, 3056:8, 3056:16, 3057:6, 3073:10, 3086:7, 3088:10

**runner-up** [33] - 2989:14, 2989:23, 2989:25, 2995:16, 2996:20, 2998:8, 2998:19, 2998:24, 3051:18, 3052:4, 3052:8, 3052:10, 3052:19, 3052:22, 3053:2, 3054:7, 3054:9, 3054:16,

3054:22, 3055:2, 3055:3, 3055:5, 3055:14, 3056:5, 3056:7, 3056:8, 3056:16, 3057:6, 3073:10, 3086:7, 3088:10

**runners** [6] - 2986:25, 2987:10, 2987:13, 2988:5, 2989:14, 2995:11

**runners-up** [6] - 2986:25, 2987:10, 2987:13, 2988:5, 2989:14, 2995:11

**RYAN** [1] - 2982:9

## S

**S&S** [7] - 2996:15, 2997:1, 3025:7, 3026:14, 3028:10, 3084:15, 3097:8

**S&S's** [1] - 3097:17

**SABMiller** [3] - 3089:17, 3089:18, 3089:19

**safe** [4] - 3108:19, 3109:14, 3109:20, 3109:22

**salary** [1] - 3026:5

**sale** [2] - 3089:19, 3102:20

**sales** [8] - 3008:22, 3009:11, 3009:13, 3009:15, 3009:20, 3009:21, 3010:5, 3046:15

**salt** [1] - 3084:19

**sample** [2] - 3084:17, 3084:21

**Sanford/Mid** [1] - 3104:21

**Sansigre** [1] - 3008:13

**saw** [7] - 2999:19, 3072:16, 3073:14, 3091:5, 3091:6, 3101:11, 3101:18

**Schuster** [35] - 2984:17, 2987:2, 2994:13, 2995:24, 2996:7, 2999:10, 3001:16, 3002:24, 3026:10, 3028:21, 3029:13, 3029:14, 3050:12, 3055:3, 3070:3, 3073:24, 3076:1, 3077:19, 3079:1, 3082:18,

3084:23, 3084:24, 3086:16, 3088:4, 3088:6, 3089:3, 3091:24, 3092:8, 3095:3, 3096:2, 3096:24, 3097:23, 3105:16, 3105:21, 3107:24

**SCHUSTER** [1] - 2982:7

**Schuster's** [2] - 3025:5, 3096:5

**SCHWARZ** [41] - 2981:16, 2984:2, 2985:2, 2985:4, 2985:20, 2986:3, 2986:4, 2986:8, 2986:11, 2986:14, 2986:16, 2988:4, 2988:7, 2988:12, 2988:15, 2989:6, 2989:10, 2989:12, 2989:17, 2990:2, 2990:5, 2995:8, 2995:22, 2998:3, 2998:25, 2999:5, 2999:7, 3002:9, 3004:14, 3004:16, 3004:17, 3005:8, 3005:10, 3005:13, 3008:12, 3008:14, 3010:15, 3021:15, 3021:18, 3035:23, 3036:23

**Schwarz** [13] - 2985:1, 2985:6, 2985:7, 2992:22, 2995:5, 2998:21, 3000:16, 3008:17, 3016:24, 3022:1, 3023:3, 3024:24, 3036:22

**Schwarz's** [2] - 3019:21, 3026:4

**sciences** [2] - 3062:21, 3063:22

**score** [20] - 3035:20, 3081:15, 3088:16, 3088:18, 3091:14, 3093:3, 3094:20, 3098:6, 3099:15, 3099:16, 3099:21, 3100:1, 3101:9, 3101:10, 3104:24, 3105:2, 3105:11, 3105:17, 3107:5, 3107:22

**SCOTT** [1] - 2981:22

**screen** [6] - 2985:17, 2986:7, 3008:24,

3022:16, 3032:3, 3097:2

**SE** [2] - 2981:6, 2984:6

**seal** [2] - 3038:10, 3038:15

**seated** [2] - 2984:25, 3042:18

**second** [48] - 2994:10, 3009:1, 3022:19, 3030:8, 3033:17, 3033:21, 3035:20, 3047:19, 3050:3, 3053:4, 3057:13, 3063:7, 3070:22, 3071:1, 3071:3, 3071:6, 3071:7, 3072:12, 3072:17, 3072:24, 3072:25, 3073:5, 3075:11, 3075:19, 3081:15, 3082:22, 3087:19, 3088:16, 3088:18, 3091:14, 3093:3, 3094:20, 3095:22, 3098:6, 3099:15, 3099:16, 3099:21, 3099:24, 3100:1, 3101:9, 3101:10, 3104:24, 3105:2, 3105:11, 3105:17, 3107:5, 3107:22

**second-best** [1] - 3087:19

**second-highest** [7] - 3033:17, 3071:1, 3071:3, 3071:7, 3072:17, 3073:5, 3099:24

**second-largest** [1] - 3053:4

**second-score** [20] - 3035:20, 3081:15, 3088:16, 3088:18, 3091:14, 3093:3, 3094:20, 3098:6, 3099:15, 3099:16, 3099:21, 3100:1, 3101:9, 3101:10, 3104:24, 3105:2, 3105:11, 3105:17, 3107:5, 3107:22

