1       UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF COLUMBIA

2

3  THE UNITED STATES OF AMERICA,    Civil Action
                 No. 21-02886
4       Plaintiff(s),

5     vs.

6  BERTELSMANN SE & CO. KGAA,    Washington, D.C.
  et al.,            August 19, 2022
7               9:30 a.m.
       Defendant(s).    **MORNING SESSION**
8  ------------------------------------------------------------

9

10        TRANSCRIPT OF BENCH TRIAL
      BEFORE THE HONORABLE FLORENCE Y. PAN
11       UNITED STATES DISTRICT JUDGE

  APPEARANCES:
12

13  FOR THE PLAINTIFF:   John R. Read, Esquire
           Ihan Kim, Esquire
14         Melvin A. Schwarz, Esquire
           Ethan Stevenson, Esquire
15          United States Department of Justice
           Antitrust Division
16          450 Fifth Street, Northwest
           Washington, D.C. 20530
17

18  FOR THE DEFENDANTS  Daniel M. Petrocelli, Esquire
  BERTELSMANN and   M. Randall Oppenheimer, Esquire
19  PENGUIN RANDOM HOUSE: Megan Smith, Esquire
           O'Melveny & Myers, LLP
20          1999 Avenue of the Stars
           Eighth Floor
21          Los Angeles, California 90067

22  FOR THE DEFENDANTS  Andrew Frackman, Esquire
  BERTELSMANN and   Abby Rudzin, Esquire
23  PENGUIN RANDOM HOUSE: Daniel L. Cantor, Esquire
           O'Melveny & Myers, LLP
24          7 Times Square
           New York, New York 10036
25

```
 1    APPEARANCES (Cont.)

 2    FOR THE DEFENDANTS          Stephen Fishbein, Esquire
      VIACOMCBS and                  Shearman & Sterling, LLP
 3    SIMON & SCHUSTER:             599 Lexington Avenue
                                    New York, New York 10022
 4

 5                                Ryan A. Shores, Esquire
                                    Shearman & Sterling, LLP
 6                                  401 Ninth Street, Northwest
                                    Washington, D.C. 20004
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
      REPORTED BY:               Jeff Hook, Official Court Reporter
24                                 U.S. District & Bankruptcy Courts
                                   333 Constitution Avenue NW
25                                 Washington, D.C. 20001
```

1                            **I N D E X**

2                                                              **PAGE**

3      CLOSING ARGUMENT

4        By Mr. Read for the United States              3230/3320

5        By Mr. Petrocelli for Bertelsmann and PRH           3260

6        By Mr. Fishbein for ViacomCBS and Simon & Schuster  3289

7

8

9                          **E X H I B I T S**

10

11             - No exhibits admitted during this session -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3229

1          **P R O C E E D I N G S**

2                  **DEPUTY CLERK:**  This is civil case 21-2886, United

3      States of America v. Bertelsmann SE & Co., et al.  Will counsel

4      please approach the podium to state their appearances for the

5      record.

6                  **MR. READ:**  Your Honor, John Read for the United

7      States.  With me at counsel table is Ben Matelson, Mel Schwarz

8      and Ethan Stevenson, and supportive colleagues in the back.

9                  **THE COURT:**  Good morning.

10                 **MR. PETROCELLI:**  Good morning, Your Honor.  Daniel

11     Petrocelli for Bertelsmann and Penguin Random House, together

12     with my colleagues at O'Melveny & Myers.

13                 **THE COURT:**  Good morning, Mr. Petrocelli.

14                 **MR. FISHBEIN:**  Good morning, Your Honor.  Steven

15     Fishbein for ViacomCBS and Simon & Schuster, and with me is

16     Ryan Shores.

17                 **THE COURT:**  Good morning.  So we are ready to hear

18     closing arguments at this time.  I just wanted to check in with

19     the parties about breaks, because we're going to have to give

20     the court reporter at least one break this morning, but I don't

21     want to interrupt anybody's closing argument.

22                 So should we have the Government go, and then take a

23     short break and then start with the defendants?  Okay, that's

24     fine then.

25                 Mr. Read.

1          **MR. READ:**  Yes, that works, Your Honor.  Your Honor, I

2     have a notebook for the closing argument, if I can hand it up?

3          **THE COURT:**  Yes, please.  Thank you.

4          **MR. READ:**  I will note, Your Honor, for slide 17,

5     you'll only see that in your notebook, it won't be on the

6     screen because it's confidential.  And slide 29 will have the

7     heading redacted for the public version.

8          **THE COURT:**  Okay.

9          **MR. READ:**  I would like to reserve a little time for

10    rebuttal, as I mentioned yesterday.

11         **THE COURT:**  Of course.

12              **CLOSING ARGUMENT OF THE UNITED STATES**

13         **MR. READ:**  May it please the Court.  As I begin, I'm

14    sure defendants will join me in thanking Your Honor for taking

15    the time to hold this hearing in August during vacation.  I

16    don't think it's lost on any of us that you had the opportunity

17    to -- with the nomination, to find someone else to do this

18    trial who may not have had time.  And I think both sides are

19    grateful that you made the time for this, even though it

20    requires writing a fast opinion, so that both sides could have

21    their day in court.  I think we're all grateful for that.

22              As I begin, I want to state how, on one level,

23    straight forward and simple this case is.  Simon & Schuster

24    compete today to acquire rights from authors.  That merger will

25    end that competition which benefits the authors.  And authors

1    will earn less money for what they write, whether the great

2    American novel or a nonfiction that inspires.  Contrary to what

3    you heard during trial, this case is not about the publishers'

4    love of books and authors.  It's not about small authors

5    winning a few books here and there.  It's not about a surprise

6    breakout star or a small advance on their first novel.  None of

7    that is surprising, but those outliers don't make a trend.

8    This merger is about the largest publisher, Penguin Random

9    House, cementing its dominant position, eliminating a major

10    competitor in a highly concentrated market, giving it

11    50 percent market share, which is all presumptively illegal.

12    And the defendants will have failed to rebut that presumption.

13        Your Honor, I'm going to organize my remarks around

14    the Baker Hughes case and how it outlines burdens.  So I will

15    start with market definition and market shares, and talk about

16    the merger being presumptively illegal.  And then I'll talk

17    about the defenses the defendants have raised to try and rebut

18    that presumption.  And I'll close with the anticompetitive

19    effects in case Your Honor believes they have rebutted the

20    presumption.

21        Before doing all that, I just want to talk about this

22    industry and the seeming argument that normal rules of

23    economics and antitrust don't apply.  We've heard statements

24    that editors and authors have a passion for books, and they do.

25    It's almost like they're claiming that the value of books is

1    not determined by expected sales or competition from other

2    publishers, but by alchemy I think was one of the words.  One

3    defense witness said publishing business is an oxymoron.  The

4    suggestion that normal laws of economics and competition don't

5    apply just isn't right.  And taken to its extreme, could lead

6    to an industry that devolves to two firms, a duopoly with lots

7    of imprints and a great loss of competition.  Put differently,

8    the good intentions of defendants don't save this merger or

9    don't save the industry from a duopoly or a monopoly.

10         Competition matters, and book publishing is a

11    business.  Penguin Random House and Simon & Schuster are very

12    successful, very profitable at acquiring books and authors --

13    books from authors and selling them.  We brought this case, the

14    United States did, because the best protection for authors is

15    robust competition, independent firms vying for the right to

16    publish the best works that the authors put their hearts and

17    souls into creating, and being rewarded for that effort for

18    acquiring the right books.  The love of books is not on trial

19    nor the passion of the authors.  In fact, Your Honor, antitrust

20    is full of examples of nonprofits and other entities where

21    social welfare aims and the nonprofit didn't excuse the

22    anticompetitive loss from applying.

23         I thought we would start with a slide after this one

24    to remind you of the head-to-head competition.  I thought about

25    going through some stories of that, but I think Your Honor's

1      heard plenty.  But I think there's value in seeing -- this is

2      from Anna Porro's summaries where she went through and found 25

3      head-to-head stories.  I wanted you to see what's at stake for

4      these authors, and the amounts of money to each individual that

5      matters if head-to-head competition is decreased.

6           Let's turn now to the Baker Hughes criteria, and the

7      order in which they set out the burdens.  So that begins with

8      product market.  There's been hours of testimony on product

9      market, and it's actually kind of a straight forward

10     proposition.  Let me illuminate how we consider pre-complaint

11     the evidence and decide to describe the authors who would see

12     less of competition.  It became clear that in this world, those

13     authors at the very high end have different needs and have

14     different competitive opportunities than those at the very low

15     end.  And I think there's little debate about that.  I think

16     Dr. Snyder essentially conceded that.

17          You've heard words to describe the high end.  I think

18     sometimes they're called franchise authors, key authors, giant

19     celebrities.  The works they do are sometimes called lead

20     titles.  At the other end -- maybe not at the low end, but you

21     hear midlist authors and midlist titles.  And given that they

22     have differences at both ends, the question was how you analyze

23     that, how you look at that, and how you describe those at the

24     high end that have a different set of competitive conditions.

25          When we looked in the data -- and Your Honor saw this

1    with PX-963, the next slide, we saw just a difference in how

2    the firms competed.  And that left us with the question of how

3    we distinguish and how do we draw the line between those two.

4    We drew guidance, as Your Honor knows, from precedent.  We

5    located a case in a creative industry like this one where

6    courts focused on the most valuable works created in that

7    industry, and that's Syufy, which Your Honor knows about and

8    has probably read.  It's not a merger case, but the Court

9    needed to find a relevant market.  It found that industry

10   anticipated top grossing films met that definition.

11         There, the Court was worried about 30 movies a year

12   that had particularly strong demand, and how to differentiate

13   those from the movies that have little demand.  The defendants

14   there argued, like plaintiffs do here, that the definition

15   there was ad hoc.  The Syufy defendants said the top grossing

16   films were, quote, "Simply those films that proved to be highly

17   successful in the marketplace, but they possessed no special

18   characteristics that differentiate them from less successful

19   films, from an ex-ante perspective."  The Ninth Circuit ended

20   up disagreeing.  Anticipated top grossing films were distinct,

21   just like anticipated top selling books are distinct from those

22   at the time the rights are acquired.

23         So let's look at some of the criteria Syufy used for

24   anticipated top grossing films, and how they map to the

25   anticipated top selling books.  You can see the size of the

1    investment initially in production budget or in advance maps;

2    the frequency of big name stars or well-known authors; large

3    marketing budgets; longer playtimes or print runs; and improved

4    contract terms.

5         With the Syufy criteria in mind, I thought I would

6    spend some time with Your Honor on the elicited testimony about

7    the distinctions between anticipated top selling books and

8    others.  We note that higher advance books are correlated with

9    higher expected sales.  There was ample testimony from industry

10   participants, including CEOs.  We cite John Karp here who

11   testified that the sales are the main factor on which advances

12   are based.

13        Next, even though defendants tried to walk away from

14   this, there's a correlation between high advances and higher

15   marketing support.  Author Andrew Solomon testified to that.

16   He said that publishers devote more publicity and marketing

17   resources to books that they expect to sell well.  Third,

18   there's a correlation between books expected to sell well and

19   the initial print run.  The CEO of HarperCollins testified to

20   that.  And fourth, there's a correlation between advance levels

21   and the publisher's willingness to negotiate with the author

22   over customized contract terms.  Ms. Walsh testified to that.

23   She talked about terms like GLAM, airfare, contributions to

24   charitable organizations that are generally correlated with

25   advance levels.

1    Beyond looking at the criteria set out in Syufy, I

2    wanted to note for Your Honor what's not in the Ninth Circuit

3    opinion.  There's no discussion there of whether industry

4    anticipated top grossing films was a phrase articulated by

5    Hollywood executives in exactly those terms.  That appears to

6    have been irrelevant to the real question the Court was facing

7    of whether those 30 popular films each year would be an

8    antitrust problem.  In this case, the real question is whether

9    authors at that high end of anticipated top selling books will

10    be harmed.

11    The other concept not in the Syufy opinion, but on

12    which we have spent a lot of time at trial, is any lingering

13    discussion of whether the product market fails because there's

14    some movies that were expected to do well but flopped, and some

15    movies that had surprising success, which happens in that

16    industry.  It would be unreasonable to expect that predictions

17    translate to reality a hundred percent of the time.  That's why

18    there's risk in this business.  The anticipation of success was

19    good enough for product market purposes for the Ninth Circuit,

20    and we believe should be here.

21    In this matter, while buying books has great risk, the

22    experience of the industry insiders and the P&Ls they create to

23    justify their purchases help them determine the monetary value

24    of the books, and whether they can expect commercial success of

25    the books they're trying to acquire.  From defendants' own

1    witnesses, Your Honor heard how the industry predicts the worth

2    of a book.  Ms. Madeline McIntosh, the CEO of Penguin Random

3    House U.S., agreed with Your Honor that the publishing industry

4    in general is, quote, "Very much driven by the expected sales

5    of books."  And agent Andrew Wylie, called by the defendants,

6    testified that he's been negotiating for, quote, "42 years, and

7    I can calculate with a high degree of accuracy the amount we

8    would be able to achieve through a multiple submission.  And if

9    we can achieve that through a single submission, then we do a

10   single submission."  Like the movies, we have a difference at

11   the high and low ends of the authors and their books, and it

12   turns on anticipated success.

13          Now let me discuss the harder issue:  How you turn

14   that idea of anticipated top selling books at the high end into

15   a concept which economists can bring data to and do their

16   analysis.  The Government's proposed relevant market in this

17   case is based on economic analysis confirming that the market

18   meets the hypothetical monopolist test, the Brown Shoe factors

19   and common-sense.  It's not arbitrary.  Dr. Hill determined

20   that using an advance level threshold of 250,000 would be a

21   reasonable demarcation.  We define the market around the

22   practical indicia relevant to those top selling authors.  We

23   use both the hypothetical monopolist test to establish a

24   market, and we look to Brown Shoe to solidify and help.  Either

25   on its own is legally sufficient, but we do both.

1          As Your Honor asked some questions about this, the

2    hypothetical monopolist test gets directly to the ultimate

3    question of whether there are substitutes sufficiently close to

4    the products that even a monopolist could not profitably worsen

5    price.  And the Brown Shoe factors are kind of qualitative

6    things that get to that same question of whether there's

7    reasonably interchangeable substitutes outside the market.

8          Let's talk about the hypothetical monopolist test a

9    little first.  This really isn't in dispute.  There are no

10   reasonably interchanged substitutes for authors of anticipated

11   top selling books.  Self-publishing was the only alternative

12   put forward in this case, and it's not reasonably

13   interchangeable for the vast majority of anticipated top

14   selling authors or, frankly, authors throughout most of the

15   spectrum.  Defendants' expert Dr. Snyder conceded that the

16   hypothetical monopolist test is satisfied at any threshold, so

17   I'm not going to dwell on that issue.  By establishing the

18   hypothetical monopolist test, we've defined a market, meaning

19   we've defined an area that merits further inquiry.

20         I'll now turn to the -- how this market satisfies the

21   Brown Shoe factors.  First, as we consider the Brown Shoe, the

22   case law is clear that market definition is supposed to be

23   pragmatic and factual, it's not supposed to be formal and

24   legalistic, and the markets are not to be measured by metes and

25   bounds.  So here's some of the factors in Brown Shoe.  The

1    first one is industry recognition.  There's evidence in the

2    industry that the industry uses 250,000 to draw lines for

3    various purposes.  So it's recognized in the industry.

4    Publishers Marketplace uses 250,000 to define significant

5    deals.  John Karp chose 250,000 as his level of approval.

6    Ms. McIntosh said that Penguin Random House Publishing Group

7    and Knopf DoubleDay require approvals at 250,000.  Ms. Kim --

8    and this is the slide that's confidential, gathered data in the

9    regular course of her work that broke out the performance of

10   Putnam's books by advance level.  I don't know if you have the

11   notebook there, but you'll see the chart.  This is, I think,

12   slide 17.

13           **THE COURT:**  Got it, thank you.

14           **MR. READ:**  This is a demonstrative that puts forward

15   the exhibit that was put in with her in which there was

16   questioning about -- we put that in not solely to show a

17   correlation between advances and marketing spend, but to also

18   show the buckets of advances that they looked at in their

19   ordinary course of documents.  As you see, 250,000 is a level.

20   And you also see that advances start to -- the slope starts to

21   change around 250,000.  So that seems to be an area where

22   there's some importance.

23           Finally, with regard to 250,000, Your Honor saw PX-87

24   where Mr. Dohle was questioned.  And he was trying to get

25   Ms. McIntosh to get involved in acquisitions at the $250,000

1    level and the $500,000 level.  The point there is he thought

2    advances at that level could materially grow Penguin Random

3    House's market share.  His thinking shows that the acquisition

4    of books at those levels is meaningful to Penguin Random House

5    and its business.

6          Agents and editors recognized anticipated top selling

7    books as well.  Andrew Wylie testified that publishing veterans

8    like him are able to determine in advance which books are

9    likely to be successful, because there are, quote,

10   "Recognizable qualities in books that people who have been in

11   this business for a long time would readily recognize."

12         The second indicia from the Brown Shoe Supreme Court

13   case is unique needs.  We see top selling authors requiring

14   stronger marketing and publicity to achieve the full potential

15   of their work.  Several witnesses, including John Karp,

16   testified that the Big 5 publishers have stronger publicity and

17   marketing capabilities, and that these stronger capabilities

18   provide a significant edge in turning books into best sellers.

19   Authors of anticipated top selling books also depend on the Big

20   5 publishers' larger sales force to maximize the sales of their

21   books.

22         The third indicia is distinct prices.  Under the

23   Government's market definition that the advance is higher for

24   anticipated top selling books than for other books, and some

25   authors seek and obtain special terms such as guaranteed

1    marketing and GLAM budget.

2            The fourth criteria is price sensitivity.  This is

3    similar to the hypothetical monopolist test.  Anticipated top

4    selling authors can be targeted because they're not as

5    sensitive to price.  They don't have alternatives that they can

6    switch to if they suffer an adverse price change.  As

7    discussed -- well, as I've chose to just glide over,

8    self-publishing is a weak substitute.

9            Finally, the fifth -- one of the fifth indicia here of

10   Brown Shoe is special characteristics.  Anticipated top selling

11   authors are often authors of successful books in the past.

12   They've appeared on best seller lists often.  They have a

13   successful track record.  They may be recognized with past

14   awards or have notoriety from their social media endeavors.

15   And as we discussed earlier, agents and editors can identify

16   those authors based on the literary quality in their

17   submissions.  So they are identified by special

18   characteristics.  The bottom line, Your Honor, is that

19   anticipated top sellers is a market under either the

20   hypothetical monopsonist test or the Brown Shoe indicia.

21           Now, Dr. Snyder criticizes Dr. Hill and us for using a

22   price number to define the product market -- or a number.

23   Turning to the next slide, courts have consistently used

24   numerical thresholds to define markets.  The first three I

25   discussed in the opening:  Wilhelmsen that focused on 10

1    fleets; Anthem which focused on 5,000 employees; and Staples,

2    on customers with 500,000 annual spend in office supplies.

3            Brown Shoe, which we just talked about, identified

4    distinct prices as an indicia.  So we look at Whole Foods where

5    the market consisted of core customers who paid distinct prices

6    at premium supermarkets.  We listed here as well -- because

7    there are markets that are harder to find with numbers, but get

8    at the same thing, is international boxing where the Supreme

9    Court held that boxing championships -- the championship could

10   be separated from other boxing matches, because it had higher

11   revenues and rights fees and greater popularity among viewers.

12   And finally in the world of amateur athletics, in the recent

13   O'Bannon case, they focused on elite athletes, which at some

14   level is hard to define, but you know when you see it -- at

15   least the people in the industry do.  Similar to these cases

16   and the numerical information in them, we used advances to

17   identify particularly valuable creative works at issue.

18           If I could, I'd like to turn to the argument about the

19   2 percent issue and the volume of commerce.  Even with this

20   argument that we only cover 2 percent of the titles, we're

21   talking about a large and meaningful market.  First of all,

22   with regard to the other 98 percent, Dr. Snyder admitted it

23   wouldn't surprise him that those 56,000 titles have sold fewer

24   than 12 copies, and 90 percent sold less than 2,000 copies.

25   The existence of so many books with negligible sales doesn't

1    hide the harm to the authors we've been focused on.  The

2    market, we alleged, is where the money is.  Advances contracted

3    to be paid to the authors are a billion dollars, and it's

4    70 percent of the advances at stake, as has been talked about.

5    This is an industry, probably like movies, where a small

6    fraction of the books drive profitability.

7         I'd like to talk about one case.  The claim the

8    Government cannot prevail because it's only talking about

9    2 percent of the titles is a losing argument.  It lost in

10   Staples.  There, Judge Sullivan had a market that was national

11   business-to-business customers, and those customers only

12   accounted for 1 percent of the sales -- of the business

13   customers of Staples.  The customers at issue were 1 percent.

14   They accounted for a large volume of commerce, 35 percent.  The

15   Court ended up enjoining the merger, because the harmed

16   1 percent of customers accounted for a disproportionate number

17   of sales because it was material.  And that argument of

18   immateriality should fail here.

19        If we could move to shares, Your Honor.  There's no

20   dispute that after this merger, Penguin Random House will be

21   more dominant than it already is -- borrowing from Mr. Dohle's

22   words, cementing its number one position in the market.

23   Dr. Hill testified Penguin Random House and Simon & Schuster

24   will have a 49 percent share of our market, the Big 5 will

25   combine for 90 percent.  None of the non-Big five will have

1    more than 1 percent.  And cumulatively, all those small

2    publishers are 10 or 9 percent.  There's no material variation

3    to these market shares if we choose different advance

4    thresholds, whether it's 150, 350, 500 or a million.

5        Defendants have presented through the three weeks of

6    trial no evidence that any purchasers of anticipated top

7    sellers were omitted from the dataset, nor have defendants

8    shown that these market shares changed substantially over time

9    other than through the march of acquisitions of smaller

10    publishers by the Big 5 over the past decade.  To the contrary,

11    as Dr. Hill explained yesterday, the combined share has

12    increased -- of the merging parties has increased in recent

13    years, while the other Big 5 have slightly lost share, and the

14    non-Big 5, all those small publishers, has been flat.  The

15    evidence has shown that the shares reflective here -- reflected

16    here are reflective of current competitiveness and the

17    likelihood of success of these companies.  As the Bertelsmann

18    board recognized in 2019, the U.S. publishing market is an

19    oligopoly.  There will be five -- there are currently five

20    firms controlling 90 percent of this market, and the merger

21    would take it down to four.

22        So the next issue is, is the merger presumptively

23    illegal.  Under Baker Hughes and its burden shifting framework,

24    if a transaction results in a high concentration and

25    significant increase, there's a presumption that it will

1    substantially lessen competition.  There's no dispute by

2    Dr. Snyder that if anticipated top sellers is a market, the

3    HHIs are sufficient under the guidelines for a presumption of

4    illegality.  To reiterate Dr. Hill's testimony, regardless of

5    the specific advance used or the year used, the mergers above

6    the guidelines level of market concentration require to

7    establish a presumption.  And under Baker Hughes, once the

8    Government establishes that presumption, the burden, quote,

9    "Then shifts to the defendants to rebut the presumption by

10   offering proof that the market share statistics give an

11   inaccurate account of the merger's probable effect on

12   competition in the relevant market."

13        Before I go further and cover the defenses to see if

14   they've done that, I'd like to spend a few moments regarding

15   the defendants' characteristic that the presumption is weak.

16   In fact, it's usually outcome determinative.  The following

17   cases from this circuit are all cases where, even after the

18   Court took evidence of efficiencies and entry and testimony

19   about unique features of the market, the Court held defendants

20   had not properly rebutted the presumption.

21        So let's turn to the defenses and see if defendants

22   have properly rebutted.  There's four principal defenses that

23   we've gleaned from this case.  Your Honor has already ruled on

24   efficiencies, so I won't discuss that, and will discuss the

25   other four.  They are entry, promise and buyer power, and then

1    the 2013 merger seems to be a defense, too.  Let's start with

2    entry.  The question this defense poses is whether suddenly new

3    publishers would enter or existing publishers would expand to

4    replace the competitive significance of Simon & Schuster.  The

5    legal test is whether the entry or expansion would be timely,

6    likely and sufficient in magnitude, character and scope to

7    replace the lost competition.  The evidence will show that the

8    entry of new firms and expansion won't satisfy that test.

9    There are high barriers to achieving scale in this industry and

10   acquiring the rights of anticipated top sellers.  Among those

11   are reputation, as you see, funding for the book, hiring

12   skilled professionals and publicity and marketing

13   professionals.  And in the supply chain, especially printing.

14          There's no dispute that in the past 30 years, no

15   publisher has entered the market and become as strong as the

16   Big 5.  For good reason:  The competitive advantages of the Big

17   5 are difficult to duplicate.  Building a large backlist takes

18   a long time, because only a small number of titles each year

19   turn into that reliable backlist titles.  New entrants seeking

20   to compete against the Big 5 have a variety of other

21   disadvantages.  Particularly, they have to solve the reputation

22   of having a long track of success.  Defendants' own documents

23   recognize this.  Mr. Dohle was -- to a famous public figure,

24   him and his team were teaching them about getting into the

25   publishing business and providing background instruction in

 1  this document.  And they told this public figure no history of

 2  company starting from scratch have achieved profitability in

 3  the three- to five-year time period.  And he also told them

 4  that the idea of creating a separate publishing company, even

 5  with Penguin Random House's help, was not a viable option.  The

 6  better option would be an imprint within Penguin Random House.

 7       Bertelsmann board documents later recognized that

 8  reputation creates a high entry barrier for a publishing

 9  company.  And Ms. Kim confirmed that when she testified, quote,

10  "I think authors want to be published by publishers with good

11  reputations, good standing, you know, with booksellers and

12  media.  They want to be part of a list that they can be proud

13  of -- that they can be proud to say they're a part of."

14       Looking at recent history on entry is informative.

15  It's shown that new publishers struggle to gain scale.  It's

16  difficult to become profitable and routinely produce best

17  sellers.  The parties stretched to find some brand new entry

18  that they could claim change everything, and is timely and

19  sufficient.  And one of the companies they focused on was

20  Spiegel & Grau, a publisher that re-founded itself a couple of

21  years ago and has published a handful of books.

22       It's informative that in its original incarnation,

23  Spiegel & Grau published important books at Penguin Random

24  House.  But when it closed their imprint and retained their

25  backlist, they had to go and start a new company.  It's

1    improbable that fine publishers who they didn't think they did

2    not want to keep are now a great competitive threat to them.

3    The expansion of small publishers by a handful of titles each

4    year won't solve the competitive problems.  We have -- there's

5    example after example of how small publishers don't have the

6    resources or the inclination to expand.  Most of that was in

7    closed testimony, so I'll refer you to the testimony of some of

8    the small publishers and their statements about their

9    willingness to expand and the challenges they face.

10            Even Amazon has not succeeded.  Here's one of the

11   largest corporations on earth.  It tried to expand its presence

12   in publishing a decade ago in the type of books at issue here,

13   and did not succeed.  They have reduced their title count in

14   recent years and are not considered a threat.  Consequently,

15   while some publishers may have grown, others have shrunk.  And

16   the data show that the non-Big 5 publishers as a group have

17   been flat over the last three years.

18            One last point on entry before I move on, and that's

19   printing.  Printing capacity is an issue for everyone, even

20   Penguin Random House, and makes it hard to expand, especially

21   if you're going to be beholden to Penguin Random House.  In

22   this exhibit, Ms. Reidy stated that Simon & Schuster did not

23   want to be 100 percent beholden to a competitor.  She was

24   concerned that Penguin Random House might deprioritize Simon &

25   Schuster's book.  When Mr. Eulau testified, he said, quote, "If

1    authors hear that you can't print books, they wouldn't want to

2    be published by you."  These sentiments of a defendant are not

3    unique.  You've heard and seen those concerns in closed

4    sessions by a number of publishers who have genuine concerns

5    about getting the printing they need to compete.

6          Let me turn to the second defense to try and rebut the

7    presumption that defendants make.  It's the promise of

8    Mr. Dohle and the existence of lots of imprints.  First, you

9    heard the testimony of the CEO of Kensington that the promise

10   makes no economic sense for a businessman.  And there are

11   reasons it shouldn't be trusted here.  The promise is

12   unenforceable, it's revocable.  Yet, even if Penguin Random

13   House were to adhere to the letter of the promise, it wouldn't

14   stop Penguin Random House and Simon & Schuster from being able

15   to lower advances or sidestep it.  For example, they can close

16   imprints; they can merge imprints; they can refocus imprints so

17   they're less likely to compete directly with sister imprints

18   for the same authors.  Penguin Random House can reduce title

19   counts, fire editors, control imprint budgets.  It can admonish

20   editors to take less risk in acquiring books, and then refuse

21   to approve editor requests for large advances when it's in

22   competition with itself.  All these measures can be done

23   internally without violating the letter of the promise, or

24   Penguin Random House can quietly violate its promise without

25   detection.

1          The Court has heard evidence of how today, Penguin

2    Random House divisions sometimes coordinate their bid despite

3    Penguin Random House's policy not to.  Mr. Tart testified to an

4    example where the divisions coordinated, slowed their bidding,

5    despite there being an external bidder.  And Ms. McIntosh

6    presented to her board one of her plans to increase the

7    background coordination and auctions, to leverage internal

8    demand information better, and avoid internal up-bidding.

9    Even -- which is all legal, but just not consistent with the

10   promise.  Even if the merger were to proceed and the promise

11   held to, when Penguin Random House bids on books, it would do

12   so knowing that there's one less independent bidder out there

13   that could drive the price up.  And there's some economic

14   testimony that that will affect its offer.  This promise by

15   defendants is unlike any other commitment a court has accepted

16   as a defense to rebut a presumption of illegality and should

17   not be accepted here.

18          The third defense, the power of agents.  The Court has

19   heard a great deal of testimony about agents in this case.

20   Defendants would have this Court believe that sophisticated

21   agents hold all the power and the leverage in the relationship.

22   Your Honor should note that this defense was provided and

23   failed in Anthem in this circuit.  There, the national

24   corporations that needed -- companies that needed insurance for

25   their employees, they had access to skilled, sophisticated

1    brokers or consultants that would help them bid for -- get bids

2    for their insurance purposes or negotiate one-on-one with

3    insurance companies.

4         Judge Jackson found that those skilled agents, even

5    with alternative means of bidding or negotiating, could not

6    mitigate the harm from the loss of a major insurer.  She

7    wrote -- and affirmed by the circuit:  "As noted above, the

8    evidence also shows that loss of one competitor from the four

9    major carriers alters the RFP, the request for a proposal, the

10   bid, and negotiating dynamic.  Even with strong advocates on

11   the other side" -- which were the agents that they were talking

12   about, "this loss of leverage undermines the defense contention

13   that customers will be able to wield their seasoned human

14   resource managers and consultants to counteract the

15   anticompetitive effects of the merger."  Defendants want the

16   Court to assume that the literary agent has the power to

17   prevent harm, just like defendants claimed in Anthem.  But

18   after weeks at trial, we have evidence as to who holds the

19   power between the agents and Penguin Random House, and it's

20   Penguin Random House.

21        I refer you to the testimony of their witness,

22   Mr. Wylie.  He experienced Penguin Random House back when it

23   was smaller and only Random House in 2010.  He tried to

24   convince Penguin Random House that EBIT growth rate should be

25   above 25 percent.  He couldn't get them to do that, so he went

1    to Amazon with his Odyssey project to try and create some

2    pressure.  When Random House found out, they announced in the

3    New York Times that they would no longer do business with him

4    and his agency.  He pulled his books from Amazon, the Odyssey

5    project, and the digital rights then went to Random House.

6    Random House won and offers the digital royalty rate of 25

7    percent they wanted.  He testified that that rate is unfair,

8    but he doesn't have the power to change it with all his skill

9    and whatever leverage he has.  His agency needed to do business

10   with Penguin Random House or he would have risked losing

11   clients.

12          If agents had all the power, all the leverage over the

13   Big 5, as claimed by the defendants, then why have payout terms

14   shifted over time from halves to thirds to quarters, and now

15   with the core payment not happening until a year after the book

16   is published, final payment.  Over the years, authors have had

17   to wait longer and longer for their advance to be paid.  And

18   audio rights, why did they used to be negotiable, and now no

19   longer are for Penguin Random House and Simon & Schuster.  The

20   evidence is the power lies more with Penguin Random House and

21   Simon & Schuster than with agents.  And what leverage agents

22   have today will be reduced with one less independent bidder.

23          The final defense is the Penguin Random House merger.

24   Given this merger happened over a decade ago, and the industry

25   has become more concentrated, and the market has changed in

1    many ways, we would understand if Your Honor preferred not to

2    resolve the actual effects of that merger.  But we think

3    there's significant evidence contrary to what defendants say

4    that it harmed authors.  You heard testimony from Christie

5    Fletcher and Ayesha Pande.  Christie Fletcher testified the

6    Penguin Random House merger harmed authors because they stopped

7    bidding against each other.  Ayesha Pande talked about how the

8    Penguin Random House, and then the Crown Random House, mergers

9    made it more challenging, quote, "to sell her clients' books

10   because there was less choice."  And then on the screen is

11   Dr. Hill's regression which suggests that anticipated top

12   selling books suffered after the merger.  At a minimum, this

13   evidence creates a red flag that defendants' attempt to point

14   to the 2013 merger as pro-competitive and as rebutting the

15   presumption of illegality fails.

16        Your Honor, we turn to the next issue.  If, under

17   Baker Hughes, Your Honor thinks they have rebutted the

18   presumption, what evidence is there that there is harm, or at

19   least there is a reasonable probability of harm, the authors

20   may be harmed.  Let me talk first about some direct evidence

21   that the economists -- that don't require economics.  You heard

22   Mr. Dohle's testimony of how he currently encourages Penguin

23   Random House to be more aggressive.  He wants them to take more

24   risk in bidding, to pay larger advances.  And the reason is he

25   wants them to grow their share, which is terrific.  We want

1    Penguin Random House to try to grow its share and compete

2    harder in doing that that way.  He conceded, however, that once

3    the merger is consummated, Penguin Random House's incentives to

4    grow its share will lessen, implying that Penguin Random House

5    would no longer feel as great a need to take as much risk and

6    to bid quite as aggressively and to pay quite as much in

7    advances.  That change in incentives is evidence the merger may

8    lead to harm.  And you can couple that with one of the exhibits

9    from John Karp where he wrote that merging with a competitor

10   will arguably be bad, quote, "for the larger book publishing

11   ecosystem."

12        Now we can turn a little bit more to the -- well,

13   before we turn to the economic evidence, there is a common

14   economic logic that fewer bidders means lower advances.  You

15   heard testimony from that early on from Michael Pietsch, the

16   CEO of Hachette.  He testified that the number of bidders --

17   the larger it is, leads to, quote, "more upward pressure in

18   auctions in general.  The price paid at auction can increase

19   because of the number of participants," end quote.  And the

20   manner the book is acquired, whether through rounds auctions,

21   best bids, preempts or negotiations doesn't change that

22   fundamental logic.  You heard testimony that when a publisher

23   is acquiring a book, even through a negotiation, the publishers

24   know the agent has the ability to shop the book if they're not

25   happy with the offer.  And so you heard the testimony of Gail

1    Ross, one of defendants' agent witnesses, talk about BATNA, the

2    best available alternative, and how that's important to getting

3    a fair deal.  If, in negotiating with Simon & Schuster, Penguin

4    Random House is currently the best alternative for fair

5    financial terms today, common-sense says it won't be as much of

6    a threat or an option that the agent can use as effectively

7    after the merger.

8            Now to all the challenging economic modeling

9    testimony.  We'd remind the Court that none of it is required,

10   as the Government need only prove a reasonable probability of

11   harm.  And there's no need for precise economic modeling.  And

12   since Your Honor heard this testimony just yesterday, I'm going

13   to touch on it lightly -- unless Your Honor has questions.

14           **THE COURT:**  That's okay.

15           **MR. READ:**  Dr. Hill used a second-score auction model,

16   as you know, to simulate the effect of the merger.  He used

17   conservative inputs.  He found that PRH authors on average will

18   have their advances reduced by about 45,000 per book, and Simon

19   & Schuster authors on average, in the anticipated top selling

20   market, will have their advances reduced by about 105,000 per

21   book.  And you can see the statistics before you.  Dr. Snyder

22   criticized the fit of his second-score auction model in the

23   publishing industry, so Dr. Hill used a GUPPI model developed

24   by the merging parties' own economists that was modified for

25   this industry.  And those models predicted similar results.

1          Dr. Hill acknowledges that his model isn't a perfect

2     fit with all the way the books are sold, but it's a reasonable

3     choice given the data that's available to everybody.  As he

4     explained, the purpose of estimating harm is less about the

5     precision and more to see if there's something substantial.

6     And remember, he did not use those models that estimated and

7     present to Your Honor the highest harm.  He presented what he

8     had the most confidence in and thought were the best

9     predictors.