**secondary** [2] - 3057:21, 3057:23

**Section** [1] - 3094:10

**see** [85] - 2986:10, 2986:18, 2987:16, 2990:25, 2991:4, 2991:19, 2992:14,

2993:4, 2995:17, 2996:14, 2996:22, 2997:3, 2997:5, 2997:16, 2998:19, 2998:21, 2999:17, 3000:25, 3002:5, 3003:13, 3003:19, 3005:16, 3006:2, 3008:22, 3008:23, 3009:1, 3009:10, 3010:2, 3017:18, 3017:24, 3019:22, 3027:5, 3027:16, 3027:20, 3028:9, 3028:15, 3032:9, 3032:11, 3033:22, 3034:18, 3044:25, 3045:2, 3049:8, 3050:3, 3050:16, 3053:9, 3056:13, 3058:12, 3062:7, 3062:10, 3063:11, 3064:3, 3064:12, 3064:17, 3064:18, 3065:15, 3067:11, 3069:2, 3071:2, 3071:10, 3073:14, 3073:18, 3073:19, 3074:18, 3075:12, 3075:14, 3075:15, 3075:25, 3077:3, 3077:7, 3077:18, 3077:21, 3079:3, 3079:17, 3080:17, 3083:2, 3084:11, 3095:4, 3097:15, 3101:2, 3101:20, 3104:16, 3105:20, 3105:24, 3106:1

**seeing** [10] - 2987:24, 2997:23, 2997:24, 3008:16, 3008:19, 3050:14, 3063:3, 3071:25, 3072:22, 3080:16

**seem** [4] - 2987:13, 2988:5, 3020:23, 3059:19

**sees** [3] - 3024:16, 3032:15, 3046:14

**segment** [2] - 2991:10, 3032:15

**selecting** [1] - 3029:25

**seller** [2] - 2995:2, 3046:16

**sellers** [53] - 2991:24, 3016:16, 3044:3, 3044:7, 3044:11, 3044:12,

3044:14, 3044:18, 3044:25, 3045:1, 3045:3, 3045:19, 3045:22, 3046:3, 3046:8, 3047:5, 3047:16, 3047:17, 3047:21, 3047:25, 3048:9, 3049:25, 3058:22, 3059:2, 3060:4, 3060:7, 3062:8, 3062:11, 3062:15, 3063:8, 3063:11, 3063:14, 3064:22, 3064:24, 3065:19, 3065:24, 3066:6, 3066:13, 3066:15, 3075:2, 3075:16, 3075:18, 3076:20, 3077:11, 3077:17, 3077:23, 3078:15, 3079:4, 3083:9, 3087:18, 3087:24

**sellers'** [1] - 3087:15

**selling** [8] - 3016:10, 3017:16, 3017:19, 3027:22, 3028:6, 3068:7, 3099:23

**sense** [7] - 3033:10, 3033:12, 3034:8, 3034:22, 3046:15, 3047:4, 3071:17

**sensitive** [1] - 3049:9

**sentence** [1] - 3069:18

**sentences** [1] - 3011:1

**separate** [5] - 3047:23, 3054:3, 3056:22, 3096:15, 3107:19

**separated** [1] - 3016:17

**separately** [1] - 3057:1

**sequence** [1] - 3025:1

**series** [1] - 3064:9

**serve** [1] - 3087:20

**session** [1] - 3110:9

**SESSION** [1] - 2981:8

**set** [4] - 2997:18, 3001:19, 3012:3, 3017:7

**sets** [1] - 2988:1

**setting** [4] - 3082:5, 3087:5, 3089:2, 3096:16

**settings** [1] - 3087:1

**Seven** [1] - 2982:4

**several** [2] - 3076:11, 3082:6

**Shapiro** [3] - 3108:19, 3109:15, 3109:23

**Shapiro's** [1] - 3109:16

**share** [45] - 2988:1, 2990:19, 2994:19, 2995:1, 2996:10, 2998:14, 2998:23, 2998:24, 3049:24, 3050:11, 3050:14, 3052:1, 3052:4, 3052:13, 3053:1, 3053:16, 3053:25, 3054:6, 3056:23, 3060:17, 3075:11, 3078:24, 3079:8, 3079:13, 3079:14, 3081:20, 3082:13, 3082:20, 3082:22, 3083:4, 3083:15, 3083:16, 3083:19, 3084:4, 3084:6, 3084:10, 3084:12, 3084:20, 3084:25, 3085:5, 3085:24, 3086:3, 3100:4

**shares** [38] - 2997:4, 2997:5, 2999:1, 3049:7, 3049:17, 3049:18, 3050:2, 3050:3, 3050:6, 3050:17, 3050:20, 3051:6, 3051:10, 3051:14, 3051:25, 3052:3, 3052:7, 3052:13, 3052:18, 3053:14, 3055:16, 3055:22, 3058:10, 3058:13, 3066:18, 3075:14, 3075:15, 3076:8, 3080:13, 3081:8, 3082:17, 3082:19, 3085:15, 3096:17, 3100:17, 3106:3