10          The second-score auction model he used is consistent

11     with the work of other economic experts relied on by courts in

12     this district.  Similar models, even if not exactly identical,

13     were used by government's economic experts in Anthem,

14     Wilhelmsen and Sysco.  And in Anthem, as the prior quote

15     showed, there was both bidding and negotiation going on in that

16     industry.  In both Anthem and Wilhelmsen, government economists

17     also used -- government experts used the GUPPI model, and they

18     were approved in those courts as well.  Though the defendants

19     have made arguments about the poor fit of the model, they

20     failed to provide the Court or prove with another model that

21     has a better fit anything materially different.  In fact, as

22     you heard from Dr. Snyder, he didn't even try to create a model

23     in this case, an alternative model.

24          The harm is substantial.  Defendants argue that the

25     measurable harm from these numbers is too small to enjoin the

1   merger.  That's wrong.  Let me first, before we get to this
2   slide, tell you about Stephen King -- or remind you about him.
3   He flew here voluntarily because he understood the impact on
4   younger up-and-coming authors, including his son.  He explained
5   that continued consolidation from the Big 5 to the Big 4 means
6   it, quote, "becomes tougher and tougher for writers to find
7   enough money to live on."  Dr. Hill's estimates were 4 percent
8   and 11 percent of harm, and that's in line with the estimates
9   you see before you from other cases in this circuit -- in this
10  district, and from the Hackensack case in the Third Circuit.
11  They all have roughly similar harm estimates, and all those
12  mergers were enjoined.

13          In addition to the quantifiable harm, there's harm
14  that's harder to measure.  That includes the increased leverage
15  to negotiate important terms like marketing or quicker payout
16  for an advance.  It also includes, if we step back a bit, the
17  effect that ensues with diversity:  Books that are never
18  written; or nonfiction books that aren't researched as
19  accurately; new voices that will never get heard.  As Mr. Dohle
20  conceded, diminished author compensation will be fewer authors
21  staying in the business, and fewer diverse stories being
22  written.

23          Your Honor, my final topic will be coordination.  As
24  defendants concede, once the United States has demonstrated
25  that this merger will create market concentration levels that

1    mandate a presumption of illegality, there's a presumption of

2    anticompetitive coordinated effects.  Defendants bear the

3    burden that the presumption by -- that the presumption fails

4    because there's proof of structural barriers that make tacit

5    coordination or direct coordination possible in this industry.

6    They failed to present such evidence.

7         Rather, the presumption of significant coordinated

8    effects has been reinforced by unusually powerful evidence of

9    explicit coordination among the Big 5 publishers.  As found in

10   the Second Circuit, the CEOs of then the Big 6 secretly met

11   quarterly without lawyers or staff to discuss whatever was on

12   their minds.  They unlawfully coordinated with Apple to raise

13   e-book prices.  Those actions alone demonstrate a willingness

14   and ability to achieve their anticompetitive goals, even when

15   there were six competitors.  Reducing to four will make that

16   even easier to orchestrate.

17        And contrary to Dr. Snyder's views that editors will

18   ignore their CEO instructions, there's every reason to believe

19   that successful coordination among the remaining big CEOs to

20   restrict acquisitions is feasible.  An agreement simply to stop

21   poaching each other's authors, each other's most successful

22   authors among the Big 4, could be readily agreed to,

23   implemented and enforced; particularly after this merger when

24   Penguin Random House has half the market and the ability to

25   counter-poach anybody who breaks the agreement and punish them;

1    and has access to printing that it can use to delay the

2    printing of its rival's books if they don't abide by the

3    agreement.

4         We've been also presented with strong evidence of

5    tacit coordination over the years, which is a major concern in

6    the guidelines, in the case law.  And contrary to Dr. Snyder's

7    unique viewpoint, the development of industry uniformity about

8    advance levels from three to four tranches, the standardization

9    of royalty rates of 15 percent for hard cover books, and the

10   non negotiability of audio rights, those are all points that an

11   industry rife with the ability to tacitly coordinate could do

12   and could harm authors.  The merger would reduce the number of

13   players needed to agree, needed to monitor, and clearly

14   exacerbates the risk of coordination in this market.

15        Let's end where we started.  We showed you the list of

16   head-to-head competition early, and the amount of money the

17   competition generated for those authors.  Some were 75,000,

18   140, and even 800,000.  That's compensation and real work,

19   creative work that fuels social discourse and progress.  These

20   numbers mean something to those that work hard to generate

21   books, and they're at stake if this merger is permitted to

22   proceed.  The Clayton Act protects this work and ensures the

23   market generates these numbers for people who perform this

24   work, which is why the United States respectfully requests that

25   the Court enjoin the merger.

1          **THE COURT:**  Thank you, Mr. Read.  Let's take a

2     10-minute break at this time, and then we'll hear closing

3     argument from the defendants.

4          (Recess taken at 10:23 a.m.)

5          (Back on the record at 10:34 a.m.)

6          **THE COURT:**  Good morning, again.  We're ready to

7     resume with closing arguments from Defendant Bertelsmann.

8          Mr. Petrocelli.

9     <u>**CLOSING ARGUMENT OF BERTELSMANN AND PENGUIN RANDOM HOUSE**</u>

10         **MR. PETROCELLI:**  Yes, Your Honor.  Daniel Petrocelli

11    for Defendants Bertelsmann and Penguin Random House.  On behalf

12    of my clients, I wish to thank you for your hard work and the

13    hard work of your staff in diligently conducting these trial

14    proceedings, keeping us on time, and diverting I'm sure very

15    valuable time that you could have spent elsewhere.  So we very

16    much appreciate it.

17         We're obviously now at the end of a long road in which

18    the defendants here have sought to put these two great

19    publishing houses together creating enormous benefits for

20    readers and authors alike.  And as we've seen, the Government

21    has tried its best to show that this merger will decrease

22    advances for a tiny set of transactions under long-settled

23    analysis the DOJ and the courts use to determine whether a

24    merger will cause a price decrease or in this case -- a price

25    increase, or in this case, a price decrease.  And we submit

1    that after three weeks of trial, the Government has not come

2    close to making that showing.  And I'll summarize the reasons

3    why, Your Honor.  And along the way, we took note that Your

4    Honor asked a lot of important questions.  And we would like --

5    I would like, together with Mr. Fishbein, to try to answer some

6    of those questions.  But of course, in our post-trial

7    submission, we'll have more opportunity to address the issues

8    fully.

9         So let me begin with the legal standard.  I want to go

10    back to the opening statement of the Government here -- Pam, if

11    you could put up slide one -- because I was somewhat surprised

12    to hear in the Government's opening statement that it stated

13    that it need only show that a substantial reduction in

14    competition may occur or that there's an appreciable danger.

15    And that is simply not the law in the D.C. Circuit, and has not

16    been for decades.  The Government has to prove, and Your Honor

17    has to find, that a substantial lessening of competition is

18    likely to result.  And I submit, perhaps the Government has

19    asserted that lower standard because it hasn't shown, and

20    cannot show, that this merger is likely to cause the harms the

21    Government alleges.

22         And as this trial unfolded, it seemed obvious, at

23    least to me, that there was a significant retreat by the

24    Government and by Dr. Hill from core principles of unilateral

25    effects in his models.  Instead, what we heard a fair amount of

1    was the Government contending that competition may be softened

2    in some generalized, unknown and unquantifiable way.  Without a

3    viable unilateral effects analysis, the Government is left only

4    with this general directional effect.  But Your Honor, that is

5    not proof of likely harm, and it's certainly not proof of

6    substantial harm, which is perhaps why the Government has

7    resisted this settled standard.

8         Now let me tell you what I'm going to discuss, Your

9    Honor, and it largely tracks Mr. Read's structure.  I'm going

10   to talk about the market definition.  And then I'm going to

11   talk about the evidence that rebuts the structural presumption,

12   and then discuss unilateral effects.  And Mr. Fishbein has a

13   number of other points that he will address to the Court.

14   Clearly, the market definition issue is critical, and perhaps

15   case dispositive here.

16        The Government, as the Court knows, has the burden to

17   prove the existence of a distinct legally cognizable product

18   market.  By its terms, the Government's anticipated top seller

19   market here is drawn by price:  Books that yield advances for

20   $250,000 or more.  The Government claims this is a sub market

21   of the market for all books, and it's solely on the basis of

22   this alleged sub market that the Government can trigger the

23   presumption of harm.  As has been acknowledged in the case, the

24   presumption does not arise based on the broader market for all

25   trade books.

1          And the cases, Your Honor, are clear, they are

2     consistent, that a product market cannot be defined solely by

3     one price along a continuum of prices.  Instead -- and you can

4     see some of the authorities on this point, to qualify as a

5     market, the Government has to prove that its price segment

6     captures a distinct category of products or customers.  Here,

7     that would be authors.  And the Government has to prove the

8     Brown Shoe industry reality factors, which the Court applies to

9     evaluate any alleged antitrust market.  And that's what the

10    courts have done in all the cases that you've heard.

11         And if you take a look at this slide -- which is just

12    a high level summary of some of the key cases on this critical

13    market definition issue, you will see here that the

14    Government's alleged market, based on the evidence in the

15    trial, really satisfies none of these requirements.  In fact, I

16    submit that the evidence is largely, if not entirely,

17    undisputed that none of these distinctive characteristics exist

18    in this case.  No one that you heard testify uses the concept

19    of anticipated top seller to segregate books into a distinct

20    category.  No one has even heard of that before this case, by

21    that or any other name.  No one in the industry provides

22    specialized services, only to books that garner advances of

23    250,000 or more.

24         What we heard throughout, Your Honor, was regardless

25    of the advance level, we see the same bargaining processes; the

1    same editorial processes; the same editors; the same marketing

2    and publicity methods; the same printing; the same

3    distribution; the same sales processes; and the same book

4    selling retailers.  Mr. Read mentioned and called out

5    specifically the Syufy case, Your Honor, where there was a

6    market for anticipated -- industry anticipated top grossing

7    films.  I suggest that case demonstrates why the Government's

8    market fails here.

9            In that case, ex-ante, before, there was no question

10   that you could identify what those films were.  They had famous

11   movie stars in them.  They had top directors in them.  They had

12   large, large budgets.  They are advertised on print and ad

13   budgets in excess of sometimes the production budget of those

14   films.  This was obvious to anybody.  There wasn't any lack of

15   clarity as to what those top grossing or anticipated top

16   grossing films were.  And they could only be exhibited in

17   certain theaters that were suitable to pictures like that.  So

18   we have none of those characteristics here, Your Honor.

19           The Government -- and yesterday Mr. Hill -- Dr. Hill,

20   excuse me, made clear that he was relying on evidence outside

21   his model such as approval levels of the various publishers.

22   If you could put up slide 35, Pam.  These approval levels do

23   nothing to identify the Government's claimed market.  There are

24   a number of different approval levels, depending on what

25   governance requirements any particular publisher has.  And they

1    vary up and down the range.  There's nothing suggesting that

2    $250,000 is an internal approval level because it identifies

3    any market.

4         Likewise, Dr. Hill mentioned the various categories of

5    publishers weekly, one of which -- I think one of six or seven

6    of which is $250,000.  That's of no moment, Your Honor.

7    They're not contending that each of those categories

8    constitutes a separate market.  Those are just different deal

9    buckets to describe different types of deals.  At the end of

10   the day, I think what the Government is really relying on is

11   the correlation between advances and predicted sales.

12        And to be clear, we have never disputed that there is

13   a general correlation between advance levels and predicted

14   sales.  After all, the profit and loss statements, Your Honor,

15   are based on estimated sales.  But there's nothing

16   qualitatively different about those estimations, whether you're

17   at the $250,000 advance or $50,000 advance or $1,000,000

18   advance.  These are just advances along a price continuum based

19   on different sales expectations.  And a general correlation

20   does nothing in and of itself to justify the definition of a

21   distinct market along any particular point in that continuum.

22        Second, to the extent that there's any reason, Your

23   Honor, to think that the industry does treat certain books or

24   authors as if they're in a different category from other books

25   or authors, the Government's proposed market doesn't capture

1    that distinction.  And we can see this at both ends of the

2    price segment that the Government defines in its market

3    boundary.

4            So according to Dr. Hill, the bottom of the

5    Government's market is roughly 250,000, and perhaps down to

6    150,000.  And we're not suggesting mathematical precision is

7    required here.  But the reason Dr. Hill draws the line in that

8    range is because he claims that's where there is a dramatic

9    change in market shares that he says occurs right around that

10   spot.  He claims that's where competitive conditions are

11   different, below and above his line.  And he relies prominently

12   on this chart.

13           But as we showed the last couple of days, Your Honor,

14   when you actually break that data down below the 250,000 mark,

15   what you see is that the Big 5 continued to lead the market as

16   it grew until you get all the way down to $50,000.  So if you

17   could -- you can see it right here, and we can break that down

18   even further.  And the only dramatic change here, if there is

19   any, Your Honor, is at the $50,000 mark.  Thereafter, it's

20   relatively stable.  And our point is not that we should draw

21   the line at $50,000.  What we're saying is that by the

22   Government's own logic, if the market for anticipated top

23   selling books is defined mainly by the point at which the vast

24   majority of buyers drop out of most acquisitions, then the

25   market boundary has to be $50,000.  And if you define it there,

1    Your Honor, there's been no evidence that the presumption would

2    be triggered.  Dr. Hill performed no calculations, as I

3    believe, below the $100,000 level.

4          Let's take a look at the other end of the telescope,

5    at the upper range.  And as you know from the Sysco case, one

6    way to think about whether a price segment captures distinct

7    products is whether there's an industry consensus that the

8    products are different in some way.  And I recall Your Honor

9    asked questions of some of our witnesses about whether such a

10   consensus exists.  And even recently, Your Honor noted that it

11   seems to be intuitive that there should be some kind of

12   segmentation based on the number of sales; and that higher

13   selling books might need different services; and that authors

14   who wrote those books might have different expectations.

15         I'd make a couple of points in response to that.  I

16   don't think it's intuitive that there must be a segmentation at

17   some level of the kind that matters for antitrust purposes, I

18   think we're mainly talking about a continuum, as I've

19   explained.  But perhaps more relevant to the way you may be

20   thinking about it is that if there is any distinct segmentation

21   of books where there is an industry consensus, books that are

22   truly likely to succeed, the evidence showed that it's books in

23   basically two categories.  One, repeat franchise authors with a

24   track record of success where you can predict with a high

25   degree of probability that those books are going to sell well.

1    And similarly, celebrity authors who have an existing following

2    that you can predict translates into book sales.  And we

3    received testimony from witnesses about this.

4         And the point here, Your Honor, is that these books

5    garner advances vastly in excess of $250,000.  We're talking

6    about advances in the multiple million dollar range.  I have

7    here an excerpt from Ms. McIntosh's testimony where she said,

8    you know, if someone's estimating with one of these types of

9    authors that we're going to sell 300,000 copies, yeah, I'm

10   going to spend millions of dollars.  300,000 copies, Your

11   Honor, is far, far, far in excess of anything that would pencil

12   out to a 250,000, 350,000, $500,000 advance.

13        In this kind of range where I think the Government is

14   trying to land their definition, sort of in this 200 to maybe

15   even up to million dollar range, that's where there's the most

16   uncertainty.  That's where, if anything, those would be

17   unanticipated top sellers.  That's where the risks and gambles

18   are being taken that you heard so much about.  And here's

19   Ms. Bergstrom from Simon & Schuster who made that point, Your

20   Honor.

21        Now, the Government of course could have tried to come

22   in here and block this merger based on a market defined by

23   those advance levels where there was a high degree of

24   predictability.  But that would have failed also, Your Honor,

25   because the authors in that price advance level have the most

1    leverage since they have the books that, by definition,

2    everyone wants to buy.  Related to this idea, Your Honor, is --

3    and we didn't hear about it in the closing, but we did in

4    Mr. Read's opening when he talked about a price discrimination;

5    or when we heard some testimony, I think, by Dr. Hill about

6    targeting authors.

7        Again, this requires the Government to prove that

8    publishers can and do identify in advance a distinct category

9    of authors who need the services that can be provided only by

10    certain publishers:  Those publishers who pay advances of

11    $250,000 or more.  The idea being that these authors are

12    captive to those select publishers, and can be targeted for

13    price decreases.

14        This price discrimination theory, as we'll amplify in

15    our post-trial submission, is simply an application of the

16    Brown Shoe industry factors, Your Honor, it's not a departure

17    from it.  But just going down that line for a moment.  If you

18    could identify the market at which authors mostly receive

19    services from the Big 5, then that market boundary, as I

20    indicated, needs to be defined at around $50,000.  Because

21    that's where the dramatic cliff occurs, not 250 or even 150 or

22    even 350.  If you can define the market by authors that truly

23    can be identified in advance based on objective criteria, such

24    as in Syufy, we're talking about the franchise and celebrity

25    authors, not a market defined by advances as low as 250,000 or

1    150,000.  But, Your Honor, those authors, as I indicated, they

2    might be identifiable, but they can't be targeted.  They have

3    the most leverage, and they're not susceptible to pricing

4    decreases.  I mean, I enjoyed listening to Stephen King, but no

5    one is cutting his compensation.  I mean, there are authors in

6    the Government's price market who are billionaires.  I mean, I

7    think Stephen King could buy Simon & Schuster if he wanted.

8        So beyond that point, Your Honor, there are -- despite

9    the Government's attempt to be dismissive of them, there are

10   other publishers -- it's not just the Big 5 -- who provide

11   services equivalent to those by the Big 5 publishers.  Some are

12   better than others.  Obviously, the Big 5 have more money and

13   do more things, buy more books.  But that's not a categorical

14   difference in services.  I mean, look at the testimony of the

15   various people that you saw, Your Honor.  None of them

16   downgraded or degraded the services of companies like Abrams,

17   Norton -- who's been around for a hundred years, or Kensington,

18   Disney, et cetera.  No one indicated that these -- the services

19   rendered by these publishers were inferior.

20        If you look at the next slide, you can just get a

21   sense of some of the books and authors.  This slide is

22   confidential.  It's confidential because some of this came out

23   in closed session, Your Honor.  But this is a who's who list of

24   books and authors here by firms other than the Big 5.  So

25   there's really no credible evidence at all that only the Big 5

1    can serve authors who want larger advances, the Big 5 just do

2    more of them.

3         Now, Ms. McIntosh addressed an issue that the

4    Government raised throughout the trial, which was about

5    marketing spend.  Because the Government was contending through

6    some of their testimony that, well, you can tell by marketing

7    spend which ones are the anticipated top sellers.  But as we

8    learned, there's a straight flat percentage put in these P&Ls

9    for marketing spend that might have, once again, a general

10   correlation to actual spend.  But, certainly, the actual spend

11   is not at all based on what's in the P&L.  Ms. McIntosh walked

12   through the process, as did Ms. Kim -- and perhaps other

13   witnesses as well, and explained that a publisher decides to

14   spend on a book what the publisher learns as the book

15   approaches publication -- which can be years after the

16   acquisition, based on feedback from salespeople, from retailers

17   and others.  And most of the time, the marketing folks don't

18   even know what the advance level is.

19        So you can't define -- you can't rely on the marketing

20   as a basis for defining something in the acquisition market, it

21   happens much later, and there's no causal connection to the

22   advance.  At most, there's a loose correlation.  And the

23   Government has never identified any level of marketing

24   expenditures that reflect some distinct category of books or

25   consensus understanding that these books differ from others.

1    Now, we heard a little bit about GLAM, but that's because

2    you're dealing with a celebrity author.  That has nothing to do

3    with the advance, Your Honor.  Indeed, I think Ms. Walsh

4    testified that she got GLAM for one of her clients who got an

5    advance under $250,000.

6         So look, we think it's quite clear what's happening

7    here, Your Honor.  As I indicated in the opening -- my opening

8    statement, the Government found no harm whatsoever in the place

9    where they always look, and that is in the downstream market.

10   There's no undue concentration, there's no harm.  Then they

11   went upstream, and they looked at the market for all trade

12   books, which is the right place to look.  And they found, once

13   again, there is no harm in that market.  And so they've come up

14   with this price boundary, and it's the only way that they can

15   trigger the presumption.  And this boundary is simply

16   arbitrary.

17        I don't know why Dr. Hill talked about the

18   hypothetical monopsonist test, because, as he pointed out, it

19   passes the test at any advance level.  It doesn't indicate

20   anything, it's utterly meaningless other than addressing

21   whether there's an outside option in the form of

22   self-publishing, which nobody was arguing in this case.  And I

23   think the fact that the hypothetical monopsonist test passes at

24   any level means there is no sensible line to draw.  So I think

25   that's supportive of our position.

1          So, again, when all is said and done, the only real

2     market here, Your Honor, is the obvious one, and that's the one

3     for all trade books.  And as the Government concedes, that's

4     not concentrated.  And as I said in my opening statement, and

5     I'll repeat again, the only reason we're here is because the

6     Government has created an artificial market to create

7     artificial concentration to create artificial harm.

8          So let me talk about the harm.

9          **THE COURT:**  Before you do that, can I ask you to

10    address one aspect of Dr. Hill's testimony.  You've said that

11    it might make more sense to draw a relevant market for the

12    celebrity authors, the above a million authors, or at 50,000.

13    He said that the existence of other markets does not

14    necessarily mean that the one that was chosen is not also a

15    relevant market.

16         Can you address that?

17         **MR. PETROCELLI:**  Yeah, Your Honor, I heard that, I

18    think it was yesterday.  The Government has never pled that

19    market.  They've never tried to prove that market.  And that

20    market is, I think -- if there is such a sub market at that

21    level, it demonstrates that the 250,000 line is arbitrary.

22    There's nothing distinguishing these books in these different

23    price segments.  The only difference is where the Big 5 kick in

24    as the more dominant buyers of the books.

25         And so, yeah, they could have come in and said there's

1    a couple of sub markets in here:  There's one from 50 to 250,

2    there's one from 250 and above.  But I think that that would

3    have been very difficult for them to maintain any sort of

4    credibility about the 250 line.  And so that's just not a case

5    that we were presented, and I think that there would be no

6    basis for carving up the market in so many different ways.

7    Because, again, the books are negotiated and edited and

8    published the same way along any of these price points.  It's

9    just a matter of these Big 5 buy more than the other

10   publishers.  That's it; that's it.  And I'm not aware of any

11   case, Your Honor -- I like to say I'm not an antitrust expert,

12   but I'm not aware of any case, Your Honor, that defines a

13   market just by the number of competitors.  And I don't think

14   any has been cited.

15        So going to the presumption.  Again, if we accept the

16   Government's market definition, then the presumption is

17   triggered.  And then our burden is to -- as I indicated in the

18   opening, it's a burden of production, not of persuasion, of

19   course.  And I believe the evidence in this case readily,

20   readily shows that the presumption has been rebutted.  And

21   here's just a summary of some of the reasons why, if you'd turn

22   to the next slide, Pam.

23        So I'll briefly go over these points, Your Honor.  Let

24   me start with the merger guidelines.  They tell us that in a

25   market for differentiating products and individual

1    bargaining -- which is what we're dealing with here, the

2    likelihood of harm is determined not by market concentration,

3    but by the degree to which the merger eliminates competition

4    between the merging parties; defined to mean when they were the

5    top two bidders, or the first and second choice.  So right off

6    the bat, you need to know more than shares.  And the

7    Government's case here relies almost entirely on shares.  But

8    shares are not a true indicator of competitive effects in this

9    case for these various reasons.  And again, I point out the

10   statement of Judge Mehta in the Sysco case that we saw in my

11   opening.

12          And when we do this analysis of taking into account

13   the shares, how often do these two firms actually meet

14   head-to-head one and two.  Professor Snyder's analysis shows us

15   that the merging parties were the first and second choices in

16   only about 6 percent.  And even in Dr. Hill's analysis, it was

17   only 12 percent.  So right off the bat, under either of those

18   experts, we're dealing with the idea that pretty much

19   90 percent of the time, 90 percent of the time, these two

20   companies are rarely one and two.

21          The second reason market information is not indicative

22   is because the agents control the acquisition formats and the

23   number of bidders.  And I know that Mr. Read made some comments

24   about this.  But it is undisputed, Your Honor, that it is the

25   agents, and only the agents, who decide who to submit proposals

1    to, who to ask for bids, who to invite to an auction, how the

2    rules for those auctions were set up.  They have the complete

3    discretion to change those rules.  They decide when they're

4    going to conduct direct negotiations.  So it is the agents who

5    are driving this bargaining process.  I'm not saying the

6    publishers don't have leverage either, I'm pointing out that it

7    is the agents who are the drivers of the process.

8            And unlike some of the assumptions made in these

9    models, the agents do not obviously invite all publishers.

10   They invite selected publishers.  And not even publishers, Your

11   Honor, that's another point I'll get to.  They're not inviting

12   these monolithic companies, they're inviting particular editors

13   at particular imprints.  And there probably are hundreds,

14   hundreds of these imprints spread around the various publishing

15   houses.  And they're looking, obviously, for the right match.

16           So the important point here is that if the merger did

17   functionally eliminate one potential participant, it will not

18   necessarily change the dynamic of any given auction.  Because

19   that publisher may not have participated in the first place, or

20   because the agent can readily replace that publisher with

21   another bidder.  And I think as Dr. Hill himself acknowledged,

22   more than half -- I think he said as high as 60 percent of all

23   acquisitions, occur by bilateral negotiations rather than by

24   auctions.  Another 20, 30 percent are best bid auctions, and

25   the remainder might be a round-robin.  Almost every witness

1    agreed that parties do not make advance offers and demands in

2    accordance with market share estimates.  None of them ever

3    track market share estimates in the acquisition market.  It's

4    not something that's ever been done, to my knowledge, before

5    this case.  They only know that there are many other parties

6    that could win the book if they don't bid high enough.  And we

7    saw quite a bit of testimony about this.

8         Next is imprint competition, Your Honor.  Market

9    shares are also not good indicators, because several of the

10   so-called Big 5 rely -- as part of their chosen business

11   models, to permit internal imprint competition.  And this, as I

12   indicated before, creates many more potential acquirers than

13   market shares reflect.  And in terms of this internal imprint

14   competition, you know, there was that sort of catchy line, I

15   guess, by Mr. King about:  It's like a husband and wife bidding

16   against each other for a house.  I had to chuckle at that,

17   because frankly, I've had some tough negotiations with my wife

18   over our house.

19        But that aside, Your Honor, imprint competition exists

20   because it's good for business.  Publishers use imprint

21   competition all the time.  The Government's first witness,

22   Mr. Pietsch, on whom they heavily rely, explained that Hachette

23   allows imprint competition.  In fact, if you recall that

24   document with his scorecard of losses to other firms for

25   advances in excess of $500,000, there were, I think, four or --

1    I can't remember exactly the number, that were lost to another

2    imprint in Hachette.  And Penguin Random House has been doing

3    this for decades.  And I think Macmillan does it, Simon &

4    Schuster and HarperCollins I believe do single house bids.

5         But these publishers believe that allowing imprints to

6    separately and competitively bid increases their chances of

7    winning the book; not only winning the book, but importantly,

8    matching up with the author.  And that could turn into, you

9    know, the next Stephen King -- or at least a long-standing

10   author-publisher relationship, which in the long run is much

11   more profitable.  So that's why they do it, it's economically

12   rational to do it.  And they do have the rule that says we're

13   not going to allow the internal bidding if we're the only ones

14   left.  But as you heard, the agents can readily avoid that

15   circumstance by including an outside bidder, an external

16   bidder.  And rarely, if ever, have gotten into a circumstance

17   where they had to give that notification -- in fact, I think we

18   heard from Gail Ross that she's only had to give the

19   notification once in some 30 years over her entire career.

20        **THE COURT:**  So Mr. Petrocelli, I agree that imprint

21   competition is an important factor to be considered.  But does

22   it undermine the Government's reliance on market shares?

23   Because the market shares include the imprint competition.

24        **MR. PETROCELLI:**  Well, it does, because -- in the

25   sense that the Government is suggesting there are only five

3279

1    bidders, now there's going to be four.  But we're talking about

2    multiple, multiple bidders.  So the market shares reflect all

3    the wins of each of the publishing houses, right.

4              **THE COURT:**  Including the imprints?

5              **MR. PETROCELLI:**  Yes, which include all the imprints.

6    But it doesn't really reflect how the acquisition process

7    occurs, and it doesn't give any credit for internal

8    competition.  You know, the agents are not provoking a

9    competition among five large publishers -- and a sixth one if

10   you want to aggregate everybody else into that other category.

11   They're provoking competition among dozens and dozens of

12   imprints, and the market shares don't really reflect that

13   reality.

14              The last point I want to make about internal imprint

15   competition is the answer to the Government's effort to show

16   that it's illusory.  They pointed to in Ms. McIntosh's

17   testimony, I don't know, three or four or five instances where

18   there was internal communication.  Let's be clear, there are

19   thousands of author submissions over the last few years.  I

20   don't know how many millions and millions of documents in this

21   case have been produced, Your Honor, and they had five or

22   six -- or whatever, instances where there was coordination.  I

23   won't go through them all.  But I think in most of those

24   instances, they didn't result in any lower bid.  Some of them

25   had to do with the strategy of how to open the bidding process.

1              And I think as you heard when I examined Ms. McIntosh,

2    there is no system in Penguin Random House where whenever a

3    proposal comes in to an imprint or an editor, they're to notify

4    everybody in order to mobilize some overarching coordination

5    process.  That doesn't occur.  And these imprints zealously

6    compete against each other.  You heard testimony that on

7    occasion, one of the Penguin Random House individuals,

8    Ms. von Moltke, was involved in these communications on the

9    e-mails.  To be clear, she has a high-level job.  She was not

10   hired or tasked to be some kind of overarching coordinator or

11   tzar of coordination.  She has gotten involved in bids from

12   time to time when the circumstances called for communication

13   for one reason or the other.  Ms. McIntosh made clear that it's

14   not common, it happens rarely.  And when you think about it,

15   why would they impose an internal structural coordination

16   system that would literally override decades of their internal

17   imprint competition, which they have decided is in the best

18   interest of their business.

19             Another point I want to make about the rebuttal of the

20   structural presumption is, again, it assumes that things are

21   static and they don't change.  But, you know, we have, first of

22   all, three other major publishers who, as you heard, are going

23   to compete fiercely to win these books post-merger, just like

24   they do premerger.  Intense competition from three major

25   publishers.  This is not a Sysco case; this is not a CC

1    Holdings case; this is not a Wilhelmsen case where you have

2    these two gigantic companies merging, and everybody else is a

3    far distant third.  And it's easy to see, intuitively there,

4    why that would be a problem, because they're almost always

5    going head-to-head.  But we don't see that here, because Simon

6    & Schuster is not at the size of Penguin Random House.  And in

7    fact, as you heard from the testimony, Simon & Schuster's

8    addition to the company would just effectively replace the lost

9    market share the company suffered after the 2013 merger with

10   Penguin.

11         So we heard testimony about new entrants.  And yes,

12   they're small, but these are prominent people who are getting

13   books, and paying even seven figures for them.  But perhaps

14   more to the point, Your Honor, we have a number of these

15   existing firms -- not just the remaining members of the Big 5,

16   but all the other firms, who have a reputation, who have the

17   skill, who have the infrastructure, who can fill the void if

18   there's an effort to win more books.  It's not like they have

19   to wait three, four, five years to develop a backlist.  I think

20   what Mr. Read was suggesting were characteristics applicable to

21   new entrants, not existing entrants who can readily expand.

22         And the last point I'm going to make on the

23   presumption, and why market shares distort the constraining

24   effects, has to do with the non-Big 5 publishers again.  And

25   I'm not going to focus on the 10 percent of all acquisitions

1     that they win.  And by the way, 10 percent is not an immaterial

2     number, because it's bigger than -- in the aggregate, some of

3     the other Big 5 members.  So it poses serious competition in

4     the aggregate.

5             And remember, every one of these books is a new

6     product.  Every one of these books is something that never

7     existed before.  There's no inherent known value to these

8     books.  So anybody at any time can show up and win a book.

9     That's why you see 10 percent, which is a significant number.

10    But what we also heard yesterday -- and I know there was some

11    debate about the math, I think Dr. -- I think Professor

12    Snyder's calculation was more accurate than Dr. Hill's.  But

13    you have the Big 5 either winning or placing second 23 percent

14    of the time.  And that's not -- that's meaningful, Your Honor,

15    because the second bid is obviously constraining the winner.

16            There was a debate, like I said, about what the right

17    denominator was:  Was it 21 over 150 or 21 or 299.  But I think

18    as Dr. Hill acknowledged, if you're looking at what are all the

19    actual auctions in which the non-Big 5 either win or come in

20    second, he agreed with that number as 23 percent.  He used his

21    fraction to describe another dynamic -- which off the top of my

22    head I can't remember.  But I do remember that he agreed that

23    if you're just looking at the acquisitions, the 23 percent

24    holds up.  And if you wanted to cut it in half, it would still

25    be --

1          THE COURT:  I don't think so.  I don't think that's

2     where we landed, Mr. Petrocelli.  We landed at 11.5 percent.

3          MR. PETROCELLI:  Well, I think Professor Snyder's

4     23 percent, Your Honor -- maybe I'm wrong --

5          THE COURT:  That's what Dr. Snyder says, but I was

6     persuaded by Dr. Hill that the number is 11.5.

7          MR. PETROCELLI:  Well, whether it's 23 or half of

8     that, Your Honor, it's a significant constraint.  Because it's

9     not just -- the point I was trying to make is that it's not

10    just the wins, it's the times they're also coming in second

11    because they're constraining the winner, okay.

12         Now, those are the reasons why I think market shares

13    don't reflect the true competitive effects.  And I think the

14    presumption is rebutted, and I think the Government then has to

15    resort to proving up their case without the benefit of the

16    presumption.

17         And on that point, Your Honor, let me go back to

18    basics here.  When the Government filed this case, it was very

19    clear that it was based strictly on the loss of competition

20    between the merging parties:  The direct head-to-head one and

21    two, of competition that would be eliminated by virtue of the

22    merger.  And that was clearly -- that was clearly what they

23    alleged, and that was how Dr. Hill proposed to analyze the

24    competitive effects.  However, it did seem that as the trial

25    evolved, we did hear testimony by Dr. Hill -- and even somewhat

1    in Mr. Read's closing remarks, about a general softening of

2    competition, and whether competition is harmed here just by the

3    elimination of one bidder.

4         Now, you know, we go from five -- putting aside the

5    imprints, we go from five to four, right.  Is that alone enough

6    to show a reduction in competition.  And the answer is that it

7    is not, not at all.  I mean, the guidelines recognize that the

8    only transactions that could be affected, even in theory, are

9    those where both the merging parties were one and two.  And

10   it's only in that situation that the merger can affect the

11   outcome.  And if you'd put up the slide, Pam.

12        What we see here is that in all these scenarios -- and

13   these are scenarios where the merging parties were not one and

14   two, where somebody else wins; where one of the merging parties

15   wins, but the other doesn't participant; where Penguin wins,

16   but Simon & Schuster is not the second runner up; Simon wins,

17   Penguin Random House is not.  I mean, these are really all of

18   the scenarios that can occur outside of the two firms being one

19   and two.  And this is the only way in which competition can be

20   harmed.  And that's what all the cases that deal with the

21   unilateral effects address, whether we're talking Sysco, CC

22   Holdings and the rest of them.

23        The guidelines obviously don't assume that just by

24   eliminating one competitor there's some automatic softening or

25   weakening of competition.  The concern is whether the combined

1    firm will be able to decrease its own prices without losing

2    authors to non-merging firms.  And that requires, Your Honor,

3    an economic and quantitative analysis to determine whether

4    reducing the number of competitors will actually reduce prices

5    given the market conditions.

6         Now, Dr. Hill tried to do exactly that.  But we submit

7    his model and analysis fell short, because they don't fit.  And

8    if the models don't fit here, absent concrete projections of

9    harm afforded by some other model or in some other way, the

10   Government simply cannot show that the merger is likely to

11   cause a substantial reduction in competition.  So I'm not going

12   to get into the details of Dr. Hill's model.  And in terms of

13   the profit margin issue, Mr. Fishbein is going to address that.

14        But Dr. Hill did attempt to model something other than

15   by way of the second-score auction model.  He tried to model

16   bilateral negotiations; he couldn't do that.  He tried to model

17   best bids; that didn't work.  And so the best he could do, I

18   think he said, was to do the rounds model under the SSA format.

19   And to be clear, I don't think there's much debate that that

20   doesn't really fit, because very few, if any, of the auctions

21   actually go to a full round.  They usually end with a best bid,

22   even when an auction is convened.

23        And so Dr. Hill's -- I think his point, at the end of

24   the day, was that there's a general downward pressure that you

25   could kind of assume is going to apply post-merger.  I think

1    that that, in many ways, has it backwards for this reason.  The

2    one thing that I think we know from the way these auctions are

3    conducted, and the way the agents run these processes, is that

4    the agents and authors consider bilateral negotiations and best

5    bids to be different and better for authors than multi-round

6    auctions.

7            And I think it's obvious, because if they thought that

8    multi-round auctions and round-robin auctions would best suit

9    their interests, they would use them.  But they rarely do.  So

10   any model focused on round-robin auctions cannot logically say

11   anything meaningful about the way that agents and authors

12   choose specifically to avoid round-robin auctions.  As I've

13   said, Mr. Fishbein will talk about the input issue.

14           We know that Dr. Hill did not select, in the first

15   instance, his GUPPI model, but he went back to it in rebuttal

16   after Dr. -- after Professor Snyder's criticisms.  And again,

17   without getting into the details -- and we can cover more of

18   this in our briefing, Your Honor, the GUPPI suffers from the

19   same limitations and flaws as the SSA; including not taking

20   into account imprint competition, responses of other

21   publishers, the role of agents.  And obviously it does not

22   cover at all direct negotiations.  And then we heard testimony

23   that, based on Professor Snyder's calculations, there may be a

24   safe harbor that shows no harm.