**sharp** [1] - 3004:1

**SHEARMAN** [2] - 2982:7, 2982:9

**SHORES** [1] - 2982:9

**short** [1] - 3029:17

**shorter** [1] - 3062:1

**shorthand** [1] - 3004:21

**shot** [1] - 3068:23

**show** [9] - 2998:16, 3005:2, 3022:10, 3044:13, 3048:16, 3070:15, 3071:16, 3072:8, 3072:13
**showed** [2] - 3083:6, 3095:14
**showing** [3] - 3079:13, 3079:15
**shown** [1] - 3038:22
**shows** [5] - 3004:25, 3010:1, 3010:11, 3071:15, 3102:13
**side** [4] - 2990:14, 3010:16, 3047:24, 3076:9
**significance** [6] - 3025:12, 3026:20, 3049:20, 3054:1, 3056:25, 3078:20
**significant** [8] - 3060:12, 3066:8, 3066:10, 3079:4, 3080:17, 3081:1, 3106:9, 3109:6
**significantly** [3] - 3045:3, 3076:6, 3077:25
**Silicon** [1] - 3017:6
**similar** [14] - 3002:23, 3048:2, 3052:12, 3053:14, 3053:17, 3062:21, 3063:21, 3072:7, 3075:15, 3076:2, 3080:2, 3084:23, 3089:12, 3105:24
**similarities** [1] - 3098:14
**similarly** [5] - 3050:17, 3059:19, 3086:20, 3088:6, 3100:23
**Simon** [37] - 2984:17, 2987:1, 2994:13, 2995:24, 2996:7, 2999:10, 3001:16, 3002:24, 3025:5, 3026:9, 3028:21, 3029:12, 3029:14, 3050:12, 3055:3, 3070:3, 3073:24, 3076:1, 3077:19, 3078:25, 3082:17, 3084:23, 3084:24, 3086:16, 3088:4, 3088:6, 3089:3, 3091:24, 3092:8, 3095:3, 3096:2, 3096:5,

3096:24, 3097:22, 3105:16, 3105:21, 3107:24
**SIMON** [1] - 2982:7
**simple** [3] - 2991:5, 2994:4, 3008:3
**simulation** [2] - 3105:7, 3106:13
**simulations** [2] - 3105:1, 3105:5
**single** [17] - 2999:16, 3012:21, 3032:21, 3032:24, 3033:13, 3033:19, 3033:20, 3033:25, 3034:4, 3034:13, 3034:15, 3034:25, 3035:3, 3056:7, 3069:13, 3104:14, 3108:6
**single-bidder** [1] - 3056:7
**single-round** [12] - 3032:21, 3032:24, 3033:13, 3033:19, 3033:20, 3033:25, 3034:4, 3034:13, 3034:15, 3034:25, 3035:3, 3069:13
**sister** [1] - 3102:24
**sit** [1] - 3000:19
**situation** [13] - 3001:8, 3003:16, 3016:18, 3020:2, 3023:15, 3024:3, 3033:15, 3033:18, 3034:7, 3034:16, 3034:25, 3035:4, 3089:13
**situations** [10] - 2999:17, 3002:4, 3002:14, 3004:12, 3011:5, 3019:13, 3087:4, 3088:9, 3088:12
**six** [8] - 3014:25, 3015:8, 3015:18, 3015:23, 3016:1, 3027:18, 3032:17, 3077:2
**sixth** [2] - 3014:23, 3081:21
**size** [2] - 3077:2, 3109:3
**sizes** [1] - 3053:6
**skew** [1] - 2996:20
**skewed** [4] - 2995:23, 2996:6, 2996:25, 3077:7
**slide** [56] - 3039:15, 3043:14, 3043:18,

3044:21, 3044:22, 3045:25, 3046:19, 3047:11, 3047:22, 3048:13, 3048:16, 3048:21, 3050:9, 3050:10, 3050:22, 3051:7, 3055:25, 3057:10, 3059:7, 3060:20, 3061:24, 3062:13, 3064:8, 3065:16, 3068:16, 3070:19, 3071:20, 3072:3, 3075:8, 3076:24, 3077:12, 3077:13, 3078:21, 3078:23, 3079:10, 3084:7, 3085:7, 3085:20, 3087:9, 3094:25, 3095:5, 3095:14, 3098:17, 3098:18, 3098:19, 3100:4, 3100:7, 3100:10, 3102:2, 3104:13, 3105:3, 3105:12, 3105:19, 3105:23, 3106:1, 3107:14
**Slide** [1] - 3022:7, 3039:15, 3039:16, 3048:14, 3048:18, 3100:5, 3102:3
**slightly** [4] - 2996:11, 3006:10, 3055:11, 3077:14
**slope** [1] - 3061:15
**slopes** [1] - 3061:20
**sloping** [2] - 3061:17, 3061:22
**slow** [1] - 3030:25
**small** [6] - 2987:25, 2990:19, 3023:10, 3024:6, 3079:18
**smaller** [5] - 3036:15, 3076:2, 3077:25, 3078:12, 3081:12
**Snyder** [70] - 2983:5, 2984:20, 2984:23, 2985:5, 2985:9, 2985:23, 2988:13, 2989:19, 3021:23, 3024:9, 3024:21, 3029:20, 3033:19, 3036:25, 3046:7, 3046:13, 3047:18, 3048:4, 3049:18, 3049:21, 3051:16, 3051:24, 3052:9, 3052:16, 3055:13, 3056:5, 3056:14,

3058:4, 3059:8, 3059:21, 3060:1, 3060:9, 3060:10, 3062:17, 3067:14, 3067:23, 3067:24, 3070:8, 3072:15, 3072:18, 3074:14, 3074:25, 3076:9, 3076:10, 3078:11, 3079:21, 3080:21, 3081:6, 3081:13, 3082:6, 3082:12, 3082:16, 3083:8, 3083:23, 3084:17, 3086:5, 3086:10, 3086:11, 3088:20, 3090:1, 3090:10, 3092:1, 3094:24, 3095:12, 3095:21, 3097:7, 3098:3, 3098:10, 3107:9, 3107:15
**SNYDER** [1] - 2984:24
**Snyder's** [43] - 3038:23, 3039:3, 3039:4, 3039:15, 3039:17, 3042:3, 3043:12, 3047:6, 3047:9, 3047:12, 3047:14, 3048:16, 3048:20, 3049:16, 3054:6, 3055:12, 3056:2, 3059:16, 3060:17, 3060:20, 3061:2, 3067:17, 3070:20, 3072:4, 3073:3, 3073:6, 3073:20, 3076:15, 3082:1, 3090:4, 3091:13, 3091:16, 3092:23, 3094:19, 3096:13, 3100:4, 3100:6, 3102:2, 3104:23, 3105:24, 3106:2, 3107:3, 3108:11
**so-called** [2] - 2988:2, 3022:18
**social** [2] - 3062:21, 3063:22
**sold** [5] - 3056:7, 3057:14, 3057:15, 3057:19, 3057:20
**Solomon's** [1] - 3041:7
**someone** [2] - 3002:10, 3003:1
**sometimes** [2] - 3089:13, 3103:8