25           And to be clear, we heard -- I'm not sure there's

1     evidence in the record on that, so I'm going to stop right

2     there.  That takes me now, Your Honor, to coordinated effects,

3     but Mr. Fishbein is going to address that.

4          So with that, let me just conclude by saying a couple

5     of other factors that I think show why this merger will not

6     reduce author advances, and then I will be done.  You may

7     recall that in the Sysco case, there were extensive ordinary

8     course business documents consistently identifying the merging

9     parties as the only other's main competitor or main rival.  And

10    again, it was very easy it infer from that that the mergers of

11    the two were going to enable that firm to exercise monopoly

12    power.

13         Here, Your Honor, despite a lot of documents that

14    we've seen -- and I think there's probably around 200 documents

15    in the exhibit list, there are no documents at all showing or

16    indicating or suggesting that Penguin Random House and Simon &

17    Schuster are direct rivals, none.  And they're not, because

18    Simon & Schuster is smaller, and HarperCollins, among others,

19    is bigger.  I know that Your Honor rejected the efficiencies

20    presentation, but the one thing I will point out about that in

21    the hundreds of tabs and cells there, that there was no

22    proposal to cut advances.  You saw nothing in there that

23    post-merger there would be a savings by reducing advances.

24    That's not something that the company ever contemplated, and

25    wouldn't make any sense.

1          And to the contrary, from the witnesses, Your Honor, I

2   think we heard that the other major competitors, they don't

3   intend to change their behavior post-merger.  We even heard

4   that from Ms. Pande.  In fact, several predicted that advances

5   will increase -- which I suggest is the most likely outcome

6   here, because these companies are going to be motivated to

7   compete against a firm with greater resources.  And in order to

8   win those books, they're going to have to pay more; because if

9   you don't win the book, you don't have anything to sell.  And

10  we heard testimony to that effect from Brian Murray and John

11  Glusman.  I think there's a confidential slide there showing

12  excerpts of their testimony.

13          And then also the next slide, Your Honor, where a

14  number of the publishers testified that they will not change --

15  they will not change bidding strategies at all.  As Mr. Glusman

16  put it:  If anything, the merger might increase advances.  Now,

17  that takes us back to one final point, and that's the 2013

18  merger.  And all I'm going to say about that is that there were

19  witnesses like Mr. Glusman and others, like Mr. Zacharius, like

20  Mr. Murray who all agreed that advances across the industry did

21  not decrease following that merger.  And we have an output

22  increase of some 13 percent for books in the Government's

23  market.  More books were published, hundreds of millions of

24  dollars were spent.

25          We saw that chart that Mr. Read showed that Dr. Hill

1    prepared.  But that does not account for the mass market turn

2    below 250,000, and doesn't account for the variability at the

3    top end for advances in the $4,000,000 and above range.  So we

4    don't think that chart is an accurate depiction of what

5    happened.

6        We will address these issues in more detail in our

7    post-trial submissions.  Again, let me thank Your Honor and

8    your staff.  This is an incredibly important case.  We know the

9    Court is going to review the evidence and the law very

10   carefully in reaching its decision.  We submit that when you

11   do, that the only decision here that is correct and just is to

12   deny the Government's motion.  Thank you.

13       **THE COURT:**  Thank you, Mr. Petrocelli.

14       Let me just check in with the court reporter here.

15       (Discussion off the record)

16       **THE COURT:**  Thank you.

17       Mr. Fishbein.

18   <u>**CLOSING ARGUMENT OF VIACOMCBS AND SIMON & SCHUSTER**</u>

19       **MR. FISHBEIN:**  Thank you, Your Honor.  I think we're

20   going to pass up some slides, and there will be some

21   confidential slides which I'll identify.  You'll see them; the

22   gallery, I believe, will not.

23       Your Honor, as I mentioned yesterday, my clients

24   ViacomCBS and Simon & Schuster, we have an independent interest

25   in seeing this merger through.  You heard from the leadership,

1    from the CEO of Simon & Schuster, from the top M&A executive at

2    ViacomCBS, they want this deal not only because Bertelsmann

3    offered the best price, also Penguin Random House they

4    concluded was the best -- a great home for Simon & Schuster.

5    But also because they felt that the deal will benefit Simon &

6    Schuster authors.  And that's what I want to focus on today.

7         So let me start with a legal principle that I think

8    we've referred to, but I think is important:  And that is that

9    the analysis under Section Seven, substantially to lessen

10   competition, is forward-looking; it focuses on the future.  Why

11   do I say that?  I mean, we've heard a lot about market shares

12   and diversion ratios.  And those are, of course, the current

13   market shares.  That's what happened in the past.  And those

14   are useful to the extent they predict the future.  But if

15   there's reason to believe that things are changing, if there's

16   reason to believe that incentives may be different -- and

17   Mr. Read mentioned that the merged entity, as a larger entity,

18   may have different incentives.  Well, the other competitors may

19   have different incentives, too, and that's what I want to look

20   at.

21        And I think that's especially important in this

22   industry, because I think everybody agrees that it's rapidly

23   changing.  I mean, we've seen it in a variety of sources.

24   There's the HarperCollins 10-K; the Department of Justice

25   argued, just a couple of days ago, the world has dramatically

1    changed since 2013.  We've heard about technological

2    innovations, all sorts of things.  So in a changing

3    environment, I think it's especially important not to simply

4    assume that market shares, diversions, competitive dynamics are

5    going to stay the same tomorrow as they are today.

6        Now, to make this concrete, so what are we sort of up

7    against.  With Simon & Schuster -- and you've heard this, the

8    calculation that comes out of the Government's models, what

9    they're alleging here, is that on average, we will pay the

10   authors of anticipated top selling books $100,000 less per

11   book.  That's a lot of money.  And that includes not only these

12   very, very top authors listed here, but everybody.  Now,

13   they've said it's an average, they're not saying it's a hundred

14   for each book.  But presumably, if you pay less -- if you don't

15   lowball Bruce Springsteen, you're going to have to raise it

16   somewhere else lower down.  And my point is that it's

17   significant, and so it puts -- you know, what they're really

18   saying is it puts Simon & Schuster editors in this kind of

19   situation.

20       And we used best bids here, because the testimony was

21   that that's a frequent method, the agents can choose it.  If

22   they're not getting what they want through rounds auctions,

23   they can go to best bids.  And you have your Simon & Schuster

24   editor in the bottom right there, and they have to think about

25   a lot.  They have to think about the other Big 5.  They have to

1    think about other publishers, there are others that may be

2    inspired by this book.  And they have to think, can they get

3    away with, can they get away with a reduction.

4            And Your Honor, I want to sort of draw a comparison

5    with commodity markets.  Dr. Hill made a couple of

6    references -- I think he must have worked on a case involving

7    beer, so he mentioned beer.  So when you're in a commodity and

8    you're making lots of sales of the same product over and over

9    and over again, it gives you a little leeway to sort of try out

10   price reductions.  You could reduce your price on beer for a

11   week or something, see how the market reacts.  If worse comes

12   to worst, you lose some sales for a week.

13           But books are not like that.  The best bids here is

14   one round.  And if you don't get the Springsteen book, you

15   never get it.  And you can't say in the future that you're the

16   leader of the singer-songwriters, et cetera.  So it's a

17   different dynamic.  And what those editors are really thinking

18   about is can I take the risk, can I take the risk of softening.

19   That would be a difficult proposition under current situation.

20           But what I submit to the Court is, when you look at it

21   from the perspective of now there's going to be this combined

22   entity, there's going to be this merged entity, how is that

23   going to change the thinking of the other competitors;

24   especially if the merged entity is trying to hold down values

25   by a hundred thousand dollars per book, which is significant.

1      And I submit, Your Honor, and what I want to spend some time on

2      is, what does that do to the incentives of the others to come

3      in, fill that gap and take away market share from the combined

4      entity if they're going to lower advances.  Because again, all

5      the models assume that the market shares stay the same.  What

6      I'm saying is that incentives can change, and that you have

7      some other competitors here that are ready, willing and able to

8      step into the gap.

9            The next slide is confidential, but I want to spend a

10     little time with this, Your Honor.  And by -- and we're not

11     talking here about entry.  Mr. Read spent a fair amount of time

12     debunking the idea that new entrants can easily come in.  I

13     don't want to belabor the point.  But obviously HarperCollins

14     is number two, so they already have a reputation, they already

15     have an infrastructure, they're already there.  And I know Your

16     Honor's familiar from other cases where we instruct juries,

17     that trying to discern what somebody's intent is in the future,

18     what they're going to do in the future, can be difficult.  It's

19     also often subject to circumstantial evidence.  I think it's

20     quite remarkable that in this case, there is such strong and

21     compelling direct evidence of what this second competitor is

22     going to do, because they've said it.

23           So on the bottom left, you remember that Mr. Murray

24     publicly said that they were going to be very aggressive.  That

25     was a statement that was made well after the merger was

1    announced.  It got the attention of the other publishers, which

2    goes back to my cartoon of people sitting around the table:

3    They're going to have to think about HarperCollins being

4    aggressive.  On the right here -- and I won't say the numbers,

5    that comes out of HarperCollins' January 2022 strategy update

6    that's well over a year after the deal was announced.  They had

7    plenty of time to think about it.  This was presented to

8    leadership of News Corp -- so Mr. Murray, the CEO, is

9    presenting to his leadership, he's accountable for it.  And

10    they project increasing titles, increasing advance spends, and

11    increasing advance per title.  So on all metrics, it's going

12    up.

13         And I specifically asked him:  Did you caveat it; did

14    you say if the merger goes through, then we can't accomplish

15    any of this?  And he said no.  So the contemporary business

16    judgment, with the merger in mind, is that they're going to

17    increase, they're going to be aggressive.  And if there's any

18    doubt about it, any doubt about what their intentions are -- if

19    there's changed incentives, there's changed motives, if there's

20    changed conduct as a result of the merger, I actually asked him

21    directly about that in his testimony.

22         And I can't repeat it, again, because it's

23    confidential.  But if you look at the top, the blue underlined

24    and then the question and answer below that, he was directly

25    asked:  "What do you intend to do with respect to this merger?"

1    And now taking a step back and going beyond HarperCollins, I

2    think we have clear evidence here that it is not going to be a

3    static situation, as the Government's models predict.  You are

4    going to have other empowered competitors motivated to take

5    advantage of any softening or reduction that they see.  And

6    they have said that.  And the DOJ models just don't account for

7    that, and for that reason are quite counter-factual.

8         Now, Your Honor asked, and it came out of a statement

9    that Mr. Murray made -- and I do want to just spend a minute on

10   it, on this issue of, well, how strong really is HarperCollins.

11   And there was this issue of Christian and romance, and should

12   it be counted.  The way it actually arose in the testimony is

13   that Mr. Murray said that one of his vendors told him that.  So

14   we're talking about downstream sales through a single vendor --

15   albeit an important vendor, who told him that Penguin Random

16   House was three times his size.  So that's a downstream market

17   from the one vendor's point of view.  The important thing is

18   we're obviously concerned about the upstream, the acquisition

19   of rights from authors.

20        THE COURT:  Well, the market shares are downstream.

21        MR. FISHBEIN:  The market share is actually -- that I

22   believe all the experts are using are upstream, they're based

23   on the advance database.

24        THE COURT:  Oh, I see, yes.

25        MR. FISHBEIN:  And they're different than the

1    downstream.  So what we care about here, being a monopsony

2    case, is the upstream market shares.

3          THE COURT:  But they're correlated.

4          MR. FISHBEIN:  They are correlated.  They're

5    correlated, and not exactly the same.  But I think the point

6    is, is that Mr. Murray repeating what a vendor told him in a

7    negotiation -- where obviously the vendor has an incentive to

8    say you don't have a lot of leverage, is not a substitute for

9    what the two experts did in this case.  And they agree -- they

10   disagreed on a lot, but they both used Christian and romance as

11   part of their data in computing market shares.

12         THE COURT:  Yes.

13         MR. FISHBEIN:  So Your Honor has a question?

14         THE COURT:  I'm absorbing what you're saying, which is

15   interesting, Mr. Fishbein.  It just seems to me that the reason

16   I kind of focused on this testimony was because -- and you make

17   a good point, that the market shares we've looked at in this

18   case is about advances, and this is a point about downstream.

19   But it struck me as an important consideration that the market

20   shares, at least in the downstream market, would overstate --

21   I'm sorry, would understate the power of Penguin Random House,

22   and even Simon & Schuster, because this publisher's market

23   share includes all these books that Penguin Random House and

24   Simon & Schuster don't compete in.

25              And I think that there is going to be some

1    correlation -- perhaps not as strong as I originally thought,

2    because we're talking about upstream versus downstream, between

3    that.  And I think that this could translate into also an

4    understatement of the power of the combined entity in the

5    advance market, given the correlation between the two.

6         MR. FISHBEIN:  So let me address that -- and I fully

7    understand the point.  So first point, which I think we've

8    covered, is that the most relevant market is the upstream.  You

9    see the graph here.  This is from both experts' data, and PRH

10   is roughly 50 percent bigger than HarperCollins on that

11   measure.  The second one, if you look at the bottom chart, that

12   is downstream.  So now I'm shifting to what Your Honor's

13   talking about is downstream.  This is HarperCollins' internal

14   market share division, and they include Christian and romance.

15   I mean, it's specifically footnoted there.  That's

16   HarperCollins Christian Publishing and romance.  And so PRH is

17   not double the size, it's whatever -- I mean, triple the size,

18   it's roughly double the size.  And there's a reason for that,

19   Your Honor.

20        THE COURT:  But I guess my question is what would it

21   be if you took out the Christian --

22        MR. FISHBEIN:  Well, why take it out?  In other words,

23   what I'm getting at is --

24        THE COURT:  Because they don't compete in those.

25        MR. FISHBEIN:  No, but most Christian, most Christian

1    is not Bibles.  Most Christian is what they call inspiration or

2    spiritual, and Penguin Random House does compete in that, they

3    do.

4            THE COURT:  Only -- no, there's three categories.

5    There's the Bibles; there's the Christian that are sold only in

6    the specialty Christian stores -- which Penguin Random House

7    does not compete very much in at all, if at all; and then

8    there's sort of the values -- more general market ones, what

9    they call crossover.  And I thought the evidence was clear that

10   they're not really competing on Christian.

11           MR. FISHBEIN:  I think Ms. McIntosh -- and obviously

12   anybody can go back and look, I believe she testified that they

13   do compete in the --

14           THE COURT:  2 percent.

15           MR. FISHBEIN:  -- in the spiritual part.

16           THE COURT:  In the spiritual part, but very small.

17           MR. FISHBEIN:  Okay.  But the only way you get to

18   three-to-one is if you exclude all of the Christian and all of

19   the romance.  And I don't think there's any evidence that -- I

20   mean, obviously everybody competes in romance.  And the other

21   thing, Your Honor, is that those --

22           THE COURT:  But not those -- not the Harlequin

23   romance, which is sold in the -- not in the regular retail

24   bookstores, but in other markets.

25           MR. FISHBEIN:  So I'll come back to that in a second.

1    But I think we all sell romances, okay, and it's not broken

2    down here what portion of that is Harlequin versus anything

3    else.  Now, the other thing, Your Honor, is that if you're

4    going to --

5             THE COURT:  I don't want to quibble about it.

6             MR. FISHBEIN:  No, go ahead.

7             THE COURT:  I don't want to get into too much detail

8    on the testimony on this, but I get your general point.

9             MR. FISHBEIN:  And look, let me -- I'm just going to

10    make two other points, which is if you take out Christian and

11    romance from HarperCollins to make the comparison, you also

12    have to take it out of Penguin Random House in --

13             THE COURT:  Exactly, and it's zero -- it's close to

14    zero.  That's why it's interesting to me.

15             MR. FISHBEIN:  Okay.  Well, yeah, the record will

16    reflect.  And I would just say, when you go back and look at

17    the record, please distinguish between the different types of

18    romance and the different types of Christian.

19             THE COURT:  Absolutely.

20             MR. FISHBEIN:  And then the final thing, Your Honor,

21    we're talking about here is the market for anticipated top

22    selling books, which the Government defines with an advance

23    level of 250.  Now, the subgroup you're talking about, these

24    pocket romance series that sell in drugstores, we've not seen

25    any of them on the list of advances of above 250.  I just don't

1    think it's a factor at all.

2         THE COURT:  But the Christian books are.

3         MR. FISHBEIN:  I'm sorry?

4         THE COURT:  But the Christian books are in there, the

5    ones that they don't compete on.

6         MR. FISHBEIN:  Well, okay.  The Bibles aren't in

7    there.

8         THE COURT:  No, but the --

9         MR. FISHBEIN:  The inspirational ones are.  But we do

10   compete on there.  So anyway, I think you understand my point.

11        THE COURT:  I do, I got it.

12        MR. FISHBEIN:  There's a number of facets to this, and

13   I don't think it's as simple as Mr. Murray saying one of his

14   vendors told him he was three times the size.

15        Okay, let's go to -- so I talked about HarperCollins.

16   And now Macmillan and Hachette, the other two of the Big 5,

17   very, very similar story.  They're ready, willing and able.

18   You can see the quotes here.  And, you know, I sort of tried to

19   imagine, well, what would Dr. Hill say about this.  You know,

20   he would say, well, the competition with the Big 5 is already

21   baked into the market share.  But again, that's the existing

22   market share, and so he'd be wrong on sort of two counts.  One

23   is that Macmillan is already, already trying to take market

24   share from the Big 5, as indicated here.  And they had a

25   spectacular year in 2021.  You might remember Mr. Weisberg

1    talking about how proud they were that they were taking market

2    share.

3         And again, like HarperCollins, there's a desire,

4    there's a stated intent to continue to claw market share away

5    from the others, which will only be enhanced if there's that

6    big, new formidable competitor trying to do better for their

7    authors.  They're going to want to do the same.  And that's

8    where the current market shares just do not predict the future.

9    They do not account for three well-funded, deeply experienced,

10   highly motivated rivals ready to pounce on any sign of softness

11   or weakening.

12        Your Honor, the same is true for the smaller ones.

13   And I'm not going to dwell on this, because Mr. Petrocelli

14   touched on it.  I just want to -- I do want to cover one

15   aspect.  This is just some more evidence, some more specifics

16   about how the non-Big 5 publishers certainly are able to

17   compete.  That first one from Norton I think is particularly

18   interesting where, if you remember, Mr. Karp said they lost a

19   big book above 250 to Norton specifically because the author

20   was impressed with the marketing plan.  And then with Abrams,

21   it was also marketing and publicity.

22        And this is interesting, too, the feeling that it

23   might benefit the author to be the big fish in a smaller pond.

24   And so they have advantages.  You know, if you're not a big

25   fish in a small pond, then I guess you're a small fish in a big

1    pond and you're kind of a guppy.  And I don't think authors are

2    interested at this point in being guppies.

3            THE COURT:  Different kind of guppy.

4            MR. FISHBEIN:  Yeah, exactly, exactly.  Okay.  Now,

5    we've tended to think about the non-Big 5 as this large group

6    of smaller entities.  And when Mr. Read talks about expansion,

7    of course he focuses on Zando and some of these smaller ones.

8    But there are several -- and I think this is important to point

9    out -- and are you guys getting the confidential ones?  Okay,

10   yeah.

11           So you've got Amazon, you've got Scholastic, you've

12   got Disney are not part of the -- aren't part of the Big 5.

13   All three of them have experience -- let's take Amazon.  And

14   there's no dispute about this, we all know that they, at a

15   certain point in time, made a big play -- I listed the books

16   down here:  Dean Koontz, Patricia Cornwell, Mindy Kaling, made

17   a big push, multimillion advances.  They have the imprints,

18   they have the editors.  They drew back for whatever reason.

19   There's some indication that, more recently, Mr. Karp said he

20   saw them in an auction.  There's one of the Colleen Hoover

21   books that's now being distributed at Barnes & Noble.  So they

22   ebb and flow to some extent.

23           But there's no doubt that they have the resources,

24   they have the expertise, they have a track record having done

25   it before.  And so they're poised to compete.  And I would

1    submit that if you have a new, big merged entity that is trying

2    to soften advances, that is a motivation for them to come in

3    and fill the gap.  Mr. Read talked about entry, I guess,

4    happening over a period of two or three years.  As you can see

5    here, Mr. Weisberg said Amazon can, again, become a formidable

6    competitor at any given moment.  That seems timely; that seems

7    timely enough.  And we saw the same thing with Scholastic, they

8    poached $2,000,000 authors from Simon & Schuster.  Disney, I

9    can't say the number of titles or the specifics, but you can

10   see it there specifically said that they had plans.  And so

11   again, added on to the existing Big 5, how do the motivations

12   change; are they going to fill the gap if the merged entity

13   tries to do what the Government says.

14          And then finally, I do -- on this topic -- and this is

15   just -- again, I won't dwell on this, because Mr. Petrocelli

16   discussed it.  But obviously some of the other smaller

17   publishers also have plans to expand.  I have to come back to

18   the farm teams, because I told you I would in my opening, and

19   because I have some associates who would be very angry if I

20   didn't spin the metaphor out further.  So what the DOJ said in

21   their opening, you know, there was that farm teams comment.

22   Okay, and it's kind of funny, it's the baseball thing.  But

23   they really did swing for the fences in the opening.  And

24   Mr. Read went out of his way to say that the metaphor is

25   especially apt, and really stressed that they're really there

1    for nothing else than to feed the Big 5, is what he said.  And,

2    you know, I think there's a reason.  I think he chose his words

3    carefully, and he wanted to prove that.

4              And it was important, because he didn't want this to

5    be collectively another Big 5.  You've got Scholastic as

6    another Big 5 in children's.  And then you've got all these

7    smaller and medium as another Big 5.  All of a sudden, it

8    starts to be six and seven, and it's just not the same argument

9    that they wanted to make.  So it's an important issue, and I

10   submit, Your Honor, just it fell flat.  So strike one:  They

11   obviously compete head-to-head.  That's not a farm team

12   situation.  They're going for the same talent.  The minor

13   league teams don't recruit the same talent as the major league

14   teams.  There's many best selling authors who stay at these

15   small and medium publishers, and we've given some examples here

16   of some of the best known authors around at Abrams, Norton and

17   otherwise.  And, you know, farm teams, the whole concept is as

18   soon as you get called up to the majors you go.  But that's not

19   the situation.

20             And then even more so, there's some who switch from

21   the Big 5 to the smaller ones.  And that's certainly never

22   happened, to my knowledge, in the major leagues, that somebody

23   got elected to the all star team and said I'm going to spend

24   the next season in the minors.  So these are real competitors,

25   they're a real force, and I think Your Honor really has to

1    think about this market and what I'm saying about others

2    filling in the gap as three significant other Big 5.

3    Scholastic, very, very strong in children's.  And then another

4    Big 5 equivalent, again, poised and ready to fill the gap if

5    there's an attempt to lower advances.

6         Okay, so let me -- and then just kind of as a reality

7    check, you know, is this theory that when there's combinations,

8    when there's M&A, others step in; does that have any validity.

9    And there was the natural experiment with the 2013 Penguin

10   Random House merger.  As Mr. Read, I think, said, the evidence

11   was a little bit inconclusive -- or at least the experts were

12   arguing with each other.  But I don't think there's any

13   disagreement at all, I don't think any of the participants in

14   the industry who came here and testified said that advances

15   have gone down over the last 10 years.  Everybody said advances

16   have gone up.

17        There's of course been a number of combinations,

18   significant ones, and I think that's relevant.  And you have

19   Mr. Murray in the middle being very, very clear advances have

20   gone up notwithstanding consolidation in the industry.  And

21   it's to similar effect, from agents, publishers, et cetera.

22   And so I think that's just kind of corroboration for what I'm

23   saying, that when there's combinations, if there's any

24   temptation to hold down advances, there's changed incentives

25   and motivations for everybody else.

1              Let me address printing, because the Government did

2    raise this, and I think that printing really is not an issue

3    here.  So, first, if the Government wanted to make the case

4    that there's some kind of foreclosure, that Penguin Random

5    House really can disadvantage competitors through its ownership

6    of -- its purchase of those Quad printing facilities, you'd

7    have to do some kind of foreclosure analysis.  You'd have to

8    look at what the options are in the market, substitutability,

9    is it just the U.S. or can you go to printers in Europe.  And

10   Dr. Hill did not do that.  There was no expert analysis in this

11   case, so we don't know really market shares.  We have anecdotal

12   information that I'll get to, but we don't have any formal

13   analysis of the issue -- which, if they wanted to prove it,

14   that's really what they would have to do.

15             The second is, yes, there are capacity constraints.  I

16   mean, everybody said that, that especially during the pandemic,

17   demand was up and the printers just couldn't keep up.  They

18   couldn't keep personnel, they had various issues.  But that was

19   not caused by the merger.  I mean, there's nothing about the

20   merger that added to this capacity issue.  If anything,

21   Bertelsmann's purchase of those failing Quad plants helped

22   retain capacity.  You remember Quad wanted to merge with LSC,

23   the government blocked it.  They closed their plants for a

24   little while, and then Bertelsmann came in and rescued them.

25   So the merger is not responsible for that.

1          I think some of the witnesses said that some of the

2     people complaining, the other publishers, said, well, if -- if

3     the merger goes through, then maybe Bertelsmann will

4     self-preference its own printing.  There's no evidence of that.

5     That was really just speculation.  And I asked the Macmillan

6     guy, I asked the HarperCollins guy, no one had any examples.

7     They said, look, for now it's going fine; we're worried about

8     this in the future.  I just think that's speculation.  There's

9     no evidence to support that.

10          And then finally, on the fundamental question of,

11     well, what would happen if Bertelsmann did do that -- even

12     though there's no evidence of it, there are plenty of other

13     options.  I think it's a little ironic, I guess, that Mr. Read

14     illustrated this point with the e-mail from Simon & Schuster

15     from Mr. Eulau, where Mr. Eulau, the CFO, was saying:  We don't

16     want to be beholden to Bertelsmann, and so they went off and

17     signed a contract with LSC.  And what Mr. Eulau testified -- I

18     don't know if you remember it, because I asked him a series of

19     questions, how have you addressed this issue of not wanting to

20     be beholden to Bertelsmann.  And he said:  Well, we put a bunch

21     of capacity with LSC; we sent some overseas; we went to small

22     and medium publishers in North America, and we have

23     successfully dealt with the situation.  So Simon & Schuster

24     successfully dealt with it.  And I can't read the bottom left

25     one out loud, but other publishers have also said that in the

1    hard cover and soft cover print, there are other options.

2    On the right here, you have, again, an excerpt from a

3    publisher's very, very recent strategy update indicating how

4    they have successfully -- they call it:  "We're performing

5    better than competitors on best selling titles," because they

6    were successfully able to replace their U.S. printing with

7    other printing.  So the big picture here, Your Honor, is

8    there's options; there's no foreclosure analysis; there's

9    really only speculation.  I just don't think the printing is a

10   relevant issue in this case.

11   I do want to talk about the margin, as Mr. Petrocelli

12   mentioned.  So there's two inputs to Dr. Hill's models -- and

13   this is true for both the GUPPI and the second-score auction,

14   as I understand it.  One is market share, and we don't -- I

15   don't think there's -- there's not a disagreement on current

16   market shares, so those are what they are.  But the other one

17   is the margins, and it makes a big difference.  So as Dr. Hill

18   testified, the higher the margin, the higher the harm.  Because

19   if you have low margin, you assume that all these buyers are

20   clustered right around where they think the value is.  And the

21   difference between the first and second isn't very big.  When

22   you have a big margin, they're spread out and the harm is much

23   higher.  So it makes a big difference.

24   Now, Dr. Hill wants to use the higher level of margin,

25   gross margin, which is the margin after variable costs, but

1    before you take out any fixed costs.  So originally he used --

2    I guess it was the variable margin for Simon & Schuster -- I

3    think I'm getting this right.  He used gross margin for one.

4    He couldn't categorize some costs, so he used the lower level

5    margin for the other.  Snyder pointed out that that's not

6    right, it's not consistent.  And so in the second effort, he

7    used the higher level margin for both, just the variable costs.

8    And he explained on the stand --

9         THE COURT:  No, I think he still used variable costs

10   for Simon & Schuster, but he assumed -- I think he told me he

11   used the same for Simon & Schuster.

12        MR. FISHBEIN:  That's correct, he stuck with the

13   variable costs for Simon & Schuster.  But then for Penguin

14   Random House, he went closer to variable costs so that they

15   were consistent for the second time around.

16        THE COURT:  Right, it was about his assumptions about

17   what is a variable cost.

18        MR. FISHBEIN:  That's exactly right.  It wasn't -- in

19   other words, he's all in on the idea that it should be the

20   variable cost margin, and not what we would call net income or

21   operating income margin.

22        THE COURT:  Yes, and he says that's what the models

23   require.

24        MR. FISHBEIN:  He did say that.  He did say that.  So

25   the question is what to do if the industry shows you that the

1    relevant measure is net income margin, but the model says you

2    have to use gross margin.  And I respectfully submit that you

3    find another model.  You don't change the industry facts to fit

4    the model, you've got to form the model around the industry.

5            THE COURT:  I think the industry models -- the

6    industry facts are disputed, because --

7            MR. FISHBEIN:  Okay, so let's --

8            THE COURT:  -- Ms. McIntosh talked about variable

9    costs.

10           MR. FISHBEIN:  Well, I think we should -- let's

11   address that, and that's what's on this slide.  So the first

12   point is that you have the these P&Ls -- and you've seen enough

13   of these P&Ls, Your Honor, they're ubiquitous, right.  So the

14   left one is Simon & Schuster, and the right one is Penguin

15   Random House.  They both have the two measures.  And so, look,

16   it's an inference, but I think it's a pretty good one, that why

17   would you set up a P&L to tell editors when they're determining

18   advances, right, why would you set it up to also have the

19   calculation of the net income or operating income if nobody

20   cares and it doesn't matter.  I think it's there for a reason,

21   and --

22           THE COURT:  Okay, I was just going to say these P&Ls

23   are flexible, at best, and they don't seem to really rely very

24   much on --

25           MR. FISHBEIN:  Well, they are flexible, I'm not going

1    to disagree with that.  There are exceptions.  I mean, we did

2    hear in Simon & Schuster's case about an exception of, I think

3    it was, an $8,000,000 memoir where they were willing to take a

4    negative, I think it was, 3 percent operating income margin.

5    But the discussion around that I think was sort of like the

6    exception that proves the rule, like should we do it, should we

7    do it.  And, look, Mr. Karp testified -- and he was not

8    challenged on this at all, and I have the quote here, that the

9    guidance is to be positive, and that it should be double digit.

10   So I think the combination of they set up the P&L to show it,

11   the guidance is to be positive in double digits, I mean, that's

12   not disputed on the Simon & Schuster side.

13        You are right, Ms. McIntosh had a different view --

14   which I'm going to get to in a second.  The P&L, though, is the

15   same.  The P&L on the Penguin Random House also has the EBIT

16   margin.  She did say -- I think what she said was:  Editors

17   were so focused on the EBIT margin, I had to sort of course

18   correct; and she said it was especially with the higher value

19   books.  And I think that's true.  I mean, nobody disputes that

20   for one or two books, or even three or four, some number of

21   books, you can depart as long as you make it up on the other.

22   But you cannot run a business like this and always be short on

23   the EBIT margin, you will go out of business.

24        So I think fairly taken as a whole, Ms. McIntosh's

25   testimony is that the default is that you want positive net --

3312

1    well, whatever they call it, positive net profit, that there

2    came a time when people were so focused on that, she wanted to

3    have a correction and focus them on the gross margin,

4    especially for the higher titles.  But I don't think that's

5    suggests that the net income is not what's relevant.  And given

6    the structure of the business, given what's clearly true on the

7    Simon & Schuster side, undisputed, choosing gross margin, that

8    higher number, is a mistake.

9          THE COURT:  So I would say all businesses have fixed

10   costs, and that model asks for variable costs only.  Why?

11         MR. FISHBEIN:  I'm sorry?

12         THE COURT:  All businesses have fixed and variable

13   costs, but the model requires variable costs.  So you're saying

14   it's not consistent with this market.  I don't think it's

15   consistent with any business.

16         MR. FISHBEIN:  Well --

17         THE COURT:  So why does the model require variable

18   costs only?

19         MR. FISHBEIN:  I didn't create the model, I just don't

20   know.  I'm not going to pretend I know why they chose that for

21   that model.  Some of it does have to do with the structure of

22   the business.  In other words, if it's -- what I believe

23   Dr. Snyder said is that if there's a business with very, very

24   strong central control where the same people are responsible

25   for the fixed costs -- the executives and the people that sort

1    of manage fixed costs at headquarters are also the ones doing

2    the sale, I guess the theory is they'll have in mind the fixed

3    costs and they don't have to worry about the variable costs.

4    What Dr. Snyder was saying when you distribute it among all

5    these imprints, you can't tell them just ignore fixed costs

6    because they'll drive you to bankruptcy.

7         THE COURT:  I understand the argument, Mr. Fishbein.

8    I just think that it's a model that is applied across all

9    industries.  All industries have fixed costs as well as

10   variable, but the model requires variable costs.  So I don't

11   think it undermines the model to say:  But in our industry, we

12   have fixed costs.

13        MR. FISHBEIN:  Okay, no, I think what I'm saying is a

14   little different.  Every industry -- I agree with you.  Every

15   industry has variable costs and fixed costs.  I cannot speak to

16   any other industry as to whether they make their pricing

17   decisions based on variable or fixed.  There may be commodity

18   industries where they view their fixed costs as sunk costs, and

19   they just don't care about them; and when they tell their

20   salespeople to set price, they say do it on the variable costs.

21   I can't speak to that, because I don't know other industries.

22   All I know is that in this industry we actually have the P&Ls,

23   hundreds of them, and they focus on the fixed costs as well.

24   And we have testimony from the executives.  So it's not a fit

25   here.  I can't explain to you why it is or is not a fit

3314

1    anywhere else.

2        **THE COURT:**  Okay.  I think this is something we don't

3    have evidence about.  We should have asked the expert about it.

4    But since we didn't, I'm not sure what to do with it.

5        **MR. FISHBEIN:**  Well, I'm sure.  I mean, they --

6        **THE COURT:**  I'm sure you should have asked him.

7        **MR. FISHBEIN:**  Yeah, okay.  They bear the burden of

8    proof, and I think they have to establish that the model they

9    picked works for this industry.

10        **THE COURT:**  Absolutely.  But if you're going to tell

11    me it doesn't work for this reason, I'm not sure what to do

12    with it if we don't have any testimony from an expert about the

13    model.

14        **MR. FISHBEIN:**  Okay.  I'll just end with this:  I

15    think where Your Honor's coming from -- and, look, it's

16    common-sense, I totally understand it.  You're saying it kind

17    of proves too much; if it doesn't work here, what about then

18    doesn't it not work everywhere else, and then what's the point

19    of the model.  And I'm just saying in a court of law where they

20    bear the burden and we're trying to accomplish a merger that we

21    believe in, and they're coming to us and saying you cannot --

22    they're coming to my client and saying:  You got the highest

23    price, you can't do it, right; you can't do it, you can't sell

24    to the one that's going to be the value for your shareholders.

25    They have to prove that it's the right fit.  I don't have to

1    prove that it's not a right fit somewhere else or that it is

2    somewhere else.

3        THE COURT:  Absolutely.  But if you want to challenge

4    an economic model for the reasons that you're saying, you need

5    evidence to challenge it.  You can't, I guess, tell me that

6    you're the expert in economics, telling me why this doesn't

7    work here.  That's all I'm saying.  I don't think I have

8    evidence on this.

9        MR. FISHBEIN:  And I'm going to move on.  The evidence

10    is on this slide, that's all I'm saying.  The evidence is on

11    this slide that it should be fixed costs.

12        THE COURT:  But the significance of it, I don't have

13    expert testimony about it.

14        MR. FISHBEIN:  Okay, I understand.  I think we've had

15    our say on this.

16        THE COURT:  We understand each other.

17        MR. FISHBEIN:  We understand, we do, we do.  I want to

18    try to answer one other question that Your Honor posed, and

19    then I'm going to wrap up, which is about the -- well, no, then

20    I'm going to get to coordinated effects and the sub markets,

21    but I'm almost done.  You asked about the sub markets, right,

22    is it okay to have multiple sub markets.  And I think there are

23    cases that can talk about different -- like, for example,

24    different types of products in sub markets.  But what you can't

25    do, though, is if you just have a continuum, and even with

1  every additional $10,000 in anticipated sales you could say

2  that you would expect more marketing, you would expect more

3  attention, you would expect a higher advance.  So if it's an

4  even continuum like that, the danger is the Government can then

5  just choose their sub market at any level they want.  And

6  that's the problem.  That's what you can't allow.  You can't

7  allow them to cherry pick at any point they want, because

8  obviously they could just go to the area on the curve where

9  there's the least competitors and it fits the HHI.  So you

10  can't have kind of a know it when I see it, it has to be

11  attached to some product difference that's clearly

12  differentiated at some point.  There could be three of them,

13  but you'd really have to be able to say below this level is

14  fundamentally different than above this level.  And that's not

15  true if you go up by 10,000, 10,000, 10,000.  So I would offer

16  that.