**somewhat** [4] - 2996:14, 3019:6, 3045:13, 3087:14
**somewhere** [3] - 3031:5, 3092:20, 3095:8
**sorry** [11] - 2998:21, 3007:22, 3030:8, 3033:22, 3039:19, 3055:23, 3074:18, 3083:4, 3092:5, 3095:21, 3098:17
**sort** [2] - 3013:13, 3069:5, 3074:7
**sounds** [1] - 3035:23
**source** [2] - 3031:11, 3050:1
**specialize** [2] - 2991:11, 2991:14
**specific** [4] - 3033:9, 3050:19, 3099:17, 3105:6
**spectrum** [3] - 2990:14, 3076:9, 3076:10
**speculate** [2] - 2997:15, 3003:12
**spelled** [1] - 2990:10
**spend** [5] - 2992:17, 3044:24, 3045:4, 3045:5, 3099:5
**spending** [3] - 3044:2, 3044:10, 3044:25
**split** [1] - 3091:2
**spread** [2] - 3087:22, 3087:25
**Square** [1] - 2982:4
**square** [1] - 3015:3
**SSA** [2] - 3100:14, 3101:10
**stability** [1] - 3051:6
**stable** [5] - 3050:3, 3050:7, 3050:17, 3051:10, 3051:13
**stacks** [1] - 3079:8
**stand** [1] - 2984:22
**standard** [3] - 3011:18, 3026:9, 3026:14
**standing** [1] - 3042:15
**Stars** [1] - 2981:23
**start** [9] - 3002:10, 3005:22, 3021:25, 3043:24, 3061:13, 3067:4, 3091:15, 3102:8
**started** [1] - 3005:25
**starting** [2] - 3007:3,

3065:5
**state** [2] - 2984:7, 3043:8
**statement** [2] - 3036:3, 3088:19
**STATES** [4] - 2981:1, 2981:3, 2981:12, 2981:17
**States** [13] - 2982:13, 2984:5, 2984:10, 2985:7, 3013:23, 3040:11, 3040:15, 3041:1, 3041:17, 3042:11, 3042:21, 3093:12, 3111:13
**statistic** [6] - 3044:5, 3051:16, 3051:21, 3051:23, 3053:7, 3056:21
**statistical** [1] - 3066:7
**statistically** [2] - 3066:8, 3066:9
**stay** [2] - 3064:4, 3078:22
**stays** [2] - 3070:1, 3089:19
**steal** [1] - 3068:7
**Stehlik's** [2] - 3041:5, 3041:6
**stenographic** [1] - 3111:5
**step** [3] - 3037:2, 3059:9, 3104:23
**STEPHEN** [1] - 2982:6
**Stephen** [1] - 2984:16
**stepping** [1] - 3106:5
**STERLING** [2] - 2982:7, 2982:9
**STEVENSON** [34] - 2981:15, 3042:20, 3042:24, 3043:4, 3043:17, 3043:21, 3043:23, 3048:18, 3048:19, 3050:22, 3051:4, 3053:10, 3055:10, 3058:17, 3062:12, 3066:1, 3067:12, 3074:22, 3078:2, 3078:9, 3079:5, 3079:7, 3081:11, 3085:7, 3085:14, 3094:18, 3098:2, 3102:1, 3104:5, 3106:16, 3106:24, 3109:10, 3109:13, 3109:24
**Stevenson** [2] -

3042:21, 3043:6
**stickers** [1] - 3041:20
**still** [9] - 3003:22, 3055:12, 3065:13, 3085:16, 3094:12, 3094:14, 3095:8, 3095:15, 3103:14
**stimulate** [1] - 3073:7
**stone** [1] - 3040:14
**strategically** [1] - 3099:16
**strategy** [1] - 3010:14
**Street** [2] - 2981:18, 2982:10
**strikes** [1] - 2987:15
**structure** [1] - 3002:22
**struggle** [1] - 3031:7
**struggling** [1] - 2985:13
**studies** [2] - 3065:9, 3090:6
**submitted** [2] - 3041:2, 3069:3
**substantial** [4] - 3071:11, 3105:8, 3105:9, 3106:14
**subtraction** [1] - 2988:8
**successful** [3] - 3047:1, 3069:19, 3082:3
**successfully** [1] - 3088:25
**sufficient** [1] - 3013:7
**suggesting** [1] - 3085:18
**sum** [4] - 2994:10, 3052:7, 3052:17, 3052:24
**summarize** [1] - 2993:22
**summarized** [1] - 3072:2
**summary** [6] - 3004:21, 3006:19, 3061:25, 3065:18, 3081:15, 3105:13
**summed** [1] - 3052:4
**sums** [3] - 3052:2, 3052:8, 3052:22
**supplemented** [1] - 2997:9
**supplier** [2] - 3099:19, 3099:20
**suppliers** [1] -

3099:17
**suppose** [1] - 3025:23
**supposed** [1] - 3096:9
**surplus** [1] - 3099:19
**surprised** [1] - 2998:19
**survey** [1] - 3073:10
**sustain** [1] - 3011:8
**sustained** [2] - 3083:3, 3083:6
**sustains** [1] - 3026:8
**switch** [1] - 3055:11, 3086:16
**sworn** [2] - 2984:22, 3042:16
**SWORN** [2] - 2984:24, 3042:17