17          THE COURT:  So I think that there is some recognition,

18  even on the defense side, that all books are not created equal.

19  And Mr. Petrocelli has acknowledged the really top sellers, the

20  celebrities and the authors with a track record.  And I

21  think -- and you can correct me if you disagree, that what

22  Dr. Hill said was he was just trying to find those books, the

23  anticipated top sellers, regardless of the advance level; just

24  the ones that need more marketing, more sales because they're

25  expected to reach a very wide audience, et cetera.  And he just

1    chose 250 to identify those books.

2          So it's not so much that the market is relying on the

3    250 -- although it does, because he had to draw a line

4    someplace.  He's looking for those top selling books, and

5    that's why he did his analysis, not just at 250, but also at I

6    think 100, 150, 250, 500 and a million.  And he said it was all

7    consistent.  So if you define the market as just the top

8    selling books, we're not exactly sure exactly where it is, but

9    this approximates it.  And then it passes all the relevant

10   market tests in terms of I guess horizontal monopsonist --

11   although, in this case, we all agree that all of the segments

12   would pass that.  And then he says you can draw this many

13   different places, but that doesn't take away from the validity

14   of where I drew it, because it's consistent at this level.

15   Then he would say this is appropriate.

16         **MR. FISHBEIN:**  Yeah, and all I'm saying is that if

17   that gets carried so far, as it is in this case, where you

18   could say the same thing about 50, 100, 150, all the way up --

19   and you could, because at each of those breaks, you anticipate

20   more sales, you'd like to have more marketing.  You saw on the

21   charts of the competitors, as you go down in advance level,

22   there's more of those non-Big 5 competitors.  So it's a gradual

23   continuum, and so that means the Government, under that logic,

24   could really choose anything.  They could choose to make it at

25   50, at 75, at 100.  And if you get to that point, they can just

1    pick and choose.  They can just pick and choose wherever the

2    competition is such that it passes the presumption.  And I

3    think that's a problem.  I think it has to be rooted in

4    something more objective, some clear break off, if you're going

5    to use those considerations.

6         On coordinated effects, Your Honor, I think the merger

7    guidelines are pretty clear on this.  And what I want to

8    emphasize is there's been discussion of whether coordination

9    has already occurred.  There was a fair amount about audio, I

10   think the payout structure.  So those things already happened,

11   and maybe they could still happen afterwards.  That's not the

12   issue.  If you look here at 7.1, the agencies examine whether a

13   merger is likely to change the map.  So, again, it's

14   merger-specific.  Is the merger going to make the vulnerability

15   or the possibility of coordination worse.  And then there's a

16   bunch of factors that are set here that both experts, I think,

17   agree to.  And on all of these -- transparency, ability to

18   monitor, ability to punish, homogeneous products, none of that

19   changes because there's one less competitor.  It's still non

20   transparent.  You can't really monitor it.  You don't know

21   exactly what the competitors paid for or bid.  It's obviously

22   not a homogeneous product, and so the only thing that's really

23   different is what I think Mr. Read said, which is if you want

24   to get together, there's one less person to invite.  That would

25   be true in any merger.  That would be true in any reduction.

1    And I think that's making light of a pretty serious issue.

2    Obviously people know if they meet and fix prices, it's a real

3    problem.  So to sort of say that the fact that there's one less

4    person to invite is going to make it more likely that they're

5    going to do it I think is farfetched.  And on this e-books

6    case, that was 10 years ago.  That's obviously a downstream

7    case.  This is an upstream case, which is fundamentally

8    different, because there is price transparency there.  That was

9    the price of e-books, which everybody could see.  There was --

10   Apple was right in the middle as a hub.  The personnel were

11   different.  The representative from Simon & Schuster that was

12   alleged to be involved is deceased.  Penguin Random House

13   wasn't involved.  So it's a very different situation, very long

14   time ago, downstream versus upstream.  I just don't think it's

15   applicable or really should be controlling here.

16          And so, Your Honor, for me to wrap up on the

17   fundamental point that I started with, which is my clients want

18   this merger because they truly believe that it's a good deal

19   for all concerned, including authors.  Obviously you heard that

20   it's a cultural fit, that Penguin Random House is

21   wholeheartedly committed to books.  And that's what Mr. Karp

22   and Mr. Berkett said.  But it wasn't only us -- and you have on

23   here what some of the other publishers -- and, again, I can't

24   quote directly.  But some of the other publishers who actually

25   were complaining about the deal -- I mean, they are opposed to

1    the deal, but what was their rationale.  Their rationale was

2    that this was going to be a formidable competitor that would

3    get good distribution deals, and increase the discoverability

4    and the visibility and the sale of its authors.  And they felt

5    disadvantaged.  They felt disadvantaged because the new entity

6    would do a better job promoting its authors than they could

7    they felt.  And I asked him specifically, like, you know, and

8    so does that help Simon & Schuster and Penguin Random House

9    authors, and they agreed.  So even their criticism, I think,

10   shows why this is better.  Now, as far as their criticism --

11   and they're right about that, the merged entity will have scale

12   and is going to do a great job for authors.  And so these other

13   publishers -- and I have to use some of their spectacular

14   profits that we heard about in the last couple of years, to

15   step up and compete the way they have said that they're going

16   to do.  And that's competition, that's competition.  That's

17   what we're here for.  And maybe author Charles Duhigg said it

18   best:  He said, "The world will be a better place."

19            And I will leave it with that, Your Honor.

20            **THE COURT:**  Thank you, Mr. Fishbein.

21            How much time do you need for rebuttal, Mr. Read?

22            **MR. READ:**  Fifteen minutes, Your Honor.

23            **THE COURT:**  You may proceed.

24            <u>**REBUTTAL CLOSING ARGUMENT OF THE UNITED STATES**</u>

25            **MR. READ:**  May it please the Court.  Starting with the

1    end of Mr. Fishbein, he argued about coordination.  What you

2    didn't hear, though, was that -- you know, none of his

3    arguments apply to the poaching or the contract terms that we

4    specifically called out.  There's no argument that the future

5    Big 4 won't know what kind of contract terms there are about to

6    payouts and negotiation of audio and other rights.  And there's

7    no discussion or recognition that you will also know if people

8    are poaching your authors.  And it's going to be far easier to

9    have a follow the leader strategy post-merger with Penguin

10   Random House so dominant and the other smaller publishers.

11         Then I want to turn to the last thing that

12   Mr. Petrocelli said.  He took on, surprisingly to me, the claim

13   that Simon & Schuster and Penguin Random House aren't rivals,

14   and contrasted that with other cases where he said it was

15   obvious they were rivals.  I would just like, Your Honor, as

16   you reflect on that, to go back to Mr. Karp's testimony -- I

17   think it was the second day of trial, where he went document

18   after document about Simon & Schuster losing to Penguin Random

19   House; and telling document after document about the

20   frustration they felt, the bids they lost, the stalking horse

21   worry that agents were using Penguin Random House to get their

22   bids up.  And when you're Simon & Schuster and facing Penguin

23   Random House, that's your rival, and that's what they're

24   worried about.  The idea that they're not direct rivals is

25   surprising on this record.  I think Mr. Karp's testimony is the

1    best place to go for that.

2              Mr. Petrocelli also encouraged you to think about the

3    imprints, and the fact that they compete and try to get authors

4    for themselves.  I would suggest, Your Honor -- I am an

5    antitrust lawyer, I don't know all the cases, but I cannot

6    think of a case where a merger was allowed because the

7    corporate parent allowed subsidiaries to compete with each

8    other.  I'm struggling to think of a concept where that would

9    be and you could rely on.  And it's telling me to they have not

10   presented one, a case for Your Honor on that issue.

11             And secondly, there is testimony from Jonathan Karp,

12   again.  He admitted in his testimony that having multiple

13   imprints from the same publisher bidding on the same book

14   rarely drives up the advance.  So it's not the imprint

15   competition that's driving up the advance, according to the CEO

16   of Simon & Schuster.  And there was an interesting quote that

17   Ms. Kim made where she said her fiercest competitor is Penguin

18   Random House and other imprints.  I've been reflecting on that,

19   and wondered if that just doesn't speak to the size of Penguin

20   Random House already:  That she's losing opportunities to other

21   editors who are bidding about the same but get some business,

22   and don't think the solution to that is letting Penguin Random

23   House get bigger.  Your Honor has heard more than enough

24   testimony -- well, Your Honor's heard a lot of testimony about

25   the 12 percent and the 23 percent.  I think I don't need to

1    spend any time there, other than to say that the testimony was

2    from Dr. Hill about 11 and a half being the right number for

3    the second place bid, which comports with the market shares

4    again, right.  It's another indication that the non-Big 5, at

5    their 10 percent share, are having about the impact you would

6    expect that a 10 percent share would bring.

7         Mr. Fishbein talked about advances going up.  First of

8    all, there's testimony from agents -- Ms. Fletcher and

9    Ms. Pande, that advances have been going down.  So there's

10   conflicting testimony.  Second of all, you would expect, all

11   else equal, as more people are buying books, and therefore

12   expected sales of books are going up, that that would be

13   reflected somewhat in the advance.  So to really do an analysis

14   of that Penguin Random House merger and whether it was so good

15   it inoculates this merger, you'd need more a complicated

16   analysis, and that just hasn't been done.  I think the red

17   flags are there, again, to have that not rebut the presumption.

18        I think maybe the biggest argument -- and I want to

19   try to spend the remaining time on, is product market, and this

20   idea that there's a gradual continuum, and then therefore

21   there's almost the argument that there's no line that can be

22   drawn.  I think the best thing to do would be go back to first

23   principles of why define a market.  We're looking to find out

24   are there authors here, are there a group of authors that are

25   vulnerable.  And under the statute, with any line of commerce,

1    if there's a group of authors that are vulnerable and don't

2    have competitive options that are sufficient, we ought to take

3    a look at them.  And that the hypothetical monopolist can be

4    satisfied at different places just tells you there's a group of

5    authors that can be fairly wide ranging about where you can

6    focus the analysis.  We thought the most relevant analysis,

7    therefore the relevant product market, is those at 250,000 and

8    up.  Because they -- you know, part of the problem is they

9    don't see the non-Big 5 as a substantial help for them.  The

10   non-Big 5 pick their shots and aren't able to provide the

11   resources on a consistent basis there.  And again, the statute

12   there goes back to any line of commerce.  And so you can have

13   multiple sub markets, and as long as there's one that's a

14   problem and it's material and substantial, a merger should not

15   be allowed.

16          I think I'll be brief, there was one other case that

17   Mr. Petrocelli put up about -- early in his presentation about

18   super premium ice cream.  And the story there was does fancy

19   super premium ice cream compete with the cheaper ice cream.

20   That is a different question than ours of authors at high end

21   and low end, because they're not competing against each other,

22   right.  So these examples of premium products that compete with

23   non premium products are different than where we're looking at

24   is there a targeted group.

25          And so that may lead me to my final point.  In this

1    district, as far as I know, in the last decade -- and we'll

2    provide the evidence in our post-trial conclusions of law, I

3    cannot think of a case where the plaintiff has failed on

4    product market without there being an adequate substitute.  So

5    the losses where the plaintiff has failed on their proof have

6    been because there is something that arguably the victims could

7    turn to as an alternative.  And that's just not here.  It's

8    conceded that there's no -- if you're an author wanting to sell

9    your manuscript, there's no other viable option if the merger

10   monopolizes -- if the industry monopolizes.  And so that leads

11   to the further inquiry that then we go into.

12        Thank you for your time, Your Honor.  It's been a

13   pleasure to present evidence and be an advocate for competition

14   in this industry.

15        **THE COURT:**  Thank you.  I want to thank the litigation

16   teams in this case.  I want to say that I think both sides did

17   an excellent job presenting their evidence and their arguments.

18   I think the parties were very well represented.  I very much

19   appreciate all the work that has gone into presenting this case

20   to the Court.  I will take the matter under advisement, and I

21   look forward to seeing your post-trial briefing.  Thank you.

22        (Proceedings adjourned at 12:21 p.m.)

23

24

25

3326

1                    **C E R T I F I C A T E**

2

3                    I, **Jeff M. Hook, Official Court Reporter**,

4      certify that the foregoing is a true and correct transcript of

5      the record of proceedings in the above-entitled matter.

6

7

8

9      __August 19, 2022__                    _____

10              **DATE**                           **Jeff M. Hook**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1,000,000 [1]**
3265/17
**$10,000 [1]**   3316/1
**$100,000 [2]**   3267/3
3291/10
**$2,000,000 [1]**
3303/8
**$250,000 [8]**
3239/25 3262/20
3265/2 3265/6
3265/17 3268/5
3269/11 3272/5
**$4,000,000 [1]**
3289/3
**$50,000 [6]**   3265/17
3266/16 3266/19
3266/21 3266/25
3269/20
**$500,000 [3]**   3240/1
3268/12 3277/25
**$8,000,000 [1]**
3311/3

**0**

**02886 [1]**   3226/3

**1**

**1 percent [4]**
3243/12 3243/13
3243/16 3244/1
**10 [4]**   3241/25
3244/2 3305/15
3319/6
**10 percent [5]**
3281/25 3282/1
3282/9 3323/5
3323/6
**10,000 [3]**   3316/15
3316/15 3316/15
**10-K [1]**   3290/24
**10-minute [1]**
3260/2
**100 [3]**   3317/6
3317/18 3317/25
**100 percent [1]**
3248/23
**10022 [1]**   3227/3
**10036 [1]**   3226/24
**105,000 [1]**   3255/20
**10:23 a.m [1]**
3260/4
**10:34 a.m [1]**
3260/5
**11 [1]**   3323/2
**11 percent [1]**
3257/8
**11.5 [1]**   3283/6
**11.5 percent [1]**
3283/2
**12 [1]**   3242/24
**12 percent [2]**
3275/17 3322/25
**12:21 p.m [1]**
3325/22
**13 percent [1]**
3288/22
**140 [1]**   3259/18
**15 percent [1]**

3259/9
**150 [5]**   3244/4
3269/21 3282/17
3317/6 3317/18
**150,000 [2]**   3266/6
3270/1
**17 [2]**   3230/4
3239/12
**19 [1]**   3226/6
**1999 [1]**   3226/19

**2**

**2 percent [4]**
3242/19 3242/20
3243/9 3298/14
**2,000 [1]**   3242/24
**20 [1]**   3276/24
**200 [2]**   3268/14
3287/14
**20001 [1]**   3227/25
**20004 [1]**   3227/6
**2010 [1]**   3251/23
**2013 [6]**   3246/1
3253/14 3281/9
3288/17 3291/1
3305/9
**2019 [1]**   3244/18
**2021 [1]**   3300/25
**2022 [2]**   3226/6
3294/5
**20530 [1]**   3226/16
**21 [2]**   3282/17
3282/17
**21-02886 [1]**   3226/3
**21-2886 [1]**   3229/2
**23 [1]**   3283/7
**23 percent [5]**
3282/13 3282/20
3282/23 3283/4
3322/25
**25 [2]**   3233/2
3252/6
**25 percent [1]**
3251/25
**250 [11]**   3269/21
3274/1 3274/2
3274/4 3299/23
3299/25 3301/19
3317/1 3317/3
3317/5 3317/6
**250,000 [16]**
3237/20 3239/2
3239/4 3239/5
3239/7 3239/19
3239/21 3239/23
3263/23 3266/5
3266/14 3268/12
3269/25 3273/21
3289/2 3324/7
**2886 [1]**   3229/2
**29 [1]**   3230/6
**299 [1]**   3282/17

**3**

**3 percent [1]**
3311/4
**30 [4]**   3234/11
3236/7 3246/14
3278/19
**30 percent [1]**

3276/24
**300,000 [2]**   3268/9
3268/10
**3230/3320 [1]**
3228/4
**3260 [1]**   3228/5
**3289 [1]**   3228/6
**3320 [1]**   3228/4
**333 [1]**   3227/24
**35 [1]**   3264/22
**35 percent [1]**
3243/14
**350 [2]**   3244/4
3269/22
**350,000 [1]**   3268/12

**4**

**4 percent [1]**
3257/7
**401 [1]**   3227/6
**42 [1]**   3237/6
**45,000 [1]**   3255/18
**450 [1]**   3226/15
**49 percent [1]**
3243/24

**5**

**5,000 [1]**   3242/1
**50 [3]**   3274/1
3317/18 3317/25
**50 percent [2]**
3231/11 3297/10
**50,000 [1]**   3273/12
**500 [2]**   3244/4
3317/6
**500,000 [1]**   3242/2
**56,000 [1]**   3242/23
**599 [1]**   3227/3

**6**

**6 percent [1]**
3275/16
**60 percent [1]**
3276/22

**7**

**7.1 [1]**   3318/12
**70 percent [1]**
3243/4
**75 [1]**   3317/25
**75,000 [1]**   3259/17

**8**

**800,000 [1]**   3259/18
**87 [1]**   3239/23

**9**

**9 percent [1]**
3244/2
**90 percent [5]**
3242/24 3243/25
3244/20 3275/19
3275/19
**90067 [1]**   3226/20
**963 [1]**   3234/1
**98 percent [1]**
3242/22
**9:30 [1]**   3226/7

**A**

**a.m [3]**   3226/7

3260/4 3260/5
**Abby [1]**   3226/22
**abide [1]**   3259/2
**ability [6]**   3254/24
3258/14 3258/24
3259/11 3318/17
3318/18
**able [11]**   3237/8
3240/8 3249/14
3251/13 3285/1
3293/7 3300/17
3301/16 3308/6
3316/13 3324/10
**above [11]**   3245/5
3251/7 3251/25
3266/11 3273/12
3274/2 3289/3
3299/25 3301/19
3316/14 3326/5
**above-entitled [1]**
3326/5
**Abrams [3]**   3270/16
3301/20 3304/16
**absent [1]**   3285/8
**Absolutely [3]**
3299/19 3314/10
3315/3
**absorbing [1]**
3296/14
**accept [1]**   3274/15
**accepted [2]**
3250/15 3250/17
**access [2]**   3250/25
3259/1
**accomplish [2]**
3294/14 3314/20
**accordance [1]**
3277/2
**according [2]**
3266/4 3322/15
**account [7]**   3245/11
3275/12 3286/20
3289/1 3289/2
3295/6 3301/9
**accountable [1]**
3294/9
**accounted [3]**
3243/12 3243/14
3243/16
**accuracy [1]**   3237/7
**accurate [2]**
3282/12 3289/4
**accurately [1]**
3257/19
**achieve [4]**   3237/8
3237/9 3240/14
3258/14
**achieved [1]**   3247/2
**achieving [1]**
3246/9
**acknowledged [4]**
3262/23 3276/21
3282/18 3316/19
**acknowledges [1]**
3256/1
**acquire [2]**   3230/24
3236/25
**acquired [2]**
3234/22 3254/20
**acquirers [1]**

**A**

acquirers... [1]
  3277/12
acquiring [5]
  3232/12 3232/18
  3246/10 3249/20
  3254/23
acquisition [7]
  3240/3 3271/16
  3271/20 3275/22
  3277/3 3279/6
  3295/18
acquisitions [7]
  3239/25 3244/9
  3258/20 3266/24
  3276/23 3281/25
  3282/23
across [2]  3288/20
  3313/8
Act [1]  3259/22
Action [1]  3226/3
actions [1]  3258/13
actual [4]  3253/2
  3271/10 3271/10
  3282/19
actually [10]
  3233/9 3266/14
  3275/13 3285/4
  3285/21 3294/20
  3295/12 3295/21
  3313/22 3319/24
ad [2]  3234/15
  3264/12
added [2]  3303/11
  3306/20
addition [2]
  3257/13 3281/8
additional [1]
  3316/1
address [11]  3261/7
  3262/13 3273/10
  3273/16 3284/21
  3285/13 3287/3
  3289/6 3297/6
  3306/1 3310/11
addressed [2]
  3271/3 3307/19
addressing [1]
  3272/20
adequate [1]  3325/4
adhere [1]  3249/13
adjourned [1]
  3325/22
admitted [3]
  3228/11 3242/22
  3322/12
admonish [1]
  3249/19
advance [41]  3231/6
  3235/1 3235/8
  3235/20 3235/25
  3237/20 3239/10
  3240/8 3240/23
  3244/3 3245/5
  3252/17 3257/16
  3259/8 3263/25
  3265/13 3265/17
  3265/17 3265/18
  3268/12 3268/23

3268/25 3269/8
3269/23 3271/18
3271/22 3272/3
3272/5 3272/19
3277/1 3294/10
3294/11 3295/23
3297/5 3299/22
3316/3 3316/23
3317/21 3322/14
3322/15 3323/13
advances [47]
  3235/11 3235/14
  3239/17 3239/18
  3239/20 3240/2
  3242/16 3243/2
  3243/4 3249/15
  3249/21 3253/24
  3254/7 3254/14
  3255/18 3255/20
  3260/22 3262/19
  3263/22 3265/11
  3265/18 3268/5
  3268/6 3269/10
  3269/25 3271/1
  3277/25 3287/6
  3287/22 3287/23
  3288/4 3288/16
  3288/20 3289/3
  3293/4 3296/18
  3299/25 3302/17
  3303/2 3305/5
  3305/14 3305/15
  3305/19 3305/24
  3310/18 3323/7
  3323/9
advantage [1]
  3295/5
advantages [2]
  3246/16 3301/24
adverse [1]  3241/6
advertised [1]
  3264/12
advisement [1]
  3325/20
advocate [1]
  3325/13
advocates [1]
  3251/10
affect [2]  3250/14
  3284/10
affected [1]  3284/8
affirmed [1]  3251/7
afforded [1]  3285/9
afterwards [1]
  3318/11
again [30]  3260/6
  3269/7 3271/9
  3272/13 3273/1
  3273/5 3274/7
  3274/15 3275/9
  3280/20 3281/24
  3286/16 3287/10
  3289/7 3292/9
  3293/4 3294/22
  3300/21 3301/3
  3303/5 3303/11
  3303/15 3305/4
  3308/2 3318/13
  3319/23 3322/12
  3323/4 3323/17

3324/11
against [7]  3246/20
  3253/7 3277/16
  3280/6 3288/7
  3291/7 3324/21
agencies [1]
  3318/12
agency [2]  3252/4
  3252/9
agent [6]  3237/5
  3251/16 3254/24
  3255/1 3255/6
  3276/20
agents [27]  3240/6
  3241/15 3250/18
  3250/19 3250/21
  3251/4 3251/11
  3251/19 3252/12
  3252/21 3252/21
  3275/22 3275/25
  3275/25 3276/4
  3276/7 3276/9
  3278/14 3279/8
  3286/3 3286/4
  3286/11 3286/21
  3291/21 3305/21
  3321/21 3323/8
aggregate [3]
  3279/10 3282/2
  3282/4
aggressive [4]
  3253/23 3293/24
  3294/4 3294/17
aggressively [1]
  3254/6
ago [6]  3247/21
  3248/12 3252/24
  3290/25 3319/6
  3319/14
agree [6]  3259/13
  3278/20 3296/9
  3313/14 3317/11
  3318/17
agreed [7]  3237/3
  3258/22 3277/1
  3282/20 3282/22
  3288/20 3320/9
agreement [3]
  3258/20 3258/25
  3259/3
agrees [1]  3290/22
ahead [1]  3299/6
aims [1]  3232/21
airfare [1]  3235/23
al [2]  3226/6
  3229/3
albeit [1]  3295/15
alchemy [1]  3232/2
alike [1]  3260/20
alleged [6]  3243/2
  3262/22 3263/9
  3263/14 3283/23
  3319/12
alleges [1]  3261/21
alleging [1]  3291/9
allow [3]  3278/13
  3316/6 3316/7
allowed [3]  3322/6
  3322/7 3324/15
allowing [1]  3278/5

allows [1]  3277/23
almost [6]  3231/25
  3275/7 3276/25
  3281/4 3315/21
  3323/21
alone [2]  3258/13
  3284/5
along [5]  3261/3
  3263/3 3265/18
  3265/21 3274/8
alternative [6]
  3238/11 3251/5
  3255/2 3255/4
  3256/23 3325/7
alternatives [1]
  3241/5
alters [1]  3251/9
although [2]  3317/3
  3317/11
always [3]  3272/9
  3281/4 3311/22
amateur [1]  3242/12
Amazon [6]  3248/10
  3252/1 3252/4
  3302/11 3302/13
  3303/5
AMERICA [3]  3226/3
  3229/3 3307/22
American [1]  3231/2
among [9]  3242/11
  3246/10 3258/9
  3258/19 3258/22
  3279/9 3279/11
  3287/18 3313/4
amount [5]  3237/7
  3259/16 3261/25
  3293/11 3318/9
amounts [1]  3233/4
ample [1]  3235/9
amplify [1]  3269/14
analysis [19]
  3237/16 3237/17
  3260/23 3262/3
  3275/12 3275/14
  3275/16 3285/3
  3285/7 3290/9
  3306/7 3306/10
  3306/13 3308/8
  3317/5 3323/13
  3323/16 3324/6
  3324/6
analyze [2]  3233/22
  3283/23
Andrew [4]  3226/22
  3235/15 3237/5
  3240/7
anecdotal [1]
  3306/11
Angeles [1]  3226/20
angry [1]  3303/19
Anna [1]  3233/2
announced [3]
  3252/2 3294/1
  3294/6
annual [1]  3242/2
ante [2]  3234/19
  3264/9
Anthem [4]  3242/1
  3250/23 3251/17
  3256/13 3256/14

**A**

Anthem... [1]
  3256/16
anticipate [1]
  3317/19
anticipated [34]
  3234/10 3234/20
  3234/21 3234/24
  3234/25 3235/7
  3236/4 3236/9
  3237/12 3237/14
  3238/10 3238/13
  3240/6 3240/19
  3240/24 3241/3
  3241/10 3241/19
  3244/6 3245/2
  3246/10 3253/11
  3255/19 3262/18
  3263/19 3264/6
  3264/6 3264/15
  3266/22 3271/7
  3291/10 3299/21
  3316/1 3316/23
anticipation [1]
  3236/18
anticompetitive [5]
  3231/18 3232/22
  3251/15 3258/2
  3258/14
antitrust [8]
  3226/15 3231/23
  3232/19 3236/8
  3263/9 3267/17
  3274/11 3322/5
appearances [3]
  3226/11 3227/1
  3229/4
appeared [1]
  3241/12
appears [1]  3236/5
Apple [2]  3258/12
  3319/10
applicable [2]
  3281/20 3319/15
application [1]
  3269/15
applied [1]  3313/8
applies [1]  3263/8
apply [4]  3231/23
  3232/5 3285/25
  3321/3
applying [1]
  3232/22
appreciable [1]
  3261/14
appreciate [2]
  3260/16 3325/19
approach [1]  3229/4
approaches [1]
  3271/15
appropriate [1]
  3317/15
approval [5]  3239/5
  3264/21 3264/22
  3264/24 3265/2
approvals [1]
  3239/7
approve [1]  3249/21
approved [1]

  3256/18
approximates [1]
  3317/9
apt [1]  3303/25
arbitrary [3]
  3237/19 3272/16
  3273/21
area [3]  3238/19
  3239/21 3316/8
arguably [2]
  3254/10 3325/6
argue [1]  3256/24
argued [3]  3234/14
  3290/25 3321/1
arguing [2]  3272/22
  3305/12
argument [18]
  3228/3 3229/21
  3230/2 3230/12
  3231/22 3242/18
  3242/20 3243/9
  3243/17 3260/3
  3260/9 3289/18
  3304/8 3313/7
  3320/24 3321/4
  3323/18 3323/21
arguments [5]
  3229/18 3256/19
  3260/7 3321/3
  3325/17
arise [1]  3262/24
arose [1]  3295/12
around [14]  3231/13
  3237/21 3239/21
  3266/9 3269/20
  3270/17 3276/14
  3287/14 3294/2
  3304/16 3308/20
  3309/15 3310/4
  3311/5
articulated [1]
  3236/4
artificial [3]
  3273/6 3273/7
  3273/7
aside [2]  3277/19
  3284/4
aspect [2]  3273/10
  3301/15
asserted [1]
  3261/19
associates [1]
  3303/19
assume [6]  3251/16
  3284/23 3285/25
  3291/4 3293/5
  3308/19
assumed [1]  3309/10
assumes [1]  3280/20
assumptions [2]
  3276/8 3309/16
athletes [1]
  3242/13
athletics [1]
  3242/12
attached [1]
  3316/11
attempt [4]  3253/13
  3270/9 3285/14
  3305/5

attention [2]
  3294/1 3316/3
auction [10]
  3254/18 3255/15
  3255/22 3256/10
  3276/1 3276/18
  3285/15 3285/22
  3302/20 3308/13
auctions [15]
  3250/7 3254/18
  3254/20 3276/2
  3276/24 3276/24
  3282/19 3285/20
  3286/2 3286/6
  3286/8 3286/8
  3286/10 3286/12
  3291/22
audience [1]
  3316/25
audio [4]  3252/18
  3259/10 3318/9
  3321/6
August [2]  3226/6
  3230/15
author [12]  3235/15
  3235/21 3257/20
  3272/2 3278/8
  3278/10 3279/19
  3287/6 3301/19
  3301/23 3320/17
  3325/8
author-publisher [1]
  3278/10
authorities [1]
  3263/4
authors [96]
  3230/24 3230/25
  3230/25 3231/4
  3231/4 3231/24
  3232/12 3232/13
  3232/14 3232/16
  3232/19 3233/4
  3233/11 3233/13
  3233/18 3233/18
  3233/21 3235/2
  3236/9 3237/11
  3237/22 3238/10
  3238/14 3238/14
  3240/13 3240/19
  3240/25 3241/4
  3241/11 3241/11
  3241/16 3243/1
  3243/3 3247/10
  3249/1 3249/18
  3252/16 3253/4
  3253/6 3253/19
  3255/17 3255/19
  3257/4 3257/20
  3258/21 3258/22
  3259/12 3259/17
  3260/20 3263/7
  3265/24 3265/25
  3267/13 3267/23
  3268/1 3268/9
  3268/25 3269/6
  3269/9 3269/11
  3269/18 3269/22
  3269/25 3270/1
  3270/5 3270/21
  3270/24 3271/1

  3273/12 3273/12
  3285/2 3286/4
  3286/5 3286/11
  3290/6 3291/10
  3291/12 3295/19
  3301/7 3302/1
  3303/8 3304/14
  3304/16 3316/20
  3319/19 3320/4
  3320/6 3320/9
  3320/12 3321/8
  3322/3 3323/24
  3323/24 3324/1
  3324/5 3324/20
automatic [1]
  3284/24
available [2]
  3255/2 3256/3
Avenue [3]  3226/19
  3227/3 3227/24
average [4]  3255/17
  3255/19 3291/9
  3291/13
avoid [3]  3250/8
  3278/14 3286/12
awards [1]  3241/14
aware [2]  3274/10
  3274/12
away [6]  3235/13
  3292/3 3292/3
  3293/3 3301/4
  3317/13
Ayesha [2]  3253/5
  3253/7

**B**

back [18]  3229/8
  3251/22 3257/16
  3260/5 3261/10
  3283/17 3286/15
  3288/17 3294/2
  3295/1 3298/12
  3298/25 3299/16
  3302/18 3303/17
  3321/16 3323/22
  3324/12
background [2]
  3246/25 3250/7
backlist [4]
  3246/17 3246/19
  3247/25 3281/19
backwards [1]
  3286/1
bad [1]  3254/10
baked [1]  3300/21
Baker [5]  3231/14
  3233/6 3244/23
  3245/7 3253/17
bankruptcy [2]
  3227/24 3313/6
bargaining [3]
  3263/25 3275/1
  3276/5
Barnes [1]  3302/21
barrier [1]  3247/8
barriers [2]  3246/9
  3258/4
baseball [1]
  3303/22
based [16]  3235/12

**B**

based... **[15]**
3237/17 3241/16
3262/24 3263/14
3265/15 3265/18
3267/12 3268/22
3269/23 3271/11
3271/16 3283/19
3286/23 3295/22
3313/17
basically **[1]**
3267/23
basics **[1]**   3283/18
basis **[4]**   3262/21
3271/20 3274/6
3324/11
bat **[2]**   3275/6
3275/17
BATNA **[1]**   3255/1
bear **[3]**   3258/2
3314/7 3314/20
became **[1]**   3233/12
become **[4]**   3246/15
3247/16 3252/25
3303/5
becomes **[1]**   3257/6
beer **[3]**   3292/7
3292/7 3292/10
begin **[3]**   3230/13
3230/22 3261/9
begins **[1]**   3233/7
behalf **[1]**   3260/11
behavior **[1]**   3288/3
beholden **[4]**
3248/21 3248/23
3307/16 3307/20
belabor **[1]**   3293/13
believes **[1]**
3231/19
below **[6]**   3266/11
3266/14 3267/3
3289/2 3294/24
3316/13
Ben **[1]**   3229/7
BENCH **[1]**   3226/9
benefit **[3]**   3283/15
3290/5 3301/23
benefits **[2]**
3230/25 3260/19
Bergstrom **[1]**
3268/19
Berkett **[1]**   3319/22
BERTELSMANN **[17]**
3226/6 3226/18
3226/22 3228/5
3229/3 3229/11
3244/17 3247/7
3260/7 3260/9
3260/11 3290/2
3306/24 3307/3
3307/11 3307/16
3307/20
Bertelsmann's **[1]**
3306/21
best **[29]**   3232/14
3232/16 3240/18
3241/12 3247/16
3254/21 3255/2
3255/4 3256/8

3260/21 3276/24
3280/17 3285/17
3285/17 3285/21
3286/4 3286/8
3290/3 3290/4
3291/20 3291/23
3292/13 3304/14
3304/16 3308/5
3310/23 3320/18
3322/1 3323/22
better **[10]**   3247/6
3250/8 3256/21
3270/12 3286/5
3301/6 3308/5
3320/6 3320/10
3320/18
beyond **[3]**   3236/1
3270/8 3295/1
Bibles **[3]**   3298/1
3298/5 3300/6
bid **[12]**   3250/2
3251/1 3251/10
3254/6 3276/24
3277/6 3278/6
3279/24 3282/15
3285/21 3318/21
3323/3
bidder **[7]**   3250/5
3250/12 3252/22
3276/21 3278/15
3278/16 3284/3
bidders **[6]**   3254/14
3254/16 3275/5
3275/23 3279/1
3279/2
bidding **[12]**   3250/4
3250/8 3251/5
3253/7 3253/24
3256/15 3277/15
3278/13 3279/25
3288/15 3322/13
3322/21
bids **[13]**   3250/11
3251/1 3254/21
3276/1 3278/4
3280/11 3285/17
3286/5 3291/20
3291/23 3292/13
3321/20 3321/22
big **[68]**   3235/2
3240/16 3240/19
3243/24 3243/25
3244/10 3244/13
3244/14 3246/16
3246/16 3246/20
3248/16 3252/13
3257/5 3257/5
3258/9 3258/10
3258/19 3258/22
3266/15 3269/19
3270/10 3270/11
3270/12 3270/24
3270/25 3271/1
3273/23 3274/9
3277/10 3281/15
3281/24 3282/3
3282/13 3282/19
3291/25 3300/16
3300/20 3300/24
3301/6 3301/16

3301/19 3301/23
3301/24 3301/25
3302/5 3302/12
3302/15 3302/17
3303/1 3303/11
3304/1 3304/5
3304/6 3304/7
3304/21 3305/2
3305/4 3308/7
3308/17 3308/21
3308/22 3308/23
3317/22 3321/5
3323/4 3324/9
3324/10
bigger **[4]**   3282/2
3287/19 3297/10
3322/23
biggest **[1]**   3323/18
bilateral **[3]**
3276/23 3285/16
3286/4
billion **[1]**   3243/3
billionaires **[1]**
3270/6
bit **[5]**   3254/12
3257/16 3272/1
3277/7 3305/11
block **[1]**   3268/22
blocked **[1]**   3306/23
blue **[1]**   3294/23
board **[3]**   3244/18
3247/7 3250/6
book **[28]**   3232/10
3237/2 3246/11
3248/25 3252/15
3254/10 3254/20
3254/23 3254/24
3255/18 3255/21
3258/13 3264/3
3268/2 3271/14
3271/14 3277/6
3278/7 3278/7
3282/8 3288/9
3291/11 3291/14
3292/2 3292/14
3292/25 3301/19
3322/13
books **[106]**
booksellers **[1]**
3247/11
bookstores **[1]**
3298/24
borrowing **[1]**
3243/21
both **[16]**   3230/18
3230/20 3233/22
3237/23 3237/25
3256/15 3256/16
3266/1 3284/9
3296/10 3297/9
3308/13 3309/7
3310/15 3318/16
3325/16
bottom **[6]**   3241/16
3266/4 3291/24
3293/23 3297/11
3307/24
boundary **[5]**   3266/3
3266/25 3269/19
3272/14 3272/15

bounds **[1]**   3238/25
boxing **[3]**   3242/8
3242/9 3242/10
brand **[1]**   3247/17
break **[6]**   3229/20
3229/23 3260/2
3266/14 3266/17
3318/4
breakout **[1]**   3231/6
breaks **[2]**   3229/19
3258/25 3317/19
Brian **[1]**   3288/10
brief **[1]**   3324/16
briefing **[2]**
3286/18 3325/21
briefly **[1]**   3274/23
bring **[2]**   3237/15
3323/6
broader **[1]**   3262/24
broke **[1]**   3239/9
broken **[1]**   3299/1
brokers **[1]**   3251/1
brought **[1]**   3232/13
Brown **[12]**   3237/18
3237/24 3238/5
3238/21 3238/21
3238/25 3240/12
3241/10 3241/20
3242/3 3263/8
3269/16
Bruce **[1]**   3291/15
buckets **[2]**   3239/18
3265/9
budget **[3]**   3235/1
3241/1 3264/13
budgets **[4]**   3235/3
3249/19 3264/12
3264/13
Building **[1]**
3246/17
bunch **[2]**   3307/20
3318/16
burden **[8]**   3244/23
3245/8 3258/3
3262/16 3274/17
3274/18 3314/7
3314/20
burdens **[2]**   3231/14
3233/7
business **[24]**
3232/3 3232/11
3236/18 3240/5
3240/11 3243/11
3243/11 3243/12
3246/25 3252/3
3252/9 3257/21
3277/10 3277/20
3280/18 3287/8
3294/15 3311/22
3311/23 3312/6
3312/15 3312/22
3312/23 3322/21
business-to-business **[1]**
3243/11
businesses **[2]**
3312/9 3312/12
businessman **[1]**
3249/10
buy **[4]**   3269/2
3270/7 3270/13