## T

**tab** [2] - 2991:19, 2992:8
**table** [1] - 3084:8
**tabs** [2] - 2990:23, 3008:10
**tacit** [3] - 3010:20, 3010:23
**target** [4] - 3049:12, 3093:18, 3093:23, 3094:8
**targeted** [3] - 3046:9, 3049:10, 3049:12, 3087:21
**targets** [2] - 3025:8, 3029:5
**tech** [3] - 3017:2, 3019:12, 3024:12
**technical** [2] - 3091:14, 3098:10
**technique** [2] - 3062:18, 3062:19
**tend** [1] - 3044:19
**tenders** [4] - 2986:2, 3005:11, 3040:23, 3042:24
**tension** [2] - 3073:19, 3074:4
**terms** [10] - 2996:10, 2997:19, 3011:10, 3012:12, 3012:15, 3021:7, 3024:17, 3030:2, 3069:1
**test** [4] - 3030:10, 3049:1, 3049:3, 3063:2
**tested** [2] - 3060:11, 3061:17

**testified** [23] - 2992:4, 3004:18, 3024:10, 3025:7, 3030:9, 3036:6, 3044:17, 3046:7, 3055:13, 3055:15, 3059:21, 3062:17, 3072:16, 3072:18, 3073:3, 3074:25, 3076:11, 3080:21, 3082:6, 3083:8, 3084:17, 3093:12, 3098:20
**testify** [1] - 2999:3
**testifying** [2] - 3044:1, 3101:5
**testimony** [57] - 3000:6, 3000:20, 3000:25, 3001:3, 3002:12, 3003:2, 3007:24, 3014:17, 3016:5, 3017:14, 3025:5, 3029:21, 3034:19, 3036:25, 3041:1, 3041:4, 3041:5, 3041:6, 3041:7, 3041:8, 3041:9, 3041:10, 3041:11, 3041:12, 3043:12, 3043:15, 3045:7, 3045:12, 3045:13, 3045:15, 3045:21, 3046:12, 3047:6, 3048:20, 3051:16, 3055:17, 3055:19, 3067:14, 3070:13, 3072:10, 3073:6, 3078:10, 3078:16, 3082:8, 3082:10, 3086:5, 3086:9, 3090:1, 3090:5, 3092:23, 3093:10, 3094:19, 3094:23, 3098:4, 3100:6, 3101:19, 3110:3
**testing** [3] - 3061:12, 3061:14, 3062:23
**tests** [2] - 3061:3, 3066:7
**THE** [231] - 2981:1, 2981:3, 2981:11, 2981:15, 2981:20, 2982:2, 2982:6, 2983:4, 2984:1, 2984:4, 2984:11, 2984:15, 2984:18, 2984:25, 2985:25, 2986:7, 2986:10, 2986:13, 2988:3,

2988:5, 2988:11, 2988:14, 2988:24, 2988:25, 2989:4, 2989:15, 2989:19, 2989:21, 2990:3, 2990:4, 2995:5, 2995:10, 2995:13, 2995:17, 2995:19, 2995:21, 2996:24, 2997:1, 2997:13, 2997:15, 2997:17, 2997:19, 2998:2, 2998:23, 2999:4, 2999:6, 3002:8, 3002:10, 3002:20, 3002:25, 3003:5, 3003:6, 3003:9, 3003:10, 3003:11, 3003:21, 3003:23, 3004:6, 3004:8, 3004:10, 3004:11, 3004:13, 3004:15, 3005:9, 3005:12, 3010:9, 3010:10, 3019:5, 3019:11, 3019:19, 3019:21, 3020:9, 3020:12, 3020:15, 3020:18, 3020:23, 3021:2, 3021:4, 3021:6, 3021:14, 3021:17, 3021:20, 3027:3, 3027:9, 3027:11, 3029:7, 3029:11, 3029:14, 3029:16, 3029:18, 3036:1, 3036:4, 3036:6, 3036:21, 3036:24, 3037:1, 3037:2, 3037:7, 3037:12, 3037:15, 3037:18, 3037:24, 3038:5, 3038:11, 3038:16, 3038:19, 3038:24, 3039:8, 3039:25, 3040:1, 3040:3, 3040:9, 3040:12, 3040:18, 3040:21, 3041:22, 3042:4, 3042:9, 3042:15, 3042:18, 3042:19, 3042:23, 3043:2, 3043:19, 3050:24, 3051:1, 3052:15, 3052:16, 3052:23, 3052:24, 3053:9, 3054:21, 3055:1, 3055:9, 3058:1, 3058:5, 3058:7, 3058:9, 3058:12, 3058:15, 3058:16,

3135

3061:10, 3061:12, 3065:1, 3065:3, 3065:5, 3065:6, 3065:7, 3065:8, 3065:15, 3065:16, 3067:2, 3067:6, 3067:11, 3074:5, 3074:11, 3074:13, 3074:17, 3078:4, 3078:6, 3079:20, 3080:9, 3081:3, 3081:4, 3081:5, 3081:7, 3081:10, 3085:9, 3085:11, 3092:10, 3092:15, 3092:23, 3093:2, 3093:16, 3093:17, 3093:25, 3094:4, 3094:17, 3095:21, 3095:25, 3096:8, 3096:11, 3096:20, 3096:21, 3096:25, 3097:1, 3097:3, 3097:5, 3097:10, 3097:11, 3097:15, 3097:16, 3097:21, 3097:24, 3098:1, 3101:16, 3101:17, 3103:7, 3103:8, 3103:25, 3104:2, 3104:4, 3106:19, 3106:21, 3107:1, 3107:6, 3107:7, 3107:9, 3107:13, 3107:14, 3107:17, 3107:21, 3108:1, 3108:2, 3108:3, 3108:5, 3108:8, 3108:9, 3108:14, 3108:16, 3108:22, 3108:24, 3109:1, 3109:2, 3109:6, 3109:8, 3109:9, 3109:12, 3109:25, 3110:5, 3110:6