**B**

buy... [1]    3274/9
buyer [1]    3245/25
buyers [3]    3266/24
3273/24 3308/19
buying [2]    3236/21
3323/11

**C**

calculate [1]
3237/7
calculation [3]
3282/12 3291/8
3310/19
calculations [2]
3267/2 3286/23
California [1]
3226/20
call [5]    3298/1
3298/9 3308/4
3309/20 3312/1
called [8]    3233/18
3233/19 3237/5
3264/4 3277/10
3280/12 3304/18
3321/4
came [5]    3270/22
3295/8 3305/14
3306/24 3312/2
can [80]    3230/2
3234/25 3236/24
3237/7 3237/9
3237/15 3241/4
3241/5 3241/15
3247/12 3247/13
3249/15 3249/16
3249/16 3249/18
3249/19 3249/22
3249/24 3254/8
3254/12 3254/18
3255/6 3255/21
3259/1 3262/22
3263/3 3266/1
3266/17 3266/17
3267/24 3268/2
3269/8 3269/9
3269/12 3269/22
3269/23 3270/20
3271/1 3271/6
3271/15 3272/14
3273/9 3273/16
3276/20 3278/14
3281/17 3281/21
3282/8 3284/10
3284/18 3284/19
3286/17 3291/21
3291/23 3292/2
3292/3 3292/18
3292/18 3293/6
3293/12 3293/18
3298/12 3300/18
3303/4 3303/5
3303/9 3306/5
3306/9 3311/21
3315/23 3316/4
3316/21 3317/12
3317/25 3318/1
3323/21 3324/3
3324/5 3324/5

3324/12
Cantor [1]    3226/23
capabilities [2]
3240/17 3240/17
capacity [5]
3248/19 3306/15
3306/20 3306/22
3307/21
captive [1]    3269/12
capture [1]    3265/25
captures [2]    3263/6
3267/6
care [2]    3296/1
3313/19
career [1]    3278/19
carefully [2]
3289/10 3304/3
cares [1]    3310/20
carried [1]    3317/17
carriers [1]    3251/9
cartoon [1]    3294/2
carving [1]    3274/6
case [67]    3229/2
3230/23 3231/3
3231/14 3231/19
3232/13 3234/5
3234/8 3236/8
3237/17 3238/12
3238/22 3240/13
3242/13 3243/7
3245/23 3250/19
3256/23 3257/10
3259/6 3260/24
3260/25 3262/15
3262/23 3263/18
3263/20 3264/5
3264/7 3264/9
3267/5 3272/22
3274/4 3274/11
3274/12 3274/19
3275/7 3275/9
3275/10 3277/5
3279/21 3280/25
3281/1 3281/1
3283/15 3283/18
3287/7 3289/8
3292/6 3293/20
3296/2 3296/9
3296/18 3306/3
3306/11 3308/10
3311/2 3317/11
3317/17 3319/6
3319/7 3319/7
3322/6 3322/10
3324/16 3325/3
3325/16 3325/19
cases [12]    3242/15
3245/17 3245/17
3257/9 3263/1
3263/10 3263/12
3284/20 3293/16
3315/23 3321/14
3322/5
catchy [1]    3277/14
categorical [1]
3270/13
categories [4]
3265/4 3265/7
3267/23 3298/4
categorize [1]

3309/4
category [6]    3263/6
3263/20 3265/24
3269/8 3271/24
3279/10
causal [1]    3271/21
cause [3]    3260/24
3261/20 3285/11
caused [1]    3306/19
caveat [1]    3294/13
CC [2]    3280/25
3284/21
celebrities [2]
3233/19 3316/20
celebrity [4]
3268/1 3269/24
3272/2 3273/12
cells [1]    3287/21
cementing [2]
3231/9 3243/22
central [1]    3312/24
CEO [8]    3235/19
3237/2 3249/9
3254/16 3258/18
3290/1 3294/8
3322/15
CEOs [3]    3235/10
3258/10 3258/19
certain [4]    3264/17
3265/23 3269/10
3302/15
certainly [4]
3262/5 3271/10
3301/16 3304/21
certify [1]    3326/4
cetera [4]    3270/18
3292/16 3305/21
3316/25
CFO [1]    3307/15
chain [1]    3246/13
challenge [2]
3315/3 3315/5
challenged [1]
3311/8
challenges [1]
3248/9
challenging [2]
3253/9 3255/8
championship [1]
3242/9
championships [1]
3242/9
chances [1]    3278/6
change [19]    3239/21
3241/6 3247/18
3252/8 3254/7
3254/21 3266/9
3266/18 3276/3
3276/18 3280/21
3288/3 3288/14
3288/15 3292/23
3293/6 3303/12
3310/3 3318/13
changed [7]    3244/8
3252/25 3291/1
3294/19 3294/19
3294/20 3305/24
changes [1]    3318/19
changing [3]
3290/15 3290/23

3291/2
character [1]
3246/6
characteristic [1]
3245/15
characteristics [6]
3234/18 3241/10
3241/18 3263/17
3264/18 3281/20
charitable [1]
3235/24
Charles [1]    3320/17
chart [5]    3239/11
3266/12 3288/25
3289/4 3297/11
charts [1]    3317/21
cheaper [1]    3324/19
check [3]    3229/18
3289/14 3305/7
cherry [1]    3316/7
children's [2]
3304/6 3305/3
choice [5]    3253/10
3256/3 3275/5
choices [1]    3275/15
choose [8]    3244/3
3286/12 3291/21
3316/5 3317/24
3317/24 3318/1
3318/1
choosing [1]    3312/7
chose [5]    3239/5
3241/7 3304/2
3312/20 3317/1
chosen [2]    3273/14
3277/10
Christian [16]
3295/11 3296/10
3297/14 3297/16
3297/21 3297/25
3297/25 3298/1
3298/5 3298/6
3298/10 3298/18
3299/10 3299/18
3300/2 3300/4
Christie [2]    3253/4
3253/5
chuckle [1]    3277/16
circuit [10]
3234/19 3236/2
3236/19 3245/17
3250/23 3251/7
3257/9 3257/10
3258/10 3261/15
circumstance [2]
3278/15 3278/16
circumstances [1]
3280/12
circumstantial [1]
3293/19
cite [1]    3235/10
cited [1]    3274/14
civil [2]    3226/3
3229/2
claim [3]    3243/7
3247/18 3321/12
claimed [3]    3251/17
3252/13 3264/23
claiming [1]
3231/25

**C**

claims [3]    3262/20
3266/8 3266/10
clarity [1]    3264/15
claw [1]    3301/4
Clayton [1]    3259/22
clear [17]    3233/12
3238/22 3263/1
3264/20 3265/12
3272/6 3279/18
3280/9 3280/13
3283/19 3285/19
3286/25 3295/2
3298/9 3305/19
3318/4 3318/7
clearly [6]    3259/13
3262/14 3283/22
3283/22 3312/6
3316/11
client [1]    3314/22
clients [5]    3252/11
3260/12 3272/4
3289/23 3319/17
clients' [1]    3253/9
cliff [1]    3269/21
close [5]    3231/18
3238/3 3249/15
3261/2 3299/13
closed [5]    3247/24
3248/7 3249/3
3270/23 3306/23
closer [1]    3309/14
closing [12]    3228/3
3229/18 3229/21
3230/2 3230/12
3260/2 3260/7
3260/9 3269/3
3284/1 3289/18
3320/24
clustered [1]
3308/20
CO [2]    3226/6
3229/3
cognizable [1]
3262/17
colleagues [2]
3229/8 3229/12
collectively [1]
3304/5
Colleen [1]    3302/20
COLUMBIA [1]    3226/1
combination [1]
3311/10
combinations [3]
3305/7 3305/17
3305/23
combine [1]    3243/25
combined [5]
3244/11 3284/25
3292/21 3293/3
3297/4
coming [5]    3257/4
3283/10 3314/15
3314/21 3314/22
comment [1]    3303/21
comments [1]
3275/23
commerce [4]
3242/19 3243/14

3323/25 3324/12
commercial [1]
3236/24
commitment [1]
3250/15
committed [1]
3319/21
commodity [3]
3292/5 3292/7
3313/17
common [5]    3237/19
3254/13 3255/5
3280/14 3314/16
common-sense [3]
3237/19 3255/5
3314/16
communication [2]
3279/18 3280/12
communications [1]
3280/8
companies [9]
3244/17 3247/19
3250/24 3251/3
3270/16 3275/20
3276/12 3281/2
3288/6
company [7]    3247/2
3247/4 3247/9
3247/25 3281/8
3281/9 3287/24
comparison [2]
3292/4 3299/11
compelling [1]
3293/21
compensation [3]
3257/20 3259/18
3270/5
compete [23]
3230/24 3246/20
3249/5 3249/17
3254/1 3280/6
3280/23 3288/7
3296/24 3297/24
3298/2 3298/7
3298/13 3300/5
3300/10 3301/17
3302/25 3304/11
3320/15 3322/3
3322/7 3324/19
3304/22
competed [1]    3234/2
competes [1]
3298/20
competing [2]
3298/10 3324/21
competition [50]
3230/25 3232/1
3232/4 3232/7
3232/10 3232/15
3232/24 3233/5
3233/12 3245/1
3245/12 3246/7
3249/22 3259/16
3259/17 3261/14
3261/17 3262/1
3275/3 3277/8
3277/11 3277/14
3277/19 3277/21
3277/23 3278/21
3278/23 3279/8

3279/9 3279/11
3279/15 3280/17
3280/24 3282/3
3283/19 3283/21
3284/2 3284/2
3284/6 3284/19
3284/25 3285/11
3286/20 3290/10
3300/20 3318/2
3320/16 3320/16
3322/15 3325/13
competitive [13]
3233/14 3233/24
3246/4 3246/16
3248/2 3248/4
3253/14 3266/10
3275/8 3283/13
3283/24 3291/4
3324/2
competitively [1]
3278/6
competitiveness [1]
3244/16
competitor [12]
3231/10 3248/23
3251/8 3254/9
3284/24 3287/9
3293/21 3301/6
3303/6 3318/19
3320/2 3322/17
competitors [15]
3258/15 3274/13
3285/4 3288/2
3290/18 3292/23
3293/7 3295/4
3304/24 3306/5
3308/5 3316/9
3317/21 3317/22
3318/21
complaining [2]
3307/2 3319/25
complaint [1]
3233/10
complete [1]    3276/2
complicated [1]
3323/15
comports [1]    3323/3
computing [1]
3296/11
concede [1]    3257/24
conceded [5]
3233/16 3238/15
3254/2 3257/20
3325/8
concedes [1]    3273/3
concentrated [3]
3231/10 3252/25
3273/4
concentration [3]
3244/24 3245/6
3257/25 3272/10
3273/7 3275/2
concept [5]    3236/11
3237/15 3263/18
3304/17 3322/8
concern [2]    3259/5
3284/25
concerned [3]
3248/24 3295/18
3319/19

concerns [2]    3249/3
3249/4
conclude [1]    3287/4
concluded [1]
3290/4
conclusions [1]
3325/2
concrete [2]    3285/8
3291/6
conditions [3]
3233/24 3266/10
3285/5
conduct [2]    3276/4
3294/20
conducted [1]
3286/3
conducting [1]
3260/13
confidence [1]
3256/8
confidential [9]
3230/6 3239/8
3270/22 3270/22
3288/11 3289/21
3293/9 3294/23
3302/9
confirmed [1]
3247/9
confirming [1]
3237/17
conflicting [1]
3323/10
connection [1]
3271/21
consensus [4]
3267/7 3267/10
3267/21 3271/25
Consequently [1]
3248/14
conservative [1]
3255/17
consider [3]
3233/10 3238/21
3286/4
consideration [1]
3296/19
considerations [1]
3318/5
considered [2]
3248/14 3278/21
consisted [1]
3242/5
consistent [10]
3250/9 3256/10
3263/2 3309/6
3309/15 3312/14
3312/15 3317/7
3317/14 3324/11
consistently [2]
3241/23 3287/8
consolidation [2]
3257/5 3305/20
constitutes [1]
3265/8
Constitution [1]
3227/24
constraining [3]
3281/23 3282/15
3283/11
constraint [1]

# C

constraint... [1]
3283/8
constraints [1]
3306/15
consultants [2]
3251/1 3251/14
consummated [1]
3254/3
Cont [1]   3227/1
contemplated [1]
3287/24
contemporary [1]
3294/15
contending [3]
3262/1 3265/7
3271/5
contention [1]
3251/12
continue [1]   3301/4
continued [2]
3257/5 3266/15
continuum [8]
3263/3 3265/18
3265/21 3267/18
3315/25 3316/4
3317/23 3323/20
contract [5]   3235/4
3235/22 3307/17
3321/3 3321/5
contracted [1]
3243/2
contrary [6]   3231/2
3244/10 3253/3
3258/17 3259/6
3288/1
contrasted [1]
3321/14
contributions [1]
3235/23
control [3]   3249/19
3275/22 3312/24
controlling [2]
3244/20 3319/15
convened [1]
3285/22
convince [1]
3251/24
coordinate [2]
3250/2 3259/11
coordinated [7]
3250/4 3258/2
3258/7 3258/12
3287/2 3315/20
3318/6
coordination [15]
3250/7 3257/23
3258/5 3258/5
3258/9 3258/19
3259/5 3259/14
3279/22 3280/4
3280/11 3280/15
3318/8 3318/15
3321/1
coordinator [1]
3280/10
copies [4]   3242/24
3242/24 3268/9
3268/10

core [3]   3242/5
3252/15 3261/24
Cornwell [1]
3302/16
Corp [1]   3294/8
corporate [1]
3322/7
corporations [2]
3248/11 3250/24
correction [1]
3312/3
correlated [5]
3235/8 3235/24
3296/3 3296/4
3296/5
correlation [11]
3235/14 3235/18
3235/20 3239/17
3265/11 3265/13
3265/19 3271/10
3271/22 3297/1
3297/5
corroboration [1]
3305/22
cost [2]   3309/17
3309/20
costs [28]   3308/25
3309/1 3309/4
3309/7 3309/9
3309/13 3309/14
3310/9 3312/10
3312/10 3312/13
3312/13 3312/18
3312/25 3313/1
3313/3 3313/3
3313/5 3313/9
3313/10 3313/12
3313/15 3313/15
3313/18 3313/18
3313/20 3313/23
3315/11
counsel [2]   3229/3
3229/7
count [1]   3248/13
counted [1]   3295/12
counter [2]   3258/25
3295/7
counter-factual [1]
3295/7
counter-poach [1]
3258/25
counteract [1]
3251/14
counts [2]   3249/19
3300/22
couple [9]   3247/20
3254/8 3266/13
3267/15 3274/1
3287/4 3290/25
3292/5 3320/14
course [11]   3230/11
3239/9 3239/19
3261/6 3268/21
3274/19 3287/8
3290/12 3302/7
3305/17 3311/17
court [31]   3226/1
3227/23 3229/20
3230/13 3230/21
3234/8 3234/11

3236/6 3240/12
3242/9 3243/15
3245/18 3245/19
3250/1 3250/15
3250/18 3250/20
3251/16 3255/9
3256/20 3259/25
3262/13 3262/16
3263/8 3289/9
3289/14 3292/20
3314/19 3320/25
3325/20 3326/3
courts [7]   3227/24
3234/6 3241/23
3256/11 3256/18
3260/23 3263/10
cover [8]   3242/20
3245/13 3259/9
3286/17 3286/22
3301/14 3308/1
3308/1
covered [1]   3297/8
cream [3]   3324/18
3324/19 3324/19
create [7]   3236/22
3252/1 3256/22
3257/25 3273/6
3273/7 3312/19
created [3]   3234/6
3273/6 3316/18
creates [3]   3247/8
3253/13 3277/12
creating [3]
3232/17 3247/4
3260/19
creative [3]   3234/5
3242/17 3259/19
credibility [1]
3274/4
credible [1]
3270/25
credit [1]   3279/7
criteria [6]   3233/6
3234/23 3235/5
3236/1 3241/2
3269/23
critical [2]
3262/14 3263/12
criticism [2]
3320/9 3320/10
criticisms [1]
3286/16
criticized [1]
3255/22
criticizes [1]
3241/21
crossover [1]
3298/9
Crown [1]   3253/8
cultural [1]
3319/20
cumulatively [1]
3244/1
current [5]   3244/16
3290/12 3292/19
3301/8 3308/15
currently [3]
3244/19 3253/22
3255/4
curve [1]   3316/8

customers [9]
3242/2 3242/5
3243/11 3243/11
3243/13 3243/13
3243/16 3251/13
3263/6
customized [1]
3235/22
cut [2]   3282/24
3287/22
cutting [1]   3270/5

# D

D.C [5]   3226/6
3226/16 3227/6
3227/25 3261/15
danger [2]   3261/14
3316/4
Daniel [4]   3226/17
3226/23 3229/10
3260/10
data [8]   3233/25
3237/15 3239/8
3248/16 3256/3
3266/14 3296/11
3297/9
database [1]
3295/23
dataset [1]   3244/7
DATE [1]   3326/10
day [4]   3230/21
3265/10 3285/24
3321/17
days [2]   3266/13
3290/25
deal [10]   3250/19
3255/3 3265/8
3284/20 3290/2
3290/5 3294/6
3319/18 3319/25
3320/1
dealing [3]   3272/2
3275/1 3275/18
deals [3]   3239/5
3265/9 3320/3
dealt [2]   3307/23
3307/24
Dean [1]   3302/16
debate [4]   3233/15
3282/11 3282/16
3285/19
debunking [1]
3293/12
decade [4]   3244/10
3248/12 3252/24
3325/1
decades [3]   3261/16
3278/3 3280/16
deceased [1]
3319/12
decide [3]   3233/11
3275/25 3276/3
decided [1]   3280/17
decides [1]   3271/13
decision [2]
3289/10 3289/11
decisions [1]
3313/17
decrease [5]
3260/21 3260/24

# D

**decrease... [3]**
3260/25 3285/1
3288/21
**decreased [1]**
3233/5
**decreases [2]**
3269/13 3270/4
**deeply [1]**   3301/9
**default [1]**   3311/25
**defendant [3]**
3226/7 3249/2
3260/7
**defendants [31]**
3226/17 3226/22
3227/2 3229/23
3230/14 3231/12
3231/17 3232/8
3234/13 3234/15
3235/13 3237/5
3244/5 3244/7
3245/9 3245/19
3245/21 3249/7
3250/15 3250/20
3251/15 3251/17
3252/13 3253/3
3256/18 3256/24
3257/24 3258/2
3260/3 3260/11
3260/18
**defendants' [6]**
3236/25 3238/15
3245/15 3246/22
3253/13 3255/1
**defense [10]**   3232/3
3246/1 3246/2
3249/6 3250/16
3250/18 3250/22
3251/12 3252/23
3316/18
**defenses [4]**
3231/17 3245/13
3245/21 3245/22
**define [10]**   3237/21
3239/4 3241/22
3241/24 3242/14
3266/25 3269/22
3271/19 3317/7
3323/23
**defined [8]**   3238/18
3238/19 3263/2
3266/23 3268/22
3269/20 3269/25
3275/4
**defines [3]**   3266/2
3274/12 3299/22
**defining [1]**
3271/20
**definition [12]**
3231/15 3234/10
3234/14 3238/22
3240/23 3262/10
3262/14 3263/13
3265/20 3268/14
3269/1 3274/16
**degraded [1]**
3270/16
**degree [4]**   3237/7
3267/25 3268/23

3275/3
**delay [1]**   3259/1
**demand [4]**   3234/12
3234/13 3250/8
3306/17
**demands [1]**   3277/1
**demarcation [1]**
3237/21
**demonstrate [1]**
3258/13
**demonstrated [1]**
3257/24
**demonstrates [2]**
3264/7 3273/21
**demonstrative [1]**
3239/14
**denominator [1]**
3282/17
**deny [1]**   3289/12
**depart [1]**   3311/21
**Department [2]**
3226/14 3290/24
**departure [1]**
3269/16
**depend [1]**   3240/19
**depending [1]**
3264/24
**depiction [1]**
3289/4
**deprioritize [1]**
3248/24
**describe [5]**
3233/11 3233/17
3233/23 3265/9
3282/21
**desire [1]**   3301/3
**despite [4]**   3250/2
3250/5 3270/8
3287/13
**detail [2]**   3289/6
3299/7
**details [2]**   3285/12
3286/17
**detection [1]**
3249/25
**determinative [1]**
3245/16
**determine [4]**
3236/23 3240/8
3260/23 3285/3
**determined [3]**
3232/1 3237/19
3275/2
**determining [1]**
3310/17
**develop [1]**   3281/19
**developed [1]**
3255/23
**development [1]**
3259/7
**devolves [1]**   3232/6
**devote [1]**   3235/16
**differ [1]**   3271/25
**difference [8]**
3234/1 3237/10
3270/14 3273/23
3308/17 3308/21
3308/23 3316/11
**differences [1]**
3233/22

**different [39]**
3233/13 3233/14
3233/24 3244/3
3256/21 3264/24
3265/8 3265/9
3265/16 3265/19
3265/24 3266/11
3267/8 3267/13
3267/14 3273/22
3274/6 3286/5
3290/16 3290/18
3290/19 3292/17
3295/25 3299/17
3299/18 3302/3
3311/13 3313/14
3315/23 3315/24
3316/14 3317/13
3318/23 3319/8
3319/11 3319/13
3324/4 3324/20
3324/23
**differentiate [2]**
3234/12 3234/18
**differentiated [1]**
3316/12
**differentiating [1]**
3274/25
**differently [1]**
3232/7
**difficult [5]**
3246/17 3247/16
3274/3 3292/19
3293/18
**digit [1]**   3311/9
**digital [2]**   3252/5
3252/6
**digits [1]**   3311/11
**diligently [1]**
3260/13
**diminished [1]**
3257/20
**direct [8]**   3253/20
3258/5 3276/4
3283/20 3286/22
3287/17 3293/21
3321/24
**directional [1]**
3262/4
**directly [5]**   3238/2
3249/17 3294/21
3294/24 3319/24
**directors [1]**
3264/11
**disadvantage [1]**
3306/5
**disadvantaged [2]**
3320/5 3320/5
**disadvantages [1]**
3246/21
**disagree [2]**   3311/1
3316/21
**disagreed [1]**
3296/10
**disagreeing [1]**
3234/20
**disagreement [2]**
3305/13 3308/15
**discern [1]**   3293/17
**discourse [1]**
3259/19

**discoverability [1]**
3320/3
**discretion [1]**
3276/3
**discrimination [2]**
3269/4 3269/14
**discuss [6]**   3237/13
3245/24 3245/24
3258/11 3262/8
3262/12
**discussed [4]**
3241/7 3241/15
3241/25 3303/16
**discussion [6]**
3236/3 3236/13
3289/15 3311/5
3318/8 3321/7
**dismissive [1]**
3270/9
**Disney [3]**   3270/18
3302/12 3303/8
**dispositive [1]**
3262/15
**disproportionate [1]**
3243/16
**dispute [5]**   3238/9
3243/20 3245/1
3246/14 3302/14
**disputed [3]**
3265/12 3310/6
3311/12
**disputes [1]**
3311/19
**distant [1]**   3281/3
**distinct [13]**
3234/20 3234/21
3240/22 3242/4
3242/5 3262/17
3263/6 3263/19
3265/21 3267/6
3267/20 3269/8
3271/24
**distinction [1]**
3266/1
**distinctions [1]**
3235/7
**distinctive [1]**
3263/17
**distinguish [2]**
3234/3 3299/17
**distinguishing [1]**
3273/22
**distort [1]**   3281/23
**distribute [1]**
3313/4
**distributed [1]**
3302/21
**distribution [2]**
3264/3 3320/3
**district [7]**   3226/1
3226/1 3226/10
3227/24 3256/12
3257/10 3325/1
**diverse [1]**   3257/21
**diversion [1]**
3290/12
**diversions [1]**
3291/4
**diversity [1]**
3257/17

**D**

diverting [1]
3260/14
division [2]
3226/15 3297/14
divisions [2]
3250/2 3250/4
document [6]   3247/1
3277/24 3321/17
3321/18 3321/19
3321/19
documents [8]
3239/19 3246/22
3247/7 3279/20
3287/8 3287/13
3287/14 3287/15
Dohle [4]   3239/24
3246/23 3249/8
3257/19
Dohle's [2]   3243/21
3253/22
DOJ [3]   3260/23
3295/6 3303/20
dollar [2]   3268/6
3268/15
dollars [4]   3243/3
3268/10 3288/24
3292/25
dominant [4]   3231/9
3243/21 3273/24
3321/10
done [9]   3245/14
3249/22 3263/10
3273/1 3277/4
3287/6 3302/24
3315/21 3323/16
double [4]   3297/17
3297/18 3311/9
3311/11
DoubleDay [1]
3239/7
doubt [3]   3294/18
3294/18 3302/23
down [15]   3244/21
3265/1 3266/5
3266/14 3266/16
3266/17 3269/17
3291/16 3292/24
3299/2 3302/16
3305/15 3305/24
3317/21 3323/9
downgraded [1]
3270/16
downstream [12]
3272/9 3295/14
3295/16 3295/20
3296/1 3296/18
3296/20 3297/2
3297/12 3297/13
3319/6 3319/14
downward [1]
3285/24
dozens [2]   3279/11
3279/11
Dr [2]   3282/11
3286/16
Dr. [52]   3233/16
3237/19 3238/15
3241/21 3241/21

3242/22 3243/23
3244/11 3245/2
3245/4 3253/11
3255/15 3255/21
3255/23 3256/1
3256/22 3257/7
3258/17 3259/6
3261/24 3264/19
3265/4 3266/4
3266/7 3267/2
3269/5 3272/17
3273/10 3275/16
3276/21 3282/12
3282/18 3283/5
3283/6 3283/23
3283/25 3285/6
3285/12 3285/14
3285/23 3286/14
3288/25 3292/5
3300/19 3306/10
3308/12 3308/17
3308/24 3312/23
3313/4 3316/22
3323/2
Dr. Hill [31]
3237/19 3241/21
3243/23 3244/11
3255/15 3255/23
3256/1 3261/24
3264/19 3265/4
3266/4 3266/7
3267/2 3269/5
3272/17 3276/21
3282/18 3283/6
3283/23 3283/25
3285/6 3285/14
3286/14 3288/25
3292/5 3300/19
3306/10 3308/17
3308/24 3316/22
3323/2
Dr. Hill's [9]
3245/4 3253/11
3257/7 3273/10
3275/16 3282/12
3285/12 3285/23
3308/12
Dr. Snyder [10]
3233/16 3238/15
3241/21 3242/22
3245/2 3255/21
3256/22 3283/5
3312/23 3313/4
Dr. Snyder's [2]
3258/17 3259/6
dramatic [3]   3266/8
3266/18 3269/21
dramatically [1]
3290/25
draw [8]   3234/3
3239/2 3266/20
3272/24 3273/11
3292/4 3317/3
3317/12
drawn [2]   3262/19
3323/22
draws [1]   3266/7
drew [3]   3234/4
3302/18 3317/14
drive [3]   3243/6

3250/13 3313/6
driven [1]   3237/4
drivers [1]   3276/7
drives [1]   3322/14
driving [2]   3276/5
3322/15
drop [1]   3266/24
drugstores [1]
3299/24
Duhigg [1]   3320/17
duopoly [2]   3232/6
3232/9
duplicate [1]
3246/17
during [4]   3228/11
3230/15 3231/3
3306/16
dwell [3]   3238/17
3301/13 3303/15
dynamic [4]   3251/10
3276/18 3282/21
3292/17
dynamics [1]   3291/4

**E**

e-book [1]   3258/13
e-books [2]   3319/5
3319/9
e-mail [1]   3307/14
e-mails [1]   3280/9
earlier [1]   3241/15
early [3]   3254/15
3259/16 3324/17
earn [1]   3231/1
earth [1]   3248/11
easier [2]   3258/16
3321/8
easily [1]   3293/12
easy [2]   3281/3
3287/10
ebb [1]   3302/22
EBIT [4]   3251/24
3311/15 3311/17
3311/23
economic [11]
3237/17 3249/10
3250/13 3254/13
3254/14 3255/8
3255/11 3256/11
3256/13 3285/3
3315/4
economically [1]
3278/11
economics [4]
3231/23 3232/4
3253/21 3315/6
economists [4]
3237/15 3253/21
3255/24 3256/16
ecosystem [1]
3254/11
edge [1]   3240/18
edited [1]   3274/7
editor [3]   3249/21
3280/3 3291/24
editorial [1]
3264/1
editors [14]
3231/24 3240/6
3241/15 3249/19

3249/20 3258/17
3264/1 3276/12
3291/18 3292/17
3302/18 3310/17
3311/16 3322/21
effect [6]   3245/11
3255/16 3257/17
3262/4 3288/10
3305/21
effectively [2]
3255/6 3281/8
effects [16]
3231/19 3251/15
3253/2 3258/2
3258/8 3261/25
3262/3 3262/12
3275/8 3281/24
3283/13 3283/24
3284/21 3287/2
3315/20 3318/6
efficiencies [3]
3245/18 3245/24
3287/19
effort [4]   3232/17
3279/15 3281/18
3309/6
Eighth [1]   3226/20
either [6]   3237/24
3241/19 3275/17
3276/6 3282/13
3282/19
elected [1]   3304/23
elicited [1]   3235/6
eliminate [1]
3276/17
eliminated [1]
3283/21
eliminates [1]
3275/3
eliminating [2]
3231/9 3284/24
elimination [1]
3284/3
elite [1]   3242/13
else [13]   3230/17
3279/10 3281/2
3284/14 3291/16
3299/3 3304/1
3305/25 3314/1
3314/18 3315/1
3315/2 3323/11
elsewhere [1]
3260/15
emphasize [1]
3318/8
employees [2]
3242/1 3250/25
empowered [1]
3295/4
enable [1]   3287/11
encouraged [1]
3322/2
encourages [1]
3253/22
end [21]   3230/25
3233/13 3233/15
3233/17 3233/20
3233/20 3233/24
3236/9 3237/14
3254/19 3259/15

**E**

end... [10]   3260/17
3265/9 3267/4
3285/21 3285/23
3289/3 3314/14
3321/1 3324/20
3324/21
endeavors [1]
3241/14
ended [2]   3234/19
3243/15
ends [3]   3233/22
3237/11 3266/1
enforced [1]
3258/23
enhanced [1]   3301/5
enjoin [2]   3256/25
3259/25
enjoined [1]
3257/12
enjoining [1]
3243/15
enjoyed [1]   3270/4
enormous [1]
3260/19
enough [7]   3236/19
3257/7 3277/6
3284/5 3303/7
3310/12 3322/23
ensues [1]   3257/17
ensures [1]   3259/22
enter [1]   3246/3
entered [1]   3246/15
entire [1]   3278/19
entirely [2]
3263/16 3275/7
entities [2]
3232/20 3302/6
entitled [1]   3326/5
entity [11]   3290/17
3290/17 3292/22
3292/22 3292/24
3293/4 3297/4
3303/1 3303/12
3320/5 3320/11
entrants [5]
3246/19 3281/11
3281/21 3281/21
3293/12
entry [11]   3245/18
3245/25 3246/2
3246/5 3246/8
3247/8 3247/14
3247/17 3248/18
3293/11 3303/3
environment [1]
3291/3
equal [2]   3316/18
3323/11
equivalent [2]
3270/11 3305/4
especially [9]
3246/13 3248/20
3290/21 3291/3
3292/24 3303/25
3306/16 3311/18
3312/4
Esquire [12]
3226/12 3226/13

3226/13 3226/14
3226/17 3226/18
3226/18 3226/22
3226/22 3226/23
3227/2 3227/5
essentially [1]
3233/16
establish [3]
3237/23 3245/7
3314/8
establishes [1]
3245/8
establishing [1]
3238/17
estimated [2]
3256/6 3265/15
estimates [5]
3257/7 3257/8
3257/11 3277/2
3277/3
estimating [2]
3256/4 3268/8
estimations [1]
3265/16
et [6]   3226/6
3229/3 3270/18
3292/16 3305/21
3316/25
Ethan [2]   3226/14
3229/8
Eulau [4]   3248/25
3307/15 3307/15
3307/17
Europe [1]   3306/9
evaluate [1]   3263/9
even [41]   3230/19
3235/13 3238/4
3242/19 3245/17
3247/4 3248/10
3248/19 3249/12
3250/9 3250/10
3251/4 3251/10
3254/23 3256/12
3256/22 3258/14
3258/16 3259/18
3263/20 3266/18
3267/10 3268/15
3269/21 3269/22
3271/18 3275/16
3276/10 3281/13
3283/25 3284/8
3285/22 3288/3
3296/22 3304/20
3307/11 3311/20
3315/25 3316/4
3316/18 3320/9
everybody [11]
3256/3 3279/10
3280/4 3281/2
3290/22 3291/12
3298/20 3305/15
3305/25 3306/16
3319/9
everyone [2]
3248/19 3269/2
everywhere [1]
3314/18
evidence [47]
3233/11 3239/1
3244/6 3244/15

3245/18 3246/7
3250/1 3251/8
3251/18 3252/20
3253/3 3253/13
3253/18 3253/20
3254/7 3254/13
3258/6 3258/8
3259/4 3262/11
3263/14 3263/16
3264/20 3267/1
3267/22 3270/25
3274/19 3287/1
3289/9 3293/19
3293/21 3295/2
3298/9 3298/19
3301/15 3305/10
3307/4 3307/9
3307/12 3314/3
3315/5 3315/8
3315/9 3315/10
3325/2 3325/13
3325/17
evolved [1]   3283/25
ex [2]   3234/19
3264/9
ex-ante [2]   3234/19
3264/9
exacerbates [1]
3259/14
exactly [12]   3236/5
3256/12 3278/1
3285/6 3296/5
3299/13 3302/4
3302/4 3309/18
3317/8 3317/8
3318/21
examine [1]   3318/12
examined [1]   3280/1
example [5]   3248/5
3248/5 3249/15
3250/4 3315/23
examples [4]
3232/20 3304/15
3307/6 3324/22
excellent [1]
3325/17
exception [2]
3311/2 3311/6
exceptions [1]
3311/1
excerpt [2]   3268/7
3308/2
excerpts [1]
3288/12
excess [4]   3264/13
3268/5 3268/11
3277/25
exclude [1]   3298/18
excuse [2]   3232/21
3264/20
executive [1]
3290/1
executives [3]
3236/5 3312/25
3313/24
exercise [1]
3287/11
exhibit [3]   3239/15
3248/22 3287/15
exhibited [1]

3264/16
exhibits [2]
3228/11 3254/8
exist [1]   3263/17
existed [1]   3282/7
existence [4]
3242/25 3249/8
3262/17 3273/13
existing [6]   3246/3
3268/1 3281/15
3281/21 3300/21
3303/11
exists [2]   3267/10
3277/19
expand [7]   3246/3
3248/6 3248/9
3248/11 3248/20
3281/21 3303/17
expansion [4]
3246/5 3246/8
3248/3 3302/6
expect [8]   3235/17
3236/16 3236/24
3316/2 3316/2
3316/3 3323/6
3323/10
expectations [2]
3265/19 3267/14
expected [7]   3232/1
3235/9 3235/18
3236/14 3237/4
3316/25 3323/12
expenditures [1]
3271/24
experience [2]
3236/22 3302/13
experienced [2]
3251/22 3301/9
experiment [1]
3305/9
expert [7]   3238/15
3274/11 3306/10
3314/3 3314/12
3315/6 3315/13
expertise [1]
3302/24
experts [8]   3256/11
3256/13 3256/17
3275/18 3295/22
3296/9 3305/11
3318/16
experts' [1]   3297/9
explain [1]   3313/25
explained [7]
3244/11 3256/4
3257/4 3267/19
3271/13 3277/22
3309/8
explicit [1]   3258/9
extensive [1]
3287/7
extent [3]   3265/22
3290/14 3302/22
external [2]   3250/5
3278/15
extreme [1]   3232/5