**themselves** [3] - 3017:10, 3021:13, 3081:3

**theoretical** [1] - 3069:23

**theoretically** [1] - 3092:24

**theories** [1] - 3035:9

**theory** [3] - 3023:19, 3086:6, 3087:3

**thereafter** [1] - 3059:13

**therefore** [1] - 3007:25

**Thereupon** [3] -

3037:10, 3042:13, 3110:7

**they've** [1] - 3003:1

**thinking** [5] - 3072:20, 3086:22, 3089:14, 3093:6, 3098:21

**thinks** [2] - 3096:9, 3100:3

**third** [6] - 3030:8, 3057:5, 3057:6, 3071:8, 3096:14, 3096:25

**thirds** [1] - 3027:14

**thoughts** [2] - 3080:9, 3101:6

**threat** [4] - 3070:6, 3073:2, 3088:14, 3089:7

**threats** [1] - 3086:15

**three** [16] - 2994:4, 2994:12, 2994:18, 3004:23, 3004:24, 3004:25, 3005:1, 3006:24, 3010:10, 3012:9, 3012:11, 3012:25, 3013:10, 3032:5, 3061:18, 3096:12

**three-year** [3] - 2994:18, 3004:24, 3004:25

**threshold** [2] - 3047:7, 3049:3

**thresholds** [1] - 3060:22

**tiny** [1] - 3064:4

**title** [6] - 2993:24, 3028:23, 3044:24, 3061:1, 3064:14, 3069:11

**title-level** [1] - 3028:23

**titled** [1] - 3027:22

**titles** [8] - 2997:5, 3031:7, 3031:9, 3032:15, 3044:6, 3044:11, 3044:15, 3077:15

**today** [4] - 3008:16, 3043:15, 3088:3, 3089:4

**together** [7] - 2994:2, 2999:23, 3014:7, 3016:9, 3017:15, 3052:17, 3065:12

**took** [7] - 3051:25, 3052:3, 3052:9, 3065:12, 3091:1,

3096:1, 3096:4

**tool** [1] - 3104:20

**top** [66] - 2991:24, 2995:1, 3001:21, 3016:10, 3016:16, 3017:16, 3017:19, 3029:2, 3033:15, 3033:16, 3044:3, 3044:6, 3044:10, 3044:12, 3044:14, 3044:18, 3044:24, 3045:1, 3045:3, 3045:19, 3045:22, 3046:2, 3046:8, 3046:16, 3047:5, 3047:16, 3047:20, 3047:21, 3047:25, 3048:9, 3049:25, 3058:22, 3059:2, 3060:4, 3060:7, 3062:8, 3062:11, 3062:15, 3063:7, 3063:11, 3063:14, 3064:22, 3064:24, 3065:19, 3065:24, 3066:6, 3066:13, 3066:15, 3068:7, 3074:9, 3075:1, 3075:15, 3075:18, 3076:20, 3077:11, 3077:16, 3077:23, 3078:15, 3079:4, 3083:9, 3088:24, 3098:20, 3100:13, 3104:13

**top-down** [1] - 3029:2

**topic** [2] - 3025:3, 3055:12

**total** [9] - 2994:22, 2995:14, 3009:10, 3054:7, 3056:3, 3071:11, 3081:1, 3083:19, 3084:9

**Total** [1] - 3032:9

**touch** [1] - 3057:8

**towards** [3] - 3072:2, 3077:7, 3106:14

**trade** [3] - 2991:18, 2992:12, 3044:6

**tranches** [1] - 3012:9

**transaction** [1] - 3065:10

**transcript** [3] - 3038:3, 3111:5, 3111:6

**TRANSCRIPT** [1] - 2981:11

**transcripts** [1] - 3041:16

**transferred** [1] - 3103:3

**transition** [1] - 3048:8

**treat** [1] - 3095:7

**treated** [7] - 3025:13, 3044:14, 3044:18, 3062:24, 3063:3, 3065:23, 3097:6

**treating** [3] - 3045:19, 3081:8, 3105:18

**treatment** [3] - 3063:20, 3092:8, 3092:9

**treats** [1] - 3028:22

**tremendous** [1] - 3100:25

**trend** [2] - 3012:1, 3061:13

**TRIAL** [1] - 2981:11

**trial** [5] - 3025:5, 3043:10, 3062:22, 3063:19, 3085:18

**trials** [1] - 3063:22

**tried** [1] - 3092:17

**Tronox** [1] - 3049:13

**trouble** [1] - 3078:23

**true** [6] - 3060:9, 3073:25, 3086:3, 3101:12, 3111:4, 3111:5

**truth** [1] - 3095:9

**truthful** [1] - 3073:16

**try** [6] - 2990:8, 3020:13, 3062:4, 3063:23, 3098:23, 3099:7

**trying** [11] - 2987:16, 2998:10, 3015:6, 3016:14, 3020:25, 3056:12, 3063:6, 3066:17, 3092:11, 3095:23, 3099:10

**turn** [2] - 2993:20, 3013:20

**turning** [1] - 3019:8

**two** [48] - 2985:17, 2986:8, 2987:19, 3004:24, 3006:5, 3019:15, 3019:20, 3022:21, 3022:24, 3027:14, 3039:12, 3041:10, 3044:13, 3047:25, 3048:2, 3048:6, 3048:12, 3049:23, 3052:17, 3053:22, 3053:23, 3054:16, 3054:24, 3056:22, 3062:5,