**F**

face [1]   3248/9
facets [1]   3300/12

**F**

facilities [1] 3306/6
facing [2] 3236/6 3321/22
fact [11] 3232/19 3245/16 3256/21 3263/15 3272/23 3277/23 3278/17 3281/7 3288/4 3319/3 3322/3
factor [3] 3235/11 3278/21 3300/1
factors [8] 3237/18 3238/5 3238/21 3238/25 3263/8 3269/16 3287/5 3318/16
facts [2] 3310/3 3310/6
factual [2] 3238/23 3295/7
fail [1] 3243/18
failed [7] 3231/12 3250/23 3256/20 3258/6 3268/24 3325/3 3325/5
failing [1] 3306/21
fails [4] 3236/13 3253/15 3258/3 3264/8
fair [5] 3255/3 3255/4 3261/25 3293/11 3318/9
fairly [2] 3311/24 3324/5
familiar [1] 3293/16
famous [2] 3246/23 3264/10
fancy [1] 3324/18
far [8] 3268/11 3268/11 3268/11 3281/3 3317/17 3320/10 3321/8 3325/1
farfetched [1] 3319/5
farm [4] 3303/18 3303/21 3304/11 3304/17
fast [1] 3230/20
feasible [1] 3258/20
features [1] 3245/19
feed [1] 3304/1
feedback [1] 3271/16
feel [1] 3254/5
feeling [1] 3301/22
fees [1] 3242/11
fell [2] 3285/7 3304/10
felt [5] 3290/5 3320/4 3320/5 3320/7 3321/20
fences [1] 3303/23
few [4] 3231/5

3245/14 3279/19 3285/20
fewer [4] 3242/23 3254/14 3257/20 3257/21
fiercely [1] 3280/23
fiercest [1] 3322/17
Fifteen [1] 3320/22
fifth [3] 3226/15 3241/9 3241/9
figure [2] 3246/23 3247/1
figures [1] 3281/13
filed [1] 3283/18
fill [5] 3281/17 3293/3 3303/3 3303/12 3305/4
filling [1] 3305/2
films [12] 3234/10 3234/16 3234/16 3234/19 3234/20 3234/24 3236/4 3236/7 3264/7 3264/10 3264/14 3264/16
final [6] 3252/16 3252/23 3257/23 3288/17 3299/20 3324/25
finally [5] 3239/23 3241/9 3242/12 3303/14 3307/10
financial [1] 3255/5
find [9] 3230/17 3234/9 3242/7 3247/17 3257/6 3261/17 3310/3 3316/22 3323/23
fine [3] 3229/24 3248/1 3307/7
fire [1] 3249/19
firm [3] 3285/1 3287/11 3288/7
firms [12] 3232/6 3232/15 3234/2 3244/20 3246/8 3270/24 3275/13 3277/24 3281/15 3281/16 3284/18 3285/2
first [22] 3231/6 3238/9 3238/21 3239/1 3241/24 3242/21 3249/8 3253/20 3257/1 3275/5 3275/15 3276/19 3277/21 3280/21 3286/14 3297/7 3301/17 3306/3 3308/21 3310/11 3323/7 3323/22
fish [3] 3301/23 3301/25 3301/25
Fishbein [14] 3227/2 3228/6 3229/15 3261/5

3262/12 3285/13 3286/13 3287/3 3289/17 3296/15 3313/7 3320/20 3321/1 3323/7
fit [13] 3255/22 3256/2 3256/19 3256/21 3285/7 3285/8 3285/20 3310/3 3313/24 3313/25 3314/25 3315/1 3319/20
fits [1] 3316/9
five [11] 3243/25 3244/19 3244/19 3247/3 3278/25 3279/9 3279/17 3279/21 3281/19 3284/4 3284/5
five-year [1] 3247/3
fix [1] 3319/2
fixed [14] 3309/1 3312/9 3312/10 3312/25 3313/1 3313/2 3313/5 3313/9 3313/12 3313/15 3313/17 3313/18 3313/23 3315/11
flag [1] 3253/13
flags [1] 3323/17
flat [4] 3244/14 3248/17 3271/8 3304/10
flaws [1] 3286/19
fleets [1] 3242/1
Fletcher [3] 3253/5 3253/5 3323/8
flew [1] 3257/3
flexible [2] 3310/23 3310/25
Floor [1] 3226/20
flopped [1] 3236/14
FLORENCE [1] 3226/10
flow [1] 3302/22
focus [5] 3281/25 3290/6 3312/3 3313/23 3324/6
focused [10] 3234/6 3241/25 3242/1 3242/13 3243/1 3247/19 3286/10 3296/16 3311/17 3312/2
focuses [2] 3290/10 3302/7
folks [1] 3271/17
follow [1] 3321/9
following [3] 3245/16 3268/1 3288/21
Foods [1] 3242/4
footnoted [1] 3297/15
force [2] 3240/20 3304/25
foreclosure [3] 3306/4 3306/7

3308/8
foregoing [1] 3326/4
form [2] 3272/21 3310/4
formal [2] 3238/23 3306/12
format [1] 3285/18
formats [1] 3275/22
formidable [3] 3301/6 3303/5 3320/2
forward [6] 3230/23 3233/9 3238/12 3239/14 3290/10 3325/21
forward-looking [1] 3290/10
found [8] 3233/2 3234/9 3251/4 3252/2 3255/17 3258/9 3272/8 3272/12
founded [1] 3247/20
four [12] 3244/21 3245/22 3245/25 3251/8 3258/15 3259/8 3277/25 3279/1 3279/17 3281/19 3284/5 3311/20
fourth [2] 3235/20 3241/2
Frackman [1] 3226/22
fraction [2] 3243/6 3282/21
framework [1] 3244/23
franchise [3] 3233/18 3267/23 3269/24
frankly [2] 3238/14 3277/17
frequency [1] 3235/2
frequent [1] 3291/21
frustration [1] 3321/20
fuels [1] 3259/19
full [3] 3232/20 3240/14 3285/21
fully [2] 3261/8 3297/6
functionally [1] 3276/17
fundamental [3] 3254/22 3307/10 3319/17
fundamentally [2] 3316/14 3319/7
funded [1] 3301/9
funding [1] 3246/11
funny [1] 3303/22
further [5] 3238/19 3245/13 3266/18 3303/20 3325/11
future [8] 3290/10 3290/14 3292/15

**F**

future... [5]
3293/17 3293/18
3301/8 3307/8
3321/4

**G**

Gail [2]    3254/25
3278/18
gain [1]    3247/15
gallery [1]    3289/22
gambles [1]    3268/17
gap [6]    3293/3
3293/8 3303/3
3303/12 3305/2
3305/4
garner [2]    3263/22
3268/5
gathered [1]    3239/8
general [10]    3237/4
3254/18 3262/4
3265/13 3265/19
3271/9 3284/1
3285/24 3298/8
3299/8
generalized [1]
3262/2
generally [1]
3235/24
generate [1]
3259/20
generated [1]
3259/17
generates [1]
3259/23
genuine [1]    3249/4
gets [2]    3238/2
3317/17
giant [1]    3233/18
gigantic [1]    3281/2
given [10]    3233/21
3252/24 3256/3
3276/18 3285/5
3297/5 3303/6
3304/15 3312/5
3312/6
gives [1]    3292/9
giving [1]    3231/10
GLAM [4]    3235/23
3241/1 3272/1
3272/4
gleaned [1]    3245/23
glide [1]    3241/7
Glusman [3]    3288/11
3288/15 3288/19
goals [1]    3258/14
goes [4]    3294/2
3294/14 3307/3
3324/12
good [18]    3229/9
3229/10 3229/13
3229/14 3229/17
3232/8 3236/19
3246/16 3247/10
3247/11 3260/6
3277/9 3277/20
3296/17 3310/16
3319/18 3320/3
3323/14

governance [1]
3264/25
government [45]
3229/22 3243/8
3245/8 3255/10
3256/16 3256/17
3260/20 3261/1
3261/10 3261/16
3261/18 3261/21
3261/24 3262/1
3262/3 3262/6
3262/16 3262/20
3262/22 3263/5
3263/7 3264/19
3265/10 3266/2
3268/13 3268/21
3269/7 3271/4
3271/5 3271/23
3272/8 3273/3
3273/6 3273/18
3278/25 3283/14
3283/18 3285/10
3299/22 3303/13
3306/1 3306/3
3306/23 3316/4
3317/23
government's [22]
3237/16 3240/23
3256/13 3261/12
3262/18 3263/14
3264/7 3264/23
3265/25 3266/5
3266/22 3270/6
3270/9 3274/16
3275/7 3277/21
3278/22 3279/15
3288/22 3289/12
3291/8 3295/3
gradual [2]    3317/22
3323/20
graph [1]    3297/9
grateful [2]
3230/19 3230/21
Grau [2]    3247/20
3247/23
great [9]    3231/1
3232/7 3236/21
3248/2 3250/19
3254/5 3260/18
3290/4 3320/12
greater [2]    3242/11
3288/7
grew [1]    3266/16
gross [5]    3308/25
3309/3 3310/2
3312/3 3312/7
grossing [8]
3234/10 3234/15
3234/20 3234/24
3236/4 3264/6
3264/15 3264/16
group [7]    3239/6
3248/16 3302/5
3323/24 3324/1
3324/4 3324/24
grow [4]    3240/2
3253/25 3254/1
3254/4
grown [1]    3248/15
growth [1]    3251/24

guaranteed [1]
3240/25
guess [9]    3277/15
3297/20 3301/25
3303/3 3307/13
3309/2 3313/2
3315/5 3317/10
guidance [3]    3234/4
3311/9 3311/11
guidelines [7]
3245/3 3245/6
3259/6 3274/24
3284/7 3284/23
3318/7
GUPPI [5]    3255/23
3256/17 3286/15
3286/18 3308/13
guppies [1]    3302/2
guppy [2]    3302/1
3302/3
guy [2]    3307/6
3307/6
guys [1]    3302/9

**H**

Hachette [4]
3254/16 3277/22
3278/2 3300/16
Hackensack [1]
3257/10
half [5]    3258/24
3276/22 3282/24
3283/7 3323/2
halves [1]    3252/14
hand [1]    3230/2
handful [2]    3247/21
3248/3
happen [2]    3307/11
3318/11
happened [5]
3252/24 3289/5
3290/13 3304/22
3318/10
happening [3]
3252/15 3272/6
3303/4
happens [3]    3236/15
3271/21 3280/14
happy [1]    3254/25
harbor [1]    3286/24
hard [7]    3242/14
3248/20 3259/9
3259/20 3260/12
3260/13 3308/1
harder [4]    3237/13
3242/7 3254/2
3257/14
Harlequin [2]
3298/22 3299/2
harm [29]    3243/1
3251/6 3251/17
3253/18 3253/19
3254/8 3255/11
3256/4 3256/7
3256/24 3256/25
3257/8 3257/11
3257/13 3257/13
3259/12 3262/5
3262/6 3262/23
3272/8 3272/10

3272/13 3273/7
3273/8 3275/2
3285/9 3286/24
3308/18 3308/22
harmed [7]    3236/10
3243/15 3253/4
3253/6 3253/20
3284/2 3284/20
harms [1]    3261/20
HarperCollins [14]
3235/19 3278/4
3287/18 3290/24
3293/13 3294/3
3295/1 3295/10
3297/10 3297/16
3299/11 3300/15
3301/3 3307/6
HarperCollins' [2]
3294/5 3297/13
head [17]    3232/24
3232/24 3233/3
3233/3 3233/5
3233/5 3259/16
3259/16 3275/14
3275/14 3281/5
3281/5 3282/22
3283/20 3283/20
3304/11 3304/11
head-to-head [8]
3232/24 3233/3
3233/5 3259/16
3275/14 3281/5
3283/20 3304/11
heading [1]    3230/7
headquarters [1]
3313/1
hear [9]    3229/17
3233/21 3249/1
3260/2 3261/12
3269/3 3283/25
3311/2 3321/2
heard [47]    3231/3
3231/23 3233/1
3233/17 3237/1
3249/3 3249/9
3250/1 3250/19
3253/4 3253/21
3254/15 3254/22
3254/25 3255/12
3256/22 3257/19
3261/25 3263/10
3263/18 3263/20
3263/24 3268/18
3269/5 3272/1
3273/17 3278/14
3278/18 3280/1
3280/6 3280/22
3281/7 3281/11
3282/10 3286/22
3286/25 3288/2
3288/3 3288/10
3289/25 3290/11
3291/1 3291/7
3319/19 3320/14
3322/23 3322/24
hearing [1]    3230/15
hearts [1]    3232/16
heavily [1]    3277/22
held [3]    3242/9
3245/19 3250/11

**H**

help [6]    3236/23
 3237/24 3247/5
 3251/1 3320/8
 3324/9
helped [1]    3306/21
here's [4]    3238/25
 3248/10 3268/18
 3274/21
HHI [1]    3316/9
HHIs [1]    3245/3
hide [1]    3243/1
high [18]    3233/13
 3233/17 3233/24
 3235/14 3236/9
 3237/7 3237/11
 3237/14 3244/24
 3246/9 3247/8
 3263/12 3267/24
 3268/23 3276/22
 3277/6 3280/9
 3324/20
high-level [1]
 3280/9
higher [15]    3235/8
 3235/9 3235/14
 3240/23 3242/10
 3267/12 3308/18
 3308/18 3308/23
 3308/24 3309/7
 3311/18 3312/4
 3312/8 3316/3
highest [2]    3256/7
 3314/22
highly [3]    3231/10
 3234/16 3301/10
Hill [32]    3237/19
 3241/21 3243/23
 3244/11 3255/15
 3255/23 3256/1
 3261/24 3264/19
 3264/19 3265/4
 3266/4 3266/7
 3267/2 3269/5
 3272/17 3276/21
 3282/18 3283/6
 3283/23 3283/25
 3285/6 3285/14
 3286/14 3288/25
 3292/5 3300/19
 3306/10 3308/17
 3308/24 3316/22
 3323/2
Hill's [9]    3245/4
 3253/11 3257/7
 3273/10 3275/16
 3282/12 3285/12
 3285/23 3308/12
himself [1]    3276/21
hired [1]    3280/10
hiring [1]    3246/11
history [2]    3247/1
 3247/14
hoc [1]    3234/15
hold [4]    3230/15
 3250/21 3292/24
 3305/24
Holdings [2]    3281/1
 3284/22

holds [2]    3251/18
 3282/24
Hollywood [1]
 3236/5
home [1]    3290/4
homogeneous [2]
 3318/18 3318/22
Honor [109]
Honor's [5]    3232/25
 3293/16 3297/12
 3314/15 3322/24
HONORABLE [1]
 3226/10
Hook [3]    3227/23
 3326/3 3326/10
Hoover [1]    3302/20
horizontal [1]
 3317/10
horse [1]    3321/20
hours [1]    3233/8
house [76]    3226/18
 3226/23 3229/11
 3231/9 3232/11
 3237/3 3239/6
 3240/4 3243/20
 3243/23 3247/6
 3247/24 3248/20
 3248/21 3248/24
 3249/13 3249/14
 3249/18 3249/24
 3250/2 3250/11
 3251/19 3251/20
 3251/22 3251/23
 3251/24 3252/2
 3252/5 3252/6
 3252/10 3252/19
 3252/20 3252/23
 3253/6 3253/8
 3253/8 3253/23
 3254/1 3254/4
 3255/4 3258/24
 3260/9 3260/11
 3277/16 3277/18
 3278/2 3278/4
 3280/2 3280/7
 3281/6 3284/17
 3287/16 3290/3
 3295/16 3296/21
 3296/23 3298/2
 3298/6 3299/12
 3305/10 3306/5
 3309/14 3310/15
 3311/15 3319/12
 3319/20 3320/8
 3321/10 3321/13
 3321/19 3321/21
 3321/23 3322/18
 3322/20 3322/23
 3323/14
House's [4]    3240/3
 3247/5 3250/3
 3254/3
houses [3]    3260/19
 3276/15 3279/3
hub [1]    3319/10
Hughes [5]    3231/14
 3233/6 3244/23
 3245/7 3253/17
human [1]    3251/13
hundred [4]    3236/17

3270/17 3291/13
 3292/25
hundreds [5]
 3276/13 3276/14
 3287/21 3288/23
 3313/23
husband [1]    3277/15
hypothetical [11]
 3237/18 3237/23
 3238/2 3238/8
 3238/16 3238/18
 3241/3 3241/20
 3272/18 3272/23
 3324/3

**I**

ice [3]    3324/18
 3324/19 3324/19
idea [9]    3237/14
 3247/4 3269/2
 3269/11 3275/18
 3293/12 3309/19
 3321/24 3323/20
identical [1]
 3256/12
identifiable [1]
 3270/2
identified [4]
 3241/17 3242/3
 3269/23 3271/23
identifies [1]
 3265/2
identify [8]
 3241/15 3242/17
 3264/10 3264/23
 3269/8 3269/18
 3289/21 3317/1
identifying [1]
 3287/8
ignore [2]    3258/18
 3313/5
Ihan [1]    3226/13
illegal [3]    3231/11
 3231/16 3244/23
illegality [4]
 3245/4 3250/16
 3253/15 3258/1
illuminate [1]
 3233/10
illusory [1]
 3279/16
illustrated [1]
 3307/14
imagine [1]    3300/19
immaterial [1]
 3282/1
immateriality [1]
 3243/18
impact [2]    3257/3
 3323/5
implemented [1]
 3258/23
implying [1]    3254/4
importance [1]
 3239/22
important [16]
 3247/23 3255/2
 3257/15 3261/4
 3276/16 3278/21
 3289/8 3290/8

3290/21 3291/3
 3295/15 3295/17
 3296/19 3302/8
 3304/4 3304/9
importantly [1]
 3278/7
impose [1]    3280/15
impressed [1]
 3301/20
imprint [17]    3247/6
 3247/24 3249/19
 3277/8 3277/11
 3277/13 3277/19
 3277/20 3277/23
 3278/2 3278/20
 3278/23 3279/14
 3280/3 3280/17
 3286/20 3322/14
imprints [19]
 3232/7 3249/8
 3249/16 3249/16
 3249/16 3249/17
 3276/13 3276/14
 3278/5 3279/4
 3279/5 3279/12
 3280/5 3284/5
 3302/17 3313/5
 3322/3 3322/13
 3322/18
improbable [1]
 3248/1
improved [1]    3235/3
inaccurate [1]
 3245/11
incarnation [1]
 3247/22
incentive [1]
 3296/7
incentives [9]
 3254/3 3254/7
 3290/16 3290/18
 3290/19 3293/2
 3293/6 3294/19
 3305/24
inclination [1]
 3248/6
include [3]    3278/23
 3279/5 3297/14
includes [4]
 3257/14 3257/16
 3291/11 3296/23
including [7]
 3235/10 3240/15
 3257/4 3278/15
 3279/4 3286/19
 3319/19
income [7]    3309/20
 3309/21 3310/1
 3310/19 3310/19
 3311/4 3312/5
inconclusive [1]
 3305/11
increase [9]
 3244/25 3250/6
 3254/18 3260/25
 3288/5 3288/16
 3288/22 3294/17
 3320/3
increased [3]
 3244/12 3244/12

**I**

increased... [1]
3257/14
increases [1]
3278/6
increasing [3]
3294/10 3294/10
3294/11
incredibly [1]
3289/8
Indeed [1]   3272/3
independent [4]
3232/15 3250/12
3252/22 3289/24
indicate [1]
3272/19
indicated [7]
3269/20 3270/1
3270/18 3272/7
3274/17 3277/12
3300/24
indicating [2]
3287/16 3308/3
indication [2]
3302/19 3323/4
indicative [1]
3275/21
indicator [1]
3275/8
indicators [1]
3277/9
indicia [6]   3237/22
3240/12 3240/22
3241/9 3241/20
3242/4
individual [2]
3233/4 3274/25
individuals [1]
3280/7
industries [4]
3313/9 3313/9
3313/18 3313/21
industry [50]
3231/22 3232/6
3232/9 3234/5
3234/7 3234/9
3235/9 3236/3
3236/16 3236/22
3237/1 3237/3
3239/1 3239/2
3239/2 3239/3
3242/15 3243/5
3246/9 3252/24
3255/23 3255/25
3256/16 3258/5
3259/7 3259/11
3263/8 3263/21
3264/6 3265/23
3267/7 3267/21
3269/16 3288/20
3290/22 3305/14
3305/20 3309/25
3310/3 3310/4
3310/5 3310/6
3313/11 3313/14
3313/15 3313/16
3313/22 3314/9
3325/10 3325/14
infer [1]   3287/10

inference [1]
3310/16
inferior [1]
3270/19
information [4]
3242/16 3250/8
3275/21 3306/12
informative [2]
3247/14 3247/22
infrastructure [2]
3281/17 3293/15
inherent [1]   3282/7
initial [1]   3235/19
initially [1]
3235/1
innovations [1]
3291/2
inoculates [1]
3323/15
input [1]   3286/13
inputs [2]   3255/17
3308/12
inquiry [2]   3238/19
3325/11
insiders [1]
3236/22
inspiration [1]
3298/1
inspirational [1]
3300/9
inspired [1]   3292/2
inspires [1]   3231/2
instance [1]
3286/15
instances [3]
3279/17 3279/22
3279/24
Instead [2]   3261/25
3263/3
instruct [1]
3293/16
instruction [1]
3246/25
instructions [1]
3258/18
insurance [3]
3250/24 3251/2
3251/3
insurer [1]   3251/6
intend [2]   3288/3
3294/25
Intense [1]   3280/24
intent [2]   3293/17
3301/4
intentions [2]
3232/8 3294/18
interchangeable [2]
3238/7 3238/13
interchanged [1]
3238/10
interest [2]
3280/18 3289/24
interested [1]
3302/2
interesting [5]
3296/15 3299/14
3301/18 3301/22
3322/16
interests [1]
3286/9

internal [12]
3250/7 3250/8
3265/2 3277/11
3277/13 3278/13
3279/7 3279/14
3279/18 3280/15
3280/16 3297/13
internally [1]
3249/23
international [1]
3242/8
interrupt [1]
3229/21
into [20]   3232/17
3237/14 3240/18
3246/19 3246/24
3263/19 3268/2
3275/12 3278/8
3278/16 3279/10
3285/12 3286/17
3286/20 3293/8
3297/3 3299/7
3300/21 3325/11
3325/19
intuitive [2]
3267/11 3267/16
intuitively [1]
3281/3
investment [1]
3235/1
invite [5]   3276/1
3276/9 3276/10
3318/24 3319/4
inviting [2]
3276/11 3276/12
involved [5]
3239/25 3280/8
3280/11 3319/12
3319/13
involving [1]
3292/6
ironic [1]   3307/13
irrelevant [1]
3236/6
issue [25]   3237/13
3238/17 3242/17
3242/19 3243/13
3244/22 3248/12
3248/19 3253/16
3262/14 3263/13
3271/3 3285/13
3286/13 3295/10
3295/11 3304/9
3306/2 3306/13
3306/20 3307/19
3308/10 3318/12
3319/1 3322/10
issues [3]   3261/7
3289/6 3306/18
it would [1]
3282/24

**J**

Jackson [1]   3251/4
January [1]   3294/5
January 2022 [1]
3294/5
Jeff [3]   3227/23
3326/3 3326/10
job [4]   3280/9

3320/6 3320/12
3325/17
John [7]   3226/12
3229/6 3235/10
3239/5 3240/15
3254/9 3288/10
join [1]   3230/14
Jonathan [1]
3322/11
JUDGE [4]   3226/10
3243/10 3251/4
3275/10
judgment [1]
3294/16
juries [1]   3293/16
Justice [2]   3226/14
3290/24
justify [2]   3236/23
3265/20

**K**

Kaling [1]   3302/16
Karp [9]   3235/10
3239/5 3240/15
3254/9 3301/18
3302/19 3311/7
3319/21 3322/11
Karp's [2]   3321/16
3321/25
keep [3]   3248/2
3306/17 3306/18
keeping [1]   3260/14
Kensington [2]
3249/9 3270/17
key [2]   3233/18
3263/12
KGAA [1]   3226/6
kick [1]   3273/23
Kim [5]   3226/13
3239/7 3247/9
3271/12 3322/17
kind [19]   3233/9
3238/5 3267/11
3267/17 3268/13
3280/10 3285/25
3291/18 3296/16
3302/1 3302/3
3303/22 3305/6
3305/22 3306/4
3306/7 3314/16
3316/10 3321/5
King [5]   3257/2
3270/4 3270/7
3277/15 3278/9
Knopf [1]   3239/7
knowing [1]   3250/12
knowledge [2]
3277/4 3304/22
known [3]   3235/2
3282/7 3304/16
knows [3]   3234/4
3234/7 3262/16
Koontz [1]   3302/16

**L**

lack [1]   3264/14
land [1]   3268/14
landed [2]   3283/2
3283/2
large [9]   3235/2

**L**

large... [8]
3242/21 3243/14
3246/17 3249/21
3264/12 3264/12
3279/9 3302/5
largely [2]   3262/9
3263/16
larger [6]   3240/20
3253/24 3254/10
3254/17 3271/1
3290/17
largest [2]   3231/8
3248/11
last [10]   3248/17
3248/18 3266/13
3279/14 3279/19
3281/22 3305/15
3320/14 3321/11
3325/1
later [2]   3247/7
3271/21
law [6]   3238/22
3259/6 3261/15
3289/9 3314/19
3325/2
laws [1]   3232/4
lawyer [1]   3322/5
lawyers [1]   3258/11
lead [5]   3232/5
3233/19 3254/8
3266/15 3324/25
leader [2]   3292/16
3321/9
leadership [3]
3289/25 3294/8
3294/9
leads [2]   3254/17
3325/10
league [2]   3304/13
3304/13
leagues [1]   3304/22
learned [1]   3271/8
learns [1]   3271/14
least [8]   3229/20
3242/15 3253/19
3261/23 3278/9
3296/20 3305/11
3316/9
leave [1]   3320/19
leeway [1]   3292/9
left [6]   3234/2
3262/3 3278/14
3293/23 3307/24
3310/14
legal [4]   3246/5
3250/9 3261/9
3290/7
legalistic [1]
3238/24
legally [2]   3237/25
3262/17
less [15]   3231/1
3233/12 3234/18
3242/24 3249/17
3249/20 3250/12
3252/22 3253/10
3256/4 3291/10
3291/14 3318/19

3318/24 3319/3
lessen [3]   3245/1
3254/4 3290/9
lessening [1]
3261/17
letter [2]   3249/13
3249/23
letting [1]   3322/22
level [32]   3230/22
3237/20 3239/5
3239/10 3239/19
3240/1 3240/1
3240/2 3242/14
3245/6 3263/12
3263/25 3265/2
3267/3 3267/17
3268/25 3271/18
3271/23 3272/19
3272/24 3273/21
3280/9 3299/23
3308/24 3309/4
3309/7 3316/5
3316/13 3316/14
3316/23 3317/14
3317/21
levels [10]   3235/20
3235/25 3240/4
3257/25 3259/8
3264/21 3264/22
3264/24 3265/13
3268/23
leverage [11]
3250/7 3250/21
3251/12 3252/9
3252/12 3252/21
3257/14 3269/1
3270/3 3276/6
3296/8
Lexington [1]
3227/3
lies [1]   3252/20
light [1]   3319/1
lightly [1]   3255/13
likelihood [2]
3244/17 3275/2
likely [11]   3240/9
3246/6 3249/17
3261/18 3261/20
3262/5 3267/22
3285/10 3288/5
3318/13 3319/4
Likewise [1]   3265/4
limitations [1]
3286/19
line [15]   3234/3
3241/18 3257/8
3266/7 3266/11
3266/21 3269/17
3272/24 3273/21
3274/4 3277/14
3317/3 3323/21
3323/25 3324/12
lines [1]   3239/2
lingering [1]
3236/12
list [5]   3247/12
3259/15 3270/23
3287/15 3299/25
listed [3]   3242/6
3291/12 3302/15

listening [1]
3270/4
lists [1]   3241/12
literally [1]
3280/16
literary [2]
3241/16 3251/16
litigation [1]
3325/15
little [12]   3230/9
3233/15 3234/13
3238/9 3254/12
3272/1 3292/9
3293/10 3305/11
3306/24 3307/13
3313/14
live [1]   3257/7
LLP [4]   3226/19
3226/23 3227/2
3227/5
located [1]   3234/5
logic [4]   3254/14
3254/22 3266/22
3317/23
logically [1]
3286/10
long [10]   3240/11
3246/18 3246/22
3260/17 3260/22
3278/9 3278/10
3311/21 3319/13
3324/13
long-settled [1]
3260/22
long-standing [1]
3278/9
longer [6]   3235/3
3252/3 3252/17
3252/17 3252/19
3254/5
look [26]   3233/23
3234/23 3237/24
3242/4 3263/11
3267/4 3270/14
3270/20 3272/6
3272/9 3272/12
3290/19 3292/20
3294/23 3297/11
3298/12 3299/9
3299/16 3306/8
3307/7 3310/15
3311/7 3314/15
3318/12 3324/3
3325/21
looked [4]   3233/25
3239/18 3272/11
3296/17
looking [9]   3236/1
3247/14 3276/15
3282/18 3282/23
3290/10 3317/4
3323/23 3324/23
loose [1]   3271/22
Los [1]   3226/20
lose [1]   3292/12
losing [5]   3267/19
3270/10 3285/1
3321/18 3322/20
loss [7]   3232/7
3232/22 3251/6

3251/8 3251/12
3265/14 3283/19
losses [2]   3277/24
3325/5
lost [8]   3230/16
3243/9 3244/13
3246/7 3278/1
3281/8 3301/18
3321/20
lot [9]   3236/12
3261/4 3287/13
3290/11 3291/11
3291/25 3296/8
3296/10 3322/24
lots [3]   3232/6
3249/8 3292/8
loud [1]   3307/25
love [2]   3231/4
3232/18
low [6]   3233/14
3233/20 3237/11
3269/25 3308/19
3324/21
lowball [1]   3291/15
lower [8]   3249/15
3254/14 3261/19
3279/24 3291/16
3293/4 3305/5
3309/4
Ls [6]   3236/22
3271/8 3310/12
3310/13 3310/22
3313/22
LSC [3]   3306/22
3307/17 3307/21

**M**

Macmillan [4]
3278/3 3300/16
3300/23 3307/5
Madeline [1]   3237/2
magnitude [1]
3246/6
mail [1]   3307/14
mails [1]   3280/9
main [3]   3235/11
3287/9 3287/9
mainly [2]   3266/23
3267/18
maintain [1]   3274/3
major [9]   3231/9
3251/6 3251/9
3259/5 3280/22
3280/24 3288/2
3304/13 3304/22
majority [2]
3238/13 3266/24
majors [1]   3304/18
makes [4]   3248/20
3249/10 3308/17
3308/23
making [3]   3261/2
3292/8 3319/1
manage [1]   3313/1
managers [1]
3251/14
mandate [1]   3258/1
manner [1]   3254/20
manuscript [1]
3325/9

**M**

many [9]    3242/25
  3253/1 3274/6
  3277/5 3277/12
  3279/20 3286/1
  3304/14 3317/12
map [2]    3234/24
  3318/13
maps [1]    3235/1
march [1]    3244/9
margin [22]    3285/13
  3308/11 3308/18
  3308/19 3308/22
  3308/24 3308/25
  3308/25 3309/2
  3309/3 3309/5
  3309/7 3309/20
  3309/21 3310/1
  3310/2 3311/4
  3311/16 3311/17
  3311/23 3312/3
  3312/7
margins [1]    3308/17
mark [2]    3266/14
  3266/19
market [149]
marketing [21]
  3235/3 3235/15
  3235/16 3239/17
  3240/14 3240/17
  3241/1 3246/12
  3257/15 3264/1
  3271/5 3271/6
  3271/9 3271/17
  3271/19 3271/23
  3301/20 3301/21
  3316/2 3316/24
  3317/20
marketplace [2]
  3234/17 3239/4
markets [12]
  3238/24 3241/24
  3242/7 3273/13
  3274/1 3292/5
  3298/24 3315/20
  3315/21 3315/22
  3315/24 3324/13
mass [1]    3289/1
match [1]    3276/15
matches [1]    3242/10
matching [1]    3278/8
Matelson [1]    3229/7
material [3]
  3243/17 3244/2
  3324/14
materially [2]
  3240/2 3256/21
math [1]    3282/11
mathematical [1]
  3266/6
matter [5]    3236/21
  3274/9 3310/20
  3325/20 3326/5
matters [3]    3232/10
  3233/5 3267/17
maximize [1]
  3240/20
may [20]    3230/13
  3230/18 3241/13

  3248/15 3253/20
  3254/7 3261/14
  3262/1 3267/19
  3276/19 3286/23
  3287/6 3290/16
  3290/18 3290/18
  3292/1 3313/17
  3320/23 3320/25
  3324/25
maybe [7]    3233/20
  3268/14 3283/4
  3307/3 3318/11
  3320/17 3323/18
McIntosh [11]
  3237/2 3239/6
  3239/25 3250/5
  3271/3 3271/11
  3280/1 3280/13
  3298/11 3310/8
  3311/13
McIntosh's [3]
  3268/7 3279/16
  3311/24
mean [21]    3259/20
  3270/4 3270/5
  3270/6 3270/14
  3273/14 3275/4
  3284/7 3284/17
  3290/11 3290/23
  3297/15 3297/17
  3298/20 3306/16
  3306/19 3311/1
  3311/11 3311/19
  3314/5 3319/25
meaning [1]    3238/18
meaningful [4]
  3240/4 3242/21
  3282/14 3286/11
meaningless [1]
  3272/20
means [5]    3251/5
  3254/14 3257/5
  3272/24 3317/23
measurable [1]
  3256/25
measure [3]    3257/14
  3297/11 3310/1
measured [1]
  3238/24
measures [2]
  3249/22 3310/15
media [2]    3241/14
  3247/12
medium [3]    3304/7
  3304/15 3307/22
meet [2]    3275/13
  3319/2
meets [1]    3237/18
Megan [1]    3226/18
Mehta [1]    3275/10
Mel [1]    3229/7
Melvin [1]    3226/13
members [2]    3281/15
  3282/3
memoir [1]    3311/3
mentioned [7]
  3230/10 3264/4
  3265/4 3289/23
  3290/17 3292/7
  3308/12

merge [2]    3249/16
  3306/22
merged [6]    3290/17
  3292/22 3292/24
  3303/1 3303/12
  3320/11
merger [71]    3230/24
  3231/8 3231/16
  3232/8 3234/8
  3243/15 3243/20
  3244/20 3244/22
  3246/1 3250/10
  3251/15 3252/23
  3252/24 3253/2
  3253/6 3253/12
  3253/14 3254/3
  3254/7 3255/7
  3255/16 3257/1
  3257/25 3258/23
  3259/12 3259/21
  3259/25 3260/21
  3260/24 3261/20
  3268/22 3274/24
  3275/3 3276/16
  3280/23 3281/9
  3283/22 3284/10
  3285/10 3285/25
  3287/5 3287/23
  3288/3 3288/16
  3288/18 3288/21
  3289/25 3293/25
  3294/14 3294/16
  3294/20 3294/25
  3305/10 3306/19
  3306/20 3306/25
  3307/3 3314/20
  3318/6 3318/13
  3318/14 3318/14
  3318/25 3319/18
  3321/9 3322/6
  3323/14 3323/15
  3324/14 3325/9
merger's [1]
  3245/11
merger-specific [1]
  3318/14
mergers [4]    3245/5
  3253/8 3257/12
  3287/10
merging [12]
  3244/12 3254/9
  3255/24 3275/4
  3275/15 3281/2
  3283/20 3284/9
  3284/13 3284/14
  3285/2 3287/8
merits [1]    3238/19
met [2]    3234/10
  3258/10
metaphor [2]
  3303/20 3303/24
metes [1]    3238/24
method [1]    3291/21
methods [1]    3264/2
metrics [1]    3294/11
Michael [1]    3234/15
middle [2]    3305/19
  3319/10
midlist [2]    3233/21
  3233/21

might [10]    3248/24
  3267/13 3267/14
  3270/2 3271/9
  3273/11 3276/25
  3288/16 3300/25
  3301/23
million [5]    3244/4
  3268/6 3268/15
  3273/12 3317/6
millions [4]
  3268/10 3279/20
  3279/20 3288/23
mind [3]    3235/5
  3294/16 3313/2
minds [1]    3258/12
Mindy [1]    3302/16
minimum [1]    3253/12
minor [1]    3304/12
minors [1]    3304/24
minute [2]    3260/2
  3295/9
minutes [1]    3320/22
mistake [1]    3312/8
mitigate [1]    3251/6
mobilize [1]    3280/4
model [37]    3255/15
  3255/22 3255/23
  3256/1 3256/10
  3256/17 3256/19
  3256/20 3256/22
  3256/23 3264/21
  3285/7 3285/9
  3285/12 3285/14
  3285/15 3285/15
  3285/16 3285/18
  3286/10 3286/15
  3310/1 3310/3
  3310/4 3310/4
  3312/10 3312/13
  3312/17 3312/19
  3312/21 3313/8
  3313/10 3313/11
  3314/8 3314/13
  3314/19 3315/4
modeling [2]    3255/8
  3255/11
models [14]    3255/25
  3256/6 3256/12
  3261/25 3276/9
  3277/11 3285/8
  3291/8 3293/5
  3295/3 3295/6
  3308/12 3309/22
  3310/5
modified [1]
  3255/24
Moltke [1]    3280/8
moment [3]    3265/6
  3269/17 3303/6
moments [1]    3245/14
monetary [1]
  3236/23
money [7]    3231/1
  3233/4 3243/2
  3257/7 3259/16
  3270/12 3291/11
monitor [3]    3259/13
  3318/18 3318/20
monolithic [1]
  3276/12