3062:6, 3063:17, 3069:24, 3071:21, 3071:24, 3072:6, 3073:18, 3074:9, 3080:9, 3083:5, 3086:3, 3086:18, 3087:2, 3087:4, 3088:14, 3088:22, 3088:24, 3090:19, 3091:2, 3095:9, 3098:19, 3101:6, 3102:19

**two-thirds** [1] - 3027:14

**type** [1] - 3024:17

**types** [1] - 3021:9

**typical** [1] - 3018:23

**typically** [1] - 3012:6

## U

**U.S** [6] - 3000:22, 3001:6, 3043:21, 3048:14, 3093:12

**unconcentrated** [2] - 3091:4, 3091:7

**under** [2] - 3038:10, 3038:15

**underlines** [1] - 3084:10

**underrepresented** [1] - 2996:18

**underrepresenting** [1] - 2998:18

**underrepresents** [1] - 2997:2

**understood** [2] - 3023:2, 3045:14

**unfair** [1] - 3101:13

**unilateral** [8] - 3054:3, 3054:10, 3057:16, 3086:4, 3087:13, 3087:20, 3104:18, 3106:9

**United** [12] - 2984:5, 2984:9, 2985:7, 3013:23, 3040:11, 3040:15, 3041:1, 3041:17, 3042:11, 3042:21, 3093:12, 3111:13

**united** [1] - 2982:13

**UNITED** [4] - 2981:1, 2981:3, 2981:12, 2981:17

**units** [2] - 3025:17, 3029:1

**Universities** [1] - 3081:18

**unknown** [1] - 3056:15
**unlawful** [1] - 3010:20
**unless** [3] - 3012:22, 3024:3, 3024:7
**unlikely** [1] - 3068:6
**unreliable** [3] - 3030:10, 3095:23, 3107:4
**unsurprisingly** [1] - 3028:24
**unsustainable** [1] - 3025:20
**up** [96] - 2986:25, 2987:10, 2987:13, 2987:17, 2988:5, 2989:14, 2989:16, 2989:23, 2989:25, 2995:16, 2996:20, 2998:8, 2998:19, 2998:24, 2999:15, 3001:19, 3002:8, 3002:14, 3003:4, 3005:6, 3006:25, 3007:8, 3007:10, 3007:16, 3008:2, 3008:4, 3008:5, 3009:11, 3009:16, 3010:5, 3013:1, 3013:11, 3015:20, 3018:5, 3018:10, 3019:12, 3021:8, 3022:1, 3022:7, 3025:23, 3026:25, 3029:2, 3040:22, 3043:10, 3048:13, 3051:18, 3051:22, 3052:4, 3052:7, 3052:8, 3052:10, 3052:11, 3052:19, 3052:20, 3052:22, 3052:24, 3053:2, 3053:5, 3054:7, 3054:9, 3054:16, 3054:22, 3055:2, 3055:3, 3055:5, 3055:14, 3056:5, 3056:7, 3056:8, 3056:16, 3057:6, 3061:11, 3064:18, 3064:25, 3065:21, 3067:4, 3069:9, 3073:10, 3079:9, 3086:7, 3088:10, 3090:23, 3096:17, 3099:18, 3102:9, 3102:12
**upbidding** [3] -

3000:15, 3000:23, 3001:7
**updates** [1] - 3040:16
**upstream** [2] - 3022:12, 3024:14
**upward** [1] - 3064:5
**upwards** [1] - 3048:1
**useful** [7] - 3053:23, 3053:24, 3053:25, 3054:16, 3054:24, 3056:23
**uses** [1] - 3084:15
**utility** [1] - 3099:18

## V

**Valley** [2] - 3017:6, 3017:8
**valuable** [1] - 3070:9
**valuation** [2] - 3073:4, 3099:24
**value** [23] - 3013:2, 3013:11, 3013:12, 3033:2, 3057:21, 3057:23, 3064:15, 3064:17, 3070:15, 3071:15, 3071:16, 3072:8, 3072:13, 3098:5, 3098:7, 3098:23, 3098:24, 3099:10, 3101:21, 3101:24, 3108:20, 3108:22
**values** [2] - 3050:14, 3077:21
**variable** [13] - 3091:21, 3091:22, 3092:3, 3092:13, 3092:14, 3092:18, 3093:4, 3093:5, 3093:13, 3094:8, 3094:13, 3095:10, 3097:6
**variety** [1] - 3101:4
**various** [3] - 2999:12, 3000:23, 3003:6
**version** [1] - 3038:9
**versions** [1] - 3106:7
**versus** [8] - 2984:6, 3013:23, 3019:16, 3030:13, 3031:7, 3044:11, 3091:22, 3098:15
**vertical** [3] - 3061:1, 3064:13, 3064:21
**via** [1] - 3041:2
**ViacomCBS** [1] -

2984:16
**VIACOMMCBS** [1] - 2982:7
**video** [1] - 3041:2
**view** [9] - 3000:21, 3001:14, 3046:8, 3053:18, 3067:22, 3076:18, 3080:4, 3088:23, 3095:11
**vis-à-vis** [1] - 3070:6
**VOELZ** [7] - 2981:22, 3038:18, 3038:20, 3039:2, 3039:9, 3039:12, 3042:1
**Voelz** [2] - 3037:19, 3038:17
**vs** [1] - 2981:5
**vulnerable** [1] - 3022:12