**M**

monopolist [9]
3237/18 3237/23
3238/2 3238/4
3238/8 3238/16
3238/18 3241/3
3324/3
monopolizes [2]
3325/10 3325/10
monopoly [2]   3232/9
3287/11
monopsonist [4]
3241/20 3272/18
3272/23 3317/10
monopsony [1]
3296/1
more [51]   3235/16
3243/21 3244/1
3252/20 3252/25
3253/9 3253/23
3253/23 3254/12
3254/17 3256/5
3261/7 3262/20
3263/23 3267/19
3269/11 3270/12
3270/13 3270/13
3271/2 3273/11
3273/24 3274/9
3275/6 3276/22
3277/12 3278/11
3281/14 3281/18
3282/12 3286/17
3288/8 3288/23
3289/6 3298/8
3301/15 3301/15
3302/19 3304/20
3316/2 3316/2
3316/24 3316/24
3317/20 3317/20
3317/22 3318/4
3319/4 3322/23
3323/11 3323/15
morning [8]   3226/7
3229/9 3229/10
3229/13 3229/14
3229/17 3229/20
3260/6
most [18]   3234/6
3238/14 3248/6
3256/8 3258/21
3266/24 3268/15
3268/25 3270/3
3271/17 3271/22
3279/23 3288/5
3297/8 3297/25
3297/25 3298/1
3324/6
mostly [1]   3269/18
motion [1]   3289/12
motivated [3]
3288/6 3295/4
3301/10
motivation [1]
3303/2
motivations [2]
3303/11 3305/25
motives [1]   3294/19
move [3]   3243/19
3248/18 3315/9

movie [1]   3264/11
movies [6]   3234/11
3234/13 3236/14
3236/15 3237/10
3243/5
Mr. [75]   3229/13
3229/25 3239/24
3243/21 3246/23
3248/25 3249/8
3250/3 3251/22
3253/22 3257/19
3260/1 3260/8
3261/5 3262/9
3262/12 3264/4
3264/19 3269/4
3275/23 3277/15
3277/22 3278/20
3281/20 3283/2
3284/1 3285/13
3286/13 3287/3
3288/15 3288/19
3288/19 3288/20
3288/25 3289/13
3289/17 3290/17
3293/11 3293/23
3294/8 3295/9
3295/13 3296/6
3296/15 3300/13
3300/15 3301/13
3301/18 3302/6
3302/19 3303/3
3303/5 3303/15
3303/24 3305/10
3305/19 3307/13
3307/15 3307/15
3307/17 3308/11
3311/7 3313/7
3316/19 3318/23
3319/21 3320/20
3320/21 3321/1
3321/12 3321/16
3321/25 3322/2
3323/7 3324/17
Mr. Dohle [4]
3239/24 3246/23
3249/8 3257/19
Mr. Dohle's [2]
3243/21 3253/22
Mr. Eulau [4]
3248/25 3307/15
3307/15 3307/17
Mr. Fishbein [11]
3261/5 3262/12
3285/13 3286/13
3287/3 3289/17
3296/15 3313/7
3320/20 3321/1
3323/7
Mr. Glusman [2]
3288/15 3288/19
Mr. Hill [1]
3264/19
Mr. Karp [4]
3301/18 3302/19
3311/7 3319/21
Mr. Karp's [2]
3321/16 3321/25
Mr. King [1]
3277/15
Mr. Murray [8]

3288/20 3293/23
3294/8 3295/9
3295/13 3296/6
3300/13 3305/19
Mr. Petrocelli [12]
3229/13 3260/8
3278/20 3283/2
3289/13 3301/13
3303/15 3308/11
3316/19 3321/12
3322/2 3324/17
Mr. Pietsch [1]
3277/22
Mr. Read [15]
3229/25 3260/1
3264/4 3275/23
3281/20 3288/25
3290/17 3293/11
3302/6 3303/3
3303/24 3305/10
3307/13 3318/23
3320/21
Mr. Read's [3]
3262/9 3269/4
3284/1
Mr. Tart [1]   3250/3
Mr. Weisberg [2]
3300/25 3303/5
Mr. Wylie [1]
3251/22
Mr. Zacharius [1]
3288/19
Ms. [26]   3235/22
3237/2 3239/6
3239/7 3239/25
3247/9 3248/22
3250/5 3268/7
3268/19 3271/3
3271/11 3271/12
3272/3 3279/16
3280/1 3280/8
3280/13 3288/4
3298/11 3310/8
3311/13 3311/24
3322/17 3323/8
3323/9
Ms. Bergstrom [1]
3268/19
Ms. Fletcher [1]
3323/8
Ms. Kim [4]   3239/7
3247/9 3271/12
3322/17
Ms. Madeline [1]
3237/2
Ms. McIntosh [10]
3239/6 3239/25
3250/5 3271/3
3271/11 3280/1
3280/13 3298/11
3310/8 3311/13
Ms. McIntosh's [3]
3268/7 3279/16
3311/24
Ms. Pande [2]
3288/4 3323/9
Ms. Reidy [1]
3248/22
Ms. von [1]   3280/8
Ms. Walsh [2]

3288/20 3293/23
3294/8 3295/9
3295/13 3296/6
3300/15 3305/19
much [18]   3237/4
3254/5 3254/6
3255/5 3260/16
3268/18 3271/21
3275/18 3278/10
3285/19 3298/7
3299/7 3308/22
3310/24 3314/17
3317/2 3320/21
3325/18
multi [2]   3286/5
3286/8
multi-round [2]
3286/5 3286/8
multimillion [1]
3302/17
multiple [7]   3237/8
3268/6 3279/2
3279/2 3315/22
3322/12 3324/13
Murray [9]   3288/10
3288/20 3293/23
3294/8 3295/9
3295/13 3296/6
3300/13 3305/19
must [2]   3267/16
3292/6
Myers [3]   3226/19
3226/23 3229/12

**N**

name [2]   3235/2
3263/21
national [2]
3243/10 3250/23
natural [1]   3305/9
necessarily [2]
3273/14 3276/18
need [13]   3249/5
3254/5 3255/10
3255/11 3261/13
3267/13 3269/9
3275/6 3315/4
3316/24 3320/21
3322/25 3323/15
needed [6]   3234/9
3250/24 3250/24
3252/9 3259/13
3259/13
needs [3]   3233/13
3240/13 3269/20
negative [1]   3311/4
negligible [1]
3242/25
negotiability [1]
3259/10
negotiable [1]
3252/18
negotiate [3]
3235/21 3251/2
3257/15
negotiated [1]
3274/7
negotiating [4]
3237/6 3251/5
3251/10 3255/3
negotiation [4]
3254/23 3256/15
3296/7 3321/6

**N**

negotiations [7]
3254/21 3276/4
3276/23 3277/17
3285/16 3286/4
3286/22
net [6]   3309/20
3310/1 3310/19
3311/25 3312/1
3312/5
new [19]   3226/24
3226/24 3227/3
3227/3 3246/2
3246/8 3246/19
3247/15 3247/17
3247/25 3252/3
3257/19 3281/11
3281/21 3282/5
3293/12 3301/6
3303/1 3320/5
News [1]   3294/8
next [12]   3234/1
3235/13 3241/23
3244/22 3253/16
3270/20 3274/22
3277/8 3278/9
3288/13 3293/9
3304/24
Ninth [4]   3227/6
3234/19 3236/2
3236/19
Noble [1]   3302/21
nobody [3]   3272/22
3310/19 3311/19
nomination [1]
3230/17
non [15]   3243/25
3244/14 3248/16
3259/10 3281/24
3282/19 3285/2
3301/16 3302/5
3317/22 3318/19
3323/4 3324/9
3324/10 3324/23
non-Big [11]
3243/25 3244/14
3248/16 3281/24
3282/19 3301/16
3302/5 3317/22
3323/4 3324/9
3324/10
non-merging [1]
3285/2
none [11]   3231/6
3243/25 3255/9
3263/15 3263/17
3264/18 3270/15
3277/2 3287/17
3318/18 3321/2
nonfiction [2]
3231/2 3257/18
nonprofit [1]
3232/21
nonprofits [1]
3232/20
nor [2]   3232/19
3244/7
normal [2]   3231/22
3232/4

**North** [1]   3307/22
Northwest [2]
3226/15 3227/6
Norton [4]   3270/17
3301/17 3301/19
3304/16
note [5]   3230/4
3235/8 3236/2
3250/22 3261/3
notebook [3]   3230/2
3230/5 3239/11
noted [2]   3251/7
3267/10
notification [2]
3278/17 3278/19
notify [1]   3280/3
notoriety [1]
3241/14
notwithstanding [1]
3305/20
novel [2]   3231/2
3231/6
number [29]   3241/22
3241/22 3243/16
3243/22 3246/18
3249/4 3254/16
3254/19 3259/12
3262/13 3264/24
3267/12 3274/13
3275/23 3278/1
3281/14 3282/2
3282/9 3282/20
3283/6 3285/4
3288/14 3293/14
3300/12 3303/9
3305/17 3311/20
3312/8 3323/2
numbers [5]   3242/7
3256/25 3259/20
3259/23 3294/4
numerical [2]
3241/24 3242/16
NW [1]   3227/24

**O**

O'Bannon [1]
3242/13
O'Melveny [3]
3226/19 3226/23
3229/12
objective [2]
3269/23 3318/4
obtain [1]   3240/25
obvious [5]   3261/22
3264/14 3273/2
3286/7 3321/15
obviously [19]
3260/17 3270/12
3276/9 3276/15
3282/15 3284/23
3286/21 3293/13
3295/18 3296/7
3298/11 3298/20
3303/16 3304/11
3316/8 3318/21
3319/2 3319/6
3319/19
occasion [1]   3280/7
occur [4]   3261/14
3276/23 3280/5

3284/18
occurred [1]   3318/9
occurs [3]   3266/9
3269/21 3279/7
Odyssey [2]   3252/1
3252/4
off [6]   3275/5
3275/17 3282/21
3289/15 3307/16
3318/4
offer [3]   3250/14
3254/25 3316/15
offered [1]   3290/3
offering [1]
3245/10
offers [2]   3252/6
3277/1
office [1]   3242/2
Official [2]
3227/23 3326/3
often [4]   3241/11
3241/12 3275/13
3293/19
oligopoly [1]
3244/19
omitted [1]   3244/7
on the [1]   3309/8
once [6]   3245/7
3254/2 3257/24
3271/9 3272/12
3278/19
one [86]   3229/20
3230/22 3232/2
3232/2 3232/23
3234/5 3239/1
3241/9 3243/7
3243/22 3247/19
3248/10 3248/18
3250/6 3250/12
3251/2 3251/2
3251/8 3252/22
3254/8 3255/1
3261/11 3263/3
3263/18 3263/20
3263/21 3265/5
3265/5 3267/5
3267/23 3268/8
3270/5 3270/18
3272/4 3273/2
3273/2 3273/10
3273/14 3274/1
3274/2 3275/14
3275/20 3276/17
3279/9 3280/7
3280/13 3282/5
3282/6 3283/20
3284/3 3284/9
3284/13 3284/14
3284/18 3284/24
3286/2 3287/20
3288/17 3292/14
3295/13 3295/17
3297/11 3298/18
3300/13 3300/22
3301/14 3301/17
3302/20 3304/10
3307/6 3307/25
3308/14 3308/16
3309/3 3310/14
3310/14 3310/16

3311/20 3314/24
3315/18 3318/19
3318/24 3319/3
3322/10 3324/13
3324/16
one-on-one [1]
3251/2
ones [12]   3271/7
3278/13 3298/8
3300/5 3300/9
3301/12 3302/7
3302/9 3304/21
3305/18 3313/1
3316/24
only [43]   3230/5
3238/11 3242/20
3243/8 3243/11
3246/18 3251/23
3255/10 3261/13
3262/3 3263/22
3264/16 3266/18
3269/9 3270/25
3272/14 3273/1
3273/5 3273/23
3275/16 3275/17
3275/25 3277/5
3278/7 3278/13
3278/18 3278/25
3284/8 3284/10
3284/19 3287/9
3289/11 3290/2
3291/11 3298/4
3298/5 3298/17
3301/5 3308/9
3312/10 3312/18
3318/22 3319/22
open [1]   3279/25
opening [12]
3241/25 3261/10
3261/12 3269/4
3272/7 3272/7
3273/4 3274/18
3275/11 3303/18
3303/21 3303/23
operating [3]
3309/21 3310/19
3311/4
opinion [3]   3230/20
3236/3 3236/11
Oppenheimer [1]
3226/18
opportunities [2]
3233/14 3322/20
opportunity [2]
3230/16 3261/7
opposed [1]   3319/25
option [5]   3247/5
3247/6 3255/6
3272/21 3325/9
options [5]   3306/8
3307/13 3308/1
3308/8 3324/2
or in [1]   3260/24
orchestrate [1]
3258/16
order [3]   3233/7
3280/4 3288/7
ordinary [2]
3239/19 3287/7
organizations [1]

O

organizations... [1]
3235/24
organize [1]
3231/13
original [1]
3247/22
originally [2]
3297/1 3309/1
other's [3]  3258/21
3258/21 3287/9
others [12]  3235/4
3248/15 3270/12
3271/17 3271/25
3287/18 3288/19
3292/1 3293/2
3301/5 3305/1
3305/8
otherwise [1]
3304/17
ought [1]  3324/2
ours [1]  3324/20
out [31]  3233/7
3236/1 3239/9
3250/12 3252/2
3264/4 3266/24
3268/12 3270/22
3272/18 3275/9
3276/6 3287/20
3291/8 3292/9
3294/5 3295/8
3297/21 3297/22
3299/10 3299/12
3302/9 3303/20
3303/24 3307/25
3308/22 3309/1
3309/5 3311/23
3321/4 3323/23
outcome [3]  3245/16
3284/11 3288/5
outliers [1]  3231/7
outlines [1]
3231/14
output [1]  3288/21
outside [5]  3238/7
3264/20 3272/21
3278/15 3284/18
over [21]  3235/22
3241/7 3244/8
3244/10 3248/17
3252/12 3252/14
3252/16 3252/24
3259/5 3274/23
3277/18 3278/19
3279/19 3282/17
3292/8 3292/8
3292/9 3294/6
3303/4 3305/15
overarching [2]
3280/4 3280/10
override [1]
3280/16
overseas [1]
3307/21
overstate [1]
3296/20
own [7]  3236/25
3237/25 3246/22
3255/24 3266/22

ownership [1]
3306/5
oxymoron [1]  3232/3

P

p.m [1]  3325/22
PAGE [1]  3228/2
paid [5]  3242/5
3243/3 3252/17
3254/18 3318/21
Pam [4]  3261/10
3264/22 3274/22
3284/11
PAN [1]  3226/10
Pande [4]  3253/5
3253/7 3288/4
3323/9
pandemic [1]
3306/16
parent [1]  3322/7
part [9]  3247/12
3247/13 3277/10
3296/11 3298/15
3298/16 3302/12
3302/12 3324/8
participant [2]
3276/17 3284/15
participants [3]
3235/10 3254/19
3305/13
participated [1]
3276/19
particular [4]
3264/25 3265/21
3276/12 3276/13
particularly [5]
3234/12 3242/17
3246/21 3258/23
3301/17
parties [13]
3229/19 3244/12
3247/17 3275/4
3275/15 3277/1
3277/5 3283/20
3284/9 3284/13
3284/14 3287/9
3325/18
parties' [1]
3255/24
pass [2]  3289/20
3317/12
passes [4]  3272/19
3272/23 3317/9
3318/2
passion [2]  3231/24
3232/19
past [5]  3241/11
3241/13 3244/10
3246/14 3290/13
Patricia [1]
3302/16
pay [6]  3253/24
3254/6 3269/10
3288/8 3291/9
3291/14
paying [1]  3281/13
payment [2]  3252/15
3252/16
payout [3]  3252/13

payouts [1]  3321/6
pencil [1]  3268/11
PENGUIN [74]
3226/18 3226/23
3229/11 3231/8
3232/11 3237/2
3239/6 3240/2
3240/4 3243/20
3243/23 3247/5
3247/6 3247/23
3248/20 3248/21
3248/24 3249/12
3249/14 3249/18
3249/24 3250/1
3250/3 3250/11
3251/19 3251/20
3251/22 3251/24
3252/10 3252/19
3252/20 3252/23
3253/6 3253/8
3253/22 3254/1
3254/3 3254/4
3255/3 3258/24
3260/9 3260/11
3278/2 3280/2
3280/7 3281/6
3281/10 3284/15
3284/17 3287/16
3290/3 3295/15
3296/21 3296/23
3298/2 3298/6
3299/12 3305/9
3306/4 3309/13
3310/14 3311/15
3319/12 3319/20
3320/8 3321/9
3321/13 3321/18
3321/21 3321/22
3322/17 3322/19
3322/22 3323/14
people [13]  3240/10
3242/15 3259/23
3270/15 3281/12
3294/2 3307/2
3312/2 3312/24
3312/25 3319/2
3321/7 3323/11
per [5]  3255/18
3255/20 3291/10
3292/25 3294/11
percent [45]
3231/11 3236/17
3242/19 3242/20
3242/22 3242/24
3243/4 3243/9
3243/12 3243/13
3243/14 3243/16
3243/24 3243/25
3244/1 3244/2
3244/20 3248/23
3251/25 3252/7
3257/7 3257/8
3259/9 3275/16
3275/17 3275/19
3275/19 3276/22
3276/24 3281/25
3282/1 3282/9
3282/13 3282/20
3282/23 3283/2

payouts [1]  3321/6
pencil [1]  3268/11
payouts... (continued)
3283/4 3288/22
3297/10 3298/14
3311/4 3322/25
3322/25 3323/5
3323/6
percentage [1]
3271/8
perfect [1]  3256/1
perform [1]  3259/23
performance [1]
3239/9
performed [1]
3267/2
performing [1]
3308/4
perhaps [8]  3261/18
3262/6 3262/14
3266/5 3267/19
3271/12 3281/13
3297/1
period [2]  3247/3
3303/4
permit [1]  3277/11
permitted [1]
3259/21
person [2]  3318/24
3319/4
personnel [2]
3306/18 3319/10
perspective [2]
3234/19 3292/21
persuaded [1]
3283/6
persuasion [1]
3274/18
Petrocelli [16]
3226/17 3228/5
3229/11 3229/13
3260/8 3260/10
3278/20 3283/2
3289/13 3301/13
3303/15 3308/11
3316/19 3321/12
3322/2 3324/17
phrase [1]  3236/4
pick [4]  3316/7
3318/1 3318/1
3324/10
picked [1]  3314/9
picture [1]  3308/7
pictures [1]
3264/17
Pietsch [2]  3254/15
3277/22
place [6]  3272/8
3272/12 3276/19
3320/18 3322/1
3323/3
places [2]  3317/13
3324/4
placing [1]  3282/13
plaintiff [4]
3226/4 3226/12
3325/3 3325/5
plaintiffs [1]
3234/14
plan [1]  3301/20
plans [3]  3250/6
3303/10 3303/17
plants [2]  3306/21

# P

plants... [1]
3306/23
play [1]  3302/15
players [1]  3259/13
playtimes [1]
3235/3
please [5]  3229/4
3230/3 3230/13
3299/17 3320/25
pleasure [1]
3325/13
pled [1]  3273/18
plenty [3]  3233/1
3294/7 3307/12
poach [1]  3258/25
poached [1]  3303/8
poaching [3]
3258/21 3321/3
3321/8
pocket [1]  3299/24
podium [1]  3229/4
point [43]  3240/1
3248/18 3253/13
3263/4 3265/21
3266/20 3266/23
3268/4 3268/19
3270/8 3275/9
3276/11 3276/16
3279/14 3280/19
3281/14 3281/22
3283/9 3283/17
3285/23 3287/20
3288/17 3291/16
3293/13 3295/17
3296/5 3296/17
3296/18 3297/7
3297/7 3299/8
3300/10 3302/2
3302/8 3302/15
3307/14 3310/12
3314/18 3316/7
3316/12 3317/25
3319/17 3324/25
pointed [3]  3272/18
3279/16 3309/5
pointing [1]  3276/6
points [6]  3259/10
3262/13 3267/15
3274/8 3274/23
3299/10
poised [2]  3302/25
3305/4
policy [1]  3250/3
pond [3]  3301/23
3301/25 3302/1
poor [1]  3256/19
popular [1]  3236/7
popularity [1]
3242/11
Porro's [1]  3233/2
portion [1]  3299/2
posed [1]  3315/18
poses [2]  3246/2
3282/3
position [3]  3231/9
3243/22 3272/25
positive [4]  3311/9
3311/11 3311/25

3312/1
possessed [1]
3234/17
possibility [1]
3318/15
possible [1]  3258/5
post [10]  3261/6
3269/15 3280/23
3285/25 3287/23
3288/3 3289/7
3321/9 3325/2
3325/21
post-merger [5]
3280/23 3285/25
3287/23 3288/3
3321/9
post-trial [5]
3261/6 3269/15
3289/7 3325/2
3325/21
potential [3]
3240/14 3276/17
3277/12
pounce [1]  3301/10
power [11]  3245/25
3250/18 3250/21
3251/16 3251/19
3252/8 3252/12
3252/20 3287/12
3296/21 3297/4
powerful [1]  3258/8
practical [1]
3237/22
pragmatic [1]
3238/23
pre [1]  3233/10
pre-complaint [1]
3233/10
precedent [1]
3234/4
precise [1]  3255/11
precision [2]
3256/5 3266/6
predict [5]  3267/24
3268/2 3290/14
3295/3 3301/8
predictability [1]
3268/24
predicted [4]
3255/25 3265/11
3265/13 3288/4
predictions [1]
3236/16
predictors [1]
3256/9
predicts [1]  3237/1
preempts [1]
3254/21
preference [1]
3307/4
preferred [1]
3253/1
premerger [1]
3280/24
premium [5]  3242/6
3324/18 3324/19
3324/22 3324/23
prepared [1]  3289/1
presence [1]
3248/11

present [3]  3256/7
3258/6 3325/13
presentation [2]
3287/20 3324/17
presented [7]
3244/5 3250/6
3256/7 3259/4
3274/5 3294/7
3322/10
presenting [3]
3294/9 3325/17
3325/19
pressure [3]  3252/2
3254/17 3285/24
presumably [1]
3291/14
presumption [33]
3231/12 3231/18
3231/20 3244/25
3245/3 3245/7
3245/8 3245/9
3245/15 3245/20
3249/7 3250/16
3253/15 3253/18
3258/1 3258/1
3258/3 3258/3
3258/7 3262/11
3262/23 3262/24
3267/1 3272/15
3274/15 3274/16
3274/20 3280/20
3281/23 3283/14
3283/16 3318/2
3323/17
presumptively [3]
3231/11 3231/16
3244/22
pretend [1]  3312/20
pretty [4]  3275/18
3310/16 3318/7
3319/1
prevail [1]  3243/8
prevent [1]  3251/17
PRH [4]  3228/5
3255/17 3297/9
3297/16
price [31]  3238/5
3241/2 3241/5
3241/6 3241/22
3250/13 3254/18
3260/24 3260/24
3260/25 3262/19
3263/3 3263/5
3265/18 3266/2
3267/6 3268/25
3269/4 3269/13
3269/14 3270/6
3272/14 3273/23
3274/8 3290/3
3292/10 3292/10
3313/20 3314/23
3319/8 3319/9
prices [8]  3240/22
3242/4 3242/5
3258/13 3263/3
3285/1 3285/4
3319/2
pricing [2]  3270/3
3313/16
principal [1]

3245/22
principle [1]
3290/7
principles [2]
3261/24 3323/23
print [5]  3235/3
3235/19 3249/1
3264/12 3308/1
printers [2]  3306/9
3306/17
printing [14]
3246/13 3248/19
3248/19 3249/5
3259/1 3259/2
3264/2 3306/1
3306/2 3306/6
3307/4 3308/6
3308/7 3308/9
prior [1]  3256/14
pro [1]  3253/14
pro-competitive [1]
3253/14
probability [3]
3253/19 3255/10
3267/25
probable [1]
3245/11
probably [4]  3234/8
3243/5 3276/13
3287/14
problem [7]  3236/8
3281/4 3316/6
3318/3 3319/3
3324/8 3324/14
problems [1]  3248/4
proceed [3]  3250/10
3259/22 3320/23
proceedings [3]
3260/14 3325/22
3326/5
process [6]  3271/12
3276/5 3276/7
3279/6 3279/25
3280/5
processes [4]
3263/25 3264/1
3264/3 3286/3
produce [1]  3247/16
produced [1]
3279/21
product [14]  3233/8
3233/8 3236/13
3236/19 3241/22
3262/17 3263/2
3282/6 3292/8
3316/11 3318/22
3323/19 3324/7
3325/4
production [3]
3235/1 3264/13
3274/18
products [9]  3238/4
3263/6 3267/7
3267/8 3274/25
3315/24 3318/18
3324/22 3324/23
professionals [2]
3246/12 3246/13
Professor [5]
3275/14 3282/11

**P**

Professor... [3]
3283/3 3286/16
3286/23
profit [3]   3265/14
3285/13 3312/1
profitability [2]
3243/6 3247/2
profitable [3]
3232/12 3247/16
3278/11
profitably [1]
3238/4
profits [1]   3320/14
progress [1]
3259/19
project [3]   3252/1
3252/5 3294/10
projections [1]
3285/8
prominent [1]
3281/12
prominently [1]
3266/11
promise [10]
3245/25 3249/7
3249/9 3249/11
3249/13 3249/23
3249/24 3250/10
3250/10 3250/14
promoting [1]
3320/6
proof [6]   3245/10
3258/4 3262/5
3262/5 3314/8
3325/5
properly [2]
3245/20 3245/22
proposal [3]   3251/9
3280/3 3287/22
proposals [1]
3275/25
proposed [3]
3237/16 3265/25
3283/23
proposition [2]
3233/10 3292/19
protection [1]
3232/14
protects [1]
3259/22
proud [3]   3247/12
3247/13 3301/1
prove [12]   3255/10
3256/20 3261/16
3262/17 3263/5
3263/7 3269/7
3273/19 3304/3
3306/13 3314/25
3315/1
proved [1]   3234/16
proves [2]   3311/6
3314/17
provide [5]   3240/18
3256/20 3270/10
3324/10 3325/2
provided [2]
3250/22 3269/9
provides [1]

3263/21
providing [1]
3246/25
proving [1]   3283/15
provoking [2]
3279/8 3279/11
public [3]   3230/7
3246/23 3247/1
publication [1]
3271/15
publicity [6]
3235/16 3240/14
3240/16 3246/12
3264/2 3301/21
publicly [1]
3293/24
publish [1]   3232/16
published [7]
3247/10 3247/21
3247/23 3249/2
3252/16 3274/8
3288/23
publisher [11]
3231/8 3246/15
3247/20 3254/22
3264/25 3271/13
3271/14 3276/19
3276/20 3278/10
3322/13
publisher's [3]
3235/21 3296/22
3308/3
publishers [55]
3232/2 3235/16
3239/4 3240/16
3244/2 3244/10
3244/14 3246/3
3246/3 3247/10
3247/15 3248/1
3248/3 3248/5
3248/8 3248/15
3248/16 3249/4
3254/23 3258/9
3264/21 3265/5
3269/8 3269/10
3269/10 3269/12
3270/10 3270/11
3270/19 3274/10
3276/6 3276/9
3276/10 3276/10
3277/20 3278/5
3279/9 3280/22
3280/25 3281/24
3286/21 3288/14
3292/1 3294/1
3301/16 3303/17
3304/15 3305/21
3307/2 3307/22
3307/25 3319/23
3319/24 3320/13
3321/10
publishers' [2]
3231/3 3240/20
publishing [19]
3232/3 3232/10
3237/3 3238/11
3239/6 3240/7
3241/8 3244/18
3246/25 3247/4
3247/8 3248/12

3254/10 3255/23
3260/19 3272/22
3276/14 3279/3
3297/16
pulled [1]   3252/4
punish [2]   3258/25
3318/18
purchase [2]   3306/6
3306/21
purchasers [1]
3244/6
purchases [1]
3236/23
purpose [2]   3256/4
purposes [4]
3236/19 3239/3
3251/2 3267/17
push [1]   3302/17
put [13]   3232/7
3232/16 3238/12
3239/15 3239/16
3260/18 3261/11
3264/22 3271/8
3284/11 3288/16
3307/20 3324/17
Putnam's [1]
3239/10
puts [3]   3239/14
3291/17 3291/18
putting [1]   3284/4
PX [2]   3234/1
3239/23
PX-87 [1]   3239/23
PX-963 [1]   3234/1

**Q**

Quad [3]   3306/6
3306/21 3306/22
qualify [1]   3263/4
qualitative [1]
3238/5
qualitatively [1]
3265/16
qualities [1]
3240/10
quality [1]   3241/16
quantifiable [1]
3257/13
quantitative [1]
3285/3
quarterly [1]
3258/11
quarters [1]
3252/14
quibble [1]   3299/5
quicker [1]   3257/15
quietly [1]   3249/24
quite [6]   3254/6
3254/6 3272/6
3277/7 3293/20
3295/7
quote [16]   3234/16
3237/4 3237/6
3240/9 3245/8
3247/9 3248/25
3253/9 3254/10
3254/17 3254/19
3256/14 3257/6
3311/8 3319/24
3322/16

quotes [1]   3300/18

**R**

raise [3]   3258/12
3291/15 3306/2
raised [2]   3231/17
3271/4
Randall [1]   3226/18
RANDOM [77]   3226/18
3226/23 3229/11
3231/8 3232/11
3237/2 3239/6
3240/2 3240/4
3243/20 3243/23
3247/5 3247/6
3247/23 3248/20
3248/21 3248/24
3249/12 3249/14
3249/18 3249/24
3250/2 3250/3
3250/11 3251/19
3251/20 3251/22
3251/23 3251/24
3252/2 3252/5
3252/6 3252/10
3252/19 3252/20
3252/23 3253/6
3253/8 3253/8
3253/23 3254/1
3254/3 3254/4
3255/4 3258/24
3260/9 3260/11
3278/2 3280/2
3280/7 3281/6
3284/17 3287/16
3290/3 3295/15
3296/21 3296/23
3298/2 3298/6
3299/12 3305/10
3306/4 3309/14
3310/15 3311/15
3319/12 3319/20
3320/8 3321/10
3321/13 3321/18
3321/21 3321/23
3322/18 3322/20
3322/22 3323/14
range [7]   3265/1
3266/8 3267/5
3268/6 3268/13
3268/15 3289/3
ranging [1]   3324/5
rapidly [1]   3290/22
rarely [5]   3275/20
3278/16 3280/14
3286/9 3322/14
rate [3]   3251/24
3252/6 3252/7
rates [1]   3259/9
rather [2]   3258/7
3276/23
rational [1]
3278/12
rationale [2]
3320/1 3320/1
ratios [1]   3290/12
re [1]   3247/20
re-founded [1]
3247/20
reach [1]   3316/25

reaching results

**R**

**reaching [1]**
3289/10

**reacts [1]**   3292/11
**read [20]**   3226/12
3228/4 3229/6
3229/25 3234/8
3260/1 3264/4
3275/23 3281/20
3288/25 3290/17
3293/11 3302/6
3303/3 3303/24
3305/10 3307/13
3307/24 3318/23
3320/21
**Read's [3]**   3262/9
3269/4 3284/1
**readers [1]**   3260/20
**readily [7]**   3240/11
3258/22 3274/19
3274/20 3276/20
3278/14 3281/21
**ready [6]**   3229/17
3260/6 3293/7
3300/17 3301/10
3305/4
**real [7]**   3236/6
3236/8 3259/18
3273/1 3304/24
3304/25 3319/2
**reality [4]**   3236/17
3263/8 3279/13
3305/6
**really [30]**   3238/9
3263/15 3265/10
3270/25 3279/6
3279/12 3284/17
3285/20 3291/17
3292/17 3295/10
3298/10 3303/23
3303/25 3303/25
3304/25 3306/2
3306/5 3306/11
3306/14 3307/5
3308/9 3310/23
3316/13 3316/19
3317/24 3318/20
3318/22 3319/15
3323/13
**reason [18]**   3246/16
3253/24 3258/18
3265/22 3266/7
3273/5 3275/21
3280/13 3286/1
3290/15 3290/16
3295/7 3296/15
3297/18 3302/18
3304/2 3310/20
3314/11
**reasonable [4]**
3237/21 3253/19
3255/10 3256/2
**reasonably [3]**
3238/7 3238/10
3238/12
**reasons [6]**   3249/11
3261/2 3274/21
3275/9 3283/12
3315/4

**rebut [6]**   3231/12
3231/17 3245/9
3249/6 3250/16
3323/17
**rebuts [1]**   3262/11
**rebuttal [5]**
3230/10 3280/19
3286/15 3320/21
3320/24
**rebutted [6]**
3231/19 3245/20
3245/22 3253/17
3274/20 3283/14
**rebutting [1]**
3253/14
**recall [3]**   3267/8
3277/23 3287/7
**receive [1]**   3269/18
**received [1]**   3268/3
**recent [5]**   3242/12
3244/12 3247/14
3248/14 3308/3
**recently [2]**
3267/10 3302/19
**Recess [1]**   3260/4
**recognition [3]**
3239/1 3316/17
3321/7
**Recognizable [1]**
3240/10
**recognize [3]**
3240/11 3246/23
3284/7
**recognized [5]**
3239/3 3240/6
3241/13 3244/18
3247/7
**record [12]**   3229/5
3241/13 3260/5
3267/24 3287/1
3289/15 3299/15
3299/17 3302/24
3316/20 3321/25
3326/5
**recruit [1]**   3304/13
**red [2]**   3253/13
3323/16
**redacted [1]**   3230/7
**reduce [5]**   3249/18
3259/12 3285/4
3287/6 3292/10
**reduced [4]**   3248/13
3252/22 3255/18
3255/20
**reducing [3]**
3258/15 3285/4
3287/23
**reduction [6]**
3261/13 3284/6
3285/11 3292/3
3295/5 3318/25
**reductions [1]**
3292/10
**refer [2]**   3248/7
3251/21
**references [1]**
3292/6
**referred [1]**   3290/8
**reflect [8]**   3271/24
3277/13 3279/2

**3279/6 3279/12
3283/13 3299/16
3321/16
**reflected [2]**
3244/15 3323/13
**reflecting [1]**
3322/18
**reflective [2]**
3244/15 3244/16
**refocus [1]**   3249/16
**refuse [1]**   3249/20
**regard [2]**   3239/23
3242/22
**regarding [1]**
3245/14
**regardless [3]**
3245/4 3263/24
3316/23
**regression [1]**
3253/11
**regular [2]**   3239/9
3298/23
**Reidy [1]**   3248/22
**reinforced [1]**
3258/8
**reiterate [1]**
3245/4
**rejected [1]**
3287/19
**Related [1]**   3269/2
**relationship [2]**
3250/21 3278/10
**relatively [1]**
3266/20
**relevant [15]**
3234/9 3237/16
3237/22 3245/12
3267/19 3273/11
3273/15 3297/8
3305/18 3308/10
3310/1 3312/5
3317/9 3324/6
3324/7
**reliable [1]**
3246/19
**reliance [1]**
3278/22
**relied [1]**   3256/11
**relies [2]**   3266/11
3275/7
**rely [5]**   3271/19
3277/10 3277/22
3310/23 3322/9
**relying [3]**   3264/20
3265/10 3317/2
**remainder [1]**
3276/25
**remaining [3]**
3258/19 3281/15
3323/19
**remarkable [1]**
3293/20
**remarks [2]**   3231/13
3284/1
**remember [10]**
3256/6 3278/1
3282/5 3282/22
3282/22 3293/23
3300/25 3301/18
3306/22 3307/18

**remind [3]**   3232/12
3255/9 3257/2
**rendered [1]**
3270/19
**repeat [2]**   3267/23
3273/5 3294/22
**repeating [1]**
3296/6
**replace [5]**   3246/4
3246/7 3276/20
3281/8 3308/6
**REPORTED [1]**
3227/23
**reporter [4]**
3227/23 3229/20
3289/14 3326/3
**representative [1]**
3319/11
**represented [1]**
3325/18
**reputation [5]**
3246/11 3246/21
3247/8 3281/16
3293/14
**reputations [1]**
3247/11
**request [1]**   3251/9
**requests [2]**
3249/21 3259/24
**require [5]**   3239/7
3245/6 3253/21
3309/23 3312/17
**required [2]**   3255/9
3266/7
**requirements [2]**
3263/15 3264/25
**requires [5]**
3230/20 3269/7
3285/2 3312/13
3313/10
**requiring [1]**
3240/13
**rescued [1]**   3306/24
**researched [1]**
3257/18
**reserve [1]**   3230/9
**resisted [1]**   3262/7
**resolve [1]**   3253/2
**resort [1]**   3283/15
**resource [1]**
3251/14
**resources [5]**
3235/17 3248/6
3288/7 3302/23
3324/11
**respect [1]**   3294/25
**respectfully [2]**
3259/24 3310/2
**response [1]**
3267/15
**responses [1]**
3286/20
**responsible [2]**
3306/25 3312/24
**rest [1]**   3284/22
**restrict [1]**
3258/20
**result [3]**   3261/18
3279/24 3294/20
**results [2]**   3244/24