## W

**Wagner** [1] - 3091:9
**wait** [7] - 2988:25, 2995:7, 3002:8, 3018:8, 3101:16, 3103:17, 3107:5
**waiting** [2] - 3098:18, 3107:16
**walking** [1] - 3099:8
**wants** [7] - 2989:18, 3007:5, 3018:19, 3026:10, 3026:14, 3035:6, 3035:8
**warehousing** [2] - 3027:21, 3028:3
**Washington** [5] - 2981:6, 2981:19, 2982:10, 2982:15, 3111:14
**waterfall** [2] - 2985:19, 2986:5
**ways** [2] - 3048:12, 3068:9
**weakens** [1] - 3011:9
**week** [11] - 3043:12, 3044:1, 3044:17, 3045:23, 3046:7, 3046:18, 3068:13, 3074:25, 3083:23, 3098:12, 3098:14
**weight** [3] - 3051:9, 3051:14, 3066:11
**welcome** [1] - 2984:21
**well-informed** [2] - 3087:22, 3087:25
**well-known** [1] - 3034:12

**whereas** [1] - 3058:13
**whole** [2] - 3007:1, 3070:15
**widely** [1] - 3104:20
**Williamson** [1] - 3028:25
**willing** [2] - 3025:18, 3033:3
**win** [9] - 2989:22, 2995:25, 2999:2, 3033:20, 3052:21, 3054:1, 3064:8, 3075:17, 3075:23
**winner** [10] - 2995:15, 3051:18, 3052:10, 3054:22, 3055:14, 3056:4, 3070:24, 3071:25, 3086:7, 3088:9
**winners** [1] - 3079:22
**winning** [6] - 3033:25, 3034:4, 3035:4, 3075:1, 3075:13, 3076:5
**wins** [9] - 2996:19, 2997:25, 2999:1, 3054:4, 3054:11, 3054:15, 3056:24, 3057:2, 3057:6
**wise** [1] - 2987:17
**wish** [1] - 3092:16
**withdraw** [2] - 2989:10, 3036:2
**witness** [11] - 2986:2, 2989:8, 2992:2, 3005:11, 3010:7, 3021:15, 3037:3, 3042:12, 3042:13, 3042:25, 3106:25
**WITNESS** [75] - 2984:24, 2988:24, 2989:21, 2990:4, 2995:13, 2995:19, 2997:1, 2997:15, 2997:19, 3002:20, 3003:5, 3003:9, 3003:11, 3003:23, 3004:8, 3004:11, 3005:12, 3010:10, 3019:11, 3019:21, 3020:12, 3020:18, 3021:2, 3021:6, 3027:11, 3029:11, 3029:16, 3036:6, 3037:1, 3042:17, 3042:19, 3052:16, 3052:24, 3055:1,

3058:5, 3058:9, 3058:15, 3061:12, 3065:3, 3065:6, 3065:8, 3065:16, 3067:6, 3074:11, 3074:17, 3080:9, 3081:4, 3081:7, 3092:15, 3093:2, 3093:17, 3094:4, 3095:25, 3096:11, 3096:21, 3097:1, 3097:5, 3097:11, 3097:16, 3097:24, 3101:17, 3103:8, 3104:2, 3107:6, 3107:9, 3107:14, 3107:21, 3108:2, 3108:5, 3108:9, 3108:16, 3108:24, 3109:2, 3109:8, 3110:5
**WITNESSES** [1] - 2983:4
**witnesses** [2] - 3045:8, 3078:11
**won** [12] - 2987:1, 2987:2, 2987:8, 2987:18, 2987:19, 2996:11, 2997:12, 2998:6, 3076:17, 3077:3, 3077:4, 3077:15
**words** [4] - 2994:21, 2997:17, 3009:18, 3010:21
**work-around** [4] - 3073:7, 3073:18, 3073:20, 3074:14
**world** [9] - 3012:2, 3016:25, 3018:6, 3035:15, 3035:16, 3035:17, 3036:13, 3036:14
**worry** [1] - 3074:2
**worrying** [1] - 3093:8
**worth** [1] - 3087:12
**worthwhile** [1] - 3094:14
**wrote** [1] - 3014:5

## Y

**Year** [1] - 3060:25
**year** [17] - 2990:18, 2991:18, 2992:12, 2994:8, 2994:16, 2994:18, 3004:24, 3004:25, 3005:22, 3030:19, 3030:20, 3032:6, 3032:15,

3032:18, 3050:19,
3065:10, 3065:13

**year's** [1] - 2994:7

**year-specific** [1] -
3050:19

**yearly** [2] - 2994:5,
2994:11

**Years** [1] - 2994:1

**years** [12] - 2994:3,
2994:12, 3009:10,
3010:5, 3032:6,
3032:10, 3050:19,
3060:25, 3062:5,
3062:6, 3064:13,
3082:7

**yellow** [2] - 3071:1,
3079:2

**yesterday** [15] -
2985:10, 2988:10,
2989:16, 2990:3,
2992:23, 2993:2,
2995:13, 2995:20,
3000:4, 3024:24,
3029:21, 3039:13,
3039:17, 3088:20,
3102:5

**York** [5] - 2982:5,
2982:8, 3014:14

## Z

**Zacharius's** [2] -
3041:3, 3041:4

**zero** [15] - 3006:13,
3006:14, 3007:7,
3007:8, 3007:16,
3007:17, 3007:19,
3008:1, 3047:15,
3047:18, 3048:3,
3048:9, 3052:1,
3094:8, 3102:13

**zero-to-250** [1] -
3007:20