## R

results... [1]
  3255/25
resume [1]   3260/7
retail [1]   3298/23
retailers [2]
  3264/4 3271/16
retain [1]   3306/22
retained [1]
  3247/24
retreat [1]   3261/23
revenues [1]
  3242/11
review [1]   3289/9
revocable [1]
  3249/12
rewarded [1]
  3232/17
RFP [1]   3251/9
rife [1]   3259/11
right [34]   3232/5
  3232/15 3232/18
  3266/9 3266/17
  3272/12 3275/5
  3275/17 3276/15
  3279/3 3282/16
  3284/5 3287/1
  3291/24 3294/4
  3308/2 3308/20
  3309/3 3309/6
  3309/16 3309/18
  3310/13 3310/14
  3310/18 3311/13
  3314/23 3314/25
  3315/1 3315/21
  3319/10 3320/11
  3323/2 3323/4
  3324/22
rights [9]   3230/24
  3234/22 3242/11
  3246/10 3252/5
  3252/18 3259/10
  3295/19 3321/6
risk [8]   3236/18
  3236/21 3249/20
  3253/24 3254/5
  3259/14 3292/18
  3292/18
risked [1]   3252/10
risks [1]   3268/17
rival [2]   3287/9
  3321/23
rival's [1]   3259/2
rivals [5]   3287/17
  3301/10 3321/13
  3321/15 3321/24
road [1]   3260/17
robin [4]   3276/25
  3286/8 3286/10
  3286/12
robust [1]   3232/15
role [1]   3286/21
romance [10]
  3295/11 3296/10
  3297/14 3297/16
  3298/19 3298/20
  3298/23 3299/11
  3299/18 3299/24
romances [1]   3299/1

rooted [1]   3318/3
Ross [2]   3255/1
  3278/18
roughly [4]   3257/11
  3266/5 3297/10
  3297/18
round [8]   3276/25
  3285/21 3286/5
  3286/8 3286/8
  3286/10 3286/12
  3292/14
round-robin [4]
  3276/25 3286/8
  3286/10 3286/12
rounds [3]   3254/20
  3285/18 3291/22
routinely [1]
  3247/16
royalty [2]   3252/6
  3259/9
Rudzin [1]   3226/22
rule [2]   3278/12
  3311/6
ruled [1]   3245/23
rules [3]   3231/22
  3276/2 3276/3
run [4]   3235/19
  3278/10 3286/3
  3311/22
runner [1]   3284/16
runs [1]   3235/3
Ryan [2]   3227/5
  3229/16

## S

safe [1]   3286/24
sale [2]   3313/2
  3320/4
sales [23]   3232/1
  3235/9 3235/11
  3237/4 3240/20
  3240/20 3242/25
  3243/12 3243/17
  3264/3 3265/11
  3265/14 3265/15
  3265/19 3267/12
  3268/2 3292/8
  3292/12 3295/14
  3316/1 3316/24
  3317/20 3323/12
salespeople [2]
  3271/16 3313/20
same [30]   3238/6
  3242/8 3249/18
  3263/25 3264/1
  3264/1 3264/1
  3264/2 3264/2
  3264/3 3264/3
  3274/8 3286/19
  3291/5 3292/8
  3293/5 3296/5
  3301/7 3301/12
  3303/7 3304/8
  3304/12 3304/13
  3309/11 3311/15
  3312/24 3317/18
  3322/13 3322/13
  3322/21
satisfied [2]
  3238/16 3324/4

satisfies [2]
  3238/20 3263/15
satisfy [1]   3246/8
save [2]   3232/8
  3232/9
savings [1]   3287/23
saw [11]   3233/25
  3234/1 3239/23
  3270/15 3275/10
  3277/7 3287/22
  3288/25 3302/20
  3303/7 3317/20
saying [22]   3266/21
  3276/5 3287/4
  3291/13 3291/18
  3293/6 3296/14
  3300/13 3305/1
  3305/23 3307/15
  3312/13 3313/4
  3313/13 3314/16
  3314/19 3314/21
  3314/22 3315/4
  3315/7 3315/10
  3317/16
scale [3]   3246/9
  3247/15 3320/11
scenarios [3]
  3284/12 3284/13
  3284/18
Scholastic [4]
  3302/11 3303/7
  3304/5 3305/3
SCHUSTER [46]
  3227/3 3228/6
  3229/15 3230/23
  3232/11 3243/23
  3246/4 3248/22
  3249/14 3252/19
  3252/21 3255/3
  3255/19 3268/19
  3270/7 3278/4
  3281/6 3284/16
  3287/17 3287/18
  3289/18 3289/24
  3290/1 3290/4
  3290/6 3291/7
  3291/18 3291/23
  3296/22 3296/24
  3303/8 3307/14
  3307/23 3309/2
  3309/10 3309/11
  3309/13 3310/14
  3311/12 3312/7
  3319/11 3320/8
  3321/13 3321/18
  3321/22 3322/16
Schuster's [3]
  3248/25 3281/7
  3311/2
Schwarz [2]   3226/13
  3229/7
scope [1]   3246/6
score [5]   3255/15
  3255/22 3256/10
  3285/15 3308/13
scorecard [1]
  3277/24
scratch [1]   3247/2
screen [2]   3230/6
  3253/10

SE [2]   3226/6
  3229/3
season [1]   3304/24
  3251/13
seasoned [1]
  3251/13
second [28]   3240/12
  3249/6 3255/15
  3255/22 3256/10
  3258/10 3265/22
  3275/5 3275/15
  3275/21 3282/13
  3282/15 3282/20
  3283/10 3284/16
  3285/15 3293/21
  3297/11 3298/25
  3306/15 3308/13
  3308/21 3309/6
  3309/15 3311/14
  3321/17 3323/3
  3323/10
second-score [5]
  3255/15 3255/22
  3256/10 3285/15
  3308/13
secondly [1]
  3322/11
secretly [1]
  3258/10
Section [1]   3290/9
seeing [3]   3233/1
  3289/25 3325/21
seek [1]   3240/25
seeking [1]   3246/19
seem [2]   3283/24
  3310/23
seemed [1]   3261/22
seeming [1]   3231/22
seems [6]   3239/21
  3246/1 3267/11
  3296/15 3303/6
  3303/6
segment [3]   3263/5
  3266/2 3267/6
segmentation [3]
  3267/12 3267/16
  3267/20
segments [2]
  3273/23 3317/11
segregate [1]
  3263/19
select [2]   3269/12
  3286/14
selected [1]
  3276/10
self [4]   3238/11
  3241/8 3272/22
  3307/4
self-preference [1]
  3307/4
self-publishing [3]
  3238/11 3241/8
  3272/22
sell [10]   3235/17
  3235/18 3253/9
  3267/25 3268/9
  3288/9 3299/1
  3299/24 3314/23
  3325/8
seller [3]   3241/12
  3262/18 3263/19

**S**

**sellers [10]**
3240/18 3241/19
3244/7 3245/2
3246/10 3247/17
3268/17 3271/7
3316/19 3316/23
**selling [26]**
3232/13 3234/21
3234/25 3235/7
3236/9 3237/14
3237/22 3238/11
3238/14 3240/6
3240/13 3240/19
3240/24 3241/4
3241/10 3253/12
3255/19 3264/4
3266/23 3267/13
3291/10 3299/22
3304/14 3308/5
3317/4 3317/8
**sense [8]**  3237/19
3249/10 3255/5
3270/21 3273/11
3278/25 3287/25
3314/16
**sensible [1]**
3272/24
**sensitive [1]**
3241/5
**sensitivity [1]**
3241/2
**sent [1]**  3307/21
**sentiments [1]**
3249/2
**separate [2]**  3247/4
3265/8
**separated [1]**
3242/10
**separately [1]**
3278/6
**series [2]**  3299/24
3307/18
**serious [2]**  3282/3
3319/1
**serve [1]**  3271/1
**services [8]**
3263/22 3267/13
3269/9 3269/19
3270/11 3270/14
3270/16 3270/18
**session [3]**  3226/7
3228/11 3270/23
**sessions [1]**  3249/4
**set [10]**  3233/7
3233/24 3236/1
3260/22 3276/2
3310/17 3310/18
3311/10 3313/20
3318/16
**settled [2]**  3260/22
3262/7
**seven [4]**  3265/5
3281/13 3290/9
3304/8
**several [4]**  3240/15
3277/9 3288/4
3302/8
**share [24]**  3231/11

3240/3 3243/24
3244/11 3244/13
3245/10 3253/25
3254/1 3254/4
3277/2 3277/3
3281/9 3293/3
3295/21 3296/23
3297/14 3300/21
3300/22 3300/24
3301/2 3301/4
3308/14 3323/5
3323/6
**shareholders [1]**
3314/24
**shares [31]**  3231/15
3243/19 3244/3
3244/8 3244/15
3266/9 3275/6
3275/7 3275/8
3275/13 3277/9
3277/13 3278/22
3278/23 3279/2
3279/12 3281/23
3283/12 3290/11
3290/13 3291/4
3293/5 3295/20
3296/2 3296/11
3296/17 3296/20
3301/8 3306/11
3308/16 3323/3
**Shearman [2]**  3227/2
3227/5
**shifted [1]**  3252/14
**shifting [2]**
3244/23 3297/12
**shifts [1]**  3245/9
**Shoe [12]**  3237/18
3237/24 3238/5
3238/21 3238/21
3238/25 3240/12
3241/10 3241/20
3242/3 3263/8
3269/16
**shop [1]**  3254/24
**Shores [2]**  3227/5
3229/16
**short [3]**  3229/23
3285/7 3311/22
**shots [1]**  3324/10
**show [13]**  3239/16
3239/18 3246/7
3248/16 3260/21
3261/13 3261/20
3279/15 3282/8
3284/6 3285/10
3287/5 3311/10
**showed [5]**  3256/15
3259/15 3266/13
3267/22 3288/25
**showing [3]**  3261/2
3287/15 3288/11
**shown [4]**  3244/8
3244/15 3247/15
3261/19
**shows [7]**  3240/3
3251/8 3274/20
3275/14 3286/24
3309/25 3320/10
**shrunk [1]**  3248/15
**side [4]**  3251/11

3311/12 3312/7
3316/18
**sides [3]**  3230/18
3230/20 3325/16
**sidestep [1]**
3249/15
**sign [1]**  3301/10
**signed [1]**  3307/17
**significance [2]**
3246/4 3315/12
**significant [12]**
3239/4 3240/18
3244/25 3253/3
3258/7 3261/23
3282/9 3283/8
3291/17 3292/25
3305/2 3305/18
**similar [7]**  3241/3
3242/15 3255/25
3256/12 3257/11
3300/17 3305/21
**similarly [1]**
3268/1
**SIMON [50]**  3227/3
3228/6 3229/15
3230/23 3232/11
3243/23 3246/4
3248/22 3248/24
3249/14 3252/19
3252/21 3255/3
3255/18 3268/19
3270/7 3278/3
3281/5 3281/7
3284/16 3284/16
3287/16 3287/18
3289/18 3289/24
3290/1 3290/4
3290/5 3291/7
3291/18 3291/23
3296/22 3296/24
3303/8 3307/14
3307/23 3309/2
3309/10 3309/11
3309/13 3310/14
3311/2 3311/12
3312/7 3319/11
3320/8 3321/13
3321/18 3321/22
3322/16
**simple [2]**  3230/23
3300/13
**simply [7]**  3234/16
3258/20 3261/15
3269/15 3272/15
3285/10 3291/3
**simulate [1]**
3255/16
**singer [1]**  3292/16
**singer-songwriters [1]**
3292/16
**single [4]**  3237/9
3237/10 3278/4
3295/14
**sister [1]**  3249/17
**sitting [1]**  3294/2
**situation [8]**
3284/10 3291/19
3292/19 3295/3
3304/12 3304/19
3307/23 3319/13

**six [4]**  3258/15
3265/5 3279/22
3304/8
**sixth [1]**  3279/9
**size [8]**  3234/25
3281/6 3295/16
3297/17 3297/17
3297/18 3300/14
3322/19
**skill [2]**  3252/8
3281/17
**skilled [3]**  3246/12
3250/25 3251/4
**slide [21]**  3230/4
3230/6 3232/23
3234/1 3239/8
3239/12 3241/23
3257/2 3261/11
3263/11 3264/22
3270/20 3270/21
3274/22 3284/11
3288/11 3288/13
3293/9 3310/11
3315/10 3315/11
**slide that [1]**
3315/11
**slides [2]**  3289/20
3289/21
**slightly [1]**
3244/13
**slope [1]**  3239/20
**slowed [1]**  3250/4
**small [16]**  3231/4
3231/6 3243/5
3244/1 3244/14
3246/18 3248/3
3248/5 3248/8
3256/25 3281/12
3298/16 3301/25
3301/25 3304/15
3307/21
**smaller [11]**  3244/9
3251/23 3287/18
3301/12 3301/23
3302/6 3302/7
3303/16 3304/7
3304/21 3321/10
**Smith [1]**  3226/18
**Snyder [11]**  3233/16
3238/15 3241/21
3242/22 3245/2
3255/21 3256/22
3283/5 3309/5
3312/23 3313/4
**Snyder's [7]**
3258/17 3259/6
3275/14 3282/12
3283/3 3286/16
3286/23
**so-called [1]**
3277/10
**social [3]**  3232/21
3241/14 3259/19
**soft [1]**  3308/1
**soften [1]**  3303/2
**softened [1]**  3262/1
**softening [4]**
3284/1 3284/24
3292/18 3295/5
**softness [1]**

**S**

softness... [1]
3301/10
sold [5]   3242/23
3242/24 3256/2
3298/5 3298/23
solely [3]   3239/16
3262/21 3263/2
solidify [1]
3237/24
Solomon [1]   3235/15
solution [1]
3322/22
solve [2]   3246/21
3248/4
somebody [2]
3284/14 3304/22
somebody's [1]
3293/17
someone [1]   3230/17
someone's [1]
3268/8
someplace [1]
3317/4
sometimes [4]
3233/18 3233/19
3250/2 3264/13
somewhat [3]
3261/11 3283/25
3323/13
somewhere [3]
3291/16 3315/1
3315/2
son [1]   3257/4
songwriters [1]
3292/16
soon [1]   3304/18
sophisticated [2]
3250/20 3250/25
sorry [3]   3296/21
3300/3 3312/11
sort [13]   3268/14
3274/3 3277/14
3291/6 3292/4
3292/9 3298/8
3300/18 3300/22
3311/5 3311/17
3312/25 3319/3
sorts [1]   3291/2
sought [1]   3260/18
souls [1]   3232/17
sources [1]   3290/23
speak [3]   3313/15
3313/21 3322/19
special [4]   3234/17
3240/25 3241/10
3241/17
specialized [1]
3263/22
specialty [1]
3298/6
specific [2]   3245/5
3318/14
specifically [8]
3264/5 3286/12
3294/13 3297/15
3301/19 3303/10
3320/7 3321/4
specifics [2]

spectacular [2]
3300/25 3320/13
spectrum [1]
3238/15
speculation [3]
3307/5 3307/8
3308/9
spend [17]   3235/6
3239/17 3242/2
3245/14 3268/10
3271/5 3271/7
3271/9 3271/10
3271/10 3271/14
3293/1 3293/9
3295/9 3304/23
3323/1 3323/19
spends [1]   3294/10
spent [4]   3236/12
3260/15 3288/24
3293/11
Spiegel [2]   3247/20
3247/23
spin [1]   3303/20
spiritual [3]
3298/2 3298/15
3298/16
spot [1]   3266/10
spread [2]   3276/14
3308/22
Springsteen [2]
3291/15 3292/14
Square [1]   3226/24
SSA [2]   3285/18
3286/19
stable [1]   3266/20
staff [3]   3258/11
3260/13 3289/8
stake [3]   3233/3
3243/4 3259/21
stalking [1]
3321/20
stand [1]   3309/8
standard [3]   3261/9
3261/19 3262/7
standardization [1]
3259/8
standing [2]
3247/11 3278/9
Staples [3]   3242/1
3243/10 3243/13
star [2]   3231/6
3304/23
stars [3]   3226/19
3235/2 3264/11
start [8]   3229/23
3231/15 3232/23
3239/20 3246/1
3247/25 3274/24
3290/7
started [2]   3259/15
3319/17
starting [2]   3247/2
3320/25
starts [2]   3239/20
3304/8
state [2]   3229/4
3230/22
stated [3]   3248/22
3261/12 3301/4

statement [7]
3261/10 3261/12
3272/8 3273/4
3275/10 3293/25
3295/8
statements [3]
3231/23 3248/8
3265/14
STATES [12]   3226/1
3226/3 3226/10
3226/14 3228/4
3229/3 3229/7
3230/12 3232/14
3257/24 3259/24
3320/24
static [2]   3280/21
3295/3
statistics [2]
3245/10 3255/21
statute [2]   3323/25
3324/11
stay [3]   3291/5
3293/5 3304/14
staying [1]   3257/21
step [5]   3257/16
3293/8 3295/1
3305/8 3320/15
Stephen [5]   3227/2
3257/2 3270/4
3270/7 3278/9
Sterling [2]   3227/2
3227/5
Steven [1]   3229/14
Stevenson [2]
3226/14 3229/8
still [4]   3282/24
3309/9 3318/11
3318/19
stop [3]   3249/14
3258/20 3287/1
stopped [1]   3253/6
stores [1]   3298/6
stories [3]   3232/25
3233/3 3257/21
story [2]   3300/17
3324/18
straight [3]
3230/23 3233/9
3271/8
strategies [1]
3288/15
strategy [4]
3279/25 3294/5
3308/3 3321/9
Street [2]   3226/15
3227/6
stressed [1]
3303/25
stretched [1]
3247/17
strictly [1]
3283/19
strike [1]   3304/10
strong [9]   3234/12
3246/15 3251/10
3259/4 3293/20
3295/10 3297/1
3305/3 3312/24
stronger [3]
3240/14 3240/16

3240/17
struck [1]   3296/19
structural [4]
3258/4 3262/11
3280/15 3280/20
structure [4]
3262/9 3312/6
3312/21 3318/10
struggle [1]
3247/15
struggling [1]
3322/8
stuck [1]   3309/12
sub [10]   3262/20
3262/22 3273/20
3274/1 3315/20
3315/21 3315/22
3315/24 3316/5
3324/13
subgroup [1]
3299/23
subject [1]   3293/19
submission [5]
3237/8 3237/9
3237/10 3261/7
3269/15
submissions [3]
3241/17 3279/19
3289/7
submit [11]   3260/25
3261/18 3263/16
3275/25 3285/6
3289/10 3292/20
3293/1 3303/1
3304/10 3310/2
subsidiaries [1]
3322/7
substantial [8]
3256/5 3256/24
3261/13 3261/17
3262/6 3285/11
3324/9 3324/14
substantially [3]
3244/8 3245/1
3290/9
substitutability [1]
3306/8
substitute [3]
3241/8 3296/8
3325/4
substitutes [3]
3238/3 3238/7
3238/10
succeed [2]   3248/13
3267/22
succeeded [1]
3248/10
success [7]   3236/15
3236/18 3236/24
3237/12 3244/17
3246/22 3267/24
successful [8]
3232/12 3234/17
3234/18 3240/9
3241/11 3241/13
3258/19 3258/21
successfully [4]
3307/23 3307/24
3308/4 3308/6
sudden [1]   3304/7

**S**

suddenly [1]   3246/2
suffer [1]   3241/6
suffered [2]
  3253/12 3281/9
suffers [1]   3286/18
sufficient [5]
  3237/25 3245/3
  3246/6 3247/19
  3324/2
sufficiently [1]
  3238/3
suggest [3]   3264/7
  3288/5 3322/4
suggesting [5]
  3265/1 3266/6
  3278/25 3281/20
  3287/16
suggestion [1]
  3232/4
suggests [2]
  3253/11 3312/5
suit [1]   3286/8
suitable [1]
  3264/17
Sullivan [1]
  3243/10
summaries [1]
  3233/2
summarize [1]
  3261/2
summary [2]   3263/12
  3274/21
sunk [1]   3313/18
super [2]   3324/18
  3324/19
supermarkets [1]
  3242/6
supplies [1]   3242/2
supply [1]   3246/13
support [2]   3235/15
  3307/9
supportive [2]
  3229/8 3272/25
supposed [2]
  3238/22 3238/23
Supreme [2]   3240/12
  3242/8
sure [8]   3230/14
  3260/14 3286/25
  3314/4 3314/5
  3314/6 3314/11
  3317/8
surprise [2]   3231/5
  3242/23
surprised [1]
  3261/11
surprising [3]
  3231/7 3236/15
  3321/25
surprisingly [1]
  3321/12
susceptible [1]
  3270/3
swing [1]   3303/23
switch [2]   3241/6
  3304/20
Sysco [6]   3256/14
  3267/5 3275/10

3280/25 3284/21
3287/7
system [2]   3280/2
  3280/16
Syufy [8]   3234/7
  3234/15 3234/23
  3235/5 3236/1
  3236/11 3264/5
  3269/24

**T**

table [2]   3229/7
  3294/2
tabs [1]   3287/21
tacit [2]   3258/4
  3259/5
tacitly [1]   3259/11
talent [2]   3304/12
  3304/13
talk [13]   3231/15
  3231/16 3231/21
  3238/8 3243/7
  3253/20 3255/1
  3262/10 3262/11
  3273/8 3286/13
  3308/11 3315/23
talked [10]   3235/23
  3242/3 3243/4
  3253/7 3269/4
  3272/17 3300/15
  3303/3 3310/8
  3323/7
talked about [1]
  3310/8
talking [15]
  3242/21 3243/8
  3251/11 3267/18
  3268/5 3269/24
  3279/1 3284/21
  3293/11 3295/14
  3297/2 3297/13
  3299/21 3299/23
  3301/1
talks [1]   3302/6
targeted [4]   3241/4
  3269/12 3270/2
  3324/24
targeting [1]
  3269/6
Tart [1]   3250/3
tasked [1]   3280/10
teaching [1]
  3246/24
team [3]   3246/24
  3304/11 3304/23
teams [6]   3303/18
  3303/21 3304/13
  3304/14 3304/17
  3325/16
technological [1]
  3291/1
telescope [1]
  3267/4
telling [3]   3315/6
  3321/19 3322/9
tells [1]   3324/4
temptation [1]
  3305/24
tended [1]   3302/5
terms [14]   3235/4

3235/22 3235/23
3236/5 3240/25
3252/13 3255/5
3257/15 3262/18
3277/13 3285/12
3317/10 3321/3
3321/5
terrific [1]
  3253/25
test [13]   3237/18
  3237/23 3238/2
  3238/8 3238/16
  3238/18 3241/3
  3241/20 3246/5
  3246/8 3272/18
  3272/19 3272/23
testified [21]
  3235/11 3235/15
  3235/19 3235/22
  3237/6 3240/7
  3240/16 3243/23
  3247/9 3248/25
  3250/3 3252/7
  3253/5 3254/16
  3272/4 3288/14
  3298/12 3305/14
  3307/17 3308/18
  3311/7
testify [1]   3263/18
testimony [51]
  3233/8 3235/6
  3235/9 3245/4
  3245/18 3248/7
  3248/7 3249/9
  3250/14 3250/19
  3251/21 3253/4
  3253/22 3254/15
  3254/22 3254/25
  3255/9 3255/12
  3268/3 3268/7
  3269/5 3270/14
  3271/6 3273/10
  3277/7 3279/17
  3280/6 3281/7
  3281/11 3283/25
  3286/22 3288/10
  3288/12 3291/20
  3294/21 3295/12
  3296/16 3299/8
  3311/25 3313/24
  3314/12 3315/13
  3321/16 3321/25
  3322/11 3322/12
  3322/24 3322/24
  3323/1 3323/8
  3323/10
tests [1]   3317/10
thanking [1]
  3230/14
theaters [1]
  3264/17
theory [4]   3269/14
  3284/8 3305/7
  3313/2
Thereafter [1]
  3266/19
therefore [3]
  3323/11 3323/20
  3324/7
thinking [4]   3240/3

3267/20 3292/17
3292/23
third [5]   3235/17
3240/22 3250/18
3257/10 3281/3
thirds [1]   3252/14
though [7]   3230/19
  3235/13 3256/18
  3307/12 3311/14
  3315/25 3321/2
thought [9]   3232/23
  3232/24 3235/5
  3240/1 3256/8
  3286/7 3297/1
  3298/9 3324/6
thousand [1]
  3292/25
thousands [1]
  3279/19
threat [3]   3248/2
  3248/14 3255/6
three [20]   3241/24
  3244/5 3247/3
  3248/17 3259/8
  3261/1 3279/17
  3280/22 3280/24
  3281/19 3295/16
  3298/4 3298/18
  3300/14 3301/9
  3302/13 3303/4
  3305/2 3311/20
  3316/12
three-to-one [1]
  3298/18
threshold [2]
  3237/20 3238/16
thresholds [2]
  3241/24 3244/4
throughout [3]
  3238/14 3263/24
  3271/4
timely [4]   3246/5
  3247/18 3303/6
  3303/7
times [5]   3226/24
  3252/3 3283/10
  3295/16 3300/14
tiny [1]   3260/22
title [3]   3248/13
  3249/18 3294/11
titles [12]   3233/20
  3233/21 3242/20
  3242/23 3243/9
  3246/18 3246/19
  3248/3 3294/10
  3303/9 3308/5
  3312/4
today [6]   3230/24
  3250/1 3252/22
  3255/5 3290/6
  3291/5
together [4]
  3229/11 3260/19
  3261/5 3318/24
told [8]   3247/1
  3247/3 3295/13
  3295/15 3296/6
  3300/14 3303/18
  3309/10
tomorrow [1]   3291/5

**T**

took [4]    3245/18
3261/3 3297/21
3321/12
top [46]    3234/10
3234/15 3234/20
3234/21 3234/24
3234/25 3235/7
3236/4 3236/9
3237/14 3237/22
3238/11 3238/13
3240/6 3240/13
3240/19 3240/24
3241/3 3241/10
3241/19 3244/6
3245/2 3246/10
3253/11 3255/19
3262/18 3263/19
3264/6 3264/11
3264/15 3264/15
3266/22 3268/17
3271/7 3275/5
3282/21 3289/3
3290/1 3291/10
3291/12 3294/23
3299/21 3316/19
3316/23 3317/4
3317/7
topic [2]    3257/23
3303/14
totally [1]    3314/16
touch [1]    3255/13
touched [1]    3301/14
tough [1]    3277/17
tougher [2]    3257/6
3257/6
track [6]    3241/13
3246/22 3267/24
3277/3 3302/24
3316/20
tracks [1]    3262/9
trade [3]    3262/25
3272/11 3273/3
tranches [1]    3259/8
transaction [1]
3244/24
transactions [2]
3260/22 3284/8
transcript [2]
3226/9 3326/4
translate [2]
3236/17 3297/3
translates [1]
3268/2
transparency [2]
3318/17 3319/8
transparent [1]
3318/20
treat [1]    3265/23
trend [1]    3231/7
trial [19]    3226/9
3230/18 3231/3
3232/18 3236/12
3244/6 3251/18
3260/13 3261/1
3261/6 3261/22
3263/15 3269/15
3271/4 3283/24
3289/7 3321/17

3325/2 3325/21
tried [10]    3235/13
3248/11 3251/23
3260/21 3268/21
3273/19 3285/6
3285/15 3285/16
3300/18
tries [1]    3303/13
trigger [2]    3262/22
3272/15
triggered [2]
3267/2 3274/17
triple [1]    3297/17
true [10]    3275/8
3283/13 3301/12
3308/13 3311/19
3312/6 3316/15
3318/25 3318/25
3326/4
truly [3]    3267/22
3269/22 3319/18
trusted [1]    3249/11
try [10]    3231/17
3249/6 3252/1
3254/1 3256/22
3261/5 3292/9
3315/18 3322/3
3323/19
trying [11]    3236/25
3239/24 3268/14
3283/9 3292/24
3293/17 3300/23
3301/6 3303/1
3314/20 3316/22
turn [15]    3233/6
3237/13 3238/20
3242/18 3245/21
3246/19 3249/6
3253/16 3254/12
3254/13 3274/21
3278/8 3289/1
3321/11 3325/7
turning [2]    3240/18
3241/23
turns [1]    3237/12
two [26]    3232/6
3234/3 3260/18
3267/23 3275/5
3275/13 3275/14
3275/19 3275/20
3281/2 3283/21
3284/9 3284/14
3284/18 3284/19
3287/11 3293/14
3296/9 3297/5
3299/10 3300/16
3300/22 3303/4
3308/12 3310/15
3311/20
type [1]    3248/12
types [5]    3265/9
3268/8 3299/17
3299/18 3315/24
tzar [1]    3280/11

**U**

U.S [5]    3227/24
3237/3 3244/18
3306/9 3308/6
ubiquitous [1]

3310/13
ultimate [1]    3238/2
unanticipated [1]
3268/17
uncertainty [1]
3268/16
under [15]    3240/22
3241/19 3244/23
3245/3 3245/7
3253/16 3260/22
3272/5 3275/17
3285/18 3290/9
3292/19 3317/23
3323/25 3325/20
underlined [1]
3294/23
undermine [1]
3278/22
undermines [2]
3251/12 3313/11
understate [1]
3296/21
understatement [1]
3297/4
understood [1]
3257/3
undisputed [3]
3263/17 3275/24
3312/7
undue [1]    3272/10
unenforceable [1]
3249/12
unfair [1]    3252/7
unfolded [1]
3261/22
uniformity [1]
3259/7
unilateral [4]
3261/24 3262/3
3262/12 3284/21
unique [4]    3240/13
3245/19 3249/3
3259/7
UNITED [12]    3226/1
3226/3 3226/10
3226/14 3228/4
3229/2 3229/6
3230/12 3232/14
3257/24 3259/24
3320/24
unknown [1]    3262/2
unlawfully [1]
3258/12
unless [1]    3255/13
unlike [2]    3250/15
3276/8
unquantifiable [1]
3262/2
unreasonable [1]
3236/16
unusually [1]
3258/8
up [43]    3230/2
3234/20 3243/15
3250/8 3250/13
3257/4 3261/11
3264/22 3265/1
3268/15 3272/13
3274/6 3276/2
3278/8 3282/8

3282/24 3283/15
3284/11 3284/16
3289/20 3291/6
3294/12 3304/18
3305/16 3305/20
3306/17 3306/17
3310/17 3310/18
3311/10 3311/21
3315/19 3316/15
3317/18 3319/16
3320/15 3321/22
3322/14 3322/15
3323/7 3323/12
3324/8 3324/17
up-and-coming [1]
3257/4
up-bidding [1]
3250/8
update [2]    3294/5
3308/3
upper [1]    3267/5
upstream [8]
3272/11 3295/18
3295/22 3296/2
3297/2 3297/8
3319/7 3319/14
upward [1]    3254/17
use [11]    3237/23
3255/6 3256/6
3259/1 3260/23
3277/20 3286/9
3308/24 3310/2
3318/5 3320/13
used [22]    3234/23
3241/23 3242/16
3245/5 3245/5
3252/18 3255/15
3255/16 3255/23
3256/10 3256/13
3256/17 3256/17
3282/20 3291/20
3296/10 3309/1
3309/3 3309/4
3309/7 3309/9
3309/11
useful [1]    3290/14
uses [3]    3239/2
3239/4 3263/18
using [4]    3237/20
3241/21 3295/22
3321/21
usually [2]    3245/16
3285/21
utterly [1]    3272/20

**V**

vacation [1]
3230/15
validity [2]    3305/8
3317/13
valuable [3]    3234/6
3242/17 3260/15
value [7]    3231/25
3233/1 3236/23
3282/7 3308/20
3311/18 3314/24
values [2]    3292/24
3298/8
variability [1]
3289/2

**V**

variable [19]
3308/25 3309/2
3309/7 3309/9
3309/13 3309/14
3309/17 3309/20
3310/8 3312/10
3312/12 3312/13
3312/17 3313/3
3313/10 3313/10
3313/15 3313/17
3313/20
variation [1]
3244/2
variety [2]   3246/20
3290/23
various [7]   3239/3
3264/21 3265/4
3270/15 3275/9
3276/14 3306/18
vary [1]   3265/1
vast [2]   3238/13
3266/23
vastly [1]   3268/5
vendor [4]   3295/14
3295/15 3296/6
3296/7
vendor's [1]
3295/17
vendors [2]   3295/13
3300/14
version [1]   3230/7
versus [3]   3297/2
3299/2 3319/14
veterans [1]   3240/7
viable [3]   3247/5
3262/3 3325/9
VIACOMCBS [6]
3227/2 3228/6
3229/15 3289/18
3289/24 3290/2
victims [1]   3325/6
view [3]   3295/17
3311/13 3313/18
viewers [1]   3242/11
viewpoint [1]
3259/7
views [1]   3258/17
violate [1]   3249/24
violating [1]
3249/23
virtue [1]   3283/21
visibility [1]
3320/4
voices [1]   3257/19
void [1]   3281/17
volume [2]   3242/19
3243/14
voluntarily [1]
3257/3
von [1]   3280/8
vulnerability [1]
3318/14
vulnerable [2]
3323/25 3324/1
vying [1]   3232/15

**W**

wait [2]   3252/17
3281/19
walk [1]   3235/13
walked [1]   3271/11
Walsh [2]   3235/22
3272/3
wants [4]   3253/23
3253/25 3269/2
3308/24
Washington [4]
3226/6 3226/16
3227/6 3227/25
way [22]   3254/2
3256/2 3261/3
3262/2 3266/16
3267/6 3267/8
3267/19 3272/14
3274/8 3282/1
3284/19 3285/9
3285/15 3286/2
3286/3 3286/11
3295/12 3298/17
3303/24 3317/18
3320/15
ways [3]   3253/1
3274/6 3286/1
weak [2]   3241/8
3245/15
weakening [2]
3284/25 3301/11
week [2]   3292/11
3292/12
weekly [1]   3265/5
weeks [3]   3244/5
3251/18 3261/1
Weisberg [2]
3300/25 3303/5
welfare [1]   3232/21
well-funded [1]
3301/9
well-known [1]
3235/2
what's [8]   3233/3
3236/2 3271/11
3272/6 3310/11
3312/5 3312/6
3314/18
whatsoever [1]
3272/8
whenever [1]   3280/2
wherever [1]   3318/1
who's [2]   3270/17
3270/23
whole [3]   3242/4
3304/17 3311/24
wholeheartedly [1]
3319/21
wide [2]   3316/25
3324/5
wield [1]   3251/13
wife [2]   3277/15
3277/17
Wilhelmsen [4]
3241/25 3256/14
3256/16 3281/1
willing [3]   3293/7
3300/17 3311/3
willingness [3]
3235/21 3248/9
3258/13
win [8]   3277/6

3280/23 3281/18
3282/1 3282/8
3282/19 3288/8
3288/9
winner [2]   3282/15
3283/11
winning [4]   3231/5
3278/7 3278/7
3282/13
wins [6]   3279/3
3283/10 3284/14
3284/15 3284/15
3284/16
wish [1]   3260/12
within [1]   3247/6
without [8]   3249/23
3249/24 3258/11
3262/2 3283/15
3285/1 3286/17
3325/4
witness [4]   3232/3
3251/21 3276/25
3277/21
witnesses [9]
3237/1 3240/15
3255/1 3267/9
3268/3 3271/13
3288/1 3288/19
3307/1
won [1]   3252/6
wondered [1]
3322/19
words [7]   3232/2
3233/17 3243/22
3297/22 3304/2
3309/19 3312/22
work [16]   3239/9
3240/15 3256/11
3259/18 3259/19
3259/20 3259/22
3259/24 3260/12
3260/13 3285/17
3314/11 3314/17
3314/18 3315/7
3325/19
worked [1]   3292/6
works [6]   3230/1
3232/16 3233/19
3234/6 3242/17
3314/9
world [4]   3233/12
3242/12 3290/25
3320/18
worried [3]   3234/11
3307/7 3321/24
worry [2]   3313/3
3321/21
worse [2]   3292/11
3318/15
worsen [1]   3238/4
worst [1]   3292/12
worth [1]   3237/1
wrap [2]   3315/19
3319/16
write [1]   3231/1
writers [1]   3257/6
writing [1]   3230/20
written [2]   3257/18
3257/22
wrong [3]   3257/1

3283/4 3300/22
wrote [3]   3251/7
3254/9 3267/14
Wylie [3]   3237/5
3240/7 3251/22

**Y**

year [9]   3234/11
3236/7 3245/5
3246/18 3247/3
3248/4 3252/15
3294/6 3300/25
years [17]   3237/6
3244/13 3246/14
3247/21 3248/14
3248/17 3252/16
3259/5 3270/17
3271/15 3278/19
3279/19 3281/19
3303/4 3305/15
3319/6 3320/14
yesterday [7]
3230/10 3244/11
3255/12 3264/19
3273/18 3282/10
3289/23
yield [1]   3262/19
York [5]   3226/24
3226/24 3227/3
3227/3 3252/3
younger [1]   3257/4

**Z**

Zacharius [1]
3288/19
zando [1]   3302/7
zealously [1]
3280/5
zero [2]   3299/13
3299/14